# EXHIBIT B

<u>STRATEGIC ALLIANCE AGREEMENT</u>

This STRATEGIC ALLIANCE AGREEMENT (this "<u>Agreement</u>") is entered into on January 6, 2014 by and among MSO Newco, LLC, a Delaware limited liability company ("<u>MSO</u>"), Pinnacle Anesthesia Consultants, P.A., a Texas professional association ("<u>PAC</u>"), U.S. Anesthesia Partners, Inc., a Delaware corporation ("<u>USAP</u>"), Envision Healthcare Holdings, Inc., a Delaware corporation ("<u>Envision</u>"), and EmCare, Inc., a Delaware corporation ("<u>EmCare</u>"), and is effective as of the closing of the transactions under the Merger Agreement (as defined below) (the date of such closing being referred to herein as the "<u>Effective Date</u>").

RECITALS

A.    MSO and PAC are party to a Management Services Agreement dated as of December 18, 2009 (the "<u>Management Agreement</u>").

B.    PAC, USAP and certain other persons are party to an Agreement and Plan of Merger dated as of December 5, 2013 (as amended, the "<u>Merger Agreement</u>").

C.    In connection with the closing of the transactions under the Merger Agreement, MSO and PAC wish to, effective as of the Effective Date, (i) terminate the Management Agreement in its entirety, (ii) agree to the payment of certain future fees by PAC to MSO and (iii) provide for the transfer and assignment by MSO to USAP or a subsidiary thereof of certain assets of MSO pursuant to the Asset Purchase Agreement (as defined below) on the terms set forth therein.

D.    The parties also wish to address certain other matters on the terms set forth in this Agreement.

AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    <u>Termination of Management Agreement</u>. MSO and PAC hereby agree that effective as of the Effective Date, the Management Agreement is terminated in its entirety and neither MSO nor PAC shall have any further rights or obligations under the Management Agreement on or after the Effective Date other than as specifically set forth herein. Concurrently therewith, in consideration of the provision of certain consulting services by EmCare and its affiliates to PAC (as further specified on <u>Exhibit A</u> hereto and as may be further specified in the Strategic Alliance Arrangements described further in this Section), and subject to Envision, EmCare and MSO complying with their respective obligations under this Agreement, including Section 4, PAC shall pay MSO an annual fee of $9,000,000 per year for the period beginning on the Effective Date and ending on December 19, 2019. Such fees shall be prorated for periods of less than a full calendar year (on the basis of a 365-day year) and shall be paid in equal monthly installments in arrears on the last business day of each month.

In addition, subject to EmCare having complied with its obligations below in this paragraph, USAP shall pay MSO a one-time consulting fee ("Strategic Alliance Fee") in an amount equal to $1,500,000 payable on the last business day of 2014; provided that if Envision (or any of its affiliates) and USAP (or any of its affiliates) enter into any commercial arrangements with each other ("Strategic Alliance Arrangements") prior to the end of 2014 that would result in Envision and its affiliates generating additional pre-tax operating income (the "Strategic Alliance Benefits"), then the Strategic Alliance Fee shall be reduced by the amount of such Strategic Alliance Benefits projected to be realized by Envision and its affiliates. EmCare shall provide USAP with a schedule setting forth in reasonable detail its good faith calculation of the projected Strategic Alliance Benefits and net Strategic Alliance Fee due (if any), and the parties shall cooperate on the final determination of the Strategic Alliance Benefits, which shall be mutually agreed by both parties. EmCare and USAP shall work in good faith to evaluate potential opportunities in which USAP and its affiliates and EmCare and its affiliates may effect and implement any Strategic Alliance Arrangements, including USAP or its affiliates providing management or similar services to anesthesia practices that are party to a contract with Envision or any of its affiliates. In connection therewith, EmCare and USAP shall establish one or more working groups that will meet at least monthly in 2014 consisting of senior management of each of USAP and the business units of EmCare responsible for the operations that are the subject matter of this Agreement to discuss, and share information with respect to, potential Strategic Alliance Arrangements. EmCare agrees to use its commercially reasonable efforts to provide USAP with reasonable information necessary to develop the proposed Strategic Alliance Arrangements and without limiting the foregoing, EmCare agrees to provide USAP with such information as may be reasonably requested by USAP with the respect to its anesthesia contracts in Texas and Florida (as well as other mutually agreed locations) so that USAP can formulate a proposal for the Strategic Alliance Arrangements; provided that any such information shall be subject to the provisions of Section 7 hereof. Neither party shall have any obligation to enter into any Strategic Alliance Arrangement other than as may be set forth in a separate definitive agreement.

2.    Consent.    EmCare and MSO hereby consent to the acquisition of PAC by U.S. Anesthesia Partners of Texas, P.A. pursuant to the Merger Agreement.

3.    Transfer and Assignment of Assets.    Following the Effective Date, MSO and USAP (or a subsidiary of USAP) shall enter into an Asset Purchase Agreement substantially in the form attached hereto as Exhibit B (the "Asset Purchase Agreement") pursuant to which MSO will transfer to USAP or a subsidiary thereof substantially all of the assets of MSO that are used, held for use or intended to be used primarily in the operation of providing the services by MSO to PAC pursuant to the Management Agreement (the "MSO Assets"), and the parties shall, unless otherwise mutually agreed by EmCare and USAP, consummate the transactions contemplated by the Asset Purchase Agreement on the date that is thirty-five (35) days following the Effective Date (and if such date is not a business day, on the next business day following such date). The parties agree to cooperate in good faith to promptly complete each schedule that is referred to in the Asset Purchase Agreement prior to the closing thereunder, such schedules to be satisfactory in form and substance to each of the parties to this Agreement. During the period from the Effective Date until the date the transactions contemplated by the Asset Purchase Agreement are consummated, MSO will provide to PAC management, administrative and business services consistent with such services provided by MSO to PAC pursuant to the Management Agreement

40519102_2

prior to the date hereof. PAC shall reimburse MSO for MSO's actual out-of-pocket costs for providing such services, maintaining the assets and retaining the Transferred Employees (as defined in the Asset Purchase Agreement) for the period beginning on the Effective Date and ending on the date that the transactions contemplated by the Asset Purchase Agreement are consummated (the "Asset Sale Closing"), which costs shall be consistent with past practice and the previously agreed budget for 2014; provided that, for purposes of clarification, PAC shall also pay or reimburse, as the case may be, EmCare or its designee for the first full payroll payment following the Asset Sale Closing in the full amount paid by EmCare or its designee with respect to the compensation for such employees accrued through the date of the Asset Sale Closing. In addition, if USAP requests additional transition services following the Asset Sale Closing for a reasonable period of time with respect to functions that EmCare and MSO provided prior to the Asset Sale Closing, EmCare shall provide such services to USAP (or a subsidiary thereof) at cost. The parties agree to cooperate in good faith to (a) promptly complete final schedules to the Asset Purchase Agreement and (b) upon the consummation of the transactions contemplated by the Asset Purchase Agreement, promptly transition the MSO Assets from the MSO to USAP or such subsidiary in an orderly manner. Concurrently with the consummation of the transactions contemplated by the Asset Purchase Agreement, the parties shall enter into a lease or sublease arrangement with respect to the portion of office space used by MSO at the offices of EmCare, Inc. on 13737 Noel Road, 13th and 14th Floors, Dallas, TX 75240, the terms of such lease or sublease to be consistent with the terms (including a pass-through of the actual rent and parking costs at the rates as of the date of this Agreement, and other costs) of the lease for such office space as in effect on the date of this Agreement. The parties agree and acknowledge that any assets of MSO other than the MSO Assets shall not be transferred pursuant to the Asset Purchase Agreement, and MSO may take any and all steps to retain the non-MSO Assets or transfer such assets to an affiliate or other designee of MSO prior to closing of the transactions contemplated by the Asset Purchase Agreement.

4.     Restrictive Covenants.

        (a)     USAP Restrictive Covenants. (i) In order to facilitate the development of the Strategic Alliance Arrangements, USAP covenants and agrees that during the period commencing on the date of this Agreement and expiring on December 31, 2014 (the "Initial Restrictive Covenant Period") USAP will not, and will cause its affiliates not to, directly or indirectly, either on such person's own account or for any other person, induce, attempt to induce, interfere with, or endeavor to cause any hospital, clinic, facility or other healthcare entity (each, a "Subject Facility") to modify, amend, terminate, or otherwise alter any portion of any contract with Envision or any of its affiliates that relates to the provision of anesthesiology or pain management services.

        (ii)     During the period commencing on the date of this Agreement and expiring on December 19, 2019 (the "Restrictive Covenant Period"), USAP will not, and will cause its affiliates not to, either directly or indirectly, either on such person's own account or for any other person, induce, attempt to induce, influence, interfere with, or endeavor to cause any Subject Facility to terminate or materially modify, amend or otherwise alter in a manner adverse to Envision or any of its affiliates any contract, affiliation, arrangement or course of dealing (in any such case (x) in existence on the date of this Agreement or (y) entered into after the date of this Agreement with respect to any Subject Facility that is developed jointly by EmCare or any of its

-3-

affiliates and USAP or any of its affiliates) with Envision or any of its affiliates with respect to the provision of outsourced facility-based physician services in the Dallas/Ft. Worth Metroplex (the "Territory"); provided, however that notwithstanding anything in this Section 4(a)(ii) to the contrary and subject to Section 4(a)(i), nothing shall prohibit USAP or any of its affiliates from providing (1) perioperative services (including the provision of anesthesiology services) or pain management services (the "Services"), (2) perioperative surgical home services or (3) critical care or intensivist services to any Subject Facility.

(b)     Envision Restrictive Covenants.

(i) Envision covenants and agrees that during the Restrictive Covenant Period, Envision will not, and will cause its affiliates not to, directly or indirectly, either on such person's own account or for any other person (1) provide the Services in the Territory; provided, however, that surgical call coverage and hospitalist services shall not be considered Services to the extent they do not include anesthesia, anesthesiologists, CRNAs or pain management services, (2) provide administrative or management services to any person that provides the Services in the Territory, or (3) engage, employ or solicit any physician who has been employed by U.S. Anesthesia Partners of Texas, P.A. or any of its subsidiaries at any time during the twelve (12) months prior to the date such determination is made.

(ii) If during the Restrictive Covenant Period USAP or any of its affiliates, on the one hand, and Envision or any of its affiliates, on the other hand, both make proposals to a Subject Facility pursuant to a formal solicitation process to provide outsourced physician services, and either (*a*) USAP (or its affiliate, as the case may be) offers to bundle its Services to such Subject Facility with any hospitalist, radiology, or surgical call coverage services, and anesthesia is not the primary service offering under the terms of such proposal, or (*b*) USAP (or its affiliate, as the case may be) offers to bundle its Services to such Subject Facility with any emergency department services, then Envision and its affiliates may offer to such Subject Facility the same bundle of services as proposed by USAP and its affiliates and, if such Subject Facility agrees to enter into an agreement with Envision or one of its affiliates for the provision of such services, then the restrictions on Envision set forth in Sections 4(b)(i)(1) and 4(b)(i)(2) shall no longer apply with respect to such Subject Facility (provided that such exclusion shall only apply to the provision of the Services at such Subject Facility).

(iii) In addition, during the Initial Restrictive Covenant Period, Envision will not, and will cause its affiliates not to, either directly or indirectly, either on such person's own account or for any other person, induce, attempt to induce, influence, interfere with, or endeavor to cause any Subject Facility to modify, amend, terminate, or otherwise alter any contract, affiliation, arrangement or course of dealing with USAP, U.S. Anesthesia Partners of Texas, P.A. or any of their respective subsidiaries with respect to the Services or administrative or management services related thereto.

(c)     Meet and Confer. If either USAP or EmCare (or their respective affiliates, as the case may be) proposes to expand the scope of the perioperative services they provide at a Subject Facility in a manner that would potentially conflict with the existing services provided by the

other party at that same Subject Facility or in a manner that would potentially conflict with the other non-compete and non-interference provisions of this Section 4, such parties shall first meet and confer and work in good faith to resolve any potential conflicts prior to seeking to enforce their other legal rights and remedies under this Agreement.

(d)     Passive Investments; Other Entities. The restriction contained in Section 4(b)(i) shall not apply to ownership as a passive investor of less than a one percent (1%) interest in the outstanding equity securities of any publicly held corporation listed on a national securities exchange or association or to any ownership interests held as of the Effective Date, or to any ownership interest held or to be purchased by a physician in any syndicated or physician-owned hospital. The parties further acknowledge that Envision is a publicly traded diversified healthcare services company, and this Agreement shall not restrict Envision from its activities other than as specifically set forth herein. The parties further acknowledge that for purposes of this Agreement the term affiliate means (i) with respect to Envision, any other person directly or indirectly controlled by Envision and any other person under an administrative or management services agreement with any of the foregoing persons and (ii) with respect to USAP, any other person directly or indirectly controlled by, and including, U.S. Anesthesia Partners Holdings, Inc. and any other person under an administrative or management services agreement with any of the foregoing persons.

(e)     Reformation. If a court of competent jurisdiction determines that any provision set forth in Sections 4(a) or 4(b) is partially or wholly inoperative, invalid or unenforceable in a particular case because of its duration, geographical scope, restricted activity or any other parameter, such court shall reform such duration, geographical scope, restricted activity or other parameter with respect to such case to permit enforcement of such reformed Section to the greatest extent allowable.

(f)     Ancillary Agreement. Each provision set forth in Sections 4(a) and 4(b) shall be construed as an agreement ancillary to the other provisions of this Agreement and the existence of any claim or cause of action of either party against the other party and any of its affiliates, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of such provision. Any breach or violation of Section 4(a) or 4(b) shall entitle the other party and its affiliates to an injunction restraining any further or continued breach or violation. Such right to an injunction shall be in addition to and cumulative of (and not in lieu of) any other remedies to which such party is entitled because of such breach or violation.

5.     Mutual Release of Claims.

A.     Effective as of the Effective Date, each of Envision and MSO (each, an "Envision Releasing Party") on the Envision Releasing Party's own behalf and on behalf of the Envision Releasing Party's past, present and future affiliates, agents, attorneys, administrators, heirs, executors, spouses, trustees, beneficiaries, representatives, successors and assigns claiming by or through the Envision Releasing Party, hereby absolutely, unconditionally and irrevocably RELEASES and FOREVER DISCHARGES PAC and its past, present and future directors, managers, members, shareholders, officers, employees, agents, subsidiaries, affiliates, attorneys, representatives, successors and assigns (each, a "PAC Released Person" and collectively, the "PAC Released Persons") from the following (collectively, the "Envision Releasing Party

-5-

Claims"): all claims (including any derivative claim on behalf of any person), actions, causes of action, suits, arbitrations, proceedings, debts, liabilities, obligations, sums of money, accounts, covenants, contracts, controversies, agreements, promises, damages, fees, expenses, judgments, executions, indemnification rights, claims and demands arising out of, relating, against or in any way connected with the Management Agreement, whether known or unknown, suspected or unsuspected, absolute or contingent, direct or indirect or nominally or beneficially possessed or claimed by the Envision Releasing Party, whether the same be in administrative proceedings, in arbitration, at law, in equity or mixed, which the Envision Releasing Party ever had, now has or hereafter may have against any or all of the PAC Released Persons, in respect of any and all agreements, liabilities or obligations entered into or incurred on or prior to the date hereof, or in respect of any event occurring or circumstances existing on or prior to the date hereof, whether or not relating to claims pending on, or asserted after, the date hereof; provided, however, the foregoing release does not extend to, include or restrict or limit in any way, and each Envision Releasing Party hereby reserves, the rights that such Envision Releasing Party has under (i) this Agreement, (ii) the Asset Purchase Agreement, (iii) under Section 8.2.1. of the Management Agreement, (iv) under Sections 9.3, 9.5, 9.6 and Article XII of that certain Membership Interest Purchase Agreement, dated as of November 9, 2009, by and among Pinnacle Consultants Limited Partnership ("PCLP"), Apex Acquisition LLC and EmCare, Inc., as amended by that certain First Amendment to the Membership Interest Purchase Agreement, dated as of December 18, 2009 (the "MIPA"), (v) under Section 8(b) of that certain Contribution Agreement, by and between PCLP and MSO, dated as of December 18, 2009, and (v) Section 11 of that certain License Agreement, by and among PAC, PCLP, MSO, Pinnacle Consultants Mid-Atlantic, L.L.C., Pinnacle Mid-Atlantic Anesthesia Associates, P.C. and Pinnacle Mid-Atlantic Pain Medicine, P.C., effective as of December 18, 2009.

B.     Effective as of the Effective Date, PAC on its own behalf and on behalf of its past, present and future affiliates, agents, attorneys, administrators, heirs, executors, spouses, trustees, beneficiaries, representatives, successors and assigns claiming by or through PAC, hereby absolutely, unconditionally and irrevocably RELEASES and FOREVER DISCHARGES Envision and MSO and their respective past, present and future directors, managers, members, shareholders, officers, employees, agents, subsidiaries, affiliates, attorneys, representatives, successors and assigns (each, an "Envision Released Person" and collectively, the "Envision Released Persons") from the following (collectively, the "PAC Releasing Party Claims"): all claims (including any derivative claim on behalf of any person), actions, causes of action, suits, arbitrations, proceedings, debts, liabilities, obligations, sums of money, accounts, covenants, contracts, controversies, agreements, promises, damages, fees, expenses, judgments, executions, indemnification rights, claims and demands arising out, relating to, against or in any way connected with the Management Agreement, whether known or unknown, suspected or unsuspected, absolute or contingent, direct or indirect or nominally or beneficially possessed or claimed by PAC, whether the same be in administrative proceedings, in arbitration, at law, in equity or mixed, which PAC ever had, now has or hereafter may have against any or all of the Envision Released Persons, in respect of any and all agreements, liabilities or obligations entered into or incurred on or prior to the date hereof, or in respect of any event occurring or circumstances existing on or prior to the date hereof, whether or not relating to claims pending on, or asserted after, the date hereof; provided, however, the foregoing release does not extend to, include or restrict or limit in any way, and PAC hereby reserves, the rights that PAC has (i) under this Agreement, the Asset Purchase Agreement and (iii) under Article XII of the MIPA.

6.    USAP of Texas Guarantee.

(a) Subject to the terms and conditions of this Agreement, U.S. Anesthesia Partners of Texas, P.A. ("USAP of Texas") irrevocably and unconditionally guarantees the prompt, complete and punctual payment and/or performance of all the obligations of PAC under this Agreement. In furtherance of the foregoing and without limiting the generality thereof, USAP of Texas agrees that (i) its guaranty under this Section 6 (this "Guaranty") is a guaranty of payment and performance when due and not collectability; (ii) this Guaranty is a primary obligation of USAP of Texas and not merely a contract of surety; and (iii) payment or performance by USAP of Texas of a portion, but not all, of the obligations under this Agreement shall in no way limit, affect, modify or abridge any liability of USAP of Texas for any portion of the obligations which have not been paid or performed.

(b) If any payment or performance of any obligation of PAC under this Agreement (including as a result of a breach by PAC of this Agreement) shall not be paid or otherwise performed when due, USAP of Texas shall: (i) become absolutely and unconditionally liable for such obligation (without any requirement that MSO bring any action against PAC), (ii) immediately pay in full such payment obligation or otherwise perform such obligation, and (iii) MSO may recover from USAP of Texas the full amount of any such payment or other obligation payable on demand.

(c)    USAP of Texas waives all diligence, presentment, protest and demand, and also notice of dishonor, demand, protest and nonpayment. No failure by MSO to assert any right or pursue any remedy with respect to PAC or under this Guaranty shall relieve USAP of Texas from its obligations under this Section 6.

7.    Confidentiality. PAC and USAP on the one hand, and Envision and MSO on the other hand (each, a "Group"), agrees not to disclose any Confidential Information (as defined below) of the members of the other Group (and its respective affiliates) without the express written authorization of the applicable member of the other Group, such Confidential Information shall not be used in any way directly or indirectly detrimental to the other Group or its affiliates, and the members of each Group shall keep the members of the other Group's Confidential Information confidential and shall ensure that its respective affiliates and representatives who have access to such Confidential Information comply with these non-disclosure obligations; provided, however, that (a) a member of a Group may disclose Confidential Information to those of its affiliates and representatives who need to know Confidential Information for the purposes of this Agreement, it being understood and agreed to that such affiliates and representatives will be informed of the confidential nature of the Confidential Information, will agree to be bound by this Section 7, and will be directed not to disclose to any other person any Confidential Information and (b) a Group may disclose any agreements to which it or any of its affiliates is a party that are included in the definition of Confidential Information in connection with (i) any debt or equity financing transaction involving such Group or any of its respective affiliates, (ii) any sale transaction (whether by sale of equity, assets, merger or otherwise) involving such Group or any of its respective affiliates and (iii) any public offering involving such Group or any of its respective affiliates; provided that except as disclosed in an offering document or information statement, the recipient of Confidential Information pursuant to this Section 7(a) is bound by a valid and enforceable customary non-disclosure agreement

with such Group or an affiliate thereof to not disclose such Confidential Information. Each member of a Group agrees to be responsible for any breach of this Section 7 by its respective affiliates or representatives. If a member of a Group is requested or required (by oral questions, interrogatories, requests for information or documents, subpoenas, civil investigative demands, or similar processes) to disclose or produce any Confidential Information furnished in the course of its dealings with a member of the other Group or its respective affiliates or representatives, it shall (i) provide the member of such other Group with prompt notice thereof and copies, if possible, and, if not, a description of the Confidential Information requested or required to be produced so that such member of such other Group may seek an appropriate protective order or waive compliance with the provisions of this Section 7 and (ii) consult with the member of such other Group as to the advisability of taking legally available action to resist or narrow such request. Each member of a Group further agrees that, if in the absence of a protective order or the receipt of a waiver hereunder such member is nonetheless compelled to disclose or produce Confidential Information concerning a member of the other Group to any tribunal or to stand liable for contempt or suffer other censure or penalty, then it may disclose or produce such Confidential Information to such tribunal legally authorized to request and entitled to receive such Confidential Information without liability hereunder; provided, however, that a party so compelled shall give the member of the other Group written notice of the Confidential Information to be so disclosed or produced as far in advance of its disclosure or production as is practicable and shall use reasonable efforts to obtain, to the greatest extent practicable, an order or other reliable assurance that confidential treatment will be accorded to such Confidential Information so required to be disclosed or produced.

For purposes of this Agreement, "Confidential Information" shall mean any information of a party (whether written or oral), including all business management or economic studies, client lists, client contact information, client data, proprietary forms, proprietary business or management methods, marketing data, fee schedules, computer hardware and software, trade secrets, documents, medical records, materials, patient and referral lists, business or technical information, fee schedules, systems, accounting and financial information, data relating to patient care and outcomes, risk management records and all other information related to a party whether or not such Confidential Information is disclosed or otherwise made available before or after the date hereof or by one party to the other pursuant to this Agreement or in connection herewith (and with respect to PAC, shall also include any such information made available by it to MSO under the Management Agreement or in connection therewith). The term Confidential Information shall not include any information that is (i) otherwise available to the public, (ii) divulged to the other party by a person not subject to obligations of confidentiality, or (iii) required to be divulged pursuant to an administrative or court order or otherwise pursuant to applicable law.

8.    Public Announcements. Each party to this Agreement agrees to coordinate with the other parties to this Agreement prior to making any public announcement relating to this Agreement or the subject matter hereof.

9.    Notices. Any notice or communication required or permitted hereunder shall be in writing and shall be delivered personally, delivered by nationally recognized overnight courier service, sent by certified or registered mail, postage prepaid, or sent by facsimile (subject to

electronic confirmation of such facsimile transmission). Any such notice or communication shall be deemed to have been given (i) when delivered, if personally delivered, (ii) one business day after it is deposited with a nationally recognized overnight courier service, if sent by nationally recognized overnight courier service, (iii) the day of sending, if sent by facsimile prior to 5:00 p.m. (EST) on any business day or the next succeeding business day if sent by facsimile after 5:00 p.m. (EST) on any business day or on any day other than a business day or (iv) five business days after the date of mailing, if mailed by certified or registered mail, postage prepaid, in each case, to the following address or facsimile number, or to such other address or addresses or facsimile number or numbers as such party may subsequently designate to the other parties by notice given hereunder:

if to Envision, EmCare or MSO:

EmCare, Inc.
CEO, Anesthesiology Division
13737 Noel Rd
Suite 1600
Dallas, Texas 75240

Facsimile Number: (214) 712-2444

With a simultaneous copy to:

Envision Healthcare
Attn: General Counsel
6200 South Syracuse Way
Suite 200
Greenwood Village, CO 80111

Facsimile Number: (303) 495-1800

if to USAP or PAC:

450 East Las Olas Blvd., Suite 850
Ft. Lauderdale, FL 33301
Facsimile Number: (713) 458-4426
Attention: Kristen Bratberg

10.  Entire Agreement; Usage.  This Agreement constitutes the entire agreement and understanding among the parties relating to the subject matter hereof and supersedes any and all prior discussions, negotiations, proposals, undertakings, understandings and agreements, whether written or oral, with respect thereto. Except as otherwise explicitly specified to the contrary, the word "including" will be construed as "including without limitation."

11.  Governing Law.  This Agreement, and all claims arising hereunder or relating hereto, shall be governed, construed and enforced in accordance with the laws of the State of Delaware.

12.     Amendments.  No amendment or modification of this Agreement shall be valid unless it is in writing and signed by each of the parties hereto.

13.     Counterparts.  This Agreement may be executed in any number of counterparts, including by facsimile or other electronic transmission, each of which shall be an original, but all of which together shall constitute one instrument.

14.     Term.  The term of this Agreement will begin on the Effective Date and shall continue until December 19, 2019 (the "Term") upon which this Agreement shall terminate in its entirety. The parties may mutually agree in writing to extend the term of this Agreement.

15.     Effective Date.  In the event that the Effective Date has not occurred within one hundred and eighty days (180) days following the date hereof, this Agreement shall automatically terminate and be of no further force and effect.

*[Signature page follows]*

40519102_2

IN WITNESS WHEREOF, each of the undersigned has executed this Agreement as of the date first above written.

MSO NEWCO, LLC

By: _____
Name: Todd Zimmerman
Title: CEO


ENVISION HEALTHCARE HOLDINGS, INC.

By: _____
Name: Todd Zimmerman
Title: EVP


EMCARE, INC.

By: _____
Name: Todd Zimmerman
Title: CEO

PINNACLE ANESTHESIA CONSULTANTS, P.A.

By:_____
Name: Michael Saunders, CPA
Title: Chief Executive Officer

U.S. ANESTHESIA PARTNERS, INC.

By: _____
Name: Kristen Bratberg
Title: President and CEO

For purposes of Section 6 of this Agreement:

U.S. ANESTHESIA PARTNERS OF TEXAS,
P.A.

By: _____
Name: Hector Herrera MD.
Title: President

## Exhibit A

## Consulting Services

Envision and its affiliates shall provide services consisting of:

1. Strategic Planning
2. Operational consulting
3. Risk management consulting

Such services will be under the primary oversight of Dr. Michael Hicks and Ron Mathews or their respective successors during the Term of this Agreement.

Exhibit B

ASSET PURCHASE AGREEMENT

See attached.

<u>ASSET PURCHASE AGREEMENT</u>

<u>January [ ], 2014</u>

The parties to this agreement are U.S.A.P. (Texas), LC, a Texas limited liability company ("Buyer"), MSO Newco, LLC, a Delaware limited liability company ("Seller") and EmCare, Inc., a Delaware corporation ("EmCare").

Seller and Pinnacle Anesthesia Consultants, P.A. ("Pinnacle") were parties to a Management Services Agreement dated as of December 18, 2009 (the "Management Services Agreement"), pursuant to which Seller provided management, administrative and business services as were necessary and appropriate for the performance of the non-medical obligations of Pinnacle (the "Business") and the Management Services Agreement was terminated on [ ].

Buyer provides certain administrative and management services to U.S. Anesthesia Partners of Texas, P.A. ("USAP of Texas") and USAP of Texas acquired Pinnacle on [ ].

EmCare (directly or through one or more wholly owned subsidiaries) owns 100% of the equity interests of Seller, and is party to a Strategic Alliance Agreement dated as of January [__], 2013 with U.S. Anesthesia Partners, Inc. ("USAP"), the parent of Buyer, and the other persons party thereto (the "Strategic Alliance Agreement").

Seller desires to sell to Buyer and Buyer desires to purchase from Seller those assets of Seller described herein on the terms and conditions set forth in this agreement. Accordingly, it is agreed as follows:

1. <u>Sale and Purchase of Assets</u>.

1.1 At the closing referred to in section 3, Seller shall sell, assign and transfer to Buyer, and Buyer shall acquire from Seller, all of Seller's right, title and interest in the Assets. "Assets" means (i) the assets listed on Schedule 1.1 and (ii) all the business, properties, assets, goodwill and rights of Seller of whatever kind and nature, real or personal, tangible or intangible, that are owned, leased or licensed by Seller as of the Closing Date (as defined in section 3) and were used or held for use primarily in the operation or conduct of the Business (but, for the avoidance of doubt, excluding the Excluded Assets (as defined in section 1.2)) including, but not limited to, the following:

(a) all rights under agreements of Seller listed on Schedule 1.1(a) (collectively, the "Assumed Contracts"), to the extent that they remain unperformed or unfulfilled on, or by their terms continue after, the Closing Date;

(b) all deposits and all prepaid items and any contract rights arising under the Assumed Contracts;

(c) all rights under express or implied warranties relating to any Assets;

(d) except as set forth in section 1.2(h), all inventory, office supplies, stationery, forms, labels, and similar supplies of Seller;

(e) all computer software (including data and related documentation) of Seller listed on schedule 1.1(e) or embedded in the equipment contemplated by section 1.1(g) below;

(f) to the extent legally transferable, all data, books of account, records (other than patient records), files, invoices, suppliers' lists and payroll records;

(g) all equipment (including computers and office equipment used by the Transferred Employees), vehicles, furniture, fixtures, inventory, and all of Seller's other tangible assets, wherever located;

(h) all transferable franchises, approvals, permits, licenses, orders, registrations, certificates, variances, and similar rights obtained from governments and governmental agencies;

(i) except as set forth in section 1.2(l), all claims of Seller against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or noncontingent; and

(j) all goodwill of Seller relating to or attributable to or arising from the Assets.

1.2 Excluded Assets. The following assets shall be retained by Seller and shall not be sold, assigned or transferred to Buyer on the Closing Date:

(a) all trademarks, trade names, trade dress and logos (including all registrations and applications for registration of any of them) now or previously used by Seller; all of Seller's rights in copyrights, and all rights of Seller to Internet domain names and the content of any websites maintained or owned by Seller or its Affiliates;

(b) Seller's tax returns and financial statements, and all minute books, equity record books and other similar records;

(c) the rights arising under those agreements and commitments of Seller that are not Assumed Contracts;

(d) the name of Seller;

(e) any capital stock or other interest in any corporation or other entity held by Seller;

(f) the contracts of Seller (collectively the "Excluded Contracts") and the assets of Seller listed on Schedule 1.2(f) **[NTD: Excluded Contracts shall include, without limitation, the MSA, the Contribution Agreement and the License Agreement]**;

(g) any products, supplies, services or assets listed on Schedule 1.2(g) owned by, or leased or licensed to, EmCare or its Affiliates (other than Seller) that Seller has access to by virtue of being a subsidiary of EmCare;

(h) any supplies or other products which include or bear the logo or mark of EmCare or any of its Affiliates (other than Seller alone);

2

(i) any accounts receivable of Seller relating to products sold or services rendered prior to the Closing Date;

(j) any national provider identifier numbers;

(k) all insurance benefits, including rights and proceeds, arising from or relating to the Assets prior to the Closing Date; and

(l) all rights of Seller under this agreement, the Strategic Alliance Agreement, the Excluded Contracts and the Ancillary Agreements (as defined in section 4.3).

The assets excluded pursuant to this section 1.2 are referred to collectively as the "Excluded Assets."

2. Consideration to Seller

2.1 Amount and Payment of Consideration. As full consideration for the assets to be sold by Seller to Buyer pursuant to this agreement at the closing Buyer shall (a) pay to Seller an aggregate purchase price of $1 ("Cash Purchase Price") and (b) assume and agree to pay, perform and discharge (i) all of Seller's obligations under the Assumed Contracts, to the extent that they remain unperformed or unfulfilled on, or by their terms continue in effect after, the Closing Date (except for any liability under any Assumed Contract that arises after the closing, but that arises out of or relates to any breach that occurred prior to the closing), (ii) (x) any compensation, salary or wages of any kind for services rendered by employees, consultants, officers or directors of Seller (including, but not limited to, the Transferred Employees) to Pinnacle pursuant to the Management Services Agreement or the Strategic Alliance Agreement, (y) any liability or obligation arising out of or in connection with any employee benefit plan or for employee post-retirement life insurance or health care benefits relating to employees of Seller (including, but not limited to, the Transferred Employees), and (z) any liability or obligation arising out of or in connection with any paid time off or vacation time of employees of Seller (including, but not limited to, the Transferred Employees), in the case of each of clauses (x), (y) and (z), to the extent arising or relating to the period prior to the Closing Date, and (iii) other expenses of Seller incurred in the ordinary course prior to the Closing Date (collectively, clauses (i) through (iii), the "Assumed Liabilities"); provided that (1) the liabilities and obligations described in clauses (ii) and (iii) shall only be Assumed Liabilities to the extent (A) any such liability or obligation would have been reimbursable by Pinnacle to Seller in accordance with the terms of the Management Services Agreement (whether or not such agreement is in effect) and (B) Pinnacle or USAP (or any of its Affiliates) has not reimbursed or otherwise paid Seller for such liabilities or obligations and (2) Assumed Liabilities shall not include any severance liabilities and obligations for employees, officers or directors of Seller who are not Transferred Employees.

2.2 Limitation on Assumption of Liabilities. Notwithstanding anything to the contrary contained herein, except for the Assumed Liabilities, Buyer shall not assume, and shall not have any liability for any liability or obligation of Seller (the "Excluded Liabilities"), and Seller shall pay, perform and discharge all such liabilities and obligations, including, without limitation, (i) any liability or obligation arising out of or relating to any claim, litigation or proceeding relating to Seller to the extent based on an act or omission occurring prior to the Closing Date, (ii) any liability or obligation of Seller for taxes, (iii) any liability of Seller to any

3

Affiliate of Seller prior to the Closing Date, (iv) any liability with respect to any Excluded Assets, (v) any liabilities relating to any breach of contract, breach of warranty, tort, infringement or fraud, by Seller arising out of or relating to an act or omission occurring prior to the Closing Date, (vi) any liability under any Assumed Contract that arises after the closing but that arises out of or relates to any breach by Seller that occurred prior to the Closing Date, or (vii) any liability of Seller arising out of or relating to violations of any law, regulation, ordinance, or any other requirement of any governmental body or court occurring prior to the Closing Date.

      3.   Date of Closing; Transactions at the Closing.

      (a) The closing under this agreement shall take place at the offices of Ropes & Gray LLP, 1211 Avenue of the Americas, New York, New York 10036, at 10:00 a.m. (EST) on the date hereof (the "Closing Date").

      (b) At the closing, Buyer shall pay to Seller the Cash Purchase Price and the parties shall execute and deliver the documents referred to in section 6.3.

      4.   Representations and Warranties by Seller.  Seller represents and warrants to Buyer as of the Closing Date as follows:

      4.1 Organization and Authority.  Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the full power and authority to enter into and to perform this agreement and each Ancillary Agreement and to carry on its business as it is presently being conducted.

      4.2 Authorization of Agreements.  The execution, delivery and performance of this agreement and the Ancillary Agreements by Seller have been duly authorized by all requisite action of Seller.  This agreement and each Ancillary Agreement have been duly executed and delivered by Seller, and this agreement and each Ancillary Agreement constitutes the valid and binding obligation of Seller and is enforceable against Seller in accordance with its terms.

      4.3 Consents of Third Parties; No Violations.  The execution, delivery and performance of this agreement by Seller, the bill of sale, assignment and assumption agreement and any other instrument of transfer executed and delivered by Seller in connection with the closing of the asset transfer contemplated hereby (the "Ancillary Agreements") will not, (i) conflict with the organizational or governing documents of Seller and will not conflict with, or result in the breach or termination of, or constitute a default under, or increase Seller's obligations or diminish its rights under, any agreement, commitment, order or other instrument, or any order, judgment or decree, to which Seller is a party or by which it is bound; (ii) constitute a violation by Seller of any law or regulation applicable to it; or (iii) result in the creation of any lien, charge or encumbrance upon any of the assets to be sold to Buyer.  No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority or any other person or entity is required on the part of Seller in connection with the execution, delivery and performance of this agreement or an Ancillary Agreement.

      4.4 Title to Assets and Related Matters.  Seller has valid title to all of the Assets (other than any asset in which it has a leasehold interest pursuant to a lease referred to on schedule 1.1(a)), which Assets will be, as of the Closing Date, free and clear of any claim, lien,

or encumbrance. At the closing, Buyer will receive valid title to (or leasehold interest in) all of the Assets. Seller has not transferred any of its assets (other than assets that would have been Excluded Assets) since December 31, 2013.

5. <u>Representations and Warranties by Buyer.</u> Buyer represents and warrants to Seller as follows:

5.1 <u>Organization and Authority.</u> Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and has the full power and authority to enter into and to perform this agreement and each Ancillary Agreement to which it is a party.

5.2 <u>Authorization of Agreement.</u> The execution, delivery and performance of this agreement by Buyer and each Ancillary Agreement to which it is a party have been duly authorized by all requisite limited liability company action. This agreement and each Ancillary Agreement to which Buyer is a party constitutes the valid and binding obligation of Buyer enforceable against it in accordance with its terms.

5.3 <u>Consents of Third Parties.</u> The execution, delivery and performance of this agreement by Buyer and each Ancillary Agreement to which it is a party will not (i) conflict with the articles of association of Buyer and will not conflict with, result in the breach or termination of, or constitute a default under, any lease, agreement, commitment or other instrument, or any order, judgment or decree, to which Buyer is a party or by which it is bound, or (ii) constitute a violation by Buyer of any law or regulation applicable to it. No consent, approval or authorization of, or designation, declaration or filing with, any governmental authority is required on the part of Buyer in connection with the execution, delivery and performance of this agreement or any Ancillary Agreement.

6. <u>Further Agreements of the Parties.</u>

6.1 <u>Employment.</u> Buyer shall offer employment to the employees of Seller set forth on Schedule 6.1 at salary levels and with employee benefits substantially equivalent to the salary levels and employee benefits of similarly situated employees of Buyer (those employees who accept such offers of employment shall be referred to as the "Transferred Employees").

6.2 <u>Further Assurances.</u> Each party shall, without further consideration, execute and deliver to the other such other instruments of transfer and assumption and shall take such other action as the other may reasonably request to carry out the transfer of Seller's operations, rights and assets and assumption of liabilities contemplated by this agreement.

6.3 <u>Collection of Receivables.</u> From and after the closing, Buyer shall have the right and authority to collect for its own account all accounts receivable generated by services provided by Pinnacle following the Closing Date ("Receivables") and other related items that are included in the Assets and to endorse with the name of Seller any checks or drafts received with respect to any Receivables or such other related items following the Closing Date. Following the Closing Date, Seller shall promptly deliver to Buyer any cash or other property received directly or indirectly by it with respect to the Receivables and such other related items, including any amounts payable as interest.

5

7. Items to be Delivered at Closing.

7.1 Items to Be Delivered by Seller.  At the closing, Seller shall deliver the following:

(a) to Buyer, such bills of sale, assignments or other instruments of transfer and assignment as shall be effective to vest in Buyer valid title to the Assets; and

(b) to Buyer, releases of all liens on any of the Assets to be transferred and assigned to Buyer.

7.2 Items To Be Delivered by Buyer.  At the closing, Buyer shall deliver to Seller the Cash Purchase Price and the instruments pursuant to which Buyer assumes the obligations and liabilities to be assumed by it under section 2.1.

8. Survival of Representations and Warranties; Indemnification.

8.1 Survival.  All representations, warranties and agreements by Seller and Buyer shall survive the closing notwithstanding any investigation at any time by or on behalf of any other party hereto.

8.2 Indemnification.

(a) Seller shall indemnify and hold harmless Buyer and each of its Affiliates (including following the closing, Pinnacle and its successors) and their respective directors, officers, employees, members, partners and representatives (the "Buyer Indemnified Parties") against all loss, liability, damage or expense (including reasonable fees and expenses of counsel, whether involving a third party or between the parties to this agreement) any of the Buyer Indemnified Parties may suffer, sustain or become subject to as a result of or arising out of (i) any breach of, or inaccuracy in, any representation or warranty of Seller contained in this agreement, or any claim by a third party which, without regard to the merits of the claim, would constitute such a breach or inaccuracy, (ii) any breach of any covenant or other agreement of Seller contained in this agreement or (iii) the Excluded Liabilities.

(b) Buyer shall indemnify and hold harmless Seller and their respective Affiliates and their respective directors, officers, employees, members, partners and representatives (the "Seller Indemnified Parties") against all loss, liability, damage or expense (including reasonable fees and expenses of counsel, whether involving a third party or between the parties to this agreement) any of the Seller Indemnified Parties may suffer, sustain or become subject to as a result of (i) any breach of, or inaccuracy in, any representation or warranty of Buyer contained in this agreement, or any claim by a third party which, without regard to the merits of the claim, would constitute such a breach or inaccuracy, (ii) any breach of any covenant or other agreement of Buyer contained in this agreement or (iii) the Assumed Liabilities.

9. Miscellaneous.

9.1 Definition; Usage. As used in this agreement, the term "Affiliate" means, in relation to any person or entity, any person or entity directly or indirectly controlling, controlled by, or under common control with, that person or entity. Except as otherwise explicitly specified to the contrary, the word "including" will be construed as "including without limitation."

6

9.2 <u>Entire Agreement.</u>  This agreement contains, and is intended as, a complete statement of all of the terms of the arrangements between the parties with respect to the matters provided for, supersedes any previous agreements and understandings between the parties with respect to those matters, and cannot be changed or terminated orally.

9.3 <u>Governing Law.</u>  This agreement shall be governed by and construed in accordance with the laws of the State of Delaware applicable to agreements made and to be performed in Delaware.

9.4 <u>Headings.</u>  The section headings of this agreement are for reference purposes only and are not to be given any effect in the construction or interpretation of this agreement.

9.5 <u>Notices.</u>  All notices and other communications under this agreement shall be in writing and shall be deemed given when delivered personally or mailed by registered mail, return receipt requested, to the parties at the following addresses (or to such other address as a party may have specified by notice given to the other party pursuant to this provision):

If to Seller or EmCare:

13737 Noel Road
Suite 1600
Dallas, TX 75240
Attn: CEO, Anesthesiology Division

with a copy to:

Envision Healthcare
Attn: General Counsel
6200 South Syracuse Way
Suite 200
Greenwood Village, CO 80111

If to Buyer:

U.S.A.P. (Texas), LC

9.6 <u>Severability.</u>  If any provision of this agreement is held to be invalid or unenforceable, the balance of this agreement shall remain in effect.

9.7 <u>Waiver.</u>  Any party may waive compliance by another with any of the provisions of this agreement.  No waiver of any provision shall be construed as a waiver of any other provision.  Any waiver must be in writing and must be signed by the party waiving the applicable provision.

9.8 <u>Assignment.</u>  No party may assign any of its rights or delegate any of its duties under this agreement without the consent of the other parties, except that Buyer may assign any of its rights and delegate any of its duties to any Affiliate thereof.

9.9 <u>Third Party Beneficiaries.</u>  Nothing in this agreement is intended to confer any rights on any persons or entities other than the parties hereto and their respective successors and permitted assigns, except that any person or entity entitled to indemnification under section 8

7

shall be third-party beneficiaries of this agreement and shall be entitled to enforce such rights directly.

        9.10        <u>Jurisdiction.</u>  The state and federal courts located in the State of Delaware shall have jurisdiction over the parties with respect to any dispute or controversy between them arising under or in connection with this agreement and, by execution and delivery of this agreement, each of the parties to this agreement submits to the jurisdiction of those courts, including, but not limited to, the in personam and subject matter jurisdiction of those courts, waives any objection to such jurisdiction on the grounds of venue or forum non conveniens, the absence of in personam or subject matter jurisdiction and any similar grounds, consents to service of process by mail (in accordance with section 9.5) or any other manner permitted by law, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this agreement.  These consents to jurisdiction shall not be deemed to confer rights on any person other than the parties to this agreement.

40486755_3

IN WITNESS WHEREOF, each of the undersigned has caused this agreement to be executed as of the date first above written.

U.S.A.P. (Texas), LC

By: _____
Name: _____
Title: _____

MSO Newco, LLC

By: _____
Name: _____
Title: _____

EmCare, Inc.

By: _____
Name: _____
Title: _____