# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, DC, 20580<br><br>**Plaintiff,**<br><br>**v.**<br><br>**U.S. ANESTHESIA PARTNERS, INC.**<br>12222 Merit Drive, Suite 700<br>Dallas, TX, 75251<br><br>**and**<br><br>**WELSH, CARSON, ANDERSON &<br>STOWE XI, L.P.,<br>WCAS ASSOCIATES XI, LLC,<br>WELSH, CARSON, ANDERSON &<br>STOWE XII, L.P.,<br>WCAS ASSOCIATES XII, LLC,<br>WCAS MANAGEMENT CORPORATION,<br>WCAS MANAGEMENT, L.P., and<br>WCAS MANAGEMENT, LLC**<br>599 Lexington Avenue, Suite 1800<br>New York, NY, 10022<br><br>**Defendants.** | **Case No.:**<br><br>**Redacted Public Version** |

**Complaint for Injunctive and Other Equitable Relief**

Plaintiff Federal Trade Commission ("FTC"), by its designated attorneys, petitions this

Court pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for a permanent injunction

and other equitable relief, against Defendants U.S. Anesthesia Partners, Inc. ("USAP"); and

Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson,

Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation,

1

WCAS Management, L.P., and WCAS Management, LLC (collectively "Welsh Carson" or the "Welsh Carson Defendants") to redress and prevent violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## NATURE OF THE CASE

1.     This action challenges USAP and Welsh Carson's multi-year anticompetitive scheme to consolidate anesthesia practices in Texas, drive up the price of anesthesia services provided to Texas patients, and increase their own profits.

2.     Welsh Carson is a New York-based private equity firm. From its Park Avenue offices in Midtown Manhattan, Welsh Carson had observed that anesthesiology in Texas was "fragmented"—that is, full of small physician practices that competed against one another. This dynamic allowed insurers to negotiate lower prices for themselves, for their clients (including Texas businesses), and ultimately for patients. Although Texans benefited from this competition, Welsh Carson saw an opportunity to profit from eliminating it and consolidating these various practices into a dominant provider with the power to extract high prices.

3.     In 2012, Welsh Carson created USAP to execute this consolidation strategy. Specifically, USAP's founding purpose was to pursue an "aggressive" strategy to "consolidat[e] practices with high market share in a few key markets." By doing so, Welsh Carson sought to exploit the fact that anesthesia services are critical to modern surgery; hospitals need to offer anesthesia services, and patients, their employers, and insurers must pay for them, even if choices dwindle and prices go up. Welsh Carson saw that eliminating competitors—by acquiring or conspiring with them, instead of competing on the merits—would give USAP the power to raise prices, raking in tens of millions of extra dollars for USAP, Welsh Carson, and their

executives. Welsh Carson and USAP spent the next decade bringing that consolidation strategy to life through a set of illegal tactics.

4.     First, USAP and Welsh Carson engaged in what they referred to as a "roll-up," buying nearly every large anesthesia practice in Texas. This scheme began in Houston, where USAP entered in December 2012 by purchasing the region's largest practice and then making three further acquisitions. USAP expanded to Dallas in 2014 and quickly acquired other key groups there. Starting in 2016, USAP made significant acquisitions elsewhere in Texas—San Antonio, Austin, Amarillo, and Tyler. All told, USAP's roll-up scheme involved over a dozen practices, 1,000 doctors, and 750 nurses.

5.     USAP's acquisitions have hit Texans' wallets hard. With each deal, USAP raised the acquired group's prices to USAP's (often much) higher price. As one insurance executive summarized, USAP and Welsh Carson used acquisitions to "take the highest rate of all . . . and then peanut butter spread that across the entire state of Texas." Welsh Carson and USAP euphemistically referred to this practice—wielding its increasingly dominant market position to net tens of millions of dollars in additional profits—as "synergies." Before USAP made a single acquisition, Welsh Carson was already bragging to potential financiers about the plan to create a "significant synergy opportunity" at the expense of patients, their employers, and insurers. USAP's and Welsh Carson's executives, in plotting their "roll up," underscored that "captur[ing] significant synergies" was a key part of their scheme. Following one acquisition, a USAP executive put it more bluntly: "Cha-ching!"

6.     Second, USAP supported its "roll-up" strategy by entering or maintaining price-setting arrangements with other, independent anesthesia groups that shared key hospitals in Houston and Dallas. Under these price-setting arrangements, USAP charges its own high prices

for services in fact provided by those independent groups that had been charging lower prices. Like its acquisitions, USAP's price-setting arrangements yielded "synergies"—or additional revenues—that USAP then split with each independent group. Despite USAP's own executives recognizing that these price-setting arrangements are "odd from a compliance standpoint," two of them remain in use today and USAP has signed or pursued multiple others.

7.    Third, USAP and Welsh Carson entered a market allocation with another large anesthesia services provider. ██████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

█████████████████████████████████████████

████████████████████████. The Welsh Carson partner who acted as USAP's chief negotiator made clear that this market allocation agreement was "what we want," and he later expressed appreciation for ██████████ "constructive" attitude towards USAP's and Welsh Carson's interest in sidelining a significant rival.

8.    Defendants' consolidation strategy has worked. Thanks to its roll-up, price-setting agreements, and market allocation scheme, USAP is the dominant provider of anesthesia services in Texas and in many of its major metropolitan areas, including Houston and Dallas. No rival comes close to matching USAP's size. As of 2021, USAP was at least four times larger than the second-largest group in Houston; six times larger than the second-largest group in Dallas; and nearly seven times larger than the second-largest group in all of Texas. It is also one of the most expensive, with reimbursement rates that are double the median rate of other anesthesia

providers in Texas. The predictable (and intended) effect is that anesthesia services—from the same anesthesiologists—cost Texans tens of millions of dollars more each year than they did before USAP was created.

9.     In other words, thanks to its anticompetitive conduct, USAP has been able to extract monopoly profits while simultaneously growing its monopoly power. Defendants' scheme was so successful that Welsh Carson has already begun "deploying a similar strategy to consolidate" multiple other physician practice specialties.

10.     The FTC now asks this Court to put an end to Defendants' unlawful scheme, prevent its recurrence, and restore competition across Texas.

# **Table of Contents**

I.      JURISDICTION AND VENUE .................................................................................. 10

II.     THE PARTIES ......................................................................................................... 11

     A.   Plaintiff Federal Trade Commission ............................................................ 11

     B.   Defendant U.S. Anesthesia Partners ............................................................ 11

     C.   Defendant Welsh Carson ............................................................................. 12

III.    BACKGROUND ...................................................................................................... 18

     A.   Anesthesia is administered to patients by doctors and nurses to prevent pain ........ 18

     B.   Anesthesia services are performed in hospitals or outpatient facilities ................... 19

     C.   Hospitals contract with anesthesia providers to serve their facilities ...................... 20

     D.   Insurers negotiate network status and reimbursement with anesthesia providers .... 22

     E.   To discipline price demands, insurers may refuse to include anesthesia groups in their network ........................................................................................... 24

IV.     USAP'S AND WELSH CARSON'S ANTICOMPETITIVE SCHEME .................... 26

     A.   Welsh Carson hatches a strategy to consolidate anesthesia practices in Texas ........ 26

     B.   Welsh Carson executes on its consolidation strategy by creating USAP and acquiring a large practice in Houston ........................................................... 27

     C.   Welsh Carson and the newly-formed USAP develop a plan to roll up independent anesthesia practices and raise prices ...................................................... 31

V.      USAP CONTINUES ITS ANTICOMPETITIVE SCHEME BY ROLLING UP ADDITIONAL PRACTICES .............................................................................. 33

     A.   After its founding acquisition, USAP makes three additional acquisitions in Houston ..................................................................................................... 33

        1.   North Houston Anesthesiology – Kingwood Division (2014) .......................... 33

        2.   MetroWest Anesthesia Care (2017) ............................................................. 34

        3.   Guardian Anesthesia Services (2020) ........................................................... 35

        4.   USAP's consolidation of Houston as it stands today ....................................... 36

B. USAP expands its roll-up scheme to Dallas ................................................ 37

    1. Pinnacle Anesthesia Consultants (2014)........................................ 38

    2. Anesthesia Consultants of Dallas (2015) ...................................... 40

    3. Excel Anesthesia Consultants (2015) ............................................ 41

    4. Southwest, BMW, Medical City Physicians, and Sundance (2015-2016) ....................................................................................... 42

    5. USAP's consolidation of Dallas as it stands today ........................ 44

C. USAP further expands its roll-up scheme by acquiring other large practices across Texas ................................................................................................ 45

    1. East Texas Anesthesiology Associates (2016)............................... 47

    2. Capitol Anesthesiology Association (2018) ................................... 48

    3. Amarillo Anesthesia Consultants (2018) ...................................... 49

    4. Star Anesthesia (2019) .................................................................. 50

VI. USAP'S OTHER ANTICOMPETITIVE CONDUCT ................................... 51

A. USAP uses price-setting arrangements to charge its own, higher rates for anesthesia services provided by other practices........................................... 52

    1. The Methodist Hospital Physician Organization ............................ 54

    2. Dallas Anesthesiology Associates ................................................. 56

    3. Baylor College of Medicine ........................................................... 57

    4. University of Texas ....................................................................... 58

B. USAP's market allocation with ████████ ............................................... 59

VII. RELEVANT MARKETS ................................................................................. 61

A. The relevant service market is commercially insured hospital-only anesthesia services............................................................................................................ 61

    1. Services performed outside a hospital are not part of the relevant service market .............................................................................. 62

    2. Non-commercial insurance plans are not part of the relevant service market.............................................................................................. 65

B.     The relevant geographic markets to assess the competitive implications of the
challenged conduct are no broader than the local metropolitan statistical areas ...... 66

1.     A relevant geographic market is no broader than the Houston
metropolitan statistical area ............................................................. 66

2.     A relevant geographic market is no broader than the Dallas-Fort Worth
metropolitan statistical area ............................................................. 68

3.     A relevant geographic market is no broader than the Austin
metropolitan statistical area ............................................................. 69

VIII.   MARKET POWER AND MONOPOLY POWER ........................................ 71

A.     USAP has monopoly power in the Houston MSA ................................... 71

1.     USAP and Welsh Carson's roll-up of anesthesia practices has
substantially increased concentration, resulting in a dominant market
share in Houston ................................................................................ 71

2.     USAP has demonstrated its ability to increase prices while retaining
and increasing its market share in Houston ..................................... 73

3.     USAP's high share of the hospital-only anesthesia market relative to
its rivals reinforces its monopoly power in Houston ....................... 74

B.     USAP has monopoly power in the Dallas MSA ..................................... 75

1.     USAP and Welsh Carson's roll-up of anesthesia practices has
substantially increased concentration, resulting in a dominant market
share ................................................................................................. 75

2.     USAP has demonstrated its ability to increase prices while retaining
and increasing its market share in Dallas ....................................... 77

3.     USAP's high share of the hospital-only anesthesia market relative to
its rivals reinforces its monopoly power in Dallas .......................... 78

C.     USAP has a dominant position in the commercially insured hospital-only
anesthesia market in Austin ................................................................... 79

1.     USAP and Welsh Carson's roll-up of anesthesia providers has
substantially increased concentration, resulting in a dominant market
share ................................................................................................. 79

2.     USAP has demonstrated its ability to increase prices while retaining
and increasing its market share in Austin ....................................... 81

3.   USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its dominance in Austin ....................................................... 82

D.   High barriers to entry to the hospital-only anesthesia markets in Houston, Dallas, and Austin protect USAP's market share ....................................................... 82

IX.   USAP'S DOMINANCE IN TEXAS ....................................................... 84

X.   HARM TO CONSUMERS AND COMPETITION ....................................................... 86

A.   USAP's conduct has increased its negotiating leverage against insurers, reducing insurers' ability to constrain USAP's demands to raise prices ................. 86

B.   USAP's conduct has increased prices for hospital-only anesthesia services in Texas ....................................................... 89

C.   There are no valid procompetitive justifications for or efficiencies from USAP's conduct ....................................................... 91

XI.   LIKELIHOOD OF RECURRENCE ....................................................... 92

A.   Without appropriate relief, USAP's harmful conduct is likely to recur ................. 92

B.   Without appropriate relief, Welsh Carson's harmful conduct is likely to recur ....... 93

XII.   VIOLATIONS ....................................................... 95

XIII.   PRAYER FOR RELIEF ....................................................... 105

## I.  JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

12.     This Court has personal jurisdiction over USAP because USAP has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

13.     This Court has personal jurisdiction over Welsh Carson because Welsh Carson has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

14.     Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b). Each Defendant resides, transacts business, committed an illegal or tortious act, or is found in this district.

15.     Defendants' general business practices, and the unfair methods of competition alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

16.     USAP, Welsh Carson Associates XI, LLC, Welsh Carson Associates XII, LLC, Welsh Carson Management Corp., and Welsh Carson Management, LLC are, and at all relevant times have been, "corporations," as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

17.     Welsh, Carson, Anderson & Stowe XI, L.P., Welsh, Carson, Anderson & Stowe XII, L.P., and Welsh Carson Management, L.P., are, and at all relevant times have been, "partnerships" within the meaning of 15 U.S.C. § 45(a).

## II.    THE PARTIES

### A. Plaintiff Federal Trade Commission

18.    Plaintiff FTC is an administrative agency of the United States Government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its principal offices in the District of Columbia. The FTC is vested with authority and responsibility for enforcing, among other things, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

19.    The FTC is authorized to bring this case in federal court because Defendants are violating or about to violate a provision of law enforced by the FTC, and this is a proper case for permanent injunctive relief within the meaning of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

### B. Defendant U.S. Anesthesia Partners

20.    Defendant U.S. Anesthesia Partners, Inc. is a for-profit Delaware corporation, with its principal place of business at 12222 Merit Drive, Suite 700, Dallas, TX, 75251.[1]

21.    Founded in late 2012, USAP is a physician-service organization that focuses on anesthesia and pain management services. Since its founding, USAP has grown significantly, primarily through acquiring other anesthesia practices. In 2013, approximately 400 USAP anesthesia providers performed 300,000 anesthesia procedures at 45 healthcare facilities. As of late 2021, over 4,500 USAP anesthesia providers performed 2.5 million anesthesia procedures at 1,100 healthcare facilities. Between 2013 and 2021, USAP's revenue increased ██████ ████████████████████████████████████████████████████████.

---

[1] Except where otherwise specified, "USAP" refers to U.S. Anesthesia Partners, Inc. and all corporate predecessors, successors, parents, subsidiaries, and affiliates.

22.     USAP currently has a presence in eight states: Colorado, Florida, Indiana, Maryland, Nevada, Tennessee, Texas, and Washington. At all times, Texas has been USAP's largest market, accounting for approximately 65% of the company's profit in 2021.

### C.  Defendant Welsh Carson

23.     Welsh Carson is engaged in the business of private equity investment and management, primarily in the healthcare and technology sectors. Since its founding in 1979, Welsh Carson has raised over $31 billion and invested in over 95 healthcare companies. Welsh Carson's investments include USAP, which it co-founded in 2012 with an approximately $ ██ ██ investment.

24.     Like other private equity firms, Welsh Carson uses a complex maze of related entities, including but not limited to the Welsh Carson Defendants, to carry out its business.

25.     Defendant WCAS Management Corporation is a for-profit Delaware corporation founded in 2000. WCAS Management Corporation employs or otherwise compensates investment professionals. This includes both Welsh Carson's "partners," who serve as the officers, directors, and managers of Welsh Carson Management Corp., and more junior investment professionals, whom the partners supervise and direct. These investment professionals raise money from investors such as insurance companies, pension plans, and high-net-worth individuals and pool that money into investment vehicles called "funds," which operate as limited partnerships.

26.     Defendant Welsh, Carson, Anderson & Stowe XII, L.P. (the "WCAS XII fund") is a Delaware limited partnership founded in 2014. The WCAS XII fund, like other Welsh Carson funds before and since, uses money raised from investors to purchase ownership stakes in

other companies. The WCAS XII fund holds, and has held since 2017, stock in USAP.[2] USAP and the other companies in which Welsh Carson's funds acquire ownership positions are referred to as "portfolio companies." Eventually, the Welsh Carson funds sell some or all of their stake in portfolio companies and distribute the proceeds to the investors and to Welsh Carson itself.

27.     Defendant WCAS XII Associates, LLC is a for-profit Delaware corporation founded in 2014. WCAS XII Associates, LLC is the general partner of the WCAS XII fund and makes investment and other decisions on its behalf.[3] Welsh Carson's general partners control and direct WCAS Associates XII—and by extension the WCAS XII fund—both in their capacity as the "managing members" of WCAS XII Associates and in their role as the officers, directors, and managers of Welsh Carson Management Corp., which serves as the investment manager for WCAS Associates XII.

28.     Defendant Welsh, Carson, Anderson & Stowe XI, L.P. (the "WCAS XI fund") is a Delaware limited partnership founded in 2008. The WCAS XI fund held USAP stock from 2012 to 2017.

29.     Defendant WCAS Associates XI, LLC is a for-profit Delaware corporation founded in 2008. WCAS Associates XI is the general partner of the WCAS XI fund and makes investment and other decisions on its behalf. As with Defendant WCAS Associates XII, Welsh Carson's partners control and direct WCAS Associates XI—and by extension the WCAS XI fund—both in their capacities as the "managing members" of WCAS Associates XI and in their

---

[2] Technically, the WCAS XII fund is comprised of four separate limited partnerships. Welsh, Carson, Anderson & Stowe XII is the "main" fund that holds most of the USAP stock controlled by Welsh Carson. There are also three "parallel" funds: Welsh, Carson, Anderson & Stowe Delaware, L.P.; Welsh, Carson, Anderson & Stowe Delaware II, L.P.; and Welsh, Carson, Anderson & Stowe Cayman, L.P.

[3] WCAS Associates XII is the general partner of the main fund and one parallel fund. The remaining two parallel funds have a different general partner, WCAS Associates XII Cayman, L.P., but WCAS Associates XII is in turn the general partner of—and controls—WCAS Associates XII Cayman, L.P. As such, WCAS Associates XII is effectively the general partner for the entirety of the WCAS XII fund.

role as officers, directors, and managers of WCAS Management Corp., which serves as the investment manager for WCAS Associates XI.

30.     Defendant WCAS Management, L.P. is a Delaware limited partnership founded in 2017. Welsh Carson has transitioned many (if not all) of the responsibilities and employees of WCAS Management Corp. to WCAS Management, L.P. Welsh Carson's partners control WCAS Management, L.P. in their capacity as directors and managing members of Defendant WCAS Management, LLC.

31.     Defendant WCAS Management, LLC is a for-profit Delaware corporation founded in 2017. WCAS Management, LLC is the general partner of WCAS Management, L.P. and makes all its "[m]ajor decisions." In other words, through both WCAS Associates XII and the WCAS Management entities, Welsh Carson controls the decision-making of the WCAS XII fund. For its other funds, including the WCAS XI fund, Welsh Carson uses or has used a similar structure to achieve the same outcome. The WCAS XI fund operated out of the same office space as the WCAS XII fund, was controlled by largely the same individuals, relied on the same personnel to conduct its operations, was engaged in the same line of business, and even invested in some of the same portfolio companies (including USAP).

32.     The Welsh Carson Defendants operate as a common enterprise. They share a website, www.wcas.com, which refers to "Welsh, Carson, Anderson & Stowe" as "the Firm." They use the same office space and principal place of business, 599 Lexington Avenue, Suite 1800, New York, NY, 10022,[4] and direct that mail sent to any Welsh Carson Defendant be addressed "c/o Welsh, Carson, Anderson & Stowe." They all use the common trademarks "WCAS" and "Welsh, Carson, Anderson & Stowe," which are registered to Defendant WCAS

---

[4] In 2017, Welsh Carson moved its principal place of business from 320 Park Avenue to 599 Lexington Avenue.

Management Corp. And the same individual "partners" serve as officers, directors, or managers of—and thus ultimately control—the different Welsh Carson Defendants. To take just one example: D. Scott Mackesy, described on the Welsh Carson website as the "Managing Partner of the Firm," is a managing member of Defendants WCAS XI and XII Associates, LLC (which, as described above, control Defendants Welsh, Carson, Anderson & Stowe XI and XII, L.P.); President and a director of Defendant Welsh Carson Management Corp.; and a managing member and director of Welsh Carson Management, LLC (which, as described above, controls Welsh Carson Management, L.P.).

33.     Welsh Carson controls many of its funds' portfolio companies. If a Welsh Carson fund directly owns more than 50% of a portfolio company or otherwise has rights to more than 50% of its shares, Welsh Carson has formal control over the company's major decisions. Welsh Carson typically is guaranteed representation—sometimes a majority—on a portfolio company's board of directors, to which the company's management reports. Welsh Carson also identifies, and has its portfolio companies hire, management teams who share the vision of and take direction from Welsh Carson. And Welsh Carson personnel supervise and assist company management and other employees in day-to-day operations.

34.     USAP has been a Welsh Carson portfolio company since 2012, when Welsh Carson created the company for the purpose of rolling up anesthesia practices in Texas.

35.     Welsh Carson's specific ownership stake in USAP has varied over time. At USAP's founding in 2012, Welsh Carson owned 50.2% of the company. Between 2013 and 2017, Welsh Carson's ownership stake was diluted to 44.8% as USAP granted equity to acquired physician groups. In late 2017, Welsh Carson sold about half its stake in USAP to other institutional investors, Berkshire Partners and GIC Capital. Today, it owns approximately 23% of

USAP. Despite the changes in the degree of its formal ownership of USAP, Welsh Carson has actively directed USAP's corporate strategy and decision-making, particularly with respect to mergers and acquisitions of anesthesia practices in Texas.

36.     At all times, Welsh Carson has been guaranteed at least two seats on the USAP board of directors. From 2012 and 2017, Welsh Carson had the right to appoint the majority of USAP's board of directors, including its chair. Between 2013 and 2017, even when its ownership stake dipped below 50%, Welsh Carson—in its own words—maintained control over USAP "in all practical respects" because it held the voting rights of almost all of the company's other shareholders. Indeed, one of the Welsh Carson partners most intimately involved with USAP's business stated in 2014 that "our mandate is to be control investors." Following its partial sale of USAP in late 2017, Welsh Carson remained, as USAP's former CEO and Chairman put it, the "most influential" member of USAP's board. Welsh Carson currently has two directors on USAP's board. In addition, the current board Chairman, though not appointed by Welsh Carson, is affiliated with the firm.

37.     While the Welsh Carson directors on USAP's board sometimes act for USAP, they retain duties to and interests in Welsh Carson. At least one Welsh Carson director on USAP's board, Brian Regan, acted in his Welsh Carson capacity when formulating, directing, and participating in USAP's unlawful conduct. As described below, Regan served on USAP's board from 2012 until 2022. During that time, he facilitated USAP's roll-up scheme by, among other things, signing deal documents for several of the challenged acquisitions—and doing so expressly on behalf of Welsh Carson. He also helped strike deals integral to USAP's consolidation strategy, such as by leading negotiations for its market-allocation agreement with █████████ with the help of a confidentiality agreement he signed on Welsh Carson's behalf. And

Regan often directed Welsh Carson employees (who were not USAP board members) to assist with USAP's consolidation scheme, such as by identifying attractive acquisitions, helping secure funding, and assisting in negotiations with insurers. ███████████████████████ ████████████████████████████████████████████ ███████████████████████████████████.

38.     Welsh Carson hired most of USAP's original management team, including the Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, and head of Human Resources, all of whom had previously served in similar capacities at other Welsh Carson portfolio companies. Other senior employees—such as USAP's longtime Vice President of Payor Contracting—were hired in part due to their Welsh Carson connections. USAP's current CEO came from Welsh Carson and █████████████████████.

39.     Welsh Carson has regularly provided USAP with strategic, operational, and financial support since its founding. Pursuant to a series of management agreements and otherwise, Welsh Carson personnel have provided USAP with services related to corporate finance, acquisition due diligence, and strategic planning (among other things). At USAP's founding, when the company was considerably smaller than it is today, USAP relied extensively on Welsh Carson personnel. Over the years, USAP and Welsh Carson personnel continued to work together frequently and closely.

40.     At all relevant times, Welsh Carson has formulated, directed, controlled, had the authority to control, dictated, encouraged, or actively and directly participated in the anticompetitive conduct describe herein.

### III.   **BACKGROUND**

**A.  Anesthesia is administered to patients by doctors and nurses to prevent pain**

41.     Anesthesia is a type of medical treatment that prevents patients from feeling pain during procedures such as surgery or dental work. Depending on the procedure, a patient may receive general anesthesia—which affects the entire body, often rendering them unconscious while sustaining critical life functions—or local / regional anesthesia, which blocks pain in only part of the body and does not affect a patient's consciousness.

42.     Patients receive general anesthesia through the bloodstream (i.e., intravenously) or by inhaling gas. General anesthesia is typically safe but can pose risks for some patients, such as the elderly or persons with chronic illnesses. Local and regional anesthesia are safer, and patients can typically return home soon after their procedure. For example, local anesthesia is often used in routine dental surgery and regional anesthesia is often used during childbirth.

43.     The practice of administering anesthesia is a specialty medical field known as anesthesiology. Anesthesia providers include physician anesthesiologists as well as nurse anesthetists. Physician anesthesiologists are doctors with a medical degree. After completing medical school, physicians complete a residency in anesthesiology. Most physician anesthesiologists then become "board-certified" by passing an examination administered by the American Board of Anesthesiology. Some physicians also complete an additional "fellowship" year of training in a sub-specialty, such as cardiovascular anesthesia.

44.     Nurse anesthetists must have a year of nursing experience and obtain a specialized certification in anesthesia administration (a training course that lasts two to three years) and then pass a national certification exam. After achieving this certification, a nurse is referred to as a "certified registered nurse anesthetist" or CRNA.

45.     Physician anesthesiologists and nurse anesthetists alike must be certified by a state's medical licensing boards to practice within that state. In Texas, the licensing and regulation of anesthesia providers is overseen by the Texas Medical Board for physician anesthesiologists and the Texas Board of Nursing for CRNAs. Each state's medical licensing boards may also decide whether and when CRNAs can administer anesthesia without supervision by a practicing physician anesthesiologist. In Texas, a CRNA can sometimes independently order and administer anesthesia supervised by a physician, but generally cannot administer anesthesia services without such supervision.

46.     Unlike other areas of medical care, patients rarely choose their anesthesia providers. Instead, a patient's chosen surgeon may select the anesthesia provider, or the anesthesia provider may be chosen randomly based on who is assigned to cover the operating room when a patient's surgery occurs. Moreover, anesthesia providers have little personal interaction with patients since their role is often to keep the patient unconscious.

**B.  Anesthesia services are performed in hospitals or outpatient facilities**

47.     Anesthesia providers can treat patients in several healthcare facility settings, including hospitals, outpatient surgery centers, ambulatory surgical centers, and doctors' offices.

48.     Hospitals, unlike ambulatory surgical centers or outpatient surgery centers, perform inpatient surgery—where the procedure requires a patient to stay overnight. Hospitals may be independent or part of a larger system. Hospital systems can include specialty hospitals, such as children's hospitals or heart-care centers, or hospitals across different geographies.

49.     Outpatient surgery centers and ambulatory surgical centers perform only outpatient surgery. Outpatient surgery consists of surgical procedures typically completed without requiring a patient to stay overnight in a hospital. These procedures can be performed in

a hospital, but it has become increasingly common to perform them in dedicated clinics. Unlike hospitals, ambulatory surgical centers do not have facilities that can accommodate a patient's overnight stay. In addition, these settings lack the specialized tools and equipment that hospitals possess to perform more complex surgeries that require a hospital setting.

50.     Local anesthesia generally can be performed in outpatient care centers (i.e., facilities where patients do not stay overnight) and doctors' offices because they require less robust medical facilities and fewer staff.

51.     General anesthesia and some regional anesthesia services, by contrast, are typically performed only in hospitals or qualified facilities specifically designed for outpatient surgery, such as ambulatory surgical centers or outpatient surgery centers.

**C.  Hospitals contract with anesthesia providers to serve their facilities**

52.     While certain hospitals directly employ anesthesia providers, many rely on independent anesthesiologists or anesthesia groups, such as USAP.

53.     Hospitals that rely on independent anesthesiologists differ in how they staff their operating rooms. Some hospitals select an "open staffing" or "follow the surgeon" model, allowing any credentialed anesthesiologist to practice at the facility and leaving it to individual surgeons to coordinate anesthesia coverage. Many other hospitals choose an exclusive anesthesia provider, whose anesthesiologists cover the entire facility or certain services lines (e.g., trauma) on a 24/7 basis.

54.     Hospitals perceive benefits to exclusive anesthesiology arrangements. For instance, an exclusive arrangement can help secure coverage overnight or during other off-peak hours. Exclusive agreements may also help guarantee treatment for less lucrative patients by ensuring 24/7 coverage.

55.     Anesthesia groups often compete for exclusive hospital contracts. By definition, winning a hospital's exclusive contract is necessary to be able to perform anesthesia services at that hospital. Obtaining an exclusive contract thus typically guarantees a provider group not only a certain amount of business—since it will perform all anesthesia at a hospital—but also a degree of control—since with limited exceptions, no other group will perform any.

56.     To win an exclusive contract, an anesthesia group needs enough local providers to staff the hospital around the clock. The larger the hospital, the more providers the group needs. As such, for large hospitals, only certain large local anesthesia groups are viable exclusive providers.

57.     Hospitals often agree to pay a fee—known as a "stipend"—to their exclusive anesthesia providers. Stipends compensate for the fact that providing 24/7 coverage at a hospital is not always lucrative for an anesthesia group. Procedures may occur infrequently during off-peak shifts, and some patients may have government insurance (which typically reimburses at lower rates) or be uninsured or under-insured.

58.     Although in theory many exclusive contracts between hospitals and anesthesia groups are terminable on short notice by either party, in practice these relationships are "sticky" because switching exclusive anesthesia providers is disruptive for hospitals. For instance, switching may interfere with surgical procedure scheduling or even negatively impact patient care. Thus, once a hospital has chosen its exclusive provider, it can be difficult for a competing group to displace that provider and take over the exclusive.

59.     Notwithstanding the difficulties, however, hospitals can—and occasionally do—switch exclusive anesthesia providers. They can do so more easily when there are sufficient alternative providers. Existing local providers tend to be the most significant competitors for

exclusive hospital contracts because, for example, they may have established reputations for quality and may not require as much recruiting, temporary hiring, or travel costs as more distant alternatives. But absent sufficient local competitors, a hospital may consider more distant alternatives. That is particularly true for hospitals that are part of larger systems, which may look to anesthesia groups from different parts of the state that reliably serve the system's other facilities.

### D.  Insurers negotiate network status and reimbursement with anesthesia providers

60.     To control healthcare costs, insurers build networks, which are combinations of hospitals, outpatient facilities, physicians, physician groups, and other providers, including anesthesia providers that are available at a lower cost to the insurer's clients.

61.     In exchange for being included in an insurer's network, providers typically agree to give a discount off the total amount they charge. These discounted reimbursement rates establish how much the payor will pay the provider on behalf of its beneficiaries (referred to as "members"). Services obtained outside of an insurer's network are subject to different—and usually higher—reimbursement rates.

62.     Anesthesia providers are typically paid based upon three factors: (1) 15-minute intervals of time spent on a procedure; (2) a base unit reflective of the difficulty or complexity of the procedure, as established by the American Society of Anesthesiologists; and (3) a dollar-value "conversion factor." Commercial insurers negotiate the conversion factor with the anesthesia providers.

63.     A provider's reimbursement is calculated by adding the number of time units and base units, then multiplying by the conversion factor. For example, a physician who provides

anesthesia during a 90-minute procedure with a base value of 4 and a negotiated conversion factor of $95 will bill $950 for that procedure.

64.     Commercial insurers use their provider networks, and the reimbursement rates they negotiate with participating providers (along with factors such as geographic coverage), to compete for clients. The party responsible for paying in-network anesthesiologists depends on the client.

65.     Although "payor" and "insurer" are often used synonymously, including by USAP and Welsh Carson, the insurer and the payor can in fact be different parties. "Payor" more accurately denotes the party that bears the financial responsibility to reimburse for the healthcare services their members receive. Which party is the payor varies. Some insurance clients—usually smaller employers or individuals—are "fully insured," meaning the insurers themselves are the payors and bear the responsibility for reimbursing members' covered healthcare costs. Other clients—more sizeable employers or other large entities—are "administrative services only" (ASO). ASO clients themselves bear financial responsibility for the members' healthcare costs; they hire insurers for administrative services like negotiating with providers and assembling provider networks, creating plans to offer members, and administering the payments. Ultimately, members finance these endeavors through premiums paid either to the insurer (for fully insured clients) or to the ASO client.

66.     For the four largest insurers in Texas (Aetna, Blue Cross Blue Shield of Texas, Cigna, and United), ███ or more of their clients are ASO. This means that in Texas, patients and their employers (not insurers) bear the brunt of higher prices for anesthesia services.

67.     These ASO clients have different demands for network access to anesthesia providers depending on where their members work and reside. Some ASO clients have members

23

concentrated in a single metropolitan area, while others have members in multiple locations throughout the state.

### E. To discipline price demands, insurers may refuse to include anesthesia groups in their network

68.     If an insurer considers the reimbursement rates demanded by an anesthesia group during negotiations to be too high, both sides understand that the insurer's primary alternative to reaching an agreement is to take the group out of network. Whether the threat of network removal can effectively keep prices low depends on how credible it is—that is, whether there are any credible alternative groups and how likely the insurer is to follow through, which would disrupt the relationship between the insurer, anesthesia group, and hospital.

69.     In general, insurers, hospitals, and anesthesia providers each prefer that the anesthesia provider remain in-network.

70.     Hospitals generally prefer to work with anesthesia providers who are in-network with insurers, and hospitals may encourage out-of-network anesthesiologists to reach in-network agreements. Having out-of-network anesthesiologists could result in large bills from the anesthesiologists, which patients and their employers may misattribute to the hospital. Moreover, in some instances, insurers condition portions of their reimbursements to hospitals on the in-network status of the hospital's anesthesia providers. For example, ███ encourages hospitals to include anesthesia providers in-network using a "pay-for-performance" term that offers hospitals better reimbursement rates based on the percentage of its anesthesia providers that are in-network.

71.     Hospitals often retain the right in their exclusive contracts with anesthesia groups to break exclusivity and use other providers if the group goes out of network with insurers. In practice, they do not exercise these rights frequently, but are more likely to do so when an

anesthesia group remains out of network for an extended period or when the anesthesia group is out-of-network with multiple large insurers.

72.     Anesthesia providers prefer to remain in-network. The reason is partially financial and administrative. Rather than collect their fees directly from the insurance company, for most of the relevant period, an out-of-network anesthesia group needed to collect money directly from patients, which can be difficult, unpredictable, and ultimately unsuccessful. Today, out-of-network anesthesiologists must obtain payment through costly and uncertain arbitration.

73.     In addition, an out-of-network anesthesia group may also jeopardize some of its hospital relationships. Because hospitals generally prefer to contract with in-network providers, they may ultimately choose to switch to a different provider if a group remains out of network. Insurers may even seek to encourage the hospital to switch by, for example, subsidizing an alternative provider's bid for a hospital contract.

74.     Insurers also prefer to have anesthesia groups in network—especially those that practice at in-network hospitals. Otherwise, their members may be treated by out-of-network anesthesiologists, who will charge much more. Certain ASO clients pay a significant portion of these bills, which can result in their dissatisfaction. And historically, out-of-network anesthesiologists billed patients directly. These "surprise bills" can upset patients—who mistakenly assume that because they went to an in-network hospital they saw an in-network anesthesiologist—and result in them complaining to their hospitals or employers.[5] Insurers can thus be pressured to return out-of-network anesthesia providers to their network by as many as

---

[5] Although certain states and, more recently, the federal government have passed legislation targeted at ending "surprise billing," the ultimate results of these legislative efforts remain uncertain. The arbitration procedures created by state or federal law still involve significant costs and uncertainty as to the amount due. These costs and uncertainties may be disproportionately large when payors arbitrate with larger anesthesia providers due to the volume of claims involved.

four parties: patients, hospitals, existing ASO clients (who may take their business elsewhere), and potential ASO clients (who may keep their business elsewhere).

75.     Insurers view certain anesthesia groups as particularly important to have in-network and, as such, particularly costly to remove from their networks. This essentially boils down to groups that are more likely to treat the insurer's members.

76.     Several factors make an anesthesia group more likely to treat an insurer's members, whether on an in- or out-of-network basis. The more hospitals a given group serves, the more likely it is to see a given insurer's members. This is particularly true at certain hospitals, which are more likely to treat members—and thus especially important to insurers' networks—based on factors like their size, location, system affiliation, or specialty care offered. In addition, a group that holds an exclusive contract at a hospital, especially an important hospital, is all but guaranteed to treat all members that visit that hospital (whereas in an openly staffed hospital, the hospital may try to direct patients towards in-network providers). Eventually, through a combination of size, hospital presence, and exclusive contracts, an anesthesia group may become effectively irreplaceable—even by a combination of multiple groups.

## IV.     USAP'S AND WELSH CARSON'S ANTICOMPETITIVE SCHEME
### A.  Welsh Carson hatches a strategy to consolidate anesthesia practices in Texas

77.     In early 2012, John Rizzo, a former executive at a large national anesthesia group, emailed D. Scott Mackesy, a partner at Welsh Carson, seeking investors for a new anesthesia practice. Rizzo planned to call the practice "New Day Anesthesia." It would have a nationwide presence built through an "aggressive 'buy and build' consolidation strategy."

78.     Mackesy handed Rizzo off to a junior partner, Brian Regan, who soon led the process of evaluating a Welsh Carson investment in New Day. After carefully evaluating Rizzo's

strategy, Regan began working with Rizzo and other Welsh Carson employees on a presentation

for Welsh Carson's partnership to secure their approval and obtain funding.

79.     On July 2, 2012, Regan and the team he was supervising at Welsh Carson

presented the vision for New Day to the Welsh Carson partnership. The presentation described

New Day Anesthesia as pursuing an "anesthesiology consolidation strategy." In Regan's words,

the "[g]oal for New Day" would be "to build a platform with national scale by consolidating

practices with high market share in a few key markets." Capturing such market share, would,

according to Regan, give New Day "[n]egotiating leverage with commercial payors"—in other

words, create a monopolist with the ability to raise prices for anesthesia care.

80.     The Welsh Carson partners agreed to invest in New Day. As Regan described the

plan, the firm would "devote real time and resources to New Day and the anesthesiology

consolidation strategy." For starters, Welsh Carson would "[c]ommit $1-$2 million to set-up

shop, develop a market roadmap, and diligence acquisition candidates."

### B.  Welsh Carson executes on its consolidation strategy by creating USAP and acquiring a large practice in Houston

81.     The first step was determining which anesthesia group New Day should acquire

as a "platform" from which to roll up other practices. Welsh Carson hired Dean & Company as a

consultant to develop a methodology for identifying attractive regions for acquisitions and

practice groups in each region. Regan provided repeated rounds of feedback to Dean on its

methodology, and a more junior Welsh Carson employee working at his direction supervised the

relationship with Dean. Ultimately, they collectively developed what they colloquially referred

to as the "Dean tool," which USAP would rely on for many years thereafter.

82.     Meanwhile, Welsh Carson found a CEO for the new venture. Welsh Carson

selected Kristen Bratberg, the former CEO of one of its portfolio companies, Pediatrix. Pediatrix

is a national group practicing neonatology, which is another hospital-based physician specialty. Mackesy, the Welsh Carson partner initially approached by John Rizzo, had been a Pediatrix board member.

83.     Bratberg had experience with "rolling up" physician practices. During his eight-year stint as CEO, Pediatrix acquired over 100 neonatology practices. Bratberg's experience with "rolling up" independent physician groups was key to Welsh Carson's decision to hire him.

84.     Regan and Bratberg began scoping out potential first acquisitions for New Day. A few months earlier, in April, Greater Houston Anesthesiology had begun searching for a buyer, billing itself as "20 times the size of the second largest local competitor." That piqued Regan's and Bratberg's interest. In June 2012, New Day signed a letter of interest with Greater Houston Anesthesiology. Regan also signed the letter of interest, in his capacity as a "General Partner" of "Welsh, Carson, Anderson & Stowe." Over the summer of 2012, Welsh Carson and executives from New Day (soon to be renamed USAP) met with and ran due diligence on Greater Houston Anesthesiology.

85.     In early August 2012, Welsh Carson and New Day presented to Greater Houston Anesthesiology's physicians about joining together and creating a new company to be named USAP. In their presentation, Welsh Carson and New Day highlighted Welsh Carson's experience investing in healthcare portfolio companies and their plan for aggressive growth through additional acquisitions. Soon after, on August 29, 2012, Welsh Carson and New Day submitted a formal Letter of Intent to acquire Greater Houston Anesthesiology for $███████████████ ████████████; Bratberg and Rizzo signed the letter for New Day, and Regan for WCAS Associates XI. To fund the Greater Houston Anesthesiology purchase and roughly $██████ in transaction expenses, Welsh Carson would contribute approximately $████████ from one of

its investment funds, WCAS XI, and New Day would borrow roughly $▮▮▮▮▮ from third-party lenders.

86.     On August 13, 2012, New Day Anesthesia, Inc. and New Day Anesthesia Holdings, Inc. were incorporated. Both companies had the same board of directors: Brian Regan, D. Scott Mackesy, Kristen Bratberg, and John Rizzo.

87.     Greater Houston Anesthesiology chose the offer from Welsh Carson and New Day out of the several it had received. On August 31, 2012, the parties agreed to a three-month exclusivity period to negotiate the details of the transaction. During that time, Welsh Carson ran extensive diligence, relying on several outside advisors, input from employees at several of its other portfolio companies, and other internal and external sources of information developed during Welsh Carson's history of investing in healthcare.

88.     Three consulting groups examined and blessed the transaction. First, Avalere Health assessed Greater Houston Anesthesiology's reimbursements and found that anesthesiologists "have more power than most specialists," and this power was "magnified" by Greater Houston Anesthesiology's "commanding market share."

89.     Second, Stax, Inc., examined the supply and demand for anesthesia services in Houston, observing that Greater Houston Anesthesiology was "the largest anesthesia physician group in the greater Houston region." Stax saw few threats to Greater Houston Anesthesiology's dominance, noting that "the closest groups to GHA in size are academic in nature, with most independent groups being much smaller" and Greater Houston Anesthesiology was "well-positioned within the [Houston region], and specifically within the four major hospital systems." According to this Stax report, these four hospital systems—Houston Methodist, Memorial Hermann, St. Luke's, and HCA—performed almost 65% of all inpatient surgeries in Houston.

90.     Third, consultants at Savvy Sherpa observed that Greater Houston Anesthesiology had "achieved very good levels of reimbursement from commercial payers." Regan heard that Greater Houston Anesthesiology's reimbursement rates were the highest from an ambulatory surgical center executive, who described it as having the "best rates."

91.     Welsh Carson swiftly leveraged these assessments with potential lenders. To make good on their offer to Greater Houston Anesthesiology, Welsh Carson and New Day needed to secure $███████ in loans. In October 2012, Regan and the Welsh Carson / New Day team gave potential lenders a simple pitch: even if USAP simply stopped after acquiring Greater Houston Anesthesiology, it would still have acquired a practice with ████████████ ███████ reimbursement rates ███████████████████████████████████. But the plan did not stop with the Greater Houston Anesthesiology acquisition.

92.     Instead, as Regan had previously explained to his partners and now reiterated to potential lenders: Greater Houston Anesthesiology would be the linchpin in USAP's ultimate plan to "build a platform with national scale by consolidating practices with high market share in a few key markets." Regan repeated that a key goal of this consolidation strategy was to increase "[n]egotiating leverage with" payors, enabling USAP to charge even higher prices.

93.     Lenders liked what they heard. Welsh Carson and USAP secured $███████ in debt financing from a consortium that included General Electric Capital, KeyBank, Bank of America, Wells Fargo, and Ares Capital. And as planned, Welsh Carson committed over $███ ████ in financing from its fund Welsh Carson XI. In a November 2012 memo to Welsh Carson's "Investment Professionals" seeking approval for that investment, Mackesy, Regan, and four Welsh Carson employees working under their direction reiterated that the Greater Houston Anesthesiology acquisition was the first and essential step in USAP's "roll-up strategy."

94.     With a deal looking likely, on November 19, 2012, Welsh Carson and Bratberg put out a press release—"Welsh, Carson Forms U.S. Anesthesia Partners"—announcing the creation of the new anesthesiology provider group.

95.     On December 12, 2012, USAP entered into an agreement to acquire Greater Houston Anesthesiology for $███████. Two weeks later, Greater Houston Anesthesiology's 220 physicians and 180 CRNAs officially joined the new company.

### C.   Welsh Carson and the newly-formed USAP develop a plan to roll up independent anesthesia practices and raise prices

96.     On December 13, 2012—one day after signing the Greater Houston deal—Bratberg and Rizzo met in New York with Regan and the Welsh Carson team to develop an acquisition strategy and discuss potential targets. At Welsh Carson's direction, USAP continued to develop its strategy, with a particular focus on its "value maximization plan." A value maximization plan, according to USAP's longtime CEO Bratberg, is a "tool that Welsh Carson introduced . . . to clarify and focus management's attention."

97.     By January 2013, USAP's strategic plan was set. In a presentation emblazoned with both the USAP and Welsh Carson logos, USAP and Welsh Carson explained that USAP would "Roll Up Houston" through a series of "tuck-in acquisitions." These acquisitions were called "tuck-ins" because they would be folded into USAP's newly acquired Greater Houston Anesthesiology "platform" operation. USAP planned to use both large and small tuck-in acquisitions to expand beyond Houston.

98.     Welsh Carson and USAP's plan exploited the fact that hospitals' contracts with their anesthesia providers are often "sticky." Rather than competing against other anesthesia practices to win their clients, Welsh Carson and USAP planned on buying practices with existing exclusive hospital contracts. Ideally, these hospitals would also be important ones for insurers to

include in their networks. The end goal was to "bolster [USAP's] market share and drive profitability" by buying up more exclusive contracts with hospitals, giving USAP the leverage to charge higher prices.

99.     But that was not all. Regan, Bratberg, and the other Welsh Carson and USAP executives agreed that a key part of USAP's expansion plans—in Houston and beyond—would be spreading Greater Houston Anesthesiology's high reimbursement rates to other practices through tuck-in acquisitions. After acquiring each firm, Welsh Carson and USAP planned to ratchet up the newly-acquired providers' rates to those used by Greater Houston Anesthesiology—which had some of the highest rates in Texas when USAP acquired it. USAP thus planned to supply hospitals with generally the same providers as before, but now at significantly higher reimbursement rates. USAP and Welsh Carson referred to these increases as "synergies," even though they were simply excess profits generated from consolidating the market.

100.     By early 2013, Welsh Carson and USAP had set in motion their consolidation strategy, outfitted USAP with the funding and personnel to execute it, and fleshed out a plan for how to realize that strategy. USAP soon began executing on it.

101.     Welsh Carson continued to play a critical oversight role. USAP's "Business Development Playbook," developed in early 2013, called it "important that [Welsh Carson] remains fully informed" and described how USAP's acquisitions "will typically involve multiple memos/presentation decks and discussions with [Welsh Carson]." Indeed, the Playbook explained, before USAP could send a letter of intent proposing an acquisition, "the deal must be reviewed and approved by Welsh Carson."

## V.    USAP CONTINUES ITS ANTICOMPETITIVE SCHEME
## BY ROLLING UP ADDITIONAL PRACTICES

### A. After its founding acquisition, USAP makes three additional acquisitions in Houston

102.    In August 2013, less than a year after acquiring Greater Houston Anesthesiology,

USAP was already "working to advance discussions with all actionable Houston practices." As

the next step in its roll-up scheme, between 2014 and 2020, USAP acquired three of the largest

remaining independent anesthesia groups in Houston.

### 1. North Houston Anesthesiology – Kingwood Division (2014)

103.    In June 2014, USAP acquired a division of North Houston Anesthesiology located

in Kingwood for $              . At the time of the acquisition, the Kingwood Division of North

Houston Anesthesiology included 21 physicians and 9 CRNAs.

104.    USAP targeted North Houston Anesthesiology because it had "[s]trategic hospital

affiliation" with important Houston hospitals, including HCA Kingwood and Memorial Hermann

Northeast.

105.    Before USAP acquired North Houston Anesthesiology, the two practices

competed head-to-head. For example, survey results included in a 2013 report prepared by a

USAP consultant indicated that hospital administrators and surgeons in Houston considered

North Houston Anesthesiology among "the best in the area," "along with the likes of [USAP]."

And when finalizing the acquisition of the Kingwood division, USAP's Chief Commercial

Officer acknowledged internally that North Houston Anesthesiology's Conroe division—which

opted not to join USAP—would remain a USAP "competitor."

106.    In August 2014, USAP and Welsh Carson explained to lenders that after uniting

with North Houston Anesthesiology's Kingwood Division, USAP had become the "clear leader"

in providing hospital-based anesthesiology services in the Houston area. At that point, USAP estimated that the next largest anesthesia group in Houston was "less than 5% the size of USAP."

107.    USAP's acquisition of NHA Kingwood resulted in significantly higher reimbursement rates. For example, before the acquisition, NHA Kingwood's reimbursement rate from ███ was $█ per unit. Following the acquisition, USAP raised NHA Kingwood's reimbursement for the same anesthesia providers to its own contracted rate—$██ per unit for ████, an increase of ██%. Other insurers also saw rate increases: ██% and ██% for Blue Cross and United, respectively. USAP estimated that raising North Houston Anesthesiology's Kingwood Division's rates to USAP levels increased the practice's revenues by about $█████ in the first year alone.

### 2. MetroWest Anesthesia Care (2017)

108.    In March 2017, USAP acquired MetroWest Anesthesia Care for $██████. At the time of the acquisition, MetroWest was a group of 51 physicians and 79 CRNAs.

109.    MetroWest was one of USAP's "high-priority" acquisition targets in the Houston market because of its relationships with the Memorial Hermann hospital system, including contracts at Memorial Hermann Katy Hospital and Memorial City Hospital. In addition, USAP recognized that acquiring MetroWest could play an important "defensive" role. In 2014, Sheridan Healthcare—a large, multi-state physician group now part of Envision Physician Services—was targeting MetroWest for acquisition; the parties signed a confidentiality agreement in April 2014. As USAP's Director of Business Development told the CEO and COO, another large player entering into Houston would "spoil the entire market." Instead, USAP planned to encourage MetroWest to consider a deal with USAP to "preserve the protected market" both enjoyed.

34

110.     Before USAP acquired MetroWest, the two practices competed head-to-head. Indeed, MetroWest was one of USAP's largest remaining competitors for hospital contracts left in Houston. In April 2016, USAP worried the Memorial Hermann hospital system (consisting of 11 hospitals) would be "moving to a single source anesthesia provider," meaning an exclusive contract for the entire hospital system. MetroWest and USAP both had exclusive contracts with hospitals in the Memorial Hermann hospital system, so both were positioned to potentially take over an exclusive systemwide contract. Instead of competing with MetroWest to win Memorial Hermann's business, USAP acquired the practice to "further expand its relationship with Memorial Hermann" while earning "synergies."

111.     USAP's acquisition of MetroWest resulted in significantly higher reimbursement rates. For example, before being acquired, MetroWest's reimbursement rate from United was $█ per unit. Six months after the acquisition, MetroWest's reimbursement rate for the same anesthesia providers from United was $████, an increase of nearly █%. After USAP acquired MetroWest, Blue Cross reported that USAP "[a]ccounted for . . . 69% of cases and 83% of cost in Houston" and that it "leverag[ed] market share" into a reimbursement rate more than double that of other Houston anesthesiologists. USAP estimated that raising MetroWest's rates to USAP levels increased the practice's incremental revenues by about $██████ in the first year.

### 3. Guardian Anesthesia Services (2020)

112.     In January 2020, USAP acquired Guardian Anesthesia Services for $███████. Guardian was a group of 21 physicians and 56 CRNAs.

113.     USAP identified Guardian as an acquisition target in 2013, along with MetroWest and NHA, because of the group's exclusive contracts with three HCA hospitals in Houston. Guardian had declined USAP's offers to merge for several years, until they acquiesced in 2020.

By acquiring Guardian and thus gaining control of its exclusive hospital contracts, USAP grew its presence in the HCA health system and increased its patient volume in Houston.

114.    Before USAP acquired Guardian, the two practices competed head-to-head. For example, in 2014, before opening its new Pearland hospital, HCA requested proposals from anesthesia groups to staff the facility. Both Guardian and USAP responded to this request. Guardian won. Guardian continued to staff HCA Pearland until the group was acquired by USAP in 2020, at which point, USAP assumed the contract.

115.    USAP's acquisition of Guardian resulted in significantly higher reimbursement rates. For example, before the acquisition, Guardian's reimbursement rate from Cigna was $█ per unit. Six months after being acquired by USAP, Guardian's reimbursement rate from Cigna for the same anesthesia providers was $█████, a nearly █% increase. USAP estimated that raising Guardian's rates to USAP levels increased the practice's incremental revenues by about $███████ in the first year.

### 4.   USAP's consolidation of Houston as it stands today

116.    After acquiring Greater Houston Anesthesiology, but before rolling up additional practices, USAP was already in a strong position. It had about 400 providers in Houston and handled a significant share of the anesthesia services there—nearly 40% of hospital-only cases and roughly half of payors' hospital-only anesthesia costs. It also controlled a majority of the surgical anesthesia volume in the Houston Methodist and St. Luke's systems (73% and 60%, respectively), with strong positions in the Memorial Hermann and HCA systems (32% and 29%).

117.    Today, the Houston market is even more concentrated. USAP now boasts nearly ███ anesthesia providers in Houston and is more than eight times larger than its next largest competitor in Houston in terms of revenue. USAP handles about 60% of the hospital-only

anesthesia cases and accounts for almost 70% of payors' hospital-only anesthesia costs. Through its acquisitions, USAP has also grown in key hospital systems, including Memorial Hermann and HCA, where Greater Houston Anesthesiology's presence had been more modest.

118.   USAP also continues to have the highest contracted reimbursement rates of any provider in Houston. That was already the case in 2013, when, for example, its rates with three of the largest commercial insurers were about $█ to $█ per unit. As of December 2022, however, its rates with these insurers ranged from about $██ to $██ per unit. As of February 2020, United reported that it reimbursed USAP at rates 95% higher than its in-network median for Texas and 65% higher than the Houston average, which was calculated including USAP. USAP has maintained its high rates and broad network of exclusive facility contracts in Houston despite an anesthesiology labor shortage, the COVID-19 pandemic, and losing network access to United Healthcare in 2020.

119.   As a result of USAP's acquisitions in Houston, both hospitals and insurers are left without sufficient alternatives to USAP to constrain the group's high rates.

**B.  USAP expands its roll-up scheme to Dallas**

120.   USAP's roll-up strategy was not confined to Houston. Between 2014 and 2016, USAP spent over $██████ to acquire at least seven practices in Dallas.

121.   From the time it founded USAP, Welsh Carson understood that USAP had "room to expand its footprint throughout Texas." The Dallas-Fort Worth area (referred to here as Dallas) was an attractive target. Four major hospital systems accounted for a large share of the surgical case volume in Dallas: Texas Health Resources, Baylor Scott & White, HCA North Texas (operating as Medical City), and Methodist Health System.

### 1. Pinnacle Anesthesia Consultants (2014)

122.    At the time of USAP's founding, Pinnacle Anesthesia Consultants was the largest anesthesia group in the Dallas region and anywhere in the state. Per USAP's and Welsh Carson's estimates, Pinnacle accounted for 26% of anesthesia providers in Dallas and about 10% of anesthesia providers in Texas. Those providers performed about 40% of the anesthesia services in Dallas and had a strong presence within each of the four hospital systems: approximately 54% of the case volume in the HCA system, 52% in the Baylor system, 42% in the Texas Health Resources system, and 22% in the Methodist Dallas system.

123.    Initially, USAP questioned whether it could acquire Pinnacle, because a competitor, EmCare, already provided Pinnacle with the same "back office" services that USAP offered its practices (such as insurer contracting and billing). However, Pinnacle reached out to USAP in early 2013 after hearing news of USAP's acquisition of Greater Houston Anesthesiology to "explor[e] potential business opportunities concerning future strategic partnerships." USAP's leadership team—John Rizzo and Kristen Bratberg—met Pinnacle's President and Chairman Mike Hicks and CEO Michael Saunders in January 2013 for an "exploratory discussion." When they met, Hicks had explained that "he has wanted to do what [USAP is] doing for years," which was "roll up" many of the largest anesthesia practices through acquisition.

124.    USAP and Welsh Carson personnel agreed that a Pinnacle acquisition was worth pursuing. Regan called it "an interesting opportunity" and "definitely a worthwhile discussion given the size of their group and market." Bratberg concurred, noting that a deal with Pinnacle "[c]ould be strategically a huge step forward from a Texas and national standpoint." Others on the Welsh Carson team agreed with Bratberg, noting there was "[s]ignificant potential revenue upside applying [USAP's Houston] rates" to Pinnacle's providers.

38

125.    USAP proceeded to "[p]ursue aggressive interaction" with Pinnacle, hoping to close an acquisition toward the end of 2013. In May 2013, EmCare communicated to the Pinnacle physicians that it did not object to USAP acquiring Pinnacle. At that point, USAP and Welsh Carson initiated due diligence, including hiring multiple consultants to review the competitive dynamics in the Dallas anesthesiology market and Pinnacle's position in it. These consultants confirmed Pinnacle's dominance, including the fact that it had managed to negotiate exclusive hospital contracts (which were more unusual in Dallas than Houston). They also confirmed that the other, much smaller anesthesia groups in Dallas "pose[d] no strategic or competitive threat to Pinnacle" and recommended that, after buying Pinnacle, USAP acquire additional groups to help enter "key [hospital] system facilities not served by Pinnacle" and secure more "exclusive contracts over time."

126.    After completing initial due diligence, USAP, Welsh Carson, and Pinnacle signed a letter of intent on September 13, 2013, which memorialized USAP and Welsh Carson's offer to purchase Pinnacle as well as the parties' plan to "expand throughout the state of Texas by acquiring other local anesthesia groups." Brian Regan signed the letter in his capacity as a managing member of WCAS Associates XI, the general partner entity for the WCAS XI fund. After signing the letter of intent, USAP and Welsh Carson personnel, including but not limited to Regan, continued to conduct further diligence and to negotiate the specifics of a transaction with Pinnacle.

127.    In January 2014, USAP acquired Pinnacle for $███████. Welsh Carson purchased approximately $██████ worth of additional shares of USAP to help fund the acquisition. At the time of the acquisition, Pinnacle employed 320 anesthesiologists and 217 CRNAs. ████████████████████████████████████████████

39

███████████████████████████████████████████████████████

████████████████████████████████████████████.

128.    USAP immediately began attempting to apply its existing (higher) reimbursement rates from Houston to Pinnacle providers. Insurers balked at the idea of Houston rates for Dallas anesthesia providers, leading to protracted negotiations. One insurer, ███, even opted to treat the former Pinnacle (now USAP) anesthesia providers as out of network and arbitrate the amount it was required to reimburse for their services. That arbitration, however, ultimately settled in early 2016, with USAP securing for its Dallas providers a roughly ███% retroactive price increase on claims filed during the dispute and a ██% price increase going forward. USAP likewise obtained significant price increases from the other insurers for the same anesthesia providers—███% to ██%, depending on the insurer.

129.    Even before they completed the Pinnacle acquisition, Welsh Carson and USAP started planning further acquisitions in Dallas. They focused on Pinnacle's pre-existing "wish list" of acquisition targets: Anesthesia Consultants of Dallas, Excel Anesthesia Consultants, and North Texas Anesthesia Consultants. USAP and Welsh Carson quickly ticked off the practices on that wish list.

**2.  Anesthesia Consultants of Dallas (2015)**

130.    In January 2015, USAP acquired Anesthesia Consultants of Dallas for $██ ████. Anesthesia Consultants of Dallas included 21 physicians and 29 CRNAs at the time of the acquisition.

131.    USAP targeted Anesthesia Consultants of Dallas largely because of its exclusive contract at Methodist Dallas's flagship facility, an already large and expanding facility that Anesthesia Consultants of Dallas had served for twenty years. Anesthesia Consultants of Dallas

covered other Methodist Dallas hospitals as well, and an acquisition would give USAP a dominant share of five of the system's six facilities in Dallas. In addition, Anesthesia Consultants of Dallas had an exclusive contract at the Texas Regional Medical Center facility and significant presence at nine open-staffed hospitals.

132.     Before USAP acquired Anesthesia Consultants of Dallas, the two practices competed head-to-head. Tom Swygert, a leading USAP anesthesiologist in Dallas who serves as a board member today, told USAP's then-CEO Bratberg and Welsh Carson's Regan that, outside of Pinnacle, Anesthesia Consultants of Dallas was one of the two groups (along with Excel) with "the largest number of anesthesiologists with specialized skill sets in the DFW market." By acquiring Anesthesia Consultants of Dallas, USAP would "create a barrier to entry and promote our ability to garner system contracts."

133.     USAP's acquisition of Anesthesia Consultants of Dallas resulted in significantly higher reimbursement rates. For example, before the acquisition, Anesthesia Consultants of Dallas's reimbursement rate from United was $███ per unit. After the acquisition, Anesthesia Consultants of Dallas's United rate went to $███ per unit for the same anesthesia providers, an increase of ███%. USAP estimated that acquiring Anesthesia Consultants of Dallas would yield $████████ per year.

### 3.   Excel Anesthesia Consultants (2015)

134.     In March 2015, USAP acquired Excel Anesthesia Consultants for $████████. At the time of the USAP acquisition, Excel employed 55 physicians and 19 CRNAs, including some providers it added after merging with North Texas Anesthesia Consultants (the other practice that had been on Pinnacle's "wish list").

135.     Excel was an attractive target in part because of its exclusive contract with Texas
Health Presbyterian Hospital Dallas, which is the second largest hospital within the Texas Health
Resources system. Beyond that, Excel had a presence in more than 20 additional hospital
facilities at all four of the area's major hospital systems. USAP and Welsh Carson anticipated
using Excel's "broad reach and relationships across the Dallas market" to "[p]osition[] [USAP]
to obtain exclusive facility contracts." Brian Regan of Welsh Carson called Excel "our most
strategic move in the market next to [Anesthesia Consultants of Dallas]."

136.     Before USAP acquired Excel, the two practices competed head-to-head. In
February 2014, Swygert had highlighted that Excel "compete[s] directly with some of the
[Pinnacle] divisions . . . within the open-staff hospitals." Absent the acquisition, Regan was
concerned that Excel could become an even bigger competitor to USAP. As Regan explained,
Excel could join a different large group, and USAP would face "a 100 doc [sic] competitive
practice with a strong sub specialty orientation in our backyard." Acquiring Excel, however,
would "create a barrier to entry."

137.     USAP's acquisition of Excel resulted in significantly higher reimbursement rates.
For example, before USAP acquired it, Excel's reimbursement rate from United was $█ per
unit. After the acquisition, USAP raised Excel's reimbursement rate from United to $█ per unit
for the same anesthesia providers, an increase of █%. USAP estimated that raising Excel's rates
to USAP levels increased the practice's incremental revenues between $█ and $███ per
year.

### 4.  Southwest, BMW, Medical City Physicians, and Sundance (2015-2016)

138.     Having acquired all the groups on their 2014 "wish list," USAP and Welsh
Carson shifted their focus to smaller groups in Dallas that had exclusive contracts or established

relationships with facilities or health systems. Over five months from December 2015 to April 2016, USAP acquired four additional groups in Dallas: Southwest Anesthesia Associates, BMW Anesthesiology, Medical City Physicians, and Sundance Anesthesia.

139.    First, in December 2015, USAP acquired Southwest Anesthesia Associates. USAP acquired Southwest Anesthesia Associates in part because it was the exclusive provider at Charlton Methodist.

140.    USAP's acquisition of Southwest Anesthesia Associates resulted in significantly higher reimbursement rates. For example, approximately six months before the acquisition, United agreed to increase Southwest Anesthesia Associates' rate to $██ per unit "in hopes to keep them independent from USAP." After the acquisition, USAP raised Southwest Anesthesia Associates' rates with United to $███ per unit rate, a ██% increase.

141.    Next, in January 2016, USAP acquired BMW Anesthesiology and unaffiliated anesthesiologists referred to as the Medical City Physicians. USAP purchased BMW, a group of 9 anesthesiologists for $███████. USAP acquired the Medical City Physicians, a group of 7 anesthesiologists for $███████

142.    Both the BMW and Medical City Physicians acquisitions were intended to expand USAP's presence at HCA's flagship facility, Medical City Dallas. Prior to these acquisitions, USAP covered only 30% of cases at Medical City Dallas and faced rigorous competition from BMW Physicians and Medical City Physicians. USAP recognized BMW's "strategic value due to their strong participation in leadership roles in the Dallas HCA flagship hospital[.]" Similarly, the Medical City Physicians held "a key strategic position within Medical City and HCA," as their group included the newly elected chief of anesthesia. After acquiring both groups, USAP controlled approximately 80% of HCA's flagship hospital.

143.    USAP's acquisition of BMW and Medical City Physicians resulted in significantly higher reimbursement rates. For example, BMW's reimbursement rate with BCBS was $███ per unit. After the acquisition, USAP raised BMW's rate from BCBS for the same anesthesia providers to USAP's contracted rate of $███ per unit, an increase of ██%. USAP estimated that raising BMW's rates to USAP levels increased the practice's incremental revenues by about $██████ per year.

144.    Finally, in April 2016, USAP acquired Sundance Anesthesia. At the time of the acquisition, Sundance consisted of 7 physicians and 24 CRNAs. USAP targeted Sundance because of its exclusive contract to service Texas Health Resources's Southwest Fort Worth hospital, which was immediately assigned to USAP. USAP's Chief Operating Officer remarked "[i]t's a huge win, that's a key THR site we didn't have. Great work[!]"

145.    USAP's acquisition of Sundance resulted in significantly higher reimbursements rates. For example, before USAP acquired Sundance, Sundance's reimbursement rate from United was $██ per unit. After the acquisition, USAP raised Sundance's reimbursement rates to $██ per unit, a ██% increase. USAP estimated that raising Sundance's rates to USAP levels increased the practice's incremental revenues between $██ to $██████ per year.

**5.  USAP's consolidation of Dallas as it stands today**

146.    In 2013, prior to USAP's acquisition spree, at least fifteen small groups accounted for 60% of the anesthesia case volume in Dallas. The competition in Dallas between those groups led to lower prices. Today, USAP has over 900 anesthesia providers and accounts for 57% of the hospital-only cases in Dallas (and 68.5% of the revenue). USAP is six times larger by case volume than the next-largest group in Dallas, and nine times larger by revenue.

147.     In total, USAP is now the exclusive provider at 13 of the largest 25 hospitals in the Dallas area and provides the majority of anesthesia services in another two. USAP is the exclusive provider for the Baylor Scott & White flagship facility—the Baylor University Medical Center—as well as its Grapevine and Irving facilities. USAP entered into an agreement in 2022 with Texas Health Resources to cover nine of its fourteen facilities on an exclusive basis until at least 2027. Finally, USAP is the exclusive provider at Methodist Health System's Dallas, Charlton, Midlothian, Mansfield, and Richardson hospitals and a dominant provider at its McKinney hospital.

148.     USAP also continues to have the highest contracted rates of any anesthesia provider in Dallas. ██████████████████████████████████████ ████████████████████████████████████████████████. USAP has maintained its high rates and broad network of exclusive facility contracts in Dallas despite an anesthesiology labor shortage, the COVID-19 pandemic, and losing network access to United Healthcare in 2020.

149.     As a result of USAP's acquisitions in Dallas, both hospitals and insurers are left without sufficient alternatives to USAP to constrain the group's high rates.

**C.  USAP further expands its roll-up scheme by acquiring other large practices across Texas**

150.     From its founding, USAP and Welsh Carson's vision for expansion extended across Texas. Their plan was simple: acquire practices throughout the state with exclusive contracts at key hospitals for insurers' networks and extract "synergies" by raising the acquired group's prices to USAP's higher price.

151.     In 2013, USAP and Welsh Carson hired consultants Welsh Carson identified to assess whether Greater Houston Anesthesiology's contracts would allow USAP to incorporate

45

acquired physician groups and bill for their services at Greater Houston Anesthesiology's reimbursement rates. The consultants—Savvy Sherpa—concluded USAP could acquire groups, incorporate them into most of Greater Houston Anesthesiology's contracts that USAP had assumed, then bill for the acquired groups at USAP's reimbursement rates.

152.    USAP and Welsh Carson decided to follow the consultants' approach with the Pinnacle acquisition, but insurers pushed back and USAP ultimately agreed to rates for Dallas that were lower than those in Houston (but still higher than rates that existed before the acquisitions). *See* ¶ 128. USAP was able to secure ██% to ██% price increases, though only after protracted negotiations that lasted months or years. For instance, ██████ opted to treat the former Pinnacle anesthesia providers as out of network; USAP arbitrated the amount owed to them, which took almost two years to settle.

153.    To resolve the confusion about whether its insurer contracts covered new acquisitions, USAP worked closely with Welsh Carson to develop a new contract clause— referred to within USAP as the "tuck-in clause"—to eliminate doubt about the rates that would apply whenever USAP acquired a new physician group. ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████

154.    █████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████████



███████████████████████████████████████████████ Welsh Carson

personnel assisted in crafting the contractual language. Eventually, USAP's Vice President of

Payor Contracting, Alan Glenesk, sent a draft to Regan to see "if you approve." Glenesk later

reported to a different insurer that Regan was required to approve all USAP's insurer contracts.

155. ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ USAP, however, credibly

threatened to leave (or not join) their networks; USAP's extensive—often exclusive—presence

at key hospitals throughout Texas made taking USAP out-of-network too difficult. ████████

████████████████████████████████████████████████

████████████

156. With the ███████████████████, from 2016 to 2019, USAP acquired

four groups—one each in Tyler, Austin, Amarillo, and San Antonio—and then raised their

reimbursement rates well above the median in each metropolitan area.

### 1. East Texas Anesthesiology Associates (2016)

157. In June of 2016, USAP acquired East Texas Anesthesiology Associates in Tyler,

Texas for $████████. East Texas Anesthesiology Associates included 23 physicians and 11

CRNAs at the time of the acquisition.

158. USAP targeted East Texas Anesthesiology Associates because of its dominant

position at the East Texas Medical Center in Tyler, at which East Texas Anesthesiology covered

over 50% of case volume and revenue. East Texas Anesthesiology Associates also provided

near-exclusive coverage at University of Texas Health Science Center at Tyler.

159.     USAP's acquisition of East Texas Anesthesiology Associates resulted in significantly higher reimbursement rates. For example, before the acquisition, East Texas Anesthesiology Associates' rate with HealthFirst was $█ per unit; afterwards reimbursement rates increased to $█ per unit—a █% increase for the same anesthesia providers. Similarly, East Texas Anesthesiology Associates' rates with █████ increased from $█ (before the acquisition) to $█ (after the acquisition), an increase of nearly █%.

**2.  Capitol Anesthesiology Association (2018)**

160.     In February 2018, USAP acquired Capitol Anesthesiology Association, the largest group in Austin, for $████████. Capitol included 80 physicians and 152 CRNAs at the time of the acquisition.

161.     USAP had initially entered the Austin market in July 2013 with its acquisition of Lake Travis Anesthesia for $██████. Lake Travis was a small group that provided local call coverage for Lakeway Hospital. USAP executives referred to the transaction as "points on the board[:] growth in Austin." Although the group was small, it was positioned to help "'Chip away' at the market leader, Capitol" and to "Continue GHA's expansion into [the] Austin MSA," where Greater Houston Anesthesiology was already the fourteenth largest group.

162.     As early as 2013, USAP and Welsh Carson had identified Capitol as an attractive acquisition target because of its "substantial market position in Austin," which they estimated at a 50% share. Capitol also had lucrative contracts with multiple hospitals in Austin, including exclusive contracts with five of the eleven hospitals in the Seton system, the largest hospital system in Austin, and a presence at five others. Capitol also had exclusive contracts at multiple other Austin-area hospitals.

163.    USAP's acquisition of Capitol resulted in significantly higher reimbursement rates. Before the acquisition, Capitol's rates from United were $██ per units. Six months after the acquisition, Capitol's United rates went to $████ per unit, a more than ██% increase for the same anesthesia providers.

164.    USAP estimated raising Capitol's rates to USAP levels would increase the practice's incremental revenues by $██████ within the first five months, and even greater revenues over the next twelve months because the rate escalation USAP had built into its insurer contracts would be applied to the now-acquired Capitol anesthesiology providers. As Capitol's Vice President of Operations, who became a USAP executive post-acquisition, put it: "Awesome! Cha-ching!"

### 3.    Amarillo Anesthesia Consultants (2018)

165.    In July 2018, USAP acquired Amarillo Anesthesia Consultants in Amarillo for $██████. Amarillo Anesthesia included 10 physicians and 10 CRNAs at the time of the acquisition. In addition, at the time of the acquisition, Cigna's internal analysis suggested that Amarillo Anesthesia accounted for as much as 85% of the hospital-based anesthesia cases in Amarillo.

166.    USAP targeted Amarillo Anesthesia because of its exclusive relationship with Baptist St. Anthony's hospital, the largest hospital in Amarillo, and one of only two hospitals in the area. Baptist St. Anthony's is also part of the Ardent Health Services system. USAP was also interested in negotiating exclusive agreements with Ardent in other locations.

167.    USAP was not the only firm that had been interested in entering Amarillo. Metro/IPN, another anesthesia provider with a significant presence in the Dallas market, also sought to enter the Amarillo market through acquisition. According to one insurer, had Metro

succeeded in acquiring an Amarillo anesthesia group, it was expected to raise the practice's rate to $█ per unit.

168.     USAP acquired Amarillo Anesthesia and raised reimbursement rates higher than Metro likely could. For example, before the acquisition, Amarillo Anesthesia's reimbursement rate from Blue Cross was $█ per unit. Six months after the acquisition, Amarillo Anesthesia's reimbursement rate from Blue Cross was $██ per unit, a ██% increase for the same anesthesia providers. Similarly, within six months of the acquisition, Amarillo Anesthesia's rate with United Healthcare increased over ██%. USAP estimated that raising Amarillo Anesthesia' rates to USAP levels would increase the practice's incremental revenues by about $███████ in the first year.

### 4.  Star Anesthesia (2019)

169.     In September 2019, USAP acquired Star Anesthesia, based in San Antonio, for $████████. Star included 182 physicians and 12 CRNAs at the time of the acquisition. At the time of the acquisition, Star was the largest remaining independent anesthesia practice in Texas.

170.     USAP and Welsh Carson identified Star as an attractive target as it considered expanding across Texas as early as 2013 because Star had exclusive contracts with the HCA co-owned Methodist San Antonio hospital system.

171.     In March 2016, Star acquired anesthesiologists that had declined to join USAP when it bought North Houston Anesthesiology in 2014. Because of Star's existing relationship with HCA in San Antonio, USAP viewed Star as a threat to its position in HCA's Houston hospitals. Indeed, when Star announced its entry into Houston, Brian Regan of Welsh Carson's reaction was that USAP "need[ed] to do a system deal with HCA and kick these guys [i.e., Star]

out of town." USAP's head of Business Development met with Star's President just a few months later to discuss the prospect of an acquisition.

172.    Star rebuffed USAP and indicated to at least one insurer that it planned to expand elsewhere in Texas. Buoyed by Star's decision, insurers such as United sought to make Star "a statewide messenger model to be a competitor against USAP," with Star leveraging its planned independence to obtain considerable price increases. USAP eliminated this competitive threat and the largest remaining independent anesthesiology practice in Texas when it acquired Star in 2019.

173.    USAP's acquisition of Star resulted in significantly higher reimbursement rates. For example, before the acquisition, Star's reimbursement rate from Cigna was $███ per unit. After the acquisition, Star's reimbursement rate was $███ per unit, a nearly ██% increase. Cigna projected that it would pay an extra $████████—or ██% more—for the same Star anesthesiologists after they joined USAP. Similarly, after the acquisition, Star's rate to United increased ██%, costing United an additional $█████████ for the same Star anesthesiologists. USAP estimated that raising Star's rates to USAP levels would increase the practice's incremental revenue by about $████████ per year.

## VI.    USAP'S OTHER ANTICOMPETITIVE CONDUCT

174.    As it was consolidating anesthesia services in Houston, Dallas, Austin, and across Texas by acquiring other practices, USAP extended and defended its growing power through further anticompetitive conduct. That conduct took at least two forms: (1) price-setting arrangements in which USAP charged its own, higher prices for services rendered by anesthesia providers who chose to remain independent; and (2) a market allocation agreement to avoid a head-to-head rivalry █████ with another large anesthesia provider, ██████.

### A. USAP uses price-setting arrangements to charge its own, higher rates for anesthesia services provided by other practices

175.    Unlike the acquired anesthesia practices described in Sections IV-V, some providers did not want to sell to USAP. Academic practices, for example, might lose their affiliation with medical schools or teaching hospitals if bought by USAP, and at least one "d[id] not view USAP employment as a viable option." And even some non-academic providers simply preferred to remain independent.

176.    USAP raised the reimbursement rates for anesthesia services provided by some of these independent practices by using price-setting arrangements. Namely, USAP and another practice would agree that USAP would bill payors for the anesthesia services rendered by both groups using USAP's own provider or tax information. These price-setting arrangements made it appear to payors as if USAP was doing the work of the other group's anesthesia providers. And the arrangements effectively raised the reimbursement rates of the non-USAP providers up to USAP's much higher rates. USAP then paid the non-USAP providers, typically sharing some portion of the mark-up from using USAP's higher rates.

177.    Although USAP nominally gained exclusive contracts at the affected hospitals, the reality was that the other groups continued to work at the affected hospitals. In fact, the hospitals expected (and often expressly required) that they would keep their existing providers. In other words, the effect of these price-setting arrangements was that, at the affected hospitals, payors paid USAP's higher rates for anesthesia services provided by the same doctors as before. These arrangements functioned the same as an agreement between USAP and the non-USAP providers to charge the higher USAP rates.

178.    These price-setting arrangements appeared in contracts styled as "collaboration," "professional services," or "independent contractor" agreements. But the price-setting

arrangements were not necessary for USAP to offer administrative services to non-USAP anesthesiologists or to collaborate with or hire them as subcontractors at facilities where USAP had an exclusive contract. USAP could have cooperated with other providers in any of those ways while still separating USAP and non-USAP claims for billing purposes. Indeed, USAP has on at least one occasion provided administrative services to an anesthesia group without entering into a price-setting arrangement.

179.     Several USAP executives recognized that these price-setting arrangements posed legal risks for the company. One senior vice president wrote that it "seems odd from a compliance standpoint" for USAP to bill on another provider's behalf while "keeping the revenue." And USAP's Vice President of Payor Relations feared that a price-setting arrangement "might possibly compromise" the company by breaching its insurer contracts "due to compliance issues related to pass through billing."

180.     Nevertheless, USAP has price-setting arrangements with at least two anesthesia groups in Texas that remain active to this day: (1) the Methodist Hospital Physician Organization ("TMHPO") in Houston, and (2) Dallas Anesthesiology Associates. At one time, USAP also had a price-setting arrangement with providers affiliated with the Baylor College of Medicine in Houston.

181.     USAP has also sought additional price-setting arrangements. USAP tried, albeit unsuccessfully, to reach a price-setting arrangement with providers affiliated with the University of Texas. USAP at least considered price-setting arrangements with even more anesthesia practices. For example, in 2014, USAP considered an arrangement with cardiovascular anesthesiologists employed at St. Luke's hospital facilities in Houston. And before Guardian was acquired by USAP, USAP had offered it a price-setting arrangement.

### 1. The Methodist Hospital Physician Organization

182.    The Methodist Hospital Physician Organization is a non-profit anesthesia group that is affiliated with Houston Methodist Hospital and Weill Cornell School of Medicine and specializes in providing anesthesia for cardiovascular care.

183.    On July 1, 2005, Greater Houston Anesthesiology (later acquired by USAP) signed a contract with the Methodist Hospital Physician Organization. Greater Houston Anesthesiology agreed to retain certain anesthesia providers employed by the Methodist Hospital Physician Organization so they could provide care at Houston Methodist Hospital. At the time of this contract, Methodist Hospital Physician Organization already provided anesthesia care at Houston Methodist Hospital.

184.    Greater Houston Anesthesiology's contract with the Methodist Hospital Physician Organization contained a price-setting arrangement. The contract provided that "GHA will bill and collect, in the name of GHA and using GHA provider numbers, for Services furnished by" the Methodist Hospital Physician Organization and its providers under the agreement. The Methodist Hospital Physician Organization, in turn, assigned to Greater Houston Anesthesiology any right to bill and receive payment from patients and payors for services rendered under the contract.

185.    Several months later, Greater Houston Anesthesiology signed an exclusive contract with the Houston Methodist Hospital. That contract required Greater Houston Anesthesiology to "provide seamless Anesthesia Services with TMH[PO] physicians." Indeed, Greater Houston Anesthesiology's contract with the hospital expressly contemplated that Houston Methodist would continue to receive anesthesia care from "anesthesiologists employed by TMHPO, including, but not limited to cardiovascular anesthesiologists." And the chair of

54

anesthesia at Houston Methodist—the "ultimate authority" in the department—would remain "an employee of TMHPO."

186.     USAP inherited Greater Houston Anesthesiology's price-setting arrangement with the Methodist Hospital Physician Organization when USAP acquired Greater Houston Anesthesiology in December 2012.

187.     Afterwards, USAP maintained the price-setting arrangement with the Methodist Hospital Physician Organization. USAP has continued billing for anesthesia services provided by the Methodist Hospital Physician Organization and has done so at USAP's reimbursement rates—which are much higher than those previously charged by the other group.

188.     USAP executives also looked for ways to build on the existing price-setting arrangement. A June 2015 internal strategy presentation states that one of USAP's "interim goals" was to "determine avenues for [a] deeper [] relationship" with the Methodist Hospital Physician Organization. USAP executives saw that interim goal as a step towards USAP becoming the "system-wide anesthesia provider" for the Houston Methodist hospital system.

189.     USAP's price-setting arrangement with the Methodist Hospital Physician Organization remains active today. USAP continues to charge higher, USAP reimbursement rates for anesthesia services rendered by the Methodist Hospital Physician Organization's providers. Under their price-setting arrangement, ████████████████████████ ████████████████████████████████████████████ ███████████.

## 2.    Dallas Anesthesiology Associates

190.    Dallas Anesthesiology Associates is a private anesthesia group of approximately 20 physicians. As of 2021, it was one of the ten largest anesthesia practices in Dallas. It also has a longstanding relationship with Baylor University Medical Center.

191.    In October 2008, Baylor University Medical Center signed a contract making Pinnacle its exclusive provider of anesthesia services. Baylor University Medical Center expected, however, to continue receiving anesthesia services from Dallas Anesthesiology Associates' providers. Indeed, in later versions of their contract, Baylor University Medical Center expressly required Pinnacle to staff the hospital "together with Dallas Anesthesia [sic] Associates."

192.    On December 31, 2008, Pinnacle Anesthesia Consultants (later acquired by USAP) signed a contract with Dallas Anesthesiology Associates. Pinnacle agreed to contract with Dallas Anesthesiology Associates' anesthesia providers to provide care at Baylor University Medical Center.

193.    Pinnacle's contract with Dallas Anesthesiology Associates included a price-setting arrangement. The contract provided that "Pinnacle shall bill and collect, or cause to be billed and collected" charges for all anesthesia services provided under the contract using Pinnacle's own name and tax identification number. Dallas Anesthesiology Associates and its providers assigned to Pinnacle "all of [their] rights and interest in receiving payment" for anesthesia provided at Baylor University Medical Center under the contract.

194.    USAP inherited Pinnacle's price-setting arrangement with Dallas Anesthesiology Associates when it acquired Pinnacle in January 2014.

195.    Pinnacle and USAP were capable of billing their own claims separately from Dallas Anesthesiology Associates' claims. Although they were required to bill Dallas

Anesthesiology Associates' claims to payors in Pinnacle's name, they had to bill the claims "to patients in the service provider Physician's name." So, the two groups remained separate from patients' perspective. In fact, Pinnacle even agreed to "provide a telephone number that will be provided on the billing documents. Calls received at the telephone number will be answered as 'Dallas Anesthesiology Associates' by Pinnacle."

196.     After acquiring Pinnacle, USAP maintained its price-setting arrangement with Dallas Anesthesiology Associates. USAP continued to bill for Dallas Anesthesiology Associates at USAP's higher reimbursement rates, compensating Dallas Anesthesiology Associates at a lower rate based on the other group's billing rate at Baylor University Medical Center before the arrangement, and thereby "collects a nice margin on the business." USAP's price-setting arrangement with Dallas Anesthesiology Associates remains active today.

### 3.  Baylor College of Medicine

197.     Baylor College of Medicine is a medical school based in Houston. It has an affiliated group of practicing physicians that includes anesthesiologists. As of 2012, Baylor College of Medicine had 50 affiliated anesthesiologists and was the second-largest anesthesia group in Houston (behind Greater Houston Anesthesiology) in terms of procedure volume.

198.     As early as August 2013, USAP considered partnering with Baylor College of Medicine. USAP executives and Brian Regan of Welsh Carson saw such a partnership as a way for USAP to become the exclusive anesthesia provider at more hospitals in Houston.

199.     By October 2013, USAP found itself in direct competition against Baylor College of Medicine to provide anesthesia to St. Luke's Health, one of the primary hospital systems in Houston. USAP quickly began sizing up Baylor College of Medicine as a competitor, including by hiring a consulting firm, Stax, to evaluate the academic anesthesia practice.

200.    But USAP soon decided that colluding, rather than competing, with Baylor College of Medicine would be more profitable. In October 2013, as USAP executives strategized over how to beat out Baylor for the contract with St. Luke's, Brian Regan made a proposal: "[I]f Baylor is really pushing for a piece of the anesthesia, get us in a room with them. Maybe we could work something out that would be mutually beneficial and acceptable to everyone."

201.    USAP acted on Regan's suggestion. USAP executives reached out to Baylor College of Medicine about a partnership and on October 23, 2014, USAP and Baylor College of Medicine signed a contract styled as an "Anesthesia Services Collaboration Agreement." Under the terms, Baylor College of Medicine agreed to provide USAP with several providers who would work at two campuses of the Baylor St. Luke's Medical Center hospital.

202.    USAP agreed to bill and collect in its own name and using its own provider numbers—and thus, at USAP's rates—for anesthesia services rendered by Baylor College of Medicine providers under the contract. Baylor College of Medicine and its providers, in turn, assigned to USAP any rights they had to bill and receive payment from patients or payors for anesthesia services rendered under the contract.

203.    For several years, USAP billed anesthesia claims performed by Baylor College of Medicine physicians in USAP's name and at USAP's higher rates. Meanwhile, USAP paid Baylor College of Medicine ██████████████████ for its anesthesia providers' time. In 2020, the practices' price-setting arrangement was terminated.

### 4.    University of Texas

204.    Like Baylor College of Medicine, the medical school programs at the University of Texas are affiliated with practicing physicians, including a group of anesthesiologists. As of

2012, that group numbered roughly 84 anesthesiologists and held an exclusive contract with Memorial Hermann's Texas Medical Center, one of the largest hospitals in the state.

205.    When USAP was considering a collaboration with Baylor College of Medicine in 2013, it also identified a similar partnership with the University of Texas anesthesia group as a "significant rate opportunity."

206.    By June 2014, USAP was actively working on an "alliance with UT." That summer, USAP and the University of Texas exchanged term sheets that contemplated UT assigning its exclusive contract at Texas Medical Center to USAP while UT's physicians would continue to work there, now as contractors for USAP. Among the terms proposed by USAP was another price-setting arrangement.

207.    Despite USAP's efforts, it could not secure a price-setting arrangement with the anesthesia group from the University of Texas. Discussions in 2014 petered out. They resumed in 2020, but the two anesthesia practices never came to an agreement.

**B.  USAP's market allocation with** ███████████

208.    In 2013, ███████████████████████ USAP learned that ██████
███████████████████████████████████.

209.    At that time, ███████ was a subsidiary of ██████████████., a publicly traded nationwide healthcare company that includes, among other things, a physician group providing services in anesthesiology and other hospital-based specialties.[6]

210.    ██████████████████████████████████████████
████████████████████████████████████████████████



───────────────

[6] ████████████████████████████████████████
████████████████████████████████████
███████████████████████████

████████████████████████████████████████████

██████████████████████████████████████ .

211.   ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████ .

212.   In late November 2013, ████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████ .

213.   ████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████ .

214.   ████████████████████████████████████

████████████████████████████████████████████

60

███████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████.

215.     This agreement had the purpose and effect of keeping ███████—a significant

potential competitor—out of the ████████████ market for anesthesia services.

## VII.     RELEVANT MARKETS

### A.  The relevant service market is commercially insured hospital-only anesthesia services

216.     The relevant service market to assess the challenged conduct is the market for

hospital-only anesthesia services sold to commercial insurers and their insured members. This

service market encompasses (1) all inpatient anesthesia services, including surgical and obstetric

anesthesia performed while the patient is admitted to a hospital; and (2) any other anesthesia

services that must be provided in a hospital setting because the procedure subjects the patient to

an elevated risk such that it requires quick access to emergency medical services.

217.     Although the conduct's likely effects on competition could be analyzed for each

commercially insured hospital-only anesthesia service, it is appropriate to evaluate the

challenged conduct's likely effects across this cluster of hospital-only anesthesia services

because these services are offered to patients in the relevant geographic markets under similar

competitive conditions. Specifically, all hospital-only anesthesia services require patients to

receive care in a hospital setting. Thus, grouping the various individual hospital-only anesthesia

services into a cluster for analytical convenience enables the effective evaluation of competitive

effects with no reduction in analytical rigor.

218.    The relevant service market, as defined, is conservative (and likely overinclusive) because it includes commercially insured hospital-only anesthesia services provided at academic medical centers by academic anesthesia provider groups in conjunction with their educational mission. Houston, for example, has numerous academic medical centers, including Memorial Hermann's Texas Medical Center facility and Houston Methodist. These academic medical centers employ professors of medicine to teach anesthesiology, as well as residents and fellows, all of whom provide anesthesia services in conjunction with their educational mission.

219.    Anesthesia services at academic medical centers related to their educational mission are not subject to the same competitive conditions as other non-education related hospital-only anesthesia services because they must be provided by academic anesthesia groups. As a result, industry typically views academic anesthesia groups as different than independent anesthesia groups. Thus, including all hospital-only anesthesia services provided by academic anesthesia groups in the relevant market (including those related to the educational mission) understates USAP's actual market share.

### 1. Services performed outside a hospital are not part of the relevant service market

220.    The relevant service market appropriately excludes anesthesia services that can be provided outside a hospital setting. Patients requiring hospital-only services must receive that service in a hospital setting and cannot obtain it elsewhere.

221.    The Centers for Medicare and Medicaid Services ("CMS") maintain a list that distinguishes between hospital-only and other anesthesia services for governmentally insured patients. The list identifies anesthesia billing codes that may be used for ambulatory surgical centers. All other anesthesia codes must be billed in a hospital setting. Commercially insured patients generally face similar billing rules either formally or because hospitals adopt CMS

policy to remain certified for government insurance programs. In practice, an insignificant amount of anesthesia services provided in a surgical center is billed to commercial insurance using the codes CMS lists as hospital-only.

222.    Competitive realities also differ for hospital-only and other anesthesia services because they are administered to distinct sets of patients. Patients who must be treated in a hospital, based on their specific medical condition, can only receive hospital-only anesthesia. Determining whether a patient must undergo a procedure in a hospital is based on medical considerations, such as the time to recuperate from surgery and the need to use anesthesia that may place the patient at risk for loss of life-preserving protective reflexes. In many cases, this overlaps with the decision to admit a patient overnight—i.e., inpatient care—but there may be medical procedures that must be performed in a hospital but do not require an overnight stay. Thus, even though the anesthesia services that form the hospital-only services may be performed by the same providers as other services, the services themselves are distinct because once a patient requires treatment in a hospital, neither the patient nor their payor can turn to non-hospital anesthesia services. Therefore, patients, their payors, and referring physicians cannot substitute non-hospital services in response to a small but significant non-transitory increase in price for hospital-only services.

223.    Hospital-only anesthesia services also require unique facilities, i.e., hospitals. Hospitals must provide a minimum standard of care, which requires providing appropriate facilities and staffing for recuperation and monitoring following certain procedures. The facilities and staffing required to admit and care for patients overnight differ from those requirements for outpatient care. Similarly, facilities administering general anesthesia may require the capability to admit a patient if an adverse event occurs during the procedure. Accordingly, outpatient

63

facilities are not viable alternatives to hospitals for procedures requiring an overnight stay because of elevated risk of adverse events during anesthesia.

224. Hospital-only anesthesia services require providers to practice under conditions distinct from outpatient services. Specifically, hospitals often need anesthesia providers to cover long shifts and overnight call. Unlike non-hospital procedures, which are frequently scheduled in advance, procedures performed during overnight call are often hospital-only or inpatient services, such as anesthesia for emergency surgery. Hospitals may also require certain specialized anesthesia services, which can require advanced training or experience and which, in turn, providers practicing only in outpatient settings are less likely to have.

225. For hospitals, anesthesia groups providing outpatient services with insufficient size to provide 24-hour coverage or without the scope of services, including specialty anesthesia services, to meet hospital needs cannot be reasonable substitutes for anesthesia groups providing hospital-only anesthesia services.

226. In addition, industry participants recognize hospital-only anesthesia services as distinct. USAP's business documents regularly measure its presence within hospital systems or at individual facilities, without regard to ambulatory surgical centers.

227. For example, when USAP and Welsh Carson were first planning to acquire Greater Houston Anesthesiology in late 2012, they emphasized its high "wallet share" of anesthesia services at at each of the four largest hospital systems in Houston, separately assessing the practice's inpatient and outpatient procedure shares.

228. Similarly, when USAP began expanding beyond Houston by acquiring Pinnacle, the company assessed Pinnacle's growth in inpatient and outpatient procedures separately and

highlighted the practice's "stable" position at the four largest hospital systems in Dallas, without focusing on the group's outpatient competitive position.

229.    Finally, from insurers' perspective, hospital-only and non-hospital or outpatient anesthesia services are not substitutes because they are not substitutes from the perspective of insurers' ASO clients or members, or their in-network hospitals and providers.

230.    Narrower relevant service markets may also exist for purposes of assessing the challenged anticompetitive conduct, including one consisting of only inpatient anesthesia services (which, for the same reasons as hospital-only anesthesia services, can be "clustered" for convenience with no reduction in analytical rigor).

### 2. Non-commercial insurance plans are not part of the relevant service market

231.    The relevant service market can be appropriately limited to anesthesia services sold to commercial insurers and their insured members.

232.    Commercial and government-sponsored insurance serve distinct customers. Private health insurance companies offer commercial insurance and plan administrative services to individuals and employers. Commercial insurance plans are typically linked to an insured member's employment. Government-sponsored plans serve individuals who meet specific eligibility criteria, such as age or income level, which are usually unrelated to their employer or employment situation.

233.    Commercial insurers pay distinct prices from government-sponsored plans. Anesthesiologists generally receive significantly higher reimbursement rates for services sold to commercial plans compared to Medicaid, Medicare, or Medicare Advantage plans, which are tied to government fee schedules.

234.     USAP, like other provider groups, recognizes the commercial insurance market as separate, tracking its pricing and positioning with commercial insurers without reference to, e.g., Medicare or Medicaid.

**B.  The relevant geographic markets to assess the competitive implications of the challenged conduct are no broader than the local metropolitan statistical areas**

235.     There are three relevant geographic markets to assess the competitive implications of the challenged conduct: (1) the Houston metropolitan statistical area ("MSA"); (2) the Dallas-Fort Worth MSA; and (3) the Austin MSA.

**1.  A relevant geographic market is no broader than the Houston metropolitan statistical area**

236.     The relevant market to address the anticompetitive effects of USAP's conduct within Houston is no broader than the Houston metropolitan statistical area.

237.     The Houston MSA includes the following counties: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

238.     Patients in the Houston MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts—often exclusive—to provide hospital-only anesthesia services at hospitals in the Houston MSA.

239.     Hospitals typically select anesthesia groups for hospital contracts in the Houston MSA from groups with a significant portion of doctors within the Houston MSA. Practices outside the Houston MSA may be less cost competitive due to the need to recruit, hire short-term substitute physicians to fill in for staffing gaps on short notice (known as *locum tenens* physicians), or provide travel and lodging for more distant providers. These groups may also lack

relationships with Houston hospitals or have little established reputation in Houston and may lead to more disruption at the hospital.

240.    To constrain rates charged by an anesthesia group in the Houston MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Houston MSA to construct its network with enough coverage to avoid burdening patients and clients in the Houston MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Houston MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Houston MSA would accept an alternative anesthesia group.

241.    To maintain the ability to make credible out of network threats, insurers may try to support the availability of alternative providers in the Houston MSA. For example, Blue Cross considered subsidizing a specific anesthesia group—MetroWest—to maintain it as an independent competitor for exclusive business at hospitals in the Houston MSA.

242.    Other qualitative evidence confirms that the Houston MSA is a relevant market to assess the competitive implications of USAP's conduct in Houston. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Houston MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

243.    Industry participants, including USAP and payors, recognize metropolitan areas, such as the Houston MSA, as markets for anesthesia services.

244.    Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Houston MSA could profitably impose small but significant non-transitory price increases.

USAP's acquisition of local rivals enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. For example, in Houston, when USAP acquired North Houston Anesthesiology, MetroWest, and Guardian, it significantly raised rates but retained enough volume to increase each practice's annual earnings by over █%, █%, and █%, respectively.

> **2.    A relevant geographic market is no broader than the Dallas-Fort Worth metropolitan statistical area**

245.    The relevant market to address the anticompetitive effects of USAP's conduct within Dallas is no broader than the Dallas-Fort Worth metropolitan statistical area.

246.    The Dallas MSA includes the following counties: Collin, Dallas, Denton, Ellis, Hood, Hunt, Johnson, Kaufman, Parker, Rockwall, Somervell, Tarrant, and Wise.

247.    Patients in the Dallas MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts (often exclusive contracts) to provide hospital-only anesthesia services at particular hospitals in the Dallas MSA.

248.    Hospitals typically select anesthesia groups for hospital contracts in the Dallas MSA from groups with a significant portion of doctors within the Dallas MSA. Practices outside the Dallas MSA serving Dallas hospitals may be less cost competitive due to the need to recruit, hire *locum tenens* physicians to fill in for staffing gaps on short notice, or provide travel and lodging for more distant providers. These groups may also lack relationships with Dallas hospitals or have little established reputation in Dallas and may lead to more disruption at the hospital.

249.    To constrain rates charged by an anesthesia group in the Dallas MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats

depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Dallas MSA to construct its network with enough coverage to avoid burdening patients and clients in the Dallas MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Dallas MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Dallas MSA would accept an alternative anesthesia group.

250.    Other qualitative evidence confirms that the Dallas MSA is a relevant market to assess the competitive implications of USAP's conduct in Dallas. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Dallas MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

251.     Industry participants, including USAP and insurers, recognize metropolitan areas, such as the Dallas MSA, as markets for anesthesia services.

252.    Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Dallas MSA could profitably impose small but significant non-transitory price increases. USAP's acquisition of local rivals enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. For example, in Dallas, after USAP acquired Excel, Anesthesia Consultants of Dallas, and BMW Anesthesiology, it significantly raised rates but retained enough volume to increase each practice's annual earnings by approximately █%, █%, and █%, respectively.

### 3.  A relevant geographic market is no broader than the Austin metropolitan statistical area

253.    The relevant market to address the anticompetitive effects of USAP's conduct within Austin is no broader than the Austin metropolitan statistical area.

254.    The Austin metropolitan statistical area includes the following counties: Bastrop, Caldwell, Hays, Travis, and Williamson.

255.    Patients in the Austin MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts (often exclusive contracts) to provide hospital-only anesthesia services at particular hospitals in the Austin MSA.

256.    Hospitals typically select anesthesia groups for hospital contracts in the Austin MSA from groups with a significant portion of doctors within the Austin MSA. Practices outside the Austin MSA serving Austin hospitals may be less cost competitive due to the need to recruit, hire *locum tenens* physicians to fill in for staffing gaps on short notice, or provide travel and lodging for more distant providers. These groups may also lack relationships with Austin hospitals or have little established reputation in Austin and may lead to more disruption at the hospital.

257.    To constrain rates charged by an anesthesia group in the Austin MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Austin MSA to construct its network with enough coverage to avoid burdening patients and clients in the Austin MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Austin MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Austin MSA would accept an alternative anesthesia group.

258.    Other qualitative evidence confirms that the Austin MSA is a relevant market to assess the competitive implications of USAP's conduct in Austin. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Austin

MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

259.     Industry participants, including USAP and insurers, recognize metro areas, such as the Austin MSA, as markets for anesthesia services.

260.     Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Austin metropolitan statistical area could profitably impose small but significant non-transitory price increases. USAP's acquisition of a local rival enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. Specifically, in Austin, after USAP acquired Capitol, it significantly raised rates but retained enough volume to increase the practice's annual earnings by █%.

## VIII.   MARKET POWER AND MONOPOLY POWER

### A.  USAP has monopoly power in the Houston MSA

#### 1.  USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share in Houston

261.     USAP and Welsh Carson's "consolidation strategy" combined four significant anesthesia practices in Houston. In 2013, after its initial acquisition, USAP controlled about 50% of the commercially insured hospital-only market, measured by revenue. In 2021, after its roll-up, USAP had a nearly 70% market share by revenue.

262.     USAP also commands a majority share of the commercially insured hospital-only anesthesia volume in Houston. One common way to measure volume is by the number of cases, though this metric may understate USAP's actual volume share to the extent USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless, even by this metric, claims data from one major insurer show that USAP controlled nearly 60% of the commercially

insured hospital-only anesthesia cases in Houston in 2021, compared to roughly 36% in 2013 after its initial acquisition.

263.    USAP's share of the commercially insured inpatient anesthesia market in Houston, under any metric, has been roughly the same as its share of the commercially insured hospital-only market in Houston at all relevant times.

264.    Insurers' ordinary course documents confirm USAP's share. For example, one calculated USAP's share in 2020 at about 63% of the inpatient anesthesia spend in Houston.

265.    The high concentration resulting from USAP's roll-up is also demonstrated by the Herfindahl-Hirschman Index (HHI). HHIs are commonly accepted (including by courts) as a measure of market concentration and are calculated by squaring the market shares of each firm competing in a market and then summing the results. Under this framework, a near-0 HHI indicates a highly competitive market filled with atomistic competitors of roughly equal size; an HHI of 10,000 indicates a pure monopoly in which there is only one firm and no competition whatsoever. Horizontal mergers—that is, mergers between market competitors—result in an increase in HHI, with the difference between the pre- and post-merger HHI often referred to as the "delta."[7]

266.    Following USAP's initial platform acquisition of Greater Houston Anesthesiology, each subsequent transaction in Houston, when measured by revenue, resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI figures for each relevant transaction are summarized in the table below:

---

[7] HHI deltas can be calculated by doubling the product of the merging firms' (unsquared) market shares.

| Table 1: Houston Acquisitions – Hospital-Only Anesthesia Services | | | | | |
|---|---|---|---|---|---|
| Date | Provider Group | Pre-Acquisition Market Share | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 12/27/2012 | Greater Houston Anesthesiology | 39.0% | 50.5% | 1774 (+0) | 2754 (+0) |
| 6/24/2014 | North Houston Anesthesiology | 4.4% | 3.2% | 2115 (+341) | 3081 (+327) |
| 3/1/2017 | MetroWest Anesthesia Care | 7.0% | 6.1% | 2979 (+649) | 3962 (+680) |
| 1/1/2020 | Guardian Anesthesia Services | 4.1% | 3.8% | 3874 (+465) | 4989 (+501) |

**2. USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Houston**

267.    USAP has maintained or grown its market share in Houston year-over-year since it acquired Greater Houston Anesthesiology, the largest group in Houston at the time. At the time of its acquisition, it had the highest average reimbursement rate of any anesthesia group in Houston.

268.    Nevertheless, USAP's reimbursement rates in Houston, aggregated and averaged across all payors, have increased regularly, without any clear improvement in quality. Since its entry in 2013, USAP has raised rates by ███ % or more. Today, USAP charges ████████ ████ the median reimbursement rate for anesthesia services in Houston.

269.    Despite charging the highest rates in Houston, USAP's volume of cases has grown significantly. From 2013 to 2021, USAP's share of case volume grew from 39.0% to

58.5%. During the same period, USAP's share of anesthesia costs in Houston grew from 50.5% to 69.5%.

270.     Despite charging the highest rates in Houston, USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems. Instead, its retention of volume year-over-year was approximately 100%. For example, in 2015, a Welsh Carson associate who was working to secure additional financing on behalf of USAP bragged that USAP's retention of hospital contracts had "effectively been 100%."

271.     USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

### 3.  USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Houston

272.     USAP is substantially larger than any other anesthesia group in Houston. Specifically, USAP is more than eight times the size of the next largest group by revenue, and four times the size of the next largest group by number of cases. Table 2 below summarizes USAP's and its rivals' shares of the commercially insured hospital-only anesthesia services market in Houston:

| Table 2: Houston Market Shares (2021) – Hospital-Only Anesthesia Services | | |
|---|---|---|
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 58.5% | 69.5% |
| UT Physicians | 13.3% | 8.3% |
| North American Partners in Anesthesia | 8.1% | 8.2% |
| Texans Anesthesia Associates | 4.8% | 3.1% |
| Compass Anesthesia Providers | 2.5% | 1.9% |
| Baylor College of Medicine | 2.4% | 1.4% |
| Best Choice Anesthesia & Pain | 1.1% | 1.0% |

273.     None of these far smaller rivals has successfully displaced USAP or eroded its market share enough to constrain its ability to charge supracompetitive rates in Houston.

## B.  USAP has monopoly power in the Dallas MSA

### 1.  USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share

274.     USAP and Welsh Carson's "consolidation strategy" combined seven significant anesthesia practices in Dallas. In 2014, after its initial acquisition, USAP controlled about 46% of the commercially insured hospital-only anesthesia market, measured by revenue. In 2021, after its roll-up, USAP had a 68% market share by revenue.

275.     USAP also commands a majority share of the commercially insured hospital-only anesthesia volume in Dallas. One common way to measure volume is by the number of cases, though this metric has the potential to understate USAP's actual volume share to the extent USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless, even by this metric, claims data from one major insurer show that USAP controlled nearly 60%

of the commercially insured hospital-only anesthesia cases in Dallas in 2021, compared to 42% in 2014 after its initial acquisition.

276.    USAP's share of the commercially insured inpatient anesthesia market in Dallas, under any metric, has been roughly the same as its share of the commercially insured hospital-only market in Dallas at all relevant times.

277.    Insurers' ordinary course documents confirm USAP's share. For example, one calculated USAP controls about 70% of the inpatient commercial anesthesia spend in Dallas. Another insurer estimated in 2020 that, excluding academic medical groups' employed providers, USAP controlled "over 80% of anesthesia in Houston. In DFW, similar dominance."

278.    The high concentration resulting from USAP's roll-up is also demonstrated by the HHI. Following its initial platform acquisition of Pinnacle, USAP's acquisitions of Excel and Sundance Anesthesia, when measured by revenue, resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. USAP's cumulative acquisitions in Dallas also resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI figures for each relevant transaction are summarized in the table below:

| Table 3: Dallas Acquisitions – Hospital-Only Anesthesia Services | | | | | |
|---|---|---|---|---|---|
| Date | Provider Group | Pre-Acquisition Market Share | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 1/6/2014 | Pinnacle Anesthesia Consultants | 39.9% | 42.3% | 1609 (+0) | 1890 (+0) |
| 1/20/2015 | Anesthesia Consultants of Dallas | 1.7% | 1.7% | 1954 (+137) | 2381 (+157) |
| 3/3/2015 | Excel Anesthesia Consultants | 5.5% | 5.3% | 2399 (+445) | 2866 (+485) |
| 12/2/2015 | Southwest Anesthesia Associates | 1.1% | 0.8% | 2588 (+106) | 3142 (+86) |
| 1/21/2016 | BMW Anesthesiology | 0.8% | 0.4% | 2762 (+82) | 3387 (+44) |
| 1/25/2016 | Medical City Physicians | 0.5% | 0.3% | 2807 (+45) | 3418 (+31) |
| 4/1/2016 | Sundance Anesthesia | 3.0% | 2.2% | 3254 (+322) | 3886 (+271) |

**2. USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Dallas**

279.     USAP has maintained or grown its market share in Dallas year-over-year since it acquired Pinnacle, the largest group in Dallas at the time. At the time of its acquisition, it had the highest average reimbursement rate of any anesthesia group in Dallas.

280.     Nevertheless, USAP's reimbursement rates in Dallas, aggregated and averaged across all major insurers, have increased regularly without any clear improvement in quality.

Since its entry in 2014, USAP has raised rates by ██% or more in Dallas. Today, USAP charges ████████████████ the median reimbursement rate for anesthesia services in Dallas.

281.    Despite charging the highest rates in Dallas, USAP's volume of cases has grown significantly. From 2014 to 2021, USAP's share of case volume grew from 39.9% to 58.6%. During the same period, USAP's share of anesthesia costs in Dallas grew from 42.3% to 68.3%.

282.    Despite charging the highest rates in Dallas, USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems. Instead, its retention of volume year-over-year was, as a Welsh Carson associated boasted in 2015, "effectively . . . 100%."

283.    USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

**3.    USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Dallas**

284.    USAP is substantially larger than any other anesthesia group in Dallas. Specifically, USAP is more than nine times the size of the next largest group by revenue, and six times the size of the next largest group by number of cases. Table 4 below summarizes USAP's and its rivals' shares of the commercially insured hospital-only anesthesia market in Dallas.

| Table 4: Dallas Market Shares (2021) – Hospital-Only Anesthesia Services | | |
| --- | --- | --- |
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 58.6% | 68.3% |
| Metropolitan Anesthesia Consultants | 9.0% | 7.4% |
| UT Physicians | 8.3% | 4.9% |
| NorthStar Anesthesia | 4.6% | 2.7% |
| Anesthesia Partners of Dallas | 3.2% | 3.3% |
| Allen Anesthesia Associates | 2.6% | 2.0% |
| Noble Anesthesia Partners | 1.1% | 1.0% |

285.     None of these far smaller rivals has successfully displaced USAP or eroded its market share enough to constrain its ability to charge supracompetitive rates in Dallas.

### C.  USAP has a dominant position in the commercially insured hospital-only anesthesia market in Austin

#### 1.  USAP and Welsh Carson's roll-up of anesthesia providers has substantially increased concentration, resulting in a dominant market share

286.     As a result of USAP and Welsh Carson's consolidation strategy, USAP is the dominant anesthesia provider in Austin. In 2013, USAP controlled about 3.5% of the commercially insured hospital-only anesthesia markets, measured by revenue. In 2021, after its roll-up, USAP had a greater than 50% market share by revenue.

287.     USAP also commands a majority share of the commercially insured hospital-only anesthesia volume in Austin. One common way to measure volume is by the number of cases, though this metric has the potential to understate USAP's actual volume share to the extent USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless, even by this metric, claims data from one major insurer show that USAP controlled nearly 44%

of the commercially insured hospital-only anesthesia cases in Austin in 2021, compared to 2.5%

in 2013 after its initial acquisition.

288.    USAP's share of the commercially insured inpatient anesthesia market in Austin,

under any metric, has been roughly the same as its share of the commercially insured hospital-

only market in Austin at all relevant times,.

289.    USAP's and payors' ordinary course documents confirm USAP's share. USAP

itself characterized its primary acquired group in Austin, Capitol Anesthesiology Association, as

having a "[l]arge share of [a] great market in top hospital systems" in Austin. Specifically, USAP

claimed Capitol had "significant organic growth for the last 3 years, although they have seen a

market share decline from 75% to around 50% today."

290.    The high concentration resulting from USAP's roll-up is also demonstrated by the

HHI. Following USAP's initial acquisition of Lake Travis Anesthesia, USAP's subsequent

acquisition of Capitol Anesthesia, whether measured by revenue or case volume, resulted in a

post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI

figures for the relevant transaction are summarized in the table below:

| Table 5: Austin Acquisitions – Hospital-Only Anesthesia Services | | | | | |
|---|---|---|---|---|---|
| Date | Provider Group | Pre-Acquisition Market Shares | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 7/3/2013 | Lake Travis Anesthesiology | 3.5% | 5.1% | 2480 (+0) | 3220 (+0) |
| 2/1/2018 | Capitol Anesthesiology Association | 33.8% | 42.0% | 2713 (+233) | 3660 (+440) |

**2. USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Austin**

291.     Despite charging the highest rates in Austin, USAP's volume of cases has grown significantly. From 2014 to 2021, USAP's share of case volume grew from 3.5% to 44.2%; during the same period, USAP's share of anesthesia costs in Austin grew from 5.1% to 52.5%.

292.     Since its entry in 2013, USAP has raised prices by at least ██%. After acquiring Capitol and raising its rates, USAP increased Capitol's incremental revenues by $████████ within five months.

293.     USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems in Austin, despite its high reimbursement rates without any clear quality improvements. Instead, its retention of volume year-over-year was approximately 100%.

294.     USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

**3. USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its dominance in Austin**

295.     USAP has a single rival in Austin, North American Partners in Anesthesia. No other group has more than 4% of the market, whether measured by revenue or volume of cases. Table 6 below summarizes USAP's and its rivals' share of the commercially insured hospital-only anesthesia market in Austin.

| Table 6: Austin Market Shares (2021) – Hospital-Only Anesthesia Services | | |
|---|---|---|
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 44.2% | 52.5% |
| North American Partners in Anesthesia | 37.8% | 37.2% |
| NorthStar Anesthesia | 1.8% | 1.2% |
| Scott & White Physicians | 2.5% | 0.8% |
| UT Physicians | 1.0% | 0.9% |
| Westlake Anesthesia | 2.5% | 0.6% |

296.     USAP's sole rival has not successfully displaced USAP or eroded its market share enough to constrain its ability to charge above-market rates in Austin.

**D. High barriers to entry to the hospital-only anesthesia markets in Houston, Dallas, and Austin protect USAP's market share**

297.     Anesthesiologists cannot easily increase their productivity and see additional patients in response to competitors' increasing their price. Limited operating room capacity and schedule availability may also prevent anesthesiologists from seeing additional patients. Even if anesthesia groups could see more patients, hospitals face complications and difficulties transitioning from one group to another.

298.     Providing hospital-only anesthesia requires postsecondary education, including either a graduate medical degree or nursing degree, in addition to training and licensing. As a

result, the supply of anesthesia providers is limited and cannot be increased or react quickly to market trends in demand or reimbursement rates.

299.    Attracting higher patient volume can require anesthesia providers to contract with hospitals because anesthesia is provided in conjunction with other medical care, rather than as a standalone service. Providers face an uphill battle to win hospital contracts because those contracts are "sticky" due to high switching costs. In addition, hospitals generally do not change their contracting practices in response to reimbursement rates anesthesia providers charge payors, because hospitals do not pay any part of those rates. Indeed, hospitals often face a disincentive to switch away from anesthesiologists who charge payors high rates, because those anesthesiologists can (and sometimes do) offer to share the spoils with hospitals in the form of a lower subsidy from the hospital.

300.    Even if a group could overcome these structural barriers to winning market share, USAP has erected additional entry barriers in Houston, Dallas, and Austin.

301.    First, USAP uses a network of physician non-compete agreements to prevent physicians from splitting off and forming their own groups or joining other groups looking to challenge USAP's market position. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████. USAP's non-competes prevent rivals from gaining scale by hiring doctors in Houston, Dallas, and Austin.

302.    Second, USAP's equity vesting rules discourage its providers from joining competing practices. ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████. This makes individual

physicians reluctant to leave until well after they join USAP, and makes it difficult for a group of

physicians, who may have joined USAP at different times and thus have different vesting

schedules, to leave en masse.

303.    Experience confirms these barriers to entry protect USAP's market share. USAP

has managed to retain its exclusive hospital relationships and insurer contracts despite both sets

of contracts containing clauses that ███████████████████████████████████

██████████████████████████████████████████████.

## IX.    USAP'S DOMINANCE IN TEXAS

304.    USAP's acquisitions in Texas have combined seventeen anesthesia practices,

growing its presence in a single city into a dominant position across the state. The direct result is

that USAP now controls nearly 60% of hospital-only anesthesia costs statewide, and

approximately 43% of cases. There is no other anesthesia group that comes close to matching

USAP's presence in Texas. USAP is more than ten times larger than the next largest group by

revenue and seven times larger by volume of cases. In fact, USAP is larger than the ten next-

largest groups in Texas combined.

305.    As USAP accumulated practices throughout the state, it has been able to exercise

more leverage in its negotiations with insurers, limiting their ability to constrain pricing.

306.    The experience in Amarillo is illustrative of how USAP's growing presence in

Texas increased its negotiating leverage, even for a group that was already locally dominant.

Before USAP acquired Amarillo Anesthesia—a group with as much as an 85% share of hospital-

only services in that city—insurers successfully resisted Amarillo Anesthesia's demands to

dramatically increase its reimbursement rates. But once USAP acquired Amarillo Anesthesia in

2018, USAP was able to ███████████ its reimbursement rate from Blue Cross, from $██ to

$██ per unit, even though the acquisition did not increase market concentration in Amarillo.

307.     The Pinnacle acquisition provides another example of how USAP's growing

statewide presence cemented its high prices. When USAP's predecessor Greater Houston

Anesthesiology practiced only in Houston, Blue Cross could—and did—exclude Greater

Houston Anesthesiology from its network in response to requested rate increases. Once USAP

expanded to Dallas through the Pinnacle acquisition, however, Blue Cross concluded that it was

too difficult to exclude USAP, even though the Pinnacle acquisition did not increase

concentration in the Dallas market. As a result, Blue Cross agreed to raise Pinnacle's

reimbursement rate by ██%, at a total cost of over $10 million. That price increase cannot be

explained by USAP simply being a more skilled negotiator than Pinnacle, as Pinnacle's contract

negotiations had been handled by EmCare, a subsidiary of a large, sophisticated corporation.

308.     USAP effectively exercised this leverage with each acquisition it made in Texas.

Each time it acquired a group, even in places where it had no existing presence, USAP raised the

target group's rates ████████████ to ██% (depending on the payor), increasing the group's

earnings—all without an offsetting loss in patient volume. These so-called "synergies" figured

prominently in USAP's planning documents.

309.     Moreover, while raising reimbursement rates for acquired groups, USAP

maintained or even raised its own already high rates. As United recounted in an internal strategy

discussion, by 2020, USAP's rates were "nearly 40% more expensive than the average cost of all

other anesthesia providers in Texas" and "USAP Texas's rates are 96% higher than the median

rate we pay other anesthesia groups in Texas, but their quality performance is not meaningfully

better than their peers." Another participant in the United strategy discussion later pointed out

that, in fact, USAP was even more expensive—110% of the statewide median. When United attempted to lower USAP's rates, resulting in USAP going out-of-network, United's clients, including ASO clients operating in multiple parts of the state, pushed for United to bring USAP back in-network to avoid disruption to their members. To return USAP to the network, however, United was forced to accept above-market reimbursement rates.

310.    USAP has steadily hiked prices across Texas without ceding—and instead growing—its dominant position. Despite these increases in reimbursement rates, USAP continued to provide the same or greater volume of hospital-only anesthesia services each year. Thanks in part to the high entry barriers that protect its positioning, *see* ¶¶ 297-303, no acquisition or concomitant average price increase resulted in meaningful volume loss for USAP. Rather, USAP successfully increased its presence in Texas, as illustrated in Table 7 below:

| Table 7: USAP Statewide Presence 2013-2021 | | |
|---|---|---|
| Year | By Cases | By Revenue |
| 2013 | 8.8% | 13.0% |
| 2014 | 22.2% | 31.6% |
| 2015 | 25.9% | 36.4% |
| 2016 | 28.8% | 40.0% |
| 2017 | 29.3% | 41.0% |
| 2018 | 34.3% | 45.9% |
| 2019 | 37.0% | 53.8% |
| 2020 | 42.2% | 60.4% |
| 2021 | 43.0% | 57.1% |

## X.    HARM TO CONSUMERS AND COMPETITION

**A.    USAP's conduct has increased its negotiating leverage against insurers, reducing insurers' ability to constrain USAP's demands to raise prices**

311.    As a result of Welsh Carson and USAP's roll-up strategy, USAP has amassed exclusive or nearly exclusive contracts at hospitals throughout Houston, Dallas, and across Texas. USAP's resulting war chest of facilities where it dominates anesthesia services includes

all or nearly all of the important hospitals for payors in Houston, Dallas, San Antonio, Austin, and several other Texas cities, and numerous other hospitals throughout Texas.

312.     USAP's price-setting arrangements, although not outright acquisitions, have had a similar effect. By enabling USAP to bill other providers' services at additional hospitals as if they were USAP's own, these price-setting arrangements further extended USAP's hold over anesthesia services in Texas.

313.     Moreover, to the extent that any anesthesia providers might have competed against USAP to displace it at key hospitals or other healthcare facilities, USAP has largely neutralized these competitors by acquiring them outright, by striking price-setting arrangements with them, or by securing their agreement not to enter the market.

314.     USAP's conduct has thus significantly increased its leverage in negotiations with insurers. Indeed, according to an executive at the largest health insurer in Texas, "every time [USAP] folded in a geographic region or every time that they grew, it just strengthened their ability to raise rates and . . . leverage at the negotiating table."

315.     Because of USAP's conduct, insurers' abilities to take USAP out of network—a key way of constraining prices—have substantially diminished. With USAP as the only exclusive provider at many hospitals across Texas, taking USAP out-of-network is now less likely to occur, and in turn, a far less powerful negotiating tool. As a Welsh Carson analyst explained to a potential lender, "if a payor refuses to give us the pricing that we're looking for, then the threat of us going out-of-network would be more painful on the payor than it would be on us. . . . [W]hen we cover every major hospital in the market, it doesn't really have much of an impact on us. All the while, the payor would be responsible for reimbursing at out-of-network rates which are substantially higher than what we see on an in-network basis . . . ." In addition,

taking USAP out of network entails administrative costs for payors. There is also the possibility of backlash from members and actual or potential clients. *See* ¶¶ 74-76.

316.    Even the biggest insurers have had to bow to USAP's dominance. Indeed, one insurer—United—learned this the hard way in a dispute with USAP in 2020. By January 2020, USAP's price increases had become unsustainable for United, which tried to renegotiate USAP's rates by unilaterally amending the United-USAP contract to reduce USAP's rates. Although the unilateral amendment resulted in some negotiations, they failed, and USAP terminated its contract with United in early 2020. At the time, United was one of the largest insurers in Texas.

317.    Over the next 18 months, USAP forced United to come back to the negotiating table and to accept USAP's high rates through a multi-front "pressure" campaign. USAP encouraged hospitals where it provided anesthesia services to lobby United to bring USAP back in-network. USAP persuaded ASO clients that bought insurance from United, █████████ ███████, to complain to United ███████████████████. USAP had patients complain to state regulators that United no longer met state-prescribed network adequacy requirements after taking USAP out-of-network. And USAP filed a lawsuit against United in Texas state court—which was sent to arbitration—alleging that United had unlawfully diverted patients away from USAP's anesthesia providers.[8] While USAP was replaced for certain procedures at select hospitals during this out of network period, no hospitals ended their exclusive contracts with USAP as a result of United having taken it out of network.

318.    Eventually, United gave in, settled the arbitration, and signed a new contract with USAP in September 2021. Under the terms, USAP's rates decreased, but far less than United was seeking, remaining well above the median rate in Texas. In addition, United had to pay some

---

[8] *See* Pl.'s Original Petition, U.S. Anesthesia Partners of Tex. v. United Healthcare Ins. Co. (DC-21-04104) (Tex. D. Ct. Dallas Cty., Mar. 31, 2021).

of USAP's out of network claims at USAP rates. In sum, United resisted USAP for over a year and had little to show for it. Taking USAP out-of-network had frustrated United's hospitals, clients, and members; incurred large out-of-network costs; and failed to meaningfully decrease USAP's reimbursement rates.

**B.      USAP's conduct has increased prices for hospital-only anesthesia services in Texas**

319.    With its increased negotiating leverage, USAP has significantly increased prices for hospital-only anesthesia services in Houston, Dallas, and throughout Texas. Just as Welsh Carson and USAP planned, USAP took Greater Houston Anesthesiology's already-high prices, increased them, and extended them across the state of Texas via further acquisitions (█████ █████████████████████). As a United executive summarized: "you've basically taken the highest rate of all in one distinct market and then peanut butter spread that across the entire state of Texas."

320.    For example, before its acquisition by USAP, MetroWest's in-network reimbursement rate with United had been $██ per unit. After USAP acquired MetroWest, it raised that rate to $█████ per unit, an increase of nearly ██%.

321.    Similarly, before its acquisition by USAP, Anesthesia Consultants of Dallas's in-network reimbursement rate with United was $████ per unit. After USAP acquired the practice, its rate rose to approximately $████ per unit, an increase of over █%.

322.    The story for Excel Anesthesia is the same. Before its acquisition by USAP, its in-network reimbursement rate with United was $██ per unit. That rate rose to more than $███ per unit—an increase of over ██%—after USAP acquired Excel.

323.     Today, USAP is the largest and most expensive anesthesia provider in Texas across all payors. USAP charges well over $███████████. For comparison, the median reimbursement rate among other anesthesia providers in Texas is roughly $██ per unit.

324.     The effect of USAP's higher rates has been to raise the costs of anesthesia care in Texas by dozens of millions of dollars every year. For example, one insurer estimated that by 2016, it was spending roughly $119 million in Texas annually on anesthesia services from USAP alone. Even ignoring USAP's rate increases in the years since, that figure suggests USAP's monopoly mark-ups are running up the cost of providing healthcare in Texas every year by tens of millions of dollars. And because—as discussed in ¶¶ 65-66—most clients of the largest insurers in Texas bear financial responsibility for their own members' healthcare costs, the burden of USAP's higher prices is borne largely by Texas businesses and their employees.

325.     USAP's conduct has not only increased its own ability to raise prices—it has led other anesthesia providers to raise their prices, too. Anesthesia practices across Texas have successfully demanded price increases by threatening to otherwise raise their reimbursement rates by selling their practices to USAP. For example, prior to its acquisition by USAP, Capitol Anesthesia in Austin threatened insurers that it would join USAP unless they raised Capitol's rates. One large insurer privately conceded that the "best option" was to accede to Capitol's demands. Guardian Anesthesia in Houston made similar threats. Before successfully acquiring Guardian in 2020, USAP reached out to Guardian in 2014 about a potential acquisition. Guardian rejected the proposal. Nevertheless, it used the USAP offer to seek a 25% increase in reimbursement rates from █████ when it previously had sought only a 3% increase. Star Anesthesia in San Antonio made similar threats. So, too, have other practices that have not yet been acquired by USAP.

326.     Similarly, USAP's price-setting arrangements with other anesthesia practices have contributed to increasing prices. By billing other providers' anesthesia services at USAP's reimbursement rates, USAP has spread its higher rates to additional anesthesia groups—just as if those, too, had been acquired by USAP. And to the extent that any of these independent anesthesia groups might have competed with USAP, thereby constraining its prices, USAP has effectively neutralized them by agreeing to instead share a portion of its monopoly profits.

327.     USAP has also neutralized competition through its market allocation agreement with ████████████████████████████████████████████████████ ████████████████, USAP stifled any competition from ██████. If not for that unlawful agreement, ██████ competitive presence ██████, or even the threat of ██████ entering the market, would likely have acted as a constraint on USAP's ability to raise prices.

### C.  There are no valid procompetitive justifications for or efficiencies from USAP's conduct

328.     USAP cannot justify the substantial harm to competition resulting from its acquisitions with valid procompetitive justifications or efficiencies that could not be achieved through other means less harmful to competition.

329.     For example, USAP holds itself out as a high-quality anesthesia practice. But USAP's own metrics are home-brewed, self-serving, and otherwise flawed. Moreover, even if it were possible to confirm that USAP anesthesiologists offer high-quality services, there is no reason to think that they owe this to USAP. USAP simply acquires physician groups with an already-strong reputation for quality and does little (if anything) to improve their services once they join USAP.

330.     There are no valid procompetitive justifications for or efficiencies from USAP's price-setting arrangements. Indeed, as discussed above, USAP could have collaborated with

other anesthesia practices or provided them with back-office services without billing their claims as USAP's own and at USAP's reimbursement rates. *See* ¶¶ 178, 195178195.

331.    There are no valid procompetitive justifications for or efficiencies from USAP's market allocation agreement with ███████████████████. That agreement was not reasonably necessary to ████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████.″

332.    Nor can the market allocation be justified as safeguarding competitively sensitive business information ████████████████████████

████████████████████████████████

██████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████

## XI.    <u>LIKELIHOOD OF RECURRENCE</u>

### A.  Without appropriate relief, USAP's harmful conduct is likely to recur

333.    USAP's course of conduct—and the resulting harm to competition and consumers—remains ongoing. In addition, there is a reasonable likelihood that USAP will engage in similar or related conduct in the future.

334.    USAP's conduct has not been isolated. Instead, USAP has engaged in a whole set of anticompetitive tactics to execute the consolidation scheme Welsh Carson set out. The dozen-plus acquisitions, price-setting arrangements, and market allocation scheme were all designed to

stifle competition and enrich USAP. This conduct has resulted in egregious price increases for patients and their employers, on the order of tens of millions of dollars or more each year.

335.    USAP has never acknowledged the wrongful nature of its conduct. Nor has it offered any assurances against engaging in similar conduct in the future, whether in Texas or in any of the nine other states in which it operates. To the contrary, USAP continues to plan for acquisitions in Texas, as well as elsewhere, and is well-positioned to continue its conduct.

**B.  Without appropriate relief, Welsh Carson's harmful conduct is likely to recur**

336.    Welsh Carson masterminded the plan for USAP to roll up markets across Texas and inflate prices. Since then, it has remained deeply involved in crafting and executing that plan. Welsh Carson itself developed the overarching strategy to consolidate anesthesia markets, recognizing that doing so would yield market power and higher prices. Welsh Carson then carefully directed—and assisted—USAP in following through on the consolidation strategy. Indeed, in internal communications, Welsh Carson has bragged that it is USAP's "primary architect." In other words, the fact that Texans pay considerably more for hospital-only anesthesia services is the direct result of Welsh Carson's conduct.

337.    Welsh Carson continues to play a critical role in USAP's anticompetitive conduct. Welsh Carson personnel still regularly advise USAP on, and assist it with, acquisitions and insurer negotiations. For instance, in 2018, Welsh Carson personnel reported "participat[ing] in commercial payor negotiations" and "due diligence on potential tuck-in acquisitions." As another example, in 2019, USAP consulted with Welsh Carson personnel when considering ███ ███████████████████████████████████████████████████████. In addition, Welsh Carson continues to benefit handsomely from USAP's supracompetitive prices, having received nearly $85 million in dividend payments between 2018 and 2020 (and over $350 million

between 2012 and 2020). Nor does anything prevent Welsh Carson from re-upping its investment in USAP, retaking formal control of the company, and directing yet more anticompetitive acquisitions.

338.     Further, there is a reasonable likelihood that Welsh Carson will engage in similar and related conduct in the future. Welsh Carson's conduct has not been isolated. Instead, Welsh Carson planned the consolidation scheme and created USAP for the express purpose of implementing that scheme. This conduct has resulted in egregious price increases for Texans, costing them tens of millions of dollars annually. Yet Welsh Carson has never acknowledged the wrongful nature of its conduct, nor has it offered any assurances against engaging in similar conduct in the future (in Texas or elsewhere). And Welsh Carson remains well-positioned to engage in similar conduct in the future, with its 16 active healthcare investments and frequent search for new investments.

339.     In fact, Welsh Carson itself has intentionally repeated its USAP strategy. In 2015 Welsh Carson entered the emergency medicine market and engaged in a similar roll-up strategy to the one it deployed with USAP. Then, in 2017, when preparing to enter the radiology market, Welsh Carson explained that "[g]iven our success to date with USAP and [in emergency medicine], we would like to . . . deploy[] a similar strategy to consolidate the market . . . ." By all appearances, Welsh Carson did just that. Today, U.S. Radiology Specialists, which describes itself as "founded jointly" by Welsh Carson and "one of the nation's largest" radiology groups, covers over 80 hospitals in more than a dozen states. Two of its directors are affiliated with Welsh Carson, and one of them is Brian Regan—the same partner who led Welsh Carson's investment and involvement in USAP.

## XII.  <u>VIOLATIONS</u>

### COUNT I

**Monopolization of Houston Hospital-Only Anesthesia Market
Arising Under Section 2 of the Sherman Act**

340.     The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

341.     USAP has monopoly power in the market for commercially insured hospital-only anesthesia services in Houston.

342.     USAP and Welsh Carson have willfully acquired and maintained monopoly power in the market for commercially insured hospital-only anesthesia services in Houston.

343.     In 2012, USAP acquired Greater Houston Anesthesiology. Subsequently, between 2014 and 2020, USAP acquired three additional Houston anesthesia practices: North Houston Anesthesiology, MetroWest Anesthesia Care, and Guardian Anesthesia (collectively, the "Houston Tuck-In Acquisitions").

344.     In addition, USAP entered into, or maintained, agreements with Baylor College of Medicine anesthesiologists and anesthesiologists in the Methodist Hospital Physician Organization in which USAP billed services by their providers at USAP's higher rates.

345.     Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, these acquisitions and price-setting arrangements.

346.     There is no valid procompetitive justification for USAP's exclusionary conduct in the commercially insured hospital-only anesthesia market in Houston.

347.     USAP and Welsh Carson's anticompetitive course of conduct constitutes unlawful monopolization in the commercially insured hospital-only anesthesia services market in

Houston in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Roll-up of Houston Hospital-Only Anesthesia Market
### in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act

348.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

349.    Between 2014 and 2020, USAP and Welsh Carson, directly or indirectly, made the three Houston Tuck-In Acquisitions.

350.    At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Houston.

351.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Houston Tuck-In Acquisitions.

352.    USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their Houston Tuck-In Acquisitions are not likely to be anticompetitive.

353.    USAP and Welsh Carson's Houston Tuck-In Acquisitions substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Houston in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, whether considered individually or as a series of acquisitions.

354.    USAP and Welsh Carson's Houston Acquisitions are an unfair method of competition in the commercially insured hospital-only anesthesia services market in Houston in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), whether considered individually or as a series of acquisitions.

## COUNT III

**Conspiracy to Monopolize Houston Hospital-Only Anesthesia Market
Arising Under Section 2 of the Sherman Act**

355.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

356.    At all relevant times, USAP has had monopoly power, or monopoly power was economically feasible for USAP to achieve, in the commercially insured hospital-only anesthesia services market in Houston.

357.    USAP and Welsh Carson entered into an agreement, understanding, or conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

358.    USAP and Welsh Carson took numerous overt acts in furtherance of their conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

359.    USAP and Welsh Carson had the specific intent to monopolize the commercially insured hospital-only anesthesia services market in Houston.

360.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston has had an effect on a substantial amount of interstate commerce.

361.    There is no valid procompetitive justification for USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

362.    Neither USAP nor Welsh Carson has withdrawn from the conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

363.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV

### Monopolization of Dallas Hospital-Only Anesthesia Market
### Arising Under Section 2 of the Sherman Act

364.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

365.    USAP has monopoly power in the commercially insured hospital-only anesthesia services market in Dallas.

366.    USAP and Welsh Carson have willfully acquired and maintained monopoly power in the commercially insured hospital-only anesthesia services market in Dallas.

367.    In 2014, USAP acquired Pinnacle Anesthesia Consultants. Subsequently, between 2015 and 2016, USAP acquired six additional Dallas anesthesia practices: Anesthesia Consultants of Dallas, Excel Anesthesia Consultants, Southwest Anesthesia Associates, BMW Anesthesiology, Medical City Physicians, and Sundance Anesthesia (collectively, the "Dallas Tuck-In Acquisitions").

368.    In addition, USAP entered into, or maintained, agreements with Dallas Anesthesiology Associates in which USAP billed services by their providers at USAP's higher rates.

369.    USAP also ███████████████████████████████████████
██████████████████████████████████████████████████████ .

370.     Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, these acquisitions and price-setting arrangements.

371.     There is no valid procompetitive justification for USAP's exclusionary conduct in the commercially insured hospital-only anesthesia market in Dallas.

372.     USAP and Welsh Carson's anticompetitive course of conduct constitutes unlawful monopolization in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### Roll-up of Dallas Hospital-Only Anesthesia Market
### in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act

373.     The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

374.     Between 2015 and 2016, USAP and Welsh Carson, directly or indirectly, made the six Dallas Tuck-In Acquisitions.

375.     At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Dallas.

376.     Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Dallas Tuck-In Acquisitions.

377.     USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their Dallas Tuck-In Acquisitions are not likely to be anticompetitive.

378.    USAP and Welsh Carson's Dallas Tuck-In Acquisitions substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, whether considered individually or as a series of acquisitions.

379.    USAP and Welsh Carson's Dallas Acquisitions are an unfair method of competition in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), whether considered individually or as a series of acquisitions.

### COUNT VI

**Conspiracy to Monopolize Dallas Hospital-Only Anesthesia Market**
**Arising Under Section 2 of the Sherman Act**

380.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

381.    At all relevant times, USAP has had monopoly power, or monopoly power was economically feasible for USAP to achieve, in the commercially insured hospital-only anesthesia services market in Dallas.

382.    USAP and Welsh Carson entered into an agreement, understanding, or conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas

383.    USAP and Welsh Carson took numerous overt acts in furtherance of their conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

384.    USAP and Welsh Carson had the specific intent to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

385.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas has had an effect on a substantial amount of interstate commerce.

386.    There is no valid procompetitive justification for USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia market in Dallas.

387.    Neither USAP nor Welsh Carson has withdrawn from the conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

388.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII

### Roll-up of Austin Hospital-Only Anesthesia Market
### in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act

389.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

390.    In 2013, USAP and Welsh Carson, directly or indirectly, acquired Lake Travis Anesthesia. Subsequently, in 2018 USAP and Welsh Carson, directly or indirectly, acquired an additional Austin anesthesiology practice: Capitol Anesthesiology Association (collectively "Austin Acquisitions").

391.    At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Austin.

392.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Austin Acquisitions.

393.     USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their acquisition of Capitol is not likely to be anticompetitive.

394.     USAP and Welsh Carson's acquisition of Capitol substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Austin in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

395.     USAP and Welsh Carson's acquisition of Capitol is an unfair method of competition in the commercially insured hospital-only anesthesia services market in Austin in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VIII
### Scheme to Reduce Anesthesia Competition in Texas
### in Violation of Section 5 of the FTC Act

396.     The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

397.     USAP's acquisition of Greater Houston Anesthesiology, the Houston Tuck-In Acquisitions, the acquisition of Pinnacle, the Dallas Tuck-In Acquisitions, the Austin Acquisitions, and the acquisitions of East Texas Anesthesiology, Amarillo Anesthesia Consultants, and Star Anesthesia (collectively, the "Texas Acquisitions"), its price-setting arrangements, and the ███████ market allocation are all methods of competition. None is an inherent feature of the anesthesia marketplace. Instead, they all result from USAP's and Welsh Carson's deliberate consolidation scheme.

398.     USAP's and Welsh Carson's Texas Acquisitions, price-setting arrangements, and ███████ market allocation are unfair: they go beyond competition on the merits. In making each of the Texas Acquisitions, Welsh Carson and USAP planned that USAP would—and USAP did in fact—accumulate positions at key hospitals across the state. Recognizing that patients will

visit these hospitals regardless of USAP's network participation status with insurers, USAP and Welsh Carson exploited USAP's positioning to extract significant rate increases following each of the Texas Acquisitions. USAP and Welsh Carson likewise used their price-setting arrangements and the ████ market allocation to secure further leverage in their insurer negotiations.

399.    USAP's and Welsh Carson's conduct has had a demonstrated tendency to harm competitive conditions for anesthesia in and across Texas. The Texas Acquisitions, price-setting arrangements, and ████ market allocation resulted in higher prices to patients and their employers for anesthesia groups who joined USAP. Moreover, the conduct has resulted in price increases even for anesthesia groups who remain unaffiliated with USAP.

400.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Texas Acquisitions, price-setting arrangements, and ████ market allocation.

401.    There is no cognizable justification for the Texas Acquisitions, price-setting arrangements, and ████ market allocation.

402.    USAP's and Welsh Carson's course of conduct, whether considered as a whole or each portion in isolation, is an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT IX

### Horizontal Agreements to Bill at a Fixed Price
### Arising under Section 1 of the Sherman Act

403.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

404. At all relevant times, USAP has had market power in Houston and Dallas with respect to commercially insured hospital-only anesthesiology services.

405. USAP entered into, or maintained, agreements with the Methodist Hospital Physician Organization, Dallas Anesthesiology Associates, and the Baylor College of Medicine in which USAP billed services by their anesthesia providers at USAP's higher rates.

406. At all relevant times, Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the price-setting arrangements.

407. These price-setting arrangements violate Section 1 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT X

**Horizontal Agreement to Divide Market**
**Arising under Section 1 of the Sherman Act**

408. The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

409. At all relevant times, USAP had market power or was acquiring market power in Dallas with respect to commercially insured hospital-only anesthesiology services.

410. USAP engaged in unlawful horizontal market allocation with an actual or potential competitor, ████████, in the market for commercially insured hospital-only anesthesiology services in ████████████████████████████████████████ ████████████████████ and USAP agreed that ████████ would not compete in the commercially insured hospital-only anesthesia services market in ████████ in exchange for consideration.

411.    At all relevant times, Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the unlawful horizontal market division.

412.    USAP's anticompetitive acts violate Section 1 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### XIII.   PRAYER FOR RELIEF

WHEREFORE, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act; therefore, the FTC requests that this Court, as authorized by 15 U.S.C. § 53(b), 15 U.S.C. § 26, and its own equitable powers, enter final judgment against Defendants, declaring, ordering, and adjudging:

413.    That USAP's course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18;

414.    That Welsh Carson's course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18;

415.    That Defendants are permanently enjoined from engaging in similar and related conduct in the future; and

416.    That the Court grant other such equitable relief, including but not limited to structural relief, as the Court finds necessary to redress and prevent recurrence of Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18, as alleged herein.

Dated: September 21, 2023                 Respectfully submitted,

Of counsel:                               */s/ Kara Monahan*

HENRY LIU                                 KARA MONAHAN (NJ Bar No. 011392010)
Director                                  Attorney-In-Charge
                                          Deputy Assistant Director
RAHUL RAO                                 Federal Trade Commission
Deputy Director                           600 Pennsylvania Avenue, N.W.
                                          Washington, D.C. 20580
SHAOUL SUSSMAN                            Tel: (202) 326-2018
Associate Director for Litigation         Email: kmonahan@ftc.gov

Federal Trade Commission                  BRADLEY S. ALBERT (MD Bar)
Bureau of Competition                     Deputy Assistant Director

                                          MICHAEL J. ARIN (CA Bar No. 335693)
                                          DYLAN HERTS (NY Bar)
                                          LEAH P. HUBINGER (CA Bar No. 324976)
                                          TIMOTHY GRAYSON (DC Bar No. 1028502)
                                          PATRICK KENNEDY (IL Bar No. 6332905)
                                          NEAL PERLMAN (NY Bar)
                                          GARY H. SCHORR (NY Bar)
                                          ERIC M. SPRAGUE (NY Bar)
                                          Admissions *pro hac vice* pending

                                          GARTH HUSTON
                                          (TX Bar No. 24041161, SDTX Bar No. 3858253)

                                          Attorneys
                                          Bureau of Competition

                                          *Counsel for Plaintiff Federal Trade Commission*