# Appendix of Authorities

# Table of Contents

Complaint for Injunctive and Other Equitable Relief, FTC v. Surescripts, LLC, No. 19-cv-1080-JDB (D.D.C. May 3, 2019), ECF No. 26 ......................................................**3**

  ¶ 5 ...........................................................5


Redacted Am. Complaint for Injunctive and Other Equitable Relief, FTC v. Vyera Pharms., LLC, No. 1:20-cv-706-DLC (S.D.N.Y. Apr. 16, 2020), ECF No. 91 .....**58**

  ¶¶ 144-75 ...............................................90


Plaintiff Federal Trade Commission's First Am. Complaint for Injunctive Relief, FTC v. Cephalon, Inc., No. 2:08-cv-2141-MSG (E.D. Pa. Aug. 12, 2009), ECF No. 40 .........................................................**144**

  ¶¶ 61-78 ...............................................159

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Avenue, N.W.
Washington, DC 20580

**Plaintiff,**

**v.**

**SURESCRIPTS, LLC**
2800 Crystal Drive
Arlington, VA 22202

**Defendant.**

---

**Case No.: 19-cv-1080 (JDB)**

**REDACTED**

**Complaint for Injunctive and Other Equitable Relief**

Plaintiff Federal Trade Commission ("FTC"), by its designated attorneys, petitions this Court pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for a permanent injunction and other equitable relief, including equitable monetary relief, against Defendant Surescripts, LLC ("Surescripts") to prevent unfair methods of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## I.      NATURE OF THE CASE

1.      Surescripts, a health information technology company, has engaged in a long-running anticompetitive scheme to maintain its monopolies over two separate, complementary markets: electronic prescription routing ("routing") and eligibility, which are often collectively referred to as "e-prescribing." Routing is the transmission of prescription and prescription-related information from a prescriber (via the prescriber's electronic health record ("EHR") system) to a pharmacy. Eligibility is the transmission of a patient's formulary and benefit information from a payer (usually the patient's pharmacy benefit manager ("PBM")) to a prescriber's EHR.

3

2.      In 2009, Surescripts had monopolies over routing and eligibility. With both of
these markets poised to experience explosive growth due to federal incentives for e-prescribing,
Surescripts feared that other health information technology companies could threaten its
dominant positions. To neutralize these competitive threats, Surescripts took a series of
anticompetitive actions to protect and maintain its monopolies. This multifaceted anticompetitive
scheme has been remarkably successful: Despite a massive increase in e-prescribing over the
past decade, Surescripts has prevented any meaningful competition, maintaining at least a 95%
share (by transaction volume) in each market.

3.      First, Surescripts changed its pricing policies to require long-term exclusivity
from nearly all of its routing and eligibility customers. Surescripts designed its new pricing to
ensure that its customers would pay a higher price on all of Surescripts's transactions unless they
were "loyal" to Surescripts, i.e., used Surescripts exclusively. With its 95%-plus share in both
markets, Surescripts knew that no competitor could ever offer customers enough savings to
compensate customers for the skyrocketing costs the customers would face by paying
Surescripts's higher "non-loyal" price on their remaining Surescripts transactions. Surescripts's
web of loyalty contracts prevented competitors from attaining the critical mass necessary to be a
viable competitor in either routing or eligibility. Those effectively exclusive contracts foreclosed
at least 70% of each market, eliminating multiple competitive attempts from other companies,
such as Emdeon, that offered lower prices and greater innovation. All of this was done
intentionally, as one Surescripts vice president gloated about how Surescripts's loyalty contracts
scheme excluded a competitor, Emdeon: "It[']s nice when a plan comes together."

4.      Second, Surescripts has engaged in a long-running campaign of threats and other
non-merits based competition to ensure that no other competitor could get a toehold in either

market. As one example, when Allscripts, a large EHR customer of Surescripts, attempted to enter into a non-exclusive agreement with Surescripts in 2014 so Allscripts could use Emdeon, Surescripts launched a series of threats—what senior Surescripts executives called their "nuclear missiles." These threats were intended to secure Allscripts's continued exclusive use of Surescripts and quash the threat from Emdeon.

5.     Third, Surescripts eliminated the competitive risk posed by RelayHealth, a subsidiary of McKesson Corporation, in routing. Surescripts feared that RelayHealth—with its extensive connections to many of the same customers Surescripts wanted to lock up via its loyalty scheme—had a "natural ability to capture 15-20% of transaction volume." Surescripts understood that competition from RelayHealth would have "dropped the price [for routing] down to 2 or 3 cents at any time." To eliminate this competitive risk, in 2010, Surescripts entered into an agreement that prohibited RelayHealth from competing in the routing market for six years. Although this agreement facially preserved the existing "value-added reseller" relationship between the two companies, Surescripts executives have repeatedly stated that, from Surescripts's perspective, the sole benefit of that ongoing relationship is that it sidelines RelayHealth as a competitor. Although the formal non-compete is no longer in the agreement, strict contract provisions continue to prevent RelayHealth from competing against Surescripts in routing, ensuring that the routing market suffers from the effects of that non-compete today.

6.     Due to Surescripts's ongoing conduct, there is no meaningful competition in the markets for routing or eligibility. The decade-long monopolies in these markets have produced predictable effects: higher prices, reduced quality, stifled innovation, suppressed output, and stymied alternative business models.

## II.    JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

8.      This Court has personal jurisdiction over Surescripts because Surescripts has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

9.      Surescripts sells e-prescribing services to customers located in this district. Surescripts has entered into e-prescribing contracts with businesses and healthcare providers located in this district.

10.     Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b). Surescripts resides, transacts business, committed an illegal or tortious act, or is found in this district.

11.     Surescripts's general business practices, and the unfair methods of competition alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

12.     Surescripts is, and at all relevant times has been, a corporation, as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## III.    THE PARTIES

13.     Plaintiff FTC is an administrative agency of the United States Government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its principal offices in the District of Columbia. The FTC is vested with authority and responsibility for enforcing, among other things, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

14.     Defendant Surescripts is a for-profit Delaware limited liability company, with its principal place of business at 2800 Crystal Drive, Arlington, VA 22202. Except where otherwise specified, "Surescripts" refers to Surescripts, LLC and all corporate predecessors, subsidiaries, successors, and affiliates.

15.     Surescripts is engaged in the business of selling e-prescribing services, including routing and eligibility. In 2016, Surescripts generated over ███████ in annual revenue, of which over ███████ came from routing and eligibility.

## IV.     BACKGROUND

### A.     Electronic prescribing consists of two transactions.

16.     E-prescribing is the electronic transmission of prescription or prescription-related information between a prescriber (through the prescriber's EHR), a pharmacy, and a payer (usually a PBM), either directly or through an intermediary.

17.     E-prescribing developed as a safer, more accurate, efficient, and lower-cost means for prescribers (via their EHRs), pharmacies, and PBMs to communicate and process patient prescriptions. The benefits of e-prescribing include fewer medical errors due to poor handwriting, greater awareness of potential adverse drug interactions, more effective communication of a patient's insurance coverage and generic alternatives, and increased adherence (the likelihood that a patient will pick up a prescription at a pharmacy after leaving the prescriber's office).

18.     The core e-prescribing services are routing and eligibility. Although these two services are usually provided to prescribers together in the same prescribing workflow, each transaction serves a different purpose, delivers different information, and occurs between different customers.

19.     Routing is the transmission of prescription and prescription-related information between the prescriber's EHR and a pharmacy. Routing transactions also include the transmission of a pharmacy's request to a prescriber's EHR for a refill of a prescription.

20.     Eligibility is the transmission of a patient's formulary and benefit information from a PBM to a prescriber's EHR prior to the patient's appointment. This information allows a prescriber to know, for example, which drugs are covered by the patient's drug benefit plan, the location of covered drugs on a patient's health insurance company's formulary, and what copay (if any) a patient will have to pay to obtain a prescribed drug. Eligibility also informs the prescriber of lower-cost alternatives, such as generic drugs.

21.     Each of the routing and eligibility transactions is governed by its own industry-wide standard created by the National Council for Prescription Drug Programs ("NCPDP"). There is no patent or other intellectual property protection for either the routing or the eligibility transactions.

**B.      Routing and eligibility are two-sided networks with a "chicken-and-egg problem."**

22.     Providing routing requires building a two-sided network (or platform) linking EHRs to pharmacies. Providing eligibility requires building a two-sided network (or platform) linking EHRs to PBMs.

23.     Two-sided platforms experience what economists refer to as "indirect network effects." That means that the value to participants on one side increases when there are more participants on the other side.

24.     Both routing and eligibility have significant indirect network effects. For routing, pharmacies get more value from a network that connects to more EHRs because there is a greater supply of prescribers that can send patients to those pharmacies to purchase the patients'

prescribed drugs. And EHRs get more value from a network that connects to more pharmacies because prescribers can send prescriptions to more pharmacies, which increases the likelihood that patients will be able to use their preferred pharmacy.

25.     Similarly, for eligibility, PBMs get more value from a network that connects more EHRs, as the increased distribution of a PBM's formulary and benefit information helps more prescribers prescribe on-formulary drugs and thereby saves PBMs more money. And the EHRs get more value from a network that connects to more PBMs because EHRs are able to obtain more complete insurance benefit information, such as for those patients who have multiple insurers.

26.     Another feature of many two-sided networks is that customers on one side of the network will not join the network unless they are confident that they will be able to access enough customers on the other side and thereby derive enough value from using the network. Neither side will join unless they believe the other side will. This gives rise to what economists refer to as the "chicken-and-egg problem." Solving this coordination problem is key to developing a viable platform.

27.     Routing and eligibility both face the chicken-and-egg problem, as the industry itself has observed. For routing, a network is unlikely to persuade EHRs to join the network, and incur the costs associated with connecting, unless those EHRs believe they will be able to access a substantial number of pharmacies on that network. And a routing network is unlikely to convince pharmacies to join the network, and incur the costs associated with connecting, unless those pharmacies believe they will be able to access a substantial number of EHRs participating in that network.

28.     For eligibility, a network is unlikely to persuade EHRs to join the network, and incur the costs associated with connecting, unless those EHRs believe they will be able to access a substantial number of PBMs on that network. And an eligibility network is unlikely to convince PBMs to join the network, and incur the costs associated with connecting, unless those PBMs believe they will be able to access a substantial number of EHRs participating in that network.

29.     Creating viable routing and eligibility networks requires solving the chicken-and-egg problem and providing sufficient value to both sides of these platforms. Economists recognize that to solve the chicken-and-egg problem networks must get a "critical mass" of customers on both sides to sign up. If a network cannot get a critical mass on both sides, then it is unlikely to be able to operate a viable platform.

30.     In its submissions to the FTC, Surescripts has acknowledged that the chicken-and-egg problem exists as a barrier to entry in each of the markets for routing and eligibility.

31.     When a new platform starts, it can achieve critical mass either by getting customers who have not signed on to any platform or by getting customers from an existing platform. Customers of an existing platform face less cost and risk when they can use both their current platform and the new platform. Economists refer to the use of more than one platform simultaneously as "multihoming." Multihoming is common and new platforms routinely rely on multihoming to enter and compete with existing platforms.

32.     Nearly all routing and eligibility customers use Surescripts's platform, so competitors in general must compete for customers already using Surescripts's routing and eligibility platforms. Because customers often prefer to avoid the cost and risk of a complete switch to an entrant, the entrant is most likely to win business through multihoming. Customers

want to multihome because it encourages price competition and innovation in e-prescribing, and a small handful do multihome. As alleged below, Surescripts intentionally set out to substantially increase all routing and eligibility customers' costs to multihome, significantly elevating the critical mass a Surescripts competitor would need to become a viable network in either routing or eligibility. Absent Surescripts's conduct, entrants in routing and/or eligibility would have used multihoming to overcome the chicken-and-egg entry barrier through normal, market-based competition.

     **C.**    **Due to federal policies and incentives, the e-prescribing industry has experienced extraordinary growth.**

    33.    In 2008, there had been limited adoption of e-prescribing by prescribers. Congress thus acted twice to encourage expansion of e-prescribing and its many benefits.

    34.    First, on July 15, 2008, Congress passed the Medicare Improvements for Patients and Providers Act ("MIPPA"). MIPPA, through regulations implemented by the Centers for Medicare and Medicaid Services ("CMS"), adopted a carrot-and-stick approach to encourage prescribers to e-prescribe. As the carrot, MIPPA provided financial incentives to prescribers equivalent to a reimbursement bonus based on the prescriber's total charges for professional services to Medicare and Medicaid. As the stick, MIPPA established penalties in the form of reduced Medicare and Medicaid reimbursements to prescribers if a prescriber was not a "successful electronic prescriber." To be considered a successful electronic prescriber under MIPPA, a prescriber must use an EHR that, among other things, allows the prescriber to obtain eligibility information and "electronically transmit prescriptions" for a specified fraction of total prescriptions.

    35.    Second, on February 17, 2009, Congress passed the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), which further expanded the

regulatory regime CMS implemented to grow e-prescribing. The HITECH Act encourages the "meaningful use" of EHRs throughout the United States. It does so by authorizing carrot-and-stick financial incentives and payment reductions to prescribers depending on whether they "meaningfully used" EHR technology. Through today, CMS has paid out over $38 billion in meaningful use financial incentives, which does not account for the effect of the potential penalties.

36.     One meaningful use objective is the ability to "[g]enerate and transmit . . . prescriptions electronically."

37.     To prescribe electronically—and thus obtain the financial incentives and later avoid penalties described above—prescribers (via their EHRs) need to connect to pharmacies and PBMs.

38.     From 2008 to 2016, the number of routing and eligibility transactions grew over 23-fold, from 147 million to 3.5 billion, and the percentage of U.S. physicians e-prescribing grew to nearly 70%. In 2017, 77% of all prescriptions were delivered electronically.

39.     This growth was primarily driven by MIPPA and the HITECH Act. Surescripts agrees, writing in 2014, "[w]e believe the dramatic growth in adoption and use [of e-prescribing] is a function of the combined forces of federal financial incentives and an aggressive response by the technology sector." As Surescripts's former CEO Harry Totonis testified, "meaningful use totally helped e-prescribing happen."

**D.     Surescripts was well positioned to capitalize on e-prescribing's explosive growth.**

40.     Surescripts, LLC was formed on May 9, 2008, through a cashless merger of two companies: RxHub LLC ("RxHub") and SureScripts Systems, Inc. ("SureScripts Systems"). The

merger was not reportable under the Hart-Scott-Rodino Act and neither the U.S. Department of Justice nor the FTC reviewed the merger.

41.     RxHub was the first major eligibility network. It was formed by three PBMs in February 2001.

42.     Six months later, in response to RxHub's formation, two pharmacy trade groups formed SureScripts Systems. SureScripts Systems primarily focused on routing.

43.     As a result of the merger, Surescripts possessed at least 95% of the routing market (by transaction volume) and at least 95% of the eligibility market (by transaction volume).

44.     Surescripts is currently owned by CVS Health ("CVS") (17%) (a pharmacy and PBM), Express Scripts (33%) (a PBM), the National Association of Chain Drug Stores (25%) (a trade association), and the National Community Pharmacists Association (25%) (a trade association).

45.     No EHR or prescriber has an ownership interest in Surescripts.

46.     No pharmacy or PBM, other than CVS and Express Scripts, has a direct ownership interest in Surescripts.

47.     No pharmacy, PBM, or EHR has a controlling interest in Surescripts.

48.     Surescripts provides connections between EHRs, pharmacies, and PBMs for routing and eligibility.

49.     Surescripts charges pharmacies (either directly or indirectly via a reseller or other third-party intermediary, such as a pharmacy technology vendor ("PTV")) a fee for each routing transaction and charges PBMs a fee for each eligibility transaction.

50.     In 2016, Surescripts received nearly ███████ in routing and eligibility fees from pharmacies, PBMs, and intermediaries, which accounted for over ███ of its total revenue.

51.     Surescripts pays EHRs a fee for each routing and eligibility transaction, but only if the EHR uses Surescripts exclusively. The industry commonly refers to these disbursements as "incentive payments."

52.     In 2016, Surescripts paid over ▬▬▬▬ in incentive payments to EHRs.

53.     Surescripts follows the NCPDP standards for routing and eligibility transactions.

54.     Surescripts creates and manages its own certification processes for its network, which means that customers (i.e., EHRs, pharmacies, PBMs, and intermediaries) must obtain certification from Surescripts and sign a contract before they can use Surescripts's network.

## V.     ANTICOMPETITIVE CONDUCT

55.     In 2009, Surescripts, with its extensive connectivity to e-prescribing stakeholders, was well positioned to benefit from enormous growth in routing and eligibility, which was catalyzed by MIPPA, the HITECH Act, CMS regulations, and a broader movement towards computerizing health records. Surescripts foresaw a vast, open, and untapped market. However, other companies saw the same potential.

56.     Surescripts faced substantial competitive threats to its routing and eligibility monopolies and was concerned that competition would drive the "commoditization" of routing and eligibility, reduce prices for each, and "devastate" Surescripts's cash flow.

57.     In late September 2009, Surescripts's management explained to its board of directors that these "competitive pressures require precipitous price drops, down near or below our average unit costs (~5c)" and that, should Surescripts "lose 2-3 midsize pharmacy customers or a large PBM" to a competitor, "Surescripts would not be financially viable."

58.     To prevent lower prices from competition, Surescripts substantially raised nearly all its customers' costs to multihome, rendering the chicken-and-egg problem insoluble for a

12

competitor. The result has been the total exclusion of all meaningful competition in routing and eligibility, higher prices, reduced innovation, lower output, and no customer choice.

### A. Surescripts learns of an emerging threat to its monopolies.

59.     On July 1, 2009, a health information technology company called Emdeon (n/k/a eRx Network) acquired eRx Network, a competing routing network. Although eRx Network only transmitted approximately 5% of routing market transactions at that time, it was well positioned for significant growth as eRx Network maintained connectivity with Allscripts, a large EHR, and PDX, a PTV providing routing connectivity that marketed primarily to medium-to-large sized retail pharmacy chains.

60.     Surescripts recognized that competition from Emdeon would "drive lower prices."

61.     On July 22, 2009, Surescripts's Chief Strategy Officer, Scott Barclay, explained that with "lower prices and further capabilities, the new Emdeon could significantly compete" with Surescripts.

62.     If Emdeon could provide lower prices to pharmacies, higher incentives to EHRs, or both, Emdeon could attract enough customers to its routing network and solve the chicken-and-egg problem. Surescripts understood that if additional customers were to multihome with Emdeon, "[t]hen it becomes a price game at pharmacy and an incentive game at the POC [point of care, i.e., prescribers/EHRs]. . . . [E]ach network fights for itself and the market share game becomes paramount quickly."

63.     Surescripts thus acted to eliminate the outbreak of competition—an outcome where one set of customers (pharmacies and PBMs) would pay lower prices, another set of customers (EHRs) would receive higher incentive payments, but Surescripts would lose its supracompetitive profits.

**B.**     **Surescripts responds to competition by devising and implementing an anticompetitive web of exclusive contracts.**

64.     In response to the threat from Emdeon and other competitors, Surescripts, with its 95%-plus established share in both markets, sought to eliminate all competition by significantly raising its customers' costs to multihome, thereby dramatically increasing the critical mass necessary for a Surescripts competitor to become viable. Surescripts did so by blanketing the markets for routing and eligibility with loyalty pricing and exclusivity contracts.

65.     Beginning in mid-2009, Surescripts devised a scheme to include "loyalty" provisions in contracts with customers on both sides of the routing and eligibility markets, which conditioned discounts or payments on actual or de facto exclusivity. Loyalty discounts apply to Surescripts's pharmacy, PTV, and PBM customers. Loyalty payments apply to Surescripts's EHR customers.

**1.  The structure of Surescripts's pharmacy, PTV, and PBM contracts.**

66.     For pharmacies and PTVs to receive a loyalty discount, a customer must be exclusive to Surescripts. To be considered exclusive, Surescripts requires that a pharmacy and PTV customer route 100% of its transactions "through and only through the Surescripts network." This requirement only applies to Surescripts-connected entities. Because Surescripts maintains connectivity to nearly all EHRs, this provision effectively requires 100% exclusivity from pharmacies and PTVs. Surescripts generally refers to these exclusive customers as "loyal" customers and those that are not exclusive as "non-loyal."

67.     The same structure exists for PBMs in eligibility.

68.     Under these loyalty provisions, because pharmacies, PTVs, and PBMs must use Surescripts for all or nearly all of their transactions, becoming non-exclusive and losing the loyalty discounts results in a significant cost increase. Surescripts's loyalty pricing scheme

14

therefore substantially increases the cost of multihoming through a second network for nearly all pharmacies, PTVs, and PBMs. Though the difference in the per-transaction price between a loyal and non-loyal transaction is often a few pennies, many pharmacy chains and PBMs send millions of transactions across the Surescripts network and a difference of a few pennies results in hundreds of thousands or even millions of dollars in cost increases.

69.     These non-loyal per-transaction prices (which are additional costs to customers) are not justified by any increased costs faced by Surescripts in transmitting routing or eligibility information. Rather they exist only to act both as penalties to those customers that may consider being non-loyal to Surescripts and as an exclusionary tactic against any competitor in routing or eligibility, thus reinforcing and maintaining Surescripts's monopolies in routing and eligibility.

70.     For routing, Surescripts's per-transaction price to non-loyal pharmacies and PTVs varies by volume but can be as high as ███ more than the price to loyal pharmacies or PTVs.

71.     For eligibility, Surescripts's per-transaction price to non-loyal PBMs varies by volume but can reach ███ more than the price to loyal PBMs.

72.     In many contracts, Surescripts also requires customers to pay the price differential between the loyal and non-loyal price for historical transaction volume retroactive over the term of the contract. For many customers, these additional clawback obligations total millions of dollars and substantially strengthen the lock-up effect of the contracts.

73.     Surescripts refers to these clawback provisions as the "teeth" of its loyalty contracts.

74.     Exhibit Two (A) of Surescripts's September 28, 2010 contract with PTV customer ████████████████ provides an illustrative example of the "teeth" of Surescripts's contracts:

> If, during the Loyalty Term, Aggregator [i.e., ███████████████] ceases to route all of its electronic Prescription Routing messages to Prescribing Participants

15

through, and only through, the Surescripts network and fails to cure within the applicable cure period, then Surescripts shall immediately cease calculating the Loyalty Discount and Aggregator agrees to pay Surescripts the amount of the Loyalty Discount received by Aggregator during the Loyalty Term.

75.     Similarly, Surescripts's June 2, 2010 contract with PBM customer █████

provides:

If, during the Loyalty Term, PBM ceases to route all of its electronic Prescription History and Benefit (Ambulatory) messages to Participants through, and only through, the Surescripts network, then Surescripts shall immediately cease applying the Loyalty Eligibility Transaction Fee price and PBM agrees to pay Surescripts the difference in the amount of Transaction Fees PBM would incur had PBM paid the [non-loyal price] versus the [loyal price] as of the Amendment Effective Date.

**2.  The structure of Surescripts's EHR contracts.**

76.     Surescripts imposes the same loyalty scheme on EHRs, except in reverse by conditioning any incentive payments on an EHR's exclusivity to Surescripts for routing, eligibility, or both.

77.     Under the EHR loyalty program as implemented for most EHRs, if an EHR agrees to be exclusive only in routing, Surescripts pays the EHR an incentive fee of ███ of the routing fee paid by pharmacy customers to Surescripts for each routing transaction. If an EHR agrees to be exclusive only in eligibility, Surescripts pays the EHR an incentive fee of ███ of the eligibility fee paid by PBM customers to Surescripts. If the EHR agrees to be exclusive in both routing and eligibility, Surescripts pays the EHR a higher ███ incentive fee on both transactions. Nearly all EHRs participating in the loyalty program agree to exclusivity on both transactions.

78.     If an EHR decides to multihome and use Surescripts for less than 100% of its transactions, Surescripts terminates incentive fees to that EHR. In other words, Surescripts raises the EHR's price by reducing the EHR's incentive fees to zero. As with the penalty price

Surescripts charges non-loyal pharmacies, PTVs, and PBMs, there are no legitimate competitive reasons (e.g., increased costs) for Surescripts to raise its EHR price to zero for non-loyal EHRs.

79.    As with its clawback provisions to pharmacies, PTVs, and PBMs, Surescripts also requires the EHR to pay back the incentive fees for historical transaction volume if the EHR violates the exclusivity commitment. Some contracts require repayment on transactions over the full term of the contract. For example, Surescripts's April 14, 2010 contract with EHR ███████████ provides:

> If, during the Loyalty Term, Surescripts determines that Aggregator [i.e., ██████████] has failed to comply with the loyalty requirements . . . Aggregator shall promptly pay back to Surescripts the amount of Incentive Fees paid by Surescripts to Aggregator during the Loyalty Term, and Aggregator shall no longer receive the Incentive Fees.

80.    Surescripts locked up one leading EHR, ███, through a unique contracting strategy intended to address the nature of ███'s business model. Unlike most EHRs, ███ does not aggregate connectivity to Surescripts on behalf of its customers, which are typically large health systems or hospital networks. ██████████████████ ████████████████████████████████████████████ ██████████████████████████████████████

81.    Under Surescripts's contract with ███, to receive incentive fees, ████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████, depriving that EHR customer of e-prescribing access to nearly all pharmacies and PBMs. While the terms of its loyalty incentive contract with ███ differed from other EHRs, Surescripts considered ███ to be loyal, writing in September 2010 that ███ is loyal "for all appropriate purposes."

82.     Surescripts's contracts with nearly all individual ███ customers also contain express exclusivity requirements that require the health system to maintain exclusivity to Surescripts for the term of the contract. ███ clients recognized these provisions prevented multihoming: "In effect . . . by contracting with Surescripts, [the ███ customer] would not be able to use other e-prescribing networks."

### 3.   Surescripts structured the contracts to lock up the routing and eligibility markets.

83.     Surescripts implemented loyalty pricing and exclusivity requirements to make the chicken-and-egg problem insurmountable for any competitor in either routing or eligibility (or both). Specifically, Surescripts's loyalty program substantially raises its customers' costs to multihome, significantly elevating the critical mass a competing platform would need to become viable, rendering the chicken-and-egg problem insoluble. As Surescripts explained in a presentation to its board, the new loyalty strategy would "[p]rotect [Surescripts's] most critical asset—[its] network—by addressing competitive market pressures and locking-in key customers."

84.     Nearly all of Surescripts's loyalty pricing and exclusive contracts in both routing and eligibility have an initial term of three years or more. With some larger customers, the terms are as long as five years.

85.     Surescripts prefers to employ long-term contracts because they enable Surescripts to lock up its customers, preventing them from using a competitor's network. As Surescripts's then-Vice President of Account Management explained in a February 2010 email to the company's then-CEO, "[o]ur 3 year commitments keep[] our competition out of those customers."

86.     Nearly all of Surescripts's loyalty pricing and exclusive contracts in both routing and eligibility automatically renew for one year unless either party gives notice.

87.     In early 2010, as demand for routing and eligibility was growing and inviting entry, Surescripts began executing loyalty pricing with nearly all of its e-prescribing customers. Most of these contracts had an effective date retroactive back to January 1, 2010.

**C.      Surescripts uses RelayHealth to extend the reach of its exclusive contracts and solidify its monopolies.**

88.     While Surescripts was able to push its loyalty pricing and exclusive contracts onto its direct customers, Surescripts was only able to lock up customers with whom Surescripts had a direct contract. But Surescripts was also concerned about a large subset of customers that it did not have direct contracts with (and thus did not have exclusivity commitments from)—namely those customers that connected to Surescripts through RelayHealth.

89.     RelayHealth is a health information technology company that is a subsidiary of McKesson. Since 2003, RelayHealth has contracted with Surescripts to resell the routing transaction to a subset of pharmacy and PTV end-customers. RelayHealth contracts with these pharmacies and PTVs, but Surescripts does not. RelayHealth also provided Surescripts's routing connectivity to some EHRs until 2015, but it no longer does so except for EHRs associated with McKesson.

90.     Surescripts sells the routing transaction to RelayHealth at a "wholesale" rate. RelayHealth then resells the transaction to a subset of pharmacies and PTVs at a higher "retail" rate. RelayHealth profits from the margin between the retail rate pharmacies and PTVs pay RelayHealth and the lower wholesale rate RelayHealth pays to Surescripts. All else equal, the lower Surescripts's wholesale rate to RelayHealth, the higher RelayHealth's margin.

91.     Through two contracts, one executed in 2010 and a second executed in 2015, Surescripts provided RelayHealth with contractual and monetary incentives to convince RelayHealth's routing customers to be loyal to the Surescripts routing network.[1]

92.     In the February 25, 2010 contract ("the 2010 contract") between Surescripts and RelayHealth, RelayHealth was required to use "commercially reasonable efforts to offer terms to incent exclusive use of the Surescripts network" by pharmacies, PTVs, and EHRs and to assist Surescripts in clawing back any incentive fees from EHRs.

93.     Under the 2010 contract, if a RelayHealth customer maintained at least ███ exclusivity to Surescripts, Surescripts discounted its wholesale price to RelayHealth for that customer by ███. Pursuant to the 2010 contract, RelayHealth entered into contracts with its pharmacies and PTVs for routing through the Surescripts network. Nearly all of these contracts went beyond the ███ Surescripts requirement and mandated that these customers use RelayHealth exclusively (i.e., for 100% of their required transactions). Because RelayHealth was exclusive to Surescripts, this provision resulted in nearly all of RelayHealth's pharmacy and PTV customers routing all of their transactions through Surescripts. As an October 2012 RelayHealth presentation put it, RelayHealth's strategy was to "[m]ove non-exclusive customers to exclusive wherever possible."

94.     RelayHealth also provided Surescripts with feedback as to RelayHealth's customers' exclusivity status. For example, in 2012, Surescripts instructed RelayHealth to inquire into the loyalty status of a routing customer called Transaction Data Systems d/b/a Rx30 ("Rx30"). RelayHealth did so and informed Surescripts that Rx30 was not loyal.

---

[1] As alleged below in paragraphs 137-156, Surescripts also feared entry by RelayHealth in routing. Due to these concerns, Surescripts took additional actions in these agreements to eliminate the risk of competition from RelayHealth.

95.     Under the 2010 contract, RelayHealth also entered into contracts with EHRs for routing through the Surescripts network. These contracts were typically for a length of two years or more, contained express exclusivity requirements to RelayHealth, and provided incentive payments to EHRs only if an EHR was 90-100% exclusive to the Surescripts network. Again, because Surescripts was the only routing network to which RelayHealth provided access, this provision resulted in nearly all of RelayHealth's EHR customers routing all of their transactions through Surescripts. For each exclusive routing transaction, Surescripts paid RelayHealth an incentive payment. RelayHealth then passed a portion (typically ████) of those incentives on to its EHRs, but only if they met RelayHealth's exclusivity requirements.

96.     RelayHealth's contracts with EHRs also required repayment of all incentive fees paid to the EHR if the EHR failed to comply with RelayHealth's exclusivity requirement.

97.     In the next contract, signed on January 16, 2015 ("the 2015 contract"), Surescripts renewed its 2010 contract with RelayHealth with modifications. The contract provided RelayHealth with a ████ higher wholesale discount for exclusive transactions; increased the loyalty threshold from ██████████; and, instead of determining loyalty on a customer-by-customer basis, determined loyalty on a platform-wide basis (i.e., in order to receive the discount, RelayHealth had to route ████ of its total, platform-wide routing transactions through Surescripts).

98.     As explained in more detail in paragraphs 151-155 below, the 2015 contract also required RelayHealth to transfer its EHR connections to Surescripts. RelayHealth therefore no longer provides routing connectivity to EHRs, except for EHRs associated with McKesson.

99.     Under the 2015 contract, RelayHealth has not changed its contracts with its end-user pharmacy and PTV customers to resell Surescripts's routing connectivity. Thus,

RelayHealth's contracts for Surescripts's routing network continue to require 100% exclusivity through today.

> **D.     Surescripts locks up a critical EHR and engages in a campaign of threats to enforce its exclusivity provisions.**

100.    While implementing this web of loyalty and exclusive contracts, Surescripts devoted special attention and resources to locking up a critical EHR: Allscripts. In 2009, Allscripts represented approximately 25% of Surescripts's routing and eligibility transactions, making it a significant customer for any e-prescribing network. Allscripts's EHR technology relied on a centralized "hub" infrastructure for all of its customers, meaning that if Allscripts multihomed with an additional e-prescribing network, the added e-prescribing network could quickly route e-prescriptions to and from Allscripts's entire e-prescribing customer base. Allscripts's exclusivity was critical to Surescripts two reasons: (1) Allscripts was one of the few EHRs that was multihoming, using Emdeon as an alternative routing network to Surescripts, which made Emdeon a more viable threat to Surescripts; and (2) Allscripts had implemented a new business model in eligibility that cut out Surescripts as the middleman.

101.    First, Allscripts had contracted with Emdeon for routing since 2007. This connection allowed Allscripts to route prescriptions to Emdeon's pharmacy customers without utilizing the Surescripts network. Emdeon paid Allscripts a routing transaction incentive fee that was at least ███ higher than what Surescripts paid Allscripts.

102.    Surescripts recognized that Allscripts was crucial to Emdeon gaining scale in routing, overcoming the chicken-and-egg problem, and offering increased competition and lower prices. Access to Allscripts's routing transaction volume (through its prescribers) made Emdeon more attractive to potential pharmacy customers. In a November 17, 2009 email, a senior Surescripts executive wrote that in order to prevent Emdeon from solving the chicken-and-egg

problem, "[t]he key to Emdeon is Allscripts[] (i.e., the key to fighting eRx networks [Emdeon] is containing their access to POC [point of care, i.e., prescribers])."

103.    Second, in September 2009, before Surescripts implemented its loyalty and exclusive contracts, Surescripts learned that Allscripts was transmitting eligibility requests around Surescripts's network directly to a PBM called SXC Health Solutions. This practice of developing "direct connections" for eligibility with PBMs represented a different means for Allscripts to receive eligibility information from PBMs and, more broadly, a different model for e-prescribing, one that cut out Surescripts as a middleman. From Surescripts's perspective, Allscripts's development of direct connections to PBMs made Allscripts "a major competitor and our largest current risk" in eligibility.

104.    By May 2010, Allscripts sold or was attempting to sell direct connections to its prescriber network to at least six PBMs, often at prices below Surescripts's.

105.    For example, Allscripts charged at least one PBM a per-transaction price ▇▇ lower than what that same PBM was paying to Surescripts for the same eligibility transaction.

106.    PBMs hoped their relationships with EHRs would create a more competitive, innovative market that would exert pressure on Surescripts to innovate. Many customers have complained that Surescripts's eligibility transaction is "not a reliable process" because it provides only static, non-patient specific formulary information.

107.    Surescripts realized that Allscripts's direct eligibility connections were "a long-term potential threat[] coming true."

**1.    Surescripts locks up Allscripts in 2010.**

108.    Facing these threats, Surescripts implemented a "full combat strategy" to "lock up . . . Allscripts" through an exclusive contract with Allscripts, which Allscripts and Surescripts signed on May 31, 2010.

23

109.    As the preamble to that contract states, "the purpose of this [agreement] is to enter into a long term arrangement for [Allscripts] to utilize Surescripts exclusively" for both routing and eligibility.

110.    The 2010 contract had a term of four years and included several provisions tailored specifically to Allscripts to ensure exclusivity from Allscripts for both routing and eligibility.

111.    First, Surescripts required Allscripts to terminate its routing connection to the Emdeon network at the expiration of Allscripts's contract with Emdeon in June 2013. Allscripts, despite its objections, agreed to this requirement to avoid losing access to Surescripts's network. Surescripts's network is a "must-have" for nearly all EHRs because EHRs must connect to pharmacies and PBMs to e-prescribe. Allscripts terminated its relationship with Emdeon on June 20, 2013.

112.    Second, Surescripts grandfathered in Allscripts's current direct connections with PBMs but prohibited Allscripts from renewing its eligibility contracts with those PBMs and from proactively marketing or entering into new eligibility agreements with PBMs. Surescripts also required Allscripts ███████████████████████████████████████████████ ███████████ Again, despite its objections, Allscripts complied with this provision because it could not afford to go without e-prescribing.

113.    Third, Surescripts imposed a "right of first refusal" procedure on Allscripts's e-prescribing business: If any third party sought to do business with Allscripts in either routing or eligibility, Allscripts was required to set up a meeting with Surescripts and that third party "to facilitate a connection between such [third party] and Surescripts." Only if the third party did not

want to do business with Surescripts after this meeting could Allscripts engage in business discussions with the third party for routing or eligibility.

114.    Fourth, Surescripts required Allscripts to remind its sales and business development personnel annually of the above terms, and Surescripts maintained the right to "review and comment" on such annual reminders.

115.    Allscripts lamented that it had "no choice" but to enter into this agreement as Surescripts was a "must-have" connectivity vendor, and without a contract, Allscripts would be unable to connect to pharmacies and PBMs and thus be unable to e-prescribe.

116.    Surescripts realized that Allscripts was key to crushing Emdeon's ability to expand and quashing any alternative e-prescribing business model via Allscripts's direct connections to PBMs. Surescripts thus provided Allscripts with "enhanced" or "relatively more attractive revenue sharing." Specifically, Surescripts paid Allscripts an incentive of ▮ of the routing and eligibility fees paid by pharmacy and PBM customers for each transaction, substantially more than similarly situated EHRs. One slide from an internal Surescripts presentation, reproduced below, described an early version of its 2010 deal with Allscripts by including a picture of the movie poster from the 2009 film "The Proposal," which included the slogan "HERE COMES THE BRIBE."

25



117.    In the five years following the execution of the contract, Surescripts paid

Allscripts approximately ███████ in incentives for routing and eligibility.

**2.  Surescripts locks up Allscripts again in 2015.**

118.    In 2014, though Surescripts had successfully forced Allscripts to sever its routing

connection with Emdeon, Surescripts still worried that Allscripts would restart multihoming,

using Emdeon as an alternative, which would, in the words of Greg Hansen, Surescripts's then-

Executive Vice President and Chief Customer Officer, "create what is essentially a bidding war

for [Allscripts's prescribers'] transactions or access to their physician community."

119.    That same executive feared that Allscripts "intend[ed] to monetize access to their physician community," and Surescripts's CEO wrote that Allscripts "[is] counting on defection from our owners to shift the balance of economic power from Pharmacies/PBMs to Physicians."

120.    To stifle this "bidding war" and maintain this "balance of economic power," Surescripts engaged in a renewed campaign to force Allscripts into exclusivity.

121.    In the second half of 2014, Surescripts threatened to withhold Allscripts's access to Surescripts's "must-have" e-prescribing network for routing and eligibility. Allscripts in turn feared that "Surescripts would have cut us off" if Allscripts did not sign a new exclusive agreement with Surescripts.

122.    During the same time period, to secure Allscripts's exclusivity, Surescripts also threatened (1) to bar Allscripts from using eligibility information obtained from Surescripts's network for Allscripts's electronic prior authorization transactions, which increases efficiency between prescribers and pharmacies by reducing the time it takes to receive pre-approval for certain prescription drugs from a patient's insurer; (2) to cut Allscripts off from Surescripts's pharmacy directory, which is necessary to allow a prescriber to locate a patient's preferred pharmacy; and (3) to sever Allscripts's access to a separate service called medication history, which Allscripts's prescribers used in both acute and ambulatory settings.

123.    Surescripts also sought to impose a penalty on Allscripts by making Allscripts pay millions of dollars if Allscripts did not enter into an exclusive agreement. For example, Surescripts sent Allscripts an approximately ███████ retroactive invoice for Allscripts's use of what was supposed to be a separate free service offered by Surescripts if Allscripts did not agree to the exclusivity terms Surescripts had proposed. Surescripts also withheld over ███ ███ in loyalty incentive payments to Allscripts until Allscripts signed the contract.

27

124.     Surescripts referred to these tactics as "nuclear missile[s]" and admitted they were designed to ensure that Allscripts would continue to use Surescripts exclusively. Both Surescripts and Allscripts understood that these tactics were meant to "exert leverage" over Allscripts to force it to sign an exclusive agreement for routing and eligibility.

125.     During this same period, Emdeon again attempted to sign Allscripts up as a customer by, for example, offering Allscripts increasingly large up-front payments and profit-sharing arrangements to compensate Allscripts for losing Surescripts's incentive fees.

126.     Despite Emdeon's efforts, Surescripts's tactics with Allscripts were successful. On January 31, 2015, Allscripts signed a new amendment with Surescripts, extending the term of the underlying exclusive contract for five years.

127.     On June 29, 2018, after Allscripts and Surescripts became aware that the FTC was investigating their conduct, Allscripts and Surescripts entered into a new amendment that deleted some of the more restrictive provisions contained in the 2010 Allscripts-Surescripts agreement and the 2015 amendment. That 2018 amendment, however, did not alter the fact that Allscripts was still required to use Surescripts exclusively for routing and eligibility or face financial penalties.

**E.     Surescripts's scheme has succeeded in excluding all meaningful competition from both routing and eligibility.**

128.     Over the last 10 years, Emdeon attempted unsuccessfully to expand its presence in the routing market and, later, in the eligibility market. Beginning in 2009, Emdeon attempted to convince pharmacies and EHRs to use its network to route transactions, circumventing the Surescripts network. Doing so would require these pharmacies and EHRs to become non-loyal to Surescripts or RelayHealth and pay back the discounts or incentive payments pharmacies and EHRs already received. In many cases, Emdeon approached these potential customers with lower

per-transaction pricing than Surescripts charged, higher per-transaction incentive payments than Surescripts paid, and no loyalty requirements.

129.    However, Emdeon was not successful. Many pharmacies and EHRs refused to connect to Emdeon, since doing so would trigger the massive penalty provisions in their contracts with Surescripts or RelayHealth and cost routing customers millions of dollars through increased prices or, for EHRs, decreased incentive payments. Because Emdeon could not expand its connectivity, it could not deliver low enough pricing on a high enough volume of transactions to make up for the huge penalties inflicted on any pharmacy or EHR that chose to become non-loyal to Surescripts. There was no price (or incentive payment) that Emdeon could offer that would offset the penalty customers would receive by becoming non-loyal to Surescripts.

130.    Surescripts executives knew that its loyalty scheme was working as intended. They repeatedly admitted that Surescripts's web of exclusive contracts quashed any competitive threat. As Surescripts explained to a RelayHealth pharmacy end customer, Rite Aid, in early 2010, because of the loyalty scheme there was no price Emdeon could offer that would reduce Rite Aid's total routing costs:

**Clarifying the Issues** 

**eRx/Emdeon cannot save Rite Aid money in
e-prescription routing by splitting traffic:**

- While eRx/Emdeon may offer a low introductory price, they can only do so for a subset of your transactions
- Rite Aid would still need to route the great majority of transactions through Surescripts and RelayHealth
- The lowest transaction pricing from RelayHealth for Surescripts connectivity is only available when routing 100% of your transactions through us
- The total cost to Rite Aid to split traffic would therefore be higher than if you continue to route 100% through RelayHealth and Surescripts

Surescripts®                              Confidential and Proprietary

131.    In the above slide, Surescripts explained to Rite Aid how its loyalty scheme

disrupted the price-setting mechanism of the routing market.

132.    In September 2010, Surescripts articulated how its exclusive contracts restricted

Emdeon's expansion and reduced its potential to reach critical mass:

> Surescripts's efforts to lock in our customers through Loyalty programs have likely had a strong impact to Emdeon's initial strategy. With most top Prescriber Vendors signed to Loyalty Incentive plans, and, a significant portion of the Pharmacy industry signed to Loyalty pricing plans (direct and via [RelayHealth]), Emdeon's ability to expand their direct connection to prescribers and pharmacies has been greatly reduced. Emdeon's ability to rapidly become a full national alternative to Surescripts is diminished.

133.    In October 2010, a Surescripts vice president wrote "the loyalty/incentive strategy

and execution made a very effective counter to the Emdeon/eRX acquisition. It[']s nice when a

plan comes together."

134.     In that same month, Surescripts described how its loyalty program foreclosed

Emdeon from the market by disabling Emdeon's ability to compete on price: "eRx/Emdeon can

undercut Surescripts on price, but only on a margin of volume . . . and Surescripts pricing

differential on pharmacy side and loyalty incentive program on POC side are worth more than

eRx / Emdeon's proposition on <10% of scripts."

135.     When Emdeon's initial efforts to expand failed, Emdeon attempted a new strategy

designed to work around Surescripts's massive financial penalty provisions. Emdeon resells the

Surescripts routing transaction to a group of pharmacies that use a PTV called PDX. Emdeon

sought to gain critical mass on the EHR side by ███████████████████████

███████████████ With the PDX pharmacies disconnected from the Surescripts network,

EHRs would be free to route directly to Emdeon without incurring Surescripts's penalties for

being non-loyal. This is because under Surescripts's contracts with EHRs, EHRs would not be

penalized for routing to a pharmacy that could not be reached using the Surescripts network.

Despite an organized campaign to attempt to sign up EHRs to contingent contracts (where the

EHR would agree to route through Emdeon only if Emdeon disconnected its pharmacies from

the Surescripts network), Emdeon was unable to execute enough contracts to obtain enough scale

to become viable in e-prescribing and solve the chicken-and-egg problem. In the midst of this

campaign, Allscripts severed its connection with Emdeon, as required by Allscripts's 2010

agreement with Surescripts, a move Emdeon described as a "devastating" blow, and one that

pushed Emdeon almost completely out of the market.

136.     In late 2013, Emdeon again attempted to compete with Surescripts, this time in

eligibility. Emdeon approached potential PBM customers with lower pricing than Surescripts as

well as offers to innovate in ways that would respond to PBM complaints regarding the quality

of Surescripts's eligibility service. Although Emdeon gained some traction, it ultimately could not acquire the critical mass of PBMs and EHRs needed to overcome Surescripts's loyalty provisions.

**F.      Surescripts ensures that RelayHealth does not compete in the routing market.**

137.      In 2003, Surescripts and RelayHealth signed an agreement in which RelayHealth expressly agreed not to compete with Surescripts in routing, meaning that while RelayHealth could resell Surescripts's routing services to certain customers, it could not compete with Surescripts by standing up its own routing network. As Surescripts was formulating its plan to push its exclusive contracts into the markets, Surescripts executives knew that its most recent agreement with RelayHealth was scheduled to expire on April 10, 2010, and along with it RelayHealth's contractual obligation not to compete against Surescripts in routing.

**1.      Surescripts recognizes the threat of competition in routing from RelayHealth.**

138.      In an August 2008 strategic risk analysis memorandum, Surescripts executives recognized that RelayHealth and its corporate parent, McKesson, presented a "significant threat in the near to longer term," particularly the threat that "RelayHealth will create a competitive [routing] network to [Surescripts]." Such competition from RelayHealth would cause Surescripts to lose transaction volume but would produce consumer benefits in the form of lower prices, increased innovation, and more choice.

139.      McKesson sells pharmaceutical and medical products as well as business services to pharmacies, hospitals, and health systems throughout North America and internationally. McKesson has sold and currently sells pharmacy management software to pharmacies. McKesson has also sold EHRs to hospitals and other health systems. In fiscal year 2008,

32

McKesson generated nearly $102 billion in total revenue and was ranked 15th on the Fortune 500 list.

140.    In a January 2009 Surescripts presentation titled "McKesson Strategy," Surescripts executives worried that failure to renew a contract with RelayHealth containing the routing non-compete would mean that the "[r]isk of RelayHealth becoming a competitor remains," leaving RelayHealth free to use its business relationships with pharmacies, PBMs, and EHRs to stand up its own routing network and go head-to-head with Surescripts. In the same presentation, Surescripts recognized that it "[m]ay not be able to compete on transaction fees due to lack of products/services to bundle pricing."

141.    Surescripts executives understood that McKesson's ownership of RelayHealth "presents an additional threat to [Surescripts]." They recognized that McKesson was a "Fortune 15 Company" with "[$]1.4 billion in cash" and "[d]iverse product offerings that span many healthcare markets serving many key stakeholders in healthcare."

142.    McKesson also provided RelayHealth with an immediate customer base, as McKesson had its own EHR and PTV offerings. In 2010, for example, McKesson owned and operated several EHR software platforms, including McKesson Horizon Clinicals, Practice Partner, and RelayHealth Consumer. McKesson also provided technology to pharmacies that included routing capabilities, including its PharmacyRx pharmacy management system.

143.    Surescripts realized that RelayHealth had a "natural ability to capture 15-20% of transaction volume" if RelayHealth started connecting just McKesson's own pharmacy and prescriber products, to say nothing about what gains RelayHealth would make if it started competing in routing more broadly.

144.    Surescripts executives also knew that RelayHealth had experience in a closely related market, claims adjudication, a service that allows pharmacies to bill a patient's insurer for a prescription, usually via the PBM contracted with the patient's insurer. Executives from both RelayHealth and Surescripts often referred to claims adjudication as an "adjacent" market to routing and eligibility. RelayHealth's experience provided it with a distinct advantage to standing up a routing network. RelayHealth already contracted with many pharmacies, PTVs, and PBMs for claims adjudication. RelayHealth's claims adjudication business and Surescripts's routing and eligibility business shared many of the same customers. In January 2009, Surescripts wrote that RelayHealth "plays in the same space as S[urescripts] (i.e. offering connectivity services to same customers)."

145.    Critically, RelayHealth also already had numerous contracts with both pharmacies and EHRs due to its reseller relationship with Surescripts. In 2009, RelayHealth connected approximately 50% of pharmacy routing transactions to the Surescripts network—including large pharmacies like Walgreens and Rite Aid—and approximately 40% of EHR routing transactions to the Surescripts network, including the large EHR Allscripts. RelayHealth thus enjoyed an advantage held by no other competitor: It had already partially solved the chicken-and-egg problem by having relationships with customers on both sides of the routing network.

146.    Surescripts was concerned not only that RelayHealth would enter routing, but also that RelayHealth would offer a lower price that Surescripts would be unable to match. Surescripts executives believed in 2009 that the unit costs for claims adjudication were between one and two cents and that RelayHealth could bring its e-prescribing costs down to that price given its scale and McKesson's funding. At that time, Surescripts's e-prescribing unit costs were approximately 600% higher and its net price to customers approximately 10 times higher.

34

147.    Surescripts understood that, if RelayHealth "dropped the price down to 2 to 3 cents . . . they would have been able to take the business away from us." Surescripts's former Chief Strategy Officer also testified that he believed RelayHealth would be able to enter at a lower price than Surescripts could offer:

> I assumed Relay and Emdeon would consider offering e-prescribing for what I estimated to be their marginal costs that they wanted to be ███████ or they might just try to undersell that and lose ████████████████████ to put us out of business and then combine and bundle that with their other fixed cost infrastructures on the adjudication side.

**2.    Surescripts eliminates the RelayHealth threat in 2010.**

148.    These fears dominated Surescripts's negotiations with RelayHealth. As a result, Surescripts's primary goal during negotiations was to "[m]aintain current status where RelayHealth does not become a competitor" or, as the same presentation explained, use a strategy where Surescripts would "keep friends close but enemies closer." RelayHealth's own internal documents show that since 2003, "[t]he dominant contracting strategy . . . [was] to prevent [RelayHealth] from competing [with Surescripts]."

149.    Surescripts achieved this goal. In its February 25, 2010 contract with RelayHealth, Surescripts obtained RelayHealth's renewed promise not to compete in routing for an additional six years. Surescripts has repeatedly admitted that the sole value of this 2010 contract is that it prevents RelayHealth from competing against Surescripts in routing. One 2012 memo, circulated to senior Surescripts executives, explicitly stated, "[o]ur VAR contract prevents them from competing against us for core e-prescribing Routing. This was a substantial concern when we were founded [in 2008], and should still be a consideration today due to R[elay]H[ealth]'s vast market share in the Pharmacy financial Claims Processing part of our industry."

35

150.    As early as December 2008, Surescripts's own documents characterized its relationship with RelayHealth as adding very little, if any, value to e-prescribing and described RelayHealth as a "value subtract," writing that "the only real value that we are getting out of the RelayHealth relationship at this point is the exclusivity." In 2013, Surescripts executives stated the only benefit it received from the 2010 contract with RelayHealth was that the contract "help[ed] keep market share." In March 2014—four years into the five-year term of the 2010 contract—Surescripts executives were still asking themselves in a presentation entitled "RelayHealth Partnership Assessment," "How does Surescripts + RelayHealth = more value than Sur[e]scripts alone?" Surescripts's then-Chief Customer Officer described RelayHealth as "sh[*]tty, non-value added partners but at least they're one of our biggest competitive threats."

### 3.  Surescripts eliminates the RelayHealth threat again in 2015.

151.    In 2015, as Surescripts's agreement with RelayHealth was nearing expiration, Surescripts's fears of entry by RelayHealth persisted, and so it took renewed action to neutralize RelayHealth. On January 16, 2015, Surescripts and RelayHealth executed a three-year contract that automatically renewed each year unless either party terminated it and is still in place today. This contract (1) tightened RelayHealth's loyalty requirements; and (2) exchanged the explicit routing non-compete provision for an implicit one, requiring RelayHealth to transition its EHR routing relationships to Surescripts directly.

152.    First, Surescripts provided additional financial incentives to RelayHealth to remain exclusive in routing, including by changing the definition of RelayHealth's "loyalty" to Surescripts from a customer-by-customer basis to a platform-wide basis. *See* paragraph 97.

153.    Second, Surescripts forced RelayHealth to terminate its routing relationships with EHRs. RelayHealth, through its reseller arrangement with Surescripts, had connections to both the pharmacy and the EHR sides of the routing network. Surescripts executives knew that EHRs

were the "gatekeepers" to prescribers. A link to the EHR side is necessary to operate a two-sided routing network, meaning that this termination would prevent RelayHealth from being a competitive threat in routing. In exchange for removing the explicit non-compete provision from the contract, Surescripts required RelayHealth to terminate its EHR connections for routing and transition those relationships directly to Surescripts. RelayHealth agreed, hoping that removing Surescripts's control over its relationship with these customers would allow RelayHealth to collaborate directly with EHRs on innovative value-added services.

154.    Surescripts executives understood that the 2015 contract continued to prevent RelayHealth from entering the routing market despite the removal of the explicit non-compete provision. On February 4, 2015, shortly after the 2015 contract was executed, Surescripts's Chief Quality Officer emailed Surescripts's Vice President of Customer Accounts: "[C]ongratulations. This is a hugely important deal for us, cementing our position for at least several more years. I would not want to have Relay out there competing directly against us."

155.    An internal Surescripts competition analysis from that time characterized RelayHealth as a "Core Systemic [Competitor]," a "Direct Competitor to Core E-Prescribing Network," and a company that is "[a]lways one to watch since they have the assets and know-how to be a threat." However, that same document continued, "[Surescripts] has done an exceptional job removing them as EHR aggregator" when assessing the competitive threat RelayHealth posed to Surescripts in routing.

156.    As of today, RelayHealth has not entered the routing market.

## VI.    SURESCRIPTS POSSESSES MONOPOLY POWER IN EACH RELEVANT MARKET

### A.    The relevant markets.

157.    There are two relevant product markets: (1) routing transactions; and (2) eligibility transactions.

158.    Other means of transmitting routing and eligibility information (e.g., paper, phone, fax) are not reasonably interchangeable with electronic prescribing because of safety concerns and greater efficiencies associated with electronic prescriptions, as well as the requirements of MIPPA, the HITECH Act, and HHS regulations.

159.    The relevant geographic market is the United States. Large pharmacy chains, EHRs, and PBMs that make up nearly all of routing and eligibility transactions have nationwide reach. Surescripts's customers enter into contracts with nationwide reach, and prices and contract terms are set at a national level. Federal laws and regulations that govern e-prescribing i.e., MIPPA, HITECH, and associated CMS regulations, operate on a national level, further supporting a national geographic market.

160.    Thus, the relevant markets in which to evaluate Surescripts's conduct are (1) routing transactions in the United States; and (2) eligibility transactions in the United States.

### B.    Surescripts possesses monopoly power in the relevant markets.

161.    Surescripts possesses durable monopoly power in each relevant market.

162.    Surescripts has possessed monopoly power in each relevant market from 2009 to present.

163.    There is substantial direct evidence that Surescripts possesses monopoly power.

164.    Direct evidence of Surescripts's monopoly power includes its demonstrated ability to control price in each relevant market.

165.    Surescripts has the ability to price substantially higher than its competitors in the routing market without losing customers. This includes both prices to pharmacies and incentives to EHRs.

166.    Surescripts has the ability to price substantially higher than its competitors in the eligibility market without losing customers. This includes pricing to PBMs and incentives to EHRs.

167.    Other direct evidence of Surescripts's market power includes the lack of any meaningful competition in either routing or eligibility from 2009 to the present. For example, when Surescripts refused to do business with a customer called PrescribersConnection in 2015, that customer was left with nowhere else to turn and as a result has had its e-prescribing functionality permanently disabled—a situation that persists today. Surescripts's customers agree that there are "no 1-1 alternatives to Surescripts," that Surescripts is a "must-have" network and a "monopolist for a key service."

168.    There is substantial indirect evidence that Surescripts possesses monopoly power.

169.    Surescripts possesses extremely high market shares in both relevant markets. Surescripts possesses at least 95% market share in the market for routing (by transaction volume). Surescripts possesses at least 95% market share in the market for eligibility (by transaction volume). As one Surescripts vice president put it in 2015: "We are a Monopoly when it comes [to] Prescription Routing." Even if routing and eligibility were to be considered part of the same market, Surescripts's own then-Executive Vice President and Chief Customer Officer testified that Surescripts's market share in both products is "[l]ikely north of 90 percent."

170.    The markets for routing and eligibility are characterized by barriers to entry in the form of the chicken-and-egg problem, which Surescripts's conduct has rendered unsolvable.

## VII.   SURESCRIPTS'S ANTICOMPETITIVE COURSE OF CONDUCT HARMED COMPETITION AND CONSUMERS

171.    Surescripts's anticompetitive course of conduct has resulted in the total exclusion of any meaningful competition in e-prescribing, repeated threats to customers to force exclusivity, higher prices, reduced innovation, and lower output.

### A.    Surescripts's conduct forecloses each market from all meaningful competition, eliminating consumer choice.

172.    Surescripts, whether directly or indirectly via RelayHealth, successfully imposed loyalty requirements on nearly all of its pharmacy and PTV customers. By January 2011, Surescripts had loyalty contracts with at least 78% of the pharmacy side of the routing market (by transaction volume), including contracts with major pharmacies such as CVS, Walgreens, Walmart, and Rite Aid. Nearly all of the loyalty contracts with these pharmacies have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts, whether directly or indirectly via RelayHealth, has loyalty contracts with at least 79% of pharmacy routing transaction volume. These contracts therefore foreclose nearly 80% of the pharmacy side of the routing network from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for Surescripts's competitors.

173.    Surescripts also imposed loyalty requirements on nearly all of its PBM customers. By October 2011, Surescripts had exclusivity contracts with at least 74% of the PBM side of the eligibility market (by transaction volume), including contracts with major PBMs such as Express Scripts, CVS, and Medco. Nearly all of the loyalty contracts with these PBMs have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts has exclusivity contracts with at least 78% of PBM eligibility transaction volume. These contracts therefore foreclose nearly 80% of the PBM side of the eligibility network from

potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for competitors.

174.    Surescripts, whether directly or indirectly via RelayHealth, also imposed loyalty requirements on nearly all of its EHR customers. By November 2010, Surescripts had exclusivity contracts with at least 81% of the EHR routing market and at least 78% of the EHR eligibility market (both measured by transaction volume), including contracts with major EHRs such as Allscripts, Epic, and eClinicalWorks. Nearly all of the loyalty contracts with these entities have been renewed or amended with similar loyalty provisions, and they remain in place today. Currently, Surescripts—which in 2015 took direct control over nearly all of RelayHealth's routing contracts with EHRs—has loyalty contracts with at least 87% of EHR routing and eligibility transaction volume. These contracts therefore foreclose well over 80% of the EHR sides of the routing and eligibility networks from potential competition. The result is to make multihoming substantially more expensive for customers, rendering the chicken-and-egg problem insoluble for competitors.

175.    The foreclosure percentages in paragraphs 172-174 likely understate the foreclosure effects of Surescripts's conduct, which is based on contracts for Surescripts's largest routing and eligibility customers. There is a "long tail" of smaller Surescripts customers that are also foreclosed by the same loyalty contracts described above, which only further increases the percentage of each side of each market that Surescripts has been able to foreclose.

176.    Surescripts's loyalty contracts disrupt competition in routing and eligibility. Because Surescripts has foreclosed at least 70-80% of each of the routing and eligibility markets, even when a competitor offers lower per-transaction prices, no customer will do business with that competitor because that competitor cannot lower the customer's total e-prescribing cost.

Because of Surescripts's conduct, no competitor can gain enough scale to solve the chicken-and-egg problem and compete with Surescripts. Customers, including PBMs, EHRs, and pharmacies, are all harmed by not having any choice of routing or eligibility provider.

177.    A pharmacy would sign up with a Surescripts competitor—and thus incur non-loyalty penalties via higher prices or clawbacks—only if the competitor can route enough prescriptions from EHRs that are priced low enough to create sufficient savings to offset the pharmacy's losses from the foregone Surescripts discounts. Likewise, an EHR will sign up with a Surescripts competitor—and thus incur non-loyalty penalties via eliminated incentive payments or clawbacks—only if the competitor can pay the EHR high enough incentives on a sufficient number of transactions to offset the EHR's losses from the foregone Surescripts payments. This same logic applies to PBMs and EHRs for eligibility.

178.    Surescripts's loyalty regime ensures that no customer could ever attain a lower *total* cost by multihoming, even if Emdeon or some other competitor offered that customer, in the words of one of Surescripts's former vice presidents, "some phenomenally low amount" on the transactions sent through Emdeon's network.

179.    Pharmacies and PBMs receive discounts from Surescripts in exchange for agreeing to exclusivity. A competing platform that sought to convince a pharmacy or PBM to multihome would need to offer a lower price to compensate that customer for losing its loyalty discount with Surescripts. Due to the limited connections to EHRs that a competing platform could offer, the compensating price would have to be *negative*, meaning the competing platform would have to *pay* pharmacies and PBMs for each routing and eligibility transaction.

180.    Similarly, EHRs receive incentive fees from Surescripts in exchange for agreeing to exclusivity. A competing platform that sought to convince an EHR to multihome would need

to offer higher incentive fees to compensate that customer for losing its incentive fees from Surescripts. Due to the limited connections to pharmacies and PBMs that a competing platform could offer, the compensating incentive fees would be unprofitable for an equally efficient competitor.

181.    By foreclosing approximately 80% of both markets and making the chicken-and-egg problem insoluble, Surescripts has ensured that no other competitor can be or remain viable in either routing or eligibility, or both.

**B.    Surescripts forces its routing and eligibility customers into exclusivity.**

182.    Many pharmacy, PBM, and EHR customers that have entered into loyalty contracts with Surescripts would prefer the option of having a competing network for routing and eligibility. However, because these pharmacies, PBMs, and EHRs compete with other pharmacies, PBMs, and EHRs, they cannot absorb higher e-prescribing costs and remain competitive. Thus, Surescripts's customers lack the realistic ability to refuse Surescripts's loyalty requirements or pricing.

183.    As one Surescripts EHR customer explained, despite "strongly object[ing] to the . . . exclusivity provisions" in Surescripts's contract, it had no choice but to agree to Surescripts's exclusivity provision "[b]ecause there were no alternative providers that could meet all of its needs." Though the customer recognized "that the inclusion of the exclusivity provisions provided Surescripts with the ability to protect its dominance in the e-prescribing market place," the EHR customer had "to enter into a contract that included those provisions if [the EHR] wanted to enter into e-prescribing."

184.    Another Surescripts customer similarly feared that "Surescripts would have cut us off" if that customer did not sign an exclusive agreement with Surescripts.

185.    Surescripts today thus no longer competes on the merits, but instead relies on its size, its ability to force customers into exclusivity, and the success of its loyalty program to maintain its monopolies.

**C.    Surescripts's conduct has led to higher net prices for routing and eligibility.**

186.    As Surescripts's then-Vice President of Corporate Strategy testified: "[P]ricing isn't dictated by competition at Surescripts."

187.    But for Surescripts's anticompetitive course of conduct, the net price (taking into account both sides of the network) of the routing transaction would be lower. Similarly, without Surescripts's loyalty contracts, the net price (taking into account both sides of the network) of the eligibility transaction would be lower.

188.    The handful of instances where a single customer uses both the Surescripts network and the Emdeon network shows that Emdeon is able to provide lower per-transaction prices or higher per-transaction incentives.

189.    For example, Kroger is one of the last companies that uses both Emdeon and Surescripts via RelayHealth for routing. Emdeon charges Kroger pharmacies per-transaction prices that are at least ███████ lower than Surescripts's prices. Similarly, Emdeon has sold the routing transaction to one PTV customer, Rx30, at a per-transaction price ████ lower than Surescripts's per-transaction price, and has offered to sell to another PTV customer, QS/1, at a per-transaction price █████ lower than Surescripts's.

190.    For eligibility, Emdeon offered prices ██████ lower than Surescripts's. A Surescripts PBM sales employee noted on May 20, 2015 that "competitors are under-pricing us such as Em[]deon with Eligibility. We are hearing that Emdeon is committing to promising half of our rate (████████) compared to our ███████. We are starting to hear a significant amount of concern that our price is too high . . . . Emdeon is making an aggressive [effort] now towards

44

MedImpact. They are about [to] launch a pilot together in a ▆▆▆▆ transaction rate." Yet there is no evidence that Surescripts attempted to match Emdeon's price for eligibility. Additionally, Allscripts charged at least one PBM (a PBM that had a direct connection with Allscripts) a price ▆▆▆ lower than what that same PBM was currently paying to Surescripts for the same eligibility transaction.

191.    On the EHR side, Surescripts understood and acknowledged its ability to price above the competitive level. In an email exchange concerning EHR eClinicalWorks's attempts to negotiate for higher incentive payments, one Surescripts executive explained to another that "[eClinicalWorks's] position in negotiating for more and more $$ only seems relevant when there are at least 5 more 'Surescripts' from which to choose. Today there is just one Surescripts."

192.    Emdeon was willing to pay higher incentives to EHRs. For example, in 2010 Emdeon paid Allscripts incentives that were ▆▆▆ higher than what Surescripts and RelayHealth paid Allscripts. And Emdeon continued to pay Allscripts incentives that were ▆▆▆▆ higher than Surescripts's until Allscripts was forced to disconnect from Emdeon in June 2013. Emdeon has also offered to pay higher incentives to EHRs such as ▆▆▆▆ and ▆▆▆▆▆▆▆.

193.    Because the loyalty contracts limited competitors' expansion, and thereby reduced pharmacies', PBMs', and EHRs' leverage with Surescripts, the contracts have enabled Surescripts, free from competitive discipline, to continue to demand higher prices from customers.

194.    For example, in April 2012, Surescripts increased transaction prices (by decreasing incentive payments) on all EHRs for both routing and eligibility. In contemporaneous documents, Surescripts recognized that it was able to use its monopoly power to take money away from EHRs by decreasing these incentive payments. Indeed, no EHR was able to avoid

these incentive payment reductions. No EHR moved its business to a Surescripts competitor or refused to do business with Surescripts as a result of this price increase.

195.     As another example, in July 2013, Surescripts analyzed the impact of Allscripts's June 20, 2013 termination of its relationship with Emdeon, which Surescripts required Allscripts to do in the 2010 Surescripts-Allscripts agreement. In a presentation that was circulated and commented on by senior Surescripts executives, Surescripts concluded that, because Allscripts had to stop using the cheaper Emdeon network and now had to route its volume through the more expensive Surescripts network, those few pharmacy customers that were not loyal to Surescripts were "feeling economic pain" and "paying 'more at the pump.'" This same presentation calculated exactly how much "economic pain" its pharmacy customers such as Kroger were experiencing: Because Kroger no longer got its Allscripts prescriptions at Emdeon's ███ per-transaction rate, but now had to pay Surescripts's ███ per transaction rate—a ███ increase—Surescripts estimated that Kroger was paying an extra ██████ in increased routing costs per year. Kroger documented that the result of being forced to pay Surescripts's higher prices meant that its routing costs "increased significantly," by approximately 25%.

**D.     Surescripts's conduct has reduced innovation in routing and eligibility.**

196.     Surescripts's dominance over routing and eligibility has allowed it to control the rate of innovation, or lack thereof. A lack of competitive discipline and customers' inability to change e-prescribing vendors has led to reduced innovation in e-prescribing. As one RelayHealth senior executive testified: "I can tell that in general that the industry wants e-prescribing to evolve, and it's not."

197.     Surescripts agrees. As Surescripts's former Chief Strategy Officer testified, from the time he joined Surescripts until when he left in 2012, that he "saw a bloated organization that wasn't lowering cost, not delivering where people would feel like they were true customers." A

January 2013 Surescripts presentation forwarded to Surescripts's Executive Vice President and Chief Customer Officer summarized the issue aptly: "There's a 'we've got such a dominant market position in e-prescriptions, who's going to come in and threaten us?' attitude."

198.     Surescripts's agreements with RelayHealth provide examples of how, in RelayHealth's words, "[t]he current [RelayHealth] relationship with [Surescripts] . . . inhibits innovation."

199.     Significantly, this innovation would have occurred in not just the routing market, but also in the eligibility market. Because of Surescripts's conduct, however, consumers have had to wait many years to receive the benefits of such innovation, if consumers ever received those benefits at all.

200.     For example, the 2010 Surescripts-RelayHealth contract called for the two companies to co-develop an initial list of 27 different value-added services, including Adherence Monitoring, Prescription History to Hospitals, Print @ Patient Cell Phone, Rx Claim Pre-Adjudication, Real-Time Benefit Check, electronic Prior Authentication, and REMS-related services such as prohibiting the prescribing/dispensing of medications with Risk Evaluation and Mitigation Strategies.

201.     Not one joint Surescripts-RelayHealth value-added product or service resulted from the 2010 contract.

202.     Similarly, not one joint Surescripts-RelayHealth product or service has resulted from the 2015 contract.

203.     As alleged above, *see* paragraphs 137-156, Surescripts repeatedly described the sole value of its agreements with RelayHealth as keeping RelayHealth's customers exclusive to Surescripts and preventing RelayHealth from competing against Surescripts in routing.

204.    On numerous occasions, RelayHealth unsuccessfully attempted to collaborate with Surescripts to develop these value-added services. One RelayHealth executive testified that Surescripts proved to be "not very innovative or cooperative when it comes to value-added services" and that Surescripts's "words were much rosier than their actions, and [RelayHealth] presented many solutions from a value-add perspective, and they seemed to fall on deaf ears, and they were not pursued." The failure of Surescripts and RelayHealth to collaborate "wasn't for a lack of trying on [RelayHealth's] part." Surescripts never provided an explanation to RelayHealth as to why Surescripts chose not to collaborate with RelayHealth on any value-added services listed in the 2010 contract.

205.    For example, the 2010 contract called for Surescripts and RelayHealth to co-develop a real-time benefit check service that would represent a significant improvement over Surescripts's existing eligibility service. Unlike Surescripts's eligibility offering, which relied on non-patient-specific, static formulary information, real-time benefit check allows a PBM to transmit patient-specific, real-time formulary information to physicians. Surescripts has known how to transmit such real-time formulary information since 2005, and RelayHealth expected to co-develop this service after the signing of the 2010 contract. Indeed, RelayHealth brought up this and other value-added services proposals at quarterly business meetings with Surescripts from 2012 to 2014. Surescripts never engaged with RelayHealth in developing real-time benefit check. Surescripts never shared any confidential or proprietary data, information, or technology with RelayHealth concerning real-time benefit check or other value-added services.

206.    Only once RelayHealth understood that Surescripts had no intention to collaborate did RelayHealth develop value-added services such as real-time benefit check on its own. As early as 2013, RelayHealth began efforts to develop a real-time benefit check solution by itself,

which RelayHealth brought to market in 2017. At that point, facing competition from RelayHealth, Surescripts finally brought its own real-time benefit check service to market.

207.    The harms from Surescripts's conduct with respect to RelayHealth continue through today. The 2015 Surescripts-RelayHealth agreement, which is currently in effect, contains an implicit non-compete, *see* paragraphs 151-156, that prevents RelayHealth from competing against Surescripts in routing.

208.    Had Surescripts not completely excluded all competition from the relevant markets—whether it was Emdeon, RelayHealth, Allscripts, or otherwise—competitive forces would have spurred Surescripts to innovate faster, bringing (or trying to bring) services such as real-time benefit check to the market earlier. Consumers were harmed as a result of these significant innovation delays.

**E.    Surescripts's conduct has reduced quality in routing and eligibility.**

209.    Similarly, because Surescripts faces no competition, it also has no incentive to improve its services, resulting in reduced quality to its customers. Again, Surescripts agrees: In 2015, Surescripts wrote, "[b]ecause we didn't grow up in a competitive environment and we grew up as a monopoly, we don't have the best way of dealing with customers."

210.    Customers agree. They have echoed these critiques, complaining that Surescripts has poor customer service, is slow to innovate, impedes EHRs' ability to innovate due to stringent certification requirements, and uses opaque pricing strategies. Surescripts's own executives report that customers use the following words to describe Surescripts: "monopoly," "entrenched," "slow," "difficult," "misleading," "challenging," "inconsistent," and "dictates."

211.    To take one example, as early as January 2011 Surescripts knew that many of its pharmacy customers were dissatisfied with Surescripts's service surrounding a specific type of routing transaction called "Denied, NewRx to Follow" or "DNTF," which small, independent

pharmacies believed—correctly—caused Surescripts to double-bill the pharmacies for a single transaction. In October 2012, Surescripts calculated that it was making "█████ a year in DNTF transaction charges" despite knowing that this was "a hot issue for independent pharmacies." Surescripts, however, did not change its practices on DNTF until April 2013, 27 months after Surescripts's senior executives knew that Surescripts was double-billing its routing customers.

212.    Had Surescripts's anticompetitive conduct not allowed it to maintain its monopoly status, consumers would have been able to choose other options that could have provided better customer service, or at least provided a competitive threat to spur Surescripts to improve the quality of its own services. But because Surescripts has unlawfully maintained its monopolies through its exclusive dealing and other anticompetitive arrangements with RelayHealth and Allscripts, consumers have been denied the quality improvements that competition brings.

### F.    Surescripts's conduct has reduced quality-adjusted output and overall transaction output.

213.    Surescripts's conduct has reduced innovation and thus has also reduced quality-adjusted output. But for Surescripts's conduct, there would be more and faster innovation in the routing and eligibility markets.

214.    In addition to quality-adjusted output, Surescripts's conduct has also reduced output as measured by transaction volume. As of 2017, 69% of doctors were utilizing e-prescribing. But for Surescripts's conduct, competition for prescribers (via their EHRs) would likely result in higher incentive payments to EHRs, which would in turn provide incentives to EHRs to increase its doctors' utilization of e-prescribing. At least one EHR welcomed the idea of higher incentives tied to growth: "[W]e would welcome an additional 'target' level whereby the incentive would increase . . . as the volume grows." And Allscripts told Surescripts that higher

incentives tied to volume instead of loyalty would allow it to commit "to an increase in electronic prescription transactions from all our products through the Surescripts network." Surescripts, however, rejected these options in favor of contractual language that implemented its loyalty scheme.

215.     Additionally, Surescripts's stringent certification requirements have delayed adoption and utilization of e-prescribing. Absent the restraints, increased price, innovation, and quality competition among networks for EHR volume would likely further incentivize or enable EHRs to increase the utilization of e-prescribing among doctors.

**G.     There is no legitimate procompetitive business justification for Surescripts's conduct.**

216.     As the Senior Vice President of one of Surescripts's large hospital system customers wrote in a March 2, 2011 letter to Surescripts's CEO expressing his "deep concern" about Surescripts's exclusivity requirements: "There is no conceivable justification for this policy other than Surescripts' desire to maintain an e-prescribing monopoly."

217.     Surescripts's exclusivity requirements do not serve any legitimate procompetitive business purpose. Increases in adoption and utilization were largely driven by incentives under MIPPA, the HITECH Act, and a broader movement towards computerized health records generally. *See* paragraphs 33-39. While incentive payments to EHRs may increase output, the exclusivity provisions to which those incentives are tied do not enhance or otherwise further the adoption or utilization of e-prescribing.

218.     Surescripts's exclusivity requirements were not reasonably necessary to reduce prices. Moreover, Surescripts could have accomplished this objective through less restrictive alternatives, primarily through discounts based on volume, not loyalty.

219.    Surescripts is not a natural monopoly. E-prescribing customers treat Surescripts like any other vendor, seeking out alternatives to Surescripts for routing and eligibility. A small number of customers use multiple networks. At least one smaller-scale competitor, Emdeon, has offered lower pricing and higher incentive payments.

220.    There is no legitimate procompetitive justification for the features in Surescripts's contracts with Allscripts discussed in paragraphs 100-127 above. Indeed, though it was only after Surescripts and Allscripts became aware of the FTC's investigation, Surescripts and Allscripts dropped many of these provisions, yet Surescripts is still able to provide routing and eligibility services to Allscripts today.

221.    There is no legitimate procompetitive justification for Surescripts's routing non-compete with RelayHealth. Other provisions in the 2010 contract provided strong protections for any of Surescripts's proprietary information. Any proprietary information disclosed by either party to the other in connection with the agreement was protected by the recipient party from disclosure to others. Any documentation provided by Surescripts under the 2010 contract was designated proprietary to Surescripts, and RelayHealth could not copy or use that documentation in any way other than as specifically authorized by the agreement.

## VIII.   VIOLATIONS OF SECTION 5 OF THE FTC ACT

### COUNT I

**Monopolization of Routing Arising under Section 2 of the Sherman Act**

222.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-221 above.

223.    At all relevant times, Surescripts has had monopoly power in the United States with respect to routing.

224.    Surescripts has willfully maintained its monopoly power through its course of anticompetitive conduct, including its exclusive or de facto exclusive agreements with pharmacies, PTVs, and EHRs, requiring those entities to use the Surescripts network exclusively or nearly exclusively for routing, as well as the non-compete provisions in its contracts with RelayHealth. Collectively, Surescripts's contracts substantially foreclose the routing market from actual and potential competition. Through its course of conduct, Surescripts has excluded competition and willfully maintained its monopoly in routing by not competing on the merits.

225.    There is no valid procompetitive justification for Surescripts's exclusionary conduct in the routing market.

226.    Surescripts's anticompetitive acts violate Section 2 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Monopolization of Eligibility Arising under Section 2 of the Sherman Act

227.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-221 above.

228.    At all relevant times, Surescripts has had monopoly power in the United States with respect to eligibility.

229.    Surescripts has willfully maintained its monopoly power through its course of anticompetitive conduct, including its exclusive or de facto exclusive agreements with PBMs and EHRs, requiring those entities to use the Surescripts network exclusively or nearly exclusively for eligibility. Surescripts has also maintained its monopoly power by entering into an especially restrictive agreement for eligibility with Allscripts. Collectively, Surescripts's contracts substantially foreclose the eligibility market from potential competition. Through its course of

conduct, Surescripts has excluded competition and willfully maintained its monopoly in eligibility by not competing on the merits.

230.    There is no valid procompetitive justification for Surescripts's exclusionary conduct in the eligibility market.

231.    Surescripts's anticompetitive acts violate Section 2 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## IX.    PRAYER FOR RELIEF

WHEREFORE, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act; therefore, the FTC requests that this Court, as authorized by 15 U.S.C. § 53(b), 15 U.S.C. § 26, and its own equitable powers, enter final judgment against Defendants, declaring, ordering, and adjudging:

1.    That Surescripts's course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

2.    That Defendant is permanently enjoined from engaging in similar and related conduct in the future; and

3.    That the Court grant other such equitable relief, including equitable monetary relief, as the Court finds necessary to redress and prevent recurrence of Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as alleged herein.

Respectfully submitted,

D. Bruce Hoffman (D.C. Bar 495385)
Director
Bureau of Competition

Ian Conner (D.C. Bar 979696)
Deputy Director
Bureau of Competition

Daniel Francis (D.C. Bar 1004918)
Associate Director
Bureau of Competition

Alden Abbott
General Counsel

Dated: April 17, 2019

Markus H. Meier (D.C. Bar 459715)
Lead Counsel
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
202-326-3759
mmeier@ftc.gov

Bradley S. Albert
David B. Schwartz
Daniel S. Bradley
D. Patrick Huyett
Joseph P. Mathias
Tanya O'Neil (D.C. Bar 1021933)

*Attorneys for Plaintiff*
*Federal Trade Commission*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

FEDERAL TRADE COMMISSION,
    600 Pennsylvania Ave., NW
    Washington, DC 20580

STATE OF NEW YORK,
    28 Liberty Street
    New York, NY 10005

STATE OF CALIFORNIA,
    455 Golden Gate Avenue Suite
    11000 San Francisco, CA 94102

STATE OF ILLINOIS,
    100 West Randolph Street
    Chicago, IL 60601

STATE OF NORTH CAROLINA,
    114 West Edenton Street
    Raleigh, NC 27603

STATE OF OHIO,
    150 E. Gay Street, 22nd Floor
    Columbus, OH 43215

COMMONWEALTH OF PENNSYLVANIA,
    Strawberry Square
    Harrisburg, PA 17120

    and

COMMONWEALTH OF VIRGINIA,
    202 North Ninth Street
    Richmond, VA 23219

            Plaintiffs,

    v.

VYERA PHARMACEUTICALS, LLC,
    600 Third Ave., 10th Floor
    New York, NY 10016

PHOENIXUS AG,
    Hadlenstrasse 5

Case No. 1:20-cv-00706-DLC

58

6340 Baar, Switzerland

MARTIN SHKRELI, individually, as an
owner and former director of Phoenixus AG
and a former executive of Vyera
Pharmaceuticals, LLC,
        FCI Allenwood Low
        Federal Correctional Institution
        P.O. Box 1000
        White Deer, PA 17887

        and

KEVIN MULLEADY, individually, as an
owner and director of Phoenixus AG and a
former executive of Vyera Pharmaceuticals,
LLC,
        330 East 38th St., Apt. 54K
        New York, NY 10016

                        Defendants.

**Redacted Amended Complaint for Injunctive and Other Equitable Relief**

Plaintiffs, the Federal Trade Commission ("FTC" or "the Commission"), by its
designated attorneys, and the states of New York, California, Illinois, North Carolina, Ohio,
Pennsylvania, and Virginia, by and through their Attorneys General, petition this Court, pursuant
to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), Section 16 of the
Clayton Act, 15 U.S.C § 26, Section 342 of the New York General Business Law, Section 63(12)
of the New York Executive Law, Sections 16700 *et seq.* and 17200 *et seq.* of the California
Business and Professions Code, Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*,
North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. §75-1 *et seq.*, Chapter 1331
and Section 109.81 of the Ohio Revised Code, Pennsylvania Unfair Trade Practices and
Consumer Protection Law, 73 P.S. § 201-1 *et seq.* and Common Law Doctrine against Restraints
of Trade proceeding under 71 P.S. §732-204 (c), and the Virginia Antitrust Act, Virginia Code §

59.1-9.1 *et seq*.; for a permanent injunction and other equitable relief, including equitable

monetary relief, against Defendants Vyera Pharmaceuticals, LLC ("Vyera"), Phoenixus AG

("Phoenixus"), Martin Shkreli, and Kevin Mulleady to undo and prevent their anticompetitive

conduct and unfair methods of competition in or affecting commerce in violation of Sections 1

and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 5(a) of the Federal Trade Commission Act,

15 U.S.C. § 45(a), and state law.

**I.      Nature of the Case**

1.      This case challenges a comprehensive scheme by Vyera, its parent company

Phoenixus, and two of the companies' owners and executives, Shkreli and Mulleady, to block

lower-cost generic competition to Daraprim, an essential drug used to treat the potentially fatal

parasitic infection toxoplasmosis. Their unlawful scheme to maintain a monopoly on Daraprim

continues to this day.

2.      Daraprim had been sold as an affordable, life-saving treatment for more than 60

years. In 2015, however, Defendants acquired the U.S. rights to Daraprim from the only existing

supplier and immediately raised the price from $17.50 to $750 per tablet—an increase of more

than 4,000%. This massive price hike delivered immediate benefits to Defendants, increasing

Daraprim's annual revenues from ███████ to over ███████ .

3.      Defendants knew, though, that this revenue boon could be short lived: Daraprim

had no patent or regulatory protection and the massive price increase would attract competition

from lower-priced generic products. To preserve the Daraprim revenue stream, Vyera and

Phoenixus—under the direction of Shkreli and Mulleady—executed an elaborate, multi-part

scheme to block generic entry.

4.      First, Defendants created a complex web of contractual restrictions that prohibit

distributors and purchasers from reselling Daraprim to generic companies or their agents.

60

Defendants understood that restricting access to branded Daraprim could stifle generic competition. The U.S. Food & Drug Administration ("FDA") requires any generic applicant to conduct bioequivalence testing comparing its product to samples of the branded drug. Vyera's resale restrictions made it virtually impossible for generic companies to purchase sufficient quantities of Daraprim to conduct these FDA-required tests. Indeed, several generic companies tried for more than a year to secure enough branded Daraprim samples for testing, but were unable to do so. At least one other generic company simply abandoned its development plans.

5.      Second, Defendants cut off competitors' access to pyrimethamine—the active pharmaceutical ingredient ("API") necessary to manufacture Daraprim. Defendants first locked up Fukuzyu Pharmaceutical Co., Ltd., the only supplier approved to manufacture pyrimethamine for the U.S. market. Under the exclusive supply agreement, Fukuzyu unequivocally agreed not to sell pyrimethamine for human use in the United States to anyone other than Defendants.

6.      After locking up Fukuzyu, Defendants moved to sideline a new potential manufacturer, RL Fine Chem Pvt. Ltd. Upon learning that multiple generic companies had been working with RL Fine to develop their generic Daraprim products, Defendants executed another exclusive supply agreement. Defendants had no need for a second source of API, never purchased any API from RL Fine, and never even completed the regulatory work necessary to use RL Fine's API in Daraprim. Nonetheless, under this agreement, Phoenixus has paid RL Fine nearly ██████ not to supply its potential competitors—while it has paid Fukuzyu only ██████ for the API it actually uses in its Daraprim product.

7.      Third, Defendants signed "data-blocking" agreements with Vyera's distributors to prevent them from selling their Daraprim sales data to third-party data reporting companies, such as IQVIA. These reporting companies purchase, compile, and sell sales data on pharmaceutical

products, which generic companies then buy. These data are critical for generic companies'
assessment of whether a given development opportunity is worth pursuing. Defendants' data-
blocking agreements prevented the reporting companies from obtaining accurate information
about Daraprim sales. By obscuring these sales, Defendants sought to prevent generic companies
from accurately assessing the market opportunity for a generic Daraprim product and thereby
deter them from even pursuing development of a generic product.

8.      The purpose and effect of Defendants' anticompetitive conduct has been to thwart
potential generic competition and protect the Daraprim revenues resulting from Vyera's
shocking price increase. Absent Defendants' anticompetitive conduct, Daraprim would have
faced generic competition years ago. Instead, toxoplasmosis patients who need Daraprim to
survive were denied the opportunity to purchase a lower-cost generic version, forcing them and
other purchasers to pay tens of millions of dollars a year more for this life-saving medication.

**II.    Jurisdiction and Venue**

9.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.
§§ 1331, 1337(a), and 1345, as well as under the principles of supplemental jurisdiction codified
in 28 U.S.C. § 1367(a). This Court's exercise of supplemental jurisdiction over Plaintiffs' state
law claims would avoid unnecessary duplication and multiplicity of actions, and should be
exercised in the interests of judicial economy, convenience, and fairness.

10.     This Court has personal jurisdiction over Vyera, Phoenixus, Shkreli, and
Mulleady because each has the requisite constitutional contacts with the United States of
America pursuant to 15 U.S.C. § 53(b). This Court also has personal jurisdiction over Vyera,
Phoenixus, Shkreli, and Mulleady because each has the requisite constitutional contacts with the
state of New York due to their domicile, extent of their business transactions within New York,
contracts to supply goods and services in New York, soliciting business in New York, and/or

committing illegal acts as alleged herein within the state of New York, pursuant to N.Y. CPLR §§301, 302.

11.     Venue in this District is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), 15 U.S.C. § 22, and 15 U.S.C. § 1391(b) and (c). Each Defendant resides, transacts business, committed an illegal act, or is found in this District.

12.     Defendants' general business practices, and the unfair methods of competition alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

13.     Vyera and Phoenixus are, and at all times relevant herein have been, corporations as defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

14.     Martin Shkreli and Kevin Mulleady are "persons" within the meaning of Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. § 45.

## III.    The Parties

### A.    Plaintiff Federal Trade Commission

15.     Plaintiff Federal Trade Commission is an independent administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*., with its principal offices in Washington, DC, and a regional office in Manhattan in New York City, New York. The FTC is vested with authority and responsibility for enforcing, *inter alia*, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

16.     The FTC is authorized to bring this case in federal court because Defendants are violating or about to violate a provision of law enforced by the Federal Trade Commission, and

this is a proper case for permanent injunctive relief within the meaning of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

### B.    Plaintiff State of New York

17.    Plaintiff State of New York is a sovereign state. Letitia James is the Attorney General of the State of New York, the chief legal officer for the state, and brings this action on behalf of the people of the State of New York to protect the state, its general economy, and its residents from Defendants' anticompetitive business practices. The Attorney General has authority under federal and state law to pursue an injunction and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in anticompetitive conduct.

### C.    Plaintiff State of California

18.    Plaintiff State of California is a sovereign state. Xavier Becerra is the Attorney General of the State of California, the chief legal officer for the state, and brings this action on behalf of the people of the State of California to protect the state, its general economy, and its residents from Defendants' anticompetitive business practices. The Attorney General has authority under federal and state law to pursue an injunction and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in anticompetitive conduct.

### D.    Plaintiff State of Illinois

19.    Plaintiff State of Illinois is a sovereign state. Kwame Raoul is the Attorney General of the State of Illinois, the chief legal officer for the state, and brings this action on behalf of the people of the State of Illinois to protect the state, its general economy, and its residents from Defendants' anticompetitive business practices. The Attorney General has authority under federal and state law to pursue an injunction and other equitable relief to prevent

and remedy the harms caused by anticompetitive conduct. The state also has authority to seek

civil penalties under state law to punish and deter those engaged in anticompetitive conduct.

### E.   Plaintiff State of North Carolina

20.   Plaintiff State of North Carolina is a sovereign state. Joshua H. Stein is the

Attorney General of the State of North Carolina, the chief legal officer for the state, and brings

this action on behalf of the people of the State of North Carolina to protect the state, its general

economy, and its residents from Defendants' anticompetitive business practices. The Attorney

General has authority under federal and state law to pursue an injunction and other equitable

relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has

authority to seek civil penalties under state law to punish and deter those engaged in

anticompetitive conduct.

### F.   Plaintiff State of Ohio

21.   Plaintiff State of Ohio is a sovereign state. David Yost is the Attorney General of

the State of Ohio, the chief legal officer for the state, and brings this action on behalf of the

people of the State of Ohio to protect the state, its general economy, and its residents from

Defendants' anticompetitive business practices. The Attorney General has authority under

federal and state law to pursue an injunction and other equitable relief to prevent and remedy the

harms caused by anticompetitive conduct. The state also has authority to seek civil penalties

under state law to punish and deter those engaged in anticompetitive conduct.

### G.   Plaintiff Commonwealth of Pennsylvania

22.   Plaintiff Commonwealth of Pennsylvania is a sovereign state. Josh Shapiro is the

Attorney General of the Commonwealth of Pennsylvania, the chief legal officer for the state, and

brings this action on behalf of the people of the Commonwealth of Pennsylvania to protect the

state, its general economy, and its residents from Defendants' anticompetitive business practices.

The Attorney General has authority under federal and state law to pursue an injunction and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in anticompetitive conduct.

### H.   Plaintiff Commonwealth of Virginia

23.    Plaintiff Commonwealth of Virginia is a sovereign state. Mark R. Herring is the Attorney General of the Commonwealth of Virginia, the chief legal officer for the state, and brings this action on behalf of the people of the Commonwealth of Virginia to protect the state, its general economy, and its residents from Defendants' anticompetitive business practices. The Attorney General has authority under federal and state law to pursue an injunction and other equitable relief to prevent and remedy the harms caused by anticompetitive conduct. The state also has authority to seek civil penalties under state law to punish and deter those engaged in anticompetitive conduct.

### I.   Corporate Defendants

24.    Phoenixus AG is a privately-held, for-profit Swiss corporation with its principal place of business located in Baar, Switzerland. Phoenixus was previously known as Turing Pharmaceuticals AG and Vyera Pharmaceuticals AG. Phoenixus transacts or has transacted business in this District.

25.    Phoenixus is engaged in the manufacture and distribution of the pharmaceutical product Daraprim. Phoenixus acquired the rights to market and distribute Daraprim in the United States in August 2015. It designated its wholly-owned subsidiary, Vyera Pharmaceuticals, LLC, as the exclusive U.S. distributor for Daraprim. Phoenixus is responsible for the manufacture and warehousing of Daraprim and sells the product to Vyera for distribution in the United States.

Phoenixus is also involved in the distribution, pricing, and commercial and marketing activities of Daraprim.

26.     Vyera Pharmaceuticals, LLC, is a privately-held, for-profit limited liability corporation that is wholly owned by Phoenixus AG. Vyera is incorporated in Delaware with its principal place of business located in New York City, New York. Vyera was previously named Turing Pharmaceuticals, LLC. Vyera transacts business in this District and throughout the United States.

27.     Vyera is registered with the FDA as the owner of the Daraprim New Drug Application (No. 008578). Vyera purchases Daraprim from Phoenixus and then markets and distributes the product throughout the United States.

28.     Defendants Phoenixus and Vyera have operated and continue to operate as a common enterprise while engaging in the unfair methods of competition alleged below. Defendants have engaged in this conduct as interrelated companies that share directors, officers, employees, business functions, and office locations. Phoenixus has only five direct employees and largely operates through Vyera, which has more than 50 employees. The current CEO of Phoenixus, Averill Powers, is also Vyera's top executive and general counsel and works out of Vyera's New York office. Phoenixus's few Switzerland-based employees perform functions for Vyera. Phoenixus's board of directors controls Vyera, which has no board.

29.     Vyera's sales of Daraprim account for over ███ of Phoenixus's revenues.

30.     Unless otherwise specified, this Complaint refers to Vyera and Phoenixus collectively as "Vyera" when discussing their joint conduct relating to Daraprim.

J.      **Individual Defendants**

1.  **Martin Shkreli**

31.     Martin Shkreli is the founder of Phoenixus and Vyera, the largest shareholder and former chairman of the board of Phoenixus, and the former CEO of Vyera. At all times material to this Complaint, acting alone or in concert with others, Shkreli has formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint. Shkreli resided in this District until his federal incarceration for securities fraud in 2017. In connection with the conduct alleged herein, he transacts or has transacted business in this District and throughout the United States.

32.     Prior to founding Vyera, from 2006 to 2011, Shkreli founded and ran three hedge funds, all of which failed.

33.     In 2011, Shkreli abandoned hedge funds for pharmaceuticals. He founded the pharmaceutical company Retrophin, Inc., despite having no pharmaceutical business experience.

34.     During his brief tenure at Retrophin, Shkreli acquired Thiola, a sole-source drug for a small but dependent patient population, placed it into a restricted distribution system, and significantly increased the price. He stated at the time that he intended to use distribution restrictions to prevent generic competition to Thiola.

35.     Shkreli was ousted from Retrophin in 2014 by the board of directors for misconduct relating to improper grants and trades of company stock.

36.     Upon leaving Retrophin, Shkreli started Vyera to look for similar products with which to replicate his Retrophin strategy.

37.     As founder and CEO of Vyera, Shkreli directed the minute details of Vyera's business and strategy, including the decision to acquire Daraprim, securing a source for the drug's API, and implementing a restricted distribution system.

68

38.     Shkreli remained CEO until his arrest in December 2015 for securities fraud stemming from conduct at his hedge funds and at Retrophin. He was subsequently convicted of several felonies, including securities fraud and conspiracy to commit securities fraud, and sentenced to seven years in federal prison. Shkreli remained free on bail until September 2017, when his bail was revoked for making threats against Hillary Clinton.

39.     With the exception of a brief period in the first half of 2017, Shkreli has maintained his influence over Phoenixus and Vyera through associates as well as his position as Phoenixus's largest shareholder. Shkreli's longtime ally Ron Tilles served as interim CEO from Shkreli's departure in December 2015 until April 2017. Tilles co-founded Retrophin with Shkreli and was a founding board member of Phoenixus. As detailed in a report by the U.S. Senate Special Committee on Aging, Tilles was Shkreli's "handpicked successor"—"a broker by training whose main skillset was soliciting investors and who, by his own admission, did not know the most basic of pharmaceutical concepts."

40.     In April 2017, Mr. Tilles was briefly replaced by Dr. Eliseo Salinas. When Dr. Salinas proved resistant to Shkreli's influence, however, Shkreli waged a successful proxy fight to oust Dr. Salinas and the Phoenixus board.

41.     In June 2017, Shkreli's close associates, including Mulleady and Akeel Mithani, were elected to Phoenixus's board of directors. Mulleady and Mithani were appointed as the only two members of the board's newly-formed "Executive Committee," which would "perform executive functions and [] take over the tasks of the Senior Management (CEO, CFO, CCO and CLO) on a temporary basis." Mulleady was appointed interim CEO notwithstanding the concerns of some board members that ████████████████████████████████ ████████████████ Mulleady's appointment ████████████████████████████████████

████████████ Mulleady assumed the position of interim CEO of Vyera in September 2017 and CEO in November 2017.

42.     Mithani is Shkreli's protégé. Mithani obtained his undergraduate degree in 2014 and soon began communicating with Shkreli through Twitter. In 2015, Shkreli invited him to apply for a job at Vyera as a junior business development analyst, which Mithani did not get because (in his own words) he "sorely lacked the qualifications." In June 2017, however, Shkreli secured Mithani's election to the Phoenixus board. Since then, Mithani has been a member of the board's Executive Committee as well as executive director and senior vice president of business development of Vyera.

43.     By August 2017, Shkreli was once again formally evaluating business development options for Vyera and working on new tactics to impede generic competition for Daraprim. Phoenixus also initiated a share buy-back initiative, which several shareholders felt was "merely intended to increase Martin Shkreli's holding in the company and to facilitate his control over it."

44.     Since his incarceration in September 2017, Shkreli has remained in regular contact with Mulleady and Mithani through phone calls, emails, in-person visits, WhatsApp messaging, and potentially other means. From June to December 2019 alone, Shkreli exchanged 240 emails with Mulleady and 391 emails with Mithani. In these communications, Shkreli continues to discuss strategies to prevent generic competition to Daraprim, as well as other matters of Vyera business strategy.

45.     In March 2019, a Wall Street Journal article reported that Shkreli "remains the shadow power at Phoenixus AG" and that he was using a contraband cell phone to run Vyera

from prison. ████████████████████████████████████████

████████████████████████████████████████████

46.    Shkreli owns approximately ████ of Phoenixus shares and controls approximately

████ of shareholder votes.

### 2.  Kevin Mulleady

47.    Kevin Mulleady is the current chairman of the Phoenixus board of directors and

former CEO of Vyera. At all times material to this Complaint (with the exception of a brief

period from early 2016 until June 2017), acting alone or in concert with others, he has

formulated, directed, controlled, had the authority to control, or participated in the acts and

practices set forth in this Complaint. Mulleady resides in this District and, in connection with the

matters alleged herein, he transacts or has transacted business in this District.

48.    Before joining Vyera, Mulleady had little pharmaceutical experience.

49.    Following his graduation from college in 2005, Mulleady held entry-level

positions in wealth management and also worked as a real estate broker.

50.    In 2011, Mulleady took a position finding investors for Shkreli's failing hedge

funds. (He was an unindicted co-conspirator in the criminal securities fraud case against Shkreli.)

Mulleady helped Shkreli start both Retrophin and Vyera.

51.    At Vyera, Mulleady initially held the position of managing director and chief of

staff to Martin Shkreli. He assisted with Vyera's search for a drug serving a small patient

population to put into restricted distribution and helped to implement this model for Daraprim. In

2016, not long after Shkreli's arrest, Vyera terminated Mulleady's employment.

52.    Mulleady returned in the summer of 2017 as a member of the Phoenixus board, a

position he still holds, and CEO of Vyera, a position he held until March 2019. In these roles,

Mulleady has directed Vyera's campaign to prevent generic competition to Daraprim, including

restricting its distribution and resale to potential generic competitors, paying an API supplier not

to supply potential generic competitors, and entering agreements to pay two of Vyera's major

distributors not to sell their Daraprim sales information to data-reporting companies.

53.     Mulleady owns more than ■ of Phoenixus shares.

## IV.    Background

### A.     Federal Law Encourages Generic Competition

54.     The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq*., as amended

by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman

Act") and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 21

U.S.C. §§ 355(b)(2) and 355(j) and 35 U.S.C. § 271(e), establishes procedures designed to

facilitate competition from lower-priced generic drugs.

55.     A company seeking to market a new pharmaceutical product in the United States

must file a New Drug Application ("NDA") with the FDA demonstrating the safety and efficacy

of the new product. These NDA-based products generally are referred to as "brand-name drugs"

or "branded drugs."

56.     A company seeking to market a generic version of a branded drug may file an

Abbreviated New Drug Application ("ANDA") with the FDA, referencing the branded drug's

NDA. The generic applicant must demonstrate that its generic drug is therapeutically equivalent

to the brand-name drug that it references, meaning that the generic drug is the same as the brand-

name drug in dosage form, safety, strength, route of administration, quality, performance

characteristics, and intended use. If the FDA determines that the generic drug is therapeutically

equivalent to the already-approved branded drug, it will assign the generic drug an "AB" rating

and will allow the generic company to rely on the studies submitted in connection with the

already-approved branded drug's NDA to establish that the generic drug is safe and effective. 21 U.S.C. § 355(j)(2)(A)(iv).

57.     To establish that the generic drug is therapeutically equivalent to the branded drug, the ANDA applicant must demonstrate bioequivalence, meaning that there is no significant difference in the rate and extent to which the active ingredient becomes available in the body. To make this showing, the applicant must acquire substantial quantities of the referenced branded drug and conduct bioequivalence testing comparing its generic version against that branded drug.

58.     The ANDA applicant must conduct both in vivo and in vitro bioequivalence testing. In the in vivo testing, the same small group of human subjects (a minimum of 12, but often 20 to 30 people) sequentially takes the two products and the pharmacokinetic performance of the drug is measured through bloodwork. The in vitro dissolution testing compares the rate and extent to which the branded and generic drugs form a solution from their original dosage form (e.g., tablet or capsule).

59.     The ANDA applicant must also reserve enough branded drug samples to perform each of the required tests five times.

60.     Depending on the product, a generic manufacturer may need as many as 1,000 to 5,000 doses of the branded drug to conduct bioequivalence testing, all of which must be from the same manufacturing lot to assure uniform character and quality.

61.     Normally, the ANDA applicant can obtain sufficient samples of the branded drug by purchasing them through normal distribution channels, such as drug wholesalers.

62.     An ANDA applicant must also secure an acceptable, steady supply of the drug's API, which is the ingredient that provides the drug's pharmacological activity. Pharmaceutical companies typically purchase API from third-party suppliers. In order for an API to be used in a

pharmaceutical product, the FDA must approve the API product, the API manufacturing process, and the API manufacturer's quality controls, facility, and compliance with good manufacturing practices. An ANDA must therefore contain extensive information about the API and its manufacturer, including a complete description of the manufacturing process and process controls, the control of materials used in the manufacture of the drug substance, controls of critical steps and intermediates, process validation, and the manufacturing process development. In addition to reviewing this information in detail, the FDA will typically audit the API manufacturer and its facility.

63.     If a generic cannot find an API supplier with an existing process that can meet the FDA's standards, it will typically need to work with a new supplier to develop a manufacturing process for the API, which can take months or years.

64.     A supplier that has already developed a process to produce an API can separately submit a drug master file ("DMF") to the FDA containing this required information. In that case, an applicant using that supplier can reference the DMF in its ANDA rather than developing and submitting the information anew. The generic applicant's path to FDA approval is easier and faster if the FDA has already inspected the API supplier's facility and approved the manufacturing process. Even if the FDA still needs to inspect the API supplier, the DMF indicates that the manufacturer has an existing, FDA-approvable process to manufacture the API, which can shorten the ANDA development timeline.

**B.     Competition from Lower-Priced Generic Drugs Saves American Consumers Billions of Dollars Each Year**

65.     Generic drugs are uniquely close competitors to their branded counterparts and are a critical part of lowering prescription drug prices in the United States.

74

66.     All 50 states and the District of Columbia have drug substitution laws that encourage and facilitate substitution of lower-cost AB-rated generic drugs for branded drugs. When a pharmacist fills a prescription written for a branded drug, these laws allow or require the pharmacist to dispense an AB-rated generic version of the drug instead of the more expensive branded drug, unless a physician directs or the patient requests otherwise. Conversely, these laws generally do not permit a pharmacist to substitute a non-AB-rated generic for a branded drug unless the physician specifically prescribes it by writing on the prescription the chemical name of the drug, rather than the brand name.

67.     The Hatch-Waxman Act and state substitution laws have succeeded in facilitating generic competition and generating large savings for patients, healthcare plans, and federal and state governments. The first generic competitor's product is typically offered at a 20% to 30% discount to the branded product. Subsequent generic entry creates greater price competition, with discounts reaching 85% or more off the brand price. According to a 2010 Congressional Budget Office report, the retail price of a generic is 75% lower, on average, than the retail price of a brand-name drug. In 2018 alone, the Association of Accessible Medicines reported that use of generic versions of brand-name drugs saved the U.S. healthcare system $293 billion.

68.     Because of these cost savings, many third-party payers of prescription drugs (e.g., health insurance plans and Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their branded counterparts. As a result of these policies and lower prices, many consumers routinely switch from a branded drug to an AB-rated generic drug upon its introduction. Consequently, AB-rated generic drugs typically capture over 80% of a branded drug's unit and dollar sales within six months of market entry.

75

C.      **Daraprim Is the Gold-Standard Treatment for Toxoplasmosis**

69.      Toxoplasmosis is a common parasitic infection typically transmitted through undercooked meat and infected cat feces. In most humans, toxoplasmosis is easily contained by their immune systems and causes no symptoms.

70.      But in immunocompromised individuals—such as those with HIV/AIDS, cancer patients, or recipients of organ transplants—the infection can morph into a potentially fatal organ infection, most commonly in the brain, lungs, or heart. The parasite can also infect the eyes (ocular toxoplasmosis).

71.      An expectant mother can also pass the *toxoplasma gondii* parasite in utero, causing congenital toxoplasmosis, which left untreated can lead to blindness, severe intellectual disabilities, and other neurological problems.

72.      In the United States, the number of toxoplasmosis cases requiring treatment each year is small (less than 7,000 per year from 2003-2012) and declining as treatment of HIV/AIDS improves.

73.      The gold-standard treatment for toxoplasmosis is pyrimethamine. All U.S. government health authority guidelines identify pyrimethamine as the preferred treatment for the infection. The Centers for Disease Control and Prevention advise that pyrimethamine is the "most effective drug against toxoplasmosis." The National Institute of Health calls pyrimethamine the "initial therapy of choice," and it advises other options only if pyrimethamine is "unavailable or there is a delay in obtaining it."

74.      Pyrimethamine is on the World Health Organization's Model List of Essential Medicines, which identifies the minimum medicines needed for a basic healthcare system.

75.      Daraprim (NDA No. 08578) is a branded version of pyrimethamine. It was first approved by the FDA in 1953. It long ago lost any patent protection or regulatory exclusivity.

76.     Daraprim is available only as a 25-milligram tablet. Generally, a toxoplasmosis infection is diagnosed in an acute hospital setting, and the patient typically remains hospitalized for two to three weeks. During this stage, the starting dosage for adults is 50 to 75 milligrams of Daraprim per day.

77.     Following discharge, patients typically continue on about half that amount for four to five additional weeks, though some patients must remain on pyrimethamine for months or years to prevent recurrence.

78.     From the time Vyera acquired Daraprim in 2015 until the FDA approved a generic version of Daraprim on February 28, 2020, Daraprim was the only FDA-approved pyrimethamine product (branded or generic).

**D.     Vyera's Acquisition of Daraprim**

       **1.  Prior ownership of Daraprim**

79.     GlaxoSmithKline plc and its predecessor entities owned the worldwide rights to Daraprim from its approval in 1953 until 2010.

80.     By 2010, GSK charged around $1 per Daraprim tablet and had relatively low revenues of less than $1 million per year in the United States due to the low incidence of toxoplasmosis.

81.     GSK still sells Daraprim in the United Kingdom, where it charges less than $1 per tablet.

82.     In 2010, GSK sold its U.S. and Canadian Daraprim rights to CorePharma LLC, which then transferred the product to its sister company, Amedra Pharmaceuticals LLC.

83.     Between 2010 and 2015, CorePharma and Amedra gradually increased the price of Daraprim to $13.50 per tablet. Additionally, Amedra developed a plan to remove Daraprim from normal distribution channels and put it into a restricted distribution system.

84.     In March 2015, Impax Laboratories, Inc. acquired Daraprim as part of a $700

million acquisition of Amedra's parent company, Tower Holdings, Inc. At the time, Impax

assessed Daraprim as a non-core asset with declining annual revenues of $5 million or less.

85.     In June 2015, Impax increased the price of Daraprim by 30%, from $13.50 to

$17.50 per tablet. Impax had considered a more "aggressive" price increase, but rejected the idea

due to concern about a public backlash from the AIDS community. Impax also began to

implement Amedra's restricted distribution system, signing contracts with two distributors.

### 2.  Vyera's acquisition of Daraprim

86.     From its inception in fall 2014, Vyera had been looking to acquire a sole-source

drug with a small patient population that it could put into restricted distribution. As Vyera

explored different drugs that fit this mold, it sought distribution partners that would "help [it]

keep a tightly controlled supply chain, where [the] drug is only supplied to verified patients."

87.     In April 2015, unaware of Impax's plan to place Daraprim into restricted

distribution, Vyera contacted Impax with an unsolicited bid to acquire the U.S. Daraprim rights

for ███████. At the time, Daraprim had annual U.S. net revenues of approximately ████████

per year. Impax had assessed Daraprim's net present value at $17.1 million, assuming no generic

entry.

88.     On August 7, 2015, Vyera acquired the U.S. rights to Daraprim for the final

negotiated price of $55 million—triple Impax's net-present-value assessment and more than 11

times Daraprim's annual net revenues.

89.     Vyera had a plan to turn Impax's $5 million-per-year drug into a $500 million-

per-year drug. The plan started with a shocking price increase: the day after finalizing the deal in

August 2015, Vyera raised the price from $17.50 to $750 per tablet, an increase of more than

4,000%.

90.     In advance of the price increase, Defendant Shkreli predicted that "nobody will notice and there will not be any consequence." He was very wrong. Vyera swiftly faced outcries from health care providers, patients, medical societies, the general public, and Congress.

91.     In the words of Vyera's then chief scientist, "the only person that didn't speak against [the price hike] was the Pope . . . . [I]t was the poster child of everything that is considered wrong about the pharmaceutical industry."

92.     In September 2015, the HIV Medicine Association ("HIVMA") of the Infectious Diseases Society of America publicly urged Vyera "to immediately revise the pricing strategy for" Daraprim. HIVMA deemed the estimated annual cost of pyrimethamine treatment for toxoplasmosis ($336,000-$634,500 depending on the patient's weight) "unjustifiable for the medically vulnerable patient population in need of this medication and unsustainable for the health care system."

## V.    Defendants' Anticompetitive Agreements to Maintain Vyera's Daraprim Monopoly

93.     Vyera knew that the dramatic price increase on its own would not secure long-term revenues because, with no patent or regulatory protection, Daraprim would be vulnerable to generic entry. Thus, to protect its Daraprim revenues, Vyera launched an elaborate scheme to prevent generic competition: it entered agreements prohibiting distributors and purchasers from reselling Daraprim to potential generic competitors or their agents; entered exclusive agreements prohibiting API manufacturers from supplying pyrimethamine to potential generic competitors; and entered data-blocking agreements to prevent distributors from selling their Daraprim sales data, thus masking the true size of the Daraprim market to deter generic competitors. Defendants Shkreli and Mulleady implemented, oversaw, and participated in this scheme.

A.    **Defendants Implement Agreements Restricting Resale and Limiting Purchases to Block Generic Entry**

94.    Before 2015, Daraprim was distributed openly for more than 60 years without any restrictions. Generic companies were able to purchase Daraprim from a local pharmacy without entering into any written contract or obtaining any type of approval.

95.    But Defendants understood that a restricted distribution system "can be a way to lower competition." One of Vyera's co-founders testified that "closed distribution can increase a product life cycle by preventing generics from potentially getting your referenced product," which they need for FDA-required bioequivalence testing. Vyera's former general counsel further testified that the use of a closed distribution system was "considered an integral part of the company's desire to block a generic entrant for at least three years."

96.    Defendant Shkreli had experience using resale restrictions to block generic competition. In 2014, Shkreli's first pharmaceutical company, Retrophin, acquired the rights to Thiola, a drug used to treat the rare disease cystinuria. At Shkreli's direction, Retrophin raised the price of Thiola by 2,000% and put it into a restricted distribution system.

97.    At that time, Shkreli told Retrophin investors that "[t]he closed distribution system . . . allows for us to control the release of our product. We do not sell Retrophin products to generic companies." As Shkreli explained, blocking generic access to drug samples in this way "takes the AB substitutable rating that generics rely on and neuters it."

98.    When Vyera was seeking to acquire Daraprim, Defendant Mulleady made clear that setting up a similar restricted distribution system for Daraprim would be Vyera's "#1 priority" and "exceptionally time sensitive." He urged Vyera employees to "all work extra long hours to get this done."

99.     Upon acquiring Daraprim, Vyera acted to implement Shkreli's blueprint. Vyera started with the restricted distribution system it inherited from Impax, expanding the number of distributors to improve distribution logistics. At the same time, however, Defendants tightened the resale restrictions by signing agreements with the distributors, hospitals, and pharmacies that purchased Daraprim barring resale of the drug to generic companies. The resulting web of contractual restrictions prevents generic companies from purchasing Daraprim at any point in the distribution chain, denying them the ability to conduct the bioequivalence testing necessary for FDA approval.

### 1.  Vyera's contractual restrictions prevent distributors from selling Daraprim to generic companies

100.    Vyera's generic-blocking agreements start with its distributors. Vyera imposes resale restrictions on all of its distributors to "block" generic companies from purchasing Daraprim, thereby "avoid[ing] generic competition." Each Vyera distributor can sell Daraprim only to specifically identified customers or customer types. Any other purchase request requires Vyera's direct approval. As Vyera's director of patient access explained, "[i]f someone else calls and asks for 50 bottles of Daraprim, they would have to come to me for approval."

101.    None of Vyera's distributors is allowed to sell Daraprim to generic companies. Nor does Vyera approve such sales. If a distributor receives a purchase request from an entity that might be a generic company or might sell to one, Vyera will "block that purchase" to "avoid generic competition."

102.    At the top of its distribution system, Vyera uses ICS (formerly Smith Medical Partners) as a third-party logistics provider. ICS receives Daraprim from Vyera's contract manufacturer, warehouses it, and ships it to Vyera's chosen distributors. ICS is compensated through a fixed monthly fee, as well as additional fees for each order it ships.

103.    Under its agreement with Vyera, ICS can only ship Daraprim to four specifically approved distributors: ASD Healthcare, Cardinal Health, BioRidge Pharma, LLC, and Optime Care Inc. Generic companies are not approved purchasers, and ICS cannot sell Daraprim to them without Vyera's approval.

104.    Below ICS, each of these four distributors is authorized to sell only to specific types of purchasers.

105.    First, Vyera has an agreement with ASD Healthcare to distribute Daraprim to hospital and government purchasers. Vyera compensates ASD by paying it ████ of Daraprim's wholesale acquisition cost ("WAC," i.e. the list price) for each sale it makes.

106.    Initially, Vyera and ASD also agreed to "verbal business rules" that further limited sales to specific government and hospital customers. Vyera and ASD later amended their written contract to enumerate "authorized customers" and to specifically require that Vyera "approve any new authorized customers via email." Generic companies are not and have never been authorized customers under the ASD agreement. Nor was ASD permitted to sell Daraprim to generic companies under the previous contractual iteration and verbal business rules. Consequently, ASD cannot sell Daraprim to generic companies without Vyera's approval.

107.    Second, Vyera has an agreement with BioRidge Pharma to distribute Daraprim to certain identified specialty pharmacies—including those owned by Walgreens. Vyera compensates BioRidge by paying it ████████████████████████.

108.    Generic companies are not identified as acceptable purchasers under the BioRidge contract. Consequently, BioRidge cannot sell Daraprim to generic companies without Vyera's approval.

109.    Third, Vyera has an agreement with ████████████ to distribute Daraprim only to "approved classes of trade," which are defined as "[h]ospitals, state AIDS Drug Assistance Programs (ADAPs), and their authorized purchasers." Purchase requests from any other "class of trade . . . require prior written approval by [Vyera]." Vyera compensates ████ by paying it ████████████████████████████████████.

110.    Generic companies are not an approved class of trade under the ██████ contract. Consequently, ██████ cannot sell Daraprim to generic companies without Vyera's approval.

111.    Fourth, Vyera has an agreement with Optime Care to distribute Daraprim only to "[a]uthorized customer types," which include hospitals, government customers, state AIDS Drug Assistance Programs, and patients with a prescription. Optime cannot sell Daraprim to a buyer that falls outside these authorized types without Vyera's approval. Under the agreement, Vyera compensates Optime by paying it ██████████████████████████, as well as ████████ ██████████████████████████.

112.    Generic companies are not an authorized customer type under the Optime contract. Consequently, Optime cannot sell Daraprim to generic companies without Vyera's approval.

113.    Taken together, Vyera's contractual restrictions prevent all of its distributors from selling Daraprim to generic companies seeking to conduct FDA-mandated bioequivalence studies unless Vyera approves the sale. And Vyera does not approve any sale of Daraprim to a generic company or a company it believes might sell to a generic company. Indeed, Vyera has denied each request from a distributor to sell Daraprim to a purchaser that might be a generic company or might sell Daraprim to a generic company, even though Vyera would make significant profits from any sales of Daraprim at list price.

### 2. Vyera's contractual restrictions prevent downstream purchasers from selling Daraprim to generic companies

114.    In addition to locking up its distributors, Vyera was also concerned that downstream purchasers, such as hospitals or pharmacies, might sell Daraprim to a generic company. To prevent this, Vyera imposed direct and indirect restrictions on these purchasers.

115.    First, Vyera required distributors to enter agreements with their own customers preventing the resale of Daraprim to generic companies.

116.    For example, in September 2015, Vyera authorized ICS (then retained as a distributor as well as a third-party logistics provider) to sell Daraprim to a group of Puerto Rican pharmacies. As part of the authorization, Vyera required ICS to "provide some wording on the account prohibiting sale of daraprim to a third party." Vyera instructed that "[p]roduct should only be dispensed to patients in their facilities." This requirement prevented ICS's customers from selling Daraprim to generic companies.

117.    Similarly, in May 2018, Vyera instructed Optime to include a "Product Use Attestation" in its agreements with hospitals. This attestation required hospitals to guarantee that Daraprim "will not be sold, resold, diverted or transferred to any other person or entity for any reason unless approved in writing by Vyera or its designee." This requirement prevented the hospitals from selling Daraprim to generic companies.

118.    Second, Vyera also entered direct agreements with hospitals and pharmacies preventing them from reselling Daraprim to generic companies.

119.    As part of its pricing agreements with thousands of hospitals, Vyera requires them to use Daraprim only for their "own use"—which is defined as the treatment of the hospital's patients. As a result, these hospitals are contractually prevented from selling Daraprim to anyone other than patients, including generic companies.

120.    Vyera includes similar terms in its agreements with hospital group purchasing organizations ("GPOs"), which purchase products on behalf of large groups of member hospitals. For example, under Vyera's contract with the GPO Vizient, Vizient's member hospitals can purchase Daraprim only for "the use of the Member" and "not for resale to anyone other than the end use patient or customer." This restriction prevents GPO member hospitals from selling Daraprim to generic companies.

121.    Vyera has also entered direct contracts with Walgreens, which sells Daraprim through its specialty pharmacies. The agreements specify that Walgreens can only provide Daraprim to its specialty pharmacies and to patients with a prescription. The contracts prevent Walgreens or its specialty pharmacies from selling Daraprim to generic companies without Vyera's approval.

122.    Taken together, Vyera's restrictions on downstream purchasers prevent them from selling Daraprim to a generic company seeking to conduct FDA-mandated bioequivalence testing unless Vyera approves the sale. Vyera does not approve downstream purchasers to sell Daraprim to a generic company or a company that might sell to a generic company. Indeed, Vyera has never authorized such a sale, even though it would make significant profits any time Daraprim is sold at its list price.

### 3.  Vyera limits and monitors approved sales of Daraprim to prevent generic companies from obtaining it

123.    In addition to its agreements with distributors and purchasers not to sell Daraprim to generic companies, Defendants took further steps to ensure generic companies could not purchase the Daraprim they needed to conduct FDA-required bioequivalence testing.

124.    A bottle of Daraprim contains 100 tablets. Defendants knew that, in order to meet FDA requirements for bioequivalence testing, any potential generic competitor would need at minimum 500 to 1,000 tablets, or five to 10 bottles of Daraprim—and likely would need more.

125.    Vyera thus limited the amount of Daraprim that any one approved entity could purchase. As a Vyera senior director informed at least one of Vyera's distributors, the goal of these quantity limits was to reduce the risk "that a generic company could access multiple bottles of [Daraprim], perhaps obtained through a hospital reselling it or distributing product to surrounding retail pharmacies." Thus, even if a generic company broke through Vyera's web of resale restrictions, it could not obtain enough Daraprim to conduct bioequivalence testing.

126.    For example, in August 2015, Vyera and ICS (then a Daraprim distributor) agreed that ICS would not sell more than five bottles to a single customer without Vyera's express approval. The purpose of the ICS restriction was to "ensure that the account is legit and not a generics manufacturer."

127.    Similarly, Vyera's 2018 contract with Optime prevents Optime from selling more than three bottles to any purchaser without Vyera's express approval. Before it will approve such a sale, Vyera requires Optime to obtain "prescription level information" on the purchase, such as the prescriber and prescription quantity. Vyera then uses this information to make sure the requested Daraprim will not be diverted to a generic company.

128.    And in February 2018, Vyera approved sales of Daraprim through a new pharmacy, Drug Mart, but limited Drug Mart to carrying only one bottle of Daraprim in inventory at a time.

129.    In August 2019, Shkreli had separate discussions with Mulleady and Mithani about limiting all sales of Daraprim to one bottle at a time in order to prevent a generic

competitor from obtaining sufficient Daraprim samples to conduct bioequivalence testing. Shkreli urged Mulleady to "really carefully screen every doctor" and ensure that no one could "sell more than one bottle at a time" to prevent a generic company from "get[ting its] hands on anything." Shkreli instructed Mithani that Vyera should "do everything" it could to prevent a generic company from obtaining samples of Daraprim, because preventing generic competition would make Daraprim a "$600 million asset . . . in perpetuity."

130.    Even with Vyera's complex web of resale restrictions and quantity limits, in 2017 Mulleady became concerned that there had been "leakage" to a generic competitor. In September 2017, Mulleady ordered a "full out audit of daraprim" so he could "know where every bottle of daraprim we sold went to." The next month, Mithani directed Vyera employees to establish a system with ASD—one of Vyera's main hospital distributors—for immediate notification of any orders. Mulleady and Mithani wanted to identify "outlier" purchases that might be intended for a generic company. ASD agreed to flag any such orders for Vyera. Mulleady and Mithani would then contact the buyer to "inquire as to what their purpose is."

131.    In at least one instance, this aggressive monitoring allowed Vyera to quickly buy back Daraprim that might otherwise have been sold to a generic company. In April 2018, Vyera employees flagged an unusual purchase from ASD: a company called Centrastate Specialty Script—which shares common ownership with Reliant Specialty LLC—had purchased five bottles of Daraprim at one time, when it had previously never ordered more than two. Mithani was concerned that Centrastate had purchased Daraprim on behalf of a generic.

132.    Mulleady determined that Vyera should buy back the five bottles from Centrastate. Using a middleman, Mulleady repurchased all five bottles for ███████—█ the price Centrastate had paid.

Case 1:20-cv-00706-DLC   Document 91   Filed 04/16/20   Page 31 of 86

133.    As part of the repurchase contract, Centrastate agreed "not to purchase, directly or indirectly . . . any Daraprim, except directly through Vyera." Vyera subsequently directed ASD to block Centrastate from purchasing any further Daraprim.

### 4. Defendants' generic-blocking restrictions prevent generic competitors from purchasing Daraprim and have no legitimate rationale

134.    Taken together, the purpose and effect of Vyera's resale restrictions, quantity limits, and monitoring is to prevent potential generic competitors from obtaining sufficient samples of Daraprim to conduct FDA-mandated bioequivalence testing.

135.    Due to Vyera's agreements restricting resale, generic companies cannot purchase Daraprim at any point in Vyera's distribution chain. Nor can generic companies purchase Daraprim directly from Vyera, which refuses to sell the product to generic companies or companies that might resell to generic companies. And Vyera's quantity limits and monitoring ensure that, even if a generic company slips through the restrictions and purchases some Daraprim, it will not likely obtain enough to conduct bioequivalence testing.

136.    Generic companies cannot circumvent Vyera's web of restrictions by obtaining a Daraprim prescription from a doctor. Doctors are allowed to write prescriptions for the treatment of a patient; a doctor cannot write a prescription for medication to be used in bioequivalence testing, which does not involve treatment of a patient. Moreover, even if a generic company could obtain a prescription and use that prescription to purchase Daraprim from a distributor or purchaser, Vyera's quantity limits would prevent filling a single prescription for the minimum five bottles needed for bioequivalence testing. And even assuming the generic company were able to acquire Daraprim from a pharmacy with a prescription, it would have no way of ensuring that all the bottles came from the same manufacturing lot, as required by the FDA.

137.    The purpose of Defendants' extensive resale restrictions and quantity limits is to prevent generic companies from obtaining the Daraprim necessary to meet the FDA's bioequivalence testing requirements and thereby impede them from launching generic Daraprim products.

138.    This purpose was publicly reported and widely known. In September 2015, the New York Times reported that "Daraprim's distribution is now tightly controlled, making it harder for generic companies to get the samples they need for the required testing" and that this could prevent generic competition. The Times further reported that Defendant Shkreli had previously used a similar strategy "as a way to thwart generics."

139.    In November 2015, the Senate Special Committee on Aging launched a bipartisan investigation into dramatic price increases on several off-patent drugs, including Daraprim. The Committee concluded that Vyera "put [Daraprim] in a closed distribution system to keep potential generic competitors from getting access to the drug to conduct required bioequivalence tests for developing generic alternatives." The Committee elaborated that "[r]estricted distribution in this case was a deliberate part of [Vyera's] plan to defend its shocking price increase and subsequent increased revenue against potential competition."

140.    As part of the Senate investigation, multiple Vyera executives testified that the purpose of the distribution restrictions was to prevent competition from generic companies by denying them access to the samples they needed for bioequivalence testing.

141.    The restrictions preventing distributors or purchasers from selling Daraprim to generic companies do not have any legitimate business rationale.

142.    The resale restrictions are not related to any safety concerns about Daraprim. Prior to 2015, Daraprim was sold in open distribution without incident for more than 60 years.

Additionally, the FDA has never subjected Daraprim to any type of safety program. When drugs pose serious safety concerns, the FDA requires sellers to implement Risk Evaluation Mitigation Strategies (REMS) to minimize those risks. A REMS requirement can include warning labels, educational guides, and restrictions on distribution. The FDA has never required that Daraprim be subject to any form of REMS. Moreover, safety concerns are not, and have never been, the reason for the restricted distribution of Daraprim.

143.    The resale restrictions are also not related to providing patient services as part of the distribution system. Blocking the sale of Daraprim to generic companies does not provide or support any services to Daraprim patients. Additionally, providing patient services is not and has never been the purpose of the restricted distribution system. When Vyera initially explored the logistics of setting up a restricted distribution system, it rejected the idea of including additional patient services because they would "take forever" to set up. And the distribution restrictions have in fact made it harder for patients to obtain Daraprim, leading to adverse medical outcomes.

**B.    Defendants Enter Exclusive Agreements With API Manufacturers to Block Generic Companies' Access to Pyrimethamine API Supply**

144.    In addition to denying potential generic competitors access to the Daraprim samples they need to conduct FDA-required testing, Vyera (under the supervision and direction of Defendants Shkreli and Mulleady) further impeded generic competition by locking up the two most viable manufacturers of pyrimethamine, the active pharmaceutical ingredient used in Daraprim.

145.    To develop and commercially market a generic version of Daraprim, a potential generic competitor would need to secure a reliable source of pyrimethamine API.

146.    It is well known in the industry that it is significantly faster and less expensive to source API from a supplier that has a pre-existing manufacturing process that is either approved

by the FDA or a good candidate for FDA approval. Different APIs require different equipment and methods to manufacture. It can take months or years, as well as an investment of hundreds of thousands of dollars or more, for a manufacturer without a pre-existing process to develop one. Moreover, the FDA must approve any API manufacturer's facilities, process, and product before the API can be used in a U.S. product. Retaining an API manufacturer with an unapproved process entails the risk that the FDA will not approve it or will require the manufacturer to invest additional time and expense correcting deficiencies. Thus, even if a manufacturer has a pre-existing process, it will not readily be able to supply API for a U.S. product if its process, facility, or manufacturing practices are not up to FDA standards.

147.    One method commonly used in the industry to identify API manufacturers with an established, FDA-approvable manufacturing process is to search for DMFs. A DMF is a submission from an API manufacturer to the FDA providing detailed information about the manufacturer's facility and process for a given API. The filing of a DMF indicates that the manufacturer has already developed a manufacturing process for that API that it believes meets FDA standards, and thus that it could serve as a reliable source. As Vyera's director of business development explained, contracting with a DMF holder for API supply diminishes a pharmaceutical company's "execution risk."

148.    Understanding these market dynamics, Defendants acted to prevent generic competitors from obtaining pyrimethamine API from suppliers with an existing, FDA-approvable manufacturing process—especially those holding pyrimethamine DMFs. Defendants decided to sign exclusive contracts with any such manufacturers to force generic competitors to spend substantial time and money working with a new manufacturer to develop an FDA-approvable pyrimethamine manufacturing process.

### 1. Vyera locks up the only manufacturer with an FDA-approved manufacturing process for pyrimethamine API

149.    In the summer of 2015, prior to acquiring Daraprim, Vyera contacted pyrimethamine suppliers from the FDA's DMF database. At that time, two API suppliers had filed DMFs with the FDA: Fukuzyu and Ipca Laboratories Ltd. On or about June 1, 2015, Vyera contacted both Ipca and Fukuzyu seeking to enter into exclusive supply agreements for pyrimethamine API that would prevent generic companies from purchasing pyrimethamine from either company.

150.    The next day, Ipca told Vyera it could not supply pyrimethamine and thus an "exclusivity deal is not possible." Several months earlier, in January 2015, the FDA had banned imports of most of Ipca's APIs, including pyrimethamine, due to manufacturing deficiencies. Vyera quickly understood that this import ban would generate the same effect as exclusivity. In a June 15, 2015 presentation to potential investors, Vyera touted how this import ban would cause "significant disruption" and delay to generic companies planning or desiring to use Ipca.

151.    This left Fukuzyu as the only established manufacturer of pyrimethamine API for the U.S. market. Indeed, Fukuzyu sells pyrimethamine API worldwide and has supplied it for branded Daraprim in the United States for decades. Because Fukuzyu's pyrimethamine was already being used in an FDA-approved product, Vyera knew that the FDA had already approved Fukuzyu's manufacturing process and any company would be able to use Fukuzyu API immediately.

152.    Vyera's initial attempts to reach an exclusivity agreement with Fukuzyu were rejected. But Vyera did not give up. In 2016, it retained a Japanese consultant to negotiate with Fukuzyu on its behalf and sent a formal letter seeking an in-person meeting. Beginning in fall 2016, Vyera and Fukuzyu began serious negotiations, and on or about November 22, 2016, they

reached an oral agreement for the exclusive supply of Fukuzyu API for human use in the United States. A Vyera executive broke the news of the agreement to colleagues by saying: "Fukuzyu has accepted our agreement to provide pyrimethamine exclusively for us for human drugs and will not sell to generic manufacturers. This is a big sigh of relief for us!"

153.    In January 2017, Phoenixus signed a  with Fukuzyu. Following the ▬▬▬▬▬ term, the agreement is ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

154.    As executed, the contract forbids Fukuzyu from selling pyrimethamine to anyone other than Vyera for human use in the United States. Vyera expected and intended that the exclusivity provision would prevent Fukuzyu from selling pyrimethamine API to generic companies.

155.    Indeed, during the negotiations, Vyera told Fukuzyu that the "most critical issue[]" was obtaining an exclusivity provision that would prevent Fukuzyu from selling pyrimethamine to Vyera's generic competitors. Vyera explained that "[i]f generic products are put on the U.S. market, [Vyera] will face a serious problem, and may eventually terminate the marketing of Daraprim." Vyera further stressed that entry of a generic Daraprim could prevent Vyera from working with Fukuzyu on future projects.

156.    Fukuzyu has abided by the terms of its exclusive supply agreement and consistently consulted with Vyera to verify that proposed sales would not violate the exclusivity provision. Vyera regularly directs Fukuzyu not to sell API to any entity that could use the pyrimethamine in the United States for human use, such as for a generic version of Daraprim. Indeed, at least two potential generic competitors sought and were denied API from Fukuzyu due to the Vyera exclusive contract.

157.     There is no legitimate business rationale for the exclusivity provision in the Fukuzyu supply contract. The exclusivity provision does not ensure Vyera's supply because Fukuzyu is not obligated to reserve any volume of pyrimethamine for Vyera and can sell any amount of pyrimethamine to companies outside the U.S. or for non-human use within the U.S. Nor does the exclusivity provision reflect a recoupment of any investment Vyera made in Fukuzyu. Instead, the purpose of the exclusivity provision is to prevent potential generic companies from obtaining pyrimethamine API from Fukuzyu.

158.     The 2017 exclusive supply agreement with Fukuzyu remains in effect.

**2.  Defendants poach a second API manufacturer from generic competitors**

159.     After obtaining exclusivity from Fukuzyu, Vyera then signed a second exclusive agreement to lock up the next most viable manufacturer of pyrimethamine API.

160.     In August 2017, Vyera became aware that another API supplier, RL Fine Chem, was preparing to file a DMF for pyrimethamine API in the United States and was working with two generic companies. RL Fine had a pyrimethamine manufacturing process in place, had filed a European DMF, and had experience manufacturing and selling pyrimethamine to European clients. RL Fine's European DMF indicated its facilities, quality standards, and manufacturing practices were likely sufficient to obtain FDA approval. After Fukuzyu, RL Fine was the next-best option for the supply of pyrimethamine API to any generic company seeking to develop a generic Daraprim product for sale in the U.S.

161.     In August 2017, shortly after taking back control of Vyera through his successful proxy fight, Shkreli directed Mulleady and Mithani to pursue a supply agreement with RL Fine.

162.     On August 21, 2017, Shkreli drafted an email to RL Fine inquiring about pyrimethamine API for the U.S. market and directed co-Executive Director Mithani to send it. RL Fine replied that it was "already working on pyrimethamine and would not be able to offer to

94

you." Undeterred, Mulleady and Shkreli (through Mithani) pushed for "a more robust

relationship."

163.    On November 2, 2017, Mulleady (then co-executive director with Mithani)

offered RL Fine ██████████████ as consideration for entering into an exclusive supply

agreement with Vyera. By November 26, 2017, Vyera had agreed to pay RL Fine even more for

an "exclusive agreement . . . for the distribution of any and all pyrimethamine based product."

On December 27, 2017, Mulleady (then serving as Vyera CEO and Phoenixus board chairman)

executed on behalf of Phoenixus two contracts with RL Fine: a product collaboration agreement

and a distribution and supply agreement.

164.    Under the product collaboration agreement, Vyera paid RL Fine ████████████

████, and the parties agreed to collaborate on the development of ██ products. Neither Vyera

nor RL Fine, however, subsequently took any steps to develop any of these products.

165.    Under the distribution and supply agreement, RL Fine designated Vyera as its

exclusive distributor of pyrimethamine API worldwide. Vyera has no API distribution

capabilities and no intention to become an API distributor. As RL Fine's pyrimethamine

distributor, however, Vyera has the power to veto any pyrimethamine API sale outside of India.

This allows Vyera to block any sale of pyrimethamine API from RL Fine to a potential generic

competitor. Indeed, at Vyera's direction, RL Fine ceased supplying pyrimethamine API to the

two generic companies with which it had been working. Since signing the agreement with Vyera,

RL Fine has not supplied pyrimethamine to any company for use in the United States.

166.    In return, Vyera agreed to pay RL Fine ██████████████ and ████████

██████████████████████. Under the distribution and supply agreement, Vyera

has made monthly payments to RL Fine ranging from ████████ to ████████ from February 2018

through at least August 2019. Vyera agreed to make these payments whether or not it receives any API from RL Fine and irrespective of whether RL Fine's API is approved for use in Daraprim. To date, Vyera has paid RL Fine approximately ████████ under the distribution and supply agreement and has not received any API from RL Fine.

167.    The purpose of the RL Fine Agreement was to ensure that RL Fine could not supply any of Vyera's potential generic competitors.

168.    There is no legitimate business rationale for the exclusivity agreement. Vyera did not need and was not seeking an additional source of pyrimethamine API. Fukuzyu is, and has been, a reliable supply partner. Throughout the term of its agreement with Vyera, Fukuzyu has never had a supply interruption or other event that prevented it from providing Vyera with pyrimethamine API. Indeed, Fukuzyu's minimum purchase batch size provides Vyera with more pyrimethamine than it can use. Vyera has purchased pyrimethamine API from Fukuzyu only twice—on August 1, 2017, and November 19, 2018—for approximately ██████ each time. And Fukuzyu has the capacity to produce significantly greater quantities of pyrimethamine API, which it still regularly supplies to other manufacturers for human use outside the U.S. and for non-human use in the United States.

169.    Even if Vyera had wanted an additional source of pyrimethamine API, it did not retain RL Fine for that purpose. For the entire term of the agreement, Vyera could not legally use RL Fine's pyrimethamine API in Daraprim because it never sought or obtained FDA approval to do so. Nor did RL Fine take any further steps to conform its process to FDA requirements.

170.    Indeed, Vyera's approach to the RL Fine negotiations demonstrates that its goal was never to obtain usable pyrimethamine API from RL Fine. When negotiating its agreement with Fukuzyu, Vyera performed extensive diligence to ensure that Fukuzyu would be able to

comply with the FDA's current good manufacturing practices ("cGMPs") and other quality-oriented measures required by the FDA. Numerous Vyera technical personnel were involved in these efforts, and the Vyera executives responsible for Quality, Regulatory Affairs, and Chemistry, Manufacturing and Controls ("CMC") traveled to Japan to meet with their Fukuzyu counterparts.

171.    The RL Fine negotiations, however, were conducted by Mulleady and Mithani alone and without any technical support. Neither Mulleady nor Mithani had any experience with or knowledge of API sourcing or FDA requirements, and neither had any relevant scientific background. No one at Vyera performed any diligence on RL Fine's ability to produce pyrimethamine API. Indeed, nobody from Vyera's CMC or Quality departments were involved in the negotiations with RL Fine in any capacity. As of September 2019, the Vyera chief scientific officer with ultimate responsibility for Daraprim manufacturing was not even aware Vyera had a contract with RL Fine.

172.    On October 25, 2019, Vyera paid RL Fine ██████ to terminate the agreement. By that date, the Federal Trade Commission had sent several discovery requests to Vyera and RL Fine and asked extensive questions about the RL Fine contracts during investigational hearings of Vyera employees.

173.    Vyera's exclusive agreements with Fukuzyu and RL Fine have sidelined the two most viable suppliers of pyrimethamine API for potential generic Daraprim competitors. This has made it significantly more difficult for potential generic competitors to obtain pyrimethamine API. Although other manufacturers might eventually be able to supply pyrimethamine for the U.S. market, during the relevant time period these manufacturers did not have an established

pyrimethamine manufacturing process, did not have facilities and processes in line with cGMP standards sufficient for FDA approval, or both.

174.    Typically, it takes months or years for a supplier to develop and test an API manufacturing process from scratch. For example, ███████████████ spent several years and over ████████ working with a supplier to develop an FDA-approvable manufacturing process for pyrimethamine API.

175.    For those manufacturers with a non-compliant FDA process, it would take substantial time and investment to bring their facilities, quality controls, and manufacturing standards in line with cGMP requirements to be eligible for FDA approval. Therefore, Vyera's agreements resulted in significant cost and delay for any potential generic applicant.

**C.    Vyera Enters Data-Blocking Agreements to Mask the True Size of the Pyrimethamine Market**

176.    Vyera also entered into data-blocking agreements with its primary distributors to mask the potential market opportunity for a generic Daraprim product.

177.    One of the first steps for a generic company considering whether to develop a competing generic product is to analyze the branded product's sales data to determine the size of the market opportunity. Based on the market size and sales data, the company can determine the potential profits it can expect from developing the product.

178.    To make this assessment, generic companies rely on commercially available sales information. These data are sold by companies such as IQVIA and Wolters Kluwer. These companies purchase sales data from drug distributors and pharmacies, aggregate the data, and sell it to pharmaceutical industry participants.

179.    Vyera relied on sales data from IQVIA in determining whether to purchase Daraprim in 2015. Vyera continues to use IQVIA data to evaluate other drug opportunities.

180.    Vyera is a privately-held company and does not publicly report Daraprim sales figures. Thus, the only way for a potential generic competitor to assess the size of the Daraprim market is to purchase commercial sales data from a third-party data reporting company.

181.    After acquiring Daraprim, Vyera sought to prevent its distributors from selling Daraprim sales information to IQVIA or other data reporting companies.

182.    Vyera feared that, after it raised the price of Daraprim, the increased sales would attract generic competitors. By preventing reporting companies from obtaining Daraprim sales data, Vyera understood that the publicly available data would be inaccurate, thereby obscuring the true size of the Daraprim market.

183.    Under Vyera's agreements with its distributors, Vyera paid them a "data blocking fee" in exchange for their agreement not to sell data to IQVIA or other similar companies.

184.    In 2017, Vyera agreed to pay ASD a "data restriction" fee of ▮▮▮▮ per month in exchange for ASD's agreement not to sell Daraprim sales data to IQVIA, Wolters Kluwer, or other third-party data reporting companies.

185.    In 2017, Vyera agreed to pay ▮▮▮▮ a "data blocking fee" of ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in exchange for ▮▮▮▮ agreement not to sell Daraprim sales data to IQVIA, Wolters Kluwer, or other third-party reporting companies.

186.    Without reporting from significant distributors like ASD and ▮▮▮▮, IQVIA's Daraprim data is "extremely incomplete and not very useful."

187.    In April 2018, the FDA noticed that the IQVIA data for Daraprim suggested extremely low sales. The FDA contacted Vyera to ask if Daraprim was in shortage. When Vyera employees looked into the issue, they quickly determined that the low sales figures that had

concerned the FDA "likely related to the business decision [Vyera] made to block dispense/sales data reported by [its] distribution partners."

188.     The purpose and effect of Vyera's data-blocking restrictions was to obscure the size of the Daraprim market to make it less attractive to generic competitors. Vyera engaged in this conduct "to prevent external visibility into [its] corporate performance." Vyera did not "want Gilead or any of the other major infectious disease companies coming in . . . and taking over [] what we created."

189.     Vyera's conduct had the desired anticompetitive effect. As result of Vyera's data-blocking restrictions, at least one generic company decided not to initiate a project to develop a generic version of Daraprim.

190.     The data-blocking restrictions imposed on two of Vyera's most important distributors have no legitimate rationale. While Vyera has no obligation to publicly report its own Daraprim sales data, the wholesalers' Daraprim sales data is not Vyera's to control. Prior to the more lucrative offer from Defendants, ASD and ██████ were regularly selling their Daraprim sales data to IQVIA and others. The sole purpose of the data-blocking agreements is to mask the size of the Daraprim market.

## VI.     Defendants' Anticompetitive Conduct Successfully Delayed and Excluded Numerous Potential Generic Competitors

191.     Defendants' anticompetitive course of conduct worked. As the result of Vyera's agreements restricting the resale of Daraprim, exclusive API agreements, and data-blocking agreements, at least four potential generic competitors have been delayed or excluded from the market: ████████, ██████████████████, ████████████████, and Mylan, N.V.

192.    Defendants' exclusionary conduct impeded ███████ ability to develop a generic version of Daraprim. Absent Vyera's conduct, ███████ likely would have entered the market years earlier with a generic version of Daraprim.

193.    Founded in ████, ██████ is a pharmaceutical company with about █ employees located in █████████████████ . Since its inception, ██████ has successfully developed ██████████████ through ANDAs.

194.    In 2013, ████████ decided to develop a generic version of Daraprim. Daraprim was attractive to ████████ because it was off patent and had no generic competition.

195.    ████████ needed a minimum of six bottles of Daraprim for FDA-required bioequivalence testing. At that time, Amedra Pharmaceuticals owned Daraprim and the drug was available through traditional distribution channels.

196.    In August 2013, █████████ bought nine 100-count bottles of Daraprim from a local pharmacy in New Jersey. It paid $10,350 for nine bottles, or $1,150 per bottle.

197.    █████████ purchased this Daraprim with no difficulty. It approached only one pharmacy, did not negotiate, and did not enter any written agreement. It received the nine bottles one day after ordering them. Neither █████████ nor the pharmacy communicated with Amedra Pharmaceuticals or requested approval for the sale.

198.    In 2013, ████████ secured Ipca as its supplier of pyrimethamine API. Ipca had a manufacturing process in place for pyrimethamine. After securing █████████ as a customer, Ipca submitted a DMF for pyrimethamine to the FDA.

199.    Throughout late 2013 and early 2014, █████████ conducted bioequivalence testing comparing its generic product—made with pyrimethamine API from Ipca—to the branded

Daraprim it bought from the local pharmacy. In May 2014, ██████ submitted the results of this testing to the FDA as part of its ANDA.

200.     In January 2015, however, the FDA banned Ipca from importing API into the United States until it remedied certain issues with its manufacturing facility in India. These issues persisted, forcing ██████ to find a new pyrimethamine API supplier.

201.     ██████ then contacted Fukuzyu. In 2016, Fukuzyu agreed to sell ██████ pyrimethamine API, but required an initial purchase of 50 kilograms for approximately $300,000 or $400,000. Even though ██████ wanted only four kilograms for its initial purchase and thought this minimum purchase size was unreasonable, it agreed to purchase 50 kilograms because the alternative of using a non-DMF supplier would have significantly delayed the approval of its generic Daraprim product.

202.     About six months after agreeing to supply ██████, however, Fukuzyu reneged on the deal, citing "economic reasons." Around this time, Fukuzyu had agreed to supply pyrimethamine to Vyera exclusively and not to any generic manufacturers for human use in the United States.

203.     ██████ had a "backup plan" for sourcing pyrimethamine API. In February 2016, ██████ had identified ██████ as another possible supplier of pyrimethamine API. ██████ did not have a U.S. DMF for pyrimethamine API, but it had a European Union DMF and was supplying pyrimethamine in Europe and Asia. This indicated it likely had an FDA-approvable process for manufacturing pyrimethamine API.

204.     In November 2016, ██████ and ██████ entered into a supply agreement for pyrimethamine API. ██████ agreed to supply ██████ with pyrimethamine API until December 31, 2021, for both product development and commercial production. The companies



also agreed that ████ would include in ██████████████ all of the information needed for the FDA to approve ████ as its API supplier.

205.   In April 2017, ████ submitted this ██████████ to the FDA.

206.   On December 26, 2017, the FDA responded to this ██████████ and notified ████ that, to use ████ as its API supplier, ████ had to redo its bioequivalence testing using ████ pyrimethamine API. ████ had no remaining unexpired Daraprim and thus had to acquire at least six additional 100-count bottles of Daraprim.

207.   This time, however, Vyera's agreements prohibiting resale to generic companies made it virtually impossible to obtain sufficient quantities of Daraprim. Over the course of the next year, ████ tried to obtain Daraprim samples from numerous sources.

208.   On December 29, 2017, ████ approached the local pharmacy from which it had purchased Daraprim in 2013. The pharmacy responded that it no longer had access to Daraprim, as the product was no longer available from wholesalers.

209.   On January 11, 2018, ████ tried to buy Daraprim through a pharmacist at a California hospital. That pharmacist could not obtain Daraprim from the hospital's usual wholesaler.

210.   On January 18, 2018, ████ contacted a company called ████ ████████, which had access to a variety of drug sources. ████ ████ checked over 20 wholesalers, as well as multiple hospitals and pharmacies. It also tried to have an animal clinic order Daraprim. But it was unable to procure Daraprim from any of these sources.

211.   ████ also engaged numerous companies that specialize in obtaining branded drug samples for bioequivalence testing, including ██████████████, ████████,

███████████████████████████, ████████████, and ████████████. After significant efforts, three of these companies—████████████████, ██████████, and ████████████—could not secure even one bottle of Daraprim. As █████████ ████████ told ████████, the "US item is impossible to get."

212.    Two of these companies were able to obtain some Daraprim for ████████, but only in limited quantities. In June 2018, ████████████ sold ████████████ bottle of Daraprim for $110,000. Over the next several months, ██████████████ tried but failed to obtain more bottles. It told ████████ that "the manufacturer is involved in every bottle transaction, which is very unusual." In November 2018, ██████████ sold ██████████████ bottles of Daraprim for $125,000 per bottle. ████████████ was unable to obtain additional bottles.

213.    After a year of effort, ██████████ was able to obtain only ██████ of the six bottles it needed to conduct FDA-required bioequivalence testing. And because the ██████████████ bottles were from a different lot than the ████████████ bottle, ██████████ could not combine them for bioequivalence testing under FDA regulations. ████████████████████████████ ████████

214.    ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████

215.    ████████████████████████████████████████████ ██████████████████████████████████

216.    On February 28, 2020, the FDA approved Cerovene's generic pyrimethamine.

217.     On March 11, 2020, in response to Cerovene's approval, Phoenixus's subsidiary Oakrum Pharma, LLC announced that it would launch an "authorized generic" version of Daraprim. An authorized generic is chemically identical to the brand drug, but is sold as a generic product. Brand pharmaceutical companies often launch lower-priced authorized generic versions of their products when they expect generic entry. The authorized generic captures some of the sales that would otherwise have gone to a generic competitor, allowing the brand to retain some of the revenue it would otherwise lose.

218.     On March 20, 2020, Dr. Reddy's Laboratories—Cerovene's commercial partner for the sale and distribution of generic pyrimethamine—announced that it had launched Cerovene's generic pyrimethamine in the United States after a "seven years' journey."

219.     Absent Defendants' anticompetitive conduct, ███████ likely would have launched its product in 2018 or earlier.

220.     Even though Cerovene's generic Daraprim is currently being sold in the United States, ██████████████████████████ due to Vyera's exclusive API supply agreements. ████████████████████████████████████ ████████████████████████████████ after signing its exclusive supply agreement with Vyera. ███████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████—which are still subject to Vyera's tightly controlled resale restrictions—██████████████████.

███████████████████████████████

221.    Defendants' exclusionary conduct also impeded ████████ ability to develop a generic version of Daraprim. Absent Defendants' conduct, ██████ likely would be on the market today with a generic version of Daraprim.

222.    ████████████████ is a pharmaceutical company with about ████████ located in ███████████████. To date, ██████ has developed █ generic products, █ of which are currently marketed.

223.    In ███, ██████ decided to develop a generic version of Daraprim. Daraprim appealed to ██████ because it was off patent and had no generic competition.

224.    ██████ needed at least six bottles of Daraprim to conduct FDA-required bioequivalence testing. At that time, Amedra Pharmaceuticals owned Daraprim and the drug was available through traditional distribution channels.

225.    In ██████, ██████ bought six 100-count bottles of Daraprim from a local pharmacy in ██████. It paid $250 per bottle.

226.    ██████ purchased this Daraprim with no difficulty. It did not sign any liability waivers or enter any indemnification agreements. Nor was ██████ informed of any risks associated with Daraprim. Neither ██████ nor the pharmacy communicated about this sale with Amedra Pharmaceuticals.

227.    Like ██████, ██████ initially retained Ipca—which had a U.S. DMF for pyrimethamine—as its API supplier. ██████ preferred a supplier with a DMF because using a supplier with an established manufacturing process would expedite the approval of its generic Daraprim product.

228.    Like ██████, however, ██████ was ultimately not able to use Ipca due to the FDA's January 2015 import ban. ██████ thus had to find a new pyrimethamine API supplier.

106

229.    In ███████, ███████ contacted ██████ after learning that it was supplying pyrimethamine in the European Union. After some discussions, the companies agreed that ██ would supply ██████ with pyrimethamine API for its generic Daraprim product.

230.    In ███████, ███████ and ██████ formalized their partnership by entering a product collaboration agreement. Under this contract, ██████ agreed to provide ██████ with pyrimethamine API for both development and commercial use. The companies also agreed that ██████ would provide a "[c]omplete set of Pyrimethamine DMF documents" for ██████ "to include in the filing of [its] ANDA." And ██████ agreed to "[a]ddress deficiencies by the USFDA related to the application in a timely manner."

231.    In ███████, ███████ submitted its ANDA to the FDA. The ANDA included the results from bioequivalence testing that ██████ had done using ██████ pyrimethamine API and the Daraprim it purchased from the local pharmacy. It also included the information on ██████ manufacturing process for pyrimethamine API.

232.    The FDA issued a preliminary response in ██████████ requiring ████████ to correct several deficiencies. ██████ immediately sent ██████ the deficiencies related to API. But by this time, ██████ was negotiating its exclusive contract with Vyera for pyrimethamine API and told ██████ that it was "no longer supporting" the company's ANDA.

233.    Later that month, an ████████ executive travelled to ████ to try to convince ██ to change its mind. As a potential compromise, he asked if ██████ would supply the company with pyrimethamine API just for its initial launch of the product. ██████ declined.

234.    In ███████, ███████ received a complete response from the FDA on its ANDA. The FDA cited numerous deficiencies related to the API manufacturing process

107

developed by ███████. ████████ once again asked ████████ for help addressing these deficiencies. ████████ again declined.

235.    Faced with ████████ complete refusal to engage, ████████ was forced to switch pyrimethamine API suppliers for a second time. In or around ████████, it settled on an API manufacturer called ████████. ████████ planned to transfer ████████ manufacturing process to ████████ and to inform the FDA of this change in responding to the agency's complete response.

236.    ████████, however, had never manufactured pyrimethamine before. As a result, before ████████ could respond to the FDA, ████████ had to replicate ████████ manufacturing process and redo three months of stability testing that ████████ had previously done. It also had to determine how to respond to the API-related deficiencies cited by the FDA relating to the manufacturing process developed by ████████.

237.    █████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████████████████████████████

238.    Absent Defendants' anticompetitive conduct, ████████ likely would have launched its product in 2019 or earlier.

████████████████████████████████

239.    Defendants' exclusionary conduct also impeded ████████ ability to develop a generic version of Daraprim. Absent Defendants' conduct, ███ likely would be on the market today with a generic version of Daraprim.

240.    █████████████████████████████████████████████████████
████████████████████████████████████████████████████



241.    ▮ decided to pursue an ANDA for generic Daraprim in early 2016 after seeing the publicity about Vyera's price increase.

242.    In February 2016, ▮ contacted Fukuzyu, then the only active pyrimethamine API supplier with an approved U.S. DMF, about buying pyrimethamine. Fukyzyu never responded.

243.    In June 2016, ▮ partnered with an ▮ manufacturer called ▮ ▮. ▮ agreed to make pyrimethamine for ▮, but did not have a manufacturing process in place for pyrimethamine API. ▮ began working with ▮ to develop a pyrimethamine manufacturing process that ▮ would file as a DMF.

244.    Meanwhile, ▮ still pursued Fukuzyu because using its API would have been faster and less expensive. In September 2017, ▮ engaged an intermediary to contact Fukuzyu on its behalf but keep its identity anonymous. Later that month, the intermediary began discussing pyrimethamine API with Fukuzyu.

245.    In October 2017, Fukuzyu told the intermediary that it had an exclusive agreement with Vyera for the supply of pyrimethamine API for use in human products in the United States. At Vyera's direction, Fukuzyu told the intermediary that it would sell pyrimethamine only if the intermediary attested that the API would "not be used to make pyrimethamine drug product, for human use, that will find its way back to the US for commercial purposes."

246.    Because this restriction would prevent ███ from using Fukuzyu's pyrimethamine API for its generic Daraprim product in the U.S., ███ ended the intermediary's discussions with Fukuzyu in January 2018.

247.    This left ███ as ███ best remaining API option. Since 2016, ███ had been working to develop an FDA-approvable manufacturing process for pyrimethamine API. In ███ —three years after partnering with ███—███ submitted a DMF for pyrimethamine API.

248.    In addition to the difficulty securing a supply of pyrimethamine API, ███ also struggled to secure Daraprim samples to conduct bioequivalence testing.

249.    In late 2016, ███ sought to buy Daraprim samples through Pharmaceutical Buyer's Inc., a company that specializes in obtaining branded samples. ███ has often purchased samples of other branded products through Pharmaceutical Buyers Inc., but the company was unable to acquire any Daraprim for ███.

250.    In January 2017, ███ contract manufacturer engaged AdiraMedica, LLC—a company that specializes in obtaining branded samples—to buy Daraprim for ███. AdiraMedica first contacted ASD Healthcare, which responded that "Daraprim is available to hospitals and government facilities only at this time."

251.    In early 2017, ███ itself tried to buy Daraprim from a local hospital. But the hospital told ███ it had an agreement with its supplier barring it from selling Daraprim to third parties. At that time, Vyera had its agreements in place with hospitals and hospital GPOs prohibiting the resale of Daraprim to anyone other than patients.

252.    In March 2017, AdiraMedica contacted Vyera directly. Vyera asked for the identity of AdiraMedica's customer and claimed that it "may be interested in negotiating an indemnification agreement from the ultimate purchaser." Over five weeks later, Vyera sent

AdiraMedica a purchase agreement containing a provision requiring the buyer to indemnify Vyera for **all** legal claims related in any way to Daraprim—regardless of whether the claim stemmed from the buyer's purchase or use of the product. Vyera further insisted that if the product was for a generic company, that company had to disclose its identity and sign the agreement.

253.    In August 2017, at ▉ request, AdiraMedica asked Vyera to delete the highly unusual and overbroad indemnity provision. Vyera never responded to AdiraMedica on the proposed deletion of this provision. As a result, AdiraMedica could not buy any Daraprim from Vyera for ▉.

254.    In January 2018, after a year of efforts, ▉ was able to buy two 100-count bottles of Daraprim for $115,250 per bottle from Reliant Specialty LLC. Several months later, Reliant Specialty told ▉ that Vyera had barred it from selling Daraprim. Reliant Specialty also told ▉ that Defendant Mulleady, on behalf of Vyera, had bought back its remaining Daraprim inventory.

255.    Soon thereafter, ▉ was approached by Vyera. In an April 2018 call, Mulleady proposed that ▉ drop its effort to develop a competing generic product and instead partner with Vyera on a Daraprim ANDA. At a meeting later that month, Mulleady and Akeel Mithani presented ▉ with a financial model showing that ▉ would be better off partnering with Vyera than competing with its own generic product.

256.    On May 4, 2018, Mulleady again met with ▉ and further discouraged it from competing with Vyera. Mulleady told ▉ that he had prevented Reliant Specialty from selling Daraprim. He also bragged that Vyera had entered into an exclusive API agreement with RL

Fine that eliminated two potential generic competitors. He then told █████ that he knew █████ was its API supplier.

257.    Discussions between █████ and Vyera ceased in June 2018. █████ then pushed forward with its own ANDA.

258.    ████████████████████████████████████████████████

████████████████████████████

259.    ██████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████

260.    ████████████████████████████████████████████

████████████████████████████████████████

261.    Absent Defendants' anticompetitive conduct, █████ likely would have launched its product in 2018 or earlier.

**D.  Mylan, N.V.**

262.    Defendants' exclusionary conduct caused Mylan to stop pursuing a generic version of Daraprim. Mylan is one of the largest generic pharmaceutical companies in the world.

263.    In late 2015, Mylan began considering developing a generic version of Daraprim. To assess the sales of Daraprim, Mylan analyzed the IQVIA data on the drug. Mylan knew that this data for Daraprim was underreported, but it could not determine a more accurate sales number because Vyera had no public financial filings.

264.    From October 2015 to April 2018, Mylan inquired about purchasing Daraprim from seven suppliers: ████████████████████████████████████████

██████████████████████████████████████

265.     Multiple suppliers told Mylan they could not access Daraprim. They provided

varying reasons. In 2016, ███████████████ told Mylan that Daraprim was in restricted

distribution and that it was "[f]or inpatient hospitals only." ███████ similarly told Mylan that

Daraprim was "only available to inpatient hospital pharmacies."

266.     In ███████████ Mylan abandoned its pursuit of a generic Daraprim product. It

decided that obtaining Daraprim samples was too difficult and expensive. It also cited its

inability to get a "real sense" of Daraprim's sales because the product was "no longer reported in

[IQVIA]" as a reason for abandoning the project.

**E.  Other generic companies**

267.     Vyera's exclusionary conduct has also likely impeded the ability of at least one

other generic company to obtain Daraprim samples. Although the name of this generic company

is not yet known, it tried to procure samples through Ambegen Pharmaceutical and Services Pvt.

Ltd., an Indian company that sources branded drugs for bioequivalence testing.

268.     On April 3, 2019, Ambegen contacted ASD Healthcare about buying Daraprim

for a "pre-clinical study." ASD Healthcare forwarded the request to Vyera, which told the

distributor to "**NOT** fulfill this order/request" and to have Ambegen contact it directly. Ambegen

then spoke to Vyera's deputy general counsel, who denied its request to purchase Daraprim.

269.     The next day, Ambegen contacted ██████████████████, another

company specializing in obtaining branded drugs, about buying Daraprim.

270.     ██████ initially contacted numerous suppliers, including Myoderm and Low Cost

RX LLC. As Myoderm explained, Daraprim is "restricted with the manufacturer and our

suppliers do not have access due to manufacturer restrictions." Low Cost RX similarly

emphasized: "This is a very strict and limited drug."

271.     In May 2019, ███ contacted ASD Healthcare about purchasing Daraprim. ASD Healthcare told ███ that the manufacturer must first approve the request and sent ███ a request form to complete. ███ completed the form, which ASD Healthcare forwarded to Vyera.

272.     On June 22, 2019, Vyera told ASD Healthcare to "**NOT** fulfill this order/request" and to have ███ contact it directly. Over the next couple of months, ███ communicated with Vyera's deputy general counsel, who would not approve the sale and instead kept asking for increasingly more information about ███ customer. ███ thereafter abandoned its efforts to buy Daraprim from Vyera.

## VII.   Defendants' Foreclosure of Generic Entry Caused Consumers to Pay Higher Prices

273.     Defendants' anticompetitive course of conduct delayed generic Daraprim entry. Absent Defendants' conduct, at least one generic version of Daraprim would have entered the market in 2018 or earlier, and multiple generic versions would likely be on the market today.

274.     Vyera's agreements prohibiting the resale of Daraprim impeded potential generic competitors, including ███, ███, and Mylan, from procuring sufficient Daraprim samples to meet FDA testing requirements. Absent these restrictions, potential generic competitors readily could have purchased sufficient quantities of Daraprim through ordinary distribution channels.

275.     Vyera's exclusive supply agreements with Fukuzyu and RL Fine—the two most viable suppliers of pyrimethamine API—impeded potential generic competitors, including ███, ███, and ███, from securing a reliable source of pyrimethamine API, an indispensable ingredient of generic Daraprim. Absent these exclusive agreements, potential generic competitors could have sourced pyrimethamine API from Fukuzyu or RL Fine instead of

a manufacturer that needed to devote the time and expense of developing an FDA-approvable process for manufacturing pyrimethamine API.

276.    Vyera's data-blocking agreements denied potential generic competitors accurate and reliable information to properly assess the generic market opportunity, thereby deterring potential generic competitors from pursuing a generic Daraprim product. Absent these agreements, which distorted Daraprim's reported sales revenues, Mylan and other pharmaceutical companies would have known that Daraprim revenues had grown substantially due to Vyera's 4,000% price increase, and thus offered a lucrative competitive opportunity.

277.    By impeding generic competition, Defendants' anticompetitive conduct denied consumers and other purchasers of Daraprim access to AB-rated generic versions of Daraprim that would offer the same therapeutic benefit as branded Daraprim, but at a fraction of the price.

278.    The first generic competitor's product is typically offered at a 20% to 30% discount to the branded product. Subsequent generic entry creates greater price competition with discounts potentially reaching 85% or more off the brand price. Defendants' anticompetitive conduct has delayed the introduction of this price competition to the detriment of consumers and other purchasers of Daraprim.

279.    Most consumers would have purchased the lower-priced AB-rated substitutes for Daraprim rather than the higher-priced branded product. A 2018 Vyera contemporaneous forecast assumed that approximately ▮ of Daraprim unit sales would switch to an AB-rated generic version of Daraprim within three months of generic entry.

280.    Defendants' anticompetitive conduct, however, forced consumers to continue paying Vyera's monopoly price for Daraprim by depriving them of access to a lower-cost generic alternative.

115

281.    Defendants' anticompetitive conduct has caused, and is continuing to cause, significant economic harm. Consumers and other purchasers of Daraprim likely would have saved tens of millions of dollars by purchasing generic versions of Daraprim.

282.    The economic harm from Defendants' conduct is ongoing. Absent Defendants' anticompetitive scheme, there would likely be multiple generic versions of Daraprim available today, leading to more intense price competition and lower prices for consumers.

283.    Defendants' anticompetitive conduct, and the corresponding reduction in the availability of Daraprim, has also resulted in harm to patients from delays in treatment, prolonged hospital stays, and poor medical outcomes. And in at least one case, Defendants' anticompetitive conduct may have contributed to a patient's death.

284.    Toxoplasmosis is a rare condition. Many hospitals treat few or no toxoplasmosis patients each year. Nonetheless, for decades, hospitals regularly stocked Daraprim because it was affordable and because patients with acute toxoplasmosis need to begin taking it immediately. Vyera's massive price increase—maintained through Defendants' anticompetitive scheme—changed hospitals' approach. Due to the price increase, hospitals became reluctant to incur the substantial cost of keeping Daraprim stocked in their inpatient pharmacies when it may never be used to treat a patient. This can lead to delays in treatment when patients present at the hospital with acute toxoplasmosis. Defendants' anticompetitive conduct denied these hospitals the option of stocking lower-cost generic versions of Daraprim.

285.    Similarly, the extremely high price of Daraprim creates challenges in discharging patients from the hospital. Physicians often delay hospital discharge of their toxoplasmosis patients until they are confident the patient will be able to obtain Daraprim after discharge. Because of the high price and limited availability of Daraprim, however, many rehabilitation

116

facilities will no longer accept patients who need it. These patients instead remain in the hospital for weeks longer than necessary, resulting in unnecessary costs, medical complications, and, in at least one case, even death.

286.    In February 2018, a toxoplasmosis patient was ready to be discharged after several weeks in the hospital. But the hospital was unable to procure Daraprim on an outpatient basis for the patient. The patient continued to be hospitalized and eventually contracted a severe hospital infection that proved fatal.

287.    In another example, a toxoplasmosis patient could not be transferred to a rehabilitation facility because the facility refused to take on the risk that it might be obligated to pay Daraprim's high price. Forced to remain in the hospital, the patient developed medical complications from the prolonged stay, including multi-drug resistant infections.

288.    Absent Defendants' anticompetitive conduct, hospitals and rehabilitation facilities would have had access to lower-cost generic versions of Daraprim years earlier.

289.    Additionally, Defendants' anticompetitive conduct has had the collateral effect of making it more difficult for some patients to obtain Daraprim from hospitals or pharmacies.

290.    For example, in November 2018, one patient with lifelong congenital toxoplasmosis sought to obtain Daraprim for necessary prophylactic outpatient treatment. Neither she nor a local hospital was able to obtain Daraprim immediately, and pharmacies in the area lacked supply. The patient was forced to contact Vyera directly and had Daraprim drop-shipped directly to her residence, where it arrived over two weeks after she first needed it.

291.    Absent relief, Defendants' anticompetitive conduct is likely to recur and cause additional harm to consumers. Defendants have continued to engage in their anticompetitive conduct despite congressional hearings and Plaintiffs' investigations.

117

292.     Vyera acquired Daraprim for the express purpose of raising its price and protecting that higher price with an anticompetitive scheme. Vyera is and has been actively looking for other drugs with a similar profile to Daraprim that it could acquire and execute a similar strategy to prevent generic competition. Absent relief, Vyera is likely to carry out a similar anticompetitive scheme with another drug.

293.     Defendant Shkreli directed Vyera to acquire Daraprim for the express purpose of raising its price and protecting that higher price with an anticompetitive scheme. Shkreli previously started another pharmaceutical company, Retrophin, for the purpose of purchasing a different drug, raising the price, and enacting distribution restrictions to impede generic competition. Shkreli is and has been actively looking for other drugs with which to replicate this strategy, either through Vyera or a new company. Absent relief, Shkreli is likely to purchase another drug and carry out a similar anticompetitive scheme.

294.     Defendant Mulleady directed, participated in, and carried out the anticompetitive scheme to protect Vyera's Daraprim price increase. Mulleady is and has been actively looking for other drugs with which Vyera or a new company could replicate the Daraprim anticompetitive scheme. Absent relief, Mulleady is likely to direct or participate in a similar anticompetitive scheme with another product.

## VIII.   Vyera Has Monopoly Power in a Relevant Market for FDA-Approved Pyrimethamine Products

295.     From 2015 until at least March 2020, Vyera exercised monopoly power in the United States with respect to Daraprim.

296.     Vyera's monopoly power can be observed directly. In 2015, Vyera raised the price of Daraprim by more than 4,000%. This massive price increase was extremely profitable: prior to the acquisition, Daraprim had annual revenues of approximately ███████. After raising

the price 4,000%, Vyera's annual Daraprim revenues were approximately ██████—an increase of more than ████.

297.    Vyera sells and has sold Daraprim at prices far above its cost of production, making it highly profitable. Even accounting for other direct expenses Vyera allocates to selling and marketing Daraprim, Vyera's profit margins on Daraprim's net sales are substantial.

298.    Vyera's monopoly power with respect to Daraprim persisted for an appreciable period. Since 2015, Vyera maintained its high price and continued to reap significantly higher profits.

299.    Vyera's monopoly power can also be observed indirectly based on its 100% share of the relevant market for pyrimethamine products approved by the FDA for sale in the United States. Vyera maintained this 100% market share from the time it purchased Daraprim in 2015 at least until generic entry occurred in March 2020.

300.    The relevant product market is FDA-approved pyrimethamine products.

301.    Despite Vyera's 4,000% price increase for Daraprim, most doctors continued to prescribe Daraprim instead of switching patients to non-pyrimethamine products or non-FDA-approved pyrimethamine products.

302.    Non-pyrimethamine pharmaceutical products are not reasonably interchangeable with pyrimethamine products.

303.    Pyrimethamine is the "gold standard" treatment for toxoplasmosis. Guidelines from U.S. government health authorities identify pyrimethamine as "the most effective drug against toxoplasmosis" and advise other options only when pyrimethamine is "unavailable or there is a delay in obtaining it." Many doctors are "at a loss to think of an appropriate alternative to pyrimethamine."

304.    Non-FDA-approved pyrimethamine products, such as compounded pyrimethamine, also are not reasonably interchangeable with FDA-approved pyrimethamine products.

305.    Most doctors have serious safety concerns about compounded products because they are not FDA approved. Additionally, federal law imposes significant restrictions on how compounded pharmaceuticals are sold, and they are thus not available for all patients.

306.    To the extent that Vyera's 4,000% price increase caused any doctors to prescribe a non-pyrimethamine product or a non-FDA approved pyrimethamine product, the change was due to the extreme nature of the price hike and the increased difficulty of obtaining Daraprim, not because such products are reasonably interchangeable with Daraprim. Indeed, if these products were reasonably interchangeable with Daraprim, a sufficient number of doctors would have switched to them to make the price increase unprofitable because they are orders of magnitude cheaper than Daraprim.

307.    Unlike non-pyrimethamine products and non-FDA-approved pyrimethamine products, generic Daraprim would be reasonably interchangeable with Daraprim. Vyera estimates that more than ███ of patients would immediately switch to generic Daraprim and that ████████████████████████████████████████. Vyera expects a generic Daraprim product to cause this ██████ shift even though it will likely be much more expensive than existing non-pyrimethamine products and non-FDA-approved pyrimethamine products. Thus, unlike non-pyrimethamine or non-FDA approved pyrimethamine products, generic Daraprim would constrain the price of branded Daraprim and is thus in the same relevant product market.

308.    The lack of an adequate substitute to Daraprim is also confirmed by the fact that the four largest pharmacy benefit managers ("PBMs")—which act as third-party administrators

for a health plan's pharmaceutical benefits—have all continued to include Daraprim on their formularies. PBMs have independent pharmacy and therapeutics committees that determine whether a given drug must be included on a formulary to provide adequate medical coverage. These independent committees for the four largest PBMs determined that their formularies had to include Daraprim despite the price increase and notwithstanding the availability of non-pyrimethamine and compounded pyrimethamine products.

309.    As a Vyera executive explained in January 2016, Vyera has "not had any rejections from commercial payers for Daraprim . . . because payers recognize the potential life-saving value of the medication, it is the only FDA approved therapy for toxo[plasmosis] (there are no on label alternatives), and the budget impact is low given the relatively low volume of patients."

310.    A relevant market consisting of FDA-approved pyrimethamine products can also be observed through application of the "SSNIP" test. The SSNIP test is a well-recognized and widely used economic method to define a relevant product market. The objective of this test is to identify the narrowest set of products for which a hypothetical monopolist could profitably impose a small but significant and non-transitory increase in price. If enough purchasers would accept a SSNIP—rather than switch to another product—such that the price increase would be profitable, then the product set constitutes an antitrust market.

311.    In the past 10 years, the price of Daraprim has increased substantially at least twice: approximately 675% in 2011 and approximately 4,000% in August 2015. Each of these price increases is significantly larger than a SSNIP. In each case, Daraprim retained the majority of its sales and yielded significantly increased profits. Thus, a monopolist owning the only FDA-approved pyrimethamine product has a proven ability to impose a price increase greater than a

SSNIP while retaining enough sales to make the price increase profitable. Indeed, the only possible constraint Impax identified for its June 2015 Daraprim price increase was potential backlash from the HIV/AIDS community.

312.    The relevant geographic market is the United States. Pharmaceutical products are sold and regulated on a nationwide basis. Additionally, because the U.S. market is limited to FDA-approved products, it can only include products sold inside the United States.

313.    Substantial barriers to entry exist in the market for FDA-approved pyrimethamine products. Potential new sellers of pyrimethamine products need to obtain FDA approval, which can take up to several years. Additionally, Vyera has erected additional barriers to entry by (1) blocking generic companies from purchasing sufficient Daraprim for FDA-required bioequivalence testing and (2) blocking generic companies from accessing pyrimethamine API suppliers necessary to make Daraprim.

## COUNT I
### Monopoly Maintenance Against All Defendants

314.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 313 above.

315.    From 2015 until at least March 2020, Vyera and Phoenixus had monopoly power in the United States with respect to FDA-approved pyrimethamine products.

316.    Vyera, Phoenixus, Shkreli, and Mulleady willfully maintained this monopoly power through their course of anticompetitive conduct.

317.    There is no valid procompetitive justification for Defendants' exclusionary conduct in the market for FDA-approved pyrimethamine products.

318.    Defendants' anticompetitive acts constitute unlawful monopoly maintenance in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II
### Agreements in Restraint of Trade (Restrictions and Limitations on Resale of Daraprim) Against All Defendants

319.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 313 above.

320.    Defendants' agreements with distributors, hospitals, and other downstream purchasers barring them from reselling Daraprim to potential generic competitors, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and unfair methods of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT III
### Agreements in Restraint of Trade (API Supply Exclusivity Agreements) Against All Defendants

321.    Plaintiffs re-allege and incorporate by reference the allegations in paragraphs 1 through 313 above.

322.    Defendants' exclusive pyrimethamine API contracts with Fukuzyu and RL Fine, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, are unreasonable restraints of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and unfair methods of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT IV
### A. Anticompetitive Contracts, Agreements and/or Arrangements in Violation of New York's Donnelly Act Against All Defendants

323.    Plaintiff State of New York re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

324.    Defendants' agreements with distributors, hospitals, and other downstream purchasers barring them from reselling Daraprim to potential generic competitors, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, constitute anticompetitive contracts, agreements, and arrangements in violation of New York's Donnelly Act, New York General Business Law § 340 *et seq*.

325.    Defendants' exclusive pyrimethamine API contracts with Fukuzyu and RL Fine, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, constitute agreements in restraint of trade in violation of New York's Donnelly Act, New York General Business Law § 340 *et seq*.

326.    Defendants' course of conduct as detailed above was done with the purpose of maintaining a monopoly in FDA-approved pyrimethamine and thus violates New York's Donnelly Act, New York General Business Law § 340 *et seq*.

### B. Illegality in Violation of New York Executive Law § 63(12) Against All Defendants

327.    Plaintiff State of New York re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

328.    Defendants' conduct violates § 63(12) of New York's Executive Law, in that Defendants engaged in repeated and/or persistent illegal acts—violations of Sections 1 and 2 of the Sherman Act and sections 340 *et seq* of the Donnelly Act—in the carrying on, conducting, or transaction of business within the meaning and intent of Executive Law § 63(12).

124

**COUNT V**
**A. Anticompetitive Contracts, Agreements and/or Arrangements in Violation of California's Cartwright Act Against All Defendants**

329.    Plaintiff State of California re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

330.    Defendants' agreements with distributors, hospitals, and other downstream purchasers barring them from reselling Daraprim to potential generic competitors, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, constitute anticompetitive contracts, agreements, and arrangements in violation of California's Cartwright Act, California Business and Professions Code § 16700 *et seq*.

331.    Defendants' exclusive pyrimethamine API contracts with Fukuzyu and RL Fine, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, constitute agreements in restraint of trade in violation of California's Cartwright Act, California Business and Professions Code § 16700 *et seq*.

**B. Anticompetitive Contracts, Agreements and/or Arrangements in Violation of California's Unfair Competition Act Against All Defendants**

332.    Plaintiff State of California re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

333.    Defendants' agreements with distributors, hospitals, and other downstream purchasers barring them from reselling Daraprim to potential generic competitors, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, constitute anticompetitive contracts, agreements, and arrangements in violation of California's Unfair Competition Act, California Business and Professions Code § 17200 *et seq*. Defendants have engaged, and continue to engage, in acts or practices that are unlawful, unfair, or fraudulent, and

which constitute unfair competition within the meaning of § 17200 of the Business and Professions Code.

334.    These acts or practices include, but are not limited to, Defendants' exclusive pyrimethamine API contracts with Fukuzyu and RL Fine, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, which constitute agreements in restraint of trade in violation of California's Cartwright Act, California Business and Professions Code § 16700 *et seq*.

### COUNT VI
### Anticompetitive Contracts, Combinations and/or Conspiracies in Violation of the Illinois Antitrust Act Against All Defendants

335.    Plaintiff State of Illinois re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

336.    Defendants' contracts and agreements restricting resale of Daraprim, to block access to pyrimethamine API, and to mask the true size of the pyrimethamine market as conceived, negotiated, signed, and/or enforced by the individual Defendants, constitute unlawful contracts, combinations or conspiracies with one or more other persons for the purpose, or with the effect, of unreasonably restraining trade in violation of the Illinois Antitrust Act, 740 ILCS 10/3(2).

337.    Defendants' course of conduct as detailed above was done with the purpose of maintaining monopoly power over a substantial part of trade or commerce of Illinois in the market for FDA-approved pyrimethamine and Daraprim, for the purpose of excluding competition or controlling, fixing, or maintaining prices for these drugs, in violation of the Illinois Antitrust Act, 740 ILCS 10/3(3).

126

## COUNT VII
### Unfair Methods of Competition and/or Unfair Acts or Practices in Violation of the North Carolina Unfair or Deceptive Practices Act Against All Defendants

338.    Plaintiff State of North Carolina re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

339.    Defendants' agreements with distributors, hospitals, and other downstream purchasers barring them from reselling Daraprim to potential generic competitors, as well as the data-blocking agreements with its primary distributors, which were conceived, negotiated, signed, and/or enforced by the individual defendants, constitute unfair methods of competition and/or unfair acts or practices within their meaning under the North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1 *et seq*.

340.    Defendants' exclusive pyrimethamine API contracts with Fukuzyu and RL Fine, which were conceived, negotiated, signed, and/or enforced by the individual defendants, constitute agreements in restraint of trade in violation of the North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*

341.    Defendants' course of conduct as detailed above was done with the purpose of maintaining a monopoly in FDA-approved pyrimethamine and thus violates the North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*

342.    The aforesaid methods, acts, or practices constitute unfair methods of competition and/or unfair acts or practices within their meaning under the North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*, and are injurious to North Carolina consumers and the general economy of the State of North Carolina.

343.    Plaintiff State of North Carolina is entitled to relief pursuant to the Unfair or Deceptive Acts or Practices Act, N.C. Gen. Stat. § 75-1 *et seq*.

127

## COUNT VIII
### Violations of Ohio's Valentine Act Against All Defendants

344.     Plaintiff State of Ohio re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

345.     Defendants' activities detailed above, including the vertical arrangements, constitute a Trust under Ohio Rev. Code § 1331.01 and are thus illegal under Ohio's Valentine Act, codified in Ohio Rev. Code Chapter 1331.

## COUNT IX
### A. Pennsylvania's Unfair Trade Practices and Consumer Protection Law

346.     Plaintiff Commonwealth of Pennsylvania re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

347.     In distributing, marketing and selling of the pharmaceutical product Daraprim to consumers through drug wholesalers and distributors, pharmacy chains, and other downstream purchasers of Daraprim and in otherwise engaging in the conduct more fully described herein with respect to Daraprim, the Defendants are engaging in trade or commerce that has directly or indirectly harmed the Commonwealth of Pennsylvania and Pennsylvania consumers within the meaning of 73 P. S. § 201-2(3) of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("PUTPCPL").

348.     Defendants' conduct as set forth in the preceding counts has been unfair or unconscionable because it offends public policy as established by statutes, the common law, or otherwise, and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to the Commonwealth of Pennsylvania and Pennsylvania consumers.

349.     The Defendants' impairment of choice and the competitive process has had the following effects: (1) competition in the market for FDA-approved pyrimethamine products has

been restrained, suppressed, and eliminated throughout Pennsylvania; (2) Daraprim prices have

been raised, maintained, and stabilized at artificially-high levels throughout Pennsylvania; (3)

Commonwealth of Pennsylvania and Pennsylvania consumers have been deprived of free and

open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers have paid

supra-competitive, artificially inflated prices for Daraprim.

350.    The aforesaid methods, acts, or practices constitute unfair methods of competition

and/or unfair acts or practices within their meaning under Sections 2 and 3 of the PUTPCPL,

including, but not limited to, "Engaging in any other fraudulent or deceptive conduct which

creates a likelihood of confusion or of misunderstanding" in violation of 73 P.S. § 201-2(4)(xxi).

351.    The above described conduct created the likelihood of confusion and

misunderstanding and exploited unfair advantage of the Commonwealth of Pennsylvania and

Pennsylvania consumers seeking to exercise a meaningful choice in a market expected to be free

of impairment to the competitive process and thus constitutes constructive fraud through one or

more of the following breaches of legal or equitable duties:

        a.   Violating federal antitrust laws as set forth in Counts I through III;

        b.   Violating Pennsylvania antitrust common law through restricting the resale of

           Daraprim;

        c.   Violating Pennsylvania antitrust common law through restricting access to a

           supply of the pyrimethamine API;

        d.   Violating Pennsylvania antitrust common law through willfully maintaining

           its monopoly power over FDA-approved pyrimethamine products; and/or

        e.   Engaging in any conduct which causes substantial injury to consumers.

352.    The above described conduct substantially injured Pennsylvania consumers and the Commonwealth of Pennsylvania.

353.    The above described conduct has been willful within the meaning of 73 P.S. § 201-8 and is unlawful under the PUTPCPL.

### B. Common Law Doctrine against Restraint of Trade

354.    Plaintiff Commonwealth of Pennsylvania re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

355.    The agreements to restrict the resale of Daraprim and the supply of the pyrimethamine API as set forth in the preceding counts constitute an unreasonable restraint of trade in violation of Pennsylvania antitrust common law.

356.    The Defendants' contracts in restraint of trade have had the following effects: (1) competition in the market for FDA-approved pyrimethamine products has been restrained, suppressed, and eliminated throughout Pennsylvania; (2) Daraprim prices have been raised, maintained, and stabilized at artificially-high levels throughout Pennsylvania; (3) Commonwealth of Pennsylvania and Pennsylvania consumers have been deprived of free and open markets; and (4) Commonwealth of Pennsylvania and Pennsylvania consumers have paid supra-competitive, artificially inflated prices for Daraprim.

### COUNT X
### A. Anticompetitive Agreements in Violation of the
### Virginia Antitrust Act Against All Defendants

357.    Plaintiff State of Virginia re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

358.    Defendants' agreements with distributors, hospitals, and other downstream purchasers barring them from reselling Daraprim to potential generic competitors, which were

130

conceived, negotiated, signed, and/or enforced by the individual Defendants constitute contracts, combinations, or conspiracies in restraint of trade or commerce in violation of the Virginia Antitrust Act, Virginia Code § 59.1-9.5.

359.    Defendants' exclusive pyrimethamine API contracts with Fukuzyu and RL Fine, which were conceived, negotiated, signed, and/or enforced by the individual Defendants, constitute contracts, combinations, or conspiracies in restraint of trade or commerce in violation of the Virginia Antitrust Act, Virginia Code § 59.1-9.5.

### B. Monopoly Maintenance in Violation of the Virginia Antitrust Act

360.    Plaintiff State of Virginia re-alleges and incorporates by reference the allegations in paragraphs 1 through 313 above.

361.    At all relevant times, Vyera and Phoenixus have had monopoly power in the United States with respect to FDA-approved pyrimethamine products.

362.    Vyera, Phoenixus, Shkreli, and Mulleady have willfully maintained this monopoly power through their course of anticompetitive conduct.

363.    There is no valid procompetitive justification for Defendants' exclusionary conduct in the market for FDA-approved pyrimethamine products.

364.    Defendants' anticompetitive acts constitute unlawful monopoly maintenance in violation of the Virginia Antitrust Act, Virginia Code § 59.1-9.6.

### Prayer for Relief

WHEREFORE, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act; Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes this Court to issue a permanent injunction for violations of the Sherman Act; New York General Business Law § 342 authorizes this Court to issue a permanent

131

injunction for violations of New York's Donnelly Act; New York Executive Law § 63(12) authorizes this Court to issue a permanent injunction for violation of the aforementioned state and federal antitrust laws; CA Bus & Prof Code § 16754.5 authorizes this Court to issue a permanent injunction in violation of California's Cartwright Act, CA Bus & Prof Code § 16700 *et seq*.; CA Bus & Prof Code § 17203 authorizes this Court to issue a permanent injuction for violations of and California's Unfair Competition Act, Ca Bus & Prof Code § 17200 *et seq.*; the Illinois Antitrust Act, Sections 7(1) and 7(2) authorizes this Court to issue a permanent injunction for violation of the aforementioned state and federal antitrust laws; N.C. Gen. Stat. §75-14 authorizes this Court to issue a permanent injunction for violations of the North Carolina Unfair or Deceptive Practices Act; Ohio Revised Code Chapter 1331 and §109.81(A) authorizes this Court to issue a permanent injunction for violations of Ohio's Valentine Act and the aforementioned federal antitrust laws; 73 P.S. §201-4 authorizes this Court to issue a permanent injunction for violations of Pennsylvania Unfair Trade Practices and Consumer Protection Law; Pennsylvania Common Law Doctrine against Restraints of Trade provides equitable relief including a permanent injunction; the Virginia Antitrust Act § 59.1-9.15(a) authorizes this Court to issue a permanent injunction for violations of the Virginia Antitrust Act, therefore the FTC and the states of New York, California, Illinois, Ohio, North Carolina, Pennsylvania, and Virginia respectfully request that this Court, as authorized by statute and its own equitable powers, enter final judgment against Defendants, declaring, ordering, and adjudging:

1. That Defendants' course of conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2;

2. That Defendants' agreements in restraint of trade violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

3.      That Defendants' course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. §
        45(a);

4.      That Defendants' agreements in restraint of trade violate Section 5(a) of the FTC Act, 15
        U.S.C. § 45(a);

5.      That Defendants' course of conduct violates New York's Donnelly Act, N.Y. GBL § 340
        *et seq.*;

6.      That Defendants' course of conduct violates New York's Executive Law, N.Y. § 63(12);

7.      That Defendants' course of conduct violates California's Cartwright Act, CA Bus & Prof
        Code § 16700 *et seq.*, and California's Unfair Competition Act, CA Bus & Prof Code §
        17200;

8.      That Defendants' course of conduct violates Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*;

9.      That Defendants' course of conduct violates the North Carolina Unfair or Deceptive
        Practices Act, N.C. Gen. Stat. § 75-1 *et seq.*;

10.     That Defendants' course of conduct violates Ohio's Valentine Act; Ohio Revised Code
        Chapter 1331;

11.     The Defendants' course of conduct violates the Pennsylvania Unfair Trade Practices and
        Consumer Protection Law, 73 P. S. §§ 201-3, 201-2(4)(xxi) and 201-4, as well as
        Pennsylvania's Common Law Doctrine against Restraints of Trade;

12.     The Defendants' course of conduct violates Virginia Antitrust Act, Virginia Code § 59.1-
        9.1 *et seq.*;

13.     That Defendants are permanently enjoined from continuing their course of conduct;

14.     That Defendants are permanently enjoined from engaging in similar and related conduct
        in the future;

133

15.     That Shkreli and Mulleady are permanently enjoined from owning in part or whole or working for a company engaged in the pharmaceutical industry;

16.     That the Court grant such other equitable relief, including equitable monetary relief, as the Court finds necessary to redress and prevent recurrence of Defendants' violations of Section 1 of the Sherman Act, Section 2 of the Sherman Act, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as alleged herein;

17.     That the Court grant such other equitable relief, including equitable monetary relief, as the Court finds necessary to redress and prevent recurrence of Defendants' violations of New York's Donnelly Act, New York Executive Law § 63(12); California's Cartwright Act, Ca Bus & Prof Code §16700 *et seq*.; California's Unfair Competition Act, CA Bus & Prof Code §17200; Illinois Antitrust Act, 740 ILCS 10/1 et seq.; North Carolina Unfair or Deceptive Practices Act, N.C. Gen. Stat. §75-1 et seq; Ohio's Valentine Act, Ohio Rev. Code Chapter 1331; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-4.1; Pennsylvania Common Law Doctrine against Restraints of Trade; Virginia Antitrust Act, Virginia Code § 59.1-9.1 et seq.;

18.     That the Court grant Plaintiff states of New York, California, Illinois, North Carolina, Pennsylvania, Ohio, and Virginia an award of reasonable attorneys fees and costs;

19.     That the Court order Defendants to pay Plaintiff states of New York, California, Illinois, North Carolina, Ohio, Pennsylvania, and Virginia civil penalties/forfeitures for their violations of the asserted state and/or federal antitrust laws, as authorized by law, N.Y. GBL § 341; CA Bus & Prof Code §17206; 740 ILCS 10/7(1), 740 ILCS 10/7(2) and 740 ILCS 10/7(4); N.C. Ge. Stat. §75-15.2; Ohio Rev. Code § 109.81 and Ohio Rev. Code §§

1331; Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. §§ 201-8(b); and Virginia Code § 59.1-9.11.

Dated: April 14, 2020

Ian R. Conner (D.C. Bar No. 979696)
Director
Bureau of Competition

Gail F. Levine (D.C. Bar No. 454727)
Deputy Director
Bureau of Competition

Alden Abbott
General Counsel

Respectfully submitted,

_____

Markus H. Meier (D.C. Bar No. 459715)
(admitted pro hac vice)
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
(202)326-3759
mmeier@ftc.gov

Bradley S. Albert (Md. Bar)
(admitted pro hac vice)
J. Maren Schmidt (D.C. Bar No. 975383)
(admitted pro hac vice)
Daniel W. Butrymowicz (N.Y. Bar)
(admitted pro hac vice)
Neal J. Perlman (N.Y. Bar)
(admitted pro hac vice)
D. Patrick Huyett (Pa. Bar No. 319668)
(admitted pro hac vice)
James H. Weingarten (S.D.N.Y. JW1979)
*Attorneys for Plaintiff*
*Federal Trade Commission*

136

Dated:   April 13, 2020

Respectfully submitted,

FOR PLAINTIFF STATE OF NEW YORK

LETITIA JAMES
Attorney General

Christopher D'Angelo
Chief Deputy Attorney General
Economic Justice Division
(pro hac vice forthcoming)

Elinor  R. Hoffmann
Elinor.Hoffmann@ag.ny.gov
Saami Zain
Saami.Zain@ag.ny.gov
Amy McFarlane
Amy.Mcfarlane@ag.ny.gov
Jeremy Kasha
Jeremy.Kasha@ag.ny.gov
Bryan Bloom
Bryan.Bloom@ag.ny.gov

Attorneys for Plaintiff State of New York

Dated:  April 6, 2020

Respectfully submitted,

FOR PLAINTIFF STATE OF
CALIFORNIA


XAVIER BECERRA
Attorney General


KATHLEEN FOOTE
Senior Assistant Attorney General

PAULA L. BLIZZARD
Supervising Deputy Attorney General


Michael Battaglia

Michael D. Battaglia
Michael.Battaglia@doj.ca.gov
Jacqueline Malafa (pro hac vice
forthcoming)
Jacqueline.Malafa@doj.ca.gov
California Office of the Attorney General
455 Golden Gate Avenue Suite 11000
San Francisco, CA 94102
Tel:  (415) 510-4400

Attorneys for Plaintiff State of California

Dated:  April 14, 2020                    Respectfully submitted,

                                       FOR PLAINTIFF STATE OF ILLINOIS


                                       KWAME RAOUL
                                       Attorney General

                                       *Blake L. Harrop*

                                       _____
                                       Blake L. Harrop
                                       Antitrust Bureau Chief
                                       bharrop@atg.state.il.us

                                       Richard S. Schultz
                                       rschultz@atg.state.il.us

                                       Office of the Illinois Attorney General
                                       100 W. Randolph Street
                                       Chicago, IL 60601
                                       Tel:  (312) 814-3000
                                       Fax:  (312) 814-4902

                                       Attorneys for Plaintiff State of Illinois

Dated: April 8 , 2020

Respectfully submitted,

FOR PLAINTIFF
STATE OF NORTH CAROLINA

JOSHUA H. STEIN
Attorney General of North Carolina

K.D. Sturgis
Special Deputy Attorney General
ksturgis@ncdoj.gov

Jessica V. Sutton
Assistant Attorney General
jsutton2@ncdoj.gov

North Carolina Dept. of Justice
Consumer Protection Division
114 West Edenton Street
Raleigh, NC 27603
Telephone: (919) 716-6000
Fax: (919) 716-6050

83

April  8    , 2020

FOR THE PLAINTIFF STATE OF OHIO

DAVE YOST
Attorney General

BETH A. FINNERTY
Assistant Section Chief

_Elizebeth M. Maag_
Elizebeth M. Maag
Associate Assistant Attorney General

Office of the Ohio Attorney General
Antitrust Section
150 E. Gay Street, 22nd Floor
Columbus, OH  43215
Telephone: 614.466.4328
beth.finnerty@ohioattorneygeneral.gov
Liz.Maag@ohioattorneygeneral.gov

Dated:  April 8, 2020

Respectfully submitted,

FOR PLAINTIFF
COMMONWEALTH OF PENNSYLVANIA

JOSH SHAPIRO
Attorney General of Pennsylvania

Tracy W. Wertz
Chief Deputy Attorney General
twertz@attorneygeneral.gov

Joseph S. Betsko
Senior Deputy Attorney General
jbetsko@attorneygeneral.gov

Stephen Scannell
Deputy Attorney General
sscannell@attorneygeneral.gov

Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120

Attorneys for Plaintiff Commonwealth of
Pennsylvania

Dated:  April 3, 2020

Respectfully submitted,

FOR PLAINTIFF
COMMONWEALTH OF VIRGINIA

MARK R. HERRING
Attorney General of Virginia

Sarah Oxenham Allen
Senior Assistant Attorney General/Unit Manager
soallen@oag.state.va.us

Tyler T. Henry
Assistant Attorney General
thenry@oag.state.va.us

Office of the Attorney General of Virginia
202 North Ninth Street
Richmond, VA  23219

143

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FEDERAL TRADE COMMISSION
    600 Pennsylvania Avenue, N.W.
    Washington, D.C. 20580

                    Plaintiff,

    v.

CEPHALON, INC.
    41 Moores Road
    Frazer, Pennsylvania 19355

                  Defendant.

Civil Action No. 2:08-cv-2141-MSG

**Plaintiff Federal Trade Commission's
First Amended Complaint for Injunctive Relief**

Plaintiff, the Federal Trade Commission, by its designated attorneys, petitions this Court, pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), for a permanent injunction against defendant Cephalon, Inc. to undo and prevent its unfair methods of competition in or affecting commerce in violation of Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

## I.  Nature of the Case

1.      This case challenges the course of anticompetitive conduct by Cephalon to prevent lower-cost generic competition to one of its key products, a branded prescription drug known as Provigil.  With U.S. sales of Provigil – over $920 million in 2008 – accounting for over 46 percent of Cephalon's total sales, the prospect of generic competition was a major threat to the company.  Cephalon knew that generic entry would decimate its sales and that any delay in such entry would be highly profitable for Cephalon, but very costly for consumers.

144

2.      By late 2005, generic competition to Provigil appeared imminent.  Several years

earlier, on the first day permitted by regulation, four companies had raced to submit applications

with the U.S. Food and Drug Administration to market generic versions of Provigil.  Each of the

generic companies had designed around, or challenged the validity of, the only then-remaining

patent that covered Provigil, a narrow formulation patent relating to the size of the particles used

in the product.  Cephalon, like the generic drug companies and the investment community,

expected that one or more of the companies would launch a generic version of Provigil in 2006.

3.      Faced with this threat to its Provigil monopoly, Cephalon bought off all four of its

potential competitors.  Cephalon handsomely compensated each generic company – more than

$200 million collectively – to abandon its patent challenge and agree to forgo entry until April

2012.  Furthermore, by securing these agreements with all four companies to forgo entry,

Cephalon blocked competition by any other potential generic entrant as well.  Cephalon obtained

this result not through the strength of its patent, but by paying its potential competitors to accept

the April 2012 entry date.

4.      As Cephalon's CEO observed shortly after entering these agreements:  "We were

able to get six more years of patent protection.  That's $4 billion in sales that no one expected."

However, Cephalon achieved this unexpected windfall at the expense of consumers.  Its

anticompetitive scheme to thwart generic competition has denied, and continues to deny, patients

the opportunity to purchase lower-cost generic versions of Provigil, forcing patients and other

purchasers to pay hundreds of millions of dollars a year more for Provigil.

## II. Jurisdiction and Venue

5.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. §§ 45(a) and 53(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

6.      This Court has personal jurisdiction over Cephalon pursuant to 15 U.S.C. § 53(b), and because Cephalon has the requisite constitutional contacts with the United States of America.

7.      Venue in this district is proper under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), because Cephalon transacts business in this District, and 28 U.S.C. § 1391(b) and (c), because Cephalon resides in this District.

8.      Cephalon's general business practices, and the unfair methods of competition alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

9.      Cephalon is, and at all times relevant herein has been, a corporation, as "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## III. The Parties

10.      Plaintiff Federal Trade Commission is an administrative agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41 *et seq.*, with its principal offices in Washington, D.C.  The FTC is vested with authority and responsibility for enforcing, *inter alia*, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

11.      Defendant Cephalon is a publicly traded, for-profit company, incorporated in Delaware and with its principal place of business located in Frazer, Pennsylvania.  Cephalon is

3

engaged in the discovery, development, manufacture, and distribution of pharmaceutical products, including Provigil.  In the twelve months ending December 31, 2008, Cephalon had worldwide net sales of over $1.9 billion, over $920 million of which were U.S. sales of Provigil.

## IV.  Background

### A.    The Regulatory System Governing Pharmaceuticals in the United States

12.    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984 (the "Hatch-Waxman Act") and the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, 21 U.S.C. § 355(j) and 35 U.S.C. § 271(e), establishes procedures designed to facilitate competition from lower-priced generic drugs, while maintaining incentives for pharmaceutical companies to invest in developing new drugs.

13.    A company seeking approval from the U.S. Food and Drug Administration ("FDA") to market a new drug (i.e., a branded drug) must file a New Drug Application ("NDA") demonstrating the safety and efficacy of its product.

14.    An "AB-rated" generic drug is one that the FDA has determined to be bioequivalent to a branded drug.  A generic drug is considered bioequivalent to a branded drug if it contains the same active pharmaceutical ingredient as the branded drug and there is no significant difference in the quality and effectiveness of the two drugs.

15.    A company seeking to market an "AB-rated" generic version of a branded drug must also file an application with the FDA, but may file an Abbreviated New Drug Application ("ANDA").

16.    When a branded drug is covered by one or more patents, a generic drug company that intends to market its generic drug prior to expiration of any patents may proceed to seek

4

FDA approval, but must certify in the ANDA that either (1) the generic version does not infringe the patents on the brand-name drug, or (2) the patents are invalid. This is referred to as a "paragraph IV certification."

17.    If it makes a paragraph IV certification, a generic drug company must notify the patent holder of the filing of its ANDA. If the patent holder initiates a patent infringement suit against the generic drug company within 45 days of receiving such notice, the FDA must stay its final approval of the ANDA for the generic drug until the earliest of (1) patent expiry, (2) district court resolution of the patent litigation in favor of the generic company, or (3) the expiration of an automatic 30-month waiting period.

18.    The Hatch-Waxman Act gives the first generic company or companies filing an ANDA containing a paragraph IV certification a period of protection from competition with other generic versions of the drug. As to paragraph IV filings made before December 2003, as is the case here, the FDA may not approve other generic versions of the same drug until 180 days after the earlier of the date on which (1) the first company begins commercial marketing of its generic version of the drug, or (2) an appeals court finds the patent(s) claiming the branded drug invalid or not infringed. This is referred to as "180-day exclusivity."

**B.    The Consumer Benefits of Generic Drugs**

19.    Although therapeutically the same as its branded counterpart, the first AB-rated generic equivalent to a branded drug is typically priced significantly lower than the brand. Upon the entry of additional AB-rated generic drugs, generic drug prices fall even more.

20.    Because of these price advantages, almost all states encourage generic competition through laws that allow pharmacists to dispense an AB-rated generic drug when presented with a prescription for its branded equivalent, unless a physician directs, or the patient

5

requests, otherwise.  These state laws facilitate substitution of lower-priced AB-rated generic drugs for higher-priced branded drugs.

21.     Many third party payers of prescription drugs (e.g., health insurance plans, Medicaid programs) have adopted policies to encourage the substitution of AB-rated generic drugs for their branded counterparts.

22.     As a result of lower prices and the ease of substitution, many consumers routinely switch from a branded drug to an AB-rated generic drug upon its introduction.  Consequently, AB-rated generic drugs typically capture a significant share of their branded counterparts' sales, causing a significant reduction of the branded drugs' unit and dollar sales.

23.     Competition from generic drugs generates large savings for consumers.  A 1998 Congressional Budget Office Report estimates that in 1994 alone, purchasers saved $8 to $10 billion on prescriptions at retail pharmacies by purchasing generic drugs instead of the equivalent branded drugs.  A 2004 FDA study calculates that patients could reduce the daily costs of their medications by more than 50 percent by purchasing generic drugs when available.  And, according to the National Association of Chain Drug Stores, the average retail price for a brand-name prescription was about $138 in 2008, while the average retail price for a generic prescription was about $35.

24.     Significant consumer savings can result when generic companies successfully challenge patents and enter prior to patent expiration.  For example, a generic company's successful challenge invalidating a patent covering the antidepressant drug Prozac resulted in generic entry 2 ½ years before patent expiry and about $2.5 billion in estimated consumer savings.  Another successful challenge invalidating patents covering the cancer drug Taxol

resulted in generic entry over 11 years before patent expiry and estimated consumer savings of more than $3.5 billion.

25.     There are many other examples of successful patent challenges by generic drug companies.  Indeed, empirical studies have shown that when pharmaceutical patent infringement claims are tested in the courts, the generic prevails in the majority of cases.  An analysis of Federal Circuit decisions from 2002 through 2004 in which the court made a final ruling on the merits of a pharmaceutical patent claim (validity, infringement, or enforceability) found that the alleged infringer had a success rate of 70 percent.  An FTC study of all patent litigation initiated between 1992 and 2000 between brand-name drug manufacturers and Paragraph IV generic applicants found similar results: when cases were litigated to a decision on the merits, the generics prevailed in cases involving 73 percent of the challenged drug products.

**C.    Cephalon's Provigil Prescription Drug**

26.     Cephalon markets a branded prescription drug called Provigil.  Provigil's active ingredient is a chemical compound called modafinil.  Modafinil was first discovered by Laboratoire L. Lafon ("Lafon"), a French pharmaceutical company, in 1976.  A drug product containing modafinil has been available in France since 1994.

27.     Cephalon obtained exclusive U.S. rights to modafinil from Lafon in 1993 and acquired Lafon outright in 2001.

28.     Cephalon filed a U.S. New Drug Application for Provigil in December 1996 and the FDA approved Provigil in December 1998.  The FDA originally approved Provigil for the treatment of excessive daytime sleepiness associated with narcolepsy.  The FDA later approved the use of Provigil to treat excessive sleepiness associated with obstructive sleep apnea and shift

7

150

work sleep disorder as well.  When it was approved for these two additional indications, Provigil was the only FDA-approved prescription medicine for these uses.

29.     Provigil has a favorable benefit and side-effect profile when compared to other amphetamine-like stimulants.  As a result, Provigil users face reduced risk of addiction or unwanted side effects.  Because of Provigil's unique properties relative to other drugs, Provigil is considered to be the "gold standard" for the treatment of excessive sleepiness associated with sleep disorders.  According to Cephalon's CEO, Provigil is a unique drug that "created the category of wakefulness products" and faces "no competition."

30.     Cephalon's sales of Provigil have grown substantially over time.  In 1999, U.S. Provigil sales were approximately $25 million.  By 2005, U.S. sales were over $475 million.  By the end of  2008, U.S. Provigil sales were over $920 million.

31.     Over the seven years from 1999 through 2005, cumulative worldwide Provigil sales were over $1.65 billion.  The vast majority of these sales were in the United States.  These sales substantially exceeded Cephalon's cost of developing Provigil.

32.     Provigil has consistently been Cephalon's highest-selling product.  In 2008, U.S. sales of Provigil accounted for over 46 percent of Cephalon's total worldwide sales.

33.     Cephalon sells Provigil at a price far above Cephalon's cost of manufacturing the product, making Provigil highly profitable for Cephalon.  Even accounting for other direct expenses Cephalon allocates to selling and marketing Provigil, Cephalon's profit margin on Provigil net sales is substantial.

**D.      Cephalon's Provigil Particle Size Patent**

34.      Provigil is no longer protected by a U.S. patent covering the modafinil compound. That patent issued in 1979 and expired in 2001.

35.      In 1994, Cephalon applied for a second U.S. patent relating to modafinil.  This patent did not claim the modafinil compound itself, but rather covered a formulation of modafinil consisting of a specified distribution of small particles.  This patent first issued in 1997 and re-issued in 2002 as U.S. Patent No. RE37,516 (the "Particle Size Patent").

36.      Cephalon's Particle Size Patent expires in October 2014.  Cephalon has received regulatory exclusivity from the FDA that would provide Cephalon with an additional six months of exclusivity beyond the expiration of its patent, to April 2015.

37.      Unlike the modafinil compound patent, which expired in 2001, Cephalon's Particle Size Patent does not block all generic competition to Provigil.  To the contrary, a consultant advised Cephalon in 2002 that "all generic drug companies know . . . the [Particle Size Patent] may be easily circumvented" by manufacturing their products to contain a distribution of modafinil particle sizes different than that covered by Cephalon's patent.

**V.  The Threat of Generic Provigil Entry to Cephalon**

**A.      Generic Companies Challenged Cephalon's Provigil Monopoly**

38.      Because Cephalon's Particle Size Patent could be easily circumvented, companies were eager to submit an application to market a generic version of Provigil.  On December 24, 2002, the first day that the FDA could accept an ANDA for generic Provigil, four companies submitted applications (three of which literally camped out in the FDA's parking lot waiting to be the first to file when the doors opened at 7:00 AM):  (1) Teva Pharmaceuticals USA, Inc. (together with its affiliates, "Teva"), (2) Ranbaxy Pharmaceuticals, Inc. (together with its

affiliates, "Ranbaxy"), (3) Mylan Pharmaceuticals Inc. (together with its affiliates, "Mylan") and (4) Barr Laboratories, Inc. (together with its affiliates, "Barr"). In their applications, Teva, Ranbaxy, Mylan, and Barr (collectively, the "First Filers") each certified that its version of generic Provigil did not infringe Cephalon's Particle Size Patent, that the patent was invalid, or both.

39. Teva, Ranbaxy, Mylan, and Barr independently developed versions of Provigil that they believed did not infringe Cephalon's Particle Size Patent.

40. Given FDA interpretation of applicable law, the four First Filers could share 180-day exclusivity because they all filed ANDAs on the same day. This meant that if the FDA approved their products, all four First Filers could simultaneously market generic products during the 180-day exclusivity period.

41. Cephalon knew that generic Provigil entry would lead to substantial declines in the company's revenues. In 2005, a Cephalon Vice President responsible for formulating generic strategy projected that if generic versions of Provigil began competing in 2006, the generic versions would be priced 75 to 90 percent below branded Provigil and would cut Cephalon's revenues by at least $400 million within one year – almost 75 percent of Provigil's annual sales. Cephalon's CEO has stated that such losses would have been devastating.

42. The generic companies also projected a substantial impact from generic entry. For example, Teva projected that generic versions would garner 90 percent of all modafinil prescriptions within a month, and that the price for its generic version of Provigil would fall to ten percent of Cephalon's price within one year of generic entry. Similarly, Ranbaxy projected that generic prices would fall to five percent of Cephalon's branded Provigil price within a year.

10

153

**B.    Cephalon's Patent Was Unlikely to Prevent Generic Competition to Provigil**

43.    In March of 2003, Cephalon filed a patent infringement lawsuit against each of the First Filers, alleging that each First Filer infringed Cephalon's Particle Size Patent.  Under the Hatch-Waxman Act, Cephalon's lawsuit triggered an automatic stay of final FDA approval of the First Filers' generic versions of Provigil.  Under FDA rules, the stay expired in June 2006.

44.    Following discovery in the patent litigation, all of the First Filers filed separate motions for summary judgment, on the grounds that they had successfully designed around Cephalon's Particle Size Patent, that the patent was invalid, or both.  These motions were fully briefed by November 2005.

45.    Teva, Barr, and Ranbaxy each presented evidence in summary judgment papers that it did not infringe Cephalon's Particle Size Patent because its generic drug contained a distribution of modafinil particles having more large particles than the formulation claimed in the patent.

46.    Ranbaxy and Mylan each argued in summary judgment papers that Cephalon's patent was invalid, for several reasons.  Ranbaxy argued that Cephalon's patent claims were invalid under 35 U.S.C. § 112 as indefinite because their scope was unclear.  Mylan argued that Cephalon was not entitled to a patent because it merely bought modafinil containing the claimed distribution of small particles from Lafon and did not "invent" anything itself, making the patent invalid under 35 U.S.C. § 102(f).  Ranbaxy and Mylan both argued that Lafon's sale of modafinil to Cephalon raised an "on-sale bar" that invalidated the patent under 35 U.S.C. § 102(b).

47.    Cephalon bore the burden of proving that each of the four different generic products was within the scope of its Particle Size Patent and infringed this patent.  Cephalon had

not met its burden at the time it settled the litigation. Moreover, had the patent litigation proceeded, Cephalon was also unlikely to prevent generic entry by the First Filers. To do so, Cephalon had to show that each of the generic modafinil products infringed the Particle Size Patent and defeat each of the generics' invalidity arguments. If Cephalon failed to establish that even one of the generic products infringed its narrow patent, generic entry would have occurred. In addition, if any one of the generics' invalidity arguments prevailed, the patent could not prevent the entry of any generic.

**C.    Market Participants Expected Generic Competition to Provigil in Mid-2006**

48.    By the end of 2005, each of the First Filers had received tentative FDA approval of their generic versions of Provigil. The FDA grants tentative approval when it determines that a generic product is bioequivalent to the brand, but cannot grant final approval pending the expiration of regulatory stays. The FDA's determination that the First Filers' generic versions of Provigil were bioequivalent meant that the generic products were as safe and effective as branded Provigil – despite the fact that the generic products contained larger-sized modafinil particles than branded Provigil.

49.    All four of the First Filers would likely have had regulatory clearance to launch generic Provigil in June 2006, upon the expiration of the 30-month stay of final FDA approval. Each of the four First Filers could have launched generic Provigil in June 2006 even if Cephalon's patent litigation were still pending, a practice commonly referred to as "launching at risk." The "risk" is that the patent holder could prevail in the patent infringement litigation and recover damages from the generic entrant for lost profits. For example, Teva has launched at risk more than 20 times.

50.    By late 2005, generic entry appeared imminent to Cephalon, the First Filers, and Wall Street analysts.  In November 2005, Cephalon provided the investment community earnings guidance that explicitly assumed that Provigil was "going away" because of generic entry in 2006.  One of the "key assumptions" in Cephalon's 2006 guidance, according to the company's Chief Financial Officer, was that "generic versions of modafinil enter the market midyear."

51.    Anticipating generic entry, Cephalon had begun to prepare for life without Provigil.  As Cephalon's CEO later explained to investment analysts, "we expected not to have [Provigil] in our portfolio."  As a result, "we haven't spent any money [in the] second half of '05 on Provigil."  Cephalon cut back on its promotion of Provigil, shifted research efforts away from Provigil, and made plans to launch its own generic version of Provigil (a so-called "authorized generic" product).  Typically, a pharmaceutical company like Cephalon will stop promoting its branded product and/or prepare to launch an authorized generic version of its brand only if it expects imminent entry from bioequivalent generic products.

52.    Each of the four First Filers prepared internal projections that assumed a June 2006 launch date and engaged in planning for a generic launch.  For example, Barr, which believed an even earlier launch was possible, ordered substantial quantities of active ingredient from its supplier in late 2005.

53.    Similarly, Wall Street analysts projected generic Provigil entry in 2006.  A September 2005 report from American Technology Research noted that "current Street expectations are for generic competition to Provigil in the mid-2006 time frame."  An October 2005 report from Lazard Capital Markets detailed one such expectation:  "Our projections assume that there will be shared generic exclusivity for Provigil and that final [FDA] approval

13

will be awarded with Summary Judgment motions still pending [in mid-2006]. At this point, generic(s) will launch at risk."

54.    To blunt the devastating impact of generic Provigil entry, Cephalon planned to introduce a branded successor product, Nuvigil, before generic entry in 2006. Because generic Provigil would not be automatically substitutable for Nuvigil, Cephalon expected to retain some portion of its franchise by converting patients from Provigil to Nuvigil. The FDA, however, had not approved Nuvigil by late 2005 and there was considerable uncertainty as to whether the FDA would approve Nuvigil early enough in 2006 to enable Cephalon to successfully migrate customers from Provigil to Nuvigil before the entry of a generic version of Provigil.

55.    Given the uncertainty surrounding its strategy to protect its flagship product – and 40% of its revenues – from generic competition, Cephalon charted a different course.

## VI. Cephalon's Anticompetitive Scheme to Maintain its Provigil Monopoly

56.    To protect its Provigil monopoly, Cephalon set out to settle its patent litigation with the four First Filers under terms that would eliminate potential generic competition for a substantial period. Given the enormous profits at stake, Cephalon was willing to compensate the generic companies handsomely to secure their agreements not to compete.

57.    From the outset of negotiations, Cephalon had decided that it would not agree to generic Provigil entry until three years before the expiration of patent-related exclusivity, in April 2012. This entry date was of limited value to the First Filers, in part because it gave Cephalon a substantial period to switch sales to Provigil's successor product, Nuvigil, and thus significantly reduce potential sales of generic Provigil. The First Filers, who had so aggressively challenged Cephalon's monopoly, were therefore unwilling to settle on this entry date without compensation.

14

157

58.    Because Cephalon was unwilling to compromise on its generic entry date and the First Filers would not agree to Cephalon's date absent other terms, Cephalon had to provide other inducements to the First Filers to secure their agreement to refrain from competing until April 2012. Cephalon provided these inducements in the form of purportedly independent business transactions – thirteen in all totaling in excess of $200 million – such as licenses to intellectual property, supply agreements, or co-development deals (collectively "side-term inducements").

59.    The side-term inducements that Cephalon provided to the First Filers, however, are not independent business transactions, but are instead inextricably linked with the agreed-upon generic entry date of April 2012, for at least the following reasons:

- The side-term inducements were entered simultaneously with the associated patent litigation settlements, and were often contained in the same document;

- Prior to patent settlement negotiations, Cephalon had no significant discussions with the generic companies regarding the matters covered by the side-term inducements;

- Cephalon was willing to agree to the side-term inducements only if the generic companies agreed to refrain from competing with their generic versions of Provigil;

- Cephalon did not need licenses to the generic companies' modafinil-related intellectual property to manufacture or sell Provigil or planned successor products; and

- By entering into a series of supply agreements, Cephalon created, in the words of a senior supply manager, a "supply chain nightmare" that makes little sense, absent offsetting consideration in the form of the elimination of potential competition.

60.    Cephalon provided an additional incentive to each of the four First Filers to settle by including a "most favored nation" clause in each proposed settlement and by publicizing that provision of each settlement. The clause allowed for accelerated entry by the First Filer in the

event that another generic company entered the market. The effect of that clause was to make it less attractive for each successive generic company to continue to litigate or enter at risk because that clause would automatically permit each generic company that had settled to compete without any risk with any non-settling generic company.

61.    The purpose and effect of Cephalon's agreements with the First Filers is to maintain Cephalon's Provigil monopoly and eliminate potential generic competition to Provigil until April 2012.

**A.    Cephalon Bought Off Potential Generic Competition From Teva**

62.    On December 8, 2005, Cephalon and Teva entered a written agreement to settle their patent litigation. Under this settlement, Cephalon required that Teva refrain from marketing any generic version of Provigil until April 2012, unless another generic company launched a generic version of Provigil earlier than that date – in which case Teva also would be allowed to enter at that time. Cephalon and Teva publicized this accelerated entry ("most favored nation") provision in press releases announcing the settlement.

63.    The settlement agreement provides significant compensation for Teva in return for its agreement to refrain from entering until April 2012. Cephalon agreed to pay Teva up to $125 million in royalties based on Cephalon's worldwide sales of Provigil and successor products. Purportedly, these payments are in exchange for a license to a patent and patent applications Teva held relating to modafinil. Cephalon, however, did not need a license to Teva's modafinil-related patent rights. In fact, Cephalon already had all it needed to successfully manufacture and sell Provigil and any planned successor products, including Nuvigil. Cephalon knew about Teva's patent applications for over three years before it showed

16

159

interest in a license, and only then because the license was tied to Teva's agreement to refrain from marketing generic Provigil until April 2012.

64.    Cephalon also agreed to purchase active pharmaceutical ingredient ("API") for Provigil from Teva at prices substantially higher than the price Cephalon paid to its existing supplier. Cephalon, moreover, did not need modafinil API supply from Teva. At one point, Cephalon even suggested that Teva "forget about api" until after a settlement had been reached. Teva, however, insisted that such a term be included in the settlement, and ultimately Cephalon agreed to a supply term that guarantees Teva a revenue stream until 2012, when Teva is permitted to market its generic version of Provigil.

65.    The compensation Cephalon agreed to provide Teva was designed to, and did, induce Teva to settle the Provigil patent litigation and agree to refrain from marketing generic Provigil until April 2012.

**B.    Cephalon Bought Off Potential Generic Competition From Ranbaxy**

66.    On December 22, 2005, Cephalon and Ranbaxy entered a written agreement to settle their patent litigation. Under this settlement, Cephalon required that Ranbaxy refrain from marketing any generic version of Provigil until April 2012, unless another generic company launched a generic version of Provigil earlier than that date.

67.    Ranbaxy would not agree to refrain from marketing generic Provigil until April 2012, however, unless it received significant compensation. Ranbaxy's chief negotiator sought to obtain "$20-30 million" in value from the settlement. He would not have recommended the settlement to Ranbaxy management absent this compensation "because the economics of the settlement would be quite different."

17

160

68.    Cephalon agreed to provide this compensation, in part, in the form of a supply agreement.  Cephalon agreed to purchase modafinil API from Ranbaxy, despite the fact that Ranbaxy does not manufacture modafinil API itself, but rather sources the API from a third party manufacturer in India.  Ranbaxy will pass API on to Cephalon at a substantial markup, and Cephalon will pay prices substantially higher than the price Cephalon paid to its existing supplier.

69.    Cephalon also agreed to pay Ranbaxy up to $5 million in exchange for a license to patent applications Ranbaxy held related to modafinil, despite the fact that Cephalon did not need the license to manufacture or sell Provigil or planned successor products, including Nuvigil.

70.    The compensation Cephalon agreed to provide Ranbaxy was designed to, and did, induce Ranbaxy to settle the Provigil patent litigation and agree to refrain from marketing generic Provigil until April 2012.

**C.    Cephalon Bought Off Potential Generic Competition From Mylan**

71.    On January 9, 2006, Cephalon and Mylan entered a written agreement to settle their patent litigation.  Under this settlement, Cephalon required that Mylan refrain from marketing any generic version of Provigil until April 2012, unless another generic company launched a generic version of Provigil earlier than that date.

72.    In December 2005, just prior to settling, Mylan forecast that it would launch a generic version of Provigil in June 2006.  Mylan was therefore unwilling to refrain from competing until April 2012 absent significant compensation.  At Mylan's urging, Cephalon agreed to enter into simultaneous product development deals that provide significant guaranteed compensation for Mylan.  Under these deals, Cephalon has paid Mylan, to date, at least $45

million.  Prior to its agreement with Mylan, Cephalon had expressed no interest to Mylan in the technology Mylan contributed to the product development deals.

73.     The compensation Cephalon agreed to provide Mylan was designed to, and did, induce Mylan to settle the Provigil patent litigation and agree to refrain from marketing generic Provigil until April 2012.

**D.     Cephalon Bought Off Potential Generic Competition From Barr**

74.     On February 1, 2006, Cephalon entered written agreements with Barr and Barr's partner, Chemagis, Ltd. (together with its affiliates, "Chemagis") to settle Cephalon's patent litigation with Barr.  Under the settlement, Cephalon required that Barr refrain from marketing any generic version of Provigil until April 2012, unless another generic company launched a generic version of Provigil earlier than that date.

75.     Barr was unwilling, however, to settle the Provigil patent litigation based solely on terms that required Barr to refrain from marketing generic Provigil until April 2012.  Instead, Barr insisted on additional compensation.  Cephalon agreed to provide this compensation.  It did so by (1) paying $1 million for a license to a patent application Barr held related to modafinil that Cephalon did not need to manufacture or sell Provigil or planned successor products, including Nuvigil; (2) agreeing to purchase modafinil API directly from Chemagis (and indirectly from Barr via Barr's profit-sharing arrangement with Chemagis) at prices substantially higher than the price Cephalon paid to its existing supplier; and (3) settling unrelated patent litigation on terms favorable to Barr.

76.     Since Barr had developed its generic version of Provigil in collaboration with Chemagis, which supplied modafinil API to Barr, any patent litigation settlement with Cephalon effectively required the assent of both Barr and Chemagis.  Therefore, to secure Barr's

agreement to refrain from marketing generic Provigil until April 2012, Cephalon was also willing to provide significant compensation to Chemagis.

77.     At the same time it entered the patent settlement with Barr, Cephalon agreed to pay Chemagis $4 million in exchange for a license to a patent and patent application Chemagis held related to modafinil that Cephalon did not need to manufacture or sell Provigil or planned successor products, including Nuvigil.  Cephalon also entered into a product development deal with Chemagis.  Under that deal, the parties agreed to collaborate on two projects.  The first was the use of Chemagis drug delivery technology with an existing Cephalon drug product, for which Cephalon agreed to make $20 million in guaranteed payments to Chemagis.  The second was a project to be named later.  Cephalon agreed to pay Chemagis at least $20 million for the project to be named later.

78.     The compensation Cephalon agreed to provide Barr and Chemagis was designed to, and did, induce Barr and Chemagis to settle the Provigil patent litigation and agree to refrain from marketing generic Provigil until April 2012.

**E.     The Broad Effects of Cephalon's Anticompetitive Agreements**

79.     The settlement agreements prevent each of Teva, Ranbaxy, Mylan, and Barr from selling the versions of generic Provigil at issue in the patent litigation.  The agreements also prevent all four firms from developing and marketing any other generic versions of Provigil.

80.     Teva and Mylan not only agreed not to develop, market, or sell generic versions of Provigil but they also agreed not to develop, market, or sell generic equivalents of successor products.

81.     Under their agreements with Cephalon, Teva, Ranbaxy, Mylan, and Barr may not sell generic products whether or not they infringe Cephalon's Particle Size Patent.  Cephalon's

20

163

patent lawsuit, in contrast, had the potential to restrict only sales of these companies' current versions of generic Provigil, the products at issue in the litigation.

82.    With Provigil's future secured, Cephalon reversed course on its plans for its flagship product.  Prior to securing the First Filers' agreements not to compete until 2012, Cephalon had cut back on promotion of Provigil in anticipation of generic entry in mid-2006. After eliminating the threat of generic entry, however, Cephalon advised the investment community that it "reinvigorat[ed]" its Provigil marketing programs.  In addition, Cephalon suspended its plans to launch an authorized generic version of Provigil and postponed its anticipated launch of Nuvigil for over three years.

### VII.  Cephalon's Agreements Harm Competition and Consumer Welfare

83.    Prior to their settlement agreements with Cephalon, the First Filers were Cephalon's potential competitors.  By entering these agreements, Cephalon eliminated the potential that (1) one or more of the First Filers would have entered with a generic version of Provigil in 2006 before conclusion of the patent litigation; (2) one or more of the First Filers would have prevailed in their patent litigation against Cephalon and introduced a generic version of Provigil well before expiration of the Particle Size Patent; or (3) Cephalon would have agreed to settle its patent litigation on terms that did not compensate the First Filers, but provided for generic entry earlier than April 2012.

84.    Cephalon eliminated this potential competition and harmed consumers by compensating the First Filers to refrain from marketing generic Provigil until April 2012. Cephalon eliminated potential competition not through the strength of its patent, but by agreeing to compensate the First Filers for accepting the 2012 entry date.  Absent compensation, the First Filers would not have agreed to the April 2012 date that Cephalon demanded.

85.     Moreover, absent the compensation Cephalon agreed to provide, generic competition to Provigil would have occurred prior to April 2012 because (1) one or more of the First Filers would have entered with its version of generic Provigil before conclusion of the patent litigation; (2) Cephalon would not have prevailed against each of the four First Filers in its patent litigation; or (3) Cephalon would have agreed to settle its patent litigation on terms that did not compensate the First Filers, but instead provided for generic entry earlier than April 2012.  As Cephalon's CEO told investment analysts in early 2007:  "We've got Provigil through 2012.  You know the history of the company.  We didn't expect to be there."

86.     Entry of generic Provigil would give consumers the choice between branded Provigil and lower-priced generic versions of Provigil.  Many consumers would choose to purchase lower-priced generic drugs instead of higher-priced branded Provigil.  Entry of generic versions of Provigil would quickly and significantly reduce Cephalon's sales of Provigil and lead to a significant reduction in the average price purchasers pay for Provigil and its generic equivalents.  Consumers likely would save hundreds of millions of dollars a year by purchasing generic versions of Provigil.  Through its anticompetitive agreements with Teva, Ranbaxy, Mylan, Barr, and Chemagis, Cephalon has retained those potential consumer savings for itself and used part of them to compensate the generic companies for their agreement to refrain from marketing generic Provigil until April 2012.

87.     Cephalon's settlement agreements with the First Filers have prevented generic competition not only from those companies, but from any other source as well.  Under the Hatch-Waxman Act, the First Filers collectively hold rights to 180-day exclusivity for generic Provigil.  The FDA is prevented by law from approving any other generic version of Provigil until the 180-day exclusivity period has been triggered and run.  Only (1) the commercial

22

165

marketing of generic Provigil by at least one of the First Filers, or (2) an appeals court decision declaring Cephalon's Particle Size Patent invalid or not infringed would trigger the 180-day exclusivity period.

88.    Because of Cephalon's anticompetitive agreements with the First Filers, their 180-day exclusivity will not be triggered by the commercial marketing of generic Provigil until April 2012, the entry date the First Filers agreed to with Cephalon.

89.    Cephalon's settlements ensure that there will not be a court decision in the patent litigation with the First Filers to trigger the 180-day exclusivity period.

90.    Cephalon has taken further steps to ensure that no court decision will trigger the 180-day exclusivity period, including settling or refusing to litigate with other generic companies that could trigger the exclusivity period.

91.    Because of Cephalon's actions, generic Provigil entry will not occur until April 2012.

92.    Even then, consumers may realize few benefits from the entry of generic versions of Provigil because of Cephalon's plans to switch sales from Provigil to its new branded product, Nuvigil.  Prior to its agreements with the First Filers, Cephalon intended to launch Nuvigil upon receiving FDA approval, which occurred in June 2007.  Having successfully forestalled generic competition, however, Cephalon delayed Nuvigil's launch until June 2009.

93.    Cephalon is actively working to destroy the market for generic Provigil, and the potential benefits to consumers from generic entry in 2012.  As Cephalon's CEO told investment analysts:  "[I]f we do our job right [switching the market to Nuvigil] . . . the Provigil number in 2012 that will be genericized will be very, very small."

23

166

94.    Cephalon raised the price of Provigil by 28 percent between March and November of 2008.  As Cephalon's Vice President of Investor Relations told investment analysts: "You should expect that we will likely raise Provigil prices to try to create an incentive for the reimbursers to preferentially move to Nuvigil."

95.     The Hatch-Waxman Act was designed to promote generic competition while preserving incentives for branded innovation.  To achieve the latter, the Act provides for a number of rewards to branded companies, including regulatory exclusivity periods for new branded drugs and automatic stays of FDA approval of generic drugs upon the filing of patent infringement suits.  To achieve the former, the Act grants generic companies an abbreviated path to FDA approval provided they wait out regulatory exclusivity periods and design around or invalidate any patents held by branded companies.

96.    As to Provigil, Cephalon benefitted from the protections of the Hatch-Waxman Act.  By June 2006, Cephalon had enjoyed seven-and-a-half years of several types of regulatory exclusivity, during which time the FDA was precluded from approving a generic version of Provigil.

97.    Cephalon was not, however, prepared to allow consumers to enjoy the benefits of generic competition after the expiration of its exclusivity periods.  Rather, through its anticompetitive settlement agreements Cephalon bought an additional six years of protection from potential competition.

98.    Exclusion payments are not a natural by-product of incentives created by the Hatch-Waxman Act.  Rather, pharmaceutical patent litigation can be, and often is, resolved

without exclusion payments from branded companies to generic companies. For instance, in fiscal year 2004, following FTC enforcement actions challenging exclusion payments, 14 pharmaceutical patent settlements were filed with the FTC under the Medicare Modernization Act and none involved an exclusion payment.

99.    Through its exclusion payment settlements, Cephalon bought protection from competition not contemplated by the Hatch-Waxman Act – with consumers paying the price for its anticompetitive conduct.

## VIII. Cephalon's Monopoly Power

100.    Cephalon has exercised and continues to exercise monopoly power in the United States with respect to Provigil. Direct evidence of this monopoly power includes Cephalon's ability to price Provigil substantially higher than the projected price of competing generic versions of Provigil and to exclude potential competitors by providing significant compensation to forestall entry.

101.    Moreover, Cephalon's monopoly power can be shown through circumstantial evidence. In particular, a relevant market for antitrust purposes exists for modafinil-containing drugs approved by the FDA for sale in the United States, consisting of Provigil and generic versions of Provigil. A unique competitive relationship exists between branded drugs and their generic equivalents, including Provigil and generic Provigil. Although other drugs may be used to treat narcolepsy and the other sleep disorders for which Provigil is indicated, the availability of these drugs is not sufficient to prevent the anticompetitive effects from Cephalon's conduct. Cephalon has proclaimed that Provigil faces "no competition" and that it is the "only

wakefulness promoter in the world," in part because of Provigil's unique properties relative to other drugs.

102.    Cephalon has consistently held a 100 percent share of the relevant market.

## IX.  Violation of Section 5 of the FTC Act

103.    The FTC realleges and incorporates by reference the allegations in all of the paragraphs above.

104.    At all times relevant to this complaint, Cephalon has had monopoly power in the United States with respect to Provigil.

105.    Cephalon has willfully maintained its monopoly power through its course of anticompetitive conduct, including its agreements with Teva, Ranbaxy, Mylan, Barr, and Chemagis that those companies will not compete by marketing generic versions of Provigil until April 2012, in exchange for compensation.  Entry of a generic version of Provigil would eliminate Cephalon's monopoly with respect to Provigil.  At the time of the agreements, each of the First Filers was a threat to enter with a generic version of Provigil prior to April 2012. Eliminating this threat of generic entry is conduct that is reasonably capable of contributing significantly to Cephalon's continued monopoly power.  Through its course of conduct, Cephalon has excluded competition and willfully maintained its monopoly not on the strength of its patent, but rather by compensating its potential competitors and abusing competitive and regulatory processes.

106.    Cephalon's acts are anticompetitive and constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

26

## X.  The Court's Power to Grant Relief

107.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act and, in the exercise of its equitable jurisdiction, to order ancillary equitable relief to remedy the injury caused by Cephalon's violation.

## XI.  Prayer for Relief

WHEREFORE, the FTC requests that this Court, as authorized by 15 U.S.C. § 53(b), 15 U.S.C. § 26 and pursuant to its own equitable powers, enter final judgment against Cephalon, declaring, ordering, and adjudging:

1.    That Cephalon's course of conduct, including its agreements with Teva, Ranbaxy, Mylan, Barr, and Chemagis, violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a);

2.    That Cephalon is permanently enjoined from maintaining or enforcing the terms in its agreements with Teva, Ranbaxy, Mylan, and Barr that prevent those companies from marketing generic versions of Provigil or successor products before April 2012;

3.    That Cephalon is permanently enjoined from engaging in similar and related conduct in the future; and

4.    That the Court grant such other equitable relief as the Court finds necessary to redress and prevent recurrence of Cephalon's violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), as alleged herein.

170

Dated: August 11, 2009                    Respectfully Submitted,

DAVID C. SHONKA                           RICHARD A. FEINSTEIN
Principal Deputy General Counsel          Director

                                          PETER J. LEVITAS
                                          Deputy Director
                                          Bureau of Competition


                                          J. ROBERT ROBERTSON
                                          MARKUS H. MEIER
                                          SARALISA C. BRAU
                                          BRADLEY S. ALBERT
                                          MARK J. WOODWARD
                                          ALPA D. GANDHI
                                          Attorneys for Plaintiff
                                          Federal Trade Commission
                                          600 Pennsylvania Avenue, N.W.
                                          Washington, D.C. 20580
                                          Telephone:  (202) 326-2008
                                          rrobertson@ftc.gov

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

FEDERAL TRADE COMMISSION
    600 Pennsylvania Avenue, N.W.
    Washington, D.C. 20580

                  Plaintiff,

    v.

CEPHALON, INC.
    41 Moores Road
    Frazer, Pennsylvania 19355

                  Defendant.

Civil Action No. 2:08-cv-2141-MSG

## CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2009, Plaintiff Federal Trade Commission's First

Amended Complaint and computer disk containing a PDF copy of said document were mailed to

the Clerk of the Court via Federal Express to be filed in the above captioned matter and served

via Federal Express on counsel listed below.

John A. Guernsey
Conrad O'Brien PC
1515 Market Street, 16th Floor
Philadelphia, PA 19102-1921
jguernsey@conradobrien.com

James C. Burling
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
james.burling@wilmerhale.com

Respectfully submitted,

By: _____

J. Robert Robertson

172