**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

FEDERAL TRADE COMMISSION,

       Plaintiff,

       v.

U.S. ANESTHESIA PARTNERS, INC. et al.

       Defendants.

Case No.: 4:23-CV-03560-KH

**APPENDIX TO DEFENDANT U.S. ANESTHESIA PARTNERS, INC.'S
<u>MOTION TO DISMISS THE FTC'S COMPLAINT</u>**

# TABLE OF CONTENTS

## CASES

*Collins v. Midland Mortg.*, 2022 WL 16556810 (S.D. Tex. Oct. 31, 2022)......................USAP001

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*,
2016 WL 3457177 (C.D. Cal. May 11, 2016) ...........................................................USAP003

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482
(S.D.N.Y. Sept. 30, 2002)...............................................................................................USAP006

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016),
*aff'd*, 724 F. App'x 556 (9th Cir. 2018) ....................................................................USAP019

*Ironshore Specialty Ins. Co. v. Facility IMS, LLC*,
2023 WL 6850006 (N.D. Tex. Oct. 17, 2023)...........................................................USAP031

*NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679 (N.D. Cal. Aug. 13, 2019)..........USAP042

## OTHER AUTHORITIES

119 Cong. Rec. 36600 (1973) (excerpt).............................................................................USAP051

J. Howard Beales III & Timothy J. Muris, *Striking the Proper Balance:
Redress Under Section 13(b) of the FTC Act*, 79 Antitrust L.J. 1 (2013)...................USAP055

Peter C. Ward, *Restitution for Consumers Under the Federal Trade Commission Act:
Good Intentions or Congressional Intentions?*, 41 Am. U. L. Rev. 1139 (1992) ......USAP090

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2023) (excerpt).....................USAP141

S. Rep. No. 93-151 (1973) (excerpt)................................................................................USAP147

## OTHER CITED DOCUMENTS

The Cigna Group, Annual Report (Form 10-K) (Feb. 23, 2023),
https://tinyurl.com/b4u8ajrm (excerpt).......................................................................USAP151

UnitedHealth Group Inc., Annual Report (Form 10-K) (Feb. 24, 2023),
https://tinyurl.com/3mudvzt8 (excerpt) .....................................................................USAP157

Dated: November 20, 2023

Respectfully submitted,

/s/ *Mark C. Hansen*

David J. Beck (TX Bar No. 00000070)
  (Federal I.D. No. 16605)
Garrett S. Brawley (TX Bar No. 24095812)
  (Federal I.D. No. 3311277)
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX 77010
Tel: (713) 951-3700
Fax: (713) 951-3720
dbeck@beckredden.com
gbrawley@beckredden.com

Mark C. Hansen (D.C. Bar No. 425930)
  (*Pro Hac Vice*)
Attorney-in-Charge
Geoffrey M. Klineberg (D.C. Bar No. 444503)
  (*Pro Hac Vice*)
David L. Schwarz (D.C. Bar No. 471910)
  (*Pro Hac Vice*)
Kevin J. Miller (D.C. Bar No. 478154)
  (*Pro Hac Vice*)
Dennis D. Howe (D.C. Bar No. 90011114)
  (*Pro Hac Vice* Application Pending)
Derek C. Reinbold (D.C. Bar No. 1656156)
  (*Pro Hac Vice* Application Pending)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
dschwarz@kellogghansen.com
kmiller@kellogghansen.com
dhowe@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Defendant U.S. Anesthesia Partners, Inc.*

2022 WL 16556810
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Kimberly COLLINS, Plaintiff,

v.

MIDLAND MORTGAGE, Defendant.

CIVIL ACTION NO. 4:22-CV-02414
|
Signed October 31, 2022

**Attorneys and Law Firms**

Kimberly Collins, Houston, TX, Pro Se.

Nicholas Michael Frame, Mackie Wolf Zientz Mann, P.C., Houston, TX, Mark Douglas Cronenwett, Mackie Wolf Zientz & Mann, P.C., Dallas, TX, for Defendant.

**MEMORANDUM OPINION AND ORDER**

Kenneth M. Hoyt, United States District Judge

**I. INTRODUCTION**

 *1  Pending before the Court is the defendant's, Midland Mortgage, motion to dismiss (Docket No. 5). The plaintiff, Kimberly Collins, is *pro se* and has not filed a response in opposition to the defendant's motion. After considering the motion, the record, and the applicable law, the Court determines that the defendant's motion should be **GRANTED**.

**II. FACTUAL BACKGROUND**

This suit arises out of a foreclosure proceeding on a residential home located at 3237 Calumet Street, Houston, Texas 77044. According to the plaintiff, on or about September 2006, she purchased and began occupying the property with her children. Yet, she did not execute a mortgage with a financial institution. Instead, she formed a purchase agreement with the legal mortgagee, Franklin Wesley Jr., without involving Chase Bank, who owned exclusive rights to the property's mortgage loan.

In 2018, the plaintiff, Wesley, and Chase Bank agreed to modify the mortgage loan, which added the plaintiff as another mortgagee. Thereafter, the defendant purchased the rights to the mortgage loan from Chase Bank. On June

26, 2020, Wesley died of complications from contracting Covid-19. After his death, the plaintiff lost access to the mortgage documents and the method(s) to forward a payment. She later discovered that the defendant did not have a record of the loan modification that she executed with Wesley and Chase Bank. In response, the plaintiff requested that the defendant modify the loan to add her as a mortgagee. Her request was denied by the defendant, but it informed her that she could "assume the loan" to avoid foreclosure. She agreed to complete the required tasks in order to successfully assume the loan and remained in telephone contact with the defendant while her application was pending. Unbeknownst to the plaintiff, however, the defendant subsequently began foreclosure proceedings on the property.

On or about June 28, 2022, the plaintiff filed an action against the defendant in the 334th District Court for Harris County, Texas, alleging violations of the Texas Debt Collection Act, the Texas Business and Commerce Code, and the Texas Property Code. In addition, she requested a declaratory judgment and a temporary restraining order to prevent the foreclosure sale that was scheduled to take place on July 5, 2022. On June 29th, the state court granted a temporary restraining order and scheduled a hearing to decide the matter on July 12, 2022. Eight days after the hearing, the defendant removed the case to this Court on diversity grounds, and approximately one month later, filed a motion to dismiss the plaintiff's case pursuant to Federal Rule of Civil Procedure 12(b)(6).

**III. LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(6) requires that a plaintiff plead facts sufficient to state a plausible cause of action. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). If a defendant believes a complaint is insufficient, he may move to dismiss an action for failure to state a claim upon which relief can be granted. In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the [nonmovant]." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). Even so, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

 *2  The court's review is limited to the complaint, any documents attached to the complaint, and any documents

USAP001

attached to the motion to dismiss that are central to the claim and referenced by the complaint. *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). When considering a 12(b)(6) motion to dismiss, the Court's task is limited to deciding whether the plaintiff is entitled to offer evidence in support of her claims, not whether the plaintiff will eventually prevail. *See Twombly*, 550 U.S. at 563 n.8 (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999). Lastly, a *pro se* plaintiff's pleadings "must be held to less stringent standards than formal pleadings drafted by lawyers." *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)).

## IV. ANALYSIS

The defendant filed its motion to dismiss more than 60 days ago, yet the plaintiff has not responded. Pursuant to this Court's local rules, responses to motions are due within 21 days unless the time is extended; hence a failure to respond may be taken as a representation of no opposition. S.D. Tex. L.R. 7.3–7.4. Notwithstanding the plaintiff's failure to file a response, the Court may not "automatic[ally] grant, upon failure to comply with such rules, [a] motion[ ] that [is] dispositive of the litigation." *See Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006) (internal quotation marks omitted) (quoting *John v. La.*, 757 F.2d 698, 709 (5th Cir. 1985)). Without "a clear record of delay or contumacious conduct," courts should consider "whether less

severe sanctions would suffice." *See Pettiford*, 442 F.3d at 919 (internal quotation marks omitted) (quoting *Ramsey v. Signal Delivery Svc.*, 631 F.2d 1210, 1214 (5th Cir. 2006)).

In this instance, the record is clear and undisputed that the plaintiff is in default. In its motion, the defendant contends that the case should be dismissed because Texas law does not require a defendant to produce an original promissory note or lien transfer documents prior to commencing a foreclosure. The plaintiff alleges, however, that the defendant is likely in possession of a document(s) that the defendant refuses to produce, which may prove that she was denied certain mortgagee rights prior to and during foreclosure proceedings. This is simply an assumption on the plaintiff's part and does not constitute evidence. Not only has the plaintiff failed to contest the motion to dismiss, she also has not provided any evidence to support her claims or to rebut the defendant's contentions. Accordingly, the plaintiff's cause of action fails.

## V. CONCLUSION

Based on the foregoing analysis and discussion, the defendant's motion to dismiss is **GRANTED**.

It is so **ORDERED**.

## All Citations

Not Reported in Fed. Supp., 2022 WL 16556810

---

     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

  © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Complete Entertainment Resources LLC v. Live Nation..., Not Reported in Fed....

2016-1 Trade Cases P 79,628

2016 WL 3457177

United States District Court, C.D. California.

COMPLETE ENTERTAINMENT RESOURCES LLC

v.

LIVE NATION ENTERTAINMENT, INC., et al.

Case No. CV 15-9814 DSF (AGRx)
|
Signed 05/11/2016

## Attorneys and Law Firms

Adam B. Wolfson, Kevin Y. Teruya, Frederick A. Lorig, Quinn Emanuel Urquhart and Sullivan LLP, Los Angeles, CA, for Complete Entertainment Resources LLC.

Daniel M. Wall, Timothy L. O'Mara, Andrew Michael Gass, Latham and Watkins LLP, San Francisco, CA, for Live Nation Entertainment, Inc., et al.

## MEMORANDUM

**Proceedings:** (In Chambers) Order GRANTING Defendants' Motion to Dismiss (Dkt. No. 23)

DALE S. FISCHER, United States District Judge

 **\*1** Defendant Live Nation Entertainment, Inc. acquired Ticketmaster Entertainment, Inc. in 2010. The statute of limitations to challenge a merger under section 7 of the Clayton Act is four years. Nonetheless, Plaintiff Complete Entertainment Resources LLC filed this case, which includes a claim challenging the initial merger under section 7, in late 2015. Defendants move to dismiss based on the statute of limitations.

Plaintiff makes two major, somewhat contradictory, arguments in opposition to the motion. First, it claims that the merger was just one part of an ongoing monopolization scheme and, thus, part of a continuing violation under section 2 of the Sherman Act. The Court rejects this argument for the same reasons it was rejected in Midwestern Mach. Co., Inc. v. Nw. Airlines, Inc., 392 F.3d 265 (8th Cir. 2004) and Z Technologies Corp. v. Lubrizol Corp., 753 F.3d 594 (6th Cir. 2014). Midwestern Mach. rejected the idea that acts taken after the consummation of a merger could extend the section

7 statute of limitations indefinitely on a continuing violation theory:

> Applying this rationale to mergers makes no sense. If the initial violation was the merger itself, none of the "continuing violations" Midwestern alleges can justify restarting the statute of limitations because these acts were not undertaken to further an illegal policy of merger or to maintain the merger. Otherwise, every business decision could qualify as a continuing violation to restart the statute of limitations as long as the firm continued to desire to be merged. Once the merger is completed, the plan to merge is completed, and no overt acts can be undertaken to further that plan.

Midwestern Mach., 392 F.3d at 271. Z Technologies applied the same basic logic to the strategy employed by Plaintiff here – an attempt to use "continuing violations" of section 2 of the Sherman Act as a backdoor around the Clayton Act statute of limitations for challenging a merger:

> Although it is true that the Sherman Act regulates a broader swath of conduct than the Clayton Act, the claim in the present case is for an acquisition-merger monopoly, which is the precise conduct governed by the Clayton Act. There is no reason to treat the same conduct differently in sister statutes that are designed to promote the same legislative objective. Moreover, the same statute – 15 U.S.C. § 15b – provides the statute of limitations for each. There is nothing in 15 U.S.C. § 15b that suggests it should be applied one way for merger-acquisition claims under the Sherman Act but differently for

USAP003

merger-acquisition claims under the Clayton Act.

[Z Technologies, 753 F.3d at 602-603](#).

The Court finds this reasoning persuasive. Section 7 of the Clayton Act is the mechanism for challenging a potentially anticompetitive merger. It has a statute of limitations. If a merger itself violates the antitrust laws, the merger must be challenged within the limitations period. It cannot be the case that if a merger leads to monopoly power then anything anticompetitive that the newfound monopolist does is a "continuing violation" that began with the merger, allowing the merger to be challenged indefinitely under section 2 of the Sherman Act.[1] If that were true, the statute of limitations for section 7 of the Clayton Act would be written out of the law.

[1]   Divestiture of assets can be a remedy for a section 2 violation. But an allegation that divestiture is needed to prevent a section 2 violation is different from a direct challenge to a previously consummated merger.

 **\*2**  Plaintiff's second theory under the "hold and use" or "new use" doctrine fares no better. The "hold and use" doctrine allegedly allows the Clayton Act statute of limitations to be restated "if assets are used in a different manner from the way that they were used when the initial acquisition occurred, and that new use injures the plaintiff." [Midwestern Mach., 392 F.3d at 273](#). The hold and use doctrine is not particularly well-developed and if interpreted too broadly could easily eviscerate the statute of limitations for section 7 of the Clayton Act. The Court is skeptical of the legitimacy of the hold and use doctrine in part for this reason. The Court can find no Ninth Circuit opinion adopting it and has found only two district court cases from within the Circuit that apply it, both relatively recently. See [Free Freehand Corp. v. Adobe Sys. Inc.](#), 852 F. Supp. 2d 1171, 1188-89 (N.D. Cal. 2012); [Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.](#), 2008 WL 4830740, \*6 (N.D. Cal. 2008). The theory stems from two Supreme Court decisions in government enforcement cases that did not even involve the statute of limitations for a private antitrust case. See [Concord Boat Corp. v. Brunswick Corp.](#), 207 F.3d 1039, 1050-51 (8th Cir. 2000) (citing [United States v. ITT Cont'l Baking Co.](#), 420 U.S. 223, 240 (1975) and [United States v. E.I. du Pont de Nemours & Co.](#), 353 U.S. 586, 589 (1957)). It is difficult to understand why a potentially much later act by an acquirer of assets should serve to restart the

statute of limitations for challenging the original acquisition of the assets. It makes much more sense to challenge the later anticompetitive act itself, rather than to couch the challenge as one against the merger or asset acquisition.

Every section 7 merger challenge is based on the concept that an acquiring firm will be able to do anticompetitive things after the acquisition that it could not have done prior to the acquisition. Section 7 bars any acquisition where "the effect of such acquisition *may be* substantially to lessen competition, or *to tend* to create a monopoly." [15 U.S.C. § 18](#) (emphasis added). In this light, it is obvious that the hold and use doctrine – to the degree that it is even valid at all – cannot be so broad that any change in operations at any time post-merger allows a long consummated merger to be challenged. The Court need not explore this issue in detail because whatever the precise contours of the doctrine, it does not apply to cases like this one where the complained of "new use" was, in fact, suspected and complained about prior to the merger. See also [Midwestern Mach., 392 F.3d at 273](#) ("Unlike [du Pont](#), it was clear at the time of the merger here that the combination ... could lessen competition."). Judicially noticeable documents show that public complaints were made about the Live Nation/Ticketmaster merger that are similar to the complaint in this case – preferential treatment for Live Nation/Ticketmaster artist presale ticketing services to the exclusion of competitors. See [United States v. Ticketmaster Entertainment, Inc.](#), CV 10-139 RMC (D.D.C.) (Dkt. No. 13-2 at 19). In fact, an extremely similar antitrust action filed years prior to the merger claimed that Ticketmaster was using its exclusive contracts with promoters – including Live Nation's predecessor – to reduce competition for artist presale ticketing services in basically the same way as alleged here. See Defs.' Suppl. Req. J. Notice, Ex. A.[2] So even if the details may have changed in some way, there is no plausible argument that Plaintiff's "new use" allegations are actually new.

[2]   Plaintiff's objection to judicial notice of this complaint misunderstands its relevance. The point is not the underlying truth of the allegations. The point is whether the kinds of conduct raised by Plaintiff in this case were understood as potentially anticompetitive behavior that could stem from the merger. That others had raised the possibility (or reality) of such conduct prior to the merger clearly shows that this type of conduct was understood to be a potential result of the merger at the time it happened. Cf. [Free Freehand Corp. v. Adobe](#)

USAP004

Sys. Inc., 852 F. Supp. 2d 1171, 1188-89 (N.D. Cal. 2012) (hold and use doctrine applied where acquirer engaged in act that it had explicitly disclaimed at time of merger).

**\*3** The motion to dismiss is GRANTED. In opposition, Plaintiff argues that it is also seeking to challenge certain purchases by Live Nation of live music festivals. The Court agrees with Defendants that these allegations are not clearly alleged in the complaint as it currently stands. Counsel are to meet and confer to discuss whether Defendants will stipulate to an amendment of the complaint to add an explicit challenge to the festival acquisitions. If not, Plaintiff should file a noticed motion for leave to amend.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3457177, 2016-1 Trade Cases P 79,628

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

USAP005

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

2002 WL 31164482

United States District Court, S.D. New York.

DRESSES FOR LESS, INC., DFL Management
Inc., the DFL Apparel Group, an unincorporated
association, Allison Che' Fashions, Inc., Bicci
Studio Ltd., Garden City Dresses for Less, Inc.,
Donald Weiner and Barbara Weiner, individually
and derivatively as a shareholder of Stella N. Bishop
Fashion Corp., and I.S.B. Fashions Corp., Plaintiffs,
v.
CIT GROUP/COMMERCIAL SERVICES, INC. and
THE UPTOWN CREDIT GROUP, INC., Defendants.

No. 01 CIV. 2669(WHP).
|
Sept. 30, 2002.

**Synopsis**
Garment manufacturers and related entities or their principles
brought action against domestic factor for garment industry,
alleging price-fixing and monopoly claims under the Sherman
Act and New York law Donnelly Act and common law
contract claims. Defendant moved to dismiss. The District
Court, Pauley, J., held that: (1) allegations supported group
boycott claims; (2) manufacturers failed to state price-fixing
claim against factor; (3) issues of fact regarding relevant
product market could not be resolved at motion to dismiss;
(4) allegations supported monopoly claims; (5) allegations
supported good faith and fair dealing contract claims against
factor; and (6) lack of contractual privity precluded certain
good faith and fair dealing contract claims.

Motion granted in part and denied in part.

**Attorneys and Law Firms**

Alexander H. Schmidt, Esq., Wolf Haldenstein Adler
Freeman & Herz LLP, New York, for Plaintiffs.

Robert A. Atkins, Esq., Paul, Weiss, Rifkind, Wharton &
Garrison, New York, for Defendant CIT Group/Commercial
Services, Inc.

Bernard Beitel, Esq., Otterbourg, Steindler, Houston &
Rosen, P.C. , New York, for Defendant CIT Group/
Commercial Services, Inc.

Harlan M. Lazarus, Esq., Larazus & Lazarus, P.C., New York,
for Defendant The Uptown Credit Group, Inc.

MEMORANDUM AND ORDER

PAULEY, District J.

 **\*1** Plaintiffs are garment manufacturers and related
entities or their principals. Defendant CIT Group/Commercial
Services, Inc. ("CIT") is the largest domestic factor for the
garment industry.

Plaintiffs assert that CIT and its predecessors conspired with
other factoring companies to deny credit to certain garment
manufacturers. Plaintiffs claim that the factors illegally
boycotted their businesses and unlawfully fixed prices in
violation of the Sherman Antitrust Act, 15 U.S.C. § 1
("Section 1"). Plaintiffs further allege that CIT, by merging
with or acquiring its competitors, obtained monopoly power
in the garment factoring industry, in violation of the Sherman
Antitrust Act, 15 U.S.C. § 2 ("Section 2"). Plaintiffs also
assert common law claims for breach of contractual good faith
and fair dealing and breach of fiduciary duty.

Defendants move to dismiss the amended complaint pursuant
to Rule 12(b) of the Federal Rules of Civil Procedure. For the
following reasons, defendants' motion is granted in part and
denied in part.

*Background*

Factoring is a business relationship in which companies
known as "factors" purchase at a discount other businesses'
rights to collect accounts receivable. The discount usually
ranges from approximately 0.5 to 0.9 percent of the
accounts. The factor then collects the accounts receivable.
(Am.Compl.¶¶ 38-39.)

Without the ability to quickly convert accounts receivable into
cash through factoring, a factor's clients could be exposed
to a liquidity crunch that would threaten their businesses.
When a factor purchases an account receivable, it assumes the
risk of collecting the receivable. (Am.Compl.¶ 39.) However,
a factor assumes that credit risk only after it has checked
whether its customer is selling to a creditworthy purchaser.
(Am.Compl.¶¶ 39, 42.) Moreover, factors like CIT may refuse
to credit check a client's purchaser for any reason, even if

USAP006

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

that customer is creditworthy. (Am.Compl.¶ 41.) Because a manufacturer usually cannot afford to risk sales that are not acceptable to the factor, the factor's credit check decision often determines whether a sale is made. (Am. Compl ¶ 39.)

In the garment industry, a factor's clients may include the "piece goods" vendors that manufacture raw materials such as fabric, buttons, trim and other accessories, or garment manufacturers who purchase materials from piece good vendors. (Am. Compl. ¶ 41; Transcript from Oral Argument dated Nov. 16, 2001 ("Tr."), at 3.) Thus, when a factor's clients include both a piece goods vendor and a garment manufacturer who purchases from the piece goods vendor, the factor faces credit checking a purchaser who is also its own client. (Am.Compl. ¶ 41.)

Accepting the allegations in the amended compliant as true, the facts are as follows. Plaintiffs Allison Che' Fashions, Inc., Bicci Studio Ltd. ("Bicci"), and I.S.B. Fashions Corp. ("ISB"), Stella N. Bishop Fashion Corp. ("Stella Bishop") are defunct clothing manufacturers. (Am.Compl.¶¶ 12-15.) They grossed sales of $30,206,570, 48,492,233, and 53,800,273 for the fiscal years ending June 1998, 1999, and 2000 respectively. (Am.Compl.¶ 16.) Each manufacturer used CIT, or its predecessor Congress Talcott Corporation ("Congress"), as their factor for some period between 1996 and 2000. (Am.Com pl.¶¶ 12-15, 24.) Dresses For Less, Inc. ("Dresses For Less") is a garment manufacturer that was denied credit by CIT. (Am.Compl.¶ 18, 245) (collectively, Bicci Studio, ISB, Stella Bishop, and Dresses for Less are referred to as the "DFL Apparel companies"). Dresses For Less guaranteed some of the DFL Apparel companies' debts to CIT. (Am.Compl.¶ 18.)

 *2 Plaintiff DFL Management Inc. operated the DFL Apparel companies. (Am.Compl.¶ 10.) Plaintiff DFL Apparel Group is an unincorporated business association comprised of the DFL Apparel companies, and previously included other manufacturers who are not parties to this litigation. (Am.Compl.¶ 11.) Plaintiffs Donald and Barbara Weiner are principals of the DFL Apparel companies and their related entities and also personally guaranteed several of the DFL Apparel companies' debts to CIT. The Weiners have lost approximately $2,600,000 in personal assets as a result of defaults. (Am.Compl.17.) Barbara Weiner owns fifty percent of ISB and forty-five percent of Stella Bishop. (Am.Compl.¶¶ 14-15.)

Plaintiff Garden City Dresses For Less ("GC Dresses For Less") leased property to DFL Apparel companies and lost more than $750,000 in annual rental income as a consequence of their defaults. (Am.Compl.¶ 19.)

CIT emerged as a dominant domestic factor after merging with its former competitors Congress and Heller Financial, Inc. in 1999 and 2000 respectively. (Am.Compl.¶ 28.) Those acquisitions caused CIT's market share in the factored retail garment industry to grow from nineteen to forty-one percent and its share of piece goods factoring to rise from fifty to ninety percent. (Am.Compl. ¶¶ 27, 60.) CIT factored approximately $26 billion of the entire domestic garment manufacturing industry. (Am.Compl.¶ 26.) CIT's largest competitor factors twenty-two percent of the market. (Am.Compl.¶ 26.)

Plaintiffs allege that CIT and several other factors formed an illegal cartel in 1924 and to this day operate as the single entity, currently known as defendant Uptown Credit Group, Inc. ("UCG"). (Am.Compl.¶¶ 25, 44.) Factors comprising the UCG include GMAC Commercial Credit LLC ("GMAC"), HSBC Business Credit (USA) Inc. ("HSBC"), the Receivable Capital Management Division of Sun Trust Banks, Inc. ("SunTrust"), Rosenthal & Rosenthal, Inc. ("Rosenthal"), Capital Factors, Inc. ("Capital"), Finova Capital Corp. ("Finova") and Sterling Factors Corp. ("Sterling") (Am.Compl.¶¶ 30-37.)

The UCG members account for approximately 80 to 85 percent of domestic garment manufacturer factoring. (Am.Compl.¶ 37.) Through acquisitions made between 1999 and 2001, including Finova, GMAC became the second largest factor in the industry with $14 billion in receivables purchased annually or twenty-two percent of the garment manufacturer factoring industry. (Am.Compl.¶ 30.) Finova previously factored $800 million, or 1.2 percent of the domestic garment manufacturing market. (Am.Compl.¶ 35.)

HSBC factors approximately $7 billion in annual receivables, or eleven percent of the industry. (Am.Compl.¶ 31.) Rosenthal controls 2.4 percent of the domestic garment manufacturing market with $1.5 billion in annual receivables. (Am.Compl.¶ 33.) Capital factors $800 million, or 1.2 percent, of the domestic garment manufacturing industry. (Am.Compl.¶ 34.) In recent years, Sterling also captured $800 million, or 1.2 percent, of the domestic garment manufacturer factoring industry. (Am. Compl. ¶ 36 .)

**\*3** Plaintiffs allege that the other factors have agreed with CIT that they will not credit check customers that CIT has refused to credit check even though they contracted to assume those customers' credit risks in factoring agreements. (Am.Compl.¶¶ 42, 54.) Plaintiffs also contend that CIT has refused to credit check customers due to its dislike of management or other reasons that are not related to their customers' creditworthiness. (Am. Compl. ¶ 41 .)

Once CIT refuses to credit check a sale from a piece goods vendor to a garment manufacturer, it stops checking every proposed sale to that manufacturer by any piece goods vendor. (Am.Comp.¶¶ 43, 49.) A manufacturer's inability to make credit purchases from a piece goods vendor will increase its costs, inhibit cash flow, and can within weeks disable the manufacturer's ability to fill existing orders from retailers. (Am.Compl.¶¶ 44, 53, 61.) Moreover, because CIT controls ninety percent of domestically factored piece goods vendors, other factors quickly realize that a manufacturer who is not being credit checked by CIT cannot obtain enough credit to purchase the materials it requires. (Am.Compl.¶¶ 43, 61, 62.) Realizing that economic urgency, the other factors will quickly follow CIT's lead and refuse to check credit. (Am.Compl.¶¶ 61, 62, 63.) In addition, through its dominance in the garment manufacturing market via control over the piece goods vendors, CIT can also discourage garment manufacturers from purchasing from specific piece goods vendors. (Am.Compl.¶ 63.)

Plaintiffs allege that over the past two decades, CIT and its fellow factors conducted two highly secretive meetings every week. (Am.Compl.¶ 44.) The first meeting, known as the "Uptown meeting" is conducted every Wednesday by conspiring factors' account officers; the second, known as the "credit manager's meeting," is conducted every Thursday by the factors' credit managers. (Am.Comp.¶ 46.) At those meetings, the factors share not only publicly available information about their clients' creditworthiness, but also highly confidential information about their clients, including whether and why they have stopped credit checking a particular client. (Am.Compl.¶¶ 48, 51.) Thus, the factors' collective decision not to credit check a certain manufacturer assures that none of them will incur a credit risk for a customer who might be creditworthy but potentially faces insolvency due to one factor's decision to deny further credit for any reason. (Am.Compl.¶ 50.)

Beginning in February 1997, Kenwin Shops Incorporated ("Kenwin"), a company controlled by Donald Weiner, was

defending a civil action by the Bank of Louisiana ("BOL") in the Eastern District of Louisiana. See *In re: Bank of Louisiana / Kenwin Shoes Inc.,* No. 97 Civ. 1193(MDL), 1998 Lexis 11680, at \*2 (E.D.La. July 27, 1998). That action resulted from Kenwin's failure to make payments to BOL in accord with their regular course of dealing. *Bank of Louisiana,* 1998 Lexis 11680, at \*3. "Kenwin was collecting and holding money paid by customers of Kenwin that was due to BOL under the Contract Agreement between them." *Bank of Louisiana,* 1998 Lexis 11680, at \*3. In the course of that litigation, D & A Funding Corporation, another company controlled by Donald Weiner, asserted that it had priority to the monies owed to BOL.

**\*4** Both parties filed motions for injunctive relief. In support of an application for a continuance on the motions, counsel for Kenwin represented that the claimed funds were sequestered precluding any harm to BOL. *Bank of Louisiana,* 1998 Lexis 11680, at \*3. After several months, the parties entered settlement discussions with the aid of the court to resolve their motions for injunctive relief. The parties stipulated that each would post a bond and thereafter voluntarily dismiss the motions. *Bank of Louisiana,* 1998 Lexis 11680, at \*6. In October 1997, Kenwin filed for Chapter 11 bankruptcy without informing BOL. *Bank of Louisiana,* 1998 Lexis 11680, at \*6. On November 3, 1997, Kenwin offered a draft bond to BOL, but eleven days later, Kenwin's counsel informed BOL that it would not file it. *Bank of Louisiana,* 1998 Lexis 11680, at \*7. At that time, the court first learned of Kenwin's bankruptcy petition. *Bank of Louisiana,* 1998 Lexis 11680, at \*8.

The court conducted a hearing regarding Weiner's apparent "material misrepresentations and omissions" regarding the sequestered funds and the timing of Kenwin's bankruptcy. *Bank of Louisiana,* 1998 Lexis 11680, at \*9. On July 27, 1998, the court sanctioned Donald Weiner after finding his testimony to be "disingenuous, obviously evasive and obfuscatory" and his memory to be "transparently convenient." *Bank of Louisiana,* 1998 Lexis 11680, at \*9.

The *Bank of Louisiana* decision, however, had no adverse impact on the creditworthiness of the DFL Apparel companies. (Am.Compl.¶ 57.) By late 1998, the DFL Apparel companies were generating net sales of approximately $10 million per month. (Am.Compl.¶ 56.) As of September 1998, DFL Apparel companies had never been denied credit. (Am.Compl.¶ 56.) Nevertheless, CIT ceased approving credit to each DFL Apparel company shortly after the issuance of

USAP008

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

the *Bank of Louisiana* opinion and advised its co-conspirator factors of its decision. (Am.Compl.¶ 57.) Each of the co-conspirator factors stopped credit checking DFL Apparel companies the next day. (Am.Compl.¶ 57.) Although CIT eventually continued to extend credit, the DFL Apparel companies suffered millions of dollars in lost sales in the interim. (Am. Compl. ¶ 57 .)

In addition to colluding with the other factors, plaintiffs further allege that CIT engaged in bad faith conduct throughout their relationship that damaged the manufacturing plaintiffs. Plaintiffs contend that starting in 1996, Donald Weiner advised CIT and numerous piece goods vendors orally and in writing that, as a condition to the guaranties of Donald Weiner, Barbara Weiner and Dresses for Less, no DFL Apparel company purchase order should be honored unless it bore his signature. (Am.Compl.¶ 69.) Despite expressly acknowledging that requirement in writing, CIT approved millions of dollars of sales to the DFL Apparel companies by CIT's factored piece goods vendors that were not supported by signed purchase orders. (Am.Compl.¶ 69.) As a result, the DFL Apparel companies suffered millions of dollars in losses and incurred millions in debt to CIT. (Am.Compl.¶ 69.)

 **\*5** Moreover, although CIT had separate factoring agreements with each DFL Apparel company, CIT treated them as if they were one company by penalizing every member when one company was delinquent on its payments. Thus, a DFL Apparel company with no credit or payment problems might nevertheless have its credit reduced or refused. (Am.Compl.¶ 70.) By treating the DFL Apparel Group as a single entity instead of several companies, CIT applied one "collective credit limit" to the entire group. Thus, if the group limit had been exceeded, CIT directed all DFL Apparel members to reduce their sales volumes and denied credit for piece goods purchases by DFL Apparel companies with remaining credit under their individual factoring agreements. (Am.Compl.¶ 71.)

At some time in 2000, CIT orchestrated a boycott where the factors ceased authorizing piece goods vendors to sell goods to Dresses For Less and DFL Apparel companies. (Am.Compl.¶ 73.) Between September 30, 2000 and January 31, 2001, the DFL Apparel companies went out of business. (Am.Compl.¶ 73.)

Plaintiffs also assert that before those failures, CIT compelled certain DFL Apparel companies to accept substantial "overadvances of credit" that bore higher interest charges

than normal advances. (Am Compl. ¶ 72.) Normally, a DFL Apparel company could obtain credit advances of up to 80 to 90 percent of the sales that it assigned to CIT. However, CIT had the discretion to extend overadvances for as much as 95 to 100 percent of assigned sales. (Am.Compl.¶ 72.) CIT regularly refused to approve credit for piece goods purchases by solvent DFL Apparel companies unless a fiscally unstable DFL company accepted an overadvance with a higher than normal interest rate and then applied the extra funds to debts it owed to piece goods vendors factored by CIT. (Am.Compl. ¶ 72.) As a result, the weaker DFL company could not purchase the piece goods and would face losing millions in sales or borrowing more at increased interest charges. (Am.Compl.¶ 72.)

Lastly, plaintiffs allege that CIT prolonged the failure of the DFL Apparel companies for several months in order to extract additional interest. (Am.Compl.¶ 75.) In June 2000, Donald Weiner discovered that CIT had approved several piece goods vendors' sales to DFL Apparel companies without first obtaining purchase orders signed by him. Concerned about his and other guarantors' exposure arising from the DFL Apparel companies' debts to CIT, Donald Weiner advised CIT that he was closing the DFL Apparel companies. (Am.Compl.¶ 75.) At that time, the DFL Apparel companies' inventories and accounts receivable exceeded their debts by 50 percent. (Am.Compl.¶ 75.) After receiving CIT's assurances that it would continue to finance and support the DFL Apparel companies, Weiner continued the businesses. (Am.Compl.¶ 75.) As a result, CIT received interest payments throughout 2000. Nevertheless, CIT stopped checking the DFL Apparel companies' credit causing them to fail. (Am.Compl.¶ 76.)

*Discussion*

I. *Motion to Dismiss Standards*

 **\*6** On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995).

There are no heightened pleading requirements for antitrust cases. *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001).

Further, dismissals of antitrust cases "prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Todd,* 275 F.3d at 198 (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). However, it is improper " 'to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." ' *Todd,* 275 F.3d at 198 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

### II. *Section One Violations*

Plaintiffs allege that CIT conspired with other factors to boycott credit checks of plaintiff companies in violation of Section One, and that their boycott resulted in the price fixing of piece goods also in violation of Section One. (Am.Compl.¶¶ 80, 86, 87.)

Section One prohibits all combinations and conspiracies that unreasonably restrain trade among the states. 15 U.S.C. § 1. To establish a Section One violation, a plaintiff must produce evidence sufficient to show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir.2001); *see also Tops Mkts., Inc., v. Quality Mkts. ., Inc.,* 142 F.3d 90, 96 (2d Cir.1998).

*Per se* illegal conduct is that which is so egregious as to constitute a violation of law without the necessity of showing an effect on competition. *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133-34, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Bogan,* 166 F.3d at 513. Among conduct falling within the *per se* rule are price fixing, territorial market division and certain group boycotts involving concerted refusals to deal. *NYNEX Corp.,* 525 U.S. at 133; *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 542-43 (2d Cir.1993). Only conduct that is "manifestly anticompetitive" is designated as per se illegal. Most cases do not fall within the *per se* category. *Bogan,* 166 F.3d at 514; *see also CDC Techs., Inc. v. IDEXX Laboratories, Inc.,* 186 F.3d 74, 79 (2d Cir.1999) (only a "handful" of practices are per se illegal); *National Camp Assoc., Inc. v. Am. Camping Assoc., Inc.,* No. 99 Civ. 11853(DLC), 2000 WL 1844764, at *5 (S.D.N.Y. Dec.15, 2000) (noting Supreme Court's refusal to extend the class of agreements to which a per se analysis applies).

*7 Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Application of this doctrine requires a plaintiff to prove not mere injury to plaintiff as a competitor but antitrust injury, i.e., actual damage to competition within the relevant market. *Capital Imaging,* 996 F.2d at 542-43. The injury to a relevant market requirement assures that the Sherman Act protects competition as a whole in the relevant market, and "not the individual competitors within that market, so that a plaintiff may succeed only when the loss he asserts derives from activities that have a 'competition-reducing" ' effect. *Tops Mkts., Inc.,* 142 F.3d at 96 (citing *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342-44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)).

A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. Such power is defined as the power to "raise prices significantly above the competitive level without losing all of one's business." *CDC Technologies,* 186 F.3d at 81 (quoting *Capital Imaging,* 996 F.2d at 546); *see also Primetime 24 Joint Venture v. Nat. Broad. Co., Inc.,* 219 F.3d 92, 103-04 (2d Cir.2000).

### III. *Group Boycott*

Plaintiffs allege group boycott conduct as *per se* and rule of reason violations. (Am.Comp.¶¶ 80, 86); *see AD/SAT v. Associated Press,* 181 F.3d 216, 232 (2d Cir.1999) (Section 1 group boycotting claim may be alleged as either a *per se* or rule of reason violation); *accord Bogan v. Hodgkins,* 166 F.3d 509, 514 (2d Cir.1999). [1] CIT contends that plaintiffs have not adequately pleaded a boycotting claim because the amended complaint fails to allege facts to support an inference of an agreement among the factors or that plaintiffs suffered an antitrust injury.

[1]   Although defendants have not argued that the alleged conspiracy cannot be considered illegal *per se,* plaintiffs contended at oral argument that any boycott of credit is *per se* illegal. (Tr. at 13.) However, this Court notes that not all horizontal group boycotts are *per se* illegal. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); *Bogan,* 166 F.3d at 514. "The scope of the *per se* rule against group boycotts is a recognized source of confusion in antitrust

law." *Bogan,* 166 F.3d at 514 (citation omitted). Moreover, the agreement alleged here does not reflect "the classic model of a group boycott-that is, a 'concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." ' *Bogan,* 166 F.3d at 514 (citing *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978)); *see also Capital Imaging,* 996 F.2d 537, 542 (2d Cir.1993) ("Conduct considered illegal *per se* is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination.").

### 1. *Existence of an Agreement*

CIT asserts that plaintiffs' conclusory allegations regarding a boycotting agreement among the several factors to cut off plaintiffs' credit are inadequate as a matter of law. (CIT's Mem. in Supp. at 6-7.) CIT further contends that inferring such an agreement would be nonsensical because it contradicts CIT's economic interests. (CIT's Mem. in Supp. at 9.)

"The plaintiff must do more than allege the existence of a conspiracy-it must allege some facts in support of the claim." *Floors-N-More, Inc. v. Freight Liquidators,* 142 F.Supp.2d 496, 501 (S.D.N.Y.2001); *see also Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972) ("[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal."); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 837 (S.D.N.Y.1988) (dismissing complaint which alleged that the defendants "conspired and contracted with [each other] ... to restrain trade").

**\*8** Here, plaintiffs allege that CIT and the other factors collectively decided whether to deny credit to a particular manufacturer. Plaintiffs contend that the factors' agreement regarding credit checks is evidenced by the factors' biweekly meetings and by the factors' unanimity in refusing to check the DFL Apparel companies' credit between September 2000 and January 2001. (Pls.' Mem. in Opp. at 5.)

Viewing the amended complaint liberally, plaintiffs have alleged sufficient facts to assert that the conspiring factors'

conduct was not simply parallel but was the product of collusion. *See Todd,* 275 F.3d at 198 (citations omitted) (finding that an inference of a horizontal price-fixing agreement could be drawn in the absence of direct "smoking gun" evidence "when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices. Information exchange is an example of a facilitating practice that can help support an inference of a price fixing agreement").

CIT further argues that the existence of an agreement among the factors cannot be inferred because plaintiffs' theory lacks any economic rationality. (CIT's Mem. in Supp. at 8.) Without great detail, plaintiffs allege that defendants' conspiracy sought to minimize their costs, stabilize prices, preserve market shares, and maintain monopoly power. (Am.Compl.¶ 47.) While, CIT acknowledges that refusing to check a purchaser can limit its own exposure, it argues that encouraging other factors also to deny credit to the DFL Apparel companies would only hasten their insolvencies preventing their continued payments to CIT. (CIT's Mem. in Supp. at 8.) Thus, CIT maintains that it lacks any incentive to collude with the other factors because the alleged conspiracy hurts its economic interests. (CIT's Mem. in Supp. at 8.)

Even if the scheme alleged was economically implausible, a conspiracy may nevertheless be proven "by strong direct or strong circumstantial evidence, [although] the implausibility of a scheme will reduce the range of inferences that may permissibly be drawn from ambiguous evidence." *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253 (2d Cir.1987) (citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Moreover, plaintiffs have proposed a reasonable economic motive for the conspiracy. Plaintiffs contend that by "weeding out" creditworthy albeit financially weaker companies, at the "slightest inkling" of their insolvency, CIT assured that it would recover fully by collecting from the guarantors. (Pls.' Mem. in Opp. at 7.) Plaintiffs further allege that the agreement to reduce credit risk stabilizes prices and the competing factors' market shares. (Am.Compl.¶ 64.) Whether any of these motives can be established and are served by the alleged conspiracy are factual questions.

### 2. *Antitrust Injury*

Section 4 of the Clayton Act provides that "any person who shall be injured ... by reason of anything forbidden in the antitrust laws may sue." 15 U.S.C. § 15(a). Despite this broad

language, plaintiffs must nevertheless demonstrate that they have suffered an "antitrust injury," and that they are otherwise proper plaintiffs to bring the action at issue. *Todd,* 275 F.3d at 213 ("An antitrust plaintiff must not only allege cognizable harm to [it]self, but an adverse effect on competition market wide.") (citing *Elecs. Communications Corp. v. Toshiba Am. Consumer Prods., Inc.,* 129 F.3d 240, 242 (2d Cir.1997)); *see also Volvo No. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 66 (2d Cir.1988).

**\*9**  An "antitrust injury" is an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Intellective v. Massachusetts Mut. Life Ins. Co.,* 190 F.Supp.2d 600, 609 (S.D.N.Y.2002).

To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging,* 996 F.2d at 543; *see also Brunswick Corp.,* 429 U.S. at 488 ("The antitrust laws ... were enacted for 'the protection of competition, not competitors.' ") (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Even when a *per se* violation of the antitrust laws occurs, a plaintiff is still required to demonstrate antitrust injury as an element of a successful claim. *See Atlantic Richfield Co.,* 495 U.S. at 341-45 (1990) ("[I]nsofar as the *per se* rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored."). As the Supreme Court explained, the antitrust injury requirement:

> ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs .... The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

*Atl. Richfield Co.,* 495 U.S. at 345.

CIT argues that the amended complaint lacks any factual allegations of anticompetitive behavior to support its "vague and conclusory" claims of "horizontal and vertical anticompetitive impacts." (CIT's Mem. in Supp. at 12.) However, the gravamen of plaintiffs' amended complaint is that CIT and the other factors agreed that once CIT refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well. By participating in the alleged conspiracy, CIT's co-conspirators protected their own market shares. (Am.Compl.¶ 47.) Moreover, if a co-conspirator abandoned the conspiracy and financed a garment manufacturer that CIT refused to credit check, CIT could nevertheless cripple that garment manufacturer through its alleged control of the piece goods vendors' purchases. (Am.Compl.¶ 63.) Thus, plaintiffs contend that CIT forged an agreement with its competitors that restricted the supply of factoring to garment manufacturers. That allegation sufficiently pleads injury to the garment manufacturing market. *Primetime 24 Joint Venture,* 219 F.3d at 102 (plaintiff "clearly alleged injury" to competition where it pleading that competitors had eliminated "potential price competition," restricted output, and diminished the quality of service to customers).

IV. *Price Fixing*

**\*10**  CIT argues that plaintiffs' claim of price fixing is inadequate because it lacks any allegation that the factors ever discussed, much less agreed on, any prices or terms for their factoring services. (CIT's Mem. in Supp. at 11.) Plaintiffs respond that the conduct alleged in their boycotting claim

USAP012

resulted in illegal price-fixing *per se.* (Pls.' Mem. in Opp. at 11.)

A horizontal price fixing conspiracy is a *per se* unreasonable restraint of trade. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 ("Under the Sherman Act, a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*").

 While the alleged conspiracy in this case was the product of a horizontal agreement, it was not a price fixing agreement. Plaintiffs argue that the factors' denial of credit is analogous to the facts of *Catalano v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). In *Catalano,* beer wholesalers agreed not to extend credit to any retailers and to sell their product only when they received payment in advance or on delivery. *Catalano,* 446 U.S. at 644. The Court held that

> [i]t is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. Thus, credit terms must be characterized as an inseparable part of price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing.

*Catalano,* 446 U.S. at 648. However, unlike *Catalano,* plaintiffs do not allege that CIT and its co-conspirators terminated the practice of providing credits to their customers. Instead, plaintiffs claim that defendants singled out the DFL Apparel companies in denying their credit.

Moreover, the amended complaint states that the factors entered the agreement to assure that "none of conspiring factors [would] incur a credit risk for a customer that appears to be worthy of credit but whose ability to remain in business is [threatened] by a competing factor's decision to deny credit." (Am.Compl. ¶ 54.) From that allegation, plaintiffs add

in conclusory fashion that the denial of credit also served to stabilize the factors' prices due to the uniform reduction of credit risk. However, at no time do they state how the market-wide denial of credit to specific companies affected market prices. In addition, as noted by CIT, there is no allegation that the factors ever discussed "any prices or terms for their factoring services-*e.g.,* interest rates, payment terms, credit limits or any aspects of the 'price' of the services." (CIT's Mem. in Supp. at 11.)

Plaintiffs' amended complaint fails to allege facts to state a claim for price fixing. Accordingly, plaintiffs' price fixing claim is dismissed.

## V. *Monopolization*

**\*11** Section 2 of the Sherman Act prohibits persons from combining or conspiring to monopolize trade or commerce among the several States ...." 15 U.S.C. § 2; *see also AD/SAT,* 181 F.3d at 232. To state a claim under Section 2, a plaintiff must plead two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power is defined "as the power to control prices in the relevant market or to exclude competitors." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596, n. 20, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). CIT argues that plaintiffs have failed to allege a relevant product market or that CIT abused its monopoly power. [2]

> [2]
> CIT also alleged that plaintiffs Section 2 claims should be dismissed because they failed to allege an antitrust injury. As discussed above, plaintiffs have sufficiently pleaded an antitrust injury at this stage.

### 1. *Relevant Market*

"A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* No. 00 Civ. 5663(MBM), 2001 WL 1468168 (S.D.N.Y. Nov.19, 2001) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)). Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. *Todd,* 275 F.3d at 199; *see also Hayden Publ'g Co. v. Cox Broad. Corp.,* 730 F.2d 64,

USAP013

70 n. 8 (2d Cir.1984) ("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unexpected. It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact ....' ").

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd,* 275 F.3d at 199 (internal citations omitted); *accord Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 86 (2d Cir.2000); *see also Yellow Page Solutions,* 2001 WL 1468168, at *12. "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way ." *Todd,* 275 F.3d at 199.

Here, the relevant markets alleged are factoring in the domestic garment manufacturing industry and factoring in the domestic piece goods industry. (Am.Compl.¶ 65.) Moreover, plaintiffs distinguish factoring from other forms of credit financing on the ground that factors "bear any and all losses stemming from [their] customers' insolvency or other financial inability to pay for goods that are sold and shipped by the client." (Am.Compl.¶ 39.) Whether that market definition is appropriate for plaintiffs' antitrust claim is a fact-intensive inquiry that cannot be resolved at this juncture.

### 2. Abuse of Monopoly Power

**\*12** Possession of monopoly power does not violate Section 2 of the Sherman Act. Plaintiffs must demonstrate that defendants abused their market power in either its acquisition or maintenance. *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979) ("defendant must refrain from conduct directed at smothering competition."); *see also Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 376-77 (7th Cir.1986) (Posner, J.). A Section 2 monopolization claim requires an allegation that defendants willfully acquired or maintained monopoly power, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *see also Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.,* 922 F.2d

1319, 1322 (7th Cir.1999) (citing *United States v. Aluminum Co. of Am.,* 148 F.2d 416 (2d Cir.1945)) (monopolization by improper methods usually involves repelling or intimidating new entrants into a market through predatory pricing). To demonstrate attempted monopolization, plaintiffs must prove that defendant engaged in predatory or anticompetitive conduct with a specific intent to monopolize and a dangerous possibility of achieving monopoly power. *Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Anticompetitive conduct is "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Covad Comms. Co. v. BellSouth Corp.,* No. 01-16064, 2002 WL 1777009 (11th Cir. Aug.2, 2002). Both monopolization and attempted monopolization claims require anticompetitive behavior by the defendant. *Invamed Inc. v. Barr Labs., Inc.,* 22 F.Supp.2d 210, 218 (S.D.N.Y.1998).

CIT contends that plaintiffs allege no abuse of market power because their one allegation, "that [CIT] decided to stop credit checking the manufacturing plaintiffs," was not anticompetitive conduct. (CIT's Mem. in Supp. at 17.) However, CIT construes plaintiffs' claim too narrowly.

Plaintiffs assert that CIT increased its market share of domestic piece goods manufacturing to 90 percent through the acquisition of several competitors, giving it a "near stranglehold on garment manufacturers" because its unilateral decisions equate to "blacklisting a manufacturer among factors." (Pls.' Mem. in Supp. at 15-16.) Thus, plaintiffs adequately plead CIT's market power in the piece goods factoring market. *Moore U.S.A., Inc. v. Standard Register Co.,* 139 F.Supp.2d 348, 364 (W.D.N.Y.2001) (alleging market share that SRC alleges in this action: 65 percent) (citing *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980)).

Plaintiffs further contend that CIT engaged in anticompetitive behavior through its aggressive mergers. However, "the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality." IV Phillip E. Areeda et al., *Antitrust Law* ¶ 901a (1998) (hereinafter "Areeda"); *see also* Irving Scher, *Antitrust Adviser* § 3.61 at 3-167 (4th ed.2001) (horizontal mergers are much more likely to be procompetitive than anticompetitive.). "Competing firms typically merge for reasons entirely unrelated to effects on marketwide output or price-for example, to achieve economies of scale or integration, to put inefficiently run assets into the hands

of superior management, to resolve management succession for an individually owned enterprise, or for tax or other reasons." Areeda ¶ 901a. Plaintiffs also assert that CIT's alleged illegal boycotts constitute anticompetitive behavior to plead a monopolization claim.

**\*13** As stated above, plaintiffs allege that through its control of the piece goods market, CIT influenced other factors to deny credit checks, and therefore financing, to garment manufacturers that could have been financed under normal market conditions. Thus, CIT, through its control of piece goods factoring, discouraged other factors from their participation in factoring for the garment industry. *See, e.g., United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (Sections 1 and 2 "overlap" in the sense that a monopoly under section 2 is a "species of restraint" under section 1.). That contention sufficiently alleges anticompetitive conduct to support plaintiffs' Section 2 claim. Accordingly, CIT's motion to dismiss plaintiffs' Section 2 monopolization claim is denied.

## VI. *Standing*

### 1. *Antitrust Claims*

CIT moves to dismiss plaintiffs Donald and Barabra Weiner, Dresses for Less, Inc., Garden City Dresses for Less, Inc., and DFL Management for lack of standing because their injuries are "merely derivative" and do not constitute an antitrust injury. (CIT's Mem. in Supp. at 19.) As stated above, an antitrust plaintiff's injury must be the kind of injury at which the antitrust laws were directed. *Brunswick Corp.,* 429 U.S. at 489. Thus, "[m]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing." *G.K.A. Beverage Corp. v.. Honickman,* 55 F.3d 762, 766 (2d Cir.1995) (citing *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1378 (7th Cir.1987)). "It follows naturally that a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing." *G.K.A. Beverage Corp.,* 55 F.3d at 766-67 (8th Cir.1992) (denying antitrust standing where sole shareholder's injury stemmed from failure of corporation)); *accord Lovett v. Gen. Motors Corp.,* 975 F.2d 518, 520 (8th Cir.1992) (dismissing car dealership owner's antitrust claims because he was not the target of anticompetitive conduct but rather suffered a consequential injury). This prerequisite necessitates that the injured party be a participant in the same market as the alleged malefactors. *Automated Salvage Transport, Inc. v. Wheelabrator Env't Sys., Inc.,* 155 F.3d 59, 78 (2d Cir.1998) (quoting *Bhan v. NME Hosps., Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985); *see also Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 989 (9th Cir.2000) ("Antitrust injury requires that the 'injured party be a participant in the same market as the alleged malefactors.' '); *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (denying antitrust standing to party that was "neither a consumer nor a competitor in the market in which trade was restrained").

**\*14** The DFL Apparel companies participate in the factoring market as consumers and therefore, their injury is a direct consequence of the alleged antitrust violations. However, the injuries suffered by Donald and Barbara Weiner, Garden City Dresses for Less, Inc., and DFL Management as a result of the alleged antitrust violations are entirely derivative of the direct antitrust injury suffered by the DFL Apparel companies. Accordingly, CIT's motion to dismiss the antitrust claims asserted by Donald and Barabra Weiner, Dresses for Less, Inc., Garden City Dresses for Less, Inc., and DFL Management for lack of standing is granted.

### 2. *Shareholder Derivative Claims*

CIT contends that Barbara Weiner's derivative shareholder claims asserted on behalf of ISB and Stella Bishop should be dismissed because she has failed to allege the reason that she did not secure initiation of those claims with the boards of those companies. (CIT's Mem. in Supp. at 19.)

The amended complaint states that Barbara Weiner owns a 50 percent stake in ISB and a 45 percent of Stella Bishop. (Am.Compl.¶¶ 20, 22.) Plaintiffs allege that ISB's other 50 percent shareholder refused to consent to this lawsuit, and that Stella Bishop's other 45 percent [3] shareholder "would plainly never consent [to this action]" because he and the Weiners are involved in several bitter lawsuits. (Am.Compl.¶ 23.) In addition, Stella Bishop's other 45 percent shareholder owns companies that are currently being factored by CIT. (Am.Compl.¶ 24.)

[3]    The remaining 10 percent of Stella Bishop is owned by a third shareholder. Any dissenting shareholder of Stella Bishop could block a corporate action

because its by-laws require unanimous shareholder consent for corporate actions. (Am.Compl.¶ 22.)

When a shareholder brings a derivative lawsuit, her complaint must set forth either the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort. *See* Fed. R. Civ. Proc. 23.1; Business Corporation Law § 626(c). "[W]here the directors and controlling shareholders are antagonistic, adversely interested, or involved in the transaction attracted, a demand on them is presumptively futile and need not be made. *Cathedral Estates v. Taft Realty Corp.,* 228 F.2d 85, 88 (2d Cir.1955); *see also Galef v. Alexander,* 615 F.2d 51 (2d Cir.1980); *General Elec. Co. v. Bucyrus-Erie Co.,* 563 F.Supp. 970, 974 (S.D.N.Y.1983).

The amended complaint's allegations regarding ISB's other shareholder's refusal to consent and the animosity between Stella Bishop's major shareholders sufficiently plead that demand would be futile. Accordingly, CIT's motion to dismiss the shareholder derivative claims is denied.

3. *DFL Apparel Group*

 CIT asserts that the DFL Apparel Group has no standing to sue on behalf of the companies it represents. An association may assert the rights of its members under the doctrine of associational standing. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343-45, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *accord Irish Lesbian and Gay Org. v. Guiliani,* 143 F.3d 638, 649 (2d Cir.1998). To bring suit on behalf of its membership, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt,* 432 U.S at 343; *see Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 596 (2d Cir.1993) (applying *Hunt* test).

 **\*15** An organization lacks standing to sue for money damages on behalf of its members if the damages "are not common to the entire membership, nor shared by all in equal degree," so that "the fact and extent of injury require[s] individualized proof." *Warth v. Seldin,* 422 U.S. 490, 515-16, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *accord Sun City Taxpayers' Ass'n v. Citizens Utils. Co.,* 45 F.3d 58, 61 (2d Cir.1995).

DFL Apparel fails the third prong of the *Hunt* test. Recovery in this case would require individualized proof by each of the companies affected by CIT's alleged anticompetitive behavior. Accordingly, CIT's motion to dismiss DFL Apparel as a plaintiff is granted.

VII. *State Law Claims*

 1. *Donnelly Act Claims*

CIT moves to dismiss plaintiffs' Donnelly Act claims on the same grounds that it moved to dismiss the Sherman Act claims. The Donnelly Act, N.Y. Gen. Bus. Law § 340, prescribes that "[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. N.Y. Gen. Bus. Law § 340(1). "The Act was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act." *Yankees Entertainment and Sports Network, LLC v. Cablevision Systems Corp.,* No. 02 Civ. 3242(DAB), 2002 WL 31010490, at \*14 (S.D.N.Y. Sept.4, 2002) (citing *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976)); *accord Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton,* 997 F.Supp. 340 (E.D.N.Y.1998) (finding Donnelly Act is modeled after the Sherman Antitrust Act and is generally interpreted in accordance with federal precedent); *Anheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988) (Donnelly Act was modeled on the Sherman Act and is to be construed in accord with it). Thus, CIT's motion to dismiss the Donnelly Act claims is granted in part and denied in part in accord with this Court's rulings set forth above.

 2. *Contractual Good Faith and Fair Dealing*

Plaintiffs contend that CIT breached its duty of good faith when it deliberately inflated the DFL Apparel companies' debts by authorizing piece goods vendors to ship unordered merchandise to those companies. (Am.Compl.¶ 69.) Plaintiffs further contend that CIT breached its duty of good faith when it refused to credit check one DFL Apparel company because a separate DFL Apparel company was in arrears (Am.Compl.¶ 70); enforced a combined credit limit for the DFL Apparel companies instead of a separate limit for each company (Am.Compl.¶ 71); coerced the DFL Apparel companies to accept excessive advances on its credit bearing higher interest charges and fees (Am.Compl.¶ 72); orchestrated the group boycotts that cut off the DFL Apparel

USAP016

companies' credit (Am.Compl.¶ 73); and induced the DFL Apparel companies to stay in business after June 2000 by falsely promising that it would continue to finance the companies (Am.Compl.¶¶ 74-75).

**\*16** Under New York law, every contract contains an implied covenant of good faith and fair dealing. *Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 684, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *see also* Restatement (Second) of Contracts § 205 comment a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party ....").

With respect to plaintiffs' claim regarding the precondition of Donald Weiner's signature on purchase orders, factual issues exist including whether Weiner and CIT had a guarantee agreement giving rise to an obligation of good faith dealing and whether his signature was a condition of that agreement. At this stage, however, plaintiffs have sufficiently alleged breach of good faith dealing with respect to the unauthorized shipments approved by CIT. Accordingly, CIT's motion to dismiss the good faith and fair dealing claims of the amended complaint is denied.

With respect to the remainder of the good faith claims, however, those allegations concern CIT's extension or refusal of credit to DFL Apparel companies. The factoring agreements ran between CIT and a piece goods vendor. Thus, the lack of contractual privity between CIT and the DFL Apparel companies precludes any good faith claim. In addition, plaintiffs further concede that CIT's agreements with the piece goods vendors permitted them to refuse credit checks for any reason or no reason at all. Thus, plaintiffs cannot claim that CIT failed to perform those contracts in good faith.

### 3. *Breach of Fiduciary Duty*

Plaintiffs argue that CIT breached a fiduciary duty when it advised Donald Weiner that it would continue to extend him credit and failed to do so. (Pls. Mem. in Opp. at 23.) To state a claim for aiding and abetting a breach of fiduciary duty under New York law, plaintiffs must allege (1) a breach by a fiduciary of obligations to another, and (2) that the defendant knowingly induced or participated in the breach. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000). The existence of a fiduciary duty is often "a fact-specific inquiry reserved for a jury." *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.,* No. 00

Civ. 8688(WHP), 2002 WL 362794, \*9 (S.D.N.Y. Mar.6, 2002). Under New York Law, " 'a fiduciary relationship exists from the assumption of control and responsibility, and is founded upon trust reposed by one party in integrity and fidelity of another .' ' *Deleu v. Scaife,* 775 F.Supp. 712, 715 (S.D.N.Y.1991) (quoting *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 772 (S.D.N.Y.1985)); *see also* Restatement (Second) of Torts § 874 cmt. a (1977) (fiduciary relationship exists "when one [party] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation"). Moreover, fiduciary relationships can arise when a party "trusts or relies on another or where confidence is based on prior business dealings." *Olshansky v. Sutton,* No. 00 Civ. 3539(LAP), 2001 WL 99857, at \*5 (S.D.N.Y. Feb.6, 2001). Claims alleging the existence of a fiduciary duty are usually not subject to dismissal in a 12(b)(6) motion. *Olshansky,* 2001 WL 99857, at \*5.

**\*17** Given the factually intensive nature of a fiduciary duty inquiry, CIT's opposition to plaintiffs' fiduciary claim is better addressed on summary judgment. Accordingly, CIT's motion to dismiss the breach of fiduciary duty claim is denied.

### VIII. *Uptown Credit Group's Motion To Dismiss*

In the amended complaint's first, second and fourth causes of action, plaintiffs allege that UCG violated Section 1 of the Sherman act and the Donnelly Act by participating in the agreement to deny credit to the DFL Apparel companies.

In addition to joining CIT's 12(b) motions, UCG moves to dismiss those causes of action on the ground that plaintiffs have not sufficiently alleged facts that tie UCG to the factoring conspiracy. (UCG's Mem. in Supp. at 5-6.) Plaintiffs allege that CIT combined with its co-conspirators to act as a cartel under the auspices of the UCG. (Am.Compl.¶¶ 4-5.) Through the UCG, the conspirators assured that the DFL Apparel companies would not be extended credit on purchases from piece goods vendors. (Am.Compl.¶ 48.) Those allegations adequately allege that UCG participated in the antitrust violations. *See* 15 U.S.C. § 1 (liable persons may include associations); *Hydrolevel Corp. v. Am. Soc. of Mech. Eng'rs, Inc.,* 635 F.2d 118, 126 (2d Cir.1980) ("It is difficult to see how a trade association should be treated any differently than a business competitor, especially when it is the association's standing and influence that makes the conspiracy effective and possible. In a variety of contexts, [associations] are obligated to take suitable precautions to avoid antitrust violations."); *Vandervelde v.*

*Put & Call Brokers & Dealers Ass'n,* 344 F.Supp. 118, *155 (S.D.N.Y.1972) (an association found liable "as an independent legal entity"). Accordingly, UCG's motion to dismiss the amended complaint is denied.

### Conclusion

For the reasons set forth above, CIT's motion to dismiss the first cause of action is granted with respect to plaintiffs' price fixing claim and denied with respect to the boycotting claim.

CIT's motions to dismiss the second, third, fourth, fifth, and sixth causes of action are denied. UCG's motion to dismiss is also denied.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 31164482, 2002-2 Trade Cases P 73,828

---

**End of Document**          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**USAP018**

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

2016 WL 1640465
United States District Court, N.D. California.

Colleen EASTMAN, et al., Plaintiffs,

v.

QUEST DIAGNOSTICS INCORPORATED, Defendant.

Case No. 15-cv-00415-WHO
|
Signed 04/26/2016

**Attorneys and Law Firms**

Robert Stephen Berry, Berry Law PLLC, Washington, DC, Colleen Duffy-Smith, Morgan Tidalgo Sukhodrev & Azzolino LLP, San Jose, CA, J. Ross Wallin, Silvia Noemi Ostrower, Grais and Ellsworth LLP, New York, NY, for Plaintiffs.

Allison Winifred Reimann, Richard Raskin, Sidley Austin LLP, Chicago, IL, Ryan M. Sandrock, Sidley Austin, LLP, San Francisco, CA, for Defendant.

**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 69

WILLIAM H. ORRICK, United States District Judge

**INTRODUCTION**

 **\*1** This is the third time I have addressed plaintiffs Colleen Eastman, Christi Cruz, and Carmen Mendez's claims against Quest Diagnostics Incorporated ("Quest"), a provider of clinical laboratory testing services. Plaintiffs accuse Quest of monopoly overpricing in violation of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law, and seek to represent a class defined as

> health plans and outpatients residing in Northern California who have paid Quest directly for routine diagnostic testing on or after January 29, 2011...under plan/outpatient billing [1] arrangements where the payment to

Quest was not entirely comprised of a fixed, per-visit copayment amount, but depended at least in part on the total amount due Quest.

Second Amended Complaint ¶ 61 ("SAC"). I previously dismissed plaintiffs' original and first amended complaints for failure to state a claim, and the SAC recycles many of their unsuccessful claims. They also assert new "tying" claims, but there are no plausible allegations indicating either that the products are tied or that medical providers are coerced. For the reasons discussed below, and in my prior orders in this case, Quest's motion to dismiss is GRANTED.

[1] Plaintiffs define "plain/outpatient billing" as "routine diagnostic testing for which a private health insurance plan, the State of California, or an outpatient has paid a fee directly to Quest." SAC ¶ 61.

**BACKGROUND**

**I. ORIGINAL COMPLAINT**

Plaintiffs filed this action on January 29, 2015. Dkt. No. 1 ("Compl."). Their original complaint brought claims under section 2 of the Sherman Act, the Cartwright Act, the Unfair Competition Law ("UCL"), and the below-cost and loss-leader sales provisions of California's Unfair Practices Act ("UPA"). *Id.*

Quest moved to dismiss, and, following briefing and oral argument, I issued an order on June 9, 2015 dismissing the original complaint with leave to amend. Dkt. No. 42 ("First Dismissal Order"). I found that plaintiffs had not established either Article III or antitrust standing because they had not alleged facts plausibly demonstrating that they had been harmed by Quest's alleged anticompetitive conduct. First Dismissal Order at 3-5. Further, plaintiffs could not bring claims on behalf of health plans because they had not alleged facts plausibly establishing that they and health plans had suffered identical harms. *Id.* at 5-6.

I also addressed and rejected each of plaintiffs' theories of liability. The original complaint alleged that Quest competes in two markets for routine diagnostic testing in Northern California: (1) the plan/outpatient market and (2) the physician billing market. Compl. ¶¶ 3-4; *see also* First

USAP019

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

Dismissal Order at 6. Plaintiffs alleged that Quest has monopolized the plan/outpatient market and has thus "been able to charge above-competitive prices to [class members] while providing inferior quality service." Compl. ¶ 20. They asserted that Quest has done this through the use of three exclusionary practices:

 **\*2**  (1) "pa[ying] kickbacks to medical providers...in the relevant market for physician billing to induce them to refer all other routine diagnostic testing done in the relevant market for plan/outpatient billing to Quest exclusively regardless of Quest's pricing or its testing quality."

(2) "collud[ing] with two major private health insurers [ – i.e., Aetna, Inc. and Blue Shield of California – ] to suppress its competition in the relevant market for plan/outpatient billing."

(3) "acquir[ing] its competitors for plan/outpatient billing in order to eliminate their competition."

*Id.*; *see also* First Dismissal Order at 6. [2]

[2]   Each of these alleged exclusionary practices was also previously raised in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847 (N.D. Cal. filed July 10, 2012), a related case brought against Quest by a group of competing laboratories alleging monopolization claims similar to those at issue here. Judge Tigar dismissed the plaintiffs' section 2 claims with leave to amend in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-JST, 2013 WL 3242245, *13-15 (N.D. Cal. June 25, 2013) ("*Rheumatology I*"). After the matter was transferred to me, I dismissed the section 2 claims with leave to amend a second time in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2013 WL 5694452, *14-16 (N.D. Cal. Oct. 18, 2013) ("*Rheumatology II*"). The plaintiffs did not allege section 2 claims in their second amended complaint, although I discussed certain aspects of their collusion theory in dismissing the second amended complaint's cause of action for violations of section 1 of the Sherman Act. *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2014 WL 524076, at *10-14 (N.D. Cal. Feb. 6, 2014) ("*Rheumatology III*").

I held that none of these theories, as alleged in the original complaint, could support plaintiffs' monopolization claims. The kickback/leveraging theory failed because plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers resulted in Quest charging above-competitive prices in the plan/outpatient market. First Dismissal Order at 8-10. The collusion theory failed because plaintiffs had not shown that the three competitors that were allegedly eliminated as a result of Quest's agreements with Aetna and Blue Shield – i.e., Hunter Laboratories, Inc. ("Hunter"), Western Health Sciences Medical Laboratory ("Western Health"), and Westcliff Medical Laboratories ("Westcliff") – constituted a substantial share of the relevant market. *Id.* at 10-11. The acquisition theory failed because plaintiffs' allegations did not provide any reason to doubt the FTC's conclusion that, following the divestitures, Quest's acquisition of Unilab in 2003 would leave competition in Northern California "virtually unchanged." *Id.* at 11-12. Further, Quest's acquisition of Dignity Health in 2013 allegedly increased Quest's market share by a mere three percent – a "relatively insubstantial" amount that was not enough to raise concern under the antitrust laws. *Id.*

The allegations in support of the below-cost and loss-leader pricing claims under the UPA were insufficient because plaintiffs had not pleaded the prices and costs for the relevant testing services, and the UCL claims failed as derivative of the monopolization and UPA claims. *Id.* at 12-14.

## II. FIRST AMENDED COMPLAINT

 **\*3**  Plaintiffs filed their first amended complaint on July 6, 2015. Dkt. No. 46 ("FAC"). Like the original complaint, the FAC brought claims under section 2 of the Sherman Act, the Cartwright Act, plus derivative claims under the UCL. FAC ¶¶ 166-84. It dropped the below-cost and loss-leader pricing claims. *Id.*

The FAC identified the same two Northern California markets as the original complaint (the plan/outpatient market and the physician billing market) and the same three exclusionary practices in the plan/outpatient market (the kickback/leveraging theory, the collusion theory, and the acquisition theory). *See, e.g., id.* ¶¶ 3-4, 20. Its most significant additions were to its allegations regarding monopoly overpricing and the named plaintiffs' individual experiences purchasing testing from Quest. Specifically, the FAC included pricing data compiled by the Truven Corporation ("Truven") for routine diagnostic testing performed in Northern California and in five other regions around the United States (New

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

York City, Portland, Seattle, Tampa, and Southern California). *See, e.g., id.* ¶ 140. It also included allegations regarding the named plaintiffs' respective health insurance providers and their payments to Quest for testing. *See, e.g., id.* ¶¶ 129-31. In addition, with respect to their acquisition theory, plaintiffs identified a third acquisition, this one of Berkeley HeartLab in 2011, which allegedly added another 4.6 percent to Quest's market share in the plan/outpatient market. *Id.* ¶ 67.

On November 25, 2015, I issued an order granting Quest's motion to dismiss the FAC. Dkt. No. 59 ("Second Dismissal Order"). I held that each of plaintiffs' three theories of liability failed for essentially the same reasons as before. *See* Second Dismissal Order at 10-23. Plaintiffs still had not adequately alleged the monopoly overpricing necessary to support their kickback/leveraging theory. *Id.* at 11-16. They still had not alleged sufficient facts showing that Quest's alleged agreements with Aetna and Blue Shield have foreclosed competition in a substantial share of the plan/outpatient market. *Id.* at 16-20. And they still had not alleged facts plausibly indicating that Quest's acquisitions have unreasonably restricted competition. *Id.* at 20-23. I dismissed the FAC with leave to amend. *Id.* at 23.

Plaintiffs appealed the Second Dismissal Order to the Ninth Circuit but voluntarily dismissed the appeal on December 23, 2015, within two weeks of filing it, after the Ninth Circuit noted that its jurisdiction over the appeal was questionable. Dkt. Nos. 60, 63. Plaintiffs then returned to this Court and renewed their request for pre-complaint discovery of Quest's fee-for-service test pricing. Dkt. No. 62. They sought fee-for-service test pricing for the years 2013 and 2015 for six geographic areas (Northern California, Southern California, New York, Portland, Seattle, and Tampa) and for twenty-one different routine diagnostic testing codes. *Id.* at 2.[3] I denied the request. Dkt. No. 65.

[3] Plaintiffs made a similar request shortly after I issued the First Dismissal Order. Dkt. No. 43. I also denied that request. Dkt. No. 45.

## III. SECOND AMENDED COMPLAINT

Plaintiffs filed the SAC on January 13, 2016. Dkt. No. 66. Their new allegations are largely identical to those in the original complaint and the FAC, but there are some material differences.

**\*4** Most significantly, plaintiffs now identify four, instead of three, exclusionary practices. *See, e.g.,* SAC ¶ 85. They continue to allege the collusion theory (regarding Quest's alleged exclusive dealing arrangements with Aetna and Blue Shield) and the acquisition theory (regarding Quest's acquisitions of Unilab, Berkeley HeartLab, and Dignity Health). But they have repackaged the alleged misconduct underlying the kickback/leveraging theory into two separate, but very similar, alleged exclusionary practices. *See id.* ¶¶ 105-21. The first accuses Quest of illegal tying, on the theory that Quest "sells to medical providers capitated testing in the physician billing market at very low rates (often below its costs) on the condition that they also purchase [its] fee-for-service testing sold in the separate plan/outpatient market." *Id.* ¶ 105. The second accuses Quest of "exclud[ing] competition throughout the plan/outpatient market with economic arrangements with medical providers which constitute exclusive dealing practices." *Id.* ¶ 115. Plaintiffs assert that Quest

> enters into express exclusive dealing contracts with medical providers where they receive capitated testing at very low rates often below Quest's costs. In return for these rates it obtains exclusivity commitments from the providers under which they send all or nearly all of their fee-for-service business to Quest. The latter commitments are not necessarily contained in the express exclusive capitated contracts. Nonetheless Quest makes it clear that, to obtain the low capitated rates and increase their profits, the medical providers must exclusively provide all or nearly all their capitated and fee-for service business to Quest.

*Id.* ¶ 116. Plaintiffs also assert, as they have throughout this case, that "medical providers have a strong preference for one-stop test shopping," and that medical providers' capitated testing agreements with Quest thus "encourage[ ] them further to deal exclusively with Quest for fee-for-service testing as well as capitated testing." *Id.* ¶ 119.[4]

[4] Plaintiffs explain this "one-stop test shopping" dynamic in more detail elsewhere in the SAC:

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

[D]ue to ease of administration and familiarity, a medical provider in Northern California (or elsewhere) overwhelmingly will prefer to direct all or nearly all of its routine testing to a single diagnostic testing company once the medical provider reaches a "tipping point" with a particular testing company. In other words, a medical provider that is sending a substantial percentage of its routine testing to one diagnostic testing company (whether or not the testing is done in the plan/out-patient or physician billing relevant market) will likely send all of its testing to that testing company because "one-stop shopping" is much more convenient for the medical provider. As a result, when Quest, as the dominant provider in the physician billing market, obtains as little as 50 percent of all routine tests ordered by the provider in both relevant markets, it is likely to obtain all or nearly all of the provider's testing in the plan/outpatient market.

Quest routinely documents that, when it obtains the exclusive capitated business of a medical provider in the physician billing relevant market, it will also receive the provider's fee-for-service business in the plan/outpatient business. Its records show that it expressly sets its capitated pricing to ensure that this tie between capitated and fee-for-service testing is accomplished

SAC ¶¶ 51-52 (internal numbering omitted). Plaintiffs included substantially similar descriptions of the "one-stop test shopping" dynamic in their FAC and original complaint. *See* FAC ¶ 18; Compl. ¶ 18.

Plaintiffs continue to bring monopolization claims under section 2 of the Sherman Act and the Cartwright Act, as well as derivative claims under the UCL. *Id.* ¶¶ 188-93, 199-211. In addition, they now allege a separate cause of action titled, "Tying," under both section 1 and section 2 of the Sherman Act. *Id.* ¶¶ 194-198.

Quest filed this motion to dismiss on February 10, 2016. Dkt. No. 69. I heard argument from the parties on April 6, 2015. Dkt. No. 75.

**LEGAL STANDARD**

**\*5** Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). A court may "reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

**DISCUSSION**

**I. MONOPOLIZATION CLAIMS**

Section 2 of the Sherman Act applies to "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. A monopolization claim under section 2 has three elements: "(a) the possession of monopoly power in the relevant market; (b) the willful

USAP022

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

acquisition or maintenance of that power; and (c) causal antitrust injury." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) (internal quotation marks omitted).

With respect to the second element, the willful acquisition or maintenance of monopoly power must be "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992); *accord Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1132 (9th Cir. 2015). "The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition." *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 739 (9th Cir. 1985); *accord Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 370 (9th Cir. 1988). To establish this element, the plaintiff must show that the defendant used its monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman*, 504 U.S. at 482-83 (internal quotation marks omitted). In other words, the defendant's conduct must be "exclusionary." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). "[T]o be condemned as exclusionary, a monopolist's act must have an anticompetitive effect. That is, it must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice." *Id.* at 58 (internal quotation marks omitted; emphasis in original).

**\*6** The third element, causal antitrust injury, requires a showing of "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the defendant's] acts unlawful."[5] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To establish such injury, the plaintiff must show "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003). In addition, "the injured party [must] be a participant in the same market as the alleged malefactor[ ]." *Id.* (internal quotation marks omitted). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.* (internal quotation marks omitted).[6]

[5] In contrast with the inquiry into whether the defendant's acts are exclusionary, the inquiry into causal antitrust injury is viewed from the "perspective of the plaintiff's position in the marketplace," not from the "perspective of the impact of a defendant's conduct on overall competition." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).

[6] A showing of antitrust injury is "necessary, but not always sufficient," to establish antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986). Factors relevant to whether a plaintiff that has established antitrust injury also has antitrust standing include "the directness of the injury," "the speculative measure of the harm," "the risk of duplicative recovery," and "the complexity in apportioning damages." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999); *accord Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).

The Ninth Circuit has stated that "[t]he analysis under [the Cartwright Act] mirrors the analysis under federal law because [it] was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *accord Name.Space*, 795 F.3d at 1131 n.5 ("Because the analysis under the Cartwright Act is identical to that under the Sherman Act, we also affirm the district court's dismissal of the Cartwright Act claim.") (internal citations omitted). Plaintiffs do not dispute that their claims under the Sherman Act and the Cartwright Act rise and fall together.

Quest contends that despite the repackaging of the kickback/leveraging theory, the exclusionary practices alleged by plaintiffs remain insufficient to support their monopolization claims.[7] I agree.

[7] Again, plaintiffs' claims are based on exclusionary practices within the plan/outpatient market, not within the physician billing market.

## A. Exclusive Dealing (or Kickback/Leveraging) Theory

The repackaging of the kickback/leveraging theory as an exclusive dealing theory does not help plaintiffs.

USAP023

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

In the First and Second Dismissal Orders, I rejected the kickback/leveraging theory on the ground that plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers in the physician billing market resulted in Quest charging above-competitive prices in the plan/outpatient billing market. *See* First Dismissal Order at 8-10; Second Dismissal Order at 11-16.

Plaintiffs have changed the label for this theory. They have also slightly modified their description of the alleged misconduct underlying the theory. Previously, they accused Quest of giving economic inducements to medical providers in the physician billing market that organically result in those medical providers referring their patients to Quest in the plan/outpatient market, due to their natural preference for "one-stop test shopping." *See, e.g.,* FAC ¶ 81 ("Quest offers medical providers sharply reduced capitated rates in the physician billing market...to achieve the one-stop shop tipping points it needs to obtain all or the vast majority of [medical providers'] plan/outpatient business."). Plaintiffs continue to describe this "one-stop test shopping" dynamic, but they now also allege, for the first time in this case, that Quest "conditions" its discounted prices in the physician billing market on "exclusivity commitments from [medical providers] under which they send all or nearly all of their fee-for-service business to Quest." SAC ¶ 116. Plaintiffs admit that these exclusivity commitments are "not necessarily contained" in the capitated contracts Quest enters with medical providers but assert that "Quest makes it clear that, to obtain the low capitated rates and increase their profits, medical providers must exclusively provide all or nearly all their capitated *and* fee-for-service business to Quest." *Id.* (emphasis in original).

 **\*7**  Crucially, however, plaintiffs have not changed those aspects of this theory that were found lacking in the First and Second Dismissal Orders. They have not changed their allegations regarding Quest's monopolistic overcharging in the plan/outpatient market – those allegations remain essentially identical to those in the FAC. *Compare* SAC ¶¶ 168-76 *with* FAC ¶¶ 136-43. Nor have they materially changed their allegations regarding Quest's "substantial economies of scale" and "large cost advantages," or explained why these factors, rather than support a plausible inference that Quest overprices in the plan/outpatient market, "indicate that Quest underprices its competitors in that market, much as plaintiffs explicitly allege that it does in the patient billing market." Second Dismissal Order at 14; *see also* SAC ¶ 80 (alleging, with respect to the plan/outpatient market, that

Quest "benefits from very substantial economies of scale," "has significantly lower unit costs than smaller regional laboratories because it processes a larger volume of tests," "is able to reduce its unit costs by negotiating volume discounts on supplies," and "minimize[s] the costly outsourcing of low-volume tests"). Accordingly, for the reasons stated in the First and Second Dismissal Orders, this theory continues to fail to support a monopolization claim against Quest.[8]

[8] Although Quest does not frame its argument in this way, I note that plaintiffs' failure to adequately plead causal antitrust injury is fatal not only to their exclusive dealing theory, but to all of their claims, because it means that they lack antitrust standing. *See Cargill,* 479 U.S. at 110-11, 110 n.5, 110 n.6 (showing of antitrust injury is necessary to establish antitrust standing under both section 4 and section 16 of the Clayton Act); *see also Somers v. Apple, Inc.,* 729 F.3d 953, 962-65 (9th Cir. 2013) (affirming dismissal of section 2 claims for failure to adequately plead antitrust injury). Further weighing against plaintiffs' antitrust standing in this case is the highly speculative measure of their alleged harm, in that (1) it is unclear how plaintiffs have been cognizably harmed by Quest's alleged overcharging unless that overcharging has caused plaintiffs to pay higher portions of their deductibles than they otherwise would have paid (and plaintiffs do not allege that this was the case); and (2) Cruz and Mendez allege that their only relevant purchases were made while they were insured by Blue Shield, and plaintiffs specifically allege that Blue Shield members receive *discounted* prices from Quest. *See* SAC ¶ 140.

Further, plaintiffs' recharacterization of Quest's economic inducements in the physician billing market as exclusive dealing arrangements highlights an additional flaw in these allegations.[9] As I explained in the First and Second Dismissal Orders in discussing plaintiffs' collusion theory, and as both Judge Tigar and I explained in *Rheumatology,* "an exclusive dealing arrangement does not violate the antitrust laws unless its probable effect is to foreclose competition in a 'substantial share' of the relevant market."[10] Second Dismissal Order at 18; *see also* First Dismissal Order at 10-11; *Rheumatology II,* 2013 WL 5694452, at *11-14, *15; *Rheumatology I,* 2013 WL 3242245, at *10-13. To determine whether the foreclosure amounts to a substantial share,

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

**\*8** it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved..., and the probable immediate and future effects which preemption of that share of the market might have on effective competition.

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). The degree of foreclosure "is important because, for the contract to adversely affect competition, the opportunities for other traders to enter into or remain in that market must be significantly limited." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (internal quotation marks omitted); *accord Microsoft*, 253 F.3d at 69.

9     Plaintiffs previously characterized Quest's economic inducements in the physician billing market as simply anticompetitive below-cost price discounts, *see* FAC ¶¶ 71-88; Compl. ¶¶ 71-81, but explicitly disclaimed any reliance on a predatory pricing theory, *see* Dkt. No. 25 at 10, and did not allege that the economic inducements amounted to illegal bundled discounts. As before, plaintiffs do not raise a predatory pricing or bundled discounts theory in the SAC or their opposition brief.

10     This use of "probable effect" is probably too generous to plaintiffs. The Ninth Circuit has held that "although a Clayton Act violation may be found where an [exclusive dealing arrangement] has the probable effect of foreclosing competition,...in a case under section 1 of the Sherman Act, the plaintiff must prove that the exclusive dealing arrangement actually foreclosed competition." *Allied Orthopedic*, 592 F.3d at 996 n.1; *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1304 n.9 (9th Cir. 1982) ("[A] greater showing of anticompetitive effect is required to establish a Sherman Act

violation than a...Clayton Act violation in exclusive dealing cases.").

Plaintiffs have not alleged facts from which it can be plausibly inferred that Quest's alleged exclusive dealing arrangements with medical providers have foreclosed a substantial share of the plan/outpatient market. Plaintiffs have not identified, for example, the approximate number of medical providers that have entered into such arrangements with Quest, the approximate number and/or characteristics of the other laboratories operating in the physician billing and plan/outpatient markets, or what competing laboratories have been adversely affected by the arrangements or the extent to which they have been affected. [11] This is the same basic deficiency in pleading substantial foreclosure that has repeatedly resulted in the dismissal of plaintiffs' collusion theory, both in this case and in *Rheumatology*. *See* Second Dismissal Order at 20 ("[A]bsent additional details regarding the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition."); First Dismissal Order at 11 ("Plaintiffs cannot...establish foreclosure of a substantial share of the plan/outpatient market in Northern California without accounting for other players who significantly impact competition in the market."); *Rheumatology II*, 2013 WL 5694452, at *15 ("[P]laintiffs do not provide any context against which the Court may evaluate the extent to which competition has been restricted."); *Rheumatology I*, 2013 WL 3242245, at *13 ("Plaintiffs fail to quantify the actual market effect of this alleged activity – i.e., the percentage of physicians who drop other laboratories, or the percentage of laboratories who are foreclosed from the market – even in gross terms."). As before, plaintiffs have not provided sufficient details about the dynamics of the relevant market to gauge whether Quest's alleged exclusive dealing arrangements have resulted in substantial foreclosure. [12]

11     Plaintiffs' allegations regarding Hunter, Western Health, and Westcliff are focused on Quest's agreements with Aetna and Blue Shield, not on Quest's capitated contracts with medical providers.

12     Also weighing against the plausibility of substantial foreclosure here is the absence of facts about the agreements Quest enters with medical providers. Plaintiffs do not provide any information regarding, for example, the approximate length of the agreements or the process by which they

USAP025

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

can be terminated. *See Omega Envtl., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997)* (finding that "the short duration and easy terminabilityof these [alleged exclusive dealing] agreements negate substantially their potential to foreclose competition") (internal footnotes omitted). Nor do plaintiffs make clear the extent to which any medical providers have actually agreed, either explicitly or implicitly, to refer any portion of their fee-for-service testing to Quest. The SAC sends mixed messages on this issue, alleging both (1) that Quest "conditions" its discounted prices on capitated contracts on medical providers' referral of their fee-for-service testing, *see, e.g.,* SAC ¶ 196; and (2) that the "pull-through" business obtained by Quest in the plan/outpatient market is merely the organic result of medical providers' natural preference for "one-stop test shopping," *see, e.g.,* SAC ¶¶ 51-52, 119. Plaintiffs do not clarify in their opposition brief whether they mean to allege one or the other of these dynamics, or some combination of the two. *See, e.g.,* Oppo. at 14 ("[Physicians] have a strong economic incentive to continue buying Quest's fee-for-service testing even though they are not contractually committed to do so.") (internal quotation marks omitted).

### B. Collusion Theory

 **\*9** The factual allegations in the SAC in support of this theory are not materially different from those in the FAC. *Compare* SAC ¶¶ 122-151 *with* FAC ¶¶ 89-120. The theory remains based on Quest's exclusive dealing arrangements with Aetna and Blue Shield. Plaintiffs still identify just three particular competing laboratories in the relevant market that have been harmed as a result of the arrangements – Hunter, Western Health, and Westcliff[13] – and still specifically allege that "approximately 1.54 million persons are enrolled in Aetna and Blue Shield plans in Northern California – 10 percent of the available enrollees in the relevant market." SAC ¶ 145. Plaintiffs also still "fail to describe the prior market shares of Hunter, Western Health, and Westcliff, the number of other competitors in the plan/outpatient market, or the circumstances of health plans other than Aetna and Blue Shield operating in Northern California." Second Dismissal Order at 19. As I held in the Second Dismissal Order, these allegations are not sufficient to plausibly establish that Quest's exclusive dealing arrangements with Aetna and Blue Shield have foreclosed a substantial share of the plan/outpatient market. *Id.* at 19-20. "[A]bsent additional details regarding

the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition." *Id.* at 20.

[13]     In addition to Hunter, Western Health, and Westcliff, plaintiffs also allege that John Muir Health has also "exited the plan/outpatient market, in large part because of Quest's other exclusionary conduct." SAC ¶ 34. But plaintiffs allege nothing more about John Muir Health. There are no allegations regarding, e.g., its previous market share, when or why it exited the market, or whether/how it was impacted by Quest's agreements with Aetna and Blue Shield.

### C. Acquisition Theory

Like their collusion theory, plaintiffs' acquisition theory has not changed materially since the FAC. *Compare* SAC ¶¶ 86-104 *with* FAC ¶¶ 55-70. It remains based on three acquisitions in Northern California between 2003 and 2013: (1) Unilab in 2003, adding 48.8 percent to Quest's share of the plan/outpatient market in Northern California; (2) Berkeley HeartLab in 2011, adding another 4.6 percent; and (3) Dignity Health in 2013, adding another 2.0 percent. SAC ¶¶ 59, 67, 69. Plaintiffs allege no new facts regarding how the three acquisitions have unreasonably restricted competition. The most significant change in their allegations concerns the FTC's decision to clear Quest's acquisition of Unilab upon requiring Quest to divest certain Northern California assets to Laboratory Corporation of America, another provider of clinical laboratory testing services that at that time had a minimal presence in Northern California. Plaintiffs now emphasize that the FTC's decision "does not immunize [Quest's] sustained march to market power over the next decade using various additional exclusionary practices." *Id.* ¶ 96.

I agree with plaintiffs that the FTC's decision is far from dispositive (although it does weigh against the conclusion that Quest's acquisition of Unilab can be plausibly characterized as an unreasonable restriction on competition). What is dispositive is that the SAC, like the FAC, "fail[s] to plausibly allege any specific anticompetitive effects of any of the three acquisitions, whether viewed in isolation or in combination." Second Dismissal Order at 22. "In these circumstances, merely pleading the occurrence of one acquisition that was cleared by the FTC upon the divestiture of assets to a

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

significant competitor, and two others that resulted in minimal market share increases, is not enough to state a claim." *Id.*

In other words, plaintiffs cannot rely on the fact of the acquisitions alone. In and of themselves, the acquisitions may help plaintiffs show the "possession of monopoly power in the relevant market," but they do not plausibly establish "the willful acquisition or maintenance of that power." *Allied,* 592 F.3d at 998. To satisfy that element, plaintiffs must plead facts showing the particular ways in which the acquisitions have unreasonably restricted competition. For the third time, they have not done so.

### D. Combined Effect

Plaintiffs dedicate much of their opposition brief to arguing that Quest's alleged exclusionary practices must be considered in combination, not in isolation. *See, e.g.,* Oppo. at 6. I agree. As I stated in the Second Dismissal Order, however, viewing Quest's alleged exclusionary practices in combination does not push plaintiffs' claims over the line:

   **\*10** Plaintiffs are correct that a court must look to the aggregate or "synergistic" effect of the alleged exclusionary practices to determine whether the allegations plausibly establish a violation of the antitrust laws. *City of Anaheim v. S. California Edison Co.,* 955 F.2d 1373, 1376 (9th Cir. 1992). "[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *Id.* Nevertheless, it is "much more difficult" to find wrongdoing where the plaintiff alleges only "a number of perfectly legal acts," and allegations that establish "some slight wrongdoing in certain areas" need not by themselves amount to a violation. *Id.* Here, plaintiffs have alleged price discounts without establishing any overcharging as a result, exclusive dealing arrangements without establishing that they impact more than a minor fraction of the relevant market, and three acquisitions, one of which was cleared by the FTC and resulted in a new significant competitor entering the market, and the other two of which account for a combined 6.6 percent increase in market share. Whether viewed in isolation or in the aggregate, these allegations do not support plaintiffs' monopolization claims against Quest.

Second Dismissal Order at 22-23. The new allegations in the SAC do not materially change this analysis, except to highlight that plaintiffs' "price discounts" theory (i.e., their exclusive dealing or kickback/leveraging theory) also fails

on the ground that plaintiffs' have not adequately alleged substantial foreclosure of the plan/outpatient market based on Quest's agreements with medical providers. Quest's motion to dismiss plaintiffs' monopolization claims is GRANTED.

## II. TYING CLAIMS

For the first time in this case, plaintiffs bring a separate cause of action accusing Quest of an illegal tying arrangement. SAC ¶¶ 194-98. The cause of action states in relevant part that

   Quest has tied fee-for-service sales sold to medical providers in the relevant market for plan/outpatient billing to its sales of separately sold capitated testing in the physician billing relevant market.

   Quest has market power in the physician billing relevant market and has conditioned its sales of capitated testing upon referral to Quest of the medical providers' fee-for-service testing as well. Such referral is the only viable economic option for the medical providers seeking to avoid substantial increased capitated costs.

   As a consequence of its conduct, Quest has caused substantial price injury in the sale of fee-for-service testing and actual damages to members of the Class, as well as denied them competitive choice.

SAC ¶¶ 195-97 (paragraph numbering omitted). Elsewhere in the SAC, plaintiffs allege that Quest has

   committed a per se tying violation to deny its rivals in the plan/outpatient market distribution of their fee-for-service routine testing to medical providers. Quest sells to medical providers capitated testing in the physician billing market at very low rates (often below its costs) on the condition they also purchase Quest's fee-for-service testing sold in the separate plan/outpatient market.

SAC ¶ 105.

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Rick-Mik Enterprises,*

USAP027

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

*Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (internal quotation marks omitted). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Id.* (internal quotation marks omitted). "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Eastman Kodak*, 504 U.S. at 464 n.9 (internal quotation marks and alterations omitted). "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* (internal quotation marks omitted).

 **\*11** Plaintiffs appear to accuse Quest of a per se tying violation under section 1 of the Sherman Act. *See, e.g.,* Oppo. at 11. [14] "A plaintiff must prove three elements to prevail on an illegal tying claim: (1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (internal quotation marks omitted).

[14] To the extent that plaintiffs also rely on their tying allegations to support their monopolization claims, those allegations do not meaningfully impact the analysis above, because they are essentially identical to the allegations in support of plaintiffs' exclusive dealing (or kickback/leveraging) theory.

Quest identifies four flaws in plaintiffs' tying theory. Mot. at 11-13. First, Quest argues that plaintiffs do not allege that a single buyer purchases the tying and tied products. According to plaintiffs' tying theory, medical providers purchase the tying product (capitated testing in the physician billing market) while health plans and patients purchase the tied product (fee-for-service testing in the plan/outpatient market). Quest quotes *Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722 (W.D. Pa. 1987), for the proposition that "an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual." *Id.* at 731. Plaintiffs respond that "[t]here is one buyer here, medical providers buying capitated testing [ – i.e., the tying product

– ] from Quest." Oppo. at 11 n.7. Plaintiffs do not dispute that, according to their tying theory, medical providers do not also purchase the tied product – i.e., fee-for-service testing – from Quest.

Second, Quest argues that plaintiffs have not plausibly alleged coercion. Quest contends that because there are different buyers for the tying product versus the tied product, coercion cannot possibly be established here. Mot. at 11. Further, Quest argues, plaintiffs have not alleged that the tying and tied products cannot be purchased separately. That is, plaintiffs have not alleged either (1) that medical providers who enter capitated testing agreements with Quest must refer their fee-for-service business to Quest, or (2) that medical providers who do not enter capitated testing agreements with Quest cannot refer their fee-for-service business to Quest. *Id.* at 12. Plaintiffs do not dispute this characterization of their allegations. They argue instead that they have adequately alleged coercion because Quest's pricing policy "makes purchase of the tying and tied products together the only viable economic option." Oppo. at 12. In support of this argument, plaintiffs point to paragraph 113 of the SAC, which states that "Quest's conditioning is also effective because, by accepting Quest's very low capitated rates, medical providers measurably increase their profits on their capitated business, and since cost minimization is their goal accepting tying conditionality is their only viable economic option." SAC ¶ 113; *see also id.* ¶ 196 ("Such referral [of fee-for-service testing] is the only viable economic option for medical providers seeking to avoid substantial increased capitated costs.").

Third and fourth, Quest argues that plaintiffs do not plausibly allege either that "the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Paladin*, 328 F.3d at 1159, or that Quest "has market power" in the tying product market, Mot. at 13. With respect to the volume of commerce affected in the tied product market, plaintiffs contend that they have "alleged that an appreciable number of buyers have accepted capitated/fee-for-service terms." Oppo. at 13. They point to paragraph 109 of the SAC, which includes the following quote from a former Quest salesperson:

 **\*12** In order to secure the fee-for-service business and referral of these medical providers, Quest offers deeply discounted prices, often below cost,

USAP028

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

for those capitated tests the medical providers pay for directly. The medical providers thereby lower their costs, and can increase profits on capitated business paid for by the providers. In exchange for these discounts, with very rare exceptions the medical providers refer all of their fee-for-service patients to Quest, including Medi-Cal patients. These referrals, obtained in exchange for discounts, are referred to industry insiders as pull-through. Medical providers paying capitated rates were told that they would have to support Quest with their Medi-Cal, Medicare and third-party insurance patients to maintain the deeply discounted capitated prices. The sales force was required to justify the discounts based on the amount of pull-thorough and track the amount of pull-through of the account to ensure that the pull-through of the account resulted in an overall profit from the client.

SAC ¶ 109 (internal emphasis and alterations omitted).[15] With respect to whether Quest's market power in the tying product market, plaintiffs allege that Quest's share of the physician billing market is 71.8 percent. *Id.* ¶ 107.

15    At oral argument, Quest pointed out, and plaintiffs did not dispute, that paragraph 109 of the SAC is taken from a declaration attached to a complaint filed by the California Attorney General against Quest, and that the declarant is describing conduct from 2003 to 2004, when the declarant worked for Quest.

I agree with Quest that plaintiffs have not adequately alleged coercion. Plaintiffs' only stated basis for a finding of coercion is that medical providers' "only viable economic option" is to purchase capitated testing at the discounted rates offered to those medical providers who also refer their fee-for-service testing to Quest. *See* Oppo. at 12; SAC ¶¶ 113, 196. But plaintiffs allege no facts indicating how this is the case.[16] For example, they do not allege the difference in pricing between capitated testing agreements with medical providers who

do refer their fee-for-service testing to Quest, and capitated testing agreements with medical providers who do not. *See Synopsys, Inc. v. ATopTech, Inc.*, No. 13-cv-02965-MMC, 2015 WL 4719048, at \*7 (N.D. Cal. Aug. 7, 2015) (dismissing tying claim where counterclaimant's theory of coercion was that counterdefendant's prices "render[ed] it economically unviable" to purchase the tying and tied products separately, and counterclaimant had not stated facts showing "how the alleged discounting practice was coercive, e.g., the amount of the difference between the price of [the tying product] when purchased separately and its price when purchased together with [the tied product]"). Nor do they allege the approximate number of medical providers who have obtained "deeply discounted prices" on capitated testing in exchange for referring their patients to Quest for fee-for-service testing, or how Quest's prices on fee-for-service testing compare to the prices of its competitors. *Cf. Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 914-15 (9th Cir. 2008) (finding triable issues on coercion where there was evidence that, among other things, only 14 percent of relevant purchasers bought the tied products separately, and a competitor's prices for the tied product were lower than defendant's, indicating that "a rational customer would not purchase [defendant's] allegedly overpriced product in the absence of a tie").

16    Quest does not dispute that this could be a meritorious theory of coercion if properly alleged. *See* Reply at 9 (Dkt. No. 73) ("It is not enough to allege that there is some discount on Product A that is only available with the purchase of Product B...A plaintiff...must allege that the discount on Product A is so dramatic (or that the non-discounted price is so punitive) that the only economically viable option is for a plaintiff to purchase both Products A and B.").

A bundled discount does not necessarily equal an illegal tying arrangement. *See id.* at 914-15, 915 n.27; *see also Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984). Accordingly, merely alleging the existence of a discount on capitated testing for those medical providers who also refer their fee-for-service testing to Quest, without also stating facts indicating how this discount "le[aves] [medical providers] with no rational economic choice" but to commit to Quest for both capitated and fee-for-service testing, *Cascade Health*, 515 F.3d at 915 n.27, does not plausibly establish coercion.[17] Quest's motion to dismiss plaintiffs' tying cause of action is GRANTED.

USAP029

**Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)**

2016-1 Trade Cases P 79,611

17    In addition, as noted above with respect to plaintiffs' exclusive dealing theory, plaintiffs do not make clear the extent to which any medical providers have actually entered capitated agreements with Quest under which they also agree, either explicitly or implicitly, to refer to Quest some or all of their fee-for-service testing. To the extent that plaintiffs have not plausibly alleged that such agreements exist, their tying claims are further deficient.

### III. UCL CLAIMS

 **\*13**  Plaintiffs allege that Quest has violated the "unlawful" and "unfair" prongs of the UCL. *See* FAC ¶¶ 199-205. These claims are derivative of the Sherman Act and Cartwright Act claims discussed above, and plaintiffs make no arguments specific to them in their opposition brief. They will also be dismissed.

### CONCLUSION

Despite the benefit of a prior related case bringing substantially similar claims against Quest, three opportunities to flesh out their claims, and two dismissal orders pointing out the deficiencies in their complaints, plaintiffs have been unable to state a plausible claim for relief, and have persisted in accusing Quest of the same basic misconduct without meaningfully adding to the facts stated in support. There is no indication that another chance to amend would yield a different result. Accordingly, and for the reasons discussed above and in my prior orders in this case, Quest's motion to dismiss the SAC is GRANTED, and plaintiffs' claims are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1640465, 2016-1 Trade Cases P 79,611

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6850006
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

IRONSHORE SPECIALTY
INSURANCE COMPANY, Plaintiff,
v.
FACILITY IMS, LLC, Thomas D. Scott, Robert J.
Riek, Gary D. Anderson, Gene Lunceford, Melinda S.
Provence, and Evelyn Breaux Tennyson, as administrator
of the Estate of Michael D. Tennyson, Defendants.

Civil Action No. 3:23-CV-00296-K
|
Signed October 17, 2023

**Attorneys and Law Firms**

D. Randall Montgomery, Alyssa Marie Barreneche, D.
Randall Montgomery & Associates, Dallas, TX, Kyle M.
Heisner, Pro Hac Vice, Matthew Nathan Klebanoff, Pro Hac
Vice, Ronald P. Schiller, Pro Hac Vice, Sharon F. McKee,
Pro Hac Vice, Hangley Aronchick Segal Pudlin & Schiller,
Philadelphia, PA, for Plaintiff.

Micah Ethan Skidmore, Storm Patrick Lineberger, Haynes
and Boone LLP, Dallas, TX, for Defendants Thomas D. Scott,
Robert J. Riek.

Linda M. Dedman, Paul Robert Flick, Dedman Law PLLC,
Dallas, TX, for Defendants Gary D. Anderson, Gene
Lunceford, Melinda Provence, Evelyn Breaux Tennyson,
Facility IMS LLC.

**MEMORANDUM OPINION AND ORDER**

ED KINKEADE, UNITED STATES DISTRICT JUDGE

 **\*1** Before the Court are Plaintiff Ironshore Specialty
Insurance Company's ("Iron-shore") Motion for Leave to
File First Amended Complaint and First Amended Answer
to Defendants' Counterclaim (the "Motion for Leave to
Amend"), Doc. No. 66, Defendants Facility IMS, LLC,
Thomas D. Scott, and Robert J. Riek's (collectively, "Facility
IMS," and, together with Ironshore, the "Parties") Response
and Supporting Brief in Opposition to Ironshore's Motion for
Leave to File First Amended Complaint and First Amended
Answer, Doc. No. 69, Ironshore's Reply in Support of

Its First Amended Complaint and First Amended Answer
to Defendants' Counterclaim, Doc. No. 71, Facility IMS's
Motion for Summary Judgment Denying Plaintiff's Claims
(the "Motion for Summary Judgment") and Brief and
Appendix in support thereof, Doc. Nos. 39– 41, Ironshore's
Response in Opposition to the Facility IMS Defendants'
Motion for Summary Judgment and Brief and Appendix
in support thereof, Doc. Nos. 50–52, Facility IMS's Reply
in Support of Motion for Summary Judgment Denying
Plaintiff's Claims, Doc. No. 59, Facility IMS's Response and
Brief in Opposition to Ironshore's Alternative Motion for
Leave to Amend Complaint, Doc. No. 58, Facility IMS's
Motion and Supporting Brief to Strike Ironshore's Opposition
Summary Judgment Evidence (the "Motion to Strike"), Doc.
No. 56, Ironshore's Brief in Opposition to the Facility IMS
Defendants' Motion to Strike Ironshore's Summary Judgment
Opposition Evidence, Doc. No. 65, Facility IMS's Reply in
Support of Motion to Strike Ironshore's Opposition Summary
Judgment Evidence, Doc. No. 68, Ironshore's Motion for
Leave to File Supplemental Declaration (the "Motion for
Leave to File"), Doc. No. 57, Facility IMS's Response
and Supporting Brief in Opposition to Ironshore's Motion
for Leave to File Supplemental Declaration, Doc. No. 62,
Ironshore's Amended Motion for Leave to File Documents
Under Seal (the "First Amended Motion to Seal"), Doc. No.
54, and Ironshore's superseding Amended Motion for Leave
to File Documents Under Seal (the "Second Amended Motion
to Seal") and Provisionally Sealed Brief in support thereof,
Doc. Nos. 60–61.

Upon consideration of the Parties' submissions, the Court
**GRANTS** Ironshore's Motion for Leave to Amend its
pleadings in part and **DENIES** it in part without prejudice.
Ironshore, an insurer, primarily seeks permission to pursue
recovery of overpayments it may have made to Facility
IMS, its insured. Facility IMS offers no persuasive reason
to prevent Ironshore from trying to recover the allegedly
excessive payments, and the Court will permit Ironshore to
do so. Facility IMS argues more persuasively that Ironshore's
remaining allegations are futile. Ironshore alleges that Facility
IMS breached contractual obligations to cooperate with
Ironshore and settle claims with its consent, but Ironshore
fails to allege that the breaches caused Ironshore harm. The
Court will permit Ironshore to file another motion for leave
to amend its pleading to address this failure.

 **\*2** Because the Court grants Ironshore's Motion for Leave
to Amend in part, the Court **DENIES** Facility IMS's Motion
for Summary Judgment without prejudice. In the interest of

USAP031

judicial economy, each Party may file or renew a summary judgment motion addressing all amended or unamended claims on which it seeks judgment in a single brief. Since the Court denies Facility IMS's Motion for Summary Judgment, it also **DENIES** Facility IMS's Motion to Strike Ironshore's summary judgment evidence and Ironshore's Motion for Leave to File supplemental summary judgment evidence as moot.

The Court **DENIES** without prejudice Ironshore's Motion to Seal several portions of its summary judgment filings. Some of the information Ironshore seeks to seal appears to be stale. Other information concerns amounts Ironshore actually paid or considered paying to settle claims against Facility IMS. Ironshore predicts that disclosure of these amounts will make settlement of other claims against Facility IMS more challenging, but the Fifth Circuit has expressly rejected this rationale for sealing documents. Nor can the Court accept Ironshore's alternative contention that the amounts are privileged. Ironshore appears to have filed the allegedly privileged material voluntarily, and Ironshore has not supported its contention with citations to applicable Texas privilege law. The Court will allow Ironshore one more opportunity to strengthen its Motion to Seal before it unseals the documents Ironshore submitted.

# I. BACKGROUND

## A. Facts

The Court draws the following facts from Ironshore's proposed First Amended Complaint and its attachments and assumes they are true. Doc. No. 66-1 ("FAC"); Doc. Nos. 1-2, 1-3, 1-4, 1-5 (collectively, "Pol'y"); Doc. No. 1-1.

Facility IMS is the subject of numerous lawsuits across the country alleging that it operated nursing homes where residents suffered injuries or died (the "Underlying Lawsuits"). FAC ¶ 15. Between 2014 and 2018, Ironshore insured Facility IMS and some of its personnel against errors and omissions in providing their customers professional services. Pol'y § I(A). Because of the Underlying Lawsuits against Facility IMS, Ironshore has now spent more than a million dollars paying defense costs and judgments or settlements for Facility IMS. FAC ¶¶ 43–50.

Under the insurance policies issued by Ironshore (the "Policies"), one million dollars is Ironshore's maximum liability for a single claim against Facility IMS. *Id.* ¶¶ 44–45. The Policies provide that related claims "shall be deemed to

be" and "will be treated as a single Claim" regardless of the number or timing of related claims, the number or identity of the claimants or insureds, and whether the claims arise in individual or class actions. *Id.* ¶ 30. Related claims are claims

> arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions, or events or the same or related series of facts, circumstances, situations, transactions, or events, whether related logically, causally, or in any other way, in any combination, whether or not involving more than one policy, practice, procedure or product, including any course of treatment, and whether or not deemed a continuous tort.

*Id.* ¶ 29.

The Policies contemplate that Ironshore and Facility IMS will work together to settle claims. A "Cooperation Provision" states that, in the "event of a Claim, [Facility IMS] shall provide [Ironshore] with all information, assistance and cooperation that [Ironshore] reasonably requests." *Id.* ¶ 54. A "Consent Provision" states that no "Insured shall, except at its own cost, incur any expense, make any payment, admit liability for, assume any obligation, or settle any Claim without [Ironshore's] written consent." *Id.* ¶ 52.

**\*3** Ironshore need not cover a claim until Facility IMS pays a $350,000 "self-insured retention" toward the claim. *Id.* ¶ 26; Pol'y Item 4. A "Reimbursement Provision" of the Policies gives Ironshore the "right and option" to "pay all or any portion of the applicable ... self-insured retention on behalf of" Facility IMS, "in which event [Facility IMS] will repay [Ironshore] any amounts so paid." FAC ¶ 26.

Facility IMS stopped paying self-insured retentions attributable to the Underlying Lawsuits in February 2019, telling Ironshore that it was "not in a position" to pay them. *Id.* ¶ 43.

USAP032

**B. Procedural History**
On February 9, 2023, Ironshore filed this action to recover the self-insured retentions Facility IMS refused to pay. Doc. No. 1 ¶ 1. Facility IMS counterclaimed, alleging that Ironshore failed to cover its share of a settlement Facility IMS arranged with Wilkes & Associates, the firm representing many of the plaintiffs in the Underlying Lawsuits (the "Wilkes Plaintiffs"). Doc. No. 24 ¶¶ 95–102. Ironshore filed an Answer to the counterclaim a little less than a month later. Doc. No. 33.

Facility IMS then filed an early Motion for Summary Judgment on Ironshore's claims. Doc. No. 39. In its Motion, Facility IMS asserts that it has no outstanding obligation to pay self-insured retentions because the claims in the Underlying Lawsuits are related claims. Doc. No. 40. Facility IMS reasons that the Policies treat related claims as a single claim subject to a single self-insured retention, and Facility IMS has already paid the self-insured retention for a single claim. *Id.* at 31–36.

After Ironshore responded to the Motion for Summary Judgment, Facility IMS filed a motion to strike Ironshore's opposition evidence, and Ironshore sought leave to supplement its evidence. Doc. Nos. 56–57. Ironshore also requested leave to file portions of its summary judgment briefing and evidence under seal, which the Court twice denied for failure to comply with the Court's procedures. Doc. Nos. 49, 53–55. Ironshore's Second Amended Motion to Seal portions of its briefing and evidence remains pending. Doc. Nos. 60–61.

With all of the foregoing motions on file, Ironshore moved for leave to amend its complaint. Doc. No. 66. In its proposed amended complaint, Ironshore first contends that Facility IMS settled with the Wilkes Plaintiffs without cooperating with Ironshore during the settlement process or obtaining Ironshore's consent to the settlement. FAC ¶ 72. According to Ironshore, this breached the Cooperation and Consent Provisions of the Policies. *Id.* Ironshore also seeks attorneys' fees under a Texas statute permitting fees awards in breach of contract cases. *Id.* at 20.

In another portion of its proposed amended complaint, Ironshore claims that it overpaid Facility IMS and should be able to recover the overpayments in unjust enrichment. *Id.* ¶¶ 76–79. Ironshore explains that the Underlying Lawsuits are subject to the coverage limit for a single claim if they involve related claims, and Ironshore has already paid more

than the single claim coverage limit on behalf of Facility IMS. *Id.* ¶¶ 64–79. Ironshore seeks related declaratory relief resolving whether the Underlying Lawsuits involve related claims, whether they are subject to the coverage limit for a single claim, and whether Ironshore is entitled to amounts paid in excess of the single claim coverage limit. *Id.* ¶¶ 64–66.

**\*4** Ironshore proposes a handful of amendments to its Answer on similar theories. Among other things, Ironshore seeks to offset its alleged excess payments against any recovery Facility IMS may obtain on its counterclaim for coverage of the settlement with the Wilkes Plaintiffs. Doc. No. 66-2 ¶ 30. Ironshore also asserts that Facility IMS is "quasi-estopped" from pursuing its counterclaim, evidently on the basis that Facility IMS is acting inconsistently when it seeks coverage of the Wilkes Plaintiffs' settlement exceeding the coverage limit for a single claim and simultaneously asserts that the Underlying Lawsuits involve related claims subject to the self-insured retention for a single claim. Doc. No. 66-2 ¶¶ 27, 31.

## II. MOTION FOR LEAVE TO AMEND
The Court begins by granting in part and denying in part Ironshore's Motion for Leave to Amend its pleadings. Facility IMS objects to Ironshore's Motion solely on the basis that Ironshore's proposed amendments are futile, and the Court limits its analysis accordingly. Doc. No. 69 at 6.

**A. Legal Standard**
The Court permits amendment of pleadings freely when justice so requires. Fed. R. Civ. P. 15(a). The Court will deny amendment of claim as futile if the amended claim would fail to meet the "same standard of legal sufficiency as applies under [Federal Rule of Civil Procedure] 12(b)(6)." *Marucci Sports, L.L.C. v. NCAA*, 751 F.3d 368, 379 (5th Cir. 2014) (citation omitted). A claim fails to satisfy Rule 12(b)(6) if the plaintiff does not plead facts sufficient to make the claim plausible. *City of Clinton v. Pilgrim's Pride Corp.*, 632 F.3d 148, 155 (5th Cir. 2010) (citing *Iqbal*, 556 U.S. at 679). In assessing the plausibility of Ironshore's proposed amended claims, the Court assumes that Ironshore's factual allegations are true but does not assume that its legal conclusions are true. *Arroyo v. Oprona, Inc.*, 736 F. App'x 427, 430 (5th Cir. 2018).

The Court similarly permits amendment of affirmative defenses unless the amendment would be futile. *Xtria LLC v. Tracking Sys., Inc.*, 2010 WL 1541505, at \*3 (N.D. Tex. Apr. 16, 2010) (Fitzwater, C.J.). An amendment to an affirmative

USAP033

defense is futile if the amended defense is insufficient as a matter of law. *Sprint Sols., Inc. v. Precise Wireless Int'l Inc.*, 2015 WL 2359519, at *2 (S.D. Tex. May 15, 2015); *see also United States v. Renda*, 709 F.3d 472, 479 (5th Cir. 2013).

The Parties assume that the substantive law of Texas applies to Ironshore's proposed pleadings, and the Court joins in their assumption. *Reynolds v. American-Amicable Life Ins. Co.*, 591 F.2d 343, 344 (5th Cir. 1979) (per curiam); *Tifford v. Tandem Energy Corp.*, 562 F.3d 699, 705 n.2 (5th Cir. 2009).

### B. Discussion

The Court concludes that Ironshore's proposed breach of contract claims and request for attorneys' fees are futile, but Ironshore's proposed unjust enrichment claim, request for declaratory relief, and amendments to its Answer are not. The Court takes each set of proposed amendments in turn.

### 1. *Breach of Contract*

Facility IMS brings two challenges to Ironshore's proposed claims that Facility IMS breached the Cooperation and Consent Provisions of the Ironshore Policies by unilaterally settling with the Wilkes Plaintiffs. The Court finds only the second challenge persuasive.

Facility IMS's first challenge relies on the overlapping concepts of contractual "conditions" and contractual "covenants" under Texas law. A condition is an event whose non-occurrence excuses a party from performing under a contract. *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010). A covenant is a contractual promise of action or inaction whose breach may give rise to a claim for damages. *Id.* at 108. A party's substantial compliance with a covenant is a condition of its counterparty's performance under a contract, but lesser breaches of a covenant will not excuse the counterparty's performance. *Id.*; Restatement (Second) of Contracts § 237. The Court distinguishes covenants from conditions by determining which type of provision the Parties intended to adopt, keeping in mind that the law favors covenants over conditions. *Criswell v. Eur. Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990).

**\*5** According to Facility IMS, its obligations to cooperate with Ironshore and obtain Ironshore's consent to the Wilkes Plaintiffs' settlement are conditions, but not covenants, they

must fulfill before Ironshore must contribute to the settlement. Doc. No. 69 at 14–15. On that interpretation, if Facility IMS breached the Cooperation and Consent Provisions of the Policies, Ironshore can refuse to cover its share of the settlement cost, but it cannot pursue a breach of contract claim for damages. *Id.*

Facility IMS's interpretation does not fit the Policies' Cooperation Provision. The Cooperation Provision requires Facility IMS, in the event of a claim, to provide Ironshore with all "information, assistance and cooperation" it reasonably requests. Pol'y § IV(J). The provision does not make Ironshore's payment of the claim contingent on Facility IMS's cooperation; it tells Facility IMS what it must do if it receives a claim for damages covered by the Policies. *See PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636 (Tex. 2008).

The Policies' Consent Provision also memorializes a covenant rather than a mere condition. The Consent Provision is an agreement to pay for unapproved settlements. It states that Facility IMS may not settle a claim without Ironshore's written consent "except at its own cost." Pol'y § IV(D)(1). If Facility IMS improperly shifts the costs of an unauthorized settlement to Ironshore, it breaches the Consent Provision, and Ironshore can recover the costs. *Md. Cas. Co. v. Am. Home Assur. Co.*, 277 S.W.3d 107, 113 n.12 (Tex. App.—Houston [1st Dist.] 2009, pet. dism'd) (construing nearly identical policy language as setting forth a covenant); *see also KIT Projects, LLC v. PLT P'ship*, 479 S.W.3d 519, 526 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (construing agreement to pay as covenant). There is no indication that Ironshore agreed to limit its remedies to withholding additional payments in that circumstance. Had it done so, the Parties presumably would have inserted language in the Consent Provision that is closer to the language they inserted in neighboring provisions. For example, in one neighboring provision, Ironshore explains that it will "have no obligation to pay" for losses if payments reach a liability cap. Pol'y § IV(D)(2).

The Court acknowledges that several federal courts have found that an insured's compliance with the cooperation provision in an insurance policy is a condition of the insurer's performance rather than a covenant whose breach can give rise to a claim for damages. *Beaufort Dedicated No. 5, Ltd. v. USA Daily Exp., Inc.*, 2012 WL 6608869, at *8 (S.D. Tex. Dec. 18, 2012); *Evanston Ins. Co. v. Tonmar, L.P.*, 669 F. Supp. 2d 725, 732 (N.D. Tex. 2009) (Fitzwater, J.); *Phila. Indem. Ins. Co. v. Stebbins Five Cos., Ltd.*, 2002

USAP034

WL 31875596, at *6 (N.D. Tex. Dec. 20, 2002) (Lynn, J.). Because the federal decisions do not reproduce the full text of the cooperation provisions the courts considered, the Court does not find them especially helpful in interpreting the Cooperation or Consent Provisions of the Ironshore Policies. The only relevant Texas precedent cited in the federal decisions turns on an analysis of policy text. *Progressive Cnty. Mut. Ins. Co. v. Trevino*, 202 S.W.3d 811, 815–16 (Tex. App.—San Antonio 2006, pet. denied). In that case, the Court of Appeals concluded that a requirement that a person "seeking any coverage" must cooperate with an insurer conditioned coverage on cooperation. *Id.* The Policies Ironshore issued to the Facility IMS Defendants do not contain similar language. To the extent that the federal decisions characterize cooperation clauses as mere conditions because insurers typically invoke the clauses to avoid paying claims, the Court finds the decisions unpersuasive. *E.g.,* *Phila. Indem.*, 2002 WL 31875596, at *6. The defensive use of cooperation provisions is consistent with them operating as covenants. A material breach of a covenant excuses the nonbreaching party's performance just as the failure of a condition does. *Solar Applications*, 327 S.W.3d at 108.

**\*6** Where no policy language dictates the result, the more persuasive rationale for denying an insurer damages when an insured settles a claim without cooperating with the insurer or obtaining the insurer's consent is that the insurer has not suffered harm. If the settlement is prejudicial to the insurer, the insurer can simply refuse to pay the claim. *See Prodigy Commc'ns Corp. v. Agric. Excess & Surplus Ins. Co.*, 288 S.W.3d 374, 382 (Tex. 2009); *Hernandez v. Gulf Grp. Lloyds*, 875 S.W.2d 691, 693 (Tex. 1994).

This is the basis for Facility IMS's second challenge to Ironshore's proposed contract claims, and the Court agrees that Ironshore has not pled damages caused by Facility IMS's alleged failure to cooperate with Ironshore and obtain its consent to the settlement with the Wilkes Plaintiffs. Doc. No. 69 at 14. Ironshore's proposed pleading generically recites that "Ironshore has sustained damages" without tying the damages to Facility IMS's alleged breaches of the Cooperation and Consent Provisions. FAC ¶ 74. Without more specific damages allegations, Ironshore's proposed amendments are futile. *See Langen v. Sanchez Oil & Gas Corp.*, 2019 WL 1674348, at *4 (S.D. Tex. Apr. 17, 2019) (dismissing claim for breach of consent-to-settlement provision for failure to plead damages with sufficient specificity).

The Court also rejects Ironshore's offer, made for the first time in its reply brief, to supplement its damages allegations. Doc. No. 71 at 9. Ironshore asserts that Facility IMS settled only some of the claims in some of the Underlying Lawsuits for which Ironshore may have to provide coverage, preventing Ironshore from settling the Underlying Lawsuits in full and putting money in the pockets of the attorneys prosecuting surviving claims. *Id.* at 8–9. Whether these allegations sufficiently describe recoverable damages is a question the Court will not answer without first giving Facility IMS an opportunity to state its position. The allegations also raise a question neither Party has briefed: whether the purported losses Ironshore describes are "costs" that Facility IMS must bear under the Consent Provision permitting it to enter unauthorized settlements only "at its own cost." Pol'y § IV(D)(1). If they are not, then Facility IMS did not breach the Consent Provision, and the Parties' remaining arguments with respect to the provision are moot. *Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 768 (Tex. 2014). The Court will permit Ironshore to file another motion to amend its pleading so that both Parties can address the sufficiency of Ironshore's newly proposed allegations.

### 2. *Attorneys' Fees*

The Court denies Ironshore leave to seek attorneys' fees because Ironshore does not identify any claim it has pled for which they are appropriate relief. In its briefing, Ironshore claims attorneys' fees solely as potential relief for Facility IMS's purported breach of the Reimbursement Provision of the Ironshore Policies. Doc. No. 71 at 10. The Reimbursement Provision requires Facility IMS to repay Ironshore to the extent Ironshore advances money toward self-insured retentions on Facility IMS's behalf. Pol'y § IV(A)(8). If Facility IMS did not repay advances, that breach of contract would entitle Ironshore to attorneys' fees under Tex. Civ. Prac. & Rem. Code § 38.001(b), which authorizes fees awards to parties prevailing on contract claims. *Price v. Allstate Ins. Co.*, 190 F. App'x 360, 362 (5th Cir. 2006). While Ironshore's reasoning is sound, it did not plead that Facility IMS breached the Reimbursement Provision in its proposed amended complaint. The Court will not let Ironshore seek remedies for unpled claims.

### 3. *Unjust Enrichment*

USAP035

**\*7** The Court grants Ironshore leave to amend its unjust enrichment claim. According to Ironshore, if the claims in the Underlying Lawsuits against Facility IMS are related claims, then they are subject to a collective coverage limit of one million dollars, and Ironshore's payments in excess of one million dollars to settle some of the claims was a mistake that unfairly benefited Facility IMS. FAC ¶ 77. Although the claim may be untenable, none of the Parties' arguments establish that it is.

Sorting out the Parties' positions begins with clarifying what they have not argued. Facility IMS does not rely on the Fifth Circuit's decision in *Aldous v. Darwin Nat'l Assur. Co.*, which held that, "under Texas law, an insurer has no right of equitable reimbursement against its insured." 851 F.3d 473, 485 (5th Cir. 2017), *adhered to in relevant part on reh'g*, 889 F.3d 798 (5th Cir. 2018). Facility IMS has forfeited the argument that *Aldous* forecloses Ironshore's proposed claims for purposes of resolving the motions pending before the Court.

Facility IMS instead argues that it has not been unjustly enriched by Ironshore's alleged overpayments, or at least that Ironshore cannot rely on equitable principles of unjust enrichment to recover the overpayments because the Policies govern Ironshore's payments. Doc. No. 69 at 11–12. That argument echoes the familiar principle that a party who has agreed to a distribution of benefits and costs in an express contract cannot use an unjust enrichment claim to extract additional benefits inconsistent with the distribution. *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000).

That argument is also a nonstarter. Ironshore is not attacking the agreed distribution of benefits and costs under the Policies. It alleges that it spent even more money for Facility IMS's benefit than the Policies required. FAC ¶ 77. Courts have uniformly held that parties may recover excess payments of this sort in unjust enrichment. *Sw. Elec. Power Co. v. Burlington N. R.R.*, 966 S.W.2d 467, 469 (Tex. 1998); *Unum Life Ins. Co. of Am. v. Munoz*, 2007 WL 628084, at \*4 (N.D. Tex. Feb. 27, 2007) (Fish, J.) (granting plaintiff summary judgment on overpayment-of-benefits claim).

Facility IMS contends that Ironshore's proposed unjust enrichment claim is time-barred regardless of its merits, but the Court sees no basis for Facility IMS's contention. Doc. No. 69 at 12–13. The Court generally will not reject a pleading on statute of limitations grounds unless it is clear from the face of the pleading that the statute of limitations is dispositive of the claims pled. *Evanston Ins. Co. v. Nat'l Union Fire Ins. Co.*, 2010 WL 11527373, at \*9 (E.D. Tex. Apr. 5, 2010).

Facility IMS points to Ironshore's allegation that Facility IMS stopped paying self-insured retentions in February 2019, about four years before filing this action. Doc. No. 69 at 12–13 (citing FAC ¶¶ 35, 43). If Ironshore's unjust enrichment claim accrued at that time, as Facility IMS contends, the applicable two-year statute of limitations would bar the claim. *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 871 (Tex. 2007). Facility IMS's reasoning breaks down because the allegation on which it relies establishes when Facility IMS purportedly stopped making payments to Ironshore, not when Ironshore stopped making payments on behalf of Facility IMS. Doc. No. 69 at 12–13. Ironshore's proposed claim seeks recovery of a portion of the latter, which may permissible if the payments were sufficiently recent. *See Allen v. Wilson*, 2016 WL 832780, at \*6 (Tex. App.—Mar. 4, 2016, pet. denied) (finding that unjust enrichment claims accrued on the dates of each of several alleged payments benefiting the defendant).

**\*8** While the Court rejects Facility IMS's statute of limitations argument at this stage of the proceedings, it also rejects Ironshore's assertion that the unjust enrichment claim accrued on May 17, 2023, when Facility IMS filed its Motion for Summary Judgment asserting that the Underlying Lawsuits against Facility IMS involve related claims. Doc. No. 71 at 5–6. An unjust enrichment claim accrues when a defendant wrongfully obtains a benefit it would be unconscionable to retain because that is when the party conferring the benefit can seek relief. *Clark v. Dillard's, Inc.*, 460 S.W.3d 714, 720 (Tex. App.—Dallas 2015, no pet.). Facility IMS's allegedly wrongful act was not filing a summary judgment motion, although Ironshore may not have realized that Facility IMS retained the alleged overpayments from Ironshore prior to the filing. The allegedly wrongful act was the receipt and retention of the overpayments. FAC ¶ 77; *see Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 411 & n.16 (5th Cir. 2004) (claim accrued upon wrongful receipt of funds); *Gaffar v. Kamal*, 2011 Tex. App. LEXIS 5714, at \*7 (Tex. App.—Dallas July 27, 2011, no pet.) (claim accrued upon wrongful receipt of funds despite later discovery of fraud).

Ironshore's purported failure to appreciate that Facility IMS received and retained alleged overpayments until Facility IMS moved for summary judgment does not, as Ironshore contends, defer accrual of Ironshore's unjust enrichment claim

USAP036

under the "discovery rule." Doc. No. 71 at 6. In limited circumstances, the discovery rule defers accrual of a claim until a plaintiff knows, or in the exercise of reasonable diligence should know, of the facts giving rise to the claim. *Ross v. NavyArmy Cmty. Credit Union*, 2022 WL 100110, at *5–6 (S.D. Tex. Jan. 11, 2022). Ironshore does not suggest that it was unaware of its payments on behalf of Facility IMS or any other fact supporting its proposed unjust enrichment claim. Ironshore's proffered basis for deferral amounts to the possibility that Ironshore did not realize that its payments were overpayments because it misunderstood the payment provisions in its Policies until Facility IMS offered an interpretation of them. Ironshore's alleged confusion about the legal effect of the Policies does not trigger the discovery rule. The "discovery rule applies to the knowledge of facts on the part of the [plaintiff] as opposed to a knowledge of the law." *White v. Cole*, 880 S.W.2d 292, 295 (Tex. App.—Beaumont 1994, writ denied). To the extent that Ironshore faults Facility IMS for not sharing its legal reasoning earlier, Ironshore fails to allege any facts suggesting that Ironshore needed Facility IMS's advice before it could discover the purported overpayments underlying its claim. *See Wagner & Brown v. Horwood*, 58 S.W.3d 732, 735–37 (Tex. 2001) (rejecting application of discovery rule where lessee failed to notify royalty owners that it retained excessive sums).

Because Facility IMS's attack on the merits of Ironshore's proposed unjust enrichment claim fails and because neither Party establishes when the claim accrued for purposes of the applicable two-year statute of limitations, the Court will permit Ironshore to assert the claim.

### 4. *Declaratory Relief*

The Court also permits Ironshore to seek the declaratory relief outlined in its proposed amended pleading. In its proposed amendments, Ironshore seeks three declarations: (1) a declaration that the Underlying Lawsuits against Facility IMS do or do not rest on related claims, (2) a declaration that coverage for the Underlying Lawsuits is capped at one million dollars if they rest on related claims, and (3) a declaration that Ironshore has no further coverage obligations and is entitled to reimbursement from Facility IMS if the Underlying Lawsuits rest on related claims because Ironshore has paid sums in excess of the one million dollar limit on behalf of Facility IMS. FAC ¶¶ 64–66.

Facility IMS objects to the first two proposed requests for declaratory relief as superfluous. According to Facility IMS, Ironshore has no reason to ask for declarations about the relatedness of the claims against Facility IMS or the coverage limit for those claims because Facility IMS's pleadings already ask the Court to opine on the same topics. Doc. No. 69 at 10–11. Courts have discretion to refuse to entertain requests for declaratory relief when their rulings on other claims and defenses will resolve the same issues raised by the requests. *Encompass Off. Sols., Inc. v. BlueCross BlueShield of Texas*, 2012 WL 13237487, at *6 (N.D. Tex. Nov. 26, 2012) (Solis, J.); *Kougl v. Xspedius Mgmt. Co. of Dallas/Fort Worth*, 2005 WL 1421446, at *4 (N.D. Tex. June 1, 2005) (Fitzwater, J.).

**\*9** The Court finds no occasion to exercise such discretion because it disagrees with the premise that Ironshore's requests for declaratory relief are duplicative of Facility IMS's pleadings. In its pleadings, Facility IMS alleges that Ironshore must make payments toward Facility IMS's settlement with the Wilkes Plaintiffs, but Facility IMS nowhere alleges that the Wilkes Plaintiffs' claims are or are not related claims. Doc. No. 24. The relatedness of the claims and the consequences of relatedness under the Policies are issues raised by Ironshore's first two requests for declaratory relief. FAC ¶¶ 64–65.

The Court acknowledges that Facility IMS's current strategy for proving its affirmative defenses and counterclaims, expressed in its Motion for Summary Judgment, relies on the proposition that the Underlying Lawsuits against Facility IMS involve related claims. Doc. No. 39. Because the Court denies Facility IMS's Motion for Summary Judgment without prejudice, and because Facility IMS's pleadings do not commit Facility IMS to litigating the relatedness of the claims against it, the Court believes the "safer course" is to permit Ironshore to pursue declaratory relief while there is some "doubt that it will be rendered moot by the adjudication of the main action." 6 Wright & Miller, Fed. Prac. & Proc. § 1406 (Apr. 2023 update); *Amerisure Ins. Co. v. Thermacor Process, Inc.*, 2021 WL 1056435, at *7 (N.D. Tex. Mar. 19, 2021) (Pittman, J.) (declining to dismiss request for declaratory relief where request raised theory of duty to defend that affirmative claims might not raise).

Facility IMS objects to Ironshore's third request for declaratory relief on different grounds, but the Court finds them similarly baseless. According to Facility IMS, Ironshore cannot obtain a declaration that it is entitled to reimbursement of alleged overpayments made on Facility IMS's behalf because Ironshore has no underlying right to reimbursement.

USAP037

Doc. No. 69 at 9–10. Facility IMS relies on the principle that a declaratory judgment is a remedy for an underlying claim rather than an independent cause of action. *Braidwood Mgmt. v. EEOC*, 70 F.4th 914, 932 (5th Cir. 2023). Since the Court grants Ironshore leave to assert its unjust enrichment claim for reimbursement, the Court cannot accept Facility IMS's position at this stage of the proceedings. *Bent v. U.S. Bank Nat. Ass'n*, 2015 WL 3454226, at *6 (N.D. Tex. May 29, 2015) (Godbey, J.) (permitting request for declaratory relief predicated on sufficient allegations of unjust enrichment to proceed).

### 5. *Ironshore's Answer*

The Court grants Ironshore leave to amend its Answer. Facility IMS offers only conclusory objections to Ironshore's proposed amendments. To the extent that the Court can discern the bases for the objections, the Court finds them unpersuasive.

Facility IMS's first objection reprises a theory the Court has already rejected. Facility IMS asserts that Ironshore cannot offset any overpayments it allegedly made on behalf of Facility IMS against amounts it may owe Facility IMS in coverage of the Wilkes Plaintiffs' settlement. Doc. No. 69 at 10. Facility IMS apparently reasons that Ironshore has no right to reimbursement of the alleged overpayments. *Id.* The Court's ruling permitting Ironshore to seek recovery of alleged payments in excess of the Policies' coverage limits undermines this reasoning. *Supra* Section II.B.3; *cf. also Shoop v. Devon Energy Prod. Co., L.P.*, 2013 WL 12251353, at *21 (N.D. Tex. Mar. 28, 2013) (Solis, J.) (permitting offset theory to proceed past summary judgment even in the absence of unjust enrichment where defendant purportedly voluntarily overpaid royalties).

**\*10** Facility IMS's second objection is nearly indecipherable. Facility IMS evidently disputes the validity of Ironshore's quasi-estoppel defense. Quasi-estoppel "precludes a party from accepting the benefits of a transaction and then taking a subsequent inconsistent position to avoid corresponding obligations or effects." *Cambridge Prod. v. Geodyne Nominee Corp.*, 292 S.W.3d 725, 732 (Tex. App.—Amarillo 2009, pet. denied). Ironshore apparently perceives an inconsistency between Facility IMS's assertion that the Underlying Lawsuits against Facility IMS involve related claims collectively subject to the self-insured retention for a single claim and its demand for coverage of the claims that

exceeds the liability limit for a single claim. Doc. No. 66-2 ¶¶ 27, 31. In opposition to this theory, Facility IMS offers a single sentence of argument, reproduced here in full with two preceding sentences of context:

> Under Texas law, there can be no recovery for unjust enrichment under a quasi-contract or contract implied-in-law theory when a valid, express contract covers the subject matter of the parties' dispute. Accordingly, the proposed amendment to paragraph 79 of Ironshore's First Amended Complaint should also be denied as futile. Ironshore's amendment in paragraph 31 of its proposed First Amended Answer—asserting a quasi estoppel defense to [Facility IMS's] Counterclaim—should also be denied for the same reason.

Doc. No. 69 at 12 (citations and internal quotation marks omitted). Facility IMS does not explain why its reasoning about unjust enrichment is applicable to the defense of quasi-estoppel, nor does Facility IMS cite any authority holding that the defense rises or falls on the existence of a valid claim for unjust enrichment or a valid contract. Perhaps Facility IMS intends to invoke the principle that a party acting in accordance with a contract is not quasi-estopped from enforcing the contract even if its counterparty mistakenly believes that the party's actions are inconsistent with the contract. *Comiskey v. FH Partners, LLC*, 373 S.W.3d 620, 638 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *Neiman-Marcus Grp., Inc. v. Dworkin*, 919 F.2d 368, 370–71 (5th Cir. 1990). If so, Facility IMS fails to connect that principle to its own actions under the Policies, and the Court will not invent arguments Facility IMS has not advanced. The Court rejects Facility IMS's opposition to Ironshore's quasi-estoppel defense as inadequately briefed. *United States v. Shah*, ⎯ F.4th ⎯⎯, 2023 WL 6385685, at *29 (5th Cir. Oct. 2, 2023).

## III. MOTION FOR SUMMARY JUDGMENT

Having granted Ironshore's Motion for Leave to Amend its pleadings in part, the Court denies Facility IMS's Motion for Summary Judgment without prejudice. The Parties may

USAP038

seek summary judgment on one or more of Ironshore's amended claims or defenses. Permitting each Party to urge a single summary judgment motion addressing all amended and unamended claims and defenses, rather than urging separate motions addressing amended and unamended claims, will best serve judicial economy. The Parties may file or renew motions for summary judgment in accordance with the Scheduling Order in this action. Doc. No. 38; *Haynes v. Ryan Drilling, LLC*, 2016 WL 11585280, at \*2 (W.D. Tex. Mar. 21, 2016) (denying summary judgment to permit renewed filing in light of amended pleading). The Court's denial of Facility IMS's Motion for Summary Judgment moots Facility IMS's Motion to Strike Ironshore's summary judgment evidence and Ironshore's Motion for Leave to File supplemental summary judgment evidence. Doc. Nos. 56–57.

The Court reminds the Parties that they should point to specific evidence in their briefing if they wish the Court to consider the evidence in ruling on any summary judgment motion. *Jesus Church of Victoria Tex., Inc. v. Church Mut. Ins. Co.*, 2022 WL 4238089, at \*6 n.5 (S.D. Tex. Sept. 13, 2022) (citing *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012)); *Fed. R. Civ. P.* 56(c)(1), (3); N.D. Tex. L. Civ. R. 56.5(c). In the Motion for Summary Judgment denied by the Court, Facility IMS cites almost exclusively to portions of pleadings in the Underlying Lawsuits that recite generic legal conclusions, like the conclusion that Facility IMS failed to provide a clientplaintiff "reasonable and appropriate healthcare services." *See* Doc. No. 40 at 17–26. If Facility IMS intends to argue that the claims against it in the Underlying Lawsuits are related claims under the Ironshore Policies and does not intend to rely on the sweeping theory that all claims for negligent provision of healthcare are related claims, Facility IMS must cite more specifically to the circumstances showing that the claims are related.

## IV. MOTION TO SEAL

**\*11** Because the Court considered Ironshore's summary judgment brief and exhibits in denying Facility IMS's Motion for Summary Judgment without prejudice, the Court turns to Ironshore's request for leave to file portions of the brief and exhibits under seal. After the Court ordered Ironshore to amend its First Amended Motion to Seal to comply with the Court's order governing sealing, Ironshore filed a superseding Second Amended Motion to Seal. The Court denies the First Amended Motion to Seal as moot and considers the Second Amended Motion to Seal. Doc. Nos. 60–61.

Under the common law, the public enjoys presumptive access to documents filed on the Court's docket. *Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 419 (5th Cir. 2021). The Court will seal documents or portions of documents only if "line-by-line" review of the documents reveals strong and specific reasons for denying public access to the material to be sealed. *IFG Port Holdings, L.L.C. v. Lake Charles Harbor & Terminal Dist.*, —— F.4th ——, 2023 WL 6151640, at \*7 (5th Cir. Sept. 21, 2023). The Court has conducted its review and denies the Second Amended Motion to Seal without prejudice.

### A. Confidential Business Information

Many of Ironshore's requests to seal portions of documents turn on an assessment of whether those portions contain confidential business information. A party's interest in sealing information that competitors would use to its disadvantage can overcome the public's right to access judicial records. *Nixon v. Warner Commc'ns*, 435 U.S. 589, 598 (1978). Only a specific threat of competitive harm may justify sealing. *Vantage Health Plan v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 451 (5th Cir. 2019).

Ironshore seeks to seal snippets of its summary judgment brief, a supporting declaration, and three other written communications between Ironshore and Facility IMS because they reveal amounts Ironshore or Facility IMS spent or considered spending to settle a subset of the claims against Facility IMS. Doc. Nos. 61-1, 61-3, 61-4, 61-5, 61-6. Ironshore observes that the public has limited interest in learning these amounts. Although Ironshore's satisfaction of the Policies' coverage limits may be an issue in this case, the specific amounts of Ironshore's coverage payments are not at this stage. *Cf. Geltzer v. Andersen Worldwide, S.C.*, 2007 WL 273526, at \*2 (S.D.N.Y. Jan. 30, 2007) (Lynch, J.) (refusing to seal amount of settlement for which bankruptcy trustee sought approval because the amount was essential to the Court's approval or disapproval of the settlement). Ironshore reasons that its own competitive interest in concealing the actual and potential settlement amounts outweighs the public's interest because disclosure of the amounts would advantage plaintiffs whose claims have not settled when they negotiate with Ironshore. Doc. No. 61 at 5–6.

While Ironshore's reasoning is superficially appealing, the Fifth Circuit has squarely rejected it. If disclosure of the settlement amounts might harm Ironshore "by exposing [it] to additional liability and litigation," that is "of no consequence" because " 'a litigant is not entitled to the court's protection

USAP039

from this type of harm' where it arises solely because of the common law right of access" to judicial records. *Bradley v. Ackal*, 954 F.3d 216, 230 (5th Cir. 2020) (quoting *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1137 (9th Cir. 2003)). The Fifth Circuit has left open the possibility that, in some circumstances, settlement amounts should be sealed if keeping them confidential was material to the decision to settle. *Id.* at 228. The Court also recognizes that the settlement of claims is a significant aspect of an insurer's business, and an insurer's settlement strategies may have competitive value that extends beyond negotiating settlements of claims under a single policy. Because Ironshore has not suggested that either consideration supports sealing here, the Court finds that the competitive interests served by sealing portions of the five documents discussing settlement amounts are not entitled to protection. The Court will give Ironshore one more opportunity to amend its sealing motion to identify interests supporting sealing.

**\*12** Turning to the remaining document Ironshore seeks to seal, a 2013 email exchange, the Court finds that Ironshore has not sufficiently explained its interest in sealing the proposed redacted portions of the exchange, which discuss Ironshore's historical reserves and premium negotiations with Facility IMS. Doc. No. 61-2. Ironshore has completed its negotiations with Facility IMS and shared the exchange with Facility IMS. Perhaps Ironshore's past reserves and negotiations remain relevant to Ironshore's business with third parties despite being fully a decade old, but Ironshore has presented no declaration or other evidence indicating that they do. The Court is unwilling to find that the seemingly stale information Ironshore provided about its finances and negotiations should be sealed as a matter of law. *See Select Interior Concepts, Inc. v. Pental*, 2020 WL 2132575, at \*4 (N.D. Tex. May 5, 2020) (Lindsay, J.) (refusing to seal documents from a three-year-old transaction merely because disclosure "could potentially" harm the transacting party). Ironshore is in a better position than the Court to know the sensitivity of such information in its industry. If Ironshore renews its sealing request, it should present facts supporting its position, including any concrete prejudice it will face or is likely to face from disclosure of the information.

### B. Privilege

Ironshore's relies on the federal common interest privilege as a second basis for sealing portions of its briefing and exhibits, including many of the same portions that purportedly contain confidential business information. Doc. No. 61. According to Ironshore, the documents it seeks to seal contain confidential

communications among Ironshore, Facility IMS, and outside counsel that enjoy protection from disclosure because they address claims against Facility IMS. *E.g.*, *id.* at 6–7.

The Fifth Circuit has not detailed the circumstances in which the application of a privilege outweighs the public's right of access to judicial records, but two guiding principles are discernible in the decisions of other courts. First, a party that puts its own privileged communications at issue in filings on the Court's docket generally waives the privilege and cannot seek to seal the communications on that basis. *See Joy v. North*, 692 F.2d 880, 893–94 (2d Cir. 1982); *cf. also In re Avantel, S.A.*, 343 F.3d 311, 324 (5th Cir. 2003) (placing documents under seal pending a ruling on whether they were privileged); Tex. Evid. R. 511(a) ("A person ... waives [a] privilege if the person ... voluntarily discloses or consents to disclosure of any significant part of the privileged matter unless such disclosure itself is privileged."). Second, a party that does not put its own privileged communications at issue may seek to seal the communications by showing that the privilege survived the filing of the communications and the interests served by the privilege outweigh the public interest in access to the communications. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 125 (2d Cir. 2006); *Crystal Grower's Corp. v. Dobbins*, 616 F.2d 458, 462 (10th Cir. 1980). If the party consistently opposed disclosure of the communications, the Court will often seal them. *See Siedle v. Putnam Invs.*, 147 F.3d 7, 12 (1st Cir. 1998); *In re City of Houston*, 772 F. App'x 143, 144 (5th Cir. 2019) (per curiam).

Ironshore's threshold problem under these standards is that it appears to have put the documents it seeks to seal in issue. Ironshore filed the documents unprompted, and it is not obvious that Facility IMS's Motion for Summary Judgment compelled Ironshore to disclose the privileged contents of the documents rather than the nonprivileged facts discussed in the documents. While Facility IMS is a party to the purportedly privileged documents, Ironshore does not contend that Facility IMS is asserting a privilege in opposition to disclosing them. Ironshore states only that Facility IMS is generally unopposed to Ironshore's Second Amended Motion to Seal. Doc. No. 60 at 15.

Assuming Ironshore could surmount these difficulties, the Court would still decline to seal Ironshore's filings on the briefing before it. Ironshore expressly relies on the federal common interest privilege, which protects communications between actual and potential co-defendants and their counsel made in furtherance of a common interest. Doc. No. 61

USAP040

at 6; *In re Santa Fe Int'l Corp.*, 272 F.3d 705, 710–13 (5th Cir. 2001). The Court cannot apply the federal law of privilege because it is presiding in diversity over a dispute arising exclusively under state law. Instead, it must apply the privilege law of the forum state: Texas. *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 299 n.26 (5th Cir. 2005). Texas has no common interest privilege; it has an allied litigant privilege that protects communications from a client, its attorney, or the representative of either of them to an attorney or an attorney's representative representing another party in a pending action. *In re XL Specialty Ins. Co.*, 373 S.W.3d 46, 54 (Tex. 2012). Ironshore may hold an allied-litigant privilege in some of the communications it wishes to seal, but Ironshore has presented no facts or legal authority tailored to the application of the privilege.

 **\*13** Since the Court permits Ironshore one more opportunity to show that the material it seeks to seal constitutes confidential business information, the Court will also permit Ironshore one more opportunity to show that the material should be sealed on the basis of privilege. If Ironshore takes that opportunity, it should not assume that the Court is familiar with the facts relevant to a finding of privilege, including which individuals are attorneys or representatives of others and the status of the various lawsuits against Facility IMS.

## V. CONCLUSION

The Court **GRANTS** in part and **DENIES** in part Ironshore's Motion for Leave to Amend. Ironshore may make only its proposed amendments to its unjust enrichment claim, its request for declaratory relief, and its Answer. Within seven days of the entry of this Order, Ironshore **SHALL FILE** (1) its First Amended Complaint, revised to reflect only those amendments permitted by the Order, and (2) redlines showing the differences between the filed pleading and Ironshore's Complaint, Doc. No. 1, and between the filed pleading and

Ironshore's proposed First Amended Complaint. Ironshore **MAY FILE** a motion for leave to further amend its pleading no later than fourteen days after the entry of this Order. If Ironshore files such a motion, it must (1) attach its proposed amended pleading to the motion and (2) attach a redline to the motion showing the differences between the proposed amended pleading and the pleading the Court has ordered Ironshore to file.

The Court **DENIES** Facility IMS's Motion for Summary Judgment without prejudice. The Court **DENIES** Facility IMS's Motion to Strike Ironshore's summary judgment evidence and Ironshore's Motion for Leave to File supplemental summary judgment evidence as moot. The Parties **SHALL FILE** any subsequent motions for summary judgment in accordance with the Court's Scheduling Order. Doc. No. 38.

The Court **DENIES** Ironshore's Motion to Seal without prejudice. Within twenty-one days of the entry of this Order, Ironshore **SHALL FILE** (1) a renewed motion or (2) a notice abandoning its motion and stating whether any Defendant intends to file a motion requesting that any of the documents lodged provisionally under seal be filed under seal. If a Defendant so intends, it **SHALL FILE** its motion no later than seven days after the filing of the notice. If no Party requests that one or more of the documents be sealed, the Court **WILL UNSEAL** them upon receipt of the notice. All documents lodged provisionally under seal **SHALL REMAIN UNDER SEAL** pending further order of the Court.

**SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 6850006

---

    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   11

NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)

2019-2 Trade Cases P 80,891

2019 WL 3804679
United States District Court, N.D. California,
San Jose Division.

NSS LABS, INC., Plaintiff,

v.

SYMANTEC CORPORATION;
ESET, LLC; and Anti-Malware Testing
Standards Organization, Inc., Defendants.

Case No. 18-cv-05711-BLF
|
Signed 08/13/2019

**Attorneys and Law Firms**

Ian Neville Feinberg, Hong Lin, Jeremiah Aaron Armstrong, Marc Christopher Belloli, Margaret Elizabeth Day, Feinberg Day Kramer Alberti Lim Tonkovich & Belloli, Menlo Park, CA, for Plaintiff.

Jonathan M. Jacobson, Daniel Paul Weick, Pro Hac Vice, Wendy Huang Waszmer, Pro Hac Vice, Wilson Sonsini Goodrich & Rosati, New York, NY, Lisa Davis, Ryan Thomas O'Hollaren, Wilson Sonsini Goodrich and Rosati, P.C., Palo Alto, CA, for Defendant Symantec Corporation.

Dylan Ian Ballard, Michael W. Scarborough, Mona Solouki, Sheppard, Mullin, Richter & Hampton LLC, San Francisco, CA, for Defendant ESET, LLC.

Arnold Edward Brown, II, Stephen Grant Sullivan, Schwabe Williamson Wyatt PC, Mountain View, CA, Brenna K. Legaard, Pro Hac Vice, Schwabe, Williamson & Wyatt, P.C., Portland, OR, for Defendant Anti-Malware Testing Standards Organization, Inc.

**ORDER GRANTING MOTIONS TO
DISMISS WITH LEAVE TO AMEND**

[Re: ECF 42, 43, 51]

BETH LABSON FREEMAN, United States District Judge

**\*1** Plaintiff NSS Labs, Inc. ("NSS Labs") provides cybersecurity testing services for vendors and end users of cybersecurity products. NSS Labs alleges that several vendors, including Defendants Symantec Corporation

("Symantec") and ESET, LLC ("ESET"), conspired with Defendant Anti-Malware Testing Standards Organization ("AMTSO") to exclude NSS Labs from cybersecurity testing markets. NSS Labs sues Symantec, ESET, and AMTSO for violations of federal and state antitrust laws, specifically, Section 1 of the Sherman Act, 15 U.S.C. § 1, and California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq.

Each of the Defendants has filed a motion to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). The Court has considered the briefing of the parties and the oral arguments presented at the hearing on May 30, 2019. For the reasons discussed below, the motions are GRANTED WITH LEAVE TO AMEND.

**I. BACKGROUND** [1]

[1]
> The background section is drawn from the allegations of the complaint, documents incorporated into the complaint by reference, and matters subject to judicial notice. *See Louisiana Mun. Police Employees' Ret. Sys. v. Wynn*, 829 F.3d 1048, 1063 (9th Cir. 2016).

*The Parties*
Plaintiff NSS Labs is the world's leading provider of cybersecurity testing services. Compl. ¶ 15, ECF 1. NSS Labs tests cybersecurity products known as Endpoint Protection ("EPP") products, which category includes Advanced Endpoint Protection ("AEP") products. *Id.* ¶¶ 6, 17. EPP products are primarily designed to protect endpoint devices such as personal computers, laptops, and smartphones. *Id.* ¶ 27. AEP products "attempt to continuously monitor threats to file systems" so as to allow users to act against these threats in real-time. *Id.* ¶ 28.

NSS Labs began its business by performing "public tests," in which it tested a number of competing cybersecurity products, assessed the products' abilities to protect from cyberattacks, and then distributed a report to paying customers. Compl. ¶ 37. NSS Labs' customers for public reports include users, potential users, and vendors of the tested products. *Id.* NSS Labs also performs "private tests" for vendors, in which NSS Labs tests a single product under a non-disclosure agreement with the vendor. *Id.* ¶ 40.

Defendants Symantec and ESET are vendors of EPP and AEP products. Compl. ¶¶ 48, 50. Defendant AMTSO holds itself out as a standards setting organization. *Id.* ¶ 52. According to

NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)

2019-2 Trade Cases P 80,891

AMTSO's website, it "was founded in 2008 to improve the business conditions related to the development, use, testing and rating of anti-malware products and solutions." *Id.* Most EPP product vendors are members of AMTSO. *Id.* ¶ 53. Symantec, ESET and other EPP product vendors have had representatives serve on AMTSO's Board of Directors. *Id.* ¶¶ 56-59. AMTSO's membership also includes companies that provide EPP testing services, including NSS Labs, but those companies are in the minority and are outvoted by the EPP vendors. *Id.* ¶¶ 54, 60.

*The Alleged Conspiracy*

**\*2** Symantec, ESET, and other EPP vendors (collectively, "Vendor Conspirators") conspired "to license their products under terms of use or end user license restrictions that purport to prevent competitive or comparative testing of their products, and purport to prohibit their customers from allowing their copies or 'instances' of EPP products to be used for competitive or comparative testing." Compl. ¶ 64. In February 2017, the Vendor Conspirators met at a conference held in San Francisco, California. *Id.* ¶ 65. The Vendor Conspirators agreed that AMTSO would adopt standards for testing and rating anti-malware products, and that the Vendor Conspirators would refuse to deal with any cybersecurity testing service that did not adhere to those standards. *Id.* ¶ 66.

In May 2018, AMTSO adopted the AMTSO Testing Standard ("the Standard"), which is attached to the complaint as Exhibit A. Compl. ¶ 75 and Exh. A. The Standard does not mandate any particular testing methodology. Compl. Exh. A. Instead, it requires advance disclosure of a test plan to EPP Vendors. Compl. ¶¶ 77-78 and Exh. A. According to NSS Labs, the purpose of the Standard is to let the Vendor Conspirators know in advance exactly how their products will be tested. *Id.* ¶ 76. This gives "Vendor Conspirators the ability to tailor their products in advance to the threats against which their products will be tested." *Id.* ¶ 79. NSS Labs asserts that the Standard is intended to, and does, "defeat the purpose of independent third-party testing by giving the EPP Vendor Conspirators the ability to cheat the tests they will be subject to and to give consumers the false impression that EPP products are free from EPP Security Defects when in fact they are not." *Id.*

On May 19, 2018, Mark Kennedy of Symantec sent an email to AMTSO membership stating that Symantec is committed to using the AMTSO Standard for all privately commissioned tests, and that Symantec will not deal with a testing company that does not follow the Standard. Compl. ¶ 73. On May 21, 2018, at an AMTSO meeting in Portland, Oregon, other

Vendor Conspirators announced that they too would refuse to deal with cybersecurity testing companies that do not adhere to the AMTSO Standard. *Id.* ¶ 74. At a June 2018 AMTSO meeting, one of the agenda items was "Driving Adoption: Companies Requiring AMTSO Standards." *Id.* ¶ 83. In September 2018, the president of AMTSO posted to the AMTSO website a blog "strongly" encouraging all testing organizations and other parties engaged in anti-malware testing to follow the AMTSO Standard. *Id.* ¶ 84.

NSS Labs refuses to adhere to the AMTSO Standard, and it continues its practice of testing without giving EPP product vendors advance information about how the tests will be performed. Compl. ¶¶ 99-100. NSS Labs claims that as a result, it is the principal target of a group boycott by the Vendor Conspirators. *Id.* ¶¶ 98-100. The Vendor Conspirators purport to prohibit even private testing of their products unless the testing company adheres to the AMTSO Standard. *Id.* ¶ 103. The Vendor Conspirators have conspired to license their products under terms of use that prevent competitive or comparative testing and prohibit customers from allowing their copies of EPP products to be used for competitive or comparative testing. *Id.* ¶ 64.

*Antitrust Claims*

NSS Labs filed the complaint in this action on September 18, 2018, alleging federal and state law antitrust claims against Symantec, ESET, and AMTSO. Compl., ECF 1. NSS Labs also named EPP Vendor CrowdStrike, Inc. as a defendant, but NSS Labs has voluntarily dismissed CrowdStrike, Inc. pursuant to Federal Rule of Civil Procedure 41(a). Notice of Voluntary Dismissal, ECF 75.

NSS Labs asserts claims for: (1) *Per Se* Violation of Section 1 of the Sherman Act (Group Boycott); (2) Violation of Section 1 of the Sherman Act under the Rule of Reason (Group Boycott); (3) *Per Se* Violation of Section 1 of the Sherman Act (Being Disadvantaged by a Membership Organization); (4) Violation of Section 1 of the Sherman Act under the Rule of Reason (Being Disadvantaged by a Membership Organization); (5) *Per Se* Violation of Section 1 of the Sherman Act (Use of Membership Organization to Commit Antitrust Violations); (6) Violation of Section 1 of the Sherman Act under the Rule of Reason (Use of Membership Organization to Commit Antitrust Violations); (7) *Per Se* Violation of Section 1 of the Sherman Act (Membership Organization is Inherently Anticompetitive); (8) Violation of Section 1 of the Sherman Act under the Rule of Reason (Membership Organization is Inherently Anticompetitive);

NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)

2019-2 Trade Cases P 80,891

(9) *Per Se* Violation of the Cartwright Act; and (10) Violation of the Cartwright Act under the Rule of Reason.

**\*3** Symantec, ESET, and AMTSO seek dismissal of all claims under Rule 12(b)(6).

## II. LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted tests the legal sufficiency of a claim." *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (internal quotation marks and citation omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

## III. DISCUSSION

The complaint asserts ten antitrust claims, eight under the Sherman Act § 1 and two under California's Cartwright Act. The claims fall into two categories: *per se* claims based on the alleged conspiracy and group boycott (Claims 1, 3, 5, 7, and 9), and rule of reason claims based on the same conduct (Claims 2, 4, 6, 8, and 10). Defendants contend that both sets of claims are subject to dismissal under Rule 12(b)(6), while NSS Labs asserts that its *per se* and rule of reason claims are pled adequately. When evaluating the adequacy of the pleading, the Court applies federal antitrust law to all claims, including those asserted under the Cartwright Act. "The analysis under California's antitrust law mirrors the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, was modeled after the Sherman Act." *Cty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001). The parties agree that, for pleading purposes, the Cartwright Act claims rise and fall with the Sherman Act § 1 claims.

### A. Sherman Act § 1

Section 1 of the Sherman Act states that "[e]very contract, combination ..., or conspiracy, in restraint of trade or commerce" is illegal. 15 U.S.C. § 1. Because "every commercial agreement restrains trade," whether particular conduct "violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). "Restraints can be unreasonable in one of two ways." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283-84 (2018). "A small group of restraints are unreasonable *per se* because they always or almost always tend to restrict competition and decrease output." *Id.* (internal quotation marks and citation omitted). "Restraints that are not unreasonable *per se* are judged under the rule of reason." *Id.* (internal quotation marks and citation omitted). "The rule of reason requires courts to conduct a fact-specific assessment of market power and market structure to assess the restraint's actual effect on competition." *Id.* (internal quotation marks, citation omitted, and alterations omitted).

Before addressing the pleading requirements particular to each of these theories of antitrust liability, the Court takes up the more basic question of whether NSS Labs has alleged enough facts to suggest the existence of a conspiracy. Defendant ESET contends that NSS Labs has not done so, and that all claims against ESET are subject to dismissal on that basis. While framed slightly differently, AMTSO also argues that the complaint alleges no unlawful conduct on its part, and therefore that it cannot be liable under NSS Labs' conspiracy theory. Defendant Symantec has stated expressly that it does not challenge the conspiracy allegations for purpose of its motion to dismiss. Accordingly, the Court first addresses the challenges to NSS Labs' conspiracy allegations raised by ESET and AMTSO, then it turns to all Defendants' motions to dismiss the *per se* claims, and finally it addresses all Defendants' motions to dismiss the rule of reason claims.

### B. Conspiracy Allegations Against ESET and AMTSO
**\*4** In order to defeat a Rule 12(b)(6) motion, a plaintiff asserting Sherman Act § 1 claims must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). It is insufficient to allege the existence of a conspiracy in conclusory terms, or to allege facts that suggesting the mere possibility of a conspiracy. *See id.* The plaintiff must plead "facts that are suggestive enough to render a § 1 conspiracy plausible." *Id.*

### 1. ESET

ESET argues that the complaint is devoid of allegations that ESET representatives agreed to, or took action in

USAP044

NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)

2019-2 Trade Cases P 80,891

furtherance of, the conspiracy. The Court agrees. NSS Labs alleges that the conspiracy began in February 2017 when CrowdStrike's CTO "organized a meeting of the EPP Vendor Conspirators with the express intent, purpose and effect of obtaining agreement among the competitors to refuse to do business with companies, including specifically NSS Labs, who attempt to perform public tests of their products using testing methodologies other than those agreed to by the EPP Vendor Conspirators and embodied in the AMTSO Testing Standard." Compl. ¶ 65. According to NSS Labs, "[t]he EPP Vendor Conspirators agreed that defendant AMTSO would adopt 'standards' for 'testing and rating of anti-malware products and solutions,' that adherence to such standards would be mandatory at least among the EPP Vendor Conspirators, and that at least the EPP Vendor Conspirators would refuse to deal with any cybersecurity testing service that did not adhere to the testing 'standards' to be adopted by AMTSO." *Id.* ¶ 66. However, the complaint does not allege that ESET representatives were at the February 2017 meeting or voted to adopt the proposed testing standards.

ESET points out that it appears from documents attached to the complaint that ESET was not a member of the AMTSO Standards Working Group that developed the Standard. *See* Compl. Exh. A at 4 (listing of AMTSO Standards Working Group). ESET requests that the Court take judicial notice of information on AMTSO's website showing that, in fact, ESET voted against adoption of the Standard. *See* ESET's RJN Exh. 1, ECF 44-1. The request for judicial notice is granted, as no party disputes ESET's vote and the vote "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).

At the hearing, NSS Labs' counsel argued that ESET voted against the AMTSO Standard because ESET wanted a *more* restrictive standard, and therefore that ESET's vote does not undermine the allegation of conspiracy. ESET's desire for a more restrictive standard is not alleged in the complaint. Further, NSS Labs does not explain how ESET's vote against the Standard that was the apparent focus of the conspiracy could give rise to a plausible inference that ESET was part of the conspiracy. "For an agreement to constitute a violation of section 1 of the Sherman Act, a conscious commitment to a common scheme designed to achieve an unlawful objective must be established." *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 983 (9th Cir. 2001) (internal quotation marks and citation omitted).

NSS Labs alleges that the Vendor Conspirators have conspired to license their products under terms of use that prevent competitive or comparative testing of their products and prohibit customers from allowing their copies of EPP products to be used for competitive or comparative testing. *Id.* ¶ 64. ESET points out that the complaint does not allege that *ESET's* EULAs contain such restrictions.

**\*5** In summary, the complaint contains no facts plausibly suggesting that ESET agreed to or participated in the alleged conspiracy to boycott NSS Labs. All of the claims against ESET are subject to dismissal on that basis as well as on the grounds discussed below.

### 2. AMTSO

AMTSO argues that it is not alleged to have done anything unlawful, as its only relevant conduct was adopting the AMTSO Standard through a vote of its members. The Standard is not mandatory, nor does it address the type of licensing restrictions described by NSS Labs. *See* Compl. Exh. A, Standard. It is entirely unclear from the complaint how AMTSO joined or participated in the alleged conspiracy. AMTSO is not a vendor and it does not hire companies such as NSS Labs to provide testing services. In short, the complaint contains no facts plausibly suggesting that AMTSO agreed to or participated in the alleged conspiracy to boycott NSS Labs. All of the claims against AMTSO are subject to dismissal on that basis as well as on the grounds discussed below.

### C. *Per Se* Claims

Defendants argue that this case does not present the type of circumstances that traditionally have warranted application of the *per se* rule, and they request that the Court dismiss the *per se* claims without leave to amend. AMTSO makes the additional argument that *per se* claims cannot be asserted against it in light of the Standards Development Organization Advancement Act of 2004 ("SDOAA"), 15 U.S.C. § 4302. In opposition, NSS Labs claims that it has alleged a "classic group boycott" falling squarely within the scope of the *per se* rule, and that the SDOAA does not prohibit application of the *per se* rule with respect to AMTSO.

### 1. Circumstances Traditionally Warranting Application of *Per Se* Rule

NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)

2019-2 Trade Cases P 80,891

Exactly what kinds of activity fall within the *per se* rule is "far from certain." *Nw. Wholesale Stationers*, 472 U.S. at 293. Defendants argue that cases in which the Supreme Court has applied a *per se* approach generally have involved joint efforts to disadvantage competitors by denying them suppliers or customers needed to compete. For example, in *Fashion Originators' Guild of America, Inc. v. FTC,* the Supreme Court applied the *per se* rule when dress and textile manufacturers who sold original designs agreed to boycott retailers that dealt with manufacturers who sold copies of those original designs. 312 U.S. 457 (1941). While the manufacturers boycotted retailers, with whom they had a vertical relationship, the purpose of the boycott was to injure competitors – manufacturers who sold copies. *Id.* at 467. In *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, the Supreme Court applied the *per se* rule to a boycott created when a retail store, Broadway-Hale, obtained agreement from manufacturers and distributors of household appliances that they would not sell (or would sell only at discriminatory prices) to Broadway-Hale's competitor, Klor's. 359 U.S. 207, 208-09 (1959). As Defendants point out, NSS Labs is not a competitor of any Defendant.

NSS Labs contends that a *per se* illegal boycott need not be aimed at a competitor, citing *F.T.C. v. Superior Court Trial Lawyers Ass'n*. In *Trial Lawyers Ass'n*, "a group of lawyers agreed not to represent indigent criminal defendants in the District of Columbia Superior Court until the District of Columbia government increased the lawyers' compensation." 493 U.S. 411, 414 (1990). The lawyers, who were in private practice, were appointed and compensated pursuant to the District of Columbia Criminal Justice Act ("CJA"). *Id.* at 415. The Supreme Court held that the lawyers' "boycott constituted a classic restraint of trade within the meaning of Section 1 of the Sherman Act," observing that "[t]he agreement among the CJA lawyers was designed to obtain higher prices for their services and was implemented by a concerted refusal to serve an important customer in the market for legal services and, indeed, the only customer in the market for the particular services that CJA regulars offered." *Id.* at 422-23 (internal quotation marks and citation omitted). Characterizing the CJA lawyers' conduct as "the essence of price-fixing," the Supreme Court concluded that "[t]he horizontal arrangement among these competitors was unquestionably a 'naked restraint' on price and output." *Id.* at 423.

**\*6** While *Trial Lawyers Ass'n* demonstrates that the *per se* rule may be applied where the conspiracy does not target a

direct competitor, it involved a price-fixing cartel and thus presented factual circumstances very different from those at issue in this action. NSS Labs has not cited, and the Court has not discovered, any case in which the *per se* rule has been applied to conduct centered on standard setting activities such as those alleged here. At least one court in this district has held that "SSO's are not illegal per se and often create a net pro-competitive effect.... Accordingly, any alleged agreement among the members of a SSO is analyzed under a rule of reason." *Analogix Semiconductor, Inc. v. Silicon Image, Inc.,* No. C 08-2917 JF PVT, 2008 WL 8096149, at \*4 (N.D. Cal. Oct. 28, 2008).

Recognizing that "there is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine," the Supreme Court in *Nw. Wholesale Stationers* offered guidance by identifying three characteristics that are indicative of a *per se* illegal boycott. *Nw. Wholesale Stationers*, 472 U.S. at 294 (internal quotation marks, citation, and alterations omitted). The Ninth Circuit has summarized those three characteristics as follows: "(1) the boycott cuts off access to a supply, facility, or market necessary to enable the victim firm to compete; (2) the boycotting firm possesses a dominant market position; and (3) the practices are not justified by plausible arguments that they enhanced overall efficiency or competition." *Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.,* 141 F.3d 947, 950 (9th Cir. 1998) (summarizing *Nw. Wholesale Stationers*). "[A] concerted refusal to deal need not necessarily possess all of these traits to merit *per se* treatment." *Nw. Wholesale Stationers*, 472 at 295. Defendants argue NSS Labs' *per se* claims possess *none* of the three characteristics articulated above. Defendants focus primarily on the third characteristic, arguing that the AMTSO Standard reveals a plausible efficiency justification on its face that makes application of the *per se* rule inappropriate. However, Defendants also argue that the complaint lacks facts showing that Defendants cut off NSS Labs' access to a necessary facility or market, or that Defendants have a dominant position in any relevant market.

### a. Plausible Efficiency Justification

Defendants argue that a plausible efficiency justification for the AMTSO Standard appears from the document itself. The Forward to the Standard states that "AMTSO is a non-profit organization established to help improve the business conditions related to the development, use, testing, and rating

NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)

2019-2 Trade Cases P 80,891

of anti-malware solutions." Standard at 3, Exh. A to Compl., ECF 1-1. The Forward goes on to discuss the critical nature of anti-malware testing, and articulates the view that "the lack of proper testing protocols can create unnecessary expense for vendors, which ultimately can impact the amount of resources devoted to research and development, and shift focus from critical threat detection toward compliance with opaque or unfair testing procedures." *Id.* The Forward states that it is "based on a premise that although testers and vendors must retain their independence, anti-malware testing is more likely to be transparent and Fair if there is communication between the parties regarding the solution being tested, and the testing methodology." *Id.*

The justification for adoption offered in the Forward to the Standard is plausible on its face. Under the applicable authorities, that alone appears to doom the *per se* claims. "When a defendant advances plausible arguments that a practice enhances overall efficiency and makes markets more competitive, *per se* treatment is inappropriate, and the rule of reason applies." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1155 (9th Cir. 2003). "This is so because plausible arguments that a practice is procompetitive make [the court] unable to conclude 'the likelihood of anticompetitive effects is clear and the possibility of countervailing procompetitive effects is remote.' " *Id.* (quoting *Nw. Wholesale Stationers*, 472 U.S. at 294).

 **\*7** NSS Labs argues that the justification set forth in the Standard's Forward cannot be accepted at face value but must be evaluated on a more developed record. NSS Labs points out that in *Paladin* the determination whether a *per se* approach was appropriate was made at summary judgment and not on a first round motion to dismiss. *See Paladin,* 328 F.3d at 1155. While NSS Labs is correct as to the procedural posture of *Paladin*, it is not apparent from the decision that the Ninth Circuit's discussion of the plausible efficiency justification turned on any particular evidence in the record. The Ninth Circuit found that a *per se* approach is inappropriate when a defendant "advances" a plausible efficiency justification. *See id.* At least one district court in the Northern District of California has applied that reasoning to preclude *per se* claims at the motion to dismiss stage, finding that a policy enacted by eBay, Inc. regarding the auctioning of coins on its website arguably was pro-competitive and thus that a *per se* approach was inappropriate. *See Universal Grading Serv. v. eBay, Inc.*, No. C-09-2755 RMW, 2011 WL 846060, at \*5 (N.D. Cal. Mar. 8, 2011). Other district courts, however, have declined to determine the applicability of the

*per se* rule on a motion to dismiss, finding "that decision is more appropriate on a motion for summary judgment." *In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012).

This Court concludes that because the *per se* claims in this case turn on enactment of a Standard which articulates plausible pro-competitive justifications on its face, dismissal is appropriate at the motion to dismiss stage. NSS Labs argues that its *per se* claims are not grounded wholly in the enactment of the Standard, but also in the EPP Vendors' agreement to boycott testing companies that refuse to comply with the Standard. NSS Labs also argues that the proffered pro-competitive justification actually is *not* plausible because there is no legitimate reason for EPP Vendors to control how their products are tested.

The separation between the enactment of the Standard and the alleged agreement to boycott is not apparent to the Court upon a reading of the complaint. The Court reads the complaint to allege that the Vendor Conspirators conceived of a scheme to enact a standard for the purpose of restricting testing of their products, and thereafter used the resulting AMTSO Standard as a justification to boycott NSS Labs. It may be that NSS Labs can clarify its theory to show anticompetitive conduct not grounded in the Standard, and to allege facts demonstrating that the justification articulated in the Forward to the Standard is not plausible. As presently framed, however, the Court reads the *per se* claims to be firmly grounded in a non-mandatory standard, which was passed by AMTSO's members in what appears to have been a legitimate vote, and which articulates a plausible efficiency justification on its face.

### b. Access / Market Power

Defendants argue that NSS Labs also has failed to allege facts showing the existence of the first two characteristics listed above, specifically, that NSS Labs was denied access to a supply, facility, or market necessary to enable the victim firm to compete, or that Defendants hold a dominant position in any relevant market. Defendants' argument on these points is well-taken, and is not refuted by NSS Labs. As noted above, it appears from the face of the complaint and attached documents that the Standard is voluntary. NSS Labs is not required to adhere to the Standard, nor are its customers. NSS Labs appears to argue that it needs access to test all anti-malware products on the market in order to provide

USAP047

**NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)**

2019-2 Trade Cases P 80,891

accurate results to its customers. However, it is unclear from the complaint that Defendants deprived NSS Labs of such access. While NSS Labs suggests that Defendants' EULAs restrict access to their products such that NSS Labs does not have access to Symantec and ESET products even for public testing, NSS Labs does not allege any specific facts to support that suggestion. Moreover, it is entirely unclear whether Symantec and ESET together make up 1% or 100% of NSS Labs' potential customer base among EPP Vendors. It therefore is unclear what effect, if any, a boycott by Symantec and ESET would have on NSS Labs. AMTSO is not alleged to participate in or hold a dominant position in any market.

### c. Conclusion

**\*8** Because it has failed to allege facts showing the existence of any of the three characteristics that are indicative of a *per se* illegal boycott, the Court concludes that NSS Labs has failed to allege a *per se* claim. While Defendants urge the Court to dismiss the *per se* claims without leave to amend, the Court is reluctant to do so without granting NSS Labs the opportunity to clarify its *per se* theories and attempt to cure the deficiencies noted herein. Accordingly, Defendants' motions to dismiss the *per se* claims are GRANTED WITH LEAVE TO AMEND.

### 2. SDOAA

Defendant AMTSO argues that the *per se* claims against it are barred by the Standards Development Organization Advancement Act of 2004 ("SDOAA"), 15 U.S.C. § 4302. That statute provides in relevant part that, in any antitrust action under federal or state law, the conduct of "a standards development organization while engaged in a standards development activity, shall not be deemed illegal *per se*; such conduct shall be judged on the basis of its reasonableness, taking into account all relevant factors affecting competition, including, but not limited to, effects on competition in properly defined, relevant research, development, product, process, and service markets." 15 U.S.C. § 4302 (2). Defendants Symantec and ESET argue that even if the SDOAA does not bar the *per se* claims against them on its face, the statute should be extended to cover them as AMTSO's members.

In opposition, NSS Labs argues that AMTSO is not a true standards setting organization covered by the SDOAA. After

the hearing, the United States filed a Statement of Interest urging the Court not to dismiss NSS Labs' *per se* claims pursuant to the SDOAA. *See* Gov't's Statement of Interest, ECF 91. The Government argues that there are factual questions whether AMTSO is a standards development organization falling within the SDOAA. The Court granted Defendants leave to respond to the Government's Statement of Interest. *See* Order Granting Leave, ECF 94. Symantec and AMTSO filed responses; ESET did not.

After reviewing the Government's Statement of Interest and the responses thereto, the Court concludes that there may be factual issues as to whether the SDOAA applies in this case. The AMTSO Standard does not proscribe any particular testing methodology but rather focuses on what information must be exchanged between the testing company and the vendor. The Court need not make any determination regarding the application of the SDOAA at this time, however, because NSS Labs' *per se* claims are subject to dismissal on other grounds, as discussed above.

### D. Rule of Reason Claims

Under the rule of reason, a plaintiff must plead four separate elements: (1) the existence of a conspiracy, (2) the intention on the part of the co-conspirators to harm or restrain competition, (3) actual injury to competition, and (4) that the plaintiffs suffered "antitrust injury" as a result of the conspiracy. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1197 (9th Cir. 2012). Defendants attack NSS Labs' pleading with respect to the first, third, and fourth elements.

### 1. Existence of Conspiracy

As discussed above, both ESET and AMTSO successfully challenge the sufficiency of NSS Labs' conspiracy allegations. The complaint does not allege facts showing that ESET's representatives were at the February 2017 where the conspiracy allegedly began, were involved in creating the AMTSO Standard, or even voted for the Standard. The complaint likewise contains no facts plausibly suggesting that AMTSO agreed to or participated in the alleged conspiracy to boycott NSS Labs.

### 2. Injury to Competition

USAP048

**NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)**

2019-2 Trade Cases P 80,891

**\*9** "Proving injury to competition in a rule of reason case almost uniformly requires a claimant to prove the relevant market and to show the effects upon competition within that market." *Oltz v. St. Peter's Cmty. Hosp.*, 861 F.2d 1440, 1446 (9th Cir. 1988). "That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). "The term 'relevant market' encompasses notions of geography as well as product use, quality, and description." *Oltz*, 861 F.2d at 1446. "The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand." *Id.*

Symantec and ESET argue that NSS Labs has not stated enough facts to plausibly establish a relevant product market or power within the market. AMTSO does not focus on the relevant product market in its motion.

*Relevant Market*

In *Newcal*, the Ninth Circuit discussed three factors, drawn from *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), that must be considered in assessing a plaintiff's definition of the relevant market. *See Newcal Indus., Inc. v. IKON Office Sol.*, 513 F.3d 1038, 1044 (9th Cir. 2008). First, "the relevant market must be a product market." *Id.* at 1045. Second, "the market must encompass the product at issue as well as all economic substitutes for the product." *Id.* As noted by the Supreme Court in *Brown Shoe*, "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe*, 370 U.S. at 325. Third, "although the general market must include all economic substitutes, it is legally permissible to premise antitrust allegations on a submarket." *Newcal*, 513 F.3d at 1045. "Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim." *Tanaka*, 252 F.3d at 1063; *see also* Newcal, 513 F.3d at 1045 ("[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable.").

The complaint alleges four product markets in the United States, referred to collectively herein as the "Relevant Product Markets": (1) national market for EPP products, (2) national market for AEP products, (3) national market for EPP product testing, and (4) national market for AEP product testing. Compl. ¶¶ 90-95. Thus, the first of the *Brown Shoe* factors is satisfied. However, the second factor is not satisfied,

because NSS Labs fails to identify the economic substitutes for the product markets. Nor does NSS Labs plead any facts regarding the cross-elasticity of demand between the Relevant Product Markets and their substitutes. NSS Labs also does not distinguish between any general or submarkets in its complaint. Accordingly, even applying a liberal pleading standard, NSS Labs has failed to allege the relevant markets.

*Market Power*

To establish the effects on competition within a relevant product market, the moving party must allege market power. *Newcal*, 513 F.3d at 1044. NSS Labs has not alleged any facts with respect to Defendants' market power in the Relevant Product Markets.

### 3. Antitrust Injury

Only those who possess antitrust standing by virtue of having suffered antitrust injury may bring a private action for damages for violation of the antitrust laws. *See Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 371 (9th Cir. 2003). Plaintiff must allege harm to competition in the market and cannot succeed by merely showing harm to itself as a competitor. *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1200 (9th Cir. 2012). There are "four requirements for antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1055 (9th Cir. 1999).

**\*10** Symantec and AMTSO argue that NSS Labs has not alleged facts showing antitrust injury. They argue that even if NSS Labs has suffered an injury, there has been no harm to competition. AMTSO also asserts that any injury suffered by NSS Labs does not flow from unlawful conduct on the part of AMTSO.

NSS Labs alleges that it has suffered an antitrust injury due to Defendants' actions because it has suffered a group boycott and lost revenue based on its refusal to adhere to the AMTSO Standard. Compl. ¶¶ 98–103. NSS Labs does not link its alleged loss of revenue to conduct that also harms competition. NSS Labs argues that competition is harmed by EPP Vendors' EULAs restricting access to their products for testing, suggesting that NSS Labs does not have access to

USAP049

**NSS Labs, Inc. v. Symantec Corporation, Not Reported in Fed. Supp. (2019)**

2019-2 Trade Cases P 80,891

Symantec and ESET products even for public testing. Those facts are not alleged in the complaint.

With respect to AMTSO, standards setting organizations can run afoul of antitrust laws under certain circumstances, for example, where the standard is a result of coercion. *See Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 505-07 (9th Cir. 2010) (finding that allegations of financial pressure and litigation threats demonstrated improper coercion of a standard-setting body at the motion to dismiss stage); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 496 (1988) (stating that packing a standard-setting organization with paid support to ban a competing product violated antitrust laws). Here, no coercion or similar activity is alleged in the complaint. It appears that the only relevant action AMTSO took was to adopt the Standard at issue pursuant to a vote of its membership. NSS Labs asserts that the Standard is anti-competitive, and causes harm to competition, because under the Standard companies such as NSS Labs are to give EPP Vendors advance notice of the test plan. However, the Standard is voluntary, not mandatory. NSS Labs has made clear on the face of the complaint that it does not adhere to the Standard, that is, that it continues to provide testing without giving EPP Vendors advance notice. NSS Labs therefore has failed to allege how AMTSO's adoption of the Standard itself, as opposed to the EPP Vendors' alleged boycott, has caused it to suffer antitrust injury.

### 4. Conclusion

NSS Labs has failed to state a claim under the rule of reason, because it has failed to allege facts showing: the existence of a conspiracy and participation in such conspiracy by ESET and AMTSO; the relevant markets and Defendants' power within those markets; or antitrust injury. NSS Labs' opposition briefs suggest that NSS Labs can allege additional facts addressing all of these elements. Accordingly, the motions to dismiss are GRANTED WITH LEAVE TO AMEND as to NSS Labs' rule of reason claims.

### IV. ORDER

(1) The motions to dismiss are GRANTED WITH LEAVE TO AMEND.

(2) Any amended complaint shall be filed on or before September 12, 2019.

(3) Leave to amend is limited to the deficiencies addressed in this order. NSS Labs may not add new parties or claims without first obtaining leave of the Court.

(4) With respect to any future motions to dismiss, the Court sets the following page limits:

(a) Defendants collectively are limited to a single main brief of no more than 20 pages. Defendants ESET and AMTSO may, but are not required to, file supplemental briefs of no more than 5 pages each. In no event may the total pages of the moving briefs exceed 30 pages.

 **\*11** (b) The opposition brief is limited to single brief that shall not exceed the total pages of the moving briefs.

(c) Defendants collectively are limited to a single reply brief of no more than 15 pages.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3804679, 2019-2 Trade Cases P 80,891

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

USAP050



UNITED STATES          OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE $93^d$ CONGRESS
FIRST SESSION

## VOLUME 119—PART 28

NOVEMBER 6, 1973 TO NOVEMBER 15, 1973

(PAGES 35989 TO 37438)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1973

USAP051

urgent in order that the trans-Alaskan pipeline may be constructed without further delay.

Construction has been delayed for years by litigation, and our national interest now requires a clear-cut and unequivocal policy decision taken by Congress. This bill is a decision by Congress that the trans-Alaska pipeline shall be built at the earliest possible time. That decision is binding on the Federal courts and on the executive branch. Every effort has been made to forestall further litigation designed to thwart the will of the Congress.

The conference committee met many times, and it has produced a good compromise that preserves substantially all of the House amendment, which was in the nature of a substitute for the provisions of the Senate bill. A compromise, however, involves concessions by both sides, and the final product truly represents a melding of the Senate and House provisions.

The guidelines governing the grant of oil and gas pipeline rights-of-way across Federal lands spell out in statutory form policies that formerly were left to administrative determination.

The mandatory directions with respect to the trans-Alaska pipeline makes the congressional policy clear beyond any reasonable doubt.

Some of the provisions of the Senate bill that are not directly related to oil and gas pipeline rights-of-way were accepted by the conferees, with modifications, after careful examination of their merit. The most controversial of those provisions relate to the right of the Federal Trade Commission to represent itself in court—now, what is wrong with that, allowing an agency of the Government after it asks the Justice Department to take proper measures to get into court, if they do not do it, why should not that agency be able to go directly to the courts?

Plus the right of all independent regulatory agencies to collect facts they need without prior approval of the Office of Management and Budget. While these subjects could have been left for treatment in separate legislation, they were a part of the Senate bill as it came to the House, and they are a part of a carefully tailored compromise package. In my opinion, that package should be accepted. A rejection of any part of the conference report will reject the entire report, and the urgently needed pipeline legislation will be imperiled.

Mr. Speaker, I urge that the conference report be approved.

Mr. SIKES. Mr. Speaker, will the gentleman from Florida yield?

Mr. HALEY. I yield to the gentleman from Florida.

Mr. SIKES. Mr. Speaker, as my distinguished friend, the gentleman from Florida (Mr. HALEY) knows, I have a great confidence in his recommendations. I know that the gentleman has studied this matter very carefully, but I believe that a number of us in the House have had a considerable number of communications from our constituents in our respective States and districts who are quite concerned about the possibility of additional Federal regulations, particularly over small businesses in our areas.

Would the gentleman from Florida tell us how much additional Federal regulations would be possible for the average business under this measure as agreed upon by the conferee?

Mr. HALEY. Mr. Speaker, may I say to my distinguished colleague, the gentleman from Florida, Mr. SIKES, that in my humble opinion there will be no great impact on small business. A great deal of thought has gone into this piece of legislation. I believe the gentleman from Florida knows who is in the situation here of trying to defeat this legislation, because this may cost them some money. The American people are entitled to know, and they should be protected, and agencies of the Federal Government should have the right to go into the courts and correct these things if necessary.

The SPEAKER. The time of the gentleman has expired.

Mr. MELCHER. Mr. Speaker, I yield 1 additional minute to the gentleman from Florida (Mr. HALEY), the chairman of the full committee.

Mr. SIKES. Mr. Speaker, would the gentleman yield further on that point?

Mr. HALEY. I yield to the gentleman from Florida.

Mr. SIKES. If I understand the answer given by the gentleman from Florida correctly, he feels there would be additional regulatory effect only on a very few major business concerns which are directly involved in the program; is that correct?

Mr. HALEY. That is correct. They have that right now. The only thing that this is going to take away from is if the Department of Justice does not move in a reasonable time, that agency can go into the courts and assert its rights and bring forth the facts.

Mr. MARTIN of Nebraska. Mr. Speaker, will the gentleman yield?

Mr. HALEY. I yield to the gentleman from Nebraska.

Mr. MARTIN of Nebraska. I thank the gentleman for yielding.

I am afraid the gentleman is a little bit mixed up here in his answer to the gentleman. He talks about the FTC Amendment, and I believe the gentleman from Florida was addressing himself to the amendment in regard to reporting businesses which would be affected.

Mr. Speaker, every business in the United States, from the pop and mom store up to A.T. & T. and all other corporations would be affected. I am sorry to differ with the gentleman, but that is the actual fact with regard to this amendment. It would affect small business and every business in the United States.

The SPEAKER. The time of the gentleman has expired.

Mr. STEIGER of Arizona. Mr. Speaker, I yield myself 5 minutes.

Mr. Speaker, I ask unanimous consent that the remarks of Mr. CRAIG HOSMER, ranking member-designate of the Committee on Interior, in support of the pending motion to recommit be inserted at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Arizona?

There was no objection.

Mr. HOSMER. Mr. Speaker, I want to speak in general support of the conference report authorizing construction of the trans-Alaskan pipeline and updating our laws dealing with rights-of-way for oil and gas pipelines across Federal lands. But as much as I support the pipeline, I am unable to support it today as it has been intermixed with matter which, under these rules, would be nongermane.

I support a motion to recommit the conference report with instructions to delete the provisions extraneous to the pipeline issue. In doing so I trust and hope the other body will respond to these instructions and permit the Nation to get on with this sorely needed project promptly.

This country is in desperate need of the petroleum resources lying under Alaska's North Slope. The construction of this pipeline would provide no immediate relief for our substantial short-term energy crises. But it is a step in the right direction. It is tragic to think that, but for a small group of short-sighted people who doggedly roadblocked the pipeline, our country could already be using these much needed oil reserves. Had construction of the pipeline started in 1969 we would not now be thinking of closing schools, living in cold homes, and of unemployment resulting from lack of fuel for our factories.

The potential flow of oil from Alaska is upward of 2 million barrels per day. What does this mean in terms of the current Middle Eastern oil cutoff? In 1972, this country was importing slightly over 4 percent or 700,000 barrels per day of our domestic consumption from the Arab world. By country, this breaks down as follows:

|  | Barrels per day |
|---|---|
| Saudi Arabia | 189,600 |
| Iran | 141,800 |
| Libya | 122,600 |
| Algeria | 92,500 |
| United Arab Emirates | 73,400 |
| Kuwait | 44,800 |
| Bahrain | 14,800 |
| Egypt | 8,400 |
| Other Arab | 12,000 |
| Total | 699,900 |

The figures for 1973 show that our imports from the Middle East and North Africa moved up to more than 8 percent of domestic consumption. While there is no breakdown immediately available, the U.S. Bureau of Mines estimates, for the first half of calendar year 1973, that we were filling our oil supply needs as follows:

|  | Percent |
|---|---|
| Domestic sources | 74.3 |
| Canada | 8.9 |
| Middle East and North Africa | 8.1 |
| Caribbean | 2.1 |
| Rest of the world | 5.9 |
| Total | 100.0 |

There has been no need to subject this country to the oil blackmail of the Arab world. The importance of the North Slope oil seems rather elementary.

Despite the facts of this simple arithmetic there are those xenophobic few who will continue to fight construction of the trans-Alaskan oil pipeline by fair means and foul. I can understand the logic of those who want to build a pipeline to bring oil to the Midwest, but such a pipeline is further down the road. The conference has authorized and requested the President to proceed with negotiations with Canada on this matter. Further, the Secretary of the Interior is authorized and directed to determine the feasibility of a line through Canada.

What I cannot understand is the faulty logic of those who would relish the thought of winning the battle to leave the oil under the North Slope. To preserve the 7,680 acres that would be occupied by the pipeline seems an inordinate price to pay for fuel rationing, cold homes, cold schools, and blackmail by the Arab world.

I am certain we can be assured of added litigation to try to delay further the building of this much needed pipeline. We can also be assured of continual harassment as construction proceeds. We can only hope the intent of the Congress is clear in that we will direct this pipeline to be constructed and completed without further action under the National Environmental Policy Act of 1969. In the event the intent is not clear the conference report has spelled out the way such litigation is to be handled. There is incorporated a modified version of the House-passed language expediting the litigation to the Supreme Court.

If this pipeline can be started next spring, and we, as a nation, undertake reasonable energy conservation measures we can effectively weather the current fuel shortages. But this petroleum problem is only one aspect of the much broader problem we are facing in our energy policy. Perhaps this slow first step on the trans-Alaskan oil pipeline will cause us to take the subsequent steps needed to effectively use atomic energy powerplants, oil shales, deepwater ports, and our large coal reserves. The great hue and cry to preserve the environment has helped bring us to the point where we cannot travel to enjoy what we preserve, where soon we will have to close businesses and factories for lack of fuel, where we cannot adequately heat or light our homes and schools, where we have allowed those to whom we have given aid and made wealthy bring this great Nation to the brink of major crisis.

Finally, Mr. Speaker, I want to tell the House my specific differences with the report of the conference. The House has never adequately considered such matters as confirmation of the Director of the Energy Policy Office (sec. 404), it has not considered it at all, the same is true as to confirmation of the head of the Mining Enforcement and Safety Administration (sec. 405), the expansion of the authority of the Federal Trade Commission (sec. 408) or the authority it is proposed to transfer from OMB to GAO over collection of information sought by the independent Federal regulatory agencies (sec. 409). A conference report dealing with oil and gas pipeline is no place to try to enact such sweeping legislation. The provisions relating to the Federal Trade Commission and the reporting services for business information were amendments adopted on the floor of the other body and pertain to the economic, security, and welfare of the people of this great Nation. Propositions of this magnitude, which take the form of floor amendments, without full considerate and deliberate attention cannot be allowed.

If the House allows this urgently needed pipeline to be held hostage by the other body, we are, in effect, allowing the House to be blackmailed and this pipeline to be held hostage. This House passed a bill dealing with oil and gas pipeline rights-of-way and authorizing the immediate construction of an Alaskan pipeline. If we pass this conference report as it stands we will accede to this blackmail and will truly become a second-class body.

Mr. Speaker, I recall these words spoken by the great Winston Churchill:

> If you will not fight for the right when you can easily win without bloodshed, you may have to fight when there is no hope of victory because it is better to perish than to live as slaves.

In this case victory is no easy matter, but it is a necessary matter unless we intend again and again to submit to the will and the whims of the other body like slaves.

Perhaps the problems caused by these amendments from the other body will cause us to pass our own bills and send them over so we will not be asked to accept a lot of nongermane language from the conference. That is a stupid and unnecessary procedure. We must stand now for our rights.

I will support strongly passage of an Alaskan pipeline bill and amendments to our outdated rights-of-way laws across Federal lands. I just as strongly urge you to support the recommittal motion instructing the conferees to delete the objectionable provisions.

Mr. STEIGER of Arizona. Mr. Speaker, there are, as with every issue that confronts us, particular ones that generate interest. There are several things at stake here that go beyond the phrasing of the language. Basically, Mr. Speaker, the reason we are confronted with this division within the House at this point is a very simple one. The Senate, in their haste to pass the pipeline bill, adopted some language which dramatically revised the Federal Trade Commission and its activities and dramatically revised the method of requiring small business, all business, to make reports to that Government agency. The Senate did so without any hearings, without any knowledge of what the language did, the importance of the language, and they did it because they knew that the pipeline was a critical piece of legislation that this Nation must have.

It is a simple case of the Senate sticking this language in here.

Mr. Speaker, the language that I will propose in the motion to recommit is very specific. It will not cause any delay in the process of the passage of the pipeline beyond that which has already been created, and it will assert once and for all the legislative sounding that I think everybody in this House wants. There have been no hearings in this body or the other body on the import of this language. This language is totally far reaching. It affects all business; it makes a totally autonomous agency under the Federal Trade Commission, an agency with no precedent, I might add.

Above all, I think the most important thing is that it was done with a certain knowledge that because of our concern over the energy crisis, we probably would not be concerned with what appeared to be innocuous language. I will tell the House exactly what happened. I will tell the House the business community was very late in being aroused over the problem. That is why we have been bombarded by the business community.

I will tell the chairman that they were late, but the language was inappropriate. It could not stand by itself. It will go down in defeat in an up or down vote in this House.

What I am going to ask the House to do is to confirm language which would restore the FTC to its present status and restore the reported practice, with slight modification, to its present status. This is not a matter of parochial pride or House pride versus Senate pride. This is a very basic issue. Should the House accept a totally inappropriate amendment to a bill simply because that bill is desperately needed at this time of an energy crisis? The answer is, I will tell the Members, a resounding no.

By adopting this language which I propose to offer in the motion to recommit, then the Senate will know we are locked into this position. They want the pipeline bill as much as we do. Then we can proceed in an orderly fashion.

Mr. Speaker, I urge the Members to support the pending motion to recommit.

Mr. LATTA. Mr. Speaker, will the gentleman yield?

Mr. STEIGER of Arizona. I yield to the gentleman from Ohio.

Mr. LATTA. I thank the gentleman for yielding.

Mr. Speaker, I think that the action taken by the majority of the conferees on this conference report is reprehensible. It is high time that this House takes steps to make certain that the rules of this House are not circumvented as they were in this case.

We have a serious parliamentary situation here and it needs correcting. The rules of the House were previously amended with the membership believing they would have an opportunity to vote on these nongermane Senate amendments brought back to the House by our conferees. To preclude the House from passing on these nongermane amendments, the conferees have substituted the Senate bill for the House-passed bill. At the present time, I am serving on a subcommittee of the Rules Committee which is delving into these devious methods of circumventing the rules of this House. Hopefully, we will report rules changes which will end these practices.

In the instant case, the House of Representatives passed this needed Alaskan pipeline legislation before we went on recess in August. I must ask the House now: Where has this legislation been all this time? Did my Democratic friends

who were in the majority in this conference committee not know how important this bill was to the welfare of the country and that an energy crisis was fast approaching?

I think the American people will be asking this question. Why was this legislation not immediately agreed to by the conferees and returned to the House? It should have been so reported. Everyone knows this but do they know how the legislation was being held captive in order for some to insert anti-business, anticonsumer amendments for reasons known only to the sponsors?

At the present time, American business spends too much of its time—and cost—in completing all too many duplicate reports requested by the Federal Government. This duplication costs money and the consumer must and is paying for it when he or she purchases an American-made product. Let us give the consumer a break and return this conference report to committee with instructions to delete these costly, nongermane amendments.

Mr. STEIGER of Arizona. I thank my friend, the gentleman from Ohio.

Mr. Speaker, I would like to explain to the House the rather unique position I find myself in, because the gentleman from Ohio has raised it. I am a signer of the conference report and I want to tell the House exactly why I signed it and why I now will offer a motion to recommit. We simply did not have the votes in the conference to take the offending language out. I thought the only remedy was to offer the motion to recommit to this whole House. I thought it was not fair to the Nation or to the House simply to arbitrarily hold up passage of the pipeline bill which I think is essential.

Mr. Speaker, I yield 3 minutes to the distinguished gentleman from Nebraska, the ranking minority member of the Rules Committee (Mr. MARTIN).

Mr. MARTIN of Nebraska. Mr. Speaker, I thank the gentleman for yielding.

Mr. Speaker, this body has been subjected for many years to amendments that are not germane to legislation under consideration, amendments which have been adopted by the other body. In 1970 in our Reorganization Act we attempted to correct this matter. We adopted a rule in the House that any nongermane amendment adopted by the other body and coming back in a conference report would require a separate vote on the floor of the House. Due to the parliamentary situation today, however, we are not allowed a separate vote on these nongermane amendments. That violates the spirit of the rules of the House. Unless the rules of the House are adhered to, the Congress, as an institution, is in its declining days.

Let me point out two of the major amendments. One is in regard to the FTC which provides that every time the Department of Justice does not act within 10 days on FTC cases, they automatically go over to the FTC for action.

The second amendment is an extremely important amendment to every businessman. I want the Members to mark this. It applies to every businessman—not only the large corporations in the country but it will apply from the mom-

and-pop stores on up, because it amends a 1942 act, Mr. Speaker, and takes away from the OMB the power to review and approve requests from the agencies to send questionnaires out to all business. It transfers the power from the OMB to GAO but it omits from the present law the requirement that the OMB has to approve before the department or agency is to send the questionnaire out. So it means every agency of the Government and every department of the Government, at will, can request information from business without the approval of anyone. Under the present law approval is required of OMB.

In the recommittal motion I understand the conferees will be instructed to omit these two sections from the bill. Approval of the recommittal motion will not delay construction of the Alaskan pipeline. The recommittal motion will simply instruct the House conferees to not accept these two nongermane amendments. The conference can resume immediately and approve the bill without these two amendments in a matter of minutes. If delay occurs, it would rest solely on the chairman of the Interior Committee of the body, as well as the chief conferee of the House. I hope the recommittal motion is adopted.

Mr. MELCHER. Mr. Speaker, I yield myself 30 seconds.

The gentleman from Ohio and the gentleman from Nebraska who have just spoken are members of the Rules Committee which gave to the House the rule that brought the pipeline bill to the floor, so they were authors of the rule that made it in order to substitute the House language for the Senate-passed bill. I find nothing wrong with that procedure. It has been used by the same Rules Committee with these two gentlemen concurring for years. I find that their protesting now on nongermane amendments does not apply since this is the language that was in the Senate bill and all of the Senate passed bill became germane under the rules of the House.

Mr. Speaker, I yield 3 minutes to the gentleman from Indiana (Mr. MADDEN).

(Mr. MADDEN asked and was given permission to revise and extend his remarks, and include extraneous matter.)

Mr. MADDEN. Mr. Speaker, on August 2, about 3 months ago, the Congress defeated a crippling amendment to the Alaska pipeline bill by a vote of 221 to 198. The same day, the Congress voted final passage of the Alaska pipeline legislation by a substantial margin.

Our Nation is suffering the most critical energy crisis in its history. We have heard the President, on television last week, lay down stringent regulations to cope with the fuel scarcity for this coming winter. We may have to ration gasoline within the next few months.

Through the well-organized lobby of special interests which have no regard for the convenience and comfort of about 200 million Americans, these special interest groups are conducting a telephone, telegraph, and mail lobby on the Members of Congress to sidetrack the Alaska pipeline legislation, with the hope that eventually billions will be spent by our Government constructing a pipeline down through the central part of Canada

and give Canada, and eventually Great Britain, something to say about the multibillions of barrels of oil in our own domain up in Alaska.

This pipeline should be constructed so that the world's great deposit of oil is under complete control of the United States. It is estimated that the U.S. energy needs will be increased almost 75 percent now and the next 15 years. The increase since 1962 for petroleum products alone has been 55 percent. It is also estimated that by the year 2000 the total energy needs will have increased 166 percent over 1972.

It is now necessary that we act immediately to take advantage of this mammoth discovery of petroleum in Alaska, and it will provide great relief for the United States within the next couple of years after this American-controlled Alaska pipeline is completed.

John W. Scott, prominent attorney of Washington, D.C., and former Assistant Attorney General of the United States, wrote me the following letter, dated September 6, 1973, which I hereby submit with my remarks:

WASHINGTON, D.C.,
*September 6, 1973.*

Hon. RAY J. MADDEN,
*House of Representatives,*
*Rayburn Building,*
*Washington, D.C.*

DEAR RAY: May I suggest that the public interest urgently requires that the legislation relating to the proposed Alaskan Pipeline contain language which will assure the American people that the fuel so urgently needed in the United States will not be diverted elsewhere. In this regard, I believe the following language would accomplish this result:

"No petroleum, natural gas, liquid hydrocarbons or petroleum products or commodities of any kind transported by or moved through any pipeline constructed, owned or operated by any person, firm or corporation pursuant to the provisions of this Act shall be pledged, bartered, traded, sold, or otherwise disposed of, or made available to anyone for use other than within the States of Alaska, Hawaii, and the continental limits of the United States. It is the express legislative intention that the reserves of petroleum, natural gas and liquid hydrocarbons transported through any pipeline constructed pursuant to this Act shall be utilized solely within said States of Hawaii, Alaska and/or the Continental United States."

Trusting that you had a pleasant visit back in Indiana, I am with kind personal regards

Cordially,

JOHN W. SCOTT,
*Attorney at Law.*

I am also enclosing with my remarks a letter dated August 1, in the form of a statement by the AFL–CIO executive council on the Alaska pipeline:

STATEMENT—AFL–CIO

The Senate is to be commended for passage of S. 1081, introduced by Senator Henry M. Jackson, to clear the way for prompt construction of the Alaska pipeline and early development of one of our largest domestic reserves of petroleum—Alaska's North Slopes. The Jackson bill, as amended by Senators Gravel and Stevens, would hasten construction of the pipeline by obviating the necessity of further judicial review.

The Interior and Insular Affairs Committee of the U.S. House of Representatives has reported out favorably a bill (H.R. 9130) by Congressman John Melcher of Montana, which is similar to the Senate-approved

**79 Antitrust L.J. 1**

Antitrust Law Journal
2013

Article

J. Howard Beales III, Timothy J. Muris [a1]

Copyright © 2013 by American Bar Association; J. Howard Beales III, Timothy J. Muris

# STRIKING THE PROPER BALANCE: REDRESS UNDER SECTION 13(B) OF THE FTC ACT

In the fall of 1981, the Federal Trade Commission was emerging from a period of extended controversy and facing continued threats to key aspects of its jurisdiction. In consumer protection, the Commission had sought to become the second most powerful legislature in Washington. Using its unfairness authority under Section 5, [1] but unbounded by meaningful standards, in the 1970s the Commission embarked on a vast enterprise to transform entire industries. Over a 15-month period, the Commission issued a rule a month, usually without a clear theory of why there was a law violation, with only a tenuous connection between the perceived problem and the recommended remedy, and with, at best, a shaky empirical foundation. [2] This enterprise foundered, **\*2** not only because of these substantive flaws, but also because of the internal inadequacies of the Commission's procedures and because of intense opposition from members of both parties in Congress.

Clearly, the Commission needed a new vision of its consumer protection mission. As discussed in detail elsewhere, [3] the FTC should be a referee, not a star player, in the economy, enforcing basic rules to protect consumers and the market process. Fraud was a major problem consumers faced, the consumer protection analog to price fixing in antitrust. The prestigious Kirkpatrick Commission of the American Bar Association had recommended in 1969 that the FTC systematically attack fraud, but the FTC largely had ignored this recommendation.

Given the limited set of tools the FTC thought it had, there was considerable justification for its decision to continue to ignore fraud. Fraudsters are unlikely to obey legal rules unless they are forced to do so, and the FTC had little ability to compel compliance. It had no criminal authority to impose personal sanctions, and its traditional remedy, the cease-and-desist order, left untouched the monetary gains from fraud.

To help remedy these problems, after years of trying, Congress had amended the FTC Act in 1975 to expand the FTC's ability to obtain monetary relief. [4] Primarily because the FTC Act's basic prohibitions against unfair and deceptive acts or practices were both broad and often ill defined, Congress rejected open-ended monetary relief. Instead, it enacted two provisions that provided for monetary relief, but only under carefully circumscribed conditions. Section 19 permitted the agency to seek consumer redress in federal court after an administrative proceeding to determine whether a violation had occurred, but only for practices that a reasonable person would have known were "dishonest or fraudulent." [5] Section 5(m)(1)(B) permitted the Commission to obtain civil penalties when a company engaged in an act or practice that the Commission had previously determined, in a litigated proceeding, was unfair or deceptive, but again only if the company had actual knowledge of that determination. [6] Although both of these provisions were potentially useful tools, neither would work against fraud. Each had the same fundamental flaw, namely, that the investigative target would have time to hide the money well before it could be ordered to pay redress.

**\*3** Thus, it was critical that the FTC be able to freeze assets pending a final determination on the merits. The agency therefore turned to the second proviso of Section 13(b), added to the FTC Act in 1973, which provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." [7] Relying on the authority to obtain permanent injunctions permitted the use of a single forum to attack fraudulent practices. The federal district court could not only issue an ex parte order freezing assets and enjoining ongoing violations, it could also dispose of the case on its merits,

USAP055

ordering, if appropriate, that the frozen assets be returned to consumers and that a permanent injunction be issued. This use of Section 13(b) became known as the "Section 13(b) Fraud Program." [8]

Admittedly, this use of Section 13(b) was something of a "stretch." Although many on the FTC staff, including the authors of this article, supported the new program, there was some internal opposition, arguing, with considerable force, that the 1975 amendments provided the exclusive road to financial relief. The response was two-fold. First, because the ability to freeze assets rested on a strong foundation, it would be nonsensical to force the Commission into three separate legal proceedings to resolve a single matter, as would have been required under Section 19. [9] Indeed, in the legislative history of the 1975 amendments, Congress recognized that judges might be reluctant to issue **\*4** preliminary relief unless it could assure that a final decision on the merits could occur expeditiously. [10] Second, and equally important, because the Commission was attacking fraud, it was respecting the carefully crafted congressional compromise that authorized monetary relief only when the conduct was dishonest or fraudulent.

The fraud program succeeded; [11] each successive Chairman embraced the program, improving and expanding it. For example, by 2004 there had been a total of 78 sweeps, resulting in 2,200 federal and state law enforcement actions. As the number of filings has increased, so too has the amount of consumer redress ordered. In fiscal year 2003, for example, nearly $873 million in consumer redress was ordered in 98 judgments. [12] More recently, between March 2008 and February 2009, the Commission filed 64 federal district court actions and secured 83 judgments and orders requiring defendants to pay more than $371 million in consumer redress or disgorgement of ill-gotten gains. [13]

But sometimes success can encourage overreaching. The FTC now threatens to expand the use of the Section 13(b) program beyond fraud cases, suggesting that it may use Section 13(b) to seek consumer redress even against legitimate companies when there are simply questions about the substantiation for claims made as part of national advertising campaigns. [14] This use of the Section 13(b) remedial authority is wrong as a matter of law, troubling as a matter of policy, and threatens to undermine the operation of the fraud program, which has proven critical to the FTC's consumer protection mission.

**\*5** This article proceeds in three parts. First, we discuss the legislative history surrounding the enactment of Sections 13(b), 19, and 5(m)(1)(B). [15] This legislative history has received vanishingly little attention in the cases that have addressed the legality of the Section 13(b) fraud program, even though it sheds considerable light on the proper scope of that provision. As we explain below, there is no hint in the legislative history that Congress intended to grant the FTC broad authority to seek monetary relief when it enacted Section 13(b). Moreover, two years *after* it enacted Section 13(b), Congress did grant the FTC authority to seek monetary relief in carefully circumscribed cases. This authority would have been wholly unnecessary under the current Commission's new reading of Section 13(b), raising questions about the validity of this interpretation.

Second, we discuss the Section 13(b) fraud program. Although Congress may not have specifically intended to grant the FTC the authority to seek broad monetary relief when it enacted Section 13(b), it became clear two years later that it did want the FTC to have the authority to seek monetary relief--in certain cases. Yet the tools it provided were, if interpreted narrowly, insufficient. Thus, the Section 13(b) fraud program was established to fill the breach. Because the FTC has, until recently, carefully limited its use of the Section 13(b) fraud program, the courts have blessed it, at least as applied to the narrow category of cases in which the FTC has used it. Expanded beyond that narrow category, however, the use of Section 13(b) is bad law that threatens to do more harm than good, especially when coupled with recent changes in the FTC's advertising substantiation program that have increased dramatically the amount of substantiation required for certain claims. [16]

Third, we explain why expansion of Section 13(b) beyond the fraud program is both wrong as a matter of law and troubling as a matter of policy. Specifically, we argue that the FTC and the courts should give meaning to the text of Section 13(b), which provides that the FTC may seek injunctive relief only in "proper cases." Perhaps because the FTC has historically limited its use of Section 13(b) to obviously "bad actors," most courts have simply ignored this statutory requirement, and those that have acknowledged it have **\*6** offered little explanation of what it means. Without proposing a "one size fits all" definition of that concept here, we suggest that the touchstone for defining a "proper case" is found in the language of Section 19, limiting monetary relief to cases involving practices that a reasonable person would have known were dishonest or fraudulent. We also suggest one class of cases clearly improper for awarding redress under Section 13(b): traditional substantiation cases, which typically involve established businesses selling products with substantial value beyond the claims at issue and disputes over scientific details with well-regarded experts on both sides of the issue. In such cases, the defendant would not have known

ex ante that its conduct was ""dishonest or fraudulent." Limiting the availability of consumer redress under Section 13(b) to cases consistent with the Section 19 standard strikes the balance Congress thought necessary and ensures that the FTC's actions benefit those that it is their mission to protect: the general public.

## I. THE LOST LEGISLATIVE HISTORY

Although various courts have attempted to determine the proper scope of Section 13(b),[17] their discussion of the provision's legislative history is, at best, cursory. Rather than comprehensively examining the extended history of debate and deliberation that led to the enactment of Sections 13(b), 19, and 5(m)(1)(B), these courts have, at most, simply extracted isolated comments from House and Senate reports. These isolated statements do a disservice to the rich and nuanced debate that produced the 1970s amendments to the FTC Act. We seek to address that deficit here by exploring the legislative history of Sections 13(b), 19, and 5(m)(1)(B) in detail. Upon examination, it is clear that this history is inconsistent with the FTC's current attempts to expand the reach of Section 13(b). We discuss the history comprehensively and chronologically, beginning with the FTC's desire for expanded injunctive authority and expanded ability to obtain monetary relief in legislation introduced in 1971. The FTC achieved expanded injunctive authority in 1973 through Section 13. Neither the FTC nor Congress thought that the changes to Section 13 solved the FTC's need for greater remedial authority, which led to the passage of Sections 19 and 5(m)(1)(B) in 1975.

### A. IN THE BEGINNING

The FTC exists to serve the consuming public, guarding against "unfair or deceptive acts or practices." But, as originally created, the FTC had big goals and incomplete tools to address fraudulent practices. The FTC could issue cease-and-desist orders, but actual penalties could be imposed only on those persons and companies that actually violated a cease-and-desist order. As  **\*7** David Fitzgerald has explained, "This 'one free bite' approach was deemed appropriate because the broad language of Section 5(a) was thought to give businesses little notice of the standards to which they would be held until the Commission applied Section 5 to specific conduct through a cease and desist order."[18]

But there were "two serious shortcomings" with this approach when applied to fraudulent practices.[19] As Fitzgerald noted, the administrative process was not a short one and, in some cases, could take "several years."[20] As a result, "the respondent remained free to employ the deceptive practices, causing continuing harm to the public."[21] Second, although a cease-and-desist order could help prevent "future harm," it did nothing to "remedy the injury to the public caused by the respondent's past deceptions, or deprive the respondent of the gains it had realized by employing them."[22]

In the late 1960s, the FTC came under considerable criticism. Two reports, one from three "Nader's Raiders" and the other from the American Bar Association responding to a request from President Nixon, excoriated the Commission.[23] The ABA Report concluded that without change, the Commission should be abolished. The ABA recommended, inter alia, that the FTC be much more aggressive in its consumer protection responsibilities.[24] Many critics, both within and without the FTC, felt that the agency needed more remedial authority,[25] and Congress began considering whether to grant the FTC new remedial powers.

### *8 B. THE LEAD-UP TO SECTION 13

#### 1. *S. 986 (1971)*

Although bills to address gaps in the FTC's remedial authority had been under consideration in Congress since at least the late 1960s, we begin our story in July 1971, when the Senate Interstate Commerce Committee reported S. 986, a bill empowering the FTC to seek both injunctive relief and consumer redress.[26] The injunctive relief provision would have authorized the FTC to bring suit in district court to seek temporary restraining orders or preliminary injunctions when it had "reason to believe ... that any person ... is engaged in, or is about to be engaged in, any act or practice which is unfair or deceptive to a consumer" and that enjoining such practice would be in "the interest of the public."[27]

Section 203, the consumer redress provision, would have empowered the FTC, upon issuance of a cease-and-desist order,

[to] institute civil actions in the district courts of the United States to obtain such relief as the court shall find necessary to redress injury to consumers, ... including but not limited to, recission or reformation of contracts, the refund of money or return of property, public notification of the violation, and the payment of damages. [28]

The bill would also have authorized the FTC to seek civil penalties under specified circumstances. [29]

The Committee's Report on S. 986 explained the need for the new FTC powers:

> In 1938 the Wheeler-Lea Trade Commission Act expanded the powers of the [FTC] to cover 'unfair or deceptive acts or practices in commerce.' ... **\*9** Congress, however, did not accompany this broad grant of authority with a concomitant expansion of the Commission's powers of enforcement, except in [one limited arena]. Thus the sole enforcement weapon available to the FTC to police the vast majority of consumer frauds and cheats has been the cease-and-desist order. [30]

On the Senate floor, Senator Magnuson echoed the Committee Report's comments, explaining that "[e]ven in 1938, a minority of the House committee reporting the Wheeler-Lea Act recognized and decried the inadequacy of such a limited enforcement power [as provided by the cease-and-desist order]." [31] These committee members feared that there could be no deterrence unless there was the possibility of criminal or civil penalties (and not just cease-and-desist orders), [32] and according to Senator Magnuson, these fears proved well-founded: "Each subsequent decade has brought forth indictments of the FTC's incapacity to enforce Section 5(a)(1) of the [FTCA], the original act." [33]

Although there was considerable support for granting the FTC more power, not everyone agreed. Even a redress bill requiring an initial cease-and-desist order was not without its detractors. Senators concerned about such a dramatic expansion in the FTC's remedial powers made these objections known. Senator Hruska, for example, criticized the bill for "seek[ing] to vastly and drastically increase and broaden the powers and the duties of the [FTC]." [34] While much of the criticism had to do with a separate provision that would have authorized the FTC to engage in rulemaking, the redress provision also came under attack on several fronts. First, some Senators were concerned that it would subject businesses to monetary liability, even in cases when they did not know they were violating the law. [35] Some of these Senators mocked the **\*10** fact that the bill limited the availability of civil penalties to cases of *knowing* violations of Section 5 given that the consumer redress provision contained no similar limitation. [36]

Senator Cook discussed this concern at length, noting that "the FTC frequently breaks very new ground in these proceedings and finds that conduct is 'unfair or deceptive' when the conduct had previously been widely regarded as proper." [37] As a result, the proposed consumer redress provision threatened to impose "ruinous retroactive liability." [38] He acknowledged that when individuals or companies knowingly engaged in conduct that is unfair or deceptive imposition of liability might be appropriate, but he said that could be accomplished without Section 203. [39]

Second, and related, some Senators saw this provision as fundamentally subverting the proper role of the FTC, converting the "Commission from a body whose orders are designed to operate prospectively into an instrument whose decisions are designed to redress injury and, in effect to punish." [40] Third, some Senators expressed concern that the provision would keep individual consumers from bringing their own claims or might result in double **\*11** liability for businesses. [41] Fourth, at least one Senator expressed concern that this power would make courts "less inclined to sustain orders breaking new ground in the area of defining unfair or deceptive practice," which would be "a most undesirable result from every point of view." [42]

Two other points from the debate are particularly noteworthy. First, a few Senators explicitly distinguished the provision addressing injunctive relief from the provision addressing consumer redress. While the former was viewed as ""reasonable"

USAP058

and "noncontroversial," the latter was not. [43] Second, proponents of the measure attempted to address concerns about the dramatic expansion of FTC power by arguing that consumer redress "would be an infrequently used authority of the FTC" and would only be employed "where there is a flagrant deception of consumers, and only in areas where rules and practices have been well established by the FTC." [44] Even though they maintained that its use would be infrequent, they argued that it would nonetheless be significant: "It will serve ... to lend credibility to the FTC's enforcement actions. We will no longer have businesses calculating as a risk of their operation that some clearly deceptive or fraudulent practice might be discontinued as a result of an FTC order, but discontinued only." [45] They also stressed the fact that the provision required the FTC to go to court to seek the monetary relief. [46]

Despite the bill's critics, it passed the Senate in November 1971 by a vote of 76-2. [47] It was sent to the House, where it ultimately died in committee.

**\*12** Over a year would pass before there was more sustained debate in the Senate over the FTC's remedial authorities. In January 1973, Senators Magnuson and Moss introduced a new bill, which again contained both preliminary injunction and consumer redress provisions. [48]

The consumer redress provision was similar to the one in S. 986, except that it addressed a number of the objections that had been made to that provision: (1) it made clear that exemplary and punitive damages were not authorized; (2) it provided for notice to consumers; (3) it established a statute of limitations; and (4) it allowed for the consolidation of similar actions. The new bill also differed from S.986 in that, by the time the bill was reported out of the Commerce Committee in May, a provision allowing for the FTC to request permanent injunctive relief had been added. [49]

The Commerce Committee Report clearly regarded the provisions that ultimately would become Section 13(b) and Section 19 as authorizing different actions. The Report explained:

> Title II of the bill improves the [FTC's] ability to deal with unfair consumer acts and practices "affecting" interstate commerce by granting the Commission the power to: (1) seek preliminary or permanent injunctions, (2) initiate actions in district courts seeking specific redress for consumers injured by unfair or deceptive acts or practices, and (3) secure civil penalties for knowing violations of the [FTCA]. [50]

Regarding the consumer redress provision, it said: "This provision would enable the Commission to more adequately protect consumers by affording them specific redress for their injuries. At the present time, cease-and-desist orders have prospective application only and afford no specific consumer redress to consumers who have been injured." [51] Regarding the injunctive relief provision:

> This section would permit the Commission to obtain either a preliminary or permanent injunction through court procedures initiated by its own attorneys against any act or practice which is unfair or deceptive to a consumer, and thus prohibited by section 5 of the [FTCA]. The purpose of [this section] is to permit the Commission to bring an immediate halt to unfair or deceptive **\*13** acts or practices when to do so would be in the public interest. At the present time such practices might continue for several years until agency action is completed. Victimization of American consumers should not be so shielded. [52]

The Report also made this somewhat elliptical statement about permanent injunctions:

> Provision is also made ... for the Commission to seek and, after a hearing, for a court to grant a permanent injunction. This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be assured of a[n] early hearing on the merits. Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date. Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent

USAP059

injection in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order. Commission resources will be better utilized, and cases can be disposed of more efficiently. [53]

During debate on the Senate floor, Senator Magnuson lauded the bill because the preliminary injunction provision would enable "the whistle [to] be blown at the moment a violation of the [FTCA] is detected--before consumers are damaged. By allowing the FTC to stop immediately an alleged unfair act or practice, it can do a much better job of protecting consumers." [54] He also applauded the bill for "allow[ing] the Commission to order specific redress for injured consumers." [55] Senator Magnuson expressed relief that the FTC would "no longer ... have to rely merely upon a slap of the violator's wrist to maintain fair play in the marketplace," and that consumers could finally have their injuries "made whole." [56] The bill passed the Senate on September 12, 1973.

### 3. *S. 2074 (1973)*

While the Congress was considering these bills focused on the FTC's remedial authority, the Senate was investigating the petroleum industry. In response to a question from the Senate Committee on Interior and Insular **\*14** Affairs about the adequacy of its discovery powers, on June 15, 1973, the FTC General Counsel explained that the agency's investigative powers were sufficient, but its enforcement powers were not; he suggested that the FTC be permitted to seek injunctions, when appropriate, in all cases. [57]

On June 26, 1973, Senator Jackson introduced S. 2074, a bill that contained the language that we now know as Section 13(b). In general, this bill was analogous to earlier Senate proposals to increase the FTC's authority, but the earlier bills granted the FTC injunctive authority only in cases involving acts or practices unfair or deceptive to consumers, whereas the new bill would have extended the new enforcement powers to all cases within the FTC's jurisdiction.

Senator Jackson explained that this bill would "give to the [FTC] major new statutory authority which is designed to enable the Commission to carry out its mandate to protect the public interest through prompt and aggressive enforcement of the laws it administers." [58] He also produced his correspondence with the FTC's General Counsel. The General Counsel had explained that "[t]he shortcomings of the Commission's present power are ... in its inability to obtain preliminary relief once the problem has been fully discovered." [59] He further noted that "[t]he Commission has sought for a long time to have ... statutory authority to seek directly in the federal district courts preliminary injunctions." [60] This bill was referred to the Senate Committee on Commerce. [61]

In July, Senator Jackson reintroduced the provisions of S. 2074 verbatim, but this time as an amendment to the Trans-Alaska pipeline bill; the amendment passed, and the bill subsequently passed the Senate on July 17, 1973. On August 2, 1973, the House passed a pipeline bill, but without a provision addressing FTC authority. The FTC provisions were added back into the bill during conference, and under the House rules at the time a floor vote to strike the individual provisions of the compromise bill was not procedurally permissible. [62]

In August, two members of the House led an effort to recommit, focusing largely on questions of congressional procedure; the motion failed, and the conference report was passed in November 1973. What little debate there was evinces no indication that *anyone* understood the FTC provision to do anything other than confer on the agency the authority to seek injunctive relief to **\*15** end practices while administrative proceedings were on-going. As one congressman explained, "The disaster that befell the independent gasoline marketers this past spring is dramatic [sic] of why the FTC needs additional powers to enable it to act quickly." [63]

Indeed, it is not at all clear that the grant of authority to seek *permanent* injunctive relief received much attention at all. In a letter discussing the bill, FTC Chairman Engman noted that one of the major provisions of the bill would "authorize the Commission to go into federal court to seek temporary injunctions to prevent the continuation of particularly aggravated violations of the laws under its jurisdiction, pending the completion of the lengthy administrative proceedings and appeals which lead to a final cease-

USAP060

and-desist order." [64] He said nothing at all about the permanent injunction provision. Likewise, in a House Report issued in June 1974, the description of the authority granted by section 408 of the Alaska Pipeline Act does not even mention permanent injunctive relief:

> Both the Nader and ABA reports recommended that the FTC be empowered to obtain preliminary injunctions against unfair or deceptive acts or practices which are unfair or deceptive to consumers. This authority was granted by Section 408 of the Alaska Pipeline Act, which authorized the FTC to obtain temporary restraining orders and preliminary injunctions of violations or threatened violations of any provision of law administered by the Commission. [65]

There was even less debate in the Senate than in the House. Senator Fannin noted that the provisions received little attention when they were initially added **\*16** to the bill. [66] Senator Bartlett expressed concern about the burden the provisions would place on small businessmen, [67] but nonetheless supported the bill, explaining that the "importance of the Alaskan pipeline overshadow[ed] [his] apprehensions toward the uncalled-for FTC provisions." [68] The Senate passed the conference report on November 13, 1973, and President Nixon signed the bill on November 16, 1973. [69]

If Congress had viewed Section 13(b) as a broad grant of authority to the FTC to seek consumer redress and other monetary relief, one would have expected the debates that began before enactment of the Trans-Alaska Pipeline bill to have ended. Those who had been seeking to expand the FTC's authority to give it the power to seek injunctive relief and consumer redress would have gotten everything they wanted--and then some. After all, the provisions being considered in the Senate in the early 1970s would have allowed the FTC to seek consumer redress, but only after first issuing a cease-and-desist order. [70] Section 13(b), if understood to be a consumer redress provision, would have allowed the FTC to seek that redress without having to go through the administrative process in the first place. Tellingly, the debate over redress did not stop. Instead, Congress continued to believe there was a need for the FTC to be able to seek monetary relief and accordingly enacted what are now Sections 19 and 5(m)(1)(B).

## C. SECTIONS 19 AND 5(m)(1)(B)

### 1. *The Relevance of Section 19*

Just two years after the enactment of Section 13(b), Congress enacted two new provisions that authorized the FTC to seek monetary relief--but only under specified circumstances. As noted above, Section 19 authorized consumer redress following issuance of a cease-and-desist order when a reasonable man would have known the conduct was "dishonest or fraudulent," and Section 5(m)(1)(B) authorized issuance of civil penalties following a litigated Commission determination that a practice was unfair or deceptive if the defendant had "actual knowledge" of that finding. [71] The enactment of these provisions **\*17** by those in Congress responsible for FTC oversight-- again, just two years after the enactment of Section 13(b)--is illuminating because it suggests that no one at the time understood Section 13(b) to authorize an award of consumer redress in all cases. [72]

The FTC has argued that the enactment of Section 19 is "irrelevant" in attempting to understand the meaning of Section 13(b) because it applies to "the targets of Commission *administrative* litigation." [73] But, in fact, Section 19 (like Section 13(b)) requires an independent action in court. Section 19--like some of the proposals the Senate was considering before Section 13(b) was enacted--simply requires an administrative proceeding *first*. [74] The FTC has not explained why Section 19 would have been necessary if Section 13(b) were understood to provide for consumer redress at the time it was enacted. After all, if Section 13(b) allowed the FTC to go into court to seek consumer redress routinely, the FTC could have used Section 13(b) with or without the issuance of a cease-and-desist order. [75] Thus, we think any complete understanding of Section 13(b) and the FTC's remedial powers requires careful **\*18** consideration of the legislative debates that surrounded the enactment of Section 19. [76]

### 2. *Section 19's Legislative History*

USAP061

In June 1974, the House Interstate and Foreign Commerce Committee reported favorably H.R. 7917 with amendments. In a statement of separate views, a number of members of Congress explained why they successfully "supported a motion to strike" in the full committee a consumer redress provision that was in the bill as reported by the Subcommittee on Commerce and Finance. [77] According to the provision's opponents, it "represented an attempt to provide the Commission with *new* authority to seek judicial redress for consumers injured by acts or practices that were found to be in violation of final Commission orders." [78] The provision's opponents expressed concern that this Section would permit the FTC to seek redress against persons in the absence of notice or a hearing to determine that they were engaging in illegal conduct, which would have "the effect of making a cease and desist order tantamount to a substantive rule without providing to those affected the procedural safeguards required in rulemaking proceedings." [79] The provision's opponents also noted that the FTC, while "not oppose[d] [to] the basic concept of consumer redress contained in [the] provision," could not "'endorse the **\*19** legislation in its present form.'" [80] Instead, the FTC felt it would be "wise to have additional hearings and study on the matter so that the deficiencies and inequities of the provision as drafted could be corrected." [81]

In debates on the House floor that September, at least some members suggested that the struck provision would have granted new authority to the FTC. [82] Representative Eckhardt explained that it was precisely because the FTC lacked this authority that it was so necessary. In his view, "Consumer fraud continues to be profitable and not subject to full redress unless the [FTC] has the authority ... to act," and therefore the FTC needed to be able "to return to the injured party that which was fraudulently taken away from him." [83]

There were two major criticisms of the provision. First, Representative Broyhill expressed concern about the FTC's "past practice" of "expand[ing] on its own rules by its own interpretation." [84] He provided a specific example: "recently General Motors was charged by the FTC with violating the Federal Trade Act because they were quoting an automobile magazine's evaluation of the Vega automobile. In other words, the FTC said that General Motors had violated the Federal Trade Act because General Motors itself had not substantiated the identified testimonial." [85] He explained that it might well be appropriate for the FTC to "have this authority to prospectively prohibit reliance on testimonial," but that it would be "unfair to institute redress actions against General Motors for failing to anticipate this expanded interpretation of a [FTC] rule just because they were relying on the testimony and the experience of some other party." [86]

**\*20** Second, Representative Young argued that the amendment would make a "radical change with respect to the concept of the role of Government agencies in protecting the public." [87] He explained that "public agencies have traditionally [tried] to protect the public by injunction action based on the public interest and not individual private interests." [88] Government should not, he argued, "act as a collection agency for particular people or particular private interests." [89] Ultimately, consumer redress was not part of the House bill.

During the Senate-House conference later that year, a consumer redress provision was added back. The Conference Report explained that the provision is "based on the Senate provision authorizing actions by the Commission to redress injury, with certain modifications." [90] The modifications limited the situations in which such actions could be initiated. First, "the Commission may commence an action for redress for persons injured by such a violation" "[i]f any person, partnership, or corporation violates a rule of the Commission respecting unfair or deceptive acts or practices." [91] Second,

> [i]f any person, partnership, or corporation engages in an unfair or deceptive act or practice resulting in the issuance of a cease and desist order by the Commission against such respondent, the Commission may commence an action for redress of the injuries caused by such respondent's act or practice. If in addition the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent, the court may grant redress. [92]

During debate in both the Senate and the House, the members of Congress who spoke on the floor again seemed to be of the view that Section 19 was giving the FTC significant, new authority. [93] Indeed, if 13(b) already gave the FTC broad redress authority, members of Congress were ignorant of that fact. Representative Broyhill, for example, noted that "[t]he rulemaking

USAP062

authority's "bite' in this new legislation derives from the consumer redress and civil penalties provisions," [94] and that "[t]he consumer redress provision, as a whole, is **\*21** a significant advance in consumer protection," in part because it would address the problem of class actions. [95]

Both houses ultimately voted for the bill in December 1974, and President Ford signed it into law in early 1975. [96]

## D. WHAT THE HISTORY TEACHES

There are several important conclusions one should draw from this history. First, what little debate there was about Section 13(b) focused almost exclusively on the provision for preliminary injunctive relief, suggesting that Congress thought there was little significance to the permanent injunction proviso. Had Congress understood that provision to be effecting a major change in the FTC's remedial authority, it surely would have occasioned more debate and commentary. Indeed, the consumer redress provision that eventually became Section 19 was the subject of considerable controversy in Congress. Second, there was one bill that contained both a consumer redress provision *and* an injunctive relief provision. No one suggested that those provisions were duplicative or would have accomplished the same objective. Third, the several failed attempts to add a redress provision to the FTC Act reveal Congress's reluctance to give the FTC broad authority to seek consumer redress. Fourth, the debate over Section 19 that occurred after the enactment of Section 13(b) suggests that Congress did not think Section 13(b) had granted the FTC expansive new authority. Thus, the legislative history of Sections 13(b), 19, and 5(m)(1)(B) does not suggest that Section 13(b), at the time it was enacted, provided the FTC with authority to seek consumer redress in all cases. [97] The FTC and its supporters desired both greater injunctive authority and the ability to obtain monetary relief. Both authorities were granted, although not in the same statute or at the same time. Nevertheless, viewed in its entirety, the legislative history provides the "inescapable inference" [98] that Congress did not intend the injunctive relief provision to swallow the monetary relief provision.

## **\*22** II. THE SECTION 13(b) FRAUD PROGRAM

Although there is a strong argument that Section 13(b) may not have been enacted to provide the FTC with authority to seek consumer redress, the agency used it in that way in the early 1980s to address gaps that remained in the FTC's enforcement authority, even after enactment of Sections 19 and 5(m)(1)(B). Although an aggressive interpretation of Section 13(b), the FTC limited Section 13(b) to a class of cases that ensured that the exercise of this power did not raise the same concerns that motivated Congress when it was enacting Section 19. The courts have repeatedly supported the FTC's careful exercise of this power. In this Part, we discuss the origins of this use of Section 13(b), its scope, and its reception by the courts. Consistent with the limitations in Section 19, the agency used Section 13(b) for a narrow class of cases involving fraud, near fraud, or worthless products. The courts blessed this limited expansion of FTC authority. Because Section 19 was not an effective tool against these targets, [99] the courts were not confronted with an effective argument, as discussed more fully in the next section, for limiting the use of Section 13(b).

### A. THE ORIGINS

Although Congress clearly intended the new provisions it enacted in the mid-1970s to address the deficiencies in the FTC's enforcement authority that had been identified in the 1960s, the new powers remained insufficient in some cases. As discussed in the introduction to this article, with fraudulent practices, the FTC could seek a cease-and-desist order, but the money would usually be gone before the administrative process was complete. [100] It was therefore necessary to seek an asset freeze under Section 13(b). Because the FTC was already using Section 13(b) actions in the district court to freeze the defendant's assets, the agency sought consumer redress under that provision, rather than Section 19. To be sure, the FTC could have gone into district court to get an asset freeze, returned to the administrative forum to secure a cease-and-desist order, and then returned again, years later, to district court to seek consumer redress, [101] but there seemed no reason to employ such a clunky, multi-step process when it was clear that the company had engaged in fraud.

**\*23** Although this "Section 13(b) Fraud Program," as it came to be called, was an important new tool, the Commission used this new power sparingly and carefully, limiting it to those cases involving fraud, near fraud, or worthless products. Further, although it did not impose a formal scienter requirement, the staff used the standard contained in Section 19 as a practical

benchmark. Thus, the FTC's actions did not subvert Congress's general intent when it enacted Sections 13(b) and 19, because it heeded the delicate remedial balance Congress intended to strike when it expanded the FTC's remedial authority.

In enacting those provisions, Congress clearly wanted the FTC to have the authority to seek monetary relief in some cases, but it wanted such relief to be available only when the defendant likely would have known that it was engaging in unlawful activity. Congress's simultaneous enactment of the rulemaking provision ("Section 18") reflects the same concern; Congress authorized the FTC to prescribe "rules which define *with specificity* acts or practices which are unfair or deceptive" because it wanted businesses and individuals to have fair warning before they were subjected to liability. [102] By carefully selecting the cases in which it was seeking consumer redress under Section 13(b), the FTC ensured that the Section 13(b) Fraud Program did not raise the concerns over notice that so motivated the contours of the 1975 amendments to the FTC Act. When Congress expanded the venue provision of Section 13(b) it essentially recognized as much, noting in a Senate Report in 1993 that the FTC can, pursuant to Section 13(b), "go into court ex parte to obtain an order freezing assets, and is also able to obtain consumer redress." [103]

## B. IN THE COURTS

Unsurprisingly, this use of Section 13(b) was challenged by those who were subjected to it. Most defendants challenged it on the ground that consumer redress was *never* available because Section 13(b), by its terms, grants the FTC the authority only to seek "permanent injunction[s]." It was not a frivolous argument--as we note below, it may even be right [104] --but it is an argument that the courts have almost universally rejected.

**\*24** In 1982, the Ninth Circuit became the first to do so. In *FTC v. H.N. Singer, Inc.*, [105] the court addressed whether Section 13(b)'s second proviso authorized preliminary injunctive relief even though it mentions only permanent injunctive relief. [106] Although the court was not considering the availability of consumer redress, its analysis suggested that the relief authorized by the second proviso of Section 13(b) is not limited, as its terms would suggest, to permanent injunctive relief. The court held that "[i]t is clear that, because the district court has the power to issue a permanent injunction to enjoin acts or practices that violate the law enforced by the Commission, it also has authority to grant whatever preliminary injunctions are justified by the usual equitable standards and are sought in accordance with Rule 65(a)." [107] Over the years, every other court of appeals to have considered whether Section 13(b)'s second proviso authorizes relief beyond permanent injunctions has followed the Ninth Circuit's lead, [108] with these courts generally citing the Supreme Court's decision in *Porter v. Warner Holding Co.* [109]

In *Porter*, the Court held that "[u]nless otherwise provided by statute, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction .... [T]he comprehensiveness of this equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command. Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied." [110]

**\*25** In applying this approach, *Porter* itself was an easy case. The statute in question, the Emergency Price Control Act of 1942, authorized the district court, on a proper showing, to grant "a permanent or temporary injunction, restraining order or other order." [111] Citing an earlier Supreme Court case, [112] the Court found that "the term 'other order' contemplates a remedy other than that of an injunction or restraining order, a remedy entered in the exercise of the District Court's equitable discretion." [113] Moreover, the Court relied on the statute's legislative history, citing the Senate Report that district courts "are given jurisdiction to issue whatever order to enforce compliance is proper in the circumstances of each particular case." [114]

Of course, neither the text of Section 13(b), nor its legislative history, contain the phrase "other orders" or a discussion of the district court's broad flexibility in framing appropriate relief. Nevertheless, to justify broad use of Section 13(b), the FTC today relies on *Porter* to argue that a Congressional grant of equitable jurisdiction encompasses all the inherent equitable powers of the court. But the Court made clear that Congress need not grant the courts full equitable jurisdiction if doing so would be inconsistent with Congress's intended statutory scheme. To be sure, courts require clear evidence that Congress did not intend to grant the courts their full equitable powers--"[u]nless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied" [115] --but the point

USAP064

remains to discern Congress's intent. Thus, courts have limited the availability of injunctive relief when the legislative history of the statute indicated that that was what Congress intended. [116]

Although courts considering the proper scope of Section 13(b) have concluded that that provision does not provide the "necessary and inescapable inference" that Congress intended to limit the courts' equitable jurisdiction, [117] those courts have not considered the legislative history of Section 13(b) and **\*26** the 1975 amendments to the FTC Act. As discussed above, the targets of the fraud program could not argue that Section 19 provided effective remedies for their practices. [118] Moreover, the legislative history supports a strong argument that Congress never intended to grant the FTC broad authority to seek consumer redress under Section 13(b).

The Eighth Circuit's 1991 decision in *FTC v. Security Rare Coin & Bullion Corp.* [119] is representative of many courts' summary application of *Porter*. Although *Security Rare Coin* does conclude that Congress intended district courts to have full equitable jurisdiction under 13(b), the only "legislative history" the court consults is the existence of section 19 and whether giving district courts full equitable jurisdiction under 13(b) would render Section 19 superfluous. They conclude that it does not, relying primarily on the savings clause in Section 19(e).

Section 19(e) provides that "[r]emedies provided in this section are in addition to, and not in lieu of, any other remedy or right of action provided by State or Federal law," and "[n]othing in this section shall be construed to affect any authority of the Commission under any other provision of law." [120] But that provision says only that Section 19 does not limit pre-existing authority; it tells us nothing about *what* pre-existing authority existed. That is the question we address here: whether Section 13(b) was understood to grant the FTC broad authority to seek consumer redress when it was enacted. Section 19 is relevant to that question not because it might be understood to *limit* the FTC's authority routinely to seek consumer redress under Section 13(b), but rather because its enactment suggests that no such authority was ever granted. [121] As discussed above, a full exploration of the legislative history--an exploration not contained in cases like *Security Rare Coin*--supports this conclusion.

**\*27** In any event, decisions such as *Security Rare Coin* are wholly unsurprising given the careful manner in which the Commission was using its Section 13(b) power and the lack of evidence that Congress would have frowned upon this use of Section 13(b) in the particular category of cases at issue. Indeed, because these cases involved practices that a reasonable person would know were dishonest or fraudulent, the courts have had little opportunity to consider whether Section 13(b) redress should be available in *all* cases.

The Appendix to this article catalogs the many circuit cases that have awarded consumer redress. As the table there details, each case involves fraud, near fraud, or worthless products, and they usually involve extensive preliminary relief, such as freezing assets. Although some of the defendants challenged the Commission's authority to obtain redress under Section 13(b), none argued that Section 13(b)'s application should be limited to "proper cases," that is, those involving the particularly egregious practices for which Section 19 permits redress. The reason is simple: limiting proper cases to such conduct would not have helped the defendants under the facts at issue.

The point is an important one because expanding the program beyond its historical scope would be in tension with Congress's intent to limit monetary relief to a narrowly defined category of cases. Sections 19 and 5(m)(1)(B) make this point clear: Congress did not intend that monetary relief be available against those defendants that did not know their conduct would be deemed unlawful. Limiting Section 13(b) redress to fraud honors this Congressional intent. Again, the FTC has taken the position that Section 13(b) is different because it involves an administrative proceeding, but the FTC has failed to explain *why* this difference matters--in other words, it has failed to explain why Congress would want to limit redress to cases of "dishonest or fraudulent" conduct when initiated administratively, but not to cases initiated in the district court.

It is important to emphasize that Sections 19 and 5(m)(1)(b) would not work against fraudsters. Under either section, the investigative target would be able to hide the money well before it could be ordered to pay redress. Moreover, as discussed above, [122] the ability of the FTC to freeze assets rested on a strong foundation. Having successfully frozen assets through a preliminary injunction in district court, it would have made no sense, as the legislative history recognized, [123] to force the Commission into three separate legal proceedings--a 13(b) preliminary injunction proceeding, an administrative proceeding, and a district court action to obtain redress under Section 19-- **\*28** when the original district court could consolidate all three steps into a single proceeding.

USAP065

## III. DEFINING "PROPER CASES"

If consumer redress under Section 13(b) should not be available routinely, the question remains: In what cases should it be available? What is the limiting principle? In trying to answer that question, we begin with the text of the statute. [124] As we noted at the outset, Section 13(b) provides that *"in proper cases* the Commission may seek, and after proper proof, the court may issue, a permanent injunction." [125] Thus, by its terms, the statute limits the availability of injunctive relief to "proper cases." Despite this clear limitation in the text of the statute, the courts have paid virtually no attention to what it means.

The reason for this is simple. In the past, there was little need: the FTC was seeking consumer redress in only a narrow category of cases that clearly fell on the "proper" side of the line. But now that the FTC is expanding the use of its Section 13(b) authority, the courts should now examine this clear limitation in the statute itself. The very inclusion of the phrase "in proper cases" suggests that there are some *improper cases* in which the FTC should not be seeking a permanent injunction in the courts. The FTC enjoys some discretion to define the meaning of the term "proper," but that discretion is not without limits. Rather, the FTC's interpretation must be consistent with the underlying statutory scheme. [126]

In this Part, we begin by discussing the little case law that does address the term "proper cases" and then offer some tentative views on how to draw the line between "proper" and "improper." [127] We conclude by discussing briefly the dangers posed by a more expansive interpretation of Section 13(b) that ignores this distinction.

### *29 A. IN THE CASE LAW

Unlike the question of whether consumer redress is ever available under Section 13(b), [128] only two courts of appeals have considered what makes a case "proper" within the meaning of Section 13(b), and neither issued a holding on this point. The Ninth Circuit, in dicta, rejected the argument that "proper cases" are only those involving "'routine fraud' or violations of previously established FTC rules." [129] And although the Seventh Circuit observed that a "substantial argument can be made" that Section 13(b) applies to "any violation of a statute administered by the FTC," it declined to decide the question. [130] Instead, it noted that it "is quite clear that Congress at least expected that the FTC could rely on this proviso when it sought to halt a straightforward violation of Section 5 that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings." [131]

Although various district courts have suggested that a "proper case" is *any* case involving a violation of the FTC Act, these cases offer virtually no analysis in support of this position. The district court's treatment of the issue in *FTC v. Ameridebt Inc.* is typical. [132] In that case, the FTC argued "that a 'proper case' under Section 13(b) is simply one that involves a violation 'of any provision of law enforced by the Commission.'" [133] Presumably this view derives from the language earlier in Section 13(b), which provides, in pertinent part, that the Commission "may bring suit in a district court of the United States to enjoin any such act or practice" "[w]henever the Commission has reason to believe ... that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission." [134] Without analysis, the court accepted the FTC's position. [135] **\*30** But that reading of the statute simply ignores the "proper" language in the second proviso. [136]

Moreover, a few courts have rejected the view that "proper" somehow means ""any" and have offered a more nuanced approach. For example, in an early case, the Ninth Circuit held that a "routine fraud case is a proper case." [137] In *FTC v. International Diamond Corp.*, a magistrate judge concluded that "'[t]he legislative history ... supports the defendants' contention that Congress intended Section 13(b) to be limited to garden variety fraudulent acts and practices" and that "[t]he other section of the Act which concerns consumer redress, Section [19], supports this conclusion." [138] The court also explained that because "the redress sought by the FTC under Section 13 parallels the remedies specifically authorized by Congress in Section [19], the fraud standard adopted by the court in *Turner* [a case which defined Section 19's "fraudulent or dishonest" standard by analogizing to the mail fraud statute] is an appropriate measure of a 'proper case' for consumer redress under Section 13(b)." [139]

At least one court has emphasized the role of the FTC's expertise in the remedial scheme and deemed a case "proper" when that expertise was unnecessary to resolve the case. In *FTC v. Abbott Laboratories*, [140] the court explained that "[s]urely a per se price fixing conspiracy such as that alleged has long been recognized as anti-competitive conduct affecting consumers and no further exercise of the Commission's expertise is required .... The precise scope of the 13(b) proviso has been considered in varying, murkier contexts. **\*31** Federal courts have shied away from accepting direct court actions by the Commission, such as this, if the offending conduct interjects the court into areas of Commission expertise involving the creation and monitoring of new concepts of unfair competitive trade practice." [141] The court then invoked the Seventh Circuit's statement in *FTC v. World Travel Vacation Brokers*, quoted above, [142] that "it is quite clear that Congress at least expected that the FTC could rely on this proviso when it sought to halt a straightforward violation of Section 5 that required no application of the FTC's expertise to a novel regulatory issue through administrative proceedings" and described it as "provid[ing] sound guidance." [143]

Thus, given these disparate approaches and the lack of any holdings on this issue in the courts of appeals, the case law does not answer the question what is a "proper case." Again, the fact that courts may have awarded broad equitable relief without addressing whether the case was "proper" within the meaning of Section 13(b) is not dispositive. Those courts were not asked to address the question and thus did not do so. Indeed, those were generally cases that would have fallen on the "proper" side of the line and thus those defendants simply launched an all-or-nothing challenge to the availability of consumer redress. Accordingly, the slate is largely a clean one.

## B. A PROPER DEFINITION

The fact that the slate is mostly clean does not mean that the task of defining the term "proper cases" is easy. The term "proper" simply means ""suitab[le]," [144] and does not tell us whether a case is one that is suitable for an award of consumer redress. Moreover, the legislative history of Section 13(b) in particular and monetary relief in general does not specifically address this point. The one relevant point we can discern from the legislative history is the one we have already discussed: Congress wanted monetary relief to be available only in cases when the defendant knew that it was engaging in egregious activity. To achieve this goal, Section 19 limited redress to cases in which a reasonable person would know that the conduct was dishonest or fraudulent. [145] This principle should guide any effort to discern the meaning of the term "proper cases."

**\*32** Based on our examination of the legislative history, redress under Section 13(b) should not be obtained in cases in which it would not be available under Section 19. Moreover, respect for the legislative history requires that Section 19 have some independent utility. We suggest two possible lines for defining "proper cases" under Section 13(b). The more restrictive line is that monetary relief under Section 13(b) is available only when there is a solvency problem with the target of the investigation. Unless there is a need to preserve assets, the process set out in Section 19 is workable.

A considerably more expansive line would allow Section 13(b) to be used for most cases involving dishonest or fraudulent conduct. One way to determine whether a case qualifies under this standard might be to consider, as did the courts in *Abbott* and *World Travel Vacation Brokers* discussed above, whether the case presents a straightforward violation of Section 5 such that the FTC's expertise is not necessary. [146] This more expansive line would reserve Section 19 for cases in which the Commission seeks to advance or clarify the law, such as the *Telebrands* case, [147] or the first litigated information security case (if there ever is one). [148] We are not arrogant enough to believe that we can draw a precise line between "proper" and other cases *ex ante* that would cover all possible situations. We would leave that development to the **\*33** common law process, under which FTC concepts have developed over the decades. [149] In any event, the reasonableness of the FTC's definition must be consistent with the underlying statute. [150]

It is important to note that the Commission need not always use administrative litigation when it seeks financial remedies outside of Section 13(b). After all, wherever the line between "proper" and "improper" cases is drawn, most Commission cases will be resolved through settlements. Our concern is that the Commission must use a sensible standard for determining when monetary relief is appropriate. As we have explained, a sensible standard would allow for monetary relief when the practices at issue are dishonest or fraudulent. [151]

USAP067

Defining the term "proper cases" more broadly than we suggest--to include cases involving disputed scientific substantiation for advertising claims, for example [152] --would run the risk of subjecting to monetary relief those that Congress sought to exempt under the 1975 statute. Thus, the FTC's advertising substantiation program, which involves cases in which established businesses are selling products of considerable value independent of the claims at issue, falls outside any reasonable definition of proper. We turn to this issue next.

## C. DANGERS OF DEFINING SCIENTIFIC SUBSTANTIATION CASES AS "PROPER"

As discussed above, the FTC has begun to seek consumer redress against legitimate companies for claims made in national advertising campaigns that lack scientific substantiation. [153] Such cases are not only without statutory **\*34** foundation, but may ultimately deter companies from providing useful information.

The Commission has long held that when an advertiser makes an objective claim, consumers expect the claim to be based on evidence. Thus, when there is no evidence to support the claim, it is deceptive whether or not the FTC proves that the objective claim is itself misleading. For example, an advertisement that "our windows reduce your energy costs by up to 20 percent" makes two claims: (1) that the windows reduce energy costs by up to 20 percent; and (2) that there is a "reasonable basis" for that estimate. The Commission frequently attacks advertising solely because the advertiser lacks a reasonable basis for the objective claim. [154]

The traditional substantiation case involves a reputable national advertiser making claims about the features of its product or services. (There is little risk that such a company will go into bankruptcy during an investigation or administrative litigation.) Although such claims may highlight a new feature or new benefit of the product, the product will often have been on the market for many years based on other claims about what it can do. For example, the Commission's recent cases against Kellogg involved claims of increased attention in class for children who eat Frosted Mini Wheats for breakfast, [155] and claims that Rice Krispies will help "support your child's immunity." [156] Even if the claims about the effects of these cereals on enhanced attention or immunity are completely unsupported, such claims generally are not the sole (or even primary) reason that most consumers purchase the products. [157]

Further, in our experience, in most of these substantiation cases the advertiser has evidence that provides some support for the claim. [158] The Commission, **\*35** however, may find that evidence inadequate either because it believes the advertiser has made a stronger claim than the evidence will support [159] or because it believes there are deficiencies in the supporting evidence that render it not sufficiently reliable to constitute a reasonable basis. Often, substantiation cases turn on debate among scientific experts about the proper methodologies to support a particular claim and whether the level of evidence provided is enough to substantiate the claim. [160] A crucial question in such substantiation cases is often how much evidence is necessary to constitute a "reasonable basis." [161]

Of course, judicial language in fraud cases can appear facially similar to the language in more complex scientific substantiation cases. Fraudsters often claim to rely on science, citing various studies, as part of their effort to look like a legitimate business. But these fraud claims are different because the scientific evidence offered in such cases is usually not even facially supportive of the claims made. In some cases, the scientific evidence cited may be sound, but it is not relevant to the claims. For example, in one case, the defendant advertised that certain calcium dietary supplements could cure cancer. Although there is evidence that calcium supplements may increase bone density, there is no evidence they can cure cancer. [162] Similarly, companies selling bogus weight loss products have sometimes combed the literature for ingredients that have a beneficial effect in some contexts, and combined numerous ingredients of that kind without regard for such crucial details as the effective dosage or route of administration. [163] In other cases, the evidence is at best pseudo-science, as when companies rely on testimonials or experts in completely different fields for substantiation. [164] At bottom, unlike the typical scientific substantiation cases involving legitimate businesses, these fraud cases do not involve disputes among reputable experts, debates about which of several recognized testing methodologies is most appropriate for a particular claim, or different interpretations of a complex body of scientific evidence.

USAP068

The typical substantiation case thus has at least three characteristics that sharply distinguish it from the typical fraud case. First, the cases often involve **\*36** disputes over scientific details, and may involve well-regarded experts on both sides of the question. Second, the respondents are established businesses with little risk of disappearing. Third, the product has substantial value for other reasons. Accordingly, none of the rationales that support permitting the award of consumer redress under Section 13(b) in cases of ""dishonest or fraudulent" conduct supports permitting the award of such redress in traditional substantiation cases. There is no solvency problem with the target of the investigation. Moreover, in cases of this kind, even if the FTC ultimately concludes that some of the defendant's claims lack sufficient substantiation, the defendant will generally have had some basis for making them and believed them to be true. These are precisely the kinds of cases in which honest firms will not know they are violating the law. Instead, they are typically cases in which reasonable people disagree about the meaning of an advertisement, or in which reasonable scientists disagree about the amount and types of evidence necessary to support a particular claim. Unlike Section 19, where consumer redress is available only if the individual engaged in conduct that an objective person would know was "dishonest or fraudulent," or Section 5(m)(1)(B) where penalties are only available if the person acted with "actual knowledge" that the conduct was unlawful, legitimate companies could make claims about their products without knowing that the FTC will ultimately determine that their claims lack sufficient substantiation. [165]

Moreover, when the case involves a legitimate company that is simply unable to substantiate fully every claim it has made in an advertisement, there is no reason to think that the administrative enforcement approach will be inadequate to achieve compliance. Both FTC researchers and independent academics have found that companies subject to a cease-and-desist order for deceptive advertising suffer a significant reduction in stock prices. [166] In addition, the expansion of both state enforcement and private class actions under state consumer protection statutes provides an alternative method of seeking financial relief when necessary. Although the Commission's Policy Statement **\*37** on Monetary Equitable Remedies in Competition Cases reserves the ability to seek monetary relief even when there are private actions, [167] it clearly regards the existence of such actions as sufficient in most cases.

The award of monetary relief is particularly problematic when the FTC is changing the rules, as it is with the current substantiation program. The Commission has historically said that (unless explicitly stated in the advertisement) the amount of evidence required depends on balancing the potential benefits of truthful claims that might be suppressed by requiring too much evidence against the potential costs of false claims that might occur if evidentiary requirements are too low. [168] For claims about drugs, for example, the potential costs of false claims are high because of the potential risks of side effects. When good alternative drugs are already on the market, the potential benefits of new drugs, although real, are smaller. This is the basis for stringent FDA regulation. [169]

In contrast, consider health claims for foods, such as the 1984 Kellogg claim that diets high in fiber could reduce the risk of cancer, a claim that the FTC and National Cancer Institute blessed over the FDA's objection. If this claim is true, prohibiting the claim by requiring too much evidence would deny consumers potentially important information and health benefits. If the claim is false, consumers may choose the wrong cereal for breakfast, and may pay a little more, but there are otherwise no significant adverse consequences. It seems clear that the more important risk to avoid here is the risk of mistakenly prohibiting truthful claims. [170] Moreover, because such cases often depend on complicated scientific issues, the risk of mistakenly prohibiting truthful **\*38** claims is relatively high. Thus, there is the potentially serious cost of chilling truthful speech. [171]

In recent consent agreements, the Commission replaced the flexible reasonable basis standard with a requirement for the same kinds of evidence that the FDA has traditionally required to approve new drugs. These orders require two well-controlled clinical trials to substantiate certain claims, including weight loss, [172] the duration of diarrhea and children's absence from school, [173] and reducing temporary irregularity or improving intestinal transit time, [174] regardless of what experts in the relevant field regard as reliable. Moreover, some orders require prior FDA approval of certain claims, [175] which the press releases specifically designate as a "fencing in" provision to facilitate compliance and enforcement, rather than a requirement of Section 5 of the FTC Act. In such circumstances, it is difficult for companies to know the substantiation standards that will apply to their claims, which was precisely the kind of legal uncertainty that motivated Congress to limit Section 19 relief to conduct that was dishonest or fraudulent. [176]

**\*39** The knowledge that the FTC might seek consumer redress in such circumstances could chill these companies from providing consumers with information that they would want to have about the products they are using. [177] Recently, the Supreme

USAP069

Court made clear that "[a] 'consumer's concern for the free flow of commercial speech may often be far keener than his concern for urgent political dialogue.'" [178]

Balancing the risk of mistakenly suppressing truthful claims against the risks of mistakenly allowing false ones does not mean that an advertiser can simply fabricate claims on the theory that *if* true they would be valuable to consumers. There must be evidence that supports the claim before the balancing of risks of mistakes even arises. Thus, substantiation theories frequently are part of complaints that the Commission pursues as part of the fraud program under Section 13(b). In many cases, respondents have no credible evidence to support their claims. Because the requirement to have a reasonable basis for objective claims is clear and well established, the Commission would have little difficulty in arguing that a reasonable person would have known that making the claims based on facially inadequate evidence was dishonest or fraudulent. [179]

 **\*40** Finally, the FTC's overly aggressive interpretation of Section 13(b) threatens to compromise the fraud program itself and thus jeopardize the FTC's ability to go after true fraudsters who impose significant harms on the consuming public. As noted above, we conclude there is a strong argument that Congress never intended to give the FTC the authority to seek consumer redress when it enacted Section 13(b). Those courts that have concluded otherwise have relied on the Supreme Court's decision in *Porter*, but as discussed above, [180] *Porter* does not help the FTC, especially in non-fraud cases. Porter requires agencies and courts to respect the overall statutory scheme, which in turn requires discerning Congress's intent. In fraud cases, the Commission can argue persuasively that the 1975 amendments are ineffective; no such argument appears available in non-fraud cases.

If the FTC pushes the Section 13(b) program beyond fraud-like cases, it runs the risk that the courts will be forced to confront the complexities of the program's legal authority. Moreover, courts may be less willing to bless the historical use of Section 13(b) if the FTC starts attempting to use it to obtain redress in contexts that lack support in the legislative history of the statutory changes in the 1970s. [181]

An additional risk to the Commission's fraud program from an expanded use of Section 13(b) lies in the way courts determine the appropriate amount of monetary relief. Although courts have been imprecise about whether equitable awards should be analyzed as "restitution" (which would be based on what consumers paid for the product) or "disgorgement" (which would be based on amounts received by the defendant), [182] the baseline for redress awards has generally been either consumer loss or the defendant's unjust gain. Because these measures usually coincide, under either measure the defendant can be required to pay amounts well in excess of profits. [183] Indeed, even if the **\*41** defendant's gain is the measure, permissible offsets are generally limited. [184] That is a reasonable approach for a "Chinese Diet Tea" [185] promoted as a weight loss product, when few, if any, consumers likely purchased the product because of its inherent value as a beverage. It is not a workable approach for a product like Rice Krispies; an unsubstantiated claim may increase sales somewhat, but is not responsible for the vast majority of the sales that occur. Thus, courts may change their measure of calculating damages, and those changes could complicate the determination of redress in fraud cases, as well.

Even if the FTC is successful in using Section 13(b) to obtain redress in traditional scientific substantiation cases, rethinking the approach to damages may reduce the amount of monetary relief available in the fraud program. If courts recognize, as they likely will, that total revenue is not the appropriate measure of restitution for mere unsubstantiated claims because the purchasers will generally still have received some value from the product, they may also decide that it is not appropriate in fraud cases when the same might be true (for example, at least some consumers may have purchased Chinese Diet Tea in part because of its value as a beverage). Thus, expansion of Section 13(b) to legitimate products will likely complicate Section 13(b)'s application to true fraud.

Seeking monetary relief in traditional substantiation cases poses yet another problem for Commission enforcement: delay in obtaining the prospective relief that has always been the hallmark of FTC enforcement against legitimate companies. FTC orders not only constrain the conduct of the named respondents, **\*42** they also provide important information to other advertisers about how the Commission approaches claims in a particular product category. Because the prospect of monetary relief increases the stakes, companies will fight harder and longer to avoid these costs, with delay being the inevitable result.

For all of these reasons, it is time for the FTC and the courts to give meaning to *all* of the language in Section 13(b), including its limitation to ""proper cases." By recognizing that relief is only available in "proper cases," courts and the FTC alike can respect the remedial balance Congress struck when it enacted Sections 13(b), 19, and 5(m)(1)(B).

## IV. CONCLUSION

The FTC's consumer protection mission is to prevent unfair or deceptive acts or practices. In giving the FTC the tools to accomplish that mission, Congress struck a delicate balance. It recognized that the FTC must prevent harm to the public and ensure that those who cause the harm are punished; at the same time, it recognized that the FTC could go too far. Imposing monetary penalties on those who did not know their conduct was unlawful could chill the provision of beneficial information and thus hurt members of the public more than it helps them. As we noted above, if companies are afraid that they will be subjected to monetary liability for claims about their products that the FTC ultimately concludes cannot be substantiated, they may not make the claims at all. As a result, consumers could be deprived of valuable information.

In trying to strike this delicate balance in its 1970s amendments to the FTC Act, Congress gave the FTC considerable new enforcement tools, but carefully limited those tools so that they could only be used against defendants who reasonably should have known they were engaged in egregious activities. Today, the FTC threatens to disrupt that balance by seeking consumer redress under Section 13(b) in cases in which the defendants were not engaged in egregious activities. Section 13(b) has not historically been used to seek consumer redress in such cases, and this aggressive policy threatens to harm the public and undermine the use of Section 13(b) to obtain consumer redress in those cases of fraud where its use is truly beneficial.

The FTC and the courts should ensure that there are meaningful limits on the use of Section 13(b) to obtain consumer redress, and there is a simple way to do that--look to the language of the statute. Section 13(b), by its terms, authorizes the FTC to seek a "permanent injunction" only in "proper cases." We have suggested that the touchstone for determining a "proper case" is whether a reasonable person would have known that the conduct was dishonest **\*43** or fraudulent. Only by giving meaning to the term "proper cases" can the courts and the FTC ensure that FTC enforcement is striking the proper balance that Congress intended.

**\*44  APPENDIX**

**CIRCUIT COURT REDRESS CASES** [186]

| CASE | PRACTICES | PRELIMINARY RELIEF |
| --- | --- | --- |
| | | |
| *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 715 (5th Cir. 1982) | Sold subdivided land in arid region with "no economically feasible commercial application and no resale value," while deceptively claiming the land was suitable for residential or commercial uses. | Preliminary injunction; asset freeze denied in district court but reversed on appeal. |
| *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) | Franchise rule violations that the court characterized as "routine fraud." | Preliminary injunction, asset freeze. |
| *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) | Telemarketing of investments in entering oil and gas lease lotteries that grossly misrepresented likelihood of winning a lease and the extent of competition for leases. | Preliminary injunction, asset freeze. |
| *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1026 (7th Cir. 1988) | Promoted $29 certificate for air transportation to Hawaii when a consumer booked a hotel stay through the company, but actual airfare was | Preliminary injunction, asset freeze. |

USAP071

| | | |
|---|---|---|
| | added on to hotel bill without consumer knowledge. | |
| *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564 (7th Cir. 1989) | Telemarketing of "vacation passports," which failed to disclose true airfare costs and sometimes promoted the $300--$350 voucher price as the total cost of a vacation that actually cost over $1900. | Temporary restraining order, asset freeze. |
| *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) | "Fraudulent" misrepresentations of market value of coins, misrepresented buyback policy, misrepresented investment value of modern date coins. | Preliminary injunction (referenced in 8th Circuit opinion). |
| *FTC v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) | False claims that a hair loss treatment was effective against baldness. | Preliminary injunction. |
| *FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) | Misrepresented the value of vacation prizes and the likelihood of winning; failed to disclose costs and conditions of receiving the prize. | Preliminary injunction (consent), asset freezes as to some defendants. |
| *FTC v. Febre*, 128 F.3d 530 (7th Cir. 1997) | Marketed work-at-home opportunities without revealing significant additional costs. | Preliminary injunction, asset freeze. |
| *FTC v. Kuykendall*, 371 F.3d 745 (10th Cir. 2004) | Telemarketing of magazine subscriptions that misrepresented cost and duration of subscriptions, charged consumers' accounts without authorization (contempt action). | Preliminary injunction, asset freeze as to corporate defendants. |
| *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48 (2d Cir. 2006) | Unauthorized billing for access to online entertainment via phone accounts (rather than taking and processing user credit cards). | Preliminary injunction, asset freeze. |
| *FTC v. QT, Inc.*, 512 F.3d 858 (7th Cir. 2008) | Marketed bracelets with claims that wearing them would result in immediate, significant, or complete pain relief. | Temporary restraining order, preliminary injunction. |
| *FTC v. Nat'l Urological Group, Inc.*, 356 F. App'x 358 (11th Cir. 2009) | Deceptive claims of rapid and substantial weight loss from use of a dietary supplement. | None. (Asset freeze entered after summary judgment and permanent injunction.) |
| *FTC v. Direct Mktg. Concepts*, 624 F.3d 1 (1st Cir. 2010) | Dietary supplement coral calcium marketed to prevent or treat diseases like lupus, cancer, MS, Parkinson's, and joint pain, all allegedly caused by "acidosis." | Injunction prohibiting claims as well as against "directly or indirectly selling, liquidating, assigning, transferring, converting, loaning, encumbering, pleading, concealing, dissipating, spending, withdrawing, or otherwise disposing of any funds" other than transfers "for actual and necessary business operations and expenses."[187] |

USAP072

| | | |
|---|---|---|
| *FTC v. Bronson Partners, LLC*, 654 F. 3d 359 (2d Cir. 2011) | False claims of rapid and substantial weight loss for Chinese Diet Tea and Bio-Slim Patch. | Preliminary injunction. |

## Footnotes

[a1]   J. Howard Beales III is Professor of Strategic Management and Public Policy at the George Washington School of Business, and Timothy J. Muris is George Mason University Foundation Professor of Law. While at the FTC from 1981-1987 and 2001-2004, the authors had at least supervisory responsibility for the cases discussed herein that were on the FTC's docket during those years. Our views are solely our own; they do not represent those of the current Commission or of any of the parties with whom we have consulted. We thank Anna Aryankalayil, Brady Cummins, Larry Demille-Wagman, Brianne Gorod, Maryanne Kane, Kevin McDonald, Lee Peeler, and anonymous referees for numerous helpful comments.

[1]   Section 5 of the Federal Trade Commission Act makes "unlawful" "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45.

[2]   *See* Timothy J. Muris, *Rules Without Reason--The Case of the FTC*, REGULATION, Sept./Oct. 1982, at 20. For similar criticisms of the FTC's rulemaking binge, see the extensive, contemporaneous studies by BARRY BOYER, REPORT TO THE ADMINISTRATIVE CONFERENCE OF THE UNITED STATES, TRADE REGULATION RULEMAKING PROCEDURES OF THE FEDERAL TRADE COMMISSION (1979); and Teresa Schwartz, *Regulating Unfair Practices Under the FTC Act: The Need for a Legal Standard*, 11 AKRON L. REV. 1 (1977). In 1980, the Commission itself recognized that Section 5 unfairness should be circumscribed. *See* FTC Policy Statement on Unfairness, *appended to* Int'l Harvester Co., 104 F.T.C. 949, 1070 (1984). In 1982, the Commission again clarified the reach of unfairness, eliminating the possibility that public policy could form an independent basis for a finding of unfairness. *See* Letter to Senators Packwood and Kasten, Mar. 5, 1982, *reprinted in* Antitrust & Trade Reg. Rep. (BNA) 1055, at 568-70. In 1994, Congress codified the definition in 15 U.S.C. § 45(n).

[3]   *See* Timothy J. Muris & Robert Pitofsky, *More than Law Enforcement: The FTC's Many Tools--A Conversation with Tim Muris and Bob Pitofsky*, 72 ANTITRUST L.J. 773 (2005).

[4]   *See infra* Part I.C.

[5]   15 U.S.C. § 57b; *see also infra* Part I.C.

[6]   *See* 15 U.S.C. § 45(m)(1)(B); *see also infra* note 76. In addition, Congress enacted Section 18, which also provided for monetary relief. 15 U.S.C. § 57a. Section 18, however, first required the Commission to promulgate a rule. Section 19, 15 U.S.C. § 57b, authorizes civil penalties for rule violations. *See infra* note 102 and accompanying text.

[7]   15 U.S.C. § 53(b). The first part of Section 13(b) provides, in pertinent part:

Whenever the Commission has reason to believe--(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC], and (2) that the enjoining thereof pending the issuance of a complaint by the [FTC] and until such complaint is dismissed by the [FTC] or set aside by the court on review, or until the order of the [FTC] made thereon has become final, would be in the interest of the public--the [FTC] by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the [FTC's] likelihood of ultimate

USAP073

success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond.

*Id.*

8      *See generally* David R. Spiegel, *Chasing the Chameleons: History and Development of the FTC's 13(b) Fraud Program*, ANTITRUST, Summer 2004, at 43. The Commission had begun to explore possible uses of Section 13(b) and Section 19 before the fraud program launched late in 1981, but there was no systematic effort to attack fraudulent practices. After the fraud program was launched, two of those exploratory cases resulted in highly useful Circuit Court opinions in 1982 granting preliminary relief. *See* Appendix.

9      *See* David M. Fitzgerald, *The Genesis of Consumer Protection Remedies Under Section 13(b) of the FTC Act* 11-12, *available at* http:// www.ftc.gov/ftc/history/docs/fitzgeraldremedies.pdf ("To obtain complete final relief, the Commission would need to litigate and win three separate actions: (1) a Section 13(b) preliminary injunction proceeding to obtain a preliminary asset freeze; (2) an administrative proceeding leading to a final cease and desist order; and (3) a district court action to obtain consumer redress under Section 19."); *see also id.* at 19 (describing such a "three-part process" as ""lengthy and cumbersome" and noting that "[t]he permanent injunction proviso of Section 13(b) ... offered a much more effective and efficient weapon against fraud").

10     *See infra* note 53 and accompanying text.

11     *See* Fitzgerald, *supra* note 9, at 2 (describing the program as a "mainstay of the Commission's consumer protection program"); *see also* Spiegel, *supra* note 8, at 1 (describing Section 13(b) as a "significant weapon in the Commission's fight against consumer fraud"); *see generally* Spiegel, *supra* note 8, at 43-44 (describing the program as "one of the FTC's potent consumer protection programs" and noting its "obvious success").

12     *Financial Services and Products: The Role of the Federal Trade Commission in Protecting Consumers: Hearing Before the Subcomm. on Consumer Protection, Prod. Safety, and Ins. of the S. Comm. on Commerce, Sci., and Transp.*, 111th Cong. 37 (2010) (Statement of Timothy J. Muris, George Mason University Foundation Professor of Law).

13     *Id.* at 7.

14     Consent Order, Oreck Corp., FTC File No. 102-3033 (Apr. 7, 2011) ($750,000); Consent Order, Beiersdorf, Inc., FTC File No. 092-3194 (June 29, 2011) ($900,000); Consent Order, NBTY, INC., FTC Docket No. C-4318, File No. 102-3080 (Dec. 13, 2010) ($2.1 million). In some cases, the redress is paid in conjunction with a settlement with other plaintiffs. *See* FTC v. Reebok Int'l Ltd., No. 1:11-cv-2046 (N.D. Ohio Sept. 29, 2011) ($25 million); Order Preliminary Certifying a Class for Settlement Purposes, *In re* Reebok Easytone Litig., No. 4:10-cv-11977-FDS (D. Mass. Oct. 6, 2011); FTC v. Skechers U.S.A., Inc., No. 1:12-cv-01214 (N.D. Ohio May 16, 2012) ($40 million); Grabowski v. Skechers U.S.A., Inc., No. 3:12-cv-00204 (W.D. Ky. May 13, 2013). (The authors advised Skechers during the course of the investigation.) *See also* Stipulation and Order, Gemelas v. The Dannon Co., No. 1:08-cv-236 (N.D. Ohio July 19, 2011).

15     The second proviso of Section 13(b) states, "Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 45 U.S.C. § 53. Section 19 authorizes "such relief as the court finds necessary to redress injury" (45 U.S.C. § 57(b)) against any party subject to a final cease and desist order "[i]f the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent ...." 45 U.S.C. § 57b(a)(2). Section 5(m)(1)(B) authorizes civil penalties against any party engaged in a practice that the Commission has found unfair or deceptive in a litigated proceeding "with actual knowledge that such act or practice is unfair or deceptive and is unlawful ...." U.S.C. § 45(m)(1)(B)(2).

16    *See infra* Part III.C.

17    *See infra* Parts II.B., III.A.-B.

18    Fitzgerald, *supra* note 9, at 3.

19    *Id.*

20    *Id.*

21    *Id.*

22    *Id.* at 5-6.

23    6 THE LEGISLATIVE HISTORY OF THE FEDERAL ANTITRUST LAWS AND RELATED STATUTES: PART I, at 5028 (Earl W. Kintner ed., 1983) [hereinafter LEGISLATIVE HISTORY] ("Rising consumer consciousness and activism in the 1960s, coupled with indications that the Commission had possibly reached its nadir in public esteem and confidence, led President Nixon, in April 1969, to seek from the American Bar Association an objective study of the FTC's efforts in the field of consumer protection.").

24    *See generally* ABA, REPORT OF THE ABA COMMISSION TO STUDY THE FEDERAL TRADE COMMISSION (1969).

25    *See, e.g.*, David O. Bickart, *Civil Penalties Under Section 5(m) of the Federal Trade Commission Act*, 44 U. CHI. L. REV. 761, 762-63 (1976) ( "During the sixty years following the passage of the [FTC Act] in 1914, it was frequently observed that the Commission's remedial authority was inadequate to deter unscrupulous businesses from engaging in deceptive practices .... [T]he late 1960s and the general dissatisfaction with the existing level of FTC consumer protection activity fostered a demand for increased federal intervention in preventing deceptive practices.").

26    S. 986, 92d Cong. (1971).

27    *Id.* § 210.

28    *Id.* § 203. The provision's requirement that the FTC issue a cease-and-desist order before seeking consumer redress was deliberate. An earlier bill would have allowed the FTC to seek consumer redress without first issuing a final cease-and-desist order, but the provision was "narrowed," presumably to address the concerns of some Senators. *See* 117 CONG. REC. 39,821 (1971) (Sen. Moss) ("[S]ection 203 has been narrowed to allow the [FTC] to bring action only after a final cease and desist order has been issued. Section 103 of S. 3201 did not so limit the Commission's authority to seek specific consumer redress."). In addition, another earlier bill would have allowed the Commission itself to "enter an ancillary remedial order requiring such further action as it may find to be reasonable and appropriate to remedy the injury to consumers caused by such acts or practices including, but not limited to, recission or reformation of contracts, the refund of money or return of property, and the public notification of the violation." S. REP. NO. 92-268, at 59 (1971). At least one Senator strongly objected to the provision, viewing it as "inadvisable to give to the Commission the authority to decide what redress of injury was reasonable to remedy a violation of the Act. Such authority was never intended for the Commission and should properly reside in the courts." S. REP. NO. 92-269, at 59 (1971).

USAP075

29    S. Rep. No. 92-269, at 37-38 (1971).

30    *Id.* at 3-4; *see also id.* at 24 ("[The consumer redress provision] would enable the Commission to more adequately protect consumers by affording them specific redress. At the present time cease-and-desist orders have prospective application only and afford no specific consumer redress to consumers already injured.").

31    *See* 117 CONG. REC. 39,609 (1971).

32    *Id.*

33    *Id.*; *see also id.* ("Commissioner Philip Elman ... explained how the FTC's regulatory anemia was related to its dependence upon the cease-and-desist order.").

34    *Id.* at 39,616 (Sen. Hruska); *see also id.* ("It seeks a comprehensive and far-reaching restructuring of that body's method of functioning, its mission, its procedures, as well as its jurisdiction.").

35    *See id.* at 39,626 (Sen. Dole) ("I believe section 203 would create many more problems than it would solve. It is language that is extremely vague and does not define those acts or practices upon which recovery may be had."); *id.* at 39,849 (Sen. Hruska) ("The second aspect is the consumer class action [i.e., the redress provision]. The dealer can be as honest as the day is long, plus an hour, and yet if he gets caught or is sued in a class action, he has no means of getting out except buying his way out or trying the case to the last remedy that is available to him, and there are problems within that area, with the lack of safeguards in it, which are much greater than any civil damage or any fine could be. So it is not a matter of the honest dealer and the honest manufacturer not being affected, and that he should not fear. He should fear, Mr. President. He should fear more mightily because this will be a very, very unfair bill for him. He will be affected.").

36    *See id.* at 39,620 (Sen. Hruska) ("The possibility of damage windfalls without proof of specific injury also suggests that section 203 may constitute the most extensive penalty provision ever devised .... [I]t is a mystery why the committee ever bothered to include in title II a special provision ... authorizing the Commission to seek civil penalties for 'knowing' violations of section 5 of the act and why any effort was made ... to raise ... the civil penalty for violation of an outstanding cease-and-desist order."); *id.* at 39,849 (Sen. Cook) ("I suggest that under section 203, there is no such language as 'knowingly,' and no limitation on the damages that can be assessed."); *id.* at 39,855 (Sen. Cook) ("To be noted is the fact that the civil penalty provided under that section is limited to $10,000. Liability under this section whereby action may be brought even though the defendant has not knowingly engaged in an unfair or deceptive act or practice is limited only by the size of class of consumers which the Commission may allege to have been adversely affected and the value of the product.").

37    *Id.* at 39,854 ("This has been one of the primary missions of the FTC--to give specific meaning to a very general statutory term and in doing so it could be far reaching in its decisions because the cease-and-desist order only operated to bar such conduct in the future.").

38    *Id.* at 39,855.

39    *Id.* at 39,854-55; *see also id.* at 39,854 ("Under section[s] 202 and 203 of the proposed amendments to the [FTCA], the Commission would, for the first time, be authorized to go into court and seek civil penalties, damages, or other relief on behalf of consumers aggrieved, based on the conduct which may have been declared unlawful for the first time by entry of the Commission's final cease-and-desist order. These amendments, I believe, will raise more problems than they will solve .... Is the term 'unfair or deceptive act or practice' sufficiently well defined to make exercise of the authority contained in section 203 by the FTC constitutional and, even if it is constitutional, is it wise? I think not.").

40  *See id.* at 39,855-56 (Sen. Cook) (noting that Assistant Attorney General McLaren said that "[s]ection 203 would substantially alter the framework of the FTC Act"); *cf. id.* at 39,839 (Sen. Cotton) ("I am concerned over the new authority which section 203 would seek to vest in the [FTC] to assume the role of 'consumer advocate' and to seek redress in the courts on the behalf of consumers.").

41  *See id.* at 39,621; *see also id.* at 39,862 (Sen. Ervin) (expressing concern about the ability of private individuals to sue).

42  *Id.* at 39,855 (Sen. Cook).

43  *Id.* at 39,845-46 (Sen. Buckley) (indicating the provision that "would authorize the Commission to seek temporary injunctions in cases involving unfair practices" is "reasonable," but expressing concern about section 203 because "[w]hile few would object to legislation empowering the Commission to seek court redress for consumers injured by established "deceptive practices' for the purpose of making them whole, there is little justification under the [FTCA] for fashioning types of legal recovery which transcend this objective. Particularly where the act for which recovery is sought may not previously have been known to be unlawful. Redress, in short, should be limited to compensating consumers for injury actually suffered as the result of known unfair practice."); *id.* at 39,848 (Sen. Magnuson) (contrasting the "noncontroversial" provision providing the "authority to issue preliminary injunctions" with the "controversial features" of the bill); *id.* at 39,853 (Sen. Cook) (including the amendment that would authorize the FTC to seek preliminary injunctions in a list of the bill's "sweeping" amendments, but noting that that provision was among those "desirable and necessary").

44  *Id.* at 39,860 (Sen. Spong).

45  *Id.*

46  *Id.* (Sen. Moss) ("It says that the [FTC] having found that there is a deceptive or fraudulent practice of some sort and having issued a cease-and-desist order may go into court--not decide on its own--to establish that the damage has occurred by that action to a number of consumers and that, therefore, they will be able to receive a recovery.").

47  *Id.* at 39,876.

48  S. 356, 93d Cong. (1973).

49  Although there are a few lines about the permanent injunction provision in the Senate Committee Report (see *infra* notes 50, 52), there is not, so far as we are aware, any other explanation in the legislative history regarding why this provision was added.

50  S. REP. NO. 93-151, at 2 (1973); *see also id.* at 3 ("Title II would authorize the [FTC] to seek either a preliminary or permanent injunction against parties committing acts or practices which are unfair or deceptive to consumers .... In order to redress consumer injury resulting from violations of the [FTCA], the Commission is authorized to initiate civil actions in United States district court seeking reasonable and appropriate consumer redress.").

51  *Id.* at 28.

52  *Id.* at 30-31. The FTC Chairman applauded Congress's decision to grant the FTC this authority, *id.* at 54 ("The supplementation of its enforcement tools by the acquisition of authority to seek preliminary injunctions has long been a prime target in the Commission's program to streamline its procedures. The denial of consumer relief during the pendency of cease-and-desist proceedings, which average more than a year, and frequently require from three to five

USAP077

years, would be averted by use of injunctions in cases where this delay causes unusual harm."), but requested a more lenient standard for establishing entitlement to that relief. *Id.* at 54-56.

53     *Id.* at 30-31.

54     119 CONG. REC. 29,480 (1973).

55     *Id.*

56     *Id.*; *see also id.* ("A mere cease-and-desist order has frequently let a wrongdoer keep his ill-gotten gains.").

57     LEGISLATIVE HISTORY, *supra* note 23, at 4951.

58     119 CONG. REC. 21,443 (1973).

59     *Id.*

60     *Id.*

61     *Id.* at 21,435.

62     *See id.* at 36,616.

63     *See id.* at 36,597 (Rep. Melcher); *see also id.* ("In fact, it was this event that gave a new sense of urgency to the effort to give the Commission the power to seek injunctions."); *id.* at 36,608-09 (Rep. Smith) ("A provision in this bill would permit the FTC to secure injunctions on their own as necessary. By the time the FTC goes through the procedure of the cease-and-desist order and obtains a final court order to that effect, these small businessmen are sometimes long since gone and they are out of business for 2 or 3 years .... The [FTC] is charged by its statute with assuring fair, free, and honest competition in the marketplace, but their ability to do so has been limited. The primary tool they have been authorized to use is the cease-and-desist order. As a practical matter, a determined and aggressive corporate giant can postpone the final date of such an order for years after the first complaint is issued. During this period millions of consumers may be misled by its false advertising and honest competing businessmen are unlikely to survive unless they are possessed of resources of extraordinary size .... Without injunctive powers the [FTC] frequently is left with having to impose remedies that are conspicuously inadequate. Even in instances where the anticompetitive nature of the conduct is obvious, the FTC lacks the power to provide the sort of immediate remedy needed to insure the survival of small business .... There are innumerable areas where the Commission, with the aid of these powers, could halt anticompetitive practices at an early stage .... The possibility of injunction should give serious second thoughts to those who plan a quick "killing' and withdrawal before retribution occurs.").

64     *Id.* at 36,610.

65     H.R. REP. NO. 93-1107, at 34 (1974).

66     119 CONG. REC. 36,816 (1973).

67    *Id.* (noting that "[t]he ensuing holocaust of inquiries and paperwork always places an undue burden on the smaller businessmen").

68    *Id.*

69    9 Weekly Compilation Presidential Doc. 1339 (Nov. 19, 1973). In signing the legislation, President Nixon commented (apparently in reference to the FTC provisions) on the "couple of clinkers in it ... that [he] would very much like to see removed." LEGISLATIVE HISTORY, *supra* note 23, at 4992.

70    *See supra* notes 26, 28, and accompanying text.

71    *See supra* notes 5, 6, and accompanying text. The Commission has never made extensive use of Section 5(m)(1)(B).

72    *See, e.g.,* FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 143 (2000) (internal citation omitted) ("At the time a statute is enacted, it may have a range of plausible meanings. Over time, however, subsequent acts can shape or focus those meanings. The 'classic judicial task of reconciling many laws enacted over time, and getting them to "make sense" in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.' This is particularly so where the scope of the earlier statute is broad but the subsequent statutes more specifically address the topic at hand.").

73    *See, e.g.,* Final Brief of FTC at 19-20, FTC v. Bronson Partners, LLC, No. 10-878 (2d Cir. 2010) [hereinafter Final Brief of FTC].

74    It could be suggested that Section 13(b) is preferable to Section 19 as an enforcement tool because district court judges make decisions independently, rather than with deference to the Commission's administrative determinations as would occur under Section 19. We are sympathetic to this point, but it has no relevance to the circumstances under which Section 13(b) permits equitable relief. Moreover, the key issue in ordering redress under Section 19--whether the practice is dishonest or fraudulent--is ultimately a question of law, and therefore courts will not simply rubber stamp the Commission's determinations. *See* FTC v. Figgie Int'l, Inc., 994 F.2d 595, 601, 603 (9th Cir. 1993), *cert. denied,* 510 U.S. 1110 (1994) (noting that "Section 19 liability must not be a rubber stamp of Section 5 liability"). That is especially important because any findings of knowledge have no particular relevance in a Section 5 administrative action, which is based on strict liability.

75    In its final brief in *Bronson,* the FTC argued that "[w]ith respect to those who violate Commission rules, Section 19(a)(1) enhances the Commission's enforcement authority beyond what it would be if the Commission were limited to its enforcement authority under Section 13(b) because it allows the Commission to seek not just injunctive relief and monetary equitable relief, but also damages." Final Brief of FTC, *supra* note 73, at 20. But Section 19 does more than grant the FTC the authority to seek damages; it also spells out in detail the various types of equitable relief the FTC can seek. And the FTC does not explain why it would have been necessary for Section 19 to do that if such relief were already available under Section 13(b). *See* 15 U.S.C. § 57b(b). Thus, even if the FTC's interpretation of Section 13(b) would not render *all* of Section 19 "superfluous," it would render much of it so.

76    We focus on the history of Section 19 in large part because Section 5(m)(1)(B) appears to have been less controversial, at least in part because it explicitly applied only to those who knowingly acted in violation of the law. *See, e.g.,* 117 CONG. REC. 39,610 (1971) (Sen. Magnuson) ("[T]he Commission is authorized in Title II to act through its own attorneys to seek civil penalties against persons knowingly--and I underline the word 'knowingly'--violating the [FTCA] or against those persons failing to comply with an order of the Commission."); *id.* at 39,855 (Sen. Cook) ("To be noted is the fact that the civil penalty provided ... is limited to $10,000. Liability under this section whereby action may be brought even though the defendant has not knowingly engaged in an unfair or deceptive act or practice is limited only by the size of class of consumers which the Commission may allege to have been adversely affected and the value of the

USAP079

product."); *see also* Bickart, *supra* note 25, at 765 (noting that, at least in one bill, "[t]he civil penalty section, like the largely uncontroversial provisions on jurisdiction, injunctions, and enforcement of process, received little attention"). *See generally* Bickart, *supra* note 25 (providing a comprehensive discussion of the history of Section 5(m)(1)(B)).

77    H.R. REP. NO. 93-1107, at 87-88 (1974). There is no record of exactly what language was struck in the full committee. As introduced, the bill included a provision that, in principal part, provided that "[a]fter an order of the Commission to cease and desist from engaging in acts or practices which are unfair or deceptive to consumers and proscribed by section 5(a)(1) of this Act has become final ... the Commission may institute civil actions to obtain such relief as the court shall find necessary to redress injury to consumers caused by the specific acts or practices which were the subject of the proceeding ... and the resulting cease-and-desist order, including, but not limited to, rescission or reformation of contracts, the refund of money or return of property, public notification of the violation, and the payment of damages, except that nothing in this paragraph is intended to authorize the imposition of any exemplary or punitive damages." H.R. 7917, 93d Cong. (1973).

78    *Id.* (emphasis added).

79    *Id.*

80    *Id.*

81    *Id.*

82    *See* 120 CONG. REC. 31,316 (1974) (Rep. Broyhill) ("Section 207, as stricken, would have provided the FTC with new authority to seek judicial redress for consumers injured by acts or practices that were found in violation of final FTC orders."); *see also id.* at 31,735 (Rep. Eckhardt) (explaining that "[the FTC] cannot proceed at all in this area because there is no such thing as a rule enforceable by the FTC's obtaining consumer redress").

83    *Id.* at 31,735; *see also id.* (Rep. Moss) ("The amendment would, under limited circumstances, authorize the [FTC] to obtain redress for consumers injured by a violation of a [FTC] rule. The Commission could obtain such redress only by establishing to the satisfaction of a Federal district court that such a remedy was warranted .... It is only fair and right that consumers who have been injured by violations of the law have a right to redress. Without this amendment, the [FTC's] only power would be to issue a cease and desist order barring further violations. Such a remedy is clearly inadequate where consumers have been injured based on a violation of an FTC rule."); *id.* (Rep. Broyhill) (suggesting that they should "go back and hold hearings on this to see what, if any, authority should be given to the FTC to seek redress for injuries to consumers").

84    *Id.*

85    *Id.*

86    *Id.*

87    *Id.* at 31,736.

88    *Id.*

89    *Id.*; *see also id.* ("It would put the [FTC] in the business of acting as a collection agency, as a lawyer, for individual private interests. I repeat, the approach that the law has taken heretofore is, for example, the [SEC] and the [FTC], to

appropriately enjoin practices which are unlawful, leaving it to the individual to pursue his own remedy. Do not put the Government in the position of trying to adjudicate between two different private interests.").

90  H.R. REP. NO. 93-1606, at 41 (1974).

91  *Id.*

92  *Id.*

93  120 CONG. REC. 40,712 (1974) (Sen. Moss) (noting that the legislation "important new authority to the Commission"); *id.* at 41,406 (Rep. Moss) (describing the provision as "quite significant").

94  *Id.* at 41,407.

95  *Id.* Representative Broyhill noted that "[i]n part because of [his] objections, a similar consumer redress provision was defeated on the floor of the House" when Representative Eckhardt attempted to amend H.R. 7917 to add such a provision. *Id.*; *see also id.* at 31,737 (voting down the amendment to add a consumer redress provision by a vote of 209 to 180). Representative Broyhill explained that he ultimately "acceded to the provision finally adopted because it seeks to provide protections against unfairness and is aimed at making whole those consumers who actually show injury from a rule violation or knowingly dishonest and fraudulent cases." *Id.* at 41,407.

96  LEGISLATIVE HISTORY, *supra* note 23, at 5048.

97  *See* Fitzgerald, *supra* note 9, at 1 ("When I arrived at the Federal Trade Commission in 1976, no one imagined that Section 13(b) of the Federal Trade Commission Act would become an important part of the Commission's consumer protection program." (internal footnote omitted)).

98  Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946); *see* discussion *infra* Part II.B.

99  As discussed above, only Section 13(b) allowed the asset freeze that was necessary for the Commission to obtain monetary relief against these targets. *See supra* text accompanying notes 4-10.

100  *See* FTC v. Bronson Partners, LLC, No. 10-0878-cv, 2011 WL 36298718, at *12 (2d Cir. Aug. 19, 2011) (noting that "[b]ecause, under Section 19, the Commission may bring suit only where the defendant has been the subject of a prior order entered in the wake of a lengthy administrative process, that provision has the disadvantages of creating substantial opportunities for delay as well as allowing merchants who knowingly engage in fraud at least one free shot at violating the Act").

101  *See supra* note 9 and accompanying text.

102  *See* 15 U.S.C. § 57a(a)(1)(B) (emphasis added).

103  S. REP. NO. 103-130, at 15-16 (1993). Thus, the Commission cannot argue that the 1994 changes approved the extension of consumer redress that the Commission now seeks. Not only are ex parte asset freezes unavailable in non-fraud cases, the Congress also explicitly recognized that "the FTC has used its Section 13(b) injunction authority to counteract consumer fraud ...." *Id.* Ex parte asset freezes are available only under extraordinary conditions not normally applicable to legitimate businesses. *See, e.g.*, Johnson v. Couturier, 572 F.3d 1067, 1085 (9th Cir. 2009) ("A party seeking an asset

USAP081

freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted.").

104 *See infra* notes 115-121 and accompanying text.

105 668 F.2d 1107 (9th Cir. 1982).

106 The Commission presumably sought the relief under the second proviso, rather than the first, because it did not want to have to file an administrative complaint. *See id.* at 1110 ("The Commission argues that the second proviso gives it the power to seek an injunction in the district court in proper cases without also initiating administrative proceedings. The appellants disagree. They read the clause as granting the Commission the power to seek permanent injunctions only under the conditions laid down earlier in the section for the issuance of preliminary injunctions. We agree with the Commission. The proviso in question does not on its face condition the issuance of a permanent injunction upon the initiation of administrative proceedings."). Moreover, Singer involved alleged violations of an FTC rule, and Section 19(a)(1) permits the Commission to proceed directly to federal court. *See* 45 U.S.C. § 57b.

107 668 F.2d at 1111.

108 *See, e.g.*, FTC v. Bronson Partners, LLC, 654 F. 3d 359 (2d Cir. 2011) ("While the provision's express text refers only to injunctive relief, courts have consistently held that 'the unqualified grant of statutory authority to issue an injunction under [S]ection 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits." (internal citation omitted)); FTC v. Freecom Commc'ns, Inc., 401 F.3d 1192, 1202 n.6 (10th Cir. 2005); FTC v. Sec. Rare Coin & Bullion Corp., 931 F.2d 1312, 1314-15 (8th Cir. 1991); FTC v. Gem Merch. Corp., 87 F.3d 466, 468 (11th Cir. 1996) (concluding that "the unqualified grant of statutory authority to issue an injunction under Section 13(b) carries with it the full range of equitable remedies, including the power to grant consumer redress and compel disgorgement of profits"); FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1026 (7th Cir. 1988).

109 328 U.S. 395 (1946).

110 *Id.* at 398.

111 *Porter*, 328 U.S. at 399; Emergency Price Control Act, Pub. L. No. 421, § 205(a), 56 Stat. 23 (1942).

112 Hecht Co. v. Bowles, 321 U.S. 321 (1944).

113 *Porter*, 328 U.S. at 399.

114 S. REP. NO. 931, 77th Cong., 2d Sess., at 10.

115 *Porter*, 328 U.S. at 399*; see also id.* (*"Unless otherwise provided by statute*, all the inherent equitable powers of the District Court are available for the proper and complete exercise of that jurisdiction.") (emphasis added).

116 *E.g.*, Cell Assocs. v. Nat'l Inst. of Health, 579 F.2d 1155, 1160 (9th Cir. 1978) ("Our examination of the legislative history of the Privacy Act confirms our view that Congress did not intend to authorize the issuance of injunctions prohibiting the disclosure of protected materials.").

USAP082

117 *See, e.g.*, FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982) ("[T]here is no necessary or inescapable inference, or, indeed, any inference, that Congress intended to restrict the broad equitable jurisdiction apparently granted to the district court by § 13(b).").

118 *See supra* text accompanying notes 5-11.

119 931 F.2d 1312 (8th Cir. 1991).

120 15 U.S.C. § 57b(e).

121 The suggestion that the existence of a "savings clause" always precludes the restriction of a pre-existing authority is, in any event, misplaced. In *Pennsylvania Railroad Co. v. Sonman Shaft Coal Co.*, the Supreme Court considered the effect of a savings clause that provided that "[n]othing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies." 242 U.S. 120, 123 (1916). The Court explained that "a manifest purpose of the provision ... is to make it plain that such "appropriate common law and statutory remedies' *as can be enforced consistently with the scheme and purpose of the act are not abrogated or displaced"* and that the provision is intended "to preserve all existing rights *not inconsistent* with those which the act creates." *Id.* at 124 (emphasis added) (internal citation omitted); *see also* Fulfillment Servs. v. UPS, 528 F.3d 614, 621-22 (9th Cir. 2008) (citing *Pennsylvania Railroad* in support of the proposition that a savings clause "merely preserves the causes of action and remedies that already existed and do not conflict" with other provisions of the statute). Here, for Section 13(b) to confer the authority to grant consumer redress in all cases would be plainly inconsistent with Section 19 and the other FTC Act amendments Congress enacted in 1975.

122 See *supra* text accompanying notes 4-11.

123 *See supra* note 53 and accompanying text.

124 *See, e.g.*, Haw. v. Office of Hawaiian Affairs, 129 S. Ct. 1436, 1443 (2009) ("We begin, as always, with the text of the statute." (internal citation omitted)).

125 15 U.S.C. § 53(b) (emphasis added).

126 *See, e.g.*, MCI Telecomms. Corp. v. AT&T, 512 U.S. 218, 229 (1994) (noting that an "agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear") (citation omitted).

127 We do not address here whether this limitation means that the FTC's ability to seek *all* permanent injunctive relief, including a basic permanent injunction, is limited to those cases that are "proper," but we think that is the most likely reading of the statute. Accordingly, the case itself and any relief awarded thereunder, must be "proper." In any event, even assuming that to be the case, preliminary injunctive relief would remain available under Section 13(b) whenever there is a likely violation of Section 5. *See supra* note 7.

128 *See supra* notes 105-110 and accompanying text.

129 FTC v. Evans Prods. Co., 775 F.2d 1084 (9th Cir. 1985). This portion of the Ninth Circuit's opinion was dicta because the Court ultimately concluded that the requested injunctive relief was unavailable for the independent reason that a "proper case" "does not encompass violations that completely ceased before the FTC brought suit and have not been shown likely to recur." *Id.* at 1087-88.

130    FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1028 (7th Cir. 1988).

131    *Id.*

132    *See* FTC v. Ameridebt, Inc., 373 F. Supp. 2d 558 (D. Md. 2005).

133    *Id.* at 562.

134    15 U.S.C. § 53(b).

135    *See also* FTC v. 1st Guar. Mortg. Corp., No. 09-cv-61840, 2011 WL 1233207, at *19 n.158 (S.D. Fla. 2011) ("The phrase 'proper case' ... refers to a case involving a violation of law enforced by the FTC."); FTC v. 1263523 Ontario, Inc., 205 F. Supp. 2d 205, 221 (S.D.N.Y. 2002) ("Violation of Section 5 of the FTC Act ... constitutes a 'proper' case for the imposition of a permanent injunction." (internal citation omitted)); FTC v. Think Achievement Corp., 144 F. Supp. 2d 1013, 1016 (N.D. Ind. 2000) ("A violation of Section 5 of the FTC Act has been found to be such a proper case."), *aff'd*, 312 F.3d 259 (7th Cir. 2002) (no discussion of the proper case issue); FTC v. Minuteman Press, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998) ("The Courts have construed the term 'proper cases' to encompass 'any violation' of a statute administered by the FTC.").

136    Even when the courts have provided somewhat more discussion of this conclusion, the analysis remains cursory. *See* FTC v. Mylan Labs., Inc., 62 F. Supp. 2d 25, 36 (D.D.C. 1999) ("Although the permanent injunction proviso speaks of 'proper cases,' there is nothing in the statute, regulations or case law restricting the statutory term 'proper cases' to *per se* violations of the antitrust laws .... [T]his Court finds that the permanent injunction proviso may be used to enjoin violations of 'any provision of law' enforced by the FTC."). Moreover, *Mylan Laboratories* relied on the *Abbott Laboratories* decision, which took a more nuanced view of the issue. *See infra* text accompanying notes 140, 141. In any event, both *Mylan* and *Abbott* involved unfair methods of competition, not unfair or deceptive acts or practices. *See infra* note 140.

137    *See* FTC v. H.N. Singer, Inc., 668 F.2d 668, 1111 (9th Cir. 1982). Of course, the Ninth Circuit did not say that the "proper cases" category was *limited* to cases of "routine fraud," as the Ninth Circuit later noted in suggesting, in dicta, that a "proper case" is any case in which there is a violation of Section 5. *See supra* text accompanying notes 105-109.

138    No. C-82-0878 WAI (JSB), 1983 WL 1911, at *2-3 (N.D. Cal. Nov. 8, 1983) (magistrate).

139    *Id.*; *see also* Peter C. Ward, *Restitution for Consumers Under the Federal Trade Commission Act: Good Intentions or Congressional Intentions?*, 41 AM. U. L. REV. 1139, 1195 (1992) ("A proper case and proper proof is established, for purposes of granting restitutionary relief, when the FTC satisfies the requirements of section 19."); *id.* at 1196 ("This should not cause the FTC undue hardship because the actions that it tends to file for section 13(b) permanent relief typically involve hard-core dishonesty or fraud.").

140    No. 92-1364, 1992 WL 335442, at *2 (D.D.C. Oct. 13, 1992) (mem.).

141    *Id.*

142    *See supra* note 131 and accompanying text.

USAP084

143    *Id.*; *see* FTC v. World Travel Vacation Brokers, 861 F.2d 1020 (7th Cir. 1988).

144    *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1817 (1993) (defining proper to mean "marked by suitability, fitness, accord, or compatibility"). Unfortunately, case law from other statutes is not relevant. Although "proper case(s)" appears eight times in the U.S. Code, only Section 13(b) uses the phrase in the context of injunctions.

145    *See* S. REP. NO. 93-151, at 30-31 (1973).

146    The Commission's 2003 Policy Statement on Monetary Equitable Remedies in Competition Cases, which emphasizes the need for "clear violations," takes a similar approach. *See* Fed. Trade Comm'n, Policy Statement on Monetary Equitable Remedies in Competition Cases (2003), *available at* http://www.ftc.gov/os/2003/07/disgorgementfrn.shtm. A divided Commission repealed this policy statement in July 2012. *See* Fed. Trade Comm'n, Withdrawal of the Commission's Policy Statement on Monetary Equitable Remedies in Competition Cases (2012), *available at* http://www.ftc.gov/os/2012/07/120731commissionstatement.pdf.; *see generally* Gil Seinfeld, *The Federal Courts as a Franchise: Rethinking the Justifications for Federal Question Jurisdiction*, 97 CALIF. L. REV. 95, 125 (2009) ("Because of the explosion of federal law, it has become impossible for generalist judges sitting on federal district and circuit courts to develop specific expertise with respect to many of the subjects that come before them.").

147    Complaint, Telebrands Corp., FTC Docket No. 9313 (Sept. 30, 2003), *available at* http://www.ftc.gov/os/2003/10/telebrandcomp.pdf. The case challenged a follow-on electronic abs belt offered as a weight loss aid. Rather than explicitly describing the alleged benefits, however, the advertising referred to "those abs belts you've seen on TV" and offered the product for less money. The Commission issued an administrative complaint in 2003, followed by a Commission opinion in 2005. The Fourth Circuit upheld the Commission's order in 2006. In 2007, the Commission filed a district court complaint seeking consumer redress. Complaint, FTC v. Telebrands Corp., No. 2:07-cv-3525-JAG-MCA (D.N.J. Aug. 2, 2007). The matter was settled in 2008, with Telebrands agreeing to pay $7 million. Stipulation of Settlement and Final Order at 4, FTC v. Telebrands Corp. (D.N.J. Dec. 31, 2008).

148    The Commission has settled a series of cases involving failure to take reasonable steps to protect sensitive personal information. To date, the cases appear to have involved negligence, but in a particularly egregious case the Commission might wish to use the Section 19 process to obtain redress. Although we do not know enough about the facts for a full assessment of whether redress was appropriate, in *ChoicePoint* the Commission's settlement included $5 million in redress, in addition to $10 million in civil penalties for violations of the Fair Credit Reporting Act. Stipulated Final Judgment and Order, United States v. ChoicePoint Inc., No. 1-06-cv-0198 (N.D. Ga. Feb. 15, 2006).

149    For the development of the FTC's enforcement standards, see generally Muris & Pitofsky, *supra* note 3.

150    *See* Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120 (2000).

151    *Rexall Sundown* may be a case in which monetary relief is appropriate, even against a solvent defendant, regardless of whether the case is proper under Section 13(b). The product at issue was a dietary supplement promoted to "eliminate" cellulite. The Commission's opposition to Rexall's motion to dismiss argued that the studies offered as substantiation had no placebo control and that the researchers never actually examined the patients to determine whether cellulite was reduced, flaws that should have been apparent from the experimental design. Plaintiff's Opposition to Defendant's Motion to Dismiss, FTC v. Rexall Sundown, Inc., No. 00-cv-7016-JEM (S.D. Fla. Sept. 14, 2000). The Commission ultimately obtained a settlement providing $12 million in redress. Stipulated Final Order, Rexall Sundown (S.D. Fla. Mar. 31, 2003).

152    *See infra* Part III.C.; *see generally* Pfizer Inc., 81 F.T.C. 23 (1972) (requiring that an advertiser making an objective claim have a "reasonable basis" for making it); J. Howard Beales, Timothy J. Muris & Robert Pitofsky, *In Defense of the* Pfizer *Factors, in* THE REGULATORY REVOLUTION AT THE FTC: A THIRTY-YEAR PERSPECTIVE ON COMPETITION AND CONSUMER PROTECTION 83 (James C. Cooper ed., 2013) (providing a comprehensive discussion of *Pfizer*).

153    *See supra* note 14 and accompanying text.

154    For background on the substantiation doctrine and its application, see FTC Policy Statement Regarding Advertising Substantiation, *appended to* Thompson Med. Co., 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986); Beales et al., *supra* note 152; *Dietary Supplements: An Advertising Guide for Industry*, FTC.GOV, http://business.ftc.gov/documents/substantiation-science-compliance; Lesley Fair, Fed. Trade Comm'n, *Federal Trade Commission Advertising Enforcement* (revised Mar. 1, 2008), *available at* http:// www.ftc.gov/oia/assistance/consumer-protection/advertising/enforcement.pdf.

155    Complaint, Kellogg Co., FTC File No. 082 3145 (July 31, 2009).

156    Press Release, Fed. Trade Comm'n, Order Modifying Order, Kellogg Co. (June 3, 2010) (modifying order to cover additional claims), *available at* http://www.ftc.gov/opa/2010/06/kellogg.shtm.

157    Thus, Frosted Mini Wheats have been successfully marketed nationally since 1970, apparently without the need to mention any effects on attentiveness. *See Kellogg in the 1970s*, http:// www.kellogghistory.com/timeline.html. Rice Krispies have been on the market much longer, first appearing in 1928. *See Kellogg in the 1920s*, http:// www.kellogghistory.com/timeline.html.

158    When there is literally no support for the claim, depending upon the totality of the evidence, the advertisement is likely to be dishonest or fraudulent and therefore meet the standard of Section 19. (Because the Commission may equate inadequate evidence with no support, actual cases are often more complex than the conclusion "no support" implies.) Even if permanent injunctive relief is unavailable, the Commission could obtain a preliminary injunction when it is likely to prevail on the merits. In such cases, the Commission will have stopped the deceptive practice and can use administrative actions to prevent and deter future violations.

159    In some substantiation cases, the dispute is really about the claim, not the evidence supporting it. An advertiser may disagree with the Commission that its messages make a claim about a certain product characteristic. Because the advertiser did not believe the claim was made, it may have no evidence to support the claim, even though it was well aware of the need to substantiate the claim if it were made.

160    *See* Beales et al., *supra* note 152.

161    *Id.*

162    *E.g.*, FTC v. Direct Mktg. Concepts, 624 F.3d 1 (1st Cir. 2010).

163    *E.g.*, FTC v. SlimAmerica, Inc., 77 F. Supp. 2d 1263 (S.D. Fla. 1999).

164    *E.g.*, FTC v. QT, Inc., 512 F.3d 858 (7th Cir. 2008).

165    *Cf.* Bickart, *supra* note 26, at 769 ("It would be unfair to permit the courts, at the Commission's behest, to impose penalties upon a defendant whose conduct had previously not been considered illegal."). These cases may involve occasional claims of falsity, but such claims do not, by themselves, support finding that the conduct was dishonest or fraudulent. Falsity under the FTC Act is a strict liability offense; no finding of scienter is required. A claim can be false without the advertiser knowing it was so.

166    Sam Peltzman, *The Effects of FTC Advertising Regulation*, 24 J.L. & ECON. 403, 418 (1981) ("The story the stock market appears to be telling is that an FTC complaint implies essentially a wiping out of the brand's advertising capital."); ALAN MATHIOS & MARK PLUMMER, FTC BUREAU OF ECONOMICS STAFF REPORT, REGULATION OF ADVERTISING: CAPITAL MARKETS EFFECTS (1988). For an explanation of the event study methodology, see S.P. Kothari & Jerold B. Warner, *Economics of Event Studies, in* 1 HANDBOOK OF CORPORATE FINANCE (B. Espen Eckbo ed., 2007); A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13 (1997).

167    *See supra* note 146.

168    These are crucial elements in the *Pfizer* factors, the case originating the substantiation doctrine. *See generally* Beales et al., *supra* note 152.

169    Nevertheless, many have argued, with considerable justification, that the FDA pays too little attention to the potential benefits of new drugs. *See id.* at 10-11. *See, e.g.*, Kip Viscusi, *Regulatory Reform and Liability for Pharmaceuticals and Medical Devices, in* ADVANCING MEDICAL INNOVATION: HEALTH, SAFETY AND THE ROLE OF GOVERNMENT IN THE 21ST CENTURY, THE PROGRESS AND FREEDOM FOUNDATION 79, 90 (1996) ("There is a widespread consensus in the literature that the current FDA drug approval process establishes safety incentives that are excessive .... This imbalance in the emphasis for these two types of errors has led to excessive deterrence of new risks that may be created by pharmaceutical products and inadequate weight on reducing existing risks that patients now experience.").

170    The FTC's own studies reveal that the Kellogg campaign had substantial benefits. New brands entered with higher fiber content, and consumption of breakfast cereals with higher fiber content increased significantly, particularly among disadvantaged groups. Importantly, consumers did not substitute other "bad" nutrients: there was no significant change in the fat or sodium content of cereals. *See* PAULINE IPPOLITO & ALAN MATHIOS, FTC BUREAU OF ECONOMICS STAFF REPORT, HEALTH CLAIMS IN ADVERTISING AND LABELING: A STUDY OF THE CEREAL MARKET (1989), *available at* http:// www.ftc.gov/be/econrpt/232187.pdf; Pauline Ippolito & Alan Mathios, *Information, Advertising, and Health Choices: A Study of the Cereal Market*, 21 RAND J. ECON. 459 (1990).

171    *See* Beales et al., *supra* note 152, at 90-91 (discussing examples in which it would be a more serious error to mistakenly prohibit truthful claims than to mistakenly allow false ones).

172    Stipulated Final Judgment and Order, FTC v. Iovate Health Scis. USA, Inc., No. 10-cv-587 (W.D.N.Y. July 29, 2010) (Beales consulted with Iovate on a separate matter); Agreement Containing Consent Order, Beiersdorf, Inc., FTC File No. 092-3194 (June 29, 2011).

173    Agreement Containing Consent Order, Nestle HealthCare Nutrition, Inc., FTC File No. 092 3087 (July 14, 2010).

174    The Dannon Co., FTC File No. 082 3158 (Dec. 15, 2010).

175    Nestle HealthCare Nutrition, Inc., FTC File No. 092 3087 (July 14, 2010) (claims of preventing or reducing the risk of upper respiratory tract infections); The Dannon Co., FTC File No. 0823158 (Dec. 15, 2010) (claims that covered products reduce the likelihood of getting a cold or the flu). These recent cases are inconsistent with the Commission's

1983 decision to modify an order prohibition to allow claims that a household disinfectant could reduce the incidence and spread of colds if supported by competent and reliable scientific evidence. *See* Sterling Drug, Inc., 101 F.T.C. 375 (1983). They are also difficult to square with the Commission's recognition "that there may be certain limited instances in which carefully qualified health claims may be permitted under Section 5 although not yet authorized by the FDA, if the claims are expressly qualified to convey clearly and fully the extent of the scientific support." *See* Fed. Trade Comm'n, Enforcement Policy Statement on Food Advertising (1994), *available at* http://www.ftc.gov/ bcp/policystmt/ad-food.shtm. Interestingly, claims that a vacuum cleaner or an air cleaner reduces the chances of getting the flu are subject to the traditional ""competent and reliable scientific evidence" standard. *See* Agreement Containing Consent Order, Oreck Corp., FTC File No. 102-3033, at 3-4 [(Apr. 7, 2011). Another order has an even broader scope of claims that require prior FDA approval. Stipulated Final Judgment and Order, FTC v. Iovate Health Scis. USA, Inc., No. 10-cv-587 (W.D.N.Y. July 29, 2010) (claims that a product "is effective in the diagnosis, cure, mitigation, treatment, or prevention of any disease") (Beales consulted with Iovate on a separate matter). The notice order in the Commission's administrative complaint against POM Wonderful sought unsuccessfully a similar preapproval requirement. Administrative Complaint, POM Wonderful LLC, FTC File No. 082-3122 (Sept. 27, 2010).

176   Although in its recent POM decision, *POM Wonderful LLC*, FTC Docket No. 9344, *available at* http:// www.ftc.gov/ os/adjpro/d9344/130116pomopinion.pdf, *appeal docketed*, POM Wonderful LLC v. FTC, No. 13-0160 (D.C. Cir. Mar. 8, 2013), the Commission asserted fealty to the traditional standard, at least three reasons cast doubt on that assertion. First, the Commission's insistence on randomized clinical trials is inconsistent with the Commission's position regarding Kellogg, discussed in the text at note 165 above. The Kellogg claim was based on the recommendations of the National Cancer Institute, which in turn were based on epidemiological evidence. Clinical tests of claims to reduce cancer risk are exceedingly costly and difficult. Second, the Commission again requires two clinical studies to substantiate claims. The Commission's rationale, that a second study might yield different results, would always be true. Third, contrary to the longstanding trend within the Commission, the Commission uses its own expertise to dismiss the Administrative Law Judge's conclusion rejecting many of the alleged claims.

177   Even with the "right" substantiation standard, uncertainty will exist about how it will be applied in a particular case. With monetary penalties, the increased risk, in combination with the uncertainty, will encourage greater caution about making truthful claims. One might argue that the chilling effect is limited because damages will be less than the full amount of sales that is typical in fraud cases. As we discuss below, however, the need to explore more limited measures of damages is itself a threat to the Commission's fraud program.

178   *See* Sorrell v. IMS Health Inc., 131 S. Ct. 2653, 2664 (2011) (quoting Bates v. State Bar of Ariz., 433 U.S. 350, 364 (1977)); Beales et al., *supra* note 152, at 86 ("When more accurate information is available to consumers, competition operates more effectively to guide producers to the types of products that consumers most prefer.").

179   Although we do not address the issue in this article, the Commission might be able to use Section 13(b) to obtain a permanent injunction, without redress, in an advertising substantiation case. *See supra* note 127. In *FTC v. Brown & Williamson*, 778 F.2d 35 (D.C. Cir. 1985), the Commission had previously determined, in a public notice and comment proceeding regarding the FTC testing methodology for the tar content of cigarettes, that tar claims for Barclay were misleading. When Brown and Williamson continued advertising contrary to the Commission's conclusion, the Commission sought and obtained a permanent injunction barring the claims. It did not seek monetary relief. To the extent that such cases are "proper," district court judges are fully capable of analyzing the factual disputes underlying a traditional national advertising substantiation case.

180   *See supra* Part II.B.

181   Because Section 19 applies to redress only for unfair or deceptive acts or practices, the Commission's reading of *Porter* has more relevance for both injunctions and unfair methods of competition cases.

182   *See, e.g.*, FTC v. Wolf, No. 94-8119-CIV-FERGUSON, 1996 WL 812940, at *9 (S.D. Fla. Jan. 31, 1996) (restitution); FTC v. SlimAmerica, Inc., 77 F. Supp. 2d 1263 (S.D. Fla. 1999) (providing "consumer redress"); FTC v. Verity Int'l,

USAP088

Ltd., 443 F.3d 48 (restitution); FTC v. Stefanchik, 559 F.3d 924 (9th Cir. 2009) ("equitable monetary relief"); FTC v. Bronson Partners, 674 F. Supp. 2d 373 (D. Conn. 2009) (restitution); FTC v. Direct Mktg. Concepts, Inc., 648 F. Supp. 2d 202 (D. Mass. 2009) (disgorgement).

183     *See, e.g.*, FTC v. Nat'l Urological Group, Inc., 645 F. Supp. 2d 1167, 1213 (N.D. Ga. 2008) (noting that "[r]estitution is intended to return the injured party to the status quo and is measured by the amount of loss suffered by the victim" and awarding total product sales over the relevant period); *see also* FTC v. Febre, 128 F.3d 530, 536 (7th Cir. 1997) ("A major purpose of the Federal Trade Commission Act is to protect consumers from economic injuries. Courts have regularly awarded, as equitable ancillary relief, the full amount lost by consumers.").

184     Redress is generally not reduced by the amount of actual operating costs, such as those for manufacturing the product, advertising, processing costs, or taxes. *Bronson Partners*, 674 F. Supp. 2d at 382 (restitution); *SlimAmerica*, 77 F. Supp. 2d at 1276 ("Costs incurred by the defendants in the creation and perpetration of the fraudulent scheme will not be passed on to the victims."); *see generally Verity Int'l*, 443 F.3d at 68 (noting that in most cases there is no difference between measuring redress according to consumer loss and the defendant's unjust gain). By contrast, in the cases reflecting the Commission's new expansion of Section 13(b) (*supra* note 14), the Commission has sought and obtained redress far less than the total sales of the product. For example, in *Skechers*, the Commission obtained $40 million, which was considerably less than 10% of *Skechers'* sales in the peak year of the toning shoe fad alone. FTC v. Skechers U.S.A., Inc., No. 1:12-CV-01214 (N.D. Ohio May 16, 2012; Christopher C. Williams, *After a Tough Stretch Adidas' Run Resumes*, BARRON'S, Aug. 16, 2010, at 17 (sales of toning shoes expected to hit $1.5 billion in 2010, and Skechers held a 67% market share). Although the Commission's complaint included a falsity claim regarding alleged serious problems with one study, it apparently rejected other studies supporting similar fitness benefits of rocker bottom shoes. Scott C. Landry, Benno M. Nigg & Karelia E. Tecante, *Standing in an Unstable Shoe Increases Postural Sway and Muscle Activity of Selected Smaller Extrinsic Foot Muscles*, GAIT & POSTURE, June 2010, at 215 (reporting findings that even when standing, muscle activation is higher in rocker bottom footwear than conventional shoes). Moreover, unlike Section 19, both falsity and lack of substantiation are strict liability offenses; the defendant's knowledge is irrelevant.

185     Chinese Diet Tea was the product at issue in *FTC v. Bronson Partners, LLC*, 654 F. 3d 359 (2d Cir. 2011).

186     The table includes cases in which the Commission ultimately obtained redress; such redress may not have been awarded in the opinions cited, but in later stages of the proceedings and in settlements.

187     FTC v. Direct Mktg. Concepts, Inc., No. Civ.A.04-11136-GAO, 2004 WL 1399185, at *13 (D. Mass. June 23, 2004).

79 ANTITRLJ 1

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

USAP089

**41 Am. U. L. Rev. 1139**

American University Law Review
Summer, 1992

Peter C. Ward [*]

Copyright (c) 1992 by The American University Law Review; Peter C. Ward

# *1139 RESTITUTION FOR CONSUMERS UNDER THE FEDERAL TRADE COMMISSION ACT: GOOD INTENTIONS OR CONGRESSIONAL INTENTIONS?

**TABLE OF CONTENTS**

Introduction
I. Authority of the FTC to Order Restitution Pursuant to Its "Cease and Desist" Power
A. The Legislative History of the FTC's Cease and Desist Authority
1. Section 5 remedial power as enacted in 1914

2. The Wheeler-Lea Amendments of 1938

B. The *Curtis* Case: The FTC's Expansive Self-Interpretation of the "Cease and Desist" Authority
1. Restitution to restore competitive status quo

2. Restitution to end a continuing violation

C. The *Heater* Case: Judicial Rejection of the FTC's Interpretation of the "Cease and Desist" Power
1. Proceedings Before the Federal Trade Commission

2. The appeal to the Ninth Circuit

II. Legislative Approaches to Consumer Redress
A. The Trans-Alaska Pipeline Act Amendments: Section 13(b) Injunctive Relief

B. The Magnuson-Moss Warranty-Federal Trade Commission Improvement Act: Congress Provides an Express Means of Consumer Redress

III. The Judiciary Takes Over
A. Judicial Construction of the Section 13(b) Preliminary Injunction Authority in Consumer Protection Cases

B. Judicial Construction of the Section 13(b) Permanent Injunction Authority: A Judicial Bypass of Section 19

C. Reconciling Section 13(b) Permanent Injunctions with Section 19 Consumer Redress

Conclusion

**INTRODUCTION 41 Am. U. L. Rev. 1140>>INTRODUCTION**

In June 1989, the Federal Trade Commission (FTC) filed an action in federal court seeking injunctive relief against Magui Publishers, Inc., a business that since 1982 had been selling to retail art dealers etchings and lithographs attributed to Salvador Dali. [1] The FTC alleged that Magui was falsely representing to purchasers that Dali had approved and supervised the preparation of the prints, that Dali had signed each print, that the prints were scarce, that the etchings were hand-produced from an 18th century press, and that the Dali works were valuable collectibles likely to appreciate in value. [2] The trial judge found these allegations of deceptive sales practices persuasive and ruled that these sales practices were unfair or deceptive. [3] The judge, therefore, enjoined the actions under the Federal Trade Commission Act ("FTC Act"). [4] In addition, the court awarded restitution in the amount of $1.96 million. [5] The number of Dali prints the defendants sold over the seven-year period was multiplied by the mean wholesale price of each print. From that figure, the cost of production was subtracted to arrive at Magui's unjust enrichment from the scheme. [6]

Is this an example of FTC vigor in pursuing its mandate to protect the public from unfair or deceptive selling practices? Certainly. It is with reluctance, therefore, overcome only by concern for paramount **\*1141** constitutional principles, that this Article criticizes the *Magui* award and the many others like it that the FTC has obtained through the courts and consent settlements. The siren song of consumer welfare has led a well-intentioned FTC and a compliant judiciary to disregard legislative intent in order to achieve consumer redress according to a scheme more favorable to injured consumers than Congress contemplated. In the *Magui* case, for example, if the court had followed the congressional intent of applying a three-year statute of limitations for consumer redress, restitution would have been limited to sales occurring after June 1986 rather than to all sales from the inception of the business in 1982. [7]

In 1914, Congress passed the FTC Act in response to widespread concern about the growth and behavior of monopolies and cartels. [8] As originally enacted in 1914, the FTC Act protected the marketplace by prohibiting "unfair methods of competition." [9] In 1938, Congress amended the FTC Act to prohibit "unfair or deceptive acts or practices" also. [10] With that amendment, the consumer, along with business competition, became the concern of the FTC. Under the FTC Act, when the FTC determines that a company has violated the prohibitions against unfair methods of competition or unfair or deceptive acts or practices, it "shall issue ... an order requiring such person, partnership, or corporation to cease and desist from using such method of competition or such act or practice." [11]

Since its enactment in 1914, and especially after the "consumer revolution" of the 1960s, commentators have criticized the cease and desist remedy as an inadequate means of dealing with unfair or deceptive conduct targeted at consumers. [12] Entry of a cease and **\*1142** desist order sometimes requires years of litigation, during which the prohibited activity continues and consumers continue to sustain injury. Additionally, critics argue that there is little deterrent value in potential FTC action when there is a prospect of engaging in fraudulent conduct with no greater consequence than receiving a reprimand and an instruction to stop. [13] Over the past twenty years, the FTC, Congress, and the courts have attempted to enhance the FTC's remedial authority. The FTC and the courts, however, have created rights for consumers that exceed what Congress, either rightly or wrongly, chose to grant.

In 1971, the FTC for the first time began asserting that its fifty-seven year old authority to issue cease and desist orders included the power to order restitution to victims of unfair or deceptive practices. [14] The only appellate court to consider this position, however, rejected it. [15] In 1973, Congress sought to address weakness in the FTC's ability to accomplish effective and expeditious law enforcement by adding section 13(b) to the FTC Act. Section 13(b) gives the FTC authority to petition federal district courts for preliminary injunctions to halt conduct allegedly violating section 5 of the FTC Act pending administrative determination of the conduct's legality. [16] Section 13(b) also authorizes courts to grant permanent injunctions in "proper cases." [17] In 1975, Congress added section 19 to the FTC Act. That section enables the FTC to obtain restitution from the courts for injured consumers if qualifying criteria, such as proof of intent and a statute of limitations, are met. [18]

USAP091

**\*1143** Notwithstanding these additional statutory remedies, judicial opinions in the 1980s created a less burdensome and more expansive avenue for consumer redress. The courts construed the FTC's power to obtain preliminary and permanent injunctions under section 13(b) to include ancillary equitable relief such as rescission and restitution. [19] Consequently, the FTC has ignored section 19's statute of limitations and proof of intent restrictions, instead seeking injunctions and restitutionary relief under the broad equitable powers inappropriately found by the courts in section 13(b). [20]

The American constitutional system mandates a separation of powers and roles among the branches of the government. Court decisions that allow the FTC to circumvent statutory procedures for obtaining consumer redress under section 19 are offensive to the constitutional separation of legislative and judicial authority, despite the public interest the courts purport to protect. [21] If the intent and statute of limitations requirements for consumer redress in section 19 are unduly restrictive, the solution lies with Congress, not with the courts or the FTC. [22] Until such a legislative change, courts **\*1144** should limit their exercise of equitable grants of restitution under section 13(b) to those cases in which the FTC meets the criteria for obtaining such relief under section 19.

# I. AUTHORITY OF THE FTC TO ORDER RESTITUTION PURSUANT TO ITS "CEASE AND DESIST" POWER

Whether the FTC's section 5 cease and desist power includes the power to order restitution might seem moot based on the Ninth Circuit's 1974 decision in *Heater v. FTC*. [23] However, the FTC did not agree with the Ninth Circuit's limitation of its cease and desist authority and continued to assert that restitution was inherent in its cease and desist power. [24] If, as the Commission asserts, Congress gave the FTC restitutionary power in its enabling act, it is of small consequence that such power is made explicit through construction of later amendments to the FTC Act. In the absence of such a grant in 1914, however, the power of the FTC to order restitutionary relief or obtain it from the courts must be determined from later legislation, with due respect for congressional intent. Thus, whether a power to order restitution is implicit in the cease and desist authority of the FTC's enabling act is of more than academic interest.

*A. The Legislative History of the FTC's Cease and Desist Authority*

Congress wrote the FTC's cease and desist remedial authority into the FTC's enabling act at a time when the Act's only prohibition was against "unfair methods of competition." [25] The FTC, however, has asserted its own restitutionary power primarily for remedying "unfair or deceptive acts or practices," a prohibition added to the FTC Act in 1938 by the Wheeler-Lea Act. [26] The following consideration of legislative history looks first at the FTC Act as originally enacted in 1914 and concludes that the intended scope of the cease and desist authority did not include a restitutionary role for the **\*1145** FTC. Then, an examination of the legislative history of the 1938 Wheeler-Lea Act amendments confirms that in enacting those consumer-oriented amendments, Congress did not expressly or implicitly broaden the FTC's remedial power. [27] Consequently, Congress did not grant the FTC remedial authority in either piece of legislation that coincides with its assertion that it has inherent power to order restitutionary relief pursuant to its cease and desist power. [28]

*1. Section 5 remedial power as enacted in 1914*

A literal reading of section 5 of the FTC Act empowering the FTC to order violators to "cease and desist" does not suggest a congressional grant of authority to seek restitution for injured consumers. [29] Looking behind the FTC Act's language to examine its legislative **\*1146** history does not produce a different conclusion. [30]

The FTC Act began as part of a package of antitrust legislation that President Wilson proposed in a speech to Congress following the presidential campaign of 1912. [31] Congress separated Wilson's proposal for a trade commission from his other proposals, which later became the Clayton Act provisions, although Congress considered both at approximately the same time. [32] The commission, as originally envisioned by President Wilson and considered by the House, would have been an administrative agency without teeth. [33] President Wilson spoke of an "interstate trade commission" that would serve "as an indispensable instrument of information and publicity." [34] The bill's sponsor in the House referred to the new commission's

USAP092

role as exposing industrial evils to "pitiless publicity."[35] A Republican representative commented that "one of the **\*1147** best provisions of this bill is that providing for publicity."[36] The Progressives, who espoused greater regulatory intervention to combat monopolies, complained that the bill created a weak commission whose only purpose would be "news gathering for the courts and for Congress."[37] Despite criticism that the commission was toothless, the House passed the trade commission measure in substantially the same form as the Committee on Interstate and Foreign Commerce had reported it.[38]

The Senate Committee on Interstate Commerce added teeth to the measure, reporting out a bill that added to the information gathering and reporting duties a prohibition of "unfair competition."[39] The committee's bill authorized the commission to issue orders "restraining and prohibiting" respondents from practices found to constitute "unfair competition."[40] The commission, however, was to **\*1148** have no enforcement power.[41] If a respondent did not obey the commission's order, the Senate committee's bill authorized the commission to seek a court order requiring compliance.[42] Only if the respondent violated that court order could the respondent suffer any meaningful adverse consequences. Any adverse consequences, then, would come from the courts, not the commission.[43]

The debate in the Senate was lengthy and unfocused. A principal concern was with the meaning of "unfair competition." Unable to come up with a better definition that would cover all possible unethical activities businesspeople could devise to accomplish a monopoly, the general phrase was retained, with only a slight modification to read "unfair methods of competition."[44] The debate on "unfair competition" occurred at a time of public concern about the abuses of monopolies.[45] The focus of Congress was not so much on the competitor injured by unfair competition as it was on the general economic and social injury caused when small practices of "unfair competition" allow the perpetrator eventually to achieve monopoly power.[46] Thus, supporters of the legislation frequently referred to it as stopping monopoly in its incipiency, before injury had occurred.[47] For this reason, supporters perceived the restraining order **\*1149** as the appropriate remedy, sufficient to stop practices before they injured the public.[48] As for injury to competitors, Senate bill supporters viewed existing common law actions based on unfair competition and statutory actions pursuant to the Sherman Act as avenues of private recourse.[49]

The debates, however, did consider the plight of the victim of unfair competition. Participants in the debates considered adding a provision allowing a private treble damage cause of action for anyone injured by reason of "unfair competition."[50] Those supporting this addition argued that if Congress was going to make unfair competition unlawful, it should give a remedy to those injured by that violation.[51] In addition, they believed that a private remedy would **\*1150** discourage businesspeople from engaging in such conduct.[52] The proponents of this amendment believed that a cease and desist order entered at the conclusion of a commission proceeding did not provide an effective deterrent.[53] The fact that some members of the Senate considered a private right of action necessary demonstrates that they did not believe the cease and desist power alone could remedy injury inflicted before the order.[54]

In the end, those arguing against a private remedy prevailed. They maintained that the breadth and vagueness of the prohibition against "unfair competition," which allowed the FTC to define "unfair competition" on a case-by-case basis, made it unfair to penalize businesspeople for engaging in conduct that they may have had no reason to believe was unlawful at the time.[55]

**\*1151** Some who argued against the private remedy assumed that private causes of action for single damages already existed in the courts.[56] They believed that if the FTC found conduct to constitute unfair competition and an antitrust violation, those injured could take advantage of the private right of action given by the antitrust laws.[57] Other conduct categorized as "unfair competition," although not a violation of the Sherman Act, might be actionable under other common law theories.[58] And some believed (erroneously) that by making unfair competition illegal, Congress automatically created a private cause of action, analogous to private rights to compensation for injury arising out of criminal conduct of a defendant.[59] There is ample evidence, therefore, that in passing the FTC Act with its cease and desist language, Congress believed that many of those injured by unfair methods of competition would have some form of private relief available and would not be dependent solely on the FTC for relief.

USAP093

When Congress debated the remedial provisions of the FTC Act, the prohibited activity involved only "unfair methods of competition." That type of activity does not suggest restitution as a remedy **\*1152** in the same way that a violation of "unfair or deceptive acts or practices" does. [60] It is understandable, then, that Congress decided to leave injured individuals to their remedies at law for damages. Congress added the prohibition of unfair or deceptive acts or practices to the FTC Act twenty-four years later, while leaving the cease and desist remedy untouched. [61] Accordingly, the addition of the deceptive act or practices prohibition should not now be used as a basis for inferring a congressional intent to distinguish between "damages" and "restitution," the former being at law and not part of the cease and desist power, but the latter representing a permissible equitable adjunct to the cease and desist power. [62] At the time Congress adopted the cease and desist authority in 1914, the context of the prohibition in the bill then under consideration did not readily suggest the need for an equitable restitutionary remedy.

Senator Newlands, one of the sponsors of the legislation that became the FTC Act, contended that including an express private right of action for damages would defeat the bill's purpose of providing fast and efficient guidance to businesspeople. [63] With the prospect of a damages action following an FTC proceeding, a respondent would not cooperate with the agency in seeking its advice and thereafter conform its practices to that advice. [64] Instead, the respondents would dig in and fight to avoid the financial burden of paying private relief. [65] Senator Newlands' conception of this legislation **\*1153** as experimental and educational prevailed. He stated, "I do not want to see this bill accepted by the business community as carrying terror and destruction. I hope they will feel, as I feel, that it will be an instrumentality of beneficence." [66] Senator Newlands urged that the bill was not intended to define crimes and misdemeanors, nor to be punitive. Rather, Newlands said that the bill "is educational and corrective in character, and we wish through it to establish administrative law upon the subject so that every man engaged in trade in the country can have a proper understanding of what the law allows and what the law forbids." [67]

In view of the originality of the concept that this legislation introduced, its supporters urged that Congress move cautiously. [68] Once experience was gained with the new commission, changes and enhancement of its powers could follow in future legislation. [69] The **\*1154** vote was decisive against the inclusion of a private remedy. [70]

The Senate also rejected a proposed amendment giving a complainant to the proposed commission the right to appeal from a commission determination that unfair competition had not occurred. [71] Sponsors of the bill, who opposed the amendment, explained that " w e are trying here to make the regulation effectual, not for the benefit of an individual, but for the benefit of society." [72] Again, the majority viewed private actions in the courts as the appropriate vehicle for the redress of private grievances. [73]

That there was no congressional intent to care for victims through the trade commission legislation is further supported by Congress' awareness of a well-known provision of the Interstate Commerce Act. Under its terms, the Interstate Commerce Commission (ICC) could determine the fairness of rates charged by carriers and, if the rates were deemed excessive, order future rates to be reduced. In addition, the ICC could order the payment of refunds to customers who had been overcharged. If the carrier refused to pay the refund, the customer could bring its own action in district court and the ICC's finding of unfairness would be prima facie evidence in the refund action. This ICC procedure, which was discussed several times in the debates on the trade commission bill, was never proposed as a remedy for those who were victims of "unfair competition." [74] On **\*1155** the contrary, Senator Cummins stated that the ICC procedure "has no relevancy or similarity to the question we are now discussing." [75]

A significant amount of debate focused on whether the commission's determination of unfair competition and its subsequent issuance of a cease and desist order constituted legislative or judicial activity. [76] The issue was important because of considerations concerning constitutional separation of powers. [77] In view of Congress' sensitivity to the constitutional issue, if it believed it was giving the new commission a restitutionary power, typically a judicial equitable power, elaborate trial and review procedures certainly would have been adopted. As was noted more than once in the debates, however, the commissioners were not required to be lawyers, [78] and the FTC procedures were to be informal with no requisite rules of evidence. [79]

**\*1156** In addition, the procedures for review of adopted FTC orders did not reflect an expectation that the FTC would be awarding monetary relief. In the reported Senate bill, there was no provision for court review. [80] This concerned many senators

USAP094

who believed that the commission's function of reviewing and branding past actions unlawful was a judicial function that required judicial review (some suggested a de novo court hearing) to be constitutional. [81] In the end, the Senate added a review provision to the bill which was modified in conference. The modified bill provided for judicial review by courts of appeals, but limited "the power of the courts to review the orders of the commission just as much, but no more, than the Constitution certainly permits." [82] Thus, the commission's findings of fact were to be conclusive "if supported by testimony," with only its conclusions of law subject to judicial review. [83] Particularly in view of the precedent of broad review of ICC orders for the payment of overcharges to shippers, it is unlikely that Congress would have accepted the limited court of appeals review procedure adopted in the FTC Act had members of Congress anticipated that FTC orders **\*1157** could include restitutionary relief. For the above reasons, both the explicit and implicit legislative history of the FTC Act contradicts the FTC's assertion that a restitutionary authority is an implied attribute of its cease and desist power. [84]

*2. The Wheeler-Lea Amendments of 1938*

The cease and desist remedial provision written into the FTC Act in 1914 prohibited "unfair methods of competition." [85] Although the FTC thereafter brought actions challenging advertising and other forms of commercial promotion, the Supreme Court held in 1931 that demonstration of an injury to competition was essential for unfair methods of competition actions; [86] consumer injury alone was insufficient. [87] This placed an additional burden of proof on the FTC and also meant that when a respondent had a monopoly in a certain market, it could not be charged with fraud or deceit because no competitor would be injured. [88] Thus, the FTC began efforts to gain the authority to prohibit "unfair or deceptive acts or practices" in addition to "unfair methods of competition."

Those efforts culminated in the Wheeler-Lea Act amendments to the FTC Act in 1938. [89] Congress combined the proposal to expand the FTC's jurisdiction with another piece of legislation designed to address a national crisis in the advertising and sale of drugs and devices that could endanger health. [90] There was virtually no opposition to the proposition that the FTC should be given the authority to prosecute "unfair or deceptive acts or practices" without having to prove anticompetitive consequences. [91] The legislative history **\*1158** does not suggest, however, that in expanding the FTC's authority to encompass consumer protection (unfair or deceptive acts or practices) in addition to the competitive environment (unfair methods of competition), Congress also intended to expand its remedial authority. In fact, the reports and debates echo Congress' original understanding in 1914 that the FTC's remedial authority was limited to prohibiting, in the future, practices that had occurred in the past. As to the FTC's new authority to prosecute "unfair or deceptive acts or practices," its purpose was clear. [92] The amendment was intended only to give the FTC authority to prohibit conduct that was unfair or deceptive to consumers without requiring the FTC to prove anticompetitive effect. [93]

The principal debate on the Wheeler-Lea Act concerned the additional provisions authorizing the FTC to prosecute unfair or deceptive advertising of food, drugs, devices, and cosmetics. [94] Those provisions gave the FTC authority to request the United States Attorney General to seek preliminary injunctions in district courts against false advertising of covered products pending FTC administrative proceedings. [95] They also authorized courts to impose criminal penalties for unfair or deceptive advertising of food, drugs, devices, or cosmetics when it could be proven that the offender sold **\*1159** something injurious to human health or acted with intent to deceive. [96]

There were two principal objections to the food and drug proposals. [97] One group believed that enforcement power over false advertising of medical-type products should be given to the Food and Drug Administration (FDA), which already had jurisdiction over drug labeling. [98] The second objection was that the criminal penalty provision was too weak because it applied only to intentional or inherently harmful situations involving food and drugs. [99] Thus, criminal penalties would not apply to false advertising for all food and drugs or to all false advertising subject to FTC jurisdiction. [100]

The common thread of these objections is the perception of the limitations inherent in the FTC's cease and desist remedial authority. Those who supported FDA enforcement of false advertising of food, drugs, devices, and cosmetics did so because the FDA had authority to seek immediate criminal penalties for false labeling of drugs. [101] This was perceived to be a stronger deterrent than the cease and desist power of the FTC. [102] A House opponent of FTC authority over advertising of food and

**USAP095**

drugs complained that the FTC Act was ineffective in preventing the initial publication of false advertising and in stopping continuing publications until after issuance of an injunctive order. [103] A Senate opponent, referring to his vote in the previous Congress opposing FTC enforcement of a prohibition against false advertising of health-related items, stated: "I was not willing to compromise by leaving to the demonstrated ineffective control of the cease-and-desist order procedure of that FTC Act law, false advertising that had a relationship to public **\*1160** health." [104]

The other debate on the food and drug amendments focused on remedial procedures that would be applied to combat health-related false advertising. [105] One criticism was that stronger remedies ought to apply to all "unfair and deceptive" conduct, [106] while another faction complained that the heightened remedial provisions for false advertising of food, drugs, devices, and cosmetics were not tough enough. [107] Both criticisms were based on the premise that the "cease and desist" procedure then in effect at the FTC was not an effective remedy. [108] The Report on the Wheeler-Lea legislation prepared by the House Committee on Interstate and Foreign Commerce added the food and drug amendments. It drew separate "additional views" from three members of the committee who believed that unless criminal penalties were applicable to all false advertising of food and drugs, there would be no deterrent value in the law. [109] They complained, "It is just this deterring effect that is lacking when dependence is placed upon the cease and desist order for enforcement." [110] The three members relied on a leading commentator on FTC law who noted these limitations and stated, " o ne who violates the Pure Food and Drugs act may be criminally prosecuted by the Department of Agriculture , whereas the Federal Trade Commission can only order him to cease and desist, without even forfeiting the unlawful gains derived from the violation." [111] The group urged that all false advertising of health-related products be subject to **\*1161** criminal penalties regardless of intent or inherent danger. [112]

Even the committee's majority report, in explaining its proposed spectrum of remedies for false advertising of food and drug products, conceded the relative innocuousness of an FTC cease and desist order. [113] The committee explained that it had designed a hierarchy of remedies for such practices, including temporary restraining orders and criminal penalties for intentional deception or for misrepresenting products that could cause injury. [114] For advertising as to which intent or inherent dangerousness could not be demonstrated, the committee recommended that " f or the offender whose transgression is trivial, inadvertent, or innocent of law offending purpose, the regular procedure of the Federal Trade Commission through a cease and desist order can be followed." [115]

In the end, Congress adopted the "middle-road" solution of the committee. [116] The weak cease and desist procedure would apply to "unfair and deceptive acts or practices" and to false advertising of food, drugs, devices, and cosmetics. [117] An exception, allowing the FTC to seek criminal penalties, would apply if the item was inherently dangerous or if the advertising was intentionally deceptive. [118] The majority explained that there was justification in treating deception regarding a dangerous product affecting a person's health differently than a product that simply affects one's pocketbook. [119] To those who believed the stronger remedy should apply to all deception, Senator Wheeler explained that such a proposal "would bring down on our heads every businessman in the United States." [120]

While these understandings of the FTC's remedial authority, expressed twenty-four years after passage of the enabling legislation, should not be looked to as dispositive of legislative intent in 1914, the legislative history is persuasive that Congress had no intention **\*1162** of expanding the limited remedial scope of the FTC cease and desist order with the Wheeler-Lea Act.

*B. The* Curtis *Case: The FTC's Expansive Self-Interpretation of the "Cease and Desist" Authority*

Notwithstanding the legislative history, the FTC in the early 1970s asserted that section 5 cease and desist authority gave it the power to order the payment of refunds to consumers injured by a respondent's unfair or deceptive acts or practices. [121] This position was taken in a case against the Curtis Publishing Company regarding its handling of uncompleted subscriptions when it stopped publishing *The Saturday Evening Post* in 1968-1969. [122] Instead of paying refunds to subscribers for the unused portions of their subscriptions, Curtis offered a list of magazines from which subscribers could select substitutes for the time remaining on their *Post* subscriptions. [123] The FTC's complaint alleged that Curtis' failure to offer and give refunds, as well as the company's failure to advise customers that they were entitled to refunds, constituted unfair or deceptive conduct under

section 5 of the FTC Act. [124] The proposed order would have required Curtis to notify all its former *Post* subscribers that they were entitled to cash refunds. [125]

After trial, the administrative law judge ordered the complaint dismissed on the ground that the relief was beyond the cease and desist authority of the FTC. [126] The judge concluded that the cease and desist authority did not enable the FTC to order affirmative acts, impose retroactive remedies, or grant money judgments. [127] On appeal to the full Commission, the FTC disagreed with the administrative law judge regarding its authority to order refunds, but affirmed the dismissal on several different grounds unique to the **\*1163** *Post* and Curtis. [128] The FTC's decision asserting its authority to order refunds but dismissing the complaint left no order for Curtis to take to a court of appeals. Thus, the FTC's assertion of its own authority stood without court review.

The FTC's rationale for asserting the authority to order refunds simply ignored legislative history. [129] Instead, it invoked the generally expansive language of the courts with regard to the discretion given to the FTC in its choice of remedy and controverted each of the three assertions on which the administrative law judge premised his conclusion that no redress authority existed. [130]

The *Curtis* opinion started with the oft-cited proposition enunciated by the Supreme Court in *Jacob Siegel Co. v. FTC* [131] that "courts **\*1164** will not interfere with FTC cease and desist orders except where the remedy selected has no reasonable relation to the unlawful practices found to exist." [132] The opinion in *Curtis,* however, omitted reference to the preceding sentence: "The Commission is the expert body to determine what remedy is necessary to eliminate the unfair or deceptive trade practices which have been disclosed." [133] This was an important modifier because the FTC's primary objective is to eliminate deceptive or otherwise unfair trade practices from the market. [134] Similarly expansive opinions regarding the FTC's remedial power can be distinguished on the same ground that the relief allowed the FTC, while broader than a simple "don't do it," must be exercised to eliminate in the future the practices of the past. [135]

Focusing on the administrative law judge's grounds for concluding that the FTC did not possess restitutionary authority diverts attention from the principal issue. [136] The question is not whether section 5 permits the imposition of affirmative duties or the awarding of money or "retroactive relief." Instead, it is whether the affirmative duty [137] or the award of money or retroactive relief [138] is **\*1165** reasonably related to the elimination of the offending practice in the future. [139] The FTC's remedial authority should be deemed to be only as broad as is appropriate to achieve that goal. Using this approach, the authority to order restitution to consumers injured by deceptive sales practices will usually fall outside the cease and desist penumbra.

Commissioner Dixon's *Curtis* opinion articulated two theories justifying restitution as consistent with the cease and desist authority of the Commission: restitution is justified when it is necessary to restore competition or when it is necessary to eliminate a continuing **\*1166** violation of section 5. [140]

*1. Restitution to restore competitive status quo*

The *Curtis* opinion asserted that deceptive conduct can impact future competition in the market by injuring ethical competitors, thus giving unethical participants an unfair financial advantage. [141] The FTC stated that to the extent deception works to divert money from ethical competitors, it injures those competitors. To the extent this injury is found to have adversely altered the competitive dynamic of the marketplace, restitution of funds to consumers might be a way to restore the competitive balance that existed before the deception occurred. [142] To justify such relief, however, there would have to be evidence not only of lost profits to ethical competitors, but a demonstrated impact on competition in the market. [143] In addition, the FTC would have to conclude that requiring restitution to be paid to consumers would somehow rectify injury to future competition. [144] Neither finding is likely in a deception case because injury to competition does not necessarily follow from a deceptive practice and because requiring proof of lost profits would turn every simple deception case into a prolonged antitrust inquiry. Ironically, the FTC invoked injury to competition to justify a remedy for unfair or deceptive acts or practices, a prohibition added to the FTC Act in 1938 to eliminate the need to prove injury to competition in deception cases. [145]

USAP097

The same predicates would have to underlie restitution when the focus is not on injury to competitors due to lost business, but on the advantage to the perpetrator of the deception. In exploring this approach, Commissioner Dixon quoted from a speech by Commissioner Jones who posited a situation where "businessmen employing such deceptive and unfair practices and reaping the profits therefrom can use those excess profits to drive out honest efficient businessmen who do not use them, and thus, severely injure the competitive structure of the affected market." [146] Under this approach, **\*1167** however, restitution would be an appropriate remedy only if the record showed: (1) the profits of the deceiver were somehow used to "drive out" the honest businessman; and (2) payment of restitution to consumers would restore the competitive vitality of the market to its predeception condition. If the "driving out" proof could be made, an extraordinarily difficult task, a better ground for a complaint would be section 5's "unfair methods of competition" prohibition, the FTC Act's equivalent to section 2 of the Sherman Act. [147] Furthermore, a remedy focusing on restoration of competition rather than on compensating deceived customers would be more appropriate. In *Curtis,* the FTC treated competitive injury as a pretext for rationalizing its order of consumer relief rather than as a condition to be addressed and rectified in its own right. [148]

### 2. Restitution to end a continuing violation

The FTC relied on a second theory to justify the use of restitution in *Curtis*. Under this theory, the Commissioners considered the retention of money obtained through deception a continuing violation of section 5 that could only be cured by restitution. [149] This analysis also fails. The holding of money, regardless of its source, does not necessarily affect future conduct. Restitution for injured victims is designed to undo past violations rather than to prevent future bad conduct, the intended aim of the cease and desist power. [150] The FTC's approach confuses prohibited conduct with the effect of prohibited conduct. Retaining money from the sale of goods or services is not unfair by itself. The unfairness is only determined after analyzing how the money was obtained, which then becomes the unfair or deceptive act or practice. [151]

To hold that every unredressed law violation is a continuing one would eliminate any meaningful distinction between continuing and **\*1168** noncontinuing violations. Every violation of the FTC Act, to the extent it produces a benefit for the perpetrator, would be deemed continuing, as long as the benefit is not somehow denied to the perpetrator. [152] In a different context, the Supreme Court has held that a violation is "continuing" only where (1) both *the detrimental effect to the public* and the violator's realized gains continue *and increase* over a period of time, and (2) the violator possesses the ability to eliminate the effects of the violation if it so desires. [153] In most cases, a cessation of the deceptive practice is sufficient to eliminate the detrimental future effect on the general public, as opposed to the effect on identifiable victims of past practices. Accordingly, restitution becomes a remedy for past violations only and falls outside the objectives of the cease and desist remedy.

In enunciating the continuing violation theory, the FTC relied on precedent in which cease and desist orders required respondents in future transactions to refund money obtained or retained pursuant to some fraudulent or unfair scheme. [154] Certainly one way to deter future deception (taking money under false pretenses) is to require the restoration of such money. As a remedy applying to future conduct, restoration does not offend the principle that a cease and desist order should address future behavior. Such cease and desist provisions, however, do not support the proposition that retention of money derived from conduct prior to FTC intervention is itself a **\*1169** continuing violation. Rather, retention of ill-gotten money derived from past conduct only falls within the cease and desist power in those rare cases where the retention affects the future competitive operation of a market, and the FTC establishes such a causal relationship. [155] In *Curtis,* the FTC failed to make a convincing case supporting its statutory authority to order restitution under its cease and desist power. In *Heater v. FTC,* the first appellate court decision to reach the question of the FTC's power to order restitution after its declaration that it possessed such power, the Ninth Circuit found the asserted authority lacking. [156]

### C. The *Heater* Case: Judicial Rejection of the FTC's Interpretation of the "Cease and Desist" Power

### 1. Proceedings Before the Federal Trade Commission

In 1973, the FTC issued a cease and desist order to a company and its officers that had offered memberships in a "universal credit card plan" to retailers. [157] Under the plan, the retailer could honor all major credit cards submitted by its customers and submit the charges to receive payment from the plan within thirty days, regardless of the customers' payment. [158] The plan appealed to merchants because it required contracting with only one plan while enabling the merchant to honor most credit cards, and

USAP098

because it offered the store prompt payment regardless of a customer's default. [159] An administrative law judge found that the company did not honor the commitment to pay the merchant regardless of the customer's default and that it was late in paying the merchants. [160] Most merchants who signed up for the plan dropped it within several months, notwithstanding their one-year memberships. [161] The administrative law judge also found that the company misrepresented the ease of selling and potential profits of the plan to the interested franchisees who marketed the plan to merchants. [162] The judge's initial decision ordered the company to cease and desist its deceptive practices and, although skeptical of the FTC's position that it had **\*1170** the power to order refunds, followed the *Curtis* holding and ordered the payment of refunds to defrauded merchants and franchisees. [163]

On appeal to the FTC, the only dispute concerned the authority of the FTC to order the payment of refunds. [164] The Commission reaffirmed the propriety of a restitution order under its cease and desist authority on the ground that it was "essential in this case in order to redress the competitive balance disrupted by respondents' fraudulent program and prevent repetition of these practices in the future." [165]

The Commission concluded that a traditional cease and desist order would be an inadequate remedy "if that businessman who has engaged in the deceptive or unfair practices has been so successful as to significantly disrupt the balance of competition." [166] Yet, the evidence in this case indicated that the respondent company was in bankruptcy and that most of those merchants persuaded to join respondents' plan quit before their one-year membership expired. [167] From this record it was impossible to conclude that the company had any significant impact on the "competitive balance" with other credit card issuers such as VISA and Mastercard franchisees. Certainly the FTC proffered nothing to suggest that the plan would continue to impact that market's "competitive balance."

Competitive analysis in deception cases can be odd. For instance, in what market does a quick cure for cancer compete? If the market includes radiation therapy and chemotherapy, the market impact of a magic elixir will be minimal. If the market is confined to quickie cures, is that a market where competition should be encouraged? Even where fraud exists in a legitimate market, as was the case in *Heater,* it usually operates on the periphery, skimming off money from a gullible few but rarely successful enough in the long run to work a change in the competitive dynamic of the market as a whole.

To buttress its argument, the FTC also asserted that "if the businessman is permitted to retain substantial funds obtained as a result of deception or fraud, the consuming public will have been deprived of the opportunity to place these funds in legitimate competitive activities and the businessman will be able to utilize these funds for further ventures." [168] According to the FTC, this would be similar **\*1171** to the retention of a company acquired in violation of the Clayton Act's prohibition of acquisitions and mergers that tend to substantially lessen competition. [169] The analogy misses a crucial difference. Divestiture is not ordered to prevent the perpetrator of the act from enjoying the fruits of illegal conduct. Rather, it is ordered to correct the distortion in market structure that adversely impacted competition when the merger occurred and that, until undone, will continue to adversely impact competition in future transactions. [170] Because the merger has a prospective effect on competition, a cease and desist order to eliminate it using the divestiture mechanism is appropriate. [171] Conversely, in the case of money obtained by fraud, there is no evidence that the perpetrator's retention of the money will have a continuing effect on the future state of competition. The fact that the defrauded consumer has lost money he or she might otherwise have spent with a legitimate enterprise does not, without some proof, suggest that there will be a lingering market dislocation. For instance, the merchants who left the Universal Plan would still sign up with another company out of competitive necessity, writing off the investment in the fraudulent product as a business expense.

The FTC suggested an alternative ground for the necessity of a restitutionary order; it concluded that a "go-and-sin-no-more" order would be ineffective against people who engage in blatant fraud in the face of the FTC Act's general prohibition of such activity. [172] Only if such people were reasonably sure that they would have to give up ill-gotten gains would there be a sufficient deterrent effect **\*1172** against the hard core defrauder. This argument, however, ignores the fact that Congress considered the same criticism of cease and desist orders during the congressional debate of the FTC Act's remedial provisions in 1914. [173] Despite those objections, Congress only adopted the cease and desist remedy for the FTC. In light of this history, it is untenable to take the position that the cease and desist authority contains an implied restitutionary element as a deterrent factor. If a deterrent factor is desirable as a policy matter (and it is difficult to argue against that proposition) it is a matter for Congress to address through legislation rather than for the FTC or the courts to effect through creative statutory interpretation.

Lack of restitutionary authority does not emasculate the FTC. The FTC is not prevented from entering broad orders to prevent future conduct related to the type found to have occurred in the past. [174] Indeed, the FTC Act establishes procedures for penalties and contempt charges if the respondent violates that order. [175] Although the prospect of a restitutionary order might make an FTC respondent less willing to engage in the prohibited conduct in the first place, Congress did not authorize such a scheme in passing the FTC legislation. In seeking to create a blank check out of its cease and desist remedial authority in *Curtis* and *Heater,* the FTC overreached. [176]

### 2. The appeal to the Ninth Circuit

One of the individuals against whom the restitutionary order in **\*1173** *Heater* was issued appealed to the Court of Appeals for the Ninth Circuit. [177] In a relatively brief opinion, the court held that the FTC's remedial authority does not include the power to order restitution. [178] The court reasoned that the broad prohibition against "unfair or deceptive acts or practices" contained in the FTC Act left to the FTC not only an enforcement responsibility but also a definitional responsibility. [179] Thus, whether certain conduct is "unfair or deceptive" may not be known for certain until the FTC so defines it. [180] The Ninth Circuit reasoned that it would be unfair to allow the FTC to order restitution for conduct that became illegal only after the FTC declared it illegal. [181] The fact that this argument might not apply to obvious fraud is a distinction that Congress did not make in the FTC Act. [182] The court indicated that the inability of the FTC to order restitutionary relief does not prevent private suits where the conduct violates established legal norms. [183]

Thus, in 1974, a federal appellate court judicially declared that the FTC did not possess the restitutionary power that it had been asserting for over two years. Although the FTC disagreed with the *Heater* decision and considered seeking Supreme Court review, [184] legislative developments overtook judicial review. The FTC decided to defer seeking judicial resolution of its cease and desist authority [185] and looked instead to the expanded restitutionary authority given to it by Congress in the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act of 1975. [186] Little did the FTC realize, however, that two years prior to the *Heater* decision, Congress had given it other authority which the courts would later construe as significantly broader than the statutory authority on which the FTC decided to rely. [187]

## \*1174 II. LEGISLATIVE APPROACHES TO CONSUMER REDRESS

Notwithstanding the FTC's assertion of its own authority to order consumer redress, the FTC also sought statutory enhancement of its remedial powers from Congress, including the power to order restitution. [188] The FTC sought expanded remedial options to more effectively accomplish its mission of promoting competition and protecting consumers. [189] As a result, Congress passed two pieces of legislation in the 1970s amending the FTC Act. The first was the Trans-Alaska Pipeline Act, [190] followed by the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act. [191]

### A. The Trans-Alaska Pipeline Act Amendments: Section 13(b) Injunctive Relief

In 1973, Congress passed the Trans-Alaska Pipeline Act in response to a national energy crisis created by a shortage of domestic crude oil. [192] Opening up the reserves on the Alaskan North Slope was seen as a critical step to achieving "energy independence" for the United States. [193] As a result, Congress passed legislation that allowed construction of a pipeline from the North Slope to a port in southern Alaska. During Senate debate, Senator Jackson introduced and the Senate accepted a floor amendment that, on its face, modestly increased the FTC's enforcement powers. Passage of the bill, with the Jackson amendment, added section 13(b) to the FTC Act. [194] This section empowers the FTC, whenever it believes that someone is violating or is about to violate any of the laws enforced by the FTC, to sue in district court to enjoin the practice pending issuance of an FTC complaint and final resolution of that action. [195] **\*1175** In addition, the provision states that "in proper cases the Commission may seek, and after proper proof the court may issue, a permanent injunction." [196]

USAP100

At the time, the FTC viewed this legislation as a "gap-filler." Congress designed this legislation to eliminate the long-recognized deficiency in FTC enforcement power that allowed respondents to carry on their activities until FTC issuance of a final cease and desist order, regardless of the injury the activities might be causing. [197]  **\*1176**  The statutory provision adopted by the conference committee declared that its purpose was to ensure "prompt enforcement" of the laws for which Congress had given the FTC enforcement authority. [198]  In the House, where the principal debate on the Senate amendment occurred, Representative Smith argued: "It is only good sense that where there is a probability that the act will eventually be found illegal and the perpetrator ordered to cease, that some method be available to protect innocent third parties while the litigation winds its way through final decision." [199]  Representative  **\*1177**  Melcher explained that the amendment removed "the procedural roadblocks that hamper the FTC in acting in a quick and effective manner." [200]

Legislators designed the new section 13(b) to help those injured by prohibited practices during the pendency of an administrative action. Section 13(b) was viewed also as a deterrent to those who might otherwise drag their feet in the administrative proceeding or to those tempted to engage in fraudulent conduct with the expectation that they could benefit while administrative proceedings were pending and then vanish. [201]

Observers have analogized section 13(b) to the authority given to the Department of Justice to seek preliminary injunctions under the Sherman and Clayton Acts and the authority of the FTC to seek injunctions for false advertising of food, drugs, devices, and cosmetics under the Wheeler-Lea amendments. [202]  Despite surface similarities  **\*1178**  between these provisions, this analogy fails. The Government has not sought or obtained restitution for those injured by the conduct for which the injunction is sought under either of the antitrust statutory provisions. Furthermore, the FTC's injunctive power relating to food, drugs, devices, and cosmetics does not include permanent relief. Finally, a private cause of action for antitrust violations is available under a separate section of the Clayton Act. [203]

With regard to the preliminary relief provision (as opposed to the permanent relief provision) of the Trans-Alaska Pipeline Act, the legislative history does not suggest that Congress expected that provision to authorize the awarding of restitution to those injured. Its purpose was simply to avoid future injury once the FTC had, by the issuance of a complaint, blown the whistle on suspect conduct. [204]  But section 13(b) also included a proviso that allowed the court "in proper cases" and "after proper proof" to enter permanent injunctions. [205]  There was no discussion of this clause during the debate on the Trans-Alaska Pipeline Act, nor did any such discussion appear in any of the committee reports on the legislation. Its purpose, however, can be discerned from the Senate committee report on the bill from which Senator Jackson extracted this provision for his floor amendment to the pipeline bill. [206]

The Senate committee report attributed two purposes to the permanent injunction language. The first purpose was to overcome possible judicial reluctance to enter preliminary relief without maintaining control over the timetable for permanent relief. [207]  This does not suggest that in granting courts the authority to issue permanent injunctions, Congress intended to grant district judges remedial power exceeding that of the FTC.

 **\*1179**  The second objective appears to have been the achievement of efficiency and expedition in routine fraud cases. The report stated that permanent injunctive relief would be appropriate for the district judge to grant in those instances involving "routine fraud" and where the expertise of the FTC to determine or define deceptiveness would not be necessary. [208]  Again, this second objective does not suggest that the committee contemplated that the district judge would be able to grant relief for violations of the FTC Act that differed from the remedies available to the FTC itself. [209]

In fact, after passage of the pipeline bill, the FTC's resort to use of its newly gained section 13(b) injunctive power languished, except in merger cases, to the point that a General Accounting Office report criticized the FTC for its failure to take advantage of it. [210]  After the passage of the pipeline bill, the FTC, which appeared to have instigated this amendment, exhibited no sign that it believed Congress had given it any new authority to obtain consumer redress through the equitable intervention of the district courts. Instead, it continued in its efforts to find such power for itself through a strained interpretation of its own enabling act. [211]  Nor did Congress contemplate the potential for consumer redress in the injunction legislation. The same Congress that passed the Trans-Alaska Pipeline Act in 1973 with the FTC injunction provision continued to work on another bill that specifically addressed the consumer redress issue.

*B. The Magnuson-Moss Warranty-Federal Trade Commission Improvement Act: Congress Provides an Express Means of Consumer Redress*

The injunction provision of the 1973 Trans-Alaska Pipeline Act was lifted from another bill pending in the Senate that proposed a number of other changes in the FTC Act. One of the proposals was **\*1180** to give the FTC the power to seek from the courts redress for injured consumers. [212] In 1974, the same Congress that proposed the Trans-Alaska Pipeline Act enacted provisions of that other Senate bill, including a consumer redress provision adding section 19 to the FTC Act, as Title II of the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act. [213] Given the common parentage of the injunction provision and the consumer redress provision, they should be construed *in pari materia,* notwithstanding their eventual enactment in different pieces of legislation. [214]

The section 19 consumer redress provision in the Magnuson-Moss legislation had an antecedent that failed to make it through the previous Congress. In the 92d Congress, the Senate had considered Senate Bill 986, which dealt with consumer warranties and FTC improvements. [215] Section 203 of that bill, as reported out of the Senate Commerce Committee, allowed the FTC to obtain redress from the courts for consumer injury flowing from unfair or deceptive acts or practices that are the subject of an FTC cease and desist order. [216] During subsequent debate, Republicans sought to detach the FTC improvements title and pass the warranty legislation alone. [217] Basing their attack against the FTC section on inadequate committee consideration, the opponents sought to highlight the ambiguities and deficiencies of the FTC title. One deficiency repeatedly mentioned was that the redress provision contained no statute of limitations. [218] Another perceived deficiency was the possibility of a seller being sued for redress for activity that only became "unfair or deceptive" after the FTC defined it to be so with the entry of a **\*1181** cease and desist order. [219]

Responding to the statute of limitations criticism, Senator Spong, a supporter of the bill, offered an amendment accepted by the bill's sponsor, Senator Magnuson, to include what he called a statute of limitations. [220] His cure was illusory. The two-year limit offered by Senator Spong applied to the time within which the FTC could file a redress action after entry of a final cease and desist order, rather than to the time from the occurrence of the offending act to the filing of the redress action. The bill, with the Spong amendment, passed the Senate but died in the House when the 92d Congress expired. [221]

In the 93d Congress, supporters in the Senate reintroduced the warranties/FTC bill, including the redress measure and its illusory two-year statute of limitations. [222] The Senate passed the measure with little debate. [223] The companion House bill came out of the House Commerce Committee, however, without a consumer redress provision. [224] A floor amendment proposed during House debate raised again the consumer redress issue. [225] Unlike the Senate provision, the amendment proposed by Representative Eckhardt was limited to redress of violations of FTC trade regulation rules (where the perpetrator could not argue ignorance of the unlawfulness of the activity) and contained a six-year statute of limitations beginning with the date of the rule violation. [226] This lengthy statutory period **\*1182** provoked an objection that while FTC rule violations were being given a six-year period for redress, securities laws only gave a three-year period for actions based on securities fraud. [227] The Eckhardt amendment was defeated [228] and the bill passed the House without a redress provision. [229]

In the Conference Committee, the Senate prevailed and a consumer redress provision was included in the legislation. [230] The Conference Committee version added section 19 to the FTC Act. [231] It addressed, among other things, the House's objections to the six-year statute of limitations and the possibility of a redress suit against someone who, at the time of the conduct at issue, was unaware of the legal violation. Thus, the provision allowed the FTC to sue in district court for consumer redress arising out of a respondent's violation of an FTC trade regulation rule [232] or a violation of the prohibitions of section 5 of the FTC Act against "unfair or deceptive acts or practices." [233] In the latter type of case, however, a district court could award redress only with respect to activity that "a reasonable man would have known under the circumstances was dishonest or fraudulent." [234] Furthermore, Congress imposed a three-year statute of limitations on all redress actions dating from the time of the injury-causing activity, regardless of whether it involved a trade regulation rule violation or an unfair or deceptive act or practice. [235]

The relief allowed by section 19 is limited only by the nature of **\*1183** the act involved and the remedial power of the court. Congress contemplated both legal and equitable remedies. For instance, the Act lists as examples of remedies the rescission or reformation of contracts, the refund of money or the return of property, the payment of damages, and public notification of the violation. [236] These remedies, however, are not exclusive. Congress also gave courts the authority "to grant such relief as the court finds necessary to redress injury to consumers or other s . ..." [237] Both houses passed the conference version [238] and the President signed it into law as the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act. [239]

As might be expected in such circumstances, section 19 as it emerged from Congress reflected compromises made during the legislative process. While these compromises placed the burdens of scienter and statute of limitations on the FTC, and while the result may not have entitled all injured consumers to redress under the new section 19, it was the scheme Congress fashioned.

Although Congress passed the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act over a year after passing the injunction provision as part of the Trans-Alaska Pipeline Act, it was well aware of that injunction provision when it considered the Magnuson-Moss consumer redress provision. [240] There is nothing in the legislative history suggesting that members of Congress who debated the 1974 consumer redress provision understood the 1973 injunction legislation to have addressed the consumer redress issue. Furthermore, the legislative history does not support a congressional intent that section 13(b) relief provide consumer restitution in circumstances where section 19 would not.

Interpreting the injunction and consumer redress provisions together, the preliminary injunction provision may be construed, consistent with congressional intent, to also allow for the freezing of assets and entry of other relief necessary to preserve assets for consumer **\*1184** relief. [241] In the case of permanent injunctions, it is reasonable to argue that such an injunction can include consumer relief, but only if the criteria of section 19 are met. Congress would not have taken the trouble in section 19 to limit consumer relief in cases not involving trade regulation rule violations to those demonstrating fraudulent intent and filed within a three-year period if, only a year before, it had intended in section 13 to give the FTC the ability to ignore those limitations by invoking the courts' equitable injunction power. [242] However, the courts have construed this legislation to permit just such an evasion of the section 19 limits. [243]

## III. THE JUDICIARY TAKES OVER

The FTC was slow to use the power it gained in 1973 to obtain injunctions. This was the subject of a critical General Accounting Office study in 1978, which motivated the FTC to become serious about exercising its new authority. [244] Shortly thereafter, the FTC started using its section 13(b) injunction power frequently in routine fraud cases. Because of the precedent established in those cases allowing consumer redress in connection with injunctions, resort to the section 19 consumer redress provision has become a less attractive option for the FTC and has languished. [245]

### A. Judicial Construction of the Section 13(b) Preliminary Injunction Authority in Consumer Protection Cases

Section 13(b) of the FTC Act gives the FTC power to seek preliminary **\*1185** injunctions and, in "proper cases," permanent injunctions. [246] The language containing the preliminary injunction authority speaks only of the FTC seeking and the court granting "a temporary restraining order or a preliminary injunction" to remain in effect until the conclusion of the FTC's administrative proceeding. [247] An early interpretational issue for courts construing this language was whether such an order could include a freeze of a respondent's assets. In *FTC v. Southwest Sunsites, Inc.,* [248] the Fifth Circuit answered this question in the affirmative. It concluded that such relief was necessary to ensure the payment of consumer redress at the conclusion of a section 19 consumer redress action, authorized in the 1975 Magnuson-Moss legislation. [249] Addressing the preliminary injunction provision and the consumer redress provision together, the court concluded that "Congress was evolving a statutory plan for the protection of the ... public." [250] The court added that if the preliminary freezing of assets was not permitted, the consumer redress provision could be nullified and the purpose of Congress' "plan" frustrated. [251]

In reaching its conclusion, the Fifth Circuit relied on two Supreme Court decisions allowing expansive construction of a statutory invocation of the courts' equitable powers. [252] In *Porter v.* **\*1186** *Warner Holding Co.,* [253] the Court dealt with a World War II

statute that authorized the Administrator of the Office of Price Administration to apply for a court order "enjoining" activity that violated the Emergency Price Control Act, or for an "order enforcing compliance" with that Act. [254] This Act authorized courts to enter "a permanent or temporary injunction, restraining order, or other order." [255] The Supreme Court held that this judicial authority included the right to order the payment of restitution to those charged real estate rentals above the maximum price level allowed under the Emergency Price Control Act. [256] The Supreme Court concluded that " u nless a statute in so many words, or by necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. ... Only in that way can equity do complete rather than truncated justice." [257]

Although the Court made a perfunctory bow to congressional intent, the polestar in the construction of any statute, [258] it displayed reverence for the broad powers of equity. [259] "The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction." [260] Other than referencing "the great principles of equity," the Court failed to explain why legislative intent should take a back seat when Congress invokes an equitable power, regardless of how venerable. This oversight is particularly grave in the legislative sphere where invocation of equity may be part of a larger remedial statutory scheme and where the concept of an "injunction" is unlikely to carry with it in the minds of legislators all the additional accoutrements of equity. The Court's construction of a presumption in favor of a full grant of equity power when the statute invokes one aspect of that power constitutes a dubious-indeed, arrogant-assertion of judicial authority. [261] Although the Court found "truncated justice" distasteful, [262]  **\*1187**  it is the intent of the legislative branch that should govern the interpretation of a statutorily created remedy, not the sensitivities of the judiciary. [263]

The *Porter* case was followed fifteen years later in *Mitchell v. Robert DeMario Jewelry, Inc.* [264] That case construed the Fair Labor Standards Act provision giving district courts the power to restrain violations of the Act. [265] The defendant, DeMario, fired employees in retaliation for their part in persuading the Department of Labor to file an action against DeMario for unpaid wages. [266] The Department of Labor brought a second action seeking an injunction prohibiting such retaliatory firing and requesting reinstatement of the employees and payment of wages lost due to the firing. [267] The district court granted the injunction and the court of appeals affirmed. [268] The court of appeals, however, held that the district court did not have the power, ancillary to its injunction power, to order the payment of lost wages. [269] The court of appeals stated that such authority had to be expressed in the statute or implied from the congressional enactment. [270]

The Supreme Court disagreed with the court of appeals' statement of the criterion. Refusing to distinguish *Porter* on its facts, [271] the Court followed *Porter* and ruled that " w hen Congress entrusts  **\*1188**  to an equity court the enforcement of prohibitions contained in a regulatory enactment, it must be taken to have acted cognizant of the historic power of equity to provide complete relief in light of the statutory purposes." [272] In other words, whenever Congress looks to the injunctive power of the courts, it must be presumed that it intended to bestow on the courts the power to invoke the full panoply of equitable relief unless Congress specifically disclaims such an intent.

Following this Supreme Court precedent, the Fifth Circuit held in *FTC v. Southwest Sunsites, Inc.* [273] that the 1973 amendment of the FTC Act, giving courts the power to enter a preliminary injunction on an FTC petition, includes the right to freeze a respondent's assets. [274] The Fifth Circuit reasoned that this protects the possibility of restitutionary relief that could be sought by the FTC pursuant to its new section 19 authority after a successful administrative prosecution of the respondent. [275] In light of the Supreme Court precedent, such a conclusion is unexceptionable because it is appropriate and supportive of the statutory purpose of the FTC Act. [276]

Disregarding for the moment the power of the courts to enter permanent injunctions for the FTC in "proper cases," the preservation of assets for the entry of an order at the conclusion of a section 19 redress proceeding is in accord with the purposes of the amended FTC Act. Such an action, in fact, would be a logical component of implied congressional intent in the Trans-Alaska Pipeline amendment. To hold that the court did not have such power would have substantially undermined the effectiveness of the redress provision, in much the same way that failure to allow payment of restitution for wages lost due to a retaliatory discharge would have nullified the policy of the Fair Labor Standards Act involved in *DeMario* to encourage individuals to complain of violations of the Act. Unless a freeze order to preserve assets is allowed, an order requiring redress

following an administrative proceeding could be ineffective because the assets could be dissipated or otherwise transferred in the interim.

**\*1189** *B. Judicial Construction of the Section 13(b) Permanent Injunction Authority: A Judicial Bypass of Section 19*

With this precedent set, however, courts blindly took the next step to conclude that the authority to issue permanent injunctions, as well as preliminary injunctions, includes the power to grant restitutionary relief outside section 19's established statutory procedures and criteria. The first case to consider this issue, and the one that set the precedent for the cases that followed, was the Ninth Circuit's decision in *FTC v. H.N. Singer, Inc.* [277] In *Singer,* the district court issued a preliminary injunction that included an order freezing the defendants' assets to preserve the possibility of restitution to those defrauded by the defendants' actions. [278] The Ninth Circuit upheld the freeze order as ancillary to an injunction to keep the possibility of a section 19 redress proceeding available. [279] The court then proceeded to address the question of whether the freeze order could be entered to protect the right of the court, acting pursuant to its own authority in equity, to grant restitution as part of a permanent injunction entered in a "proper case" pursuant to section 13(b). [280] Such relief would not be constrained by the intent and **\*1190** statute of limitations prerequisites for section 19 consumer restitution. [281]

In concluding that the district court had the power to order restitution in connection with its equitable power to grant permanent injunctions, the Ninth Circuit quoted *Porter v. Warner Holding Co.,* which held that once any aspect of the equitable power of the courts is invoked, the full range of equitable relief is presumed. [282] Whether or not one agrees with the *Porter/DeMario* doctrine, [283] its application requires that two criteria be met. First, the payment of restitution must further the "policy of the act." [284] Second, the statutory scheme must not contain "by a necessary or inescapable inference" a restriction on the exercise of such authority. [285] The courts have ignored these limitations on the *Porter/DeMario* doctrine by permitting the award of restitutionary relief in section 13(b) permanent injunction cases without regard for the prerequisites for such relief in section 19. [286] This circumvention of section 19 defies the **\*1191** policy of the FTC Act to provide restitution while providing "protection against unfairness" negotiated in Congress. [287] Consequently, the interpretation flies in the face of a "necessary and inescapable inference" that permanent injunction authority is constrained, when granting restitution, by the criteria set forth in section 19.

Section 19 embodies the FTC Act's policy regarding the provision of restitutionary relief and sets out requirements for such relief. [288] It requires that the FTC meet three criteria as a predicate for obtaining any restitutionary recovery for deceptive conduct outside the proscription of a trade regulation rule. [289] These criteria are: (1) the FTC must have issued a final cease and desist order against the respondent prohibiting an unfair or deceptive act or practice; [290] (2) the conduct subject to that order must have been of a nature "that a reasonable man would have known under the circumstances was dishonest or fraudulent;" [291] and (3) the act or practice for which restitution is ordered must not have occurred more than three years prior to commencement of the action. [292]

Finding a separate unrestricted restitutionary procedure under section 13(b) all but nullifies the statute of limitations and intent element required by Congress. [293] To use the Supreme Court's language in *Porter,* the finding that section 13(b) permits an unrestricted means of restitution creates such a conflict with section 19 that an "inescapable inference" arises that the power to grant permanent injunctions under section 13(b) does not include the power to grant redress to consumers injured by the conduct giving rise to the injunction when the requirements of section 19 have not been **\*1192** satisfied. [294] The same Congress that passed section 13(b) demonstrated that it knew how to invoke equitable jurisdiction when it wanted and did so in great detail in section 19. [295] The necessary implication is that what Congress did so specifically in one section, it would not have left for implication in another. [296]

In what appears to be a botched effort, the court in *Singer* attempted to deal with the argument that granting restitutionary relief pursuant to section 13(b) might be inconsistent with the section 19 relief. [297] The court relied on the language of section 19(e) that the section 19(a)(2) restitutionary remedy is "in addition to and not in lieu of, any other remedy or right of action provided by State or **\*1193** Federal law." [298] That provision, however, is not support for the existence of section 13(b) equitable restitutionary relief. At best, it only allows other forms of relief if their separate existence can be established. That evidence

USAP105

does not exist to support the judicial interpretations of section 13(b) finding unrestricted restitutionary authority included in the power of district courts to order permanent injunctions in "proper cases." [299]

Many respondents, particularly those that may be subject to restitutionary orders, are not nice people and have engaged in conduct that may run afoul of other criminal or civil mandates. Congress did not mean to preempt other forms of relief for those violations by passage of section 19. The Conference Report explained the purpose for inserting section 19(e) into the legislation: "It is not the intention of the conferees that private actions for redress based on the acts or practices which are the subject of a Commission consumer redress action be barred by a Commission action." [300] In addition, the conferees did not want to foreclose to the FTC civil penalty actions under other provisions of its enabling act. [301] The language of section 19(e), however, should not be used to nullify congressional intent within the FTC Act itself. Section 19 relief was, by its own language, "in addition to" other forms of relief. [302] That phrase would not have been used if Congress believed it was creating a right more restrictive than another already given in section 13. At the time that Congress adopted section 19, there was no construction of section 13, either legislative or judicial, that would have led Congress to understand that it was adding a limited consumer remedy to a statute that already permitted an unlimited one in section 13(b).

Another objective for inclusion of section 19(e) is suggested by the Conference Report's explanation that "[t]he Commission may have [power] to itself issue orders designed [for] remedying violations of the law. That issue is now before the courts. It is not the **\*1194** intent of the Conferees to influence the outcome in any way." [303] Thus, section 19(e) preserved for the FTC its litigation position in the then-pending *Heater* case. [304] It does not constitute authority for an expansive reading of section 13(b) that all but nullifies specific statutory restraints that Congress imposed on section 19 relief. [305]

It is true that *Porter* and *DeMario* involved statutes that set forth types of private and public relief provisions. [306] That did not prevent the Supreme Court from also allowing equitable restitutionary relief as part of the entry of an injunction. The statutes in each of those two cases, however, differ in material respects from the amended FTC Act. In *Porter,* the Emergency Price Control Act allowed private suits for overcharges if brought within thirty days from the date of the violation. [307] The Emergency Price Control Act then contemplated that if private relief was not sought, the Administrator could sue for damages that would be paid into the public treasury. [308] The Court did not find a conflict in permitting restitution in connection with an injunction because it supplemented either private or public suits for "damages," which the Court distinguished **\*1195** from equitable restitution. [309] Thus, the Court found the relief supplementary to, rather than in conflict with, that relief. [310] In the FTC Act, however, the courts have found an implied restitution remedy in section 13(b) that is inconsistent with a restitution right explicitly granted, with limitations, by section 19.

Also in contrast to the FTC Act, the Fair Labor Standards Act as explained in *DeMario* encouraged private individuals to complain about infractions of the Act. [311] To prohibit payment of lost wages after a retaliatory firing would have severely interfered with the policy of promoting complaints. Workers would be reluctant to complain, fearing they would sacrifice current wages to recover unpaid amounts from the past. [312] That type of situation does not exist under the FTC Act, because section 19 of the Act already provides restitutionary relief. The additional equitable relief is completely coextensive with that relief and, in part, inconsistent with it. The specific grant of relief, with its restraints, should take precedence over a power that is only presumed whenever the court is given equitable authority to enter injunctions.

*C. Reconciling Section 13(b) Permanent Injunctions with Section 19 Consumer Redress*

Given the *Porter/DeMario* doctrine that a statutory grant of injunction power to the courts calls into play all equitable remedies to do complete justice "in light of the statutory purposes," [313] and considering that Congress in section 19 explicitly restricted restitutionary relief available to the FTC with a statute of limitations and a scienter prerequisite, [314] the reconciliation of this situation is self-evident. Section 13(b) permanent relief, by its own terms, is limited to "proper cases" and is authorized "after proper proof." [315] A proper case and proper proof is established, for purposes of granting restitutionary relief, when the FTC satisfies the requirements of section 19. Thus, in cases of a trade regulation rule violation, the FTC would establish a "proper case" and "proper proof" for restitution under section 13(b) ancillary to a permanent injunction if the requirement of section 19, that the FTC seek restitution in court **\*1196** within three years of the occurrence of the conduct violating the rule, is met. [316]

When considering an unfair or deceptive act or practice outside FTC trade regulation rule violations, section 19 imposes the further requirement that the FTC establish that the conduct was such that "a reasonable man would have known under the circumstances was dishonest or fraudulent." [317] This should not cause the FTC undue hardship because the actions that it tends to file for section 13(b) permanent relief typically involve hard-core dishonesty or fraud. [318]

The third requirement of section 19 is that the request for restitution follow an FTC cease and desist order directed at such practices. This requirement can be dispensed with because both section 13(b) and section 19 contemplate that a district court will conduct the same inquiry. Likewise, a permanent injunction will follow a court finding that the conduct under scrutiny constituted an unfair or deceptive act or practice. Forsaking a separate administrative proceeding for that purpose fulfills the legislative objective of expedition and efficiency that underlies section 13(b). [319]

The reconciliation of section 19 and section 13(b) is neither tortured nor difficult and does not impose undue burdens on the FTC. The most difficult aspect is the statute of limitations. FTC investigations are not speedy once commenced, and usually there is considerable delay before a course of conduct becomes so serious that it induces the FTC to begin an investigation. It is likely, therefore, that the three-year statute of limitations may have passed on much of the conduct that forms the evidentiary basis for a permanent injunction. This is not an insurmountable problem, but requires the FTC to develop tighter control over the conduct of its consumer protection investigations and to be more responsive when fraudulent practices are brought to its attention. The three-year limit is **\*1197** also an issue the FTC may wish to bring to the attention of Congress for future legislative action.

Already, the FTC has become sensitive to the passage of time. For instance, it is now standard operating procedure that when the FTC staff believes that the restitution statute of limitations is in danger of running on unfair or deceptive conduct before an investigation is complete, the FTC staff requests a waiver of the statute of limitations from the investigated company until the investigation is completed. [320] If the company refuses, the alternative is to file an action administratively or in court before concluding the investigation. Most potential respondents agree to a waiver, hoping that they will be able to persuade the FTC not to bring a case at all or to allow more time for the negotiation of a consent agreement.

## CONCLUSION

Under our constitutional system, all legislative powers are vested in Congress. The expansive judicial interpretation of section 13(b) permanent injunction power improperly invades the legislative domain. With minor adjustment, however, the judiciary can honor congressional intent while achieving a just result for the benefit of most consumers injured by the dishonest or fraudulent practices of unethical businesses. If the current limitations of section 19 are not satisfactory, the proper place to seek relief is in Congress rather than in the courts.

## Footnotes

[*]     Associate Professor of Business Law, Else School of Management, Millsaps College, Jackson, Mississippi; A.B., Amherst College; J.D., University of Pennsylvania.

[1]     FTC v. Magui Publishers, Inc., Civ. No. 89-3818 RSWL (GX), 1990 U.S. Dist. LEXIS 17005 (C.D. Cal. Apr. 23, 1990) (filed June 1989).

[2]     FTC v. Magui Publishers, Inc., 1991-1 Trade Cas. (CCH) ¶69,425, at 65,717-29 (C.D. Cal. 1991) (setting forth FTC's Proposed Findings of Fact and Conclusions of Law).

[3]     FTC v. Magui Publishers, Inc., 1991-1 Trade Cas. (CCH) ¶69,391, at 65,572-75 (C.D. Cal. 1991) (Final Judgment and Permanent Injunction).

4     *Id.* (citing Federal Trade Commission Act, 15 U.S.C. § 45(a) (1988)).

5     *Id.* at 65,512. The FTC must distribute the fund proceeds to compensate purchasers of Magui Dali art works who file a claim of injury.

6     FTC v. Magui Publishers, Inc., 1991-1 Trade Cas. (CCH) ¶69,425, at 65,726 (C.D. Cal. 1991) (FTC's Proposed Findings of Fact and Conclusions of Law). In addition to prohibiting the defendant from misrepresenting the art works, the FTC required Magui to disclose to all potential purchasers that the prints only "interpret" Dali's work and are not "by" Dali. *Id.*

7     Defendant Magui Publishers, Inc., was incorporated in California in 1983. Magui was controlled by Pierre Marcand, a French citizen, who was also the principal in two overseas corporations involved in the same business, one of which was incorporated in France in 1981. *Magui Publishers,* 1991-1 Trade Cas. (CCH) ¶69,425, at 65,718. These two overseas corporations sold prints in the United States before Magui Publishers, Inc. incorporated in this country. *Id.* at 65,718-19.

8     *See* Woodrow Wilson, Address Before a Joint Session of Congress on Additional Legislation for the Control of Trusts and Monopolies (Jan. 20, 1914), H.R. Doc. No. 625, 63d Cong., 2d Sess. 3 (1914), *reprinted in* 5 EARL W. KINTNER, LEGISLATIVE HISTORY OF THE FEDERAL ANTITRUST LAWS AND RELATED STATUTES 3746-47 (1982) [hereinafter Wilson Address] (explaining need to create "programe" to control private monopoly).

9     Federal Trade Commission Act, ch. 311, §5(a), 38 Stat. 717, 719 (1914) (codified as amended at 15 U.S.C. §45(a) (1988)).

10    Wheeler-Lea Act of 1938, ch. 49, Pub. L. No. 75-447, 52 Stat. 111, 111 (1938) (amending Federal Trade Commission Act, ch. 311, 38 Stat. 717 (1914)) ("Unfair methods of competition in or affecting commerce, and unfair deceptive acts or practices in or affecting commerce are hereby declared unlawful.").

11    Federal Trade Commission Act, §5(b), 15 U.S.C. §45(b) (1988).

12    *See* EDWARD F. COX ET AL., THE NADER REPORT ON THE FEDERAL TRADE COMMISSION 66-73 (1969) [hereinafter THE NADER REPORT] (describing cease and desist remedy as inadequate and criticizing FTC enforcement as inconsistent and haphazard); REPORT OF THE ABA COMMISSION TO STUDY THE FEDERAL TRADE COMMISSION 62-64 (1969), *reprinted in* 1 J. REPRINTS FOR ANTITRUST LAW AND ECONOMICS 885, 952-54 (1969) (addressing inadequacy of then-existing sanctions for FTC Act violations).

13    *See* THE NADER REPORT, *supra* note 12, at 72-73 (estimating four years as average duration of investigation and noting that some extend more than twenty years). The authors note that alleged violators exhibit little fear of potential sanctions, and may continue deceptive practices until an FTC order is entered. *Id.* at 73.

14    *See* Curtis Publishing Co., 78 F.T.C. 1472, 1512-18 (1971) (noting that while use not warranted in case at bar, FTC does have powers beyond "cease and desist"). The FTC's position was endorsed in substantial part by John A. Sebert, Jr., *Obtaining Monetary Redress for Consumers Through Action by the Federal Trade Commission,* 57 MINN. L. REV. 225, 227 (1972) (stating that FTC may require payment of restitution in certain circumstances).

15    Heater v. FTC, 503 F.2d 321, 322-27 (9th Cir. 1974) (holding that requiring violator of FTC Act to pay restitution exceeds powers Congress gave to FTC).

16    Federal Trade Commission Act, §13(b), tit. IV, §408(f), Pub. L. No. 93-153, 87 Stat. 576, 592 (1973) (codified as amended at 15 U.S.C. § 53(b) (1988)) (allowing FTC to obtain preliminary injunctions when it believes FTC Act will be violated and when it is in public interest).

17    *Id.* (requiring "proper proof" be made before permanent injunction is granted).

18    Federal Trade Commission Act, §19, tit. II, §206(a), Pub. L. No. 93-637, 88 Stat. 2183, 2201 (1975) (codified as amended at 15 U.S.C. §57b (1988)).

19    *See, e.g.,* FTC v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1314-16 (8th Cir. 1991) (upholding FTC's grant of monetary equivalent of rescission for victimized consumers); FTC v. Evans Prods. Co., 775 F.2d 1084, 1088 (9th Cir. 1985) (finding that FTC has authority to exercise discretionary equitable powers to order rescission and restitution); FTC v. Oil & Gas Corp., 748 F.2d 1431, 1432 (11th Cir. 1984) (upholding FTC power to grant ancillary equitable relief including freezing assets and appointing receiver); FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1109-14 (9th Cir. 1982) (affirming FTC power to freeze assets and to order permanent injunction and "any ancillary relief necessary to accomplish complete justice. ...").

20    *See* Report of the American Bar Association Section of Antitrust Law Special Committee to Study the Role of the Federal Trade Commission, App. B (Apr. 7, 1989), *reprinted in* Trade Reg. Rep. (CCH) No. 46 (extra ed. Apr. 13, 1989) *and* Trade Reg. Rep. (CCH) ¶50,017 (May 9, 1989) (summary form) (emphasizing effective use of FTC's section 13(b) injunctive power).

21    *See supra* note 19 and accompanying text (identifying cases in which court allowed FTC to sidestep statutory procedures for obtaining consumer redress under section 19 by petitioning for exercise of unconstrained equitable discretion under section 13(b)).

22    It is too facile to argue that judicial activism in statutory interpretation is harmless because Congress can always undo a judicial interpretation. *See* ROBERT H. BORK, THE TEMPTING OF AMERICA 102 (1990) ("The Court's alteration of the law becomes permanent."). The legislative process is a cumbersome affair at best. Except for highly visible decisions that hit a currently hot political nerve, legislators usually will not go back and fine-tune a statute distorted by judicial emendations. *Id.* The losers on the issue in Congress, whose views prevail in the courts, will have no disposition to return to negotiations. *Id.* That leaves the winners in Congress, whose views ultimately lose in the courts, to mount a campaign on an issue that, standing alone, may not attract sufficient support to propel the correction all the way through the legislative labyrinth. Even if such a campaign is begun, the Constitution neither envisages nor encourages a legislative process where the judiciary becomes a player in the negotiations, reversing burdens of passage if it agrees with the losers in the congressional negotiations preceding initial passage of the legislation. The ability of Congress to overturn a judicial interpretation of statutory language should not be viewed as an invitation for judges to ignore or give short shrift to apparent choices (including decisions to do nothing) of Congress. *But cf.* Abner T. Mikva, *A Reply to Judge Starr's Observations,* 1987 DUKE L.J. 380, 386 ("It gives me some solace to know that even if I am wrong, Congress is there to correct me.").

23    *See* Heater v. FTC, 503 F.2d 321, 326 (9th Cir. 1974) (concluding that legislative history clearly reflects intent not to empower FTC with right to order restitution).

24    *See* Holiday Magic, Inc., 84 F.T.C. 748, 1045 n.11 (1974) (stating intention to appeal *Heater* decision, asserting that FTC has authority to require restitution of funds obtained in violation of FTC Act).

25    Federal Trade Commission Act, §5(a), 15 U.S.C. § 45(a) (1988) (originally enacted as Act of Sept. 26, 1914, ch. 311, 38 Stat. 717) (limiting violation to "unfair methods of competition").

26    Wheeler-Lea Act of 1938, ch. 49, 52 Stat. 111 (codified as amended at 15 U.S.C. §45(a) (1988)) (expanding prohibition to also include "unfair or deceptive acts or practices"); *see* FTC v. Colgate-Palmolive Co., 380 U.S. 374, 384 (1965) (affirming FTC cease and desist order against defendant for deceptive advertising associated with shaving product under Wheeler-Lea amendment); Pep Boys-Manny, Moe, & Jack, Inc. v. FTC, 122 F.2d 158, 161 (3d Cir. 1941) (upholding FTC determination that defendant engaged in deceptive act or practice under Wheeler-Lea amendment).

27    *See* 6 EARL W. KINTNER, THE LEGISLATIVE HISTORY OF THE FEDERAL ANTITRUST LAW AND RELATED STATUTES 4838-4935 (1982-83) (setting forth legislative history of Wheeler-Lea Act of 1938). For example, the Senate Commerce Committee, in reporting to the full Senate on the proposed bill, emphasized that the purpose of the amendment was solely to extend protection to consumers and noted that while the amendment must not weaken the Act's enforcement power, it also must not impose any greater hardship on commercial businesses or industries. REPORT OF THE SENATE COMMITTEE ON COMMERCE, S. REP. No. 91, 75th Cong., 1st Sess. 5 (1937).

28    The use of legislative history in statutory construction is a subject of considerable current debate. *See* Michael D. Sherman, *The Use of Legislative History: A Debate Between Justice Scalia and Judge Breyer,* 16 A.B.A. Admin. L. News, Summer 1991, at 1 [hereinafter *Debate*] (discussing different positions regarding use of legislative history); Conference on Statutory Interpretation, 1987 DUKE L.J. 361, 361-68 [hereinafter *Conference*] (setting forth discussion between Judge Kenneth W. Starr and Judge Abner J. Mikva regarding role of legislative history in judicial interpretation). The issue revolves around the extent to which a judge should look to legislative history to determine congressional intent when a statute is either silent or ambiguous on a subject. One side of the debate is reluctant to move from the language of the statute itself because of skepticism that most documents that make up a legislative history reflect Congress' intent as a whole. *See Debate, supra,* at 13-14 (comments of Justice Scalia); *Conference, supra,* at 371-79 (comments of Judge Starr). The other side welcomes the assistance of legislative materials to clarify ambiguity. *See Debate, supra,* at 13-14 (comments of Judge Breyer); *Conference, supra,* at 380-86 (comments of Judge Mikva). Those who argue against the use of legislative history do so to discourage unelected judges from expanding statutory coverage beyond the language of the elected legislators. *See Conference, supra,* at 376 (comments of Judge Starr). This Article advocates the use of legislative history to support the ordinary meaning of the statutory language, and condemns attempts to go beyond that language to achieve a more desirable solution to the problem than that contained in the statutory text. The arguments against using legislative history to find congressional intent should not preclude its use to confirm the intent that emerges from the face of the statute. The legislative history of the Federal Trade Commission Act and its amendments is compiled in 5-7 EARL W. KINTNER, THE LEGISLATIVE HISTORY OF THE FEDERAL ANTITRUST LAWS AND RELATED STATUTES (1982-1983).

29    *See* Heater v. FTC, 503 F.2d 321, 323 (9th Cir. 1974) (interpreting Federal Trade Commission Act as precluding FTC authority to compel restitution); *Curtis Publishing Co.,* 78 F.T.C. 1472, 1512 (1971) (finding FTC remedial authority is broader "than a literal reading of the statutory language would indicate"); *see also* Sebert, *supra* note 14, at 230 (concluding that FTC flexibility in determining what constitutes violation of Act appears, "at least at first blush," to be broader than its authority to remedy violations); *cf.* Pan Am. World Airways, Inc. v. United States, 371 U.S. 296, 311 (1963) (holding that Civil Aeronautics Board does not have power to award damages under its "cease and desist" authority).

30    Professor Sebert's conclusion that "the legislative history concerning the scope of the FTC's cease and desist power is at best sketchy and inconclusive" is erroneous. *See* Sebert, *supra* note 14, at 230. His conclusion references Professor Kauper's statement that "there was little debate over the enforcement provisions themselves." *Id.; see* Thomas E. Kauper, *Cease and Desist: The History, Effect and Scope of Clayton Act Orders of the Federal Trade Commission,* 66 MICH. L. REV. 1095, 1102 (1968) (describing legislative history of cease and desist provision of Federal Trade Commission Act). Kauper, however, overstates his point. The bill's supporters accepted the relatively weak enforcement provisions as adequate on the whole. The bill's opponents, on the other hand, gave the enforcement provisions little attention, instead choosing to concentrate their attack on the newly created prohibition against "unfair competition." Sebert, *supra* note 14, at 230. Although there was significant discussion of the enforcement mechanism, the debate was not comprehensive in defining the breadth of the cease and desist power. *See* Sebert, *supra* note 14, at 230 n.24 (citing 51 CONG. REC. 12,145, 12,652, 14,932 (1914) (citing debates that reflected greater concern about FTC's inability to impose sanctions)). For instance, there was no discussion of what a reviewing court could do if it took issue with the provisions of a cease

USAP110

and desist order. But as the discussion in this section indicates, the legislative history is not "sketchy and inconclusive" on the issue of whether Congress intended the FTC to have restitutionary authority. The congressional decision not to give the FTC authority to impose sanctions clearly encompassed restitutionary orders, at least to the extent that such orders would attempt to rectify past injuries.

31    Wilson Address, *supra* note 8 (expressing grave concern about effect of uncontrolled monopolies on free-enterprise system).

32    Clayton Antitrust Act, ch. 323, 38 Stat. 730 (1914) (codified as amended at 15 U.S.C. §18 (1988)). The trade commission bill, H.R. 15,613, 63d Cong., 2d Sess. (1914), was referred to the Interstate Commerce Committees in each house and the Clayton bill, H.R. 15,657, 63d Cong., 2d Sess. (1914), was referred to the Judiciary Committees of each house.

33    The House bill adopted the proposal of a 1902 Industrial Commission study that recommended "as the chief measures of reform to check the growth of monopoly greater publicity regarding the operations of corporations, and particularly the establishment of some organ of publicity in the Federal Government." H.R. REP. No. 533, pt. 1, 63d Cong., 2d Sess. 4 (1914). President Wilson's proposals included giving a private right of action to those injured due to violations of the antitrust laws, but that provision became part of the Clayton Act. Because the FTC Act is not defined in the Clayton Act as one of the "antitrust laws" whose violation gives rise to a cause of action, there is no authority for private damage suits for FTC Act violations. *See* Clayton Antitrust Act, §§1, 4(a), 15 U.S.C. §§12, 15(a) (1988).

34    Wilson Address, *supra* note 8 (promising that new commission would "do justice to business when judicial action is inadequate to provide fair remedy").

35    51 CONG. REC. 8849 (1914) (remarks of Rep. Covington). The full context of Rep. Covington's remark is as follows:

The vast majority of the evils still existing in the industrial world will be in the future corrected by that pitiless publicity which will make the man of devious ways an object of reproach among his fellow men.

*Id.*

36    *Id.* at 8858 (remarks of Rep. Knowland). According to Representative Knowland:

One of the best provisions in this bill is that providing for publicity. Many of us realize the fact that in many instances business concerns resort to certain doubtful practices because followed by their competitors, but if they knew that these practices had to be reported to a commission, and that the commission had the power to give the facts to the public, it would prove a very potent deterrent.

*Id.*

37    *Id.* at 8861 (remarks of Rep. Hinebaugh). The full text of Rep. Hinebaugh's comment is as follows:

The only purpose which the Democratic interstate trade commission will serve is that of news gathering for the courts and for Congress. Why should you limit the powers of your commission purely to matters of investigation if you really mean business? ... Why do not you [sic] put teeth into the trade commission by adopting our plan to define and punish violations of the law? Why do not you [sic] give your trade commission power to prevent unfair competition? When an unfair practice or violation of the law has been established by the commission, why not give that same body power to punish and prevent a repetition? The people are looking for results.

*Id.; see* H.R. REP. No. 533, pt. 3, 63d Cong., 2d Sess. 1 (1914) (Minority Report of Rep. Lafferty) (recommending that bill either be defeated or rewritten to adequately empower effective enforcement of antitrust laws).

38    *See* H.R. 15,613, 63d Cong., 2d Sess. (1914), *reported in* H.R. REP. No. 533, 63d Cong., 2d Sess. 1 (1914), *passed at* 51 CONG. REC. 9910-11 (1914) (recording passage of bill and summary of votes by each representative).

39    S. REP. No. 597, 63d Cong., 2d Sess. 3 (1914) (reporting S. 597, 63d Cong., 2d Sess. (1914)).

40    *Id.* at 4. The "cease and desist" language of the final legislation was contained in a substitute proposed by Senator Cummins for the section 5 language reported by the Committee. 51 CONG. REC. 12,873 (1914). There was no debate over this difference in wording. Apparently the change was made to accommodate an objection, raised early in the debate, to the original "restraining and prohibiting" language on the ground that those words are "words which have received clear judicial construction, and which pertain to the processes of the courts and ... not to those of a commission." *Id.* at 11,185 (remarks of Sen. Saulsbury); *see id.* at 12,652 (remarks of Sen. Cummins) ("It does not make any difference what words we use. I quite agree that the words 'restrain' or 'prohibit' are words that are ordinarily applied to judicial process, but that makes no difference. The commission has no power to issue an injunction.").

41    51 CONG. REC. 12,652 (1914) (remarks of Sen. Cummins).

42    *Id.*

43    *See id.* at 11,112 (remarks of Sen. Newlands). Sen. Newlands stated:

Mr. President, I will state that there is no other penalty in this act with reference to unfair competition than the one which the Senator suggests, and that is, if the order of the court is disobeyed, the court will then deal with the offender. ... This bill itself constitutes the extent to which society itself, in its collective capacity, will move in the direction of protecting a man against unfair competition.

*Id.*

The Wheeler-Lea Act of 1938 amended the Federal Trade Commission Act to allow courts to impose penalties for violations of final FTC orders. Wheeler-Lea Act of 1938, ch. 49, 52 Stat. 111, 113-15 (codified as amended at 15 U.S.C. §§ 45-57 (1988)). The "two-bites-at-the-apple" approach, under which a respondent under FTC order could avoid monetary penalties until it was found to have violated a court order, continued for orders entered pursuant to the authority given to the FTC to enforce the Clayton Act. This was not corrected until enactment of the Finality Act of 1959, Pub. L. No. 86-107, 73 Stat. 243 (amending Clayton Antitrust Act, §11, 15 U.S.C. §21 (1988)).

44    *See* 51 CONG. REC. 14,929 (1914) (remarks of Rep. Covington) (noting that meaning of term was sufficiently clear and included all "unjust, dishonest, and inequitable practices" used to damage competition). The House-Senate conference adopted the phrase "unfair method of competition" on the final version of the bill. *Id.* The rephrasing distinguished the new statutory concept from the common law concept that associated "unfair competition" only with the palming off of one's product as that of another. *Id.*

45    *See* Arthur B. Cornell, Jr., *Federal Trade Commission Permanent Injunction Actions Against Unfair and Deceptive Practices: The Proper Case and the Proper Proof,* 61 ST. JOHN'S L. REV. 503, 512 (1987) (noting that Federal Trade Commission Act was drafted to identify and prevent monopolistic practices harmful to public interest).

46    *See* 51 CONG. REC. 11,105 (1914) (remarks of Sen. Cummins) ("The unfairness must be tinctured with unfairness to the public; not merely with unfairness to the rival or competitor.").

47    *See id.* at 11,455 (remarks of Sen. Cummins) (stating that purpose of statute is to prevent initial creation of monopoly); *id.* at 11,539 (remarks of Sen. Cummins) (describing amendments to bill directed at allaying start of formation of monopoly); *id.* at 12,030 (remarks of Sen. Newlands) ("We want to check monopoly in the embryo."); *id.* at 12,146 (remarks of Sen. Hollis) (expressing concern that Sherman Antitrust Act is only invoked once monopoly is "full-

USAP112

grown"); *id.* at 12,623 (remarks of Sen. Newlands) ("[W]e have concluded ... to reach practices which, whilst perhaps they might be incidentally reached through the administration of the Sherman antitrust law, could not always be reached. These practices constitute the very germ of monopolies."); *id.* at 14,929 (remarks of Rep. Covington) (explaining provisions of bill agreed on by House-Senate conference); *id.* at 14,941 (remarks of Rep. Stevens) (debating on conference report); *id.* at 14,927 (remarks of Rep. Covington) ("The most certain way to stop monopoly at the threshold is to prevent unfair competition.").

48      *See id.* at 12,791 (remarks of Sen. White) (finding that commission proceedings "are largely preventive in their purposes and objects").

49      *See id.* at 11,112 (remarks of Sen. Newlands) (noting that injured victim of unfair competition could seek legal or equitable remedy through private cause of action); *id.* at 11,533 (remarks of Sen. Cummins) (preferring civil to criminal penalty as more effective recourse); *id.* at 12,208 (remarks of Sen. McCumber) ('ßn all cases of fraud there is a remedy in the courts of law at the present time."); *id.* at 14,937 (remarks of Rep. Stevens) ("Thus it is that we provide that where the act or a series of acts injuriously affect the public interests, then this commission is given authority to interfere on behalf of the public, and on behalf of the public only. ... The proceeding must not concern any injured individual; he must care for himself, exactly as he now does; but on behalf of the public in cases like that the commission may order the offender to cease and desist from that sort of practice.").

50      *See id.* at 13,141 (remarks of Sen. Clapp) (expressing concern for rights of injured citizens and recommending passage of private right of action for injured citizens, once practice is found unlawful). Professor Sebert asserts that "[o]ther possible sanctions, such as awarding of damages or restitution, do not appear to have been much discussed." Sebert, *supra* note 14, at 238. This statement is belied, however, by the congressional debates, particularly those occurring in the Senate.

51      *See* 51 CONG. REC. 11,301 (1914) (remarks of Sen. Borah) (stating that law prohibiting unfair competition can only be effective in fighting monopoly if commission is given sufficient enforcement power); *id.* at 11,533 (remarks of Sen. Norris) (focusing on period of time between filing of complaint and ultimate "cease and desist" order, and commenting that "[t]here ought to be a provision somewhere in the bill ... that would make it unprofitable"). According to Senator Borah:

While you are taking care of a small man in this fight, you are also taking care of the monopolist. He escapes without any treble damages, without any trouble of moment, and with no punishment and without any costs, or without anything commensurate with the wrong. All he gets is a reprimand from the Government; and he will go out to find other victims, and you have got to have another lawsuit.

*Id.* at 11,598 (remarks of Sen. Borah); *see id.* at 13,065 (remarks of Sen. Clapp) (stating that punishment needs to be strong enough to be effective deterrent for potential wrongdoer); *id.* at 13,113 (remarks of Sen. Clapp) (stating that victim must have right to recovery); *id.* at 14,788 (remarks of Sen. Reed) (debating report of House-Senate conference and noting inadequacy of commission order as sole penalty).

The desire of some for a remedy focusing on individual injury was motivated both by concern for the injured competitor and also by a desire to make the commission's action more meaningful. For example, during the debate on the conference report, Senator Reed stated:

But now I find we have devised a method for the control of these cases such as was never before conceived in the brain of any man to stop a practice admittedly criminal. Who has ever heard of creating a commission to determine, first, whether a man has been guilty of committing burglary, then to order him to stop, then to give him a right to appeal to a court, and in the end if he be defeated to solemnly adjudge that he must now stop? Why should a man hesitate to commit burglary with such a law as that? If he succeeds in escaping with the goods, wares, and chattels of his victim and is not detected he is so much the profiter. If he is detected all he has to do is to lay down the swag and seek other windows and other doors.

*Id.* at 14,790 (remarks of Sen. Reed).

52 *See id.* at 13,115 (remarks of Sen. Clapp) (arguing that subjecting potential violators to private causes of action would deter violations).

53 *See id.* at 13,148 (remarks of Sen. Clapp) ("The man who violates this law must be in precisely the same position as the man who commits a willful trespass. He has to respond in threefold damages-not for what he does after the court has stopped the trespass, but for what he did while he was committing the trespass. ...").

54 *See, e.g., id.* at 13,144 (remarks of Rep. Brandegee) ("That is all we have empowered this commission to do. ... We have ordered, or authorized, them, when they have discovered, in their opinion, a case of unfair competition, to order it to cease."); *id.* at 13,145 (remarks of Rep. Clapp) (noting that order only prohibits further commission of unfair act); *id.* at 13,146 (remarks of Rep. Clapp) ("What I want to do is not to load this bill, but to put at least about a one-horse motor power somewhere in this legislation; and I believe the way to do it is to give the citizen who has been injured the right of action for threefold damages. ...").

55 *See id.* at 11,379-80 (remarks of Sen. Cummins) (expressing concern that those who violate the act without moral turpitude should not be unfairly punished); *id.* at 13,114 (remarks of Sen. McCumber) (finding treble damages against unsuspecting violator is harsh penalty); *id.* at 13,119 (remarks of Sen. Williams) (expressing concern that businesspeople performing established business practices might be punished retroactively for actions redefined as unfair or unlawful); *id.* at 13,121 (remarks of Sen. Reed) (noting unfairness of exposing businesspeople to vague or incomplete laws).

Although the private right of action was defeated, the sponsor of the amendment sought to qualify it before the vote. Senator Clapp suggested allowing private actions only after issuance of a commission order that the respondent had practiced unfair competition. *Id.* at 13,143 (remarks of Sen. Clapp). The change was suggested because of the Senator's view that nothing "is an offense until the commission shall first designate it as an offense." *Id.* To retain the deterrence objective of the proposed amendment, however, damages would have been allowed arising from conduct predating the commission order. *Id.* at 13,148 (remarks of Sen. Clapp). *But cf.* Heater v. FTC, 503 F.2d 321, 324 (9th Cir. 1974) (denying retroactive impact for FTC orders).

56 *See* 51 CONG. REC. 13,120 (1914) (remarks of Sen. Reed) (asserting that there was no current limitation preventing victim from suing in court).

57 *Id.* at 13,149 (remarks of Sen. Newlands). According to Senator Newlands: "Any of these acts complained of covered by this section which amount to restraint of trade can be punished under the antitrust law." *Id.*

58 *See id.* at 11,112 (remarks of Sen. Newlands) (responding to concern that if commission's injunctive power was sole restraint on conduct of violators, violators might continue to act unlawfully until enjoined from doing that specific act, and then "engage in some similar form of unfair competition"). Thus, Senator Newlands noted, the Act is merely one means, exercised at a collective governmental level, to restrain unfair competition. Individual victims of unfair competition also have the ability to proceed in private causes of action. *Id.; see also id.* at 13,115 (remarks of Sen. Brandegee) (stating that even prior to judgment by commission, injured plaintiff could sue corporation for damages resulting from unfair practices); *id.* at 13,145 (remarks of Sen. Clapp) (arguing that citizen injured by violative conduct would be able to recover damages under Act despite absence of expressly stated remedy in statute); *id.* at 14,937 (remarks of Rep. Stevens) (arguing that injured individuals must resolve their claims through private means, and that individual who is injured by "deception, substitution, or misrepresentation" would have cause of action for fraud).

59 *See id.* at 13,054 (remarks of Sen. Cummins) (noting that enforcement would be achieved through "personal actions" rather than through public regulation); *id.* at 13,117 (remarks of Sen. Walsh) (stating that all victims of unfair competition have right to sue); *id.* at 13,145 (remarks of Sen. Clapp) (noting little difference between prohibiting wrong as "unlawful" versus "unreasonable"); *id.* at 13,146-47 (remarks of Sen. Shields) (maintaining likelihood of civil and criminal actions); *id.* at 13,148 (colloquy between Sen. McCumber and Sen. Cummins) (agreeing that any individual injured by unfair competition is entitled to sue for damages and prevail). These Senators were mistaken, however, in believing that a

private cause of action would automatically be implied in legislation. *See* Cort v. Ash, 422 U.S. 66 (1975) (establishing four factors for determining when private cause of action may be implied).

60    *Cf.* 51 CONG. REC. 13,007 (1914) (remarks of Sen. Cummins) ("I do not think the inquiry into [unconstitutional] confiscation will often arise under the 'unfair competition' section.").

61    Wheeler-Lea Act of 1938, ch. 49, Pub. L. No. 75-447, 52 Stat. 111 (codified as amended at 15 U.S.C. §§45-57 (1988)). Congress' later addition of "unfair or deceptive acts or practices" as a subject of FTC concern would not change the nature of the FTC's remedial authority unless Congress amended the Act to that effect. No such amendment was made in 1938. *See infra* notes 85-120 and accompanying text (noting absence of legislative history indicating intent to broaden FTC remedial authority).

62    The FTC and the principal commentator on the remedy both assert that the congressional intention not to allow "damages" did not also apply to the awarding of "restitution." Universal Credit Acceptance Corp., 82 F.T.C. 570, 653, 655-66 (1973) (discussing FTC's reasons for finding restitutionary authority in its cease and desist power), *rev'd sub nom.* Heater v. FTC, 503 F.2d 321 (9th Cir. 1974); Curtis Publishing Co., 78 F.T.C. 1472, 1517 (1971) (distinguishing between unfair practices that harm the public which FTC has power to correct and unfair practices that harm individuals but are outside of FTC's power); Sebert, *supra* note 14, at 239 (distinguishing between damages that put plaintiff in position as though contract had been performed and those that only correct unjust enrichment); *see infra* note 138 (discussing whether FTC has authority to order legal damages and equitable restitution remedy).

63    51 CONG. REC. 13,116, 13,143 (1914) (remarks of Sen. Newlands) (stressing importance of educative role of Act).

64    *Id.* (noting likelihood that presence of damages provision might dissuade potential violator from consulting with FTC for guidance).

65    *Id.* at 13,116 (remarks of Sen. Newlands). According to Senator Newlands:

We hold this sword of Damocles above every business man in the country, and either compel him to abandon a practice which perhaps he thinks is right, or to pursue litigation to the bitter end, when we want through this instrumentality not to punish, but to secure higher standards of conduct, by rules that will be laid down by this commission and sustained by the court, and which will have an educational effect upon the commerce of the country.

*Id.; see id.* at 13,143 (remarks of Sen. Newlands) (advocating nonpunitive approach to avoid excessive litigation and enhance public policy of educating businesspeople about new regulation).

66    *Id.* at 13,116; *see id.* at 13,119 (remarks of Sen. Stone) ("This ... is an experimental legislative enterprise upon which we are entering."); *id.* at 13,120 (remarks of Sen. Stone) (recommending limited approach during "experimental" period).

67    *Id.* at 13,149; *see id.* at 14,788 (remarks of Sen. Reed) (discussing conference report on new legislation and contemptuously characterizing commission's remedial authority). Senator Reed noted:

We have discussed section 5 until I think we know what it is intended to mean. It is intended to place in a board the right to say what is fair and what is unfair in trade; to give that board the right to issue an order of prohibition against the particular practice it does not like, and if that order is not obeyed no penalty whatever follows-no fine, no imprisonment, nothing, except that a man may be called to court and that the court may then affirm or set aside the judgment or order; and then no penalty follows unless the order of the court is violated. Thus, instead of having criminal penalties, instead of having the shadow of the jail hanging over those who indulge in practices which are unjust and improper, we have a long course of delay, followed by nothing worse in the end than an order saying, "You must stop something out of which you have been making money."

*Id.*

68    *Id.* at 13,120 (remarks of Sen. Stone). As Senator Stone commented:

[I]nasmuch as this is an experimental kind of legislation we are entering upon, may we not undertake to do too much? Let us get the commission, and give to it all reasonably necessary authority, and stop there. ... I am fearful about putting amendments of this nature in the bill. I have a well-formed conviction that if we attempt to do too much we will accomplish less for the public good.

*Id.*

69    *Id.* at 13,143 (remarks of Sen. Newlands).

It seems to me that legislation of this kind might well be deferred until later on, when the commission, having acquired experience in these matters, will, under the power of recommendation, suggest legislation to Congress that will make the act more efficient.

*Id.; see id.* at 13,149 (remarks of Sen. Newlands) (recommending that legislation directed at punishing violators be delayed until determinations about what practices constitute violations can be more clearly and knowingly defined).

70    *Id.* at 13,149. The vote was 41-18. *Id.* Without the passage of the amendment, it was understood that the Act did not grant relief for private injury. *See id.* at 13,050 (colloquy between Sen. Cummins and Sen. Clapp) (debating need for private remedy in addition to public enforcement ability).

71    *Id.* at 13,317. The amendment was defeated by a vote of 38-27. The right of a complainant to appeal a commission finding that a business had not engaged in an unfair method of competition was included in a proposal to amend the bill offered earlier in the debate. *See id.* at 12,993 (setting forth amendment offered by Sen. Pomerene). The Senate rejected that proposal and voted for a substitute amendment offered by Senator Cummins which did not include such a right of review. *See id.* at 13,045 (suggesting alternative amendment as substitute for Pomerene amendment); *id.* at 13,109 (adopting substitute).

72    *Id.* at 13,050 (remarks of Sen. Cummins); *id.* at 13,062 (remarks of Sen. Clapp) (stating that intent of bill was for commission to give "definite guidance" as to what is and what is not law).

73    *See id.* at 13,102 (remarks of Sen. Cummins) ("Its enforcement is precisely like that of a criminal statute; society enforces the statute; society, through the commission or through the Government, enforces the law, leaving each individual to the recovery of his damages according to the law, but not through the commission, which is a representative of the Government."); *id.* at 13,150-51 (remarks of Sen. Cummins) (stating that while judgment of commission should be admissible as prima facie evidence in subsequent litigation, it should not be conclusive).

74    *See, e.g., id.* at 12,652 (remarks of Sen. Cummins) (asserting trade commission order does not usurp judicial function); *id.* at 12,815 (colloquy between Sen. Cummins and Sen. Sutherland) (debating merits of powers granted to ICC); *id.* at 13,005 (colloquy between Sen. Saulsbury and Sen. Cummins) (noting that Interstate Commerce Act provides several methods of reviewing ICC orders); *id.* at 13,054-56 (colloquy between Sen. Cummins and Sen. Sutherland) (disagreeing about whether ICC encroached on judicial power by making determinations of unreasonable or unjust discrimination).

75    *Id.* at 13,005 (remarks of Sen. Cummins); *id.* at 13,046 (remarks of Sen. Cummins).

76    *Id.* at 12,652. Senator Cummins, one of the principal supporters of the legislation, argued that what the commission was empowered to do did not cross over the line into judicial activity:

MR. CUMMINS: If we believe that unfair competition ... ought to cease in interstate commerce, we have a right to prohibit it.

....

And we have a right to prevent it in any way that we see fit-

....

Save that we can not punish; we can not usurp judicial powers. Under our Constitution we can not send an offender to jail; we can not impose upon him a fine; we can not in any way trespass upon or invade the judicial functions; but if we can prevent the recurrence of unfair competition without recourse to fines, imprisonment, jail, or injunction, we have an ample and abundant constitutional authority to do so. The only limitation is the constitutional prohibition against invading the judicial power. The judicial power does not extend to the work which this Commission is authorized to do.

*Id.* The fact that the commission would have to seek judicial enforcement of its order if a respondent failed to obey it does not suggest that Congress believed that a commission judicial-type order redressing past injury could pass constitutional muster simply because the order required judicial enforcement. *Id.* Cummins' point was that the commission would act as an arm of Congress refining a broad legislative definition of unfair methods of competition on a case-by-case basis and, like legislation, those definitional refinements would then apply to future market activity. *Id.* at 13,046 (remarks of Sen. Cummins).

77     Although the issue was not resolved in this debate, the Supreme Court later stated that in performing its adjudicative function, the Commission acts in part "quasi-legislatively and [in part] quasi-judicially." Humphrey's Ex'r v. United States, 295 U.S. 602, 624 (1935).

78     *See, e.g.,* 51 CONG. REC. 12,216 (1914) (remarks of Sen. Brandegee) (noting absence of any requirement that issues be decided by lawyers, only that they be decided by knowledgeable businesspeople); *id.* at 13,005 (remarks of Sen. Pomerene) (emphasizing need for both business and legal expertise on commission); *id.* at 13,106 (remarks of Sen. Myers) (advocating role of commission as nonlegal in nature); *id.* at 13,121 (remarks of Sen. Reed) (cautioning against creation of complex legal enforcement agency that would be incomprehensible to average citizen).

79     *Id.* at 11,533 (remarks of Sen. Cummins) (referring to commission proceedings as "summary proceedings"); *id.* at 12,029 (remarks of Sen. Saulsbury) (referring to commission proceedings as securing rights of persons "in a preliminary way"); *id.* at 13,106 (remarks of Sen. Myers) (recommending that hearings be conducted "in a summary manner" without legal formalities); *id.* at 13,159 (remarks of Sen. Cummins) ("The commission under this bill is given certain power to make an investigation or hold a hearing and issue an order. That will be done in very much less time and in a much more summary way than it could possibly be done in the courts.").

80     *See id.* at 11,451, 13,007, 13,045 (remarks of Sen. Cummins). The federal judiciary was simply made available to the commission to obtain a court order enjoining the violation of previously issued commission orders. *Id.* The court's review would have been limited to determining whether the commission acted nonarbitrarily within the scope of its authority and without contravening respondent's rights. *Id.; see id.* at 13,066 (remarks of Sen. Newlands) (noting that bill did not include court review).

81     *See id.* at 13,109-10 (remarks of Sen. Sutherland) (maintaining that assigning "judicial" power to administrative agencies would be unconstitutional). Senator Sutherland viewed the power of the ICC to order future rates after finding past rates of common carriers unreasonable as "legislative." *Id.* He saw the obtaining of refunds by those overcharged as "judicial" and, therefore, requiring greater judicial scrutiny mandated by the Act. *Id.* Looking at the FTC Act, he viewed a determination by the commission that one had engaged in unfair competition as closer to the judicial than the legislative function. *Id.* at 13,111. This view differed from that of Senator Cummins, one of the bill's sponsors. *See supra* note 76 (stating that commission determinations do not usurp judicial power). But in conference, the Sutherland view that a commission determination, looking to past practices and ordering their cessation, is judicial, while the ICC engages in the legislative act of mandating future rates, had an impact. *See* 51 CONG. REC. at 14,931-33 (1914) (remarks of Rep.

Covington) (describing conference report as reflecting congressional concern that commission exercise legitimately delegated legislative power, but that its judicial decisionmaking authority is more circumscribed). Thus, the review provision finally adopted made the FTC's role as fact-finder conclusive if supported by the record, but allowed federal courts of appeals to review the FTC's determinations of law.

82      51 CONG. REC. 14,931 (1914) (remarks of Rep. Covington); *see also id.* at 11,179, 12,997 (remarks of Sen. Hollis) (stating that judicial review could range from requiring de novo trial on appeal or giving commission decision prima facie weight subject to rebuttal by respondent, to making commission decision "absolutely binding unless the court should think there is bad faith or that the commission has not used sound judgment."). The latter standard, similar to the one finally adopted, was viewed by Senator Hollis as "extremist." *Id.*

83      This standard has become the "substantial evidence" standard under the Administrative Procedure Act, 5 U.S.C. §706(2) (E) (1988) (setting forth scope of review for government agency actions).

84      *See infra* notes 121-87 and accompanying text (analyzing absence in legislative history of authority to grant restitution).

85      *See* FTC v. Gratz, 253 U.S. 421, 427-28 (1920) (finding that before FTC can issue cease and desist order, record must indicate existence of unfair method of competition); *see also* 51 CONG. REC. 12,145 (1914) (remarks of Sen. Hollis) (stating that phrase "unfair methods of competition" connotes activity broader than common law "unfair competition" involving palming off one merchant's goods as those of another).

86      FTC v. Raladam Co., 283 U.S. 643, 646-49 (1931) (noting that FTC must decide whether activity adversely affected competition in commerce).

87      *See id.* at 646 (holding that interest of public is only one part of three-step analysis that FTC must consider before issuing cease and desist order).

88      *Id.* at 649 (requiring that FTC must first determine that party in question used or is using unfair method of competition).

89      Wheeler-Lea Act of 1938, ch. 49, 52 Stat. 111 (codified as amended at 15 U.S.C. §§45-57 (1988)).

90      *See infra* note 93 (discussing combination of two pieces of legislation). The Act also streamlined enforcement of FTC cease and desist orders by making them final when entered, thus bypassing the need for a separate court mandate ordering compliance before a violation could be found, and authorizing the imposition of penalties for violations of final orders. *See* Federal Trade Commission Act, §5(*l*), 15 U.S.C. §45(*l*) (1988) (stating also that district courts are empowered to grant injunctive relief when violations of FTC orders are found).

91      *See* 83 CONG. REC. 396 (1938) (remarks of Rep. Crosser) (stating that extension of FTC's authority over unfair or deceptive acts or practices is necessary regardless of whether anticompetitive activities are shown).

92      *See id.* at 397-98 (statement of Rep. Reece) (addressing scope of amendment and discussing its implications).

93      *See* REPORT OF SENATE COMM. ON INTERSTATE COMMERCE, S. REP. No. 221, 75th Cong., 1st Sess. 2 (1937) (reporting S. 1077 which passed the Senate without debate and was combined with food and drug amendments in House to become Wheeler-Lea Act). The Report stated:

USAP118

The inevitably sound conclusion is that where it is not a question of a purely private controversy, and where the acts and practices are unfair or deceptive to the public generally, they should be stopped regardless of their effect upon competitors. This is the sole purpose and effect of the chief amendment to section 5.

*Id.; see also* FTC v. Sperry & Hutchinson Co., 405 U.S. 233, 244 (1972) (stating that Wheeler-Lea Act "charged the FTC with protecting consumers as well as competitors"); Pep Boys-Manny, Moe & Jack, Inc. v. FTC, 122 F.2d 158, 160-61 (3d Cir. 1941) (finding that FTC can focus on protection of consumers).

94    Federal Trade Commission Act, §12, 15 U.S.C. §52 (1988); *see, e.g.,* 83 CONG. REC. 393 (remarks of Rep. Mapes) (discussing controversy surrounding giving FTC control over advertising of food, drugs, cosmetics, and devices); *id.* at 395 (remarks of Rep. Wolverton) (noting that major debate centers on who will enforce provisions of bill and what is appropriate punishment); *id.* at 399 (remarks of Rep. Reece) (noting that one side of debate focuses on insufficiency of provisions while other side feels bill invests too much power in FTC).

95    Federal Trade Commission Act, §13(a), 15 U.S.C. §53(a) (1988). Notwithstanding congressional recognition of the injury that can occur to consumers between the time of issuance of a FTC complaint and the entry of a final order, the right to seek preliminary injunctive relief was limited to activities involving the advertising of food, drugs, devices, and cosmetics. *See* 83 CONG. REC. 398 (1938) (remarks of Rep. Reece) (stating that under pending legislation, FTC will have right to seek injunction to prevent dissemination of false or misleading advertisement which may be injurious to human health).

96    Federal Trade Commission Act, §14(a), 15 U.S.C. §54(a) (1988).

97    *See* 83 CONG. REC. 399 (1938) (remarks of Rep. Reece) (noting that while objections still existed, proposed bill was balance between two positions).

98    *See id.* at 399-400 (remarks of Rep. Chapman) (reasoning that Food and Drug Administration is appropriate agency for dealing with both initial and subsequent publication of false advertisements).

99    *Id.* at 396 (remarks of Rep. Wolverton) (noting that opponents of bill feel that provisions would not provide any deterrent effect).

100   *Id.* at 3292 (remarks of Sen. Copeland) (stating that more effective bill would provide criminal penalties for false advertising of all commodities).

101   *Id.* at 399 (remarks of Rep. Chapman) (discussing Food and Drug Act's deterrent effect over businesses that improperly label goods).

102   *See id.* at 394 (Statement of Rep. Kenney) (claiming that cease and desist orders have no deterrent effect).

103   *Id.* at 399-400 (remarks of Rep. Chapman) (stating that by time cease and desist order is made effective, many individuals will be harmed). One representative noted that the FTC Act "sets up procedural machinery which is designed to prevent unfair practices upon competitors in the interest of the public; but that machinery was not intended primarily to protect the consuming public and such machinery under this bill will be ineffective to protect the public from false advertising." *Id.* at 394 (remarks of Rep. Kenney).

104   *Id.* at 3288 (remarks of Sen. Copeland).

105    *See id.* at 406 (remarks of Rep. Kenney) (proposing additional amendment designed to apply punishments to all those who participate in false advertising).

106    *Id.* at 3293 (remarks of Sen. Copeland) (expressing hope that bill would extend to all commodities, not just food, drugs, devices, and cosmetics).

107    *Id.* at 398 (statement of Rep. Reece) (noting that bill does not have "teeth" effective enough to deal with health injuries caused by false advertising).

108    *See id.* at 400 (statements of Rep. Kenney) (stating that cease and desist orders are ineffective against false advertising because once advertising is in stream of commerce, its effects continue regardless of whether subsequent advertisements are published).

109    H.R. REP. No. 1613, 75th Cong., 1st Sess. 23-27 (1937) (additional views of Reps. Chapman, Kenney, and Mapes) (offering that only effective deterrent is imposition of appropriate criminal penalties).

110    *Id.* at 24 (additional views of Reps. Chapman, Kenney, and Mapes).

111    *Id.* at 25 (quoting GERALD C. HENDERSON, THE FEDERAL TRADE COMMISSION 230 (1924)) (additional views of Reps. Chapman, Kenney, and Mapes). These three committee members went on to comment:

Even after the order became effective, the false information or claims contained in the advertisement would still repose in the minds of the millions of persons who had read or listened to or been told about the claims made in the advertisement. And the manufacturer will have reaped the benefits of the false advertisement without the slightest fear of a penalty of any kind.

*Id.* at 26. The additional views were clear in directing criticism at the weak remedial authority itself and not at the FTC for not exercising authority it had. *Id.*

112    *See id.* at 27 (additional views of Reps. Chapman, Kenney, and Mapes) (noting adverse effect on consumer is same regardless of advertiser's intent).

113    *Id.* at 6.

114    *See id.* (finding that because of wide variety and degree of potential offenses, one penalty could not be applied to all).

115    *Id.*

116    Wheeler-Lea Act, 15 U.S.C. §§45-57 (1988); *see* 83 CONG. REC. 399 (1938) (remarks of Rep. Reece) (stating that bill strikes "happy medium"); *id.* at 410 (remarks of Rep. Lea) (stating that bill treads "middle path").

117    *See* 83 CONG. REC. 397-99 (1938) (statement of Rep. Reece) (discussing application of cease and desist orders to prevent dissemination of false advertising).

118    *Id.*

USAP120

119    *Id.* at 3256 (remarks of Sen. Wheeler) ("More stringent control over the advertising of these four commodities has been provided because their use directly affects the consumer's health rather than his pocketbook.").

120    *Id.* at 3293.

121    Curtis Publishing Co., 78 F.T.C. 1472, 1476 (1970) (initial decision) (setting forth FTC's complaint that claims "that publishing company participated in unfair and deceptive practice by failing to offer subscribers refunds for unused subscriptions"), *aff'd on other grounds,* 78 F.T.C. 1472, 1507 (1971) (Comm'n op.).

122    *See* Curtis Publishing Co., 78 F.T.C. 1472, 1516-17 (1971) (Comm'n op.) (determining that FTC has necessary power to require restitution of money illegally held). *The Saturday Evening Post* resumed publication two years later as a monthly. *See Saturday Evening Post to Reemerge Next Week,* WALL ST. J., June 3, 1971, at 31 (Eastern ed.).

123    *Curtis Publishing,* 78 F.T.C at 1474 (compl. ¶4 & 5).

124    *Id.* at 1474-75 (compl. ¶7 & 9). The FTC deemed the conduct misleading in that subscribers were led to believe that there was no choice other than to substitute another magazine for the unexpired portion of their subscriptions. *Id.* at 1474 (compl. ¶7).

125    *Id.* at 1508-09 (Comm'n op.).

126    *Id.* at 1502 (initial decision).

127    Curtis Publishing Co., 78 F.T.C. 1472, 1502 (1970) (initial decision), *aff'd on other grounds,* 78 F.T.C. 1472, 1507 (1971) (Comm'n op.).

128    Curtis Publishing Co., 78 F.T.C. 1472, 1507 (1971) (Comm'n op.). Commissioner Dixon wrote the opinion for the four Commission members hearing the appeal. *Id.* (Comm'n op.). Chairman Kirkpatrick had been counsel to Curtis before his appointment to the Commission and did not participate. *Id.* at 1525 (Comm'n op.). Commissioner MacIntyre concurred in the result. *Id.* (Comm'n op.). Although agreeing with Commissioner Dixon as to the Commission's authority to order refunds, Commissioners Jones and Dennison disagreed with his reason for dismissal. *See id.* at 1520-24 (Comm'n op.) (stating that dismissal is warranted because respondent's probable bankruptcy made refunds unrealistic possibility).

With regard to dismissal, Commissioner Dixon concluded that the complaint was limited to the allegation that Curtis had misled subscribers about their right to a refund. *Id.* at 1518 (Comm'n op.) Such a right was a matter of contract law that required proof of the law of the fifty states and also the circumstances surrounding each subscriber's contract before rights could be determined. *Id.* at 1519 (Comm'n op.). This proof was not in the record. *Id.* (Comm'n op.). Furthermore, because the complaint was limited to alleging misrepresentation as to rights, an order requiring that Curtis advise subscribers of their rights would be sufficient to remedy the offense. *Id.* at 1520 (Comm'n op.). No restitution would be necessary. *Id.* (Comm'n op.). Commissioner Dixon concluded that even if the complaint had alleged the retention of subscriber money as an unfair practice, restitution would not have been an appropriate remedy because that retention did not affect future competition and, in any event, Curtis was not financially able to pay the refunds even if ordered. *Id.* (Comm'n op.). He concluded by noting that subscription income covered only a small portion of the publication's cost and that Curtis did not benefit from unjust enrichment. *Id.* (Comm'n op.).

Commissioners Jones and Dennison believed that the Commission could take notice of subscribers' legal right to refunds and that the burden should be shifted to the respondent to prove any state law that would negate general contract principles. *Id.* at 1521-22 (Comm'n op.). They also read the complaint as containing an allegation that the retention of subscriber monies by Curtis was an unfair practice. *Id.* at 1523 (Comm'n op.). They concluded that if the money was available, restitution would be the only remedy "that would effectively remedy the situation to protect the public

USAP121

interest." *Id.* (Comm'n op.). They were persuaded that the complaint should be dismissed, however, because Curtis was never in a position to pay refunds. *Id.* (Comm'n op.). Even if subscribers had been advised of their rights, they would not have been better off and, thus, Curtis' misrepresentation was not material. *See id.* (Comm'n op.) (noting that it may have been equally misleading for publisher to have offered unconditional refunds).

129   Commissioner Dixon, who wrote the opinion, had complained two years earlier that "administrative remedies, such as those presently provided in the Federal Trade Commission Act, are not adequate since they do not provide for recovery of individual losses." *Hearings on S. 2246, S. 3092, S. 3201 Before the Consumer Subcomm. of the Senate Comm. on Commerce,* 91st Cong., 2d Sess. 39 (1970). In *Curtis,* Commissioner Dixon conceded that "a literal reading" of the remedial provisions of section 5 indicates a narrower and more rigid application than he was then espousing. *Curtis Publishing,* 78 F.T.C. at 1512 (Comm'n op.).

130   *Curtis Publishing,* 78 F.T.C. at 1512-18 (Comm'n op.).

131   327 U.S. 608 (1946).

132   *Curtis Publishing,* 78 F.T.C. at 1513 (Comm'n op.) (citing Jacob Siegel Co. v. FTC, 327 U.S. 608, 613 (1946)).

133   Jacob Siegel Co. v. FTC, 327 U.S. 608, 612 (1946).

134   *Id.* at 614 (stating that accomplishing that objective, FTC can appraise facts from particular cases and draw from its generalized experience).

135   *Cf.* FTC v. Ruberoid Co., 343 U.S. 470, 473 (1952) (recognizing that cease and desist orders are "not intended to impose punishment or exact compensatory damages for past acts but to prevent illegal practices in the future").

136   *See Curtis Publishing,* 78 F.T.C. at 1503-07 (initial decision) (concluding that FTC lacked jurisdiction to render necessary monetary judgment).

137   Although "cease and desist" has a negative connotation, it is not an untenable stretch of the statutory language to construe it as permitting a requirement that respondent perform affirmative acts if those acts are necessary to eliminate a particular practice. *See* FTC v. Dean Foods Co., 384 U.S. 597, 606 n.4 (1966) (finding FTC orders may require divestitures). "Cease and desist" applies to the practice found to be unfair and deceptive, not to the permissible avenue for accomplishing that objective. *See Ruberoid,* 343 U.S. at 473 (finding FTC's orders are intended to prevent future illegal practices). Thus, where appropriate for ending an unfair or deceptive practice, courts have affirmed an FTC requirement that respondent engage in affirmative acts to bring about the cessation of conduct that violates the Act. *See, e.g.,* Warner-Lambert Co. v. FTC, 562 F.2d 749, 762-64 (D.C. Cir. 1977) (ordering corrective advertising to correct years of misleading advertising), *cert. denied,* 435 U.S. 950 (1978); American Cyanamid Co. v. FTC, 363 F.2d 757, 771-72 (6th Cir. 1966) (holding compulsory licensing of patents is reasonable where substantive evidence indicates antitrust violations); Ward Lab., Inc. v. FTC, 276 F.2d 952, 955 (2d Cir.) (requiring affirmative disclosure when advertising is found to be deceptive or misleading), *cert. denied,* 364 U.S. 827 (1960); Raymond Lee Org., Inc., 92 F.T.C. 489, 650-51 (1978) (requiring cooling-off period to allow customers to determine whether they want to continue with respondent's contract), *aff'd sub nom.* Lee v. FTC, 679 F.2d 905 (D.C. Cir. 1980).

138   *Curtis Publishing,* 78 F.T.C. at 1503-04 (initial decision). The actual question is whether the order is prospective in the sense that it is confined to those measures that are aimed at stopping known unlawful practices. *See* Coro, Inc. v. FTC, 338 F.2d 149, 153 (1st Cir. 1964) (holding that FTC only has power to require affirmative acts aimed at current unlawful practices and preventing their recurrence in future), *cert. denied,* 380 U.S. 954 (1965); Standard Containers Mfrs. Ass'n v. FTC, 119 F.2d 262, 266 (2d Cir. 1941) (finding that cease and desist orders look to end current illegal practices and prevent future illegal conduct). If the remedy is not necessary to accomplish the remedial objectives of FTC orders,

USAP122

then it may be deemed to be "punitive" or "retroactive." *Curtis Publishing,* 78 F.T.C. at 1505 (initial decision) (citing FTC v. Ruberoid Co., 343 U.S. 470, 473 (1952)) (finding purpose of FTC orders is to prevent future illegal practices rather than punish for past transgressions); Amalgamated Workers v. Edison, 309 U.S. 261, 268-69 (noting that Congress established FTC to protect public interest, not to provide remedial measures for private persons). The administrative law judge in *Curtis* asserted that an FTC remedy may not impose a penalty or award damages. *See Curtis Publishing,* 78 F.T.C. at 1506 (initial decision) (citing Guziak v. FTC, 361 F.2d 700, 703 (8th Cir. 1966), *cert. denied,* 385 U.S. 1007 (1967)) (finding purpose of FTC Act is prevention of potential injury resulting from unfair methods of competition); Regina Corp. v. FTC, 322 F.2d 765, 768 (3d Cir. 1963) (noting that FTC remedies are not intended to punish wrongdoer); Ford Motor Co. v. FTC, 120 F.2d 175, 182 (6th Cir. 1941) (stating that FTC Act does not give Commission authority to grant compensatory relief). The FTC's opinion discounted the preceding line of cases on the ground that restitution is an equitable remedy to restore the status quo rather than a penalty or an award of damages. *Curtis Publishing,* 78 F.T.C. at 1518 (Comm'n op.) (finding that if public interest is served, restitution may be used to restore status quo). The FTC looked at case that distinguish between "damages" and "restitution" because it found support for its position in statements that analogize its cease and desist authority to the equitable jurisdiction of courts. *Id.* at 1516-17 (Comm'n op.). Because restitution is an equitable remedy in which the public interest is served by forcing the return of unjust enrichment, and because the FTC's cease and desist authority is equitable in nature, the FTC argued that it must have the restitution authority. *Id.* at 1517 (Comm'n op.).

The focus should not be on how the relief is denominated, but on what it is designed to do. The fact that restitution is not a "penalty" does not place it, by that fact alone, within the FTC's remedial arsenal. The crucial distinction is whether awarding restitution is designed to remedy a past wrong or to prevent a future wrong. *See id.* at 1513-15 (Comm'n op.) (differentiating between prospective and retrospective relief). The award of money to identified or identifiable persons or entities is usually aimed at private relief rather than avoidance of future injury to unidentified members of the public. The FTC justified its award of private relief by stating: "[I]f adequate public interest grounds for granting restitution are present in a particular case, the benefit to private persons who may be restored to the *status quo ante* would be merely an incidental aspect of the Commission order." *Curtis Publishing,* 78 F.T.C. at 1518 (Comm'n op.). The statutory criteria for an FTC order, however, is not simply the public interest. Public interest is merely a criterion for issuing a complaint. *See* FTC v. Klesner, 280 U.S. 19, 21 (1929) (finding that before issuing complaint FTC must determine whether proceeding will be in public interest). The remedial language refers only to "cease and desist" orders and the legislative history is clear that this remedy was not to be coextensive with equity jurisdiction in the courts. *See* 83 CONG. REC. 391-414 (1938). *But cf.* FTC v. Sperry & Hutchinson Co., 405 U.S. 233 (1972) (noting that FTC acts like court of equity when it considers public values against standards of fairness).

139 *Curtis Publishing,* 78 F.T.C. at 1514 (Comm'n op.). The FTC's *Curtis* opinion expands the FTC Act's purpose to eradicate unfair or deceptive acts to include the dissipation of "any lingering effects of past violations." *Id.* (Comm'n op.). To the extent those "lingering effects" do not impact on future commerce, the FTC overstated the end to more easily justify its assertion of authority to order restitutionary relief.

140 *Curtis Publishing,* 78 F.T.C. at 1512-17 (Comm'n op.).

141 *Id.* at 1515 (Comm'n op.).

142 *Id.* (Comm'n op.).

143 *See* FTC v. Raladam Co., 283 U.S. 643, 646-47 (1931) (stating that then-existing language of FTC Act required Commission to show that methods complained of were unfair and adversely affected competition, and that prevention of use of such methods was in public interest).

144 *Curtis Publishing,* 78 F.T.C. at 1515-16 (Comm'n op.) (stating that ordering restitutionary relief, although directed at past wrongs, may sometimes operate prospectively to restore competition).

USAP123

145     *See supra* note 93 and accompanying text.

146     *Curtis Publishing,* 78 F.T.C. at 1515 (Comm'n op.).

147     Federal Trade Commission Act, §5, 15 U.S.C. §45 (1988); *see* Sherman Act, §2, 15 U.S.C. §2 (1988). Section 2 states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony. ..." *Id.*

148     *Cf.* Sebert, *supra* note 14, at 246 n.95 ("[T]he possibility of competitive injury to *competitors* does not provide much of a basis for restitution to *consumers.*").

149     *Curtis Publishing,* 78 F.T.C. at 1516 (Comm'n op.).

150     *Cf.* FTC v. Evans Prod. Co., 775 F.2d 1084, 1087 (9th Cir. 1985) (noting that to justify injunctive relief, violation must be ongoing or likely to recur).

151     *See* Heater v. FTC, 503 F.2d 321, 323 (9th Cir. 1974) (finding continuing unfairness in retaining ill-gotten gains is "not implausible construction" of FTC Act "as an abstract proposition," but rejecting it because FTC Act does not permit granting of private relief that such interpretation would allow). An analogy to divestiture orders in merger cases does not withstand analysis. *See also infra* notes 170-71 and accompanying text (discussing divestiture and procedures for disgorgement of profits).

152     Sebert, *supra* note 14, at 247. Professor Sebert views a continuing violation to exist for restitution purposes "in any case in which misrepresentations of the quality or characteristics of respondent's goods or services resulted in the payment by consumers of a price that substantially exceeded the value of the goods or services." *Id.* Under this formulation, he continues, "restitution could be considered a permissible remedy in a relatively significant portion of the Commission's deceptive practice cases." *Id.; see also* Heater v. FTC, 503 F.2d 321, 323 n.6 (9th Cir. 1974) ("[T]he FTC position [rejected by the court] supports restitution as an appropriate remedy in all cases.").

153     United States v. ITT Continental Baking Co., 420 U.S. 223, 231 (1975) (interpreting Federal Trade Commission Act, §5*(l),* 15 U.S.C. § 45*(l)* (1988) and finding that Act authorizes daily penalties for order violations when there is "continuing failure or neglect to obey a final order of the Commission"). The Court found that the defendant's holding of a company acquired in violation of an FTC order prohibiting the acquisition constituted a continuing violation. *Id.* at 239-40. The conclusion is logical because an impact on competition occurs not only at the moment of the acquisition, but continues to affect *future* competition until undone. *Id.* at 242. That situation does not exist in the case of deceptive obtaining of money, because absent additional deceptive acts, retention of the money does not ordinarily affect future transactions in the marketplace.

154     *Curtis Publishing,* 78 F.T.C. at 1514-16 (Comm'n op.). Specifically, the *Curtis* decision relied on Windsor Distrib. Co., 77 F.T.C. 204, 222 (1970) (ordering company to refund money in connection with any future unlawful practice), *aff'd,* 437 F.2d 443 (3d Cir. 1971) and Interstate Home Equip. Co., 40 F.T.C. 260, 267-68 (1945) (requiring company in future to issue refunds where company refuses to complete sale or to return merchandise sent to company for repair). *See also* Universal Elec. Corp., 78 F.T.C. 265, 296-97 (1971), *clarified on denial of reconsideration,* 78 F.T.C. 1576 (1971) (ordering corporation to refund all money to any purchaser who is induced to purchase product by conduct violating final FTC order).

155    *See Curtis Publishing,* 78 F.T.C. at 1504-05 (initial decision) (finding FTC has authority to issue orders that have prospective effect only); *see also* FTC v. Cement Inst., 333 U.S. 683, 706 (1948) (noting that FTC authority rests in its ability to prohibit specific future practices).

156    Heater v. FTC, 503 F.2d 321, 325 (9th Cir. 1974).

157    Universal Credit Acceptance Corp., 82 F.T.C. 570, 646 (1973), *rev'd sub nom.* Heater v. FTC, 503 F.2d 321 (9th Cir. 1974).

158    *Id.* at 583.

159    *Id.*

160    *Id.* at 583, 618-19.

161    *See id.* (noting that many merchants cut their losses and ended their relationship with company after eight months).

162    *See id.* at 593-601 (finding misrepresentation of profit expectations and selling ease).

163    *Id.* at 634. The case is referred to as the "*Heater* case" after the name of the individual respondent who appealed and won in the Ninth Circuit. Heater v. FTC, 503 F.2d 321 (9th Cir. 1974).

164    *See Universal Credit,* 82 F.T.C. at 646.

165    *Id.* at 654.

166    *Id.* at 652.

167    *See id.* at 657-59 (noting bankruptcy of company).

168    *Id.* at 652.

169    *See id.* (noting that where competitive balance is upset, divestiture is appropriate remedy).

170    A closer analogy would exist if, in addition to divestiture, an FTC order required the disgorgement of any profits made by the company during the time it possessed the illegally acquired company. The FTC has declined to take a position on whether it has that authority. Liggett & Myers Inc., 87 F.T.C. 1074, 1182-83 (1976) (finding that issue was not ripe for FTC consideration), *aff'd on other grounds sub nom.* Liggett & Myers Inc. v. FTC, 567 F.2d 1273 (4th Cir. 1977). *But cf.* Beatrice Foods Co., 101 F.T.C. 733, 795 (1980) (initial decision) (holding that FTC has authority to order divestiture and disgorgement of profits made from illegally acquired company), *complaint dismissed,* 101 F.T.C. 733, 797 (1983); American Gen. Ins. Co., 89 F.T.C. 557, 646 (1977) (implying FTC can order divestiture of dividends received by acquiring company from acquired company, but declining to do so), *rev'd on other grounds sub nom.* American Gen. Ins. Co. v. FTC, 589 F.2d 462 (9th Cir. 1979), *dismissed,* 97 F.T.C. 339, 342 (1981) (declining to order profits divestiture for lack of support in record demonstrating injury to acquired company).

**USAP125**

171    *Cf.* California v. American Stores Co., 495 U.S. 271, 285 n.11 (1990) (finding that continuing ownership of stock unlawfully acquired is continuing violation of Clayton Act). Professor Sebert makes no distinction between specific injury to identifiable individuals arising from past transactions and the speculative unquantified injury to future competition in merger cases in concluding that the FTC's power to order divestiture in merger cases "provides some of the strongest support for the view that a restitution order in a case such as *Curtis* is authorized and is not improperly "retrospective." Sebert, *supra* note 14, at 240.

172    *Universal Credit,* 82 F.T.C. at 652-53.

173    *See supra* notes 52-54 (discussing ineffectiveness of cease and desist order to remedy wrongs committed before order's issuance).

174    *See* FTC v. Ruberoid Co., 343 U.S. 470, 473 (1952) ("[The FTC] must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity."); *see also* Amrep Corp. v. FTC, 768 F.2d 1171, 1180 (10th Cir. 1985) (concluding that FTC is not prevented from prohibiting future enforcement of existing illegal contracts), *cert. denied,* 475 U.S. 1034 (1986).

175    Federal Trade Commission Act, §5*(l),* 15 U.S.C. §45*(l)* (1988). The penalty provision states:

> Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation. ... Each separate violation of such an order shall be a separate offense except that in the case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.

> *Id.*

176    It would have been within the FTC's authority to meet the deterrence objective by requiring that if such activity were to occur in the future, restitution would have to be made. *See* Windsor Distrib. Co., 77 F.T.C. 204 (1970), *aff'd sub nom.* Windsor Distrib. Co. v. FTC, 437 F.2d 443 (3d Cir. 1971).

177    Heater v. FTC, 503 F.2d 321, 321 (9th Cir. 1974).

178    *Id.* at 326-27.

179    *Id.* at 324-25.

180    *See id.* at 323 (stating that certain acts only become illegal after FTC specifically declares them to be illegal).

181    *See id.* at 325 (noting that Congress did not intend to give FTC power to "recast consequences of conduct occurring prior to its entry of final order").

182    *See id.* at 326 (finding that if Congress wanted to grant FTC power to order restitution in fraud cases it would have done so explicitly).

USAP126

183    *See id.* at 325 n.15 (recognizing that common law remedies are available for especially egregious conduct).

184    *See* Holiday Magic, Inc., 84 F.T.C. 748, 1045 n.11 (1974) (calling *Heater* decision "incorrect" and stating FTC's intention to seek Supreme Court review).

185    *See* Holiday Magic, Inc., 85 F.T.C. 90, 90-91 (1975) (announcing decision not to file for certiorari in *Heater*).

186    Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, § 201, Pub. L. No. 93-637, 88 Stat. 2183, 2193 (1975).

187    *See infra* notes 188-99 and accompanying text (discussing Trans-Alaska Pipeline Act, tit. IV, §408, Pub. L. No. 93-153, 87 Stat. 576 (1973)).

188    *See* S. REP. No. 151, 93d Cong., 1st Sess. 9 (1973) (accompanying S. 356) (referencing 1970 testimony of Commissioner Elman complaining that "no recovery of damages may be had under the FTC Act even when they result from unfair and deceptive practices" and Commissioner Jones' statement that "what we need are stronger sanctions"); *see also supra* note 129 (testimony of then-Chairman Dixon) (discussing Dixon's dissatisfaction with current FTC remedies).

189    *Id.*

190    Trans-Alaska Pipeline Act, Pub. L. No. 93-153, 87 Stat. 576 (1973) (amending 15 U.S.C. §§45-46, 53, 56 (1988)).

191    Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, 88 Stat. 2183, 2193 (1975).

192    Trans-Alaska Pipeline Act, Pub. L. No. 93-153, 87 Stat. 576 (1973).

193    *See* MESSAGE FROM PRESIDENT NIXON, H.R. Doc. No. 187, 93d Cong., 2d Sess. 1-4 (1973), *reprinted in* 119 CONG. REC. 36,620-22 (1973) (calling Congress to move nation toward energy self-sufficiency).

194    *See* 119 CONG. REC. 36,594, 36,622 (1973) (passing pipeline legislation).

195    Federal Trade Commission Act, §13(b), 15 U.S.C. §53(b) (1988); *see* 119 CONG. REC. 22,980 (1973) (statement of Sen. Jackson) (noting that amendment will allow FTC to seek subpoena enforcement and injunctive relief in federal district courts). In the first session of the 93rd Congress, a bill had been introduced in the Senate addressing the same problem. *See* S. 356, 93d Cong., 1st Sess. (1973). That bill later became the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act of 1975. That bill, however, would have limited preliminary injunctive relief only to cases involving "unfair or deceptive practices" and would not have applied to cases involving unfair methods of competition.

Senator Jackson also introduced a bill in the Senate to meet the FTC's request for injunctive authority applicable to all its cases and enforcement of its own subpoenas in court. *See* S. 2074, 93d Cong., 1st Sess. (1973), *introduced at* 119 CONG. REC. 21,443 (1973). Before his bill could be considered in committee and reported to the Senate, however, Senator Jackson proposed it on the floor as an amendment to the Trans-Alaska pipeline legislation then being debated by the Senate. *See id.* at 22,978 (amending S. 1081, 93d Cong., 1st Sess. (1973)). It was adopted without debate. *See* 119 CONG. REC. 22,981 (1973) (adopting amendment by vote of 78-11). The House substituted its own version of the Trans-Alaska Pipeline Act which stripped out the FTC amendments. *See* H.R. 9130, 93d Cong., 1st Sess. (1973). In conference between the houses on their differing provisions, the FTC amendments were reinserted. *See* H.R. CONF. REP. No. 624, 93d Cong., 1st Sess. 16-20 (1973). Both houses passed the conference version and President Nixon signed

USAP127

it into law, notwithstanding his reservations about the FTC amendments. Trans-Alaska Pipeline Act, §408, Pub. L. No. 93-153, 87 Stat. 576, 591 (1973) (adding Federal Trade Commission Act, § 13(b), 15 U.S.C. §53(b) (1988)); *see also* 6 KINTNER, *supra* note 27, at 4992 (reprinting President Nixon's signing statement). In his statement, the President noted that he was signing the legislation even though it contained a "few clinkers." *Id.*

196    Federal Trade Commission Act, §13(b), 15 U.S.C. §53(b) (1988). Section 13(b) reads in full:

Whenever the Commission has reason to believe-

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public-

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further,* That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

*Id.*

197    *See* Letter from Lewis A. Engman, Chairman, Federal Trade Commission, to Rep. Harold T. Johnson (Nov. 9, 1973), *reprinted in* 119 CONG. REC. 36,610 (1973) (writing that bill enhances FTC's effectiveness without increasing its jurisdiction). In introducing his amendment, Senator Jackson stated that a shortcoming of the Federal Trade Commission was its lack of authority to obtain preliminary injunctive relief. 119 CONG. REC. 22,979-80 (1973) (remarks of Sen. Jackson). In fact, those who voted for the original FTC Act noted this deficiency in 1914. *See supra* note 51 (discussing inherent weakness of cease and desist order).

198    *See* Trans-Alaska Pipeline Act, tit. IV, §408, Pub. L. No. 93-153, 87 Stat. 576, 591 (1973) (noting that inability to enforce subpoenas or seek preliminary injunctions restricts FTC in performing its investigative and law enforcement function). Congressional intent about the FTC amendment is sketchy. This reflects the procedural shortcut taken by Senator Jackson in introducing it as a floor amendment to legislation dealing with another subject of significant national concern. Several representatives complained about the inadequate attention that was given to the FTC proposal. *See* 119 CONG. REC. 36,600 (1973) (remarks of Rep. Hosmer) (commenting that Senate did not give proposal necessary attention); *id.* (remarks of Rep. Steiger) (noting that Senate passed bill without hearings or knowledge of language contained in bill). The Senate also echoed this view. *See id.* (remarks of Sen. Fanin) ("I do not think very many Senators were observant of just exactly what was involved when they voted on the FTC regulation amendment.").

199    119 CONG. REC. 36,609 (1973) (remarks of Rep. Smith). Of course, if the FTC had possessed authority to provide redress for injury occurring during the litigation period, the need for preliminary injunctive relief would not have been so pressing.

At the time Senator Jackson added his amendment to the Trans-Alaska pipeline bill, another piece of legislation, enabling the FTC to seek preliminary injunctions in instances of unfair or deceptive acts or practices, was pending before Congress. *See* S. 356, 93d Cong., 1st Sess. (1973), *reprinted in* 119 CONG. REC. 29, 492-94 (1973). While that bill was pending in committee, legislation concerning the Alaska pipeline was moving rapidly through Congress, which was focusing on the energy crisis. Senator Jackson, Chairman of the Senate Committee on Interior and Insular Affairs, requested that the FTC provide a report on the relationship between the structure of the petroleum industry and

the shortages of petroleum products being experienced. *See* Letter from Sen. Henry M. Jackson to Lewis A. Engman, Chairman, Federal Trade Commission, *reprinted in* 119 CONG. REC. 21,444-45 (1973). In discussions with the FTC about that report, Jackson's staff became concerned about the ability and authority of the FTC to deal with situations comparable to "the current petroleum emergency." *See* 119 CONG. REC. 21,443 (1973) (remarks of Sen. Jackson) (referring to discussion with staff members). In response to this concern, the FTC's general counsel wrote to Senator Jackson, stating that the FTC's investigative authority seemed to be adequate but that the FTC's enforcement authority was hampered because it was not able to go into court to enforce its own subpoenas or to obtain preliminary injunctive relief during the pendency of FTC administrative litigation. *See* Letter from Ronald M. Dietrich, General Counsel, Federal Trade Commission, to Sen. Henry M. Jackson, *reprinted in* 119 CONG. REC. 21,445 (1973) (writing that FTC should be granted power to seek injunctions on cases involving deceptive practices and cases where anticompetitive conduct is shown). The pending bill regarding court injunctions was noted, but the FTC believed that it should include all matters over which the FTC had enforcement authority and not just consumer protection cases. *See id.* (recommending that FTC be granted power to seek injunctions whenever it deems necessary). The FTC urged Senator Jackson to expand that authority to include unfair methods of competition. *Id., reprinted in* 119 CONG. REC. 21,445 (1973).

The preliminary injunction provision, first proposed as separate legislation by Senator Jackson and then adopted as a floor amendment to the Trans-Alaska Pipeline Act, was attractive to members of Congress who had received numerous complaints from independent refiners and marketers of petroleum products complaining that the major integrated oil companies had deprived them of supplies and were putting them out of business. *See* 119 CONG. REC. 21,443 (1973) (remarks of Sen. Jackson) (noting numerous complaints that major petroleum companies were deliberately trying to destroy independent refiners and marketers to gain exclusive control over petroleum market). The FTC asserted that it was powerless to act to bring relief in the short term because it only had authority to grant relief at the conclusion of administrative proceedings. *See* Letter from Lewis A. Engman, Chairman, Federal Trade Commission, to Rep. Harold T. Johnson (Nov. 9, 1973), *reprinted in* 119 CONG. REC. 36,610 (1973). Some members of Congress believed that giving the FTC preliminary injunction authority would allow it to rectify alleged competitive problems at an early stage and limit the harm to small businesses. *See* 119 CONG. REC. 36,597 (1973) (remarks of Rep. Melcher) (stating that FTC needs to react quickly to save small businesses); *id.* at 36,608 (remarks of Rep. Smith) (noting that FTC needs injunctive powers to provide immediate remedy in extreme cases). This was a mistaken perception. Other than in merger cases, antitrust complaints seldom lend themselves to quick resolution or confident predictions of outcome from the beginning. *Cf.* Robert D. Paul, *The FTC's Increased Reliance on Section 13(b) in Court Litigation,* 57 ANTITRUST L.J. 141, 146 (1988) (discussing use of section 13(b) in merger cases and noting lack of use in antitrust cases). The FTC has not used its preliminary injunction authority in competition cases other than mergers. Responding to the concerns mentioned by legislators during the Trans-Alaska Pipeline Act debate, the FTC issued an administrative complaint against the major integrated oil companies in the summer of 1973. *See* Exxon Corp., 98 F.T.C. 453, 454-59 (1981) (compl.) (alleging major oil companies have maintained monopoly power and noncompetitive market structure). That proceeding was an expensive burden to the FTC until it finally conceded that its action was unmanageable and dismissed the complaint in 1983. *Id.* at 460-61 (stating that lack of progress warranted dismissal).

200   119 CONG. REC. 36,597 (1973) (remarks of Rep. Melcher); *see also id.* at 36,610 (remarks of Rep. Johnson) (stating that amendment gives FTC power to enforce its subpoenas through its own attorneys and to obtain preliminary injunctions from courts).

201   *Id.* at 36,609 (remarks of Rep. Smith) ("The possibility of injunction should give serious second thoughts to those who plan a quick 'killing' and withdrawal before retribution occurs."); *id.* at 36,610 (remarks of Rep. Johnson) (noting injunction has dual advantage of providing due process to FTC respondent and eliminating incentive for action taken for purposes of delay).

202   For the relevant provisions see Sherman Act, §4, 15 U.S.C. §4 (1988); Clayton Antitrust Act, §15, 15 U.S.C. §25 (1988); Federal Trade Commission Act, §13(a), 15 U.S.C. §53(a) (1988); *see also* Letter from Lewis A. Engman, Chairman, Federal Trade Commission, to Rep. Harold T. Johnson (Nov. 9, 1973), *reprinted in* 119 CONG. REC. 36,610 (1973) (noting similarities in authorities of FTC and Department of Justice); *cf.* H.R. CONF. REP. No. 624, 93d Cong., 1st Sess. 31 (1973), *reprinted in* 1199 CONG. REC. 36,242 (1973) (observing standard of proof to be met by FTC to issue

USAP129

injunctions is "public interest" standard rather than more stringent equity standard that private litigants are subject to under common law).

203  Clayton Antitrust Act, §4, 15 U.S.C. §15 (1988); *see supra* notes 50-59 and accompanying text (discussing private cause of action under Clayton Act).

204  *See* Letter from Lewis A. Engman, Chairman, Federal Trade Commission, to Rep. Harold T. Johnson (Nov. 11, 1973), *reprinted in* 119 CONG. REC. 36,610 (1973) (report of Conference Committee) (observing that section 13(b) would authorize FTC to seek temporary injunctions to prevent continuation of "particularly aggravated violations of the laws" pending completion of time-consuming administrative procedure necessary for final cease and desist order).

205  Federal Trade Commission Act, §13(b), 15 U.S.C. § 53(b)(2) (1988).

206  REPORT OF THE SENATE COMM. ON COMMERCE, S. REP. No. 151, 93d Cong., 1st Sess. 8-11 (1973) (accompanying S. 356) (explaining history of bill).

207  *Id.* at 30-31 (1973). The report states:

This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be assured of a [sic] early hearing on the merits. Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date.

*Id.*

208  *Id.* at 31. The report states:

Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease and desist order. Commission resources will be better utilized, and cases can be disposed of more efficiently.

*Id.*

209  *Id.* Although Congress might have felt comfortable in giving the court such power because it would not be playing the "definitional" role assigned to the FTC, the legislative history does not indicate that Congress intended or even considered such a result.

210  Letter from Gregory J. Ahart, Director, U.S. General Accounting Office to Michael Pertschuk, Chairman, Federal Trade Commission (undated), *reported in* 889 Antitrust & Trade Reg. Rep. (BNA) A-24, F-1 (Nov. 16, 1978).

211  *See supra* notes 122-56 and accompanying text.

212  *See* S. 356, §203, 93d Cong., 1st Sess. 24-25 (1973); *see also supra* note 195 (explaining history of bill).

213  Pub. L. No. 93-637, tit. 11, 88 Stat. 2183, 2193 (1975) (codified at 15 U.S.C. §57b (1988)).

214  *See* FTC v. Southwest Sunsites, Inc., 665 F.2d 711, 720 (5th Cir. 1982) (concerning injunction and consumer redress provisions, "Congress was evolving a statutory plan for the protection of the ... public"); *cf.* SEC v. Keller Corp., 323 F.2d 397, 403 (7th Cir. 1963) (construing sections of Investment Company Act as reflecting "statutory plan" to give

district court statutory power as well as inherent equitable power to protect investing public); Larimore v. Comptroller of the Currency, 789 F.2d 1244, 1251-52 (7th Cir. 1986) (finding that statutory cease and desist power does not include power to require bank director to reimburse bank for unsafe loans when statute contains separate provision requiring federal court proceeding to impose personal liability on director).

215    S. 986, 92d Cong., 1st Sess. (1971).

216    *Id.* §203.

217    117 CONG. REC. 39,617 (1971) (remarks of Sen. Hruska) (arguing that reasons to bifurcate into two sections included different subject matter and separate committee jurisdictions).

218    *Id.* at 39,620 (remarks of Sen. Cook); *id.* at 39,621, 39,827, 39,857 (remarks of Sen. Hruska); *id.* at 39,626 (remarks of Sen. Dole).

219    *Id.* at 39,849 (colloquy between Sens. Hruska, Magnuson, and Cook); *id.* at 39,855, 39,861 (remarks of Sen. Cook); *id.* at 39,856 (remarks of Sen. Hruska).

220    *Id.* at 39,865 (remarks of Sen. Spong).

221    117 CONG. REC. 39,876 (1971) (passing in Senate by vote of 76-2).

222    S. 356, 93d Cong., 1st Sess. §203 (1973) (introduced Jan. 12, 1973); *see also* REPORT OF SENATE COMM. ON COMMERCE, S. REP. No. 151, 93d Cong., 1st. Sess. 27-29 (1973) (reporting bill with redress provision out of Commerce Committee).

223    *See* 119 CONG. REC. 29,479 (1973) (observing that major provisions of bill had passed Senate twice and on last occasion by vote of 76 to 2).

224    *See* REPORT OF HOUSE COMM. ON INTERSTATE AND FOREIGN COMMERCE, H.R. REP. No. 1107, 93d Cong., 2d Sess. 44-53 (1974) (accompanying H.R. 7917). The principal objection in committee was that the Senate version, which the House bill copied, was construed to have permitted redress for conduct that violated an FTC cease and desist order although the person being sued had not been a party to, or had notice of, the order. *Id.* at 87. This would, in effect, make a cease and desist order tantamount to a substantive rule without providing procedural safeguards required in rulemaking proceedings. *Id.* The final version of the Magnuson-Moss Act gave the FTC the power only to bring penalty actions against persons knowingly engaged in activity that was ruled unfair or deceptive in a cease and desist order against another person. The Magnuson-Moss Warranty-Federal Trade Commission Improvement Act, Pub. L. No. 93-637, §205, 88 Stat. 2193, 2201 (1975) (adding Federal Trade Commission Act, § 5(m)(1)(B), 15 U.S.C. §45(m)(1) (B) (1988)).

225    120 CONG. REC. 31,734 (1974) (describing amendment offered by Rep. Eckhardt).

226    *Id.* The amendment read:

No action may be brought by the Commission under this section more than six years after the violation of the rule to which the action relates; except that if a cease and desist order with respect to a violation of a rule by any person has become final and such order was issued in a proceeding under subsection (b) which was commenced not later than six

years after the violation occurred, a civil action may be commenced under this section against such person at any time before the expiration of one year after such order becomes final.

*Id.*

227    *See id.* at 31,736 (remarks of Rep. Young) (arguing that six-year statute of limitations would be twice as long as that provided for securities fraud actions).

228    *Id.* at 31,737 (listing vote as 180 in favor and 209 against, with 45 not voting).

229    *Id.* at 31,739-40 (reporting passage of H.R. 7917 by vote of 384 to 1). Representative Bingham noted, however, that the bill "falls short of giving the FTC the full range of legal powers which it must have if it is to protect consumers forcefully and efficiently." *Id.* at 31,739.

230    S. CONF. REP. No. 1408, 93d Cong., 2d Sess. 20-21 (1974) (adding consumer redress provision and changing statute of limitations to three years).

231    Federal Trade Commission Act, §19, 15 U.S.C. §57b (1988).

232    *Id.* §57b(a)(1).

233    *Id.* §57b(a)(2).

234    *Id.* The provision reads: "If the Commission satisfies the court that the act or practice to which the cease and desist order relates is one which a reasonable man would have known under the circumstances was dishonest or fraudulent, the court may grant relief under subsection (b) of this section." *Id.*

235    Federal Trade Commission Act, §19(d), 15 U.S.C. §57b(d) (1988). Section 57b(d) states that "[n]o action may be brought ... more than 3 years after the rule violation ... or the unfair or deceptive act or practice" to which the action relates. If the FTC brings an administrative action within the three years, it may file for consumer redress in court within one year after the entry of a final cease and desist order. *Id.*

236    Federal Trade Commission Act, §19(b), 15 U.S.C. §57b(b) (1988).

237    *Id.; see also* REPORT OF SENATE COMM. ON COMMERCE, S. REP. No. 151, 93d Cong., 1st Sess. 28 (1973) (accompanying S. 356).

238    *See* 120 CONG. REC. 40,725 (1974) (listing vote in Senate on S. 356 as 70 in favor, 5 against, with 25 not voting); *id.* 41,408 (accepting H.R. CONF. REP. No. 1606) (1974).

239    Pub. L. No. 93-637, 88 Stat. 2183 (1975).

240    The awareness was brought home by the need to explain why the injunction provision adopted by the Senate in 1973 was no longer in the bill when the House came to vote on its version in 1974. *See* H.R. REP. No. 1107, 93d Cong., 2d Sess. 34 (1974) (explaining inclusion of injunction provision in Trans-Alaska Pipeline Act); *see also* 120 CONG. REC. 41,407-08 (1974) (remarks of Sen. Broyhill) ("[The FTC Improvement Act] completes the FTC reform begun with the

USAP132

amendments to the Alaska pipeline bill, and these two bills together constitute an important new consumer protection measure for which we should all feel proud.").

241 *See* FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1112 (9th Cir. 1982) (allowing asset freezes and preliminary enjoining of conduct).

242 There is no legislative history from which such an intention can be inferred. In addition, neither the FTC nor the trade regulation bar evidenced an understanding after passage of section 19 that the FTC already had the ability to obtain consumer redress under section 13(b). In presentations following passage of the Magnuson-Moss legislation, the Commission's chairman, its deputy general counsel, and private practitioners made no mention of consumer redress under section 13. *See* Hon. Lewis A. Engman, *Report From the Federal Trade Commission,* 44 ANTITRUST L.J. 161, 164 (1975) (stating that "[w]ith respect to consumer redress, Congress has created a wholly new approach capable of tremendous flexibility" in Magnuson-Moss Act); Panel Discussion, *Emerging Issues Under the Magnuson-Moss Warranty- Federal Trade Commission Improvement Act: Part II-FTC Improvement Act,* 45 ANTITRUST L.J. 96, 100-02 (1976) (discussing consumer redress, but making no mention of section 13(b)).

243 *See* FTC v. Southwest Sunsites, Inc., 655 F.2d 711, 718 (5th Cir. 1982) (holding grant of jurisdiction in section 13(b) includes authorization to exercise full range of equitable remedies traditionally available), *cert. denied,* 456 U.S. 973 (1982); FTC v. H.N. Singer, Inc., 688 F.2d 1107, 1113 (9th Cir. 1982) (deciding that Congress in §19 did not intend to restrict broad equitable jurisdiction granted to district court by §13(b)).

244 U.S. GENERAL ACCOUNTING OFFICE, VICTIMS OF UNFAIR BUSINESS PRACTICES GET LIMITED HELP FROM THE FEDERAL TRADE COMMISSION, 23-24 (1978).

245 *See* John H. Carley, *FTC Muscle Evident in Its Settlements,* LEGAL TIMES, Nov. 7, 1983, at 11 (noting that while section 19 is procedurally cumbersome and causes delay, section 13(b) allows consumer recovery in unified district court action).

246 Federal Trade Commission Act, §13(b), 15 U.S.C. §53(b)(1)-(2) (1988). Section 13(b) reads:

Whenever the Commission has reason to believe-

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public-

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order of a preliminary injunction may be granted without bond: *Provided, however,* That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: *Provided further,* That in *proper cases* the Commission may seek, and after *proper proof,* the court may issue, a permanent injunction. Any such suit shall be brought in the district in which such person, partnership, or corporation resides or transacts business.

*Id.* (emphasis added).

247  *See supra* note 196 (quoting statutory language).

248  665 F.2d 711 (5th Cir.), *cert. denied,* 456 U.S. 973 (1982).

249  FTC v. Southwest Sunsites, Inc., 665 F.2d 711, 720-21 (5th Cir.), *cert. denied,* 456 U.S. 973 (1982).

250  *Id.* at 720 (quoting SEC v. Keller Corp., 323 F.2d 397, 403 (7th Cir. 1963)).

251  *Id.*

252  *Id.* at 717-18.

253  328 U.S. 395 (1946).

254  Porter v. Warner Holding Co., 328 U.S. 395, 399 (1946).

255  *Id.* at 397.

256  *Id.* at 402-03.

257  *Id.* at 398.

258  *See* Equal Employment Opportunity Comm'n v. Arabian Am. Oil Co., 111 S. Ct. 1227, 1231 (1991) (refusing to apply Title VII of Civil Rights Act of 1964 overseas because statute lacked "affirmative congressional intent" to do so).

259  *Porter,* 328 U.S. at 398.

260  *Id.* (quoting Brown v. Swann, 35 U.S. (10 Pet.) 496, 503 (1836)).

261  This is particularly true with regard to section 13(b) injunction authority that was inserted as a last minute floor amendment to a large and complicated bill on another matter. *See supra* note 198 (discussing procedural short-cut used to pass FTC Act amendment); *cf.* REPORT OF HOUSE COMM. ON INTERSTATE AND FOREIGN COMMERCE ON H.R. 7917, H.R. REP. No. 1107, 93d Cong., 2d Sess. 84 (1974) (relating separate views reporting objection raised at time to including FTC Act amendments in Alaska pipeline legislation and referring to new House rule adopted to address "this type of mischief").

262  *Porter,* 328 U.S. at 398.

263  The statutory scheme in *Porter v. Warner Holding Co.* allowed for private actions to recover damages arising from overcharges for a limited period after the overcharge occurred. *Id.* at 397. Thereafter, the Act authorized the Administrator to sue for damages in the public interest if private actions had not been brought. *Id.* at 401. The proceeds of such actions would be paid into the U.S. Treasury. *Id.* at 402. This scheme notwithstanding, the Court also found an inherent equitable power to grant restitution to individuals who were overcharged when the Administrator sought the Court's exercise of its equitable power to restrain conduct that violated the Price Control Act. *Id.* at 403. The Court

found no conflict between the explicit statutory scheme for the recovery of "damages" and the implied equitable power to order "restitution" in connection with the entry of an injunction. *Id.* at 397-403.

264    361 U.S. 288 (1960).

265    Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 289-90 (1960).

266    *Id.* at 290.

267    *Id.*

268    *Id.*

269    Mitchell v. Robert DeMario Jewelry, Inc., 260 F.2d 929, 934 (5th Cir. 1958), *rev'd,* 361 U.S. 288 (1960). The district court had not decided the jurisdictional question because it had declined to award lost wages as a matter of discretion. *See* Mitchell v. Robert DeMario Jewelry, Inc., 180 F. Supp. 800, 800 (M.D. Ga. 1957) (granting injunction against discrimination and ordering reinstatement of discharged employees), *aff'd,* 260 F.2d 929 (5th Cir. 1958), *rev'd,* 361 U.S. 288 (1960).

270    *DeMario,* 260 F.2d at 933.

271    *DeMario,* 361 U.S. at 291. The Court refused to look on *Porter* as a "wartime statute" that may have gone further than is appropriate for a peacetime environment, or to view the statutory language in *Porter* permitting the court to enter "other orders" as the basis on which that case rested. *Id.*

272    *Id.* at 291-92. In so holding, the Court was not persuaded that a proviso in the injunctive power section prohibiting a court from awarding "unpaid minimum wages or unpaid overtime compensation" applied as well to the award of wages lost because of a retaliatory firing in violation of the Act. *Id.* at 294-95.

273    665 F.2d 711 (5th Cir.), *cert. denied,* 456 U.S. 973 (1982).

274    FTC v. Southwest Sunsites, Inc., 665 F.2d 711, 718 (5th Cir.), *cert. denied,* 456 U.S. 973 (1982).

275    *Id.* at 719-20.

276    *Id.*

277    668 F.2d 1107 (9th Cir. 1982); *accord* FTC v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1314-15 (8th Cir. 1991) (granting monetary equivalent of rescission as part of ancillary equitable relief); FTC v. Amy Travel Serv., Inc., 875 F.2d 564, 571 (7th Cir.) (allowing rescission and restitution in monetary relief), *cert. denied,* 493 U.S. 954 (1989); FTC v. Evans Prods. Co., 775 F.2d 1084, 1088 (9th Cir. 1985) (holding that preliminary asset freezing is appropriate to protect court's permanent injunction authority to order restitution); FTC v. United States Oil & Gas Corp., 748 F.2d 1431, 1434 (11th Cir. 1984) (allowing preliminary freezing of assets and appointing of receiver to protect court's ability to order permanent injunction); FTC v. Atlantex Assocs., 1987-2 Trade Cas. (CCH) ¶ 67,788, at 59,254-55 (S.D. Fla. 1987) (giving monetary restitution), *aff'd,* 872 F.2d 966 (11th Cir. 1989); FTC v. Solar Michigan, Inc., 1988-2 Trade Cas. (CCH) ¶ 68,339, at 59,919 (E.D. Minn. 1988) (finding asset freeze necessary to protect ability to order consumer redress); Evans Prods. Co., 1986-1 Trade Cas. (CCH) ¶67,113, at 62,725 (S.D. Fla. 1986) (holding that courts may order

restitution even if violations have stopped and are not likely to recur); FTC v. Kitco of Nevada, Inc., 612 F. Supp. 1282, 1298 (D. Minn. 1985) (ordering permanent injunction granting consumer redress); FTC v. International Diamond Corp., 1983-2 Trade Cas. (CCH) ¶65,506, at 68,457 (N.D. Cal. 1983) (concurring with *Singer*).

278   FTC v. H.N. Singer, Inc., 1982-83 Trade Cas. (CCH) ¶65,011, at 70,611 (N.D. Cal. 1982).

279   FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1112 (9th Cir. 1982).

280   The FTC has suggested that a "proper case" is one in which the applicable rule of law is clear enough that the court can rely readily on prior precedent or express statutory authority in determining the meaning of "unfair or deceptive" in the circumstances of the case. FTC v. H.N. Singer, Inc., 1982-83 Trade Cas. (CCH) ¶65,011 at 70,618 (N.D. Cal. 1982). Some courts prefer to consider a case "proper" when it is a "routine fraud case" or one that involves "garden variety fraudulent acts and practices." *See* FTC v. World Travel Vacation Brokers, Inc., 861 F.2d 1020, 1028 (7th Cir. 1988) (holding FTC has authority to seek injunctive relief in routine fraud cases); FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1111 (9th Cir. 1982) (holding that "routine fraud case is a proper case"); FTC v. International Diamond Corp., 1983-2 Trade Cas. (CCH) ¶65,725, at 69,706 (N.D. Cal. 1983) (noting legislative history supports idea that Congress intended section 13(b) to be limited to "garden variety fraudulent acts"). Courts have also held section 13(b) to authorize permanent injunctions against acts that violate a statute for which the FTC has enforcement responsibility or an FTC trade regulation rule. *See* FTC v. Virginia Homes Mfg. Corp., 509 F. Supp. 51, 54 (D. Md.) (noting section 13(b) applies to violations of any provisions of law enforced by FTC), *aff'd without pub. opinion,* 661 F.2d 920 (4th Cir. 1981); *see also* JS & A Group Inc. v. FTC, 716 F.2d 451, 455 (7th Cir. 1983) (allowing FTC to grant permanent injunction for defendant's violation of FTC's Mail Order Rule).

281   *Cf.* FTC v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1315 (8th Cir. 1991) (asserting there can be "no inference that Congress intended section 19 to restrict broad equitable jurisdiction granted to district court by section 13(b)"); FTC v. Virginia Homes Mfg. Corp., 509 F. Supp. 51, 55 (D. Md.) ("It is the authority of the courts rather than the authority of the Commission which is at issue."), *aff'd without pub. opinion,* 661 F.2d 920 (4th Cir. 1981).

282   *H.N. Singer,* 668 F.2d at 1112 (quoting Porter v. Warner Holding Co., 328 U.S. 395, 398 (1946)). Even the FTC appeared surprised at the favorable turn of events, as evidenced by its general counsel referring to it as "the most striking development in Section 13(b) law in recent years." *See* Paul, *supra* note 199, at 142, 145 (stating that FTC was "beneficiary of this principle of statutory interpretation").

283   *See* notes 253-72 and accompanying text (explaining *Porter/DeMario* doctrine). The reasoning of the two cases is not persuasive. *See supra* text accompanying notes 253-83. The precedent exists, however, and is a longstanding means of statutory interpretation. *See, e.g.,* California v. American Stores Co., 495 U.S. 271, 295 (1990) (holding "injunctive relief" available to private antitrust plaintiffs includes divestiture of illegally acquired competitor); Commodity Futures Trading Comm'n v. CoPetro Mktg. Group, Inc., 680 F.2d 573, 583-84 (9th Cir. 1982) (refusing to deny "inherent equitable powers of a court to afford complete relief"); ICC v. B & T Transp. Co., 613 F.2d 1182, 1184-85 (1st Cir. 1980) (applying *Porter* to allow ICC to seek restitution); Commodity Futures Trading Comm'n v. Hunt, 591 F.2d 1211, 1223 (7th Cir.) (concluding district court has authority to order restitution pursuant to Commodity Exchange Act), *cert. denied,* 442 U.S. 921 (1979); SEC v. Bangor Punta Corp., 480 F.2d 341, 390 (2d Cir.) (relying on *DeMario* to allow SEC to seek ancillary relief), *cert. denied,* 414 U.S. 924 (1973); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2d Cir. 1972) (conferring power to district courts to fashion "appropriate remedies" in cases involving securities laws); SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1307 (2d Cir.) (citing *DeMario* to uphold power of Government to seek restitution without specific statutory authority), *cert. denied,* 404 U.S. 1005 (1971). Thus, it is unlikely the Supreme Court will overrule the precedent established in *Porter* and *DeMario*.

284   *DeMario,* 361 U.S. at 291-92; *Porter,* 328 U.S. at 400.

285    *Porter,* 328 U.S. at 398.

286    *See infra* note 292 and accompanying text (listing section 19 prerequisites).

287    *See* 120 CONG. REC. 41,407 (1973) (remarks of Rep. Broyhill) (urging passage of conference report on Magnuson-Moss Warranty-Federal Trade Commission Improvement Act despite inclusion of consumer redress section that he and majority of House opposed during House consideration of bill); *supra* notes 222-31 and accompanying text (discussing negotiations and compromise that occurred during passage of bill).

288    Federal Trade Commission Act, §§19(a)(1)-(2), (d), 15 U.S.C. §§ 57b(a)(1)-(2), (d) (1988).

289    *Id.*

290    The provision has been construed to apply to conduct taking place before the entry of the order. *See* FTC v. Glenn W. Turner Enters., Inc., 446 F. Supp. 1113, 1114-15 (M.D. Fla. 1978) (construing these criteria to apply even though practice may not have been repeated or continued in violation of order).

291    Federal Trade Commission Act, §19(a)(2), 15 U.S.C. § 57b(a)(2) (1988).

292    *Id.* §19(d), 15 U.S.C. §57b(d). If the FTC files its own administrative complaint within the three-year period, it may seek restitution under section 19 at any time up to one year after entry of a final order against the respondent. *Id.*

293    This has a profound effect on the type of action the FTC decides to file to enforce the FTC Act. It also gives the FTC enormous leverage in negotiating consent orders with redress provisions.

294    *Porter,* 328 U.S. at 398 (referring to Emergency Price Control Act and stating that "unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied."); *cf.* Morton v. Mancari, 417 U.S. 535, 551 (1974) ("The courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). The conclusory assertion of the Ninth Circuit in *Singer* that "there is no necessary or inescapable inference, or, indeed, any inference, that Congress intended to restrict the broad equitable jurisdiction apparently granted to the court by section 13(b)" did not come as a result of any analysis of §13(b) as it relates to the rest of the Act. FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982). A "holistic" analysis would have led to a contrary conclusion. *Cf.* United Sav. Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988) ("Statutory construction ... is a holistic endeavor."); FTC v. University Health, Inc., 938 F.2d 1206, 1216 (11th Cir. 1991) ("[I]n interpreting one section of a statute, it is usually best to refer first to the overall statutory scheme of which the section is a part before turning to other sources. ..."); Kenneth W. Starr, *Of* Forests and Trees: Structuralism in the Interpretation of Statutes, 56 GEO. WASH. L. REV. 703, 706 (1988) (noting trend toward studying statutes in their entirety).

295    In spelling out the courts' powers with respect to requests for restitution under section 19, the Act states:

The court in an action under subsection (a) of this section shall have jurisdiction to grant such relief as the court finds necessary to redress injury to consumers or other persons, partnerships, and corporations resulting from the rule violation or the unfair or deceptive act or practice, as the case may be. Such relief may include, but shall not be limited to, rescission or reformation of contracts, the refund of money or return of property, the payment of damages, and public notification respecting the rule violation or the unfair or deceptive act or practice, as the case may be; except that nothing in this subsection is intended to authorize the imposition of any exemplary or punitive damages.

Federal Trade Commission Act, §19(b), 15 U.S.C. §57b(b) (1988).

296   *See* Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15-16 (1979) (explaining that "what must ultimately be determined is whether Congress intended to create the ... remedy asserted").

297   *H.N. Singer,* 688 F.2d at 1113. Either the court misstated defendant's argument or the defendant missed the argument. According to the court:

Appellants argue that Congress in §19 explicitly granted the district court power to award rescission and other forms of redress only when a Commission rule had been violated, and thus implicitly restricted the remedy for other violations of the Act to agency processes and to the injunctive relief provided by §13(b).

*Id.* Section 19(a)(2) is clear, however, that it also applies to violations of the FTC Act when the person knew or should have known that the conduct was deceptive or fraudulent. 15 U.S.C. §57b(a)(2) (1988).

298   Federal Trade Commission Act, §19(e), 15 U.S.C. §57b(e) (1988); *see also* FTC v. Security Rare Coin & Bullion Corp., 931 F.2d 1312, 1315 (8th Cir. 1991) (concluding consumer redress under section 19 does not restrict redress under section 13(b)); FTC v. International Diamond Corp., 1983-2 Trade Cas. (CCH) ¶65,506, at 68,457 (N.D. Cal. 1983) (finding section 19 does not preclude section 13(b) consumer redress).

299   *See supra* note 280 and accompanying text (discussing court's view of "proper cases").

300   H.R. CONF. REP. No. 1606, 93d Cong., 2d Sess. 41 (1974); *see also* REPORT OF SENATE COMM. ON COMMERCE, S. REP. No. 151, 93d Cong., 1st Sess. 28 (1973) (accompanying S. 356) (stating that redress provision "does not in any way purport to supplant private actions by consumers").

301   H.R. CONF. REP. No. 1606, 93d Cong., 2d Sess. 41 (1974).

302   Federal Trade Commission Act, §19(e), 15 U.S.C. §57b(e) (1988).

303   H.R. CONF. REP. No. 1606, 93d Cong., 2d Sess. 42 (1974).

304   Heater v. FTC, 503 F.2d 321, 326 (9th Cir. 1974); *see* Gerald P. Norton, *Emerging Issues Under the Magnuson-Moss Warranty-Federal Trade Commission Improvement Act: Part II-FTC Improvement Act,* 45 ANTITRUST L.J. 97, 102 (1976) (arguing that section 19 does not alter FTC's authority as it stood before Magnuson-Moss amendment).

305   It may be argued that section 19 and section 13 are mutually exclusive. Section 13 applies to relief for "routine fraud" cases prosecuted by the FTC in the courts by seeking an injunction and section 19 redress applies when the FTC must exercise its definitional role under section 5 by prosecuting through its own administrative proceeding. There is no legislative history, however, supporting such a construction, nor is there an adequate explanation of why a consumer's ability to recover monies extracted from him or her by fraud or deception should in some cases turn on the enforcement mechanism selected by the FTC. For instance, a case instituted more than three years from the date of the deception can result in restitution for consumers only if the FTC decides to proceed by seeking a court injunction rather than by entering its own cease and desist order. That is not a distinction that has any basis in the legislative histories of either the Trans-Alaska Pipeline Act or the Magnuson-Moss legislation.

If Congress had specified the permanent injunctions for cases in which the practice had already been categorized as deceptive, and administrative proceedings only for fact situations that require the definitional role of the FTC, then providing for unlimited redress in the former but limiting section 19 redress in the latter might be consistent, at least for the imposition of the scienter requirement in the latter. Section 19(a)(1), however, contemplates FTC proceedings

in clear-cut trade regulation rule violations. Additionally, a statute of limitations difference between section 13(b) and section 19(a) is not logical. In any event, Congress evidenced no intention to create such a scheme. Judicial attempts to do so usurp the Article I legislative function. *Cf.* Hon. Felix Frankfurter, *Some Reflections on the Reading of Statutes,* 47 COLUM. L. REV. 527, 533 (1947) ("[N]o one will gainsay that the function in construing a statute is to ascertain the meaning of words used by the legislature. To go beyond it is to usurp a power which our democracy has lodged in its elected legislature.").

306    Porter v. Warner Holding Co., 328 U.S. 395, 401 (1946); Mitchell v. Robert DeMario Jewelry, Inc., 361 U.S. 288, 293-94 (1960).

307    *Porter,* 328 U.S. at 401.

308    *Id.* at 402.

309    *Id.* at 402-03.

310    *Id.* at 402. The Court noted that there was no legislative history showing that Congress intended to "whittle down the equitable jurisdiction recognized by §205(a) so as to preclude a suit for restitution." *Id.* at 403 n.5.

311    *DeMario,* 361 U.S. at 289-91.

312    *Id.* at 292-93 (calling this "Hobson's choice").

313    *Porter,* 328 U.S. at 400; *DeMario,* 361 U.S. at 292.

314    Federal Trade Commission Act, §19, 15 U.S.C. §57b (1988).

315    *See supra* note 196 (providing text of section 13(b)).

316    The FTC has not been consistent in the application of a three-year statute of limitations in section 13(b) permanent injunctions cases. Perhaps for strategic purposes, it has occasionally acquiesced to application of the section 19 criteria in such cases. *See* FTC v. National Business Consultants, Inc., 1991-2 Trade Cas. (CCH) ¶69,631, at 66,828 n.30 (E.D. La. 1991) ("The statutory limit for obtaining redress under Section 19(b) of the FTC Act is three years. Section 13(b) contains no such limitation, however, the FTC has not suggested extending redress beyond that three year period.").

317    Federal Trade Commission Act, §19(a)(2), 15 U.S.C. § 57(b)(a)(2) (1988).

318    *See, e.g.,* FTC v. Sharp, 1991-2 Trade Cas. (CCH) ¶69,579, at 66,552 (D. Nev. 1991) (applying scienter requirement of section 19 in section 13(b) case); FTC v. Magui Publishers, Inc., 1991-1 Trade Cas. (CCH) ¶69,391, at 69,425 (C.D. Cal. 1991) (imposing final judgment based on Findings of Fact and Conclusions of Law proposed by FTC).

319    REPORT OF THE SENATE COMM. ON COMMERCE, S. REP. No. 151 93d Cong., 1st Sess. 31 (1973) (accompanying S. 356) (observing that injunction provision allows FTC to better utilize its resources and dispose of cases more efficiently).

320    FTC OPERATING MANUAL §11.3.1.4 (1988).

41 AMULR 1139

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.



# [Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶902. Brief Historical Review of Merger Law Interpretation](#)

Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp

Phillip E. Areeda (late) & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶902. (Fourth and Fifth Editions 2018-2023)

Fourth and Fifth Editions

Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp ¶902.

[Click to open document in a browser](#)

**Last Updated: 8/2023**

This Paragraph offers a thumbnail sketch of United States merger policy, focusing mainly on the Sherman Act of 1890, judicial interpretation of the original Clayton Act §7 of 1914, and then of the Act's 1950 amendments in the Celler-Kefauver Act. Many details are omitted or reviewed only briefly, but we supply several cross-references to the extensive historical and policy literature. [1]

Before the Sherman Act was passed, the federal government had no merger policy at all. Nor, for that matter, did the common law. Although noncompetition agreements or other contracts in restraint of trade contained in acquisitions might be unlawful, the acquisitions themselves were not condemned on grounds relating to their impact on competition. [2] States had expressed a concern with mergers, but the legal vehicle for challenging them was state corporate law, and the final decades of the nineteenth century saw many state law challenges to acquisitions for violating various corporate law rules, such as those prohibiting holding companies, preventing corporations from entering into partnerships with other corporations, or preventing corporations from engaging in ultra vires acts generally. [3]

**902a. Sherman Act..—**

**1. *Generally*..—**Sherman Act §1 prohibits "combinations" in restraint of trade, whether "in the form of trust or otherwise," and §2 prohibits conspiracies to monopolize. The statutory language clearly covers horizontal mergers. And, indeed, the first major successful antimonopoly suits, *Northern Securities* , [4] *Standard Oil*, [5] and *American Tobacco*, [6] were essentially merger cases. One might have expected §1 to have evolved as a significant limitation on mergers that fell short of conferring monopoly power, and on occasion the Sherman Act was successfully invoked in cases of that kind. [7] Arguably, the Sherman Act served to deter some anticompetitive mergers, although much of the evidence suggests that the Sherman Act encouraged rather than prevented early mergers. [8] In any event, the constraints imposed on mergers by the Sherman Act, as interpreted during most of its history up to 1950, can only be described as modest. The lenient or even benign view of mergers reflected in the Supreme Court decisions in the *United Shoe Machinery* [9] (1918) and *United States Steel* [10] (1920) decisions effectively chilled enforcement actions under the Sherman Act until the 1950 amendment of Clayton Act §7 largely superseded the Sherman Act's role.

However, the Court took a severe approach to mergers in several railroad consolidation cases beginning with *Northern Securities*  in 1904 and ending with *Southern Pacific*  in 1922. [11] The former involved the unification through a holding company of the Great Northern and Northern Pacific railroads, which operated lines roughly parallel but at varying distances apart between St. Paul and Seattle. The combination was held to be a violation of Sherman Act §1. The Court did not closely examine the degree to which the carriers actually competed, nor did it otherwise attempt to appraise the merger's competitive impact. Plainly, there had been some competition between the merging routes, and that was deemed enough. In the 1922 decision, Southern Pacific's acquisition



of the stock of Central Pacific was held to violate the Act, though the railroads were not parallel and competed largely or entirely as parts of competing transcontinental transportation systems.

In the interim, however, the Court had refused to invalidate extensive consolidations in the shoe machinery and steel industries. In *United Shoe Machinery* (1918), the Court, by a four-to-three vote, upheld several acquisitions yielding a near monopoly of shoe machinery manufacturing in the United States. [12] While the Court majority viewed the mergers as involving complementary rather than competitive machines, [13] the record left little doubt that significant competition, actual and potential, had been eliminated.

Moreover, any reason to believe that complementarity was the only basis for the decision was removed one year later in *United States Steel* , when the Court, again by a vote of four to three, absolved the steel company of §1 and §2 violations, though the company was created by mergers of companies accounting at the time for over 50 percent of aggregate iron and steel products, and as much as 80 to 95 percent of some lines (although it is not clear how many of these lines were relevant markets). Further, the consolidation was undertaken with the intent of gaining monopoly control. The Court concluded that the monopolistic purpose had not been achieved, because the company's share of aggregate product sales had declined to 40 percent at the time of suit. The Court also believed that the defendant's purpose subsequently had been abandoned. In the majority's view, that was the end of the matter:

> The Corporation is undoubtedly of impressive size….But we must adhere to the law and the law does not make mere size an offense or the existence of unexerted power an offense. It…requires overt acts and trusts to its prohibition of them and its power to punish or repress them. It does not compel competition nor require all that is possible. [14]

Why mergers eliminating substantial competition were not "overt acts" warranting relief, as Justice Day stressed in dissent, was never adequately explained. The implication was that mergers falling short of monopoly were lawful unless the resulting power was "abused."

While other political or economic factors also may have played a role, there is little doubt that the *United States Steel* decision contributed heavily to the virtually complete demise of Sherman Act enforcement efforts against horizontal mergers for nearly three decades. The railroad cases, like railway tickets, appeared to be good for those days and trains only. And when antimerger enforcement efforts resumed in the late 1940s with the *Columbia Steel* case, [15] the government failed again. The Court concluded that United States Steel's acquisition of a substantial competing West Coast fabricator was not "an unreasonable restraint of trade." The merger was not nearly of the magnitude of that in *United States Steel*, and the decision was defensible on the facts. [16] Yet, the cloudy and confused opinion seemed to suggest a generous approach to horizontal mergers under the Sherman Act and was significantly responsible for the amendment of Clayton Act §7 in 1950.

**902a2. *Did the Sherman Act restrain or encourage pre–Clayton Act mergers?.*—**Some historical evidence suggests that, far from preventing mergers, early federal antitrust policy actually facilitated more of them than might otherwise have occurred. [17] The basic argument is that early antitrust policy was quite aggressive toward cartels but powerless against mergers. The *Trans-Missouri*, *Joint-Traffic*, and *Addyston Pipe* decisions all condemned cartels. [18] However, in *E.C. Knight*, the Supreme Court held that the Sherman Act did not reach a combination formed by common law trust, even though the combination manufactured sugar in several different states. [19] The Supreme Court's rationale was that manufacturing was not commerce. While the *Northern Securities* decision in 1904 did condemn a merger formed by the transfer of stock to a holding company, the market affected by that merger involved the interstate shipment of freight on railroads. [20]

Thus the message sent by these decisions was that while cartels were illegal per se, mergers would be tolerated as long as they involved manufacturing and the markets restrained were not the interstate shipping markets

© 2023 CCH Incorporated and its affiliates and licensors.
All rights reserved.



themselves. So, for example, after the cast-iron pipe cartel was condemned in *Addyston Pipe* , [21] the parties responded by completely merging into a single firm. [22]

The argument is incomplete, however, without one additional premise—namely, that combination of some kind was in the interest of the firms. Of course, they could have been combining in order to create monopolies or more profitable oligopoly markets. But an equally plausible explanation is that in an age when technology was changing rapidly, firms had to attain larger size in order to take advantage of economies of scale in manufacturing and distribution. [23] If markets did not expand sufficiently to permit firms to grow to the larger size needed to achieve these economies, then all the firms would have to operate at less than optimal output or else some of the firms would have to be eliminated. Cartelization would have permitted the firms to reduce their output, but mergers were undoubtedly socially preferred, for they permitted the post-merger firms to attain the size that would minimize their costs. Of course, this would entail the closure of some plants and other facilities— a fact that courts cited with suspicion [24]—but the facilities that were closed were probably obsolete in any event.

**902b. Original Clayton Act §7..—**Section 7 of the Clayton Act of 1914 was specifically directed at mergers. It might have led to rigorous antimerger enforcement had it not suffered from a fatal defect: it did not cover asset acquisitions. As originally enacted, the principal paragraph of §7 read as follows:

> That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly in any line of commerce.

The failure of the statute to cover the acquisition of assets was confirmed by subsequent judicial decisions. [25] Indeed, it was held that a statutory consolidation in which the initial step is the acquisition of stock passed beyond the scope of the statute once the assets of the acquired corporation were merged with those of the acquiring entity. [26]

Moreover, while the last two clauses of the above provision seemed broad enough to cover vertical and conglomerate mergers, horizontal mergers seemed to be the main target, and further coverage was open to doubt. Also, prohibiting acquisitions that might substantially lessen competition between the acquiring and acquired corporations, taken literally, appeared to be an absolute ban on horizontal mergers. Unable to believe that Congress so intended, the courts fell back on Sherman Act tests of "reasonableness." [27]

Whatever other purposes Congress may have had in amending §7 in 1950, it clearly intended to repair these defects.

**902c. 1950 Clayton Act amendments..—**As amended by the Celler-Kefauver Act of 1950, §7 read as follows:

> That no corporation [28] engaged in commerce [29] shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

Perhaps uncertain as to what substantive changes in prior law the amendment of §7 would be held to have made, government enforcement agencies were slow in utilizing it. Not until the *Brown Shoe* decision of 1962 [30] did the Supreme Court have its first opportunity to pass on the revised statute's effect. *Brown Shoe*

© 2023 CCH Incorporated and its affiliates and licensors. All rights reserved.



eschewed any single test for illegality and appeared to invite an inquiry into a range of economic as well as some noneconomic issues. Nevertheless, in finding illegality in the horizontal aspects of the merger, the Court relied heavily on the combined market shares of the merging retail stores in various cities.

Beginning with *Philadelphia Bank* , [31] later decisions made "undue" or "substantial" market shares presumptive proof of illegality, apparently rebuttable only by proof that the acquired firm was a "failing company." [32] Moreover, the threshold of "substantial" aggregate market shares fell quickly from the 30 percent figure in *Philadelphia Bank* to 7 or 8 percent in *Von's Grocery* [33] and to 4.5 percent for a majority of the Court in *Pabst Brewing*. [34] Thus the Department of Justice in its 1968 Merger Guidelines could confidently state that absent a "failing company" defense, it ordinarily would challenge a merger involving two firms each with 4 percent or more of a highly concentrated market, or 5 percent or more in any market. [35]

The balance of our discussion in this chapter deals mainly with decisions following *Brown Shoe*  and *Philadelphia Bank* , although occasional reference will be made to earlier decisions as well. Most important, except for its idiosyncratic *General Dynamics*  decision, [36] the Supreme Court has not been involved in the making or enforcing of substantive merger standards: the Court leaves that role mainly to the two federal enforcement agencies and the lower courts. Indeed, the Rehnquist Supreme Court did not decide a single merger case on the merits. Nor, as of this writing, has the Roberts Court.

---

## Footnotes

1    Readers interested in the history of United States merger policy under the Sherman and Clayton Acts may select from a wealth of sources, including Herbert Hovenkamp, The Opening of American Law: Neoclassical Legal Thought, 1870–1970 chs. 11 (horizontal) & 12 (vertical) (2015); Tony Freyer, Regulating Big Business: Antitrust in Great Britain and America: 1880–1990 (1992); Morton Keller, Regulating a New Economy: Public Policy and Economic Change in America, 1900–1933 (1990); William Kovacic, *Failed Expectations: The Troubled Past and Uncertain Future of the Sherman Act as a Tool for Deconcentration,* 74 Iowa L. Rev. 1105 (1989); William Letwin, Law and Economic Policy in America: The Evolution of the Sherman Antitrust Act (1965); James May, *Antitrust in the Formative Era: Political and Economic Theory in Constitutional and Antitrust Analysis* , 50 Ohio St. L.J. 257 (1989); Rudolph Peritz, Competition Policy in America, 1888–1992: History, Rhetoric, Law (1996); Martin J. Sklar, The Corporate Reconstruction of American Capitalism, 1890–1916: The Market, the Law and Politics (1988); The Political Economy of the Sherman Act: The First One Hundred Years (E. Thomas Sullivan ed., 1991); Hans B. Thorelli, The Federal Antitrust Policy: Origination of an American Tradition (1955).

2    *See*  Herbert Hovenkamp, Enterprise and American Law, 1836–1937 ch. 20 (1991).

3    Many of these developments are summarized in ¶102.

4    *Northern Sec. Co. v. United States* , 193 U.S. 197 (1904).

5    *Standard Oil Co. v. United States* , 221 U.S. 1 (1911).

6    *United States v. American Tobacco Co.* , 221 U.S. 106 (1911).

7    For example, the railroad merger cases *Northern Securities Co. v. United States,*  193 U.S. 197 (1904), and *United States v. Southern Pacific Co.* , 259 U.S. 214 (1922).

8    See ¶a2.

9    *United States v. United Shoe Mach. Co. of New Jersey* , 247 U.S. 32 (1918) (refusing to condemn horizontal merger because post-merger firm failed to attain market dominance, because the firms were not clearly competing with each other before the merger occurred, and because defendant's patents would always tend to limit competition anyway).

10   *United States v. United States Steel Corp.* , 251 U.S. 417 (1920) (refusing to condemn merger falling short of creating a monopoly where tendency in industry was toward integration and combination and the industry was quite distressed until combination occurred).

© 2023 CCH Incorporated and its affiliates and licensors. All rights reserved.       Nov 20, 2023 from VitalLaw®



11  *Northern Sec.* , 193 U.S. at 197; *United States v. Southern Pac. Co.* , 259 U.S. 214 (1922).

12  *United Shoe Mach.,*  247 U.S. at 32.

13  *Id.*  at 40.

14  *United States Steel* , 251 U.S. at 451.

15  *United States v. Columbia Steel Co.* , 334 U.S. 495 (1948).

16  The record indicated that United States Steel, the acquiring firm, manufactured mainly heavy steel products, while Consolidated, the acquired firm, manufactured mainly light products. The extent of their competition, or lack thereof, was revealed by the record. During the relevant time period United States Steel had bid on 2,400 jobs and Consolidated on 6,400, and each had been successful about one-third of the time. However, the two firms had bid on the same job only 166 times. 334 U.S. at 515 n.13. Clearly, the merger was "horizontal " with respect to the sales covered by those 166 bids but not so clearly with respect to the firms' remaining business, which was of far greater magnitude. The district court had found that competition between the two firms before the merger occurred was "not substantial, " and the Supreme Court agreed. *Id.*  at 516. The firms also operated largely in different geographic regions.

17  *See, e.g.,*  George Bittlingmayer, *Did Antitrust Policy Cause the Great Merger Wave?* , 28 J.L. & Econ. 77 (1985); Herbert Hovenkamp, Enterprise and American Law, 1836–1937 ch. 20 (1991); and see ¶102a.

18  *United States v. Trans-Missouri Freight Ass'n* , 166 U.S. 290 (1897); *United States v. Joint-Traffic Ass'n* , 171 U.S. 505 (1898); *United States v. Addyston Pipe & Steel Co.* , 85 F. 271 (6th Cir. 1898), *modified and aff'd,*  175 U.S. 211 (1899). See ¶2003a, b.

19  *United States v. E.C. Knight Co.* , 156 U.S. 1 (1895). On the trust history under state corporate law, see *People v. North River Sugar Refining Co.* , 24 N.E. 834 (N.Y. 1890), and Hovenkamp, Enterprise and American Law, 1836–1937, at 250–53 (1991).

20  *Northern Sec.* , 193 U.S. at 197.

21  *Trans-Missouri Freight Ass'n* , 166 U.S. at 290.

22  See ¶1905 ; Almarin Phillips, Market Structure, Organization and Performance ch. 5 (1962) (noting that four of the six *Addyston Pipe*  cartel members merged in 1898, and the remaining two joined them in 1899, forming the United States Cast Iron Pipe and Foundry Co., with about 75 percent of United States capacity).

23  *See*  George Bittlingmayer, *Decreasing Average Cost and Competition: A New Look at the*  Addyston Pipe *Case,*  25 J.L. & Econ. 443 (1988).

24  *United States v. American Can Co.* , 230 F. 859, 875 (D. Md. 1916), *appeal dismissed* , 256 U.S. 706 (1921) (noting that American Can purchased several rivals' plants and promptly shut them down).

25  *E.g., FTC v. Western Meat Co.* , 272 U.S. 554, 561 (1926) (acquisitions of "property, " as opposed to stock, not covered by statute).

26  *See Arrow-Hart & Hegeman Elec. Co. v. FTC* , 291 U.S. 587 (1934), which involved manufacturers of electric wiring devices. The common shares of each company were exchanged for equal shares in a holding company, with the two original entities continuing as operating units complete with original trade names and products. In response to a complaint by the FTC, the holding company was dissolved, its stock distributed to two new firms, and a single corporate entity was created in their stead. *Id.*  at 589–92. The Court concluded that if the companies had merged directly, omitting the intermediate step of the holding company, they would not have violated the Clayton Act. The same would be true if the holding company had transferred assets to itself from the operating units. *Id.*  at 595. Here the holding company had dissolved, disbursed the disputed shares and ceased operations. As a result, the newly merged firm never held the stock against which the FTC's complaint was directed, and the FTC lacked jurisdiction over the acquisition. *Id.*  at 598.

27  *Standard Oil Co. v. Federal Trade Comm'n* , 282 F. 81, 87 (3d Cir. 1922) (adopting Sherman Act reasonableness test), *aff'd* , 261 U.S. 463 (1923). *See also International Shoe Co. v. Federal Trade Comm'n* , 280 U.S. 291, 298 (1930) (approving *Standard Oil*  holding and requiring effect of "unduly restricting competition or unduly obstructing the due course of trade. ").

© 2023 CCH Incorporated and its affiliates and licensors. All rights reserved.



28  The statute was subsequently amended to change the word "corporation, " to "person, " thus reaching both incorporated and unincorporated entities.

29  A 1980 amendment added the words "or in any activity affecting commerce. " Pub. L. No. 96-349 (Sept. 12, 1980).

30  *Brown Shoe Co. v. United States* , 370 U.S. 294 (1962). That the Court would take a more severe approach under new §7 was presaged in *United States v. E.I. DuPont de Nemours & Co.*  (General Motors), 353 U.S. 586 (1957), where the Court held original §7 applicable to vertical acquisitions and, borrowing from its earlier §3 decision in *Standard Oil Co. of California (Standard Stations) v. United States* , 337 U.S. 293 (1949), held unlawful the acquisition of GM stock by DuPont on the ground that it foreclosed to DuPont's competitors a substantial share of the relevant paint and fabric markets.

31  *United States v. Philadelphia Nat'l Bank* , 374 U.S. 321 (1963). See the excellent symposium on this decision: Philadelphia National Bank *at 50,*  80 Antitrust L.J. 189–430 (2015).

32  On the "failing company " defense, see [Subchapter 9D-1](#)

33  *United States v. Von's Grocery Co.* , 384 U.S. 270 (1966).

34  *United States v. Pabst Brewing Co.* , 384 U.S. 546 (1966) (merger presumptively unlawful not only in Wisconsin and a three-state market, but in the national market as well).

35  A "concentrated " market was defined as one in which the aggregate shares of the four largest firms were 75 percent or more. These Guidelines, which are no longer in use, are reproduced in 4 Trade Reg. Rep. ¶13,101.

36  *United States v. General Dynamics Corp.* , 415 U.S. 486 (1974).

| 93D CONGRESS<br>*1st Session* } | SENATE | { REPORT<br>No. 93–151 |
|---|---|---|

# MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT

---

## REPORT

OF THE

### SENATE COMMITTEE ON COMMERCE

ON

## S. 356

TO PROVIDE DISCLOSURE STANDARDS FOR WRITTEN CONSUMER PRODUCT WARRANTIES AGAINST DEFECT OR MALFUNCTION; TO DEFINE FEDERAL CONTENT STANDARDS FOR SUCH WARRANTIES; TO AMEND THE FEDERAL TRADE COMMISSION ACT IN ORDER TO IMPROVE ITS CONSUMER PROTECTION ACTIVITIES; AND FOR OTHER PURPOSES.



MAY 14, 1973.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE
83-010
WASHINGTON : 1973

It is anticipated that a final cease-and-desist order will be given the same effect in a subsequent action for redress under section 203 that a government obtained antitrust decree is given in a subsequent private treble damage action. In that situation, the government obtained decree (including an FTC order) is given only prima facie effect and is thus at least rebuttable. It is not the intent of the Committee to encourage respondents to resist the finalization of cease-and-desist orders because of fear of the effects of an FTC order in a possible consumer redress action under section 203. This effect would be both unfortunate for the Federal Trade Commission, resulting in further delays in FTC proceedings, and unfair to the respondents, who would have to conduct themselves before the FTC with too strong an eye on the possible effect of the FTC cease and desist order in a subsequent consumer redress action under section 203. Thus, it is anticipated that a final cease-and-desist order would be given prima facie effect in a subsequent action under section 203, as is already the case under section 5(a) of the Clayton Act (see 15 U.S.C. 16(a)).

Finally, section 203 makes clear that the court has the power to consolidate an action under section 203 with any other action requesting the same or substantially the same relief upon motion of any party.

*Penalty for Violation of Cease and Desist Order (section 204)*

This section increases the potential penalty for violation of an order of the Commission from $5,000 to $10,000. The FTC may seek such penalty through its own attorneys rather than relying upon the Justice Department. In addition to increasing the penalty, this section authorizes the Commission to seek mandatory injunctions against persons in violation of a Commission order for whom the threat of economic penalty is more apparent than real because they have no available resources with which to pay the penalty.

*Commission Self-Representation (section 205)*

This section insures that the Commission will be able to represent itself in any civil proceeding involving the Federal Trade Commission Act. At the present time, the Commission must, in many situations, rely on the Department of Justice, which has been sluggish in the past in enforcing regulatory agency decisions in Federal courts. Similar authority to litigate to enforce independent agency determinations is already enjoyed by the National Labor Relations Board (see 29 U.S.C. 154(a)).

In addition to the representational authority specifically provided the Commission by sections 202, 203, 204, 207, 208, and 210 in actions to redress consumer grievances, and to enforce Commission orders, penalties, and subpoenas, the Committee intends to permit the Commission to conduct and control all other litigation involving Commission action under the FTC Act, whether the Commission be acting as plaintiff or defendant. Without intending any limitation, the Committee has in mind, for instance, actions seeking injunctions, declaratory judgments or other relief.

*Expansion of Jurisdiction (section 206)*

See discussion in section 201 supra.

*Securing of Documentary Evidence (section 207)*

This section is basically designed to simplify the securing of documentary evidence and testimony. It authorizes the Commission to seek documentary evidence from any "party"; under the present terms of the Federal Trade Commission Act such evidence may be obtained only from "corporations".

As authorized in sections 202 and 205, the Commission may act through its own attorneys to enforce the Federal Trade Commission Act. Section 207 permits the FTC to use its own attorneys "to invoke the aid of a court in requiring the attendance and testimony of witnesses and the production of documentary evidence" and authorizes the Commission to go to court in its own behalf to seek "writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission issued under this Act."

*Reporting Requirements (section 208)*

This section streamlines reporting requirements under the Federal Trade Commission Act. The Commission is authorized to seek a civil penalty against any corporation which fails to file any annual or special report required by the Federal Trade Commission Act. Currently, a more complicated procedure involving the Department of Justice is necessary.

*Expansion of Jurisdiction (section 209)*

See discussion in section 201 supra.

*Injunctions (section 210)*

This section would permit the Commission to obtain either a preliminary or permanent injunction through court procedures initiated by its own attorneys against any act or practice which is unfair or deceptive to a consumer, and thus prohibited by section 5 of the Federal Trade Commission Act. The purpose of section 210 is to permit the Commission to bring an immediate halt to unfair or deceptive acts or practices when to do so would be in the public interest. At the present time such practices might continue for several years until agency action is completed. Victimization of American consumers should not be so shielded.

Section 210 authorizes the granting of a temporary restraining order or a preliminary injunction without bond pending the issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5. The test the Commission would have to meet in order to secure this injunctive relief is similar to the test it must already meet when attempting to secure an injunction against false advertising of food, drugs, devices, or cosmetics. (See 15 USC 53(a).)

Provision is also made in section 210 for the Commission to seek and, after a hearing, for a court to grant a permanent injunction. This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be

assured of a early hearing on the merits. Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date. Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order. Commission resources will be better utilized, and cases can be disposed of more efficiently.

*Enforcement Proceedings (section 211)*

This section permits the Commission to enforce penalties under the Federal Trade Commission Act. It is similar in concept to sections 202 and 205.

*Financial Institutions (section 212)*

This section removes from the Federal Trade Commission Act the presently existing exemption for banks insofar as unfair or deceptive acts or practices affecting commerce are concerned. The intent of the Committee in taking this action is to remove the anticompetitive situation which exists at present because some financial institutions are regulated for consumer protection purposes by the Federal Trade Commission and some are not, even though both types of institutions are offering substantially the same services to consumers. Second, presently existing Federal financial regulatory agencies either do not have the power or the desire to promulgate and enforce strong and uniform rules and regulations prohibiting unfair or deceptive acts or practices in the consumer credit field. The report of the National Commission on Consumer Finance has recommended that a single agency be given the power to promulgate rules and regulations in this area. It makes little sense to have agencies whose primary duty is to insure the solvency and liquidity of the institutions under their jurisdiction promulgating rules and regulations the violation of which may provide for potentially substantial civil penalties. The assumption of an active consumer protection role by such an agency could have a detrimental effect on the very solvency of the institution which the agency is required to protect. Furthermore, just as the Federal Reserve Board is authorized under the Truth In Lending Act to prescribe rules and regulations dealing with credit cost disclosure which apply to all creditors, it makes sense that the Commission should be empowered to issue rules and regulations to prevent unfair or deceptive acts or practices on the part of all business enterprises, including financial institutions.

The Federal Trade Commission would not issue rules or regulations in areas which are already adequately covered by the Federal Reserve Board's regulations under the Truth in Lending Act. If the Commission's legislative rulemaking authority is affirmed, then such rules would apply to financial institutions in the same manner as they would to all business enterprises. (See discussion of rulemaking, infra.)

Section 212 requires that the Commission consult with the various Federal financial regulatory agencies listed therein prior to prescribing rules and regulations. Furthermore, section 212 requires the Commission to delegate the power to enforce these rules and regulations to the



# FORM 10-K

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**

**OR**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 001-38769

# The Cigna Group

(Exact name of registrant as specified in its charter)

| **Delaware** | **82-4991898** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **900 Cottage Grove Road, Bloomfield, Connecticut** | **06002** |
| (Address of principal executive offices) | (Zip Code) |

**(860) 226-6000**

Registrant's telephone number, including area code

| **Securities registered pursuant to Section 12(b) of the Act:** | | |
|---|---|---|
| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
| **Common Stock, Par Value $0.01** | **CI** | **New York Stock Exchange, Inc.** |

| **Securities registered pursuant to Section 12(g) of the Act:** |
|---|
| **NONE** |

|  | Yes | No |
|---|---|---|
| Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. | ☒ | ☐ |
| Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. | ☐ | ☒ |
| Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. | ☒ | ☐ |
| Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). | ☒ | ☐ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☒ | Accelerated filer | ☐ | Non-accelerated filer | ☐ |
|---|---|---|---|---|---|
|  |  | Smaller reporting company | ☐ | Emerging growth company | ☐ |

| | |
|---|---|
| If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. | ☐ |
| Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. | ☒ |
| If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. | ☐ |
| Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). | ☐ |
| Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). | ☐  No ☒ |

The aggregate market value of the voting stock held by non-affiliates of the registrant as of June 30, 2022 was approximately $82.8 billion.

As of January 31, 2023, 297,059,973 shares of the registrant's Common Stock were outstanding.

DOCUMENTS INCORPORATED BY REFERENCE

Part III of this Form 10-K incorporates by reference information from the registrant's definitive proxy statement related to the 2023 annual meeting of shareholders.

**Item 7.** *MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS*

| | PAGE |
|---|---|
| *Executive Overview* | 53 |
| *Liquidity and Capital Resources* | 58 |
| *Critical Accounting Estimates* | 63 |
| *Segment Reporting* | 66 |
| *Evernorth Health Services* | 67 |
| *Cigna Healthcare* | 69 |
| *Other Operations* | 71 |
| *Corporate* | 71 |
| *Investment Assets* | 72 |

*Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A") is intended to provide information to assist you in better understanding and evaluating The Cigna Group's financial condition as of December 31, 2022 compared with December 31, 2021 and our results of operations for 2022 compared with 2021 and 2020 and is intended to help you understand the ongoing trends in our business. For comparisons of our results of operations for 2021 compared with 2020, please refer to the previously filed MD&A included in Part II, Item 7 of our Form 10-K for the year ended December 31, 2021. We encourage you to read this MD&A in conjunction with our Consolidated Financial Statements included in Part II, Item 8 of this Annual Report on Form 10-K ("Form 10-K") and the "Risk Factors" contained in Part I, Item 1A of this Form 10-K.*

*Unless otherwise indicated, financial information in this MD&A is presented in accordance with accounting principles generally accepted in the United States of America ("GAAP"). See Note 2 to the Consolidated Financial Statements in this Form 10-K for additional information regarding the Company's significant accounting policies. In some of our financial tables in this MD&A, we present either percentage changes or "N/M" when those changes are so large as to become not meaningful. Changes in percentages are expressed in basis points ("bps").*

*In this MD&A, our consolidated measures "adjusted income from operations," earnings per share on that same basis and "adjusted revenues" are not determined in accordance with GAAP and should not be viewed as substitutes for the most directly comparable GAAP measures of "shareholders' net income," "earnings per share" and "total revenues." We also use pre-tax adjusted income (loss) from operations and adjusted revenues to measure the results of our segments.*

*The Company uses "pre-tax adjusted income (loss) from operations" and "adjusted revenues" as its principal financial measures of segment operating performance because management believes these metrics best reflect the underlying results of business operations and permit analysis of trends in underlying revenue, expenses and profitability. We define adjusted income from operations as shareholders' net income (or income before income taxes less pre-tax income (loss) attributable to noncontrolling interests for the segment metric) excluding net realized investment results, amortization of acquired intangible assets, and special items. The Cigna Group's share of certain realized investment results of its joint ventures reported in the Cigna Healthcare segment using the equity method of accounting are also excluded. Special items are matters that management believes are not representative of the underlying results of operations due to their nature or size. Adjusted income (loss) from operations is measured on an after-tax basis for consolidated results and on a pre-tax basis for segment results. Consolidated adjusted income (loss) from operations is not determined in accordance with GAAP and should not be viewed as a substitute for the most directly comparable GAAP measure, shareholders' net income. See the below Financial Highlights section for a reconciliation of consolidated adjusted income from operations to shareholders' net income.*

*The Company defines adjusted revenues as total revenues excluding the following adjustments: special items and The Cigna Group's share of certain realized investment results of its joint ventures reported in the Cigna Healthcare segment using the equity method of accounting. Special items are matters that management believes are not representative of the underlying results of operations due to their nature or size. We exclude these items from this measure because management believes they are not indicative of past or future underlying performance of the business. Adjusted revenues is not determined in accordance with GAAP and should not be viewed as a substitute for the most directly comparable GAAP measure, total revenues. See the below Financial Highlights section for a reconciliation of consolidated adjusted revenues to total revenues.*

## EXECUTIVE OVERVIEW

The Cigna Group, together with its subsidiaries, is a global health company. On February 13, 2023, we changed our corporate name from Cigna Corporation to The Cigna Group. We will not distinguish between our prior and current corporate name and will refer to our current corporate name throughout this Annual Report on Form 10-K. As such, unless expressly indicated or the context requires otherwise, the terms "Company," "we," "us," and "our" in this document refer to The Cigna Group, a Delaware corporation, and, where appropriate, its subsidiaries. On February 13, 2023, we also changed the name of our Evernorth segment to Evernorth Health Services. We will not distinguish between our prior and current segment name and will refer to our current segment name throughout this Annual Report on Form 10-K. Our common stock continues to be listed with, and trades on, the New York Stock Exchange under the ticker symbol "CI". The Cigna Group has a mission of helping those we serve improve their health and vitality. Our subsidiaries offer a differentiated set of pharmacy, medical, behavioral, dental and related products and services. For further information on our business and strategy, see Item 1, "Business" in this Form 10-K.

### Financial Highlights

See Note 1 to the Consolidated Financial Statements for a description of our segments.

Summarized below are certain key measures of our performance by segment:

**Financial highlights by segment**

| (Dollars in millions, except per share amounts) | | For the Years Ended December 31, | | | Increase (Decrease) | Increase (Decrease) |
|---|---|---|---|---|---|---|
| | | 2022 | 2021 | 2020 | 2022 vs. 2021 | 2021 vs. 2020 |
| **Revenues** | | | | | | |
| **Adjusted revenues by segment** | | | | | | |
| Evernorth Health Services | $ | **140,335** | $ 131,912 | $ 116,130 | 6 % | 14 % |
| Cigna Healthcare | | **45,036** | 44,652 | 41,135 | 1 | 9 |
| Other Operations | | **2,262** | 3,989 | 8,446 | (43) | (53) |
| Corporate, net of eliminations | | **(6,991)** | (6,475) | (5,644) | (8) | (15) |
| Adjusted revenues | | **180,642** | 174,078 | 160,067 | 4 | 9 |
| Net realized investment results from certain equity method investments | | **(126)** | — | 130 | N/M | N/M |
| Special item related to contractual adjustment for a former client | | **—** | — | 204 | N/M | N/M |
| Total revenues | $ | **180,516** | $ 174,078 | $ 160,401 | 4 % | 9 % |
| **Shareholders' net income** | $ | **6,668** | $ 5,365 | $ 8,458 | 24 % | (37) % |
| **Adjusted income from operations** | $ | **7,284** | $ 6,980 | $ 6,795 | 4 % | 3 % |
| **Earnings per share (diluted)** | | | | | | |
| Shareholders' net income | $ | **21.30** | $ 15.73 | $ 22.96 | 35 % | (31) % |
| Adjusted income from operations | $ | **23.27** | $ 20.47 | $ 18.45 | 14 % | 11 % |
| **Pre-tax adjusted income (loss) from operations by segment** | | | | | | |
| Evernorth Health Services | $ | **6,127** | $ 5,818 | $ 5,363 | 5 % | 8 % |
| Cigna Healthcare | | **4,072** | 3,609 | 4,031 | 13 | (10) |
| Other Operations | | **500** | 889 | 966 | (44) | (8) |
| Corporate, net of eliminations | | **(1,466)** | (1,339) | (1,552) | (9) | 14 |
| Consolidated pre-tax adjusted income from operations | | **9,233** | 8,977 | 8,808 | 3 | 2 |
| Income attributable to noncontrolling interests | | **84** | 58 | 37 | 45 | 57 |
| Net realized investment (losses) gains [1] | | **(621)** | 196 | 279 | N/M | (30) |
| Amortization of acquired intangible assets | | **(1,876)** | (1,998) | (1,982) | 6 | (1) |
| Special items | | **1,533** | (451) | 3,726 | N/M | N/M |
| **Income before income taxes** | $ | **8,353** | $ 6,782 | $ 10,868 | 23 % | (38) % |

[1] Includes the Company's share of certain realized investment results of its joint ventures reported in the Cigna Healthcare segment using the equity method of accounting.

For further analysis and explanation of each segment's results, see the "Segment Reporting" section of this MD&A.

USAP153

**Consolidated Results of Operations (GAAP basis)**

| (Dollars in millions) | For the Years Ended December 31, | | | Increase (Decrease) 2022 vs. 2021 | | Increase (Decrease) 2021 vs. 2020 | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2021 | 2020 | | | | |
| Pharmacy revenues | $ 128,566 | $ 121,413 | $ 107,769 | $ 7,153 | 6 % | $ 13,644 | 13 % |
| Premiums | 39,915 | 41,154 | 42,627 | (1,239) | (3) | (1,473) | (3) |
| Fees and other revenues | 10,880 | 9,962 | 8,761 | 918 | 9 | 1,201 | 14 |
| Net investment income | 1,155 | 1,549 | 1,244 | (394) | (25) | 305 | 25 |
| Total revenues | 180,516 | 174,078 | 160,401 | 6,438 | 4 | 13,677 | 9 |
| Pharmacy and other service costs | 124,834 | 117,553 | 103,484 | 7,281 | 6 | 14,069 | 14 |
| Medical costs and other benefit expenses | 32,206 | 33,562 | 32,710 | (1,356) | (4) | 852 | 3 |
| Selling, general and administrative expenses | 13,186 | 13,030 | 14,072 | 156 | 1 | (1,042) | (7) |
| Amortization of acquired intangible assets | 1,876 | 1,998 | 1,982 | (122) | (6) | 16 | 1 |
| Total benefits and expenses | 172,102 | 166,143 | 152,248 | 5,959 | 4 | 13,895 | 9 |
| Income from operations | 8,414 | 7,935 | 8,153 | 479 | 6 | (218) | (3) |
| Interest expense and other | (1,228) | (1,208) | (1,438) | (20) | (2) | 230 | 16 |
| Debt extinguishment costs | — | (141) | (199) | 141 | N/M | 58 | 29 |
| Gain on sale of businesses | 1,662 | — | 4,203 | 1,662 | N/M | (4,203) | N/M |
| Net realized investment (losses) gains | (495) | 196 | 149 | (691) | N/M | 47 | 32 |
| Income before income taxes | 8,353 | 6,782 | 10,868 | 1,571 | 23 | (4,086) | (38) |
| Total income taxes | 1,607 | 1,367 | 2,379 | 240 | 18 | (1,012) | (43) |
| Net income | 6,746 | 5,415 | 8,489 | 1,331 | 25 | (3,074) | (36) |
| Less: Net income attributable to noncontrolling interests | 78 | 50 | 31 | 28 | 56 | 19 | 61 |
| Shareholders' net income | $ 6,668 | $ 5,365 | $ 8,458 | $ 1,303 | 24 % | $ (3,093) | (37) % |
| Consolidated effective tax rate | 19.2 % | 20.2 % | 21.9 % | (100) bps | | (170) bps | |
| Medical customers (in thousands) | 18,004 | 17,081 | 16,650 | 923 | 5 % | 431 | 3 % |

**Reconciliation of Shareholders' Net Income (GAAP) to Adjusted Income from Operations**

| (Dollars in millions) | For the Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2022 | | 2021 | | 2020 | |
| | Pre-tax | After-tax | Pre-tax | After-tax | Pre-tax | After-tax |
| Shareholders' net income | | $ 6,668 | | $ 5,365 | | $ 8,458 |
| Adjustments to reconcile to adjusted income from operations | | | | | | |
| Net realized investment losses (gains) [1] | $ 621 | 503 | $ (196) | (158) | $ (279) | (244) |
| Amortization of acquired intangible assets | 1,876 | 1,345 | 1,998 | 1,494 | 1,982 | 1,431 |
| Special items | | | | | | |
| Integration and transaction-related costs | 135 | 103 | 169 | 71 | 527 | 404 |
| Charge for organizational efficiency plan | 22 | 17 | 168 | 119 | 31 | 24 |
| (Benefits) charges associated with litigation matters | (28) | (20) | (27) | (21) | 25 | 19 |
| (Gain) on sale of businesses | (1,662) | (1,332) | — | — | (4,203) | (3,217) |
| Debt extinguishment costs | — | — | 141 | 110 | 199 | 151 |
| Risk corridors recovery | — | — | — | — | (101) | (76) |
| Contractual adjustment for a former client | — | — | — | — | (204) | (155) |
| Total special items | $ (1,533) | (1,232) | $ 451 | 279 | $ (3,726) | (2,850) |
| Adjusted income from operations | | $ 7,284 | | $ 6,980 | | $ 6,795 |

[1] Includes the Company's share of certain realized investment results of its joint ventures reported in the Cigna Healthcare segment using the equity method of accounting.

54

## SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Date: February 23, 2023

**THE CIGNA GROUP**

By:    /s/ Brian C. Evanko
Brian C. Evanko
Executive Vice President and
Chief Financial Officer
(Principal Financial Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities indicated as of February 23, 2023.

| Signature | Title |
| --- | --- |
| /s/ David M. Cordani | |
| David M. Cordani | Chairman and Chief Executive Officer |
| | (Principal Executive Officer) |
| /s/ Brian C. Evanko | |
| Brian C. Evanko | Executive Vice President and Chief Financial Officer |
| | (Principal Financial Officer) |
| /s/ Mary T. Agoglia Hoeltzel | |
| Mary T. Agoglia Hoeltzel | Senior Vice President, Tax and Chief Accounting Officer |
| | (Principal Accounting Officer) |
| /s/ William J. DeLaney | |
| William J. DeLaney | Director |
| /s/ Eric J. Foss | |
| Eric J. Foss | Director |
| /s/ Elder Granger, M.D. | |
| Elder Granger, M.D. | Director |
| /s/ Neesha Hathi | |
| Neesha Hathi | Director |

USAP155

| | |
|---|---|
| /s/ George Kurian | |
| George Kurian | Director |
| | |
| /s/ Kathleen M. Mazzarella | |
| Kathleen M. Mazzarella | Director |
| | |
| /s/ Mark B. McClellan, M.D. | |
| Mark B. McClellan, M.D. | Director |
| | |
| /s/ Kimberly A. Ross | |
| Kimberly A. Ross | Director |
| | |
| /s/ Eric C. Wiseman | |
| Eric C. Wiseman | Lead Independent Director |
| | |
| /s/ Donna F. Zarcone | |
| Donna F. Zarcone | Director |

151

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE FISCAL YEAR ENDED December 31, 2022**

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**FOR THE TRANSITION PERIOD FROM _____ TO _____**

**Commission file number: 1-10864**

# UNITEDHEALTH GROUP

### UnitedHealth Group Incorporated
#### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **41-1321939** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **UnitedHealth Group Center** | |
| **9900 Bren Road East** | **55343** |
| **Minnetonka, Minnesota** | **(Zip Code)** |
| (Address of principal executive offices) | |

**(952) 936-1300**
(Registrant's telephone number, including area code)

### Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, $.01 par value | UNH | New York Stock Exchange |

### Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | |
|---|---|---|
| Large accelerated filer ☒ | Accelerated filer ☐ | Non-accelerated filer ☐ |
| Smaller reporting company ☐ | Emerging growth company ☐ | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☒

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).   Yes ☐   No ☒

The aggregate market value of voting stock held by non-affiliates of the registrant as of June 30, 2022 was $479,550,880,245 (based on the last reported sale price of $513.63 per share on June 30, 2022 as reported on the New York Stock Exchange), excluding only shares of voting stock held beneficially by directors, executive officers and subsidiaries of the registrant.

As of January 31, 2023, there were 932,846,602 shares of the registrant's Common Stock, $.01 par value per share, issued and outstanding.

### DOCUMENTS INCORPORATED BY REFERENCE

The information required by Part III of this report, to the extent not set forth herein, is incorporated by reference from the registrant's definitive proxy statement relating to its 2023 Annual Meeting of Shareholders. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

USAP157

The commercial risk market remains highly competitive in the small group, large group and individual segments. We expect broad-based competition to continue as the industry adapts to individual and employer needs.

Medicare Advantage funding continues to be pressured, as discussed below in "Regulatory Trends and Uncertainties."

In Medicaid, we believe the payment rate environment creates the risk of continued downward pressure on Medicaid margin percentages. We continue to take a prudent, market-sustainable posture for both new business and maintenance of existing relationships. We continue to advocate for actuarially sound rates commensurate with our medical cost trends and we remain dedicated to partnering with those states that are committed to the long-term viability of their programs.

**Medical Cost Trends.** Our medical cost trends primarily relate to changes in unit costs; care activity; and prescription drug costs. We endeavor to mitigate those increases by engaging physicians and consumers with information and helping them make clinically sound choices, with the objective of helping them achieve high-quality, affordable care.

**Medicaid Redeterminations.** In December 2022, Congress passed the 2023 Omnibus Appropriations bill that allows states to resume Medicaid redeterminations beginning in April 2023. Redeterminations will result in a decline in people served through our Medicaid business and an expected increase in people served through our commercial and exchange-based offerings as we endeavor to ensure that people have continued access to benefits.

**Delivery System and Payment Modernization.** The health care market continues to change based on demographic shifts, new regulations, political forces and both payer and patient expectations. Health plans and care providers are being called upon to work together to close gaps in care and improve overall care quality and patient experience, improve the health of populations and reduce costs. We are working to accelerate this vision through the innovation and integration of our care delivery models including in clinic, in-home, behavioral and virtual care, and by using our data and analytics to provide clinicians with the necessary information in order to provide the best possible care in the most cost efficient setting. We continue to see a greater number of people enrolled in fully accountable value-based plans rewarding high-quality, affordable care and fostering collaboration.

This trend is creating needs for health management services which can coordinate care around the primary care physician, including new primary care channels, and for investments in new clinical and administrative information and management systems, which we believe provide growth opportunities for our Optum business platform.

## Regulatory Trends and Uncertainties

Following is a summary of management's view of the trends and uncertainties related to regulatory matters. For additional information regarding regulatory trends and uncertainties, see Part I, Item 1 "Business — Government Regulation" and Item 1A, "Risk Factors."

**Medicare Advantage Rates.** Medicare Advantage rate notices over the years have at times resulted in industry base rates well below industry forward medical trend. For example, the February 2023 Advance Notice for 2024 rates would result in an industry base rate decrease, well short of what is an increasing industry forward medical cost trend, creating continued pressure in the Medicare Advantage program. Further, proposed substantial revisions to the risk adjustment model, which serves to adjust rates to reflect a patient's health status and care resource needs, would result in reduced funding and benefits for people, especially those with some of the greatest health and social challenges.

As a result of ongoing Medicare funding pressures, there are adjustments we can make to partially offset these rate pressures and reductions for a particular period. For example, we can seek to intensify our medical and operating cost management, make changes to the size and composition of our care provider networks, adjust member benefits and implement or increase the member premiums supplementing the monthly payments we receive from the government. Additionally, we decide annually on a county-by-county basis where we will offer Medicare Advantage plans.

USAP158

*SELECTED OPERATING PERFORMANCE ITEMS*

The following represents a summary of select 2022 year-over-year operating comparisons to 2021.

- Consolidated revenues increased by 13%, UnitedHealthcare revenues increased 12% and Optum revenues grew 17%.

- UnitedHealthcare served nearly 1.1 million more people, led by growth in community-based and senior offerings.

- Earnings from operations increased by 19%, including an increase of 20% at UnitedHealthcare and 17% at Optum.

- Diluted earnings per common share increased 17% to $21.18.

- Cash flows from operations were $26.2 billion.

- Return on equity was 27.2%.

*RESULTS SUMMARY*

The following table summarizes our consolidated results of operations and other financial information:

| (in millions, except percentages and per share data) | For the Years Ended December 31, | | | Change | |
| | 2022 | 2021 | 2020 | 2022 vs. 2021 | |
| --- | --- | --- | --- | --- | --- |
| Revenues: | | | | | |
| Premiums | $ 257,157 | $ 226,233 | $ 201,478 | $ 30,924 | 14% |
| Products | 37,424 | 34,437 | 34,145 | 2,987 | 9 |
| Services | 27,551 | 24,603 | 20,016 | 2,948 | 12 |
| Investment and other income | 2,030 | 2,324 | 1,502 | (294) | (13) |
| Total revenues | 324,162 | 287,597 | 257,141 | 36,565 | 13 |
| Operating costs: | | | | | |
| Medical costs | 210,842 | 186,911 | 159,396 | 23,931 | 13 |
| Operating costs | 47,782 | 42,579 | 41,704 | 5,203 | 12 |
| Cost of products sold | 33,703 | 31,034 | 30,745 | 2,669 | 9 |
| Depreciation and amortization | 3,400 | 3,103 | 2,891 | 297 | 10 |
| Total operating costs | 295,727 | 263,627 | 234,736 | 32,100 | 12 |
| Earnings from operations | 28,435 | 23,970 | 22,405 | 4,465 | 19 |
| Interest expense | (2,092) | (1,660) | (1,663) | (432) | 26 |
| Earnings before income taxes | 26,343 | 22,310 | 20,742 | 4,033 | 18 |
| Provision for income taxes | (5,704) | (4,578) | (4,973) | (1,126) | 25 |
| Net earnings | 20,639 | 17,732 | 15,769 | 2,907 | 16 |
| Earnings attributable to noncontrolling interests | (519) | (447) | (366) | (72) | 16 |
| Net earnings attributable to UnitedHealth Group common shareholders | $ 20,120 | $ 17,285 | $ 15,403 | $ 2,835 | 16% |
| Diluted earnings per share attributable to UnitedHealth Group common shareholders | $ 21.18 | $ 18.08 | $ 16.03 | $ 3.10 | 17% |
| Medical care ratio (a) | 82.0% | 82.6% | 79.1% | (0.6)% | |
| Operating cost ratio | 14.7 | 14.8 | 16.2 | (0.1) | |
| Operating margin | 8.8 | 8.3 | 8.7 | 0.5 | |
| Tax rate | 21.7 | 20.5 | 24.0 | 1.2 | |
| Net earnings margin (b) | 6.2 | 6.0 | 6.0 | 0.2 | |
| Return on equity (c) | 27.2% | 25.2% | 24.9% | 2.0% | |

(a) Medical care ratio (MCR) is calculated as medical costs divided by premium revenue.

(b) Net earnings margin attributable to UnitedHealth Group common shareholders.

(c) Return on equity is calculated as net earnings attributable to UnitedHealth Group common shareholders divided by average shareholders' equity. Average shareholders' equity is calculated using the shareholders' equity balance at the end of the preceding year and the shareholders' equity balances at the end of each of the four quarters of the year presented.

USAP159

*2022 RESULTS OF OPERATIONS COMPARED TO 2021 RESULTS*

**Consolidated Financial Results**

*Revenues*

The increases in revenues were primarily driven by growth in the number of people served through Medicare Advantage and Medicaid, pricing trends and growth across the Optum businesses.

*Medical Costs and MCR*

Medical costs increased due to growth in people served. The MCR decreased due to COVID-19 effects, partially offset by decreased prior years favorable development and business mix.

*Operating Cost Ratio*

The operating cost ratio decreased primarily due to productivity gains, partially offset by investments and business mix.

**Reportable Segments**

See Note 14 of Notes to the Consolidated Financial Statements included in Part II, Item 8, "Financial Statements and Supplementary Data" for more information on our segments. We utilize various metrics to evaluate and manage our reportable segments, including individuals served by UnitedHealthcare by major market segment and funding arrangement, people served by Optum Health and adjusted scripts for Optum Rx. These metrics are the main drivers of revenue, earnings and cash flows at each business. The metrics also allow management and investors to evaluate and understand business mix, including the level and scope of services provided to people and pricing trends when comparing the metrics to revenue by segment.

The following table presents a summary of the reportable segment financial information:

| (in millions, except percentages) | For the Years Ended December 31, | | | Change | |
| --- | --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2020 | 2022 vs. 2021 | |
| **Revenues** | | | | | |
| UnitedHealthcare | $ 249,741 | $ 222,899 | $ 200,875 | $ 26,842 | 12% |
| Optum Health | 71,174 | 54,065 | 39,808 | 17,109 | 32 |
| Optum Insight | 14,581 | 12,199 | 10,802 | 2,382 | 20 |
| Optum Rx | 99,773 | 91,314 | 87,498 | 8,459 | 9 |
| Optum eliminations | (2,760) | (2,013) | (1,800) | (747) | 37 |
| Optum | 182,768 | 155,565 | 136,308 | 27,203 | 17 |
| Eliminations | (108,347) | (90,867) | (80,042) | (17,480) | 19 |
| Consolidated revenues | $ 324,162 | $ 287,597 | $ 257,141 | $ 36,565 | 13% |
| **Earnings from operations** | | | | | |
| UnitedHealthcare | $ 14,379 | $ 11,975 | $ 12,359 | $ 2,404 | 20% |
| Optum Health | 6,032 | 4,462 | 3,434 | 1,570 | 35 |
| Optum Insight | 3,588 | 3,398 | 2,725 | 190 | 6 |
| Optum Rx | 4,436 | 4,135 | 3,887 | 301 | 7 |
| Optum | 14,056 | 11,995 | 10,046 | 2,061 | 17 |
| Consolidated earnings from operations | $ 28,435 | $ 23,970 | $ 22,405 | $ 4,465 | 19% |
| **Operating margin** | | | | | |
| UnitedHealthcare | 5.8% | 5.4% | 6.2% | 0.4% | |
| Optum Health | 8.5 | 8.3 | 8.6 | 0.2 | |
| Optum Insight | 24.6 | 27.9 | 25.2 | (3.3) | |
| Optum Rx | 4.4 | 4.5 | 4.4 | (0.1) | |
| Optum | 7.7 | 7.7 | 7.4 | — | |
| Consolidated operating margin | 8.8% | 8.3% | 8.7% | 0.5% | |

USAP160

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Dated: February 24, 2023

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

UNITEDHEALTH GROUP INCORPORATED

By: _____/s/ ANDREW WITTY_____
**Andrew Witty**
**Chief Executive Officer**

| Signature | Title | Date |
|---|---|---|
| /s/ ANDREW WITTY<br>**Andrew Witty** | Director and Chief Executive Officer<br>(principal executive officer) | February 24, 2023 |
| /s/ JOHN REX<br>**John Rex** | Executive Vice President and<br>Chief Financial Officer<br>(principal financial officer) | February 24, 2023 |
| /s/ THOMAS ROOS<br>**Thomas Roos** | Senior Vice President and<br>Chief Accounting Officer<br>(principal accounting officer) | February 24, 2023 |
| *<br>**Timothy Flynn** | Director | February 24, 2023 |
| *<br>**Paul Garcia** | Director | February 24, 2023 |
| *<br>**Kristen Gil** | Director | February 24, 2023 |
| *<br>**Stephen Hemsley** | Director | February 24, 2023 |
| *<br>**Michele Hooper** | Director | February 24, 2023 |
| *<br>**F. William McNabb III** | Director | February 24, 2023 |
| *<br>**Valerie Montgomery Rice, M.D.** | Director | February 24, 2023 |
| *<br>**John Noseworthy, M.D.** | Director | February 24, 2023 |
| *By   /s/ KUAI LEONG<br>**Kuai Leong**<br>**As Attorney-in-Fact** | | |

86

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2023, I filed the foregoing document with the Court and served it on opposing counsel through the Court's CM/ECF system. All counsel of record are registered ECF users.

Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen