**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | **REDACTED PUBLIC VERSION** |
| v. | Case No.: 4:23-CV-03560-KH |
| U.S. ANESTHESIA PARTNERS, INC. et al. | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**DEFENDANT U.S. ANESTHESIA PARTNERS, INC.'S
<u>MOTION TO DISMISS THE FTC'S COMPLAINT</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 5

    A.    Anesthesia Providers Work Both In And Out of Hospitals And Negotiate Rates Directly With Insurance Companies ............................................................ 5

    B.    USAP Inherited Reimbursement Rates That Had Been Negotiated Between Commercial Insurers And GHA ............................................................. 8

    C.    USAP Expanded Its Provision Of High-Quality Anesthesia Services Within And Outside Of Houston ............................................................................ 9

    D.    USAP Inherited And Executed Ancillary Agreements In Connection With Certain Acquisitions ............................................................................................ 10

LEGAL STANDARD ....................................................................................................... 11

ARGUMENT ................................................................................................................... 11

I.    THE FTC LACKS AUTHORITY TO SEEK INJUNCTIVE RELIEF UNTETHERED FROM AN ADMINISTRATIVE PROCEEDING AND FOR LONG-PAST CONDUCT ............................................................................................ 11

    A.    Section 13(b) Bars The FTC From Seeking Injunctive Relief Independent Of Administrative Proceedings ............................................................................ 12

          1.    The Statute Does Not Permit An Independent Federal Court Action ....... 12

          2.    Traditional Tools Of Statutory Interpretation Confirm That Section 13(b) Requires Administrative Proceedings For Injunctive Relief ............................................................................................................. 14

    B.    The FTC Lacks Statutory Authority To Challenge USAP's Past Acquisitions Or Agreements ............................................................................ 18

          1.    Congress Authorized The FTC To Sue In Federal Court Only To Halt Imminent Or Ongoing Violations Of Law ........................................ 18

          2.    USAP's Acquisitions And Contractual Arrangements Are Past Conduct Not Cognizable Under Section 13(b) ........................................ 19

II.    THE COMPLAINT FAILS TO ALLEGE PLAUSIBLE ANTITRUST CLAIMS .......... 22

    A.    The FTC Fails To Plausibly Allege A Relevant Market ...................................... 22

B. The FTC Fails To Plausibly Allege Monopoly Power .......................................... 26

C. The FTC Fails To Plausibly Allege Exclusionary Conduct................................... 28

D. The FTC Fails To Plausibly Allege A Violation Of The Clayton Act ................. 31

E. The FTC Fails To Plausibly Allege A Price-Fixing Agreement.......................... 32

F. The FTC Fails To Plead A Valid Conspiracy Claim ............................................. 35

CONCLUSION.................................................................................................................... 35

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*1-800 Contacts, Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021)............................................. 35

*Abbott v. United States*, 562 U.S. 8 (2010)................................................................. 14

*Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*,
776 F.3d 321 (5th Cir. 2015) ................................................ 26, 27, 28, 31

*AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341 (2021).......................... 2, 12, 13, 14,
15, 17, 18

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620 (5th Cir. 2002) ............................ 22, 23

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................... 5

*Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585 (5th Cir. 2020)................................... 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................ 11, 20, 27, 28
31, 32, 34, 35

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022).......... 32, 35

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023), *cert. granted*,
2023 WL 7266996 (Nov. 3, 2023)........................................................ 15-16

*Collins v. Midland Mortg.*, 2022 WL 16556810 (S.D. Tex. Oct. 31, 2022)................................ 11

*Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*,
2016 WL 3457177 (C.D. Cal. May 11, 2016) ......................................... 20

*Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039 (8th Cir. 2000)................................... 20

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984).................................... 4, 35

*David B. Turner Builders LLC v. Weyerhaeuser Co.*,
603 F. Supp. 3d 459 (S.D. Miss. 2022)................................................... 31

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480 (5th Cir. 1984), *aff'd*,
2023 WL 2401587 (5th Cir. Mar. 8, 2023)............................................. 31

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482
(S.D.N.Y. Sept. 30, 2002)....................................................................... 29

*Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451 (1992) .......................................... 26, 28

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016), *aff'd*,
724 F. App'x 556 (9th Cir. 2018) .......................................................................... 29

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) ............................................................. 19

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) .................................... 19

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) .............................................. 19

*FTC v. Shire Viropharma, Inc.*, 917 F.3d 147 (3d Cir. 2019) .................................... 16, 19, 20, 21

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982) .................................... 19

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018) ............................................... 24

*Ironshore Specialty Ins. Co. v. Facility IMS, LLC*,
2023 WL 6850006 (N.D. Tex. Oct. 17, 2023) ........................................................ 21

*It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016) ............................ 2-3, 25-26

*Jarkesy v. SEC*, 34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023) ................. 16

*Katrina Canal Breaches Litig., In re*, 495 F.3d 191 (5th Cir. 2007) ............................ 11

*Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355 (1986) ........................................ 12

*Madison 92nd St. Assocs. v. Courtyard Mgmt. Corp.*, 624 F. App'x 23 (2d Cir. 2015) .............. 24

*Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004) ...................... 20

*MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835 (5th Cir. 2015) ........................................ 32

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan
Cemeteries*, 56 F.4th 1026 (5th Cir. 2023) ............................................................... 25

*NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679 (N.D. Cal. Aug. 13, 2019) ..................... 23

*Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320 (1909) ............................................. 16

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ......................................................... 22

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ............................ 23

*Rambus, Inc. v. FTC*, 522 F.3d 456 (D.C. Cir. 2008) ......................................................... 3, 26, 30

*Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981 (N.D. Cal. 2020) ................. 20

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994) ............................. 31

*Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020) ........................................................... 16

*Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450 (5th Cir. 2021)........................... 22, 25

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999) ................................... 26

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*,
   309 F.3d 836 (5th Cir. 2002) ............................................................................ 35

*Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x 410 (5th Cir. 2007)............................. 26

*Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827 (5th Cir. 2023) .................................................. 18

*United States v. Am. Can Co.*, 230 F. 859 (D. Md. 1916) ............................................................ 30

*United States v. Am. Tobacco Co.*, 221 U.S. 106 (1911)............................................................... 30

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001).................................................. 30

*United States v. Moore*, 71 F.4th 392 (5th Cir. 2023) ................................................................... 15

*United States v. Morrow*, 266 U.S. 531 (1925) ...................................................................... 14, 15

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004)........ 28, 31

*West Virginia v. EPA*, 142 S. Ct. 2587 (2022).............................................................................. 15

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001) ......................................................... 14, 15

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) ................................................. 20

**STATUTES**

Federal Trade Commission Act, 15 U.S.C. §§ 45 *et seq.* ............................................................ 14

   15 U.S.C. § 45(b) ................................................................................................................... 13

   15 U.S.C. § 45(c) ................................................................................................................... 13

   15 U.S.C. § 53(b) ............................................................................................................. *passim*

Trans-Alaska Pipeline Act, Pub. L. No. 93-153, 87 Stat. 576 (1973) .......................................... 16

**RULES**

Fed. R. Evid.:

   201(b)...................................................................................................................................... 7

   201(d)...................................................................................................................................... 7

Fed. R. Civ. P. 12(b)(6).................................................................................................... 11

**OTHER AUTHORITIES**

119 Cong. Rec. 36600 (1973) ....................................................................................... 16

IV Phillip E. Areeda et al., *Antitrust Law* (1998) ........................................................ 29

J. Howard Beales III & Timothy J. Muris, *Striking the Proper Balance:  Redress Under*
   *Section 13(b) of the FTC Act*, 79 Antitrust L.J. 1 (2013) ........................................ 17

Peter C. Ward, *Restitution for Consumers Under the Federal Trade Commission Act:*
   *Good Intentions or Congressional Intentions?*, 41 Am. U. L. Rev. 1139 (1992) ............ 16-17

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*  (2023) ................................ 29

S. Rep. No. 93-151 (1973) ............................................................................................ 17

**INTRODUCTION**

The Federal Trade Commission's lawsuit against U.S. Anesthesia Partners, Inc. threatens the ability of a leading physician-owned anesthesiology practice to continue to provide high quality service to Texas hospitals and other healthcare facilities. Individual hospitals and hospital systems decide who can practice at their facilities, and many hospitals in Houston and Dallas have determined that USAP will provide the best care for their patients—particularly those in underserved communities. By partnering with USAP, hospital systems secure 24/7 coverage for all procedures across multiple sites, whether their patients have commercial or government sponsored insurance (such as Medicare or Medicaid), or no ability to pay. And competition for these hospital partnerships is fierce. But despite this competition, the FTC now objects to local hospitals' decisions about how best to provide quality care to their patients. With this lawsuit, the FTC seeks to skew the market for anesthesiology services, placing its thumb on the scale to support the nation's wealthiest and most powerful commercial insurance companies.

The FTC's misguided litigation effort reflects an ever-expanding sense of its own authority. Its lawsuit not only suffers from the constitutional infirmities raised by Welsh Carson in its motion to dismiss (which USAP hereby joins and incorporates by reference), but also ignores clear limits that Congress imposed when authorizing the FTC to come into federal court. And besides proceeding *ultra vires*, the FTC brings claims that would improperly remake antitrust law in multiple respects. For the reasons explained further below, the complaint is fatally defective and should be dismissed.

***The FTC Lacks Statutory Authority To Maintain This Suit.*** Section 13(b) of the FTC Act, 15- U.S.C. § 53(b), is the sole source of authority the FTC invokes to bring this case. *See* Compl. ¶¶ 18-19. That statute authorizes the FTC to proceed in federal district court *only* when doing so would aid parallel proceedings in the FTC's own administrative court. Congress

enacted Section 13(b) in 1973 to address a specific problem:  Because the FTC's administrative process could take years, the FTC needed a mechanism to halt ongoing or imminent violations of law in the interim.  Section 13(b) provides that mechanism.  But it does *not* provide a substitute for the FTC's administrative process.  Indeed, just two years ago, the Supreme Court held that Congress "could not have . . . inten[ded]" the FTC "to use § 13(b) as a substitute for" its own internal administrative procedure.  *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1349 (2021).  Section 13(b) gives the FTC no power to bring a permanent injunction action in district court where, as here, it has bypassed its own administrative process.  *See infra* Part I.A.

Section 13(b) also focuses narrowly on empowering the FTC to stop ongoing or imminent legal violations.  It does *not* authorize the FTC to sue in federal court to remedy past conduct.  Yet the FTC challenges acquisitions that closed, and contracts that expired, years ago.  The FTC contends that USAP's continued ownership of anesthesiology practices acquired almost a decade ago constitutes an ongoing violation of the antitrust laws, but that is contrary to authority:  Completed acquisitions are not ongoing violations.  Here too, the FTC's attempt to challenge past conduct is at war with the plain text of Section 13(b).  *See infra* Part I.B.

***The FTC Has Not Alleged A Plausible Relevant Market.***  On the merits, the FTC's antitrust claims depend on a market defined to exclude readily substitutable services.  The FTC alleges that there is a unique market for "commercially insured hospital-only anesthesia services," but it fails to support this illogical line drawing with any factual allegations justifying those arbitrary boundaries.  Moreover, the FTC's proposed market clearly excludes reasonably interchangeable substitutes—most obviously, anesthesiology performed in ambulatory surgical centers—and therefore represents an attempt to "gerrymander its way to an antitrust victory

2

without due regard for market realities." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016).  That, too, requires dismissal.  *See infra* Part II.A.

    ***The FTC Has Not Plausibly Alleged That USAP Has Monopoly Power.***  Even crediting the FTC's gerrymandered market definition, its monopolization claims fail because the FTC does not allege that USAP has charged or has the power to charge a supracompetitive price—*i.e.*, monopoly power.  The complaint never alleges that USAP raised rates above the competitive level in any alleged market; indeed, the FTC takes no steps to analyze competitive market pricing at all.  Instead, the FTC's own allegations prove that USAP *cannot* charge rates higher than those set by competitive market negotiation *before USAP even entered the market*.  Were there any doubt, recent legislation subjecting out-of-network anesthesiologists' rates to mandatory arbitration now effectively prevents any provider from charging supracompetitive rates.  The absence of any plausible factual basis for a claim of monopoly power is likewise fatal to the FTC's monopolization theory.  *See infra* Part II.B.

    ***The FTC Has Not Plausibly Alleged Exclusionary Conduct.***  The FTC's Section 2 claims require it to advance plausible allegations of exclusionary conduct.  But the acquisitions on which the FTC relies are not alone sufficient; acquisitions often increase competition and therefore support no presumption of anticompetitive harm.  Moreover, exclusionary conduct "must harm the competitive process and thereby harm consumers." *Rambus, Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008).  But because USAP's rates were set by its predecessor without monopoly power, the FTC has failed to allege any price increase above the competitive level, and the FTC makes no other claim of consumer harm.  *See infra* Part II.C.

    ***The FTC Has Not Alleged A Plausible Violation of the Clayton Act.***  The FTC's claims under Section 7 of the Clayton Act require it to allege a probability of anticompetitive results

flowing from the challenged acquisitions.  Not only was there no such probability, but here, the acquisitions are long since past, and the FTC points to no anticompetitive results that have actually materialized.  *See infra* Part II.D.

**The FTC Has Not Alleged A Plausible Agreement To Fix Prices.**  The FTC also seeks to attack USAP's practice of handling administrative-billing and payor-relations functions on behalf of three small anesthesiology practices by contorting these separate administrative services agreements into a Section 1 "price-fixing" claim.  That claim fails for the simple reason that the complaint does not allege an agreement among competitors to fix prices.  Rather, the complaint alleges that USAP's administrative services clients assigned it their right to payment from insurers in exchange for compensation at rates other than USAP's.  Even as alleged, that bargain bears no resemblance to price fixing, and those claims should be dismissed.  *See infra* Part II.E.

**No Other Claim Survives.**  The FTC's remaining claims fail as well.  The FTC's conspiracy claims require dismissal because, for the reasons Welsh Carson explains in its motion, USAP and Welsh Carson are legally incapable of conspiring under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770-71 (1984).  And because the FTC's "unfair method of competition" claims under Section 5 of the FTC Act merely duplicate its theories under the Sherman and Clayton Acts, those claims cannot survive either.  *See infra* Part II.F.

For all these reasons, the complaint should be dismissed in its entirety.

# BACKGROUND[1]

USAP is a physician-owned organization that provides anesthesia and pain management services to patients throughout Texas.  *See* Compl. ¶¶ 21, 302.  USAP did not exist until 2012, when it acquired a preexisting, standalone practice called Greater Houston Anesthesiology, or GHA.  *See id.* ¶¶ 21, 95.  For the last 11 years, USAP providers have cared for patients across Texas in both inpatient and outpatient facilities, no matter the patients' insurance status or ability to pay.  *See id.* ¶¶ 3, 57.  Besides caring for patients, USAP also provides certain administrative services.  *See id.* ¶ 176.  The FTC does not question or challenge the quality of the services USAP provides to patients, hospitals, or other anesthesiology practices.

## A.   Anesthesia Providers Work Both In And Out of Hospitals And Negotiate Rates Directly With Insurance Companies

"Anesthesia is a type of medical treatment that prevents patients from feeling pain during procedures such as surgery or dental work."  Compl. ¶ 41.  Physician anesthesiologists and certified registered nurse anesthetists, or CRNAs, are qualified to practice anesthesiology.  *See id.* ¶¶ 43-44.  These providers can render anesthesia services "in several healthcare facility settings" throughout Texas, "including hospitals, outpatient surgery centers, ambulatory surgical centers, and doctors' offices."  *Id.* ¶¶ 45, 47.  Inpatient anesthesia services "may be performed by the same providers" who work in outpatient settings, and the same services are provided without regard to the payor.  *Id.* ¶ 222.  Yet the FTC's claims are limited to (a) "hospital-only anesthesia services sold to commercial insurers" that are (b) performed in the Houston, Dallas, and Austin, Texas metropolitan areas.  *See id.* ¶¶ 216, 235.

---

[1] Although USAP disputes many of the facts alleged in the FTC's complaint, the factual allegations described below are from the complaint and are taken as true for this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To guarantee the availability of "hospital-only anesthesia services," hospitals often choose to partner exclusively with "independent anesthesiologists or anesthesia groups, such as USAP." *Id.* ¶¶ 52-53. Hospitals benefit from these contractual agreements as they help secure coverage for the "entire facility . . . on a 24/7 basis," including "overnight or during other off-peak hours." *Id.* ¶¶ 53-54. These arrangements also "help guarantee treatment for less lucrative patients by ensuring 24/7 coverage." *Id.*

While "[a]nesthesia groups often compete for exclusive hospital contracts," these contracts are "not always lucrative." *Id.* ¶¶ 55, 57. That is in part because the group must "staff the hospital around the clock," which requires having providers "cover long shifts and overnight call." *Id.* ¶¶ 56, 224. And it is also because hospitals may treat many patients who have "government insurance," such as Medicare or Medicaid, or no insurance at all. *Id.* Anesthesiologists "receive significantly higher reimbursement rates for services sold to commercial plans compared to" government insurance, so staffing a hospital with more government-insured patients is less lucrative to anesthesia groups. *Id.* ¶ 233. Moreover, hospitals serve patients that may be "uninsured or under-insured," further lowering the chances that the anesthesia group will be paid in full or at all. *Id.* ¶ 57.

Given these challenges, hospitals often provide subsidies to encourage anesthesia practice groups to enter into exclusive partnerships under which the group commits to providing comprehensive coverage "on a 24/7 basis." *Id.* ¶¶ 53, 57. The FTC alleges that hospitals benefit from anesthesia groups that take "a lower subsidy" and instead rely on alternative revenue streams—namely, the payments they receive from insurance companies for the anesthesia services they provide. *Id.* ¶ 299.

In Texas, "the four largest insurers" are "Aetna, Blue Cross Blue Shield of Texas, Cigna, and United." *Id.* ¶ 66. For context, while the complaint alleges that USAP generated $▮▮▮▮ in revenue nationwide in 2021, *see id.* ¶ 21, UnitedHealth Group Inc. and The Cigna Group respectively reported generating $287.5 billion[2] and $174.1 billion[3] in revenue that same year.

The rates at which anesthesia groups are compensated for their services differ depending on whether the payor is a government or commercial insurer. Government insurers reimburse anesthesia groups at set rates tied to government fee schedules. *See id.* ¶ 233. In contrast, anesthesia groups and commercial insurers can directly negotiate reimbursement rates. *See id.* ¶ 65. As a first step, the anesthesia groups and commercial insurers negotiate whether the group will be included in the insurer's "network" of providers. *See id.* ¶¶ 61-62. In exchange for being part of the insurer's "network," anesthesia groups offer to give insurers "a discount off the total amount [they] charge" for their services. *Id.* The agreed-upon rates and "network status" are reflected in contracts between the providers and the insurers. If the providers and insurers do not form such an agreement, the anesthesia group is considered "out of network." *Id.* ¶ 61. Out-of-network providers used to be able to bill at higher rates, but the law has recently changed such that this is no longer the case.[4]

---

[2] *See* UnitedHealth Group Inc., Annual Report (Form 10-K) at 29 (Feb. 24, 2023), https://tinyurl.com/3mudvzt8. The court may take judicial notice of a Form 10-K filing and its contents at the motion to dismiss stage. *See Basic Cap. Mgmt., Inc. v. Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020); *see* Fed. R. Evid. 201(b), (d).

[3] *See* The Cigna Group, Annual Report (Form 10-K) at 53 (Feb. 23, 2023), https://tinyurl.com/b4u8ajrm.

[4] *See* Compl. ¶ 74 n.5. Under recent state and federal legislation (the latter known generally as the No Surprises Act), "out-of-network anesthesiologists must obtain payment through costly and uncertain arbitration." *Id.* ¶ 72.

**B.**     **USAP Inherited Reimbursement Rates That Had Been Negotiated Between Commercial Insurers And GHA**

The FTC focuses much of its attention on the rates at which USAP's anesthesiologists are reimbursed.  *See*, *e.g.*, Compl. ¶ 5.  Many of these rates were established before USAP itself was formed.  They trace back to long-term agreements between commercial insurers and GHA, which USAP acquired upon its formation in 2012.  At the time of its acquisition, GHA was "well-positioned" with the four hospital systems in Houston that "performed almost 65% of all inpatient surgeries in Houston."  *Id.* ¶ 89.  GHA's 220 physicians and 180 CRNAs, *see id.* ¶ 95, handled around 39% of hospital-based anesthesia cases in Houston, *id.* ¶ 266 tbl. 1.  The FTC does not allege that GHA had monopoly power before USAP acquired it.

In acquiring GHA, USAP inherited GHA's contracts with commercial insurance companies—contracts that established, for example, GHA's in-network status and reimbursement rates.  *See id.* ¶¶ 60-64 (describing the process of setting reimbursement rates for health care providers); *see id.* ¶ 90 (alleging one consultant's analysis of GHA's then-existing reimbursement rates with commercial payors).  GHA's pre-acquisition negotiations with commercial insurers "achieved very good levels of reimbursement from commercial payers."  *Id.* ¶ 90.  The FTC does not allege that these rates were supracompetitive or that GHA had monopoly power when it negotiated these rates.

GHA's legacy contracts generally established that if GHA acquired another practice, the insurer would reimburse the newly acquired physicians for their services at GHA's pre-existing, contractually agreed upon rates.  *See*, *e.g.*, *id.* ¶ 151.  USAP negotiated with certain insurers to modify these legacy contracts, clarifying, for example, that the GHA rates would not apply right away but would, instead, start applying ██████ after the acquisitions.  *See id.* ¶ 153.  The

FTC refers to these provisions as "tuck-in" clauses.  *Id.*  The FTC does not allege that these clauses deviated from market norms or were otherwise unique to GHA.

### C. USAP Expanded Its Provision Of High-Quality Anesthesia Services Within And Outside Of Houston

After acquiring GHA, USAP sought to grow its business and to improve the quality of anesthesia services offered across the State of Texas.  The complaint alleges that USAP made the following acquisitions:

| Year | Practice | Total Providers | Location | Complaint Citation |
|------|----------|-----------------|----------|--------------------|
| 2013 | Lake Travis Anesthesiology | "small group" | Austin | ¶ 161 |
| 2014 | Pinnacle Anesthesia Consultants | 537 | Dallas | ¶ 127 |
| 2014 | North Houston Anesthesiology—Kingwood Division | 30 | Houston | ¶ 103 |
| 2015 | Anesthesia Consultants of Dallas | 50 | Dallas | ¶ 130 |
| 2015 | Excel Anesthesia Consultants | 74 | Dallas | ¶ 134 |
| 2015 | Southwest Anesthesia Associates | Not alleged | Dallas | ¶ 139 |
| 2016 | BMW Anesthesiology | 9 | Dallas | ¶ 141 |
| 2016 | Medical City Physicians | 7 | Dallas | ¶ 141 |
| 2016 | Sundance Anesthesia | 31 | Dallas | ¶ 144 |
| 2016 | East Texas Anesthesiology Associates | 34 | Tyler | ¶ 157 |
| 2017 | MetroWest Anesthesia Care | 130 | Houston | ¶ 108 |
| 2018 | Capitol Anesthesiology Association | 232 | Austin | ¶ 160 |
| 2018 | Amarillo Anesthesia Consultants | 20 | Amarillo | ¶ 165 |
| 2019 | Star Anesthesia | 194 | San Antonio | ¶ 169 |
| 2020 | Guardian Anesthesia Services | 77 | Houston | ¶ 112 |

Even though GHA's contracts with many commercial insurers authorized USAP to bill the newly acquired practitioners at GHA's negotiated rates, *see id.* ¶ 151, the insurers did not always honor those prior agreements.  Instead, the insurers started "push[ing] back" on the very rates they had agreed to before, leading to "protracted negotiations" that "lasted months or years."  *Id.* ¶ 152.  For example, when USAP acquired Pinnacle—an anesthesia practice in Dallas—one insurer refused to recognize the agreed-upon GHA rates, and instead "opted to treat the former Pinnacle (now USAP) anesthesia providers as out of network."  *Id.* ¶ 128.  It took

nearly two years to resolve that dispute, with USAP ultimately agreeing to a lower reimbursement rate than the legacy rate from GHA.  *See id.* ¶¶ 128, 152.

Commercial insurers have continued to force USAP to accept lower rates over time.  *See id.* ¶¶ 316-318.  For example, in 2020, United sought to "unilaterally amend[] the United-USAP contract to reduce USAP's rates."  *Id.* ¶ 316.  As USAP could not agree to the size of the rate reductions, United's demand temporarily forced USAP out of network.  After eighteen months, United secured a new contract with USAP under which "USAP's rates decreased."  *Id.* ¶ 318.

### D.   USAP Inherited And Executed Ancillary Agreements In Connection With Certain Acquisitions

The FTC also challenges certain agreements that USAP either inherited or executed between 2012 and 2014 that are separate from its provision of anesthesia services.

*First*, the FTC alleges that USAP has been party to three administrative services agreements.[5]  Under these agreements, USAP agreed to perform back-office functions such as payor relations and billing on behalf of a group of physicians.  *See id.* ¶¶ 176, 184.  USAP "bill[s] payors for the anesthesia services rendered by" client provider groups "using USAP's own provider or tax information."  *Id.* ¶ 176.  USAP then collects the payments from insurers and other payors, remitting to the non-USAP physicians what they are owed while keeping "some portion" of the collected payment as compensation for the administrative services it has performed.  *Id.* ¶ 176; *see also* ¶¶ 196, 203 (discussing these mechanisms in similar agreements).

Of the administrative services agreements the FTC challenges, USAP inherited two of them from practices it had acquired—in 2012, USAP became party to its predecessor GHA's

---

[5] The complaint also alleges that USAP attempted to enter into a fourth administrative services agreement with physicians at the University of Texas in 2014 and again in 2020, but an agreement was never reached.  *See* Compl. ¶¶ 204-207.

contract with The Methodist Hospital Physicians Organization, *see id.* ¶ 183; and in 2014, USAP

inherited Pinnacle's contract with the Baylor University Medical Center. *See id.* ¶ 192. USAP

itself entered into the third challenged agreement with the Baylor College of Medicine in 2014.

*See id.* ¶ 201. Notably, that latest agreement "was terminated" in 2020. *Id.* ¶ 203. The FTC

nowhere alleges that any of these agreements were materially significant.



    *Second*, the FTC alleges that USAP negotiated a ███████████████████

████████████████████ in connection with the sale of an anesthesia practice. *See id.* ¶ 410.

█████████████████████. *See id.* ¶ 214.

## LEGAL STANDARD

    "Federal Rule of Civil Procedure 12(b)(6) requires that a plaintiff plead facts sufficient to

state a plausible cause of action." *Collins v. Midland Mortg.*, 2022 WL 16556810, at *1 (S.D.

Tex. Oct. 31, 2022) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "In deciding

a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court 'accepts all well-pleaded

facts as true, viewing them in the light most favorable to the [nonmovant].'" *Id.* (alteration in

original) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)).

"Even so, 'a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief'

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do.'" *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555).

## ARGUMENT

### I.    THE FTC LACKS AUTHORITY TO SEEK INJUNCTIVE RELIEF UNTETHERED FROM AN ADMINISTRATIVE PROCEEDING AND FOR LONG-PAST CONDUCT

    The FTC invokes Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), as its sole source of

authority to bring this suit in federal district court, *see* Compl. ¶¶ 18-19. For two independent

reasons, the FTC's complaint exceeds its statutory authority: *First*, Section 13(b) authorizes the

FTC to proceed in federal court *only* to support enforcement proceedings in its own administrative forum, but the FTC has instituted no such proceedings and apparently intends to litigate only in this Court.  When the FTC seeks to follow the statute by moving only for preliminary relief, it does so expressly and then promptly files an administrative complaint—it has not done so here.  *Second*, Section 13(b) authorizes *only* injunctions to halt ongoing or imminent anticompetitive conduct, but the FTC complains about past acquisitions and agreements that are no longer operative.  The FTC is a creature of statute, and possesses only those powers Congress has given to it.  *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Because Congress did not grant the FTC the authority it claims here, the case should be dismissed.

## A.    Section 13(b) Bars The FTC From Seeking Injunctive Relief Independent Of Administrative Proceedings

### 1.    The Statute Does Not Permit An Independent Federal Court Action

In Section 13(b), which is titled "Temporary restraining orders; preliminary injunctions," Congress granted the FTC limited authority to seek injunctive relief in federal district court "while administrative proceedings are foreseen or in progress."  *AMG Cap.*, 141 S. Ct. at 1349.  Section 13(b) states:

> **Temporary restraining orders; preliminary injunctions**
>
> Whenever the Commission has reason to believe—
>
> (1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—
>
> the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to

enjoin any such act or practice.  Upon a proper showing that,
weighing the equities and considering the Commission's likelihood
of ultimate success, such action would be in the public interest, and
after notice to the defendant, a temporary restraining order or a
preliminary injunction may be granted without bond:  Provided,
however, That if a complaint is not filed within such period (not
exceeding 20 days) as may be specified by the court after issuance
of the temporary restraining order or preliminary injunction, the
order or injunction shall be dissolved by the court and be of no
further force and effect:  Provided further, That in proper cases the
Commission may seek, and after proper proof, the court may issue,
a permanent injunction.  . . .

Before Congress enacted Section 13(b), the FTC had no authority to seek a court-ordered injunction to halt ongoing or imminent violations.  *See AMG Cap.*, 141 S. Ct. at 1346.  Congress enacted Section 13(b) to "address[ ] a specific problem, namely, that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness" in parallel administrative proceedings.  *AMG Cap.*, 141 S. Ct. at 1348.

By its plain terms, Section 13(b) requires the FTC to proceed administratively.  It can proceed here only "pending the issuance of a complaint by the Commission."[6]  Section 13(b)'s first proviso (the clause that begins, "Provided, however") confirms that any injunction obtained here "shall be dissolved" if the FTC does not bring an administrative proceeding within twenty days of getting the injunction.  So while Section 13(b) lets the FTC seek injunctive relief in court to aid its administrative proceedings, those administrative proceedings are a necessary predicate. The FTC cannot simply choose to litigate its antitrust claims in federal court.

---

[6] "Complaint" here means an administrative complaint issued by the FTC under Section 5(b), 15 U.S.C. § 45(b).  Section 13(b) provides for preliminary injunctive relief "pending the issuance of a complaint" and "until such complaint is dismissed by the [FTC] or set aside by the court on review, or until the order of the [FTC] made thereon has become final," which is a clear reference to the FTC's administrative adjudication procedures, *see* 15 U.S.C. § 45(b), (c).

13

The FTC's authority to seek a *permanent* injunction under Section 13(b) is also tied to administrative proceedings and not a warrant for independent federal court litigation.  In its second proviso, Section 13(b) states:  "Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  As the Supreme Court has explained, "the appearance of the words 'permanent injunction' (as a proviso) suggests that those words are directly related to a previously issued preliminary injunction."  *AMG Cap.*, 141 S. Ct. at 1348.  That conclusion flows from longstanding interpretive principles:  "The 'grammatical and logical scope' of a proviso . . . 'is confined to the subject-matter of the principal clause' to which it is attached."  *Abbott v. United States*, 562 U.S. 8, 25-26 (2010) (quoting *United States v. Morrow*, 266 U.S. 531, 534-35 (1925)).  The principal clause here lets the FTC seek "a temporary restraining order or a preliminary injunction" only when tied to administrative proceedings.  The permanent-injunction proviso therefore necessarily conditions the availability of a "permanent injunction" on the existence of those administrative proceedings.  Nothing in the statutory language or structure authorizes the FTC to institute federal court litigation without any connection to an administrative proceeding.

## 2. Traditional Tools Of Statutory Interpretation Confirm That Section 13(b) Requires Administrative Proceedings For Injunctive Relief

The FTC's assertion of authority under Section 13(b) to institute litigation in this Court independent of administrative proceedings also clashes with the provision's context, the principle of constitutional avoidance, and Section 13(b)'s own history.

*First*, "statutory and historical context" show that Section 13(b) was not meant to provide an end run around the FTC's administrative proceedings.  *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 471 (2001).  Since its creation in 1914, the FTC has had the power to enforce the FTC Act through administrative proceedings under Section 5.  *See* 15 U.S.C. § 45.  Given this long

14

history, the Supreme Court has rejected the notion "that Congress, without mentioning the matter, would have granted the [FTC] authority so readily to circumvent its traditional § 5 administrative proceedings" by bringing a federal court action under Section 13(b) instead. *AMG Cap.*, 141 S. Ct. at 1349.  In *AMG Capital*, the Supreme Court held, "[i]n light of the historical importance of administrative proceedings," that allowing the FTC to go directly to federal court to seek monetary relief without first engaging in administrative proceedings "would allow a small statutory tail to wag a very large dog."  *Id*. at 1348-49.  That logic applies here.

Text and context instead confirm that Congress did *not* intend Section 13(b)'s permanent-injunction proviso to create a "separate, parallel enforcement path[ ]."  *Id*. at 1350; *see Morrow*, 266 U.S. at 535 (rejecting interpretation of proviso that would "introduce independent legislation").  If Congress actually *had* intended to create such an alternative to the FTC's administrative proceedings, it would not have buried that massive expansion of enforcement authority 213 words into a provision entitled "Temporary restraining orders; preliminary injunctions."  *See United States v. Moore*, 71 F.4th 392, 397 (5th Cir. 2023) ("Titles . . . can be a helpful tool for statutory interpretation.").  "Congress does not hide elephants in mouseholes." *AMG Cap.*, 141 S. Ct. at 1349 (cleaned up) (quoting *Whitman*, 531 U.S. at 468).  "Nor does Congress typically use oblique or elliptical language to empower an agency to make a 'radical or fundamental change' to a statutory scheme."  *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (citation omitted) ( "major questions doctrine" exists to address the "problem" of "agencies asserting highly consequential power beyond what Congress could reasonably be understood to have granted").

*Second*, accepting a broader interpretation of Section 13(b) "would raise serious constitutional problems" that a narrower interpretation would avoid.  *Cargill v. Garland*, 57

F.4th 447, 471-72 (5th Cir. 2023) (en banc), *cert. granted*, 2023 WL 7266996 (Nov. 3, 2023). As the Fifth Circuit has held in an analogous case involving the SEC, "the power to assign disputes to agency adjudication is 'peculiarly within the authority of the legislative department.'" *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)), *cert. granted*, 143 S. Ct. 2688 (2023). But under the FTC's broad view of Section 13(b), Congress "gave the [agency] the unfettered authority to choose whether to bring enforcement actions in Article III courts or within the agency." *Jarkesy*, 34 F.4th at 459; *cf. FTC v. Shire Viropharma, Inc.*, 917 F.3d 147, 159 n.17 (3d Cir. 2019) (describing FTC argument that it has "unreviewable discretion to file suit" in federal court under Section 13(b)).  If that interpretation were correct, then under binding Fifth Circuit precedent, "Congress unconstitutionally delegated legislative power to the [FTC]" because it provided no "intelligible principle by which to exercise that power." *Jarkesy*, 34 F.4th at 459, 462; *see id.* at 459 n.9 (alternative holdings by the Fifth Circuit are binding precedent). This Court should interpret Section 13(b) to avoid creating such a constitutional problem.[7]

*Third*, the FTC's attempt to use Section 13(b) as authority for a standalone permanent-injunction suit flouts Section 13(b)'s history.  Congress enacted Section 13(b) in a last-minute amendment to the Trans-Alaska Pipeline Act, which aimed to address a national energy crisis created by a shortage of domestic crude oil.  *See* Trans-Alaska Pipeline Act, Pub. L. No. 93-153, 87 Stat. 576 (1973); *see* 119 Cong. Rec. 36600 (1973).  "There was no discussion of [the

---

[7] Accepting a broad interpretation of Section 13(b) would also create the Article II problem that Welsh Carson details in its motion to dismiss, which USAP joins and incorporates by reference.  If Congress granted the agency authority to sue for permanent injunctive relief in federal district court, then it unconstitutionally vested executive law-enforcement power in an agency whose members are not removable at will by the President.  *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020).

permanent-injunction proviso] during the debate on the Trans-Alaska Pipeline Act."  Peter C. Ward, *Restitution for Consumers Under the Federal Trade Commission Act:  Good Intentions or Congressional Intentions?*, 41 Am. U. L. Rev. 1139, 1178 (1992).  "What little debate there was evinces no indication that *anyone* understood [Section 13(b)] to do anything other than confer on the agency the authority to seek injunctive relief to end practices while administrative proceedings were on-going."  J. Howard Beales III & Timothy J. Muris, *Striking the Proper Balance:  Redress Under Section 13(b) of the FTC Act*, 79 Antitrust L.J. 1, 14-15 (2013); *see AMG Cap.*, 141 S. Ct. at 1346 (citing the Beales & Muris article).  Given this enactment history, the FTC's "broad reading" of the permanent-injunction proviso, which "would allow it to use § 13(b) as a substitute for § 5," "could not have been Congress'[s] intent."  *AMG Cap.*, 141 S. Ct. at 1349.

The legislative history demonstrates that the permanent-injunction proviso was carefully cabined.  According to the Senate report accompanying the provision, Congress's "purpose" in enacting Section 13(b) was to "permit the Commission to bring an immediate halt to unfair or deceptive acts or practices" that would otherwise "continue for several years *until agency action is completed*."  S. Rep. No. 93-151, at 30 (1973) (emphasis added).  Within this scheme, the permanent-injunction proviso played a limited role:  it aimed to solve the practical problem of "when a court is reluctant to grant a temporary injunction because it cannot be assured of a[n] early hearing on the merits."  *Id.* at 30-31.  Rather than issue a preliminary injunction and then wait years to judge the case on the merits—until after the administrative proceedings ran their course—the court could "set a definite hearing date" for a permanent injunction.  *Id.*

Other appellate courts have ignored the plain language of Section 13(b).  But the Fifth Circuit has not addressed this issue, and this Court should be guided by the text of the statute.

*See Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 840-42 (5th Cir. 2023) (adopting plain-text statutory interpretation and rejecting cases from other circuits that "assume[d] the Commission's authority without analyzing the statute").  In *AMG Capital*, "eight Circuits" had accepted the FTC's interpretation of Section 13(b), and none had rejected it.  141 S. Ct. at 1351.  All nine Justices rejected that interpretation because it was inconsistent with the plain language of the statute.  This Court can and should reach the same conclusion that the Supreme Court did in *AMG Capital*:  Section 13(b)'s plain meaning controls.

**B.      The FTC Lacks Statutory Authority To Challenge USAP's Past Acquisitions Or Agreements**

The FTC acknowledges that it can maintain its suit in federal district court under Section 13(b) only if USAP is "violating or about to violate" the antitrust laws.  Compl. ¶ 19.  But the complaint challenges conduct that ended years ago.  USAP's last Texas acquisition closed in 2020, *see id.* ¶ 112, its billing arrangement with Baylor College of Medicine "was terminated" in 2020, *id.* ¶ 203, and its contractual relationship with ████████████████████ *see id.* ¶ 214.  The FTC's contention that it may proceed because USAP continues to operate long after those past actions have ceased contorts the statutory language and has been rejected by many courts.  The complaint should be dismissed for this reason as well.

**1.      Congress Authorized The FTC To Sue In Federal Court Only To Halt Imminent Or Ongoing Violations Of Law**

Section 13(b) allows the FTC to "bring suit in a district court of the United States" only when "any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the [FTC] . . . to enjoin any such act or practice."  15 U.S.C. § 53(b).  By its plain terms, Section 13(b) "focuses upon relief that is *prospective*, *not retrospective*."  *AMG Capital*, 141 S. Ct. at 1348 (emphasis added).  It allows the FTC to proceed in federal district court only in cases of an ongoing ("is violating") or imminent ("is about to violate") violation.

*See FTC v. AbbVie Inc.*, 976 F.3d 327, 376 (3d Cir. 2020) ("imminent or ongoing"); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 772, 774 (7th Cir. 2019) ("ongoing and imminent future violations").  The FTC cannot invoke Section 13(b) "to remedy a past violation."  *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1089 (9th Cir. 1985).

Section 13(b)'s "unambiguous" and "clear text" "does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation."  *Shire*, 917 F.3d at 147, 150, 156.  In *Shire*, the FTC alleged only "a violation in the distant past and a vague and generalized likelihood of recurrent conduct," so it "fail[ed] to state a claim upon which relief can be granted."  *Id.* at 159, 161.  The FTC makes the same insufficient allegations here.[8]

### 2.    USAP's Acquisitions And Contractual Arrangements Are Past Conduct Not Cognizable Under Section 13(b)

***USAP's long-closed acquisitions are past conduct.***  The FTC alleges that USAP's acquisitions all closed years ago.  The FTC alleges that "[b]etween 2014 and 2020" USAP "made the three Houston Tuck-In Acquisitions," Compl. ¶ 349; "[b]etween 2015 and 2016" it "made the six Dallas Tuck-in Acquisitions," *id.* ¶ 374; and in 2013 and 2018 it made the "Austin Acquisitions," *id.* ¶ 390.  USAP's most recent challenged acquisition—of Guardian Anesthesia Services—closed "[i]n January 2020."  *Id.* ¶ 112.  USAP's alleged acquisition conduct is therefore beyond the scope of a Section 13(b) suit.

---

[8] *Shire* should control here because it reflects a plain-text reading of Section 13(b).  The Fifth Circuit's decision in *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982), provides no reason to depart from *Shire*'s straightforward conclusion that Section 13(b) requires either ongoing or imminent violations.  There, the defendants' "continuing" and "large-scale systematic scheme tainted by fraudulent and deceptive practices" was "still in place," *id.* at 723, so the court did not weigh in on Section 13(b)'s imminence requirement.

Here, as in *Shire*, the FTC attempts to clear the statutory bar with a vague and conclusory allegation that USAP's conduct "remains ongoing." Compl. ¶ 333. But such "a naked assertion . . . without some further factual enhancement . . . stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557. A closed merger cannot "remain[] ongoing," Comp. ¶ 333, because it is not a "continuing violation," *Complete Entm't Res. LLC v. Live Nation Entm't, Inc.*, 2016 WL 3457177, at *1 (C.D. Cal. May 11, 2016). A merger is a "discrete act" that is completed upon closing, "not an ongoing scheme"; "[o]nce the merger is completed, the plan to merge is completed." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 995 (N.D. Cal. 2020) (alteration in original) (quoting *Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265, 271 (8th Cir. 2004)). As a result, federal courts have consistently held that the continued operation of a company formed by an allegedly illegal acquisition is *not* an "ongoing" or "continuing" violation of the antitrust laws. *See, e.g.*, *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 599, 604 (6th Cir. 2014) (collecting cases).

Neither does the FTC plead facts raising a plausible claim that additional acquisitions in Texas are imminent. It simply alleges that USAP might make future acquisitions. *See* Compl. ¶ 335 ("USAP continues to plan for acquisitions in Texas, as well as elsewhere, and is well-positioned to continue its conduct."). The complaint's naked conclusion, with no factual support, amounts only to "a vague and generalized likelihood of recurrent conduct." *Shire*, 917 F.3d at 159. "If this were enough to make out a continuing violation, there would in effect be no statute of limitations since a Section 7 challenge to the holding or use of assets could be brought at any time." *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1052 (8th Cir. 2000).

USAP's past acquisitions are all beyond the reach of Section 13(b).  The Court should therefore dismiss the FTC's "roll-up" claims, Counts II, V, and VII.  The Court should also dismiss Counts I, III, IV, VI, and VIII to the extent that they depend on acquisition conduct.

**_USAP's billing services for Baylor College of Medicine is past conduct._**  The FTC acknowledges that USAP's administrative services arrangement with Baylor College of Medicine "was terminated" in 2020.  Compl. ¶ 203.  The FTC does not allege that USAP is imminently about to enter into any additional agreement to provide administrative billing services.  And the FTC's allegation that USAP has not "offered any assurances against engaging in similar conduct in the future," *id.* ¶ 335, is plainly inadequate.  *See Shire*, 917 F.3d at 160 ("vague allegations" of restarting terminated conduct do not plausibly support finding that a defendant is "about to" restart that conduct).  The FTC does not allege that USAP has taken any steps or made any plans to reinstate its past arrangement with Baylor College of Medicine or that it is still providing services at the same hospital, so it cannot establish an imminent violation.

The Court should dismiss Counts I, III, and IX to the extent that they depend on the past agreement with Baylor College of Medicine.

**_USAP's contract with_** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. **_is past conduct._**  The FTC alleges that USAP and ▮▮▮▮▮▮▮▮▮▮. had a contractual relationship ▮▮▮▮▮▮▮▮▮▮ Compl. ¶ 214. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮  And the FTC does not even attempt to plausibly allege that a similar agreement is likely to recur.  The Court should therefore dismiss Count X.

\*       \*       \*

Section 13(b) limits the FTC's power to proceed in this Court.  In two distinct respects, the FTC has attempted to expand that authority beyond what Congress provided.  The Court should dismiss the FTC's overreaching complaint.

## II.    THE COMPLAINT FAILS TO ALLEGE PLAUSIBLE ANTITRUST CLAIMS

### A.    The FTC Fails To Plausibly Allege A Relevant Market

It is axiomatic that an antitrust case like this one requires enough pleaded facts to establish both a geographic market and a product market in which the defendant competes. Without "an accurate definition of the relevant market" that outlines "the area of effective competition" for the defendant's product and "reflects commercial realities," there is "no way to measure" whether the defendant has any "ability to lessen or destroy competition" and harm the consumers the antitrust laws are designed to protect.  *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (citations omitted); *see Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (relevant market must be defined for Sherman Act and Clayton Act claims); *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453-54 (5th Cir. 2021) (relevant market necessary for both Sherman Act Sections 1 and 2).

Whether a relevant market has been alleged "may be determined as a matter of law." *Apani*, 300 F.3d at 628.  As the Fifth Circuit has explained, "[w]here the plaintiff [1] fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or [2] alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient, and a motion to dismiss may be granted."  *Id.*

Courts regularly dismiss antitrust complaints where the plaintiff's proposed market definition is unsupported by factual allegations that justify its asserted boundaries. *See, e.g.*, *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-37 (3d Cir. 1997) (affirming dismissal where "the relevant market [was] legally insufficient" because plaintiff "fail[ed] to define" it "with reference to the rule of reasonable interchangeability and cross-elasticity of demand"). The FTC's complaint provides a laundry list of reasons why "hospital-only anesthesia services" are supposedly distinct. But all of them reduce to the irrelevant tautology that "hospital-only anesthesia services" must be provided in hospitals. *See* Compl. ¶ 176 ("Specifically, all hospital-only anesthesia services require patients to receive care in a hospital setting."); *id.* ¶ 220 ("Patients requiring hospital-only services must receive that service in a hospital setting and cannot obtain it elsewhere"); *id.* ¶ 222. Conspicuously absent from the complaint are any supporting allegations regarding reasonable interchangeability (what can be substituted for the relevant service) or cross-elasticity of demand (where consumers will go if prices rise). That alone compels dismissal. *See NSS Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissing antitrust claims for improper market definition where the plaintiff "fail[ed] to identify the economic substitutes for the product markets" and did not "plead any facts regarding the cross-elasticity of demand").

Besides this pleading failure, the FTC's "hospital-only" market definition "clearly does not encompass all interchangeable substitute products." *Apani*, 300 F.3d at 628. While licensed anesthesiologists may work in inpatient or outpatient hospital settings, as well as other outpatient settings (such as ambulatory surgical centers), the FTC fails to allege any distinction between the *nature of the services provided* in these settings. Indeed, the FTC expressly concedes that "the anesthesia services that form the hospital-only services may be performed by the same providers

23

as other services." Compl. ¶ 222.  In other words, trained anesthesiologists can provide services to patients in hospitals regardless of where those anesthesiologists typically practice—in hospitals, in outpatient surgery centers (whether at hospitals or external to them), or in medical offices.  The FTC claims that doctors who practice at *any* hospital, not just the doctors who practice at the hospital where the patient undergoes surgery, are competitors in the alleged relevant market.  *See id.* ¶ 217.  Yet doctors of equal skill and training who currently locate their practice in other non-hospital facilities are supposedly *not* competitors, even though they are fully capable of providing the same services.

This is both implausible on its face and unsupported by any facts.  Anesthesiologists who are located in various settings—not just hospitals—have the actual or potential ability to take cases away from hospital-based physicians.  As such the FTC's alleged market does *not* "encompass[] the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business," *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018) (citation omitted).  The FTC's market definition is therefore inadequate because the availability of "non-hospital"-based anesthesiologists "restrains [USAP's] ability to raise prices above the competitive level."  *Madison 92nd St. Assocs. v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015) (citation omitted).

The FTC has several *arguments*—not facts—for its obviously crabbed market definition. It claims, first, that some patients need to be treated in hospitals.  But that says nothing about which anesthesiologists can provide the requisite care in any particular hospital.  If doctors from *other* hospitals can also provide that care, there is no basis for excluding from the relevant market doctors with the same expertise who are practicing in non-hospital settings.  All may be acceptable substitutes; the complaint contains no facts that suggest otherwise.  Moreover, the

FTC does not allege, and cannot allege, that insurers prevent hospitals from employing fully credentialed anesthesiologists at lower cost, merely because they do not currently practice at a hospital. If, contrary to the FTC's theory, insurers are the relevant consumers in this market and have the power to dictate who provides what service to patients, then plainly the power lies with insurers and the FTC's allegations of monopolization by USAP are entirely misdirected.

Courts, and the Fifth Circuit in particular, have routinely rejected artificial market definitions similar to the FTC's litigation-driven definition here. For instance, in *Shah*, the plaintiff attempted to define a market for "pediatric anesthesia services" provided at a handful of facilities within an eight-county radius. *See Shah*, 985 F.3d at 454. The Fifth Circuit found the plaintiff's proposed market "insufficient as a matter of law" because it failed to "encompass all interchangeable substitute products." *Id.* at 455 (emphasis in original). The same is true here. By limiting the market to "hospital-only" anesthesia services, the FTC has artificially excluded the large population of "non-hospital" anesthesiologists capable of providing the same services, without facts establishing a plausible basis for that exclusion. The FTC has thereby scrubbed its proposed market of "reasonably interchangeable substitutes," rendering it "unduly narrow and legally insufficient." *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1038 (5th Cir. 2023) (affirming dismissal of antitrust complaint on that ground).

The FTC's proposed market definition is simply not plausible. Because "the anesthesia services that form the hospital-only services may be performed by the same providers as other [outpatient] services," Compl. ¶ 222, the FTC's proposed market for "commercially insured hospital-only anesthesia services" is "plainly designed to bolster" its claims "by artificially

exaggerating [USAP's] market power." *It's My Party*, 811 F.3d at 683.  Dismissal of the complaint is therefore required.

### B.     The FTC Fails To Plausibly Allege Monopoly Power

The FTC's Sherman Act Section 2 claims (Counts I, III, IV, and VI) require the assertion of *facts* making out a plausible claim that USAP has a monopoly position in a relevant antitrust market.  As discussed above, the FTC's market allegations are insufficient.  But equally insufficient are its claims that USAP has monopoly power, a *sine qua non* of any Section 2 monopolization claim.  *See Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 481 (1992); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015) (Section 2 monopolization claim requires showing that defendant "possesses monopoly power in the relevant market") (citing *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999)).

Monopoly power is the power to raise price *above a competitive level,* to restrict output (to the same effect), or to reduce quality below a competitive level.  *See, e.g.*, *Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x 410, 412 (5th Cir. 2007); *see also Rambus*, 522 F.3d at 466. The FTC does not allege that USAP either restricted output or reduced quality in any way.  The FTC does claim that prices have increased.  *See* Compl. ¶ 319.  But the dispositive fact is that the complaint lacks any claim that USAP raised prices "above the competitive level," *Abraham*, 776 F.3d at 335, after it supposedly attained a monopoly through its "roll-up" of anesthesia practices in Texas.

Indeed the pricing history recounted in the complaint alleges the opposite of what the FTC needs to plead and prove.  It establishes that, at all relevant times, USAP has functioned in a highly competitive marketplace that sets prices based on individualized negotiations.  The FTC does not allege that USAP has extracted a monopoly price from any purchaser.  On the contrary,

it has struggled to maintain the contractually agreed prices that a predecessor, *non-monopolist* provider (GHA) negotiated prior to its acquisition by USAP.  The FTC's allegations merely establish that USAP has sought payment at the prices previously agreed by GHA and payors— except for instances in which it has been unable to charge even those prices.  *See*, *e.g.*, Compl. ¶ 318 (acknowledging that "USAP's rates decreased" pursuant to renegotiation after United took USAP out of network).[9]

The FTC's only pricing allegations in the complaint pertain to a series of "Tuck-In Acquisitions" by which USAP acquired a number of smaller anesthesiology practices in Houston and Dallas following its anchor purchase of Greater Houston Anesthesiology in December 2012. *See*, *e.g.*, Compl. ¶¶ 102-115 (describing USAP's "roll-up" of the Houston market by acquiring North Houston Anesthesiology's Kingwood Division, MetroWest Anesthesia Care, and Guardian Anesthesia Services).  Rather than alleging that USAP followed these acquisitions by raising prices to supracompetitive levels, the FTC claims that USAP "tucked in" these acquired practices to the *preexisting* rates that GHA had negotiated with the commercial insurers.[10]  *See id.* ¶ 107 ("Following the acquisition, USAP raised NHA Kingwood's reimbursement for the same anesthesia providers *to its own contracted rate*" (emphasis added)); *see also id.* ¶ 111 (same for MetroWest Anesthesia Care); *id.* ¶ 115 (same for Guardian Anesthesia Services).  And

---

[9] The recent passage of the federal No Surprises Act, which the FTC references in its complaint, Compl. ¶ 74, directly undermines its claim that USAP possesses monopoly power. By requiring mandatory arbitration for disputes between providers and insurers over out-of-network rates, the Act denies USAP significant leverage in its negotiations with insurers.  It is doubtful whether any provider could exercise monopoly power—"the ability to charge a price above the competitive level," *Abraham*, 776 F.3d at 335—in the teeth of these statutory protections for patients and insurers.  At a minimum, against the backdrop of the No Surprises Act, the FTC's allegation of USAP's monopoly power is simply not "plausible."  *See Twombly*, 550 U.S. at 570.

[10] Indeed, the FTC's own allegations confirm that, from 2013 to 2020, USAP's rates have only increased by roughly ██% per year.  *See* Compl. ¶ 118.

at the time of the USAP acquisition of GHA in December 2012, GHA only had a 39% share of the FTC's own gerrymandered market definition of "commercially insured hospital-only anesthesia services" in Houston. *Id.* ¶ 266. In other words, the FTC's only alleged fact regarding monopoly power is that, after acquiring small anesthesiology practices, USAP raised the rates of *some* but not all of those anesthesiologists to the prevailing market rate for their services, as it was contractually permitted to do under agreements that were negotiated at arms-length with sophisticated commercial payors by USAP's concededly non-monopolist predecessor GHA.

An alleged monopolist that cannot charge more than a competitive price, restrict output to the same effect, or reduce quality below competitive levels is no monopolist at all. The complaint contains no such allegations, and the FTC has therefore failed to plead facts "plausibly suggesting" USAP's "possession of monopoly power." *Twombly*, 550 U.S. at 557; *Eastman Kodak*, 504 U.S. at 481. To the contrary, the facts that the FTC *has* alleged soundly refute any "presumption" of monopoly power created by the allegedly high share held by USAP in the gerrymandered "hospital-only" anesthesiology services market. For the reasons set forth above, those facts establish that USAP does *not* have monopoly power, and accordingly cannot be subject to the FTC's monopolization claims under section 2 of the Sherman Act.

### C.   The FTC Fails To Plausibly Allege Exclusionary Conduct

The FTC's Sherman Act Section 2 claims (Counts I, III, IV, and VI) fail for the additional reason that the complaint contains no cognizable allegations of exclusionary conduct. As the Supreme Court has made clear, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004); *see Abraham*, 776 F.3d at 334 ("Having or acquiring a monopoly is not in and of itself illegal.")

The FTC's principal allegation of exclusionary conduct is that USAP obtained a monopoly by acquiring several anesthesia practices throughout Texas, consolidated these providers under the USAP umbrella, and thereby increased its market share.[11]  No court has ever held that acquisition-based allegations similar to these amount to a plausible claim of actionable exclusionary conduct under Section 2.  Acquisitions, including acquisitions of competitors, support no presumption of anticompetitive effect because such acquisitions often increase competition and benefit consumers.  *See Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) ("plaintiffs cannot rely on the fact of the acquisitions alone"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018); *Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) ("[T]he mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality.") (quoting IV Phillip E. Areeda et al., *Antitrust Law* ¶ 901a (1998)).  This is particularly true when an established firm acquires a fledgling competitor: there are obvious opportunities for benefits not only to the acquiring company, but also to consumers.  *See Dresses for Less*, 2002 WL 31164482, at *12 ("horizontal mergers are much more likely to be procompetitive than anticompetitive"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law*  ¶ 901a (2023) (competitors may merge "to achieve synergies in the production or distribution of complementary goods, to put inefficiently run assets into the hands of superior management").

---

[11] The FTC also points to USAP's supposed "price-setting arrangements" and "market allocation agreement" with ███████ as further instances of exclusionary conduct.  But the "price-setting arrangements" are wholly valid for the reasons explained in Part II.E, *infra*, and the ████████████████, entered into in connection with the sale of an anesthesia practice, is long-past conduct that the FTC may not challenge via this Section 13(b) court proceeding, *see* Part I.B, *supra*.

Only in rare circumstances not alleged here have acquisitions of competitors been held to be exclusionary under Section 2.  For example, in the historic *American Tobacco* case, the Supreme Court condemned the defendant's serial acquisition of rivals' assets solely to shut them down and make them unavailable for competition.  *See United States v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911) (Section 2 violation where defendant spent "millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless for the purposes of trade"); *see also United States v. Am. Can Co.*, 230 F. 859, 875 (D. Md. 1916) (Section 2 violation where monopolist shut down two-thirds of the plants it acquired within two years of their purchase).  But the FTC has made no such allegations here—indeed it has alleged precisely the opposite.  The complaint describes USAP's plan to consolidate a handful of compatible anesthesiology practices, but "to supply hospitals with generally the same providers as before."  Compl. ¶ 99.  The FTC therefore has no basis to claim exclusionary conduct by virtue of the alleged acquisitions alone.

Moreover, actionable exclusionary conduct must have an "anticompetitive effect," that is, "it must harm the competitive process and thereby harm consumers."  *Rambus*, 522 F.3d at 463; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 58, 79 (D.C. Cir. 2001) (preventing distribution of rival browsers on third-party PCs prevented competition on the merits in the PC operating system market).  But the FTC's complaint contains no plausible allegation that USAP's acquisitions caused harm to competition or consumers in any measurable way.  As explained above, the FTC nowhere alleges that USAP's rates themselves have increased above a competitive level as a consequence of its acquisitions.  And its core allegation—that the newly acquired practices were "tucked in" at USAP's existing rates, *see*, *e.g.*, Compl. ¶ 107—merely reflects the extension of market rates negotiated at arms-length by a non-monopolist.

The FTC states, in conclusory fashion, that USAP's acquisitions have increased prices for anesthesia services.  But given the concrete facts alleged in the complaint regarding USAP's pricing practices (as discussed above), the FTC's claims of market-wide harm are unfounded, contrary to the admitted fact that USAP has never charged more than a competitive price and, even without all that, purely speculative.  *See Twombly*, 550 U.S. at 555 (conclusions must be disregarded); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects is not enough.").  The FTC has failed to allege any facts regarding USAP's "exercise[ ] [of] its power to control prices or exclude competitors from the relevant market for its products," *Abraham*, 776 F.3d at 334, and thus has not alleged the "element of anticompetitive conduct" that a Section 2 monopolization claim requires, *Trinko*, 540 U.S. at 407.  Counts I, III, IV, and VI should therefore be dismissed.

### D.     The FTC Fails To Plausibly Allege A Violation Of The Clayton Act

The FTC's Clayton Act claims (Counts II, V, and VII) also fail.  "To state a claim under Section 7, a complaint must define the relevant market and demonstrate the probability of anticompetitive results flowing from the challenged merger or acquisition." *David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 466 (S.D. Miss. 2022) (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491-92 (5th Cir. 1984)), *aff'd*, 2023 WL 2401587 (5th Cir. Mar. 8, 2023).  The FTC's market definition is deficient for the reasons stated above, and the Section 7 claims fail for the same reasons as the Section 2 claims fail.

But the FTC's Section 7 claims further require dismissal because the acquisitions described in the complaint are not alone sufficient to state a claim, given the absence of any factual allegations establishing consumer or competitive harm "flowing from" these acquisitions. *Turner Builders*, 603 F. Supp. at 466 (dismissing section 7 claim where complaint did "not provide any facts to plausibly suggest the probability of anticompetitive results" from the

31

acquisitions in question).  Unlike a typical Section 7 case, where courts have to speculate about potential harm to consumers from a challenged acquisition, here there is no need to speculate.  These acquisitions have already taken place (some more than a decade ago), yet the FTC does not (because it cannot) allege that consumers have sustained any cognizable harm as a result of USAP's expanded ability to provide critical care in hospitals throughout Texas.  That is, as explained *infra,* the acquisitions have *not* led to prices above competitive levels.

### E.        The FTC Fails To Plausibly Allege A Price-Fixing Agreement

The FTC's price-fixing claim (Count IX) fails because the complaint does not allege the most basic ingredient of such a claim:  an agreement among competitors to fix prices.  To establish a violation of Section 1 of the Sherman Act, "a plaintiff must show that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market."  *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (cleaned up) (quoting *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015)).  For purposes of the first element, "[t]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or *from an agreement*, tacit or express."  *Id.* at 526 (quoting *Twombly*, 550 at 553 (emphasis in original)).  At the pleading stage, it is the plaintiff's burden to make "allegations plausibly suggesting (not merely consistent with) agreement."  *Id.* at 528 (quoting *Twombly*, 550 U.S. at 557).

Count IX of the FTC's complaint alleges a violation of Section 1 of the Sherman Act based on USAP's "[h]orizontal [a]greements [with other anesthesiology practices] to [b]ill [for anesthesiology services] at a [f]ixed [p]rice."  That claim should be dismissed because the FTC has not plausibly alleged an "agreement" between USAP and competing anesthesiology practices to fix prices for their anesthesia services.  The "agreements" that the FTC labels "price-setting arrangements" for purposes of this claim are in fact contracts to provide back-office,

administrative services.  USAP performs these functions for its own anesthesiologists, but not all

anesthesiology practices do.  For that reason, three smaller anesthesiology practices contracted

with USAP or its predecessors to obtain reimbursement from payors on their behalf.  The

provider groups "assign[ ] to [USAP] any right to bill and receive payment from patients and

payors for services rendered."  Compl. ¶ 184.  USAP then "bill[s] payors for the anesthesia

services rendered by" the client provider groups "using USAP's own provider or tax

information," obtains reimbursement from payors, and then "[pays] the non-USAP"

anesthesiologists, typically retaining "some portion" of the reimbursement amount as

compensation for the administrative services it has performed.  *Id.* ¶ 176.  USAP also provides

two hospitals (and used to provide one hospital) with certain other ancillary services related to

billing and reimbursement.[12]

The FTC concedes that anesthesiologists at the three relevant hospitals are (or were)

compensated at different reimbursement rates than USAP's.  *See*, *e.g.*, *id.* ¶ 203 ("USAP paid

Baylor College of Medicine ████████████████ for its anesthesia providers' time."); *id.*

¶ 196 (alleging that USAP "compensat[ed] Dallas Anesthesiology Associates . . . based on [that]

group's billing rate at Baylor University Medical Center").  Thus, not only does the FTC fail to

allege the existence of an agreement between USAP and its competitors setting prices for

anesthesia services, its own allegations expressly confirm that USAP and the other

anesthesiology practices at issue continued to offer their anesthesia services at different prices.

That these other practices assign their right to payment to USAP, *see*, *e.g.*, *id.* ¶ 184, and that

---

[12] For instance, the FTC alleges that Pinnacle's administrative services practice (later acquired by USAP) maintained a customer service phone number that Pinnacle's back-office staff would answer on behalf of another practice, Dallas Anesthesiology Associates.  *See id.* ¶ 195.

USAP uses its own tax and provider information to obtain reimbursement from payors, *see*, *e.g.*, *id.* ¶ 176, do not constitute an "agreement" to fix prices that is the "crucial" requirement of the FTC's Section 1 claim, *see Twombly*, 550 U.S. at 553.

The FTC challenges USAP's administrative services business for several reasons, but none of them cures this fatal deficiency with the FTC's price-fixing claim.  The FTC complains that USAP's administrative services contracts "made it appear to payors as if USAP was doing the work of the other group's anesthesia providers," *id.* ¶ 176; that USAP "could have cooperated with other providers" by "hir[ing] them as subcontractors," *id.* ¶ 178; that USAP's reimbursement practices might breach its insurer contracts due to "compliance issues related to pass through billing," *id.* at ¶ 179; and that USAP was pleased that its administrative service business allowed it to "collect[] a nice margin," *id.* at ¶ 196.  None of these concerns have merit. But the more important point here is that none of these objections to USAP's business practices so much as reference the horizontal price-fixing agreement that the FTC's Section 1 claim requires, let alone constitute "allegations plausibly suggesting (not merely consistent with) [that] agreement."  *Twombly*, 550 U.S. at 557.

Ultimately, the FTC's own account of USAP's administrative services business concedes the absence of the price-fixing agreement that its Section 1 claim requires.  The FTC alleges that USAP's administrative services contracts "*effectively* raised the reimbursement rates of the non-USAP providers up to USAP's much higher rates," Compl. ¶ 176 (emphasis added), and that they "*functioned the same as* an agreement between USAP and the non-USAP providers to charge the higher USAP rates," *id.* ¶ 177 (emphasis added).  But the FTC does not allege that non-USAP providers *actually* charged the same rates for their anesthesia services as USAP providers did, and it does not allege that USAP *actually* entered into an agreement with

competing anesthesiology providers to fix prices for anesthesia services.  Nor can it, because no

such agreement has ever existed.  Because the FTC has not even alleged a price-fixing

agreement, it has failed to "nudge[] [its price fixing claim] across the line from conceivable to

plausible," *Twombly*, 550 U.S. at 570, and Count IX must therefore be dismissed.  *See*, *e.g.*,

*BRFHH Shreveport*, 49 F.4th at 525 (dismissing Section 1 claim because plaintiff failed to

plausibly allege an "agreement" to fix prices for healthcare services).

### F.     The FTC Fails To Plead A Valid Conspiracy Claim

USAP hereby incorporates by reference Section III.C of Welsh Carson's motion to

dismiss.  *See* WC Mot. Section III.C.  Independent of the reasons stated above, the FTC's

conspiracy claims in Counts III and VI must be dismissed because Welsh Carson and USAP

were not separate economic entities and were thus incapable of conspiring as a matter of law

under *Copperweld*, 467 U.S. at 770-71.  *See*, *e.g.*, *Surgical Care Ctr. of Hammond, L.C. v. Hosp.*

*Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 840-41 (5th Cir. 2002) ("as a matter of

law, a corporation and its agent . . . are incapable of conspiring with one another to violate the

antitrust laws").  The FTC all but concedes as much, repeatedly alleging that Welsh Carson and

USAP were functionally indistinguishable, not distinct actors with disparate economic

objectives.  *See* Compl. ¶¶ 35, 37, 39, 40, 345, 351, 370, 376, 392, 400, 406, 411.  Counts III and

VI must therefore be dismissed.[13]

### CONCLUSION

The Court should dismiss the FTC's complaint in its entirety.

---

[13] The FTC's claims under Section 5 of the FTC Act are merely derivative of the FTC's
claims under the Sherman Act and Clayton Act, and therefore require dismissal on any of the
grounds enumerated above.  *See 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 122 (2d Cir. 2021)
(where conduct does "not constitute a violation of the Sherman Act . . . an asserted violation of
the FTC Act fails of necessity").

Dated: November 20, 2023

David J. Beck (TX Bar No. 00000070)
  (Federal I.D. No. 16605)
Garrett S. Brawley (TX Bar No. 24095812)
  (Federal I.D. No. 3311277)
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX 77010
Tel: (713) 951-3700
Fax: (713) 951-3720
dbeck@beckredden.com
gbrawley@beckredden.com

Respectfully submitted,

/s/ *Mark C. Hansen*
Mark C. Hansen (D.C. Bar No. 425930)
  (*Pro Hac Vice*)
Attorney-in-Charge
Geoffrey M. Klineberg (D.C. Bar No. 444503)
  (*Pro Hac Vice*)
David L. Schwarz (D.C. Bar No. 471910)
  (*Pro Hac Vice*)
Kevin J. Miller (D.C. Bar No. 478154)
  (*Pro Hac Vice*)
Dennis D. Howe (D.C. Bar No. 90011114)
  (*Pro Hac Vice* Application Pending)
Derek C. Reinbold (D.C. Bar No. 1656156)
  (*Pro Hac Vice* Application Pending)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
dschwarz@kellogghansen.com
kmiller@kellogghansen.com
dhowe@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Defendant U.S. Anesthesia Partners, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2023, I filed the foregoing document with the

Court and served it on opposing counsel through the Court's CM/ECF system.  All counsel of

record are registered ECF users.


Respectfully submitted,

/s/ *Mark C. Hansen*
Mark C. Hansen