**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. ANESTHESIA PARTNERS, INC., | § | Civil Action No. 4:23-cv-03560 |
| | § | |
| and | § | |
| | § | |
| WELSH, CARSON, ANDERSON & | § | |
| STOWE XI, L.P., et al. | § | |
| | § | |
| Defendants | § | |

## WELSH CARSON ENTITIES' MOTION TO DISMISS

R. Paul Yetter
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
(713) 632-8000

Kenneth Field (*pro hac vice*)
ken.field@hoganlovells.com
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
(202) 637-5600

Perry A. Lange (*pro hac vice* forthcoming)
perry.lange@wilmerhale.com
WILMER CUTLER PICKERING HALE AND
DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 633-6493

David B. Hennes (*pro hac vice*)
david.hennes@ropesgray.com
Jane E. Willis (*pro hac vice*)
jane.willis@ropesgray.com
C. Thomas Brown (*pro hac vice*)
thomas.brown@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

Douglas Hallward-Driemeier
 (*pro hac vice*)
douglas.hallward-
driemeier@ropesgray.com
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 508-4600

Kathryn Caldwell (*pro hac vice*)
kathryn.caldwell@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street

Boston, Massachusetts 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

*Counsel for Defendants Welsh, Carson,
Anderson & Stowe XI, L.P., WCAS
Associates XI, LLC, Welsh, Carson,
Anderson & Stowe XII, L.P., WCAS
Associates XII, LLC, WCAS Management
Corporation, WCAS Management, L.P.,
and WCAS Management, LLC*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

SUMMARY OF THE ARGUMENT ........................................................................ 3

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............................ 6

STATEMENT OF THE ISSUES................................................................................ 6

FACTUAL BACKGROUND.................................................................................... 7

STANDARD OF REVIEW ...................................................................................... 9

ARGUMENT ........................................................................................................ 10

I.      The FTC Is Not Authorized to Bring this Action under Section 13(b) of the FTC Act.  10

II.     The FTC Fails to State a Claim for Alleged Violation of the Antitrust Laws by Welsh Carson. ................................................................................................ 15

        A.      The Complaint States No Claims Against the Welsh Carson Entities for Monopolization, Unlawful Agreements in Restraint of Trade, or Unfair Methods of Competition. ................................................................ 16

                1.      The FTC Fails to Plead that Welsh Carson Is a Monopolist Engaged in Exclusionary Conduct under Section 2 of the Sherman Act (Counts I & IV)........................................................................ 16

                2.      The FTC Does Not Allege that any Welsh Carson Entity Was Party to an Agreement or Transaction in Violation of the Antitrust Laws (Counts II, V, VII, IX, & X)........................................................ 18

                3.      The FTC Fails to State a Claim under Section 5 of the FTC Act Against the Welsh Carson Defendants (Count VIII)................................ 20

        B.      Welsh Carson Cannot Be Liable for Alleged Violations of the Antitrust Laws by USAP. ................................................................ 21

                1.      Courts Respect the Corporate Form........................................ 22

                2.      The Welsh Carson Entities' Alleged Activities Incidental to their Investments Do Not Constitute Independent Conduct.......................... 24

                3.      None of the FTC's Remaining Allegations Properly Plead Independent Conduct by the Welsh Carson Entities. .............................. 26

    4. The FTC Fails to Plead Any Claim Based on Agency Liability................ 28

  C. The FTC Fails to State a Valid Conspiracy Claim Under Section 2 of the Sherman Act (Counts III & VI). ........................................................... 29

III. The Case Should Also Be Dismissed Because, as an Independent Agency, the FTC Cannot File an Enforcement Action—an Authority Reserved to Agencies Directly Supervised by the President. .............................................................. 30

  A. The FTC Act Amendments, Which Authorized Independent FTC Commissioners to Exercise the President's Executive Power, Such as By Filing this Enforcement Action in Court, Violate Article II of the Constitution. ......... 31

  B. The Appropriate Remedy for this Constitutional Violation Is to Strike the Executive Powers Granted to the FTC in 1973, which Compels Dismissal of this Action.................................................................................................. 34

CONCLUSION.................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Alper Holdings USA, Inc.*,
   398 B.R. 736 (S.D.N.Y. 2008)........................................................................27

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010)........................................................................................29

*AMG Capital Mgmt., LLC v. Fed. Trade Comm'n*,
   141 S. Ct. 1341 (2021)..............................................................................11, 33

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)........................................................................................10

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   140 S. Ct. 2335 (2020)....................................................................................35

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................10

*Bond v. United States*,
   572 U.S. 844 (2014)........................................................................................31

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
   49 F.4th 520 (5th Cir. 2022) ..........................................................10, 13, 15, 17

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
   447 F.3d 411 (5th Cir. 2006) ..........................................................................22

*Buckley v. Valeo*,
   424 U.S. 1 (1976)............................................................................................33

*Chandler v. Phoenix Servs.*,
   No. 7:19-CV-00014, 2020 WL 1848047 (N.D. Tex. Apr. 13, 2020), *aff'd*, 45
   F.4th 807 (5th Cir. 2022) ..........................................................................16, 23

*Clark v. Thompson*,
   850 Fed App'x 203 (5th Cir. 2018) ................................................................21

*Cnty. Ct. of Ulster Cnty., N.Y. v. Allen*,
   442 U.S. 140 (1979)........................................................................................31

*E.I. du Pont de Nemours & Co. v. Fed. Trade Comm'n*,
   729 F.2d 128 (2d Cir. 1984)............................................................................20

i

*Fed. Trade Comm'n v. AdvoCare Int'l, L.P.*,
  No. 4:19-CV-715, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) .........................................14

*Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*,
  937 F.3d 764 (7th Cir. 2019) ..............................................................................................10

*Fed. Trade Comm'n v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ...........................................................................11, 12, 13

*Fed. Trade Comm'n v. Shire ViroPharma, Inc.*,
  917 F.3d 147 (3d Cir. 2019)...........................................................................10, 11, 13, 14

*Gurgunas v. Furniss*,
  No. 3:15-CV-03964, 2016 WL 3745684 (N.D. Tex. July 13, 2016).....................................15

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) .............................................................................................19

*Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*,
  471 F.2d 894 (5th Cir. 1973) ..............................................................................................19

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935)......................................................................................5, 32, 34, 35

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
  847 F.3d 1221 (10th Cir. 2017) ..........................................................................................16

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
  No. 11 MDL 2262, 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) .....................................23

*Masimo Corp. v. Wireless*,
  No. 19-CV-01100, 2020 WL 7260660 (S.D. Cal. Dec. 10, 2020) ..................................24, 29

*Off. Airline Guides, Inc. v. Fed. Trade Comm'n*,
  630 F.2d 920 (2d Cir. 1980)................................................................................................20

*In re Penn. Title Ins. Antitrust Litig.*,
  648 F. Supp. 2d 663 (E.D. Pa. 2009) ..............................................................................23, 25

*PostX Corp. v. Secure Data in Motion, Inc.*,
  No. C 02-044832005 WL 8177634 (N.D. Cal. Aug. 17, 2005)......................................29, 30

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
  566 F. Supp. 2d 363 (M.D. Pa. 2008) ................................................................................25

*Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*,
  786 F. Supp. 2d 1202 (S.D. Tex. 2009) ..............................................................................18

*Rohlfing v. Manor Care, Inc.*,
   172 F.R.D. 330 (N.D. Ill. 1997)................................................................30

*Seila Law, LLC v. Consumer Financial Prot. Bureau*,
   140 S. Ct. 2183 (2020) .............................................................. *passim*

*Shujauddin v. Berger Bldg. Prods., Inc.*,
   No. CV 19-876, 2019 WL 9102043 (E.D. Pa. June 18, 2019) .............................15

*SSP Partners v. Gladstrong Invs. (USA) Corp.*,
   275 S.W.3d 444 (Tex. 2008)...............................................................22

*Stankis v. Environmental Protection Agency*,
   713 F.2d 1181 (5th Cir. 1983) .............................................................11

*Stearns Airport Equip. Co. v. FMC Corp.*,
   170 F.3d 518 (5th Cir. 1999) .............................................................16

*T D X Energy, LLC v. Chesapeake Operating, Inc.*,
   857 F.3d 253 (5th Cir. 2017) .............................................................11

*Top Rank, Inc. v. Haymon*,
   No. CV154961, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ..............................30

*Transamerica Leasing, Inc. v. La Republica de Venezuela*,
   200 F.3d 843 (D.C. Cir. 2000)...............................................................29

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)...............................................................33

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
   No. CIV.A. 08-1498, 2014 WL 1766083 (W.D. Pa. May 2, 2014), *aff'd*, 903
   F.3d 333 (3d Cir. 2018)...............................................................27

*United States v. Jon-T Chems., Inc.*,
   768 F.2d 686 (5th Cir. 1985) .............................................................23

*United States v. Bestfoods*,
   524 U.S. 51 (1998)...............................................................22, 26, 27

*United States v. Grinnell Corp.*,
   384 U.S. 563 (1966)...............................................................16, 17

*Valdez v. Cap. Mgmt. Servs., LP*,
   No. CIV.A. B:09-246, 2010 WL 4643272 (S.D. Tex. Nov. 16, 2010)......................23

*Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*,
   No. CIV.A. 10-00124, 2010 WL 3488244 (E.D. La. Aug. 26, 2010) ......................18

*Verizon Commc'ns, Inc. v. Law Off. of Curtis V. Trinko*,
   540 U.S. 398 (2004) ..................................................................................28

*Walker v. Beaumont Indep. Sch. Dist.*,
   938 F.3d 724 (5th Cir. 2019) ..............................................................9, 10

*Weinberger v. UOP, Inc.*,
   457 A.2d 701 (Del. 1983) .........................................................................26

**Statutes**

15 U.S.C. § 18 .............................................................................................18

15 U.S.C. § 41 .............................................................................................32

15 U.S.C. § 41 *et seq.* ..................................................................................33

15 U.S.C. § 45(a)(1) ....................................................................................20

15 U.S.C. § 53(b) ................................................................................. *passim*

Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973) ............................32

**Other Authorities**

Fed. R. Civ. P. Rule 8 .............................................................................15, 21

Fed. R. Civ. P. Rule 12(b)(6) ............................................................... *passim*

U.S. Const. Art. II ................................................................................ *passim*

28 C.F.R. § 0.40 ..........................................................................................34

Fed. Trade Comm'n – Enforcement, https://www.ftc.gov/enforcement .......................................34

Transcript, A Conversation with FTC Chair Lina Khan and DOJ Assistant
   Attorney General Jonathan Kanter on Antitrust Enforcement, Brookings Inst.
   2, 22 (Oct. 5, 2023) (Chair Khan: FTC has "a whole set of law enforcement
   tools"), https://www.brookings.edu/wp-
   content/uploads/2023/08/gs_20231005_antitrust_transcript.pdf ...........33

Q&A with FTC Chair Lina Khan, Chicago Booth Stigler Ctr. (June 3, 2022)
   (antitrust statutes "allow the FTC to police unfair methods of competition"),
   https://www.promarket.org/2022/06/03/qa-with-ftc-chair-lina-khan-the-word-
   efficiency-doesnt-appear-anywhere-in-the-antitrust-statutes/ ..................33

## PRELIMINARY STATEMENT

This case involves an unprecedented attempt by the Federal Trade Commission ("FTC") to challenge and unravel long-ago investments in a healthcare company that provides vital services in this State. The investments facilitated delivery of needed anesthesia services to Texas cities, including medically underserved areas here in Houston. The FTC's lawsuit evidently seeks to dismantle this physician-owned company and disrupt its delivery of vital services, all while ignoring well-settled principles of corporate and antitrust law in seeking to somehow hold its minority investor liable.

A decade ago, a Welsh Carson fund helped finance a local group of physicians to create defendant U.S. Anesthesia Partners, Inc. ("USAP"). Over the years, USAP grew into a company that expands access to quality anesthesia services across Texas and other states. Part of USAP's approach was to attract and combine with other quality practices—a strategy used by countless other companies in many other industries. Its growth has allowed USAP to invest in technology, quality, and infrastructure to provide comprehensive 24/7 anesthesia services to hospitals both large and small, including those with patient populations that previously had access only to lower quality anesthesia services or struggled to access such services at all. And USAP serves these patient needs at prices that, accounting for inflation, have basically stayed flat since inception.

None of this seems to matter to the FTC. This lawsuit focuses on supposed harm to the healthcare *insurance* industry, dominated by four insurers: Aetna, United, Cigna, and Blue Cross. Nothing in the Complaint alleges that USAP's success has harmed patient care, much less that Welsh Carson investments have done so. Nor does the Complaint assert that any of the respected Texas hospitals (which rely on USAP for access to high-quality care for underserved populations) has been hurt by the supposed anticompetitive acts. Instead, the FTC complains that the big four

insurance companies—which routinely kick out healthcare providers from coverage during pricing negotiations—now are allegedly less able to leverage their bargaining power against USAP.

Beyond that, the Complaint just looks backward and cites no specific current or imminent violation by the Welsh Carson entities.[1] That is fatal to its claims. The FTC's power to sue under Section 13(b) of the Federal Trade Commission Act (the "FTC Act") is restricted to a putative defendant that *is* violating, or *is about* to violate, a law enforced by the FTC. The last act alleged by the FTC was more than four years ago; most are more than a decade old. As a matter of this governing statute, hindsight enforcement over long-completed investments by the Welsh Carson Funds is well beyond the authority of the FTC.

Even more, the Complaint targets mere investors, turning decades of settled corporate law on its head. The FTC alleges that Fund XII is the only Welsh Carson investor in USAP since 2017, and it has never held more than a 23% share in USAP and two of fourteen USAP board seats. But rather than admit the illogic of suing non-controlling investors for alleged misconduct by the company in which they invested, the Complaint instead lumps everyone together to try to conceal the illogic. It ignores longstanding principles of corporate law and separateness, apparently hoping to survive a motion to dismiss through hazy and undifferentiated group pleading.

By limiting the FTC to its statutory authority and holding it to the pleading standards, the Court will avoid the need to reach serious constitutional issues raised by the agency's aggressive new litigation agenda. Recent Supreme Court precedent highlights that the FTC's exercise of

---

[1] Welsh, Carson, Anderson & Stowe XI, L.P. ("Fund XI"), WCAS Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P. ("Fund XII" and, together with Fund XI, "the Funds"), WCAS Associates XII, LLC, WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC (collectively, the "Welsh Carson entities").

quintessentially executive power under the FTC Act, as amended, violates Article II of the Constitution.

In short, the FTC's Complaint greatly overreaches its standing and statutory power, ignores the harm that it will cause to consumers of USAP's critical services here and elsewhere, and improperly sues Welsh Carson investors which are not controlling, conspiring, or even proper parties.

## SUMMARY OF THE ARGUMENT

*Section 13(b) of the FTC Act.* The FTC's action exceeds the scope of its statutory authority because no Welsh Carson entity "is violating" or "is about to violate" any law protecting competition, as required to invoke Section 13(b) of the FTC Act. Congress specifically limited the FTC's authority in federal court to situations where the FTC seeks to remedy ongoing or impending conduct; past conduct alone will not suffice. But no Welsh Carson entity owns a majority of or controls USAP today, nor has any Welsh Carson entity ever provided anesthesia services. Most of the FTC's allegations about Welsh Carson-related conduct are more than a decade old; the most recent of the scant allegations are from 2019, more than four years ago. And the FTC's conclusory and speculative allegations do not show that any Welsh Carson entity is about to make additional investments or take action of any kind that will violate the antitrust laws. Indeed, the FTC's resort to such non-factual speculation confirms its failure to meet the statutory standard. The FTC therefore lacks authority to bring this action under Section 13(b) of the FTC Act, and dismissal is required.

*Failure to State a Claim under Rule 12(b)(6).* The FTC's threadbare group-pleading allegations about the Welsh Carson entities' purported involvement in the business activities of USAP present additional grounds for dismissal under Rule 12(b)(6). Even if the FTC could

plausibly allege antitrust violations directly by USAP,[2] its attempt to sweep seven Welsh Carson entities into the litigation ignores basic and long-settled principles of corporate separateness and agency law, constituting an unprecedented overreach.   The FTC's story, as alleged in the Complaint, is simple:  Fund XI "founded" USAP by providing startup capital in 2012.  USAP (not any Welsh Carson entity) expanded by acquiring additional anesthesia physician practices.   In short, the FTC alleges that USAP's multiple acquisitions resulted in violations of the antitrust laws, but it alleges no well-pleaded fact suggesting that any *Welsh Carson* entity committed such a violation.   At most, the FTC alleges that "Welsh Carson" was responsible for the *idea* to create, grow, and expand USAP, a platform of supported anesthesiology practices—but that does not state a claim for violation of the antitrust laws.   At all times, the Funds acted as a financing source, and no Welsh Carson entity acted as a market participant.   The alleged conduct by the Welsh Carson entities is typical of the relationship between an investor and the entity in which it invested:  advice, financial support and oversight that has been repeatedly rejected as a basis to impute liability to the investor as a matter of settled corporate law.   By attempting to convert investments by the Welsh Carson Funds into liability for *USAP's* alleged subsequent antitrust violations, the FTC casually ignores fundamental principles of corporate law, including corporate separateness.   Nor can the FTC carry its burden as to the Welsh Carson entities based on conduct before USAP's formation or conduct by a USAP director (appointed by Welsh Carson) who is legally presumed to act on USAP's behalf.

The FTC's conspiracy claims under Section 2 of the Sherman Act also fail because the FTC does not plausibly allege that any Welsh Carson entity ever had a separate economic interest

---

[2]  For the reasons stated in USAP's Motion to Dismiss, in which the Welsh Carson entities join, the FTC fails adequately to plead any primary violation of the antitrust laws by USAP.

from USAP in any relevant market.  Nor could it: the Welsh Carson investment funds were merely investors in USAP's business of providing Texans access to efficient, high-quality anesthesiology services.  And the FTC does not (because it cannot) allege that the Welsh Carson entities and USAP are, or at any time were, actual or potential competitors.  The conspiracy claims should be dismissed for these reasons.

*Article II of the U.S. Constitution.*  This Court should dismiss the claims against the Welsh Carson entities entirely for failure to satisfy the Section 13(b) standard, or on the basis of the pleading defects under Rule 12(b)(6) that are obvious from the face of the Complaint.  But, if it does not, then this enforcement action must be dismissed because it is premised on an impermissible exercise of executive authority in violation of Article II of the Constitution.  Almost a century ago, the Supreme Court upheld the constitutionality of the FTC Act, which restricts the President's appointment and removal authority with respect to FTC Commissioners.  But the Court did so because the FTC, as it existed in 1935, did not exercise "executive" power.  *Humphrey's Executor v. United States*, 295 U.S. 602, 628–29 (1935).  The 1973 amendments to the FTC Act granted the FTC substantial authority to enforce antitrust laws—authority that the Supreme Court has recently characterized as "quintessentially executive power."  *Seila Law, LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183, 2200 (2020).  The FTC Act, as amended, violates Article II of the Constitution to the extent it purports to grant FTC Commissioners essential executive powers, while limiting both the President's appointment and removal authority.  The appropriate remedy for this constitutional violation is to strike the 1973 amendments and to dismiss this suit as an unconstitutional exercise of executive power by the FTC.

*     *     *

After a two-year investigation involving hundreds of thousands of documents and extensive sworn testimony, the FTC's resort to hazy and undifferentiated pleading, supported only by non-factual, conclusory allegations regarding the Welsh Carson entities, amplifies the failure of its pleading.  And the FTC's efforts to ignore black-letter corporate law betray its true policy motives in bringing the action.  The Welsh Carson entities respectfully seek dismissal of all claims alleged against them.

### STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiff FTC filed its complaint (the "Complaint") on September 21, 2023.  ECF No. 1. All defendants have waived service of process.  The Welsh Carson entities now move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Complaint for failure to state a claim.

### STATEMENT OF THE ISSUES

1.      Whether Section 13(b) of the FTC Act, which allows the FTC to bring an action for injunctive relief in federal court only upon a showing that a defendant "is violating, or is about to violate" the law, authorizes the FTC to bring this action against any Welsh Carson entity, where the FTC alleges only long-past conduct as a basis for its action against the Welsh Carson entities.

2.      Whether the FTC adequately pleads a claim that any Welsh Carson entity is liable for USAP's alleged antitrust violations, based on imputing USAP's conduct to its shareholder in violation of bedrock corporate law, while failing to differentiate among the seven Welsh Carson entities named as defendants.

3.      Whether the FTC, as an independent agency, has the constitutional authority to bring this enforcement action pursuant to the 1973 amendment to the FTC Act, which granted the FTC the quintessentially executive power to bring enforcement actions, where the FTC Act otherwise restricts the President's appointment and removal authority.

## FACTUAL BACKGROUND

Fund XI and Fund XII are separate private equity investment funds that made separate investments at different times in healthcare and technology companies on behalf of different investors. *See* Compl. ¶¶ 26, 28. Each of Fund XI and Fund XII pooled capital from independent investors, such as pension and retirement funds, which was then invested to create ownership stakes in its respective portfolio companies. *Id.* ¶ 26. WCAS Associates XI, LLC is the general partner of Fund XI. *Id.* ¶ 29. WCAS Associates XII, LLC is the general partner of Fund XII. *Id.* ¶ 27. Each general partner entity is empowered to act on behalf and for the benefit of its respective Fund and its investors. *Id.* ¶¶ 27, 29. WCAS Management Corporation provides investment advisory and consulting services to the Funds and their portfolio companies. *Id.* ¶ 25. WCAS Management, L.P. serves as a sub-advisor to WCAS Management Corporation, and WCAS Management, LLC is the general partner of WCAS Management, L.P. *Id.* ¶¶ 30–31.

Fund XI owned stock in USAP from 2012 until 2017, and no longer owns stock in USAP. *Id.* ¶¶ 28, 35. Fund XII has held a minority stake (never more than 23%) in USAP since 2017. *Id.* ¶¶ 26, 35. The FTC does not allege that any of the five other Welsh Carson defendants ever owned any portion of USAP or engaged in any specific conduct relating to USAP. Throughout its Complaint, the FTC lumps together these seven entities as "Welsh Carson" as if they were one, without regard to their distinct legal identities and distinct practical functions. *See id.* at 1–2 (defining "Welsh Carson" to refer to all seven Welsh Carson-affiliated defendants); *see also id.* at 13 nn.2–3 (eliding further distinctions among Welsh Carson-related entities, including non-party entities).

USAP is a healthcare services organization focused on anesthesia and pain management services. *Id.* ¶ 21. Established in Texas in 2012, USAP currently operates in eight states. *Id.* ¶ 22. USAP was formed with the goal of establishing a physician-centric organization providing high-

7

quality anesthesia services that result in excellent clinical outcomes for patients.  Since its founding, USAP has been a separate legal entity with separate management and employees from the Welsh Carson entities named as defendants.  *See id.* ¶¶ 20, 38.

USAP's partnership model means that its many physician partners collectively hold the largest share of USAP's stock, retain clinical control of their practices and devote their time to patient care rather than to administrative tasks, which are delegated to management services professionals.  USAP provides doctors with access to capital, technology, improved quality management and reporting capabilities, and the business capabilities and sophistication necessary to contend with the increasingly complex healthcare industry.  The FTC's Complaint does not allege that any patient received substandard or poor-quality care, or that any patient was denied access to medical care because of financial need.  Nor does it allege that any Texas hospital that relies on USAP has been hurt by any alleged anticompetitive conduct.  Rather, the Complaint repeatedly points to the alleged grievances of the powerful insurance industry, not patients (who require access to high-quality care) or physicians (who face increasing challenges to serve the complex needs of their patients).  *See id.* ¶¶ 2, 5, 68, 74–76, 155, 307, 314–18.

Fund XI invested in USAP at its founding in 2012.  *Id.* ¶ 93.  Consistent with its initial 50.2% stake in USAP, Fund XI received typical shareholder rights, including the *right*—never alleged to have been exercised—to fill a majority of USAP's board of directors.  *See id.* ¶¶ 35–36.  Shortly after USAP's founding in 2012, Fund XI's equity interest in USAP began declining, as equity was issued to new USAP physician partners, and Fund XI was soon a minority holder.  *Id.* ¶ 35.  During 2017, Fund XI sold its entire interest in USAP.  *Id.* ¶¶ 28, 35.  Fund XII first made a minority investment in USAP in 2017, and today it owns approximately 23% of USAP.  *Id.* ¶¶ 26, 35.  As a result of its 2017 investment, Fund XII is entitled to appoint just two out of fourteen

directors to the USAP board, less than its proportional equity interest in USAP. *See id.* ¶ 36. Indeed, the FTC conspicuously avoids mentioning that at no time have the Funds appointed more than two of USAP's fourteen directors. Similarly, the FTC does not (and cannot) allege that USAP's organizational documents and operative agreements granted either Fund the legal authority to control USAP's day-to-day operations at any time. Brian Regan, a Welsh Carson executive, served as a USAP director from Fund XI's initial investment in 2012 until 2022. *Id.* ¶ 37.

The Complaint outlines two main categories of alleged *USAP* conduct that the FTC deems anticompetitive and in which it tries to implicate the Welsh Carson entities: (i) acquisitions of certain anesthesia practices in the Houston, Dallas, and other Texas locations by USAP; and (ii) a so-called "market allocation" agreement by USAP.[3] But the FTC alleges that USAP (not any Welsh Carson entity) acquired each anesthesia practice at issue, and that USAP (not any Welsh Carson entity) was the signatory to the alleged January 2014 agreement. *See id.* ¶¶ 102–49, 157–73, 214. To the extent the Complaint contains allegations about the Welsh Carson entities that go beyond the incidents of equity ownership in USAP, the FTC's undifferentiated pleading simply lumps together "USAP and Welsh Carson," without elaboration on the role of any Welsh Carson entity in the conduct at issue. *See, e.g., id.* ¶¶ 3–5, 7, 98–100, 106, 124–25, 129, 138, 150–52, 261, 274, 286.

## STANDARD OF REVIEW

"[C]laims may be dismissed under Rule 12(b)(6) on the basis of a dispositive issue of law. Dismissal under [Rule] 12(b)(6) also is warranted if the complaint does not contain sufficient

---

[3] Although the FTC also complains of USAP's alleged price setting arrangements, the Complaint is devoid of any allegation that Welsh Carson played any role at all in those arrangements, save for a reference to a "suggestion" offered by the then-USAP director designated by Welsh Carson. *See* Compl. ¶¶ 175–200.

factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 734 (5th Cir. 2019).[4]   A complaint with only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" cannot survive a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (courts will not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions").   Nor can a complaint survive a motion to dismiss "by stating facts 'merely consistent with' liability.'" *BRFHH Shreveport*, 49 F.4th at 525 (quoting *Twombly*, 550 U.S. at 557 (2007)); *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).   "Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Walker*, 938 F.3d at 734.

## ARGUMENT

### I.      THE FTC IS NOT AUTHORIZED TO BRING THIS ACTION UNDER SECTION 13(b) OF THE FTC ACT.

Section 13(b) of the FTC Act authorizes the FTC to sue in federal court to enjoin a defendant that "is violating, or is about to violate" a law enforced by the FTC.   *See* 15 U.S.C. § 53(b)(1).   As numerous courts have held, Congress expressly limited the FTC's authority to sue in federal court to circumstances where there is a need for immediate relief due to "existing or impending conduct." *Fed. Trade Comm'n v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) ("Simply put, Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation."); *see also Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 774 (7th Cir.

---

[4]  Unless otherwise noted, alterations, citations and internal quotation marks are omitted and emphases are added.

2019) ("Section 13(b) serves a . . . forward-facing role: enjoining ongoing and imminent future violations."); *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 26-27 (D.D.C. 2021) (rejecting the FTC's claim for injunctive relief under Section 13(b) where "no actionable violation [was] either ongoing or about to occur").  Section 13(b) is not satisfied by allegations of *past* violations, or by allegations suggesting a mere possibility of future recurrence.  *See Shire*, 917 F.3d at 156–59; *see also AMG Capital Mgmt., LLC v. Fed. Trade Comm'n*, 141 S. Ct. 1341, 1348 (2021) ("Taken as a whole, the provision focuses upon relief that is *prospective, not retrospective*.").

Indeed, the plain language of Section 13(b)—using the present tense—signifies that Congress intended to provide a remedy for presently occurring or imminent future acts, but *not* for completed, past acts.  *See Stankis v. Environmental Protection Agency*, 713 F.2d 1181, 1185 (5th Cir. 1983) ("We start with a strong presumption that Congress meant what it said."); *see also T D X Energy, LLC v. Chesapeake Operating, Inc.*, 857 F.3d 253, 266 (5th Cir. 2017) ("The use of the present and future tenses ['drilling or intending to drill'] shows legislative intent that the provision did not apply to completed wells.").  "[T]he words 'is violating' and 'is about to violate' (not 'has violated') . . . reflect that the provision addresses a specific problem, namely, that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness." *AMG Capital Mgmt.*, 141 S. Ct. at 1348.

In the limited instances where the Complaint offers non-conclusory allegations about the conduct of any Welsh Carson entity, those allegations relate exclusively to *long-past, plainly stale* conduct.  The FTC devotes significant attention to "Welsh Carson's" alleged role in founding USAP more than a decade ago, when Fund XI made an investment in 2012. *See, e.g.*, Compl. ¶ 34 (alleging "Welsh Carson" "created" USAP); *id.* at 26 & ¶¶ 77–80 (alleging "Welsh Carson"

"hatche[d] a strategy to consolidate anesthesia practices in Texas" in 2012); *id.* ¶¶ 81–95 (alleging the circumstances of USAP's founding in 2012); *id.* ¶ 336 (around USAP's founding, "Welsh Carson" "developed the overarching strategy to consolidate anesthesia markets").  However, the Complaint also acknowledges that Fund XI divested its minority stake in 2017, and that, since its investment in 2017, Fund XII has never held more than a minority interest in USAP.  *See id.* ¶ 35. Even crediting all reasonable inferences in its favor, the most that the FTC alleges is that "Welsh Carson"—referring to all seven entities without distinction—generally participated in meetings, presentations, and activities in furtherance of USAP's diligence of potential acquisition targets between 2012 and 2019.  *See, e.g.*, *id.* ¶¶ 79, 96, 200, 211, 337.

In other words, at most, the FTC alleges that Fund XI completely divested its investment more than six years ago; that Fund XII is and always has been a minority investor in USAP; and that no Welsh Carson entity has engaged in conduct in furtherance of alleged antitrust violations since 2019, more than four years ago.[5]  The FTC's allegations of long past-conduct by the Welsh Carson entities are insufficient to satisfy the statutory standard.  *See Facebook, Inc.*, 560 F. Supp. 3d at 26 (FTC cannot pursue claim under Section 13(b) where alleged anticompetitive policy was suspended three years earlier).

Nor has the FTC alleged any facts regarding current or future conduct that suggest any Welsh Carson entity is "about to" violate the antitrust laws.  The Complaint's resort to non-factual speculation and hypothesis confirms this failure.  The FTC alleges that nothing "prevent[s] Welsh Carson from re-upping its investment in USAP, *retaking* formal control of the company, and directing yet more anticompetitive acquisitions."  Compl. ¶ 337 (emphasis added).  In other words,

---

[5]  The only Welsh Carson-related allegations after 2019 relate to Fund XII's alleged receipt of dividend payments through 2020, which are irrelevant to the alleged antitrust violations and still occurred nearly three years ago.  *See* Compl. ¶ 337.

the FTC expressly concedes that the Welsh Carson entities have no control of USAP.  Theoretical speculation about a series of hypothetical future events, absent factual indicia showing they are "about to" happen, fails the statutory test.  *See Shire*, 917 F.3d at 156 ("[Section 13(b)] was not designed to address hypothetical conduct or the mere suspicion that such conduct may yet occur."); *Facebook, Inc.*, 560 F. Supp. 3d at 26–27 (rejecting the FTC's allegation that the defendant could, hypothetically, reinstate a challenged policy from 2018, calling it "conditional and conclusory," and "insufficient to establish the requisite imminence").  And, in any event, the assertion is implausible on its face: many facts might "prevent" such a hypothetical massive reinvestment by the Welsh Carson entities in USAP, including the fact that USAP is owned by hundreds of other stockholders who would have to agree to sell their stakes, a speculative scenario not alleged to have been discussed or planned, or even contemplated, at any time in the last six years.   *See BRFHH Shreveport*, 49 F.4th at 525 (on motion to dismiss, courts need not "accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions").[6]

The FTC also offers a vague and insufficient allegation that the Welsh Carson entities are about to violate the antitrust laws because, more than *six years in the past*, "Welsh Carson" made two unrelated investments in unrelated geographic locations and unrelated healthcare specialties. *See* Compl. ¶ 339.  Specifically, the FTC points to a 2015, past investment in "the emergency medicine market" and an investment in or around 2017 in "the radiology market" to support its claim that the Welsh Carson entities are "about to violate" the antitrust laws.  *Id.*  But this pleading gambit has been repeatedly rejected by courts.  The FTC alleges nothing more than "a violation in

---

[6]  Moreover, the FTC does not allege that either of Fund XI or Fund XII has any remaining funds available to make such an acquisition, let alone cash sufficient to acquire a majority of USAP.  The FTC's non-factual, conclusory allegations about "Welsh Carson's" general financial capacity and "frequent search for new [healthcare] investments," Compl. ¶ 338, support no inference that any Welsh Carson entity "is about to violate" the antitrust laws.

the distant past and a vague and generalized likelihood of recurrent conduct." *Shire*, 917 F.3d at 159, 161 (admonishing the FTC for its "improper use of Section 13(b)" where it "waited until five years after [the defendant] had stopped its allegedly illegal conduct before seeking an injunction").

The statutory standard set forth in Section 13(b) is not satisfied by years-old conduct and speculative musings about hypothetical future conduct. *See Fed. Trade Comm'n v. AdvoCare Int'l, L.P.*, No. 4:19-CV-715, 2020 WL 6741968, at *5–6 (E.D. Tex. Nov. 16, 2020) (granting defendants' motion to dismiss because "each of the FTC's factual allegations pertain[ed] only to *past* misconduct" by the defendants, and noting that Section 13(b) "unambiguously requires plausible factual allegations" of current or future violation (emphasis in original)). The Fifth Circuit's opinion in *Federal Trade Commission v. Southwest Sunsites, Inc.* is consistent with this approach. 665 F.2d 711, 723 (5th Cir. 1982) (finding Section 13(b) action authorized based on a factual showing of "continuing" conduct and a "large-scale systematic scheme").

Finally, the FTC offers the non-factual and speculative conclusion that "there is a reasonable likelihood that Welsh Carson will engage in similar and related conduct in the future." Compl. ¶ 338. But as the Third Circuit explained, this is plainly not the statutory standard under Section 13(b), which requires a showing that a Welsh Carson entity "is violating, or is about to violate" a law enforced by the FTC. *See Shire*, 917 F.3d at 158 (rejecting FTC's reliance on the "likelihood of recurrence" standard because "the FTC cannot overcome Congress's plain language in Section 13(b)"); *id.* at 160 ("Section 13(b) cannot accommodate the FTC's interpretation—that 'about to violate' means only that a violation could recur at some future point."). Even if, despite the statutory text, the standard for an injunction under Section 13(b) were "reasonable likelihood of recurrence" (which it is not), the FTC pleads no facts supporting any inference (let alone a plausible one) that any Welsh Carson defendant is likely to engage in related or similar conduct

that would violate the antitrust laws. *See AdvoCare Int'l*, 2020 WL 6741968, at *6 (finding pleading insufficient to support an inference of present or future violations where the channel of misconduct was permanently defunct or reformed, lawful, and monitored for compliance); *BRFHH Shreveport*, 49 F.4th at 525 (courts need not accept unwarranted factual inferences).

## II.    THE FTC FAILS TO STATE A CLAIM FOR ALLEGED VIOLATION OF THE ANTITRUST LAWS BY WELSH CARSON.

All ten of the FTC's causes of action against the Welsh Carson entities should also be dismissed under Rule 12(b)(6) because the Complaint contains no allegations that any of the seven distinct Welsh Carson entities named as defendants engaged in any conduct in violation of the antitrust laws. Instead, the FTC hides behind improper group pleading that fails to comply with basic notice pleading requirements. Where, as here, the complaint names multiple entities as defendants, a plaintiff must plead the elements of each claim as to each defendant; generalized pleading directed at all defendants will not suffice. *See Gurgunas v. Furniss*, No. 3:15-CV-03964, 2016 WL 3745684, at *5 (N.D. Tex. July 13, 2016) ("group pleading" failed to meet Rule 8 standard because it was "impossible to ascertain which particular [d]efendant(s) [we]re supposedly responsible" for each alleged act); *Shujauddin v. Berger Bldg. Prods., Inc.*, No. CV 19-876, 2019 WL 9102043, at *1 n.2 (E.D. Pa. June 18, 2019) ("An allegation against multiple defendants that is bereft of specific wrongdoing by those proposed defendants is insufficient to state a claim. Generalized pleadings are not entitled to the assumption of truth.").

This hazy and undifferentiated pleading is exacerbated by the FTC's efforts to evade decades of bedrock corporate law, which makes clear distinctions between investors and the operating company in which they invested. At their core, all of the FTC's claims against the Welsh Carson entities are based on alleged conduct by USAP, a separate and independent corporation with a separate board of directors and separate officers, in which Fund XI was once an investor

15

and in which Fund XII has owned a minority (*i.e.*, non-controlling) stake since 2017.  But the FTC fails to allege facts necessary to show that any of USAP's conduct, or the conduct of its directors, can be properly attributed to any particular Welsh Carson entity, much less to *all* of the Welsh Carson entities named as defendants.  *See, e.g.*, *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1237 (10th Cir. 2017) (plaintiff must "come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise"); *Chandler v. Phoenix Servs.*, No. 7:19-CV-00014, 2020 WL 1848047, at *14 (N.D. Tex. Apr. 13, 2020) ("[A] plaintiff is [] required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise."), *aff'd*, 45 F.4th 807 (5th Cir. 2022).  By improperly lumping together all eight defendants, the FTC tries to create the impression that "USAP and Welsh Carson" are somehow a unified entity.  But they are not: each defendant is distinct.  The FTC has not pled and cannot plead the independent conduct necessary to sustain any claim against any Welsh Carson entity, and all ten of the FTC's claims against the Welsh Carson entities should be dismissed.

    **A.**    **The Complaint States No Claims Against the Welsh Carson Entities for Monopolization, Unlawful Agreements in Restraint of Trade, or Unfair Methods of Competition.**

        1.    *The FTC Fails to Plead that Welsh Carson Is a Monopolist Engaged in Exclusionary Conduct under Section 2 of the Sherman Act (Counts I & IV).*

A monopolization claim under Section 2 of the Sherman Act requires a showing "that the asserted violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999) (citing *United States*

*v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  "Exclusionary conduct under [S]ection 2 is the creation or maintenance of monopoly by means other than the competition on the merits embodied in the *Grinnell* standard."  *Id.*

These claims fail because there is no factual allegation that any Welsh Carson entity was a participant (let alone a monopolist) in any relevant market.  To the contrary: the FTC alleges that "Welsh Carson" is a New York-based private equity firm "engaged in the business of private equity investment and management," Compl. ¶¶ 2, 23, while alleging that "USAP has monopoly power" in the markets for commercially insured hospital-only anesthesia services in Dallas and Houston.  *See* Compl. at 71, 75.  Put simply, no Welsh Carson entity can be a monopolist in a market in which it does not participate.  And, by definition, no market can have more than one monopolist; the FTC alleges USAP is the monopolist, not any Welsh Carson entity.  *See Grinnell*, 384 U.S. at 571 (defining monopoly power).

Nor has the FTC, in hundreds of paragraphs of allegations and after years of investigation, pleaded any fact sufficient to establish that any Welsh Carson entity engaged in any actionable exclusionary conduct.  *See BRFHH Shreveport*, 49 F.4th at 529 (defining exclusionary conduct as "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor").  While the FTC recites the elements in the conclusory assertion that "USAP and Welsh Carson have willfully acquired and maintained monopoly power," Compl. ¶¶ 342, 366, the alleged specifics of the purportedly exclusionary conduct concern only USAP.  *See id.* ¶¶ 343–44, 367–69 (alleging that "USAP acquired" certain practices and that "USAP entered into, or maintained" certain agreements alleged to violate Section 1).  The FTC pleads no exclusionary conduct by any Welsh Carson entity, and certainly not by any of the four Welsh Carson entities that did not even exist and/or have a role in USAP at the time of the alleged conduct between 2012

and 2017.  *See* Compl. ¶¶ 26 (Fund XII), 27 (WCAS XII Associates, LLC); 30 (WCAS Management L.P.); 31 (WCAS Management LLC); *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1202, 1212 (S.D. Tex. 2009) (dismissing Section 2 monopolization claim for failure to allege "actionable exclusionary conduct").  The monopolization claims fail, and Counts I and IV should be dismissed.

2. *The FTC Does Not Allege that any Welsh Carson Entity Was Party to an Agreement or Transaction in Violation of the Antitrust Laws (Counts II, V, VII, IX, & X).*

The FTC likewise fails to allege that any Welsh Carson entity was a party to any allegedly unlawful agreement, as required by each of Counts II, V, VII, IX and X.

**Section 7 Claims.**  In Counts II, V, and VII, the FTC alleges violations of Section 7 of the Clayton Act, which prohibits a party from acquiring a target competitor where the effect "may be substantially to lessen competition, or to tend to create a monopoly."  15 U.S.C. § 18.  The FTC alleges that USAP (not the Welsh Carson entities) acquired certain physician practices in Houston (Count II), Dallas (Count V), and Austin (Count VII).  The Complaint never alleges that any Welsh Carson entity acquired any of the anesthesia practices identified in the Complaint.

**Price Fixing Claim under Section 1 of the Sherman Act.**  In Count IX, the FTC alleges that USAP and the Welsh Carson entities violated Section 1 of the Sherman Act by engaging in "price-setting" where USAP provided administrative billing services for other anesthesiologists. Compl. ¶¶ 176, 405–06.  It is the FTC's burden to plead facts which establish that USAP and the Welsh Carson entities entered into an agreement or conspiracy "among actual competitors." *Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*, No. CIV.A. 10-00124, 2010 WL 3488244, at *16 (E.D. La. Aug. 26, 2010) (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 216–19 (1940)).  The FTC alleges that *USAP* (not the Welsh Carson entities) entered into or maintained agreements with third parties, pursuant to which *USAP* (not the Welsh Carson

18

entities) provided administrative billing services, and that those agreements purportedly resulted in *USAP* (not Welsh Carson entities) billing for others' services at USAP's higher rates.  Compl. ¶¶ 175–81.  The Complaint never once alleges that any Welsh Carson entity was a competitor in the relevant markets, or entered into any of those agreements.

  ***Market Allocation under Section 1 of the Sherman Act.***  In Count X, the FTC alleges that USAP and the Welsh Carson entities violated Section 1 of the Sherman Act by engaging in horizontal market allocation or division as a result of USAP's alleged noncompete agreement with a potential competitor.  Compl. ¶¶ 214, 410–11.[7]  But the FTC must plead facts establishing an agreement among competitors "at the same level of the market structure to allocate territories in order to minimize competition."  *Hobart Bros. Co. v. Malcolm T. Gilliland, Inc.*, 471 F.2d 894, 899 (5th Cir. 1973).  The FTC's allegations focus on *USAP*'s (not the Welsh Carson entities') alleged agreement with a potential competitor, in which the potential competitor allegedly agreed not to compete with *USAP* (not the Welsh Carson entities) in the Dallas-Fort Worth market in connection with *USAP*'s (not the Welsh Carson entities') acquisition of Pinnacle Anesthesia Consultants.  Compl. ¶¶ 214, 410.  No Welsh Carson entity is alleged to have been a market participant or to have entered into any agreement with the named potential competitor.  *See id.* ¶¶ 208–15; *see* also *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1132 (9th Cir. 2011) (Section 1 outlaws "[a]greements of competitors, whether express or implicit, whether by formal agreement or otherwise, in restraint of trade.").

---

[7]  To the extent the FTC refers to the "Welsh Carson"-affiliated executive in its discussion of market allocation (Compl. ¶¶ 208–15), he was at all times relevant to this allegation a *director of USAP* (*id.* ¶ 37) and is thus presumed to have been acting in his capacity as a USAP director, as detailed below.  *See infra* at 26–27.

3.      *The FTC Fails to State a Claim under Section 5 of the FTC Act Against the Welsh Carson Defendants (Count VIII).*

In Count VIII, the FTC purports to bring a claim under Section 5 of the FTC Act, alleging generally that "USAP's and Welsh Carson's course of conduct, whether considered as a whole or each portion in isolation, is an unfair method of competition."  Compl. ¶ 402.  The FTC pleads no additional factual allegations in Count VIII; its Section 5 claim merely restates and combines the FTC's Sherman Act and Clayton Act claims and fails for the same reasons explained above.

To the extent the FTC is attempting to allege a standalone theory under Section 5—*i.e.*, a claim that the WCAS entities have violated Section 5 of the FTC Act even if they have not violated *any* of the antitrust laws—the FTC's theory is far too vague to give fair notice to the defendants regarding what conduct is permissible or to provide the court a basis to determine whether Count VIII states a claim.  *See E.I. du Pont de Nemours & Co. v. Fed. Trade Comm'n*, 729 F.2d 128, 139 (2d Cir. 1984) (Under Section 5, the Commission "owes a duty to define the conditions under which conduct [would be an unfair method of competition] so that businesses will have an inkling as to what they can lawfully do rather than be left in a state of complete unpredictability.").

Nevertheless, despite the FTC's silence about its theory under Section 5, such a claim requires, *at a minimum*, that the defendant be a market participant engaged in unfair methods of competition.  *See* 15 U.S.C. § 45(a)(1); *see also Off. Airline Guides, Inc. v. Fed. Trade Comm'n*, 630 F.2d 920, 926 (2d Cir. 1980) (reversing FTC order under Section 5, holding that entity not engaged in business as an air carrier could not be held liable under Section 5 for conduct relating to competition in the air carrier business).  Here, the FTC does not allege that any Welsh Carson entity was a market participant in the provision of anesthesia services in any geography.  The Section 5 claim fails.

**B.      Welsh Carson Cannot Be Liable for Alleged Violations of the Antitrust Laws by USAP.**

Even though USAP is the only entity even arguably alleged to have engaged in anticompetitive conduct, the FTC tries to impute liability to all seven of the Welsh Carson entities (without distinction) for the alleged conduct of USAP.  This approach has no basis in corporate or antitrust law, and instead betrays the FTC's true motivation here, which is to advance its new policy goal of targeting the private equity industry by presuming certain acquisitions are anticompetitive.

Hoping to elide the clear corporate separateness between USAP and each of the Welsh Carson entities, the FTC repeatedly incants the allegation that "Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in," the challenged conduct.  *See, e.g.*, Compl. ¶¶ 40, 345, 370, 351, 376, 392, 400, 406, 411.  But this non-factual, legal conclusion is entitled to no weight on a motion to dismiss.  *See Iqbal*, 556 U.S. 662, 678–79 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"); *Clark v. Thompson*, 850 Fed App'x 203, 208 (5th Cir. 2018) (dismissal appropriate where plaintiff offers "speculation and conclusory allegations").[8]  And the FTC fails to plead sufficient facts showing that any of USAP's conduct (including the conduct of USAP's directors designated by one of the Funds) can be properly attributed to any particular Welsh Carson entity, or that any Welsh Carson entity independently engaged in such conduct.

Instead, the FTC engages in impermissible group pleading as to all of the named defendants, rendering the Complaint unintelligible as to what any given entity is allegedly

---

[8] Indeed, the FTC's own pleading admits that the Welsh Carson entities do not control USAP.  Compl. ¶ 336 (hypothesizing about future conduct that might allow "Welsh Carson" to "retak[e] formal control of the company).

supposed to have done.  As an especially egregious example, the FTC repeatedly alleges that in 2012, "Welsh Carson" (defined by the FTC to refer to *all seven* Welsh Carson entities, Compl. at 1–2) "created USAP," *id.* ¶ 3; devised USAP's "consolidation strategy," *id.*; hired some of USAP's original management team, *id.* ¶ 38; and committed capital, *id.* ¶ 80.  Of course, these allegations about conduct at the time of USAP's creation in 2012 cannot be attributable to all seven Welsh Carson entities, let alone the *four* Welsh Carson entities that (as the FTC's pleading itself makes clear) did not exist at that time.[9]  The FTC bears the burden of pleading the elements of each of its claims against all seven Welsh Carson entities, and it has failed to carry that burden here.  Even after a lengthy investigation, the FTC has failed to plead facts demonstrating the type of "independent conduct" required for the claims against any Welsh Carson entity to proceed; all it alleges is conduct wholly typical of investor and investee.  Quite frankly, it has made no effort at all to do so; all it alleges is conduct that is wholly typical of the investor and investee relationship. Fundamental principles of corporate law, which the FTC seeks to ignore, dictate that these claims be dismissed.

### 1. *Courts Respect the Corporate Form.*

As the Supreme Court has held, "[i]t is a general principle of corporate law that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries."  *United States v. Bestfoods*, 524 U.S. 51, 52 (1998); *see also Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (same); *SSP Partners v. Gladstrong Invs. (USA) Corp.*, 275 S.W.3d 444, 455 (Tex. 2008) ("We have never held corporations liable for each other's obligations merely because of centralized control, mutual

---

[9] *See* Compl. ¶¶ 26 (Fund XII founded in 2014; no role in USAP before 2017), 27 (WCAS XII Associates, LLC founded in 2014; no role in USAP before 2017); 30 (WCAS Management L.P. founded in 2017); 31 (WCAS Management LLC founded in 2017).

purposes, and shared finances."); *Valdez v. Cap. Mgmt. Servs., LP*, No. CIV.A. B:09-246, 2010 WL 4643272, at \*6–7 (S.D. Tex. Nov. 16, 2010) (declining to disregard corporate form where entities were alleged to have acted as agents and assigns for each other).[10]   Courts respect the corporate form because "limited liability remains the norm in American corporate law."  *United States v. Jon-T Chems., Inc.*, 768 F.2d 686, 691 (5th Cir. 1985).

Consistent with this settled principle, an entity cannot be liable for violations of the antitrust laws unless it participated in those violations through some "independent conduct."  *See, e.g.*, *Chandler*, 2020 WL 1848047, at \*14 ("[A] plaintiff is . . . required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise."); *In re Penn. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688 (E.D. Pa. 2009) ("[T]o state a claim against parent corporations, plaintiffs must set forth facts establishing the parent corporations' direct and independent participation in the alleged conspiracy."); *In re LIBOR-Based Financial Instruments Antitrust Litig.*, No. 11 MDL 2262, 2019 WL 1331830, at \*38 (S.D.N.Y. Mar. 25, 2019) (dismissing claims where complaint did not allow an "inference that [defendants'] subsidiaries and affiliates independently participated in [the alleged misconduct]" or "actually played a role in the scheme").

A credible and factual showing that the parent directed or controlled the subsidiary's anticompetitive conduct is required.  *See In re Penn. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d at 689 ("[P]laintiffs here rely on general statements that barely rise above mere labels and conclusions and thus hardly raise a right to relief above a speculative level.").  Conduct "typical of any parent

---

[10]   This concept of corporate separateness is another reason why the FTC's attempt to lump together the various Welsh Carson defendants necessarily fails. Allegations that "[t]he Welsh Carson Defendants operate as a common enterprise" because they "share a website," "use the same office space," or have overlapping officers and directors cannot overcome this bedrock corporate law principle that the Welsh Carson defendants are, in fact, separate entities, with separate stakeholders, business purposes, and operations.  Compl. ¶ 32.

and subsidiary" is insufficient. *Id.*; *see also Masimo Corp. v. Wireless*, No. 19-CV-01100, 2020 WL 7260660, at *16 (S.D. Cal. Dec. 10, 2020) (liability only attaches to a parent where its authority over a subsidiary is "so extensive that the subsidiary becomes only a means through which the parent acts, or nothing more than an incorporated department of the parent").

> 2. *The Welsh Carson Entities' Alleged Activities Incidental to their Investments Do Not Constitute Independent Conduct.*

The FTC fails to allege facts showing that any Welsh Carson entity independently participated in any unlawful conduct. Despite its repeatedly-incanted but conclusory allegations of "Welsh Carson's" direction and control of USAP's conduct, the purported factual predicates alleged by the FTC merely reflect nothing more than the "typical" relationship between an investor and its portfolio or subsidiary company. The FTC cannot establish "independent conduct" based on its allegations that Welsh Carson:

- held varying ownership interests in USAP over time and certain associated shareholder rights, including the right to nominate directors to USAP's board of directors, Compl. ¶¶ 35–36;[11]

- "assist[ed]" USAP by "identifying attractive acquisitions, helping secure funding, and assisting in negotiations with insurers," *id.* ¶ 37;

- "hired most of USAP's original management team" around the time of USAP's founding in 2012, *id.* ¶ 38;

- "regularly provided USAP with strategic, operational, and financial support . . . [and, p]ursuant to a series of management agreements and otherwise, . . . provided USAP with services related to corporate finance, acquisition due diligence, and strategic planning (among other things)," *id.* ¶ 39;[12] and

---

[11]  As explained above, the Funds had certain customary shareholder rights in USAP, including, prior to 2017, the right to fill a majority of directors to USAP's Board with Welsh Carson-affiliated directors. The FTC does not allege—because it cannot—that the Funds ever exercised that right.

[12]  There is no allegation that USAP was under an obligation to use those services (which are typical of those offered by capital sponsors to their portfolio companies), or to take direction from these professionals.

- "continued to play a critical oversight role," citing only a 2013 USAP-drafted "Playbook" about USAP's plan for future interactions with "Welsh Carson," *id.* ¶ 101.[13]

These allegations of basic stockholder rights and advisory assistance are typical of, and incidental to, the Funds' holdings in USAP and are plainly insufficient to show independent participation, much less management of USAP's day-to-day operations. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 376 (M.D. Pa. 2008) (allegation that parent regarded wholly-owned subsidiary as a "valuable asset" because an alleged anticompetitive agreement allowed it to maintain supracompetitive prices did not support an inference that parent was party to such agreement). The FTC never alleges that Fund XII has the legal authority to control USAP under Delaware law, USAP's organizational documents, or the operative agreements. And the FTC concedes that the Funds have held a minority share for most of USAP's existence, and they have never appointed more than two of USAP's directors, despite an alleged right to appoint more. This counsels strongly against any finding of control by the Welsh Carson entities.

The district court's decision in *In re Pennsylvania Title Insurance Antitrust Litigation* is instructive. There, the court respected the legal distinction between a parent and its wholly-owned subsidiary and rejected plaintiffs' argument that they had set forth independent participation. The court did not find independent conduct where the parent entities allegedly gave "their assent and approval to their respective [wholly-owned] subsidiaries' conduct" and "had ownership and control of their respective subsidiaries." *In re Penn. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d at 688. Those allegations were insufficient to impute liability; that conduct was "typical of any parent and subsidiary." *Id.* The allegations failed to demonstrate independent conduct because they did not plausibly allege facts showing conduct by the parent that violated the antitrust laws. So, too,

---

[13] Notably, the FTC does not allege that Welsh Carson ever enforced its "critical oversight" function.

here.  Taken individually or collectively, the FTC's allegations come nowhere close to establishing independent participation in unlawful, anticompetitive conduct by any Welsh Carson entity.

   3.   *None of the FTC's Remaining Allegations Properly Plead Independent Conduct by the Welsh Carson Entities.*

As detailed above, there are no allegations that any Welsh Carson entity was a monopolist engaged in exclusionary conduct or a party to any USAP acquisitions and agreements alleged to violate the antitrust laws.  *See supra* Parts II.A.1 & II.A.2.[14]  So all the FTC is left with is that "Welsh Carson" created the idea for USAP and that a USAP director who was affiliated with Welsh Carson acted on behalf of USAP.  Neither can impute liability to any Welsh Carson entity.

**USAP Director Conduct.**  The bulk of the FTC's allegations regarding "Welsh Carson's" conduct concern the alleged conduct of a USAP director, Mr. Regan, who is also affiliated with Welsh Carson.  These allegations cannot establish the independent conduct of any Welsh Carson entity.  As the Supreme Court has held, it is a "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately."  *Bestfoods*, 524 U.S. at 69 (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997)).  Directors are presumed to act on behalf of the company on whose board they sit when involved in company business:

> Since courts generally presume that the directors are wearing their subsidiary hats and not their parent hats when acting for the subsidiary, it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility.

*Id.*, 524 U.S. at 69–70; *see also Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (under Delaware law, designated directors owe the company on whose board they sit "uncompromising"

---

[14]  The FTC alleges that a representative of Welsh Carson signed certain documents or agreements, but does not allege those documents or agreements had anything to do with any violation of the antitrust laws.  *See, e.g.*, Compl. ¶¶ 84, 126, 211.

fiduciary duties, and "[t]here is no dilution of this obligation where one holds dual or multiple directorships"). Dual directors must "depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary." *Bestfoods*, 524 U.S. at 71.

The FTC pleads no facts to rebut the presumption that the USAP director affiliated with Welsh Carson was acting on behalf of USAP. The best the FTC can muster is the non-factual allegation that "[a]t least one Welsh Carson director on USAP's board . . . acted in his Welsh Carson capacity" in connection with USAP business. Compl. ¶ 37. But this conclusory allegation is insufficient to rebut the Supreme Court's presumption, as it lacks any supporting factual detail showing that any USAP director acted to benefit a Welsh Carson entity and *not* USAP. *See Bestfoods*, 524 U.S. at 70 & n.13 (plaintiff bears the burden of "show[ing] that dual officers or directors were in fact acting on behalf of the parent").[15] Indeed, it does not come close to the "so far from the norms" principle established by the Supreme Court. *Id.* at 70 n.13, 71.

Because the Complaint alleges *neither* independent participation in the allegedly unlawful conduct by any Welsh Carson entity, *nor* conduct by the director appointed by the Welsh Carson Funds that is inconsistent with acting for USAP, the Welsh Carson entities cannot be liable for USAP's conduct.

**Pre-USAP Formation Conduct.** Nor can Fund XI's provision of start up capital and outlining a proposed strategy leading up to USAP's founding in 2012 be a basis for liability. *Id.*

---

[15] *See also In re Alper Holdings USA, Inc.*, 398 B.R. 736, 752–54 (S.D.N.Y. 2008) (parent company not liable for the conduct of its subsidiary where pleadings did not identify any specific actions undertaken by the dual agent that were for the benefit of the parent but not for the benefit of the subsidiary); *Trinity Indus., Inc. v. Greenlease Holding Co.*, No. CIV.A. 08-1498, 2014 WL 1766083, at *11 (W.D. Pa. May 2, 2014), *aff'd*, 903 F.3d 333 (3d Cir. 2018) (where plaintiff did not point to evidence showing that the parent's officers or directors acted on the subsidiary's board "in any way that was 'plainly contrary to the interests of [the subsidiary] yet nonetheless advantageous to [the parent],'" plaintiff failed to rebut the presumption that the dual officers and directors acted in their capacity as the subsidiary's board members).

¶¶ 77–94.  From this pre-founding conduct, the FTC alleges that *USAP* (not the Welsh Carson entities) made a series of acquisition and management decisions purportedly consistent with that strategy over the course of the next decade.  All the allegations of purportedly unlawful conduct focus on USAP, not on any Welsh Carson entity.  *See, e.g.*, *id.* ¶ 100 ("Welsh Carson and USAP had set in motion their consolidation strategy . . . USAP soon began executing on it."); *id.* ¶ 334 ("USAP has engaged in a whole set of anticompetitive tactics to execute the consolidation scheme Welsh Carson set out."); *id.* at 37 ("USAP expands its roll-up scheme . . ."); *id.* ¶ 174 ("USAP extended and defended its growing power through . . . (1) price-setting arrangements in which USAP charged its own, higher prices for services rendered by anesthesia providers who chose to remain independent; and (2) a market allocation agreement to avoid a head-to-head rivalry . . . with another large anesthesia provider. . . .").

In other words, the FTC impermissibly attempts to hold the Welsh Carson entities liable for allegedly supplying an *idea* to USAP which, in turn, was led by its own management empowered to make its own decisions over the course of the next decade.  *See, e.g., Verizon Commc'ns, Inc. v. Law Off. of Curtis V. Trinko*, 540 U.S. 398, 407 (2004) ("The opportunity to charge monopoly prices—at least for a short period—is what attracts 'business acumen' in the first place; it induces risk taking that produces innovation and economic growth.").

### 4.     *The FTC Fails to Plead Any Claim Based on Agency Liability.*

To the extent there is any unpled suggestion that the Welsh Carson entities are liable on the theory that USAP acted as any of the Welsh Carson entities' agent, that theory of liability also fails.  Consistent with its other pleading failures, the FTC's allegations that the Funds had rights as stockholders and appointed two directors to the USAP board are insufficient to state an agency

claim against the Welsh Carson entities for the alleged conduct of USAP.[16]  *See Transamerica Leasing, Inc. v. La Republica de Venezuela*, 200 F.3d 843, 851 (D.C. Cir. 2000) (rejecting agency theory based on allegations that Republic of Venezuela owned majority of corporate entity and could appoint directors and officers of corporate entity, put its chosen manager in charge of entity and let him run "day-to-day" operations, and provided funds to entity); *Masimo Corp.*, 2020 WL 7260660, at *16–18 (dismissing vicarious liability infringement claims, as allegations that parent and subsidiary shared officers and/or directors, parent was involved in subsidiary's legal disputes, and parent was involved in "minutia of a product line" were insufficient to demonstrate agency relationship).  The claims against the Welsh Carson entities should be dismissed because the FTC fails to plead that USAP acted as any Welsh Carson entity's agent.

### C.   The FTC Fails to State a Valid Conspiracy Claim Under Section 2 of the Sherman Act (Counts III & VI).

Finally, the FTC cannot plead a viable "conspiracy" claim in violation of Section 2 of the Sherman Act as between USAP and any of the seven Welsh Carson entities.  As the Supreme Court has held, a conspiracy requires "concerted activity" between two "separate economic actors pursuing separate economic interests."  *Copperweld Corp.*, 467 U.S. at 768.  Corporate separateness does not drive the *Copperweld* analysis; rather, the concerted action inquiry is informed by "competitive reality."  *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196 (2010).  "The crucial question is whether the entities alleged to have conspired maintain an economic unity, and whether the entities were either actual or potential competitors."  *PostX Corp. v. Secure Data in Motion, Inc.*, No. C 02-04483, 2005 WL 8177634, at *3 (N.D. Cal. Aug. 17, 2005).

---

[16] The FTC likewise fails to plead any other basis for vicarious liability for any of the Welsh Carson entities.

The Complaint does not, and cannot, allege that USAP and Welsh Carson were separate economic actors capable of conspiring as competitors (or even market participants) in any relevant market in violation of the antitrust laws.  The FTC does not allege that Welsh Carson had interests that diverged from USAP's, or that Welsh Carson and USAP are or were actual or potential competitors.  In fact, the opposite is true:  at all times, at least one of the Welsh Carson entities was an investor in, or otherwise aligned with, USAP, and no Welsh Carson entity ever provided anesthesia services.  As such, they were never "separate economic actors" capable of concerted action and were not actual or potential competitors.  *See, e.g.*, *PostX Corp.*, 2005 WL 8177634, at *4 (holding that a 20% investor could not have conspired with the company because they had shared economic interests and were not actual or potential competitors); *Top Rank, Inc. v. Haymon*, No. CV154961, 2015 WL 9948936, at *3, *16 (C.D. Cal. Oct. 16, 2015) (dismissing claims against asset management and investment advisory firms that held equity interests in and "commit[ted] funding, business expertise, and operational supervision" to a portfolio company because they were incapable of conspiring under *Copperweld*: they "share[d] a complete unity of economic interest in the venture's success, and [had] no alleged separate interest, at least as it relate[d] to the relevant . . . markets," and the investor firms were not actual or potential competitors of the portfolio company); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 344 (N.D. Ill. 1997) ("Even in cases where the parent's ownership interest is not strong, unity of interest may be established if the economic objectives of the corporations are interdependent.").

## III.   THE CASE SHOULD ALSO BE DISMISSED BECAUSE, AS AN INDEPENDENT AGENCY, THE FTC CANNOT FILE AN ENFORCEMENT ACTION—AN AUTHORITY RESERVED TO AGENCIES DIRECTLY SUPERVISED BY THE PRESIDENT.

As outlined above, all of the FTC's claims against the Welsh Carson entities fail both as a matter of statute and pleading, and they should be dismissed.  Dismissal on those grounds would

fully resolve this motion.  However, if the Court does not dismiss the FTC's claims on the merits, the Court would need to address the constitutional problems posed by the FTC's lawsuit, which is an impermissible exercise of executive branch authority—an important constitutional issue that the Court could otherwise avoid resolving.  *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 855 (2014) ("[I]t is a well-established principle governing the prudent exercise of this Court's jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case.").[17]  In the event the Court does not dismiss on statutory or procedural grounds, it should dismiss the FTC's action as a violation of Article II of the U.S. Constitution.  The choice whether to initiate an enforcement action in court is the paradigmatic exercise of executive branch authority; but the FTC is an independent agency whose existence and structure the Supreme Court upheld only because it *did not* exercise executive branch functions. The FTC's power to bring enforcement lawsuits for injunctions under Section 13(b) in federal court must therefore be stricken and, as a result, this case must be dismissed.[18]

### A.   The FTC Act Amendments, Which Authorized Independent FTC Commissioners to Exercise the President's Executive Power, Such as By Filing this Enforcement Action in Court, Violate Article II of the Constitution.

This case presents the very same problem that the Supreme Court has already recognized as a constitutional violation: an independent agency (here, the FTC) is exercising fundamentally executive power (filing an enforcement action) that is reserved exclusively to the President under

---

[17] *See also Cnty. Ct. of Ulster Cnty., N.Y. v. Allen*, 442 U.S. 140, 154 (1979) (although courts "have a duty to decide constitutional questions when necessary to dispose of the litigation before them," they "have an equally strong duty to avoid constitutional issues that need not be resolved in order to determine the rights of the parties to the case under consideration").

[18] USAP argues that the FTC's power to file suit in federal court for a preliminary or permanent injunction (as here) is conditioned upon the FTC promptly pursuing or having pursued to completion an administrative proceeding against the defendants (which it has not done here).  The Welsh Carson entities agree with USAP's position and incorporate USAP's argument herein.

the U.S. Constitution, while enjoying protection from Presidential oversight.  *See Seila Law*, 140 S. Ct. at 2191 (holding that structure of Consumer Financial Protection Bureau ("CFPB") violated separation of powers).  Under Article II of the Constitution, "the 'executive Power'—all of it—is 'vested in a President.'"  *Id.*  This power necessarily includes "appointing, overseeing, and controlling" principal executive officers, *id.* at 2197, such as those who "set enforcement priorities" and "initiate prosecutions," *id.* at 2203–04.

Since its creation in 1914, the FTC has been, by conscious design, "independent" of the President's control.  Congress limited *both* the President's power to appoint FTC commissioners of his choice (mandating that "[n]ot more than three of the Commissioners shall be members of the same political party"), *and* the President's power to remove them (providing that a "Commissioner may be removed by the President" only "for inefficiency, neglect of duty, or malfeasance in office").  15 U.S.C. § 41.  In 1935, the Supreme Court upheld the constitutionality of the FTC, notwithstanding its structure as an independent agency, based on the limited, quasi-judicial and quasi-legislative nature of the authorities the Commissioners could exercise.  *See Humphrey's Executor*, 295 U.S. at 628.  The Court's opinion was built on the crucial understanding that the FTC, at the time, "exercis[ed] 'no part of the executive power.'"  *Seila Law*, 140 S. Ct. at 2198 (quoting *Humphrey's Executor*, 295 U.S. at 628).  The Court found that the FTC instead functioned "as a legislative or as a judicial aid."  *Humphrey's Executor*, 295 U.S. at 628.

Decades later, however, Congress amended the FTC Act to vest in FTC Commissioners the indisputably executive power of seeking injunctive relief in federal district court (so long as it is tethered to a parallel administrative proceeding).  *See* 15 U.S.C. § 53(b) (amended in Pub. L. No. 93-153, § 408(f), 87 Stat. 576, 592 (1973)).  As a result of these amendments, the FTC now wields substantial executive power: it operates, in large part, as an enforcement agency, and its

function is quintessentially executive in nature.  *See AMG Capital Mgmt.*, 141 S. Ct. at 1346

(detailing Congress's conferral of enforcement authority on the FTC beginning in the 1970s).[19]

Lest there be any doubt that the FTC is an enforcer, the FTC Chair has repeatedly referred to the

FTC as an "enforcement" agency.[20]

Congress's grant to the FTC—an independent agency—of such core enforcement powers

breached the limits of Article II.  The powers that were added to the FTC's authority in 1973 are

at the heart of the duty "vested" exclusively in the President to "take Care that the Laws be

faithfully executed."  U.S. Const. Art. II, §§ 1, 3.  "[T]he choice of how to prioritize and how

aggressively to pursue legal actions against defendants who violate the law falls within the

discretion of the Executive Branch."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021);

*see also Buckley v. Valeo*, 424 U.S. 1, 138 (1976) ("A lawsuit is the ultimate remedy for a breach

of the law, and it is to the President . . . that the Constitution entrusts th[is] responsibility.").  The

FTC Commissioners enjoy the same powers to "set enforcement priorities [and] initiate

prosecutions" that the Supreme Court recently concluded, when reviewing the structure of the

CFPB, were "significant executive power[s]."  *Seila Law*, 140 S. Ct. at 2201, 2203–04.

In sum, much of the authority the FTC claims today no longer resembles that of the

independent agency that the Supreme Court endorsed in 1935.  The FTC's exercise of executive

---

[19]  The FTC is equipped with the authority to investigate suspected violations of the laws that it is tasked with enforcing, the power to order compulsory process, and the ability to initiate administrative proceedings or to seek injunctive relief in federal court.  *See* 15 U.S.C. § 41 *et seq.*

[20]  *See generally* Transcript, A Conversation with FTC Chair Lina Khan and DOJ Assistant Attorney General Jonathan Kanter on Antitrust Enforcement, Brookings Inst. 2, 22 (Oct. 5, 2023) (Chair Khan: FTC has "a whole set of law enforcement tools"), https://www.brookings.edu/wp-content/uploads/2023/08/gs_20231005_antitrust_transcript.pdf; Q&A with FTC Chair Lina Khan, Chicago Booth Stigler Ctr. (June 3, 2022) (antitrust statutes "allow the FTC to police unfair methods of competition"), https://www.promarket.org/2022/06/03/qa-with-ftc-chair-lina-khan-the-word-efficiency-doesnt-appear-anywhere-in-the-antitrust-statutes/.

power under Section 13(b) cannot be reconciled with the independence that the Commission enjoys, both in the form of restrictions on the President's appointment authority and the Commissioners' insulation from Presidential removal.  Section 13(b) thus violates the U.S. Constitution.

>   **B.**   **The Appropriate Remedy for this Constitutional Violation Is to Strike the Executive Powers Granted to the FTC in 1973, which Compels Dismissal of this Action.**

The inquiry does not end at identifying the constitutional violation; the Court must determine the remedy for the violation.  In *Seila Law*, the Supreme Court concluded that it could sever the CFPB Director's removal protection (i) "because the surviving provisions were capable of functioning independently," (ii) because other agencies had been closed and their authorities transferred to CFPB, and (iii) because "nothing in the text or history of the [statute] demonstrates Congress would have preferred *no* CFPB to a CFPB supervised by the President."  140 S. Ct. at 2208–10 (emphasis in original).  But the same logic does not apply here, and the FTC's executive power should be revoked.

The FTC existed for half a century before Congress granted it the expansive executive powers outlined in the 1973 amendments that give rise to the constitutional violation in this case. Indeed, the Supreme Court upheld the structure of the FTC as originally constituted and endorsed Congress's conception of an independent FTC with restrictions on the President's authority over FTC Commissioners' appointment and removal.  *See Humphrey's Executor*, 295 U.S. at 628. Striking the FTC's executive powers would not, however, limit the government's ability to enforce the antitrust laws.  The Antitrust Division of the Department of Justice ("DOJ"), a body directly accountable to the President, is already tasked with "[g]eneral enforcement, by criminal and civil proceedings, of the Federal antitrust laws."  *See* 28 C.F.R. § 0.40.  Nor would it leave the FTC without a mandate.  The FTC is charged with administering more than seventy laws and related

regulations.  *See* Fed. Trade Comm'n – Enforcement, https://www.ftc.gov/enforcement (last visited Nov. 11, 2023).  The FTC can thus still function as legislative and judicial aid.  *See Humphrey's Executor*, 295 U.S. at 628.  Severing the FTC's later-added executive authorities would thus *both* preserve the independent character of the agency as Congress created it more than a century ago (and has never seen fit to change), *and* preserve to DOJ the authority to execute the laws subject to the President's full supervision.  Here, Section 13(b) in the 1973 amendment is what must be severed so the original law can stand without the unconstitutional amendment.

Severing Section 13(b) in the later-enacted amendments, which created the constitutional problem, is also consistent with the Supreme Court's precedent on severability.  "The Court has long applied severability principles . . . where Congress added an unconstitutional amendment to a prior law.  In those cases, the Court has . . . severed the [problem] introduced by amendment, so that the original law stands without the amendatory [violation]."  *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2353 (2020) (plurality opinion).

Striking the FTC's more recently added executive functions will return the body to what Congress originally, constitutionally created—"a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions."  *Seila Law*, 140 S. Ct. at 2199.  Striking the amendment would also compel dismissal of this action, which proceeds under authority unconstitutionally granted to the FTC by the amendment. Without constitutional authority for the FTC to bring this suit, dismissal is the appropriate result.

## CONCLUSION

For the foregoing reasons, the Welsh Carson entities respectfully request that all claims against them be dismissed with prejudice.

Dated: November 20, 2023

/s/ R. Paul Yetter

R. Paul Yetter
(Attorney-in-Charge)
State Bar No. 22154200
Fed I.D. 3639
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Telephone: (713) 632-8000
Facsimile: (713) 632-8002

David B. Hennes (pro hac vice)
david.hennes@ropesgray.com
Jane E. Willis (pro hac vice)
jane.willis@ropesgray.com
C. Thomas Brown (pro hac vice)
thomas.brown@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

Douglas Hallward-Driemeier (pro hac vice)
douglas.hallward-driemeier@ropesgray.com
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

Kathryn Caldwell (pro hac vice)
kathryn.caldwell@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

Kenneth Field (pro hac vice)
ken.field@hoganlovells.com
HOGAN LOVELLS US LLP
Columbia Square

36

555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Perry A. Lange (*pro hac vice* forthcoming)
perry.lange@wilmerhale.com
WILMER CUTLER PICKERING HALE AND
DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 633-6493
Facsimile: (202) 663-6363

*Counsel for Defendants Welsh, Carson, Anderson*
*& Stowe XI, L.P., WCAS Associates XI, LLC,*
*Welsh, Carson, Anderson & Stowe XII, L.P., WCAS*
*Associates XII, LLC, WCAS Management*
*Corporation, WCAS Management, L.P., and WCAS*
*Management, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Welsh Carson Entities' Motion to Dismiss was electronically filed and served on all counsel of record on November 20, 2023.

*/s/ R. Paul Yetter*
R. Paul Yetter

37