UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. ANESTHESIA PARTNERS, INC., | § | Civil Action No. 4:23-cv-03560 |
| | § | |
| and | § | |
| | § | |
| WELSH, CARSON, ANDERSON & STOWE XI, L.P., et al. | § | |
| | § | |
| | § | |
| Defendants | § | |

**APPENDIX TO WELSH CARSON ENTITIES' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

**Cases**

*Chandler v. Phoenix Servs.*,
No. 7:19-CV-00014, 2020 WL 1848047 (N.D. Tex. Apr. 13, 2020), *aff'd*, 45
F.4th 807 (5th Cir. 2022) ......................................................................... WCAS001

*Fed. Trade Comm'n v. AdvoCare Int'l, L.P.*,
No. 4:19-CV-715, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) ........................... WCAS014

*Gurgunas v. Furniss*,
No. 3:15-CV-03964, 2016 WL 3745684 (N.D. Tex. July 13, 2016) ......................... WCAS020

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
No. 11 MDL 2262, 2019 WL 1331830 (S.D.N.Y. Mar. 25, 2019) ........................... WCAS026

*Masimo Corp. v. Wireless*,
No. 19-CV-01100, 2020 WL 7260660 (S.D. Cal. Dec. 10, 2020) ............................ WCAS065

*PostX Corp. v. Secure Data in Motion, Inc.*,
No. C 02-044832005 WL 8177634 (N.D. Cal. Aug. 17, 2005) ................................. WCAS081

*Shujauddin v. Berger Bldg. Prods., Inc.*,
No. CV 19-876, 2019 WL 9102043 (E.D. Pa. June 18, 2019) ................................. WCAS087

*Top Rank, Inc. v. Haymon*,
No. CV154961, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ................................ WCAS091

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
No. CIV.A. 08-1498, 2014 WL 1766083 (W.D. Pa. May 2, 2014), *aff'd*, 903
F.3d 333 (3d Cir. 2018) ............................................................................ WCAS109

*Valdez v. Cap. Mgmt. Servs., LP*,
No. CIV.A. B:09-246, 2010 WL 4643272 (S.D. Tex. Nov. 16, 2010) ..................... WCAS123

*Vaughn Med. Equip. Repair Serv., L.L.C. v. Jordan Reses Supply Co.*,
No. CIV.A. 10-00124, 2010 WL 3488244 (E.D. La. Aug. 26, 2010) ...................... WCAS137

**Other Cited Documents**

Fed. Trade Comm'n – Enforcement, https://www.ftc.gov/enforcement ........................ WCAS155

Transcript, A Conversation with FTC Chair Lina Khan and DOJ Assistant
    Attorney General Jonathan Kanter on Antitrust Enforcement, Brookings Inst.
    2, 22 (Oct. 5, 2023) (Chair Khan: FTC has "a whole set of law enforcement
    tools"), https://www.brookings.edu/wp-
    content/uploads/2023/08/gs_20231005_antitrust_transcript.pdf..............................WCAS156

Q&A with FTC Chair Lina Khan, Chicago Booth Stigler Ctr. (June 3, 2022)
    (antitrust statutes "allow the FTC to police unfair methods of competition"),
    https://www.promarket.org/2022/06/03/qa-with-ftc-chair-lina-khan-the-word-
    efficiency-doesnt-appear-anywhere-in-the-antitrust-statutes/ ..................................WCAS187

Dated: November 20, 2023

/s/ R. Paul Yetter
R. Paul Yetter
*(Attorney-in-Charge)*
State Bar No. 22154200
Fed I.D. 3639
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Telephone: (713) 632-8000
Facsimile: (713) 632-8002

David B. Hennes (*pro hac vice*)
david.hennes@ropesgray.com
Jane E. Willis (*pro hac vice*)
jane.willis@ropesgray.com
C. Thomas Brown (*pro hac vice*)
thomas.brown@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

Douglas Hallward-Driemeier (*pro hac vice*)
douglas.hallward-driemeier@ropesgray.com
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

Kathryn Caldwell (*pro hac vice*)
kathryn.caldwell@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

Kenneth Field (*pro hac vice*)
ken.field@hoganlovells.com
HOGAN LOVELLS US LLP
Columbia Square

555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Perry A. Lange (*pro hac vice* forthcoming)
perry.lange@wilmerhale.com
WILMER CUTLER PICKERING HALE AND
DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 633-6493
Facsimile: (202) 663-6363

*Counsel for Defendants Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC*

## Certificate of Service

I certify that on November 20, 2023, a copy of this document was served on all counsel of record using the Court's e-filing system.

*/s/ R. Paul Yetter*
R. Paul Yetter

2

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 6 of 202

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)
2020 WL 1848047, 2020-1 Trade Cases P 81,180

2020 WL 1848047
United States District Court, N.D.
Texas, Wichita Falls Division.

Ronald CHANDLER, et al., Plaintiffs,

v.

PHOENIX SERVICES, et al., Defendants.

Civil Action No. 7:19-cv-00014-O
|
Signed 04/13/2020

**Attorneys and Law Firms**

Theodore G. Baroody, Carstens & Cahoon, LLP, Dallas, TX, Don Ross Malone, Malone Law Firm, Vernon, TX, for Plaintiffs.

DeVan V. Padmanabhan, Pro Hac Vice, Britta S. Loftus, Pro Hac Vice, Paul J. Robbennolt, Pro Hac Vice, Padmanabhan & Dawson P.L.L.C., Minneapolis, MN, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Reed O'Connor, UNITED STATES DISTRICT JUDGE

*\*1* Before the Court are Plaintiffs Ronald Chandler's, Chandler Manufacturing, LLC's, Newco Enterprises, LLC's, and Supertherm Heating Services, LLC's (collectively, the "Chandler Plaintiffs") Motion for Partial Summary Judgment, Brief in Support, and Appendix in Support (ECF Nos. 61–63), filed February 13, 2020; Defendants Phoenix Services, LLC's and Mark H. Fisher's (collectively, the "Phoenix Defendants") Response, Brief in Support, and Appendix in Support (ECF Nos. 67–69), filed March 5, 2020; and the Chandler Plaintiffs' Reply (ECF No. 73), filed March 14, 2020. Also before the Court are the Phoenix Defendants' Motion for Summary Judgment, Brief in Support, and Appendix in Support (ECF Nos. 64–66), filed February 14, 2020; the Chandler Plaintiffs' Response, Brief in Support, and Appendix in Support (ECF Nos. 70–72), filed March 6, 2020; and the Phoenix Defendants' Reply and Appendix in Support (ECF Nos. 74–75), filed March 20, 2020. Having considered the motions, briefing, and applicable law, the Court **DENIES** the Chandler Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** the Phoenix Defendants' Motion for Summary Judgment.[1]

[1]

Were the Court to reach the third and most contested Sherman Act element—dangerous probability of achieving monopoly power—it would deny both the Chandler Plaintiffs' and Phoenix Defendants' motions for summary judgment. Based on the differing market analyses of former HOTF employee James Cole ("Cole") and economic expert Allan Jacobs, a jury would need to determine whether the market was susceptible to monopolization and, if so, whether there was a dangerous probability that HOTF would unlawfully achieve market power. *Compare* Pls.' App. Supp. Mot. Partial Summ. J. 22–29, ECF No. 63, *with* Defs.' App. Supp. Mot. Summ. J. 162–88, ECF No. 66. However, due to the Chandler Plaintiffs' lack of standing, failure to file their claims within the Clayton Act's statute of limitations, and inability to establish Phoenix's corporate liability and Fisher's individual liability, the Court need not reach the merits of the Chandler Plaintiffs' antitrust claims.

The Chandler Plaintiffs do not have standing to bring their claims against the Phoenix Defendants. Moreover, the Chandler Plaintiffs' claims are barred by the Clayton Act's four-year statute of limitations, and no exception applies to toll the limitations period. Finally, the Chandler Plaintiffs cannot establish Phoenix's or Fisher's liability for HOTF's allegedly anticompetitive conduct. Accordingly, the Chandler Plaintiffs' claims for *Walker Process* fraud and sham patent litigation are **DISMISSED with prejudice.**

**I. FACTUAL BACKGROUND**
After years of litigation regarding the validity and enforcement of United States Patent No. 8,171,993 (the "'993 Patent"), the Federal Circuit affirmed the District of North Dakota's finding that the '993 Patent is unenforceable due to patent owner Heat On-The-Fly's ("HOTF") inequitable conduct. *See Energy Heating, LLC v. Heat On-The-Fly, LLC,* 889 F.3d 1291 (Fed. Cir. 2018). Relying on the Federal Circuit's ruling, the Chandler Plaintiffs then brought *Walker Process* fraud and sham patent litigation claims against the Phoenix Defendants. *See* First Am. Compl., ECF No. 23. The Chandler Plaintiffs allege that Phoenix and Fisher—HOTF's parent company and CEO, respectively—are liable for HOTF's and their own unlawful attempts to exploit the '993 Patent and unlawfully gain monopoly power. *See id.* To adjudicate the parties' cross motions for summary judgment, the Court must first return to " 'the heart' of both this antitrust

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 7 of 202

2020 WL 1848047, 2020-1 Trade Cases P 81,180

litigation ... and several related patent-infringement suits"—the acquisition and enforcement of the '993 Patent. *Chandler v. Phoenix Servs., LLC*, 419 F. Supp. 3d 972, 977 (N.D. Tex. 2019) (quoting First. Am. Compl. ¶ 11, ECF No. 23).

### A. HOTF Acquisition and Enforcement of the '993 Patent

**\*2** In 2006, HOTF founder Ransom Mark Hefley created a fracking [2] process to heat water "on demand or inline" or, as HOTF puts it, to heat water "on-the-fly." First Am. Compl. ¶ 11, ECF No. 23. HOTF began using the process on fracking jobs Hefley claimed were "experimental." Pls.' App. Supp. Resp. 17, ECF No. 72. When, on September 18, 2009, Hefley filed an application to patent his "Water Heating Apparatus for Continuous Heated Water Flow and Method for Use in Hydraulic Fracturing," Defs.' App. Supp. Resp. 155, ECF No. 69, Hefley knew he was required to "file within one year" of inventing the process, Pls.' App. Supp. Resp. 14, ECF No. 72. *See also* 35 U.S.C. § 102. Yet, when Hefley filed the first application for the '993 Patent, he failed to disclose the sixty-one frack jobs completed more than a year earlier. *See* Defs.' Br. Supp. Mot. Summ. J. 2, ECF No 65 (citing First Am. Compl. P 11, ECF No. 23); Pls.' App. Supp. Resp. 9, 14, ECF No. 72. On May 8, 2012, the United States Patent and Trademark Office ("USPTO") approved and issued the '993 Patent. Defs.' App. Supp. Resp. 155, ECF No. 69.

[2]     In previous orders, the Court has adopted the parties' use of "frac" and "fracking" as the abbreviated forms of "fracture" and "fracturing." *See, e.g.*, Mem. Op. & Order, ECF No. 44; Mem. Op. & Order, ECF No. 52. Upon further research, the Court adopts the alternative spelling of "frack." Though "frac" is more common among industry experts, most scientists and academics now use "frack." Jason Lavis, *Fracking Vs Fracing – The End of the Debate?*, DRILLERS.COM (Aug. 22, 2017), https://drillers.com/fracking-vs-fracing-end-debate/. And most persuasively, dictionaries uniformly recognize "frack" but not "frac." *See, e.g.*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/frac (stating that "the word ['frac'] isn't in the dictionary," and suggesting "frack" as an alternative); MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/frack ("The word *fracking* (sometimes spelled *fracing* or *fracing*, particularly by those in the gas and oil industries) was created by shortening 'fracturing.' The addition of the 'k' brings the word into conformity with the inflected forms of similar English words ending in a vowel plus 'c,' such as *shellacking*, *panicking*, and *frolicking*."). Adopting the dictionary definition, the Court now uses "frack" except when quoting the parties.

During September and October of 2013, HOTF determined that at least seventeen companies were using the patented process without obtaining licenses. Pls.' App. Supp. Mot. Partial Summ. J. 80–113, ECF No. 63. HOTF sent these non-licensed companies cease-and-desist letters stating that HOTF "received information that certain water heating contractors providing water heating services and equipment to [the companies] may be infringing the '993 Patent" and "ask[ing] that [the companies] undertake the necessary steps to ensure that any possible infringement by [their] water heating contractors or subcontractors ceases." Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66.

Hess Corporation ("Hess"), Supertherm's largest customer, received one such letter. *Id.* Hess informed Supertherm of the letter and continued to hire Supertherm to perform in-line frack water-heating jobs. *Id.* at 55, 117, 208. But Hess also hired two to three additional non-licensed vendors and gradually decreased its work with Supertherm. Pls.' App. Supp. Resp. 329, ECF No. 72. Supertherm was eager to make up the lost business, but it declined to perform jobs for new clients due to fear of potential patent-infringement litigation. *Id.* at 331. Supertherm went out of business in May of 2016, stating "[a] general business decline in that area ma[de] it impossible to justify keeping the office open." Defs.' App. Supp. Mot. Summ. J. 233, ECF No. 66.

### B. Phoenix's Purchase of HOTF and Continued Enforcement of the '993 Patent

On January 31, 2014, nearly two years after the '993 Patent issued, Phoenix acquired HOTF. *Id.* at 6. HOTF became a subsidiary of Phoenix Consolidated Oilfield Services, LLC ("Phoenix Consolidated"), which is fully owned by Phoenix. *Id.* at 2. As a Phoenix subsidiary, HOTF is a member-managed limited liability company, meaning "the Board of Directors can direct the business and affairs of, and make decisions for" HOTF. Pls.' Br. Supp. Resp. 138, ECF No. 72. Fisher has remained the head of all three companies, and he and Danny Shurden ("Shurden"), the vice president of Phoenix, are the only two remaining officers of HOTF. Defs.' App.

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 8 of 202

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020 WL 1848047, 2020-1 Trade Cases P 81,180

Supp. Mot. Summ. J. 4, ECF No. 66. Thus, though "Heat On-The-Fly legally still exists, ... it's controlled by Phoenix Services." Pls.' Br. Supp. Mot. Partial Summ. J. 11, ECF No. 62 (emphasis omitted) (quoting Pls.' App. Supp. Mot. Partial Summ. J. 132, ECF No. 63). Phoenix's, Phoenix Consolidated's, and HOTF's finances are all encompassed by a single financial statement. Pls.' App. Supp. Mot. Partial Summ. J. 177, ECF No. 72. Phoenix Consolidated funds HOTF—including by paying its attorneys' fees—because HOTF "has always been [in] a negative cash position" since the acquisition. *Id.* at 88.

**\*3** Under HOTF's new structure and leadership, HOTF and Phoenix employees continued discussions about the enforcement and validity of the '993 Patent. On February 8, 2014, Fisher emailed one of HOTF's licensees to suggest "having a meeting to discuss the near future of HOTF" and assuring the licensee, "we think very highly of the value of the Patent, and plan to enforce it vigorously." Pls.' Br. Supp. Mot. Partial Summ. J. 8, ECF No. 62 (citing Pls.' App. Supp. Mot. Partial Summ. J. 58–60, ECF No. 63). He signed the email, "Mark Fisher CEO Phoenix Services, LLC." *Id.* During his deposition, Fisher stated that he would "certainly" try to capture the highest market share possible. *Id.* at 9 (quoting Pls.' App. Supp. Mot. Partial Summ. J. 61, ECF No. 63).

On March 10, 2014, a licensee complained to Fisher, Shurden, Cole, and the HOTF attorneys about several non-licensed companies infringing the '993 Patent. Pls.' App. Supp. Resp. 78, ECF No. 72. "Other heating providers ... have no regard for the patent," the licensee wrote. *Id.* The licensee claimed its non-licensed competitors were "ruining the frac water heating business and ... making [licensees] look like [they we]re gouging [their] customers when [they] charge[d] standard market rates." *Id.* Given the licensee was "losing work from customers who use[d non-licensed competitors]," the licensee worried that "the longer this [went] on the harder it w[ould] be to get that work back." *Id.*

The patent litigation also continued under Phoenix's ownership. On July 14, 2014, HOTF filed a counterclaim in *Newco Enterprises, LLC v. Super Heaters North Dakota, LLC*, 7:14-CV-87-O [hereinafter *Newco*], alleging that Chandler and Newco had "been actively and knowingly inducing infringement of the 993 Patent" by their customers. Defs.' App. Supp. Mot. Summ. J. 46, ECF No. 66. On October 24, 2014, the *Energy Heating* plaintiffs sought to amend their complaint—adding, for the first time, a claim that the '993 Patent was unenforceable due to Hefley's and

HOTF's inequitable conduct. *Id.* at 118–29. HOTF also added claims for patent infringement against Energy Heating and against Supertherm in December 2014. *Newco*, 7:14-CV-87-O; *Energy Heating*, 4:13-CV-10-RRE-ARS.

Even after the Federal Circuit affirmed the '993 Patent's invalidity, HOTF and Phoenix continued to assert the '993 Patent. "The website of Phoenix Services, LLC, incorporated a logo for 'Heat On The Fly®' that referred to [the '993 Patent] ... from in or around February 2018 through approximately January 29, 2019." Pls.' App. Supp. Mot. Partial Summ. J. 27, ECF No. 72; *see also* Defs.' App. Supp. Mot. Summ. J. 149–52, ECF No. 66 (website screenshots). And the *Newco* patent-infringement claims remain stayed but pending in this Court.

## II. LEGAL STANDARD

### A. Summary Judgment

The Court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is not "a disfavored procedural shortcut," but rather an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of its motion and demonstrate from the record that no genuine dispute as to any material fact exists. See *Celotex*, 477 U.S. at 323. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

**\*4** When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. See *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If there appears to be some support for disputed allegations, such that "reasonable

minds could differ as to the import of the evidence," the court must deny the motion. *Id.* at 250.

## B. The Sherman Antitrust Act

### 1. Standing

"Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (internal citation omitted). "Although the question of causation is generally a factual question for the jury, a court should direct a verdict where the plaintiff has failed to present substantial evidence that defendant's illegal practices were a material cause of plaintiff's injuries." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 485 (5th Cir. 2000) [hereinafter *Taylor*] (internal citation omitted). "Though jury inferences of causation are in some cases permissible, 'the required causal link must be proved as a matter of fact with a fair degree of certainty.' " *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 454 (5th Cir. 2005) [hereinafter *El Aguila*] (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978)). This is "especially so" when plaintiffs are damaged by other "salient factors distinct from the challenged conduct." *Id.*

### 2. Statute of Limitations

Under the Clayton Act's statute of limitations, an antitrust plaintiff must file its complaint within four years of the date the cause of action accrued. *See* 15 U.S.C. § 15(b); *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186 (5th Cir. 1988). The date of accrual is factual; therefore, to prevail on summary judgment, a defendant must establish there is no genuine issue regarding when the statute of limitations accrued. *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1170 (5th Cir. 1979).

The Fifth Circuit recognizes three exceptions to toll the Sherman Act's statute of limitations: (1) fraudulent concealment; (2) damages not initially ascertainable; and (3) continuing violation. *See id.*; *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982) [hereinafter *Kaiser*]. To demonstrate a defendant's fraudulent concealment, "an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that

[it] failed, despite the exercise of due diligence on [its] part, to discover the facts that form the basis of [its] claim." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169. To prove that damages are not ascertainable, plaintiffs must prove that both the *existence* and the *amount* of damages are uncertain. *See Delta Produce, L.P. v. H.E. Butt Grocery Co.*, No. SA-12-CA-353, 2013 WL 12121118, at *4 (W.D. Tex. Jan. 17, 2013). And to invoke a continuing violation, a new injurious act must occur and its damages must be recoverable. *See Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321, 338 (1971) [hereinafter *Zenith*].

### 3. *Walker Process* Patent Fraud

**\*5** To establish antitrust liability based on the unlawful enforcement of a patent, a claimant must either (1) "prove that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process*," or (2) "demonstrate that the infringement suit was a mere sham." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000) (internal citation omitted). The Supreme Court in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corporation*, 382 U.S. 172 (1965) established that "the enforcement of a patent procured by fraud on the Patent Office may be violative of [§] 2 of the Sherman Act." *Id.* at 174. To succeed on a *Walker Process* claim, a plaintiff must prove two elements: (1) "the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced that patent with knowledge of the fraudulent procurement" and (2) the plaintiff can satisfy "all other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). As to the first element, the Supreme Court "made clear that the invalidity of the patent [i]s not sufficient; a showing of intentional fraud in its procurement [i]s required." *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012). As to the second, "the Court incorporated the rules of antitrust law generally. As Justice Harlan stated in his concurring opinion, 'as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play.' " *Id.* (citing *Walker Process*, 382 U.S. at 180 (Harlan, J., concurring)).

Under § 2 of the Sherman Act, a defendant may be liable for monopolization, attempt to monopolize, or conspiracy to monopolize. 15 U.S.C. § 2. When the plaintiff alleges monopolization, a court must "focus on the harm done,

WCAS004

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020 WL 1848047, 2020-1 Trade Cases P 81,180

Case 4:23-cv-03560  Document 101  Filed on 11/20/23 in TXSD  Page 10 of 202

in the form of a monopolization which the defendant willfully creates or maintains," but when a plaintiff alleges attempted monopolization, the court must instead "focus on the harm that potentially *might* have been caused by the conduct in light of the state of the market." *Taylor*, 216 F.3d at 474 (emphasis added). "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "The first element considers the conduct, the second looks to the motivation behind the conduct, and the third looks to the defendant's market power and commensurate ability to lessen or destroy competition in that market." *Taylor*, 216 F.3d at 474 (internal citation omitted). When the third, "dangerous probability" element is at issue, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.

#### 4. Sham Patent Litigation

A plaintiff may also base its claim for antitrust liability on an allegation that defendant engaged in sham patent litigation. *Cf. Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*, 762 F.3d 1338, 1343 (Fed. Cir. 2014) (noting that while, "[a] party is ordinarily exempt from antitrust liability for bringing a lawsuit against a competitor ... [t]here is a recognized exception ... for 'sham litigation' " (internal citation omitted)). Indeed, antitrust law precludes a purported patent owner from "bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed" when "the litigation is conducted for anti-competitive purposes." *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed. Cir. 1998). In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc. (PRE)*, 508 U.S. 49 (1993), the Supreme Court established the two-part test for "sham" litigation: "(1) the lawsuit must be objectively meritless such that 'no reasonable litigant could expect success on the merits' and (2) it must be found that 'the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor." ' " *C.R. Bard*, 157 F.3d at 1368 (quoting *PRE*, 508 U.S. at 60). Because "[f]raud in the procurement of a patent is governed by *Walker Process* ... the complainant 'must still prove a substantive antitrust violation.' " *Id.* (quoting *PRE*, 508 U.S. at 61).

### III. ANALYSIS

#### A. Standing

**\*6** The Chandler Plaintiffs have failed to present substantial evidence that HOTF's or the Phoenix Defendants' own alleged antitrust violations were a material cause of Supertherm's business losses. Accordingly, they do not have standing to pursue their *Walker Process* and sham litigation claims for lost-profit damages.

"Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Sanger Ins. Agency*, 802 F.3d at 737 (internal citation omitted). The Phoenix Defendants raise only the first issue, claiming the Chandler Plaintiffs cannot prove that HOTF's unlawful conduct caused Supertherm to gradually lose business from its largest customer and eventually go out of business.

"Although the question of causation is generally a factual question for the jury, a court should direct a verdict where the plaintiff has failed to present substantial evidence that the defendant's illegal practices were a material cause of plaintiff's injuries." *Taylor*, 216 F.3d at 485 (internal citation omitted); *see also H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978) ("To succeed, an antitrust plaintiff must show the defendants' wrongful actions materially contributed to an injury to the plaintiff's business, and must provide some indication of the amount of damage done."). In some instances, the jury can infer facts to establish causation, but "the required causal link must be proved as a matter of fact with a fair degree of certainty." *Blue Bird Body Co.*, 573 F.2d at 317. This is "especially so" when plaintiffs are damaged by other "salient factors distinct from the challenged conduct." *El Aguila*, 131 F. App'x at 454 (requiring more when there was "increased competition" and the plaintiffs refused to mitigate damages); *see also Taylor*, 216 F.2d at 485 (holding that the plaintiff "had to establish a tighter connection between the behavior and the damages" because the plaintiff "concededly also lost customers (i.e., suffered damage)" for reasons unrelated to the antitrust violation). And "[w]hen the fact of injury is in issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." *H&B*, 577 F.2d at 247 (internal citation omitted).

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 11 of 202

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020 WL 1848047, 2020-1 Trade Cases P 81,180

In September 2013, HOTF sent a cease-and-desist letter to Hess, implying that Supertherm, its only in-line frack water-heating provider, was violating the '993 Patent. Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66. Hess immediately told Supertherm about the cease-and-desist letter; but following a brief conversation, Hess and the Chandler Plaintiffs never again discussed the letter or the '993 Patent. *Id.* at 55–69, 207–08. Over the next three years, Hess gradually reduced its work with Supertherm and hired other non-licensed vendors to complete some of its frack jobs. Pls.' App. Supp. Resp. 326–31, ECF No. 72. But Hess never hired HOTF or any of its licensees. Defs.' App. Supp. Mot. Summ. J. 147, ECF No. 66. Supertherm "tr[ied] to replace the business from Amerada Hess with other customers," but due to the cease-and-desist letter to Hess and pending lawsuits against other non-licensed companies, Supertherm was " 'scared' and 'hiding in the shadows.' " Pls.' Br. Supp. Resp. 21, ECF No. 71 (citing Pls.' App. Supp. Resp. 326–27, 330–31, ECF No. 72). This fear allegedly led Supertherm to decline business from other prospective in-line fracking customers. *Id.*

**\*7** After the District of North Dakota concluded that the '993 Patent was unenforceable due to inequitable conduct, neither Supertherm nor the other Chandler Plaintiffs reached out to Hess to ask for more work. Defs.' App. Supp. Mot. Summ. J. 66–67, ECF No. 66. And by the end of 2015 and beginning of 2016, the market for oil bottomed out. *See id.* at 58, 217–18, 224–25, 231–32. In 2016, Supertherm ceased operations and sent out a memorandum stating that it was shutting down due to lack of business in the field. *Id.* at 57, 233.

The Chandler Plaintiffs provide evidence that HOTF sent Hess a cease-and-desist letter in 2013 and that Supertherm went out of business in 2016, but they do not provide evidence of any "causal link." *Blue Bird Body Co.*, 573 F.2d at 317. If Hess was in fact influenced by the cease-and-desist letter, it would have stopped working with Supertherm and instead hired HOTF or a licensee authorized to use the patented process. It did neither. Instead, it defied HOTF's instructions —continuing to work with Supertherm and hiring other non-licensed vendors. Moreover, though Supertherm's manager testified he was scared to complete fracking projects for new customers, a plaintiff's deposition testimony cannot be the sole piece of "substantial evidence." *See H&B*, 577 F.2d at 247 (internal citation omitted) ("When the fact of injury is at issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely."). Because Supertherm was also damaged by "salient factors distinct from the challenged

conduct," *El Aguila*, 131 F. App'x at 454—namely, the fluctuating oil market and increase in competition among non-licensed fracking providers—the Chandler Plaintiffs must "establish a tighter connection between the behavior and the damages," *Taylor*, 216 F.2d at 485. Viewing the evidence in the light most favorable to the Chandler Plaintiffs, they are unable to establish the necessary causal connection.

Without proving HOTF's cease-and-desist letter caused Supertherm's monetary damages, the Chandler Plaintiffs cannot satisfy the standing elements with regard to their claims for lost profits. Accordingly, the Court holds that the Chandler Plaintiffs lack standing to pursue these claims. Nevertheless, the Chandler Plaintiffs do have standing to pursue their *Walker Process* and sham patent litigation claims for fees expended in defending against HOTF's patent-infringement claims.

### B. Statute of Limitations

Pursuant to the Clayton Act's four-year statute of limitations, the Chandler Plaintiffs must present evidence sufficient to prove either (1) a specific injurious act occurred within four years of the suit's inception or (2) an exception applies to toll the limitations period. *See* 15 U.S.C. § 15(b); *Bell*, 847 F.2d at 1186. At the summary-judgment stage, the Phoenix Defendants must prove there is no genuine issue of material fact regarding the date of accrual. *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1170. If the Phoenix Defendants meet this initial burden, the burden shifts to the Chandler Plaintiffs to establish the applicability of a tolling doctrine. *See id.* Because the Chandler Plaintiffs' filed this suit on January 29, 2019, they must present evidence of a specific injurious act that the Phoenix Defendants or HOTF took on or after January 29, 2015. The Phoenix Defendants have established that the only two allegedly injurious acts occurred outside the limitations period, and the Chandler Plaintiffs have not established that an exception tolls the limitations period. Thus, the Chandler Plaintiffs' *Walker Process* fraud and sham patent litigation claims are barred as untimely.

#### 1. Acts Within the Limitations Period

**\*8** In their First Amended Complaint, the Chandler Plaintiffs pleaded three allegedly injurious acts: (1) HOTF's sending a cease-and-desist letter to Supertherm's largest customer, (2) HOTF's assertion of patent-infringement claims against the Chandler Plaintiffs, and (3) Phoenix's

advertisement of the '993 Patent on its website. The first two actions occurred outside the limitations period, and the third is not actionable.

On September 13, 2013, HOTF sent Hess a cease-and-desist letter, ordering the company to "undertake the necessary steps to ensure that any possible infringement by [its] water heating contractors or subcontractors ceases." Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66. HOTF sent this letter—as well as the cease-and-desist letters to the other sixteen non-licensed vendors—more than four years before the Chandler Plaintiffs filed this suit. *Id.* at 80–113. "[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *TCA Bldg. Co. Nw. Res. Co.*, 861 F. Supp. 1366, 1377 (S.D. Tex. 1994) (quoting *Poster Exch. v. Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975)). In this case, though the Chandler Plaintiffs allege the letter continued to harm Supertherm, the gradual decline in work is merely an "inertial consequence." *Id.* The injurious action itself occurred on September 13, 2013, when Hess received the letter and began decreasing its business to Supertherm.

Then, on July 18, 2014, HOTF filed patent-infringement claims against Newco and Chandler. Defs.' App. Supp. Mot. Summ. J. 46–47, ECF No. 66. HOTF added a claim against Supertherm on December 22, 2014. *Newco*, 7:14-CV-87-O. "Any injury ... resulting from the continued prosecution [of the lawsuit] relates back to the initial decision to file." *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274 (5th Cir. 1991) (internal citation omitted); *see also Internet Corporativo S.A. de C.V. v. Bus. Software All., Inc.*, No. Civ.A.H-04-2322, 2004 WL 3331843, at *5 ("The Fifth Circuit has specifically addressed the accrual of a cause of action based on allegations that the filing and prosecution of litigation violated the antitrust laws, rejecting the application of the continuing violation exception." (citing *Al George*, 939 F.2d 1271)). Thus, any injuries stemming from the litigation occurred on July 18, 2014 and December 22, 2014, when HOTF filed the patent-infringement claims against the Chandler Plaintiffs.

Finally, from January 2018 to January 2019, the Phoenix Defendants posted the HOTF logo in association with the '993 Patent on the Phoenix website. Pls.' App. Supp. Resp. 27, ECF No. 72. Unlike the first two actions, this action did occur within the limitations period. However, the Chandler Plaintiffs present no claim nor other evidence showing they were injured by the website. Rather, Supertherm CFO and the Chandler Plaintiffs' Rule 30(b)(6) designee Reanna Chandler Jones admitted that the Chandler Plaintiffs were *not* injured by the Phoenix Defendants' website. Defs.' App. Supp. Mot. Summ. J. 49–51, ECF No. 66. Because the action did not injure any plaintiff, it too may not be used as a specific act for purposes of the statute of limitations. *See Rx.com v. Medco Health Sol., Inc.*, 322 F. App'x 394, 396 (5th Cir. 2009).

### 2. Tolling the Limitations Period

**\*9** Both alleged injuries occurred outside the limitations period, so the Chandler Plaintiffs must show that one of three exceptions applies to toll the statute of limitations. The Chandler Plaintiffs argue that each of the Fifth Circuit's three exceptions applies: (1) fraudulent concealment; (2) damages not initially ascertainable; and (3) continuing violation. Pls.' Br. Supp. Resp. 1–26, ECF No. 71 (citing *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169; *Kaiser*, 677 F.2d at 1051). Each argument fails.

#### a. *Fraudulent Concealment*

"Fraudulent concealment tolls the Clayton Act's statute of limitations." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169. To avail itself of the fraudulent-concealment exception, "an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that [it] failed, despite the exercise of due diligence on [its] part, to discover the facts that form the basis of [its] claim." *Id.* The Chandler Plaintiffs may be able to prove that the Phoenix Defendants actively concealed HOTF's conduct, but the Chandler Plaintiffs cannot prove that they did not discover the facts that form the basis of their claims.

The Phoenix Defendants argue that the Chandler Plaintiffs may not raise the fraudulent-concealment argument because they did not plead the defense nor facts to support application of the defense. Defs.' Br. Supp. Mot. Summ. J. 8, ECF No. 65. The Chandler Plaintiffs need not have pleaded the defense, but they did need to plead the fraudulent facts with particularity. *See* FED. R. CIV. P. 9(b); *Colonial Penn. Ins. Co. v. Market Planners Ins. Agency*, 1 F.3d 374, 376 & n.2 (5th Cir. 1993); *Tangela Levels v. Merlino*, 969 F. Supp. 2d 704, 721 (N.D. Tex. 2013). The Chandler Plaintiffs only pleaded two relevant and potentially fraudulent facts with particularity: (1) the '993 Patent inventor's failure to "disclose

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020 WL 1848047, 2020-1 Trade Cases P 81,180

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 13 of 202

any of the 61 frac jobs to the Patent Trademark Office ('PTO') during prosecution as potential on-sale or public uses of the invention that might have triggered the on-sale bar," and (2) HOTF's threatening of the Chandler Plaintiffs' customers via cease-and-desist letters. First Am. Compl. ¶¶ 12, 14, ECF No. 23.

The Chandler Plaintiffs argue that the Federal Circuit's holding that "the '993 Patent is unenforceable due to inequitable conduct, and that the infringement claim was asserted in bad faith ... is ample evidence of acts by Defendants to conceal this *antitrust* cause of action, not merely an action based on inequitable conduct." Pls.' Br. Supp. Resp. 8, ECF No. 71. They also argue "there is further documentary evidence that the fraudulent nature of the patent prosecution and the subsequent enforcement of the '993 Patent was expressly concealed by HOTF and its lawyers." *Id.* The record evidence does suggest HOTF and its attorneys knew of and actively concealed the prior use from the USPTO. *See* Pls.' App. Supp. Resp. 16–18, 21, 24, 573–81, 588–91, 597, ECF No. 72. And though the Phoenix Defendants differentiate between concealment from plaintiffs and concealment from third parties, Defs.' Reply 3, ECF No. 74, Fifth Circuit case law does not make this distinction. *See, e.g., State of Texas v. Allan Constr. Co., Inc.*, 851 F.2d 1526, 1529 (5th Cir. 1988) [hereinafter *Allan Construction*] (discussing affirmative acts of fraudulent concealment generally, not just as to the plaintiffs). Thus, a jury could find that this act constitutes an "affirmative act[ ] of concealment." *Id.* (internal citation omitted).

**\*10** However, the Chandler Plaintiffs cannot show that they did not and could not discover the actionable conduct through due diligence. Throughout the litigation, the Chandler Plaintiffs' counsel was in regular communication with patent-plaintiff Energy Heating's counsel. *See* Defs.' App. Supp. Mot. Summ. J. 131, ECF No. 66 (stating Energy Heating's counsel "was involved in very similar litigation and so it was helpful to talk to him about what he was experiencing in that litigation."). "Plaintiffs' privilege log shows extensive communications with Energy Heating's counsel," including "53 emails alone starting in starting in early September, right before Energy Heating sought to amend its complaint." Defs.' Br. Supp. Mot. Summ. J. 9–10, ECF No. 65 (internal emphasis omitted) (citing Defs.' App. Supp. Mot. Summ. J. 132–33, ECF No. 66).

On December 4, 2014, Energy Heating amended its complaint to add the inequitable-conduct claim. It listed "[s]pecific

invalidating prior art public use and on-sale projects" as its invalidity contentions. *Id.* at 10 (quoting Defs.' App. Supp. Mot. Summ. J. 136, ECF No. 66). Given the Chandler Plaintiffs' knowledge of the *Energy Heating* litigation and their interactions with counsel, the Chandler Plaintiffs are presumed to be aware of the contents of the amended complaint and, therefore, aware of the actionable conduct. *Cf. Allan Constr.*, 851 F.2d at 1533 (presuming the plaintiffs had knowledge of the basis for claims asserted in "a nearly identical antitrust claim against the same defendants[, which] had been filed several years earlier in California"). But even without the presumption of knowledge, the Chandler Plaintiffs would be unable to invoke the fraudulent-concealment exception because they have not and cannot prove they "failed, *despite the exercise of due diligence* on [their] part, to discover the facts that form the basis of [their] claim[s]." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169 (emphasis added).

Moreover, were the Court to accept the Chandler Plaintiffs' contention that they were unaware of the actionable conduct until the District of North Dakota issued its inequitable-conduct ruling, a key concession would still undercut their fraudulent-concealment argument. In their Response to the Phoenix Defendants' Motion for Summary Judgment, the Chandler Plaintiffs state they "*agree* with Defendants that actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants ... until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71 (emphasis in original). If the Phoenix Defendants did not know of their actionable conduct until the district court found it unlawful, they would not have the ability to fraudulently conceal it.

Finally, within their fraudulent-concealment argument, the Chandler Plaintiffs make two arguments based on fairness. First, they contend "[t]here is at least a triable issue of fact as to the reasonableness of tolling the statute of limitations as to Plaintiffs based on fraudulent concealment to further investigate a complex antitrust claim based on *Walker Process* fraud and sham litigation." *Id.* at 16. The Chandler Plaintiffs note they filed suit on January 29, 2019—only four years and about five weeks after HOTF filed the patent-infringement suit—and they argue a jury should consider whether Supertherm, "an unsophisticated 'Mom and Pop' family-run oilfield manufacturing and services business in Wichita Falls, Texas ... exercised sufficient due diligence as to both the *Walker Process* patent fraud claim and the sham

WCAS008

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020 WL 1848047, 2020-1 Trade Cases P 81,180

patent litigation claim." *Id.* But they do not cite a single case in support of this argument, and they do not tie "reasonableness" to fraud. The Chandler Plaintiffs also argue that "[a]dequate notice to Plaintiffs of facts necessary to support just an *antitrust* claim is a far more complex issue than even just the already complex issue of an inequitable conduct counterclaim." *Id.* (emphasis in original). They discuss details about the market share covered by the '993 Patent, which they did not discover until 2016. *See id.* at 17–19. But this argument also fails for two reasons. First, there is no indication that the Phoenix Defendants "fraudulently concealed" details regarding their engagement with the market or market power. And second, even if they did, the Chandler Plaintiffs did not plead this at all —much less with the particularity required under Rule 9(b). *See generally* First Am. Compl., ECF No. 23

 **\*11** Each of the Chandler Plaintiffs' arguments regarding fraudulent concealment is unavailing. Thus, this exception does not toll the statute of limitations.

### b. *Damages Not Yet Ascertainable*

The Chandler Plaintiffs also contend the statute of limitations should be tolled because their damages were not ascertainable when HOTF sent Plaintiff Supertherm its cease-and-desist letter and when HOTF filed its patent-infringement claims against the Chandler Plaintiffs. *See* Pls.' Br. Supp. Resp. 20–22, ECF No. 71. They argue "Supertherm's damage claim thus did not accrue until the damages could be ascertained, which began in May, 2016 with the failure of the business." *Id.* at 22. But while Supertherm could not have known the exact amount of lost profits, it did know of their existence.

Antitrust plaintiffs may recover both past and future damages. *See* Zenith, 401 U.S. at 338. "The fact that the act may inflict damages in the future, as opposed to at the time the acts are committed, does not prevent the cause of action from accruing." *Astoria Entm't, Inc. v. Edwards*, 159 F. Supp. 2d 303, 316 (E.D. La. 2001) (quoting Julian O. van Kalinowski, Peter Sullivan & Maureen McGuirl, 8 ANTITRUST LAWS AND TRADE, § 162.02[1], at 162–5 (citations omitted)). Rather, to prove that damages are not ascertainable, plaintiffs must prove that both the *existence* and the *amount* of damages are uncertain. *See Delta Produce, L.P.*, 2013 WL 12121118, at \*4.

The Chandler Plaintiffs knew they were financially damaged as soon as Hess reduced its business with Supertherm. Thus,

they knew damages existed well before January 2015, even if they did not yet know the monetary amount. In *Delta Produce*, the Western District of Texas considered nearly identical facts and concluded the damages-not-initially-ascertainable exception did not apply. 2013 WL 12121118, at \*4 ("While the amount of damages may have been speculative, the injury itself, assuming Delta's allegations are true, was not. Delta alleges that it first sustained injury in 2002, when it was prevented from selling products to an HEB competitor. Thus, Delta's cause of action under Section One of the Sherman Act is barred by limitations."). The Phoenix Defendants argue this Court should do the same, as "[u]nder Plaintiffs' theory, if Supertherm has never gone out of business, Plaintiffs could wait to file suit indefinitely, always alleging that their damages were 'not ascertainable' because its business was ongoing." Defs.' Reply 10–11, ECF No. 74.

The Court finds the *Delta Produce* court's holding and the Phoenix Defendants' reasoning persuasive. Accordingly, the damages-not-yet-ascertainable exception does not apply.

### c. *Continuing Violation*

Finally, the Chandler Plaintiffs also argue the continuing-violation exception applies. They state that "[t]he key question is whether some injurious act actually occurred during the limitations period." Pls.' Br. Supp. Resp. 22, ECF No. 71 (quoting *Eurotec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.*, No. 3:15-CV-3454, at \*14 (N.D. Tex. Aug. 1, 2019) (emphasis omitted)). And they contend "[t]he answer to this question for purposes of HOTF's conduct is 'yes' for two reasons: (1) HOTF filed a Response to the USPTO on April 13, 2015 in a reexamination proceeding ... and (2) in February, 2018 through January 29, 2019, Defendant Phoenix Services modified its website to reference the '993 Patent and offer licensing." *Id.* at 22–23. However, these acts do not constitute continuing violations.

 **\*12** There are two restrictions to the continuing-violation exception, both of which foreclose its application here. First, the act must actually injure the plaintiffs. *See Edwards*, 159 F. Supp. 2d at 316 ("The key to this exception is that plaintiff itself, not some other third party, was injured by the continuing conspiratorial conduct."). Second, plaintiffs can only recover damages caused by the new act; the new act does not revive old damages occurring before the limitations period. *See* Zenith, 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws, ... each

time plaintiff is injured by an act of the defendants, a cause of action accrues to him to recover those damages *caused by that act* and that, as to *those* damages, the statute of limitations runs from the commission of the act." (emphasis added)).

The Chandler Plaintiffs pleaded three allegedly injurious acts: (1) HOTF's sending the cease-and-desist letter to Hess, (2) HOTF filing patent-infringement claims against the Chandler Plaintiffs, and (3) Phoenix advertising the '993 Patent on its website. *See* Am. Compl. ¶¶ 14, 15, 19, ECF No. 23. As discussed, the first two indisputably occurred before the limitations period and the Chandler Plaintiffs were not injured by the third. *See supra* Section III.B.1. The only potentially injurious act occurring within the limitations period is HOTF's response to the USPTO. But the Chandler Plaintiffs did not plead the response in their Amended Complaint. *See generally* First Am. Compl., ECF No. 23. In fact, "[t]his is a brand new allegation." Defs.' Reply 14, ECF No. 74. And regardless, "[t]here is no evidence ... that this document caused any injury to the Plaintiffs. None of the Plaintiffs' deposition witnesses cited the reexamination as causing injury to the Plaintiffs, instead pointing solely [to] the cease and desist letter and litigation filings." *Id.* So, even if the Court did find that the response constituted a violation, it could not revive the actual damages—all of which allegedly stem from the cease-and-desist letter and patent-infringement claims. *See Zenith*, 401 U.S. at 338.

Thus, the continuing-violation exception also does not apply to toll the statute of limitations. Because none of the three exceptions applies, the Sherman Act's four-year statute of limitations bars the Chandler Plaintiffs *Walker Process* fraud and sham patent litigation claims.

## C. The Phoenix Defendants' Liability for HOTF's Conduct

Even if the Chandler Plaintiffs had standing and their claims were not barred by the statute of limitations, the Court would grant summary judgment in favor of the Phoenix Defendants because neither Phoenix nor Fisher may be held liable for HOTF's alleged antitrust violations. The Chandler Plaintiffs admit that they "*agree* with Defendants that actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants ... until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71 (emphasis in original). Given this concession, Phoenix and Fisher cannot be held liable under the applicable single-enterprise and the corporate-officer standards of liability.

### 1. Single-Enterprise Liability

Whether a parent may be liable for the attempted monopolization of its subsidiary is an issue of first impression in the Fifth Circuit. Accordingly, the Court looks to the single-enterprise-liability standard advanced by the Ninth Circuit and the Tenth Circuit—the only two federal circuits to have addressed the issue. *Arandell Corp. v. Centerpoint Energy Servs.*, 900 F.3d 623 (9th Cir. 2018); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017) [hereinafter *Lenox*]. The Court finds the *Arandell Corp.* and *Lenox* opinions persuasive and, in adopting their approach, concludes that Phoenix may not be held liable for HOTF's allegedly anticompetitive conduct.

**\*13** Both circuits' opinions rely on the Supreme Court's opinion in *Copperweld Corporation v. Independence Tube Corporation*, 467 U.S. 752 (1984). In *Copperweld*, the Supreme Court concluded that a parent cannot conspire with its subsidiary in violation of § 1 of the Sherman Act. *Id.* at 771–72. The Supreme Court reasoned:

> [T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.

*Id.* "For these reasons, the Court held that 'the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise.' " *Lenox*, 847 F.3d at 1233 (quoting *Copperweld*, 467 U.S. at 771). In the context of conspiracy claims, several courts have "held that affiliated

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 16 of 202

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020 WL 1848047, 2020-1 Trade Cases P 81,180

entities which must be treated as a single enterprise for purposes of § 1 also must be treated as a single enterprise for purposes of § 2." *Id.* at 1235 (collecting cases).

The Tenth Circuit was the first circuit court to address whether *Copperweld*'s reasoning also applies to § 2 Sherman Act claims for monopolization or attempted monopolization. *See generally id.* "[A]lthough *Copperweld* did not expressly reach this issue, [the Tenth Circuit] conclude[d] *Copperweld*'s reasoning necessarily denounces [the defendants'] belief that [the plaintiff] could directly establish its non-conspiracy § 2 claims only by proving that '*specific* Defendants' independently satisfied each necessary element of the claims." *Id.* at 1236 (emphasis in original). Rather, the court reasoned, "in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim." *Id.* (emphasis in original) (citing 7 Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law* ¶ 1464g, at 227 (3d ed. 2008) ("[A] single entity can violate § 2 if the prerequisites of monopolization or attempted monopolization are met.")). "To hold otherwise—to require that each affiliated defendant independently satisfy every element in order to be held liable—would be difficult to justify ... in part because the enterprise they form 'is fully subject to § 2 of the Sherman Act.' " *Id.* (quoting *Copperweld*, 467 U.S. at 776–77). And rejection of the single-enterprise theory "would all but eviscerate the statute with respect to sophisticated competitors," like Phoenix. *Id.* "So long as a corporation spreads its anticompetitive scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability, it could unlawfully monopolize with impunity." *Id.* The Tenth Circuit says "*Copperweld* forecloses this result." *Id.*

**\*14** The Ninth Circuit became the second circuit to address the issue, and it agreed with the Tenth Circuit's interpretation of *Copperweld*. *See Arandell Corp.*, 900 F.3d 623 (Bea, J.). The Ninth Circuit noted that "Supreme Court precedent establishes that 'a parent and a wholly owned subsidiary *always* have a "unity of purpose" ' and thus act as a 'single enterprise' whenever they engage in 'coordinated activity.' " *Id.* at 625 (citing *Copperweld*, 467 U.S. 752). The court further reasoned that "[i]t would be inconsistent to insist" that, though the parent and subsidiary " 'always' share a 'unity of purpose,' " one can nevertheless escape liability "by disavowing the anticompetitive intent of the other, even

where the two acted together." *Id.* at 631–32. Accordingly, Judge Bea, writing for the unanimous panel, concluded that "*Copperweld* supports the following rule: A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purpose of the single 'economic unit' of which it is a part." *Id.* at 632.

The Phoenix Defendants do not address *Copperweld, Lenox,* or *Arandell Corp.*. Rather, they claim that "[b]ecause the Fifth Circuit has not recognized a single enterprise theory of antitrust liability, the Plaintiffs' claims against Phoenix are not viable." Defs.' Br. Supp. Resp. 5, ECF No. 68. And they reference, without explanation, the Texas Supreme Court's rejection of the theory in the context of tort claims. *Id.* (citing *SSP Partners v. Gladstrong Invest. (USA) Corp.*, 275 S.W.3d 444 (Tex. 2008)). Given that both *Walker Process* and sham patent litigation are federal claims, and that the only two federal circuits to review the issue have endorsed the single-enterprise theory under like circumstances, the Phoenix Defendants' reliance on a state supreme court provides a weak refutation. Thus, the Court follows the Ninth and Tenth Circuit's lead and applies the single-enterprise theory of liability.

But the Court must also determine how to apply this theory —an issue that the appellate courts did not resolve. It is well established that a parent cannot be held liable for the anticompetitive conduct of its subsidiary "merely by virtue of its place in the same corporate family." *Lenox*, 847 F.3d at 1237. Indeed, "*Copperweld* 'held that only "the coordinated activity" of [related entities] must be viewed as that of a single enterprise.' " *Id.* (quoting *Copperweld*, 467 U.S. at 771). Thus, a plaintiff is "still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise." *Id.* But how involved must the parent-defendant be?

In *Lenox*, after observing that no circuit had "provided a clear answer to the question of what level of involvement is sufficient to meet that burden," the Tenth Circuit looked to two district court cases, in which the courts concluded that, "[w]hen the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act." *Id.* at 1237–38 (quoting *Climax Molybdenum Co. v.*

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 17 of 202

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020 WL 1848047, 2020-1 Trade Cases P 81,180

*Molychem, LLC*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005) (quoting *Nobody in Particular Presents, Inc. v. Clear Channels Comm'cns, Inc.*, 311 F. Supp. 2d 1048, 1071 (D. Colo. 2004) [hereinafter *Nobody in Particular*])). Because the Tenth Circuit could resolve the issue on other grounds, it left the issue's "resolution for another day ... [and] express[ed] no opinion" on the test. *Id.* at 1239. Given this is still "uncharted territory at the federal circuit level," the Court applies the Colorado district courts' "control, dictates or encourages" test. *Id.* (internal citations omitted).

This brings the Court back to the Chandler Plaintiffs' concession, that "actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants ... until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71. The Chandler Plaintiffs argue that HOTF's inequitable conduct satisfies the first two Sherman Act elements. Pls.' Br. Supp. Mot. Partial Summ. J. 4–5, ECF No. 62 (citing *TransWeb, LLC*, 812 F.3d at 1307). The Phoenix Defendants concede that when "the party that engaged in inequitable conduct is the same party that subsequently asserts the patent, it makes sense to hold that the inequitable conduct finding also established the 'anticompetitive conduct' and 'specific intent to monopolize' requirements." Defs.' Br. Supp. Resp. 19, ECF No. 68. Here, however, HOTF engaged in the inequitable conduct, but the Chandler Plaintiffs intend to hold Phoenix liable for asserting the patent.

**\*15** To be liable for its subsidiary's conduct, a parent must engage in "coordinated activity," *Copperweld*, 467 U.S. at 771, to "purposely advance the very same scheme ... for an illegal, anticompetitive purpose," *Arandell Corp.*, 900 F.3d at 631. Without knowledge that HOTF was engaging in inequitable conduct when it sent the seventeen cease-and-desist letters and filed several patent-infringement claims against non-licensed competitors, Phoenix could not have purposely "control[led], dictate[d] or encourage[d]" HOTF's anticompetitive conduct by continuing to enforce the '993 Patent. *Nobody in Particular*, 311 F. Supp. 2d at 1071. *Contra id.* at 1069 ("To conclude that a parent can direct and require anticompetitive conduct of its subsidiaries, like any principal directing the conduct of an agent, and then escape antitrust liability by hiding behind the separate corporation is counterintuitive."). And the Chandler Plaintiffs provide no evidence that Phoenix shared HOTF's "intention of monopolizing the relevant market." *Climax Molybdenum Co.*, 414 F. Supp. 2d at 1013. Thus, given Phoenix's lack of

knowledge, intent, and involvement in HOTF's injurious acts, Phoenix may not be held liable as part of a single enterprise.

## 2. Individual Liability

For similar reasons, Fisher also cannot be held liable for HOTF's anticompetitive conduct. In its Memorandum Opinion and Order denying Defendants' Motion to Dismiss, the Court addressed the issue of Fisher's potential individual liability. *Chandler*, 419 F. Supp. 3d at 986–89. There, the Court applied the reasoning from *MVConnect, LLC v. Recovery Database Network, Inc.*, No. 3:10-CV-1948, 2011 WL 13128799 (N.D. Tex. May 27, 2011). In *MVConnect*, this Court held that "a corporate officer or director can be held personally liable for damages arising out of an antitrust violation where he participated in the unlawful acts, or where he acquiesced or ratified the actions of other officers or agents of the corporation which were in violation of the antitrust law." *Id.* at \*10. The "essential principle" necessary to hold a director or officer individually liable for a company's alleged violation is the director's or officer's "direct, personal participation." *Id.* Accordingly, to survive a motion to dismiss a claim for individual liability based on an antitrust violation, a plaintiff must plead "factual allegations of some sort of conscious wrongdoing by [an] officer on the corporation's behalf" and that the officer had "some direct role" in the alleged violation. *Id.* at \*9 (citing *In re Morrison*, 555 F.3d 473, 481 (5th Cir. 2009); *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)).

Applying this standard at the Rule 12(b)(6) stage, the Court found that "the Chandler Plaintiffs ha[d] pleaded facts sufficient to allege that Fisher had a direct role in the attempted monopolization and a specific intent to monopolize the in-line frac water-heating market." *Chandler*, 419 F. Supp. 3d at 988. But this only applied to Fisher's actions on behalf of HOTF. *See id.* at 988–89. Though the Chandler Plaintiffs also contended that Fisher should be held liable for his acts on behalf of Phoenix, the Court dismissed the claim because the Chandler Plaintiffs presented only a "mere suggestion of what Fisher *likely knew* or *should have known*—not a factual allegation regarding his 'direct role.' " *Id.* (emphasis in original) (quoting *MVConnect*, 2011 WL 13128799, at \*9).

Now, at the Rule 56 stage, the Court must consider whether the summary-judgment evidence creates a genuine issue of fact regarding whether Fisher had a direct role in HOTF's attempted monopolization. The Chandler Plaintiffs claim

there is "no genuine issue of material fact that Mark Fisher had the requisite 'direct role' and 'conscious wrongdoing' in the enforcement of the '993 Patent against Plaintiff Supertherm as an attempted monopolization." Pls.' Br. Supp. Mot. Partial Summ. J. 25, ECF No. 62. The Phoenix Defendants respond that "there is substantial evidence in the record that Fisher did not know or have reason to know when he authorized the patent infringement claims against Plaintiffs that the '993 Patent was unenforceable due to inequitable conduct." Defs.' Br. Supp. Resp. 24, ECF No. 68.

**\*16** Just as the Chandler Plaintiffs' concession that the Phoenix Defendants did not have "actual notice of facts to support a *Walker Process* fraud claim ... until January 2016 when the District Court made its inequitable conduct finding" negates Phoenix's corporate liability, it also negates Fisher's individual liability for his actions on behalf of HOTF. Pls.' Br. Supp. Resp. 15, ECF No. 71. The Chandler Plaintiffs list several ways in which Fisher participated in the enforcement of the '993 Patent after Phoenix acquired HOTF. *See* Pls.' Br. Supp. Mot. Partial Summ. J. 23–25, ECF No. 62. But given that the only two potentially injurious actions—HOTF's sending Hess a cease-and-desist letter and HOTF suing the Chandler Plaintiffs for patent infringement—occurred before the District of North Dakota's ruling, Fisher did not previously have the requisite knowledge to engage in "conscious wrongdoing." *MVConnect*, 2011 WL 13128799, at *9. Arguably, Fisher could have consciously engaged in

continuing the *Newco* litigation on behalf of HOTF, but given that the case has been stayed since 2015, the Chandler Plaintiffs should not have expended fees on litigation since the District of North Dakota's ruling. *See* 7:14-CV-87-O. Accordingly, because Fisher also did not have the requisite knowledge, intent, and direct involvement in HOTF's alleged anticompetitive injurious acts, Fisher also cannot be held liable for his role as an HOTF corporate officer.

## IV. CONCLUSION

Due to the Chandler Plaintiffs' lack of standing to bring antitrust claims for lost-profit damages, failure to file suit within the four-year limitations period, and inability to establish Phoenix's corporate liability and Fisher's individual liability, the Chandler Plaintiffs may not proceed on the merits of their *Walker Process* and sham patent litigation claims. Accordingly, the Court **DENIES** the Chandler Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** the Phoenix Defendants' Motion for Summary Judgment. The Chandler Plaintiffs' claims are **DISMISSED with prejudice.**

**SO ORDERED** on this **13th day** of **April, 2020**.

## All Citations

Not Reported in Fed. Supp., 2020 WL 1848047, 2020-1 Trade Cases P 81,180

---

**End of Document**                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Federal Trade Commission v. AdvoCare International, L.P., Slip Copy (2020)

2020 WL 6741968, 2020-2 Trade Cases P 81,455

KeyCite Yellow Flag - Negative Treatment

Distinguished by Federal Trade Commission v. Walmart Inc., N.D.Ill., March 27, 2023

2020 WL 6741968

United States District Court, E.D. Texas, Sherman Division.

FEDERAL TRADE COMMISSION

v.

ADVOCARE INTERNATIONAL, L.P., et al.

CIVIL NO. 4:19-CV-715-SDJ

|

Signed 11/16/2020

**Attorneys and Law Firms**

M. Hasan Aijaz, Pro Hac Vice, Thomas B. "Tom" Carter, Pro Hac Vice, Aaron J. Haberman, Federal Trade Commission - Dallas Dallas Regional Office, Dallas, TX, for Federal Trade Commission.

John Robert Robertson, DLA Piper LLP, Chicago, IL, Meagan Dyer Self, DLA Piper LLP, Dallas, TX, for AdvoCare International, L.P.

Baxter Ward Banowsky, Banowsky & Levine, PC, Dallas, TX, for Danny McDaniel, Diane McDaniel.

**MEMORANDUM OPINION AND ORDER**

SEAN D. JORDAN, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are two motions: Defendants' Motion to Dismiss for failure to state a claim filed by Defendants Danny McDaniel and Diane McDaniel ("the McDaniels") pursuant to Federal Rule of Civil Procedure 12(b)(6), (Dkt. #17), and Plaintiff's Motion to Exclude, (Dkt. #23), certain factual allegations, documents, and legal arguments included in the McDaniels' Reply Brief, (Dkt. #20). For the following reasons, the Court **GRANTS** the McDaniels' Motion to Dismiss, (Dkt. #17), and **DENIES as moot** Plaintiff's Motion to Exclude, (Dkt. #23).

**I. BACKGROUND**

In March 2017, consumers filed a class-action lawsuit in the Northern District of Texas against AdvoCare International, L.P. ("AdvoCare"), alleging that AdvoCare had been operating as an illegal pyramid scheme. *Ranieri v. AdvoCare Int'l, L.P.*, No. 3:17-cv-00691-B, 2017 WL 947224 (N.D. Tex. Mar. 9, 2017); *see also* (Dkt. #1 at 25, #17 at 12). That suit named, among others, Danny McDaniel—but not his wife, Diane McDaniel—as a defendant. *Ranieri, 2017 WL 947224*. However, the district court ultimately dismissed with prejudice the action against Danny McDaniel, holding that if AdvoCare indeed operated an illegal pyramid scheme, Danny McDaniel did not operate said scheme. *Ranieri v. AdvoCare Int'l, L.P.*, 336 F.Supp.3d 701, 718 (N.D. Tex. 2018);[1] *see also* (Dkt. #17 at 12).

[1]    "In the instant case, Plaintiffs have not shown that creating and disseminating promotional materials ... caused Plaintiffs' injuries, and they have not shown that the Individual Defendants operated the alleged pyramid scheme...." *Id.*

Separately, the Federal Trade Commission ("FTC" or "Commission") began investigating AdvoCare for potential violations of consumer-protection law. (Dkt. #1 at 25). In July 2019, during negotiations with the FTC, AdvoCare terminated its "multi-level marketing" ("MLM") program, which was alleged to be an illegal pyramid scheme. (Dkt. #1 at 25–26).

On October 2, 2019, the FTC brought a complaint in this Court requesting a permanent injunction and other equitable relief against AdvoCare and at least five individual members thereof, including the McDaniels. (Dkt. #1). The Complaint alleges that Defendants engaged in unlawful business practices in violation of the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. *See, e.g.,* (Dkt. #1 at 26). In particular, the Complaint alleges that AdvoCare—which the FTC describes as "a multi-level marketing company that promotes health and wellness products"— deceived individuals into becoming "Distributors" and "Advisors," or salespeople for AdvoCare, the majority of whom never earned compensation for their sales. (Dkt. #1 at 4–6). The Complaint further alleges that Defendants consistently and deceptively portrayed AdvoCare as a "life-changing financial solution," (Dkt. #1 at 6–9), and trained recruits to do the same, (Dkt. #1 at 9). The Complaint thus asserts that AdvoCare operated an unlawful pyramid scheme whereby AdvoCare's compensation structure relied on the fraudulent recruitment of Distributors and Advisors who would unwittingly pass on

WCAS014

profits to those higher up the chain of command. (Dkt. #1 at 16–23).

**\*2** Simultaneous to, or immediately after, the FTC's filing of the Complaint, on October 2, 2019, all named Defendants —except for the McDaniels—reached a settlement agreement with the FTC. (Dkt. #2, #2-1, #2-2). Pursuant to the settlement agreement, the settling Defendants, including AdvoCare, submitted to a host of sanctions, including an outright ban on: multi-level marketing; operating "chain referral" programs or similar schemes; managing compensation for any business ventures unless certain criteria are satisfied; and making material misrepresentations regarding any business venture. (Dkt. #2-2 at 3–5, #15, #16). The settling Defendants also agreed to (a) provide equitable monetary relief and payment to the Commission, (b) cooperate in the settlement, and (c) record progress while otherwise submitting to wide-reaching compliance monitoring. (Dkt. #2-2 at 5–16, #15, #16). The FTC has continued to pursue the instant action against the McDaniels, which the McDaniels now move to dismiss under Rule 12(b)(6).

## II. LEGAL STANDARD

Under the relaxed pleading standards of Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement requires only that the plaintiff provide "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility, under *Twombly*, means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[ ] [its] claims across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." *Id.* at 679–80 (first quoting *Twombly*, 550 U.S. at 570, then citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2nd Cir. 2007)) (internal quotation marks omitted). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

Further, when evaluating a Rule 12(b)(6) motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). However, a district court may also consider any "matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Courts have taken judicial notice of the existence and content of settlement agreements when evaluating Rule 12(b)(6) motions to dismiss. *See, e.g.*, *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1008 n.2 (9th Cir. 2014) (holding that because the settlement agreement was filed with the court and is a publicly available record, it is properly subject to judicial notice and thus may be considered on a Rule 12(b)(6) motion); *Estate of Brown v. Arc Music Grp.*, 523 F.App'x 407, 410 (7th Cir. 2013) (holding that the settlement agreement was a public record, of which the court could take judicial notice without converting the motion into one for summary judgment). Finally, a court may take judicial notice sua sponte. FED. R. CIV. P. 201(c)(1).

Here, the Court takes judicial notice of the settlement agreement between Plaintiff and all Defendants to the instant action besides the McDaniels, (Dkt. #2, #15, #16).[2] The Court thus considers the existence and content of the settlement agreement in its analysis.

[2]  The Unopposed Motion for Settlement, (Dkt. #2), was filed with the Court the same day as the Complaint, (Dkt. #1), October 2, 2019, and the Court entered the stipulated orders, (Dkt. #15, #16), which collectively granted the motion, one week later.

## III. DISCUSSION

### A. The FTC's Complaint is Not Exempt from the Pleading Standards Prescribed by the Federal Rules of Civil Procedure.

**\*3** The Federal Trade Commission Act instructs the Commission to "prevent persons, partnerships, or corporations" from using "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The Commission has "multiple instruments in its toolbox"

WCAS015

to accomplish this statutory directive, among which are administrative proceedings and litigation in federal court. *FTC v. Shire Viropharma, Inc.*, 917 F.3d 147, 155 (3d Cir. 2019).

As relevant here, Section 13(b) of the FTC Act empowers the FTC to "bring suit in a district court of the United States" to obtain a "temporary restraining order," a "preliminary injunction," or a "permanent injunction" against an "act or practice" that violates the FTC Act. 15 U.S.C. § 53(b). To bring such an action, the FTC must have "reason to believe" that the entity or person sued "is violating, or is about to violate" the Act. *Id.*

The McDaniels contend that the FTC's complaint must be dismissed under Rule 12(b)(6) because the Complaint fails to state a plausible claim under Section 13(b) that the McDaniels are violating or are "about to violate" the FTC Act. (Dkt. #17 at 6). Pointing to the FTC's Complaint itself, as well as the settlement agreement with AdvoCare and the other Defendants, the McDaniels assert that the FTC's suit recognizes that the alleged pyramid scheme operated by AdvoCare, and in which the McDaniels were allegedly involved, ended in July 2019. (Dkt. #17 at 7–8). The McDaniels further argue that there are no factual allegations supporting the FTC's conclusory contention that the McDaniels are presently violating the FTC Act or are "about to" violate the Act.[3]

[3] The McDaniels have not challenged the Court's jurisdiction in this matter. Although their dismissal motion included some language suggesting a potential jurisdiction argument, *see* (Dkt. #17 at 8), the substance of the McDaniels' motion and briefing asserts only a Rule 12(b)(6) motion for failure to state a claim and does not contest the Court's jurisdiction. *See* (Dkt. #20 at 1 n.3) (the McDaniels' reply brief affirms that they are not raising a jurisdictional challenge). In any event, the Court concludes that it has jurisdiction because the FTC's claim arises under a law of the United States, 15 U.S.C. § 53(b), and therefore falls within the general grant of jurisdiction in 28 U.S.C. § 1331. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (confirming that a plaintiff obtains the "basic statutory grant[ ]" of subject matter jurisdiction in 28 U.S.C. § 1331

by pleading a colorable claim that arises under the Constitution or the laws of the United States).

The FTC's first response to the McDaniels' motion is to suggest that, because the agency has already made its own, internal determination that it has "reason to believe" that the McDaniels are violating or are "about to violate" the FTC Act, the Complaint before the Court is largely immunized from judicial scrutiny under Rule 12(b)(6). The FTC states that "[t]he Commission's determination that there is sufficient 'reason to believe' under Section 13(b) is left to the agency's discretion." (Dkt. #19 at 5). The FTC goes on to cite and quote *Standard Oil Co. of California v. FTC*, 596 F.2d 1381, 1386 (9th Cir. 1979), *rev'd on other grounds*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), for the proposition that, "[i]f the district court finds as a fact that the FTC made the 'reason to believe' determination ... further review would be foreclosed." (Dkt. #19 at 5). Ultimately, the FTC asserts that, rather than engaging in a straightforward application of pleading standards under Rule 8, the Court is bound to deny the McDaniels' Rule 12(b)(6) motion unless it concludes that the FTC "abused its discretion" in making its internal "reason to believe" determination. (Dkt. #19 at 12–13). According to the Commission, limiting the Court's analysis to an "abuse of discretion" standard "fits with the broad prosecutorial discretion federal agencies have to bring suit." (Dkt.#19 at 6).

**\*4** The Court disagrees. Taken to its logical conclusion, the FTC's argument would mean that, no matter how insubstantial the factual allegations in an FTC complaint under Section 13(b), a court must accept that the complaint is sufficient to withstand a Rule 12(b) motion so long as the FTC avers that it has "reason to believe" that a defendant is "about to" engage in unfair methods of competition, or unfair or deceptive acts or practices. The FTC's position is contrary to accepted rules of pleading and finds no support in applicable case law.

First, Rule 8(a) of the Federal Rules of Civil Procedure requires that anyone filing a complaint must include a statement demonstrating "the grounds for the court's jurisdiction" and a "showing that the pleader is entitled to relief." In a Section 13(b) case, that requirement includes factual allegations from the FTC that there exist reasons to believe that the defendant is violating or "is about to violate" the FTC Act.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A bare allegation by the FTC that "we have reason to

believe that the defendant is about to violate the law," when unaccompanied by supporting factual allegations, clearly does not "state a claim to [injunctive] relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This Court is fully capable of determining whether the FTC's factual allegations in a Section 13(b) complaint are sufficient to make the requisite "about-to-violate" showing. Therefore, there is no reason to conclude that Congress intended to eliminate judicial scrutiny under Rule 8.

The cases that the FTC cites do not support its argument that its internal, "reason to believe" determination is an effective "King's X" against a motion to dismiss a Section 13(b) complaint brought by the FTC in federal court. For example, *Standard Oil* addressed a challenge by an oil company to an administrative proceeding initiated by the FTC in connection with unfair trade practices. 596 F.2d at 1384. The oil company's challenge, brought under the Administrative Procedure Act ("APA"), was rejected by the Ninth Circuit based on the court's determination that the FTC's commencement of an administrative proceeding was not subject to challenge under the APA. *Id.* at 1385. *Standard Oil* did not involve a lawsuit brought by the FTC and it says nothing about deference to the FTC in cases in which the FTC, as the plaintiff in federal court, bears the threshold burden to meet the requirements of Rule 8 and state a claim for relief that is plausible on its face.

The other cases cited by the FTC are equally unhelpful because they involve the inapposite circumstances of judicial review of agency action. *See Slough v. FTC*, 396 F.2d 870 (5th Cir. 1968) (suit seeking review of a cease and desist order issued by the FTC after an administrative hearing); *FTC v. Nat'l Urological Grp., Inc.*, No. 1:04-cv-3294-CAP, 2006 WL 8431977 (N.D. Ga. Jan. 9, 2006) (dismissing counterclaims brought under the APA challenging the FTC's decision to initiate a lawsuit); *Boise Cascade Corp. v. FTC*, 498 F.Supp. 772 (D. Del. 1980) (involving an APA action seeking an order that the FTC withdraw an administrative complaint).

Judicial review of agency action under the APA is governed by the APA itself, which expressly precludes judicial review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). No such review is at issue here. Instead, the McDaniels' motion raises a different issue: whether the FTC has stated a claim under the Federal Rules of Civil Procedure. The resolution of the McDaniels' motion is governed by Rule 8 of the Federal Rules of Civil Procedure, which mandates, rather than precludes, judicial review to ensure compliance

with federal pleading requirements. "It is precisely the Court's duty under Rule 8 to scrutinize a party's right to proceed in federal court." *FTC v. Hornbeam Special Situations, LLC*, No. 1:17-cv-3094-TCB, 2018 WL 6254580, at *4 (N.D. Ga. Oct. 15, 2018).

**\*5** In sum, to avoid dismissal of its Section 13(b) action at the pleadings stage, the FTC must plausibly allege, in satisfaction of *Iqbal* and *Twombly*, that the McDaniels *are currently* violating the FTC Act *or are about to* do so.

## B. The FTC's Factual Allegations Pertain Only to *Past* Misconduct by the McDaniels and not to Present or Future Misconduct.

Section 13(b) of the FTC Act empowers the Commission to file a claim in federal court "[w]henever the Commission has reason to believe ... that any person, partnership, or corporation *is violating*, or *is about to violate*, any provision of law enforced by the [FTC]...." 15 U.S.C. § 53(b) (emphasis added). Section 13(b) thus unambiguously requires plausible factual allegations supporting a reasonable belief of present or future misconduct. *Shire*, 917 F.3d at 156–57 ("Section 13(b) requires that the FTC have reason to believe a wrongdoer 'is violating' or 'is about to violate' the law.... [T]his language is unambiguous; it prohibits existing or impending conduct ... [and] does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation.").

In *Shire*, the conduct in question was five years past. Here, the McDaniels' past conduct is more recent; at the time the FTC filed the Complaint, only three months had passed since the McDaniels ceased their alleged misconduct. However, like in *Shire*, the FTC identifies no ongoing misconduct and, in fact, appears to concede that the McDaniels' alleged misconduct continued only until July 2019. [4]

[4]     "The McDaniels ... continued to engage in deception until AdvoCare abandoned its multi-level marketing structure in July 2019 during its negotiations with the FTC." (Dkt. #1 at 26).

Further, even if the FTC had alleged ongoing or impending violations by the McDaniels, such allegations are implausible because, according to the FTC's own factual allegations, at the time the Complaint was filed, the primary mechanism of the McDaniels' alleged wrongdoing, the MLM program, had been permanently defunct for months. (Dkt. #1 at 26). Additionally, the sole business through which the McDaniels

Federal Trade Commission v. AdvoCare International, L.P., Slip Copy (2020)
2020 WL 6741968, 2020-2 Trade Cases P 81,455

allegedly undertook such actions—AdvoCare—had, either before or simultaneous to the Complaint's filing, entered into a comprehensive agreement to halt AdvoCare's unlawful activities, reform its business practices, and submit to government compliance monitoring. (Dkt. #2, #2-1, #2-2).

The FTC has not alleged that the McDaniels are *currently* violating or *are about to* violate the law enforced by the FTC. Every factual allegation that the FTC presents refers to past misconduct by the McDaniels. Although this misconduct was extensive and longstanding—having taken place for "a period of more than 20 years"—all factual allegations indicate that the alleged violations ended entirely in July 2019 when AdvoCare's MLM program was permanently terminated. (Dkt. #1 at 25–26). And it is implausible that the McDaniels can commit ongoing violations because the MLM program is now defunct, (Dkt. #1 at 26), and AdvoCare has been extensively sanctioned, reformed, and monitored for compliance, (Dkt. #15, #16). Finally, the FTC has not alleged—either in the initial Complaint filed in October 2019 or in any amended pleadings since that time—that either the MLM is still operating or that the McDaniels are otherwise continuing to engage in misconduct after July 2019.

**C. Past Violations May Sometimes Give Rise to an Inference of Ongoing or Future Violations, but the FTC has not Plausibly Alleged that Such is the Case Here.**

 **\*6**  Section 13(b) generally cannot be used to remedy past violations. *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). However, a plaintiff may state a plausible claim under Section 13(b) by showing that a past violation or series of past violations is likely to recur. *Id.* In some instances, courts have found that an extensive history of past violations is itself sufficient to create an inference of ongoing violations. *See, e.g.*, *FTC v. GTP Mktg., Inc.*, No. 4-90-123-K, 1990 WL 54788, at \*5 (N.D. Tex. Mar. 15, 1990) (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987)) ("An extensive history of violations does beget an inference that future violations are likely to occur."). The Fifth Circuit, however, has held merely that past violations may, but do not necessarily, support an inference of future substantive violations. *SEC v. First Fin. Grp. Tex.*, 645 F.2d 429, 434 (5th Cir. 1981) (holding in an analogous context that finding a reasonable likelihood of future securities-law violations requires "proof of past substantive violations *that indicate* a reasonable likelihood of future substantive violations." (emphasis added)).

In each of the above cases, the recurrence of violations was at least possible, and in some instances likely, because the channels of misconduct utilized by the defendants remained open—*i.e.*, free and clear of government sanction—upon filing of the litigation. *See, e.g.*, *Odessa*, 833 F.2d at 176–77. In *Odessa*, for instance, the defendant warehouse co-op was still fully operational at the outset of litigation. *Id.* Moreover, while the defendant stated an intent to comply with sanitation laws, it continued to manage its own sanitation practices free of government intervention. *Id.* Absent such intervention, and given the defendant's history of violations, the court held that "serious questions remain[ed]" as to whether the defendant's violations would recur or continue. *Id.*

Here, by contrast, at the outset of litigation and pursuant to FTC intervention, the McDaniels' channel of misconduct was either permanently defunct (in the case of the MLM program) or reformed, lawful, and monitored for compliance (in the case of AdvoCare more broadly). To this end, the FTC not only fails to adequately allege ongoing or future misconduct by the McDaniels but appears to affirmatively concede that the channels through which the McDaniels engaged in misconduct are permanently closed. (Dkt. #1 at 26); *see also* (Dkt. #2, #15, #16). Therefore, under the circumstances, an inference of present or future violations by the McDaniels is unsupported.

**IV. CONCLUSION**

The FTC is authorized to bring an action under Section 13(b) of the FTC Act only when there is "reason to believe" that a defendant is currently engaged in, or about to engage in, conduct violating the Act. 15 U.S.C. § 53(b). Here, each of the FTC's factual allegations pertains only to *past* misconduct by the McDaniels. While courts may sometimes infer ongoing or future violations based on an extensive history of past violations, here such an inference is improper because the sole channel through which the McDaniels allegedly engaged in violations—AdvoCare— agreed to abandon its MLM program entirely (as well as all other allegedly unlawful practices) and subject itself to wide-ranging government monitoring for compliance. This fundamental transformation began with the termination of AdvoCare's MLM program in July 2019 and culminated in AdvoCare's settlement with the FTC on the day of the Complaint's filing, of which the Court takes judicial notice. Under the circumstances, the FTC has failed to provide plausible factual allegations that there is reason to believe

WCAS018

that the McDaniels are currently violating the FTC Act or are about to violate the Act.

Finally, the FTC has filed with the Court a Motion to Exclude, (Dkt. #23), arguing that certain documents, legal arguments, and factual allegations presented in the McDaniels' Reply Brief, (Dkt. #20), should be excluded from consideration. In resolving the McDaniels' dismissal motion, the Court did not consider or rely upon any of the arguments, alleged facts, or documents complained of in the FTC's Motion to Exclude. For this reason, the Court finds that the FTC's Motion to Exclude should be DENIED as moot.

 **\*7** It is therefore **ORDERED** that Defendants Diane McDaniel's and Danny McDaniel's Motion to Dismiss, (Dkt. #17), is **GRANTED**. The Federal Trade Commission's claims against the McDaniels, *see* (Dkt. #1), are hereby **DISMISSED without prejudice**. [5] It is further **ORDERED** that the FTC is granted leave to replead its claims by filing an amended complaint, with such amended complaint to be filed within thirty (30) days from the date of the issuance of this Order.

[5]     Because the Court dismisses the claims asserted against the McDaniels by the FTC, the Court need not address the parties' arguments on the scope of the remedies that would be available if the FTC's claims against the McDaniels were successful.

It is further **ORDERED** that the FTC's Motion to Exclude is **DENIED as moot**.

It is further **ORDERED** that all other motions pending before the Court are **DENIED as moot**.

**So ORDERED and SIGNED this 16th day of November, 2020.**

**All Citations**

Slip Copy, 2020 WL 6741968, 2020-2 Trade Cases P 81,455

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Gurganus v. Furniss, Not Reported in Fed. Supp. (2016)

2016 WL 3745684

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 25 of 202

2016 WL 3745684
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Laura GURGANUS, on Behalf of Herself
and all others Similarly Situated, Plaintiffs,

v.

Todd FURNISS, Glendontodd Capital, LLC, Mary
Hatcher, Wade N. Barker, M.D. and Fpmc Services,
LLC, All Individually and d/b/a (1) the Management
Company at Forest Park Medical Center, LLC, (2)
the Management Company at Forest Park Medical
Center Ii, LLC, (3) the Management Company
at Forest Park Medical Center III, LLC, (4) the
Management Company at Forest Park Medical
Center IV, LLC, and (5) Fpmc Services, Defendants.

Civil Action No. 3:15-cv-03964-M
|
Signed 07/13/2016

**Attorneys and Law Firms**

Richard A. Capshaw, Christopher M. Blanton, Capshaw &
Associates, Dallas, TX, for Plaintiffs.

Jacob B. Kring, Britton D. McClung, Hedrick Kring, PLLC,
Dallas, TX, for Defendants.

**MEMORANDUM OPINION AND ORDER**

BARBARA M. G. LYNN, CHIEF JUDGE

 **\*1** Before the Court is Defendants' Motion to Dismiss
Plaintiff's First Amended Class Action Complaint [Docket
Entry #8]. For the reasons set forth below, the Court
**GRANTS** the Motion with regard to Plaintiff's federal law
claim (Count One), but with leave to amend. After the
filing of Plaintiff's Second Amended Class Action Complaint,
the Court will determine whether to exercise supplemental
jurisdiction over Plaintiff's state law claims (Counts Two and
Three). The Court therefore **DENIES** the remainder of the
Motion.

**I. BACKGROUND**
This case arises out of the closure of Forest Park Medical
Center, located in Dallas, Texas (the "Dallas Facility").

Plaintiff Laura Gurganus filed this lawsuit in County Court
at Law No. 3 in Dallas, Texas, against her former employer,
several individuals, and two limited liability companies,
asserting state law causes of action in connection with the
Dallas Facility's closure. Defendants removed this action
based on federal question jurisdiction. On January 12, 2016,
Plaintiff filed her First Amended Class Action Complaint
("Complaint") [Docket Entry #5], which is the live pleading.

Plaintiff alleges she was employed by FPMC Services to work
as a scrub nurse at the Dallas Facility. [1] Compl. ¶ 5. On or
about October 31, 2015, she, "and other employees employed
at the Dallas Facility were notified of their immediate
termination effective at noon that day." *Id.* ¶ 18. Plaintiff
and other employees at the Dallas Facility claim they had no
prior notice that they would be terminated, and that they were
each deprived of at least three weeks of pay to which they
were entitled, as well as accrued benefits. *Id.* ¶¶ 1-2. Plaintiff,
on behalf of herself and the putative class, alleges violations
of the Worker Adjustment and Retraining Notification Act,
29 U.S.C. § 2101 *et seq.* (the "WARN Act") (Count One),
as well as state law claims for negligence (Count Two), and
and fraud by non-disclosure (Count Three), in connection
with the Dallas Facility's closure. Plaintiff seeks to certify
a class under Federal Rule of Civil Procedure 23, and to
recover back pay and benefits for herself, and on behalf of
each former employee in the putative class, and costs and
attorney's fees. Defendants are Todd Furniss, Mary Hatcher,
Wade N. Barker, M.D, glendonTODD Capital, LLC, and
FPMC Services, LLC (the "Alter-Ego Defendants"), whom
she alleges are "severally and collectively" liable for the
WARN Act violations. *Id.* ¶¶ 1, 13. [2]

---

[1]     In its recitation of the facts, the Court accepts all
        well-pleaded facts in the Complaint as true, and
        views them in the light most favorable to Plaintiff.
        *See Sonnier v. State Farm Mut. Auto. Ins. Co.*, 509
        F.3d 673, 675 (5th Cir. 2007); *In re Katrina Canal
        Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007).

[2]     The Alter-Ego Defendants are sued individually,
        and doing business as (1) The Management
        Company at Forest Park Medical Center, LLC, (2)
        The Management Company at Forest Park Medical
        Center II, LLC, (3) The Management Company
        at Forest Park Medical Center III, LLC, (4) The
        Management Company at Forest Park Medical

Gurganus v. Furniss, Not Reported in Fed. Supp. (2016)

2016 WL 3745684

Center IV, LLC, and (5) FPMC Services. None of these five entities were served with process.

**\*2** The Alter-Ego Defendants move to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b) (6) for failure to state a claim upon which relief can be granted.

## II. LEGAL STANDARD

To defeat a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). The "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Twombly*, 550 U.S. at 555 (internal citations omitted).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' " it does require more than " 'labels and conclusions.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Further, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## III. ANALYSIS

The Court first addresses Defendants' motion to dismiss Plaintiff's WARN Act claim.

### A. The WARN Act

The WARN Act prohibits an employer from ordering a "plant closing or mass layoff until the end of a 60-day period after the employer serves written notice" of the closure or layoff to its employees. 29 U.S.C. § 2102(a). Employers that violate the WARN Act's notice requirement are liable to the affected workers for each day notice is not provided, for up to 60 days. *Id.* § 2104(a). "In short, [the] WARN [Act] imposes a statutory duty on businesses to notify workers of impending large-scale job losses and allows for limited damages designed to penalize the wrongdoing employer, deter future violations, and facilitate simplified damages proceedings." *Hollowell v. Orleans Regional Hosp. LLC*, 217 F.3d 379, 382 (5th Cir. 2000) (internal quotation marks and citation omitted).

The WARN Act defines an employer as "any business enterprise" that employs 100 or more employees, but does not further define the term. *See* 29 U.S.C. § 2101(a)(1). "Because a plant closure often presages a corporation's demise, leaving workers with no source of satisfaction from their employer, plaintiffs have frequently sought damages from affiliated corporations," with claims arising from "non-WARN Act sources of law[.]" *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 476-77 (3d Cir. 2001). The WARN Act itself does not address the situation where an employee cannot recover WARN Act damages from an insolvent or dissolved employer, and seeks to pursue other entities related to the former employer on the theory that the other entity actually controlled the former employer and should be treated as an employer for WARN Act purposes. The Department of Labor ("DOL") has issued a regulation setting forth relevant factors to determine whether "independent contractors and subsidiaries which are wholly or partially owned by a parent company are treated as separate employers or as part of the parent or contracting company." 20 C.F.R. § 639.3(a) (2). The overriding concern in answering that question is stated to be the "degree of [a subsidiary's] independence from the parent." *Id.* Some of the factors to be considered are: "(i) common ownership, (ii) common directors and/ or officers, (iii) de facto exercise of control, (iv) unity of personnel policies emanating from a common source, and (v) the dependency of operations." *Id.* Following the lead of the Third Circuit, the Fifth Circuit has adopted the multi-factored test promulgated by the DOL as the appropriate test for federal courts determining liability of alleged affiliates under the WARN Act. *See Administaff Cos. v. UNITE*, 337 F.3d 454, 457-58 (5th Cir. 2003) (citing with approval *Pearson*, 247 F.3d at 490) ("As the Third Circuit explained, 'the DOL factors are the best method for determining WARN Act liability because they were created with WARN Act policies in mind....' "); *see also Vogt v. Greenmarine Holding, LLC*, 318 F. Supp. 2d 136, 142-46 (S.D.N.Y. 2004) (adopting the DOL's five-factor test to evaluate whether nominally separate entities were liable as a "single employer" to laid-off employees for WARN Act violations).

### B Plaintiff's WARN Act Claims

WCAS021

Gurganus v. Furniss, Not Reported in Fed. Supp. (2016)
2016 WL 3745684

Case 4:23-cv-03560  Document 101  Filed on 11/20/23 in TXSD  Page 27 of 202

**\*3** In Count One, Plaintiff alleges that her former employer, FPMC Services, is subject to the notice and back pay requirements of the WARN Act, and that the Alter-Ego Defendants, under the doctrines of alter ego or veil-piercing, are liable for FPMC Services' WARN Act violations. Compl. ¶¶ 39-45. The question presented by Defendants' motion to dismiss Count One is whether Plaintiff has alleged facts which, if true, are sufficient to show that within the meaning of the WARN Act, the Alter-Ego Defendants are employers of those employees laid off when the Dallas Facility closed in October 2015. In support of dismissal, Defendants argue that "the WARN Act does not provide for relief against non-employers, and Plaintiff does not and cannot sufficiently allege that the non-Employer Defendants were part of a 'single employer' with FPMC Services for purposes of the WARN Act." Defs.' Br. 1 [Docket Entry #9]. Defendants also argue that "Plaintiff's general alter-ego and veil-piercing allegations are insufficient to create any liability as a matter of law, as Plaintiff's conclusory allegations do not establish any entity as an alter ego and do not properly state a fraud claim for veil-piercing." *Id.* In response, Plaintiff argues that she has adequately alleged that "the Alter-Ego Defendants controlled and operated FPMC Services – the name of the entity that employed [her]," and that she is "entitled to pierce the corporate veil of FPMC Services to impute the liability of FPMC Services onto the Alter-Ego Defendants." Pl.'s Resp. 17 [Docket Entry #13].

### *1. Direct Liability for WARN Act Violations*

### *a. FPMC Services*

Plaintiff alleges she was "employed by FPMC Services[.]" Compl. ¶ 5. [3] However, as correctly noted by Defendants, FPMC Services is not included in the group of "Alter-Ego Defendants" repeatedly claimed to be responsible for the alleged failure to provide the requisite notice under the WARN Act. *See, e.g.*, Compl. ¶ 43 ("The Alter-Ego Defendants willfully violated the federal WARN Act by failing to provide the required notice."); *id.* ¶ 45 ("Plaintiff and all similarly situated employees have been damaged by the acts of the Alter-Ego Defendants constituting violations of the WARN Act[.]"). Even assuming FPMC Services had been served with process, there are no allegations that FPMC Services, as Plaintiff's employer, failed to provide sixty-days advance written notice of the Dallas Facility's closure. The Court thus concludes that Plaintiff has failed to state a claim

against FPMC Services for violations of the WARN Act. *See* 28 U.S.C. § 2102. Accordingly, the Court **grants** Defendants' Motion to Dismiss Plaintiff's WARN Act claim against FPMC Services.

[3]   It is unclear from the Complaint whether Plaintiff is suing her former employer, FPMC Services, under the WARN Act. Additionally, in her Response to Defendants' Motion to Dismiss, Plaintiff confusedly states that she was employed by FPMC Services, LLC, which is alleged in the Complaint to be a different entity. *See* Pl.'s Resp. ¶ 1 [Docket Entry #13]. Further, as the Court has already noted, the docket sheet does not show that FPMC Services has been served with process. *See supra* note 2. Out of an abundance of caution, however, the Court will address whether Plaintiff has alleged facts which, if true, would state a claim for a WARN Act violation against FPMC Services.

### *b. glendonTODD Capital, LLC and FPMC Services, LLC*

Plaintiff asserts WARN Act claims against glendonTODD Capital, LLC and FPMC Services, LLC. To be directly liable as an employer under the Act, glendonTODD Capital, LLC and FPMC Services, LLC must be considered a "single employer" with FPMC Services. *See Administaff*, 337 F.3d at 457-58. As already stated, the Fifth Circuit has adopted the five-factor test developed by the DOL to evaluate whether legally distinct entities acted as a "single employer" for purposes of WARN Act liability. *See id.* (applying five-factor DOL test and holding that a payroll and staffing company was not part of a "single employer" with its customer who initiated a mass layoff, since the payroll company did not exercise control over the layoff or share personnel policies with its customer).

In her response, Plaintiff does not address the five-factor DOL test, nor does she otherwise argue that her pleadings satisfy such factors, instead relying only on general principles of veil-piercing and alter ego under Texas law. Absent single-employer liability, the WARN Act only imposes direct liability on the Plaintiff's employer, which in this case Plaintiff alleges is FPMC Services. Compl. ¶ 5. *See Administaff*, 337 F.3d at 457. The Court concludes that Plaintiff has failed to state a claim against glendonTODD Capital, LLC and FPMC Services, LLC for single employer liability under the WARN Act, and **grants** Defendants' Motion to Dismiss these claims.

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 28 of 202

Gurganus v. Furniss, Not Reported in Fed. Supp. (2016)

2016 WL 3745684

### 2. Derivative Liability for WARN Act Violations by the Alter-Ego Defendants

**\*4** The Court now turns to Plaintiff's argument that the Court should pierce the corporate veil and hold the Alter-Ego Defendants liable for a WARN Act violation. *See* Compl. ¶¶ 1, 13-14.

Texas law recognizes that the corporate form can be disregarded in certain circumstances, including:

(1) when the [corporate] fiction is used as a means of perpetrating fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation;

(4) where the corporate fiction is employed to achieve or perpetrate [a] monopoly;

(5) where the corporate fiction is used to circumvent a statute; and

(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong.

*Castleberry v. Branscum*, 721 S.W.2d 270, 272-73 (Tex. 1986) (citations and footnotes omitted); *see also Western Horizontal Drilling, Inc. v. Jonnet Energy Corp.*, 11 F.3d 65, 67 (5th Cir. 1994) (The Fifth Circuit has "interpreted [*Castleberry*] as establishing three broad categories in which a court may pierce a corporate veil: (1) the corporation is the alter ego of its owners and/or shareholders; (2) the corporation is used for illegal purposes; and (3) the corporation is used as a sham to perpetrate a fraud."). While the factors listed in *Castleberry* still apply in tort actions, the holding in *Castleberry* that failure to observe corporate formalities is a factor in proving an alter ego theory in actions for breach of contract has been abrogated by statute and now actual fraud must be shown. *See* Tex. Bus. Corp. Act art. 2.21, *recodified* at Tex. Bus. Orgs. Code § 21.223. The parties do not address whether a WARN Act claim is analogous to a tort or contract action. Although the Fifth Circuit has encountered the issue, it has not yet resolved the question. *See Hollowell*, 217 F.3d at 386. For the reasons that follow, regardless of whether a WARN Act claim is considered more like a tort

or contract claim, the Court concludes that the allegations in the Complaint are insufficient to warrant piercing the corporate veil to impose WARN Act liability on the Alter-Ego Defendants.

Plaintiff alleges she "and all other similarly situated persons, suffered employment losses due to the acts and omissions of the Alter-Ego Defendants and did not receive the 60 day notice required by the WARN Act." Compl. ¶ 19. She alleges that:

> Rather than issue timely notice under the WARN Act and in order to protect their own personal interests and further their financial gain, the Alter-Ego Defendants – through their control and direction of The Management Company of Forest Park Medical Center and FPMC Services, continued to operate the Facility –employing Plaintiff and her co-workers – in order to increase the likelihood of the sale of the Facility and/or the acquisition of additional financing. The Alter-Ego Defendants did so in an attempt to further their own financial gain.

*Id.* ¶ 16. Plaintiff further alleges that "[d]espite the illusion of independent business relationships and 'arms-length' transactions, the facts show that the Alter-Ego Defendants Todd Furniss, glendonTODD Capital, LLC, Mary Hatcher, Wade N. Barker, M.D. and FPMC Services, LLC": (i) controlled the operation, management and direction at the Dallas Facility; (ii) "called the shots" of FPMC Services, "including decisions about whether or not employees would be directed to work despite the lack of funds to pay wages"; (iii) "called the shots" at the Management Company of Forest Park Medical Center, "including decisions about what claims would get paid and not paid"; (iv) possessed actual knowledge that the Dallas Facility was no longer solvent and, despite that knowledge, directed Plaintiff and her fellow employees to continue working at the Dallas Facility, (v) possessed actual knowledge that there was either no financial ability or no present intent to compensate Plaintiff and her fellow employees for their work, (vi) failed to timely disclose the fact that Plaintiff and her fellow employees would not be compensated for services rendered despite having the

Case 4:23-cv-03560  Document 101  Filed on 11/20/23 in TXSD  Page 29 of 202

Gurganus v. Furniss, Not Reported in Fed. Supp. (2016)
2016 WL 3745684

obligation to do so; (vii) "did these things in a manner they knew would result in a mass layoff of the Dallas Facility workforce without full payment of accrued wages"; and (viii) failed to make such disclosures for their own financial gain and personal investment. *See id.* ¶ 2.

**\*5** Conclusory allegations that the Alter-Ego Defendants "called the shots" at FPMC Services and at The Management Company of Forest Park Medical Center, and vague allegations that the Alter-Ego Defendants operated, controlled, and managed the Dallas Facility, are insufficient to allege a plausible theory of liability. This is especially true where, as here, a plaintiff is seeking to pierce the corporate veil based on allegations of actual or constructive fraud. *See generally In re Parkcentral Global Litig.*, 2010 WL 3119403, at \*10 (N.D. Tex. Aug. 5, 2010) (Lynn, J.) (granting motion to dismiss where "Plaintiffs offer conclusory accusations lacking factual support and lump all Defendants together and merely restate some elements of proof necessary to pierce the corporate veil, without providing necessary factual allegations").

It is impossible to tell from the Complaint what corporate veil Plaintiff seeks to pierce — that of FPMC Services, The Management Company at Forest Park Medical Center, glendonTODD Capital, LLC, or FPMC Services, LLC. She fails to allege which entity acted fraudulently or as an alter ego for which other party. As to the three individual defendants, Todd Furniss, Mary Hatcher, and Wade N. Barker, M.D., Plaintiff fails to allege which of these individuals is liable as the alter ego of which entity, nor does she state facts giving rise to any individual's liability on behalf of any entity. In addition to being conclusory and formulaic, this type of group pleading fails to meet the pleading requirements of Federal Rule of Civil Procedure 8. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556) (under the pleading requirements of Rule 8, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that *the defendant* is liable for the misconduct alleged.") (emphasis added). As correctly stated by Defendants, "Plaintiff's group pleading fails to state a claim and makes it impossible to ascertain which particular Defendant(s) are supposedly responsible for the acts allegedly creating the WARN Act violation." Defs.' Br. 7 [Docket Entry #9].

For these reasons, the Court concludes that Plaintiff has failed to allege facts which, taken as true, are sufficient to pierce the corporate veil to extend WARN Act liability for the Dallas

Facility's closure to the Alter-Ego Defendants. Accordingly, the Court **grants** Defendants' Motion to Dismiss Plaintiff's WARN Act claim against the Alter-Ego Defendants. [4]

4

> The Court also rejects Plaintiff's argument that she "pled facts which give rise to Defendants' liability in their individual capacity...." *See* Pl.'s Resp. 15-16. In contrast to the cases upon which she relies, Plaintiff has not alleged that Defendants Todd Furniss, Mary Hatcher, or Wade N. Barker, M.D, made any affirmative or misleading representation to her or that she ever had any contact with any of them.

Although the Court is dismissing Plaintiff's WARN Act claim, it will permit Plaintiff to replead. "[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). In this case, Plaintiff has requested leave to amend in the event the Court finds her pleadings deficient. The Court allows Plaintiff until **August 12, 2016**, to amend her Complaint.

### B. Counts Two (Negligence) and Three (Fraud by Non-Disclosure)

Defendants move to dismiss Plaintiff's state law claims alleged in Counts Two and Three of the Complaint. After the filing of Plaintiff's Second Amended Class Action Complaint, the Court will determine whether to exercise supplemental jurisdiction over Plaintiff's state law claims. Accordingly, the Court **denies without prejudice** Defendants' Motion to Dismiss Counts Two and Three.

### IV. CONCLUSION

**\*6** For the reasons stated above, Defendants' Motion to Dismiss Plaintiff's First Amended Class Action Complaint is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Motion is **GRANTED** with regard to Plaintiff's WARN Act claim (Count One), and **DENIED without prejudice** in all other respects. Plaintiff's WARN Act claim (Count One) is hereby **DISMISSED without prejudice**, and Plaintiff is **GRANTED** leave to file an amended complaint by **August 12, 2016**. If Plaintiff fails to timely amend her pleadings, the Court will decline to exercise supplemental jurisdiction over

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 30 of 202

**Gurganus v. Furniss, Not Reported in Fed. Supp. (2016)**

2016 WL 3745684

the remaining state law claims, which will be remanded to state court.

**SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3745684

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 31 of 202
In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

2019 WL 1331830
United States District Court, S.D. New York.

IN RE: LIBOR-BASED FINANCIAL
INSTRUMENTS ANTITRUST LITIGATION.
This Document Applies to: Cases Listed in Appendix

11 MDL 2262 (NRB)
|
Signed 03/25/2019

**MEMORANDUM AND ORDER**

NAOMI REICE BUCHWALD, UNITED STATES
DISTRICT JUDGE

**LIBOR VIII**

**Table of Contents**

**\*1**  I. Introduction...——

II. Background...——

III. Plaintiffs' Motions for Leave to Amend...——
1. General Legal Standard for Leave to Amend...——

2. Amendments Related to Personal Jurisdiction...——

   2.1. Counterparty Claims...——

   2.2. Indirect Counterparty Claims...——

   2.3. Non-Counterparty Claims and Conspiracy Jurisdiction...——

   2.4. "Overt Acts" in Furtherance of the Conspiracy...——

3. Other Amendments...——

   3.1. Lender Plaintiffs' Proposed Amendments...——

   3.2. NCUA's Proposed Amendments...——

   3.3. FFP Plaintiffs' Proposed Amendments...——

IV. Defendants' Motion to Dismiss Against Schwab and Doral...——

1. General Legal Standard for Motion to Dismiss...——

2. Motion to Dismiss Schwab's Claims Based on Lack of Personal Jurisdiction...——

   2.1. Nationwide General Jurisdiction Based on the Exchange Act's Nationwide Service of Process...——

   2.2. Specific Jurisdiction over Defendants in Exchange Act Claims...——

   2.3. Pendent Jurisdiction over State Law Claims...——

3. Motion to Dismiss Schwab's Claims Based for Failure to State a Claim...——

   3.1. Addition of New Defendants and Claims...——

   3.2. Exchange Act § 10(b) Claims...——

   3.3. Exchange Act § 20(a) Claims...——

   3.4. Unjust Enrichment Claims...——

   3.5. Tortious Interference Claims...——

4. Motion to Dismiss Doral's Claims for Lack of Personal Jurisdiction...——

5. Motion to Dismiss Doral's Claims for Failure to State a Claim...——

   5.1. Fraud, Tortious Interference, and Negligent Misrepresentation Claims...——

   5.2. Donnelly Act Claim...——

   5.3. Sherman Act Claims...——

V. Defendants' Motion for Judgment on the Pleadings...——
1. General Legal Standard for Judgment on Pleadings...——

2. Instruments Issued by Panel Bank Defendants' Subsidiaries/Affiliates...——

3. Instruments Issued by Panel Banks but Sold by Their Related or Unrelated Subsidiaries/Affiliates...——

VI. Conclusion...——

**I. Introduction**

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 32 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

This Memorandum and Order, our eighth extensive opinion in this consolidated multi-district litigation ("MDL"), addresses eight different motions post-dating the Second Circuit's decision in Charles Schwab Corp. v. Bank of America Corp., 883 F.3d 68 (2d Cir. 2018) ("Schwab"), in which the Circuit reviewed de novo this Court's decision to dismiss all claims brought by Charles Schwab Corporation and its related entities ("Schwab"), see In re LIBOR-Based Fin. Instruments Antitrust Litig., 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015) ("LIBOR IV"). Since many of the motions have been brought in response to Schwab, we summarize the relevant rulings in the decision before addressing each motion on its merits.

## II. Background

The nature of LIBOR, its alleged manipulation, and the parties in this case have been explored in our prior opinions. [1] Thus, we assume familiarity with the facts. Likewise, the unique procedural journey of Schwab's action [2] need not be repeated here as it was discussed at great length in LIBOR IV, see 2015 WL 6243526, at *10, *18, and in Schwab, see 883 F.3d at 80-81.

[1]    In re LIBOR-Based Fin. Instruments Antitrust Litig., 299 F. Supp. 3d 430 (S.D.N.Y. 2018) ("LIBOR VII"); In re LIBOR-Based Fin. Instruments Antitrust Litig., 2016 WL 7378980 (S.D.N.Y. Dec. 20, 2016) ("LIBOR VI"); In re LIBOR-Based Fin. Instruments Antitrust Litig., 2015 WL 6696407 (S.D.N.Y. Nov. 3, 2015) ("LIBOR V"); LIBOR IV, 2015 WL 6243526, aff'd in part, vacated and remanded in part sub nom. Schwab, 883 F.3d 68; In re LIBOR-Based Fin. Instruments Antitrust Litig., 27 F. Supp. 3d 447 (S.D.N.Y. 2014) ("LIBOR III"); In re LIBOR-Based Fin. Instruments Antitrust Litig., 962 F. Supp. 2d 606 (S.D.N.Y. 2013) ("LIBOR II"); In re LIBOR-Based Fin. Instruments Antitrust Litig., 935 F. Supp. 2d 666 (S.D.N.Y. 2013) ("LIBOR I"), vacated and remanded sub nom. Gelboim v. Bank of Am. Corp., 823 F.3d 759 (2d Cir. 2016) ("Gelboim").

[2]    The action under consideration in this opinion is Charles Schwab Corp., et al. v. Bank of America Corp., et al., 13-cv-7005 (NRB). Schwab brought three other actions that have been consolidated into this MDL: Schwab Short-Term Bond Market Fund, et al. v. Bank of America Corp., et al., 11-

cv-6409 (NRB); Charles Schwab Bank, et al. v. Bank of America Corp., et al., 11-cv-6411 (NRB); Schwab Money Market Fund, et al. v. Bank of America Corp., et al., 11-cv-6412 (NRB). The main difference between the instant action and the other three actions is the type of federal claims Schwab asserts against defendants. In the instant action, Schwab asserts claims under the Securities Exchange Act of 1934. In the other three actions, Schwab asserts claims under the Sherman Act and the Racketeer Influenced and Corrupt Organization Act (RICO), which we dismissed in LIBOR I. Schwab appealed only our dismissal of its Sherman Act claims, and the Second Circuit reversed that dismissal in Gelboim. On remand, we dismissed Schwab's antitrust claims on personal jurisdiction grounds. See LIBOR VI, 2016 WL 7378980, at *25. LIBOR VI is currently on appeal. See In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 17-1569 (2d Cir. filed May 12, 2017).

**\*2**  In LIBOR IV, we dismissed Schwab's complaint in its entirety. [3] On appeal, Schwab argued that we erred in dismissing: (1) its state law claims for lack of personal jurisdiction, see LIBOR IV, 2015 WL 6243526, at *19-38; (2) its fraud claims relating to fixed-rate instruments for failure to state a claim, see id. at *65; (3) its Exchange Act claims for failure to state a claim, see id. at *70; and (4) some of its unjust enrichment claims as untimely, see id. at *127-28, *177. See Schwab, 883 F.3d at 81.

[3]    In its complaint, Schwab asserted federal securities claims based on defendants' alleged violations of the Securities Exchange Act of 1934 and SEC Rule 10b-5 and various state law claims, including: fraud (and aiding and abetting fraud); unfair business practices; interference with prospective economic advantage; breach of the implied covenant of good faith and fair dealing; violations of California's blue sky law; rescission of contract; and unjust enrichment.

In reviewing our decision to dismiss Schwab's state law claims for lack of personal jurisdiction, the Circuit made rulings that are applicable to three categories of defendants: (1) defendants who "allegedly solicited and sold debt instruments directly to Schwab in California" ("Counterparty defendants"), Schwab, 883 F.3d at 79; (2) defendants who "allegedly sold debt instruments indirectly to Schwab through 'broker-dealer subsidiaries or affiliates' " ("Indirect

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

Counterparty defendants"), id.; and (3) defendants who did not transact with Schwab but "allegedly conspired with the other Defendants to manipulate LIBOR to Schwab's detriment" ("Non-Counterparty defendants"), id.

As to Counterparty defendants, the Circuit found that "[t]he solicitation of and sale of financial instruments to Schwab in California" were sufficient to establish personal jurisdiction. [4] Id. at 83. However, the Circuit continued, "sales in California do not alone create personal jurisdiction for claims premised solely on Defendants' false LIBOR submissions in London" because Schwab "must establish the court's jurisdiction with respect to each claim asserted." Id. (quoting Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 24 (2d Cir. 2004)). In addition, the Second Circuit held that Schwab's allegations were "insufficiently individualized to make out a prima facie case of personal jurisdiction over" Citibank, HSBC, and JPMorgan Chase because "each of those 'Defendants' is actually two distinct Defendants – a parent and a wholly owned subsidiary"; Schwab must put forth sufficiently individualized allegations against each defendant so that this Court could determine whether defendant "sold directly to Schwab and, if not, whether [defendant] should be considered an indirect seller or non-seller (or whether it belongs in this lawsuit at all)." Id. at 84.

[4] In making this ruling, the Second Circuit considered declarations of several Schwab employees, see Goldman Decl., ECF No. 1512; Hastings Decl., ECF No. 1513; Klingman Decl., ECF No. 1514, that had not been previously filed and, therefore, played no part in LIBOR IV. The declarations alleged that some defendants solicited business from Schwab via telephone calls, emails, Bloomberg messages, and other forms of solicitation in California. See Hastings Decl. ¶ 4, Klingman Decl. ¶ 4. No such allegation was even mentioned in Schwab's amended complaint (ECF No. 672) that we reviewed in LIBOR IV. Had Schwab submitted those affidavits to this Court, our ruling would have been different at least as to Counterparty defendants. See In re LIBOR-Based Fin. Inst. Antitrust Litig., 2016 WL 1301175, at *4 (S.D.N.Y. Mar. 31, 2016), ECF No. 1357 ("March 31, 2016 Order") (finding that defendants' solicitation and sale of mortgage loans to Freddie Mac supported the exercise of personal jurisdiction).

*3 As to Indirect Counterparty defendants, the Circuit found Schwab's allegations of agency relationship insufficient. In order to establish specific jurisdiction over a defendant based on its affiliate's or subsidiary's activities in California, Schwab must plausibly allege that the subsidiary or affiliate acted as the defendant's agent in California "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." Id. at 85 (quoting Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981)).

As to Non-Counterparty defendants, the Circuit adopted the three-factor test for alleging a conspiracy theory of jurisdiction set forth in Unspam Technologies, Inc. v. Chernuk, 716 F.3d 322, 328 (4th Cir. 2013). Schwab must allege that: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." Schwab, 883 F.3d at 87. In alleging conspiracy jurisdiction, Schwab could not rely on a defendant's sale of LIBOR-based instruments as an overt act in furtherance of the pled conspiracy because "the conspiracy to manipulate LIBOR had nothing to do with the California transactions, and there is thus no reason to impute the California contacts to the co-conspirators." Id. Finally, the court rejected Schwab's assertion that personal jurisdiction could be established over all defendants based on "the obvious and direct effects of [defendants' manipulation of LIBOR] in California." Id. Mere foreseeability that the effects of LIBOR manipulation would "reach an economy as large as California's does not mean that Defendants' conduct in London was 'expressly aimed' at that state." Id. at 88.

Turning to our dismissal of Schwab's fraud and Exchange Act claims concerning fixed-rate notes, the Second Circuit affirmed our decision because fixed-rate notes "do not reference LIBOR at all." Id. at 91. Since Schwab did not plausibly allege that defendants made false LIBOR submissions "[to] induc[e] purchases of fixed-rate instruments," id. at 92, or "in connection with Schwab's purchase of fixed-rate instruments," id. at 96, Schwab could not assert state law or securities fraud claims concerning fixed-rate notes. The Circuit noted: "When Schwab purchased fixed-rate instruments, it received exactly what it expected." Id.

The Circuit, however, reversed our decision to dismiss Schwab's Exchange Act claims concerning floating-rate notes. In LIBOR IV, we found that Schwab's claims failed

WCAS028

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 34 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

at the causation stage because, if LIBOR was "persistently suppressed when Schwab bought LIBOR-based bonds, then the bond's expected future interest payments would also have been suppressed." 2015 WL 6243526, at *70. Thus, since a bond's price is "equal to the present value of its expected future interest and principal payments, the bond's purchase price would also necessarily have been suppressed, so that Schwab may reap a windfall now that suppression has ended." Id. The Circuit disagreed, finding that "[a]lthough a depressed LIBOR that caused expectations of future interest payments to decrease might result in lock-step reductions in the price of floating-rate instruments," such an effect was not certain and could not be assumed at the pleading stage. Schwab, 883 F.3d at 93. Nonetheless, finding that Schwab's allegations of loss causation were unclear, the court instructed Schwab to "add allegations clarifying the loss causation theory or theories on which it relies." Id.

**\*4** Schwab also reversed our partial dismissal of Schwab's unjust enrichment claims. In LIBOR IV, we found that, under California law, the statute of limitations on fraud claims "begins when 'a plaintiff suspects or should suspect that her injury was caused by wrongdoing.' " 2015 WL 6243526, at *127 (quoting Jolly v. Eli Lilly & Co., 44 Cal. 3d 1103, 1110 (1988)). Since it was unclear when Schwab "became aware of the news articles that would have put them on inquiry notice," we did not dismiss any tort claims as untimely. Id. at *177. However, we held that Schwab's unjust enrichment claims were partially time-barred because an unjust enrichment claim was subject to a more limited discovery rule under which "the clock starts when the breach is no longer 'difficult ... to detect.' " Id. at *128 (quoting April Enters., Inc. v. KTTV, 195 Cal. Rptr. 421, 436 (Ct. App. 1983)). The Second Circuit found that we had erred in applying the more limited discovery rule to Schwab's unjust enrichment claims. Since the claims "sound[ed] in fraud," they were subject to the inquiry notice rule as set forth in Jolly, 883 F.3d at 97. Accordingly, "partial dismissal of the unjust enrichment claims was unwarranted." Id.

Although the Circuit considered only Schwab's action, the Schwab decision has broader implications for all actions in this MDL because the decision affirmed several key jurisdictional rulings that we repeatedly made in our prior opinions. First, defendants' sales-related activities in plaintiffs' forum states cannot establish specific jurisdiction over claims premised on defendants' "daily LIBOR submissions to the BBA in London" because "activities in London do not constitute [in-forum] contacts."

Schwab, 883 F.3d at 84; see also LIBOR IV, 2015 WL 6243526, at *30 ("[T]hat a panel bank defendant engaged in LIBOR 'marketing' activities which reached a given forum state does not mean that the same defendant is subject to personal jurisdiction in that state on the basis of the defendant's manipulation of LIBOR."). Second, "the conspiracy to manipulate LIBOR had nothing to do with" defendants' transactions with plaintiffs, because the sale of LIBOR-based instruments motivated by defendants' "financial self-interest" could not have furthered their conspiracy to manipulate LIBOR. Schwab, 883 F.3d at 87; see also LIBOR VI, 2016 WL 7378980, at *9 ("[D]efendants' sales and trades of LIBOR-based products to plaintiffs in the United States are not within the scope of the reputation-motivated antitrust conspiracy."). Third, mere foreseeability that the effects of LIBOR manipulation could be felt in plaintiffs' forum states "does not mean that Defendants' conduct in London was 'expressly aimed' at that state." Schwab, 883 F.3d at 87; see also LIBOR IV, 2015 WL 6243526, at *20 ("[W]hile the effect of LIBOR manipulation in the states in which plaintiffs sued was foreseeable, mere foreseeability does not confer personal jurisdiction."). In sum, the Circuit did not disturb our general ruling that, unless plaintiffs can plausibly allege that "a defendant determined, or transmitted, a false LIBOR submission" from the United States, id. at *32, we would exercise personal jurisdiction only over Counterparty defendants for plaintiffs' claims that are premised on their transactions with defendants or their purchases of instruments issued by defendants.

Finding that Schwab's deficient pleading of jurisdictional allegations was not insurmountable, the Second Circuit granted Schwab leave to amend so that it could "clarify the status of the grouped entities ... and add allegations in support of its agency and conspiracy theories of jurisdiction." Id. at 90. After the Circuit's remand, we afforded other plaintiffs the same opportunity by instructing plaintiffs who wished to move for leave to amend to "demonstrate why leave to amend [was] warranted." See Apr. 11, 2018 Order, ECF No. 2490. However, we warned moving plaintiffs that "the scope of any amendment shall be limited to those prompted by the Second Circuit's decision in Schwab." Id.

**\*5** In Part III of this opinion, we consider the motions for leave to amend filed by six different plaintiffs: (1) the Federal Home Loan Mortgage Corporation ("Freddie Mac"), see ECF No. 2563; (2) the Federal Deposit Insurance Corporation ("FDIC") [5] in its capacity as receiver for 38 closed banks, see ECF No. 2562; (3) Principal Financial Group and

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 35 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

its affiliated entities ("Principal Financial"), see ECF No. 2546; (4) Principal Funds and its affiliated funds ("Principal Funds"), see ECF No. 2551; (5) plaintiffs in the lending institutions class action ("Lender plaintiffs"), see ECF No. 2552; and (6) the National Credit Union Administration Board [6] ("NCUA"), see ECF No. 2544. [7]

5    The FDIC seeks to incorporate the complaint filed on behalf of Doral Bank ("Doral") in 18-cv-1540 (NRB) into the complaint filed on behalf of 38 closed banks in 14-cv-1757 (NRB). Defendants do not oppose this request. See FDIC Mem. of Law in Supp. of Mot. for Leave to Amend, at 1, ECF No. 2568. Therefore, Doral's claims that survive the motion to dismiss will be consolidated into the main complaint. To avoid confusion between the two actions, we refer to the FDIC's complaint filed on behalf of Doral as Doral's complaint in this opinion.

6    The NCUA brought its action as liquidating agent of U.S. Central Federal Credit Union ("U.S. Central"), Western Corporate Federal Credit Union, Members United Corporate Federal Credit Union, Southwest Corporate Federal Credit Union, and Constitution Corporate Federal Credit Union.

7    In this opinion, we refer to Freddie Mac, FDIC, Principal Financial, and Principal Funds collectively as "FFP plaintiffs." We also refer to Principal Financial and Principal Funds as "Principal." Per our April 11, 2018 Order, each moving plaintiff submitted its proposed amended complaint: (1) Freddie Mac Proposed Third Amended Compl. ("Freddie Mac PTAC"), ECF No. 2567-1; (2) FDIC Proposed Second Amended Compl. ("FDIC PSAC"), ECF No. 2568-1-2; (3) Principal Financial Proposed Second Amended Compl. ("Principal Financial PSAC"), ECF No. 2547-1; (4) Principal Funds Proposed Second Amended Compl. ("Principal Funds PSAC"), ECF No. 2554-1; (5) Lender Plaintiffs Proposed Third Amended Consolidated Class Action Compl. ("Lender Pls. PTAC"), ECF No. 2572-1; and (6) NCUA Proposed Second Amended Compl. ("NCUA PSAC"), ECF No. 2545-1.

In Part IV, we consider defendants' motion for partial dismissal of Schwab's second amended complaint [8] and

Doral's complaint [9] for lack of personal jurisdiction and venue and for failure to state a claim. See ECF No. 2622. In Part V, we consider defendants' motion for judgment on the pleadings to dismiss in the Over-the-Counter (OTC) class action plaintiffs' antitrust claims based on transactions with Panel Banks' subsidiaries or affiliates. See ECF No. 2620.

8    After the Circuit's remand, Schwab filed their second amended complaint as of right. See Schwab Second Am. Compl. ("Schwab SAC"), ECF No. 2578.

9    Doral's complaint was filed on February 20, 2018. See Compl., ECF No. 1, 18-cv-1540 (NRB).

**III. Plaintiffs' Motions for Leave to Amend**

In allowing plaintiffs to move for leave to amend, we limited the scope of proposed amendments "to those prompted by the Second Circuit's decision in Schwab." Apr. 11, 2018 Order. We also cautioned plaintiffs that Schwab "offer[ed] no occasion to add or alter unrelated allegations that a plaintiff wishes had been better pleaded in the first instance." Id.

**1. General Legal Standard for Leave to Amend**

Rule 15 of the Federal Rules of Civil Procedure directs a court to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, motions for leave to amend "should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008) (per curiam).

*6    A proposed amendment is futile if "the proposed new pleading fails to state a claim on which relief can be granted." Krys v. Pigott, 749 F.3d 117, 134 (2d Cir. 2014). "The adequacy of a proposed amended complaint to state a claim is to be judged by the same standards as those governing the adequacy of a filed pleading." Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 185 (2d Cir. 2012). Thus, when evaluating the adequacy of claims in a proposed amended complaint, we follow the standards applicable to a motion to dismiss brought under Rule 12(b)(6), "accepting as true all factual allegations in the complaint, and drawing all reasonable inferences in the plaintiff's favor." Barrows v. Burwell, 777 F.3d 106, 111 (2d Cir. 2015).

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 36 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

The standards of review under Rule 12(b)(2) apply to proposed amendments related to personal jurisdiction. [10] We must construe all jurisdictional allegations "in the light most favorable to plaintiffs, resolving all doubts in their favor." Porina v. Marward Shipping Co., 521 F.3d 122, 126 (2d Cir. 2008). However, we may not "draw argumentative inferences in the plaintiff's favor," Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994) (internal quotation marks omitted), and need not "accept as true a legal conclusion couched as a factual allegation," Jazini v. Nissan Motor Co., 148 F.3d 181, 185 (2d Cir. 1998). If the defendant challenges personal jurisdiction at the pleading stage, the plaintiff bears the burden of making a prima facie showing that personal jurisdiction exists. See Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A., 722 F.3d 81, 84-85 (2d Cir. 2013). Jurisdiction must be "establish[ed] ... with respect to each claim asserted." Sunward, 362 F.3d at 24 (emphasis in original). A motion to amend will be denied if the amended complaint does not provide "any basis to demonstrate that the district court would have [ ] personal jurisdiction" over a defendant. Spiegel v. Schulmann, 604 F.3d 72, 78 (2d Cir. 2010).

[10] With respect to actions brought in states other than New York and transferred here for pretrial proceedings under the MDL statute, 28 U.S.C. § 1407 (2012), we analyze whether personal jurisdiction exists in the transferor court, not in New York. See In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000, 343 F. Supp. 2d 208, 213 (S.D.N.Y. 2004). Nonetheless, we conduct this analysis according to the law not of the transferor circuit, but of the Second Circuit. See In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig., No. 00-cv-1898 (SAS), 2005 WL 106936, at *5 (S.D.N.Y. Jan. 18, 2005); see also Menowitz v. Brown, 991 F.2d 36, 40 (2d Cir. 1993) (per curiam) ("[A] transferee court should apply its interpretations of federal law, not the constructions of federal law of the transferor circuit.").

## 2. Amendments Related to Personal Jurisdiction

We first address the NCUA's and FFP plaintiffs' proposed amendments related to personal jurisdiction organized by the categories of claims to which the amendments correspond: (1) Counterparty Claims (i.e., common law claims against certain defendants based on their direct transactions with plaintiffs); (2) Indirect Counterparty Claims (i.e., common law claims against defendants based on plaintiffs' transactions

with defendants' subsidiaries and affiliates); and (3) Non-Counterparty Claims (i.e., antitrust and common law claims against all defendants based on their alleged participation in an alleged conspiracy to manipulate LIBOR that occurred in London).

### 2.1. Counterparty Claims

For context and clarity, we summarize our previous jurisdictional rulings addressing common law claims against Counterparty defendants. For swap counterparties, we upheld specific jurisdiction "where a plaintiff was located when it entered into the swap agreement." LIBOR IV, WL 6243526, at *37. For bond counterparties, we upheld specific jurisdiction "where the bond was issued." [11] Id. As to both, we upheld specific jurisdiction "where permitted by a forum selection clause, where the defendant's LIBOR submission was determined or transmitted, and where a trader requested an artificial LIBOR submission." Id. Finally, we upheld specific jurisdiction over claims arising out of the defendant's "course of dealing" in the plaintiff's forum state. See March 31, 2016 Order, 2016 WL 1301175, at *4; see also Schwab, 883 F.3d at 83 (allegations that defendants solicited and sold "financial instruments to Schwab in California" are sufficient to "make out a prima facie showing of personal jurisdiction for claims relating to those transactions.").

[11] In other words, bond obligors can be subjected to personal jurisdiction where "the bond was placed with an underwriter or agent for sale or marketing." LIBOR IV, WL 6243526, at *37. The Court clarified this requirement during a telephone conference on May 19, 2016: "The location of the underwriter is the office where the deal was actually done. That would include the relevant office of any other member of the syndicate. The same is true if there actually were agents involved. The locations do not include all the branch offices of any of these entities." Tr. 3:10-15, ECF No. 1429.

**\*7** FFP plaintiffs misleadingly simplify the rulings of this Court and the Second Circuit by asserting that "even a single transaction can support personal jurisdiction over a defendant." Pls.' Joint Reply to Defs.' Opp. To Pls.' Mots. Leave to Amend on Jurisdictional and Venue Grounds ("Pls.' Joint PJ Br."), at 7, ECF No. 2667. Admittedly, there is no question that the commission of some single or occasional

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 37 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

act may establish specific jurisdiction. See Daimler AG v. Bauman, 571 U.S. 117, 127 (2014). But as demonstrated by two cases that the Second Circuit cites in Schwab – Chloé v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158 (2d Cir. 2010) and Eades v. Kennedy, PC Law Offices, 799 F.3d 161 (2d Cir. 2015) – the analysis is far more nuanced than plaintiffs posit. In each case, the Circuit examined the defendant's contacts in the context of the defendant's overall relationship with the forum state. See Chloé, 616 F.3d at 170-71 (holding that specific jurisdiction in New York over the defendant was appropriate because the defendant had "developed and served a market for its products"); Eades, 799 F.3d at 168-69 (examining the quality and nature of the defendant's contacts – several mailings and telephone calls – with New York to establish specific jurisdiction). See also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 n.18 (1985) ("[S]ingle or occasional acts related to the forum may not be sufficient to establish [specific] jurisdiction if their nature and quality and the circumstances of their commission create only an attenuated affiliation." (citation and internal quotation marks omitted)). The analytical framework that we previously articulated for assessing defendants' suit-related contacts adheres to these binding precedents. See, e.g., LIBOR IV, WL 6243526, at *31 (The Court would "consider as a whole the defendants' suit-related contacts with the forum, including prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.") (citation and internal quotation marks omitted).

Consistent with our previous rulings and the aforementioned precedents, we allow moving plaintiffs' amendments that sufficiently demonstrate a "course of dealing" in plaintiffs' forum states. For example, Freddie Mac alleges that multiple defendants and their affiliated entities solicited business and sold mortgage-backed securities ("MBS") and mortgage loans to Freddie Mac in Virginia. [12] See, e.g., Freddie Mac PTAC ¶¶ 23, 30, 45, 47, 68, 70, 87, 89, 99, 101, 116, 118, 129, 131, 167, 169. Whereas the mere issuance of a LIBOR-based bond would not support personal jurisdiction, see LIBOR IV, WL 6243526, at *37, plaintiffs specifically allege that defendants purposely solicited and sold LIBOR-based financial products directly to Freddie Mac. As we held in the March 31, 2016 Order, such allegations of direct solicitation or transactions between defendant and plaintiff are sufficient to establish specific jurisdiction over defendant.

LIBOR. See Joint Mem. of Law in Supp. of Defs' Mot. Dismiss for Lack of Personal Jurisdiction and Venue and in Opp'n to Pls.' Mots. Leave to Amend on Jurisdiction and Venue Grounds ("Defs.' Joint PJ Br."), at 28, ECF No. 2627. At oral argument, Freddie Mac confirmed that its common law claims asserted against Counterparty defendants are all premised on the sale of mortgage loans that are linked to LIBOR. Tr. 29:12-18, ECF No. 2792.

That said, we reject the NCUA's amendments that seek to establish specific jurisdiction over defendants based on their alleged contacts with Kansas. See NCUA PSAC ¶¶ 43-44. According to the NCUA, its motion to amend is in response to a footnote in LIBOR IV. [13] See 2015 WL 6243503 at *31 n.51 (disregarding the NCUA's argument that defendants engaged with U.S. Central, a Kansas credit union, to execute certain transactions with four non-Kansas credit unions because the NCUA "cite[d] nothing in the complaint or declarations that specifically support[ed]" that argument). In the proposed amended complaint, the NCUA alleges, for example, that several defendants were "specifically on notice at the time of transacting with United, Southwest, or WesCorp of U.S. Central's role in those transactions." NCUA PSAC ¶ 44. Defendants were allegedly also on notice that "swap payments would be made to or from an account at U.S. Central" in Kansas. [14] Id. These allegations, however, do not show "where a plaintiff was located when it entered into the swap agreement." LIBOR IV, 2014 WL 6243526, at *37. The fact that the NCUA chose to pay defendants out of accounts controlled by U.S. Central in Kansas does not mean that defendants purposefully availed themselves of the privilege of conducting activities in Kansas. See Walden v. Fiore, 571 U.S. 277, 284 (2014).

13    Since none of the NCUA's proposed amendments is related to Schwab, we note that the NCUA's motion for leave to amend could and should have been brought following our decision in LIBOR IV and is thus untimely.

14    The NCUA additionally alleges that securities sold to the credit unions were "routed through U.S. Central's safe-keeping accounts," and that "U.S. Central took custody of any securities sold to the Credit Unions" and "safe-kept any interest coupon on the securities paid by the Defendants to the Credit Unions." NCUA PSAC ¶ 43.

12    According to defendants, Freddie Mac fails to specify that the mortgage loans were "tied to"

WCAS032

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 38 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

**\*8** We also reject Principal's proposed amendment regarding forum selection clauses in its swap agreements. [15] Principal asserts that we can exercise specific jurisdiction over Counterparty defendants based on their swap transactions with Principal because its ISDA agreements contained forum selection clauses designating the Southern District of New York as the parties' forum of choice. However, Principal's lawsuit was originally filed in Iowa and was subsequently transferred to this District for pre-trial proceedings. Therefore, "our task is to determine whether [courts in Iowa] may exercise personal jurisdiction," and a defendant's contractual consent to the jurisdiction of New York is irrelevant in making that determination. See LIBOR IV, WL 6243526, at *35.

[15]    Both Principal and defendants raise arguments that we decline to address here. First, Principal argued at oral argument that "several of the defendants have consented to personal jurisdiction in Iowa by registering with the Iowa Secretary of State," Tr. 70:23-71:2, but Principal does not propose any amendment relying on the defendants' registration in Iowa. Even if we were to consider Principal's argument, we would most likely find it meritless under the Second Circuit precedents. See, e.g., Brown v. Lockheed Martin Corp., 814 F.3d 619, 623 (2d Cir. 2016). Second, defendants assert that claims based on swap transactions fail because moving plaintiffs "fail to allege that they filed suit in the forum where the swap transactions were entered into." See Defs.' Joint PJ Br., at 31. Defendants seek to dismiss those claims, which were not the subject of any amendment, but do not move against any proposed amendment. Since we are now considering whether proposed amendments are futile in light of Schwab, we do not resolve those arguments, but note that the parties may raise them at the motion to dismiss stage.

Finally, defendants broadly assert that moving plaintiffs' proposed amended complaints do not allow the Court to assess each defendant's contacts individually because they collapse affiliated entities into one single defendant. [16] See Defs.' Joint PJ Br., at 34; Schwab, 883 F.3d at 84 (holding that Schwab's allegations as to Citibank, HSBC, and JPMorgan Chase could not establish jurisdiction over those banks because the allegations were not sufficiently individualized). However, defendants' argument is not persuasive, as plaintiffs allege specific defendant entities with which they transacted.

See, e.g., Principal Funds PSAC ¶¶ 27, 33, 37, 45, 50, 55, 65, 72. After identifying each defendant and its role in various transactions, plaintiffs collectively refer to the affiliated entities under a single name. See, e.g., Principal Funds PSAC ¶ 28. Such a practice does not violate Rule 8(a)'s requirements. See Wyndner v. McMahon, 360 F.3d 73, 79 (2d Cir. 2004) (holding that the "key to Rule 8(a)'s requirements is whether adequate notice is given," and that "fair notice" is given when it allows the defendant "to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial" (citations and internal quotation marks omitted)).

[16]    We have previously declined to exercise personal jurisdiction because of plaintiffs' insufficiently individualized allegations. See, e.g., March 31, 2016 Order, 2016 WL 1301175, at *4 (rejecting personal jurisdiction over Freddie Mac's claims related to bond transactions because Freddie Mac provided "no description as to what role any defendant played in any sale," "no description of any MBS transactions," and no "suggestion of which defendants in fact sold these products to plaintiff.").

### 2.2. Indirect Counterparty Claims

Though the corporate form is generally accorded respect under the law, an act taken by a corporate entity's subsidiary or affiliate can be imputed to the entity in certain circumstances for purposes of personal jurisdiction. As explained in Schwab, it is "plausible that an agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities." 883 F.3d at 85-86. To establish jurisdiction over an Indirect Counterparty defendant, moving plaintiffs must plausibly allege that defendant's subsidiary or affiliate acted as defendant's agent in the relevant forum state "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." Id. at 85 (quoting Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981)); see also Ingenito v. Riri USA, Inc., 89 F. Supp. 3d 462, 476 (E.D.N.Y. 2015); CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 366 (2d Cir. 1986) ("To be considered an agent for jurisdictional purposes, the alleged agent must have acted in the state for the benefit of, and with the knowledge and

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 39 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

consent of the non-resident principal." (citation and internal quotation marks omitted)).

**\*9** We have previously addressed the applicable pleading standard for common law claims against Indirect Counterparty defendants. In LIBOR V, we considered whether two OTC plaintiffs, Texas Competitive Electric Holdings ("TCEH") and the SEIU Pension Plans Master Trust ("SEIU"), sufficiently alleged agency relationships between Credit Suisse Group AG ("CSGAG"), the parent entity, and its two affiliates, Credit Suisse International ("CSI") and Credit Suisse (USA), Inc. ("CSUSA"). [17] 2015 WL 6696407, at \*21. TCEH alleged that it had traded a swap with CSI, and SEIU alleged that it had purchased corporate bonds issued by CSUSA from the issuer's broker-dealer affiliate. See LIBOR V, 2015 WL 6696407, at \*21.

[17] Although TCEH and SEIU named CSGAG as the panel bank, Credit Suisse stated that Credit Suisse AG ("CSAG") was the panel bank. See LIBOR V, 2015 WL 6696407, at \*20 n.31, \*22 n.34. We granted only SEIU leave to make its agency allegations against CSAG instead of against CSGAG because we rejected TCEH's allegations of an agency relationship between CSI and CSGAG. See id.

We found that TCEH's allegations, even if true, did not establish an agency relationship because TECH failed to show that CSGAG managed CSI's swap-trading operations, see Elbit Systems, Ltd. v. Credit Suisse Group, 917 F. Supp. 2d 217, 225–26 (S.D.N.Y. 2013), or directed the specific CSI activities at issue, see In re South African Apartheid Litigation, 617 F. Supp. 2d 228, 274–75 (S.D.N.Y. 2009). LIBOR V, 2015 WL 6696407, at \*21. TCEH's conclusory allegations [18] of "corporate ownership, combined marketing, [and] shared board membership" were "insufficient to establish a principal-agent relationship between corporate entities." LIBOR V, 2015 WL 6696407, at \*21 (citing Fletcher v. Atex, Inc., 68 F.3d 1451, 1459-62 (2d Cir. 1995)). See also Williams v. Yamaha Motor Co., 851 F.3d 1015, 1025 n.5 (9th Cir. 2017) (allegations that the parent and subsidiary are "the agents or employees of each other" and that the parent is "legally responsible" for the subsidiary are conclusory legal statements that cannot establish an agency relationship). Because TCEH failed to put forth any factual allegations that demonstrated how the bank managed or directed its agent's operations and activities, we rejected its attempt to establish personal jurisdiction over the principal (i.e., Indirect Counterparty) bank.

[18] TCEH alleged "that CSI is 'controlled' by CSGAG, that the two entities use the same brand and logo, that Credit Suisse presents itself as an 'integrated global bank,' that it 'takes a unified approach to risk management,' that CSI personnel reports to CSGAG personnel, that CSI is generally managed as part of CSGAG, that CSI shares revenue with CSGAG, that CSGAG lends money to CSI, that CSGAG and CSI have overlapping Boards of Directors, and that CSI adheres to CSGAG's employment policies." LIBOR V, 2015 WL 6696407, at \*21.

In contrast, we reached a different conclusion with respect to SEIU. Id. at \*22. Although SEIU and TCEH essentially advanced similar arguments, we reasoned that, unlike a discrete swap transaction, a bond issuance "is a major corporate event that officers and directors of the corporate parent would typically oversee." Id. It was unlikely that CSGAG allowed CSUSA to issue securities "without top-level approval," and it was plausible that CSUSA "acted at the direction of its corporate parents." Id. In other words, SEIU plausibly alleged that the agent acted "for the benefit of, with the knowledge and consent of, and under some control by" the principal bank. Schwab, 883 F.3d at 85. Thus, our analytical approach in assessing claims against Indirect Counterparty defendants has been very much in line with Schwab.

**\*10** Moving plaintiffs' proposed amendments are indistinguishable from the ones made by TCEH: they similarly lack the requisite factual basis needed to support the conclusion that the subsidiary acted "for the benefit of, with the knowledge and consent of, and under some control by" the principal. The list of conclusory allegations of intra-corporate affiliations made by plaintiffs include: that each parent defendant operates the investment division as part of a single global business unit without regard to corporate formalities and with common branding; [19] that each parent treats its subsidiary or affiliate's profits as the global unit's profits; [20] that the related entities have overlapping key executives; [21] and that the subsidiary's personnel reports to the parent defendant's personnel. [22] These allegations, along with legal conclusions that defendants "knew of," "directed," and/or "benefited" from their subsidiaries or affiliates' transactions with plaintiffs, [23] are insufficient to

WCAS034

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 40 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

establish personal jurisdiction over defendants. See Jazini, 148 F.3d at 185 (declining to find specific jurisdiction over a parent entity based on its subsidiary's activities because the pleading "lacked the factual specificity" necessary to establish jurisdiction).

[19] See, e.g., Freddie Mac PTAC ¶¶ 40, 76, 114, 177; FDIC PSAC ¶¶ 38, 59, 90, 97; Principal Funds ¶¶ 30, 38, 54.

[20] See, e.g., Freddie Mac PTAC ¶¶ 40, 53, 76, 96, 97, 108; FDIC PSAC ¶¶ 64, 90; Principal Funds ¶¶ 30, 51, 62.

[21] See, e.g., Freddie Mac PTAC ¶¶ 41, 57, 76, 94, 196; FDIC PSAC ¶¶ 63, 68; Principal Funds PSAC ¶¶ 24, 31, 46.

[22] See, e.g., Freddie Mac PTAC ¶¶ 49, 58, 76, 90, 177, 112, 198.

[23] See, e.g., Freddie Mac PTAC ¶¶ 30, 40, 45, 60, 76, 94, 108, 125, 140.

Freddie Mac's additional allegations that it internally considered the financial strength of the parent entities through its quarterly "Dealer Scorecards,"[24] in which defendants provided research notes to Freddie Mac,[25] do not demonstrate that the parent entities managed their subsidiaries' operations or directed their activities with Freddie Mac. None of the amendments demonstrates that the affiliate or subsidiary entity conducted the transactions with Freddie Mac "for the benefit of, with the knowledge and consent of, and under some control by" the parent entity.

[24] Freddie Mac PTAC ¶¶ 12-14, 31, 46, 69, 88, 100, 117, 130, 151, 168, 191.

[25] Freddie Mac PTAC ¶¶ 61, 95, 119, 132, 160.

However, Freddie Mac's allegations regarding Royal Bank of Scotland ("RBS") and its non-defendant subsidiary, RBS Securities Inc. ("RBSI"), suffice to establish specific jurisdiction over RBS. Freddie Mac alleges that RBSI's sale of MBS to Freddie Mac was a part of a strategy that was directed by RBS's executives to "overvalue asset-backed securities to protect RBS's reputation." Freddie Mac PTAC ¶ 178. Since we have found that RBSI's activities of soliciting Freddie Mac are sufficient to establish specific jurisdiction over RBSI, see supra Part III.2.1., and since Freddie Mac plausibly alleges that RBS managed RBSI's operations and directed its

transactions with Freddie Mac, we can exercise jurisdiction over RBS based on RBSI's activities in Virginia.[26]

[26] Defendants argue that plaintiffs must show the parent entity's "pervasive control" over its agent. Defs.' Joint PJ Br., at 38 (quoting Wilder v. News Corp., No. 11-cv-4947 (PGG), 2015 WL 5853763, at *6 (S.D.N.Y. Oct. 7, 2015)). However, plaintiffs correctly point out that Judge Gardephe's ruling in Wilder only concerns whether "a foreign subsidiary of a United States corporation may be subject to general jurisdiction in the United States on the basis of the parent-subsidiary relationship." Id. (emphasis added). In contrast, under consideration in our case is whether an affiliate's specific acts (i.e., transactions involving LIBOR-based instruments) can establish specific jurisdiction over its parent for legal claims based on those transactions.

### 2.3. Non-Counterparty Claims and Conspiracy Jurisdiction

Moving plaintiffs assert that certain acts taken by several defendants, who are mostly domestic banks, can establish personal jurisdiction over all defendants, including foreign bank defendants who did not have any contractual relationships with plaintiffs, for fraud and antitrust claims. The acts allegedly constitute overt acts that furthered "a conspiracy aimed at the projection of financial soundness." LIBOR VI, 2016 WL 7378980, at *7. Accordingly, moving plaintiffs claim that all defendants, regardless of their domiciles or membership on the LIBOR panel, can be haled into this Court applying conspiracy jurisdiction.

*11 It is important to note at the threshold that, given the relevant holdings of Schwab, this Court may not exercise personal jurisdiction over Non-Counterparty defendants for fraud and antitrust claims if moving plaintiffs cannot invoke (or rely upon) conspiracy jurisdiction. First, Schwab held that this Court cannot exercise specific jurisdiction over fraud claims premised on LIBOR submissions in London because "activities in London do not constitute" contacts with the relevant forum states.[27] 883 F.3d at 84. Second, Schwab rejected the assertion that, since the effects of LIBOR manipulation on California were "foreseeable," personal jurisdiction should attach, because the conduct was not expressly aimed at the state. Id. at 87. Although the

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 41 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

Second Circuit rejected the "foreseeability" argument only in the context of Schwab's California transaction claims, the Circuit's rationale effectively affirms our prior rulings that the manipulation of LIBOR was not expressly aimed at the United States. See LIBOR IV, 2015 WL 6243526, at *32 ("[T]here is no suggestion, and it does not stand to reason, that foreign defendants aimed their manipulative conduct at the United States or any particular forum state."); LIBOR VI, 2016 WL 7378980, at *9 (holding that the conduct did not have sufficient contacts with the United States to establish jurisdiction over all defendants for antitrust claims). Given that LIBOR was "the world's most important number" that served as "one of the most reliable barometers of risk in the global economy," Freddie Mac PTAC ¶ 2, it is simply implausible that defendants expressly aimed their conduct at the United States.

27    Although Schwab made it clear that specific jurisdiction does not exist over defendants for fraud claims, the Circuit's reasoning applies equally to tortious interference claims, which are also predicated on allegedly false LIBOR submissions in London. See infra at Part IV.3.5.

In LIBOR VI, we declined to express an opinion as to "whether conspiracy jurisdiction survives as a doctrine" after the Walden decision and recent opinions 28 in the Southern District of New York because plaintiffs did not plausibly allege that "any defendant committed an act pursuant to the alleged conspiracy in the United States." 2016 WL 7378980, at *12. In light of the Schwab decision, we do not question whether conspiracy jurisdiction is a cognizable basis for personal jurisdiction in this Circuit.

28    For example, Judge Forrest rejected the idea that an assertion of participation in a conspiracy "generally can provide a standalone basis for jurisdiction subject only to the constraints of due process." In re Alumnium Warehousing Antitrust Litigation, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015). If a foreign defendant participated in a conspiracy but did not have sufficient contacts with the United States, then personal jurisdiction could not be exercised over that entity based on a co-conspirator's act that occurred in or was expressly aimed at the United States. Id. However, if the entity "in fact engaged in some affirmative act directed at the forum," the rules and doctrines applicable to personal jurisdiction, such as Walden, are sufficient to

establish personal jurisdiction without conspiracy jurisdiction. Id.

However, any discussion of conspiracy jurisdiction must be approached with caution. For one, the states in which Schwab, 29 Principal, 30 and the FDIC 31 bring their state law claims either reject conspiracy jurisdiction or impose more stringent requirements than the ones adopted by Schwab. Moreover, a cautious approach to the exercise of conspiracy jurisdiction finds support in the criminal law and, more broadly, in jurisdiction jurisprudence. For example, in the criminal law, from which the theory of conspiracy jurisdiction is derived, a co-conspirator's statement allegedly made in furtherance of a conspiracy is admissible at trial (despite a grand jury indictment) only after a trial court finds by a preponderance of the evidence that the conspiracy existed and that both the declarant and the defendant were part of that conspiracy. 32 See Bourjaily v. United States, 483 U.S. 171, 175-76 (1987). Additionally, "a defendant who does not directly commit a substantive offense" can be liable only if a co-conspirator's commission of the offense in furtherance of the conspiracy was "reasonably foreseeable to the defendant as a consequence of their criminal agreement." Cephas v. Nash, 328 F.3d 98, 101 n.3 (2d Cir. 2003) (emphasis added). 33 While a wholesale importation of concepts from criminal law is admittedly unwarranted, a cautious assessment of allegations of conspiracy jurisdiction seems particularly appropriate in this case, where moving plaintiffs are relying on random acts taken mainly by domestic banks to establish jurisdiction over foreign defendants who had no direct contacts with plaintiffs whatsoever. An expansive exercise of extraterritorial jurisdiction would not only create comity issues; it would contravene the central dictate of the Supreme Court's ruling in Walden that, under the due process analysis, we must look to the contacts that each defendant himself or herself created with the forum. See 571 U.S. at 284.

29    California does not recognize conspiracy as a basis for asserting jurisdiction over a non-forum defendant. See, e.g., Murphy v. Am. Gen. Life Ins. Co., No. ED CV14-00486 (JAK)(SPX), 2015 WL 4379834, at *9 (C.D. Cal. July 15, 2015); Mansour v. Superior Court, 38 Cal. App. 4th 1750, 1760 (1995).

30    A federal court in Iowa found that conspiracy jurisdiction was not cognizable under Iowa law. See Brown v. Kerkhoff, 504 F. Supp. 2d 464, 518 (S.D. Iowa 2007) ("This Court concludes a

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 42 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

nonresident's alleged participation in a conspiracy cannot serve as a constitutionally sufficient basis to exercise in personam jurisdiction over that individual in situations which would otherwise fail the "minimum contacts" approach. As a result, Plaintiffs' allegations of a conspiracy cannot serve as an independent basis for the exercise of in personam jurisdiction over the nonresident Defendants.").

31    Under New York law, a plaintiff must allege that a defendant exercised direction or control over the co-conspirator to establish conspiracy jurisdiction over the defendant. See, e.g., Related Companies, L.P. v. Ruthling, No. 17-cv-4175, 2017 WL 6507759, at *13 (S.D.N.Y. Dec. 18, 2017).

32    We certainly recognize that the burden of proof in a criminal trial is different from the pleading stage of a civil case.

33    Interestingly, the First Circuit has adopted "reasonable foreseeability" as one of the pleading requirements that a plaintiff must meet to establish conspiracy jurisdiction over a non-forum defendant. See Glaros v. Perse, 628 F.2d 679, 682 (1st Cir. 1980) ("But, to sustain jurisdiction over an out-of-state co-conspirator these courts required something more than the presence of a co-conspirator within the forum state, such as substantial acts performed there in furtherance of the conspiracy and of which the out-of-state co-conspirator was or should have been aware.").

*12  Many of the acts that moving plaintiffs now seek to allege for purposes of establishing conspiracy jurisdiction have previously been considered as potential grounds for jurisdiction and rejected by the Court because plaintiffs either: (1) sought to use the acts to establish specific jurisdiction for claims that did not arise out of those acts, [34] see LIBOR IV, 2015 WL 6243526, at *30; or (2) failed "to carry their burden of making a prima facie showing of minimum contacts" created by the acts, [35] LIBOR VI, 2016 WL 7378980, at *11.[36] Although plaintiffs insist that a different outcome is now warranted in light of Schwab, see Pls. Joint PJ Br., at 22, they are mistaken, as that decision affirmed our analytical framework for assessing acts by defendants that allegedly furthered the sufficiently pled conspiracy.

34    Plaintiffs previously tried to establish specific jurisdiction over Panel Bank defendants and the BBA for claims based on their alleged manipulation of LIBOR in London by alleging that they made "false representations about the quality of LIBOR [in the United States] in order to reassure the public after the emergence of reports that LIBOR was being manipulated." LIBOR IV, 2015 WL 6243526, at *29.

35    The alleged acts rejected in LIBOR VI that moving plaintiffs repackage as new amendments include: defendants' sales and trades of LIBOR-based products to plaintiffs in the United States; defendants' marketing activities; and unestablished claims that senior executives at Citibank, JPMorgan, and Barclays directed the LIBOR manipulation from the United States. 2016 WL 7378980, at *9-11. We found that none of these acts constituted sufficient contact with the United States. Id. at *9.

36    While moving plaintiffs also put forth allegations of acts by defendants that we have not considered before, for reasons explained below, they still fail to allege plausibly that "any defendant committed an act pursuant to the pled conspiracy in the United States." LIBOR VI, 2016 WL 7378980, at *9.

In LIBOR VI, we explained that, since the actual conspiratorial agreement took place in a foreign jurisdiction, special attention must be given to whether plaintiffs meet the "purposeful availment" prong of the due process analysis by plausibly alleging that overt acts in furtherance of the reputation-driven conspiracy occurred in or were aimed at the United States. Id. at *8. In addition, we found that "defendants' sales and trades of LIBOR-based products to plaintiffs in the United States are not within the scope of the reputation-motivated antitrust conspiracy" and could not be considered as overt acts in furtherance of the conspiracy.[37] Id. at *9. In other words, plaintiffs' allegations of conspiracy jurisdiction must meet two requirements: 1) defendants' acts must have constituted sufficient contact with the relevant forum; and 2) the acts furthered the conspiracy to project financial soundness.

37    In LIBOR VI, we rejected plaintiffs' characterization of the conspiracy as "one with a profit motive" based on the Second Circuit's

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 43 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

opinion is in Gelboim, which stated: "[C]ommon sense dictates that the Banks operated not just as borrowers but also as lenders in transactions that referenced LIBOR. Banks do not stockpile money, any more than bakers stockpile yeast. It seems strange that this or that bank (or any bank) would conspire to gain, as a borrower, profits that would be offset by a parity of losses it would suffer as a lender." Gelboim, 823 F.3d at 783. As we explained, the actual goal of the sufficiently pled conspiracy – in which Panel Bank defendants participated through the LIBOR setting process in London – was the "projection of financial soundness." 2016 WL 7378980, at *7. This was in turn based on our interpretation of the phrase "increased profits and the projection of financial soundness" in Gelboim, 823 F.3d at 782, as describing "collectively a single, reputation-based motive to conspire, where increased profits followed from a positive reputation," LIBOR VI, 2016 WL 7378980, at *5.

*13 The Second Circuit effectively adopted these requirements in Schwab. The Circuit held that, in order to establish jurisdiction over a non-forum defendant based on the acts committed by the defendant's co-conspirator, plaintiffs must show that "[the] co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in that state." Schwab, 883 F.3d at 87 (citing Unspam, 716 F.3d at 329). Thus, overt acts are not themselves sufficient; rather, it is essential the acts be in furtherance of the pled conspiracy. See id. ("To allow jurisdiction absent a showing that a co-conspirator's minimum contacts were in furtherance of the conspiracy would be inconsistent with the 'purposeful availment' requirement."). Here, given that the object of the plausibly alleged conspiracy was to project financial soundness, an act that does not further the reputation-enhancing object of the conspiracy – such as a defendant's activities related to the sale of LIBOR-based instruments that can only further their "financial self-interest" – is not sufficient to establish conspiracy jurisdiction. See id. ("[T]he conspiracy to manipulate LIBOR had nothing to do with the California transactions, and there is thus no reason to impute the California contacts to the co-conspirators.").

In a desperate attempt to establish conspiracy jurisdiction over defendants with no forum contacts of their own, FFP plaintiffs try to expand the scope of the pled conspiracy and plead random acts by defendants that allegedly furthered

the conspiracy as expanded. First, Freddie Mac asserts - directly contrary to Schwab - that, since "numerous Panel Bank Defendants profited from their positive reputation with Freddie Mac," defendants' acts that facilitated business transactions with Freddie Mac furthered "the conspiracy's profit objectives." See Freddie Mac's PJ Mem., at 18. But as we held in LIBOR VI, though "increased profits followed from a positive reputation," defendants' potential profit motive was not a part of the sufficiently pled conspiracy.[38] 2016 WL 7378980, at *5. Second, FFP plaintiffs argue that conspiracy jurisdiction can be established over all defendants for fraud claims; yet they fail to put forth any plausible allegation that defendants conspired to commit fraud.[39] Third, despite our repeated rulings, FFP plaintiffs re-allege the "boycott" theory in which defendants allegedly fixed the market for benchmark rates. See, e.g., Principal Financial SAC ¶¶ 288-93. In LIBOR VI, we declined, for the second time, to consider the viability of the "boycott" theory, holding that Gelboim "did not revive an alternative theory of antitrust violation." 2016 WL 7378980, at *2 n.3. FFP plaintiffs subsequently filed motions for reconsideration of our decision to reject the theory, which we denied. See Mem. & Order, 2017 WL 946338, at *1 (S.D.N.Y. Feb. 16, 2017), ECF No. 1774. In re-alleging the theory, FFP plaintiffs simply state – incorrectly - that the "boycott" theory is "one aspect of the much larger persistent suppression conspiracy." Pls.' Joint PJ Br., at 18. However, since the theory "was dismissed by this Court and [was] neither before nor addressed by the Second Circuit [in Gelboim]," we reject for the fourth and final time FFP plaintiffs' assertion that personal jurisdiction can be premised on the "boycott" theory. Id. at *3. In sum, all of these allegations go beyond the scope of the conspiracy that the Second Circuit and this Court previously defined, we reject the proposed amendments by FFP plaintiffs.

[38] For example, Freddie Mac alleges that it authorized its traders to conduct transactions with only counterparties that were pre-approved by Freddie Mac's Counterparty Credit Risk Management group ("CCRM"). Freddie Mac PTAC ¶¶ 11-14, 23. The CCRM allegedly calculated each counterparty bank's perceived credit risk based on information provided by the banks. Id. As the allegation only speaks to defendants' profit motive, we reject Freddie Mac's assertion that defendants' contacts with CCRM plausibly furthered the pled conspiracy. See Schwab, 883 F.3d at 87 (rejecting the notion that sales-related activities furthered

Case 4:23-cv-03560  Document 101  Filed on 11/20/23 in TXSD  Page 44 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

the conspiracy). Furthermore, there is no causal relationship between defendants' alleged contacts and the conspiracy to manipulate LIBOR because Freddie Mac does not allege that the information provided by defendants in the pre-approval process included any LIBOR data or was even related to LIBOR. See id. (holding that Schwab must show a causal relationship between a defendant's in-forum contacts (e.g., transactions in California) and the conspiracy).

39    In our view, FFP plaintiffs' allegation of a fraud-based conspiracy is merely an end run around this Court's interpretation of Gelboim that found defendants' profit motive to be excluded from the scope of the sufficiently pled conspiracy to manipulate LIBOR. In any event, even if FFP plaintiffs plausibly allege a conspiracy to commit fraud, none of defendants' acts, as discussed infra, see Part III.2.4, constitutes sufficient contact with the United States (and, a fortiori, with plaintiffs' forum states).


**2.4. "Overt Acts" in Furtherance of the Conspiracy**

*14  With our prior rulings, Schwab, and the clearly defined scope of the plausibly pled conspiracy in mind, we next consider seriatim each "overt act" that moving plaintiffs allege defendants committed in furtherance of the conspiracy.


Directing LIBOR Suppression from the United States
We previously considered and rejected the allegations that executives at certain defendant banks in the United States directed LIBOR submitters to suppress their submissions. See LIBOR VI, 2016 WL 7378980, at *11. Citing "newly discovered" facts, moving plaintiffs now propose amendments designed to "clarify and/or supplement the allegations" that were addressed in LIBOR VI. Pls.' Joint PJ Br., at 27. The proposed amendments, however, do not make the allegations concerning conspiracy jurisdiction any more plausible. For example, in LIBOR VI, we observed, based on supporting material submitted by FFP plaintiffs, that Barclays' former CEO Robert Diamond may have directed BCI Executive Officer Jerry del Missier to submit low LIBOR rates. 2016 WL 7378980, at *10 n.17. Plaintiffs now allege that Mr. Diamond worked from Barclays' New York office when he made a phone call to direct Mr. del Missier to submit low LIBOR rates. Freddie Mac PTAC ¶ 340. However, a

single telephone call that was allegedly "interpreted" as an "instruction to artificially suppress" LIBOR submissions at one bank, see Freddie Mac PTAC ¶ 340, could not have furthered the conspiracy to project the financial soundness of all Panel Banks. Without any factual allegation that the conversation took place between two or more Panel Banks, it is more plausible that the alleged call furthered only Barclays' projection of financial soundness. Furthermore, Freddie Mac does not allege that Mr. Diamond was in fact in New York when he made the call; rather, it alleges that he "worked out of Barclays' New York offices" during the alleged LIBOR suppression period. Without any allegation that Mr. Diamond physically made the call from his New York office, we cannot draw an argumentative inference in Freddie Mac's favor even if it was relevant. See Overseas Military, 21 F.3d at 507.

Other amendments based on newly discovered intrabank communications do not fare any better. Moving plaintiffs assert that the communications show how executives at several defendant banks in New York allegedly directed their own LIBOR submitters to submit artificially suppressed submissions. See, e.g., Freddie Mac PTAC 269, 274-79, 293, 316, 338. However, as a substantive matter, the communications are "nothing more than intrabank communications regarding the executive's thoughts on LIBOR levels."[40] LIBOR VI, 2016 WL 7378980, at *11; see also LIBOR IV, 2015 WL 6243526, at *60 (such communications do not "purport[ ] to do anything more than to state a sincere opinion based on publicly available information"). In sum, none of plaintiffs' allegations makes a prima facie showing of acts on the part of defendants, within the United States, and in furtherance of the conspiracy.

40    Plaintiffs also discuss an email exchange between Scott Bere, Citibank's Head of Risk Treasury, and John Porter, Barclays Capital's Global Head of Portfolio and Liquidity Management. In the email, Mr. Bere allegedly told Mr. Porter to examine Barclays' LIBOR submissions because they "appear to be high." Freddie Mac PTAC ¶ 274. No reasonable person would see this email communication as an indication that either Mr. Bere or Mr. Porter directed anyone to submit false LIBOR submissions from the United States.


Transmission of Individual LIBOR Submissions to Plaintiffs
*15  We have previously considered and rejected the assertion that defendants' alleged transmissions of individual LIBOR submissions and daily LIBOR rates to the United

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 45 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

States established personal jurisdiction over defendants in the United States. See LIBOR IV, 2015 WL 6243526, at *29-30 (rejecting the argument that defendants' transmissions of LIBOR rates to plaintiffs established jurisdiction); LIBOR VI, 2016 WL 7378980, at *10 (rejecting the allegation that defendants transmitted their individual LIBOR submissions from the United States to Thomson Reuters in New York). Freddie Mac's allegation that defendants published LIBOR data via several data vendors, see Freddie Mac PTAC ¶ 239, is substantially identical to those previous assertions and is thus rejected.

Freddie Mac also alleges that Bank of America directly sent its LIBOR submissions to Freddie Mac. Id. ¶ 239. Even assuming arguendo that Bank of America's act constituted contacts sufficient to establish jurisdiction in the United States, [41] the conduct did not further the conspiracy. After calculating the LIBOR rate, every Panel Bank's submission was published. LIBOR I, 935 F. Supp. 2d at 679. "Therefore, it is a matter of public knowledge ... what quote each bank submitted and how the final fix was calculated." Id. Thus, even assuming that, in addition to daily worldwide publication, Bank of America sent their own LIBOR quotes to Freddie Mac, the transmissions could not have furthered the conspiracy to project the financial soundness of all Panel Banks. At best, the transmissions helped with Bank of America's solicitation of business, and such sales-related activities do not further the alleged conspiracy.

[41] In LIBOR VI, we found personal jurisdiction over the FDIC's antitrust claims against the Bank of America entities, so this issue is academic.

Acts of "False Assurance"
As a threshold matter, we reject FFP plaintiffs' attempt to cast the BBA as a member of the plausibly pled conspiracy and thereby reject their efforts to rely on the BBA's acts in the United States for jurisdictional purposes. Even FFP plaintiffs point out that the BBA's incentive was "to portray LIBOR as a reliable benchmark, to appease its constituent members and to profit from the licensing of LIBOR," Pls.' Joint PJ Br., at 21. Thus, the BBA is not a financial institution whose main concern is to project financial soundness, and any act of assurance that the BBA allegedly took did not further the alleged conspiracy. [42]

[42] This ruling is separate from the issue of whether, in the context of inquiry notice, a plaintiff reasonably

relied on the BBA's statements about the accuracy of LIBOR. See Schwab, 883 F.3d at 96-98.

With respect to other defendants that arguably fall within the scope of the pled conspiracy, there is no question that an act of concealment can constitute an overt act in furtherance of the conspiracy. See, e.g., United States v. Grant, 683 F.3d 639, 648-49 (5th Cir. 2012) ("[E]fforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end."); Grunewald v. United States, 353 U.S. 391, 405 (1957) (holding that an act of concealment occurring after the conspiracy ended could still be seen as furthering the conspiracy if prosecutors could prove the existence of an express original agreement to conceal the conspiracy). In their proposed amended complaints, plaintiffs assert that defendants' publications and statements about the quality of LIBOR – and their transmission of the publications directly to plaintiffs – served to conceal the conspiracy and, consequently, establish jurisdiction over all defendants. See, e.g., Freddie Mac PTAC ¶¶ 119, 132, 160, 193, 320, 406; Principal Financial PSAC ¶¶ 263, 265-67.

*16 However, moving plaintiffs do not plausibly demonstrate how the acts could have provided false assurance or furthered the conspiracy. For example, Freddie Mac alleges that several defendants published and distributed in the United States general reports on "global or U.S. Fixed Income Strategy, which included analyses on" LIBOR, e.g., Freddie Mac PTAC ¶¶ 33, 61, 70, 95, 119, 132, 160, but Freddie Mac does not identify anything in the reports that serves as, or can even be interpreted as, false assurance about the quality of LIBOR. In fact, the reports were designed "for the purpose of soliciting and engaging in financial transactions." E.g., Freddie Mac PTAC ¶¶ 70, 80, 89, 101, 118, 131, 146, 169, 192. Thus, the reports furthered the financial self-interest of the individual banks who published them, and they did not further a conspiracy to project financial soundness for sixteen Panel Banks. See Schwab, 883 F.3d at 87.

Moreover, applying the Supreme Court's analysis in Calder v. Jones, 465 U.S. 783 (1984), we find that none of the "false assurance" acts constituted sufficient contact with the United States. In Calder, the Supreme Court considered a libel suit in California state court that sought to establish specific jurisdiction over two defendants who worked for a national newspaper company headquartered in Florida. Id. at 784-86. The plaintiff's libel claims were based on a newspaper article written and edited by the defendants in Florida that was subsequently distributed in California and

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 46 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

the rest of the country. Id. The Court examined the various contacts the defendants had with California (as opposed to the contacts the defendants had with the plaintiff) and found those forum contacts to be sufficient: "The defendants relied on phone calls to 'California sources' for the information in their article; they wrote the story about the plaintiff's activities in California; they caused reputational injury in California by writing an allegedly libelous article that was widely circulated in the State; and the 'brunt' of that injury was suffered by the plaintiff in that State." Walden, 571 U.S. at 287. The injury caused by the news article in California "connected the defendants' conduct to California, not just to a plaintiff who lived there." Id. Therefore, California was "the focal point both of the story and of the harm suffered." Calder, 465 U.S. at 789. Jurisdiction was proper "based on the 'effects' of their Florida conduct in California." Id.

Unlike the defendants' acts in Calder, none of the acts in the instant case were specifically targeted at causing injury in the United States. For example, Freddie Mac alleges that JPMorgan published a research note in response to the May 29, 2018 article that questioned the accuracy of several defendants' LIBOR submissions. Freddie Mac PTAC ¶ 317, 406. There is no allegation that the note, which criticized the research methodology used by the article, was specifically published for or targeted at Freddie Mac or the United States. Rather, the note was distributed to subscribers of the Bloomberg Terminal, see id. ¶ 406 n.457, "which sits on the desk of more than 300,000 of the 'world's most influential decision makers,' " id. ¶ 64 n.38. In other words, the note ended up in the hands of investors throughout the world. JPMorgan's act thus mirrors the words of Henry Wadsworth Longfellow: "I shot an arrow into the air; It fell to earth, I knew not where; For, as swiftly it flew, the sight; Could not follow it in its flight." By Freddie Mac's logic, JPMorgan would be subject to "de facto universal jurisdiction" throughout the world. Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc., 751 F.3d 796, 801 (7th Cir. 2014).

In sum, moving plaintiffs fail to show that defendants' acts furthered the pled conspiracy or had sufficient contacts with the United States. Thus, we need not address whether the exercise of jurisdiction would comport with traditional notions of fair play and substantial justice. We also need not reach defendants' argument regarding lack of venue under the Clayton Act. [43]

[43] We explicitly note that, even if the BBA were a member of the conspiracy, it is not subject to the Clayton Act's venue provision because the BBA is not "a corporation" as defined by the Act. See 15 U.S.C. § 22; World Skating Fed'n v. Int'l Skating Union, 357 F. Supp. 2d 661, 664 (S.D.N.Y. 2005).

### 3. Other Amendments

*17 In this section, we address plaintiffs' amendments that are not related to personal jurisdiction. We conclude that almost all of the amendments do not comport with the dictates of Schwab and are thus futile. We consider each amendment seriatim.

### 3.1. Lender Plaintiffs' Proposed Amendments

In LIBOR V, we dismissed the fraud claims asserted by Government Development Bank for Puerto Rico ("GDB") as time-barred because the bank was on inquiry notice of the basis for all of its claims by May 31, 2010, but failed to assert them until November 21, 2012. 2015 WL 6696407, at *12-13. We assumed without deciding that Puerto Rico would apply the "weak inquiry notice" rule because GDB's claims were time-barred even under that plaintiff-friendly rule. Id. However, we now find that Puerto Rico has a "strong inquiry notice" rule, under which the statute of limitations begins to run on the inquiry notice date. See infra Part IV.5.1. Therefore, GDB's claims expired on May 31, 2011. After Schwab, Lender plaintiffs concurrently filed a motion for leave to amend, see ECF No. 2552, and a pre-motion letter seeking leave to move for reconsideration of LIBOR V, see ECF No. 2555. They argued that, by reversing our partial dismissal of Schwab's unjust enrichment claims under California law, Schwab changed the controlling law of this case and thereby reinstated GDB's fraud claims. Mem. Law in Supp. of GDB Mot. Leave to Amend ("Lender Pls.' Br."), at 9, ECF No. 2572. Failing to recognize the variations in state law, Lender plaintiffs requested that we reconsider our analysis of Puerto Rico law in light of the Second Circuit's decision. [44] See Mem. & Order, 2018 WL 3222518, at *1 (S.D.N.Y. Jul. 2, 2018), ECF No. 2607 ("July 2, 2018 Order").

[44] Lender plaintiffs' utter failure to grasp state law variations is evidenced in their pre-motion letter. Lender plaintiffs did not "consider, address, or even cite any Puerto Rico law in contending that we

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 47 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

should reconsider our prior analysis of Puerto Rico law." July 2, 2018 Order, 2018 WL 3222518, at *1.

We denied Lender plaintiffs' request to move for reconsideration in July 2018, and we see no reason to rule otherwise on their duplicative motion for leave to amend. In their motion, Lender plaintiffs argue that Puerto Rico recognizes a "defendant reassurance" exception, see Reply to Defs.' Opp. to Pls.' Mots. Leave to Amend Compls. ("Pls.' Joint Non-PJ Br."), at 22, ECF No. 2666, even though we held in the July 2, 2018 Order that our analysis would not change even if the exception applied. [45] 2018 WL 3222518, at *2. In view of the foregoing, and because there is no question that GDB's claims were filed after the statute of limitations had run, Lender plaintiffs' motion is denied.

[45]    We now explicitly hold that the "defendant reassurance" exception does not apply to GDB's claims because Lender plaintiffs do not allege that GDB conducted reasonable due diligence to discover fraudulently concealed material facts after it had been put on inquiry notice in May 2010. See, e.g., Maurás v. Banco Popular De Puerto Rico, Inc., No. 16-2864 (BJM), 2017 WL 5158677, at *6 (D.P.R. Nov. 7, 2017); Garcia Colon v. Garcia Rinaldi, 340 F. Supp. 2d 113, 121-22 (D.P.R. 2004).

### 3.2. NCUA's Proposed Amendments

**\*18**  The NCUA moves to add amendments detailing its LIBOR-based transactions in asset-backed securities. [46] See NCUA PSAC ¶¶ 235-236, 239-240, 243-244, 247-251, 254. Whether the NCUA has standing to bring antitrust claims as a beneficiary of the trusts is discussed in our consideration of FFP plaintiffs' proposed amendments regarding asset-backed securities. To the extent that the NCUA bases its antitrust claims on transactions with non-defendant third parties, we reject the amendments based on our ruling in LIBOR VI. See 2016 WL 7378980, at *16.

[46]    The NCUA claims that it engaged in 2,237 transactions involving asset-backed securities ("ABS"). See Letter from Andrew Shen to the Court, Feb. 1, 2019, ECF No. 2790. 2,033 of those transactions involved residential mortgage-backed securities, and the rest of the transactions (except for two that involved corporate bonds) involved assets such as aircrafts, automobiles, commercial

mortgages, credit card debt, and student loan collateral. Id.

### 3.3. FFP Plaintiffs' Proposed Amendments [47]

[47]    We do not consider Freddie Mac's request to add Barclays Capital as a defendant because it withdrew the request. See Pls.' Joint Non-PJ Br., at 17 n.23.

FFP Plaintiffs' Attempt to Expand the Suppression Period
FFP plaintiffs seek to extend the end of the alleged suppression period from May 2010 to October 2011 based on the indictment of two former employees of Société Générale and the bank's recent settlements with U.S. regulators. See, e.g., FDIC PSAC ¶ 1; Freddie Mac PTAC ¶ 7. We have previously considered the implications of the indictment for this MDL when the Direct Action plaintiffs ("DAP"), which include FFP plaintiffs, filed a motion to defer their deadline to move for reconsideration in light of the indictment until after the Second Circuit ruled on the appeals from LIBOR IV and LIBOR VI. See Letter from James Martin to the Court, Sep. 14, 2017, ECF No. 2263. We denied the motion because the indictment "does not contain any previously unknown facts of relevance" and "does [not] alter the factual and legal bases underlying this Court's prior decisions." Sep. 26, 2017 Order, ECF No. 2289.

We reject FFP plaintiffs' proposed amendments for the same reasons. The settlements [48] contain no allegation or finding that an inter-bank persistent suppression conspiracy existed. In addition, there is no suggestion that false LIBOR submissions were submitted from or directed by individuals in the United States. The assertion that the internal documents allegedly show "all Panel Bank Defendants manipulated their submissions," see, e.g., FDIC PSAC ¶ 306, does not find any support in the documents themselves. Since we deny FFP plaintiffs' attempt to expand the relevant time period, we do not address defendants' arguments to dismiss claims that are premised on the new conduct period as untimely. [49]

[48]    The settlements include the bank's deferred prosecution agreement with the U.S. Department of Justice, see Deferred Prosecution Agreement, United States v. Société Générale S.A., No. 18-cr-253 (E.D.N.Y. Jun. 5, 2018), and the bank's settlement with the Commodity Futures Trading

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 48 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

Commission, see Order, In the Matter of Société Générale S.A., CFTC No. 18-14 (June 4, 2018).

**49**

In their effort to overcome the statute of limitations bar, FFP plaintiffs grossly misinterpret the Circuit's ruling when they state: "The Second Circuit held that, even if California law were no different than other jurisdictions, Schwab could plausibly have relied on the BBA's false assurances." Pls.' Joint Non-PJ Br., at 9 (emphasis added). Nowhere in Schwab does the Circuit suggest that the BBA's false assurances could have resulted in a finding of justifiable reliance in any other state besides California.

Standing to Bring Claims Premised on Asset-Backed Securities

**\*19** Like the NCUA, FFP plaintiffs move to add amendments detailing their transactions of LIBOR-based ABS. See, e.g., Freddie Mac PTAC ¶¶ 56, 85, 94, 122, 140, 177; FDIC PSAC ¶¶ 68, 89; Principal Financial PSAC ¶¶ 31, 46, 230-39. In LIBOR IV, we found that, "[w]hen an investor holds an asset-backed security, the investor actually holds a certificate as evidence that the investor is entitled to certain disbursements as beneficiary of a trust." 2014 WL 6243526, at \*84. Furthermore, the trust "has legal personality and acts through its trustee, who (at least following a default) is a fiduciary for the investors collectively." Id. Therefore, the NCUA and FFP plaintiffs must show that they are proper parties to maintain contract-related claims against the trust's counterparties. Id. at \*85.

Defendants argue that individual certificate holders cannot bring claims related to the certificate holders' investments in ABS because of "no-action" clauses that are typically found in Pooling and Servicing Agreements ("PSAs"). See Defs.' Joint Non-PJ Br., at 15; see also Letter from Paul S. Mishkin to the Court, Feb. 19, 2019, ECF No. 2808. But defendants rely on inapposite case law discussing how certificate holders cannot bring breach of representation and warranty claims; plaintiffs' claims, of course, sound in antitrust and fraud. See, e.g., Deutsche Bank Nat'l Trust Co. v. Quicken Loans Inc., 810 F.3d 861, 868 n.8 (2d Cir. 2015). Plaintiffs, for their part, assert that "no-action" clauses do not "extend to a security holder's common law and statutory claims." Letter from James Martin to the Court, Feb. 4, 2019, ECF No. 2791.

As the legal authorities on which plaintiffs rely make clear, the legal effect of a "no-action" clause depends on a fact-specific inquiry into the language of the particular "no-action" clause at issue. See Quadrant Structured Prod. Co. v. Vertin, 23 N.Y.3d 549, 564-65 (2014) (discussing cases in which federal courts analyze different "no-action" clauses and finding that the scope of legal claims that security holders are allowed to bring depends on the language of each "no-action" clause).

We cannot determine whether the NCUA and FFP plaintiffs can bring antitrust and fraud claims without reviewing the "no-action" clauses contained in the PSAs of the asset-backed securities they purchased. Therefore, we direct the NCUA and FFP plaintiffs to include representative samples of the "no-action" clauses in their amended complaints. Defendants will then have an opportunity, if appropriate, to move for dismissal of plaintiffs' claims.

Principal's Amendments That Add Details of Swap Transactions

**\*20** Principal moves to add more details regarding their swap transactions with defendants. To the extent that Principal is simply providing more information about the transactions, we allow their amendments because we do not find that the amendments prejudice defendants in any way. See Pasternack v. Shrader, 863 F.3d 162, 174 (2d Cir. 2017). However, to the extent that Principal is adding more details to reassert claims that we have previously dismissed, we reject the proposed amendments. See, e.g., Mem. & Order, 2016 WL 4773129, at \*9 (S.D.N.Y. Sep. 12, 2016) (dismissing Principal's fraud and negligent misrepresentation claims against Credit Suisse International, Chase Bank USA, and Royal Bank of Scotland because Principal failed to allege swap agreements during the alleged suppression period).

FDIC's Amendments Related to Previously Dismissed Claims

Finally, the FDIC reasserts claims [50] that were already dismissed by the Court in LIBOR IV. At oral argument, the FDIC confirmed that it had included the dismissed claims in the proposed amended complaint for the sole purpose of preserving them for appeal, rendering it unnecessary to discuss them further.

**50**

Defendants stated that the FDIC reasserts "claims for tortious interference with prospective economic advantage, breach of contract, and negligent misrepresentation." Joint Mem. Law in Supp.

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 49 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

Defs.' Opp. Pls.' Mots. for Leave to Amend ("Defs.' Joint Non-PJ Br."), at 6, ECF No. 2625.

## IV. Defendants' Motion to Dismiss Against Schwab and Doral

Defendants move for partial dismissal of Schwab's and Doral's complaints for lack of personal jurisdiction [51] and for failure to state a claim. Since the same standards of review are used to evaluate motions for leave to amend and motions to dismiss, our jurisdictional analyses in the previous section also apply to Schwab's and Doral's claims; indeed, some of the jurisdictional issues presented in the motions for leave to amend appear in both Schwab's and Doral's complaints. This is especially true for Doral, whose complaint is substantially similar to the FDIC's proposed second amended complaint.

[51]     Defendants also move to dismiss Doral's antitrust claims against certain defendants for improper venue under Rule 12(b)(3). Since we find that the FDIC fails to establish conspiracy jurisdiction, see supra Part III.2.4, we need not reach defendants' argument regarding lack of venue under the Clayton Act.

### 1. General Legal Standard for Motion to Dismiss

As we have already described the general standards applicable to motions to dismiss in the context of evaluating the motions for leave to amend, see supra Part III.1, we discuss only the standards that are specific to the instant motions.

When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), we must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009). Nevertheless, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The well-pleaded allegations must show "more than a sheer possibility that a defendant has acted unlawfully" to pass muster. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). If the plaintiff has "not nudged [its] claims across the line from conceivable to plausible, [the] complaint must be dismissed." Twombly, 550 U.S. at 570.

When a defendant in a federal securities claim brought under the Exchange Act challenges the exercise of personal jurisdiction, the challenge "must be tested against due process standards." S.E.C. v. Unifund SAL, 910 F.2d 1028, 1033 (2d

Cir. 1990). The due process test has two related components: the "minimum contacts" inquiry and the "reasonableness" inquiry. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 567 (2d Cir. 1996). When conducting a "minimum contacts" inquiry in a federal securities action, a court looks at the defendant's contacts with the entire United States. S.E.C. v. Straub, 921 F. Supp. 2d 244, 253 (S.D.N.Y. 2013). If sufficient contacts are found, the court may exercise jurisdiction so long as "it is reasonable [to do so] under the circumstances of the particular case." [52] Id.

[52]     However, the "reasonableness" inquiry rarely defeats jurisdiction where a defendant has sufficient contact with the forum. See Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cty., 480 U.S. 102, 116 (1987) (Brennan, J., concurring) (noting that only in "rare cases" will the inquiry defeat jurisdiction). In addition, the inquiry is "largely academic in non-diversity cases brought under a federal law which provides for nationwide service of process." S.E.C. v. Softpoint, Inc., No. 95-cv-2951 (GEL), 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001).

### 2. Motion to Dismiss Schwab's Claims Based on Lack of Personal Jurisdiction

**\*21** Schwab asserts federal securities claims premised on its purchase of floating-rate notes. [53] Specifically, Schwab asserts: (1) claims under Section 10(b) of the Securities Exchange Act of 1934 [54] and SEC Rule 10b-5 [55] ("10(b) claims") against Counterparty defendants who issued and/ or sold floating-rate notes to Schwab, see Schwab SAC ¶¶ 186-87; (2) 10(b) claims against Non-Counterparty defendants based on their false LIBOR submissions, see id. ¶ 185; and (3) claims under Section 20(a) of the Exchange Act [56] ("20(a) claims") against the parent entities of 10(b) defendants through a control person theory, id. ¶ 195. Under California law, Schwab asserts: (1) fraud claims and breach of the implied covenant of good faith and fair dealing claims against Counterparty defendants who issued floating-rate notes, id. ¶¶ 200, 204; (2) unjust enrichment claims against Counterparty defendants who issued floating-rate or fixed-rate notes, id. ¶¶ 206-209; (3) fraud (and aiding and abetting fraud) claims against Non-Counterparty defendants based on their false LIBOR submissions, [57] id. ¶ 201; and (4) tortious interference claims against certain Non-Counterparty

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 50 of 202
In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

defendants whose affiliates issued floating-rate notes, id. ¶¶
210-212. [58]

[53]     Schwab no longer asserts its federal securities
        claims concerning fixed-rate notes in light of the
        Second Circuit's affirmance of our decision to
        dismiss the claims. See Schwab, 883 F.3d at 95-96.

[54]     § 10(b), 15 U.S.C. § 78j(b) (2012).

[55]     17 C.F.R. § 240.10b–5 (2014).

[56]     § 20(a), 15 U.S.C. § 78t(a) (2012).

[57]     In light of our ruling that "a plaintiff may not
        sue its own counterparty for fraud on the basis of
        false LIBOR submissions," LIBOR IV, 2015 WL
        6243526, at *62 n.92, Schwab "limits these claims
        to its purchases of floating-rate notes issued by
        Bank Affiliates, Parent Company Defendants, or
        non-Defendants." Schwab SAC ¶ 201.

[58]     Schwab also asserts that, under the theory of civil
        conspiracy, each defendant "is being sued both
        individually as a primary violator of the law ... and
        as a co-conspirator as provided for under state law."
        Schwab SAC ¶ 217.

Schwab argues that we should exercise personal jurisdiction
over defendants for all of its claims. While we previously
considered whether personal jurisdiction could be established
over defendants in Schwab's state law claims, we had no
occasion to make specific rulings on jurisdiction in the
context of the federal securities laws. However, a number of
our earlier jurisdictional rulings are applicable to Schwab's
federal securities claims.

In LIBOR IV, we found that personal jurisdiction could
be established over a defendant for a claim arising from a
federal statute with a nationwide service of process provision,
such as the Exchange Act, if the defendant had sufficient
contacts with the United States. 2015 WL 6243526, at
*23. For Counterparty defendants who issued bonds, we
upheld jurisdiction "where the bond was issued," or more
specifically, "where the bond was placed with an underwriter
or agent for sale or marketing." Id. at *37. We also upheld
jurisdiction where Counterparty defendants directly solicited
and sold LIBOR-linked financial instruments. March
31, 2016 Order, 2016 WL 1301175, at *4; see also Schwab, 883
F.3d at 83. But entities that were merely involved in the sale
of LIBOR-based financial instruments - such as brokers, dealers,

and agents - had no duty to disclose the alleged manipulation
of LIBOR and could not be held liable for issuing defendants'
failure to disclose the alleged manipulation. See LIBOR IV,
WL 6243526, at *75. Synthesizing those rulings in the context
of Schwab's Exchange Act claims, we can exercise personal
jurisdiction over a Counterparty defendant who had sufficient
contacts with the United States by issuing notes in the United
States or placing them with a U.S.-based agent for sale. [59]

[59]     This exercise of jurisdiction is in line with the
        Supreme Court's ruling in Blue Chip Stamps v.
        Manor Drug Stores, 421 U.S. 723 (1975), that a
        private cause of action under § 10(b) is limited to
        purchasers or sellers of securities.

We have repeatedly found that, unless there is a plausible
allegation that LIBOR submissions were made in the
United States, we would exercise personal jurisdiction only
over Counterparty defendants who: (1) transacted directly
with plaintiffs by issuing LIBOR-based instruments and/or
engaging in a "course of dealing" in the relevant forums;
or (2) transacted indirectly with plaintiffs through their
subsidiaries or affiliates. See supra Part III.2. As defendants
argue in their briefs, Schwab attempts to broaden the
jurisdictional scope of its claims to include Non-Counterparty
defendants in spite of our prior rulings and the Second
Circuit's affirmance of those rulings. For the reasons stated
below, we reject Schwab's assertion that we should exercise
personal jurisdiction over Non-Counterparty defendants.

### 2.1. Nationwide General Jurisdiction Based on the Exchange Act's Nationwide Service of Process

**\*22**  Under a novel theory of nationwide general jurisdiction,
Schwab asserts that the nationwide service of process
provision of the Exchange Act establishes federal general
jurisdiction over all defendants who are domiciled in the
United States. [60] See Schwab's Opp'n to Defs.' Mot. Dismiss
("Schwab Br."), at 11-13, ECF No. 2668. Schwab argues
that a defendant's residency in the United States creates
"minimal contacts" with the United States and can justify
the federal government's exercise of general jurisdiction. See
id. at 11 (quoting Mariash v. Morrill, 496 F.2d 1138, 1143
(2d Cir. 1974)). In response, defendants contend that Schwab
"improperly conflates" the analysis for general jurisdiction in
a specific state with the sufficiency of a defendant's residency
in the United States for purposes of establishing specific

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 51 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

jurisdiction in federal securities claims. See Defs.' Joint PJ Br., at 46.

60      They include: (1) Bank of America, N.A., Citibank, N.A., and JP Morgan Chase Bank, N.A., who Schwab refers to as "Domestic Panel Bank" defendants; and (2) Bank of America Corp., Citigroup Inc., and JP Morgan Chase & Co., who Schwab refers to as "Domestic Parent Company" defendants. See Schwab SAC ¶ 220.

We agree with defendants. In LIBOR IV, we held that, in evaluating the existence of personal jurisdiction for federal claims arising from statutes with nationwide service of process provisions, we would make a "minimum contacts" inquiry and examine a defendant's suit-related contact with the entire United States, rather than just the forum state. See 2015 WL 6243526, at *23. We also held that, under the Supreme Court's rulings in Daimler and Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915 (2011), we would examine a defendant's "continuous and systematic" contacts with the forum state in evaluating general jurisdiction in that state. Id. at *25-27; see also Metro. Life, 84 F.3d at 568 ("Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff to demonstrate the defendant's continuous and systematic general business contacts." (internal citation omitted)). Therefore, "[g]eneral jurisdiction and specific jurisdiction require different legal analyses ... and the question of minimum contacts only applies in a specific jurisdiction analysis. Mem. & Order, 2017 WL 532465, at *1 (S.D.N.Y. Feb. 2, 2017), ECF No. 1761.

At oral argument, Schwab argued that, applying a theory of federal general jurisdiction predicated on the Exchange Act's nationwide service of process provision, this Court could exercise jurisdiction over Non-Counterparty defendants for state law claims. See Tr. 4:12-18. According to Schwab, finding federal general jurisdiction based on a defendant's U.S. residency has been "Second Circuit law for about 45 years" since the Circuit's decision in Mariash, 496 F.2d 1138. Id. But Schwab grossly misinterprets Mariash. In that case, the Circuit considered whether a defendant's residency in the United States was sufficient to establish personal jurisdiction over the defendant for claims brought under the Exchange Act. Although the Mariash court did not explicitly state whether that jurisdiction was specific or general, its analysis of the defendant's "minimal contacts" indicates that specific jurisdiction was at issue. See 496 F.2d at 1143. In other words, the Circuit examined whether the defendant's residency in the

United States created "minimal contacts" that would allow specific jurisdiction over the defendant for an Exchange Act claim.

Schwab also points to Porina v. Marward Shipping Co., 521 F.3d 122 (2d Cir. 2008), in which the Circuit considered the question of whether a foreign defendant's contacts with the United States were sufficiently "continuous and systematic" to establish nationwide general jurisdiction. The defendant in Porina had insufficient contacts with any specific state, so the plaintiffs relied on Rule 4(k)(2), which allows a federal court to exercise personal jurisdiction when the defendant is not "subject to jurisdiction in any state's courts of general jurisdiction." 61 Fed. R. Civ. P. 4(k)(2)(A). This rule was "specifically designed to 'correct[ ] a gap' in the enforcement of federal law in international cases," Porina, 521 F.3d at 126 (alternation in original) (quoting Fed. R. Civ. P. 4 advisory committee's note, 1993 Amendments), which "arose from the general rule that a federal district court's personal jurisdiction extends only as far as that of a state court in the state where the federal court sits," id. Consequently, a federal court could not exercise jurisdiction over a foreign defendant that had sufficient contact with the United States but not with any single state. Thus, the Circuit's analysis of the foreign defendant's "continuous and systematic general business contacts" with the United States in Porina has no bearing on Schwab's argument because Schwab cannot rely on Rule 4(k)(2): defendants over which Schwab attempts to establish nationwide general jurisdiction are domestic entities who are subject to general jurisdiction in their home states.

61      Rule 4(k)(2) allows a federal court to exercise personal jurisdiction when three requirements are met: "(1) the claim must arise under federal law; (2) the defendant must not be subject to jurisdiction in any state's courts of general jurisdiction; and (3) the exercise of jurisdiction must be consistent with the United States Constitution and laws." Porina, 521 F.3d at 127 (internal quotation marks omitted).

*23  Other cases on which Schwab relies do not support its novel theory. Rather, the cases answer affirmatively the question of whether a defendant in a federal securities lawsuit could be subject to specific jurisdiction in any federal court based on the defendant's U.S. residency. 62 See, e.g., Moon Joo Yu v. Premiere Power LLC, No. 14-cv-7588 (KPF), 2015 WL 4629495, at *5 (S.D.N.Y. Aug. 4, 2015) (holding that a New York federal court could exercise jurisdiction over a

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 52 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

defendant for Exchange Act claims even though the defendant was a resident of Oklahoma).

62    None of the cases even mentions general jurisdiction or engages in an analysis of whether a defendant's contacts with the United States are sufficiently "continuous and systematic" to subject them to general jurisdiction.

For these reasons, we reject Schwab's attempt to establish jurisdiction over Non-Counterparty defendants under the theory of nationwide general jurisdiction.

## 2.2. Specific Jurisdiction over Defendants in Exchange Act Claims

Schwab plausibly alleges that Floating-Rate Issuer defendants [63] had sufficient contacts with the United States by issuing notes in the United States or placing them with U.S.-based agents for sale. See Schwab SAC ¶¶ 162-65, 168, 224-28. Therefore, consistent with our prior rulings, we exercise specific jurisdiction over Floating-Rate Issuer defendants. [64]

63    Schwab brings various claims against defendants who issued floating-rate notes and refers to these defendants as "Floating-Rate Issuer Defendants" in its complaint. We adopt Schwab's labeling, which includes domestic banks (Bank of America, Citigroup Inc., JPMorgan Chase Bank, and JPMorgan Chase & Co.) and foreign banks (Barclays Bank plc, Credit Suisse AG, Deutsche Bank AG, Rabobank, Royal Bank of Canada, The Royal Bank of Scotland plc, and UBS AG).

64    According to defendants, Schwab fails to plausibly allege personal jurisdiction based on the place of issuance because Schwab does not identify the exact location within the United States where notes were issued. Joint Reply Mem. of Law in Further Support of Defs.' Mot. Dismiss for Lack of Personal Jurisdiction and Venue ("Defs.' Joint MTD PJ Reply"), ECF No. 2701, at 12-13. However, in evaluating whether we can exercise personal jurisdiction over a defendant in a federal securities claim, we examine the defendant's contact with the entire United States. Therefore, Schwab does not need to allege the exact locations

in which defendants issued their notes; rather, Schwab only needs to allege that defendants issued floating-rate notes in the United States or placed them with U.S.-based agents for sale.

However, for some notes that were issued by foreign defendants, Schwab does not sufficiently allege that they were issued or placed with an agent for sale in the United States. See, e.g., id. at ¶ 163 n.187 & n.188 (noting that transactions numbered FL925-26 do not have agent information). Schwab argues that any ambiguity as to whether the seller was located in the United States should be resolved in its favor at the pleading stage. [65] But we may not "draw argumentative inferences in the plaintiff's favor." Overseas Military Sales, 21 F.3d at 507 (internal quotation marks omitted). Without any specific allegation about the identity or location of the defendant's agent, we cannot draw the requested inferences in Schwab's favor, especially since Schwab has had more than seven years to review its transaction data.

65    At oral argument, Schwab stated that "many [notes] were purchased at issuance by the Schwab investment people in San Francisco" in the primary market. Tr. 7:19-25. Since Schwab cannot represent that it purchased all of its notes at issuance, we cannot reasonably infer that the notes without adequate seller information were issued or placed for sale in the United States.

*24    Schwab contends that, even if the selling agent information is missing, we can still exercise jurisdiction over defendants for Exchange Act claims that are premised on the notes at issue because foreign Floating-Rate Issuer defendants delivered the notes "into the stream of commerce with the expectation that they would be purchased by investors in the United States." [66] Schwab Br., at 15 (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 298 (1990)). However, floating-rate notes "may arrive in the hands of plaintiffs and other investors anywhere in the world by the investors' own trades – not at the direction of the issuers. Such a fortuitous, plaintiff-driven contact cannot support personal jurisdiction." LIBOR IV, 2015 WL 6243526, at *31; see also Volkswagen, 444 U.S. at 298 (1990) ("[T]he mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State.").

66    To the extent that Schwab relies on the "foreseeability" theory (i.e., it was foreseeable that

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 53 of 202
In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

the notes would arrive in the United States), we reject it. See LIBOR IV, WL 6243526, at *31; see also Schwab, 883 F.3d at 87-88.

Therefore, in addition to domestic defendants who issued notes in the United States, we exercise specific jurisdiction over foreign Floating-Rate Issuer defendants who Schwab sufficiently alleges issued notes or placed them for sale in the United States.

Jurisdiction Based on the Sale of Floating-Rate Notes

Schwab also asserts claims against five Panel Bank defendants [67] for selling Schwab floating-rate notes that were issued by either themselves or others. See Schwab SAC ¶¶ 160-61, 165, 170, 172, 187. Relying on Schwab, Schwab argues that we must exercise jurisdiction over the five defendants based on their direct sales to Schwab. See 883 F.3d at 82 ("Allegations of billions of dollars in transactions in California easily make out a prima facie showing of personal jurisdiction for claims relating to those transactions." (emphasis added)).

[67]     The defendants are Bank of America, N.A., Deutsche Bank AG, JPMorgan Chase Bank, N.A., Royal Bank of Canada, and The Royal Bank of Scotland plc.

Defendants correctly point out that, in making this argument, Schwab ignores our prior rulings and other binding authorities. Generally, there can be no material omission under § 10(b) absent a duty to disclose. [68] See, e.g., Basic v. Levinson, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); Chiarella v. United States, 445 U.S. 222, 235 (1980) ("When an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak."). As we held in LIBOR IV, entities that were merely involved in the sale of LIBOR-based financial instruments "had no duty under contract law to advise sophisticated investors of LIBOR-related risks, no duty to deal at any particular price, and no ongoing duties of good faith after concluding a sale on bargained-for terms." 2015 WL 6243526, at *75. Therefore, we do not exercise specific jurisdiction over defendants who were merely involved in the sale of floating-rate notes to Schwab. [69]

[68]     Whether a selling entity had a duty to disclose may be an issue of merits, not of jurisdiction.

However, since defendants raise the issue as one of jurisdiction, see Defs.' Joint MTD PJ Reply, at 13-15, we address it here.

[69]     We still exercise specific jurisdiction over four of the five Panel Bank defendants (Bank of America, N.A., Deutsche Bank AG, Royal Bank of Canada, and The Royal Bank of Scotland plc) based on Schwab's allegations that they issued notes in the United States or placed notes for sale with U.S.-based agents.

Jurisdiction Based on False LIBOR Submissions

Schwab also asserts that we should exercise jurisdiction over Non-Counterparty defendants for their allegedly false LIBOR submissions in furtherance of the conspiracy, reasoning that there is "at least a 'but for' connection between the sale of floating-rate notes to Schwab ... and Section 10(b) claims against all Defendants based on their false LIBOR quotes." Schwab Br., at 17.

**25** As a threshold matter, a private cause of action under Section 10(b) of the Exchange Act is limited to "actual ... sellers" of securities. Blue Chip Stamps, 421 U.S. at 731. Thus, Schwab cannot assert 10(b) claims against Non-Counterparty defendants. In addition, as defendants point out, § 10(b) of the Exchange Act may not be the predicate of a conspiracy claim. See, e.g., Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 841 (2d Cir. 1998). Even if such a cause of action existed under the Exchange Act, the Second Circuit held that the alleged conspiracy to manipulate LIBOR "had nothing to do with the California transactions." See Schwab, 883 F.3d at 87. Furthermore, we have repeatedly rejected the assertion that defendants had sufficient contacts with the United States by transmitting LIBOR data to data vendors in the United States. See supra Part III.2.4. To the extent that Thomson Reuters had a role in the setting of all LIBOR benchmarks, it was a pre-existing one as a calculation agent of the BBA, who is neither a defendant nor a co-conspirator in this action. [70] See LIBOR VI, 2016 WL 7378980, at *10. Accordingly, we do not exercise specific jurisdiction over Non-Counterparty defendants for Schwab's Exchange Act claims based on the allegations of false LIBOR submissions.

[70]     The BBA's limited use of Thomson Reuters as its calculation agent simply does not change the fact that the setting of LIBOR rates for 10 currencies, including the U.S. Dollar, took place at 11:00

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 54 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

AM London time. See British Bankers' Ass'n, Understanding the Construction and Operation of BBA LIBOR - Strengthening for the Future, Jun. 10, 2008, § 9.1.

### 2.3. Pendent Jurisdiction over State Law Claims

As relevant here, the doctrine of pendent personal jurisdiction provides that "where a federal statute authorizes nationwide service of process, and the federal and state claims derive from a common nucleus of operative fact, the district court may assert personal jurisdiction over the parties to the related state law claims even if personal jurisdiction is not otherwise available." IUE AFL–CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056 (2d Cir. 1993) (citation and internal quotation marks omitted). However, pendent jurisdiction "need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966). In determining whether pendent jurisdiction should be exercised, a federal court must consider "judicial economy, convenience and fairness to litigants." Id.

As discussed infra, see Part IV.3.2, all of Schwab's Exchange Act claims for which defendants were not dismissed for lack of personal jurisdiction survive defendants' motion to dismiss for failure to state a claim. And as we did in LIBOR IV, we exercise pendent personal jurisdiction over those defendants for state law claims deriving from "a common nucleus of operative fact" as Schwab's surviving Exchange Act claims. See 2015 WL 6243526, at *24. Conversely, since we have dismissed Schwab's 10(b) claims that are based on allegedly false LIBOR submissions, we do not exercise pendent party jurisdiction over Non-Counterparty defendants for Schwab's fraud (and aiding and abetting) claims, which are based on the same factual predicate.[71]

[71]    As discussed infra, see Part IV.3.5, we dismiss Schwab's claims of tortious interference against certain Panel Bank defendants because the claims are time-barred and insufficiently pled. But even if the claims survived defendants' motion to dismiss, we would still decline to exercise pendent jurisdiction over defendants for those claims because they are based on those defendants' allegedly false LIBOR submissions to the BBA.

Schwab urges a different outcome, arguing that we should exercise pendent party jurisdiction over Non-Counterparty defendants for its state law claims premised on false LIBOR submissions because those claims and its federal claims "substantially overlap." Schwab Br., at 19 (quoting Cohen v. Facebook, Inc., 252 F. Supp. 3d 140, 154 (E.D.N.Y. 2017)). However, Schwab's surviving Exchange Act claims are, as defendants point out, based on Floating-Rate Issuer defendants' failure to disclose the artificial suppression of LIBOR in their issuance of notes in the United States. Thus, all factual events underlying the federal claims took place in the United States, while allegedly false LIBOR submissions occurred in London.[72] Moreover, exercising pendent party jurisdiction over Non-Counterparty defendants, many of whom are foreign and had no contacts of their own with the United States, "would not comport with notions of fair play and substantial justice." Laydon v. Mizuho Bank, Ltd., No. 12-cv-3419 (GBD), 2015 WL 1515358, at *6 (S.D.N.Y. Mar. 31, 2015); see also Brown v. Lockheed Martin Corp., 814 F.3d 619, 625 (2d Cir. 2016).

[72]    Schwab asserts that we should exercise specific jurisdiction over Non-Counterparty defendants for state law claims under the conspiracy theory of jurisdiction. Even if California recognized conspiracy jurisdiction (which it does not, see supra note 29), Schwab fails to plausibly allege conspiracy jurisdiction because defendants' alleged acts, see Schwab SAC ¶¶ 257-64, are not overt acts in furtherance of the alleged conspiracy. See supra Part III.2.4.

**\*26** Finally, as we noted in LIBOR IV, the Second Circuit "recognizes a version of pendent personal jurisdiction under which a federal court may 'entertain [state-law] claims that are not expressly covered by the long-arm statute, so long as they derive from the same nucleus of operative fact as claims that are.' " 2015 WL 6243526, at *23 n.40 (alteration in original) (quoting Hanly v. Powell Goldstein, L.L.P., 290 F. App'x 435, 438 (2d Cir. 2008)). "This judge-made exception to the general rule that a federal court must look to the law of the forum state to determine whether personal jurisdiction must lie," id. (citation and internal quotation marks omitted), may have bearing on Schwab's attempt to establish jurisdiction over some Indirect Counterparty defendants who "affirmatively directed notes for sale in California ... through Bank Affiliates that acted as agents for the purpose of selling notes." Schwab SAC ¶ 245. But Schwab alleges that defendants designated the affiliates as

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 55 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

their selling agents and provided offering materials that specified the affiliates' "authority and permissible activities with respect to the offering." Id. ¶ 131. Since Schwab's allegations sufficiently show that the affiliates acted "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal," Schwab, 883 F.3d at 85, we can (and do) exercise specific jurisdiction over Indirect Counterparty defendants based on their affiliates' activities. Thus, the consideration of the Second Circuit's rule is academic.

### 3. Motion to Dismiss Schwab's Claims Based for Failure to State a Claim

Defendants move to dismiss under Rule 12(b)(6) Schwab's federal claims <u>and</u> its state law claims for: (1) unjust enrichment premised on Schwab's purchase of fixed-rate notes; and (2) tortious interference with contracts. Only Schwab's 10(b) claims against Floating-Rate Issuer defendants survive the motion. [73]

[73]      The parties agree that Schwab's 10(b) claims exclude floating-rate instruments with maturities of less than nine months. <u>See</u> 15 U.S.C. § 78c(a)(10) (excluding from the definition of a "security" any note "which has a maturity at the time of issuance of not exceeding nine months").

### 3.1. Addition of New Defendants and Claims

We first address Schwab's amendments that identify: (1) Bank of Scotland plc, Credit Suisse AG, Lloyds Bank plc, and Royal Bank of Scotland plc as Panel Bank defendants, <u>see, e.g.</u>, Schwab SAC ¶ 48 n.48 (citing Fed. R. Civ. P. 15(c)(1)); and (2) certain Indirect Counterparty defendants as both direct and indirect sellers of financial instruments, <u>see, e.g.</u>, id. ¶ 161 (identifying Bank of America, N.A., Royal Bank of Canada, and Royal Bank of Scotland plc as having conducted "direct transactions" with Schwab).

In its previous complaints in this action, filed in April 2013 (ECF No. 1, 13-cv-7005 (NRB)) and October 2014 (ECF No. 672), Schwab incorrectly identified certain members of the LIBOR panel. For example, in its April 2013 complaint that was originally filed in California state court and removed to federal court, Schwab identified Credit Suisse Group AG (the parent company of the Credit Suisse entities) as a member of the LIBOR panel even though Credit Suisse AG is the

entity that served on the panel. See April 2013 Compl., 13-cv-7005 (NRB), ECF No. 1-1, ¶¶ 39, 49. Schwab made similar mistakes with respect to three other entities. See id. ¶¶ 43 (identifying Lloyds Banking Group plc and HBOS plc as defendants), 46 (identifying The Royal Bank of Scotland Group plc as a defendant), 49 (identifying defendants as panel members).

Schwab moves to correct its mistakes by substituting for the erroneously named defendants their affiliated entities that actually served on the LIBOR panel during the relevant period. [74] Schwab asserts that it did not learn the true identities of the LIBOR Panel Banks until November 2014, when the banks' employee declarations, see ECF Nos. 767, 781, 784, identified the entities that served on the LIBOR panel. Defendants object to Schwab's amendments and argue that Schwab attempts to impermissibly add new defendants. See Joint Mem. of Law in Supp. of Defs.' Mot. for Partial Dismissal of Schwab and Doral Compls. For Failure to State a Claim ("Defs.' Joint MTD Br."), at 19-21, ECF No. 2623.

[74]      Schwab removes the original defendants from those claims deriving from service on the LIBOR panel. However, Schwab continues to name the original defendants in its Section 20(a) and fraud claims as parent company defendants.

**\*27** We accept Schwab's position that it merely seeks to correct its mistake concerning the proper identity of the relevant parties by now bringing its claims against defendants who "knew or should have known that [they] would have been named as ... defendant[s] but for an error." Krupski v. Costa Crociere S.p.A., 560 U.S. 538, 548 (2010); see also Datskow v. Teledyne, Inc., 899 F.2d 1298, 1302 (2d Cir. 1990) (holding that plaintiffs' complaint sufficiently alerted the erroneously named corporate defendant's affiliated entity that plaintiffs sought to sue it by including details concerning that entity). In its original complaint, Schwab clearly indicated that it sought to bring its claims against the entities that served on the LIBOR panel, and thus those entities will not be "prejudiced in defending" themselves in the litigation. Fed. R. Civ. P. 15(c)(1)(C)(i).

Schwab also seeks to clarify that, based on its transaction data, certain Indirect Counterparty defendants sold notes both directly and indirectly to Schwab. Though Schwab thus seeks to bring new claims against some of the original defendants based on transaction data that it had since the beginning of its lawsuit, the amendments would neither "require

WCAS050

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 56 of 202
In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

[defendants] to expend significant additional resources to conduct discovery and prepare for trial" nor "significantly delay the resolution of the dispute." Pasternack v. Shrader, 863 F.3d 162, 174 (2d Cir. 2017) (internal quotation marks omitted). Therefore, we allow the amendments. [75]

[75]   At oral argument, we asked defendants whether allowing these new claims would subject them to any prejudice "beyond potentially [rendering them] liable for additional damages." Tr. 10:3-22. Defendants simply stated that the amendments should not be allowed because they were not specifically "permitted by the mandate of the Second Circuit to this Court" in Schwab. Id. However, the Circuit's mandate did not preclude such amendments, and Rule 15(a) vests the Court with broad discretion to permit amendments "when justice so requires."

### 3.2. Exchange Act § 10(b) Claims

Defendants assert that we should dismiss Schwab's 10(b) claims because Schwab continues to fail to adequately plead loss causation. See LIBOR IV, 2015 WL 6243526, at *70 (rejecting Schwab's theory that it suffered losses on floating-rate notes purchased and interest paid during the persistent suppression period because any downward distortion in the LIBOR rate would have been offset by a reduction in the price of the instrument). As discussed in Part II of this opinion, Schwab vacated our dismissal of Schwab's 10(b) claims based on floating-rate notes. [76] The Second Circuit reasoned that Schwab could have plausibly alleged two potential theories of loss causation: Schwab could have incurred losses if it "held a mispriced instrument to maturity" or "tried to sell [the instrument] after LIBOR manipulation was revealed." Schwab, 883 F.3d at 93. The Circuit instructed Schwab to add on remand "allegations clarifying the loss causation theory or theories on which it relied." Id.

[76]   The Second Circuit, however, upheld our rejection of Schwab's loss causation theory based on suppressed interest payments made during the persistent suppression period. See Schwab, 883 F.3d at 93 ("We agree with the district court that to the extent that Schwab seeks to impose liability for false LIBOR submissions that affected the amount

of money it received on instruments it had already purchased, its claims fail." (emphasis omitted)).

In light of Schwab, we now find that Schwab has adequately clarified its theory and plausibly alleged loss causation. As the Circuit noted, Schwab's burden here is "not a heavy one." Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 797 F.3d 160, 187 (2d Cir. 2015). Schwab must simply give defendants "some indication" of the actual loss and "of a plausible causal link between the loss and the alleged fraud." Schwab, 883 F.3d at 93 (citation and internal quotation marks omitted). Schwab alleges that it held "virtually all" [77] of its floating-rate notes from issuance to maturity and that "each time a coupon payment was made, Schwab received less than it would have received absent Defendants' suppression of LIBOR." Schwab SAC ¶ 194. Applying the Circuit's rationale in Schwab, we find that these allegations plausibly provide a causal link between the alleged losses (i.e., lower amounts on coupon payments) and defendants' allegedly fraudulent manipulation of LIBOR.

[77]   Schwab admits that it did not hold all of the notes to maturity. See Letter from Michael J. Miarmi to the Court, Feb. 12, 2019, ECF No. 2794. Whether Schwab held all of its notes to maturity is, defendants argue, "central to determining whether [Schwab] has stated a claim." See Letter from Alan C. Turner to the Court, Feb. 25, 2019, ECF No. 2821. However, the Second Circuit found that, "if Schwab tried to sell a floating-rate instrument after LIBOR manipulation was revealed, it might have been forced to sell at a loss." See Schwab, 883 F.3d at 93.

*28   Defendants also move to dismiss Schwab's 10(b) claims that they argue are based on the purchase or sale of instruments that are not "securities" under the Exchange Act. See 15 U.S.C. § 78c(a)(10). The appendices that Schwab filed with its second amended complaint contain detailed information about the financial transactions that serve as the factual predicates of Schwab's claims. In one appendix, Schwab lists transactions involving "time certificates," see, e.g., Schwab SAC App'x A, at 95 (transactions numbered FL943-946), which Schwab alleges are floating-rate notes purchased from broker-dealers. Defendants contend that the "time certificates" are certificates of deposit that are insured by the FDIC and are "protected by the reserve, reporting, and inspection requirements of the federal banking laws." Marine Bank v. Weaver, 455 U.S. 551, 558 (1982). While such certificates would not constitute securities under Marine

**WCAS051**

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 57 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

Bank, defendants fail to identify a single allegation in Schwab's complaint that suggests that the instruments are so regulated. [78]  Accepting as true all factual allegations and drawing all reasonable inferences in Schwab's favor, we find it plausible that the instruments are widely offered securities that are not "abundantly protected under the federal banking laws." Id. at 559.

[78]     As a matter of fact, Schwab, in response to our request at oral argument, submitted evidence that the instruments at issue were not regulated by the FDIC. See Letter from Michael J. Miarmi, Feb. 12, 2019, ECF No. 2794.

### 3.3. Exchange Act § 20(a) Claims

Schwab asserts 20(a) claims against the parent companies of the Panel Bank defendants that are the subject of the 10(b) claims. [79]  To establish a prima facie case under Section 20(a) of the Exchange Act, plaintiff must show: (1) "a primary violation by the controlled person"; (2) "control of the primary violator by the targeted defendant"; and (3) "that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person." S.E.C. v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (internal quotation marks and alterations omitted). As the parties recognize, "this Court has consistently sided with most judges in the District and found that a plaintiff must plead culpable participation with scienter." In re ForceField Energy Inc. Sec. Litig., No. 15-cv-3020 (NRB), 2017 WL 1319802, at *16 (S.D.N.Y. Mar. 29, 2017) (emphasis added). Therefore, to withstand a motion to dismiss a 20(a) claim, a plaintiff "must allege, at a minimum, particularized facts of the controlling person's conscious misbehavior or recklessness." In re MBIA, Inc., Sec. Litig., 700 F. Supp. 2d 566, 598 (S.D.N.Y. 2010).

[79]     Schwab also brings a 20(a) claim against Barclays Bank plc for non-defendant Barclays Capital Inc.'s "violations of Section 10(b) in failing to disclose, in soliciting and selling floating-rate notes to Schwab, that LIBOR was suppressed." Schwab SAC ¶ 198. Since a broker or selling agent does not have a duty to disclose LIBOR manipulation, see supra Part IV.2.2, Schwab fails to allege any primary violation by Barclays Capital, and it therefore cannot establish control liability against Barclays

Bank plc. See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) (holding that control person liability could not be established when the plaintiff failed to allege any primary violation by the controlled entity).

In support of its 20(a) claims, Schwab advances two theories of control person liability. First, Schwab asserts that the parent company defendants are liable for their Panel Bank subsidiaries' alleged false LIBOR submissions to the BBA. See Schwab SAC ¶ 196. Second, Schwab argues that the parent company defendants are liable for their Panel Bank subsidiaries' failure to disclose the alleged LIBOR manipulation in their issuance of floating-rate notes. Id. ¶ 197. However, both theories fail because Schwab does not set forth any particularized factual allegation that demonstrates the parent company defendants' culpable participation. [80]  Schwab merely alleges that each of the parent company defendants was "a culpable participant in the fraud" alleged in Schwab's complaint. Schwab SAC ¶ 483. Such a general and conclusory allegation of culpable participation cannot withstand defendants' motion.

[80]     Since we have rejected Schwab's 10(b) claims premised on false LIBOR submissions to the BBA, the first theory also fails on the independent ground that Schwab has failed to plausibly allege a primary violation by Panel Bank defendants. See ATSI, 493 F.3d at 108.

 *29  Schwab misleadingly cites our prior ruling in LIBOR IV in support of its argument that it has sufficiently alleged the parent company defendants' culpable participation. In LIBOR IV, we found that, for fraud by omission in the course of offering or trading securities, it is sufficient for purposes of pleading scienter "to state plausibly that defendants were either themselves manipulating LIBOR or that defendants were large banking institutions with access to nonpublic data about real inter-bank transactions." 2015 WL 6243526, at *58. Specifically, Schwab argues that, since the parent company defendants are large banking institutions who could have plausibly known of the manipulation "when LIBOR suppression became so widespread," id., Schwab asserts that it is "highly plausible that the Parent Company Defendants knew about or recklessly disregarded" the Panel Bank defendants' manipulation of LIBOR, Schwab Br., at 39. However, as defendants correctly point out, the ruling in LIBOR IV concerned whether a Counterparty defendant had a duty to disclose facts, such as suppressed LIBOR rates, that are "basic to the transaction and when the customs

WCAS052

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

of the trade ... would reasonably demand disclosure." See 2015 WL 6243526, at *57. We have never found that the parent companies knew about or participated in manipulating LIBOR, and Schwab does not allege particularized facts that demonstrate "a showing of both fraudulent conduct and a culpable state of mind" by the defendants. Steed Fin. LDC v. Nomura Sec. Int'l, Inc., No. 00-cv-8058 (NRB), 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001). Therefore, we dismiss Schwab's 20(a) claims against the parent company defendants.

### 3.4. Unjust Enrichment Claims [81]

[81] The parties agree that Schwab's unjust enrichment claims based on floating-rate notes are limited to the notes that were issued by Floating-Rate Issuer defendants. However, defendants request that, since Schwab does not specifically state that it seeks to recover from defendants based only on their issuance of floating-rate notes (and not on their sale of floating-rate notes), we require Schwab to file a corrected complaint. See Joint Reply Mem. of Law in Supp. of Defs.' Mot. for Partial Dismissal of Schwab and Doral Compls. for Failure to State a Claim ("Defs.' Joint MTD Reply"), at 9 n.10, ECF No. 2697. Since Schwab has confirmed that its unjust enrichment claims based on floating-rate notes are "limited to transactions in which those Defendants issued the notes," Schwab Br. 47 n.20, no correction is necessary.

In LIBOR IV, we dismissed Schwab's unjust enrichment claims mainly for lack of personal jurisdiction.[82] In this motion, defendants argue that we should dismiss Schwab's unjust enrichment claims against defendants who issued fixed-rate notes because, based on the Circuit's affirmance of our dismissal of Schwab's Exchange Act and fraud claims [83] premised on fixed-rate notes, Schwab cannot and does not plausibly allege that it was harmed by the alleged LIBOR suppression on fixed-rate notes. [84]

[82] As discussed in Part II of this opinion, we also held that they were partially time-barred, see LIBOR IV, 2015 WL 6243526, at *177, but that ruling was vacated in Schwab, see 883 F.3d at 96-98.

[83] We dismissed the state law fraud claims because "plaintiffs who used LIBOR-based pricing to decide whether to invest in LIBOR-based instruments" were relying on the "fraud on the market" doctrine that was rejected under California law. LIBOR IV, 2014 WL 6243526, at *65. The Circuit found that, because Schwab's allegations went "beyond the bare assertion that Defendants' fraudulent LIBOR submissions were embedded in the price of fixed-rate instruments," we erred in finding that Schwab was relying on that doctrine. Schwab, 883 F.3d at 91. The Circuit, however, affirmed our dismissal because defendants had no reason to expect that Schwab would consider LIBOR in deciding whether to buy fixed-rate notes, which did not reference LIBOR at all. Id. at 91-92; see also supra Part II.

[84] The parties disagree as to: (1) whether Schwab asserted unjust enrichment claims based on fixed-rate notes in the first amended complaint; and (2) whether defendants waived their right to dismiss the claims under Rule 12(b)(6) by not raising the argument in their initial motion to dismiss. Since Schwab alleged that it purchased both fixed-rate and floating-rate instruments, see Schwab's Amend. Compl., ECF No. 672, ¶¶ 5, 12, 270, and did not specify which instruments served as the basis for its unjust enrichment claims, we draw a reasonable inference in Schwab's favor and conclude that Schwab asserted unjust enrichment claims based on both fixed-rate and floating-rate notes. We also conclude that defendants did not waive their right to challenge Schwab's fixed-rate unjust enrichment claims. See Fed. R. Civ. P. 12(h) (2).

**\*30** Under California law, the legal elements of unjust enrichment are "receipt of a benefit and unjust retention of the benefit at the expense of another." Lectrodryer v. SeoulBank, 77 Cal. App. 4th 723, 726 (2000); see also First Nationwide Sav. v. Perry, 11 Cal. App. 4th 1657, 1662 (1992). "The term 'benefit' denotes any form of advantage." F.D.I.C. v. Dintino, 167 Cal. App. 4th 333, 346 (2008) (internal quotation marks omitted). The equitable remedy of restitution "is designed to restore the aggrieved party to his or her former position by return of the [benefit] or its equivalent in money." Id. (citation omitted).

WCAS053

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 59 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

Schwab conclusorily asserts that defendants who issued fixed-rate notes were unjustly enriched because the LIBOR suppression "caused Schwab to receive lower returns on those notes in exchange for the use of its money than if the suppression had not occurred." Schwab SAC ¶ 208. See also id. ¶ 139 ("[T]o the extent LIBOR was suppressed during the Relevant Period, the yield received on [fixed-rate notes] would have been correspondingly lower."). In making this claim, Schwab fails to understand that a yield rate on a bond is calculated based on its price and interest rate. The price fluctuates based on macroeconomic conditions and, unless defendants had a magical, unilateral power to control the world economy, they could not have manipulated the yield rates on fixed-rate notes and received monetary benefits. Furthermore, as the Second Circuit found, Schwab "received exactly what it expected" when it purchased fixed-rate notes. Schwab, 883 F.3d at 96.

Schwab also asserts that suppressed LIBOR rates allowed the issuing defendants to "offer less interest in return for the use of Schwab's money." Schwab SAC ¶ 208. But there is no allegation that defendants either took LIBOR into consideration when setting interest rates on fixed-rate notes or suppressed LIBOR in order to set low interest rates on the notes. In fact, Schwab cannot link defendants' alleged profits from issuing fixed-rate notes to LIBOR manipulation because fixed-rate notes do not "reference or relate to Defendants' LIBOR submissions in any way." Schwab, 883 F.3d at 96. In other words, there is no causal connection between LIBOR manipulation and the profits that defendants allegedly reaped from Schwab. [85] Schwab even admits that using LIBOR as a reference point "to evaluate [the] credit and market risks" of investments was an independent decision made by investors; issuers do not quote fixed-rate instruments in terms of LIBOR. Schwab SAC ¶ 139-40. Following Schwab's line of reasoning, anyone who decided to use LIBOR as a benchmark in comparing investment options – which would include virtually all investors in the world, since "LIBOR is a component or benchmark used in countless business dealings," Gelboim, 823 F.3d at 765 – would be able to bring suit against defendants. See Schwab, 883 F.3d at 92.

[85]   Schwab argues that, under California law, pleading unjust enrichment "at most requires alleging but-for caus[ation]." Schwab Br., at 47 (citing Uzyel v. Kadisha, 188 Cal. App. 4th 866, 892 (2010)). This is a gross misinterpretation of the Uzyel decision. The plaintiff in Uzyel brought a breach of trust suit against a trustee seeking a disgorgement of profits made through the alleged breach. The court found that the plaintiffs did not need to trace the misappropriated funds in the trust to the profit that the trustee gained by using the funds. Rather, the plaintiff could prevail on an unjust enrichment claim if the plaintiff could "establish a sufficient causal relationship" between the wrongful conduct and the defendant's profits." Uzyel, 188 Cal. App. 4th at 892. The court did not hold that alleging but-for causation was sufficient to plead a plausible unjust enrichment claim.

*31  In sum, as Schwab fails to plausibly allege that Fixed-Rate Issuer defendants were unjustly enriched, we dismiss Schwab's unjust enrichment claims based on fixed-rate notes.

### 3.5. Tortious Interference Claims

Schwab previously asserted claims for tortious interference with prospective economic advantage, which we dismissed for lack of personal jurisdiction in LIBOR IV. Schwab now brings new tortious interference claims, this time on the ground that certain Panel Bank defendants [86] interfered with Schwab's contracts with the defendants' affiliated entities. Defendants argue that these new claims are both time-barred and meritless.

[86]   Schwab asserts these claims against Panel Bank defendants Bank of Tokyo Mitsubishi UFJ, Ltd., Citibank, N.A., HSBC Bank plc, JPMorgan Chase Bank, N.A., and The Royal Bank of Scotland plc.

Federal Rule of Civil Procedure 15(c)(1)(B) permits an amendment to a complaint to relate back to the original pleading if "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). As we have explained, "a viable tortious interference claim alleges that a panel bank entity intended to disrupt a specific contract." LIBOR IV, 2015 WL 6243526, at *148. Yet Schwab made no allegations in its original and first amended complaints related to this unique factual predicate. In fact, it failed to specify any contract with which defendants allegedly interfered. Rather, Schwab alleged that Panel Bank defendants' manipulation of LIBOR interfered with an economic relationship between Schwab and unspecified "issuers and sellers of LIBOR-based financial instruments" "by defeating the parties' expectations that LIBOR would be set honestly and accurately and would provide a fair

WCAS054

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 60 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

benchmark for [ ] LIBOR-based financial instruments." April 2013 Compl. ¶¶ 346-47; Schwab's Amend. Compl. ¶¶ 336-37. Even though both sets of claims concern the same underlying event (defendants' alleged manipulation of LIBOR) and ultimate result (Schwab's financial loss from receiving lower payments or overpaying for financial instruments), Schwab's new claims are based on a distinct set of contracts that were not specified or referenced in the original complaint. See Nettis v. Levitt, 241 F.3d 186, 193 (2d Cir. 2001) (holding that the plaintiff's new claim did not relate back to his original complaint because the new claim, while stemming from the same event as the original claims, was based on "an entirely distinct set" of facts), overruled on other grounds by Slayton v. Am. Exp. Co., 460 F.3d 215 (2d Cir. 2006). Therefore, we find that the new claims do not relate back to its original complaint under Rule 15. Accordingly, they are untimely.

Even if we assume arguendo that Schwab's new claims relate back, they fail on the merits in any event. Under California law, Schwab must plead: "(1) a valid contract between [Schwab] and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." Pac. Gas & Elec. Co. v. Bear Stearns & Co., 791 P.2d 587, 589-90 (Cal. 1990) (en banc). In LIBOR IV, we allowed tortious interference claims to proceed as to bonds issued by corporate affiliates because it was "plausible that corporate affiliates are aware of each other's financing arrangements." [87] 2015 WL 6243526, at *84. Relying on that decision, Schwab conclusorily alleges without any factual specificity that the Panel Bank defendants "acted with the knowledge" that interference with Schwab's contractual relationships was "certain or substantially certain to result from" the manipulation of LIBOR. Schwab SAC ¶ 512-13. However, even assuming (without deciding) that such an allegation suffices to plead the "knowledge" element of a tortious interference claim, LIBOR IV predates the Second Circuit's decisions in Schwab, in which the Circuit determined that "the conspiracy to manipulate LIBOR had nothing to do with" LIBOR-based financial transactions. 883 F.3d at 87. If the object of the pled conspiracy had nothing to do with LIBOR-based financial transactions, it is not plausible that the Panel Bank defendants' manipulation of LIBOR was an intentional act designed to induce their affiliates to breach or disrupt their contracts with Schwab. Because Schwab fails to plausibly allege at least one required element, we dismiss its new claims of tortious interference with contracts in their entirety. [88]

[87] In addition, we held that plaintiffs "must ultimately prove that the issuing entity breached the implied covenant by assisting in the panel entity's LIBOR manipulation." LIBOR IV, 2015 WL 6243526, at *84.

[88] Even if Schwab's new tortious interference claims were timely and meritorious, we would not exercise pendent jurisdiction over them because Schwab asserts the claims against Non-Counterparty defendants based on their allegedly false LIBOR submissions in London. See supra Part IV.2.3.

### 4. Motion to Dismiss Doral's Claims for Lack of Personal Jurisdiction

*32 In Part III of this Memorandum and Order, we considered and mostly rejected the FDIC's proposed amendments related to personal jurisdiction, which are substantially similar to Doral's jurisdictional allegations. We do not repeat our rulings from Part III, though they apply here with equal force. [89] We do, however, address two jurisdictional issues that are specific to Doral's claims concerning swap transactions.

[89] We explicitly state that Doral's claims against Non-Counterparty defendants based on conspiracy jurisdiction are dismissed for lack of jurisdiction.

First, defendants argue that personal jurisdiction cannot be premised on Doral's swap transactions that occurred before the alleged LIBOR manipulation period. Defs.' Joint MTD PJ Reply, at 15 n.16. Since Doral does not explain how defendants can be held liable for transactions that were not induced by their allegedly fraudulent omissions, we reject its attempt to establish personal jurisdiction over defendants for claims based on swap transactions that occurred before the relevant time period.

Second, defendants challenge Doral's reliance on forum selection clauses in its swap agreements that submit parties "to the jurisdiction of the Courts of the State of New York," reasoning that such clauses do not include federal courts located in New York. See Beach v. Citigroup Alternative Investments LLC, No. 12-cv-7717 (PKC), 2014 WL 904650, at *8 (S.D.N.Y. Mar. 7, 2014) ("[A] majority of courts have held that 'the courts of' a state refers only to state courts, and not to state and federal courts."). Doral argues that Beach

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 61 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

is inapposite because the forum selection clause at issue in Beach vested "exclusive" jurisdiction in the courts of the state, whereas the clauses at issue here do not require such exclusivity. Pls.' Joint PJ Br., at 5 n.5. However, the Beach court's analysis does not in any way turn on the issue of exclusivity. Rather, the court only considered the clause's use of the word "of," rather than "in." Beach, 2014 WL 904650, at *8 ("The word 'of' denotes the source of a court's authority and is more than its mere location. The courts 'of' a state are courts whose authority derive[s] from that state's power."). Therefore, we agree with defendants and reject Doral's reliance on the forum selection clauses to establish jurisdiction in this forum.

### 5. Motion to Dismiss Doral's Claims for Failure to State a Claim

Doral asserts federal antitrust claims as well as numerous state law claims. Many of Doral's state law claims [90] are identical to the FDIC's claims that, as Doral acknowledges, were previously dismissed by this Court. [91] Therefore, we consider only the claims that Doral addresses in response to defendants' motion to dismiss for failure to state a claim.

[90]
The claims include: fraud and negligent misrepresentation claims (and related aiding and abetting and civil conspiracy claims) based on allegedly false statements about LIBOR; fraud by omission claims against Non-Counterparty defendants; tortious interference with contract claims (and related aiding and abetting and civil conspiracy claims) that exceed the scope permitted under LIBOR IV, 2015 WL 6243526, at *84; tortious interference with prospective economic advantage claims (and related aiding and abetting and civil conspiracy claims); and a breach of the implied covenant of good faith and fair dealing claim against Credit Suisse International.

[91]
At oral argument, the FDIC conceded that its proposed second amended complaint, which incorporates Doral's complaint, includes claims that have previously been dismissed by this Court for the sole purpose of preserving them for appeal. Tr. 34:16-25. Furthermore, the FDIC confirmed that it was not asserting the claims anew by adding Doral as one of the plaintiffs in its consolidated complaint.

### 5.1. Fraud, Tortious Interference, and Negligent Misrepresentation Claims

**\*33** Defendants move to dismiss Doral's fraud, tortious interference, and negligent misrepresentation claims as untimely in whole or in part. See Defs.' Joint MTD Br., at 22. Specifically, defendants argue that Doral's negligent misrepresentation claim is fully time-barred, while its fraud, tortious interference, and related aiding and abetting claims are time-barred insofar as they accrued on or before February 26, 2009.

The parties' dispute centers on the proper accrual date for Doral's claims. [92] Relying on LIBOR V, in which we considered the timeliness of the claims asserted by the Government Development Bank for Puerto Rico (GDB), defendants argue that Doral, like GDB, was on inquiry notice of its state law claims no later than May 29, 2008. See Defs.' Joint MTD Br., at 23-26. Thus, Doral's claims accrued on May 29, 2008, and the one-year limitations period expired on May 29, 2009. See Defs.' Joint MTD Reply, at 21-22. Doral claims that, since this Court found Puerto Rico to be a "weak inquiry notice" jurisdiction in which it would have taken one year for "a sophisticated investor to discover that he had been injured by the panel banks' LIBOR suppression," LIBOR IV, 2015 WL 6243526, at *135, Doral's claims did not accrue until May 29, 2009, and the one-year limitations period did not expire until May 29, 2010. See Pls.' Joint Non-PJ Br., at 12.

[92]
The parties agree that Puerto Rico's one-year statute of limitations applies to Doral's tort claims. See Pls.' Joint Non-PJ Br., at 12 (applying Puerto Rico's one-year statute of limitations); Defs.' Joint MTD Br., at 23 (same); see also Rodriguez-Suris, 123 F.3d at 13 ("The Puerto Rico statute of limitations for tort actions provides for a one-year limitation period that begins to run from 'the time the aggrieved person has knowledge of the injury.' " (quoting 31 P.R. Laws Ann. tit. 31, § 5298)¢). The one-year statute of limitations also applies to Doral's aiding and abetting claims because the claims are "actions to demand civil liability." See id. In addition, as defendants correctly point out, Doral's implied covenant of good faith and fair dealing and unjust enrichment claims are subject to the one-year statute of limitations applicable to tort claims because the claims are not based on

WCAS056

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 62 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

an alleged breach of an obligation that was agreed upon between Doral and defendants. See Ramos Lozada v. Orientalist Rattan Furniture Inc., No. RE-88-67, 1992 WL 755597, at *10-11 (P.R. June 15, 1992).

Doral's premise that we found Puerto Rico to be a "weak inquiry notice" jurisdiction is simply incorrect. Rather, in LIBOR IV, we simply assumed (without deciding) "in the absence of specific contrary briefing on the discovery rules of each bank's home state ... that each of the remaining jurisdictions [including Puerto Rico] would also apply the plaintiff-friendly 'weak inquiry notice' rule." 2015 WL 6243526, at *167. We made the same assumption in LIBOR V because GDB's claims were time-barred even under the "weak inquiry notice" rule. 2015 WL 6696407, at *12. However, after reviewing applicable precedents, we now find that Puerto Rico has a "strong inquiry notice" rule, under which the statute of limitations begins to run on the inquiry notice date. See, e.g., Arturet-Velez v. R.J. Reynolds Tobacco Co., 429 F.3d 10, 14 (1st Cir. 2005) (holding that, under Puerto Rico law, the running of the one-year statute of limitations for tort actions "does not require actual knowledge; it is enough that the would-be plaintiff had notice that would have led a reasonable person to investigate and so uncover the needed information"); see also Rodriguez-Suris, 123 F.3d at 16.[93]

[93]   The one-year statute of limitations may be tolled by: "(1) judicial proceedings, (2) extra-judicial claims, and (3) acknowledgment of the debt by the person liable." Bryan v. Wal-Mart Puerto Rico, Inc., 951 F. Supp. 2d 236, 240 (D.P.R. 2013). However, "tolling acts must be interpreted restrictively against the party invoking their protection." Rodriguez Narvaez v. Nazario, 895 F.2d 38, 45 (1st Cir. 1990).

*34  In addition to making an erroneous argument that Puerto Rico is a "weak inquiry notice" jurisdiction, Doral asserts that it was not on inquiry notice until October 2011, the proposed extended date of the alleged conspiracy's termination based on the 2017 Société Générale regulatory disclosures. Apart from our rejection of FFP plaintiffs' attempt to expand the time period of the alleged conspiracy based on the same regulatory disclosures, see supra Part III.3.3, we do not see any connection between inquiry notice and the length of the alleged conspiracy. Thus, we see no reason to change our LIBOR V ruling that financial institutions holding LIBOR-based instruments in Puerto Rico, such as Doral, were on inquiry notice by May 29, 2008, because they had "every

reason to follow news about LIBOR." 2015 WL 6696407, at *12. Accordingly, any claim that is based on defendants' conduct on or before May 29, 2008, expired on May 29, 2009.

Since Doral's claims are brought by the FDIC, they implicate the FDIC's extender statute, 12 U.S.C. § 1821(d)(14) (2013), which contains a provision that revives any tort claim[94] for which the limitations period expired within five years of the FDIC's appointment. See 2015 WL 6243526, at *121. Therefore, Doral's fraud, tortious interference, and related aiding and abetting claims are revived to the extent that the limitations period expired within five years of February 27, 2015, the date that the FDIC was appointed as receiver. See Doral Compl. ¶ 15. Applying the one-year statute of limitations for fraud claims, we find that any fraud or tortious interference claim based on defendants' conduct on or before February 26, 2009 are time-barred.[95] Since the provision does not apply to negligent misrepresentation claims, see LIBOR IV, 2015 WL 6243526, at *121, and Doral alleges misconduct occurring from August 2007 to May 2010, Doral's negligent misrepresentation claim should have been brought by May 2011 at the latest and is thus fully time-barred.

[94]   The provision defines a tort claim as "a claim arising from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the institution." 12 U.S.C § 1821(d)(14)(C)(ii).

[95]   Thus, Doral's claims based on defendants' conduct on or before the inquiry notice date cannot be revived because they expired on May 29, 2009, which is before February 27, 2010.

### 5.2. Donnelly Act Claim

Although Doral has no presence in New York, it asserts a state antitrust claim[96] against defendants under the Donnelly Act, which prohibits agreements for monopoly or in restraint of trade "in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y. Gen. Bus. Law § 340(1).

[96]   Doral asserts that we upheld the FDIC's Donnelly claims in LIBOR VI. See Pls.' Joint Non-PJ Br., at 18. Doral's reading of LIBOR VI is deeply flawed. We found that the same analytical framework could

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 63 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

be used to assess both Sherman Act and Donnelly Act claims, see LIBOR VI, 2016 WL 7378980, at *24, but we never considered the merits of the FDIC's Donnelly claims. As a matter of fact, we found that defendants had "properly preserved their request to move for dismissal on other bases," which we now consider. Id. at *1.

Defendants argue that we should dismiss the claim based on federal preemption grounds. The New York Court of Appeals has not specifically determined when the Sherman Act preempts the Donnelly Act. See Conergy AG v. MEMC Elec. Materials, Inc., 651 F. Supp. 2d 51, 58 (S.D.N.Y. 2009). But lower courts in New York have found that "[w]here the conduct complained of principally affects interstate commerce, with little or no impact on local or intrastate commerce, it is clear that Federal antitrust laws operate to preempt the field." Two Queens, Inc. v. Scoza, 745 N.Y.S.2d 517, 519 (1st Dep't 2002). And federal courts have similarly recognized that a viable Donnelly Act claim requires "an impact on intrastate commerce so as to avoid a dormant Commerce Clause issue." In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 416 (S.D.N.Y. 2011).

 *35 Doral argues that its complaint is "replete with (presumptively true) allegations that show [a] sufficient impact on local or intrastate commerce." Pls.' Joint Non-PJ Br., at 19. However, none of Doral's allegations makes the requisite showing. The allegations of defendants' transactions of LIBOR-based instruments, transmission of individual LIBOR submissions, and acts of concealment have nothing to do with the pled conspiracy. See supra Part III.2.4. Nor do the allegations that defendants owned property in New York and acceded to New York choice of law and forum selection clauses lend any support to Doral's argument. See, e.g., H-Quotient, Inc. v. Knight Trading Grp., Inc., No. 03-cv-5889 (DAB), 2005 WL 323750, at *5 (S.D.N.Y. Feb. 9, 2005) (holding that plaintiffs' allegation that defendants' principal places of business were in New York was not sufficient to establish an impact on intrastate commerce); Conergy, 651 F. Supp. 2d at 61 (holding that choice of law and forum selection clauses do not demonstrate an impact on intrastate commerce).

Since Doral fails to plausibly allege that defendants' conduct had a sufficient impact on New York commerce, we dismiss its Donnelly Act claim.

**5.3. Sherman Act Claims**

Defendants move to dismiss Doral's Sherman Act claims that are based on: (1) transactions with non-defendant third parties as Counterparties; (2) transactions with Panel Bank defendants' subsidiaries and affiliates (i.e., instruments issued by the subsidiaries and affiliates); and (3) transactions in which Doral purchased instruments issued by Panel Bank defendants and sold by their subsidiaries and affiliates. Based on our LIBOR VI decision, we dismiss Doral's claims based on transactions with non-defendant third parties. Furthermore, as discussed in Part V, we dismiss antitrust claims based on instruments issued by Panel Banks' subsidiaries and affiliates, and we circumscribe claims based on instruments issued by Panel Bank defendants and sold by their subsidiaries and affiliates.

**V. Defendants' Motion for Judgment on the Pleadings**

Bank of America, N.A. and JPMorgan Chase Bank, N.A. - the only remaining Panel Bank defendants in OTC plaintiffs' antitrust claims after our LIBOR VII decision [97] - move for partial judgment on the pleadings under the Federal Rule of Civil Procedure 12(c) as to OTC plaintiffs' claims that are based on transactions with Panel Banks' subsidiaries or affiliates.

[97]     In LIBOR VI, we granted defendants' motion to dismiss certain defendants for lack of personal jurisdiction as to antitrust claims. The only remaining defendants after LIBOR VI with respect to OTC plaintiffs' antitrust claims were: Bank of America Corp.; Bank of America, N.A.; Citigroup, Inc.; Citibank, N.A.; JPMorgan Chase & Co.; and JPMorgan Chase Bank, N.A. See 2016 WL 7378980, at app. In LIBOR VII, we certified a class limited to OTC plaintiffs' antitrust claims against Bank of America, JPMorgan Chase, and their parent entities because Citibank, N.A. and Citigroup, Inc. had reached a settlement with OTC plaintiffs. See 299 F. Supp. 3d at 582, 607. After LIBOR VII, Bank of America and JPMorgan Chase filed a motion for leave to appeal under Rule 23(f), which the Second Circuit denied. See In re LIBOR-Based Fin. Instruments Antitrust Litig., No. 18-728, Doc. No. 84 (2d Cir. Nov. 6, 2018).

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 64 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

In LIBOR VI, we employed, consistent with Gelboim, the four-factor analysis outlined by the Supreme Court in Associated General Contractors of California, Inc. v. California State Council of Carpenters ("AGC"), 459 U.S. 519, 540–45 (1983), for determining whether a plaintiff has antitrust standing. [98] After conducting a highly fact-specific inquiry, we drew "a line between plaintiffs who transacted directly with defendants and those who did not," LIBOR VI, 2016 WL 7378980, at *16, and found that plaintiffs who transacted with third party banks did not satisfy the first factor ("directness or indirectness of the asserted injury") of the AGC analysis. We reasoned that defendants could not be held liable for an independent decision by a plaintiff and a third party to incorporate LIBOR into financial transactions because the decision "breaks the chain of causation between defendants' actions and a plaintiff's injury." Id.

[98]   "The four efficient enforcer factors are: (1) the directness or indirectness of the asserted injury, which requires evaluation of the chain of causation linking appellants' asserted injury and the Banks' alleged price-fixing; (2) the existence of more direct victims of the alleged conspiracy; (3) the extent to which appellants' damages claim is highly speculative; and (4) the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other." Gelboim, 823 F.3d at 778 (citation and internal quotation marks omitted).

**\*36** However, LIBOR VI did not resolve the question of whether a plaintiff "who transacted with a subsidiary or affiliate of a panel bank" could be considered as an efficient enforcer. Id. at *16 n.25. We reserved our ruling on that question and instructed the parties to consider it "at the class certification stage." Id. Instead of addressing the issue in their class certification briefing in LIBOR VII, moving defendants waited until now to move for dismissal of OTC plaintiffs' claims concerning transactions with defendants' subsidiaries or affiliates. Specifically, moving defendants now assert that OTC plaintiffs lack antitrust standing to bring claims that are based on: 1) instruments issued and sold only by Panel Banks' subsidiaries or affiliates; 2) instruments issued by Panel Banks' subsidiaries or affiliates but sold by Panel Banks; and 3) instruments issued by Panel Banks but sold by their affiliates or subsidiaries.

We grant moving defendants' motion as to the first two of these groups of claims. While we deny the motion as to the third group of claims, those claims are circumscribed as set forth below. In considering the motion, we focus primarily on the first factor of the AGC test – directness of the asserted injury - because our analysis of the other three other factors would be substantially the same as it was in LIBOR VI. [99]

[99]   We found that none of the other three AGC factors militated in favor of dismissing OTC plaintiffs' claims in LIBOR VI. See 2016 WL 7378980, at *17-20, *23.

**1. General Legal Standard for Judgment on Pleadings**

A motion under Rule 12(c) is subject to the same standard that applies to a motion under Rule 12(b)(6). See Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006). Under that standard, a court "must accept as true the complaint's factual allegations and draw all inferences in favor of the non-movant. A complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Id. (citations and internal quotation marks omitted).

We must also generally confine ourselves to the four corners of the complaint and look only to the allegations contained therein. See, e.g., Williams v. City of New York, No. 10-cv-9594 (CM)(DCF), 2012 WL 547508, at *2 (S.D.N.Y. Feb. 17, 2012). "[W]hen matters outside the pleadings are presented in response to a 12(b)(6) motion," a district court must either "exclude the additional material and decide the motion on the complaint alone" or "convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." Fonte v. Board of Managers of Continental Towers Condominium, 848 F.2d 24, 25 (2d Cir. 1988). This conversion requirement is strictly enforced. See Amaker v. Weiner, 179 F.3d 48, 50 (2d Cir. 1999).

**2. Instruments Issued by Panel Bank Defendants' Subsidiaries/Affiliates**

Moving defendants argue that OTC plaintiffs lack standing to bring claims based on instruments issued by Panel Banks' subsidiaries or affiliates [100] because there is no plausible allegation that the issuing entities "played a role in [the] alleged suppression of LIBOR." LIBOR VI, 2016 WL 7378980, at *10 (quoting Mem. & Order, 2016 WL 1733463, at *3 (S.D.N.Y. Apr. 29, 2016), ECF No. 1396). According to defendants, since the subsidiaries or affiliates did not participate in the alleged manipulation of LIBOR,

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 65 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

their independent decisions to incorporate LIBOR into financial instruments break "the chain of causation between defendants' actions and a plaintiff's injury." Id. at *16. We agree.

100    Based on defendants' definitions, these instruments could have been sold by: (1) the issuing entity; (2) another subsidiary or affiliate that is related to the issuing entity; or (3) the Panel Bank that is related to the issuing entity. See Mem. of Law in Supp. of Defs.' Mot. for Partial J. on Pleadings ("Defs.' OTC Br."), ECF No. 2621, at 2, 4.

**\*37** OTC plaintiffs' attempt to rebut defendants' argument by conclusorily alleging that "every panel bank belonged to an integrated global enterprise that actively managed its interest rate risk, including LIBOR" is unavailing. OTC Pls.' Mem. of Law in Opp. to Defs.' Mot. for Judgment on Pleadings ("Pls.' OTC Br."), ECF No. 2669, at 3. They rely on annual reports published by Panel Banks' parent entities and argue that "the treasury or asset and liability management functions of the main bank" worked with different affiliated entities to "coordinate LIBOR submissions" and ensure that "customer-facing business segments did not sell (or even offer) financial instruments with interest rates above that of the bank's LIBOR submissions." Id. at 3-4. As these exhibits were neither attached to nor incorporated into plaintiffs' complaint, we need not consider them in deciding the instant motion. [101] In any event, the exhibits do not demonstrate that Panel Banks directed their subsidiaries or affiliates to use LIBOR in their issuance of financial instruments.

101    OTC plaintiffs submitted more than 140 extrinsic exhibits in support of their opposition to moving defendants' motion. See ECF Nos. 2684, 2685, 2686.

Plaintiffs try to overcome their pleading deficiencies by advancing the "single enterprise" theory adopted by the Supreme Court in Copperweld Corp. v. Independent Tube Corp., 467 U.S. 752 (1984). In Copperweld, the Supreme Court considered whether a wholly owned subsidiary is capable of conspiring with its parent company for purposes of violating § 1 of the Sherman Act. Since "[a] parent and its wholly owned subsidiary have a complete unity of interest," the Court held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise." Id. at 771 (emphasis added). Thus, the Court reasoned, a parent company and its wholly owned subsidiary

"are incapable of conspiring with each other for purposes of § 1 of the Sherman Act." [102] Id. at 777.

102    Although Copperweld addressed the relationship between a parent company and its wholly owned subsidiary, "[l]ower courts have since applied Copperweld's reasoning ... to a broader variety of economic relationships." Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc., 407 F.3d 1027, 1034 (9th Cir. 2005).

The Ninth Circuit recently adopted a corollary of the "single enterprise" theory in Arandell Corp. v. Centerpoint Energy Services, Inc., 900 F.3d 623 (9th Cir. 2018). In Arandell, the Ninth Circuit considered a case in which a natural gas company and other natural gas conglomerates conspired to fix retail natural gas prices. Id. at 628. The company's subsidiaries allegedly actively engaged in "coordinated price-fixing efforts" to further the company's price-fixing scheme. The court held that, since a parent company and its subsidiary "always have a 'unity of purpose' and act as a 'single entity' whenever they engage in 'coordinated activity,' " the subsidiaries were "deemed to have shared the intent of" their parent company because "it is legally impossible for firms with a single 'economic unit' to act together in furtherance of the same [conspiracy] for independent and distinct purposes." Id. at 630-31; see also Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 847 F.3d 1221, 1236-39 (10th Cir. 2017).

Applying the rationale from Copperweld and Arandell, OTC plaintiffs argue that they have standing to assert antitrust claims against Panel Bank defendants because a Panel Bank and its subsidiaries and affiliates are part of a "single enterprise" that participated in the alleged conspiracy to manipulate LIBOR. Pls. OTC Br., at 7. Panel Banks' subsidiaries and affiliates are "guilty of selling price-fixed instruments to the OTC Class while sharing their profits with the price-fixing panel bank," and since a Panel Bank and its affiliated entities can be deemed to have shared the anticompetitive intent, Panel Banks are "directly responsible for price-fixed products sold by their subsidiaries and affiliates." See id.

**\*38** What is missing from OTC plaintiffs' argument, however, is an allegation of any "coordinated activity" between a Panel Bank and its subsidiaries and affiliates. Under Copperweld, only a "coordinated activity" of related entities can be viewed as that of a single enterprise. See, e.g., Mitchael v. Intracorp, Inc., 179 F.3d 847, 857 (10th

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 66 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

Cir. 1999) (finding that the Supreme Court held "only that 'the underlined activity' of a parent and subsidiary must be viewed as that of a single enterprise for § 1 purposes") (emphasis in original). This understanding is further supported by the cases on which OTC plaintiffs themselves rely. See Arandell, 900 F.3d at 632 (holding that, based on plaintiffs' specific factual allegations [103] of "coordinated activity" between a parent company and its subsidiary, the subsidiary "had an anticompetitive purpose" that could give rise to antitrust liability "with or without an additional finding of knowledge" (citations omitted)); Lenox MacLaren, 847 F.3d at 1237 (holding that, in order to apply the "single enterprise" theory, a plaintiff must "come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise"). [104]

[103]    Plaintiffs alleged that each subsidiary entity "played a necessary role" in the price-fixing scheme by inflating "retail natural gas prices through manipulative trading," selling gas at inflated prices to its sister subsidiary entity, reselling the gas at inflated prices to other businesses, and "funnel[ing] the revenues from these sales" to the parent company. Arandell, 900 F.3d at 628. Plaintiffs also alleged that the parent company's officers and directors orchestrated the scheme, directing the subsidiaries "to manipulate retail prices" and "to send its illegal profits" to the parent company. Id.

[104]    We recognize that the antitrust claims in Arandell and Lenox MacLaren were dismissed at the summary judgment stage. However, applying the legal standards applicable to a Rule 12(c) motion, we find here that OTC plaintiffs have not plausibly alleged any coordinated activity between Panel Bank defendants and their subsidiaries and affiliates. Furthermore, unlike most litigations at the motion to dismiss stage, OTC plaintiffs have received access to a considerable amount of discovery materials, including "disclosures previously made to governmental authorities." Jun. 17, 2016 Order, ECF No. 1461. Specifically, OTC counsel acknowledges that they reviewed "more than 1.5 million documents produced by the defendants and third parties" during the course of spending "over 52,000 hours prosecuting this

case." OTC Pls. Mem. Law in Supp. of Mot. Atty. Fees, ECF No. 2705, at 14.

At oral argument, OTC plaintiffs argued that the sale of instruments by the subsidiaries and affiliates constitutes such "coordinated activity." Tr. 47:15 – 48:14. This argument might make sense if the conspiracy were based on profit motives. But as the Second Circuit held in Schwab, the pled conspiracy "had nothing to do with" the sale of LIBOR-based instruments. 883 F.3d at 87. The independent decision of Panel Banks' subsidiaries and affiliates to sell LIBOR-based financial instruments did not further the plausibly pled conspiracy, the main objective of which was achieved when Panel Banks submitted allegedly suppressed LIBOR submissions. [105] Given that OTC plaintiffs' complaint does not contain any factual allegations that give rise to the inference that Panel Banks' subsidiaries and affiliates "independently participated in" the alleged manipulation of LIBOR manipulation, Lenox MacLaren, 847 F.3d at 1237, or actually "played a role in" the scheme, LIBOR VI, 2016 WL 7378980, at *10, we find that OTC plaintiffs lack antitrust standing to bring claims based on instruments issued by Panel Banks' subsidiaries or affiliates.

[105]    The universality of the use of LIBOR also undermines the significance of its use as evidence of "coordinated activity."

### 3. Instruments Issued by Panel Banks but Sold by Their Related or Unrelated Subsidiaries/Affiliates

**\*39**  Moving defendants assert that OTC plaintiffs are barred from asserting claims based on instruments issued by a Panel Bank but sold by its subsidiaries or affiliates under the "direct purchaser" rule of Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).

Under Illinois Brick, a "direct purchaser" is a plaintiff who purchased an allegedly price-fixed product directly from an alleged co-conspirator defendant. See id. at 728-29. The Supreme Court laid the groundwork for the "direct purchaser" rule in Hanover Shoe, Inc. v. United Shoe Machinery Corp., 392 U.S. 481 (1968), in which the defendant, a manufacturer of shoe-making machinery, was accused of driving up the price of the machinery. The defendant argued that the plaintiff, a shoe seller that leased the defendant's machines, had not suffered any injury from these inflated prices because the plaintiff had passed the overcharge on to its own customers by selling its shoes at higher prices. The Supreme Court "rejected as a matter of law this defense

WCAS061

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 67 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

that indirect rather than direct purchasers were the parties injured by the antitrust violation." Illinois Brick, 431 U.S. at 724 (summarizing the holding in Hanover Shoe). The Court reasoned that adopting such a theory as a viable defense against an antitrust suit would force courts to consider a wide range of market-based factors that could potentially influence a company's pricing policies. Id. at 492-93.

While the defendants in Hanover Shoe fashioned this "pass-on" theory as a shield to defend against antitrust suits, the plaintiffs in Illinois Brick sought to use it as a sword, arguing that they had antitrust standing to sue concrete block manufacturers and distributers who allegedly conspired to fix the price of concrete block even though they had not purchased the block directly from the alleged price-fixers. See 431 U.S. at 726-27. The Court held that, since a defendant in an antitrust lawsuit could not use the "pass-on" theory to claim that a direct purchaser suffered no loss or injury, an indirect-purchaser plaintiff could not use the same theory to claim damages for an overcharge that was allegedly passed on from the defendant, through intermediaries, to the plaintiff. Id. at 730. According to the Court, the "evidentiary complexities and uncertainties" discussed in Hanover Shoe would be multiplied if a plaintiff who is "several steps removed from the defendant in the chain of distribution" could claim an injury for an overcharge allegedly caused by that defendant. Id. at 732.

While the Court in Illinois Brick held that indirect purchasers generally do not have antitrust standing, it suggested in a footnote an exception to that rule whereby indirect purchasers who "owned or controlled" the direct purchaser may be permitted to sue. 431 U.S. at 736 n.16. This "ownership or control" exception "is now firmly established and has been expanded to include instances where the defendant owns or controls the intermediary that sold the goods to the indirect-purchaser plaintiff." In re Vitamin C Antitrust Litig., 279 F.R.D. 90, 101 (S.D.N.Y. 2012). Plaintiffs using this exception, however, "may not rely simply on the existence of a parent-subsidiary relationship," Vitamin C, 279 F.R.D. at 102; they must present facts that the relationship between the defendant and the intermediary "involve[s] such functional economic or other unity that there effectively has been only one sale" between the defendant and the intermediary. In re Microsoft Antitrust Litigation, 127 F. Supp. 2d 702, 713 (D. Md. 2001) (alterations omitted) (quoting Jewish Hosp. Ass'n v. Stewart Mech. Enters. Inc., 628 F.2d 971, 975 (6th Cir. 1980)); see also In re NASDAQ Mkt.-Makers Antitrust Litig., 169 F.R.D. 493, 505 (S.D.N.Y. 1996) ("[W]here a particular

industry structure includes a principal-agent relationship between the indirect and direct purchasers such that the two are not distinct economic entities in the purchase chain, the indirect purchaser has antitrust standing under Illinois Brick.").

**\*40** OTC plaintiffs assert that the "direct purchaser" rule is not (as defendants argue) dispositive here because the instruments that OTC plaintiffs purchased are not like the price-fixed goods at issue in Illinois Brick and Hanover Shoe, which raised concerns about "duplicative recovery by upstream and downstream purchases of the same price-fixed good." Pls.' OTC Br., at 8. [106] Rather, OTC plaintiffs purchased securities from which "no two OTC Class members ever received the same suppressed interest payment." [107] Id. Courts in this District recognize the distinction made by OTC plaintiffs. For example, in cases addressing securities transactions involving brokers, plaintiffs have advanced the argument that, "as a matter of law, securities brokers are not distinct economic entities; rather, as statutorily defined, brokers buy or sell 'for the account of others,' not for their own accounts." NASDAQ, 169 F.R.D. at 505 (quoting 15 U.S.C. § 78c). The NASDAQ court held that the viability of this argument "turns on the scope of the brokers' role in relation to the transaction at issue." Id. If the brokers' purchase of a security is "itself the ultimate service provided to the investor," then they "do not constitute a distinct link in the chain of distribution" and investors who transacted with the brokers were thus "direct purchasers" with antitrust standing. Id. at 506.

| 106 | Defendants argue that the same double recovery issue may also exist in transactions in which OTC plaintiffs purchased and resold the instruments during the suppression period. Reply Mem. of Law in Supp. of Defs.' Mot. for Partial Judgment on Pleadings, ECF No. 2703, at 5. This argument fails for two reasons. First, a party that purchased an instrument from an OTC plaintiff would not have antitrust standing because the party would fail to meet the fourth factor of the AGC test. See LIBOR VI, 2016 WL 7378980, at \*23 (finding that, under the fourth factor, "courts are traditionally concerned with the prospect of different groups of plaintiffs attempting to recover for the same exact injury"). Second, a defensive use of the "pass-on" theory was rejected in Hanover Shoe and has no |

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 68 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....
2019 WL 1331830, 2019-1 Trade Cases P 80,717

bearing on the determination of OTC plaintiffs' antitrust standing. See 392 U.S. at 492-93.

107  OTC plaintiffs define the securities at issue to include "an interest rate swap or bond/floating rate note that includes any term, provision, obligation or right for the purchaser or counterparty to be paid interest by a Panel Bank (or a Panel Bank's subsidiaries or affiliates) based upon the 1 month or 3 month U.S. dollar LIBOR rate)." OTC Pls.' Compl., ECF No. 1857, ¶ 44.

In their complaint, OTC plaintiffs do not provide enough information about their transactions to permit us to determine the exact role that Panel Banks' subsidiaries and affiliates played. However, based on this District's precedents, we find that plaintiffs' antitrust standing extends only to claims based on purchases of Panel Bank-issued, LIBOR-based instruments [108] from Panel Banks' subsidiaries and affiliates that effectuated transactions "for the account of others." 15 U.S.C. § 78c. In other words, if the subsidiaries or affiliates played the role of a broker by simply "execut[ing] the purchases and sales requested by" OTC plaintiffs for panel bank issuances, then antitrust standing attaches. NASDAQ, 169 F.R.D. at 506.

108  Presumably, this ruling does not have any impact on the antitrust standing of OTC plaintiffs who purchased interest rate swaps from defendants, since swap agreements are "bespoke" contracts executed directly between two parties.

## VI. Conclusion

The motions for leave to amend brought by Freddie Mac, Principal, the FDIC, and the NCUA are granted in part and denied in part. Lender plaintiffs' motion for leave to amend is denied. Moving plaintiffs are ordered to file their amended complaints in accordance with our rulings in this opinion by April 16, 2019.

Defendants' motion for partial dismissal of Schwab's and Doral's claims is granted in part and denied in part. As agreed upon by the FDIC and defendants, Doral's surviving claims will be incorporated into the amended complaint filed by the FDIC on behalf of the 38 other failed banks.

The motion for partial judgment on OTC plaintiffs' pleadings brought by Bank of America, N.A. and JPMorgan Chase Bank, N.A. is granted in part and denied in part.

*41  This Memorandum and Order resolves the motions listed at docket entries 2544, 2546, 2551, 2552, 2562, 2563, 2620, and 2622.

**SO ORDERED.**

## APPENDIX

This Memorandum and Order resolves the following docket entries in the following cases:

| CASE NAME | CASE NO. | ECF No. |
|---|---|---|
| In re Libor-Based Financial Instruments Antitrust Litigation | 11-md-2262 | 2544 |
|  |  | 2546 |
|  |  | 2551 |
|  |  | 2552 |
|  |  | 2562 |
|  |  | 2563 |
|  |  | 2620 |
|  |  | 2622 |
| Mayor & City Council of Baltimore v. Credit Suisse Group AG | 11-cv-5450 | 432 |

WCAS063

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 69 of 202

In re LIBOR-Based Financial Instruments Antitrust Litigation, Not Reported in Fed....

2019 WL 1331830, 2019-1 Trade Cases P 80,717

| | | |
|---|---|---|
| Berkshire Bank v. Bank of America Corp. | 12-cv-5723 | 327 |
| Federal Home Loan Mortgage Corp. v. Bank of America Corp. | 13-cv-3952 | 293 |
| Principal Financial Group, Inc. v. Bank of America Corp. | 15-cv-9792 | 58 |
| Principal Funds, Inc. v. Bank of America Corp. | 15-cv-9793 | 52 |
| Charles Schwab Corp. v. Bank of America Corp. | 13-cv-7005 | 286 |
| National Credit Union Administration Board v. Credit Suisse Group AG | 13-cv-7394 | 244 |
| Federal Deposit Insurance Co. v. Bank of America Corp. | 14-cv-1757 | 251 |
| Federal Deposit Insurance Co. v. Bank of America, N.A. | 18-cv-1540 | 56 |

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1331830, 2019-1 Trade Cases P 80,717

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WCAS064

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 70 of 202

2020 WL 7260660
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

MASIMO CORPORATION, Plaintiff,

v.

Sotera WIRELESS; Hon Hai Precision
Industry Co., Ltd., Defendants.

Case No. 19-cv-01100-BAS-NLS
|
Signed 12/09/2020
|
Filed 12/10/2020

**Attorneys and Law Firms**

Baraa Kahf, Brian Christopher Claassen, Irfan A. Lateef, Jonathan Bachand, Joseph R. Re, Perry D. Oldham, Stephen C. Jensen, Knobbe Martens, Irvine, CA, for Plaintiff.

Daisy Manning, Pro Hac Vice, Dustin L. Taylor, Pro Hac Vice, Nathan P. Sportel, Pro Hac Vice, Jennifer E. Hoekel, Pro Hac Vice, Rudolph A. Telscher, Jr., Pro Hac Vice, Husch Blackwell, LLP, St. Louis, MO, John Christopher Jaczko, Procopio, Cory, Hargreaves & Savitch, LLP, San Diego, CA, for Defendants.

**ORDER:**

**(1) GRANTING IN PART DEFENDANT HON HAI'S MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT (ECF No. 62);**

**AND**

**(2) TERMINATING AS MOOT PLAINTIFF'S MOTION TO SEAL (ECF No. 66)**

Cynthia Bashant, United States District Judge

**\*1** Plaintiff Masimo Corporation ("Masimo") filed this patent infringement action on June 12, 2019 against Defendants Sotera Wireless, Inc. ("Sotera") and Hon Hai Precision Industry Co. Ltd. ("Hon Hai") (collectively, "Defendants"). [1] (Compl., ECF No. 1.) The Court previously granted Hon Hai's Motion to Dismiss Plaintiff's Complaint

on May 8, 2020. (*See* Order Granting Mot. to Dismiss.) Plaintiff then filed a First Amended Complaint ("FAC") on June 8, 2020. (ECF No. 52.) Hon Hai now brings a Motion to Dismiss Plaintiff's FAC ("Motion") for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). (Mot., ECF No. 62.) The Court finds the Motion suitable for determination without oral argument. *See* CivL.R. 7.1(d)(1). For the reasons stated below, the Court **GRANTS IN PART** Hon Hai's Motion.

[1]    The Court previously noted that the parties did not address the appropriate name by which to identify Defendant Hon Hai. (Order Granting Foxconn's Mot. to Dismiss Pl.'s Compl. ("Order Granting Mot. to Dismiss") at 1 n.1, ECF No. 46.) Hon Hai now states that it should be referred to by this name instead of "Foxconn" because Hon Hai is the parent company of "an assortment of affiliated legal entities" also using Foxconn as an identifier. (Mem. of P. & A. in supp. of Mot. to Dismiss FAC ("Mem. of P. & A.") at 1 n.1, ECF No. 62-1.) Masimo disputes this, claiming that Foxconn and Hon Hai are synonymous. (Opp'n to Mot. to Dismiss ("Opp'n") at 12, ECF No. 68.) To avoid confusion with other corporate entities, the Court will refer to the parent company as "Hon Hai," consistent with the named defendant in the original Complaint and the FAC. This includes modifying Masimo's allegations to refer to "Hon Hai" instead of "Foxconn" where necessary, as Masimo intends the terms to be synonymous. However, the Court's use of this identifier is not a legal conclusion about any of the issues underlying the instant Motion to Dismiss.

**I. BACKGROUND** [2]

[2]    The Court adopts the factual background from its previous order regarding other specifics about the technology at issue in this case and the patents alleged to be infringed. (*See* Order Granting Mot. to Dismiss at 2–4.)

In its FAC, Masimo once again states infringement claims for each of its nine patents related to a noninvasive patient monitoring device called the "ViSi Mobile Monitoring System" ("ViSi Mobile" or "Accused Product") and seeks to hold Han Hai liable directly and as Sotera's parent corporation. (*See generally*, FAC.) The FAC describes ViSi Mobile

as a platform for vital signs monitoring, including pulse oximetry, pulse rate, and respiration rate. The ViSi Mobile Monitoring System includes a ViSi Mobile Monitor, ViSi Mobile Thumb Sensor, ViSi Mobile Cuff Module, ViSi Mobile Chest Module, ViSi Mobile Wrist Strap, ViSi Mobile Wrist Cradle, ViSi Mobile Remote Viewer, and associated computer resources and cloud-based databases.

(*Id.* ¶ 53.) Masimo alleges that Hon Hai "directly or indirectly controlled Sotera's activities" to make, use, offer to sell, and/or sell this system within the United States and is involved in the manufacturing and supply of the components—such as batteries, housings, circuit boards, cables, and sensors—that comprise the system. (*Id.* ¶¶ 54–55.) Plaintiff further claims that Hon Hai collects data from the ViSi Mobile device in the United States and markets the ViSi Mobile Monitoring System as a "smart hospital product" on the U.S.-based website for Foxconn Health Technology Business Group. (*Id.* ¶¶ 56–57.)

**\*2** Specifically, the FAC includes allegations that Hon Hai directly and contributorily infringed the claims of Masimo's patents related to ViSi Mobile and that it is vicariously liable for Sotera's infringing conduct. To this end, Masimo adds several allegations in the FAC regarding alter ego and agency theories of liability, as well as its direct and contributory infringement claims as they relate to Hon Hai, which are described in more detail in Section III, *infra*. (*See id.* ¶¶ 20–52.)

Masimo again seeks monetary relief against both Defendants and equitable relief against Sotera, Hon Hai, and "officers, agents, servants, employees, attorneys and all others in active concert and/or participation with them" for the alleged infringement of each of its nine patents. (*See* FAC, Prayer for Relief.)

## II. LEGAL STANDARD
A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted in the complaint. *Navarro v. Block*, 250 F.3d 729, 731 (9th Cir. 2001). [3] The court must accept all factual allegations pleaded in the complaint as true and must construe them and draw all reasonable inferences from them in favor of the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead "enough facts to state a claim to relief that is plausible on its face."*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *see also City of Oakland v. Wells Fargo & Co.*, 972 F.3d 1112, 1135 (9th Cir. 2020) (citing *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 515 (2002)) ("It is important to note that this case reaches us at the motion to dismiss stage, where Oakland has the burden of meeting a plausibility standard, not a reasonable probability or more-likely-than-not standard.").

[3]     "A motion to dismiss for failure to state a claim generally raises a 'purely procedural question not pertaining to patent law,' for which courts apply 'the law of the regional circuit.' " *Labyrinth Optical Techs., LLC v. Fujitsu Am., Inc.*, No. SACV 13-0030 AGM (LGx), 2013 WL 12126111, at *1 (C.D. Cal. Aug. 21, 2013) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1355–56 (Fed. Cir. 2007)). Accordingly, the Court applies the *Twombly/Iqbal* pleading standard—not the standard under Form 18— to Masimo's claims. (*See* Order Granting Foxconn's Mot. to Dismiss Compl. at 8 n.5, ECF No. 46 (citing *Vigil Sys. Pty. Ltd. v. Trackit, LLC*, No. 16-CV-198 JLS (JMA), 2016 WL 4595538, at *3 (S.D. Cal. Aug. 22, 2016); *Rembrandt Patent Innovations LLC v. Apple Inc.*, Case No. C 14-05093 WHA, 2015 WL 8607390, at *2 (N.D. Cal. Dec. 13, 2015)).)

Nonetheless, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)) (alteration in original). A court need not accept "legal conclusions" as true. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) ("Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it

2020 WL 7260660

stops short of the line between possibility and plausibility of 'entitlement to relief.' "). Further, despite the deference the court must pay to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts that [he or she] has not alleged or that the defendants have violated the ...laws in ways that have not been alleged." *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

**\*3** As a general rule, a court freely grants leave to amend a complaint that has been dismissed. Fed. R. Civ. P. 15(a); *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency."*Schreiber Distrib. Co.*, 806 F.2d at 1401 (citing *Bonanno v. Thomas*, 309 F.2d 320, 322 (9th Cir. 1962)).

## III. ANALYSIS

Hon Hai moves to dismiss all claims. First, Hon Hai argues that the amended allegations "do not meet the pleading standards for vicarious infringement." (Mem. of P. & A. at 1.) As to Masimo's alter ego theory of liability, Hon Hai states that it fails because "(1) Masimo does not allege any facts supporting the conclusion that Sotera is a sham that exists solely as an inequitable vehicle for fraud; and (2) the facts Masimo alleges are insufficient to show that Sotera and Hon Hai have a unity of interest and ownership." (*Id.* at 1–2.) As to Masimo's agency claims, Hon Hai argues that there are insufficient facts to support "that Hon Hai controls day-to-day operations of Sotera." (*Id.*) Lastly, Hon Hai moves for dismissal of the direct and contributory infringement claims because, it argues, "Masimo conflates Hon Hai and its affiliates." (*Id.* at 2.)

The Court first addresses the evidentiary issues raised by the documents submitted in support of the parties' briefings before turning to the claims for direct and vicarious liability.

### A. Evidentiary Issues

The parties once again submit materials outside the pleadings to support their arguments at the dismissal stage. Hon Hai attaches its annual report to show that its many affiliated legal entities use the "Foxconn" name. (Mem. of P. & A. at 1 n.1 (citing Annual Rep., Ex. A to Decl. of Ying Lu ("Lu Decl."), ECF No. 62-3); Reply in supp. of Mot. ("Reply") at 9–10, ECF No. 69 (citing Webpage, Ex. B to Decl. of

Hua Chen ("Chen Decl."), ECF No. 69-1).) It also attaches exhibits to its Reply to show that Sotera is insured and therefore not undercapitalized. (Reply at 3–4 (citing Sotera's Rule 26 Disclosures, Ex. A to Chen Decl., ECF No. 69-1).) Masimo includes multiple exhibits to support its argument that Hon Hai has sufficient control over and involvement in Sotera's operations to be held liable for infringement and to support its allegations that Hon Hai seeks to have Sotera file bankruptcy in bad faith. (*See generally*, Opp'n to Mot. to Dismiss ("Opp'n"), ECF No. 68; *see also* Exs. 1–8, 10 to Decl. of Baraa Kahf, ECF No. 67-1 (filed under seal), Ex. 9 to Kahf Decl., ECF No. 68-1.)

"[W]hen the legal sufficiency of a complaint's allegations is tested by a motion under Rule 12(b)(6), '[r]eview is limited to the complaint.' " *Lee v. City of Los Angeles*, 250 F. 3d 668, 688 (9th Cir. 2001) (quoting *Cervantes v. City of San Diego*, 5 F.3d 1273, 1274 (9th Cir. 1993)). If a court considers documents extraneous to the pleadings on a 12(b)(6) motion, the court must treat the motion as a motion for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, "[t]here are two exceptions to this rule: the incorporation-by-reference doctrine and judicial notice under Federal Rule of Evidence 201."*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018); *see also United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) (considering whether exhibits attached to the Government's opposition to a Rule 12(b)(6) motion could be considered under the doctrine of incorporation-by-reference or judicial notice).

### 1. Judicial Notice

**\*4** Judicial notice permits a court to notice an adjudicative fact if it is "not subject to reasonable dispute." Fed. R. Evid. 201(b). A fact is not subject to reasonable dispute if it is "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Id.* 201(b)(1)–(2). The court may take judicial notice on its own. *Id.* 201(c)(1). "Facts subject to judicial notice may be considered on a motion to dismiss." *Maiman v. Talbott*, No. SACV 09–0012 AG (ANx), 2011 WL 13065750, at \*2 (C.D. Cal. Aug. 29, 2011) (citing *Mullis v. U.S. Bankr. Ct.*, 828 F.2d 1385 (9th Cir. 1987)). However, "accuracy is only part of the inquiry under Rule 201(b). A court must also consider—and identify—which fact or facts it is noticing from [a document]. Just because the document itself is susceptible to judicial notice does not mean that every

**WCAS067**

assertion of fact within that document is judicially noticeable for its truth." *Khoja*, 899 F.3d at 999.

### a. Hon Hai's exhibits

Hon Hai submits excerpts from its annual report and a screenshot of a webpage to support its argument that the website offering for sale the Accused Product was not attributable to Hon Hai, but to other Foxconn affiliates. (Ex. B to Chen Decl.)

As to the annual report, Hon Hai argues that because Masimo did not dispute its accuracy, judicial notice is appropriate. (Reply at 1 n.1.) However, the fact that Masimo did not dispute its accuracy does not mean that the report itself, or the facts contained therein, are judicially noticeable. As stated above, Rule 201 requires that a judicially noticeable fact be both beyond reasonable dispute and originate from a source whose accuracy cannot be reasonably questioned. Here, the report is attached to a declaration from defense counsel and appear to be part of a discovery production. (*See* Lu Decl. ¶ 3.) There is no indication that the facts in the report are based on an irrefutable source such that the Court could take judicial notice of even the existence of the report, let alone the truth of its content. *See, e.g.*, *In re Am. Apparel, Inc. S'holder Derivative Litig.*, No. CV 10-06576 MMM RCX, 2012 WL 9506072, at *18 (C.D. Cal. July 31, 2012) (taking judicial notice of corporate filings with the SEC only for their existence and contents, not for "the truth of information contained in them"); *U.S. ex rel. Calilung v. Ormat Indus., Ltd.*, No. 3:14-CV-00325-RCJ, 2015 WL 1321029, at *9 (D. Nev. Mar. 24, 2015) (same). Similarly, regarding the webpage, the Court does not know who maintains the website or how information on the webpage is obtained. Thus, the facts contained therein are not from sources whose accuracy is beyond question. Therefore, judicial notice is inappropriate. *See Estate of Fuller v. Maxfield & Oberton Holdings, LLC*, 906 F. Supp. 2d 997, 1004 (N.D. Cal. 2012).

Second, Hon Hai argues that the presence of insurance representatives at the Early Neutral Evaluation and the fact of Sotera's insurance coverage are also properly subject to judicial notice because these facts are accurately and readily determined and not subject to dispute. (Reply at 3 n.3.) Hon Hai alleges that evidence of insurance coverage is contained in Sotera's Rule 26 Initial Disclosures and on the docket in a minute entry for the Early Neutral Evaluation Conference, where insurance representatives were purportedly present.

(Chen Decl. ¶¶ 2–3.) The minute entry, however, does not indicate whether insurance representatives were present or not. (ECF No. 40.) As such, the Court does not see the relevance of taking judicial notice of this entry and declines to do so. *United Safeguard Distributors Ass'n v. Safeguard Bus. Sys., Inc.*, 145 F. Supp. 3d 932, 942 (C.D. Cal. 2015) (citing *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 821 (C.D. Cal. 1998)) ("[T]he court may deny a request for judicial notice of facts that are not relevant to the question at issue.").

**\*5** As to the initial disclosures, the facts in these documents were presumably based on Sotera's business records and other internal documents. These facts are therefore not "generally known" and derived from sources whose reliability is beyond doubt. *See Leonhart v. Nature's Path Foods, Inc.*, No. 13-CV-00492-BLF, 2014 WL 6657809, at *3 (N.D. Cal. Nov. 21, 2014) (quoting Fed. R. Evid. 201(b)) (denying request for judicial notice of initial disclosures because "they do not contain facts that 'can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned' "). As such, the Court declines to take judicial notice of this exhibit as well.

### b. Masimo's exhibits

Masimo's exhibits include Sotera's board meeting minutes, portions of slideshow presentations presumably made to the board, internal emails, and a job description. (Kahf Decl. ¶¶ 1–11; Exs. 1–10 to Kahf Decl.) In this case, the exhibits are documents produced by Sotera in response to discovery requests. (*See* Kahf Decl. ¶ 11 (identifying Exhibit 10 as "a document Sotera produced on July 10, 2020, bearing production numbers SOTERA 00023769 and -00023771.").) As stated above, Sotera's business records are not a source whose accuracy cannot be reasonably questioned. Thus, these documents are not suitable for judicial notice. *See United Safeguard Distributors*, 145 F. Supp. 3d at 942; *U.S. Commodity Futures Trading Comm'n v. Paron Capital Mgmt., LLC*, No. 11-CV-04577 CW NC, 2012 WL 5389912, at *4 (N.D. Cal. Nov. 5, 2012) (declining to take judicial notice of "documents produced in discovery from other parties" because "they are not undisputed facts, and the Court cannot readily ascertain the accuracy . . . of the documents").

Further, the facts in these documents are not properly subject to judicial notice because their meaning—*e.g.*, whether they reflect Hon Hai's control of Sotera's day-to-day operations or its bad faith attempt to have Sotera seek bankruptcy—is

subject to reasonable dispute. *See In re Apple Inc. Device Performance Litig.*, 386 F. Supp. 3d 1155, 1165 (N.D. Cal. 2019) (declining to take judicial notice of an email produced during discovery because "the meaning of the email is subject to reasonable dispute"); *see also Brown v. Allstate Ins. Co.*, 17 F. Supp. 2d 1134, 1138 (S.D. Cal. 1998) ("The court proceeds with particular caution with respect to a request for judicial notice, when, as here, it is urged so to resolve a fundamental, dispositive factual dispute"). Accordingly, the Court declines to take judicial notice of these documents.

### 2. Incorporation-By-Reference

The incorporation-by-reference doctrine permits courts to consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999) (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)). [4] Under this circuit's precedent, the doctrine of incorporation-by-reference allows consideration of the following extrinsic evidence at the Rule 12(b)(6) stage: (1) materials attached to the complaint that are referenced by the complaint; (2) materials not attached to the complaint if the complaint "necessarily relies" on them and the complaint refers to the documents, the documents are central to the plaintiff's claim, and no party questions their authenticity; and (3) materials not attached to the complaint or referred to in the complaint, but the plaintiff's claim depends on the contents of the documents and the parties do not dispute their authenticity. *Hsu v. Puma Biotechnology, Inc.*, 213 F. Supp. 3d 1275, 1281 (C.D. Cal. 2016); *see also Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).

[4]  Generally, the incorporation-by-reference doctrine applies to documents that a *defendant* seeks to submit in support of a 12(b)(6) motion. *Branch*, 14 F.3d at 453 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1327, at 762–63 (2d ed. 1990)) ("[W]hen [the] plaintiff fails to introduce a pertinent document as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleading."), *overruled on other grounds by Galbraith v. Cty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002); *see also Five Star Gourmet Foods,*

*Inc. v. Fresh Express, Inc.*, No. 19-CV- 05611-PJH, 2020 WL 1250802, at *3 (N.D. Cal. Mar. 16, 2020) ("The present situation does not fall within the incorporation by reference doctrine because plaintiffs (rather than defendant) seek to incorporate a new document outside of their own initial pleadings."). However, other district courts, including in this district, have applied incorporation-by-reference to documents attached to oppositions. *See Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1021 (C.D. Cal. 2015) ("Courts regularly decline to consider declarations and exhibits submitted in support of or opposition to a motion to dismiss, however, if they constitute evidence not referenced in the complaint or not a proper subject of judicial notice."); *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1060 (N.D. Cal. 2012) (noting that the plaintiffs' declaration submitted in support of their opposition to a motion to dismiss could only be considered if the document was attached to the complaint, incorporated by reference, or subject to judicial notice); *Lemperle v. Wash. Mut. Bank*, No. 10-cv-1550-MMA POR, 2011 WL 197590, at *2 (S.D. Cal. Jan. 20, 2011) (considering a letter attached to plaintiff's opposition pursuant to the incorporation-by - reference doctrine). Because no controlling authority precludes the application of the incorporation-by- reference doctrine to materials submitted by a plaintiff in opposition, the Court applies the doctrine to Masimo's exhibits.

**\*6**  The exhibits attached to the briefings are not attached to the FAC, nor does the FAC refer to these specific documents. Thus, the Court considers whether Masimo's claims depend on the contents of the documents and whether the parties dispute their authenticity. *Hsu*, 213 F. Supp. 3d at 1281.

### a. *Hon Hai's exhibits*

The authenticity of Hon Hai's exhibits (the annual report, Sotera's initial disclosures, and the webpage) is not disputed by either party. The annual report, however, does not "form the basis of any claim" in the FAC such that it is central to Masimo's claims. *See Khoja*, 899 F.3d at 1003 (finding that the district court abused its discretion by incorporating an exhibit that was not extensively referenced in the complaint and did not form the basis of any claim in the complaint); *see also Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1085 n.1

(9th Cir. 2020) (incorporating by reference a disclosure where the plaintiff alleged claims under the Fair Credit Reporting Act, which requires "clear and conspicuous disclosures" about obtaining consumer reports); *Mueller v. San Diego Entm't Partners, LLC*, 260 F. Supp. 3d 1283, 1293 n.1 (S.D. Cal. 2017) (incorporating by reference a subscription agreement attached to motion to dismiss that was central to securities and contract claims). While the report illustrates Hon Hai's corporate structure with its various "affiliated companies," this is not dispositive of whether an alter ego or agency relationship exists between Hon Hai and Sotera. *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001) ("[R]eferences in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship."), *abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017).

Further, Masimo's claims do not depend on the information contained in the initial disclosures. The fact of Sotera's insurance coverage—for which the Rule 26 disclosures are proffered—are not necessary or sufficient for any of Masimo's claims.

The webpage, however, forms the basis for Masimo's direct infringement claim against Hon Hai. According to Masimo, the page constitutes the offer of sale of the Accused Product purportedly made by Hon Hai (FAC ¶ 57 ("[O]n information and belief, Foxconn has offered for sale the ViSi Mobile Monitoring System on its U.S.-based website for the Foxconn Health Technology Business Group")), [5] while Hon Hai cites to the same page to show that this offer was made by its affiliate, and not by the parent company itself. As such, the Court finds it appropriate to incorporate this exhibit by reference.

[5]   Masimo offered the same webpage in support of its opposition to Hon Hai's first motion to dismiss the Complaint. (*See* Ex. M to Decl. of Brian C. Claassen, ECF No. 33-1.)

### b. *Masimo's exhibits*

Sotera provided the exhibits attached to Masimo's Opposition in response to discovery requests; the exhibits themselves bear bates stamps indicating the documents were produced in discovery. (*See* Kahf Decl. ¶¶ 2–11.) Thus, they are self-authenticating. *See Barefield v. Bd. of Trustees of Cal. State*

*Univ., Bakersfield*, 500 F. Supp. 2d 1244, 1257–58 (E.D. Cal. 2007) (citing *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 777–78 (9th Cir. 2002) ("Authentication-by-production is permitted when the party identifies who produced the document, or if the party opponent admits to having produced it."). [6]

[6]   This is also true for Exhibit 10, which Hon Hai objects to on the grounds of authenticity and relevance. (Reply at 2 n.2.)

**\*7** However, while the contents of the exhibits correspond to certain factual allegations raised in the FAC, the Court does not find that the claims in the FAC necessarily depend on the contents of most of these documents at this stage in the litigation. While these exhibits contain facts that, if true, supplement the theories of liability in the FAC, they are not central to any of Plaintiffs' claims. *See Khoja*, 899 F.3d at 1003; *see also Ariz. Civil Constructors, Inc. v. Colony Ins. Co.*, No. 2:20-cv-00010-JAD-DJA, 2020 WL 5042778, at \*3 (D. Nev. Aug. 25, 2020) (citing *Schneider v. Cal. Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998)) (declining to incorporate by reference documents attached to an opposition to a motion to dismiss that "would provide additional factual support for [plaintiffs'] claims" because "a deficient pleading cannot be cured by new allegations raised in a plaintiff's response to a motion to dismiss"). As such, the Court declines to incorporate by reference the exhibits attached to Masimo's Opposition.

In sum, the Court incorporates by reference only the webpage attached to the Reply (Ex. B to the Chen Decl.). The remaining exhibits are not considered by the Court in its analysis of the Motion to Dismiss the FAC. *See Gerritsen*, 112 F. Supp. 3d at 1021 ("Courts regularly decline to consider declarations and exhibits submitted in support of or opposition to a motion to dismiss...if they constitute evidence not referenced in the complaint or not a proper subject of judicial notice."). [7]

[7]   Because the Court did not consider any of Masimo's exhibits in deciding Hon Hai's Motion, the Motion to Seal these exhibits (ECF No. 66) is **TERMINATED AS MOOT**.

### B. Direct Liability for Direct Infringement

The Patents Act holds liable for direct infringement "whoever without authority makes, uses, offers to sell, or sells any patented invention...." 35 U.S.C. § 271(a); *see also Joy Techs.,*

*Inc. v. Flakt, Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993). "[F]or a party to be liable for direct patent infringement under 35 U.S.C. § 271(a), that party must commit all the acts necessary to infringe the patent, either personally or vicariously." *Aristocrat Tech. Austrl. Pty Ltd. v. Int'l Game Tech.*, 709 F.3d 1348, 1362 (Fed. Cir. 2013) (citation omitted); *Sorensen v. Black & Decker Corp.*, No. 06-cv-1572-BTM-CAB, 2007 WL 951839, at *3 (S.D. Cal. Feb. 27, 2007) (holding that direct patent infringement requires a plaintiff to show that a parent company either: "(1) makes, uses, offers to sell, sells, or imports products that use the [ ] patent process without authorization; or (2) controls similar conduct undertaken by its subsidiaries such that it justifies piercing the corporate veil"). Allegations of direct infringement are subject to the Rule 8 pleading standards established by *Twombly* and *Iqbal*. *Atlas IP LLC v. Pac. Gas & Elec. Co.*, No. 15-CV-05469-EDL, 2016 WL 1719545, at *2 (N.D. Cal. Mar. 9, 2016).

The FAC alleges that Hon Hai's "use and offer for sale of the ViSi Mobile directly infringe" each patent. (FAC ¶¶ 70, 85, 100, 115, 130, 145, 160, 175, 190.) Specifically, Masimo alleges that Hon Hai:

- "us[es] the ViSi Mobile to collect 12 million hours of de-identified vital signs data from more than 300,000 patient sessions";

- offers the ViSi Mobile for sale on the website of Foxconn Health Technology Business Group ("FHTBG");

- promoted the device as "part of its smart hospital products that follow the patient throughout the continuum of care," which has since been removed from its website; and

- "touts the ViSi Mobile Monitoring System as its own product."

(*Id.*; *see also* FAC ¶¶ 56–57.)

Hon Hai argues Masimo's failure to distinguish FHTBG from Hon Hai is fatal to its claim that Hon Hai directly infringed the patents in question. (Mem. of P. & A. at 16–17.) In support, Hon Hai provides a screenshot of the FHTBG website where the Accused Product is offered for sale, noting that nowhere on the webpage is Hon Hai identified as the entity offering the product for sale. (Reply at 9–10; Ex. B to Chen Decl.) Masimo does not dispute this but argues that FHTBG is a "division of Foxconn." (Opp'n at 10.) Masimo does not clarify the status of the other entities cited in the FAC.

**\*8** Masimo's allegation about FHTBG's website is not sufficient to state a claim against Hon Hai. [8] Although it argues that it is "at least entitled to the inference that FHTBG is part, or a division of, Hon Hai" (Opp'n at 6), this alone does not plausibly show that FHTBG's conduct is attributable to Hon Hai. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995) (referring to a subsidiary as a "division" of Kodak was not evidence that the two companies operated as "single economic entity"). Moreover, Masimo does not present any other legal theory under which Hon Hai should be held responsible for the acts of a division.

[8]      To the extent Hon Hai argues that the FAC's reference to "Foxconn" alone does not properly identify Hon Hai, the Court does not find this argument persuasive. Masimo clearly intends "Foxconn" to refer to Hon Hai Precision Industry Co. Ltd., as indicated in the very first sentence of its FAC, and Masimo refers to "Foxconn" as the party responsible for holding out the accused product for sale. (FAC ¶ 3 (using "Foxconn" as a stand-in for Hon Hai and identifying Foxconn—"also known as Foxconn Technology Group"—as "a multinational electronics manufacturing company" based in Taiwan with "an undisclosed stake in Sotera" and control of Sotera's management team).)

The remaining allegations in the FAC do not contain enough factual content to allow the Court to reasonably infer that Hon Hai's conduct constituted direct infringement. First, the allegation that Hon Hai collected data from patient sessions does not claim that Hon Hai "made, used, offered to sell, or sold" ViSi Mobile without authorization. Second, the conclusory allegation that Hon Hai "touted" the Accused Product as its own, without any factual support, is too vague to raise a colorable claim that Hon Hai directly infringed. Lastly, the allegation of Hon Hai's "promotion" of the ViSi Mobile Monitoring System as "part of its smart hospital products" does not state a claim for direct infringement. Specifically, Masimo does not describe what this promoting activity entailed such that it plausibly shows Hon Hai offered to sell or sold the Accused Product. *See, e.g.*, *E.Digital Corp. v. Microsemi Corp.*, No. 15-CV-319-H-BGS, 2015 WL 11237472, at *3 (S.D. Cal. July 28, 2015) (finding a pleading that "public websites that describe the functionality and use of the accused products in an infringing manner" and claims that defendant made available "informational material that encourages customers to use the accused products" in an infringing manner sufficient to state a claim for direct

infringement); *Mophie, Inc. v. Shah*, No. SACV 13-01321 DMG (JEMx), 2014 WL 12603184, at *2 (C.D. Cal. Aug. 25, 2014) (denying dismissal of direct infringement claim where complaint alleged that defendant made an "offer of sale" of infringing product by "listing a price, photograph of the product, product details, and a link reading 'Buy now!' ").[9]

[9] Promotion of a product generally supports claims of active inducement, a cause of action that, while included in the Complaint, was not included in the FAC. *See Techno View IP, Inc. v. Sony Interactive Entm't LLC*, No. SACV 17-01268 CJC (JCGx), 2018 WL 3031518, at *7 (C.D. Cal. Apr. 18, 2018) ("[W]here, as here, a party, with knowledge of another party's patent, advertises or promotes its product for use in an infringing manner, this is sufficient to support an inference that the promoting party intended to induce infringement.") (citations omitted); *see also Randall May Int'l Inc. v. Pearl Corp.*, No. SACV 13-00016 JVS (RNBx), 2013 WL 12130018, at *6 (C.D. Cal. June 3, 2013) ("Sales-related activities, including advertising, solicitation, and product instruction that encourage the infringing use may be acts constituting inducement.").

**\*9** In sum, the FAC does not contain enough specific facts to allege a clear and definite theory of direct liability against Hon Hai for direct infringement. Accordingly, the Court **GRANTS** Hon Hai's Motion to Dismiss this claim.

**C. Direct Liability for Contributory Infringement**
Under 35 U.S.C. § 271(c), a party is liable for contributory infringement if it

> offers to sell or sells within the United States or imports into the United States ...a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or

commodity of commerce suitable for substantial noninfringing use.

To establish contributory infringement, then, a plaintiff must show that defendants had knowledge of plaintiff's rights in the patents-in-suit, knew of a third party's infringement, and sold components especially made for infringing use and not capable of substantial noninfringing uses. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1320 (Fed. Cir. 2009).[10]

[10] The Court adopts its previous conclusion that the ViSi Mobile Monitoring System is not suitable for any other substantial non-infringing use, which is not challenged here by Hon Hai. (*See* Order at 21–22.)

The FAC reiterates that "Foxconn" contributorily infringes by "mak[ing] and offer[ing] to sell and or sell[ing]...components of the ViSi Mobile Monitoring System" protected under each patent. (FAC ¶¶ 76, 91, 106, 121, 136, 151, 166, 181, 196.) It adds the specific allegation that "Foxconn supplies Sotera with 'cables, printed circuit board assemblies (PCBAs), housing parts, sensors, and batteries' " for the ViSi Mobile Monitoring System, is one of "Sotera's main suppliers of sensors and batteries for its medical equipment," and publicizes its involvement in the manufacturing process. (*Id.*; *see also* FAC ¶ 55.) Hon Hai argues that Masimo still fails to state that Hon Hai had pre-suit knowledge of the patents to support the contributory infringement claim. (Mem. of P. & A. at 17.)[11]

[11] Hon Hai opposes again on the basis that Masimo's reference to "Foxconn" does not sufficiently state claims against Hon Hai. The Court rejects this argument for the same reason stated above. (*See supra*, n.11.) Masimo makes a specific claim against "Foxconn," which unambiguously intends to refer to the parent company, Hon Hai, and its involvement in making and selling particular parts of the product in the United States.

Masimo clearly alleges in the FAC that Hon Hai "knew of the patents no later than the filing of the Complaint." (FAC ¶¶ 74, 89, 104, 119, 134, 149, 164, 179, 194.) Thus, the contributory infringement claim against Hon Hai survives on these allegations, although they are limited in scope to post-filing conduct. *See Garrett v. TP-Link Research Am. Corp.*, No. 20-CV-03491-SI, 2020 WL 5517202, at *6 (N.D.

Cal. Sept. 14, 2020) ("Because [plaintiff] has pled post-filing knowledge, this element is met, but the claim for contributory infringement will be limited to post-filing conduct."); *CG Tech. Dev., LLC v. Big Fish Games, Inc.*, 226 F. Supp. 3d 1116, 1121–22 (D. Nev. 2017) (granting a motion to dismiss as to a defendant's pre-filing conduct but denying with respect to post-filing conduct where the plaintiff adequately pled knowledge based on the filing of the case).

**\*10** However, the FAC also includes allegations implying that Hon Hai had pre-suit knowledge of the patents. For example, Masimo alleges that "Foxconn" had knowledge "by hiring former Masimo employees and following previous trade secret misappropriation litigation asserted against Sotera by Masimo," during which "Foxconn" purportedly exercised control over Sotera. (FAC ¶¶ 74, 89, 104, 119, 134, 149, 164, 179, 194.) Hon Hai claims that none of the alleged actions—"such as investment, ability to seat board members, or participation in settlement negotiations over the prior trade secret lawsuit"— permit an inference that Hon Hai knew of Masimo's patents before this action was filed. (Mem. of P. & A. at 17.)

Generally, the fact of a parent/subsidiary relationship is not enough, on its own, to establish that either entity had the requisite knowledge for contributory infringement. *See Varian Medical Systems, Inc. v. Elekta AB*, No. 15-871-LPS, 2016 WL 3748772 at \*5 (D. Del. 2016) (finding that the "[p]laintiff needs to set out more than just the bare fact of the parent/subsidiary relationship in order to make out a plausible claim that" subsidiary's knowledge can be imputed to the parent); *In SoftView LLC v. Apple Inc.*, No. 10-389-LPS, 2012 WL 3061027, \*5 (D. Del. 2012) (finding a subsidiary's citation to a published application of a patent-at-issue in another case did not provide a plausible basis to infer the parent's pre-suit knowledge of the patent).

Here, however, the FAC goes beyond merely alleging that this relationship imputes knowledge to Hon Hai. Masimo has alleged that both Sotera and Hon Hai "monitored" the patents "by hiring former Masimo employees and following previous trade secret misappropriation litigation asserted against Sotera by Masimo," during which Hon Hai purportedly exercised control over Sotera. (FAC ¶¶ 74, 89, 104, 119, 134, 149, 164, 179, 194.) The FAC also alleges that an employee in common between the two entities represented that Hon Hai had authority to resolve the previous trade secret dispute on Sotera's behalf—a dispute involving former Masimo employees' theft of the company's confidential

information and subsequent hiring by Sotera. (*Id.* ¶¶ 16, 35.) The Court finds that at this stage, this is sufficient to allege some pre-suit knowledge by Hon Hai regarding the patents at issue, the precise degree of which would be further determined through discovery. *See SoftView LLC v. Apple Inc.*, No. CIV. 10-389-LPS, 2012 WL 3061027, at \*5 (D. Del. July 26, 2012) (finding allegations that a defendant parent company became aware of a patent through litigation of a subsidiary, connection with plaintiff's inventor and general manager, and its relationship with a co-defendant).

Accordingly, the Court **DENIES** Hon Hai's Motion as to Masimo's contributory infringement claim.

### D. Vicarious Liability for Direct Infringement

One "infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it[.]" *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005).[12] When a patentee claims direct infringement through vicarious liability, it "must show that one party directed or controlled the performance of all of the infringing steps to prove direct infringement liability." *Grecia v. VUDU, Inc.,* No. C-14-0775-EMC, 2015 WL 538486, at \*4 (N.D. Cal. Feb. 9, 2015). In the parent-subsidiary context, a parent corporation may be liable as a direct infringer under 35 U.S.C. § 271(a) for infringement by subsidiary corporations only if "the evidence reveals circumstances justifying disregard of the status of [the subsidiaries and the parent] as distinct, separate corporations." *A. Stucki Co. v. Worthington Inds., Inc.*, 849 F.2d 593, 596 (Fed. Cir. 1988).

[12]  As explained by the Ninth Circuit:
Although "the lines between direct infringement, contributory infringement, and vicarious liability are not clearly drawn," in general, contributory liability is based on the defendant's failure to stop its own actions which facilitate third-party infringement, while vicarious liability is based on the defendant's failure to cause a third party to stop its directly infringing activities.
*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. 2007) (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 435 n.17 (1984)).

**\*11** In the FAC, Masimo alleges Hon Hai is liable for Sotera's infringing conduct under both alter ego and agency theories of vicarious liability. The Court finds, however, that

Masimo has failed to state a claim against Hon Hai under either theory.

### 1. Alter Ego Theory of Liability

It is a fundamental principle of corporate law that a parent and its subsidiary are separate legal entities. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998). This principle of corporate separateness generally "insulates a parent corporation from liability created by its subsidiary, notwithstanding the parent's ownership of the subsidiary." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1070 (9th Cir. 2015). However, when the corporate form is used for a wrongful or inequitable purpose, a court may disregard the corporate form and impute the acts of a subsidiary to the parent, under the theory that the subsidiary is an "alter ego" of the parent. *Sonora Diamond Corp. v. Sup. Court*, 83 Cal. App. 4th 523, 538 (2000).[13]

[13]    In patent cases, federal courts look to the alter ego law of the regional circuit. *Wechsler v. Macke Int'l Trade, Inc.*, 486 F.3d 1286, 1295 (Fed. Cir. 2007). The Ninth Circuit applies the law of the forum state — in this case, California—to determine whether an alter ego relationship exists between a parent and subsidiary. *Id.* (citing *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391 (9th Cir. 1993)).

The alter ego doctrine prevents a parent corporation from escaping liability by abusing corporate privilege through a subsidiary that is, in effect, a sham corporation, to commit wrongful acts. *Id.*; *see also Hennessey's Tavern, Inc. v. Am. Air Filter Co.*, 204 Cal. App. 3d 1351, 1358 (1988) ("The purpose behind the alter ego doctrine is to prevent defendants who are the alter egos of a sham corporation from escaping personal liability for its debts.") (citation omitted). A plaintiff seeking to invoke the alter ego doctrine must allege: (1) that there is such a unity of interest and ownership between a subsidiary and its parent corporation that the separate personalities of the two do not exist; and (2) that failure to disregard the corporate form would cause inequitable results by "sanction[ing] a fraud or promot[ing] injustice." *See Firstmark Capital Corp. v. Hempel Fin. Corp.*, 859 F.2d 92, 94 (9th Cir. 1988) (emphasis omitted) (citing *Wood v. Elling Corp.*, 572 P.2d 755, 761–62 n.9 (1977)); *Sonora*, 83 Cal. App. 4th at 538.

As an exception to basic principles of corporate law, "[a]lter ego is an extreme remedy, sparingly used." *Sonora*, 83 Cal.

App. 4th at 539; *see also Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) ("The doctrine of piercing the corporate veil, however, is the rare exception, applied in the case of fraud or certain other exceptional circumstances...."). Because there is a strong presumption against disregarding corporate identities, a plaintiff must allege specific facts supporting both of the necessary elements for alter ego liability; conclusory allegations will not suffice. *See Johnson v. Serenity Transp., Inc.*, 141 F. Supp. 3d 974, 984 (N.D. Cal. 2015); *see also Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1040–41 (N.D. Cal. 2014).

Hon Hai argues that neither prong of the alter ego test has been met. For the reasons stated below, the Court agrees.

#### a. Unity of Interest

**\*12** The unity of interest prong "envisions pervasive control over the subsidiary, such as when a parent corporation dictates every facet of the subsidiary's business—from broad policy decisions to routine matters of day-to-day operation." *Ranza*, 793 F.3d at 1073 (quotations omitted). California courts consider several factors to determine whether there is a unity of interest and ownership between a parent and its subsidiary. These include, but are not limited to: (1) the commingling of funds and other assets, (2) identical equitable ownership of the two entities, (3) use of the same offices and employees, (4) use of the subsidiary as a mere shell for the affairs of the parent, (5) failure to maintain adequate corporate records, (6) failure to adequately capitalize the subsidiary, and (7) the holding out by the parent that it is liable for the debts of the subsidiary. *See Wady v. Provident Life and Accident Ins. Co. of Am.*, 216 F. Supp. 2d 1060, 1067 (C.D. Cal. 2002) (citing *Roman Catholic Archbishop of S.F. v. Superior Court*, 15 Cal. App. 3d 405, 411 (1971)); *see also Gerritsen*, 116 F. Supp. 3d at 1137 (listing additional factors). This list is not exhaustive, and no single factor controls. A court must examine all the circumstances to determine whether the complaint states a plausible claim for liability under an alter ego theory. *VirtualMagic Asia, Inc. v. Fil-Cartoons, Inc.*, 99 Cal. App. 4th 228, 245 (2002).

Hon Hai again argues that Masimo "conflates Hon Hai with other entities" using the Foxconn name, which it claims makes the allegations insufficient to state an alter ego claim against Hon Hai. (Mem. of P. & A. at 10.) In its FAC, Masimo's alter ego allegations name FHTBG (FAC ¶¶ 25, 28, 30) and refer to other Foxconn companies. (*Id.* ¶¶ 22, 24– 26, 28, 30 (noting overlapping employees between

WCAS074

**Masimo Corporation v. Wireless, Slip Copy (2020)**

2020 WL 7260660

Sotera and "Hon Hai Technology Business Group, "Foxconn Technology Group – Hon Hai Precision," FHTBG, "Sharp Life Sciences," and "DCI Health Technology").

As with Masimo's direct liability claim, the fact that FHTBG is a division of Hon Hai—even if reflected in the annual report—cannot establish that the two entities are alter egos of each other. *See Unocal*, 248 F.3d at 928 (9th Cir. 2001) (noting "references in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship"); *see also Sandoval*, 34 F. Supp. 3d at 1040 (finding allegations that collectively referred to separate corporate entities "too conclusory" to state a claim for alter ego liability); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F. Supp. 227, 238 (D. Del. 1984) (determining language of annual report and employee testimony describing subsidiaries as divisions of a parent were not sufficient, even in conjunction with other evidence, to establish alter ego relationship). In turn, actions attributed to employees of FHTBG cannot be understood by the Court to be actions taken on behalf of Hon Hai. The same applies to the other entities named in the FAC that have no specified relationship to Hon Hai. [14] The Court simply does not have enough information from which it can plausibly infer that these entities' actions equate with the actions of the parent company. Thus, to the extent Masimo relies on allegations about these other entities to support its alter ego theory against Hon Hai, the Court does not consider them in its evaluation of the claim.

[14]     To the extent Masimo argues that Hon Hai's representations on its website are evidence of an alter ego relationship, the Court finds that this is also insufficient. *See Moody v. Charming Shoppes of Del., Inc.*, No. C 07-06073 MHP, 2008 WL 2128955, at *3 (N.D. Cal. May 20, 2008) ("Generic language on [company's] website and in its press releases simply do not rise to the day-to-day control required to impute the subsidiary's contacts to the parent.").

The remaining allegations regarding unity of interest include the following:

- Hon Hai made substantial investments in Sotera during its Chapter 11 reorganization and is its majority shareholder, owning a two-thirds equity stake in Sotera and has two board seats, and recently increased its investment to $100 million (FAC ¶¶ 20, 22);

**\*13** • Hon Hai ordered an executive "to go to the US and solve the problem of Sotera Wireless" after it emerged from bankruptcy (*id.* ¶¶ 21, 22, 32);

- Hon Hai entered into discussions with investment bankers about selling Sotera and "will be negotiating the terms of any sale" (*id.* ¶ 23);

- Hon Hai and Sotera intermingle several of the same high-level employees (*id.* ¶¶ 24–30);

- Hon Hai "has exercised control over discussions between Masimo and Sotera" and had authority to resolve the trade secret dispute (*id.* ¶¶ 31, 35); and

- The CEO of Sotera represented that Hon Hai had plans to use Sotera technology in a cancer hospital that the company's founder was developing in Taiwan, had instituted the changes to Sotera's management team, and had the authority to resolve the trade secret dispute between Sotera and Masimo (*id.* ¶¶ 31–36, 47).

Hon Hai argues that these allegations taken together, even if true, do not sufficiently allege the factors necessary to establish unity of interest. (Mem. of P. & A. at 9–10.)

Construing the facts most favorably to Masimo, the Court finds that it has not pled unity of interest. First, the Court notes that Masimo does not allege at all that Hon Hai and Sotera commingled funds or other assets, failed to maintain adequate corporate records, or that Hon Hai failed to adequately capitalize Sotera. In fact, as Hon Hai points out, Masimo alleges that Hon Hai invested $100 million in Sotera. (FAC ¶¶ 22, 51.) Further, the FAC does not claim that Hon Hai has ever held itself out as liable for Sotera's debts, or that Sotera was used as a mere shell for Hon Hai's affairs. The failure to discuss these factors weighs against a finding of alter ego liability. *See Stewart v. Screen Gems-EMI Music, Inc.*, 81 F. Supp. 3d 938, 955 (N.D. Cal. 2015).

Masimo's allegations that Hon Hai has a significant ownership stake in Sotera, played a role in negotiating the sale of Sotera, and placed its employees at high-level positions in Sotera, reflect high-level involvement by a parent company in a subsidiaries' operations or finances that is generally insufficient to establish unity of interest. *See Unocal*, 248 F.3d at 927–28 (finding high-level involvement, without any indication that corporate formalities were not observed, established only that the defendant was "an active parent

corporation involved directly in decision-making about its subsidiaries' holdings").

Further, it is well-established "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Bestfoods*, 524 U.S. at 69. "Courts generally presume that such dual status individuals wear their 'parent hats' when serving the parent's interests, and their 'subsidiary hats' when serving the subsidiary's interests." *Bastidas v. Good Samaritan Hosp.*, No. C 13-04388 SI, 2014 WL 3362214, at *4 (N.D. Cal. July 7, 2014). "To defeat this presumption, a plaintiff would need to allege facts demonstrating that the dual status individuals were acting in the parent's interest, and not the subsidiary's, when they engaged in the challenged conduct." *Id.*

**\*14** Masimo has alleged no such facts here. The FAC does not specifically allege that any of the several individuals named in the FAC that were simultaneously serving in positions at both Hon Hai and Sotera were acting solely in the interest of Hon Hai. (*See* FAC ¶¶ 24–30.) The mere fact of their dual roles therefore does not lend plausibility to the allegation that an alter-ego relationship exists between the two entities. *See Ranza*, 793 F.3d at 1074–75 (holding that because "total ownership and shared management personnel are alone insufficient to establish the requisite level of control," placement of "[a parent's] directors on the subsidiary's board" does not singularly create an alter-ego relationship) (internal quotations and citations omitted); *see also Barantsevich v. VTB Bank*, 954 F. Supp. 2d 972, 988 (C.D. Cal. 2013) (holding that "general policy-setting" or direct involvement of "macro-management" of a subsidiary does not expose the parent company to alter ego allegations").

Lastly, Masimo supports its alter ego theory with Sotera CEO Francis Chen's statements about Hon Hai's increased control over Sotera in the wake of its bankruptcy and its representation of ownership over the proprietary information in question. However, as pointed out by Hon Hai, Masimo does not indicate which of the alter ego factors these facts are intended to support. *See NetApp, Inc. v. Nimble Storage, Inc.*, No. 5:13-CV-05058-LHK-HRL, 2015 WL 400251, at *6 (N.D. Cal. Jan. 29, 2015) ("As a preliminary matter, [the plaintiff] fails to explain how several of its [factual] allegations...are relevant to the eight factors in the unity of interest and ownership inquiry....[The plaintiff] does not otherwise explain how these alleged facts are applicable."); *see also Reynolds v. Binance Holdings Ltd.*,

No. 20-CV-02117-JSC, 2020 WL 5074391, at *4 (N.D. Cal. Aug. 26, 2020); *Nakanwagi v. Tenet Healthcare Corp.*, No. CV-15-01596-PHX-DGC, 2017 WL 394492, at *3 (D. Ariz. Jan. 30, 2017) (finding no showing of unity of interest where the plaintiff alleged only that the subsidiary's "operational activities [we]re controlled by" a parent corporation but provided no facts to show pervasive control over the day-to-day operations of the subsidiary).

The Court therefore finds Masimo has inadequately pled unity of interest.

### b. Inequitable Results

Even had Masimo satisfactorily pled unity of interest, the Court cannot find that Masimo has adequately alleged that an inequitable result would follow if the corporate separateness of the defendant entities was not disregarded.

As aforementioned, the inequitable results prong of the alter ego doctrine requires a showing that failing to pierce the corporate veil would sanction a fraud or promote injustice. *Gerritsen*, 116 F. Supp. 3d at 1143. The parties presume that bad faith is required for this factor. Relying on various California case law,[15] the Ninth Circuit has held that a specific showing of bad faith is not required where there has been an abuse of the corporate form, "such as under-capitalization or misrepresentation of the corporate structure to creditors," but is required where no such abuse is alleged. *Sentry Life Ins. Co. v. Roberts*, 925 F.2d 1470 (9th Cir. 1991); *see also Orloff v. Allman*, 819 F.2d 904, 908 (9th Cir. 1987) (citing *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985) (unpublished)), *abrogated on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990); **\*15** *United States v. Standard Beauty Supply Stores, Inc.*, 561 F.2d 774, 777 (9th Cir. 1977) (holding that California's alter ego doctrine applies "where some conduct amounting to bad faith makes it inequitable" for the defendant to hide behind the corporate veil) (quotation omitted); *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1117 (C.D. Cal. 2003) (dismissing alter ego claims because plaintiff failed to allege that parent company engaged in any bad faith conduct).[16]

15    *See Westinghouse Elec. Corp. v. Superior Court of Alameda County*, 17 Cal. 3d 259, 274 (1976) ("Bad faith in one form or another must be shown

before the court may disregard the fiction of separate corporate existence."); *Mid–Century Ins. Co. v. Gardner*, 9 Cal. App. 4th 1205, 1213 (1992) ("The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct amounting to bad faith makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil."); *Arnold v. Browne*, 27 Cal. App. 3d 386, 397 (1972) (requiring fraud or bad faith to pierce the corporate veil pursuant to the alter ego doctrine) *disapproved of on other grounds by Reynolds Metals Co. v. Alperson*, 25 Cal. 3d 124 (1979); *Associated Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 838 (1962) ("[B]ad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity."); *see also Automotriz Del Golfo De Cal. S. A. De C. V. v. Resnick*, 47 Cal. 2d 792, 797 (1957) ("If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability.") (quotations omitted); *Am. Home Ins. Co. v. Travelers Indem. Co.*, 122 Cal. App. 3d 951, 966 (1981) ("The fraud or inequity sought to be eliminated must be that of the party against whom the alter ego doctrine is invoked, and such party must have been an actor in the course of conduct constituting the 'abuse of corporate privilege.'") (quotations omitted).

16    The Court notes, however, that whether bad faith is required to show inequitable results is not fully resolved in this circuit. *See Updateme Inc. v. Axel Springer SE*, No. 17-CV-05054-SI, 2018 WL 1184797, at \*10 n.13 (N.D. Cal. Mar. 7, 2018). Other courts have found that "the bulk of [California] case law seems to omit or even expressly disavow a bad-faith or fraudulent-intent requirement." *Pac. Bell Tel. Co. v. 88 Connection Corp.*, No. 15-CV-04554-LB, 2016 WL 3257656, at \*4 (N.D. Cal. June 14, 2016); *see Triyar Hospitality Mgmt., LLC v. WSI (II) - HWP, LLC*, No. B301158, 2020 WL 6816648, at \*4 (Cal. Ct. App. Oct. 22, 2020) (finding that a moving party

is required to prove only "that the alter ego's acts caused an inequitable result," not conduct amounting to bad faith), *reh'g denied* (Nov. 17, 2020); *Relentless Air Racing, LLC v. Airborne Turbine Ltd.*, 222 Cal. App. 4th 811, 813, 816 (2013) ("An inequitable result does not require a wrongful intent" and that the trial court erred by requiring the creditor to prove otherwise."). However, the controlling precedent in this circuit and from the California Supreme Court, cited above, establish that bad faith is a necessary part of the alter ego test where a plaintiff does not show an abuse of the corporate form. Further, Masimo does not dispute that bad faith is required in this case. (*See* Opp'n at 18.) As such, the Court follows the line of precedent requiring a showing of bad faith to sufficiently plead an alter ego theory of liability.

The FAC itself states that "[o]n information and belief, [Hon Hai] desires to potentially escape liability for infringement by having Sotera again seek bankruptcy protection." (*Id.* ¶ 37.) Masimo provides some context for this claim, stating that in 2016, Sotera petitioned for bankruptcy five weeks before trial in a trade secrets case previously brought by Masimo for the express purpose of preventing the claims from going to trial. (*Id.* ¶ 18.) It further alleges that after Sotera's bankruptcy, Hon Hai made significant investments in the company, became its largest investor, and effectively "had taken control of the company as it emerged from bankruptcy." (*Id.* ¶¶ 20, 32.) In this way, Masimo argues, Hon Hai is in a position to execute a "bad faith scheme" by threatening Sotera's bankruptcy as a means of immunizing both Sotera and itself from liability. (Opp'n at 18– 19.) Hon Hai argues that this amounts to only "speculative assertions that 'Foxconn' may have Sotera seek bankruptcy protection to avoid potential patent infringement liability," which are insufficient because Masimo has not also alleged bad faith conduct. (Mem. of P. & A. at 8.) Masimo's claimed inequity, according to Hon Hai, amounts to an argument that it will not be able to recover if Sotera seeks bankruptcy. (*Id.*)

Even if Masimo's "bad faith scheme" is more than just an argument that it will be unable to recover against an insolvent defendant, its allegations still fall short of alleging an inequitable result for the purposes of alter ego liability. Masimo only states that Hon Hai "potentially" seeks to pursue Sotera's bankruptcy to escape liability; it offers no support for the allegation that Hon Hai is, in fact, pursuing this option. *See Cook v. Brewer*, 637 F.3d 1002, 1006 (9th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555) ("While the pleading standard for

Rule 8(a) is liberal, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'' ''). The allegation is based solely "[o]n information and belief"; there are no other specific facts from which the Court can infer that Hon Hai seeks to have Sotera file for bankruptcy at all, let alone for bad faith reasons that would make treating the two entities as separate inequitable. *See In re Hydroxycut Mktg. & Sales Practices Litig.*, 810 F. Supp. 2d 1100, 1123 (S.D. Cal. 2011) (inferring bad faith motive where parent company selling nutritional supplements changed its name and description of business activities to that of a "holding company" in response to litigation from the FDA); *Craigslist, Inc. v. Mesiab*, No. C 08-05064 CW MEJ, 2010 WL 5300883, at *7 (N.D. Cal. Nov. 15, 2010) (finding statements by the individual defendant that entity defendant was created to remain "untouchable by present litigation" sufficient to establish bad faith on a motion for default judgment), *report and recommendation adopted*, No. C 08-5064 CW, 2010 WL 5300881 (N.D. Cal. Dec. 20, 2010). In any event, Hon Hai considering or even pursuing Sotera's bankruptcy does not, without more, satisfy the bad faith standard if the bankruptcy was sought in the best financial interest of the company. *See Sonora*, 83 Cal. App. 4th at 539 (citing *Lowell Staats Mining Co., Inc. v. Pioneer Uravan Inc.*, 878 F.2d 1259, 1263 (10th Cir. 1989)) (holding that a parent company is not "exposed to liability for the obligations of [the subsidiary] when [the parent] contributes funds to [the subsidiary] for the purpose of assisting [the subsidiary] in meeting its financial obligations and not for the purpose of perpetuating a fraud").

**\*16** Thus, the Court finds that Masimo has not sufficiently alleged inequitable results for purposes of stating an alter ego claim against Hon Hai.

### 2. Agency Theory of Liability

A parent corporation can also be held vicariously liable for the acts of a subsidiary corporation if an agency relationship exists between the two entities. Unlike piercing the corporate veil to recover from a parent company, finding a parent liable under agency theory is premised on the idea "that the parent fraudulently induced the subsidiary to incur the obligation" underlying legal liability. *Royal Indus. Ltd. v. Kraft Foods, Inc.*, 926 F. Supp. 407, 412 (S.D.N.Y. 1996), *aff'd*, 164 F.3d 619, 1998 WL 695034 (2d Cir. 1998).

Agency can be established in two ways: (1) the parent company must be shown to have "moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy"; or (2) the subsidiary is shown to "perform[ ] services that are sufficiently important to the [parent] corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *See whiteCryption Corp. v. Arxan Techs., Inc.*, No. 15-CV-00754-WHO, 2015 WL 3275944, at *11 (N.D. Cal. June 15, 2016); *see also Dong AH Tire & Rubber Co. v. Glasforms, Inc.*, No. C 06-3359 JFRS, 2009 WL 975817, at *7 (N.D. Cal. Apr. 10, 2009).

In the first test, which appears to be at issue here, an agency relationship exists "where the nature and extent of the control exercised over the subsidiary by the parent is so pervasive and continual that the subsidiary may be considered nothing more than an agent or instrumentality of the parent, notwithstanding the maintenance of separate corporate formalities." *Sonora*, 83 Cal. App. 4th at 541. The California Court of Appeal has described the level of "control" necessary for an agency relationship as extending beyond control incident to ownership, such as "interlocking directors and officers, consolidated reporting, and shared professional services," as well as "a close financial connection." *Id.* at 540–42 (citations omitted). Practically speaking, a parent company's control must be so extensive that the subsidiary becomes "only a means through which the parent acts, or nothing more than an incorporated department of the parent[.]" *Id.* at 541; *Consortium of Servs. Innovation v. Microsoft Corp.*, No. C19-0750-JCC, 2020 WL 885742, at *2 (W.D. Wash. Feb. 24, 2020) (citing *Campagnolo S.R.L. v. Full Speed Ahead, Inc.*, Case No. C08-1372-RSM, Dkt. No. 331 at 12 (W.D. Wash. 2010), *aff'd*, 447 F. App'x 814 (9th Cir. 2011)) (agency requires that a parent exercise "complete domination," the subsidiary is a mere shell, or a parent uses its ownership interest to "command rather than merely cajole" the subsidiary).

In support of its agency theory, Masimo alleges that Hon Hai:

- has "effectively taken over the day-to-day operation of Sotera" because it controls Sotera's executives, board members, and management (FAC ¶¶ 38, 42, 44);

- intermingles employees by appointing "several high-level Sotera employees" to "high-level positions" at Hon Hai (*id.* ¶¶ 38, 50) and sending one such employee to "take control" of Sotera after its bankruptcy (*id.* ¶¶ 40, 46, 47);

**\*17** • retained authority to resolve the trade dispute between Sotera and Masimo (*id.*);

• invested heavily in Sotera (*id.* ¶¶ 40, 41);

• has negotiating power over the sale of Sotera (*id.* ¶¶ 43, 51).

• hired the same counsel for the bankruptcy proceeding as Sotera (*id.* ¶ 45);

• has jointly developed the ViSi Mobile Monitoring System with Sotera and manufactures parts of it (*id.* ¶¶ 48–49), and

• is a "real party-in-interest" to Sotera's petition for *inter partes* review seeking to invalidate Masimo's patents before the U.S. Patent and Trademark Office (*id.* ¶ 52).

Hon Hai argues that these allegations reflect nothing more than "high-level involvement" that do not concern the day-to-day activity of Masimo's operation and are merely incidental to its ownership of Sotera. (Mem. of P. & A. at 13–14.)

The Court finds the FAC's allegations fail to show that Sotera is an agent of Hon Hai. First, as aforementioned, a bare allegation that two entities share officers and/or directors does not suffice to show any dissolution of the corporate structure warranting piercing of the corporate veil. *See Bestfoods*, 524 U.S. at 69; *Bastidas*, 2014 WL 3362214, at *4. Further, a parent's investment in a subsidiary and authority over its possible sale are well within the typical scope of a parent-subsidiary relationship. *See Bestfoods*, 524 U.S. at 72 (holding that "monitoring of the subsidiary's performance" and "supervision of the subsidiary's finance and capital budget decisions...are consistent with the parent's investor status").

Second, Hon Hai's oversight or management of Sotera's legal actions, such as the trade dispute or Sotera's bankruptcy, also does not give rise to the plausible inference that Sotera is merely an "incorporated department" of Hon Hai. *Sonora*, 83 Cal. App. 4th at 541. Supervision over legal decisions is incident to Hon Hai's ownership over Sotera and does not reflect any purposeful disregard of Sotera's independent corporate existence.[17] *Sonora*, 83 Cal. App. 4th at 542. Masimo does not allege any additional specifics about Hon Hai's involvement in the bankruptcy or trade dispute that indicate it went beyond this standard oversight to the type of pervasive control that characterizes an agency relationship.

*See Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 622 F. Supp. 2d 890, 901 (N.D. Cal. 2009) ("[S]ome degree of control is usually[,] even if not necessarily[,] implicit in the parent subsidiary relationship. Thus, the degree of control exercised by the parent in order for the subsidiary to qualify as an agent must therefore exceed that which is to be expected in the normal scope of any such relationship.").

[17] Hon Hai's involvement in Sotera's legal affairs is also insufficient to show the degree of control necessary for unity of interest. *See MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, 2019 WL 4963253, at *12–13 (N.D. Cal. Oct. 8, 2019) (finding no alter ego liability where parent and wholly owned subsidiaries had identical officers and directors, shared employees, and parent provided financial and legal support to subsidiaries); *NetApp*, 2015 WL 400251, at *5 (same); *Grayson Serv., Inc. v. Crimson Res. Mgmt. Corp.*, 2016 WL 8730734, at *8 (E.D. Cal. Feb. 5, 2016) (same).

**\*18** Neither does the alleged joint development of the ViSi Mobile Monitoring system plausibly allege that Sotera was an agent of Hon Hai. A parent company's involvement in the minutia of a product line does not give rise to agency liability. *See Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177 (9th Cir. 1980) (concluding that no agency liability existed where a parent company was responsible for sale of subsidiary's products abroad, "had general executive responsibility for the operation of" the subsidiary, "reviewed and approved its major policy decisions," guaranteed its obligations, and worked closely with the subsidiary's executives regarding pricing and marketing); *whiteCryption Corp.*, 2016 WL 3275944, at *11 (finding a parent company's role in branding decisions, providing technical support, naming and pricing products, developing marketing strategies, and reselling and distributing subsidiary's products did not establish agency relationship). Further, allegations about the "joint development" of a product implies Sotera independently contributed to the venture, belying the notion that Sotera was a mere instrumentality through which Hon Hai conducted its business. *See Sonora*, 83 Cal. App. 4th at 541.[18]

[18] To the extent Masimo intends allegations about Defendants' joint development of the product to support alter ego liability, this argument also fails. *See Tahaya Misr Inv., Inc. v. Helwan Cement*

*S.A.E.*, No. 2:16- cv-01001-CAS (AFMx), 2016 WL 9024808, at *4 (C.D. Cal. May 23, 2016) (noting "the mere fact that a parent coordinates its efforts with its subsidiary does not establish that the subsidiary is the alter ego of the parent"); *see also Unocal*, 248 F.3d at 927–28 (finding no unity of interest even where a parent company was involved in forming the subsidiary's business plan).

Accordingly, having found insufficient allegations to plausibly demonstrate that an alter ego or agency relationship exists between Hon Hai and Sotera, the Court **GRANTS** Hon Hai's Motion to dismiss these claims. *See Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001) ("In the absence of evidence showing that the parent company either was an alter ego of the subsidiary or controlled the conduct of the subsidiary, we have refused to find direct infringement.").

## IV. CONCLUSION

Accordingly, the Court **ORDERS** the following:

(1) Hon Hai's Motion to Dismiss the FAC (ECF No. 62) is **GRANTED IN PART**. Masimo's direct infringement claim and vicarious liability claims against Hon Hai are **DISMISSED WITH LEAVE TO AMEND**. Masimo has until **December 31, 2020** to file an amended complaint.

(2) The Motion is **DENIED** as to Masimo's contributory infringement claim.

(3) The associated Motion to Seal (ECF No. 66) is **TERMINATED AS MOOT**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 7260660

---

End of Document                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

PostX Corporation v. Secure Data in Motion, Inc., Slip Copy (2005)

2005 WL 8177634

KeyCite Yellow Flag - Negative Treatment

Order Amended on Reconsideration by PostX Corporation v. Secure Data in Motion, N.D.Cal., August 31, 2005

2005 WL 8177634

Only the Westlaw citation is currently available.

United States District Court, N.D. California.

POSTX CORPORATION, Plaintiff,

v.

SECURE DATA IN MOTION, INC.,

d/b/a Sigaba, et al., Defendants.

and Related Counterclaims.

No. C 02-04483 SI

|

Signed 08/16/2005

|

Filed 08/17/2005

**Attorneys and Law Firms**

David A. Jakopin, Joseph R. Tiffany, II, Mark J. Danielson, Chang H. Kim, Dianne L. Sweeney, Theodore K. Bell, Pillsbury Winthrop Shaw Pittman LLP, William Frederick Abrams, Steptoe & Johnson LLP, Palo Alto, CA, John M. Grenfell, Pillsbury Winthrop Shaw PittmanLLP, San Francisco, CA, Nicole Townsend Bartow, Atmel Corporation, San Jose, CA, for Plaintiff.

John L. Cooper, Eric M. Bass, James W. Morando, Jeffrey M. Fisher, Stephanie Powers Skaff, Farella Braun & Martel LLP, San Francisco, CA, Heather S. Tewksbury, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, CA, for Defendant Secure Data In Motion, Inc.

Heather S. Tewksbury, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, CA, Stephanie Powers Skaff, Farella Braun and Martel LLP, San Francisco, CA, for Defendant Clearswift Corporation.

**ORDER GRANTING PLAINTIFF'S AND COUNTERDEFENDANTS' MOTION FOR SUMMARY ADJUDICATION OF ANTITRUST CONSPIRACY CLAIMS**

SUSAN ILLSTON, United States District Judge

**\*1** On April 22, 2005, the Court heard oral argument on counterdefendants PostX and Mayfield's motion for summary adjudication of Sigaba's first, third, and fifth counterclaims. Having carefully considered the arguments of counsel and the papers submitted, the Court hereby GRANTS the motion for the reasons set forth below.

**BACKGROUND**

OnSeptember 13, 2002, PostX Corporation ("PostX") filed a complaint for patent infringement against Secure Data In Motion, d/b/a Sigaba ("Sigaba"). On September 29, 2003 and November 25, 2003, the Court granted Sigaba's motions for summary judgment of non-infringement of United States Patent No. 6,477,647 ("the '647 Patent") and U.S. Patent No. 6,014,688 ("the '688 patent"). The Federal Circuit affirmed without opinion on November 15, 2004. On February 4, 2004, the Court granted summary judgment for defendants on PostX's claim for misappropriation of trade secrets under the UniformTrade Secrets Act ("UTSA") because of PostX's failure to adequately disclose the trade secrets at issue in that claim. This left for resolution defendant's three antitrust counterclaims and one false advertising counterclaim.

In its counterclaims, Sigaba alleges that PostX initiated the patent suit against it for improper and anticompetitive purposes. Sigaba's Answer and Counterclaims ¶ 20. In August 2000, officers of both companies met to explore business opportunities and entered into a Non-Disclosure Agreement. Id. at ¶ 14. After these discussions ended, PostX and Sigaba remained competitors in the market for "non-PKI-based Secure Document Delivery Systems," particularly for the business of Bank of America. Id. at ¶ 10, 16. On about August 28, 2002, Bank of America signed a contract to purchase Sigaba's secure document delivery system. Id. at ¶ 16.

According to the counterclaims, PostX learned that it had lost the Bank of America contract to Sigaba and, on September 12, 2002, sent a fax to Bank of America informing the bank that it had filed a patent infringement suit against Sigaba, and posted a press release on its website announcing the filing of its suit. Id. at ¶ 18-19. PostX did not actually file the patent infringement suit until September 13, 2002. Id. at ¶ 19. Sigaba alleges that, because of the 2000 meeting between the companies, PostX knew that Sigaba's products did not infringe the '688 patent, and in fact PostX's Chief Technology Officer admitted that the suit had no technical merit. Id. at ¶ 21-22. After a second patent, the '647 patent,

2005 WL 8177634

was issued to PostX in November 2002, PostX filed a second patent infringement suit against Sigaba, which Sigaba also claims is sham litigation. Id. at ¶ 23. According to Sigaba's counterclaims, PostX conspired with counterdefendant the Mayfield Funds ("Mayfield" or "the Mayfield Funds") and attempted to monopolize the market for "non-PKI-based Secure Document Delivery Systems." Id. at ¶¶ 10-11.

The Mayfield Funds are the investment vehicles for a venture capital firm that invested in PostX multiple times since 1998 and has owned approximately 20% of PostX's stock during this time. Decl. of Yogen Dalal ("Dalal Decl.") at ¶ 4. Mayfield has the right to appoint a director of PostX, and Mayfield managing director Yogen Dalal served on PostX's board from November 1998 to September 2002. PostX and Mayfield also entered into a Management Rights Agreement ("MRA") which gave Mayfield the right, among others, to: "consult with and advise management of PostX on significant business issues, including management's proposed annual and quarterly operating plans," and stated that "if [Mayfield] is not represented on PostX's Board of Directors, PostX shall invite a representative of [Mayfield] to attend all meetings of its Board of Directors in a non-voting observer capacity ... [who] may participate in discussions of matters brought to the Board provided that the representative will recuse himself or herself from discussions that involve conflict of interest between PostX and Mayfield." Dalal Decl., Ex. A at PXT 0089751. According to Sigaba, this MRA granted unique rights to Mayfield that exceeded those guaranteed other PostX investors. Def.'s Opp'n at 2:22-24.

 *2 According to PostX, Dr. Dalal took a sabbatical from late June through September 2002. Dalal Decl. ¶ 8; Decl. of Allen Morgan ("Morgan Decl.") ¶ 8. Allen Morgan, a managing director of Mayfield, had been attending PostX board meetings as a non-voting observer during the late spring and summer of 2002. Before Dalal's departure, Sigaba alleges that Dalal led the PostX board in its decision to fire the current CEO and replace him with Thampy Thomas in June 2002. Def.'s Opp'n at 4:19;5:3. Thomas developed a "counteroffensive" strategy to win the Bank of America business, which included the patent lawsuit. According to Sigaba, PostX sought the "agreement, approval and backing of Mayfield" to initiate the lawsuit by involving Allen Morgan in the decision-making process. Specifically, Thomas, Morgan, and PostX CTO Cayce Ullman held a one-hour conference call on September 12, 2002, during which they reached agreement that PostX would file the sham suit. Decl. of John L. Cooper, Ex. P (Thomas Depo.) at

335:20-336:18. No other PostX board members participated in this call. Id. at 304:1-9.

Then, on September 13, 2002, at 9:00 a.m., the PostX board voted to (1) remove Dalal as the Mayfield representative on the PostX board and appoint Mr. Morgan as a PostX director, and (2) approve the filing of the lawsuit. Cooper Decl., Ex. CC at PXT 0087030. The PostX board made Morgan's appointment effective September 11, 2002 by a resolution stating "[t]hat all actions taken by Allen Morgan from and after September 11, 2002, and his participation in all deliberations of the Board from and after that date, are hereby ratified, approved and confirmed as taken in his capacity as a member of the Board." Id. at 0087029. Morgan states that he attended the board meetings prior to September 13, 2002 as a non-voting observer, and became a director of PostX on September 11, 2002, "for the purpose of casting a vote at the September 13, 2002 PostX Board meeting." Morgan Decl. ¶ 8. When Dr. Dalal returned from sabbatical at the beginning of October 2002, he replaced Morgan as a director of PostX. Id. at ¶ 11.

Sigaba alleges that this conduct by PostX and Mayfield reveals their anticompetitive objectives in filing the sham litigation. In addition, it contends that Mayfield materially contributed to the anticompetitive conduct "pledg[ing] continuing support" to PostX and thereby helping to finance the litigation. Cooper Decl., Ex. G (Dean Mayer Depo.) at 428:20-22. Mayfield provided $1 million in PostX's December 2002 round of financing and $1.5 million in an August 2003 financing for PostX's operating expenses, which would include the litigation expenses for the Sigaba suit. Id., Ex. A (Dalal Depo.) at 274:15-275:8.

Now before the Court is a motion by PostX and the Mayfield Funds for summary adjudication of three of defendant's counterclaims: (1) for "restraint of trade" under Section 1 of the Sherman Act; (2) for "conspiracy to attempt monopolization" under Section 2 of the Sherman Act; and (3) for declaratory relief as to these claims.

## LEGAL STANDARD

Summary judgment or adjudicatio n is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any materialfact and that the

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 317 (1986)). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. See T.W. Electric, 809 F.2d at 630-31 (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986)); Ting v. United States, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

**\*3** PostX and Mayfield bring this motion for summary adjudication of Sigaba's first and third counterclaims, which allege a conspiracy to violate §§ 1 and 2 of the Sherman Act, and the fifth counterclaim, which seeks declaratory relief. The gravamen of Sigaba's allegations is that PostX's patent suit constituted sham litigation prosecuted for an anticompetitive purpose, and that Mayfield and PostX together conspired to initiate and finance the suit. PostX and Mayfield contend that these counterclaims must be dismissed because, under the "intracorporate conspiracy doctrine," PostX and Mayfield were legally incapable of an antitrust conspiracy because Mayfield's nominees to the PostX board do not have an independent personal stake in the antitrust violation and because Mayfield does not compete with PostX in the relevant market.

## A. Application of the intracorporate conspiracy doctrine

Under the intracorporate conspiracy doctrine, certain actors who "operate within and for the benefit of a single economic enterprise" do not meet the "concerted action" requirement of Section 1 of the Sherman Act. Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc., 332 F.3d 6, 13 (1st Cir. 2003).[1] The doctrine precludes antitrust claims where the officers or employees of a company are alleged to have conspired with the corporation. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 (1984) ("officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not bring together economic power that was previously pursuing divergent goals"). The doctrine also applies generally to the "internally coordinated conduct of a corporation and one of its unincorporated divisions." Id. at 770. In Copperweld, the Supreme Court extended this doctrine to a claim that a corporation conspired with its wholly-owned subsidiary. Id. at 771. Many courts have recognized an exception for "corporate officers acting on their own behalf," see Copperweld, 476 U.S. at 770 n. 15, which applies when an officer has "an independent personal stake in achieving the corporation's illegal objective." Greenville Publ'g Co. v. Daily Reflector, Inc., 496 F.2d 1391, 1399 (4th Cir. 1974).

[1]     According to PostX, the concerted action requirement for Section 1 claims also applies to Section 2 claims of conspiracy to monopolize.

In two recent decisions, the Ninth Circuit has clarified the general principles to guide the inquiry when separate entities with a common economic interest are alleged to have conspired. In Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1148-49 (9th Cir.), cert. denied, 540 U.S. 940 (2003), the Court of Appeals stated:

> Although the single-entity inquiry is fact-specific, a few general guidelines emerge. First, in the absence of economic unity, the fact that joint venturers pursue the common interests of the whole is generally not enough, by itself, to render them a single entity ... Second, in the absence of economic unity, the fact that firms are not actual competitors is also usually not enough, by itself, to render them a single entity. Absence of actual competition may simply be a manifestation of the

> anticompetitive agreement itself ...
> Cases have required instead that the
> constituent entities be neither actual
> nor *potential* competitors. Finally,
> where firms are not an economic unit
> and are at least potential competitors,
> they are usually not a single entity for
> antitrust purposes.

322 F.3d at 1148-49 (italics in original).

Since Freeman, the Ninth Circuit has reaffirmed these general principles and held that "[t]he crucial question is whether the entities alleged to have conspired maintain an 'economic unity,' and whether the entities were either actual or potential competitors. Our inquiry is a functional one." Jack Russell Terrier Network of Northern Cal. v. Amer. Kennel Club, Inc., 407 F.3d 1027, 1034 (9th Cir. 2005), citing Freeman, 322 F.3d at 1148-49, and Copperweld, 467 U.S. at 773 n.21 ("substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1"). [2]

[2]   The parties have briefed the significance of the Jack Russell decision in letter briefs to the Court filed since the hearing.

**\*4**  Sigaba cites several cases for the propositions that (1) entities may share one aligned economic interest but not be entitled to single entity status, and (2) there need not be any competitive relationship between the conspiring parties for a conspiracy to exist. See Minpeco, S.A. v. ContiCommodity Services, Inc., 673 F. Supp. 684 (S.D.N.Y. 1987) (finding conspiracy between investors and silver traders, despite their aligned interest in the restraint of trade); Pinhas v. Summit Health Ltd., 894 F.2d 1024 (9th Cir. 1989) (finding no immunity from conspiracy for an attorney and client allegedly engaging in anticompetitive behavior); Agron, Inc. v. Chien-Lu Lin, 2004 WL 555377 (C.D. Cal. March 16, 2004) (applying Pinhas and finding a cognizable conspiracy claim against a lawyer and patent holder who agreed to bring baseless patent suits). According to Sigaba, the question of actual or potential competition is "*not the only method* to determine whether the entities economic interests are diverse," see Def.s' June 3, 2005 Letter Br. at 2 (italics in original), citing City of Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 276 (8th Cir. 1988) ("By 'diverse,' we mean interests which tend to show that any two of the defendants are, or have been, actual or potential competitors,

or, at the very least, interests which are sufficiently divergent so that a reasonable juror could conclude that the entities have not always worked together for a common cause.").

While in some contexts, courts have apparently recognized antitrust conspiracies among individuals or entities without a competitive relationship, like lawyers and their clients, the Court finds that the general principles enunciated in Freeman and Jack Russell apply in this case, where the alleged conspiracy is between two economic actors with independent – though not necessarily diverse – economic interests. Copperweld teaches that the fundamental issue is whether the entities are "separate economic actors pursuing separate economic interests [such that] agreements among them ... suddenly bring together economic power that was previously pursuing divergent goals." In the context of an investor and an investee like PostX and Mayfield, the appropriate inquiry is whether the two maintain an economic unity and whether they are actual or potential competitors.

**B. Economic unity and competition between PostX and Mayfield**

In conducting the fact-specific inquiry under the principles of Freeman and Jack Russell, the Court considers whether PostX and Mayfield possessed economic unity at the time of their agreement and whether they are actual or even potential competitors.

Mayfield was the most important PostX investor, holding 20% of its shares, and had significant access to and influence over PostX, including a Management Rights Agreement that was favorable to Mayfield. While Sigaba suggests that this level of access and involvement was somehow illicit, it is difficult to see how such substantial influence would make the two entities more capable of conspiring rather than less. See Fresh Made, Inc. v. Lifeway Foods, Inc., 2002 WL 31246922 at \*7 (E.D. Pa. Aug. 9, 2002). At the same time, PostX and Sigaba are separate economic entities, and of course they do not have identical economic interests in all circumstances. Nonetheless, their interests in PostX's success were one and the same, and the Court cannot conceive of how Mayfield's interest in obtaining a favorable return on its investment in PostX constitutes a "separate" interest from that of PostX's other shareholders or of PostX itself. [3] The aligned interest of PostX and Mayfield in PostX's success is not the "commonality of interest" that "exists in every cartel," L.A. Memorial Coliseum Comm'n v. N.F.L., 726 F.2d 1381, 1389 (9th Cir. 1984), but rather the unity of economic

2005 WL 8177634

interest shared between any shareholder and the company in which it invests. Sigaba's only concrete suggestion of how those interests might diverge is that Dr. Dalale mailed the PostX board on May 16, 2002, suggesting a possible merger of PostX with another company:

> I have been thinking about what the future holds for PostX and I don't feel good ... Mayfield has a lot invested and I can't watch it get wasted without doing all I can to make this investment return something for us ... We must consolidate or we will find ourselves with no cash at the end of the year and then its lights out. Mike has been unsuccessful in raising any money and it's not surprising why – no revenues and high valuation at PostX! I suggest we cut the company back and merge it with Boldfish ASAP ... I had a long chat with John Shoch today and he is supportive as both Mayfield and Alloy have a lot of money in both companies and we need to get some returns now ... We need to salvage all our work quickly.

**\*5** Cooper Decl., Ex. O (Dalal Depo.), Depo. Ex. 1034.

3
> According to Dr. Dalal's deposition, Mayfield would now no longer be considered the "lead investor" in PostX (which is the term for an investor that provides the largest dollar amount and sets the terms of the company's financings), because another firm led the investment and set the terms of the most recent financing, and that firm now owns the same percentage of PostX as Mayfield. Cooper Decl., Ex. O (Dalal Depo.) at 23:8-24:15.

Sigaba argues that this email is proof that Mayfield sought return on its investment regardless of the consequences for PostX. But, as Thampy Thomas testified, that merger never occurred because the PostX board, including Dalal, and together with Thomas, "decided against it." Cooper Decl., Ex. P (Thomas Depo.) at 848:18. As PostX points

out, Dalal's suggestion does not so much reflect an interest diverse from PostX's as the interest in maximizing PostX's shareholder value. In addition, while Sigaba suggests that Mayfield was the animating force behind the strategy to eliminate competition from Sigaba, it is clear that PostX's "counteroffensive" plan to defeat Sigaba was initiated by PostX CEO Thampy Thomas.

Rather than indicating divergent or potentially competing interests coming together for a single anticompetitive objective, these facts weigh in favor of a finding that PostX and Mayfield shared a common interest in PostX's financial success before the decision to file the patent suit. In addition, there is no evidence that they were or might be competitors previously pursuing separate interests "sudden[ly] joining economic power." Copperweld, 467 U.S. at 771. Rather, at all times, the two entities and their representatives were engaged in corporate governance decisions regarding PostX, a company in which they have shared an economic interest since 1998. Accordingly, they are entitled to the protection of the intracorporate conspiracy doctrine.

### C. Morgan's director status

Because the Court finds that PostX and Mayfield were legally incapable of an antitrust conspiracy, the matter of Allen Morgan's precise status on September 12, 2002 is not dispositive of this motion. Sigaba contends that Allen Morgan was not a board member at the time of his September 12, 2002 conversation with Thampy Thomas, during which they agreed that PostX should file suit. Sigaba characterizes the board's retroactive appointment of Morgan as "backdating" his directorship precisely to avoid liability for conspiracy, and it argues that Morgan was acting on Mayfield's behalf, not PostX's, at the time of the allegedly conspiratorial agreement. In addition, Sigaba contends that Morgan was capable of conspiring with PostX even when he was a director, because Mayfield had independent economic interests which Morgan was protecting.

PostX contends that this issue is a red herring, because Thomas could consult with Morgan under the terms of the Management Rights Agreement between PostX and Mayfield both before and after his appointment to the board, and the board's retroactive ratification of Morgan as a director was entirely effective under California law. In addition, PostX and Mayfield apparently seek a broader holding from the Court that corporate directors and the minority shareholders who appoint them are legally incapable of conspiring with the corporation in which the shareholder invests.

2005 WL 8177634

 **\*6**  As PostX points out, counterdefendants do not dispute that Mayfield's representative on the PostX board, Allen Morgan, participated in and supported the decision to sue Sigaba. The Court agrees that the application of the intracorporate conspiracy doctrine rests on the above analysis of PostX and Mayfield's corporate relationships, not "on dispute issues of who knew what when, or who said what to whom." Pls.' Reply at 2:18-19. Both parties correctly recognize that, regardless of Morgan's director status on September 12, 2002, the intracorporate conspiracy doctrine looks to economic reality, not corporate form. Copperweld, 467 U.S. at 772; City of Mt. Pleasant, supra, 838 F.2d at 275. Viewing the evidence in the light most favorable to Sigaba, the Court declines to hold that Allen Morgan's director status itself on September 12, 2002, makes PostX and Mayfield legally incapable of antitrust conspiracy.

However, the Court also declines to adopt a broader holding that would suggest that a corporate director and the shareholder he or she represents are always shielded under the intracorporate conspiracy doctrine. Under the circumstances of this case, and on the record before the Court, Mayfield and PostX enjoyed an economic unity, were neither actual nor potential competitors, and were legally incapable of the alleged conspiracy. Sigaba has not established a triable issue of fact on any of these issues.

### D. Objections to evidence

PostX has filed a series of objections to statements in Sigaba's Opposition brief and evidence submitted. The Court finds that, even assuming all statements and evidence are admissible, Sigaba has not established that a triable issue of material fact exists to defeat summary judgment. Accordingly, it does not rule on PostX's objections individually.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS PostX and Mayfield's motion for summary adjudication of Sigaba's antitrust counterclaims. [Docket # 509].

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2005 WL 8177634

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WCAS086

2019 WL 9102043
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

Khokar SHUJAUDDIN, et al., Plaintiffs

v.

BERGER BUILDING PRODUCTS,

INC., et al., Defendants

CIVIL ACTION NO. 19-876
|
Filed 06/18/2019

**Attorneys and Law Firms**

James D. Golkow, Kyle D. Reich, Timothy J. Ryan, Golkow
Hessel LLC, Philadelphia, PA, for Plaintiffs.

Kiernan G. Cavanagh, Campbell Conroy & O'Neil, PC,
Berwyn, PA, Keith D. Heinold, Marshall Dennehey Warner
Coleman & Goggin, Tara Gill Nalencz, Rawle & Henderson
LLP, Philadelphia, PA, for Defendant Omnimax International,
Inc.

Kiernan G. Cavanagh, Campbell Conroy & O'Neil, PC,
Berwyn, PA, Eric A. Weiss, Keith D. Heinold, Marshall,
Dennehey, Warner, Coleman, & Goggin, Tara Gill Nalencz,
Rawle & Henderson LLP, Philadelphia, PA, for Defendant
Euramax International, Inc.

John R. O'Rourke, McTighe, Weiss & O'Rourke, Norristown,
PA, for Defendant the Heim Group.

Joseph H. Riches, Law Offices of Mason & Eiseman,
Philadelphia, PA, for Defendant Automation Direct.

Daniel W. Gerber, Gerber Ciano Kelly Brady LLP, New York,
NY, for Defendant Comepi, Srl.

## ORDER

NITZA I. QUIÑONES ALEJANDRO, Judge

**\*1  AND NOW**, this 18th day of June 2019, upon
consideration of the *motion to dismiss* filed pursuant to
Federal Rules of Civil Procedure ("Rules") 12(b)(2), (5),
and (6) by Defendant OmniMax Holdings, Inc. ("OMH")
(formerly known as EuraMax Holdings, Inc. ("EMH")),[1]
[ECF 5], the response in opposition filed by Plaintiffs Khokar

Shujauddin and Najma Shuja, ("Plaintiffs"), [ECF 8], OMH's
reply, [ECF 21], and the allegations in the complaint, [ECF
1 at 38], it is hereby **ORDERED** that OMH's motion to
dismiss is **GRANTED**. Accordingly, all claims against OMH
are **DISMISSED**.[2]

[1]  Though Plaintiff sued OMH and EMH as separate
Defendants, OMH has consistently maintained
that they are a single entity. [*See, e.g.*, ECF 5
at 6]. In support, OMH supplied a Certificate
of Amendment signed by the Secretary of State
of Delaware which reflects that EMH officially
changed its name to OMH on January 6, 2017.
[ECF 5-1 at Ex. E]. Plaintiffs have not challenged
this certificate. Accordingly, though OMH is
discussed herein as a single entity, for the reasons
set forth below, Plaintiffs' claims against both
OMH and EMH are dismissed.

[2]  On January 23, 2019, Plaintiffs filed this civil
action in state court asserting claims of strict
product liability, negligence, breach of express
and/or implied warranty, and loss of consortium
stemming from an accident Shujauddin allegedly
suffered in July 2017 when, while working as
a die setter, the press machine he was using
"unexpectedly cycled," causing severe injuries
to Shujauddin's left hand. [ECF 1]. On March
15, 2019, OMH filed the underlying motion
to dismiss. [ECF 5]. In said motion, OMH
argues that Plaintiffs' claims against it should be
dismissed because, *inter alia*, Plaintiffs have failed
to make a *prima facie* showing that this Court
has personal jurisdiction. Plaintiffs disagree and
argue that OMH is subject to (1) general personal
jurisdiction because its wholly-owned subsidiary,
OmniMax International, Inc., conducts business
in Pennsylvania, and (2) specific jurisdiction
because sufficient contacts exist between OMH and
Pennsylvania, and this litigation arises out of those
contacts.

Under Rule 12(b)(2), a defendant may move to
dismiss a claim for lack of personal jurisdiction.
To determine whether personal jurisdiction exists,
courts "must accept all of the plaintiff's allegations
as true and construe disputed facts in favor of
the plaintiff." *Pinker v. Roche Holdings Ltd.*,
292 F.3d 361, 368 (3d Cir. 2002). However,
once a defendant has raised a jurisdictional

defense, a plaintiff has the burden to show, "with reasonable particularity," enough contact between the defendant and the forum to support the exercise of personal jurisdiction by the forum state. *Id.*; *see also Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992) (internal citations omitted); *Action Mfg. Co. v. Simon Wrecking Co.*, 375 F. Supp. 2d 411, 418 (E.D. Pa. 2005) ("In order to establish a *prima facie* case, the plaintiff must present specific facts that would allow the court to exercise jurisdiction over the defendant."). Moreover, once a plaintiff's "allegations are contradicted by an opposing affidavit ... [the plaintiff] must present similar evidence in support of personal jurisdiction." *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 556 (M.D. Pa. 2009). That is, to counter opposing affidavits, "[p]laintiffs may not repose upon their pleadings ... [r]ather, they must counter defendant['s] affidavits with contrary evidence in support of purposeful availment jurisdiction." *Id.* at 559. To that end, "[t]he plaintiff must respond to the defendant's motion with 'actual proofs;' 'affidavits which parrot and do no more than restate [the] plaintiff's allegations ... do not end the inquiry.' " *Lionti v. Dipna, Inc.*, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) (quoting *Time Share Vacation Club v. Atl. Resorts, Ltd.*, 735 F.2d 61, 66, n.9 (3d Cir. 1984)); *see also Lehigh Gas Wholesale, LLC v. LAP Petro., LLC*, 2015 WL 1312213, at *2 (E.D. Pa. Mar. 23, 2015) ("Plaintiff carries the burden to prove personal jurisdiction using 'affidavits or other competent evidence.' ") (quoting *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009)).

Federal courts may assert jurisdiction over a nonresident of the forum state to the extent authorized by the law of the forum. *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir. 2001). Here, Pennsylvania's long-arm statute is the applicable statute, and it grants jurisdiction coextensive with that permitted by the due process clause of the Fourteenth Amendment of the United States Constitution. *Id.*; *see also* 42 Pa. Cons. Stat. § 5322(b). Under the Fourteenth Amendment due process analysis, a federal court must possess either general jurisdiction or specific jurisdiction. *See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 102 (3d Cir. 2009)

(citing *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). General jurisdiction allows a court to hear any claim against a party whose "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *Daimler AG v. Bauman*, 571 U.S. 117, 127, 134 S.Ct. 746, 187 L.Ed.2d 624 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011)). In all but "exceptional case[s]," corporate defendants like OMH and EMH are "at home" in the states in which they are incorporated and maintain their principal place of business. *BNSF Ry. Co. v. Tyrrell*, —— U.S. ——, 137 S. Ct. 1549, 1552, 198 L.Ed.2d 36 (2017) (citing *Daimler*, 571 U.S. at 137, 134 S.Ct. 746); *see also Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016). Specific jurisdiction allows a court to hear *only* claims that "aris[e] out of or relat[e] to the defendant's contacts with the forum." *Helicopteros*, 466 U.S. at 414 n.8, 104 S.Ct. 1868. To be subject to specific jurisdiction, "[t]he defendant must have 'purposefully directed his activities at the forum.' " *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 317 (3d Cir. 2007) (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). In determining whether specific jurisdiction exists, courts are to consider "the relationship among the forum, the defendant and the litigation in order to determine whether the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there." *Mellon Bank PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1221 (3d Cir. 1992) (internal quotations and citations omitted).

In the underlying motion, OMH argues that it (1) is incorporated in Delaware and maintains its principal place of business in Georgia, and (2) "had no involvement in the purchase, design, installation, testing, safety assessment, or operation of any equipment located at the subject facility, does not employ anyone who works at the facility, and is not otherwise involved with the operations at the facility" where Shujauddin was injured. [ECF 5 at 8]. To support these contentions, OMH offers a signed affidavit in which Christopher Berg, Vice President, General Counsel, and

Corporate Secretary of OMH subsidiary, OmniMax International, Inc. ("OMI"), attests to those facts. [ECF 5 at Ex. D]. In response, Plaintiffs argue that (1) OMH's ownership of subsidiary OMI, which conducts business in Pennsylvania, subjects OMH to both general and specific jurisdiction in this forum, and that (2) Plaintiffs' allegations that OMH "designed, manufactured, supplied, distributed, modified, and/or sold the subject die press machinery and equipment which caused Plaintiff [Shujauddin]'s injuries," [ECF 8 at 7], are sufficient to support specific jurisdiction. Plaintiffs are mistaken on both arguments.

With respect to Plaintiffs' argument that OMH's relationship to OMI supports personal jurisdiction in Pennsylvania, Plaintiffs cite to the state court's observation in *Hall v. Penn Hosp.*, 429 A.2d 80 (Pa. Super. Ct. 1980), that "a foreign corporation cannot avoid jurisdiction of Pennsylvania Courts by conducting business in Pennsylvania through a subsidiary corporation." *Id.* at *7-8. This single proposition of law is, however, insufficient to establish federal personal jurisdiction over OMH. "In order to impute the jurisdictional contacts of [a subsidiary to a parent], [Plaintiffs] must present prima facie evidence to overcome the general rule that mere ownership of a subsidiary does not subject the parent corporation to personal jurisdiction in the state of the subsidiary." *Blackwell v. Marina Assocs.*, 2006 WL 573793, at *5 (E.D. Pa. Mar. 9, 2006). Moreover, *Daimler* all but closed the door on the viability of the "agency" theory of personal jurisdiction on which Plaintiffs rely. 571 U.S. at 136, 134 S.Ct. 746 ("Even if we were to assume that [a subsidiary] is at home in California, and further to assume that [the subsidiary's] contacts are imputable to [the nonresident parent], there would still be no basis to subject [the parent] to general jurisdiction in California, for [the parent's] slim contacts with the state hardly render it at home there."). Therefore, Plaintiffs' reliance on the mere fact that OMH owns OMI to establish personal jurisdiction is baseless. Plaintiffs also argue that OMH should be subject to specific jurisdiction in Pennsylvania because "Omnimax Holdings, Inc. designed, manufactured, supplied, distributed, modified, and/or sold the subject die press machinery and equipment which

caused Plaintiff [Shujauddin]'s injuries." [ECF 8 at 7]. This argument, however, contains two critical flaws. First, the complaint contains no such specific allegation against OMH. Rather the complaint contains only generalized allegations that *all* Defendants "designed, manufactured ..." the machinery in question. Such allegations fail. "Even under the most liberal notice pleading requirements of Rule 8(a), a plaintiff must differentiate between defendants. An allegation against multiple defendants that is bereft of specific wrongdoing by those proposed defendants is insufficient to state a claim." *Binder v. Weststar Mortg.*, 2016 WL 3762710, at *3 (E.D. Pa. July 13, 2016) (internal quotations and citations omitted). Generalized pleadings "are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679, 129 S.Ct. 1937. Second, "[w]hen a defendant challenges personal jurisdiction, the plaintiff has the burden of proof to establish 'jurisdictional facts through sworn affidavits or other competent evidence.' " *Regan v. Loewenstein*, 292 F. App'x 200, 204-05 (3d Cir. 2008) (quoting *Patterson by Patterson v. F.B.I.*, 893 F.2d 595, 604 (3d Cir. 1990)); *see also Time Share Vacation Club*, 735 F.2d at 66 n.9 ("at no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of *in personam* jurisdiction."). Here, Plaintiffs have offered no "sworn affidavits or other competent evidence" to rebut OMH's assertion that it "had no involvement in the purchase, design, installation, testing, safety assessment, or operation of any equipment located at the subject facility, does not employ anyone who works at the subject facility, and is not otherwise involved with the operations at the facility" where Shujauddin was injured.

This Court agrees with OMH that Plaintiffs have failed to make a *prima facie* showing of personal jurisdiction. Accordingly, OMH's motion is granted, and Plaintiffs' claims against both OMH and EMH are dismissed pursuant to Rule 12(b)(2). Under these circumstances, discussion of OMH's remaining arguments (under Rules 12(b)(5) and (6)) is unnecessary.

**All Citations**

Slip Copy, 2019 WL 9102043

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015 WL 9948936, 2015-2 Trade Cases P 79,332

2015 WL 9948936
United States District Court, C.D. California.

TOP RANK, INC.
v.
Alan HAYMON, et al.

CV 15–4961–JFW (MRWx)
|
Signed 10/16/2015

**Attorneys and Law Firms**

Daniel M. Petrocelli, David Marroso, James Michael Pearl, Stephen Mcintyre, O'Melveny and Myers LLP, Los Angeles, CA, for Plaintiffs.

Howard Weitzman, Jeremiah Tracy Reynolds, Kinsella Weitzman Iser Kump and Aldisert LLP, Santa Monica, CA, Barry H. Berke, Marjorie E. Sheldon, Norman C. Simon, Kramer Levin Naftalis and Frankel LLP, New York, NY, Russell F. Sauer, Monica R. Klosterman, Robin A. Kelley, Thomas Rickeman, Latham & Watkins LLP, Los Angeles, CA, Brendan A. McShane, Christopher S. Yates, Latham and Watkins LLP, San Francisco, CA, for Defendants.

**PROCEEDINGS (IN CHAMBERS): ORDER GRANTING IN PART THE HAYMON DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6) [filed 8/31/2015; Docket No. 60];**

**ORDER GRANTING WADDELL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) [filed 8/31/2015; Docket No. 61]**

HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

**\*1** On August 31, 2015, Defendants Alan Haymon, Haymon Boxing LLC ("Haymon Boxing"), Haymon Sports LLC ("Haymon Sports"), Haymon Holdings LLC ("Haymon Holdings"), and Alan Haymon Development, Inc. ("Haymon Development") (collectively, the "Haymon Defendants") filed a Motion to Dismiss Pursuant to FRCP 12(b)(6) ("Motion to Dismiss") [Docket No. 60]. On September 18, 2015, Plaintiff Top Rank, Inc. ("Plaintiff" or "Top Rank")

filed its Opposition [Docket No. 79]. On September 25, 2015, the Haymon Defendants filed a Reply [Docket No. 81].

On August 31, 2015, Defendants Waddell & Reed Financial, Inc. ("W & R Financial"), Waddell & Reed Investment Management Company ("WRIMCO"), Ivy Investment Management Company ("IICO"), and Media Group Holdings, LLC ("MGH") (collectively, the "Waddell Defendants") filed a Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss") [Docket No. 61]. On September 18, 2015, Top Rank filed its Opposition [Docket No. 78]. On September 25, 2015, the Waddell Defendants filed a Reply [Docket No. 80].

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7–15, the Court found these matters appropriate for submission on the papers without oral argument. The matters were, therefore, removed from the Court's October 5, 2015 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I. FACTUAL AND PROCEDURAL BACKGROUND**
In its First Amended Complaint filed on August 3, 2015, Top Rank alleges that the Haymon Defendants, "[w]ith the financial backing, complicity, strategic planning, and material assistance" of the Waddell Defendants, are seeking to monopolize and restrain trade in the markets for managing and promoting "Championship–Caliber Boxers" in the United States. First Amended Complaint ("FAC") at ¶¶ 1, 3, 137–155. Top Rank alleges that the Haymon Defendants' and Waddell Defendants' conduct violates the Sherman Act, the Muhammad Ali Boxing Reform Act, and other federal and state laws. FAC at ¶¶ 137–184.

**A. The Parties**
Plaintiff Top Rank is a boxing promoter licensed in the States of California and Nevada, among others. FAC at ¶ 9.

Defendant Alan Haymon, and the other Haymon Defendants, are allegedly engaged in the business of professional boxing management as well as the business of professional boxing promotion throughout the United States. FAC at ¶ 122. The Haymon Defendants have approximately 200 fighters in their management stable, including current and former world champions Adonis Stevenson, Danny Garcia, Adrien Broner,

WCAS091

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 97 of 202

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)
2015 WL 9948936, 2015-2 Trade Cases P 79,332

Anthony Dirrell, Peter Quillin, and Keith Thurman. FAC at ¶ 45.

The Waddell Defendants are asset management and investment advisory firms. Specifically, W & R Financial is a "publicly traded asset management and financial planning company." FAC at ¶ 15. WRIMCO and IICO, subsidiaries of W & R Financial, are a "national investment advisory business" and a "registered investment advisor for [W & R Financial's] 'Ivy Funds,' " respectively. FAC at ¶¶ 16–17. MGH, a Delaware series LLC, is alleged to be a subsidiary of W & R Financial and the vehicle through which the Waddell Defendants invested in the Haymon Defendants. FAC at ¶¶ 18, 57. MGH is allegedly a member of Haymon Holdings. FAC at ¶ 18. According to the First Amended Complaint, the Waddell Defendants are allegedly agents and alter egos of one another. FAC at ¶ 19.

### B. The Haymon Defendants' Alleged Conduct

**\*2** As discussed in greater detail below, Top Rank alleges that the Haymon Defendants have engaged in at least four types of anticompetitive and tortious behavior: (1) inducing professional boxers to enter unlawful "tie out" agreements, which prevent the boxers from "freely" or "independently" contracting with legitimate promoters (FAC at ¶¶ 63–66, 137–144); (2) illegally acting as a promoter and fraudulently operating in the promotion business through a network of "sham promoters;" (FAC at ¶¶ 72–82, 147); (3) blocking legitimate promoters' access to major venues through fraud, overbooking, and other unlawful means (FAC at ¶¶ 97–100, 147); and (4) utilizing predatory "payola" practices, i.e., preventing legitimate promoters from access to television broadcasters through exclusive dealing, overbooking, and other unlawful means (FAC at ¶¶ 83-96).

#### 1. *"Tie Out" Contracts and "Sham Promoters"*

The Haymon Defendants allegedly require boxers to sign long-term, exclusive management agreements, which prevent boxers from entering into contracts with "legitimate" promoters without the Haymon Defendants' express consent. FAC at ¶¶ 63–66. Top Rank alleges that the Haymon Defendants, on one occasion, withheld their consent and refused to allow Roc Nation to promote a bout involving one of the Haymon Defendants' boxers. FAC at ¶ 80. In addition, Top Rank alleges that "in at least some instances," the Haymon Defendants employ the services of "sham promoters" that are controlled by the Haymon Defendants. FAC at ¶¶ 73, 82. Top Rank alleges that the use of these "tie out" contracts and "sham promoters" excludes legitimate promoters from accessing and promoting many of the industry's top boxers and allows the Haymon Defendants to act illegally as both manager and promoter in violation of the "firewall" provisions of the Muhammad Ali Boxing Reform Act. FAC at ¶¶ 65, 82.

#### 2. *Predatory "Payola" Practices*

The Haymon Defendants have allegedly reversed the ordinary flow of money between television broadcasters and promoters by purchasing air time with over half a dozen leading broadcasters to air fights involving Haymon-contracted boxers under the "Premier Boxing Champions" ("PBC") brand. FAC at ¶¶ 6, 86, 87, 92. Top Rank alleges that the Haymon Defendants have obtained "exclusive commitments," from broadcasters, either tacit or express, and have locked up over 100 different dates, allegedly leaving no room, dates, or opportunities for other promoters or fighters. FAC at ¶¶ 6, 87, 94. Top Rank alleges that, between paying the broadcasters for air time and the expenses of promoting each televised match, the Haymon Defendants are operating significantly below cost in the short term so that they can expand their presence in the boxing promotion business, eliminate competition from promoters, build a monopoly, and ultimately charge supracompetitive prices. FAC at ¶¶ 6, 92, 93.

#### 3. *Venue Blocking*

Top Rank alleges that the Haymon Defendants have used their dominant position in the management market to block legitimate promoters from obtaining favorable dates at top venues. FAC at ¶¶ 4, 97–100. Specifically, Top Rank alleges that two promoters, Golden Boy and Banner Promotions, recently attempted to stage a fight between Ruslan Provodnikov and Lucas Matthyse at the StubHub Center in Carson, California. FAC at ¶ 97. The fight was originally scheduled for March 28, 2015. FAC at ¶ 97. However, Top Rank alleges that the Haymon Defendants "locked up" the desired date for the Provodnikov–Matthyse fight at the StubHub Center (as well as other Southern California venues), ostensibly to host a fight between Jhonny Gonzalez and Garry Russell Jr. FAC at ¶¶ 97–98. Because the StubHub Center and other Southern California venues were

booked, Golden Boy and Banner Promotions were forced to move the fight to another location. FAC at ¶ 98. As soon as the Provodnikov–Matthyse fight was relocated, the Haymon Defendants allegedly moved the Gonzalez–Russell fight to The Palms in Las Vegas. FAC at ¶ 98. Top Rank alleges that the Haymon Defendants' purpose in "locking up" the StubHub Center and alternative Southern California venues was to "lock out" the Provodnikov–Matthyse fight and prevent any possible cannibalization of tickets sales in the same local area for the Haymon Defendants' bout between Julio Cesar Chavez, Jr. and Andrzej Fonfara, which was scheduled to take place at the StubHub Center just three weeks later, on April 18, 2015. FAC at ¶ 98.

### C. The Waddell Defendants' Alleged Conduct

**\*3** Top Rank alleges that Ryan Caldwell, a senior executive and portfolio manager of W & R Financial, WRIMCO, and IICO, had ambitions to "own live sports." FAC at ¶ 56. After discussions with Alan Haymon, he allegedly agreed that the Waddell Defendants would "commit funding, business expertise, and operational supervision" to the Haymon Defendants. FAC at ¶ 56 Pursuant to that agreement, the Waddell Defendants arranged for at least four investment funds, under the management of WRIMCO and IICO, to collectively purchase hundreds of millions of dollars of "Series H" stock in MGH. FAC at ¶ 57. MGH in turn invested these funds in Haymon Holdings on August 29, 2013 and October 31, 2013. FAC at ¶ 57.

On August 29, 2013, concurrent with its investment, MGH entered into an Amended and Restated Limited Liability Company Agreement with respect to Haymon Holdings (which is, in turn, the managing member of Haymon Sports). FAC at ¶ 58. The Agreement provided that MGH would become a "member" of Haymon Holdings, along with Haymon Development and at least one other member. FAC at ¶ 58. Pursuant to the Agreement, MGH is allegedly entitled to appoint two "Observers" to Haymon Holdings' Board of Directors, who receive all of the information provided to any Board member, and who, in the past, had the power to convene special meetings of the Board of Directors. FAC at ¶ 59. In addition, MGH allegedly possesses approval rights (or veto power) over Haymon Holdings' and its subsidiaries' "Major Decisions," including those related to material contracts, any material change in business, adoption of annual budgets and business plans, and any material action or material expenditure. FAC at ¶ 61.

In addition to the Waddell Defendants' alleged investment in Haymon Holdings, Top Rank alleges that Ryan Caldwell, and other representatives of the Waddell Defendants: (1) attended meetings and engaged in negotiations for the possible acquisition of Golden Boy Promotions, one of the industry's premier promoters (FAC at ¶¶ 67–71); [1] and (2) attended meetings and engaged in negotiations with broadcasters to reassure them that the Haymon Defendants had adequate funding for their new PBC boxing venture and alleged "payola" scheme (FAC at ¶¶ 91, 95).

[1]     Due to Top Rank's reliance on group pleading, it is impossible to determine which entity that Top Rank claims attempted to acquire Golden Boy Promotions.

The remainder of the allegations concerning the Waddell Defendants consist of impermissible group pleading, i.e., lumping the Waddell Defendants and the Haymon Defendants together, or are bare legal conclusions cleverly disguised as factual allegations.

### D. Top Rank's Claims

In its First Amended Complaint filed on August 3, 2015, Top Rank alleges the following claims for relief against all defendants: (1) unlawful "tie out" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (3) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (4) injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26; (5) violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 et seq.; (6) violation of the California Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200 et seq.; and (7) tortious interference with prospective economic advantage.

The Haymon Defendants and the Waddell Defendants move to dismiss all of the claims asserted against them for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " *Summit Technology, Inc. v. High–*

*Line Medical Instruments Co., Inc.,* 922 F.Supp. 299, 304 (C.D.Cal.1996) (quoting *Balistreri v. Pacifica Police Dept.,* 901 F.2d 696, 699 (9th Cir.1988)). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

**\*4** In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.,* 135 F.3d 658, 661 (9th Cir.1998). "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Technology,* 922 F.Supp. at 304 (citing *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981) *cert. denied,* 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g., id.*; *Branch v. Tunnel,* 14 F.3d 449, 454 (9th Cir.1994).

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend. Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely given. *See, e.g., DeSoto v. Yellow Freight System, Inc.,* 957 F.2d 655, 658 (9th Cir.1992). However, a Court does not need to grant leave to amend in cases where the Court determines that permitting a plaintiff to amend would be an exercise in futility. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

## III. THE HAYMON DEFENDANTS' MOTION TO DISMISS

### A. The Sherman Act Claims

Top Rank alleges three claims for violation of the Sherman Act—two claims for violation of Section 1, which governs unreasonable restraints of trade and tying,[2] and one claim for violation of Section 2, which governs attempted monopolization.[3] The Haymon Defendants move to dismiss Top Rank's three Sherman Act claims, arguing that they suffer from certain common pleading defects, including Top Rank's (1) failure to adequately plead antitrust injury; (2) failure to adequately define the relevant markets; (3) failure to adequately allege market power; and (4) impermissible reliance on group pleading.

[2]    Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Despite the literal language of the statute, Section 1 "outlaw[s] only unreasonable restraints." *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997).

[3]    Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations ... " 15 U.S.C. § 2.

In addition, the Haymon Defendants move to dismiss each Sherman Act claim on individual grounds. The Court addresses the common pleading requirements first, and then the pleading requirements for each individual claim.

#### 1. *Common pleading requirements*

##### a. *Antitrust injury*

**\*5** The Haymon Defendants move to dismiss Top Rank's antitrust claims on the grounds that Top Rank has failed to allege "antitrust injury." Specifically, the Haymon Defendants argue that Top Rank has failed to allege injury to itself or to competition.

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 100 of 202

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)
2015 WL 9948936, 2015-2 Trade Cases P 79,332

A plaintiff may only pursue an antitrust action if it can show "antitrust injury," i.e., "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) (quoting *Brunswick v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977)). The four requirements for antitrust injury are: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California,* 190 F.3d 1051, 1055 (9th Cir.1999). "Injury of the type antitrust laws were intended to prevent" means harm to competition, not harm to individual competitors. *See Brunswick,* 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962)) ("The antitrust laws ... were enacted for 'the protection of competition not competitors.' "). In order to plead harm to competition sufficiently to withstand a motion to dismiss, a claimant "may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 507–08 (9th Cir.1989). "Rather, a claimant must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail." *Id.* at 508.

The Court concludes that Top Rank has not adequately alleged injury to itself, which is not only an element of antitrust injury, but also of Article III standing. As discussed, Top Rank alleges that the Haymon Defendants engage in unlawful conduct in the form of exclusionary "tie out" contracts, the use of "sham" promoters, predatory "payola practices," and venue blocking. However, as the Haymon Defendants point out, Top Rank has failed to allege how it has been injured by the alleged conduct. Indeed, it has not identified a single bout that it has attempted to promote but was precluded from promoting by the Haymon Defendants, a single venue from which it has been blocked, or a single network that has refused to broadcast a fight promoted by Top Rank. Top Rank correctly argues that competitors who are "frozen out" of a market by an antitrust violation have suffered antitrust injury and possess antitrust standing. However, Top Rank has failed to allege any facts demonstrating that it has actually been "frozen out" by any of the Haymon Defendants' conduct.

With respect to the alleged "tie out," for example, Top Rank only alleges that the Haymon Defendants, on one occasion, withheld their consent and refused to allow Roc Nation to promote a bout involving one of the Haymon Defendants' boxers. FAC at ¶ 80. With respect to venue blocking, Top Rank only alleges that the Haymon Defendants blocked Golden Boy and Banner Promotions from booking a venue for a single fight. FAC at ¶¶ 97–98. With respect to the alleged "payola practice," Top Rank merely alleges that the Haymon Defendants have booked "over 100 different show dates" on "over half a dozen major broadcasters" and that the Haymon Defendants obtained undefined "exclusivity commitments (tacit or express)". FAC at ¶ 94. These alleged actions may not have affected all promoters equally, may not have affected certain promoters at all, and in fact, may have even helped certain promoters. Without any additional factual allegations, the Court cannot determine whether Top Rank has alleged an injury-in-fact, let alone whether that injury flows from that which makes the conduct unlawful.

### b. *Market definition*

**\*6** The Haymon Defendants also move to dismiss Top Rank's Sherman Act claims on the grounds that Top Rank has not adequately defined the relevant markets.

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Sol.,* 513 F.3d 1038, 1044 (9th Cir.2008). Allegations concerning the relevant market and the defendant's market power are required under both Section 1 and Section 2 of the Sherman Act. *Id.* at 1044 n.3 ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the [Sherman] Act....").

The relevant market definition must include both a product market and a geographic market. *Id.* at 1045 n.4. The product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* at 1045. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States,* 370 U.S. 294, 325 (1962).

As the Ninth Circuit has held, "there is no requirement that [the relevant market and defendant's market power] ... be pled with specificity." *Newcal,* 413 F.3d at 1045. "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. And since the validity of

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 101 of 202

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)
2015 WL 9948936, 2015-2 Trade Cases P 79,332

the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Id.* A complaint, however, may be dismissed under Rule 12(b)(6) if the complaint's "relevant market" definition is "facially unsustainable." *Id.*

In this case, Top Rank identifies two relevant markets: (1) the market for the management of Championship–Caliber Boxers [4] in the United States; and (2) the market for the promotion of Championship–Caliber Boxers in the United States. The Court cannot conclude that these market definitions are facially unsustainable, especially given that the Supreme Court upheld a market definition for the "promotion of championship boxing contests" in the United States (albeit over 50 years ago). *See Int'l Boxing Club of New York, v. United States,* 358 U.S. 242, 249–52 (1959); *United States v. Int'l Boxing Club of New York,* 150 F.Supp. 397, 418–21 (S.D.N.Y.1957). Although these market definitions may prove to be unsustainable on a motion for summary judgment, the Court concludes that they survive scrutiny on a motion to dismiss under Rule 12(b)(6).

[4]    "Championship–Caliber Boxers" are defined as "professional boxers who, within the past three years, have demonstrated through such quantitative factors as purse size, television rights, viewership, ticket revenue, and other objective criteria that they belong to the 'cream' of the boxing business." FAC at ¶ 104 (quotations and citations omitted).

### c. *Market power*

**\*7** Although the Court concludes that Top Rank's definitions of the relevant markets survive the pleading stage, the Court concludes that Top Rank has failed to adequately allege market power or economic power within those markets.

Each of Top Rank's Sherman Act claims requires Top Rank to allege market power or economic power in the relevant market. *Newcal,* 513 F.3d at 1044 n.3 (9th Cir.2008) ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the [Sherman] Act."). The relevant market for the tying claim is the alleged market for management of Championship–Caliber Boxers. *See Ill. Tool Works Inc. v. Indep. Ink, Inc.,* 547 U.S. 28, 46 (2006) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power

in the tying product."); FAC at ¶ 141 (alleging that the tying product is the management of Championship–Caliber Boxers). The relevant markets for the conspiracy claim are the alleged markets for the management and promotion of Championship–Caliber Boxers. [5] *See Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768 (1984) (equating analysis under "rule of reason" for alleged unreasonable restraints under Section 1 to "an inquiry into market power and market structure designed to assess the combination's actual effect"); FAC at ¶ 147 (alleging an unreasonable restraint of trade in both the management and promotion markets). And, finally, the relevant market for the attempted monopolization claim is the alleged market for the promotion of Championship–Caliber Boxers. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993) ("[D]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."); FAC at ¶ 152 (alleging attempted monopolization of the promotion market).

[5]    Top Rank argues that it need not allege dominance in the promotion market for its conspiracy in restraint of trade claim, relying on cases concerning tying arrangements. However, Top Rank's conspiracy claim does not appear to limit itself to tying arrangements. *See* FAC at ¶ 147.

Market power is the ability "(1) to price substantially above the competitive level and (2) to persist in doing so for a significant period without erosion by new entry or expansion." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501. Market power may be demonstrated through either of two types of proof: (1) "direct evidence of the injurious exercise of market power," i.e., "evidence of restricted output and supracompetitive prices;" or (2) more commonly, "circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co., Inc. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995). "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* Although market power need not be pled with specificity, the allegations must be sufficiently detailed "to raise a right to relief above the speculative level." *Rick–Mik Enters., Inc. v. Equilon Enters. LLC,* 532 F.3d 963, 973 (9th Cir.2008) (quoting *Twombly,* 550 U.S. at 555).

**\*8** In this case, the Court concludes that Top Rank has failed to adequately allege that the Haymon Defendants possess market power or economic power in either of the relevant markets. With respect to the management market, Top Rank's allegations of the Haymon Defendants' market power are completely disconnected from the relevant market definition. Top Rank defines the relevant market as the market for the management of "Championship–Caliber Boxers" in the United States. FAC at ¶ 104. Yet, Top Rank's allegations supposedly reflecting the Haymon Defendants' "dominant share" of that market are not limited to Championship–Caliber Boxers, but encompass *all* boxers. Specifically, Top Rank alleges that:

> Haymon's stable includes approximately 200 fighters, including numerous Championship–Caliber Boxers. No other boxing manager represents more than a handful of boxers. While Plaintiff does not have access to precise figures, Plaintiff alleges that Haymon's share of this relevant market is greater than 50%.

FAC at ¶ 119. As the Haymon Defendants point out, "Top Rank alleges no such facts or figures concerning *Championship–Caliber Boxers* : how many of them there are, how many promoters promote them, how many managers manage them, or how many of them the Haymon Defendants manage." Reply [Docket No. 81] at 5. Moreover, although Top Rank alleges that "Haymon's share of this relevant market is greater than 50%," the Court has no idea how Top Rank arrived at this figure, or whether it is limited to the management of Championship–Caliber Boxers. Top Rank's Opposition, rather than clarifying the issue, merely repeats the same confusing allegations, and, in fact, creates additional confusion. *See, e.g.,* Opposition [Docket No. 79] at p. 25 ("Top Rank did allege the approximate number of boxers Defendants manage, averred that their control exceeds 50% of the overall market, and is at least 15 times greater than any other manager."). Although the Court agrees with Top Rank that it does not have to allege an exact, percentage-based market share, Top Rank must include enough facts to raise its right to relief above the speculative level. The Court concludes that Top Rank has failed to do so. *See Rick–Mik Enters., Inc., 532 F.3d at 972–73* (finding the allegations

of market power inadequate where the allegations related to the retail gasoline market and not the relevant market for franchises).

Top Rank's allegations with respect to the Haymon Defendants' market power or economic power in the promotion market are even weaker, more speculative, and virtually non-existent. Indeed, although Top Rank contends that it has alleged the Haymon Defendants' economic power circumstantially, Top Rank utterly fails to allege any facts concerning the Haymon Defendants' market share in the promotion market, and instead relies on the same flawed allegations concerning the Haymon Defendants' power in the management market. *See* FAC at ¶¶ 119–121 (only alleging that the Haymon Defendants possess market power in the management market); Opposition [Docket No. 79] at p. 26 (relying on allegations related to Defendants' power in the management market).

Although Top Rank argues that it has also alleged direct evidence of the Haymon Defendants' market power, based on, for example, their ability to elicit "exclusionary" terms from broadcasters and to make "exclusionary demands" of venues, these conclusory allegations are insufficient. Although Top Rank may allege market power through "direct evidence of the injurious exercise of market power," i.e., "evidence of restricted output and supracompetitive prices," *see Rebel Oil, 51 F.3d at 1434,* Top Rank fails to allege any evidentiary facts plausibly suggesting restricted output or supracompetitive prices in the promotion market.

**\*9** Accordingly, the Court concludes that Top Rank has failed to allege market power in either the management market or promotion market for Championship–Caliber Boxers.

### d. *Group pleading*

The Haymon Defendants also move to dismiss Top Rank's antitrust claims on the grounds that Top Rank's allegations draw no meaningful distinctions between or among the nine defendants against whom they are collectively asserted.

The Court agrees that Top Rank has impermissibly relied on group pleading, *especially* by lumping the Waddell Defendants and the Haymon Defendants together. Accordingly, in its Second Amended Complaint, Top Rank

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 103 of 202

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)
2015 WL 9948936, 2015-2 Trade Cases P 79,332

shall allege the specific conduct engaged in by each of the remaining defendants.

### 2. *Pleading Requirements for Individual Claims*

#### a. *Tying in violation of Section 1 of the Sherman Act (Count I)*

In its first claim for relief, Top Rank alleges that the Haymon Defendants have violated Section 1 of the Sherman Act by entering into unlawful "tying" or "tie out" arrangements. Specifically, Top Rank alleges that the Haymon Defendants condition the provision of their management services on the boxers' agreement "to not contract with legitimate boxing promoters without [the Haymon Defendants'] consent." FAC at ¶ 139. The Haymon Defendants move to dismiss the tying claim on the grounds that the alleged "tie out" does not, on its face, constitute a tie out. [6]

[6] The Haymon Defendants also move to dismiss the tying claim on the grounds that their alleged market power cannot be premised on a voluntary contractual relationship. *See, e.g., Rick–Mik Enters. Inc. v. Equilon Enters., LLC,* 532 F.3d 963, 973 (9th Cir.2008) ("A tying claim generally requires that the defendant's economic power be derived from the market, not from a contractual relationship that the plaintiff has entered into voluntarily."). However, contrary to the Haymon Defendants' argument, Top Rank alleges that the Haymon Defendants' economic power is derived from the market, not from a voluntary contractual relationship.

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 912 (9th Cir.2008). "To accomplish this objective, the competitor agrees 'to sell one product (the tying product) but only on the condition that the buyer also purchase a different product (the tied product), or at least agrees that he will not purchase the tied product from any other supplier.' " *Paladin Assocs., Inc. v. Mont. Power Co.,* 328 F.3d 1145, 1159 (9th Cir.2003) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 461 (1992)). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase

of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 (1984) (emphasis added). "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Cascade,* 515 F.3d at 912.

**\*10** A tying arrangement is a *per se* violation [7] of Section 1 of the Sherman Act if the plaintiff establishes that: "(1) the defendant tied together the sale of two distinct products or services; (2) the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *See Cascade,* 515 F.3d at 912; *Paladin Assocs.,* 328 F.3d at 1159 (citing *Eastman Kodak,* 504 U.S. at 461–62).

[7] "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.' " *Texaco v. Dagher,* 547 U.S. 1, 5 (2006) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692 (1978)).

The Court concludes that Top Rank has failed to allege sufficient facts to support its per se tying claim. As previously discussed, Top Rank has failed to adequately allege that the Haymon Defendants possess market or economic power in the management market and has failed to allege injury to itself. Moreover, although Top Rank's allegations are carefully and creatively worded, Top Rank has failed to allege that the Haymon Defendants tied together the sale of two distinct services. Indeed, Top Rank merely alleges that the Haymon Defendants' management agreement provides that boxers cannot contract with promoters without the Haymon Defendants' consent. *See* FAC at ¶ 64 ("These purported management agreements – which Haymon often styles as 'advisor contracts' – not only lock up managerial rights, but also restrict boxers from entering into any other agreement, including those related to promotional rights, without Haymon's express consent."); FAC at ¶ 139 ("Haymon's 'advisor' contracts with Championship–Caliber Boxers contain exclusionary provisions that condition his professional services on the boxers' agreement to not contract with legitimate boxing promoters without his consent. These agreements constitute unlawful 'tying' or 'tie out'

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 104 of 202

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015 WL 9948936, 2015-2 Trade Cases P 79,332

arrangements.”). Contrary to Top Rank's argument, this "consent" provision does not, on its face, tie two services together (management services and promotion services). *See Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 712 (11th Cir.1984) ("An approved source requirement is not, alone, illegal. Only if a franchisee is coerced into purchasing products from a company in which the franchisor has a financial interest does an illegal tie exist." ); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1753g ("And when there are many approved suppliers in which the defendant lacks a financial interest, the products should not be deemed tied together because buyers have not been denied a competitive market in the tied product.").

Top Rank correctly argues that illegal tying arrangements need not be express, and that "consent" clauses may practically function as unlawful tying arrangements. *See, e.g.,* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1753g ("To be sure, a tie-in would exist if the willingness to approve others is merely a charade."); *Tic–X–Press, Inc. v. Omni Promotions Co. of Ga.,* 815 F.2d 1407, 1416 (11th Cir1987) ("Where a contract ... provides that buyers shall use only the seller or a source 'approved' by the seller to purchase the tied product, the courts have looked to see if the approval clause was reasonable and permitted the buyer meaningful freedom of choice, or whether it is manipulated by the seller to force the buyer to purchase the tied product from the seller."). However, Top Rank's First Amended Complaint is devoid of any factual allegations demonstrating that the consent clause functioned, in practice, as a tying arrangement or "tie out," at least with respect to Top Rank. Indeed, Top Rank does not allege, for example, that it was generally understood that boxers in the Haymon Defendants' management stable were not allowed to contract with all or even certain legitimate promoters or that they were required to use one of the Haymon Defendants' alleged sham promoters.[8] Rather, all that Top Rank alleges is that "in at least some instances," the Haymon Defendants' boxers have used "sham promoters" who are in fact controlled by the Haymon Defendants, and, on *one* occasion, the Haymon Defendants withheld their consent and did not allow one of their boxers to fight in a bout promoted by Roc Nation. Without any additional factual allegations supporting the existence of a de facto tying arrangement, these allegations fail to state a plausible tying claim. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1755c ("Absent an announced or reasonably understood tying condition, ... two products have not been tied together."); *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 722 (7th Cir.1979) ("Given the contractual language, which

at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause.").

[8]    In its Opposition, Top Rank contends that it has alleged that the Haymon Defendants have "never consented" to allowing boxers in their management stable to sign with "legitimate" promoters, citing to paragraph 65 of the First Amended Complaint. *See* Opposition at p. 26. However, paragraph 65 does not so allege. If Top Rank can, in good faith, allege facts showing that the Haymon Defendants have never consented to allowing boxers in their management stable to sign with "legitimate promoters," Top Rank may be able to state a viable tying claim.

**\*11** For the foregoing reasons, the Haymon Defendants' Motion to Dismiss Top Rank's claim for an unlawful "tie out" in violation of Section 1 of the Sherman Act (Count I) is **GRANTED.**

### b. *Conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II)*

In its second claim for relief, Top Rank alleges that the Haymon Defendants entered into a contract, combination, or conspiracy (with the Waddell Defendants, Championship–Caliber Boxers, boxing venues, television broadcasters, advertisers, sponsors and/or "sham promoters") in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. FAC at ¶¶ 145–150. In addition to the grounds previously discussed, the Haymon Defendants move to dismiss this claim on the grounds that it lacks the requisite factual specificity.

"To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as conspiracy) but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir.2008).

2015 WL 9948936, 2015-2 Trade Cases P 79,332

As discussed, Top Rank fails to state a claim for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act because it fails to adequately allege that the Haymon Defendants possess market power in either the management market or promotion market and has failed to adequately allege injury to itself.[9] Accordingly, the Haymon Defendants' Motion to Dismiss Top Rank's claim for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II) is **GRANTED**. However, with the exception of these defects, the Court concludes that, although Top Rank's First Amended Complaint is short on factual detail and clarity, Top Rank's allegations, for the most part,[10] sufficiently answer the basic questions of "who, did what, to whom (or with whom), where, and when?" *Kendall,* 518 F.3d at 1048.

[9]    In addition, although Top Rank alleges the existence of several other allegedly anticompetitive agreements, as discussed *infra,* the Court concludes that Top Rank has failed to adequately allege an agreement between the Waddell Defendants and the Haymon Defendants.

[10]    Although Top Rank's allegations, for the most part, meet the applicable pleading standard, Top Rank's allegations with respect to, for example, the "exclusivity commitments" with unspecified broadcasters are vague and lack the requisite factual detail. *See* FAC at ¶ 94.

c. *Attempted monopolization in violation of Section 2 of the Sherman Act (Count III)*

In its third claim for relief, Top Rank alleges that the Haymon Defendants "orchestrated a predatory and anticompetitive scheme to leverage Haymon's monopoly power in the market for management of Championship–Caliber Boxers, in an attempt to obtain a monopoly in the market for promotion of Championship–Caliber Boxers, in violation of Section 2 of the Sherman Act." FAC at ¶ 152.

**\*12** "A claim for attempted monopolization has three elements: 1) a specific intent to monopolize a relevant market; 2) predatory or anticompetitive conduct; and 3) a dangerous probability of success." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 542 (9th Cir.1991). In the Ninth Circuit, leveraging of a monopoly does not constitute an independent Section 2 claim. *Id.* at 546–49. However, "[i]f there is a dangerous probability that a monopoly will

be created by leveraging conduct, then the conduct will be reached under the doctrine of attempted monopoly." *Id.* at 549.

"[D]emonstrating the dangerous probability of monopolization in an attempt case [ ] requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993). In this case, Top Rank alleges attempted monopolization of the promotion market. Although a lower percentage of market share can support a claim for attempted monopolization than that required for actual monopolization, as the Court has already concluded, Top Rank fails to allege *any* facts regarding the Haymon Defendants' economic power in the promotion market and thus has not alleged any facts to demonstrate that the Haymon Defendants' economic power meets even this lower threshold. Accordingly the Court concludes that Top Rank has failed to state a claim for attempted monopolization. *See, e.g., ChriMar Sys., Inc v. Cisco Sys., Inc.,* 72 F.Supp.3d 1012, 1019–20 (N.D.Cal.2014) ("[A]lthough a lower percentage is required for an attempted monopoly claim, as opposed to an actual monopoly claim, HP must still allege sufficient market power."); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.,* 2013 WL 5694452, at *15–16 (N.D.Cal. Oct. 18, 2013) (dismissing attempted monopolization claim for failure to adequately allege market power in the relevant market).

Accordingly, the Haymon Defendants' Motion to Dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act (Count III) is **GRANTED**.

**B. Injunctive Relief Under Section 16 of the Clayton Act (Count IV)**

Section 16 of the Clayton Act "does not furnish an independent cause of action." *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1051 (9th Cir.2008). "Rather, it allows the court to fashion relief upon a showing of a separate violation of the antitrust laws." *Id.* Because Top Rank has failed to state a claim for relief under Section 1 or Section 2 of the Sherman Act, the Haymon Defendants' Motion to Dismiss Top Rank's claim for injunctive relief under Section 16 of the Clayton Act (Count IV) is **GRANTED**.

**C. State Law Claims**

The Haymon Defendants also move to dismiss Top Rank's claims for violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 *et seq.* (Count V), violation

2015 WL 9948936, 2015-2 Trade Cases P 79,332

of the California Unfair Competition Law, Cal. Bus. & Prof Code §§ 17200 et seq. (Count VI), and tortious interference with prospective economic advantage (Count VII).

The Court declines to address the Haymon Defendants' arguments relating to Top Rank's state law claims for relief at this time. If Top Rank is able to cure the pleading defects with respect to its Sherman Act claims and states viable claims for relief under the Sherman Act (and Clayton Act), many of the pleading defects raised by the Haymon Defendants with respect to the state law claims will also be cured. On the other hand, if Top Rank ultimately fails to allege a viable federal claim for relief under the Sherman Act (or Clayton Act), the Court will likely decline to exercise supplemental jurisdiction over Top Rank's state law claims for relief. Accordingly, the Court **DEFERS** ruling on the Haymon Defendants' Motion to Dismiss Top Rank's claims for violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 et seq. (Count V), violation of the California Unfair Competition Law, Cal. Bus. & Prof Code §§ 17200 et seq. (Count VI), and tortious interference with prospective economic advantage (Count VII).

## IV. THE WADDELL DEFENDANTS' MOTION TO DISMISS

### A. Claims for Violation of Section 1 of the Sherman Act (Counts I and II)

**\*13** The Waddell Defendants move to dismiss Top Rank's claims for violation of Section 1 of the Sherman Act, in relevant part, on the grounds that: (1) there are no allegations which plausibly suggest that the Waddell Defendants entered into an "illegal agreement;" (2) the Waddell Defendants are incapable of conspiring with the Haymon Defendants; and (3) there is no recognized claim for "aiding and abetting" a Sherman Act violation.

### 1. The allegations regarding the Waddell Defendants do not plausibly suggest an illegal agreement.

As previously stated, "[t]o state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition."

Kendall v. Visa U.S.A., Inc., 518 F.3d 1042, 1047 (9th Cir.2008).

Whether a restraint is analyzed under the rule of reason or a per se rule, a claim for violation of Section 1 of the Sherman Act, "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007). In other words, the pleaded facts must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id. at 555–56. "[T]erms like 'conspiracy,' or even 'agreement,' are borderline: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint." Id. at 557 (quoting DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56 (1st Cir.1999)). Indeed, "[a] bare allegation of conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements daily." Kendall, 518 F.3d at 1047. Importantly, "[a]llegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." Id. at 1049.

When the First Amended Complaint is stripped of conclusory statements, legal conclusions disguised as factual allegations, and group pleading allegations, the allegations regarding the Waddell Defendants can be summarized as follows: (1) the Waddell Defendants are investment advisors; (2) the Waddell Defendants made an investment in Haymon Holdings through MGH; (3) as a result of that investment and pursuant to the "Amended and Restated Limited Liability Company Agreement," MGH allegedly possesses approval rights (or veto power) over Haymon Holdings' and its subsidiaries' "Major Decisions;" (4) Ryan Caldwell, and other representatives of the Waddell Defendants, attended meetings and engaged in negotiations for the possible acquisition of Golden Boy Promotions, which ultimately failed; and (5) Ryan Caldwell attended meetings and engaged in negotiations with broadcasters to reassure them that the Haymon Defendants had adequate funding for their new PBC boxing venture.

The Court concludes that these allegations do not plausibly suggest that the Waddell Defendants entered into a conspiracy or agreement to restrain trade. Indeed, the only agreements

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 107 of 202

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)
2015 WL 9948936, 2015-2 Trade Cases P 79,332

allegedly entered into by the Waddell Defendants (and supported by the facts alleged in the First Amended Complaint) are the alleged investment in Haymon Holdings and the corresponding Amended and Restated Limited Liability Company Agreement.[11] However, there is nothing about these agreements, standing alone, that suggest or hint of an agreement to restrain trade in the management or promotion markets, and these agreements are entirely consistent with rational, legal business behavior. "The antitrust laws are not offended by agreements as such, but only by those with an anticompetitive content." *49er Chevrolet, Inc. v. Gen. Motors Corp.,* 803 F.2d 1463, 1467 (9th Cir.1986).

[11]  Although it initially appeared to the Court that Top Rank was attempting to hold the Waddell Defendants vicariously or indirectly liable for the conduct of the Haymon Defendants (based on their investment in the Haymon Defendants and their approval power or veto power over the Haymon Defendants' major decisions), Top Rank adamantly disavows any attempt to impose "indirect or vicarious liability" on the Waddell Defendants based on a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. See Opposition [Docket No. 78] at 7 n. 3.

**\*14** Top Rank has not alleged that the Waddell Defendants signed, or entered into, any of the other allegedly anticompetitive agreements described in the First Amended Complaint. Instead, Top Rank argues that it has adequately alleged that the Waddell Defendants entered into an "overarching" conspiracy or agreement to "eliminate competition in the markets for managing and promoting Championship–Caliber Boxers," and seeks to hold the Waddell Defendants liable for acts taken by the Haymon Defendants in furtherance of that alleged conspiracy. However, before the Waddell Defendants can be liable for acts taken by the Haymon Defendants in furtherance of the alleged conspiracy, Top Rank must allege sufficient facts, taken as true, to plausibly suggest that the Waddell Defendants were in fact members of the alleged conspiracy. As the Waddell Defendants point out in their Reply [Docket No. 80 at 3–4], Top Rank's "overarching" conspiracy theory relies almost exclusively on paragraph 56 of the First Amended Complaint, which states in its entirety:

The Waddell & Reed Defendants' *involvement in the conspiracy* began when a senior executive and portfolio manager with WRF, WRIMCO, and IICO named Ryan Caldwell was presented with an opportunity to meet Al Haymon. An avid boxing fan with ambitions to "own live sports," Caldwell leapt at the chance. Haymon first spoke with Caldwell from an office in Burbank, California. In the course of this and later discussions, Caldwell agreed that the Waddell & Reed Defendants would commit funding, business expertise, and operational supervision to Haymon's *illegal scheme* — which was, in substantial part, directed at the State of California and at California businesses and consumers. From that time forward, the Waddell & Reed Defendants *actively participated in, and materially furthered, the plot to take over the boxing promotion business.*

FAC at ¶ 56 (emphasis added); Opposition [Docket No. 78] at 1, 6, 9, 10, 11, 12, 18, 24, 27 (relying on paragraph 56 of the First Amended Complaint). The allegations that the Waddell Defendants were involved in a "conspiracy", agreed to enter into an "illegal scheme," and "actively participated in, and materially furthered, the plot to take over the boxing promotion business" are conclusory statements coupled with legal conclusions that cannot support the existence of an agreement to restrain trade in violation of Section 1 of the Sherman Act.[12] *See Kendall,* 518 F.3d at 1048 ("Although appellants allege the Banks 'knowingly, intentionally and actively participated in an individual capacity in the alleged scheme' to fix the interchange fee or the merchant discount fee, this allegation is nothing more than a conclusory statement."). In fact, stripped of its conclusory statements, paragraph 56 merely alleges that Caldwell desired to "own live sports" and agreed that the Waddell Defendants would commit "funding, business expertise, and operational supervision" to the Haymon Defendants, which is consistent

2015 WL 9948936, 2015-2 Trade Cases P 79,332

with and suggests rational, legal business behavior rather than an illegal conspiracy.

12    Top Rank's First Amended Complaint is littered with such conclusory statements and hyperbole regarding the Waddell Defendants. *See, e.g.,* FAC at ¶ 55 ("The Waddell & Reed Defendants have played an active, complicit, and indispensable role in bringing the anticompetitive scheme to fruition."); ¶ 57 ("The Waddell & Reed Defendants orchestrated an elaborate business arrangement to facilitate—and to try to conceal—their involvement in the conspiracy.").

Top Rank also relies heavily on the Waddell Defendants' participation in meetings and negotiations regarding the failed acquisition of Golden Boy Promotions and their participation in meetings and negotiations with broadcasters regarding the Haymon Defendants' new PBC venture. However, this alleged conduct is also entirely consistent with the Waddell Defendants' ordinary business activities as asset management and investment advisory firms, and does not plausibly suggest that the Waddell Defendants entered into an "overarching conspiracy" to eliminate competition in the markets for the management and promotion of Championship–Caliber Boxers.

**\*15** Accordingly, the Court concludes that Top Rank has failed to allege sufficient facts to suggest that the Waddell Defendants entered into an illegal agreement to restrain trade.

### 2. *The Waddell Defendants cannot conspire with the Haymon Defendants as a matter of law.*

Moreover, even if the Waddell Defendants "agreed" to participate in the Haymon Defendants' alleged anticompetitive scheme, the Court concludes that the Waddell Defendants are not legally capable of conspiring with the Haymon Defendants under Section 1 of the Sherman Act. Rather, the Court concludes that the conduct of the Haymon Defendants and the Waddell Defendants must be viewed as that of a single enterprise.

"The Sherman Act contains a 'basic distinction between concerted and independent action.' " *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761 (1984)). "Sherman Act § 1 reaches concerted action in

unreasonable restraint of trade, while § 2 covers unilateral action only when monopoly power is present or attempted." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1402a. "Concerted activity subject to § 1 is judged more sternly than unilateral activity under § 2." *Copperweld,* 467 U.S. at 768.

Accordingly, in analyzing any Section 1 claim, the Court must first determine whether the alleged contract, combination, or conspiracy constitutes "concerted action." Although the Waddell Defendants and the Haymon Defendants are legally distinct entities, that does not automatically result in the conclusion that there is concerted action for the purposes of Section 1 of the Sherman Act. As the Supreme Court explained:

> [S]ubstance, not form, should determine whether a[n] ... entity is capable of conspiring under § 1. This inquiry is sometimes described as asking whether the alleged conspirators are a single entity. That is perhaps a misdescription, however, because the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged 'contract, combination ..., or conspiracy' is concerted action – that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a 'contract, combination ... or conspiracy' amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition.

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 109 of 202

2015 WL 9948936, 2015-2 Trade Cases P 79,332

*Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 195 (2010) (internal quotations and citations omitted). Two Supreme Court cases – Copperweld and American Needle – demonstrate the application of these principles. In Copperweld, the Supreme Court held that a parent corporation and its wholly owned subsidiary were not legally capable of conspiring, reasoning:

> A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.... With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

*16 *Copperweld,* 467 U.S. at 771. In contrast, in American Needle, the Supreme Court held that the licensing activities of National Football League Properties ("NFLP")—a corporate joint venture formed by thirty-two National Football League teams to manage their intellectual property—constituted "concerted activity." Am. Needle, 560 U.S. at 196–202. The Supreme Court partially relied on the fact that the teams compete in the market for intellectual property, and concluded that, "[a]lthough NFL teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned." Id. at 198. Accordingly, "[t]hirty-two teams operating independently through the vehicle of the NFLP are not like the components of a single firm that act to maximize the firm's profits. The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's well-being." Id. at 201.

Applying these principles, the Court concludes that the Waddell Defendants' alleged "agreement" with the Haymon Defendants does not constitute "concerted action" for the purposes of Section 1. As pled by Top Rank, the Waddell Defendants and the Haymon Defendants share a complete unity of economic interest in the venture's success, and have no alleged separate interest, at least as it relates to the relevant management and promotion markets. Indeed, as investors, the Waddell Defendants are similar to the "components of single firm that act to maximize the firm's profits." [13] Am. Needle, 560 U.S. at 201. Moreover, the Waddell Defendants, as asset management and investment advisory firms, are not actual or potential competitors of the Haymon Defendants. [14] Accordingly, their alleged venture with the Haymon Defendants does not "deprive[ ] the marketplace of independent centers of decisionmaking," or of a "diversity of entrepreneurial interests," and "thus of actual or potential competition." Am. Needle, 560 U.S. at 195.

[13]  This unity of interest is further supported by Top Rank's allegations that Waddell Defendants and Haymon Defendants are, at least to some extent, under common control. See, e.g., FAC at ¶ 15 (alleging that W & R Financial actively manages and controls Haymon Holdings, which is "exercised by its President and General Counsel who sit as MGH's 'Observer' representatives on the Haymon Holdings Board of Directors"); ¶ 16 (alleging that WRIMCO's senior officers actively manage and control Haymon Holdings); ¶ 18 (alleging that MGH is a member of Haymon Holdings and "exercises strategic and operational control" over Haymon Holdings' business activities).

[14]  Top Rank argues that it has alleged that the Waddell Defendants are actual competitors in the relevant markets. However, those allegations are solely based on the Waddell Defendants' investment and alleged management and control over Haymon Holdings. See FAC at ¶ 15 ("[W & R Financial] participates in the managerial and promotional market in California through its active management and control over Haymon Holdings, exercised by its President and General Counsel who sit as MGH's 'Observer' representatives on the Haymon Holdings Board of Directors."); ¶ 16 ("WRIMCO also participates in the managerial and promotional market in California through its senior officers'

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 110 of 202

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015 WL 9948936, 2015-2 Trade Cases P 79,332

active management and control over and direct financial interest in Haymon Holdings.").

Accordingly, the Court concludes that the Waddell Defendants cannot, as a matter of law, conspire with the Haymon Defendants.

### 3. *The Waddell Defendants cannot be held liable as "aiders and abetters."*

Top Rank contends that, even if the Waddell Defendants are not members of the conspiracy, they can be held liable as "aiders and abetters" of that conspiracy. However, the Court concludes that aiding and abetting is not an independent theory of civil liability under the Sherman Act. *See MCI Telecomms. Corp. v. Graphnet, Inc.,* 881 F.Supp. 126, 129 (D.N.J.1995) ("Because the Sherman Act is a statute providing for civil damages for violative conduct and fails to explicitly provide for aiding and abetting liability, none will be presumed unless there is sufficient evidence of congressional intent to the contrary."). Moreover, even if it is an independent theory of civil liability under the Sherman Act, for the same reasons that the Waddell Defendants are not capable of conspiring with the Haymon Defendants, the Court concludes that the Waddell Defendants are not capable of aiding and abetting the Haymon Defendants. *Cf id.* at 131 (noting that the "Graphnet's efforts to allege antitrust aiding and abetting against MCIT seem ... to be primarily an attempt to circumvent the limitation on intraenterprise conspiracy claims" and dismissing the antitrust counterclaim).

**\*17** For the foregoing reasons, the Waddell Defendants' Motion to Dismiss Top Rank's claims for unlawful 'tie out' in violation of Section 1 of the Sherman Act (Count I) and for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II) is **GRANTED**.

### B. Attempted Monopolization in Violation of Section 2 of the Sherman Act (Count III)

The Waddell Defendants move to dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act, on the grounds that the Waddell Defendants are not competitors in the relevant market.

The Court agrees. *See, e.g., name.space, Inc. v. Internet Corp. for Assigned Names and Numbers,* 795 F.3d 1124, 1131 (9th Cir.2015) ("Because ICANN is not a competitor in any of the three markets, they cannot serve as the basis for a *§ 2*

monopoly claim."); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1075 (11th Cir.2004) ("There is no question that CC does not participate in the Spanish-language radio market. Thus, CC cannot attempt to monopolize that market.") (cited favorably by *name.space, Inc.,* 795 F.3d at 1131); *Transphase Sys., Inc. v. S. Cal. Edison Co.,* 839 F.Supp. 711, 717 (C.D.Cal.1993) ("It is axiomatic in antitrust law that a defendant may not be found liable under the Sherman act for monopolizing or attempting or conspiring to monopolize a market unless that defendant is a competitor in the relevant market and his conduct creates a dangerous probability that he will gain a dominant share of the market.").

Top Rank argues that it has sufficiently alleged that the Waddell Defendants are competitors in the relevant market. However, as stated in footnote 14, those allegations are solely based on the Waddell Defendants' investment and alleged management and control over Haymon Holdings via their veto or approval power over "Major Decisions." The Court concludes that these allegations are insufficient to find that the Waddell Defendants are competitors in the relevant markets. "[O]ne company's minority ownership interest in another company is not sufficient by itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiaries rivals. To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.,* 148 F.3d 1080, 1088 (D.C.Cir.1998); *see also Spanish Broad. Sys. of Fla., Inc.,* 376 F.3d at 1075 ("Absent allegations of significant control over the policies of a subsidiary, a minority ownership share does not convert a parent corporation into a competitor."). In other words, Top Rank would have to allege a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. *See Caribbean Broad. Sys., Ltd.,* 148 F.3d at 1088–89. However, Top Rank disavows any reliance whatsoever on a a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. *See* Opposition [Docket No. 78] at 7 n.3. Accordingly, because the Waddell Defendants are not competitors in the relevant market, Top Rank cannot state a claim for attempted monopolization in violation of Section 2 of the Sherman Act against the Waddell Defendants.

**\*18** In addition, to the extent Top Rank seeks to assert a claim for "conspiring to attempt to monopolize" under Section 2 of the Sherman Act, no such claim exists. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 809 ("An occasional complaint has alleged that the defendant conspired

to attempt to monopolize. Courts have correctly held that § 2 states no such offense.").

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act (Count III) is **GRANTED**.

### C. Injunctive Relief Under Section 16 of the Clayton Act (Count IV)

Because Top Rank has failed to state a claim for relief under Section 1 or Section 2 of the Sherman Act, the Waddell Defendants' Motion to Dismiss Top Rank's claim for injunctive relief under Section 16 of the Clayton Act (Count IV) is **GRANTED**. *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1051 (9th Cir.2008).

### D. State Law Claims

#### 1. *Violation of the California Unfair Practices Act as to the Waddell Defendants (Count V)*

In its fifth claim for Relief, Top Rank alleges that the Waddell Defendants sold "boxing broadcast rights" at less than the cost thereof, and/or gave away that product to television broadcasters, as a "loss leader" in violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17043 and 17044. FAC at ¶¶ 161–168.

In order to be liable under Section 17043 or 17043, a defendant must have sold an article or product at less than cost of the article or product or given away that article or product. *See* Cal. Bus. & Prof.Code § 17043, ("It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."); Cal. Bus. & Prof Code §§ 17044, 17030 (making it unlawful for any person engaged in business in California to sell or use any article or product as a "loss leader," i.e., any article or product sold at less than cost where the purpose is to induce, promote, or encourage the purchase of other merchandise, or where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers, or where the effect is to divert trade from or otherwise injure competitors). However, Top Rank fails to allege any facts demonstrating that the Waddell Defendants sold any article or product at less than cost, or gave away an article or product. Indeed, Top Rank's

allegations solely relate to the Haymon Defendants, not the Waddell Defendants.

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for violation of the California Unfair Practices Act (Count V) is **GRANTED**.

#### 2. *Violation of California's Unfair Competition Law (Count VI)*

In its sixth claim for relief, Top Rank alleges that the Waddell Defendants violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200 *et seq.* The Waddell Defendants move to dismiss the UCL claim on the grounds that the alleged conduct underlying this claim does not relate to any business practices engaged in by the Waddell Defendants. The Court agrees.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. "Each prong of the UCL is a separate and distinct theory of liability." *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1127 (9th Cir.2009). "As to the unlawful prong, the UCL incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law." *See Clark v. Countrywide Home Loans, Inc.,* 732 F.Supp.2d 1038, 1049 (E.D.Cal.2010) (citing *Chabner v. United Omaha Life Ins. Co.,* 225 F.3d 1042, 1048 (9th Cir.2000)). An "unfair" business practice is one "that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel–Tech Commc'ns, Inc. v. LA. Cellular Tel. Co.,* 20 Cal.4th 163, 187 (1999). In addition, a business practice is "unfair" when that practice "either offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *McDonald v. Coldwell Banker,* 543 F.3d 498, 506 (9th Cir.2008) (quotations and citations omitted). Finally, a business practice is "fraudulent" if members of the public are likely to be deceived. *Prata v. Superior Court,* 91 Cal.App. 4th 1128, 1146 (2001). If the claim is grounded in fraud, the pleading of that claim must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See, e.g., Ward v. Wells Fargo Home Mortg., Inc.,* 2015 WL 1744235, at *9 (N.D.Cal. Apr. 13, 2015). Although Top Rank appears to allege in its First Amended Complaint that the Waddell Defendants violated all three prongs of the

2015 WL 9948936, 2015-2 Trade Cases P 79,332

UCL, Top Rank solely relies on the "unlawful" prong in its Opposition. [15]

[15] Top Rank does not address any of the state law claims in its Opposition to the Waddell Defendants' Motion to Dismiss, but merely incorporates its Opposition to the Haymon Defendants' Motion to Dismiss (even though the Waddell Defendants and Haymon Defendants primarily moved to dismiss on different grounds). *See* Opposition to Waddell Defendants' Motion to Dismiss [Docket No. 78] at 20. In its Opposition to the Haymon Defendants' Motion to Dismiss, Top Rank only argues that its UCL claim is sufficient based on the "unlawful" prong.

**\*19** Top Rank's UCL claim based on the "unlawful" prong is premised on alleged violations of the following laws: (1) Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; (2) the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et seq.,* which prohibits, in relevant part, a manager from having a direct or indirect financial interest in the promotion of a boxer; (3) California Code of Regulations, title 4, § 396, which prohibits, in relevant part, a promoter from acting directly or indirectly as a manager of a boxer; and (4) the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 *et seq.* However, as previously discussed, the Court concludes that Top Rank has failed to state a claim against the Waddell Defendants for violation of Sections 1 or 2 of the Sherman Act or the California Unfair Practices Act. In addition, the Court concludes that Top Rank fails to allege that the Waddell Defendants violated the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et seq.* or California Code of Regulations § 396 because the Waddell Defendants have never acted as boxing managers or promoters. Accordingly, because Top Rank fails to allege that the Waddell Defendants committed a predicate violation of another law, Top Rank fails to state a UCL claim against the Waddell Defendants based on the "unlawful" prong. *See Dorado v. Shea Homes Ltd. Partnership,* 2011 WL 3875626, at *19 (E.D.Cal. Aug. 31, 2011) ("Where a plaintiff cannot state a claim under the 'borrowed' law, she cannot state a UCL claim either.").

Top Rank also fails to state a claim against the Waddell Defendants premised on the "unfair" or "fraudulent" prongs of the UCL. Indeed, Top Rank has failed to allege any "unfair" or "fraudulent" conduct specifically committed by the Waddell Defendants. Apparently recognizing its inability to plead a UCL claim against the Waddell Defendants based

on the "unfair" or "fraudulent" prongs, Top Rank failed to oppose the Waddell Defendants' Motion to Dismiss the UCL claim based on these prongs.

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for violation of the UCL (Count VI) is **GRANTED**.

### 3. *Tortious Interference with Prospective Economic Advantage (Count VII)*

In its seventh claim for relief, Top Rank alleges a claim against the Waddell Defendants for tortious interference with prospective economic advantage.

In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must plead the following elements: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1153 (2003) (quotations and citations omitted). In addition, a plaintiff must allege that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 393 (1995); *see also Korea Supply Co.,* 29 Cal.4th at 1158 ("To establish a claim for interference with prospective economic advantage, ... a plaintiff must plead that the defendant engaged in an independently wrongful act."). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co.,* 29 Cal.4th at 1159.

As the Court previously concluded, Top Rank has failed to allege any independently wrongful or unlawful conduct committed specifically by the Waddell Defendants. Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for tortious interference with prospective economic advantage (Count VII) is **GRANTED**.

### V. CONCLUSION

WCAS107

2015 WL 9948936, 2015-2 Trade Cases P 79,332

For the foregoing reasons, the Haymon Defendants' Motion to Dismiss is **GRANTED in part**. The Haymon Defendants' Motion to Dismiss Counts I, II, III, and IV is **GRANTED**. The Court will grant Top Rank an opportunity to amend these claims, and, thus, Counts I, II, III, and IV as to the Haymon Defendants are **DISMISSED with leave to amend.** Top Rank shall file its Second Amended Complaint on or before **October 30, 2015**. The Court **DEFERS** ruling on the Haymon Defendants' Motion to Dismiss Counts V, VI, and VII.

**\*20** The Waddell Defendants' Motion to Dismiss is **GRANTED** in its entirety. Because the Court concludes that granting leave to amend as to the Waddell Defendants would be futile, the First Amended Complaint against the Waddell Defendants is **DISMISSED without leave to amend.** Although the Court recognizes that this Circuit has a liberal policy favoring amendments and that leave to amend should be freely granted, the Court is not required to grant leave to amend if the Court determines that permitting Top Rank to amend would be an exercise in futility. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile."). In this case, Top Rank has already had an opportunity to file an amended pleading and has failed to provide the Court with any facts or arguments in its Opposition that indicate leave to amend with respect to the Waddell Defendants would not be futile. Accordingly, the Court denies leave to amend as to the Waddell Defendants.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9948936, 2015-2 Trade Cases P 79,332

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1766083
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

TRINITY INDUSTRIES, INC., Trinity
Industries Railcar Corporation, Plaintiffs,

v.

GREENLEASE HOLDING COMPANY,
Ampco–Pittsburgh Corporation, Defendants.

Civil Action No. 08–1498.
|
Signed May 2, 2014.

**Attorneys and Law Firms**

Frederick W. Addison, III, Nolan C. Knight, Munsch Hardt
Kopf & Harr, Dallas, TX, Leonard G. Ambrose, III, Ambrose
Law Firm, Erie, PA, for Plaintiffs.

Steven F. Baicker-McKee, Marc J. Felezzola, Mark K.
Dausch, Babst, Calland, Clements & Zomnir, Paul D.
Steinman, Eckert, Seamans, Cherin & Mellott, Pittsburgh,
PA, for Defendants.

*OPINION*

CONTI, Chief Judge.

**I. *Introduction***

*1  The issues before the court in this opinion are whether
defendant Ampco–Pittsburgh Corporation ("Ampco") can
be held *directly* liable for *its* actions or *derivatively* liable
for the actions of its subsidiary, defendant Greenlease
Holding Company ("Greenlease") with respect to enumerated
claims raised in connection with a manufacturing plant,
located at 60 Union Street, Greenville, Mercer County,
Pennsylvania (the "North Plant"), which previously was
owned by Greenlease and currently is owned by plaintiffs
Trinity Industries, Inc. ("Trinity Industries") and Trinity
Industries Railcar Corporation ("Trinity Railcar") (together,
"Trinity" or "plaintiffs"). These issues were raised in cross-
motions for summary judgment filed by Trinity (ECF No.
151), and Ampco (ECF No. 147).

**II. *Procedural History***

On October 24, 2008, Trinity filed a complaint against
Greenlease and Ampco setting forth the following claims:

- count I seeking cost recovery under § 107
  under the Comprehensive Environmental Response,
  Compensation and Liability Act ("CERCLA"), 42
  U.S.C. § 9601 *et seq.;*

- count II seeking contribution under §§ 113(f)(1) and
  113(f) (3)(B) of the CERCLA;

- count III seeking recovery under § 7002(a)(1)(B) of the
  Resource Conservation and Recovery Act ("RCRA"), 42
  U.S.C. § 6901 *et seq.;*

- count IV seeking recovery under section 1101 of the
  Pennsylvania Hazardous Sites Cleanup Act ("HSCA"),
  35 PA. CONS.STAT. § 6020.101 *et seq.;*

- count V seeking recovery under sections 701 and 702 of
  the HSCA;

- count VI seeking contribution under section 705(c)(2) of
  the HSCA;

- count VII seeking contribution under Pennsylvania state
  law; and

- count VIII setting forth a state law claim for negligence
  per se.

(ECF No. 1.)

On October 30, 2013, Ampco filed a motion for summary
judgment seeking a judgment in its favor with respect to all
counts of the complaint arguing that as a matter of law, it is
not directly liable under any claim or derivatively liable for
the alleged acts of Greenlease with respect to North Plant.
(ECF No. 143.) On the same day, Trinity filed a partial motion
for summary judgment arguing, among other things, that it is
entitled to summary judgment on its claims against Ampco
because Ampco operated the North Plant and piercing of the
corporate veil is warranted under the applicable statutes and
case law. (ECF No. 151.) On November 4, 2013, Ampco
filed a response in opposition to Trinity's partial motion
for summary judgment, (ECF No. 209), and Trinity filed
a response in opposition to Ampco's motion for summary
judgment, (ECF No. 212). On November 7, 2013, Trinity
filed a reply brief to Ampco's brief in opposition to its partial
motion for summary judgment, (ECF No. 219), and Ampco
filed a reply brief to Trinity's brief in opposition to its motion
for summary judgment, (ECF No. 221). On November 12,

2013, Ampco filed a combined concise statement of facts with respect to its motion for summary judgment, (ECF No. 223), and Trinity filed a combined concise statement of fact with respect to plaintiffs' motion for summary judgment, (ECF No. 224).

**\*2** On December 19, 2013, the court held a hearing with respect to the Ampco's and Trinity's motions for summary judgment limited to the issue whether Ampco may be held liable to Trinity as a matter of law. The court—based upon its review of the submissions of Ampco and Trinity and the arguments presented at the hearing—determined Ampco's motion for summary judgment should be granted and Trinity's motion for summary judgment should be denied. This opinion sets forth the reasoning for the court's decision.

### III. *Background* [1]

[1] Other factual matters of record will be discussed in context when pertinent to a particular issue.

#### A. Greenville and Ampco

In or about 1910, Greenville Steel Car Company ("Greenville") began operating a railcar manufacturing facility at the North Plant. (Ampco's Combined Statement of Fact ("ACSOF") ¶ 1.) Greenville was originally organized as the Greenville Metal Products Company. (*Id.* ¶ 2.) In 1914, the company adopted the name Greenville Steel Car Company. (*Id.*) In 1924, Greenville Steel Car Company was formally chartered in the Commonwealth of Pennsylvania. (*Id.*) In August 1937, Pittsburgh Forging Company ("PFC") purchased all Greenville's stock. (*Id.* ¶ 3.)

In or about October 1979, Ampco acquired all PFC's stock through a wholly-owned acquisition subsidiary, Ampco–Pittsburgh Securities I Corporation. (ACSOF ¶ 4.) On December 29, 1983, Greenville declared a dividend to PFC of the stock of Greenville's then subsidiary, Greenville Leasing Company, which was an entity that leased railcars. (*Id.* ¶ 6.) On that same day, PFC declared a dividend to Ampco–Pittsburgh Securities I Corporation of the stock of PFC's then subsidiary, Greenville, making Ampco–Pittsburgh Securities I Corporation the sole shareholder of Greenville. (*Id.* ¶ 5.) In January 1984, PFC changed its name to GLC Holding Company. (*Id.* ¶ 7.) On December 21, 1984, the stock of GLC Holding Company was purchased by GATLX Leasing Corporation. (*Id.* ¶ 8.) In 1985, Ampco–Pittsburgh Securities I Corporation was merged into Ampco, making Ampco the sole shareholder of Greenville. (ACSOF ¶ 10.)

#### B. Greenville's Operation of the North Plant

Greenville's employees were responsible for all day-to-day operations at the North Plant, including any waste disposal, waste handling, painting, abrasive blasting, welding, and fabrication operations. (ACSOF ¶ 20.) For example, Greenville's management met with paint manufacturers to discuss what changes needed to be made to the paint that Greenville used in order to ensure the paint would meet new standards and regulations coming into effect. (*Id.* ¶ 21.) William C. Bubeck ("Bubeck"), director of safety and security for Greenville, communicated with the Pennsylvania Department of Environmental Protection (the "DEP"), formerly known as the Pennsylvania Department of Environmental Resources, with respect to environmental matters including air toxics emissions, PCB transformers, hazardous waste inspections, and alleged violations of the solid waste management act. (*Id.* ¶ 22.) George Fisher ("Fisher"), plant maintenance engineer for Greenville, communicated with the DEP with respect to environmental matters, including air emissions calculations from the paint booths and hazardous waste notification forms. (*Id.* ¶ 23.) Fisher was responsible for obtaining information about the DEP's volatile organic compound ("VOC") regulations and disseminating it to the plant. (*Id.*)

**\*3** Albert Beers ("Beers") was a Greenville employee from 1965 until 1986. (ACSOF ¶ 24.) While a plant engineer for Greenville, Beers communicated with the DEP with respect to environmental matters, including hazardous waste generator inspections and a permit to construct and use an on-site solid waste incinerator. (*Id.* ¶ 25.) Beers communicated with outside contractors with respect to off-site disposal of used paint mixtures. (*Id.* ¶ 26 .) After the North Plant was sold in 1986, Gottschall provided documentation to the Environmental Protection Agency with respect to waste Greenville may have sent to an offsite landfill known as the River Road Landfill. (*Id.* ¶ 33.)

#### C. Ampco's Parent–Subsidiary Relationship with Greenville

At all relevant times, Ampco held an ownership interest in various entities, including companies engaged in manufacturing diversified engineered products or industrial equipment, employed only a professional staff, e.g., accountants, actuaries, and lawyers, and did not employ any engineers or persons with technical experience in manufacturing. (ACSOF ¶ 34.)

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 116 of 202
Trinity Industries, Inc. v. Greenlease Holding Co., Not Reported in F.Supp.3d (2014)
2014 WL 1766083

Between 1979 and 1986, Ampco and Greenville had overlapping board members, but did not share formal corporate office space. (ACSOF ¶¶ 36, 38.) Gottschall, Ed Moores, and John R. Young were overlapping board members from 1979 to 1986, and Ernest Siddons was an overlapping officer from 1984 to 1986. (*Id.* ¶ 38.) No employees, other than officers and directors, were employees both of Greenville and Ampco. (*Id.* ¶ 37.) Greenville adopted a resolution that said "any action which the [Ampco] Board, or its Executive Committee, may think necessary and desirable to take on behalf of [Greenville] shall be deemed to be the action of [Greenville's Board]." (*Id.* ¶ 39.)

Ampco retained the right to approve Greenville's expenditures that exceeded a certain threshold. (ACSOF ¶ 42.) Ampco provided certain high level services to its subsidiaries in the areas of insurance, legal, banking, and accounting. (*Id.* ¶ 43.) In 1985, Greenville's pension plan for salaried employees was merged into Ampco's retirement plan. (*Id.* ¶ 44.) Ampco's retirement plan covered all its subsidiaries for purposes of administration. (*Id.*) Each subsidiary maintained its separate identity and separate individual plans. (*Id.*) Ampco used a centralized banking system for all its subsidiaries in order to maximize the amount on which it could obtain interest and either maximize or minimize borrowing amounts. (*Id.* ¶ 45.) Greenville had its own banking account, account number, and all checks were signed and approved by officers of Greenville. (*Id.*) Ampco had master insurance policies in order to obtain lower costs and better coverage, in which all subsidiaries, including Greenville, were named insureds. (*Id.* ¶ 46.) The individual subsidiaries were charged for their pro rata portion of the premium payment. (*Id.*)

 *4 Ampco had bulk services agreements on behalf of its subsidiaries in order to obtain lower prices due to the bulk purchasing capability of the group. (ACSOF ¶ 47.) The actual order placement and payment for such orders would be made in the normal course by the subsidiary, such as Greenville. (*Id.*) Ampco had a revolving credit agreement with several banks to benefit the entire organization as a whole and on occasion, used the value of its investment in Greenville to guaranty these lines of credit. (*Id.* ¶ 48.)

### D. The Sale of the North Plant from Greenville to Trinity

As of December 1986, Greenville was solvent. (ACSOF ¶ 52.) On December 9, 1986, Trinity purchased the North Plant from Greenville, pursuant to a Purchase and Sale Agreement, for an $8,000,000 cash payment and in consideration of Trinity's execution of a promissory note in the face amount of $6,075,120 for the benefit of Greenville. (*Id.* ¶¶ 11, 49.) Ampco, as the sole shareholder of Greenville, authorized the Greenville board of directors to proceed with negotiations and sell the North Plant on terms deemed by Greenville's board to be in the best interest of Greenville and Ampco. (*Id.* ¶ 51.) From 1986 until 2000, Trinity operated a railcar manufacturing business at the North Plant as its Greenville Steel Car Division. (*Id.* ¶ 50.)

### E. Greenville After the Sale of the North Plant to Trinity

In February 1987, following the sale of the North Plant to Trinity, Greenville maintained a reserve for liabilities in the amount of $250,000 and amended its articles of incorporation to change its name to Greenlease Holding Company. (ACSOF ¶¶ 13, 54; ECF No. 150–1 at 22–23; ECF No. 150–40 at 2.) In or about May 1987, Ampco authorized Greenlease to sell the promissory note directly to Principal Mutual Life Insurance. (ACSOF ¶ 56.) On August 1, 1989, and October 15, 1990, respectively three and four years after Trinity purchased the North Plant from Greenlease, Greenlease issued dividends to Ampco. (*Id.* ¶ 57.)

### F. The Criminal Complaint against Trinity with respect to the North Plant

The Commonwealth of Pennsylvania and the DEP, began an investigation at the North Plant based upon allegations that Trinity illegally dumped and disposed of hazardous waste on the site. (ACSOF ¶ 16.) In April 2006—twenty years after Trinity purchased the North Plant from Greenlease —the Commonwealth of Pennsylvania filed a criminal complaint against Trinity asserting three felony counts related to the illegal management of hazardous waste and eight misdemeanor counts related to the illegal dumping and disposal of solid hazardous waste. (*Id.* ¶ 17.) On October 31, 2006, Trinity [2] entered into a plea agreement with the Pennsylvania Office of Attorney General. (ECF No. 150–19 at 2.) Pursuant to the plea agreement, Trinity was to: (i) plead nolo contendere to five counts of the criminal information filed at CP–43–1655–2006; (ii) reimburse the DEP in the amount of $54,502.55 for investigative costs; (iii) pay a $200,000 fine to Pennsylvania's Solid Waste Abatement Fund; (iv) make a $50,000 contribution to a nonprofit organization; and (v) remediate all environmental contamination at the North Plant as set forth in the consent

Trinity Industries, Inc. v. Greenlease Holding Co., Not Reported in F.Supp.3d (2014)

2014 WL 1766083

order and agreement attached to the plea agreement. (*Id.*) Trinity was sentenced on December 21, 2006, in the Court of Common Pleas of Mercer County, pursuant to the consent order and agreement ("Consent Order") entered into by DEP and Trinity on the same day.[3] (ECF No. 150–19 at 5.)

[2] The designation of the parties involved in the criminal matter is inconsistent. The plea agreement was entered between the Pennsylvania Attorney General and Trinity Railroad. (ECF No. 150–19.) The Consent Order was entered into between the DEP and Trinity Industries. (ECF No. 150–19 at 31.) The sentence, imposed on December 21, 2006, was against Trinity Industries. (ECF No. 150–19 at 42.)

[3] The parties agreed that the Consent Order "is an Order of [the DEP] authorized and issued pursuant to Section 1102 of HSCA, 35 P.S. § 6020.1102; Section 104(b) of the Land Recycling Act, 35 P.S. § 6026.104(b); and Section 1917–A of the Administrative Code, 71 P.S. §§ 510–17." (ECF No. 150–19 at 5.)

**\*5** The Consent Order, in pertinent part, provided:

6. a. *The North Plant and South Plant*[4] . Trinity shall obtain prior approval from [the DEP] and conduct the Response Actions in accordance with [the DEP]-approved schedule to fully investigate and respond to the release of hazardous substances at the North Plant and South Plant to attain one or a combination of the Background, Statewide Health, or Site Specific cleanup standards selected by Trinity and approved by [the DEP] pursuant to Chapter 3 of the Land Recycling Act, 35 P.S. §§ 6026.302–6026.303, for non-residential use.

[4] The Consent Order involves, in addition to the North Plant, the "South Plant," which is not part of this litigation. (*See* ECF No. 150–19 at 6.)

b. *Contamination migrating from the North Plant or South Plant.* For any release of hazardous substances in groundwater or soil that is migrating from the North Plant and/or South Plant, Trinity shall attain one or a combination of the Background or Statewide Health cleanup standards selected by Trinity, and approved by [the DEP] pursuant to Chapter 3 of the Land Recycling Act, 35 P.S. §§ 6026.302–6026.303, for non-residential use.

c. The Response Actions[5] required by Paragraph 6.a. and 6.b., above, shall include, without limitation: paying all fees required under the Land Recycling Act; publishing notices; submitting, revising, and finalizing all required documents for [the DEP]'s approval; and completing and maintaining the Response Actions, including the investigations, remediation, and post-remediation care activities at each Plant, if necessary, in accordance with the Land Recycling Act, any other applicable environmental laws and Regulations, and the requirements of this Consent Order and Agreement.

[5] Under the Consent Order, the term "Response Actions" is defined as follows:

"Response Actions" shall mean any and all of the actions taken or to be taken by [the DEP], Trinity, and/or any other responsible persons under the direction of [the DEP], relating to and addressing the release and threatened release of any hazardous substances at the North Plant and South Plant. Response Actions include, but are not limited to: investigations of responsible persons; investigations of environmental conditions at the North Plant and South Plant; investigations of contaminated groundwater, if any, at and potentially migrating from the Plants, including groundwater (if any) that has migrated and contaminated drinking water; actions to respond to the release and threatened release of any hazardous substance at and/or potentially migrating from the North Plant and South Plant; and maintenance of those actions.

(ECF No. 150–19 at 9–10.)

(ECF No. 150–19 at 11.)

### G. Greenlease and the North Plant—2009 to the Present

As of 2009, Greenlease had positive reserves and equity. (*Id.* ¶ 58.) Greenlease exists today as a shell holding company and it does not have any employees, business activities, for profit activities, or other commercial undertakings. (*Id.* ¶ 14.)

The North Plant currently is a non-operating facility held by Trinity's subsidiary Waldorf Properties, Inc. and is contaminated with substances that include, *inter alia,* iron, lead, trichloroethene, xylene, and polychlorinated bi-phenyls

WCAS112

2014 WL 1766083

("PCBs") such as "Aroclor." (Trinity's Combined Statement of Facts ("TCSOF") ¶ 1.)

#### IV. *Standard of Review*

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Se. Pa. Transp. Auth.,* 479 F.3d 232, 238 (3d Cir.2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.").

**\*6** The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.* The court may consider material evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993) (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed.1983)); *Pollack v. Newark,* 147 F.Supp. 35, 39 (D.N.J.1956), *aff'd,* 248 F.2d 543 (3d Cir.1957) ("[I]n considering a motion for summary judgment, the court is entitled to consider exhibits

and other papers that have been identified by affidavit or otherwise made admissible in evidence.").

#### V. *Discussion*

Trinity is suing Ampco *directly* for "operating" the North Plant and *derivatively* for Greenlease's actions in operating the North Plant by piercing the corporate veil. [6] The Supreme Court of the United States in *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), discussed the law applicable to a parent corporation's *direct* liability for *operating* a plant and *derivative* liability for its *subsidiary's actions* in operating a plant.

[6]     The foregoing discussion refers only to the CERCLA claims (counts I and II) and not the RCRA claim (count III) or the HSCA claims (counts IV and V). The discussion is equally applicable to the RCRA claim and the HSCA claims, however, because those statutes have the same liability schemes as the CERCLA with respect to owners and operators. *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.,* 602 F.3d 204, 236 (3d Cir.2010) ("The District Court correctly held that Carpenter's liability "is neither greater nor lesser under the HSCA."... Indeed, the cost recovery and contribution provisions in HSCA are virtually identical to those in CERCLA....Thus, on remand, the District Court should continue to address the CERCLA and HSCA issues in this case identically.); *Bd. of Cnty. Commissioners v. Brown Grp. Retail, Inc.,* Civ. Action 08–855, 2009 WL 1108463, at \*4 (D.Colo. April 24, 2009) ("As the definition of "operator" under RCRA is substantially the same as the definition under CERCLA, a finding that Plaintiff meets the former is sufficient to show Plaintiff meets the latter.").

With respect to distinguishing a parent corporation's *direct* liability for its *own* action from derivative liability, the Supreme Court explained:

> [D]erivative liability cases are to be distinguished from those in which "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management" and "the parent is directly a participant in the wrong complained of." Douglas 207, 208. In such instances, the parent is directly liable for its own actions. *See* H. Henn & J. Alexander, Laws of Corporations 347 (3d ed.1983) (hereinafter Henn & Alexander) ("Apart from

corporation law principles, a shareholder, whether a natural person or a corporation, may be liable on the ground that such shareholder's activity resulted in the liability"). The fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace the rule that the parent "corporation is [itself] responsible for the wrongs committed by its agents in the course of its business," *Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 395, 42 S.Ct. 570, 577, 66 L.Ed. 975 (1922), and whereas the rules of veil piercing limit derivative liability for the actions of another corporation, CERCLA's "operator" provision is concerned primarily with direct liability for one's own actions. *See, e.g., Sidney S. Arst Co. v. Pipefitters Welfare Ed. Fund,* 25 F.3d 417, 420 (C.A.7 1994) ("[T]he direct, personal liability provided by CERCLA is distinct from the derivative liability that results from piercing the corporate veil" (internal quotation marks omitted)).

**\*7** *Id.* at 64–65.

The Court noted with respect to a corporation's protection from liability for acts of its subsidiary:

> It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. Douglas & Shanks, *Insulation from Liability Through Subsidiary Corporations,* 39 Yale L.J. 193 (1929) (hereinafter Douglas)

> ...

> Thus it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal." Douglas 196 (footnotes omitted).

*Bestfoods,* 524 U.S. at 60. The Court, however, explained:

> [T]here is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would

otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf.

> ...

The Court of Appeals was accordingly correct in holding that when (but only when) the corporate veil may be pierced, may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions. *Id.* at 64. Whether Ampco can be *directly* or *derivatively* liable to Trinity will be addressed below.

### A. *Direct Liability*

Trinity asserts Ampco is directly liable to Trinity under the following provision of 42 U.S.C. § 9607:

> (1) the owner and **operator** of ... a facility, [or] (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ... shall be liable for ... any ... necessary costs of response incurred by any other person consistent with the national contingency plan.

42 U.S.C. § 9607(a)(4)(B) (emphasis added). In *Bestfoods,* the Supreme Court explained:

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions

WCAS114

about compliance with environmental regulations.

*Id.* at 66–67. The Supreme Court gave the following guidance to aide a court in determining whether a parent "operated" its subsidiary's facility:

**\*8** Identifying such an occurrence calls for line-drawing yet again, since the acts of direct operation that give rise to parental liability must necessarily be distinguished the interference that stems from the normal relationship between parent and subsidiary. Again norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points. Just as we may look to such norms in identifying the limits of the presumption that a dual officeholder acts in his ostensible capacity, so here we may refer to them in distinguishing a parent officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility. "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." [Oswald, Bifurcation of the Owner and Operator Analysis under CERCLA, 72 Wash. U.L.Q. 223, 282 (1994) ]. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

*Id.* at 71–72. The Supreme Court identified three possible scenarios in which a parent corporation could be held directly liable for operating its subsidiary's facility:

In our enquiry into the meaning Congress presumably had in mind when it used the verb "to operate," we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate "operation" as including the exercise of direction over the facility's activities. See *supra,* at [67– 8]. The Court of Appeals recognized this by indicating that *a parent can be*

*held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture.* See [*U.S. v. Cordova Chemical Co. of Michigan,* 113 F.3d 572, 579 (1997) ]. We anticipated a further possibility above, however, when we observed that *a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility.* See n. 13, supra. Yet another possibility, suggested by the facts of this case, is that *an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility.*

*Id.* at 71–72 (emphasis added).

Here, Trinity argues that "Ampco's involvement with relevant North Plant operations exceeded anything that could be characterized as a 'normal relationship between parent and subsidiary.' " (ECF No. 152 at 12) (quoting *Bestfoods,* 524 U.S. at 71). Trinity argues Ampco:

**\*9** • advised Greenlease regarding the operation of laws and regulations related to Greenlease's waste generation practices;

• monitored Greenlease's waste generation practices;

• authorized its personnel to seek funding for and assist with portions of Greenlease's effort to 'modernize' painting operations at the North Plant after it was evident the operations were causing product releases into the environment;

• had its officers or directors that constituted Greenlease's board make decisions regarding Greenlease's core manufacturing activities by approving leases or customer financing for railcars that were manufactured at the North Plant; and

• had its officers submit filings to the Commonwealth wherein they acted as if they did not recognize a

meaningful distinction between Ampco and Greenlease, because Ampco referred to the changing of *"our name from Greenville Steel Car Company to Greenlease Holding Company."*

(ECF Nos. 212; 224.) Trinity argues that Ampco personnel—Fisher and Beers—believed Ampco owned the North Plant or "otherwise had an intimate connection to operations at the North Plant." (ECF No. 212 at 3.) Based upon the foregoing evidence, Trinity asserts that Ampco "operated" the North Plant and can be held *directly* liable for its actions in doing so. Ampco argues that the evidence of record is insufficient for a reasonable jury to conclude that Ampco's involvement with the North Plant was "eccentric under accepted norms of parental oversight of a subsidiary's facility." *Bestfoods,* 524 U.S. at 72.

The arguments and evidence presented by the parties do not support the argument that Ampco's involvement with the North Plant was outside the bounds of a normal parent-subsidiary relationship. First, there is no dispute that Greenville employees were responsible for all day-to-day operations at the North Plant, including any waste disposal, waste handling, painting, abrasive blasting, welding, and fabrication operations. (ACSOF ¶ 20.) Beers communicated with outside contractors regarding off-site disposal of used paint mixtures. (*Id.* ¶ 26.) Bubeck, director of safety and security for Greenville, communicated with the DEP regarding environmental matters including air toxics emissions, PCB transformers, hazardous waste inspections and alleged violations of the solid waste management act. (*Id.* ¶ 22.) Fisher, plant maintenance engineer for Greenville, communicated with the DEP regarding environmental matters, including air emissions calculations from the paint booths and hazardous waste notification forms. (*Id.* ¶ 23.) Fisher was responsible for obtaining information about the Environmental Protection Agency's VOC regulations and disseminating it to Greenville employees. (*Id.*) Beers, as plant engineer for Greenville, communicated with the DEP regarding environmental matters, including hazardous waste generator inspections and a permit to construct and use an on-site solid waste incinerator. (*Id.* ¶ 25.) Most significantly, during the relevant time period, Ampco employed only a professional staff, such as accountants, actuaries, and lawyers, and did not employ any engineers or persons with technical experience in manufacturing that could make decisions for Greenville with respect to environmental compliance or waste management. (*Id.* ¶ 34.)

**\*10** There is no dispute that Gotschall provided free legal advice to Greenville during the relevant time period. Courts have recognized, however, that it is within the normal bounds of a parent-subsidiary relationship for a parent corporation to provide in-house legal counsel to its subsidiaries. *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* Civ. Action No. 00–2447, 2003 WL 21542491, at *5 (N.D.Ill. July 3, 2003) ("It is also common practice that certain functions, such as accounting and legal services, be shared within a corporate family."); *Schiavone v. Pearce,* 77 F.Supp.2d 284, 290 (D.Conn.1999) (finding that a parent was not directly liable under CERCLA where the subsidiary used the parent's legal department).

With respect to Ampco's monitoring of Greenlease's waste generation services, the Supreme Court in *Bestfoods* noted that a parent corporation's monitoring of its subsidiary's performance does not give rise to direct liability for the parent corporation. *Bestfoods,* 524 U.S. at 72. Ampco being interested in and paying close attention to Greenlease's waste disposal, therefore, is not sufficient to support Ampco being directly liable for the activities of the North Plant. As noted, Ampco only employed a professional staff and under that circumstance, its involvement in the waste generation services could not give rise to an *eccentric* parent-subsidiary relationship.

The approval by Ampco's officers or directors, who served on Greenlease's board of directors, of leases or customer financing for railcars that were manufactured at the North Plant is insufficient evidence to support Ampco's direct liability for the North Plant. In *Bestfoods,* the court noted that "[s]ince courts generally presume 'that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary'... it cannot be enough to establish liability [where] dual officers and directors made policy decisions and supervised activities at the facility." *Bestfoods,* 524 U.S. at 69 (quoting PHILLIP I. BLUMBERG, THE LAW OF CORPORATION GROUPS: PROCEDURAL PROBLEMS IN THE LAW OF PARENT AND SUBSIDIARY CORPORATIONS § 1.02.1 at 12 (1983)). In order to prevail at the summary judgment stage, Trinity would have to adduce evidence to show that the dual officers and directors were acting only in their capacities as directors and officers of Ampco when they committed those acts. *Bestfoods,* 524 U.S. at 70 ("The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott II officers and

directors, when they committed those acts."). The Court in *Bestfoods* did not describe in detail how a party could rebut the presumption, but explained:

> We do not attempt to recite the ways in which the Government could show that dual officers or directors were in fact acting on behalf of the parent. Here, it is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

**\*11** *Bestfoods,* 524 U.S. at 70 n. 13. Here, Trinity did not point to evidence to show that Ampco's officers or directors acted on Greenlease's board in any way that was "plainly contrary to the interests of [Greenlease] yet nonetheless advantageous to [Ampco]." *Id.* Trinity, therefore, failed to rebut the presumption that the dual officers and directors acted in their capacity as Greenlease board members and to show they acted solely as officers or directors of Ampco.

The reference by John Young, an Ampco officer, to the name Greenlease as "our name" in a letter to the Commonwealth of Pennsylvania is not sufficient to support a direct liability claim against Ampco. Ampco owned all shares of Greenlease. It is not out of the bounds of a normal parent-subsidiary relationship for an Ampco officer to use a possessive to refer to the subsidiary's name.

The authorization by Ampco personnel to seek funding for and to assist with portions of Greenlease's effort to 'modernize' painting operations at the North Plant after it was evident the operations were causing product releases into the environment, is likewise not sufficient to support a direct liability claim against Ampco. Trinity cites to exhibits 315, 316, 317, and 318 in support of this evidence.

With respect to exhibits 315 and 316, Ampco argues:

> Trinity's characterization [of the documents cited] is misleading because Trinity conflates two separate projects. Trinity's Exhibits 315 and 316 refer to Greenville minutes approving an appropriation request for a spray booth project that was part of an overall modernization that was approved by the Greenville board in 1976, prior to the acquisition by Ampco of Greenville's parent PFC's stock in 1979. Neither exhibit evidences that "Ampco authorized and allowed its personnel to seek funding for and assist" Greenville's effort in this spray booth project.

(ECF No. 224 at 27–28.) To the extent Greenville approved the modernization plan, Ampco's subsequent approval of the expenditure to fund the spray booth and modernization plan is not a basis to find Ampco directly liable for operating the North Plant. *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1459 (2d Cir.1995) (finding a parent's approval for major capital expenditures was "typical of a majority shareholder or parent corporation") (citing *Phoenix Canada Oil Co. v. Texaco,* 842 F.2d 1466, 1476 (3d Cir.1988)). Exhibit 315, board minutes of Greenville from August 31, 1979 (prior to its acquisition by a subsidiary of Ampco), shows that the board on August 15, 1979, approved an expenditure of $330,000 for a spray paint booth improvement at Greenville. (ECF No. 193–3 at 6.) The approval of the spray paint booth expenditure was part of an overall modernization project the Greenville's board of directors approved totaling $1,394,000. (*Id.* at 7.) Exhibit 316 is the board minutes from the August 15, 1979, board meeting at which the board approved the expenditure for the spray paint booth. (ECF No. 193–4.) Ampco's subsequent approval of the major capital expenditure, i.e., the spray paint booth and the modernization as a whole, was within the bounds of a normal parent-subsidiary relationship and does not support a reasonable jury finding that Ampco operated the North Plant.

**\*12** Exhibit 317 is a "Plan to Increase Production Capacity." (ECF No. 193–5.) Exhibit 318 is an inter-office correspondence showing Gotschall—an officer of both Ampco and Greenville—attended a meeting and told the meeting participants, which included at least three other persons from Greenville, about the plan to increase Greenville's production capacity. (ECF No. 194–1.) With respect to exhibits 317 and 318, Ampco argues:

> Trinity's Exhibits 317 and 318 refer to a 'Greenville Steel Car Company Plan to Increase Production Capacity." *This plan was never implemented. Trinity's Exh. 7 at p. 62.* Further, Mr. Gottschall, a dual officer for both Greenville

Trinity Industries, Inc. v. Greenlease Holding Co., Not Reported in F.Supp.3d (2014)

2014 WL 1766083

and Ampco, was the only person with a connection to Ampco who attended a meeting in Washington DC regarding Greenville's Plan. Trinity's App. Exh. 318; Ampco's App. Exhs. 30 and 31.

(ECF No. 224 at 29) (emphasis added.) The parties did not provide the court the page of Siddons' deposition, i.e., Trinity's exhibit 7, page 62, that Ampco refers to as evidence that the plan to increase capacity was never implemented. Trinity provided page 61 of Siddons' deposition. The last question on that page reads: "Whatever came of that process? Was it something that was implemented? Help me understand?" (ECF No. 155–4 at 15.) The very next page of the deposition, i.e., page 62, is not included in the record. It is difficult to understand how exhibits 317 and 318 support Trinity's position. The plan to increase capacity appears to be authored by Greenville. Although Gottschall is listed as a representative of Ampco in the meeting notes in exhibit 318, he is an officer of Greenville. Under those circumstances, exhibits 317 and 318 are insufficient to show Ampco operated the North Plant.

A reasonable jury based upon the evidence of record could not conclude that Ampco's actions with respect to North Plant were "eccentric under accepted norms of parental oversight of a subsidiary's facility." *Bestfoods*, 524 U.S. at 72. For this reason, Ampco's motion for summary judgment with respect to Trinity's direct liability claims will be granted and Trinity's partial motion for summary judgment with respect to Trinity's direct liability claims will be denied.

**B.** *Derivative Liability* [7]

[7] The veil piercing principles are similar under federal and Pennsylvania law. *See United States v. Union Corp.,* 259 F.Supp.2d 356, 389 (E.D.Pa.2003) (citing *Ashley v. Ashley,* 482 Pa. 228, 393 A.2d 637, 641 (Pa.1978)). The foregoing discussion is, therefore, equally applicable with respect to Trinity's state law claims.

The second issue before the court is whether Ampco may be held derivatively liable for Greenlease's actions in operating the North Plant. "Corporate veil-piercing has been approved in the context of CERCLA actions. The contours of alter ego liability in this context are determined by federal common law." *United States v. Union Corp.,* 259 F.Supp.2d 356, 388 (E.D.Pa.2003) (citing *Bestfoods,* 524 U.S. at 63–64.) Under the Court of Appeals for the Third Circuit's alter ego test, a parent company's derivative liability is determined in light of eight non-exclusive factors: (i) its subsidiary's gross undercapitalization for its purpose, (ii) failure to observe corporate formalities; (iii) nonpayment of dividends; (iv) the insolvency of the subsidiary; (v) siphoning of funds of the corporation by the dominant stockholder; (vi) nonfunctioning of other officers or directors; (vii) absence of corporate records; and (viii) whether the corporation is merely a facade for the operations of the dominant stockholder or stockholders. *United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981). The situation "must present an element of injustice or fundamental unfairness, but a number of these factors can be sufficient to show such unfairness." *Id.* No single factor is dispositive; rather, a determination on veil-piercing is to be made based on the totality of the circumstances. *Id.* Piercing the corporate veil "does not require proof of actual fraud." *Trustees of Nat. Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk,* 332 F.3d 188, 194 (3d Cir.2003). Alter ego theory, however, "has elements of fraud theory, [so] it too must be shown by clear and convincing evidence." *Id.* at 192. The alter ego factors relevant to this case that were addressed by Trinity and Ampco and the evidence of record with respect to those factors are discussed below.

1. *Subsidiary's gross undercapitalization for its purpose; siphoning of funds of the corporation by the dominant stockholder*

**\*13** Trinity argues that "Ampco's siphoning of funds from Greenlease once Greenlease became a non-operating subsidiary warrants veil piercing" in this case because it left Greenlease undercapitalized and shows Ampco's dominion and control over Greenlease. (ECF No. 152 at 20; ECF No. 212 at 7.) Ampco argues that at all relevant times, Greenlease was adequately capitalized in light of the liabilities known to Ampco, and, therefore, veil piercing is not warranted in this case. (ECF No. 209 at 7.)

The general rule is gross undercapitalization is to be analyzed according to the subsidiary's initial capitalization. *Trustees of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk,* 332 F.3d 188, 197 (3d Cir.2003) ("[T]he inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business"). The relevant inquiry with respect to whether a subsidiary is grossly undercapitalized is whether the corporation's "resources [are] reasonable 'in relation to the nature of the business of the corporation and the risks attendant to such businesses.' " *Pharmacia Corp. v.*

WCAS118

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 124 of 202
Trinity Industries, Inc. v. Greenlease Holding Co., Not Reported in F.Supp.3d (2014)

2014 WL 1766083

*Motor Carrier Servs. Corp.,* 309 F. App'x 666, 672 (3d Cir.2009). Trinity argues that veil piercing is warranted "when a non-operating subsidiary is drained of assets that could have been used to satisfy its liabilities—particularly when the assets could have been used to satisfy environmental liabilities." (ECF No. 152 at 19–20.) As pointed out by Ampco, however, piercing the corporate veil is warranted based upon the siphoning of a subsidiary's assets only when the parent has *knowledge* of the subsidiary's liabilities when the assets are siphoned from the subsidiary. *ITT Corp. v. Borgwarner Inc.,* Civ. Action No. Civ. Action No. 05–674, 2009 WL 2242904, at *7 (W.D.Mich. July 22, 2009) ("Evidence that a parent corporation drained a subsidiary of its assets so that the subsidiary could not meet its known environmental liabilities might well provide a basis for piercing the corporate veil. However, Plaintiff would have to show both knowledge of environmental liabilities and a removal of assets to avoid those liabilities.").

Here, the undisputed evidence of record in this case shows:

- Greenlease operated the North Plant until it was sold to Trinity in 1986. Up until that time, the company was solvent;

- After the sale of the North Plant to Trinity, Greenlease existed as a shell holding company without any business activities, for profit activities, or other commercial undertakings, did not have any employees, and held $250,000 in reserve for liabilities;

- In 1989 and 1990, respectively three and four years after Greenlease sold the North Plant to Trinity, Greenlease issued dividends to Ampco, leaving the $250,000 in reserve. At that time, Greenlease's alleged liability with respect to the North Plant was not *known* to Ampco or Greenlease.

**\*14** This evidence shows that Greenlease was not knowingly grossly undercapitalized because at the time it issued dividends to Ampco, it was a shell corporation, and there is no evidence of record that at a time of the issuance of the dividends, Ampco knew about the liabilities at issue in this case. As Ampco points out, the facts of this case are unlike the facts in the decisions cited by Trinity. In those decisions, the parent corporations were *aware* of the liabilities of the subsidiary corporations at the time the parent corporations siphoned funds from the subsidiary corporations. *Pharmacia,* 309 F. App'x at 672 (holding the subsidiary's assets were not reasonable in relation to the nature of its business

"given its lack of revenue and acknowledged responsibility under the Agreement for (at least some) environmental contamination"); *Bernardin, Inc. v. Midland Oil Corp.,* 520 F.2d 771, 775 (7th Cir.1975) (affirming district court's decision that "the equities among the parties required and dictated [the plaintiff's] recovery from [the parent corporation defendant] which had taken over and acquired all that [its subsidiary] had had to offer its creditors."); *Union Corp.,* 259 F.Supp.2d at 390 ("Where the conduct of a dominant corporation is deliberate, with the specific intent to escape liability for a specific tort or class of torts, corporate veil piercing is justified. The court finds that Union's actions were a deliberate attempt to evade anticipated liability for contamination of the Cottman Property." (internal quotations marks and citations omitted)); *Waykesha v. Viacom, Int'l Inc.,* 404 F.Supp.2d 1112, 1119 (E.D.Wis.2005) (holding piercing the corporate veil was warranted because "[parent corporation] evaded its obligation to pay for its share of liability at the West Avenue Landfill by manipulating [the subsidiary] during the 1996 asset sale."); *AT & T Global Info. Solutions Co. v. Union Tank Car Co.,* 29 F .Supp.2d 857, 869 (S.D.Ohio 1998) (finding piercing the corporate veil was warranted where the parent corporation "owned all the relevant assets of [the subsidiary] from whom they profited for many years" when the subsidiary violated the CERCLA); *see Crane v. Green & Freedman Baking Co.,* 134 F.3d 17, 23 (1st Cir.1998) ("wrongful diversion of corporate assets to or for controlling individuals at a time when the corporation is in financial distress ... can justify piercing the corporate veil"); *United States v. Golden Acres,* 702 F.Supp. 1097, 1106 (D.Del.1988) ("[D]efendants were siphoning funds out of the corporation at regular intervals ... [d]espite a mounting mortgage debt and an insolvent corporate shell.").

As noted, there is no evidence of record that Ampco knew about the environmental liabilities at issue in this case at the time the dividends were issued. Greenlease was not an operating company at the time it paid dividends to Ampco, and it was not knowingly grossly undercapitalized by Ampco. There is no evidence that at that time Greenlease or Ampco knew about liabilities of Greenlease that could exceed the $250,000 in reserve. Based upon the foregoing, the issuance of the dividends by Greenlease to Ampco approximately eighteen years prior to the commencement of this litigation is not a sufficient basis for piercing the corporate veil in this case.

**\*15** Trinity cites *Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC,* 402 F. App'x 623 (2d Cir.2010), in

support of its argument that "the siphoning off of funds from on entity to another can be probative of the domination exerted by one entity over another, especially when there is no commercially reasonable explanation for the transfer of assets." (ECF No. 212 at 7.) In this case, however, the undisputed evidence of record shows that Greenelease made the dividend payments to Ampco and left $250,000 in reserve for liabilities following the sale of the North Plant because Greenlease was a nonoperating company with no *known* liabilities exceeding the $250,000 in reserve at that time. Trinity did not point to evidence of record to show Ampco "siphoned" any of Greenlease's funds during the time when Greenlease operated North Plant. The payments which Trinity is concerned about in this case, i.e., the dividend payments issued approximately eighteen years prior to the initiation of this case *and* after Greenlease sold all its assets, do not qualify as payments for which the is no commercially reasonable explanation. To the contrary, it would be unreasonable for Ampco to leave Greenlease's earnings from the sale of the North Plant in an account when at the time the dividends were issued Greenlease was a nonoperating company with no *known* liabilities exceeding the $250,000 in reserve. Accordingly, no reasonable jury could find Greenlease was grossly undercapitalized or that Ampco siphoned funds from Greenlease at any time relevant to this case.

### 2. *Nonfunctioning of other officers or directors*

Trinity alleges that Ampco dominated Greenlease because it "stocked" the Greenlease board of directors with people from the pool of Ampco's directors and officers. (ECF No. 152 at 20.) The Supreme Court has made clear, however, "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Bestfoods,* 524 U.S. at 69. Since courts generally presume "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, ... it cannot be enough to establish liability ... that dual officers and directors made policy decisions and supervised activities at the [subsidiary]." [8] *Id.* A party arguing in favor of piercing the corporation veil must point to evidence to show the directors purportedly acting for the benefit of the subsidiary corporation were—in actuality—acting solely for the benefit of the parent corporation. The Supreme Court in *Bestfoods* did not "attempt to recite the ways in which [a party] could show that dual officers or directors were in fact acting on behalf of the parent[,]" but, as previously noted, stated:

[8] While this statement was made in the context of a direct liability analysis, courts have applied this principle when determining derivative liability as well, making this distinction inconsequential. *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484 (3d Cir.2001).

Here, it is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

**\*16** *Bestfoods,* 524 U.S. at 70 n. 13.

Greenlease's board of directors was comprised entirely of persons from the pool of Ampco's directors and officers; indeed, several of Greenlease's officers came from that pool as well. Greenlease's board of directors passed a resolution providing that Greenlease would be deemed to have adopted any action Ampco thought necessary and desirable to take on behalf of Greenlease. Notably, there is no evidence that Greenlease in fact deemed adopted any such action or that Ampco exercised any power under that resolution.

As stated by the Supreme Court, "it cannot be enough to establish liability ... that dual officers and directors made policy decisions and supervised activities at the [subsidiary]." *Bestfoods,* 524 U.S. at 69. Trinity has the burden to show that the directors of both corporations were acting solely for the benefit of Ampco when they made decisions for Greenlease. Trinity did not point to any evidence of record to show that any measure adopted by Greenlease ran contrary to Greenlease's best interests or that the conduct of the directors was contrary to "norms of corporate behavior." [9] *Bestfoods,* 524 U.S. at 70 n. 13. Under those circumstances, this factor, i.e., the nonfunctioning of other officers or directors, does not weigh in favor of piercing the corporate veil in this case.

[9] It is "assumed to be the norm that a parent will have not only ... the potential to exercise control [over the subsidiary], but to exercise it to a substantial degree." *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 150 (3d Cir.1988).

### 3. *Whether the corporation is merely a facade for the operations of the dominant stockholder or stockholders.*

Trinity Industries, Inc. v. Greenlease Holding Co., Not Reported in F.Supp.3d (2014)

2014 WL 1766083

Trinity argues that Greenlease and Ampco "comingled" their assets and that Ampco provided Greenlease with several "free" services, such as legal and accounting services, insurance policies, and employee benefit plans. Plaintiffs did not cite to any decision that suggests the provision of these services from a parent to a subsidiary runs afoul of normal corporate behavior. To the contrary, courts have held legal and accounting services, *Catalina Mktg.,* 2003 WL 21542491, at *5, the provision of employee benefit plants, *Wehner v. Syntex Agribusiness, Inc.,* 616 F.Supp. 27, 30 (E.D.Mo.1985), and a centralized cash management system where accounting records reflect the indebtedness of one entity to another, *In re Acushnet River & New Bedford Harbour Proceedings,* 675 F.Supp. 22, 34 (D.Mass.1987), are consistent with the normal parent-subsidiary relationship. No reasonable jury could, therefore, find that based upon Ampco providing Greenlease with legal and accounting services, insurance policies, and employee benefit plans warrants piercing the corporate veil in this case.

### 4. *Policy Considerations*

Trinity argues that "Ampco's actions threaten to circumvent the fundamental purposes of CERCLA, HSCA, and RCRA." (ECF No. 212 at 9.) Trinity argues those statutes are meant to reach as far back into the past as necessary to identify those responsible for the harm and, therefore, Ampco should be held responsible for the alleged harm in this case. Trinity's argument lacks merit, however, because based upon the foregoing discussion, Ampco is not *directly* responsible or *derivatively* responsible for the harm caused at the North Plant. Piercing of the corporate veil is, therefore, not warranted in this case.

### 5. *Conclusion*

**\*17** Based upon the foregoing discussion, Trinity failed to show by *clear and convincing* evidence that Greenville was an alter ego of Ampco. Ampco may have, among other things, retained oversight over Greenville, shared officers and directors between the two corporations, and approved large expenditures for Greenville, but the evidence of record is insufficient for a reasonable jury to find an element of injustice or fundamental unfairness in this case warranting piercing of the corporate veil. Greenville—while an active corporation—was never knowingly grossly undercapitalized by Ampco or was insolvent. Greenlease had its own employees, separate bank account number, and carried on its responsibilities as an entity separate and apart from Ampco. There is no evidence of record to show Ampco knew about

North Plant's liabilities when Greenlease, a nonoperating company with no employees, paid Ampco dividends in 1989 and 1990. Under those circumstances, Trinity's motion for summary judgment will be denied with respect to its claims against Ampco. Ampco's motion for summary judgment will be granted with respect to those claims.

### C. *Common Law Claims—Negligence Per Se and Contribution*

The law concerning negligence per se "is so well established as to be beyond cavil." *C.C.H. v. Phila. Phillies, Inc.,* 596 Pa. 23, 940 A.2d 336, 347 n. 17 (Pa.2008). In *In re Reglan/Metoclopramide Litigation,* 81 A.3d 80, 94 n. 13 (Pa.Super.Ct.2013), the court explained:

> Pennsylvania recognizes that the standard of care may be prescribed by legislative enactment so that "a violation of the statute or ordinance may serve as the basis for negligence per se." *Wagner v. Anzon, Inc.,* 453 Pa.Super. 619, 684 A.2d 570, 574 (1996). The plaintiff must show: (1) that the purpose of the statute is "at least in part, to protect the interest of a group of individuals, as opposed to the public generally;" (2) that the statute clearly applies to the conduct of the defendant; (3) that the defendant violated the statute; and (4) that the violation was the proximate cause of the plaintiff's injuries. 684 A.2d at 574.

*Id.*

Here, Trinity argues Ampco was negligent because it violated the HSCA. In other words, the HSCA establishes the "duty" owed by Ampco, and the violation of that provision constitutes a breach of Ampco's duty of care. *See Keifer v. Reinhart Foodservices, LLC,* Civ. Action Nos. 09–1187, 09–1558, 2012 WL 368047, at *5 (W.D.Pa. Feb.1, 2012) (citing *Cabiroy v. Scipione,* 767 A.2d 1078, 1079 (Pa.Super.Ct.2001)). Summary judgment will be entered in favor of Ampco with respect to Trinity's claims for negligence per se because Ampco—based upon the foregoing discussion —cannot be found to have violated the HSCA [10] as a matter of law. Trinity's negligence per se claim, therefore, fails as a matter of law because Trinity is unable to establish liability on the part of Ampco.

[10]      *See* footnote 6 *supra.*

Because Trinity cannot establish Ampco was either directly or derivatively liable for the harm alleged in this case, a reasonable jury could not find Ampco responsible for

2014 WL 1766083

contribution to Trintiy. *United States v. Zarra,* Civ. Action No. 10–811, 2011 WL 3667313, at *4 (W.D.Pa. Aug.22, 2011) ("A claim for contribution based upon negligence is only proper when it arises between joint tortfeasors.") (citing *Nat'l R.R. Passenger Corp. v. URS Corp.,* 528 F.Supp.2d 525, 531 (E.D.Pa.2007). In other words, a reasonable jury could not find Trinity and Ampco are joint tortfeasors with respect to the North Plant. Under those circumstances, Trinity is not entitled to contribution from Ampco as a matter of law. Summary judgment will be entered in favor of Ampco with respect to Trinity's claim for negligence per se and the request for contribution.

## VI. *Conclusion*

**\*18**  For the reasons stated in this opinion and on the record at the hearing on December 19, 2013, Ampco's motion for summary judgment (ECF No. 147) will be GRANTED, and Trinity's partial motion for summary judgment (ECF No. 151) will be DENIED with respect to its claims against Ampco.

An appropriate order will be entered.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 1766083

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 4643272
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Brownsville Division.

Jose VALDEZ & Josefina Valdez, Plaintiffs,
v.
CAPITAL MANAGEMENT
SERVICES, LP; et al., Defendants.

Civil Action No. B:09–246.
|
Nov. 16, 2010.

**Attorneys and Law Firms**

Ahmad Keshavarz, The Law Offices of Ahmad Keshavarz, Brooklyn, NY, for Plaintiffs.

David Clayton Sander, Scanlan Buckle & Young PC, Austin, TX, Amy L. Mitchell, Mitchell and Duff, Richmond, TX, Javier Gonzalez, Royston, Rayzor, Vickery & Williams, L.L.P., Brownsville, TX, for Defendants.

*REPORT AND RECOMMENDATION*
*OF THE MAGISTRATE JUDGE*

RONALD G. MORGAN, United States Magistrate Judge.

 **\*1**  Pending before the Magistrate Judge are the Motions to Dismiss filed by Defendants Capital Management Services ("CMS"), CMS General Partner, LLC ("CMS General Partner"), and Travelers Casualty and Surety Company of America ("Travelers"), Dkt. No. 81; as well as by Cavalry Portfolio Services ("Cavalry Portfolio"), Dkt. No. 86; International Fidelity Insurance Company ("International Fidelity"), Dkt. No. 100; and Cavalry Investments, LLC and Cavalry SPV II, LLC, Dkt. No. 108. Also pending before the Magistrate Judge is the joint motion to dismiss, filed by the Plaintiffs and Defendants National Action Financial Services ("NAFS") and Hartford Fire Insurance Company ("Hartford"). Dkt. No. 131. The final matter currently pending before the Magistrate Judge is the notice of dismissal of Josefina Valdez as a plaintiff from this case. Dkt. No. 139.

At this stage of the proceedings, and under the standards established by FED. R. CIV. P. Rule 12(b)(6), Plaintiff Jose

M. Valdez ("Valdez") has alleged sufficient facts to show that Cavalry Portfolio, CMS and NAFS violated portions of the Fair Debt Collection Practices Act and the Texas Fair Debt Practices Act. Valdez has also alleged sufficient facts to show that Cavalry Portfolio violated the Fair Credit Reporting Act. On the other hand, Valdez has—despite repeated amendments—failed to plead sufficient facts to show the intentional tort of unreasonable collection. Accordingly, for the reasons set forth below, it is recommended that the motions to dismiss be **GRANTED** in part and **DENIED** in part.

**I. Background**

 **A. Factual background** [1]

[1]  In deciding a motion under 12(b)(6), the Court accepts "all well-pleaded facts as true" and views "those facts in the light most favorable to the plaintiff." *Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 546 (5th Cir.2010). The factual background is taken from the Plaintiffs' complaint with these principles in mind.

In June 1999, Valdez's identity was stolen and the thief used Valdez's identity to finance the purchase of a mobile home. Dkt. No. 109, ¶ 14. The thief defaulted on the payments, leaving a debt of nearly $40,000. *Id.* Since 2002, Valdez has been contacted by various debt collection agencies regarding this debt, which is the basis for this lawsuit. *Id.*

Conseco Financial, the original creditor, sold the account to Cavalry Investments. Dkt. No. 109, ¶ 18. The account was then transferred to Cavalry SPV II. *Id.* Cavalry Portfolio serviced the account on behalf of Cavalry SPV II. Dkt. No. 109, ¶ 21.

Valdez asserts that, on October 31, 2002, he informed Cavalry [2] that he was represented by counsel, but that Cavalry continued to call "Mr. Valdez's family" to collect on the debt. Dkt. No. 109, ¶ 27. Valdez also claims that, on January 16, 2003, he again informed Cavalry that he was represented by counsel, but that Cavalry "continued to call Mr. Valdez's home, Mr. Valdez's family and even third parties in an attempt to collect" the debt. *Id.*

[2]  Valdez's complaint is based upon a theory of joint and several liability for Cavalry Investments, Cavalry SPV II and Cavalry Portfolio. Dkt. No. 109, ¶ 24. Therefore, Valdez did not specify which

2010 WL 4643272

Cavalry entity he was communicating with. Any references to "Cavalry" in the factual background are taken directly from the complaint.

Valdez asserts that, through his attorney, he sent Cavalry a "very detailed" identity theft affidavit, "[m]ultiple times in 2003." Dkt. No. 109, ¶ 26. Valdez also alleges that, on February 28, 2003, Cavalry received a letter from Valdez's attorney, explaining the "circumstances of the identity theft affidavit." This letter, by implication, again informed Cavalry that Valdez was represented by counsel. Dkt. No. 109, ¶ 27. Valdez states that, on June 3, 2003, he sent Cavalry a "detailed police report" and documentation showing that the date of birth on the credit application was incorrect; as well as documentation establishing that he was out of the state when the mortgage agreement was signed. *Id.* [3] Despite receiving the documentation showing identity theft, Valdez alleges that Cavalry took no steps to verify the report and continued to contact Valdez directly, rather than through his attorney. Dkt. No. 109, ¶ 30. On November 11, 2003, Valdez's attorney mailed to Cavalry Portfolio the identity theft affidavit, the police report, documentation that the credit application incorrectly listed his date of birth and documentation establishing that he was out of the state when the mortgage agreement was signed. Dkt. No. 109, ¶ 28.

[3]    Valdez admits these alleged violations fall outside of the statute of limitations, but pleads them to show that Cavalry's violations were "done willfully and wantonly," justifying punitive damages. Dkt. No. 109, n. 3. The statute of limitations under the Fair Debt Collection Practices Act is "one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). The statute of limitations for the state claims is two years. TEX. CIV. PRAC. & REM.CODE § 16.003. Accordingly, any claims predating October 27, 2008—under the FDCPA—or October 27, 2007—under state law—are barred by the applicable statute of limitations.

**\*2**  Valdez maintains that Cavalry sent the account to CMS "on or about June 14, 2008," but did not disclose that Valdez was represented by counsel or that he disputed the debt. Dkt. No. 109, ¶ 31. Valdez asserts that CMS then sent Valdez a collection letter, dated July 8, 2008, rather than sending it to his attorney. *Id.* In the alternative, Valdez alleges that Cavalry did inform CMS—that Valdez was represented by counsel and that he disputed the debt—but, despite that knowledge, CMS continued to contact Valdez directly. Dkt. No. 109, ¶ 33.

In his complaint, Valdez asserts that, "on more than one occasion in June 2008," Cavalry—through CMS—pulled a copy of Valdez's credit report to collect "a debt Mr. Valdez did not owe." Dkt. No. 109, ¶ 35.

Valdez further asserts that he sent Cavalry Portfolio and CMS a letter, dated November 4, 2008, in which he provided written proof that the debt had been removed from Valdez's credit report following a fraud investigation. Dkt. No. 109, ¶ 36. Despite this letter, "the debt collection activities would not stop." *Id.* Neither Cavalry nor CMS made a written record of this dispute; nor did either send Valdez a written statement within 30 days of the dispute, admitting or denying the accuracy of the dispute, or stating that it did not have sufficient time to investigate the dispute. *Id.*

"Within one year of the filing of this lawsuit," CMS returned the account to Cavalry without disclosing that Valdez made a written dispute of the debt or providing notice that Valdez was represented by counsel. Dkt. No. 109, ¶ 38.

Valdez states that, on May 12, 2009, NAFS received the account from Cavalry. Dkt. No. 109, ¶ 39. Cavalry did not inform NAFS that Valdez disputed the debt in writing or that Valdez was represented by counsel. *Id.* In the alternative, Valdez asserts that Cavalry did inform NAFS, but that NAFS "intentionally" ignored the information. Dkt. No. 109, ¶ 42.

On May 14, 2009, Cavalry, through NAFS, obtained a copy of Valdez's credit report. Dkt. No. 109, ¶ 44. On June 4, 2009, NAFS sent Valdez a collection letter, stating that it was attempting to collect the debt on behalf of Cavalry Portfolio, who was listed as the "current creditor." Dkt. No. 109, ¶ 40.

**B. Procedural Background**

On October 26, 2009, Jose M. Valdez and Josefina Valdez filed a complaint against CMS, Cavalry Portfolio Services, NAFS, CMS General Partner [4], Travelers, RLI Insurance Company, and Hartford. [5] Dkt. No. 1. On November 30, 2009, Jose and Josefina Valdez dismissed their claim against RLI Insurance Company. Dkt. No. 4.

[4]    No claims of independent wrong-doing are made against CMS General Partner. Valdez has pled that there is a general partnership agreement between CMS and CMS General Partner. Dkt. No. 109, p. 10, n. 1. Under both Delaware (state of incorporation) and Texas (forum state) law, a

**WCAS124**

Valdez v. Capital Management Services, LP, Not Reported in F.Supp.2d (2010)

2010 WL 4643272

general partner is liable to third parties for actions taken by the partnership. 6 Del. C. § 17–403(b); 6 Del. C. § 1515(2); TEX. BUS. ORG.CODE § 152.303–.304.

5       No independent causes of action are alleged against Travelers, Fidelity and Hartford; they are bonding companies employed by various co-defendants as required by Texas law. TEX. FIN.CODE § 392.101–102. The bonding companies are being sued in their capacity as sureties. TEX. FIN.CODE § 392.102.

On May 5, 2010, Jose and Josefina Valdez moved to amend their complaint to add Cavalry SPV II, Cavalry Investments, and International Fidelity as defendants. Dkt. No. 54. On May 11, 2010, the Court granted the motion to amend and dismissed the original complaint, as moot. Dkt. No. 70.

On May 25, 2010, Defendants NAFS and Hartford filed a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). Dkt. No. 80. That same day, Defendants CMS, CMS General Partner, and Travelers filed a motion to dismiss, pursuant to the same rule. Dkt. No. 83. On May 26, 2010, Defendant Cavalry Portfolio did the same, Dkt. No. 84; as did International Fidelity, on June 24, 2010. Dkt. No. 100. On July 19, 2010, Cavalry Investments and Cavalry SPV II did the same. Dkt. No. 108. In each of their motions, the defendants requested—in the alternative—a more definite statement pursuant to FED. R. CIV. P. 12(e).

*3  On July 28, 2010, Valdez [6] filed a second amended complaint. Dkt. No. 109. Valdez claimed the right to file the second amended complaint as a matter of course, pursuant to FED. R. CIV. P. 15, but—in the alternative—also sought leave to file the amended complaint. Id. Because the second amended complaint was more detailed than the previously filed complaints, and effectively served as a more definite statement, the Court granted the motion for leave to file the second amended complaint. Dkt. No. 120.

6       Josefina Valdez was dropped as a plaintiff in this amended complaint. On November 10, 2010, the parties filed a stipulation of dismissal of all claims by Josefina Valdez. Dkt. No. 109.

Further, because the second amended complaint only added an additional theory of recovery based upon previously pled facts and to "facilitate speedy resolution," the Court did not require the defendants to re-file their pending motions

to dismiss. Id. Instead, the defendants were afforded an opportunity to supplement their motions and the plaintiff was given an opportunity to respond to those supplements. Id. Cavalry Portfolio, Cavalry Investments and Cavalry SPV II ("the Cavalry companies") and CMS availed themselves of this opportunity. Dkt Nos. 122, 123. Valdez filed a response to those pleadings. Dkt. No. 126.

In his second amended complaint, Valdez asserts that Cavalry Portfolio, Cavalry SPV II, and Cavalry Investments "are jointly and severally liable for each other's actions acts [sic] because they share a common control and management, and act as agents or assigns for one another." Dkt. No. 109, ¶ 15. In support of this claim, Valdez cites the collection agreement between NAFS and Cavalry Portfolio, which was also signed on behalf of "Cavalry Portfolio Services, LLC, and any and all of its affiliates, subsidiaries, or related business entities, including but not limited to Cavalry SPV I, LLC, Cavalry SPV II, LLC, and Cavalry Investments, LLC (herein collectively referred to as 'Client')." Dkt. No. 109, ¶ 16. Based upon public records attached to the complaint, Valdez "suggest[s]" that Cavalry Investments "manages and controls" Cavalry SPV II and Cavalry Portfolio. Dkt. No. 109, ¶ 17. [7]

7       Valdez has pled that Cavalry Investments, Cavalry SPV II, Cavalry Portfolio, CMS, and CMS General Partner are corporations organized under the laws of Delaware. Dkt. No. 109, p. 2–5. Valdez has pled that NAFS is incorporated in Georgia. Id. at p. 4.

The Second Amended Complaint alleges that the Cavalry companies, NAFS, and CMS violated 15 U.S.C. §§ 1692b-g, which are various provisions of the Fair Debt Collection Practices Act. Dkt. No. 109, ¶ 57. Valdez also alleges that the Defendants violated the Texas Debt Collection Practices Act, Tex. Fin.Code § 392.001, et seq. Dkt. No. 109, ¶ 64. Valdez further alleges that the Defendants committed the common law tort of unreasonable debt collection. Dkt. No. 109, ¶ 69. Valdez also claims that the Cavalry defendants—through CMS and NAFS—obtained Valdez's credit report, despite knowing that he did not owe the debt; thereby, violating the Fair Credit Reporting Act. Dkt. No. 109, ¶ 83.

On October 11, 2010, Valdez, NAFS, and Hartford filed a joint motion to dismiss, with prejudice, the claims against those defendants—based upon a settlement agreement. Dkt. No. 131. The motion stated that an unnamed party objected to the dismissal. Id . On October 14, 2010, the Court ordered any

**WCAS125**

2010 WL 4643272

party with an objection to the joint motion to dismiss to file their objection no later than October 19, 2010. Dkt. No. 132. On October 19, 2010, CMS and CMS General Partner filed their objection, which was procedural rather than substantive. Dkt. No. 136. CMS wanted NAFS to comply with outstanding discovery requests before they were dismissed from the case. *Id.* On October 20, 2010, the Court informed the parties that it would hold NAFS's motion to dismiss in abeyance until CMS filed "an affirmative representation" that NAFS had complied with all outstanding discovery requests. Dkt. No. 137. On November 1, 2010, CMS filed that affirmative representation. Dkt. No. 138. Thus, the joint motion to dismiss NAFS and Hartford, as defendants, is unopposed.

## II. Jurisdiction

**\*4** As identified above, Valdez asserts claims under the Fair Debt Collection Practices Act ("FDCPA"), the Fair Credit Reporting Act ("FCRA"), the Texas Debt Collection Practices Act ("TDCPA"), and Texas tort law. Dkt. No. 109. The Court has jurisdiction over the FDCPA and FCRA claims pursuant to 28 U.S.C. § 1331 because they arise under federal law.

The Court must exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Section 1367(a) has been described as mandatory in nature. *Certain Underwriters at Lloyd's, London et. al. v. Warrantech Corp.,* 461 F.3d 568, 578 (5th Cir.2006). The reasons for declining supplemental jurisdiction over related state law claims are found in 28 U.S.C. § 1367(c). [8] None of the listed reasons apply here. Supplemental jurisdiction extends to parties against whom solely state law claims are alleged. 28 U.S.C. § 1367(a) ("Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.").

[8]   "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if (1) the claim raises a novel or complex issue of State law[;] (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction[;] (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c).

## III. Dismissal Standards

### A. Motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6)

"Motions to dismiss under Rule 12(b)(6) are rarely granted and generally disfavored." *Rodriguez v. Rutter,* 310 Fed. Appx. 623, 626 (5th Cir.2009) (unpubl.) (citing *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498 (5th Cir.2000)). Nevertheless, dismissal under Rule 12(b)(6) is appropriate when the plaintiff has failed to allege "enough facts to state a claim to relief that is plausible on its face' and fails to 'raise a right to relief above the speculative level.' " *Nationwide Bi–Weekly Admin., Inc. v. Belo Corp.,* 512 F.3d 137, 140 (5th Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Supreme Court has further defined the *Twombly* standard, explaining that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* It follows that, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Id.* at 1950 (quoting FED. R. CIV. P. 8(a)(2)).

Generally, if evidence outside of the pleadings is considered in ruling on a motion to dismiss, the matter must be converted into a motion for summary judgment. FED. R. CIV. P. 12(d). "However, if the complaint refers to the document, the document is central to the Plaintiff's case and no party questions its authenticity[,] the Court may consider it without the need of converting the Motion to Dismiss to a Motion for Summary Judgment." *Hensley v. Livingston,* Civil Action No. G–07–123, 2007 WL 4528063, \*1, n. 1 (S.D.Tex.2007) (citing *Branch v. Tunnell,* 14 F.3d 449, 454 (9th Cir.1994)); *see Clorox Co. Puerto Rico v. Proctor & Gamble,* 228 F.3d 24, 32 (1st Cir.2000) ("Were the rule otherwise, a plaintiff could maintain a claim ... by excising an isolated statement from a document and importing it into the complaint....") (citing *Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1220 (1st Cir.1996)).

**\*5** In this case, various documents relating to the ownership and control of the Cavalry entities are referenced in the complaint; are central to Plaintiff's case; and no party questions their authenticity—only their relevance and meaning. Additionally, Plaintiff has referenced the contracts between various Defendants to prove the relationships between the various Cavalry entities. Again, the contracts are part of the record; are central to Plaintiff's case; and no party questions their authenticity. As such, each may be considered without converting the motion into one for summary judgment.

### B. Motion to Dismiss pursuant to FED. R. CIV. P. 41(a)(2)

"Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." FED. R. CIV. P. 41(a)(2). Motions for voluntary dismissal should be freely granted, absent some "plain legal prejudice" to a non-moving party. *Elbaor v. Tripath Imaging, Inc.,* 279 S.W.3d 314, 317 (5th Cir.2002).

### IV. Applicable Law

#### A. Fair Debt Collection Practices Act

The Fair Debt Collection Practices Act ("FDCPA") was written to "eliminate abusive debt collection practices by debt collectors." 15 U.S.C. § 1692(e). The FDCPA sets out which parties qualify as debt collectors and regulates their collection activities to prevent "abusive" practices. 15 U.S.C. § 1692, *et seq.* The FDCPA permits individual consumers to seek damages in federal court. 15 U.S.C. § 1692k. "[I]n determining whether a violation of the FDCPA has occurred, the debt collector's representations, notices[,] and communications to the consumer must be viewed objectively from the standpoint of the 'least sophisticated consumer.' " *Taylor v. Perrin, Landry, deLaunay & Durand,* 103 F.3d 1232, 1236 (5th Cir.1997). The "least sophisticated consumer standard ... serves the dual purpose of protecting all consumers, including the inexperienced, the untrained[,] and the credulous, from deceptive debt collection practices and protecting debt collectors against liability for bizarre or idiosyncratic consumer interpretations of collection materials." *Id.*

#### B. Fair Credit Reporting Act

The stated purpose of the Fair Credit Reporting Act ("FCRA") is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit ... in a manner which is fair and equitable to the consumer ... in accordance with the requirements of this subchapter." 15 U.S.C. § 1681(b). The FCRA also creates a private cause of action for consumers. 15 USC § 1681n.

#### C. Texas Debt Collection Practices Act

The Texas Debt Collection Practices Act ("TDCPA") permits a consumer to sue for threats, coercion, harassment, abuse, unconscionable collection methods, or misrepresentations made in connection with the collection of a debt. TEX. FIN.CODE ANN. § 392.001, *et seq.* A prevailing plaintiff may recover actual damages, attorneys' fees, and at least $100 for each violation. *Id.* at § 392.403.

#### D. Unreasonable Debt Collection

**\*6** Under Texas common law, unreasonable collection is an intentional tort. *EMC Mortgage Corp. v. Jones,* 252 S.W.3d 857, 868 (Tex.App.-Dallas 2008); *Pullins v. Credit Exchange of Dallas, Inc.,* 538 S.W.2d 681 (Tex.Civ.App.-Waco 1976, writ refused n.r.e.) ("contributory negligence is not a defense"). Unreasonable is measured by the common meaning of the word. *EMC,* 252 S.W.3d at 869 (defining unreasonable as "exceeding the bounds of reason or moderation.").

Conduct amounting to unreasonable collection varies by case. *Carlson v. Trans Union, LLC.,* No. 3:02–CV–2654–H, 2003 WL 21750706 at *3 (N.D.Tex. July 22, 2003). In every case though, the predicate acts must be "willful, wanton and malicious and intended to inflict mental anguish and result in bodily harm." *Mitchell v. Chase Home Finance LLC,* No. 3:06–CV–2099–K, 2008 WL 623395 at *6 (N.D.Tex. March 4, 2008) (citing *Connell v. Rosales,* 419 S.W.2d 673, 676 (Tex.Civ.App.-Texarkana 1967)); *Montgomery Ward & Co. v. Brewer,* 416 S.W.2d 837, 844 (Tex.Civ.App.-Waco 1967, writ refused n.r.e.). "Exemplary damages may be properly awarded for a violation of the common law tort of unreasonable collection." *EMC,* 252 S.W.3d at 873.

Generally speaking, however, "mental anguish alone is insufficient to sustain a recovery of damages, at common law, for unreasonable collection efforts." *Naranjo v. Universal Sur. of America,* 679 F.Supp.2d 787, 802 (S.D.Tex.2010) (citing *McDonald v. Bennett,* 674 F.2d 1080, 1088 (5th Cir.1982)).

Valdez v. Capital Management Services, LP, Not Reported in F.Supp.2d (2010)

2010 WL 4643272

## V. Analysis

### A. Joint and Several Liability for Cavalry Companies

Without citing any authority, Valdez asserts that, because Cavalry Portfolio, Cavalry SPV II, and Cavalry Investments "share a common control and management, and act as agents or assigns for one another[,]" they are to be held jointly and severally liable for their actions. Dkt. No. 109, ¶ 15. As evidence of common control, et cetera, Valdez cites the collection agreement between NAFS and Cavalry Portfolio, which was signed on behalf of "Cavalry Portfolio Services, LLC, and any and all of its affiliates, subsidiaries, or related business entities, including but not limited to Cavalry SPV I, LLC, Cavalry SPV II, LLC, and Cavalry Investments, LLC (herein collectively referred to as 'Client')." Dkt. No. 109, ¶ 16. In the collection agreement between CMS and Cavalry Investments, Cavalry Portfolio is added as an assignee for Cavalry Investments. Dkt. No. 109, ¶ 16.

Valdez also points to public records, filed with the Texas Secretary of State and the North Carolina Secretary of State, to show that the Cavalry entities share a common control and ownership. Dkt. No. 109, ¶ 17. Valdez also introduces records from the Cavalry Investments website, which lists Cavalry Portfolio, Cavalry SPV I, and Cavalry SPV II as affiliates. Dkt. No. 109, ¶ 19.

The plain import of Valdez's argument is that, because of the common ownership and control—as well as the fact that the entities act as agents and assigns for each other—the corporate form should be disregarded for purposes of liability. The Fifth Circuit has made it clear that the doctrine of limited liability, which respects the corporate form, is to be the norm. *U.S. v. Jon–T Chemicals, Inc.,* 768 F.2d 686, 691–92 (5th Cir.1985). [9] There are exceptions to this rule. *Id.*

[9]     *Jon–T Chemicals* was before the Fifth Circuit under federal question jurisdiction. "Our non-diversity alter ego cases have rarely stated whether they were applying a federal or state standard, and have cited federal and state cases interchangeably." *Jon–T Chemicals,* 768 F.2d at 690, n. 6.

**\*7** Three possible theories, that would support disregarding the corporate forms, are raised by Valdez's pleadings. The first is that the defendants were acting as each others' alter ego. The second is that the defendants operated as a joint venture. The third is that each of the defendants were agents of the other defendants and each, accordingly, is liable for the acts of the other. Thus, the question is whether Valdez has pled sufficient facts to establish that, despite the different corporate entities, the corporate forms should be ignored. Each theory is addressed in turn.

### 1. Alter Ego Theory

When a parent company "totally dominates and controls its subsidiary," the subsidiary is considered to be the "alter ego" of the parent. *Jon–T Chemicals,* 768 F.2d at 691. When this occurs, "the district court, acting in its equitable capacity, is entitled to pierce the corporate veil." *Id.* "In lieu of articulating a coherent doctrinal basis for the alter ego theory," the Fifth Circuit has "developed a laundry list of factors to be used in determining" if the alter ego exception is applicable. *Id.*

The twelve factors include whether the parent and subsidiary have common directors or officers; the subsidiary operates with grossly inadequate capital; the subsidiary only receives business from the parent; and the subsidiary does not observe basic corporate formalities. *Id.* at 692. The only factor pled by Valdez is common directors and officers. [10] The decisional law in this circuit, however, makes it "clear that one-hundred percent [commonality of] ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil." *Id.* at 691. Yet, this appears to be Valdez's sole basis for applying the alter ego theory amongst the various Cavalry entities.

[10]     A subsidiary that is wholly owned by a parent corporation is rather obviously going to have a common control—both companies are owned and managed by the same people. In that situation, "operating the subsidiary independently of the parent company not only has little practical meaning, it would also constitute a breach both of the subsidiary's duty to further the interests of its owner, and of the directors' and officers' duty towards the parent company." *Jon–T Chemicals,* 768 F.2d at 691. However, this commonality of interests does not mean the corporate form is to be disregarded. *Id.*

None of the other factors, supporting an alter ego, have been pled by Valdez. Thus, as a matter of law, Valdez has failed to plead sufficient facts to show that the alter ego theory should be applied in this case.

WCAS128

### 2. Joint Venture

Valdez also asserts that the Cavalry companies "are in a joint venture to collect alleged debts." Dkt. No. 109, ¶ 15. Affording Valdez the benefit of the doubt, the Court understands the claim to be a joint venture, as a legal entity; rather than generally as a common undertaking. Because the latter is not a basis for piercing the corporate veil, the Court will focus upon the former. In resolving this issue, the initial inquiry is which jurisdiction's substantive law applies.

Federal courts apply state substantive law "to any issue or claim which has its source in state law." *Camacho v. Texas Workforce Com'n,* 445 F.3d 407, 409 (5th Cir.2006). [11] "There is no federal general common law," *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). More specifically, there is no federal law regarding joint ventures. Therefore, the Court determines the existence of a joint venture according to state law. The initial question is which state's law should be applied.

[11]    This rule applies regardless of whether the case comes to the Court on diversity jurisdiction or federal question jurisdiction. *Camacho,* 445 F.3d 409, n. 1.

**\*8** "Texas choice of law rules follow the 'internal affairs doctrine,' so that the laws of the state of formation govern the internal affairs of an entity." (*In re Parkcentral Global Litigation,* 2010 WL 3119403, *4 (N.D.Tex. August 5, 2010) (citing TEX. BUS. ORGS.CODE ANN. § § 1.102, 1.105). As previously noted, all of the Cavalry entities were formed in Delaware. Dkt. No. 109, p. 2–5.

Under Delaware law, the elements of a joint venture are: "1) a community of interest in the performance of a common purpose, 2) joint control or right of control, 3) a joint proprietary interest in the subject matter, 4) a right to share in the profits, and 5) a duty to share in the losses which may be sustained." *Haley v. Talcott,* 864 A.2d 86, 95, n. 22 (Del.Ch.2004) (unpubl.) (citing *Warren v. Goldinger Brothers, Inc.,* 414 A.2d 507, 509 (Del.1980)). All of these elements "must" be present. *Warren,* 414 A.2d at 509.

The test for joint venture is not substantially different under Texas law. Texas law requires: "(1) a community of interest in the venture; (2) an agreement to share profits; (3) an express agreement to share losses; and (4) a mutual right of control or management of the venture." *Arthur v. Grimmett,* 319 S.W.3d 711, 721 (Tex. Ct.App.-El Paso 2009). "A joint venture is not

established if any one of the four elements is not present." *Swinehart v. Stubbeman,* 48 S.W.3d 865, 879 (Tex.App.-Houston [14th Dist.] 2001, pet. denied).

Thus, Texas, the forum state, and Delaware, the state of formation, use similar tests to determine whether a joint venture exists. Despite this similarity, Valdez has pled no facts to show any of the elements of joint venture under either test. Therefore, Valdez cannot sustain a theory of joint venture to hold the Cavalry companies jointly and severally liable for each others' actions. Simply undertaking a single effort does not make the participants a "joint venture," warranting disregard of the distinct corporate entities involved in the effort.

### 3. Agency Theory

The third possible theory alleged by Valdez for seeking joint and several liability against the Cavalry entities is that of agency. Valdez also asserts that CMS and NAFS acted as agents of the Cavalry companies; thus making the Cavalry entities liable for the acts of CMS and NAFS.

#### a. Cavalry companies

Valdez asserts that because the Cavalry companies "act as agents or assigns for one another" they may be held jointly and severally liable. There is no federal law of agency. Again, the Court must turn to state law to resolve the issue of agency. Again, the threshold issue is which state's law to apply.

In determining which state law applies, the Court must consider the conflict of law principles of the forum state and the federal common law of conflicts. *F.D.I.C. v. Massingill,* 24 F.3d 768, 775 (5th Cir.1994). Both lead to the same conclusion. Texas law and the federal common law of conflicts rely upon the Restatement (Second) of Conflict of Laws. *Gutierrez v. Collins,* 583 S.W.2d 312, 318–19 (Tex.1979); *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC,* 589 F.3d 778, 809, n. 39 (5th Cir.2009).

**\*9** The Restatement (Second) provides "[t]he rights and duties of a principal and agent toward each other are determined by the local law of the state which, with respect to the particular issue, has the most significant relationship to the parties and the transaction...." *Restatement (Second) of Conflict of Laws § 291 (1971).* The state that best fits this test is Texas. The transaction at issue is an attempt by various entities to collect a debt from Valdez. The defendants were communicating with a Texas citizen regarding a debt

2010 WL 4643272

that was incurred in Texas—regardless of the identity of who actually incurred the debt. By attempting to collect this debt, the defendants were doing business in Texas. The nexus of this transaction was centered in Texas and Texas law applies.

Under Texas law, "[a] principal is liable for the acts of its agent when the agent has actual or apparent authority to do those acts or when the principal ratifies those acts." *Spring Garden 79U, Inc. v. Stewart Title Co.,* 874 S.W.2d 945, 948 (Tex.App. Houston [1st Dist.] 1994). Actual authority, "which includes both express and implied authority, usually denotes that authority a principal 1) intentionally confers upon an agent, 2) intentionally allows the agent to believe that he possesses, or 3) allows the agent to believe that he possesses by want of due care." *Id.* Generally, in Texas, the doctrine of vicarious liability, or respondeat superior, makes a principal liable for the conduct of his employee or agent. *Owens v. McLeroy, Litzler, Rutherford, Bauer & Friday, P.C.,* 235 S.W.3d 388, 392 (Tex.App.-Texarkana 2007) (citing *Minyard Food Stores v. Goodman,* 80 S.W.3d 573, 578 (Tex.2002)). [12]

[12]   Courts interchangeably use the terms "vicariously liable" and "jointly and severally liable" to express the same idea. *Vestal v. Wright,* 2009 WL 2751020, *6, n. 23 (Tex.App.-Fort Worth 2009) (unpubl.) (citing *In re Enron Corp. Securities, Derivative & ERISA Litigation,* 623 F.Supp.2d 798, 834, n. 33 (S.D.Tex.2009))

Valdez alleges that Cavalry Investments purchased the debt and "transferred" the debt to Cavalry SPV II, who in turn retained Cavalry Portfolio to service the debt. Dkt. No. 109, ¶ 17. While Valdez does not specifically define what "transferred" means in this context, the Court will construe it in "the light most favorable to the plaintiffs." *Dorsey v. Portfolio Equities, Inc.,* 540 F.3d 333, 338 (5th Cir.2008).

Accepting the allegations as true, Valdez claims that Cavalry Investments retained ownership of the debt, transferred the debt for purposes of servicing to Cavalry SPV II, who in turn transferred the debt for purposes of servicing to Cavalry Portfolio. Based solely upon the pleadings, it appears that Cavalry Investments owns the debt and has created an agency relationship with Cavalry SPV II for purposes of servicing the debt. It also appears, based solely upon the pleadings, that Cavalry SPV II created an agency relationship with Cavalry Portfolio for purposes of servicing the debt. At this stage, Valdez has pled sufficient factual information to show an agency relationship between the Cavalry companies.

**b. CMS and NAFS**

Based upon the pleadings, it further appears that nearly all of the defendants have a relationship with each other. It is clear that CMS contracted with both Cavalry Investments and Cavalry Portfolio Services [13] to collect unpaid accounts on behalf of those Cavalry companies. Dkt. No. 128. It is equally clear that NAFS contracted with Cavalry Portfolio Services, Cavalry SPV II, and Cavalry Investments to collect unpaid accounts on behalf of those companies. Dkt. No. 129. Thus, according to the factual allegations contained in the complaint, the Cavalry companies entered into a contractual agreement to have NAFS collect unpaid accounts on their behalf; the exact duty that is the basis for this lawsuit. Meanwhile, Cavalry Portfolio and Cavalry Investments entered into a contractual obligation to have CMS collect unpaid accounts on their behalf, again the subject of this litigation.

[13]   Cavalry Portfolio was added as an assignee to the contract. Dkt. No. 128, p. 13.

  **\*10**  While the Fifth Circuit has not addressed the question, the Third and Ninth Circuits have concluded that "an entity which itself meets the definition of "debt collector" may be held vicariously liable for unlawful collection activities carried out by another on its behalf." *Pollice v. National Tax Funding, L.P.,* 225 F.3d 379, 404 (3d Cir.2000); *Fox v. Citicorp Credit Services, Inc.,* 15 F.3d 1507, 1516 (9th Cir.1994). The rule makes sense and, for purposes of Rule 12(b)(6), Valdez has pled sufficient facts to sustain a theory that holds all of the Cavalry companies liable for its own actions as well as actions taken by NAFS on behalf of the Cavalry companies. [14] Cavalry Portfolio and Cavalry Investments may be held liable for any actions taken by CMS on their behalf.

[14]   While NAFS and Valdez have reached a settlement of their dispute and request dismissal of Valdez's claim against NAFS, that settlement does not necessarily affect any claims of vicarious liability against a Cavalry company for actions taken by NAFS. Under Texas law, a release of one party does not automatically release one who is vicariously liable for the dismissed party's conduct. *Wasson v. Stracener,* 786 S.W.2d 414, 416 (Tex.Ct.App.1990).

Valdez v. Capital Management Services, LP, Not Reported in F.Supp.2d (2010)

2010 WL 4643272

## B. FDCPA Claims

Valdez further alleges that various acts by Cavalry Portfolio, Cavalry Investments, Cavalry SPV II, CMS and NAFS violated the Fair Debt Collection Practices Act. Valdez alleges that those defendants violated 15 U.S.C. 1692b through 1692g. Dkt. No. 109, ¶ 57.

### 1. Definitions

The FDCPA defines which persons, companies, and debts are subject to its provisions. 15 U.S.C. § 1692a. Valdez has pled sufficient facts to show that this case falls within the ambit of the FDCPA. He has shown that he is a "consumer"—"any natural person obligated or allegedly obligated to pay any debt"—as defined by the FDCPA. 15 U.S.C. § 1692a(3). Valdez has also alleged sufficient facts to show that the debt at issue—which is for the purchase of a mobile home—is one for the purchase of a good "primarily for personal, family, or household purposes" and qualifies as a debt under the FDCPA. 15 U.S.C. § 1692a(5). Finally, § 1692a defines a debt collector as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. 1692a(6). Again, Valdez has alleged sufficient facts to show that Cavalry Portfolio, Cavalry Investments, Cavalry SPV II, CMS and NAFS are debt collectors pursuant to the statute.

### 2. 15 U.S.C. § 1692b

Valdez alleges that the Defendants violated 15 U.S.C. § 1692b, which regulates communications between debt collectors and persons other than the consumer solely for the purposes of acquiring location-identifying information. Pursuant to this section, if the debt collector knows that the consumer is represented by an attorney, the debt collector shall "not communicate with any person other than that attorney." 15 U.S.C. § 1692b(6). Valdez's only timely factual pleading [15] is that CMS and NAFS—after knowing that Valdez was represented by counsel—communicated with a credit reporting agency seeking location information about Valdez. Dkt. No. 109, ¶ 35, 44. Further, Valdez maintains that this act was carried out by CMS and NAFS on behalf of Cavalry.

[15] Valdez also asserts that Cavalry called Valdez's home, family and third parties between October 31, 2002 and October 31, 2003. Dkt. No. 109, ¶ 27. This conduct, however, is beyond the FDCPA's one-year statute of limitations. 15 U.S.C. § 1692k(d).

*11 As to the Cavalry companies, Valdez has stated a claim upon which relief can be granted. As a general matter, a principal is responsible for the acts of its agent. *Nahm v. J.R. Fleming & Co.*, 116 S.W.2d 1174, 1176 (Tex.Civ.App.1938). Here, Valdez alleges that the Cavalry companies—through the actions of NAFS and CMS—communicated with "any person" other than Valdez's attorney to obtain location information. Moreover, this communication occurred despite Cavalry's knowledge of Valdez's representation by counsel. Thus, as alleged, a claim is stated against Cavalry.

As to CMS, Valdez has alleged that Cavalry did not inform CMS that Valdez was represented by counsel, an allegation that CMS "concurs with." Dkt. No. 109, ¶ 31; Dkt. No. 104, p. 16. In the alternative, [16] Valdez has pled that Cavalry did inform CMS, that Valdez was represented by counsel, and that CMS ignored that information. Dkt. No. 109, ¶ 33.

[16] "If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." FED. R. CIV. P. 8(d)(2). It is not necessary for Valdez to know the exact communications at this stage. *See Deston Therapeutics LLC v. Trigen Laboratories Inc.,* Civil No. 09–809, 2010 WL 2773317, *7, (D.Del.2010) (holding that one well-pled factual allegation permitted the alternative pleading pursuant to FED. R. CIV. P. 8(d)(2)).

Under the alternative pleading—that CMS knew Valdez was represented by counsel—Valdez has pled sufficient facts to state a claim upon which relief can be granted. Assuming the facts to be true, CMS knew Valdez was represented by counsel and communicated with the credit bureau to acquire location-identifying information. This conduct violated § 1692b(6) and states a claim that is not subject to dismissal under the applicable standard.

The alternative pleading analysis regarding CMS is equally true for the allegations against NAFS. Valdez has also alleged —under the alternative pleading—that NAFS knew Valdez was represented by counsel, but, despite this knowledge, contacted someone other than that attorney. Valdez has

WCAS131

alleged sufficient facts to overcome the motion to dismiss, for which reason it should be denied, as to this claim.

### 3. 15 U.S.C. § 1692c

Valdez also alleges that Defendants violated 15 U.S.C. § 1692c. Dkt. No. 109, ¶ 57. Under this provision, after a debt collector knows that the consumer is represented by an attorney "with regard to the subject debt," the debt collector shall not "communicate with a consumer in connection with the collection" of the debt. 15 U.S.C. § 1692c(a)(2).

Valdez alleges that Cavalry Portfolio had known—since October 2002—that Valdez was represented by counsel. Valdez further alleges that despite this knowledge, Cavalry Portfolio, through the acts of NAFS and CMS, continued to communicate directly with Valdez. Dkt. No. 109, ¶ 31, 40. Valdez has alleged sufficient factual matter against Cavalry Portfolio to survive a 12(b)(6) motion to dismiss this claim.

Valdez also alleges that CMS communicated directly with Valdez. Under the previously discussed alternative pleading, Valdez alleges that CMS contacted Valdez—despite knowing that Valdez was represented by counsel. Again, Valdez has alleged sufficient facts to overcome a motion to dismiss for failure to state a claim against CMS. Dkt. No. 109, ¶ 31.

Valdez alleges the same alternative theories for NAFS's liability under 5 U.S.C. § 1692c(2). The analysis applicable to the claim against CMS applies equally to the claim against NAFS. Thus, Valdez has stated sufficient facts to overcome a motion to dismiss. Dkt. No. 109, ¶ 40. Accordingly, the motion to dismiss as to this claim against NAFS should be denied as well.

### 4. 15 U.S.C. § 1692d

*12 Valdez also alleges that all of the Defendants violated 15 U.S.C. § 1692d, which prohibits "any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." Dkt. No. 109, ¶ 57. While the statute specifically states that it is not an exhaustive list, the types of conduct prohibited by § 1692d include: threats of violence; profane language; threatening to publish a list of customers who refuse to pay debts; advertising sale of the debt as a means of coercion; and repeatedly and continuously calling a consumer. It is clear that the statute intends to prohibit conduct that is abusive, regardless of the nature of the debt. Valdez has not pled any evidence to show this type of abusive or harassing

conduct by any Defendant. *See* McGinnis v. Dodeka, LLC, No. 4:09cv334, 2010 WL 1856450 (E.D.Tex.2010) (unpubl.) (dismissing a § 1692d claim under a Rule 12(b)(6) standard when the conduct pled was "misleading" and "unfair," but was not abusive or harassing). In short, despite repeated opportunities, Valdez has alleged no facts showing such conduct. Accordingly, the FDCPA claims pursuant to § 1692d should be dismissed for failing to state a claim.

### 5. 15 U.S.C. § 1692e

Valdez also alleges that the Defendants violated 15 U.S.C. § 1692e, which prohibits debt collectors from misrepresenting the status of the debt. Dkt. No. 109, ¶ 57. This section prohibits debt collectors from falsely representing the "character, amount, or legal status of any debt." 15 U.S.C. § 1692e(2)(A).

Several district courts have held that attempting to collect a debt from a person whom the debt collector knows does not owe the debt misrepresents the "character" or "legal status" of the debt and is actionable under 15 U.S.C. § 1692e(2)(A). Beattie v. D.M. Collections, Inc., 754 F.Supp. 383, 392 (D.Del.1991); Taylor v. Midland Credit Management, Inc., 2008 WL 544548, *4 (W.D.Mich.2008); Johnson v. Bullhead Investments, LLC, 2010 WL 118274, *6 (M.D.N.C.2010).

Valdez has alleged that Cavalry Portfolio continued to attempt to collect the debt, through CMS and NAFS, despite knowing that Valdez did not incur or owe the debt. Dkt. No. 109, ¶ 46. This action would, if true, misrepresent the "character" or "legal status" of the debt. Valdez has stated a claim against Cavalry Portfolio upon which relief can be granted.

Valdez has alleged, under the alternative pleading, that Cavalry informed CMS that Valdez "had disputed the debt by providing an identity theft affidavit and police report." Dkt. No. 109, ¶ 33. Despite knowing that Valdez's identity was stolen and that he did not incur or owe the debt, CMS sent a collection letter to Valdez. Dkt. No. 109, ¶ 31. If true, the letter would have misrepresented the "character" or "legal status" of the debt. Valdez has stated a claim against CMS upon which relief can be granted.

Valdez makes identical factual allegations regarding NAFS under the alternative pleading. Dkt. No. 109, ¶ 42. Under this pleading, Valdez has alleged NAFS, despite knowing that Valdez did not incur or owe the debt, nevertheless attempted to collect the debt from him.

Valdez v. Capital Management Services, LP, Not Reported in F.Supp.2d (2010)

2010 WL 4643272

**\*13** Each of the foregoing states a claim upon which relief can be granted against the named defendants and the motion to dismiss should be denied as to each of these claims.

### 6. 15 U.S.C. § 1692f

Valdez claims that the defendants violated 15 U.S.C. § 1692f, which prohibits debt collectors from collecting any amount "unless such amount is expressly authorized by the agreement creating the debt or permitted by law." Dkt. No. 109, ¶ 57. Valdez asserts that, because the agreement was invalid due to identity theft, the Defendants were attempting to collect a debt under an invalid contract. This argument is not supported by the language Valdez cites. Section 1692f is primarily concerned with preventing debt collectors from collecting charges greater than the sum that is owed. *Beattie,* 754 F.Supp. at 392 (citing S.Rep. 382 95th Cong., 1st Sess. 4 reprinted in 1977 U.S.Code Cong. & Admin. News 1695, 1698).

Valdez does not allege that the defendants were attempting to charge more than the putative contract allowed; rather, he disputes the validity of the contract. This does not state a claim pursuant to § 1692f(1). *Taylor v. Midland Credit Management, Inc.,* 2008 WL 544548, \* 4 (W.D.Mich.2008) ( "Accordingly, where the amount being collected by the collection agency was not different than the amount owed, § 1692f(1) was inapplicable to the plaintiff's claim that the collection agency was attempting to collect the debt from the wrong person"). Accordingly, Valdez does not state a claim pursuant to § 1692f(1) against any defendant and the motion to dismiss as to this claim should be granted.

### 7. 15 U.S.C. § 1692g

Valdez further claims that Defendants violated 15 U.S.C. § 1692g, which creates procedures by which consumers can dispute debts. Dkt. No. 109, ¶ 57. Section 1692g(a) requires that "[w]ithin five days after the *initial communication* with a consumer in connection with the collection of any debt," the debt collector shall provide the consumer with certain information, including that he or she has a right to dispute the debt. 15 U.S.C. § 1692g(a) (emphasis added). Valdez alleges that Cavalry Portfolio Services never provided the § 1692g(a) notices. Even assuming this to be true, the initial communications between Cavalry Portfolio and Valdez took place in 2002. Dkt. No. 109, ¶ 27. This failure is beyond the one-year statute of limitations for FDCPA violations. 15 U.S.C. § 1692k(e).

Valdez has failed to allege sufficient factual matter to show that any defendant violated its duties pursuant to 15 U.S.C. § 1692g. Valdez has not timely alleged that any defendant failed to include the information required by 15 U.S.C. § 1692g(a). Nor has Valdez alleged that he disputed the debt within the 30–day period described in 15 U.S.C. § 1692g(a), which would have created affirmative obligations for the defendants under 15 U.S.C. § 1692g(b). Thus, as to this allegation, Valdez fails to plead sufficient facts to state a claim upon which relief can be granted and the corresponding motion to dismiss should be granted.

### B. TDCPA Claims

**\*14** Valdez alleges that various acts by Cavalry Portfolio, Cavalry Investments, Cavalry SPV II, CMS, and NAFS "violated Tex. Fin. C. § 392.001 et seq., the Texas debt collection act." Dkt. No. 109, ¶ 64. Based upon the general nature of this pleading, if any of the actions of any Defendant violated the Texas Debt Collection Practices Act ("TDCPA"), Count II survives the motion to dismiss.

### 1. Definitions

The TDCPA defines which individuals, companies, and debts are within its coverage. TEX. FIN.CODE § 392.001. Valdez has pled sufficient facts to show that this case falls within the ambit of the TDCPA. Under the TDCPA, a consumer is defined as "an individual who has a consumer debt." TEX. FIN.CODE § 392.001(1). The debt at issue is alleged to be one "primarily for personal, family, or household purposes," which comports with the definition of a consumer debt. TEX. FIN.CODE § 392.001(2). Finally, the TDCPA defines a "third party debt collector" in the same terms used for "debt collector" in the FDCPA; as previously discussed, Cavalry Portfolio, Cavalry Investments, Cavalry SPV II, CMS and NAFS meet that definition.

### 2. Cavalry Portfolio and CMS

If a consumer disputes, in writing, the accuracy of an item in the file of a third party debt collector, there are affirmative obligations placed upon the third party debt collector. TEX. FIN.CODE § 392.202(a). The third party debt collector (1) shall make a record of the dispute; (2) if they do not report "information related to the dispute" to a credit bureau, the third party debt collector must cease collection efforts until an investigation is completed; and, (3) within 30 days of the written notice from the consumer, the third party debt collector must send a written statement either admitting the

WCAS133

2010 WL 4643272

inaccuracy, denying it, or stating it has not had sufficient time to complete its investigation. TEX. FIN.CODE § 392.202(a)-(b). The TDCPA does not specify when the debt must be disputed for these provisions to apply.

Valdez alleges that, on November 4, 2008, his counsel sent a letter to Cavalry Portfolio and CMS disputing that he owed the debt. Dkt. No. 109, ¶ 36. Valdez alleges that Cavalry Portfolio and CMS took none of the affirmative steps required by TEX. FIN.CODE § 392.202(a)-(b). Therefore, Valdez has pled sufficient facts—if accepted as true—to survive a motion to dismiss against Cavalry Portfolio and CMS and the motion to dismiss should be denied . [17]

[17]     CMS alleges that because it did not report the debt to a credit bureau and did not continue collection efforts, it complied with TEX. FIN.CODE § 392.202(a)-(b). However, the statute also establishes an obligation to make a written record of the dispute and, within 30 days, to report to the consumer the findings of its investigation. CMS does not argue that it complied with those affirmative responsibilities.

### 3. NAFS

The TDCPA prohibits a debt collector from "misrepresenting the character, extent, or amount of a consumer debt." TEX. FIN.CODE § 392.304(8). This language tracks the language of 15 U.S.C. § 1692e(2)(A). As previously discussed, under the theory that Cavalry informed NAFS that the debt was disputed, Valdez has pled sufficient facts to survive a motion to dismiss and the motion to dismiss this specific claim should be denied. [18]

[18]     Rather, than resolving the validity of each of Valdez's claims under FDCPA and TDCPA, as would be the case with summary judgment, the Court limits the discussion to the motions before it. If the complaint states a claim under a count, then the motion to dismiss that count should be denied.

### C. Unreasonable Debt Collection

**\*15**  As discussed earlier, the Texas common law tort of unreasonable debt collection requires actions by the debt collector that are "willful, wanton and malicious and intended to inflict mental anguish and result in bodily harm." *Connell v. Rosales,* 419 S.W.2d 673, 676 (Tex.App.1967). To determine whether Valdez has pled a plausible case for relief, the Court

is to "draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* ——U.S. ——, ——, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

Valdez does not allege that any of the defendants' actions were abusive individually; for example, there are no claims of: repeated phone calls at odd hours; obscene language; threats of bodily harm; or, criminal prosecution. Rather, Valdez bases this claim upon the theory that the Cavalry companies continued to attempt to collect a disputed debt. Even accepted as true, the actions pled by Valdez are insufficient to state a plausible claim for unreasonable debt collection. In essence, Valdez argues a theory of liability arising out of the defendants' persistence. Mere persistence, however, is insufficient to state a claim for unreasonable debt collection.

The Fifth Circuit has observed that the tort of unreasonable collection is intended to deter "outrageous collection techniques." *McDonald v. Bennett,* 674 F.2d 1080, 1089, n. 8 (5th Cir.1982). Among the techniques that have been found to sufficiently state a cause of action are: sending a large man to the plaintiff's home, who "yelling and screaming, demanded the keys to the house, and told the [Plaintiff's] family to get out." *EMC Mortg. Corp. v. Jones,* 252 S.W.3d at 864; falsely accusing the plaintiff of committing a crime to collect a debt, *Lloyd v. Myers,* 586 S.W.2d 222, 227 (Tex.Civ.App.-Waco 1979); sending a large man to the plaintiff's home, who stood over the plaintiff shouting, shaking his finger and calling him a liar, *Credit Plan Corp. of Houston v. Gentry,* 516 S.W.2d 471, 475 (Tex.Civ.App.-Houston [14th Dist.] 1974) (rev'd on other grounds in *Gentry v. Credit Plan Corp. of Houston,* 528 S.W.2d 571 (Tex.1975)); sending a representative to the plaintiff's home, confronting and embarrassing the plaintiff's fiancee in front of social guests, *Bank of North America v. Bell,* 493 S.W.2d 633, 635 (Tex.Civ.App.-Houston [14th Dist.] 1973); calling the plaintiff five times in one night, with the final call including a threat of personal violence, *Pioneer Finance & Thrift Corp. v. Adams,* 426 S.W.2d 317, 319 (Tex.Civ.App.-Eastland 1968).

By the same token, merely making mistakes, because the defendant is inefficient, is not enough to sustain a claim of unreasonable debt collection. *Montgomery Ward & Co. v. Brewer,* 416 S.W.2d 837, 844 (Tex.Civ.App.-Waco 1967). Moreover, attempting to collect a time-barred debt, by itself, does not rise to the level of unreasonable debt collection. *Naranjo v. Universal Sur. of America,* 679 F.Supp.2d 787, 801 (S.D.Tex.2010). Thus, Valdez has not pled the type of

2010 WL 4643272

outrageous collection techniques needed to sustain a claim of unreasonable collection.

**\*16** Furthermore, the statute of limitations for an intentional tort in Texas is two years. TEX. CIV. PRAC. & REM.CODE 16.003(a). Within this limitations period, the only collections actions pled by Valdez are that the Cavalry companies forwarded the account to CMS and NAFS; that both CMS and NAFS each sent one letter to Valdez; and that both CMS and NAFS returned the account to the Cavalry companies. This conduct does not rise to the level of an outrageous collection technique, irrespective of the age of the debt.

Thus, even assuming outrageous conduct at some point during the collection process, none has been alleged within the statute of limitations. This failure to plead, despite repeated amendments, clearly indicates that no such actions—and certainly none within the statute of limitations period—have been alleged and dismissal of this count is appropriate.

### D. Fair Credit Reporting Act

The FCRA forbids using or obtaining a credit report unless the report is obtained for a permissible purpose. 15 U.S.C. § 1681b(f). Among the permissible purposes for obtaining a credit report are "collection of an account" belonging to the consumer, as well as "in connection with a business transaction that is initiated by the consumer." 15 U.S.C. § 1681b(a)(3)(A); (a)(3)(F)(I). The FCRA also creates civil liability for those who violate its provisions. 15 U.S.C. § 1681n-o.

Valdez alleges that the Cavalry companies knew Valdez did not owe the debt, based upon the dispute letters and evidence sent by his attorney. Valdez also alleges that the Cavalry companies forwarded the Valdez account to NAFS and CMS, "knowing and intending" that those entities would pull Valdez's credit report. Dkt. No. 109, ¶ 83.

Under the law of agency, a principal is responsible for the acts of its agent. Nahm, 116 S.W.2d at 1176. Valdez has alleged that the Cavalry companies sent NAFS and CMS to do what it knew (based upon its knowledge that the debt was invalid) it could not do: pull Valdez's credit report. Valdez has alleged sufficient facts to state a claim that—despite knowing that the debt was not Valdez's—the Cavalry companies forwarded the debt to their agents and knew that their agents, after receiving the information from Cavalry, would pull Valdez's credit report. Thus, assuming the truth of the assertions, Valdez has alleged facts to show that the Cavalry companies

either willfully or negligently obtained his credit report without having a legitimate business purpose for doing so. See Cappetta v. GC Services Ltd. Partnership, 654 F.Supp.2d 453, 461 (E.D.Va.2009) (holding that a plaintiff may state a claim for relief under the FCRA when she pled facts to show that the defendant pulled her credit report despite knowing she was not the account holder). Accordingly, the motion to dismiss this claim should be denied.

### E. Joint Motion to Dismiss

NAFS, Hartford and Valdez have filed a joint motion to dismiss, pursuant to a confidential settlement agreement. Dkt. No. 131. No party has lodged any substantive objections to the motion to dismiss. Finding no reasons to deny the motion, the Court recommends that it be granted.

### F. Dismissal of Josefina Valdez

**\*17** The parties have filed a stipulation which dismisses—with prejudice—all claims made by Josefina Valdez. Given that the dismissal appears to be for good cause, the Court recommends that all claims by Josefina Valdez be dismissed with prejudice.

### VI. Recommendation

For the reasons stated above, the Court **recommends** that the motions to dismiss by CMS, CMS General Partner and Travelers, Dkt. No. 81; Cavalry Portfolio, Dkt. No 86; International Fidelity, Dkt. No. 100; Cavalry Investments and Cavalry SPV II, Dkt. No. 108, be **GRANTED** in part and **DENIED** in part.

Specifically, as to the Fair Debt Collection Practices Act, the motions to dismiss should be granted as to all defendants for claims under 15 U.S.C. §§ 1692d, 1692f, and 1692g. The motions to dismiss should be denied as to all defendants for claims arising under 15 U.S.C. §§ 1692b, 1692c and 1692e.

The motions to dismiss should be denied for all defendants for claims under the Texas Debt Collection Practices Act.

The motions to dismiss should be granted as to all defendants for claims of unreasonable debt collection.

The motion to dismiss should be denied as to the Cavalry companies for claims pursuant to the Fair Credit Reporting Act.

WCAS135

Valdez v. Capital Management Services, LP, Not Reported in F.Supp.2d (2010)

2010 WL 4643272

The Court further **RECOMMENDS** that the joint motion to dismiss filed by NAFS, Hartford and Valdez be **GRANTED.** Dkt. No. 131. Accordingly, all claims against NAFS and Hartford should be dismissed. This dismissal renders the motion to dismiss filed by NAFS and Hartford, Dkt. No. 80, moot, for which reason it should be denied.

The Court further **RECOMMENDS** that Josefina Valdez be dismissed with prejudice as a plaintiff in this case.

### A. Notice to Parties

The parties have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with the Honorable Andrew S. Hanen, United States District Judge. 28 U.S.C. § 636(b)(1) (eff.Dec. 1, 2009). Failure to file objections timely shall bar the parties from a *de novo* determination by the District Judge of an issue covered in the report and shall bar the parties from attacking on appeal factual findings accepted or adopted by the district court except upon grounds of plain error or manifest injustice. *See* § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428–29 (5th Cir.1996).

### All Citations

Not Reported in F.Supp.2d, 2010 WL 4643272

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WCAS136

2010 WL 3488244, 2011-2 Trade Cases P 77,583

2010 WL 3488244
United States District Court,
E.D. Louisiana.

VAUGHN MEDICAL EQUIPMENT
REPAIR SERVICE, L.L.C.,
v.
JORDAN RESES SUPPLY COMPANY, Respironics,
Inc., a/k/a/ Philips Respironics, and Resmed. Corp.

Civil Action No. 10–00124.
|
Aug. 26, 2010.

**Attorneys and Law Firms**

Robert P. Wynne, Arnold & Itkin, LLP, Houston, TX, for
Plaintiff.

Donald Richard Abaunza, Kelly Titus Scalise, Liskow &
Lewis, Wayne J. Lee, Jennifer Borum Bechet, Stone, Pigman,
Walther, Wittmann, LLC, James M. Garner, Peter L. Hilbert,
Jr., Sher, Garner, Cahill, Richter, Klein & Hilbert, LLC, New
Orleans, LA, Brett Ackerman, Curtis L. Frisbie, Jr., Randy
D. Gordon, Gardere, Wynne & Sewell, LLP, Dallas, TX,
Geoffrey H. Bracken, Jessica Glatzer Mason, Gardere, Wynne
& Sewell, LLP, Timothy S. McConn, Andrews Kurth, LLP,
Houston, TX, for Defendant.

R. Casey Low, Andrews Kurth, LLP, Austin, TX, Pro Hac,
Vice.

***ORDER AND REASONS*** [1]

[1]    Geoffrey M. Sweeney, a student at the Loyola
University of New Orleans College of Law,
assisted in the preparation of this Order and
Reasons.

HELEN G. BERRIGAN, District Judge.

**\*1** Before the Court is a Motion to Dismiss for improper
venue pursuant to Federal Rule of Civil Procedure 12(b)(3).
(Rec.Doc.14). In the alternative, defendants assert that this
case should be transferred to the Southern District of Texas
under 28 U.S.C. § 1404(a). (Rec.Doc.16).

Also before the Court is a Motion to Dismiss the plaintiff's
claims on the following grounds: (1) the claims are
defectively pled; (2) plaintiff alleges no antitrust injury and
therefore fails to state a claim; (3) plaintiff has not and can
not plead a relevant market, thereby precluding the assertion
of the antitrust claims; (3) plaintiff's specific antitrust theories
fail as a matter of law; (4) the Noerr–Pennington doctrine
bars all antitrust claims; (5) the facts alleged do not support
plaintiff's civil rights claims; (6) plaintiff's state law claims
are unsupported by the facts alleged. (Rec. Doc. 18–1 at
4). The motions are before the Court on the briefs without
oral argument. Having considered the memoranda of counsel,
the record, and the applicable law, the Court DENIES the
defendants' 12(b)(3) motion to dismiss, but GRANTS the
defendants' 12(b)(6) motion to dismiss all claims for reasons
explained below. Because the Court grants the 12(b)(6)
motion to dismiss, it need not reach the motion to transfer,
which is MOOT.

**I. Plaintiff's Allegations** [2]

[2]    The following section details the factual allegations
made by the plaintiff, which are accepted as true
solely for the purposes of ruling on the motions
before the Court.

Vaughn Medical Equipment Service, L.L.C. ("Vaughn
Medical" or "plaintiff") contracted with defendants
Respironics, Inc. ("Respironics") to purchase certain devices
used to treat sleep apnea known as continuous positive airway
pressure devices and related products ("CPAPs"). (Rec. Doc.
14–1 at 2). Plaintiff later sought to expand their services
to provide CPAPs and related products to the United States
Department of Veteran Affairs ("VA"). (Rec. Doc. 4–2 at
9). However, plaintiff's distribution rights for Respironics'
CPAPs and related products were limited by contract to
patient-only. (Rec. Doc. 4–2 at 8). Although the VA and
Vaughn Medical mutually sought to establish a relationship,
Respironics refused plaintiff's requests to provide a "Letter of
Commitment," which the VA required as a means to guarantee
an uninterrupted source of supply. (Rec. Doc. 4–2 at 9).
After discussing the matter with the VA, a representative
of the plaintiff was informed that the necessary "Letter of
Commitment" could be obtained from a third-party vendor.
(Rec. Doc. 4–2 at 10). As a result, plaintiff proceeded to obtain
Respironics' CPAPs and related products from third-party
vendor Sleep Management Solutions ("Sleep Management").
(Rec. Doc. 4–2 at 10–11). Despite the added costs of
procuring Respironics' products from a third party vendor,

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

**WCAS137**

2010 WL 3488244, 2011-2 Trade Cases P 77,583

Vaughn Medical was selling these products to the VA for less than JRS. (Rec. Doc. 4–2 at 12).

Plaintiff alleges that its efforts to enter the VA market drew the ire of Respironics and Jordan Reses Supply Company ("JRS"), and that the following actions occurred as a result. After procuring the necessary CPAPs through Sleep Management for a short while, Respironics contacted the VA to inform them that Vaughn Medical was not legally authorized to sell Respironics' CPAPs. (Rec. Doc. 4–2 at 13). As a result, the VA ceased to purchase these products from Vaughn Medical. *Id.* Shortly thereafter, Vaughn Medical met with the VA to discuss why it would no longer purchase Respironics CPAPs from plaintiff. *Id.* The VA informed Vaughn Medical that it needed to "increase its prices" to those of the VA. *Id.* After Vaughn Medical contacted members of the U.S. Congress about the matter, the VA once again began to purchase Respironics' CPAPs from the plaintiff. *Id.*

 **\*2**  A few weeks later, representatives of JRS confronted Vaughn Medical personnel at a conference to inform them of JRS' "strong influence at Respironics and the VA." (Rec. Doc. 4–2 at 14). Despite this alleged power to influence, Vaughn Medical began to increase its sales of Respironics CPAPs to individual VA medical centers throughout the country. *Id.* At the same time, Respironics began to investigate how Vaughn Medical was obtaining its CPAPs. *Id.* After learning of the third-party resale system, Respironics threatened Sleep Management with punitive measures unless it agreed to extinguish its relationship with Vaughn Medical. *Id.* Around this same time, Respironics informed the VA that it would not warrant CPAPs sold to the VA by Vaughn Medical. (Rec. Doc. 4–2 at 15). The VA advised plaintiff that a viable alternative was necessary. *Id.* Eventually, after another incident of Congressional intervention, the VA accepted Vaughn Medical's personal warranty in place of Respironics warranty. (Rec. Doc. 4–2 at 16).

JRS then approached Vaughn Medical to discuss terms of a possible business relationship. (Rec. Doc. 4–2 at 15). In exchange for certain concessions relating to the VA market, JRS agreed to push Vaughn Medical as a vendor to the Department of Defense. (Rec. Doc. 4–2 at 16). At this meeting, JRS also informed Vaughn Medical that it realized over $30 million per month in revenue from the sale of CPAPs and related products to the VA. *Id.*

Eventually, Vaughn Medical met with Respironics to discuss entering a distribution agreement. (Rec. Doc. 4–2 at 16–17).

The prices reflected on the distribution agreement were higher than the prices Vaughn Medical was paying its third-party vendor. (Rec. Doc. 4–2 at 17). Vaughn Medical signed and executed the distribution agreement, and submitted it to the VA. *Id.* When the VA contacted Respironics to validate the agreement, Respironics informed the VA that it had rescinded the distribution contract with plaintiff, claiming that the terms of the agreement restricted plaintiff from selling Respironics CPAPs to the VA. *Id.* As a result of submitting this new agreement, Vaughn Medical unknowingly terminated its pre-existing Letter of Commitment with Sleep Management. *Id.* Furthermore, the VA refused to honor any third-party Letter of Commitment. *Id.*

Respironics and JRS then informed the VA that only JRS was permitted to sell Respironics CPAPs to the VA. (Rec. Doc. 4–2 at 18). The VA, however, refused to honor the defendants' position, but did implicitly reaffirm their preference for Respironics' CPAPs by discouraging individual VA medical centers from purchasing CPAPs from any company other than JRS. *Id.*

After a meeting with the Undersecretary of the VA, Vaughn Medical was informed that the VA would honor a Letter of Commitment from a third party vendor. (Rec. Doc. 4–2 at 19). The defendants then stepped up their efforts to exterminate Vaughn Medical's supply lines. Representatives of JRS began to obtain serial numbers from Respironics' CPAPs at VA medical centers. *Id.* JRS then passed those numbers to Respironics, who could use them to track which third-party vendors were selling to Vaughn Medical. (Rec. Doc. 4–2 at 20). As a result of this activity, Respironics learned that Sleep Management was Vaughn Medical's sole source of supply. *Id.* Respironics contacted Sleep Management and encouraged the firm to cease its business with Vaughn Medical, which it eventually did. *Id.*

 **\*3**  Vaughn Medical found additional third-party vendors from which to buy Respironics' CPAPs. *Id.* In response, JRS representatives continued to track serial numbers. *Id.* Respironics then informed all of its suppliers that they were not authorized to sell products to Vaughn Medical. (Rec. Doc. 4–2 at 20). Simultaneously, local representatives for JRS and Respironics began to disparage Vaughn Medical to individual VA medical centers. (Rec. Doc. 4–2 at 21). Respironics implemented an "Honesty, Ethics and Integrity Campaign," the purpose of which was to undermine Vaughn Medical's credibility. *Id.* Respironics and JRS once again informed the VA that only JRS was permitted to sell Respironics'

WCAS138

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 144 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...

2010 WL 3488244, 2011-2 Trade Cases P 77,583

CPAPs to the VA, (Rec. Doc. 4–2 at 22), and have falsified correspondence from the VA in an attempt to further tarnish the plaintiff's reputation. *Id.*

In the summer of 2009, the VA was informed that Respironics CPAP masks were manufactured in China, which was a clear violation of federal regulations. (Rec. Doc. 4–2 at 24). The VA then began to purchase these products from ResMed Corporation ("ResMed"). *Id.* ResMed also falsified correspondence from the VA to read that Vaughn Medical was not permitted to sell CPAPs and related products. (Rec. Doc. 4–2 at 25). This correspondence was then shown to individuals at VA medical centers. *Id.* Additionally, ResMed terminated its contract with Sleep Management after learning that firm was selling the defendants' products to Vaughn Medical. (Rec. Doc. 4–2 at 26).

Plaintiff originally filed suit on August 24, 2009, in Jefferson County, Texas, alleging violations of Texas antitrust law, libel, slander, business disparagement, tortuous interference and other causes of action. (Rec. Doc. 14–1 at 2). On October 12, 2009, two individual defendants filed motions to transfer venue to Fort Bend County, Texas. *Id.* at 3. Plaintiff amended its petition twice while the Jefferson County state court considered the defendants' motions to transfer venue. *Id.* The Jefferson County state court ultimately concluded that the Fort Bend County state court was the proper venue for the case, and granted the individual defendants' motions to transfer. (Rec. Doc. 14–1 at 3).

Plaintiff filed the present suit in the Eastern District of Louisiana while the state case was pending in Fort Bend County, Texas. *Id.* After filing the present suit, the Plaintiff nonsuited its claims against all defendants in the Fort Bend County, Texas litigation. *Id.* Defendants JRS and Respironics retain pending counter-claims against the Plaintiff Vaughn Medical in the state court action. *Id.* Plaintiff sought to transfer venue of the state court case back to Jefferson County, Texas. That motion was denied. *Id.* Defendants subsequently filed these motions that are now before this Court.

## II. Law and Analysis

A. *Motion to Dismiss for Improper Venue*

1. *Standard of Review*

**\*4** Defendants, JRS, Respironics, and ResMed (collectively, "defendants") seek dismissal of the claims asserted by

Plaintiff, Vaughn Medical, pursuant to Federal Rule of Civil Procedure 12(b)(3).

Federal Rule of Civil Procedure 12(b)(3) states that a party may move the court to dismiss the action for "improper venue." FED. R. CIV. P. 12(b)(3). Once a defendant has raised the improper venue issue by motion, the burden of sustaining venue rests with the plaintiff. [3] *Dupree v. Valero Energy Corp.,* 2003 WL 22466234 at *1 (E.D.La.2003); *see also Corbello v. Devito,* 2008 WL 2097435 at *2 (E.D.Tex.2008); *McCaskey v. Continental Airlines, Inc.,* 133 F.Supp.2d 514, 523 (S.D.Tex.2001). In the absence of an evidentiary hearing, a plaintiff may carry this burden by pleading facts that, if taken as true, establish proper venue. *McCaskey,* 133 F.Supp.2d at 523; *Wilson v. Belin,* 20 F.3d 644, 648 (5th Cir.1994). The court accepts undisputed facts in the Plaintiff's pleadings as true, and resolves any conflicts in the Plaintiff's favor. *McCaskey,* 133 F.Supp.2d at 523.

[3]    The Court recognizes that the federal district courts in the Fifth Circuit have been inconsistent on the question of which party bears the burden of proof on a Rule 12(b)(3) Motion to Dismiss for improper venue. Some cases have held that the movant bears the burden to establish that venue is improper. *See, e.g., Texas Marine & Brokerage, Inc., v. Euton,* 120 F.Supp.2d 611, 612 (E.D.Tex.2000) (stating that the burden to demonstrate that venue is improper lies with the movant); *Sanders v. Seal Fleet, Inc.,* 998 F.Supp. 729, 733 (E.D.Tex.1998). "But 'the better view,' and the clear weight of authority, is that when an objection has been raised, the burden is on the plaintiff to establish that the district he chose is a proper venue." 14D CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3826 (3d ed.2010); *see, e.g., Terra Nova Sciences, LLC v. JOA Oil and Gas Houston,* 2010 WL 2671584 at *3 (S.D.Tex.2010); *Psarros v. Avior Shipping, Inc.,* 192 F.Supp.2d 751, 753 (S.D.Tex .2002).

2. *Analysis*

Plaintiff asserts venue in the Eastern District of Louisiana under 15 U.S.C. § 22 is proper due to federal antitrust allegations against defendants. [4] This statutory venue provision provides that "[A]ny suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant,

2010 WL 3488244, 2011-2 Trade Cases P 77,583

but also in any district wherein it may be found or transacts business." 15 U.S.C. § 22.

4       In its complaint, Plaintiff did not plead 15 U.S.C. § 22 as grounds for venue in this court. Plaintiff did so in its opposition to Defendants' 12(b)(3) motion to dismiss. This Court may consider venue grounds that the plaintiff did not plead in its complaint to establish venue. *Bro–Tech Corp. v. Purity Water Co. of San Antonio, Inc.,* 2008 WL 4326345 at *2 (W.D.Tex.2008).

Taking the Plaintiff's allegations as true, the defendants' CPAPs and related products are distributed to VA hospitals in every district in the United States. (Rec. Doc. 25 at 4). Plaintiff also alleges that defendants JRS, Respironics, and ResMed all maintain a presence in Louisiana and have engaged in business transactions in Louisiana, thereby rendering this court a proper venue. (Rec. Doc. 4–2 at 3–4).

The test for "transacting business" within the meaning of 15 U.S.C. § 22 was set forth in *Eastman Kodak Company v. Southern Photo Materials Company.* 273 U.S. 359, 373 (1927). In *Eastman Kodak,* the Court stated that "a corporation is engaged in transacting business in a district ... if, in fact, in the ordinary and usual sense, it 'transacts business' therein of any substantial character." *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 373 (1927); *see United States v. Scophony Corp.,* 333 U.S. 795, 807 (1948); *see also National Athletic Trainers' Ass'n, Inc., v. American Physical Therapy Ass'n,* 2008 WL 4146022 at *11 (N.D.Tex.2008) (stating that "a corporation transacts business ... when a substantial business activity is performed within the jurisdiction with continuity of character, regularity, ... and not looking toward cessation of business.") (quoting *Daniel v. Am. Board of Emergency Med.,* 988 F.Supp. 127, 260 (W.D.N.Y.1997). The *Eastman Kodak* decision effectively broadened the venue of the district courts in anti-trust suits. *Datamedia Computer Service, Inc. v. AVM Corp.,* 441 F.2d 604 (5th Cir.1974).

**\*5** With regard to the character of a corporation's business activity, numerous courts have discussed the test for substantiality in various contexts. [5] For example, in *Jeffrey–Nichols Motor Company v. Hupp Motor Car Corporation,* the United States Court of Appeals for the First Circuit explained that "while a single transaction of business may not be sufficient to establish venue in a district, it does not require the maintenance of an office or place of business or

the presence of agents soliciting or taking orders." 46 F.2d 623, 625 (1st Cir.1931). Nor is "the sale of goods essential to constitute transacting business. All the steps leading to or promoting sales may constitute the transaction of business." *Id.*

5       The Fifth Circuit has addressed how to evaluate whether a corporation conducts business of a substantial character in the context of gross sales revenue. *See Green v. U.S. Chewing Gum Mfg. Co.,* 224 F.2d 369 (5th Cir.1955). In *Green,* the Fifth Circuit reasoned that the test of substantiality is not one of percentages. *Id.* at 371–72. If it were, courts "would have different tests of substantiality applying to different corporations according to their size; a large corporation could, with impunity, engage in the same acts which would subject a smaller corporation to jurisdiction and venue." *Id.* Instead, the proper test is "whether or not the sales would appear to be substantial from the average businessman's point of view." *Id.*

The defendants have neither challenged nor denied the Plaintiff's allegation that they have transacted business in this district within the meaning of 15 U.S.C. § 22. Instead, the defendants argue that Plaintiff has failed to illustrate any "reasonable relation" between its lawsuit and this district. There is no case law found in this district or otherwise to show a specific requirement for a "reasonable relation" between the lawsuit and the judicial district in which venue is sought under 15 U.S.C. § 22. The defendants argument is seemingly a response to a pleading deficiency under the general venue statute, *see* 28 U.S.C. § 1391(b), (c), and does not address the plaintiff's reliance on 15 U.S.C. § 22 to establish this court as a proper venue. Since venue is proper under the antitrust venue provision of 15 U.S.C. § 22, this court need not address the general venue statute.

Defendants' further allege that Plaintiff has engaged in forum shopping. Defendants cite to certain decisions that, they contend, support the proposition that dismissal under Rule 12(b)(3) is appropriate when a plaintiff engages in "improper forum shopping." (Rec. Doc. 14 at 4).

After a review of these decisions, this court finds that defendants mischaracterize the cases cited as support. In *King v. Russell,* plaintiff filed suit in the district court for the District of Arizona. 963 F.2d 1301 (9th Cir.1992). In that case, plaintiff's choice of venue was reviewed under the general venue statute, 28 USC § 1391, and not 15 U.S.C. § 22. *Id.*

**Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...**
2010 WL 3488244, 2011-2 Trade Cases P 77,583

at 1305–06. Furthermore, in *King,* the only connection of Arizona to the lawsuit was that the plaintiff was a resident of Arizona at the time the suit was filed. *Id.* at 1304. The district court, under its own discretion, chose to dismiss the case instead of transfer because "interests of justice" did not support a transfer to United States District Court for the Central District of California. *Id.* at 1304–05. The United States Court of Appeals for the Ninth Circuit explained that the district court did so because, "[the Plaintiff] expressed no interest in transfer and because 'of the fact that the action smacks of harassment and bad faith on the plaintiff's part in that it appears that she filed it here *after repeatedly losing on at least some similar claims in California.*' " *King,* 963 F.2d at 1304 (emphasis added). The court therefore issued a dismissal pursuant to 28 U.S.C. § 1406 based primarily on the fact that the plaintiff had already lost on several similar claims in previous litigation in California state courts; the court did not issue a 12(b)(3) dismissal based solely on improper forum shopping. *See id.* at 1304–05.

**\*6** In this case, Plaintiff had not lost on any claims prior to filing its suit in this court. According to the defendants' memorandum in support for their 12(b)(3) motion to dismiss, the plaintiff filed this lawsuit in this court while the state court case was still pending. (Rec. Doc. 14–1 at 3). The merits of the state law claims had yet to be addressed or adjudicated by any Texas state court.

Defendants also cite *Wood v. Santa Barbara Chamber of Commerce Incorporated* as support to assert that dismissal is appropriate under Rule 12(b)(3) when a plaintiff engages in forum shopping. 705 F.2d 1515 (9th Cir.1983). In *Wood,* the plaintiff originally filed a lawsuit against his employer in the district court for the Central District of California. *Wood v. McEwen,* 644 F.2d 797, 799 (9th Cir.1981). After a United States magistrate dismissed his original lawsuit for abuse of discovery, Wood filed a second action claiming that the magistrate was fraudulently biased. *Id.* at 800. After losing his action against the magistrate, Wood shifted his original claims and redirected his litigation against over 250 defendants. *Id.* At one point, Wood had filed suits containing the same or similar claims in over 30 district courts. *Id.* Neither the district court's initial determination to dismiss Wood's case, nor the Ninth Circuit's affirmation of the district court's decision, was a 12(b)(3) dismissal for improper venue based on improper forum shopping. In the present case, the plaintiff's conduct is not indicative of an egregious exploitation of the Federal Rules of Civil Procedure, as was the case in both *King* and

*Wood.* The defendants' attempt to analogize these cases with the procedural circumstances of this case is unwarranted.

Lastly, the defendants seek to limit the deference accorded to plaintiff's choice of forum by citing to a Second Circuit case, which stated "the sliding scale of deference tilts in favor of dismissal where the choice of forum is 'indicative of forum shopping .' " *Lasker v. UBS Securities, LLC,* 614 F.Supp.2d 345, 358 (E.D.N.Y.2008) (citing *Norex Petroleum Ltd. v. Access Indus. Inc.,* 416 F.3d 146, 155 (2d Cir.2005). In reviewing *Lasker,* this Court disagrees with defendants' interpretation of that holding.

In *Lasker,* the defendants had filed a motion to dismiss based on the doctrine of forum non conveniens. Forum non conveniens "permits a court, in its discretion, 'to resist the imposition upon its jurisdiction,' even though jurisdiction may be lawfully exercised and *venue is technically proper,* where the convenience of the parties and interests of justice favor trial in another forum ." *Lasker,* 614 F.Supp.2d at 358 (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507 (1947) (emphasis added). The statement cited by the defendants was offered by the *Lasker* court in the context of a three-step process used by the Second Circuit to guide the exercise of judicial discretion in applying the doctrine of forum non conveniens. *Id.* at 358. Therefore, in *Lasker,* the court's reference to the diminished deference afforded a plaintiff's choice of forum was limited to the Second Circuit's forum non conveniens analysis, and is inapplicable to the instant litigation.

**\*7** Since the defendants "transact business" within the meaning of the antitrust venue provision 15 U.S.C. § 22, and the Eastern District of Louisiana may properly exercise subject matter jurisdiction over the claims and personal jurisdiction over the defendants, venue is this court is proper. Defendants' motion to dismiss for improper venue is DENIED. Because the Court holds, *infra,* that the Defendants' Motion to Dismiss should be granted, it need not reach their Motion to Transfer pursuant to 28 U.S.C. § 1404(a), which is now MOOT. [6]

[6]    To succeed in such a motion, the movant must "clearly demonstrate that the requested transfer is '[f]or the convenience of the parties and witnesses, in the interest of justice.' " *In re Volkswagen of America, Inc.,* 545 U.S. 304, 315 (5th Cir.2008). It would be neither efficient nor in the interests of justice for the Court to transfer a case which, on the

WCAS141

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 147 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...

2010 WL 3488244, 2011-2 Trade Cases P 77,583

merits of a 12(b)(6) motion, should ultimately be dismissed.

B. *Motion to Dismiss for Failure to State a Claim*

1. *Plaintiff Has Failed to State Claim*

a. Standard of Review

Federal Rule of Civil Procedure 8(a) provides, in relevant part, that

[a] pleading that states a claim for relief must contain:

(1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no jurisdictional support; and

(2) a short and plain statement of the claim showing that the pleader is entitled to relief; and

(3) a demand for the relief sought, which may include relief in the alternative or different types of relief.

FED.R.CIV.P. 8(a)

Under Rule 8(a)(2), the statement need only "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)). While a complaint attacked by a Rule 12(b)(6) motion to dismiss need not contain detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions; a formulaic recitation of the elements of a cause of action will not suffice. *Twombly,* 550 U.S. at 555.

To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citing *Twombly,* 550 U.S. at 570). A plaintiff must do more than pleads facts that are "merely consistent with" a defendant's liability. *Id.* Facial plausibility exists when the facts pleaded permit the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* This is not to say that the plausibility standard is akin to a probability requirement, but it does ask for more than the sheer possibility that a defendant has acted unlawfully. *Id.*

Plausibility pleading calls for "enough fact to raise a reasonable expectation that discovery will reveal evidence of the [unlawful conduct]." *Twombly,* 550 U.S. at 556. Despite this reasonability requirement, the *Twombly* Court further explained that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Id.* Thus, plausibility pleading still retains the primary function of serving notice to a defendant of the pending claims. The Supreme Court's mandate for contextualized factual assertions is critical to this notice function, since a complaint that relies on legal conclusions and bare assertions would leave a defendant "seeking to respond to plaintiffs' conclusory allegations ... [with] little idea where to begin." *Twombly,* 550 U.S. at 565.

b. Antitrust Claims

*i). Section 1 of the Sherman Act*

**\*8** In the Fifth Circuit, to allege a violation of § 1 of the Sherman Act, a plaintiff must plead that (1) the defendants engaged in a conspiracy, (2) the conspiracy restrained trade, and (3) trade was restrained in the relevant market. *See Wampler v. Sw. Bell Tele. Co.,* 597 F.3d 741, 744 (5th Cir.2010) (citing *Apani S.W., Inc. v. Coca–Cola Enters.,* 300 F.3d 620, 627 (5th Cir.2002). Stating a claim under this provision requires a complaint with enough factual matter, taken as true, to suggest that an agreement was made. *Twombly,* 550 U.S. at 555. In addition to presenting contextualized facts to show an agreement or conspiracy, the plaintiff must also allege sufficient factual material to show the alleged agreement had an anticompetitive effect. *N. Tex. Specialty Physicians v. F.T.C.,* 528 F.3d 346, 358–363 (5th Cir.2008).

Plaintiff alleges that Respironics and ResMed, pursuant to an illicit agreement among the defendants, refused to offer the products necessary to compete in the VA market to companies other than JRS. (Rec. Doc. 4–2 at 9–10, 18, 24–25). Plaintiff also contends that Respironics and JRS fixed minimum prices at which Respironics' products could be sold to the VA, (Rec. Doc. 4–2 at 13), and that they took numerous steps to staunch Vaughn Medical's third-party supply lines for defendants' products (Rec. Doc. 4–2 at 14, 19–21). Finally, the plaintiff asserts that the defendants falsified correspondence from the VA with the sole purpose of damaging Vaughn Medical's credibility, thereby eliminating opportunities to generate sales to VA medical centers. (Rec. Doc. 4–2 at 23–24). Taking the complaint's factual allegations as true, plaintiff has pleaded sufficient facts to state a claim under § 1. *See In re Katrina Canal Breaches Litigation,* 495 F.3d 191, 205 (5th Cir.2007)

WCAS142

("The court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.").

Defendants seek dismissal of plaintiff's section 1 claim based on a failure to plead anything more than conclusory allegations. For its section 1 claim, however, plaintiff is required only to plead a plausible claim of an illicit agreement to restrain trade. "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 555. JRS and Respironics are not merely two companies against which random accusations of conspiracy have been levied. Defendants Respironics and JRS both admit to the existence of an intimate business relationship since 1985. (Rec. Doc. 18–1 at 2). Plaintiff has pleaded that the substantial financial benefits achieved from this relationship are derived from a mutually beneficial arrangement to artificially inflate prices charged to the VA. (Rec. Doc. 4–2 at 15). If JRS were to lose market share in the VA market, the profits of both JRS and Respironics would decline. (Rec. Doc. 4–2 at 16). ResMed enters the picture by allegedly agreeing to participate in efforts to use falsified documents to attack Vaughn Medical's reputation, and refusing to sell its products to Vaughn Medical for distribution to the VA. (Rec. Doc. 4–2 at 24–25). The Court finds that Vaughn Medical has alleged sufficient facts that, if proven, demonstrate that defendants conspired to engage in a pattern of exclusionary and anticompetitive conduct aimed at eliminating competition for the sale of Respironics' CPAPs and ResMed's CPAP masks to the VA. Plaintiff has therefore stated a plausible claim under § 1.

*ii). Section 2 of the Sherman Act*

**\*9** Plaintiff has alleged that defendants have monopolized, attempted to monopolize, and conspired to monopolize the sale of CPAPs and related equipment to the VA. Each of these three allegations requires different measures of proof, and will be addressed in turn.

To state a claim for monopolization under § 2 of the Sherman Act, a plaintiff must allege "(1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 481 (1992) (quoting *United States v. Grinnel Corp.,* 384 U.S. 563, 570–71 (1966). Plaintiff has pleaded that JRS is the only company authorized

to distribute Respironics CPAPs and ResMed CPAP masks to the VA. (Rec. Doc. 4–2 at 9–10, 16, 24–25). Thus, it possesses total control over the flow of these products to the VA. Plaintiff further alleges that JRS' market position was obtained pursuant to exclusivity agreements, and was maintained by improperly influencing the VA's purchasing decisions. (Rec. Doc. 4–2 at 13–16, 18). This is sufficient to state a claim of monopolization under § 2.

The elements of a claim based on *attempted* monopolization are (1) the specific intent to monopolize; (2) the use of predatory or anticompetitive tactics; and (3) the dangerous probability of success in monopolizing the relevant product and geographic markets. *Star Tobacco, Inc. v. Darileck,* 298 F.Supp.2d 436, 447–48 (E.D.Tex.2003) (emphasis added). Plaintiff has pleaded that JRS derives monthly revenue of over $30 million from the sale of CPAPs and related devices to the VA, and that JRS intended to preserve this revenue stream by any means necessary. (Rec.Doc.15–16). Plaintiff has also alleged that JRS representatives began visiting VA medical centers to obtain serial numbers off of Respironics CPAPs that had been sold to the VA by Vaughn Medical. The alleged purpose was to determine from where Vaughn Medical was obtaining the CPAPs and to cut off their supply lines. (Rec. Doc. 4–2 at 19–20). Taking well-pleaded facts as true, plaintiff has shown that JRS intentionally engaged in anticompetitive tactics to secure its position of market dominance and exclude all other competitors from the national VA market for the sale of Respironics' CPAPs and ResMed's CPAP masks. (Rec. Doc. 4–2 at 13–16, 18, 19–20)

Further, to state a claim for *conspiracy* to monopolize, a plaintiff must allege (1) a specific intent to monopolize; (2) the existence of a combination or conspiracy; and (3) an overt act in furtherance of the conspiracy. *Stewart Glass & Mirror v. Auto Discount Ctrs., Inc.,* 200 F.3d 307, 316 (5th Cir.2000) (emphasis added). Plaintiff cites numerous instances that it alleges are illustrative of an elaborate conspiracy to exclude competition and monopolize the VA market. Plaintiff contends that the defendants undertook efforts to cut off Vaughn Medical's supply lines for Respironics' CPAPs. (Rec. Doc. 4–2 at 19–20). Plaintiff has also pleaded facts to demonstrate that the defendants unveiled an extensive smear campaign, dubbed the "Honesty, Ethics, and Integrity Campaign," intended to undermine Vaughn Medical's credibility to VA representatives. (Rec. Doc. 4–2 at 21). Finally, plaintiff alleges that representatives for the defendants have falsified certain documents in an attempt to damage Vaughn Medical's reputation. (Rec. Doc. 4–2

at 25). Here, plaintiff has satisfied the threshold pleading requirement by presenting facts to show that defendants conspired to undertake numerous anticompetitive measures intended to secure JRS position as the sole distributor of Respironics CPAPs and ResMed's CPAP masks to the VA.

#### iii). Robinson–Patman Act

**\*10** To state a claim under section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), a plaintiff must allege facts to demonstrate (1) "the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers and (2) the effect of such discrimination was to injure competition." *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc .,* 159 F.3d 129, 142 (3d Cir.1998) (citing *Brooke Group, Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 219–27, 113 S.Ct. 2578 (1993)). "[T]o allege a violation of § [13(a) ] one seller must have made two actual sales to two actual buyers at different prices." *Staton Holdings, Inc. v. Russell Athletic, Inc.,* 2009 WL 4016117 at \*6 (N.D.Tex.2009) (citing *L & L Oil Co. v. Murphy Oil Corp.,* 674 F.2d 1113, 1120 (5th Cir.1982).

The Court finds that the plaintiff has not alleged that any discriminatory sales actually occurred. Plaintiff has alleged only the following: (1) Vaughn Medical has previously purchased CPAPs and related products from Respironics for patient-only distribution (Rec. Doc. 4–2 at 8); (2) because Respironics refused to sell its CPAPs to Vaughn Medical for distribution to the VA, Vaughn Medical was forced to purchase from a reseller for a higher price than that charged by Respironics to its vendors (Rec. Doc. 4–2 at 11); and (3) that Vaughn Medical subsequently entered into a second distribution agreement with Respironics which contained discriminatory pricing (Rec. Doc. 4–2 at 17).

Regarding the first allegation, Vaughn Medical does not allege that the CPAPs purchased from Respironics for patient-only distribution were sold on discriminatory terms. While plaintiff does speculate that such discriminatory terms would exist today if Respironics did sell its CPAPs to Vaughn Medical, mere hypothetical transactions do not give rise to a claim under the Act.

As to the second allegation, Vaughn Medical actually bought Respironics' CPAPs through a reseller, not through Respironics itself. Plaintiff does not allege that this reseller suffered from discriminatory pricing terms. In fact, plaintiff explicitly alleges the typical arrangement between

Respironics and all of its vendors operated according to the same or similar terms. (Rec. Doc. 4–2 at 11). Instead, Vaughn Medical asserts the price discrimination resulted from Respironics' refusal to sell its products to plaintiff. (Rec. Doc. 4–2 at 11). Vaughn Medical avers that, because it bought Respironics CPAPs through a reseller, it was forced to take a less favorable deal by incurring shipping costs, storage costs, and mark-up fees. (Rec. Doc. 4–2 at 11–12). Thus, any difference in pricing resulted not from Respironics' sale to Vaughn Medical on discriminatory terms, but from Respironics refusal to sell to Vaughn Medical. Such allegations, while potentially viable under other provisions of the federal antitrust laws, do not give rise to an actionable claim under the Robinson–Patman Act.

**\*11** Plaintiff's final allegation involves a purported distribution agreement entered into by Respironics and Vaughn Medical. Plaintiff alleges the prices reflected in the agreement were significantly higher than those charged by Respironics to its other vendors. (Rec. Doc. 4–2 at 17). Notably, though, Vaughn Medical does not allege any actual sales took place pursuant to the alleged agreement. Merely *offering* different pricing to different customers does not state a claim for price discrimination under the Robinson–Patman Act. *See Stough v. May & Co. of Ga., Inc.,* 484 F.2d 22, 23 (5th Cir.1973) ("[I]n order for there to be discrimination between purchasers, there must be actual sales at two different prices to two different actual buyers"); *see also Crossroads,* 159 F.3d at 142 ("Merely offering lower prices to a customer does not state a price discrimination claim"); *Terry's Floor Fashions, Inc. v. Burlington Indus.,* 763 F.2d 604, 615 (4th Cir.1985) (noting that a failure to allege "two comparable, completed sales" will defeat a claim under Section 2(a) of Robinson–Patman); *Fusco v. Xerox Corp.,* 676 F.2d 332, 337 (8th Cir.1982). Plaintiff's price discrimination claim brought under 15 U.S.C. § 13(a) is thus fatally flawed and must be DISMISSED.

#### 2. *Failure to Allege Antitrust Injury*

#### a. Law

Defendants also seek dismissal of plaintiff's antitrust claims on the grounds that the plaintiff has not pleaded an antitrust injury. (Rec. Doc. 18–1 at 4–5). Failure to plead antitrust injury would preclude the plaintiff from establishing "antitrust standing." Standing to pursue an antitrust suit requires a plaintiff to plead: 1) injury-in-fact—that is, an injury proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, "which assures

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 150 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...

2010 WL 3488244, 2011-2 Trade Cases P 77,583

that other parties are not better situated to bring suit." *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.,* 123 F.3d 301, 305 (5th Cir.1997); *see also Hydril Company, L.P., et al. v. Grant Pideco, L.P., et al.,* 2007 WL 1791663 (S.D.Tex.2007). In this case, the first and third elements are not in dispute.

Courts have made clear that antitrust injury is a predicate to antitrust standing. *See, e.g., Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 110 n. 5 (1986) ("A showing of antitrust injury is necessary ... to establish standing under [the antitrust laws]"; *T.O. Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1182 (5th Cir.1988) ("Proving antitrust injury is a necessary requirement for proving standing; the former cannot stand alone from the latter"); *City of Pittsburgh v. W. Penn Power Co.,* 147 F.3d 256, 265 (3d Cir.1998) ("If antitrust injury is not found, further inquiry is unnecessary."). As a threshold matter, the necessary antitrust injury is an injury attributable to the anticompetitive aspect of the practice under scrutiny. *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884 (1990) ("Antitrust injury does not arise for purposes of [15 U.S.C. § 15] ... until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct.").

b. Analysis

 **\*12** Defendants seek dismissal of plaintiff's antitrust claims on the grounds that the only injuries asserted by Plaintiff are those suffered in an individual capacity. (Rec. Doc. 18–1 at 4–5). Specifically, defendants assert that the plaintiff cannot state an antitrust claim because it has not alleged facts to show a market-wide injury to competition. (Rec. Doc. 18–1 at 5). In response, plaintiff contends that it has pleaded an antitrust injury. (Rec. Doc. 27 at 6–8).

The Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition. *See, e.g, Doctors' Hosp.,* 123 F.3d at 305; *Walker v. U–Haul Co.,* 747 F.2d 1011, 1016 (5th Cir.1984); *Multiflex, Inc. v. Samuel Moore & Co.,* 709 F.2d 980, 986 n. 6 (5th Cir.1983). Antitrust injury exists when (1) the injury was of the type antitrust laws were intended to prevent, and (2) that the injury "flows" or was caused by that which makes the defendant's conduct unlawful. *Brunswick Corp. v. Pueblo Bowl–OMat, Inc.,* 429 U.S. 477, 488–89 (1977). Injury to competition, on the other hand, while often a necessary component to substantive liability, need not be pleaded for a plaintiff's antitrust claims to survive a motion to dismiss. *Doctor's Hosp.,* 123 F.3d at 305. In this circuit, antitrust injury for standing purposes is viewed from

the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition. *Id.* Thus, to state a claim under the Sherman Act, a plaintiff, in addition to stating an antitrust violation, must allege facts sufficient to show antitrust injury. *In re Tamoxifen Antitrust Litigation,* 466 F.3d 187, 219 (2d Cir.2006).

As support for its assertion that it has pleaded antitrust injury, plaintiff cites to the Fifth Circuit decision in *Norris v. Hearst Trust.* 500 F.3d 454 (5th Cir.2007). Plaintiff's reading of *Norris* proposes that the antitrust injury requirement is met when an injury is inflicted on a business consumer or competitor of a defendant. (Rec. Doc. 27 at 7); *see Norris,* 500 F.3d 454 at 465–66. The plaintiff seeks recognition of its injuries as both a consumer of Respironics' and ResMed's products, and a competitor of Jordan Reses' distribution services. Under the plaintiff's suggested interpretation of *Norris,* such recognition would establish the requisite antitrust injury.

Such a reading of *Norris,* however, is inaccurate. It drastically oversimplifies the question of whether the defendants' activities resulted in antitrust injury. In that case, the Fifth Circuit was commenting less on the dynamics of anticompetitive conduct and more on which parties are most likely to bring suit under the federal antitrust laws. Thus, it was focused on the third element of the standing inquiry —the issue of whether the plaintiff is a proper party to an antitrust claim. *See Norris,* 500 F.3d at 466 (noting that consumers and competitors are the appropriate parties to bring antitrust claims because they are often the only parties injured by the harm to competition caused by antitrust violations). The Fifth Circuit was not stating a bright-line rule for gauging the occurrence of an antitrust injury. While it is typically consumers and competitors who suffer as a result of calculated anticompetitive conduct, [7] this fact alone does not reflexively manifest an antitrust injury.

[7]
It is important to note that customers and competitors do not automatically have antitrust standing. The plaintiff's opposition brief focuses mainly on the fact that, as both a consumer and a competitor, it has suffered antitrust injury and should therefore have antitrust standing. Such an assertion oversimplifies the antitrust standing analysis. *See Atl. Richfield,* 495 U.S. at 338; *accord Cargill,* 479 U.S. at 122; *Brunswick,* 429 U.S. at 488; *see also Novell, Inc. v. Microsoft Corp.,* 505

F.3d 302, 310–314 (4th Cir.2007) (declining to adopt a bright line rule that only consumers and competitors have antitrust standing).

**\*13** Nevertheless, Vaughn Medical's alleged losses and competitive disadvantage resulting from its exclusion from the VA market fall within the conceptual bounds of antitrust injury. Vaughn Medical is a would-be provider of CPAPs and related products to the VA and a direct competitor of JRS. Plaintiff alleges that JRS conspired with manufacturers Respironics and ResMed to deprive Vaughn Medical and other competitors of the opportunity to actively compete in the VA market. (Rec. Doc. 4–2 at 26). Plaintiff further alleges that the defendant JRS exploited its market power in the VA market to weaken Vaughn Medical as a competitor. (Rec. Doc. 27 at 10). Plaintiff also asserts that Respironics and ResMed sold their products to JRS at a price lower than that charged to its competitors. (Rec. Doc. 4–2 at 28). These are the types of injuries that the antitrust laws were intended to prevent. And since Vaughn Medical has pleaded that its purported injuries flow directly from the defendants' allegedly exclusionary conduct, the second prong of the antitrust injury analysis is also satisfied. See *Brunswick Corp.,* 429 U.S. at 488–89. Thus, Vaughn Medical has adequately alleged antitrust injury.

### 3. *Failure to Plead a Relevant Market*

Defendants seek dismissal of plaintiff's section 1 and section 2 claims for failure to plead a relevant market. (Rec. Doc. 18–1 at 6). In response, the plaintiff asserts that the defendants actions were *per se* unlawful under the Sherman Act and, as a result, it need not plead a relevant market. (Rec. Doc. 27 at 8–9). In the alternative, plaintiff avers that it has adequately alleged a relevant market. (Rec. Doc. 27 at 10–12). To determine if the plaintiff is required to plead a relevant market, the Court must first establish whether the defendants' alleged anticompetitive activities are *per se* unlawful, or if they should be analyzed under the rule of reason. *Apani,* 300 F.3d at 627; *Blanchard & Co. v. Barrick Gold Corp.,* 2003 WL 22071173 at \*7 (E.D.La.2003).

### a. *Per se* or Rule of Reason?

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states ... is declared to be illegal." 15 U.S.C. § 1. Though on its face § 1 creates only a criminal penalty, § 4 of the Clayton Act, 15 U.S.C. § 15(a), provides treble damages relief to "any person who shall be injured in his business or property by

reason of anything forbidden in the antitrust laws." While this language is seemingly broad, the Supreme Court has construed this provision to afford a remedy to only those victims of "unreasonable" restraints of trade. See *Texaco, Inc. v. Dagher,* 547 U.S. 1, 5 (2006); *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 723 (1988); 15 U.S.C. § 1.

Ordinarily, alleged violations of § 1 of the Sherman Act undergo the rule of reason analysis. See *Khan,* 522 U.S. at 10; *Bus. Elecs.,* 485 U.S. at 723. In the Fifth Circuit, "[p]roof that the defendant's activities ... adversely affected competition in the appropriate product and geographic markets is essential to recovery under the rule of reason." *Apani,* 300 F.3d at 627 (citing *Hornsby Oil Co. v. Champion Spark Plug Co.,* 714 F.2d 1384, 1392 (5th Cir.1983)).

**\*14** However, if the restraint alleged is among that small class of actions that courts have deemed to have "such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit," it will be considered *per se* unreasonable. *Khan,* 522 U.S. at 10; *see also Jayco Sys., Inc. v. Savin Bus. Mach. Corp.,* 777 F.2d 306, 317 (5th Cir.1985) (explaining that certain business practices have such an inherently detrimental effect on competition that they are presumed facially unreasonable and therefore illegal). *Per se* liability is reserved for only those agreements that are "so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher,* 547 U.S. at 5 (quoting *National Soc. of Professional Engineers v. U.S.,* 435 U.S. 679, 692 (1978)). In other words, if the plaintiff's factual allegations create an inference that the defendants' activities were *per se* unlawful, the requirement to plead a relevant market is lifted, as the anticompetitive effects of defendants' activities are considered facially apparent. *Doctor's Hosp. of Jefferson, Inc. v. Southeast Med. Alliance, Inc.,* 123 F.3d 301, 307 (5th Cir.1997).

Plaintiff alleges harm suffered as a result of numerous anticompetitive acts committed by the defendants and asserts a remedy is warranted under § 1. These acts include exclusive dealing arrangements, group boycotts, and price fixing. *Per se* liability has been applied to certain incarnations of these particular business practices. See *Jayco,* 777 F.2d at 317; *see also U.S. v. Socony–Vacuum Oil Co.,* 310 U.S. 150 (1940) (price fixing); *Klors, Inc. v. Broadway–Hale Stores, Inc.,* 359 U .S. 207 (1959)(group boycotts). Importantly, though, none of these practices receives blanket application of *per*

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 152 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...
2010 WL 3488244, 2011-2 Trade Cases P 77,583

*se* treatment. Instead, each requires the presence of certain specific characteristics to trigger *per se* liability under the antitrust laws. Specifically, the Court must ascertain whether the alleged anticompetitive acts were the result of a horizontal agreement, from which flows *per se* liability, or whether they stem from a vertical agreement, which generally implicates the rule of reason. [8] *Jayco,* 777 F.2d at 317; *see also Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1004 (5th Cir.1981).

[8]     As explained infra, "[r]estraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints." *Bus. Elecs.,* 485 U.S. at 730.

b. Horizontal or Vertical Agreements?
"Whether or not a combination or conspiracy falls under the *per se* rule often depends upon whether the restriction is implemented by a vertical or horizontal agreement." *Jayco,* 777 F.2d at 317; *see also Red Diamond,* 637 F.2d at 1004. Horizontal combinations are agreements among competitors that restrain competition among enterprises at the same level of distribution. [9] *Bus. Elecs.,* 485 U.S. at 730. These are generally considered facially unreasonable and are therefore illegal *per se. See Catalano, Inc. v. Target Sales, Inc.,* 446 U.S. 643, 647 (1980); *Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295 (5th Cir.1981).

[9]     They affect *inter* brand competition, which is considered to be the "primary concern of antitrust law." *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 52 n. 19, 97 S.Ct. 2561 (1977) (emphasis added). Interbrand competition is the competition among the manufacturers of the same product. *Ibid.*

 *15 Vertical restraints are those "imposed by persons or firms further up the distribution chain of a specific product (or in rare cases, further down the chain) than the enterprise restrained." [10] *Muenster,* 651 F.2d at 295. The courts have concluded that a vertical restraint is unreasonable when its probable anticompetitive effects outweigh any procompetitive benefits. *Viazis v. American Ass'n of Orthodontists,* 314 F.3d 758, 765 (5th Cir.2002); *see also Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342 (1990).

[10]     They generally affect *intra* brand competition and are analyzed under the rule of reason. *Continental T.V.,* 433 U.S. at 52 n. 19, 97 S.Ct. at 2558 (emphasis added). Intrabrand competition exists between the distributors of the product of a particular manufacturer. *Ibid.*

Here, plaintiff alleges that defendants conspired to commit numerous anticompetitive acts, ultimately depriving it of the right to distribute Respironics' CPAPs and ResMed CPAP masks to VA medical centers. Plaintiff's allegations, however, do not embody the requisite characteristics of horizontal restraints to which *per se* liability would attach. A vast majority of the alleged anticompetitive acts are the result of purported agreements between manufacturers and a distributor. These are vertical in nature, since the parties operate on separate levels of distribution. *See Muenster,* 651 F.2d at 295. Below, the Court will more fully explain the vertical character of each of the plaintiff's specific antitrust theories.

 *i). Group Boycott*
The Supreme Court has defined group boycotts as "joint efforts by a firm or firms to disadvantage competitors by either directly denying or persuading or coercing suppliers or customers to deny relationships the competitors need in the competitive struggle." *N.W. Wholesale Stationers, Inc. v. Pacific Stationary & Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613 (1985). A group boycott, or concerted refusal to deal, can be a violation of section 1 of the Sherman Act. *Tunica Web Adv. v. Tunica Casino Operators Ass'n, Inc .,* 496 F.3d 403, 412 (5th Cir.2007). Depending on the factual circumstances, group boycotts may be either unlawful per se or subject to the rule of reason. *Id.*

The Supreme Court has clarified that a necessary predicate for a *per se* group boycott is that it is horizontal, i.e., it must involve an agreement among enterprises that ordinarily compete with each other at the same level of the market. *See NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 135, 119 S.Ct. 493 (1998) ("[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors"); *see also Bus. Elecs.,* 485 U.S. at 723 ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints [.]"). Moreover, the *per se* approach is generally limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business

WCAS147

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 153 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...

2010 WL 3488244, 2011-2 Trade Cases P 77,583

with a competitor." *F.T.C. v. Indiana Fed. of Dentists,* 476 U.S. 447, 458 (1986).

Therefore, to plead a *per se* group boycott, the plaintiff must allege facts to demonstrate that the concerted anticompetitive activity involved two or more competitors positioned at the same market level with each other. Plaintiff argues that it need only plead that JRS has conspired with Respironics and ResMed to make it more difficult for Vaughn Medical to obtain the products it needs to conduct business with the VA. (Rec. Doc. 27 at 13). In response, defendants point to plaintiff's failure to present facts alleging that JRS possesses the requisite market power to coerce or influence the VA from conducting business with Vaughn Medical. (Rec. Doc. 18–1 at 10). Defendants also argue that the boycott alleged by plaintiff is a vertical restraint, as plaintiffs have not asserted that the alleged agreement was between at least two competitors at the same market level. (Rec. Doc. 18–1 at 10).

**\*16** To begin, of the defendants, JRS is the plaintiff's only competitor. Plaintiff has not alleged that JRS conspired horizontally with another competitor in an attempt to discourage the VA from doing business with Vaughn Medical. Based on the allegations in the complaint, the plaintiff is incapable of making such an assertion since there is no CPAP distributor other than JRS who would benefit from the facts underlying the present dispute. Furthermore, while the plaintiff has pleaded that both Respironics and ResMed are privy to the alleged conspiracy, it has not alleged that they have conspired in their capacity as competitors. Both companies manufacture and sell CPAPs, but only Respironics sells its CPAPs to the VA. These firms do not actively compete for the sale of CPAPs to the VA market. Nor has plaintiff alleged that Respironics and ResMed made threats to the VA to withhold their products if the VA continued to conduct business with Vaughn Medical.

The Court reads the complaint to allege two separate vertical agreements; the first between Respironics and JRS for the distribution of CPAPs; and the second between ResMed and JRS for the distribution of CPAP masks. Group boycotts that are vertical in nature must be examined under the rule of reason standard, since, although competition among distributors is reduced, competition of manufacturers may be promoted by allowing them to achieve certain efficiencies in the distribution of their products. *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.1978). Plaintiff's contention that the defendants' alleged group boycott is *per se* unlawful is therefore incorrect. The rule of reason is the appropriate

barometer with which to gauge the defendants' alleged anticompetitive activities.

### ii). Price–Fixing

Plaintiff alleges that Respironics and JRS conspired to fix prices at which CPAPs were sold to the VA. (Rec. Doc. 4–2 at 13, 15). Specifically, plaintiff argues that Respironics and JRS conspired to establish a minimum resale price at which distributors could sell Respironics' CPAPs to the VA. [11] (Rec. Doc. 4–2 at 13, 15). The Courts have stated that only horizontal price-fixing agreements are *per se* unlawful. *See, e.g, Dagher,* 547 U.S. at 5; *North Texas Specialty Physicians v. F.T.C.,* 528 F.3d 346, 362 (5th Cir.2008) (noting that only horizontal price fixing agreements are generally deemed *per se* violations); *Elliot Indust. Ltd. Partnership v. BP America Prod. Co.,* 407 F.3d 1091, 1123 n. 29 (10th Cir.2005) (claim of horizontal price fixing requires conspiracy "among actual competitors (i.e. at the same level of distribution)"). Horizontal price fixing has been defined as "an arrangement among competitors that interferes with the setting of prices by free market forces." *Quest Exploration & Dev. Co. v. Transco Energy Co.,* 1992 WL 682756 at \*6 (S.D.Tex.1992) (citing *Times–Picayune Pub. Co. v. United States,* 345 U.S. 594, 614 (1953). To plead a claim of horizontal price-fixing, the plaintiff must allege facts to show the existence of an agreement or conspiracy among actual competitors, with the purpose or effect of depressing, fixing, or stabilizing the price of a commodity in interstate commerce. *United States v. Socony–Vacuum Oil Co.,* 310 U.S.150, 216–19 (1940). The complaint, however, does not plead this species of price-fixing.

[11]  This type of activity is also referred to as resale price maintenance, which, when conducted in the manner alleged, is a vertical restraint. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 890, 127 S.Ct. 2705, 2715 (2007).

**\*17** Vertical price-fixing occurs when two firms in a distribution chain establish price ranges of goods or services. *Socony–Vacuum,* 310 U.S. at 222–23. Plaintiff alleges that Respironics and JRS conspired to fix minimum prices at which Respironics' brand CPAPs were sold to the VA. The alleged agreement involves only a manufacturer and a distributor, two parties that undoubtedly operate at different market levels. As a result, this type of alleged price-fixing agreement is vertical in nature. While vertical price-fixing agreements were previously held to be *per se* unlawful under the antitrust laws, the Supreme Court recently changed its

Case 4:23-cv-03560   Document 101   Filed on 11/20/23 in TXSD   Page 154 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...

2010 WL 3488244, 2011-2 Trade Cases P 77,583

position. *See Leegin Creative Leather Products, Inc. v. PSKS, Inc.,* 551 U.S. 877, 890, 127 S.Ct. 2705, 2715 (2007). Vertical price-fixing is now evaluated under the rule of reason. [12] *Id.*

[12]    Horizontal price-fixing remains unlawful *per se* under the antitrust laws. *See Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 315 (2d Cir.2008) (citing *Arizona v. Maricopa County Med. Soc.,* 457 U.S. 332, 102 S.Ct. 2466 (1982)).

### iii). Exclusive Dealing

Exclusive dealing occurs "when a seller agrees to sell its output of a commodity to a particular buyer." *Apani,* 300 F.3d at 625 (citing WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK § 4.02[3] (1999)). Plaintiff argues that both Respironics and ResMed violated section 1 through exclusive agreements with JRS for the distribution of their products to the VA. Defendants point out that "exclusive dealing arrangements are presumptively legal," and the policing of a valid distribution agreement is not an actionable violation of section 1. (Rec. Doc. 18–1 at 8); *see E & L Consulting, Ltd. v. Doman Indus., Ltd.,* 472 F.3d 23, 29–30 (2d Cir.2006) (stating that an exclusive distributorship agreement, standing alone, is not illegal).

Exclusive dealing agreements can be attacked under the rule of reason, but are not *per se* violations of the antitrust laws. *Eastern Food Servs., Inc. v. Pontifical Catholic University,* 357 F.3d 1, 4–5 (1st Cir.2004); *see also A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1306 (9th Cir.1981) (stating that exclusive manufacturer dealer arrangements are generally viewed as vertical in nature, thus rendering the per se rule of illegality inapplicable). This is because the focus of the analysis remains on market effect. *George Haug Co., Inc. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 140 n. 1 (2d Cir.1998). An exclusive dealing arrangement does not violate the antitrust laws "unless the probable effect of the agreement 'will foreclose competition in a substantial share of the line of commerce affected.' " *Apani,* 300 F.3d at 625 (citing *Bob Maxfield, Inc. v. Am. Motors Corp.,* 637 F.2d 1033, 1036 (5th Cir.1981)).

To properly allege that an exclusive dealing agreement violates the Sherman Act, a plaintiff must first define the relevant market in terms of its product and geography. *Apani,* 300 F.3d at 625 (citing *Tampa Elec.,* 365 U.S. at 327–28, 81 S.Ct. 623). A plaintiff must then plead facts to demonstrate that the "competition foreclosed by the

arrangement constitutes 'a substantial share of the relevant market.' " *Apani,* 300 F.3d at 625–26 (explaining that "in order to determine whether a substantial portion of the competition has been foreclosed, [plaintiff] must first identify the relevant product and geographic markets"). Thus, because exclusive dealing agreements are analyzed under the rule of reason, pleading a relevant market is a necessary predicate to examining the agreement's anticompetitive impact.

### iv). An Exception

**\*18** While vertical restraints typically undergo a rule of reason analysis, there are limited exceptions to the horizontal / vertical dichotomy. The only exception applicable to the facts of this case is when a supplier, "although acting vertically, refuses to deal with ... a customer at the behest of the customer's competitor." *Jayco,* 777 F.2d at 317–18. Although the result is, itself, a vertical restraint, "the desired impact is horizontal and on the dealer, not the manufacturer, level." *Cernuto, Inc. v. United Cabinet Corp.,* 595 F.2d 164, 168 (3d Cir.1979).

To qualify for this exception, JRS must be the source of the alleged restraint, because, of the defendants, JRS is plaintiff's only competitor. *See Abadir & Co. v. First Miss. Corp.,* 651 F.2d 422, 427 n. 5 (5th Cir.1981); *see also Red Diamond,* 637 F.2d at 1004 n. 4 (stating that "conspiracies between a manufacturer and its distributors are only treated as horizontal ... when the source of the conspiracy is a combination of the distributors."). With regard to Respironics, plaintiff asserts that JRS had "strong influence at Respironics." (Rec. Doc. 4–2 at 14). Taken as true, this statement does not give rise to an inference that JRS was the source of Respironics' decision to limit Vaughn Medical to patient-only distribution rights. If anything, the facts pleaded suggest that the defendant manufacturer Respironics acted independently when it denied Vaughn Medical the right to distribute its products to the VA. (Rec. Doc. 4–2 at 9). As a result, the agreement between Respironics and JRS must be evaluated using the rule of reason. *See Red Diamond,* 637 F.2d at 1004 ("When the manufacturer is the source, the conspiracy is vertical.") (citing *United States v. Arnold Schwinn & Co.,* 388 U.S. 365, 372, 87 S.Ct. 1856 (1967)).

ResMed's involvement in the alleged conspiracy, though, warrants closer scrutiny. Plaintiff proposes that JRS may have initiated an arrangement that granted ResMed access to the VA market, provided that JRS was the only firm allowed to distribute its CPAP masks to the VA. (Rec. Doc. 4–2 at 24). Aside from the conclusory nature of this

WCAS149

allegation, the plaintiff overlooks one key feature of this exception. The exception is activated only by a concerted refusal to deal. Here, the complaint paints the picture of an exclusive distribution agreement between ResMed and JRS. The complaint suggests only that ResMed will not allow Vaughn Medical to distribute its CPAP masks to the VA. However, ResMed also manufactures CPAPs. The facts alleged do not permit the Court to reasonably infer that ResMed will not allow Vaughn Medical to distribute its products to other clients on the open market. It is difficult to rationalize how any alleged agreement between JRS and ResMed could be *per se* illegal, as plaintiff suggests, if Vaughn Medical retains the ability to distribute ResMed's products to clients other than VA. The Court finds this exception inapplicable to the facts of this case. Plaintiff has not pleaded facts to demonstrate ResMed's blanket refusal to deal with Vaughn Medical. Consequently, the rule of reason applies to all of plaintiff's section 1 claims.

c. Relevant Market Allegations

**\*19** Under section 1 of the Sherman Act, a relevant market must be pleaded for the Court to assess any anticompetitive effects in a rule of reason analysis. *Muenster,* 651 F.2d at 295. The definition of a relevant market is "a function of the relevant product market and the relevant geographic market." *Wampler v. S .W. Bell Tel. Co.,* 597 F.3d 741, 744 (5th Cir.2010); *see also Apani,* 300 F.3d at 627 (citing *Spectators',* 253 F.3d at 220). A relevant product market includes the line of goods or services reasonably interchangeable in use. *U.S. v. E.I. duPont de Nemours & Co.,* 351 U.S. 377, 396, 76 S.Ct. 994 (1956). The relevant geographic market is "the area of effective competition ... in which the seller operates, and to which the purchaser can practicably turn for supplies." *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623 (1961).

The Court recognizes that market definition is a deeply fact-intensive inquiry that generally cannot be resolved at the motion to dismiss stage. *See Seidenstein,* 769 F.2d at 1106. However, "[w]here the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted." *Apani,* 300 F.3d at 628.

*i). Product Market*

The boundaries of a product market are determined by the reasonable interchangeability of use and "the degree of cross-elasticity of demand between the product and substitutes for it." *Apani,* 300 F.3d at 626. "Interchangeability implies that one product is roughly equivalent to another for the use to which it is put." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F .3d 430, 437 (3d Cir.1997) (internal quotation and citation omitted). Cross-elasticity of demand measures the substitutability of those products from viewpoint of the buyers.[13] *Id.* at 438 n. 6.

[13]    Cross-elasticity of demand is defined as "[a] relationship between two products, usually substitutes for each other, in which a price change for one product affects the price of the other." BLACK'S LAW DICTIONARY 405 (8th ed.2004).

Defendants read the complaint to imply that the product market is the sale of Respironics' CPAPs to VA medical centers. (Rec. Doc. 18–1 at 6–7). In its opposition brief, the plaintiff disputes such a reading, insisting that the alleged product market includes all CPAPs. (Rec. Doc. 27 at 12). The facts alleged in the complaint, however, wholly contradict such an assertion. Nowhere does plaintiff assert that JRS distributes any CPAPs other than Respironics' CPAPs. (Rec. Doc. 27 at 11). Nor does the plaintiff mention any CPAP manufacturer other than the defendants Respironics and ResMed. In reference to its section 1 claim, all of the plaintiff's allegations of anticompetitive activities are made solely in reference to their ability to resell Respironics brand CPAPs. (Rec. Doc. 4–2 at 26–29). This deficiency is critical because courts have generally held that a single brand, no matter how distinctive or unique, and no matter how intense the brand loyalty, cannot constitute a relevant market.[14] *See PSKS, Inc., v. Leegin Creative Leather Prods.,* 2009 WL 938561 at \*2 (E.D.Tex.2009) (citations omitted); *see also Will v. Comprehensive Accounting Corp.,* 776 F.2d 665, 672–73 (7th Cir.1985); *General Business Sys. v. North American Phillips Corp.,* 699 F.2d 965, 972–75, 977–78 (9th Cir.1983); *Little Caesar Enters., Inc. v. Smith,* 34 F.Supp.2d 459, 477 n. 30 (E.D.Mich.1998).

[14]    While it is true that "antitrust law recognizes ... economically significant submarkets ... which themselves constitute relevant product markets," plaintiff has not alleged that the Respironics CPAPs constitute a unique submarket that

WCAS150

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 156 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...

2010 WL 3488244, 2011-2 Trade Cases P 77,583

should be considered separately for antitrust purposes. *Leegin,* 2009 WL 938561 at *3 (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.,* 732 F.2d 480, 487–88 (5th Cir.1984). "The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Apani,* 300 F.3d at 626 (citing *Heatransfer Corp. v. Volkswagenwerk, A. G.,* 553 F.2d 964, 980 (5th Cir.1977)). Even if this assertion were made, Respironics' CPAPs are not a viable submarket, since "a submarket is still a market" and "a single brand cannot be its own market." *Leegin,* 2009 WL 938561 at *3.

**\*20** More importantly, the complaint is entirely devoid of any allegations that CPAPs manufactured and sold to the VA are not reasonably interchangeable with CPAPs sold to individuals, sleep centers, or other government entities, for example. Nothing in the record would suggest that the CPAPs sold to the VA are unique or functionally distinguishable from other CPAPs. Yet plaintiff makes no mention of interchangeable substitute products. Plaintiff asserts only that the VA prefers Respironics' CPAPs to those of other distributors. While this may be the case, a separate product market cannot be established by a single customer's preference for a particular manufacturer of a particular device. *See Newcal Indus., Inc. v. Ikon Office Solutions,* 513 F.3d 1038, 1045 (9th Cir.2008) ("The consumers do not define the boundaries of the market, the products or producers do."). Nor may a company that "limits its competitive activities to a single firm's products (and at only one competitive level) ... control the definition of the relevant market." *Spectrofuge Corp., v. Beckman Instruments, Inc.,* 575 F.2d 256, 282 (5th Cir.1978) (citing *Telex Corp. v. Int'l Bus. Mach. Corp.,* 510 F.2d 894, 917 (10th Cir.1975). As the plaintiff has wholly neglected to reference the rule of reasonable interchangeability, its proposed product market of Respironics CPAPs is legally unsustainable. When such a deficiency is present, a motion to dismiss may be granted. *See Apani,* 300 F.3d at 628; *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430, 436 (3d Cir.1997) (affirming district court's dismissal of claim for failure to plead relevant market; proposed relevant market defined too narrowly); *TV Comms. Net., Inc. v. Turner Net. Telev., Inc.,* 964 F.2d 1022, 1025 (10th Cir.1992) (affirming district courts dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); *Tower Air, Inc. v. Federal Exp. Corp.,* 956 F.Supp. 270 (E.D.N.Y.1996) ("Because a relevant market includes all products that are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."). Furthermore, because the entire foundation of plaintiff's antitrust claims is constructed only of its inability to distribute Respironics' CPAPs to the VA, the Court finds that plaintiff is incapable of successfully asserting the existence of any legally sufficient product market. As a result of this finding, the plaintiff's section 1 claims are irreversibly flawed. [15] Plaintiff's section 1 claims are therefore DISMISSED. d. Section 2 of the Sherman Act

> [15] Due to the Court's finding that the plaintiff is wholly incapable of defining a relevant product market in support of its antitrust claims, the Court need not address the sufficiency of plaintiff's proposed geographic market.

Section 2 provides a cause of action against "single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports v. McQuillan,* 506 U.S. at 447, 454, 113 S.Ct. 884 (1993). Monopoly power is understood as "the power to control price or exclude competition" from the relevant market. *E.I. duPont de Nemours,* 351 U.S. at 391. Plaintiff alleges that defendants have monopolized, attempted to monopolize, and conspired to monopolize the sale of CPAPs and CPAP-related products to the VA. Defendants respond that plaintiff's § 2 claims should be dismissed for failure to plead a relevant market. (Rec. Doc. 18–1 at 12–14).

**\*21** The Fifth Circuit has held that "[b]ecause the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement under § 2 [of the Sherman Act]." *Seidenstein v. National Med. Enters., Inc.,* 769 F.2d 1100, 1106 (5th Cir.1985); *see also Doctor's Hosp.,* 123 F.3d at 311. For the reasons stated in the previous section, plaintiff has failed to plead a relevant product market from which the anticompetitive effects of defendants' conduct can be measured.

e. Anticompetitive Effect

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 157 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...

2010 WL 3488244, 2011-2 Trade Cases P 77,583

Market considerations provide the objective benchmark for the measurement of competitive impact. *Continental T.V.,* 433 U.S. at 54. Competitive injury cannot be ascertained without first defining the relevant market. *Apani,* 300 F.3d at 627 (noting that the relevant market must be identified before a court may determine whether an alleged anticompetitive arrangement foreclosed competition). In this case, the absence of a legally cognizable market precludes the Court from assessing the anticompetitive effect of defendant's alleged activities. *See Leegin,* 2009 WL 938561 at *5 (commenting that when a plaintiff fails to define a relevant market, the court is left without a means to gauge anticompetitive effect.). Plaintiff's section 2 claims are also DISMISSED.

4. *Civil Rights Claims*
The complaint asserts that the defendants have acted individually and in concert, combination, and conspiracy to impede Vaughn Medical's right to make and enforce contracts and its right to buy, sell, and hold property in violation of 42 U.S.C. §§ 1981, 1982, 1985. (Rec. Doc. 4–2 at 29). To establish a prima facie claim under § 1981, the plaintiff must allege facts to support the following three elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by defendants; (3) the discrimination concerns one or more of the activities enumerated in the statute. [16] *Green v. State Bar of Tex.,* 27 F.3d 1083, 1086 (5th Cir.1994). The "enumerated activity" implicated in this case is the right to "make and enforce contracts."

[16] "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981

A § 1982 claim requires the plaintiff to "allege with specificity facts sufficient to show or raise a plausible inference of (1) the defendant's racial animus; (2) intentional discrimination; and (3) that the defendant deprived plaintiff of his rights [to buy, sell, and hold property] because of race." [17] *Zuyus v. Hilton Riverside, et al.,* 439 F.Supp.2d 631, 636 (E.D.La.2006) (citing *Brown v. Philip Morris, Inc.,* 250 F.3d 787, 797 (3d Cir.2001).

[17] *Section 1982* provides that all U.S. citizens have the same right as white citizens to purchase real or personal property. 42 U . S.C. § 1982.

The conspiracy claim under § 1985(3) requires the plaintiff to plead (1) the existence of a conspiracy; (2) the purpose of the conspiracy was to deprive, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) a resulting injury in the plaintiff's person or property or the deprivation of a right or privilege of a citizen. *See Mian v. Donaldson, Lufkin, and Jenrette Securities Corp.,* 7 F.3d 1085, 1087 (2d Cir.1993); *see also United Brotherhood of Carpenters and Joiners of America et al. v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352 (1983). Additionally, a § 1985(3) claim requires a plaintiff to allege "that (1) some racial (or otherwise class-based, invidiously discriminatory) animus" underlie the conspirators' action; and (2) that the conspiracy "aimed at interfering with federal right that are protected against private, as well as official, encroachment." *Zuyus,* 439 F.Supp.2d at 637 (citing *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268, 113 S.Ct. 753 (1993). To guarantee the survival of each of these claims at the motion to dismiss stage, the complaint must plead facts sufficient to support an inference that the defendants intended to discriminate against the plaintiff on the basis of race.

*22 The defendants advance numerous reasons why plaintiff's civil rights claims should be dismissed. It is unnecessary, however, for the Court to expound on the virtues of each argument. Although replete with conclusory allegations of racial animus, the complaint is bereft of any contextualized factual assertions from which to infer the defendants' activities were ultimately driven by discriminatory intent. This deficiency is fatal to plaintiff's civil rights claims.

The plaintiff's civil rights claims rely heavily on Exhibit A, also referred to as the Whistleblower Letter. In that letter, an anonymous source alleged that members of the VA's Product Team Committee made discriminatory remarks about Vaughn Medical and other minority-owned companies. (Rec.Doc.4–2, Ex. A). Defendants rely on Federal Rule of Civil Procedure 10(a) when arguing that the exhibit is not a proper attachment since it does not give rise to the claims asserted. (Rec. Doc. 18–1 at 17–18).

Case 4:23-cv-03560 Document 101 Filed on 11/20/23 in TXSD Page 158 of 202

Vaughn Medical Equipment Repair Service, L.L.C. v...., Not Reported in...

2010 WL 3488244, 2011-2 Trade Cases P 77,583

The plaintiff refers to Exhibit A when asserting that Respironics and JRS referred to Vaughn Medical and two other companies as "ni* *er companies." (Rec. Doc. 4–2 at 19). Exhibit A, however, does not lend support to this assertion. As the exhibit shows, the statement was made not by an employee of Respironics or JRS, but by an employee of the VA. Even if the defendants were aware that these statements were made, such racial animus would only be relevant as it pertains to decisions reached by the VA. Here, the Court will not impute the alleged racial animus of one VA employee to the defendant corporations. As the exhibit does not give rise to the legal rights asserted here by plaintiff under 42 U.S.C. §§ 1981, 1982, and 1985, the Court will not consider its content. [18]

[18]    See *Walker v. S. W.I.F. T. SCRL,* 517 F.Supp.2d 801, 806 (E . D.Va.2007) (noting that, when evaluating a dismissal motion, not every document referenced in the complaint can be considered a part of the complaint; the referenced document must be "central or integral to the claim in the sense that its very existence, and not the mere information it contains, gives rise to the legal rights asserted.").

Turning to the complaint, a brief review of the allegations contained therein clearly illustrates the formulaic character of plaintiff's claims of discrimination. The plaintiff makes the following assertions: that defendants "improperly exerted pressure on the VA to coerce it into its erroneous decision that Vaughn Medical was not authorized to do business with the VA," and that these efforts were partially based "on the fact that Vaughn Medical was a minority-run business" (Rec. Doc. 4–2 at 11–12, 18); that defendants Respironics and JRS were motivated by racial animus when they conspired to prevent Vaughn Medical from competing in the sale of Respironics' brand CPAPs to the VA (Rec. Doc. 4–2 at 13); that defendant Respironics' refusal to warrant Respironics brand CPAPs sold to the VA by Vaughn Medical was motivated by racial animus (Rec. Doc. 4–2 at 15); that JRS was able to exploit its non-minority owned status to the detriment of Vaughn Medical and other so-called "ni* *er companies" (Rec. Doc. 4–2 at 19); that the defendants' efforts to undermine the credibility of Vaughn Medical to VA medical centers throughout the country were motivated, at least partially, by racial animus (Rec. Doc. 4–2 at 21); that the defendants' representatives were motivated by racial animus when they created and showed falsified correspondence to individual VA medical centers in an attempt to further diminish Vaughn Medical's reputation (Rec. Doc. 4–2 at 23). But the plaintiff has failed to

provide any facts that, when taken in context, would indicate that any of the defendants' activities were in fact driven by racial animosity.

**\*23** One illustration of the contradictory character of the allegations of racial animus is as follows. Plaintiff pleads that it was a customer to Respironics prior to seeking entry to the VA market. (Rec. Doc. 4–2 at 8). Plaintiff asserts that defendant would still be selling its products to Vaughn Medical today had plaintiff never decided to enter the VA market. (Rec. Doc. 4–2 at 8). Specifically, the complaint alleges that, although the defendant refused to provide the necessary "Letter of Commitment" to conduct business with the VA, Respironics remained willing to sell its products to Vaughn Medical for any purpose other than resale to the VA. (Rec. Doc. 4–2 at 9). Taken as a whole, the allegations are seemingly meant to suggest that Respironics' refusal to grant distribution rights to the plaintiff for its CPAPs is racially motivated only when the buyer is VA medical centers. Notably absent are any facts to explain this distinction. Also missing is any explanation of why plaintiff's efforts to pursue the VA market arbitrarily prompted sentiments of racial animosity among the defendants, or how such sentiments actually drove their policy of exclusion. As a result, the plaintiff's assertions amount to nothing more than mere conclusions. See *Twombly,* 550 U.S. at 555.

Pursuant to *Ashcroft v. Iqbal,* each of these conclusory assertions is to be ignored. 129 S.Ct. 1937, 1951 (2009) ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth."). The plaintiff has failed to plead any facts that would permit the reasonable inference that the defendants activities were motivated by an intent to discriminate against plaintiff on the basis of race. *See Iqbal,* 129 S.Ct. 1949. Therefore, it cannot state a claim under §§ 1981, 1982, and 1985, and these claims must be DISMISSED.

5. *State Law Claims*
In addition to the federal claims, plaintiff asserts numerous claims under state law. [19] However, because the Court has dismissed the plaintiff's federal claims, the Court dismisses the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

[19]    Plaintiff asserts claims under Texas state law for tortuous interference, civil conspiracy, defamation, and unjust enrichment.

Absent an independent basis for federal subject matter jurisdiction, plaintiff's Texas state law claims may remain in federal court only if this Court decides to exercise supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367. Under this statute, the court may decline to exercise supplemental jurisdiction over a pendent state law claim if (1) the claim raises a novel or complex issue of state law; (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; or (3) the district court has dismissed all claims over which it has original jurisdiction. *See* 28 U.S.C. § 1367(c)(1)-(3)

The Court notes that all federal claims over which it has jurisdiction have been dismissed. When such is the case, the Court has wide discretion to dismiss pendent state law claims. *See Robertson v. Neuromedical Center,* 161 F.3d 292, 296 (5th Cir.1998); *Bennett v. City of New Orleans,* 2004 WL 60316 at *9 (E.D.La.2004). However, when the federal claims are dismissed before trial, such as here, the general rule is to dismiss pendent state law claims. *See Holland v. GEXA Corp.,* 161 Fed. Appx. 364, 366 (5th Cir.2005). As the Supreme Court has stated,

> **\*24**  Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties.... Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

*United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130 (1966).

Furthermore, all of the plaintiff's state claims arise under Texas law, not Louisiana law. Thus, this Court has no incentive to retain jurisdiction over the plaintiff's pendent state law claims now that the federal claims have been dismissed. Plaintiff's state law claims are therefore DISMISSED without prejudice so that the plaintiff may re-file those claims in Texas state court should it so choose.

### 6. *The Noerr–Pennington Doctrine Bars all Claims*
As the plaintiff's federal claims have been dismissed on other grounds, the Court need not address the applicability of the Noerr–Pennington doctrine.

### 7. *Conclusion*
Accordingly, IT IS ORDERED that that defendants' motion to dismiss for improper venue is DENIED.

IT IS FURTHER ORDERED that plaintiff's federal claims under 15 U.S.C. § 1, 2, 13, 14 and 42 U.S.C. § 1981, 1982, 1985 are DISMISSED.

IT IS FURTHER ORDERED that plaintiff's remaining state law claims for lack of subject matter jurisdiction under 28 U.S.C. § 1367 are DISMISSED without prejudice.

IT IS FURTHER ORDERED that defendants' motion to transfer is MOOT.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 3488244, 2011-2 Trade Cases P 77,583

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

# Enforcement

The FTC enforces federal consumer protection laws that prevent fraud, deception and unfair business practices. The Commission also enforces federal antitrust laws that prohibit anticompetitive mergers and other business practices that could lead to higher prices, fewer choices, or less innovation.

Whether combating telemarketing fraud, Internet scams or price-fixing schemes, the FTC's mission is to protect consumers and promote competition.

The FTC administers a wide variety of laws and regulations, including the Federal Trade Commission Act, Telemarketing Sale Rule, Identity Theft Act, Fair Credit Reporting Act, and Clayton Act. In total, the Commission has enforcement or administrative responsibilities under [more than 70 laws](#).

Give Feedback

THE BROOKINGS INSTITUTION

FALK AUDITORIUM

A CONVERSATION WITH FTC CHAIR LINA KHAN AND DOJ ASSISTANT ATTORNEY GENERAL

JONATHAN KANTER ON ANTITRUST ENFORCEMENT

Washington, D.C.

Thursday, October 5, 2023


PANEL:

      LINA M. KHAN
      Chair
      Federal Trade Commission

      JONATHAN KANTER
      Assistant Attorney General, Antitrust Division
      U.S. Department of Justice

MODERATOR:

      BILL BAER
      Visiting Fellow, Governance Studies
      The Brookings Institution


\* \* \* \* \*

**BAER:** Good morning, everybody, and welcome to Brookings. Welcome to those in person and those online and on C-SPAN. Before I introduce our distinguished guests, I thought I'd give you a little sense of how we propose to run the program today. We are going to do 60 minutes of discussion among the three of us. Then we'll open up for 30 minutes of questions from the floor, as well as questions submitted online. We do ask if you're going to ask a question, identify yourself, and identify any appropriate affiliation. Let's get on with the program. So, The Brookings Institution and the Governance Studies program, of which I am part — I'm Bill Baer, by the way, a visiting fellow here at Brookings and the Governance Studies program. We're honored to welcome back to Brookings, Chair Lina Khan of the FTC, Assistant Attorney General Jonathan Kanter from the Justice Department. Let me quickly introduce both. They need no introduction but I'm going to give them a short one here.

Lina Khan. Most recent job prior to the FTC was on the faculty of Columbia Law School. Before that, she was counsel of the House Antitrust Subcommittee. She, before that, was an attorney advisor to then Commissioner Chopra, who's now chair of the Consumer Financial Protection Board. She's a prolific contributor to the antitrust debate, including a widely read piece while she was a student at Yale, a law journal on tech platform dominance. She was nominated by President Biden to be a commissioner on the FTC. She was confirmed by the Senate in June of 2021. I think she set a record in terms of time as a commissioner before becoming chair, because a nanosecond after her confirmation, the president announced he was going to designate her as FTC chair.

Jonathan Kanter. He's been a partner in two different national law firms. Most recently, though, set up an antitrust boutique here in D.C. Like Chair Khan, he's been an advocate, a vocal advocate, for vigorous antitrust enforcement. Also like Lina, he's tough and determined, as demonstrated early in his legal career by surviving two years working for me. So let's get to the questions. Although, I should note that Assistant Attorney General Kanter was confirmed by the Senate in November of 2021. So he's coming up on two years, Lina's got almost two and a half years in position.

First of all, welcome. Thank you for coming. The first question really is at about 10,000 feet. Both of you, before assuming your roles in government, have been critical of underenforcement of the antitrust laws and judicial interpretation of the Sherman, the Clayton, and the FTC Act. I think the bottom-line position you both have articulated is that past antitrust enforcement maybe over the last 30 to 40 years has left a lot of consumer injuries unaddressed or under-addressed. And that means

harm to consumers, to workers that antitrust enforcement should be reaching and had not been doing. I think it's fair to say and you would embrace the notion that the president appointed you because you saw the need to be a game changer. So the first question is, is that an accurate characterization of the role, specifically as you approached the job upon Senate confirmation? What goals did you have in mind? And can you offer a little bit of a self-assessment of progress thus far? Lina, why don't we start with you as the more senior member of the Antitrust administration.

KHAN: Well, first of all, let me just say it's so great to be here. Thanks so much for Brookings for hosting, and this is just an honor to share the stage with Bill. As you all know, Bill is an antitrust legend, and I've just been so grateful for his friendship and counsel over the years. So, look, there's no question that, as the president noted in his 2021 executive order on competition, there's been a serious reassessment of antitrust and the need for a reinvigorated competition policy. I think there is a decent understanding that over recent decades we've seen waves of M&A, waves of consolidation across markets so that many markets across the U.S. are now dominated by a small number of companies, and that that lack of competition is harming the American people. It's resulting in higher prices. It's resulted in lower wages. It's led innovation to decline. It's made it more difficult for entrepreneurs and startups to really get a foothold in the market. And that this overall means that our economy is worse off. But also, as the president noted, it also means our democracy is worse off. And I think there's been a government-wide effort, a whole of government effort to reinvigorate competition policy. And it's been an honor to be part of that effort at the FTC.

At the FTC we have a whole set of law enforcement tools, but we also have policy tools. And we've really been seeking to fire on all cylinders to make sure that we're faithfully enforcing the laws that Congress passed. So we enforce the Sherman Act and the Clayton Act, but also critically, the FTC Act. And one of the things that we've been doing at the FTC is really going back to the statutes, including Section 5 of the FTC Act, and understanding what was Congress's goal when Congress wrote unfair methods of competition, how have courts interpreted that, and how can we make sure that across our enforcement, we are being entirely faithful to the text of the statutes and to the legal precedent that's on the books. So that's really what we've been engaged in. It's been so fantastic to be in close partnership with our colleagues at the Antitrust Division. And, you know, we always want to be moving with even greater urgency and greater speed, but we're really thrilled with the progress

we've already made. In the last month alone, we filed two major monopolization lawsuits. This past summer in conjunction with the DOJ, proposed draft merger guidelines.

BAER: That's where I'm going next but go ahead.

KHAN: Have a whole set of rulemakings underway, both on the consumer protection side as well as the competition side, including our rule that we proposed earlier this year that would eliminate non-compete clauses in contracts. So, we're really thrilled with the progress we've already made. The FTC is quite small, all things considered. We have around 1200 people, only half of which are really devoted to antitrust. We're smaller today than we were in the 1970s. And so we're small but mighty, and really looking to fire on all cylinders to to meet the moment because we recognize the urgency of the problems that we're looking to address.

BAER: Thanks. Jonathan.

KANTER: Sure, allow me to also echo the sentiments that Lina shared. When I started at the FTC as a bright-eyed summer intern summer of 1996 and, and eventually as a first-year lawyer in 1998, I looked up and saw two giants. I saw Bill Baer and then chair Bob Pitofsky, Bill as director of the Bureau of Competition. And I thought to myself, that if I'm fortunate, I will grow up to be like Bill and Bob and--.

BAER: But with more hair than Bill.

KANTER: Well, not, not much. Yeah. And so, you know, being here and being in this moment with you and with Chair Khan is unbelievably humbling for me and very meaningful and moving. So I do think that, you know, Lina encapsulated a lot of what it is we're trying to do, which is we're trying to go back to first principles. What is the goal? What are the goals of the antitrust laws? Well, Congress made a value judgment, and I think it was a wise value judgment, that competition matters. Why? Because a democratic society depends on opportunity, access to opportunity, the ability to start a business and realize the American dream, the ability to be upwardly mobile as a worker, as an entrepreneur, the ability to benefit from innovations, lower prices. All of these are core fundamental values to our society. And the antitrust laws are the cornerstone of protecting those values. And we have a very serious responsibility, which is to do that, and we take that very seriously. And we have to look at the world around us and not think about antitrust as this overly technocratic exercise, but instead think about antitrust as law enforcement. Congress wrote a law; courts have interpreted it. Our job is to enforce that law.

And so, first and foremost, when I had the great fortune and privilege of a lifetime to take the reins of the Antitrust Division, I started with the principle of, this is an exercise in law enforcement. And so we, we start with the facts, and we follow the law, and we see where it leads. And I've also, you know started with the appreciation, but have come to really appreciate that key to success is not what I do. The key to success is harnessing the talent of the Antitrust division. And that's something, you know Bill well as someone who sat in my chair as assistant attorney general. But the talent is overflowing. The dedication, the wisdom, the institutional knowledge, the fortitude, the commitment to the mission is unending. And so part of my job as I see it, and perhaps the most key ingredient to success, is making sure we can unleash that. Is-- I look back and think about President Biden's executive order, the support we received from Attorney General Garland in his dedication to reinvigorating antitrust enforcement.

We have a lot to do, but I'm really proud of where we've come. I see, you know, for example, we've challenged the first ever, and succeeded, in a monopsony case in Penguin Random House, Simon & Schuster, the first ever successful challenge to an airline transaction at trial. For the first time in over 45 years, we not only brought monopolization cases as criminal, but we brought two of them, including one conviction, one that's pending trial. We've had the first ever systematic enforcement of Section 8 of the Clayton Act, which involves interlocking directorates, which has forced nearly 20 directors to resign from boards with many more investigations ongoing. We've made it very clear that we are going to, "Follow the puck where it's going," to quote Wayne Gretzky, and enforce the law in light of how markets actually work. And as a result, we've seen a decline in problematic mergers that are coming to us in the first place. And that is a win-win. It means that we don't have to use unnecessary taxpayer resources to block transactions, because those transactions, to quote one of my predecessors who might be on stage here, "Some transactions should never leave the boardroom." Also, we've, we've seen many abandonments — over ten, not over a dozen — since we've started, and these are transactions that in the face of a challenge or the threat of a challenge, have abandoned.

So when I look back, you know, it's been a-- the first two years has been a long decade and-- but we're, we're we're excited. We have an amazing team. I am blessed to have — and I see a bunch of them out here today — an extraordinary team, both in the front office at the Antitrust Division at the

department more broadly, but most importantly, the Antitrust Division employees who are, with no offense to my friends at the FTC, second to none.

  **BAER:** They can be tied.

  **KANTER:** They can be tied.

  **BAER:** But, Lina, let me just follow up on a point John Kanter made. I think the public perception, certainly the antitrust bar and the business community perception, is that the two agencies have dramatically increased the number of matters, particular in the M&A context they're investigating and the numbers they're challenging. Jonathan just suggested that's maybe not quite right. That, in fact, the percentage of problematic transactions is probably about the same or a little less than it had been previously. Is that your experience as well?

  **KHAN:** So, I think overall it's true. When I first joined, the number of second requests that we were issuing went up. But, you know, as a law enforcer, a key goal is deterrence. And more and more, we're hearing from senior deal makers. I believe there was a head of M&A from a prominent investment banker on CNBC the other day who said that, previously, considerations around antitrust used to come in the middle of a deal or even at the end of a deal. And now he's seeing that antitrust considerations and assessment of antitrust risk is happening at the very start and that there are deals that are not being proposed because it's determined that from an antitrust perspective, there are serious legal concerns. And that those deals are, in fact, not getting out of the boardroom. And from a law enforcement perspective, that deterrence is absolutely a mark of our success. We're looking to continue building on that. But I think the more we can achieve deterrence, the more we can make sure that our resources are being deployed more effectively and not having to kind of go after the flagrant law violations that we're seeing and and really be able to shift attention to areas where we think there needs to be more efforts, including, for example, on the conduct side. And so overall, we think that's a really important advancement.

  **BAER:** That's great. I like the way both of you frame up what you're doing as law enforcement as opposed to many people misuse the term antitrust regulation. There's not a lot of regulation and there's a lot of enforcement. But let me continue on the merger thing. For those who are not antitrust nerds like me, you may be aware that there are draft revised merger guidelines that have been out for public comment. Public comment period closed a few weeks ago. Merger guidelines have been around in various forums since the late sixties. They've been updated and revised. The most recent

revision is 2010. It's sort of attempts to provide the business community and really agency staff, I

think, with a sense of what the framework of analysis should be. And just somewhat to people's

surprise, the courts over the years have embraced these as a helpful and informative statement of

what the analytical framework ought to be for looking at proposed M&A transactions. Earlier this

summer, you issued new revised-- proposed guidelines, and I want to ask you some specific

questions about what's in there. But you changed the format in a very significant way from the way

they had been since 1982, when my old law professor, Bill Baxter, issued the first revision. But so,

John, can you talk about what went into that thinking and why the framework has changed, and what

significance we should draw from that?

    **KANTER:** Sure, so let's start with 1982. I was nine years old with a full head of hair. So a lot

has changed in 1982. For those of you who can remember back that far, think about what your lives

were like in 1982, what cars looked like, what phones look like. They had rotors, documents were

stored in file cabinets, not in clouds, and the world was very different. And so the idea that we're

bringing a new format and new framework to how we think about mergers in 2023 versus 1982 should

seem-- the reason for that should be self-evident. The world has changed, and that world has

changed in many ways. World has changed in terms of how competition presents itself. And so that's

how we started this project.

    We said, well, if the goal of antitrust enforcement is to protect competition, then the first

question shouldn't be overly technocratic, like is this horizontal or vertical? Terms that have lots of

meaning to antitrust lawyers, but absolutely, in my 25 years of practice, I don't think I ever saw an

executive refer to a market as horizontal or vertical. We have platform businesses, we have data, we

have privacy issues. People pay with their privacy and their data just as much as they pay with their

wallets now. How people pay, how people communicate has changed. The state of the art in terms of

how we understand markets has changed. A lot of economics has shifted from theoretical abstract to

applied research. We have data science, we have cognitive science, and behavioral economics. The

world's changed. And so by starting with the question, how does competition present itself? And then

saying, does this merger threaten to harm that competition by lessening it or tend to create a

monopoly? We can be faithful to the statute.

    And so we've laid out a number of ways that we see competition presenting itself, all of which

are obvious to people in the business community. Is it a platform market while you look at it one way?

Is it a straight, you know, horizontal merger among retailers on the same corner? You look at it one way. Is it a merger that's likely to affect a traditional supply chain with a manufacturer, a distributor, a retailer? You look at it one way, but there are lots of different ways in which competition presents itself. And by organizing the guidelines around the realities of the market, it makes certain, we hope, that we don't miss those market realities as we enforce the law.

BAER: Thanks. Lina, in this proposed iteration, for the first time, the guidelines cite case law. What's the rationale behind deciding to refer to antitrust jurisprudence?

KHAN: So a core pillar of what we're looking to do is fidelity to the law. And so a key part of this exercise for both of our agencies at the front end was to say, "Let's go back and look at what the law says," both the text of the Clayton Act, but also the legal precedent that's still on the books, that's still routinely cited by the courts. And as we went through that exercise, we both identified instances in which, you know, there had been a bit of a gap between what some of the guidelines had laid out and what the law on the books had said, as well as just entire kind of doctrinal frameworks that hadn't really been front and center. And so as part of this exercise, we wanted to make sure we were closing that gap, making sure that the guidelines were fully faithful to the legal precedent on the books, and that we were also ensuring that this document was comprehensive. And so they were accounting for different ways that mergers may threaten competition, even if these hadn't been top of mind in recent years. So as part of that exercise, we wanted to make sure that we were showing our work, to make sure that, you know, if these guidelines are going to look different, the burden is on us to explain how they're grounded in the law. And citing to legal precedents seemed like an actual part of that exercise.

It's actually been really striking to me to see the sharp reaction to that fact. And I think reflecting more generally, it seems like in antitrust over the last few decades, there's been, you know, greater, greater reliance on a whole set of tools, including economic tools that are really important. But ultimately, this is a law enforcement exercise, and the law is the core anchor. And so we wanted to make sure that we were giving due respect and appreciation to the law on the books. I'll say more generally one thing that I think the current structure of the guidelines also does really nicely is it does a lot of analytical work on the front end. And so you look at the document and there are at least 12 different ways that you can analyze mergers on the front end. And I'll just say, internally, as we think about how does our staff, with the very limited resources they have on a very expedited timeline, assess mergers? It's already providing a lot of kind of analytical efficiency on the front end because

you can look at a deal and say, "This is raising concerns under guideline two, seven, and eight," you know, whatever combination. And that just anchors the analysis and provides a lot more efficiency and effectiveness in knowing what are going to be the key dimensions that we're going to be looking at. And so both from a fidelity to law perspective, but also kind of ease of use for our teams, hopefully for the business community. I think it's going to, you know, mark a big step forward.

**BAER:** Thank you. I'd just add a comment and I've seen some of the comments that have been filed, and what are there, over 4,000 or something? I've not read them all — most of them, of course — but have suggested that you're citing old Supreme Court cases. Well, the challenges there aren't all that many new Supreme Court cases involving mergers. And if you look back, I think Jonathan, one of your colleagues did a little research and found that in the last 10 years, 50 different merger decisions have cited to those old Supreme Court cases. They remained good law. They relied upon the courts. It's not as though the agencies have kind of resurrected them from the grave. They are alive and functioning, right?

**KANTER:** So in a in a law enforcement exercise, you have to look at the law. Has anyone out here heard of the case, Brown versus Board of Education? No, seriously, raise your hand if you've heard of it. Do you think we should still cite it as valid case law? Raise your hands. Let the record reflect that most people are raising our hands. I want to talk to those who are not. That was decided, what, 1954? My recollection from law school — it's been a while — is that Supreme Court cases don't expire. And so the question is, how do you take those questions of law and apply them to facts on the ground today? And as you point out, Bill, these are the cases not only that we're citing to in our guidelines, these are the cases that the courts are citing to. And in-- and the cases stand for key legal principles, like mergers shouldn't increase concentration to a certain level, mergers shouldn't take a firm that already has monopoly power and entrench it further, mergers shouldn't cut off supply of key inputs to rivals. These are core principles. Questions of law, as they're often referred to in law school, that's separate from questions of fact. And so how you analyze the fact at any particular merger depends on the facts of any particular merger, but the key principles are still sound.

The other thing I'd point out is a lot of the seminal cases in merger enforcement were decided — and this is actually, I think an important point historically — right after the Celler-Kefauver amendments, the Anti-Merger Act, right? So the Clayton Act which governs mergers was actually updated in the fifties to strengthen it to close some loopholes, to make sure that not just horizontal

mergers, as we call them, were covered. And so what followed, as you might expect after a statute is updated or written, there were a bunch of cases that were decided to determine what that statute meant. And so cases like Brown Shoe, and Philadelphia National Bank, and numerous others were decided in the following decade in order to determine what Congress meant when it revised the statute. And they went back, and they looked at the text of the statute. They went back and they looked at what Congress said when they were enacting the statute. And they decided that certain legal principles applied.

So, it is not surprising to me that a lot of the key cases interpreting the law were decided right after the law was updated. But-- and and for that reason, among others, perhaps there have not been a lot of Supreme Court cases in the last 20 or 30 years. I think the last one didn't even involve-- involving a merger was California-American stores, probably in the early nineties. And before that, it might have been the seventies. Merger cases just don't go to the Supreme Court that often because a lot of the key questions around the scope of the statute have already been decided, or at least the court has determined, do not need clarification or don't get appealed up. That's the reality of what we have. We have tried to take those principles, embed them into the law, into the merger guidelines, and then figure out what analytical tools, using the state-of-the-art thinking today, state-of-the-art economics, state-of-the-art data science, state-of-the-art investigation tools, to figure out how best to apply the law as written by Congress, interpreted by courts to the facts as they present themselves today. Certainly, the tools we use today are different than the tools we would have used in the fifties or sixties, but the legal principles underlying how to-- what principles we're applying. still remain intact.

BAER: Okay. Let me go to some of the specific criticisms or feedback that appear in the comment. One I'll hand in myself, which is people, some people seem to perceive the new guidance as a commitment to when you're going to go to court as opposed to a statement of when you're going to look and examine the opportunity to go to court. And that misperception isn't, isn't helpful, I think. But there is one recurrent theme among a fair number of mainstream academicians and others with a serious interest in effective enforcement. They're trying to understand whether these guidelines are suggesting that increasing-- increases in concentration in a market, is in and of itself, sufficient to initiate an investigation to go to court. That showing threat of substantial economic harm, showing a-- the risk that market power will be obtained or enhanced, isn't part of what the government needs to do when it challenges an acquisition. Is that a fair reading of the way the draft is intended to work?

**KHAN:** So look, the structural presumption has been longstanding, and the guideline honors that. The first 13 principles that we lay out are really about what the government is going to be doing as part of its prima facie assessment. There is a separate section of the guidelines that's devoted to rebuttals, laying out what opportunity firms have to say, "Okay, I understand government, this is your initial case, but hey there's all this additional evidence that you should take into account." And so I think there's also been a misunderstanding about what we're saying relating to the opportunity to provide rebuttal evidence, and the first 13 guidelines really laying out what is it that the government will be using as key templates as we make our initial assessments. So that's the core a core part of it.

I think another key feature of these guidelines is that we recognize that no single set of analytical tools are necessarily going to be the right ones, right? There's no one-size-fits-all all. The right analytical tools to assess what competition looks like is going to vary depending on the market. And so the guidelines honor that fact. We say there's no single tools that are going to have primacy. Here are a whole set of tools, some of which are going to be looking at direct evidence of market power, some of which are going to be relying on more kinds of econometric tools that we've been using. And we're gonna use the right tools depending on the context. And so, I think that's actually a really important step forward because, you know, we've seen all too often, and I think the courts have kind of said this back to us, that we need to be mindful about what are the right tools for a particular context. And so that's what the document's also trying to reflect.

**BAER:** Jonathan, can you also give your sense of when we can expect a final version?

**KANTER:** Oh, that's a great question that I won't answer. No, we're somewhere working as quickly as we can to ingest the comments. I've read a lot of them. Let me start by saying that I think one of the things that's absolutely remarkable about the process this time around — and I'd be interested in your observations, Bill, because I know you lived through earlier revisions both in the agencies and around the agencies — but a lot of the comments are from people, workers, farmers, emergency room nurses, small business owners, and they're writing in in their own name and in their own words. And they're making sense. They're talking about their concerns. They're talking about how concentration and mergers have affected their lives and their-- the opportunities that they believe should be available to them to compete and to work and to benefit from competitive economies, not only in certain parts of the country but throughout the country. And I think this, to me, encapsulates

the moment. One, the moment of-- the country's watching. The country cares about competition in a competitive economy because it affects so many aspects of our lives and our democracy. But also, and this was a deliberate choice on our part, to write the guidelines in a way that's accessible to the broader public.

And I think one of the concerns I had — and I've talked about this — is that the language we use in antitrust has become exclusionary and it's become overly technocratic in many instances when it's not necessary. And by using words that people can relate to, terms that resonate with people who actually have important experiences to share, increases participation. And I think we're seeing that in the public comment process. And I think that's a really important part of what we're doing. And I will say — and I haven't seen all of them, but I've read more than half of the comments, every single one, and I'm gonna read them all before we finalize this — the overwhelming majority are not critical of the merger guidelines, more of the majority support the direction we're going. And that means a lot.

I think the idea about concentration is a little bit head-scratching to me. Almost every case the agencies have brought going back-- going back to the sixties has cited Philadelphia National Bank, as Lina mentioned, which stands for the proposition that increases in concentration can be a proxy for showing competitive harm. And so the idea that we are continuing to rely on those cases and those binding Supreme Court precedents shouldn't come as a surprise to anybody. And the statute says transaction can be anti-competitive if the effect may be, may, to substantially lessen competition or tend to create a monopoly. And so that's what the guidelines focus on. But rather than being overly doctrinal and rigid, and I'll again, I'll-- you know, particularly to folks who are not antitrust lawyers, but you know, that the previous horizontal merger guidelines were focused on this framework around things called coordinated effects and unilateral effects as the way in which harm presents itself.

These are terms that have been effectively made up by the antitrust institutions. And all of these cases that were being brought were being shoehorned into these narrow paradigms that probably, you know, are important but not fully reflective of how competition presents itself. And the idea that we would continue to rely just on those paradigms without thinking about all the other ways in which competition presents itself, I think would be a major disservice to the public.

**KHAN:** If I could just underscore one point that Jonathan made, which is about the public participation here. And we made a very concerted effort to do listening sessions with, you know, health care workers, just ordinary people who've lived through consolidation. The other week I had the

chance to go out to Las Vegas with the AG there to do some listening sessions around the potential effects of a big grocery merger that's being considered. And it's just been so humbling to hear directly from people who have seen firsthand how consolidation and mergers all too often have meant that prices are higher. They're having-- having to drive further for basics like hospital care or groceries. Their jobs have gotten worse. And to be honest, you know, what I sense is that there's also been a deep disillusionment with government, and a sense that government isn't out there fighting for them and protecting them from monopoly power and corporate power.

And so, I also think, you know, the burden for us is getting this right from a competition perspective, but, I think, also showing people that we have cops on the beat that are fighting to protect people from these forms of private coercion and abuse of monopoly power. And that's really what I worry about as well, is the kind of maintaining the democratic legitimacy of antitrust, making sure we have the right feedback loops in place to be understanding how is the work that our agencies are doing affecting people out there in the real world. And so, you know, the merger guidelines are going to be really important for us from an enforcement perspective. But I think as part of this broader exercise to make sure we're fully serving the public; it carries that burden as well.

KANTER: So, I will add that now that I no longer work for you, Bill, and in the spirit of this being an organic conversation, maybe I'm going to ask you a question.

BAER: Uh oh.

KANTER: This is genuinely unrehearsed. But you've seen the guidelines iterated over numerous versions, including 1997, which was the first time the guidelines really added efficiencies. I think a lot of folks often try to portray it as efficiencies being embedded by the framers in the U.S. Constitution, but I don't think that's really true-.

BAER: I think it was the Declaration of Independence--.

KANTER: Yeah. And so I guess I would be curious about your observations because, you know, you've seen the evolution of the guidelines going back, and what you think of those criticisms.

BAER: Well, let's talk about efficiencies because that-- I was working with Bob Petrovsky when he and his fellow commissioners concluded that there needed to be a discussion of efficiencies in the merger guidelines. The courts were beginning to talk about it, even though there wasn't a lot of precedent saying it was, it was a legitimate defense to an otherwise anti-competitive merger. And so we put together some principles that basically said, you know, you can assert them, we will look at

them, they're not going to be outcome determinative in a merger where there's serious risk of anti-competitive harm. They need to be unique to the merger, not achievable through other means, that sort of stuff. And while we were talking about what to say and how to say it, I flew out to Stanford to see my old law-- law professor, Bill Baxter, and I--.

KANTER: Who is Bill Baxter?

BAER: Bill Baxter, I'm sorry, a leading antitrust professor, and in 1981, Ronald Reagan's choice to be head of the Antitrust Division where Jonathan and I had both been privileged to serve. He was a friend. We went out, we actually played a round of golf and then spent three hours over lunch talking about efficiencies. And he said, "You guys are out of your mind to consider putting efficiencies in the merger guidelines. Why? Because they're bullshit. That people will assert them. You're not going to be able to verify them. And very often mergers don't produce the efficiencies that are asserted." A few months later, we were in district court challenging the first Staples/Office Depot case and the-- I mean, his words were prophetic. The defense in that case was that the efficiencies dwarf any anti-competitive concern.

And somehow, by the time we got to what was a five day trial, the defendant, Staples and Office Depot, had upped their efficiency claims by five X over what they had presented to the respective boards at the time the transaction was authorized. And Judge Thomas Hogan, in an extraordinarily well-written opinion, said it's just B.S. They also claimed that that these efficiencies inevitably are going to be passed through to consumers in terms of lower prices and said, "We're going to pass through 80% of these efficiencies. Consumers will benefit. Let this deal combining three of the-- two of the three office supply superstores of the country into, into one." We presented evidence showing that on prior transactions by Staples and Office Depot buying up competitors, the pass-through was about 15 to 16 percent. And Hogan just said, "I just can't trust any of this." So there is, I think, reason to be-- to scrutinize carefully, to be skeptical about what are-- what the parties are asserting the particular benefits are. But let me-- I wanna move on, if I can, to a related point.

Since, what, 1976 for those who are not-- merger aficionados, you know, there's been a a pre-merger reporting requirement for transactions of a certain size. What is it, about 90 million? Now, if your transaction is that big, you've got to file a Hart-Scott-Rodino premerger notification form. Just about the same time these draft revised merger guidelines came out, the FTC, with the consent or concurrence of the Antitrust Division, proposed a dramatic rewrite of the form. That form had basically

been unchanged for about 45 years. And having been both in private practice and in the government, it was not capturing the data that was most important to understanding what the deal rationale was and what the potential antitrust risks were. So, if you wouldn't mind, talk a little about what you're trying to achieve through the rewrite of the form and then also about the concerns that, that-- of what 3,000 or so, 3,500 transactions looked at a year. You're only seriously investigating three or four percent. And how do you weigh the burden on that 96, 97 percent of transactions, which you're not going to look at because you don't see a problem, although maybe it goes up when the new form is in place? But how do you balance burden on those deals versus legitimately asking the tough questions of the deals that may have problems?

     **KHAN:** So the revision of the HSR form is really animated by the fact that on the front end, we're not getting even remotely a fraction of the information that we need to really do a reasonable and sound competition analysis. As Bill noted, this form has not been challenged effectively for, you know, 4 to 5 decades. And it's important to remember that when a merger filing comes in, our teams have just 30 days to assess, is this deal problematic? And when you went-- when we went through the merger wave of 2021, where, you know, filings were up 70%, I mean, our teams were just drowning and you were having to look at these filings and make very quick assessments about what are we even gonna take a look at to do an initial investigation. And that process really highlighted for us that this form is not functioning as even a remotely effective screen to surface, are there competition problems or not?

     The economy has changed dramatically in the last few decades. Deals have become more complex. We're seeing all sorts of unique investment vehicles. And there's just basic information that other jurisdictions request, including relating to deal rationale, you know, narratives relating to what the effects of the deal will be that we were just missing out on. So the proposed revision is really designed to mitigate blind spots on the front end. A lot of the information that we request is-- we expect information that the parties already have. There's not going to be a tremendous amount of burden, we assume, of actually providing that, in part because other jurisdictions already have the information. In other instances, we're looking for, for example, a list of prior acquisitions. This is in part designed to address the types of serial acquisitions that we've seen.

     **BAER:** And you've recently brought a case on that.

**KHAN:** And we recently brought a case, yes. A few weeks ago, the FTC brought a case alleging that this company, USAP, and its private equity owner, Welsh Karson, had engineered a roll-up scheme buying out the largest anesthesiology practices across Texas, jacking up the price. And then ultimately, Texas patients and businesses were paying millions of dollars more for anesthesia. And this scheme was engineered in part through these serial acquisitions, no single one of which will necessarily raise competition problems. But in the aggregate, you can really have a roll-up of a market. And so the form is going to allow us to be able to screen for those types of dynamics on the front end.

The form also ask questions about labor markets. This is an area of merger analysis that we're really doubling down on because we've heard a lot about how all too often mergers among firms have left workers worse off. We're still really building up the muscle to figure out what's the right data that we need on the front end. But we think the data that we capture in the renewed HSR form will help expedite some of that analysis. So, we think this is a really just important and honestly overdue step forward for the HSR analysis. We've gotten a lot of comments. and so our teams right now, we're reading through those, carefully digesting those. But ultimately, we think that this has the prospect of actually making our analysis more efficient in ways that will benefit businesses as well. Sometimes we will, through this additional information, be able to determine actually there are no problems, actually. And previously we may have issued a second request to get this additional information, but now we have that on the front end. So we're not going to tie up the deal any longer. So, those efficiency benefits could pay off internally, but also externally.

**KANTER:** If I may add on that--.

**BAER:** Of course.

**KANTER:** Incredibly important explanation, which I completely agree with. For the antitrust nerds, a little humor, but the the form and the issues that that Chair Khan just talking about line up nicely with the new draft guidelines, their guidelines for all those concerns she just raised, that is a cognizable efficiency. Thank you to the two people who left. So, the other thing I would say is I really would encourage people to look at the old form because it's not like-- and I, when I started in the mid to late nineties, the form wasn't relevant then either, right? The, the, you know, the the perhaps the untold truth or, or the truth that wasn't discussed too broadly and has been in this way for a long time, is that most of the form, if not almost all of it with the exception of one or two document requests, has

no bearing whatsoever on the substantive antitrust analysis. And so if we had proposed the form as it exists today, the criticism would have been, "Why are you proposing a form and creating all this work that has no relevance whatsoever to an antitrust analysis?" And so, when people ask about the new form, I say, "Well, the best way to understand the new form is to look at the old form." And the fact that we're asking questions that are relevant to the analysis actually is far more faithful to the direction of Congress and the intention of the Hart-Scott-Rodino Act, which mandates merger filings. And I think it's really important for people to understand that the purpose of the form is to give us the information that we need to make an efficient determination about whether there needs to be an investigation. And if the form has no information that's relevant, that makes the process less efficient and undermines the intent of Congress, which was to provide notification.

KHAN: Interestingly, Congress, when passing the Hart-Scott-Rodino Act, believed that around 150 mergers would need to be reported every year. We're now at a stage where we get 150 filings, you know, every month sometimes. And so just the volume of transactions that we're getting is dramatically off the charts, and that requires us to be getting more information.

BAER: Right. You had mentioned looking at labor market effects as, as part of what the guidelines do, and what the information the new form would require. But let's talk about your respective involvement in labor markets not related to M&A activity. Jonathan, towards the end of the Obama administration, we announced at the Antitrust Division that we were going to pursue no-poach agreements between competitors as criminal violations of the antitrust laws going forward. You have been saddled with that responsibility, for which I apologize, and have brought a number of cases. The courts have generally said, these are legitimate-- it's legitimate to treat these no-poach agreements as criminal violations of Section 1 of the Sherman Act. But juries haven't quite gone along with the prosecutions you've done. What have you learned from what's happened out there in the real world, and is that affecting willingness to bring those cases or willingness to rethink how you bring those cases? What's going on?

KANTER: So, thank you for that question. Let me start by reiterating, as I did a few weeks ago, that this remains a high priority for the Antitrust Division, protecting workers from criminal behavior that harms their ability to get better wages, to realize upward mobility in their lives by getting access to better jobs, better training, and opportunities to provide for their families is fundamental and foundational to the work we do as antitrust enforcers. And we continue to take it as seriously as we

ever have. And we're committed to enforcing the law both as criminal enforcement, as well as civil enforcement, depending on the facts and circumstances. I will also say that it is our job to make sure that we are learning from every experience. And certainly, there are, as you described, Bill, courts have essentially agreed with our characterization of the law, but we have an obligation to present cases to juries, and that's a burden that's on us. And we need to make sure that we are looking at our cases and how we bring them with fresh eyes and fresh perspective

. The one thing I can assure you is that we constantly do that, win or lose, and that we are always learning from our experiences. And if we are fighting to protect the rights of workers, and the facts and the law support prosecution, we will bring those cases and make sure that we are benefiting from all of our experiences, win or lose, to ensure that we are presenting cases the right way to juries. A lot of our experience historically has been consumer criminal antitrust cases where we talk about price fixing and other kinds of per se agreements. And, you know, there are things that we can and should learn about how we explain effects on workers because they're different and they present differently than they do to consumers. And so, again, those are deep learnings that we have been able to ingest, that we've been able to take into account, and that we will factor in both as we try cases going forward and make charging decisions. But this is fundamental and foundational to our mission. And when the facts and the law support bringing a case, we will not hesitate to do so.

BAER: Thanks. Meanwhile, down the street at Federal Trade Commission, you've been shining — you and your fellow commissioners — a spotlight on non-compete agreements, which are really quite pervasive throughout the economy, affecting all different levels of workers. Can you tell the audience a little about the rulemaking you have pending, what its status is, and and why that ought to be a subject of concern to antitrust enforcers?

KHAN: Absolutely. So, as you alluded to, non-competes have really expanded across the economy. Their use, you know, they started in the boardroom, but increasingly they've been applied in all sorts of sectors ranging from, you know, fast food workers to security guards, to engineers to doctors. And, you know, before I joined the commission, actually under my predecessors, there were efforts to start studying what is the impact of non-competes. And one interesting-- you know, there have been certain states that de facto have rendered non-competes not enforceable for many, many years, such as California and Oklahoma. But over the last couple of decades, we've seen more and more states introduce certain state-level policies to further curb the use of non-competes. And what

that has done is actually created nationally a natural experiment that allowed us to really isolate the empirical effects of non-competes.

And so there's been a whole set of empirical scholarship finding that non-- non-competes are bad for workers. They result in lower wages and fewer opportunities. Interestingly, not just for the workers that are directly bound by non-competes, but even work for workers who aren't, which is really quite striking but makes sense, right? If there are few, if there are workers who are kind of locked into their jobs and not moving as much, that's creating fewer openings even for the workers who are not directly affected by non-competes. We also found that employers actually continue to use non-competes even in states when they're non-enforceable or they'll use, you know, choice of forum clauses to make sure that they're getting the advantages of different states.

And so there was a whole set of empirical work showing that these are bad for workers. Interestingly, there's also now been empirical evidence suggesting that non-competes have a negative effect on competition and on economic growth as a whole. And so, you know, if you have new startups or entrepreneurs or businesses that are looking to enter a market, sometimes they find that even if they're able to secure capital, they're not able to secure the necessary talent because the talent pool is locked up from non-competes. And so our teams looked at that evidence as a whole and determined that we should issue a rule.

So earlier this year in January, we proposed a rule that would eliminate non-compete clauses in employment contracts. That proposed rule followed certain enforcement actions that we had brought. One of which was in the context of security guards. These are people who make close to minimum wage who were subject to non-compete clauses. The Michigan State Court actually ruled that these non-competes were not enforceable, but the security guard company continued to enforce them, threatening security guards with having to pay hundreds of thousands of dollars. And so, you know, these are people who are making close to minimum wage, who are blocked from seeking better opportunities. Because of the FTC's enforcement action, these non-competes were dropped for thousands of workers.

And we similarly brought a different case in the context of the glass manufacturing industry, an industry that's fairly concentrated. And here we said the harmful effects were not just to workers, but actually on competition, because there had been newer firms that were looking to enter and inject competition that ultimately couldn't because the relevant talent pool was locked up. And so we've

been moving forward, both on the enforcement front as well as the rulemaking. We got over 26,000 comments as part of our non-compete rulemaking, an overall warming number of which were from healthcare workers who were sharing that, you know, some of the justifications that you hear about why you need non-competes really don't apply in healthcare. They were saying they themselves are the ones who invest in their training, not their employers. They shared how non-competes can actually also impair patient care. We heard stories about how, for example, during the pandemic, healthcare workers wanted to be mobile and move around. So if you had an outbreak in one city, they wanted to go over and help out. But ultimately, many of them weren't able to do so because of non-competes. And so you had, during a pandemic, enormous need for healthcare workers, healthcare workers willing and able and wanting to jump in, but they weren't able to because of the non-competes. So, you know, the real-life effects are quite significant here. And we're really excited about this effort, are still processing the comments, but we'll move forward as appropriate.

      **BAER:** Thank you. Let me turn next to a narrative out there that appeared a lot in the press, particularly in The Wall Street Journal, that the two agencies are losing cases left and right, and that suggests a degree of overreach in civil enforcement. I suspect you don't agree with the narrative. And Jonathan, why don't you tell me why or not?

      **KANTER:** Yeah, because it's wrong.

      **BAER:** Okay. Well, actually that's a good start.

      **KANTER:** Yeah. So we blocked and won in court, challenging a merger involving some of the largest book publishers in the country. We went to court and challenged a merger transaction involving, effectively, a merger transaction involving airlines. And we won in court decisively in both cases, one of which is now pending on appeal, I will note. And that's-- those are pretty big victories, I would think. And it was the first time ever we've challenged successfully in court an airline transaction and the first time we've ever successfully challenged a merger based on harm to workers, in this case, authors, and as opposed to just higher book prices. And so those are pretty extraordinary victories and I'm really proud of our team. We're in court litigating monopolization case. We have another case going to trial in a month, and there have been instances where we haven't succeeded. But but they're not overwhelming in terms of the numbers. And I also note that we've had a number of transactions, one that settled in court and one that-- and numerous transactions that were abandoned after we filed. So when I look at our record, I see, frankly, quite a bit of success, and I'm quite proud of

it. And I think it reflects on the amazing work at the Antitrust Division. So, I think that narrative is not just unfair, it's inaccurate.

**BAER:** Lina.

**KHAN:** I would echo that. I mean, look, within the first year the FT-- that I joined the FTC, we challenged two major vertical deals, Nvidia's attempted acquisition of ARM, Lockheed's attempted acquisition of Aerojet. Two major vertical deals. It's no secret that, you know, we have not challenged as many vertical deals in recent decades. In both instances, the parties walked away and, you know, we were excited to litigate those cases. We think we would have won. But ultimately, the parties walked away and obviated the need to do so. It's also been interesting to see the aftermath of that. You know, Nvidia and ARM have continued to be enormously successful as standalone entities. We've — separate from that — blocked close to 20 deals altogether, have not always won in court, but we always look at those instances very closely in the matter within decision.

For example, the court offered some really important propositions relating to how merger law applies in digital markets. Noted, for example, that even if you have high levels of entry and exit in a market, if you have high concentration that can signal, you know, a presumption of market power despite the ongoing degrees of entry and exit, which is really important in digital markets, also ratified potential competition as a doctrine that's alive and well, including in digital markets. We have another case that's pending, both on appeal in the Ninth Circuit as well as an administrative adjudication, so I won't go into that. We're, you know, are litigating a whole set of monopolization cases. Last summer, the FTC sued two pesticide giants, Syngenta and Corteva, for engaging in pay-to-block schemes that ultimately kept generic pesticide manufacturers off the market, resulting in farmers across the country paying billions of dollars more for pesticide, this essential input, than they would otherwise. That's still pending.

Two monopolization cases that we brought in the last month, one's USAP and Welsh Carson. the other against Amazon. The Facebook case that was filed before I joined the agency and then we've refiled, is probably going to go to trial next summer. And we're excited for that in terms of, you know, explaining to the judge how competition in digital markets works and why it was that these two acquisitions that the company made were unlawful. So, we have a very, very active program underway. We think we've already had significant success in instances where we haven't. We look at

that closely and see how we can learn from it. But, you know, I think the deterrence value also speaks for itself.

**BAER:** Thank you. Let me ask one more question and then we'll turn it over to the audience. We've seen play out in the Google litigation in district court here, this conflict between companies, both defendants in government lawsuits, and third parties, businesses who are asked to provide data through the discovery process, claiming broad confidentiality protection over that information. And it's resulted in the Google case, a number of days in which testimony is taken all behind closed doors, exhibits aren't available to the press and the public. The government, I appreciate, is in a bind in these cases.

You know, your first principle is to get to trial, see that justice is done. If there's economic harm out there, to challenge it, get the court to block it. And often judges don't want to be in the middle of a fight over what's confidential and what's not. And say they say to your litigators, "Just work it out." Well, if the judge wants you to work it out, it, and not personally be involved in deciding what's confidential, what's not, that tends to skew towards keeping it confidential. Otherwise, you have to get the judge involved, and who wants to anger judges about to decide your case? At the same time, there's a huge value here in the public's right to know. And I know as public officials, you respect that. But how do you advance the public's right to know in these cases where you have extraordinarily broad claims of privilege and a judge who just doesn't want to get involved in it? Do you have an obligation to force that issue?

**KANTER:** Well, I think, you know, we certainly believe in the public's right to know, and we want to fight to protect it when appropriate. We adhere to and we respect very much the role that courts play in administering protective orders and other confidentiality requirements. In my experience, and I can talk about any specific case, certainly nothing that's pending, but that most courts are equally interested in, in protecting the right of the public to know. And I think that's, you know, something that I think we value, that we share with the court system. And it's important to our democratic process that our cases be tried in daylight. At the same time, there are instances where part of what we're trying to do is keep competitively sensitive information, competitively sensitive. And, and so there may be instances where it is appropriate for minor redactions or closed sessions. But, you know, we do what we think is appropriate under the circumstances and-- but very much share and support the importance of public access.

**BAER:** Thanks. Lina, anything to add to that.

**KHAN:** Similarly, you know, maintaining access to the public has been a key value for us. We started doing regular open commission meetings where anybody from the public can come up and speak to us and share with us issues that they're seeing in the marketplace. We've also, over the last couple of years, opened up a whole set of dockets inviting public information. And so making sure we're regularly engaging with the public, hearing from the public has been a core goal at the FTC, and we're really thrilled about the progress we've been able to make.

**BAER:** That's great. All right, so we're going to go to questions. We've got some that have come in online. The first question I'll pose is something that was submitted ahead of time. What I think we'll do then is go to one side of the room, get a question, opportunity for a question to be asked, another question from the other side of the room, and then you guys can fight over who answers what, okay? But so the first question online is from Randy Marks, a retired attorney at the Federal Trade Commission, that, Jonathan, you remember, a good guy. He asks, "Don't we need new antitrust laws given the hostility of the courts to aggressive enforcement? Lina, you want to start?

**KHAN:** So as enforcers, our obligation is to enforce the laws on the books do so faithfully, both with regards to Congressional mandate and legal precedent. It's been enormously exciting to see Congress reassert itself in antitrust. The historic investigation that Congress did in the House a couple of years ago looking at digital markets, and really laying out in that report instances where Congress thought there may be a gap between how competition needed to work in digital markets and what the antitrust laws were delivering. We've of course seen over the last few years a whole set of bills introduced relating to antitrust enforcement. And so we at the FTC always stand ready to be good partners to Congress. And so if they're looking at proposed legislation, we provide technical assistance. We're able to share with them where we think the potential updates need to be made. At the FTC, though, we're just squarely focused on using the tools we already have.

**BAER:** Anything to add to that?

**KANTER:** Yes.

**BAER:** Okay, go ahead.

**KANTER:** Oh, no, no, no. I think, as always, Chair Khan nailed it.

**BAER:** All right. Let's go to some questions. Why don't we start over here in front? If you can identify yourself and any organizational affiliation, that'd be helpful.

**AUDIENCE MEMBER:** I'm Dave Michaels with The Wall Street Journal. You've both, Chair Khan and Attorney General Kanter, both voiced criticisms are concerned about practices and outcomes, even in private equity ownership. So, as Chair Khan mentioned, a lot of these individual deals that are part of a roll up would not require HSR reporting, of course, you proposed updating the filing. But the question is, what are you doing today to look into private equity's potential role in concentration and potentially monopolization? Do you have other active conduct investigations of PE-owned or backed companies in addition to the USAP-Welsh Carson case that you brought? And if so, would you expect to bring more cases like that one?

**BAER:** Let's, let's just go to the question. It's a good question.

**KANTER:** Sure. Let me start by saying so, as we were talking about earlier in the conversation, you know, making sure that we are using tools that are fit for purpose in today's economy is important, and making sure that we understand how competition presents itself and the realities of a modern economy are really important. And so the role of private equity today is different than it certainly was when I started practicing, and unrecognizable relative to, for example, the 1982 guidelines. So, these are business commercial realities. And our goal is to make sure we understand those commercial realities and just enforce the law as we see it based on the facts presented today. And so, you know, sometimes a private equity transaction doesn't raise a concern, and sometimes it does. But how it might present itself might be different than in previous generations. We might see roll-ups. We might see board interlocks. The kinds of issues that surface in an antitrust context might be a little different in a private equity transaction than in a standard public company transaction. Those are just differences, and our goal is to make sure we understand those differences and then apply the law based on the facts as we see them.

**BAER:** Anything to add?

**KHAN:** I think that summed it up.

**BAER:** Okay, good. All right, up here on the left.

**AUDIENCE MEMBER:** [Inaudible].

**BAER:** All right. We got another one coming, Sam.

**AUDIENCE MEMBER:** All right, round two. Great. Sam Thorpe, Economic Studies here at Brookings. So one word that's come up only intermittently so far has been monopsony. And it seems to me like one of the really important innovations of this new antitrust regime has been treating labor

market concentration as an end that's worth enforcing. I'm curious to hear two specific things. First, what you feel the legal basis is for treating labor market power as sort of on par with product market power. And second, what each of your agencies are intending to do specifically on monopsony-related antitrust in the coming years?

KHAN: So, look, the Clayton Act, you know, prohibits mergers that may substantially lessen competition or tend to create a monopoly. They don't specify that justice with regards to consumers. And so we interpret that to mean that it protects all Americans, consumers, but also workers, but also businesses, but also entrepreneurs. So, we think the statutory hook is very clear. This also isn't a new issue, right? I mean, we've seen over decades that antitrust enforcers have recognized that harm to workers can be problematic. You know, the Supreme Court in the Alston case recognized that as well, so we think the legal basis is clear.

Last year, the FTC challenged a hospital merger where my colleague, Commissioner Slaughter, and I noted that we would have also included a labor count because we believe there was a basis to allege harm to nurses there. And more generally, as we are doing, especially our merger investigations, we're looking at all sides, including on the worker side. We started hearing much more from worker organizations, from unions who are looking at these deals and sharing information with us about how it could be problematic. So, that's a muscle that we're continuing to build, and are very eager for continued engagement and information on that front. On the conduct side, we've had our non-compete enforcement work and are continuing to look at other ways that, you know, unfair methods of competition may be harming workers as well.

KANTER: Yeah, I mean, I would strongly encourage you to come away from this discussion with the impression that this is very top of mind for us. It's foundational to the work we're doing in the merger context, in the non-merger context. In monopsony has an important principle where concentration can create and exacerbate asymmetries of power and competitive market power over, over workers, over input suppliers, over content creators, industries that are the lifeblood of a functioning democracy. And so we care deeply about this. It is central to the work that we're doing.

KHAN: And this is also where interagency work is so important. So I know our agency, as well as the Justice Department, has entered into MOs-- MOUs with the Labor Department, with the NLRB, to make sure that we're sharing information. And if we see issues that seem problematic, but our tools don't necessarily apply, we're able to share that information and vice versa. So, I think

there's a whole of government effort right now to ensure that workers are protected under the law as well.

KANTER: I'd be remiss if I didn't acknowledge, I see in the back of our room, the principal deputy assistant attorney general from the Antitrust Division, Doha Mekki, who has been perhaps the world's leader on labor and antitrust, going back a decade, and has been a real pioneer in this area. And so seeing Doha reminds me that both agencies and, and the amazing work that's being done at the FTC, we have literally the best and the brightest thinking about how we bring these issues to protect opportunities for people to provide for themselves and their families and benefit from the American dream.

BAER: And I should add that just a couple of weeks ago, out of the Seventh Circuit, Judge Easterbrook authored an opinion that really enforced the notion that the antitrust laws apply in monopsony, monopsony markets.

KANTER: Thank you. I'm really proud of this. We we filed an amicus brief and oral argument advocating for this position in the Seventh Circuit, and we were just absolutely thrilled that Judge Easterbrook acknowledged that those harms are cognizable antitrust harms and per se illegal in the context of a no-poach agreement. And the facts matter here, right? The facts in that case involved a woman who was a fry cook and had the opportunity to become a manage-- manager at another McDonald's but was denied, deprived the opportunity to go from one McDonald's to another with a promotion in hand because of a no-poach agreement. And the Judge Easterbrook in the Seventh Circuit said unequivocally, that is a per se illegal restriction, and the harm to the ability of a worker to move from one McDonald's to the other is actionable under the antitrust laws.

BAER: There you go. Yeah. All right, down here upfront. Yep, you. We got the microphone on the way. Thanks, Catalina.

AUDIENCE MEMBER: Hi, Alan Loeb, Washington attorney. So, this question starts with Ms. Khan. You came to public notice when you published an article, and if I have it right, what you focused on was the harms that come from having market power that doesn't necessarily raise prices but allows companies to exert force over the way the market operates. And so I'd like to ask you, and actually, both of you, what that implies is that if we haven't been enforcing that for a long period of time, to look more broadly at the harms from antitrust, there would probably be cases back in the history that were never recognized. And I'd like to know if maybe you are, or maybe even in the

literature, there is a list of such cases that now are coming up and recognizing this broader sense of the harms?

KHAN: Yeah, it's a good question. And I think, you know, one of the key pillars of our efforts, in addition to fidelity to law, is making sure that we're mitigating blind spots and being honest to the way that competition is presenting itself and harm to competition is presenting itself. In addition to, you know, harm to consumer prices, we're looking at harm to wages, to quality of benefits. One of the comments that we got as part of our merger guidelines noted that a really important dimension of competition and quality for workers is actually having control and predictability over your schedule, right? And so, we're just-- through this process, I think, getting a much more granular understanding of what are the different dimensions of quality, for example, that really matter.

We also want to make sure that we're fully grasping the realities of how competition works in digital markets. I think the chapter in the guidelines that lays out platform market dynamics is incredibly important and notes, for example, that in platform markets, a key source of competition is not necessarily going to be from a direct replica, but oftentimes from a company that may be, say, depending on the platform, you know, the Microsoft case, I think is emblematic here.

And so we need to be mindful of the different sources of competition. We need to be mindful of the fact that in digital markets in particular, for example, multihoming can be a really essential mechanism of injecting more competition, because when you have economies of scale and network externalities that can tip markets, multihoming can be a really important path out of that. And so overall, I think we're really in the midst of an important exercise to be understanding deeply how competition is showing itself in a whole set of contexts in markets. And our case is already starting to reflect that. And I anticipate that in the coming, you know, 15 months or so, we'll continue to see more of that.

KANTER: Yeah, I'll add it's just been such a privilege to work with Chair Khan and the FTC on these issues. This is so important to the work we're doing. And for decades since I started practicing, we've heard people say, "Oh, of course, competition is more than just price," but we've, we've talked the talk as an industry, antitrust enforcement industry, but we haven't walked the walk, right? The fact of the matter is we haven't built the tool kit. We haven't built the analytical framework to adequately address that. But let's take a step back and think about why it matters, right? And this is, I think when Chair Khan so eloquently talked about in a very moving and meaningful way, the impact of

their non-compete rules. We've reduced human impact to grayed-out triangles and that's not an effective way for us to enforce the law.

The fact of the matter is competition can affect the quality of healthcare, which affects lives. My father just had life-saving surgery in a community hospital and the level of care was something I hadn't seen in decades. The attention, the willingness of the doctors to sit with, with the patient's family. Those are real benefits, not just real in a quantifiable sense, they're real in the human sense. When we think about the free flow of information we're talking about in journalism, and authors, and content creators, we're talking about the lifeblood of a functioning democracy.

This goes to the heart of of of what makes our country so wonderful. When we talk about the ability to get a job, we're talking of the American dream. The ability to have upward mobility, to start from nothing, and and grow to provide opportunities to your children that you never had the ability to realize yourself and leave the next generation better off. Those are real things that affect real people. And if we try, if we, if we are overdependent on just grayed-out triangles and price harms, we lose that connection to the human impact. And the law was written, it was written for farmers who are looking to to build thriving small businesses and provide for themselves by selling their cattle or other crops. These are real harms. These are real people. And these are exactly why the antitrust laws exist. And we have an obligation to make sure that we are protecting competition, enforcing the antitrust laws to preserve all of those benefits for competition.

**BAER:** Thank you. Steve?

**AUDIENCE MEMBER:** Hi, I'm Steve Pearlstein from the Washington Post. Sort of following up on what you both just said, giving district court judges 13 different analytical tools to use in assessing behavior or a merger. I think we've all observed that district court judges are somehow very reluctant to exercise their judgment, subjective judgment, to bring logic and just pure observation to their decisions. They're looking for a hard number. They're looking for something that is purely an objective reason why they might or might not take action. They seem to be reluctant to sort of get into it. And now you — and that was when they only had one tool or two tools — now you want them to give 13 tools. And I'm wondering about, realistically, their, their capacity and willingness to do that kind of complicated, and to some degree, subjective work that you're going to ask them to do by first choosing which tool to use and then having to to master using 13 different tools?

**KANTER:** So I-- let me start there, because I think that it's important to really read and digest the current draft guidelines and compare to previous guidelines. They're actually, in my view, much easier to use and easier to apply. And the, the tools, they're not-- the tools are, are how you look at the facts. Well, we're talking about our legal principles that have existed and continue to exist. We're talking about, does the merger entrench monopoly power. Does it raise a rival-- cost of a rival and in a way? Does it increase concentration? Does it harm workers? Those are fundamental legal principles. And I think they're written in a way that is-- that we think are accessible and understandable but also have foundation in the law.

And I think part of what's happened over the last 20, 30 years is that antitrust has become more complex, more in the weeds, more about, you know, quantifying to the fourth decimal point a criticism that has come from some of our predecessors and articulated quite well, and moved away from understanding whether this, the risk assessment framework that Congress laid out, which is, does this merger risk threatening competition or intending to create a monopoly? And we're going back to those first principles. And we're saying that if we're going to be relevant in 2023 and going forward, we have to understand the economy as it presents itself today.

**AUDIENCE MEMBER:** Yeah, I understand that. But the question is, are our judges willing to do what [inaudible]

**KANTER:** They're doing it--.

**AUDIENCE MEMBER:** [Inaudible] much more complex--.

**KHAN:** So, Steve, I think one really striking thing to me over the last few years has been actually sensing a lot of frustration from judges, including district court judges, when they effectively are saying, "Okay, here I am with this merger before me. The defendants have an economist, very fancy economist, with all these fancy models. The plaintiff has an economist, very fancy economist, with all these fancy models. They kind of cancel each other out for me right now. And so what am I really left with," right? And you see, actually, judges going back to those prin-- first principles saying, "Okay, I'm going to think about whose witnesses were more credible." And I think to us, especially as enforcers who end up having to pay millions and millions in dollars to economic experts, the fact that, all too often, judges are saying, "This is not actually providing a whole set of value add to me analytically," I think that's a major problem, right? We, as agencies, are spending millions of dollars of taxpayer resources to put forth economists in these trials. And judges are saying increasingly, "This is

not helpful to me." So, I think we're here seeing that problem loud and clear, and I think this document will help mitigate that.

KANTER: I'll also say 13 clearly articulated principles are easier to apply than two very difficult to understand principles. And so, I think how we write it is as important as how many we write.

KHAN: And I think this, you know, objectivity, subjectivity issue is very important. But I sometimes worry that the type of economics we've been using can actually look objective, that mask a lot of subjective decisions that are actually being made under the surface, and judges also realize that. So, you know, when you have clear bright line rules, clear administrative principles, I think those can more honestly be a basis for telling judges this is what we're doing, this is what the work that we're doing. We're not professing a certain objectivity that's actually masking subjectivity. And, you know, the burden ultimately is going to be on us and our agencies to go to courts, explain how do you apply these guidelines. But I think we have an enormous amount of confidence in the righteousness of that exercise.

KANTER: I think Lina hit the nail on the head. We're listening to the courts, we're listening to what they're saying and what they're asking for. When we bring cases, they're asking for, "What are the legal principles, what's the simplicity, and how are the facts present in this case?" And that's what we're trying to do with the guidelines, is we're trying to map to what courts are saying in their legal opinions, what courts are telling us in trial they're looking for, as opposed to trying to find some theoretical utopia.

BAER: Thank you. Look, I think we're we're running up against our time limit. I did have one question I was going to ask that does that need to be asked because you've answered already, which is, in a situation where you two agencies have overlapping jurisdiction and sometimes, historically, there's been competition among the the leaders about what to do and, you know, how they're two of you getting along. As I said, you've answered that question for this audience here today. No issue there. Before we thank Lina and Jonathan, I did want to acknowledge the hard work of the staff here at Brookings, the governance group. They really put together a wonderful forum, made sure we got massive online signup, were able to welcome a bunch of you here, and I want to thank them. But I do want to thank and ask the audience to join me and thank the two of you for taking the time for speaking English, not antitrust jargon to the audience here and and around the world. You do that in a

wonderful way, which makes the value of antitrust enforcement accessible to those of us who are not the nerds.

   **KANTER:** Bill, you're a national treasure and we're delighted to be with you today.

   **BAER:** All right. Anyway, thanks, folks. Thank you.

THE ROLE OF THE STATE   ANTITRUST AND COMPETITION   NEWS

## Q&A With FTC Chair Lina Khan: "The Word 'Efficiency' Doesn't Appear Anywhere in the Antitrust Statutes"

BY GUY ROLNIK   *June 3, 2022*



FTC Chair Lina Khan sat down with Guy Rolnik to discuss changes in governmental posture toward antitrust enforcement, her goals as head of the FTC and much more.

———————

On June 15th, 2021, Lina Khan, a 32 year-old legal scholar, was sworn in as the chair of the Federal Trade Commission. Her appointment by President Joe Biden came as a complete surprise not only because of her young age, but mostly because she was already well-known in Washington and antitrust circles as part of a movement that wants to uproot and transform the way antitrust is enforced in the US. Antitrust scholar and former FTC Chair William Kovacic wrote last summer that with Khan's appointment—along with those of Jonathan Kanter as Assistant Attorney General for the Antitrust Division at the Department of Justice, and Tim Wu's as Biden's special advisor for technology and competition—the United States now stands at the threshold of a major realignment of the competition policy regime.

In 2017, Khan, still in her last year at Yale Law School, was an invited guest and speaker at the Stigler Center's inaugural antitrust and concentration conference. No one could have predicted at that point that in less than five years, she would return to the conference in 2022 as the keynote speaker and Chairwomen of one of the two most important regulatory agencies in the US.

*Below is an abridged transcript of a conversation Chairwoman Khan had at the 2022 Stigler Center Antitrust conference with Chicago Booth Professor Guy Rolnik.*

[The following interview has been edited and condensed for length and clarity]

**Q: The first time you were here in this room was in March 2017. The title of that inaugural Stigler Conference was "<span style="color:#8B0000">Is There a Concentration Problem in America?</span>" Correct me if I'm wrong, but in DC and in most capitals, this is not a question anymore. But if people would have [asked] me in March 2017, "What are the chances that in 2022 you will be hosting Lina Khan as the chairwoman of the FTC?" my answer would probably be "near zero." Can you explain what happened in the last five years? How did we get this takeover of the Khan, Kanter, and Wu partnership over Washington?**

First of all, let me say it's so great to be back here, and such an honor to be here with you. I don't think you would have been alone in making that wager.

Look, I think it's a remarkable moment. The speed and magnitude of the change that we've seen over the last few years is something that I expect historians to be studying for many, many years to come. There [is] a whole set of factors that I think contributed, but at the end of the day, I think the change is being driven by a deep recognition that something has been awry in how we've been doing antitrust and that how we've been doing antitrust has resulted in, say, a farmer being dependent on a single meat packer and the whims of that meatpacker for their livelihood, or a parent having to ration their child's insulin—those types of problems in our economy are connected to the decisions that are being made at the FTC and the DOJ. I think that the basic connection of the dots is something that we've seen become much more vivid for people.

I'd be remiss if I didn't acknowledge the important role of many people in this room in drawing those connections and showcasing the deep problems in our economy, and connecting them to how we've been doing antitrust. I think this conference, in particular, played an incredibly important role—including back in 2017 because, at that point, the Stigler conference did a couple of things right. One was it said: Let's ask the question and let's look at the evidence; and when we say let's look at the evidence, let's broaden our aperture and move beyond just IO and look at a broader variety of methods from a broader variety of disciplines. Let's look at what the labor economists have been saying, what the macroeconomists have been saying, and what the non-economists have been saying. I think that fresh look at the evidence at that moment in time was incredibly important.

I also think that the Stigler Center as an institution gave credibility and respectability to a set of questions that, even at that moment in time, were not seen as respectable. It's really important for disciplines to be able to have that healthy type of self-reflection, and I think antitrust over the years had kind of settled into a type of "end of history" moment where there was a sense that the deep contestations and the deep debates had kind of settled and

been resolved. And now there were questions, important questions, but they were mostly at the margins.

There were some exceptions to that. [Former FTC chair] Bill Kovacic, even back in 1998, predicted that there would be a swinging back of the pendulum. Overall, there had been a distancing from the more existential questions for the field, and I think Stigler did a lot to refocus and say, "No, these are legitimate, important, credible questions for this field."

I'd also be remiss if I didn't acknowledge the incredibly important role of Congress and lawmakers. Something that we saw coincide with the period of deep retrenchment over the last few decades was Congress becoming more of a backseat player in antitrust, and I think we've seen remarkable work by lawmakers across the political spectrum to deeply study the problems in our economy, to start educating the public about those problems, and to start introducing a remarkable series of bills and proposals.

I think those are some of the factors that contribute. Again, this is something that's going to be continued to be studied for some time.

> "I think this conference, in particular, played an incredibly important role—including back in 2017 because, at that point, the Stigler conference did a couple of things right. One was it said: Let's ask the question and let's look at the evidence."

**Q: In your writing and your research, in law school and Open Markets, you started to develop a theory of what happened to antitrust in the last 30-40 years and why antitrust enforcement had declined. Now that you are almost a year at the helm of the FTC, or down in the trenches really [having] to deliver on those promises, has your perspective on what happened to antitrust changed?**

I think the basic story remains the same: there were a set of policy changes and policy choices that were made that led to significant retrenchment in how we do antitrust, and that contributed to a whole set of harms. On the ground floor, you see a whole set of realities at the institution in terms of the severe mismatch between the job that Congress has given to the agency and the set of resources that it has available. By some metrics, staffing at the agency is lower today than it was back in the 1980s.

I think for a place like the FTC, there's also a way in which the ghost of the 70s can loom large in the building. There's a very standard account that's often given of what happened in the 70s and what to learn from it, and it goes something like, "Here you had this agency, it acted boldly, tried to do a lot, and that triggered an enormous political backlash in ways that led to efforts to defund the agency," and that that's a cautionary tale for us where we really need to be, under the radar, doing our job but not rocking the boat too much. I think it's worth, of

course, learning the lessons from that period. But I think every moment has a different mandate. In the same ways that antitrust enforcers talk about type one versus type two errors and the cost of action and inaction, I think we need to have that conversation at the institutional level as well, where decades of actual under-enforcement has severe institutional costs as well—kind of rebalancing how we do the analysis. Because inaction means that Congress can start seeing you as irrelevant. The public can lose faith in institutions, and that can also lead to certain types of neglect in ways that have deep institutional costs. Rebalancing how we think about the tradeoffs between action and inaction and realizing that there are severe costs under-enforcement and inaction, I think, is something that is something that within the building we're thinking a lot about as well.

**Q: There was a ton of discussion here about what's going to happen with the courts, if courts are going to be a significant barrier to your new agenda. AAG Kanter said that he's not worried as much about losing cases because he's not a member of "the Chickenshit Club." Do you think if you lose multiple cases but still convince the public or maybe legislators that there needs to be a legislative change, you're still winning? Do you subscribe to this?**

I'm certainly not somebody who thinks that success is marked by a 100 percent court record. I think, as public enforcers, we have a special obligation to be bringing the hard cases. I think it's also really important to be having the institutional dialogue among the three branches. If the antitrust agencies look at the market and think that there's a law violation and the current law might make it difficult to reach, there's a huge benefit to still trying, especially with some of the bigger companies, some of the more high-profile cases. Because if you don't try, the message that sends out to the world is that the enforcers don't think there's a problem in the market. Whereas if you try, even if you lose, that then creates the message for Congress to know, "Hey, here are these law enforcers, they recognize there's a problem here, the current law is not adequate for them to reach it, so let's change the law."

I think that type of institutional dialogue among the three branches is incredible. If instead, as enforcers, you think these are really hard cases, we recognize that there's an enormous risk with bringing them, we don't want to make the law worse, and so you just never bring those hard cases, I think there are severe costs to that that can lead to stagnation and stasis.

**Q: You have a very ambitious agenda and limited resources, or even maybe limited time, considering what might happen in politics. So maybe one of the ways to consolidate gains is by creating real deterrence in the market. So how do you determine which [of the] cases that you pick are worth fighting because winning them will send a strong message to the market?**

It's an incredibly important question and one that we've been given a lot of thought to, given the limited resources and given the importance of promoting deterrence. Oftentimes, we're just looking at where is the most harm happening. Oftentimes, that involves some of the biggest companies and the biggest players.

I think one area where we've seen success is in our merger enforcement work, where over the last few months we've seen significant victories, including in the context of vertical mergers. The FTC challenged in the last few months both the Nvidia-Arm merger and the Lockheed-Aerojet merger, both vertical transactions in both instances, the parties ended up abandoning, which is enormously significant if you think about how even a few years back, when the DOJ challenged that AT&T-Time Warner merger, the atmospherics around that was that was quite radical, the antitrust agencies hadn't brought a vertical challenge in many decades. They ended up losing there, but the fact that we've gone from that outcome then to instances in which the FTC's filing a complaint in these vertical challenges [is] leading companies to abandon, I think, shows remarkable progress. I also think the fact that we challenged Lockheed-Aerojet, in particular, sent a very strong message [to] the defense industry, where for years, the approach has instead been to allow the consolidation to happen to accept settlements and remedies that, in hindsight, I don't think have been as strong. So being able to take that type of action ended up sending an important message that we're not going to be settling for weak remedies. There are some deals that are illegal and can't be remedied, and in those instances, they need to be blocked.

> "I think as public enforcers, we have a special obligation to be bringing the hard cases."

Q: Going back to "terrifying rhetoric," you and AAG Kanter believe that it's time to go back to criminal investigation and enforcement. I know this is the DOJ's purview, but probably your attitude towards it will also carry weight. Do you think that agencies should pursue more criminal investigations, maybe even name the names of executives when they are suing companies?

Yes, absolutely. Last fall, we took some steps to strengthen our ability to more regularly and routinely refer criminal cases to the Justice Department. So that's something that we have underway. We also recently had great success in actually naming an individual in one of our antitrust cases: Martin Shkreli. This was a case that was initiated under my predecessor. In the fall, we ended up settling with a whole bunch of defendants but ended up deciding to actually continue to go to trial on the case against Martin Shkreli personally, and we ended up getting a terrific outcome in January, where we ended up getting a lifetime ban on Shkreli from the pharmaceutical industry, as well as a whole set of additional relief. So I think naming individuals is incredibly important. I'd also be remiss if I didn't recognize here the work of former commissioner and now CFPB director Rohit Chopra, who has given an enormous amount of thought to how you deter law-breaking and, in particular, how you craft remedies to deal with recidivism. He gave an incredibly important speech a few weeks ago at Wharton that lays out some additional tactics, and I think that type of worldview is also informing how we're looking at these things.

**Q: You said that Martin Shkreli was banned for life from pharmaceuticals. Do you think that on top of structural remedies, or governance remedies, at some point, we will see agencies, let's say, banning Mark Zuckerberg from going on social networks or limiting his screen time?**

I think the industry ban we were able to secure in the Shkreli case is enormously important and somewhat precedent-setting in the antitrust context. The way I think about remedies, and the traditional way to think about remedies, is that there are at least three goals. The immediate goal is to stop the illegal conduct and to stop the recurrence of that conduct. A second goal is to cure the harm that's occurred through the underlying illegal conduct, the harm both to the market as well as to the victims of that conduct. The third is to really disincentivize further law-breaking.

With each of those prongs, we're thinking about how we can be more effective. On the first—stopping the law-breaking—I think we need to act in a more timely manner. We need to be going into court more quickly; we need to be seeking preliminary injunctions. On the consumer protection side, the FTC, a few weeks ago, filed a lawsuit against TurboTax on the consumer protection side, alleging that TurboTax had been showing all these ads that are allegedly deceptive, and that it was really important to get that relief ahead of Tax Day. I think that type of timely intervention and timely filing of lawsuits is incredibly important.

Thinking about how you actually cure the underlying harm is incredibly important. There's this really terrific quote from Justice Robert Jackson where he says that the goal of antitrust lawsuits must really be to pry open the competitive market that had been closed shut by the illegal conduct. Thinking about how you actually do that prying opening of the market, especially in the context of some of these digital markets, is incredibly important, where you need to make sure that some of the illegal gains that were obtained through the illegal conduct—certain types of data, certain types of scale that were achieved through basically determining that unlawful conduct was worth the cost of business because it might help you tip the market or achieve a greater market share—that those are types of business strategies, incentives that we really need to be studying in order to be able to undo the harm, similar with making sure that the victims of that conduct are fully compensated.

The third prong— thinking about how we should be disincentivizing law breaking to begin with—gets into the category of preventing recidivism, thinking about the structure or relief, the relief with regards to individual executives, governance level changes that are incredibly important as well.

**Q: At this time of polarization, identity politics, and culture wars, how do you convince the average American that FTC and DOJ policies and actions are very important to their lives?**

Yes, it's a great question. And I think in many ways that work has already been done. I think there's already wide recognition that the decisions that are being made in these buildings

have enormous consequences for the way in which people experience power in their lives, whether people do or don't have access to affordable medicines.

We've been doing a few things at the FTC to make sure that we are encouraging and enabling more participation. We've started to do these open monthly meetings, where we have items on the agenda, but we also have a portion of the meeting where people can just sign up and come speak to us, tell us about problems that they're seeing in the marketplace, problems that they think should be on our radar. It's been really terrific to be able to hear regularly from people who are not in Washington, DC, about the types of problems that they're seeing in marketplaces.

We are government officials, we are public servants, we serve the public, and so we need to very actively be listening to the public, learning from the public. I think those types of forums have been really incredibly important. As we do the revision of the merger guidelines, we've also been doing these listening forums where we are inviting market participants who are not the types to be able to hire law firms to write the 100-page submissions to the agencies but really have deep expertise from their own day-to-day experience in these markets, to be able to share with us what they're seeing. A few weeks ago, we did one focused on the healthcare industry, where we heard from physicians who could attest to the effects of private equity roll-ups of physician practices. We heard from nurses, we heard from independent pharmacists, as well as from patient advocates who could share with us their real-world experience, having lived through mergers and acquisitions and the types of harms that those have created.

So I think some of this work is already being done, and people are already realizing how the kind of day to day realities that they're living connect to the decisions being made by antitrust enforcers, but I think there's certainly a lot that the agencies can also be doing to actively encourage and welcome that type of regular public input. It's something that's incredibly important to me, and I think we've already seen some great success in terms of being able to shape our work based on what we're hearing.

Some of the most significant input that we've gotten at our open commission meetings has been from patient advocates, people in particular who come and talk to us about the way in which the price of insulin has surged over the last few years, ways that are leading people to ration their medicine, oftentimes leading to bad health outcomes, even death. We've also heard a lot from independent pharmacists, who have been alleging that the practices of the pharmacy benefit managers are basically squeezing out the pharmacies. So a lot of the input that we received there has basically gone into shaping a study that we hope to be able to do on pharmacy benefit managers, as well as internally how we're thinking about some of our enforcement strategy. So we're really expecting that there's going to be a feedback loop between what we're hearing from people and how that's directly informing our work.

**Q: One of the issues that we discussed a lot today is that maybe there is a tradeoff between efficiency and democracy? If you are a hardcore New Brandeisian, you think the most**

important thing is democracy. If you are more moderate, you think about tradeoffs with efficiency. Where do you stand on that?

The word efficiency doesn't appear anywhere in the antitrust statutes. They're really written to, in the FTC's case, allow the FTC to police unfair methods of competition. Implicit in that prescription is the idea that there are illegitimate forms of competition and legitimate forms of competition, and it's really up to the FTC to be defining what is fair and what is unfair when it comes to competition. It's not that any business practice that increases welfare or increases efficiency is fine. It's really this conception of unfair methods of competition. Embedded within that is a task for the agency to be defining that.

There's a lot of interest right now in having us think about the proliferation of noncompetes in labor contracts. I think we hear a lot of arguments from firms around why those might be efficient in terms of enabling investment, enabling training. I think we've also seen tradeoffs in terms of the type of restrictions that they placed on workers' liberties. I think that's a side where you see some of those arguments made. But I think ultimately, even within the language of the antitrust statutes, as established, we don't see some type of preference given to efficiency over democracy— it's really focused on competition, and in the FTC's case, unfair methods of competition.

> " *"THE WORD EFFICIENCY DOESN'T APPEAR ANYWHERE IN THE ANTITRUST STATUTES."* "

Q: One of the issues we discussed here is the question of bigness per se. I think it was Fiona Scott Morton who said that if we think we have a problem with bigness per se, maybe we should have laws on the book that limit size. Say, once you get to a trillion-dollar market cap, we break you up. So how does the FTC, given the current laws, view, bigness per se? For instance, a very large conglomerate goes out and buys a large operating company. On the face of it, there are no horizontal or vertical issues her, but yet we see a $2-3 trillion company gobbling up more and more companies in other industries. How do you view that?

I mean, I think on the first question, there's no doubt that indicators of concentration, consolidation, size, those can oftentimes be proxies for market power, and where market power exists is where market power can be exploited and used in an unlawful way. Focusing on the areas where we see some of the most significant incumbents and instances in which they've been able to maintain dominant positions over a long period of time, I think that can often be a fruitful area to focus on.

This question of conglomerates is incredibly interesting. There was a really robust discussion and engagement with conglomerates back in the 60s and 70s, where the agencies were thinking about law enforcement theories, what happens when you see this type of

conglomeration, what should antitrust and merger law, in particular, have to say about it. Some of those discussions then fizzled out because I think we saw certain diseconomies of scale that hit, and we saw the dissipation of the traditional industrial conglomerate back in the 60s, 70s, and 80s.

I think what we now see, especially in the digital context, is that those diseconomies of scale don't hit in the same way—they either hit at a much later scale or just, you know, might not come into the picture at all. That really invites us to engage with this conglomerate question. We might not think it's worth calling it conglomerate, maybe some of the dynamics are a little different, but the types of instances where we see individual firms establish positions across markets, across sectors invites scrutiny. One thing that we're trying to do with the revision of the merger guidelines is to determine what should we as enforcers be thinking about when we encounter situations like this because, as of right now, this is a somewhat understudied topic in the context of our new economy.

**Q: Next year, we'll convene here again, and hopefully, you will be here again to answer questions. Can you offer us a metric to assess your success at that point, after two years at the helm of the FTC?**

I think it goes back to what I said earlier: are these agencies really showing the country and showing the public that we're willing to take on the fights that matter, the big fights? Again, that's not always going to translate into universal victories in the courts, but I think it's certainly a commitment, a mandate that we feel. I think these types of windows of opportunity where there's deep public hunger for change create enormous responsibility for us to respond and act, and I think that's going to be an important metric for us.

No related posts.

| TAGS | antitrust and competition | Consumer welfare standard | Digital platforms | FTC | Lina Khan | regulatory capture |
| --- |

Previous article
**Chart of the Week: EU Officials and Economists Disagree Over Sanctioning Russian Natural Gas**

Next article
**DuckDuckGo, Data Collection Innovation, and Right to Repair**

**LATEST NEWS**



US Taxpayers Should Not Be Subsidizing Harmful Big Oil Mergers

Seeing Others

How Well Consumers Know Prices Matters for Tax Policy 

Is Social Science Research Politically Biased? 

Revisiting Milton Friedman 

Market Competition Hurts Firm's ESG Performance 

How Monopolies are Making TV Worse 

What Antitrust Experts Want You to Know About the Amazon Trial 

How China's Anti-Corruption Campaign Impacted Firm Performance 

Zephyr Teachout: The Death of the Consumer Welfare Standard 

No related posts.



ProMarket is dedicated to discussing how competition tends to be subverted by special interests. The posts represent the opinions of their writers, not necessarily those of the University of Chicago, the Booth School of Business, or its faculty. For more information, please visit ProMarket Policy.

  

ABOUT US



MASTHEAD AND CONTACTS

ABOUT THIS PUBLICATION

TERMS AND CONDITIONS

**CATEGORIES**

WHAT WE ARE READING

ANTITRUST AND COMPETITION

NEWS

REGULATORY CAPTURE

COMMENTARY

RESEARCH

CHICAGO BOOTH

Stigler Center
for the Study of the Economy and the State