# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

FEDERAL TRADE COMMISSION,

*Plaintiff*,

v.

U.S. ANESTHESIA PARTNERS, INC., *et al.*,

*Defendants*.

Civil Action No.
4:23-CV-03560

### BRIEF OF THE AMERICAN INVESTMENT COUNCIL AS *AMICUS CURIAE* IN SUPPORT OF WELSH CARSON'S MOTION TO DISMISS

Benjamin Gruenstein (*pro hac vice* pending)
Noah Joshua Phillips (*pro hac vice* pending)
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

Gregg J. Costa
GIBSON, DUNN & CRUTCHER LLP
811 Main Street, Suite 3000
Houston, TX 77002
(346) 718-6600

Counsel for *Amicus Curiae*

Dated:  November 27, 2023

## CORPORATE DISCLOSURE STATEMENT

Counsel for *amicus curiae*, the American Investment Council, certifies that *amicus curiae* has no parent corporation and that no publicly held corporation owns 10% or more of any stock in *amicus curiae*.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ............................................................... ii

TABLE OF AUTHORITIES ...................................................................................... iv

INTEREST OF AMICUS ............................................................................................1

ARGUMENT ..............................................................................................................2

    I.     PRIVATE EQUITY GREATLY BENEFITS THE AMERICAN
          ECONOMY ................................................................................................2

    II.    RECENT FTC ENFORCEMENT EFFORTS CONCERNING PRIVATE
          EQUITY WILL HINDER, NOT PROMOTE, COMPETITION ............................5

    III.   THE CLAIMS AGAINST WELSH CARSON CONFLICT WITH
          FUNDAMENTAL CORPORATE LAW PRINCIPLES AND
          THREATEN COMPETITION ..........................................................................10

CONCLUSION .........................................................................................................16

CERTIFICATE OF SERVICE ...................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172 (E.D.N.Y. 2006) .............................14

*Burnet v. Clark*, 287 U.S. 410 (1932) ..........................................................................................14

*Castleberry v. Branscum*, 721 S.W.2d 270 (Tex. 1986)...............................................................14

*First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983)...........14

*In re Pressure Sensitive Labelstock*, 566 F. Supp. 2d (M.D. Pa. 2008) .......................................13

*Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.*,
   381 U.S. 676 (1965)..................................................................................................................14

*Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301 (S.D.N.Y. 2003) ..............13

*United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080 (1st Cir. 1992) .........................14

*United States v. Bestfoods*, 524 U.S. 51 (1998) ...........................................................................13

*United States v. Jon-T Chem., Inc.*, 768 F.2d 686 (5th Cir. 1985) ...............................................14

*United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022), *dismissed*,
   No. 22-5301, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023) .......................................................9

*Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) ...................................................................13

*Willis v. Donnelly*, 199 S.W.3d 262 (Tex. 2006)..........................................................................14

*Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670 (6th Cir. 1999) .......................................14

**Statutes & Rules**

Section 7 of the Clayton Act............................................................................................................5

Section 8 of the Clayton Act............................................................................................................8

Section 5 of FTC Act ......................................................................................................................8

**Other Authorities**

*Building Competition: How Buy-and-build Helps the American Economy*, Am. Inv.
   Council (Feb. 2023), https://www.investmentcouncil.org/wp-
   content/uploads/2023/02/2022_AIC_BB_report_V3.pdf.............................................................5

iv

Complaint, JAB Consumer Partners SCA SICAR, FTC Docket No. C-4766 (2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/Complaint%20JAB.pdf ................7

Complaint, JAB Consumer Partners SCA SICAR, FTC Docket No. C-4770 (2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/2110174C4770JABEthosComplaint.pdf ..........7

David W. Leebron, *Limited Liability, Tort Victims, and Creditors*, 91 Colum. L. Rev. 1565 (1991) ...................................................................................................................15

Decision and Order, JAB Consumer Partners SCA SICAR, FTC Docket No. C-4766 (2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/Decision%20and%20Order.pdf ......................7

Decision and Order, JAB Consumer Partners SCA SICAR, FTC Docket No. C-4770 (2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/C-4770%20211%200174%20-%20JAB%20Consumer%20Fund-VIPW%20Final%20Order%28NoSig%29.pdf ...........................................................................7

Drew Malone, *A power grab against private equity threatens the US economy*, Financial Times (Sept. 28, 2023)......................................................................................................5

*Economic Contribution of the US Private Equity Sector in 2022*, Am. Inv. Council (Apr. 20, 2023), https://www.investmentcouncil.org/wp-content/uploads/2023/04/EY-AIC-PE-economic-contribution-report-FINAL-04-20-2023.pdf..............................................3, 4, 5

Exec. Order No. 14036, 86 Fed. Reg. 36987 (July 14, 2021).........................................6

Frank H. Easterbrook & Daniel R. Fischer, *Limited Liability and the Corporation*, 90 U. Chi. L. Rev. 89 (1985) ................................................................................................15

FTC's Merger Remedies 2006-2012 (Jan. 2017), https://www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf ................................................................................................................5, 6

Henry Manne, *Our Two Corporation Systems: Law and Economics*, 53 Va. L. Rev. 259 (1969)...........................................................................................................................15

*How Does Private Equity Work?*, Am. Inv. Council, https://www.investmentcouncil.org/private-equity-at-work/ (last visited Nov. 27, 2023) ............................................................................................................................3

Juan A. Arteaga, *DOJ and FTC Push Merger Consent Decree Enforcement to Top of the Agenda*, Global Competition Review (Oct. 25, 2023), https://globalcompetitionreview.com/guide/the-guide-merger-remedies/fifth-edition/article/doj-and-ftc-push-merger-consent-decree-enforcement-top-of-the-agenda ........................................................................................................................6

Lina Khan, *It's Time to Halt Roll-up Schemes That Violate Antitrust Laws*, Financial Times (Sept. 21, 2023), https://www.ft.com/content/93103af9-768a-4545-9166-20389c254edc ..............................................................................................................10

Martha Samuelson et al., *Economic Analysis of Merger Remedies*, Global Competition Review (Oct. 25, 2023), https://globalcompetitionreview.com/guide/the-guide-merger-remedies/fifth-edition/article/economic-analysis-of-merger-remedies ......................6

Matt Reilly et al., *Merger Remedy Divestitures: The Agencies Zig and the Courts Zag*, 37 Antitrust 13 (2023)...........................................................................................................6

Michael Kroin & Ezra Simons, *Industry Voices-Private Equity Investment in Healthcare Is Making a Positive Impact . . . Especially for Doctors*, Fierce Healthcare (Apr. 28, 2023 1:00 PM), https://www.fiercehealthcare.com/finance/industry-voices-private-equity-investment-healthcare-making-positive-impact-especially ...........................16

Press Release, FTC Challenges Private Equity Firm's Scheme to Suppress Competition in Anesthesiology Practices Across Texas (Sept. 21, 2023), https://www.ftc.gov/news-events/news/press-releases/2023/09/ftc-challenges-private-equity-firms-scheme-suppress-competition-anesthesiology-practices-across?utm_source=govdelivery.................10

Priv. Inv. Works, *Time and Again, Private Equity Pays Off for American Pensioners*, Am. Inv. Council (July 25, 2023), https://www.privateinvestmentworks.com/2023/07/25/time-and-again-private-equity-pays-off-for-american-pensioners/...............................................................................4

Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro Bedoya, In the Matter of EQT Corporation, Commission File No. 221-0212 (Aug. 16, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2022.06.13%20-%20Statement%20of%20Chair%20Lina%20M.%20Khan%20Regarding%20NVA-Sage%20-%20new.pdf.................................................................................................8, 9

Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya, In the Matter of JAB Consumer Fund/SAGE Veterinary Partners Commission File No. 2110140 (June 13, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/2022.06.13%20-%20Statement%20of%20Chair%20Lina%20M.%20Khan%20Regarding%20NVA-Sage%20-%20new.pdf.........................................................................................................7

Steven Shavell, *Risk Sharing and Incentives in the Principal-Agent Relationship*, 10 Bell J. Econ. 55 (1979) ...........................................................................................................15

*Top States and Districts in 2022*, Am. Inv. Council, https://www.investmentcouncil.org/wp-content/uploads/2023/03/Top-States-and-Districts-in-2022-Report.pdf (last visited Nov. 27, 2023).........................................................4

U.S. Census Bureau, *Quick Facts: United States*,
    https://www.census.gov/quickfacts/fact/table/US/BZA210221 (last visited
    November 27, 2023) .................................................................................................4

U.S. Dep't of Just., 2020 Merger Remedies Manual,
    https://www.justice.gov/atr/page/file/1312416/download ........................................................6

## INTEREST OF AMICUS

The American Investment Council ("AIC") respectfully submits this brief as *amicus curiae* in support of the motion to dismiss filed by Defendants Welsh, Carson, Anderson & Stowe XI, L.P.; WCAS Associates XI, LLC; Welsh, Carson, Anderson & Stowe XII, L.P.; WCAS Associates XII, LLC; WCAS Management Corporation; WCAS Management, L.P.; and WCAS Management, LLC (collectively, "Welsh Carson").[1]

AIC is an advocacy and research organization dedicated to the promotion of responsible long-term investment by the private equity and credit investors who comprise its membership. Acting on this mission, AIC works to improve access to capital, create jobs, expand retirement security, generate innovation, and support economic growth throughout the United States.  AIC's mission is an important one considering the positive role that private equity and credit investors play in communities across America: supporting millions of jobs, helping thousands of small businesses, and delivering the strongest returns of any investment vehicle for public pensions. Even throughout the global pandemic, private equity advisers continued to deliver superior returns for investors and the pension funds they serve compared to other asset classes.  Texas, in particular, has reaped these benefits of private equity.

AIC has a significant interest in this case, particularly with regard to the claim of the Federal Trade Commission ("FTC") that Welsh Carson, a private equity firm, should be liable under the antitrust laws based solely on its investment in and advice to a portfolio company, and the service of an employee of Welsh Carson as a board member of that company.  AIC takes no position on the allegations against U.S. Anesthesia Partners, Inc. ("USAP"), the defendant whose

---

[1] No party's counsel or other person except *amicus curiae* and its counsel authored this brief or contributed money to fund its preparation or submission.

conduct is central to the allegations in the Complaint.  AIC respectfully presents this brief to provide background on the private equity industry, recent FTC enforcement efforts that concern it, and the harmful consequences of allowing the claims against Welsh Carson to move forward.

## ARGUMENT

Private equity creates high-paying jobs, enhances gross domestic product, and produces above-market returns for investors including pensions, charities, and universities.  Yet recent FTC enforcement efforts involving private equity—with this case being the latest—threaten to deter this investment, which helps power the U.S. and Texas economies.  These efforts do not further the antitrust laws' goal of promoting competition. The FTC seeks to hold Welsh Carson liable under the antitrust laws for the alleged conduct of a company in which it is a minority investor. This novel approach conflicts with legal principles of corporate separateness and limited investor liability that undergird the American economy and are critical to spurring investment.  By raising the specter that private equity firms (and all investors) can be liable for the conduct of a portfolio company based on actions typical of any responsible investor, this suit would chill investment and salutary investor input, making companies weaker and undermining the very competition the FTC is charged to protect.  A decision allowing the claims against Welsh Carson to go forward would threaten legal liability for standard, pro-competitive conduct, and in turn would chill progress, investment, and competition.

## I. PRIVATE EQUITY GREATLY BENEFITS THE AMERICAN ECONOMY

Private equity investment is vital to the U.S. economy.  Private equity firms invest capital from large institutional investors into companies with perceived growth potential (commonly referred to as "portfolio companies"), and then consult with those companies to expand or

turnaround their business.[2]  Many private equity firms invest in more mature businesses with the goal of improving those companies' performance.[3]  Others invest in less mature companies in order to help those companies expand into new industries or new markets; often, that expansion is not possible without outside funding.[4]

The capital from private equity allows companies not only to remain afloat but also to expand their footprint, while the strategic, financial, and operational expertise that private equity firms provide allows companies to improve and transform their operations.  As such, private equity furthers the competition the antitrust laws protect.  For instance, a study of 3,200 private equity companies from 1980 through 2005 showed that private equity-backed companies saw significant increased productivity with near-zero net employment change, as private equity firms were able to help refocus the company on higher-productivity activities.[5]

Private equity firms also help investors, which encompass a wide range of entities including pension funds, university endowments, charitable foundations, and insurance companies.  These investors benefit greatly from the increased returns that private equity generates, typically by "exiting" a portfolio company after three to seven years, selling the private equity firm's interest in the company, and distributing profits to investors.[6]  Studies show that

---

[2] *See How Does Private Equity Work?*, Am. Inv. Council, https://www.investmentcouncil.org/private-equity-at-work/ (last visited Nov. 27, 2023).

[3] *Economic Contribution of the US Private Equity Sector in 2022*, Am. Inv. Council 1-2 (Apr. 20, 2023), https://www.investmentcouncil.org/wp-content/uploads/2023/04/EY-AIC-PE-economic-contribution-report-FINAL-04-20-2023.pdf [hereinafter "2022 Report"].

[4] *Id.* at 2.

[5] *Id.* at 3.

[6] *See id.* at 1-2.

3

private equity consistently yields strong returns for public pension funds and outperforms public markets in the long run.[7]

Given the substantial benefits to private equity-funded companies and private equity investors, it is no surprise that private equity improves the economy more broadly. According to a recent, detailed study of the U.S. private equity sector that Ernst & Young conducted, in 2022 the U.S. private equity sector employed 12 million workers, earning $1 trillion in wages and benefits.[8] The average private equity employee earned $80,000 in wages and benefits, equating to about $41 per hour for a full-time worker—significantly above the national median household income.[9] Private equity investments generated approximately $1.7 trillion of gross domestic product ("GDP").[10]

Private equity plays an especially significant role in Texas. In 2022, the private equity sector employed an estimated 1.1 million people in the State, contributing approximately $93 billion in wages and benefits.[11] More than 600 private equity-backed companies existed in the State, amounting to $82 billion in private equity investment and $161 billion in direct GDP contribution.[12] Those figures do not tell the whole story. Private equity has other important ripple

---

[7] Priv. Inv. Works, *Time and Again, Private Equity Pays Off for American Pensioners*, Am. Inv. Council (July 25, 2023), https://www.privateinvestmentworks.com/2023/07/25/time-and-again-private-equity-pays-off-for-american-pensioners/.

[8] 2022 Report at i, 4, 11.

[9] *Id.* at 4-5, 11; *see* U.S. Census Bureau, *Quick Facts: United States*, https://www.census.gov/quickfacts/fact/table/US/BZA210221 (last visited November 27, 2023) (collecting census information for 2017-2021).

[10] 2022 Report at 4-5, 11.

[11] *Id.* at 11.

[12] *Id.*; *Top States and Districts in 2022*, Am. Inv. Council 5-6, https://www.investmentcouncil.org/wp-content/uploads/2023/03/Top-States-and-Districts-in-2022-Report.pdf (last visited Nov. 27, 2023).

effects on the economy, as private equity-backed companies purchase goods and services from other businesses, thus supporting those businesses and their employees.[13]

Private equity provides these benefits to companies in many industries but fills critical gaps in the healthcare system in particular.  The healthcare industry is cost-intensive.  Private equity helps control healthcare costs and improve quality care for patients.[14]  It also expands access to healthcare, such as by bringing much needed urgent care facilities to rural communities.[15]  These efforts contribute to job growth and greater patient access across the country.

## II.   RECENT FTC ENFORCEMENT EFFORTS CONCERNING PRIVATE EQUITY WILL HINDER, NOT PROMOTE, COMPETITION

Until recently, the federal agencies tasked with enforcing the antitrust laws—the Department of Justice ("DOJ") and the FTC—recognized the important benefits private equity investing has on competition.  For example, in a 2017 study on the efficacy of the agency's merger remedy program (i.e., the remedies the FTC imposes for acquisitions that it finds are likely to substantially lessen competition in violation of Section 7 of the Clayton Act), the FTC highlighted cases in which an outside buyer, like private equity, can be beneficial.[16]  The agency explained that an outside buyer's "flexibility in investment strategy, commitment to the divestiture, and willingness to invest more when necessary were important to the success of the remedy" in certain

---

[13] 2022 Report at 6-8.

[14] See *Building Competition: How Buy-and-build Helps the American Economy*, Am. Inv. Council, 7 (Feb. 2023), https://www.investmentcouncil.org/wp-content/uploads/2023/02/2022_AIC_BB_report_V3.pdf   [hereinafter "*Building Competition*"]; Drew Malone, *A power grab against private equity threatens the US economy*, Financial Times (Sept. 28, 2023), https://www.ft.com/content/79117c1b-7a1f-411a-8472-d41f8539fad7 ("Studies show that private equity-backed hospitals earn better marks on quality—meaning better care for patients.").

[15] *Building Competition* at 8.

[16] FTC's Merger Remedies 2006-2012, § IV.D.2 (Jan. 2017), https://www.ftc.gov/system/files/documents/reports/ftcs-merger-remedies-2006-2012-report-bureaus-competition-economics/p143100_ftc_merger_remedies_2006-2012.pdf.

cases.[17]  The DOJ likewise recognized the positive contribution of private equity.  Agreeing with the FTC, the DOJ's 2020 Merger Remedies Manual stated that "in some cases a private equity purchaser may be preferred" to a strategic buyer.[18]  Although the Manual was withdrawn in April 2022, the DOJ has not provided any replacement yet, and it is still used by companies as merger guidance.[19]

Notwithstanding this prior recognition of the benefits of private equity investing, the FTC has recently begun to target private equity companies with unprecedented legal theories and remedies not applied to transactions involving other kinds of companies.  This new posture is odd for a number of reasons, among them that the President's 2021 Executive Order on Promoting Competition in the American Economy, while outlining over 70 initiatives across the federal government and touching upon myriad topics including data privacy, real estate, agriculture, and prescription drugs, makes no mention of private equity.[20]

---

[17] *Id.*

[18] U.S. Dep't of Just., 2020 Merger Remedies Manual § IV.B (Sept. 2020), https://www.justice.gov/atr/page/file/1312416/download.

[19] Martha Samuelson et al., *Economic Analysis of Merger Remedies*, Global Competition Review, n.4 (Oct. 25, 2023), https://globalcompetitionreview.com/guide/the-guide-merger-remedies/fifth-edition/article/economic-analysis-of-merger-remedies ("The DOJ withdrew its 2020 Merger Remedies Manual in April 2022. Since the DOJ has not provided any replacement yet and this manual is still informative, it is cited throughout this chapter."); Juan A. Arteaga, *DOJ and FTC Push Merger Consent Decree Enforcement to Top of the Agenda*, Global Competition Review (Oct. 25, 2023), https://globalcompetitionreview.com/guide/the-guide-merger-remedies/fifth-edition/article/doj-and-ftc-push-merger-consent-decree-enforcement-top-of-the-agenda ("[T]he principles set forth in the DOJ Merger Remedies Manual still provide helpful guidance for merging parties considering entering into a consent decree with US antitrust enforcers").  The DOJ has not explained why it withdrew the Manual.  *See* Matt Reilly et al., *Merger Remedy Divestitures: The Agencies Zig and the Courts Zag*, 37 Antitrust 13, 15 (2023) ("DOJ did not issue a press release or otherwise explain its decision to withdraw the Manual . . . .  Notwithstanding the lack of explanation, it is hard to interpret this dead-of-night withdrawal of the Merger Remedies Manual—which had been updated only two years before—as anything other than a reflection of DOJ's desire to change its approach to remedies and, perhaps, to avoid having the Manual cited against it in litigation, as occurred in *United States v. UnitedHealth Group Inc. & Change Healthcare, Inc. (UHG/Change)*.").

[20] Exec. Order No. 14036, 86 Fed. Reg. 36987 (July 14, 2021).

Recent enforcement efforts involving private equity firms have adopted remedies and legal theories not applied in other enforcement contexts.  *First*, in June 2022, the FTC blocked a private equity firm, JAB Consumer Partners SCA SICAR, from acquiring two pet care and pet health companies.[21]  The underlying case was a typical antitrust enforcement, with the agency requiring the divestiture of overlapping competitors in local markets for emergency and specialty veterinary services.[22]  But the agency also required JAB to seek prior approval and notice for later acquisitions *outside* the areas where the agency alleged a harm to competition.[23]  The statements of agency leaders tied these requirements to the status of the acquiror as a private equity investor. The FTC Chair wrote:

> Private equity firms' playbook for purchasing or investing in companies can include tactics such as leveraged buyouts, which saddle businesses with debt and shift the burden of financial risk in ways that can undermine long-term health and competitive viability. While private equity firms can support capacity expansion and upgrades, firms that seek to strip and flip assets over a relatively short period of time are focused on increasing margins over the short-term, which can incentivize unfair or deceptive practices and the hollowing out of productive capacity.  Meanwhile, serial acquisitions or "buy-and-buy" tactics can be used by private equity firms and other corporations to roll up sectors, enabling them to accrue market power and reduce incentives to compete, potentially leading to increased prices and degraded quality.[24]

---

[21] Decision and Order, JAB Consumer Partners SCA SICAR, FTC Docket No. C-4766 (2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/Decision%20and%20Order.pdf; Decision and Order, JAB Consumer Partners SCA SICAR, FTC Docket No. C-4770 (2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/C-4770%20211%200174%20-%20JAB%20Consumer%20Fund-VIPW%20Final%20Order%28NoSig%29.pdf.

[22] Complaint ¶ 9, JAB Consumer Partners SCA SICAR, FTC Docket No. C-4766 (2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/Complaint%20JAB.pdf; Complaint ¶ 10, JAB Consumer Partners SCA SICAR, FTC Docket No. C-4770 (2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/2110174C4770 JABEthosComplaint.pdf.

[23] Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro M. Bedoya, In the Matter of JAB Consumer Fund/SAGE Veterinary Partners Commission File No. 2110140 (June 13, 2022), https://www.ftc.gov/system/files/ftc_gov/pdf/2022.06.13%20-%20Statement%20of%20Chair%20Lina%20M.%20Khan%20Regarding%20NVA-Sage%20-%20new.pdf.

[24] *Id.*

But the agency's allegations in the JAB matter did not involve "saddling with debt," "stripping and flipping," or the like.  This unusual remedy, a prior approval requirement going beyond the alleged harm to competition, was apparently related only to this generally negative view of private equity.

*Second*, in August 2023, the FTC announced a settlement with EQT Corporation, the nation's largest natural gas producer, and Quantum Energy Partners, LP, a private equity firm with investments in the oil and gas industry that, according to the FTC, competed with EQT in the Appalachian Basin.[25]  Quantum sought to sell certain assets to EQT as part of a transaction that would have resulted in Quantum being one of EQT's largest shareholders and would have ensured a Quantum designee on EQT's board.[26]  The agency found that this would constitute an illegal interlocking directorate in violation of Section 8 of the Clayton Act.  Additionally, the FTC found this to be an unfair method of competition in violation of Section 5 of FTC Act "due to the potential for exchange of confidential and competitively significant information," a theory of liability never before advanced by the agency.[27]  The FTC Chair wrote that "the dense and tangled web of co-investments, joint operations, and other methods of coordination between and among natural gas producers and investors in the Appalachian Basin" could lead the companies to "exchange non-public sensitive business information and participate in or influence each other's strategic decisions."[28]  But, again, the complaint filed by the agency made no such claim, nor cited any

---

[25] Statement of Chair Lina M. Khan Joined by Commissioner Rebecca Kelly Slaughter and Commissioner Alvaro Bedoya, In the Matter of EQT Corporation, Commission File No. 221-0212 (Aug. 16, 2023), https://www.ftc.gov/system/files/ftc_gov/pdf/2022.06.13%20-%20Statement%20of%20Chair%20Lina%20M.%20 Khan%20Regarding%20NVA-Sage%20-%20new.pdf.

[26] *Id.*

[27] *Id.*

[28] *Id.*

evidence for this theory as applied to the case.  The statement issued by the commissioners focused on private equity:  "[T]he private equity and financial sectors" use "various limited liability vehicles, limited partnerships, and structured funds intricately entangled through a web of corporate and fiduciary relationships."[29]

Because the allegations were not part of the complaints, and these cases were resolved via consent orders, the claims involving the business of private equity have not been fully explored or tested in practice.  There is good reason to think that they would not succeed, as there is nothing to suggest that private equity is inherently harmful to competition.  When a similar argument that private equity investment hinders competition was recently tested, it failed.  *See United States v. UnitedHealth Grp. Inc.*, 630 F. Supp. 3d 118 (D.D.C. 2022), *dismissed*, No. 22-5301, 2023 WL 2717667 (D.C. Cir. Mar. 27, 2023).  In *UnitedHealth Group*, the DOJ's Antitrust Division sought to enjoin UnitedHealth Group's proposed acquisition of Change Healthcare, which included an alleged horizontal overlap in "the sale of first-pass claims editing solutions in the United States."  *Id.* at 123, 131.  The DOJ claimed that the companies' plan to divest certain businesses to TPG Capital, a private equity firm, as part of the merger would not restore competition because "private equity firms can have . . . incentives or commitments to innovation [that] are not always aligned with those of the strategic buyers."  *Id.* at 136.  After trial, the district court rejected this argument, finding that "TPG's incentives are geared toward preserving, and even improving, [the acquired business's] competitive edge" and that the additional investment from the private equity firm could result in more innovation.  *Id.*  The district court found that, based on the evidence, "TPG is well-positioned to maintain, and perhaps even improve upon, [the divested company's] performance in the [relevant] market."  *Id.* at 137.

---

[29] *Id.*

9

Private equity investors have the same obligations as any market actors to abide by the antitrust laws, but they are entitled to the equal application of those laws.  Enforcement of those laws should be aimed at supporting competition, not at generalized and unfounded concerns about a business model.  While it is not, of course, the role of courts to adjust a government agency's enforcement priorities, when those priorities are enforced through lawsuits based on novel liability theories without a sound basis—as is the case here, as shown in the next section—courts should not allow such cases to proceed.

III.   THE CLAIMS AGAINST WELSH CARSON CONFLICT WITH FUNDAMENTAL CORPORATE LAW PRINCIPLES AND THREATEN COMPETITION

This latest FTC action makes claims against a private equity firm that are not grounded in antitrust law.  The conduct described in the Complaint is almost all undertaken by USAP, and the allegations against Welsh Carson are transparently thin. The rhetoric it —"[f]rom its Park Avenue offices" (Compl. ¶ 2)—and the agency's accompanying press release—"raking in tens of millions of extra dollars for these executives"[30]—use suggest that the novel inclusion of Welsh Carson as a defendant is related to its status as a private equity firm.

Targeting an investor without allegations of wrongdoing is not without cost, and not just to Welsh Carson, as the FTC's pursuit of Welsh Carson conflicts with established legal principles that undergird the U.S. economy.  According to these principles, investors remain distinct from the companies in which they invest and are not liable for the debts of those companies or for any alleged wrongdoing of those companies.  Given the dearth of allegations that Welsh Carson itself engaged in any anticompetitive conduct, there is no basis to allow the unprecedented claims against

---

[30] Press Release, FTC Challenges Private Equity Firm's Scheme to Suppress Competition in Anesthesiology Practices Across Texas (Sept. 21, 2023),   https://www.ftc.gov/news-events/news/press-releases/2023/09/ftc-challenges-private-equity-firms-scheme-suppress-competition-anesthesiology-practices-across?utm_source=gov delivery; *see also* Lina Khan, *It's Time to Halt Roll-up Schemes That Violate Antitrust Laws*, Financial Times (Sept. 21, 2023), https://www.ft.com/content/93103af9-768a-4545-9166-20389c254edc.

it to move forward.  Doing so would have negative ripple effects on investment, growth, and competition.

The FTC alleges that Welsh Carson and USAP executed a consolidated strategy through a series of allegedly illegal tactics:  a "roll-up" strategy that merged competing firms, price-setting agreements, and a market allocation arrangement.  But it is well settled that for liability to attach under the antitrust laws, an investor must be directly liable or otherwise liable as an agent, alter ego, or conspirator of the primary violator.  The Complaint's allegations against Welsh Carson on each count are conclusory, based exclusively on conduct allegedly committed by USAP.  There is no allegation of any independent actions by Welsh Carson that amount to anticompetitive activity; and the Welsh Carson conduct with which the FTC does take issue is simply that of a typical investor that cannot support any theory of liability.

Specifically, the Complaint alleges that "USAP and Welsh Carson engaged in what they referred to as a 'roll-up,' buying nearly every large anesthesia practice in Texas."  (Compl. ¶ 4.) However, when describing every acquisition that was a part of this "scheme," the FTC only points to USAP.  Some examples of the USAP-focused allegations that do not mention any Welsh Carson conduct include:

- "As the next step in its roll-up scheme, between 2014 and 2020, **USAP** acquired three of the largest remaining independent anesthesia groups in Houston." (*See id.* ¶ 102 (emphasis added).)

- "**USAP's** roll-up strategy was not confined to Houston. Between 2014 and 2016, USAP spent over [*redacted*] to acquire at least seven practices in Dallas." (*See id.* ¶ 120 (emphasis added).)

- "[F]rom 2016 to 2019, **USAP** acquired four groups—one each in Tyler, Austin, Amarillo, and San Antonio." (*See id.* ¶ 156 (emphasis added).)

The allegations of USAP's "other anticompetitive conduct," namely the alleged price-setting arrangements and market allocation agreement, likewise do not involve Welsh Carson.  For

11

these allegations, the Complaint again only describes USAP's alleged anticompetitive actions. The FTC claims that USAP "supported its 'roll-up' strategy by entering or maintaining price-setting arrangements with other, independent anesthesia groups that shared key hospitals in Houston and Dallas." (*Id.* ¶ 6.) The Complaint does not allege that Welsh Carson entered into or maintained these arrangements. Lastly, the Complaint alleges that "USAP and Welsh Carson entered a market allocation with another large anesthesia services provider." (*Id.* ¶ 7.) But the market allocation agreement was alleged to have been executed and maintained by USAP. And the alleged anticompetitive consequences flowing from such an agreement only related to USAP. (*Id.* ¶ 327 ("USAP has also neutralized competition through its market allocation agreement with [*redacted*].").)

By contrast, the Complaint's description of Welsh Carson's role in this "anticompetitive scheme" is brief; and, as a result, the agency's theory of liability is unclear. The Complaint alleges that Welsh Carson "hatche[d]" the consolidation strategy, "execute[d]" the strategy by creating USAP and acquiring Greater Houston Anesthesiology, and, with USAP, "develop[ed] a plan to roll up independent anesthesia practices and raise prices." (*Id.* § IV.) The FTC further alleges that Welsh Carson "controlled, directed, dictated, or encouraged USAP's conduct" (*see, e.g., id.* ¶ 345), primarily based on Welsh Carson's alleged role in directing USAP's "corporate strategy and decision-making" (*id.* ¶ 35), ability to appoint board members (*id.* ¶¶ 36-38), hire managers (*id.* ¶ 33), and supervise and assist company management (*id.*)—all notwithstanding its less than 50% interest in USAP (*id.* ¶ 35). But the Complaint does not explain how this conduct, which is standard fare for many investors, could create antitrust liability for Welsh Carson.

Welsh Carson created USAP to be a separate legal entity. Welsh Carson did not operate in the relevant market. (*See id.* ¶ 61 ("The relevant service market to assess the challenged conduct

is the market for hospital-only anesthesia services sold to commercial insurers and their insured members.").)  Welsh Carson is not the parent of USAP, but rather an investor, and a minority one at that.  The Complaint does not allege any independent anticompetitive conduct by Welsh Carson.  Nor does it allege any commingling of the entities' separate operations, finances, reporting, or corporate formalities.   And it certainly does not allege that Welsh Carson "st[ood] as the decisionmaking entity behind" USAP, "calling the shots on its daily decisions."  *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 323-25 (S.D.N.Y. 2003); *see also In re Pressure Sensitive Labelstock*, 566 F. Supp. 2d at 376 (M.D. Pa. 2008).

The FTC seeks instead to hang its hat on Welsh Carson's placement of representatives on the USAP board of directors as evidence of direct control.  The Supreme Court has rejected this as a basis for liability.  *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998) ("Thus it is hornbook law that the exercise of the control which stock ownership gives to the stockholders . . . will not create liability beyond the assets of the subsidiary.  That 'control' includes the election of directors, the making of by-laws . . . and the doing of all other acts incident to the legal status of stockholders.  Nor will a duplication of some or all of the directors or executive officers be fatal." (citation omitted)).   Moreover, the Complaint offers no basis to conclude that placing representatives on the USAP board in fact gave Welsh Carson legal control over USAP.  Nor does the FTC allege facts to support the notion that conduct by those directors is properly attributable to Welsh Carson, as opposed to USAP, to which they owe a fiduciary duty.[31]  It is routine practice for private equity investors to offer business and financial expertise by appointing directors to

---

[31] Under fundamental principles of corporate law, when Welsh Carson representatives were acting as USAP directors owing fiduciary duties to USAP, they were acting on behalf of USAP.  *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del. 1983) (emphasizing that, under Delaware law, designated directors owe the company on whose board they sit "uncompromising" fiduciary duties, and "[t]here is no dilution of this obligation where one holds dual or multiple directorships").

corporate boards.  Such involvement is typical of investor relationships and does not impute to Welsh Carson culpability for USAP's conduct.

Allowing this case to proceed against Welsh Carson for its investment in, advice to, and board representation with respect to USAP would conflict with bedrock legal principles.  The creation of a corporation establishes a new entity that is legally separate from its investors. *Burnet v. Clark*, 287 U.S. 410, 415 (1932); *see First Nat. City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611, 625 (1983) ("Separate legal personality has been described as 'an almost indispensable aspect of the public corporation.'").  Shareholder limited liability is "a fundamental principle of corporate law" according to which shareholders remain distinct entities from those companies in which they invest, and as such do not take on liability for the companies' debts or misdeeds.  *Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670 (6th Cir. 1999); *see also United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1091 (1st Cir. 1992) ("The principle of limited liability is a pillar of corporate law."); *Willis v. Donnelly*, 199 S.W.3d 262, 271 (Tex. 2006) ("A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations."); *Castleberry v. Branscum*, 721 S.W.2d 270, 271 (Tex. 1986) ("The corporate form normally insulates shareholders, officers, and directors from liability for corporate obligations. . . ."); *see also United States v. Jon-T Chem., Inc.*, 768 F.2d 686, 691 (5th Cir. 1985) ("Limited liability remains the norm in American corporation law.").  Accordingly, the ownership by a shareholder or parent company of an interest in a corporation that violates antitrust laws simply does not, on its own, impose antitrust liability on the shareholder or parent company.  *See Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.*, 381 U.S. 676, 734 (1965); *Arnold Chevrolet LLC v. Tribune Co.*, 418 F. Supp. 2d 172, 177-78 (E.D.N.Y.

2006) (dismissing antitrust claims against parent company for failing to delineate parent's role in any alleged anticompetitive conduct).

This protection from liability fuels innovation and progress. It promotes shareholder engagement, as shareholders can invest in companies without fear of losing more than their investment. Corporate and securities law encourage investor engagement as a mechanism to address the "principal-agent" problem, which arises when the agent (management) fails to act in the best interests of the principal (shareholders). *See* Steven Shavell, *Risk Sharing and Incentives in the Principal-Agent Relationship*, 10 Bell J. Econ. 55, 65 (1979); Frank H. Easterbrook & Daniel R. Fischer, *Limited Liability and the Corporation*, 90 U. Chi. L. Rev. 89, 90 (1985); *see also* Henry Manne, *Our Two Corporation Systems: Law and Economics*, 53 Va. L. Rev. 259 (1969) ("If investors could be required to supply unlimited amounts of additional capital, wealthy people would be reluctant to make small investments. Every share of stock would place all their assets at risk. To guard against this risk, the investor would reduce the number of different firms he holds and monitor each more closely.").

Creating the risk of personal liability for investors, especially based on conduct that is not readily distinguishable from typical investor conduct, threatens active investment, which is a central feature of private equity. Most immediately, overriding longstanding investor protections from liability disincentivizes the pro-competitive shareholder engagement discussed above. *See, e.g.*, David W. Leebron, *Limited Liability, Tort Victims, and Creditors*, 91 Colum. L. Rev. 1565, 1611 (1991) (positing that unlimited liability against shareholders would lead to high transaction costs that "would in almost every case be so high that it would not be worth it" and that the

"uncertain application of the rule would create substantial uncertainty").  That will, in turn, chill investment, including in sectors like healthcare that are most in need.[32]

Because these principles of corporate law create certainty for investors, just opening the door to costly litigation will deter investment and engagement.  When there is no liability as a matter of law, nor any serious allegation of independent conduct or reason to pierce the corporate veil, the case against an investor should be dismissed and the investor should not be required to incur unnecessary legal fees.  That is precisely the case here.

The Complaint's inclusion of Welsh Carson as a defendant is based on sparse and conclusory allegations; and its rhetoric and novel legal pleading suggest that Welsh Carson has been included because it is a private equity firm.  Allowing the claims against Welsh Carson to go forward will contravene fundamental legal principles that promote investment in the U.S. economy.  It will further increase legal uncertainty for investors generally, including in private equity, as it will expose them to the prospect of litigation based exclusively on the conduct of the companies in which they have invested.

## CONCLUSION

For these reasons, along with those presented by Welsh Carson, the Court should grant Welsh Carson's motion to dismiss.

---

[32] *See* Michael Kroin & Ezra Simons, *Industry Voices—Private Equity Investment in Healthcare Is Making a Positive Impact . . . Especially for Doctors*, Fierce Healthcare (Apr. 28, 2023 1:00 PM), https://www.fiercehealthcare .com/finance/industry-voices-private-equity-investment-healthcare-making-positive-impact-especially.

November 27, 2023                              Respectfully submitted,


                                               */s/ Benjamin Gruenstein*
                                               **CRAVATH, SWAINE & MOORE LLP**
                                               Benjamin Gruenstein (*pro hac vice* pending)
                                               Noah Joshua Phillips (*pro hac vice* pending)
                                               Worldwide Plaza
                                               825 Eighth Avenue
                                               New York, NY 10019
                                               (212) 474-1000
                                               bgruenstein@cravath.com
                                               nphillips@cravath.com

                                               **GIBSON, DUNN & CRUTCHER LLP**
                                               Gregg J. Costa
                                               811 Main Street, Suite 3000
                                               Houston, TX 77002
                                               (346) 718-6600
                                               gcosta@gibsondunn.com

                                               Counsel for *Amicus Curiae*

17

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Texas by using the court's CM/ECF system on November 27, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the court's CM/ECF system.

November 27, 2023                                        Respectfully submitted,

                                        _/s/ Benjamin Gruenstein_
                                        **CRAVATH, SWAINE & MOORE LLP**
                                        Benjamin Gruenstein (_pro hac vice_ pending)
                                        Noah Joshua Phillips (_pro hac vice_ pending)
                                        Worldwide Plaza
                                        825 Eighth Avenue
                                        New York, NY 10019
                                        (212) 474-1000
                                        bgruenstein@cravath.com
                                        nphillips@cravath.com

                                        **GIBSON, DUNN & CRUTCHER LLP**
                                        Gregg J. Costa
                                        811 Main Street, Suite 3000
                                        Houston, TX 77002
                                        (346) 718-6600
                                        gcosta@gibsondunn.com

                                        Counsel for _Amicus Curiae_

18