**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,** | |
| **Plaintiff,** | **Case No.: 4:23-CV-03560-KH** |
| **v.** | |
| **U.S. ANESTHESIA PARTNERS, INC., et al.,** | |
| **Defendants.** | |

**Plaintiff Federal Trade Commission's Opposition to
U.S. Anesthesia Partners, Inc.'s Motion to Dismiss**

## Table of Contents

Summary of Argument ................................................................................................ 1

Nature and Stage of Proceedings .............................................................................. 2

Issues to be Decided by the Court ............................................................................. 3

Factual Background .................................................................................................... 3

Standard of Review .................................................................................................... 6

Argument .................................................................................................................... 7

I.     The FTC's Claims Are Properly in Federal Court ............................................. 7

     A.     Section 13(b) authorizes the FTC to seek a permanent injunction without filing an administrative proceeding ................................................ 8

          1.     The plain text of Section 13(b) permits the FTC to enforce the antitrust laws in federal court .................................................................. 9

          2.     Traditional tools of statutory interpretation confirm that a parallel administrative proceeding is not required ...................................... 12

     B.     The complaint plausibly alleges reason to believe USAP is violating or "about to violate" the law ........................................................................ 14

          1.     The complaint alleges ongoing violations .................................... 15

          2.     The complaint alleges a reasonable likelihood of future violations .............. 17

II.     The Complaint States Valid Antitrust Claims ................................................ 20

     A.     The complaint states claims for monopolization ................................. 20

          1.     The complaint plausibly alleges that USAP possesses monopoly power ....... 21

          2.     The complaint plausibly alleges anticompetitive conduct ............................. 27

          3.     The complaint plausibly alleges a conspiracy to monopolize ...................... 29

     B.     The complaint states claims under Section 7 of the Clayton Act ......................... 29

     C.     The complaint states a claim against USAP's price-setting arrangements .......... 31

     D.     The complaint states a "standalone" Section 5 claim broader than its Sherman or Clayton Act claims .................................................................. 34

Conclusion ................................................................................................................ 35

## Table of Authorities

<u>Cases</u>

*Abbott v. BP Expl. & Prod. Inc.*,
    781 F. Supp. 2d 453 (S.D. Tex. 2011) .................................................................................. 7

*ADT, L.L.C. v. Richmond*,
    18 F.4th 149 (5th Cir. 2021) ............................................................................................... 13

*Alaska v. United States*,
    545 U.S. 75 (2005) ............................................................................................................... 11

*AMG Cap. Mgmt., LLC v. FTC*,
    593 U.S. 67 (2021) ........................................................................................................ passim

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002) ........................................................................................ 21, 22

*Assoc. Radio Serv. Co. v. Page Airways, Inc.*,
    624 F.2d 1342 (5th Cir. 1980) ........................................................................................... 27

*Atl. Refin. Co. v. FTC*,
    381 U.S. 357 (1965) ........................................................................................................... 34

*BBL, Inc. v. City of Angola*,
    809 F.3d 317 (7th Cir. 2015) ............................................................................................. 17

*Behrend v. Comcast Corp.*,
    No. 03-cv-6604, 2012 WL 1231794 (E.D. Pa. Apr. 12, 2012) ........................................... 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ............................................................................................................. 7

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,
    176 F. Supp. 3d 606 (W.D. La. 2016) ......................................................................... 27, 28

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*,
    49 F.4th 520 (5th Cir. 2022) .................................................................................. 24, 31, 32

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ...................................................................................................... 29, 30

*Catalano, Inc. v. Target Sales, Inc.*,
    446 U.S. 643 (1980) ........................................................................................................... 32

*Chi. Bridge & Iron Co. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) ........................................................................................ 30, 31

*Citizen Publ'g Co. v. United States*,
    394 U.S. 131 (1969) ........................................................................................................... 33

*Clean Water Opportunities, Inc. v. Williamette Valley Co.*,
   759 F. App'x 244 (5th Cir. 2019) ....................................................... 28

*Colony Ins. Co. v. Peachtree Constr., Ltd.*,
   647 F.3d 248 (5th Cir. 2011) .............................................................. 6

*Constr. Cost Data, LLC v. Gordian Grp., Inc.*,
   No. CV H-16-114, 2017 WL 2266993 (S.D. Tex. Apr. 24, 2017) ................................. 21, 23

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962) ......................................................................... 17

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984) ......................................................................... 29

*Credit Bureau Reps., Inc. v. Retail Credit Co.*,
   358 F. Supp. 780 (S.D. Tex. 1971) ........................................................ 30

*David B. Turner Builders LLC v. Weyerhaeuser Co.*,
   603 F. Supp. 3d 459 (S.D. Miss. 2022) ................................................... 29

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*,
   No. 01-CIV-2669 (WHP), 2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002) ........................ 28

*E.I. du Pont de Nemours & Co. v. FTC*,
   729 F.2d 128 (2d Cir. 1984) ............................................................... 34

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992) ......................................................................... 20

*Eastman v. Quest Diagnostics, Inc.*,
   No. 15-cv-00415-WHO, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016) ......................... 28

*Epic Games, Inc. v. Apple, Inc.*,
   67 F.4th 946 (9th Cir. 2023) .............................................................. 27

*FTC v. AdvoCare Int'l, LP*,
   No. 4:19-CV-715-SDJ, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) ....................... 18, 19

*FTC v. Am. Future Sys., Inc.*,
   No. 20-cv-2266, 2021 WL 3185777 (E.D. Pa. July 26, 2021) ........................... 9, 10

*FTC v. Brown Shoe Co.*,
   384 U.S. 316 (1966) ......................................................................... 34

*FTC v. Commonwealth Mktg. Grp., Inc.*,
   72 F. Supp. 2d 530 (W.D. Pa. 1999) ...................................................... 9

*FTC v. Credit Bureau Ctr., LLC*,
   937 F.3d 764 (7th Cir. 2019) .............................................................. 19

*FTC v. Educare Ctr. Servs., Inc.*,
  433 F. Supp. 3d 1008 (W.D. Tex. 2020) ...................................................................... passim

*FTC v. Evans Prods. Co.*,
  775 F.2d 1084 (9th Cir. 1985) ........................................................................... 13, 19

*FTC v. Facebook, Inc.*,
  581 F. Supp. 3d 34 (D.D.C. 2022) ........................................................ 17, 21, 25, 28

*FTC v. Facebook, Inc.*,
  560 F. Supp. 3d 1 (D.D.C. 2021) ...................................................................... 16

*FTC v. H.J. Heinz Co.*,
  246 F.3d 708 (D.C. Cir. 2001) ........................................................................... 8

*FTC v. H.N. Singer*,
  668 F.2d 1107 (9th Cir. 1982) ...................................................................... 9, 12

*FTC v. Hackensack Meridian Health, Inc.*,
  No. 20-cv-18140, 2021 WL 4145062 (D.N.J. Aug. 4, 2021) .............................. 31

*FTC v. Ind. Fed'n of Dentists*,
  476 U.S. 447 (1986) ...................................................................... 2, 7, 22, 34

*FTC v. Nat'l Urological Grp., Inc.*,
  80 F.4th 1236 (11th Cir. 2023) ...................................................................... 10

*FTC v. Neora LLC*,
  552 F. Supp. 3d 628 (N.D. Tex. 2021) ...................................................... passim

*FTC v. Proctor & Gamble Co.*,
  386 U.S. 568 (1967) ...................................................................................... 31

*FTC v. ProMedica Health Sys., Inc.*,
  No. 3:11-CV-47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ...................... 24

*FTC v. Pukke*,
  53 F.4th 80 (4th Cir. 2022) ...................................................................... 10

*FTC v. Roomster Corp.*,
  654 F. Supp. 3d 244 (S.D.N.Y. 2023) ...................................................... 20

*FTC v. Shire ViroPharma, Inc.*,
  917 F.3d 147 (3d Cir. 2019) ...................................................................... 19, 20

*FTC v. Staples, Inc.*,
  970 F. Supp. 1066 (D.D.C. 1997) ...................................................................... 23

*FTC v. SuperTherm Inc.*,
  No. CV-20-08190-PCT-DWL, 2021 WL 3419035 (D. Ariz. Aug. 5, 2021) .......... 10

iv

*FTC v. Surescripts, LLC,*
    424 F. Supp. 3d 92 (D.D.C. 2020) .................................................................... 13

*FTC v. Surescripts, LLC,*
    No. CV 19-1080 (JDB), 2023 WL 2707866 (D.D.C. Mar. 30, 2023) .................................. 25

*FTC v. Sw. Sunsites, Inc.,*
    665 F.2d 711 (5th Cir. 1982) ................................................................... 12, 14

*FTC v. Texaco, Inc.,*
    393 U.S. 223 (1968) ................................................................................ 34

*FTC v. U.S. Oil & Gas Corp.,*
    748 F.2d 1431 (11th Cir. 1984) ..................................................................... 9

*FTC v. Vyera Pharms., LLC,*
    479 F. Supp. 3d 31 (S.D.N.Y. 2020) ........................................................... 16, 17

*FTC v. Walmart Inc.,*
    No. 22-cv-3372, 2023 WL 2646741 (N.D. Ill. Mar. 27, 2023) ................................... 17, 20

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.,*
    386 F.3d 485 (2d Cir. 2004) ...................................................................... 22

*Heatransfer Corp. v. Volkswagenwerk, A. G.,*
    553 F.2d 964 (5th Cir. 1977) ..................................................................... 23

*Hornsby Oil Co. v. Champion Spark Plug Co.,*
    714 F.2d 1384 (5th Cir. 1983) .................................................................... 23

*Illumina, Inc. v. FTC,*
    88 F.4th 1036 (5th Cir. 2023) .................................................................... 14

*In re AndroGel Antitrust Litig. (No. II),*
    No. 1:09-MD-2084-TWT, 2018 WL 2984873 (N.D. Ga. June 14, 2018) ............................... 32

*In re Mun. Bond Reporting Antitrust Litig.,*
    672 F.2d 436 (5th Cir. 1982) ..................................................................... 23

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.,*
    940 F. Supp. 2d 367 (E.D. La. 2013) ......................................................... 22, 25

*Jones v. Cain,*
    600 F.3d 527 (5th Cir. 2010) ..................................................................... 13

*Kaplan v. Burroughs Corp.,*
    611 F.2d 286 (9th Cir. 1979) ..................................................................... 23

*LePage's Inc. v. 3M,*
    324 F.3d 141 (3d Cir. 2003) ...................................................................... 27

*N. Tex. Specialty Physicians v. FTC*,
  528 F.3d 346 (5th Cir. 2008) ........................................................................... 33

*Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*,
  20 F.4th 466 (9th Cir. 2021) ........................................................................... 23

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*,
  9 F.4th 247 (5th Cir. 2021) ............................................................................... 7

*ProMedica Health Sys., Inc. v. FTC*,
  749 F.3d 559 (6th Cir. 2014) ........................................................................... 31

*Republic of Iraq v. Beaty*,
  556 U.S. 848 (2009) ......................................................................................... 11

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
  471 F. Supp. 3d 981 (N.D. Cal. 2020) ............................................................ 16

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ........................................................................ 23

*Spitzer v. Saint Francis Hosp.*,
  94 F. Supp. 2d 399 (S.D.N.Y. 2000) ............................................................... 32

*Standard Oil Co. v. United States*,
  221 U.S. 1 (1911) ............................................................................................ 28

*Taylor Publ'g Co. v. Jostens, Inc.*,
  216 F.3d 465 (5th Cir. 2000) ........................................................................... 28

*Times-Picayune Pub. Co. v. United States*,
  345 U.S. 594 (1953) ......................................................................................... 23

*United States v. E. I du Pont de Nemours & Co.*,
  353 U.S. 586 (1957) ................................................................................... 16, 31

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956) ......................................................................................... 21

*United States v. Grinnell Corp.*,
  384 U.S. 563 (1966) ............................................................................. 21, 25, 27

*United States v. Healthco, Inc.*,
  387 F. Supp. 258 (S.D.N.Y.) ........................................................................... 30

*United States v. ITT Cont'l Baking Co.*,
  420 U.S. 223 (1975) ......................................................................................... 16

*United States v. Jerrold Elecs. Corp.*,
  187 F. Supp. 545 (E.D. Pa. 1960) ................................................................... 30

vi

*United States v. Jindal*,
   No. 4:20-CR-00358, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) ................................... 32

*United States v. JS & A Grp., Inc.*,
   716 F.2d 451 (7th Cir. 1983) ....................................................................... 8, 9, 13

*United States v. Microsoft Corp.*,
   253 F.3d 34 (D.C. Cir. 2001) ................................................................... 25, 27, 28

*United States v. Morrow*,
   266 U.S. 531 (1925) ................................................................................... 11

*United States v. Nat'l Dynamics Corp.*,
   525 F. Supp. 380 (S.D.N.Y. 1981) ........................................................... 10, 12

*United States v. Phila. Nat'l Bank*,
   374 U.S. 321 (1963) ................................................................................... 30

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ................................................................................... 33

*Va. Excelsior Mills, Inc. v. FTC*,
   256 F.2d 538 (4th Cir. 1958) ..................................................................... 33

*Wampler v. Sw. Bell Tel. Co.*,
   597 F.3d 741 (5th Cir. 2010) ..................................................................... 22

*Warren v. New Orleans Police Dep't*,
   No. 92-cv-2037, 1992 WL 245655 (E.D. La. Sept. 11, 1992) ............................ 13

*Z Techs. Corp. v. Lubrizol Corp.*,
   753 F.3d 594 (6th Cir. 2014) ..................................................................... 16

**Statutes**

15 U.S.C. § 1 .......................................................................................... 2, 32

15 U.S.C. § 18 ......................................................................................... 2, 30

15 U.S.C. § 2 .............................................................................................. 21

15 U.S.C. § 45(a) ......................................................................................... 7

15 U.S.C. § 53(b) .................................................................................. 1, 8, 14

**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2023) ........................... 28, 29

S. Rep. 93-151 (1973) ................................................................................. 13

U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* (Aug. 19, 2010) ........................... 31

U.S. Dep't of Justice & FTC, *Merger Guidelines* (Dec. 18, 2023) ......................................... 30, 31

**<u>Rules</u>**

Fed. R. Civ. P. 18 ................................................................................................................... 18

## SUMMARY OF ARGUMENT

This case challenges a decade-long consolidation scheme by U.S. Anesthesia Partners to eliminate competition, raise prices, and line its own pockets and those of its private equity sponsor, Welsh Carson. Since its founding in 2012, USAP has acquired fifteen of the largest anesthesia practices in Texas. In addition to buying out many of its biggest competitors, USAP has entered into agreements with other rivals to charge the same rates as USAP or stay away from part of USAP's territory. As a result of this anticompetitive scheme, USAP has acquired a dominant position in Texas and many of its largest cities, including Houston, Dallas, and Austin. In the words of one customer, USAP has used its dominance to "peanut butter spread" high prices across the state. For USAP, this has been extraordinarily profitable. As one executive succinctly put it: "Cha-ching!" But for Texas employers and patients, the scheme is costly, resulting in tens of millions of dollars more *per year* for anesthesia services.

In its motion to dismiss, USAP ignores the complaint allegations and asks the Court to dismiss on procedural grounds. USAP first argues that Section 13(b) of the FTC Act (15 U.S.C. § 53(b))—the statutory provision that authorizes this lawsuit—requires the FTC to file a complaint in its administrative court. USAP's reading of Section 13(b), however, is contradicted by the statute's plain text and has been rejected by every court to consider it. USAP also contends that this suit does not satisfy Section 13(b)'s threshold requirement that a defendant "is violating . . . or is about to violate" the law. But the complaint plausibly alleges that USAP "is violating" the law because its anticompetitive scheme is ongoing, and that USAP is "about to" engage in violations under the well-established Fifth Circuit standard.

USAP's motion also raises a laundry list of other erroneous challenges to the FTC's claims. First, USAP says that neither its nearly 70% market share in Dallas and Houston nor its demonstrated ability to price above the competitive level is sufficient to establish that it had

monopoly power. But these arguments mistake the governing law and improperly raise factual assertions that are not appropriate to resolve on a motion to dismiss. And contrary to USAP's further contention, it is well established that obtaining or maintaining monopoly power in the way USAP did—by acquiring and conspiring with competitors—is unlawful.

Second, USAP asserts that the FTC's challenges to USAP's acquisitions under Section 7 of the Clayton Act, 15 U.S.C. § 18, do not establish the necessary anticompetitive effect. But USAP's acquisitions—whether examined as a series or individually—easily meet the Section 7 standard. They raised USAP's market share to presumptively unlawful levels, increased prices, otherwise harmed competition and consumers, and brought USAP measurably closer to the monopoly power it now possesses.

Third, USAP attacks the FTC's claim challenging its price-setting arrangements as a violation arising under Section 1 of the Sherman Act, 15 U.S.C. § 1, on the basis that there are no "agreements" between it and its competitors. But these arrangements—akin to per se unlawful price fixing—are *expressly* memorialized in signed, written contracts. This satisfies Section 1.

Finally, USAP contends that the FTC's standalone claims under Section 5 of the FTC Act are merely derivative of claims invoking the Clayton and Sherman Acts. But the FTC Act bars "not only practices that violate the Sherman Act and the other antitrust laws, [] but also practices that the Commission determines are against public policy for other reasons." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986). USAP's conduct falls squarely within this prohibition.

The Court should deny USAP's motion.

## NATURE AND STAGE OF PROCEEDINGS

The FTC filed its Complaint for Injunctive and Other Equitable Relief on September 21, 2023. ECF No. 1. USAP and Welsh Carson moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on November 20, 2023. ECF Nos. 97 ("USAP Mot."),

100. The FTC now separately opposes USAP's and Welsh Carson's ("WC Opp.") motions.

## ISSUES TO BE DECIDED BY THE COURT

1.      Whether the FTC can bring this case in federal court under 15 U.S.C. § 53(b) in light of the ongoing nature of the alleged anticompetitive scheme and danger of recurrence.

2.      Whether the complaint states valid antitrust claims against USAP.

## FACTUAL BACKGROUND

### Hospital anesthesiologists and insurer reimbursement

Anesthesiologists specialize in medical treatments that prevent pain. Compl. ¶¶ 41-45, ECF No. 62. Hospitals need anesthesiologists on hand 24/7 to provide anesthesia for surgical procedures. *Id.* ¶¶ 47-48, 53-54, 224-25. While some hospitals directly employ anesthesiologists, many contract with an independent group as their exclusive anesthesia provider. *Id.* ¶¶ 52-53. Anesthesia groups like USAP compete for those exclusive contracts. *Id.* ¶¶ 55-56.

Anesthesiologists are primarily compensated through reimbursement by insurers—or more frequently, insurers' clients, such as employers. *See id.* ¶¶ 60-65. Anesthesia groups strive to participate in commercial insurance networks; nonparticipation can make obtaining payment more onerous and jeopardize hospital relationships. *See id.* ¶¶ 69-73. In exchange for network inclusion, anesthesiologists and insurers negotiate a reimbursement rate. *Id.* ¶¶ 61-62. The insurers' main leverage to keep rates low for their clients is the threat of network exclusion. *Id.* ¶¶ 60, 68, 70-73. But exclusion is not always feasible: An anesthesia group can become so large that it is effectively irreplaceable as part of any insurer's network, giving the group significant power to extract high rates. *Id.* ¶¶ 75-76. In Texas, the burden of paying these high rates falls largely on employers and patients (not insurers). *Id.* ¶¶ 66.

### USAP and Welsh Carson develop and execute their consolidation scheme

USAP's animating purpose since its founding has been to consolidate anesthesia

practices, raise prices, and reap the resulting millions of dollars in profits. In the summer of 2012, the New York-based private equity firm Welsh Carson began exploring anesthesia. *Id.* ¶¶ 77-80. It observed that the anesthesia landscape was "fragmented"—that is, full of small competitors from whom insurers could obtain low prices for employers and patients. *Id.* ¶ 2. Welsh Carson created USAP to "roll up" these small practices into a single large one with enormous pricing power. *See id.* ¶¶ 86, 96-100. Specifically, USAP would "consolidat[e] [anesthesia] practices with high market share in a few key markets." *Id.* ¶¶ 79, 92. Doing so would yield negotiating leverage with insurers—and high prices to match. *Id.*

USAP and Welsh Carson have executed on their consolidation strategy in three ways. First, USAP acquired at least fifteen anesthesiology practices in Texas. It started in Houston, buying the region's largest practice in 2012 and then three others. *Id.* ¶¶ 84, 95, 103, 108, 112. Each of these three groups held strong relationships with important Houston hospitals, and each had previously competed head-to-head with USAP. *Id.* ¶¶ 104-05, 109-110, 113-14. As it acquired each group, USAP ended that competition, raising the acquired group's rates to match its own higher (and ever-increasing) prices, netting millions of dollars in what it and Welsh Carson called "synergies." *Id.* ¶¶ 5, 99, 107, 111, 115, 268. Beginning in 2014, USAP followed the same playbook in Dallas: it bought the area's largest practice and then six more, snuffing out the previous competition and significantly raising prices. *Id.* ¶¶ 120-145. USAP then expanded to Tyler, Austin, Amarillo, and San Antonio. *Id.* ¶¶ 157, 160, 165, 169. There, too, USAP used its growing dominance and hospital positioning to raise prices at the expense of patients and their employers. *Id.* ¶¶ 159, 164, 167-68, 173, 305-308. As one insurance executive summarized, USAP has used acquisitions to "take the highest rate of all . . . and then peanut butter spread that across the entire state of Texas." *Id.* ¶ 5.

Second, USAP maintains price-setting agreements with several competitors. In these contracts, USAP agrees to bill—at USAP's high rates—for the work its competitors perform at certain key hospitals. *See id.* ¶¶ 183-86, 191-94, 201-03. This is not mere administrative support to help the other groups collect revenue under contracts they negotiated. *Cf. id.* ¶ 178. Instead, USAP bills for its competitors as though they are USAP anesthesiologists. *Id.* ¶¶ 176-77. In other words, USAP and these groups have agreed that they will charge the same price—USAP's higher price—rather than independently negotiate rates with insurers. *Id.* ¶ 177. This increases USAP's bargaining leverage with insurers and results in price increases to payors and patients. *Id.* ¶¶ 312, 326. USAP's own executives have recognized that these arrangements "seem[] odd from a compliance standpoint" and "might possibly compromise" the company. *Id.* ¶ 179. But USAP actively maintains two (which it inherited from groups it acquired), executed a third that has since ended, and has explored several others. *Id.* ¶¶ 180-81, 204-07.

Third, USAP secured an agreement that Envision Healthcare would stay out of Dallas. Envision is a large national healthcare company that provides, among other things, anesthesia services to hospitals. *Id.* ¶ 209. At one point, its subsidiary EmCare provided back-office support (such as billing) to Pinnacle Anesthesia Consultants, the largest anesthesia practice in Dallas. *Id.* ¶ 210. When USAP and Welsh Carson sought to acquire Pinnacle in 2013, they also explored ways to neutralize Envision as a competitor. Initially, they asked Envision to agree not to compete anywhere in Texas. *Id.* ¶¶ 210-12. Eventually, Envision agreed to terminate EmCare's relationship with Pinnacle and not to otherwise compete in Dallas for five years. *Id.* ¶¶ 213-14. In exchange, USAP agreed to pay EmCare $9 million per year during that period. *Id.* This deal not only paved the way for USAP's acquisition of Pinnacle but also had the purpose and effect of keeping a significant competitor out of a key geography. *Id.* ¶¶ 127, 215.

**USAP has achieved dominance in Texas and has significantly increased prices**

USAP and Welsh Carson's consolidation strategy played out exactly as planned: USAP is, by far, the largest anesthesia practice in Texas and many of its metro areas. It has a nearly 70% share of the commercially insured, hospital-only anesthesia services market in Houston, a similar share in Dallas, and over 52% in Austin. *Id.* ¶¶ 272, 277, 284, 295. Across the state, USAP handles nearly half of all hospital-only anesthesia cases—and earns close to 60% of all hospital anesthesia revenue paid by Texas insurers, employers and patients. *Id.* ¶ 310 & Table 7.

As planned, USAP's dominant position has led to significant negotiating leverage with commercial insurers. As one insurance executive explained, "every time [USAP] folded in a geographic region or every time that they grew, it just strengthened their ability to raise rates and . . . leverage at the negotiating table." *Id.* ¶ 314. USAP and Welsh Carson recognized as much, boasting that "if a payor refuses to give us the pricing that we're looking for, then the threat of us going out-of-network would be more painful on the payor than it would be on us." *Id.* ¶ 315. One USAP executive put it more bluntly: "Cha-ching!" *Id.* ¶ 164. USAP has used its negotiating leverage to raise prices for hospital-only anesthesia services across Texas. *Id.* ¶¶ 319, 323. The result is that patients and their employers pay tens of millions of dollars more each year for anesthesia than they did before USAP existed. *Id.* ¶ 324.

USAP's consolidation scheme remains ongoing. The company continues to plan for further acquisitions, both in Texas and in other states (where it has deployed a similar strategy), and is well-positioned to add to its portfolio of anticompetitive agreements. *Id.* ¶ 335.

**STANDARD OF REVIEW**

When a party moves to dismiss under Rule 12(b)(6), the court must "liberally construe the complaint," *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011), "accept[ing] all well-pleaded facts as true [and] viewing them in the light most favorable to the

plaintiff." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 253 (5th Cir.

2021). Plaintiffs' factual allegations need only "be enough to raise a right to relief above the

speculative level" and state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*,

550 U.S. 544, 555-56, 570 (2007). "[T]he Court's task is limited to deciding whether the plaintiff

is entitled to offer evidence in support of [its] claims, not whether the plaintiff will eventually

prevail." *Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453, 459 (S.D. Tex. 2011) (Hoyt, J.).

## ARGUMENT

## I.    The FTC's Claims Are Properly in Federal Court

The FTC enforces, among other laws, the Clayton Act and Section 5 of the FTC Act, the

latter of which prohibits "[u]nfair methods of competition" and encompasses violations of the

Sherman Act. 15 U.S.C. § 45(a); *see FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454 (1986).

Before 1973, the FTC could enforce these laws only through internal administrative adjudicative

proceedings. In 1973, Congress enacted Section 13(b) to expand the FTC's enforcement

authorities. *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 72 (2021). "That provision permits the

Commission to proceed directly to court (prior to issuing a cease and desist order) to obtain a

'temporary restraining order or a preliminary injunction,' and also allows the Commission, 'in

proper cases,' to obtain a court-ordered 'permanent injunction.'" *Id.* The text of Section 13(b)

states, in relevant part:

> Whenever the Commission has reason to believe—
>
> (1) that any person, partnership, or corporation is violating, or is about to violate, any
> provision of law enforced by the Federal Trade Commission, and
>
> (2) that the enjoining thereof pending the issuance of a complaint by the Commission and
> until such complaint is dismissed by the Commission or set aside by the court on review,
> or until the order of the Commission made thereon has become final, would be in the
> interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or preliminary injunction may be granted without bond: Provided, however, That if a complaint is not filed within such period (not exceeding 20 days) as may be specified by the court after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect: **Provided further, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction**.

15 U.S.C. § 53(b) (emphasis added).

As courts have consistently explained, Section 13(b) contains two separate grants of authority. First, Section 13(b) provides that "the FTC may seek a preliminary injunction to" enjoin potentially illegal conduct "pending the Commission's administrative adjudication." *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001). If the FTC obtains preliminary relief under this authority, it must then file an administrative complaint "within such period (not exceeding 20 days) as may be specified by the court." 15 U.S.C. § 53(b). The FTC frequently uses this first authority to temporarily enjoin potentially anticompetitive mergers while the FTC conducts an internal administrative trial.

The second authority (bolded above) allows the FTC to litigate its entire case in federal court without initiating an administrative proceeding. This permanent injunction authority is an "entirely different animal[] . . . governed by a separate statutory provision" from the preliminary injunction authority in the principal clause. *United States v. JS & A Grp., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983). The FTC has brought this case, like many of its Section 13(b) cases, under this second authorization.

### A.   Section 13(b) authorizes the FTC to seek a permanent injunction without filing an administrative proceeding

USAP asks this Court to adopt an unsupported interpretation of Section 13(b) in which

the FTC must file a parallel administrative proceeding when it seeks a permanent injunction in district court. *See* USAP Mot. 13. The statute's plain text forecloses this reading. The Supreme Court's recent decision in *AMG* explicitly recognized that "the Commission may use § 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, *or when it seeks only injunctive relief*." *AMG Cap.*, 593 U.S. at 78 (emphasis added). Every court of appeals to consider USAP's argument has uniformly rejected it. And the other tools of statutory interpretation on which USAP purports to rely—such as the context of Section 13(b) and its legislative history—only further undercut its proposed construction. Finally, the Fifth Circuit recently foreclosed USAP's constitutional-avoidance argument.

### 1. The plain text of Section 13(b) permits the FTC to enforce the antitrust laws in federal court

The plain language of Section 13(b) does not require the FTC to initiate an administrative proceeding when it seeks a permanent injunction. As the Seventh Circuit explained in *JS & A Group*: "The statutory language of section 13(b) limits the availability of preliminary injunctive relief to situations 'pending issuance of a complaint by the Commission.' No similar language is found in the second proviso relating to permanent injunctive relief." 716 F.2d at 456. "Had Congress intended the initiation or not of an administrative cease and desist proceeding to affect the ability of the Commission to seek permanent injunctive relief, it undoubtedly would have included language similar to that found in the provision governing preliminary injunctive relief." *Id.* Every court to consider the issue has agreed. *See FTC v. H.N. Singer*, 668 F.2d 1107, 1110-11 (9th Cir. 1982); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434-35 (11th Cir. 1984); *FTC v. Neora LLC*, 552 F. Supp. 3d 628, 635-36 (N.D. Tex. 2021); *FTC v. Am. Future Sys., Inc.*, No. 20-cv-2266, 2021 WL 3185777, at *1 n.1 § A (E.D. Pa. July 26, 2021); *FTC v. Commonwealth Mktg. Grp., Inc.*, 72 F. Supp. 2d 530, 535 (W.D. Pa. 1999); *United States v. Nat'l Dynamics*

*Corp.*, 525 F. Supp. 380, 381 (S.D.N.Y. 1981).

The Supreme Court also endorsed this uniform interpretation in the *AMG* case. In *AMG*, the Supreme Court addressed whether Section 13(b) authorizes the FTC to seek and be awarded equitable monetary relief. Although the Supreme Court concluded that Section 13(b) did not authorize equitable monetary remedies, the Court expressly acknowledged that the FTC may sue in federal court under Section 13(b) without initiating administrative proceedings "when it seeks only injunctive relief." *AMG Cap.*, 593 U.S. at 78. The courts of appeal that have considered *AMG* have therefore concluded that "it did not threaten [courts'] authority to enter injunctions under § 13(b)." *FTC v. Nat'l Urological Grp., Inc.*, 80 F.4th 1236, 1242 (11th Cir. 2023); *see also FTC v. Pukke*, 53 F.4th 80, 106 (4th Cir. 2022). As the Eleventh Circuit explained, Section 13(b) still "allows the FTC to proceed directly to court—without first going through administrative proceedings—to obtain a 'permanent injunction.'" *Nat'l Urological Grp.*, 80 F.4th at 1242. A district court in this circuit reached a similar conclusion: "*AMG Capital* contemplates that a permanent injunction under § 13(b) would be available in circumstances . . . where the FTC dispenses with administrative proceedings and seeks only injunctive relief." *Neora*, 552 F. Supp. 3d at 635-36; *see also Am. Future Sys.*, 2021 WL 3185777, at *1 n.1 § A (same); *FTC v. SuperTherm Inc.*, No. CV-20-08190-PCT-DWL, 2021 WL 3419035, at *6 (D. Ariz. Aug. 5, 2021) (same).

USAP's efforts to spin *AMG* in its favor are unpersuasive. It quotes out of context dictum that "the appearance of the words 'permanent injunction' (as a proviso) [in Section 13(b)] suggests that those words are directly related to a previously issued preliminary injunction." USAP Mot. 14 (quoting 593 U.S. at 76). But the *very next sentence* of the opinion, which USAP omits, observes that the words "permanent injunction" in Section 13(b) "might also be read, for

example, as granting authority for the Commission to go one step beyond the provisional and ('in proper cases') dispense with administrative proceedings to seek what the words literally say (namely, an *injunction*)." 593 U.S. at 76. Similarly, USAP contends *AMG* "held that Congress 'could not have . . . inten[ded]' the FTC 'to use § 13(b) as a substitute' for its own administrative procedure." USAP Mot. 2 (citing *AMG Cap.*, 593 U.S. at 78). But again, in context, this passage said nothing about the FTC's ability to obtain a permanent injunction and instead merely observed that "the Commission's broad reading" of the phrase "permanent injunction" to include monetary relief was unlikely because of other provisions allowing the FTC to seek monetary relief. *AMG Cap.*, 593 U.S. at 78.

Finally, USAP's textual interpretation finds no support in the general principle that a proviso is "confined to the subject-matter of the principal clause to which it is attached"—here one that lets "the FTC seek a temporary restraining order or a preliminary injunction only when tied to administrative proceedings." USAP Mot. 14 (citation omitted). As the cases on which USAP relies explain, "[t]he general office of a proviso is *to except something* from the enacting clause." *United States v. Morrow*, 266 U.S. 531, 534 (1925) (emphasis added). Indeed, "[a] proviso may refer only to things covered by a preceding clause, but it can also state a general, independent rule." *Alaska v. United States*, 545 U.S. 75, 77 (2005); s*ee also Republic of Iraq v. Beaty*, 556 U.S. 848, 858 (2009) ("The principal clause granted the President a power; the second proviso purported to grant him an *additional* power."). Thus, Section 13(b)'s permanent injunction proviso does not incorporate the administrative proceeding requirement of the preliminary injunction clause, and provides the FTC an independent authority to seek different relief.

### 2. Traditional tools of statutory interpretation confirm that a parallel administrative proceeding is not required

USAP's arguments that traditional tools of statutory interpretation support its understanding of Section 13(b) fare no better.

*First*, contrary to USAP's interpretation, the historical context of Section 13(b) indicates it was intended to authorize standalone cases in federal court. The statute was enacted in the 1970s, when Congress passed multiple bills "to improve the Commission's consumer protection powers" and "add significant new weapons to the Commission's enforcement arsenal." *FTC v. Sw. Sunsites, Inc.*, 665 F.2d 711, 719-20 (5th Cir. 1982). The Fifth Circuit has explained that "through these various [] amendments to the Federal Trade Commission Act, Congress was evolving a statutory plan for the protection of the . . . public," and that "the Act clearly makes the district court a vital enforcement arm of the statute." *Id.* (quotation omitted); *see also AMG Cap.*, 593 U.S. at 72 ("In the 1970s Congress authorized the Commission to seek additional remedies in court.").

*Second*, "[w]hat little legislative history there is supports [the] conclusion" that "the second proviso gives [the FTC] the power to seek an injunction in the district court in proper cases without also initiating administrative proceedings." *Singer*, 668 F.2d at 1110; *accord Nat'l Dynamics*, 525 F. Supp. at 381. USAP cites a portion of the Senate Report accompanying Section 13(b) that describes the Commission's ability to use the permanent injunction proviso as a complement to its preliminary injunction authority. USAP Mot. 17 (citing S. Rep. No. 93-151, at 30 (1973)). But USAP omits the remainder of that paragraph: "Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order." S. Rep. 93-151, at 31

(1973).[1] This passage makes clear that Congress intended the FTC to seek a permanent injunction in federal court in "proper cases" without resorting to its own internal processes.[2]

*Third*, USAP fails to explain how its interpretation would give the permanent injunction proviso any useful function. *See ADT, L.L.C. v. Richmond*, 18 F.4th 149, 156 n.9 (5th Cir. 2021) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009))). If USAP were correct that the FTC must always file an administrative complaint seeking a cease-and-desist order (contrary to every court's interpretation of Section 13(b)), it is unclear what purpose would be served by also using Section 13(b) to "seek . . . a permanent injunction" from a district court for the same violation.[3] USAP vaguely asserts that Section 13(b) allows a district court to "set a definite hearing date" for a permanent injunction to avoid protracted agency proceedings. USAP Mot. 17 (quoting S. Rep. No. 93-151, at 30-31). But the text undermines that interpretation: it does not contemplate the court raising a permanent injunction on its own but rather in response to the FTC "seek[ing]" one. *Cf. JS & A Grp.*, 716 F.2d at 456 (rejecting interpretation in which a district court issues an injunction only following an FTC cease-and-desist order).

---

[1] Courts have consistently recognized that the reference to "routine fraud" is an example of, rather than a limitation on, cases in which the FTC may seek a permanent injunction. *See, e.g.*, *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086-88 (9th Cir. 1985); *FTC v. Surescripts, LLC*, 424 F. Supp. 3d 92, 97-100 (D.D.C. 2020).

[2] USAP has not argued that this is not a "proper case" for a permanent injunction, and therefore has waived any such argument. *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived."). In any event, this is a "proper case": the FTC alleges that equitable remedies are needed to protect consumers from violations of laws enforced by the FTC. *See, e.g.*, *Evans Prods.*, 775 F.2d at 1086-88.

[3] If the FTC were to be required to pursue both administrative and district court cases for the same conduct, USAP's interpretation could potentially result in two entirely duplicative litigations. Far from allowing "Commission resources [to] be better utilized, and cases [] disposed of more efficiently," S. Rep. 93-151, at 31, this would be "a colossal waste of time and money for the parties and the courts." *See Warren v. New Orleans Police Dep't*, No. 92-cv-2037, 1992 WL 245655, at *1 (E.D. La. Sept. 11, 1992).

*Finally*, the Fifth Circuit recently foreclosed USAP's argument that its interpretation of Section 13(b) is necessary to avoid a "serious" constitutional concern that Congress improperly delegated unguided authority to the FTC to choose between its administrative process and federal court litigation. In *Illumina, Inc. v. FTC*, the Fifth Circuit held that Congress's direction to consider the "public interest" in selecting a forum was a sufficient intelligible principle to moot any constitutional problem. 88 F.4th 1036, 1046 (5th Cir. 2023) ("[T]he Supreme Court has repeatedly 'found an 'intelligible principle' in various statutes authorizing regulation in the 'public interest.'"" (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001))).[4]

### B.   The complaint plausibly alleges reason to believe USAP is violating or "about to violate" the law

Section 13(b) empowers the FTC to seek a permanent injunction in federal court when it "has reason to believe that any person, partnership, or corporation . . . is violating, or is about to violate" the law. 15 U.S.C. § 53(b). In *FTC v. Southwest Sunsites*, the Fifth Circuit held that the FTC can satisfy this requirement by alleging facts that give rise to a "fair inference of a reasonable expectation of continued violations." 665 F.2d at 723; *see also FTC v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020) ("Following *Sunsites*, when applying § 13(b), district courts have analyzed whether the surrounding circumstances—in addition to the past violations alleged—create a reasonable expectation that violations will continue."). One way to meet this standard is to allege ongoing conduct—i.e., that "the scheme could continue at the time the case was filed." *See Educare*, 433 F. Supp. 3d at 1014. Another is to allege "past conduct" that is likely to recur, either "in conjunction with other circumstances or where the past violations are extensive." *Neora*, 552 F. Supp. 3d at 637. The complaint here alleges both that

---

[4] To the extent USAP incorporates Welsh Carson's argument that the FTC unconstitutionally exercises executive power because its commissioners are not subject to presidential removal, the Fifth Circuit rejected this argument as well. *See Illumina*, 88 F.4th at 1047. *See also* WC Opp. Part III.

USAP's conduct is ongoing—USAP continues to hold its unlawful acquisitions and maintains other unlawful agreements—and that USAP is likely to commit similar violations in the future.

USAP raises two challenges: First, it erroneously characterizes its consolidation scheme as "past conduct" that ended "years ago." USAP Mot. 18-19. Second, USAP improperly relies on an interpretation of Section 13(b)'s "about to" standard from an out-of-circuit decision, instead of the Fifth Circuit *Sunsites* standard. Because Section 13(b) can be satisfied by *either* ongoing conduct ("is violating") or potential future conduct ("is about to violate"), USAP must prevail on both arguments to warrant dismissal. Neither is meritorious.

### 1. The complaint alleges ongoing violations

The FTC's complaint amply alleges that USAP's unlawful conduct is ongoing. USAP continues to own the anesthesia groups it unlawfully acquired and continues to charge high prices to Texas employers and patients. *See* Compl. ¶¶ 87, 91, 95, 96-100, 102-173, 261-264, 267-272, 274-277, 279-284, 286-289, 291-295, 304-311, 313-318, 323-25. It currently maintains two price-setting arrangements that likewise result in higher prices. *See* USAP Mot. 21; Compl. ¶¶ 180, 189, 326, 405. And USAP's overall monopolization scheme is ongoing. *See id.* ¶¶ 8-10, 174, 333. In short, "[j]ust as in *Sunsites*," the FTC has "evidence of a large-scale [] scheme with intact infrastructure at the initiation of the litigation." *Educare*, 433 F. Supp. 3d at 1014.

USAP concedes that allegations of ongoing unlawful conduct are sufficient to proceed under Section 13(b). USAP Mot. 18-19. It disputes, though, that its anesthesia consolidation scheme is ongoing because its acquisitions "all closed years ago," one of several challenged price-setting agreements was terminated in 2020, and its market allocation ended in 2019. USAP Mot. 19-21. None of these assertions renders USAP's scheme "past conduct."

First, the fact that USAP's acquisitions "all closed years ago" is irrelevant; those violations are ongoing because USAP continues to unlawfully hold the acquired practice groups

and extract profits. USAP Mot. 19-20. In drafting the antitrust laws, Congress "did not regard the terms 'acquire' and 'acquisition' as unambiguously banning only the initial transaction of acquisition; rather, they read the ban against 'acquisition' to include a ban against *holding* certain assets." *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 241 (1975) (emphasis added). For instance, the Supreme Court in *United States v. E. I du Pont de Nemours & Co.*, held a stock acquisition in 1917 could be challenged in 1947, because "[t]he fire that was kindled in 1917 continues to smolder." 353 U.S. 586, 607 (1957). More recently, *FTC v. Facebook, Inc.* held that "an injunction under Section 13(b) is a theoretically available remedy in a . . . challenge to long-ago mergers so long as the defendant still holds the purchased assets." 560 F. Supp. 3d 1, 32 (D.D.C. 2021) (applying *ITT Continental* and *du Pont* to monopolization claim).

USAP ignores these authorities and relies exclusively on irrelevant cases finding that a merger does not count as a "continuing violation" that tolls the statute of limitations applicable in *private plaintiff* antitrust suits. *See* USAP Mot. 19-21. But "there is no statute of limitations for a § 13(b) claim." *FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 52 (S.D.N.Y. 2020). Unlike private plaintiffs, "so long as an acquiring company continues to hold acquired assets, *the Government* may 'at any time' argue that such company is violating Section 7." *Facebook*, 560 F. Supp. 3d at 31 (quoting *du Pont*, 353 U.S. at 597) (emphasis added).[5]

Second, the allegations that USAP's price-setting conduct is ongoing satisfy Section 13(b). The fact that one such agreement ended in 2020 does not alter this conclusion, particularly because that agreement is challenged only as an example of an unlawful price-setting

---

[5] Even for private plaintiffs, several of USAP's authorities recognize that a different rule may apply to a series of acquisitions like USAP's. *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 995 (N.D. Cal. 2020) (acknowledging that an "ongoing scheme" could toll the statute of limitations (citation omitted)); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598 (6th Cir. 2014) (recognizing that tolling can be proper when a defendant "undertook action . . . to monopolize a market").

arrangement (*see* Compl. Count IX) or part of a course of conduct involving other ongoing

violations (*see id.* Counts I, III, IV, VI, VIII). USAP suggests that the court can dismiss these

counts in part, "to the extent that they depend on the past arrangement." USAP Mot. 21. But "a

motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims."

*BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (citation omitted). *Cf. FTC v.

Facebook, Inc.*, 581 F. Supp. 3d 34, 59-61 (D.D.C. 2022) (limiting discovery into conduct that

had ceased "seven years before [] suit was filed").

      Finally, regardless of whether any individual agreement (such as USAP's market

allocation agreement with Envision, *cf.* USAP Mot. 21) has ended, the complaint plausibly

alleges an ongoing consolidation scheme. Compl. ¶¶ 8-10, 174, 333. Courts in the Fifth Circuit

assess ongoing conduct by examining whether "*the scheme* could continue"—not each individual

component. *Educare*, 433 F. Supp. 3d at 1014 (emphasis added); *see also Vyera*, 479 F. Supp. 3d

at 44 ("[i]t is the extant scheme that provides the basis for the lawsuit"); *FTC v. Walmart Inc.*,

No. 22-cv-3372, 2023 WL 2646741, at *21 n.35 (N.D. Ill. Mar. 27, 2023) (declining to focus

solely on "a specific act or practice" (citation omitted)). USAP's scheme must be considered in

its totality, rather than "tightly compartmentalizing the various factual components and wiping

the slate clean after scrutiny of each." *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370

U.S. 690, 699 (1962).[6]

### 2.  The complaint alleges a reasonable likelihood of future violations

      Even if USAP's challenged conduct had ceased, "to plead that a defendant 'is violating,

or is about to violate' under § 13(b), the FTC need only allege practices 'giving rise to a fair

---

[6] Further, the plain text of Section 13(b) only requires allegations that a defendant "is violating" the law in at least one way. Other claims, even those involving solely past conduct, are subject to Rule 18, which permits a party to "join, as independent or alternative claims, as many claims as it has against an opposing party." Fed. R. Civ. P. 18.

inference of a reasonable expectation of continued violations absent restraint.'" *Neora*, 552 F. Supp. 3d at 637 (quoting *Sunsites*, 665 F.2d at 723). *See also FTC v. AdvoCare Int'l, LP*, No. 4:19-CV-715-SDJ, 2020 WL 6741968, at *6 (E.D. Tex. Nov. 16, 2020); WC Opp. Part II.A. "Courts in the Fifth Circuit have concluded that allegations of past conduct can give rise to a reasonable inference of current or future violations, either in conjunction with other circumstances or where the past violations are extensive." *Neora*, 552 F. Supp. 3d at 637. This is a holistic and contextual analysis, in which courts consider six non-exclusive factors to ultimately decide whether to grant a permanent injunction:

> [1. T]he egregiousness of the defendant's actions, [2.] the isolated or recurrent nature of the infraction, [3.] the degree of scienter involved, [4.] the sincerity of the defendant's assurances against future violations, [5.] the defendant's recognition of the wrongful nature of his conduct, and [6.] the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.* at 637-38 (quoting *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008) (quotation omitted)). At the pleading stage, the FTC must only plausibly allege sufficient facts to demonstrate that a permanent injunction might be warranted.

The complaint easily establishes a likelihood of recurrence under the *Cornerstone Wealth* factors. First, USAP's price increases were egregious and cost Texans "dozens of millions of dollars" each year. Compl. ¶ 324. *See also id.* ¶¶ 3, 314-15, 319-23. Second, USAP's conduct is not isolated; it involves a "dozen-plus" acquisitions, three price-setting arrangements, and a market allocation agreement spread out over many years. *See id.* ¶ 334. *See also id.* ¶¶ 311, 313-18, 334. Third, USAP acted with a high degree of scienter; its conduct—and the resulting harm to competition and consumers—was a deliberate part of an express plan to profit by overcharging for anesthesia services. *Id.* ¶¶ 77, 79-80, 92, 98-101. Fourth and fifth, USAP not only fails to recognize the wrongful nature of its conduct or offer assurances against recurrence,

it seeks out opportunities to engage in similar acts. *Id.* ¶¶ 334-35. And sixth, as one of the country's largest anesthesiology groups, USAP remains well-positioned for future violations. *Id.* ¶¶ 8-9, 334-35. Indeed, USAP plans for future acquisitions (*Id.* ¶ 335); has explored new billing arrangements (*Id.* ¶¶ 181, 204-07); and has ample opportunity and incentive to repeat the Envision market allocation (*Id.* ¶ 211). *See also id.* ¶¶ 123, 125, 127, 208-215.

USAP ignores this well-established likelihood of recurrence standard, claiming that *Sunsites* is inapplicable to assessing the FTC's statutory authority to file in federal court. USAP Mot. 19 n.8. Instead, USAP asserts that the Third Circuit's decision in *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019), "should control here" and requires the FTC to allege ongoing or "imminent" unlawful conduct. USAP Mot. 18-19 & n.8.[7] USAP is wrong on both counts.

*Sunsites* is "binding Fifth Circuit authority which takes a different approach from the *Shire* court to this issue." *Educare*, 433 F. Supp. 3d at 1012 & n.1 ("[T]he *Sunsites* court's § 13(b) standard is not dictum, but is a holding that binds this Court."). In *Sunsites*, the Fifth Circuit specifically "applied the [likelihood of recurrence] standard in an FTC enforcement case." *Neora*, 552 F. Supp. 3d at 637. The court "read the phrases 'reason to believe' and 'about to violate' in § 13(b) as covering situations where defendants claim that violations have ceased, but the FTC acts on evidence that supports a reasonable inference that violative conduct will continue absent injunctive relief." *Educare*, 433 F. Supp. 3d at 1013. It is thus well established that the FTC may "state a plausible claim under Section 13(b) by showing that a past violation or series of past violations is likely to recur." *AdvoCare*, 2020 WL 6741968 at *6. And this

---

[7] USAP also cites cases from two other circuits, but both support the Fifth Circuit's interpretation of Section 13(b). In *FTC v. Evans Products Co.*, the Ninth Circuit held that "§ 13(b) may not be used to remedy a past violation *that is not likely to recur.*" 775 F.2d at 1089 (emphasis added). In *FTC v. Credit Bureau Center, LLC*, the Seventh Circuit held that Section 13(b) did not allow the FTC to obtain monetary restitution for past conduct, and though it used the terms "ongoing or imminent" in dicta, it equated those terms to "the forward-facing nature of injunctions"—which can be obtained by showing a likelihood of recurrence. 937 F.3d 764, 772 (7th Cir. 2019).

standard, the same one used to evaluate whether a permanent injunction should issue, does not demand imminence. *See Neora*, 552 F. Supp. 3d at 637. *Sunsites* thus forecloses USAP's effort to read an "imminent" requirement into Section 13(b).[8]

Moreover, even *Shire* did not adopt USAP's "imminent" standard. The Third Circuit "expressly did not opine on what would satisfy a showing of 'about to violate' under § 13(b)." *Neora*, 552 F. Supp. 3d at 637. *See also Shire*, 917 F.3d at 157 n.15. And the *Shire* court "emphasized the factual confines" of its ruling, dismissing the FTC's complaint because the conduct had undisputedly ceased five years earlier and was related to a single drug product the defendant no longer owned. *See Educare*, 433 F. Supp. 3d at 1016-17. In those circumstances, *Shire* merely held that "Section 13(b) does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation." 917 F.3d at 156. Here, in contrast, USAP continues to operate in Texas (and other states), maintains monopolies in Texas, has a well-established and long-standing pattern of behavior, and anticipates similar conduct in the future. *See* Compl. ¶¶ 304-10, 314-25, 334-35.

## II.     The Complaint States Valid Antitrust Claims

### A.      The complaint states claims for monopolization

Counts I and IV charge USAP with unlawful monopolization under the principles of Section 2 of the Sherman Act, 15 U.S.C. § 2. This offense has two elements: (1) the possession of monopoly power and (2) the acquisition or maintenance of that power through anticompetitive conduct. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). The

---

[8] Other courts outside of the Third Circuit have also rejected *Shire* and agreed with the Fifth Circuit's view that showing "that illegal conduct is likely to recur is the same as showing that someone 'is violating' or 'is about to violate' the law." *FTC v. Walmart Inc.*, No. 22 CV 3372, 2023 WL 2646741, at *21 (N.D. Ill. Mar. 27, 2023); *FTC v. Roomster Corp.*, 654 F. Supp. 3d 244, 258 (S.D.N.Y. 2023) (same).

complaint sufficiently alleges both, and USAP's arguments raise (at most) factual disputes that are not properly resolved at this stage.

### 1. The complaint plausibly alleges that USAP possesses monopoly power

The first element of a monopolization claim—monopoly power—is the ability "to control price or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). This power can be proven through "direct evidence of anticompetitive effects," such as higher prices, reduced quality, or decreased innovation. *See Facebook*, 581 F. Supp. 3d at 43, 55 (quoting *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000)); *see also Constr. Cost Data, LLC v. Gordian Grp., Inc.*, No. CV H-16-114, 2017 WL 2266993, at *14 (S.D. Tex. Apr. 24, 2017). Alternatively, monopoly power can be proven indirectly from a firm's possession of a "predominant share of [a relevant] market," protected by barriers to entry. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966). Defining the relevant market(s) is "deeply fact-intensive" and cannot usually be decided on a motion to dismiss. *Constr. Cost Data*, 2017 WL 2266993, at *14 (quoting *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.)); *see also Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) ("Whether a relevant market has been identified is usually a question of fact . . . .").

Here, the complaint alleges both direct and indirect evidence of monopoly power. It alleges direct evidence based on USAP's demonstrated ability to increase the cost of anesthesia services for Texas employers and patients beyond their competitive level. *E.g.*, Compl. ¶¶ 4-6, 8, 273, 285, 311-18. It separately alleges that USAP controls a dominant share (nearly 70%) of the relevant Houston and Dallas markets for anesthesia services provided to commercially insured patients that must be performed at hospitals, and that this share is protected by entry barriers. *Id.* ¶¶ 261-62, 274-77, 297-303. Indeed, no other group rivals USAP's size in either metropolitan

21

area or has demonstrated the capacity to challenge USAP's dominant position or constrain its high rates. *Id.* ¶¶ 8, 272 (Table 2), 284 (Table 4), 273, 285.

USAP does not dispute that its market shares establish dominance. *See*, *e.g.*, *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 382 (E.D. La. 2013) (market shares around 70 percent or more "generally suffic[e]"). Instead, USAP argues that: (1) the relevant market improperly excludes anesthesia services performed at outpatient facilities; and (2) direct evidence fails to establish monopoly power because, according to USAP, its prices are not supracompetitive. USAP Mot. 24-26. To prevail, USAP must succeed on both fronts because *either* a predominant share of a plausibly defined market *or* direct evidence of supracompetitive prices alone suffices to establish monopoly power. But both arguments are without merit and, in any event, raise factual disputes that cannot be resolved on a motion to dismiss.

### a) The relevant market is plausibly limited to "hospital-only" anesthesia services

Market definition aids in "determin[ing] whether an arrangement has the potential for genuine adverse effects on competition." *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 460-61 (1986). The goal is to "identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004). Market definition has two components: "the relevant product market and the relevant geographic market." *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010). USAP challenges only the alleged product market.

To determine "the relevant product market, courts consider the extent to which the seller's product is interchangeable in use and the degree of cross-elasticity of demand between the product itself and substitutes for it." *Apani*, 300 F.3d at 626 (internal quotation omitted). The underlying question is whether consumers may switch to other products in the event of a price

increase. Products that lack any "reasonable interchangeability of use" are not viable alternatives and thus not included in the market. *See Heatransfer Corp. v. Volkswagenwerk, A. G.*, 553 F.2d 964, 980 (5th Cir. 1977). Even "among products which are reasonably interchangeable," courts must evaluate "the responsiveness of the consumer to price changes." *In re Mun. Bond Reporting Antitrust Litig.*, 672 F.2d 436, 442 n.8 (5th Cir. 1982) (internal quotation omitted); *see also Constr. Cost Data*, 2017 WL 2266993, at *16. If "only a limited number of buyers" will switch to a product in the event of a price increase, that product is not properly included within the relevant market. *Times-Picayune Pub. Co. v. United States*, 345 U.S. 594, 612 n.31 (1953).

There are various ways to determine the set of products with sufficient cross-elasticity to comprise the relevant market. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 482 (9th Cir. 2021). One common approach is to assess practical indicia, including:

> industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized venders.

*Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir. 1983) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)); *see Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986) (calling the *Brown Shoe* indicia "evidentiary proxies" for direct proof of substitutability). These practical indicia are non-exhaustive, and even a few can support a relevant market. *See*, *e.g.*, *Kaplan v. Burroughs Corp.*, 611 F.2d 286, 292 (9th Cir. 1979); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997).

The complaint plausibly alleges that non-hospital, outpatient anesthesia services lack interchangeability of use or cross-elasticity with hospital-only services. Patients requiring hospital care cannot switch to outpatient anesthesia services regardless of price. *See* Compl. ¶¶ 220-22. Nor can insurers steer patients who require hospital care to non-hospital settings, even if lower-cost anesthesia services at outpatient facilities were available. *Id*. For this reason, courts

routinely exclude outpatient services from relevant markets when evaluating potential competitive harm to patients and payors. *See*, *e.g.*, *FTC v. ProMedica Health Sys., Inc.*, No. 3:11-CV-47, 2011 WL 1219281, at *9 (N.D. Ohio Mar. 29, 2011) (relevant market "exclude[d] outpatient services" because "[p]atients would not substitute outpatient services in response to price increases for inpatient services, because such substitution is instead based on clinical considerations"); *cf. BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 530 (5th Cir. 2022) (parties agreed relevant market was limited to inpatient services).

In addition, the complaint alleges that multiple practical indicia support a relevant market excluding non-hospital anesthesia services. For example, hospital-only anesthesia serves distinct customers and requires unique facilities because patients who need inpatient admission or whose procedures have a sufficient risk of requiring inpatient admission must receive services at a hospital. Compl. ¶¶ 222-23. Hospital-only anesthesia services also have characteristics distinct from outpatient services: they can occur at any time, often requiring 24-hour coverage from providers and certain subspecialties. *Id.* ¶¶ 224-25. Industry participants, including USAP and insurers, recognize these distinctions. *Id.* ¶¶ 226-29. These allegations are sufficient to plausibly support a relevant market limited to hospital-only anesthesia services.

USAP's argument that the relevant product market should include anesthesiologists who practice at outpatient facilities misses the point. *See* USAP Mot. 23-25. The purpose of market definition is to identify what *products or services* are reasonably interchangeable from the perspective of buyers—here, patients, insurers, employers, and others that pay for anesthesia services. In other words, the relevant product market definition question is whether a patient who medically requires hospital care that includes anesthesia services could reasonably substitute anesthesia services at an outpatient facility if the hospital-based anesthesia cost increased. As

24

described above, the complaint plausibly alleges they could not. To the extent USAP is

suggesting that non-hospital anesthesia providers constrain prices because any attempt to raise

prices above a competitive level would lure them into the market, this factual claim directly

contradicts the allegations that USAP faced no such constraint. *See* Compl. ¶¶ 244, 252, 269-73,

279-85, 303. The complaint clearly alleges that outpatient-focused anesthesiologists cannot

easily move to hospitals given the significantly different working conditions (including overnight

call requirements), sticky hospital contracts, and other barriers. *See id.* ¶¶ 224-25, 297-303.

### b) **The complaint plausibly alleges both indirect and direct proof of USAP's monopoly power**

USAP also attempts to dispute its monopoly power by arguing that the complaint fails to

allege that it "raised prices 'above the competitive level.'" USAP Mot. 26-28 (citation omitted).

As a threshold matter, the FTC does not need to make this showing. Though direct evidence of

supracompetitive pricing can establish monopoly power, "courts more typically examine market

structure in search of circumstantial evidence of monopoly power." *United States v. Microsoft

Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001) (en banc). On a motion to dismiss, "[a] nonconclusory

allegation that a defendant holds a predominant share of the relevant market will usually satisfy

the monopoly power element." *In re Pool Prods.*, 940 F. Supp. 2d at 382 (citing *Grinnell*, 384

U.S. at 571). As such, the Court can and should deny USAP's motion without considering direct

evidence. *See Microsoft*, 253 F.3d at 56-57 ("Microsoft cites no case, nor are we aware of one,

requiring direct evidence to show monopoly power in any market. We decline to adopt such a

rule now."); *Facebook*, 581 F. Supp. 3d at 44; *FTC v. Surescripts, LLC*, No. CV 19-1080 (JDB),

2023 WL 2707866, at *22 (D.D.C. Mar. 30, 2023).

In any event, the complaint plausibly alleges that USAP prices significantly above the

competitive level. *See* Compl. ¶¶ 267-70, 279-82. USAP charges the highest rates in Houston

and Dallas—and double the median rate in Texas. *Id.* ¶¶ 8, 118, 148, 309. With each acquisition, USAP profitably imposed significant price increases without any meaningful volume loss or quality improvement. *Id.* ¶¶ 268-70, 280-81; *see also id.* ¶ 5 (USAP executive summarizing the benefits of an acquisition as: "Cha-ching!"). None of these other groups could achieve such prices before being acquired by USAP. *E.g.*, *id.* ¶¶ 5, 107, 111, 115, 244, 325. And none of USAP's far smaller rivals has constrained its high rates. *Id.* ¶¶ 119, 149, 273, 285. As a result, Texans, their employers, and insurers have endured significant increases in the cost of anesthesia care—paying "tens of millions of dollars more each year than they did before USAP was created." *Id.* ¶¶ 8, 324.

USAP claims that these high rates and increased costs to consumers reflect not the exercise of monopoly power, but merely the predestined mechanics of a decade-old contract negotiated by its powerless predecessor. USAP Mot. 26-28. This factual assertion plainly contradicts the complaint. First, USAP's predecessor did not lack the market power to charge supracompetitive prices, as USAP suggests. On the contrary, the complaint alleges that USAP's predecessor already enjoyed a "commanding" share in Houston and the highest rates in the entire state. Compl. ¶¶ 5, 88-90, 267. Indeed, as one insurance executive explained, USAP's acquisition strategy was to "take the highest rate of all . . . and then peanut butter spread that across the entire state of Texas." *Id.* ¶ 5. Second, USAP ignores allegations that—since its consolidation began—payors repeatedly tried to constrain USAP's high rates and their swelling anesthesia costs, but failed due to the lack of sufficient alternatives. *E.g.*, *id.* ¶¶ 118-19, 148-49, 307-09, 316-319. Thus, whether USAP's prices are supracompetitive remains a factual dispute.[9]

---

[9] USAP's bald assertion that, after the No Surprises Act, it is "doubtful" that "any provider could exercise monopoly power" (USAP Mot. 27 n.9) directly contradicts the complaint's allegations that the effects of the No Surprises Act remain uncertain and may actually favor large anesthesia providers like USAP. Compl. ¶ 74 n.5.

### 2.  The complaint plausibly alleges anticompetitive conduct

The second element of unlawful monopolization is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Grinnell*, 384 U.S. at 570-71. "[T]he means of illicit exclusion, like the means of legitimate competition, are myriad." *Microsoft*, 253 F.3d at 58. And when confronting a multifaceted course of conduct, courts assess its anticompetitive potential "as a whole rather than considering each aspect in isolation." *LePage's Inc. v. 3M*, 324 F.3d 141, 162 (3d Cir. 2003) (en banc) (citing *Cont'l Ore Co.*, 370 U.S. at 699); *accord Assoc. Radio Serv. Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1356 (5th Cir. 1980) (affirming liability finding based on "a pattern of exclusionary behavior").

Here, the complaint plausibly alleges that USAP's scheme, and its individual parts, constitute anticompetitive conduct. The cornerstone of that scheme is a series of acquisitions of direct competitors, which the Supreme Court has held are "unlawful and exclusionary practices." *Grinnell*, 384 U.S. at 576. *See also BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*, 176 F. Supp. 3d 606, 619 (W.D. La. 2016) ("The Supreme Court has established that acquiring a viable competitor constitutes anticompetitive conduct."). Beyond acquisitions, USAP's anticompetitive scheme also includes price-setting arrangements and a market allocation. Because the complaint plausibly alleges that these agreements constitute unlawful restraints of trade, they qualify as anticompetitive conduct. *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 998 (9th Cir. 2023) (simultaneously reviewing conduct challenged under Sections 1 and 2).

USAP's efforts to dispute anticompetitive conduct fail. USAP first wrongly asserts that acquisitions can be anticompetitive "[o]nly in rare circumstances" absent here, such as when a firm buys a rival and then shuts it down. USAP Mot. 30. Such acquisitions are indeed examples of anticompetitive conduct. However, monopolists can violate Section 2 by acquiring rivals even

27

when they continue to operate the assets. *See Grinnell*, 384 U.S. at 566-67, 575 (referencing continued operation of acquired firms); *Standard Oil Co. v. United States*, 221 U.S. 1, 33, 72-77 (1911) (same); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 701b (2023) ("[A] merger does eliminate a rival—so while the acquired firm's assets remain on the market, the second firm as a distinct entity can properly be said to be 'excluded.'"). "Indeed, there is no shortage of authorities observing that 'historically and today, merging viable competitors to create a monopoly is a clear § 2 offense.'" *Facebook*, 581 F. Supp. 3d at 53 (quoting Areeda & Hovenkamp ¶ 701a).[10]

USAP next misunderstands the law in contending that the complaint fails to allege its "acquisitions caused harm to competition or consumers in any measurable way." USAP Mot. 30-31. In monopolization cases, an "anticompetitive effect" means that the defendant's conduct "must harm the *competitive process* and thereby harm consumers." *Microsoft*, 253 F.3d at 58-59 (emphasis added). The complaint meets this burden by plausibly alleging that USAP's acquisitions enabled it to acquire or maintain monopoly power. *See Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000) (conduct harms the competitive process when it "reasonably appear[s] capable of making a significant contribution to creating or maintaining monopoly power").[11] Nevertheless, the complaint goes much further and alleges a host of consumer harms stemming from USAP's conduct, including supracompetitive prices, elimination of head-to-head competition, increased barriers to entry, and fewer choices for

---

[10] *See also BRFHH Shreveport*, 176 F. Supp. 3d at 622; *Clean Water Opportunities, Inc. v. Williamette Valley Co.*, 759 F. App'x 244, 247 (5th Cir. 2019) (per curiam); *Behrend v. Comcast Corp.*, No. 03-cv-6604, 2012 WL 1231794, at *20 (E.D. Pa. Apr. 12, 2012).

[11] USAP's cases merely confirm that courts sustain complaints explaining how defendants suppressed competition. *Compare Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, No. 01-CIV-2669 (WHP), 2002 WL 31164482, at *12-13 (S.D.N.Y. Sept. 30, 2002), *with Eastman v. Quest Diagnostics, Inc.*, No. 15-cv-00415-WHO, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016).

consumers. Compl. ¶¶ 118, 136, 148, 172, 268, 280, 300-03, 313-27.[12]

Finally, USAP largely ignores its price-setting arrangements and market allocation. USAP Mot. 29 n.11. Its argument that the former—memorialized in written contracts—do not constitute "agreements" is deeply flawed. *See infra* Part II.C. And its reliance on the timing of the latter is likewise unavailing. *See supra* Part I.B.

### 3.   The complaint plausibly alleges a conspiracy to monopolize

In addition to claims for monopolization, the complaint also states valid claims against USAP (and Welsh Carson) for conspiracy to monopolize (Counts III and VI). As explained more fully in the FTC's Opposition to the Welsh Carson Entities' Motion to Dismiss, the facts in the complaint plausibly satisfy each of the elements of a conspiracy to monopolize. *See* WC Opp. Part I.B.1. USAP's only counterargument—that it cannot conspire with USAP under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) (USAP Mot. 35)—is inapt for resolution now and better addressed at summary judgment or trial. *See* WC Opp. Part I.B.1.

### B.   The complaint states claims under Section 7 of the Clayton Act

Counts II (Houston), V (Dallas), and VII (Austin) charge USAP with making acquisitions whose effects "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18. These claims require "defin[ing] the relevant market and demonstrat[ing] the probability of anticompetitive results." *David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 466 (S.D. Miss. 2022). Because market definition analysis here is the same as for monopolization (*see* USAP Mot. 31), USAP's arguments fail for the reasons discussed above. *See infra* Part II.A.1. USAP also contends that the FTC has not "established" anticompetitive

---

[12] USAP's suggestion that these effects are offset by efficiencies (*see* USAP Mot. 29) is inappropriate for resolution now, *see BRFHH Shreveport*, 176 F. Supp. 3d at 623, and unlikely to succeed in any event. *See* Areeda & Hovenkamp ¶ 701h (efficiencies in monopolization cases require "an overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms").

effects. *See* USAP Mot. 31-32. But the Clayton Act deals in "probabilities, not certainties," *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 & n.39 (1962), and the complaint here alleges five reasons why USAP's acquisitions plausibly qualify as anticompetitive.

First, the complaint alleges that USAP's series of acquisitions collectively increased its market share to greater than 30% in Houston, Dallas, and Austin (Compl. ¶¶ 261, 269, 274, 281, 286)—a presumptively anticompetitive level. *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 364 (1963) (mergers resulting in a 30% market share "clear[ly]" threaten anticompetitive effects); *see Credit Bureau Reps., Inc. v. Retail Credit Co.*, 358 F. Supp. 780, 794 (S.D. Tex. 1971) ("Section 7 . . . prohibits a series of acquisitions which would result in the same end [as a merger between two large corporations]."), *aff'd*, 476 F.2d 989 (5th Cir. 1973); U.S. Dep't of Justice & FTC, *Merger Guidelines* (Dec. 18, 2023) ("*2023 Merger Guidelines*") §§ 2.7, 2.8.[13]

Second, assessed individually, each of USAP's acquisitions raised its market share above the proscribed 30%. *See* Compl. ¶¶ 265-69, 277-78, 281 & Tables 1-3. Nearly all also fail the standards in the *2023 Merger Guidelines*, which provide that in a market with an "HHI"[14] greater than 1,800, any merger that increases the HHI by more than 100 points is presumptively unlawful. *See 2023 Merger Guidelines* § 2.1; *Chi. Bridge & Iron Co. v. FTC*, 534 F.3d 410, 431, 434 n.13 (5th Cir. 2008) (crediting 1992 Guidelines with same thresholds as "highly persuasive authorities"). And many fail even the standards in the now-withdrawn *2010 Horizontal Merger Guidelines*. *See* U.S. Dep't of Justice & FTC, *Horizontal Merger Guidelines* § 5.3 (Aug. 19, 2010) (200-point increase in a market with an HHI over 2,500 presumptively unlawful).

---

[13] *See also United States v. Healthco, Inc.*, 387 F. Supp. 258, 271 (S.D.N.Y.), *aff'd*, 535 F.2d 1243 (2d Cir. 1975); *United States v. Jerrold Elecs. Corp.*, 187 F. Supp. 545, 563-67 (E.D. Pa. 1960), *aff'd*, 365 U.S. 567 (1961).

[14] The "HHI" or Herfindahl-Hirschman Index is the sum of the squares of the market shares of each market participant and a commonly accepted way of measuring market concentration. Compl. ¶ 265.

Third, while Section 7 does not require a showing of actual anticompetitive effects, *see Brown Shoe*, 370 U.S. at 323 & n.39, the complaint plausibly alleges that USAP's acquisitions significantly increased its bargaining leverage over insurers, leading to increased prices. Compl. ¶¶ 118, 148, 268, 280, 314-27. This increase in bargaining leverage, and the resulting price increases, are quintessential anticompetitive effects that courts cite in condemning mergers. *See*, *e.g.*, *FTC v. Hackensack Meridian Health, Inc.*, No. 20-cv-18140, 2021 WL 4145062, at *23-24 (D.N.J. Aug. 4, 2021) (crediting direct evidence of potential price increases resulting from "Acquisition Clauses" with commercial insurers), *aff'd*, 30 F.4th 160, 175 (3d Cir. 2022).

Fourth, the complaint plausibly alleges other hallmarks of acquisitions that may substantially lessen competition. The acquisitions eliminated head-to-head competition between USAP and its acquired rivals. *See, e.g.*, Compl. ¶¶ 105, 110, 132, 136, 142; *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 569 (6th Cir. 2014); *2023 Merger Guidelines* § 2.2. They created additional barriers to entry or expansion in the markets. *See, e.g.*, Compl. ¶¶ 109-10, 132, 136; *FTC v. Proctor & Gamble Co.*, 386 U.S. 568, 578-79 (1967). And they furthered a trend towards concentration. *See* Compl. Tables 1, 3, 5; *Chi. Bridge & Iron*, 534 F.3d at 428, 432 & n.12.

Fifth, the complaint plausibly alleges that the acquisitions "tend to create a monopoly" by bringing USAP "measurably closer" to achieving monopoly power. *du Pont*, 353 U.S. at 592-93 (citation omitted). Indeed, the complaint alleges that USAP is a monopolist in Houston and Dallas thanks to its acquisitions (and other conduct). *See supra* Part II.A.1. And it alleges that, by acquiring Capitol Anesthesia, USAP grew from a small presence in Austin into the region's dominant anesthesia provider. Compl. ¶¶ 286, 290 & Table 5.

### C.  The complaint states a claim against USAP's price-setting arrangements

Count IX charges USAP's price-setting arrangements as unlawful under Section 1 of the Sherman Act, which prohibits (1) agreements that (2) unreasonably restrain trade. *See* 15 U.S.C.

§ 1; *BRFHH Shreveport*, 49 F.4th at 525. USAP asserts that this claim should be dismissed, purportedly because the complaint does not allege "an 'agreement' between USAP and competing anesthesiology practices." USAP Mot. 32-35. USAP does not actually dispute the existence of an agreement, however. Unlike in the only case it cites,[15] USAP acted on written contracts—ones allowing it to set competitors' prices by billing for them using its own name and credentials. *See* Compl. ¶¶ 184, 186, 192-94, 201-02. These plainly constitute agreements. *In re AndroGel Antitrust Litig. (No. II)*, No. 1:09-MD-2084-TWT, 2018 WL 2984873, at *7-8 (N.D. Ga. June 14, 2018) (contracts "specifically address[ing] the conduct the Plaintiffs argue is unlawful" satisfy "agreement" element). USAP's real contention is that its agreements "bear[] no resemblance to price fixing" and thus are not unlawful. USAP Mot. 4. But USAP is incorrect.

"It has long been settled that an agreement to fix prices is unlawful *per se*." *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980). This "per se ban on price fixing is not limited to an express horizontal agreement setting a uniform price for a product or service." *Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 412 (S.D.N.Y. 2000). Rather, "[t]he scope of conduct found to constitute horizontal price-fixing agreements warranting application of the *per se* rule is broad." *United States v. Jindal*, No. 4:20-CR-00358, 2021 WL 5578687, at *4 (E.D. Tex. Nov. 29, 2021) (collecting cases).

Among other things, the per se rule applies to arrangements that give one party the power to set a competitor's price. In *Saint Francis Hospital*, for instance, the court held the per se rule applied when two competing hospitals formed a third and relied on it to "jointly negotiat[e] contracts and rates" with insurers. 94 F. Supp. 2d at 406, 414. Although the defendants argued they had agreed only to abide by the rate their agent negotiated—not to charge a predetermined

---

[15] *Cf. BRFHH Shreveport*, 49 F.4th at 526-28 (evaluating whether a "tacit" agreement existed).

price—the court recognized that the "practical effect" was to "prevent[] determination of the rates and terms of the services they provide by free competition alone." *Id.* at 412, 414. *See also Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134-36 (1969) (affirming judgment where joint agent set newspaper prices); *Va. Excelsior Mills, Inc. v. FTC*, 256 F.2d 538, 540 (4th Cir. 1958) (affirming that joint agent setting uniform prices was per se unlawful).

Here, as in *Saint Francis Hospital*, the complaint plausibly alleges that USAP's price-setting arrangements effectively appoint USAP as the price-setting agent for its direct competitors. Previously, USAP and each of the three competitors set their own rates. Compl. ¶¶ 6, 175-76. Under the price-setting arrangements, however, USAP's higher rates apply across the board. *Id.* ¶¶ 187, 189, 193, 196, 202-203. Each arrangement thus "function[s] the same as an agreement between USAP and the non-USAP providers to charge the higher USAP rates." *Id.* ¶ 177. This qualifies for per se condemnation.

USAP's efforts to escape liability all fail. First, calling the price-setting arrangements mere "contracts to provide back-office, administrative services" (USAP Mot. 32-33) contradicts the well-pleaded facts that they—unlike more benign agreements—allow USAP to set competitors' prices. Compl. ¶¶ 6, 176-78. Second, that USAP shared only some of the excess revenues with its competitors and kept some for itself (*see* USAP Mot. 33-34) does not change the reality that prices to *customers* were set by agreement and not independently—the relevant antitrust question. *See, e.g.*, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 221 (1940) ("Any combination which tampers with price structures is engaged in an unlawful activity."). Finally, even if the per se rule did not apply (and it does), the complaint still plausibly alleges that USAP's price-setting arrangements are unlawful. Because these agreements between competitors resulted in higher prices for consumers, an "observer with even a rudimentary

understanding of economics could conclude that the[y] . . . have an anticompetitive effect." *See N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 360, 363-71 (5th Cir. 2008) (describing the "inherently suspect" framework and affirming that physician organization negotiating prices on behalf of members was unlawful). For these reasons, the Court should not dismiss Count IX.

      **D.**      **The complaint states a "standalone" Section 5 claim broader than its Sherman or Clayton Act claims**

Counts II, V, VII, and VIII charge USAP with violating Section 5 of the FTC Act, 15 U.S.C. § 45(a). USAP incorrectly contends these counts must be dismissed for the same reasons as the others because Section 5 is "merely derivative" of the Sherman and Clayton Acts. USAP Mot. 35 n.13. To be sure, practices that violate the Sherman Act or the Clayton Act violate Section 5. *See Ind. Fed'n of Dentists*, 476 U.S. at 454. But it is "well established" that Section 5 also prohibits "trade practices which conflict with the basic policies of the Sherman and Clayton Acts even though such practices may not actually violate these laws." *FTC v. Brown Shoe Co.*, 384 U.S. 316, 321 (1966). *See also Ind. Fed'n of Dentists*, 476 U.S. at 454-55 (Section 5 "encompass[es] not only practices that violate the Sherman Act and the other antitrust laws but also practices the Commission determines are against public policy for other reasons" (internal citations omitted)). For this reason, Section 5 does not require the same proof—including of market definition or competitive effects. *See, e.g., FTC v. Texaco, Inc.*, 393 U.S. 223, 230 (1968) ("It is enough that the Commission found that the practice in question unfairly burdened competition for a not insignificant volume of commerce."); *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 371 (1965) ("unnecessary to embark upon a full-scale economic analysis of competitive effect").

Instead, conduct may violate Section 5 if it is both (1) a method of competition; and (2) unfair—by going beyond competition on the merits. *See, e.g., E.I. du Pont de Nemours & Co. v. FTC*, 729 F.2d 128, 138-40 (2d Cir. 1984) (conduct that is "collusive, coercive, predatory or

exclusionary," or possesses other "indicia of oppressiveness," violates Section 5). The complaint plausibly alleges conduct falling squarely within that prohibition. USAP's behavior reflects the decade-long implementation of a deliberate anticompetitive scheme. Compl. ¶¶ 96-100. As a result of this scheme, USAP has acquired and exploited positions in important hospitals, increased its bargaining leverage over insurers, and raised prices to patients and their employers, who now pay tens of millions of dollars more for anesthesia services. *Id.* ¶¶ 304-05, 308-10.

USAP's violations of the Sherman and Clayton Acts establish a violation of the FTC Act. But even if they did not, the complaint states a claim for violations of the FTC Act on a standalone basis and dismissal is therefore unwarranted.

## CONCLUSION

For the foregoing reasons, the Court should deny USAP's motion to dismiss.

Dated: January 19, 2024

Respectfully submitted,

/s/ Kara Monahan
Kara Monahan
  Attorney-in-Charge
  NJ Bar No. 011392010 (*Pro Hac Vice*)
Bradley S. Albert (*Pro Hac Vice*)
Michael J. Arin (*Pro Hac Vice*)
Daniel W. Butrymowicz (*Pro Hac Vice*
  pending)
Timothy Grayson (*Pro Hac Vice*)
Dylan Herts (*Pro Hac Vice*)
Leah P. Hubinger (*Pro Hac Vice*)
Patrick Kennedy (*Pro Hac Vice*)
Neal Perlman (*Pro Hac Vice*)
Gary H. Schorr (*Pro Hac Vice*)
Eric. M. Sprague (*Pro Hac Vice*)

600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Tel: (202) 326-2018
kmonahan@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on this day, I caused the foregoing Plaintiff Federal Trade

Commission's Opposition to U.S. Anesthesia Partners, Inc.'s Motion to Dismiss, Proposed

Order, and the First and Second Appendices of Authorities in this opposition to be served on all

counsel of record using the ECF system of the United States District Court for the Southern

District of Texas.

Dated: January 19, 2024

*/s/ Kara Monahan*
Kara Monahan
Attorney-in-Charge
NJ Bar No. 011392010 (*Pro Hac Vice*)
600 Pennsylvania Avenue, N.W.
Washington, DC 20580
Tel: (202) 326-2018

*Counsel for Plaintiff*
*Federal Trade Commission*