# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**FEDERAL TRADE COMMISSION,**

**Plaintiff,**

**v.**

**U.S. ANESTHESIA PARTNERS, INC., et al.,**

**Defendants.**

**Case No.: 4:23-CV-03560-KH**

**First Appendix to**
**Plaintiff Federal Trade Commission's Opposition to**
**U.S. Anesthesia Partners, Inc.'s Motion to Dismiss**

## Table of Contents – First Appendix

### Cases

*Behrend v. Comcast Corp.*,
No. 03-cv-6604, 2012 WL 1231794 (E.D. Pa. Apr. 12, 2012)................................................. 4

*Clean Water Opportunities, Inc. v. Williamette Valley Co.*,
759 F. App'x 244 (5th Cir. 2019) ........................................................................... 40

*Constr. Cost Data, LLC v. Gordian Grp., Inc.*,
No. CV H-16-114, 2017 WL 2266993 (S.D. Tex. Apr. 24, 2017)....................................... 45

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*,
No. 01-cv-2669-WHP, 2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002).............................. 61

*Eastman v. Quest Diagnostics, Inc.*,
No. 15-cv-00415-WHO, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016)............................. 77

*FTC v. AdvoCare Int'l, LP*,
No. 4:19-CV-715-SDJ, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020)............................... 89

*FTC v. Am. Future Sys., Inc.*,
No. 20-cv-2266, 2021 WL 3185777 (E.D. Pa. July 26, 2021) .............................................. 95

*FTC v. Hackensack Meridian Health, Inc.*,
No. 20-cv-18140, 2021 WL 4145062 (D.N.J. Aug. 4, 2021) ...............................................101

*FTC v. ProMedica Health Sys., Inc.*,
No. 3:11 CV 47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ....................................... 130

## Table of Contents – Second Appendix

**Cases**

*FTC v. SuperTherm Inc.*,
No. CV-20-08190-PCT-DWL, 2021 WL 3419035 (D. Ariz. Aug. 5, 2021) ......................... 4

*FTC v. Surescripts, LLC*,
No. CV 19-1080 (JDB), 2023 WL 2707866 (D.D.C. Mar. 30, 2023)................................. 13

*FTC v. Walmart Inc.*,
No. 22-cv-3372, 2023 WL 2646741 (N.D. Ill. Mar. 27, 2023) ............................................ 43

*In re Androgel Antitrust Litig. (No. II)*,
No. 1:09-MD-2084-TWT, 2018 WL 2984873 (N.D. Ga. June 14, 2018) ...........................76

*United States v. Jindal*,
No. 4:20-CR-00358, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) ................................... 98

*Warren v. New Orleans Police Dep't*,
No. 92-cv-2037, 1992 WL 245655 (E.D. La. Sept. 11, 1992) ............................................115


**Other Authorities**

S. Rep. 93-151, at 30-31 (1973) ..................................................................................................117

U.S. Dep't of Justice & FTC,
*Horizontal Merger Guidelines* § 5.3 (Aug. 19, 2010) ...........................................................138

U.S. Dep't of Justice & FTC,
*Merger Guidelines* §§ 2.1-2.2, 2.7-2.8 (Dec. 18, 2023) ......................................................144

Phillip E. Areeda & Herbert Hovenkamp,
*Antitrust Law* ¶ 701 (2023) ......................................................................................................170

Behrend v. Comcast Corp., Not Reported in F.Supp.2d (2012)

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

2012 WL 1231794

Only the Westlaw citation is currently available.

United States District Court,

E.D. Pennsylvania.

Caroline BEHREND, et al.

v.

COMCAST CORPORATION, et al.

Civil Action No. 03–6604.

|

April 12, 2012.

**Attorneys and Law Firms**

Carol A. Mager, Console Law Office LLC, David Anziska, Martin I. Twersky, Berger & Montague, PC, Roberta D. Liebenberg, Fine, Kaplan and Black, Philadelphia, PA, Daniel H. Charest, Donna McNamara, Stephen Shackelford, Jr., Susman Godfrey LLP, Dallas, TX, Douglas A. Millen, William H. London, Freed, Kanner, London & Millen LLC, Bannockburn, IL, Hilary K. Ratway, Hausfeld LLP, Washington, DC, Jayne A. Goldstein, Shepherd, Finkelman, Miller & Shah, Media, PA, Jessica N. Servais, Katherine T. Kelly, Heins, Mills & Olson PLC, Minneapolis, MN, Joseph Goldberg, Sara Berger, Freedman, Boyd, Daniels, Hollander & Goldberg, PA, Albuquerque, NM, Shawn Jonathan Rabin, Susman Godfrey, L.L.P., Annika K. Martin, Lieff, Cabraser, Heimann & Bernstein LLP, New York, NY, William R.H. Merrill, Susman Godrey, LLP, Houston, TX, Joseph R. Saveri, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA, for Plaintiffs.

Alycia Regan Benenati, David M. Max, Dorit Ungar, James T. Cain, Michael E. Hagenson, Michael S. Shuster, Sheron Korpus, Kasowitz, Benson, Torres & Friedman, LLP, New York, NY, Darryl J. May, Burt M. Rublin, Ballard, Spahr, Andrews & Ingersoll, LLP, Philadelphia, PA, for Defendants.

---

***MEMORANDUM***

PADOVA, District Judge.

**I. INTRODUCTION**

**\*1** Presently before the Court in this class action suit alleging violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, is the motion of Defendants Comcast Corporation, Comcast Holdings Corporation, Comcast Cable Communications, Inc., Comcast Cable Communications Holdings, Inc., and Comcast Cable Holdings, LLC (collectively "Comcast") for summary judgment pursuant to Fed.R.Civ.P. 56. The Third Amended Complaint alleges that Comcast entered into agreements with its competitors to allocate the nation's regional cable markets amongst themselves through swaps of their respective cable assets. The Class alleges that, as a result of all the swap agreements, Comcast unreasonably restrained trade and willfully obtained and maintained monopoly power in the relevant geographic market, the Philadelphia direct marketing area ("DMA"). The Class contends that Comcast has used its monopoly power to raise cable prices to artificially high, supra-competitive levels. For the following reasons, we grant Comcast's motion for summary judgment on the Class's section 1 claim, insofar as it charges that Comcast's conduct was a *per se* violation of the antitrust laws. We also grant the motion in part on the Class's section 2 claims.

**II. SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). An issue is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party also bears the burden of proof at trial, that party must support its motion with sufficient evidence that would entitle it to a directed verdict. *In re Bressman,* 327 F.3d 229, 237 (3d Cir.2003) (citations omitted). Once the moving party has made such a showing, the non-moving party can defeat the motion "with probative evidence that would demonstrate the existence of a triable issue of fact." *Id.* at 238 (citations omitted).

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

## III. SECTION 1 *PER SE* LIABILITY BASED UPON HORIZONTAL MARKET ALLOCATION

In order to prove its antitrust claims, the Class must establish: (1) a violation of the antitrust laws, here sections 1 and 2 of the Sherman Act, (2) individual injury resulting from that violation (antitrust impact), and (3) measurable damages. 15 U.S.C. § 15; *In re Hydrogen Peroxide Antitrust Litig.,* 552 F.3d 305, 311 (3d Cir.2008) (citing *Am. Bearing Co. v. Litton Indus., Inc.,* 729 F.2d 943, 948 (3d Cir.1984)). Section 1 of the Sherman Act condemns contracts, conspiracies, and combinations in restraint of trade. 15 U.S.C. § 1. Because even beneficial legitimate contracts or combinations restrain trade to some degree, section 1 has long been interpreted to prohibit only those contracts or combinations that are "unreasonably restrictive of competitive conditions." *Standard Oil Co. of N.J. v. United States,* 221 U.S. 1, 58, 31 S.Ct. 502, 55 L.Ed. 619 (1911). "Three general standards have emerged for determining whether a business combination unreasonably restrains trade under section 1." *United States v. Brown Univ.,* 5 F.3d 658, 668 (3d Cir.1993).

**\*2** Under traditional "rule of reason" analysis, a fact finder "weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). "The inquiry is whether the restraint at issue 'is one that promotes competition or one that suppresses competition.'" *Deutscher Tennis Bund v. ATP Tour, Inc.,* 610 F.3d 820, 830 (3d Cir.2010) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 691, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978)). To establish a section 1 violation under the rule of reason test, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action. *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 464–65 (3d Cir.1998) (citation omitted).

"The plaintiff bears an initial burden under the rule of reason of showing that the alleged combination or agreement produced adverse, anticompetitive effects within the relevant product and geographic markets." *Brown [Univ.],* 5 F.3d at 668. "The plaintiff may satisfy this burden by proving the existence of actual anticompetitive effects," or defendant's market power. *Id.* "If a plaintiff meets his initial burden of adducing adequate evidence of market power or actual anti-competitive effects, the burden shifts to the defendant to show that the challenged conduct promotes a sufficiently pro-competitive objective." *Id.* at 669. "To rebut, the plaintiff must demonstrate that the restraint is not reasonably necessary to achieve the stated objective." *Id.*

*Deutscher Tennis Bund,* 610 F.3d at 830.

Certain restraints are *per se* illegal " 'because of their pernicious effect on competition and lack of any redeeming virtue....' " *Id.* (quoting *Brown Univ.* 5 F.3d at 669); *see also N.* *W. Wholesale Stationers, Inc. v. Pac. Stationery and Printing Co.,* 472 U.S. 284, 289–90, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). However, " '[p]er se liability is reserved for only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.' " *Deutscher Tennis Bund,* 610 F.3d at 830 (quoting *Texaco Inc. v. Dagher,* 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006) (stating "this Court presumptively applies rule of reason analysis....") (quoting *Nat'l Soc'y of Prof'l Eng'rs,* 435 U.S. at 692)); *see also* *State Oil v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("Per se treatment is appropriate '[o]nce experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it.' " (quoting *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 344, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982) (alteration in original)). A horizontal market allocation agreement is one of the species of perniciously anticompetitive conduct that is *per se* illegal. *See* *Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49–50, 111 S.Ct. 401, 112 L.Ed.2d 349 (1990) (per curium); *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 608, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972).

Behrend v. Comcast Corp., Not Reported in F.Supp.2d (2012)

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

**\*3** Finally, courts apply an intermediate or "quick look" rule of reason analysis "in cases where *per se* condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint." *Deutscher Tennis Bund,* 610 F.3d at 830 (quoting *Brown Univ.,* 5 F.3d at 669 (internal quotation marks omitted)). "Under 'quick look' analysis, the competitive harm is presumed, and 'the defendant must promulgate 'some competitive justification' for the restraint.' " *Id.* at 831 (quoting *Brown Univ.,* 5 F.3d at 669 quoting *NCAA v. Bd. of Regents,* 468 U.S. 85, 110, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)). [1]

Comcast argues that application of the *per se* rule here is improper for several reasons. First, it asserts that courts are increasingly reluctant to apply the *per se* label, especially where the economic impact of the challenged business practice is not immediately obvious. Second, no court has previously condemned as a *per se* violation transactions that have been approved by federal antitrust or regulatory agencies. [2] Third, it asserts that the alleged market allocation here was not among competing firms. [3] Finally, Comcast contends that the swap transactions were not naked restraints on trade because no markets were actually allocated since the swap agreements did not contain no-compete clauses restricting the Counterparties from re-entering the market and competing with one another. The Class responds that the summary judgment record establishes a horizontal allocation of markets between competitors that is a naked restraint on trade constituting a *per se* violation of section 1.

### A. Comcast's Acquisition of Cable Companies and Cable Assets

Beginning in 1998, Comcast embarked upon a course of conduct to create a cable "cluster" in the Philadelphia DMA by acquiring the cable systems of other large multi-system operators ("MSOs") that operated and offered multichannel video programming distributor ("MVPD") service in various franchise areas in the Philadelphia DMA. (*See* Class Certification Memorandum Opinion, Doc. No. 430, entered January 7, 2010 ("Class Cert. Mem."), at 7–8 n. 8; Def. Ex. 59, Deposition of Michael A. Williams, Ph. D. on May 29, 2009 ("Williams Dep."), at 104–105.) In the first acquisition transaction, occurring in April 1998, Comcast acquired from Marcus Cable certain cable systems operating as the incumbent wireline MVPD provider in franchise areas located in Kent County, Delaware, serving approximately 27,000 subscribers. (*See* Compl., ¶ 52(a) [4]; Class Cert. Mem., p. 7–8 n. 8.) In June 1999, Comcast acquired from Greater Philadelphia Cablevision, Inc. certain cable systems operating as the incumbent wireline MVPD provider in franchise areas located in one of the four franchise areas in the City of Philadelphia. The system had approximately 79,000 subscribers. (Compl.¶ 52(b); Class Cert. Mem., p. 7–8 n. 8.)

**\*4** In January 2000, Comcast acquired certain cable systems previously owned and operated by Lenfest Communications, Inc. ("Lenfest") in the Philadelphia region. The Lenfest systems operated as the incumbent wireline MVPD operator in franchise areas located in Berks, Bucks, Chester, Delaware, and Montgomery Counties, Pennsylvania; Atlantic, Camden, Burlington, Cape May, Cumberland, and Salem Counties, New Jersey; and New Castle County, Delaware. These cable systems served approximately 1.1 million cable subscribers. (*See* Compl., ¶ 52(c); Class Cert. Mem., p. 7–8, n.8.) Comcast also acquired Lenfest's ownership interests in Garden State Cablevision L.P. and its 212,000 subscribers located in the Philadelphia DMA. (Expert Decl. of Michael Williams, Ph.D. ¶ 113 ("Williams Decl.").) Thus, Comcast acquired a total of approximately 1.25 million subscribers from Lenfest.

Comcast's acquisition of the Lenfest systems was part of a larger course of conduct of swapping cable assets to build Comcast's cable cluster in the Philadelphia DMA. In December 2000 and April 2001, Comcast and AT & T Corporation swapped certain cable system assets that were previously owned by MediaOne Group, Inc., including AT & T-owned systems operating as the incumbent wireline MVPD provider in franchise areas located in the Philadelphia region. (*See* Compl., ¶ 55(a), (c); Class Cert. Mem., p. 7–8, n. 8.) Prior to the transaction, Comcast had sought a merger agreement with MediaOne, but AT & T had made a superior bid. (Pl.Ex. 32 at COM—PA1151021.) Rather than engage in "another round of competitive bidding," Comcast and AT & T "reach[ed] an amicable and acceptable alternative" calling for Comcast to terminate its proposed merger and for the two companies to divide the MediaOne assets between themselves. (*Id.*) In the transaction, Comcast acquired from AT & T approximately 1.365 million MediaOne and legacy AT & T subscribers in the Philadelphia DMA—representing all of AT & T's cable assets and subscribers in the Philadelphia DMA—in exchange for AT & T's receipt of all of Comcast's cable assets and subscribers in Chicago and certain parts of California, Colorado, Florida, Georgia and Pennsylvania (all of which were outside the Philadelphia DMA). (Williams'

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

Decl. ¶ 113; Compl. ¶ 55(b).) As a result of the transaction, AT & T exited the Philadelphia DMA.

Leo Hindery, the former CEO of TCI, as well as AT & T Broadband after it acquired TCI, authored a book in which he described how Comcast's acquisition of Lenfest was intimately tied to the AT & T/Comcast/MediaOne swap transaction. At that time, AT & T owned 50% of Lenfest, with the other 50% owned by the company's founder, Harold "Gerry" Lenfest, and his family. Hindery, who wanted to acquire MediaOne to both build AT & T's cable business and to create cross-marketing opportunities for AT & T's branded telephone service, developed a strategy to combat Comcast's bid for MediaOne by attempting to purchase the other half of Lenfest in order to offer it as "trade bait" to Comcast in exchange for Comcast dropping its pursuit of MediaOne. (Pl.Ex. 52, Hindery, *The Biggest Game of All,* p. 133, 146–151.) Hindery was successful, and the combined result of the transactions gave Comcast control of its own legacy franchises in the Philadelphia DMA, the much larger holdings of Lenfest, and AT & T's former legacy franchises in the Philadelphia DMA.

**\*5** In January 2001, Comcast and Adelphia Communications Corporation swapped certain cable system assets, including Adelphia-owned systems operating as the incumbent wireline MVPD provider in franchise areas located in Chester, Delaware and Montgomery Counties, Pennsylvania, involving 464,000 subscribers—representing all of Adelphia's cable assets and subscribers in the Philadelphia DMA. As a result of the transaction, Adelphia exited the Philadelphia DMA. (*See* Compl., ¶ 55(b); Class Cert. Mem., p. 7–8, n. 8; Williams Decl. ¶ 113.)

In July 2006, Time Warner Cable, Inc. ("Time Warner") and Comcast acquired, pursuant to a joint bid, certain cable systems from the bankruptcy estate of Adelphia (the "Time Warner/Comcast/Adelphia Transaction"). As part of the Time Warner/Comcast/Adelphia Transaction, Comcast and Time Warner swapped certain cable systems, including both self-owned systems as well as Adelphia-owned systems. One of the systems Comcast acquired was a Time Warner-owned cable system operating as the incumbent wireline MVPD provider in the city of Philadelphia, serving approximately 40,000 subscribers. (See *Adelphia Comm'ns Corp.,* 21 FCC Rcd 8203 (2006) ("Time Warner/Comcast/Adelphia Order"), ¶ 12; *see also* Class Cert. Mem., p. 7–8, n. 8.) The transaction involved all of Time Warner's cable assets and subscribers in

the Philadelphia DMA. As a result of the transaction, Time Warner exited the Philadelphia DMA.

Finally, in August of 2007, Comcast acquired from Patriot Media & Communications ("Patriot") certain cable systems operating as the incumbent wireline MVPD provider in franchise areas located in Somerset, Hunterdon, Morris and Mercer counties in New Jersey, serving approximately 81,000 subscribers. (*See* Class Cert. Mem., p. 7–8, n. 8; Def. Ex. 38, Plaintiffs' Class Certification Hearing Ex. 91; *see also* Def. Ex. 27, Comcast Press Release, Comcast Corporation to Acquire Patriot Media, April 3, 2007.)

B. The Class's Evidence of Comcast's Anticompetitive Intent in Forming the Philadelphia Cluster.

The Class presents evidence in several areas to support its contention that there are genuine issues of material fact concerning whether Comcast had anticompetitive intent in entering into the swap transactions.

1. Evidence that Comcast had a long-standing corporate strategy to develop clusters.

The Class cites to internal Comcast documents evincing a twenty-year strategy of acquiring cable properties in contiguous areas, including the Philadelphia DMA. (*See e.g.,* Pl.Ex. 49, "Comcast History—1998–1999," p. 3 ("For nearly twenty years, Comcast had pursued a strategy of acquiring cable properties in contiguous areas, especially in the Atlantic seaboard region...."); Pl.Ex. 51, Special Board Mtg. Minutes of May 24, 1999, p. 1 (concerning the Adelphia swaps, Comcast CEO Brian Roberts "noted that the Company, under the proposed swaps, would acquire cable systems in New Jersey and Eastern Pennsylvania to enhance the Company's clustering strategy in its mid-Atlantic region.").) In announcing the bid to acquire MediaOne assets, CEO Roberts emphasized that the combination would have a direct clustering effect, giving Comcast clusters in the top 20 markets representing 80% of the cable market and would leave Comcast a "well-clustered company." (Pl.Ex. 54, Tr. of Conf. Call of March 22, 1999, p. 2.) After the agreement with AT & T supplanted Comcast's initial MediaOne bid, and resulted in Comcast and AT & T allocating Lenfest's cable systems to Comcast, Roberts stated that Comcast's "clustering position becomes even better." (Pl.Ex. 49, Comcast History 1998–1999, p. 12.) Comcast COO Steven Burke testified that Comcast's goal was "to have clusters that were as big as possible in each DMA, our goal was and is." (Pl.Ex. 82, Dep. of Steven Burke on December 5, 2008 ("S. Burke Dep."),

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

117:10–12.) Burke wrote to the attendees of a corporate retreat that, "[f]ully 85% of our 8.2 million subscribers will be in clusters over 200,000 subscribers. These clusters represent a unique opportunity to maximize our business *if* we learn how to manage them as efficiently as possible." (Pl.Ex. 63, "Clusters/2000 Management Retreat," p. 1 (emphasis in original).) Robert Pick, Comcast's executive in charge of corporate development wrote that clustering "is the impetus for the next wave of cable acquisitions." (Pl.Ex. 26A, "Trades/Swap Memo.") In testimony before the FTC in the Adelphia acquisition case, Pick stated that Comcast and Time Warner agreed to divide Adelphia assets between themselves to enable geographic clustering, which "was really most important to Comcast.... [T]o the extent we could get an entire market, that was important because we wanted—we wanted clustering." (Pl.Ex. 26, Dep. of Robert Pick of July 19, 2005, 36:5–21.)

    2. Evidence that the purpose behind the swaps and acquisitions strategy was to control, dominate and consolidate cable markets.

 **\*6** The Class cites numerous Comcast internal documents as evidencing its strategy to gain control over cable markets. In announcing Comcast's acquisition of Lenfest, Roberts stated that "Comcast views geographic consolidation of key markets as critically important to the company's future." (Pl.Ex. 62, Comcast Press Release of January 18, 2000, p. 1.) Joseph Donnelly of Comcast's corporate development unit wrote about the Adelphia acquisition, "step back and say where does it get us—ie—can we dominate mkt, etc." (Pl.Ex. 29, Handwritten note on Letter of July 22, 1999.) An analysis of a Toledo, Ohio cable company noted its acquisition "would present Comcast with the opportunity to own approximately 50% of the 66th largest DMA in the nation." (Pl.Ex. 39, Memo of May 27, 1999.) An analysis of Cablevision properties stated that the "Cleveland market offers Comcast the opportunity to consolidate the 13th largest DMA in the country, as currently, no MSO dominates this market" and the "Kalamazoo system offers Comcast the opportunity to dominate a top–50 DMA, provided Comcast does a second swap with AT & T to obtain its subscriber base in this market." (Pl.Ex. 40, Memo of October 13, 1999, p. 4.) A 2005 memo about New Hampshire stated Comcast had a "real opportunity to consolidate this market along DMA-rational lines and effectively lock up one of the real growth areas in New England." (Pl.Ex. 41, Email of October 19, 2005.)

    3. Evidence that clustering was a common strategy among market participants.

In his book, Leo Hindery declared that shared markets made no sense in the cable industry; that the industry would benefit from clustering with one cable operator per market; and to effectuate this happening, cable operators would have to voluntarily swap systems across the country. (Pl.Ex.52, Hindery, *The Biggest Game of All,* p. 73–74.[5]) In his deposition, Hindery testified that "the whole premise ... was that some operators would leave an area and others would stay and you would become the significant operator in that DMA." (Pl.Ex. 89, Dep. of Leo Hindery of November 14, 2008 ("Hindery Dep."), 190:14–16.) He stated that "all of the cable operators by 1997, 1998, at TCI's urging, adopted [his strategy].... Every major company participated in the exchange of systems over those 24 months, roughly." (*Id.* at 86:14–18.)

When asked about Comcast's desire to control DMAs, Brian Roberts stated in his deposition that, during the time frame of the July 2006 Time Warner/Comcast/Adelphia swap transaction, "there was a lot of swapping going on, as you referred to, that Mr. Hindery facilitated. Satellite is there, as a real competitor. There are other competitors in the market, real and future competitors, like phone companies. I think it's, you know, the notion of aggregating more customers in one cluster. Once you do so, there's only an incumbent cable company in each of these different 30,000 franchises, and if somebody is able to secure acquiring them, then they have a major presence in the market." (Pl.Ex. 93, Roberts Dep., 127:22–128:11.)

    4. Evidence that the swap agreements were naked restraints of trade as market and customer allocations.

 **\*7** To support its position that Comcast engaged in an illegal market allocation scheme, the Class cites to numerous Comcast internal documents, wherein company executives discussed "rationalizing" the cable industry through possible cable swaps and acquisitions that would consolidate Comcast's position in certain markets in exchange for its giving up positions in other markets. (*See* Pl.Ex. 28, Memo of August 15, 1996, p. 2 ("Both Comcast and Adelphia would like to obtain the other's eastern Florida systems."); Pl.Ex. 32, Special Bd. Mtg. Minutes of May 4, 1999, p. 3 (listing systems to be swapped between Comcast and AT & T); Pl.Ex. 36, Memo of July 11, 1996 (discussing Philadelphia DMA as a "Comcast Sacrosanct System"; and proposing swaps in California); Pl.Ex. 37,

Memo of September 29, 1997 (discussing swap of Pittsburgh system for New Jersey and Tennessee systems to "further rationalize the NYC"); Pl.Ex. 38, Memo of May 25, 1999 (discussing clustering opportunity in Southeast Georgia and South Carolina, including swaps of Savannah and Macon, Georgia systems where Comcast "currently dominates each of these markets"); Pl.Ex. 42, Memo of April 6, 2000 (discussing swap of Muncie, Indiana for Kentucy systems to enable Comcast to "get even better clustered" in the Indianapolis DMA in exchange for "get[ting] out of Kentucky"); Pl.Ex. 44 at COM–PA2107968, (attachment to email of April 8, 2003 discussing swaps in Ohio, Kentucy, Indiana, and New Mexico "to rationalize the large Ohio markets"); Pl.Ex. 46, Email of November 13, 2003 (discussing swaps in Tennessee, Colorado and New Mexico that were never consummated)). The Class also cites Steve Burke's testimony that Comcast and AT & T agreed to swap their respective cable assets in Philadelphia and Chicago because "there was no clear path to [Comcast] having a big cluster in Chicago, it would make more sense for us to get Philadelphia and to swap Chicago." (Pl.Ex. 82, S. Burke Dep. 109–110.) Robert Pick described the swapping of cable assets between Comcast and Time Warner as "horse trading" among the companies. (Pl.Ex. 26, Pick FTC Testimony, at 23:25–25:6; Pl.Ex. 92, Pick Dep. 228:3–8.)

5. Evidence that Comcast had anticompetitive intent to allocate markets.

The Class asserts that Comcast had an anticompetitive intent to allocate the Philadelphia DMA in entering into the AT & T transaction, based primarily upon the content of Leo Hindery's book describing the negotiations between Comcast and AT & T. [6] The Class describes the deal as an agreement by Comcast to stand down from competitive bidding with AT & T for MediaOne in return for receiving Lenfest. (Class Pl. Mem. at 43.) Its evidence of anticompetitive intent includes the Comcast Board minutes describing "discussions with AT & T to reach an amicable and acceptable alternative to another round of competitive bids," (Pl.Ex. 32, Special Mtg. Of Bd. Minutes of May 4, 1999, p. 2), as well as deposition evidence that the transaction made Comcast the dominant cable operator in the Philadelphia DMA. (*See* Pl.Ex. 31, Donnelly "Lenfest Due Diligence" Memo at 4 ("The acquisition of Lenfest will make Comcast the dominant CATV operator in the Philadelphia DMA (rank—4th)"); Pl.Ex. 89, Hindery Dep., 53:16–20 ("Q. When it attained Lenfest, did Comcast become dominant within the Philadelphia DMA? ... A. It certainly became the largest cable operator in that market,

yes.); Pl.Ex. 102, AT & T Bd. of Directors Mtg. of March 17, 1999 "Executive Summary" (noting Lenfest "is the leading cable television operator in the greater Philadelphia market."). [7]

6. Evidence of non-compete provisions.

**\*8** The Class argues that the existence of non-compete clauses further supports application of the *per se* rule. Contrary to Comcast's factual assertion, the Class asserts that following the MediaOne deal, Comcast obtained non-compete agreements with Gerry Lenfest and members of his family. (Pl.Ex. 25, Non–Compete Agreement of January 18, 2000.) The term was 3 years and covered Pennsylvania, Delaware and New Jersey. (*Id.*) While it does not assert that the non-compete agreements were themselves a *per se* violation, [8] the Class asserts that the non-compete agreements are evidence that Lenfest exited the market, and of Comcast's intention to dominate the Philadelphia market.

7. Evidence of the consequences of the swaps.

Finally, the Class contends that there is ample evidence of anticompetitive consequences arising from Comcast's clustering activity. It offers Dr. Williams' opinions that Comcast's gain in market share was a consequence of the swap transactions, making the Philadelphia DMA more concentrated, creating entry barriers, removing firms that competed in the geographic market, deterring overbuilding, and increasing prices. (Williams Decl. ¶ 56 ("In sum, economic analysis shows that Comcast's alleged anticompetitive conduct in the Philadelphia DMA reduced the extent of competition provided by overbuilders in the Philadelphia DMA. Econometric evidence shows that reductions in overbuilding cause cable rates to increase, all else equal. Thus, Comcast's conduct led to rates being increased or maintained above the level that would prevail in the absence of that conduct throughout the Philadelphia DMA."); ¶ 120 ("the effect of the swaps is to allocate that geographic market between the firms;" "market allocation has diminished competition in the Philadelphia DMA".)

C. Comcast's Evidence of Pro–Competitive Justifications.

Comcast responds to the Class's evidence by contending that none of the swap transactions were "naked" market allocation agreements with no other purpose or effect; that each involved real, substantial exchanges of plant, infrastructure, employees, contracts and other business resources; and its growth strategy to use clustering did not transform

otherwise lawful swap agreements into a horizontal market allocation because cable firms have legitimate business reasons for clustering that have been recognized by regulators and the Class's own experts. Comcast asserts that the summary judgment record establishes that clustering the Philadelphia DMA allowed it to introduce new products, such as high-speed internet, telephone, pay per view, video on demand, digital video recorders, digital cable, substantially increased channel choice and high-definition television. (Def. Statement of Undisputed Facts ¶ 48; Def. Ex. 50, Doyle Dep., 91:12–92:3.[9]). It also asserts that the economies of scale associated with clustering enable cable providers to compete against DBS companies with a national footprint, as well as telephone companies, who by virtue of their existing telephone clusters, and possessing vastly larger resources, were emerging as competitors in multiple product markets —video, data and telephone. (Def. Statement of Undisputed Facts ¶ 49–51; Def. Ex. 54, Deposition of Robert S. Pick on October 28, 2008 ("Pick Dep."), 56:1–57:23[10]; *see also* Def. Ex. 51, HinderyDep., 132:11–15[11]; Def. Ex. 56, Roberts Dep., 144:23–145:22.[12]). Finally, it asserts that the FCC has recognized the efficiencies associated with clustering and expressly considered the potential effects of clustering when it approved the Time Warner/Comcast/Adelphia transaction in 2006, well after clustering in the Philadelphia DMA had already occurred. (Def. Statement of Undisputed Facts ¶ 52–53; Def. Ex. 17, FCC 99–418, Sixth Annual Competition Report, ¶¶ 161–162[13]; *see also* Def. Ex. 18, FCC 01–1, Seventh Annual Competition Report, ¶ 166 (clustering "permits cable operators to ... gain efficiencies related to economies of scale and scope resulting in lower administrative costs, enhanced deployment of new technologies and services, and encouraging the extension into previously unserved areas"); Def. Ex. 19, FCC 01–389, Eighth Annual Competition Report, ¶ 14 ("By clustering their systems, cable operators may be able to achieve efficiencies that facilitate the provision of cable and other services, such as telephony.").).

**\*9** Based in large part upon these governmental reports, Comcast's expert Dr. David Tecce opined that the entry of the DBS companies, who were capable of offering higher quality digital television in a nationwide footprint, created a competitive crisis for cable firms, who up to that time were providing analog signals to non-contiguous individual franchise areas.

The need to make significant investments in order to upgrade cable systems to compete with DBS providers led to consolidation among cable operators. DBS had large-scale national operations, which gave them ability to take advantage of scale economies. To compete effectively, most cable firms needed to achieve larger scale.

(April 10, 2009 Expert Report of David J. Teece, Ph.D. ("Teece Report") at ¶ 17.) "As a result, cable firms sought to achieve economies of scale through mergers and acquisitions. Many old-line cable firms decided to sell their systems rather than make the investments in system upgrades necessary to stay competitive with DBS providers in the new competitive environment." (*Id.* ¶ 18.) Teece recounts the history of the "deployment of digital cable transmission that paved the way for cable firms to offer other advanced services. In addition to offering superior video picture quality, digital transmission allows for the provision of several other advanced digital services such as HDTV, Video–on–Demand ("VOD"), Digital Video Recorder ("DVR"), broadband Internet, and cable telephony. These technological advances have ushered a new paradigm in the telecommunications industry, dubbed 'convergence,' under which multiple forms of telecommunications content (audio, video, and data) are delivered to the consumer by a single firm." (*Id.* ¶ 16 (citations omitted).) He concludes that:

Regional clustering created significant efficiencies, including achieving economies of scale in upgrading systems to digital and to offer advanced services such as broadband Internet and cable telephony.... Clustering allowed cable operators to achieve regional scale comparable to DBS providers and ILECs. For instance, a former TCI and AT & T executive testified that clustering "had everything to do with putting ourselves in an operating cost structure that mirrored as closely as possible our nearest and closest competitors."

(*Id.* ¶ 21.)

Comcast also presents evidence that the entry of incumbent local exchange carriers ("LECs" or "ILECs") such as

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

Verizon's FiOS system, also created new competition for the cable industry. Dr. Teece reports that ILEC competition, which by 2008 had captured 18% market share, is expected to continue to provide significant competition to cable and DBS firms in the next few years. (*Id.* ¶ 25–26.) He states:

> The threat of competition from ILECs has been another factor contributing to cable operators' clustering strategy. Because the ILECs' phone footprints were much larger than a typical cable franchise area, clustering allowed cable firms to capture economies of scale and compete effectively in offering advanced services and selling advertising. According to testimony from a former TCI and AT & T executive, clustering was designed to "meet the challenge of these regional phone companies coming and providing video and providing Internet over their existing phone lines.

**\*10**  (*Id.* ¶ 28 (citations omitted).) Dr. Teece concludes that Comcast's clustering in response to new sources of competition has benefitted consumers. He asserts that consumers benefit from the programming diversity brought about by increased MVPD channel capacity (*id.* ¶ 32–33), and from the ability of a clustered system to provide advanced services such as HDTV, internet and cable telephony (*id.* ¶ 34–39).[14]

Another Comcast expert, Dr. Stanley Besen, opines that entry into the MVPD market by ILECs, who are essentially in the same shoes as wireline overbuilders, has not been impeded by clustering. He opines that,

> Verizon is currently an actual competitor, providing service that is comparable to that provided by the other operators in large sections of the Philadelphia Cluster. Moreover, Verizon is a well-financed, sophisticated company, with access to the same programming that is available to Comcast, an established brand-name, and long-standing consumer relationships. In addition, it is able to offer both telephone and high-speed internet services along with television programming, in what has come to be called "Triple Play" packages. In short,

> it poses a formidable competitive threat to Comcast and other cable operators not only as a potential but as an actual competitor. Verizon was not eliminated as either an actual or potential competitor by the transactions at issue so that, on Plaintiffs' theory, households in the areas that they serve, or might serve in the future, have not been harmed by the transactions at issue.

(May 6, 2009 Expert Report of Dr. Stanley Besen ¶ 32 (citations omitted).)

### D. Analysis

The United States Supreme Court has held that the *per se* test applies to naked restraints on trade, one where the "purpose of the practice are to threaten the proper operation of our predominantly free-market economy—that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.' " *Broad. Music, Inc. v. CBS.,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979) ("*BMI*" ) (quoting *United States v. U.S. Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *see also* 2 Areeda and Hovenkamp, *Antitrust Law,* § 305 (3d ed.2007) (*per se* rule "rests on various judgments about facts, economics, and social policy: that naked price fixing usually harms the economy if the collaborators have any marked power; that legitimate objectives are so rarely present that they should be disregarded; and that little or nothing worthwhile is lost by a categorical prohibition, which dispenses with unnecessary and costly litigation about power, purpose, effect, or claimed redeeming virtues, and which establishes the 'bright line' permitting those severe punishments that deter and guide private conduct."). The geographic division of markets among competitors is a *per se* violation of the Sherman Act. *See Palmer,* 498 U.S. at 49 (per curiam) ("[A]greements between competitors to allocate territories to minimize competition are illegal"); *Topco Assocs., Inc.,* 405 U.S. at 608 ("This Court has reiterated time and time again that '[h]orizontal territorial limitations ... are naked restraints of trade with no purpose other than stifling

of competition.' Such limitations are *per se* violations of the Sherman Act." (alteration in original; internal citations omitted)).

**\*11** However, even when the *per se* label has been applied to a category of anticompetitive conduct, the cases establish that courts may still look to see whether the economic effects of a particular practice in a particular industry justify abandoning a rule of reason analysis. In *BMI,* the Court found that, because the blanket license at issue, granting a licensee access to an entire music catalog, created an entirely different product from one that any given composer was able to sell by himself, and did not restrain the right of any individual copyright owner to sell his own compositions separately to any buyer at any price, it could not "be wholly equated with a simple horizontal arrangement among competitors." 441 U.S. at 23–24. The Court cautioned that when reviewing courts "have some doubt ... about the extent to which [a] practice threatens the 'central nervous system of the economy,' ... that is, competitive pricing as the free market's means of allocating resources," application of the *per se* rule should not be used to short circuit a more critical analysis of the practice. *Id.* (quoting *United States v. Socony–Vacuum Oil Co.,* 310 U.S. 150, 226 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)). Similarly, in *Eichorn,* the United States Court of Appeals for the Third Circuit held that even where the plaintiff alleged a classic variety of *per se* violation, in that case a group boycott, where the facts used to establish the antitrust violation "are substantially different from the classic *per se* horizontal price fixing and group boycott conspiracies the Court has generally found to be *per se* antitrust violations," the rule of reason must be used to determine whether the practice is condemned by section 1. *Eichorn,* 248 F.3d at 139 (citing *BMI,* 441 U.S. at 8 ("Easy labels [like price fixing] do not always supply ready answers.")).

The authorities agree that this "modern approach" to antitrust analysis should apply where the rationale of the *per se* rule does not neatly fit the industry involved. In *BMI,* the Supreme Court held that countervailing pro-competitive virtues, like the creation of efficiencies in the operation of a market or in the provision of goods and services, made application of the *per se* test inappropriate to blanket licenses for copyrighted music. 441 U.S. at 20 ("The blanket license, as we see it, is not a 'naked restrain[t] of trade with no purpose except stifling of competition,' *White Motor Co. v. United States,* 372 U.S. 253, 263, 83 S.Ct. 696, 702, 9 L.Ed.2d 738 (1963), but

rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use.")

In light of *BMI,* the earlier *Topco* decision, holding that horizontal market allocation agreements were a *per se* section 1 violation, has been criticized as going too far. One commentator stated,

> The Court in *Topco* was a bit like a driver who, because of his "rule" never to pick up hitchhikers, refuses to give a ride to a close friend whose car has broken down. This wooden approach to *per se* rules has been abandoned in subsequent horizontal restraint cases, particularly *Broadcast Music,* which emphasized the need to characterize restraints before applying a *per se* rule.... [U]nder *Broadcast Music,* a court must determine whether the restraint at issue is one to which the rationale of the rule applies. The *Topco* association could not possibly have been a cartel, because no licensee had a significant market share in its designated territory; the market shares were so trivial, that the licensees could have merged—at least under modern standards—without drawing the attention of the enforcement agencies. Moreover, the defendants articulated and proved procompetitive benefits. The association seems clearly to have been ancillary to a larger productive purpose.

**\*12** 2 Kintner, *Federal Antitrust Law,* § 11.39 (2002) (citing *Eichorn; Polk Bros. v. Forest City Enter.,* 776 F.2d 185,189–90 (7th Cir.1985) (holding that *per se* rule is designed for "naked" restraints rather than agreements that facilitate productive activity)); *see also Augusta News Co. v. Hudson News Co.,* 269 F.3d 41, 48 (1st Cir.2001) ("Despite unguardedly broad language in [*Topco* ], it is commonly understood today that *per se* condemnation is limited to 'naked' market division agreements, that is, to those that are not part of a larger pro-competitive joint

venture."). In *Polk Bros.*, the United States Court of Appeals for the Seventh Circuit noted that courts "must distinguish between 'naked' restraints, those in which the restriction on competition is unaccompanied by new production or products, and 'ancillary' restraints, those that are part of a larger endeavor whose success they promote." *Id.* at 188 (citing *National Collegiate Athletic Assoc. v. Bd. of Regents of Univ. of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984)). Noting the Supreme Court's admonition in *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 767–68, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) that "it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects," *Polk Bros.* stressed that

> a court must be very sure that a category of acts is anti-competitive before condemning that category *per se. See* [*BMI* ] and *NCAA, supra,* both of which assess under the Rule of Reason horizontal agreements that also involve cooperation among rivals that might produce larger output and more desirable products. Both *BMI* and *NCAA* emphasize that condemnation *per se* is an unusual step, one that depends on confidence that a whole category of restraints is so likely to be anticompetitive that there is no point in searching for a potentially beneficial instance.

776 F.2d at 189; *accord Texaco Inc. v. Dagher,* 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006) ("Accordingly, 'we have expressed reluctance to adopt *per se* rules ... 'where the economic impact of certain practices is not immediately obvious.' ' " quoting *State Oil Co.,* 522 U.S. at 10); *Eichorn,* 248 F.3d 131, 144 n. 2.

We find that the Class has failed to meet its summary judgment burden with respect to whether the swap transactions were naked market division agreements, rather than merely ancillary restraints on trade. The Class's evidence, for example, that Comcast executives, as well as Leo Hindery, had a long standing desire to "rationalize" the

cable industry by consolidating positions in certain markets in exchange for giving up positions in other markets, does not support the conclusion that the swap agreements were naked restraints of trade that were " 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.' " *Deutscher Tennis Bund,* 610 F.3d at 830 (quoting *Texaco Inc.,* 547 U.S. at 5). Moreover, the ability of cable companies to provide new and advanced services, achieved through clustering their systems, requires proof of facts that "are substantially different from the classic *per se* horizontal price fixing and group boycott conspiracies the Court has generally found to be *per se* antitrust violations.' " *Eichorn,* 248 F.3d at 139. The competitive efficiencies achieved by clustering—economies of scale needed to upgrade systems to digital service, and creating the ability to offer advanced services such as broadband Internet and cable telephony in larger geographic footprints to effectively compete with DBS providers and ILECs—are the type of pro-competitive conditions that the Third Circuit held can render an industry practice "substantially different from the classic" horizontal restraints subjected to *per se* treatment. *Eichorn* 248 F.3d at 139 (citing *BMI,* 441 U.S. at 8 ("Easy labels [like price fixing] do not always supply ready answers.")). Like the creation of the blanket license in *BMI,* creation of cable clusters in order to allow MVPD providers to offer new and improved products is not a categorically "naked restrain[t] of trade with no purpose except stifling of competition." *BMI,* 441 U.S. at 20. Accordingly, we hold that the rule of reason test is the proper method of analyzing the Class's section 1 claim.

## IV. SECTION 1 RULE OF REASON ANALYSIS— ACTUAL AND POTENTIAL COMPETITION

**\*13** Having addressed the parties' arguments on the issue of *per se* liability, the only section 1 issue remaining to be decided is Comcast's argument that summary judgment must be entered in its favor because the transaction counterparties were never "competitors." In granting class certification, we determined that class treatment of the section 1 liability issue was limited to whether the Class could demonstrate that Comcast conspired **with competitors** to allocate markets. (*See* Amended Class Certification Order, Doc. No. 432, entered January 13, 2010 ("1/13 Order"), ¶ 11(a) (emphasis added).) Comcast argues that, even applying a rule of reason analysis to the section 1 claim, the Class has

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

failed to meet its Rule 56 burden to create a genuine issue of fact that Comcast conspired with its competitors to allocate markets because the Transaction Counterparties never directly competed for cable subscribers. We find that the Class has met its Rule 56 burden to create a jury issue on whether Comcast and the Counterparties were competitors.

A. Evidence of Actual Competition.

Comcast concedes that, prior to the Transactions, Comcast and the Counterparties each offered cable services to subscribers in the Philadelphia DMA. However, it asserts that they were never "competitors" because, at all times, they operated cable systems in their own respective, non-overlapping franchise areas and never offered services to the same subscribers, at the same time, anywhere in the Philadelphia region. (Def. Ex. 59, Williams Dep., at 80:12–25, 104:24–105:3; Def. Ex. 46, Deposition of Steve Burke on December 5, 2008 ("S. Burke Dep."), at 15:23–16:6; 24:23–25:1, 51:17–22, 205:19–21; Def. Ex. 47, Deposition of Scott Burnside on November 11, 2008 ("Burnside Dep."), at 183:16–184:5; Def. Ex. 55, Deposition of Thomas Steel on July 17, 2008 ("RCN 30(b)(6) Dep."), at 192:21–193:17; Def. Ex. 51, Deposition of Leo Hindery, Jr., on November 14, 2008 ("Hindery Dep."), at 94:5–8; 167:9–12; Def. Ex. 52, Deposition of Harold (Gerry) Lenfest on November 18, 2008 ("Lenfest Dep.") at 89:14–90:5, 95:9–14; Def. Ex. 50, Deposition of Michael Doyle on November 6 and 20, 2008 ("Doyle Dep."), at 155:1–18; Def. Ex. 56, Deposition of Brian Roberts on September 23, 2008 ("Roberts Dep."), at 208:14–17.)

Prior to the Transactions, no class member had the option of simultaneously obtaining video programming from both Comcast and any of the Counterparties at the same household or within the same local franchise area. (*See* Def. Ex. 59, Williams Dep., at 104:24–105:3; Def. Ex. 51, Hindery Dep., at 167:9–12; Def. Ex. 46, S. Burke Dep., at 15:23–16:6; 24:23–25:1, 51:17–22, 205:19–21; Def. Ex. 50, Doyle Dep., at 155:1–18; Def. Ex. 56, Roberts Dep., at 208:14–17.) Because each cable company offered MVPD service within separate, non-overlapping franchise areas, Comcast asserts that it did not actually and directly compete with any Counterparty for the business of any cable subscriber. (*See* Def. Ex. 51, Hindery Dep., at 94:5–8, 167:9–12; Def. Ex. 52, Lenfest Dep., at 89:14–90:5, 95:9–15; Def. Ex. 46, S. Burke Dep., at 24:23–25:1; *see also* Def. Ex. 22, Michael Salinger, Dir., Bureau of Econ., Prepared Statement of the FTC, before the Cmte. on the Judiciary United States Senate: Sports Programming and Cable Distribution: The

Comcast/Time Warner/Adelphia Transaction (Dec. 7, 2006), at 4 (testifying that "the FTC staff determined that [Time Warner] and Comcast were not acquiring any cable assets that competed with their existing assets. In other words, the transaction eliminated no horizontal competition between the parties.")

**\*14** Comcast supports its assertion by citing the rationale of the Federal Communications Commission in rejecting an objection to the Time Warner/Comcast/Adelphia Transaction that it reduced competition between Comcast and Adelphia or Time Warner. The FCC determined that, prior to the Transaction, Comcast did not compete directly with Adelphia or Time Warner because each offered cable services in adjacent franchises and, thus, consumers did not have the ability to choose between them.[15] (*See* Def. Ex. 16, Time Warner/Comcast/Adelphia Order, ¶ 82.) Similarly, the FCC rejected an objection to the Comcast/AT & T/MediaOne Transaction on the ground that Comcast and AT & T, or AT & T and MediaOne were competitors, finding that actual competition exists only among cable firms that overbuild each other's franchise areas and that there was no evidence that Comcast and AT & T, or AT & T and MediaOne, would have overbuilt one another in the absence of the transactions.[16] (*See* Def. Ex. 15, AT & T/Comcast Order, ¶ 94; Def. Ex. 14, *MediaOne Group, Inc.,* 15 FCC Rcd 9816 (2000) ("AT & T/MediaOne Order"), ¶¶ 94–95.) Finally, Comcast asserts that the swap agreements did not contain non-compete or other enforceable provisions restricting Comcast or the Counterparties from re-entering the area and competing with one another. However, as noted, the Lenfest acquisition agreement involved a contractual covenant not to compete binding upon Gerry Lenfest, and other family member owners of Lenfest.

The Class responds that each Counterparty offered the same product in the same geographic market; namely, each operated as an MVPD distributor at the same level of the market within the Philadelphia DMA, and therefore were actual competitors prior to the Transactions. Its economics expert, Dr. Michael A. Williams, opines that Comcast and each of the Counterparties were competitors because they engaged in the same business in the same product market and geographic market. (Williams Decl. ¶ 164; Expert Reply Decl. Of Michael Williams, Ph.D. ("Williams Reply Decl.") ¶ 15 (stating that at least eight cable companies provided service in the Philadelphia DMA in areas adjacent to Comcast franchises, before being acquired by Comcast)).

Comcast's internal documents show that the company itself viewed other MSOs as its competitors. (*See* Pl.Ex. 134 (Comcast internal emails identifying companies that are Comcast's major competitors.)) Comcast required the CEO of Lenfest to sign a non-compete agreement as part of the Lenfest acquisition. According to Dr. Williams, the non-compete clause "demonstrate[s] that in Comcast's view, the relevant geographic area where these individuals represented a continuing competitive threat to Comcast was not only larger than [a local franchise area], it was larger than the footprints [in which the companies had previously provided service] ... showing that Comcast viewed MVPD companies in these neighboring geographic locations as competitors and/or potential competitors, even though Comcast was not an incumbent cable provider in those locations at that time." (Williams Decl. ¶ 79–80.) [17]

**\*15** Comcast also viewed other MSOs as competitors for the purchase of cable assets and customers. (Pl.Ex. 32, "Minutes of a Special Mtg. of Bd. of Directors of Comcast Corp. of May 4, 1989, at COM PA1151021 (describing the arrangement by which Comcast and AT & T agreed to abandon their competition to purchase MediaOne's cable assets and, instead, "reach[ed] an amicable and acceptable alternative to another round of competitive bids," involving a swap of various AT & T and Comcast cable assets resulting in the addition of 750,000 subscribers for Comcast.) Dr. Williams cites the MediaOne transaction, as well as the competition between Comcast, Lenfest and Mediacom for Marcus Cable's Eastern Shore Systems, and the competition between Comcast and several other MSOs for the assets of Cablevision systems in Ohio, Massachusetts and Michigan, to support his assertion that Comcast competed with the Counterparties to acquire cable assets before they were themselves acquired by Comcast. (Williams Decl. ¶ 122.) Brian Roberts, Comcast's CEO, also acknowledged that Lenfest, prior to its acquisition, was a potential competitor for other cable systems in the Philadelphia DMA. (Pl.Ex. 93, Roberts Dep., 231–32.)

Finally, the Class contends that Comcast's competitors also considered other MSOs to be competitors. For example, AT & T Board of Directors' internal documents list other MSOs, including Comcast, as competitors. (Pl.Ex. 101, October 1999 AT & T Bd. of Directors Mtg., "Competitive Cable TV Statistics"; Pl.Ex. 102, March 1999 AT & T Bd. of Directors Mtg. "Acquisition of 50% Interest in Lenfest Communications Executive Summary".) Gerry

Lenfest likewise testified that Comcast was a "competitor in acquiring systems," although he stated that Comcast was not a direct competitor for subscribers. (Pl.Ex. 90, Dep. of Harold Lenfest on November 18, 2008, 89:10–25.) [18]

**B. Evidence of Potential Competition.**
Comcast also argues that the Class cannot create a genuine issue of material fact that the transactions eliminated any potential competition between itself and the Counterparties because there is no evidence that it or any Counterparty ever intended to enter another's market as an overbuilder. Comcast asserts that the Class has produced no evidence that Comcast, Lenfest, or any of the other Counterparties intended to overbuild one another in the Philadelphia DMA at some future time. (*See* 10/15 Tr. 84:24–85:16; Def. Ex. 59, Williams Dep., 105:9–106:18. [19] ) It also asserts that there is no evidence that any Counterparty had any intention of overbuilding Comcast or took affirmative steps toward doing so. Rule 30(b)(6) representatives of Lenfest and AT & T, the only two Counterparties deposed by Plaintiffs, each testified that the companies had no intention of overbuilding Comcast, had not taken any affirmative steps toward doing so, and did not consider overbuilding to be economically viable. (*See* 10/14 Tr., 140:9–14; Def. Ex. 52, Lenfest Dep., 82:25–85:3, 89:23–90:5; Def. Ex. 51, Hindery Dep., 181:7–23.)

**\*16** Comcast also asserts:

- It had no interest in, or intent to, overbuild any Counterparty nor had it taken any affirmative steps toward doing so, such as seeking to obtain the necessary franchise approvals, building out infrastructure, setting aside capital for that purpose or otherwise performing any planning whatsoever for such a move, because Comcast did not consider overbuilding to be an economically viable business model. (*See* Def. Ex. 46, S. Burke Dep., 13:7–14:8, 52:16–57:7; Def. Ex. 56, Roberts Dep., 173:4–174:24.)

- Its pricing decisions were not based on a concern that other MSOs might overbuild Comcast. (*See* Def. Ex. 46, S. Burke Dep., 207:14–20; Def. Ex. 50, Doyle Dep., 183:14–23; Def. Ex. 57, Deposition of David Scott on December 3, 2008 ("Scott Dep."), 107:19–108:6.)

- There is no evidence that any of the Counterparties based their pricing decisions on Comcast prices. To the contrary, Gerry Lenfest testified that Lenfest did not base its pricing decisions on a concern that Comcast might

overbuild Lenfest franchise areas. (Def. Ex. 52, Lenfest Dep., 70:8–16, 72:6–73:16, 90:21–91:9.)

- The Federal Communications Commission determined in evaluating several of the Transactions that the merging entities had no intention of overbuilding one another's franchise areas, nor were they likely to do so. (*See* Def. Ex. 15, AT & T/Comcast Order, ¶ 94; Def. Ex. 14, AT & T/MediaOne Order, ¶¶ 94–95.)

Based upon these averments, Comcast argues that the Class cannot demonstrate a jury issue that any Counterparty's presence on the fringe of a Comcast franchise prior to the merger, tempered Comcast's competitive behavior.

The Class responds that it has produced evidence that there was a "potential for incumbent MSOs in the Philadelphia DMA to overbuild each other's territories, since they have done so in other markets," and that the FCC recognizes that adjacent cable operators are the most likely entrants. (Counterstatement of Facts ¶ 36). To support its factual assertions of potential overbuilding in the Philadelphia DMA, the Class relies upon specific instances of overbuilding in **other** parts of the country;[20] deposition testimony from Leo Hindery that it is not uncommon for MSOs to overbuild each other's franchise areas (Pl.Ex. 89, Hindery Dep. at 95–96); an assertion by its expert, Dr. Williams, that "there's certainly a potential for the incumbent MSOs in the Philadelphia DMA to overbuild each other's territories because they have done it in other places, (Pl.Ex. 100, Williams Dep. at 46–47); and the FCC's Thirteenth Annual Report, which states that "clustering can present a barrier to entry for the most likely potential overbuilder, (i.e. an adjacent cable operator)" (Pl.Ex. 146, Thirteenth Annual Report ¶ 180 (parenthetical in original)). It asserts that, to the extent that Comcast and other MSOs avoid overbuilding adjacent franchise areas, record evidence shows that they do so as part of, and in support of, collusive and illegal agreements to allocate cable markets.

## C. Analysis

**\*17** We find that the Class has produced evidence from which a jury could find in its favor on the 🚩 section 1 claim's requirement that Comcast conspired with competitors to allocate markets. Comcast's assertions that the Counterparties were not its actual competitors—because each operated cable systems in their own respective, non-overlapping franchise area, and never offered services to the same subscribers, at the same time, anywhere in the Philadelphia region—

would have some purchase had we determined that the relevant geographic market was the individual franchise area. However, in the class certification proceedings, we specifically rejected the opinion of Comcast expert Dr. Teece that the relevant geographic market should be pegged at the franchise level or, alternatively at the even smaller household level because the Class showed that it could establish by common evidence that the relevant geographic market should be the DMA.[21] Importantly, Comcast has not challenged at the summary judgment stage the Class's position that the relevant geographic market is the DMA.

We find that the Class need not show that Comcast competed with the Counterparties in the same franchise areas for those Counterparties to be deemed its actual competitors. Rather, based upon the proposed market definitions, it is sufficient that each provided MVPD services in the Philadelphia DMA. Were we to agree with Comcast's assertion that parties to an alleged market allocation scheme must have actually competed with one another for the same customers irrespective of market definitions, bizarre results could ensue. Assume, for example, that two firms at opposite ends of the country—who have never grown so large as to be able to expand to the center of the country—agree they will never cross the Mississippi River to directly compete with one another. In a suit against both firms asserting a nationwide geographic market definition, their agreement would satisfy all of the elements of an illegal horizontal market allocation. But each firm could immunize itself from antitrust liability merely by agreeing to the allocation early enough to avoid being deemed direct competitors. Clearly, the teaching of *Palmer* and *Topco* prohibits this result. *See* 🚩 *Palmer* 498 U.S. at 49–50 (noting that "[t]he defendants in *Topco* had never competed in the same market, but had simply agreed to allocate markets"). Given the relevant product and geographic market definitions presumed by Comcast, it necessarily follows that each Counterparty could be its actual competitor in the market.[22] Accordingly, we conclude that Comcast's contentions that (1) each company operated within its own respective, non-overlapping franchise area, and (2) never offered services to the same subscribers at the same time anywhere within the Philadelphia DMA, cannot eliminate the Class's market allocation claim as a matter of law where the Class has created a genuine issue of material fact that each company offered MVPD services in the Philadelphia DMA prior to the swap transactions.

**\*18** We find, however, that the Class has failed to meet its summary judgment burden to create a genuine issue of material fact that Comcast or a Counterparty was a potential overbuild competitor. The two variants of potential competition theory apply section 7 of the Clayton Act to prohibit mergers and acquisitions by one company with another if "the effect of such acquisition may be substantially to lessen competition." *United States v. Marine Bancorporation,* 418 U.S. 602, 622, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).[23] The Class's assertion that overbuilding has occurred in other markets does not create a genuine factual issue that there was any potential for overbuilding in the Philadelphia DMA among the transaction Counterparties prior to the mergers. Evidence that other MSOs in other parts of the country engaged in overbuilding, and evidence that neighboring MSOs are the most likely overbuilder entrants, is insufficient to establish a genuine issue of material fact on whether (1) the transaction Counterparties here would likely have entered a competitor's franchise area in the near future as a potential overbuilder had they not been acquired by Comcast or (2) that they had any intention to potentially overbuild each others' franchise areas, when the record evidence of those parties' intentions is directly to the contrary. Accordingly, we conclude that the section 1 rule of reason claim may proceed on the Class's theory that Comcast and the Counterparties were "competitors" prior to the Transactions, but not upon its theory that they were potential overbuild competitors.[24]

## V. SECTION 2 CLAIM—PREDATORY CONDUCT

The Third Amended Complaint contains two claims under section 2 of the Sherman Act,[25] monopolization (Count II) and attempted monopolization (Count III)[26]. The Class identifies two types of allegedly predatory conduct to support its section 2 claims: Comcast's clustering conduct and its conduct toward RCN, a cable overbuilder that attempted to overbuild Comcast franchises in Delaware County, Pennsylvania. (Compl.¶¶ 83–103.) Comcast argues it is entitled to summary judgment because its clustering strategy had legitimate business justifications, and, accordingly, cannot be deemed to be predatory anticompetitive conduct. It asserts that the Class has failed to meet its summary judgment burden to create a genuine issue of material fact that the transactions creating the cluster, either singly or collectively, lacked a legitimate non-pretextual business purpose. Additionally, it argues that its conduct in relation

to RCN was not predatory or exclusionary, and that no jury could find that either (1) Comcast's conduct in licensing Comcast SportNet Philadelphia ("CSN Philadelphia") to RCN, (2) RCN's inability to engage contractors, or (3) Comcast's price discounts to potential RCN subscribers, constituted predatory conduct.[27] Rather, it asserts, the summary judgment record demonstrates that RCN's inability to compete in the Philadelphia DMA resulted from its own financial difficulties in raising capital. The Class responds that it has presented ample evidence demonstrating the transactions were anticompetitive and lacked valid business justifications. It also asserts that genuine issues of fact exist regarding Comcast's conduct toward RCN.

**\*19** The elements of a section 2 monopolization claim are (1) the possession of monopoly power and (2) the willful acquisition and maintenance of that power as distinguished from growth or development or consequences of a superior product, business acumen, or historical accident. *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Crossroads Cogeneration Corp. v. Orange & Rockland Utils., Inc.,* 159 F.3d 129, 141 (3d Cir.1998). The elements of section 2 attempted monopolization are (1) that the defendant has a specific intent to monopolize, and (2) that the defendant has engaged in anticompetitive conduct that, taken as a whole, creates (3) a dangerous probability of achieving monopoly power. *West Penn Allegheny Health Sys., Inc. v. UPMC,* 627 F.3d 85,108 (3d Cir.2010) (citing *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993)).[28] The distinction between the two claims is that "monopolization requires proof of monopoly power, while attempted monopolization requires only proof of a dangerous probability of achieving a monopoly. Courts interpret the latter requirement to imply a showing of market share somewhat less than that required for monopoly power." 2 Kintner, *Federal Antitrust Law* § 14.9.

The possession of monopoly power "will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (emphasis deleted);

*Broadcom Corp. v. Qualcomm Inc.,* 501 F.3d 297, 308 (3d Cir.2007) ("the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

part of the possessor"); *Morris Comm'ncs Corp. v. PGA Tour, Inc.,* 364 F.3d 1288, 1295 (11th Cir.2004) ("Unlawful monopoly power requires anticompetitive conduct, which is 'conduct without a legitimate business purpose that makes sense only because it eliminates competition.' " (quoting *Gen. Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 804 (8th Cir.1987))); *LePage's Inc. v. 3M,* 324 F.3d 141, 153–54 (3rd Cir.2003). Antitrust conduct, also called exclusionary conduct or predatory conduct, "is central to the offenses of both monopolization and attempted monopolization." 2 Kintner, *Federal Antitrust Law,* § 14.9. The analysis of predatory conduct is the same under both sections. *Id.*

Courts follow a sequential analysis in examining predatory conduct. First, the burden of proof of demonstrating predatory conduct and anticompetitive effect rests on the plaintiff. *United States v. Microsoft Corp.,* 253 F.3d 34, 58 (D.C.Cir.2001) (citing *Monsanto,* 465 U.S. at 763). If a plaintiff successfully demonstrates anticompetitive conduct, the defendant must demonstrate a "procompetitive justification" for its conduct. *Id.* at 59 (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 483, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). A "procompetitive justification" is a "nonpretextual claim that [the monopolist's] conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal...." *Id., see also LePage's Inc.,* 324 F.3d at 163 (" 'In general, a business justification is valid if it relates directly or indirectly to the enhancement of consumer welfare. Thus, pursuit of efficiency and quality control might be legitimate competitive reasons ..., while the desire to maintain a monopoly market share or thwart the entry of competitors would not.' " (quoting *Data Gen. Corp. v. Grumman Sys. Support Corp.,* 36 F.3d 1147, 1183 (1st Cir.1994))) (alteration in original); *see also* 2 Kintner, *Federal Antitrust Law* § 14.35 ("practices that harm other firms without harming competition, or that harm rivals because of the defendant's superior efficiency cannot constitute unlawfully exclusionary conduct in the attempt context.")[29]. Once the defendant has met its burden to demonstrate a valid business justification,[30] the burden shifts back to the plaintiff to show that the proffered business justification is pretextual. *See Image Technical Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1212 (9th Cir.1997).[31]

A. Creation of the Philadelphia cluster.

1. Has the Class created a genuine issue of material fact that the creation of the Philadelphia DMA cluster was predatory?

**\*20** The Class contends that building the Philadelphia cluster was predatory conduct because it was accomplished through the use of the swap agreements to allocate the market between Comcast, AT & T and Time Warner. (Compl.¶ 83.) In addition to the evidence already discussed, the Class points to Dr. Williams' opinions that the swaps and acquisitions caused large increases in Comcast market share and market concentration. Its market share rose from 23.9% in 1998 to 77.8% in 2Q2002, ending at 69.5% in 4Q2007. (Williams Decl. ¶ 114.) Williams opined that Comcast "would be expected to exercise substantial market or monopoly power, unless barriers to entry were low." (*Id.* ¶ 117.) However, he opined, there exist substantial barriers to entry into the MVPD market, both wire-based and satellite, including substantial sunk capital cost, strategic behavior by incumbents designed to raise their rivals' costs, such as limiting programming availability, local and state level regulations, and technological limitations. (*Id.* ¶ 118.) Dr. Williams contends that, among the anticompetitive results from Comcast's acquisition of market power from its clustering the Philadelphia DMA was its ability to deter overbuilding. (*Id.* ¶ 131; Williams Supp. Decl., Table 5; *see also* Singer Reply Decl. ¶¶ 42–59.) Because, Dr. Williams opines, the presence of an overbuilder restrains cable prices (*see* Williams Decl. ¶ 133 and App. IV), the Class contends there is ample evidence from which a reasonable jury could conclude that Comcast's clustering of the Philadelphia DMA decreased overbuilding and led to increased prices. Relying upon the Supreme Court's decision in *Grinnell Corp.,* the Class argues that the swaps transactions are thus sufficient proof of anticompetitive conduct, standing alone, to permit a jury to find for the Class on its section 2 claims.

In *Grinnell,* the Court held that acquiring competitors in order to perfect a monopoly is predatory conduct. 384 U.S. at 576[32]; *see also* 2 Kintner, *Federal Antitrust Law* § 14.13 ("The conduct element of the monopolization offense can be satisfied by a merger (or series of mergers) to monopoly or by inefficient exclusionary conduct.... An acquisition or series of acquisitions that threaten to achieve monopoly power may establish the requisite conduct and specific intent for an attempt to monopolize."). Because the Class has presented

evidence creating genuine issues of material fact that (1) the swaps resulted in a dominate market share, (2) the anticompetitive results from Comcast's acquisition of market power from its clustering the Philadelphia DMA included its ability to deter overbuilding and (3) the presence of an overbuilder restrains cable prices, the Class may rely upon the transactions themselves and evidence of Comcast's resultant increase in market share as proof of predatory conduct.

### 2. Has Comcast stated a "procompetitive justification" for its conduct?

**\*21** Comcast argues it is entitled to summary judgment on the 🚩 section 2 claim because it had legitimate, procompetitive justifications in creating the Philadelphia cluster, and the Class has failed to create a triable issue negating this claim. Based on the evidence already discussed in conjunction with the arguments on the *per se* claim, Comcast argues that each transaction was undertaken for valid business purposes. It argues that its decision to create a cluster in the Philadelphia DMA was undertaken to achieve greater efficiency, a prototypically valid business purpose.

Comcast asserts that contemporaneous Comcast documents identify the efficiencies and advantages associated with clustering, including opportunities in the areas of general management, new product introductions, marketing, brand building, retail presence, ad sales, government and community relations, local programming, call centers, training, and business communications services. (Def. Mem. at 34–35; Def. Ex. 29, "Clusters/2000 Management Retreat Memo.," at COM–PA0214427–28 (outlining management opportunities created by large clusters, including general management, new product introduction, marketing, ad sales, government/community relations, local programming, call centers and training); Def. Ex. 28 (same).) It adds that testimony confirmed that clustering enabled Comcast to realize marketing efficiencies by increasing its presence across a DMA (thereby enabling its self-advertising to reach a wider audience), and to realize other efficiencies such as consolidating infrastructure, operations, call centers, and management. (Def. Statement of Undisputed Facts ¶¶ 46–47; Def. Ex. 56, Roberts Dep., 116:2–117:16 [33]; Def. Ex. 50, Doyle Dep., 90:3–92:3 (stating that a benefit of clustering was the ability to recruit better people and manage business more efficiently); Def. Ex. 53, Marshall Dep., 32:24–33:22 (stating that a benefit of clustering was better ad sales and economies of scale).) As noted in the discussion of *per se* liability, Comcast asserts that clustering also allowed it to introduce

new products such as high-speed internet, telephone, pay per view, video on demand, digital video recorders, digital cable, substantially more channels, and high-definition television. (Def. Statement of Undisputed Facts ¶ 48.) The economies of scale associated with clustering enabled cable providers to compete with satellite companies with a national footprint, and telephone companies possessing vastly larger resources and clusters, who were emerging as competitors in multiple product markets—video, data, and telephone. (*Id.* ¶ 49; Def. Ex. 54, Pick Dep., 56:1–57:23; Def. Ex. 51, Hindery Dep., 132:11–15; Def. Ex. 56, Roberts Dep., 144:23–146:7.). We find that Comcast has stated procompetitive justifications for its clustering conduct.

### 3. Has the Class created a genuine issue of material fact that the proffered business justification for clustering is pretextual?

**\*22** The Class does not dispute that Comcast has identified efficiencies purportedly associated with clustering. (Counterstatement of Facts ¶ 46.) Rather, the Class asserts that Comcast did not present evidence that it conducted any post-transaction studies to see whether its assumptions about efficiencies were correct and there is no evidence in the record creating a genuine issue of material fact that the transactions actually resulted in increased efficiency for Comcast. It argues that a reasonable jury could conclude from Comcast's "lack of interest" in whether its stated justification was true that its claimed efficiency justification was pretextual. (Class Pl. Mem. at 70.)

In contrast to the lack of evidence of actual efficiencies, the Class argues that the evidence creates a genuine issue of material fact that, with each transaction Comcast raised its prices, suggesting that the claim of efficiency is pretextual. (Class Pl. Mem. at 72–73 (citing Pl.Ex. 6, "Analysis of Adelphia New Jersey Rates," at COM–PA0513589 (stating "it appears that Adelphia's rates could rise about $8.53 to be in line with Comcast's rates."); Pl.Ex. 126, Peyton Email of March 30, 2006 (stating with regard to the Adelphia/Time Warner swap transaction that a "factor[ ] driving the brand transition timing" was "[a] desire to take as many scheduled rate increases as possible under the existing Adelphia or TW system name."); Pl.Ex. 5, "Rating Agency Presentation January 2002," at COM–PA0206424 (noting that operating cash flow per former subscriber of E.W. Scripps, Jones Intercable and Lenfest increased, on average, 30% within one year of Comcast's acquisition of those systems.); Pl.Ex. 130, "Key Messages," (noting after integration of AT & T systems revenues increased by 9.8%,

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 20 of 173

Behrend v. Comcast Corp., Not Reported in F.Supp.2d (2012)
2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

operating cash flow by 22.9%, margins by 8.2 points, and operating cash flow per subscriber by 23.4%; after integration of Adelphia systems revenues increased by 15.3%, operating cash flow by 28%, margins by 12 points, and operating cash flow per subscriber by 23.4%); Pl.Ex. 113, Presentation of Brian Roberts at Salomon Smith Barney 12th Annual Entertainment, Media & Telecommunications Conference, at COM–PA0470175 (stating that "in every other acquisition we've been able to get the Comcast margin to 42 percent within two years"); Pl.Ex. 123, Announcement of Adelphia and Time Warner Transactions, at COM–PA1137177–178 (showing acquired Adelphia systems' operating cash flow margin increasing from 30% to 39% after acquisition, showing history of increases after AT & T and prior Adelphia acquisitions).) When asked about projecting revenues models after completing acquisitions, Robert Pick testified that Comcast "generally assume[d] there [would] be rate increases in the—over the modeling period." (Pl.Ex. 92, Pick Dep., 87:2–4.) David Scott, Comcast's executive vice-president of finance and administration, testified that Comcast's cable headquarters "directionally" advised how much it expected companywide prices to increase in its budgeting model each year, while allowing individual franchises to vary across the country. (Pl.Ex. 96, Scott Dep., 26:22–28:14.)

**\*23** The Class also asserts that Comcast did not need to allocate markets in order to achieve efficiency; that it could have built its cluster by overbuilding its competitors rather than acquiring them or swapping for their assets. (Pl. Mem. at 75–76.) It argues that a reasonable jury could find that Comcast's decision to pursue efficiency through swaps and acquisitions, rather than through overbuilding, harmed competition, was unnecessarily restrictive, and was thus anticompetitive, even if Comcast was allegedly engaging in those transactions in pursuit of increased efficiency.

Comcast responds that (1) the Class cites no authority for its assertion that a company claiming efficiency must conduct formal studies to establish that its goal was achieved, (2) the Class itself elicited testimony that Comcast had achieved efficiencies, (3) the Class's experts conceded that clustering can lead to efficiencies, (4) the FCC concluded that clustering increased efficiencies, and (5) the Class itself elicited testimony that obvious efficiencies were observed by Comcast after the transactions.[34] It points out that it raised cable prices annually both before and after the transactions, in both legacy and in newly acquired franchises. (Def. Sup. Ex. 93, S. Burke Dep., 44:5–20, 45:5–8.[35]) Thus, it argues that its intention to raise prices after acquiring systems does

not establish pretext. It also emphasizes that it is undisputed that it introduced new services into its acquired territories that were not previously available, like digital cable, DVRs, and telephone and internet service.

We find that the Class has not met its summary judgment burden to create a genuine issue of material fact that Comcast's claim of efficiency as a justification for clustering was a pretext. The Class's evidence that Comcast raised prices does not refute the claim of efficiency. While the Class did not have to present direct evidence establishing pretext to meet its summary judgment burden, it had to present probative evidence that would demonstrate the existence of a triable issue of fact upon which a reasonable jury could disbelieve what Comcast asserts. It has tried to do this by arguing that Comcast could have achieved the same efficiency of clustering by overbuilding its competitors, rather than acquiring them or swapping for their assets, and asserting that Comcast never studied whether it was achieving its goals. We reject these contentions for several reasons.

First, the underlying assumptions—that clustering efficiencies can be similarly created through overbuilding, and that creating a cluster through overbuilding is an equally efficient business model—are unsupported by any evidence. Second, the fact that Comcast could have achieved efficiencies differently is insufficient to show that Comcast's efficiency justifications were a pretext. Third, there is no authority that an antitrust defendant's expectations of efficiency proved accurate. Similarly, the fact that Comcast did not study its efficiencies is also insufficient to show that the efficiency justification was a pretext. Moreover, the evidence in the record supports the fact that clustering in fact leads to efficiencies of scale.[36] Finally, the Class does not dispute that Comcast was able to provide significant new services to its customers as a result of clustering.

**\*24** Accordingly, we grant summary judgment to Comcast on the Class's 🔖 section 2 claim regarding Comcast's clustering conduct. The Class has failed to create a genuine issue of material fact that Comcast's proffered business justification was pretextual.

### B. RCN
As noted above, the Class argues that Comcast's conduct toward RCN was predatory in three respects: (1) its conduct blocking RCN's access to cable infrastructure installation contractors, (2) its conduct in licensing CSN Philadelphia

to RCN, and (3) its practice of offering price discounts to potential RCN subscribers. We shall examine each claim individually.

1. Access to cable infrastructure installation contractors.

a. Has the Class created a genuine issue of material fact that Comcast's actions blocking RCN's access to cable infrastructure installation contractors were predatory?

In June 1998, RCN sought and received certifications to operate Open Video Systems [37] ("OVS") in four counties in the Philadelphia DMA (Delaware, Bucks, Chester, and Montgomery). (Def. Statement of Undisputed Facts ¶ 54.) Of those four counties, RCN chose to enter Delaware County first, breaking ground on its overbuild cable system in the Borough of Folcroft in late 1999. (*Id.* ¶ 55.) From there, RCN continued its overbuilding throughout Delaware County. In 2000, RCN overbuilt in Folcroft, Ridley Township, Eddystone, Norwood, Sharon Hill, Prospect Park and Collingdale. In 2001 RCN overbuilt in Glenolden, Ridley Park, Upper Darby, Colwyn, Morton, Tinicum Township, Clifton Heights, Darby Township and Darby Borough. In 2002, RCN overbuilt in Rutledge, Milbourne, East Lansdowne and Lansdowne. In 2003, RCN overbuilt in Yeadon. (*Id.* ¶ 57; Def. Ex. 41, Laura Burke Deposition Exhibit 13.).)

On May 29, 2002, RCN sent a letter to the FCC complaining that "it [was] aware of no less than fifteen (15) contractors in the Philadelphia market—representing virtually all of the viable construction and installation contractors in the area —whom Comcast or, prior to its acquisition by Comcast, Suburban Cable, have prevented or tried to prevent from doing business with RCN." [38] (Def. Ex. 43, RCN 30(b)(6) Dep. Ex. 22 at RCN 0000237.) After Suburban merged into Comcast, those Suburban personnel responsible for the company's contractor non-compete policy "went to work for Comcast, where the practice of intimidating contractors continued." (*Id.* at RCN 0000238.) Scott Burnside, RCN's Senior Vice President for Regulatory and Governmental Affairs, testified that RCN suffered "delays and setbacks by not having full cooperation from the outside contractors that it would normally expect to have." (Pl.Ex. 83, Burnside Dep., 81:13–16.)

James Cleaver, an installation subcontractor who had worked for Suburban Cable, testified that several subcontractors who had worked for Comcast were barred from further work

when Comcast became aware that they were working as subcontractors for his company on the RCN build out. (Pl.Ex. 84, Cleaver Dep., 61:9–77:22.) When Cleaver's company began working for RCN as a subcontractor, he received an email from Chris Patterson of Suburban Cable, which was about to be acquired by Comcast. (Def. Ex.43, RCN 30(b)(6) Dep. Ex. 22, at RCN0000241.) Patterson told Cleaver:

**\*25**  You suggest that Suburban did not have a problem with you working for other area cable companies and you were right, because they were not in direct competition with Suburban Cable as RCN is. Every mile of rear buss plant that you build gives RCN, our competitor the ability to take customers away from Suburban Cable. Our company and the Cable industry does not share the same perspective that you do in regards to competition.

...

You are correct, you are a business man and as we discussed on the phone you need to take the proper business decisions for your company. In my opinion your business decision should have been to stay with Suburban and become a part of our major project. You also know that we will become part of a larger cluster under Comcast ownership which will span the Tri-state area and south through Baltimore and Washington. You need to know that they have a more intense feeling about competing with RCN than Suburban does, and our intensity is pretty strong. Why you choose to work for a smaller company such as RCN in light of things to come are more of a short term decision vs looking at the long term in this area with Comcast. Again, you made a business decision for your company any your employee's [sic] and that is fine. Suburban had to act on a legal document that you signed for Non-compete. This is the only reason why Suburban terminated your contracts, because it was in breach.

(*Id.*) Cleaver testified on cross examination at his deposition that when he worked for Suburban Cable he had access to the company's design plans and used Suburban's equipment. (Def. Ex. 48 Cleaver Dep. 101:14–25.) He understood that Suburban had concerns because its design plans were confidential and also concerns about equipment being mixed up with the equipment of other companies. (*Id.* at 101:14–104:7.) He also testified that he currently continues to get work from Comcast, even though he also works for RCN and Verizon. (*Id.* at 79:13–17.) Finally, Cleaver testified that RCN paid contractors higher rates "because they wanted to lure whoever [sic] they could, and the only way you are going to

get them on is to pay the money." (Pl.Ex. 84, Cleaver Dep., 118:2–23.)

Notwithstanding the evidence of RCN's complaint to the FCC and the Burnside and Cleaver testimony, Comcast offers evidence that by April 2001, RCN was able to complete its buildout in Delaware County, achieving a penetration rate of 20–21%, which was above its 20% minimum target required to keep its operations viable and generate a return. (Def. Statement of Undisputed Facts ¶ 58; Def. Ex. 55, RCN Rule 30(b)(6) Dep., 62:12–18.) It adds that, when deposed by the Class, RCN did not identify any barriers to entry created by Comcast in the Philadelphia DMA; instead, RCN's 30(b)(6) designee stated that the only barriers to entry RCN faced in entering the Philadelphia DMA were (i) physical access to the poles that were owned by the utilities to build its system and (ii) obtaining a franchise from each municipality to provide the service. (Def. Statement of Undisputed Facts ¶ 59; Def. Ex. 55, RCN 30(b) (6) Dep., 47:17–49:4, 55:11–21.) The Rule 30(b)(6) witness testified that the company had not experienced "any lack of contractors" at the hands of Comcast, and that it was able to retain all the cable construction and installation contractors necessary to build out its cable systems in Delaware County. (Def. Statement of Undisputed Facts ¶¶ 67–69; Def. Ex. 55, RCN 30(b)(6) Dep., 152:24–153:1; *see also* Def. Ex. 47, Burnside Dep., 158:25–159:13. [39] ) Comcast has also presented evidence that the pool of cable installers and construction contractors available to build out cable systems in Eastern Pennsylvania numbered in the hundreds, including both locally-based contractors and national companies. (Def. Statement of Undisputed Facts ¶ 66; Def. Ex. 48, Deposition of James Cleaver on May 14, 2008 ("Cleaver Dep."), 114:23–117:16; Def. Ex. 40, Cleaver Dep. Ex. 9.) Comcast notes that RCN stated to the FCC that Comcast had exclusive arrangements with only 15 of these contractors. (Def. Ex. 43, RCN 30(b)(6) Dep. Ex. 22 at RCN 0000237.)

**\*26** Although RCN complained to the FCC that Comcast had tied up fifteen installation contractors with non-compete agreements, the record contains evidence of only two signed contractor non-compete agreements—the one discussed in the Cleaver deposition between Suburban Cable TV Co. (which was later acquired by Comcast) and Installation Technologies, Inc. ("ITI"), dated April 22, 1999 and terminated on November 26, 1999, (Def. Ex. 39, Cleaver Deposition Exhibit 6); and another between Suburban and Lewis Communications dated April 9, 1999. (Def. Statement of Undisputed Facts ¶ 71; Def. Ex. 43, RCN 30(b)(6) Dep. Ex.

22 at RCN000242–45.) Both non-compete agreements were executed before the class period. Those provisions prohibited the contractors from working for anyone besides Comcast during the term of the principal contract in geographic areas where Comcast faced competition. (Def. Ex. 43; Def. Ex. 39.) In the Suburban/ITI contract, the term of the non-compete extended for six months after termination of the contract, i.e., May 2000. (Def. Statement of Undisputed Facts ¶ 73; Def. Ex. 39.) It is undisputed that Comcast never brought an action to enforce this provision and ITI continued to work for RCN after Comcast terminated the contract for cause. (Def. Statement of Undisputed Facts ¶ 74; Counterstatement of Facts ¶ 74.) The Suburban/Lewis non-compete only lasted for the duration of the contract. Moreover, it is undisputed that, when asked by Comcast to honor the agreement, Lewis instead chose to work for RCN. (Def. Statement of Undisputed Facts ¶ 75; Counterstatement of Facts ¶ 75.)

Comcast also presents evidence that RCN's tenuous financial condition, rather than any problems it experienced with the availability of contractors, caused the company to ultimately abandon its efforts to overbuild in the Philadelphia DMA. In December 2000, while its build-out of Delaware County was underway, RCN announced that, in order to conserve cash, the company had abandoned its plans to enter any new markets where it did not already provide video service. This announcement applied nationwide—not just to Philadelphia. (Def. Statement of Undisputed Facts ¶ 80; Def. Ex. 45, RCN 30(b)(6) Dep. Ex. 34.) RCN confirmed in its public filings pursuant to the federal securities law and in statements to the FCC that it had abandoned plans to engage in further overbuilding (in Philadelphia or elsewhere) because it lacked the necessary capital. (Def. Statement of Undisputed Facts ¶¶ 81–83; Def. Ex. 3, RCN 2001 10–K405, p. 51.; Def. Ex. 42, RCN 30(b)(6) Dep. Ex. 8 (Initial Comments of RCN Corp. in re Annual Assessment of the State of Competition, dated August 3, 2001), p. 7; *see also* Def. Ex. 47, Burnside Dep., 170:7–171:22.) Consistent with the announced change in its strategy, RCN did not start any new overbuild construction, and instead actually sought to free itself from its build-out obligations in the Philadelphia DMA and elsewhere. RCN did not even build out franchise areas where it already had franchise approvals and therefore the legal obligation to build. (Def. Statement of Undisputed Facts ¶ 84; Def. Ex. 3, RCN 2001 10–K405, p. 20, 52; Def. Ex. 55, RCN 30(b)(6) Dep., 159:9–160:13; Def. Ex. 3, RCN 2001 10–K405, p. 20, 26; Def. Ex. 4, RCN 2002 10–KA, p. 22, 28; Def. Ex. 5 RCN 2003 10–K, p. 32; Def. Ex. 6, RCN 2004 10–K, p. 16; Def.

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

Ex. 7, RCN 2005 10–K, p. 19.) Among the areas affected by RCN's strategic retrenchment were communities in Bucks County where RCN had franchise approvals and build out obligations. In 2002 and 2003, due to its continuing net losses and ongoing inability to raise capital, RCN reiterated in its public disclosures that it would not be able to honor its build-out requirements in certain communities across the country, including in Eastern Pennsylvania. (Def. Statement of Undisputed Facts ¶ 8 8; Def. Ex. 3, RCN 2001 10–K405, p 20, 24, 51–52; Def. Ex. 4, RCN 2002 10–KA, p. 22, 26–27; Def. Ex. 5, RCN 2003 10–K, p. F–1, F–26, F–29, F–39; Def. Ex. 55, RCN 30(b)(6) Dep., 164:20–165:6, 167:20–168:24.) In May 2004, RCN filed for bankruptcy. (Def. Statement of Undisputed Facts ¶ 89; Counterstatement of Facts ¶ 89.) Even after emerging from bankruptcy, RCN's financial problems persisted, and its losses continued to mount. It is undisputed that, in May 2005, RCN disclosed that it was continuing its efforts to terminate or renegotiate franchise agreements in communities across the country, including Eastern Pennsylvania, to avoid breaches and related penalties, and announced that it expected to continue to experience net losses "for the foreseeable future." (Def. Statement of Undisputed Facts ¶ 93; Counterstatement of Facts ¶ 93.)

**\*27** The Class does not dispute that RCN was suffering from financial problems. It contends that RCN, in part, blamed its problems on "the inability to secure, or the uncertainty about whether it will be able to secure, essential programming," (Def. Ex. 42, Initial Comments of RCN Corp to FCC, p. i-ii) and that RCN repeatedly complained to the FCC about Comcast. It contends that RCN's financial problems are evidence of the toll Comcast exacted on its competitor through its anticompetitive conduct in the Philadelphia DMA, i.e, by limiting RCN's access to contractors, as well as its conduct in targeting price discounts to prospective RCN subscribers—which we discuss below—Comcast raised RCN's costs. (*See* Singer Merits Reply Decl. ¶ 34 ("Comcast's contractor-foreclosure strategy directly raised RCN's costs of supplying MVPD service in the Philadelphia DMA and thereby provided Comcast with an artificial cost advantage vis-a-vis RCN. Dr. Teece's proposed remedy—importing contractors from distant areas—is also an example of raising rivals' costs."); *see also* Teece Decl. ¶ 176 (finding that "a number of Philadelphia area contractors chose to work solely (or mostly) with RCN," but noting also that "RCN apparently paid contractors more than Comcast in order to incentivize them to work with RCN.").)

Drawing all inferences in favor of the Class as the non-moving party, we find that the Class has succeeded in creating a genuine issue of material fact that Comcast acted with predatory intent regarding RCN's access to cable infrastructure installation contractors. There is a genuine issue of fact with regard to the reasons why RCN encountered problems in its build out in Delaware County. Comcast's evidence showing a larger pool of contractors, that RCN was able to complete its build out in Delaware County with available contractors, that Comcast never enforced non-compete agreements with contractors, and that RCN's problems arose from its lack of capital, does not establish that it is entitled to judgment as a matter of law on the issue. The contrary evidence Comcast presents merely counters the Class's evidence; it does not establish that no jury could find predatory conduct on the part of Comcast if it chose to believe the Class's evidence.

b. Has Comcast stated a "procompetitive justification" for its conduct?

Comcast's stated justification for "tying up" contractors with non-compete clauses is that it utilized non-compete clauses with contractors to protect its proprietary customer information, confidential design plans, and equipment. (Def. Statement of Undisputed Facts ¶ 76; Def. Ex. 46, S. Burke Dep., 167:15–168:21; Def. Ex. 48, Cleaver Dep., 103:18–104:4 (acknowledging that Comcast personnel expressed concerns about confidential design plans and mixing up equipment on the same truck)). Comcast's Steve Burke testified generally that the company was concerned that an installation contractor, who had access to Comcast's customer lists, might also work for DirecTV or RCN:

> **\*28** we don't like the fact that you have names of our customers and now you are doing business with DirecTV, and the potential for somebody to make a bigger commission by doing business with DirecTV than Comcast, all of a sudden we lose a customer. So I think it's totally appropriate to tell a contractor, you know, we have enough work for 50 people, you work for us, we don't want you working for our competitor. But I don't know in the

specific case of RCN whether that was done in Philadelphia.

(Def. Ex. 46, S. Burke Dep. 167:16–168:1.) He added,

> It's not a matter of company policy that if a company does work for anyone else they can't do work for us, but just as a matter of common business sense, if someone—if you have someone who is doing a lot of business with you and a lot of business with one of your competitors and you suspect that that is damaging you because they are taking your names and customers to someone else, boy, if I was running a system in Sarasota, Florida, I would stop it.

(*Id.* 168:13–22.) We find that Comcast has stated a legitimate procompetitive justification for its conduct with regard to cable infrastructure installation contractors.

c. Has the Class created a genuine issue of material fact that the proffered business justification is pretextual?

We find that the Class has failed to create a genuine issue of material fact that Comcast's stated justification was a pretext for predatory conduct. Indeed, in its summary judgment brief, the Class does not address Comcast's justifications for imposing no-compete terms on cable installers, i.e., the need for cable companies to protect their customer lists, design plans, and equipment. [40] Accordingly, we conclude that the Class has failed to meet its summary judgment burden on the issue of whether Comcast's justifications for requiring no-compete clauses by cable infrastructure installation contractors were pretextual.

2. RCN's access to CSN Philadelphia.

The Class contends that CSN Philadelphia, Comcast's regional sports network, is "must have" programming needed by MVPDs, including RCN, to compete in the Philadelphia DMA. (Pl.Ex. 83, Burnside Dep., 83:14–85:12.) The Third Amended Complaint alleges that Comcast initially refused to provide RCN, and then provided only on a short-term basis, access to Comcast SportsNet Philadelphia, refusing

to enter into a stable, multi-year license for the content until only shortly before the Third Amended Complaint was filed. (Compl.¶¶ 86–90.) The Class asserts that RCN's initial attempt to license CSN Philadelphia was "initially rebuffed," and that Comcast later indicated it would terminate RCN's access to CSN Philadelphia during the time period that it was building out its Delaware County communities. (Counterstatement of Facts ¶ 61; Pl.Ex. 97, RCN 30(b) (6) Dep., 69:16–20; Pl.Ex. 118.) It presents evidence that, during this time frame when RCN was attempting to sign up customers in its new operating areas, Comcast call center workers were directed to tell subscribers cancelling in favor of RCN that RCN will no longer have the right to carry Comcast SportsNet after October 1, 2000. (Pl.Ex. 81, S. Burke Dep., 123:6–19; Pl.Ex. 83, Burnside Dep., 116:22–118:8). While conceding that "Comcast eventually allowed RCN access to the 'must-have' programming on a series of short term, month-to-month contracts," it characterizes this arrangement as "outside the industry norm." (Counterstatement of Facts ¶ 61 (citing Pl.Ex. 135, Letter of April 16, 2001, p. 6.).) [41]

**\*29** In his report, Dr. Singer opined that Comcast sought to deny RCN access to CSN Philadelphia, and then sought to raise its rival's costs by artificially inflating the price, once the FCC determined that Comcast was required to provide access to its wireline competitors. (Singer Decl. ¶ 97.) Dr. Singer opines that, "[e]ven though Comcast ultimately was compelled to supply RCN with [CSN Philadelphia], the episode reveals Comcast's anticompetitive intent and highlights the competitive implications of such exclusionary conduct in the downstream market." (Singer Decl. ¶ 100.)

Comcast responds that RCN has had access to CSN Philadelphia continuously from before the class period to the present day and that RCN's own corporate designee testified that lack of access to CSN Philadelphia programming did not constitute a barrier to entry for RCN into the Philadelphia DMA. (Def. Statement of Undisputed Facts ¶ 61; Def. Ex. 55, RCN 30(b)(6) Dep., p. 127:17–22; Def. Ex. 47, Burnside Dep., 143:16–144:12.) It adds that RCN had a "most-favored-nation" clause guaranteeing that it would receive CSN Philadelphia on terms no less favorable than those provided to other licensees. (Def. Statement of Undisputed Facts ¶ 63; Def. Ex. 31, 32.) Comcast asserts that it licensed the programming to RCN, its competitor, on exactly the same terms offered to all CSN Philadelphia licensees (including Comcast Cable itself). (Def. Statement of Undisputed Facts ¶ 64; Def. Ex. 49, Deposition of Joseph Donnelly on November 19, 2008 ("Donnelly Dep."), 162:15–19 (stating "I can tell

you that the Comcast SportsNet rates in Philadelphia are the same for everybody. And there are competitors, people who are, like Verizon who get it and pay the same rate as we do, RCN who pays the same rate as we do."); Def. Ex. 60, Deposition of Jack Williams on December 16, 2008 ("Jack Williams Dep."), 45:20–46:2; 69:12–18; Def. Ex. 55, RCN 30(b)(6) Dep. 139:6–12, 141:16–143:20.) The "short-term" agreements, which were the same for all licensees, occurred only during a one-year period when Comcast was conducting an internal review of pricing strategy. (Def. Statement of Undisputed Facts ¶ 65; Def. Ex. 60, Jack Williams Dep., p. 45:8–46:23 (stating "When RCN came on in Philadelphia, we offered a contract that would expire at the same time of all the other contracts. That contract was then extended for a year, as were all of the others.").)

Construing the evidence in the light most favorable to the Class, we find that the Class has failed to create a genuine issue of material fact that Comcast acted with predation toward RCN with regard to its carriage of CSN Philadelphia. While the Class contends that Comcast acted with predation toward RCN because it was overbuilding Comcast's Delaware County franchises, the Class failed to create a genuine issue of material fact that Comcast treated RCN differently from all of its other CSN Philadelphia affiliates during the relevant time frame. Comcast advised each affiliate that its contract would not be renewed on the existing terms; it offered each affiliate short term contracts extending their carriage during the period in which Comcast was reassessing its terms of carriage; and it eventually offered RCN—like every other affiliate—a long term carriage contract back dated to the end of the prior long term contract, with no interruption in service. Information provided by Comcast call center workers to prospective RCN subscribers, that RCN had access to CSN Philadelphia on a short term basis, was truthful and there is no evidence that Comcast offered dissimilar information to inquiries from non-RCN prospective subscribers. The Class offered no evidence to create a genuine issue that Comcast threatened to cancel RCN's carriage or that Comcast acted "outside the industry norm" in placing all of its affiliates on short term carriage contracts while it reassessed its terms of carriage. Accordingly, we find that the Class has failed to create a genuine issue of material fact that Comcast acted with predatory intent in dealing with RCN's carriage of CSN Philadelphia.

3. Targeted price discounts.

**\*30** Finally, the Class asserted in the Third Amended Complaint that Comcast's policy of offering targeted price discounts to prospective RCN customers to convince them not to switch service was predatory conduct. (Compl. ¶¶ 93–94.) The summary judgment record shows that, beginning in the winter of 2000 when RCN was about to offer service in Folcroft, Delaware County, Comcast offered discounts in the form of the "Comcast Advantage Plan" or "CAP" to customers in Folcroft. CAP offered a price freeze and free premium channels for eighteen months to customers who signed a written agreement not to cancel service during that period. (Def. Statement of Undisputed Facts ¶ 77–78; Counterstatement of Facts ¶ 77.) Customers who switched to another provider or otherwise terminated the contract incurred a termination penalty ranging from $30 to $75 dollars. (Pl.Ex. 2 at COM–PA0982337; Pl.Ex. 81, Dep. of Laura Burke of April 25, 2008 ("L. Burke Dep.") 37:13–38:4.) Comcast did not use written contracts for customers in any other franchise area in the Philadelphia DMA at the time it offered CAP to customers in Folcroft. (Pl.Ex. 81, L. Burke Dep., 42:4–17.) The early termination penalty was also unique to CAP. (*Id.* at 44:13–17.) Comcast enforced the penalty, collecting the termination fee by including it as a separately itemized line on the customer's monthly cable bill. (Pl.Ex. 81, L. Burke Dep., 92:3–93:11.) Although it began offering CAP in Folcroft, Comcast adjusted and changed the program over time, extending the offer to other areas that RCN entered as an overbuilder. (*Id.* at 97:4–99:3.)

The purpose of CAP was to keep customers from switching cable providers. (Pl.Ex. 85, Dep. of Frank Dingianni of June 25, 2008 ("Dingianni Dep."), 19:22–24.) Specifically, Comcast

> wanted to hold RCN at bay.... There was a certain percentage number that they were trying to hit, that they thought that RCN wouldn't be able to survive.... If they held them under 30 percent .... The amount of subscribers that RCN could get out of the areas and then maintain profitability.... [T]here was a break point where they wouldn't be viable, RCN.

(*Id.* at 40:8–19, 42:22–24.) In Folcroft, an area "[s]wept by CAP reps in March/April," as of June 2000, Comcast was able to sign up 70% of its subscribers to CAP contracts; for Ridley Township, which was "[s]wept by CAP reps in May/

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

June," Comcast was able to sign up 77% of its subscribers to CAP contracts. (Pl.Ex. 1, "Marketing Overview".) Dr. Singer opined for the Class that

> Comcast believed that RCN's minimum viable scale was a 50 percent penetration rate.... Comcast documents demonstrate that Comcast's CAP program held RCN to 10 percent penetration, and that the CAP program ensured that RCN could not under any circumstances achieve a penetration rate of more than 16 percent. By holding RCN to a penetration rate below this minimum viable scale, Comcast ensured that RCN's business model was doomed to fail. Facing these "unfavorable economics," RCN would incur a loss on every subscriber it successfully wrested from Comcast. Accordingly, Comcast's exclusionary conduct significantly impaired competition from RCN.

**\*31** (Singer Merits Reply Decl. ¶ 41.) According to Dr. Singer, because of the price freeze in RCN areas and increased prices in non-RCN areas, "Comcast customers in RCN areas received rates that were 18 to 38 percent below the rate paid by Comcast customers in non-RCN areas. The implications of this disparate pricing policy are clear—but for RCN's failure to enter the City of Philadelphia, Comcast's customers in those areas would have enjoyed significantly lower prices." (Singer Decl. ¶ 115.)

Comcast responds that CAP was a purely voluntary program, which subscribers were free to accept or reject. It notes too that the Class's own expert opined that price discounts in response to entry by a new competitor are a consumer benefit of competition. (*See* Williams Decl., ¶¶ 142–43, Table 6. [42] ) Finally, it asserts, and the Class does not dispute, that there is no evidence that the prices charged under CAP were lower than any relevant measure of Comcast's costs. (Def. Statement of Undisputed Facts ¶ 78; Counterstatement of Facts ¶ 78.) It argues that, irrespective of the evidence marshaled by the Class that Comcast specifically targeted CAP to maintain its subscriber base against incursion by RCN, its CAP pricing cannot be deemed predatory absent evidence that Comcast

offered cable services below cost to drive RCN out of the market.

We find that the fact that Comcast never charged below cost prices to potential RCN customers does not mandate a summary judgment finding that CAP was not exclusionary conduct. While Comcast is correct that section 2 claims based upon predatory pricing require evidence that the defendant has cut prices below some measure of its costs in providing the product, *see* *Brook Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 222–23, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) ("a plaintiff seeking to establish competitive injury resulting from a rival's low prices must prove that the prices complained of are below an appropriate measure of its rival's costs"), the theory upon which the Class proceeds is not that Comcast's pricing policy was predatory. The Class asserts that CAP constituted predatory conduct because it was an exclusionary practice, entered into by a monopolist, to block the entry of a new competitor.

The Class has presented evidence that CAP was an exclusivity arrangement, that its purpose was to prevent RCN from attaining market penetration by locking up customers to an incentivized long term commitment to receiving their MVPD services from Comcast, and included penalty provisions if a customer chose to switch providers. An exclusivity arrangement by monopolists can constitute an exclusionary practice. *LePage's Inc.,* 324 F.3d at 157 (citing *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 593 (1st Cir.1993). [43] An exclusionary practice is " 'a method by which a firm ... trades a part of its monopoly profits, at least temporarily, for a larger market share, by making it unprofitable for other sellers to compete with it.' " *Id.* at 164 (alteration in original) (quoting Richard A. Posner, *Antitrust Law: An Economic Perspective* 28 (1976)). In discussing the antitrust impact of an exclusivity arrangement in the form of bundled rebates, the *en banc* court in *LePage's, Inc.* held that "[w]hen a monopolist's actions are designed to prevent one or more new or potential competitors from gaining a foothold in the market by exclusionary, i.e. predatory, conduct, its success in that goal is not only injurious to the potential competitor but also to competition in general." *Id.* at 159. Most importantly, *LePages's, Inc.* rejected the proposition advanced by 3M and repeated here by Comcast that "after *Brooke Group,* no conduct by a monopolist who sells its product above cost —no matter how exclusionary the conduct—can constitute

2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

monopolization in violation of 🔖 § 2 of the Sherman Act." *Id.* at 147. *LePage's, Inc.* unequivocally closes the door in this Circuit on an assertion that above cost pricing safe-harbors otherwise exclusionary conduct.

**\*32** While a new entrant may engage in "promotional" activity, such as offering a discount in exchange for a period of exclusivity, or offering below cost pricing in the short term in order to introduce itself or a new product to the market, "[w]hen a firm has considerable market power in the very product or service being promoted, the promotional pricing defense disappears." 3A Areeda and Hovenkamp, *Antitrust Law,* § 746 (3d Ed.2008); *see also id* . at § 1807 (discount contracts are "problematic" when the defendant is a dominant firm in a position to force "an all-or-nothing choice"). The Class has created a genuine issue of material fact that Comcast, a firm possessing market power, was able to lock up 70% to 77% of the potential customer base available to the new entrant. Because it possessed market power, its decision to target promotional discounts to deter a new entrant may be deemed predatory and an exercise of market power to maintain its monopoly. As Comcast makes no arguments that CAP had otherwise legitimate business justifications, we conclude that the claim must be submitted to a jury. [44]

## VI. ANTITRUST INJURY

We have previously determined that proof of antitrust impact of the 🔖 section 1 and 🔖 section 2 claims must be limited to the one theory the Class successfully demonstrated could be proved by evidence common to the Class, namely, that Comcast's clustering conduct deterred the entry of overbuilders in the Philadelphia DMA. (Class Cert. Mem. at 45–47; Order of January 13, 2010 at ¶ 11.) Comcast argues that summary judgment should be entered on all claims because the Class has failed to create a trial issue on this sole remaining theory of antitrust injury. [45] Comcast argues that (1) the Class has failed to prove the antitrust impact of clustering on RCN, and (2) Dr. Williams' theories of the general antitrust impact of clustering are purely theoretical and divorced from the factual record. It argues that some amount of empirical evidence is required to show antitrust impact; because the Class cannot present empirical evidence to support Dr. Williams' theory, the fact that the Class has successfully stated a theory should not prevent the grant of summary judgment.

Because we have found the Class has presented evidence from which a jury could find that Comcast had monopoly power derived from its creation of its cluster in the Philadelphia DMA, and acted with predation toward RCN in its targeted discounts to prospective RCN subscribers, it follows that the Class has met its summary judgment burden on the causation issue of antitrust impact. The Class has presented evidence from which a jury could find that Comcast's conduct did deter overbuilding, as well as evidence that RCN stopped overbuilding because of Comcast's conduct. Genuine issues of fact exist on both these issues rendering summary judgment inappropriate.

We also reject Comcast's arguments that the Class cannot show antitrust impact on a theory that clustering deters overbuilding in general. Comcast argues that the Class has failed to meet its summary judgment burden because it has not presented empirical evidence to support Dr. Williams' theory that clustering deterred overbuilding. (Def. Mem. at 57 (citing, among others, 🔖 *In re Baby Food Antitrust Litig.,* 166 F.3d 112, 135 (3d Cir.1999) (holding that expert's unsupported economic theory and assumptions must be rejected where the opinion was not supported by actual record evidence); 🔖 *Mass. School of Law v. Am. Bar Ass'n,* 107 F.3d 1026, 1040 (3d Cir.1997) (holding that economic expert's report was properly disregarded where it was based on general and theoretical observations and was not tied to evidence in the record)). In granting class certification, we found that, although Dr. Williams' other theories of antitrust impact were not capable of proof common to the class, his clustering theory was supported by empirical evidence and was based upon the factual record. (Class Cert. Mem. 29–47.) Dr. Williams had theorized that econometric studies showed that, "all else equal, ownership of a cable system by a large MSO (typically defined as one of the ten largest MSOs) generally results in higher [cable] rates of approximately 5% to 10%." (Williams Decl. ¶ 52.) He concluded that studies showed that an MSO "can increase its profits by clustering its cable systems so that they share their boundaries with one another and share as little total boundary as possible with other cable providers serving adjacent franchise areas. Such contiguous clustering is profit-enhancing for an MSO because it reduces the likelihood or amount of overbuilding into its franchise areas." (*Id.* ¶ 88.) He identified several anticompetitive consequences arising from the resulting reduction in overbuilding within the MSO's franchise areas, and supported his theories by presenting (1) two economic models of overbuilding (Williams Decl. App'x

II at 107–26; Williams Cl. Reply Decl. App'x I at 13–18.), (2) citations to reports issued by the FCC and the General Accounting Office, and (3) at least six scholarly articles. (Class Cert. Mem. 34–38.)

**\*33** In accepting Dr. Williams' general theory on the anticompetitive impact of clustering, we rejected competing opinions offered by Comcast's experts and concluded that the Class "has successfully shown, through Dr. Williams' model, as well as his citations to empirical studies conducted by governmental agencies and private researchers, that the presence of an overbuilder constrains cable prices." (Class Cert. Mem. at 45–46.) We found that the Class "has also shown that Comcast engaged in conduct designed to deter the entry of overbuilders in the Philadelphia DMA, including denying RCN access to the services of cable installation contractors." (*Id.* at 46.) While that last portion of our decision has now been shown to be unsupported by the summary judgment record, the Class has presented the governmental and scholarly research supporting the general antitrust impact theory that clustering deters overbuilding, as well as evidence that the CAP discounts were predatory. Accordingly, we find that the Class has met its summary judgment burden of presenting evidence sufficient to create a genuine fact issue on the antitrust impact theory that clustering deters overbuilding.

**VII. CONCLUSION**

We find that the Class can proceed to trial on Count I of the Third Amended Complaint, the Sherman Act

section 1 rule of reason claim, based upon the theory that Comcast's creation of the Philadelphia cluster through its acquisition of competing cable companies and its swapping of cable assets constituted a horizontal allocation of markets.

However, *per se* treatment of the section 1 claim is rejected because Comcast has succeeded in showing that the clustering of its cable assets created pro-competitive economic efficiencies and allowed it to offer new products and services to consumers. The portions of Count II, asserting a section 2 monopolization claim, and Count III, asserting an attempted monopolization claim, which contend that Comcast acted with predation in creating its anti-RCN targeted discounts, may also proceed to trial. We grant summary judgment to Comcast on those portions of Counts II and III contending that (1) Comcast's clustering conduct, (2) its conduct blocking RCN's access to cable infrastructure installation contractors, and (3) its conduct in licensing CSN Philadelphia to RCN, constituted acts of monopolization or attempted monopolization.

An appropriate order will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1231794, 2012-1 Trade Cases P 77,862, 55 Communications Reg. (P&F) 967

---

### Footnotes

1    The selection of the mode of analysis to apply to an antitrust claim is a question of law for the court to determine. *California ex rel. Harris v. Safeway, Inc.,* 651 F.3d 1118, 1124 (9th Cir.2011) (holding that the selection of the proper mode of antitrust analysis is a question of law, to be reviewed *de novo* on appeal (citing XI Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1909b, at 279 (2d ed.2005))); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,* 373 F.3d 57, 61 (1st Cir.2004) (stating that whether a plaintiff's alleged facts comprise a *per se* claim is normally a question of legal characterization that can often be resolved by the judge on a motion to dismiss or for summary judgment); *Deutscher Tennis Bund,* 610 F.3d at 833 (holding that the "application of the quick look analysis is a question of law to be determined by the court," and therefore has no application to jury inquiry (citing ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases A–8 n. 2 (2005))).

2    Comcast's argument about *per se* liability and regulatory approval is not new. In deciding Comcast's Rule 12(b)(6) motion, we rejected—both on initial review and on reconsideration—its argument that the initial

Class Complaint failed to state a *per se* violation, finding that the allegations supported a claim that the swap agreements constituted a horizontal market allocation. Addressing one of Comcast's main arguments, we held that "[t] he mere fact that regulatory and law enforcement agencies may have reviewed and approved the challenged transactions is not ground for dismissal of Plaintiffs' claims." *Glaberson v. Comcast Corp.,* Civ. A. No. 03–6604, 2006 WL 2559479, at *10 (E.D.Pa. Aug.31, 2006) *modified by Glaberson v. Comcast Corp.,* Civ. A. No. 03–6604, 2006 WL 3762028 (E.D.Pa. Dec.19, 2006) (citing *Otter Tail Power Co. v. United States,* 410 U.S. 366, 372, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973) (explaining that "[a]ctivities which come under the jurisdiction of a regulatory agency nevertheless maybe subject to scrutiny under the antitrust laws"); *Cableamerica Corp. v. Fed. Trade Comm'n,* 795 F.Supp. 1082, 1092 (N.D.Ala.1992) (stating that " '[a]ntitrust immunity is not conferred by the bare fact that defendants' activities might be controlled by an agency having broad powers over their conduct' " and that " '[t]here is no general presumption that Congress intends the antitrust laws to be displaced whenever it gives an agency regulatory authority over an industry' " (quoting *Phonetele, Inc. v. Am. Tel. & Tel. Co.,* 664 F.2d 716, 729 (9th Cir.1981)))).

3    Comcast argues that because the transactions were not among competitors, the entire section 1 claim fails, even if analyzed under the rule of reason. We will return to this issue *infra.*

4    All references herein to the Complaint are to the Class's Third Amended Complaint.

5    Hindery wrote that cable systems owning spread out franchises,

> had always struck me as nonsensical. It was inefficient for cable operators and confusing for customers. I strongly believed that the entire industry, including TCI, would benefit enormously by "clustering" cable systems into specific markets, with one cable operator per market. To make this plan work, however, we'd have to convince other cable operators to voluntarily swap systems across the country. This was no small challenge. To pull it off, we'd have to get everybody to agree to basic valuations and stick to them. But I knew it was quite doable, provided we could get everybody rowing in the same direction.

> (Pl.Ex.52 at 73–74.)

6    In his book, Hindery wrote,

> Comcast, which is based in Philadelphia, had been trying for years to buy Lenfest Communications, which owned the cable systems in suburban Philadelphia. Gerry Lenfest, the company's founder and namesake, had always refused to sell. Luckily for me, AT & T owned 50 percent of Lenfest. To entice Brian [Roberts] to stand down on MediaOne, I decided to offer him Lenfest Communications....

> I told Brian flat out that he could have Lenfest, and therefore the Philadelphia systems he'd wanted for so long, on one condition. He had to promise right then and there not to fight me on MediaOne. He had to agree to take Lenfest as a consolation prize and walk away.... Brian considered my offer, then extended his had to shake on the deal.

> (Pl.Ex. 52, Hindery, *The Biggest Game of All,* p. 2.)

7    In response to this evidence, Comcast asserts that the Class's reliance upon the Lenfest transaction to support a *per se* claim of market allocation is improper because the Lenfest transaction was an acquisition transaction, not a swap of cable assets. Comcast argues that the Class seeks to mischaracterize the Lenfest sale as a swap because we have previously held that the *per se* claim is limited to the Class's allegations in the Third Amended Complaint that only the swap agreements constituted *per se* violations, while the Class separately alleged that the acquisition agreements were subject to rule of reason analysis. *See Glaberson,*

2006 WL 2559479, at *9 n. 7 (citing Third Amended Complaint ¶¶ 73–74.) Based on the Hindery evidence, we find that the Class has met its summary judgment burden to demonstrate a genuine issue of fact whether AT & T's agreement to sell the Lenfest assets was an integral part of a broader agreement to swap cable assets between AT & T and Comcast.

8    We have previously held that non-compete agreements executed upon the sale of a business are generally not recognized as antitrust violations, *see* Class Cert. Mem. at 18–19, and rejected the Class Expert's market structure analysis to the extent he relied upon the Lenfest non-compete agreement. (*Id.*)

9    Michael Doyle, the president of Comcast's Eastern Division, testified that

> one additional advantage of the clustering, too, is your ability of getting into the new products. In a lot of Comcast acquisitions where companies were smaller, they didn't have and didn't spend the capital necessary to offer the new products. And so certainly the advantage to clustering is you have the resources and you have the personnel who can run the new products. And in this day and age, as well as it's been over the last years, it's not a video industry anymore. It's a video, Internet, and telephone industry. It's a commercial business application.

> So, I think the clustering certainly gives you the ability to offer more advanced services to consumers.

(Def. Ex. 50, Doyle Dep., 91:12–92:3.)

10    Robert Pick, Comcast's senior vice president of corporate development, testified that

> the idea of clustering just sort of morphed from the industry. Part of it was competitively driven when you have—when you had like the direct broadcast satellite providers come into being. Their footprint by nature is national. They just put a satellite up in the air and then the signal can reach most of the country.

> So when their footprint is national, you know, and we're dealing with small franchises, we obviously cannot compete effectively. They can tell one story. They have an upgraded network. They give one channel lineup. They can offer more channels. So for us to compete when we're just a particular franchise in a market makes it more difficult. It also started to develop as the telephone companies got into the business and their—their footprint by nature is much larger than ours. And so—and then it just sort of happened when you—you know, TCI at one point in time was the largest cable operator in the U.S. and they were financially and operationally stressed at one point in time, so they looked to create clusters or they were giving—they've either sold systems or created joint ventures with—with operators where they would put the systems, clustered systems, on a local basis and said to an operator, here, you run it, you're better able to run these things because of the scale economies within a cluster.

(Def. Ex. 54, Pick Dep., 56:6–57:13.)

11    Hindery testified that clustering "had nothing to do with controlling the market. It had everything to do with putting ourselves in an operating cost structure that mirrored as closely as possible our nearest and closest competitors." (Def. Ex. 51, Hindery Dep., 132:11–15.)

12    Roberts testified that

> [t]here was, post-#92, as I have said repeatedly, a desire to take this patchwork of cable systems, and create more sensible businesses so we can compete more effectively in the future against the oncoming competitors, who all had complete DMAs, where in case of satellite, two competitors for every market who had a hundred percent market share in the United States. So every home in America can get the

product. They [national footprint DBS providers] can run an ad in the middle of the Super Bowl, let alone, in local broadcast television.

So there was, no question, a lot of desire to try to get larger in markets.

(Def. Ex. 56, Roberts Dep., 144:23–145:22.)

13    The FCC stated that

Clustering of cable systems can create greater economies of scale and size. Accordingly, it can enable cable operators to offer a wider variety of broadband services at lower prices to customers in geographic areas that are larger than single cable franchise areas. Clustering can thus make cable operators more effective competitors to LECs whose local service areas are usually much larger than a single cable franchise area. The General Accounting Office, in its report on the changing status of competition to cable television, also found that ownership ties and clustering strategies may provide cost savings and possible competitive advantages.

(Def. Ex. 17, FCC 99–418, Sixth Annual Competition Report, ¶ 162.)

14    Michael Salinger, Director of the Federal Trade Commission's Bureau of Economics, testified before the Senate Judiciary Committee on the Time Warner/Comcast/Adelphia transaction that:

It was also very clear from the outset that the parties' principal objective in making the acquisition and asset swap was to increase "clustering" in the TWC and Comcast cable assets. Clustering enables cable firms to realize economies of scale associated with providing cable service in contiguous areas. By acquiring contiguous systems, TWC and Comcast could lower several categories of costs, such as management, administrative and marketing costs, as well as the expense of providing system upgrades. In addition, TWC and Comcast could use clustering to position themselves better to compete with local telephone companies and other providers in the delivery of video and telephone service.

(Def. Ex. 22, Michael Salinger, Dir. Bureau of Econ., Prepared Statement of the FTC: Sports Programming and Cable Distribution: The Comcast/Adelphia/Time Warner Transaction (Dec. 7, 2006), p. 4.)

15    The FCC's Time Warner/Comcast/Adelphia Order stated, in response to an objection to the proposed merger that:

In DMAs where both Time Warner and Comcast currently operate, however, they generally do not compete directly for subscribers. Their systems usually operate in adjacent franchise areas within a DMA, and consumers do not have the ability to choose between them. Accordingly, the elimination of Time Warner's or Comcast's presence in a particular DMA does not likely indicate the loss of head-to-head competition.

(Def. Ex. 16 ¶ 82.) The Class concedes that the FCC approved the transaction, but contends that neither the FCC's approval nor its legal conclusion are proper evidence of competition. (Counterstatement of Facts ¶ 33.)

16    In approving the Comcast/AT & T Transaction, the FCC stated:

CFA offers no evidence to suggest that AT & T and Comcast would overbuild each other's cable systems such that the proposed merger would diminish competition in these local franchise areas. Applicants deny having any intentions to overbuild, and confirm that they have not overbuilt in each other's franchise areas, with the exception of the few non-consolidated affiliate systems. Accordingly, we cannot conclude

from the record that AT & T and Comcast had intentions of overbuilding each other's local markets, or that they were likely to do so.

(Def. Ex. 15 ¶ 94.) In the AT & T/MediaOne order, the FCC found:

> BellSouth argues that the merger will eliminate current and future MVPD competition between AT & T and MediaOne in local areas where the Applicants have overlapping or adjacent cable franchise areas. BellSouth contends that, in the absence of the proposed merger, AT & T and MediaOne would build over ("overbuild") each other's cable systems, thereby offering consumers in those areas two MVPD cable choices. However, we find no evidence in the record to suggest that AT & T and MediaOne would overbuild each other's cable systems such that the proposed merger would diminish competition in these local areas.
>
> ...
>
> Since the initial acquisition of the Fayetteville and Powder Springs overbuilt systems, the system owners have not constructed anymore overbuilds, and there is no evidence to suggest that AT & T and MediaOne would overbuild one another absent the merger. AT & T and MediaOne hold overlapping franchise authority in 13 other areas, but have no overbuilds in these areas. There is no evidence that they would overbuild each other in these areas absent the merger. We find that the proposed merger is unlikely to diminish MVPD competition between the Applicants to a degree that would warrant the denial of the Application or the imposition of conditions.

(Def. Ex. 14 ¶¶ 94–95.) The Class concedes that the FCC approved the transactions, but contends that neither the FCC's approval nor its legal conclusion are proper evidence of competition. (Counterstatement of Facts ¶ 34.)

17    Dr. Williams also notes that a non-compete agreement was executed between Comcast and executives at Prime Communications, as part of a loan agreement. (Williams Decl. ¶ 23.) There is no evidence that Prime Communication was involved in any of the acquisition or swap transactions.

18    The Class makes additional arguments that Comcast also competed with other MSOs for original cable franchises and engaged in "benchmark competition" with other MSOs. We have already rejected these portions of the Class expert's market structure analysis. (*See* Class Cert. Mem. at 18 (rejecting theory of competition for the award of original franchises because all awards occurred before the class period); *id.* at 51–52 (rejecting theory of benchmark competition as not capable of proof at trial through common evidence).)

19    Dr. Williams conceded that, in reviewing all of the documents and depositions in the case, he had seen no business plan suggesting that Comcast or another MSO was planning to overbuild another MSO in the Philadelphia DMA. (Def. Ex. 59, Williams Dep., 105:9–106:18.)

20    *See* Counterstatement of Facts ¶ 8. The Class cites overbuilding that occurred in **New York City** (Pl.Ex. 89, Hindery Dep., 95–96); **Dover, Delaware** (where Storer Cable, a competitor to a corporate predecessor of Marcus Cable—itself now a Comcast corporate predecessor—overbuilt approximately 500 homes) (Pl.Ex. 27 at COM–PA0776597); **Terre Haute, Indiana** (where 20–25% of Time Warner's territory had been overbuilt by Charter) (Pl.Ex. 23 at COM–PA1130645); **Tampa, Florida** (where an Adelphia franchise was overbuilt by Time Warner) (Pl.Ex. 35); **Kalamazoo, Michigan** (where Cablevision overbuilt approximately 300 homes served by Adelphia) (Pl.Ex. 40 at COM–PA1835049); **Ann Arundel County, Maryland** (where Millenium Cable and AT & T had overbuilt each other's areas representing 50,000 homes passed) (Pl.Ex. 92 at 294–95; Pl.Ex. 103 at COM–DOJ273974–75); **City of Aventura, Florida** (where a Comcast area was overbuilt by Cablevision and Comcast overbuilt AT & T areas) (Pl.Ex. 120 at COM–PA1082923); **Alameda, California** (5,300 homes overbuilt by Comcast) (Pl.Ex. 124 at COM–PA1267909); **Newman County, Georgia** (18,000

subscribers overbuilt by Charter and Comcast) (*Id.* at COM–PA1267922); **Oshtemo County, Michigan** (Cablevision overbuilt an Adelphia franchise area) (Pl.Ex. 133 at COM–PA1835049); **Orlando, Florida area** (Brighthouse overbuilt an Adelphia franchise area) (Pl.Ex. 106 at COM–PA00011036); **Powhatan, Virginia** (80,000 homes overbuilt by Adelphia) (Pl.Ex. 112 at COM–PA0374859); and **Dolthan, Alabama** (6,500 homes in a Comcast franchise area overbuilt by Time Warner) (Pl.Ex. 125 at COM–PA1382980).

21    We concluded that "[b]ecause the record evidence shows that consumers throughout the DMA can face similar competitive choices and suffer the same alleged antitrust impact resulting from Comcast's clustering conduct in the Philadelphia DMA, we find that it can be the appropriate geographic market definition." (Class Cert. Mem. at 14–15.)

22    We reject Comcast's reliance upon 🚩 *Volvo Trucks N. Am., Inc. v. Reeder–Simco GMC, Inc.,* 546 U.S. 164, 174–75, 126 S.Ct. 860, 163 L.Ed.2d 663 (2006) and 🚩 *Feesers, Inc. v. Michael Foods, Inc.,* 498 F.3d 206, 214 (3d Cir.2007). *Volvo Trucks* and *Feesers* were not Sherman Act market allocation cases. Rather they were decisions construing 🚩 Section 2(a) of the Robinson–Patman Act, 15 U.S.C. § 13(a), involving claims of price discrimination by a manufacturer against entities in the market position of a wholesaler. *See* 🚩 *Volvo Trucks,* 546 U.S. at 171; 🚩 *Feesers,* 498 F.3d at 208–11.

23    As we stated in the class certification proceedings,

> Under the first theory, "perceived potential competition," the Supreme Court held that competition might be diminished if a company that industry participants had thought might actually enter the market on its own, instead simply acquired a company already in that market. *See* 🚩 *Marine Bancorporation,* 418 U.S. at 625 ("[T]he Court has interpreted § 7 as encompassing what is commonly known as the 'wings effect'— the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter de novo.... The elimination of such present procompetitive effects may render a merger unlawful under § 7."). Under these cases, "perceived potential competition focuses on the premerger effect on prices of the perception that if profits rise, a new company will enter the market and drive down both prices and profits." 🚩 *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De nemours and Co.,* 826 F.2d 1235 (3d Cir.1987).

> ...

> The actual potential competition doctrine has not received a clear stamp of validity from the Supreme Court, but other courts have applied it where the plaintiff can show: (1) that the relevant market is oligopolistic; (2) that absent the acquisition [of the incumbent cable operator], the acquiring company [Comcast] would likely have entered the market in the near future either de novo or through a toehold acquisition; and (3) that such entry by the acquiring company [Comcast] would carry a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects. 🚩 *Tenneco, Inc. v. FTC,* 689 F.2d 346, 352 (2d Cir.1982) (citing 🚩 *Marine Bancorporation,* 418 U.S. at 630, 633).

> *Behrend v. Comcast,* 245 F.R.D. 195, 207 (E.D.Pa.2007).

24    We also find that the Class, to the extent that it raises the issues, cannot rely upon other forms of competition identified by its expert Dr. Williams, namely benchmark competition, competition for original cable franchises,

and competition for bargaining power with programming content providers, which we have previously rejected as unsupported by evidence common to the class.

25   Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations" is guilty of an offense and subject to penalties. 15 U.S.C. § 2.

26   Comcast argues with respect to both claims that the Class has failed to show predatory conduct. Accordingly, our analysis of the two section 2 claims is identical for the purposes of the Motion.

27   In the class certification proceedings, we rejected two other theories presented by the Class to demonstrate predatory conduct. We rejected the Class's assertion that Comcast's anti-RCN lobbying activity could be used as proof of predatory conduct, because it was at odds with the *Noerr–Pennington* doctrine. (Class Cert. Mem. at 46 (citing *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (holding that an individual is immune from antitrust liability for exercising First Amendment right to petition the government)).) We also extensively discussed the issue of Comcast's conduct in denying access to its DBS competitors to CSN Philadelphia in the last class certification opinion, which was based on the same record currently before us on summary judgment. We rejected Dr. Williams' and Dr. Singer's opinions tying Comcast's clustering activity in the Philadelphia DMA to reduced DBS penetration rates as susceptible to proof at trial through available evidence common to the class. (*Id.* at 26–28.) In its summary judgment brief and in its Counterstatement of Facts, the Class concedes that these issues have been rejected and does not reraise them, other than to preserve an objection to the prior rulings.

28   To determine whether there exists a viable claim of monopolization or attempted monopolization, a court must inquire into the relevant product and geographic market. *Spectrum Sports, Inc.,* 506 U.S. at 459. We have already held in the class certification proceeding that the Class can establish through common evidence its definitions that the relevant product market is the provision of multichannel video programming service ("MVPS") and the relevant geographic market is the Philadelphia DMA. For the purposes of its summary judgment motion, Comcast does not challenge these definitions.

29   Kintner explains,

> In considering exclusionary practices, it is critical to bear in mind that all competition excludes. Every act of innovation, price cutting, new entry or expanded output harms competitors, excluding them from some part of the market, sometimes to the point of destruction. But the antitrust laws actively promote this kind of harm to competitors.... [I]t is only when firms engage in practices that are *inefficiently* exclusionary —practices that predictably will lead to lower output and higher prices by reducing competition in the market as a whole—that antitrust law may intervene to enjoin or penalize the conduct.

> 2 Kintner, *Federal Antitrust Law,* § 14.14.

30   At least one court has held that the question is **not** whether the business justification is sufficient, but merely whether defendant establishes it had one. *Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1186 (5th Cir.1988) (stating that the Supreme Court's decision in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 597, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985) "does not hold that a jury can weigh the sufficiency of a legitimate business justification against the anticompetitive effects of a refusal to deal in or order to find intent by a defendant to monopolize.... The fact determination that may be left to a jury is whether the defendant has a

legitimate business reason for its refusal, *not* whether that reason is sufficient. The *Aspen* jury presumably found all of [defendant's] business justifications to be unpersuasive, *not* persuasive but insufficient.").

31    We note that in *Microsoft* the United States Court of Appeals for the District of Columbia Circuit offered an alternative route to demonstrating that the conduct was predatory, holding that "if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Microsoft,* 253 F.3d at 59; *see also Abbott Labs. v. Teva Pharms. USA, Inc.,* 432 F.Supp.2d 408, 422 (D.Del.2006) (stating that *Microsoft*'s rubric allowed alternate means to plaintiff to rebut defendant's justification: as pretextual or, alternatively, by demonstrating that the anticompetitive harm of the conduct outweighs the procompetitive benefit). The Third Circuit has never specifically adopted this alternative. *See e.g.,* *United States v. Dentsply Intern., Inc.,* 399 F.3d 181, 187, 196 (3d Cir.2005) (acknowledging business justification defense to predatory conduct claim without mentioning balancing) (citing *LaPage's Inc.* 324 F.3d at 152); *Broadcom Corp.,* 501 F.3d at 318 (same). Other post-*Microsoft* appellate decisions have also been silent on whether this alternative is available. *See e.g.,* *Morris Commc'ns Corp. v. PGA Tour, Inc.,* 364 F.3d 1288, 1295 (11th Cir.2004) (holding that once the defendant has met its burden to show its valid business justification, the burden shifts to the plaintiff to show that the proffered business justification is pretextual); *ACT, Inc. v. Sylvan Learning Sys., Inc.,* 296 F.3d 657, 670 (8th Cir.2002) (holding that when a valid business reason exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the inference of a section 2 violation; plaintiff's evidence did not create a triable jury question on whether defendant's proffered business reasons were legitimate); *see also* 3 Areeda and Hovenkamp, *Antitrust Law,* § 658 (3d ed.2007) (noting generally that few decisions have discussed the burden shifting issue in any detail).

In their discussion of the section 2 issues, neither party relied upon the alternative balancing test, made any argument that the test is applicable under Third Circuit case law, or attempted to apply the test to the summary judgement record. Moreover, the Class initially advised the Court that it was not relying upon the alternative balancing test. (N.T. 4/2/12 at 3:16–5:3.) However, in a later correspondence, the Class noted that, as part of its argument that Comcast lacked a valid business justification, it had argued in a footnote that a reasonable jury could conclude that the harm caused by Comcast's anticompetitive conduct "far overshadowed" any claimed business justification. (*See* Pl. Mem. at 72 n. 55.)

We find that any reliance upon the alternative balancing test was waived. The Class's footnote was entirely devoted to the pretext issue, not the balancing test. Moreover, arguments "raised in passing (such as, in a footnote), but not squarely argued, are considered waived." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1076 n. 6 (3d Cir.1997) (finding cursory arguments contained in footnote in appellate brief were waived). The Class's correspondence, issued after it had stated on the record that it was not relying upon the test, is insufficient to raise an argument that it did not include in its formal brief. *See Acumed LLC v. Advanced Surgical Servs., Inc.,* 561 F.3d 199, 223 (3d Cir.2009) (holding that a party has sufficient notice before a summary judgment is entered against it if it had reason to believe that the court might reach the matter at issue on the pending summary judgment application and the party had an opportunity to support its position fully); *Warren G. v. Cumberland County Sch. Dist.,* 190 F.3d 80, 84 (3d Cir.1999) (holding that an issue is waived if it is not raised in a party's initial appellate brief).

32    The Court stated:

We have said enough about the great hold that the defendants have on this market. The percentage is so high as to justify the finding of monopoly. And, as the facts already related indicate, this monopoly

was achieved in large part by unlawful and exclusionary practices. The restrictive agreements that pre-empted for each company a segment of the market where it was free of competition of the others were one device. Pricing practices that contained competitors were another. The acquisitions by Grinnell of ADT, AFA, and Holmes were still another. Grinnell long faced a problem of competing with ADT. That was one reason it acquired AFA and Holmes. Prior to settlement of its dispute and controversy with ADT, Grinnell prepared to go into the central station service business. By acquiring ADT in 1953, Grinnell eliminated that alternative. Its control of the three other defendants eliminated any possibility of an outbreak of competition that might have occurred when the 1907 agreements terminated. By those acquisitions it perfected the monopoly power to exclude competitors and fix prices.

🚩 *Grinnell,* 384 U.S. at 576.

33    CEO Roberts testified that among the advantages of clustering were

economies of scale and improved consumer benefits. And I would say that those two categories are what I've been talking about with clustering, that I think in #99 you—depending on the scale, now this total acquisition would have done what I said earlier, make us substantially larger, so we would have qualified for programing discounts.

We would be able to consolidate managers within a market. We'd be able to open up call centers within those markets, that would be open 24 hours a day, instead of kicking over to an answering service at night. When most people watch television, historically, that's how cable service was provided. Now you had a much larger area, and you're able to use new technology, as well as have a bigger scale of operations.

We are able to recruit better executives because it's closer to the caliber of being a TV station general manager. Often considered the best job in media was to run one of the local markets, because you had the entire market in the broadcast industry or the radio industry, or the newspaper industry, or frankly, the phone industry. You were in charge of either a state or a city. So heretofore, we would have, you know, lower paid, smaller area of line of responsibility. So there's a myriad of benefits that happened in that situation.

Def. Ex. 56, Roberts Dep., 116:2–117:16

34    Robert Pick testified in response to a question by Class counsel about whether Comcast studied whether its estimated efficiencies were realized that,

I'm not aware—I'm not sure or at least I'm not aware of any specific studies that were done to see if they were achieved or not achieved. Some of them obvious were obvious. For instance, I think in the operating efficiencies, we assumed that we could bring margins of the AT & T systems to that level close to or similar to the Comcast system.

And so it's just obvious that you could see during the financial—looking at financial results that if the margins of those things approved—improved at or close to Comcast systems, you would see that we were able to do that.

(Pl.Ex. 92, Pick Dep., 305:12–22.)

35    COO Burke testified that

Basic cable rates in virtually every system in every cable company in every state in the country are raised every year because our programming costs go up every year. And, so, there were basic rate increases I would say in virtually all of the systems in the Philadelphia area every year during the period of time.

...

We raise prices every year because our programming increases every year.

(Def. Sup. Ex. 93, S. Burke Dep., 44:5–20, 45:5–8.)

36   *See* Def. Ex. 18, Seventh Annual Competition Report, ¶ 166 (clustering "permits cable operators to ... gain efficiencies related to economies of scale and scope resulting in lower administrative costs, enhanced deployment of new technologies, and encouraging the extension into previously unserved areas"); Def. Ex. 19, FCC 01–389, Eighth Annual Competition Report, ¶ 14 ("By clustering their systems, cable operators may be able to achieve efficiencies that facilitate the provision of cable and other services, such as telephony.").

37   An OVS is a "facility consisting of a set of transmission paths and associated signal generation, reception, and control equipment that is designed to provide cable service which includes video programming and which is provided to multiple subscribers within a community...." 47 C.F.R. § 76.1500(a).

38   Dr. Singer, a class expert, opined that the fifteen area contractors constituted approximately 53% of the available contractors in the Philadelphia area. (Singer Decl. ¶ 124.)

39   After offering direct testimony that RCN had suffered set backs and delays due to Comcast's interference with contractors, on cross-examination at his deposition, RCN executive Scott Burnside confirmed the testimony of the Rule 30(b)(6) witness:

Q. And you testified about access to contractors. RCN was able to get contractors to build out in Delaware County, right?

...

THE WITNESS: To some degree, yes.

BY MR. KORPUS:

Q. To a degree sufficient to build out its system in Delaware County to its specifications, right?

MR. WOODWARD: Objection. Form.

THE WITNESS: To do construction in Delaware County, they were able to get construction people willing to do work in Delaware County.

(Def. Ex. 47, Burnside Dep., 158:25–159:13.). Burnside also testified that some contractors left Comcast to work for RCN because they did not like Comcast's "bullying tactics." (*Id.* at 160:25–161:11.)

40   We note that Dr. Singer addresses the issue in his declaration, opining that "[t]here does not appear to be a compelling justification for [the contractor no-compete] conduct, as one Comcast official noted to another that 'I am not entirely sure what problem a[n] [exclusivity] program would be designed to solve' and that exclusive contracting 'has not bubbled up from the field as an urgent need and so I am not sure what we are trying to fix.' " (Singer Decl. ¶ 112 (quoting COM–PA1456482).) While it is unclear whether Dr. Singer was aware of Comcast's stated justifications when he stated there did not appear to be one, his opinion denying that Comcast had stated any justifications is not supported by the record.

41    We note that the summary judgment record includes testimony from Scott Burnside that Comcast used CSN Philadelphia to create an entry barrier. Burnside, referring to the month-to-month contract period, testified "it gave Comcast some leverage ... over RCN and where RCN might go into other competitive—other communities in that greater Philadelphia market. (Pl.Ex. 83, Burnside Dep., 104:23–105:2.; *but see* Def. Ex. 47, Burnside Dep., 114:18–21 (stating "RCN still does have the programming required to be competitive because they are there and competing on a daily basis."); *see also* Def. Ex. 55, RCN 30(b)(6) Dep., 49:5–15 (stating that obtaining programming is not an entry barrier)).

> However, we find that the evidence cited for the "outside the industry norm" proposition, as well as the claim that Comcast told RCN it would terminate its access to CSN Philadelphia, is taken out of context. CSN Philadelphia's CEO Jack Williams informed RCN on May 25, 2000 that, due to changes in the cost of programming, the market, and the needs of Comcast's affiliates, Comcast would not be able "to extend its arrangement with your system **at the price and on the other terms and conditions currently in effect** when your agreement expires this coming October." (Pl.Ex. 118, Letter of May 25, 2000 (emphasis added).) The letter states that this same notice was being given to all CSN Philadelphia affiliates. The Class concedes that RCN received a long-term contract executed in December 2003, and made effective as of October 1, 2001, the termination date of its prior long-term contract. (Pl.Ex. 79.)

> The contention that the intervening short-term contracts were "outside the industry norm" is based upon a letter Comcast CEO Brian Roberts sent to Senator Arlen Specter. In describing Comcast's relations with RCN, he stated that RCN "has had, and continues to have, a contractual agreement to carry Comcast SportsNet on its systems in the network's greater Philadelphia service area;" that in "October 2000, *every* Comcast SportsNet affiliate was offered a six-month carriage renewal (through March 2001), after which the carriage agreement would remain in place on a continuous, month-to-month basis; while this month-to-month agreement is in place, either Comcast SportsNet or the affiliate has the right to terminate the agreement on 90 days' notice." (Pl.Ex. 135, Letter of April 16, 2001, p. 6 (emphasis in original).) Roberts told Specter that Comcast did this "to assure affiliates of continuous service while the company reviewed its business plan and structure" and Roberts stated that Comcast advised RCN that, on completion of that review, it would offer *"all* affiliates a standard new contract whose terms and length will be consistent with established industry practices." (*Id.* (emphasis in original).) The Class reads the statement that the new contract would "be consistent with industry standards" as evidence that the interceding month-to-month arrangement was outside the norm. This characterization ignores the evidence, undisputed by the Class, that the interceding arrangement was imposed on all affiliates and was instituted by Comcast "to assure affiliates of continuous service while the company reviewed its business plan and structure." (*Id* .)

42    In the section of his report entitled "Incumbent Cable Operators Reduce Rates when Competitors Enter," Dr. Williams opines

> The evidence illustrates, through individual pricing decisions, how incumbent cable operators responded to new entrants. The econometric analyses reviewed above establish that competition lowers rates, while the evidence shown in the table illustrates how incumbent cable operators compete for subscribers using lower rates and other promotional incentives. Comcast's anticompetitive conduct, which created and increased barriers to entry, reduced the extent of that entry, which would have required Comcast to offer such lower rates and promotions.

> (Williams Decl., ¶ 143.) As evidence supporting his opinion, Dr. Williams specifically cites the CAP program in Folcroft. (*Id.,* Table 6.)

43    In addition to relying upon the decision in *LePage's,* ⚑ *Inc., the* Class cites to *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.,* 305 F.3d 1124, 1139–40 (10th Cir.2002) to also support the proposition that conduct by

a monopolist to lock up customers with long term contracts in anticipation of competition is exclusionary. The case is inapposite. At the referenced pin cite, the United States Court of Appeals for the Tenth Circuit, discusses whether the "state action doctrine" immunized conduct under state antitrust law, declining to reach the question because "it is clear that no state policy expressly permitted Southwestern Bell to attempt to lock up customers contractually long beyond the November 1996 introduction of competition in an effort to stymie that competition." *Id.* The Court was clearly discussing an inapposite doctrine concerning an inapposite state law issue.

44   We note that Comcast asks that, in the event we should only find that there is a genuine issue of fact as to whether its conduct toward RCN was predatory, we amend our class certification order to limit the Class to subscribers residing in Delaware County. (*See* Def. Mem. at 50–51.) Because we conclude that the Class may present to a jury its section 1 rule of reason claim that Comcast's clustering conduct unreasonably restrained trade, as well as its section 2 monopolization claim based upon the targeted discounts in Delaware County, we find no cause to amend our order.

45   Individual antitrust injury or antitrust impact, must be established for a plaintiff to have standing under section 1 or section 2 of the Sherman Act. *Bell v. Dow Chem. Co.,* 847 F.2d 1179, 1182 (5th Cir.1988) (holding that "Antitrust injury is a component of the standing inquiry, not a separate qualification."). This requirement is inferred from section 4 of the Clayton Act, 15 U.S.C. § 15, which affords a remedy to any person injured in his business or property "by reason of" an antitrust violation. In *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court described antitrust injury as

> ... injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause."

> *Id.* (citing *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 125, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969)); *see also Atl. Richfield,* 495 U.S. at 342–44.

---

End of Document                                                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 40 of 173

Clean Water Opportunities, Incorporated v. Willamette..., 759 Fed.Appx. 244...

2019-1 Trade Cases P 80,630

759 Fed.Appx. 244
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1
generally governing citation of judicial decisions
issued on or after Jan. 1, 2007. See also
U.S.Ct. of App. 5th Cir. Rules 28.7 and 47.5.
United States Court of Appeals, Fifth Circuit.

CLEAN WATER OPPORTUNITIES,
INCORPORATED, doing business as Engineered
Polyurethane Patching Systems, Plaintiff-Appellant

v.

The WILLAMETTE VALLEY
COMPANY, Defendant-Appellee

No. 18-30245

|

Filed January 4, 2019

**Synopsis**

**Background:** Corporation brought action against competitor alleging predatory pricing and violations of antitrust law. The United States District Court, Middle District of Louisiana, No. 3:16-CV-227, granted competitor's motion to dismiss. Corporation appealed.

**Holdings:** The United States Court of Appeals held that:

[1] corporation failed to allege predatory pricing under the Sherman Act by competitor, and

[2] corporation failed to allege exclusionary conduct with no rational business purpose by a competitor, as required to support claim for unlawful maintenance of a monopoly under the Sherman Act.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Dismiss for Failure to State a Claim.

**West Headnotes (2)**

**[1]** **Antitrust and Trade Regulation** ⬡ Complaint

Corporation failed to allege predatory pricing under the Sherman Act by competitor; corporation only provided conclusory allegations that the competitor effectively priced polyurethane patch material used to fill knot holes in plywood below average variable cost by substantially discounting non-patch products to induct customers to purchase its patch. Sherman Act, § 1 et seq., 🚩 15 U.S.C.A. § 1 et seq.

1 Case that cites this headnote

**[2]** **Antitrust and Trade Regulation** ⬡ Complaint

Corporation failed to allege exclusionary conduct with no rational business purpose by a competitor, as required to support corporation's claim for unlawful maintenance of a monopoly under the Sherman Act, where corporation only alleged that competitor offered substantial discounts to its customers in an attempt to sell its product. Sherman Anti-Trust Act, § 2 as amended 🚩 15 U.S.C.A. § 2.

1 Case that cites this headnote

Appeal from the United States District Court for the Middle District of Louisiana, USDC No. 3:16-CV-227

**Attorneys and Law Firms**

Joseph R. Ward, Jr., Esq., Ward & Condrey, L.L.C., Covington, LA, Stacy R. Palowsky, Esq., Palowsky Law, L.L.C., Covington, LA, for Plaintiff-Appellant

Bradley Charles Myers, Esq., Katie Deranger Bell, Kean Miller, L.L.P., Baton Rouge, LA, Robert Nathan Hochman, John W. Treece, Sidley Austin, L.L.P., Chicago, IL, Amanda Starer Norton, Sidley Austin, L.L.P., Washington, DC, for Defendant-Appellee

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 41 of 173

Clean Water Opportunities, Incorporated v. Willamette..., 759 Fed.Appx. 244...

2019-1 Trade Cases P 80,630

Before STEWART, Chief Judge, KING and OWEN, Circuit Judges.

**Opinion**

PER CURIAM: *

 **\*245**  Clean Water Opportunities, Incorporated, appeals the district court's order dismissing its various federal and state antitrust claims against The Willamette Valley Company. We AFFIRM.


**I.**

We set forth the facts as alleged in the complaint and accept them as true, as we are required to do at the motion-to-dismiss stage. Clean Water Opportunities, Incorporated, doing business as Engineered Polyurethane Patching Systems ("EPPS"), manufactured patch, a polyurethane material used to fill knot holes in plywood. EPPS offered patch to plywood manufacturers in the so-called Southern Market, which includes portions of Louisiana, Texas, Mississippi, Alabama, Florida, and Arkansas.

Manufacturers of patch sell the product to plywood manufacturers on a per-gallon basis. In their dealings with plywood manufacturers, patch manufacturers sell not only patch itself, but also the equipment used to apply patch and servicing for that equipment.

Although David Edwards, the owner and founder of EPPS, had previously competed with The Willamette Valley Company ("Willamette") in the patch market, EPPS itself entered into the market in or around 2013. At that time, Willamette was the sole seller of patch. Shortly after entering the market, EPPS entered into a production contract with MARTCO, a Louisiana-based plywood manufacturing company, to supply patch for one of MARTCO's two manufacturing lines. Subsequently, EPPS proposed an additional contract under which it would supply patch to both of MARTCO's manufacturing lines for five years at $12.90 per gallon. This price was significantly lower than Willamette's price of $17 per gallon.

Willamette managed to scuttle this transaction, however. Upon learning of EPPS's proposal, Willamette offered MARTCO "a substantial discount" on all the non-patch products it sold to MARTCO, contingent upon MARTCO

purchasing all its patch from Willamette. EPPS attempted to offer similar discounts to MARTCO, but MARTCO advised EPPS that EPPS was unable to offer anything that could match Willamette's discounts. MARTCO thereafter "terminate[d] its relationship with EPPS." During this time period, EPPS also sought business from two other plywood manufacturers, but discussions stalled prior to the creation of any formal agreement, also allegedly due to Willamette's offer of a substantial discount on non-patch products to those manufacturers.

As a result of this lost business, it was no longer financially viable for EPPS to compete in the patch market. Approximately two months after losing MARTCO's business, EPPS entered into a contract with Willamette to sell all of its assets. The agreement included a noncompete clause. Willamette thereafter became the sole seller of patch in the Southern Market.

In April 2016, EPPS sued Willamette in federal court, alleging violations of the Sherman Act, the Clayton Act, and Louisiana's  **\*246**  antitrust analogue. EPPS alleged that Willamette had engaged in predatory pricing in violation of the Sherman Act when it offered discounts on non-patch products to the would-be EPPS customers, because these discounts resulted in a price for patch that was effectively below Willamette's average variable costs for producing patch. It also alleged that Willamette illegally established a monopoly, in violation of state and federal law, and had purchased EPPS's assets to maintain its monopoly. Upon Willamette's motion to dismiss, the district court determined that EPPS had failed sufficiently to allege pricing below average variable cost and that its predatory-pricing claim therefore failed. The district court alternatively held that the predatory-pricing claim failed because EPPS had failed to allege that Willamette would have been able to recoup losses incurred as a result of its alleged pricing scheme after EPPS exited the market. The district court also concluded that EPPS's other claims depended on its predatory pricing claim, and therefore dismissed those claims as well. EPPS now appeals.


**II.**

**A.**

We review a district court's grant of a motion to dismiss de novo, applying the same standard on review as that applied

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 42 of 173

Clean Water Opportunities, Incorporated v. Willamette..., 759 Fed.Appx. 244...

2019-1 Trade Cases P 80,630

by the district court. See *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). In order to survive a motion to dismiss, a plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Although we are bound to accept plaintiff's factual allegations as true, this principle "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). A plaintiff is not entitled to relief when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 679, 129 S.Ct. 1937.

**B.**

[1]  EPPS first alleges that Willamette engaged in predatory pricing in order to maintain its monopoly over the patch industry when it offered substantial discounts on its non-patch products to several would-be EPPS customers. "Predatory pricing occurs when a defendant 'sacrifice[s] present revenues for the purpose of driving [a competitor] out of the market with the hope of recouping the losses through subsequent higher prices.' " *Felder's Collision Parts, Inc. v. All Star Advert. Agency, Inc.*, 777 F.3d 756, 759 (5th Cir. 2015) (alterations in original) (quoting *Int'l Air Indus., Inc. v. Am. Excelsior Co.*, 517 F.2d 714, 723 (5th Cir. 1975) ). In order to successfully state a claim of predatory pricing under the Sherman Act, a plaintiff must plausibly allege that "1) the prices complained of are below an appropriate measure of the alleged monopolist's costs and 2) that the alleged monopolist has a reasonable chance of recouping the losses through below-cost pricing." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 527 (5th Cir. 1999). As to the first element, an ideal measure of the alleged monopolist's cost would be true marginal cost. *Id.* at 532. However, because of difficulties in ascertaining true marginal cost, this court looks to average variable cost in conducting the predatory-pricing inquiry. *Id.* Average variable costs are costs that "vary with the amount produced," including "hourly labor, the cost of materials, transport, and electrical consumption at a plant." *Id.* Accordingly, in order to state a **\*247** claim for predatory pricing, a plaintiff must sufficiently plead that the alleged monopolist priced its goods below its average variable costs for producing those goods.

EPPS alleges that, although Willamette did not price patch itself below average variable cost, it effectively did so when it substantially discounted non-patch products to induce customers to purchase its patch. When these discounts are considered, EPPS argues, the price of patch sank below Willamette's average variable cost to produce it. Willamette does not appear to dispute that the effective price of patch, with discounts on other products considered, constituted an appropriate measure of price for purposes of the predatory-pricing analysis, and we see no authority barring such an approach. We therefore consider Willamette's pricing holistically, rather than focusing exclusively on the price at which it sold patch.

EPPS's factual allegations fail to plausibly support its claim that Willamette effectively priced its patch below average variable cost. EPPS alleges that Willamette offered discounts to several plywood manufacturers that "were substantial and represented a benefit below Willamette's cost to produce patch." Absent further factual enhancement, these claims amount to no more than conclusory allegations, which we are not bound to accept as true Federal Rule of Civil Procedure 12(b)(6). See *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937.

The specific factual allegations EPPS does plead only serve to render its case implausible. First, EPPS alleges that it offered to sell patch at $12.90 per gallon and that Willamette sold patch at $17 per gallon. Second, it alleges that the competitive price for patch was $10. Thus, the average variable cost for producing patch likely falls somewhere below the competitive price of $10. Even setting average variable cost directly at the competitive price of $10, Willamette needed only to discount its other products to undercut EPPS's price of $12.90. In doing so, Willamette only had to remain within the $2.90 interval between EPPS's price and the competitive price in order to maintain above-cost pricing. And likely, it could have gone further, since its average variable costs were almost certainly lower than the competitive price. Accordingly, we have no reasonable basis to infer that Willamette effectively priced its patch below average variable cost. Because EPPS failed to plausibly allege one of the two essential elements of its predatory pricing claim against Willamette, dismissal of that claim is appropriate. We therefore need not consider the question of whether EPPS successfully alleged recoupment.

Case 4:23-cv-03560  Document 119-2  Filed on 01/19/24 in TXSD  Page 43 of 173

Clean Water Opportunities, Incorporated v. Willamette..., 759 Fed.Appx. 244...

2019-1 Trade Cases P 80,630

### C.

EPPS also alleges that Willamette violated § 2 of the Sherman Act and §§ 4 and 7 of the Clayton Act when it purchased EPPS's assets and entered into a noncompete agreement with EPPS's founder. The Supreme Court has recognized that the acquisition of a competitor alone may constitute a violation of federal antitrust laws, under certain circumstances. *See* *United States v. Grinnell Corp.*, 384 U.S. 563, 576, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966) (listing acquisition by defendant of its competitors as one of several "unlawful and exclusionary practices" used by defendant to achieve monopoly).

In its brief, EPPS does not argue that Willamette's acquisition of EPPS, standing alone, amounted to an antitrust violation. Instead, EPPS contends that because the district court erred in dismissing its predatory-pricing claim, it similarly erred in dismissing its unlawful-acquisition claim. The two claims allegedly must rise and fall together. Because we reject the latter **\*248** claim, we must likewise reject the former. Accordingly, we affirm the district court's grant of Willamette's motion to dismiss as to EPPS's unlawful-acquisition claim.

### D.

 **[2]**  The balance of EPPS's complaint consists of its allegation that Willamette illegally monopolized the patch market in violation of § 2 of the Sherman Act and an analogous Louisiana law. Unlike its unlawful-acquisition claim, EPPS argues that its § 2 claim stands independent of its predatory-pricing claim. For support, EPPS cites out-of-circuit precedent holding that "[b]ehavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). The thrust of EPPS's § 2 theory is that although Willamette's pricing scheme may not have itself violated federal law as a predatory-pricing scheme, it may nonetheless violate § 2 because it has been practiced by a monopolist and had the effect of maintaining that monopoly.

In order to state a claim under § 2 for the unlawful maintenance of a monopoly, a plaintiff must allege that the defendant: "1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident." *Stearns Airport*, 170 F.3d at 522 (citing *Grinnell*, 384 U.S. at 563, 86 S.Ct. 1698). We assume arguendo that EPPS has successfully alleged facts demonstrating that the first element is present. The second element requires a showing of exclusionary conduct. "Exclusionary conduct under section 2 is the creation or maintenance of monopoly by means other than the competition on the merits embodied in the *Grinnell* standard." *Id.* The "key factor" we look to in conducting this inquiry is "the proffered business justification for the act. If the conduct has no rational business purpose other than its adverse effects on competitors, an inference that it is exclusionary is supported." *Id.*

The rationality of Willamette's acts is readily apparent. The only exclusionary conduct EPPS alleges is Willamette's offering of substantial discounts to its customers. Willamette's justification for these actions "is obvious: it was trying to sell its product." *Id. at 524*. Here, Willamette was faced with the prospect of losing business to a competitor. In order to keep that business, it offered discounts on its other products. Although, as the predatory-pricing framework contemplates, certain discounts may be so substantial as to cross the line into economic irrationality, no such discounts are present here: as stated above, the discounts resulted in an effective selling price of patch that was, in all likelihood, either competitive or supracompetitive.

While the rationality of a business decision is a significant factor in ascertaining whether conduct is exclusionary, it is not a sine qua non. *See* *id. at 524-26* (considering other factors in addition to business rationality, including the approval of the consumer and the potential existence of bribery or threats, in determining the validity of plaintiff's § 2 claim). EPPS does not, however, explain why this court should deem this economically rational conduct exclusionary. As a result, the rationality of Willamette's actions is determinative. We therefore affirm as to the district court's denial of EPPS's § 2 claim.

### E.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 44 of 173

Clean Water Opportunities, Incorporated v. Willamette..., 759 Fed.Appx. 244...

2019-1 Trade Cases P 80,630

Finally, the Louisiana antitrust claim similarly rises and falls with the claims discussed above. The parties do not dispute **\*249** that EPPS's Louisiana antitrust claim hinges on the success of the federal claims, because the Louisiana statute substantially mirrors the Sherman Act. This circuit's caselaw confirms that understanding. 🚩 *Felder's Collision Parts, 777 F.3d at 759*. Because each of EPPS's federal-law claims fails, so too must its Louisiana claim.

## III.

We therefore conclude that dismissal pursuant to Rule 12(b)(6) was appropriate as to each of EPPS's claims against Willamette. Accordingly, the judgment of the district court is AFFIRMED.

**All Citations**

759 Fed.Appx. 244, 2019-1 Trade Cases P 80,630

## Footnotes

\*        Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 45 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

KeyCite Yellow Flag - Negative Treatment

Distinguished by Tricon Precast, Ltd. v. Easi Set Industries, Inc., S.D.Tex., July 8, 2019

2017 WL 2266993

Only the Westlaw citation is currently available.

United States District Court, S.D. Texas, Houston Division.

CONSTRUCTION COST DATA, LLC;

Job Order Contracting Group, LLC; and

Managed JOC Solutions, LLC, Plaintiffs,

v.

The GORDIAN GROUP, INC.; and

R.S. Means Company, LLC, Defendants.

Civil Action No. H–16–114

Signed 04/24/2017

**Attorneys and Law Firms**

John Hooshik Kim, The Kim Law Firm, Teia Moore Kelly, Coats Rose, James Arthur Collura, Jr., Bradley Arant Boult Cummings LLP, Houston, TX, for Plaintiffs.

Eric Clendening, Jeffrey A. Cohen, Flaster/Greenberg, P.C., Cherry Hill, NJ, John Dalston Smith Gilmour, Kelley Drye & Warren, LLP, Houston, TX, for Defendants.

## REPORT AND RECOMMENDATION

Dena Hanovice Palermo, United States Magistrate Judge

*\*1* Before the Court is Defendants' motion to dismiss Plaintiffs' First Amended Complaint. ECF No. 49. United States District Judge Keith P. Ellison referred that motion for a report and recommendation in accordance with 28 U.S.C. § 636(b)(1)(B). ECF No. 52. Having considered the parties' briefing [1] and the applicable law, the Court **RECOMMENDS** that the motion be **DENIED**.

## I. BACKGROUND

Plaintiffs Construction Cost Data, LLC ("CCD"), Job Order Contracting Group, LLC ("JOC Group"), and Managed JOC Solutions, LLC ("MJS") commenced this action in the 295th Judicial District Court of Harris County, Texas. Defendants The Gordian Group, Inc. ("Gordian") and R.S. Means Company, LLC ("R.S. Means") removed the case to federal court based on diversity and filed an answer. ECF Nos. 1, 7. Defendants subsequently filed counterclaims against Plaintiffs, naming All Cost Data Info, LLC ("All Cost Data"), Benjamin Stack ("Stack"), and Mark Powell as additional Counter–Defendants. ECF No. 29. All Cost Data was later dismissed for lack of personal jurisdiction. ECF No. 44. After obtaining leave of court, Plaintiffs filed their First Amended Complaint, ECF No. 48, which Defendants now move to dismiss.

The following allegations are drawn from the First Amended Complaint. Job order contracting is "a collaborative construction project delivery method that enables organizations to get numerous, commonly encountered construction projects done quickly and easily through multi-year contracts for on-call construction services with a single competitively bid contract." Am. Compl. ¶ 6. In 2013, JOC Group began providing estimating services to contractors involved in job order contracting. *Id.* ¶ 16. A central feature of the job order contracting process is the use of a "unit price book," which is essentially a list of preset costs for a wide range of specific construction tasks. *Id.* ¶ 7. JOC Group used the unit price books its customers selected, including unit price books Gordian and R.S. Means created. *Id.* ¶¶ 14, 16. On July 1, 2014, JOC Group entered into a one-year contract to provide estimating services for Region 4 Education Service Center ("Region 4 ESC"); another entity, The Cooperative Purchasing Network ("TCPN") approved that contract. *Id.* ¶ 17. [2] On January 6, 2015, TCPN notified JOC Group that the contract would be renewed for another year, expiring on June 30, 2016. *Id.*

Prior to 2014, vendors like TCPN had at least two choices for commercial unit price books: R.S. Means' and Gordian's. *Id.* ¶ 35. In July 2014, however, Gordian acquired R.S. Means in what Plaintiffs describe as "an attempt to dominate the industry and create a monopoly." *Id.* ¶¶ 15, 35. That acquisition gave Gordian and R.S. Means control of "100% of the market" for unit price books, both nationally and in Texas. *Id.* ¶ 36. After the acquisition, Gordian marked up prices by about 30%. *Id.*

*\*2* In 2015, Plaintiffs decided to develop their own unit price book and enter the market. *Id.* ¶ 37. MJS and CCD were formed in March and April 2015, respectively. *Id.* ¶¶ 18, 19. CCD was to develop a new unit price book that MJS would

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 46 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

market and offer to contractors. *Id.* On May 28, 2015, Region 4 ESC issued a request for quotation for TCPN Solicitation Number 15–17. *Id.* ¶ 21. In mid-June 2015, CCD, hoping to market its new unit price book to TCPN for this solicitation, hired Counter–Defendant Stack as a consultant to provide the necessary data. *Id.* ¶¶ 19, 21. In developing the new unit price book, Stack used data he had maintained and developed based on a publicly available unit price book the U.S. Army Corps of Engineers had created. *Id.* ¶ 20. The new unit price book was named the "Construction Cost Catalogue." *Id.*

On June 1, 2015, JOC Group and KATA Management, LLC ("KATA Management") entered into a contract under which JOC Group would provide business support to KATA Management on projects with TCPN for a period of five years. *Id.* ¶ 22. Under the terms of the contract, JOC Group was to, among other things, provide the Construction Cost Catalogue and estimating software for the projects through CCD. *Id.*

On July 23, 2015, CCD and 4Clicks Solutions, LLC ("4Clicks Solutions") entered into a contract providing that 4Clicks Solutions would incorporate the Construction Cost Catalogue's data into estimating software for bidding purposes. *Id.* ¶ 23.

On August 6, 2015, Region 4 ESC began seeking bids for TCPN Solicitation Number 15–17, with a September 1, 2015 due date. *Id.* ¶ 24. After learning that TCPN would allow contractors to submit bids using the Construction Cost Catalogue, rather than requiring that the bids be based solely on Defendants' unit price book, Defendants sent a cease-and-desist letter to Plaintiffs. *Id.* ¶ 25. That letter, dated September 1, 2015, "alleged without justification that the use of the [Construction Cost Catalogue] was 'a misuse of R.S. Means' proprietary information, as well as an infringement upon R.S. Means' copyrights and trademarks,' " and "specifically referenced the publication and distribution of [the Construction Cost Catalogue] in connection with TCPN Solicitation Number 15–17." *Id.* Defendants also "alleged that CCD attempted to cause confusion in the marketplace by selling a product with a title similar to" Gordian's unit price book, which was called the "Construction Task Catalog." *Id.* ¶¶ 14, 25.

Defendants then sought to have JOC Group removed as a contractor on all TCPN projects. *Id.* ¶ 26. On September 3, 2015, Defendants sent a cease-and-desist letter to TCPN, stating that Plaintiffs were improperly using Defendants' proprietary material and intellectual property in

the Construction Cost Catalogue. That letter also demanded that TCPN immediately remove the Construction Cost Catalogue from use in TCPN's bid process and that TCPN extend Solicitation Number 15–17 by two weeks "to allow a resolution with Plaintiffs." *Id.* ¶ 27. On or about September 3, 2015, Region 4 ESC extended the bid deadline for TCPN Solicitation Number 15–17 to September 22, 2015. *Id.* ¶ 28.

On September 11, 2015, Defendants "demanded that Plaintiffs cease all production, marketing, sales, and distribution of the [Construction Cost Catalogue] as well as their use and return of all alleged proprietary data and documentation related to Defendants' products and copyrights." *Id.* ¶ 29. To avoid the threatened legal action and resolve the dispute, CCD agreed to cease marketing the Construction Cost Catalogue, but it demanded that Defendants provide "sufficient evidence showing the alleged copied material." *Id.* ¶ 30. Defendants failed to provide "any evidence establishing the basis for their claims." *Id.* As a result, Plaintiffs were unable to dispel Defendants' allegations concerning ownership of the Construction Cost Catalogue, TCPN was forced to use Defendants' unit price book, and JOC Group was unable to perform under its contract with KATA Management. *Id.*

**\*3** In September 2015, Defendants also began threatening to take legal action against 4Clicks Solutions if it did not terminate its contact with CCD. *Id.* ¶ 26. In addition, Gordian began publicly "alleging that Plaintiffs did not have ownership rights to the material in the [Construction Cost Catalogue]." *Id.* On October 14, 2015, 4Clicks Solutions informed CCD that it would terminate their contract unless CCD cleared "the cloud of legal uncertainty" arising from Defendants' claims within twenty days. *Id.* ¶ 31. When Plaintiffs were unable to do so, 4Clicks Solutions terminated the contract effective October 1, 2015. *Id.* Around the same time, KATA Management informed JOC Group that it would terminate its contract based on Defendants' claims. *Id.* ¶ 32. Sometime in October 2015, Defendants registered their copyright to the information they claimed Plaintiffs had misappropriated. *Id.* ¶ 27. On February 3, 2016, TCPN informed JOC Group that it intended to recommend that Region 4 ESC not renew its contract for JOC Group's estimating services after June 30, 2016. *Id.* ¶ 33.

Plaintiffs allege that Defendants used their "monopoly power," made false allegations about ownership rights, sent demand letters to Plaintiffs' customers, and required vendors to stop using the Construction Cost Catalogue—all in an effort

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 47 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

to prevent Plaintiffs from entering the unit price book market "in Texas and elsewhere." *Id.* ¶ 37. To control the market for job order contracting "management programs," Defendants allegedly mandated that their management program be used in connection with their unit price book. *Id.* ¶ 38. The result, Plaintiffs claim, is that contractors must "pay whatever price Defendants determine in order to participate in [job order contracting] projects." *Id.*

Plaintiffs set forth two categories of claims under Texas state law. First, they sue under several business tort theories, claiming that Defendants: (1) tortiously interfered with (a) the contract between 4Clicks Solutions and CCD and (b) the contract between KATA Management and the JOC Group, *id.* ¶¶ 56–60; (2) conspired to interfere with those contracts, *id.* ¶¶ 67–68; (3) tortiously interfered with the prospective and/or advantageous commercial relationships between (a) Plaintiffs and 4Clicks Solutions and (b) Plaintiffs and KATA Management, *id.* ¶¶ 61–66; and (4) maliciously published "disparaging" and "false" oral and written statements about Plaintiffs' business and Plaintiffs' ownership rights to the material in the Construction Cost Catalogue, *id.* ¶¶ 69–74. Second, Plaintiffs claim that Defendants monopolized and/or attempted to monopolize "the Texas market" for unit price books, in violation of the Texas Free Enterprise and Antitrust Act, TEX. BUS. & COM. CODE § 15.05(b). *Id.* ¶¶ 39–55.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint, or any portion of a complaint, for "failure to state a claim upon which relief can be granted." "To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "[A] complaint must be liberally construed in favor of the plaintiff, and all well-pleaded facts must be taken as true," but "[l]egal conclusions are not entitled to the assumption of truth." *Duke Energy*

*Intern., L.L.C. v. Napoli*, 748 F. Supp. 2d 656, 665 (S.D. Tex. 2010) (Atlas, J.) (internal quotation marks and citations omitted). "[T]he burden is on the moving party to prove that no legally cognizable claim for relief exists." 5B Charles Alan Wright et al., *Federal Practice & Procedure* § 1357 (3d ed. 2017); *accord* In re Paracelsus Corp., 6 F. Supp. 2d 626, 630 (S.D. Tex. 1998) (Werlein, J.) ("under Rule 12(b)(6), the defendant bears the burden of proving that no relief could be granted"). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted).

## III. DISCUSSION

### A. Plaintiffs' Business Tort Claims Should Not Be Dismissed

**\*4** Defendants move to dismiss all of Plaintiffs' business tort claims, arguing that those claims are based on Defendants' "pre-litigation correspondence with Plaintiffs and TCPN" and therefore barred under the *Noerr–Pennington* doctrine. Mot. Dismiss 7–12. Defendants' reliance on the *Noerr–Pennington* doctrine to support their motion to dismiss is misplaced.[3]

#### 1. The *Noerr–Pennington* Defense

The *Noerr–Pennington* doctrine protects private parties from liability for petitioning the government (including the courts) to take action favorable to them, even when such petitioning is motivated by anticompetitive intent. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972); *Video Int'l Prod., Inc. v. Warner–Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1082 (5th Cir. 1988). "Although the *Noerr–Pennington* doctrine initially arose in the antitrust field," courts—the Fifth Circuit and Texas state courts included—"have expanded it to protect first amendment petitioning of the government from claims brought under federal and state laws, including ... common-law tortious interference with contractual relations." *Video Int'l*, 858 F.2d at 1084 (citations omitted) ("There is simply no reason that a common-law tort doctrine can any more permissibly abridge or chill the constitutional right of petition than can a statutory claim such as antitrust."); *accord RRR Farms, Ltd. v. Am. Horse Prot. Ass'n, Inc.*, 957 S.W.2d 121, 126–31 (Tex. App.—Houston [14th Dist.] 1997, pet. denied) (applying doctrine to Texas state-law tort claims); *Profinity,*

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 48 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

*LLC v. One Techs., L.P.*, No. 05–14–00403–CV, 2015 WL 9257025, at \*13–15 (Tex. App.—Dallas Dec. 17, 2015, no pet.) (applying doctrine to claim under Texas antitrust statute).

Courts have further broadened the doctrine to protect "those acts reasonably and normally attendant upon effective litigation," including threats to litigate, such as cease-and-desist letters. *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983); *accord Source Network Sales & Mktg., LLC v. Ningbo Desa Elec. Mfg. Co.*, No. 3:14–CV–1108–G, 2015 WL 2341063, at \*8 (N.D. Tex. May 15, 2015); *Long Canyon Phase II & III Homeowners Ass'n, Inc. v. Cashion*, No. 03–15–00498–CV, 2017 WL 875314, at \*5 & n.32 (Tex. App.—Austin Mar. 3, 2017, no pet. h.) ("[P]resuit demand letters generally fall within the 'right to petition.' ").

**\*5** There is an exception to the *Noerr–Pennington* doctrine: it does not protect "sham" litigation. *Bryant v. Military Dep't of Miss.*, 597 F.3d 678, 690 (5th Cir. 2010); *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861 (5th Cir. 2000) ("The [Supreme] Court has allowed only one exception to the *Noerr–Pennington* doctrine—the 'sham' exception." (citing *Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991))); *see also Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("Baseless litigation is not immunized by the First Amendment right to petition."). Consequently, the doctrine also does not protect pre-litigation activities where the threatened lawsuit is a sham. *Coastal States Mktg.*, 694 F.2d at 1367–69 ("*If litigation is in good faith*, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." (emphasis added)); *Rock River Commc'ns, Inc. v. Universal Music Grp., Inc.*, 745 F.3d 343, 351 (9th Cir. 2014).

The Supreme Court has crafted a two-part inquiry for determining whether the "sham exception" applies to a given lawsuit. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993). First, "the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* "If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized." *Id.* Only if the challenged litigation is "objectively meritless" may a court proceed to the second part of the inquiry, which entails examining the

litigant's subjective motivation to determine "whether the baseless lawsuit conceals an attempt to interfere *directly* with the business relationships of a competitor through the use of the governmental *process*—as opposed to the *outcome* of that process." *Id.* at 60–61 (emphases in original) (citations, internal quotations marks, and brackets omitted); *accord Bryant*, 597 F.3d at 690. Where a pre-litigation cease-and-desist letter is concerned, courts follow this framework by "first assess[ing] the merits of the threatened litigation underlying the cease and desist letter and, if they are objectively lacking, ... then assess[ing] [the sender's] subjective motivation in sending the letter." *Wolf v. Cowgirl Tuff Co.*, No. 1:15–CV–1195, 2016 WL 4597638, at \*9 & n.7 (W.D. Tex. Sept. 2, 2016).

### 2. The *Noerr–Pennington* Defense Does Not Warrant Dismissal

Defendants contend that Plaintiffs' business tort claims must be dismissed on *Noerr–Pennington* grounds because Plaintiffs "cannot meet the heavy burden of establishing" that: (1) "the cease-and-desist correspondence was objectively baseless" and (2) Defendants' "subjective intent in sending the letters was to interfere with business opportunities." Mot. Dismiss 11; *see also* Defs.' Reply 4, ECF No. 51 (asserting that "Plaintiffs cannot satisfy the heightened standard" for establishing the sham exception to *Noerr–Pennington*).

#### a. Plaintiffs need not plead against an affirmative defense

Defendants' argument relies on the premise that Plaintiffs were required to plead against the *Noerr–Pennington* defense and/or affirmatively plead the sham litigation exception to that defense. That premise is mistaken. The *Noerr–Pennington* doctrine functions as an affirmative defense. *Bayou Fleet*, 234 F.3d at 860; *Acoustic Sys., Inc. v. Wenger Corp.*, 207 F.3d 287, 295 (5th Cir. 2000) ("[T]he *Noerr–Pennington* doctrine ... provides only a defense to liability, not an immunity from suit." (citations omitted)). As such, it "authorizes dismissal through a Rule 12(b)(6) motion only when its applicability appears on the face of the pleadings." *Source Network*, 2015 WL 2341063, at \*11 (citation, internal quotation marks, and ellipsis omitted); *see also Miller v. BAC Home Loans Servicing, L.P.*, 726 F.3d 717, 726 (5th Cir. 2013); *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986) ("[A] claim may ... be dismissed

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 49 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

if a successful affirmative defense appears clearly on the face of the pleadings.").

**\*6** Crucially, a plaintiff "is under no obligation to plead against a possible affirmative defense or the possible exceptions to an affirmative defense." *River Capital Advisors of N. Carolina, Inc. v. FCS Advisors, Inc.,* No. 4:10–cv–471, 2011 WL 831282, at \*9 (E.D. Tex. Feb. 7, 2011), *adopted,* 2011 WL 831186 (E.D. Tex. Mar. 3, 2011); *accord* 🔖 *Jaso v. The Coca Cola Co.,* 435 Fed.Appx. 346, 351 (5th Cir. 2011) (per curiam) (unpublished opinion) ("A plaintiff typically is not required to plead, in the complaint, facts that negate an affirmative defense."); 🔖 *Xechem, Inc. v. Bristol–Myers Squibb Co.,* 372 F.3d 899, 901 (7th Cir. 2004) ("Complaints need not contain *any* information about defenses and may not be dismissed for that omission."); *see also* FED. R. CIV. P. 8(c)(1) (providing that the party "responding to a pleading" must "affirmatively state any ... affirmative defense"). As other courts have stated, the *Noerr–Pennington* defense is "typically only 'properly analyzed through a consideration of evidence outside of the pleadings and as such, [is usually] not appropriately considered in [a] Rule 12(b)(6) context." 🔖 *Wolf,* 2016 WL 4597638, at \*9 (ellipsis omitted) (quoting 🔖 *Morrone Co. v. Barbour,* 241 F. Supp. 2d 683, 690 (S.D. Miss. 2002) (denying motion to dismiss based on *Noerr–Pennington*)); *accord* 🔖 *Eon Corp. IP Holdings, LLC v. Landis+Gyr Inc.,* No. 611–cv–00317, 2013 WL 12040726, at \*5 (E.D. Tex. May 17, 2013) (finding "resolution of the applicability of *Noerr–Pennington* doctrine inappropriate for a 12(b)(6) determination"), *adopted,* 2013 WL 12044954 (E.D. Tex. July 30, 2013).

### b. Dismissal is appropriate only when the complaint forecloses any potential response to an affirmative defense

Only when a plaintiff "pleads itself out of court—that is, admits all the ingredients of an impenetrable defense—may a complaint that otherwise states a claim be dismissed under Rule 12(b)(6)." 🔖 *Xechem,* 372 F.3d at 901. As the Fifth Circuit has explained:

> [B]ecause an adequately stated claim may be supported by showing *any set of facts* consistent with the allegations in the complaint, dismissal

for failure to state a claim based on [an affirmative] defense should be granted only when the plaintiff's potential rejoinder to the affirmative defense [is] foreclosed by the allegations in the complaint.

🔖 *Jaso,* 435 Fed.Appx. at 352 (internal quotation marks and citations omitted; emphasis in original) (quoting 🔖 *Goodman v. Praxair, Inc.,* 494 F.3d 458, 466 (4th Cir. 2007) (en banc)); *see also* 🔖 *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA,* 467 F.3d 466, 469–71 (5th Cir. 2006) (dismissal at 12(b)(6) stage was improper because plaintiff was not "foreclosed by the face of [its] pleadings" from showing factual scenarios under which it satisfied statute-of-frauds-like provision that operated as an affirmative defense).

This is an exacting rule: if the sham litigation exception "is not foreclosed by the allegations in the complaint," a motion to dismiss based on the *Noerr–Pennington* defense must be denied. 🔖 *Wolf,* 2016 WL 4597638, at \*9 & n.7 (citations and internal quotation marks omitted); 🔖 *Jaso,* 435 Fed.Appx. at 352.[4]

### c. Plaintiffs' amended complaint does not foreclose the sham litigation exception

**\*7** Applying the proper rule, the Court concludes that Defendants' argument for dismissal on *Noerr–Pennington* grounds is without merit. Nothing on the face of the amended complaint "forecloses the possibility" that Defendants' pre-litigation activities fall within the sham exception to the *Noerr–Pennington* defense.[5] *See* 🔖 *Wolf,* 2016 WL 4597638, at \*9; 🔖 *Jaso,* 435 Fed.Appx. at 352. Specifically, the complaint does not contain factual allegations precluding the possibility (1) that the litigation Defendants threatened to pursue was objectively baseless, or (2) that Defendants were subjectively motivated to threaten such litigation as a means of directly interfering with Plaintiffs' business relationships through the litigation process itself. *See* 🔖 *GoForIt Entm't, LLC v. DigiMedia.com L.P.,* 750 F. Supp. 2d 712, 742 (N.D. Tex. 2010) (denying summary judgment for party asserting *Noerr–Pennington* defense because it failed to demonstrate that "the sham exception cannot apply in this case"). Accordingly, Plaintiffs may be able to show, consistent

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 50 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

with the allegations in the amended complaint, that the sham exception applies.

### d. Defendants' exhibits do not establish a *Noerr–Pennington* defense for purposes of Rule 12(b)(6) dismissal

**\*8**  Defendants attached the following three exhibits to their motion to dismiss and assert that those documents establish their *Noerr–Pennington* defense: (1) the declaration of Scott Smith, who is Gordian's vice president and general manager, as well as the "head of enterprise solutions" for Gordian and R.S. Means, ECF No. 49–1; (2) the cease-and-desist letter Defendants sent to Plaintiffs on September 1, 2015, ECF No. 49–2; and (3) the cease-and-desist letter Defendants sent to TCPN on September 3, 2015, ECF No. 49–3. When ruling on a motion to dismiss under Rule 12(b)(6), a court's analysis is "limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). Smith's declaration, which falls into none of those categories, is "well beyond the scope of what may properly be considered, and will be disregarded as such." *Jaber v. Metro. Transit Auth.*, No. 4:14–CV–201, 2014 WL 4102120, at \*3 (S.D. Tex. Aug. 14, 2014) (Harmon, J.). [6] The two cease-and-desist letters, on the other hand, are properly before the Court: Plaintiffs do not dispute the authenticity of those letters, *see Brock v. Baskin–Robbins USA Co.*, 113 F. Supp. 2d 1078, 1092 (E.D. Tex. 2000), they are central to Plaintiffs' claims, and Plaintiffs refer to (and even quote) them in their complaint. *See* Am. Compl. ¶¶ 25, 27; *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).

The letter dated September 1, 2015 is from Jeffrey A. Cohen, an attorney representing Gordian and R.S. Means, and addressed to Ben Stack/All Cost Data and Mark Powell/CCD/JOC Group/MJS with the subject line "Re: Construction Cost Catalogue—Demand to Immediately Cease and Desist Use of Catalogue and All Data Contained Therein." The body of the letter reads:

> It has come to The Gordian Entities' [i.e., Gordian and R.S. Means] attention that [All Cost Data] and [CCD], as well as its subsidiaries and partners (including, but not limited to [JOC Group] and [MJS] ) ... are improperly using the proprietary material and intellectual property

of The Gordian Entities in CCD's [7] 2015 Construction Cost Catalogue publication, as well as on the website www.allcostdata.info, which is owned and maintained by Mr. Stack and [All Cost Data].

As you are both aware, Mr. Stack worked for U.S. Cost from 1996 to 2012, performing tasks including software development for construction cost estimation using the proprietary construction cost data provided to U.S. Cost, among others, including, but not limited to, the compilations of RSMeans [*sic*] data licensed to U.S. Cost and other third parties. The construction cost data was provided by RS Means to U.S. Cost subject to a license agreement, which included restriction on the use and distribution of the proprietary construction cost data. Upon Mr. Stack's departure from U.S. Cost, or at some time during his tenure there, Mr. Stack appears to have taken this proprietary information for use through the website www.allcostdata.info and in CCD's 2015 Construction Cost Catalogue.

As we further know, [JOC Group], including Mr. Powell, is the owner of CCD and a primary contributing source to the Construction Cost Catalogue and, therefore, the information provided to this catalogue by Mr. Powell is a misuse of RSMeans' proprietary information, as well as an infringement upon RS Means' copyrights and trademarks.

The Gordian Entities also note that CCD has attempted to cause confusion in the marketplace by selling a product that not only contains the proprietary information of RS Means, but also, not coincidentally, has a title confusingly similar to products sold by RS Means' parent company, [Gordian]. CCD's published work is titled "Construction Cost Catalogue," while [Gordian]'s much more established published work is titled "Construction Task Catalog®" which is a registered trademark of [Gordian].

**\*9**  In light of the above, it is clear that [All Cost Data], CCD and its subsidiaries and related companies have (1) infringed on RSMeans' copyrights and trademarks, (2) misappropriated and misused the proprietary information of RS Means, and (3) intentionally caused unfair competition in the marketplace. These improper acts appear to be continuing at present with the publication and distribution of the Construction Cost Catalogue in connection with TCPN Solicitation Number 15–17 for Job Order Contract Services.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 51 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

RSMeans and [Gordian] have suffered damage and continue to suffer additional damage with each day that CCD and All Cost Data Info improperly use the proprietary data of RSMeans. As such, RSMeans and [Gordian] demand that All Cost Data Info, CCD, all subsidiaries and affiliated companies, and all individuals associated with these entities, immediately:

- Cease and desist use of the Construction Cost Catalogue and all of RSMeans' proprietary data and copyrighted material contained therein;

- Cease and desist the use of RSMeans' proprietary data and copyrighted material on the website www.allcostdata.info;

- Return all proprietary data of RSMeans;

- Advise TCPN that the Construction Cost Catalogue shall not be available for use in TCPN's Job Order Contracts awarded pursuant to Solicitation Number 15–17;

- Remove all copies [of] the Construction Cost Catalogue from avenues of commerce;

- Cease use of the title "Construction Cost Catalogue";

- Remove all infringing data and documentation from any affiliated websites, including, but not limited to, www.allcostdata.info,www.constructioncostdata.us, www.thejocgroup.com, and any other affiliated websites; and

- Confirm that All Cost Data Info, CCD, all subsidiaries and affiliated companies, and all individuals associated with these entities, will not use any of RSMeans' construction cost data without the express written consent and license from RSMeans.

RS Means and [Gordian] demand that you provide written assurance of the above no later than September 2, 2015 at 5:00 pm Eastern Time. If you do not do so by the aforementioned date and time, we will immediately seek to have the courts restrain you for the activities referenced above, as well as seeking substantial money damages including, but not limited to, those related to RSMeans' lost sales and opportunities, disgorgement of your profits, attorneys' fees and costs of suit.

\*\*\*

The September 3, 2015 letter is from the same law firm and addressed to "Stuart Verdon, Director, TCPN Facilities Solutions"/TCPN Management Group LLC with the subject line "Re: Request for TCPN to Immediately Cease and Desist Use of Construction Cost Data, LLC's Construction Cost Catalogue in Project Bidding." The letter contains the exact same first paragraph as the September 1 letter and reads:

As a result of CCD's misappropriation of The Gordian Entities' proprietary data compilations and infringement on The Gordian Entities' copyrights, on September 1, 2015, The Gordian Entities served a cease and desist letter on all related individuals and entities. In addition to demanding they cease using, selling and marketing the Construction Cost Catalogue, The Gordian Entities has [*sic*] demanded they immediately withdraw the Construction Cost Catalogue from the market, including its use with TCPN.

It is our understanding that TCPN has a deadline of September 8, 2015 for the submission of bids, and that the bids can rely upon The Gordian Entities' catalogs and data or the Construction Cost Catalogue. We ask that TCPN immediately remove the Construction Cost Catalogue from use in TCPN's bid process and/or extend the deadline for a reasonable period of two weeks while we attempt to resolve this dispute with CCD. We also ask that you provide us with notice of your intent to do so by 3:00 pm Eastern Time today or we will be proceeding with an application for a restraining order without further notice as early as this afternoon.

**\*10**  As with the amended complaint itself, these letters do not foreclose either prong of the sham litigation exception (i.e., objective baselessness and improper subjective motivation) and therefore fail to establish Defendants' affirmative defense under *Noerr–Pennington* for purposes of dismissal under Rule 12(b)(6). Defendants maintain that the letters "set forth [their] good faith belief that their intellectual property rights were being infringed by the Plaintiffs." Defs.' Reply 4. In appropriate circumstances, *Noerr–Pennington* immunity can apply to owners' good faith "attempts to protect their intellectual property rights."

*GoForIt Ent.*, 750 F. Supp. 2d at 742. But for 12(b)(6) purposes, the cease-and-desist letters themselves establish, at most, that Defendants made the assertions contained in those letters, not that Defendants made those assertions *in good faith*. See *Sweet St. Deserts, Inc. v. Chudleigh's Ltd.*,

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 52 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

No. 12–3363, 2013 WL 1389760, at *2, 7 (E.D. Pa. Apr. 4, 2013) (denying motion to dismiss on *Noerr–Pennington* grounds, even though demand letter claimed infringement of trademark registered with Patent and Trademark Office).[8] Whether the letters were objectively baseless and sent with an impermissible subjective motivation can only be analyzed based on further evidence not properly before the Court at this stage. *See* 🚩*Wolf*, 2016 WL 4597638, at *9; 🚩*Morrone*, 241 F. Supp. 2d at 690.

In a similar vein, Defendants assert that the sham exception cannot apply here because sending the letters was "not only objectively reasonable but mandatory in order to protect their intellectual property rights." Mot. Dismiss 11; *see* 🚩*Sweet St. Deserts*, 2013 WL 1389760, at *6 (noting that trademark registrants are generally "barred from recovering profits or damages if they do not notify the infringing party of the alleged infringement prior to filing their complaint" (citing 15 U.S.C. § 1111)). But this argument begs the question: if the threatened litigation was a sham, then the letters were *not* calculated to protect Defendants' intellectual property rights.

*See* 🚩*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed. Cir. 1998) (*Noerr–Pennington* does not apply when a litigant "bring[s] suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anti-competitive purposes.").

**\*11** An examination of the legal claims Defendants threatened to pursue in the September 1 letter confirms that Plaintiffs are not foreclosed from successfully establishing the sham exception. (This examination focuses on the "objectively baseless" prong, but the subjective prong remains viable as well for the reasons stated above.)

### i. Plaintiffs may be able to show that Defendants' threat to pursue a trademark infringement claim was objectively baseless

To begin, that letter alleged that Plaintiffs' Construction Cost Catalogue unlawfully infringed on Defendants' trademark in the "Construction Task Catalog®." "To succeed in a trademark infringement claim, a party must first show that it has a protectable right in the mark and, second, show that there is a likelihood of confusion between the marks." 🚩*Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008) (per curiam) (citing *Security Ctr., Ltd.*

*v. First Nat'l Security Ctrs.*, 750 F.2d 1295, 1298 (5th Cir. 1985)).

In determining whether a likelihood of confusion exists, [courts] considers the following nonexhaustive list of factors: (1) the type of trademark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. No one factor is dispositive, and a finding of a likelihood of confusion does not even require a positive finding on a majority of these "digits of confusion." This Court has also added "[a]n eighth factor, the degree of care employed by consumers."

🚩*Paulsson Geophysical Servs.*, 529 F.3d at 310 (citations omitted); *accord* 🚩*Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 194 (5th Cir. 1998) ("In addition to the listed factors, a court is free to consider other relevant factors in determining whether a likelihood of confusion exists.").

While Gordian has a protectable trademark right in the Construction Task Catalog,[9] the letter does not foreclose Plaintiffs from showing that a reasonable litigant could not have expected to succeed in showing a likelihood of confusion between it and Plaintiffs' unit price book. The letter's various assertions—e.g., that Stack and Powell misappropriated Defendants' construction cost data and that "CCD has attempted to cause confusion in the marketplace by selling a product that ... contains the proprietary information of RS Means"—establish only that Defendants made those assertions, not that those assertions were true or that Defendants reasonably believed they were true.[10] *See* 🚩*Prof'l Real Estate Inv'rs*, 508 U.S. at 62–63 ("Probable cause to institute civil proceedings requires ... a reasonable belief that there is a chance that a claim may be held valid upon adjudication." (internal quotation marks, brackets, and citation omitted)). Further, the Court cannot say, at this stage, that the titles of the two unit price books are, as the letter states, "confusingly similar." *See* 🚩*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 485–86 (5th Cir. 2004) (emphasizing the importance of context in evaluating the "digits of confusion"). And even if they were, that would not definitively establish, under the multifactor test for "likelihood of confusion," that the trademark infringement litigation Defendants threatened to pursue was not objectively meritless.

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 53 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

### ii. Plaintiffs may be able to show that Defendants' threatened copyright infringement claim was objectively baseless

**\*12** The September 1 letter claimed copyright infringement as well. "To prove copyright infringement a party must show that '(1) he owns a valid copyright and (2) the defendant copied constituent elements of the plaintiff's work that are original.' " *Phoenix Ent. Partners LLC v. Boyte*, No. 4:16–cv–2911, 2017 WL 1153969, at \*5 (S.D. Tex. Mar. 28, 2017) (Rosenthal, J.) (quoting *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012)). Plaintiffs allege that Defendants did not register their copyright to the information at issue until October 2015—a month after it sent out the cease-and-desist letter claiming copyright infringement—and the Court accepts that allegation as true for present purposes. Am. Compl. ¶ 27; ECF No. 29–1 (U.S. Copyright Office certificate of registration for "RSMeans 2008 Data Compilation" dated October 5, 2015; *see also Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (per curiam) ("A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright."). [11]

To establish the second element of a copyright infringement claim, a plaintiff must make two showings. "First, the plaintiff must, as a factual matter, prove that the defendant actually used the copyrighted material to create [the defendant's] own work." *Id.* (internal quotation marks and citation omitted); *see also id.* at 142 ("In some cases, factual copying may be proven without a showing of access if the two works are so strikingly similar as to preclude the possibility of independent creation." (internal quotation marks, brackets, and citation omitted)). Second, because "not all copying is legally actionable," a plaintiff must show that the alleged copy "bear[s] a substantial similarity to the protected aspects of the original." *1 Peel & Co. v. The Rug Market*, 238 F.3d 391, 398 (5th Cir. 2001). "[A] side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.' " *Gen. Universal Sys.*, 379 F.3d at 142 (citation omitted). Here, the September 1 letter does not foreclose Plaintiffs from demonstrating the objective baselessness of Defendants' threatened copyright infringement claim with respect to either actual copying or substantial similarity.

### iii. Plaintiffs may be able to show that Defendants' threatened claims for misappropriation and unfair competition were objectively baseless

The September 1 letter also threatened claims for misappropriation and misuse of proprietary information and for unfair competition. Those claims require a plaintiff to show, among other things, that *its* proprietary information or product was used in an impermissible way. *See Guy Carpenter & Co. v. Provenzale*, 334 F.3d 459, 467 (5th Cir. 2003) (misappropriation of trade secrets claim requires proof of "(1) the existence of a trade secret; (2) a breach of a confidential relationship or improper discovery of the trade secret; and (3) use of the trade secret without authorization."); *Ultraflo Corp. v. Pelican Tank Parts, Inc.*, 845 F.3d 652, 657 n.7 (5th Cir. 2017) ("The elements of Texas's unfair competition by misappropriation are: (1) the creation by a plaintiff of a product through extensive time, labor, skill, and money; (2) the use of that product by defendant in competition with plaintiff; and (3) commercial damage to the plaintiff."). As already explained, the letter does not establish, for 12(b)(6) purposes, that Stack or Powell misappropriated Defendants' construction cost data. It therefore does not foreclose Plaintiffs from showing the objective baselessness of these claims.

### 3. Conclusion
**\*13** In sum, Defendants' motion should be denied insofar as it seeks dismissal of Plaintiffs' business tort claims based on the *Noerr–Pennington* affirmative defense. "[A] responding party often imposes an undue burden on the trial court and impedes the orderly administration of the lawsuit when [it] relies on a motion to dismiss to raise such an affirmative defense." *Richards v. Mileski*, 662 F.2d 65, 73 (D.C. Cir. 1981).

### B. Plaintiff's Antitrust Claims Should Not Be Dismissed
The Texas Free Enterprise and Antitrust Act ("TFEAA") provides that "[i]t is unlawful for any person to monopolize, attempt to monopolize, or conspire to monopolize any part of trade or commerce." TEX. BUS. & COM. CODE § 15.05(b). Defendants move to dismiss Plaintiffs' claims for monopolization and attempted monopolization under this provision, arguing that "Plaintiffs cannot rely

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 54 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

on [Defendants'] pre-litigation correspondence which is immunized by the *Noerr–Pennington* [d]octrine" and that when the allegations related to that correspondence are excluded, all that remains are "wildly speculative assertions and legal conclusions that are not supported by any factual allegations." Mot. Dismiss 12–14. Because Defendants have failed to establish their *Noerr–Pennington* defense under Rule 12(b)(6), the Court will not exclude the amended complaint's allegations concerning the pre-litigation correspondence from consideration.

Defendants next contend that, regardless of the *Noerr–Pennington* defense, "there is no evidence, let alone any appropriately and specifically detailed facts pled in the First Amended Complaint, to allow Plaintiffs to proceed with [the monopolization and attempted monopolization] claims." *Id.* 13. Before turning to each claim, it bears emphasizing that "[a]ntitrust claims do not necessitate a higher pleading standard and a plaintiff need only plead enough facts to state a claim to relief that is plausible on its face." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (internal quotation marks and citations omitted); *see also Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) ("[I]n antitrust cases ... dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly.").

**1. Plaintiffs Have Adequately Stated Their Monopolization Claim**

To establish a claim for monopolization under the TFEAA, a plaintiff must prove two elements: (1) "the possession of monopoly power in the relevant market" and (2) "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Caller–Times Pub. Co. v. Triad Commc'ns, Inc.*, 826 S.W.2d 576, 580 (Tex. 1992) (internal quotation marks and citation omitted) (quoting *United States v. I.T.T. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966) (setting forth the elements of the offense of monopolization under § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)). [12] Defendants challenge only the first element, which is often analyzed as two interrelated sub-elements: the "relevant market" and "monopoly power" within that market.

**a. Defendants' challenge to Plaintiffs' definition of the "relevant market" is without merit**

**\*14** Defendants appear to attack Plaintiffs' definition of the "relevant market," asserting that "Plaintiffs' allegations have not even properly defined an actual market" and that "Plaintiffs' attempt to designate the parameters of a 'Texas [job order contracting unit price book]' market must be rejected because there simply is no such market." Defs.' Reply 7 (quoting Pls.' Resp. to Mot. Dismiss ¶ 20, ECF No. 50).

As an initial matter, "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant ... market." *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.); *see also Le v. Zuffa, LLC*, No. 215–cv–01045, 2016 WL 6134520, at \*6 (D. Nev. Oct. 19, 2016) ("[S]ince the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." (internal quotation marks omitted) (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008))). Defendants' perfunctory briefing of this argument makes the Court especially reluctant to entertain it as a basis for dismissal. *See FTC v. Verma Holdings, LLC*, No. 4:13–cv–00594, 2013 WL 4506033, at \*7 (S.D. Tex. Aug. 22, 2013) (Atlas, J.) (denying motion to strike affirmative defenses because "[t]he issues surrounding these defenses are inadequately briefed to enable an informed determination about the legal viability of the issues [d]efendants raise"); *Saldana v. Int'l Shipbreaking Ltd.*, No. 1:07–cv–160, 2009 WL 1704274, at \*4 (S.D. Tex. June 17, 2009) (Hanen, J.) ("[Defendant] should have provided the Court with authority supporting its claim." (citing *United States v. Stevens*, 487 F.3d 232, 242 n.1 (5th Cir. 2007) ("Inadequately briefed issues are deemed abandoned.")). As Judge Posner has observed, "[i]t is always possible to take pot shots at a market definition." *United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1285 (7th Cir. 1990).

Further, even if Defendants had properly briefed this argument, "a relevant market definition is not a necessary component of a monopolization claim." *PepsiCo, Inc. v. Coca–Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) (per

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 55 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

curiam) (citations omitted). Specifically, a plaintiff "does not need to define a market if it can support its claim [of monopolization] with direct evidence that the defendant controlled prices or excluded the competition." *Rio Grande Royalty Co. v. Energy Transfer Partners, L.P.*, 786 F. Supp. 2d 1190, 1197 (S.D. Tex. 2009) (Ellison, J.) (collecting cases); *accord* 🔖 *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 937 (7th Cir. 2000) ("The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects." (citations omitted)). Here, Plaintiffs allege that Defendants used threats of baseless litigation and false accusations about Plaintiffs' business to successfully exclude competition. That is the sort of direct evidence that plausibly supports a monopolization claim, particularly when taken in combination with other allegations in the amended complaint suggesting Defendants' monopoly power (examined below). *See* 🔖⚠️ *United States v. Microsoft Corp.*, 253 F.3d 34, 56–58, 77–78 (D.C. Cir. 2001) (Microsoft's threats to retaliate against Intel were "direct proof" of monopoly power); 🔖 *Reazin v. Blue Cross & Blue Shield of Kan., Inc.*, 899 F.2d 951, 971 (10th Cir. 1990) (evidence that health care financing organization's threat to terminate agreement with perceived competitor excluded competition by inhibiting hospitals from pursuing alternative delivery systems supported finding of monopoly power). Thus, assuming *arguendo* that Defendants' challenge to Plaintiffs' market definition had merit, dismissal at this stage would still not be appropriate since Plaintiffs may succeed on their claims under the direct evidence approach.

*Cf.* 🔖 *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 510–12 (2002) (holding that plaintiffs in employment discrimination cases need not establish a prima facie case under the *McDonnell Douglas* framework to survive a 12(b)(6) motion to dismiss because that framework is inapplicable if plaintiffs present "direct evidence" of discrimination; it would be "incongruous to require a plaintiff, in order to survive a motion to dismiss, to plead more facts than he may ultimately need to prove to succeed on the merits if direct evidence of discrimination is discovered").

**\*15** Some courts have held that, under the direct evidence approach, plaintiffs must still describe the "rough contours of a relevant market," although they need not make "the usual showing of a precisely defined relevant market." 🔖 *Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004). Plaintiffs in this case have done so. A "relevant market" is a function of "the relevant product market" and

"the relevant geographic market." *Wampler v. S.W. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010); *see also* 🔖 *Toys "R" Us*, 221 F.3d at 937. Defendants challenge only the "relevant product market." *See MVConnect, LLC v. Recovery Database Network, Inc.*, No. 3:10–cv–1948, 2011 WL 13128799, at *6 (N.D. Tex. May 27, 2011) (not examining the "relevant geographic market" where defendants did not challenge that aspect of plaintiffs' pleadings). [13]

**\*16** "In ascertaining the relevant product market, courts consider the extent to which the seller's product is 'interchangeable in use' and the degree of 'cross-elasticity of demand between the product itself and substitutes for it.'" *Apani Sw., Inc. v. Coca–Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (quoting 🔖 *C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1245 (5th Cir. 1985)). "Cross-elasticity of demand" refers to "the extent to which consumers will change their consumption of one product in response to a price change in another." 🔖 *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 (1992). Here, Plaintiffs' amended complaint defines the proposed relevant product market as comprising "job order contracting unit price books." Am. Compl. ¶¶ 36–38, 40–41. Plaintiffs allege that: unit price books are a "major component" of job order contracting projects, *id.* ¶ 7; contractors' bids on job order contracting projects are based on the prices listed in a "pre-determined" unit price book, *id.*; prior to Gordian's acquisition of R.S. Means, vendors had "at least *two* choice for commercial [job order contracting unit price books]," *id.* ¶ 35, but afterwards "vendors no longer had a readily available alternative [commercial job order contracting unit price book] to use," *id.* ¶ 37; when Defendants came to control "100% of the market" in 2014, they raised prices by about 30%, *id.* ¶ 36; and, following the anticompetitive actions Defendants took against Plaintiffs, "contractors are now forced to use" Defendants' unit price book and must pay "whatever price Defendants determine in order to participate in [job order contracting] projects," *id.* ¶ 38. These allegations support the inference that there are no reasonably interchangeable substitutes for job order contracting unit price books and thus make Plaintiffs' definition of the relevant product market plausible.

Defendants suggest that the relevant product market in this case consists not just of "job order contracting unit price books" but also includes other types of "commercially available construction cost data," such as "estimating guides [that] are not marketed or sold as [job order contracting unit

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 56 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

price books]" but which "some consumers" have "adapted for that purpose." Defs.' Reply 7–8. To the extent it occurs, such "adaptation" does not mean that these other products are *reasonably* interchangeable with job order contracting unit price books. *See* 🔖 *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 394–95 (1956) (relevant market includes "alternatives that buyers may **readily** use" (emphasis added) and "commodities reasonably interchangeable by consumers for the same purposes"); *Universal Computer Sys., Inc. v. Volvo Cars of N. Am., Inc.*, 207 F.3d 658 (5th Cir. 2000) (per curiam) (unpublished opinion) (product that could be sold outside the purported relevant market "with little or no modification" was "reasonably interchangeable"). Plaintiffs' allegations indicate they are not, and the Court must accept those allegations as true. Also, Defendants themselves state that they "strongly believe that a customized, locally-priced unit price book, developed and published specifically for [job order contracting]" is "most effective" and that they recommend against consumers adapting estimating guides for use as job order contracting unit price books. Defs.' Reply 7–8. At this stage, the Court cannot say that Plaintiffs' relevant product market definition "clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [P]laintiff[s'] favor." *Apani*, 300 F.3d at 628. Thus, Defendants' motion to dismiss based on Plaintiffs' purported failure to define the relevant market is without merit.

### b. Plaintiffs have plausibly alleged that Defendants possess monopoly power

"Monopoly power is the power to control prices or exclude competition." 🔖 *E. I. du Pont*, 351 U.S. at 391. Plaintiffs have sufficiently pled that Defendants have such monopoly power.

Accepting the factual allegations in the amended complaint as true, Defendants' unit price book "is currently the only available option on the market." Am. Compl. ¶ 38; *id.* ¶ 40 ("Defendants are the only company that offers a [job order contracting unit price book] in Texas"). As a result, contractors "are now forced to use" that unit price book, as well as Defendants' management program, which "subjects [those] contractors to pay whatever price Defendants determine in order to participate in [job order contracting] projects." *Id.* ¶ 38. Moreover, in the year prior to Plaintiffs' attempted entry into the market, Defendants "literally controlled 100% of the market" for job order

contracting unit price books, both nationally and in Texas, and "marked up prices" by 30%. *Id.* ¶ 36. These factual allegations, [14] along with those relating to Defendants' conduct during the period Plaintiffs attempted to market a competing unit price book, plausibly support the conclusion that Defendants possess monopoly power in the relevant market. *See* 🔖 *Coca–Cola Co. v. Harmar Bottling Co.*, 218 S.W.3d 671, 690 & n.62 (Tex. 2006) (75–80% market share was sufficient to support a finding of monopoly power).

**\*17** Defendants rely on Scott Smith's declaration as factual proof that they "do not possess a monopoly or unlawful control of the market for commercially available construction cost data and pricing information." Mot. Dismiss 14. That document is not properly before the Court on this 12(b)(6) motion and cannot be considered.

Accordingly, Plaintiffs' monopolization claim should not be dismissed.

### 2. Plaintiffs Have Adequately Stated Their Attempted Monopolization Claim

To establish a claim for attempted monopolization, Plaintiffs must show that Defendants (1) have "engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." 🔖 *Star Tobacco Inc. v. Darilek*, 298 F. Supp. 2d 436, 447–48 (E.D. Tex. 2003) (internal quotation marks omitted) (quoting 🔖 *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

There is no question that Plaintiffs have sufficiently pled the first element. Taking the factual allegations in the amended complaint as true and drawing all reasonable inferences in Plaintiffs' favor, Defendants made false assertions about Plaintiffs and threatened to pursue baseless legal action against them and others, all in an (ultimately successful) effort to undercut Plaintiffs' ability to compete in the market. That is "predatory or anticompetitive conduct." *See* 🔖 *Universal Hosp. Servs., Inc. v. Hill–Rom Holdings, Inc.*, No. SA–15–CA–32, 2015 WL 6994438, at \*5 (W.D. Tex. Oct. 15, 2015) ("Predatory or anticompetitive conduct is conduct which 'tends to impair the opportunities of rivals [and] either does not further competition on the merits or does so in an unnecessarily restrictive way.' " (quoting 🔖 *Aspen Skiing Co.*

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 57 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

*v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n.32 (1985))).

Defendants assert that the amended complaint is "devoid of any factual allegations to establish the [Defendants'] 'specific intent to monopolize' or 'a dangerous probability of achieving monopoly power.' " Mot. Dismiss 12–13. Specific intent to monopolize "may be inferred from evidence of anticompetitive conduct." *Id.* at *7; *accord* 🚩 *Nat'l Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.*, 850 F.2d 904, 915 (2d Cir. 1988) ("Proof of the first element of an attempted monopolization claim, anticompetitive conduct, may be used to infer the second element, specific intent to monopolize ....."). Because they have plausibly alleged that Defendants took anticompetitive action, Plaintiffs are entitled to an inference of specific intent.

As to the third element, the allegations of anticompetitive conduct, combined with the allegations supporting Plaintiffs' monopolization claim, are sufficient to plausibly show a "dangerous probability" that Defendants will achieve monopoly power. *See* 🚩 *Nat'l Ass'n of Pharm. Mfrs.*, 850 F.2d at 915 ("[W]hen coupled with proof of monopoly power, evidence of anticompetitive conduct may also prove a dangerous probability of success."); 🚩 *Universal Hosp. Servs.*, 2015 WL 6994438, at *7 (allegation that defendant was a "monopolist already" in a related market supported the "dangerous probability" element); *Avnet, Inc. v. Motio, Inc.*,

No. 12–C–2100, 2015 WL 425442, at *6 (N.D. Ill. Jan. 30, 2015) (allegation that company and competitor's "products account for approximately 95% of the revenues in the market" plausibly supported conclusion that, if the competitor were "driven out" of the market, there was a dangerous probability that the company would achieve monopoly power); *Berman v. Riverbay Corp.*, No. 89–CIV–5538, 1990 WL 116765, at *2 n.3 (S.D.N.Y. Mar. 29, 1990) (allegations supporting monopolization claim also supported alternative claim for attempted monopolization).

**\*18** Plaintiffs' attempted monopolization claim should not be dismissed.

### IV. CONCLUSION

The Court **RECOMMENDS** that Defendants' motion to dismiss Plaintiffs' First Amended Complaint be **DENIED**. The parties have fourteen days from service of this Report and Recommendation to file written objections. 🚩 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72. Failure to file timely objections may preclude appellate review of factual findings or legal conclusions, except for plain error. *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

### All Citations

Not Reported in Fed. Supp., 2017 WL 2266993

---

### Footnotes

1   The Court did not consider Plaintiffs' surreply, ECF No. 53, because it was filed without leave of court. "Neither the local rules of this Court nor the Federal Rules of Civil Procedure allow a party to file a surreply as a matter of right." *Mize v. Quarterman*, No. 4:07–cv–3507, 2010 WL 644844, at *5 (S.D. Tex. Feb. 18, 2010) (Ellison, J.) (striking surreply filed without leave of court).

2   It is not clear from the amended complaint what the exact relationship is between Region 4 ESC and TCPN.

3   Defendants do not challenge Plaintiffs' business tort claims on any other grounds. Nonetheless, the Court observes that Plaintiffs' claim that Gordian and R.S. Means conspired to "cause the breach of contract that resulted in [P]laintiffs' damages," Am. Compl. ¶ 68, would likely not withstand 12(b)(6) scrutiny. Under Texas law, "[t]he essential elements of a civil conspiracy claim are: 1) two or more persons; 2) an object to be accomplished; 3) a meeting of the minds on the object or course of action; 4) one or more unlawful, overt acts; and 5) damages as the proximate result." 🚩 *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 404–05 (5th Cir. 2013) (citing 🚩 *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)). Plaintiffs have not alleged

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 58 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

sufficient factual matter to support all of these elements. In addition, Plaintiffs vaguely allege that Gordian "acquired" R.S. Means in July of 2014. Am. Compl. ¶ 15. It is not apparent that Texas law would permit a civil conspiracy claim in light of that acquisition. *See* 🚩 *Grizzle v. Tex. Commerce Bank, N.A.*, 38 S.W.3d 265, 284 (Tex. App.—Dallas 2001) (acknowledging split among Texas courts of appeals on whether a parent corporation can civilly conspire with its wholly-owned subsidiary), *rev'd in part on other grounds*, 🚩 96 S.W.3d 240 (Tex. 2002).

4 Defendants cite 🚩 *Love Terminal Partners, L.P. v. City of Dallas*, 527 F. Supp. 2d 538 (N.D. Tex. 2007). There, a court granted a motion to dismiss on *Noerr–Pennington* grounds, finding the sham exception inapplicable because the complaint "fail[ed] to allege facts that would support [that] exception." 🚩 *Id.* at 552 n.7. Some other courts have also stated that plaintiffs must plead facts plausibly supporting the sham exception in order to avoid Rule 12(b)(6) dismissal on *Noerr–Pennington* grounds. *E.g.*, 🚩 *Sweet St. Deserts, Inc. v. Chudleigh's Ltd.*, No. 12–3363, 2013 WL 1389760, at *7 (E.D. Pa. Apr. 4, 2013) ("Plaintiff must sufficiently plead, therefore, that the demand letter was both 'objectively baseless' and 'subjectively motivated' by anticompetitive intent."); 🚩 *Select Comfort Corp. v. Sleep Better Store, LLC*, 838 F. Supp. 2d 889, 899 (D. Minn. 2012) ("the pleadings do not reveal [the] claim [in a demand letter] to be objectively baseless"). These cases cannot be reconciled with the numerous authorities cited above, some of which are binding on this Court and all of which are more persuasive on this issue.

5 For purposes of the present motion, the Court assumes that the pre-litigation conduct upon which Plaintiffs' business tort claims are based consists entirely of "acts reasonably and normally attendant upon effective litigation." *See* 🚩 *Coastal States Mktg.*, 694 F.2d at 1367. It is not clear that this is an accurate assumption, however.

The amended complaint alleges that Defendants took various actions beyond sending the cease-and-desist letter to Plaintiffs. *See, e.g.*, Am. Compl. ¶ 26 (alleging that Gordian "publically [*sic*] criticiz[ed] Plaintiffs by alleging that Plaintiffs did not have ownership rights to the material in the CCD Catalogue"); *id.* ¶ 59 (Defendants "threat[ened] legal action" *and* "publically alleg[ed] that Plaintiffs did not have ownership rights to the material in the CCD Catalogue," which resulted in both 4Clicks Solutions and KATA Management terminating their agreements with Plaintiffs); *id.* ¶ 70 ("Defendants published disparaging statements, ***both orally and written***, about Plaintiffs' ownership rights to the material in the CCD Catalogue. Defendants stated Plaintiffs did not have ownership rights to the material in the CCD Catalogue .... " (emphasis added)). It is not readily apparent that these actions were "reasonably and normally attendant upon effective litigation," at least insofar as they were directed to Plaintiffs' customers and business partners or other third parties and were not sufficiently tied to the threatened litigation. *See* 🚩 *Wolf*, 2016 WL 4597638, at *8 n.6 (refusing to decide, at 12(b)(6) stage, whether defendant's "direct communications with [plaintiff's client] encouraging [the client] not to work with [p]laintiffs should be considered acts reasonably attendant upon litigation and immunized under *Noerr–Pennington*"); *Luxpro Corp. v. Apple, Inc.*, 658 F. Supp. 2d 921, 929 (W.D. Ark. 2009) (denying 12(b)(6) motion where defendant had not shown that its "post-litigation conduct of sending warning letters, making threats, and exerting pressure on [plaintiff's] clients [was] incidental to the prosecution of the ... litigation ... [or] was in anyway related to its right to petition a court"); 🚩 *Laitram Mach., Inc. v. Carnitech A/S*, 901 F. Supp. 1155, 1161 (E.D. La. 1995) ("The *Noerr–Pennington* doctrine does not extend to sending letters to a competitor's ***customers*** alleging violation of trade secrets and infringement of patents." (emphasis added)); *cf.* 🚩 *Coastal States Mktg.*, 694 F.2d at 1367–68 & n.30 (threats to actually litigate against a competitor's customers are not "*per se* unprotected"); 🚩 *Matsushita Elecs. Corp. v. Loral Corp.*, 974 F. Supp. 345, 359 (S.D.N.Y. 1997) (holding that demand letters sent to defendants on day suit was filed, and letters sent

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 59 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

thereafter to non-litigant companies as part of a "reasonable attempt to determine whether it should join those companies as defendants," were "reasonably attendant upon effective litigation"). To the extent they were not, those actions lie outside the limits of the *Noerr–Pennington* defense, regardless of the sham litigation exception.

The Court's recommendation that Defendants' motion be denied in light of the sham exception makes further consideration of this issue unnecessary at this stage. *See* *Wolf*, 2016 WL 4597638, at *8 n.6. Further development of the facts may add clarity or obviate the question entirely.

6    The Court does not find it appropriate to convert Defendants' 12(b)(6) motion into one for summary judgment. *See* *Harris v. Coastal Offshore, Inc.*, No. 2:11–cv–58, 2011 WL 2457922, at *3–4 (S.D. Tex. June 16, 2011) (Jack, J.).

7    The letter designates "CCD" as collectively referring to All Cost Data, CCD, JOC Group, and MJS, but also appears to use "CCD" to mean Construction Cost Data, LLC alone.

8    This case is unlike those where courts have found that an exhibit, on its face, "directly refute[s]" a crucial allegation made in the complaint. *See* *Sheppard v. Tex. Dep't of Transp.*, 158 F.R.D. 592, 597–98 (E.D. Tex. 1994) (granting motion to dismiss where plaintiff alleged he had received a right-to-sue letter but exhibit showed that the letter was not a right-to-sue letter); *Case v. State Farm Mut. Auto. Ins. Co.*, 294 F.2d 676, 676–78 (5th Cir. 1961) (district court properly dismissed plaintiff's claim that defendant wrongfully terminated contract because terms of the contract, which was attached to the complaint, gave defendant the right to terminate the agreement with or without cause).

9    The letter's mere assertion that the Construction Task Catalog was "a registered trademark" of Gordian does not establish this fact. Rather, the Court takes judicial notice of the official trademark registration documents attached to Defendants' Second Amended Counterclaims. ECF No. 29–2; *see* *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.6 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.").

10    Nor does it directly refute, for 12(b)(6) purposes, Plaintiffs' allegation that the Construction Cost Catalog was based on data from a publicly available unit price book the U.S. Army Corps of Engineers created. *See* Am. Compl. ¶ 20.

11    While the October 2015 registration occurred after Defendants sent the cease-and-desist letters, "registration is not required to obtain copyright protection, *see* 17 U.S.C. § 408(a), [although] it is a prerequisite to bringing an infringement action in federal court, *see* [17 U.S.C.] § 411(a)." *BWP Media USA, Inc. v. Gossip Cop Media, LLC*, 87 F. Supp. 3d 499, 503 (S.D.N.Y. 2015).

12    The TFEAA provides that it is to be interpreted "in harmony with federal judicial interpretations of comparable federal antitrust statutes." TEX. BUS. & COM. CODE § 15.04. Courts regularly apply principles developed under federal antitrust law, particularly the Sherman Antitrust Act, to claims brought under the TFEAA. *See* *In re Mem'l Hermann Hosp. Sys.*, 464 S.W.3d 686, 708 & n.107 (Tex. 2015); *McPeters v. LexisNexis*, 11 F. Supp. 3d 789, 796–97 (S.D. Tex. 2014) (Ellison, J.).

13    In the Court's view, Defendants' motion to dismiss meaningfully challenges only the "monopoly power" sub-element. *See* Mot. Dismiss 13–14. In their response, however, Plaintiffs argue that Defendants' motion seeks to "re-defin[e] the relevant market presented in Plaintiffs' [amended complaint]" by "deceptively expanding the market to include all services involving construction cost data" rather than just job order contracting unit price books. Pls.' Resp. to Mot. Dismiss ¶¶ 20–21. While that response arguably removes any prejudice Plaintiffs

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 60 of 173

Construction Cost Data, LLC v. Gordian Group, Inc., Not Reported in Fed. Supp. (2017)

may have incurred with respect to the relevant *product* market issue, at no point have the parties presented argument regarding the relevant *geographic* market. Even if Defendants' reply could somehow be construed as doing so, Defendants' "failure to raise this argument in [their] opening brief is sufficient to deny it." *Barrash v. Am. Ass'n of Neurological Surgeons, Inc.,* No. 4:13–CV–1054, 2014 WL 357809, at *12 (S.D. Tex. Jan. 31, 2014) (Ellison, J.) (citing *Conway v. United States,* 647 F.3d 228, 237 n.8 (5th Cir. 2011) ("Arguments raised for the first time in a reply brief are forfeited.")); *accord* 🚩 *Gillaspy v. Dallas Ind. Sch. Dist.,* 278 Fed.Appx. 307, 315 (5th Cir. May 13, 2008) (unpublished opinion) ("It is the practice of this court and the district courts to refuse to consider arguments raised for the first time in reply briefs." (citations omitted)); 🚩 *Murthy v. Abbott Labs.,* 847 F. Supp. 2d 958, 977 n.9 (S.D. Tex. 2012) (Ellison, J.) (same).

In any case, the Court concludes that Plaintiffs have plausibly alleged the "rough contours" of a relevant geographic market. A relevant geographic market is "the area in which the defendant effectively competes with other individuals or businesses for the distribution of the relevant product." 🚩 *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910, 918 (8th Cir. 1976); *accord Wampler,* 597 F.3d at 744 (the relevant geographic market is defined as "the area of effective competition," which is the "area 'in which the seller operates and to which buyers can practicably turn for supplies' "). The parties agree that Plaintiffs define the relevant geographic market to be "Texas," which is consistent with the repeated references to Texas in the amended complaint. Pls.' Resp. to Mot. Dismiss ¶ 20; Defs.' Reply 7. The allegations that Plaintiffs competed with Defendants in Texas and that vendors and contractors in Texas were unable to find alternatives to Defendants' product before Plaintiffs entered the market or after Plaintiffs left it, Am. Compl. ¶¶ 36–38, plausibly suggest that Texas is the area of effective competition. Although Plaintiffs allude to the national market and other markets, those references are not inconsistent with the existence of a discrete Texas market (or submarket), and there is nothing before the Court to indicate that a localized market for job order contracting unit price books is implausible.

14 Contrary to Defendants' contention, these allegations are not "conclusory." *See* Mot. Dismiss 13. Courts "label allegations conclusory when they are vague, lacking in specifics, or amount to mere recitations of the relevant legal standards without any supporting factual narrative." 🚩 *Morris v. Thaler,* 425 Fed.Appx. 415, 423 (5th Cir. 2011) (per curiam) (unpublished opinion). Plaintiffs' allegations are none of those things. For example, the allegation that Gordian's acquisition of R.S. Means in 2014 gave Defendants control of "100% of the market" for unit price books is supported not only by the alleged 30% price hike, but also by allegations that "vendors no longer had a readily available alternative commercial" unit price book to use and that Plaintiffs' short-lived entry into the market gave customers "2 options" to select from. Am. Compl. ¶ 37.

---

**End of Document**          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

⚑ KeyCite Yellow Flag - Negative Treatment

Called into Doubt by   PharmacyChecker.com, LLC v. National Association of Boards of Pharmacy,   S.D.N.Y.,   March 30, 2021

2002 WL 31164482

United States District Court, S.D. New York.

DRESSES FOR LESS, INC., DFL Management
Inc., the DFL Apparel Group, an unincorporated
association, Allison Che Fashions, Inc., Bicci
Studio Ltd., Garden City Dresses for Less, Inc.,
Donald Weiner and Barbara Weiner, individually
and derivatively as a shareholder of Stella N. Bishop
Fashion Corp., and I.S.B. Fashions Corp., Plaintiffs,
v.
CIT GROUP/COMMERCIAL SERVICES, INC. and
THE UPTOWN CREDIT GROUP, INC., Defendants.

No. 01 CIV. 2669(WHP).

|

Sept. 30, 2002.

**Synopsis**

Garment manufacturers and related entities or their principles brought action against domestic factor for garment industry, alleging price-fixing and monopoly claims under the Sherman Act and New York law Donnelly Act and common law contract claims. Defendant moved to dismiss. The District Court, Pauley, J., held that: (1) allegations supported group boycott claims; (2) manufacturers failed to state price-fixing claim against factor; (3) issues of fact regarding relevant product market could not be resolved at motion to dismiss; (4) allegations supported monopoly claims; (5) allegations supported good faith and fair dealing contract claims against factor; and (6) lack of contractual privity precluded certain good faith and fair dealing contract claims.

Motion granted in part and denied in part.

West Headnotes (12)

**[1]    Antitrust and Trade
Regulation** 👉 Complaint

Allegations that domestic factor for garment industry and other factors collectively decided

whether to deny credit to a particular manufacturer, and that the factors met biweekly and acted unanimously toward garment manufacturer, supported manufacturers' group boycott Sherman Act and New York law Donnelly Act restraint-of-trade claims against domestic factor, although factor claimed that manufacturers' theory lacked economic rationality. Sherman Act, ⚑ § 1 et seq., as amended, ⚑ 15 U.S.C.A. § 1 et seq.; ⚑ McKinney's General Business Law § 340.

**[2]    Antitrust and Trade
Regulation** 👉 Particular Cases

Allegations that domestic factor for garment industry agreed with other factors that once domestic factor agreed to refuse to credit check a garment manufacturer other actors would also refuse to check the manufacturer's credit and that factor could cripple garment manufacturer through control of piece goods sellers' purchases supported existence of antitrust injury under Clayton Act, as required for manufacturer's group boycott Sherman Act and New York law Donnelly Act restraint of claims suit against domestic factor. Sherman Act, ⚑ § 1 et seq., as amended, ⚑ 15 U.S.C.A. § 1 et seq.; Clayton Act, ⚑ 15 U.S.C.A. § 15(a); ; ⚑ McKinney's General Business Law § 340.

1 Case that cites this headnote

**[3]    Antitrust and Trade
Regulation** 👉 Complaint

Garment manufacturers failed to state Sherman Act or New York law Donnelly Act price-fixing claim against domestic factor for garment industry; although manufacturers alleged conspiracy that was a product of a horizontal agreement, manufacturers alleged that domestic factor and co-conspirators singled out certain manufacturers in denying credit, and manufacturers failed to state how market-wide denial of credit to specific companies affected market prices and to allege that factors discussed

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 62 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

any prices or terms for factoring services. Sherman Act, 🚩 § 1 et seq., as amended, 🚩15 U.S.C.A. § 1 et seq.; ; 🚩McKinney's General Business Law § 340.

1 Case that cites this headnote

**[4]** **Antitrust and Trade Regulation** 🔑 Complaint

Issue of whether garment manufacturer alleged relevant product market could not be resolved at motion to dismiss phase, on manufacturers' Sherman Act and New York law Donnelly Act antitrust monopoly claims against domestic factor, because of factual dispute as to market definition of factoring in domestic garment manufacturing industry and whether factoring was distinguishable from other forms of credit financing. Sherman Act, 🚩 § 2, as amended, 🚩15 U.S.C.A. § 2; ; 🚩McKinney's General Business Law § 340.

1 Case that cites this headnote

**[5]** **Antitrust and Trade Regulation** 🔑 Particular Industries or Businesses

Allegations that domestic factor increased its market share of domestic piece goods manufacturing to 90% through acquisition of competitors, giving it a "near stranglehold on garment manufacturers" because of its practice of making unilateral decisions equivalent to "blacklisting a manufacturer among factors" supported market power element of manufacturers' Sherman Act and New York law Donnelly Act claims that domestic factor abused monopoly power. Sherman Act, 🚩 § 2, as amended, 🚩15 U.S.C.A. § 2.

**[6]** **Antitrust and Trade Regulation** 🔑 Complaint

Allegations that, through domestic factor's control of the piece goods market for garment industry, domestic factor influenced other factors

to deny credit checks, and therefore financing, to garment manufacturers that could have been financed under normal market conditions, and thus discouraged other factors from participation in factoring for garment industry, supported manufacturers' claims against domestic factor under anti-monopoly provisions of Sherman Act and New York law Donnelly Act. Sherman Act, 🚩 § 2, as amended, 🚩15 U.S.C.A. § 2.

1 Case that cites this headnote

**[7]** **Antitrust and Trade Regulation** 🔑 Particular Cases

Injuries underlying derivative antitrust claims, by related entities of manufacturer and principles of garment manufacturer against domestic factor for garment industry, were not the sort of injury at which antitrust laws were directed, and thus principles lacked standing, although manufacturer had standing to bring Sherman Act price-fixing and monopoly claims. Sherman Act, 🚩 § 1 et seq., as amended, 🚩15 U.S.C.A. § 1 et seq.

1 Case that cites this headnote

**[8]** **Antitrust and Trade Regulation** 🔑 Complaint

Shareholder's allegations regarding other shareholders' refusal to consent to initiate Sherman Act price-fixing and monopoly claims against domestic factor in garment industry supported shareholder's claim that it would have been futile to secure initiation of claims with company boards, rather than as derivative shareholder claims; as to one corporation, shareholder who brought suit claimed that other 50% shareholder refused to consent, and as to other corporation, shareholder alleged that any dissenting shareholder could block corporate action and other shareholders refused to consent.

Sherman Act, 🚩 § 1 et seq., as amended, 🚩15 U.S.C.A. § 1 et seq.; Fed.Rules Civ.Proc.Rule 23.1, 28 U.S.C.A.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 63 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

**[9]** **Antitrust and Trade Regulation** 🚩 Particular Cases

Garment manufacturers' organization lacked standing to bring Sherman Act anti-monopoly and price-fixing claims, seeking money damages, against domestic factor for garment industry; fact and extent of injury required individualized proof by each company affected by the alleged anticompetitive behavior.

Sherman Act, 🚩 § 1 et seq., as amended, 🚩 15 U.S.C.A. § 1 et seq.

2 Cases that cite this headnote

**[10]** **Factors** 🚩 Contracts in General

Allegations that domestic factor for garment industry deliberately inflated garment manufacturers' debt by authorizing piece goods vendors to ship unordered merchandise to manufacturers supported manufacturers' New York law good faith and fair dealing contract claims against factor.

**[11]** **Factors** 🚩 Contracts in General

Lack of contractual privity between domestic factor for garment industry and association of garment manufacturers precluded any good faith and fair dealing contract claims by association against factor.

**[12]** **Federal Civil Procedure** 🚩 Fact Issues

Issue of whether domestic factor for garment industry breached fiduciary duty to principal of manufacturer could not be resolved at motion to dismiss phase because of factual dispute as to whether fiduciary relationship existed between parties. Restatement (Second) of Torts § 874.

5 Cases that cite this headnote

**Attorneys and Law Firms**

Alexander H. Schmidt, Esq., Wolf Haldenstein Adler Freeman & Herz LLP, New York, for Plaintiffs.

Robert A. Atkins, Esq., Paul, Weiss, Rifkind, Wharton & Garrison, New York, for Defendant CIT Group/Commercial Services, Inc.

Bernard Beitel, Esq., Otterbourg, Steindler, Houston & Rosen, P.C. , New York, for Defendant CIT Group/ Commercial Services, Inc.

Harlan M. Lazarus, Esq., Larazus & Lazarus, P.C., New York, for Defendant The Uptown Credit Group, Inc.

MEMORANDUM AND ORDER

PAULEY, District J.

**\*1** Plaintiffs are garment manufacturers and related entities or their principals. Defendant CIT Group/Commercial Services, Inc. ("CIT") is the largest domestic factor for the garment industry.

Plaintiffs assert that CIT and its predecessors conspired with other factoring companies to deny credit to certain garment manufacturers. Plaintiffs claim that the factors illegally boycotted their businesses and unlawfully fixed prices in violation of the Sherman Antitrust Act, 15 U.S.C. § 1 ("🚩 Section 1"). Plaintiffs further allege that CIT, by merging with or acquiring its competitors, obtained monopoly power in the garment factoring industry, in violation of the Sherman Antitrust Act, 15 U.S.C. § 2 ("🚩 Section 2"). Plaintiffs also assert common law claims for breach of contractual good faith and fair dealing and breach of fiduciary duty.

Defendants move to dismiss the amended complaint pursuant to Rule 12(b) of the Federal Rules of Civil Procedure. For the following reasons, defendants' motion is granted in part and denied in part.

*Background*

Factoring is a business relationship in which companies known as "factors" purchase at a discount other businesses' rights to collect accounts receivable. The discount usually

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 64 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

ranges from approximately 0.5 to 0.9 percent of the accounts. The factor then collects the accounts receivable. (Am.Compl.¶¶ 38-39.)

Without the ability to quickly convert accounts receivable into cash through factoring, a factor's clients could be exposed to a liquidity crunch that would threaten their businesses. When a factor purchases an account receivable, it assumes the risk of collecting the receivable. (Am.Compl.¶ 39.) However, a factor assumes that credit risk only after it has checked whether its customer is selling to a creditworthy purchaser. (Am.Compl.¶¶ 39, 42.) Moreover, factors like CIT may refuse to credit check a client's purchaser for any reason, even if that customer is creditworthy. (Am.Compl.¶ 41.) Because a manufacturer usually cannot afford to risk sales that are not acceptable to the factor, the factor's credit check decision often determines whether a sale is made. (Am. Compl ¶ 39.)

In the garment industry, a factor's clients may include the "piece goods" vendors that manufacture raw materials such as fabric, buttons, trim and other accessories, or garment manufacturers who purchase materials from piece good vendors. (Am. Compl. ¶ 41; Transcript from Oral Argument dated Nov. 16, 2001 ("Tr."), at 3.) Thus, when a factor's clients include both a piece goods vendor and a garment manufacturer who purchases from the piece goods vendor, the factor faces credit checking a purchaser who is also its own client. (Am.Compl. ¶ 41.)

Accepting the allegations in the amended compliant as true, the facts are as follows. Plaintiffs Allison Che' Fashions, Inc., Bicci Studio Ltd. ("Bicci"), and I.S.B. Fashions Corp. ("ISB"), Stella N. Bishop Fashion Corp. ("Stella Bishop") are defunct clothing manufacturers. (Am.Compl.¶¶ 12-15.) They grossed sales of $30,206,570, 48,492,233, and 53,800,273 for the fiscal years ending June 1998, 1999, and 2000 respectively. (Am.Compl.¶ 16.) Each manufacturer used CIT, or its predecessor Congress Talcott Corporation ("Congress"), as their factor for some period between 1996 and 2000. (Am.Com pl.¶¶ 12-15, 24.) Dresses For Less, Inc. ("Dresses For Less") is a garment manufacturer that was denied credit by CIT. (Am.Compl.¶ 18, 245) (collectively, Bicci Studio, ISB, Stella Bishop, and Dresses for Less are referred to as the "DFL Apparel companies"). Dresses For Less guaranteed some of the DFL Apparel companies' debts to CIT. (Am.Compl.¶ 18.)

**\*2** Plaintiff DFL Management Inc. operated the DFL Apparel companies. (Am.Compl.¶ 10.) Plaintiff DFL Apparel Group is an unincorporated business association comprised of the DFL Apparel companies, and previously included other manufacturers who are not parties to this litigation. (Am.Compl.¶ 11.) Plaintiffs Donald and Barbara Weiner are principals of the DFL Apparel companies and their related entities and also personally guaranteed several of the DFL Apparel companies' debts to CIT. The Weiners have lost approximately $2,600,000 in personal assets as a result of defaults. (Am.Compl.17.) Barbara Weiner owns fifty percent of ISB and forty-five percent of Stella Bishop. (Am.Compl.¶¶ 14-15.)

Plaintiff Garden City Dresses For Less ("GC Dresses For Less") leased property to DFL Apparel companies and lost more than $750,000 in annual rental income as a consequence of their defaults. (Am.Compl.¶ 19.)

CIT emerged as a dominant domestic factor after merging with its former competitors Congress and Heller Financial, Inc. in 1999 and 2000 respectively. (Am.Compl.¶ 28.) Those acquisitions caused CIT's market share in the factored retail garment industry to grow from nineteen to forty-one percent and its share of piece goods factoring to rise from fifty to ninety percent. (Am.Compl. ¶¶ 27, 60.) CIT factored approximately $26 billion of the entire domestic garment manufacturing industry. (Am.Compl.¶ 26.) CIT's largest competitor factors twenty-two percent of the market. (Am.Compl.¶ 26.)

Plaintiffs allege that CIT and several other factors formed an illegal cartel in 1924 and to this day operate as the single entity, currently known as defendant Uptown Credit Group, Inc. ("UCG"). (Am.Compl.¶¶ 25, 44.) Factors comprising the UCG include GMAC Commercial Credit LLC ("GMAC"), HSBC Business Credit (USA) Inc. ("HSBC"), the Receivable Capital Management Division of Sun Trust Banks, Inc. ("SunTrust"), Rosenthal & Rosenthal, Inc. ("Rosenthal"), Capital Factors, Inc. ("Capital"), Finova Capital Corp. ("Finova") and Sterling Factors Corp. ("Sterling") (Am.Compl.¶¶ 30-37.)

The UCG members account for approximately 80 to 85 percent of domestic garment manufacturer factoring. (Am.Compl.¶ 37.) Through acquisitions made between 1999 and 2001, including Finova, GMAC became the second largest factor in the industry with $14 billion in receivables purchased annually or twenty-two percent of the garment manufacturer factoring industry. (Am.Compl.¶ 30.) Finova

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 65 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

previously factored $800 million, or 1.2 percent of the domestic garment manufacturing market. (Am.Compl.¶ 35.)

HSBC factors approximately $7 billion in annual receivables, or eleven percent of the industry. (Am.Compl.¶ 31.) Rosenthal controls 2.4 percent of the domestic garment manufacturing market with $1.5 billion in annual receivables. (Am.Compl.¶ 33.) Capital factors $800 million, or 1.2 percent, of the domestic garment manufacturing industry. (Am.Compl.¶ 34.) In recent years, Sterling also captured $800 million, or 1.2 percent, of the domestic garment manufacturer factoring industry. (Am. Compl. ¶ 36 .)

**\*3** Plaintiffs allege that the other factors have agreed with CIT that they will not credit check customers that CIT has refused to credit check even though they contracted to assume those customers' credit risks in factoring agreements. (Am.Compl.¶¶ 42, 54.) Plaintiffs also contend that CIT has refused to credit check customers due to its dislike of management or other reasons that are not related to their customers' creditworthiness. (Am. Compl. ¶ 41 .)

Once CIT refuses to credit check a sale from a piece goods vendor to a garment manufacturer, it stops checking every proposed sale to that manufacturer by any piece goods vendor. (Am.Comp.¶¶ 43, 49.) A manufacturer's inability to make credit purchases from a piece goods vendor will increase its costs, inhibit cash flow, and can within weeks disable the manufacturer's ability to fill existing orders from retailers. (Am.Compl.¶¶ 44, 53, 61.) Moreover, because CIT controls ninety percent of domestically factored piece goods vendors, other factors quickly realize that a manufacturer who is not being credit checked by CIT cannot obtain enough credit to purchase the materials it requires. (Am.Compl.¶¶ 43, 61, 62.) Realizing that economic urgency, the other factors will quickly follow CIT's lead and refuse to check credit. (Am.Compl.¶¶ 61, 62, 63.) In addition, through its dominance in the garment manufacturing market via control over the piece goods vendors, CIT can also discourage garment manufacturers from purchasing from specific piece goods vendors. (Am.Compl.¶ 63.)

Plaintiffs allege that over the past two decades, CIT and its fellow factors conducted two highly secretive meetings every week. (Am.Compl.¶ 44.) The first meeting, known as the "Uptown meeting" is conducted every Wednesday by conspiring factors' account officers; the second, known as the "credit manager's meeting," is conducted every Thursday by the factors' credit managers. (Am.Comp.¶ 46.) At those

meetings, the factors share not only publicly available information about their clients' creditworthiness, but also highly confidential information about their clients, including whether and why they have stopped credit checking a particular client. (Am.Compl.¶¶ 48, 51.) Thus, the factors' collective decision not to credit check a certain manufacturer assures that none of them will incur a credit risk for a customer who might be creditworthy but potentially faces insolvency due to one factor's decision to deny further credit for any reason. (Am.Compl.¶ 50.)

Beginning in February 1997, Kenwin Shops Incorporated ("Kenwin"), a company controlled by Donald Weiner, was defending a civil action by the Bank of Louisiana ("BOL") in the Eastern District of Louisiana. See *In re: Bank of Louisiana / Kenwin Shoes Inc.,* No. 97 Civ. 1193(MDL), 1998 Lexis 11680, at \*2 (E.D.La. July 27, 1998). That action resulted from Kenwin's failure to make payments to BOL in accord with their regular course of dealing. *Bank of Louisiana,* 1998 Lexis 11680, at \*3. "Kenwin was collecting and holding money paid by customers of Kenwin that was due to BOL under the Contract Agreement between them." *Bank of Louisiana,* 1998 Lexis 11680, at \*3. In the course of that litigation, D & A Funding Corporation, another company controlled by Donald Weiner, asserted that it had priority to the monies owed to BOL.

**\*4** Both parties filed motions for injunctive relief. In support of an application for a continuance on the motions, counsel for Kenwin represented that the claimed funds were sequestered precluding any harm to BOL. *Bank of Louisiana,* 1998 Lexis 11680, at \*3. After several months, the parties entered settlement discussions with the aid of the court to resolve their motions for injunctive relief. The parties stipulated that each would post a bond and thereafter voluntarily dismiss the motions. *Bank of Louisiana,* 1998 Lexis 11680, at \*6. In October 1997, Kenwin filed for Chapter 11 bankruptcy without informing BOL. *Bank of Louisiana,* 1998 Lexis 11680, at \*6. On November 3, 1997, Kenwin offered a draft bond to BOL, but eleven days later, Kenwin's counsel informed BOL that it would not file it. *Bank of Louisiana,* 1998 Lexis 11680, at \*7. At that time, the court first learned of Kenwin's bankruptcy petition. *Bank of Louisiana,* 1998 Lexis 11680, at \*8.

The court conducted a hearing regarding Weiner's apparent "material misrepresentations and omissions" regarding the sequestered funds and the timing of Kenwin's bankruptcy. *Bank of Louisiana,* 1998 Lexis 11680, at \*9. On July 27,

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 66 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

1998, the court sanctioned Donald Weiner after finding his testimony to be "disingenuous, obviously evasive and obfuscatory" and his memory to be "transparently convenient." *Bank of Louisiana,* 1998 Lexis 11680, at *9.

The *Bank of Louisiana* decision, however, had no adverse impact on the creditworthiness of the DFL Apparel companies. (Am.Compl.¶ 57.) By late 1998, the DFL Apparel companies were generating net sales of approximately $10 million per month. (Am.Compl.¶ 56.) As of September 1998, DFL Apparel companies had never been denied credit. (Am.Compl.¶ 56.) Nevertheless, CIT ceased approving credit to each DFL Apparel company shortly after the issuance of the *Bank of Louisiana* opinion and advised its co-conspirator factors of its decision. (Am.Compl.¶ 57.) Each of the co-conspirator factors stopped credit checking DFL Apparel companies the next day. (Am.Compl.¶ 57.) Although CIT eventually continued to extend credit, the DFL Apparel companies suffered millions of dollars in lost sales in the interim. (Am. Compl. ¶ 57 .)

In addition to colluding with the other factors, plaintiffs further allege that CIT engaged in bad faith conduct throughout their relationship that damaged the manufacturing plaintiffs. Plaintiffs contend that starting in 1996, Donald Weiner advised CIT and numerous piece goods vendors orally and in writing that, as a condition to the guaranties of Donald Weiner, Barbara Weiner and Dresses for Less, no DFL Apparel company purchase order should be honored unless it bore his signature. (Am.Compl.¶ 69.) Despite expressly acknowledging that requirement in writing, CIT approved millions of dollars of sales to the DFL Apparel companies by CIT's factored piece goods vendors that were not supported by signed purchase orders. (Am.Compl.¶ 69.) As a result, the DFL Apparel companies suffered millions of dollars in losses and incurred millions in debt to CIT. (Am.Compl.¶ 69.)

 **\*5**  Moreover, although CIT had separate factoring agreements with each DFL Apparel company, CIT treated them as if they were one company by penalizing every member when one company was delinquent on its payments. Thus, a DFL Apparel company with no credit or payment problems might nevertheless have its credit reduced or refused. (Am.Compl.¶ 70.) By treating the DFL Apparel Group as a single entity instead of several companies, CIT applied one "collective credit limit" to the entire group. Thus, if the group limit had been exceeded, CIT directed all DFL Apparel members to reduce their sales volumes and denied credit for piece goods purchases by DFL Apparel

companies with remaining credit under their individual factoring agreements. (Am.Compl.¶ 71.)

At some time in 2000, CIT orchestrated a boycott where the factors ceased authorizing piece goods vendors to sell goods to Dresses For Less and DFL Apparel companies. (Am.Compl.¶ 73.) Between September 30, 2000 and January 31, 2001, the DFL Apparel companies went out of business. (Am.Compl.¶ 73.)

Plaintiffs also assert that before those failures, CIT compelled certain DFL Apparel companies to accept substantial "overadvances of credit" that bore higher interest charges than normal advances. (Am. Compl. ¶ 72.) Normally, a DFL Apparel company could obtain credit advances of up to 80 to 90 percent of the sales that it assigned to CIT. However, CIT had the discretion to extend overadvances for as much as 95 to 100 percent of assigned sales. (Am.Compl.¶ 72.) CIT regularly refused to approve credit for piece goods purchases by solvent DFL Apparel companies unless a fiscally unstable DFL company accepted an overadvance with a higher than normal interest rate and then applied the extra funds to debts it owed to piece goods vendors factored by CIT. (Am.Compl. ¶ 72.) As a result, the weaker DFL company could not purchase the piece goods and would face losing millions in sales or borrowing more at increased interest charges. (Am.Compl.¶ 72.)

Lastly, plaintiffs allege that CIT prolonged the failure of the DFL Apparel companies for several months in order to extract additional interest. (Am.Compl.¶ 75.) In June 2000, Donald Weiner discovered that CIT had approved several piece goods vendors' sales to DFL Apparel companies without first obtaining purchase orders signed by him. Concerned about his and other guarantors' exposure arising from the DFL Apparel companies' debts to CIT, Donald Weiner advised CIT that he was closing the DFL Apparel companies. (Am.Compl.¶ 75.) At that time, the DFL Apparel companies' inventories and accounts receivable exceeded their debts by 50 percent. (Am.Compl.¶ 75.) After receiving CIT's assurances that it would continue to finance and support the DFL Apparel companies, Weiner continued the businesses. (Am.Compl.¶ 75.) As a result, CIT received interest payments throughout 2000. Nevertheless, CIT stopped checking the DFL Apparel companies' credit causing them to fail. (Am.Compl.¶ 76.)

*Discussion*

2002-2 Trade Cases P 73,828

I. *Motion to Dismiss Standards*

**\*6** On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995).

There are no heightened pleading requirements for antitrust cases. *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001). Further, dismissals of antitrust cases "prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Todd,* 275 F.3d at 198 (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). However, it is improper " 'to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Todd,* 275 F.3d at 198 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

II. *Section One Violations*

Plaintiffs allege that CIT conspired with other factors to boycott credit checks of plaintiff companies in violation of Section One, and that their boycott resulted in the price fixing of piece goods also in violation of Section One. (Am.Compl.¶¶ 80, 86, 87.)

Section One prohibits all combinations and conspiracies that unreasonably restrain trade among the states. 15 U.S.C. § 1. To establish a Section One violation, a plaintiff must produce evidence sufficient to show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir.2001); *see also Tops Mkts., Inc., v. Quality Mkts. ., Inc.,* 142 F.3d 90, 96 (2d Cir.1998).

*Per se* illegal conduct is that which is so egregious as to constitute a violation of law without the necessity of showing an effect on competition. *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133-34, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Bogan,* 166 F.3d at 513. Among conduct falling within the *per se* rule are price fixing, territorial market division and certain group boycotts involving concerted refusals to deal. *NYNEX Corp.,* 525 U.S. at 133; *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 542-43 (2d Cir.1993). Only conduct that is "manifestly anticompetitive" is designated as per se illegal. Most cases do not fall within the *per se* category. *Bogan,* 166 F.3d at 514; *see also CDC Techs., Inc. v. IDEXX Laboratories, Inc.,* 186 F.3d 74, 79 (2d Cir.1999) (only a "handful" of practices are per se illegal); *National Camp Assoc., Inc. v. Am. Camping Assoc., Inc.,* No. 99 Civ. 11853(DLC), 2000 WL 1844764, at \*5 (S.D.N.Y. Dec.15, 2000) (noting Supreme Court's refusal to extend the class of agreements to which a per se analysis applies).

**\*7** Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Application of this doctrine requires a plaintiff to prove not mere injury to plaintiff as a competitor but antitrust injury, i.e., actual damage to competition within the relevant market. *Capital Imaging,* 996 F.2d at 542-43. The injury to a relevant market requirement assures that the Sherman Act protects competition as a whole in the relevant market, and "not the individual competitors within that market, so that a plaintiff may succeed only when the loss he asserts derives from activities that have a 'competition-reducing' " effect. *Tops Mkts., Inc.,* 142 F.3d at 96 (citing *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342-44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)).

A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. Such power is defined as the power to "raise prices significantly above the competitive level without losing all of one's business." *CDC Technologies,* 186 F.3d at 81 (quoting *Capital Imaging,* 996 F.2d at 546); *see also Primetime 24 Joint Venture v. Nat. Broad. Co., Inc.,* 219 F.3d 92, 103-04 (2d Cir.2000).

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 68 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

### III. *Group Boycott*

Plaintiffs allege group boycott conduct as *per se* and rule of reason violations. (Am.Comp.¶¶ 80, 86); *see AD/ SAT v. Associated Press,* 181 F.3d 216, 232 (2d Cir.1999) (Section 1 group boycotting claim may be alleged as either a *per se* or rule of reason violation); *accord Bogan v. Hodgkins,* 166 F.3d 509, 514 (2d Cir.1999). [1] CIT contends that plaintiffs have not adequately pleaded a boycotting claim because the amended complaint fails to allege facts to support an inference of an agreement among the factors or that plaintiffs suffered an antitrust injury.

#### 1. *Existence of an Agreement*

CIT asserts that plaintiffs' conclusory allegations regarding a boycotting agreement among the several factors to cut off plaintiffs' credit are inadequate as a matter of law. (CIT's Mem. in Supp. at 6-7.) CIT further contends that inferring such an agreement would be nonsensical because it contradicts CIT's economic interests. (CIT's Mem. in Supp. at 9.)

"The plaintiff must do more than allege the existence of a conspiracy-it must allege some facts in support of the claim." *Floors-N-More, Inc. v. Freight Liquidators,* 142 F.Supp.2d 496, 501 (S.D.N.Y.2001); *see also Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972) ("[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal."); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 837 (S.D.N.Y.1988) (dismissing complaint which alleged that the defendants "conspired and contracted with [each other] ... to restrain trade").

**\*8**  **[1]**   Here, plaintiffs allege that CIT and the other factors collectively decided whether to deny credit to a particular manufacturer. Plaintiffs contend that the factors' agreement regarding credit checks is evidenced by the factors' biweekly meetings and by the factors' unanimity in refusing to check the DFL Apparel companies' credit between September 2000 and January 2001. (Pls.' Mem. in Opp. at 5.)

Viewing the amended complaint liberally, plaintiffs have alleged sufficient facts to assert that the conspiring factors' conduct was not simply parallel but was the product of collusion. *See Todd,* 275 F.3d at 198 (citations omitted) (finding that an inference of a horizontal price-fixing agreement could be drawn in the absence of direct "smoking gun" evidence "when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices. Information exchange is an example of a facilitating practice that can help support an inference of a price fixing agreement").

CIT further argues that the existence of an agreement among the factors cannot be inferred because plaintiffs' theory lacks any economic rationality. (CIT's Mem. in Supp. at 8.) Without great detail, plaintiffs allege that defendants' conspiracy sought to minimize their costs, stabilize prices, preserve market shares, and maintain monopoly power. (Am.Compl.¶ 47.) While, CIT acknowledges that refusing to check a purchaser can limit its own exposure, it argues that encouraging other factors also to deny credit to the DFL Apparel companies would only hasten their insolvencies preventing their continued payments to CIT. (CIT's Mem. in Supp. at 8.) Thus, CIT maintains that it lacks any incentive to collude with the other factors because the alleged conspiracy hurts its economic interests. (CIT's Mem. in Supp. at 8.)

Even if the scheme alleged was economically implausible, a conspiracy may nevertheless be proven "by strong direct or strong circumstantial evidence, [although] the implausibility of a scheme will reduce the range of inferences that may permissibly be drawn from ambiguous evidence." *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253 (2d Cir.1987) (citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Moreover, plaintiffs have proposed a reasonable economic motive for the conspiracy. Plaintiffs contend that by "weeding out" creditworthy albeit financially weaker companies, at the "slightest inkling" of their insolvency, CIT assured that it would recover fully by collecting from the guarantors. (Pls.' Mem. in Opp. at 7.) Plaintiffs further allege that the agreement to reduce credit risk stabilizes prices and the competing factors' market shares. (Am.Compl.¶ 64.) Whether any of these motives can be established and are served by the alleged conspiracy are factual questions.

#### 2. *Antitrust Injury*

Section 4 of the Clayton Act provides that "any person who shall be injured ... by reason of anything forbidden

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

in the antitrust laws may sue." 🚩 15 U.S.C. § 15(a). Despite this broad language, plaintiffs must nevertheless demonstrate that they have suffered an "antitrust injury," and that they are otherwise proper plaintiffs to bring the action at issue. 🚩 *Todd,* 275 F.3d at 213 ("An antitrust plaintiff must not only allege cognizable harm to [it]self, but an adverse effect on competition market wide.") (citing 🚩 *Elecs. Communications Corp. v. Toshiba Am. Consumer Prods., Inc.,* 129 F.3d 240, 242 (2d Cir.1997)); *see also* 🚩 *Volvo No. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 66 (2d Cir.1988).

 **\*9** An "antitrust injury" is an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

🚩 *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also* 🚩 *Intellective v. Massachusetts Mut. Life Ins. Co.,* 190 F.Supp.2d 600, 609 (S.D.N.Y.2002).

To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." 🚩 *Capital Imaging,* 996 F.2d at 543; *see also* 🚩 *Brunswick Corp.,* 429 U.S. at 488 ("The antitrust laws ... were enacted for 'the protection of competition, not competitors.' ") (quoting 🚩 *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Even when a *per se* violation of the antitrust laws occurs, a plaintiff is still required to demonstrate antitrust injury as an element of a successful claim. *See* 🚩 *Atlantic Richfield Co.,* 495 U.S. at 341-45 (1990) ("[I]nsofar as the *per se* rule

permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored."). As the Supreme Court explained, the antitrust injury requirement:

> ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs .... The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

🚩 *Atl. Richfield Co.,* 495 U.S. at 345.

 **[2]** CIT argues that the amended complaint lacks any factual allegations of anticompetitive behavior to support its "vague and conclusory" claims of "horizontal and vertical anticompetitive impacts." (CIT's Mem. in Supp. at 12.) However, the gravamen of plaintiffs' amended complaint is that CIT and the other factors agreed that once CIT refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well. By participating in the alleged conspiracy, CIT's co-conspirators protected their own market shares. (Am.Compl.¶ 47.) Moreover, if a co-conspirator abandoned the conspiracy and financed a garment manufacturer that CIT refused to credit check, CIT could nevertheless cripple that garment manufacturer through its alleged control of the piece goods vendors' purchases. (Am.Compl.¶ 63.) Thus, plaintiffs contend that CIT forged an agreement with its competitors that restricted the supply of factoring to garment manufacturers. That allegation sufficiently pleads injury to the garment manufacturing market. 🚩 *Primetime 24 Joint Venture,* 219 F.3d at 102 (plaintiff "clearly alleged injury" to competition where it pleading that competitors had eliminated "potential price competition," restricted output, and diminished the quality of service to customers).

IV. *Price Fixing*

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 70 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

**\*10** CIT argues that plaintiffs' claim of price fixing is inadequate because it lacks any allegation that the factors ever discussed, much less agreed on, any prices or terms for their factoring services. (CIT's Mem. in Supp. at 11.) Plaintiffs respond that the conduct alleged in their boycotting claim resulted in illegal price-fixing *per se*. (Pls.' Mem. in Opp. at 11.)

A horizontal price fixing conspiracy is a *per se* unreasonable restraint of trade. *See* ⚑ *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 ("Under the Sherman Act, a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*.").

**[3]** While the alleged conspiracy in this case was the product of a horizontal agreement, it was not a price fixing agreement. Plaintiffs argue that the factors' denial of credit is analogous to the facts of ⚑ *Catalano v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). In *Catalano,* beer wholesalers agreed not to extend credit to any retailers and to sell their product only when they received payment in advance or on delivery. ⚑ *Catalano,* 446 U.S. at 644. The Court held that

> [i]t is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. Thus, credit terms must be characterized as an inseparable part of price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing.

⚑ *Catalano,* 446 U.S. at 648. However, unlike *Catalano,* plaintiffs do not allege that CIT and its co-conspirators terminated the practice of providing credits to their customers. Instead, plaintiffs' claim that defendants singled out the DFL Apparel companies in denying their credit.

Moreover, the amended complaint states that the factors entered the agreement to assure that "none of conspiring factors [would] incur a credit risk for a customer that appears to be worthy of credit but whose ability to remain in business is [threatened] by a competing factor's decision to deny credit." (Am Compl. ¶ 54.) From that allegation, plaintiffs add in conclusory fashion that the denial of credit also served to stabilize the factors' prices due to the uniform reduction of credit risk. However, at no time do they state how the market-wide denial of credit to specific companies affected market prices. In addition, as noted by CIT, there is no allegation that the factors ever discussed "any prices or terms for their factoring services-*e.g.,* interest rates, payment terms, credit limits or any aspects of the 'price' of the services." (CIT's Mem. in Supp. at 11.)

Plaintiffs' amended complaint fails to allege facts to state a claim for price fixing. Accordingly, plaintiffs' price fixing claim is dismissed.

## V. *Monopolization*

**\*11** Section 2 of the Sherman Act prohibits persons from combining or conspiring to monopolize trade or commerce among the several States ...." ⚑ 15 U.S.C. § 2; *see also* ⚑ *AD/SAT,* 181 F.3d at 232. To state a claim under ⚑ Section 2, a plaintiff must plead two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power is defined "as the power to control prices in the relevant market or to exclude competitors." ⚑ *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596, n. 20, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). CIT argues that plaintiffs have failed to allege a relevant product market or that CIT abused its monopoly power. [2]

### 1. *Relevant Market*

"A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." ⚑ *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* No. 00 Civ. 5663(MBM), 2001 WL

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 71 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

1468168 (S.D.N.Y. Nov.19, 2001) (citing 🚩 *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)). Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. 🚩 *Todd,* 275 F.3d at 199; *see also* 🚩 *Hayden Publ'g Co. v. Cox Broad. Corp.,* 730 F.2d 64, 70 n. 8 (2d Cir.1984) ("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unexpected. It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact ....' ").

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." 🚩 *Todd,* 275 F.3d at 199 (internal citations omitted); *accord* 🚩 *Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 86 (2d Cir.2000); *see also* 🚩 *Yellow Page Solutions,* 2001 WL 1468168, at *12. "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way ." 🚩 *Todd,* 275 F.3d at 199.

[4] Here, the relevant markets alleged are factoring in the domestic garment manufacturing industry and factoring in the domestic piece goods industry. (Am.Compl.¶ 65.) Moreover, plaintiffs distinguish factoring from other forms of credit financing on the ground that factors "bear any and all losses stemming from [their] customers' insolvency or other financial inability to pay for goods that are sold and shipped by the client." (Am.Compl.¶ 39.) Whether that market definition is appropriate for plaintiffs' antitrust claim is a fact-intensive inquiry that cannot be resolved at this juncture.

2. *Abuse of Monopoly Power*

*12 Possession of monopoly power does not violate 🚩 Section 2 of the Sherman Act. Plaintiffs must demonstrate that defendants abused their market power in either its acquisition or maintenance. 🚩 *Berkey Photo Inc. v.*

*Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979) ("defendant must refrain from conduct directed at smothering competition."); *see also* 🚩 *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 376-77 (7th Cit.1986) (Posner, J.). A 🚩 Section 2 monopolization claim requires an allegation that defendants willfully acquired or maintained monopoly power, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 🚩 *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *see also Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.,* 922 F.2d 1319, 1322 (7th Cir.1999) (citing 🚩 *United States v. Aluminum Co. of Am.,* 148 F.2d 416 (2d Cir.1945)) (monopolization by improper methods usually involves repelling or intimidating new entrants into a market through predatory pricing). To demonstrate attempted monopolization, plaintiffs must prove that defendant engaged in predatory or anticompetitive conduct with a specific intent to monopolize and a dangerous possibility of achieving monopoly power. 🚩 *Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Anticompetitive conduct is "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor." 🚩⚠️ *Covad Comms. Co. v. BellSouth Corp.,* No. 01-16064, 2002 WL 1777009 (11th Cir. Aug.2, 2002). Both monopolization and attempted monopolization claims require anticompetitive behavior by the defendant. *Invamed Inc. v. Barr Labs., Inc.,* 22 F.Supp.2d 210, 218 (S.D.N.Y.1998).

[5] CIT contends that plaintiffs allege no abuse of market power because their one allegation, "that [CIT] decided to stop credit checking the manufacturing plaintiffs," was not anticompetitive conduct. (CIT's Mem. in Supp. at 17.) However, CIT construes plaintiffs' claim too narrowly.

Plaintiffs assert that CIT increased its market share of domestic piece goods manufacturing to 90 percent through the acquisition of several competitors, giving it a "near stranglehold on garment manufacturers" because its unilateral decisions equate to "blacklisting a manufacturer among factors." (Pls.' Mem. in Supp. at 15-16.) Thus, plaintiffs adequately plead CIT's market power in the piece goods factoring market. *Moore U.S.A., Inc. v. Standard Register Co.,* 139 F.Supp.2d 348, 364 (W.D.N.Y.2001) (alleging market share that SRC alleges in this action: 65 percent) (citing

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 72 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980)).

[6]   Plaintiffs further contend that CIT engaged in anticompetitive behavior through its aggressive mergers. However, "the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality." IV Phillip E. Areeda et al., *Antitrust Law* ¶ 901a (1998) (hereinafter "Areeda"); *see also* Irving Scher, *Antitrust Adviser* § 3.61 at 3-167 (4th ed.2001) (horizontal mergers are much more likely to be procompetitive than anticompetitive.). "Competing firms typically merge for reasons entirely unrelated to effects on marketwide output or price-for example, to achieve economies of scale or integration, to put inefficiently run assets into the hands of superior management, to resolve management succession for an individually owned enterprise, or for tax or other reasons." Areeda ¶ 901a. Plaintiffs also assert that CIT's alleged illegal boycotts constitute anticompetitive behavior to plead a monopolization claim.

**\*13**   As stated above, plaintiffs allege that through its control of the piece goods market, CIT influenced other factors to deny credit checks, and therefore financing, to garment manufacturers that could have been financed under normal market conditions. Thus, CIT, through its control of piece goods factoring, discouraged other factors from their participation in factoring for the garment industry. *See, e.g.,* *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (Sections 1 and 2 "overlap" in the sense that a monopoly under section 2 is a "species of restraint" under section 1.). That contention sufficiently alleges anticompetitive conduct to support plaintiffs' Section 2 claim. Accordingly, CIT's motion to dismiss plaintiffs' Section 2 monopolization claim is denied.

## VI. *Standing*

### 1. *Antitrust Claims*

CIT moves to dismiss plaintiffs Donald and Barabra Weiner, Dresses for Less, Inc., Garden City Dresses for Less, Inc., and DFL Management for lack of standing because their injuries are "merely derivative" and do not constitute an antitrust injury. (CIT's Mem. in Supp. at 19.) As stated above, an antitrust plaintiff's injury must be the kind of

injury at which the antitrust laws were directed. *Brunswick Corp.,* 429 U.S. at 489. Thus, "[m]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing." *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 766 (2d Cir.1994) (citing *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1378 (7th Cir.1987)). "It follows naturally that a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing." *G.K.A. Beverage Corp.,* 55 F.3d at 766-67 (8th Cir.1992) (denying antitrust standing where sole shareholder's injury stemmed from failure of corporation)); *accord* *Lovett v. Gen. Motors Corp.,* 975 F.2d 518, 520 (8th Cir.1992) (dismissing car dealership owner's antitrust claims because he was not the target of anticompetitive conduct but rather suffered a consequential injury). This prerequisite necessitates that the injured party be a participant in the same market as the alleged malefactors. *Automated Salvage Transport, Inc. v. Wheelabrator Env't Sys., Inc.,* 155 F.3d 59, 78 (2d Cir.1998) (quoting *Bhan v. NME Hosps., Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985); *see also* *Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 989 (9th Cir.2000) ("Antitrust injury requires that the 'injured party be a participant in the same market as the alleged malefactors." '); *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (denying antitrust standing to party that was "neither a consumer nor a competitor in the market in which trade was restrained").

**\*14**   [7]   The DFL Apparel companies participate in the factoring market as consumers and therefore, their injury is a direct consequence of the alleged antitrust violations. However, the injuries suffered by Donald and Barbara Weiner, Garden City Dresses for Less, Inc., and DFL Management as a result of the alleged antitrust violations are entirely derivative of the direct antitrust injury suffered by the DFL Apparel companies. Accordingly, CIT's motion to dismiss the antitrust claims asserted by Donald and Barabra Weiner, Dresses for Less, Inc., Garden City Dresses for Less, Inc., and DFL Management for lack of standing is granted.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 73 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

### 2. *Shareholder Derivative Claims*

**[8]**    CIT contends that Barbara Weiner's derivative shareholder claims asserted on behalf of ISB and Stella Bishop should be dismissed because she has failed to allege the reason that she did not secure initiation of those claims with the boards of those companies. (CIT's Mem. in Supp. at 19.)

The amended complaint states that Barbara Weiner owns a 50 percent stake in ISB and a 45 percent of Stella Bishop. (Am.Compl.¶¶ 20, 22.) Plaintiffs allege that ISB's other 50 percent shareholder refused to consent to this lawsuit, and that Stella Bishop's other 45 percent [3] shareholder "would plainly never consent [to this action]" because he and the Weiners are involved in several bitter lawsuits. (Am.Compl.¶ 23.) In addition, Stella Bishop's other 45 percent shareholder owns companies that are currently being factored by CIT. (Am.Compl.¶ 24.)

When a shareholder brings a derivative lawsuit, her complaint must set forth either the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort. *See* Fed. R. Civ. Proc. 23.1; Business Corporation Law § 626(c). "[W]here the directors and controlling shareholders are antagonistic, adversely interested, or involved in the transaction attracted, a demand on them is presumptively futile and need not be made. *Cathedral Estates v. Taft Realty Corp.,* 228 F.2d 85, 88 (2d Cir.1955); *see also Galef v. Alexander,* 615 F.2d 51 (2d Cir.1980); *General Elec. Co. v. Bucyrus-Erie Co.,* 563 F.Supp. 970, 974 (S.D.N.Y.1983).

The amended complaint's allegations regarding ISB's other shareholder's refusal to consent and the animosity between Stella Bishop's major shareholders sufficiently plead that demand would be futile. Accordingly, CIT's motion to dismiss the shareholder derivative claims is denied.

### 3. *DFL Apparel Group*

**[9]**    CIT asserts that the DFL Apparel Group has no standing to sue on behalf of the companies it represents. An association may assert the rights of its members under the doctrine of associational standing. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343-45, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *accord Irish Lesbian and Gay Org. v. Giuliani,* 143 F.3d 638, 649 (2d Cir.1998). To bring suit on

behalf of its membership, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt,* 432 U.S at 343; *see Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 596 (2d Cir.1993) (applying *Hunt* test).

***15**   An organization lacks standing to sue for money damages on behalf of its members if the damages "are not common to the entire membership, nor shared by all in equal degree," so that "the fact and extent of injury require[s] individualized proof." *Warth v. Seldin,* 422 U.S. 490, 515-16, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *accord Sun City Taxpayers' Ass'n v. Citizens Utils. Co.,* 45 F.3d 58, 61 (2d Cir.1995).

DFL Apparel fails the third prong of the *Hunt* test. Recovery in this case would require individualized proof by each of the companies affected by CIT's alleged anticompetitive behavior. Accordingly, CIT's motion to dismiss DFL Apparel as a plaintiff is granted.

### VII. *State Law Claims*

### 1. *Donnelly Act Claims*

CIT moves to dismiss plaintiffs' Donnelly Act claims on the same grounds that it moved to dismiss the Sherman Act claims. The Donnelly Act, N.Y. Gen. Bus. Law § 340, prescribes that "[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. N.Y. Gen. Bus. Law § 340(1). "The Act was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act." *Yankees Entertainment and Sports Network, LLC v. Cablevision Systems Corp.,* No. 02 Civ. 3242(DAB), 2002 WL 31010490, at *14 (S.D.N.Y. Sept.4, 2002) (citing *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976)); *accord Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton,* 997 F.Supp. 340 (E.D.N.Y.1998) (finding Donnelly Act is modeled after the Sherman Antitrust Act and is generally interpreted in accordance with federal precedent);

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 74 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

*Anheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988) (Donnelly Act was modeled on the Sherman Act and is to be construed in accord with it). Thus, CIT's motion to dismiss the Donnelly Act claims is granted in part and denied in part in accord with this Court's rulings set forth above.

2. *Contractual Good Faith and Fair Dealing*

Plaintiffs contend that CIT breached its duty of good faith when it deliberately inflated the DFL Apparel companies' debts by authorizing piece goods vendors to ship unordered merchandise to those companies. (Am.Compl.¶ 69.) Plaintiffs further contend that CIT breached its duty of good faith when it refused to credit check one DFL Apparel company because a separate DFL Apparel company was in arrears (Am.Compl.¶ 70); enforced a combined credit limit for the DFL Apparel companies instead of a separate limit for each company (Am.Compl.¶ 71); coerced the DFL Apparel companies to accept excessive advances on its credit bearing higher interest charges and fees (Am.Compl.¶ 72); orchestrated the group boycotts that cut off the DFL Apparel companies' credit (Am.Compl.¶ 73); and induced the DFL Apparel companies to stay in business after June 2000 by falsely promising that it would continue to finance the companies (Am.Compl.¶¶ 74-75).

**\*16** Under New York law, every contract contains an implied covenant of good faith and fair dealing. *Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 684, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *see also* Restatement (Second) of Contracts § 205 comment a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party ....").

**[10]** With respect to plaintiffs' claim regarding the precondition of Donald Weiner's signature on purchase orders, factual issues exist including whether Weiner and CIT had a guarantee agreement giving rise to an obligation of good faith dealing and whether his signature was a condition of that agreement. At this stage, however, plaintiffs have sufficiently alleged breach of good faith dealing with respect to the unauthorized shipments approved by CIT. Accordingly, CIT's motion to dismiss the good faith and fair dealing claims of the amended complaint is denied.

**[11]** With respect to the remainder of the good faith claims, however, those allegations concern CIT's extension

or refusal of credit to DFL Apparel companies. The factoring agreements ran between CIT and a piece goods vendor. Thus, the lack of contractual privity between CIT and the DFL Apparel companies precludes any good faith claim. In addition, plaintiffs further concede that CIT's agreements with the piece goods vendors permitted them to refuse credit checks for any reason or no reason at all. Thus, plaintiffs cannot claim that CIT failed to perform those contracts in good faith.

3. *Breach of Fiduciary Duty*

**[12]** Plaintiffs argue that CIT breached a fiduciary duty when it advised Donald Weiner that it would continue to extend him credit and failed to do so. (Pls. Mem. in Opp. at 23.) To state a claim for aiding and abetting a breach of fiduciary duty under New York law, plaintiffs must allege (1) a breach by a fiduciary of obligations to another, and (2) that the defendant knowingly induced or participated in the breach. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000). The existence of a fiduciary duty is often "a fact-specific inquiry reserved for a jury." *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.,* No. 00 Civ. 8688(WHP), 2002 WL 362794, \*9 (S.D.N.Y. Mar.6, 2002). Under New York Law, " 'a fiduciary relationship exists from the assumption of control and responsibility, and is founded upon trust reposed by one party in integrity and fidelity of another .' " *Deleu v. Scaife,* 775 F.Supp. 712, 715 (S.D.N.Y.1991) (quoting *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 772 (S.D.N.Y.1985)); *see also* Restatement (Second) of Torts § 874 cmt. a (1977) (fiduciary relationship exists "when one [party] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation"). Moreover, fiduciary relationships can arise when a party "trusts or relies on another or where confidence is based on prior business dealings." *Olshansky v. Sutton,* No. 00 Civ. 3539(LAP), 2001 WL 99857, at \*5 (S.D.N.Y. Feb.6, 2001). Claims alleging the existence of a fiduciary duty are usually not subject to dismissal in a 12(b)(6) motion. *Olshansky,* 2001 WL 99857, at \*5.

**\*17** Given the factually intensive nature of a fiduciary duty inquiry, CIT's opposition to plaintiffs' fiduciary claim is better addressed on summary judgment. Accordingly, CIT's motion to dismiss the breach of fiduciary duty claim is denied.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 75 of 173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

VIII. *Uptown Credit Group's Motion To Dismiss*

In the amended complaint's first, second and fourth causes of action, plaintiffs allege that UCG violated 🚩 Section 1 of the Sherman act and the Donnelly Act by participating in the agreement to deny credit to the DFL Apparel companies.

In addition to joining CIT's 12(b) motions, UCG moves to dismiss those causes of action on the ground that plaintiffs have not sufficiently alleged facts that tie UCG to the factoring conspiracy. (UCG's Mem. in Supp. at 5-6.) Plaintiffs allege that CIT combined with its co-conspirators to act as a cartel under the auspices of the UCG. (Am.Compl.¶¶ 4-5.) Through the UCG, the conspirators assured that the DFL Apparel companies would not be extended credit on purchases from piece goods vendors. (Am.Compl.¶ 48.) Those allegations adequately allege that UCG participated in the antitrust violations. *See* 🚩 15 U.S.C. § 1 (liable persons may include associations); 🚩 *Hydrolevel Corp. v. Am. Soc. of Mech. Eng'rs, Inc.,* 635 F.2d 118, 126 (2d Cir.1980) ("It is difficult to see how a trade association should be treated any differently than a business competitor, especially when it is the association's standing and influence that makes the conspiracy effective and possible. In a variety of contexts, [associations] are obligated to take suitable precautions to avoid antitrust violations."); 🚩 *Vandervelde v. Put & Call Brokers & Dealers Ass'n,* 344 F.Supp. 118, *155 (S.D.N.Y.1972) (an association found liable "as an independent legal entity"). Accordingly, UCG's motion to dismiss the amended complaint is denied.

### *Conclusion*

For the reasons set forth above, CIT's motion to dismiss the first cause of action is granted with respect to plaintiffs' price fixing claim and denied with respect to the boycotting claim. CIT's motions to dismiss the second, third, fourth, fifth, and sixth causes of action are denied. UCG's motion to dismiss is also denied.

SO ORDERED:

**All Citations**

Not Reported in F.Supp.2d, 2002 WL 31164482, 2002-2 Trade Cases P 73,828

## Footnotes

1     Although defendants have not argued that the alleged conspiracy cannot be considered illegal *per se,* plaintiffs contended at oral argument that any boycott of credit is *per se* illegal. (Tr. at 13.) However, this Court notes that not all horizontal group boycotts are *per se* illegal. *See* 🚩 *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); 🚩 *Bogan,* 166 F.3d at 514. "The scope of the *per se* rule against group boycotts is a recognized source of confusion in antitrust law." 🚩 *Bogan,* 166 F.3d at 514 (citation omitted). Moreover, the agreement alleged here does not reflect "the classic model of a group boycott-that is, a 'concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level." ' 🚩 *Bogan,* 166 F.3d at 514 (citing 🚩 *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978)); *see also* 🚩 *Capital Imaging,* 996 F.2d 537, 542 (2d Cir.1993) ("Conduct considered illegal *per se* is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination.").

2     CIT also alleged that plaintiffs 🚩 Section 2 claims should be dismissed because they failed to allege an antitrust injury. As discussed above, plaintiffs have sufficiently pleaded an antitrust injury at this stage.

3    The remaining 10 percent of Stella Bishop is owned by a third shareholder. Any dissenting shareholder of Stella Bishop could block a corporate action because its by-laws require unanimous shareholder consent for corporate actions. (Am.Compl.¶ 22.)

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2016-1 Trade Cases P 79,611

2016 WL 1640465

United States District Court, N.D. California.

Colleen EASTMAN, et al., Plaintiffs,

v.

QUEST DIAGNOSTICS INCORPORATED, Defendant.

Case No. 15-cv-00415-WHO

Signed 04/26/2016

### Attorneys and Law Firms

Robert Stephen Berry, Berry Law PLLC, Washington, DC, Colleen Duffy-Smith, Morgan Tidalgo Sukhodrev & Azzolino LLP, San Jose, CA, J. Ross Wallin, Silvia Noemi Ostrower, Grais and Ellsworth LLP, New York, NY, for Plaintiffs.

Allison Winifred Reimann, Richard Raskin, Sidley Austin LLP, Chicago, IL, Ryan M. Sandrock, Sidley Austin, LLP, San Francisco, CA, for Defendant.

### ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT

Re: Dkt. No. 69

WILLIAM H. ORRICK, United States District Judge

### INTRODUCTION

 **\*1** This is the third time I have addressed plaintiffs Colleen Eastman, Christi Cruz, and Carmen Mendez's claims against Quest Diagnostics Incorporated ("Quest"), a provider of clinical laboratory testing services. Plaintiffs accuse Quest of monopoly overpricing in violation of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law, and seek to represent a class defined as

> health plans and outpatients residing in Northern California who have paid Quest directly for routine diagnostic testing on or after January 29, 2011...under plan/outpatient billing [1] arrangements where the payment to

> Quest was not entirely comprised of a fixed, per-visit copayment amount, but depended at least in part on the total amount due Quest.

Second Amended Complaint ¶ 61 ("SAC"). I previously dismissed plaintiffs' original and first amended complaints for failure to state a claim, and the SAC recycles many of their unsuccessful claims. They also assert new "tying" claims, but there are no plausible allegations indicating either that the products are tied or that medical providers are coerced. For the reasons discussed below, and in my prior orders in this case, Quest's motion to dismiss is GRANTED.

### BACKGROUND

### I. ORIGINAL COMPLAINT

Plaintiffs filed this action on January 29, 2015. Dkt. No. 1 ("Compl."). Their original complaint brought claims under section 2 of the Sherman Act, the Cartwright Act, the Unfair Competition Law ("UCL"), and the below-cost and loss-leader sales provisions of California's Unfair Practices Act ("UPA"). *Id.*

Quest moved to dismiss, and, following briefing and oral argument, I issued an order on June 9, 2015 dismissing the original complaint with leave to amend. Dkt. No. 42 ("First Dismissal Order"). I found that plaintiffs had not established either Article III or antitrust standing because they had not alleged facts plausibly demonstrating that they had been harmed by Quest's alleged anticompetitive conduct. First Dismissal Order at 3-5. Further, plaintiffs could not bring claims on behalf of health plans because they had not alleged facts plausibly establishing that they and health plans had suffered identical harms. *Id.* at 5-6.

I also addressed and rejected each of plaintiffs' theories of liability. The original complaint alleged that Quest competes in two markets for routine diagnostic testing in Northern California: (1) the plan/outpatient market and (2) the physician billing market. Compl. ¶¶ 3-4; *see also* First Dismissal Order at 6. Plaintiffs alleged that Quest has monopolized the plan/outpatient market and has thus "been able to charge above-competitive prices to [class members] while providing inferior quality service." Compl. ¶ 20. They asserted that Quest has done this through the use of three exclusionary practices:

2016-1 Trade Cases P 79,611

**\*2**  (1) "pa[ying] kickbacks to medical providers...in the relevant market for physician billing to induce them to refer all other routine diagnostic testing done in the relevant market for plan/outpatient billing to Quest exclusively regardless of Quest's pricing or its testing quality."

(2) "collud[ing]with two major private health insurers [ – i.e., Aetna, Inc. and Blue Shield of California – ] to suppress its competition in the relevant market for plan/outpatient billing."

(3) "acquir[ing] its competitors for plan/outpatient billing in order to eliminate their competition."

*Id.*; *see also* First Dismissal Order at 6. [2]

I held that none of these theories, as alleged in the original complaint, could support plaintiffs' monopolization claims. The kickback/leveraging theory failed because plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers resulted in Quest charging above-competitive prices in the plan/outpatient market. First Dismissal Order at 8-10. The collusion theory failed because plaintiffs had not shown that the three competitors that were allegedly eliminated as a result of Quest's agreements with Aetna and Blue Shield – i.e., Hunter Laboratories, Inc. ("Hunter"), Western Health Sciences Medical Laboratory ("Western Health"), and Westcliff Medical Laboratories ("Westcliff") – constituted a substantial share of the relevant market. *Id.* at 10-11. The acquisition theory failed because plaintiffs' allegations did not provide any reason to doubt the FTC's conclusion that, following the divestitures, Quest's acquisition of Unilab in 2003 would leave competition in Northern California "virtually unchanged." *Id.* at 11-12. Further, Quest's acquisition of Dignity Health in 2013 allegedly increased Quest's market share by a mere three percent – a "relatively insubstantial" amount that was not enough to raise concern under the antitrust laws. *Id.*

The allegations in support of the below-cost and loss-leader pricing claims under the UPA were insufficient because plaintiffs had not pleaded the prices and costs for the relevant testing services, and the UCL claims failed as derivative of the monopolization and UPA claims. *Id.* at 12-14.

## II. FIRST AMENDED COMPLAINT

**\*3**  Plaintiffs filed their first amended complaint on July 6, 2015. Dkt. No. 46 ("FAC"). Like the original complaint, the FAC brought claims under section 2 of the Sherman Act, the Cartwright Act, plus derivative claims under the UCL. FAC ¶¶ 166-84. It dropped the below-cost and loss-leader pricing claims. *Id.*

The FAC identified the same two Northern California markets as the original complaint (the plan/outpatient market and the physician billing market) and the same three exclusionary practices in the plan/outpatient market (the kickback/leveraging theory, the collusion theory, and the acquisition theory). *See, e.g., id.* ¶¶ 3-4, 20. Its most significant additions were to its allegations regarding monopoly overpricing and the named plaintiffs' individual experiences purchasing testing from Quest. Specifically, the FAC included pricing data compiled by the Truven Corporation ("Truven") for routine diagnostic testing performed in Northern California and in five other regions around the United States (New York City, Portland, Seattle, Tampa, and Southern California). *See, e.g., id.* ¶ 140. It also included allegations regarding the named plaintiffs' respective health insurance providers and their payments to Quest for testing. *See, e.g., id.* ¶¶ 129-31. In addition, with respect to their acquisition theory, plaintiffs identified a third acquisition, this one of Berkeley HeartLab in 2011, which allegedly added another 4.6 percent to Quest's market share in the plan/outpatient market. *Id.* ¶ 67.

On November 25, 2015, I issued an order granting Quest's motion to dismiss the FAC. Dkt. No. 59 ("Second Dismissal Order"). I held that each of plaintiffs' three theories of liability failed for essentially the same reasons as before. *See* Second Dismissal Order at 10-23. Plaintiffs still had not adequately alleged the monopoly overpricing necessary to support their kickback/leveraging theory. *Id.* at 11-16. They still had not alleged sufficient facts showing that Quest's alleged agreements with Aetna and Blue Shield have foreclosed competition in a substantial share of the plan/outpatient market. *Id.* at 16-20. And they still had not alleged facts plausibly indicating that Quest's acquisitions have unreasonably restricted competition. *Id.* at 20-23. I dismissed the FAC with leave to amend. *Id.* at 23.

Plaintiffs appealed the Second Dismissal Order to the Ninth Circuit but voluntarily dismissed the appeal on December 23, 2015, within two weeks of filing it, after the Ninth Circuit noted that its jurisdiction over the appeal was questionable. Dkt. Nos. 60, 63. Plaintiffs then returned to this Court and renewed their request for pre-complaint discovery of Quest's fee-for-service test pricing. Dkt. No. 62. They sought fee-for-service test pricing for the years 2013 and 2015 for six

2016-1 Trade Cases P 79,611

geographic areas (Northern California, Southern California, New York, Portland, Seattle, and Tampa) and for twenty-one different routine diagnostic testing codes. *Id.* at 2.[3] I denied the request. Dkt. No. 65.

### III. SECOND AMENDED COMPLAINT

Plaintiffs filed the SAC on January 13, 2016. Dkt. No. 66. Their new allegations are largely identical to those in the original complaint and the FAC, but there are some material differences.

**\*4** Most significantly, plaintiffs now identify four, instead of three, exclusionary practices. *See, e.g.,* SAC ¶ 85. They continue to allege the collusion theory (regarding Quest's alleged exclusive dealing arrangements with Aetna and Blue Shield) and the acquisition theory (regarding Quest's acquisitions of Unilab, Berkeley HeartLab, and Dignity Health). But they have repackaged the alleged misconduct underlying the kickback/leveraging theory into two separate, but very similar, alleged exclusionary practices. *See id.* ¶¶ 105-21. The first accuses Quest of illegal tying, on the theory that Quest "sells to medical providers capitated testing in the physician billing market at very low rates (often below its costs) on the condition that they also purchase [its] fee-for-service testing sold in the separate plan/ outpatient market." *Id.* ¶ 105. The second accuses Quest of "exclud[ing] competition throughout the plan/outpatient market with economic arrangements with medical providers which constitute exclusive dealing practices." *Id.* ¶ 115. Plaintiffs assert that Quest

enters into express exclusive dealing contracts with medical providers where they receive capitated testing at very low rates often below Quest's costs. In return for these rates it obtains exclusivity commitments from the providers under which they send all or nearly all of their fee-for-service business to Quest. The latter commitments are not necessarily contained in the express exclusive capitated contracts. Nonetheless Quest makes it clear that, to obtain the low capitated rates and increase their profits, the medical providers must exclusively provide all or nearly all

their capitated and fee-for service business to Quest.

*Id.* ¶ 116. Plaintiffs also assert, as they have throughout this case, that "medical providers have a strong preference for one-stop test shopping," and that medical providers' capitated testing agreements with Quest thus "encourage[ ] them further to deal exclusively with Quest for fee-for-service testing as well as capitated testing." *Id.* ¶ 119.[4]

Plaintiffs continue to bring monopolization claims under section 2 of the Sherman Act and the Cartwright Act, as well as derivative claims under the UCL. *Id.* ¶¶ 188-93, 199-211. In addition, they now allege a separate cause of action titled, "Tying," under both section 1 and section 2 of the Sherman Act. *Id.* ¶¶ 194-198.

Quest filed this motion to dismiss on February 10, 2016. Dkt. No. 69. I heard argument from the parties on April 6, 2015. Dkt. No. 75.

### LEGAL STANDARD

**\*5** Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," 🚩 *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." 🚩 *Mendiondo v. Centinela Hosp. Med. Ctr.,* 521 F.3d 1097, 1104 (9th Cir. 2008). While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face." 🚩 *Cousins v. Lockyer,* 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the

2016-1 Trade Cases P 79,611

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). A court may "reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

## DISCUSSION

## I. MONOPOLIZATION CLAIMS

Section 2 of the Sherman Act applies to "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. A monopolization claim under section 2 has three elements: "(a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power; and (c) causal antitrust injury." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) (internal quotation marks omitted).

With respect to the second element, the willful acquisition or maintenance of monopoly power must be "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992); *accord Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1132 (9th Cir. 2015). "The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition." *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 739 (9th Cir. 1985); *accord Oahu Gas Serv., Inc. v. Pac.*

*Res., Inc.*, 838 F.2d 360, 370 (9th Cir. 1988). To establish this element, the plaintiff must show that the defendant used its monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman*, 504 U.S. at 482-83 (internal quotation marks omitted). In other words, the defendant's conduct must be "exclusionary." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). "[T]o be condemned as exclusionary, a monopolist's act must have an anticompetitive effect. That is, it must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice." *Id.* at 58 (internal quotation marks omitted; emphasis in original).

**\*6** The third element, causal antitrust injury, requires a showing of "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the defendant's] acts unlawful."[5] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To establish such injury, the plaintiff must show "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003). In addition, "the injured party [must] be a participant in the same market as the alleged malefactor[ ]." *Id.* (internal quotation marks omitted). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.* (internal quotation marks omitted).[6]

The Ninth Circuit has stated that "[t]he analysis under [the Cartwright Act] mirrors the analysis under federal law because [it] was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *accord Name.Space*, 795 F.3d at 1131 n.5 ("Because the analysis under the Cartwright Act is identical to that under the Sherman Act, we also affirm the district court's dismissal of the Cartwright Act claim.") (internal citations omitted). Plaintiffs do not dispute that their claims under the Sherman Act and the Cartwright Act rise and fall together.

Quest contends that despite the repackaging of the kickback/leveraging theory, the exclusionary practices alleged by plaintiffs remain insufficient to support their monopolization claims.[7] I agree.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 81 of 173

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

### A. Exclusive Dealing (or Kickback/Leveraging) Theory

The repackaging of the kickback/leveraging theory as an exclusive dealing theory does not help plaintiffs.

In the First and Second Dismissal Orders, I rejected the kickback/leveraging theory on the ground that plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers in the physician billing market resulted in Quest charging above-competitive prices in the plan/outpatient billing market. *See* First Dismissal Order at 8-10; Second Dismissal Order at 11-16.

Plaintiffs have changed the label for this theory. They have also slightly modified their description of the alleged misconduct underlying the theory. Previously, they accused Quest of giving economic inducements to medical providers in the physician billing market that organically result in those medical providers referring their patients to Quest in the plan/outpatient market, due to their natural preference for "one-stop test shopping." *See, e.g.,* FAC ¶ 81 ("Quest offers medical providers sharply reduced capitated rates in the physician billing market...to achieve the one-stop shop tipping points it needs to obtain all or the vast majority of [medical providers'] plan/outpatient business."). Plaintiffs continue to describe this "one-stop test shopping" dynamic, but they now also allege, for the first time in this case, that Quest "conditions" its discounted prices in the physician billing market on "exclusivity commitments from [medical providers] under which they send all or nearly all of their fee-for-service business to Quest." SAC ¶ 116. Plaintiffs admit that these exclusivity commitments are "not necessarily contained" in the capitated contracts Quest enters with medical providers but assert that "Quest makes it clear that, to obtain the low capitated rates and increase their profits, medical providers must exclusively provide all or nearly all their capitated *and* fee-for-service business to Quest." *Id.* (emphasis in original).

*7 Crucially, however, plaintiffs have not changed those aspects of this theory that were found lacking in the First and Second Dismissal Orders. They have not changed their allegations regarding Quest's monopolistic overcharging in the plan/outpatient market – those allegations remain essentially identical to those in the FAC. *Compare* SAC ¶¶ 168-76 *with* FAC ¶¶ 136-43. Nor have they materially changed their allegations regarding Quest's "substantial economies of scale" and "large cost advantages," or explained

why these factors, rather than support a plausible inference that Quest overprices in the plan/outpatient market, "indicate that Quest underprices its competitors in that market, much as plaintiffs explicitly allege that it does in the patient billing market." Second Dismissal Order at 14; *see also* SAC ¶ 80 (alleging, with respect to the plan/outpatient market, that Quest "benefits from very substantial economies of scale," "has significantly lower unit costs than smaller regional laboratories because it processes a larger volume of tests," "is able to reduce its unit costs by negotiating volume discounts on supplies," and "minimize[s] the costly outsourcing of low-volume tests"). Accordingly, for the reasons stated in the First and Second Dismissal Orders, this theory continues to fail to support a monopolization claim against Quest. [8]

Further, plaintiffs' recharacterization of Quest's economic inducements in the physician billing market as exclusive dealing arrangements highlights an additional flaw in these allegations. [9] As I explained in the First and Second Dismissal Orders in discussing plaintiffs' collusion theory, and as both Judge Tigar and I explained in *Rheumatology*, "an exclusive dealing arrangement does not violate the antitrust laws unless its probable effect is to foreclose competition in a 'substantial share' of the relevant market." [10] Second Dismissal Order at 18; *see also* First Dismissal Order at 10-11; 📁*Rheumatology II*, 2013 WL 5694452, at *11-14, *15; 📁*Rheumatology I*, 2013 WL 3242245, at *10-13. To determine whether the foreclosure amounts to a substantial share,

> *8 it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved..., and the probable immediate and future effects which preemption of that share of the market might have on effective competition.

📁⚠️ *Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 329 (1961). The degree of foreclosure "is important because, for the contract to adversely affect competition, the

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 82 of 173

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

opportunities for other traders to enter into or remain in that market must be significantly limited." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (internal quotation marks omitted); *accord* 🔖⚠ *Microsoft*, 253 F.3d at 69.

Plaintiffs have not alleged facts from which it can be plausibly inferred that Quest's alleged exclusive dealing arrangements with medical providers have foreclosed a substantial share of the plan/outpatient market. Plaintiffs have not identified, for example, the approximate number of medical providers that have entered into such arrangements with Quest, the approximate number and/or characteristics of the other laboratories operating in the physician billing and plan/outpatient markets, or what competing laboratories have been adversely affected by the arrangements or the extent to which they have been affected.[11] This is the same basic deficiency in pleading substantial foreclosure that has repeatedly resulted in the dismissal of plaintiffs' collusion theory, both in this case and in *Rheumatology. See* Second Dismissal Order at 20 ("[A]bsent additional details regarding the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition."); First Dismissal Order at 11 ("Plaintiffs cannot...establish foreclosure of a substantial share of the plan/outpatient market in Northern California without accounting for other players which significantly impact competition in the market."); 🔖 *Rheumatology II*, 2013 WL 5694452, at *15 ("[P]laintiffs do not provide any context against which the Court may evaluate the extent to which competition has been restricted."); 🔖 *Rheumatology I*, 2013 WL 3242245, at *13 ("Plaintiffs fail to quantify the actual market effect of this alleged activity – i.e., the percentage of physicians who drop other laboratories, or the percentage of laboratories who are foreclosed from the market – even in gross terms."). As before, plaintiffs have not provided sufficient details about the dynamics of the relevant market to gauge whether Quest's alleged exclusive dealing arrangements have resulted in substantial foreclosure.[12]

**B. Collusion Theory**

**\*9** The factual allegations in the SAC in support of this theory are not materially different from those in the FAC. *Compare* SAC ¶¶ 122-151 *with* FAC ¶¶ 89-120. The theory remains based on Quest's exclusive dealing arrangements with Aetna and Blue Shield. Plaintiffs still identify just three

particular competing laboratories in the relevant market that have been harmed as a result of the arrangements – Hunter, Western Health, and Westcliff[13] – and still specifically allege that "approximately 1.54 million persons are enrolled in Aetna and Blue Shield plans in Northern California – 10 percent of the available enrollees in the relevant market." SAC ¶ 145. Plaintiffs also still "fail to describe the prior market shares of Hunter, Western Health, and Westcliff, the number of other competitors in the plan/outpatient market, or the circumstances of health plans other than Aetna and Blue Shield operating in Northern California." Second Dismissal Order at 19. As I held in the Second Dismissal Order, these allegations are not sufficient to plausibly establish that Quest's exclusive dealing arrangements with Aetna and Blue Shield have foreclosed a substantial share of the plan/outpatient market. *Id.* at 19-20. "[A]bsent additional details regarding the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition." *Id.* at 20.

**C. Acquisition Theory**

Like their collusion theory, plaintiffs' acquisition theory has not changed materially since the FAC. *Compare* SAC ¶¶ 86-104 *with* FAC ¶¶ 55-70. It remains based on three acquisitions in Northern California between 2003 and 2013: (1) Unilab in 2003, adding 48.8 percent to Quest's share of the plan/outpatient market in Northern California; (2) Berkeley HeartLab in 2011, adding another 4.6 percent; and (3) Dignity Health in 2013, adding another 2.0 percent. SAC ¶¶ 59, 67, 69. Plaintiffs allege no new facts regarding how the three acquisitions have unreasonably restricted competition. The most significant change in their allegations concerns the FTC's decision to clear Quest's acquisition of Unilab upon requiring Quest to divest certain Northern California assets to Laboratory Corporation of America, another provider of clinical laboratory testing services that at that time had a minimal presence in Northern California. Plaintiffs now emphasize that the FTC's decision "does not immunize [Quest's] sustained march to market power over the next decade using various additional exclusionary practices." *Id.* ¶ 96.

I agree with plaintiffs that the FTC's decision is far from dispositive (although it does weigh against the conclusion that Quest's acquisition of Unilab can be plausibly characterized as an unreasonable restriction on competition). What is dispositive is that the SAC, like the FAC, "fail[s] to plausibly

allege any specific anticompetitive effects of any of the three acquisitions, whether viewed in isolation or in combination." Second Dismissal Order at 22. "In these circumstances, merely pleading the occurrence of one acquisition that was cleared by the FTC upon the divestiture of assets to a significant competitor, and two others that resulted in minimal market share increases, is not enough to state a claim." *Id.*

In other words, plaintiffs cannot rely on the fact of the acquisitions alone. In and of themselves, the acquisitions may help plaintiffs show the "possession of monopoly power in the relevant market," but they do not plausibly establish "the willful acquisition or maintenance of that power." 🚩 *Allied*, 592 F.3d at 998. To satisfy that element, plaintiffs must plead facts showing the particular ways in which the acquisitions have unreasonably restricted competition. For the third time, they have not done so.

### D. Combined Effect

Plaintiffs dedicate much of their opposition brief to arguing that Quest's alleged exclusionary practices must be considered in combination, not in isolation. *See, e.g.,* Oppo. at 6. I agree. As I stated in the Second Dismissal Order, however, viewing Quest's alleged exclusionary practices in combination does not push plaintiffs' claims over the line:

**\*10** Plaintiffs are correct that a court must look to the aggregate or "synergistic" effect of the alleged exclusionary practices to determine whether the allegations plausibly establish a violation of the antitrust laws. 🚩⚠ *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). "[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *Id.* Nevertheless, it is "much more difficult" to find wrongdoing where the plaintiff alleges only "a number of perfectly legal acts," and allegations that establish "some slight wrongdoing in certain areas" need not by themselves amount to a violation. *Id.* Here, plaintiffs have alleged price discounts without establishing any overcharging as a result, exclusive dealing arrangements without establishing that they impact more than a minor fraction of the relevant market, and three acquisitions, one of which was cleared by the FTC and resulted in a new significant competitor entering the market, and the other two of which account for a combined 6.6 percent increase in market share. Whether viewed in isolation or in the aggregate, these allegations

do not support plaintiffs' monopolization claims against Quest.

Second Dismissal Order at 22-23. The new allegations in the SAC do not materially change this analysis, except to highlight that plaintiffs' "price discounts" theory (i.e., their exclusive dealing or kickback/leveraging theory) also fails on the ground that plaintiffs' have not adequately alleged substantial foreclosure of the plan/outpatient market based on Quest's agreements with medical providers. Quest's motion to dismiss plaintiffs' monopolization claims is GRANTED.

## II. TYING CLAIMS

For the first time in this case, plaintiffs bring a separate cause of action accusing Quest of an illegal tying arrangement. SAC ¶¶ 194-98. The cause of action states in relevant part that

> Quest has tied fee-for-service sales sold to medical providers in the relevant market for plan/outpatient billing to its sales of separately sold capitated testing in the physician billing relevant market.

> Quest has market power in the physician billing relevant market and has conditioned its sales of capitated testing upon referral to Quest of the medical providers' fee-for-service testing as well. Such referral is the only viable economic option for the medical providers seeking to avoid substantial increased capitated costs.

> As a consequence of its conduct, Quest has caused substantial price injury in the sale of fee-for-service testing and actual damages to members of the Class, as well as denied them competitive choice.

SAC ¶¶ 195-97 (paragraph numbering omitted). Elsewhere in the SAC, plaintiffs allege that Quest has

> committed a per se tying violation to deny its rivals in the plan/outpatient market distribution of their fee-for-service routine testing to medical providers. Quest sells to medical providers capitated testing in the physician billing market at very low rates (often below its costs) on the condition they also purchase Quest's

2016-1 Trade Cases P 79,611

fee-for-service testing sold in the separate plan/outpatient market.

SAC ¶ 105.

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." 🔖 *Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (internal quotation marks omitted). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Id.* (internal quotation marks omitted). "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." 🔖 *Eastman Kodak*, 504 U.S. at 464 n.9 (internal quotation marks and alterations omitted). "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* (internal quotation marks omitted).

**\*11** Plaintiffs appear to accuse Quest of a per se tying violation under section 1 of the Sherman Act. *See, e.g.,* Oppo. at 11.[14] "A plaintiff must prove three elements to prevail on an illegal tying claim: (1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." 🔖⚠️ *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (internal quotation marks omitted).

Quest identifies four flaws in plaintiffs' tying theory. Mot. at 11-13. First, Quest argues that plaintiffs do not allege that a single buyer purchases the tying and tied products. According to plaintiffs' tying theory, medical providers purchase the tying product (capitated testing in the physician billing market) while health plans and patients purchase the tied product (fee-for-service testing in the plan/outpatient market). Quest quotes *Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722 (W.D. Pa. 1987), for the proposition that "an illegal tying arrangement requires that at least two products and/or

services are purchased by the same individual." *Id.* at 731. Plaintiffs respond that "[t]here is one buyer here, medical providers buying capitated testing [ – i.e., the tying product – ] from Quest." Oppo. at 11 n.7. Plaintiffs do not dispute that, according to their tying theory, medical providers do not also purchase the tied product – i.e., fee-for-service testing – from Quest.

Second, Quest argues that plaintiffs have not plausibly alleged coercion. Quest contends that because there are different buyers for the tying product versus the tied product, coercion cannot possibly be established here. Mot. at 11. Further, Quest argues, plaintiffs have not alleged that the tying and tied products cannot be purchased separately. That is, plaintiffs have not alleged either (1) that medical providers who enter capitated testing agreements with Quest must refer their fee-for-service business to Quest, or (2) that medical providers who do not enter capitated testing agreements with Quest cannot refer their fee-for-service business to Quest. *Id.* at 12. Plaintiffs do not dispute this characterization of their allegations. They argue instead that they have adequately alleged coercion because Quest's pricing policy "makes purchase of the tying and tied products together the only viable economic option." Oppo. at 12. In support of this argument, plaintiffs point to paragraph 113 of the SAC, which states that "Quest's conditioning is also effective because, by accepting Quest's very low capitated rates, medical providers measurably increase their profits on their capitated business, and since cost minimization is their goal accepting tying conditionality is their only viable economic option." SAC ¶ 113; *see also id.* ¶ 196 ("Such referral [of fee-for-service testing] is the only viable economic option for medical providers seeking to avoid substantial increased capitated costs.").

Third and fourth, Quest argues that plaintiffs do not plausibly allege either that "the tying arrangement affects a not insubstantial volume of commerce in the tied product market." 🔖⚠️ *Paladin*, 328 F.3d at 1159, or that Quest "has market power" in the tying product market, Mot. at 13. With respect to the volume of commerce affected in the tied product market, plaintiffs contend that they have "alleged that an appreciable number of buyers have accepted capitated/fee-for-service terms." Oppo. at 13. They point to paragraph 109 of the SAC, which includes the following quote from a former Quest salesperson:

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 85 of 173

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

\*12 In order to secure the fee-for-service business and referral of these medical providers, Quest offers deeply discounted prices, often below cost, for those capitated tests the medical providers pay for directly. The medical providers thereby lower their costs, and can increase profits on capitated business paid for by the providers. In exchange for these discounts, with very rare exceptions the medical providers refer all of their fee-for-service patients to Quest, including Medi-Cal patients. These referrals, obtained in exchange for discounts, are referred to industry insiders as pull-through. Medical providers paying capitated rates were told that they would have to support Quest with their Medi-Cal, Medicare and third-party insurance patients to maintain the deeply discounted capitated prices. The sales force was required to justify the discounts based on the amount of pull-thorough and track the amount of pull-through of the account to ensure that the pull-through of the account resulted in an overall profit from the client.

SAC ¶ 109 (internal emphasis and alterations omitted).[15] With respect to whether Quest's market power in the tying product market, plaintiffs allege that Quest's share of the physician billing market is 71.8 percent. *Id.* ¶ 107.

I agree with Quest that plaintiffs have not adequately alleged coercion. Plaintiffs' only stated basis for a finding of coercion is that medical providers' "only viable economic option" is to purchase capitated testing at the discounted rates offered to those medical providers who also refer their fee-for-service testing to Quest. *See* Oppo. at 12; SAC ¶¶ 113, 196. But plaintiffs allege no facts indicating how this is the case.[16] For example, they do not allege the difference in pricing between capitated testing agreements with medical providers who do refer their fee-for-service testing to Quest, and capitated

testing agreements with medical providers who do not. *See Synopsys, Inc. v. ATopTech, Inc.*, No. 13-cv-02965-MMC, 2015 WL 4719048, at \*7 (N.D. Cal. Aug. 7, 2015) (dismissing tying claim where counterclaimant's theory of coercion was that counterdefendant's prices "render[ed] it economically unviable" to purchase the tying and tied products separately, and counterclaimant had not stated facts showing "how the alleged discounting practice was coercive, e.g., the amount of the difference between the price of [the tying product] when purchased separately and its price when purchased together with [the tied product]"). Nor do they allege the approximate number of medical providers who have obtained "deeply discounted prices" on capitated testing in exchange for referring their patients to Quest for fee-for-service testing, or how Quest's prices on fee-for-service testing compare to the prices of its competitors. *Cf. Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 914-15 (9th Cir. 2008) (finding triable issues on coercion where there was evidence that, among other things, only 14 percent of relevant purchasers bought the tied products separately, and a competitor's prices for the tied product were lower than defendant's, indicating that "a rational customer would not purchase [defendant's] allegedly overpriced product in the absence of a tie").

A bundled discount does not necessarily equal an illegal tying arrangement. *See id.* at 914-15, 915 n.27; *see also Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984). Accordingly, merely alleging the existence of a discount on capitated testing for those medical providers who also refer their fee-for-service testing to Quest, without also stating facts indicating how this discount "le[aves] [medical providers] with no rational economic choice" but to commit to Quest for both capitated and fee-for-service testing, *Cascade Health*, 515 F.3d at 915 n.27, does not plausibly establish coercion.[17] Quest's motion to dismiss plaintiffs' tying cause of action is GRANTED.

## III. UCL CLAIMS

\*13 Plaintiffs allege that Quest has violated the "unlawful" and "unfair" prongs of the UCL. *See* FAC ¶¶ 199-205. These claims are derivative of the Sherman Act and Cartwright Act claims discussed above, and plaintiffs make no arguments specific to them in their opposition brief. They will also be dismissed.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 86 of 173

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

## CONCLUSION

Despite the benefit of a prior related case bringing substantially similar claims against Quest, three opportunities to flesh out their claims, and two dismissal orders pointing out the deficiencies in their complaints, plaintiffs have been unable to state a plausible claim for relief, and have persisted in accusing Quest of the same basic misconduct without meaningfully adding to the facts stated in support. There is no indication that another chance to amend would yield a

different result. Accordingly, and for the reasons discussed above and in my prior orders in this case, Quest's motion to dismiss the SAC is GRANTED, and plaintiffs' claims are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1640465, 2016-1 Trade Cases P 79,611

## Footnotes

1    Plaintiffs define "plain/outpatient billing" as "routine diagnostic testing for which a private health insurance plan, the State of California, or an outpatient has paid a fee directly to Quest." SAC ¶ 61.

2    Each of these alleged exclusionary practices was also previously raised in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847 (N.D. Cal. filed July 10, 2012), a related case brought against Quest by a group of competing laboratories alleging monopolization claims similar to those at issue here. Judge Tigar dismissed the plaintiffs' section 2 claims with leave to amend in 🚩 *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-JST, 2013 WL 3242245, *13-15 (N.D. Cal. June 25, 2013) ("*Rheumatology I*"). After the matter was transferred to me, I dismissed the section 2 claims with leave to amend a second time in 🚩 *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2013 WL 5694452, *14-16 (N.D. Cal. Oct. 18, 2013) ("*Rheumatology II*"). The plaintiffs did not allege section 2 claims in their second amended complaint, although I discussed certain aspects of their collusion theory in dismissing the second amended complaint's cause of action for violations of section 1 of the Sherman Act. *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2014 WL 524076, at *10-14 (N.D. Cal. Feb. 6, 2014) ("*Rheumatology III*").

3    Plaintiffs made a similar request shortly after I issued the First Dismissal Order. Dkt. No. 43. I also denied that request. Dkt. No. 45.

4    Plaintiffs explain this "one-stop test shopping" dynamic in more detail elsewhere in the SAC:

[D]ue to ease of administration and familiarity, a medical provider in Northern California (or elsewhere) overwhelmingly will prefer to direct all or nearly all of its routine testing to a single diagnostic testing company once the medical provider reaches a "tipping point" with a particular testing company. In other words, a medical provider that is sending a substantial percentage of its routine testing to one diagnostic testing company (whether or not the testing is done in the plan/out-patient or physician billing relevant market) will likely send all of its testing to that testing company because "one-stop shopping" is much more convenient for the medical provider. As a result, when Quest, as the dominant provider in the physician billing market, obtains as little as 50 percent of all routine tests ordered by the provider in both relevant markets, it is likely to obtain all or nearly all of the provider's testing in the plan/outpatient market.

Quest routinely documents that, when it obtains the exclusive capitated business of a medical provider in the physician billing relevant market, it will also receive the provider's fee-for-service business in the

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 87 of 173

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

plan/outpatient business. Its records show that it expressly sets its capitated pricing to ensure that this tie between capitated and fee-for-service testing is accomplished

SAC ¶¶ 51-52 (internal numbering omitted). Plaintiffs included substantially similar descriptions of the "one-stop test shopping" dynamic in their FAC and original complaint. *See* FAC ¶ 18; Compl. ¶ 18.

5    In contrast with the inquiry into whether the defendant's acts are exclusionary, the inquiry into causal antitrust injury is viewed from the "perspective of the plaintiff's position in the marketplace," not from the "perspective of the impact of a defendant's conduct on overall competition." 🏳 *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).

6    A showing of antitrust injury is "necessary, but not always sufficient," to establish antitrust standing. 🏳 *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986). Factors relevant to whether a plaintiff that has established antitrust injury also has antitrust standing include "the directness of the injury," "the speculative measure of the harm," "the risk of duplicative recovery," and "the complexity in apportioning damages." 🏳 *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999); *accord* 🏳 *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).

7    Again, plaintiffs' claims are based on exclusionary practices within the plan/outpatient market, not within the physician billing market.

8    Although Quest does not frame its argument in this way, I note that plaintiffs' failure to adequately plead causal antitrust injury is fatal not only to their exclusive dealing theory, but to all of their claims, because it means that they lack antitrust standing. *See* 🏳 *Cargill*, 479 U.S. at 110-11, 110 n.5, 110 n.6 (showing of antitrust injury is necessary to establish antitrust standing under both section 4 and section 16 of the Clayton Act); *see also* 🏳 *Somers v. Apple, Inc.*, 729 F.3d 953, 962-65 (9th Cir. 2013) (affirming dismissal of 🏳 section 2 claims for failure to adequately plead antitrust injury). Further weighing against plaintiffs' antitrust standing in this case is the highly speculative measure of their alleged harm, in that (1) it is unclear how plaintiffs have been cognizably harmed by Quest's alleged overcharging unless that overcharging has caused plaintiffs to pay higher portions of their deductibles than they otherwise would have paid (and plaintiffs do not allege that this was the case); and (2) Cruz and Mendez allege that their only relevant purchases were made while they were insured by Blue Shield, and plaintiffs specifically allege that Blue Shield members receive *discounted* prices from Quest. *See* SAC ¶ 140.

9    Plaintiffs previously characterized Quest's economic inducements in the physician billing market as simply anticompetitive below-cost price discounts, *see* FAC ¶¶ 71-88; Compl. ¶¶ 71-81, but explicitly disclaimed any reliance on a predatory pricing theory, *see* Dkt. No. 25 at 10, and did not allege that the economic inducements amounted to illegal bundled discounts. As before, plaintiffs do not raise a predatory pricing or bundled discounts theory in the SAC or their opposition brief.

10    This use of "probable effect" is probably too generous to plaintiffs. The Ninth Circuit has held that "although a Clayton Act violation may be found where an [exclusive dealing arrangement] has the probable effect of foreclosing competition,...in a case under section 1 of the Sherman Act, the plaintiff must prove that the exclusive dealing arrangement actually foreclosed competition." 🏳 *Allied Orthopedic*, 592 F.3d at 996 n.1; *see also* 🏳 *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1304 n.9 (9th Cir. 1982) ("[A] greater showing of anticompetitive effect is required to establish a Sherman Act violation than a...Clayton Act violation in exclusive dealing cases.").

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 88 of 173

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

11    Plaintiffs' allegations regarding Hunter, Western Health, and Westcliff are focused on Quest's agreements with Aetna and Blue Shield, not on Quest's capitated contracts with medical providers.

12    Also weighing against the plausibility of substantial foreclosure here is the absence of facts about the agreements Quest enters with medical providers. Plaintiffs do not provide any information regarding, for example, the approximate length of the agreements or the process by which they can be terminated. *See* ⚐ *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997) (finding that "the short duration and easy terminabilityof these [alleged exclusive dealing] agreements negate substantially their potential to foreclose competition") (internal footnotes omitted). Nor do plaintiffs make clear the extent to which any medical providers have actually agreed, either explicitly or implicitly, to refer any portion of their fee-for-service testing to Quest. The SAC sends mixed messages on this issue, alleging both (1) that Quest "conditions" its discounted prices on capitated contracts on medical providers' referral of their fee-for-service testing, *see, e.g.,* SAC ¶ 196; and (2) that the "pull-through" business obtained by Quest in the plan/outpatient market is merely the organic result of medical providers' natural preference for "one-stop test shopping," *see, e.g.,* SAC ¶¶ 51-52, 119. Plaintiffs do not clarify in their opposition brief whether they mean to allege one or the other of these dynamics, or some combination of the two. *See, e.g.,* Oppo. at 14 ("[Physicians] have a strong economic incentive to continue buying Quest's fee-for-service testing even though they are not contractually committed to do so.") (internal quotation marks omitted).

13    In addition to Hunter, Western Health, and Westcliff, plaintiffs also allege that John Muir Health has also "exited the plan/outpatient market, in large part because of Quest's other exclusionary conduct." SAC ¶ 34. But plaintiffs allege nothing more about John Muir Health. There are no allegations regarding, e.g., its previous market share, when or why it exited the market, or whether/how it was impacted by Quest's agreements with Aetna and Blue Shield.

14    To the extent that plaintiffs also rely on their tying allegations to support their monopolization claims, those allegations do not meaningfully impact the analysis above, because they are essentially identical to the allegations in support of plaintiffs' exclusive dealing (or kickback/leveraging) theory.

15    At oral argument, Quest pointed out, and plaintiffs did not dispute, that paragraph 109 of the SAC is taken from a declaration attached to a complaint filed by the California Attorney General against Quest, and that the declarant is describing conduct from 2003 to 2004, when the declarant worked for Quest.

16    Quest does not dispute that this could be a meritorious theory of coercion if properly alleged. *See* Reply at 9 (Dkt. No. 73) ("It is not enough to allege that there is some discount on Product A that is only available with the purchase of Product B...A plaintiff...must allege that the discount on Product A is so dramatic (or that the non-discounted price is so punitive) that the only economically viable option is for a plaintiff to purchase both Products A and B.").

17    In addition, as noted above with respect to plaintiffs' exclusive dealing theory, plaintiffs do not make clear the extent to which any medical providers have actually entered capitated agreements with Quest under which they also agree, either explicitly or implicitly, to refer to Quest some or all of their fee-for-service testing. To the extent that plaintiffs have not plausibly alleged that such agreements exist, their tying claims are further deficient.

---

**End of Document**                                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 89 of 173

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

KeyCite Yellow Flag - Negative Treatment

Distinguished by Federal Trade Commission v. Walmart Inc., N.D.Ill., March 27, 2023

2020 WL 6741968

United States District Court, E.D. Texas, Sherman Division.

FEDERAL TRADE COMMISSION

v.

ADVOCARE INTERNATIONAL, L.P., et al.

CIVIL NO. 4:19-CV-715-SDJ

Signed 11/16/2020

### Attorneys and Law Firms

M. Hasan Aijaz, Pro Hac Vice, Thomas B. "Tom" Carter, Pro Hac Vice, Aaron J. Haberman, Federal Trade Commission - Dallas Dallas Regional Office, Dallas, TX, for Federal Trade Commission.

John Robert Robertson, DLA Piper LLP, Chicago, IL, Meagan Dyer Self, DLA Piper LLP, Dallas, TX, for AdvoCare International, L.P.

Baxter Ward Banowsky, Banowsky & Levine, PC, Dallas, TX, for Danny McDaniel, Diane McDaniel.

### MEMORANDUM OPINION AND ORDER

SEAN D. JORDAN, UNITED STATES DISTRICT JUDGE

*1 Before the Court are two motions: Defendants' Motion to Dismiss for failure to state a claim filed by Defendants Danny McDaniel and Diane McDaniel ("the McDaniels") pursuant to Federal Rule of Civil Procedure 12(b)(6), (Dkt. #17), and Plaintiff's Motion to Exclude, (Dkt. #23), certain factual allegations, documents, and legal arguments included in the McDaniels' Reply Brief, (Dkt. #20). For the following reasons, the Court **GRANTS** the McDaniels' Motion to Dismiss, (Dkt. #17), and **DENIES as moot** Plaintiff's Motion to Exclude, (Dkt. #23).

### I. BACKGROUND

In March 2017, consumers filed a class-action lawsuit in the Northern District of Texas against AdvoCare International, L.P. ("AdvoCare"), alleging that AdvoCare had been operating as an illegal pyramid scheme. *Ranieri v. AdvoCare Int'l, L.P.*, No. 3:17-cv-00691-B, 2017 WL 947224 (N.D. Tex. Mar. 9, 2017); *see also* (Dkt. #1 at 25, #17 at 12). That suit named, among others, Danny McDaniel—but not his wife, Diane McDaniel—as a defendant. *Ranieri*, 2017 WL 947224. However, the district court ultimately dismissed with prejudice the action against Danny McDaniel, holding that if AdvoCare indeed operated an illegal pyramid scheme, Danny McDaniel did not operate said scheme. *Ranieri v. AdvoCare Int'l, L.P.*, 336 F.Supp.3d 701, 718 (N.D. Tex. 2018);[1] *see also* (Dkt. #17 at 12).

Separately, the Federal Trade Commission ("FTC" or "Commission") began investigating AdvoCare for potential violations of consumer-protection law. (Dkt. #1 at 25). In July 2019, during negotiations with the FTC, AdvoCare terminated its "multi-level marketing" ("MLM") program, which was alleged to be an illegal pyramid scheme. (Dkt. #1 at 25–26).

On October 2, 2019, the FTC brought a complaint in this Court requesting a permanent injunction and other equitable relief against AdvoCare and at least five individual members thereof, including the McDaniels. (Dkt. #1). The Complaint alleges that Defendants engaged in unlawful business practices in violation of the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. *See, e.g.*, (Dkt. #1 at 26). In particular, the Complaint alleges that AdvoCare—which the FTC describes as "a multi-level marketing company that promotes health and wellness products"— deceived individuals into becoming "Distributors" and "Advisors," or salespeople for AdvoCare, the majority of whom never earned compensation for their sales. (Dkt. #1 at 4–6). The Complaint further alleges that Defendants consistently and deceptively portrayed AdvoCare as a "life-changing financial solution," (Dkt. #1 at 6–9), and trained recruits to do the same, (Dkt. #1 at 9). The Complaint thus asserts that AdvoCare operated an unlawful pyramid scheme whereby AdvoCare's compensation structure relied on the fraudulent recruitment of Distributors and Advisors who would unwittingly pass on profits to those higher up the chain of command. (Dkt. #1 at 16–23).

*2 Simultaneous to, or immediately after, the FTC's filing of the Complaint, on October 2, 2019, all named Defendants —except for the McDaniels—reached a settlement agreement

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 90 of 173

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

with the FTC. (Dkt. #2, #2-1, #2-2). Pursuant to the settlement agreement, the settling Defendants, including AdvoCare, submitted to a host of sanctions, including an outright ban on: multi-level marketing; operating "chain referral" programs or similar schemes; managing compensation for any business ventures unless certain criteria are satisfied; and making material misrepresentations regarding any business venture. (Dkt. #2-2 at 3–5, #15, #16). The settling Defendants also agreed to (a) provide equitable monetary relief and payment to the Commission, (b) cooperate in the settlement, and (c) record progress while otherwise submitting to wide-reaching compliance monitoring. (Dkt. #2-2 at 5–16, #15, #16). The FTC has continued to pursue the instant action against the McDaniels, which the McDaniels now move to dismiss under Rule 12(b)(6).

## II. LEGAL STANDARD

Under the relaxed pleading standards of Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement requires only that the plaintiff provide "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility, under Twombly, means "more than a sheer possibility," but not necessarily a probability. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. Id. To determine whether the plaintiff has pleaded enough to "nudge[ ] [its] claims across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." Id. at 679–80 (first quoting Twombly, 550 U.S. at 570, then citing Iqbal v. Hasty, 490 F.3d 143, 157–58 (2nd Cir. 2007)) (internal quotation marks omitted). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556).

Further, when evaluating a Rule 12(b)(6) motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010). However, a district court may also consider any "matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Courts have taken judicial notice of the existence and content of settlement agreements when evaluating Rule 12(b)(6) motions to dismiss. See, e.g., ASARCO, LLC v. Union Pac. R.R. Co., 765 F.3d 999, 1008 n.2 (9th Cir. 2014) (holding that because the settlement agreement was filed with the court and is a publicly available record, it is properly subject to judicial notice and thus may be considered on a Rule 12(b)(6) motion); Estate of Brown v. Arc Music Grp., 523 F.App'x 407, 410 (7th Cir. 2013) (holding that the settlement agreement was a public record, of which the court could take judicial notice without converting the motion into one for summary judgment). Finally, a court may take judicial notice sua sponte. FED. R. CIV. P. 201(c)(1).

Here, the Court takes judicial notice of the settlement agreement between Plaintiff and all Defendants to the instant action besides the McDaniels, (Dkt. #2, #15, #16).[2] The Court thus considers the existence and content of the settlement agreement in its analysis.

## III. DISCUSSION

### A. The FTC's Complaint is Not Exempt from the Pleading Standards Prescribed by the Federal Rules of Civil Procedure.

**\*3** The Federal Trade Commission Act instructs the Commission to "prevent persons, partnerships, or corporations" from using "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The Commission has "multiple instruments in its toolbox" to accomplish this statutory directive, among which are administrative proceedings and litigation in federal court. FTC v. Shire Viropharma, Inc., 917 F.3d 147, 155 (3d Cir. 2019).

As relevant here, Section 13(b) of the FTC Act empowers the FTC to "bring suit in a district court of the United States"

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 91 of 173

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

to obtain a "temporary restraining order," a "preliminary injunction," or a "permanent injunction" against an "act or practice" that violates the FTC Act. 15 U.S.C. § 53(b). To bring such an action, the FTC must have "reason to believe" that the entity or person sued "is violating, or is about to violate" the Act. *Id.*

The McDaniels contend that the FTC's complaint must be dismissed under Rule 12(b)(6) because the Complaint fails to state a plausible claim under Section 13(b) that the McDaniels are violating or are "about to violate" the FTC Act. (Dkt. #17 at 6). Pointing to the FTC's Complaint itself, as well as the settlement agreement with AdvoCare and the other Defendants, the McDaniels assert that the FTC's suit recognizes that the alleged pyramid scheme operated by AdvoCare, and in which the McDaniels were allegedly involved, ended in July 2019. (Dkt. #17 at 7–8). The McDaniels further argue that there are no factual allegations supporting the FTC's conclusory contention that the McDaniels are presently violating the FTC Act or are "about to" violate the Act. [3]

The FTC's first response to the McDaniels' motion is to suggest that, because the agency has already made its own, internal determination that it has "reason to believe" that the McDaniels are violating or are "about to violate" the FTC Act, the Complaint before the Court is largely immunized from judicial scrutiny under Rule 12(b)(6). The FTC states that "[t]he Commission's determination that there is sufficient 'reason to believe' under Section 13(b) is left to the agency's discretion." (Dkt. #19 at 5). The FTC goes on to cite and quote *Standard Oil Co. of California v. FTC*, 596 F.2d 1381, 1386 (9th Cir. 1979), *rev'd on other grounds*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), for the proposition that, "[i]f the district court finds as a fact that the FTC made the 'reason to believe' determination ... further review would be foreclosed." (Dkt. #19 at 5). Ultimately, the FTC asserts that, rather than engaging in a straightforward application of pleading standards under Rule 8, the Court is bound to deny the McDaniels' Rule 12(b)(6) motion unless it concludes that the FTC "abused its discretion" in making its internal "reason to believe" determination. (Dkt. #19 at 12–13). According to the Commission, limiting the Court's analysis to an "abuse of discretion" standard "fits with the broad prosecutorial discretion federal agencies have to bring suit." (Dkt. #19 at 6).

**\*4** The Court disagrees. Taken to its logical conclusion, the FTC's argument would mean that, no matter how insubstantial the factual allegations in an FTC complaint under Section 13(b), a court must accept that the complaint is sufficient to withstand a Rule 12(b) motion so long as the FTC avers that it has "reason to believe" that a defendant is "about to" engage in unfair methods of competition, or unfair or deceptive acts or practices. The FTC's position is contrary to accepted rules of pleading and finds no support in applicable case law.

First, Rule 8(a) of the Federal Rules of Civil Procedure requires that anyone filing a complaint must include a statement demonstrating "the grounds for the court's jurisdiction" and a "showing that the pleader is entitled to relief." In a Section 13(b) case, that requirement includes factual allegations from the FTC that there exist reasons to believe that the defendant is violating or "is about to violate" the FTC Act.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A bare allegation by the FTC that "we have reason to believe that the defendant is about to violate the law," when unaccompanied by supporting factual allegations, clearly does not "state a claim to [injunctive] relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This Court is fully capable of determining whether the FTC's factual allegations in a Section 13(b) complaint are sufficient to make the requisite "about-to-violate" showing. Therefore, there is no reason to conclude that Congress intended to eliminate judicial scrutiny under Rule 8.

The cases that the FTC cites do not support its argument that its internal, "reason to believe" determination is an effective "King's X" against a motion to dismiss a Section 13(b) complaint brought by the FTC in federal court. For example, *Standard Oil* addressed a challenge by an oil company to an administrative proceeding initiated by the FTC in connection with unfair trade practices. 596 F.2d at 1384. The oil company's challenge, brought under the Administrative Procedure Act ("APA"), was rejected by the Ninth Circuit based on the court's determination that the FTC's commencement of an administrative proceeding was not subject to challenge under the APA. *Id.* at 1385. *Standard Oil* did not involve a lawsuit brought by the FTC and it says nothing about deference to the FTC in cases in which the FTC, as the plaintiff in federal court, bears the threshold burden to

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 92 of 173

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

meet the requirements of Rule 8 and state a claim for relief that is plausible on its face.

The other cases cited by the FTC are equally unhelpful because they involve the inapposite circumstances of judicial review of agency action. *See* Slough v. FTC, 396 F.2d 870 (5th Cir. 1968) (suit seeking review of a cease and desist order issued by the FTC after an administrative hearing); FTC v. Nat'l Urological Grp., Inc., No. 1:04-cv-3294-CAP, 2006 WL 8431977 (N.D. Ga. Jan. 9, 2006) (dismissing counterclaims brought under the APA challenging the FTC's decision to initiate a lawsuit); Boise Cascade Corp. v. FTC, 498 F.Supp. 772 (D. Del. 1980) (involving an APA action seeking an order that the FTC withdraw an administrative complaint).

Judicial review of agency action under the APA is governed by the APA itself, which expressly precludes judicial review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). No such review is at issue here. Instead, the McDaniels' motion raises a different issue: whether the FTC has stated a claim under the Federal Rules of Civil Procedure. The resolution of the McDaniels' motion is governed by Rule 8 of the Federal Rules of Civil Procedure, which mandates, rather than precludes, judicial review to ensure compliance with federal pleading requirements. "It is precisely the Court's duty under Rule 8 to scrutinize a party's right to proceed in federal court." FTC v. Hornbeam Special Situations, LLC, No. 1:17-cv-3094-TCB, 2018 WL 6254580, at *4 (N.D. Ga. Oct. 15, 2018).

**\*5** In sum, to avoid dismissal of its Section 13(b) action at the pleadings stage, the FTC must plausibly allege, in satisfaction of *Iqbal* and *Twombly*, that the McDaniels *are currently* violating the FTC Act *or are about to* do so.

### B. The FTC's Factual Allegations Pertain Only to *Past* Misconduct by the McDaniels and not to Present or Future Misconduct.

Section 13(b) of the FTC Act empowers the Commission to file a claim in federal court "[w]henever the Commission has reason to believe ... that any person, partnership, or corporation *is violating*, or *is about to violate*, any provision of law enforced by the [FTC]...." 15 U.S.C. § 53(b) (emphasis added). Section 13(b) thus unambiguously requires plausible factual allegations supporting a reasonable belief of present or future misconduct. Shire, 917 F.3d at 156–

57 ("Section 13(b) requires that the FTC have reason to believe a wrongdoer 'is violating' or 'is about to violate' the law.... [T]his language is unambiguous; it prohibits existing or impending conduct ... [and] does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation.").

In *Shire*, the conduct in question was five years past. Here, the McDaniels' past conduct is more recent; at the time the FTC filed the Complaint, only three months had passed since the McDaniels ceased their alleged misconduct. However, like in *Shire*, the FTC identifies no ongoing misconduct and, in fact, appears to concede that the McDaniels' alleged misconduct continued only until July 2019. [4]

Further, even if the FTC had alleged ongoing or impending violations by the McDaniels, such allegations are implausible because, according to the FTC's own factual allegations, at the time the Complaint was filed, the primary mechanism of the McDaniels' alleged wrongdoing, the MLM program, had been permanently defunct for months. (Dkt. #1 at 26). Additionally, the sole business through which the McDaniels allegedly undertook such actions—AdvoCare—had, either before or simultaneous to the Complaint's filing, entered into a comprehensive agreement to halt AdvoCare's unlawful activities, reform its business practices, and submit to government compliance monitoring. (Dkt. #2, #2-1, #2-2).

The FTC has not alleged that the McDaniels are *currently* violating or *are about to* violate the law enforced by the FTC. Every factual allegation that the FTC presents refers to past misconduct by the McDaniels. Although this misconduct was extensive and longstanding—having taken place for "a period of more than 20 years"—all factual allegations indicate that the alleged violations ended entirely in July 2019 when AdvoCare's MLM program was permanently terminated. (Dkt. #1 at 25–26). And it is implausible that the McDaniels can commit ongoing violations because the MLM program is now defunct, (Dkt. #1 at 26), and AdvoCare has been extensively sanctioned, reformed, and monitored for compliance, (Dkt. #15, #16). Finally, the FTC has not alleged—either in the initial Complaint filed in October 2019 or in any amended pleadings since that time—that either the MLM is still operating or that the McDaniels are otherwise continuing to engage in misconduct after July 2019.

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 93 of 173

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

**C. Past Violations May Sometimes Give Rise to an Inference of Ongoing or Future Violations, but the FTC has not Plausibly Alleged that Such is the Case Here.**

**\*6** Section 13(b) generally cannot be used to remedy past violations. *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). However, a plaintiff may state a plausible claim under Section 13(b) by showing that a past violation or series of past violations is likely to recur. *Id.* In some instances, courts have found that an extensive history of past violations is itself sufficient to create an inference of ongoing violations. *See, e.g.*, *FTC v. GTP Mktg., Inc.*, No. 4-90-123-K, 1990 WL 54788, at \*5 (N.D. Tex. Mar. 15, 1990) (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987)) ("An extensive history of violations does beget an inference that future violations are likely to occur."). The Fifth Circuit, however, has held merely that past violations may, but do not necessarily, support an inference of future substantive violations. *SEC v. First Fin. Grp. Tex.*, 645 F.2d 429, 434 (5th Cir. 1981) (holding in an analogous context that finding a reasonable likelihood of future securities-law violations requires "proof of past substantive violations *that indicate* a reasonable likelihood of future substantive violations." (emphasis added)).

In each of the above cases, the recurrence of violations was at least possible, and in some instances likely, because the channels of misconduct utilized by the defendants remained open—*i.e.*, free and clear of government sanction—upon filing of the litigation. *See, e.g.*, *Odessa*, 833 F.2d at 176–77. In *Odessa*, for instance, the defendant warehouse co-op was still fully operational at the outset of litigation. *Id.* Moreover, while the defendant stated an intent to comply with sanitation laws, it continued to manage its own sanitation practices free of government intervention. *Id.* Absent such intervention, and given the defendant's history of violations, the court held that "serious questions remain[ed]" as to whether the defendant's violations would recur or continue. *Id.*

Here, by contrast, at the outset of litigation and pursuant to FTC intervention, the McDaniels' channel of misconduct was either permanently defunct (in the case of the MLM program) or reformed, lawful, and monitored for compliance (in the case of AdvoCare more broadly). To this end, the FTC not only fails to adequately allege ongoing or future misconduct by the McDaniels but appears to affirmatively concede that the channels through which the McDaniels

engaged in misconduct are permanently closed. (Dkt. #1 at 26); *see also* (Dkt. #2, #15, #16). Therefore, under the circumstances, an inference of present or future violations by the McDaniels is unsupported.

## IV. CONCLUSION

The FTC is authorized to bring an action under Section 13(b) of the FTC Act only when there is "reason to believe" that a defendant is currently engaged in, or about to engage in, conduct violating the Act. 15 U.S.C. § 53(b). Here, each of the FTC's factual allegations pertains only to *past* misconduct by the McDaniels. While courts may sometimes infer ongoing or future violations based on an extensive history of past violations, here such an inference is improper because the sole channel through which the McDaniels allegedly engaged in violations—AdvoCare—agreed to abandon its MLM program entirely (as well as all other allegedly unlawful practices) and subject itself to wide-ranging government monitoring for compliance. This fundamental transformation began with the termination of AdvoCare's MLM program in July 2019 and culminated in AdvoCare's settlement with the FTC on the day of the Complaint's filing, of which the Court takes judicial notice. Under the circumstances, the FTC has failed to provide plausible factual allegations that there is reason to believe that the McDaniels are currently violating the FTC Act or are about to violate the Act.

Finally, the FTC has filed with the Court a Motion to Exclude, (Dkt. #23), arguing that certain documents, legal arguments, and factual allegations presented in the McDaniels' Reply Brief, (Dkt. #20), should be excluded from consideration. In resolving the McDaniels' dismissal motion, the Court did not consider or rely upon any of the arguments, alleged facts, or documents complained of in the FTC's Motion to Exclude. For this reason, the Court finds that the FTC's Motion to Exclude should be DENIED as moot.

**\*7** It is therefore **ORDERED** that Defendants Diane McDaniel's and Danny McDaniel's Motion to Dismiss, (Dkt. #17), is **GRANTED**. The Federal Trade Commission's claims against the McDaniels, *see* (Dkt. #1), are hereby **DISMISSED without prejudice**.[5] It is further **ORDERED** that the FTC is granted leave to replead its claims by filing an amended complaint, with such amended complaint to be

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 94 of 173
**Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....**
2020-2 Trade Cases P 81,455

filed within thirty (30) days from the date of the issuance of this Order.

It is further **ORDERED** that the FTC's Motion to Exclude is **DENIED as moot**.

It is further **ORDERED** that all other motions pending before the Court are **DENIED as moot**.

**So ORDERED and SIGNED this 16th day of November, 2020.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6741968, 2020-2 Trade Cases P 81,455

## Footnotes

1   "In the instant case, Plaintiffs have not shown that creating and disseminating promotional materials ... caused Plaintiffs' injuries, and they have not shown that the Individual Defendants operated the alleged pyramid scheme...." *Id.*

2   The Unopposed Motion for Settlement, (Dkt. #2), was filed with the Court the same day as the Complaint, (Dkt. #1), October 2, 2019, and the Court entered the stipulated orders, (Dkt. #15, #16), which collectively granted the motion, one week later.

3   The McDaniels have not challenged the Court's jurisdiction in this matter. Although their dismissal motion included some language suggesting a potential jurisdiction argument, *see* (Dkt. #17 at 8), the substance of the McDaniels' motion and briefing asserts only a Rule 12(b)(6) motion for failure to state a claim and does not contest the Court's jurisdiction. *See* (Dkt. #20 at 1 n.3) (the McDaniels' reply brief affirms that they are not raising a jurisdictional challenge). In any event, the Court concludes that it has jurisdiction because the FTC's claim arises under a law of the United States, 15 U.S.C. § 53(b), and therefore falls within the general grant of jurisdiction in 28 U.S.C. § 1331. *See* *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (confirming that a plaintiff obtains the "basic statutory grant[ ]" of subject matter jurisdiction in 28 U.S.C. § 1331 by pleading a colorable claim that arises under the Constitution or the laws of the United States).

4   "The McDaniels ... continued to engage in deception until AdvoCare abandoned its multi-level marketing structure in July 2019 during its negotiations with the FTC." (Dkt. #1 at 26).

5   Because the Court dismisses the claims asserted against the McDaniels by the FTC, the Court need not address the parties' arguments on the scope of the remedies that would be available if the FTC's claims against the McDaniels were successful.

End of Document                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 3185777
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.

FEDERAL TRADE COMMISSION, et al., Plaintiffs,
v.
AMERICAN FUTURE SYSTEMS,
INC., et al., Defendants.

CIVIL ACTION NO. 20-2266

Filed 07/26/2021

**Attorneys and Law Firms**

Christian M. Capece, Derek E. Diaz, Harris A. Senturia, Jonathan L. Kessler, Nicole J. Guinto, Amy C. Hocevar, Federal Trade Commission, Cleveland, OH, for Plaintiff Federal Trade Commission.

John Abel, PA Office of Attorney General Bureau of Consumer Protection, Harrisburg, PA, Sarah Anne Ellis Frasch, PA Office of Attorny General, Philadelphia, PA, for Plaintiff Commonwealth of Pennsylvania.

Ilana H. Eisenstein, DLA Piper LLP, David H. Marion, Morgan S. Birch, White and Williams LLP, Philadelphia, PA, Casey A. Coyle, Mark S. Stewart, Eckert Seamans Cherin & Mellott LLC, Harrisburg, PA, for Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., Edward M. Satell.

Stephen M. Hladik, Eric J. Phillips, Lauren L. Schuler, Pamela L. Cunningham, Hladik Onorato & Federman, LLP, North Wales, PA, for Defendants International Credit Recovery, Inc., Richard Diorio, Jr., Cynthia Powell.

**ORDER**

JOEL H. SLOMSKY, District Judge

**\*1 AND NOW**, this 26th day of July 2021, upon consideration of Defendants American Future Systems, Inc., Progressive Business Publications of New Jersey, Inc., and Edward M. Satell's ("AFS Defendants") Motion for Judgment on the Pleadings (Doc. No. 97), Plaintiff Federal Trade Commission's Response in Opposition to the Motion (Doc. No. 99), Plaintiff Commonwealth of Pennsylvania's Response in Opposition to the Motion (Doc. No. 100), Defendants International Credit Recovery, Inc., Richard Diorio, Jr., and Cynthia Powell's ("ICR Defendants") Response in Support of the Motion (Doc. No. 101), Plaintiff Federal Trade Commission's Reply to ICR Defendants' Response (Doc. No. 102), AFS Defendants' Reply in Support of the Motion (Doc. No. 103), and Plaintiff Commonwealth of Pennsylvania's Reply to ICR Defendants' Response (Doc. No. 104), it is **ORDERED** as follows:

1. AFS Defendants' Motion for Judgment on the Pleadings (Doc. No. 97) is **DENIED**. [1]

2. Since ICR Defendants adopt AFS Defendants' Motion for Judgment on the Pleadings (Doc. No. 97), ICR Defendants' Motion (Doc. No. 101) also is **DENIED**. (See id. at 1.)

**All Citations**

Not Reported in Fed. Supp., 2021 WL 3185777

---

**Footnotes**

1    On May 13, 2020, Plaintiff Federal Trade Commission ("FTC") initiated this action against AFS Defendants and ICR Defendants under Section 13(b) of the Federal Trade Commission Act ("FTCA"), 🚩15 U.S.C. § 53(b), and the Unordered Merchandise Statute ("UMS"), 39 U.S.C. § 3009. (See Doc. No. 1 ¶ 1.) FTC sought "permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices," in violation of Section 5(a) of the FTCA, 🚩15 U.S.C. § 45(a), and the UMS, 39 U.S.C. § 3009, "in connection with Defendants' deceptive selling of and collection of payment for publication subscriptions." (Id.) Thereafter, FTC

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 96 of 173

Federal Trade Commission v. American Future Systems, Inc., Not Reported in Fed....

filed a Motion for Leave to File a First Amended Complaint (Doc. No. 20), attaching a proposed First Amended Complaint ("FAC") (Doc. No. 20-3) in which it sought to add to this action the Commonwealth of Pennsylvania ("the Commonwealth") as a co-Plaintiff, and four additional claims by the Commonwealth against Defendants under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 et seq. (See Doc. Nos. 20 at 1; 20-1 at 1.) AFS Defendants opposed the Motion, arguing, inter alia, that the Court lacked supplemental jurisdiction over the Commonwealth's "purely state law claims." (Doc. No. 22 at 4.) On January 20, 2021, the Court granted FTC's Motion for Leave to File a First Amended Complaint, and in an Opinion issued that day, the Court held that it had supplemental jurisdiction over the state law claims and that the Commonwealth could properly be added as a party to this action. (See Doc. Nos. 41 at 6-10; 42.)

The next day, Plaintiffs FTC and the Commonwealth filed the FAC (Doc. No. 43), alleging facts identical to those set forth in the original Complaint. (See Doc. Nos. 1 ¶¶ 1-52; 43 ¶¶ 1-55.) In the FAC, FTC pleads that "[b]ased on the facts and violations of law alleged [there]in ..., [it] has reason to believe that Defendants are violating or are about to violate laws enforced by the Commission[,]" i.e., Section 5(a) of the FTCA, 15 U.S.C. § 45(a), and the UMS, 39 U.S.C. § 3009. (Doc. No. 43 ¶ 55; see also id. ¶ 1.) Thereafter, ICR Defendants filed a Motion to Dismiss Counts III and VII (Doc. No. 48), and AFS Defendants filed a Motion to Dismiss the Commonwealth's claims in Counts V, VI, and VIII (Doc. No. 55). (See Doc. No. 85 at 8 & nn.10-11.) On April 30, 2021, the Court denied Defendants' Motions to Dismiss. (See Doc. Nos. 85-86.)

On June 24, 2021, AFS Defendants filed the instant Motion for Judgment on the Pleadings (Doc. No. 97), which ICR Defendants "incorporate by reference and adopt" in their Response filed on July 8, 2021 in Support of the Motion (Doc. No. 101). (Id. at 1.) In the Motion, AFS Defendants contend that under the United States Supreme Court's recent decision in AMG Capital Management, LLC v. Federal Trade Commission, 141 S. Ct. 1341 (2021) and other court decisions, FTC's claims in the FAC must be dismissed because they are "improperly brought under Section 13(b) of the [FTCA]," § 53(b). (Doc. No. 97-1 at 5.) Further, they argue that because FTC's claims fail as a matter of law, the Court should refrain from exercising supplemental jurisdiction over the Commonwealth's "purely state-law claims." (Id.) Thereafter, FTC and the Commonwealth filed separate Responses in Opposition to the Motion (Doc. Nos. 99-100) and Replies to ICR Defendants' Response in Support of the Motion (Doc. Nos. 102, 104). On July 14, 2021, AFS Defendants filed a Reply. (Doc. No. 103.)

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In deciding a motion for judgment on the pleadings, a court must consider only those documents contained in the pleadings. See Moco Invs., Inc. v. United States, 362 F. App'x 305, 307 n.4 (3d Cir. 2010) (explaining that the district court's consideration of documents outside the pleadings converts the motion for judgment on the pleadings into a motion for summary judgment).

A motion for judgment on the pleadings is analyzed under the same standard as a motion to dismiss under Fed. R. Civ. P. 12(b)(6). See Spruill v. Gillis, 372 F.3d 218, 223 n.2 (3d Cir. 2004) (explaining that "[t]here is no material difference in the applicable legal standards" for Rule 12(b)(6) and Rule 12(c) motions). Like a motion to dismiss, under Rule 12(c) "the trial court must view the facts in the pleadings in the light most favorable to plaintiff and must grant the motion only if the moving party establishes that no material issues of fact remain[ ] and that it is entitled to judgment as a matter of law." Shelly v. Johns-Manville Corp., 798 F.2d 93, 97 n.4 (3d Cir. 1986); see also Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008). A motion for judgment on the pleadings is granted only where "the plaintiffs would not be entitled to relief under any set of facts that could be proved." Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 220 (3d Cir. 2001).

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 97 of 173

Federal Trade Commission v. American Future Systems, Inc., Not Reported in Fed....

### A. Neither __AMG Capital__ Nor Other Cases Relied Upon By Defendants Preclude FTC's Section 13(b) Claims for Permanent Injunctive Relief

In <u>AMG Capital</u>, the Supreme Court addressed the issue of whether Section 13(b) of the FTCA, 15 U.S.C. § 53(b), the provision at issue here, "authorizes [FTC] to seek, and a court to award, equitable monetary relief such as restitution or disgorgement." AMG Cap. Mgmt., LLC, 141 S. Ct. at 1344. In holding that Section 13(b) does not authorize such monetary relief, the Supreme Court discussed the history of the FTCA and FTC's authority thereunder. See id. at 1345-7. To summarize, the FTCA prohibits, <u>inter</u> ALIA, "unfair or deceptive acts or practices" involving commerce, 15 U.S.C. § 45(a)(1), and empowers FTC to enforce this prohibition through administrative proceedings (Section 5) and lawsuits in federal court (Section 13(b)). See §§ 45(b), 53(b); FTC v. Shire ViroPharma, Inc., 917 F.3d 147, 155 (3d Cir. 2019) ("FTC has multiple instruments in its toolbox ... among these are administrative proceedings and lawsuits in federal court."). In Section 5 cases, <u>i.e.</u>, where FTC commences administrative proceedings, district courts have the authority under Section 5(l) and Section 19, §§ 45(l), 57b(b), "to impose limited monetary penalties and to award monetary relief...." AMG Cap. Mgmt., LLC, 141 S. Ct. at 1348-9. As mentioned, in Section 13(b) cases like the one presently before the Court, although monetary remedies are unavailable, injunctive relief can still be imposed. See id. at 1343-44, 1349.

Section 13(b) of the FTCA, § 53(b), "authorizes [FTC] to obtain, 'in proper cases,' a 'permanent injunction' in federal court against 'any person, partnership, or corporation' that it believes 'is violating, or is about to violate, any provision of law' that the [FTC] enforces." AMG Cap. Mgmt., LLC, 141 S. Ct. at 1344 (quoting § 53(b)). As discussed <u>infra</u>, in the FAC, FTC seeks a permanent injunction under Section 13(b) with respect to Defendants' alleged "deceptive selling of and collection of payment for publication subscriptions[,]" in violation of the FTCA. (Doc. No. 43 ¶ 1.)

In the instant Motion for Judgment on the Pleadings, Defendants seek to dismiss FTC's claims as a matter of law, contending that under <u>AMG Capital</u>, Section 13(b) precludes FTC from obtaining not only monetary relief but also a permanent injunction without initially obtaining preliminary injunctive relief or pursuing administrative proceedings set forth in Section 5. (See Doc. No. 97 at 1-2); §§ 45(b), 53(b). In its Response, FTC concedes that consistent with the holding in <u>AMG Capital</u>, absent "a change in law, [it] does not seek and will not pursue equitable monetary relief in this matter." (Doc. No. 99 at 11.) Thus, the parties do not dispute that monetary relief is unavailable under Section 13(b). (See Doc. Nos. 97-1 at 13; 99 at 10-12.) However, FTC submits that the <u>AMG Capital</u> decision does not prevent it from seeking a permanent injunction against Defendants directly in the district court under Section 13(b). (See Doc. No. 99 at 5, 12-15.) Moreover, FTC avers it may do so under this provision without obtaining prior preliminary injunctive relief or invoking the FTCA's administrative procedures. (See id. at 13-15, 19-21.) Accordingly, FTC argues that its claims against Defendants for Section 13(b) injunctive relief are properly before the Court and Defendants' Motion should be denied.

In Defendants' Motion, they contend that <u>AMG Capital</u> placed additional limitations on Section 13(b) actions in the district courts—namely, that this provision may not be used to seek: (1) "permanent injunctive relief in federal court that is not 'directly related' to previously granted temporary or preliminary injunctive relief[,]" or (2) "an injunction as a means of evading the FTC's administrative process...." (Doc. No. 97-1 at 5-6) (citation

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 98 of 173

Federal Trade Commission v. American Future Systems, Inc., Not Reported in Fed....

omitted). But the clear language of the AMG Capital decision is contrary to Defendants' interpretation of Section 13(b) of the FTCA. See 📄 15 U.S.C. § 53(b).

Neither AMG Capital nor any other case in this Circuit or others requires FTC to seek or obtain a temporary restraining order or preliminary injunction before pursuing permanent injunctive relief under Section 13(b). In AMG Capital, the Supreme Court stated that Section 13(b) "permits [FTC] to proceed directly to court (prior to issuing a cease and desist order [as set forth in Section 5]) to obtain a 'temporary restraining order or a preliminary injunction,' and also allows [FTC], 'in proper cases,' to obtain a court-ordered 'permanent injunction.' " AMG Cap. Mgmt., LLC, 141 S. Ct. at 1436 (quoting 📄 § 53(b)). It did not opine that a permanent injunction under Section 13(b) must be " 'directly related' to previously granted temporary or preliminary injunctive relief...." (Doc. No. 97-1 at 5-6.) Rather, the Supreme Court used the phrase "directly related" to support its interpretation of Section 13(b) as only precluding equitable monetary relief:

> [T]he appearance of the words "permanent injunction" (as a proviso) suggests that those words are directly related to a previously issued preliminary injunction. They might also be read, for example, as granting authority for the Commission to go one step beyond the provisional and ("in proper cases") dispense with administrative proceedings to seek what the words literally say (namely, an injunction). But to read those words as allowing what they do not say, namely, as allowing the Commission to dispense with administrative proceedings to obtain monetary relief as well, is to read the words as going well beyond the provision's subject matter....

📄 AMG Cap. Mgmt., LLC, 141 S. Ct. at 1348 (emphasis added). Cases from other circuits confirm that FTC may seek a permanent injunction under Section 13(b) without initially obtaining preliminary relief. In 📄 Federal Trade Commission v. Credit Bureau Center, LLC, 937 F.3d 764, 766 (7th Cir. 2019), FTC sought and obtained in the first instance a permanent injunction under Section 13(b). In affirming the injunction, the Seventh Circuit Court of Appeals made clear that Section 13(b) "by its terms authorizes temporary restraining orders and permanent injunctions to enjoin violations of federal trade law." 📄 Id. at 769; see also 📄 Shire ViroPharma, Inc., 917 F.3d at 157 n.14 (citing 📄 F.T.C. v. Evans Products Co., 775 F.2d 1084, 1086 (9th Cir. 1985)) (stating that the Ninth Circuit accepted FTC's position that Section 13(b)'s "permanent injunction proviso was a standalone cause of action that authorized it to obtain a permanent injunction against violations of any provision of law it enforced."). Thus, a permanent injunction under Section 13(b) need not be preceded by preliminary injunctive relief.

Moreover, AMG Capital does not stand for the proposition that a permanent injunction under Section 13(b) must be sought in conjunction with an administrative proceeding under Section 5. Rather, in AMG Capital, the Supreme Court clearly stated that FTC "may use [Section] 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, or when it seeks only injunctive relief." 📄 141 S. Ct. at 1349 (emphasis added); see also 📄 id. at 1343 ("Section 13(b) allows the Commission to go directly to district court when the Commission seeks injunctive relief pending administrative proceedings or when it seeks only a permanent injunction."). Further, in discussing Section 13(b)'s evolution as FTC's preferred enforcement tool over its Section 5 administrative process, the Supreme Court clarified the issue before it:

> Our task here is not to decide whether this substitution of § 13(b) for the administrative procedure contained in § 5 and the consumer redress available under § 19 is desirable. Rather, it is to answer a more purely legal question: Did Congress, by enacting § 13(b)'s words, "permanent injunction," grant [FTC] authority to obtain monetary relief directly from courts, thereby effectively bypassing the process set forth in § 5 and § 19?

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 99 of 173

Federal Trade Commission v. American Future Systems, Inc., Not Reported in Fed....

Id. at 1347. In AMG Capital, the Supreme Court answered the question with a "no." See id. Accordingly, after AMG Capital, FTC may not use Section 13(b) to obtain monetary relief directly from courts. See id.

The decisions relied upon by Defendants do not support the notion that a permanent injunction must be preceded by a preliminary injunction or an administrative proceeding. In discussing the differences between Section 13(b)'s permanent injunction provision and "the provision governing temporary restraining orders and preliminary injunctions," the Seventh Circuit in Credit Bureau Center mentioned its holding in a prior case that "[FTC] can seek a permanent injunction without initiating an internal adjudication[.]" 937 F.3d at 773 (citing United States v. JS & A Grp., 716 F.2d 451, 456-57 (7th Cir. 1983)); see also id. at 771 ("Under [S]ection 13(b) of the FTCA, the Commission can forego any administrative adjudication or rulemaking and directly pursue a temporary restraining order and a preliminary or permanent injunction in federal court."); F.T.C. v. NHS Sys., Inc., 936 F. Supp. 2d 520, 537-38 (E.D. Pa. 2013) (granting FTC's request for a permanent injunction without mentioning Section 5 administrative process). And in Federal Trade Commission v. Shire ViroPharma, Inc., 917 F.3d 147, 155 (3d Cir. 2019), the Third Circuit Court of Appeals noted that FTC can use, inter alia, administrative proceedings and federal lawsuits to enforce FTCA violations. See also id. at 156 (applying Section 13(b)'s requirement that FTC plead an ongoing or imminent FTCA violation to the permanent injunction provision); 15 U.S.C. § 53(b)(1) (requiring FTC to plead in a Section 13(b) action that "[it] has reason to believe ... [the defendant] is violating, or is about to violate, any provision of law enforced by [FTC]...."). Nor does Federal Trade Commission v. AbbVie, Inc., 976 F.3d 327 (3d Cir. 2020) lend Defendants support, for in that case, the Third Circuit held that Section 13(b)'s provision allowing FTC in a proper case to seek directly in the district court a permanent injunction "does not empower district courts to order disgorgement." Id. at 376.

For all these reasons, Section 13(b) may be used in conjunction with or instead of the administrative process contained in Section 5, and FTC's decision not to pursue Section 5 proceedings against Defendants is not fatal to its claims in the instant case.

In addition, under Section 13(b), FTC may bring an action in this Court to obtain a permanent injunction without initially obtaining preliminary injunctive relief. Therefore, FTC's claims in the FAC for a permanent injunction are proper under Section 13(b).

### B. The FAC Alleges that Defendants Are Violating or Are About to Violate Laws Enforced by FTC

Under Section 13(b), FTC must "ha[ve] reason to believe ... that ... [Defendants are] violating, or [are] about to violate, any provision of law enforced by [FTC]...." 15 U.S.C. § 53(b)(1). Accordingly, FTC "must plead that a violation of the [FTCA] 'is' occurring or 'is about to' occur[,]" i. e., the FAC must allege that Defendants' "existing or impending conduct" violates the FTCA. Shire ViroPharma, Inc., 917 F.3d at 156, 159 (quoting 15 U.S.C. § 53(b)).

In the instant Motion, Defendants argue that FTC fails to state a claim for injunctive relief because the allegations in the FAC concern Defendants' past conduct and therefore do not amount to an "existing or impending" violation of the FTCA. Id. at 156 (3d Cir. 2019); (see also Doc. Nos. 97 at 1; 97-1 at 6.) In its Response, FTC asserts that the FAC properly pleads ongoing illegal conduct and that the allegations regarding Defendants' past conduct are still relevant to the Court's determination of whether injunctive relief should ultimately issue. (See Doc. No. 99 at 16-19.)

In the FAC, FTC alleges that Defendants' "selling of and collection of payment for publication subscriptions" constitute "unfair or deceptive acts or practices," in violation of the FTCA. 🚩15 U.S.C. § 45(a)(1). Specifically, the FAC alleges that Defendants are presently engaged in the business of selling and collecting payment for publication subscriptions and that their current acts or practices constitute deceptive commercial conduct that violates Section 5(a), 🚩 § 45(a). (See Doc. No. 43 ¶¶ 1, 9-16, 19, 20-25.) Based on the allegations in the FAC, FTC pleads that it "has reason to believe that Defendants are violating or are about to violate laws [it] enforce[s]...." (Id. ¶ 55.) Accordingly, the FAC sufficiently alleges "existing or impending" violations of the FTCA by Defendants, and FTC's claims for injunctive relief will not be dismissed. 🚩Shire ViroPharma, Inc., 917 F.3d at 156.

### C. The Court Will Continue to Exercise Supplemental Jurisdiction Over the Commonwealth's Claims

In the Motion, Defendants also seek dismissal of the Commonwealth's claims for lack of jurisdiction. (See Doc. Nos. 97 at 2; 97-1 at 18-21.) However, this request is predicated on the dismissal of FTC's claims in the FAC. (See ids.) As discussed above, FTC's claims for injunctive relief under Section 13(b) are properly before the Court and will not be dismissed. Moreover, the Court previously held that it could properly exercise supplemental jurisdiction over the Commonwealth's state law claims under the UTPCPL. (See Doc. No. 41 at 6-9.) For these reasons, the Court will continue to exercise supplemental jurisdiction over the Commonwealth's claims in the FAC.

**\*2**  Based on the foregoing reasons, Defendants' Motion for Judgment on the Pleadings (Doc. No. 97) will be denied.

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

2021 WL 4145062
**Not for Publication**
United States District Court, D. New Jersey.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

HACKENSACK MERIDIAN HEALTH, INC. and
Englewood Healthcare Foundation, Defendants.

Civil Action No. 20-18140

|

Signed 08/04/2021

**Attorneys and Law Firms**

Jonathan Lasken, Charles E. Dickinson, Christopher Caputo, Nandu Machiraju, Anthony Saunders, Cathleen Williams, Christopher Megaw, Elizabeth Arens, Jonathan Robert Wright, Lindsey Bohl, Rohan Pai, J. Wells Harrell, Jamie France, Susan Musser, Nathan Brenner, Federal Trade Commission Bureau of Competition, Washington, DC, Emily Bowne, Vienna, VA, Samantha Gordon, Federal Trade Commission, Chicago, IL, for Plaintiff.

Frank F. Velocci, Drinker Biddle & Reath LLP, Florham Park, NJ, James Bucci, Genova Burns LLC, Camden, NJ, John S. Yi, Paul H. Saint-Antoine, Faegre Drinker Biddle & Reath LLP, Philadelphia, PA, for Defendant Hackensack Meridian Health, Inc.

Angelo Joseph Genova, Peter Francis Berk, Genova Burns LLC, Newark, NJ, Christopher S. Porrino, Lowenstein Sandler LLP, Roseland, NJ, James Bucci, Genova Burns LLC, Camden, NJ, Kerry C. Donovan, Winston & Strawn LLP, New York, NY, for Defendant Englewood Healthcare Foundation.

## OPINION WITH FINDINGS OF
## FACT & CONCLUSIONS OF LAW

John Michael Vazquez, U.S.D.J.

**\*1** In this hotly contested matter, Plaintiff Federal Trade Commission ("FTC") seeks to stop Defendant Hackensack Meridian Health, Inc. ("HMH"), the largest health system in New Jersey, from acquiring Defendant Englewood Healthcare Foundation ("Englewood"), an alleged close and local competitor to two of HMH's medical centers. Presently pending before the Court is the FTC's motion for a preliminary injunction to prevent HMH and Englewood from consummating their proposed merger until completion of the pending administrative proceedings. D.E. 133. The parties agree to the relevant product market but little else. The relevant product market is a cluster of inpatient general acute care ("GAC") services sold and provided to commercial insurers and their members.

Defendants filed a brief in opposition to the FTC's motion, D.E. 157, to which the FTC filed a reply, D.E. 228. The parties also filed several motions *in limine* in advance of the evidentiary hearing, D.E. 246, 248, 260, 264, in addition to proposed findings of fact and conclusions of law, D.E. 320-21, 323-29. The Court reviewed the submissions in support of and opposition to the motions and held a seven-day evidentiary hearing via videoconference. The parties also provided post-hearing submissions, D.E. 320, 324, and the Court heard closing arguments, also via videoconference, on June 2, 2021. For the reasons stated below, the motion for a preliminary injunction is **GRANTED**. [1]

## I. WITNESSES

During the evidentiary hearing, the Court heard testimony from the following individuals, in order of appearance:

• Michael Maron; President & Chief Executive Officer, Holy Name Medical Center;

• Michele Nielsen; Vice President of Network Contracting & New Jersey Market Lead, UnitedHealthcare;

• Lynda A. Grajeda; Director of Contracting for Medicaid & Medicare, Amerigroup of New Jersey [2];

• Walter C. Wengel, III; Senior Director for the New Jersey Network, Aetna;

• Sue Anderson; Principal, The Chartis Group;

• Kevin Lenahan; Senior Vice President, Chief Administrative Officer, Chief Financial Officer, Atlantic Health System;

• Dr. Leemore Dafny; Plaintiff's expert in healthcare and antitrust economics [3];

• Ken Kobylowski; Senior Vice President for Provider Contracting & Network Operations, AmeriHealth New Jersey & AmeriHealth Administrators;

Case 4:23-cv-03560  Document 119-2  Filed on 01/19/24 in TXSD  Page 102 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

• Ryan Tola; President, New Jersey Division, Doyle Alliance Group;

• Robert C. Garrett; President & Chief Executive Officer, HMH;

• Warren Geller; President & Chief Executive Officer, Englewood;

• Dr. Lawrence Wu; Defendants' expert in healthcare and antitrust economics;

• Kristen Strobel; Senior Director of Global Benefits, Becton, Dickinson & Co.;

• Patrick Young; President of Population Health, HMH;

• Allen Karp; Executive Vice President of Healthcare Management & Transformation, Horizon Blue Cross & Blue Shield of New Jersey;

 **\*2** • Mark Sparta; President & Chief Hospital Executive, Hackensack University Medical Center;

• Kevin C. "Casey" Nolan; Defendants' expert in hospital operations, capacity and strategic planning;

• Dr. Gautam Gowrisankaran; Defendants' expert in the areas of industrial organization, economics and econometrics in the healthcare industry;

• Dr. Stephen Brunnquell; President, Englewood Health Physician Network;

• Dr. Gregg Meyer; Defendants' expert in the area of healthcare quality, population health and value-based care;

• Lisa Ahern; Defendants' expert on cost savings and efficiencies for healthcare provider transactions; and

• Dr. Patrick Romano; Plaintiff's rebuttal expert on healthcare quality. [4]

## II. BACKGROUND, EVIDENCE, and FINDINGS OF FACT

Defendants Englewood and HMH both have hospitals in Bergen County, a densely populated county in northern New Jersey. Englewood operates a single hospital, while HMH has two in the county, including one that it owns with a non-party partner.

Hospitals provide inpatient and outpatient care. Outpatient care generally refers to a same-day medical service, whereas inpatient care requires an overnight stay. Tr. at 48:11. [5] The focus of this case is inpatient care, specifically inpatient GAC services. As to inpatient GAC services, the type of care is divided into four categories: primary, secondary, tertiary, and quaternary care. The categories reflect the level of complexity of care; primary care is the least complex and quaternary care is the most complex. On average, patients need primary and secondary care more frequently than the higher levels of tertiary and quaternary care. Tr. at 49:7-19. For example, delivery of a baby without complications is considered primary care. A C-section, by comparison, reflects secondary care. A baby born with medical complications requiring neonatal treatment receives tertiary care. Tr. at 49:23-9. Quaternary care includes complex procedures such as organ transplants and high-end cancer care. Tr. at 73:23-25; 736:15-19. Hospitals that provide only primary and secondary care are often referred to as community hospitals (although some witnesses used community hospital to refer to an entity that also provided limited tertiary services). *See, e.g.*, Tr. at 46:24-47:6.

### A. Healthcare Providers

 **\*3** The following hospitals and healthcare systems are relevant to the Court's analysis: (1) Englewood; (2) Hackensack University Medical Center; (3) Pascack Valley Medical Center; (4) Holy Name Medical Center; (5) Valley Hospital Medical Center; (6) Bergen New Bridge Medical Center; (7) Palisades Medical Center; (8) Mountainside Medical Center; (9) St. Joseph's Hospital (2 locations); (10) St. Mary's General Hospital; (11) RWJBarnabas Health; (12) Atlantic Health System; and (13) New York city hospitals, including New York Presbyterian, Hospital for Special Surgery, Mt. Sinai, and Memorial Sloan Kettering.

### 1. Bergen County Hospitals

Defendant Englewood is a high-quality, community teaching hospital in Bergen County. Englewood provides primary, secondary, and some tertiary care, including cardiac and cancer surgery programs. Tr. at 845:13-19, 24-25; 845:25-846:3; 865:12-13. Englewood is licensed for 531 beds and is currently able to operate 350. Englewood, however, frequently operates under its 350-bed capacity. For example, the day before Englewood's President & Chief Executive

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 103 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

Officer Warren Geller testified in this matter, Englewood's census was just 222 patients. Tr. at 847:20-848:16. As to payor mix, about half of Englewood's patients use government programs, such Medicare and Medicaid, while the other half have commercial insurance. Tr. at 849:14-18. Of the commercially insured patients, approximately 55% are Bergen County residents. The remaining 45% come from Hudson, Essex, Passaic, and Rockland counties, which all border Bergen County. Tr. at 850:2-6. About half of Englewood's revenue is generated from patients outside of Bergen County. Tr. at 851:3-5. Englewood's growth over the last several years has come from counties other than Bergen County. Tr. at 850:11-18.

Defendant HMH's flagship hospital, Hackensack University Medical Center ("HUMC"), is also located in Bergen County, approximately five miles from Englewood. HUMC is licensed for 781 beds and has 711 operational beds. Tr. at 1148:9-13. HUMC is the busiest hospital in New Jersey and more than 50% of HUMC's commercially insured patients come from outside of Bergen County. Tr. at 735:3-17; 783:10-14. HUMC is HMH's only hospital that performs complex tertiary and quaternary care, in addition to primary and secondary care. Tr. at 735:3-17. HUMC is considered an academic medical center. According to Robert C. Garrett, HMH's President & Chief Executive Officer, this means that in addition to providing complex tertiary and quaternary care, HUMC is focused on academics, research, and innovation. Tr. at 735:6-20. Nevertheless, there is a high overlap in the inpatient GAC services provided by HUMC and Englewood. [Redacted].

HUMC is currently adding a new tower to its hospital complex, which was described as a "modernization project" and was referred to during the hearing as the "Second Street" project. Tr. at 1150:23-1151:6. The Second Street project will (1) replace the currently 40-year-old operating room platform with larger operating rooms that can house equipment and technology used for complex tertiary and quaternary care; (2) convert existing medical-surgical ("med-surg") beds into private rooms; and (3) add twenty-two new intensive care unit ("ICU") beds. Tr. at 1151:6-18. HUMC started planning the Second Street project in 2012 and, at the time of the hearing, anticipated that it would be ready for partial occupancy in approximately 18 months. Tr. at 1151:21-25.

HMH also co-owns, with Ardent Health Services ("Ardent"), Pascack Valley Medical Center ("Pascack Valley"). Tr. at 769:6-9. Pascack Valley is the smallest acute care community

hospital in Bergen County, providing primary and secondary care, Tr. at 57:12-19; 768:16-18, but not tertiary care. Tr. at 768:17-18.

**\*4** Holy Name Medical Center ("Holy Name") is also in Bergen County. Tr. at 44:19-20. Holy Name is a Catholic sponsored community hospital that provides primary and secondary care services. Tr. at 47:2-6. At least 80% of Holy Name's inpatient admissions come from within Bergen County. Tr. at 52:18-21. Michael Maron, Holy Name's President & Chief Executive Officer, believes that this is because people want convenient, consistent care that is readily available. Tr. at 52:25-6. Englewood is approximately five miles northeast of Holy Name, and there is a significant overlap in the geographic range of patients that the two hospitals service. Tr. at 56:5-15. With the exception of Englewood's tertiary care offerings, the two hospitals offer virtually identical services and are roughly the same size. Tr. at 55:25-56:4; 57:17-18. HUMC is five miles west of Holy Name. Tr. at 57:4-5. Because of the overlap in services and location, Holy Name views Englewood and HUMC as its primary competitors. Tr. at 86:10-23; 87:19-25.

Valley Hospital Medical Center ("Valley") is another hospital in Bergen County. Valley is the second largest hospital in the county, and offers primary, secondary, and limited tertiary care. Tr. at 59:1-3. Valley Hospital is currently located in Ridgewood, New Jersey but is relocating to a new facility about two miles east, in Paramus, New Jersey. Tr. at 88:5-17. Valley's new location is a modernization project; [Redacted] Tr. at 88:13-14; 89:5-13. The project is nearing completion. The new construction will ultimately take Valley over five years to complete and is estimated to cost more than $750 million. Tr. at 449:13-23. Because of the location, Garrett believes that Valley's new hospital will make it a stronger competitor in the region. Tr. at 776:20-25.

Bergen New Bridge Medical Center ("New Bridge") is a government-run, county-owned hospital in Bergen County. New Bridge is predominately a long-term care facility for behavioral health but has a small acute care component that largely services its long-term care residents. Tr. at 59:20-60:3. New Bridge has a new management team that is investing in the facility and recently started to accept commercially insured patients. Tr. at 864:2-9.

### 2. Health Systems

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 104 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

As noted, HMH is the largest healthcare system in New Jersey. HMH was formed after Hackensack University Health Network and Meridian Health merged in 2016. Two additional large health systems play a significant role in the northern New Jersey marketplace, although neither has a hospital in Bergen County: RWJBarnabas Health ("RWJBH") and Atlantic Health System ("Atlantic"). RWJBH has numerous facilities throughout New Jersey, including Saint Barnabas Medical Center, an academic medical center in Essex County. Tr. at 1108:1-8. In 2017 and 2018, RWJBH was the market share leader within Bergen, Essex, Hudson, and Passaic Counties. DX3213-019. [6] According to Garrett, RWJBH is HMH's strongest competitor even though RWJBH does not have an inpatient hospital in Bergen County. Tr. at 774:23-12; 777:16-19. Atlantic has five hospitals: Morristown Medical Center and Chilton Medical Center, which are both in Morris County; Overlook Hospital in Union County; Newton Medical Center in Sussex County; and Hackettstown Medical Center in Warren County. Tr. at 434:1-10. Morristown Medical Center is also an academic medical center. Tr. at 1108:9-13. Although Atlantic does not have a hospital in Bergen County, it is affiliated with an urgent care facility in the county through a joint partnership. Tr. at 434:11-13; 436:17-437:7. [Redacted]

### 3. Non-Bergen County Hospitals

**\*5** Turning to facilities outside of Bergen County, Palisades Medical Center ("Palisades") is in Hudson County, just south of the Bergen County line. Palisades is owned by HMH and provides primary and secondary care. Tr. at 768:16-18; 769:1-3. HMH also co-owns Mountainside Medical Center with Ardent. Tr. at 769:6-9. Mountainside is a community hospital in Essex County that provides primary and secondary care. Tr. at 768:16-18; 769:1-3. St. Joseph's Hospital and Medical Center is in Paterson, New Jersey and St. Joseph's Wayne Hospital is in Wayne, New Jersey. Wayne and Paterson are both in Passaic County, and both hospitals are within 10 miles of HUMC. Tr. at 775:17-25. St. Mary's General Hospital is an additional for-profit hospital in Passaic County. Tr. at 80:24-6.

Certain New York City hospitals are also relevant. New York Presbyterian, Hospital for Special Surgery ("HSS"), Mt. Sinai, and Memorial Sloan Kettering ("MSK") were mentioned most frequently during the hearing. Although no party denies that some New Jersey residents receive primary and secondary care at New York hospitals, the witnesses

largely view these hospitals as providing high-end, specialty care (more complex tertiary and quaternary care) to New Jersey residents. Tr. at 73:20-74:5; [Redacted]; 397:1-10. As to outmigration – that is, New Jersey residents seeking medical care at a New York hospital, *see, e.g.*, Tr. at 767:10-11 – less than 30,000 New Jersey residents were discharged from a New York hospital in 2018. DX3601-16.

New York City hospitals are also establishing a physical presence in New Jersey, which the parties refer to as "front doors." MSK and HSS, for example, have outpatient facilities in Bergen County, and Mount Sinai has affiliations with Holy Name and Valley. Tr. at 779:20-780:13. Other New Jersey health systems, such as Atlantic, do the same. These outpatient facilities – the front doors – are intended to steer patients requiring inpatient care to an affiliated hospital. Tr. at 780:14-16; 780:21-25. The parties, however, failed to provide any evidence demonstrating that the outpatient facilities actually materially impact inpatient admissions. [7] In fact, [Redacted], stated that the number of patients that ultimately came to [Redacted] hospital for inpatient care after visiting one of its [Redacted] facilities accounted for [Redacted] of [Redacted] total inpatient admissions over a 1.5-year period. [Redacted]. With respect to the number of patients who were initially treated at the Bergen County [Redacted] facility and received subsequent inpatient or outpatient care at [Redacted] hospital, [Redacted] indicated that the number was [Redacted] to [Redacted] utilization strategy. [Redacted].

The parties also consider physician practice groups to be a driver of inpatient admissions. For example, Geller appeared to attribute Englewood's overall growth to its expanding physician network, the Englewood Health Physician Network. Englewood's physician network is "robust," encompassing over 500 physicians in five different counties. In fact, [Redacted] of Englewood's revenue comes from its outpatient services. Tr. at 872:4. Moreover, these 500 physicians, who are fully integrated into the Englewood network, funnel care to Englewood's hospital. Tr. at 852:11-14; 853:6-12; 1311:1-10. Dr. Stephen Brunnquell, President of the Englewood Health Physician Network, explained that the physician network is also a "front door" to the hospital. Tr. at 1309:18-1; 1313:4-5.

### B. Insurance Companies & Plans

**\*6** Private (or commercial) insurance companies play a major role in the United States' healthcare system and are

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 105 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

the payors at issue here. Within New Jersey, the four major commercial insurance companies, from largest to smallest, are Horizon Blue Cross & Blue Shield of New Jersey ("Horizon"), UnitedHealthcare ("United"), Aetna, and Cigna. Tr. at 1024:6-10. Within the commercial insurance sphere, each insurance company offers fully insured and employer-sponsored (or self-insured) plans. For a self-insured product, the employer bears the financial responsibility for the medical expenses that are incurred on behalf of its covered employees, and the employer typically pays the insurance company a fee to administer the plan. Tr. at 151:13-22; 1104:16-22. For a fully insured plan, the insurance company bears the risk if the medical expenses exceed the premium paid by the employer. Tr. at 151:23-152:5. [8]

Medical providers and facilities contract with insurance companies to be in the plan's "network." If a provider goes "out of network," the provider is no longer a participating provider in that insurance company's product or plan. Tr. at 1038:14-21. Each insurance company witness spoke to the importance of a network, which includes physicians, other providers, facilities (including hospitals), and other services that are offered to plan users. Each insurance company witness also testified that a network is "an integral component of the products" offered by the company. *See, e.g.*, Tr. at 152:13-25. Of critical importance is a network with a full scope of services and providers that are well-dispersed geographically. *See, e.g.*, Tr. at 153:19-23; 156:19-25; 335:24-336:4 (explaining that Aetna wants a "big network presence" that does not have any "holes"). Individual members, and therefore plan purchasers, also want access to care that is geographically convenient. [9] *See, e.g.*, Tr. at 155:9-15. If an insurance company does not provide an attractive network, the insurance company will not be able to sell the plan. *See, e.g.*, Tr. at 154:16-19.

At the same time, healthcare providers and facilities want to be in-network because, among other things, it increases their volume of patients. *See, e.g.*, [Redacted]. Patrick Young, HMH's President of Population Health, explained that from HMH's perspective, it is not a benefit for a provider to go out of network (or become non-participating). Young testified that if HMH went out of network with an insurance company, it would cause a significant financial hit for the organization due to lost revenue, and it would be disruptive to patients and physicians. Tr. at 1039:1-1040:4.

In New Jersey, insurance companies negotiate with health systems and hospitals on a statewide basis. This means that

all of an insurer's plan members in New Jersey have access to in-network health systems' facilities and hospitals. At the same time, counties are important considerations for insurers in developing and selling a health plan. Bergen County is an important county because of its population size and affluence. FTC FOF ¶ 19. The relevant insurers have the following number of customers in Bergen County: United has approximately [Redacted] commercial members, Tr. at 161:13-15; Aetna has [Redacted] commercial members, Tr. at 341:9-11; and AmeriHealth has about 15,000 members, Tr. at 678:6-8. All insurers who testified indicated that they could not market a plan to Bergen County residents if the plan did not include a Bergen County hospital.

**\*7** The Court heard a great deal of testimony about HMH's experience with commercial insurance companies, both from HMH's view and from the perspective of the insurance companies. HMH negotiates with commercial insurers "as a fully integrated network," that is, on a system-wide basis. Tr. at 1024:19-25. This means that HMH negotiates for a consistent (or the same) rate increase across all its facilities. The base rate of each facility, however, differs. Tr. at 1026:15-22. Accordingly, the actual rate charged by each specific HMH facility is not uniform across HMH's system although each facility's percentage rate increases are the same. In addition, the rates HUMC charges insurers for GAC services are substantially higher than the rates that Englewood charges. On an adjusted case-mix basis, [Redacted]. [10] DX5001, ¶ 162.

The commercial insurance witnesses who testified in this matter largely described their negotiations with HMH as difficult. [Redacted], from [Redacted] believed that HMH's position during [Redacted] last negotiations with HMH in [Redacted] were "as close to take it or leave it as I've seen in the marketplace without much justification." [Redacted] further believed that HMH's most recent rate increases were [Redacted] than those of other health systems in New Jersey. [Redacted], explained that after [Redacted]' [Redacted] discussions for the [Redacted] contract with HMH hit a "stalemate," the final rates were only agreed to [Redacted]. In [Redacted] years with [Redacted] had never seen negotiations escalate in such a manner. [Redacted] stated that the ultimate rate was [Redacted] of what [Redacted] typically agrees to for similarly situated hospitals. [Redacted]

From HMH's perspective, Young stated that HMH never gets everything that it wants when negotiating with insurance companies and believes that the commercial insurance

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 106 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

companies have significant leverage. Tr. at 1043:22-23; 1048:2-1050:2. Young also indicated that HMH never negotiates on a take-it-or-leave-it basis, Tr. at 1043:19-21, but an email provided by the FTC seems to suggest otherwise. PX1241. In the first paragraph of this email, which was sent by a HMH employee to [Redacted] on [Redacted], the HMH representative wrote: "[Redacted]." *Id.* [Redacted]" *Id.*

In addition to rates, the other sticking point in HMH's recent negotiations with private insurers involves language in certain contracts about rates after an HMH acquisition (the "Acquisition Clause"). The Acquisition Clauses predates HMH and appeared in legacy Meridian's contracts with certain commercial insurers. Through the Acquisition Clause, when HMH acquires an entity, the new facility moves to the same rates as HMH's similar facilities within a certain time frame. Tr. at [Redacted]; 1036:5-14. In other words, once HMH acquires a facility, that facility can charge insurers more than it used to, pursuant to the Acquisition Clause.

After the FTC filed its opening brief in this matter pointing to the Acquisition Clause, HMH informed insurers that it was waiving the Acquisition Clause for the Englewood merger. Young was not aware of [Redacted], [Redacted], [Redacted]. [Redacted]. The Acquisition Clause has had a substantial financial impact on [Redacted] After HMH acquired JFK University Medical Center, it cost [Redacted] more per year; after HMH acquired Raritan Bay Medical Center, it cost [Redacted] more per year. [Redacted] As a result, during the [Redacted] negotiations, [Redacted] asked [Redacted]. [Redacted] testified that HMH [Redacted] The Acquisition Clause was also a major sticking point with [Redacted] negotiations. [Redacted], however, had [Redacted]. [Redacted]. When HMH previously acquired the Carrier Clinic, HMH and [Redacted] could not agree as to whether [Redacted]. The classification impacted [Redacted]. As a result, HMH [Redacted]. Ultimately, HMH's acquisition cost [Redacted] and additional [Redacted]. [Redacted].

**\*8** Horizon is the largest insurer in New Jersey and provides both commercial and government-sponsored plans. Horizon's commercial plans account for approximately 60 % of its business in New Jersey. Tr. at 1092:8-1093:5. Although numerous insurance companies have had challenges with HMH, Horizon did not voice the same concerns and supports the proposed merger. DX1101. In fact, after the HMH and Englewood merger was announced, Allen Karp, Horizon's Executive Vice President of Healthcare Management and Transformation, sent Young a letter indicating that Horizon

supported the merger. [11] DX1101. Karp did so at the request of HMH. Tr. at 1133:12-15.

In the letter, Karp explained that the merger allows Englewood to "focus on tertiary care for residents of Bergen County" and provide Englewood's patients with access to coordinated quaternary care within the HMH system. DX1101. Karp also stated that HMH's ability to expand quaternary care would "have the added benefit of keeping care in New Jersey." *Id.* Karp does not believe that the merger would increase HMH's bargaining leverage with Horizon. Tr. at 1103:16-24. At the same time, [Redacted]. Tr. at 1116:19-22. In addition, Karp is not aware what tertiary care will be provided at Englewood post-merger, or how HMH intends to keep quaternary care patients in New Jersey after the merger. Tr. at 1128:12-1129:5.

The Court does not give Karp's letter much weight. It was written at the request of HMH and while long on superlatives, it is short on supporting information or analysis.

## C. The Proposed Merger

In April 2018, Englewood's Executive Committee and Board's outside counsel retained a consultant, The Chartis Group ("Chartis"), to assist with Englewood's strategic planning. Geller explained that he [Redacted] Tr. at 871:15-18; 384:6-9. Geller continued that Englewood had and has [Redacted] but it would be [Redacted]. Tr. at 871:21-25. Englewood also had [Redacted], and wanted an [Redacted]. Tr. at 872:3-19.

The Court also heard about Englewood's strategic planning process, which led to the proposed merger, from Sue Anderson, a Principal at Chartis. Tr. at 383:4-5. Chartis's work was divided into two phases; Anderson was highly involved in both. Tr. at 386:17-22.

In Phase I, Chartis looked at whether Englewood could achieve its strategic goals by itself or whether it needed a "stronger affiliation with another health system." Tr. at 386:23-387:3. Chartis presented its Phase I work to the Executive Committee in June 2018. PX2079. Chartis identified Englewood's key local competitors within Englewood's primary service area ("PSA") [12] : HMH accounted for 34% of inpatient discharges; Englewood for 15%; [Redacted]. No other New Jersey hospital in the region had a percentage of discharges larger than 7%. Tr. at

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 107 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

391:9-392-18; 06:14-16; PX2079-16. In addition, about 8% of patients in Englewood's PSA sought care at a New York facility but the outmigration was for relatively complex care. Tr. at 396:12-397:10.

**\*9** At the time, Englewood and HMH had a limited relationship related to a Horizon narrow network insurance product. [13] PX2079-70. During its Phase I presentation, Chartis determined that the most likely future market scenario was that [Redacted]. Tr. at 389:9-399:10; PX2079-71–PX2079-72. Chartis identified other threats to Englewood's patient share, which included competition from New York health systems moving into the New Jersey arena (through "front doors") and the new capital projects at Valley and [Redacted] (*i.e.* Valley's new hospital and [Redacted]). PX2079-006. Ultimately, Chartis recommended that it would "be an opportune time for [Englewood] to explore [a] partnership opportunity, a strong affiliation." Tr. at 399:13-20. After Chartis presented its Phase I work, the Englewood Board [Redacted]. Tr. at 873:23-25.

In Phase II, Chartis helped Englewood find a partner. Chartis initially identified five potential partners: HMH; [Redacted]; [Redacted]; [Redacted]; and [Redacted]. Tr. at 399:22-400:12. Chartis met with all five, and Englewood representatives attended some of the meetings. Tr. at 400:13-15; 486:6-9.

Chartis also established a data room to enable Englewood and its potential partners to share information. Tr. at 401:10-16. When Englewood was first informed about the data room, Anderson suggested [Redacted] PX2311-002. Within the same email chain, an Englewood executive expressed concern over [Redacted] PX2311-001. Geller responded to this email with [Redacted] and then directed that the recipient have [Redacted]. *Id.*

During the hearing, however, HMH and Englewood downplayed the fact that they are competitors. *See, e.g.,* Tr. at 781:12-782:1 (Garrett explaining that HUMC only competes with academic medical centers in New Jersey and New York City); Tr. at 859:22-25 (Geller stating that Englewood does not compete with HUMC). HMH and Englewood's mantra during the proceeding was that they are complements rather than competitors. The email chain and other ordinary course documents discussed below, however, demonstrate otherwise. *See, e.g.,* PX2291-004 (in a Q&A document that Englewood drafted after the merger was announced, one of the questions was "For a long time, Hackensack has been a fierce but

respected competitor. So how do we now become partners and colleagues?"). Accordingly, the Court finds that Englewood and HUMC do in fact compete for patients who receive the primary, secondary, and tertiary services provided at both hospitals and that they view themselves as competitors.

Chartis and certain Englewood Executive Committee members met with HMH representatives on November 26, 2018. After the meeting, Chartis compiled feedback that it had received from Englewood's representatives. Tr. at 487:11-16; PX2325. Comments included the following: "[Redacted]." PX2325 at 3. Anderson explained that there was concern that [Redacted]. Tr. at 489:16-21. Another Englewood attendee commented that "[Redacted]." PX2325 at 3.

As Phase II continued, [Redacted] withdrew from consideration. Tr. at 512:23-25; 874:15-22. [Redacted] provided a formal bid to Englewood, but the Englewood Board voted in January 2019 not move forward with [Redacted]. Tr. at 512:7-18; 874:23-875:7. Geller stated that Englewood rejected [Redacted] offer because [Redacted]. Tr. at 875:9-24. [Redacted] testified that Englewood was concerned that [Redacted] was not [Redacted]. [Redacted]. Next, in February 2019, [Redacted] and Englewood mutually decided not to move forward, Tr. at 490:10-19; 513:1-5, leaving HMH and [Redacted] as the two remaining potential partners.

Turning to HMH, as it was developing its proposal to Englewood in February of 2019, James Blazer wrote an internal email addressing Chartis's follow-up questions to HMH. PX1061-001. Blazer is the Chief Strategy Officer at HMH and "one of the key [HMH] executives that was involved with the transaction." Tr. at 823:9-12. In the email, Blazer wrote that HMH wanted to [Redacted]. The email continued that Englewood "[Redacted]." *Id.* Five days later, Garrett sent by email, a letter to Chartis responding to Englewood's follow-up questions. PX1042. [14] Blazer was copied on the email, and the letter used a similar structure and language as that in Blazer's email. *Id.* Garrett began the letter by explaining that a partnership will allow HMH to build on its successes and offer more advanced care. Garrett wrote that "HMH is confident that we can sustain or more likely grow EH's current high volume and increase its case mix index." *Id.* But he then stated that "a formal partnership would allow [Englewood] *to continue* to reap the benefits of the Horizon Omnia contract, as well as the Medicare Shared Savings Plan." *Id.* (emphasis added). In other words, HMH approached the Englewood negotiation not only with a kind

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 108 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

word (potential benefits to Englewood) but also a gun (a threat to ending the affiliation with HMH).

 **\*10** On March 28, 2019, Chartis presented the offers from HMH and [Redacted] to the Executive Committee. In comparing the two entities as potential partners, Chartis noted that a "pro" of choosing HMH is that it would "[Redacted]" PX6004-009. Relatedly, a "con" for [Redacted] was that a partnership with [Redacted]" *Id.* As a "con" for HMH, Chartis indicated that "[Redacted]." *Id.*

Next, in reviewing the differences for clinical services in the two bids, the HMH offer contained several specific numerical commitments regarding the number of transfers and patients that HMH would send to Englewood and outlined certain intended capital improvement projects. The [Redacted] offer did not provide the same level of detail. *Id.* at 004. Anderson, however, explained that Englewood wanted [Redacted] from HMH [Redacted]. Accordingly, Englewood explicitly asked Chartis to raise this issue with HMH. Anderson did not recall asking [Redacted] for a similar level of detail and did not believe that Englewood asked for such information from [Redacted]. Tr. at 516:22-517:15; 529:1-16. Anderson explained that if Englewood had wanted similar detailed plans from [Redacted], [Redacted]." Tr. at 516:6-15. Geller, however, testified that Englewood had Chartis [Redacted]. Tr. at 876:17-877:15; *but see* DX0103 (Englewood's "deal asks" which does not include any questions about [Redacted] at Englewood). The Court credits Anderson's recollection. She was the point person on the deal asks, and the [Redacted] requested from HMH is consistent with [Redacted]. No such similar concerns were raised as to [Redacted].

Finally, [Redacted] intended to provide [Redacted] million in "fresh" capital within the [Redacted], with a total capital contribution of [Redacted] million over [Redacted]. HMH intended to provide [Redacted] in "fresh" capital, with a total capital contribution of [Redacted] over an [Redacted]. PX6004-006. Geller stated that on paper, the [Redacted] offer looked significant but that after the Board studied the offers, it determined that the HMH offer was better. With the [Redacted] offer, money that the Englewood Foundation [15] raised would decrease [Redacted]s contribution and [Redacted] that would boost Englewood's bottom line and balance sheet. Tr. at 882:11-883:10. But again, it appears that [Redacted] did not give [Redacted] because Englewood did not ask. As for the HMH offer, Geller explained that Garrett gave his commitment that [Redacted]

and that this was ultimately put into the final agreement. Tr. at 883:11-884:-2.

Once Englewood chose HMH as its partner, the parties negotiated the precise terms of the merger. On September 23, 2019, HMH and Englewood entered into the Definitive Agreement (the "Agreement"), under which HMH will become the sole member and ultimate parent of Englewood. DX3800. The Agreement sets forth numerous specific commitments and provides a level of detail that is not typically seen in a merger agreement. Tr. at 744:15-18.

The Agreement states that Englewood "will play a critical role as a tertiary hub in the HMH Northern Region." DX3800, § 3.1. HMH agreed that Englewood would continue as a separate legal entity for at least 10 years with its own board of trustees. *Id.* HMH also agreed to provide Englewood with a $404,500,000 capital investment for specified projects (with 60% coming in the first 4 years) and $5,000,000 in operating funds per year for seven years, beginning three years after the closing date. *Id.*, § 3.5.2.

 **\*11** During the hearing, Defendants pointed to Exhibit C to the Agreement, entitled "Clinical Initiatives," as evidence of firm commitments that HMH was making to Englewood. *Id.*, Ex. C. There are 27 total commitments, but numbers 20-27 are "operational commitments" which require HMH to use its "best efforts" and to which the Englewood Trust [16] has no "right to enforce[.]" *Id.* Moreover, closer inspection of the first 19 "firm commitments" reveals that they, for the most part, do not promise much except to explore, assess, or collaborate on different issues, or make "regional" improvements. *Id.* There are, however, a few firm commitments: Englewood will become part of HMH's regional transfer center; Englewood will get a new robot; HMH [Redacted] at Englewood; and HMH's capital commitment will be earmarked for certain projects. *Id.* The non-enforceable operational commitments (20-27) address, among other things, actual increases in patient volume ([Redacted]). *Id.*

While Defendants touted increased inpatient admissions at Englewood as a result of the merger, the Agreement also contemplates the opposite effect. If Englewood's volume in certain service lines [Redacted], then Englewood's "Trust Board" has some limited remedies. *Id.*, §§ 3.2.1, 3.2.3. After a number of cumbersome steps and arbitration, the Trust Board can only require HMH to engage a healthcare consultant to develop a "further revised Action Plan" that has to be

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 109 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

approved by the post-closing boards. *Id.* And if that revised plan is not properly implemented, then the Trust Board can return to arbitration after a meet-and-confer period. *Id.*

Garrett explained that with the merger, HMH plans to "optimize services between the two organizations" and convert Englewood to its tertiary hub in the northern New Jersey region. Tr. at 743:2-8. This conversion will alleviate "significant capacity issues at HUMC," and allow HMH to expand HUMC as a quaternary academic medical center that provides the highest level of care in New Jersey. Tr. at 743:15-20; *see also* 763:3-9. Garrett further explained that there are specific commitments in the Agreement because "they're the basis of how we're going to transform care" and are the basis of the "optimization of services." Tr. at 743:25-744:5. According to Garrett, these commitments are "the centerpiece" of the merger so it was "important to put it right in the definitive agreement." Tr. at 745:12-14. [17]

After the Agreement was signed, Englewood and HMH formed multiple committees, which were overseen by the Steering Committee, to create a plan to implement the Exhibit C commitments upon consummation of the merger. Tr. at 1315:17-22. Garrett stated that the Steering Committee "met regularly" after the Agreement was signed but acknowledged that there was a "significant pause" due to the COVID-19 pandemic because "people's attentions were 100 percent dedicated to taking care of COVID patients." Tr. at 795:14-21. Mark D. Sparta, the President and Chief Hospital Executive at HUMC, believed that between March 2020 and March 2021, the surgical, physician and cardiac integration teams "[Redacted]" [Redacted]. Tr. at 1172:24-25. Dr. Brunnquell, President of the Englewood Health Physician Network, testified that as of October 2020, the clinical teams had stopped meeting, but the Steering Committee continued to do so. Tr. at 1329:8-19. Dr. Brunnquell also indicated that much of the planning work was suspended because the committees had done as much as they could prior to the actual closing of the deal. Tr. at 1328:18-1329:4.

The initial work product from the Steering Committee was the first draft of the "HMH-Englewood Health Service Optimization Framework" (the "Optimization Plan"), dated February 26, 2021. Tr. at 794:9-10. A second draft was produced shortly thereafter. The most recent Optimization Plan is dated March 31, 2021. DX3601. By the time this document was produced, not only had discovery been underway in this matter, but several key witnesses had already been deposed. The Optimization Plan discusses "persistent

capacity constraints" at HUMC that HMH cannot address without a merger with Englewood. DX3601-006, 007. Of course, the parties had already agreed to the merger in September 2019 so this after-the-fact justification is, at best, odd. For the reasons stated in the Analysis section below, the Court gives the Optimization Plan little weight. Nevertheless, the Court reviews below some of the statements in the Optimization Report in light of other evidence.

**\*12** Sparta discussed the capacity challenges at HUMC. Sparta explained that the long-standing capacity problems stem from a shortage of med-surg beds in the facility, which are general adult hospital beds. This causes backups in the emergency department, operating rooms, and the intensive care unit, as patients in these department are typically moved to med-surg beds for continued care. Tr. at 1143:2-15; 1143:24-16; 1145:9-10; 1145:6-10. The average occupancy of med-surg beds at HUMC ranges between 90 to 94% of HUMC's actual capacity over the last four years. Tr. at 1144:19-22. The industry standard for hospital occupancy is 85%. Tr. at 1186:16-18.

Critically, HMH does not point to any ordinary course documents discussing HUMC's capacity challenges before Englewood sought a merger. Englewood, not HMH, initiated the process to achieve its strategic goals. Moreover, others in the industry were not aware of any severe capacity issues – HUMC never declined transfers and has not gone on divert in several years. *See, e.g.,* Tr. at 90:10-22 (Maron stating that he was not aware of capacity issues at HUMC, that HUMC had never turned away a transfer from Holy Name, and that he did not believe that HUMC's emergency department has gone on divert in the last eight or ten years); [Redacted] ([Redacted] explaining that [Redacted] was not aware of any severe capacity issues at HUMC and would have expected to hear about it if that were the case); Tr. at 1127:10-22 (Karp stating that he was not aware of any severe capacity issues at HUMC and that because of his position he would have expected that he would have known of such a problem).

The Optimization Plan states that in order to alleviate the capacity problems at HUMC, HMH plans to shift and redirect certain tertiary care from HUMC to Englewood. HMH plans to redirect non-complex tertiary cases to Englewood as soon as the merger is finalized and has identified a number of cases that can annually be redirected from HMH's other hospitals in the region, including HUMC. DX3601-011. While HUMC plans to transfer cases to Englewood on the first day that the merger becomes effective, HUMC does not currently

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 110 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

do so because Englewood is a competitor and Englewood would lose the revenues of the transferred case. PX7004–189—PX7004-190. Although there is no legal impediment to such transfers, [18] HUMC has a legitimate business reason for not doing so. At the same time, the fact that such legitimate financial considerations are dispositive undercuts other claims by Defendants, such as Garrett's indication that HMH's strategy is "New Jersey First," that is, to improve healthcare for New Jersey residents, as Defendants indicated that capacity constraints can have a deleterious impact on care. Tr. at 768:4-9. If HMH's primary concern was New Jersey first, it seems that it would currently transfer patients away from HUMC to alleviate its capacity constraints.

In addition, several witnesses called into question the number of patients that HMH could transfer on its own accord. For example, Sparta explained that about 70% of HUMC's medical staff are not HUMC employees, so HUMC cannot control where the non-staff physicians admit their patients. Tr. at 1147:22-1148:6; *see also* Tr. at 123:22-124:7 (Maron explaining that hospitals do not refer patients to hospitals, physicians do). In addition, when HMH first started looking into the specific number of patients that it could commit to transferring to Englewood, Sparta stated in a March 24, 2019 email that "[Redacted]." [Redacted]. At the hearing, Sparta explained that after he sent the email, HMH [Redacted]. Tr. at 1178:8-18. But notably, Sparta did not [Redacted] in his email. Finally, Defendants' expert witness in hospital operations, capacity, and strategic planning, Kevin C. "Casey" Nolan, also stated that because 80% of the physicians on staff at HUMC are independent, "it's very difficult for HUMC to dictate to them where they want to admit their patients." Tr. at 1215:10-17. Nolan acknowledged that "transfers, frankly, are a last resort." Tr. at 1215:16-17.

**\*13** In addition, the Optimization Plan notes that annually, 50 NICU patients will be redirected from HUMC to Englewood. DX3601-011. But again, other testimony undercuts this representation. Geller conceded that Englewood needs a new, updated NICU to alleviate space and noise issues. Tr. at 915:10-20. And Brunnquell stated that Englewood's NICU is "an older unit" that "would not meet the current code." Tr. at 1321:7-9. Finally, Nolan explained that "[m]oms can and do shop for their physician and the hospital they want to deliver at and they've chosen HUMC, so the ability to transfer those patients is probably not very high." Tr. at 1215:1-4.

The Optimization Plan also states that the Second Street project (referred to as the "Helena Theurer Pavilion") "will not alleviate HUMC's capacity challenges." DX3601-008. Nevertheless, the construction project expands HUMC's existing footprint. The project will result in [Redacted] new operating rooms, and HUMC plans to [Redacted] operating rooms. Tr. at 1173:25-1174:9. The new tower will also have [Redacted] new ICU beds, and HUMC plans to [Redacted] of its existing ICU beds. Tr. at 1175:9-14. In addition, the tower will have space for [Redacted] additional ICU beds that can be added if the need arises. Tr. at 1175:15-18. Finally, the new tower will have [Redacted] new private med-surg beds, and HMH plans to [Redacted]. HUMC's plan to [Redacted] cuts against its capacity claims, as does the fact that it is not currently [Redacted].

Finally, Defendants tout the cost savings that will result from this merger. Neither the Steering Committee, nor HMH or Englewood independently did any work, outside of this litigation, to assess the cost savings that may be incurred by transferring patients to Englewood after the merger. Tr. at 796:19-25. Defendants also state that their plan to optimize care between the two hospitals will reduce the need for patients to seek services at the more expensive New York hospitals. Tr. at 766:4-21; DX3601-016.

As to cost savings from the merger, Defendants largely rely the testimony of Lisa Ahern, Defendants' expert witness on cost savings and efficiencies for healthcare provider transactions. Ahern identified eleven categories of cost saving categories that she anticipates will result from the merger. The first eight categories address cost savings caused by corporate restructuring, such as reducing staffing redundancies and streamlining the supply chain between the two entities. Ahern referred to the remaining three categories as "ancillary services," and these are more patient "facing." Tr. at 1385:22-1386:10. Ahern opined that by four years after the merger closes, there will be $38 million in annual recurring efficiencies. Tr. at 1386:23-1387:2. Critically, however, Ahern failed to conduct any analysis as to what percentage of the identified cost savings would be passed on to commercial insurers. Tr. at 1402:16-18. Similarly, HMH has a history of mergers and acquisitions. The corporate restructuring cost savings should, to some degree, result from any merger or acquisition. But HMH failed to present any evidence of its historical performance as to the relevant cost savings being passed on to commercial insurers.

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

One final note, no party disputed that HMH, as a large health system, and HUMC, as a large academic center, are more desirable to insurers than Englewood. This fact is reflected in the large price differential for services between HUMC and Englewood; in other words, Englewood is not nearly as important to an insurer as HUMC. [Redacted].

The extensive expert testimony from economists is discussed below.

### III. PROCEDURAL HISTORY

**\*14** After HMH and Englewood entered into the Agreement, the FTC filed an administrative complaint against HMH and Englewood. Through the administrative complaint, the FTC alleges that if consummated, the proposed merger violates Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the Federal Trade Commission Act ("FTC") Act, 15 U.S.C. § 45. On December 3, 2020, five FTC Commissioners voted unanimously to authorize FTC staff "to obtain preliminary injunctive relief under Section 13(b) of the FTC Act." Plf. FOF ¶ 4. The FTC filed its Complaint in this matter the following day, December 4, 2020, seeking a temporary restraining order and preliminary injunction that enjoins the merger. D.E. 1. The same day, the parties entered into a stipulated temporary restraining order, through which HMH and Englewood agreed that they would not consummate the proposed merger until after the Court rules on the FTC's motion for a preliminary injunction. D.E. 4. Then, on March 22, 2021, pursuant to the parties' case management order, the FTC filed its motion for a preliminary injunction, which sought to preserve the status quo pending a full administrative proceeding on the merits. D.E. 133. From May 10 through May 19, 2021, the Court conducted an evidentiary hearing on the FTC's motion for a preliminary injunction and heard closing arguments on June 2, 2021.

### IV. LEGAL STANDARD

Pursuant to Section 13 of the FTC Act, the FTC can file suit in district court seeking a preliminary injunction "to prevent a merger pending a FTC administrative adjudication '[w]henever the Commission has reason to believe that a corporation is violating, or is about to violate, Section 7 of the Clayton Act.' " *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 337 (3d Cir. 2016) (quoting *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 714 (D.C. Cir. 2001)). The standard for granting a preliminary injunction under the FTC Act is not the same as the standard used to grant injunctive relief under

Federal Rule of Civil Procedure 65. Rather, a court should issue a preliminary injunction pursuant to Section 13 "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b).

Under Section 13(b), a court first considers the FTC's likelihood of success on the merits. *Penn State Hershey Med. Ctr.*, 838 F.3d at 337. Next, the court weighs the equities to determine whether a preliminary injunction is in the public interest. "The question is whether the harm that the [Defendants] will suffer if the merger is delayed will, in turn, harm the public more than if the injunction is not issued." *Id.* at 352. Ultimately, in deciding whether to preliminarily enjoin a merger "doubts are to be resolved against the transaction." *Id.* at 337.

The FTC must show that it has a likelihood of success of demonstrating, during the administrative proceeding, that the proposed merger violates Section 7 of the Clayton Act. *Id.* at 337. Section 7 prohibits mergers where the effect "*may be substantially to lessen competition, or tend to create a monopoly.*" 15 U.S.C. § 18 (emphasis added). The definition of antitrust liability under Section 7 is "relatively expansive" as the language deals in "probabilities, not certainties." *Penn State Hershey Med. Ctr.*, 838 F.3d at 337 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 323 (1962)). "To stop a merger, a Section 7 plaintiff ultimately must show that a 'substantial lessening of competition' is 'sufficiently probable and imminent.' " *FTC v. Thomas Jefferson Univ.*, 505 F. Supp. 3d 522, 537 (E.D. Pa. 2020) (quoting *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 622, 623 n.22 (1974)). Thus, at the preliminary injunction stage, the FTC does not need to establish that the proposed merger violates Section 7. Rather, the FTC "need only show that there is a reasonable probability that the challenged transaction will substantially impair competition." *FTC v. Sysco Corp.*, 113 F. Supp. 3d 1, 22 (D.D.C. 2015) (quoting *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1072 (D.D.C. 1997)).

Courts use a burden-shifting framework to determine whether a merger is likely to harm competition pursuant to Section 7. The FTC must first establish a *prima facie* case by demonstrating that the merger is anticompetitive. *Penn*

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 112 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

*State Hershey Med. Ctr.*, 838 F.3d at 337. If the FTC establishes its *prima facie* case, "it creates a presumption in favor of preliminary relief." *Thomas Jefferson Univ.*, 505 F. Supp. 3d at 538. Next, to rebut the presumption, a defendant must show "either that the combination would not have anticompetitive effects or that the extraordinary effects of the merger will be offset by extraordinary efficiencies resulting from the merger." *Penn State Hershey Med. Ctr.*, 838 F.3d at 337. If the defendant successfully rebuts the *prima facie* case, "the burden of production shifts back to the Government and merges with the ultimate burden of persuasion, which is incumbent upon the Government at all times." *Id.* at 337 (internal quotation omitted).

## V. ANALYSIS & CONCLUSIONS OF LAW

### A. Likelihood of Success

#### 1. *Prima Facie* Case

**\*15** To establish a *prima facie* case, the FTC must "(1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." *Id.* at 337-38.

#### a. Relevant Market

The relevant market includes two components: the product market and the geographic market. *Id.* at 338. Appropriate market definitions are " 'critical' because a proposed merger's legality 'almost always depends upon the market power of the parties involved.' " *Thomas Jefferson*, 505 F. Supp. 3d at 539 (quoting *FTC v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 45 (D.D.C. 1998)). Thus, defining the proper relevant market is a fact-specific analysis. Here, the FTC defines the relevant product market as the cluster of inpatient GAC services offered by Englewood and HMH's Bergen County hospitals and sold to commercial insurers. [19] FTC FOF ¶¶ 13-16. Dr. Dafny, the FTC's expert in healthcare and antitrust economics, explained that (1) 97% of patient admissions at both HUMC and Englewood are for overlapping services, and that (2) 85% of the service lines offered at HUMC or Pascack Valley are offered at Englewood, while 99% of Englewood's service lines are offered at HUMC or Pascack Valley. Tr. at 556:15-21. Defendants do not meaningfully challenge the relevant product market as defined by the FTC. Accordingly, the Court adopts the FTC's proposed relevant market, and focuses on the geographic market.

"The relevant geographic market 'is that area in which a potential buyer may rationally look for the goods or services he seeks.' " *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 (*Gordon v. Lewistown Hosp.*, 423 F.3d 184, 212 (3d Cir. 2005)). Moreover, the identified relevant market "is dependent on the special characteristics of the industry involved[.]" *Thomas Jefferson*, 505 F. Supp. 3d at 539 (internal quotations omitted). Courts and the FTC frequently use the hypothetical monopolist test ("HMT") to determine the relevant geographic market. Defendants do not challenge the FTC's use of the HMT, instead they challenge the FTC's application of the test. Specifically, Defendants contend that the FTC's geographic market does not comport with commercial realities or the *Horizontal Merger Guidelines* (the "*Merger Guidelines*"). [20]

An HMT analysis starts by selecting a narrow candidate market. Then,

> if a hypothetical monopolist could impose a small but significant non-transitory increase in price ("SSNIP") in the proposed market, the market is properly defined. If, however, consumers would respond to a SSNIP by purchasing the product from outside the proposed market, thereby making the SSNIP unprofitable, the proposed market definition is too narrow.

**\*16** *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 (internal quotations omitted). A "SSNIP is typically about 5%." *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 n.1 (quoting *Merger Guidelines*, § 4.1.2). A relevant geographic market should not be broadly defined, and the HMT "is designed to ensure that candidate markets are not overly narrow." *Merger Guidelines*, § 4.

The healthcare industry is unique in antitrust cases because patients, the direct users of inpatient GAC services, do

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 113 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

not pay competitors for the services (with the exception of co-pays or other similar charges). Rather, "the healthcare market is represented by a two-stage model of competition." *Penn State Hershey Med. Ctr.*, 838 F.3d at 342. At the first stage, medical providers, including hospitals, compete to be included in an insurance plan's hospital network. At the second stage, medical providers compete to attract individual members of an insurer's plan. *Id.* at 342; *see also* FTC FOF ¶ 5; Tr. at 935:13-25. Competition at the second stage involves non-monetary factors like quality and reputation. Tr. at 550:16-551:1. Moreover, "[p]atients are largely insensitive to healthcare prices because they utilize insurance, which covers the majority of their healthcare costs." *Penn State Hershey Med. Ctr.*, 838 F.3d at 342. Accordingly, the Third Circuit has instructed that courts must focus their analysis on insurers, who are the actual payors. *Id.* The Circuit has recognized, however, that "[p]atients are relevant to the analysis, especially to the extent that their behavior affects the relative bargaining positions of insurers and hospitals as they negotiate rates." *Id.*; *see also* Tr. at 555:2-6 (Dafny explaining that patient preferences influence insurers' decisions when forming their networks). In other words, the first stage is not independent from the second stage as patients (insureds) influence decisions at the first stage. With this in mind, the Court focuses its attention on the first stage, with the understanding that the two stages cannot be completely divorced from each other. And, as noted, the Court is only focused on private (or commercial insurance) companies rather than government payors.

Here, Dr. Dafny explained that her candidate market is commercially insured patients in Bergen County. Tr. at 557:15-17. This means that any hospital that serves a resident of Bergen County is included as a market participant even if that hospital is not located in Bergen County. Tr. at 558:17-22. Dr. Dafny chose Bergen County as her candidate market for three principal reasons: (1) Englewood and HUMC are both located in Bergen County; (2) the vast majority of Bergen County residents receive care in Bergen County; and (3) Bergen County is an economically significant area for insurers. Tr. at 557:19-558:13.

The commercial insurers, including Horizon, testified that they cannot offer a marketable plan in Bergen County that does not include a Bergen County hospital. *See, e.g.*, Tr. at 165:19-22 (Nielsen testifying that United could not sell a marketable plan to Bergen County residents that did not include any Bergen County hospitals); Tr. at 339:14-23 (as

to whether Aetna could sell a network without a Bergen County hospital, Wengel explained that "if you live and reside in a county and you don't have a hospital but maybe the competitor does, I think you'll lose those cases nine times out of ten"); Tr. at 1119:22-1120:5 (Karp stating that he did not think Horizon could market a plan to residents and employers of Bergen County that did not have a Bergen County hospital). Consequently, these insurers would be forced to accept a SSNIP from a hypothetical monopolist of all Bergen County hospitals to continue competing in the county. This is even reflected in the insurers' testimony. *See* [Redacted] (explaining that [Redacted] would likely be forced to accept a reasonable price increase imposed by all hospitals serving Bergen County); Tr. at 1119:22-1120:10 (explaining that if all Bergen County hospitals increased rates a reasonable amount, Horizon would continue to sell plans in Bergen County provided that the increase was reasonable and fit within Horizon's budget). Accordingly, the Court finds that the FTC has sufficiently established that its proposed geographic market of Bergen County satisfies the HMT. FTC FOF ¶ 66.

**\*17** Dr. Dafny performed a willingness to pay ("WTP") analysis to empirically test her conclusion that Bergen County satisfies the HMT. As Dafny explained, a WTP analysis provides numbers that serve to confirm that the candidate market, here Bergen County, satisfies the HMT. Tr. at 563:11-564:11. The WTP analysis examines the negotiating leverage that a hypothetical monopolist of Bergen County hospitals would have as to insurers. In performing the analysis, Dafny used a subset of hospitals that serve Bergen County residents, and her analysis showed a substantial increase in willingness to pay. Tr. at 563:11-564:15. Specifically, Dafny assumed that the hypothetical monopolist owned all hospitals in Bergen County, a subset of her candidate market (all hospitals that serve Bergen County residents). And her analysis indicated that an insurer's willingness to pay for a hypothetic monopolist of this subset increased by 65% when compared with the hospitals independently. As a result, Dafny believed that her geographic market satisfies the HMT. Tr. at 564:4:15. Dr. Dafny also performed a second WTP analysis that considered Bergen County hospitals vis-à-vis patients from Bergen County and its three surrounding counties. The WTP for this market is 49%, which is also more than a SSNIP. Tr. at 1511:17-1512:7.

Defendants challenge the FTC's proposed geographic market on several grounds. Defendants first maintain that the FTC fails to establish a relevant geographic market because it

1-113

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 114 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

used customers, rather than suppliers, to define the area but failed to establish price discrimination. Defs. COL ¶ 8-13. Defendants rely on the *Merger Guidelines*, which provide as follows:

> In the absence of price discrimination based on customer location, the [FTC] normally define[s] geographic markets based on the locations of suppliers.... In other cases, notably if price discrimination based on customer location is feasible ... the [FTC] *may* define geographic markets based on the location of customers.

*Merger Guidelines*, § 4.2 (emphasis added). Defendants contend that as a result, the FTC must establish price discrimination as a matter of law to support its proposed geographic market here.

Although often used as persuasive authority, the *Merger Guidelines* are not binding. 🚩 *Penn State Hershey Med. Ctr.*, 838 F.3d at 338 n.2. Moreover, Section 4.2 of the *Guidelines* does not use mandatory language. Consequently, price discrimination is not required as a matter of law. Importantly, the FTC has successfully used a patient-based market without evidence of price discrimination. *See, e.g.*, *Saint Alphonsus Med. Ctr.-Nampa, Inc. v. Saint Luke's Health Sys., Ltd.*, No. 12-560, 2014 WL 4074466, at *7-8 (D. Idaho Jan. 24, 2014), *aff'd* 🚩 778 F.3d 775, 784-85 (9th Cir. 2015). The Court concludes that the lack of price discrimination here does not doom Bergen County as the relevant geographic market.

Defendants next contend that the FTC's geographic market does not reflect commercial realities. Defendants maintain that Bergen County is an arbitrary "political" boundary that plays no meaningful role in the first stage of hospital competition. Defs. COL ¶ 8. The Court would agree if a political boundary (such as a municipality, county, or state) were not otherwise supported by evidence. But here, the FTC has provided sufficient evidence to support a geographic market of Bergen County. Indeed, numerous courts have defined a relevant market by county or other "political" boundary. *See, e.g.*, 🚩 *Penn State Hershey Med. Ctr.*, 838 F.3d at 342 (concluding that the FTC "met its burden

to properly define the relevant geographic market" as "the four-county Harrisburg area"); 🚩 *Saint Alphonsus Med. Ctr.-Nampa, Inc.*, 778 F.3d at 781, 84 (stating that district court did not err in finding that *one city* in Idaho was the relevant geographic market); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 565 (6th Cir. 2014) (stating that there was no dispute that a *single county* was the relevant geographic market).

As noted, the critical inquiry is whether adequate evidence supports the FTC's proposed market. Here, the evidence reflects that commercial insurers treat Bergen County as a significant target within the larger New Jersey market. This was illustrated by testimony from representatives of United, Aetna, AmeriHealth, and Horizon. For example, Nielsen testified that when United looks at whether its plans are attractive to its members, it reviews coverage at a state-wide level but also "drills that down to the county level" to ensure that the plan is attractive to the specific county's members. Tr. at 161:20-23; *see also* Tr. at 180:2-6 (referring to Bergen County as a "[Redacted]"). In addition, AmeriHealth tracks its membership and sales in Bergen County and has specifically tried to grow its membership within the county. Tr. at 682:15-22; Tr. at 683:11-13. Ken Kobylowski, Senior Vice President for Provider Contracting & Network Operations for AmeriHealth testified that as AmeriHealth is trying to expand its business, Bergen County is an attractive market because it is such a densely populated county. Tr. at 683:11-18. Even Horizon, who supports the merger, conceded that Bergen County is an important county "because of the number of members that we have there and the population." Tr. at 1118:1-5. Moreover, as noted, the insurers testified that they could not offer a marketable plan to Bergen County residents that did not include a Bergen County hospital. *See, e.g.*, Tr. at 165:19-22 (Nielsen from United); 339:14-23 (Wengel as to Aetna); 1119:22-1120:5 (Karp as to Horizon).

 **\*18** Defendants argue that commercial insurers do not just look at Bergen County because all offer statewide plans. Defendants continue that no insurer offers only Bergen County plans and the providers do not ask for county only plans. *See* Defs. FOF ¶¶ 42-47. Thus, Defendants argue that because the actual commercial insurance plans do not align with the FTC's defined geographic market, the FTC fails to establish a relevant market. Tr. at 1664:4-1665:2. But Dr. Dafny explained that a relevant geographic market for antitrust purposes does not necessarily align with a consumer's understanding of a relevant market. Tr. at 592:1-17. In fact, in *Hershey*, the Third Circuit emphasized that "[t]he hypothetical monopolist test is exactly what its

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 115 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

name suggests: hypothetical." *Penn State Hershey Med. Ctr.*, 838 F.3d at 344. Moreover, economic significance does not need to be unique. Dr. Dafny recognized, and other insurers testified, that other counties and areas of New Jersey are also important markets, Tr. at 1508:10-19, but this does not mean that Bergen County is *not* important to insurers. Dr. Dafny explained that "there is nothing in [her] opinion that relies on Bergen County being the only county that an insurer is interested in targeting." Tr. at 632:10-12.

Next, Defendants argue that using Bergen County customers artificially excludes patients just outside of Bergen County and "distinguishes between Bergen County residents and non-residents in a way that neither payors nor providers do." Defs. FOF ¶ 14. "Whatever market urged by the FTC, the other party can usually contend plausibly that something relevant was left out, that too much was included, or that dividing lines between inclusion and exclusion were arbitrary." *FTC v. Tronox Ltd.*, 332 F. Supp. 3d 187, 202 (D.D.C. 2018) (quoting 2B Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 530d (4th ed. 2014)). Defendants point to Englewood and HUMC's PSAs, which demonstrate that both hospitals serve individuals who reside outside of Bergen County, and the fact that HUMC and Englewood consider their reach to extend beyond Bergen County.[21] *See* DX5001, Exs. 8, 9. But looking at a hospital's PSA to determine a geographic market is viewing the market from the lens of the supplier, not the buyer. As discussed, the Third Circuit has instructed that courts must apply the HMT through the lens of the insurer. *Penn State Hershey Med. Ctr.*, 838 F.3d at 342. In addition, although the Court recognizes that patients certainly can and do cross county lines for inpatient GAC care, the evidence demonstrates that, at least for Bergen County, most residents stay within the county for such care. Dr. Dafny calculated that more than 75% of Bergen County residents receive their inpatient GAC services at a hospital in Bergen County. PX8000, Fig. 25. As a result, focusing on Bergen County is likely to capture a "significant amount of potential harm."[22] Tr. at 622:2-24. Notably, Defendants' expert economist, Dr. Wu, did not disagree with Dr. Dafny's calculation about the number of Bergen County residents who received care within the County. Tr. at 980:3-14.

The concept that individuals prefer to receive care close to home was also recognized by the payors. For example, Karp explained that for emergency services and most elective in-patient services, patients will choose to go to the closest provider. Tr. at 1121:21-1122:1; *see also* [Redacted] testifying that a large proportion of [Redacted] Bergen County participants seek care within the county and that [Redacted] data demonstrates that [Redacted] Bergen County commercial participants accessed care at hospitals within the county). So, while the proposed market does exclude non-Bergen County residents, the case law recognizes that a geographic market is often imprecise. *See United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974) ("An element of 'fuzziness would seem inherent in any attempt to delineate the relevant geographic market.' " (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 360 n.37 (1963))). Moreover, the exclusion is justified by the evidence.

**\*19** Finally, Defendants critique Dr. Dafny's decision to start with Bergen County because Englewood and its "closest and largest" HMH rival, HUMC, are both in Bergen County. Defendants point out that Dafny did not form an opinion as to whom Englewood's closest rival is overall or who HUMC's closest rival might be. Thus, Defendants explain that Dafny's "first principal reason ... boils down to the proposition that these two hospitals happen to be in the same county." Tr. at 1663:2-5. Defendants also contend that Englewood and HUMC are complements, not competitors. *See* Defs. FOF ¶ 85.

As noted, prior to the merger, HUMC and Englewood were competitors and viewed each other as such. More importantly, commercial payors viewed the two as competitors. For example, [Redacted] testified that [Redacted] considers HUMC to be the best possible alternative for Englewood because of the "tremendous amount of overlap" of services provided by the two facilities and geographic proximity. [Redacted]. Other insurers also consider the two hospitals to be competitors. *See, e.g.*, Tr. at 1116:23-25 (Karp agreeing that Englewood and HUMC are currently competitors). Even Garrett acknowledged that there were overlapping services between the two hospitals. Tr. at 782:2-13. Finally, according to Dr. Wu, across all inpatient GAC services, Englewood provides 73% of the same services that are offered at HUMC. DX5001, Ex. 4. The non-overlapping services account for only [Redacted] of HUMC's revenue. *Id.* This evidence undercuts Defendants' critique of Dr. Dafny's decision to use Bergen County as a candidate market.[23]

Defendants also challenge Dr. Dafny's application of the HMT. Defendants argue that although Dafny states that she considered hospitals that served individuals outside of Bergen

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 116 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

County, in actuality, she only looked at hospitals within Bergen County when considering whether insurers would accept a SSNIP. Defs. COL ¶ 13. To determine whether a hypothetical monopolist would be able to impose a SSNIP, Dafny considered the insurer's testimony that Bergen County is significant and that they could not market a plan to Bergen County residents that did not include a Bergen County hospital. *See* PX8000-074. In addition, Dafny only used all Bergen County hospitals for her WTP analysis instead of all hospitals that serve Bergen County residents. *Id.* at 075. But Dr. Dafny explained that if this subset (Bergen County hospitals only) could "impose a SSNIP, then surely all the hospitals that are serving Bergen County could do so." Tr. at 564:4-7. As a result, and in light of the insurer testimony about accepting a SSNIP, Dafny believed that it was appropriate to extrapolate the results of her WTP with the subset to the geographic market as a whole. Tr. at 563:21-564:15; 642:4-7. Defendants do not meaningfully challenge this decision,[24] and the Court finds that it is a reasonable inference.

**\*20**  If a hypothetical monopolist owned all the hospitals in Bergen County, then insurers could attempt to redirect their customers to nearby hospitals outside of the county (and even this scenario ignores the insurer's testimony that they cannot market a viable plan to Bergen County residents that does not include a Bergen County hospital). But if the hypothetical monopolist owned not only the hospitals in Bergen County but also the other nearby hospitals, then the monopolist would have greater leverage over the insurers because the insurers could not redirect their Bergen County customers to nearby, non-county hospitals. In other words, if a hypothetical monopolist also owned hospitals outside of Bergen County, then insurers would have even less choice in declining a SSNIP if they wanted a marketable plan for Bergen County residents.

Next, Defendants take issue with Dr. Dafny's confirmatory WTP analysis because it focused on stage two of hospital competition. The WTP model looks at the value that a hospital or health system adds to an insurer's network. PX8000-057, ¶ 117. As discussed, factors that are important in stage 2 inform stage 1 competition, which Dr. Wu acknowledges. Tr. at 990:15-21 (testifying that while the focus is on stage 1, stage 2 competition is "important" so that stage 2 must be analyzed as to how it affects stage 1). For example, if an insurer knows that individuals frequently choose Hospital A over Hospital B, that insurer would want Hospital A in its network because that hospital makes the network more desirable. Accordingly, stage 1 and stage 2 competition cannot be viewed in separate,

isolated spheres. Even the Third Circuit recognizes that "[p]atients, of course, are relevant." 🏳 *Penn State Hershey Med. Ctr.*, 838 F.3d at 343. Therefore, the fact that elements of patient choice play a part of the WTP analysis is not fatal.

Thus, in sum, the FTC demonstrates that commercially insured patients in Bergen County is a relevant geographic market.

**b. Anticompetitive Effects**

After the relevant markets are determined, "a prima facie case is established if the plaintiff proves that the merger will probably lead to anticompetitive effects in that market." 🏳 *Penn State Hershey Med. Ctr.*, 838 F.3d at 346 (quoting 🏳 *Saint Alphonsus Med. Ctr.-Nampa, Inc.*, 778 F.3d at 785). An anticompetitive effect means that the transaction would create an incentive for the merged parties to raise prices, lower quality, and innovate less. *See, e.g.,* 🏳 *Saint Alphonsus Med. Ctr.-Nampa Inc.*, 778 F.3d at 786 (finding that high HHI and evidence demonstrating that merger would likely lead to increased reimbursement rates with high entry barriers for other entities sufficient to establish prima facie case). The *Merger Guidelines* state that market concentration, which is measured by the Herfendahl-Hirschman Index ("HHI"), is a useful indicator of the competitive effects of a merger. *Merger Guidelines*, § 5.3. "In determining whether the HHI demonstrates a high market concentration, we consider both the post-merger HHI number and the increase in the HHI resulting from the merger." 🏳 *Penn State Hershey Med. Ctr.*, 838 F.3d at 346-47 (quoting *Horizontal Merger Guidelines*, § 5.3, at 18-19). An HHI above 2,500 in the post-merger market is considered "highly concentrated" and if the merger increases the HHI by more than 200 points it is "presumed to be likely to enhance market power." *Id.* (quoting *Merger Guidelines*, § 5.3, at 19). The FTC "can establish a prima facie case simply by showing a high market concentration based on HHI numbers." *Id.*

The FTC put forth evidence demonstrating that under a patient-based model, which is based on inpatient GAC discharges of Bergen County residents, the post-merger HHI is 2,835 and the change in HHI is 841.[25] PX8000-080, Fig. 15. The post-merger HHI is considered highly concentrated, and the increase is above 200, meaning that the merger is likely to enhance the merged entities' market power. In

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 117 of 173
Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....
2021-2 Trade Cases P 81,763

addition, HMH would control almost half of the market share in Bergen County post-merger. PX8000, Fig. 15. Consequently, the FTC satisfies is *prima facie* case based on this information alone.

**\*21** Defendants respond that small adjustments to the geographic market eliminate the presumption of enhanced market power. Defs. COL ¶ 19. The *Merger Guidelines* state that "[w]here analysis suggests alternative and reasonably plausible candidate markets, and where the resulting market shares lead to very different inferences regarding competitive effects, it is particularly valuable to examine more direct forms of evidence concerning those effects." *Merger Guidelines*, § 4. Defendants rely on a number of calculations performed by Dr. Wu to demonstrate that different candidate markets lead to very different competitive effect results. Wu compared the post-merger HHIs for three other "markets." DX5001, Ex. 16, 20. Wu, however, never proposed that any of the "markets" he looked to were a potential candidate market. Tr. at 952:25-953:26. And Wu conceded that before calculating market concentration, there "needs to be [ ] an appropriately defined market." Tr. at 49:13-15. Moreover, Wu's markets use patient flow data, which adopts the perspective of the hospitals; this approach has been rejected by the Third Circuit. *Penn State Hershey Med. Ctr.*, 838 F.3d at 340 ("But subsequent empirical research demonstrated that utilizing patient flow data to determine the relevant geographic market resulted in overbroad markets with respect to hospitals.").

But even if the Court were to accept any of Dr. Wu's markets as alternative candidate markets, direct evidence supports the conclusion that the merger will substantially lessen competition in Bergen County. *See Saint Alphonsus Med. Ctr.-Nampa, Inc.*, 778 F.3d at 788 (considering HHI and direct evidence of anticompetitive effect to determine that plaintiffs established their *prima facie* case); *H.J. Heinz Co.*, 246 F.3d at 717 (concluding that ordinary course documents and direct evidence regarding the market "bolstered" the FTC's market concentration statistics); *Sysco Corp.*, 113 F. Supp. 3d at 71-72 ("In summary, the FTC has bolstered its *prima facie* case with additional proof that the merger would harm competition[.]"). Using Englewood's information, Chartis calculated that HMH accounted for 34% of hospital discharges in Englewood's PSA and Englewood accounted for approximately 15% of discharges in its own PSA. PX2079-016. Englewood's PSA covers a large portion of Bergen County and small areas of Passaic, Hudson,

and Rockland Counties. PX2079-015. Accordingly, after the merger, Englewood's data suggests that HMH will account for almost 50% of the market share in Englewood's PSA. HMH's ordinary course documents before this litigation identify Bergen County as HUMC's PSA. *See* PX1129-007, -051. The fact that HUMC and Englewood historically defined their PSA to include similar areas demonstrates that combining the two entities will eliminate a competitor in the county.

Many insurance companies also believe that the proposed merger will lead to anticompetitive effects, as illustrated by insurers' testimony and their ordinary course documents. For example, [Redacted] internal analysis, using [Redacted] claim data, indicated that together, HMH's Bergen County hospitals and Englewood would account for [Redacted] of [Redacted] commercial inpatient spend. [Redacted]. In addition, [Redacted] believed that post-merger, [Redacted] market share in Bergen County will go to HMH. [Redacted] testifying that under [Redacted] modeling and projections, if HUMC were to leave [Redacted] broad coverage network, [Redacted] of the patients who would have gone to HUMC would chose Englewood under a conservative assumption).

Defendants' ordinary course documents and testimony also demonstrate that HMH and Englewood are competitors. By way of example, as previously discussed, during Phase 2 of Chartis's work with Englewood, Chartis set up a data room so Englewood could share documents with potential merger partners. When Englewood was first informed about the data room, an Englewood executive expressed concern with [Redacted]." PX2311-001. Geller responded to this email with [Redacted] and then directed the recipient [Redacted]. *Id.* Moreover, after meeting with HMH during phase 2 of Chartis's work, an Englewood Board member commented that "[Redacted]." PX2325 at 3. Finally, even after the merger was announced, Englewood acknowledged that "[f]or a long time, Hackensack has been a fierce but respected competitor." PX2291-004. And HMH indicates that once the merger is consummated, it can immediately transfer many cases to Englewood. Garrett, however, explained that presently, HMH has no incentive to transfer patients from HUMC because Englewood is a competitor. PX7004–189-90.

**\*22** The FTC also relies on Dr. Dafny's diversion ratio calculations to further demonstrate that the merger will have an anticompetitive effect. This quantitative analysis assesses what other hospitals patients would choose if one hospital were not available. Tr. at 571:22-72:23. A "higher diversion ratio is indicative of closer competition between the parties."

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 118 of 173
Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....
2021-2 Trade Cases P 81,763

Tr. at 572:6-7. Dafny used a patient-choice model for a four-county area. Using this model, if Englewood were not available, more than 40% of its patients would use an HMH hospital, and almost 30% would choose HUMC. The next closest hospital is Valley, at 12%. Tr. at 573:9-18. If HUMC was not available, about 17% would go to Valley and approximately 10% would go to Englewood. Tr. at 574:1-7. Dafny explained that this quantitative analysis shows that HMH, and specifically HUMC, places a strong competitive constraint on Englewood, which affects Englewood's pricing and quality. Tr. at 574:20-23. Defendants maintain that the diversion ratio analysis focuses on stage 2 competition because Dafny's analysis did not capture price differences between HUMC and Englewood. Defs. FOF ¶¶ 98-99. As discussed, there is a large price difference between the two hospitals. *See* [Redacted]. But as also discussed, patients' preferences inform insurers' decisions when creating networks and negotiating rates, thus are relevant to stage 1. In fact, Dafny also relied on [Redacted] redirection analysis and [Redacted] termination analysis. Tr. at 575:11-21. Accordingly, while Dafny's diversion ratio analysis alone would not establish an anticompetitive effect, when viewed in combination with the HHI and direct evidence, the quantitative analysis further supports the FTC.

Dr. Dafny also calculated a "rough estimate" of the price impact of the merger at $31 million per year. To do so, Dafny used her patient-based WTP model, which quantified the impact of the acquisition on Defendants' bargaining leverage with insurers. [26] Plf. FOF ¶ 114. She based her calculation on information from a peer-reviewed paper, referred to during the hearing as the Garmon study. Tr. at 576:16-24. Defendants argue that Dafny's "rough estimate" is unreliable because it too is based on stage 2 considerations. Defendants also challenge her estimate because it was based on a single study and assert that Dafny did not use an appropriate coefficient. Defs. FOF ¶¶ 102-110.

Again, patient preferences impact and inform stage 1 negotiations. Turning to Defendants' critiques of the Garmon study, Dafny first noted that while she adopted the coefficient from the Garmon study, substantial literature supported the general proposition that "hospitals and hospital systems with higher willingness to pay command higher negotiated prices in the marketplace." Tr. at 577:12-14; *see also* 654:13-15. Dafny then explained that she selected the coefficient that only included mergers without variable cost savings. Dafny further indicated that she purposefully selected this coefficient to look at the price impact of the merger because

she was "assessing the competitive effect absent mitigating factors, absent entry or efficiencies." Tr. at 1520:9-15. In other words, Dafny selected the category without variable cost savings because she accounted for such savings in her efficiencies analysis: "If I were to use an estimate that included all mergers, including those with cost savings, then I [would] be double counting because I would be having cost savings in my price effect and then cost savings potentially in the efficiencies analysis." Tr. at 1520:16-20. Defendants do not meaningfully challenge Dafny's explanation, and the Court finds it persuasive.

Defendants point out that the full sample of mergers in the Garmon study showed that there was no statistically significant relationship between changes in WTP and price, and that the Garmon study did not include any hospitals in New Jersey. Defs. FOF ¶¶ 108-09. Accordingly, Defendants point to Dr. Wu's analysis of New Jersey claims data, which allegedly demonstrates that the merger will not lead to higher prices. *Id.* ¶¶ 111-12. According to Wu, Garmon indicated that commercial claims information is "the ideal data" to evaluate potential price increases. Tr. at 964:15-22. Using this claims data, Wu concluded that there is no statistically significant relationship between price and hospitals' willingness to pay in Northern New Jersey. Tr. at 965:4-11. But even accepting Wu's conclusion, the direct evidence indicates otherwise.

**\*23** Namely, the FTC points to the Acquisition Clauses as proof of a likely price impact. *See* Plf. FOF ¶¶ 116-17. When HMH acquires or merges with an entity, the Acquisition Clause permits HMH to raise rates at the new facility to match HMH's similar facilities. [Redacted]; 1036:5-14; 1083:14-21. In response, Defendants point to unsolicited letters that HMH sent to insurers stating that HMH would not enforce the Acquisition Clauses with respect to this merger (the "Waiver Letters"). *See* [Redacted]. HMH sent these letters after the FTC filed its opening briefing in this matter. As a result, the FTC contends that the letters "may lack the reliability necessary to be admitted under Rule 803(6)," the business records exception. D.E. 246 at 4.

The FTC does not identify any cases demonstrating that post-litigation created business records are inadmissible. Moreover, the Court is not aware of any evidentiary rule that bars a business record simply because it was created after litigation began. *See* 🚩 *United States v. Casoni*, 950 F.2d 893, 911 n.10 (3d Cir. 1991) ("Thus, we are satisfied Rule 803(6) contains no general rule limiting admissible business records to those prepared *ante litem motam*."). Accordingly,

the Court will not exclude the Waiver Letters. Rather, the critical issue is how much weight the Court should give this evidence. The Supreme Court has explained that post-acquisition evidence "tending to diminish the probability or impact of anticompetitive effects" can be considered but "the probative value of such evidence" is "extremely limited." 🔖 *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 504 (1974) (internal citations omitted). Lower courts have determined that such evidence is "deemed of limited value whenever such evidence *could arguably* be subject to manipulation." *Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 435 (5th Cir. 2008) (emphasis in original); *see also* 🔖 *United States v. Aetna Inc.*, 240 F. Supp. 3d 1, 80-90 (D.D.C. 2017) (giving less weight to business decision made after the merger was agreed to because the court determined that it was made to improve the defendant's litigation position).

As discussed, Young was not aware [Redacted], and after each acquisition [Redacted]. Tr. at 1083:14-21. [Redacted] and [Redacted] both sought to [Redacted] with HMH [Redacted]. The Acquisition Clause still appears in [Redacted] and [Redacted] contracts with HMH, although was able to [Redacted].[27] [Redacted]. Finally, Garrett explained that the clauses were intended to ensure that HMH hospitals were "paid fairly for the services that they delivered," Tr. at 787:4-9, and at his deposition in this matter, Young testified that with respect to the Acquisition Clauses, [Redacted] PX7026-148. Thus, until the FTC argued in its opening brief that the Acquisition Clauses are evidence of a likely price increase, HMH seemingly had no intention of waiving the Acquisition Clauses after it acquired Englewood. Yet, shortly after HMH learned of the FTC's argument, it sent the Waiver Letters.

The Waiver Letters are a prime example of alleged business records that were created to bolster Defendants' litigation position. HMH [Redacted] and, just prior to the FTC's opening brief, Young effectively testified [Redacted]. And the Waiver Letters run contrary to HMH's own financial interest. As a result, the Court gives little weight to the Waiver Letters.[28] Even if the Court were to consider the Waiver Letters, they do not constitute binding contracts; Defendants point to no consideration given by the insurance companies in exchange for the waivers.[29]

 *\*24* More importantly, even if the Acquisition Clause was enforced, it would not change the Court's analysis. The critical

inquiry, in the Court's view, is the impact that the merger will have on future negotiations with commercial insurers. To this end, HMH makes no representations about rate increases or nonprice terms for any future system-wide negotiations.[30] Because HMH has historically been able to negotiate higher rate increases than Englewood, the reasonable inference is that HMH will be able to do so after the merger (with the benefit of having added Englewood to its portfolio).[31] Accordingly, although the Waiver Letters may delay a price increase in the short term, as [Redacted] explained, HMH is "really just putting off the inevitable." [Redacted]

The Merger would also likely eliminate competition on a non-price level. As discussed, although Defendants downplayed the fact that they are competitors during the hearing, ordinary course evidence demonstrates that HMH and Englewood currently monitor each other's service offerings. For example, after Englewood advertised its use of a new technology as "first in the State," HMH expedited its approval process for the same technology due to concerns from an HMH physician about his ability to keep up with competitors. PX1205. Similarly, an Englewood employee noted that Englewood should market a new technology that HMH did not have "as this will give [Englewood] the edge." PX2358. Moreover, Garrett explained that HMH monitors competitors' quality ratings, which helps improve HMH's services. Tr. at 800:2-17. As part of this tracking, HMH looks at Englewood's ratings. PX1055. If Englewood and HUMC were no longer competitors, it would remove an incentive for both entities to continue to improve quality metrics and offer innovative medical technology. *See Merger Guidelines*, § 6.4 (explaining that "[c]ompetition often spurs firms to innovate" and that the FTC "may consider whether a merger is likely to diminish innovation competition by encouraging the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger").

In fact, one of the concerns that Englewood raised as to potentially partnering with [Redacted] was that it would lead to *further* competition with HMH. As noted, on March 28, 2019, Chartis presented the offers from HMH and [Redacted] to the Executive Committee. In comparing the two entities as potential partners, Chartis noted that a "pro" of choosing HMH, "[Redacted]" PX6004-009. Relatedly, a "con" for [Redacted] was that a partnership with [Redacted] [Redacted]" *Id.* The "[Redacted]" refers to future competition between HUMC and Englewood; likewise, the potential for [Redacted] indicates [Redacted], *i.e.*, direct

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 120 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

competition resulting in more and/or improved services for patients.

Finally, Defendants contend that market responses from competitors will also constrain Defendants post-merger. Defs. COC ¶ 24. "[I]n certain cases, repositioning by other competitors may be sufficient to deter or counteract the anticompetitive effects of a merger" 🚩 *Penn State Hershey Med. Ctr.*, 838 F.3d at 351, but the repositioning must be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern," *Merger Guidelines*, § 9. Defendants' argument regarding competitors is not supported by the evidence.

**\*25** Defendants argue that hospitals and health systems' use of front doors will mitigate against any price increase post-merger. Defs. FOF ¶¶ 127. But there is little to no evidence demonstrating that front doors actually have any impact on the inpatient market in Bergen County. The only evidence about the effectiveness of front door came from [Redacted]. Specifically, the number of patients that utilized [Redacted] Bergen County front door who were then subsequently treated at an [Redacted] was "[Redacted]" to [Redacted] utilization strategy. [Redacted]. Defendants also contend that after the merger, insurers will be able to steer patients away from HMH. But again, there is no evidence that insurers are likely to take this approach. The Court also has serious doubts that this would occur given the repeated testimony that Bergen County residents prefer to receive care close to home and that insurers need to include HUMC in their networks to remain marketable to Bergen County residents. Finally, potential competitors seeking to enter the Bergen County market face high entry barriers and costs. This is evidenced by HUMC's tower project and the new Valley hospital, both of which are multi-year and multi-million-dollar (actually hundreds of millions) projects. And while Garrett and Geller both opined that Valley's new location will increase competition, Defendants did not provide persuasive evidence to support these opinions. Finally, any new entry into the market would need to proceed through New Jersey's certificate of need process, which is time-consuming and expensive. FTC FOF ¶ 152.

As a result, the FTC demonstrates that the merger will likely create an anticompetitive effect. The FTC, therefore, establishes its *prima facie* case.

## 2. Rebuttal Evidence

To rebut the presumption that the merger is anticompetitive, Defendants must present evidence "that the market-share statistics [give] an inaccurate account of the [merger's] probable effects on competition." 🚩 *H.J. Heinz Co.*, 246 F.3d at 715. The stronger the Government's *prima facie* case, the more evidence that Defendants must present to successfully rebut the presumption. *FTC v. Sanford Health*, 926 F.3d 959, 963 (8th Cir. 2019) (quoting 🚩 *United States v. Baker Hughes, Inc.*, 908 F.2d 981, 991 (D.C. Cir. 1990)). Defendants focus on three overarching procompetitive effects that they argue rebut the FTC's presumption: (1) upgrades to Englewood's physical plant and increased capacity; (2) expansion of the complex tertiary and quaternary care at HUMC; and (3) service optimization between the entities. Defendants maintain that these effects will lower costs and increase the quality of healthcare for the community.

Apart from the service optimizations that will be realized through the merger, Defendants frame their rebuttal arguments in terms of the procompetitive benefits of the merger. Defs. FOF ¶ 130, COL ¶¶ 25, 27. Defendants do not characterize these arguments as asserting an efficiencies defense. The FTC contends that there is "no distinction between a procompetitive benefit and an efficiency; rather efficiencies are cognizable only if they are procompetitive in nature." Plf. COL ¶ 43. Thus, the FTC treats Defendants' rebuttal case as invoking an efficiencies defense.

The Clayton Act itself does not expressly provide for an efficiencies defense nor has the Supreme Court formally addressed whether one exists. Although the Third Circuit has also not concluded that an efficiencies defense exists, other circuits have determined that the defense is cognizable. 🚩 *Penn State Hershey Med. Ctr.*, 838 F.3d at 348. Moreover, the *Merger Guidelines* recognize the defense. *Merger Guidelines*, § 10. Assuming that the defense is legally cognizable, it must meet several requirements. Among other things, the efficiencies must be "merger specific," which means "they must be efficiencies that cannot be achieved by either company alone." 🚩 *Penn State Hershey Med. Ctr.*, 838 F.3d at 348. The efficiencies must also be verifiable and not speculative. *Id.* This is a high bar, as "[t]he presumption of illegality may be overcome only where the defendants 'demonstrate that the intended acquisition would result in

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 121 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

significant economies and that these economies ultimately would benefit competition and, hence, consumers.' " *Id.* (quoting *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1223 (11th Cir. 1991)). However, "where the evidence of efficiencies in the relevant market will not support an outright defense to an anticompetitive merger, such evidence is relevant to the competitive effects analysis of the market required to determine whether the proposed transaction will substantially lessen competition." *FTC v. Arch Coal, Inc.*, 329 F. Supp. 2d 109, 151 (D.D.C. 2004); *see also FTC v. Tenet Health Care Corp.*, 186 F.3d 1045, 1054 (8th Cir. 1999) ("We further find that although Tenet's efficiencies defense may have been properly rejected by the district court, the district court should nonetheless have considered evidence of enhanced efficiency in the context of the competitive effects of the merger.").

**\*26** Whether the Court construes Defendants as invoking a formal efficiencies defense or as addressing the competitive effects analysis, Defendants fail to establish extraordinary procompetitive effects to offset Plaintiff's *prima facie* case.

#### a. Upgrades and Increased Capacity at Englewood

Englewood's goals in finding a strategic partner, and in choosing HMH specifically, were to increase its inpatient utilization and obtain capital for needed improvements to the hospital. HMH is providing significant capital that is specifically earmarked for Englewood through the merger, and Garrett explained that HMH intends to turn Englewood into "a leading provider of tertiary care in Northern New Jersey." Tr. at 743:5-8.

As noted, Defendants repeatedly pointed to the Agreement, specifically to HMH's "hard commitments" in Section 3 and Exhibit C, as evidence of HMH's plans to grow Englewood's utilization and improve its clinical offerings. *See* Tr. at 886:19-25; DX3800, Ex. C. But as noted, for many of the "hard commitments" (1 through 19), the commitments are to explore, assess, and collaborate on different issues or to make "regional" (not Englewood specific) improvements. DX3800, Ex. C. Moreover, as to the first 19 commitments in Exhibit C, Englewood is only permitted to arbitrate disputes, with a remedy of specific performance or the reimbursement of costs. *Id.*, §§ 3.2.5, 7.1.3.3. In addition, the commitments to increase Englewood's inpatient volume

(certain of commitments 20-27) are not enforceable by Englewood.

Nevertheless, HMH is providing significant capital to Englewood for necessary improvements to its physical plant, including upgrades to the OR and the Heart Center of Excellence, and providing Englewood with a robot for Englewood's robotic urology services and [Redacted]. *Id.*, Ex. C, ¶¶ 3, 11, 15, 19. While not as comprehensive or firm as represented by Defendants during the hearing, the Court recognizes that these improvements to Englewood could likely amount to a procompetitive benefit to Bergen County, in that Englewood should be able to upgrade its facilities and equipment thereby offering a broader array of services for its patients. Dr. Gowrisankaran, Defendants' expert on industrial organization, economics, and econometrics in the healthcare industry, testified that his analysis of such capital investments indicated that they were likely to attract more patients. Tr. at 1246-45. [32]

#### b. Expansion of Complex Services at HUMC

Next, Defendants tout that the merger will allow HMH to expand the complex tertiary and quaternary care provided at HUMC. Defendants continue that this will reduce the outmigration of patients to New York, Defs. FOF ¶¶ 134, 140, which, in turn, helps the community in terms of cost of care and quality. To expand HUMC's services, HMH maintains that it needs to relieve capacity constraints and "[t]he merger will ease HUMC's capacity constraints by redirecting non-complex tertiary patients to Englewood." *Id.* ¶ 136. Defendants continue that HUMC does not have feasible alternatives to alleviate capacity constraints outside of the merger. *Id.* ¶ 137.

**\*27** The Court has doubts as to several representations regarding HMH's need for the merger to realize its vision for HUMC. First, HMH indicates that it can transfer many cases to Englewood on day one, that is, before any capital contributions and resulting improvements to Englewood have been made. HUMC also claims that it has had capacity issues for a number of years. As a result, the FTC posed the question as to why HUMC has not previously transferred cases to Englewood to address its capacity issues. As discussed, in his deposition, Garrett stated that it did not presently make sense for HUMC to transfer patients to Englewood because Englewood is a competitor. PX7004–189—PX7004-90. And there was no indication that transferring such patients would

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 122 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

place either HMH or HUMC in financial jeopardy. Garrett's response is illuminating because it reflects HMH's position that financial results are more important than its claimed concern for the community and patients, *i.e.*, "New Jersey First." The Court is not critical of this motive – HMH's financial interests are legitimate business considerations. However, this statement nevertheless undercuts Defendants' claims that New Jersey and its residents are the primary consideration.

Defendants also rely on the Optimization Plan to support the strategy to transfer patients to Englewood and to establish that HUMC faces capacity constraints. Among other things, the Optimization Plan identifies an initial estimate on the number and type of patients that can be transferred to Englewood. DX3601. Like the Waiver Letters, the FTC argues that the Optimization Plan was created after the FTC filed its complaint in this matter and contends that it "may lack the reliability necessary to be admitted under Rule 803(6)," the business records exception. D.E. 246 at 4.

The FTC argues that the Optimization Plan is not a business record and was created for this litigation. The FTC points to the fact that the document was not circulated until March 26, 2021, yet Defendants' capacity expert, among other of Defendants' experts, relied on the document extensively in his April 9, 2021, report. D.E. 246 at 4-5. Moreover, the first draft of the Optimization Report was only created on February 27, 2021. *Id.* at 8; *see also* DX3602.

Garrett explained that the Optimization Plan was the result of the efforts of nineteen planning teams that in combination met over 300 times. Tr. at 759:11-15. Defendants further explain that the information about transfers in the Optimization Plan was largely created through the work of the Transfer Team, which it appears, first began meeting in April 2020. *See* Defs. June 8, 2021, Ltr. at 1-2; DX3792-001. Defendants also identify several documents that allegedly illustrate the various committee work that started in April 2020 and led to the Optimization Plan. *See* Defs. June 8, 2021 Ltr. [33]

The Optimization Plan reads like an advocacy piece created for the current litigation. [34] As noted, Defendants represented that the purpose of the Steering Committee was to create a plan *to implement* the Exhibit C commitments upon consummation of the merger, but the Optimization Plan noticeably fails to do so. For example, despite the months of planning, the document contains no details as to how the merged entity intends to redirect cases to Englewood.

Instead, the Optimization Plan largely repeats information in the Agreement. In fact, although the Optimization Plan identifies the number of cases HMH believes it can redirect from its other regional hospitals, the numbers for Palisades and Pascack Valley are actually less than the numbers contemplated in the Agreement. The number of patients for Englewood's cardiac surgery and robotics urology programs are the same as in the Agreement. Thus, rather than providing Defendants with a comprehensive plan to implement, the document reads as a sales pitch to justify the merger after the fact. The Court, therefore, admits the Optimization Plan but gives it little weight. To give the Optimization Plan any significant weight would merely invite future antitrust litigants to create similar documents.

**\*28** Next, although Defendants maintain that HMH has no alternatives to relieve the capacity constraints at HUMC except to transfer patients to Englewood, Defendants gloss over the fact that HUMC is currently expanding capacity through the Second Street Tower project. In the Optimization Plan and throughout the hearing, Defendants repeatedly explained that the Second Street project "will not alleviate HUMC's capacity challenges." DX3601-008. But the construction project expands HUMC's existing footprint. Through the project, HUMC is building [Redacted] new operating rooms and plans to [Redacted] operating rooms. Tr. at 1173:25-1174:9. The new tower will also have [Redacted] new ICU beds and HUMC plans to [Redacted] of its existing ICU beds. Tr. at 1175:9-14. In addition, there is space for [Redacted] additional ICU beds that can be added if the need arises. Tr. at 1175:15-18. Finally, the new tower will have [Redacted] new private med-surg beds and HMH [Redacted]. Tr. at 1175:19-1176:2. If HUMC's capacity constraints were so severe, or the need to expand HUMC's tertiary and quaternary services were as acute as Defendants make them out to be, the Court questions why HMH is [Redacted]. At a minimum, HMH did not provide any adequate explanation as to this fact. Moreover, HMH planned *pre-merger* to expand certain quaternary service lines with the Tower project. PX1051. In addition, HUMC never gave a signal to insurers or competitors that it had severe capacity constraints; HUMC never declined a transfer and never went on redirect in the time leading up to the Agreement. Finally, HMH has three hospitals near HUMC: Pascack Valley (owned with Ardent), Palisades, and Mountainside (owned with Ardent). These three hospitals provide primary and secondary care. Pascack Valley is not at capacity, and there was no indication that either Palisades or Mountainside was at capacity. Nevertheless, HMH provided no reason as

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 123 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

to why HUMC could not alleviate its capacity constraints to some degree through using one or more of the three. [35]

Dr. Gowrisankaran evaluated the procompetitive benefits of the proposed merger, finding nine benefits. Tr. at 1226:12-13. The first benefit was increased patient volume at Englewood. *Id.* at 1242:14-23. Gowrisankaran explained that payors would save money through transfers to Englewood and tertiary redirections from HUMC to Englewood. Gowrisankaran continued that payors would save because Englewood is cheaper than HUMC. Tr. at 1244:11-12. The Court agrees with Dr. Dafny that transfers or redirections from HUMC to Englewood are not an efficiency; instead the transfers/redirections are a voluntary decision by HUMC to give away profits. Tr. at 586:7-24. Not only is it a voluntary decision, but it is a decision that runs counter to HUMC and HMH's financial interest. Besides the transfers not being in HMH and HUMC's financial interest, there are also serious questions as to whether the number of projected transfers can be implemented. As noted, a large number of hospital referrals come from physicians not employed by the hospital; those physicians do not have to send their patients to Englewood. And HUMC is not reducing it tertiary service lines. Moreover, Gowrisankaran drew his transfer/redirection figures from the Optimization Plan, Tr. at 1283-84:13-20, of which the Court gives little weight for the reasons stated above.

Defendants also primarily rely on Dr. Gowrisankaran to quantify the benefits that would result from HUMC's increased quaternary services. HMH, however, glosses over the fact that it needs state approval to expand HUMC's quaternary service lines. Plf. FOF ¶ 162. At least with respect to hospitals obtaining tertiary capacity, this is an expensive and time-consuming process, and approval is not guaranteed. Tr. at 768:13-25; *see also* 93:4-19. And Gowrisankaran opined that there would be direct payor cost savings from quaternary care received in New Jersey versus New York. *See* Defs. FOF ¶ 146. But quaternary services are highly complex and infrequently performed, and Gowrisankaran's patient choice model, which he based [36] on HMH's [Redacted] recapture rate, amounts to [Redacted] patients. DX5002, Table 11A. Moreover, Gowrisankaran acknowledged that the actual reduced payor expenditures would be much less once he accounted for transfers from lower-priced New Jersey hospitals to HUMC. Tr. at 1287:11-18. In fact, Gowrisankaran found that [Redacted] would have reduced expenditures post-merger for quaternary services; [Redacted] would all have increased expenditures. Tr. at 1288-89:12-13.

### c. Service Optimization

**\*29** The final procompetitive benefit asserted by Defendants is cost-savings that will result from service optimization between the two entities. [37] For this benefit, Defendants rely on their expert Ms. Ahern, who calculated that the merger would result in $38 million in cost-savings efficiencies annually. Defs. FOF ¶ 150. Ahern, however, failed to account for the $439 million capital contribution by HMH, which would result in not reaching a net positive gain until thirteen years after the merger. [38] Tr. at 1529-30:24-15. Ms. Ahern recognized that HMH had a demonstrated track record of cost savings through past mergers and acquisitions. Dr. Gowrisankaran estimates that 50% of Ms. Ahern's amount would be passed through to payors. Tr. at 1529:24-15. While Gowrisankaran estimates that payors would see cost savings, there is no evidence that these cost savings will be realized. *Id.* ¶ 150. Critically, HMH has acquired other hospitals in New Jersey, including Palisades in 2016 and JFK in 2018, and Defendants provide no evidence that the cost-savings from service optimization between the prior merger entities was passed through to payors. Therefore, with history as a guide, the Court doubts that any costs savings HMH realizes will be passed through to payors.

### d. Quality Improvements

Finally, the Court briefly addresses the alleged quality improvements that Defendants submit will be achieved at Englewood and HUMC after the merger. Dr. Meyer, Defendants' healthcare quality expert, testified that HMH has a history of being a leader in healthcare quality and a track record of improving the quality of care with its merger partners. [39] *Id.* ¶ 154. The Court also agrees that HMH's capital commitment will certainly permit Englewood to upgrade and expand its facilities and equipment. This is a quality improvement. At the same time, Englewood is also a high-quality hospital. Tr. at 846:4-16. In fact, Dr. Romano, the FTC's expert on healthcare quality opined that "Englewood performs better than HUMC on some important measures." Tr. at 1435:22-23. In other words, even without HMH's capital infusion, Englewood still outperforms HUMC in certain areas. Consequently, although both hospitals (particularly Englewood) will likely see certain improvements in quality due to the merger, this merger is fundamentally different than, for example, a merger where a large successful health

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 124 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

system acquires a small, failing hospital. Because Englewood and HUMC consistently perform well in multiple quality assessments, Defendants also fail to establish that any improvements in quality at either entity will be a sufficient procompetitive benefit.

**\*30** In sum, Defendants do establish that improvements at Englewood will result in an adequate procompetitive benefit. In addition to a limited benefit of HUMC recapturing a small number of outmigration patients, Englewood should be able to expand and upgrade its physical plant, equipment, and services. But these benefits do not amount to extraordinary efficiencies that offsets the likely anticompetitive effect of the merger. Consequently, Defendants fail to rebut the FTC's *prima facie* case and the Court concludes that the FTC establishes a likelihood of success in demonstrating that the merger violates Section 7 of the Clayton Act, or in other words, that "there is a reasonable probability that the challenged transaction will substantially impair competition."

🚩 *Sysco Corp.*, 113 F. Supp. 3d at 22 (quoting 🚩 *Staples*, 970 F. Supp. at 1072). [40]

### B. Weighing the Equities

"Although the Government's showing of likelihood of success creates a presumption in favor of preliminary injunctive relief, we must still weigh the equities in order to decide whether the merger would be in the public interest." 🚩 *Penn State Hersey Med. Ctr.*, 838 F.3d at 352 (quoting 🚩 *H.J. Heinz Co.*, 246 F.3d at 726). The Court must determine whether the harm Defendants "will suffer if the merger is delayed will, in turn, harm the public more than if the injunction is not issued." *Id.* In addition, the Third Circuit has explained that although a court may consider the private equities, "they are not to be afforded great weight." 🚩 *Id.* at 352.

The FTC contends that "[t]he principal equity in favor of issuance of the injunction is the public's interest in effective enforcement of the antitrust laws." Plf. FOF ¶ 50. If Defendants are allowed to proceed with the transaction, and then the administrative proceeding finds that the merger is unlawful, it will be difficult to unscramble the proverbial egg. *See id.* ¶ 50. Defendants argue that if the merger is enjoined it will "derail the Merger" and "deny[ ] the community of [the] significant healthcare benefits" of the expanded complex care at HUMC and tertiary care at Englewood. Defs. FOF ¶ 31. In arguing that the community will be denied the benefits of the changes to care, Defendants incorrectly focus on whether the merger is in the public interest. At this stage, the Court must determine whether the *injunction* is in the public interest. 🚩 *Penn State Hershey Med. Ctr.*, 838 F.3d at 353. As for Defendants' argument that the injunction will derail the merger, it is not a consideration endorsed by the Third Circuit. "We see no reason why, if the merger makes economic sense now, it would not be equally sensible to consummate the merger following a FTC adjudication on the merits that finds the merger lawful." *Id.* Accordingly, on balance the equities favor granting the injunction.

### VI. CONCLUSION

In sum, the FTC demonstrates a likelihood of success on the merits and the equities favor granting the injunction. Therefore, the Court preliminarily enjoins the proposed acquisition pending the outcome of the administrative proceeding. An appropriate Order accompanies this Opinion.

### All Citations

Not Reported in Fed. Supp., 2021 WL 4145062, 2021-2 Trade Cases P 81,763

### Footnotes

1     The Court has considered all submissions, testimony, and exhibits in this matter. To the extent the Court does not expressly address an argument raised by the parties, the Court has considered it and found that it does not change the Court's analysis.

2     Ms. Grajeda testified that Amerigroup only offers Medicaid and Medicare plans in New Jersey. Tr. at 282:1-4. The FTC, however, expressly excludes Medicare Advantage and managed Medicaid insurers from

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 125 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

its relevant product market. FTC Br. at 17 n.42. As a result, the Court finds little probative value to Ms. Grajeda's testimony.

3    Dr. Dafny also testified as a rebuttal expert.

4    Plaintiff also sought to qualify Dr. Romano as an expert on capacity issues from the hospital operations perspective, including calculations of capacity or steps that a hospital could take to relieve capacity issues. Defendants challenged Dr. Romano's qualification regarding capacity issues, outside of the limited scope of how capacity challenges impact the quality of care. D.E. 264. Dr. Romano is a clinical practitioner. He does not have experience with healthcare system capacity constraints from the operational viewpoint. As a result, the Court grants Defendants' request to preclude Dr. Romano as an expert on operational capacity issues.

5    Citations to "Tr." refer to the transcript from the seven-day evidentiary hearing in this matter.

6    On June 1, 2021, Defendants provided the Court with their list of exhibits that they seek to move into evidence. D.E. 332. The FTC provided its list on June 7, 2021, D.E. 340, and Defendants provided a supplemental list on June 9, 2021. D.E. 344. The parties also set forth a limited list of objections to documents on the exhibit lists. D.E. 331, 332, 344. The Court addresses the objections to PX1061, the Optimization Plans, and the Waiver Letters below. Otherwise, the Court did not rely on any of the documents for which there remain objections so the objections are moot. Those exhibits without objections in D.E. 332, 340 and 344 are admitted into evidence.

7    Of course, there could be at least one other rational business reason for establishing outpatient facilities without regard to inpatient admissions: they are independently profitable. The parties, however, did not address this point, so the Court does not speculate.

8    When referring to commercial insurers herein, the Court does not distinguish between fully insured and self-insured plans, as the difference is immaterial to the Court's analysis.

9    The Court notes that New Jersey has GeoAccess standards that apply to certain commercial and government plans. These standards generally require that an insurance company's network offers the requisite number of providers and facilities within a certain distance, time, and mileage of the insured population. Tr. at 330:2-10.

10    The case-mix index is used to compare the level of care provided at different hospitals and facilities. The higher the case-mix index, the higher the overall acuity, or complexity of care, provided at the facility. *See* Tr. at 191:8-15; 397:6-10.

11    During the hearing, the FTC emphasized the fact that Horizon, HMH and RWJBH are co-owners of Braven Health, a new Medicare Advantage program. Tr. at 1131:12-1132:1; 1069:9-25. These entities share [Redacted] generated by Braven Health, with [Redacted]. Tr. at 1075:20-1076:1; 1131:21-23. This relationship creates an additional financial incentive for Horizon to keep patients at HMH's hospitals. The FTC also emphasized the fact that except for HSS, Horizon does not have any direct contracts with New York hospitals. Tr. at 1131:3-11. Again, this also creates a motive to support the merger that is unique to Horizon. Similarly, Defendants emphasized that Atlantic and United formed a competing physicians' practice group, which gives both United and Atlantic a motive to oppose the proposed merger. The Court ultimately gives the various relationships little weight as the evidence did not adequately establish how the insurers' motives resulted in slanted or biased testimony.

12    By way of reference, HUMC defines a primary service area as the geographic area where 75% of inpatient discharges originate. Tr. at 1158:18-21. Englewood provided Chartis with information about its PSA but Defendants did not provide any evidence explaining how Englewood determined its PSA.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 126 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

13    Generally, a narrow network insurance product offers members access to fewer providers than the insurance company's standard offering. Tr. at 241:9-24.

14    The FTC introduced Blazer's email during its cross-examination of Garrett. Defendants objected to the email because Garrett was not copied on it. Tr. at 824:8-11. The FTC established that while Blazer was the point person for the merger transaction, Garrett had final sign-off. Tr. at 823:6-15; 824:14-21. Moreover, as noted, Garrett sent the letter to Chartis soon after the email. Given the timing of the two documents, the similarity in content, and Blazer and Garrett's roles, it is reasonable to infer that Garrett was aware of the contents of Blazer's email, PX1061, when Garrett wrote the letter. *See* Egan v. Live Nation Worldwide, Inc., 764 F. App'x 204, 208-09 (3d Cir. 2019) (explaining that the burden to authenticate a document under Fed. R. Evid. 901 is "slight" and that a "party can meet its burden by making 'a prima facie showing of some competent evidence to support authentication' " (quoting *United States v. Turner*, 718 F.3d 226, 232 (3d Cir. 2013))).

15    The Foundation is the philanthropic arm for Englewood Health. *See* About Us, Englewood Health Foundation, https://www.englewoodhealthfoundation.org/about-us/.

16    The Englewood Trust is an entity that will be formed when the merger is consummated to enforce certain terms of the Agreement on Englewood's behalf. DX3800, at 1.

17    [Redacted], the testimony of Anderson from Chartis suggested that [Redacted] was due to [Redacted]. PX6004-006.

18    There was no evidence that HUMC or HMH would face perilous economic consequences if it transferred those case to Englewood.

19    Although specific inpatient GAC services are not interchangeable, courts and parties look at these services together as a "cluster" when the competitive conditions are reasonably similar across services. *See* ProMedica Health Sys., Inc. v. FTC, 749 F.3d 559, 565-66 (6th Cir. 2014); *see also* Penn State Hershey Med. Ctr., 838 F.3d at 338 (defining relevant product market at general acute care services sold to commercial payors).

20    The *Merger Guidelines* are issued by the U.S. Department of Justice's Antitrust Division and the FTC. Although the *Guidelines* are not binding on this Court, "they are often used as persuasive authority." Penn State Hershey Med. Ctr., 838 F.3d at 338 n.2 (quoting Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint Lukes Health Sys., Ltd., 778 F.3d 775, 784 n.9 (9th Cir. 2015)).

21    It is not clear if Garrett or Geller were even aware of HUMC or Englewood's PSAs before this litigation began. *See* Tr. at 806:11-18; Tr. at 908:1-25. If the top executives of the entities at issue here were not aware of this information in ordinary course, it is difficult to infer that payors were aware of the PSA for either entity or that it was relevant to payors' decisions when forming their networks.

22    Defendants harp on Dr. Dafny's use of the word "significant" as a subjective and the fact that Dr. Dafny did not quantify the actual harm. Tr. at 622:10-15; 624:3-8. But Dr. Dafny's conclusion about "significant" harm is supported by data – that 75% of Bergen County residents receive care within the County. Further, Dr. Dafny characterized the harm as significant to indicate that it was enough *to continue with* (not end) her analysis as to whether Bergen County satisfied the HMT. Tr. at 622:19-24.

23    In any event, the Third Circuit has found that true complements can nevertheless potentially run afoul of the antitrust laws. *See* Penn State Hershey Med. Ctr., 838 F.3d at 334, 353-54 (granting preliminary injunction

Case 4:23-cv-03560 Document 119-2 Filed on 01/19/24 in TXSD Page 127 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

of proposed merger of academic medical center that specialized in complex services and a health system that focused on primary and secondary care).

24    Dr. Wu indicated that there is no actual evidence of price discrimination in Bergen County and that if more hospitals were considered, it does not seem possible that a hypothetical monopolist could raise prices for Bergen County residents. Tr. at 944:4-16. Putting aside the Third Circuit's remonstration that the HMT is *hypothetical*, Wu's analysis appears to ignore the commercial reality that the large majority of Bergen County residents do seek inpatient GAC services in Bergen County. Dr. Wu also challenged Dr. Dafny's HMT for focusing on hospitals rather than patients. Tr. at 943. The Court disagrees with this reasoning. The patients would be the appropriate focus in the opposite scenario – if an insurance company merger was being challenged and the resulting hypothetical monopolist had all of the commercially insured customers in Bergen County. Then the inquiry would be whether such an insurer monopolist could impose a SSNIP (meaning a larger discount for the monopolist) on the hospitals.

25    Dr. Dafny also calculated HHI using a hospital-based approach, as a "sensitivity check," which also resulted in an HHI over 2,500 and a change in HHI greater than 200. Tr. at 647:7-648:22. The patient-based calculation is the more conservative of the two approaches. Tr. at 648:10-13.

26    In addition to the patient-choice model, Dafny also calculated willingness to pay using a hospital-choice model. Tr. at 575-76. When considering all discharges in a four-county area, Dafny concluded that "the parties combined yields an increase in this willingness to pay of 10.1% per discharge." Tr. at 576:2-9. Dafny then estimated that the 10% increase caused a 5.7% price increase for transaction absent any cost efficiencies, and it would increase Englewood's price around 35%. Tr. at 576-78.

27    The Court notes that [Redacted] and [Redacted] contracts were executed after the proposed transaction was announced, and [Redacted] negotiations for its current contract with HMH occurred after the announcement. [Redacted].

28    Defendants also argue that, based on Third Circuit precedent, the Court cannot consider private agreements or contractual language in conducting an antitrust analysis. The Court disagrees. The Third Circuit has clearly stated that private contracts cannot be considered in determining the relevant product market or the relevant geographic market. ⚑ *Penn State Hershey Med. Ctr.*, 838 F.3d at 344 (citing ⚑ *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 438-39 (3d Cir. 1997)). But the Acquisition Clause is being considered as to anticompetitive effects, not in defining the relevant market.

29    Defendants contend that the Waiver Letters are enforceable on equitable grounds. D.E. 313.

30    [Redacted].

31    Defendants also contend that adding Englewood will not increase HMH's leverage with commercial insurers. Defs. FOF ¶¶ 113-21. Dr. Dafny acknowledged that Englewood does not have much bargaining leverage when compared to HMH, Tr. at 1522:9-10, and unlike HUMC, no commercial insurer testified that it needed Englewood in its network to create a desirable network. However, Defendants conflate two separate issues. The first is whether HMH and HUMC are more important to insurers than Englewood. The answer to that inquiry is clearly yes. The second is whether adding Englewood to HMH will further increase HMH's leverage with insurers. The answer to that query is, based on the evidence, yes-subject to a final determination in the administrative action.

32    For the reasons stated in note 37, the Court declines the FTC's invitation to analyze and compare the capital investment offered by [Redacted] to Englewood during their merger discussions.

Case 4:23-cv-03560   Document 119-2   Filed on 01/19/24 in TXSD   Page 128 of 173

Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....

2021-2 Trade Cases P 81,763

33    Defendants submitted their June 8 letter with leave of Court, in response to questions that arose during closing arguments. While Defendants reference exhibits that were included in its exhibit list in the June 8 letter, they also rely on documents that were not on their exhibit list. Defendants sought leave to admit these additional exhibits into evidence. These new documents are not critical to Defendants' argument on this issue, nor are they pertinent to the Court's conclusion. As a result, the Court does not reach the request for leave to admit.

34    In fact, the FTC also points out that statements from the Optimization Plan are word-for-word copies of statements made in a July 21, 2021 white paper that Defendants submitted to the FTC to support this merger. D.E. 246 at 6-7. Defendants counter that in actuality, the statements from the white paper were "derived from and consistent with their internal analysis and integration planning activities." D.E. 256 at 7. But the first draft of the Optimization Plan was not created until February 2021. Moreover, despite Defendants' position that the white paper was influenced by Defendants' integration planning activities, Defendants fail to point to any documents that support this statement. Even Defendants' additional documents identified in their June 8 Letter do not reflect that such work product existed. Tellingly, not a single document cited in the letter makes even passing reference HUMC's capacity constraints.

35    In fact, when HMH acquired Pascack Valley, one of its stated reasons to reopen the facility was to serve as a pressure relief valve for overflow patients at HUMC. Tr. at 1437:25-4. But at the present time, Pascack Valley only operates at about 50% to 60% of its occupancy rate. Tr. at 1212:12-15.

36    The Court notes that Dr. Gowrisankaran utilized a patient-choice model for his analysis of the cost-savings that HMH will realize by capturing outmigration. The Court also notes that one of Dr. Wu's critiques of Dr. Dafny's analysis is that she improperly used a patient-choice model.

37    Defendants frame this as an efficiency. Defs. FOF ¶¶ 27-29. The FTC argues that these service optimization efficiencies are not merger specific because they could also be achieved if Englewood chose a different merger partner, such as [Redacted]. *See* Plf. COL ¶ 46. An efficiency is merger specific if it "cannot be achieved by either company alone because, if they can, the merger's asserted benefits can be achieved without the concomitant loss of a competitor." ⚑ *H.J. Heinz Co.*, 246 F.3d at 722. Thus, there is no legal requirement that Defendants must compare the efficiencies alleged here with those of a different hypothetical merger partner. And the FTC has cited no authority indicating that a court can consider other potential merger partners in conducting an efficiencies analysis. The merger specific inquiry focuses on the efficiencies that could theoretically be achieved by either merging entity alone, absent the merger.

38    The Court is also concerned that neither Ms. Ahern nor anyone from her team, produced any notes, despite the fact that she interviewed more than 100 Englewood and HMH employees, because, according to Ahern, her team is well versed in the field of healthcare organizations and operations. Tr. at 140:6-1402:11. Yet, neither Ms. Ahern nor any of her team members claimed to have an eidetic memory. Further, no explanation was provided as to how Ms. Ahern was able to effectively incorporate her team's verbal work product into her final report. Absent an extraordinary and credible explanation, the Court cannot fathom how Ms. Ahern and her team were able to accurately synthesize over 100 interviews from memory alone.

39    The FTC seeks to preclude Defendants from relying on certain portions of Dr. Meyer's report because Dr. Meyer destroyed notes from interviews that were incorporated into his report, in contravention of the Case Management Order. D.E. 248. The FTC seeks to exclude those portions of the report that relied on the destroyed notes under Federal Rule of Evidence 37(b)(2)(A). A court has broad discretion when imposing sanctions pursuant to Rule 37(b). ⚑ *Wachtel v. Health Net, Inc.*, 239 F.R.D. 81, 84 (D.N.J. 2006). In this instance, although Dr. Meyer intentionally destroyed his notes, there is no evidence of bad faith. Accordingly, the Court denies the FTC's request.

**Federal Trade Commission v. Hackensack Meridian Health, Inc., Not Reported in Fed....**

2021-2 Trade Cases P 81,763

40   Even if the Court were to conclude that Defendants rebutted the FTC's *prima facie* case that the merger will be anticompetitive, the Court would conclude that the FTC appropriately meets its burden of persuasion to demonstrate a likelihood of success in establishing that the merger violates Section 7.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

2011 WL 1219281
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Western Division.

FEDERAL TRADE COMMISSION, et al., Plaintiff,

v.

PROMEDICA HEALTH SYSTEM, INC., Defendant.

No. 3:11 CV 47.

|

March 29, 2011.

**Attorneys and Law Firms**

Janelle Filson, Jeffrey H. Perry, Matthew J. Reilly, Sara Y. Razi, Willard K. Tom, Stephanie L. Reynolds, U.S. Federal Trade Commission, Washington, DC, Edward J. Olszewski, Jennifer L. Pratt, Beth A. Finnerty, Office of the Attorney General, Columbus, OH, for Plaintiffs.

Amy J. Carletti, David Marx, Jr., Erin C. Arnold, Stephen Y. Wu, McDermott, Will & Emery, Chicago, IL, Amy E. Hancock, Jennifer L. Westbrook, Vincent Van Panhuys, McDermott, Will & Emery, Washington, DC, Marshall A. Bennett, Jr., Marshall & Melhorn, Toledo, OH, for Defendant.

*FINDINGS OF FACT AND CONCLUSION OF LAW*

KATZ, District Judge.

**BRIEF OVERVIEW**

 **\*1**  The Federal Trade Commission ("FTC") and the State of Ohio ("Ohio") initiated this action against ProMedica Health System, Inc. ("ProMedica") seeking a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act, 🚩 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining ProMedica from further consolidating its operations with those of St. Luke's Hospital ("St.Luke's") pursuant to a Joinder Agreement executed on August 31, 2010.

This matter is now before the Court following a hearing on Plaintiffs' motion for a preliminary injunction (Doc. No.4), which took place on February 10–11, 2011. Also before the Court are Plaintiffs' Supplemental Memorandum in Support (Doc. No. 83), Defendant's Pre–Trial Brief in Opposition (Doc. No. 85), Defendant's Post–Trial Brief in Opposition (Doc. No. 103), Plaintiff's Post–Hearing Brief in Support (Doc. No. 104), Defendant's Notice of Supplemental Authority (Doc. No. 109), Defendant's Supplemental Post–Trial Brief in Opposition (Doc. No. 111), and Plaintiffs' Supplemental Post–Hearing Memorandum (Doc. No. 113).

It must be remembered that at this stage the Court has heard only summaries of testimony and neither party has had the benefit of presenting live witnesses subjected to extensive cross-examination. The Administrative Law Judge has scheduled over 200 hours beginning May 31, 2011, for a trial and will have the opportunity to hear live testimony and judge the credibility of witnesses, both fact and expert.

Initially, the Court acknowledges the difficulty of this determination because of the possible adverse impact on the contracting parties. However, following the one and a half-day hearing and reviewing hundreds of pages of briefs and exhibits, the Court is driven to the conclusion that the Plaintiffs have satisfied their burden of proof and will grant the preliminary injunction.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1345. Pursuant to Fed.R.Civ.P. 52 and Fed.R.Civ.P. 65, the Court sets forth the following findings of facts and conclusions of law.

**FINDINGS OF FACT**

**I. THE RELEVANT PARTIES AND HISTORY**

**A. Procedural History**
1. ProMedica Health System, Inc. ("ProMedica" or "PHS") and St. Luke's Hospital ("St.Luke's") entered into a Joinder Agreement on May 25, 2010. PX 00058.

2. On September 1, 2010, St. Luke's became a part of ProMedica pursuant to the Joinder Agreement.

3. In July 2010, the FTC and Ohio ("Plaintiffs") opened investigations into ProMedica's acquisition of St. Luke's. The FTC and ProMedica subsequently entered into a voluntary Hold Separate Agreement ("HSA") that, to date, restricted ProMedica from making certain changes to St. Luke's.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)
2011-1 Trade Cases P 77,395

4. On January 6, 2011, the FTC filed an administrative complaint alleging the consummated joinder violates Section 7 of the Clayton Act, as amended 15 U.S.C. § 18.

5. On January 7, 2011, Plaintiffs filed a Complaint for a Temporary Restraining Order ("TRO") and Preliminary Injunction, arguing that this relief was necessary to maintain the *status quo* during the pendency of the FTC's administrative proceeding. (Doc. No. 1.) Plaintiffs also filed Motions for a TRO (Doc. No. 3) as well as for a Preliminary Injunction (Doc. No. 4).

**\*2** 6. The Court held a hearing on Plaintiff's Motion for TRO on January 13, 2011. (Doc. No. 52.) The parties agreed to an extension of an existing voluntary HSA until two days after the Court rules on Plaintiff s Motion for Preliminary Injunction. (Doc. No. 61–1.) Based upon that agreement, Plaintiffs requested and the Court granted withdrawal of the Motion for TRO. (Doc. No. 62.)

7. The parties conducted limited fact discovery until February 4, 2011 (Doc. No. 69), and this Court held a two-day hearing on the Motion for Preliminary Injunction on February 10 and February 11, 2011. (Doc. Nos. 101 and 102.)

8. A full administrative trial on the merits will begin on May 31, 2011, before Administrative Law Judge Chappell, and will include up to 210 hours of live testimony.

### B. ProMedica Health System, Inc.

9. Defendant ProMedica is a not-for-profit integrated healthcare delivery system serving northwestern and west central Ohio and southeast Michigan., DX–ZZ (Guerin–Calvert Supp. Decl.) ¶ 4, which includes Lucas County.

10. Excluding St. Luke's, ProMedica operates three general acute-care hospitals in Lucas County: The Toledo Hospital ("TTH"); Flower Hospital ("Flower"); and Bay Park Hospital ("Bay Park").

11. TTH is a 794–bed facility but staffed for only 660, and offers primary, secondary, and some tertiary-level services, including high-level obstetrics services, a NICU, cardiovascular surgery, and trauma care.

12. Flower Hospital is staffed to use 257 out of its 292 licensed beds and provides primary, secondary, as well as some sophisticated services, particularly for oncology.

13. Bay Park Community Hospital, which is licensed and staffed for 86 beds, is a community hospital, located in the eastern part of Toledo, across the Maumee River.

14. TTH, Flower and Bay Park offer inpatient obstetrics services.

15. Flower and Bay Park do not offer tertiary level services.

16. ProMedica also operates the Toledo Children's Hospital, which is located on the same campus as TTH and houses 151 beds in its facility.

17. ProMedica also operates an insurance company, ProMedica Insurance Group or Paramount Health Care ("Paramount"). Paramount is a commercial insurance plan that markets a Health Maintenance Organization ("HMO"), a Preferred Provider Organization ("PPO") and a Medicare managed plan. DX–DDD ¶ 10.

18. ProMedica also operates a multi-speciality physician group, ProMedica Physicians Group, or PPG, which employs approximately 250 primary care physicians and specialists located throughout the Toledo area.

19. In 2009, ProMedica's revenues totaled approximately $1.6 billion. (Doc. No. 29 at ¶ 13.); PX 15 at 6.

20. ProMedica is a dominant hospital system in Lucas County. PX 270 at 25; PX 221 at 2; and PX 319.

21. ProMedica accounted for almost 50 percent of patient days for general acute-care services in Lucas County from July 2009 through March 2010. PX 2125 at 29; PX 2150 at 1.

**\*3** 22. In obstetrics services, ProMedica accounted for 71.2 percent of patient days for services from July 2009 through March 2010. PX 2125 at 29; PX 2150 at 2.

23. ProMedica receives the highest commercial reimbursement rates in Lucas County. PX 2125 at 27; PX 153; and PX 2072 at ¶ 16.

24. In 2009, ProMedica's hospitals in Lucas County had lower quality measures and outcomes than St. Luke's. PX 1172; PX 1030 at 18–19; and PX 1016 at 6.

### C. St. Luke's Hospital

25. St. Luke's is a formerly independent, non-profit general acute-care community hospital, located in Maumee, Ohio, the southwestern portion of Lucas County, Ohio.

26. St. Luke's has 178 staffed beds and provides a full array of general acute-care services and some tertiary cardiac services through its Heart Center.

27. Prior to the acquisition by ProMedica, St. Luke's was broadly recognized as a low-cost, high-quality hospital. PX 380; PX 1072 at 1; PX 2065; TRO Tr. At 54:9–10.

28. St. Luke's is located in a desirable and strategically important southwestern suburb in Lucas County. PX 2008 at 52:14–20; PX 2005 at 117:6–13, 118:3–5; PX 2016 at 61:7–62:17, 76:5–18. St. Luke's is easily accessible from major highways, and its location provides it with access to a growing population of employed and commercially-insured patients. PX 2008 at 53:25–55:24; PX 1132; PX 2065 at ¶ 8.

29. St. Luke's revenues for 2009 were approximately $156 million. PX 1006 at 5; (Doc. No. 26 at ¶ 13).

### D. The Acquisition

30. On May 25, 2010, ProMedica entered into a Joinder Agreement with OhioCare Health System, Inc. ("OHS"), St. Luke's and St. Luke's Foundation, Inc. ("SLF") to acquire St. Luke's, SLF, and other affiliates. Prior to the acquisition, OHS was the parent company of St. Luke's, SLF, and other affiliates. Upon consummation of the acquisition, ProMedica became the sole corporate member or shareholder of St. Luke's and other OHS affiliates. PX 58.

31. The Joinder Agreement vests ProMedica with economic and decision-making control over St. Luke's and other OHS Affiliates. Among other things, and subject only to certain limited qualifications, ProMedica has the right to: (a) appoint ProMedica nominees to the boards of directors of St. Luke's and other OHS affiliates; (b) approve members from the boards of St. Luke's and other OHS Affiliates; (d) remove members from the boards of St. Luke's and other OHS Affiliates; (d) adopt and approve strategic plans and annual operating and capital budgets for St. Luke's and other OHS Affiliates; (e) authorize and approve non-budgeted operating expenses and capital expenditures above certain amounts for them; (f) authorize and approve the incurrence or assumption of debt above certain amounts; (g) authorize and approve contracts for expenditures above certain amounts; (h) authorize and approve any merger, consolidation, sale or lease

of St. Luke's and other OHS Affiliates; and (i) appoint and remove the President, Secretary, and Treasurer of St. Luke's and other OHS Affiliates. PX 58 at 16–18. ProMedica also has the exclusive right to negotiate contracts with managed care organizations on behalf of St. Luke's. PX 58 at 25, 58.

**\*4** 32. The Agreement requires ProMedica to add St. Luke's to the provider network of its health-insurance subsidiary, Paramount, at rates comparable to other general acute-care hospitals in the ProMedica system. PX 58 at 22–23. After the consummation of the Acquisition, Paramount added St. Luke's to its network. PX 2021 at 73:14–19.

33. The Agreement requires ProMedica to provide $5 million to SLF, and also to provide St. Luke's with a $10 million per year for three years for capital projects. PX 140 at 1. This capital commitment is an absolute obligation of ProMedica as long as St. Luke's and the other OHS Affiliates remain in the ProMedica system (and survives if ProMedica removes them from its system) and cannot be reduced or delayed for any reason. PX 58 at 22. The Agreement also envisions return of these dollars in the event a federal court rescinds the Agreement. PX 140 at 1.

34. The Agreement requires ProMedica to maintain St. Luke's as an acute-care hospital providing six general categories of services in its current location for ten years, but does not require ProMedica to maintain or provide any other services at St. Luke's that are not specified in the Agreement, including but not limited to oncology, cardiology, orthopedics, spinal neurosurgery, pediatrics, or diabetes care, and does not require any minimum service levels. PX 58 at 23, 45–46.

35. The Agreement prohibited ProMedica from terminating OHS Affiliates' employees for 90 days after consummation of the Acquisition. This obligation has since expired, and as a result, ProMedica is free to reduce staff levels at St. Luke's without limitation. PX 58 at 46. ProMedica intends to reduce staffing levels at St. Luke's. PX 20 at 15.

36. ProMedica's acquisition of St. Luke's and other OHS Affiliates was not reportable under the Hart–Scott–Rodino Antitrust Improvements Act of 1976. PX 57 at 1.

### E. The Voluntary Hold–Separate Agreement

37. On August 18, 2010, the FTC and ProMedica entered into a limited, 60–day Hold–Separate Agreement ("HSA") to allow the expedited FTC investigation to continue. PX 69.

38. The HSA includes several key provisions designed to temporarily preserve St. Luke's viability, competitiveness, and marketability. The HSA prevents, among other things: (1) ProMedica's termination of St. Luke's health-plan contracts (while allowing health plans the option to extend their contracts with St. Luke's past the termination date, if a new agreement is not reached); (2) the elimination, transfer, or consolidation of any clinical service at St. Luke's; and (3) the termination of employees at St. Luke's without cause. PX 69 at ¶¶ 1–5.

39. On October 15, 2010, ProMedica agreed to extend the HSA to expire 15 days after ProMedica substantially complied with subpoenas and civil investigative demands. On the same day, the FTC granted ProMedica's request for a modification to the HSA to allow ProMedica to move inpatient rehabilitation beds at St. Luke's to Flower to create additional medical/surgical rooms at St. Luke's.

**\*5** 40. After the TRO hearing on January 13, 2011 ProMedica agreed to extend the HSA (with one modification) until 5:00 p.m. on the second day following the Court's ruling on Plaintiffs' Motion for Preliminary Injunction. Dkt. # 61–1 at 2.

## II. FUNDAMENTALS OF HOSPITAL COMPETITION AND PRICING

### A. Reimbursements for Hospital Services

41. Privately-insured patients obtain health insurance coverage primarily through commercial health plans. PX 2124 at ¶ 7 (Town Decl.). Health plans negotiate with hospitals to determine the scope of coverage for their members and the reimbursement rates for services. PX 2065 at ¶ 3; PX 2067 at ¶ 11; PX 2072 at ¶ 8.

42. For patients covered by Medicare or Medicaid, the government sets the reimbursement rates for hospital services. PX 2117 at ¶ 7 n. 1 (Wachsman (PHS) Decl.); PX 2027 at 134:11–134:13 (Town Dep.).

43. Self-pay patients, including indigent patients, pay hospitals directly for services received. *See* PX 2124 at ¶ 6 (Town Decl.); PX 2027 at 99:7–101:7 (Town Dep.). Hospitals often provide indigent and charity care at a discount or at the hospitals' own expense. *See* PX 2117 at ¶ 4 (Wachsman (PHS) Decl.).

### B. Relationships Between Employees, Employers, Health Plans, and Hospitals

44. Employers offer their employees health insurance as part of compensation packages. PX 2124 at ¶ 8 (Town Decl.).

45. Employers that offer health insurance negotiate with health plans and select the combination of rates, benefit structures, and healthcare provider networks that best meets the needs of the employer and its employees. PX 2124 at ¶ 11 (Town Decl.); PX 2070 at ¶ 3, 6; PX 2058 at ¶ 5; PX 2059 at ¶ 4.

46. Employers generally do not negotiate directly with hospitals; instead, employers rely on health plans to do so. PX 2053 at ¶ 4; PX 2059 at ¶ 5; PX 2061 at ¶ 5.

47. Hospitals compete with each other for inclusion in health plans' provider networks and, once included, for the use of their hospital by health plans' members. *See infra* § II.C.3.

48. Similarly, health plans compete with one another to be offered by employers in the menu of plans that are available to employees. PX 2124 at ¶ 9 (Town Decl.). Once on the employer's menu, health plans compete with one another to attract enrollees. PX 2124 at ¶ 9 (Town Decl.).

49. Health plans regularly survey members and review consumer preferences in order to maintain marketable and attractive provider networks that appeal to employers and employees. *See* PX 2067 at ¶ 6; PX 2072 at ¶ 6; PX 2013 at 49:19–51:2.

50. Health plans offer two broad classes of insurance arrangements to employers: self-insured and fully-insured. PX 2124 at ¶ 10 (Town Decl.). Under self-insured plans, employers collect premiums from their employees and pay the full costs of employees' healthcare, bearing the risk that healthcare costs may exceed premiums. PX 2124 at ¶ 10 (Town Decl.); PX 2072 at ¶ 3; PX 2067 at ¶ 4; PX 2013 at 34:14–35:4. Under self-insured plans, the employers pay the health plan in exchange for administration of its employees' claims. PX 2124 at ¶ 10 (Town Decl.); PX 2072 at ¶ 3; PX 2013 at 34:14–35:4. Under fully-insured plans, a health plan collects premiums from employers and pays the cost of the employees' healthcare, bearing the risk that healthcare costs may exceed premiums. PX 2124 at ¶ 10 (Town Decl.); PX 2013 at 34:8–13; PX 2072 at ¶ 3.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

### C. Rate Negotiations Between Health Plans and Hospitals

#### 1. Bargaining Dynamics

**\*6** 51. Rates for hospital services are determined through contract negotiations between hospitals and health plans. PX 2124 at ¶ 16 (Town Decl.). Health plans negotiate rates for hospital services on behalf of their customers, who are both self-insured and fully-insured employers. PX 2124 at ¶ 17 (Town Decl.); PX 2013 at 49:15–18; PX 2072 at ¶ 12. These negotiations typically involve a series of offers and counteroffers, and result in either the inclusion of a hospital in a health plan's network or the failure of the health plan and hospital to reach an agreement. PX 2124 at ¶ 7 (Town Decl.); PX 2065 at ¶ 11.

52. The rates and terms of the contracts that are negotiated by a hospital and a health plan are a function of each party's bargaining leverage in negotiations. PX 2013 at 53:1–7; PX 2065 at ¶ 11. The respective degrees of bargaining leverage are determined by how each party would fare if no agreement were reached. PX 2124 at ¶ 18 (Town Decl.); PX 2067 at ¶ 13.

53. Failure to reach an agreement depends on the hospital's and health plan's respective "walk-away" points. PX 2124 at ¶ 18 (Town Decl.); PX 2013 at 51:11–53:7. If a hospital demands rates above a health plan's walk-away point, the health plan will refuse to contract with the hospital. PX 2124 at ¶ 18 (Town Decl.) If a health plan only offers to pay rates below a hospital's walk-away point, the hospital will refuse to contract with the health plan. PX 2124 at ¶ 18 (Town Decl.) Each party's walk-away point is a function of that party's bargaining leverage. PX 2124 at ¶ 18 (Town Decl.)

54. The bargaining power of a hospital is tied to the value that the health plan's current and potential members place on having in-network access to that hospital. PX 2124 at ¶ 19 (Town Decl.); PX 2013 at 50:5–9. This is reflected in the number of the health plan's members that use or would use the hospital. PX 2072 at ¶ 9; PX 2067 at ¶ 12. The more a health plan's members value a hospital, the more bargaining leverage the hospital possesses in its negotiations with the health plan. PX 2124 at ¶ 19 (Town Decl.); PX 2065 at ¶ 13; PX 2067 at ¶ 13. If failing to reach an agreement with a particular hospital would make a health plan's network substantially less attractive to the health plan's members, then that hospital would have substantial bargaining leverage against the health plan. PX 2124 at ¶ 19 (Town Decl.)

55. In Lucas County, there is a strong, positive correlation between a hospital's market share and the rates that the hospital succeeds in negotiating with health plans. PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl., Ex. 4). In other words, the higher a hospital's market share, the higher the rates it is able to demand and receive from health plans: St. Luke's has the smallest market share in Lucas County 11.5% for GAC and receives the lowest rates; UTMC has a 13% GAC market share and its average rates are X[1] % greater than St. Luke's; Mercy has a 29% GAC market share and its average rates are X% greater than St. Luke's; and ProMedica has a 46.8% GAC market share, with average rates exceeding St. Luke's by X%. PX 2139 at 13 (Town Supp. Decl. Exhs.). ProMedica's economic expert did not calculate or even estimate the rate differentials among the various Lucas County hospitals and therefore Dr. Town's calculation of rate differentials is unrebutted.

**\*7** 56. A hospital's bargaining power with health plans also depends in part on the availability of alternatives that could serve as substitutes for the hospital in the eyes of the health plan's current and prospective members. PX 2072 at ¶ 9; PX 2067 at ¶ 12; PX 2006 at 121:10–121:19 (Wachsman (PHS) IH). The larger the number of such alternatives and the more closely substitutable they are in the eyes of health plan members, the lower the hospital's bargaining leverage against the health plan. PX 2013 at ¶ 54:9–25; PX 2065 at ¶ 11; PX 2124 at ¶ 22 (Town Decl.).

57. If a hospital is able to negotiate with a health plan to exclude competing hospitals from the health plan's network, the remaining in-network hospitals benefit from the reduced competition for the health plan's members. PX 2124 at ¶ 14 (Town Decl.).

58. As the corollary of the hospitals' bargaining leverage, a health plan's bargaining power in negotiations is determined by how much the hospital values being included in the health plan's network. PX 2124 at ¶ 20 (Town Decl.); PX 2065 at ¶ 12. This depends on the size of the health plan's membership, or patient volume, that the health plan can offer the hospital. PX 2072 at ¶ 9; PX 2067 at ¶ 12; PX 2124 at ¶ 20 (Town Decl.). The more patient volume that a hospital stands to lose if it fails to reach an agreement with the health plan, the greater the bargaining leverage the health plan will have with the hospital. PX 2124 at ¶ 20 (Town Decl.); PX 2072 at ¶ 9.

59. In the past, hospitals and health plans in Lucas County have sometimes failed to reach agreement in contract

negotiations, resulting in the health plans offering narrower or exclusive provider networks. PX 2138 at ¶ 15 (Town Supp. Decl.); PX 2136 at ¶ 27 (Guerin–Calvert Supp. Decl.). The threat of termination is implicit, if not explicit, in negotiations between hospitals and health plans. PX 2016 at 41:8–41:12, 93:17–94:16; PX 2017 at 21:16–23. Thus, in Lucas County, the threat of failing to reach an agreement, resulting in the exclusion of a hospital from a health plan's network, is a significant factor in the negotiations between hospital and health plans. PX 2124 (Town Decl.) at ¶ 21; PX 2016 at 94:4–25; PX 2013 at 51:23–52:25.

### 2. Health Plans' Criteria for Creating Hospital Networks

60. Health plans generally value a broad network of providers, desiring to have in-network access to physicians and hospitals that span the geographic areas in which their members work and reside. PX 2124 at ¶ 9 (Town Decl.). Health plans that do not have sufficient geographic coverage in a market will have difficulty marketing their insurance products to employers and their employees. PX 2124 at ¶ 9 (Town Decl.).

61. A hospital's market share, geographic location, and breadth of services are important criteria for inclusion in the health plan's provider network. PX 2072 at ¶ 9; PX 2016 at 72:7–74:18.

**\*8** 62. Health plans will find it difficult to market products to employers if their networks do not include the hospitals desired by current and potential members. PX 2124 at ¶ 9 (Town Decl.).

63. In deciding whether to add a hospital to its network, a health plan balances the value its current and prospective members place on having in-network access to the hospital against the costs of adding that hospital to the network. PX 2124 at ¶ 12 (Town Decl.).

### 3. Hospitals Compete for Network Inclusion, as well as for Selection by Health–Plan Members

64. Hospitals compete with one another on multiple levels. PX 2124 at ¶ 13 (Town Decl.). First, hospitals compete with one another for inclusion in health plans' provider networks. PX 2124 at ¶¶ 12, 13, 18 (Town Decl.). Health plan members have access to in-network hospitals at rates substantially lower than out-of-network hospitals. PX 2124 at ¶ 11 (Town Decl.). Because of this cost difference experienced by members, a hospital's volume of patients from a specific

health plan is determined largely by whether the hospital is part of the health plan's provider network. PX 2124 at ¶ 15 (Town Decl.). All things being equal, an out-of-network hospital will treat significantly fewer patients from that health plan than an in-network hospital, because members bear higher out-of-pocket costs to use out-of-network hospitals. PX 2124 at ¶ 15 (Town Decl.).

65. Second, hospitals in a particular health plan network compete with each other to attract the health plan's members. PX 2124 at ¶ 14 (Town Decl.). Because members generally face little or no out-of-pocket price difference between in-network hospitals, in-network hospitals compete primarily on non-price dimensions, such as location, quality, patient experience, and other factors. PX 2124 at ¶ 14 (Town Decl.). This type of competition is reduced if a hospital successfully negotiates with the health plan to have one or more of its competitors excluded from the health plan's network. PX 2124 at ¶ 14 (Town Decl.).

### 4. Hospital Rates Reflect Relative Bargaining Power with Health Plans

66. If a health plan's network is substantially less attractive or marketable to employers due to the exclusion of a hospital, that hospital will be able to command higher rates for its inclusion in the health plan's network than a less-valued hospital. PX 2124 at ¶¶ 19, 23 (Town Decl.); PX 2067 at ¶¶ 12–13.

67. A hospital may have greater bargaining power with respect to some of its services by virtue of the attractiveness of its offerings and/or the lack of alternative providers for those services. PX 2124 at ¶¶ 19, 22–23 (Town Decl.). A hospital can impose a separate rate structure on health plans for these particular services by negotiating a "carve-out," also referred to as a "case rate." PX 2124 at ¶ 23 (Town Decl.); PX 2026 at 73:19–21 (Guerin–Calvert Dep.). A hospital with enhanced bargaining power for certain services can also exploit the bargaining power across additional services, leading to higher rates for any number of the hospital's services. PX 2124 at ¶ 23 (Town Decl.).

### III. GENERAL ACUTE–CARE INPATIENT HOSPITAL SERVICES SOLD TO COMMERCIAL HEALTH PLANS CONSTITUTE A RELEVANT PRODUCT MARKET

**\*9** 68. General acute-care ("GAC") inpatient hospital services sold to commercial health plans are a relevant

product market in which to evaluate the effects of the Acquisition. PX 2124 at ¶ 29 (Town Decl.). GAC services are a broad "cluster market" of inpatient surgical, medical, and supporting services provided in a hospital setting to commercially-insured patients. PX 2124 at ¶ 27 (Town Decl.); *see also* PX 2013 at 18:7–19:5; PX 2012 at 94:20–95:7. "[T]he purpose of the cluster market is to formulate aggregates across products in order to do the analysis in a practical way." PX 2027 at 45:3–11 (Town Dep.).

69. The GAC product market excludes services that St. Luke's currently does not perform, such as most complex "tertiary" and "quaternary" services. PX 2124 at ¶ 29 (Town Decl.); *see also* PX 2002 at 78:1–25 (Hanley (PHS) IH); PX02067 at ¶ 7.

70. The GAC market also excludes outpatient services. Patients would not substitute outpatient services in response to price increases for inpatient services, because such substitution is instead based on clinical considerations. PX 2067 at ¶ 8; PX 2013 at 21:9–22:3; PX 2124 at ¶ 31 (Town Decl.).

71. ProMedica has conceded that GAC services constitute an appropriate relevant market for this case. Dkt. # 26 (Answer) at ¶ 19 ("ProMedica admits that general acute-care inpatient hospital services sold to commercial health plans constitutes a valid service market.").

## IV. INPATIENT OBSTETRICAL SERVICES SOLD TO COMMERCIAL HEALTH PLANS CONSTITUTE A RELEVANT PRODUCT MARKET

72. Inpatient obstetrical ("OB") services are a cluster of procedures relating to pregnancy, labor, and post-delivery care provided to patients for the labor and delivery of newborns. PX 2075 at ¶ 4; PX 2081 at ¶ 3. No other hospital services are reasonably interchangeable with inpatient obstetrical services. PX 2124 at ¶ 30 (Town Decl.); PX 2075 at ¶ 4; PX 2081 at ¶ 3; PX 2013 at 65:19–66:9.

73. In this case, it would be inappropriate to analyze OB services as part of the cluster market of GAC services because OB services are offered by a different set of providers in Lucas County and, thus, are subject to different competitive conditions than are GAC services. Specifically, two other Lucas County hospitals, UTMC and Mercy St. Anne Hospital, do not provide OB services. PX 2124 at ¶¶ 28, 30 (Town Decl.); PX 2064 at ¶ 9; PX 2068 at ¶¶ 6, 8, 11.

74. ProMedica and St. Luke's acknowledge this reality by obtaining and tracking separate market shares and other data for OB services. *See, e.g.,* PX 1016 at 3 (Dec.2009 SLH Affiliation Update); PX 1077 at 3, 5 (2008 SLH Market Report); PX 9 at 22 (PHS Credit Presentation).

75. Moreover, hospitals often "carve out" OB services from other GAC services and negotiate separate rates for OB services. *See, e.g.,* PX 365 at 30; PX 363 at 19, 22.

## V. LUCAS COUNTY IS THE RELEVANT GEOGRAPHIC MARKET

 **\*10**  76. The relevant geographic market is no broader than Lucas County. This conclusion is compelled by the fact that a hypothetical monopolist controlling every hospital in Lucas County could increase the price of inpatient general acute-care services and obstetrics services in Lucas County by at least 5–10 percent, a small but significant amount. PX 2124 at ¶¶ 26, 32 (Town Decl.). Health plans agree that an overwhelming number of patients are unwilling to travel outside of Lucas County for general acute-care services. PX 2013 at 30:10–34:1, 66:10–19; PX 2065 at ¶ 9. ProMedica's expert also acknowledged that it is more likely than not that Lucas County is the relevant geographic market for GAC services under the hypothetical monopolist test. PX 2026 at 51:4–53:16 (Guerin–Calvert Dep.). Indeed, Defendant has not seriously disputed that Lucas County is the relevant geographic market for GAC.

77. With extremely rare exception, Lucas County residents do not use more distant providers of GAC or OB services. PX 2124 at ¶ 36 (Town Decl.); *see also* PX 2125 at 40–41 (Town Decl., Ex. 7). Only 2.1% of Lucas County residents leave the county for GAC services, and only 0.6% leave the county for OB services. PX 2124 at ¶ 36 (Town Decl.).

78. Defendant has suggested that inpatient OB services are the one service for which Lucas County residents are willing to drive outside of Lucas County, pointing to Wood County Hospital as a possible alternative. However, Defendant has not pointed to evidence in the record to support this claim. Rather, the evidence shows that *fewer* OB patients (0.6%) leave Lucas County for care than do patients in need of other hospital services (2.1%), which is not surprising in light of the nature of OB services (delivering babies). PX 2124 at ¶ 36 (Town Decl.). 95 percent of Lucas County residents drive fewer than 24.5 minutes for OB services and residents' average drive time is just 11.5 minutes. PX 2125 at 24–25 (Town Decl., Ex. 3). Wood County Hospital is approximately

30 minutes from Toledo, and so it is not a realistic competitor in the market for OB services.

79. Health plans have testified that the residents of Lucas County are not willing to travel outside of Lucas County for inpatient hospital care, and that they would not be able to market health plan networks to Lucas County residents that consist solely of hospitals outside of Lucas County. *See, e.g.,* PX 2013 at 29:6–30:23, 33:1–34:1, 66:10–19; PX 2065 at ¶ 9; PX 2016 at 26:20–27:5.

80. Physicians in Lucas County have testified that their patients seek inpatient hospital care close to home, especially for obstetric services. It is more convenient for them, as well as for friends and family who want to come to visit. PX 2081 at ¶ 6; PX 2075 at ¶¶ 6–8; PX 2082 at ¶ 5. Further, physicians testified that even if hospitals in Lucas County were to raise their prices significantly, their patients would rather pay higher prices than travel to hospitals outside of Lucas County to receive inpatient hospital care. PX 2081 at ¶ 6; PX 2075 at ¶ 7; PX 2082 at ¶ 5.

**\*11** 81. ProMedica acknowledges that it competes only with other Lucas County hospitals for GAC services. PX 2002 at 22:10–22, 72:20–73:15 (Hanley (PHS) IH). ProMedica's counsel noted at the TRO hearing: "[P]ayers and their patients have alternative hospitals to turn to that are conveniently located in the market. And those alternative hospitals are Mercy's three hospitals and UTMC." TRO Hearing Tr. at 50:11–14.

82. Neither X nor Y views itself as a competitor with the Lucas County hospitals. PX 2056 at ¶¶ 4–6; PX 2057 at ¶ 7.

# VI. EXTRAORDINARILY HIGH MARKET CONCENTRATION LEVELS ESTABLISH A STRONG PRESUMPTION OF HARM TO COMPETITION IN BOTH RELEVANT MARKETS

83. The calculation and the examination of market concentration is an important tool for performing merger analysis, as it provides relevant information regarding the current competitive conditions in a market. PX 2124 at ¶ 48 (Town Decl.).

84. Markets that are more highly concentrated are presumed to be less competitive than less concentrated markets. In less competitive markets, firms will charge higher prices to consumers, and generally have less incentive to innovate and offer higher quality goods and services. PX 2124 at ¶ 48

(Town Decl.). Indeed, in Lucas County, market shares of the hospital systems are an accurate predictor of each hospital's relative rates. *See infra* Section II.C.l.

## A. Market Structure

### 1. Additional Market Participants

85. In addition to ProMedica and St. Luke's, there are only two other general acute-care competitors in Lucas County: Mercy Health Partners ("Mercy") and the University of Toledo Medical Center ("UTMC"). *See supra* Section V.

### a. Mercy

86. Mercy is a not-for-profit health system providing inpatient and outpatient hospital services in northwestern Ohio and southeastern Michigan. In Lucas County, Mercy has three general acute-care hospitals: Mercy St. Vincent Medical Center ("St.Vincent"), Mercy St. Charles Hospital ("St.Charles"), and Mercy St. Anne Hospital ("St.Anne"). PX 2068 at ¶¶ 12–3.

87. St. Vincent is a 445–bed critical-care regional referral and teaching center near downtown Toledo. St. Vincent is a tertiary facility that also houses a children's hospital on its campus. PX 2068 at ¶¶ 3–4. St. Charles is a 294–bed, full-service community hospital located in an eastern suburb of Toledo. *Id.* at ¶ 5. St. Anne is a small community hospital with 100 beds in northwestern Toledo. *Id.* at ¶ 6.

88. St. Anne, which is the closest Mercy hospital to ProMedica's Flower Hospital, does not provide obstetrical services. PX 2068 at ¶ 8; *see also* PX 2006 at 128:10–11 (Wachsman (PHS) IH).

89. Mercy has a GAC market share of 28.7%, and an OB market share of 19.5% by patient days. PX 2125 at 29 (Town Decl. Ex. 5); *see also* PX 2150 (market share chart). ProMedica's market share is 60% higher than Mercy's for GAC services and three times larger for OB services. PX 2124 at ¶ 43 (Town Decl.). Immediately prior to the Acquisition, ProMedica's severity-adjusted rates were X percent higher than Mercy's rates, on average. PX 2138 at ¶ 3 (Town Supp. Decl.).

### b. UTMC

**\*12** 90. UTMC was formed when the University of Toledo and the Medical Center of Ohio merged in 2006. UTMC is the

only academic medical center in the area, and provides GAC services as well as tertiary and quaternary hospital services. PX 2064 at ¶¶ 1–3.

91. UTMC does not provide inpatient obstetrical services. PX 2064 at ¶ 9.

92. UTMC has a 13% market share for GAC services in Lucas County, which is less than one-third of ProMedica's market share. *See* PX 2125 at 29 (Town Decl. Ex. 5); PX 2150 (Market share chart). Immediately prior to the Acquisition, ProMedica's severity-adjusted rates were 51% higher than UTMC's rates, on average. PX 2138 at ¶ 3 (Town Supp. Decl.).

**2. The Acquisition Left Only Three Competitors in the Lucas County GAC Services Market**

93. ProMedica concedes that the Acquisition reduced the number of general acute-care competitors in Lucas County from four to three-leaving only ProMedica, Mercy, and UTMC. 2/10 PI Hearing Tr. at 122:6–7; 1/13 TRO Hearing Tr. at 50:9–14.

**3. The Acquisition Results in a Duopoly in the Lucas County OB Services Market**

94. In the relevant market for inpatient OB services, the Acquisition is a merger to duopoly with Mercy being the only remaining competitor. 2/10 PI Hearing Tr. at 122:20–22; PX 2000 at 132:24–133:11 (Steele (PHS) IH).

**B. Market Shares, Concentration, and the Presumption of Competitive Harm**

95. The Acquisition significantly increases concentration in the already highly-concentrated Lucas County markets for GAC and OB services. ProMedica's post-Acquisition market share is 58.3% in the GAC market, where only two competitors remain, and 80.5% in the OB market, where only one competitor remains. PX 2124 at ¶¶ 51–52 (Town Decl.); PX 2125 at 29 (Town Decl., Ex. 5); PX 2150 (market share charts).

96. Under the U.S. Department of Justice and the Federal Trade Commission Horizontal Merger Guidelines (*"Merger Guidelines"*), which guide federal courts for merger analysis, a transaction that increases concentration by 200 points and results in a highly-concentrated market (HHI over 2,500) is presumed likely to enhance market power. PX 2214 at §

5.3 (*Merger Guidelines* ). This Acquisition far exceeds these thresholds: in the GAC market, concentration rises 1,078 points to 4,391; in OB, concentration rises 1,323 points to 6,854. PX 2124 at ¶ 52 (Town Decl.); PX 2125 at 29 (Town Decl., Ex. 5); PX 2150 (GAC and OB market share charts based on Town Decl. data).

97. By a wide margin, therefore, viewed from the above-cited thresholds, the Acquisition is presumptively anticompetitive in both relevant markets based on these high levels of market concentration, and is presumed likely to enhance ProMedica's market power in both markets. PX 2214 at § 5.3 (*Merger Guidelines); see* Conclusions of Law at Section II.D.

**VII. PROMEDICA AND ST. LUKE'S WERE SIGNIFICANT COMPETITORS PRIOR TO THE ACQUISITION**

**A. Because ProMedica's Lucas County Hospitals and St. Luke's Hospital Were Close Substitutes, the Acquisition Eliminates Significant Competition**

**1. Independent St. Luke's Hospital and ProMedica's Lucas County Hospitals Were Close Substitutes**

 **\*13** 98. St. Luke's provides care to a significant number of commercial patients in the Lucas County market. PX 2139 at 17 (Town Supp. Decl., Ex. 7); PX 2023 at 49:11–51:13 (Wakeman (SLH) Dep.); PX 1409 (July 2010 Wakeman e-mail).

99. St. Luke's is the third-largest hospital in the market based on commercial volume: St. Luke's had 2,846 commercial discharges between July 1, 2009 and March 31, 2010, exceeded only by St. Vincent and TTH. PX 2139 at 17 (Town Supp. Decl., Ex. 7). By July 2010, St. Luke's had surpassed UTMC, Flower Hospital, and St. Charles Hospital to serve the third-largest number of patients in the market based on total discharges and outpatient visits. PX 2023 at 49:11–51:13 (Wakeman (SLH) Dep.); PX 1409 (July 2010 Wakeman e-mail).

100. Prior to the Acquisition, ProMedica was St. Luke's "most significant competitor." PX 2008 at 245:23–246:23 (Wakeman (SLH) IH) (using inpatient market shares in SLH core service area); PX 2009 at 172:10–19 (Dewey (SLH) IH) (in obstetrics).

101. According to internal documents, in St. Luke's core service area (St. Luke's top eight zip codes), St. Luke's and

ProMedica had the first—and second-largest market shares, respectively, for GAC. PX 1235 at 3 ("Total Inpatient Market Share 1997–2010"). ProMedica and St. Luke's had the first- and second-largest market shares, respectively, for OB in St. Luke's core service area. PX 1235 at 5 ("Total Inpatient Market Share 1997–2010").

102. Based on Ms. Guerin–Calvert's data, in St. Luke's top ten zip codes by volume, (accounting for 64% of admissions), ProMedica (43%) and St. Luke's (26%) rank first and second in market share. PX 2138 at ¶ 25 (Town Supp. Decl.); PX 2123 at 41–42 (Guerin–Calvert Decl.). In eight of St. Luke's top ten zip codes, and in all of St. Luke's "core" zip codes, St. Luke's and ProMedica had the first—and second-highest shares of the GAC market. PX 2123 at 42 (Guerin–Calvert Supp. Decl. at 25); PX 2138 at ¶ 5 (Town Supp. Decl.); PX 2139 at 3 (Town Supp. Decl., Ex. 1).

103. In a 2008 survey conducted by St. Luke's in the ordinary course of business, respondents ranked St. Luke's and TTH first and second in patient preference and awareness within St. Luke's primary service area. PX 1077 at 9–14 ("St. Luke's Market Report 2008"). For obstetrics ("maternity"), TTH, St. Luke's, and Flower ranked as the top three preferred hospitals. PX 1077 at 13 ("St. Luke's Market Report 2008").

104. Testimony by executives of ProMedica and St. Luke's, third-party hospitals, and health plans all confirm the similarities in size and service offerings between St. Luke's and Flower Hospital. PX 2068 at ¶ 12; PX 2013 at 56:20–57:14; PX 2075 at ¶ 12; PX 2005 at 183:14–20 (Oostra (PHS) IH); PX 2008 at 184:11–16 (Wakeman (SLH) IH); *see also* PX 291 at 1 (March 2010 Steele and Sattler e-mails).

105. ProMedica's and St. Luke's market shares in southwestern Lucas County are significantly greater than Mercy's in both relevant product markets. PX 2138 at ¶¶ 5–6 (Town Supp. Decl.); PX 2125 at 38–41 (Town Decl. Ex. 7). See also, PX 2290 at 2–3

### 2. Independent St. Luke's Impacted ProMedica's Bottom Line

**\*14** 106. A 2010 ProMedica report concluded that "[m]arket share continued to wane early in 2009" and that "[a]dding St. Luke's would 'recapture' a substantial portion of recent losses." PX 159 at 5 (ProMedica 2010 Environmental Assessment). The same report noted, "[I]n metro Toledo, ProMedica's share of the inpatient market declined 1% through nine months of 2009, with St. Luke's Hospital picking

up half of that share[.]" PX 159 at 12 (ProMedica 2010 Environmental Assessment). One percent of ProMedica's 2009 gross revenue represents tens of millions of dollars. PX 322 at 1 (PHS Gross Revenues 1Q2009).

107. Real-world natural experiments in the marketplace confirm that St. Luke's successfully competed with ProMedica for a significant number of patients. For example, ProMedica estimated that St. Luke's readmission to X's network in 2009, after being excluded since 2005, would cost ProMedica X dollars in gross margin annually. PX 333 at 2. After St. Luke's was readmitted in July 2009, St. Luke's market share in its core service area rose from 36 percent to 43.1 percent in 2010, while ProMedica's market share in the same area declined. PX 1235 at 3. Mercy's and UTMC's shares during this period changed little in comparison. PX 1235 at 3.

108. ProMedica estimated that St. Luke's readmission to Paramount's network, after being excluded since 2001, would lead to a reduction of 255–344 commercial inpatient admissions (and hundreds of outpatient procedures) at ProMedica hospitals each year. PX 40 at 7–8 (ProMedica 2010 analysis); *see also* PX 236 at 2 (ProMedica 2008 analysis). ProMedica estimated that the impact on Flower Hospital alone would be $2.8 million of lost margin annually. PX 240 at 2; PX 291 at 1. The loss of admissions and "the potential for the acute care impact (loss) to be bigger over time" concerned ProMedica executives. PX 236 at 1. ProMedica estimated that some of the losses would be offset by an increase in membership for Paramount—up to 15,000 new members solely—from the addition of St. Luke's into the Paramount network. PX 40 at 8 (ProMedica 2010 analysis); *see also* PX 236 at 2 (ProMedica 2008 analysis).

### B. ProMedica Took Aim at St. Luke's as a Significant Marketplace Competitor

109. St. Luke's was significant enough in the marketplace that ProMedica sought to have third-party health plans exclude St. Luke's from their hospital provider networks and ProMedica refused to admit St. Luke's into Paramount's provider network. *See, e.g.,* PX 1127 at 1 (St. Luke's Competitor Assessment 2000–2008); PX 231 at 15 (X's 2008 Letter of Agreement); PX 1233 at 5 (St. Luke's 2009 Presentation).

110. ProMedica's 2008 Letter of Agreement with X contained a provision preventing X from adding St. Luke's (referred to in the agreement as the "participating network provider in

western Lucas County") until July 1, 2009. PX 231 at 15. The Letter of Agreement also specified a X% rate increase for all ProMedica hospitals to be paid by X to ProMedica upon adding St. Luke's to its network. PX 231 at 15.

**\*15** 111. A ProMedica executive noted in a May 7, 2008 e-mail that X "would add [St. Luke's] as soon as they are able" but that they "will have to pay PHS for the privilege." PX 380 at 1 (May 2008 Wachsman e-mail). The issue of St. Luke's exclusion from X's network was the "main deal breaker" for ProMedica in its negotiations with X and required a "huge effort" to accomplish. PX 295 at 1 (February 2008 Wachsman e-mail). ProMedica wanted to exclude St. Luke's in order to prevent a loss of volume to St. Luke's. PX 2017 at 60:7–60:23; PX 328 at 1 (ProMedica notes re: X).

112. ProMedica sought to exclude St. Luke's from X's network and indicated to X that this would be "an advantage to them." PX 2267 at 1 (X e-mail).

113. ProMedica evaluated opportunities to exclude St. Luke's from X's network. PX 407 at 1 (ProMedica Managed Care Strategy Recommendations).

114. St. Luke's noted that "Paramount leaders want SLH in; ProMedica leaders want to keep SLH out." PX 1233 at 5 (St. Luke's 2009 Presentation). A 2008 St. Luke's internal document stated that Paramount would "only let us back in when we give them [ProMedica] the keys." PX 1119 at 4 (St. Luke's Growth Pillar Update).

### C. St. Luke's Executives Knew St. Luke's Was Being Targeted by ProMedica and Feared Retaliation if St. Luke's Chose Other Affiliation Partners

115. In 2007, St. Luke's considered filing an antitrust suit against ProMedica, in response to perceived efforts by ProMedica to exclude or disadvantage St. Luke's in the market. PX 1144 at 3 (2007 Notes, Rupley, VP of Marketing and Planning); PX 1207 at 3 (2007 Mem. to Board of Directors).

116. A St. Luke's competitor assessment observed that "ProMedica desires the SLH geographic area, so they will continue to starve SLH through exclusive managed care contracts and owned physicians. They will do this until we sign up with them or are weakened[.]" PX 1127 at 1 (St. Luke's Competitor Assessment 2000–2008).

117. A St. Luke's document noted that ProMedica is "continuing an aggressive strategy to take over St. Luke's or put us out of business." PX 1152 at 1 (Notes re: Paramount negotiations).

118. In a speech to the Perrysburg Chamber of Commerce in 2008, St. Luke's CEO Daniel Wakeman stated that in order to "provide the best value to employers and consumers," hospitals should compete on "price, quality and service," but instead were competing on "how well you can lock out hospitals and other healthcare providers [from] health insurance networks." PX 1380 at 1; PX 2023 at 137:11–140:17 (Wakeman (SLH) Dep.) (confirming that speech referred to ProMedica and X and that St. Luke's was at the time excluded from X and Paramount). Unlike ProMedica, there is no evidence in the record that Mercy ever attempted to persuade a health plan to exclude St. Luke's.

119. In 2008, Mr. Wakeman described ProMedica as "[t]he organization that has taken the greatest resources from the community, made the best bottom line and perform[ed] poorly in terms of costs and outcomes." PX 1378 at 1 (December 2008 Wakeman e-mail); PX 2023 at 98:14–22 (Wakeman (SLH) Dep.) (confirming that reference is to ProMedica).

**\*16** 120. After years of competing vigorously against ProMedica, St. Luke's decided to become part of the ProMedica system, primarily to gain access to ProMedica's extraordinary health plan rates and out of fear of ProMedica's retaliation. In October 2009, in describing a possible affiliation with ProMedica, Mr. Wakeman advised leaders of the St. Luke's Board of Directors that ProMedica would bring "strong market/capital position" and "incredible access to outstanding pricing on managed care agreements" to St. Luke's. PX 1125 at 2. Mr. Wakeman concluded: "Taking advantage of these strengths may not be the best thing for the community in the long run. Sure would make life easier right now though." PX 1125 at 2.

121. St. Luke's feared that ProMedica would retaliate if St. Luke's affiliated with X or Y. PX 1030 at 21 (St. Luke's 2009 Affiliation Analysis Update); PX 1232 at 3 (August 2009 Wakeman e-mail to Board of Directors); PX 1130 at 6 (August 2009 Due Diligence Notes). St. Luke's determined that choosing ProMedica "[w]ould reduce or eliminate significant ProMedica actions that are bound to happen if St. Luke's partners with X or Y." PX 1030 at 16 (St. Luke's 2009 Affiliation Analysis Update). If St. Luke's partnered with X, St. Luke's expected a "[s]corched [e]arth [r]esponse" from

ProMedica and "the wrath of Alan [Brass, then-CEO of ProMedica]." PX 1030 at 21 (St. Luke's 2009 Affiliation Analysis Update); PX 1232 at 3 (August 2009 Wakeman e-mail to Board of Directors).

122. St. Luke's suspected that ProMedica was "threatening **[X]**" in order to "keep St. Luke's Hospital out of potential affiliations[.]" PX 1130 at 6 (Notes from Due Diligence Meetings, August 26, 2009).

## VIII. THE ACQUISITION ENABLES PROMEDICA TO RAISE RATES FOR ST. LUKE'S AND PROMEDICA'S OTHER LUCAS COUNTY HOSPITALS

### A. By Joining a Dominant System, St. Luke's Can Obtain Higher Rates Than It Could On Its Own

### 1. ProMedica and St. Luke's Understood that the Acquisition Would Increase St. Luke's Bargaining Leverage and Rates

123. ProMedica clearly was aware of its bargaining leverage before the Acquisition, as it even advertised this strength to entice potential affiliation partners. PX 226 at 8 (PHS presentation to potential hospital partners) ("Why ProMedica? ... Payer System Leverage").

124. SLH's own ordinary-course documents show that St. Luke's was fully aware that its acquisition by ProMedica would increase SLH's bargaining leverage and result in higher healthcare prices to health plans, employers, and patients.

125. A presentation to SLH's Board of Directors, regarding potential affiliation partners, states: "An SLH affiliation with ProMedica has the greatest potential for higher hospital rates. A ProMedica–SLH partnership would have a lot of negotiating clout." PX 1030 at 20 (Affiliation Analysis Update, October 30, 2009).

126. Formal notes, distributed among SLH's executives and assessing potential affiliation scenarios, point out that a "ProMedica or Mercy affiliation could still stick it to employers, that is, to continue forcing high rates on employers and insurance companies." PX 1130 at 5 (Notes from Due Diligence Meetings, August 26, 2009).

**\*17** 127. In an email to SLH's Board of Directors on October 11, 2009, SLH's CEO, Daniel Wakeman, wrote that "incredible access to outstanding pricing on managed care

agreements" is among the important "things Pro[M]edica brings to the table" as an affiliation partner, and that "[t]aking advantage" of this strength "may not be the best thing for the community in the long run" but that it "[s]ure would make life much easier right now though." PX 1125 at 2; *see also* PX 1130 at 4 ("Concern that U .T.[M.C.] does/may not have as high of [sic] reimbursement rates as ProMedica and/or Mercy.").

128. A presentation from SLH's top executives to SLH's Board of Directors in early 2009 states: "[I]n essence, the message [to payors] would be pay us now (a little bit more) or pay us later (at the other hospital system contractual rates)." PX 1018 at 9 (Options for St. Luke's: St. Luke's is now at a cross-roads); PX 2008 at 182:1–15 (Wakeman (SLH) IH). This same presentation states: "Option 3: Affiliate with ProMedica. What do they bring? Strong managed care contracts." PX 1018 at 14 (Options for St. Luke's: St. Luke's is now at a cross-roads).

129. SLH's CEO, Daniel Wakeman, and its Director of Marketing & Strategic Planning, Scott Rupley, both noted that an independent St. Luke's acts as a competitive constraint in the market and that SLH's merger with a larger system would lead to higher rates. PX 1144 at 3 (Rupley Notes from Planning Session, January 9, 2007) (Health plans should care about SLH's independence because "St. Luke's Hospital keeps the systems a little more honest. The [health plans] lose clout if St. Luke's is no longer independent."); *see also* PX 1229 (Email from Wakeman (SLH) to Oppenlander (SLH), August 20, 2009) ("[W]e need to show [X] that we intend to merge with another system, and all the value we produce will [be] diluted, as our payments skyrocket.").

130. St. Luke's anticipated as much as X to Y in additional revenues from X, Y, and Paramount as a result of joining ProMedica. PX 1231 ("Yes we asked X for X dollars, but if we go over to the dark green side [i.e., PHS] ... we may pick up as much as Y dollars in additional X, Y and Paramount fees").

131. St. Luke's anticipated that the transaction with ProMedica, and its potential for higher prices, would undergo antitrust scrutiny. PX 1228 at 2 (Email from Oppenlander (SLH) to Rupley (SLH), October 15, 2009) ("Slides 6, 11 and 17 will need some modification in your discussion of managed care rates/leverage. Unfortunately we can't talk about raising rates, managed care leverage and the like due to anti-trust issues."); PX 1030 at 17 ("significant legal, regulatory considerations ... ProMedica: HHI with St. Luke's

2011-1 Trade Cases P 77,395

is 34.7% and 29.9% without.... Any obstetrics affiliation may need to be carefully reviewed. Note: Anything [referring to HHIs] over 18% throws up a red flag.")

**2. Health Plans Expect the Acquisition to Result in Increased Bargaining Leverage and Higher Rates**

**\*18** 132. Health plans testified that the Acquisition has enhanced the bargaining leverage of St. Luke's and ProMedica.

a. X's representative testified that the Acquisition eliminates competition between ProMedica and St. Luke's and increases ProMedica's bargaining leverage against X. PX 2067 at ¶ 20. The increased bargaining leverage results from the fact that the Acquisition has made the prospect of walking away from PHS far less economically feasible for X than it was before the Acquisition. *Id.* at ¶ 21 ("Without St. Luke's and ProMedica, X's network would be much less attractive and we would lose members, particularly in southwestern Lucas County."); *see also* PX 2016 at 86:5–20 ("If ProMedica walked away, we would be devastated, business-wise.").

b. X's executive testified that the Acquisition increases ProMedica's bargaining leverage against X. PX 2017 at 51:14–20.

c. X's representative testified that the addition of St. Luke's to ProMedica's hospital network in Lucas County likely increased ProMedica's bargaining leverage and that this increase is potentially significant. PX 2013 at 61:6–23.

d. X's representative testified that X used its negotiated rates with St. Luke's as a benchmark in negotiations with ProMedica. PX 2073 at ¶ 11. However, as a result of the Acquisition, "what little leverage we had in negotiations with PHS has all but disappeared, and PHS's ability to demand higher rates from X and our clients has increased even further." PX 2073 at ¶ 15.

e. X's executive testified that SLH's merger with a larger system might give SLH the ability to negotiate higher rates. PX 2001 at 56:4–11. X's executive testified that, as a result the Acquisition, X will "[a]bsolutely" find it harder to serve its members in Lucas County without ProMedica in its network. *Id.* at 63:11–19. The executive also testified that if a contract was not reached with ProMedica, X would cease to operate in Lucas County. *Id.* at 64:12–65:4.

133. Health plans also testified that the Acquisition will likely allow ProMedica to demand and obtain higher reimbursement rates for not only St. Luke's but also ProMedica's other Lucas County hospitals.

a. X's representative testified that X expects ProMedica, "at a minimum," to increase SLH's reimbursement rates to the rates received by PHS's other hospitals. PX 2067 at ¶¶ 20, 22. In fact, since the Acquisition, PHS has already presented X with a proposal to increase SLH's rates to those received by PHS's other hospitals, resulting in an estimated rate increase of 22 percent. PX 2016 at 96:6–15. X is also concerned that the Acquisition could give ProMedica enough leverage to increase rates at PHS's other Lucas County hospitals. PX 2067 at ¶ 22.

b. An X executive, testified that, based on his experience, hospital mergers in which a large system acquires an independent community hospital typically cause the community hospital's rates to rise to the rates of the acquiring system through the greater bargaining leverage of the larger system. PX 2072 at ¶ 18("This occurs in large part because the community hospital gains increased leverage to negotiate with health plans by having a larger hospital system in a local area to use as leverage"). The executive likened these past mergers to ProMedica's acquisition of St. Luke's. PX 2072 at ¶ 18. X's current reimbursement rates at SLH are approximately 40 percent to 55 percent lower than its rates to PHS's Flower and Bay Park. PX 2072 at ¶ 16.

**\*19** c. X's representative testified that the Acquisition reduced competition in the market for general acute-care services in Lucas County. PX 2013 at 60:21–25. When competition is reduced in a market, healthcare costs and the reimbursement rates that X has to pay typically rise. PX 2013 at 61:1–5. The increased bargaining leverage that ProMedica obtained as a result of the Acquisition creates the potential for ProMedica to increase its reimbursement rates to X. PX 2013 at 61:18–23.

d. X's representative testified that, as a result of the bargaining leverage that ProMedica gained by acquiring St. Luke's, X "will have no choice but to accept these [increased] rates or consider exiting Lucas County altogether. As a direct result of this change in leverage, I expect PHS to increase SLH's rates significantly by at least 20% and also to increase the rates at its existing hospitals." PX 2073 at ¶ 15.

2011-1 Trade Cases P 77,395

e. X's executive testified that X expects SLH's reimbursement rates to rise as a result of the Acquisition. PX 2001 at 62:6–12.

f. X's executive testified that "[a] hospital's relative bargaining leverage against X is based on the hospital's importance and desirability" in the eyes of X's members. PX 2065 at ¶ 13. X's executive also testified that "the greater the hospital's relative bargaining leverage, the higher the prices and the less favorable the contract terms it will be able to demand from X." PX 2065 at ¶ 11.

g. ProMedica's economic expert, Margaret Guerin–Calvert, testified that an independent St. Luke's could obtain virtually the same rates as it could as part of ProMedica's system. PX 2026 at 216:11–217:23 (Guerin–Calvert Dep.). This claim, which was not supported by any ordinary course documents or testimony, or empirical support, is contradicted by numerous ProMedica and St. Luke's documents, as well as testimony from dozens of third-party witnesses.

134. Health plan executives testified that their firms will have little choice but to share with both their self—and fully-insured members any rate increases at St. Luke's or ProMedica's legacy hospitals after the Acquisition. PX 2067 at ¶ 26 ("When hospitals increase rates, health plans like X are forced to pass on the cost increase to employers and individuals, which results in significant increases in premiums."); PX 2013 at 14:20–15:20 (X must pass on any healthcare cost savings or increases to its members); PX 2072 at ¶ 20 increases in healthcare costs will fall directly on X's self-insured members and indirectly, via higher premiums, on X's fully-insured members); PX 2065 at ¶ 3("any discounts or rate increases that result from X's negotiations with healthcare providers flow directly and fully to our plan sponsors"); PX 2001 at 60:20–61:10; PX 2004 at 39:7–40:14; PX 2073 at ¶ 16.

**B. Already Dominant and High–Priced, ProMedica Becomes a Must–Have System With the Acquisition**

**1. ProMedica Becomes Even More Dominant Than Before**

*20 135. Prior to the Acquisition, ProMedica acknowledged its dominance in the Lucas County market through ordinary course documents.

a. A Standard & Poor's credit presentation stated: "ProMedica Health System has market dominance in the Toledo MSA."

PX 270 at 25 (ProMedica "Credit Presentation" to Standard & Poor's on 04/02/2008).

b. A 2010 presentation noted ProMedica's "leading market position within the Toledo metropolitan area" celebrating "dominant market share[s]" in oncology, orthopedics, and women's services. PX 320 at 3 (Kaufman Hall Presentation on ProMedica's Credit and Capital Position).

c. In its "2010 Environmental Assessment," ProMedica noted its status as a "clear market leader" in cancer services and orthopedics. PX 159 at 12–13. Regarding obstetrics services, the document states: "ProMedica has expanded on its already commanding share of the women's product line in metro Toledo, growing from 65% to 65.9% through nine months of 2009." PX 159 at 12–13 (ProMedica "2010 Environmental Assessment").

d. In a 2009 document, ProMedica noted that it was the "clear market leader" in obstetrics for the metro Toledo area, with a "commanding and largely stable market share" of 65% as of June 2008. PX 265 at 60 (ProMedica "2009 Environmental Assessment Draft").

e. In a strengths, weaknesses, opportunities and threats ("SWOT") analysis, ProMedica listed its "[d]ominant market share" as a strength. PX 319 ("TTH Medical Executive Committee SWOT Analysis Results 2007").

136. ProMedica's pre-Acquisition dominance was evident in its ability to successfully negotiate St. Luke's exclusion from X's network for 16 months. See VII B ¶¶ 109–111.

137. Prior to the Acquisition, ProMedica had the highest market shares for inpatient general acute-care and obstetrics services and the highest prices in Lucas County. PX 2125 at 27, 29 (Town Decl. Exhs.); PX 2139 at 13 (Town Supp. Decl. Exhs.); see also PX 153 (Email from Oostra (PHS) to Steele (PHS), Jan. 14, 2009) ("we hear from payors we are among the most expensive in ohio [sic]").

138. Market shares correlate with a hospital's market power. PX 2138 at ¶ 32 (Town Supp. Decl.). Professor Town's examination of hospital prices in Lucas County prior to the Acquisition demonstrates a high correlation between market shares and prices. PX 2138 at ¶ 33 (Town Supp. Decl.). ProMedica, the system with the highest market shares, had the highest prices. *Id.* Mercy, the system with the second-highest share, had the second-highest prices. *Id.* UTMC, with

the third-highest share, had the third-highest prices. *Id.* And St. Luke's, with the smallest share, had the lowest prices. *Id.*

139. Professor Town's analysis of willingness-to-pay demonstrates that consumers place 28 percent more value on having access to ProMedica hospitals in their networks than Mercy hospitals. PX 2138 at ¶ 6 (Town Supp. Decl.).

140. The Acquisition increases ProMedica's market shares for inpatient general acute-care services and obstetrics and its bargaining leverage with health plans. PX 2124 at ¶ 52, 55 (Town Decl.). The Acquisition increases ProMedica's market share among Lucas County hospitals from 47 percent to 58 percent for inpatient general acute-care services, and from 71 percent to over 80 percent for inpatient obstetrics services. PX 2125 at 29 (Town Decl., Ex. 5). The increases in ProMedica's market shares create a strong presumption of enhanced market power. PX 2124 at ¶ 53 (Town Decl.).

**\*21** 141. Patients in southwest Lucas County prefer to receive inpatient general acute-care and obstetrics services from ProMedica or St. Luke's. PX 2124 at ¶ 59 (Town Decl.); PX 2125 at 38–39 (Town Decl. Exs.). St. Luke's and ProMedica have the first—and second-largest market shares for general acute-care services in 11 of St. Luke's top drawing zip codes and for obstetrics services in 10 of St. Luke's top drawing zip codes. *See* PX 2125 at 38–39 (Town Decl. Exs.). Because St. Luke's was critical to health plans serving southwestern Lucas County residents that did not contract with ProMedica, the Acquisition removes consumers' ability to choose an independent St. Luke's and increases PHS's bargaining power in the Toledo area. PX 2016 at 75:18–76:10. X's own ordinary course calculations demonstrate that in the southwestern portion of the market St. Luke's maintained a 40 percent share, ProMedica a 36 percent share, UTMC all percent share, and Mercy a 10 percent share. PX 2290 at 2,3 (X Business Development Committee Meeting Minutes, March 9, 2010).

142. Ownership of St. Luke's—the only community hospital in southwest Lucas County—increases ProMedica's bargaining leverage with health plans. PX 2016 at 75:10–76:10; PX 2017 at 51:14–20. Development of proposed health care facilities by others were a response to growth in Lucas County's southwest quadrant. PX 2005 at 80:17–82:20 (Oostra (PHS) IH); PX 2018 at 54:14–57:6; PX 1148 at 10 (Health Leaders: Toledo Market Overview, 2008). These developments, near St. Luke's, were motivated by a "void" in ProMedica's hospital coverage in Lucas County.

PX 2005 at 81:3–82:20 (Oostra (PHS) IH). As Ms. Guerin–Calvert, ProMedica's expert, stated: "St. Luke's would serve as ProMedica's principle [sic] access to the southern and western portions of the Toledo MSA." PX 2136 at ¶ 94 (Guerin–Calvert Supp. Decl.).

**2. Health Plans Expect It Will Be Far More Difficult to Market a Hospital Network Without ProMedica**

143. The acquisition of St. Luke's increases ProMedica's market share and, in turn, its bargaining power with health plans, by a significant amount, because ProMedica now owns the only community hospital located in Maumee, in the southwestern portion of Lucas County. PX 2016 at 75:10–77:10.

144. The Acquisition increases ProMedica's importance to X. PX2016 at 76:11–14. X's representative stated that "it would be exponentially more difficult to market a network in Lucas County without ProMedica *and* St. Luke's." PX 2067 at ¶ 21. The representative testified that post-Acquisition: "If [ProMedica] decided to walk away, it would be significantly detrimental to [X's] business." PX 2016 at 76:17–18.

145. X's executive testified that the Acquisition would "absolutely" make it harder to serve its membership in Lucas County without ProMedica. PX 2001 at 63:11.

146. X's representative testified that the acquisition of St. Luke's has increased PHS' bargaining power and given PHS the ability to demand higher rates. PX 2073 at ¶ 15. Further, the representative testified that X has no choice but to accept the rate increases or consider exiting the market all together. PX 2073 at ¶ 15.

**\*22** 147. X's executive testified that X added St. Luke's to its network in 2008 because it concluded that it needed St. Luke's to be competitive in the market. PX 2017 at 56:4–11. The executive also testified that he expects ProMedica's acquisition of St. Luke's to increase ProMedica's bargaining leverage with X. PX 2017 at 51:14–20.

148. X's representative testified that the addition of St. Luke's to ProMedica's network likely increases ProMedica's bargaining leverage. PX 2013 at 61:6–14.

149. No health plan in at least the last ten years has offered a network without both ProMedica and St. Luke's. PX 2022 at 69:3–6 (Wachsman (PHS) Dep.); PX 2138 at ¶ 17 (Town Supp. Decl.).

### C. ProMedica Will Exercise its Increased Leverage to Extract Higher Rates

#### 1. ProMedica is Particularly Aggressive in Seeking Highest Rates Possible

150. ProMedica's CEO, Randall Oostra, concedes that PHS exercises its bargaining leverage to obtain the most favorable reimbursement rates possible from commercial health plans. PX 2005 at 259:22–24 (Oostra (PHS) IH) ("Q: Is one of ProMedica's goals to increase or to maximize revenue? A: Yes."), 260:20–22 ("Q: Is ProMedica happy with the rates that they have with managed care organizations? A: No. We would always like more."). ProMedica's own expert, Ms. Guerin–Calvert, concedes that PHS seeks to obtain the highest rates possible from commercial health plans. PX 2026 at 220:2–12 (Guerin–Calvert Dep.) ("Q: Are you aware of ProMedica ever saying to any health plan, 'That's too much?' A: I have never heard of-there may be an exception, but I do not recall any small, medium, or large hospital ever saying, 'Please, no, it's too much.' ").

151. ProMedica claims that it attempts to obtain a cost-coverage ratio of only X percent from commercial health plans, PX 2117 at ¶ 8 (Wachsman (PHS) Decl.). However, PHS's documents and testimony tell a different story. ProMedica's cost-coverage ratios for significant third-party, commercial health plans range from X percent (X) to Y percent (Y). PX 233 (PHS's Annualized Cost–Coverage Ratios for 2009); *see also* PX 2022 at 37:6–40:9 (Wachsman (PHS) Dep.) (supporting the view that PHS seeks to maximize cost-coverage ratios with third-party, commercial health plans, given the bargaining dynamic between PHS and each health plan); PX 381 (explanation of the cost-coverage ratio as a calculation of operating margin that—is, net revenue as a percentage of cost).

152. ProMedica's aggressiveness in seeking the highest rates possible was evidenced during X's last round of contract negotiations with PHS in 2009. X's representative testified that PHS "sought a rate increase of approximately X–Y% plus an annual inflation adjustment[,] ... substantially greater than that sought by St. Luke's and other hospitals in Lucas County in our last round of negotiations." PX 2067 at ¶ 18.

153. In Lucas County, there is a strong, positive correlation between a hospital's market share and the rates that the hospital is able to negotiate with commercial health plans. PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl. Exhs.). ProMedica's market share and rates are the highest in Lucas County. PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl. Exhs.).

#### 2. ProMedica's Ownership of Paramount May Further Enhance ProMedica's Incentive to Seek Post–Acquisition Rate Increases

**\*23** 154. Paramount pays lower reimbursement rates to ProMedica's hospitals, relative to the rates that third-party health plans pay to PHS's hospitals. PX 2006 at 60:6–11 (Wachsman (PHS) IH); PX 2013 at 62:11–15.

155. ProMedica's ownership of Paramount may increase PHS's incentive to bargain more aggressively with health plans for higher rates. PX 2067 at ¶ 24; PX 2016 at 49:6–13; PX 2124 at ¶ 82 (Town Decl.).

156. If ProMedica raised reimbursement rates to third-party health plans, these health plans' insurance products would become more expensive and, thus, less attractive to employers relative to Paramount's products. PX 2013 at 62:19–63:5; PX 2067 at ¶ 24. As a result, such a rate increase would benefit PHS not only by increasing revenues at its hospitals (because of the higher rates) but also by attracting more customers to Paramount's insurance products. PX 2013 at 63:6–15; PX 2067 at ¶ 24.

157. If a third-party health plan were unable to offer a network that included ProMedica, Paramount would benefit because its network would become more attractive relative to the other health plan's network. PX 2067 at ¶ 24; PX 2016 at 98:18–22, 98:25–99:1; *cf.* PX 2013 at 63:16–25.

158. ProMedica's ownership of Paramount makes a health plan's failure to contract with PHS more costly for the health plan because walking away from PHS would cause the health plan to become less attractive to current and potential members, relative to other health plans (including Paramount) that include ProMedica in its network. PX 2067 at ¶ 24; PX 2124 at ¶ 82 (Town Decl.); *cf.* PX 2013 at 63:16–25.

159. The cost to ProMedica of failing to reach an agreement with a health plan is diminished by the increased revenue Paramount will receive from patients switching from that health plan to Paramount as a result of PHS being out of that health plan's network. PX 2067 at ¶ 24; PX 2124 at ¶ 82 (Town Decl.); *cf.* 2013 at 63:16–25.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

160. Adding St. Luke's to ProMedica and, thus, to Paramount's network increases the attractiveness of Paramount's products to customers in Lucas County. PX 2013 at 64:1–6; PX 2067 at ¶ 24.

161. ProMedica's acquisition of St. Luke's makes failing to contract with PHS even more costly to third-party health plans and less costly to PHS, because walking away from PHS creates a much wider disparity than before the Acquisition: the third-party health plan's network becomes significantly less attractive *without* both PHS and SLH, while Paramount's network becomes significantly more attractive *with* both PHS and SLH. PX 2067 at ¶ 24; PX 2124 at ¶ 82 (Town Decl.); *cf.* PX 2013 at 64:15–65:5.

**D. Health Plans Cannot Constrain ProMedica's Price Increases**

**1. Mercy's Presence in the Relevant Market Will Not Constrain ProMedica's Exercise of Increased Market Power Resulting From the Acquisition**

162. Mercy has not been a sufficiently strong competitive constraint before the Acquisition against ProMedica's exercise of market power. Despite the geographic proximity of Mercy's three Toledo-area hospitals and PHS's three legacy Toledo-area hospitals, and the relative similarity of their service offerings, PHS maintained a substantial advantage in terms of its Lucas County market share prior to the Acquisition. PX 2138 at ¶ 2 (Town Supp. Decl.). Prior to the Acquisition, PHS's market share for inpatient GAC services was 63 percent larger than that of Mercy. For inpatient obstetrics services, PHS's share was 266 percent larger than Mercy's. *Id.;* PX 2125 at 29 (Town Decl. Exhs.). The difference in shares between PHS and Mercy prior to the Acquisition demonstrates that consumers do not view the hospital systems as interchangeable. PX 2138 at ¶ 2 (Town Supp. Decl.); PX 2016 at 87:11–88:2.

 **\*24** 163. The Acquisition has further increased the disparity between ProMedica's and Mercy's market shares in both relevant markets. PX 2138 at ¶ 7 (Town Supp. Decl.). PHS's post-Acquisition market share in inpatient GAC services is roughly twice as large as Mercy's. *Id.;* PX 2125 at 29 (Town Decl. Exhs.). PHS's post-Acquisition market share in inpatient obstetrics services is more than four times greater than Mercy's. PX 2138 at ¶ 7 (Town Supp. Decl.).

164. Prior to the Acquisition, Mercy's presence in the market did not limit ProMedica's ability to charge the highest rates, by far, in Lucas County. PHS's severity-adjusted (i.e., apples-to-apples) prices were X percent higher than Mercy's, X percent higher than UTMC's, and X percent higher than SLH's. PX 2138 at ¶ 3 (Town Supp. Decl.); *see also* PX 2125 at 27 (Town Decl. Exhs.). There is no evidence before the Court suggesting that these price disparities are due to differences in costs of care or quality of care. PX 2138 at ¶ 3 (Town Supp. Decl.). If, prior to the Acquisition, Mercy served as a very close substitute to PHS and constrained it accordingly, one would expect ProMedica's rates to be much lower and much closer to Mercy's. *Id.*

165. The Acquisition has given PHS a significant locational advantage over Mercy because Mercy offers no direct counterpart to St. Luke's in southwestern Lucas County. PX 2138 at ¶ 7 (Town Supp. Decl.); PX 2016 at 61:23–62:17. *See also* PX 2290 at 2–3.

166. In southwestern Lucas County, the combined market share of ProMedica and St. Luke's in both inpatient GAC services and inpatient obstetrics services is much larger than Mercy's corresponding share. PX 2138 at ¶¶ 5–6 (Town Supp. Decl.); PX 2139 at 3 (Town Supp. Decl. Exhs.); PX 2125 at 38–41 (Town Decl. Exhs.); PX 2290 at 2–3.

167. Econometric analysis of willingness-to-pay shows that, prior to the Acquisition, commercially-insured patients placed 28 percent more value on having in-network access to ProMedica than on having in-network access to Mercy. PX 2138 at ¶ 6 (Town Supp. Decl.); PX 2139 at 8 (Town Supp. Decl. Exhs.). This same analysis shows that the Acquisition has increased by 58 percent the value that commercially-insured patients place on having in-network access to PHS. PX 2139 at 8 (Town Supp. Decl. Exhs.). In other words, as a result of the Acquisition, consumers value in-network access to ProMedica nearly twice as much as they value in-network access to Mercy. *Id.* Thus, the Acquisition has rendered Mercy a significantly more distant substitute for PHS in the eyes of health plans and their members. PX 2138 at If 7 (Town Supp. Decl.).

168. Mercy did not provide a sufficiently strong competitive constraint to prevent ProMedica from exercising its market power before the Acquisition. PX 2138 at ¶ 8 (Town Supp. Decl.). In light of the fact that the Acquisition has made ProMedica more dominant and has made Mercy less competitive against ProMedica, there is no reason to believe that Mercy will be able to constrain ProMedica's post-

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

acquisition exercise of enhanced market power. PX 2138 at ¶ 8 (Town Supp. Decl.).

### 2. A Hospital Network Consisting of Mercy and UTMC is Not a Viable Substitute for One Including ProMedica

**\*25** 169. No health plan in the last 10 years has ever offered a network comprised of only UTMC and Mercy. PX 2022 at 69:3–5 (Wachsman (PHS) Dep.); PX 2138 at ¶ 17 (Town Supp. Decl.).

170. ProMedica's post-Acquisition market share is significantly higher than the combined market share of Mercy and UTMC. PX 2138 at ¶ 17 (Town Supp. Decl.). A Mercy and UTMC network is not a viable or close substitute for a ProMedica–St. Luke's network, as evidenced by relative market shares, and patient draw by zip codes, which indicate each hospital's relative desirability among patients. PX 2138 at ¶ 17 (Town Supp. Decl.).

171. In particular with respect to obstetrics services, a network comprised of Mercy and UTMC would not be nearly as attractive as a network comprised of ProMedica and St. Luke's because Mercy's St. Anne, located proximally to ProMedica's Flower Hospital, and UTMC, located proximally to St. Luke's, do not offer obstetrics services. PX 2124 at ¶ 30 n. 22 (Town Decl.).

172. An X executive testified that prior to the Acquisition, marketing a network consisting of St. Luke's, Mercy, and UTMC would have been feasible. PX 2067 at ¶ 21. However, post-Acquisition, marketing a network that excludes ProMedica would be "detrimental to X's business." PX 2016 at 76:17–18. X would try to find any solution other than marketing a network comprised of only Mercy and UTMC because employers strongly prefer a network that includes ProMedica. PX 2016 at 89:5–23.

173. An X executive testified that marketing a network without ProMedica post-Acquisition makes it much more difficult to serve its members. PX 2001 at 63:11–19.

174. X testified that it cannot create a viable hospital network in Lucas County that consists only of Mercy and UTMC. PX 2073 at ¶ 15.

175. Employers testified that a network comprised of UTMC and Mercy would not be suitable to employees. PX 2070 at ¶ 8; PX 2069 at ¶ 8; PX 2062 at ¶ 8; PX 2058 at ¶ 7.

### 3. Health Plans Cannot Defeat ProMedica's Price Increases By Steering Members to Less Expensive Hospitals

176. Health plans are currently placing greater emphasis on open-access networks than they did prior to 2008. PX 2138 at ¶ 16 (Town Supp. Decl.); PX 2067 at ¶ 15. For example, an X executive testified that it added Mercy in 2008 and St. Luke's in 2009 in response to member preferences for access to all Lucas County hospitals. PX 2072 at ¶ 13; *see also* PX 2067 at ¶ 15.

177. Employers testified that their employees prefer health plan networks that include all Lucas County hospitals. PX 2054 at ¶ 5; PX 2059 at ¶ 4; PX 2052 at ¶ 3.

178. It is not practical to steer members to lower cost providers because members prefer full access to their health plan's network and find steering mechanisms inconvenient and difficult to understand. PX 2124 at ¶ 39 (Town Decl.). ProMedica's economic expert could only identify one employer in Lucas County, X, who engages in any steering by providing incentives to its employees to use Mercy hospitals. PX 2026 at 147:24–150:15 (Guerin–Calvert Dep.).

**\*26** 179. An X executive testified that there generally is member resistance to steering mechanisms in a network plan. PX 2016 at 68:21–25.

180. Despite the existence of excess capacity in the Lucas County market prior to the Acquisition, health plans did not attempt to steer patients from ProMedica to lower priced hospitals, such as St. Luke's. PX 2138 at ¶ 13 (Town Supp. Decl.); PX 2124 at ¶ 39 (Town Decl.).

181. An X executive testified that, "[a]s of today, X does not have a mechanism in place to steer its members from high-cost hospitals to lower-cost hospitals." PX 2067 at ¶ 17.

182. It would be even more difficult for health plans to steer Lucas County residents to hospitals outside of Lucas County, such as Fulton County Health Center or Wood County Hospital, even if these hospitals have available capacity, in an effort to resist a price increase. PX 2124 at ¶ 39 (Town Decl.).

183. An X executive testified that it is probable that hospital systems like ProMedica, with substantial bargaining leverage, can reject a health plan's attempt to negotiate terms that would steer patients to low-cost providers. PX 2016 at 65:22–68:8.

184. An X executive testified that although it provides online tools that allow members to access quality and cost information about hospitals, it does not provide economic incentives for members to use any particular hospitals, and its online tools have not resulted in any shifts in the hospitals its members utilize. PX 2017 at 12:4–13:10.

### 4. A High Degree of Overlap in Physicians' Admitting Privileges Has Not And Will Not Constrain ProMedica's Exercise of Increased Market Power Resulting From the Acquisition

185. It is not uncommon for physicians to maintain admitting privileges at hospitals where they rarely admit patients. PX 2138 at ¶ 28 (Town Supp. Decl.); *see, e.g.,* PX 2056 at ¶ 3 ("X has a total of approximately X physicians on its staff. However, many of these physicians visit X only three to four times per year.").

186. Admitting privileges across hospitals is a misleading measure of physician preferences or a physician's actual admission patterns. PX 2138 at ¶ 28 (Town Supp. Decl.). Market shares are a much better measure of physician (and patient) preferences and admission patterns. *Id.*

187. Hospitals in Lucas County are differentiated by location and other characteristics, and, therefore, patients face costs associated with hospital switching independent of the physicians' cost of shifting their patients. PX 2138 at ¶ 28 (Town Supp. Decl.).

188. The fact that many physicians in Lucas County had admitting privileges at both PHS and SLH before the Acquisition, if anything, supports the conclusion that PHS and SLH directly competed with one another before the Acquisition. *Id.; see* PX 2136 at ¶ 42 (Guerin–Calvert Supp. Decl.). This is because, in addition to competing for inclusion in health plan networks, PHS and SLH competed prior to the Acquisition to attract patients based on variables such as quality and patient satisfaction while also competing to convince physicians to refer to their hospitals rather than a competitor's hospital. PX 2138 at ¶ 28 (Town Supp. Decl.).

**\*27** 189. The high degree of overlap in physician's admitting privileges prior to the Acquisition did not constrain ProMedica from charging among the highest prices in Lucas County and some of the highest in the state. PX 153 (Oostra (PHS) January 2009 e-mail).

## IX. LUCAS COUNTY EMPLOYERS AND RESIDENTS WILL BE HARMED BY HIGHER HOSPITAL REIMBURSEMENT RATES

### A. Local Employers and Physicians are Concerned About the Competitive Harm From the Acquisition

190. Local employers and physicians recognize that ProMedica is the dominant healthcare provider in Lucas County. PX 2062 at ¶ 8; PX 2061 at ¶ 6; PX 2051 at ¶ 9; PX 2053 at ¶ 5; PX 2076 at ¶ 10. An employer explained the reasons behind ProMedica's dominance: "ProMedica already has substantial leverage in the Toledo area due to its ownership of several hospitals and numerous physicians, as well as its ownership of Paramount, a dominant local health plan." PX 2062 at ¶ 8.

191. Local employers testified that they are concerned that the Acquisition will provide ProMedica with increased bargaining leverage against health plans, enabling ProMedica to raise rates at St. Luke's and ProMedica's other Lucas County hospitals. PX 2070 at ¶ 8; PX 2052 at ¶ 4; PX 2051 at ¶ 9; PX 2062 at ¶ 8; PX 2058 at ¶ 7; PX 2053 at ¶ 5; PX 2061 at ¶ 6; PX 2066 at ¶ 7. This would result in higher healthcare costs for employers and their employees. *Id.*

192. Local employers and physicians are concerned that the Acquisition may diminish St. Luke's quality of care and patient-centered approach. PX 2075 at ¶ 14 (St. Luke's provides "an intimate, family-like atmosphere"); PX 2055 at ¶ 6 ("I would be concerned if St. Luke's quality and community health programs were compromised after its merger with ProMedica"); PX 2074 at ¶ 9. One physician testified: "I am concerned that PHS will change the quality-driven, patient-focused gestalt of SLH and that SLH's distinct community feel will diminish, as occurred at DRMC after it was taken over by PHS." PX 2076 at ¶ 11. An employer stated: "St. Luke's provides high-quality patient care and a personal touch that our employees appreciate. I hope that St. Luke's warm atmosphere and attentive patient care will not lessen or disappear after its acquisition by ProMedica." PX 2058 at ¶ 5.

193. Local employers and physicians are concerned that the Acquisition will result in the elimination or transfer of service lines from St. Luke's to other less-preferred and less-convenient ProMedica facilities. PX 2074 at ¶ 9; PX 2077 at ¶ 8. As a local physician testified, "[t]he elimination of services will result not only in less patient choice but in longer wait times for appointments, as the same number of patients try to utilize a smaller number of facilities." PX 2077 at ¶ 8.

### B. Self-insured Employers' Costs Will Increase Directly and Immediately

194. Unlike fully-insured employers who pay fixed monthly premiums to health plans, selfinsured employers directly pay the full cost of their employees' healthcare claims to healthcare providers. PX 2124 at ¶ 10 (Town Decl.); PX 2070 at ¶¶ 3, 8; PX 2069 at ¶¶ 2, 8; PX 2054 at ¶ 8. Thus, when hospital reimbursement rates increase, self-insured employers immediately and directly must pay these higher costs. *Id.*

**\*28** 195. In Lucas County, approximately 70 percent of the commercially insured business is selfinsured. PX 2124 at ¶ 10 (Town Decl.).

### C. Fully-insured Employers' Premiums Will Increase

196. Under a fully-insured plan, an employer pays a premium to a health plan and the health plan absorbs all of the costs for the medical care that the employees receive. PX 2124 at ¶ 10 (Town Decl.). Thus, the health plan bears the risk that the employees' medical expenses will exceed the amount collected from premiums. *Id.*

197. When a health plan incurs a rate increase from a hospital, it must pass down the increased costs to employers in the form of higher premiums. PX 2067 at ¶ 26; PX 2013 at 15:16–20; PX 2073 at ¶ 16.

198. Increased premiums can lead some employers to drop or reduce health care coverage. PX 2124 at ¶ 105 (Town Decl.); PX 2055 at ¶ 4 ("lower funding combined with rising healthcare costs forced us to drop our insurance coverage"). Reducing or dropping health care coverage adversely impacts Lucas County residents' access to important medical services and, as a result, adversely impacts their overall health and well-being. *See, e.g.,* PX 2070 at ¶ 8; PX 2054 at ¶ 8.

### D. Employees' Premiums and Out-of-Pocket Costs Will Increase

199. Employers cite healthcare costs as one of their largest expenses. PX 2060 at ¶ 8 ("Healthcare is X's largest overhead expenditure"); PX 2061 at ¶ 6 ("[h]ealth insurance costs are one of X's largest expenditures, second only to employee salaries"); PX 2063 at ¶ 2 ("X spends a significant portion of our budget on healthcare costs"); PX 2069 at ¶ 8 ("Healthcare costs are already a significant expense for X").

200. When healthcare costs rise due to hospital rate increases, employers generally must increase employees' premiums, co-payments, deductibles, and out-of-pocket costs. PX 2061 at ¶ 6 ("X already has had to pass along health insurance premium increases to employees" in recent years); PX 2059 at ¶ 7 ("X cannot absorb increased healthcare costs, therefore, we would be forced to pass on these additional costs to our employees by raising their deductibles and co-payments ... or increasing the percentage of the health insurance premium that our employees pay"); PX 2069 at ¶ 8 ("we will have few options but to share these increased costs with our employees through higher deductibles and co-payments"); PX 2074 at ¶ 8; PX 2058 at ¶ 7 ("X may have to start making our employees pay for 10 to 20 percent of the premium costs."); PX 2051 at ¶ 9; PX 2063 at ¶ 7; PX 2069 at ¶ 8.

201. Higher healthcare costs may force employers to offer more restrictive health insurance plans, with fewer provider choices. PX 2060 at ¶ 8; PX 2069 at ¶ 8 (a limited provider network would be "extremely unpopular and burdensome to our employees"); PX 2066 at ¶ 7. Less provider choice would force some employees to travel farther for services, and to lose access to their preferred physician or hospital unless they are able to pay higher, out-of-network rates. *Id.* "[I]f our employees wanted to continue to use St. Luke's [and it was no longer in our health plan's network], they would have to pay double the cost of their current deductibles, and their out-of-pocket maximum costs would be exponentially higher than before the merger." PX 2060 at ¶ 8.

## X. THE ACQUISITION WILL ELIMINATE BENEFICIAL NON–PRICE COMPETITION AND RESULT IN LOWER QUALITY OF CARE AND SERVICE LEVELS

**\*29** 202. Hospitals compete on the basis of clinical quality, amenities, overall patient experience, and price. PX 2124 at ¶ 84 (Town Decl.).

### A. Pre–Acquisition Competition Between ProMedica and St. Luke's Resulted in Improved Hospital Quality and Service Offerings

203. The Acquisition eliminates important non-price competition between ProMedica and St. Luke's. Post–Acquisition, "with lessened competition, ProMedica will have diminished incentives to provide better services or improved quality." PX 2082 at ¶ 13; *see also* PX 2077 at ¶ 7–8; *see* PX 1170 at 20 (Draft SLH Presentation to employers)

(St. Luke's as an independent hospital: "Challenges [other hospital] systems to keep service levels up.").

204. Testimony of ProMedica executives confirms that hospital competition within Lucas County has led to increased quality of care, additional service offerings, and other non-financial benefits for the residents of Lucas County. PX 2006 at 127:5–20 (Wachsman (PHS) IH); PX 2005 at 174:2–180:18 (Oostra (PHS) IH).

205. Health plan executives have testified that non-price dimensions, including clinical quality and patient satisfaction levels, are important factors to consider when negotiating for a hospital's inclusion in the health plan's network. PX 2001 at 43:12–44:1; PX 2067 at ¶¶ 6, 13; PX 2072 at ¶ 9.

206. Local employers have noted that competition among healthcare providers has led to higher quality of care and better healthcare services for their employees. PX 2066 at ¶ 7; PX 2052 at ¶ 4; PX 2062 at ¶ 8.

### B. St. Luke's Recognized as Providing High Quality Services

207. St. Luke's ranks as a high quality, low cost hospital in the Toledo market. PX 1018 at 12 (Options for SLH); PX 1072 at 11 (SLH Key Messages); PX 2009 at 56:16–58:24, 115:20–22 (Dewey (SLH) IH).

208. Despite St. Luke's rapid growth in patient volume in 2010, patient satisfaction and quality were unaffected and remained at very high levels. PX 2023 at 17:15–24; 55:9–18; 90:21–91:2 (Wakeman (SLH) Dep.). In fact, several quality measures improved, such as myocardial infarction (i.e., heart attack) care, emergency and obstetrical satisfaction levels, and door to artery time for cardiac intervention. PX 2023 at 53:25–54:7 (Wakeman (SLH) Dep).

209. St. Luke's achievements in clinical quality exceed those of TTH and Flower, its closest competitors in the ProMedica system for inpatient hospital services. ProMedica's flagship hospital, TTH, ranked *last* in the Toledo market and below the state average for quality. PX1172 (SLH e-mail, Kathy Connell, Corp. Comm'ns Director, to Scott Rupley, August 28, 2009) ("[I]n the Commonwealth scoring on quality, SLH was the best, just a hair shy of the top 10% nationally, with Toledo Hospital dead last and well below the state average."); PX 1030 at 18–19 (SLH Affiliation Analysis Update, Oct. 2009); PX 1016 at 6 (SLH Board Meeting Affiliation Update, Dec. 2009). Flower ranked sixth in Lucas County for overall quality. PX 1030 at 18–19 (SLH Affiliation Analysis Update, Oct. 2009).

**\*30** 210. ProMedica has acknowledged that SLH is a high quality hospital. PX 2015 at 119:1–4 (Hammerling (PHS) IH) (St. Luke's has a "good reputation historically" for quality and patient care); PX 2002 at 123:3–5 (Hanley (PHS) IH) ("I think St. Luke's has strong quality of care [.]"); TRO Hearing Tr. at 54:6–10.

211. ProMedica documents reflect patients' awareness that St. Luke's was a high-quality hospital, often scoring better than ProMedica in quality rankings. PX 399 (PHS Central Region, Great Lakes Marketing Presentation); PX 272 (Commonwealth Fund 2007 scores); PX 2299 (CareChex Hospital Quality Ratings). ProMedica also has admitted that St. Luke's scored higher than TTH and Flower in patient satisfaction scores. PX 2000 at 131:13–18 (Steele (PHS) IH).

212. Health plans have testified that St. Luke's is an attractive and valuable hospital to their Lucas County provider networks because it provides high-quality services. *See* PX 2013 at 55:17–56:2; PX 2280 (X document on SLH quality); PX2065 at ¶ 8 (; PX 2073 at ¶ 11.

213. Both X and Y view St. Luke's as a high-quality competitor. PX 2018 at 89:21–23 ("St. Luke's is a high-quality hospital. I mean, their numbers prove that out."); PX 2068 at ¶ 27; PX 2019 at 43:10(describing St. Luke's as a "historically excellent, small, community hospital").

214. St. Luke's "is regularly recognized by third-party quality ratings organizations that rank St. Luke's within the top 10% of hospitals nationally, based on outcomes, cost and patient satisfaction." PX 390 (ProMedica News Release May 26, 2010), *see also* PX 1073 (SLH Press Release *Healthgrades.com* ). Third-party quality ranking organizations also regularly praise St. Luke's for its value, *i.e.,* its combination of high quality and low costs. PX 2300 (Leap Frog 2008) (Leap Frog recognized St. Luke's as one of only 13 hospitals across the nation to be rated "Highest Value"); PX 1138 (Quality Scoring from hospitalbenchmark.com).

215. Independent physicians testified that St. Luke's quality was higher than ProMedica's, and expressed concern that St. Luke's quality would decrease after the Acquisition. PX 2077 at ¶ 7; PX 2081 at ¶¶ 10–11; PX 2075 at ¶¶ 11–13.

216. Employers and community organizations have testified that St. Luke's is committed to delivering high-quality, patient-minded care. PX 2055 at ¶ 6; PX 2054 at ¶ 6; PX 2058 at ¶ 6; PX 2069 at ¶ 3; PX 2074 at ¶ 9.

### C. ProMedica Cannot Be Expected to Improve St. Luke's Quality

217. In an internal analysis of potential acquisition options, St. Luke's noted that its "well maintained facilities," "strong clinical quality outcomes," "strong patient/employee satisfaction and loyalty," and "positive working relationships with affiliated physicians" were all important points of leverage "to secure the best offer" for St. Luke's from several possible affiliation partners. PX 1018 at 18 (Options for SLH).

**\*31** 218. Delivering high-quality service is an important part of St. Luke's culture. According to Barbara Machin, former Chairman of St. Luke's board, "Our motto has always been 'Patients First Always.' Quality and patient service and patient care has been our mantra." PX 2007 at 54:19–21 (Machin (SLH) IH).

219. St. Luke's feared that the Acquisition by ProMedica would lower St. Luke's quality. PX 1130 at 2 (Notes from Due Diligence Meetings, August 26, 2009) ("Some of ProMedica's quality outcomes/measures are not very good. Would not want them to bring poor quality to St. Luke's."); PX 1016 at 23 (SLH Affiliation Update Dec. 2009); PX 2008 at 237:2–5 (Wakeman (SLH) IH) (acknowledging concern that affiliating with a lower quality institution might have an adverse impact on St. Luke's.).

220. ProMedica acknowledged the need to improve its clinical quality. PX 1030 at 18; *see* PX 153 (Oostra (PHS) January 2009 e-mail re: ProMedica's "subpar quality scores"); PX 2000 at 129:10–15 (Steele (PHS) IH) (TTH struggled to be patient-centered). Mr. Wakeman informed the St. Luke's Board of Directors that ProMedica "acknowledges they need to improve" quality measures. PX 1030 at 18 (SLH Oct. 2009 Affiliation Analysis Update); *see also* PX 2023 at 92:14–93:9 (Wakeman (SLH) Dep.).

### XI. NEW ENTRY AND EXPANSION WILL NOT COUNTERACT OR DETER THE ANTICOMPETITIVE EFFECTS OF THE ACQUISITION

### A. Entry or Expansion Will Not Be Timely, Likely, or Sufficient

221. It would take significantly longer than the two-year timeframe prescribed by the *Merger Guidelines* to plan, obtain zoning, licensing, and regulatory permits, and construct a new hospital in Lucas County. ProMedica's CEO Randall Oostra testified that building even a small hospital the size of Bay Park—which has approximately 72 staffed beds and is far smaller than St. Luke's—would be a "several-year project." PX 2005 at 92:17–93:7 (Oostra (PHS) IH). X's executive testified that it took X more than two years to construct and open its facility. PX 2068 at ¶ 25.

222. Constructing a new obstetrics unit and encouraging a sufficient number of obstetricians to utilize and support it would take a substantial amount of time as well. X's executive testified that it would be very challenging to encourage obstetricians to utilize a new unit since most obstetricians tend to deliver at the hospital that employs them, and it is difficult to recruit new obstetricians. PX 2068 at ¶¶ 20, 21. X of Y testified that it would be necessary to build both an obstetrics unit and a NICU unit and to ensure sufficient emergency department capacity, at a cost of tens of millions of dollars. PX 2064 at ¶ 10.

223. The *Merger Guidelines* explain that for entry to be considered likely, it must be a profitable endeavor, in light of the associated costs and risks. Constructing a new hospital requires an extraordinarily large, up-front capital investment, and the pay-off is risky and deferred into the future, which makes it highly unlikely that a new hospital competitor will enter the Lucas County hospital market. PX 2124 at ¶ 97 (Town Decl.).

**\*32** 224. It would cost a substantial amount of money to construct even a basic 35–bed general acute-care hospital in Lucas County. X's executive testified that it would require at least $55 million in up-front, initial capital to build this type of basic general-acute care hospital. PX 2068 at ¶¶ 25, 26. By comparison, the executive stated that, in the early 2000s, it cost over $61 million to construct X's facility. PX 2068 at 25.

225. ProMedica's CEO Randall Oostra testified that it would cost $350 million or more in today's market to build a hospital with 300 licensed beds similar to St. Luke's. PX 2005 at 86:13–22 (Oostra (PHS) IH). Charles Kanthak, SLH's Facilities Services Director, estimated that to build a new hospital identical to St. Luke's in northwest Ohio in 2009 would cost $165 million "on the cheap" and over $200 million

to "do it right." PX 1257 (October 2009 email describing SLH's buildings and departments and estimating how much it would cost to build a "replacement" St. Luke's in 2009). Although ProMedica purchased land in southwest Lucas County around 2000, ProMedica has not budgeted any money for constructing a new hospital and no construction has taken place. *See* PX 2005 at 82:21–25 (Oostra (PHS) IH) (stating that ProMedica purchased property approximately ten years prior); PX 2132 at ¶ 113 (Dagen Supp. Decl.). The most recent discussions about developing the property took place over two years ago and no plans for the project appear in ProMedica's 2010–2012 Strategic Plans. PX 2005 at 93:21–94:18; PX 6 (PHS Hospitals' 2010–2012 Strategic Goals and Objectives); *see infra* Section XV.A.2.

226. Access to necessary capital is a significant barrier to entry for the vast majority of potential entrants to Lucas County. PX 2124 at ¶ 97 (Town Decl.). Current economic conditions make it particularly challenging to obtain the necessary capital to undertake significant hospital expansions or to construct a new hospital in Lucas County. David Dewey, SLH's VP of Business Development, testified that "it would be more difficult to get [ ] capital" and establish a new hospital in today's economic environment. PX 2009 at 174:12–25 (Dewey (SLH) IH). A 2009 presentation created by SLH's senior executives and presented to SLH's Board explains how the tight capital markets have made new hospital construction or expansion in Toledo highly unlikely: "ProMedica and Mercy do not want to build in the [southwest] area due to lack of capital access. Also, both have taken on large amounts of debt due to recent major construction projects. [UTMC does] not want to build either." PX 1018 at 6. In his May 2009 planning notes, Scott Rupley, SLH's Marketing and Planning Director, declared, "Nobody is going to be able to build anything for awhile. Can't borrow money." PX 1120 at 2.

227. The fact that Lucas County already has ample general acute-care inpatient beds to fulfill the needs of the community makes entry or expansion even more unlikely. ProMedica's economic expert, Margaret Guerin–Calvert, testified that there is "substantial excess hospital bed capacity in Toledo." PX 2122 at ¶ 20 (Guerin–Calvert Decl.). David Dewey, SLH's VP of Business Development, testified that "there is enough [hospital service] capacity" in "northwest Ohio as a whole." PX 2009 at 176:8–10, 176:22–177:1 (Dewey (SLH) IH). X's executive shared his perspective that "there are already more than enough hospital beds to serve the community and utilization rates remain low." PX 2068 at ¶ 26.

***33** 228. Lucas County's population currently is flat or declining, making it economically unattractive to add more hospital beds. SLH's CEO, Dan Wakeman, testified that "the general metropolitan Toledo area has seen a population decline in the last ten years." PX 2008 at 54:19–21 (Wakeman (SLH) IH). ProMedica's documents also project a flat or declining population for Lucas County. ProMedica's 2010 Environmental Assessment states that "Overall demographics indicate little or no growth for [the] next five years." PX 159 at 5. One of the key assumptions in ProMedica's Strategic Plan for 2009 through 2011 is "flat demographics overall." PX 324 at 5.

229. A potential entrant into the Lucas County obstetrics services market would face significant costs and risks associated with constructing and operating a new obstetrics unit, thus making it highly unlikely that such entry or expansion will occur. X's executive estimated that establishing a new, financially viable labor-and-delivery unit inside a hospital's existing space would cost at least $10 to $12.6 million. PX 2068 at ¶ 20. Further, X's executive testified that constructing a neonatal intensive care unit ("NICU") for high-risk births, in addition to establishing a labor-and-delivery unit, would cost tens of millions of dollars. PX 2064 at ¶ 10. X's executive also noted that Toledo-area hospitals with a NICU and Level II perinatal referral center are "required by law to have an in-house obstetrician and in-house anesthesiologist that can provide obstetrical coverage, two costly resources." PX 2068 at ¶ 19.

230. In addition, obstetrics services typically do not generate sufficient revenue to cover their costs, making it economically undesirable to expand or build an obstetrics unit. David Dewey, SLH's Vice President of Business Development, testified that SLH's obstetrics unit "does not financially cover its costs." PX 2009 at 243:21–25 (Dewey (SLH) IH). X's executive affirmed that "[o]bstetrics is often a money-loser for hospitals because payments tend to be low, but expenses are high." PX 2068 at ¶ 19. X's representative also asserted that it is difficult to operate a profitable labor-and-delivery unit. PX 2064 at 10.

231. The decline in the overall birthrate over the last decade in Lucas County makes entry or expansion into obstetrics particularly unappealing. David Dewey, SLH's Vice President of Business Development, testified that "[t]he overall OB business in northwest Ohio is going down." PX 2009 at 171:14–15 (Dewey (SLH) IH). The Project Director of

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)
2011-1 Trade Cases P 77,395

PHS's Regional Perinatal Center Program sent an email in September 2010 that provided the statistics for total deliveries in Lucas County, noting that deliveries decreased from 2000 through 2009 and explaining that this downward trend has continued through June 2010. PX 1107. X's executive testified that "we're looking at [ ] a decrease, continually predictable decrease, in the number of births in and about Lucas County." PX 2018 at 37:12–14.

**\*34** 232. Under the *Merger Guidelines,* for entry or expansion to be sufficient, it must replace at least the scale and strength of one of the merging firms in order to replace the lost competition from the Acquisition. PX 2214 at § 9.3 (*Merger Guidelines* ). Here, any entry that does occur will not be sufficient under the *Merger Guidelines,* for many of the same reasons that entry is unlikely in the first place. Due to the time and significant expense it takes to become established in the market and earn a sufficient return on investment, an entrant would have a difficult time competing successfully in the market and replacing the competition eliminated from the Acquisition. PX 2124 at ¶ 98 (Town Decl.).

233. Establishing a new hospital, let alone obtaining sufficient market share to earn a sufficient return on investment, is challenging. David Dewey, SLH's Vice President of Business Development, testified that if another hospital entered Lucas County, it "would have to establish its own market share. It would have to hire its own staff, get its own medical staff support," all of which he stated would be difficult because of the tight capital markets. PX 2009 at 174:12–25 (Dewey (SLH) IH).

234. A new entrant also would have a difficult time establishing a new obstetrics unit that would sufficiently replace the competition eliminated by the Acquisition. X's executive stated that "[t]oday, it would take a substantial monetary commitment to construct a birthing center and hire a sufficient number of obstetricians to generate enough deliveries to break even." PX 2068 at ¶ 23. The executive also testified: "One of the most significant difficulties with creating a financially viable obstetrics unit is the ability to encourage obstetricians to utilize the new unit." PX 2068 at ¶ 21. The executive noted that "many obstetricians are employed by ProMedica, which instructs its obstetricians to direct expectant mothers to use ProMedica hospitals," making it difficult to gain market share. PX 2068 at ¶ 19. Therefore, any new obstetrics entry is highly unlikely to be sufficient to restore the competition lost by the Acquisition.

**B. No Planned Expansion by Existing Lucas County Firms**

235. Neither X nor Y has plans to construct a new hospital in Lucas County. Several years ago, X purchased land in southwest Lucas County and considered building a small, 34–bed hospital that would have provided limited general medical/surgical care, and would not have offered services such as obstetrics or pediatrics. PX 2068 at ¶ 24. However, X's executive recently testified that X has "no plans to [build a hospital] now, if ever" in Lucas County. PX 2068 at ¶ 24. The executive stated that "X only considered opening a new hospital" through a "50–50 joint venture with participating physicians" so that "X could align objectives with the physicians and share ownership risks." PX 2068 at ¶ 24. The executive testified that because the recently enacted 2010 Healthcare Reform Act prohibits physicians from holding a financial investment in a hospital, X no longer plans to build a hospital on its southwest land. PX 2068 at ¶ 24.

**\*35** 236. Similarly, X's representative testified that "X does not currently have any plans to construct a new hospital in the greater Toledo area." PX 2064 at ¶ 11. In particular, X does not have plans to adjust or expand its general acute-care inpatient services in response to ProMedica's acquisition of St. Luke's. PX 2064 at ¶ 11. X's representative testified that a five-percent rate increase would not cause X to rededicate registered beds from their current usage to general acute-care inpatient beds. PX 2019 at 69:24–71:7.

237. X has no plans to expand, and Y has no plans to offer, obstetrics services in Lucas County, even if rates for obstetrics services rose by a significant amount as a result of the Acquisition. X's executive asserted that it is not "worthwhile to open a new birthing center at X or another location." PX 2068 at ¶ 23. X's executive further testified that X "would not build obstetrics." PX 2018 at 56:3–10. Y's representative also testified that "it is highly unlikely that Y will build a new obstetrics or delivery unit in the greater Toledo area in the next few years, if ever" even if rates for obstetrics services increased by "10 to 15 percent." PX 2064 at ¶ 10.

**XII. THE ACQUISITION PRODUCES NO CREDIBLE MERGER–SPECIFIC EFFICIENCIES TO REBUT THE PRESUMPTION OF COMPETITIVE HARM**

238. The *Horizontal Merger Guidelines* (*"Merger Guidelines"* ) provide a framework within which to assess the efficiencies that PHS alleges may result from the Acquisition. PX 2214 at § 10 (*Merger Guidelines* ).

**A. The Asserted Efficiencies Are Not Credible**

239. The May 6, 2010 "Efficiencies Analysis of the Proposed Joinder of PHS Health System and OhioCare Health System" ("Compass Lexecon Report") is a summary of work done primarily by PHS management, under the oversight of Compass Lexecon, an economic consulting firm specializing in antitrust merger litigation. PX 20 at 1–39 (Compass Lexecon Report); PX 2005 at 293:17–21 (Oostra (PHS) IH). The Compass Lexecon Report was created to present the alleged efficiencies that may result from the Acquisition. PX 20 at 3–4.

240. The proposed efficiencies in the Compass Lexecon Report represent an "initial plan." PX 2005 at 291:16–19 (Oostra (PHS) IH). Mr. Oostra, PHS's CEO, testified about the contents of the report: "if we don't find those efficiencies, we will find other efficiencies." PX 2005 at 294:15–25 (Oostra (PHS) IH).

241. PHS's CFO Kathleen Hanley testified that the conclusions in the Compass Lexecon Report were based on a mere "gut feeling" that the Acquisition would generate efficiencies. PX 2002 at 206:14–207:3 (Hanley (PHS) IH).

242. The Compass Lexecon Report itself acknowledges: "estimates ... are preliminary and subject to further analysis, revision, and substantiation." PX 20 at 3 (Compass Lexecon Report).

243. Key St. Luke's personnel who would be best-positioned to consider possible efficiencies had little or no input into the efficiencies calculations. Douglas Deacon, Vice President of Professional Services at SLH, never saw the Compass Lexecon Report before his investigational hearing in September 2010. PX 2010 at 191:16–192:4. His involvement with the development of the analysis was "nil," even though the analysis was "something [he] should be involved with." PX 2010 at 193:5–194:3 (Deacon (SLH) IH).

**\*36** 244. Dennis Wagner, SLH's Interim Treasurer at the time of the Acquisition, had never before seen the Compass Lexecon Report when he was presented with a copy during his investigational hearing in September 2010. PX 2014 at 156:4–18 (Wagner (SLH) IH). Mr. Wagner testified that the report's alleged savings for supply chain efficiencies involved "no[ ] or very little analysis." PX 2014 at 204: 19–22 (Wagner (SLH) IH). He said of the speech-and-hearing services efficiency

claim, "I don't believe this claim." PX 2014 at 173:1–8 (Wagner (SLH) IH).

245. In her two declarations, Ms. Guerin–Calvert does not discuss most of the efficiency claims contained in the Compass Lexecon Report. *See* PX 2122 (Guerin–Calvert Decl.); PX2136 (Guerin–Calvert Supp. Decl.). Indeed, Ms. Guerin–Calvert admitted that she had not conducted an efficiencies analysis. PX 2026 at 42:18–24 (Guerin–Calvert Dep.). ProMedica has put forth no other expert testimony on the issue of efficiencies.

**1. Revenue Enhancements Are Not Cognizable Efficiencies**

246. The numerous claimed revenue enhancement opportunities are not true efficiencies because they merely shift revenue among the participants in the market and, in effect, do nothing more than increase PHS's bottom-line. PX 2132 at ¶¶ 99–110 (Dagen Supp. Decl.) To be credited, an efficiency must either reduce costs or increase output. PX 2132 at ¶ 100 (Dagen Supp. Decl.); PX 20 at 29–33 (description of revenue enhancement efficiencies in Compass Lexecon Report). The claimed revenue enhancements do neither.

**2. Capital Cost Avoidance Opportunities Are Not Cognizable Efficiencies**

247. The bulk of the claimed efficiencies from the Acquisition are avoided capital costs. *See* PX 20 at 6–7 (summary of efficiencies). In general, capital cost avoidance claims are not cognizable efficiencies. PX 2138 at ¶ 62 (Town Supp. Decl.). Firms invest in their businesses to better compete and thus enhance consumer welfare, and if these competition-driven investments are "avoided," consumers generally are left worse off. PX 2138 at ¶ 62 (Town Supp. Decl.). Moreover, ProMedica's claims of capital cost avoidance are suspect because ProMedica had no plans to invest the capital that it claims it would have spent without the Acquisition. PX 2132 at ¶¶ 113–114 (Dagen Supp. Decl.)

248. ProMedica alleges that, as a result of the Acquisition, it may be able to avoid spending $90–100 million on constructing and equipping a new hospital at its "Arrowhead" property (located less than three miles away from SLH). PX 20 at 35 (Compass Lexecon Report); PX 2104 at ¶ 30 (Akenberger Decl.). In the course of describing the asserted Arrowhead hospital capital cost avoidance, Ms. Hanley testified that PHS joined with SLH "instead of investing

millions of dollars in a competing facility." PX 2002 at 243:22–244:22 (Hanley (PHS) IH).

249. Even if cognizable in theory, the alleged capital cost avoidance savings from not constructing and equipping a new hospital on ProMedica's Arrowhead property cannot be credited under the facts here. PX 2132 at ¶ 111–113 (Dagen Supp. Decl.); PX 2138 at ¶¶ 63–64 (Town Supp. Decl.). Mr. Oostra testified that ProMedica has owned the Arrowhead land for a decade. PX 2005 at 82:21–25 (Oostra (PHS) IH). Yet PHS has not broken ground, obtained permits, or even undertaken site planning at Arrowhead in recent years. PX 2132 at ¶ 113 (Dagen Supp. Decl.). The Arrowhead project does not appear in PHS's 2010–2012 Strategic Plans. PX 6 (PHS Hospitals' 2010–2012 Strategic Goals and Objectives); PX 7 (PHS 2010–2012 Strategic Goals and Objectives). Aside from PHS' arguments in court, there is no evidence to suggest that PHS was likely to construct a new hospital at Arrowhead in the next few years, if ever.

*37 250. ProMedica also alleges that the Acquisition may enable it to avoid spending $25 to 30 million to construct a second bed tower at Flower Hospital. PX 20 at 36 (Compass Lexecon Report); PX 2104 at ¶ 31 (Akenberger Decl.). Mr. Dagen concluded that PHS's capital cost avoidance claim relating to the Flower Hospital bed tower is unsubstantiated. PX 2132 at ¶ 114 (Dagen Supp. Decl.). PHS's Strategic Plans do not include plans to construct a second bed tower at Flower any time in the near future. PX 6 (PHS Hospitals' 2010–2012 Strategic Goals and Objectives); PX 7 (PHS 2010–2012 Strategic Goals and Objectives). Ms. Hanley testified that PHS's plans for financing the expansion were "premature until we really get to a point where we prioritize, authorize ..." and said that plans had not yet reached the Board level. PX 2002 at 248:24–246:4, 249:14–15 (Hanley (PHS) IH). Scott Fought, SLH's Administrative Director of Finance, stated in an email that he had "no basis" for the costs he assigned to building the Flower bed tower (which were used as the basis for the capital cost avoidance savings alleged in the Compass Lexecon Report). PX 394 at 2.

251. ProMedica alleges that the Acquisition may save St. Luke's approximately $7.6 to $15.6 million in avoided costs relating to implementation of an Electronic Medical Records ("EMR") system and other information technology upgrades. PX 20 at 38 (Compass Lexecon Report); PX 2104 at ¶ 32 (Akenberger Decl.). These claims overstate any savings that might be achieved relating to EMR. PX 2132 at ¶ 116 (Dagen Supp. Decl.). In particular, the Compass Lexecon

Report asserts a higher price than what is indicated in ordinary course documents for implementing an EMR at SLH absent the joinder. PX 2132 at ¶ 116 (Dagen Supp. Decl.). The Compass Lexecon Report also overstates any potential savings because it fails to deduct over $6 million in expected federal subsidies from SLH's total expected costs relating to EMR implementation. PX 2132 at ¶ 116 (Dagen Supp. Decl.).

252. Mr. Deacon's testimony and a St. Luke's presentation on EMR indicate that a standalone St. Luke's would receive significant subsidies to fund the project through the American Recovery and Reinvestment Act of 2009. PX 2010 at 213:9–23 (Deacon (SLH) IH); PX 1281 at 12 (Finance Pillar Challenge Presentation). The Compass Lexecon Report also fails to take these subsidies into account when estimating how much St. Luke's would have spent on EMR absent the Acquisition. PX 2132 at ¶ 116 (Dagen Supp. Decl.). And a declaration filed by the Chairman of the St. Luke's Board suggests that SLH's costs on a standalone basis for implementing "necessary" EMR and information technology upgrades would be substantially lower than the costs asserted in the Compass Lexecon Report. PX 2106 ¶ 10 (Black (SLH) Decl.) (describing total information technology cost of $12 to $14 million); PX 20 at 38 (Compass Lexecon Report alleges costs of $5 to $9 million on information technology application upgrades, and $11 to $15 million on EMR).

**B. The Asserted Efficiencies Are Speculative**
*38 253. The *Merger Guidelines* state that "[e]fficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means." PX 2214 at § 10 (*Merger Guidelines* ).

254. Virtually all of the claimed efficiencies in the Compass Lexecon Report contain the caveat that they "may" be accomplished by the Acquisition. PX 20 (Compass Lexecon Report).

255. The Compass Lexecon Report alleges that the Acquisition may generate $1.3 million in savings from shifting SLH's inpatient rehabilitation services to Flower Hospital, a figure that subsequently was reduced to $200,000. PX 20 at 11 (Compass Lexecon Report); PX 2104 at ¶ 9 (Akenberger Decl.).

256. The inpatient rehabilitation efficiency claim involves only a few hundred thousand dollars of cost reductions, and the remaining $1 million in alleged savings actually

constitutes a price increase to consumers. PX 2132 at ¶¶ 74–75 (Dagen Supp. Decl.).

257. The Compass Lexecon Report asserts that the Acquisition may generate $1.45 million in savings from consolidating Heart/Vascular, Orthopedics, Women's, Neuro/Stroke, Cancer and Pulmonary services at either a PHS or SLH facility. PX 20 at 13 (Compass Lexecon Report). These asserted savings are unsubstantiated because PHS has not conducted a detailed analysis of clinical consolidation opportunities that might result from the Acquisition. PX 2132 at ¶ 78–79 (Dagen Supp. Decl.). Mr. Akenberger, PHS's Senior Vice President of Finance, confirmed in his December 23, 2010 declaration that the consolidation of clinical services is still "not yet quantified." PX 2104 at ¶ 10 (Akenberger (PHS) Decl).

258. In January 2011, Navigant Consulting completed a preliminary "Executive Summary" of clinical service consolidation recommendations but did not provide details of how St. Luke's would be impacted by clinical consolidations. The summary primarily addresses relocating existing ProMedica services to existing ProMedica facilities. PX 396 at 8–10 (Clinical Integration Strategy Executive Summary).

259. The Compass Lexecon Report states that approximately $1.4 million in savings may arise from lowering St. Luke's physician coverage costs in General Surgery, Obstetrics, and Interventional Services to a median benchmark rate. PX 20 at 23. Mr. Dagen concluded that these claims are unsubstantiated because ProMedica assumed that St. Luke's could lower its physician coverage costs to the benchmark median rate without any consideration of why St. Luke's rates might be higher in the first place. PX 2132 at ¶¶ 93–94 (Dagen Supp. Decl.). Ms. Steele testified that the physician coverage contracts discussed in the Compass Lexecon Report "aren't apples to apples" because they contain different duties. PX 2000 at 182:1–183:8 (Steele (PHS) IH).

260. ProMedica mistakenly used the benchmark median rate for the lower-priced restricted (part-time) obstetrics coverage, when St. Luke's was paying for the high-priced unrestricted obstetrics coverage prior to the Acquisition, leading to an overstatement of alleged savings. PX 33 at 1, 8 (PHS back-up materials for physician coverage efficiency); PX 2132 at ¶ 95 (Dagen Supp. Decl.).

**\*39** 261. Mr. Dagen concluded that many other efficiency claims asserted by ProMedica are unsubstantiated and

speculative because the back-up materials submitted by ProMedica lacked details about how prices paid by St. Luke's and ProMedica differ and omitted analyses of ProMedica's capacity to absorb St. Luke's volumes. These claims include: lowering the prices that St. Luke's pays for its supplies, cost savings from transferring St. Luke's pathology lab testing services to TTH, eliminating interventional services contracts at St. Luke's, lowering obstetrics coverage costs, and moving St. Luke's speech and hearing services from a third party provider to in-house at PHS. PX 2132 at ¶¶ 88, 91, 95–98 (Dagen Supp. Decl.).

**C. The Proposed Efficiencies Are Not Merger–Specific**

262. The *Merger Guidelines* "credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects. These are termed merger-specific efficiencies." PX 2214 at § 10 (*Merger Guidelines*).

263. A substantial portion of the claimed efficiencies could be achieved by St. Luke's through an affiliation with UTMC. PX 2132 at ¶ 121 (Dagen Supp. Decl.) *See also* PX 2206 at 3–4.

264. A 2009 St. Luke's Board presentation described various "clinical consolidation" opportunities that could result from a UTMC affiliation. PX 1035 at 9 (SLH 2009 "Affiliation Analysis Update"); *cf.* PX 20 at 12 (description of clinical consolidation efficiency in Compass Lexecon Report). In early 2009, SLH's CFO at the time, David Oppenlander, sent an email to St. Luke's CEO Dan Wakeman that stated: "X has a Y agreement ... [i]f we were to move down that pathway, that would be [an] inexpensive way to get into one of the big 6 [Health Information Management] systems." PX 1317 at 1; *cf.* PX 20 at 38 (description of EMR efficiency in Compass Lexecon Report). St. Luke's CEO noted that "[t]he community and organizational benefits of [a] partnership [with UTMC] are endless" and that "[i]n terms of reduction of expense, a closer relationship with [UTMC] would provide just as much value as the two systems [Mercy and ProMedica]." PX 1406 (July 2009 Wakeman (SLH) e-mail to Dr. Gold(UTMC)); PX 1407 at 1 (Oct.2009 Wakeman (SLH) e-mail to Dr. Gold (UTMC)); *see also* PX 2023 at 148:5–149:21 (Wakeman (SLH) Dep.).

265. In addition to concluding that St. Luke's could attain many of the alleged efficiencies by merging with UTMC, Mr. Dagen also determined that several of the cost savings, and all of the revenue enhancement efficiencies, alleged in

the Compass Lexecon Report are not merger-specific because they could be achieved unilaterally by either SLH or PHS absent the Acquisition. For instance, PHS intends to reduce SLH's staffing level to reflect PHS's practices at Flower Hospital. PX 20 at 15 (Compass Lexecon Report). However, this alleged efficiency could be accomplished without the Acquisition because there is nothing proprietary about PHS's "best practices" with respect to "proper" staffing levels, meaning that SLH could have cut staff on its own if it believed doing so was appropriate. PX 2132 at ¶ 82 (Dagen Supp. Decl.). Furthermore, testimony by SLH and PHS executives revealed that cutting staff at SLH could lower its quality of care, but no such analysis was performed when calculating the savings from this alleged efficiency. PX 2009 at 188:20–189:3 (Dewey (SLH) IH) (stating that SLH is "a pretty lean organization" and that cutting staff "would be impacting our service, our quality"); PX 2011 at 199:1–7 (Akenberger (PHS) IH).

**\*40** 266. The Compass Lexecon Report also states that the Acquisition may generate \$4.5 million in savings from eliminating a family practice residency program and replacing it with a regular physician's practice. PX 20 at 16 (Compass Lexecon Report). ProMedica's CFO Kathleen Hanley testified that there is an excess of family practice doctors in Toledo, and that ProMedica intends to close a family practice residency program housed at a PHS (not SLH) facility after the Acquisition. PX 2002 at 211:25–213:6 (Hanley (PHS) IH). As a result, this efficiency is not merger-specific because PHS could have eliminated one of its residency programs on its own absent the Acquisition. PX 2132 at ¶ 86 (Dagen Supp. Decl.).

267. Defendant asserts approximately \$2.1 million of efficiencies relating to implementing new coding and charge capture practices at SLH, and \$467,000 from increasing referrals between PHS and SLH facilities. PX 20 at 30, 32–33 (Compass Lexecon Report). SLH could have improved its coding and charge capture "best practices" on its own, and SLH and PHS each could have unilaterally increased referral of patients to each other without the Acquisition in place. PX 2132 at ¶¶ 102–106, 110 (Dagen Supp. Decl.). Dennis Wagner, SLH's Finance Director, testified about the coding and charge capture efficiency claim: "I would not think there was that much opportunity, because I believe our routines are proper and correct right now." PX 2014 at 209:15–24 (Wagner (SLH) IH).

268. The final asserted revenue enhancement is the addition of St. Luke's to the Paramount provider network. PX 20 at 31 (Compass Lexecon Report). This alleged efficiency also could have been accomplished absent the Acquisition. PX 2132 at ¶ 109 (Dagen Supp. Decl.). SLH's executives expressed interest in participating in Paramount's provider network prior to the Acquisition. PX 2008 at 135:1–14 (Wakeman (SLH) IH) ("we'd really like to get back in"). Ron Wachsman, PHS's Vice President of Managed Care, testified that it was PHS's reluctance that prevented SLH from being a part of the Paramount provider network prior to the Acquisition. PX 2006 at 203:16–22 (Wachsman (PHS) IH).

### D. The Proposed Efficiency Projections Appear Designed for Litigation

269. Projections of efficiencies may be viewed with skepticism, particularly if they are generated outside of the usual business planning process. PX 2214 at § 10 (*Merger Guidelines*).

270. By late 2009, SLH leadership was aware that a transaction with PHS would generate an antitrust review. PX 1030 at 17 (SLH 2009 "Affiliation Analysis Update" to the St. Luke's Board containing HHI calculations). Even before Plaintiffs' investigation began, PHS had budgeted hundreds of thousands of dollars for the anticipated antitrust review, which it expected would last at least several months. PX 77 (PHS "High Level Timeline"); PX 2021 at 86:19–87:7 (Oostra (PHS) Dep.). A January 2010 document planning for the Acquisition includes references to "[e]fficiency [e]xperts" and "[e]fficiency expert reports" under the column "Antitrust Review." PX 77 at 1 (PHS "High Level Timeline"). And a PHS executive testified that they hired Compass Lexecon, in part, to present an efficiencies analysis of the Acquisition during regulatory review. PX 2005 (Oostra (PHS) IH) at 284:14–285:12; PX 2002 (Hanley (PHS) IH) at 225:15–24.

**\*41** 271. The Compass Lexecon Report that contains PHS's alleged efficiencies includes a summary of the underlying process used to generate and document the asserted efficiencies. The report's summary states that the process was "supervised by antitrust counsel" and that "Compass Lexecon's role ... was to provide antitrust guidance." PX 20 at 3 (Compass Lexecon Report).

272. After ProMedica received "[u]nfavorable responses from Compass Lex[e]con" because it had not "accomplished enough in savings," PHS concluded that it would "need to be more aggressive with a timeline of the first 3–5 years"

because the *"FTC discounts [the] value of [efficiencies] each year the farther out you go."* PX 1136 at 1 (PHS "Joinder Efficiencies Opportunities") (emphasis added).

### E. The Proposed Efficiencies Do Not Outweigh the Anticompetitive Harm Resulting From the Acquisition

273. Dr. Town concurred with Mr. Dagen's analysis of PHS's alleged efficiencies, and concluded that the alleged benefits of the Acquisition would not outweigh the significant competitive harm that would result from the Acquisition. PX 2138 at ¶ 61 (Town Supp. Decl.).

### F. Healthcare Reform Measures Do Not Justify the Acquisition

274. Ongoing healthcare reform provides incentives for providers to form Accountable Care Organizations ("ACO"). PX 1449 at 14–15 (Nov.2009 Reform Readiness Assessment by Kaufman Hall). Another component of healthcare reform is the installation of Electronic Medical Records ("EMR" or "EHR") systems at hospitals. PX 2102 at ¶ 38 (Wakeman (SLH) Decl.).

275. Because SLH was, prior to the Acquisition, a low-cost and high-quality provider, it was well-positioned to take advantage of pending healthcare reform. PX 1072 at 1 ("Key Messages from St. Luke' Hospital"). Furthermore, it was in a financial position to implement an EMR system and appeared motivated prior to the Acquisition to do so in time to receive federal subsidies. PX 2132 at ¶ 28 (Dagen Supp. Decl.); PX 2010 at 213:9–12 (Deacon (SLH) IH).

### 1. ACO Requirements Have Not Yet Been Finalized

276. Providers in an ACO agree to be accountable for quality, cost, and overall care in exchange for a share of the savings achieved. PX 1449 at 14–15 (Nov.2009 "Reform Readiness Assessment" by Kaufman Hall). The savings achieved by an ACO can be shared via contractual relationships, joint ventures, and other methods besides mergers, joinders, or acquisitions. PX 2023 at 111:3–8 (Wakeman (SLH) Dep.); PX 1449 at 20–22 (Reform Readiness Assessment by Kaufman Hall). Indeed, it is likely that, absent this Acquisition, an independent St. Luke's would participate both in ProMedica's and Mercy's ACOs if invited rather than being limited to only ProMedica's. PX 2023 at 111:14–16 (Wakeman (SLH) Dep.).

277. Healthcare reform remains in flux, and the nature and form of ACOs remain undetermined. SLH's CEO, Mr.

Wakeman, noted: "I think we know there's going to be ACOs. Exactly what they're going to look like and who's going to be in them and how they're going to perform has yet to be defined." PX 2023 at 114:17–20 (Wakeman (SLH) Dep.). Mr. Wakeman added: "[i]t's all speculation at this point because again ACO rules haven't been finalized yet." PX 2023 at 111:24–112:1 (Wakeman (SLH) Dep.). As a result of the ACO rules not yet being clearly defined, SLH's CEO has not studied them in depth. PX 2023 at 114:8–9 (Wakeman (SLH) Dep.).

**\*42** 278. Another component of healthcare reform is the implementation of an EMR system at all hospitals. Under the American Recovery and Reinvestment Act of 2009, hospitals receive incentives for meeting certain "meaningful use" targets for degrees of implementation. PX 1281 at 10–12 (SLH "Financial Pillar Challenge").

### 2. Independent St. Luke's Was Well–Positioned for Healthcare Reform

279. In November 2009, St. Luke's concluded that it was "uniquely positioned for a smooth transition to expected health care reform. The hospital already focuses on quality and cost—key components of reform." PX 1072 at 1 ("Key Messages from St. Luke's Hospital"). Further, St. Luke's could have participated in Lucas County ACOs without the Acquisition. *See* PX 2023 at 111:14–16 (Wakeman (SLH) Dep.).

280. In a "Competitive Profile Matrix" conducted in the ordinary course of business, St. Luke's concluded that its "low cost position" and "[i]nformation flow and infrastructure" meant that it had "much already in place to deal with possible upcoming changes" related to healthcare reform. PX 1132 at 4–5.

281. At the time of the Acquisition, St. Luke's had adequate reserves and cash from operations to fully fund the installation of an EMR system, and still have money left over to fund other capital projects, pay off its debt, and retain sufficient reserves for future use. PX 2132 at ¶¶ 29, 64 (Dagen Supp. Decl.).

282. SLH's ordinary course of business documents indicated that the cost of implementing an EMR system would be approximately $12.5 million. PX 1281 at 17 (SLH "Financial Pillar Challenge"). St. Luke's already had placed a $6 million "placeholder" on its capital budget for EMR. PX 22 at 2. Furthermore, St. Luke's concluded that it would qualify for $6.3 million in federal subsidies to help fund its EMR system. PX 1281 at 12 (SLH "Financial Pillar Challenge").

283. Doug Deacon, SLH's Vice President of Professional Services, testified that SLH "would have to move forward" with implementing an EMR system absent the Acquisition. PX 2010 at 213:9–12 (Deacon (SLH) IH).

## XIII. PROMEDICA CANNOT MEET ITS BURDEN TO SHOW ST. LUKE'S IS A FAILING- OR FLAILING–FIRM

### A. Factual Predicates for Failing–Firm Defense are Lacking

284. ProMedica cannot meet its burden to demonstrate that St. Luke's faced imminent failure and that St. Luke's adequately pursued less harmful alternatives, nor has ProMedica asserted a failing-firm defense in this proceeding.

### 1. St. Luke's Not in Grave Danger of Imminent Failure

285. St. Luke's Hospital was not in grave danger of imminent failure. PX 2023 at 141:25–142:12 (Wakeman (SLH) Dep.); PX 2014 at 211:12–21 (Wagner (SLH) IH); PX 2021 at 45:19–24 (Oostra (PHS) Dep.).

286. The CEO of St. Luke's, Dan Wakeman, instituted a turnaround plan in 2008 that has been successful and has enabled St. Luke's to improve its financial condition significantly, as evidenced by numerous objective financial indicators. PX 2023 at 13:13–22 (Wakeman (SLH) Dep.); PX 1235 (Toledo Market Share Data); *see infra* Section XVI.B.

**\*43** 287. Plaintiffs' financial expert, Mr. Dagen, concluded that SLH's reserve fund and positive EBITDA have enabled it to make all necessary debt payments, pay its bills on time, and make necessary capital expenditures throughout the last decade. PX 2132 at ¶ 11 (Dagen Supp. Decl.). Mr. Dagen also concluded that focusing solely on SLH's operating margin or cost coverage ratios does not capture its ability to make investments to maintain facilities and quality of care, as well as grow its business. PX 2132 at ¶¶ 20–21 (Dagen Supp. Decl.).

### a. Pension Fund Loss is Misleading

288. Mr. Dagen noted that the 2008 financial crisis precipitated a decline in SLH's pension fund that resulted in an anomalous "paper loss" of X dollars to SLH's operating income in 2009 compared to the year before. PX 2132 at ¶ 40 n. 46 (Dagen Supp. Decl.). Focusing solely on the pension shortfall in 2009 ignores the cyclical nature of financial markets and SLH's demonstrated ability to rebound from such events. *Id.* at ¶ 41.

289. The pension fund has since increased in value from its 2008 levels. Between 2007 and 2008, the fair market value of the plan assets declined from X dollars to Y dollars. PX 2132 at ¶ 40 (Dagen Supp. Decl.); PX 1060 at 15 (Feb.2010 SLH Retirement Plan Actuarial Valuation Report). As of September 2010, the fair market value was X dollars. PX 1288 at 18 (SLH Sep. 2010 interim financial statements). Increases in the equity markets since September 2010 likely have resulted in additional increases in the value of SLH's pension fund. Between August and September 2010 alone, the pension fund increased by over X dollars. *Compare* PX 1288 at 18 (SLH Sep. 2010 interim financial statements) *with* PX 1287 at 16 (SLH Aug. 2010 interim financial statements)).

290. As the pension fund value has increased, so has the pension funding level. In 2009, the pension was X percent funded, on par with large companies such as Exxon Mobil, CBS, Disney, and Motorola. PX 2132 at ¶ 42 (Dagen Supp. Decl.); PX 1060 at 15 (Feb.2010 SLH Retirement Plan Actuarial Valuation Report). The pension fund is now Y percent funded. PX 2023 at 14:22–15:3 (Wakeman (SLH) Dep.). Further, based on the current value of its pension fund and the average annual pension payments to SLH retirees, St. Luke's has sufficient funds to meet its obligations for the next decade and beyond, even assuming no increase in the value of fund assets. PX 2132 at ¶ 42 (Dagen Supp. Decl.).

### b. SLH's Credit Rating is Not a Sign of a Firm in Distress

291. Moody's Investors Service, Inc. ("Moody's") assigns a credit rating by performing a holistic qualitative and quantitative analysis of the borrower. PX 1370 at 1 (Moody's Rating Methodology); PX 2130 at ¶ 13 (Brick Decl.). Moody's examines certain variables over time and in relation to the industry generally. PX 1370 at 5 (Moody's Rating Methodology); PX 2130 at ¶ 13 (Brick Decl.).

**\*44** 292. Immediately before the Acquisition by ProMedica, St. Luke's had a medium-grade, "Baa2" credit rating from Moody's. PX 1372 at 1 (Moody's Rating Update: SLH, February 3, 2010); PX 1371 at 4 (Moody's Rating Symbols and Definitions); PX 2130 at ¶ 9 (Brick Decl.). This is in the same category of credit rating as 28 percent of other hospitals. PX 2130 at ¶ 9 (Brick Decl.). As the Plaintiffs' bond-rating

expert, Mr. Errol Brick, testified, "If Moody's felt that this hospital was not going to be able to survive, [it] would be more than a medium grade risk, ..." PX 2024 at 76:9–17 (Brick Dep.).

293. Investors and the capital markets have an appetite from debt issuers of medium grade risk, with "Baa" rated hospitals and healthcare systems issuing $2.6 billion in debt from January 2010 through January 2011. PX 2130 at ¶ 9 (Brick Decl.); PX 2131 (Appendix 1 to Brick Decl.).

294. In its last ratings update for an independent St. Luke's, Moody's identified certain factors that "could change the rating-UP[,]" including: "[c]ontinued growth and stability of inpatient and outpatient volume trends; significantly improved and sustainable operating performance for multiple years; strengthening of debt coverage measures and liquidity balance; improved market share." PX 1372 at 3 (Moody's Rating Update: SLH, February 3, 2010). Based on these factors, SLH's recent financial turnaround has produced results that would have led Moody's to upgrade SLH's credit rating. PX 2130 at ¶ 13–16 (Brick Decl.).

295. St. Luke's had experienced growth and stability of inpatient and outpatient volume in the period before the Acquisition and expected to continue this trend as an independent hospital. PX 170 at 1–2, 6 (SLH Board Monthly Report); PX 2014 at 73:17–74:15 (Wagner (SLH) IH).

296. SLH's operating performance was steady with positive cash flows and, as Mr. Dagen concludes, this trend would have improved even more with time. PX 2132 at ¶ 20, 57 (Dagen Supp. Decl.); PX 2122 at ¶¶ 67, 69, 71–72 (Guerin–Calvert Decl.); PX 2129 at 2 (Hanley (PHS) Decl., Ex. 1).

297. SLH's debt coverage measures and liquidity balance had also strengthened before the Acquisition. PX 2130 at ¶ 16, n. 32 (Brick Decl.). SLH's maximum annual debt service ratio had improved from X in 2009 to Y in 2010. PX 2129 at 2 (Ex. 1 to Hanley Decl.). Even in 2009, St. Luke's cash to debt ratio was X%, compared with a median of 102% for all hospitals rated by Moody's. PX 1372 at 4 (Moody's Rating Update: SLH, February 3, 2010); PX 1368 at 10 (Moody's 2009 Median Report).

298. Finally, SLH's market share had increased from 36 percent in 2009 to 43 percent in 2010 for its core service area, PX 1235 at 3 (Toledo Market Share Analysis), along with

occupancy rates and expected volumes. PX 2129 (Hanley (PHS) Decl., Ex. 1).

### 2. St. Luke's Had Alternatives to ProMedica

299. ProMedica was not St. Luke's only option. St. Luke's considered alternative purchasers to ProMedica, including Mercy, UTMC, and out-of-area systems. PX 1016 at 22–24 (Affiliation Update Board Presentation); PX 2008 at 209:18–210:10 (Wakeman (SLH) IH).

**\*45** 300. St. Luke's and UTMC had discussed several factors as part of a potential affiliation. PX 1030 at 11 (St. Luke's Affiliation Analysis Update); PX 1035 at 9 (St. Luke's Affiliation Analysis Update); PX 2206 at 3–4. St. Luke's and UTMC even drafted an X before St. Luke's ended discussions with UTMC. PX 2205; PX 2019 at 66:23–67:19.

301. Partnering with UTMC would have been an option which could have benefitted the community and would have fit within SLH's mission. PX 1112 (SLH Integration Decision Grid). "St. Luke's leadership believes this affiliation is in the best interests of the community with the potential partnership leading the way for economic change." PX 1030 at 20 (SLH Affiliation Update). St. Luke's directors and executives saw substantial benefits to partnering with UTMC. PX 2023 at 148:5–149:2 (Wakeman (SLH) Dep.); PX 1321 at 2 (SLH Dec. 2009 e-mail); PX 1130 at 5 (SLH Recovery/Strategic Plan). *See also* PX 1406 (July 2009 Wakeman (SLH) e-mail) (benefits to UTMC partnership are "endless"); PX 1407 at 1 (Oct.2009 Wakeman (SLH) e-mail to Dr. Gold (UTMC)) (a UTMC affiliation "would provide just as much [expense reduction] as the two systems [Mercy and ProMedica].").

302. St. Luke's was concerned that UTMC would not be able to deliver sufficient pricing leverage with health plans, however. PX 1018 at 17 (SLH Partnership Options Presentation) ("Would ... [UTMC] give us ... enough managed care clout?"); PX 1130 at 4 (SLH Aug. 2009 Due Diligence Meeting Notes) ("Concern that [UTMC] does/may not have as high of reimbursement rates as ProMedica or Mercy"). St. Luke's also feared retaliation by ProMedica if it affiliated with UTMC. *See infra* at Section VII.C. UTMC does not offer OB services, and thus a merger of SLH and UTMC would not increase market share or market concentration in the Lucas County OB services market. PX 2064 at ¶ 9. In GAC, the combination of UTMC and St. Luke's would result in a smaller combined share than Mercy, and a combined share more than 60 percent smaller than ProMedica. PX 2125

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

at 29 (Town Decl., Ex. 5); PX 2150 at 1 (GAC market share chart reflecting data in Town Decl.).

303. Mr. Wakeman acknowledges that it was St. Luke's that ended discussions with UTMC. PX 2102 at ¶ 32 (Wakeman Decl.).

304. For their part, St. Luke's and Mercy had discussed clinical consolidation as well as information technology and administration integration as part of a potential affiliation. PX 1030 at 11 (St. Luke's Affiliation Analysis Update); PX 1035 at 9 (St. Luke's Affiliation Analysis Update). St. Luke's ended discussions with Mercy. PX 2018 at 80:18–19, 89:6–13.

**B. SLH's Successful Rebound Rebuts ProMedica's "Flailing Firm" Claims**

305. SLH's new CEO as of early 2008, Dan Wakeman, had been involved in improving the operating performance of several hospitals before coming to SLH. PX 2008 at 27:1–20, 37:1–38:16, 45:2–12, 51:13–21 (Wakeman (SLH) IH). Mr. Wakeman testified that, at his previous three hospital positions, his leadership led to a "positive trajectory in terms of revenue and operation." PX 2008 at 51:22–52:1 (Wakeman (SLH) IH).

**\*46** 306. When first assessing St. Luke's, Mr. Wakeman concluded that it had "huge potential" because a "decline in revenue, in itself, in an area where you have growth, means opportunity." PX 2008 at 59:25–61:16 (Wakeman (SLH) IH).

**1. Wakeman Three–Year Growth Plan, Sustainable Improvements**

307. Mr. Wakeman instituted a "Three Year Plan" in June 2008 that contained several goals, including: increasing inpatient and outpatient net revenues, growing SLH's market share to 40 percent within its "core service area," hiring "core physicians" in various specialties, and attaining "access" to 90 percent of the managed care enrollees in the Toledo area. PX 1026 at 1–2 (SLH Three Year Plan).

308. By April 2009, one year into the three year plan, St. Luke's already had achieved its goals for increasing inpatient and outpatient net revenue. PX 2008 at 161:18–162:21 (Wakeman (SLH) IH). SLH's total net patient service revenues increased X percent from X million in 2007 to approximately Y million in 2010 (calculated by annualizing figures as of August 31, 2010). PX 1265 at 4 (OhioCare Consolidated Statement of Operations as of August 31, 2010).

Mr. Wakeman testified that SLH's inpatient and outpatient revenue growth was "significant" during the twelve months prior to the Acquisition's consummation on August 31, 2010. PX 2023 at 30:16–31:12 (Wakeman (SLH) Dep.).

309. By the end of the first quarter of 2010, two years into the three year plan, St. Luke's had surpassed its market-share goal by achieving a X percent share in its core service area (compared to Y percent in 2007). PX 1235 at 3 (SLH market-share reports).

310. Between 2008 and 2009, St. Luke's employed 21 new physicians. PX 1278 at 7 ("Growth" presentation). According to Ms. Guerin–Calvert, as of January 2011, St. Luke's had 27 employed physicians. PX 2136 at ¶ 7(e) (Guerin–Calvert Supp. Decl.). SLH's strategy for employing physicians was projected to generate a positive return on investment by 2013. PX 1080 at 3 ("Physician Strategy Investments").

311. St. Luke's successfully re-negotiated its participation in the Anthem provider network as of July 2009. PX 1016 at 5 (presentation to SLH Board of Directors); PX 2276 at 2–3 (amendment to the Anthem–SLH "Provider Agreement," effective July 2, 2009). As a result, St. Luke's achieved access to 83 percent of the managed care enrollees in the Toledo area. PX 1289 at 3 ("Strategic Plan/Pillar Update"). Although St. Luke's also had sought readmission to Paramount's hospital network, after a long period of nonparticipation, PHS made a "business decision" to decline St. Luke's pleas. PX 2002 at 229:8–14; 230:18–231:7 (Hanley (PHS) IH).

312. Based on his experience at other hospitals, Mr. Wakeman also made it a goal to increase SLH's outpatient ratio to X percent, meaning that St. Luke's was to earn X percent of its revenues from outpatient procedures. PX 2008 at 68:10–19; 115:24–116:3 (Wakeman (SLH) IH). Increasing a hospital's outpatient ratio is beneficial because outpatient procedures typically generate higher margins than inpatient procedures. PX 2132 at ¶ 46 (Dagen Supp. Decl.). St. Luke's increased its outpatient ratio from approximately X percent in 2008 to nearly Y percent as of September 2010. PX 2008 at 115:13–23 (Wakeman (SLH) IH). St. Luke's acquired four offsite imaging centers, formerly known as "X–Ray Associates," at the close of 2008. PX 2010 at 24:16–25:2, 26:24–27:10 (Deacon (SLH) IH). The X–Ray Associates facilities generated X dollars in profits in 2009. PX 1359 at 43 ("Our Missions" presentation).

**\*47** 313. St. Luke's acquired another imaging center, Regency Medical Imaging, on August 31, 2010. PX 2010 at 24:11–15 (Deacon (SLH) IH). SLH's former CFO, David Oppenlander, called the Regency acquisition a "no brainer," projecting that it would generate approximately X dollars in annual profits. PX 1162 at 1, 3 (Dec.2009 SLH e-mail).

314. Mr. Dagen concluded that accounting for the "marked improvement in SLH's financial performance in 2010" is necessary to properly assess SLH's financial condition at the time of its acquisition by ProMedica. PX 2132 at ¶ 23 (Dagen Supp. Decl.). As a result, Mr. Dagen concluded that Ms. Guerin–Calvert's analysis, which instead focuses on 2009, "provides a misleading picture of SLH's financial condition because she captures SLH's financial results at [their] lowest point during the decade." PX 2136 at ¶ 23 (Guerin–Calvert Supp. Decl.).

### 2. Increases in Volume and Occupancy

315. SLH's total acute inpatient admissions were projected to be X in 2010, an increase of X percent from Y in 2007. PX 2129 (Hanley (PHS) Decl., Ex. 1) (annualized projection). Its patient days increased X percent from Y in 2007 to a projected Z during the same time period (2010 calculated by annualizing figures as of August 31, 2010). PX 2129 (Hanley (PHS) Decl., Ex. 1).

316. Total outpatient visits at St. Luke's increased X from 2007 (X number) to 2010 (a projected Y visits based on annualizing figures as of August 31, 2010). PX 2129 (Hanley (PHS) Decl. Ex. 1). A SLH "2010 Strategic Planning" summary through August 2010 shows that, in the first eight months of 2010, outpatient visits increased X percent over the previous year. PX 1199 at 1 (SLH Top Three Strategic Issues (Growth)).

317. The number of cases treated at SLH's Ambulatory Surgery Center, Surgi–Care, increased from X in 2007 to Y as of August 31, 2010 (which would annualize to X cases for all of 2010). PX 1214 at 6 ("Surgi–Care Board of Manager Meeting").

318. SLH's overall occupancy rate in the twelve months prior to the Acquisition increased by approximately X%. PX 2023 at 31:13–23 (Wakeman (SLH) Dep.).

319. In September 2009, David Oppenlander, SLH's CFO at the time, noted that "the hospital is close to capacity with inpatients ." PX 1292 at 3 (SLH Board Minutes 9/22/09). A

March 2010 letter to the Ohio Department of Health described a "surge in obstetrical patients" that caused the maternity unit to be "full." PX 1086 (Konwinski Letter to OH Dep't of Health 3/19/10). By August 2010, Mr. Wakeman noted in a monthly update to the St. Luke's Board: "inpatient capacity is limited except for weekends." PX 170 at 1 (Sept.2010 Wakeman Memo to SLH Board).

### 3. Solid and Improving Financials

320. St. Luke's volume growth in 2010 led to decreasing losses and positive EBITDA. PX 2026 at 209:20–210:13 (Guerin–Calvert Dep.); PX 2129 (Hanley (PHS) Decl., Ex. 1). St. Luke's did not, as Defendant asserts, lose money on the commercial patients who received services at St. Luke's. Based on St. Luke's own ordinary-course-of-business accounting documents, as adopted and verified by ProMedica's expert, Ms. Guerin–Calvert, St. Luke's was covering by a substantial margin its direct costs for each X and Y patient it served, with excess to cover its fixed costs. PX 2136 at 56 (Guerin–Calvert. Supp. Decl. at 54, Table 11); PX 2025 at 173:8–174:9 (Dagen Dep.). This analysis is confirmed by Mr. Wakeman's statement in an August 2010 monthly update to the St. Luke's Board-the last update to the Board before the Acquisition-that St. Luke's "positive margin confirms that we can run in the black if activity stays high." PX 170 at 1 (Sept.2010 Wakeman Memo to SLH Board).

**\*48** 321. SLH's operating performance improved in the first eight months of 2010 compared to 2008 and 2009. According to PHS's CFO, Kathleen Hanley, SLH's operating cash flow margin improved from X percent in 2009 to positive Y percent as of August 31, 2010, and its operating margin improved from X percent to Y percent during the same time period. PX 2129 (Hanley (PHS) Decl. Ex. 1).

322. SLH's total net revenues for its hospital and all subsidiaries increased X percent from X dollars in 2007 to a projected Y dollars in 2010 (calculated by annualizing August 31, 2010 figures). PX 1003 at 5 (2007 OhioCare Consolidated Financial Report); PX 1265 at 4 (OhioCare Consolidated Statement of Operations as of August 31, 2010).

323. As of August 31, 2010, St. Luke's had approximately X dollars in cash and reserves (incorporating both the assets limited as to use and the assets of SLF). PX 1265 at 1 (OhioCare Consolidated Balance Sheet as of August 31, 2010: sum of "Assets Limited As to Use" and "Cash and Cash Equivalents" lines). Mr. Dagen concluded that, based on a review of ordinary course of business documents, it was

appropriate to include assets from SLF and board-designated funds when calculating SLH's total "reserves." PX 2132 at ¶ 26 n. 19 (Dagen Supp. Decl.).

324. Ms. Guerin–Calvert described SLH's "Days Cash on Hand" as of August 31, 2010 as "slightly above its comparables." PX 2136 at ¶ 74 (Guerin–Calvert Supp. Decl.); *see also* PX 1372 at 2 (Moody's Rating Update: SLH, February 3, 2010).

325. SLH's total outstanding debt as of August 31, 2010 was X dollars. PX 1265 at 2 (OhioCare Consolidated Balance Sheet as of August 31, 2010: sum of "Current Portion of Long-term Debt" and "Long-term Debt, less current portions"). St. Luke's has never missed or been late on any debt payment. PX 2023 at 100:13–25 (Wakeman (SLH) Dep.). Notes from a February 2010 Finance Committee meeting described the bond payments as "a car payment" and not a risk to St. Luke's because "we have [ ] enough cash to completely defease these." PX 1204 at 11 (SLH Finance Committee Notes).

326. Mr. Wakeman stated, "[a]s bond issues go for not-for-profit organizations, it wasn't a large bond issue for a hospital of our size." PX2023 at 107:4–6 (Wakeman (SLH) Dep.)

327. Consistent with its historical use, St. Luke's could draw X dollars from its reserve fund "to invest ... in appropriate capital projects as needed." PX 2132 at ¶ 28 (Dagen Supp. Decl.). In particular, Mr. Dagen found that SLH's reserves were sufficient to fund implementation of an Electronic Medical Records system and completion of a private room conversion project. PX 2132 at ¶ 28 (Dagen Supp. Decl.). SLH's positive trajectory in 2010 would have caused it to reach increasingly higher levels of EBITDA in the next several years, including positive EBITDA in 2011, 2012, and 2013. PX 2132 at ¶¶ 63–64 (Dagen Supp. Decl.). This positive trajectory would have resulting in SLH improving operating income every year for at least the next few years, with positive operating income in 2013. PX 2132 at ¶¶ 63–64 (Dagen Supp. Decl.).

### 4. Last Words to the Board as an Independent Hospital

**\*49** 328. On September 24, 2010, Mr. Wakeman sent a "Monthly Report" to the St. Luke's Board that analyzed SLH's operating performance. PX 170 (Sept.2010 Wakeman Memo to SLH Board). In this memo he advised SLH's Board that:

a. "[I]n the past three years ... [w]e went from an organization with declining activity to near capacity." PX 170 at 7.

b. "[W]e have built our volume up to a point where we can produce an operating margin and keep our variable expenses under control." PX 170 at 1.

c. "Even with our increased activity, the patient satisfaction scores improved ..." PX 170 at 4.

d. "Our leadership status in quality, service and low cost stayed firmly in place." PX 170 at 7.

e. "In the past six months our financial performance has improved significantly. The volume increase and awareness of expense control were key." PX 170 at 7.

### C. Even in the Worst Case Scenario, St. Luke's Would Have Been Financially Viable for at Least Four to Seven Years

329. In the worst case scenario, at St. Luke's worst financial point in the last decade, St. Luke's CEO told its Board that St. Luke's would stay open for four to seven years without partnering with another hospital, even without the significant financial and economic improvements of 2010. PX 2023 at 141:25–142:12 (Wakeman (SLH) Dep.); *see also* PX 2014 at 211:12–21 (Wagner (SLH) IH). Improvements in equities markets and cash-flow operating margins in 2009 to 2010 extend this timeframe even further, PX2023 at 145:3–146:19 (Wakeman (SLH) Dep.), or, even more likely, ensure St. Luke's long-term financial viability.

330. St. Luke's had access to its reserve fund, which held approximately X dollars as of August 31, 2010. PX 1273 (unaudited interim financial statements); PX 1274 at 1 (Wakeman e-mail) (noting in mid–2009: "[w]e are blessed to have reserves.").

331. The reserve fund has been, and can continue to be, used for appropriate capital projects as needed. St. Luke's "established its investment policy to provide a financial reserve for long-term replacement, modernization and expansion of hospital facilities." PX 1275 at 47 (SLH Credit Presentation). St. Luke's has spent an average of X dollars annually on capital projects over the past ten years, including a heart center in 2001, a physical rehabilitation center in 2003, and the acquisitions of multiple physician groups and five freestanding imaging centers since December 2008. PX 2132 at ¶ 27 (Dagen Supp. Decl.).

332. Currently, St. Luke's has sufficient funds to complete its high priority capital projects, including EMR implementation and private room conversions. PX 2132 at ¶¶ 28–31 (Dagen Supp. Decl .); *see also* PX 2010 at 216:4–14 (Deacon (SLH) IH); PX 1156 (Scott Rupley's handwritten notes).

333. Mr. Dagen's analysis confirms that St. Luke's would be able to continue to make growth-minded investments, eliminate its outstanding debt, and still have approximately X dollars in cash and reserves. PX 2132 at ¶ 57 (Dagen Supp. Decl.)

### XIV PURPORTED EQUITIES ASSERTED BY PROMEDICA DO NOT OUTWEIGH THE PUBLIC'S INTEREST IN EFFECTIVE ANTITRUST ENFORCEMENT

**\*50** 334. ProMedica and St. Luke's entered into their transaction with full knowledge of the applicable antitrust laws, and a recognition that the Acquisition raised serious antitrust issues. *See* PX 2021 at 86:19–87:7 (Oostra (PHS) Dep.) (testifying that ProMedica budgeted hundreds of thousands of dollars for an antitrust review of the Acquisition that was expected to take a minimum of several months to complete); PX 1136 at 1 (ProMedica–Ohio Care Efficiency Opportunities) (efficiencies made for FTC review); PX 2002 (Hanley (PHS) IH) at 225:15–24) (stating that the "secondary" purpose of commissioning consultants was for dealing with FTC regulatory review); PX 2008 at 234:17–235:17 (Wakeman (SLH) IH) (presentation to St. Luke's Board about increased antitrust risk of ProMedica affiliation); PX 1030 at 17 (St. Luke's Board Affiliation Analysis Update) (stating that "[a]ny obstetrics affiliation may need to be carefully reviewed.").

335. ProMedica now claims that the Plaintiffs' requested relief—a narrowly-tailored hold-separate order ("HSO")—precludes its investment in St. Luke's. ProMedica's claim is without merit. Under the HSO, ProMedica is fully permitted to make investments it had agreed to make under the Joinder Agreement. In addition, the order *explicitly and unambiguously permits* coordination of patient care and sharing of information that is lawful and reasonably necessary to comply with healthcare reform. *See infra* Section XV.D.

### XV. PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT INTERIM HARM AND TO PRESERVE

### THE FTC'S ABILITY TO RESTORE BENEFICIAL PRE–ACQUISITION COMPETITION

336. The strong public interest in the effective enforcement of the antitrust laws weighs in favor of a preliminary injunction in the instant case. A preliminary injunction, continuing the HSA, is necessary to maintain the *status quo* and ensure availability of relief, if warranted, after the full administrative proceeding on the merits. Absent a preliminary injunction, ProMedica will be free to implement its plans to increase hospital rates, terminate employees at St. Luke's, and eliminate important clinical services currently offered at SLH. These actions will cause immediate harm to the community and will make it difficult, if not impossible, to restore competition to pre-Acquisition levels should the FTC ultimately prevail in its administrative challenge.

### A. The Joinder Agreement Does Not Maintain the Competitive Viability of St. Luke's as an Independent Hospital

337. Under the Joinder Agreement ("Agreement"), ProMedica must retain only six specified service categories at St. Luke's. PX 58 at 23 (Joinder Agreement § 7.1) (the covered service categories are: emergency room, ambulatory surgery, inpatient surgery, obstetrics, inpatient nursing, and a CLIA-certified laboratory). Even for these basic service categories, the Agreement does not include minimum operational or quality standards.

338. Under the Agreement, ProMedica faces no obligation whatsoever to preserve other critical services at St. Luke's, such as oncology, cardiology, orthopedics, radiology and imaging, spinal neurosurgery, pediatrics, and diabetes care, among others. *Compare* PX 58 at 23 (Joinder Agreement § 7.1) *with* PX 2102 at ¶ 5 (Wakeman (SLH) Decl.) (listing current services); PX 2023 at 152:5–153:20 (Wakeman (SLH) Dep.); *see also* PX 396 at 2–3 (Navigant Consulting, Clinical Integration Strategy: Executive Summary, Jan. 11, 2011) (seven areas analyzed for potential consolidation or "reconfiguration."). Even if ProMedica were to eliminate or transfer a subset of services within a clinical service line, this could have serious negative implications. For example, if ProMedica were to discontinue open-heart surgery at St. Luke's (which is permissible under the Agreement), this could undermine the overall viability of St. Luke's Heart Center and interventional cardiology program.

**\*51** 339. ProMedica can amend the Agreement with approval from SLH's Board, which is now subject to the exercise of PHS's reserve powers. PX 58 at 51–52 (Joinder

Agreement § 17.3); PX 2023 at 155:8–156:2 (Wakeman (SLH) Dep.).

### B. ProMedica Plans to Increase Hospital Reimbursement Rates

340. Under the Agreement, ProMedica will take over the management and negotiation of SLH's contracts with health plans. PX 58 at 58 (Joinder Agreement, Ex. 9); PX 2006 at 162:2–5 (Wachsman (PHS) IH). ProMedica already has taken steps to raise rates immediately if the Court does not impose preliminary injunctive relief. PX 2021 at 33:25–35:21 (Oostra (PHS) Dep).

341. Health plans expect ProMedica to increase SLH's rates significantly. *See supra* Section VIII. A.2 ["Health Plans Expect the Acquisitions to Result in Increased Bargaining Leverage and Higher Rates"]. If SLH's rates increase to the rates at ProMedica's hospitals, as health plans expect, this would represent a rate increase of more than X percent, on average. PX 2125 at 27 (Town Decl., Ex. 4) (severity adjusted price differential between ProMedica and St. Luke's).

342. Without a Court order protecting competition pending the full administrative trial on the merits, Lucas County employers and their employees clearly could suffer substantial, immediate and irreversible harm from higher healthcare-insurance prices, as PHS plans to raise SLH's rates as soon as possible. PX 2022 at 82:10–83:17, 85:25–86:11, 87:18–25 (Wachsman (PHS) Dep.). Ultimately, higher healthcare costs will be borne by Lucas County residents, many of whom already are struggling financially. *See supra* Section IX. In response, some Lucas County employers may reduce healthcare benefits for their employees, and some insured employees may drop their healthcare coverage altogether and/or forgo medical treatment due to higher out-of-pocket expenses. *See supra* Section IX. There is no means for redressing this harm once it has occurred.

343. A preliminary injunction is the only meaningful method for preventing this competitive harm, because it is virtually impossible to make consumers whole once such harm has occurred.

### C. ProMedica Plans to Close and Consolidate Hospital Services and to Reduce Staffing at St. Luke's

344. ProMedica's CEO, Mr. Oostra, acknowledged that ProMedica plans to close and consolidate several of SLH's service lines. PX 2021 at 98:5–9 (Oostra (PHS) Dep.).

345. The Compass Lexecon report initially identified several of SLH's service lines as candidates for consolidation, including heart/vascular, orthopedics, women's, neuro/stroke, cancer, and pulmonary services for consolidation. PX 20 at 13 (Compass Lexecon Report). ProMedica then hired Navigant specifically to determine which services to transfer or consolidate. PX 222 at 2 (Navigant Service Line and Clinical Integration Report); *see also* PX 2011 at 122:10–125:4, 162:15–164:4 (Akenberger (PHS) IH). In January 2011, Navigant analyzed seven service lines for consolidation, including open-heart surgery, and it also looked at integration opportunities in psychiatry and rehabilitation services. PX 396 at 3, 8–10 (Navigant Consulting, Clinical Integration Strategy: Executive Summary, Jan. 11, 2011) (the seven service lines were cancer, heart and vascular, neuroscience, orthopedics, obstetrics, pediatrics, gastroenterology/urology).

**\*52** 346. The same process of service consolidation took place at Flower following its acquisition by ProMedica in 1996. ProMedica's CFO, Ms. Hanley, testified that Flower had a significant number of redundant practices, and ProMedica consolidated service lines and department heads. PX 2002 at 172:2–13 (Hanley (PHS) IH). ProMedica's consolidation of services at Flower included downsizing the number of operating rooms from twelve to three following a sharp reduction in the number of hospital anesthesiologists. PX 2081 at ¶ 12.

347. ProMedica also plans to reduce staffing at St. Luke's. The Compass Lexecon report indicates that ProMedica plans to lower SLH's overall staffing levels to those of Flower Hospital. PX 20 at 15 (Compass Lexecon Report). The Agreement does not prevent ProMedica from immediately reducing the number of St. Luke's employees.

348. St. Luke's ranks highly in quality and patient satisfaction scores, and patient satisfaction levels at St. Luke's have increased further, relative to last year. PX 2023 at 16:17–17:4, 89:17–21 (Wakeman (SLH) Dep.); PX 390 at 1 (May 2010 ProMedica Press Release); PX 1072 at 1 (Key Messages from St. Luke's). Such high quality and patient satisfaction levels are made possible by St. Luke's employees and the overall staffing levels that St. Luke's has maintained. Providing uninterrupted, high-quality patient care and patient safety were the precise reasons for which St. Luke's chose not to lay off employees and in fact *continued hiring* over the past two years. PX 2023 at 22:13–27:6 (Wakeman (SLH) Dep.). *See*

*also* PX 1274 at 1 (Wakeman e-mail). If ProMedica reduces St. Luke's staffing levels thereby eliminating employees who currently contribute to the attentive, high-quality care the hospital offers quality, and as a result, patients, appear likely suffer. *See* PX 2077 at ¶ 8.

349. Absent a preliminary injunction, it will be extremely difficult, if not impossible, to restore clinical service lines to St. Luke's and fully restore St. Luke's to its pre-Acquisition status. Thus, a preliminary injunction is necessary for the FTC to achieve meaningful relief, if warranted, following the administrative trial on the merits and exhaustion of all appeals.

## CONCLUSIONS OF LAW

**I. APPLICABLE LAW**

1. Section 7 of the Clayton Act states:

> No person ... shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... of another person ... Where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or ten to create a monopoly.

18 U.S.C. § 18.

Section 7 is "designed to arrest in its incipiency ... the substantial lessening of competition from the acquisition by one corporation of the whole or any part of the stock" or assets of a competing corporation. *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). The Supreme Court has explained that "Congress used the words ' *may* be substantially to lessen competition' (emphasis supplied), to indicate that its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States,* 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). *The government can satisfy its burden by establishing a "reasonable probability" of substantial

anticompetitive effects. Du Pont,* 353 U.S. at 589, 77 S.Ct. 872, 1 L.Ed.2d 1057. Section 7 "can *deal only with probabilities, not with certainties.* And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (citations omitted). However, "ephemeral possibilities" will not satisfy the requirement of a reasonable probability.

*United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 623, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

**\*53** In perhaps the seminal case on Section 7, the Supreme Court explained that where an acquisition would "produce[ ] a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market," the likelihood that competition will be substantially lessened is so great "that it must be enjoined in the absence of evidence clearly showing that the [acquisition] is not likely to have such anticompetitive effects." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Thus, where the government shows that the acquisition in question would result in a firm controlling an undue percentage of the relevant market and a significant increase in the concentration of firms in that market, a presumption of illegality arises because there is a presumption of anticompetitive effects.

*United States v. Dairy Farmers of America, Inc.,* 426 F.3d 850, 848 (6th Cir.2005). (Emphasis added.)

2. Section 13(b) of the FTC Act authorizes the Court to grant a preliminary injunction if, upon "weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). As such, this Court should: (1) determine the likelihood that the FTC will ultimately succeed on the merits in its case under Section 7 of the Clayton Act; and (2) balance the equities. *FTC v. H.J. Heinz Co.,* 246 F.3d 708, 714 (D.C.Cir.2001).

3. The "only purpose of a proceeding under Section 13[ (b) ] is to preserve the status quo until the FTC can perform

2011-1 Trade Cases P 77,395

its function. *FTC v. Food Town Stores, Inc.,* 539 F.2d 1339, 1342 (4th Cir.1976). The ultimate determination as to a Section 7 violation of the Clayton Act is an "adjudicatory function [ ] vested in the FTC." *Id.*

4. To show a likelihood of success in a 13(b) proceeding, Plaintiffs must only "raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *FTC v. Butterworth Health Corp.,* 946 F.Supp. 1285, 1289 (W.D.Mich.1996), *aff'd,* 121 F.3d 708, 1997 WL 420543 (6th Cir.1997). (Citations omitted.)

5. While the FTC need not establish irreparable harm under § 13(b) to secure a preliminary injunction, a burden shifting analysis is appropriate:

First, the FTC must make *a prima facie* showing that the merger would lead to undue concentration in the product market in the geographical area in question; such a showing gives rise to a presumption of illegality. *University Health,* 938 F.2d at 1218. If a *prima facie* case is made out, the burden of producing evidence to rebut the presumption shifts to the defendants. *Id.* If the defendants produce such evidence, the FTC has the burden of producing additional evidence to show the anticompetitive effects of the merger. *Baker Hughes,* 908 F.2d at 983. The ultimate burden of persuasion remains with the FTC at all times. *Id.*

**\*54** *Id.* 121 F.3d 708, 1997 WL 420543 at \*2, citing, *FTC v. University Health, Inc.,* 938 F.2d 1206, 1218–1219 (11th Cir.1991); *United States v. Baker Hughes, Inc.,* 908 F.2d 981, 983 (D.C.Cir.1990); *United States v. Waste Management, Inc.,* 743 F.2d 976, 981 (2d Cir.1984).

## II. LEGAL CONCLUSIONS

6. ProMedica's statements of market dominance may be construed as an admission against interest. Fed.R.Evid. 801(d)(2).

### A. GENERAL ACUTE–CARE INPATIENT HOSPITAL SERVICES CONSTITUTE A RELEVANT PRODUCT MARKET

7. A relevant product market is one in which a hypothetical monopolist could increase prices profitably by a "small but significant" amount for a meaningful period of time. (U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines (2010) § 4.1.1 (*"Merger Guidelines"*)). Defining the product market generally focuses on "demand substitution factors, *i.e.,* on customers' ability and willingness to substitute away from one product to another in response to a price increase or ... reduction in product quality or service." *Id.* at § 4. Courts frequently have relied on the *Merger Guidelines* framework to assess how acquisitions impact competition. *See, e.g.,* *Butterworth,* 946 F.Supp. at 1294; *Chicago Bridge & Iron Co. N.V. v. FTC,* 534 F.3d 410, 432 n. 11 (5th Cir.2008); *Heinz,* 246 F.3d at 716 n. 9; *FTC v. Univ. Health Inc.,* 938 F.2d 1206, 1211 n. 12 (11th Cir.1991).

8. Evidence that predicts a price increase for a group of products "can itself establish that those products form a relevant [product] market." *Merger Guidelines* § 4; *see also Whole Foods,* 548 F.3d at 1046–47 (Tatel, J., concurring) (CEO's statement that it was buying company to "avoid nasty price wars" was relevant evidence of market definition); *In re Evanston Nw. Healthcare,* No. 9315, 2007 WL 2286195, at 60–61 (F.T.C. Aug.6, 2007).

9. The first relevant product market in this case is general acute-care inpatient services ("GAC") sold to commercial health plans. This is a "cluster market" of services that courts consistently have found when analyzing hospital mergers. *See, e.g .,* *Butterworth,* No. 96–2440, 1997 U.S.App. LEXIS 17422; *Univ. Health Inc.,* 938 F.2d at 1210–11; *United States v. Rockford Mem. 'l Corp.,* 898 F.2d 1278, 1284 (7th Cir.1990); *Evanston,* No. 9315, 2007 WL 2286195, at 55–57.

10. The inpatient services included in the cluster market are not substitutes for one another (*i.e.,* appendectomies and coronary bypass surgery are not interchangeable). However, the cluster market is used "as a matter of analytical convenience [because] there is no need to define separate markets for a large number of individual hospital services ... when market shares and entry conditions are similar for each." *Emigra Group v. Fragomen,* 612 F.Supp.2d 330, 353 (S.D.N.Y.2009) (citing Jonathan B. Baker, *Market Definition: An Analytical Overview,* 74 ANTITRUST L.J. 129, 157–59 (2007)).

**\*55** 11. The specific inpatient services included in the cluster market are those that both ProMedica and St. Luke's offer, and therefore those for which competition will be affected by the Acquisition. *See Little Rock Cardiology Clinic v. Baptist Health,* 573 F.Supp.2d 1125 n. 46 (E.D.Ar.2008) (excluding cardiologists' services from market definition because "[defendant] does not compete in the cardiologists' service market; it has no market share and therefore no market power in [that market].").

12. Outpatient services are excluded from the GAC market because they are not substitutes for inpatient services and because they are subject to different competitive conditions (including a different set of providers) than are inpatient services. *See* 🚩 *Rockford Mem'l Hosp.,* 898 F.2d at 1284 (excluding outpatient services from a GAC product market).

### B. INPATIENT OBSTETRICAL SERVICES CONSTITUTE A RELEVANT PRODUCT MARKET

13. Inpatient obstetrical services constitute a separate relevant product market in which the competitive effects of the Acquisition must be analyzed. A separate product market for this service line is necessary because "market shares and entry conditions" are different for obstetrics than for the overall cluster of GAC services: UTMC and Mercy St. Anne do not offer obstetrical services. *See* 🚩 *Emigra Group,* 612 F.Supp.2d at 353. As such, it would be inappropriate and misleading to include obstetrical services in the GAC cluster market; the effect of the Acquisition on the provision of obstetrical services in Lucas County must be separately analyzed.

14. Inpatient obstetrical services need not be included in the overall general acute-care inpatient services market simply because they are offered within the same facilities as the other services. *See* 🚩 *Rockford Mem. 'l Hosp.,* 898 F.2d at 1284 (Posner, J.) ("Hospitals can and do distinguish between the patient who wants a coronary bypass and the patient who wants a wart removed from his foot; these services are not in the same product market merely because they have a common provider.").

15. Courts in the Sixth Circuit have recognized different product markets with different market structures and competitive conditions in hospital mergers. 🚩 *Butterworth,* 946 F.Supp. at 1290–91 (accepting two market definitions-general acute care inpatient hospital services and primary care

inpatient hospital services-each with different competitors); *Defiance Hosp. v. Fouster–Cameron, Inc.,* 344 F.Supp.2d 1097, 1109 (N.D.Ohio 2004) (finding narrower market of anesthesia services where, *inter alia,* only certain providers perform the service).

### C. THE RELEVANT GEOGRAPHIC MARKET IS LUCAS COUNTY

16. Section 7 of the Clayton Act prohibits acquisitions that are likely to lessen competition in "any section of the country," otherwise known as a geographic market. 🚩 *Phila. Nat'l Bank,* 374 U.S. at 356.

17. Under the case law and *Merger Guidelines,* the relevant question to define the geographic market is whether a hypothetical monopolist controlling *all* Lucas County hospitals could profitably implement a small but significant non-transitory increase in price ("SSNIP"). *Merger Guidelines* § 4.2. Defining the geographic market is a "pragmatic" undertaking and the Plaintiffs must "present evidence of practical alternative sources to which consumers ... would turn if the merger were consummated."

🚩 *Butterworth,* 946 F.Supp. at 1291; *see generally* 🚩 *Phila. Nat'l Bank,* 374 U.S. at 358–62. Therefore, the relevant geographic market within which to analyze the competitive effects of the Acquisition is no broader than Lucas County.

### D. THE ACQUISITION IS PRESUMED UNLAWFUL BASED ON CONCENTRATION THRESHOLDS

**\*56** 18. "A transaction resulting in a high concentration of market power and creating, enhancing, or facilitating a potential that such market power could be exercised in anticompetitive ways is presumptively unlawful."

🚩 *Butterworth,* 946 F.Supp. at 1294 (citations omitted); *see also* 🚩 *Phila. Nat'l Bank,* 374 U.S. at 363; 🚩 *Baker Hughes,* 908 F.2d at 982–83.

19. Market concentration can be measured using the Herfindahl–Hirschman Index ("HHI"), as adopted by the federal antitrust enforcement agencies. *Merger Guidelines* § 5.3. Courts have likewise adopted and relied on the HHI as a measure of market concentration. *See, e.g.,* 🚩 *Univ. Health Inc.,* 938 F.2d at 1211 n. 12 (HHI is "most prominent method" of measuring market concentration) 🚩 *FTC v. PPG*

*Indus.,* 798 F.2d 1500, 1503 (D.C.Cir.1986); *FTC v. Cardinal Health,* 12 F.Supp.2d 34, 53–54 (D.D.C.1998); *FTC v. Staples,* 970 F.Supp. 1066, 1081–82 (D.D.C.1997). The HHI is calculated by summing the squares of the market shares of all firms in the market. A transaction that increases concentration by 200 points and results in a highly-concentrated market (HHI over 2,500) is *presumed* likely to enhance market power. *Merger Guidelines* § 5.3.

20. Sufficiently large HHI figures establish the FTC's *prima facie* case that a merger is anti-competitive. *Heinz,* 246 F.3d at 716 (citing *Phila. Nat'l Bank,* 374 U.S. at 363); *Baker Hughes,* 908 F.2d at 982–83.

21. The market shares and HHI levels here far exceed levels found to be unlawful by the Supreme Court and other courts. (See ¶ 96) In *Philadelphia National Bank,* the Supreme Court found that a combined market share of 30 percent, with many remaining competitors, violated the Clayton Act. 374 U.S. at 364. In *University Health Inc.,* the Court found that the FTC had "clearly established a *prima facie* case of anticompetitive effect" when it proved that a merger of two nonprofit hospitals would have reduced the number of competitors from five to four and resulted in a combined share of about 43 percent, an increase in HHI of over 630, and a post-merger HHI of 3200. 938 F.2d at 1211 n. 12, 1219; *see also FTC v. Bass Bros. Enters., Inc.,* No. C84–1304, 1984 U.S. Dist. LEXIS 16122, at *65 (N.D. Ohio June 6, 1984) (enjoining two mergers that would have resulted in 200 and 300 point increases in HHI); *Cardinal Health,* 12 F.Supp. at 52–53 (enjoining two mergers that would have resulted in 600 and 800 point increases in HHI).

22. A duopoly, as in the inpatient obstetrical services market here, is presumptively unlawful in and of itself. There is "by a wide margin, a presumption that [a three-totwo] merger will lessen competition ..." *Heinz,* 246 F.3d at 716; *PPG,* 798 F.2d at 1503; *Cardinal Health,* 12 F.Supp.2d at 52–53.

**E. DEFENDANT HAS FAILED TO REBUT THE PRESUMPTION OF LIKELY HARM**

23. Proof that the acquisition will increase concentration in one or more relevant markets with significant barriers to entry establishes a *prima facie* case that a merger is

anticompetitive. *Heinz,* 246 F.3d at 716 (likelihood of success demonstrated by showing that market concentration would increase substantially). The burden shifts to the Defendant to rebut the *prima facie* case by attempting to show that market-share statistics do not accurately reflect the market. *Id.* at 715; *Baker Hughes,* 908 F.2d at 982–83. "The more compelling the *prima facie* case, the more evidence the defendant must present to rebut it successfully." *Heinz,* 246 F.3d at 725 (quoting *Baker Hughes,* 908 F.2d at 991).

**1. There Will Be No Timely, Likely, or Sufficient Entry or Expansion in the Relevant Markets**

**\*57** 24. Entry must be "timely, likely, and sufficient in its magnitude, character and scope to deter or counteract the competitive effects" of a proposed transaction. *Merger Guidelines* § 9; *FTC v. Procter & Gamble, Co.,* 386 U.S. 568, 579, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *Bass Bros.,* No. C84–1304, 1984 U.S. Dist. LEXIS 16122, at *32 (noting unlikelihood of entry due to regulatory and cost barriers); *see also* *Cardinal Health,* 12 F.Supp.2d at 55–58 (adopting "timely, likely, and sufficient" test). Defendants must show both that entry is *likely*—meaning both technically possible —and economically feasible-and that it will *replace* the competition that existed prior to the merger. *See* *Cardinal Health,* 12 F.Supp.2d at 56 (quotation omitted); *In re Chicago Bridge & Iron Co.,* 138 F.T.C. 1024, 1067 (2005) (noting "new entrants and fringe competitors" might not replace lost competition), *aff'd sub nom. Chicago Bridge & Iron Co. N.V. v. FTC,* 534 F.3d 410 (5th Cir.2008).

25. The higher the barriers to entry, as in this case, the less likely it is that the "timely, likely, and sufficient" test can be met. *United States v. Visa U.S.A., Inc.,* 163 F.Supp.2d 322, 342 (S.D.N.Y.2001), *aff'd,* 344 F.3d 229, 240 (2d Cir.2003). (See ¶¶ 221–234).

**2. Defendant's Efficiencies Claims Fail**

26. Defendant has failed in its burden of proving that its asserted efficiencies are: (1) verifiable; (2) not attributable to reduced output or quality; (3) merger-specific; and (4) sufficient to outweigh the transaction's anticompetitive effects. *See* *Heinz,* 246 F.3d at 721 (evidence cannot be "mere speculation and promises about post-merger

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

behavior"); *Univ. Health Inc.,* 938 F.2d at 1223 ("defendant [cannot] overcome a presumption of illegality based solely on speculative, self-serving assertions");

*Staples,* 970 F.Supp. at 1089; *see also Merger Guidelines* § 10.

27. Efficiencies must be "extraordinary" to overcome high concentration levels. *Heinz,* 246 at 721–22.

28. No court in a 13(b) proceeding, or otherwise, has found efficiencies sufficient to rescue an otherwise illegal merger. *See Phila. Nat'l Bank,* 374 U.S. at 371 (noting that where a merger substantially lessens competition, it "is not saved because, on some ultimate reckoning of social or economic debits or credits, it may be deemed beneficial."); *Procter & Gamble,* 386 U.S. at 580 ("[P]ossible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in economies but it struck the balance in favor of protecting competition").

**3. St. Luke's Is Not a Failing Firm**

29. Defendant cannot meet the requirements of the failing-firm defense, under which ProMedica must prove that it was St. Luke's only available purchaser and that St. Luke's was in imminent danger of business failure. *See Citizen Publ'g Co. v. United States,* 394 U.S. 131, 136–37, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) (citing *Int'l Shoe Co. v. FTC,* 280 U.S. 291, 302, 50 S.Ct. 89, 74 L.Ed. 431 (1930)); *see also U.S. Steel Corp. v. FTC,* 426 F.2d 592, 608 (6th Cir.1970); *Merger Guidelines* § 11.

**\*58** 30. The failing-firm defense has "strict limits[.]" *Warner Commc 'ns, Inc.,* 742 F.2d at 1156; *see also United States v. General Dynamics Corp.,* 415 U.S. 486, 507, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974) (failing-firm defense is "lesser of two evils approach"); *Citizen Publ'g Co.,* 394 U.S. at 137 (failing-firm defense should be confined to its "narrow scope").

31. The failing-firm defense has never succeeded in a 13(b) proceeding.

**4. St. Luke's Is Not a "Flailing Firm"**

32. A defense based on the financial weakness of the acquired company-sometimes referred to as a "flailing-firm defense" is an even more tenuous ground on which to justify the Acquisition. Courts have viewed the defense with extreme skepticism, describing it as "probably the weakest ground of all for justifying a merger." *Kaiser Alum. & Chem. Corp. v. FTC,* 652 F.2d 1324, 1338–41 (7th Cir.1981) (noting further that it "certainly cannot be the primary justification of a merger"). *Id.* The Ninth Circuit rejected the defense, explaining that it inappropriately expands the "strict limits" of the failing-firm defense. *Warner Commc 'ns, Inc.,* 742 F.2d at 1165 (quoting and citing *Kaiser Alum. & Chem. Corp.,* 652 F.2d at 1339).

33. To the limited extent that courts consider the defense, it requires a "substantial showing that the acquired firm's weakness, *which cannot be resolved by any other means,* would cause the firm's market share to reduce to a level that would undermine the government's *prima facie* case." *Univ. Health Inc.,* 938 F.2d at 1221 (emphasis added). Thus, to succeed, Defendant must make a "substantial showing" of an imminent, steep plummet in St. Luke's market share (from 11.5 percent to less than 2 percent for GAC services and from 9.3 percent to less than 1.3 percent for OB services) such that market concentration falls below levels that trigger the presumption of anticompetitive harm.

34. The strength of the FTC's *prima facie* case here differs greatly from the circumstances in *FTC v. Arch Coal, Inc.,* 329 F.Supp.2d 109 (D.D.C.2004), the only case in which a court has relied on financial weakness (and only in part) to deny relief in a 13(b) proceeding. In *Arch Coal,* the FTC "just barely" raised competitive concerns with "an increase in HHI of only 49." *Id.* at 158. The court noted that less of a showing was required from the defendant to rebut the "less-than-compelling *prima facie* case" and further cautioned that it was "important to note that this case is *not* one in which the post-merger increase in FTHI produces an overwhelming statistical case." *Id.* at 129, 158 (emphasis added). [2]

**5. Defendant's Other Novel Defenses Are Entitled to Little Weight**

35. No court has ever denied relief in a 13(b) proceeding despite an acknowledgment by the defendant that prices will increase by double-digits. The Court cannot accept Defendant's argument that recent rate negotiations prove that it will only seek "reasonable" price increases in the future:

"[p]ost-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight."

*Hosp. Corp. of Am. v. FTC,* 807 F.2d 1381, 1384 (7th Cir.1986) (Posner, J.).

**\*59** 36. Furthermore, the Court declines Defendant's invitation to delve into whether St. Luke's current prices are "subcompetitive" or otherwise unreasonable in some way. Section 7 of the Clayton Act does not prevent *St. Luke's* from seeking better rates as an independent hospital, but it does prohibit any transaction that may "substantially lessen competition" and allow higher rates to result from an unlawful exercise of market power. 15 U.S.C. § 18 (2006).

37. Indeed, no court has ever engaged in an inquiry into the reasonableness of pre-merger or post-merger prices in a 13(b) proceeding. To do so "is to set sail on a sea of doubt" because courts are "ill-suited to act as central planners, identifying the proper price, quantity and other terms of dealing." *Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.,* 555 U.S. 438, 129 S.Ct. 1109, 1121, 172 L.Ed.2d 836 (2009) (quotations and citations omitted). Rather, "the normal assumption in examining assertions of market power is that the current price is at least the competitive price." *CF Indus., Inc. v. Surface Transp. Bd.,* 255 F.3d 816, 824 (D.C.Cir.2001) (citing IIA Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 537b (1995)). As the leading antitrust treatise states: "[T]he market is presumably behaving competitively, or at least nearly so, prior to the merger. The concern is whether the merger may lead to a further price increase *above current levels.*" IIB Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 539a2 (2009) (emphasis added). No court has ever concluded that significant price increases resulting from an acquisition are fair and reasonable. [3]

38. Defendant cites to prior hospital merger cases in which courts denied preliminary injunctive relief despite allegations of high post-merger market shares. However, in all but one of those cases (discussed below), either the court held that the government did not meet its burden of proving the high market shares or the court did not reach the issue. For example, in *United States v. Mercy Health Servs.,* 902 F.Supp. 968 (N.D.Iowa 1995), the Department of Justice alleged that the parties had a combined 86 percent share. However, the government failed to prove that the relevant geographic market extended beyond an area in which the parties' held only a 10 percent share, which even the government acknowledged would not violate § 7. *Id.; see also* *FTC v. Tenet Health Care Corp.,* 186 F.3d 1045 (8th Cir.1999), (government did not meet burden of proving geographic market that supported an alleged 84 percent market share); *FTC v. Freeman Hosp.,* 69 F.3d 260 (8th Cir.1995) (FTC alleged market with post-merger HHIs between 3088 and 3417, but court found broader geographic market with post-merger HHIs between 1322 and 1496 and combined shares between 21 and 24 percent); *FTC v. Hosp. Bd. of Dirs.,* 38 F.3d 1184 (11th Cir.1994) (court never reached market shares because acquisition immune under state action doctrine).

**\*60** 39. The only case in which the court permitted a hospital merger despite apparently large market shares, *Butterworth,* 946 F.Supp. 1285, involved two key issues that are not relevant here: first, the Court credited arguments that a non-profit hospital was not likely to raise prices, in part because the hospital's Board of Directors, composed of local community members, would not allow it; and second, the Court relied on the merging hospitals' commitment to freeze prices at both of the merging hospitals for three years and limit price increases for the following four years. *Id.* at 1302–1304. Neither fact fits the evidence in this case. *See* Findings of Fact at Section VI.

### III. THE EQUITIES FAVOR A PRELIMINARY INJUNCTION

40. No court has denied relief to the FTC in a 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits. "The equities will often weigh in favor of the FTC because 'the public interest in effective enforcement of the antitrust laws' was Congress's specific 'public equity consideration' in enacting Section 13(b)." *CCC Holdings,* 605 F.Supp.2d at 36 (citing *Heinz,* 246 F.3d at 726).

41. Private equities "are not proper considerations for granting or withholding injunctive relief under section 13(b)"—instead, public equities are paramount. *Food Town,* 539 F.2d at 1346. Moreover, if the benefits of a merger are available after the trial on the merits, they do not constitute public equities weighing against a preliminary injunction. *Heinz,* 246 F.3d at 726 ("If the merger makes economic

2011-1 Trade Cases P 77,395

sense now, the appellees have offered no reason why it would not do so later.").

42. In a preliminary injunction action under Section 13(b), the FTC is not required to show irreparable harm. *See* 🚩 *Heinz,* 246 F.3d at 714; *Elders Grain,* 868 F.2d at 903; *Warner Commc 'ns,* 742 F.2d at 1159.

### IV. COURT–ORDERED RELIEF IS NECESSARY TO PRESERVE THE POSSIBILITY OF MEANINGFUL PERMANENT RELIEF AND TO PREVENT INTERIM HARM

43. The very purpose of a Section 13(b) proceeding is to preserve the FTC's ability to achieve meaningful relief, if it succeeds on the merits, by preventing the difficulty of splitting up operations that have become commingled. *Whole Foods,* 548 F.3d at 1034 ("[E]ven with the considerable flexibility of equitable relief, the difficulty of 'unscrambl[ing] merged assets' often precludes 'an effective order of divestiture' " (citation omitted)); 🚩 *FTC v. Libbey, Inc.,* 211 F.Supp.2d 34 (D.D.C.2002) ("Preserving the status quo so that meaningful relief will be available to the FTC, is another equity that weighs in favor of issuing the preliminary injunction. 'Unscrambling the eggs' after the fact may not be a realistic option in [the] case." (citations omitted)); *FTC v. Ill. Cereal Mills, Inc.,* 691 F.Supp. 1131, 1146 (N.D.Ill.1988) ("This persistent problem [of unscrambling assets] has been long recognized by courts, and is the underlying reason for the Commission's authority to seek preliminary relief under Section 13(b) of the FTC Act.").

**\*61** 44. Another principal reason for preliminary relief is to prevent interim harm to consumers while the merits trial and any appeals are underway, even if a suitable divestiture remedy could later be devised. *Bass Bros.,* No. C84–1304, 1984 U.S. Dist. LEXIS 16122, at \*70 (failure to halt illegal acquisitions causes interim harm and "later remedies cannot remove retroactively the harm that has already occurred.").

45. Accordingly, and for the reasons stated above, the FTC's Motion for Preliminary Injunction (Doc. No. 4) is hereby Granted.

46. The parties are to abide by terms of the current Hold Separate Agreement until either (1) the completion of all legal proceedings by the Commission challenging the Acquisition, including all appeals, or (2) further order of the Court, including upon the request of the Commission before completion of such legal proceedings.

47. The Court envisions a relatively short stay of the completion of the relationship between Plaintiffs and SLH, pursuant to the HSA of August 2010. Toward that end, if the FTC has not completed actions before it by November 30, 2011, this Court will entertain taking additional steps to insure that all parties are treated fairly and expeditiously.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2011 WL 1219281, 2011-1 Trade Cases P 77,395

### Footnotes

1    Due to the confidential nature of information in this litigation and consistent with the Stipulated Interim Protective Order (Doc. No. 16), the Court will refer to such information as X, Y, or Z, as necessary, in these Findings of Fact.

2    *Arch Coal* is distinguishable in numerous other ways: *inter alia,* the transaction at issue involved coal reserves that, once depleted, could never be replenished, making the financial decline of the acquired company irreversible; and the transaction did not result in a decrease in the number of competitors in the market.

3    Defendant relies on 🚩 *United States v. Long Island Jewish Med. Ctr.,* 983 F.Supp. 121 (E.D.N.Y.1997) to argue that this Court may accept price increases because they are purportedly not "supracompetitive." However, the court in *Long Island Jewish Medical Center* did not condone price increases; rather, it concluded

2011-1 Trade Cases P 77,395

that prices would not increase at all as a result of the merger. *Id.* at 145 ("In sum, the evidence in this case indicates that, in the event the merger is consummated, it is unlikely that there will be a price increase.").

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.