# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

**FEDERAL TRADE COMMISSION,**

**Plaintiff,**

**v.**

**U.S. ANESTHESIA PARTNERS, INC., et al.,**

**Defendants.**

**Case No.: 4:23-CV-03560-KH**

**Second Appendix to**
**Plaintiff Federal Trade Commission's Opposition to**
**U.S. Anesthesia Partners, Inc.'s Motion to Dismiss**

## Table of Contents – First Appendix

<u>**Cases**</u>

*Behrend v. Comcast Corp.*,
   No. 03-cv-6604, 2012 WL 1231794 (E.D. Pa. Apr. 12, 2012)................................................. 4

*Clean Water Opportunities, Inc. v. Williamette Valley Co.,*
   759 F. App'x 244 (5th Cir. 2019) ........................................................................................ 40

*Constr. Cost Data, LLC v. Gordian Grp., Inc.*,
   No. CV H-16-114, 2017 WL 2266993 (S.D. Tex. Apr. 24, 2017)....................................... 45

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*,
   No. 01-cv-2669-WHP, 2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002)............................. 61

*Eastman v. Quest Diagnostics, Inc.*,
   No. 15-cv-00415-WHO, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016)............................. 77

*FTC v. AdvoCare Int'l, LP*,
   No. 4:19-CV-715-SDJ, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020).............................. 89

*FTC v. Am. Future Sys., Inc.*,
   No. 20-cv-2266, 2021 WL 3185777 (E.D. Pa. July 26, 2021) ............................................ 95

*FTC v. Hackensack Meridian Health, Inc.*,
   No. 20-cv-18140, 2021 WL 4145062 (D.N.J. Aug. 4, 2021) ............................................101

*FTC v. ProMedica Health Sys., Inc.*,
   No. 3:11 CV 47, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011) ...................................... 130

# Table of Contents – Second Appendix

## Cases

*FTC v. SuperTherm Inc.*,
  No. CV-20-08190-PCT-DWL, 2021 WL 3419035 (D. Ariz. Aug. 5, 2021) ......................... 4

*FTC v. Surescripts, LLC*,
  No. CV 19-1080 (JDB), 2023 WL 2707866 (D.D.C. Mar. 30, 2023).................................. 13

*FTC v. Walmart Inc.*,
  No. 22-cv-3372, 2023 WL 2646741 (N.D. Ill. Mar. 27, 2023) ............................................ 43

*In re Androgel Antitrust Litig. (No. II)*,
  No. 1:09-MD-2084-TWT, 2018 WL 2984873 (N.D. Ga. June 14, 2018) ...........................76

*United States v. Jindal*,
  No. 4:20-CR-00358, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) ................................... 98

*Warren v. New Orleans Police Dep't*,
  No. 92-cv-2037, 1992 WL 245655 (E.D. La. Sept. 11, 1992)  ...........................................115

## Other Authorities

S. Rep. 93-151, at 30-31 (1973) ................................................................................................117

U.S. Dep't of Justice & FTC,
  *Horizontal Merger Guidelines* § 5.3 (Aug. 19, 2010) .........................................................138

U.S. Dep't of Justice & FTC,
  *Merger Guidelines* §§ 2.1-2.2, 2.7-2.8 (Dec. 18, 2023) .......................................................144

Phillip E. Areeda & Herbert Hovenkamp,
  *Antitrust Law* ¶ 701 (2023) ...............................................................................................170

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 4 of 179
Federal Trade Commission v. Supertherm Incorporated, Not Reported in Fed. Supp....
2021-1 Trade Cases P 81,762

2021 WL 3419035
United States District Court, D. Arizona.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
SUPERTHERM INCORPORATED, Roberto
Guerra, and Susana Guerra, Defendants.

No. CV-20-08190-PCT-DWL.
|
Signed 08/04/2021
|
Filed 08/05/2021

**Attorneys and Law Firms**

Jonathan Wesley Ware, Michelle L. Schaefer, Federal Trade Commission, Washington, DC, for Plaintiff.

Robert C. Brown, Waldron Evans PLC, Scottsdale, AZ, for Defendants.

## ORDER

Dominic W. Lanza, United States District Judge

**\*1** In this action, the Federal Trade Commission ("FTC") alleges that SuperTherm Incorporated ("SuperTherm") and its two sole officers and employees, Roberto and Susana Guerra (the "Guerras") (collectively, "Defendants"), have made false or unsubstantiated performance claims about their building insulation coating products, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (Doc. 1.) Now pending before the Court is the FTC's motion for default judgment and permanent injunction. (Doc. 18.) For the following reasons, the motion is granted.

## BACKGROUND

### I. Factual Background

The following facts are derived from the FTC's complaint. (Doc. 1.) SuperTherm is an Arizona corporation that advertises, markets, distributes, or sells "MultiCeramics Insulation" coating for residential and commercial applications to consumers throughout the United States. (*Id.* ¶¶ 9, 13.) Roberto Guerra is SuperTherm's founder and principal and Susana Guerra is SuperTherm's president and director. (*Id.* ¶¶ 10-11.) The Guerras are SuperTherm's sole officers and employees and are responsible for its day-to-day management and the development of its advertising and marketing materials. (*Id.* ¶ 25.)

Since at least 2014, Defendants have advertised and promoted MultiCeramics Insulation on their website and through other media. (*Id.* ¶ 16.) In their promotional materials, Defendants claim that MultiCeramics Insulation "provides R equivalent 'RE' insulation" and describe the product as "Multi-Ceramics Insulation Coating RE19." (*Id.* ¶ 17.) R-value measures resistance to heat flow: "The greater the R-value, the greater the reduction in heat flow, and the more energy may be saved to heat or cool a building." (*Id.* ¶ 18.) Different materials have different R-values. (*Id.* ¶ 19.) For example, fiberglass batt has an R-value of between R-3.0 to R-3.8 per inch, while polyisocyanurate or polyurethane foam have R-values of R-5.6 to R-8.0 per inch. (*Id.*) Generally, these materials must be applied several inches thick to achieve the desired level of insulation. (*Id.*) Common building materials have much lower R-values (absent insulation coating): hardwood, for example, has a value of R-0.9 per inch and concrete has a value of R-0.08 per inch. (*Id.*)

Defendants' marketing materials claim their product is an "R Equivalent INSULATION COATING THAT REALLY WORKS!" (*Id.* ¶ 23.) They also claim that MultiCeramics Insulation "INSULAT[ES] WITH A SINGLE COAT NOT THICKER THAN A BUSINESS CARD," provides "R Equivalence with a 0.007 coat," and "features an insulating factor only slightly less than products up to 20 times its thickness." (*Id.* ¶ 24.) [1]

**\*2** In reality, MultiCeramics Insulation's coatings "do not significantly restrict heat flow, much less to the extent claimed by Defendants." (*Id.* ¶ 26.) In fact, "the R-value of MultiCeramics Insulation coatings applied at the recommended thickness is considerably less than one." (*Id.*)

### II. Procedural History

On April 15, 2019, the FTC sent SuperTherm "a letter asking for information related to its marketing of the R-Value and R-Value equivalence of its products" and requesting information on sales, prices, and promotional expenditures related to MultiCeramics Insulation. (Doc. 18-1 at 3 ¶ 4, 8-16.)

In May 2019, Defendants produced some, but not all, of the information the FTC had requested. (*Id.* at 3 ¶ 6.)

In June 2019, Defendants stopped responding to the requests contained in the April 15, 2019 letter. (*Id.* at 3 ¶ 8.)

On October 1, 2019, the FTC sent Defendants a proposed complaint and an offer to discuss a settlement. (*Id.* at 3 ¶ 9.) "There were preliminary settlement discussions but Defendants stopped communicating with the FTC and no settlement was reached." (*Id.*)

On July 28, 2020, the FTC filed the complaint. (Doc. 1.)

On August 5, 2020, the FTC served Defendants with the complaint and summonses. (Docs. 9-11.)

On August 17, 2020, the FTC served Defendants with the Court's preliminary order (Doc. 8) via mail and email. (Doc. 12.)

Defendants did not timely answer or otherwise respond to the complaint and have not done so to date.

On September 10, 2020, the FTC filed an application for entry of default against Defendants. (Doc. 13.) The FTC sent Defendants a copy of the application. (Doc. 18-1 at 4 ¶¶ 14-15, 6 ¶ 33.)

On September 11, 2020, the Clerk entered default. (Doc. 14.)

On October 1, 2020, Roberto Guerra reached out on behalf of all Defendants to express interest in settling the dispute. (Doc. 18-1 at 4 ¶ 17.)

On October 2, 2020, the FTC sent Roberto Guerra an email requesting sales and financial information needed to facilitate settlement and for Defendants to fill out financial disclosure forms. (*Id.* at 4 ¶ 18.) Roberto Guerra said he would produce the requested information by October 16, 2020, but the information was not ready by that date (or months later), despite representations that the information was forthcoming. (*Id.* at 4 ¶¶ 20-23.)

On January 8, 2021, the Court issued an order to show cause why the case should not be dismissed for failure to prosecute. (Doc. 15.) The FTC sent Defendants a copy of this order. (Doc. 18-1 at 5-6 ¶ 33.)

On January 22, 2021, the FTC filed a memorandum showing cause why the case should not be dismissed. (Doc. 16.)

The FTC noted, among other things, that "the delay [was] the result of the parties attempting to come to a negotiated resolution of the matter." (*Id.* at 2.) The FTC sent Defendants a copy of the memorandum. (Doc. 18-1 at 5-6 ¶ 33.)

On January 25, 2021, the Court ordered that the FTC either move for default judgment or seek voluntary dismissal by March 26, 2021, and that any motion to set aside the entry of default was due on the same date. (Doc. 17.) The Court further ordered that the FTC provide a copy of the January 25, 2021 order to Defendants. (*Id.*)

On January 26, 2021, the FTC emailed Defendants the January 25, 2021 order. (Doc. 18-1 at 5-6 ¶¶ 25, 33.)

On January 30, 2021 and February 1, 2021, Roberto Guerra emailed SuperTherm's income tax returns for 2015 to 2019 to the FTC, although this was not responsive to all of the financial and sales information the FTC had earlier requested. (*Id.* at 5 ¶¶ 26-27.)

**\*3** On March 3 and March 4, 2021, Defendants produced additional, but still not all, of the financial information the FTC had requested. (*Id.* at 5 ¶ 30.)

On March 10, 2021, the FTC requested that Defendants provide the missing information. (*Id.* at 5 ¶ 31.) The FTC never heard back from Defendants about this request. (*Id.* at 5 ¶ 32.)

On March 26, 2021, the FTC filed the motion for default judgment. (Doc. 18.) The FTC served the motion on the Defendants via mail and email. (Doc. 18 at 22.)

On April 9, 2021, Defendants, via counsel, requested an extension of time to respond to the motion for default judgment (Doc. 19), which the Court granted (Doc. 20).

On April 26, 2021, the FTC filed a supplemental brief in support of the motion for default judgment. (Doc. 21.) In the supplemental brief, the FTC withdrew its request for equitable monetary relief in light of the Supreme Court's decision in

*AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021). (*Id.*)

On April 29, 2021, Defendants' counsel filed a stipulation on behalf of Defendants and the FTC seeking another extension of time "so the parties [could] continue settlement discussions." (Doc. 22.) The Court granted the stipulation,

Federal Trade Commission v. Supertherm Incorporated, Not Reported in Fed. Supp....

2021-1 Trade Cases P 81,762

extending the deadline to respond to May 5, 2021. (Doc. 23.) That deadline expired about three months ago, yet Defendants still have not responded to the motion for default judgment.

## DISCUSSION

### I. Motion for Default Judgment

The "decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). The following factors, known as the *Eitel* factors, may be considered when deciding whether default judgment is appropriate: (1) the possibility of prejudice to the plaintiff, (2) the merits of the claims, (3) the sufficiency of the complaint, (4) the amount of money at stake, (5) the possibility of factual disputes, (6) whether the default was due to excusable neglect, and (7) the policy favoring decisions on the merits. *Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

"[T]he general rule" for default judgment purposes "is that well-pled allegations in the complaint regarding liability is deemed true." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 906 (9th Cir. 2002). "The district court is not required to make detailed findings of fact." *Id.* "However, necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992), *superseded by statute on other grounds as recognized in United States v. Lozano*, 2020 WL 905676, *3 (S.D. Cal. 2020).

### A. The First *Eitel* Factor—Possible Prejudice To Plaintiff

The first factor weighs in favor of default judgment. Prejudice to the FTC is obvious—if the motion for default judgment were denied, the FTC would be without other recourse. *FTC v. DiscountMetalBrokers Inc.*, 2017 WL 6940502, *3 (C.D. Cal. 2017) ("Without default judgment, Plaintiff is unable to ... prevent recurrence of the wrongful conduct. Therefore, this factor favors entry of a default judgment."); *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery.").

### B. The Fifth *Eitel* Factor—Possible Disputes Of Material Facts

**\*4** The fifth factor weighs in favor of default judgment. Because of Defendants' failure to participate (apart from seeking and obtaining two extensions of time to respond), there is no dispute over material facts. *Elektra Ent. Grp. Inc. v. Crawford*, 226 F.R.D. 388, 393 (C.D. Cal. 2005) ("Because all allegations in a well-pleaded complaint are taken as true after the court clerk enters default judgment, there is no likelihood that any genuine issue of material fact exists.").

### C. The Sixth *Eitel* Factor—Excusable Neglect

The sixth factor weighs in favor of default judgment or is neutral. Excusable neglect is exceedingly unlikely in this case. Defendants first became aware of an FTC investigation in April 2019 (Doc. 18-1 at 3), have received notice of this lawsuit and the possibility of a default judgment on many occasions since then, later sought and obtained two extensions of time, yet ultimately failed to respond. *Cf. Laser Spine Inst., LLC v. Playa Advance Surgical Inst., LLC*, 2020 WL 5658711, *4 (C.D. Cal. 2020) ("As Defendants have received ample warnings and sufficient notice concerning the grounds for default judgment, th[e sixth] factor favors entry of default judgment."); *PepsiCo*, 238 F. Supp. 2d at 1177 ("Although Defendant did not respond to the Complaint, he contacted Plaintiffs' counsel to discuss settlement of the matter.... Subsequently, Plaintiffs have made numerous, albeit unsuccessful, attempts to contact Defendant to achieve a settlement of this matter. Given Defendant's early participation in the matter, the possibility of excusable neglect is remote.").

### D. The Seventh *Eitel* Factor—Policy Favoring A Decision On The Merits

The seventh factor generally weighs against default judgment, given that cases "should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. However, the existence of *Rule 55(b) of the Federal Rules of Civil Procedure*, which authorizes default judgments, "indicates that this preference, standing alone, is not dispositive." *PepsiCo*, 238 F. Supp. 2d at 1177 (internal quotation marks omitted). Put simply, "the default mechanism is necessary to deal with wholly unresponsive parties who otherwise could cause the justice system to grind to a halt. Defendants who appear to be 'blowing off' the complaint

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 7 of 179

Federal Trade Commission v. Supertherm Incorporated, Not Reported in Fed. Supp....

2021-1 Trade Cases P 81,762

should expect neither sympathy nor leniency from the court." 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 55, at 123-24 (2021) (footnote omitted).

### E. The Fourth *Eitel* Factor—The Amount Of Money At Stake

As noted, the FTC no longer seeks any equitable monetary relief, asking only for a permanent injunction. (Doc. 21.) This favors granting default judgment. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1176-77 ("In the instant case, Plaintiffs are not seeking monetary damages. They seek only injunctive relief.... [so] this factor favors granting default judgment.").

### F. The Second And Third *Eitel* Factors—Merits And Sufficiency

That leaves the second and third *Eitel* factors—the merits of the claim and the sufficiency of the complaint. "These two factors are often analyzed together and require courts to consider whether a plaintiff has state[d] a claim on which [it] may recover." *Vietnam Reform Party v. Viet Tan-Vietnam Reform Party*, 416 F. Supp. 3d 948, 962 (N.D. Cal. 2019) (alterations in original) (internal quotation marks omitted). "Of all the *Eitel* factors, courts often consider the second and third factors to be the most important." *Id.*

**\*5** The complaint asserts a single count of making false or unsubstantiated performance claims in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (Doc. 1 ¶¶ 30-32.) "Section 5 of the FTC Act prohibits, *inter alia,* 'unfair or deceptive acts or practices in or affecting commerce.' " *FTC v. Stefanchik*, 559 F.3d 924, 928 (9th Cir. 2009). An act or practice is deceptive if: (1) "there is a representation, omission, or practice," that (2) "is likely to mislead consumers acting reasonably under the circumstances," and (3) "the representation, omission, or practice is material." *Id.* (footnotes and internal quotation marks omitted). "Deception may be found based on the 'net impression' created by a representation." *Id.* (citation omitted).

The FTC has sufficiently alleged all three requirements of a deceptive act or practice and has thus established the merits of its claim.

First, the FTC has established that Defendants engaged in a practice of representing that MultiCeramics Insulation provides R-value equivalent insulation with a very thin layer of coating. (Doc. 1 ¶¶ 17-24, 26.) The complaint is accompanied by six exhibits comprising Defendants' MultiCeramics Insulation promotional and informational materials, at least three of which demonstrate the existence of multiple representations about the insulating power of MultiCeramics insulation. (Docs. 1-2, 1-3,1-4.) [2]

Second, the FTC has shown that these representations are likely to mislead consumers acting reasonably under the circumstances. "In demonstrating that a representation is likely to mislead, the FTC must establish that (1) such representation was false or (2) the advertiser lacked a reasonable basis for its claims." *FTC v. John Beck Amazing Profits, LLC*, 865 F. Supp. 2d 1052, 1067 (C.D. Cal. 2012).

*See also* *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1096 (9th Cir. 1994) (setting out the "falsity" and "reasonable basis" theories of establishing that a representation is misleading). As noted, a representation may be misleading based on the "net impression" it conveys, even if "every sentence separately considered is literally true." *John Beck*, 865 F. Supp. 2d at 1066. The FTC's allegations, taken as true, establish that Defendants' representations were false. In particular, Defendants represented that their product provides "R Equivalence with a 0.007 coat" and insulates "with a single coat no thicker than a business card," even though when applied at the recommended thickness, the product's R-value "is considerably less than one." (Doc. 1 ¶¶ 24, 26.) Further, as noted, some of Defendants' materials suggest that MultiCeramics Insulation has an R-value equivalent of "RE19," which is a much higher R-value than the product has when applied as recommended. (*Id.* ¶¶ 17-24, 26.) At a minimum, the FTC has established that these representations lack a reasonable basis: nothing in the promotional materials states what substantiation Defendants relied on for their representations. *Cf. John Beck*, 865 F. Supp. 2d at 1067 ("Defendants have the burden of establishing what substantiation they relied on for their product claims."). Finally, even if some of the representations in the materials are truthful, the net impression is still misleading: the representations, taken together, suggest that MultiCeramics Insulation is able to provide high R-value, effective insulation even when only a very thin coat is applied, which is inaccurate. Thus, even if some product claims— such as that MultiCeramics Insulation is an "R equivalent" coating—were, under some reasonable definition of R-value equivalency, literally true, the overall impression is that a very thin coat of MultiCeramics Insulation can act as a stand-in for thicker coatings, when in fact MultiCeramics' R-value

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 8 of 179

Federal Trade Commission v. SuperTherm Incorporated, Not Reported in Fed. Supp....

2021-1 Trade Cases P 81,762

"is considerably less than one." (Doc. 1 ¶ 26.) *Cf.* 🚩 *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures.").

**\*6** Third, the representations are material. "A misleading impression created by a solicitation is material if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product." 🚩 *Id.* at 1201 (internal quotation marks omitted). "Express product claims are presumed to be material...." 🚩 *Pantron I Corp.*, 33 F.3d at 1095-96. Implied product claims are also material "when they pertain to the central characteristics of the products or services." *John Beck*, 865 F. Supp. 2d at 1076 (internal quotation marks omitted). Defendants expressly represent that MultiCeramics Insulation effectively insulates when a thin coating is applied, which addresses a central aspect of the product that is important to consumers.

In sum, taken as true, the allegations in the complaint suffice to state a claim on which the FTC may recover.

### G. **The Guerras' Individual Liability**

The FTC argues the Guerras may be held personally liable for the misrepresentations outlined above. The Court agrees.

"Individuals may be held liable for injunctive relief based on corporate entity violations of the FTC Act if (1) the corporation committed misrepresentations of a kind usually relied on by a reasonably prudent person and resulted in consumer injury, and (2) individuals participated directly in the violations or had authority to control the entities." 🚩 *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101 (9th Cir. 2014).

As explained above, SuperTherm made misrepresentations. As for the individuals' participation, according to the complaint, Roberto Guerra "is responsible for [SuperTherm's] product development and prepares the advertisements for the MultiCeramics Insulation coatings" and co-managed the company's day-to-day operations, including its website and marketing materials. (Doc. 1 ¶ 25.) Susana Guerra, the other person in this two-person company, is SuperTherm's President and Director and controlled and managed the company's day-to-day operations, including its website and marketing materials. (*Id.* ¶¶ 11, 25.) Thus, at a minimum, Roberto Guerra participated directly in the violations and

Susana Guerra had the authority to control SuperTherm when the violations were committed.

## II. Permanent Injunction

### A. **Whether An Injunction Should Issue**

Section 13(b) of the FTC Act, 🚩 15 U.S.C. § 53(b), provides that "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." This section authorizes the Court "to permanently enjoin defendants from violating the FTC Act if there is some cognizable danger of recurring violation." 🚩 *FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999) (citing 🚩 *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)), *aff'd*, 🚩 265 F.3d 944 (9th Cir. 2001).

Further, the FTC may seek "injunctive relief ... [in] any case involving a law enforced by the FTC." 🚩 *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1086-87 (9th Cir. 1985). The FTC's authority to seek such relief is not, in other words, "limit[ed] ... to cases involving 'routine fraud' or violations of previously established FTC rules." *Id.* Nor is the FTC's authority to seek permanent injunctive relief under § 13(b) "condition[ed] ... upon the initiation of administrative proceedings." 🚩 *FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1110 (9th Cir. 1982). Instead, the FTC possesses "the power to seek an injunction in the district court in proper cases without also initiating administrative proceedings." *Id.*

It should be noted that, in *AMG Capital*, the Supreme Court overruled existing Ninth Circuit law in one respect, by holding that the FTC may not obtain a particular category of relief—"equitable monetary relief such as restitution or disgorgement"—pursuant to its authority under § 13(b) to seek a permanent injunction. 🚩 *AMG Capital*, 141 S. Ct. at 1344 ("Section 13(b) of the Federal Trade Commission Act authorizes the Commission to obtain, 'in proper cases,' a 'permanent injunction' in federal court against 'any person, partnership, or corporation' that it believes 'is violating, or is about to violate, any provision of law' that the Commission enforces. The question presented is whether this statutory language authorizes the Commission to seek, and a court to award, equitable monetary relief such as restitution or disgorgement. We conclude that it does not.") (citation omitted). Nevertheless, this holding is not "clearly irreconcilable" with the Ninth Circuit's previous holdings in

*Federal Trade Commission v. SuperTherm Incorporated, Not Reported in Fed. Supp....*

2021-1 Trade Cases P 81,762

*H.N. Singer* and *Evans Products* that the FTC may (as in this case) rely on § 13(b) to seek a permanent injunction to restrain conduct that violates a law the FTC is tasked with enforcing (*i.e.,* § 5 of the FTC Act), irrespective of whether the FTC has initiated administrative proceedings related to that conduct and irrespective of whether the conduct qualifies as "routine fraud" or violates a rule promulgated by the FTC. To the contrary, *AMG Capital*'s recognition that § 13(b) broadly authorizes the FTC to seek a permanent injunction concerning "any provision of law the Commission enforces" seems to reaffirm—or, at a minimum, does not disturb—*H.N. Singer*'s and *Evans Products*' recognition that a permanent injunction may issue under § 13(b) without regard to the existence of administrative proceedings, "routine fraud," or the violation of an FTC-promulgated rule. *See also* 🔖 *AMG Capital,* 141 S. Ct. at 1348 (recognizing that the text of § 13(b) can be interpreted "as granting authority for the Commission to ... dispense with administrative proceedings to seek what the words literally say (namely, an injunction)"); 🔖 *id.* at 1349 ("The Commission may obtain monetary relief by first invoking its administrative proceedings and then § 19's redress provisions ... [and] may use § 13(b) ... when it seeks only injunctive relief."). Accordingly, *H.N. Singer*'s and *Evans Products*' holdings on those points remain binding on district courts within the Ninth Circuit. 🚩 *Miller v. Gammie,* 335 F.3d 889, 899-900 (9th Cir. 2003) (concluding, in response to the question of "when, if ever, a district court ... is free to reexamine the holding of a prior [Ninth Circuit] panel in light of an inconsistent decision by a court of last resort on a closely related, but not identical issue," that "the relevant court of last resort must undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable").

 **\*7** This narrow interpretation of *AMG Capital* is further supported by *FTC v. Hoyal & Associates, Inc.,* 2021 WL 2399707 (9th Cir. 2021). There, the district court granted a permanent injunction and issued monetary relief in an FTC enforcement action under § 13(b) predicated on deceptive marketing practices that violated § 5 of the FTC Act. *Id.* at \*1. While the case was on appeal, *AMG Capital* was decided. Although the Ninth Circuit proceeded to vacate the monetary portion of the judgment based on *AMG Capital*, it otherwise affirmed the permanent injunction. *Id.* at \*2. In the course of doing so, it observed that "[w]e have long held that the FTC can obtain injunctive relief without initiating administrative proceedings" and continued to cite *H.N. Singer* and *Evans Products* as good law on issues unrelated to the

availability of monetary relief under § 13(b). *Id.* Accordingly, the Court is satisfied that the FTC's request for permanent injunctive relief in this case (*i.e.,* a request arising under § 13(b), predicated on a violation of § 5, unaccompanied by administrative proceedings and untethered to the violation of an FTC-promulgated rule) remains legally viable under Ninth Circuit law.

Turning back to the merits, the FTC argues that Defendants' misrepresentations constituted "systematic wrongdoing," and therefore there is a cognizable danger of recurring violation. (Doc. 18 at 11-13.) The Court agrees. Taken as true, the allegations in the complaint establish that Defendants' misrepresentations were ongoing from 2014 to 2020. (Doc. 1 ¶¶ 16, 21.) This pattern of misconduct, combined with the Guerras' continued ownership of two additional Arizona companies that appear to be engaged in a similar line of business (Doc. 18-1 at 6 ¶ 36), suggests there is a "cognizable danger of recurring violation." Although SuperTherm was dissolved in October 2020 (Doc. 18-1 at 6 ¶ 34), absent an injunction the Guerras—whether as individuals, through one of their companies, or through a reconstituted SuperTherm —could continue to misrepresent the insulation capacity of MultiCeramics Insulation. *Cf.* 🔖 *DiscountMetalBrokers Inc.,* 2017 WL 6940502 at \*7 (granting default judgment and permanent injunction against company and individual defendants where their "business practices ... over the course of time [the company] was operating demonstrate a pattern of systematic wrongdoing, rather than mere isolated events"). *See also* 🔖 *Grant Connect,* 763 F.3d at 1105 (holding injunction applying to multiple corporate entities and individuals involved in a common scheme was not overbroad). Accordingly, a permanent injunction against all three Defendants is warranted.

### B. **Scope**

An injunction must bear a "reasonable relation to the unlawful practices found to exist." 🔖 *Grant Connect,* 763 F.3d at 1105. In considering the proper scope of a permanent injunction, courts consider: "(1) the seriousness and deliberateness of the violation; (2) [the] ease with which the violative claim may be transferred to other products; and (3) whether the [defendant] has a history of prior violations." *Id.* The FTC "is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past."

*Id.* (quoting 🔖 *FTC v. Ruberoid Co.,* 343 U.S. 470, 473 (1952)). Those " 'caught violating' the FTC Act 'must expect

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 10 of 179

Federal Trade Commission v. SuperTherm Incorporated, Not Reported in Fed. Supp....

2021-1 Trade Cases P 81,762

some fencing in.' " *Id.* (quoting *FTC v. Nat'l Lead Co.*, 352 U.S. 419, 431 (1957)). "Accordingly, injunctive relief under the FTC Act may be framed 'broadly enough to prevent respondents from engaging in similarly illegal practices in future advertisements.' " *Id.* (quoting 📁 *FTC v. Colgate—Palmolive Co.*, 380 U.S. 374, 395 (1965)).

The FTC seeks a permanent injunction that, in brief:

(1) prohibits Defendants (and their officers, agents, employees, attorneys, "and all other persons in active concert or participation with any of them") from misrepresenting the effectiveness of their insulation coating products or "any other material fact concerning any good or service;"

(2) prohibits Defendants (and their officers, agents, etc.) from making unsubstantiated claims about their coating products;

**\*8** (3) requires Defendants to notify their customers of the permanent injunction and require the customers to remove any misleading statements about the coating materials from marketing materials that the customers use to resell the products to ultimate consumers;

(4) requires Defendants to acknowledge receipt of the order and seek and obtain written confirmation of notice of the order from all principals, officers, directors, managers, members, and entities related to the Defendants;

(5) requires Defendants to submit a compliance report one year after the entry of the permanent injunction, and provide other types of notice if certain changes occur over a 20-year period;

(6) mandates creation of "certain records for 20 years after entry" of the injunction; and

(7) requires Defendants to submit compliance reports while authorizing continued monitoring by the FTC for an indefinite time period.

(Doc. 18-2 at 3-12.)[3]

The Court finds that conditions (1), (2) and (4) are merited by the seriousness of the violation, the possibility of violations recurring with respect to other products, and Defendants' history. Conditions (1)-(2) are reasonably targeted at the underlying offenses of making false, misleading, and/or unsubstantiated claims about Defendants' insulation coating

products. Although the conditions extend beyond the specific product (MultiCeramics Insulation) that is at issue in this action, the Court concludes that prohibiting false, misleading, and/or unsubstantiated claims about other coating products fits within the reasonable range of "fencing in" that will prevent similar types of misconduct from occurring in the future. Condition (4) ensures that Defendants and affiliated persons and entities receive adequate notice of the injunction, which is reasonably tailored to ensure a fair probability of compliance.

The remaining conditions, however, will be modified. Condition (3) extends the prohibitions of conditions (1)-(2) to Defendants' customers, requiring Defendants to notify the customers of the permanent injunction and seek the abatement of misrepresentations that appear in customers' marketing materials to ultimate consumers. The Court modifies two aspects of condition (3), as follows.

First, as explained in greater detail below, the Court is not persuaded that Defendants should be required to maintain records of these notices for 10 years.

Second, the Court will amend the language of the order to state that Defendants must *request*—not *require*—their customers to cease making any misrepresentations about the coating products. The proposed order, as well as the notice the FTC proposes Defendants must send to customers, could be read to suggest that the customers themselves are bound by the permanent injunction, even though they are nonparties. (Doc. 18-2 at 6, 13.) Federal Rule of Civil Procedure 65(d)(2) provides that only parties, their agents, servants, employees, and attorneys, or other persons who are in active concert or participation with such persons are bound by an injunction. "An injunction binds a non-party only if it has actual notice, and either 'abets the enjoined party' in violating the injunction, or is 'legally identified' with the enjoined party." *CFPB v. Howard Law, P.C.*, 671 F. App'x 954, 955 (9th Cir. 2016) (cleaned up). *See also Saga Int'l, Inc. v. John D. Brush & Co.*, 984 F. Supp. 1283, 1285-86 (C.D. Cal. 1997) (Tashima, J.) ("Courts have uniformly held that [the language of Rule 65(d)] is no more than a way of saying that an injunction binds only the party to the suit, as well as those who aid and abet the party's violation of the injunction."); 11A Charles Alan Wright, Arthur R. Miller, *et al.*, *Federal Practice and Procedure* § 2956 (3d ed. 1998) ("A court ordinarily does not have power to issue an order against a person who is not a party and over whom it has not acquired in personam jurisdiction."). The language of

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 11 of 179

Federal Trade Commission v. SuperTherm Incorporated, Not Reported in Fed. Supp....

2021-1 Trade Cases P 81,762

condition (3) as written in the proposed order could be read to suggest that the permanent injunction *requires* nonparties to undertake certain conduct, even absent a finding that those nonparties have aided and abetted violations or are legally identified with Defendants. [4] Alternatively, to the extent the language of condition (3) is intended to require Defendants to ensure that their customers engage in certain conduct (or not engage in certain conduct), such a construction would raise a different set of problems—the FTC has not identified any reason to believe that Defendants possess the legal ability to force their customers to do anything, so condition (3) could result in Defendants being held responsible for conduct over which they have no control. Accordingly, the Court modifies this language, and does not include the FTC's proposed notice (Doc. 18-2 at 13-14) as part of the permanent injunction.

**\*9** The Court also concludes that the remaining provisions must be modified. Although the FTC's allegations, taken as true, establish that Defendants made false, misleading, and/or unsubstantiated claims about their products, there are no allegations (or evidence) that these misrepresentations resulted in concrete financial or other damage to consumers. [5] Of course, the FTC is not required to prove consumer harm to establish entitlement to an injunction. *Gill*, 71 F. Supp. 2d at 1047, *aff'd*, 265 F.3d 944 (9th Cir. 2001). *Cf. FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1214 (9th Cir. 2019) ("Although in the ordinary case a showing of irreparable harm is required to obtain injunctive relief, no such showing is required when injunctive relief is sought in conjunction with a statutory enforcement action where the applicable statute authorizes injunctive relief."). But the Court considers the extent of the harm when assessing the proper scope of the injunction, because it indicates the seriousness of the violation. *Compare Grant Connect*, 763 F.3d at 1105 (upholding injunction where the defendant "consistently engaged in variations on the same deceptive marketing scheme, which, in its latest iteration alone, [had] defrauded consumers of more than $29 million"). Further, although the misrepresentations have taken place in multiple media over a period of years, there are no allegations or evidence suggesting any of the Defendants engaged in similar or related misconduct in the context of other businesses or products. In short, taking the complaint's allegations as true, what is before the Court is an instance of a two-person insulation business that made a series of misrepresentations about a particular product over a seven-year period. The Court does not minimize this violation, but it is not the fraud of the

century. As a result, 10 years of maintaining the notices to customers (Doc. 18-2 at 7), 20 years of submitting compliance notices (*id.* at 9), 20 years of recordkeeping (*id.* at 10), and indefinite compliance monitoring (*id.* at 11-12) are, under the circumstances, unduly broad and burdensome remedies.

The Court will accordingly modify the proposed injunction by shortening the period of all the above conditions to five-year (instead of 10-year, 20-year, or indefinite) time periods. The Court acknowledges that other courts have imposed similar conditions for longer durations, but concludes such cases are distinguishable because they involved conduct that was more egregious or pervasive or involved defendants with more substantial track records of violating the FTC Act. *See, e.g., DiscountMetalBrokers*, 2017 WL 6940502 at \*1, 7 (in case where large numbers of consumers were defrauded out of money used to pay for gold or silver, court imposed permanent injunction banning defaulted defendants from marketing investments to consumers, but did not require mandatory compliance reporting); *FTC v. Ideal Fin. Sols., Inc.*, 2016 WL 756527, \*1, 4-6 (D. Nev. 2016) (in case involving "wide-ranging scheme fraud scheme" wherein defendants "charged unwitting consumers a fee for financial services never provided," court granted some portions of proposed injunction and denied others and shortened compliance period from 20 to 10 years); *FTC v. Mortgage Relief Advocates LLC*, 2015 WL 11257575, \*3-4, 9 (C.D. Cal. 2015) (imposing monitoring provisions as requested by FTC where defendants among other things targeted financially distressed homeowners with misleading representations about providing financial relief and accepted fees without providing the promised results or services). Thus, under these circumstances, the Court concludes that a five-year duration is sufficient. The details of the conditions to be imposed can be found in the accompanying judgment.

Accordingly,

**IT IS ORDERED** that the FTC's motion for default judgment (Doc. 18) is **granted**. A separate judgment against Defendants will issue, after which the Clerk of Court shall terminate this action.

### All Citations

Not Reported in Fed. Supp., 2021 WL 3419035, 2021-1 Trade Cases P 81,762

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 12 of 179

Federal Trade Commission v. SuperTherm Incorporated, Not Reported in Fed. Supp....

2021-1 Trade Cases P 81,762

## Footnotes

1    This final claim applies only to the MultiCeramics Insulation roofing system. (Doc. 1 ¶ 24.)

2    These documents are part of the complaint. 🚩 *Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir. 1987) ("If a complaint is accompanied by attached documents, the court is not limited by the allegations contained in the complaint. The[ ] documents are part of the complaint and may be considered in determining whether the plaintiff can prove any set of facts in support of the claim.") (citation omitted).

3    The original proposed order also sought a monetary judgment and information necessary to obtain monetary relief and effectuate consumer redress. (Doc. 18-2 at 5-6.) However, the FTC no longer seeks monetary relief in light of *AMG Capital.* (Doc. 21.)

4    Of course, if the FTC later determined that a nonparty—who received notice of the injunction and was subject to it by virtue of aiding and abetting or being legally identified with Defendants—violated the terms of the injunction, then the FTC could seek appropriate remedies at that time.

5    The only evidence the FTC proffers of concrete consumer harm is that SuperTherm netted $767,950 in gross receipts from 2015 to 2019. (Doc. 18-1 at 5.) This suggests, at most, that perhaps some number of customers purchased MultiCeramics Insulation and accordingly spent funds on a product whose qualities had been materially misrepresented. Even assuming that such circumstances demonstrate consumer harm, the gross receipts do not distinguish among receipts for purchases of products or services other than MultiCeramics Insulation, so the Court has no way of knowing how much of the receipts are attributable, directly or indirectly, to the misrepresentations.

---

**End of Document**          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2707866
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

SURESCRIPTS, LLC, Defendant.

Civil Action No. 19-1080 (JDB)

Signed March 30, 2023

**Synopsis**
**Background:** Federal Trade Commission (FTC) filed civil complaint against health information technology company, seeking permanent injunction to prevent unfair methods of competition in violation of FTC Act, prohibiting monopolization conduct proscribed under Sherman Act, that company allegedly violated by maintaining monopoly in both electronic prescription routing market and electronic eligibility market, collectively known as "e-prescribing," through anticompetitive conduct, including its loyalty pricing program for routing, which included electronic transmission of drug prescriptions and prescription-related information such as prescription refill requests, and for patient eligibility checks, which included requesting and transmitting patient's formulary and benefit information. Parties cross-moved for summary judgment.

**Holdings:** The District Court, John D. Bates, J., held that:

[1] case was not mooted by company's voluntary cessation of loyalty program;

[2] relevant e-prescribing product markets excluded analog methods;

[3] company possessed dominant share in relevant markets;

[4] relevant markets featured significant barriers to entry; and

[5] lower prices and increased output did not undermine FTC's indirect evidence of company's monopoly power.

Motions granted in part and reserved in part.

**Procedural Posture(s):** Motion for Summary Judgment.

West Headnotes (44)

**[1]    Antitrust and Trade
    Regulation** 🔑 Injunction

Federal Trade Commission's (FTC) suit seeking permanent injunction to prevent health information technology company from maintaining alleged monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for electronic drug prescription routing and patient eligibility markets, was not rendered moot by company's voluntary cessation of loyalty program; company had not yet eliminated all loyalty provisions, company took no affirmative steps toward entering irrevocable covenant that it would not reinstate loyalty program in future, company's new program did not provide reasonable expectation that no further alleged violation would recur or that its effects were completely and irrevocably eradicated, and FTC could still be granted cognizable relief. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[2]    Summary Judgment** 🔑 What constitutes "genuine" issue or dispute

Summary judgment may not be avoided based on just any disagreement as to the relevant facts; the dispute must be "genuine," meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant. Fed. R. Civ. P. 56(a).

**[3]    Summary Judgment** 🔑 Right to judgment as matter of law

**Summary Judgment** 🔑 Conflicting Evidence; Extent of Disagreement or Dispute as to Facts

On a motion for summary judgment, a court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law. Fed. R. Civ. P. 56(a).

**[4]  Summary Judgment** 🔑 Weighing evidence, resolving conflicts, and determining credibility

Credibility determinations, weighing of the evidence, and drawing of legitimate inferences from the facts are jury functions, not those of a judge, and are thus inappropriate at summary judgment. Fed. R. Civ. P. 56(c)(1).

**[5]  Summary Judgment** 🔑 Genuine Issue or Dispute as to Material Fact

**Summary Judgment** 🔑 Conflicting inferences or conclusions

If material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences, a court should not grant summary judgment. Fed. R. Civ. P. 56(c)(1).

**[6]  Summary Judgment** 🔑 Burden of Proof

**Summary Judgment** 🔑 Cross-motions

On cross-motions for summary judgment, each must carry its own burden under the applicable standard; the court then reviews the motions separately to determine whether either party is entitled to summary judgment, analyzing facts and making inferences in the light most favorable to the non-moving party. Fed. R. Civ. P. 56(c)(1).

**[7]  Antitrust and Trade Regulation** 🔑 Intent

**Antitrust and Trade Regulation** 🔑 Market Power; Market Share

To prove monopolization under the Sherman Act, the Federal Trade Commission (FTC) must show that defendant: (1) possessed monopoly power in the relevant market, and (2) willfully acquired or maintained that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[8]  Antitrust and Trade Regulation** 🔑 Market Power; Market Share

**Antitrust and Trade Regulation** 🔑 Relevant Market

The threshold element of a monopolization offense, under the Sherman Act, is the possession of monopoly power in the relevant market; accordingly, the first step in assessing monopoly power is determining the relevant market. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[9]  Antitrust and Trade Regulation** 🔑 Product market

**Antitrust and Trade Regulation** 🔑 Geographic market

In analyzing a monopolization claim, under the Sherman Act, antitrust markets have two dimensions: product and geographic area. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[10]  Antitrust and Trade Regulation** 🔑 Product market

In analyzing a monopolization claim, under the Sherman Act, a relevant product market includes only those products that are reasonably interchangeable. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[11]  Antitrust and Trade Regulation** 🔑 Elasticity of supply and demand

**Antitrust and Trade Regulation** 🔑 Product market

In analyzing a monopolization claim, under the Sherman Act, not every functionally interchangeable product should be included in the relevant market; rather, the relevant market should be construed to include only competitor products that a significant percentage of consumers could substitute for defendant's

products without incurring substantial costs. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[12]** **Antitrust and Trade Regulation** 🔑 Elasticity of supply and demand

**Antitrust and Trade Regulation** 🔑 Product market

In determining the relevant product market for a monopolization claim, under the Sherman Act, the degree to which a similar product will be substituted for the product in question is said to measure the cross-elasticity of demand, while the capability of other production facilities to be converted to produce a substitutable product is referred to as the cross-elasticity of supply; the higher these cross-elasticities, the more likely it is that similar products or the capacity of production facilities now used for other purposes are to be counted in the relevant market. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[13]** **Antitrust and Trade Regulation** 🔑 Product market

In determining the relevant product market for a monopolization claim, under the Sherman Act, the proper test is to look to the availability of substitute commodities, in other words, whether there are other products offered to consumers which are similar in character or use, and how far buyers will go to substitute one commodity for another. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[14]** **Antitrust and Trade Regulation** 🔑 Product market

In determining the relevant product market for a monopolization claim, under the Sherman Act, markets must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[15]** **Antitrust and Trade Regulation** 🔑 Product market

In assessing whether competitor products belong in the relevant market for a monopolization claim, under the Sherman Act, the court considers practical indicia, including industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[16]** **Summary Judgment** 🔑 Partial summary judgment

**Summary Judgment** 🔑 Antitrust and price discrimination

Federal Trade Commission's (FTC) motion for partial summary judgment only on issues of market definition and monopoly power, in its suit seeking permanent injunction to prevent health information technology company from maintaining alleged monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for electronic drug prescription routing and patient eligibility markets, was procedurally proper, under summary judgment rule, allowing party to move for summary judgment, identifying each claim or defense, or "part of each claim" or defense, on which summary judgment was sought, since rule permitted entry of summary judgment as to some, but not all, elements of claim. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[17]** **Summary Judgment** 🔑 Partial summary judgment

**Summary Judgment** 🔑 Continuance

Federal Trade Commission's (FTC) motion for partial summary judgment on issue of market definition was not premature, in its suit seeking permanent injunction to prevent health information technology company from maintaining alleged monopoly in violation

of Sherman Act, by anticompetitive conduct including its loyalty pricing program for electronic drug prescription routing and patient eligibility markets; although market definition was fact-sensitive inquiry, market definition could be resolved on summary judgment so long as there was no genuine dispute of material fact, and district court's ability to determine issue of market definition promoted judicial efficiency. Sherman Act § 2, ⚑ 15 U.S.C.A. § 2.

[18]   **Antitrust and Trade Regulation** 👈 Medical supplies and pharmaceuticals

Federal Trade Commission's (FTC) definitions of relevant markets for health information technology company's alleged monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for electronic drug prescription routing and patient eligibility, collectively known as "e-prescribing," were required to be assessed as of present day, even though company's alleged anticompetitive behavior began years earlier, since focusing on present-day market was appropriate when considering relief that district court could fashion if FTC succeeded on its claims. Sherman Act § 2, ⚑ 15 U.S.C.A. § 2.

[19]   **Antitrust and Trade Regulation** 👈 Medical supplies and pharmaceuticals

Health information technology company's electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," did not include analog methods of routing and eligibility, as relevant product markets for Federal Trade Commission's (FTC) suit seeking to enjoin company from maintaining alleged monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets; analog methods were not reasonable substitutes for e-prescribing, while functionally similar, as e-prescribing had many benefits over analog methods, including increased efficiency, accuracy, and significant cost savings, and customers had adopted e-prescribing, had not

switched back to analog methods, and were unlikely to do so. Sherman Act § 2, ⚑ 15 U.S.C.A. § 2.

[20]   **Antitrust and Trade Regulation** 👈 Medical supplies and pharmaceuticals

Practical indicia factor considering whether competing products had distinct prices weighed in favor of determining that relevant product markets for health information technology company's electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," excluded analog methods, as defined by Federal Trade Commission (FTC), in claiming that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets, since pricing structure of electronic routing and eligibility was distinct from analog methods of prescribing, so pricing structure difference indicated that electronic and analog products were not substitutes and constituted different product markets. Sherman Act § 2, ⚑ 15 U.S.C.A. § 2.

[21]   **Antitrust and Trade Regulation** 👈 Product market

The relevant inquiry when discussing the practical indicia factors to assess whether competitor products belong in the relevant market for a monopolization claim, under the Sherman Act, is not whether the products can be substitutes, but rather, the presence or absence of certain factors is meant to measure whether the products are substitutes. Sherman Act § 2, ⚑ 15 U.S.C.A. § 2.

[22]   **Antitrust and Trade Regulation** 👈 Medical supplies and pharmaceuticals

Practical indicia factor considering consumer sensitivity to price changes weighed in favor of determining relevant product markets for health information technology company's electronic

drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," excluded analog methods, as defined by Federal Trade Commission (FTC) in claiming that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets, since e-prescribing carried significant cost savings over analog methods, so customers would not stop e-prescribing in favor of analog prescribing even in face of substantial price increases, indicating products were not substitutes and were different product markets. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

---

**[23]** **Antitrust and Trade Regulation** 👉 Medical supplies and pharmaceuticals

Practical indicia factor considering peculiar characteristics weighed in favor of determining that relevant product markets for health information technology company's electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," excluded analog methods, as defined by Federal Trade Commission (FTC), in claiming that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets; e-prescribing had several benefits over analog counterparts, as e-routing was safer for patients, more efficient, and was measurable improvement on analog methods of ascertaining patient eligibility, indicating products were not substitutes and were different product markets. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

---

**[24]** **Antitrust and Trade Regulation** 👉 Medical supplies and pharmaceuticals

Practical indicia factor considering different vendors weighed in favor of determining that relevant product markets for health information technology company's electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing,"

excluded analog methods, as defined by Federal Trade Commission (FTC), in claiming that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets, since e-prescribing vendors did not also deal in analog method, with exception of one vendor using fax as back-up, thereby indicating that products were not substitutes and were different product markets.

Sherman Act § 2, 🚩15 U.S.C.A. § 2.

---

**[25]** **Antitrust and Trade Regulation** 👉 Medical supplies and pharmaceuticals

Practical indicia factor considering distinct production facilities weighed in favor of determining that relevant product markets for health information technology company's electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," excluded analog methods, as defined by Federal Trade Commission (FTC), in claiming that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets, since e-prescribing used distinct facilities as it involved electronic connections, whereas paper, phone, or fax prescriptions were transmitted by other analog means, thereby indicating that products were not substitutes and were different product markets. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

---

**[26]** **Antitrust and Trade Regulation** 👉 Medical supplies and pharmaceuticals

Practical indicia factor considering distinct customers weighed in favor of determining that relevant product markets for health information technology company's electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," excluded analog methods, as defined by Federal Trade Commission (FTC), in claiming that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing

and eligibility markets, since e-prescribing engaged customers that were not involved in analog prescription delivery or facilitation of eligibility information via analog methods absent rare exceptions. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[27]   Antitrust and Trade Regulation** 👉 **Medical supplies and pharmaceuticals**

Practical indicia factor considering industry or public recognition of submarket as separate economic entity weighed in favor of determining that relevant product markets for health information technology company's electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," excluded analog methods, as defined by Federal Trade Commission (FTC), in claiming that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets; company and competitor routinely discussed e-prescribing markets without reference to analog methods in their ordinary-course business documents, thus indicating products were not substitutes and were different product markets. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[28]   Antitrust and Trade Regulation** 👉 **Product market**

When determining the relevant product market for a monopolization claim, under the Sherman Act, courts often pay close attention to the defendant's ordinary course of business documents. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[29]   Antitrust and Trade Regulation** 👉 **Market Power;  Market Share**

In analyzing a monopolization claim, under the Sherman Act, "monopoly power" is power to control prices or exclude competition; more precisely, a firm is a "monopolist" if it can

profitably raise prices substantially above the competitive level. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[30]   Antitrust and Trade Regulation** 👉 **Market Power;  Market Share**

While merely possessing monopoly power is not itself an antitrust violation, it is a necessary element of a monopolization charge under the Sherman Act. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[31]   Antitrust and Trade Regulation** 👉 **Presumptions and burden of proof**

**Antitrust and Trade Regulation** 👉 **Monopolization or attempt to monopolize**

In analyzing a monopolization claim, under the Sherman Act, because direct proof of profitably raising prices is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power; under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[32]   Antitrust and Trade Regulation** 👉 **Entry barriers**

In analyzing a monopolization claim, under the Sherman Act, "entry barriers" are factors such as certain regulatory requirements that prevent new rivals from timely responding to an increase in price above the competitive level. Sherman Act § 2, 🚩15 U.S.C.A. § 2.

**[33]   Antitrust and Trade Regulation** 👉 **Entry barriers**

In analyzing a monopolization claim, under the Sherman Act, any market condition that

makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm should be considered a barrier to entry, regardless of who is responsible for the existence of that condition.

Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[34]**  **Antitrust and Trade Regulation** 🔑 Entry barriers

To support a monopolization claim, under the Sherman Act, plaintiffs must not only show that barriers to entry protect the properly defined market, but that those barriers are significant.

Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[35]**  **Antitrust and Trade Regulation** 🔑 Medical supplies and pharmaceuticals

Health information technology company possessed dominant share in electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," in support of determining that company had monopoly power in relevant routing and eligibility markets that excluded analog methods, as required for Federal Trade Commission's (FTC) claim that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets, where company held at least 95% share of both electronic routing and eligibility markets for at least last 13 years, and company recognized in one of its internal documents that it had no real competitors in either routing or eligibility markets during that time period. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[36]**  **Antitrust and Trade Regulation** 🔑 Medical supplies and pharmaceuticals

Health information technology company's relevant electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," in which company held 95%

dominant share, had significant barriers to entry, thus supporting determination that company had monopoly power in relevant routing and eligibility markets that excluded analog methods, as required for Federal Trade Commission's (FTC) claim that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for those markets; "chicken-and-egg" problem caused by two-sided markets with indirect network effects was barrier to entry, as well as regulatory requirements, company's first-mover advantage, and need for substantial financial investment. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[37]**  **Antitrust and Trade Regulation** 🔑 Entry barriers

In determining whether a company has monopoly power, as required to support a monopolization claim under the Sherman Act, the "chicken-and-egg problem" is a legitimate barrier to entry, in which users on each side of a market will not invest in the market until they are confident that there will be enough users on the other side. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[38]**  **Antitrust and Trade Regulation** 🔑 Monopolization or attempt to monopolize

Federal Trade Commission's (FTC) indirect evidence of monopoly power of health information technology company in relevant electronic drug prescription routing and patient eligibility markets, collectively known as "e-prescribing," in which company held 95% dominant share, was not undermined by company's direct evidence of falling prices and increased output, in support of FTC's claim that company maintained monopoly in violation of Sherman Act, by anticompetitive conduct including its loyalty pricing program for routing and eligibility markets, since low prices were not inconsistent with company's monopoly power, and company did not show that prices fell below

or output increased above competitive level. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[39]**   **Antitrust and Trade Regulation** 🚩 Market Power; Market Share

In analyzing a monopolization claim under the Sherman Act, the existence of so-called "calling cards" of a competitive market, such as falling prices and increased output, do not by themselves negate the existence of monopoly power as a matter of law. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[40]**   **Antitrust and Trade Regulation** 🚩 Market Power; Market Share

The material consideration in determining whether a monopoly exists in violation of the Sherman Act is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[41]**   **Antitrust and Trade Regulation** 🚩 Market Power; Market Share

Once it is established that defendant holds monopoly power, liability attaches for a monopolization claim under the Sherman Act only when the defendant engages in exclusionary conduct to maintain its monopoly. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[42]**   **Antitrust and Trade Regulation** 🚩 Illegal Restraints or Other Misconduct

Courts use a burden-shifting framework to answer the question of whether the defendant engages in exclusionary conduct to maintain its monopoly, in violation of the Sherman Act; the first question in this analysis is whether the defendant engaged in exclusionary conduct as distinguished from growth or development as a consequence of a superior product, business

acumen, or historic accident. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[43]**   **Antitrust and Trade Regulation** 🚩 Illegal Restraints or Other Misconduct

To be condemned as exclusionary conduct in violation of the Sherman Act's prohibition against anticompetitive monopolies, a monopolist's act must have anticompetitive effect; however, harm to one or more competitors will not suffice, and instead, plaintiff must show harm to the competitive process and thereby harm to consumers. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**[44]**   **Antitrust and Trade Regulation** 🚩 Presumptions and burden of proof

If a plaintiff successfully establishes a prima facie case of monopolization, under the Sherman Act, by demonstrating an anticompetitive effect, then the monopolist may proffer a procompetitive justification for its conduct; if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit. Sherman Act § 2, 🚩 15 U.S.C.A. § 2.

**Attorneys and Law Firms**

Bradley Albert, Andrew Kennedy, Daniel Butrymowicz, Nicholas Aaron Leefer, Timothy Grayson, Markus H. Meier, Daniel John Matheson, David B. Schwartz, Joseph P. Mathias, Tanya T. O'Neil, Federal Trade Commission Bureau of Commission, Washington, DC, for Plaintiff.

Amanda P. Reeves, Allyson M. Maltas, Latham & Watkins LLP, Washington, DC, Alfred C. Pfeiffer, Jr., Pro Hac Vice, Latham & Watkins LLP, San Francisco, CA, John Francis Frost, Pro Hac Vice, Marc Robert Lewis, Pro Hac Vice, Lewis & Llewellyn LLP, San Francisco, CA, Elyse Greenwald, Pro

Hac Vice, Latham & Watkins LLP, Los Angeles, CA, for Defendant.

## MEMORANDUM OPINION

JOHN D. BATES, United States District Judge

**\*1** Before the Court are two motions for summary judgment. This case arises from loyalty pricing contracts offered beginning in 2010 by defendant Surescripts, LLC ("Surescripts"), a health information technology company, to its customers in the electronic prescription routing and eligibility markets, complementary markets collectively known as "e-prescribing." Plaintiff Federal Trade Commission (the "FTC") brought this suit against Surescripts alleging two violations of Section 2 of the Sherman Act—Count I alleges a violation in the electronic routing market, and Count II alleges a violation in the electronic eligibility market. The FTC argues that Surescripts violated Section 2 through its loyalty pricing contracts and other allegedly anticompetitive conduct in both markets. The parties now each seek summary judgment: Surescripts seeks total summary judgment on both claims, and the FTC seeks partial summary judgment on a limited pair of issues—specifically, market definition and monopoly power. Almost a year after summary judgment briefing began, the parties recently notified the Court that the case may be moot due to Surescripts's voluntary cessation of its loyalty pricing program. For the reasons explained below, the Court determines that the case is not moot at this time and will grant the FTC's motion for partial summary judgment but reserve decision on Surescripts's motion for summary judgment.

## Background

### I. Factual Background
Surescripts is a Virginia-based health information technology company created in 2008 by the merger of RxHub LLC and SureScripts Systems, Inc. that provides routing and eligibility network services. Statement of Undisputed Facts in Supp. of Surescripts's Mot. for Summ. J. [ECF No. 104][1] ¶¶ 1, 10 ("Surescripts SUF"); Pl. FTC's Statement of Undisputed Facts [ECF No. 103-2] ¶¶ 1–3 ("FTC SUF").

#### A. Routing and Eligibility

An electronic routing transaction is the transmission of prescriptions and prescription-related information (e.g., requests for prescription refills) from a prescriber's electronic health record vendor ("EHR") to a pharmacy either directly or indirectly through an intermediary pharmacy technology vendor ("PTV"). FTC SUF ¶ 4; Surescripts SUF ¶¶ 2–4. An electronic eligibility transaction is the request for and subsequent transmission of a patient's formulary and benefit information from the pharmacy benefit manager ("PBM") to the prescriber's EHR before the patient's appointment. Surescripts SUF ¶ 5; FTC SUF ¶ 5. This information includes "which drugs are covered by the patient's drug benefit plan, the location of covered drugs on a patient's health insurance company's formulary, what copay (if any) a patient will have to pay to obtain a prescribed drug, and lower-cost alternatives, such as generic drugs." Surescripts SUF ¶ 6; see id. ¶ 9; FTC SUF ¶ 5. Electronic routing and eligibility are sometimes referred to collectively as "e-prescribing." FTC SUF ¶ 6. While routing and eligibility transactions can occur directly between the relevant parties, id. ¶ 8, Surescripts provides a two-sided platform to connect the players in both routing and eligibility markets, id. ¶ 7. Before the advent of e-prescribing, the transmission of routing and eligibility information occurred only by other means, such as by paper, fax, or phone, referred to as "analog methods." Id. ¶¶ 9–10.

**\*2** Routing and eligibility are two-sided platforms with indirect network effects, meaning that "participants on one side of the platform value having more participants on the other side." Pl. FTC's Statement of Material Facts Presenting a Genuine Issue for Trial in Opp'n to Def.'s Mot. for Summ. J. [ECF No. 156-1] ("FTC SOMF") ¶ 25;[2] see Surescripts Resp. to FTC SOMF ¶ 25;[3] see also FTC SUF ¶ 7. Indirect networks often feature a "chicken-and-egg" problem in which "the entrant cannot get one side on board without having the other side on board, and vice versa." FTC SOMF ¶ 26; see Surescripts Resp. to FTC SOMF ¶ 26. Indirect network effects tend to work against new entrants and instead in favor of preexisting market participants that have already amassed a large customer base on both sides of the market. See FTC SOMF ¶ 27; see Surescripts Resp. to FTC SOMF ¶ 27.

#### B. E-Prescribing Versus Analog Methods
Electronic routing and eligibility differ in critical ways from analog methods. Starting with routing, analog methods of routing are distinct from electronic routing on several key metrics.

- **Efficiency:** Electronic routing is less error-prone and more accurate than analog methods. See FTC SUF ¶¶ 34–35. Electronic routing is also more efficient than analog methods because it is associated with fewer instances of "manual follow-ups" and "adverse patient events," "causes less interruption to the pharmacy workflow," "results in increased prescription adherence," and eliminates human error associated with analog methods of transmitting prescription information. Id. ¶¶ 36–40 (internal quotation marks omitted).

- **Cost:** Electronic routing is also more cost-effective than analog methods. See FTC SUF ¶ 42. It is estimated that pharmacies save between $0.89 and $1.05 per script when they use electronic routing to send prescription information instead of analog methods, which is a significant portion of the gross margin on prescription-filling. Id. ¶¶ 43–44. Electronic routing also yields cost-savings for prescribers due to the federal incentives to switch to e-prescribing methods. Id. ¶ 47.

- **\*3 • Pricing:** Electronic routing and analog methods of routing also feature different pricing structures. Surescripts charges a per-transaction price to pharmacies and PTVs for using its network and either charges nothing or gives a loyalty payment to EHRs for each transaction on its network. FTC SUF ¶¶ 50–51. There is no analogous "price" charged for the use of analog methods. Id. ¶ 52.

- **Customers:** Electronic routing and analog methods also have a different customer base. EHRs do not contract with any company for prescriptions delivered by analog methods (though may in some instances receive prescription information via analog method if the electronic method were to fail). See FTC SUF ¶ 54; Surescripts's Resp. to FTC SUF [ECF No. 157-1] ("Surescripts Resp. SUF") ¶ 54; Pl. FTC's Reply to Surescripts Resp. SUF [ECF No. 118-1] ("FTC Reply SUF") ¶ 54. Similarly, PTVs do not contract for prescriptions delivered by analog methods. See FTC SUF ¶ 56; Surescripts Resp. SUF ¶ 56; FTC Reply SUF ¶ 56.

- **Vendors:** Finally, vendors typically provide electronic routing, while analog methods are not provided by a vendor, except in the case of an e-prescribing company using an analog method as a back-up in case electronic routing were to fail. See FTC SUF ¶¶ 57–59; Surescripts Resp. SUF ¶ 59; FTC Reply SUF ¶ 59.

The electronic transmission of eligibility information differs from analog methods in many of the same ways.

- **Efficiency:** Electronic eligibility transactions provide "more effective communication of a patient's insurance coverage and generic alternatives, which reduces the possibility that a patient does not pick up their prescription due to a surprising high price." FTC SUF ¶ 60.

- **Cost:** Electronic eligibility is also more cost-effective than analog methods. It saves PBMs money by encouraging prescribers to use cheaper generic drugs and reduces insurer spending on drugs by 8 to 15%. Id. ¶¶ 65–66. These savings provide "substantial value to PBMs, delivering several times the return on investment per transaction." Id. ¶ 67. In addition, using electronic eligibility made some prescribers eligible for federal incentives. See id. ¶ 68; Surescripts Resp. SUF ¶ 68; FTC Reply SUF ¶ 68.

- **Pricing:** Electronic eligibility and analog methods have different pricing structures. On Surescripts's network, PBMs are charged on a per-transaction basis and EHRs are charged nothing or given a loyalty payment on each transaction. FTC SUF ¶¶ 71–72. Analog methods, on the other hand, are not priced on a per-transaction basis. Id. ¶ 73.

- **Customers:** Electronic eligibility and analog methods also have different customers. EHRs are customers of electronic eligibility but they are not customers of analog methods because such methods entail prescribers calling PBMs directly or mailing plan information to PBMs without the use of EHRs. FTC SUF ¶¶ 74–75; see also Surescripts Resp. SUF ¶ 74; FTC Reply SUF ¶ 74.

- **Vendors:** Electronic eligibility information is transmitted by vendors over the vendor's network. In contrast, analog methods do not involve transmission of information through a vendor on a network—instead, such information is transmitted via phone calls and benefit manuals. See FTC SUF ¶¶ 76–78; Surescripts Resp. SUF ¶ 78; FTC Reply SUF ¶ 78.

Market participants—namely, Surescripts and its largest competitor, Emdeon (discussed below)—have also implied in several business documents that e-prescribing is distinct from analog methods. FTC SUF ¶¶ 85–95.

### C. The Rise of E-Prescribing

**\*4** Before 2007, e-prescribing was prohibited in many states and was rarely used. Surescripts SUF ¶ 14. In 2007, e-prescribing was widely legalized, id. ¶¶ 14–16, and in 2008, Congress enacted federal legislation, the Medicare Improvements for Patients and Providers Act of 2008, Pub. L. No. 110-275, 122 Stat. 2494 ("MIPPA"), that incentivized the use of e-prescribing, see FTC SUF ¶¶ 12–15. Under that legislation, "prescribers could not receive incentive payments, and later were subject to financial penalties, unless they met certain criteria regarding transmitting prescriptions electronically and using e-prescribing technology capable of providing eligibility checks." Id. ¶ 14. In 2009, Congress enacted another law, the Health Information Technology for Economic and Clinical Health Act, Pub. L. No. 111-5, 123 Stat. 226 (2009) ("HITECH"), that promoted physician adoption of EHRs under which "eligible prescribers could receive tens of thousands of dollars in incentive payments by meeting certain criteria for the 'meaningful use' of certified EHRs. Eligible prescribers also faced financial penalties for not satisfying 'meaningful use' criteria." Id. ¶¶ 16–18. One of those criteria was using e-routing. Id. ¶ 19.

The volume of e-prescribing transactions has increased dramatically since 2007. Surescripts SUF ¶¶ 17–18. Electronic routing has become the dominant method of transmitting prescription information, growing from 3% of all prescriptions in 2008 to more than 90% since 2018. FTC SUF ¶ 27. The same is true for electronic eligibility transactions: in 2007, less than 1% of all prescriptions were accompanied by an electronic eligibility transaction, and that figure has skyrocketed to over 95% since 2017.[4] Id. ¶ 28.

### D. Surescripts's Pricing and Loyalty Program

In routing, Surescripts charges a per-transaction price to pharmacies and PTVs for using its network to send and receive prescription information. FTC SUF ¶ 50. On the other hand, Surescripts charges a "zero or often negative price"—that is, it often provides a payment—to an EHR for each transaction it engages in over Surescript's network. Id. ¶ 51. In eligibility, Surescripts charges PBMs a per-transaction fee, but it similarly charges EHRs a "zero or negative price" for each transaction that occurs on its network. Id. ¶¶ 71–72.

In early 2010, Surescripts began a loyalty pricing program for its routing and eligibility customers. Surescripts SUF ¶ 20. Under this program, Surescripts gave EHR, pharmacy, PBM, and PTV customers a discount or payment in exchange

for their agreement to loyalty—i.e., their agreement not to use any e-prescribing platforms other than Surescripts for transactions with other entities on the Surescripts network —for a certain predetermined period of time. Id. ¶ 22. If EHRs joined the loyalty program for only one of routing or eligibility, they could earn an incentive payment of [Redacted] of the routing fee paid by pharmacy customers for each transaction. Id. ¶ 24. If EHRs joined both loyalty programs, they received an incentive payment of [Redacted] of the fee paid by the pharmacy customers for each transaction. Id. Customers who chose not to opt into the loyalty program were still able to access Surescripts's network —they just did not receive the discounts or payments. See id. ¶ 23. Customers enrolled in the loyalty program were still able to use other e-prescribing networks to connect with entities not on the Surescripts network; connecting with these outside entities did not jeopardize their ability to earn incentives for transactions with entities on Surescripts's network. Id. ¶¶ 31–33.

The typical period of a loyalty contract was three years, see Surescripts SUF ¶ 25, although some customers successfully negotiated shorter terms, id. ¶ 26. Most of the contracts automatically renewed for a one-year term upon expiration. FTC SOMF ¶¶ 8–9; see Surescripts Resp. to FTC SOMF ¶¶ 8–9. If a customer ceased participation in the program before the end of the predetermined period, it was not entitled to keep the incentive payments or discounts accrued over the course of the customer's participation in the loyalty program (known as a "claw back" provision). See FTC SOMF ¶ 11; Surescripts Resp. to FTC SOMF ¶ 11.[5] However, Surescripts allowed EHRs in the loyalty program to retain the incentives and payments they earned over the course of their participation if they gave at least six months' notice before unilateral termination of participation. Surescripts SUF ¶ 25.

**\*5** Some of Surescripts's loyalty contracts also contained express exclusivity provisions requiring the customers to use Surescripts for all its transactions and limiting the customers' ability to form direct connections off the Surescripts network. See FTC SOMF ¶¶ 10, 13–16; Surescripts Resp. to FTC SOMF ¶¶ 10, 13–16. Specifically, Surescripts had unique exclusivity and pricing terms in its loyalty contracts with Allscripts and RelayHealth, both customers of Surescripts and potential competitors in the e-prescribing market. FTC SOMF ¶ 12; Surescripts Resp. to FTC SOMF ¶ 12.

Some of Surescripts's customers chose not to enroll in the loyalty program. See Surescripts SUF ¶¶ 38–39, 42–43

(listing [Redacted], Kroger, and [Redacted] as examples); Pl. FTC's Resps. to Surescripts SUF [ECF No. 156-2] ("FTC Resp. SUF") ¶¶ 38–39, 42–43. Other customers enrolled in the loyalty program for some period of time before unenrolling. See Surescripts SUF ¶¶ 40–41, 44–45 (listing [Redacted], TDS/Rx30, and [Redacted] as examples); FTC Resp. SUF ¶¶ 40–41, 44–45.

Between 2010 and 2019, Surescripts's loyalty contracts covered an average of [Redacted] of total EHR routing volume, [Redacted] of total pharmacy routing volume, [Redacted] of total EHR eligibility volume, and [Redacted] of total PBM eligibility volume. FTC SOMF ¶¶ 18–21; see Surescripts Resp. to FTC SOMF ¶¶ 18–21.

At the same time that it rolled out its loyalty pricing program, Surescripts lowered transactions prices for pharmacy and PBM customers in routing and eligibility. Surescripts SUF ¶ 21; FTC Resp. SUF ¶ 21. Surescripts's prices for routing continued to fall from 2010 until at least 2013. Surescripts SUF ¶ 36; FTC Resp. SUF ¶ 36. [6]

As discussed further below, in 2019, Surescripts began the process of ending its loyalty programs and has recently represented that as of March 2023, they have been fully eradicated. See Surescripts's Position Regarding Mootness [ECF No. 172] ("Surescripts Mootness Br.") at 3–5.

**E. Surescripts's Position in E-Prescribing**
Surescripts has held at least 95% of the electronic routing market since 2010, FTC SUF ¶ 103; see Surescripts Resp. SUF ¶ 103, and some of Surescripts's own internal documents indicate that it held at least a 95% share of all e-routing transactions since 2009, FTC SUF ¶ 104; see Surescripts Resp. SUF ¶ 104. Most of Surescripts's customers joined its network before 2010. FTC SUF ¶ 100. Pharmacies that ultimately accounted for more than 95% of all routing transaction volume and EHRs that ultimately accounted for more than 94% of the same joined Surescripts's network before 2010. Id. ¶¶ 101–02.

Surescripts has also handled at least 95% of all electronic eligibility transactions since 2009. FTC SUF ¶¶ 116–17; see Surescripts Resp. SUF ¶¶ 116–17. PBMs that accounted for over 97% of eligibility transaction volume and EHRs accounting for over 83% of the same joined Surescripts before 2010. FTC SUF ¶¶ 114–15. Surescripts accounts for the "vast

majority of U.S. prescription routing and eligibility checks today." Id. ¶ 105 (internal quotation marks omitted).

Surescripts has no comparable rivals in either routing or eligibility. See FTC SUF ¶¶ 106, 118. Surescripts's closest rival in electronic routing is Change Healthcare ("Emdeon"), [7] a healthcare technology company founded in 2006 that provides electronic routing services. Id. ¶¶ 58, 107; Surescripts SUF ¶ 54. Even as Surescripts's main competitor, Emdeon has handled [Redacted] of electronic routing volume from 2009 to 2020. FTC SUF ¶ 108. Both Surescripts's eligibility and routing networks are viewed as "must haves" by many EHRs, pharmacies, PTVs, and PBMs, and those entities widely believe that there are no reasonable alternatives. See id. ¶¶ 110, 112, 120–21; Surescripts Resp. SUF ¶¶ 110, 112, 120–21.

**\*6** Some of Surescripts's customers have expressed a lack of interest in "multihoming"—that is, using both Surescripts's network and another e-prescribing network, such as Emdeon. See Surescripts SUF ¶¶ 47, 49 (identifying CVS and NextGen as examples); FTC Resp. SUF ¶¶ 47, 49. Others considered the prospect of multihoming but ultimately chose not to do so for various reasons. See Surescripts SUF ¶¶ 50–51, 53 (identifying [Redacted], eClinicalWorks, and [Redacted] as examples); FTC Resp. SUF ¶¶ 50–51, 53. And some others still have multihomed, using both Surescripts's and Emdeon's networks. See FTC SOMF ¶ 34 (citing [Redacted] as examples); Surescripts Resp. to FTC SOMF ¶ 34.

Since 2014, Surescripts has held at least 62.4% of a routing market that includes both electronic and analog methods of routing. FTC SUF ¶ 122; Surescripts Resp. SUF ¶ 122. And it has held at least 61.6% of all eligibility transactions—both electronic and non-electronic—since 2014. [8] FTC SUF ¶ 126; Surescripts Resp. SUF ¶ 126.

**F. Surescripts's Competitors**
Emdeon is Surescripts's foremost competitor in routing but has still handled [Redacted] of all electronic routing transaction volume from 2009 to 2020. FTC SUF ¶ 108. Emdeon had signed up few customers to its network relative to Surescripts by 2008. Surescripts SUF ¶ 57. In 2009, Emdeon acquired eRx Network and began strategizing to grow its presence in the routing market. See FTC Resp. SUF ¶ 58. By 2009, Surescripts's internal business documents and executives began identifying Emdeon, as well as Allscripts and RelayHealth, as "serious competition" in

e-prescribing. See FTC SUF ¶¶ 88–89. In 2012, Emdeon initiated "Project Normandy," an attempt to grow its routing business. Surescripts SUF ¶ 58. Emdeon was able to sign contracts with EHRs including Epic, NextGen, and NewCrop through the initiative. Id. ¶ 59. Despite signing up these EHRs, Project Normandy was largely a failure. Id. ¶ 62; see FTC Resp. SUF ¶ 62. Project Normandy failed in part due to EHRs' preexisting relationships with Surescripts. See Surescripts SUF ¶¶ 62–64 (giving EHRs eClinicalWorks and AthenaHealth as examples); FTC Resp. SUF ¶¶ 62–64. As of April 2021, Emdeon had routing contracts with several pharmacies, including PDX and Kroger. Surescripts SUF ¶ 56.

Emdeon also tried to enter the electronic eligibility market around late 2013 or early 2014 with an initiative titled "Project Victory." Surescripts SUF ¶ 68; see FTC SUF ¶ 77. Despite contracting with PBMs MedImpact and Argus, Emdeon's attempt to enter eligibility largely failed. See Surescripts SUF ¶¶ 39, 69; FTC Resp. SUF ¶ 69. Its efforts to develop an eligibility product continued until around 2017, when it finally exited the market due to its inability to gain ground. Surescripts SUF ¶¶ 68, 70.

**\*7** Another customer and potential competitor, Allscripts, signed a four-year express exclusivity agreement with Surescripts in 2010, [Redacted] Surescripts SUF ¶ 30; FTC SOMF ¶ 13; see also Surescripts SUF ¶ 72; FTC Resp. SUF ¶ 72; Surescripts Resp. to FTC SOMF ¶ 13. [Redacted] See Surescripts SUF ¶¶ 28–30. And RelayHealth, another customer and potential rival, also signed an [Redacted] agreement with Surescripts in 2010, which it renewed in 2015. FTC SOMF ¶¶ 14–16; see also Surescripts SUF ¶ 73; FTC Resp. SUF ¶ 73; Surescripts Resp. to FTC SOMF ¶¶ 14–16.

## II. Procedural Background

On April 17, 2019, the FTC filed a civil complaint against Surescripts seeking a permanent injunction and other equitable relief, including equitable monetary relief,[9] to prevent unfair methods of competition in violation of Section 5(a) of the FTC Act, 🔖 15 U.S.C. § 45(a), which prohibits conduct proscribed under Section 2 of the Sherman Act, 🔖 15 U.S.C. § 2. Compl. [ECF No. 1] at 1. The FTC alleges that Surescripts has violated 🔖 Section 2 by maintaining a monopoly in both electronic routing and eligibility through

anticompetitive conduct, including its loyalty program. See id. ¶¶ 222–31.

Specifically, the Complaint alleges that Surescripts had a monopoly—more than a 95% share—in both markets by 2009 and, after facing competitive threats to its dominance, "took a series of anticompetitive actions to protect and maintain its monopolies." Compl. ¶¶ 2–3. These anticompetitive actions included "chang[ing] its pricing policies to require long-term exclusivity from nearly all of its routing and eligibility customers." Id. ¶ 3. The Complaint alleges that this new scheme caused customers who did not agree to loyalty to pay a relatively higher price on each transaction, which protected Surescripts's monopolies because "no competitor could ever offer customers enough savings to compensate customers for the skyrocketing costs the customers would face by paying Surescripts's higher 'non-loyal' price on their remaining Surescripts transactions." Id. Thus, the loyalty pricing program prevented nascent competitors—such as Emdeon—from attaining the critical mass necessary to enter the electronic routing and eligibility markets by foreclosing at least 70% of each market. Id.

In addition to its loyalty pricing scheme, the FTC alleges Surescripts also "engaged in a long-running campaign of threats and other non-merits based competition to ensure that no other competitor could get a toehold in either market," citing Allscripts and RelayHealth as examples of potential competitors that Surescripts foreclosed from entering the markets. Compl. ¶¶ 4–5. Due to this anticompetitive conduct, the FTC contends, "there is no meaningful competition in the markets for routing or eligibility. The decade-long monopolies in these markets have produced predictable effects: higher prices, reduced quality, stifled innovation, suppressed output, and stymied alternative business models." Id. ¶ 6.

In July 2019, Surescripts filed a motion to dismiss. See Surescripts's Mot. to Dismiss Compl. [ECF No. 32]. It argued that (1) the Court lacked subject-matter jurisdiction under Section 13(b) of the FTC Act, (2) the FTC's claim that Surescripts's loyalty pricing program violated 🔖 Section 2 must fail because it cannot show that the prices were "predatory," and (3) the FTC did not plead sufficient facts to show that Surescripts's loyalty contracts caused anticompetitive effects or foreclosed a substantial amount of competition in either market. Id. at 1–2. After a hearing on the motion, see Nov. 19, 2019 Min. Entry, and subsequent supplementary briefing, see Jan. 3, 2020 Min. Order; Def.

Surescripts's Resp. to the Court's Min. Order [ECF No. 42]; Pl. FTC's Resp. to the Court's Jan. 3, 2020 Min. Order [ECF No. 43], the Court denied Surescripts's motion to dismiss. See Fed. Trade Comm'n v. Surescripts, LLC, 424 F. Supp. 3d 92, 104 (D.D.C. 2020).

**\*8** The Court first held that it had subject-matter jurisdiction because the FTC pleads a "proper case" for a permanent injunction under Section 13(b). See Surescripts, 424 F. Supp. 3d. at 96–100. The Court next held that the FTC stated a claim sufficient to survive the pleadings stage. See id. at 100–04. Specifically, the Court held that (1) the FTC pled facts sufficient to state a claim of monopolization based on Surescripts's loyalty contracts under 🔖 Section 2, see id. at 100-02, and (2) even under the rule of reason, the FTC has met its burden of pleading facts sufficient to raise an inference at the pleadings stage that Surescripts's loyalty contracts and other allegedly anticompetitive behavior substantially foreclosed competition, resulting in anticompetitive effects, see id. at 102–04. Surescripts then filed an answer on February 10, 2020, denying almost all the FTC's substantive allegations. See Answer to Compl. [ECF No. 48].

In March 2022, after over two years of discovery, both parties moved for summary judgment. On March 28, 2022, the FTC moved for partial summary judgment on the issues of market definition and monopoly power. See Pl. FTC's Mot. for Partial Summ. J. [ECF No. 103]; Pl. FTC's Mem. of Law in Supp. of Mot. for Partial Summ. J. [ECF No. 103-1] ("FTC Mot."). The next day, Surescripts moved for summary judgment on the issue of anticompetitive effects.[10] See Surescripts's Mot. for Summ. J. [ECF No. 104] ("Surescripts Mot."). Both parties responded in opposition to the other party's motion, see Surescripts's Mem. of Law in Supp. of Opp'n to FTC Mot. [ECF No. 157] ("Surescripts Opp'n"); FTC's Mem. of Law in Opp'n to Surescripts Mot. [ECF No. 156] ("FTC Opp'n"), and both parties then filed replies in support of their respective motions, see Reply Mem. in Supp. of FTC Mot. [ECF No. 118] ("FTC Reply"); Surescripts Reply Mem. in Supp. of Surescripts Mot. [ECF No. 119]. The Court held a hearing on the motions on March 16, 2023, and the motions are now ripe for decision.

About a week before the hearing, on March 10, 2023, the parties filed a joint letter notifying the Court that the case may be moot. See Joint Letter Concerning Briefing of Mootness Question [ECF No. 170]. Surescripts stated that the case was moot because it had "effectively completed th[e] process [of discontinuing its loyalty program] and waived or removed loyalty provisions and obligations for substantially all of its relevant partners on both sides of its network—and expects to address the few remaining stragglers (if any) in the coming weeks" and it "is prepared to execute an irrevocable covenant stating that it will not utilize loyalty provisions in its contracts at any point in the future." Id. at 1. The FTC disagreed, arguing that Surescripts's mootness argument was not ripe because it had not yet fully ended its loyalty programs and, even if it had, the case would not be moot because "there is [still] a variety of relief the Court could order if it finds in favor of the FTC." Id. at 3–4. The Court ordered expedited briefing on the issue, and the parties submitted their opening briefs on March 17, 2023, see Surescripts Mootness Br.; Pl. FTC's Mem. of Law in Resp. to the Court's Mar. 12, 2023 Min. Order Addressing Why This Case Is Not Moot [ECF No. 171] ("FTC Mootness Br."), and responses on March 24, see Pl. FTC's Mem. of Law in Resp. to Surescripts Mootness Br. ("FTC Mootness Resp."); Surescripts's Reply to FTC Mootness Resp. ("Surescripts Mootness Reply").

**\*9** **[1]** The Court determines that, at this time, based on the record before it, the FTC's case against Surescripts is not moot. At the outset, the Court has doubts that, at this time, Surescripts has eliminated all of its loyalty provisions. See Decl. of Katie Felder [ECF No. 172-1] ("Felder Decl.") ¶ 9 ("As of today, March 17, 2023, only two PBM customers are connecting to Surescripts pursuant to legacy contracts that still contain loyalty terms and requirements."); id. ¶¶ 7, 15 (indicating contracts that still contain loyalty or exclusivity provisions that Surescripts represents it will not enforce); id. ¶ 16 (noting that a "final audit" still needs to be completed to identity any other loyalty provisions in operative contracts). It has also taken no affirmative steps toward entering into an irrevocable covenant stating that it will not reinstate any such loyalty or exclusivity terms in its contracts in the future. See FTC Mootness Resp. at 3 (noting that "Surescripts has not entered or even provided proposed language for such a covenant"). Both failures are independently fatal to its claim of mootness under the voluntary cessation doctrine. See 🔖 Am. Bar Ass'n v. FTC, 636 F.3d 641, 648 (D.C. Cir. 2011) ("Voluntary cessation will only moot a case if there is no reasonable expectation that the alleged violation will recur ...." (cleaned up)). But even if the Court accepts Surescripts's representation that it has completed the process of discontinuing its loyalty programs—and accepts that Surescripts will execute an irrevocable covenant that it will not utilize loyalty contracts at any point in the future—the case would not be moot for two reasons.

Federal Trade Commission v. Surescripts, LLC, --- F.Supp.3d ---- (2023)

First, Surescripts has not carried the "heavy" burden of showing that "there is no reasonable expectation that the alleged violation will recur and interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." 🚩 Am. Bar Ass'n, 636 F.3d at 648 (cleaned up); [11] 🚩 id. ("The defendant carries the burden of demonstrating that there is no reasonable expectation that the wrong will be repeated, and the burden is a heavy one." (cleaned up)). Even without its loyalty contracts, Surescripts still enjoys the primary alleged benefit of the contracts—its durable monopoly power. See FTC Mootness Resp. at 5 ("Until competition takes root in the absence of exclusionary contracts, the impact of Surescripts' anticompetitive conduct will persist."). And the new program with which Surescripts has replaced its loyalty contracts does not provide assurance that the effects of the loyalty contracts have been eradicated—in fact, it does the opposite, giving the Court cause for concern that the new volume-based discounts may have much of the same anticompetitive effect as the FTC alleges the loyalty programs have had. [12] Surescripts's statement to the contrary that "[q]uite simply, volume discounts have nothing to do with this case at all," Surescripts Mootness Reply at 4, is incorrect, as Surescripts has brought the volume discount scheme into the case by citing it as the "replacement" for the loyalty programs and because even a cursory review of the scheme raises questions about its potential negative impact on competition.

**\*10** Second, and relatedly, there is still cognizable relief the Court could grant the FTC. In its Complaint, the FTC asked for injunctive relief preventing Surescripts "from engaging in similar and related conduct in the future" and "other such equitable relief ... as the Court finds necessary to redress and prevent recurrence of Defendants' violations." Compl. at 54 (emphases added). This requested relief goes beyond just ceasing the loyalty programs. The Court could, for example, enter an injunction preventing Surescripts from imposing "new contractual terms that have the same practical effect of blocking competition for routing or eligibility," FTC Mootness Br. at 7. Accord 🚩 ⚠️ New York v. Microsoft Corp., 224 F. Supp. 2d 76, 109 (D.D.C. 2002) ("[F]ederal court[s] ha[ve] broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past." (quoting 🚩 Zenith Radio Corp. v. Hazeltine Rsch., Inc., 395 U.S. 100, 132, 89 S.Ct.

1562, 23 L.Ed.2d 129 (1969))), aff'd, 🚩 373 F.3d 1199 (D.C. Cir. 2004). Surescripts's new volume-based discount program may be one such similar act. See FTC Mootness Resp. at 4 (noting that under the volume-based discount scheme "if an EHR decides to multihome a significant share of its transactions to a different network, it will be penalized by forfeiting the highest incentive payments," which "may also have the practical effect of substantially foreclosing competition in the routing market and is precisely the type of 'similar and related conduct' the FTC seeks to bar").

Although the Court cannot conclude at this time that the case is moot based on the facts before it, it will nonetheless reserve judgment on Surescripts's summary judgment motion. As the Court sees it, the complete (or near-complete) cessation of Surescripts's loyalty programs fundamentally changes its motion for summary judgment on anticompetitive effects, as those loyalty programs are the focus of its motion as currently drafted. The Court will, however, decide the FTC's motion for partial summary judgment now, as it focuses only on the relevant market and monopoly power—issues the Court is confident are not materially affected by Surescripts's voluntary cessation of its loyalty programs.

### Legal Standard

**[2]** **[3]** A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." 🚩 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). But summary judgment may not "be avoided based on just any disagreement as to the relevant facts; the dispute must be 'genuine,' meaning that there must be sufficient admissible evidence for a reasonable trier of fact to find for the non-movant." Etokie v. Duncan, 202 F. Supp. 3d 139, 146 (D.D.C. 2016) (quoting 🚩 Anderson, 477 U.S. at 248, 106 S.Ct. 2505). Thus, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." 🚩 Anderson, 477 U.S. at 251–52, 106 S.Ct. 2505.

Federal Trade Commission v. Surescripts, LLC, --- F.Supp.3d ---- (2023)

**[4]** **[5]** To support its factual positions, a party must "cit[e] ... particular parts of materials in the record" or "show[ ] that the materials cited" by the opposing party "do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Courts must avoid making 'credibility determinations or weigh[ing] the evidence' " and should accept the non-movant's evidence as true and make all justifiable inferences in its favor. Perry-Anderson, 192 F. Supp. 3d at 143 (alteration in original) (quoting Reeves, 530 U.S. at 150, 120 S.Ct. 2097). This is so because " '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' and are thus inappropriate at summary judgment." United States v. $17,900.00 in U.S. Currency, 859 F.3d 1085, 1092 (D.C. Cir. 2017) (alteration in original) (quoting Anderson, 477 U.S. at 255, 106 S.Ct. 2505). Thus, "[i]f material facts are genuinely in dispute, or undisputed facts are susceptible to divergent yet justifiable inferences," a court should not grant summary judgment. Hagan v. United States, 275 F. Supp. 3d 252, 257 (D.D.C. 2017).

**\*11** **[6]** Although the parties have not filed cross motions for summary judgment on the same issues—rather, they seek summary judgment on distinct legal elements—"each must carry its own burden under the applicable standard." United States ex rel. Morsell v. Symantec Corp., 471 F. Supp. 3d 257, 276 (D.D.C. 2020) (quoting Ehrman v. United States, 429 F. Supp. 2d 61, 67 (D.D.C. 2006)). The court then reviews the motions separately to determine whether either party is entitled to summary judgment, analyzing facts and making inferences in the light most favorable to the non-moving party. See id.

## Analysis

The FTC is empowered under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to bring suit to enjoin violations of any law the FTC enforces. The FTC Act prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," id. § 45(a)(1), and directs the FTC to prevent corporations "from using [such] unfair methods," id. § 45(a)(2). Here, the FTC alleges that Surescripts's conduct "violate[s] Section 2 of the Sherman Act and thus constitute[s] an unfair method

of competition, in violation of Section 5(a) of the FTC Act." Compl. ¶ 226.

**[7]** Section 2 of the Sherman Act prohibits, in relevant part, "monopoliz[ing], or attempt[ing] to monopolize ... any part of the trade or commerce among the several States." 15 U.S.C. § 2; see also United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (per curiam) ("Section 2 of the Sherman Act makes it unlawful for a firm to 'monopolize.' "). To prove both its claims against Surescripts under Section 2 of the Sherman Act, the FTC must show that Surescripts (1) "possess[ed] ... monopoly power in the relevant market"—namely, the routing and eligibility markets, and (2) "willful[ly] acqui[red] or maint[ained] ... that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); accord Microsoft, 253 F.3d at 50 (applying the Grinnell test).

The FTC moves for partial summary judgment on the issues of market definition and monopoly power. FTC Mot. at 2–3. The FTC asks the Court to "enter summary judgment that (1) the relevant markets in this case are the U.S. markets for [electronic] routing and [electronic] eligibility; and (2) Surescripts has possessed monopoly power in both markets since 2010." Id. In the alternative, the FTC asks the Court to enter summary judgment that "Surescripts has possessed monopoly power since at least 2014, leaving for trial the questions of market definition and Surescripts' monopoly power from 2010–2013." Id. at 3. For the reasons explained below, the Court will grant the FTC's motion as to both issues.

### I. Market Definition

**[8]** **[9]** The threshold element of a § 2 monopolization offense is "the possession of monopoly power in the relevant market." Grinnell, 384 U.S. at 570, 86 S.Ct. 1698 (emphasis added). Accordingly, the first step in assessing monopoly power is determining the relevant market. See Grinnell, 384 U.S. at 570–71, 86 S.Ct. 1698. "Antitrust markets have two dimensions: product and geographic area." United States v. Aetna Inc., 240 F. Supp. 3d 1, 19 (D.D.C. 2017) (quoting FTC v. Arch Coal, Inc., 329 F. Supp. 2d 109, 110 (D.D.C. 2004)). The parties here agree that the

geographic area is the United States. FTC SUF ¶¶ 98–99. But they sharply dispute the relevant product market.

**\*12**  **[10]**  A relevant product market includes only those products that are "reasonably interchangeable." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal.").

**[11]** **[12]** **[13]** **[14]** But not every functionally interchangeable product should be included in the relevant market. *Aetna*, 240 F. Supp. at 23 (citing *United States v. H & R Block, Inc.*, 833 F. Supp. 2d 36, 54 (D.D.C. 2011)); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 218 (D.C. Cir. 1986); *FTC v. Staples, Inc.*, 970 F. Supp. 1066, 1075 (D.D.C. 1997) ("[T]he mere fact that a firm may be termed a competitor in the overall marketplace does not necessarily require that it be included in the relevant product market for antitrust purposes."). Rather, the relevant market should be construed to include only competitor products that a "significant percentage of [consumers] could substitute for [Surescripts's products] without incurring substantial costs." *United States v. Microsoft Corp.*, 87 F. Supp. 2d 30, 36 (D.D.C. 2000), aff'd in part, rev'd in part and remanded, 253 F.3d 34 (D.C. Cir. 2001). Relevant to this inquiry,

> [t]he degree to which a similar product will be substituted for the product in question is said to measure the cross-elasticity of demand, while the capability of other production facilities to be converted to produce a substitutable product is referred to as the cross-elasticity of supply. The higher these cross-elasticities, the more likely it is that similar products or the capacity of production facilities now used for other purposes are to be counted in the relevant market.

*Rothery Storage & Van*, 792 F.2d at 218. The proper test is to " 'look to the availability of substitute commodities, i.e. whether there are other products offered to consumers which are similar in character or use,' and 'how far buyers will go to substitute one commodity for another.' " *Aetna*, 240 F. Supp. 3d at 19 (quoting *Staples*, 970 F. Supp. at 1074). "Markets 'must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited number of buyers will turn.' " *Id.* at 20 (quoting *Times-Picayune Publ'g Co. v. United States*, 345 U.S. 594, 612 n.31, 73 S.Ct. 872, 97 L.Ed. 1277 (1953)).

**[15]**  In assessing whether competitor products belong in the relevant market, the Supreme Court identified additional "practical indicia" to consider. *Brown Shoe Co. v. United States*, 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). These indicia, known as the *Brown Shoe* indicia, are "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

The FTC argues that the undisputed facts show that analog methods of routing and eligibility are not reasonable substitutes for electronic routing and electronic eligibility, and thus the appropriate relevant markets for both routing and eligibility exclude analog methods. FTC Mot. at 10–11. The FTC seeks summary judgment on this issue. See id. at 2–3. Surescripts disagrees. It first argues that the FTC's request for summary judgment on only one element of a Section 2 claim is procedurally improper under Federal Rule of Civil Procedure 56(a), see Surescripts Opp'n at 1, and that, in any event, there are genuine disputes of material fact regarding market definition that can only be resolved at an evidentiary hearing or trial, which precludes the entry of summary judgment on that element, id. at 2.

**\*13**  For the reasons explained below, the Court agrees with the FTC and will grant summary judgment on market definition in its favor, holding that the relevant markets exclude analog methods and are thus electronic routing and electronic eligibility, respectively.

**A. Partial Summary Judgment Is Procedurally Proper**

As an initial matter, Surescripts first argues that the FTC's motion for summary judgment on only one element of a Section 2 claim is "procedurally improper" under Rule 56(a) because the FTC does not request a judgment, as contemplated under Rule 56(a), but rather a "freestanding declaration." Surescripts Opp'n at 3–10. The FTC disagrees, claiming that the plain text of Rule 56(a) permits courts to enter summary judgment on only one element of a claim. See FTC Reply at 1–2.

Rule 56(a) provides, in relevant part, that "[a] party may move for summary judgment, identifying each claim or defense— or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Rule 56(a) was amended in 2010 to "make clear ... that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense." Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment.

Surescripts primarily relies on Davis v. District of Columbia for the proposition that "[a] party may not file a motion for partial summary judgment on a fact or an element of a claim." 496 F. Supp. 3d 303, 312 n.8 (D.D.C. 2020) (quoting Carson v. Sim, Civ. A. No. 04-1641 (RWR), 2009 WL 3151335, at *1 (D.D.C. Sept. 24, 2009)). Although Davis was decided after the 2010 amendment to Rule 56(a), the cases cited by the Davis court all predate the amendment, see id., which renders the cited proposition of little value.

Surescripts also recognizes that in United States ex rel. Landis v. Tailwind Sports Corp., a court granted summary judgment on only two elements of plaintiff's claims, see 234 F. Supp. 3d 180, 185 (D.D.C. 2017) (granting summary judgment only as to "the precise number ... and the total amount ... of the payment invoices" and not as to liability in a False Claims Act case alleging fraudulent claims and statements made in connection with those payments), but argues that Landis is an outlier case. See Surescripts Opp'n at 5 n.1. The court in Landis noted that "[w]hen Rule 56(a) was amended in 2010, the accompanying commentary indicated that the [amendment] was intended to clarify that summary judgment is proper for even a portion of a claim," and hence "summary judgment can be entered on narrow, factual issues." 234

F. Supp. 3d at 191 (citing Branch Banking & Tr. Co. v. Rappaport, 982 F. Supp. 2d 66, 69 (D.D.C. 2013)).

Surescripts also urges that the case cited by the Landis court in support of its decision does not support the outcome in Landis because the facts of Branch Banking are too different. See Surescripts Opp'n at 5 n.1. The Branch Banking court granted summary judgment on a divisible part of a claim— that the defendants were responsible for the principal of a loan they had guaranteed—but reserved judgment as to whether the defendant must pay any interest on that loan. See 982 F. Supp. 2d at 69. Surescripts notes that "[t]hat is exactly the type of claim that is appropriate for partial summary judgment because it is wholly divisible and fully resolves a part of the claim," while the claim in Landis was not. Surescripts Opp'n at 5 n.1. It also cites four cases from other districts to support its argument, see id. at 6 & n.2, and notes that, from a judicial efficiency standpoint, granting the FTC's partial summary judgment motion "would not streamline the trial" because "the FTC's attempt to establish the existence of monopoly power ... incorporates some of the same disputed evidence that the Court must consider in determining that there are no anticompetitive effects caused by Surescripts' loyalty contracts," and thus "flies in the face of Rule 56(a)," id. at 7–8.

**\*14** The FTC disagrees, pointing to the plain language of the rule as well as other cases in this District—including cases before this Court specifically—that have granted partial summary judgment on elements of a claim. See FTC Reply at 2; see also Apprio, Inc. v. Zaccari, Civ. A. No. 18-2180 (JDB), 2021 WL 2209404, *4, *12 (D.D.C. June 1, 2021) (granting partial summary judgment on two of the four elements of a claim); Jackson v. Att'y Gen. of U.S., 456 F. Supp. 3d 62, 66–68 (D.D.C. 2020) (granting partial summary judgment on three of the four elements of a claim); Landis, 234 F. Supp. 3d at 190–92. It also cites cases in which courts have granted partial summary judgment on market definition specifically. See FTC Reply at 2–3 & n.3 (citing, e.g., In re Zetia (Ezetimibe) Antitrust Litig., 587 F. Supp. 3d 356, 360–66 (E.D. Va. 2022), and Remington Prod., Inc. v. N. Am. Philips Corp., 717 F. Supp. 36, 42–44 (D. Conn. 1989), rev'd on reconsideration, 755 F. Supp. 52 (D. Conn. 1991)). The FTC lastly contends that granting partial summary judgment as requested would appreciably streamline the trial by "significantly narrow[ing] the scope of fact and expert witness testimony, decreas[ing]

Federal Trade Commission v. Surescripts, LLC, --- F.Supp.3d ---- (2023)

the number of exhibits introduced, and otherwise significantly streamlin[ing] the evidence." FTC Reply at 4.

 **[16]**  The Court agrees with the FTC. Under the plain text of Rule 56(a), the Court can enter summary judgment as to some, but not all, elements of a claim, as it expressly allows summary judgment on "part of [a] claim." Fed. R. Civ. P. 56(a) (emphasis added). Moreover, the cases Surescripts cites to the contrary are not persuasive—the only case cited from this District, Davis, relies on pre-2010 cases, which were decided before the rule was amended to allow for summary judgment on parts of claims or defenses. And while the Court appreciates Surescripts's argument that partial summary judgment may not streamline the subsequent proceedings as much as the FTC contends, that is not an independent basis to deny the FTC's motion as procedurally improper.

### B. Summary Judgment on Market Definition Is Proper

Surescripts next argues that the FTC's motion for summary judgment on market definition is premature as market definition is such a fact-sensitive inquiry that it must be decided after a full evidentiary hearing or trial rather than on summary judgment. Surescripts Opp'n at 12. In support, it points out that in many cases upon which the FTC relies to support its definition of the relevant market, the court did not decide the question of market definition until after a full evidentiary hearing or trial. Id. at 12–13. Moreover, Surescripts argues that the FTC does not "provide the type of rigorous economic evidence required to prove market definition." Id. at 13.

The FTC disagrees, contending that "[t]here is no such rule." FTC Reply at 5. It then cites cases in which courts have granted summary judgment on market definition. See id. (citing, e.g., United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA, 296 F. Supp. 3d 1142 (N.D. Cal. 2017)); Zetia, 587 F. Supp. 3d 356.

 **[17]**  The Court agrees with the FTC that there is no rule prohibiting the Court from deciding market definition at the summary judgment stage. While market definition is a fact-sensitive inquiry, that does not mean that it cannot be resolved on summary judgment so long as there is no genuine dispute of material fact—most inquiries are "fact sensitive" to some extent. Moreover, as the FTC notes, it is not uncommon for courts to decide market definition at the summary judgment

stage. See, e.g., United Food, 296 F. Supp. 3d at 1176 (granting partial summary judgment on market definition); Zetia, 587 F. Supp. 3d at 366 (same). And from an efficiency standpoint, the Court appreciates that were this case to go to trial, there may be some overlap between the issues of monopoly power and anticompetitive effects. See Surescripts Opp'n at 9–10. But this overlap can be mitigated through pretrial motions and, in any event, is not a persuasive reason to avoid deciding a ripe legal issue. And in light of the mootness issue the parties have raised, the Court's ability to cleave this aspect of the case, which is materially unaffected by whether Surescripts has ceased its loyalty programs, certainly promotes judicial efficiency.

### C. The Proper Time Period for Assessing the Relevant Markets Is Present Day

 **\*15**  The parties also disagree about the proper time period for assessing the relevant markets. The FTC suggests that the Court should measure the cross-elasticity of demand in the present day; thus, the appropriate question in determining if the relevant markets include analog methods is whether consumers would switch back from e-prescribing to analog methods today. See FTC Reply at 9–12. In support, it cites other antitrust cases in which courts have assessed the current state of the market despite the alleged anticompetitive behavior beginning much earlier. See id. at 10 (collecting cases).

Surescripts, however, posits that "the relevant markets must be assessed back to at least 2010—if not further back—to determine whether Surescripts' loyalty provisions allowed it to create or maintain monopoly power in properly defined markets at that time" given that the FTC alleges that the loyalty provisions have been unlawful since at least 2010. Surescripts Opp'n at 15. The correct inquiry then, it argues, "is whether a price increase would have stymied initial switching from analog methods to electronic methods of routing." Id. (emphasis added). [13]

 **[18]**  The Court agrees with the FTC's proposed framework. Many courts have looked at present-day realities to assess the relevant market despite the alleged anticompetitive conduct having begun earlier. In Ohio v. American Express Co., the Supreme Court assessed whether American Express's antisteering provisions violated Section 1 of the Sherman Act. —— U.S. ——, 138 S. Ct. 2274, 2280, 201 L.Ed.2d 678 (2018). Although the antisteering provisions were

implemented in the 1950s, 🚩 id. at 2282, the Court's analysis did not focus on the state of the market in the 1950s but rather on the modern market for credit card transactions, see 🚩 id. at 2285–87. And in 🚩 Epic Games, Inc. v. Apple Inc., 559 F. Supp. 3d 898, 944 (N.D. Cal. 2021), the anticompetitive action challenged began over ten years before the court's decision, 🚩 id. at 944, but when assessing the relevant product market the court "determine[d] where the actual competition lies between these platforms based on the current state of play in the overall market," 🚩 id. at 985 (second emphasis added). Moreover, beyond attempting to distinguish the FTC's authorities, Surescripts offers very little, if any, authority in support of its own proposed framework. Looking at the present-day market also makes sense when considering what appropriate relief the Court could fashion were the FTC to succeed on its claims. Hence, the Court concludes that focusing on the state of the market now to determine the relevant product market is appropriate, and the Court will adopt the FTC's framework.

### D. Analog Methods Are Not Reasonable Substitutes for E-Prescribing

**[19]** On the issue of market definition, the parties' central dispute is whether the relevant markets include both electronic and analog methods of routing and eligibility, or whether those should be treated as separate markets. See FTC Mot. at 9–21; Surescripts Opp'n at 10–22. In opposing the FTC's motion for summary judgment on this issue, Surescripts alleges numerous disputed material facts that they claim preclude the Court from entering summary judgment on market definition. See Surescripts Opp'n at 14–22. Many of these "disputes" are not really disputes at all. But even considering the actual disputes Surescripts raises, the Court concludes that the undisputed facts are such that a reasonable fact finder could not conclude that analog methods are reasonable substitutes for e-prescribing, despite being functionally similar in that they provide the same service. In other words, the evidence on market definition is "so one-sided" in the FTC's favor that it "must prevail as a matter of law." 🚩 Anderson, 477 U.S. at 251–52, 106 S.Ct. 2505.

**\*16** It is undisputed that e-prescribing has many benefits over analog methods, including increased efficiency and accuracy. See FTC SUF ¶¶ 34–41, 60; Surescripts Resp. SUF ¶¶ 34–41, 60. It is also undisputed that e-prescribing provides significant cost-savings to pharmacies and PBMs

over analog methods. FTC SUF ¶¶ 42–47, 60, 65–67; Surescripts Resp. SUF ¶¶ 42–47, 60, 65–67. Surescripts does not genuinely dispute that its own executives, employees, and economic expert have indicated that as providers have adopted e-prescribing, they have not switched back to analog methods and are unlikely to do so. FTC SUF ¶¶ 30–33 (citing testimony of former Surescripts CEO stating that he could not "envision any realistic scenario under which [customers] would go back to paper and fax prescriptions"); Surescripts Resp. SUF ¶¶ 30–33. [14] Surescripts also does not genuinely dispute that federal laws substantially impacted the adoption of e-prescribing and that, as a result, losing access to electronic routing and eligibility would be a "catastrophic failure" for EHRs. FTC SUF ¶¶ 12–18, 20; Surescripts Resp. SUF ¶¶ 12–18, 20. [15] These facts alone show that analog methods, while functionally similar, are less desirable than e-prescribing on every major metric and more expensive, and that Surescripts's own employees and its economic expert believe that customers are unlikely to switch back to analog methods as a result. Hence, the undisputed evidence suggests that e-prescribing and analog methods are not "reasonably interchangeable" in the relevant sense. [16] Cf. 🚩 H & R Block, 833 F. Supp. 2d at 54–60 (holding that assisted tax preparation and manual tax preparation were not in the relevant product market of digital do-it-yourself tax preparation products even though all three products provided the same end service of tax preparation and were in "some degree" of competition); 🚩 Staples, 970 F. Supp. at 1074–81 (excluding consumable office supplies sold outside office supply superstores from the relevant market even though the "products in question are undeniably the same no matter who sells them").

Surescripts mainly objects to these undisputed facts by claiming they are not supported by sufficient and/or adequate evidence. Surescripts claims the FTC's cited evidence is "not supported by any actual relevant testimony or documents by customers." Surescripts Opp'n at 17 (emphasis added). But this argument would go to the relative weight of the FTC's evidence against any conflicting evidence Surescripts may raise at trial—it is inapposite on summary judgment here, as Surescripts does not provide contradictory evidence in the record or otherwise create a genuine dispute sufficient to defeat summary judgment. Surescripts thus does not point to "sufficient admissible evidence for a reasonable trier of fact to find for the non-movant." Etokie, 202 F. Supp. 3d at 146 (quoting 🚩 Anderson, 477 U.S. at 248, 106 S.Ct. 2505).

In the eligibility market specifically, Surescripts also attempts to raise the existence of two "potential ... substitutes" for electronic eligibility to broaden the relevant market: electronic prior authorization ("EPA") and real time prescription benefits ("RTPB"), which they claim are "newer processes that compete with eligibility," with the potential to "displace eligibility altogether." Surescripts Opp'n at 21. It argues that "as these newer methods improve and gain traction, standard eligibility transactions may provide less relative value and decline in popularity." Id. But Surescripts admits that the two potential substitutes they cite "provide[ ] a different service than eligibility." FTC SUF ¶¶ 79, 81; Surescripts Resp. SUF ¶¶ 79, 81. And, in any event, Surescripts only posits that these substitutes are "potential" and "may" compete with eligibility in the future, which is irrelevant to the issue of whether there have been competitors to Surescripts in the eligibility market up to this point. See Surescripts Opp'n at 21.

**\*17** These undisputed facts alone show that the relevant markets should not include analog methods because there is little to no cross-elasticity between the products. There is no evidence that customers would revert to analog methods to substitute for e-prescribing through electronic routing and eligibility if faced with substantial price increases. Simply put: a fact finder could not reasonably conclude that analog methods and e-prescribing are reasonably interchangeable based on the facts in the record.

A consideration of the 🚩 Brown Shoe indicia does not alter the Court's conclusion. While the Brown Shoe factors are by no means dispositive, see 🚩 Staples, 970 F. Supp. at 1075 ("Since the Court described these factors as 'practical indicia' rather than requirements, subsequent cases have found that submarkets can exist even if only some of these factors are present."), the undisputed facts related to the factors further support the FTC's definition of the relevant markets. And even if the Court were to resolve the few factual disputes in Surescripts's favor, the 🚩 Brown Shoe factors taken together would still support the FTC's definition of the markets, rendering any such disputes immaterial.

**[20]**   **[21]** One 🚩 Brown Shoe factor considers whether products have "distinct prices." 🚩 370 U.S. at 325, 82 S.Ct. 1502. Surescripts does not dispute that the pricing structure of electronic routing and eligibility is distinct from that of

analog methods of prescribing. FTC SUF ¶¶ 50–52, 71–73; Surescripts Resp. SUF ¶¶ 50–52, 71–73. Surescripts's only argument on this point is that "free products can be substitutes for for-charge products." Surescripts Opp'n at 18. But that argument misses the point: the relevant inquiry when discussing 🚩 Brown Shoe factors is not whether the products "can be" substitutes—the presence or absence of certain factors is meant to measure whether the products are substitutes. When the pricing structure of two products is different—as Surescripts concedes is the case for electronic routing and eligibility versus their analog counterparts—that is one indication that those products are not substitutes and thus should constitute different product markets. Hence, the undisputed facts as to this 🚩 Brown Shoe factor support the FTC's market definitions.

**[22]** Another 🚩 Brown Shoe consideration is consumer "sensitivity to price changes." 🚩 370 U.S. at 325, 82 S.Ct. 1502. Surescripts's only argument on this factor is that the FTC "presents no analysis of 'sensitivity to price changes.' " Surescripts Opp'n at 18. But it does not dispute that e-prescribing carries significant cost savings over analog methods. FTC SUF ¶¶ 42–47, 60, 65–67; Surescripts Resp. SUF ¶¶ 42–47, 60, 65–67. The FTC argues that "[b]ecause routing prices are small in comparison to these savings, pharmacies would not stop routing in favor of analog prescribing even in the face of substantial price increases" and that "EHRs are likewise unlikely to forego routing due to small price changes: EHRs that failed to provide routing services would not have been attractive alternatives to prescribers seeking to obtain incentives and avoid penalties under MIPPA and HITECH." FTC Mot. at 17.

As for eligibility, the FTC argues that there would be little sensitivity to price changes because "EHRs regard eligibility as a must-have service," FTC Mot. at 19, and there are "no reasonable alternatives to eligibility for obtaining patient eligibility information," id. at 20. Ultimately, Surescripts may quibble with the conclusion drawn from the FTC's cited evidence, but Surescripts fails to provide any counterevidence on this point tending to show that customers would switch back to analog methods in the event of a price increase. Surescripts's qualm that the FTC does not provide economic analysis of price sensitivity goes to the sufficiency or weight of the FTC's evidence on this one factor but does not create a genuine factual dispute as to the application of it, and thus this factor counsels in favor of the FTC's view of market definition.

**\*18**  **[23]**  Courts also consider whether the products have "peculiar characteristics" as part of the 🚩 Brown Shoe assessment. 🚩 370 U.S. at 325, 82 S.Ct. 1502. As discussed above, Surescripts does not dispute that e-prescribing has several benefits over its analog counterparts: e-routing is safer for patients and more efficient, and eligibility is a "measurable improvement" on analog methods. FTC SUF ¶¶ 34–41; Surescripts Resp. SUF ¶¶ 34–41. Surescripts's only argument on this point is that "the FTC does not provide any evidence showing that efficiency is the key characteristic driving switching decisions." Surescripts Opp'n at 19. But that is a strawman argument, as it is not necessary for the FTC to show that any 🚩 Brown Shoe factor is the "driving characteristic" guiding consumer behavior. Hence, this factor too supports the FTC's definition of the relevant markets.

**[24]**  Another 🚩 Brown Shoe factor is whether the products have different vendors. 🚩 370 U.S. at 325, 82 S.Ct. 1502. The FTC posits that routing has unique vendors—Surescripts and Emdeon—that do not also deal in analog methods, and that Surescripts does not offer analog methods of receiving eligibility information nor do other vendors. FTC Mot. at 17–18, 20. Surescripts disputes this by pointing to evidence that Emdeon offers a fax method for routing when [Redacted] Surescripts Opp'n at 19. But even if one company uses a fax as a back-up in the even that e-routing fails, that does not establish that the company is also a vendor of analog methods more generally, so this factor also supports the FTC's market definitions.

**[25]**  Courts also consider whether the products have distinct "production facilities." 🚩 Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502. Surescripts does not dispute that it and other e-prescribing companies use distinct facilities: e-prescribing involves electronic connections between specific EHRs and pharmacies/PTVs, whereas paper, phone, or fax prescriptions are transmitted by other means, and non-electronic eligibility information is transmitted by phone calls or paper books/pamphlets. See FTC SUF ¶¶ 7–8, 11; Surescripts Resp. SUF ¶¶ 7–8, 11; FTC Mot. at 18, 20–21. This factor also supports the FTC's market definitions.

**[26]**  Another 🚩 Brown Shoe consideration is whether the products have "distinct customers." 🚩 370 U.S. at 325, 82 S.Ct. 1502. Surescripts does not dispute that e-prescribing

engages EHRs and PTVs, which are not involved in analog prescription delivery or the facilitation of eligibility information via analog methods absent rare exceptions. FTC SUF ¶¶ 53–56; Surescripts Resp. SUF ¶¶ 53–56; FTC's Reply SUF ¶¶ 54, 56. Surescripts argues instead that the end customer—the patient—is the same in both e-prescribing and analog transactions despite the "middle men" being different. See Surescripts Opp'n at 19–20; FTC Reply at 14. First, the Court disagrees that end patients are "customers" of e-prescribing since they do not interface with e-prescribing networks at all during transactions and may not even know of the network's existence or involvement in the transaction. But, even taking Surescripts's proposition as true, the fact that some categories of customers may be shared between analog and electronic services makes this factor at best neutral for Surescripts and does not undermine the FTC's characterization of the relevant market as excluding analog methods.

**[27]**  **[28]**  The final 🚩 Brown Shoe factor is "industry or public recognition of the submarket as a separate economic entity." 🚩 370 U.S. at 325, 82 S.Ct. 1502. Surescripts does not dispute that it has routinely discussed electronic routing and eligibility markets without reference to analog methods in its ordinary-course business documents, FTC SUF ¶¶ 86, 88–90, 92, 94; Surescripts Resp. SUF ¶¶ 86, 88–90, 92, 94, as has its main competitor, Emdeon, FTC SUF ¶ 93; Surescripts Resp. SUF ¶ 93. "When determining the relevant product market, courts often pay close attention to the defendant['s] ordinary course of business documents." 🚩 H & R Block, 833 F. Supp. 2d at 52.

**\*19**  Regarding routing, Surescripts argues that the internal documents the FTC cites are "cherry pick[ed]" and points to an annual status report it published that "clearly compared electronic routing to analog methods." Surescripts Opp'n at 18 (citing Ex. 15–27 attached to its opposition, docketed at ECF Nos. 109-17–29). But Surescripts does not explain how those reports "clearly compare[ ]" the two methods, and the Court's independent review of them does not illuminate any direct comparison. Instead, as the FTC notes, "these reports merely confirm that routing eventually replaced analog methods," FTC Reply at 12, as the reports show the growth of e-prescribing. As for eligibility, Surescripts raises that there are ordinary-course business documents that group eligibility with the other products Surescripts has argued were competitors (EPAs and RTBPS). Surescripts Opp'n at 22. Even if there is a factual dispute as to the application of this

factor, one factor is not dispositive, *see* 🚩 Staples, 970 F. Supp. at 1075, and all the 🚩 Brown Shoe factors viewed in totality support the FTC's definition of the relevant markets. Thus, there is no genuine dispute of material fact raised by the 🚩 Brown Shoe factors that precludes summary judgment for the FTC on market definition.

\* \* \*

All the evidence in the record tends to support that analog methods are not legitimate substitutes for electronic routing and eligibility and that electronic routing and eligibility are thus distinct markets. Surescripts's attempt to manufacture genuine disputes mainly takes issue with the sufficiency or weight of specific pieces of the FTC's evidence rather than marshalling counterevidence in the record. On the evidence in the record, a reasonable fact finder could not conclude that the relevant market includes analog methods. Thus, the Court will grant the FTC's motion for partial summary judgment as to the relevant markets and conclude that the relevant markets are electronic routing and electronic eligibility, which do not include analog methods of routing and eligibility.

## II. Monopoly Power

**[29]** **[30]** **[31]** The next step in a 🚩 Section 2 analysis is assessing whether the defendant had monopoly power in the relevant market. "Monopoly power is the power to control prices or exclude competition." 🚩 United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). "More precisely, a firm is a monopolist if it can profitably raise prices substantially above the competitive level." 🚩⚠ Microsoft, 253 F.3d at 51. "While merely possessing monopoly power is not itself an antitrust violation, it is a necessary element of a monopolization charge." 🚩⚠ Id. (citations omitted). "Because such direct proof [of profitably raising prices] is only rarely available, courts more typically examine market structure in search of circumstantial evidence of monopoly power." 🚩⚠ Id. "Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." 🚩⚠ Id.; *see also* Fed. Trade Comm'n v. Facebook, Inc., 581 F. Supp. 3d 34, 43 (D.D.C. 2022) ("[A] plaintiff proceeding by the indirect method must also show that the firm's dominant share

of the relevant market is protected by 'barriers to entry' into the market.").

**[32]** **[33]** **[34]** At least one judge in this District has found that as low as a 60% share in the relevant market establishes dominance. See Facebook, 581 F. Supp. 3d at 48–49. " 'Entry barriers' are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level." 🚩⚠ Microsoft, 253 F.3d at 51. "Any market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on the pricing behavior of the dominant firm should be considered a barrier to entry, regardless of who is responsible for the existence of that condition." S. Pac. Comm'ns Co. v. Am. Tel. & Tel. Co., 740 F.2d 980, 1001 (D.C. Cir. 1984). "Plaintiffs must not only show that barriers to entry protect the properly defined ... market, but that those barriers are 'significant.' " 🚩⚠ Microsoft, 253 F.3d at 82.

The FTC asks the Court to enter summary judgment on Surescripts's possession of monopoly power in the relevant markets. FTC Mot. at 8–9. Specifically, the FTC argues that there is no genuine dispute of material fact that Surescripts "has possessed dominant shares in the routing and eligibility markets that have been protected by barriers to entry" since 2010. Id. at 21. Surescripts responds that the entry of summary judgment on monopoly power is precluded because "[it] has never demonstrated any market power to raise prices or reduce output" and thus this direct evidence "defeats" the FTC's claim of monopoly power. Surescripts Opp'n at 22–23. Moreover, Surescripts posits that even if the FTC's indirect evidence was sufficient to prove monopoly power, there are genuine disputes of material fact as to that evidence that preclude summary judgment. Id. at 25.

**\*20** For the reasons explained below, the Court agrees with the FTC and will grant summary judgment in its favor, finding that Surescripts possesses monopoly power in the relevant market.

### A. Surescripts Possesses a Dominant Share in the Relevant Markets

**[35]** Surescripts has held at least a 95% share of both the electronic routing and eligibility markets since 2010. FTC SUF ¶¶ 103–04, 116–17 (noting that Surescripts recognized in one of its internal documents from 2011 that it had "no real competitors" in either routing or eligibility when describing

its 95%+ share in each market). This is surely dominance by any definition or metric. [17] And Surescripts does not dispute that—its only response is that "the FTC has not proven, and cannot prove without a full trial, that any such markets exist as the FTC wants to define them," and thus the FTC cannot argue that Surescripts had a certain market share of an undefined market. Surescripts Opp'n at 25; Surescripts Resp. SUF ¶¶ 103–04, 116–17. But this argument necessarily fails because, as discussed above, the Court agrees with the FTC's definitions of the relevant markets. There is thus no genuine dispute that Surescripts has held a dominant share of the electronic routing and eligibility markets since at least 2010.

### B. There Are Barriers to Entry in the Relevant Markets

**[36]**   It is not enough to show that Surescripts held a dominant position in the market. Because the FTC only relies on indirect proof of monopoly power, FTC Mot. at 8–9, it must also show that Surescripts was able to protect that dominant position with barriers to entry in the relevant markets. Microsoft, 253 F.3d at 82.

**[37]**   The FTC argues that barriers to entry exist in the relevant markets because entry into routing and eligibility is difficult due to the "chicken-and-egg" problem caused by the indirect network effects of the electronic routing and eligibility markets—that "users on each side of a routing or eligibility network will not invest in the network until they are confident that there will be enough users on the other side." FTC Mot. at 22–23; see also FTC SUF ¶¶ 128–29. The D.C. Circuit recognized this "chicken-and-egg" problem as a legitimate barrier to entry in Microsoft. See 253 F.3d at 55. As the court explained it, the barrier to entry in that case

> stem[med] from two characteristics of the software market: (1) most consumers prefer operating systems for which a large number of applications have already been written; and (2) most developers prefer to write for operating systems that already have a substantial consumer base. This "chicken-and-egg" situation ensures that applications will continue

to be written for the already dominant Windows, which in turn ensures that consumers will continue to prefer it over other operating systems.

**\*21**   Id. (citations omitted). The court found that barrier "g[ave] Microsoft power to stave off even superior new rivals." Id. at 56. So too here: the chicken-and-egg problem caused by the two-sided markets with indirect network effects creates a "structural barrier that protects [Surescripts's] future position." See id. at 55.

The FTC also points to the many regulatory requirements that must be met to enter these markets, as well as the fact that any would-be entrant would have to confront Surescripts's strong first-mover advantage, resulting in the need for substantial financial investment in order to successfully enter the market. FTC Mot. at 23; see also FTC SUF ¶¶ 130–34; Microsoft, 253 F.3d at 51 (recognizing regulatory requirements as a legitimate barrier to entry).

Surescripts does not dispute that entry into the markets is "not easy" "for a lot of reasons." FTC SUF ¶ 128; Surescripts Resp. SUF ¶ 128. Surescripts also does not dispute that (1) entrants to routing and eligibility must solve a chicken-and-egg problem given the two-sided nature of the markets "where users on each side of a network will not invest in the network until they are confident that there will be enough users on the other side," FTC SUF ¶ 129; Surescripts Resp. SUF ¶ 129; (2) routing and eligibility entrants must comply with federal laws and regulations as well as industry standards, FTC SUF ¶¶ 130–31; Surescripts Resp. SUF ¶¶ 130–31; (3) Surescripts has a first-mover advantage in routing and eligibility, FTC SUF ¶ 132; Surescripts Resp. SUF ¶ 132; and (4) entry into routing and eligibility requires substantial investment to the order of tens of millions of dollars and may take several years, FTC SUF ¶¶ 133–34; Surescripts Resp. SUF ¶¶ 133–34 (only disputing the materiality of the facts, not the facts themselves).

But Surescripts does contest, as a matter of law, that these facts, even if true, are sufficient to constitute a barrier to entry. See Surescripts Opp'n at 28. The primary case on which Surescripts relies is Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421 (9th Cir. 1995), an out-of-circuit case standing for the proposition that "[e]ntry barriers are

additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants," 🚩 id. at 1429 (internal quotation marks omitted), which is a much narrower definition of barriers to entry than what the FTC proposes. However, there is in-circuit precedent dictating a different standard. The D.C. Circuit defines a barrier to entry as "[a]ny market condition that makes entry more costly or time-consuming and thus reduces the effectiveness of potential competition as a constraint on ... the dominant firm." S. Pac. Commc'ns, 740 F.2d at 1001. The D.C. Circuit re-endorsed that definition in 🚩⚠️ Microsoft, adding that " '[e]ntry barriers' are factors (such as certain regulatory requirements) that prevent new rivals from timely responding to an increase in price above the competitive level." 🚩⚠️ 253 F.3d at 51.

Surescripts also contends that the FTC raises only theoretical barriers to entry rather than evidence supporting the existence of barriers to entry in fact, Surescripts Opp'n at 26–30, and that Emdeon's ability to enter the market suggests that there are not, in fact, barriers to entry, see id. at 28–30. Setting aside that the FTC disputes that Emdeon entered the markets successfully, see FTC Reply at 23, the standard for barriers to entry does not require the FTC to show that no competitors were able to successfully enter the market. In the very case Surescripts cites to argue that the standard for barriers to entry is higher than what the D.C. Circuit endorses, the court noted that "[t]he fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers." 🚩 Rebel Oil, 51 F.3d at 1440. This makes intuitive sense—the entry of a competitor does not mean the dominant firm did not have a monopoly—and here, it is undisputed that Emdeon could not capture [Redacted] of the relevant markets, see FTC SUF ¶¶ 103–04, 116–17; Surescripts Resp. SUF ¶¶ 103–04, 116–17. In other words, the ability of one competitor to capture [Redacted] of the market does not undermine Surescripts's durable monopoly power protected and perpetuated by barriers to entry.

*22 Thus, the undisputed facts—that there were several significant challenges faced by would-be entrants, which aided Surescripts in maintaining its dominance—establish that the relevant markets feature significant barriers to entry.

### C. Lower Prices and Increased Output Does Not Undermine Indirect Evidence

[38] Notwithstanding the FTC's indirect evidence of monopoly power, Surescripts argues more broadly that the direct evidence of falling prices and increased output [18] during the relevant period in the electronic routing and eligibility markets "disproves" the FTC's indirect evidence. Surescripts Opp'n at 23–25. The FTC does not dispute that prices have fallen and output has risen but rather argues that this reality "is not inconsistent with possession of monopoly power." FTC Reply at 17.

[39] [40] Courts have held that the existence of so-called "calling cards" of a competitive market, such as falling prices and increased output, do not by themselves negate the existence of monopoly power as a matter of law. In 🚩⚠️ Microsoft, the court held that

> [e]ven if we were to require direct proof, moreover, Microsoft's behavior may well be sufficient to show the existence of monopoly power. Certainly, none of the conduct Microsoft points to—its investment in R&D and the relatively low price of Windows—is inconsistent with the possession of such power .... [I]f monopoly power has been acquired or maintained through improper means, the fact that the power has not been used to extract a monopoly price provides no succor to the monopolist.

🚩⚠️ 253 F.3d at 57 (cleaned up). And the Supreme Court has noted that "the material consideration in determining whether a monopoly exists is not that prices are raised and that competition actually is excluded but that power exists to raise prices or to exclude competition when it is desired to do so." 🚩 Am. Tobacco Co. v. United States, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946) (emphasis added).

Surescripts argues that this incongruous direct and indirect evidence creates an issue of fact precluding summary judgment. Surescripts Opp'n at 23. Not so. First, this is not an issue of fact—the FTC does not disagree with the facts Surescripts relies on. FTC Reply at 17. Instead, it is a disagreement over the law: does undisputed evidence of falling prices undermine other evidence of monopoly power? Cases such as 🚩⚠️ Microsoft clearly answer that question

—low prices are not "inconsistent" with monopoly power." 253 F.3d at 57. Moreover, Surescripts only points to the fact that prices fell and output increased over the relevant period—it does not attempt to show that prices fell below or output increased above the competitive level. The FTC argues, and the Court agrees, that without an attempt to show that prices were lower and output higher than the competitive level, the "direct evidence" Surescripts offers is of little value. Thus, that evidence is not a sufficient basis to deny summary judgment.

* * *

**\*23** The undisputed facts are sufficient to grant summary judgment in the FTC's favor on monopoly power. The Court is unaware of, and Surescripts was unable to point the Court to, any antitrust case in which a defendant with a 95% share of the relevant market did not hold monopoly power. The best Surescripts could offer was Tops Markets, Inc. v. Quality Markets, Inc., 142 F.3d 90 (2d Cir. 1998), where the defendant held 79% of the market but the Court found it was not a monopolist "[d]espite its high market share" because "no other evidence—such as barriers to entry, the elasticity of demand, or the nature of defendant's conduct —supports the conclusion that [it] can control prices or exclude competition." Id. at 99. But that "other evidence" exists here. At bottom, Surescripts holds a supershare of the electronic routing and eligibility markets—the likes of which is rarely ever seen in antitrust cases—and there are inherent and significant obstacles to entering those markets due to their two-sided nature. Accordingly, the Court will grant the FTC's motion for partial summary judgment on element one of its Section 2 claims and hold that Surescripts held monopoly power in the electronic routing and eligibility markets since at least 2010.

### III. Anticompetitive Effects

**[41] [42] [43] [44]** Once it is established that a defendant holds monopoly power, § 2 liability attaches "only when it ... engag[es] in exclusionary conduct .... to maintain its monopoly." Microsoft, 253 F.3d at 58. Courts use a burden-shifting framework to answer that question. See id. at 58–60. The first question in this analysis is whether the defendant "engag[ed] in exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'

" Id. 58 (quoting Grinnell, 384 U.S. at 571, 86 S.Ct. 1698); see also Microsoft, 87 F. Supp. 2d at 37 ("The threshold question in this analysis is whether the defendant's conduct is 'exclusionary'—that is, whether it has restricted significantly, or threatens to restrict significantly, the ability of other firms to compete in the relevant market on the merits of what they offer customers."). "[T]o be condemned as exclusionary, a monopolist's act must have an 'anticompetitive effect.' " Microsoft, 253 F.3d at 58–59. "[H]arm to one or more competitors will not suffice"—plaintiff must show harm to the "competitive process and thereby harm [to] consumers." Id. at 58. "[I]f a plaintiff successfully establishes a prima facie case under § 2 by demonstrating anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct." Id. at 59. "[I]f the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." Id.

Surescripts moves for complete summary judgment on this element, arguing that the FTC has not presented any evidence that its loyalty pricing contracts for its routing or eligibility customers foreclosed competitors from a substantial portion of or caused anticompetitive effects in the electronic routing and eligibility markets. That would mean that summary judgment should be granted in its favor on both Counts I and II, resolving the entire case in Surescripts's favor. See Surescripts Mot. at 14–15. The FTC opposes the motion, arguing that Surescripts's loyalty contracts "leverage[ ] its longstanding dominant position to exploit structural features of the routing and eligibility markets," FTC Opp'n at 1, and that there are genuine disputes of fact on this issue that preclude the entry of summary judgment for Surescripts, id. at 2.

As discussed at the outset of this Opinion, the Court will reserve judgment on Surescripts's summary judgment motion pending further developments on the mootness issue given that the motion as currently written centers on the loyalty pricing program—which is the primary alleged "exclusionary conduct" producing "anticompetitive effects"—and Surescripts represents that it has since completely eliminated that program (and that if it has not yet completed that process, it will be completed soon). The Court does note, however, that as the briefing currently

stands, there are several material factual disputes that may have prevented summary judgment for Surescripts on anticompetitive effects.[19] Before Surescripts raised the possibility of mootness, success on its motion was an uphill battle. And although its loyalty programs may be defunct now—a development which will certainly alter the focus of Surescripts's summary judgment motion—the Court is unaware of any rule that the FTC must show that the challenged conduct is still ongoing to prove anticompetitive effects in the market and for liability to accordingly attach. The Court encourages the parties to explore these issues further and thus will refer them to mediation in an attempt to resolve the case or at least narrow the live issues.

**Conclusion**

**\*24**  For the foregoing reasons, the Court determines that the case is not moot at this juncture and will grant the FTC's motion for partial summary judgment and reserve decision on Surescripts's motion for summary judgment. Accordingly, the only remaining issue in this case is whether Surescripts's loyalty pricing or other conduct has caused anticompetitive effects in the electronic routing and electronic eligibility markets. The Court will refer the parties to mediation at this juncture. A separate Order accompanying this Memorandum Opinion will issue on this date.

**All Citations**

--- F.Supp.3d ----, 2023 WL 2707866

**Footnotes**

1  Surescripts's statement of undisputed facts is appended to its motion for summary judgment in the same document. References to the statement of undisputed facts will be denoted by the corresponding paragraph within this section of the document, which spans pages 50 through 69 of the PDF.

2  The FTC filed this statement of material facts presenting a dispute for trial in addition to responding to Surescripts's statement of facts. Surescripts argues that the Court should not consider this filing because "the Local Rules are clear that a litigant responding to a statement of facts accompanying a dispositive motion is only afforded a single statement in which to set out its areas of disagreement." Def. Surescripts' Resp. to FTC SOMF [ECF No. 119-1] ("Surescripts Resp. to FTC SOMF") at 1. 🚩Local Civil Rule 7(h) requires that an opposition to a motion for summary judgment "be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement." In support of its argument, Surescripts cites cases in which courts found that merely filing a separate statement of facts that does not engage with the movant's statement of facts is not sufficient to meet 🚩Local Civil Rule 7(h)'s requirement. See id. at 1–2. But that is not the case here. The FTC both responded to Surescripts's statement of facts and provided an additional, if unnecessary, statement of material facts in dispute. Accordingly, the Court will consider both submissions in resolving these motions.

   Further, although the FTC styles the submission as a statement of material facts "which preclude summary judgment," FTC SOMF at 1, upon review, there are several facts therein that are not in dispute. The Court thus references certain aspects of this statement of material facts, and Surescripts's response, in this Opinion's factual section to establish facts not in dispute where there is a gap in the parties' statements of undisputed facts.

3    Surescripts's response to the FTC's statement of material facts does not number its paragraphs but does label each paragraph with the corresponding number of the paragraph in the FTC's statement of material facts to which it is responding. The Court uses that numbering system throughout this Opinion.

4    Although there is comprehensive data on the volume of non-electronic routing transactions, no such data exists for non-electronic eligibility transactions. FTC SUF ¶ 28. As a result, "quantifying eligibility adoption is 'somewhat more difficult than routing.' " Id.

5    Many of the assertions in the FTC's statement of material facts in dispute rely on the testimony of Dr. Evans, the FTC's economic expert. Surescripts objects to many of those facts because "Dr. Evans's testimony is itself insufficient to create a genuine dispute of fact." See, e.g., Surescripts Resp. to FTC SOMF ¶ 11. In support, Surescripts cites Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). But that case assessed a judgment notwithstanding the verdict after the jury returned a verdict in favor of one party. See id. at 218, 113 S.Ct. 2578. There, the Supreme Court upheld a district court's decision to overturn a jury's verdict because the expert's opinion was "not supported by sufficient facts to validate it in the eyes of the law." Id. at 242–43, 113 S.Ct. 2578. Beyond making the blanket objection that "Dr. Evans's testimony is itself insufficient to create a genuine dispute of fact," Surescripts has not explained why that is the case as to each specific objection. Moreover, the standard at summary judgment is lower than that for a judgment notwithstanding the verdict—as discussed further below, at the summary judgment stage, "[c]ourts must avoid making 'credibility determinations or weigh[ing] the evidence' " and should accept the non-movant's evidence as true and make all justifiable inferences in its favor. Perry-Anderson v. Howard Univ. Hosp., 192 F. Supp. 3d 136, 143 (D.D.C. 2016) (second alteration in original) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Thus, the Court will not consider Surescripts's objections on this ground as a basis to find that a fact is not genuinely in dispute.

6    The parties dispute how large the price drop was and whether it continued from 2013 to 2020. See Surescripts SUF ¶ 36; FTC Resp. SUF ¶ 36.

7    Emdeon is now known as Change Healthcare following a re-branding.

8    As discussed supra p. ——— n.4, determining the denominator for non-electronic eligibility transactions is very difficult, and the measures used to reach these statistics are imperfect ones. See FTC SUF ¶ 28. Surescripts's economic expert "provides two proxies" for Surescripts's share of all eligibility transactions (both electronic and non-electronic): "(1) the percentage of routing transactions accompanied by an eligibility transaction and (2) the percentage of prescriptions delivered by any method accompanied by an eligibility transaction." Id. at ¶ 125. And, according to Surescripts's expert, "eligibility transactions have accompanied at least 61.6% of all prescriptions delivered by analog or electronic methods since 2014," meaning Surescripts has had at least a 61.6% share of all eligibility transactions since 2014. Id. ¶ 126. While the Court recognizes the limitations of such a proxy, the parties agree on the metrics used to reach these statistics and the statistics themselves, so the Court will adopt them for the purposes of this Opinion. See id. ¶¶ 28, 125–26; Surescripts Resp. SUF ¶¶ 28, 125–26.

9    In May 2021, the parties stipulated that the FTC can no longer seek equitable monetary relief after the Supreme Court's opinion in AMG Capital Management, LLC v. Federal Trade Commission, ——— U.S. ———, 141 S. Ct. 1341, 209 L.Ed.2d 361 (2021), and the Court approved the stipulation. May 17, 2021 Order [ECF No. 93].

10    Because both parties moved for summary judgment on different issues, these are not "cross" motions for summary judgment in the common sense of the term. Specifically, Surescripts only moves for summary judgment on the second element of each ⚑Section 2 claim, and the FTC only moves for summary judgment on the first element of each ⚑Section 2 claim. But Surescripts moves for complete summary judgment (rather than partial summary judgment, like the FTC) because, if it were successful, both the FTC's claims would fail, and the case would not move forward.

11    To the extent Surescripts's disagrees with the D.C. Circuit's standard for voluntary cessation as articulated in ⚑American Bar Association v. FTC and argues that the Supreme Court has not adopted a test that requires the defendant to show that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," see Surescripts Mootness Reply at 6 n.3 (collecting cases), even under Surescripts's proposed standard, it is unable to show that "there is no reasonable expectation that the alleged violation will recur."

12    Surescripts represents that in 2022 it "sent letters to its EHR partners ... removing all relevant loyalty provisions and replacing any applicable loyalty incentive programs with terms that pay incentives without requiring loyalty." Surescripts Mootness Br. at 4. The new program provides that

>    depending on the historical Routing Transaction volumes associated with EHR vendor, either (i) "Surescripts shall pay to Aggregator a percentage of the applicable Weighted Average Routing Transaction Fee for each Eligible Prescription Routing Transaction," ... and "Surescripts shall pay to Aggregator fifteen percent (15%) of the applicable Weighted Average Eligibility Transaction Fee for each Eligible Prescription Eligibility Transaction;" or (ii) "Surescripts shall pay Aggregator ten percent (10%) of the applicable Weighted Average Routing Transaction Fee for each Eligible Prescription Routing Transaction, plus fifteen percent (15%) of the applicable Weighted Average Eligibility Transaction Fee for each Eligible Prescription Eligibility Transaction."

>    Felder Decl. ¶ 13. While this jargon-heavy description is difficult for the Court to follow without more explanation or briefing on the matter, it seems to the Court that this replacement program heavily incentivizes EHRs to execute all their transactions on Surescripts's network by rewarding EHRs that increase their volume of routing transactions with a correlated increase in payments. For example, if an EHR decreases its volume of routing transactions on Surescripts's network from the previous year by 10% or greater, it receives only 12% of each transaction fee, whereas if it increases its volume on the network from the previous year, its percentage of the fee increases to 30% or 35%, depending on the size of the increase in volume. Without the benefit of more information, common sense dictates that this scheme would have a similar effect on the electronic routing and eligibility markets as the loyalty program in that it could thwart the ability of new competitors to enter the markets.

13    The FTC notes that Surescripts's proposed approach is "legally flawed" but would not change the outcome of the analysis in any event because the appropriate inquiry "is whether Surescripts is currently maintaining, or has at any time maintained, its monopoly power through exclusionary means." FTC Reply at 9–10.

14    Surescripts disagrees that its "economic expert does not dispute that routing and eligibility market participants are unlikely to revert to analog methods," FTC SUF ¶ 30; Surescripts Resp. SUF ¶ 30. But this disagreement is not a genuine one, as Surescripts only points out that its economic expert predicated this opinion on the new e-prescribing technology being competitive, Surescripts Resp. SUF ¶ 30, but does not dispute that e-prescribing technology is competitive. In fact, Surescripts's position seems to be that e-prescribing technology is very competitive.

15    The Court does not find the purported disputes Surescripts raises on this point to be genuine because they do not cite to contradictory record evidence but instead merely create strawman by raising additional nonmaterial facts. See Surescripts Resp. SUF ¶¶ 19, 21–25, 63; FTC's Reply SUF ¶¶ 19, 21–25, 63.

16    Any disputes as to whether analog methods were part of the market in 2010, see Surescripts Opp'n at 14–15, are not material because, as discussed above, the relevant inquiry is interchangeability in the present day.

17    Even under Surescripts's proposed definition of the market, it has held at least 62.4% of both electronic and analog methods of routing, FTC SUF ¶ 122; Surescripts Resp. SUF ¶ 122, and at least 61.6% of all eligibility transactions—both electronic and analog—since 2014, FTC SUF ¶ 126; Surescripts Resp. SUF ¶ 126. And as low as a 60% share in the relevant market may establish dominance. See Facebook, 581 F. Supp. 3d at 48–49.

18    While the Court recognizes that increased output is a sign of competition in many markets, it has doubts about whether that is the case here in the electronic routing and eligibility markets. Typically, output is a function of consumer demand, which is a function of price—in competitive markets, prices are lower, which causes higher demand, which, in turn, causes higher output. But that model does not cleanly map onto the market for prescriptions. Because prescriptions are not "consumer goods" in any ordinary sense, fluctuations in demand are likely due to factors other than lower prices, such as a decline in the health of the patient population, an increase in the availability of prescription drugs, an increase in doctors prescribing medication, or an increase in the population. Hence, the Court has doubts that an increase in output here is as powerful a sign—if a sign at all—of a competitive market in the prescription market as it is in markets for consumer goods.

19    To give a few examples, the parties seem to dispute (1) whether Surescripts's loyalty contracts had an exclusive effect, compare Surescripts SUF ¶¶ 23, 25–27, 32, 38–46, with FTC SOMF ¶¶ 11–16, 36, 42–43, (2) whether Emdeon's failure was due to Surescripts's loyalty contracts, compare Surescripts SUF ¶¶ 62–67, with FTC SOMF ¶¶ 53–57, and (3) whether Surescripts's customers wanted to multihome, compare Surescripts SUF ¶¶ 47–53, 62, with FTC SOMF ¶ 32, and FTC Resp. SUF ¶¶ 47–53.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2646741
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

WALMART INC., Defendant.

No. 22 CV 3372

|

Signed March 27, 2023

**Synopsis**
**Background:** Federal Trade Commission (FTC) filed enforcement action suit against money transfer services provider, claiming violation of FTC Act and Telemarketing Sales Rule (TSR) by allegedly knowingly processing fraudulent money transfers to and from consumers conned by telemarketers, sellers, and con artists, and by failing to implement and maintain effective policies to prevent fraud and money laundering, properly train and oversee employees, warn consumers, or address suspicious transactions. Provider moved to dismiss for failure to state claim.

**Holdings:** The District Court, Manish S. Shah, J., held that:

[1] underlying TSR violation was not plausibly alleged for accessory liability claim;

[2] knowledge was not plausibly alleged for TSR accessory liability claim;

[3] substantial assistance was not plausibly alleged for TSR accessory liability claim;

[4] violation of FTC Act by unfair acts or practices was plausibly alleged;

[5] ongoing or imminent misconduct under FTC Act was plausibly alleged;

[6] FTC Act was not unconstitutionally vague as applied to provider; and

[7] Commissioners of FTC were constitutionally appointed and authorized to bring suit.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (43)

**[1]** **Federal Civil Procedure** 🔑 Fraud, mistake and condition of mind

Under the heightened pleading rule for claims sounding in fraud, plaintiff must describe the who, what, when, where, and how of the fraud.

🔖 Fed. R. Civ. P. 9(b).

**[2]** **Federal Civil Procedure** 🔑 Construction and operation

A consent order can never bind, either explicitly by applying through its terms to the agents of a signatory or through the operation of contracts law, a non-party to the consent order.

**[3]** **Antitrust and Trade Regulation** 🔑 Telecommunications; telemarketing

To state a claim for assisting and facilitating under the Telemarketing Sales Rule (TSR), the Federal Trade Commission (FTC) must allege an underlying violation of the rule by a seller or telemarketer. 16 C.F.R. §§ 310.3(a)(4), 310.3(b).

**[4]** **Antitrust and Trade Regulation** 🔑 Particular cases

Federal Trade Commission's (FTC) allegations of breadth of alleged misconduct by fraudsters using provider's money transfer services did not plausibly allege claim against provider for underlying violation of Telemarketing Sales Rule (TSR) by telemarketer or seller, as would be required to state claim for assisting and facilitating under TSR's accessory liability provision, since FTC alleged that provider knowingly processed fraudulent money transfers

to and from consumers on behalf of criminal fraud rings that perpetrated telemarketing scams, but FTC did not plausibly allege that fraud fit TSR's definitions of seller, telemarketer, and telemarketing and did not allege with particularity details of alleged fraudulent scams.

🗂 Fed. R. Civ. P. 9(b); 16 C.F.R. §§ 310.2(dd), 310.2(ff), 310.2(gg), 310.3(a)(4), 310.3(b).

**[5]** **Antitrust and Trade Regulation** 👉 Telecommunications; telemarketing

**Antitrust and Trade Regulation** 👉 Persons liable

Knowledge required to support an accessory liability claim, under the Telemarketing Sales Rule (TSR), prohibiting giving substantial assistance to a seller or telemarketer when someone knows or consciously avoids knowing about an underlying TSR violation by a telemarketer or seller, can be inferred from a combination of suspicion and indifference to the truth. 16 C.F.R. § 310.3(b).

**[6]** **Antitrust and Trade Regulation** 👉 Particular cases

Federal Trade Commission (FTC) did not plausibly allege that money transfer services provider had knowledge or consciously avoided knowing that subset of its business involved violations of Telemarketing Sales Rule (TSR) by fraudulent telemarketing schemes transferring money to and from consumers, as would be required to state claim against provider for assisting and facilitating violation under TSR's accessory liability provision, since FTC did not allege with particularity that any alleged fraud fell within prohibitions of TSR and only alleged that provider processed tens of millions of money transfers each year about which hundreds of thousands of complaints were filed, but not how many transactions could have raised red flags so that provider would have had reason for suspicion. 16 C.F.R. § 310.3(b).

**[7]** **Antitrust and Trade Regulation** 👉 Persons liable

Under the Telemarketing Sales Rule's (TSR) accessory liability provision, substantial assistance requires more than casual or incidental help to a telemarketer; there must be some link between the third party's actions and the telemarketer's actions, but not necessarily a direct connection. 16 C.F.R. § 310.3(b).

**[8]** **Antitrust and Trade Regulation** 👉 Persons liable

Aiding and abetting principles, as seen in tort and securities case law, are relevant in understanding substantial assistance under the Telemarketing Sales Rule's (TSR) accessory liability provision. 16 C.F.R. § 310.3(b).

**[9]** **Antitrust and Trade Regulation** 👉 Persons liable

Processing routine transactions is not "substantial assistance," within the meaning of Telemarketing Sales Rule (TSR), accessory liability provision, which prohibits giving substantial assistance to a seller or telemarketer when someone knows or consciously avoids knowing about an underlying TSR violation. 16 C.F.R. § 310.3(b).

**[10]** **Antitrust and Trade Regulation** 👉 Persons liable

If a defendant knows enough about the underlying fraud, an ordinary transaction becomes extraordinary, and processing it can constitute "substantial assistance," within the meaning of Telemarketing Sales Rule's (TSR) accessory liability provision, which prohibits giving substantial assistance to a seller or telemarketer when someone knows or consciously avoids knowing about an underlying TSR violation. 16 C.F.R. § 310.3(b).

**[11]     Antitrust and Trade Regulation** 🔑 **Particular cases**

Federal Trade Commission (FTC) failed to plausibly allege that money transfer services provider gave substantial assistance to telemarketers in violating Telemarketing Sales Rule (TSR) by fraudulent telemarketing schemes transferring money to and from consumers, as would be required to state claim against provider for assisting and facilitating violation under TSR's accessory liability provision, since FTC's allegations were not sufficiently particularized to connect provider's general awareness of red flags and fraud with its specific knowledge about vast majority of money transfers, such that processing those transfers became something other than merely routine. 🚩 **Fed. R. Civ. P. 9(b); 16 C.F.R. § 310.3(b).**

**[12]     Action** 🔑 **Statutory rights of action**

**Antitrust and Trade Regulation** 🔑 **Private entities or individuals**

There is no private right of action under Federal Trade Commission Act's unfair acts or practices provision. Federal Trade Commission Act § 5, 🚩 **15 U.S.C.A. § 45(a)(1).**

**[13]     Antitrust and Trade Regulation** 🔑 **Powers, functions, jurisdiction, and authority**

After the Federal Trade Commission (FTC) has brought suit in federal court, it is the court, not the agency, that decides whether a practice is unfair in violation of the FTC Act; but an unfair practice only arrives in federal court if the agency brings suit. Federal Trade Commission Act § 5, 🚩 **15 U.S.C.A. § 45(a)(1).**

**[14]     Antitrust and Trade Regulation** 🔑 **Powers, functions, jurisdiction, and authority**

Given the Federal Trade Commission's (FTC) unique power to enforce the FTC Act's unfair acts or practices provision, Congress did not authorize the FTC to declare an act unfair

under the later-codified flexible cost-benefit approach that was not also unfair under the FTC Act's earlier provision itself. Federal Trade Commission Act § 5, 🚩 **15 U.S.C.A. §§ 45(a)(1),** 🚩 **45(n).**

1 Case that cites this headnote

**[15]     Antitrust and Trade Regulation** 🔑 **In general; unfairness**

Public policy considerations can be relevant to an unfairness finding, but offending public policy is not necessary to violate Federal Trade Commission Act's unfair acts or practices provision. Federal Trade Commission Act § 5, 🚩 **15 U.S.C.A. §§ 45(a)(1),** 🚩 **45(n).**

**[16]     Antitrust and Trade Regulation** 🔑 **In general; unfairness**

Under the Federal Trade Commission Act's unfair acts or practices provision, limiting public policy to a relevant, but not sole or primary ground for an unfairness determination does not leave defendants or courts at sea in uncharted waters; unfairness tied to substantial consumer injury is a knowable, judicially administrable concept. Federal Trade Commission Act § 5, 🚩 **15 U.S.C.A. §§ 45(a)(1),** 🚩 **45(n).**

**[17]     Statutes** 🔑 **Defined terms; definitional provisions**

Congress may define terms outside their usual meanings in statutes.

**[18]     Antitrust and Trade Regulation** 🔑 **In general; unfairness**

Under the Federal Trade Commission Act, an act or practice is "unfair" when it (1) causes or is likely to cause, (2) substantial injury to consumers, (3) which is not reasonably avoidable by consumers themselves, and (4) not outweighed by countervailing benefits to consumers or to competition. Federal Trade

Commission Act § 5, 🏳15 U.S.C.A. §§ 45(a)(1), 🏳45(n).

1 Case that cites this headnote

**[19]** **Antitrust and Trade Regulation** 🔑 Source of prohibition or obligation; lawfulness

**Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

Under the Federal Trade Commission Act's unfair acts or practices provision, public policy can inform the kind or degree of injury at issue, namely, an expression of the types of harms or burdens that ought not to be borne by consumers, or public policy can express some of the costs or benefits of an act or practice; but the Act's focus remains on whether a practice causes substantial injury to consumers. Federal Trade Commission Act § 5, 🏳15 U.S.C.A. §§ 45(a)(1), 🏳45(n).

**[20]** **Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

If consumers had a free and informed choice in the matter, their injury is reasonably avoidable, and thus does not violate the Federal Trade Commission Act's unfair acts or practices provision. Federal Trade Commission Act § 5, 🏳15 U.S.C.A. §§ 45(a)(1), 🏳45(n).

**[21]** **Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

Consumers may act to avoid injury before it occurs, and thus, the injury does not violate the Federal Trade Commission Act's unfair acts or practices provision, if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end. Federal Trade Commission Act § 5, 🏳15 U.S.C.A. §§ 45(a)(1), 🏳45(n).

**[22]** **Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

The requirement that a substantial injury not be reasonably avoidable in order to constitute a violation of the Federal Trade Commission Act's unfair acts or practices provision preserves the default rule that consumer choice governs the market; but when someone unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision-making, an injury is not reasonably avoidable. Federal Trade Commission Act § 5, 🏳15 U.S.C.A. §§ 45(a)(1), 🏳45(n).

**[23]** **Antitrust and Trade Regulation** 🔑 Particular cases

Federal Trade Commission (FTC) plausibly alleged that consumers' injury from inadequacies in money transfer services provider's fraud prevention program was not reasonably avoidable, as required to state claim against provider for violating FTC Act's unfair acts or practices provision; FTC alleged that consumers complained of $200 million lost from fraudulent money transfers processed by provider, that provider failed to establish or follow effective anti-fraud program, train or adequately supervise employees, adequately monitor suspicious activity, or adequately report fraud, that consumers did not know money transfers were riskier than other payments, that provider insufficiently warned of fraud, and that recovery of transferred funds and tracing fraudsters was difficult. Federal Trade Commission Act § 5, 🏳15 U.S.C.A. §§ 45(a)(1), 🏳45(n).

**[24]** **Injunction** 🔑 Injury to or restraint of trade or business in general

Under the Federal Trade Commission Act's provision authorizing permanent injunctive

relief, the requirement that a defendant "is violating" or "is about to violate" the law mirrors the common law requirement that a plaintiff seeking injunctive relief show that it will suffer irreparable harm if a preliminary injunction is denied; a showing that illegal conduct is likely to recur is the same as showing that someone "is violating" or "is about to violate" the law. Federal Trade Commission Act § 13, 🚩 15 U.S.C.A. § 53(b).

**[25]**    **Injunction** 👈 Trade or Business

The Federal Trade Commission Act's provision authorizing permanent injunctive relief focuses upon relief that is prospective, not retrospective; yet the power to grant injunctive relief survives the discontinuance of the illegal conduct. Federal Trade Commission Act § 13, 🚩 15 U.S.C.A. § 53(b).

**[26]**    **Injunction** 👈 Injury to or restraint of trade or business in general

Under the Federal Trade Commission Act's provision authorizing permanent injunctive relief, to show that injunctive relief is needed when a violation has ceased, a party must demonstrate some cognizable danger of recurrent violation, and the court should consider all of the circumstances, including the bona fides of the expressed intent to comply, the effectiveness of discontinuance, and, in some cases, the character of the past violations. Federal Trade Commission Act § 13, 🚩 15 U.S.C.A. § 53(b).

**[27]**    **Injunction** 👈 Financial institutions, transactions, and services

Federal Trade Commission (FTC) plausibly alleged that money transfer services provider was violating or was about to violate FTC Act's unfair acts or practices provision, as required for FTC to request permanent injunction to remedy ongoing or imminent unfair practices due to consumers' injury, that was not reasonably

avoidable, from inadequacies in provider's fraud prevention program; FTC plausibly alleged some likelihood that provider's unlawful conduct would recur in that it repeatedly failed to train employees or institute robust fraud prevention systems, despite waves of consumer complaints, repeated audits by money transfer providers that reported deficiencies, and receipt of consent orders requiring more prevention. Federal Trade Commission Act §§ 5, 13, 🚩 15 U.S.C.A. §§ 45(a)(1), 🚩 45(n), 🚩 53(b).

**[28]**    **Constitutional Law** 👈 Certainty and definiteness; vagueness

Under the Due Process Clause of the Fifth Amendment, laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. U.S. Const. Amend. 5.

**[29]**    **Constitutional Law** 👈 Certainty and definiteness; vagueness

Due process does not mean perfect clarity and precise guidance; but a statute is impermissibly vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. U.S. Const. Amend. 5.

**[30]**    **Constitutional Law** 👈 Certainty and definiteness; vagueness

A statute can be unconstitutionally vague under the Due Process Clause either facially, in the abstract, or as-applied, meaning in light of the facts of the particular case. U.S. Const. Amend. 5.

**[31]**    **Constitutional Law** 👈 Invalidity as applied

Generally, the constitutionality of a statute is determined as applied to a litigant.

**[32]**    **Constitutional Law** 🔑 Certainty and definiteness; vagueness

The degree of vagueness that the Due Process Clause tolerates, as well as the relative importance of fair notice and fair enforcement, depends in part on the nature of the enactment. U.S. Const. Amend. 5.

**[33]**    **Constitutional Law** 🔑 Vagueness

In determining whether a statute is unconstitutionally vague under the Due Process Clause, criminal statutes must be clearer than laws that carry only civil penalties, and laws must be clearest when constitutional rights are at stake. U.S. Const. Amend. 5.

**[34]**    **Constitutional Law** 🔑 Certainty and definiteness; vagueness

**Courts** 🔑 Previous Decisions as Controlling or as Precedents

In deciding whether a statute is vague in violation of the Due Process Clause, courts look to the words of the law itself, the interpretations of other courts, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it. U.S. Const. Amend. 5.

**[35]**    **Antitrust and Trade Regulation** 🔑 In general; unfairness

**Constitutional Law** 🔑 Antitrust regulation in general

In deciding whether a statute is vague in violation of the Due Process Clause, the Federal Trade Commission Act's unfair acts or practices provision does not implicate any constitutional rights, regulates economic behavior, and is a civil statute, not a criminal one; that means a defendant accused of violating that provision is entitled to the lowest level of notice under the Due Process Clause. U.S. Const. Amend. 5; Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. § 45.

**[36]**    **Antitrust and Trade Regulation** 🔑 In general; unfairness

The Federal Trade Commission Act's unfair acts or practices provision sets up a cost-benefit analysis in which regulated parties must compare a substantial injury that they have caused to consumers with countervailing benefits to consumers or to competition, while also considering whether injuries were reasonably avoidable. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. § 45(n).

**[37]**    **Constitutional Law** 🔑 Certainty and definiteness; vagueness

In deciding whether a statute is vague in violation of the Due Process Clause, flexible laws often require people to correctly judge how a standard applies to their conduct, and such flexible laws may still comply with due process requirements. U.S. Const. Amend. 5.

**[38]**    **Antitrust and Trade Regulation** 🔑 Validity

**Constitutional Law** 🔑 Antitrust regulation in general

Federal Trade Commission Act's unfair acts or practices provision, setting up cost-benefit analysis in which regulated parties were required to compare substantial injury that they had caused to consumers with countervailing benefits to consumers or to competition, while also considering whether injuries were reasonably avoidable, was not unconstitutionally vague in violation of Due Process Clause, as applied to money transfer services provider that allegedly committed unfair practices due to consumers' injury, that was not reasonable avoidable, from inadequacies in provider's fraud prevention program; provider had fair notice that lax fraud prevention injuring consumers was forbidden, but provider failed to take basic steps to prevent fraud despite knowing of enormous consumer losses. U.S. Const. Amend. 5; Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. § 45(n).

**[39]**  **Antitrust and Trade Regulation** 👈 Officers and Employees

**Public Employment** 👈 Authority to impose adverse action; manner and mode of imposition

Under the Federal Trade Commission Act, the Commissioners' for-cause protections from removal stand in contrast to the general rule that the President may remove most executive officials from office for any reason. U.S. Const. art. 2, §§ 1, 3; Federal Trade Commission Act § 1, 🚩15 U.S.C.A. § 41.

**[40]**  **Antitrust and Trade Regulation** 👈 Powers, functions, jurisdiction, and authority

Federal Trade Commission (FTC) was authorized to bring suit seeking permanent injunctive relief without agency adjudication and civil penalties against money transfer services provider that allegedly committed unfair practices in violation of FTC Act due to consumers' injury, that was not reasonably avoidable, from inadequacies in provider's fraud prevention program, even though FTC Act contained potentially unconstitutional limit on President's authority to remove Commissioners, since Commissioners were constitutionally appointed in that Act's grant of executive power to FTC in order to sue for penalties or injunctive relief was not unconstitutional standing on its own. U.S. Const. art. 2, § 2, cl. 2; Federal Trade Commission Act §§ 1, 5, 17, 🚩15 U.S.C.A. §§ 41, 🚩45(n), 57.

**[41]**  **Statutes** 👈 Trade or business

The Federal Trade Commission Act includes a severability clause, which means Congress did not want it to rise or fall on any single provision, absent strong evidence to the contrary. Federal Trade Commission Act § 17, 15 U.S.C.A. § 57.

**[42]**  **Statutes** 👈 Effect of Partial Invalidity; Severability

When confronting a constitutional flaw in a statute, courts should try to limit the solution to the problem.

**[43]**  **Federal Civil Procedure** 👈 Complaint

Ordinarily, a plaintiff should be given at least one opportunity to amend a complaint.

**Attorneys and Law Firms**

Karen D. Dodge, Matthew Gene Schiltz, Rachel F. Sifuentes, Purba Mukerjee, Federal Trade Commission, Midwest Region, Chicago, IL, for Plaintiff.

Hashim M. Mooppan, Pro Hac Vice, Krista Perry Heckmann, Pro Hac Vice, Jones Day, Washington, DC, Drew R. Wisniewski, Jessica Lynn Saba, Pro Hac Vice, Roman Martinez, Pro Hac Vice, Blake Stafford, Pro Hac Vice, Latham & Watkins LLP, Washington, DC, Sean M. Berkowitz, Johanna Margaret Spellman, Latham & Watkins LLP, Chicago, IL, for Defendant.

Jennifer Lee Mascott, Pro Hac Vice, Separation of Powers Clinic, Scalia Law School, Arlington, VA, R. Trent McCotter, Pro Hac Vice, Separation of Powers Clinic, George Mason University, Antoni, Arlington, VA, Robert Kry, Pro Hac Vice, MoloLamken LLP, Washington, DC, Steven Francis Molo, MoloLamken LLP, Chicago, IL, for Amicus Jennifer L. Mascott.

Linda T. Coberly, Kevin Benjamin Goldstein, Winston & Strawn LLP, Chicago, IL, for Amici Chamber of Commerce of the United States of America, Retail Litigation Center, Inc.

Gregory Dolin, New Civil Liberties Alliance, Washington, DC, for Amicus New Civil Liberties Alliance.

**MEMORANDUM OPINION AND ORDER**

Manish S. Shah, United States District Judge

**\*1**  Walmart Inc. provided money transfer services, allowing customers to send and receive funds from its stores.

Telemarketers conned consumers into sending money using Walmart's services. The Federal Trade Commission alleges that Walmart knew that it was processing fraudulent money transfers and failed to do enough to protect consumers. The FTC claims that Walmart failed to implement and maintain effective policies, properly train and oversee its employees, warn consumers, or address suspicious transactions. The agency brings claims against Walmart for violations of the Federal Trade Commission Act and the Telemarketing Sales Rule. Defendant moves to dismiss under Rule 12(b)(6). For the reasons discussed below, the motion is granted in part and denied in part.

## I. Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In reviewing a motion to dismiss, a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018) (citing *Deppe v. NCAA*, 893 F.3d 498, 499 (7th Cir. 2018)).

 **[1]**   A plaintiff alleging fraud must do so with particularity. Fed. R. Civ. P. 9(b); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citations omitted) (Claims that sound in fraud—meaning premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011) (citation omitted) (Rule 9(b) applies to "allegations of fraud, not claims of fraud."). They must describe the "who, what, when, where, and how" of the fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

## II. Background

### A. Walmart's Money Transfer Services

Walmart offered a variety of financial products to its customers, driving traffic to the company's stores and generating significant revenue. [1] ¶¶ 6, 8, 22. [1] Among those products were money transfer services. *Id.* ¶ 8. Walmart relied on other companies' systems—including those belonging to MoneyGram International, Inc., RIA Financial Services, and The Western Union Company—to facilitate money transfers. *Id.* ¶¶ 9–11, 13. Walmart acted as an agent of those companies. *Id.* ¶ 9.

Consumers who wanted to send or receive money at Walmart visited the company's Customer Service Desks and MoneyCenters. [1] ¶ 18. Customers could also begin a money transfer online and then finalize the transaction at a Walmart store. *Id.* For some time, money transfer senders at Walmart were required to complete a "send form." *Id.* ¶ 20. [2] In 2019, however, Walmart stopped using the forms, and instead provided senders with a printout including consumer fraud warnings in small print. *Id.* For years, Walmart didn't ask senders to present identification unless their transfers exceeded limits set by the money transfer provider. *Id.* ¶ 21. Walmart began verifying and recording sender ID information for all transactions in January 2018. *Id.* Customers who sent $3,000 or more were required to provide their social security number, tax identification number, or other identifying information. *Id.*

 **\*2**  Walmart's money transfers were intended to be person-to-person, and weren't meant for business transactions. [1] ¶ 19. The company didn't limit the amount that a consumer could send or receive, and instead relied on its money transfer providers—MoneyGram, Ria, and Western Union—to impose limits. *Id.* [3] Consumers sending a money transfer from Walmart had to pay with cash or a PIN-based debit card. *Id.* Consumers also had to pay either a variable or flat fee to Walmart. *See id.* ¶ 22. Money transfer senders at Walmart were given a unique reference number to track their transfers, and the money being sent was typically available within minutes. *Id.*

Walmart's providers required that money transfer recipients complete a "receive form" before accessing transferred funds. [1] ¶ 23. Recipients had to provide the transaction reference number, the receive amount, their name, address, telephone number, and information about the sender. *Id.* Recipients were also required to present government-issued photo ID, but Walmart recorded recipient ID information only for certain transactions. *Id.* For transfers of $3,000 or more, U.S. recipients were required to provide a social security number,

tax identification number, or other identifying information. *Id.* In 2016, Walmart began requiring ID for all recipients, and the company stopped using the receive forms. *Id.*

Walmart used its own point-of-sale system to process money transfers and to communicate with its providers. [1] ¶ 12. Walmart also designed and controlled the systems that its employees used to record information about money transfers and to prevent fraud-induced transactions. *Id.*

### B. Fraudulent Money Transfers at Walmart

For more than a decade, fraudsters used money transfers to steal from their victims, especially U.S. customers. [1] ¶ 14; *see id.* ¶ 48. Victims of fraud often sent their money from Walmart, *id.* ¶ 42, and fraud-induced money transfers at Walmart often involved large amounts of money picked up using out-of-state IDs. *Id.* ¶ 97. Using Walmart's money transfer services, perpetrators of common telemarketing scams (including, in some cases, Walmart employees) received millions of dollars from victimized consumers, many of whom were elderly. *See id.* ¶¶ 25, 42. By allowing them access to its providers' money transfer systems, Walmart provided an essential service to fraudulent telemarketers, sellers, and con artists. *Id.* ¶ 25; *see id.* ¶¶ 41, 48. Fraudsters liked using Walmart because the company's many locations made it convenient for victims, Walmart paid recipients in cash, transferred funds were available within minutes, and recipients could operate anonymously, either because Walmart didn't require an ID check or because fraudsters used fake IDs. *Id.* ¶ 26.

Consumers who had been deceived by a fraudulent scheme weren't usually in a position to prevent fraud. [1] ¶ 29. Based on false promises or fear of financial or legal consequences, victims felt compelled to complete money transfers. *Id.* Many consumers also weren't aware that fraud detection and transaction reversal were less likely with money transfers than with other payment mechanisms. *Id.* Once cash was paid to a money transfer recipient, fraud victims were usually unable to get their money back. *Id.* ¶ 24. After MoneyGram and Western Union reached agreement with the FTC and many states in 2016 and 2018, customers could receive refunds on fraudulent transactions if money transfer providers or their agents (including Walmart) failed to follow certain anti-fraud policies and procedures. *Id.*

**\*3** Walmart told consumers to report fraud to its money transfer providers, who maintained databases of complaints. [1] ¶ 30. Ria, Western Union, and MoneyGram shared

complaints with Walmart. *Id.* Between 2013 and 2018, those companies received at least 226,679 complaints about fraud-induced money transfers sent or received at Walmart, transactions involving at least \$197,316,611. *See id.* ¶¶ 30, 43–45.[4] Many of those complaints involved telemarketing scams. *Id.* ¶ 43. The complaints made to Walmart's providers represented only a small percentage of the actual fraud perpetrated through money transfers at Walmart. *Id.* ¶ 30. There were more complaints about fraud-induced money transfers at Walmart than at any of the money transfer providers' other agents. *Id.* ¶ 31.

Walmart knew that its services were used by fraudsters. *See* [1] ¶¶ 14, 27, 46, 48. MoneyGram, Ria, and Western Union told Walmart about suspicious activity, and alerted the company to certain Walmart stores where twenty-five, fifty, or even seventy-five percent of money transfer activity was fraudulent. *See id.* ¶ 46.[5] Between 2015 and 2019, at least 101 Walmart stores were responsible for paying out over \$100,000 in fraudulent transfers that were complained about, including at least eleven stores that paid out more than \$200,000. *Id.* ¶ 98. The company also knew that many scams that made use of its services—including person-in-need, government agent impersonator, and lottery, sweepstakes, and prize scams—often involved telemarketing. *See id.* ¶¶ 14, 41.[6]

Walmart learned about prosecutions involving fraud perpetrated in its stores. Criminal authorities across the country charged individuals in connection with mass marketing and telemarketing schemes that obtained millions of dollars sent or received at Walmart. [1] ¶ 28; *United States v. Caballero*, No. 16-cr-0124 (E.D. Ark.); *United States v. Caballero*, No. 16-cr-0201 (D. Minn); *United States v. Mirabel*, No. 16-cr-0269 (N.D. Tex.); *United States v. Pando*, No. 17-cr-0046 (N.D. Miss); *United States v. Labra*, No. 17-cr-0314 (D. Md.); *United States v. Gohill*, No. 17-cr-0212 (E.D. Wis.); *United States v. Patel*, No. 17-cr-0094 (E.D. Wis.); *United States v. Marcks*, No. 19-cr-0315 (D. Nev.); *United States v. Parmar*, No. 19-cr-0160 (E.D. Va.); *United States v. Hines*, No. 17-cr-1038 (N.D. Iowa); *United States v. Smith*, No. 21-cr-0372 (M.D. Pa.); *United States v. Budhadev*, No. 20-cr-0252 (M.D. Pa.). For instance, in May 2016, Walmart learned about an Internal Revenue Service impersonation scam conducted over the telephone that made use of the defendant's money transfer services. [1] ¶ 27. That scam ultimately resulted in at least fifteen prosecutions. *See id.*

Walmart knew or should have known that its stores were susceptible to fraud because the company had thousands of associates authorized to provide money transfers, associate turnover rates were high, the company had heavy customer traffic, and multiple shifts of associates worked at a single store. [1] ¶ 48. There's an allegation that Walmart's contracts with Western Union and MoneyGram, along with court orders obtained by the FTC against those companies, gave Walmart notice about its obligations to detect and prevent fraud. *Id.* ¶ 14; *see FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20 (N.D. Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12 (M.D. Pa. Jan. 20, 2017).

### C. Walmart's Fraud Prevention Efforts

**\*4** As the agent of money transfer providers dealing directly with consumers, Walmart was well positioned to detect and prevent fraud. [1] ¶ 32. Walmart controlled its own fraud policies and procedures, the training and supervision of its employees, warnings provided to consumers, monitoring and investigation of suspicious activity, and other actions designed to prevent fraudulent transfers. *Id.* ¶ 33.

Walmart's written agreements with MoneyGram, Ria, and Western Union required Walmart to comply with the providers' policies and procedures, maintain records, train its employees, allow only authorized persons to access money transfer systems, and prevent unauthorized use. [1] ¶ 34. The agreements also said that Walmart was to maintain its own anti-fraud policies and procedures, and that the company needed to comply with any court orders that applied to its money transfer providers. *Id.* ¶¶ 34, 39.

 **[2]** The FTC entered into consent orders with MoneyGram in 2009 and 2018. *See* [1] ¶¶ 35, 38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20 (N.D. Ill. Nov. 13, 2018). The Commission also entered into a consent order with Western Union in 2017. [1] ¶ 37; *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12 (M.D. Pa. Jan. 20, 2017). The orders bound Western Union, MoneyGram and their agents (including Walmart). *See* [1] ¶¶ 35, 37–38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13, p. 5 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20, p. 7 (N.D. Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 6 (M.D. Pa. Jan. 20, 2017). [7] Walmart was required to implement and

maintain a comprehensive anti-fraud program designed to prevent fraudulent money transfers. *See FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13, p. 7 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20, p. 11 (N.D. Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 11 (M.D. Pa. Jan. 20, 2017). The Western Union order also required Walmart to identify and prevent cash-to-cash money transfers from being used as a form of payment in telemarketing transactions. *See FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 7 (M.D. Pa. Jan. 20, 2017). Walmart received all three orders, and told the FTC that the company had implemented a comprehensive anti-fraud program. *See* [1] ¶¶ 35, 37–38. [8]

 **\*5** Despite its obligations, Walmart failed to effectively detect and prevent fraud at its stores. *See* [1] ¶¶ 14, 40, 49. Walmart didn't have a written anti-fraud and consumer protection plan until November 2014. *Id.* ¶ 51. The company failed to implement and maintain a comprehensive and effective anti-fraud program, properly train and supervise its employees, warn consumers, adequately monitor and investigate unusual or suspicious activity, stop transfers that Walmart should have known or suspected were fraud-induced, adequately collect, record, and report consumer fraud, or take other reasonable steps to prevent fraudulent use of Walmart's money transfer services. *Id.* ¶¶ 15–16, 40, 51. [9]

Walmart failed to adopt effective policies, failed to adhere to existing policies, and didn't fix those problems in a timely manner. *See* [1] ¶¶ 40, 50. For example, while Walmart's anti-fraud program said that employees who worked at stores with a heightened risk of fraud were to receive special training, many stores failed to offer that training on time. *Id.* ¶ 52. Similarly, the company's program called for consumer warnings and pamphlets, but many Walmart stores didn't offer those materials, and versions of Walmart's anti-fraud systems included no instructions for associates who suspected that money transfer recipients were fraudsters. *Id.* ¶¶ 52–53.

### 1. Receive-Side Fraud

In 2015, Walmart employees who suspected that the recipient of a money transfer was involved in fraud were supposed to complete the transaction, not deny or reject payouts. [1] ¶ 55. [10] Walmart's employees were to report suspected receive-side fraud by faxing a report to the company's home office. *Id.* Without consistent policies and procedures

requiring employees to deny suspected receive-side fraud, Walmart money transfers were more susceptible to consumer fraud, including by telemarketers and sellers. *Id.* ¶ 56. For much of the period between September 2015 and May 2019, Walmart's receive-side fraud rate by volume using MoneyGram's systems was higher than the rates for the rest of MoneyGram's combined agent network. *Id.*

Walmart changed course with respect to receive-side fraud in May 2017, after MoneyGram began suspending Walmart stores from its services. [1] ¶ 57. MoneyGram required the company to offer remedial training to Walmart employees at stores with higher rates of fraud. *Id.* This remedial training included instructions about Walmart's new fraud reporting system, but didn't solve the problem. *Id.* ¶ 58. For instance, the company's new reporting system included a "scam" button, but the scam button was only to be used during the send-side of the transaction, not for potential fraudsters collecting a payment. *Id.* Walmart's fraud-monitoring system included an option for "Suspicious Behavior During a Money Transfer Receive," but indicated that associates were only to use that option when a recipient had received more than five different transactions in a day. *Id.* The company's system also didn't instruct employees to cancel suspected receive-side fraud, merely to report it. *Id.*

**\*6** In November 2017, Walmart changed its systems again, instructing some associates to cancel suspicious transactions on the receive-side of a money transfer. [1] ¶ 59. Walmart told associates to cancel transactions when a customer received multiple large money transfers or when a customer presented different IDs during different visits. *Id.* Employees who suspected fraud that didn't fit those parameters were instructed to report the suspicious transaction, but not to cancel it. *Id.* Even after it made this change, however, Walmart continued to tell other employees to complete fraudulent transactions. *Id.* ¶ 61. The company didn't update its annual associate training on receive-side fraud until late 2018, and even then gave mixed signals about when transactions were to be cancelled. *Id.* ¶ 62.

Even when a transaction was cancelled, Walmart sometimes failed to do so effectively. *See* [1] ¶ 60. From May 2017 until late 2018, even if a Walmart employee cancelled a transaction, suspected fraudsters could go to another Walmart employee or to a different location to complete the transaction. *Id.* Although Walmart told associates to call the money transfer provider about the fraud—which would

have killed a transaction once and for all—many Walmart employees failed to make those calls. *Id.*

When Walmart's system became better at automatically cancelling transactions, Walmart's fraud prevention continued to be ineffective because the company provided inconsistent training on how to handle receive-side fraud and use the fraud-prevention system, the company's prevention efforts didn't capture certain frauds, and managers sometimes override associate decisions not to complete a transaction. [1] ¶ 64. Walmart also didn't routinely train its employees to ask questions about the nature of money transfer transactions and whether consumers were receiving telemarketing-related payments. *Id.* ¶ 65.

### *2. Send-Side Fraud*

Walmart failed to provide clear and consistent instructions to its employees about how to effectively report and stop fraudulent telemarketing-related money transfers. [1] ¶ 66. As a result, Walmart failed to prevent fraud victims, especially the elderly, from being victimized through various scams, including grandparent, Good Samaritan, lottery, prize, and romance scams. *Id.* In some cases, fraudsters specifically directed consumers to use Walmart's money transfer services because of the company's lack of safeguards. *Id.*

Certain characteristics of money transfers suggested fraud, including when multiple transfers were made in a short period of time, transfers were sent to high-risk countries, transfers of above average amounts of money, and transfers that were sent to different individuals. *See* [1] ¶ 67. In many cases when these characteristics were present, however, Walmart failed to step in. *Id.* For example, from February to March 2017, Walmart sent fifty-two transfers totaling $51,000 for one older consumer to seven different receivers in Ghana and the United States. *Id.* In March and April 2017, Walmart sent $54,550 in thirty-three transfers on behalf of another consumer to a recipient in Ghana. *Id.* In a third example, Walmart sent forty-two transfers totaling $71,235.16 for a customer to ten recipients in Ghana, the United States and Turkey, despite the customer saying that he was sending money to buy millions of dollars in gold. *Id.* Walmart waited until all of these transfers were completed to report the incidents to law enforcement and Walmart's providers. *Id.*

Walmart failed in many cases to provide warnings to senders about common money transfer frauds. [1] ¶¶ 68, 99–101.

While FTC orders required Walmart to use send forms with a warning on the front page, Walmart stores were often missing those forms, or used forms without warnings. *Id.* In other cases, Walmart stores didn't have fraud warning signs and failed to provide consumers with brochures or pamphlets. *Id.* Until at least March 2019, Walmart employees didn't ask senders whether their transfers were related to telemarketing, or warn consumers that cash-to-cash money transfers were illegal as a form of payment for telemarketing transactions. *Id.* ¶¶ 69, 99. As a result, consumers were often unaware of the risks associated with money transfers. *Id.* ¶ 99.

### 3. Employee Training and Oversight

 **\*7**  Walmart employees could process hundreds of thousands of dollars in money transfers during a single shift. [1] ¶ 70. Walmart and its money transfer providers knew that employees processing transactions were the first line of defense to detect and prevent fraud. *Id.* Yet the company failed to ensure that its employees were trained and knowledgeable about anti-fraud and anti-money-laundering policies and procedures. *Id.*

Walmart's written policies and contracts said that training was important and that all Walmart associates who processed money transfers would be trained. [1] ¶ 71. The company primarily trained employees through annual computer learning sessions. *Id.* For years, however, Walmart failed to ensure that its employees actually completed the training. *Id.* ¶¶ 15, 71. Although MoneyGram required Walmart to provide remedial training at high-risk locations, Walmart failed to ensure that all employees at those locations promptly received the training. *Id.* ¶ 70. [11]

The training itself was inadequate, too. *See* [1] ¶ 72. For years, Walmart's annual training included limited information about how to detect and prevent fraudulent money transfers. *Id.* Walmart's materials focused only on preventing send-side fraud (protecting victims), rather than stopping fraudsters, and while the company knew that fraudsters often used fake IDs, Walmart didn't adequately train its employees on how to detect or prevent that practice. *Id.* ¶¶ 78–79. Until 2019, Walmart didn't train its employees about telemarketing rules, or advise associates to ask consumers whether they were sending money as a result of telemarketing. *Id.* ¶¶ 15, 80.

During audits and reviews of Walmart stores, money transfer providers found that Walmart employees lacked proper

training and knowledge about how to prevent fraud and money laundering. [1] ¶ 73. For instance, a 2014 MoneyGram audit found that 1,863 employees at 397 stores had not received either initial or ongoing fraud-prevention training, and that overall thirty-nine percent of Walmart locations had untrained primary employees, with sixty percent of stores having untrained secondary employees (those who filled in for those primarily responsible for providing money transfer services). *See id.* ¶¶ 71, 74. Subsequent MoneyGram and Ria reviews continued to find significant percentages of stores with untrained or undertrained employees. *See id.* ¶ 75. Even after Walmart locked untrained employees out of the money transfer system, Walmart's providers continued to find untrained, undertrained, or unknowledgeable employees providing money transfer services at Walmart. *Id.* ¶ 76. [12]

Walmart had control over background checks on its employees, the credentials for the money transfer systems, which resource materials employees received, whether employees complied with policies and procedures, and how the company monitored the areas in Walmart stores where money transfers were provided. [1] ¶ 81; *see id.* ¶ 84. Because some 60,000 Walmart employees processed tens of millions of money transfers each year at more than 4,700 stores, oversight was important. *Id.* ¶ 82.

 **\*8**  Walmart's failure to properly supervise and monitor employees at its Customer Service Desks and MoneyCenters allowed Walmart associates to become complicit in fraud. [1] ¶ 90. For years, employees received cash tips for their assistance in processing fraud, allowed individuals to use multiple names or IDs to receive money transfers, used the same personal information for different customers, structured transfers for customers to avoid ID requirements, made up fictitious information, or conducted suspicious money transfers themselves. *Id.* While Walmart didn't routinely share information about its employees with its providers, Walmart relied on MoneyGram, Ria, and Western Union to identify corrupt or complicit Walmart employees. *Id.* ¶ 84.

### 4. Walmart's Fraud Monitoring,
### Investigation, and Mitigation

Walmart failed to adequately monitor, investigate, or address suspicious money transfers. [1] ¶¶ 16, 91. Instead, the company relied on its money transfer providers. *Id.* ¶ 91. Because Walmart used both MoneyGram and Ria for its money transfer services, however, Walmart was the only party

able to see money transfers that went through both systems. *Id.* ¶ 92. Fraudsters exploited Walmart's use of two money transfers systems, along with the company's shift structure, workforce size, high turnover of associates, heavy customer traffic, and lax anti-fraud program. *Id.* ¶ 93.

MoneyGram, Ria, and Western Union had security systems that blocked use by fraudsters. *See* [1] ¶ 94. But those systems, as Walmart knew, were vulnerable: they sometimes broke down, could be circumvented by consumers changing biographical information, using fake IDs, or switching to another money transfer provider at Walmart. *Id.* Instead of using its own blocking system, however, Walmart relied on those of its providers, making fraud-induced money transfers at Walmart more likely. *Id.*

Walmart didn't effectively use its providers' blocking systems, either. *See* [1] ¶ 95. The company didn't give Ria lists of consumers to be blocked until 2016. *Id.* And while Walmart maintained an internal list of potential victims or fraudsters and could cancel transactions at the point of sale, the company didn't promptly communicate that information to its providers so that future fraud could be stopped. *Id.* Rather than tell all of its providers about a suspected fraudster, Walmart only identified suspicious customers to the provider who had been used by that customer. *Id.* [13]

Walmart didn't monitor certain suspicious behaviors, including consumers receiving money transfers at multiple Walmart stores in the same area or visiting stores across state lines. [1] ¶ 96. The company didn't stop consumers or even its own employees from sending or receiving money transfers that it knew or had reason to believe were related to consumer fraud, or that had suspicious characteristics. *Id.* Walmart also didn't take other measures to mitigate consumer fraud, such as verifying and validating consumer IDs, limiting the associates responsible for providing money transfer services, providing a point-of-sale system that could effectively address suspicious activities, or imposing a limit on the amount of money that could be paid out in cash. *Id.* ¶ 104. The FTC alleges that Walmart is violating or is about to violate the laws enforced by the FTC. *Id.* ¶ 105.

## III. Analysis

### A. Substantial Assistance Under the Telemarketing Sales Rule

The Telemarketing Sales Rule prohibits sellers and telemarketers from (1) making false or misleading statements

to induce someone to pay for goods, services, or a charitable contribution, (2) requesting or receiving payment in advance of obtaining credit when the seller or telemarketer has guaranteed or represented a high likelihood of success of obtaining credit, and (3) accepting a "cash-to-cash money transfer" [14] as payment for goods or services offered or sold through telemarketing or "as a charitable contribution solicited or sought through telemarketing." 16 C.F.R. §§ 310.3(a)(4), 310.4(a)(4), (10).

**\*9** The FTC doesn't allege that Walmart directly violated these prohibitions, but instead invokes the TSR's accessory liability provision. *See* [1] at 57–58. That part of the rule says that a person violates the TSR by providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer" is violating the rule. 16 C.F.R. § 310.3(b). The FTC claims that by processing ill-gotten payments despite many red flags, failing to institute an effective anti-fraud program, and allowing some of its employees to participate in fraudulent schemes, Walmart provided an essential service —and substantial assistance or support—to telemarketers. *See* [43] at 39–42. The FTC also alleges that Walmart knew or consciously avoided knowing about the underlying violations. *See id.* at 42–44.

Some of the FTC's theories of underlying TSR violations require deceptive conduct, *see* 16 C.F.R. § 310.3(a)(4), and the complaint itself repeatedly alleges that Walmart processed fraud-induced money transfers. A plaintiff alleging fraud must do so with particularity. Fed. R. Civ. P. 9(b); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citations omitted) (holding that claims that sound in fraud—meaning premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446– 47 (7th Cir. 2011) (citation omitted) (Rule 9(b) applies to "allegations of fraud, not claims of fraud."). [15] They must describe the "who, what, when, where, and how" of the fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

**[3]** To state a claim for assisting and facilitating under the TSR, the FTC must allege an underlying violation of the rule by a seller or telemarketer. *See* 16 C.F.R. § 310.3(b). The TSR includes definitions of seller, telemarketer, and telemarketing. A seller is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). A telemarketer is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff). Telemarketing is "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

**[4]** This is a case about a lot of fraud: hundreds of thousands of allegedly fraudulent money transfers involving many millions of dollars. *See* [1] ¶¶ 30, 43–45. And while the complaint lays out the breadth of the alleged misconduct by fraudsters making use of Walmart's services, the FTC hasn't plausibly alleged that any of this fraud fits the TSR's definitions of seller, telemarketer, and telemarketing.

**\*10** For instance, while the complaint says that Walmart processed money transfers on behalf of criminal fraud rings that perpetrated telemarketing scams, *see* [1] ¶ 27, the FTC hasn't alleged the details of those scams: whether they involved a "a plan, program, or campaign" using telephones, involved more than one interstate call, or whether the scams traded in goods, services, or charitable contributions. *See* 16 C.F.R. § 310.2(gg). That thousands of complaints about money transfers at Walmart were filed by consumers, and that consumers complained they were swindled by common telemarketing schemes (such as "grandparent," "loan-grant," and "romance" scams), *see* [1] ¶¶ 43, 98, doesn't show that the fraud at issue fits a pattern of prohibited conduct under the TSR. Plaintiff points to criminal cases involving telemarketing fraud at Walmart, *see id.* ¶¶ 27–28, but those cases don't show that the transactions *in this case* were made by telemarketers or sellers and involved telemarketing. [16] The TSR doesn't prohibit fraud generally or all fraud involving phone calls, and so it's not enough that a large number of fraudulent transfers at Walmart made use of phones, or that Walmart associates were told to process some suspicious transactions. *See id.* ¶¶ 55, 80, 98. Allegations about allegations make it difficult to know what it is the FTC intends to prove—that people complained about or were

accused of telemarketing fraud, or that specific telemarketing fraud occurred in fact? The former does not prove a TSR violation, and the latter is not alleged with particularity.

That's not to say that the FTC must allege the details of thousands of TSR violations to state a claim. The agency could have plausibly alleged underlying TSR violations through examples of transactions that fit the TSR's definitions, or by describing in more detail categories of fraud that hit all the elements of a TSR violation perpetrated using Walmart's services. But repeatedly using the words telemarketer, seller, and telemarketing, and making conclusory allegations of underlying TSR violations, isn't enough. *See* [1] ¶¶ 112, 119; 16 C.F.R. § 310.3(b); *Pierce v. Zoetis, Inc.,* 818 F.3d 274, 279–80 (7th Cir. 2016) (calling statements "injurious" doesn't make them injurious); *Tierney v. Advoc. Health and Hospitals Corp.,* 797 F.3d 449, 451–52 (7th Cir. 2015) (finding that a plaintiff must plausibly allege that conduct fits within the meaning of terms defined in a statute). [17] The FTC hasn't plausibly alleged an underlying violation of the TSR such that a claim for accessory liability will lie. Even if the agency had overcome this initial hurdle, the complaint also fails to allege either the knowledge or substantial assistance required to state a claim.

### 1. Knowledge

**[5]** The TSR prohibits giving substantial assistance to a seller or telemarketer when someone "knows or consciously avoids knowing" about an underlying TSR violation. 16 C.F.R. § 310.3(b). A person consciously avoids knowing about a violation when "there are facts and evidence that support an inference of deliberate ignorance." Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,852 n.106 (Aug. 23, 1995) (citing *United States v. Williams,* 32 F.3d 570, 1994 WL 463430, at *6 (7th Cir. 1994)); *see* FTC v. Chapman, 714 F.3d 1211, 1219 (10th Cir. 2013) (quoting *FTC, Complying with the Telemarketing Sales Rule,* available at https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (Feb. 2011)) ("[T]aking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability."). Knowledge can be inferred from a combination of suspicion and indifference to the truth. *See United States v. Salinas,* 763 F.3d 869, 875 (7th Cir. 2014) (discussing the "ostrich instruction"); *Global-Tech*

*Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011) (finding that a willfully blind defendant takes deliberate actions to avoid confirming a high probability of wrongdoing).

**\*11**   The FTC argues that Walmart had both direct knowledge of and consciously avoided knowing about TSR violations. *See* [43] at 42–44. First, the FTC points to an instruction Walmart gave to some of its employees, telling them to complete transactions even when they suspected fraud. *See* [1] ¶ 55. Walmart also knew that fraudsters involved in telemarketing used the company's money transfer system. *See id.* ¶¶ 27–28, 37, 105. Plaintiff contends that Walmart consciously avoided knowing about violations of the TSR by failing to take basic steps to detect fraud, like training its associates to ask for IDs. *See* [1] ¶ 16.

 [6]   To support an inference of the requisite knowledge, the complaint must suggest that Walmart consciously avoided facts about an identifiable telemarketer's fraudulent act or practice: substantial assistance liability attaches to one who consciously avoids knowing that "*the* seller or telemarketer" is violating the TSR. 16 C.F.R. § 310.3(b) (emphasis added). In this case, the FTC hasn't alleged enough about the circumstances of the money transfers at issue to show that Walmart knew or consciously avoided knowing about TSR violations. For one thing, as discussed above, the complaint doesn't allege that any of the alleged fraud fell within the prohibitions of the TSR. A second problem is that the FTC hasn't alleged the kinds of details about the majority of transactions in this case that would show that Walmart knew or consciously avoided knowing about underlying TSR violations. For instance, while the complaint says that the company processed "tens of millions of money transfers" each year, [1] ¶ 82, and hundreds of thousands of complaints were filed about Walmart's money transfers, *see id.* ¶¶ 43–45, there's no allegation suggesting how many of these transactions may have raised red flags, such as when customers presented different IDs during different visits, received multiple large transfers in a short period of time, or when a transaction involved suspicious statements, patterned activity, or other indications of fraud. *See id.* ¶¶ 59, 96. [18]   Without more information about why Walmart should have suspected specific transactions, Walmart's failure to ask questions and processing of suspected fraud, *see id.* ¶¶ 55, 65, isn't evidence of conscious avoidance of TSR violations. *See*

🚩 *United States v. L.E. Myers Co.*, 562 F.3d 845, 854 (7th

Cir. 2009) (quoting 🚩 *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990)). [19]

Without an allegation of an underlying violation and more detail about why Walmart knew or consciously avoided knowledge that a subset of its money transfer business involved TSR violations, the complaint hasn't alleged the knowledge required.

### *2. Substantial Assistance*

 **\*12**   [7]   Substantial assistance requires more than casual or incidental help to a telemarketer. *See* 16 C.F.R. § 310.3(b);

🚩 *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) (quoting *FTC, Complying with the Telemarketing Sales Rule*, available at http://business.ftc.gov/documents/bus27-complying-telemarketing-sales-rule#assisting (Feb. 2011)); *Consumer Financial Protection Bureau v. Nesheiwat*, No. 21-56052, 2022 WL 17958636, at *1 (9th Cir. Dec. 27, 2022); *FTC v. Consumer Health Benefits Ass'n*, No. 10-CV-3551 (ILG), 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011) (quoting Telemarketing Sales Rule, 60 Fed. Reg. 43842-01, 43852 (Aug 23, 1995)). There must be some link between the third party's actions and the telemarketer's, but not necessarily a direct connection. *See* 🚩 *Chapman*, 714 F.3d at 1216 (citations omitted). [20]

Agency guidance includes some examples of what conduct is and isn't enough to constitute substantial assistance. On the one hand, someone who provides lists of contacts to a seller or telemarketer, drafts the language used for telemarketing, or makes available incentives to be used in the telemarketing, provides substantial assistance. *See* Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995). On the other hand, providing services like cleaning or food delivery to telemarketers, "or engaging in some other activity with little or no relation to the conduct that violates the Rule" would not be enough to show substantial assistance. *See FTC, Complying with the Telemarketing Sales Rule* (Feb. 2011), available at https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.

 [8]   Aiding and abetting principles (as seen in tort and securities case law) are relevant in understanding substantial assistance under the TSR. *See FTC v. WV Universal Mgmt.,*

*LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017) (In a dispute about joint and several liability under the TSR, the FTC argued and the Eleventh Circuit agreed that the TSR emerged from "comparable tort and securities concepts."); Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851–52 & nn.96–98 (Aug. 23, 1995) (comparing substantial assistance under the TSR with substantial assistance in tort and securities cases, and noting that "the ordinary understanding of the qualifying word 'substantial' " should apply under the TSR). *But see* ⚑ *C.F.P.B. v. Daniel A. Rosen, Inc.*, Case No. 2:21-cv-07492-VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022).[21]

**\*13**  Walmart processed large numbers of fraud-induced money transfers, and it knew that the proceeds of fraud were being transferred using its services. *See* [1] ¶¶ 42–43, 46, 50. Walmart made it easier for fraudulent transactions to succeed by failing to provide consumer fraud warnings, verify or accurately record the IDs of money transfer recipients, and by processing some suspicious transactions. *Id.* ¶¶ 24–26, 55. The complaint also says that some Walmart associates were complicit in fraudulent transactions. *See id.* ¶ 50.

 **[9]**  Processing routine transactions isn't substantial assistance. *See* ⚑ *Grijalva v. Kevin Mason, P.A.*, Case No. 8:18-cv-02010-JLS-DFM, 2019 WL 8221076, at *5 (C.D. Cal. Dec. 30, 2019) (deciding that processing payments for other defendants and accepting a fee for those transactions was not substantial assistance under the TSR); *Berdeaux v. OneCoin Ltd.*, 561 F.Supp.3d 379, 416 n.35 (S.D.N.Y. 2021) (considering a claim for aiding and abetting fraud and gathering cases); *PLB Investments LLC v. Heartland Bank and Tr. Co.*, No. 20 C 1023, 2021 WL 492901, at *9 (N.D. Ill. Feb. 9, 2021) (discussing a claim of aiding and abetting fraud and breach of fiduciary duty); ⚑ *Bane v. Sigmundr Expl. Corp.*, 848 F.2d 579, 582 (5th Cir. 1988) (discussing aider and abettor liability under Rule 10b-5); ⚑ *Rosner v. Bank of China*, 528 F.Supp.2d 419, 426–27 (S.D.N.Y. 2007) (considering a common-law fraud claim against a bank); *see also* ⚑ *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) (citing ⚑ *United States v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989)) (noting that the ordinary understanding of culpable assistance requires a desire to promote the wrongful venture's success).

 **[10]**  But an ordinary transaction becomes extraordinary— and processing it can constitute substantial assistance— if a defendant knows enough about the underlying fraud. *See* ⚑ *S.E.C. v. Apuzzo*, 689 F.3d 204, 212–14 (2d Cir. 2012) (holding that a chief financial officer of a corporation provided substantial assistance when he participated in extraordinary transactions and knew of underlying violations of the securities laws); ⚑ *In re First All. Mortg. Co.*, 471 F.3d 977, 995–96 (9th Cir. 2006) (considering a state-law fraud claim); ⚑ *Damian v. Heartland Bank and Tr. Co.*, No. 20 C 7819, 2021 WL 5937153, at *11 (N.D. Ill. Dec. 15, 2021) (citations omitted) (finding that a bank that processed payments provided substantial assistance in breaching a fiduciary duty when the bank knew of a Ponzi scheme underlying the transactions and its inaction allowed a fraudster to continue the scheme); ⚑ *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F.Supp.2d 875, 910–14 (W.D. Mich. 2010) (holding that a bank's provision of routine banking services wasn't enough to show substantial assistance of fraud and conversion "unless the bank actually knew that those services were assisting the customer in committing a specific tort"); Restatement (2d) Torts § 876(b), comment d (noting that assistance can be tortious depending on (1) the nature of the act encouraged, (2) the amount of assistance given, (3) a defendant's presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind).[22]

 **\*14**   **[11]**  Walmart may have known enough about transactions at stores where a large majority of money transfers were fraudulent, such that defendant's continued processing constituted substantial assistance. *See* [1] ¶ 46.[23] But, as discussed above, the complaint doesn't connect Walmart's general awareness of red flags and fraud with its specific knowledge about the vast majority of money transfers at issue in this case, such that processing those transactions became something other than routine. *Cf.* ⚑ *Damian*, 2021 WL 5937153, at *11; ⚑ *Apuzzo*, 689 F.3d at 214–15; ⚑ *FTC v. HES Merch. Services Co., Inc.*, No. 6:12-cv-1618-Orl-22KRS, 2014 WL 6863506, at *8 n.5 (M.D. Fla. Nov. 18, 2014); ⚑ *FTC v. Chapman*, 714 F.3d 1211, 1216–17 (10th Cir. 2013). While Walmart may have provided an essential service to fraudsters by delivering the proceeds of their misconduct, the FTC hasn't alleged that Walmart's awareness of fraud rose to the level that would transform the

processing of money transfers into substantial assistance of TSR violations.

Without a showing of underlying TSR violations or details about how Walmart knew that the majority of transactions at issue were extraordinary, the complaint doesn't state a claim for substantial assistance.

Count Two is dismissed without prejudice.

### B. Unfair Acts or Practices

The FTC alleges that Walmart violated § 5(a) of the Federal Trade Commission Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1); *see* *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 768 (7th Cir. 2019); *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–44, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). Plaintiff claims that Walmart violated § 5 in two ways: by failing to effectively prevent fraudulent money transfers and by violating the TSR. *See* [1] ¶¶ 108–18. Because the FTC hasn't stated a claim for a violation of the TSR, as discussed above, it cannot pursue that theory of liability under § 5.[24] The parties disagree about the elements of a § 5 claim as applied to Walmart's failure to stop consumer injury.

### 1. The Unfairness Standard

The FTC Act of 1914 prohibited "unfair methods of competition in commerce." Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (codified as amended at 15 U.S.C. § 45(a)). In drafting that provision, Congress declined to specify the meaning of "unfair methods of competition." *See* *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) (citing S. Rep. No. 63-597, at 13 (1914)); *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015). Instead, unfairness was left as a "flexible concept with evolving content," one whose development was intentionally left to the Commission. *FTC v. Bunte Bros.*, 312 U.S. 349, 353, 61 S.Ct. 580, 85 L.Ed. 881 (1941); *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 367, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965).

In 1964, the Commission issued a statement describing three factors relevant to deciding whether an act or practice was unfair. Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (July 2, 1964). While the FTC drafted those factors to assess conduct by the tobacco industry, the Supreme Court in *Sperry* appeared to approve of the more general use of that three-part analysis to decide whether any act or practice was unfair. *See* *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).

The Seventh Circuit addressed § 5's prohibition on unfair conduct in *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976). The FTC brought suit against a corporation, alleging unfair practices. *Id.* at 290. Approving of the FTC's conclusion that the conduct at issue was unfair, the court noted that the Commission's analysis of unfairness "remained faithful to its previously announced criteria," and (repeating that criteria, as cited in *Sperry*) that a practice is unfair "when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Spiegel*, 540 F.2d at 293–94.

**\*15** In 1980, the FTC issued a second policy statement that changed the Commission's approach to § 5. *See* FTC Policy Statement on Unfairness, Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Senate Comm. on Commerce, Sci., and Transp. (Dec. 17, 1980) (available at https://www.ftc.gov/legal-library/browse/ftc-policy-statement-unfairness) (hereinafter 1980 FTC Unfairness Policy Statement). The Commission wrote that public policy considerations were relevant, abandoned reliance on "immoral or unscrupulous conduct" as an independent basis for an unfairness finding, and said that unjustified consumer injury was the "primary focus" of the Act and could by itself "warrant a finding of unfairness." *Id.*

In 1994, Congress codified the FTC's 1980 approach to unfairness in 15 U.S.C. § 45(n):

> The Commission shall have no authority under this section ... to declare unlawful an act or practice on the grounds that such act or practice

is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

Walmart argues that in this circuit, *Spiegel* provides the applicable standard for unfair practices under § 5. *See* [24] at 40. *Spiegel* remains good law, but neither that case nor *Sperry* adopted a test for § 5 liability. "*Sperry* did not adopt [a test for unfair conduct], but rather was merely quoting, in a footnote, the test that the FTC uses to determine whether a practice that is neither in violation of the antitrust laws nor deceptive could still be unfair." *McMillan v. Collection Professionals Inc.*, 455 F.3d 754, 764 n.13 (7th Cir. 2006). Similarly, the *Spiegel* court reviewed an unfairness finding made by the Commission and paraphrased the FTC's then-approach to § 5, as quoted in *Sperry. See Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 & n.8 (7th Cir. 1976); *see also CFPB v. ITT Educ. Services, Inc.*, 219 F.Supp.3d 878, 903 (S.D. Ind. 2015) (discussing *Spiegel*, 540 F.2d at 293); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945 (N.D. Ill. 2008) (applying a three-part test derived from 15 U.S.C. § 45(n), not the FTC's earlier standard); *United States v. Dish Network LLC*, 256 F.Supp.3d 810, 965–66 (C.D. Ill. 2017) *aff'd in part, vacated in part, remanded on other grounds sub nom*, 954 F.3d 970 (7th Cir. 2020) (recognizing the same three-part test as the current rule for unfair conduct under § 5). Like *Sperry*, *Spiegel* described the FTC's approach but did not settle on an exclusive definition of unfairness (and seems to have rested its decision not on any articulable public policy but on the substantial harm to debtors from cost-

prohibitive but lawful debt-collection suits filed in a distant forum). *Spiegel*, 540 F.2d at 293–94. [25]

Both the *Sperry* and *Spiegel* courts looked to the FTC's interpretation of unfairness at that time. But in 1994, Congress offered further guidance. It's true that § 5(n) is a limitation on the FTC's power to "declare unlawful an act or practice" because it is unfair, not an explicit definition of unfairness under § 5(a). *See* 15 U.S.C. § 45(n). But the FTC's exclusive role in enforcing the Act, the text of the statute, and the history of the prohibition on unfair conduct show that § 5(n) sets the standard for unfairness, both for the court and for the Commission.

**\*16** **[12]** **[13]** There is no private right of action under the Act. *See Marquette Cement Mfg. Co. v. FTC*, 147 F.2d 589, 594 (7th Cir. 1945) (holding that only the FTC has the power to protect the public against unfair methods of competition); *Moore v. New York Cotton Exch.*, 270 U.S. 593, 603, 46 S.Ct. 367, 70 L.Ed. 750 (1926) (noting that relief for unfair methods of competition "must be afforded in the first instance by the commission"); *J.R. v. Walgreens Boots All., Inc.*, No. 20-1767, 2021 WL 4859603, at \*8 (4th Cir. Oct. 19, 2021) (gathering cases). That means that the FTC is the only party capable of bringing suit based on an unfair act or practice. *See Sperry*, 405 U.S. at 249, 92 S.Ct. 898 ("A court cannot label a practice 'unfair' under 15 U.S.C. § 45(a)(1). It can only affirm or vacate an agency's judgment to that effect."). Limitations imposed by Congress on the agency's power to declare an act unfair, then, also restrict the circumstances when an act can be found unfair in court. Of course, after the FTC has brought suit in federal court, it is the court—not the agency—that decides whether a practice violates § 5. But an unfair practice only arrives in federal court if the agency brings suit. *See Marquette Cement Mfg. Co.*, 147 F.2d at 594. A limitation on the FTC's power to bring suit under § 5, then, is in effect a limitation on the court's power to find a practice unfair.

**[14]** Through § 5(n), Congress told the FTC that the Commission had no power to declare conduct unfair unless certain conditions were met. *See* 15 U.S.C. § 45(n). One implication of that restriction is that, when the conditions under § 5(n) *are* met, the FTC *has* power to find unfairness. And when the FTC has power to find unfairness under § 5(n), it makes sense that the act or practice at issue is also unfair

under § 5(a). In other words, given the FTC's unique power to enforce § 5, Congress did not authorize the FTC to declare an act unfair under § 5(n) that wasn't also unfair under § 5(a).

*See* 15 U.S.C. § 45; *see also White v. United Airlines, Inc.*, 987 F.3d 616, 623 (7th Cir. 2021) (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990)) (discussing the presumption that "identical words used in different parts of the same act are intended to have the same meaning"). [26]

The history of § 5 supports this approach, and perhaps explains why Congress declined to define unfairness in a more direct way. When Congress first banned unfair competition in commerce, it considered and decided against identifying particular practices that were unfair. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) (citing S. Rep. No. 63-597, at 13 (1914)). Instead, Congress chose to make unfairness a flexible concept, and left its development to the Commission.

*See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015) (quoting *FTC v. Bunte Bros.*, 312 U.S. 349, 353, 61 S.Ct. 580, 85 L.Ed. 881 (1941) and *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 367, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965)). Given that legislative history, it's unsurprising that Congress provided further guidance on the meaning of unfairness in 1994 by codifying the FTC's flexible cost-benefit approach, rather than (for instance) enumerating a list of prohibited practices or using definitional language. *See id.* at 244.

Relying on *Spiegel*, Walmart argues that § 5(n) clarifies only the substantial injury requirement under § 5(a), and also that § 5(n)'s requirements are necessary but not sufficient conditions to find unfairness. *See* [44] at 22–23; *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 259 (3d Cir. 2015); *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 & n.24 (11th Cir. 2018). In addition to the requirements of § 5(n), Walmart argues that the FTC must show that conduct violates established public policy, and that a showing of immoral, unethical, oppressive, or unscrupulous conduct is also relevant. *See* [24] at 40–46.

**\*17** Behind Walmart's interpretation is the assumption that *Spiegel* and *Sperry* set a standard for unfairness, one

that wasn't fundamentally altered by the addition of § 5(n). As discussed above, however, neither of those cases established a test. *See also Wyndham Worldwide Corp.*, 799 F.3d at 244–45, 255–56 (treating the § 5(n) factors as the test for unfairness under § 5(a)); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009) (same); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (same).

**[15]** Section 5(n) is more than an elaboration of the substantial injury requirement: it also addresses the importance of public policy. *See* 15 U.S.C. § 45(n). And while one might understand *Spiegel* to mean that conduct must violate established public policy to be unfair, *see Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976), Congress in § 5(n) directed that "public policy considerations may not serve as a primary basis for [an unfairness] determination." *Id.* Public policy considerations can be relevant to an unfairness finding, but § 5(n) (and the FTC's 1980 policy statement) show that offending public policy isn't necessary to violate of § 5(a). *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement. [27]

**[16]** Walmart contends that without a requirement that unfair conduct violate public policy, § 5 might run afoul of the void-for-vagueness, non-delegation, or major-questions doctrines. *See* [24] at 40–41 & nn.9–10 (citing *Skilling v. United States*, 561 U.S. 358, 405–06, 407–09, 412–13, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), *Mistretta v. United States*, 488 U.S. 361, 371–73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), and *West Virginia v. E.P.A.*, ––– U.S. ––––, 142 S. Ct. 2587, 2609, 213 L.Ed.2d 896 (2022)). But limiting public policy to a relevant, but not sole or primary ground for an unfairness determination does not leave defendants or courts at sea in uncharted waters. Unfairness tied to substantial consumer injury is a knowable, judicially administrable concept. In any event, as discussed below at ––– – –––, § 5 isn't unconstitutionally vague as applied in this case, which is all that need be said here. *See also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255–59 (3d Cir. 2015) (citation omitted) ("While far from precise, [the standard in § 5(n)] informs parties that the relevant inquiry here is a cost-benefit analysis ... that considers a number of relevant factors."). And even before Congress further defined § 5's coverage, the Supreme Court held that the FTC did

not "arrogate excessive power to itself" by assessing unfair conduct under a broad and flexible standard. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).

**\*18** **[17]** That Congress in § 5(n) chose to omit reference to immoral, unethical, oppressive, or unscrupulous conduct means that such a showing isn't necessary, either. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement (finding that this requirement was duplicative and noting that the Commission would no longer rely on it as an independent basis for a finding of unfairness); *Wyndham*, 799 F.3d at 244–45 (rejecting a requirement that unfair conduct must be unscrupulous or unethical). Even under the FTC's earlier approach, as discussed in *Spiegel*, evidence that conduct was wrongful wasn't required because the FTC could also show that the practice was "substantially injurious to consumers." *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976). [28]

The conditions of § 5(n) are sufficient and necessary for a finding of unfairness. Section 5(n) implicitly authorizes the Commission to find unfairness when conduct meets certain requirements. Congress would not have authorized the FTC to declare conduct unfair that was not, in fact, unfair under § 5(a). Given the expression of four requirements in § 5(n) and considering the 1980 policy statement that it grew from, Congress excluded additional requirements. *See Nat'l Lab. Relations Bd. v. SW Gen., Inc.*, 580 U.S. 288, 302, 137 S.Ct. 929, 197 L.Ed.2d 263 (2017) (quoting *Chevron USA Inc. v. Echazabal*, 536 U.S. 73, 80, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002)) (discussing the canon of *expressio unius est exclusio alterius*). [29]

**[18]** **[19]** Under § 5, then, an act or practice is unfair when it (1) causes or is likely to cause, (2) substantial injury to consumers, (3) which is not reasonably avoidable by consumers themselves, and (4) not outweighed by countervailing benefits to consumers or to competition. *See* 15 U.S.C. § 45(a), (n); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244–45, 255–56 (3d Cir. 2015); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010). Whether an act or practice violates an established public policy or is wrongful are relevant, but not necessary

conditions to finding unfairness. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement. Public policy can inform the kind or degree of injury at issue—an expression of the types of harms or burdens that ought not to be borne by consumers. Or, public policy can express some of the costs or benefits of an act or practice. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement. But the statute's focus remains on whether a practice causes substantial injury to consumers.

### 2. Walmart's Fraud-Prevention Practices

The FTC's theory of § 5 liability in this case is that Walmart's failure to effectively prevent fraud caused consumers to lose millions of dollars to fraudsters. *See* [43] at 29–30. Walmart waived argument as to causation, substantial injury, and whether the injury to consumers was outweighed by countervailing benefits. *See* [24] at 39–48; [43] at 31–34; [44] at 21–24. The FTC waived argument that Walmart's fraud-prevention practices were immoral, unethical, oppressive, or unscrupulous. *See* [43] at 29–34. The only public policy the FTC invokes is negligence, *see* [43] at 31 n.15, but negligence liability is predicated on a cost-benefit analysis, and so negligence policy doesn't provide any additional evidence of unfairness beyond what's already considered under § 5(n). *See Navarro v. Fuji Heavy Indus., Ltd.*, 117 F.3d 1027, 1029 (7th Cir. 1997) (discussing negligence and cost-benefit analysis). The only issue remaining, then, is whether the injury to consumers caused by inadequacies in Walmart's fraud-prevention program was reasonably avoidable by consumers. *See* 15 U.S.C. § 45(n).

**\*19** **[20]** **[21]** **[22]** If consumers had a free and informed choice in the matter, an injury is reasonably avoidable. *See American Fin. Services Ass'n v. FTC*, 767 F.2d 957, 976–78 (D.C. Cir. 1985); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945 (N.D. Ill. 2008). "Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (quoting *FTC v. Orkin Exterminating Co.*, 108 F.T.C. 263, 1986 WL 722153, at \*8 (1986)); *see Neovi, Inc.*, 604 F.3d at 1158; *IFC Credit Corp.*, 543 F.Supp.2d at 945. The requirement that a

substantial injury not be reasonably avoidable preserves the default rule that consumer choice governs the market. *See* 1980 FTC Unfairness Policy Statement. But when someone "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer [decision-making]," an injury isn't reasonably avoidable. *See id.*

 **[23]**  Consumers complained of nearly $200 million they lost through fraud-related money transfers processed at Walmart, and there's reason to believe that the total harm may have been much higher. [1] ¶¶ 30, 43. The complaint lays out a series of failings in Walmart's fraud prevention and mitigation systems. Walmart either didn't establish or failed to follow an effective antifraud program, didn't train or adequately supervise its employees, failed to adequately monitor suspicious activity, and didn't adequately report fraud to others. *See, e.g.,* [1] ¶¶ 40, 50–53, 71, 86. Victims of fraud who used Walmart's services felt compelled—based on false promises or fear of financial or legal consequences—to send money to fraudsters. *Id.* ¶ 29. Consumers didn't know that money transfers were riskier than other forms of payment, *id.* ¶¶ 29, 69, 99, and Walmart routinely either didn't warn consumers about fraud at all or provided insufficient warnings. *See id.* ¶¶ 15–16, 24, 49, 52, 68, 85, 99–101. [30] Getting the money back after it had been transferred was hard, too, because fraud detection and transaction reversals were more challenging with money transfers, Walmart didn't do enough to stop fraudsters from picking up money, and the company didn't communicate well with its money transfer providers (which meant fraudsters weren't effectively blocked from using money transfer systems). *Id.* ¶¶ 29, 55–65, 91–96.

It's reasonable to infer that victims of fraud who used Walmart's services were not making fully informed choices. *See Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("Fraud is an intentional tort, and victims need not take precautions against such torts in order to preserve their rights."); *Ellis v. DHL Express Inc. (USA)*, 633 F.3d 522, 527 (7th Cir. 2011) (quoting *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828–29 (7th Cir. 1987)) (finding that, in the context of early retirement officers, the voluntariness of a choice turned on (among other things) whether "the choice [was] free from fraud or other misconduct"); *Restatement (2d) of Torts § 481 (1965)* (noting that a plaintiff's contributory negligence does not bar recovery for damages associated with an intentional tort). [31] Walmart didn't warn or adequately warn consumers about the possibility of fraud, and so victims didn't have reason to anticipate the loss,

either. *See Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (affirming a finding that an injury was not reasonably avoidable when contracts gave consumers no warning of impending harm); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010) (finding that an issue of material fact existed as to whether injuries were reasonably avoidable when it was likely that some consumers never noticed unauthorized withdrawals and, even if they had noticed, recovering the lost funds "required a substantial investment of time, trouble, aggravation, and money"); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945–48 (N.D. Ill. 2008). *Cf. Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (holding that an injury was avoidable when an advertisement included a disclaimer which would have motivated a reasonable consumer to consult the terms and conditions, giving consumers reason to anticipate a potential loss). [32] And because it was hard to recover funds sent through money transfers and difficult to trace fraudsters, consumers didn't have the means to avoid the injury. *See Orkin Exterminating Co., Inc.*, 849 F.2d at 1365; *Neovi, Inc.*, 604 F.3d at 1158.

 **\*20**  Relying on the FTC's 1980 policy statement, Walmart argues that the injuries in this case weren't reasonably avoidable unless Walmart's conduct created an obstacle to the free exercise of consumer decision-making. *See* [24] at 47 (citing 1980 FTC Unfairness Policy Statement). But the policy statement says that injuries aren't reasonably avoidable when someone either "unreasonably creates *or takes advantage* of an obstacle to the free exercise of consumer [decision-making]." 1980 FTC Unfairness Policy Statement (emphasis added). In this case, the complaint says that Walmart took advantage of an obstacle in the market —scams that caused consumers (lacking the knowledge or ability to protect themselves) to send money to fraudsters. Put differently, by failing to warn consumers or provide avenues to mitigate their losses, Walmart withheld crucial information from consumers, leaving fraud victims with insufficient information. *See id.* (noting that a seller may unjustifiably hinder a free-market decision by failing to give buyers critical information). Walmart wasn't required to overrule consumer choices, and the Commission may ultimately fail to demonstrate that inserting more detailed and onerous fraud prevention would be reasonably successful. But for now, it's plausible that the company took advantage of defrauded consumers by profiting from transactions while withholding reasonably available information.

The FTC has alleged a violation of § 5.

### 3. On-going or Imminent Misconduct

Even if the FTC has stated a claim under § 5, Walmart argues that the FTC's request for relief should be dismissed because the FTC hasn't alleged any ongoing misconduct. *See* [24] at 38–39. To remedy Walmart's unfair practices under § 5, the FTC seeks a permanent injunction, as authorized by 15 U.S.C. § 53(b). *See* [1] ¶ 121(A). [33] That portion of the Act says that:

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted ... *Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.

The parties seem to agree that the two requirements at the head of § 13(b)—a showing that someone "is violating, or is about to violate" a law enforced by the FTC and that an injunction would be in the public interest—also apply to requests for a permanent injunction authorized in the statute. *See* [24] at 38–39; [43] at 44. [34]

Walmart argues that past conduct is irrelevant to a request for a permanent injunction under § 13(b), relying on *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 155–59 (3d Cir. 2019).

*See* [44] at 19–21. In *Shire*, the Third Circuit found that the FTC had to show that a wrongdoer "is violating" or "is about to violate" the law to secure an injunction. *See Shire ViroPharma, Inc.*, 917 F.3d at 156. The Third Circuit held that this requirement was antecedent to and separate from the common law standard for an award of injunctive relief, and (relatedly) that a likelihood of recurrent illegal conduct wasn't relevant to whether a defendant "is violating" or "is about to violate" the law. *See id.* at 157.

**\*21** **[24]** I disagree with the Third Circuit's approach, and decline to distinguish between the requirements of § 13(b)(1) and the common law standard for injunctive relief. The requirement that a defendant "is violating" or "is about to violate" the law mirrors the common law requirement that a plaintiff seeking injunctive relief show that it will "suffer irreparable harm if a preliminary injunction is denied." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011); *see also Swanigan v. City of Chicago*, 881 F.3d 577, 583 & n.2 (7th Cir. 2018) (citations omitted) (noting that injunctions are forward-looking, and a plaintiff must show that the injury is certainly impending or that there is a substantial risk of harm). And a showing that illegal conduct is likely to recur is the same as showing that someone "is violating" or "is about to violate" the law. *See also FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (applying the common law likelihood of recurrence to a request for an injunction under § 13(b)); *FTC v. Evans Products Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) (same); *FTC v. Lifewatch, Inc.*, 176 F.Supp.3d 757, 785–86 (N.D. Ill. 2016) (same); *FTC v. Roomster Corp.*, No. 22 Civ. 7389 (CM), ---- F.Supp.3d ----, ----, 2023 WL 1438718, at *7 (S.D.N.Y. Feb. 1, 2023) (same); *FTC v. AdvoCare Int'l, L.P.*, CIVIL NO. 4:19-CV-715-SDJ, 2020 WL 6741968, at *5–6 (E.D. Tex. Nov. 16, 2020) (same).

**[25]** **[26]** Section 13(b) "focuses upon relief that is prospective, not retrospective." *AMG Cap. Mgmt., LLC v. FTC*, ---- U.S. ----, 141 S. Ct. 1341, 1348, 209 L.Ed.2d 361 (2021); *see also Credit Bureau Ctr., LLC*, 937 F.3d at 772. Yet the power "to grant injunctive relief survives the discontinuance of the illegal conduct." *Accusearch Inc.*, 570 F.3d at 1201 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)) (applying the rule to a request for permanent

injunctive relief under § 13(b)); *Lifewatch Inc.*, 176 F.Supp.3d at 785–86 (same); 🚩 *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773 (7th Cir. 2013). To show that relief is needed when a violation has ceased, a party must demonstrate "some cognizable danger of recurrent violation," and the court should consider all of the circumstances, including "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of the past violations." 🚩 *W.T. Grant Co.*, 345 U.S. at 633, 73 S.Ct. 894; *see also* 🚩 *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275–76 (7th Cir. 2009) (finding that voluntary cessation of wrongful conduct is a factor to consider when deciding if an injunction is necessary, and that the court may also consider what led to the cessation and how easily former practices may be resumed); *Wilk v. American Med. Ass'n*, 895 F.2d 352, 367 (7th Cir. 1990).

**[27]**   The complaint says that Walmart is violating is or is about to violate § 5. [1] ¶ 105. And beyond that conclusory allegation, the FTC has plausibly alleged some likelihood that Walmart's unlawful conduct will recur. For instance, the complaint says that Walmart repeatedly failed to train its employees or institute robust fraud-prevention systems, despite waves of consumer complaints, repeated audits by its money transfer providers that reported deficiencies, and receipt of consent orders requiring more. *See id.* ¶¶ 35, 37–38, 40, 43, 46, 48–52, 105. While the complaint doesn't date all of its allegations (suggesting that the underlying conduct continues), *see, e.g., id.* ¶¶ 40, 46, the FTC identifies problems with Walmart's inadequate fraud-prevention efforts as recently as 2019. *See id.* ¶¶ 15, 17, 56, 100. Walmart corrected some of its practices only after the FTC began investigating in 2017. *See id.* ¶¶ 57, 62, 64, 76, 85, 100, 105. And the company has opportunity and incentive to continue its lax security practices: Walmart still processes large amounts of money transfers and makes millions of dollars in related fees. *See id.* ¶¶ 8–14, 22. [35]

**\*22**   The FTC has shown some reason to believe that Walmart is or is about to violate § 5. If it prevails in this case, a permanent injunction may be available.

### *4. Due Process*

**[28]**   **[29]**   **[30]**   **[31]** Walmart argues that § 5 is unconstitutionally vague as applied in this case. *See* [24]

at 48–50. [36]   Under the Due Process Clause of the Fifth Amendment, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." 🚩 *Midwest Fence Corp. v. United States Dep't of Transp.*, 840 F.3d 932, 947 (7th Cir. 2016) (quoting 🚩 *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012)). Due Process doesn't mean "perfect clarity and precise guidance." *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012) (quoting 🚩 *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)). But a statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." 🚩 *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 478–79 (7th Cir. 2012) (quoting 🚩 *Fox Television Stations, Inc.*, 567 U.S. at 253, 132 S.Ct. 2307).

**[32]**   **[33]**   **[34]** "[T]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." 🚩 *Karlin v. Foust*, 188 F.3d 446, 458 (7th Cir. 1999) (quoting 🚩 *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)). Criminal statutes must be clearer than laws that carry only civil penalties, and laws must be clearest when constitutional rights are at stake. *See* 🚩 *Vill. of Hoffman Estates*, 455 U.S. at 498–99, 102 S.Ct. 1186; 🚩 *Fuller ex rel. Fuller v. Decatur Public Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 667 (7th Cir. 2001). In deciding whether a statute is vague, courts look to the words of the law itself, the interpretations of other courts, "and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." 🚩 *Grayned v. City of Rockford*, 408 U.S. 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); 🚩 *United States v. Cook*, 970 F.3d 866, 874 (7th Cir. 2020) (considering an earlier construction of a statute by the Seventh Circuit in assessing a vagueness challenge); 🚩 *Pleasureland Museum, Inc. v. Beutter*, 288 F.3d 988, 995–96 (7th Cir. 2002) (quoting 🚩 *Vill. of Hoffman Estates*, 455 U.S. at 494 n.5, 102 S.Ct. 1186) (ruling that, in assessing vagueness "a federal court must, of course, consider any limiting construction that a state court or enforcement agency has offered").

[35] [36] [37] Section 5 of the Act doesn't implicate any constitutional rights, regulates economic behavior, and is a civil statute (not a criminal one). *See* 15 U.S.C. § 45; *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255 (3d Cir. 2015). That means that Walmart is entitled to the lowest level of notice under the Due Process Clause. *See Fuller ex rel. Fuller*, 251 F.3d at 667 (citing *Vill. of Hoffman Estates*, 455 U.S. at 497, 102 S.Ct. 1186); *United States v. Walton*, 36 F.3d 32, 35 (7th Cir. 1994) (citations omitted). The statute sets up a cost-benefit analysis: regulated parties must compare a substantial injury that they have caused to consumers with "countervailing benefits to consumers or to competition," while also considering whether injuries were reasonably avoidable. 15 U.S.C. § 45(n); *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010); *American Fin. Services Ass'n v. FTC*, 767 F.2d 957, 975–76 (D.C. Cir. 1985); *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (citation omitted); *Wyndham Worldwide Corp.*, 799 F.3d at 255 (citations omitted). This flexible standard isn't unusual: laws often require people to correctly judge how a standard applies to their conduct, *see Benner v. Carlton*, 58 F.4th 923, 927 (7th Cir. 2023) (quoting *Johnson v. United States*, 576 U.S. 591, 603–04, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015)), and flexible rules may still comply with the requirements of Due Process. *See Midwest Fence Corp.*, 840 F.3d at 947–48.

**\*23** [38] The complaint alleges that Walmart knew about a substantial injury to consumers. MoneyGram, Western Union, and Ria told Walmart repeatedly about the hundreds of thousands of complaints about fraud involving Walmart's money transfers, and about hundreds of millions of dollars in related consumer losses. *See* [1] ¶¶ 30–31, 43. While Walmart hasn't contested causation yet, it seems likely that not all of those losses were attributable to deficiencies in Walmart's anti-fraud programs. But it's reasonable to infer that some of these injuries *were* caused by Walmart's conduct. The complaint says that Walmart failed to take basic steps to prevent or mitigate fraud, such as implementing and maintaining effective policies and procedures, consistently training its employees, requiring IDs for all money transfer recipients, warning consumers about the risk of fraud, and communicating with its providers so that fraudsters would be blocked from making future transfers. *See, e.g., id.* ¶¶ 49, 51–54, 56, 70–80, 88–89, 95–101.

Walmart's as-applied challenge fails when considering the magnitude of the consumer injury at issue. Section 5 required to Walmart to weigh the benefits of non-existent or lax security measures against the substantial harm to consumers who were defrauded as a result. As a sophisticated corporation, defendant was well-positioned to conduct that analysis. The FTC alleges that Walmart knew that its customers were losing millions to fraudsters making use of it services, but the company failed to implement and maintain its own policies and procedures and violated those of its money transfer providers. *See* [1] ¶¶ 16, 26, 30–31, 40, 43, 49, 50–51. As a result, consumers suffered millions of dollars in losses which were, as discussed above, not avoidable by the consumers themselves. Walmart hasn't argued that its conduct met the balancing test, and § 5 was clear enough as applied in this case to "provide a person of ordinary intelligence fair notice" that Walmart needed to do more. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012).

Walmart argues that the FTC's complaint needed to tell the company what it had to do so as to avoid liability. *See* [24] at 49. "Do better," is not meaningful guidance. Fair enough. But plaintiff wasn't required to guide Walmart's conduct in its complaint. The FTC was required to articulate a plausible set of allegations demonstrating that Walmart engaged in a practice that caused substantial consumer injury, that consumers could not reasonably avoid, and that was not justified by a cost-benefit analysis. That much the FTC has done.

Walmart also argues that the law didn't provide a sufficient standard against which the company was to compare its anti-fraud efforts. *See* [24] at 49. The FTC has targeted a set of practices, and Walmart argues that without more specific guidance, the company couldn't have known it would run afoul of § 5. *See id.* But in addition to the text of the statute, Walmart also had the benefit of cases considering similar issues and practices. *See Grayned*, 408 U.S. at 110, 92 S.Ct. 2294 (holding that court interpretations of a statute are relevant to a void-for-vagueness analysis); *United States v. Plummer*, 581 F.3d 484, 488–89 (7th Cir. 2009). In *Wells*, the FTC alleged that defendants—a payment processing company and an officer of that company—failed to follow security guidelines, ignored a high rate of expected fraud,

Federal Trade Commission v. Walmart Inc., --- F.Supp.3d ---- (2023)

ignored related consumer and bank complaints, and instead processed related transactions, causing harm to consumers. *See* Complaint ¶¶ 5–6, 8–17, *FTC v. InterBill Ltd. and Thomas Wells*, No 2:06-cv-01644-JCM-PAL, 2006 WL 4062458 (D. Nev. Dec. 26, 2006). The district court found that those allegations were supported by the uncontroverted evidence, and granted summary judgment to the FTC on its § 5 claim. *See FTC v. InterBill, Ltd.*, No. CV-S-06-01644-JCM-PA, 2009 WL 10267504, at *1 (D. Nev. April 30, 2009). The Ninth Circuit affirmed, noting that, when a defendant received reports of fraud and reversed transactions at "10 to 20 times" the generally permitted rates, failed to conduct "reasonable due diligence," ignored other red flags, and knew or should have known that transactions were unauthorized, carrying out the related transactions was an unfair practice. *FTC v. Wells*, 385 Fed. App'x. 712, 713 (9th Cir. 2010).

**\*24**   In *Neovi*, the FTC brought suit under § 5 against a software maker. *See FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010). Fraudsters took advantage of the defendant's vulnerable systems, leading to fraudulent transactions totaling more than $402,750,000 in losses. *See id.* at 1154. Despite receiving thousands of complaints, the software maker didn't effectively utilize its anti-fraud systems or otherwise solve the problem, and continued processing the fraudulent transactions, legitimizing them in the eyes of consumers. *See id.* at 1154–57. The Ninth Circuit affirmed a district court's grant of summary judgment to the FTC on the question of liability. *Id.* at 1153.

That the courts in *Neovi* and *Wells* found defendants liable under § 5 for a set of deficiencies in their anti-fraud programs and for allowing business to go forward as usual despite notice of significant consumer losses, is further reason to believe that Walmart had fair notice. *See FTC v. Wells*, 385 Fed. App'x. 712, 713 (9th Cir. 2010); *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015). While Walmart complains that it was surprised to find itself in hot water over such a broad set of practices, these cases and those filed against Walmart's money transfer providers (discussed below) should have alerted the company that a set of decisions and practices that, together, failed the cost-benefit analysis and substantially injured consumers, could be prohibited under § 5. [37]

As further reason to find that Due Process was met, the FTC cites the complaints it filed against MoneyGram and Western Union and the related consent orders it reached with those companies. *See* [43] at 35–36. While weaker evidence, these sources also suggest that Walmart had fair notice of what § 5 required. [38] Considering the complaints filed against Walmart's money transfer providers and the resulting consent orders, the FTC alleged similar theories of liability under § 5, suggesting that the agency itself thought that lax security practices related to money transfers could fail the test. *See* [1] ¶¶ 35, 37–38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 1, 13, 20 (N.D. Ill. Oct. 19, 2009); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 1, 12 (M.D. Pa. Jan. 19, 2017); *see also* 16 C.F.R. § 3.11(a) (The FTC Commissioners must vote on whether to issue a complaint.).

Walmart failed to take basic steps to prevent fraud in its money transfers, despite knowledge of enormous consumer losses. While § 5 sets up a flexible rule, considering the economic context, the balancing test set up by § 5(n), and cases imposing and suggesting liability under similar circumstances, Walmart had fair notice that lax fraud prevention that injured consumers was forbidden.

### C. Removal Protections and Agency Authority

**\*25**   Walmart argues that the Commission, by virtue of the removal protections for its commissioners, is unconstitutionally exercising executive power with this complaint. *See* [24] at 18–23. Defendant identifies a potentially unconstitutional limit on the President's removal authority, but that's not a reason to dismiss plaintiff's claims.

The FTC is led by a commission of five members, who are appointed by the President and confirmed by the Senate. *See* 15 U.S.C. § 41; *Humphrey's Ex'r v. United States*, 295 U.S. 602, 619–20, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). No more than three of the FTC's members can come from the same political party, and the Commissioners' staggered, seven-year terms enable the agency to accumulate technical expertise that outlasts changes in leadership. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 2198–99, 207 L.Ed.2d 494 (2020) (quoting *Humphrey's Ex'r*, 295 U.S. at 624, 55 S.Ct. 869); 15 U.S.C. § 41. The President can remove a Commissioner— a principal officer of this independent agency—but only for good cause: "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41; *see Free Enter. Fund v. Public*

*Co. Acct. Oversight Bd.*, 561 U.S. 477, 493, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (discussing *Humphrey's Ex'r*, 295 U.S. at 620, 55 S.Ct. 869).

[39]   The Commissioners' for-cause protections stand in contrast to the general rule: the President may remove most executive officials from office for any reason. *See* Art. II, §§ 1, 3 ("The executive Power shall be vested in a President" who must "take Care that the Laws be faithfully executed."); *Seila Law LLC*, 140 S. Ct. at 2197–98 (citing *Myers v. United States*, 272 U.S. 52, 163–64, 47 S.Ct. 21, 71 L.Ed. 160 (1926) and *Free Enter. Fund*, 561 U.S. at 483, 130 S.Ct. 3138). The Court has recognized two exceptions, however. *See* *Seila Law LLC*, 140 S. Ct. at 2198–2200. The first exception—at issue here—applies to "multimember expert agencies that do not wield substantial executive power." *Id.* at 2199–2200.

In *Humphrey's Executor*, the Court upheld for-cause removal protection for the FTC's Commissioners. *295 U.S. at 631–32, 55 S.Ct. 869.* The *Humphrey's Executor* Court reasoned that the Commission was an administrative body that performed executive functions as part of its "quasi-legislative or quasi-judicial powers." *Id.* at 628, 55 S.Ct. 869. The Court also stressed the Commission's non-partisan and staggered term structure, and saw the agency as exercising "no part of the executive power." *Id.* at 624, 628, 55 S.Ct. 869; *see* *Seila Law LLC*, 140 S. Ct. at 2199.

[40]   Decades after *Humphrey's Executor* was decided, Congress granted the FTC new powers, which the agency has invoked in this case. *See* 15 U.S.C. §§ 45(m), 53(b), 57b. These provisions allow the FTC to seek permanent injunctive relief (without agency adjudication) and civil penalties in federal court. *See id.* While the FTC's removal protections were lawful in 1935 (when *Humphrey's Executor* was decided), Walmart argues that the subsequent grant of litigation authority took the FTC out of the *Humphrey's Executor* exception. *See* [24] at 18–23. Walmart reasons that the litigation authority granted to the Commission is substantial executive power that wasn't considered in *Humphrey's Executor*. *See id.*

The litigation authority given to the FTC in the 1970s may have taken the Commission's for-cause protections past "the outermost constitutional limits" on the President's removal power. *See* *Seila Law LLC*, 140 S. Ct. at 2199–2200 (quoting then-Judge Kavanaugh's dissent in *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 196 (D.C. Cir. 2018)) (noting that the power to seek monetary penalties against private parties on behalf of the United States is "a quintessentially executive power not considered in *Humphrey's Executor*"). [39] But it doesn't follow that plaintiff cannot pursue this lawsuit.

*26   [41]   The Act includes a severability clause, which means Congress didn't want it to rise or fall on any single provision, absent strong evidence to the contrary. *See* 15 U.S.C. § 57; *Seila Law LLC*, 140 S. Ct. at 2209 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987)). Since the agency's structure was lawful before Congress granted it the litigation powers invoked in this case, Walmart argues that the solution is to strike the FTC's litigation authority, rather than the removal protections. *See* [24] at 23 (citing *Barr v. American Ass'n of Political Consultants, Inc.*, ––– U.S. ––––, 140 S. Ct. 2335, 2353, 207 L.Ed.2d 784 (2020) and *Bowsher v. Synar*, 478 U.S. 714, 734–35, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)). But the constitutional problem at issue centers on the interaction of the Commissioners' removal protections with the subsequent litigation authority given to the agency, not an unconstitutional amendment to an earlier law. *Cf.* *Barr*, 140 S. Ct. at 2353. In other words, the grant of executive power to the FTC, standing on its own, isn't unconstitutional: executive agencies often have power to sue for penalties or injunctive relief. *See, e.g.*, 7 U.S.C. § 13a-1(b), (d) (Commodity Futures Trading Commission); 15 U.S.C. § 78u(d) (Securities Exchange Commission); *see also* *Free Enter. Fund*, 561 U.S. at 508–09, 130 S.Ct. 3138 (holding that an agency's regulatory authority didn't violate the separation of powers, but the removal protections for its officers did). The real problem here is a potentially unconstitutional limit on the President's removal power. The best solution would be to target that limit.

[42]   In cases when the Court has confronted similar issues, the remedy has been to strike the offending removal

protections. *See* Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 508–09, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010);* Seila Law LLC v. Consumer Fin. Prot. Bureau*, — U.S. —, 140 S. Ct. 2183, 2207– 11, 207 L.Ed.2d 494 (2020); *see also* Collins v. Yellen*, — U.S. —, 141 S. Ct. 1761, 1787–88 & n.23, 210 L.Ed.2d 432 (2021)* ("Settled precedent ... confirms that the unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake the ... responsibilities of his office."). [40]  That makes sense, given that "when confronting a constitutional flaw in a statute," courts should "try to limit the solution to the problem." Free Enter. Fund*, 561 U.S. at 508, 130 S.Ct. 3138* (quoting Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006)).*

Another reason not to strike the agency's litigation authority is that it might not resolve the issue. As Walmart notes, the Humphrey's Executor Court may not have accurately assessed the FTC's executive powers as they existed in 1935. *See* [24] at 23; Seila Law LLC v. Consumer Fin. Prot. Bureau*, — U.S. —, 140 S. Ct. 2183, 2198–00 & nn.2, 4, 207 L.Ed.2d 494 (2020).* Striking the FTC's ability to sue for injunctive and monetary relief, then, might not be enough. The sure solution, as in *Seila Law*, would be to target the offending removal provision. *See* Seila Law LLC*, 140 S. Ct. at 2209* ("If the Director were removal at will by the President, the constitutional violation would disappear.").

The Commissioners were constitutionally appointed, and an unconstitutional removal restriction isn't a reason to void the FTC's action in this case. *See* U.S. Const. art. II, § 2, cl. 2; Collins*, 141 S. Ct. at 1787–88 & n.23.* The FTC has authority to bring this suit.

### IV. Conclusion

 **[43]**  Defendant's motion to dismiss, [23], is granted in part and denied in part. Count One is not dismissed. Count Two is dismissed without prejudice. [41]

### All Citations

--- F.Supp.3d ----, 2023 WL 2646741

---

### Footnotes

1   Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the complaint. [1].

2   First-time senders had to give their name, address, telephone number, the name of the recipient, and the state or province and country where the money was headed, but repeat customers weren't required to complete the full form. [1] ¶ 20.

3   Before 2018, the most a customer could send through MoneyGram was $20,000 per day, with a maximum single transaction of $10,000. [1] ¶ 19. In early 2018, MoneyGram lowered the single transaction limit to $8,000. *Id.* Ria money transfers through the Walmart2Walmart service were capped at $900, but that limit was raised to $2,500 in October 2016. *Id.* Before 2018, there were no limits on the amount of money that a customer could receive in a single day through either MoneyGram or Ria. *Id.* In Canada, Walmart customers could send a maximum of $7,500 (CAD) in a single transfer, and could receive no more than $5,000 (CAD). *Id.*

4   Money transfers that were related to complaints (and could have been fraud-induced) totaled over $1.3 billion. [1] ¶ 43.

5   A 2018 Walmart analysis identified 317 instances when Walmart stores met a court-established criteria for an Elevated Fraud Risk Agent Location based on the number of complaints made at certain Walmart stores. [1] ¶ 47; *see FTC v. The Western Union Co.*, 17-cv-0110, at Dkt. 12, ¶ F (M.D. Pa. Jan. 1, 2017).

6    There's an allegation that these and similar scams violated 🚩15 U.S.C. § 45(a), and that many of the same scams violated 16 C.F.R. § 310. *See* [1] ¶ 41. Consumers in such scams were instructed to send money transfers, and were induced to pay for goods or services or to make payments as a result of circumstances that did not actually exist. *See id.*

7    The cases cited by defendant don't show that a consent order can never bind—either explicitly (by applying through its terms to the agents of a signatory) or through the operation of contracts law—a non-party to the consent order. In 🚩*Altria Group, Inc.*, the Supreme Court noted that "a consent order is ... only binding on the parties to the agreement," but didn't consider the situation alleged in this case: a consent order that allegedly ran to the agent of a party to the order. 🚩*Altria Group, Inc. v. Good*, 555 U.S. 70, 89 n.13, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). 🚩*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland* doesn't disagree, because the Court in that case reasoned that parties to a consent decree could not impose obligations on a third party "without that party's agreement." 🚩478 U.S. 501, 529, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). In this case, the complaint says that Walmart entered contracts that required Walmart to comply with orders that applied to MoneyGram and Western Union. *See* [1] ¶¶ 34, 39. At this point in the case, it's reasonable to infer that these consent orders applied to Walmart as the agent of its money transfer providers. *See also* 🚩*Consumer Fin. Prot. Bureau v. TransUnion*, No. 22 C 1880, 2022 WL 17082529, at *5–7 (N.D. Ill. Nov. 18, 2022) (holding that an officer of a corporation was bound by a consent order binding the corporation); 🚩*Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir. 1984) (citation omitted) (noting that contract principles apply to the interpretation of a consent decree).

8    As a licensed money service business, Walmart was subject to the Bank Secrecy Act, which required the company to prevent certain types of fraud. *See* [1] ¶ 39; 🚩31 U.S.C. § 5311 *et seq.*

9    A 2017 MoneyGram review of Walmart's anti-fraud program identified several problems, including that defendant hadn't effectively prevented fraud, kept required transaction records, and had failed to report, file, or refer suspicious activity reports. [1] ¶ 54. MoneyGram told Walmart that its main concern was that Walmart wasn't rejecting potentially fraudulent transactions at the receive end of the transaction. *Id.*

10   A quick reference guide for Walmart associates said that if associates suspected fraud on the receiving end, they should complete the transaction. *See* [45-1] at 26. Employees were then to immediately report the fraud. *Id.* Elsewhere in the guide, employees were told not to process suspicious transactions. *Id.* at 24, 27.

11   Along the same lines, MoneyGram's 2009 consent order with the FTC required its agents to offer mandatory training at high-risk locations. [1] ¶ 77. Yet in many cases Walmart didn't promptly train employees after MoneyGram identified stores where fraud was prevalent. *Id.*

12   Ria identified many Walmart stores from 2017 to 2019 as being at a high risk for fraud. [1] ¶ 83. Some Walmart stores didn't have the right resources for employees. *Id.* ¶ 85. And compliance reviews by MoneyGram and Ria found other problems: Walmart employees weren't properly trained and didn't accurately keep records, report suspicious actives, or verify customer identities. *Id.* ¶¶ 86–89.

13   Walmart didn't provide information to its money transfer providers about all of the fraud complaints and reports it received. [1] ¶ 102. By failing to report some fraud to Ria, MoneyGram, and Western Union, Walmart made it harder for those companies to mitigate consumer fraud. *Id.* ¶ 103.

14   A cash-to-cash money transfer is the electronic transfer of cash from one person to another "sent by a money transfer provider and received in the form of cash." 16 C.F.R. § 310.2(f).

15    *AFD Advisors, LLC* is distinguishable, because the allegations in that case didn't involve fraud. *See FTC v. AFD Advisors, LLC*, No. 13 CV 6420, 2014 WL 274097, at *2 (N.D. Ill. Jan. 24, 2014). The complaint in this case sounds repeatedly in fraud. Because plaintiff's TSR claims are premised on a course of deceptive or fraudulent conduct, I disagree with *FTC v. Student Aid Center, Inc.* insofar as that case suggests that Rule 9 can never apply to a TSR claim. 281 F.Supp.3d 1324, 1331–32 (S.D. Fla. 2016); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007); *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019) (allegations of deception trigger Rule 9(b)).

16    *See United States v. Caballero*, No. 16-cr-0124 (E.D. Ark.); *United States v. Caballero*, No. 16-cr-0201 (D. Minn); *United States v. Mirabel*, No. 16-cr-0269 (N.D. Tex.); *United States v. Pando*, No. 17-cr-0046 (N.D. Miss); *United States v. Labra*, No. 17-cr-0314 (D. Md.); *United States v. Gohill*, No. 17-cr-0212 (E.D. Wis.); *United States v. Patel*, No. 17-cr-0094 (E.D. Wis.); *United States v. Marcks*, No. 19-cr-0315 (D. Nev.); *U.S. v. Parmar*, No. 19-cr-0160 (E.D. Va.); *United States v. Hines*, No. 17-cr-1038 (N.D. Iowa); *United States v. Smith*, No. 21-cr-0372 (M.D. Pa.); *United States v. Budhadev*, No. 20-cr-0252 (M.D. Pa.).

17    The cases cited by the FTC are distinguishable. *Glob. Mktg. Grp., Inc.*, involved the evidence supporting a monetary judgment under the TSR, not the pleading standard for a violation of the rule. *FTC v. Glob. Mktg. Grp., Inc.*, 594 F.Supp.2d 1281, 1290 (M.D. Fla. 2008). The court in *Figgie Int'l Inc.* found that a showing of individual reliance on misrepresentations wasn't required to secure an injunction to prevent unfair practices, but didn't assess what was required to allege a violation of the TSR. *FTC v. Figgie Int'l Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993).

18    That Walmart associates were told to process certain suspicious transactions, [1] ¶ 55, doesn't show that the company knew that those transactions were violating the TSR. Similarly, Walmart's general awareness of criminal prosecutions involving money transfers at its stores, *id.* ¶¶ 27–28, receipt of consent orders, *id.* ¶¶ 35, 37–38, 105, and the language of the TSR's preamble—describing the general use of money transfers by telemarketers—aren't sufficient, either.

19    The facts here aren't like those in *HES* and *Chapman*, cases involving detailed awareness of red flags related to particular set of accounts and transactions. *See FTC v. HES Merch. Services Co., Inc.*, No. 6:12-cv-1618-ORL-22KRS, 2014 WL 6863506, at *8 n.5 (M.D. Fla. Nov. 18, 2014); *FTC v. Chapman*, 714 F.3d 1211, 1217–19 (10th Cir. 2013). Here, by contrast, Walmart isn't alleged to have had reason to suspect any particular transactions or subset of transactions, but was generally aware of fraud in its (extensive) money transfer business.

20    In its original version of the rule, the FTC would have required more of a direct connection between a third party's assistance and an underlying violation, but the FTC rejected that requirement in the final rule. *See* Revised Notice of Proposed Rulemaking, Telemarketing Sales Rule, 60 Fed. Reg. 30,406, 30,414 (June 8, 1995); Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995). Explaining the change, the FTC cited a concern that the additional element of proof "would burden law enforcement." Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995).

21    Because the FTC rejected a direct-relation requirement for substantial assistance, the *Rosen* court concluded that aider-abettor principles under securities law weren't persuasive as to what constitutes substantial assistance under the TSR. *See C.F.P.B. v. Daniel A. Rosen, Inc.*, Case No. 2:21-cv-07492-

VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) (citations omitted). I disagree with 🔖*Rosen*'s conclusion that these background principles aren't relevant. The agency removed the direct-connection requirement to avoid burdening law enforcement (not to signal deviation from aiding-and-abetting principles) and, in the same explanation for the rule, cited tort and securities laws and referenced an "ordinary" understanding of the word "substantial." *See* Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851–52 & nn.96–98 (Aug. 23, 1995).

22    Processing extraordinary transactions, given the right amount of knowledge, can be active participation in the underlying fraud. *See Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025–26 (7th Cir. 2018) (citations omitted) (applying Illinois law and noting that, under Restatement (2d) of Torts § 876, in-concert liability requires active participation in the tortious conduct of another); 🔖*JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 257 (S.D.N.Y. 2005) (citation omitted) (executing an ordinary transaction can be substantial assistance if it "made a substantial contribution to the perpetration of the fraud"); *see also* 🔖*Aluminicaste Fundicion De Mex. S. De RL CV v. Shen*, Case No. 2:17-cv-002255-CAS( ), 2017 WL 6453276, at *10 (C.D. Cal. Dec. 11, 2017) (deciding that performance of an ordinary business transaction when a bank knows it's assisting in the commission of a tort is active participation).

23    When Walmart employees actively participated in fraud, *see* [1] ¶ 50, Walmart may have crossed the culpability line, but those transactions need to be alleged with particularity.

24    Any violation of the TSR would constitute a violation of Section 5. *See* 15 U.S.C. §§ 6102(c), 🔖57a(d)(3).

25    🔖*Samuels* is distinguishable because that case involved Illinois law, which applies the factors from 🔖*Sperry* (and 🔖*Spiegel*). *See* 🔖*Samuels v. Old Kent Bank*, No. 96 C 6667, 1997 WL 458434, at *9 (N.D. Ill. Aug. 1, 1997); *see also* 🔖*Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) (citing *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417–18, 266 Ill.Dec. 879, 775 N.E.2d 951 (2002)). Insofar as 🔖*Samuels* or other cases applying Illinois law suggest that 🔖*Spiegel* or 🔖*Sperry* define the test under the Federal Trade Commission Act, I disagree.

26    That the Supreme Court in 🔖*Sperry* referred to the FTC's approach to unfairness underscores the one-to-one relationship between how the FTC must approach unfairness under § 5 and how that term is reviewed in a court. *See* 🔖*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). In arguing that § 5(n)'s requirements are necessary conditions for a finding of unfairness, *see* [44] at 22, Walmart admits that there's overlap between § 5(n)'s approach and the definition of unfairness under § 5(a).

27    The 🔖*LabMD* court understood the FTC's 1980 policy statement, combined with 🔖*Sperry*, to establish a requirement that to be unfair an act must violate an established public policy. *See* 🔖*LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 & n.24, 1231 & n.28 (11th Cir. 2018). I decline to follow the Eleventh Circuit's approach. While acknowledging that public policy considerations were relevant, neither 🔖*Sperry* nor the 1980 policy statement specified that a violation of public policy was required to find unfairness. *See* 🔖*FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); 1980 FTC Unfairness Policy Statement. The 🔖*LabMD* court found § 5(n)'s discussion of public policy to be "ambiguous." 🔖*LabMD, Inc.*, 894 F.3d at 1229 n.24. While § 5(n) could perhaps have been clearer about the role of public policy considerations, it undermines the proposition that a violation of an established public policy is a requirement for finding unfairness. In fact, § 5(n) suggests that public policy considerations are an optional analysis. *See*

⚑15 U.S.C. § 45(n) (emphasis added) ("[T]he Commission *may* consider established public policies as evidence."); *see also* ⚑*Sperry & Hutchinson Co.*, 405 U.S. at 245 n.5, 92 S.Ct. 898 (discussing the possibility that an act or practice could be unfair based only on a finding of substantial injury); ⚑*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244 (3d Cir. 2015) ("[Section 5(n)] acknowledges the potential significance of public policy."); *Miner v. Gov't Payment Serv., Inc.*, Case No. 1:14-cv-07474, 2015 WL 3528243, at *6 (N.D. Ill. June 4, 2015). A public policy analysis under § 5 began with the FTC's 1964 approach, as discussed in ⚑*Sperry*. But Congress has now addressed the subject, and under § 5(n) a violation of public policy is no longer required.

28    That the word unfair sometimes means injustice or wrongfulness, *see, e.g.,* ⚑*Zablocki v. Merchants Credit Guide Co.*, 968 F.3d 620, 627 (7th Cir. 2020), isn't a reason to import additional requirements into the § 5 standard. Congress may define terms outside their usual meanings, and § 5(n) adequately defines unfairness without excluding wrongfulness as a relevant consideration.

29    The ⚑*Wyndham* court discussed the possibility that § 5(n)'s conditions may be necessary, rather than sufficient conditions for finding unfairness. *See* ⚑*FTC v. Wyndham Worldwide Corp*, 799 F.3d 236, 259 (3d Cir. 2015). The Third Circuit declined to decide the issue, and was unpersuaded by additional requirements proposed by a defendant. *See* ⚑*id.* Here, Walmart has failed to show additional requirements (beyond those specified in § 5(n)) that must be met before conduct qualifies as unfair. As discussed above, the two requirements that defendant proposes—a violation of established public policy and some version of wrongfulness—run counter to the text of § 5(n) and the FTC's 1980 policy statement.

30    Walmart argues that because the FTC is seeking an injunction to remedy violations of § 5, past conduct isn't relevant. *See* [44] at 24 n.8. But past violations of § 5 matter here because they can show that there remains a risk of future violations. *See* ⚑*United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *see also* ⚑*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275–76 (7th Cir. 2009).

31    That victims consciously chose to send money and that other people didn't send funds to fraudsters doesn't show that the injuries in this case were reasonably avoidable. *See* ⚑*Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("Tolerating fraud by excusing deceit when the victim is too easily gulled increases both the volume of fraud and expenditures on self-defense. Society is better off with less fraud and fewer precautions against it.").

32    That Walmart provided some warnings to consumers, *see* [1] ¶ 20, doesn't show that consumers had an informed choice. The FTC has alleged that Walmart's warnings were non-existent or insufficient in many circumstances. *See id.* ¶¶ 15–16, 49, 52, 68, 85, 99–101.

33    The FTC also asks for civil penalties for each violation of the TSR. *See* [1] ¶ 118; ⚑15 U.S.C. § 45(m)(1)(A). Because the complaint fails to allege any TSR violations, the request for related civil penalties is dismissed without prejudice. I decline to decide whether Walmart knew or should have known that its conduct was prohibited by the rule. *See* ⚑15 U.S.C. § 45(m)(1)(A).

34    *But see* ⚑*United States v. JS & A Grp., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983); ⚑*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 773 (7th Cir. 2019) (noting that not every one of § 13(b)'s requirements apply to a request

for a permanent injunction). Even if some of § 13(b)'s requirements don't apply to permanent injunctions, however, they "inform the meaning of 'injunction' " in the statute. 🚩 *Credit Bureau Ctr.*, 937 F.3d at 773.

35    Walmart argues that the agency needed to allege that Walmart could resume "a specific act or practice" that the company ceased because of the FTC's investigation, not a general set of practices that violate the law. *See* [44] at 20–21 (citing *FTC v. Elec. Payment Solutions of America Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at *9–10 (D. Ariz. Aug. 28, 2019)). But violations of the law can include diffuse actions, and whether Walmart ceased its conduct because the FTC began investigating is just one relevant factor. That the court in *Electric Payment Solutions* considered a single scheme doesn't mean that only discrete actions can violate § 5. *See FTC v. Elec. Payment Solutions of America Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at *9–10 (D. Ariz. Aug. 28, 2019). The other cases cited by Walmart are distinguishable. Unlike in 🚩 *Shire* and 🚩 *Facebook*, the complaint says that Walmart's conduct continues to violate § 5 and that the company changed course only after the FTC intervened. *See* 🚩 *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159–60 (3d Cir. 2019); 🚩 *FTC v. Facebook, Inc.*, 560 F.Supp.3d 1, 26–27 (D.D.C. 2021). This case isn't like the situation in 🚩 *AdvoCare* because Walmart continues to process large numbers of money transfers, *see* [1] ¶¶ 8, 82, which means the "channels of misconduct utilized by" Walmart remain open. 🚩 *FTC v. AdvoCare Int'l, L.P.*, CIVIL NO. 4:19-CV-715-SDJ, 2020 WL 6741968, at *6 (E.D. Tex. Nov. 16, 2020).

36    A statute can be vague either facially—in the abstract—or as-applied, meaning "in light of the facts of the particular case." 🚩 *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020) (citing 🚩 *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) and *United States v. Johnson*, 875 F.3d 360, 370 (7th Cir. 2017)). Generally, the constitutionality of a statute is determined as applied to a litigant. 🚩 *Id.* (citing 🚩 *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) and 🚩 *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

37    *LabMD, Inc.*, is distinguishable, because that case discussed the clarity required in a cease-and-desist order, not what was required to put a party on notice under the Due Process Clause. *See* 🚩 *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235–36 (11th Cir. 2018).

38    Walmart is right that consent orders are not precedential and do not reflect merits determinations as to liability under § 5. But the complaints and consent orders in this case are relevant to what § 5 requires because they provide a signal of the FTC's interpretation of that law. *See* 🚩 *Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see also* 🚩 *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 256–58 & n.23 (3d Cir. 2015). Recall that the FTC is the only party that can bring an action under § 5, making its interpretation a signal to potential defendants.

39    There's reason to believe that the FTC may still fall within the exception. The 🚩 *Humphrey's Executor* exception is premised not only on the amount of executive power an agency wields but also on organizational features that show an agency to be non-executive. *See* 🚩 *Humphrey's Executor v. United States*, 295 U.S. 602, 624, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). And, even after *Seila Law*, it's not clear how much executive power is too much, such that the removal protections of an independent agency, formed like the FTC, offend Article II. *See* 🚩 *Seila Law LLC v. Consumer Fin. Prot. Bureau*, ⸺ U.S. ⸺, 140 S. Ct. 2183, 2199–2200 & nn.2, 4, 207 L.Ed.2d 494 (2020). That the Supreme Court has repeatedly declined to overturn 🚩 *Humphrey's*

*Executor*, even after the agency was granted additional litigation authority by Congress, may also show that the agency's removal protections continue to fall under the exception.

40   Walmart argues that *Seila Law* and 🚩 *Collins* are distinguishable because those cases considered agencies that had executive powers from the outset, and so accompanying removal restrictions were never enforceable. *See* [24] at n.3 (discussing 🚩 *Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 2207–11, 207 L.Ed.2d 494 (2020) and 🚩 *Collins v. Yellen*, —— U.S. ——, 141 S. Ct. 1761, 1788–89 & n.23, 210 L.Ed.2d 432 (2021)). But those cases are helpful insofar as they considered—and remedied—statutes that unconstitutionally limited the President's removal power. That the potential removal problem in this case began with a grant of litigation authority doesn't change the underlying problem, which is about the President's removal power, not about a principal officer's use of executive power.

41   Ordinarily a plaintiff should be given at least one opportunity to amend a complaint. *See* 🚩 *Saint Anthony Hosp. v. Eagleson*, 40 F.4th 492, 517 (7th Cir. 2022) (quoting 🚩 *Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519 (7th Cir. 2015)).

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 76 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

KeyCite Yellow Flag - Negative Treatment

Disagreed With by In re Loestrin 24 Fe Antitrust Litigation, D.R.I., December 17, 2019

2018 WL 2984873

United States District Court,
N.D. Georgia, Atlanta Division.

IN RE: ANDROGEL ANTITRUST

LITIGATION (NO. II)

Federal Trade Commission, Plaintiff,

v.

Actavis, Inc., et al., Defendants.

MDL DOCKET NO. 2084

1:09-MD-2084-TWT

CIVIL ACTION FILE NO. 1:09-CV-955-TWT

Signed 06/14/2018

**OPINION AND ORDER**

THOMAS W. THRASH, JR., United States District Judge

**\*1** This is an antitrust action brought by the Federal Trade Commission and private antitrust actions transferred to this Court by the Judicial Panel on Multidistrict Litigation. They are before the Court on the Defendant Solvay's Motion for Summary Judgment on the FTC's Claims [FTC Doc. 620], Solvay's Motion for Summary Judgment as to the Par/Paddock Settlement [FTC Doc. 621, MDL Doc. 1551], the Defendants Actavis and Actavis Holdco's Motion for Summary Judgment [FTC Doc. 625, MDL Doc. 1556], Solvay's Motion for Summary Judgment for Lack of Antitrust Injury Against the Private Plaintiffs [MDL Doc. 1550], Solvay's Motion for Summary Judgment as to Retailer's Damages Claims on AndroGel 1.62% Purchases [MDL Doc. 1552], the Defendants Par and Paddock's Motion for Summary Judgment [MDL Doc. 1559], the Defendants Actavis, Inc. and Solvay's Motion to Exclude Plaintiffs' Proposed Patent Law Expert Jack C. Goldstein, Esq. [FTC Doc. 622, MDL Doc. 1553], and the Defendants Solvay, Par, and Paddock's Motion to Exclude in Part Plaintiffs' Expert James R. Bruno [FTC Doc. 630, MDL Doc. 1562].

For the reasons set forth below, Solvay's Motion for Summary Judgment on the FTC's Claims [FTC Doc. 620] is DENIED, Solvay's Motion for Summary Judgment as to the Par/Paddock Settlement [FTC Doc. 621, MDL Doc. 1551] is DENIED, Actavis and Actavis Holdco's Motion for Summary Judgment [FTC Doc. 625, MDL Doc. 1556] is DENIED, Solvay's Motion for Summary Judgment for Lack of Antitrust Injury Against the Private Plaintiffs [MDL Doc. 1550] is DENIED, Solvay's Motion for Summary Judgment as to Retailer's Damages Claims on AndroGel 1.62% Purchases [MDL Doc. 1552] is GRANTED, the Defendants Par and Paddock's Motion for Summary Judgment [MDL Doc. 1559] is DENIED, Actavis, Inc. and Solvay's Motion to Exclude Plaintiffs' Proposed Patent Law Expert Jack C. Goldstein, Esq. [FTC Doc. 622, MDL Doc. 1553] is DENIED, and Solvay, Par, and Paddock's Motion to Exclude in Part Plaintiffs' Expert James R. Bruno [FTC Doc. 630, MDL Doc. 1562] is GRANTED in part and DENIED in part.

**I. Background**

In the early nineties, Besins Healthcare, S.A. developed the pharmaceutical formulation for AndroGel, a prescription topical gel used to treat low testosterone in men. In August 1995, Besins granted Solvay Pharmaceuticals, Inc., a license to sell AndroGel in the United States. [1] Besins also agreed to manufacture AndroGel and supply it to Solvay once Solvay received FDA approval to sell the drug.

At this point, it is important to understand how new drugs enter the market in the United States. In order to sell a new drug in the United States, a pharmaceutical firm must file a New Drug Application ("NDA") with the Food and Drug Administration. [2] The NDA must contain a complete report about the drug, including safety and efficacy studies, the composition of the drug, a description of how the drug is produced, and proposed labeling. [3] The process to approve new proprietary drugs—known as "brand name" drugs—is both time consuming and costly.

**\*2** Although the possibility for large profits after FDA approval is often an incentive for pharmaceutical companies to pursue the NDA process for brand name drugs, the cost associated with it may also serve as a significant barrier to entry by generic formulations of the same drug. These high barriers limit competition, which in turn may hurt consumers. This concern led Congress to enact the Hatch-

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 77 of 179

In re AndroGel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

Waxman Act in 1984.[4]  The Hatch-Waxman Act enables companies that want to market and sell a generic version of a brand-name drug to avoid filing an NDA. As long as the generic and the brand-name drug are effectively the same thing, generic manufacturers can file a substantially shorter Abbreviated New Drug Application ("ANDA"). This reduces costs for generics manufacturers, which may allow them to charge much lower prices than brand name drugs, therefore benefitting consumers.

In order to prevent generic manufacturers from completely cutting into the profitability of brand name drugs, thereby reducing the incentive for brand name manufacturers to go through the cost and risk of the NDA process, federal law provides two ways for brand name pharmaceutical manufacturers to protect their investment. First, the FDA can grant brand name manufacturers periods of "exclusivity," which means that the FDA will not approve another application to sell the same drug until the exclusivity period (usually three or five years) ends. Second, brand name manufacturers can patent their new drug. Just like any other patent, drug patents grant brand name manufacturers a legal monopoly for a limited period of time. If there are any patents that cover the brand name drug, a generic manufacturer's ANDA must contain an additional certification. The ANDA must certify that (1) the patent has not been listed with the FDA, (2) the patent has expired, (3) the patent will expire on a certain date, or (4) the patent is invalid or will not be infringed by the generic drug.[5]  The last certification is known as a Paragraph IV certification. For any ANDA with a Paragraph IV certification, the applicant must also notify the patent holder of the ANDA.[6]  If the patent holder decides to file an infringement suit after receiving notice of the Paragraph IV certification, the FDA is then prohibited from approving the generic for market entry for up to thirty months while the litigation proceeds.

In April 1999, Solvay filed an NDA for AndroGel. It was approved by the FDA in February 2000, and Solvay received three years of exclusivity. Solvay was also issued a patent on AndroGel, U.S. Patent No. 6,503,894 ('894 patent). Although AndroGel was not the only available method of testosterone replace-ment therapy, other methods were not as effective or as popular as AndroGel. The protection afforded Solvay by the exclusivity period and Solvay's patent helped AndroGel to quickly become the most popular form of testosterone replacement therapy. From 2000 to 2007, sales of AndroGel in the United States were over $1.8 billion.

In the meantime, other pharmaceutical companies were developing generic versions of AndroGel. Once Solvay's new drug product exclusivity expired in February 2003, the FDA was authorized to approve generic versions of AndroGel. In May 2003, two companies each submitted ANDAs with Paragraph IV certifications for generic AndroGel. Actavis, Inc.[7] submitted the first ANDA, and Paddock Laboratories, Inc. submitted the second. Both companies also sent notice of their ANDAs to Solvay and Besins. In July 2003, Paddock reached an agreement with Par Pharmaceuticals. Par agreed to share any litigation costs with Paddock, and to sell Paddock's generic AndroGel. In return, Paddock agreed to share profits with Par.

**\*3**  Solvay responded to the ANDAs by asserting its rights under the '894 patent. In August 2003, Solvay's subsidiary, Unimed Pharmaceuticals, Inc., filed patent infringement actions against Watson and Paddock (the "Generics") in this Court.[8]  Solvay alleged infringement based on the filing of the ANDAs.[9]  Because Solvay filed infringement actions against the Generics within the forty-five day window of receiving notice, the FDA stayed approval of their ANDAs for thirty months.

For the next few years, Solvay and the Generics litigated the infringement actions. Both followed a similar schedule. From late 2003 to the middle of 2005, the parties engaged in discovery, scheduling, and other initial litigation matters. By August 2005, the parties had filed motions for claim construction. By December 2005, the Generics had filed motions for summary judgment on the validity of the '894 patent as well as claims construction briefs. All of the motions were fully briefed and ready for decision in early 2006.

While the motions were pending, Actavis and Paddock moved toward entering the market with generic AndroGel. In January 2006, the thirty month stay ended, and the FDA approved Actavis' ANDA. The FDA, however, continued to stay approval of Paddock's ANDA. The first firm to file an ANDA with a Paragraph IV certification receives generic exclusivity upon FDA approval, which is similar to brand-name exclusivity, but shorter. Generic exclusivity means that the FDA will not approve a subsequent ANDA for the same drug until 180 days after the earlier of (1) the date the first filer begins commercial marketing of its generic drug, or (2) the date a district court enters judgment that the patent is invalid or not infringed, whichever date is earlier.[10]  Because Actavis was the first to file an ANDA for generic AndroGel,

2018-1 Trade Cases P 80,409

it received generic exclusivity over Paddock. In February 2006, Actavis prepared a report predicting that it would sell generic AndroGel by January 2007 and that the price would be 75 percent less than brand name AndroGel. In the same month, Par prepared a report predicting that Actavis would sell generic AndroGel as early as March 2006 and that Par and Paddock would follow in September 2006.

But before the Court decided the pending motions in the infringement actions, and before anyone entered the market with generic AndroGel, Solvay and the Generics settled the cases. Under the September 13, 2006 settlement between Solvay and Actavis, Solvay agreed to voluntarily dismiss the infringement action, and Actavis agreed not to market generic AndroGel until the earlier of August 31, 2015 or the date another company marketed generic AndroGel. [11] And under the September 13, 2006 settlement between Solvay and Par/Paddock, Solvay agreed to a consent judgment dismissing the infringement action, and Par/Paddock agreed not to market generic AndroGel until the earliest of August 31, 2015 (but only if Actavis did not assert its 180 day generic exclusivity period), the date another company launched generic AndroGel, or February 28, 2016. [12]

 **\*4** On the same day as the settlements, Solvay also entered into business promotion agreements with Actavis, Par, and Paddock. Under the agreement between Solvay and Actavis, Solvay agreed to share profits of AndroGel with Actavis, and Actavis agreed to promote AndroGel to urologists. [13] Under the agreement between Solvay and Par, Solvay agreed to share profits of AndroGel with Par, and Par agreed to promote AndroGel to primary care physicians. [14] And under the agreement between Solvay and Paddock, Solvay agreed to share profits of AndroGel with Paddock, and Paddock agreed to serve as a backup supplier of AndroGel. [15]

Together, these types of settlements are called "reverse payment" settlements, and they have recently become popular in pharmaceutical litigation. Reverse payment settlements are so called because they are the reverse of traditional patent infringement settlements. In a traditional settlement, the party with the claim—in this case, the brand name manufacturer—receives a payment from the defendant—in this case the generic—either equal to or less than the value of its claim. [16] But in a reverse settlement, "a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market." [17]

The reverse payment settlements prompted an investigation by the Federal Trade Commission for violations of antitrust laws. That investigation was completed in 2008. In 2009, the FTC and a number of private parties filed these antitrust actions against Solvay, Actavis, Par, and Paddock. All of the actions were filed in other federal district courts and then transferred to this Court either by change of venue or by order of the United States Judicial Panel on Multidistrict Litigation. On February 22, 2010, applying settled Eleventh Circuit precedent, this Court dismissed the FTC action for failure to state a claim. [18] On appeal, the Eleventh Circuit affirmed. [19] However, the Supreme Court granted certiorari, and eventually reversed and remanded the cases in 2013. [20]

So, after five years, everything started all over. [21] The Plaintiffs are divided into three groups: the FTC, the Direct Purchaser Class Plaintiffs, and the Retailers. [22] The Direct Purchaser Class Plaintiffs and the Retailers constitute the Private Plaintiffs. All of the Plaintiffs allege that the Defendants violated federal antitrust law. [23] The Defendants now move for summary judgment on various grounds.

## II. Legal Standards

### A. Daubert Motions

 **\*5** Federal Rule of Evidence 702 governs the admission of expert opinion testimony. Pursuant to that rule, before admitting expert testimony a court must consider: (1) whether the expert is competent to testify regarding the matters he intends to address; (2) whether the methodology used to reach his conclusions is sufficiently reliable; and (3) whether the testimony is relevant, in that it assists the jury to understand the evidence or determine a fact in issue. [24] In ruling on the admissibility of expert testimony, "[t]he focus must be 'solely' on the expert's 'principles and methodology, not on the conclusions that they generate.' " [25] If the expert predicates his testimony on an assumption that is belied by the evidence, the expert's testimony is properly excluded. [26] The party offering the expert's testimony has the burden to prove it is admissible by a preponderance of the evidence. [27]

### B. Summary Judgment

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no

2018-1 Trade Cases P 80,409

genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. [28] The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. [29] The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact. [30] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. [31] "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." [32]

### III. Discussion

The FTC and the Private Plaintiffs allege that the Defendants violated federal antitrust law by entering into the reverse settlement agreements. Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." [33] Section 2 of the Sherman Act likewise prohibits agreements to monopolize trade. [34] And Section 5 of the Federal Trade Commission Act states that "unfair methods of competition" are illegal, [35] a prohibition which has long been held to encompass the violations of the Sherman Act. [36] Thus, the different claims can be analyzed together.

### A. Daubert Motions

#### 1. Jack Goldstein

Solvay and Actavis move to exclude the testimony of Jack Goldstein. The Private Plaintiffs will call Goldstein to testify at trial as to how a reasonable and competent patent attorney would have advised litigants in Solvay's or the Generics' positions at the time they settled the underlying patent litigation on (1) the likelihood of success in the litigation; (2) the likely timing of the litigation's resolution if the parties had not settled; and (3) each of the parties' likely litigation costs had they not settled. [37] The Defendants argue that Goldstein is not qualified to give these opinions, and that his methodology is unreliable. Both arguments are without merit.

**\*6** The Defendants challenge Goldstein's qualifications, arguing that he does not have the requisite firsthand experience to properly assess the likely outcome, cost, or timing of the litigation. But the Defendants mistakenly argue that in order to testify about these issues, Goldstein needs to have recent, repeated, and specialized experience litigating patent cases arguing the specific legal and factual issues that were at issue in the underlying patent litigation. Goldstein does not need such specialized experience at all. "It is not necessary that the witness be recognized as a leading authority in the field in question.... Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony—not its admissibility." [38] Further, Goldstein is testifying as to what a reasonable and competent patent attorney would have thought at the time of the settlements. The question, therefore, is whether Goldstein has experience as a reasonable and competent patent attorney. [39]

There can be no doubt that the answer to that question is yes. Goldstein has had a long and distinguished career in the field of patent law. He has studied, interacted with, and litigated patent issues for fifty years. [40] After earning his law and engineering degrees, Goldstein began his legal career as a clerk for a judge on the U.S. Court of Customs and Patent Appeals, one of the predecessor courts to the Federal Circuit. [41] He then went on to work for a law firm specializing in intellectual property for almost thirty years, during which time he also taught patent and copyright law as an adjunct professor at South Texas College of Law in Houston. [42] After leaving the firm in 1997, Goldstein became president of an intellectual property holding company, during which time he enforced the company's IP rights through patent litigation multiple times. [43] Goldstein now serves as a mediator, arbitrator, counsel, and expert in intellectual property matters. [44] In addition, he serves or has served in numerous national intellectual property law professional groups, including as President of the American Intellectual Property Law Association. [45] The experience the Court lists here is only a fraction of that listed on Goldstein's *curriculum vitae*. Goldstein clearly "possess[es] skill or knowledge greater than the average layman," [46] and is qualified to testify as to what a reasonable and competent attorney would have considered the likely outcome, length, and cost of pursuing the underlying litigation to a complete and final end.

The Defendants also seek to exclude Goldstein's testimony on the grounds that his methodology is unreliable. First, the

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 80 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)
2018-1 Trade Cases P 80,409

Defendants argue that Goldstein had no methodology at all for his opinion that a reasonable and competent patent attorney would have advised Solvay that it had a 20% chance of winning the litigation. This is incorrect. Goldstein began his analysis by using two studies available at the time of the settlement to assess what the average outcomes were in patent cases involving a generic defendant. [47] Using these studies, it is Goldstein's opinion that on average a brand manufacturer plaintiff would have about a 25-30% chance of winning a Hatch-Waxman patent infringement case. [48] Goldstein then examined the merits of the underlying patent litigation in this case to determine whether Solvay's position was stronger or weaker than the average Hatch-Waxman plaintiff. [49] Goldstein found that it was weaker than the average, although not by a lot. Goldstein estimated that a reasonable and competent patent attorney would have discounted Solvay's chances of success by about 10%, meaning that it would have had between a 15-20% chance of succeeding in the underlying litigation. [50] Goldstein clearly has a methodology, even if the Defendants believe it to be a weak one.

**\*7** Similarly, Goldstein's opinions on the merits, cost, and timing of the litigation are reliable enough to be put to a jury. Although the Defendants argue that his views on the law are unreliable because they are incorrect, that is something on which reasonable and competent patent attorneys can disagree. Indeed, the only people who can say with true 100% certainty what the law is are the Justices of the United States Supreme Court. Further, while using survey data and the Court's statements to estimate cost and timing are not foolproof, they are reliable enough for reasonable jurors to consider. The Defendants' arguments basically boil down to the fact that they disagree with Goldstein's opinions, not their reliability. Such arguments are better addressed through the traditional means of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." [51] For these reasons, the Defendants' motion to exclude Goldstein's testimony is denied.

### 2. James Bruno

The Defendants also seek to exclude testimony of the Plaintiffs' expert James Bruno. In particular, the Defendants seek to exclude Bruno's opinions and testimony on the valuation of the Backup Manufacturing Agreement ("BMA") between Solvay and Par/Paddock, including whether Solvay's

compensation to Par/Paddock was fair value for services or constituted a large and unjustified payment. The Court agrees, and the Plaintiffs concede, that Bruno does not offer a quantitative valuation of the BMA. [52] As such, Bruno does not and cannot offer testimony as to a specific monetary value for the BMA. To the extent that other experts assign one to the BMA based on Bruno's testimony, such testimony would be inappropriate and should be excluded.

However, the Defendants are incorrect in saying that all of Bruno's testimony regarding the BMA should be excluded. Although Bruno does not offer a specific monetary value to the BMA, such testimony is not *necessary* to show that a payment is "large and unjustified" under *Actavis*. As discussed later in this Opinion, the key inquiry in determining whether the reverse payment settlements violated the antitrust laws is whether they were entered into for the purpose of avoiding the risk of competition. Bruno's other testimony regarding the BMA, including his opinions that the BMA was out of step with industry practice and the Generics' regular business practices, is certainly relevant to answering that question. [53] Thus, while Bruno's testimony cannot support a specific, monetary valuation for the purpose of mathematically comparing the value of services, his testimony is relevant to answering what the "value" of the settlement was to the Defendants, whether its value was actually in the services provided, or in avoiding the risk of competition. On those grounds, Bruno's testimony would be helpful to the jury, and is allowed.

### B. Antitrust Conspiracy

Turning now to the summary judgment motions, Actavis first moves for summary judgment on the theory that the Plaintiffs have failed to demonstrate that Actavis conspired to restrain trade. [54] Under the Sherman Act, 🚩Section 1 claims and 🚩Section 2 conspiracy to monopolize claims "require the same threshold showing—the existence of an agreement to restrain trade." [55] A written contract satisfies this requirement "only if it embodies an agreement to unlawfully restrain trade." [56]

Actavis argues that the settlement agreements do not meet this standard because "they evince no agreement or understanding by [Actavis] to 'delay its entry' in exchange for a share of Solvay's monopoly profits ..." [57] Actavis cites a number of cases that find that the mere existence of a contract between

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 81 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

two parties is not sufficient to establish a conspiracy between them. [58] In those cases, however, the contracts were merely *indirect* evidence of a conspiracy from which the factfinder could infer an agreement to violate the antitrust laws. Finding a conspiracy on such indirect evidence raises the concern that "contractual partners would potentially be on the hook for any future conduct the other party engages in under color of the contract." [59]

**\*8** But that concern is not present in cases with *direct* evidence, such as this one. "Direct evidence of a conspiracy 'obviates the need' for evidence that excludes the possibility of independent action." [60] In this case, the settlement agreements specifically address the conduct the Plaintiffs argue is unlawful. The parties negotiated and agreed that in exchange for dropping the patent litigation, providing some services, and delaying generic introduction until 2015, the Generics would receive compensation. [61] Whether that common objective—dropping the patent litigation in exchange for compensation—was an illegal restraint of trade is a separate question. But if it was, then the settlements are clear, direct evidence of an agreement to unlawfully restrain trade. [62] Not only is there enough evidence for a jury to find that there was an agreement, it is doubtful that a reasonable jury could find otherwise. Therefore, Actavis' motion for summary judgment on the issue of conspiracy is denied.

### C. Anticompetitive Effect

Having disposed of Actavis' conspiracy argument, the Court now turns to what has been the central issue in this case all along: whether the reverse settlement agreements were unlawful. [63] The antitrust laws prohibit conduct that is "unreasonable and anticompetitive." [64] "A restraint is unreasonable if it has an adverse impact on competition and cannot be justified as a pro-competitive measure." [65] Usually this is determined by balancing the effects under the test known as the "rule of reason." "[T]he rule of reason standard hinges the ultimate legality of a restraint on whether the plaintiff has demonstrated an anticompetitive effect which is not offset by a need to achieve a procompetitive benefit or justification." [66] Sometimes, however, conduct is so blatantly anticompetitive that courts have found it to be illegal *per se*. [67]

When this case was before the Supreme Court on appeal, the FTC and the Defendants took starkly opposing views

on the question of the settlements' effect on competition. The Defendants argued that the settlements were not anticompetitive because they did not delay generic entry past the life of the '894 patent. In other words, as long as the '894 patent would have independently blocked generic entry, the settlements could not possibly be anticompetitive. If anything, the settlements should be considered procompetitive by allowing entry earlier than the expiration of patented exclusivity. The FTC, by contrast, took the view that reverse payment settlements are by their very definition anticompetitive, and should be subject to the *per se* rule of illegality, because they explicitly and openly involve sharing the profits of a monopoly to buy off competitors and delay generic entry in order to restrict competition.

**\*9** The Supreme Court took a middle road between these two extremes. While recognizing that a valid patent certainly would have excluded generics from the market, the Court noted that "an *invalidated* patent carries with it no such right. And even a valid patent confers no right to exclude products or processes that do not actually infringe." [68] Thus, the existence of a patent does not necessarily say anything about whether competition was restricted.

At the same time, the Court said abandoning the rule of reason in favor of the FTC's *per se* approach was not appropriate, because "the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification." [69] Instead, the Court held that when it comes to scrutinizing reverse payment settlements, the "FTC must prove its case as in other rule-of-reason cases."

The parties disagree about what constitutes an anticompetitive harm and what the Plaintiffs must demonstrate to prove it. The Defendants argue that the relevant anticompetitive harm is an *actual* harm to consumers in the form of higher prices through the delay of generic entry into the market. Thus, the Defendants argue the Plaintiffs must show that the settlements *actually* caused a delay in the sale of generic versions of AndroGel. [70] But as the FTC points out, the Supreme Court made clear in *Actavis* that avoiding even the possibility of competition, however small, is itself an antitrust violation. [71] Rather than having to litigate the merits of any underlying patent suits or establish a theory of causation, the Supreme Court said that courts can look to the "size of the payment ...

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 82 of 179

In re AndroGel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)
2018-1 Trade Cases P 80,409

[to] be able to assess its likely anticompetitive effects...." [72] Where the size of a reverse payment "reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, there is not the same concern that a patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement." [73] But where a payment is "large and unjustified" by these traditional settlement concerns, it is likely directed toward avoiding the risk of competition. Thus, if the settlement payments are shown to be larger than what could reasonably be expected to cover such traditional settlement concerns as future litigation costs or the value of services rendered, the Plaintiffs will have satisfied their burden in showing that the settlements violated the antitrust laws. [74]

**\*10** In this case, the Defendants entered into two separate settlement agreements. [75] The first, between Solvay and Actavis, provided that Solvay would drop its patent claims against Actavis and pay Actavis 60 to 70% of AndroGel's profits in exchange for co-promoting AndroGel and delaying generic entry until 2015. [76] The second, between Solvay, Paddock, and Par, likewise had Solvay drop its patent claims and pay $12 million to Par per year in exchange for a delay in generic entry until 2015, as well as co-promotion and manufacturing help from Paddock and Par. [77] Clearly, Solvay agreed to pay the Generics significant sums of money. The only remaining question, therefore, is whether these payments were "large" relative to the services provided or the cost of avoided litigation.

According to the Plaintiffs, Solvay determined that it would be much better off if the Generics delayed entering the market until 2015. [78] However, Solvay also figured out that the Generics would see a loss in value of generic entry compared to continuing the litigation if entry was delayed that long. [79] This made it unlikely that the Generics would agree to such a settlement without added incentives. [80] Consequently, Solvay offered the Co-Promotion Agreements ("CPAs") and Backup Manufacturing Agreement ("BMA") in order to entice the Generics to settle their claims.

The Plaintiffs present significant evidence from the negotiation of the settlements to suggest that the services were merely an afterthought to the Defendants, the proverbial lipstick on the pig that was the delay in generic entry. [81] But even if taken at face value, the Plaintiffs' experts opine that Solvay vastly overpaid for the services it was receiving. [82]

The Plaintiffs' experts also will testify that the side agreements did not make much business sense on their own. [83]

The Defendants respond in two ways. First, they argue that the FTC failed to show that the settlements *actually* delayed entry. [84] That may well be true, but that is not what the FTC needs to prove in order to show an antitrust harm. As discussed above, the FTC only needs to prove that the Defendants entered into the settlements in order to avoid the risk of a competitive market.

The Defendants' second argument focuses only on Solvay's settlement with Par and Paddock. The Defendants argue that the Plaintiffs have failed to show that the Par/Paddock settlement was "large and unjustified" because the Plaintiffs did not supply their own valuation of some of the services in those contracts. While the Plaintiffs' expert valued the CPA between Solvay and Par/Paddock, the Defendants point out that the Plaintiffs' expert never quantitatively valued the BMA, which the Defendants argue must be considered jointly with the CPA. Without their own valuation of the BMA, the Plaintiffs must rely on the defense expert's valuation of the CPA in order to show that the agreements were out of step with the value of the services provided. This, the Defendants argue, inappropriately shifts the burden onto them.

**\*11** However, comparative valuations of services are not a necessary requirement to show that a reverse payment is "large and unjustified." Helpful, certainly, but not necessary. The size of the payment is merely the Supreme Court's proxy for reaching the ultimate question: whether the agreement was entered into for the purpose of avoiding the risk of competition. If a settlement was agreed to for that purpose, it is "large and unjustified."

As discussed above, the Plaintiffs have provided evidence to suggest that the BMA and CPA in the Par/Paddock settlement were merely vehicles to facilitate payment to the Generics for delaying entry. In addition to the size of the settlement —$12 million per year—the Plaintiffs' experts opine that the BMA was out of step with industry practice and the Generics' regular business practices. [85] In particular, the Plaintiffs' experts criticize the loose oversight over Paddock, the lack of any assurance that Paddock could meet Solvay's manufacturing needs, Solvay's inability under the contract to cancel if Paddock did not meet its manufacturing needs, and the fact that Paddock was unable to manufacture AndroGel for the vast majority of the agreement's term. [86] In addition,

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 83 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

there is evidence that the Defendants agreed to the reverse payment amount before negotiating the specifics of any services Par/Paddock were going to render.[87] A reasonable jury could infer from such evidence that the BMA and CPA were merely post-hoc justifications when the true purpose of the settlement was to avoid the risk of competition. This evidence is enough to shift the burden to the Defendants to justify the payments as being procompetitive.

Solvay's counsel suggested at oral argument that one way the Defendants plan to justify the settlements as procompetitive is to argue that the patents were valid and infringed; in other words, the settlements were procompetitive because they allowed generic entry earlier than the patent would have allowed. There are two ways to make this argument. One way would be to provide evidence that shows what Solvay *thought* at the time about the strength of its patents. The other is to argue that Solvay would have won the underlying patent litigation.

While the former is acceptable, the latter is problematic for two reasons. First, as discussed above, the actual validity of the patent is irrelevant to the question of whether the reverse payments violated the antitrust laws. Paying the Generics to stay out of the market for the purpose of avoiding the risk of competition is an antitrust harm, *regardless* of whether or not the patent is actually valid and infringed.[88] Put another way, even if the patent was valid and infringed, the Defendants took away the opportunity to know that for sure by settling before the end of the litigation. If they did so for the purpose of avoiding the risk that a court would find otherwise, however small a risk they considered it to be, that is an antitrust violation under *Actavis.*[89]

 **\*12**  Second, for reasons explained more fully elsewhere in this Opinion, even if the actual validity of the patent was relevant, determining the ultimate outcome of the underlying patent litigation is both fundamentally unknowable and procedurally impossible. The underlying litigation was assigned to me. There is no one who can say how I would have ruled on the summary judgment motions, how I would have construed the claims, and whether I would have found infringement. There is no one who can say how the Federal Circuit would have ruled upon any unknowable judgment that may have been rendered. In Actavis, the Supreme Court said "it is normally not necessary to litigate patent validity to answer the antitrust question (unless, perhaps, to determine whether the patent litigation is a sham ...)."[90] I

will accept the Court's invitation to "structure [this] antitrust litigation so as to avoid, on the one hand, the use of antitrust theories too abbreviated to permit proper analysis, and, on the other, consideration of every possible fact or theory irrespective of the minimal light it may shed on the basic question—that of the presence of significant unjustified anticompetitive consequences."[91] Any evidence or argument on actual outcome would be far too speculative to aid a jury in making a reasoned decision. Thus, any arguments based on the actual validity or invalidity of the patent, or about what would have happened in the underlying patent litigation, are inappropriate and will be disallowed regarding the antitrust violation question.

In sum, the Court finds that the Plaintiffs have provided enough evidence for a reasonable jury to find that, by overvaluing these side agreements in the settlement, the Defendants were able to reach agreements that left them better off than any party would have been had the Generics won the patent litigation. A reasonable jury could find that the settlements were structured so as to be more beneficial to everyone involved than a competitive market; everyone, that is, except the consumer. Settling for that purpose is an antitrust harm. Of course, the Defendants may still justify the settlements by demonstrating that the payments were for "traditional settlement considerations, such as avoided litigation costs or fair value for services,"[92] but they may not justify the payments on the grounds that the patent was valid and infringed because such an argument is irrelevant and, in any case, impossible to know without relitigating to their conclusion the underlying patent cases. I do not plan to do that. Because the Plaintiffs have shown enough to satisfy their prima facie burden, the Defendants' motions for summary judgment on these issues are denied.

### D. Antitrust Standing

Unlike the FTC, which only needs to prove an antitrust violation, private plaintiffs asserting a private right of action under the Clayton Act must also establish antitrust standing.[93] This is separate from Article III standing.[94] "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action."[95]

The Eleventh Circuit employs a two-prong test for antitrust standing. "First, the plaintiff must establish that it has suffered

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 84 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

an antitrust injury."[96] This means the plaintiff must have suffered an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful."[97] "The injury should reflect the anticompetitive effect ... of the violation...."[98] "Second, the plaintiff must be an 'efficient enforcer' of the antitrust laws."[99] The Defendants move for summary judgment only on the first prong.

In this case, the harm "that flows from that which makes the defendants' acts unlawful"—the avoidance of the risk of competition—is higher drug prices. The Private Plaintiffs must therefore prove that they suffered an injury in the form of higher drug prices because of the delay in generic entry caused by the reverse payment settlements. The Private Plaintiffs have offered, at various times, three alternative theories for why the Generics would have entered the market prior to 2015: (1) the Generics ultimately would have prevailed in the underlying patent litigation; (2) the Generics would have come to the market "at risk" during the patent litigation; and (3) the parties would have reached an alternative settlement with an earlier entry date than 2015.

### 1. Success on the Patent Merits and At-Risk Entry

**\*13** During oral argument, the Private Plaintiffs disavowed the argument that they would have won the underlying patent litigation, leaving only the latter two theories to show causation. However, the Private Plaintiffs' at-risk theory of causation still ultimately depends on showing that the Generics would have won the underlying patent litigation. The *Wellbutrin* district court stated this point clearly. "The existence of a valid and uninfringed patent would interfere with the plaintiffs' chain of causation: a valid patent independently preclude[s] competition apart from any agreement and an 'at risk' launch is unlawful absent a later finding of patent invalidity or non-infringement."[100] In other words, if the patent was valid, any at-risk launch would have been unlawful if it infringed on the patent, and the law will not allow the Private Plaintiffs to use illegal behavior as a link in their chain of causation.[101] At least three other courts have reached similar results.[102] In order to show that the Generics could have successfully—i.e., legally—launched at-risk, the Private Plaintiffs would therefore need to show that the patent would ultimately have been found either invalid or uninfringed in the underlying patent litigation.

This raises again the central problem raised by Actavis: how to determine what the outcome of the underlying patent litigation would have been in a way that is manageable. Do the parties need to accomplish what Judge Carnes called the "turducken task" of litigating "a patent case within an antitrust case about the settlement of the patent case?"[103] Alternatively, can they offer experts to testify as to what would have happened in the but-for world, neatly summarized into each party's percent chance of winning?[104] Is it even possible to do either?

It is the Court's opinion that it is not. At least in relation to this particular case, arguments which depend on determining what the ultimate outcome of the underlying patent litigation would have been are simply too procedurally burdensome and speculative to serve as valid theories of causation under *Actavis*. Consider for a moment the particularly thorny issues that would be raised were the Court to consider such a theory at trial. Would the Private Plaintiffs be allowed to make any argument that was potentially available to the Generics, or would they be limited to the arguments the Generics had actually made up to the point the parties settled? The Defendants at various points in their papers assume the latter, but the underlying litigation never came to a final, preclusive decision. It did not even reach summary judgment. Who knows what arguments may have been raised as the litigation went forward?

Further, is the outcome of the underlying litigation a question of fact or law, and who would decide what the outcome would have been—the Court or the jury? If the latter, how could a jury determine what the outcome of a bench trial would have been? Unlike the issue of an antitrust violation, a jury cannot estimate the likelihood of the Generics' success on the patent merits by simply looking to the size of the reverse payment as a proxy.[105] Instead, a jury would have to answer that question by determining how the judge—in this case, me—would have found on the merits. Thus, when combined with the standard of proof in this case, this means that to survive summary judgment, the Private Plaintiffs would have to provide enough evidence to show that a reasonable jury could find it more likely than not that a judge would have found it more likely than not that the Generics did not infringe or that the '894 patent was invalid.[106] On top of that, a jury would have to determine how the judge would have decided various legal issues, including claim construction and summary judgment. If that sounds ridiculously unwieldy, that's because it is. And

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 85 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

even if a jury could comprehend that standard, how would the inevitable appeal be handled? Would the case be split, with the antitrust issues going to the Eleventh Circuit, but the patent issues going to the Federal Circuit? Clearly, actually litigating the underlying merits would be a procedural and administrative nightmare.

**\*14** But let us assume for a moment that the procedural issues could somehow be worked out. At least with regard to this case, it is impossible to say what the court would have actually done in the underlying case. Any experts who testify otherwise, like the expert relied upon in *Wellbutrin*, [107] are coming up with probabilities out of whole cloth. Unlike the antitrust issues, where we can assume that the parties would have acted in their best economic interest, such assumptions cannot necessarily be made about courts and juries. One court is not the same as another. Much of a patent case depends on how a claim is construed, and no one can say how I would have construed the claims at issue. Nor can one simply estimate what would have happened based on other cases. Every patent case is inherently different, with numerous variable affecting the outcome. And the issue here is not what would have happened in a generic case, but what would have happened in *this* case.

By contrast, most of the cases which have considered this question and decided otherwise have differed from this case in at least one of two ways. First, at least two of those cases relied upon what this Court views was an improper causation standard, finding that the plaintiffs only needed to show that the generics *could* have won, not that they *would* have won. [108] Obviously it is much easier to provide substantive proof of what could have happened as opposed to what would have happened. Second, the experts offering testimony in those cases had at least some concrete outcome in the underlying litigation on which to base their opinions. For example, in the *Lidoderm* litigation, the defendants had actually gone to trial on the case, but settled before the judge issued his opinion. [109] Thus, the expert was able to rely on statements made by the judge, as well as his claim construction order. [110] And in *Wellbutrin*, where there were two underlying patent suits, the court in one of them had also entered claim construction and summary judgment orders (the plaintiffs did not argue the generic could have won the other). [111] In this case, however, the Court never entered a claim construction or summary judgment order in the underlying patent litigation in this case, let alone actually tried the issues. Any opinion that would purport to state how

a particular piece of litigation would turn out without any evidence from the court in question on how it would rule can only be characterized as pure speculation. Such attenuated evidence cannot possibly serve as the basis of a reasonable decision by a jury.

Although this eliminates two of the Private Plaintiffs' theories of causation, as well as a possible procompetitive justification for the settlements, the Court feels it is justified in light of *Actavis*, the other theories available to the parties, and the desire for a logical congruency of outcome. First, as noted earlier, Justice Breyer explicitly states that:

> [a]s in other areas of law, trial courts can structure antitrust litigation so as to avoid, on the one hand, the use of antitrust theories too abbreviated to permit proper analysis, and, on the other, consideration of every possible fact or theory irrespective of the minimal light it may shed on the basic question—that of the presence of significant unjustified anticompetitive consequences. [112]

**\*15** Admittedly, Justice Breyer was speaking only in the context of an antitrust violation, not causation. But his concern for the ability of trial courts to manage the cases before them extends here.

Second, not all theories of causation are now out of bounds for the Private Plaintiffs. As discussed in more detail below, they still have the ability to show that the Defendants would have reached alternative, legal settlements that would have allowed for earlier generic entry without the reverse payments. Indeed, this theory is less attenuated than any theory based on the outcome of the underlying patent litigation because a factfinder can rely on the assumption that the parties are economic actors who would have done what was in their best financial interest.

Lastly, precluding such a basis of causation avoids potentially inconsistent outcomes. As discussed above, the FTC does not need to prove causation to win its case. The Supreme Court was clear, for better or worse, that it merely needs to prove that the Defendants entered into the settlements for the

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 86 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

purpose of avoiding the risk, however small, of competition. Consider the incongruity, then, if the FTC should win its case on those grounds, while the Private Plaintiffs lose because the Defendants are able to show the patent would have been declared valid and infringed. How can the Defendants both have a valid patent, and commit an antitrust violation? Such an outcome makes no sense.

The Court recognizes that this solution is not the most appetizing, but it benefits from the sheer distastefulness of the other options available. To quote Churchill, "[i]t has been said that democracy is the worst form of Government except all those other forms that have been tried from time to time." [113] The same is true here. The Court can simply see no way of entertaining arguments that purport to say what the outcome would have been in the underlying patent litigation without relying on wholly speculative evidence or untying a Gordian knot of procedural problems. With that in mind, it is the Court's opinion that such arguments are simply unworkable, and should not be considered further in this litigation.

### 2. Alternative Settlement Scenario

The Private Plaintiffs' remaining causation theory is that but-for the reverse payment the Defendants would have come to an alternative, legal settlement that would have allowed for generic entry earlier than 2015. In *Actavis*, the Supreme Court endorsed patent litigation settlements that do not involve reverse payments. [114] The Defendants argue that this alternative settlement theory is ultimately dependent on the outcome of the patent merits because "if the '894 patent was valid and infringed, then Plaintiffs are complaining about the inability to buy an *infringing* product." [115]

**\*16** This argument is unpersuasive. Unlike the at-risk theory of causation, the Private Plaintiffs are not arguing that they would have done something illegal. Instead, their theory is that Solvay, faced with the uncertain prospect of continuing the litigation and acting in its economic best interest, still would have granted the Generics a license to enter the market before the expiration of the patent. Without a payment, however, the Generics, if confident in their chances at trial and on appeal, would have required an earlier entry date than 2015, the entry date under the actual reverse settlement. Using leverage to negotiate an earlier settlement date is obviously legal. Further, focusing upon the difference between 2015 and a hypothetical earlier entry date results in the type of injury

intended to be prevented by the antitrust laws as interpreted by the Supreme Court in *Actavis*. If the Private Plaintiffs can show that, but-for an illegal reverse payment intended to avoid the risk of a competitive market place, the Generics would have entered earlier, they will have shown they have suffered an antitrust injury.

Other courts have endorsed this approach. In *Wellbutrin*, the district court accepted the plausibility of an alternative settlement scenario, although it granted summary judgment to the defendants because the brand manufacturer had "expressly and unwaveringly refused to settle" without the allegedly anticompetitive provision of the actual settlement. [116] In *Lidoderm*, the court also found that the alternative settlement theory was cognizable, and found there to be sufficient evidence to submit the issue to a jury. [117] And in *Solodyn*, the district court also allowed the plaintiffs to proceed on an alternative settlement theory. [118]

In order to prove this theory, of course, the Private Plaintiffs must have evidence that an alternative settlement *would* have occurred in the but-for world. To do so, the Private Plaintiffs offer three expert opinions, as well as some direct evidence. The first, that of Jack Goldstein, thoroughly evaluates the merits of the underlying patent litigation, comparing it to the average patent case, and concludes that a reasonable and competent attorney would have advised Solvay and the Generics that Solvay had about a 20% chance of winning, if not less. [119]

Independently of Goldstein, the Private Plaintiffs' other two experts, Dr. Leffler and Prof. Elhauge, each reach their own conclusions on what the Defendants considered their chances to be. [120] Dr. Leffler looked to the terms of the actual settlement, and concluded that Solvay likely viewed its chances of winning to be at about 33%. [121] Likewise, Prof. Elhauge looked to the actual terms of the settlement agreement and determined that it would only have been economically rational for Solvay to agree to the actual settlements at issue if it believed its chances of winning were at best 48.8%. [122] This is consistent with the "Project Tulip" evidence which shows that Solvay's executives crafted the settlement with Actavis around a 50% chance of winning the patent litigation. [123]

With these expectations in mind, Dr. Leffler and Prof. Elhauge each agree that it would have been economically

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 87 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

rational for Solvay to settle, even without a reverse payment. Using Goldstein's estimate of Solvay's chance of winning the litigation, Dr. Leffler concludes that the Defendants would have agreed to an alternative settlement that allowed for generic entry on January 1, 2008, while Prof. Elhauge concludes the Generics would have entered on May 22, 2009. [124] And using his own estimate of Solvay's belief about the strength of the patent, based upon the actual settlement, Dr. Leffler concludes that the Generics would have entered on October 1, 2010. [125] Under all of these scenarios, the Generics would have entered the market earlier than 2015.

*17 The Defendants argue that the Private Plaintiffs' evidence is not sufficient because they do not have actual, direct evidence that the Defendants ever negotiated a different date. [126] "Requiring such evidence, however, would be an almost impossible standard to require of Plaintiffs, given that this is a but-for scenario." [127] "Because this case is set in a but-for world, it is not surprising that no evidence shows that defendants were contemplating anything other than the actual settlement." [128] If Solvay and the Generics "were acting unlawfully to eliminate competition throughout their settlement negotiations, then it is unreasonable to expect a paper trail signifying rational, lawful business choices." [129] Any criticism the Defendants have of the experts' methodologies or conclusions are best handled through cross-examination and the production of contrary evidence.

The Defendants also mistakenly argue that Dr. Leffler's and Prof. Elhauge's models assume that a reverse payment always causes delay. Their models assume nothing of the sort. Rather, both experts use their experience and knowledge in the field to conclude that reverse payments cause delay, and they confirm that conclusion in their models addressing the specific settlement at issue in this case.

Indeed, such a conclusion is economically logical, especially at the causation stage, in which the Private Plaintiffs will have already proven that the purpose of the reverse payment was to avoid the risk of competition. It would make no sense for Solvay to pay the Generics tens of millions of dollars if it could get the Generics to enter on the same date without paying them all of that money. Nor would it make sense for the Generics to agree to delay entry for free if they could receive tens of millions of dollars to do the same thing. Solvay paid the Generics a lot of money for something, and if it was not

for services or saved litigation costs, it is logical to conclude it was for delay. [130]

Lastly, Par/Paddock argue that even if the Private Plaintiffs prove their case as to the Actavis settlement, they cannot show causation regarding Solvay's settlement with Par/Paddock because Par/Paddock could not have entered before Actavis did. [131] But the fact that Actavis would have had to agree to a settlement before Par/Paddock could have does not vitiate causation, it merely adds another step. If the Private Plaintiffs can show that Solvay and Actavis would have settled earlier without a reverse payment, then they might also be able to show that Par/Paddock would have done so as well. And for all the reasons discussed above regarding the Actavis settlement, the Private Plaintiffs have produced evidence that indeed Par/Paddock and Solvay also would have settled earlier. For these reasons, the Court finds that the Private Plaintiffs have provided enough evidence for an alternative settlement theory of causation to survive summary judgment.

### 3. Lack of Injury Regarding AndroGel 1.62%

The final antitrust injury related argument involves AndroGel 1.62%. All of the Private Plaintiffs in this case are seeking damages regarding the original AndroGel formula, AndroGel 1%. However, one group of plaintiffs—the Retailers—is also seeking damages related to purchases of a newer formulation, AndroGel 1.62%. [132]

*18 AndroGel 1.62% was not introduced until 2011, five years after the challenged settlements. [133] It was developed in order to improve upon AndroGel 1%, namely by increasing the ease of application and reducing drying time, thereby increasing patient satisfaction. [134] When it was introduced, AndroGel 1.62% quickly became the leading testosterone replacement therapy. [135] Even after generic versions of AndroGel 1% were introduced to the market, consumers still continued to prefer AndroGel 1.62% by a wide margin despite its significantly higher price. [136]

The Retailers argue that the settlements delayed the launch of generic AndroGel 1% long enough that Solvay could "switch the market" to AndroGel 1.62%. [137] This argument can only work under one of two theories: either Solvay engaged in an anticompetitive "product hop," or AndroGel 1.62% is essentially the same product as AndroGel 1%. The Retailers

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 88 of 179

In re AndroGel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

are adamant that they are not pursuing a "product hop theory," so the Court need not address it. [138] As for the latter theory, there can be no doubt that AndroGel 1.62% is a different product than AndroGel 1%. AndroGel 1.62% is covered by eight different patents that do not cover AndroGel 1%. [139] This is further supported by the fact that, if the products were the same, one would expect consumers in a competitive market place to choose the less expensive of two identical products. But as mentioned above, even when faced with a fully competitive market after 2015 that includes AndroGel 1.62%, and branded and generic AndroGel 1%, consumers have still chosen the significantly higher priced AndroGel 1.62% over generic AndroGel 1% by a wide margin. [140]

In essence, then, the Retailers are arguing that the alleged delay in entry of one product caused them damages by forcing them to pay higher prices for a different, better product. This is the Retailer's "shifting the market" argument, meaning that the reverse settlements gave Solvay the time to "shift the market" to AndroGel 1.62%. But courts generally presume that the introduction of new, better products is a good thing for competition. "The attempt to develop superior products is ... an essential element of lawful competition." [141] Plus, if the '894 patent was valid, the patent itself would have given Solvay the time to "shift the market" by introducing a new product. This is further proof that "shifting the market" is not, in and of itself, a problem. [142] Instead, the proper measure of injury is and must be the comparison between like-products. Given that AndroGel 1.62% and AndroGel 1% are different products, the Retailers cannot claim that they were injured by purchasing AndroGel 1.62% simply because that is what consumers wanted.

### E. FTC's Available Remedies

**\*19**  Should the FTC successfully prove that the reverse payment settlements were anticompetitive and violated the antitrust laws, the FTC is seeking broad equitable relief, including preventing the Defendants from entering into any reverse payment agreements in the future, as well as compulsory generic licenses for AndroGel 1.62%. [143] The Defendants argue that these remedies are far too broad, and that they would inappropriately restrain lawful conduct.

But federal courts have extensive authority to order equitable relief in antitrust cases. [144] The goal of an equitable antitrust

suit is not to simply punish past behavior, "nor is it merely to end specific illegal practices." [145] The goal is to "effectively pry open to competition a market that has been closed by defendants' illegal restraints." [146] In other words, the goal is to prevent anticompetitive activity in the future, and the courts have a wide range of means at their disposal to do so. [147] "[I]t is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." [148] Sometimes, this may even mean that otherwise legal activity may have to be enjoined. [149] "The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." [150] Because the appropriate remedy fundamentally depends on the nature and scope of any wrongful conduct, it is premature to determine what may or may not be an appropriate remedy at this stage in the litigation, where there has not yet been a decision on liability.

### IV. Conclusion

For the reasons stated above, Solvay's Motion for Summary Judgment on the FTC's Claims [FTC Doc. 620] is DENIED, Solvay's Motion for Summary Judgment as to the Par/ Paddock Settlement [FTC Doc. 621, MDL Doc. 1551] is DENIED, Actavis and Actavis Holdco's Motion for Summary Judgment [FTC Doc. 625, MDL Doc. 1556] is DENIED, Solvay's Motion for Summary Judgment for Lack of Antitrust Injury Against the Private Plaintiffs [MDL Doc. 1550] is DENIED, Solvay's Motion for Summary Judgment as to Retailer's Damages Claims on AndroGel 1.62% Purchases [MDL Doc. 1552] is GRANTED, the Defendants Par and Paddock's Motion for Summary Judgment [MDL Doc. 1559] is DENIED, Actavis, Inc. and Solvay's Motion to Exclude Plaintiffs' Proposed Patent Law Expert Jack C. Goldstein, Esq. [FTC Doc. 622, MDL Doc. 1553] is DENIED, and Solvay, Par, and Paddock's Motion to Exclude in Part Plaintiffs' Expert James R. Bruno [FTC Doc. 630, MDL Doc. 1562] is GRANTED in part and DENIED in part.

**\*20**  SO ORDERED, this 14 day of June, 2018.

### All Citations

Not Reported in Fed. Supp., 2018 WL 2984873, 2018-1 Trade Cases P 80,409

## Footnotes

1    Technically speaking, Unimed entered into the Agreements with Besins. Solvay, now known formally as Abbvie Products LLC, later acquired Unimed. However, in order to reduce confusion, the Court will simply use the name Solvay throughout this Opinion.

2    🚩 21 U.S.C. § 355(a).

3    🚩 21 U.S.C. § 355(b).

4    Pub.L. No. 98–417, 98 Stat. 1585 (1984).

5    *See* 🚩 21 U.S.C. § 355(j)(2)(A)(vii).

6    🚩 21 U.S.C. § 355(j)(2)(B).

7    Originally known as Watson Pharmaceuticals, the company has since split into two separate entities now known as Actavis, Inc. and Actavis Holdco US, Inc. For the purposes of this Opinion, the Court will refer to these as just Actavis. And while the Court continues to call Solvay by its original name, it will use Actavis' new name to minimize confusion in light of the Supreme Court's opinion in 🚩 *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

8    *See Unimed Pharm., Inc. v. Watson Pharm., Inc.*, No. 1:03-CV-2501-TWT, 2003 WL 23824320 (N.D. Ga. Aug. 21, 2003); *Unimed Pharm., Inc. v. Paddock Labs., Inc.*, No. 1:03-CV-2503-TWT, 2003 WL 23824347 (N.D. Ga. Aug. 21, 2003).

9    *See* 🚩 35 U.S.C. § 271(e)(2)(A) (submitting an ANDA is an act of infringement if the branded drug is covered by a patent).

10   🚩 21 U.S.C. § 355(j)(5)(B)(iv).

11   FTC's Statement of Additional Material Facts ("SAMF") ¶ 174 [FTC Doc. 689].

12   *Id.* at ¶ 186.

13   *Id.* at ¶¶ 180-183.

14   *Id.* at ¶ 185.

15   *Id.*

16   🚩 *Actavis*, 570 U.S. at 152.

17   *Id.*

18   *In re Androgel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371 (N.D. Ga. 2010). The Court also dismissed the Private Plaintiffs' per se claims, and later granted the Defendants' motion for summary judgment on the "sham litigation" claims of the Private Plaintiffs. 🚩 *In re Androgel Antitrust Litig. (No. II)*, 888 F. Supp. 2d 1336 (N.D. Ga. 2012).

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 90 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)
2018-1 Trade Cases P 80,409

19    🚩 *FTC v. Watson Pharm., Inc.*, 677 F.3d 1298 (11th Cir. 2012), *rev'd and remanded sub nom.* 🏳 *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

20    *See* 🏳 *Actavis*, 570 U.S. at 160.

21    Now, after five more years, it remains to be seen whether this case or I will first confirm Queen Gertrude's observation: "Thou know'st 'tis common; all that lives must die, passing through nature to eternity." WILLIAM SHAKE-SPEARE, HAMLET, act 1, sc. 2.

22    The Direct Purchaser Plaintiffs include Rochester Drug Co-Operative, Inc., Louisiana Wholesale Drug Co., Inc., Meijer Inc., and Meijer Distribution, Inc. The Retailers include Rite Aid Corp., Rite Aid Hdqtrs. Corp., JCG (PJC) USA, LLC, Maxi Drug, Inc., Eckerd Corp., CVS Pharmacy, Inc., Caremark L.L.C., Walgreens Co., Safeway, Inc., American Sales Co., Inc., HEB Grocery Co., LP, Supervalu, Inc., and Giant Eagle, Inc.

23    *See* Sherman Antitrust Act §§ 1–2, 🏳 15 U.S.C. §§ 1–🏳 2; Federal Trade Commission Act § 5(a), 🏳 15 U.S.C. § 45(a).

24    Fed. R. Evid. 702; 🏳 *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

25    🏳 *KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1289, 1292 (M.D. Ala. 2001) (quoting 🏳 *Daubert*, 509 U.S. at 594-95).

26    🏳 *Ferguson v. Bombardier Services Corp.*, 244 Fed. Appx. 944, 949 (11th Cir. 2007).

27    🏳⚠ *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

28    FED. R. CIV. P. 56(a).

29    🏳 *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

30    🏳 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

31    🏳 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

32    🏳 *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

33    🏳 15 U.S.C. § 1.

34    *Id.* at § 2.

35    *Id.* at § 45(a).

36    *See, e.g.*, 🏳 *FTC v. Cement Institute*, 333 U.S. 683, 691-93 (1948) ("In other cases this Court has pointed out many reasons which support interpretation of the language 'unfair methods of competition' in [Section] 5 of the Federal Trade Commission Act as including violations of the Sherman Act.... We adhere to our former rulings.").

37    Goldstein Rep. ¶ 2 [Doc. 1564-33].

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 91 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

38    🚩 *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 692 (N.D. Ga. 2006) (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure*; *Evidence* § 6265 (West 1997) ).

39    "Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." MODEL RULES OF PROF'L CONDUCT r. 1.1 (AM. BAR ASS'N 2018).

40    Goldstein Rep. ¶ 4.

41    *Id.* at ¶¶ 5, 7.

42    *Id.* at ¶ 8.

43    *Id.* at ¶ 12.

44    *Id.*

45    *Id.*

46    🚩 *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting 🚩 *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987) ).

47    Goldstein Rep. ¶¶ 40-46.

48    *Id.* at ¶ 46.

49    *Id.* at ¶¶ 46, 53.

50    *Id.* at ¶¶ 179-181.

51    🚩 *Daubert*, 509 U.S. at 596.

52    Pls.' Resp. to Defs.' Mot. to Exclude, at 13 [MDL Doc. 1616].

53    FTC's SAMF at ¶¶ 278-81, 290-93 [FTC Doc. 689].

54    *See* Actavis' Mot. for Summ. J. [FTC Doc. 625, MDL Doc. 1556].

55    🚩 *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1576 (11th Cir. 1991).

56    🚩 *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016).

57    Actavis' Mot. for Summ. J. at 13 [MDL Doc. 1556, FTC Doc. 625].

58    *See* 🚩 *Procaps*, 845 F.3d at 1081 (finding that an agreement which was legal at its conception could not on its own conclusively demonstrate a conspiracy related to later unlawful conduct); *Merced Irrigation District v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 139-40 (S.D.N.Y. 2016) (finding that a series of contracts in furtherance of one party's monopolization efforts could support a 🚩Section 2 claim, but not a 🚩Section 1 claim because there was no evidence of an agreement on the ultimate objective).

59    *Id.*

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 92 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)
2018-1 Trade Cases P 80,409

60   ⚑ *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 770 (E.D. Pa. 2015), *aff'd,* ⚑ 868 F.3d 132 (3d Cir. 2017) [hereinafter *Wellbutrin Summary Judgment*].

61   *See, e.g.*, FTC's SAMF ¶¶ 174-82 [FTC Doc. 689].

62   ⚑ *Wellbutrin Summary Judgment,* 133 F. Supp. 3d at 770 (finding settlement agreement to be direct evidence of conspiracy where manufacturer was involved in settlement negotiations, provided sublicenses, and waived its right to launch an authorized generic).

63   This is also why this case is different in that there is direct evidence of an agreement to restrain trade. Unlike other cases, where it is "rare ... that a plaintiff can establish a conspiracy by showing an explicit agreement," *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1218 (N.D. Al. 2011), the parties here explicitly and openly agreed to the course of conduct. The real question is whether that conduct was illegal.

64   ⚑ *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

65   ⚑ *Seagood*, 924 F.2d at 1569.

66   *Id.* (citing ⚑ *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir. 1978) ).

67   *Id.* at 1567 ("Some violations of ⚑ section 1, however, are illegal per se because of their pernicious effect on competition and lack of any redeeming virtue ...") (quotations omitted).

68   ⚑ *Actavis,* 570 U.S. at 147 (emphasis original).

69   *Id.* at 159.

70   *See* Defs.' Mot. for Summ. J., at 5-9. *See also* Solvay's Mot. for Summ. J. as to the Par/Paddock Settlement, at 19-27 [FTC Doc. 621, MDL Doc. 1551]; and Par/Paddock's Mot. for Summ. J., at 23-24 [MDL Doc. 1559].

71   ⚑ *Actavis,* 570 U.S. at 157 ("The owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely seeks to prevent the risk of competition. And, as we have said, that consequence constitutes the relevant anticompetitive harm."). Candidly, it seems unlikely that many reverse payments will survive such scrutiny.

    Virtually all settlements are, to some extent, designed to avoid the risk of competition. *See also* ⚑ *id.* at 173 (Roberts, C.J. dissenting) (Under the majority's opinion, "taking away any *chance* that a patent will be invalidated is itself an antitrust problem....") (emphasis in original).

72   *Id.* at 158.

73   *Id.* at 156.

74   *See* ⚑ *In re Lipitor Antitrust Litigation*, 868 F.3d 231, 251-52 (3d Cir. 2017) (articulating a similar standard at the motion to dismiss stage). Solvay argues that this amounts to a "quick look" test, which the Supreme Court expressly rejected in ⚑ *Actavis,* 570 U.S. at 158-59, because all the FTC has to do is show that Solvay made a reverse payment. *See* Solvay Reply in Supp. of Mot. for Summ. J., at 9 [FTC Doc. 681]. But under this standard, the FTC has to prove much more than the simple fact that a reverse payment occurred; it

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 93 of 179

In re AndroGel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)
2018-1 Trade Cases P 80,409

also has to prove that the payment was "large" relative to traditional settlement concerns. *See* ⚑ *In re K-Dur Antitrust Litig.*, No. 01CV1652SRCCLW, 2016 WL 755623, at *12 (D.N.J. Feb. 25, 2016) ("the burden must be on Plaintiffs to show that the settlement delayed the generic company's entry onto the market, that the brand-name company paid the generic company consideration of some kind, and that the consideration exchanged in the settlement exceeded the estimated cost of litigation and the costs of other services and products, in order to establish a prima facie case.").

75  The two settlements actually contained multiple agreements within them. For example, the Solvay-Actavis settlement included three agreements: a Final Settlement and Release Agreement, a Patent License Agreement, and a Co-Promotion Agreement. FTC's SAMF ¶ 172 [FTC Doc. 689]. The parties do not argue that these should be considered separately, so for simplicity's sake, the Court will refer to the constituent agreements collectively, unless otherwise noted.

76  FTC's SAMF ¶¶ 178-79, 181-82 [FTC Doc. 689]. Beginning at 60% in 2006, Actavis' share of AndroGel's profits was to increase over time to 70% by 2012. *Id.* at ¶ 181.

77  *Id.* at ¶¶ 307, 308.

78  *See* FTC's Resp. to Defs.' Mot. for Summ. J., at 8 [FTC Doc. 657].

79  *Id.*

80  *Id.*

81  *See, e.g.*, FTC's SAMF at ¶¶ 88, 100, 109, 133-34 [FTC Doc. 689].

82  *Id.* at ¶ 231.

83  *Id.* at ¶¶ 232-34.

84  Solvay's Reply in Support of its Mot. for Summ. J., at 3 [FTC Doc. 681].

85  FTC's SAMF at ¶¶ 278-81, 290-93 [FTC Doc. 689].

86  *Id.* at ¶¶ 290-96.

87  *Id.* at ¶¶ 131-33, 135, 139.

88  ⚑ *Actavis*, 570 U.S. at 157 ("The owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely seeks to prevent the risk of competition. And, as we have said, that consequence constitutes the relevant anticompetitive harm.").

89  *Id.* at 173 (Roberts, C.J. dissenting) (Under the majority's opinion, "taking away any *chance* that a patent will be invalidated is itself an antitrust problem....") (emphasis in original).

90  *Id.* at 157.

91  *Id.* at 159-60.

92  *Id.* at 156.

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 94 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

93    🚩 15 U.S.C. § 15(a).

94    🚩 *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983).

95    *Id.*

96    🚩 *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013).

97    *Id.* at n.16 (quoting 🚩 *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977) ).

98    🚩 *Brunswick*, 429 U.S. at 489.

99    🚩 *Sunbeam*, 711 F.3d at 1271.

100    🚩 *Wellbutrin Summary Judgment*, 133 F. Supp. 3d at 764 (quotations omitted).

101    *Id.* at 765 ("Where a regulation—such as patent law—precludes competition, that regulation cuts off the chain of causation.").

102    *See* 🚩 *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 63 (1st Cir. 2016) (stating that at-risk entry theories ultimately depend on the outcome of the patent litigation); 🚩 *In re Wellbutrin*, 868 F.3d 132, 165 (3d Cir. 2017) [hereinafter *Wellbutrin Appeal*] (same); 🚩 *Apotex, Inc. v. Cephalon, Inc.*, 2017 WL 2473148, at *8 (E.D. Pa. June 8, 2017) (same).

103    🚩 *FTC v. Watson*, 677 F.3d at 1315.

104    *See, e.g.*, 🚩 *Wellbutrin Appeal*, 868 F.3d at 169 (finding that plaintiffs could not show generics would have won where expert testified they only had a 20% chance of winning).

105    For a discussion of why the size of the reverse payment does not serve well as a proxy for what the parties thought of the merits, *see* 🚩 *Wellbutrin Appeal*, 868 F.3d at 167-69.

106    *Id.* at 169 (using the preponderance of the evidence standard with regard to the patent merits).

107    🚩 *Wellbutrin Appeal*, 868 F.3d at 169.

108    *See* 🚩 *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2018 WL 563144, at *14 (D. Mass. Jan. 25, 2018); 🚩 *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc. (Lidoderm)*, 296 F. Supp. 3d 1142, 2017 WL 50682533, at *5 (N.D. Cal. 2017). The Court views this standard as inappropriate because evidence that the Generics *could* have won gets us no closer than we are now to answering the question of whether the Generics *would* have been able to enter the market in a but-for world, or if a valid patent would *have* prevented them.

109    *Lidoderm*, 🚩 74 F. Supp. 3d 1052, 1063 (N.D. Cal. 2014).

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 95 of 179

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

110   *Lidoderm*, 🚩 296 F. Supp. 3d 1142, 2017 WL 50682533, at *28-29 (N.D. Cal. 2017).

111   🚩 *Wellbutrin Summary Judgment*, 133 F. Supp. 3d at 766-67.

112   🚩 *Actavis*, 570 U.S. at 159-60.

113   444 Parl Deb HC (5th ser.) (1947) col. 207.

114   🚩 *Actavis*, 570 U.S. at 158 (Defendants "may, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point.").

115   Solvay's Mot. for Summ. J., at 8 [Doc. 1566-1].

116   🚩 *Wellbutrin Summary Judgment*, 133 F. Supp. 3d at 757. On appeal, the Third Circuit agreed. 🚩 *Wellbutrin Appeal*, 868 F.3d at 167 & n.57.

117   *Lidoderm*, 🚩 296 F. Supp. 3d 1142, 2017 WL 5068533, at *10-13.

118   🚩 *Solodyn*, 2018 WL 563144, at *21-23.

119   Goldstein Rep. ¶¶ 181, 193.

120   The Defendants do not move to exclude either Dr. Leffler or Prof. Elhauge.

121   Leffler Rep. ¶ 83 [Doc. 1564-22].

122   Elhauge Rep. ¶ 149 [Doc. 1564-31].

123   Private Pls.' SAMF ¶ 49 [Doc. 1598].

124   *Id.* at ¶¶ 15, 26.

125   *Id.* at ¶ 14.

126   Solvay's Mot. for Summ. J., at 33-34 [MDL Doc. 1566].

127   🚩 *Solodyn*, 2018 WL 563144, at *21.

128   *Lidoderm*, 🚩 296 F. Supp. 3d 1142, 2017 WL 5068533, at *34.

129   🚩 *Solodyn*, 2018 WL 563144, at *21.

130   Other courts have come to the same conclusion. *See, e.g.*, 🚩 *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 752 (E.D. Pa. 2014) ("One can logically infer that, all else equal, with a [reverse payment], a generic would be willing to agree to a later entry date than it would otherwise agree to in order to settle a patent-infringement case.").

131   Par/Paddock's Mot. for Summ. J., at 16-18 [MDL Doc. 1559].

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 96 of 179

In re AndroGel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018-1 Trade Cases P 80,409

132   AndroGel 1.62% was developed in order to increase the ease of application and reduce drying time, thereby increasing patient satisfaction. *See* Solvay's Mot. for Summ. J., at 5 [MDL Doc. 1552].

133   Solvay's SMF ¶ 23 [MDL Doc. 1567-2].

134   *See* Solvay's Mot. for Summ. J., at 5 [MDL Doc. 1552].

135   Solvay's SMF ¶¶ 27, 29-30 [MDL Doc. 1567-2].

136   *Id.* at ¶¶ 30, 35.

137   Retailer Pls.' Resp. to Solvay's Mot. for Summ. J., at 1 [MDL Doc. 1610]. The Retailers do not allege that the introduction of AndroGel 1.62% was itself in anyway anticompetitive.

138   *Id.* at 5-6, 9.

139   Solvay's SMF ¶ 25 [MDL Doc. 1567-2].

140   Solvay's Mot. for Summ. J., at 4 [MDL Doc. 1567-1].

141   ⚑ *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 286 (2d Cir. 1979).

142   It can potentially be a problem if brand name manufacturers tweak a drug and pull the older version off the shelf just as a generic is about to enter the market. This is the "product hopping" referenced above. It is problematic because it extends a manufacturer's monopoly at the expense of consumer choice. Again, however, the Retailers were clear that they were not pursuing this kind of theory. But even if they were, such an argument would have failed because Solvay never pulled AndroGel 1% off the shelf.

143   The FTC abandoned any damages claims it had when it applied for *certiorari* with the Supreme Court. *See* Petition for Writ of Certiorari, *FTC v. Watson Pharmaceuticals, Inc.,* 2012 WL 4750283, at *31 (U.S.) ("here the FTC seeks only declaratory and prospective injunctive relief....").

144   🚩 *Int'l Salt Co. v. United States,* 332 U.S. 392, 400–01 (1947) *abrogated by* ⚑ *Illinois Tool Works Inc. v. Indep. Ink, Inc.,* 547 U.S. 28 (2006) (District Courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case.").

145   *Id.* at 401.

146   *Id.*

147   *Fed. Trade Comm'n v. Nat'l Lead Co.,* 352 U.S. 419, 430 (1957) (Courts are "obliged not only to suppress the unlawful practice but to take such reasonable action as is calculated to preclude the revival of the illegal practices.").

148   🚩 *Int'l Salt Co.,* 332 U.S. at 400.

149   *Nat'l Lead Co.,* 352 U.S. at 430 ("... decrees often suppress a lawful device when it is used to carry out an unlawful purpose.").

150   ⚑ *Nat'l Soc. of Prof'l Engineers v. United States,* 435 U.S. 679, 698 (1978).

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 97 of 179

**In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)**
2018-1 Trade Cases P 80,409

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2021-2 Trade Cases P 81,898

2021 WL 5578687
United States District Court, E.D. Texas, Sherman Division.

UNITED STATES of America,
v.
Neeraj JINDAL (1), John Rodgers (2)

Civil Action No. 4:20-CR-00358

|
Signed 11/29/2021

**Attorneys and Law Firms**

Jariel A. Rendell, Matthew William Lunder, Doha Gamal Mekki, Assistant US Attorneys, Rachel Danielle Kroll, US Department of Justice, Antitrust Division, Washington, DC, for United States of America.

Paul Edward Coggins, Bradley Carroll Weber, Brendan Patrick Gaffney, Locke Lord LLP, Dallas, TX, for Neeraj Jindal.

Brian Daniel Poe, Brian D. Poe, Attorney at Law, PLLC, Fort Worth, TX, for John Rodgers.

## MEMORANDUM OPINION AND ORDER

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is Defendant Neeraj Jindal's Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36), and Defendant John Rodgers' Motion to Dismiss the Superseding Indictment (Dkt. #45). Having considered the motions and the relevant pleadings, the Court finds the motions should be **DENIED**.

## FACTUAL BACKGROUND

One December 12, 2020, the Government filed an indictment against Neeraj Jindal ("Jindal") (Dkt. #1), and on April 15, 2021, the Government filed the First Superseding Indictment (hereinafter "Indictment") as to Neeraj Jindal and John Rodgers ("Rodgers") (Dkt. #21). Pursuant to the Indictment, Defendants were charged with violating the following statutes: 1) 🚩 15 U.S.C. § 1 (Antitrust Conspiracy: Price Fixing under the Sherman Act); 2) 18 U.S.C. § 371

(Conspiracy to Commit Offense); and 3) 18 U.S.C. §§ 1505 and 2 (Obstruction of Proceedings before the Federal Trade Commission).

The complexity of this case warrants a recitation of the events leading up to the Indictment. Jindal owned a therapist staffing company, which the Indictment refers to as "Company A" (Dkt. #21 ¶ 5). Rodgers was a physical therapist who contracted with Company A and was a clinical director of Company A (Dkt. #21 ¶ 6). Rodgers reported to Jindal in his work (Dkt. #21 ¶ 6).

Company A contracted with physical therapists ("PTs") and physical therapist assistants ("PTAs") to provide in-home physical therapy to patients (Dkt. #21 ¶ 7). Therapist staffing companies such as Company A receive patient referrals from home health agencies and act as "middlemen," staffing their PTs or PTAs to provide in-home patient care (Dkt. #21 at ¶¶ 1–2). Therapist staffing companies compete with each other to contract with or employ PTs and PTAs (Dkt. #21 ¶ 4). Each PT and PTA who contracted with Company A had set prices (a "rate" or "pay rate") that Company A paid them for providing in-home care visits (Dkt. #21 ¶ 7). Company A billed home health agencies set prices (the "bill rate") for providing the services (Dkt. #21 ¶ 7). The difference between the pay rates that Company A paid to its PTs and PTAs and the bill rates that it billed to the home health agencies constituted Company A's margin (Dkt. #21 ¶ 7).

Count One of the Indictment charges Defendants with violating 🚩 15 U.S.C. § 1 of the Sherman Act. More specifically, Count One states:

> From in or around March 2017 to in or around August 2017 (the Relevant Period), in the Eastern District of Texas and elsewhere, Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs. The conspiracy engaged in by Jindal, Rodgers, and co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 99 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

Section 1 of the Sherman Act (⚑15 U.S.C. § 1).

(Dkt. #21 ¶ 11).

The Indictment alleges that on March 10, 2017, Rodgers, acting on behalf of Jindal and Company A, texted with the owner of a competing staffing company, Individual 2, regarding the rates that Company A and Individual 2's staffing company paid their PTs and PTAs (Dkt. #21 ¶ 12(a)). During the text exchange, Rodgers texted Individual 2, asking, "[h]ave you considered lowering PTA reimbursement" and stating, "I think we're going to lower PTA rates to $45" (Dkt. #21 ¶ 12(a)). Individual 2 responded, "[y]es I agree" and "I'll do it with you" (Dkt. #21 ¶ 12(a)). Rodgers responded with a "thumbs up" emoji and texted, "I feel like if we're all on the same page, there won't be a bunch of flip flopping and industry may stay stable" (Dkt. #21 ¶ 12(a)). According to the Indictment, Rodgers reported back to Jindal regarding this text message conversation with Individual 2 (Dkt. #21 ¶ 12(a)).

**\*2**  The Indictment further alleges that, following the text exchange between Rodgers and Individual 2, Jindal texted the owners of other therapist staffing companies to recruit additional competitors to join the conspiracy to collectively lower rates (Dkt. #21 ¶ 12(b)). Specifically, on March 10, 2017, Jindal separately texted at least four other owners of therapist staffing companies, saying "I am reaching out to my counterparts about lowering PTA rates to $45. What are your thoughts if we all collectively do it together?" (Dkt. #21 ¶ 12(b)). Jindal further texted each owner that he had Individual 2's company "on board" (Dkt. #21 ¶ 12(b)).

The Indictment then references another text exchange between Rodgers and Individual 2 that took place on March 17, 2017 (Dkt. #21 ¶ 12(c)). Rodgers stated: "FYI we made rate changes effective next payroll Monday decreasing PT's and PTA's" (Dkt. #21 ¶ 12(c)). Individual 2 responded: "Well I can join in where did u go" (Dkt. #21 ¶ 12(c)). According to the Indictment, Rodgers and Individual 2 subsequently exchanged text messages regarding their companies' pay rates for PTs and PTAs (Dkt. #21 ¶ 12(c)). And, pursuant to the agreement, Company A thereafter paid lower rates to certain PTs and PTAs (Dkt. #21 ¶ 12(d)).

On May 25, 2021, Jindal filed his Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36). On June 18, 2021, Rodgers filed his Motion to Dismiss the Superseding Indictment (Dkt. #45). In Rodgers' motion, he incorporated the arguments in Jindal's motion and added a separate argument alleging the Government's prosecution of him breached an oral agreement (Dkt. #45). The United States Responded to Jindal's Motion on June 22, 2021 (Dkt. #46) and responded to Rodgers' Motion on July 16, 2021 (Dkt. #48). Jindal filed a Reply on July 6, 2021 (Dkt. #47). Rodgers filed a Reply on July 30, 2021 (Dkt. #50).

## STATUTORY BACKGROUND

Since Count One of the Indictment charges Defendants with violating ⚑§ 1 the Sherman Act, the Court finds it helpful to provide an overview of the Sherman Act before turning to Defendants' arguments. The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." ⚑15 U.S.C. § 1. The Supreme Court, however, "has not taken a literal approach" in interpreting this language. ⚑*Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Instead, the Supreme Court has found ⚑§ 1 "outlaw[s] only *unreasonable* restraints." ⚑*State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added). In determining whether a restraint is unreasonable, and thus unlawful, courts use one of two rules of decision. ⚑*MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015).

Most restraints under ⚑§ 1 are analyzed under the so-called rule of reason. ⚑*Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343 (1982). As its name suggests, the rule of reason requires a context-specific inquiry to "distinguish[ ] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." ⚑*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Rule of reason analysis involves "analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." ⚑*Nat'l Soc'y of Prof. Eng'r v. United States*, 435 U.S. 679, 692 (1978).

A smaller group of restraints under ⚑§ 1 are at the outset "deemed unlawful *per se*" dispensing with the need for case-

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 100 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

by-case evaluation. *Kahn*, 522 U.S. at 10. These restraints are unreasonable *per se* because the conduct at issue is "manifestly anticompetitive" and "always or almost always tend[s] to restrict competition and decrease output." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988) (internal citations omitted). *Per se* treatment is reserved for "only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher*, 547 U.S. at 5 (internal citations omitted). Thus, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue" in order to determine whether it has the requisite "manifestly anticompetitive effect[ ]." *Leegin*, 551 U.S. at 886 (quotation omitted).

**\*3** "Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2283–84 (2018) (quoting *Bus. Elecs.*, 485 U.S. at 730). Courts have found three types of horizontal restraints to be *per se* violations of the Sherman Act: price fixing, market allocation, and bid rigging. [1] *See, e*.g., *Dagher*, 547 U.S. at 5 (price fixing); *Palmer v. BRG of Ga, Inc.,* 498 U.S. 46, 49–50 (1990) (market allocation); *United States v. Young Brothers Inc.*, 728 F.2d 682, 687 (5th Cir. 1984) (bid rigging). If a naked trade restraint falls in one of these forms, it is summarily condemned *per se* illegal.

The Sherman Act is enforced both criminally and civilly. *See* *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978) ("Both civil remedies and criminal sanctions are authorized with regard to the same generalized definitions of the conduct proscribed."). But the Department of Justice has a longstanding policy of only bringing criminal antitrust prosecutions based on *per se* violations of the Act. *See United States v. Kemp & Assocs, Inc.* 907 F.3d 1264, 1274 (10th Cir. 2018) (noting that the United States Attorney's Antitrust Manual states that "current Antitrust Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements."). Whether the allegations in an Indictment constitute a *per se* violation is a legal question for the court. *MM Steel*, 806 F.3d at 847 ("The decision to analyze the conspiracy under a per se theory of liability is a question of law...."); *see also* *Maricopa Cnty.*, 457 U.S. at 337 n.3, 354.

## LEGAL STANDARD

An indictment is subject to dismissal for the Government's failure to state an offense. *See* FED. R. CRIM. P. 12(b)(3)(B). This means that, taking the Government's allegations as true, *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011), the indictment must state the elements of each offense and facts "sufficient to permit the defendant to plead former jeopardy in a subsequent prosecution." *United States v. Contris*, 592 F.2d 893, 896 (5th Cir. 1979). Indictments are read as a whole, and "[t]he sufficiency of an indictment is to be tested by practical rather than technical considerations." *Id.* Indeed, "the law does not compel a ritual of words." *United States v. Ratcliff*, 488 F.3d 639, 643 (5th Cir. 2007) (citation omitted). As such, an indictment will not be dismissed based on minor deficiencies or because it "could have been more artfully or precisely drawn." *Contris*, 592 F.2d at 896. Courts generally measure the sufficiency of an indictment "by whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *United States v. Threadgill*, 172 F.3d 357, 366 (5th Cir. 1999) (citation omitted).

## ANALYSIS: JINDAL'S MOTION

In the present motion, Jindal argues that Count One of the Indictment should be dismissed for two main reasons (Dkt. #36). First, he argues that that Count One fails to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) because it does not identify a *per se* Sherman Act violation (Dkt. #36 at p. 1). Second, Jindal argues that Count One violates due process under the Fifth and Sixth Amendments because he did not receive "fair warning" the conduct was criminal, and the *per se* designation improperly promotes a presumption of intent (Dkt. #36 at pp. 13–14). Rodgers adopts Jindal's arguments for Count One and also moves to dismiss the Indictment on the basis that the Government has breached an alleged oral agreement not to prosecute him. Because both Defendants move to dismiss Count One on the same grounds, the Court will address the arguments pertaining to Count One in Jindal's motion first before addressing Rodgers' separate argument.

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 101 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

#### I. Sufficiency of the Indictment—Do the Allegations in the Indictment Constitute a *Per Se* Violation of the Sherman Act?

**\*4** In Count One of the Indictment, Defendants were charged with conspiracy to fix prices in violation of § 1 of the Sherman Act. The Indictment further alleges that the alleged conspiracy was a *per se* violation of the Sherman Act (Dkt. #21 ¶ 11) ("The conspiracy engaged in by Jindal, Rodgers, and co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act."). Accordingly, in the Government's view, to obtain conviction, it does not need to prove market power, intent, or any anticompetitive effects on trade—it simply must prove the bare fact that an agreement existed. This is further reflected by the Indictment —it does not allege any of the elements of a rule-of-reason offense. Thus, the Indictment can only stand if the allegations in it constitute a *per se* violation of the Sherman Act. Stated differently, the Indictment must be dismissed if it fails to state a cognizable *per se* offense under the Sherman Act. Whether the allegations in the Indictment constitute a *per se* violation is a question of law for the Court. 🚩 *MM Steel*, 806 F.3d at 847.

For over 100 years, the Supreme Court has consistently held that price-fixing agreements are unlawful *per se* under the Sherman Act. 🚩 *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940). In fact, the Supreme Court has stated that "[n]o antitrust offense is more pernicious than price fixing." 🚩 *Fed. Trade Comm'n v. Ticor Title Ins. Co.*, 504 U.S. 621, 639 (1992). Defendants do not dispute that the Supreme Court has designated price fixing as a *per se* Sherman Act violation (Dkt. #47 at p. 3). But Defendants do dispute that the Indictment in-fact alleges a price-fixing agreement (Dkt. #47 at p. 4).

The core of Defendants argument is that the Indictment does not allege a price-fixing agreement because it "[a]t most[ ] alleges an agreement to fix wages" (Dkt. #36 at p. 13). According to Defendants, though the Indictment uses the word "prices" to refer to the "pay rates" for the PTs and PTAs, the "appropriate word" to describe the "pay rates" is "wages" because the rates constitute compensation for the PTs' and PTAs' labor (Dkt. #36 at p. 13). Thus, Defendants argue that the "Indictment does not allege any agreement to fix 'prices' " because "[w]ages do not fall within the

definition of 'price fixing,' which is defined as 'fixing ... the price of a commodity' " (Dkt. #36 at p. 12-13). Further, according to Defendants, "[m]erely substituting the word 'prices' for 'wages' does not transform the factual allegations from alleging a wage-fixing agreement to alleging a price-fixing agreement" (Dkt. #47 at p. 4). But Defendants' narrow view of horizontal price-fixing agreements reveals the flaw in their arguments.

#### A. Price-Fixing Agreements Come in Many Forms.

The scope of conduct found to constitute horizontal price-fixing agreements warranting application of the *per se* rule is broad. For example, courts have applied the *per se* rule to price-fixing agreements: 1) establishing minimum prices, 🚩 *United States v. Trenton Potteries Co.*, 273 U.S. 392, 401 (1927); 2) setting maximum prices, 🚩 *Maricopa Cnty.*, 457 U.S. at 335; 3) fixing credit terms, 🚩 *Catalano, Inc. v. Target Sales Inc.*, 446 U.S. 643, 648 (1980); 4) setting fee schedules, 🚩 *Goldfarb v. Va. State Bar*, 421 U.S. 773, 783 (1975); 5) purchasing surplus product to keep it off the market, 🚩 *Socony-Vacuum*, 310 U.S. at 167; 6) refusing to advertise prices, 🚩 *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 691 (7th Cir. 1961); and 7) excluding purchasers unless they increased the price they paid for a service, *Fed. Trade Comm'n. v. Superior Ct. Trial Laws.* 🚩 *Ass'n*, 493 U.S. 411, 436 n.19 (1990). Thus, contrary to Defendants' argument, "price fixing" has not been limited to conduct that literally directly "fix[es] ... the price of a commodity." (*See* Dkt. #36 at p. 13). Instead, as the above cases and many more have recognized, the definition of horizontal price-fixing agreements cuts broadly. As such, any naked agreement among competitors—whether by sellers or buyers—that fixes components that affect price meets the definition of a horizontal price-fixing agreement. *See* 🚩 *Socony-Vacuum*, 310 U.S. at 221 ("Any combination which tampers with price structures is engaged in an unlawful activity."); *Jacobi v. Bache & Co., Inc.*, 377 F. Supp 86, 95–96 (S.D.N. Y 1974) ("When the purpose of an agreement is to fix or stabilize prices, even if the means used affects only one element of the price structure, or only indirectly affects prices, the agreement is illegal per se....")

**\*5** The Court recognizes that the facts of this case do not present those typical of a price-fixing agreement. For

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 102 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

example, the classic horizontal price-fixing scheme involves an agreement among sellers to fix the prices of goods they sell. But just because the typical price-fixing conspiracy involves certain hallmarks does not mean that other less prevalent forms of price-fixing agreements are not likewise unlawful. Indeed, Courts have not limited price-fixing conspiracies to agreements concerning the purchase and sale of goods but have found them to cover the purchase and sale of services.

*See* Goldfarb, 421 U.S. at 783 (finding that minimum fee schedule for lawyers services' "constitute[d] a classic illustration of price fixing"); Superior Ct. Trial Laws. Ass'n, 493 U.S. at 423 (finding that lawyers' boycott aimed at forcing increase of compensation paid to them was "the essence of 'price fixing[.]' "). More importantly, courts have also not only found price-fixing agreements among sellers, but also among buyers. *See* Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co., 334 U.S. 219, 235 (1948) ("It is clear that the agreement is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured ... are sellers, not customers or consumers."); Nat'l Macaroni Mfrs. Ass'n v. Fed. Trade Comm'n., 345 U.S. 421, 426–27 (7th Cir. 1995) (finding a price-fixing agreement among manufacturers to standardize the composition of their product in an effort to depress the price of an essential raw material to be illegal *per se*). In sum, price-fixing agreements come in many forms and include agreements among competing buyers of services.

### B. The Sherman Act Prohibits Conspiracies Among Buyers of Labor.

The Supreme Court has made clear that the Sherman Act applies equally to all industries and markets—to sellers and buyers, to goods and services, and consequently to buyers of services—otherwise known as employers in the labor market. *See* Anderson v. Shipowners' Ass'n of Pac. Coast, 272 U.S. 359, 361–65 (1926). More than a century ago, the Supreme Court recognized that the Sherman Act applies to labor markets. *Id.* In *Anderson*, along with other restraints that were imposed on the seamen to control their employment, the "[shipowners] fix[ed] the wages which shall be paid to the seamen." 272 U.S. at 362. The Court found that this conduct, along with the other restraints on labor by the employers, violated the Sherman Act. Id. at 365. Thus, there is little doubt that "[t]he Sherman Act ... applies to abuse

of market power on the buyer side...." Todd v. Exxon Corp., 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J); *see also* All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc., 135 F.3d 740, 747 (11th Cir. 1998) ("That price fixing is equally violative of antitrust laws whether it is done by buyers or sellers is also undisputed.").

### C. The Indictment Alleges a Price-Fixing Agreement That Is *Per Se* Illegal.

With these principles in mind, the Court turns to the Indictment to determine if it alleges a price-fixing agreement that is *per se* illegal. MM Steel, 806 F.3d at 847. The Indictment alleges that "Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs" (Dkt. #21 ¶ 11). The Indictment thus alleges a naked price-fixing conspiracy among buyers in the labor market to fix the pay rates of the PTs and PTAs. As such, the Indictment describes a price-fixing conspiracy that is *per se* unlawful. *See* Socony-Vacuum, 310 U.S. at 222 ("[T]he Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike."). In other words, to summarize, the scope of anticompetitive conduct that constitutes price fixing is broad —it covers agreements among buyers in the labor market. And the *per se* rule applies to naked price-fixing agreements categorically. Accordingly, the Indictment sufficiently alleges a price-fixing conspiracy that warrants the *per se* rule.

### D. Fixing the Price of Labor, or Wage Fixing, is a Form of Price Fixing and Thus Illegal *Per Se*.

Defendants do not dispute that price-fixing agreements are *per se* illegal; they do, however, challenge how the Government labeled the offense and whether the charged conduct constitutes a *per se* offense (Dkt. #36 at p. 8). But, contrary to Defendants' argument, whether the Indictment refers to the "pay rates" of the PTs and PTAs as "prices" or "wages" does not affect the outcome. *See* L. Sullivan, Handbook of the Law of Antitrust, s 74, at 198 (1977) ("The antitrust laws concern substance, not form, in the preservation of competition."). The antitrust laws fully apply to the labor markets, and price-fixing agreements among buyers—like therapist staffing companies—are prohibited by

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 103 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

the Sherman Act. *See* Anderson, 272 U.S. at 361–65. At bottom, the alleged agreement between Defendants and co-conspirators had the purpose and effect of fixing the pay rates of the PTs and PTAs—the price of labor. When the price of labor is lowered, or wages are suppressed, fewer people take jobs, which "always or almost always tend[s] to restrict competition and decrease output." *See* Bus. Elecs. Corp., 485 U.S. at 723. This type of agreement is plainly anticompetitive and has no purpose except stifling competition. *See* All Care Nursing Serv., Inc., 135 F.3d at 748 ("The key to per se treatment is whether the conduct is of the kind that can only be anticompetitive."). Indeed, "[b]uyers' cartels engaged in price fixing have been held to be illegal under the Sherman Act even though their goal is to lower the price of the input." Int'l Outsourcing Servs., LLC v. Blistex, Inc., 420 F. Supp. 2d. 860, 864 (N.D. Ill. 2006).

 *6 Additionally, contrary to Defendants' argument, that the Indictment lacks allegations that Defendants "made any agreement to fix prices paid by consumers" does not mean the Indictment fails to state a price-fixing agreement (*see* Dkt. #36 at p. 13). The Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or sellers." Mandeville, 334 U.S. at 236. Rather, the statute protects "all who are made victims of the forbidden practices by whomever they may be perpetrated," and those protections extend to sellers of goods and services—such as the PTs and PTAs—to the same extent they do buyers, consumers, or competitors. *Id.* Besides, "[j]ust as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services." Roman v. Cessna Aircraft Co., 55 F.3d 542, 544 (10th Cir. 1995) (quoting II Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 377c (rev. ed. 1995)). As *Anderson* makes clear, employees are no less entitled to the protection of the Sherman Act than are consumers. *See* 272 U.S. at 364–65.

Justice Kavanaugh's recent concurrence in *National Collegiate Athletic Ass'n v. Alston* provides further support for the conclusion that fixing the price of labor, or wage fixing, is a form of price fixing. 141 S. Ct. 2141 (2021). In *Alston*, the Supreme Court addressed wage fixing by the NCAA—namely the NCAA's cap on education-related compensation that student-athletes are eligible to receive. *Id.* at 2147.

In his concurrence, Justice Kavanaugh unequivocally asserts: "Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Id.* at 2167–68 (Kavanaugh, J., concurring) (citations omitted). Thus, in Justice Kavanaugh's mind, wage fixing is price fixing—price fixing of labor. *See id.*

While Defendants correctly state that *Alston* does not classify wage fixing as a *per se* violation,[2] Justice Kavanaugh's concurrence is significant because he characterizes wage fixing as price fixing. *See id.* And, "[i]t has long been settled that an agreement to fix prices is unlawful *per se.*" Catalano, 446 U.S. at 647. Thus, outside the extraordinary context at issue in *Alston*, naked horizontal agreements to fix the price of labor, like the agreement here, are ordinarily *per se* illegal.

### E. Other Courts Have Recognized that Wage-Fixing Conspiracies Are *Per Se* Unlawful as Price-Fixing Agreements.

Other courts have also recognized that wage-fixing conspiracies—or horizontal agreements among buyers in the labor market—are illegal *per se* like other price-fixing agreements. *See* Todd, 275 F.3d at 198 ("If the plaintiff in this case could allege that defendants actually formed an agreement to fix [ ] salaries, [the] *per se* rule would likely apply."); Law v. Nat'l Coll. Athletic Ass'n, 134 F.3d 1010, 1017 (10th Cir. 1998) (finding that NCAA rule limiting salary of basketball coaches would ordinarily be a *per se* violation of § 1 of the Sherman Act); In re Animation Workers Antitrust Litig., 123 F. Supp. 3d 1175, 1179, 1213–14 (N.D. Cal. 2015) ("[T]he Court concludes that [p]laintiff[-employees] have alleged sufficient facts to support a plausible *per se* claim that [d]efendant[-employers] allegedly conspired to suppress the compensation of the putative class."); Cason-Merenda v. Detroit Med. Ctr., 862 F. Supp. 2d 603, 624–25 (E.D. Mich. 2012) (noting plaintiffs and defendants agreed that wage fixing "like an analogous horizontal price-fixing conspiracy" should be characterized as a *per se* violation); Fleischman v. Albany Med. Ctr., 728 F. Supp. 2d. 130, 157 (N.D.N.Y. 2010) ("Generally, price-fixing [or in this case wage-fixing] agreements are considered

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

a per se violation of the Sherman Act.") (alterations in original) (internal quotations and citations omitted); *Doe v. Ariz. Hosp. & Healthcare Ass'n,* No. CV07-1292, 2009 WL 1423378, at \*3–4 (D. Ariz. Mar. 19, 2009) (finding complaint that alleged defendant-hospitals conspired to keep temporary nursing wages below free market level should survive motion to dismiss because agreement was a *per se* illegal price-fixing agreement); *Cordova v. Bache & Co.,* 321 F. Supp. 600, 606 (S.D. N.Y. 1970) ("There can be little doubt about the fact that if a group of employers, as the complaint here alleges, were allowed ... to agree together to reduce the commissions paid to their respective employees, they would have the same power to restrain competition as is inherent in a price-fixing agreement.").

**\*7** Though Defendants take issue with the fact that all the cases that have labeled wage fixing as a *per se* violation are civil cases, (*see* Dkt. #47 at p. 5), the distinction is irrelevant. Just because this is the first time the Government has prosecuted for this type of offense does not mean that the conduct at issue has not been illegal until now. Rather, as these cases indicate, price-fixing agreements—even among buyers in the labor market—have been *per se* illegal for years.

### F. There is Sufficient Judicial Experience with Price Fixing to Justify a *Per Se* Designation.

Defendants misapprehend the role of judicial experience in applying a *per se* designation to certain conduct. Defendants contend that agreements are deemed unlawful *per se* "only after courts have had considerable experience with the type of restraint at issue" (Dkt. #36 at p. 10) (quoting *Leegin,* 551 U.S. at 886). As a result, because neither the Supreme Court nor any Court of Appeals has ever determined whether a purported wage-fixing agreement is *per se* unlawful under § 1 of the Sherman Act, Defendants argue there is insufficient judicial experience with wage fixing to justify a *per se* designation (Dkt. #36 a p. 9). Defendants are mistaken.

Judicial experience informs the decision to recognize a "*new per se* rule." *See Maricopa Cnty.,* 457 U.S. at 350 n.19 (emphasis in original). Price-fixing agreements, as horizontal restraints, have long been held to merit a *per se* designation. *Socony-Vacuum,* 310 U.S. at 218. Thus, courts "have [ ] considerable experience with the *type of restraint* at issue"— price-fixing agreements. See *Leegin,* 551 U.S. at 886

(emphasis added). As courts have recognized, price-fixing agreements come in many forms. *See supra* pp. 8–10. And though no appellate court has ever specifically found that a price-fixing agreement among employers in the labor market is *per se* illegal does not mean the Court is recognizing a new *per se* rule. *See United States v. Andreas,* 216 F.3d 645, 667 (7th Cir. 2000) ("Yet the fact that the lysine producers' scheme did not fit precisely the characterization of a prototypical *per se* practice does not remove it from *per se* treatment."). Rather, a restraint that is "tantamount to" *per se* unlawful conduct "falls squarely within the tradition *per se* rule." *Catalano,* 446 U.S. at 648. Similarly, here, an agreement to fix the price of labor is "tantamount" to an agreement to fix prices, and "thus falls squarely within the traditional *per se* rule against price fixing." *See id.* Besides, the Supreme Court has explicitly rejected arguments like Defendants': "[T]he argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules...." *Maricopa Cnty.,* 457 U.S. at 351.

Moreover, Defendants further argue that "[t]he need for further judicial experience and analysis is also evident" in light of the possibility that wage-fixing could "benefit[ ] consumers downstream through lower prices" and "encourage, rather than discourage, competitors" (Dkt. #36 at p. 11). In other words, *per se* designation is not appropriate because Defendants' conduct cannot be said to "lack any redeeming virtue" (Dkt. #36 at p. 11) (internal citations omitted). But the Supreme Court has also rejected similar arguments.

For example, in *Catalano,* the Supreme Court explicitly rejected similar procompetitive justifications that the court of appeals had relied upon—namely that the anticompetitive behavior at issue might actually decrease prices for consumers and increase competition by removing a barrier to market entry. *Id.* at 649–50. The Court stated that "[w]hile it may be that the elimination of a practice of giving variable discounts" may ultimately lead to a decrease in the invoice price, "[i]t is more realistic to view an agreement to eliminate credit sales as extinguishing one form of competition among the sellers." *Id.* at 649. Similarly, here, though an agreement to fix the price of labor could benefit consumers, "that is surely not necessarily to be anticipated" and that will not prevent it from being declared unlawful *per se. See id.* Undeniably, "Supreme Court jurisprudence is clear: where the per se rule applies, it is of no consequence that an agreement could

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 105 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

potentially bring net economic benefits to some part of the market...." *Kemp & Assocs., Inc.* 907 F.3d at 1277.

**\*8** Further, in *Catalano*, the Supreme Court rejected the justification that an agreement to eliminate the practice of giving credit could actually enhance competition by removing a barrier to entry for other sellers. 446 U.S. at 649. The Court reasoned, "it would seem to follow that the more successful an agreement is in raising the price level [or curtailing production], the safer it is from antitrust attack. Nothing could be more inconsistent with our cases." *Id.* Again, similarly, Defendants' argument that an agreement to fix the price of labor may "encourage, rather than discourage, competitors" misses the mark (*see* Dkt. #36 at p. 11). Time and time again, the Supreme Court has reiterated, "when a particular concerted activity entails an obvious risk of anticompetitive impact with no apparent potentially redeeming value, the fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent its being declared unlawful *per se*." *Catalano*, 446 U.S. at 649.

### G. Count One of the Indictment Sufficiently Charges a Conspiracy to Fix Price.

Since the Court has found that the allegations in the Indictment constitute a *per se* offense, the Court must next review the Indictment to determine whether it is legally sufficient on its face. To prove a *per se* violation of 15 U.S.C. § 1, the Government must prove that (1) the defendant knowingly formed, joined, or participated in a contract, combination, or conspiracy; (2) its purpose was to fix, raise, maintain, or stabilize prices; and (3) the activities subject to the conspiracy occurred in the flow of interstate commerce or substantially affected interstate commerce. 15 U.S.C. § 1; *Socony-Vacuum*, 310 U.S. at 219–20, 223; *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 679, 681 (5th Cir. 1981).

Count One tracks the elements of a *per se* violation of 15 U.S.C. § 1. It alleges that Defendants knowingly formed, joined, or participated in a conspiracy, that the conspiracy was meant to suppress competition by agreeing to fix prices,[3] and that the business activities occurred within the flow of, and substantially affected, interstate trade and commerce.[4]

The Indictment therefore is legally sufficient on its face. It contains the "essential elements of the offense charged, [ ] the elements are described with particularity, without any uncertainty or ambiguity, and [ ] the charge is specific enough to protect Defendants against a subsequent prosecution for the same offense." *United States v. Lavergne*, 805 F.2d 517, 521 (5th Cir. 1986).

Thus, Count One of the Indictment sufficiently alleges facts constituting a *per se* violation of the Sherman Act. Because the Court has found that the Indictment properly alleges a *per se* violation of the Sherman Act, the Court now turns to Defendants' next argument as to why the Court should dismiss Count One.

### II. Constitutional Issues

**\*9** Defendants argue that application of the *per se* rule is unconstitutional because it violates the Fifth and Sixth Amendments of the U.S. Constitution (Dkt. #36 at p. 15). Specifically, first, Defendants argue the Indictment violates the Fifth Amendment because it "violates the rule of lenity and fails to give fair warning of the prohibited conduct" (Dkt. #36 at pp. 15–16). Second, Defendants argue the Indictment violates the Sixth Amendment because it "improperly promotes a presumption of intent, vitiating the requirement of proof of state of mind in the criminal context" (Dkt. #36 at p. 16). The Court will address each argument in turn.

### A. Defendants' Fifth Amendment Challenges Fail.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ... nor be deprived of life, liberty, or property without due process of law...." U.S. CONST. amend. V. As embodied by the "fair warning requirement," due process requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265 (1997) (internal quotations omitted).

The Supreme Court has identified "three related manifestations of the fair warning requirement." *Id.* at 266. "First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 106 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)
2021-2 Trade Cases P 81,898

so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (internal quotations omitted). Second, the rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Id.* (citations omitted). And third, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* (citations omitted). To satisfy each of these requirements, a criminal statute, "standing alone or as construed" must "ma[k]e it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

Defendants do not contend that the Sherman Act itself is unconstitutionally vague; rather, they argue that the Indictment violates the second and third manifestations of the fair warning requirement (Dkt. 47 at pp. 10–11). According to Defendants, because no court has found that purported wage-fixing agreements constitute criminal conduct and neither the Supreme Court nor any Court of Appeals has held wage fixing to be *per se* unlawful, then Defendants "could not possibly have had fair warning that the conduct alleged in the Indictment may be criminal" (Dkt. #36 at p. 18). Further, Defendants argue that because there is "a grievous uncertainty as to whether the Supreme Court condemns wage fixing as a *per se* antitrust violation," the rule of lenity mandates dismissal (Dkt. #47 at p. 11). In response, the Government argues "[t]his is not even close" because "the Supreme Court has long recognized that wage fixing is price fixing" (Dkt. #46 at p. 15 (citing *Anderson,* 272 U.S. at 361–63; *Superior Ct.,* 493 U.S. at 423, 427, 432, 436 n.19)). While the issue is not as clear-cut as the Government suggests, Defendants' constitutional arguments fail.

### i. The Defendants Received Fair Notice That Their Conduct Was Illegal.

The Indictment charges Defendants with price fixing. For more than 100 years, courts have repeatedly held price fixing as *per se* illegal under the Sherman Act. *Socony-Vacuum.,* 310 U.S. at 218. Thus, Defendants could not have had any reasonable doubt that any price-fixing agreement was *per se* illegal. Defendants do not dispute this conclusion and instead insist that the "novel construction of the statute to construe *'wage fixing'* as *per se* unlawful ... fails to give fair warning of the prohibited conduct" (Dkt. #36 at p. 15) (emphasis added).

But this argument relies on the same semantical arguments this Court already rejected. *See supra* Part I.

**\*10** Regardless of whether the Indictment characterizes Defendants' conduct as wage fixing or price fixing, the Sherman Act, in conjunction with the decades of case law, made it "reasonably clear" that Defendants' conduct was unlawful. *See Lanier,* 520 U.S. at 267. Indeed, most criminal statutes "deal with untold and unforeseen variations in factual situations," so "no more than a reasonable degree of certainty can be demanded." *Boyce Motor Lines v. United States,* 342 U.S. 337, 340 (1950). Belaboring the point discussed in Part I, the Supreme Court has long recognized that price-fixing agreements come in many forms. *See Catalano,* 446 U.S. at 647–50; *see also supra* Part I pp. 8–10. And the Supreme Court has long recognized that § 1 categorically prohibits *per se* unlawful restraints across all markets and industries—including restraints on the buyer side and in the labor market. *See Mandeville,* 334 U.S. at 235–36; *Anderson,* 272 U.S. at 361–63; *see also supra* Part I pp. 9–11. Thus, decades of precedent gave Defendants more than sufficient notice that agreements among competitors to fix the price of labor are *per se* illegal. Moreover, the numerous district court decisions holding that agreements to fix the compensation of employees are *per se* unlawful reinforce this conclusion. *See supra* Part I. p. 14. At a minimum, these decisions foreclose Defendants' argument because it cannot be said that "no[ ] [ ] prior judicial decision has fairly disclosed [Defendants' conduct] to be within [the] scope [of the Sherman Act]." *See Lanier,* 520 U.S. at 266.

Moreover, the holding today is not a "novel" construction of the Sherman Act—it comports with previous broad interpretations of the Act and is a logical application of precedent. Similarly, that "no court has found that purported wage-fixing agreements constitute criminal conduct under the Sherman Act" does not mean that Defendants' did not have fair notice. *See United States v. Kinzler,* 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of this prosecution does not help [defendant's fair notice argument], for it is immaterial that there is no litigated factual pattern precisely on point.") (internal quotations omitted). Rather, the lack of criminal judicial decisions only indicates Defendants' unlucky status as the first two individuals that the Government has prosecuted for this type of conduct before.

But, "[t]o find unfair notice whenever a court specified new types of acts to which a criminal statute applied would stifle courts' ability to interpret and fairly apply criminal statutes."

*United States v. Kay*, 513 F.3d 432, 444–45. Rather, "as *Lanier* points out, lack of prior court interpretations 'fundamentally similar' to the case in question does not create unfair notice." *Id.* at 444. Instead, "so long as the prior decisions gave reasonable warning" that the conduct was unlawful, then fair notice was satisfied. *See id.* And, here, decades of judicial interpretations gave Defendants more than "reasonably clear" notice that their conduct was unlawful. *See Lanier*, 520 U.S. at 267.

Even where the Supreme Court has considered certain conduct "not price fixing as such," it has affirmed the district court's application of the *per se* rule. *United States v. Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. 681, 692, 699 (1978). Thus, even accepting Defendants' argument that their conduct was not literally price fixing, Defendants were still on notice that their conduct was "perilously close" to a line that subjected them to criminal prosecution. *See Boyce*, 342 U.S. at 331; *Id.* ("Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."). Thus, Defendants received fair notice that their conduct was illegal.

### ii. The Rule of Lenity Does Not Apply.

Defendants also argue that the rule of lenity requires dismissal of Count One because there remains a "grievous uncertainty as to whether the Supreme Court condemns wage fixing as a *per se* antitrust violation" since "it has never evaluated it as such" (Dkt. #47 at p. 11). The Government responds by arguing that the rule of lenity is inapplicable here because "[t]here is no grievous ambiguity or uncertainty in this case" (Dkt. #46 at p. 15).

The rule of lenity is a principle of statutory construction that "applies primarily to the interpretation of criminal statutes." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011). It dictates that courts resolve ambiguities in criminal statutes in favor of defendants. *See Crandon v. United States*, 494 U.S. 152, 168 (1990). But "[c]ourts do not resort to the rule of lenity every time a difficult issue of statutory interpretation arises." *United States v. Bittner*, 469 F. Supp. 3d 709, 723 (E.D. Tex. 2020) (citation

and internal quotation marks omitted). "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted).

**\*11** Here, the rule of lenity has no application. As discussed, the rule of lenity applies only if a court can make "no more than a guess as to what Congress intended." *Ladner v. United States*, 358 U.S. 169, 178 (1958). Here, the Court can do much better than "guess." *See id.* Indeed, the Supreme Court has recognized that "Congress intended to strike as broadly as it could in § 1 of the Sherman Act...." *Goldfarb*, 421 U.S. at 787. And price-fixing agreements—in many forms—have long been held to be *per se* violations of the Act. *See Catalano*, 446 U.S. at 647–50; *see also supra* Part I pp. 8–10. The Supreme Court has also long held that the Sherman Act applies equally to all industries and markets—including to agreements made by buyers in the labor market. *See Mandeville*, 334 U.S. at 235–36; *Anderson*, 272 U.S. at 361–63; *see also* supra Part I pp. 9–11. Thus, these cases leave no room for application of the rule of lenity. Put bluntly, "the rule of lenity cannot be used to create ambiguity when the meaning of a law, even if not readily apparent, is, upon inquiry, reasonably clear." *United States v. Nippon Paper Industries Co.*, 109 F.3d 1,8 (1st Cir. 1997). Though Defendants disagree with this Court's interpretation of the Sherman Act, that does not mean there is a "grievous ambiguity." *See Barber*, 560 U.S. at 488. Rather, decades of precedent make it clear that agreements to fix the price of labor—like all other price-fixing agreements—are *per se* illegal. Thus, the rule of lenity does not apply.

### B. Defendants' Sixth Amendment Challenge Also Fails.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." U.S. CONST. amend. VI. Defendants argue that the Indictment's *per se* designation violates the Sixth Amendment because it "improperly suggest[s] that intent could be presumed without further evidence" (Dkt. #36 at p. 20). According to Defendants, such a presumption would unconstitutionally take from the jury the determination of intent—thus depriving Defendants

Case 4:23-cv-03560 Document 119-3 Filed on 01/19/24 in TXSD Page 108 of 179

*United States v. Jindal*, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

of their right to trial by jury (Dkt. #36 at p. 20). The basis of Defendants' argument stems from *United States v. U.S. Gypsum Co.*, where the Supreme Court held "that a defendant's state of mind or intent is an element of a criminal antitrust offense" which "cannot be taken by the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices." 🏴 438 U.S. at 435. But Defendants' cursory Sixth Amendment argument also fails.

Decades ago, the Fifth Circuit rejected essentially the same argument that Defendants now make. 🏴 *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 681–84 (5th Cir. 1981). Defendants fail to acknowledge, much less distinguish, this precedent. In *Cargo Service*, defendants were charged with a conspiracy to fix prices and subsequently found guilty after a jury trial. 🏴 *Id.* at 678. On appeal, relying on *Gypsum*, defendants argued that they were denied due process of law because the district court's jury instruction "improperly allowed the jury to convict absent a finding of intent" 🏴 *Id.* at 684. The Fifth Circuit rejected this argument: "Neither a conclusive nor a permissive presumption is at issue here" because "a finding of intent to fix prices [equates to] an intent to unreasonably restrain trade." 🏴 *Id.* at 683 n.7. Thus, "a finding that [defendants] intended to fix prices supplies the criminal intent necessary for a conviction of a criminal antitrust offense." 🏴 *Id.* at 684. Further, the Fifth Circuit found the Defendants' reliance on *Gypsum* was misplaced —*Gypsum* was "easily distinguishable" because it involved the mere exchange of price information, not price fixing itself, and thus was a rule of reason case. 🏴 *Id.* at 683. This Court thus finds that *Cargo Service* forecloses Defendants' argument. [5] Accordingly, application of the *per se* rule does not violate the Sixth Amendment.

**\*12** Since the Court has addressed both Defendants' arguments pertaining to Count One, the Court will now turn to Rodgers' separate argument.

### ANALYSIS: RODGERS' MOTION

In addition to adopting Jindal's arguments for Count One, Rodgers moves to dismiss the entire Indictment against him on another ground (Dkt. #45). Specifically, Rodgers argues the Indictment should be dismissed because the Government's prosecution breaches an oral non-prosecution agreement

between Rodgers and the Government (Dkt. #45). In response, the Government denies the existence of an oral non-prosecution agreement (Dkt. #48). In fact, the Government contends that the only agreements between Rodgers and the Government were two no-direct use agreements ("NDU's"), commonly referred to as "proffer letters" (Dkt. #48 at p. 3).

### I. Rodgers' Background

Details of the events between Rodgers, his attorney, and the Government are helpful for context regarding the alleged non-prosecution agreement. Based on a declaration from Brian Poe ("Poe"), Rodgers' attorney, and a declaration from Ryan Danks ("Danks"), Acting Chief of the Washington Criminal I Section of the Antitrust Division, the Court summarizes the following background information (Dkt. #45-8; Dkt. #48-1).

On November 26, 2019, DOJ Trial Attorney Katie Stella ("Stella") contacted Poe and the two spoke on the phone following a brief email exchange (Dkt. #45-8 ¶ 2). During the phone call, Stella stated that the Government considered Rodgers to be a "subject" of a criminal investigation and wanted to interview Rodgers in connection with an antitrust investigation. (Dkt. #45-8 ¶ 2). According to Poe's declaration, Stella also stated that "she did not anticipate Rodgers being charged if he continued to cooperate with the government's investigation" (Dkt. #45-8 ¶ 2). Danks' declaration does not mention this phone call.

On December 12, 2019, Rodgers and Poe met with the Government in Fort Worth for an interview or "proffer" (Dkt. #45-8 ¶ 4). A written NDU was executed before the interview on the same day, setting out the terms of the interview (Dkt. #48-1 ¶ 6; Dkt. #48, Exhibit 2). Poe's declaration does not mention the written NDU. Following Rodgers' proffer, Poe and the Government communicated several times via phone and email (Dkt. #45-8 ¶ 6). On May 22, 2020, Poe received a phone call from Stella concerning Rodgers (Dkt. #45-8 ¶ 7). During the call, Poe claims that Stella confirmed that Rodgers was still considered a "subject" of the criminal investigation and stated again that Rodgers would not be charged criminally if he continued to cooperate with the Government's investigation (Dkt. #45-8 ¶ 7). Again, Danks' declaration contains no mention of this call.

On or about December 9, 2020, Poe states he received a phone call from DOJ Antitrust Trial Attorney Megan Lewis ("Lewis") regarding Rodgers (Dkt. #45-8 ¶ 9). The purpose of the call was to inform Poe that a Grand Jury had indicted Jindal and that the Government anticipated Rodgers would

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 109 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

need to testify at trial (Dkt. #45-8 ¶ 9; Dkt. #45-1 ¶ 7). Poe claims that while he had been previously assured by Stella that Rodgers would not be charged if he continued to cooperate, he took the opportunity to confirm this with Lewis since she was Stella's supervisor (Dkt. #45-8 ¶ 9). According to Poe's declaration, "Lewis unequivocally stated that Rodgers would not be charged if he continued to cooperate with the [G]overnment" (Dkt. #45-8 ¶ 9). Danks admits the Government contacted Poe on that day, but his declaration contains no further details of the substance of the conversation (Dkt. #48-1 ¶ 7). He does state, however, that the Government attorney with whom Poe spoke was not Lewis, nor was the attorney a supervisor of another attorney who worked on the investigation (Dkt. #48-1 ¶ 7).

**\*13** On January 27, 2021, Rodgers and Poe attended a virtual proffer with the Government (Dkt. #45-8 ¶ 11). As with the first proffer, another NDU was executed setting out terms of the interview (Dkt. #48-1 ¶ 9; Dkt. #48, Exhibit 3). Again, Poe's declaration contains no mention of the written agreement that was executed that day. Subsequently, on a March 1, 2021 phone call, the Government notified Poe that it was recommending prosecution for Rodgers because, in the Government's view, Rodgers had not been truthful during the proffer on January 27, 2021 (Dkt. #45-8 ¶ 12; Dkt. #48-1 ¶ 10). Rodgers was indicted on April 15, 2021 (Dkt. #45-8 ¶ 14).

## II. Non-Prosecution Agreement Legal Standard

"Non[-]prosecution agreements, like plea bargains, are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." *United States v. Castaneda*, 162 F.3d 832, 835 (5th Cir. 1998). Applying contract law, Rodgers "bears the burden of proving that there was a mutual manifestation of assent —either verbally, or through conduct—to the agreement's essential terms." *United States v. Jimenez*, 256 F.3d 330, 347 (5th Cir. 2001).

If Rodgers proves that there was a non-prosecution agreement and "lives up to his end of the bargain, the government is bound to perform its promises." *Castaneda*, 162 F.3d at 835–36. If Rodgers " 'material breaches' his commitments under the agreement, however, the government can be released from its reciprocal obligations." *Id.* at 836. To be relieved of its obligations, the Government must "prove to the court by a preponderance of the evidence that (1)

the defendant breached the agreement, and (2) the breach is sufficiently material to warrant rescission." *Id.*

## III. Analysis

Armed with a better understanding of the communication between Rodgers' counsel, Poe, and the Government, the Court turns back to Rodgers' argument. Rodgers claims there was an oral non-prosecution agreement that was "reached on or about December 9, 2020" "that Rodgers would not be charged if [he] continued to cooperate, which included testifying at trial" (Dkt. #50 at p. 6). Rodgers further contends that the Government has not proved that Rodgers breached the terms of his non-prosecution agreement (Dkt. #45 at p. 9). Accordingly, Rodgers argues the Government cannot rescind the agreement (Dkt. #45 at p. 9). The Government counters by arguing that no oral agreement was ever reached (Dkt. #48 at p. 10). The Government also argues that two written NDUs "conclusively establish that Rodgers did not have a non-prosecution agreement" "[b]ecause parol evidence is inadmissible to prove the meaning of the unambiguous NDUs" (Dkt. #48 at p. 10). Further, while the Government has not come forward with any evidence proving Rodgers violated any alleged oral agreement, it argues that "[i]f necessary" it "could readily show a material violation of any non-prosecution agreement" (Dkt. #48 at p. 13).

Applying basic contract principles to the alleged agreements in this case, in order to dismiss the Indictment, the Court must 1) find that the parol evidence rule does not bar the enforcement of the alleged oral non-prosecution agreement; 2) an oral non-prosecution agreement was in fact reached; 3) Rodgers performed his part of the agreement; and 4) the Government has breached the agreement. [6] *See Jimenez*, 256 F.3d at 347 n.23 (noting that before considering whether any alleged agreement was breached, it must first be determined whether an agreement ever existed). Thus, the Court will first consider the effect of the written NDUs as part of its inquiry into whether an oral non-prosecution agreement was ever reached.

### A. The Two Written NDUs Do Not Bar Enforcement of Any Alleged Oral Agreement.

**\*14** As previously stated, the Government argues that two written NDUs between the Government and Rodgers trigger the parol evidence rule and thus "conclusively establish that Rodgers did not have a non-prosecution agreement" (Dkt.

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 110 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

#48 at p. 10). According to the Government, because the NDUs contemplate Rodgers' potential prosecution and contain merger clauses, they "foreclose any contention that there was a non-prosecution agreement at the time of their signing" (Dkt. #48 at p. 10). In his motion to dismiss the Indictment, Rodgers does not mention the written NDUs. In his reply, however, Rodgers concedes that the written NDUs exist, but cites no law on the parol evidence rule and instead just repeatedly asserts that the Government "misconstrue[s] the language of these agreements" (Dkt. #50 at p. 5).

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the writing itself. 🔖 *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Parties may not rely on extrinsic evidence to create an ambiguity or give the contract a different meaning from that which its language imports. 🔖 *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." 🔖 *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Likewise, "when a contract is unambiguous, [courts] generally will not look beyond the four corners of the document." *United States v. Long*, 722 F.3d 257, 262 (5th Cir. 2013) (internal quotations omitted). Further, when there is valid integrated agreement with respect to a particular subject matter, the parol evidence rule "precludes the enforcement of inconsistent prior or contemporaneous agreements." *Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990). However, the parol evidence rule "does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof." *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958).

As a starting point, only the second NDU—executed on January 22, 2021—would trigger the parol evidence rule and thus bar enforcement of the alleged oral non-prosecution agreement. The first NDU was executed on December 12, 2019, (Dkt. #48, Exhibit 2), and Rodgers claims the oral agreement was not reached until about one year later—on or about December 9, 2020 (Dkt. #50 at p. 6). Yet, the parol evidence rule only bars enforcement of prior or contemporaneous agreements; it does not apply to agreements made *subsequent* to the written agreement. 🔖 *Brumitt*, 519

S.W.3d at 111. Thus, only the second written NDU, executed on January 22, 2021, could trigger the parol evidence rule since the oral agreement was allegedly formed before the second written NDU was signed.

Moreover, the second NDU is the type of agreement that triggers the parol evidence rule. It is a written agreement that is "integrated." Indeed, it contains an integration or "merger" clause. *See People's Cap. & Leasing Corp. v. McClung*, No. 4:18-CV-00877, 2020 WL 4464503, at *8 (E.D. Tex. Aug. 4, 2020) ("A merger clause is a provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document.") (internal quotations omitted). But, as well, by its own terms, it is integrated only as to the parties' agreements relating to the subject matter it addresses —not as to all prior or contemporaneous agreements between the parties related to other matters. *See West v. Quintanilla*, 573 S.W.3d 237, 244 (Tex. 2019) ("Although it is complete and final as to its subject matter, it does not purport to address or supersede agreements related to other matters."). In this sense, the NDU is only partially integrated. The language in the NDU makes this clear. For example, it states:

> **\*15** It is understood that this agreement is limited to statements made during the interview on January 27, 2021, and does not apply to any oral, written, or recorded statements made by you at any other time. This letter and the attached Addendum constitute the entire understanding between the United States and you *in connection with this interview.*

(Dkt. #48, Exhibit 3) (emphasis added). Accordingly, though the NDU unambiguously states that it "constitute[s] the entire understanding between the United States and [Rodgers,]" it does so only in connection with the terms of the January 22, 2021, proffer meeting (*See* Dkt. #48, Exhibit 3). Thus, even though the NDU contains an integration clause, it does not foreclose the possibility that Rodgers and the Government reached another separate, unrelated agreement.

This is significant because under the parol evidence rule, the written, integrated NDU only "precludes enforcement of any prior or contemporaneous agreement that addresses the

Case 4:23-cv-03560  Document 119-3  Filed on 01/19/24 in TXSD  Page 111 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

same subject matter and is inconsistent with [the NDUs']
terms." *Id.* at 244–45. Stated differently, the parol evidence
rule does not preclude enforcement of a prior agreement that
is "collateral to and not inconsistent" with the NDU. *Id.* at
245. Therefore, to determine if the parol evidence rule bars
enforcement of the oral agreement, the Court must determine
whether the alleged oral agreement was "collateral" to the
NDU and whether it was "not inconsistent" with it. *See id.*

Here, the Court finds that any alleged oral non-prosecution
agreement was "collateral" to the second NDU. To be
collateral, the agreement must be one the parties might
naturally make separately and would not be ordinarily be
expected to be embodied in or integrated with the written
agreement and not so clearly connected with the principal
transaction as to be part and parcel of it. *Boy Scouts of
Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 745
(Tex. App.—Dallas 1990, writ withdrawn). Here, the NDU
and the oral agreement addressed different subject matters.
An NDU is generally "an agreement between an [individual]
and the government in a criminal case that sets forth the
terms under which the [individual] will provide information
to the government during an interview, commonly referred
to as a 'proffer session.' " *United States v. Lopez*, 219
F.3d 343, 345 n.1 (4th Cir. 2000). On the other hand, a non-
prosecution agreement is exactly what it sounds like—it is
an agreement that states the Government will agree not to
prosecute an individual if certain conditions are met (Dkt.
#48-1 ¶3). Thus, the NDU agreement addressed the terms of
the proffer session, while the alleged oral agreement would
have addressed the terms of any protection from prosecution.
Even in the Government's own words, "[n]on-prosecution
agreements differ markedly from NDUs" (Dkt. #48 at p. 4).
Consequently, because the oral non-prosecution agreement
was collateral to the written NDU, the Court must resolve
whether the oral non-prosecution agreement was inconsistent
with the terms of the NDU. *See Quintanilla*, 573 S.W.3d
at 244–45. If the oral non-prosecution agreement was "not
inconsistent" with the NDU, then the parol evidence rule will
not preclude enforcement of the oral agreement. *Id.*

The Court turns to the language of the NDU to determine if
it is consistent with the alleged oral agreement that Rodgers
would not be prosecuted if he continued to cooperate. In
relevant part, the agreement states:

**\*16** 3. The United States agrees that no statement made
by you during the interview will be used directly against
you in any legal proceeding, except that your statements

may be offered in any such proceeding to impeach your
testimony or to rebut evidence offered on your behalf. In
addition, the United States may use any statements made
in the interview in a prosecution of you for making a false
statement or declaration (18 U.S.C. §§ 1001, 1623),
obstruction of justice (18 U.S.C. § 1503, *et seq.*), or perjury
(18 U.S.C. § 1621).

4. The United States is free to use any information directly
or indirectly derived from the interview to pursue its
investigation and in any subsequent prosecution of you or
others.

(Dkt. #48, Exhibit 3). The language, particularly in paragraph
four, broadly contemplates future prosecution of Rodgers. At
first glance, this broad language appears to be inconsistent
with the Government's oral promise not to prosecute Rodgers.
But, after a closer examination of the language, the Court
reaches a different conclusion. Instead, the Court finds that
the collateral oral agreement at issue is "not inconsistent" with
the written NDU—even though the NDU contemplates future
prosecution of Rodgers. Indeed, in *Quintanilla*, the Texas
Supreme Court explored what "inconsistent" means in this
context and found that when the oral agreement contradicts
or varies the parties' obligations under the written agreement,
the oral agreement is an inconsistent collateral agreement. *Id.*
at 247.

Here, the alleged oral agreement does not vary the parties'
obligations under the written NDU. For one thing, the NDU
does not specifically state that Rodgers is subject to a future
prosecution; it simply states the Government can use the
information from the interview in any subsequent prosecution
(Dkt. #48, Exhibit 3). Further, the alleged oral agreement
was not simply an agreement to not prosecute Rodgers—
it was conditioned on his continued cooperation. Thus, just
like the NDU contemplates future prosecution of Rodgers,
so, too, does the alleged oral agreement—if Rodgers fails to
continue to cooperate. As such, the oral agreement does not
alter fundamental terms of the NDU.

Consequently, because the alleged oral non-prosecution
agreement is "collateral to and not inconsistent" with the
second NDU, the parol evidence rule does not preclude
enforcement of it. *See id.* at 245. Accordingly, since the parol
evidence rule is not applicable, the Court now turns to whether
Rodgers has proved that there was a legally enforceable oral
non-prosecution agreement.

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

## B. No Legally Enforceable Oral Non-Prosecution Agreement Was Reached.

A defendant claiming to have a non-prosecution agreement bears the burden of "prov[ing] that such an agreement existed." *Jimenez*, 256 F.3d at 347. "Non-prosecution agreements ... are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." 🚩 *Castaneda*, 162 F.3d at 835. Any "ambiguities" in a non-prosecution agreement "must be construed against the government." 🚩 *McBride*, 571 F. Supp. at 605. Because a non-prosecution agreement is governed by contract law standards, whether the parties reached an agreement is question of fact. *Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 238–39 (5th Cir. 2012). However, whether an agreement has all the essential terms to be an enforceable agreement is a question of law. *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012). In other words, Rodgers' contention has both a factual dimension—namely, whether Rodgers and the Government agreed that the Government would not prosecute him if he cooperated—and a legal dimension—whether there was a meeting of minds on the agreement's essential terms.

**\*17** Rodgers claims the oral agreement "that Rodgers would not be charged if Rodgers continued to cooperate, which included testifying at trial" was reached "on or about December 9, 2020" (Dkt. #50 at p. 6). In other words, Rodgers argues that the basis for the oral agreement was Poe's phone call with Lewis. Further, Rodgers asserts that the Government's failure to deny the occurrence of the oral conversation and the Government's failure to deny that an agreement was reached "is further proof to corroborate counsel's declaration" (Dkt. #50 at p. 6). Indeed, the Court does find that the absence of any explicit denial of an oral agreement in Danks' declaration is telling. But the Court also notes that Rodgers bears the burden of proving an agreement existed, and he faces some difficult challenges.

For example, contrary to Poe's declaration, Danks declares that Lewis was *not* the attorney on the phone call on December 9, 2021, and the attorney on the phone call was *not* a supervisor of another attorney who worked on the investigation (Dkt. #48-1 ¶ 7). These statements both directly contradict Poe's statements. While the name of the Government attorney who made the alleged agreement might seem like a minor detail, it does cast doubt on Poe's

"unequivocal[ ]" recollection of the events. *See United States v. Casares*, No. 2:14-653, 2019 WL 1243617, at \*4 (S.D. Tex. Mar. 18, 2019) (singling out Defendant's failure to "specify with whom he entered into this alleged agreement" in holding no oral non-prosecution agreement existed). Further, while Poe asserts an oral agreement was made, Danks declares that "[t]he Division's general practice is that both NDUs and NPAs are written" (Dkt. #48-1 ¶ 3). Moreover, while Poe claims an oral non-prosecution was reached around December 9, 2020, Rodgers entered into a second written NDU with the Government after this that contained no mention of the oral agreement. The execution of the written NDU not only reinforces the Government's claim that agreements like this are in writing, but it also indicates that the course of dealing between the parties was to put important agreements in writing.

Even more telling, the Court finds it odd that Poe's declaration does not mention that two written NDUs were executed. And, finally, looking at Poe's declaration, the Court finds it noteworthy that when Poe was notified that the Government was now recommending prosecution, he never asserted that the change violated any alleged agreement. *See United States v. Sattar*, No. 02-CR-395, 2003 WL 22510398, \*3 (S.D.N.Y Nov. 5, 2003) (noting that if a non-prosecution agreement had been reached then Poe's response upon learning of the indictment "should have been an anguished howl of protest over the breach of the agreement.") (internal quotations omitted).

Nonetheless, even fully crediting Poe's declaration and assuming *arguendo* that Rodgers has demonstrated the factual aspect of the alleged agreement, the Court finds that no agreement was reached as a matter of law. *See Coe*, 695 F.3d at 320 ("Whether an agreement fails for indefiniteness is a question of law."). Indeed, a contract is "legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations." 🚩 *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006) (internal quotations omitted). Stated differently, "when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Coe*, 695 F.3d at 320. To determine whether essential terms were sufficiently settled to find a contract, "[c]ourts look not only at any relevant written agreements but also at the relationship of the parties, [and] their course of dealings...." 🚩 *APS Cap.*

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 113 of 179

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021-2 Trade Cases P 81,898

*Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272–73 (5th Cir. 2009).

**\*18**  Here, no legally enforceable agreement was reached because there was no "meeting of the minds" on all essential terms. Even accepting Rodgers' Poe's declaration as the truth —"that Rodgers would not be charged if Rodgers continued to cooperate, which included testifying at trial"—the agreement nevertheless fails to contain essential terms. *See id.* at 272 ("[A]n agreement is not enforceable unless it resolves all essential terms and leaves no material matters open for future negotiation."). Indeed, not every "meeting of the minds" is a contract. The minds may not have met on essential terms. When the parties leave an essential term open for future negotiation, there is no binding contract. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Here, the alleged agreement contains no mention of essential terms like "what level of cooperation would be required of [Rodgers] in order for h[im] to satisfy the purported [non-prosecution] agreement [and] who would determine whether [Rodgers] had fulfilled [his] part of the [ ] agreement." *See United States v. Lua*, 990 F. Supp. 704, 711 (N.D. Iowa 1998); *see also Commonwealth v. Stewart*, No. 04-1409, 2004 WL 3455442, at \*17 (Va. Cir. Ct. Oct. 22, 2004) (finding an absence of sufficient detail to prove a meeting of the minds). Absent such essential terms, there could be no meeting of the minds. That Rodgers now argues that he has lived up to his end of the agreement—by cooperating—and the Government disagrees illustrates how these details were material terms to the agreement. Undeniably, these details could change the outcome of the case. *See United States v. Aleman*, 286 F.3d 86, 92 (2d. Cir. 2002) ("A critical factual element of the alleged agreement will be who determines [Defendant]'s truthfulness and willingness to testify-the government, the court, or some other party.").

Further, examining the written NDUs, the relationship of the parties, their course of dealings, and other evidence only confirms there was no meeting of the minds as to the essential terms of the non-prosecution agreement. *See Mesa*, 580 F.3d 272–73. Indeed, when the agreement is oral, the court "must consider the possibility that immunity discussions ... never progressed to a meeting of the minds and formation of an enforceable bargain." *Aleman*, 286 F.3d at 89. That a final oral agreement was never reached is bolstered by the existence of two written NDUs. These objectively show the course of dealing between the parties—when the

parties agreed to final and essential terms of a contract, they did so in writing. By contrast, the only evidence that Rodgers offers to show that an oral agreement was reached is subjective evidence—Poe's declaration. But even Poe's declaration supports the conclusion that no final agreement was ever reached. Indeed, Poe's repeated conversations with the Government indicate that there was a possibility a deal could be made in the future, not that a final agreement already existed as to all essential terms. *See Lua*, 990 F. Supp at 711. For example, Poe acknowledges that he asked the Government about Rodgers' status several times. However, if there had been a prior meeting of the minds on all essential terms, then Poe's inquiries would have been unnecessary. Thus, his repeated inquiries highlight that even he might have been unsure that there was a final agreement on the table.

In short, the Court finds that Rodgers has failed to prove that essential terms of the agreement were sufficiently settled and definite. Indeed, the lack of detail regarding the terms of the alleged agreement highlight that the parties never reached a final agreement. And a court may not create an agreement where none exists. *See Lamajak, Inc. v. Frazin*, 230 S.W.3d 786, 793 (Tex. App.—Dallas 2007, no pet.). A defendant must establish something "more than an unfounded and unilateral belief" that the government made a claimed promise in exchange for his cooperation. *United States v. Williams*, 198 F.3d 988, 992 (7th Cir. 1999). Rodgers has not done so. Accordingly, because the Court concludes that there was no meeting of the minds as to the essential terms, the Court finds no non-prosecution agreement exists for the Court to enforce. Therefore, the Court denies Rodgers' motion to dismiss on this ground.

## CONCLUSION

It is therefore **ORDERED** that Defendant Neeraj Jindal's Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36) and Defendant John Rodgers' Motion to Dismiss the Superseding Indictment (Dkt. #45) are hereby **DENIED.**

**IT IS SO ORDERED.**

**United States v. Jindal, Not Reported in Fed. Supp. (2021)**

2021-2 Trade Cases P 81,898

**All Citations**

Not Reported in Fed. Supp., 2021 WL 5578687, 2021-2 Trade
Cases P 81,898

## Footnotes

1   Certain types of group boycotts have also been found to be *per se* illegal, but "precedent limits the per se
    rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX
    Corp. v. Discon, Inc.* 525 U.S. 128, 135 (1998).

2   In *Alston*, the Supreme Court affirmed a judgment that evaluated the NCAA's limit on education-related
    compensation under the rule of reason. *Id.* at 10–11 (majority opinion). However, for many years, the Supreme
    Court has declined to condemn the NCAA's restraints as illegal *per se* because the "horizontal restraints
    on competition are essential if the product is to be available at all." *Nat'l Collegiate Athletic Ass'n v. Bd.
    of Regents of Univ. of Okla.,* 468 U.S. 85, 101 (1984). In these situations—where collaboration is essential
    among certain actors for there to be a product at all—the rule of reason applies regardless of the nature of the
    restraint at issue. *See id.* at 103. Accordingly, contrary to Defendants' argument, that the Supreme Court
    evaluated the NCAA's wage-fixing under the rule of reason does not justify the rule of reason in this case.

3   "... Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress
    competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs" (Dkt. #21 at pp. 3–4).

4   "During the Relevant Period, the business activities of Jindal, Rodgers, and their co-conspirators that are
    the subject of the conspiracy charged in this Count were within the flow of, and substantially affected,
    interstate trade and commerce. For example, during the Relevant Period: (a) Insurance funds, including
    federal Medicare funds, traveled from banks or companies located in states outside of Texas through a home
    health agency to Company A in Texas, and from Company A to its PTs and PTAs to pay them for providing
    care to patients; (b) To provide care in patients homes and assisted living facilities, PTs and PTAs used
    equipment and vehicles purchased in interstate commerce; and (c) The conspiracy was intended to lower
    rates paid to PTs and PTAs, which would lessen their purchases in interstate trade and commerce" (Dkt.
    #21 at p. 6).

5   Moreover, every other circuit to address this issue has agreed. *United States v. Giordano*, 261 F.3d 1134,
    1143–44 (11th Cir. 2001); *United States v. Fishbach & Moore, Inc.*, 750 F.2d 1183, 1195–96 (3d. Cir. 1984);
    *United States v. Koppers Co.*, 652 F.2d 290, 293–95 (2d Cir. 1981); *United States v. Brighton Bldg. &
    Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979); *United States v. Mfrs.' Ass'n*, 462 F.2d 49, 52 (9th Cir. 1972).

6   The parties did not address choice of law questions. The Court, however, is bound by *Erie R. Co. v.
    Tompkins*, 304 U.S. 64 (1938) to apply the contract law of the State of Texas, where was the agreement was
    allegedly executed and where it would be performed. *United States v. McBride*, 571 F. Supp. 596, 604
    n.3 (S.D. Tex. 1983), *aff'd*, 915 F.2d 1569 (5th Cir. 1990)

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

1992 WL 245655
Only the Westlaw citation is currently available.
United States District Court, E.D. Louisiana.

Sean Patrick WARREN, et al.

v.

NEW ORLEANS POLICE DEPARTMENT, et al.

Civ. A. No. 92–2037

Sept. 11, 1992.

MINUTE ENTRY

Charles SCHWARTZ, Jr., District Judge.

**\*1** Before the Court is the Motion to Sever filed on behalf of defendants, certain officers of the New Orleans Police Department pursuant to F.R.C.P. Rule 21. Counsel for plaintiffs timely filed formal opposition to the aforesaid motion. The matter was set for oral hearing on September 16, 1992, but was submitted on the briefs as of September 10, 1992.

Counsel for defendant officers argues that the plaintiffs' complaint sets forth numerous counts depicting multiple incidents which occurred on different dates in different locations involving different plaintiffs and defendants and that "the issues and parties fail to connect or relate in any just fashion for which legal representation for defendants could provide an adequate defense." [1] Invoking relevant authority regarding the propriety of joinder and severance [i.e., F.R.C.P. Rules 20(a) and 21, respectively], movants also suggest that no legitimate interest in the promotion of judicial economy would be served if the present action is prosecuted in its present form, and that the considerable likelihood of jury confusion underscores the impropriety of trying the plaintiffs' discrete claims in one proceeding.

The plaintiffs take strong exception to the defendants' assertion that there does not exist sufficient commonality to permit the trial of all claims in one action. The plaintiffs direct the Court's attention to the factual similarities between their claims and to the allegations in their petition that defendant officers, all from the same District, *conspired* to deny plaintiffs, who are all members of the same family, fundamental rights guaranteed by the Constitution of the United States, as well as, the Constitution and laws of the state of Louisiana. The gravamen of plaintiffs' complaint is that harassment and deprivation of their rights suffered at the hands of the defendant officers was in fact retaliation by the individually named defendant officers against plaintiffs for filing charges with Internal Affairs Division, New Orleans Police Department against the aforesaid officers. It is plaintiffs' contention that the abuses escalated and more charges were filed with the Internal Affairs Department, and consequently more officers became involved. The plaintiffs argue that the defendant officers treatment of each of them constitutes a series of transactions or occurrences inextricably intertwined, such as to present common questions of law and fact, making severance under Rule 21 improper.

F.R.C.P. Rule 20(a) plainly establishes the right of all persons to "join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of occurrences and if any question of law or fact common to all these persons will arise in the action...." F.R.C.P. Rule 20(a). The unmistakable purpose of the Rule is to promote judicial efficiency by avoiding multiple lawsuits, such duplicity of action constituting a colossal waste of time and money for the parties and the courts. Moreover, under the Federal Rules of Civil Procedure, "joinder of claims, parties and remedies is strongly encouraged." *United Mine Workers v. Gibbs,* 383 U.S. 715, 724, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

**\*2** In this vein, there is no strict rule for determining what constitutes the same occurrence or series of transactions or occurrences for the purposes of Rule 20(a). *Mosley v. General Motors Corp.,* 497 F.2d 1330, 1333 (8th Cir.1974). Courts have allowed joinder of defendants where "[t]he operative facts are related even if the same transaction is not involved," *Civil Aeronautics Bd. v. Carefree Travel Inc.,* 513 F.2d 375, 384 (2nd Cir.1975), where there are "enough ultimate factual concurrences that it would be fair to the parties to require them to defend jointly," *Hall v. E.I. Du Pont de Nemours & Co.,* 345 F.Supp. 353, 381 (E.D.N.Y.1972), and where the claims are "reasonably related." *Mosley,* 497 F.2d at 1333.

In the case bar and as previously mentioned the substance of the plaintiffs' complaint against the defendant police officers is that they conspired to deprive plaintiffs of their rights and harassed the plaintiffs, which action was taken

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 119-3   Filed on 01/19/24 in TXSD   Page 116 of 179

**Warren v. New Orleans Police Dept., Not Reported in F.Supp. (1992)**

by the defendant police officers in retaliation for filing charges with Internal Affairs Division of the New Orleans Police Department against certain defendant police officers. The fact that more than one plaintiff is involved will no doubt mean that at the trial of this case, evidence will be presented involving individual claims. However, since there is a likelihood that this evidence will be introduced to demonstrate an alleged plan or scheme on the part of the defendants, the plaintiffs claims against individual police officers should not be severed.

As plaintiffs accurately note, the remedy for improper joinder is prescribed by Rule 21 states that "[a]ny claim against a party may be severed and proceeded with separately." F.R.C.P. Rule 21. Under F.R.C.P. Rule 21, the determination of a motion to sever is within the discretion of the Court.

Applying the general standards discussed above to the facts of the case at bar, the Court is of the opinion that the resolution of the plaintiffs' claims would be best promoted in a single proceeding. The Court feels strongly that any burden imposed upon the defendants is far outweighed by the practical benefits likely to accrue to all concerned in the conservation of judicial prosecutorial, and defensive resources. The Court has no reason to believe at this juncture of the proceedings, that the specter of jury confusion is sufficiently ominous to justify wholesale severance of this matter into 16, and perhaps more, discrete lawsuits.

Simply stated, the Court concludes that the interests of justice would be best served if the action is permitted to proceed in its present form. For the reasons stated above, the Court finds that severance of this matter into numerous separate causes of action would, in the end, prove both unjustified and unwise. This is true particularly in light of the Supreme Court's statement that joinder rules should be interpreted to encourage "the broadest possible scope of action consistent with fairness to the parties." *United Mine Workers*, 86 S.Ct. at 1138. Accordingly,

**\*3** IT IS ORDERED that defendants' Motion to Sever is DENIED.

**All Citations**

Not Reported in F.Supp., 1992 WL 245655

## Footnotes

1    See, Defendants' Memorandum in Support of Motion to Sever Excessive Number of Defendant Parties, at p. 1.

End of Document                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Calendar No. **143**

| 93D CONGRESS<br>*1st Session* } | SENATE | { REPORT<br>No. 93–151 |
|---|---|---|

# MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT

---

## R E P O R T

OF THE

## SENATE COMMITTEE ON COMMERCE

ON

## S. 356

TO PROVIDE DISCLOSURE STANDARDS FOR WRITTEN
CONSUMER PRODUCT WARRANTIES AGAINST DEFECT
OR MALFUNCTION; TO DEFINE FEDERAL CONTENT
STANDARDS FOR SUCH WARRANTIES; TO AMEND THE
FEDERAL TRADE COMMISSION ACT IN ORDER TO IM-
PROVE ITS CONSUMER PROTECTION ACTIVITIES; AND
FOR OTHER PURPOSES.



MAY 14, 1973.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

83-010                    WASHINGTON : 1973

11

Commission Act in the 92d Congress through the introduction of the "Consumer Products Warranties and Federal Trade Commission Improvements Act of 1971," which combined the warranty provisions discussed above with the FTC reforms.

After extensive consideration of this legislation, the Committee reported it favorably to the floor of the Senate, where it passed by a vote of 72 to 2. In the rush of business surrounding the end of the 92nd session, the House was unable to act.

On January 12, 1973, Chairman Magnuson and Senator Moss introduced S. 356, a refined version of the same legislation. Comments on the bill were solicited, and after further refinements, the legislation was ordered reported to the floor of the Senate.

## SECTION-BY-SECTION ANALYSIS

### TITLE I

*Definitions (section 101)*

(1) As used in title I, "Commission" means the Federal Trade Commission.

(2) The term "consumer product" is limited to tangible personal property, not realty. Furthermore, to qualify as a consumer product, the tangible personal property must normally be used for either personal, family, or household purposes.

There are many products which are used for both personal and business purposes. For example, a typewriter is clearly a consumer product when used in the home by members of the family. It is not uncommon, however, for typewriters to be purchased by businessmen for exclusively business purposes. This may create an ambiguous situation in many instances. To the extent that there is any necessary ambiguity in the term "consumer product," the ambiguity should be resolved in favor of coverage. Personal or family use of a typewriter is not uncommon; therefore, for the purposes of this title, a typewriter would be considered a "consumer product" if any question arose. Of course, the Federal Trade Commission could exempt a warrantor from the disclosure and labeling provisions of the bill to the extent that he sells consumer products to persons for use in their businesses.

The term "consumer product" is also defined to include property which is intended to be attached to, or installed in, real property—without regard to whether it is so attached or installed. An appliance which has been attached to or installed in real property might no longer be considered "tangible personal property" for purposes other than this bill because the appliance may become a fixture, and thus be characterized as realty rather than personalty. The definition of "consumer product" insures that fixtures which are normally used for personal, family or household purposes will be covered by the act without regard to whether the object in question would be considered realty or personalty for some other purpose.

The term "consumer product" is limited in subsection (2) of section 101 by the sentence, "not withstanding the foregoing, the provisions of 102 and 103 of this title affecting consumer products apply only to consumer products each of which actually costs the purchaser more than $5." This language has the effect of excluding products costing $5 or less from the disclosure and designation requirements of title I.

13

maintenance be necessary in order to keep the consumer product operating in a predetermined manner and performing its intended function.

(5) The term "repair" is defined in subsection (5) of Section 101 to include not only repair in the normal sense of correcting a malfunctioning consumer product, but also replacement of that malfunctioning product with a new consumer product or a component thereof which is identical or equivalent to the malfunctioning consumer product or component. The term is used in Section 104 in defining the duties of suppliers meeting Federal standards for warranties. To that extent, the normal concept of repairs set forth in subsection (5) of section 101 has direct applicability only to a "full" warranty. However, it is possible that in the context of a warranty other than a "full" warranty, the definition of repair in this bill might serve as a guide to the meaning of the word "repair".

(6) The term "replacement" is defined in subsection (6) of section 101. This term has direct applicability only to "full" warranties but might also serve as a guide in other warranty situations. The term includes the normal concept of replacement and requires that such replacement be with a new consumer product. The term also includes the refunding of the actual purchase price of the consumer product if repair or replacement is not commercially practicable or if the purchaser is willing to accept such refund in lieu of repair or replacement. In other words, the purchaser is required to accept a refund in lieu of repair or replacement if such repair and replacement it not commercially practicable; on the other hand, if repair and replacement is commercially practicable the consumer may, if he desires, accept such refund in lieu of repair or replacement if it is offered. This would allow the supplier, when he decides that neither repair nor replacement is commercially practicable, to refund the purchase price. A supplier could decide that repair or replacement is not commercially practicable, for example, in a situation of supplier-consumer disagreement over such things as whether reasonable and necessary maintenance has been performed, or whether misuse has occurred. This allows the supplier to make a business decision as to when neither replacement in kind nor repair is commercially practicable and to instead refund the purchase price.

Of course, when a product is to be replaced, the consumer is obliged to make the defective product "available" to the supplier. If the product is portable, the consumer might have to return the product to the point of purchase. In making a product "available" the consumer is required to free that product of any liens or incumbrances, but in those situations where fixtures are to be replaced, the consumer should be under no obligation to make the malfunctioning consumer product available free and clear of any liens or incumbrances attached to it because it is part of the real property. It would be impracticable to require the consumer to pay off the mortgage on his house in order to be eligible for replacement. The substitution of one such fixture for another should result in the transfer of the security interest on the defective product to the new consumer product so that the interest of the secured party would not be prejudiced.

14

(7) The term "supplier" is defined in subsection (7) of Section 101 as any person (including any partnership, corporation, or association) engaged in the business of making a consumer product or service contract available to consumers, either directly or indirectly. This definition would include all persons in the distribution chain including the component supplier, the manufacturer, the distributor, and the retailer.

Because the definition of "supplier" excludes those persons not regularly engaged in the business of making consumer products available to consumers, the warranty provisions of S. 356 do not apply to periodic private transactions.

(8) The term "warrantor" is defined in subsection (8) of section 101 as any supplier or any other party who gives a warranty in writing. Thus, a party not selling a product but offering a warranty on the product for the benefit of a consumer would be a warrantor.

(9) The term "warranty" is defined in subsection (9) of section 101 as including guarantee, and to warrant is to guarantee.

(10) The term "warranty in writing" or "written warranty" is defined in subsection (10) of section 101. Depending upon whether or not the warranty incorporates at a minimum the uniform Federal standards for warranty set forth in section 104, it may be either a "full warranty" or a "limited warranty".

(11) The words "warranty in writing against defect or malfunction of a consumer product" are defined in subsection (11) of section 101. A warranty in writing against defect or malfunction is one in which there is a written affirmation of fact or promise made "at the time of sale". Therefore, as applied to advertising, only point of sale advertising could be found to create a warranty in writing under the terms of this definition. Of course, this is not the case with respect to the broader category of express warranty as used in section 110(d). In order to create a warranty in writing against defect or malfunction of a consumer product under this section, the written affirmation or promise must relate to the nature of the material or workmanship and promise or affirm that such material or workmanship is defect free or will meet a specified level of performance for a particular period of time.

For example, a written statement given at the time of sale that a particular clothes washer would "effectively wash clothes" would create a "warranty in writing against defect or malfunction of the consumer product" if that statement became part of the basis of the bargain between the supplier and the purchaser. This statement would represent a "promise" that the "material or workmanship" of the product are such that it will "meet a specified level of performance", namely washing clothes effectively. Alternatively, a warranty in writing against defect or malfunction of the consumer product could arise if the supplier undertakes in writing to refund, repair, replace, or take other remedial action with respect to the sale of a consumer product in the event that the product fails to meet specifications set forth in the undertaking. For example, the supplier might state: "if this washer doesn't wash clothes effectively, I will refund its purchase price." Since this represents an undertaking in writing to refund the purchase price of the product if the product fails to wash clothes effectively, a warranty in writing against defect or malfunction of a

consumer product would have been created. In any event, any written affirmation, promise or undertaking discussed above would have to become part of the basis of the bargain between the supplier and the purchaser to qualify as a "warranty in writing against defect or malfunction of a consumer product".

(12) The term "without charge" is defined in subsection (12) of section 101. In section 104 a supplier making a "full" warranty and thus necessarily meeting or exceeding Federal standards must repair or replace any malfunctioning or defective consumer product within a reasonable time and "without charge". Normally a warrantor who assumes the obligation to remedy a defect or malfunction within a reasonable time and "without charge" would not assess a consumer with any cost attendant to the discharge of the warranty obligations. For example, the warrantor could not require the purchaser to return a consumer product by mail if the consumer had to pay for the postage or it was very difficult to mail. Likewise, if a repair facility was located at an unreasonable distance, it would normally be expected that the supplier would bear the cost of transporting the product to that facility. (See discussion of section 104, infra.)

The term does not necessarily mean that the warrantor must necessarily compensate the purchaser for incidental expenses, however, if the supplier can affirmatively demonstrate that such expenses should be borne by the purchaser. (See section 104, infra.)

Subsection 12 of section 101, however, does affirmatively require the warrantor to compensate the purchaser for any reasonable, incidental expenses resulting from the warrantor's failure to repair or replace within a reasonable time the malfunctioning or defective consumer product. Such incidental expenses may also be compensated if the warrantor imposes any unreasonable duties upon the purchaser as a condition of servicing, repair or replacement. (The use of the term incidental expenses here is not to be confused with the concept of incidental or consequential damages, which are to be governed by state law. See section 113(c).)

*Disclosure Requirements (section 102)*

Section 102 of title I outlines disclosure requirements for suppliers of consumer products who offer warranties in writing or service contracts in writing. Suppliers are required to disclose fully and conspicuously in simply and readily understood language the terms and conditions of their warranties. The Federal Trade Commission is authorized to detail these disclosure requirements in accordance with procedures set forth in section 109 of title I.

Enumerated in section 102 are certain informational areas which the Federal Trade Commission is to consider when promulgating disclosure regulations. These guidelines exemplify information that would promote consumer understanding of warranties both at the time of the sale and when the product breaks down. For example, subparagraph (h) of paragraph (2) of subsection (a) of section 102 suggests that the warrantor tell the consumer on what days and during what hours he will perform his obligations in case of defect or malfunction. For instance, if a refrigerator breaks down, a consumer could consult his warranty to ascertain whether the warrantor had emergency service on Saturdays or Sundays. This information, coupled

with that in subparagraph i) relating to the period of time it would take the warrantor to effect repair or replacement, would enable the consumer to know what to expect and to take necessary precaution against the spoilage of food in the interim before the necessary repairs could be completed. Such information would also be useful to the consumer in making a product selection at the time of sale. One may be more prone to purchase products from a supplier who provides emergency service for such items as refrigerators.

The Committee is of the belief that the informal dispute resolving mechanisms encouraged in section 110 will be useful for the redress of grievances only when their existence is known. Subparagraphs (j) and (k) suggests that the consumer should be notified of his ability to seek redress through both any informal dispute settlement mechanisms that the warrantor may offer or through legal remedies made economically feasible because of provision for recovery of reasonable costs, including attorney's fees based on actual time expended. Furthermore, if the warrantor is required to inform the consumer of his rights in the event the warrantor fails to perform, the Committee believes that the warrantor will have greater incentive to perform as promised.

Of course, the items of information suggested for disclosure in Section 102(a)(2)(A) through (K) are not intended to be either mandatory or exclusive. The Commission may well determine, in accordance with section 109, that disclosure of additional items of information may be appropriate. For instance, it may well be that for some products, disclosure of what constitutes "reasonable and necessary maintenance" would be appropriate.

Section 102(a)(1) authorizes the Federal Trade Commission to determine the manner and form in which information pertaining to any written warranty should be presented and displayed in advertising, labeling, point-of-sale material, or other representations in writing. Subsection (b) makes explicit the fact that the Commission is not authorized by this title to prescribe the duration of warranties given or to require that a product or its components be warranted. While it is the intent of the Committee that the Commission under authority of title I of this bill may not prescribe the substance of written warranties, except to the extent provided in section 104, this limitation is to be read in conjunction with the savings provision in section 112 which says that, "Nothing contained in this title shall be construed to repeal, invalidate, or supersede the Federal Trade Commission Act (15 U.S.C. 41 et. seq.) or any statute defined as an Anti-Trust Act." Furthermore, the Commission is expressly granted the authority to prescribe rules requiring warranty or service contract periods to be extended to compensate the consumer for the time during which the warranted use of his product was lost as a result of a defect or malfunction. As stated in section 102(b), such an extension should not occur unless the consumer is denied the use of his product at least ten days. The ten-day figure should be cumulative over the duration of the warranty period, since otherwise the purpose of any such rule could be circumvented.

*Designation of Warranties (section 103)*

Section 103 of title I requires suppliers who warrant in writing their consumer products to clearly and conspicuously designate such war-

17

ranties in a manner that will enable consumers to readily discern the type of warranty being given. If a warranty meets the Federal standards set forth in Section 104, and does not limit the liability of the warrantor for consequential damages, then it is to be conspicuously designated as a "full (statement of duration)" warranty. For example, an appliance guaranteed for a full year in accordance with Section 103(a)(1) would have a warranty headed with the designation: "full one year warranty." If a warranty in writing limits the liability of the warrantor for consequential damages, but in all other respects meets the requirements set forth in Section 104, then it shall be labeled as a "full (statement of duration) warranty (remedy limited to free repair or replacement within a reasonable time, without charge)". If a warranty in writing does not meet Federal standards, it would be designated in such a way as to clearly indicate to the consumer the fact that it is a "limited" as opposed to a "full" warranty. The designation should indicate the limited scope of the coverage afforded. For example, a warranty on an appliance might be designated as a "parts only warranty", or a warranty on an article of clothing might be headed "colorfastness only". The Federal Trade Commission, in Section 109, is empowered to define in detail the designation requirements for limited warranties.

There are several exceptions to the designation requirements set forth in section 103. First, if a product costs the purchaser $5 or less, a warranty on that product does not need to be designated in accordance with section 103. Second, the Federal Trade Commission may, pursuant to section 109, exempt a supplier from complying with the designation requirements in section 103. Finally, section 103(b) excludes from the designation requirements of Section 103 "expressions of general policy concerning customer satisfaction which are not subject to any specific limitations." For example, a statement such as "satisfaction guaranteed or your money back" does not have to be designated as a full or partial warranty. Section 103(b) also exempts such general policy statements from the provisions of sections 102 and 104 of title I. In order to be eligible for exemption, a general policy statement must not be subject to any "specific" limtiations. The word "specific" is included in order to protect a supplier from a consumer who uses a product for 10 years and then complains of dissatisfaction with the product. A refusal of a supplier to honor such an expression of dissatisfaction from a consumer who has used a product without expressing his objections for 10 years would not amount to a "specific" limitation on the general policy concerning consumer satisfaction.

In those situations where the purchaser may obtain both written statements or representations not subject to any specific limitations as well as specific warranties in writing from the same supplier of a consumer product, the written statement or representation not subject to any specific limitations should control unless the warranty in writing clearly and conspicuously excludes the guarantee of consumer satisfaction. (See also section 110(d)(2)). In any event, any statement or representation falling within the exclusion contained in section 103(b) would remain subject to the provisions of the Federal Trade Commission Act and to section 110 of title I.

*Federal Standards for Warranty (section 104)*

The minimum duties which a supplier must assume when giving a "full" warranty are described in section 104 of title I. At a mini-

mum, the supplier must promise to repair or replace any malfunctioning or defective consumer product covered by the warranty, within a reasonable time, and without charge. In addition, the warrantor is prohibited from imposing any duties other than notification upon the purchaser as a condition of securing repair or replacement of a consumer product covered by a warranty meeting Federal standards, unless the warrantor can affirmatively demonstrate that additional duties would be reasonable.

The words "repair," and "replace," are defined with specificity in section 101 of title I. The concept of "reasonable time" cannot be precisely defined. The amount of time which is reasonable will vary according to the customary time for repair of similar consumer products, the location of the defective consumer product in relation to the repair facility, the consumer's day to day need for the product, and other factors. The term "without charge" is defined in paragraph 12 of section 101 of title I. In order to add certainty and specificity to the relationship between the supplier and the purchaser, the Federal Trade Commission is empowered under Section 109(e) to define, to the extent possible, the duties imposed upon the supplier who decides to fully warrant his products. Such rules and regulations would be promulgated in accordance with the procedures set forth in section 109 of title I.

In determining whether a supplier can impose duties other than notification upon the purchaser, a court or the Commission would compare the magnitude of the economic burdens "necessarily" imposed upon a warrantor against the magnitude of the burdens of inconvenience and expense "necessarily" imposed upon the purchaser. The word "necessarily" requires a court or the Commission to explore the alternatives available to the supplier and the purchaser before weighing the supplier's burden against the purchaser's burden. As an illustration, suppose the manufacturer of a small, portable consumer product offers a "full" warranty but requires the consumer to personally deliver the product to a service center in case of malfunction or defect. The supplier might argue that this is a reasonable burden because it would be cheaper for the purchaser to bring the product to the service center than it would be for the supplier to maintain a pick-up system. Before evaluating the reasonableness of the duty imposed by the supplier, a court or the Commission should explore alternative methods of returning the product to the service center for repair.

For example, it may be less costly to all parties concerned to use the mails or a private delivery service to transport the malfunctioning or defective product. If this were so, then placing the burden of personal delivery to the service center upon the consumer would be unreasonable. Further analysis may be necessary, however, in order to determine what type of mailing duty or delivery to the private carrier would be reasonable. For example, the warrantor in the above example might change his warranty to require the purchaser to mail the defective or malfunctioning consumer product to a service center for repair. If the average rate of return for repair or replacement of the product is one for every hundred sold and if the average cost for mailing that product to the service center is $1.00, the supplier's economic burden would be $1.00 per hundred sold, assuming he already absorbs the cost of mailing the product back to the consumer. In all likelihood, this

19

cost would be passed on to purchasers of these products by charging 1¢ more per product. If the supplier pays the cost of the return mailing, then the cost to the one purchaser out of one hundred who has to send his product for repair would be his time in having to package and mail the product plus the 1¢ increase in purchase price. The remaining 99¢ would be paid by other purchasers, and the price of the product involved would reflect both its acquisition and complete warranty cost. If the consumer was required to pay the mailing charge, then his expense would be his time required to package and mail the product plus the $1.00 mailing charge; this would impose a burden on him which would be one hundred times greater. The burden on the supplier, however, would remain relatively constant in either situation. A requirement for the consumer to pay the mailing cost would, therefore, be unreasonable because the magnitude of the burden imposed upon the consumer in relation to the magnitude of the burden imposed upon the supplier is so much greater.

Subsection (b) of section 104 gives the purchaser or consumer the right to demand and receive replacement of a consumer product which has needed repair an unreasonable number of times during the warranty period. The provision is designed to rectify the situation where a consumer has received a product which turns out to be a "lemon", or where the supplier's repair system is so ineffectual that defects are not corrected even though the product is repeatedly returned for repair. In the face of continual malfunctions of the consumer product, the ability to continue to return the product for repair is insufficient recourse for the consumer. In order to give specificity to the language "unreasonable number of times during the warranty period," the Federal Trade Commission, in section 109(e), has been directed to "define in detail" the provisions of subsection (d) of section 104. This would allow the FTC by rule to establish what in fact is "an unreasonable number of times" for different categories of consumer products. A full refund of the purchase price in lieu of replacement with a new product would satisfy the requirements of this section if the supplier determined that repair or replacement was not commercially practicable in the circumstances. In either case, the burden of depreciation is to fall upon the supplier. (See discussion of section 101(6), supra.)

Subsection (c) of section 104 states that the full warranty duties assumed by a supplier extend to the consumer. "Consumer" is defined in section 101(3).

Subsection (d) of section 104 states that a supplier does not have to repair or replace a consumer product which malfunctions or becomes defective during the warranty period if he can sustain the burden of proof and show that damage, while in the possession of the purchaser, (opposed to damage in transit prior to the possession, for example), or unreasonable use caused the product to malfunction or become defective. (See discussion of "reasonable and necessary maintenance" supra, at section 102.)

*Full and Limited Warranties of a Consumer Product (section 105)*

Section 105 states that the warranty provisions in S. 356 would not prohibit the selling of both full, full (with limitation of liability for consequential damages), and limited warranties if such warranties are clearly and conspicuously differentiated. For example, a consumer

20

product might be sold with a "full one year warranty—remedy limited to free repair or replacement within a reasonable time, without charge". The supplier might also offer free parts replacement for an additional year. That limited warranty might be labeled a "two year free parts replacement guarantee." In other words, the measures of time for the limited warranty would run from the time of purchase to the end of the warranty period. In the example given the limited warranty during the first year would actually be subsumed under the full warranty.

*Service Contracts (section 106)*

Section 106 provides that a supplier may sell a service contract to the purchaser in lieu of, or in addition to, the warranty. Section 106 requires that a service contract fully and conspicuously disclose in simple and readily understood language its terms and conditions. The Federal Trade Commission is authorized to prescribe the manner and form in which the terms of service contracts should be clearly and conspicuously disclosed. The effect of this section is to require the same sort of disclosure requirements on both service contracts and warranties so that both will be fully understandable to the consumer.

*Designation of Representatives (section 107)*

In hearings before the Committee in the 92d Congress, concern was expressed that warrantors might be prevented from delegating to representatives the performance obligations assumed under a written warranty. Section 107 states that nothing in title I shall be construed to prevent any warrantor from making any "reasonable and equitable arrangements" for representatives to perform warranty duties.

The Committee did not intend to allow warrantors to make unjust or inequitable arrangements under which representatives would be bound to perform warranty duties. The phrase "reasonable and equitable arrangements" is intended to make clear that, to the extent a supplier asks or requires another party to assume responsibilities under the warranty, that party is not to be victimized by unreasonable or inequitable arrangements. Hence one of the purposes of this section is to insure that the manufacturer does not escape his liability under this title by shifting responsibility to dealers, wholesalers, retailers, or others in the chain of distribution. Since manufacturers have primary control over the quality of products, the intent of this section is to place full responsibility on them, while at the same time allowing others, such as dealers, to perform services related to warranties if they are equitably compensated. Therefore, this section also states that "no such arrangements shall relieve the warrantor of his direct responsibility to the purchaser or necessarily make the representative a co-warrantor." For example, the Federal Trade Commission has reported that some of the problems associated with automobile warranties in the past may have resulted from the failure of auto manufacturers to reasonably and equitably compensate their dealers for warranty work.

Nothing in section 107 is intended to dictate the method of compensation for warranty or service contract work, so long as whatever method used insures that such compensation is equitable. For instance, the supplier could build into the wholesale price the cost of warranty service and then compensate dealers who perform the warranty obligations by direct payment for services performed; or the manufacturer could establish a low wholesale price that excludes the cost of war-

21

ranty service and a dealer who performs the warranty obligation could receive his compensation out of the dollar margin between the wholesale and retail price. While both methods could be examples of compensation which would satisfy the requirements of section 107 so long as the particular arrangements are "reasonable and equitable," direct payments would be the more likely method to meet the test.

While a manufacturer can issue a warranty that says certain authorized service representatives will repair or replace the defective product, the consumer has recourse directly against the manufacturer as warrantor, if these representatives fail to perform. The manufacturer could not defend against an action for failure to perform by arguing that the designated representative, not the manufacturer, was responsible for the failure of performance.

*Limitation on Disclaimer of Implied Warranties (section 108)*

Subsection (a) of section 108 prohibits a supplier (defined in paragraph 7 of Section 101) from disclaiming implied warranties such as the warranties of merchantibility or fitness, thereby building a base of protection for consumers whose products are warranted in writing. This subsection is designed to eliminate the practice of giving an express warranty while simultaneously disclaiming implied warranties. This practice has often had the effect of limiting the rights of the consumer rather than expanding them, as he might be led to believe.

Subsection (b) of section 108 has been included in the bill to clarify the relationship between implied warranties and express warranties. The subsection states that implied warranties may not be limited as to duration either expressly or impliedly through a designated warranty in writing or other express warranty. This provision clarifies the relationship between express and implied warranties on consumer products, by maintaining the independence of one from the other. This will mean that the implied warranties, created by operation of law, can only be limited by operation of law and not "expressly or impliedly" by an express warranty. As a result, suppliers and consumers are placed on equal footing when determining how long a particular implied warranty lasts. Through negotiation between consumer and supplier (and ultimately through determination by courts if that becomes necessary) the duration of an implied warranty such as the warranty of fitness for ordinary use would be established. Thus, a consumer whose warranty in writing for one year is unenforceable because the warranted product malfunctioned one year and six days after the time of purchase might still have recourse against the supplier for warranty of fitness for ordinary use.

It is not the intent of the Committee to alter in any way the manner in which implied warranties are created under the Uniform Commercial Code. For instance, an implied warranty of fitness for particular purpose which might be created by an installing supplier is not, in many instances, enforceable by the consumer against the manufacturing supplier. The Committee does not intend to alter currently existing state law on these subjects.

*Federal Trade Commission (section 109)*

The Federal Trade Commision is required to promulgate rules and regulations to facilitate the implementation of certain aspects of title

S. Rept. 151, 93–1——4

22

I. The Commission is to define in detail the disclosure requirements for warranties set out in 102, and to define the disclosure requirements for service contracts as provided in section 106; it is to determine when a warranty in writing does not have to be designated in accordance with section 103, and to define in detail the disclosure requirements of section 103 (2) (a) ; and it is to define in detail the duties set forth in section 104 (a), (b), and (c), and to define their applicability to warrantors of different categories of consumer products with "full" warranties.

Section 109 also sets forth in the procedure which the Federal Trade Commission is required to follow in establishing these rules. The language describing the type of procedure which the Commission is to follow in promulgating rules represents a compromise between simple informal rulemaking procedures and the more complex, complicated, and time consuming formal hearing procedures contained in sections 556 and 557 of title 5 of the United States Code. But for the qualifying words "structured so as to proceed as expeditiously as practicable," the Commission would be bound to follow at all times the formal hearing procedure when carrying out its rulemaking responsibilities. The qualifying words, however, have been added to indicate the Committee's desire not to require a formal oral hearing with cross examination as a part of all proceedings. It is the intent of the Committee to afford interested parties, both consumers and industry representatives, greater procedural rights than accorded under section 553. Therefore, the Committee provides for a public record and an opportunity for an agency hearing which assures judicial review on the basis of "substantial evidence." (See section 706 of title 5 of the United States Code.)

As to the type of public record developed and the form of agency hearing provided, the Committee is of the opinion that the Federal Trade Commission can best determine the type of proceeding it should hold so as to promulgate rules as expeditiously as practicable. The Committee desires to avoid the abuse of cross examination by interested parties which delays unduly the rulemaking process. Therefore, it is anticipated that expeditious rulemaking would not normally include formal hearings. But an opportunity for all interested persons to participate in the rulemaking should be afforded. In many situations, in the Committee's view, interested persons could submit all or part of the evidence in written form. The Committee also expects the Federal Trade Commission to exercise vigorously its discretion which permits it "as a matter of policy . . . to provide for the exclusion of irrelevant, immaterial or unduly repetitious evidence." (See subsection (b) of section 556 of title 5 of the United States Code.) Such Commission action would avoid unwarranted delays caused by repetitious testimony offered by parties with essentially common interests.

*Private Remedies (section 110)*

Section 110 spells out the remedies available to the purchaser of consumer products. A purchaser can utilize informal dispute settlement procedures established by suppliers or, having afforded a supplier a reasonable opportunity to cure, may resort to formal adversary

proceedings with reasonable attorney's fees available if successful in the litigation (including settlement).

Subsection (a) of section 110 declares that it is the policy of Congress to encourage the development of informal dispute settlement mechanisms. If a supplier develops such a mechanism, then the "consumer" as defined in title I is required to utilize such mechanism as part of the opportunity given the supplier to cure a breach prior to resorting to formal legal action. The Federal Trade Commission is empowered to promulgate guidelines for the establishment of these informal dispute settlement mechanisms and is required to supervise them on its own initiative or when petitioned by an interested party to insure their bona fide operation. This provision is not intended to require the Commission to review individual disputes but only to require them to oversee generally dispute settlement mechanisms.

Subsection (b) authorizes any "consumer" (defined in section 101 (3)) to sue for breach of warranty or service contract in an appropriate district court, but any such suit shall be subject to the jurisdictional requirements of section 1331 of title 28 of the United States Code. In effect, this means a person or at this time a class of persons must show individual damages of ten thousand dollars or more in order to bring suit in a Federal court.

But any "consumer" damaged by the failure of a supplier to comply with any obligations assumed under an express or implied warranty or service contract subject to this title—i.e. a warranty in writing, a service contract in writing, an express warranty (defined in section 110(d)(1)), or implied warranties—may sue in any State or District of Columbia court of competent jurisdiction. Thus, for the most part, the Federal rights created by title I of this bill will be enforced in State rather than Federal courts.

As previously mentioned, prior to commencing any proceeding authorized by title I a purchaser must afford the supplier a reasonable opportunity to cure any breach, including the utilization of any bona fide informal dispute settlement mechanism. Any purchaser who utilizes an informal dispute settlement mechanism would not be prevented from seeking formal judicial relief following such utilization. Of course in a class action suit only representatives of the class would have to avail themselves of any bona fide informal dispute settlement mechanism on behalf of the class before the class action suit could be instituted.

In order to preserve the status quo as to the eligibility under State law for participation in class actions, subsection (b) of section 110 provides that "nothing in this subsection shall be construed to change in any way the jurisdictional or venue requirements of any State." Because Federal rights would be enforced in State courts, some might argue that limitations that certain States impose on participation in class action litigation, would not be valid. The above-mentioned language preserves such limitations but does not affect the requirement that suits authorized by title I may not be maintained until a purchaser or his representative first utilizes any bona fide informal dispute settlement mechanism which the supplier has provided.

Subsection (c) of section 110 provides for the recovery of court costs and reasonable attorney's fees in the event a "consumer", as de-

fined in title I, is successful in a suit for breach of an express or implied warranty or service contract obligation. This provision would make economically feasible the pursuit of remedies by consumers in State and Federal courts. It should be noted that an attorney's fee is to be based upon actual time expended rather than being tied to any percentage of the recovery. This requirement is designed to make the pursuit of consumer rights involving inexpensive consumer products economically feasible. Of course, where small claims courts are available and function adequately in resolving consumer disputes, the Committee encourages their use; and to the extent legal representation is not necessary in such courts, attorney's fees would probably not be available.

Subsection (d) of section 110 defines an "express warranty" in a manner paralleling the Uniform Commercial Code's definition. If a consumer product accompanied by a warranty in writing or service contract in writing has been expressly warranted outside the writing, then the purchaser can enforce the terms of that warranty against the supplier actually making it and recover court costs and reasonable attorney's fees. For example, a salesman selling a consumer product warranted in writing for one year who said: "I guarantee that this product will perform perfectly for 5 years" would be deemed to have created an express warranty. If he was not acting as an agent for the retailer or manufacturer in making that statement, only the salesman himself would be the warrantor, and the purchaser would have recourse only against the salesman in enforcing the terms of the express warranty. Of course an affirmation merely of the value of the consumer product or service or a statement purporting to be merely the supplier's opinion or commendation would not create an express warranty.

*Government Enforcement (section 111)*

Subsection (a) of section 111 states that any failure to comply with the requirements imposed by or pursuant to title I shall be considered a violation of section 5 of the Federal Trade Commission Act.

Paragraph (1) of subsection (b) of section 111 gives the district courts of the United States jurisdiction to restrain violations of title I in an action brought by the Attorney General or the Commission. Any temporary restraining order or preliminary injunction would be issued by a District Court without bond. Such restraining order or preliminary injunction may be dissolved if a complaint is not filed within a reasonable time after issuance as specified by the court. Provision is made for joining other parties as the court deems appropriate, and to that end nationwide service of process is provided for.

Paragraph (2) of subsection (b) of section 111 authorizes the Attorney General to serve a civil investigative demand upon any person "under investigation" who may be in the possession, custody or control of documentary material relative to any violation of title I. The procedures to be followed in serving civil investigative demands are set out in detail in section 111. It is important to note that such demand may be served only on persons who are under investigation. This burden, however, should not be great because the Attorney General, believing anyone to be in possession of documentary material relevant to any violation of this title, could put that person under investigation

25

prior to the serving of a demand in order to comply with the "under investigation" requirement.

*Savings Provision (section 112)*

This section states the authority of the Federal Trade Commission under the Federal Trade Commission Act is in no way superseded by this title. This provision also assures that those products not specifically covered under this bill because of the $5 exemption applicable to section 102 and 103 are, nevertheless, subject to the Federal Trade Commission's power to proscribe unfair and deceptive acts or practices. (*See also* section 113(c)).

*Scope (section 113)*

Subsection (a) of this section states that the provisions of the bill and the powers granted to both the Federal Trade Commission and to the Attorney General extend to the sale of consumer products and services "affecting" interstate commerce as well as those "in" interstate commerce. This subsection would make the rights and remedies in title I available to low income consumers within our cities who are often victimized by acts only "affecting" interstate commerce. A proviso was included in subsection (a) to make clear that the operation of this Act is not to interfere with the operation of other Federal laws, such as the Clean Air Act.

Subsection (b) of section 113 specifies the way in which title I would interact with State laws regulating warranty practices. States would be preempted from requiring labeling or disclosure requirements that differed from those prescribed pursuant to title I of this bill. This was designed to insure that suppliers of consumer products would not have to print warranties in conformance with the many possible State and Territorial disclosure formulas or labeling procedures. Rules of the Federal Trade Commission detailing disclosure and designation requirements pursuant to sections 102 and 109 would preempt any different State requirements. Any rules defining "full" warranty duties (section 104) would constitute preemptive national standards for warranties unless the Commission permitted a State to deviate from those rules in a manner prescribed in the rule.

Because title I of this bill allows a supplier to give a warranty or not as he chooses and because it allows him to define the contents of any warranty given (as long as it is not unfair or deceptive or does not contain a disclaimer or limitation on the duration of implied warranties), the Committee has not been willing to follow the suggestion of those affected persons who asked that federal legislation totally preempt State action. The Committee was of the opinion that States should be free to determine that, for the protection of their citizens, a higher level of warranty protection would be required. Of course, the way in which any mandatory warranty protection would be required to be presented would have to be consistent with federal disclosure and designation standards. Furthermore, to the extent a supplier offers a "full" warranty in compliance with Federal standards, he is protected against the imposition of additional burdens by a State unless the Federal Trade Commission, in exercising its rulemaking authority, permits such imposition in accordance with the considerations set out in section 113(b).

26

For the purposes of illustration, it would probably be consistent with the provisions of subsection (b) of section 113 for a State to determine that all widgets sold in that State must contain a "Parts Only Warranty" for one year or a "Full One Year Warranty". In other words, a State can work within the provisions of this bill, and the rules and regulations implementing it, to advance the interests of consumers within its borders by mandating coverages which the Federal bill describes but does not mandate.

Subsection (c) of section 113 states that nothing in title I changes State law which allows a person to recover consequential damages for injury to the person resulting from a breach of warranty, or any State law which restricts the ability of a warrantor to limit his liability for consequential damages. For instance, since section 2–719 of the Uniform Commercial Code permits the limitation of remedies only when such a provision is included in the warranty, any limitation on incidental or consequential damages would have to be clearly disclosed in accordance with section 103.

*Effective date (section 114)*

Section 114 sets forth the timing for implementation of title I. The effective date is six months after the date of enactment, except that any of those portions of title I which can not reasonably be met without the promulgation of rules, shall take effect six months after the promulgation of such rules by the Federal Trade Commission (with an additional six month extention possible). The Commission is to promulgate such rules as soon as possible, but no event later than one year after the date of enactment of this Act. The time limitations contained in section 114 regarding the promulgation of rules by the Commission apply only to the promulgation of initial rules and do not restrict the Commission's rule-making activity in the warranty area *in futuro*.

Comments received by the Committee on this section expressed fears that a rule or regulation might be applied to merchandise manufactured prior to its effective date. The intent of the Committee is clear that, "this title shall take effect six months after the date of its enactment but shall not apply to consumer products manufactured prior to such effective date." Furthermore, any rules promulgated by the Commission would not take effect until six months after their final promulgation, except that the Commission may provide an additional six months so that suppliers can bring their written warranties into compliance. Thus any product manufactured prior to these effective dates would not have to comply with either the provisions of the Act or rules promulgated by the Commission.

TITLE II

*Expanded Federal Trade Commission Jurisdiction (section 201)*

Section 201 of this title expands the Federal Trade Commission's jurisdiction from acts and practices "in" interstate commerce to those "affecting" interstate commerce. This expansion of the Commission's jurisdiction is intended to permit more effective policing of the marketplace by bringing within reach practices which are unfair or deceptive and which, while local in character, nevertheless have an adverse impact upon interstate commerce.

27

In considering certain arguments against expansion of the Commission's jurisdiction, the Committee was mindful of the danger of making the Commission alone responsible for eradicating fraud and deceit in every corner of the marketplace. This is not the Committee's intent in expanding the jurisdiction of the Commission. State and local consumer protection efforts are not to be supplanted by this expansion of jurisdiction. In many situations the Commission, through its Consumer Advisory Boards and expanded field office operations would work concurrently with State and local governments to attack in their incipiency flagrant consumer abuses. However, this expansion of jurisdiction, in conjunction with the authority to seek injunctive relief, will enable the Commission to move against local consumer abuses where State or local consumer protection programs are nonexistent or where fly-by-night operators hit one local area and then quickly move on to another before local officials can take action. (For similar expansion of authority see section 206 and 209 of title II of this bill.)

*Civil Penalties (section 202)*

This section of the bill authorizes the Federal Trade Commission, through its own attorneys, to initiate civil actions to recover penalties against any person (including partnerships, corporations, or other entities) who commits an act or engages in a practice which he knows is unfair or deceptive to consumers and prohibited by section 5(a)(1). The maximum penalty recoverable would be $10,000 per violation, but this penalty could be settled if the Commission publicly stated its reasons and the court approved the settlement.

It should be noted that the word "consumer" as used in title II is not related to the definition of that term in title I. The use of the word "consumer" in title II is to be read in its broadest sense and is not limited to those persons defined in section 101(3) of title I of S. 356.

In any civil action initiated under authority of the amendment to the Federal Trade Commission Act set forth in this section, the Commission would have to show "actual knowledge or knowledge fairly implied from objective circumstances." A violation of a Commission rule would in most cases constitute a violation with "knowledge fairly implied from objective circumstances" unless the person against whom the action was brought could show why he should not have been expected to have knowledge of the Commission rule or that the rule itself is invalid.

The civil penalty which can be imposed is $10,000 "for each such violation." The Commission would have to judge what constituted "each such violation" in the particular case, but "each such violation" would not necessarily be each product unfairly or deceptively sold. The focus, in the opinion of the Committee, should be on the decision-making process of the person against whom the penalty is sought, the number of different decisions he made and the harm generated by those decisions.

*Consumer Redress (section 203)*

After a cease-and-desist order is made final, the Commission may seek remedial relief on behalf of consumers injured by the specific

28

unfair or deceptive act or practice which was the subject of the cease-and-desist proceeding in an action initiated in Federal district court. This provision would enable the Commission to more adequately protect consumers by affording them specific redress for their injuries. At the present time, cease-and-desist orders have prospective application only and afford no specific consumer redress to consumers who have been injured. A proceeding for consumer redress under section 203 could seek relief only for injury sustained as a result of the particular unfair or deceptive act or practice which was the subject of the cease and desist order.

In granting new powers to the Commission, section 203 does not in any way purport to supplant private actions by consumers. The Committee's intent in giving these remedial powers was (1) to reinforce the Commission's credibility in policing the marketplace by authorizing sanctions which could realistically be expected to inhibit unlawful business practices, and (2) to enable the Commission, where its investigation of an act or practice revealed damage to consumers, to utilize the results of that investigation for the benefit of the damaged parties.

The nature of the relief the Commission could obtain from the court on behalf of consumers would be limited only by the nature of the injury done and the remedial powers of the court. The enumeration in section 203 of the types of relief available are advisory only and would not limit the Commission in pleading or the court in acting to fashion other appropriate remedial relief. It is clear, however, that no punitive or exemplary damages are authorized under this section.

This section would not affect whatever power the Commission may have under section 5 of the FTC Act to fashion relief in its initial cease-and-desist order, such as corrective advertising or any other remedy, which may be appropriate to terminate effectively unfair or deceptive acts or practices. Likewise, there is no intent on the part of the Committee to disturb the Commission's power to compel restitution by its own order when such restitution is necessary to terminate a continuing violation of section 5 of the Federal Trade Commission Act. Section 203 is applicable to those situations where the Commission acts to make specific consumers whole and is not intended to supplant general actions by the Commission which are designed to dissipate the prior effects of unfair or deceptive acts or practices.

The court is expressly authorized to give notice reasonably calculated, under all the circumstances, to appraise all consumers allegedly injured by the defendant's acts, of the pendency of the action for redress under section 203. While an action under section 203 is not a class action, it may be useful for the court to be guided by some of the provisions of Federal Rule of Civil Procedure 23. It is anticipated that those consumers actually receiving notice under this provision would be considered parties by representation in a section 203 action and bound by any judgment therein as if they were actual parties. Therefore, in any subsequent suit brought by such consumers under State law, they would be bound under the doctrine of collateral estoppel, as to issues actually litigated and necessarily determined in the section 203 action.

29

It is anticipated that a final cease-and-desist order will be given the same effect in a subsequent action for redress under section 203 that a government obtained antitrust decree is given in a subsequent private treble damage action. In that situation, the government obtained decree (including an FTC order) is given only prima facie effect and is thus at least rebuttable. It is not the intent of the Committee to encourage respondents to resist the finalization of cease-and-desist orders because of fear of the effects of an FTC order in a possible consumer redress action under section 203. This effect would be both unfortunate for the Federal Trade Commission, resulting in further delays in FTC proceedings, and unfair to the respondents, who would have to conduct themselves before the FTC with too strong an eye on the possible effect of the FTC cease and desist order in a subsequent consumer redress action under section 203. Thus, it is anticipated that a final cease-and-desist order would be given prima facie effect in a subsequent action under section 203, as is already the case under section 5(a) of the Clayton Act (see 15 U.S.C. 16(a)).

Finally, section 203 makes clear that the court has the power to consolidate an action under section 203 with any other action requesting the same or substantially the same relief upon motion of any party.

*Penalty for Violation of Cease and Desist Order (section 204)*

This section increases the potential penalty for violation of an order of the Commission from $5,000 to $10,000. The FTC may seek such penalty through its own attorneys rather than relying upon the Justice Department. In addition to increasing the penalty, this section authorizes the Commission to seek mandatory injunctions against persons in violation of a Commission order for whom the threat of economic penalty is more apparent than real because they have no available resources with which to pay the penalty.

*Commission Self-Representation (section 205)*

This section insures that the Commission will be able to represent itself in any civil proceeding involving the Federal Trade Commission Act. At the present time, the Commission must, in many situations, rely on the Department of Justice, which has been sluggish in the past in enforcing regulatory agency decisions in Federal courts. Similar authority to litigate to enforce independent agency determinations is already enjoyed by the National Labor Relations Board (see 29 U.S.C. 154(a)).

In addition to the representational authority specifically provided the Commission by sections 202, 203, 204, 207, 208, and 210 in actions to redress consumer grievances, and to enforce Commission orders, penalties, and subpoenas, the Committee intends to permit the Commission to conduct and control all other litigation involving Commission action under the FTC Act, whether the Commission be acting as plaintiff or defendant. Without intending any limitation, the Committee has in mind, for instance, actions seeking injunctions, declaratory judgments or other relief.

*Expansion of Jurisdiction (section 206)*

See discussion in section 201 supra.

30

*Securing of Documentary Evidence* (*section 207*)

This section is basically designed to simplify the securing of documentary evidence and testimony. It authorizes the Commission to seek documentary evidence from any "party"; under the present terms of the Federal Trade Commission Act such evidence may be obtained only from "corporations".

As authorized in sections 202 and 205, the Commission may act through its own attorneys to enforce the Federal Trade Commission Act. Section 207 permits the FTC to use its own attorneys "to invoke the aid of a court in requiring the attendance and testimony of witnesses and the production of documentary evidence" and authorizes the Commission to go to court in its own behalf to seek "writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission issued under this Act."

*Reporting Requirements* (*section 208*)

This section streamlines reporting requirements under the Federal Trade Commission Act. The Commission is authorized to seek a civil penalty against any corporation which fails to file any annual or special report required by the Federal Trade Commission Act. Currently, a more complicated procedure involving the Department of Justice is necessary.

*Expansion of Jurisdiction* (*section 209*)

See discussion in section 201 supra.

*Injunctions* (*section 210*)

This section would permit the Commission to obtain either a preliminary or permanent injunction through court procedures initiated by its own attorneys against any act or practice which is unfair or deceptive to a consumer, and thus prohibited by section 5 of the Federal Trade Commission Act. The purpose of section 210 is to permit the Commission to bring an immediate halt to unfair or deceptive acts or practices when to do so would be in the public interest. At the present time such practices might continue for several years until agency action is completed. Victimization of American consumers should not be so shielded.

Section 210 authorizes the granting of a temporary restraining order or a preliminary injunction without bond pending the issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5. The test the Commission would have to meet in order to secure this injunctive relief is similar to the test it must already meet when attempting to secure an injunction against false advertising of food, drugs, devices, or cosmetics. (See 15 USC 53(a).)

Provision is also made in section 210 for the Commission to seek and, after a hearing, for a court to grant a permanent injunction. This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be

assured of a early hearing on the merits. Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date. Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order. Commission resources will be better utilized, and cases can be disposed of more efficiently.

*Enforcement Proceedings (section 211)*

This section permits the Commission to enforce penalties under the Federal Trade Commission Act. It is similar in concept to sections 202 and 205.

*Financial Institutions (section 212)*

This section removes from the Federal Trade Commission Act the presently existing exemption for banks insofar as unfair or deceptive acts or practices affecting commerce are concerned. The intent of the Committee in taking this action is to remove the anticompetitive situation which exists at present because some financial institutions are regulated for consumer protection purposes by the Federal Trade Commission and some are not, even though both types of institutions are offering substantially the same services to consumers. Second, presently existing Federal financial regulatory agencies either do not have the power or the desire to promulgate and enforce strong and uniform rules and regulations prohibiting unfair or deceptive acts or practices in the consumer credit field. The report of the National Commission on Consumer Finance has recommended that a single agency be given the power to promulgate rules and regulations in this area. It makes little sense to have agencies whose primary duty is to insure the solvency and liquidity of the institutions under their jurisdiction promulgating rules and regulations the violation of which may provide for potentially substantial civil penalties. The assumption of an active consumer protection role by such an agency could have a detrimental effect on the very solvency of the institution which the agency is required to protect. Furthermore, just as the Federal Reserve Board is authorized under the Truth In Lending Act to prescribe rules and regulations dealing with credit cost disclosure which apply to all creditors, it makes sense that the Commission should be empowered to issue rules and regulations to prevent unfair or deceptive acts or practices on the part of all business enterprises, including financial institutions.

The Federal Trade Commission would not issue rules or regulations in areas which are already adequately covered by the Federal Reserve Board's regulations under the Truth in Lending Act. If the Commission's legislative rulemaking authority is affirmed, then such rules would apply to financial institutions in the same manner as they would to all business enterprises. (See discussion of rulemaking, infra.)

Section 212 requires that the Commission consult with the various Federal financial regulatory agencies listed therein prior to prescribing rules and regulations. Furthermore, section 212 requires the Commission to delegate the power to enforce these rules and regulations to the

# Horizontal Merger Guidelines

 

U.S. Department of Justice

and the

Federal Trade Commission

Issued: August 19, 2010

e.g., customers in the region travelling outside it to purchase the relevant product. In this exercise, the terms of sale for products sold to all customers outside the region are held constant.

> *Example 13:* Customers require local sales and support. Suppliers have sales and service operations in many geographic areas and can discriminate based on customer location. The geographic market can be defined around the locations of customers.

> *Example 14:* Each merging firm has a single manufacturing plant and delivers the relevant product to customers in City X and in City Y. The relevant product is expensive to transport. The merging firms' plants are by far the closest to City X, but no closer to City Y than are numerous rival plants. This fact pattern suggests that customers in City X may be harmed by the merger even if customers in City Y are not. For that reason, the Agencies consider a relevant geographic market defined around customers in City X. Such a market could be defined even if the region around the merging firms' plants would not be a relevant geographic market defined based on the location of sellers because a hypothetical monopolist controlling all plants in that region would find a SSNIP imposed on all of its customers unprofitable due to the loss of sales to customers in City Y.

When the geographic market is defined based on customer locations, sales made to those customers are counted, regardless of the location of the supplier making those sales.

> *Example 15:* Customers in the United States must use products approved by U.S. regulators. Foreign customers use products not approved by U.S. regulators. The relevant product market consists of products approved by U.S. regulators. The geographic market is defined around U.S. customers. Any sales made to U.S. customers by foreign suppliers are included in the market, and those foreign suppliers are participants in the U.S. market even though located outside it.

# 5.   Market Participants, Market Shares, and Market Concentration

The Agencies normally consider measures of market shares and market concentration as part of their evaluation of competitive effects. The Agencies evaluate market shares and concentration in conjunction with other reasonably available and reliable evidence for the ultimate purpose of determining whether a merger may substantially lessen competition.

Market shares can directly influence firms' competitive incentives. For example, if a price reduction to gain new customers would also apply to a firm's existing customers, a firm with a large market share may be more reluctant to implement a price reduction than one with a small share. Likewise, a firm with a large market share may not feel pressure to reduce price even if a smaller rival does. Market shares also can reflect firms' capabilities. For example, a firm with a large market share may be able to expand output rapidly by a larger absolute amount than can a small firm. Similarly, a large market share tends to indicate low costs, an attractive product, or both.

## 5.1   Market Participants

All firms that currently earn revenues in the relevant market are considered market participants. Vertically integrated firms are also included to the extent that their inclusion accurately reflects their competitive significance. Firms not currently earning revenues in the relevant market, but that have committed to entering the market in the near future, are also considered market participants.

Firms that are not current producers in a relevant market, but that would very likely provide rapid supply responses with direct competitive impact in the event of a SSNIP, without incurring

15

significant sunk costs, are also considered market participants. These firms are termed "rapid entrants." Sunk costs are entry or exit costs that cannot be recovered outside the relevant market. Entry that would take place more slowly in response to adverse competitive effects, or that requires firms to incur significant sunk costs, is considered in Section 9.

Firms that produce the relevant product but do not sell it in the relevant geographic market may be rapid entrants. Other things equal, such firms are most likely to be rapid entrants if they are close to the geographic market.

> *Example 16:* Farm A grows tomatoes halfway between Cities X and Y. Currently, it ships its tomatoes to City X because prices there are two percent higher. Previously it has varied the destination of its shipments in response to small price variations. Farm A would likely be a rapid entrant participant in a market for tomatoes in City Y.

> *Example 17:* Firm B has bid multiple times to supply milk to School District S, and actually supplies milk to schools in some adjacent areas. It has never won a bid in School District S, but is well qualified to serve that district and has often nearly won. Firm B would be counted as a rapid entrant in a market for school milk in School District S.

More generally, if the relevant market is defined around targeted customers, firms that produce relevant products but do not sell them to those customers may be rapid entrants if they can easily and rapidly begin selling to the targeted customers.

Firms that clearly possess the necessary assets to supply into the relevant market rapidly may also be rapid entrants. In markets for relatively homogeneous goods where a supplier's ability to compete depends predominantly on its costs and its capacity, and not on other factors such as experience or reputation in the relevant market, a supplier with efficient idle capacity, or readily available "swing" capacity currently used in adjacent markets that can easily and profitably be shifted to serve the relevant market, may be a rapid entrant.[8] However, idle capacity may be inefficient, and capacity used in adjacent markets may not be available, so a firm's possession of idle or swing capacity alone does not make that firm a rapid entrant.

## 5.2    Market Shares

The Agencies normally calculate market shares for all firms that currently produce products in the relevant market, subject to the availability of data. The Agencies also calculate market shares for other market participants if this can be done to reliably reflect their competitive significance.

Market concentration and market share data are normally based on historical evidence. However, recent or ongoing changes in market conditions may indicate that the current market share of a particular firm either understates or overstates the firm's future competitive significance. The Agencies consider reasonably predictable effects of recent or ongoing changes in market conditions when calculating and interpreting market share data. For example, if a new technology that is important to long-term competitive viability is available to other firms in the market, but is not available to a particular firm, the Agencies may conclude that that firm's historical market share

---

[8]     If this type of supply side substitution is nearly universal among the firms selling one or more of a group of products, the Agencies may use an aggregate description of markets for those products as a matter of convenience.

overstates its future competitive significance. The Agencies may project historical market shares into the foreseeable future when this can be done reliably.

The Agencies measure market shares based on the best available indicator of firms' future competitive significance in the relevant market. This may depend upon the type of competitive effect being considered, and on the availability of data. Typically, annual data are used, but where individual transactions are large and infrequent so annual data may be unrepresentative, the Agencies may measure market shares over a longer period of time.

In most contexts, the Agencies measure each firm's market share based on its actual or projected revenues in the relevant market. Revenues in the relevant market tend to be the best measure of attractiveness to customers, since they reflect the real-world ability of firms to surmount all of the obstacles necessary to offer products on terms and conditions that are attractive to customers. In cases where one unit of a low-priced product can substitute for one unit of a higher-priced product, unit sales may measure competitive significance better than revenues. For example, a new, much less expensive product may have great competitive significance if it substantially erodes the revenues earned by older, higher-priced products, even if it earns relatively few revenues. In cases where customers sign long-term contracts, face switching costs, or tend to re-evaluate their suppliers only occasionally, revenues earned from recently acquired customers may better reflect the competitive significance of suppliers than do total revenues.

In markets for homogeneous products, a firm's competitive significance may derive principally from its ability and incentive to rapidly expand production in the relevant market in response to a price increase or output reduction by others in that market. As a result, a firm's competitive significance may depend upon its level of readily available capacity to serve the relevant market if that capacity is efficient enough to make such expansion profitable. In such markets, capacities or reserves may better reflect the future competitive significance of suppliers than revenues, and the Agencies may calculate market shares using those measures. Market participants that are not current producers may then be assigned positive market shares, but only if a measure of their competitive significance properly comparable to that of current producers is available. When market shares are measured based on firms' readily available capacities, the Agencies do not include capacity that is committed or so profitably employed outside the relevant market, or so high-cost, that it would not likely be used to respond to a SSNIP in the relevant market.

> *Example 18:* The geographic market is defined around customers in the United States. Firm X produces the relevant product outside the United States, and most of its sales are made to customers outside the United States. In most contexts, Firm X's market share will be based on its sales to U.S. customers, not its total sales or total capacity. However, if the relevant product is homogeneous, and if Firm X would significantly expand sales to U.S. customers rapidly and without incurring significant sunk costs in response to a SSNIP, the Agencies may base Firm X's market share on its readily available capacity to serve U.S. customers.

When the Agencies define markets serving targeted customers, these same principles are used to measure market shares, as they apply to those customers. In most contexts, each firm's market share is based on its actual or projected revenues from the targeted customers. However, the Agencies may instead measure market shares based on revenues from a broader group of customers if doing so would more accurately reflect the competitive significance of different suppliers in the relevant market. Revenues earned from a broader group of customers may also be used when better data are thereby available.

17

## 5.3 Market Concentration

Market concentration is often one useful indicator of likely competitive effects of a merger. In evaluating market concentration, the Agencies consider both the post-merger level of market concentration and the change in concentration resulting from a merger. Market shares may not fully reflect the competitive significance of firms in the market or the impact of a merger. They are used in conjunction with other evidence of competitive effects. See Sections 6 and 7.

In analyzing mergers between an incumbent and a recent or potential entrant, to the extent the Agencies use the change in concentration to evaluate competitive effects, they will do so using projected market shares. A merger between an incumbent and a potential entrant can raise significant competitive concerns. The lessening of competition resulting from such a merger is more likely to be substantial, the larger is the market share of the incumbent, the greater is the competitive significance of the potential entrant, and the greater is the competitive threat posed by this potential entrant relative to others.

The Agencies give more weight to market concentration when market shares have been stable over time, especially in the face of historical changes in relative prices or costs. If a firm has retained its market share even after its price has increased relative to those of its rivals, that firm already faces limited competitive constraints, making it less likely that its remaining rivals will replace the competition lost if one of that firm's important rivals is eliminated due to a merger. By contrast, even a highly concentrated market can be very competitive if market shares fluctuate substantially over short periods of time in response to changes in competitive offerings. However, if competition by one of the merging firms has significantly contributed to these fluctuations, perhaps because it has acted as a maverick, the Agencies will consider whether the merger will enhance market power by combining that firm with one of its significant rivals.

The Agencies may measure market concentration using the number of significant competitors in the market. This measure is most useful when there is a gap in market share between significant competitors and smaller rivals or when it is difficult to measure revenues in the relevant market. The Agencies also may consider the combined market share of the merging firms as an indicator of the extent to which others in the market may not be able readily to replace competition between the merging firms that is lost through the merger.

The Agencies often calculate the Herfindahl-Hirschman Index ("HHI") of market concentration. The HHI is calculated by summing the squares of the individual firms' market shares,[9] and thus gives proportionately greater weight to the larger market shares. When using the HHI, the Agencies

---

[9]   For example, a market consisting of four firms with market shares of thirty percent, thirty percent, twenty percent, and twenty percent has an HHI of 2600 ($30^2 + 30^2 + 20^2 + 20^2 = 2600$). The HHI ranges from 10,000 (in the case of a pure monopoly) to a number approaching zero (in the case of an atomistic market). Although it is desirable to include all firms in the calculation, lack of information about firms with small shares is not critical because such firms do not affect the HHI significantly.

consider both the post-merger level of the HHI and the increase in the HHI resulting from the merger. The increase in the HHI is equal to twice the product of the market shares of the merging firms.[10]

Based on their experience, the Agencies generally classify markets into three types:

- Unconcentrated Markets: HHI below 1500

- Moderately Concentrated Markets: HHI between 1500 and 2500

- Highly Concentrated Markets: HHI above 2500

The Agencies employ the following general standards for the relevant markets they have defined:

- *Small Change in Concentration:* Mergers involving an increase in the HHI of less than 100 points are unlikely to have adverse competitive effects and ordinarily require no further analysis.

- *Unconcentrated Markets:* Mergers resulting in unconcentrated markets are unlikely to have adverse competitive effects and ordinarily require no further analysis.

- *Moderately Concentrated Markets:* Mergers resulting in moderately concentrated markets that involve an increase in the HHI of more than 100 points potentially raise significant competitive concerns and often warrant scrutiny.

- *Highly Concentrated Markets:* Mergers resulting in highly concentrated markets that involve an increase in the HHI of between 100 points and 200 points potentially raise significant competitive concerns and often warrant scrutiny. Mergers resulting in highly concentrated markets that involve an increase in the HHI of more than 200 points will be presumed to be likely to enhance market power. The presumption may be rebutted by persuasive evidence showing that the merger is unlikely to enhance market power.

The purpose of these thresholds is not to provide a rigid screen to separate competitively benign mergers from anticompetitive ones, although high levels of concentration do raise concerns. Rather, they provide one way to identify some mergers unlikely to raise competitive concerns and some others for which it is particularly important to examine whether other competitive factors confirm, reinforce, or counteract the potentially harmful effects of increased concentration. The higher the post-merger HHI and the increase in the HHI, the greater are the Agencies' potential competitive concerns and the greater is the likelihood that the Agencies will request additional information to conduct their analysis.

---

[10]   For example, the merger of firms with shares of five percent and ten percent of the market would increase the HHI by 100 ($5 \times 10 \times 2 = 100$).




# Merger Guidelines

**U.S. Department of Justice and the Federal Trade Commission**

Issued: December 18, 2023

## 2.  Applying the Merger Guidelines

This section discusses the frameworks the Agencies use to assess whether a merger may substantially lessen competition or tend to create a monopoly.

### 2.1.  Guideline 1: Mergers Raise a Presumption of Illegality When They Significantly Increase Concentration in a Highly Concentrated Market.

Market concentration and the change in concentration due to the merger are often useful indicators of a merger's risk of substantially lessening competition. In highly concentrated markets, a merger that eliminates a significant competitor creates significant risk that the merger may substantially lessen competition or tend to create a monopoly. As a result, a significant increase in concentration in a highly concentrated market can indicate that a merger may substantially lessen competition, depriving the public of the benefits of competition.

The Supreme Court has endorsed this view and held that "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market[,] is so inherently likely to lessen competition substantially that it must be enjoined in the absence of [rebuttal] evidence."[9] In the Agencies' experience, this legal presumption provides a highly administrable and useful tool for identifying mergers that may substantially lessen competition.

An analysis of concentration involves calculating pre-merger market shares of products[10] within a relevant market (see Section 4.3 for a discussion of market definition and Section 4.4 for more details on computing market shares). The Agencies assess whether the merger creates or further consolidates a highly concentrated market and whether the increase in concentration is sufficient to indicate that the merger may substantially lessen competition or tend to create a monopoly.[11]

The Agencies generally measure concentration levels using the Herfindahl-Hirschman Index ("HHI").[12] The HHI is defined as the sum of the squares of the market shares; it is small when there are many small firms and grows larger as the market becomes more concentrated, reaching 10,000 in a market with a single firm. Markets with an HHI greater than 1,800 are highly concentrated, and a change of more than 100 points is a significant increase.[13] A merger that creates or further consolidates a highly

---

[9] *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 363 (1963); *see, e.g.*, *FTC v. v. Hackensack Meridian Health, Inc.*, 30 F.4th 160, 172-73 (3d Cir. 2022); *United States v. AT&T, Inc.*, 916 F.3d at 1032.

[10] These Guidelines use the term "products" to encompass anything that is traded between firms and their suppliers, customers, or business partners, including physical goods, services, or access to assets. Products can be as narrow as an individual brand, a specific version of a product, or a product that includes specific ancillary services such as the right to return it without cause or delivery to the customer's location.

[11] Typically, a merger eliminates a competitor by bringing two market participants under common control. Similar concerns arise if the merger threatens to cause the exit of a current market participant, such as a leveraged buyout that puts the target firm at significant risk of failure.

[12] The Agencies may instead measure market concentration using the number of significant competitors in the market. This measure is most useful when there is a gap in market share between significant competitors and smaller rivals or when it is difficult to measure shares in the relevant market.

[13] For illustration, the HHI for a market of five equal firms is 2,000 (5 x $20^2$ = 2,000) and for six equal firms is 1,667 (6 x $16.67^2$ = 1667).

5

concentrated market that involves an increase in the HHI of more than 100 points[14] is presumed to substantially lessen competition or tend to create a monopoly.[15] The Agencies also may examine the market share of the merged firm: a merger that creates a firm with a share over thirty percent is also presumed to substantially lessen competition or tend to create a monopoly if it also involves an increase in HHI of more than 100 points.[16]

| Indicator | Threshold for Structural Presumption |
|---|---|
| Post-merger HHI | Market HHI greater than 1,800<br><br>AND<br><br>Change in HHI greater than 100 |
| Merged Firm's Market Share | Share greater than 30%<br><br>AND<br><br>Change in HHI greater than 100 |

When exceeded, these concentration metrics indicate that a merger's effect may be to eliminate substantial competition between the merging parties and may be to increase coordination among the remaining competitors after the merger. This presumption of illegality can be rebutted or disproved. The higher the concentration metrics over these thresholds, the greater the risk to competition suggested by this market structure analysis and the stronger the evidence needed to rebut or disprove it.

## 2.2. Guideline 2: Mergers Can Violate the Law When They Eliminate Substantial Competition Between Firms.

A merger eliminates competition between the merging firms by bringing them under joint control.[17] If evidence demonstrates substantial competition between the merging parties prior to the

---

[14] The change in HHI from a merger of firms with shares $a$ and $b$ is equal to $2ab$. For example, in a merger between a firm with 20% market share and a firm with 5% market share, the change in HHI is 2 x 20 x 5 = 200.

[15] The first merger guidelines to reference an HHI threshold were the merger guidelines issued in 1982. These guidelines referred to mergers with HHI above 1,000 as concentrated markets, with HHI between 1,000 and 1,800 as "moderately concentrated" and above 1,800 as "highly concentrated," while they referred to an increase in HHI of 100 as a "significant increase." Each subsequent iteration until 2010 maintained those thresholds. *See* Fed. Trade Comm'n & U.S. Dep't of Justice, Horizontal Merger Guidelines § 1.51 (1997); Fed. Trade Comm'n & U.S. Dep't of Justice, Horizontal Merger Guidelines § 1.51 (1992); U.S. Dep't of Justice, Merger Guidelines § 3(A) (1982). During this time, courts routinely cited to the guidelines and these HHI thresholds in decisions. *See, e.g.*, *Chicago Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 431 (5th Cir. 2008); *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 716 (D.C. Cir. 2001); *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1211 (11th Cir. 1991). Although the Agencies raised the thresholds for the 2010 guidelines, based on experience and evidence developed since, the Agencies consider the original HHI thresholds to better reflect both the law and the risks of competitive harm suggested by market structure and have therefore returned to those thresholds.

[16] *Phila. Nat'l Bank*, 374 U.S. at 364-65 ("Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat.").

[17] The competitive harm from the elimination of competition between the merging firms, without considering the risk of coordination, is sometimes referred to as unilateral effects. The elimination of competition between the merging firms can also lessen competition with and among other competitors. When the elimination of competition between the merging firms

6

merger, that ordinarily suggests that the merger may substantially lessen competition.[18]Although a change in market structure can also indicate risk of competitive harm (see Guideline 1), an analysis of the existing competition between the merging firms can demonstrate that a merger threatens competitive harm independent from an analysis of market shares.

Competition often involves firms trying to win business by offering lower prices, new or better products and services, more attractive features, higher wages, improved benefits, or better terms relating to various additional dimensions of competition. This can include competition to research and develop products or services, and the elimination of such competition may result in harm even if such products or services are not yet commercially available. The more the merging parties have shaped one another's behavior, or have affected one another's sales, profits, valuation, or other drivers of behavior, the more significant the competition between them.

The Agencies examine a variety of indicators to identify substantial competition. For example:

**Strategic Deliberations or Decisions.** The Agencies may analyze the extent of competition between the merging firms by examining evidence relating to strategic deliberations or decisions in the regular course of business. For example, in some markets, the firms may monitor each other's pricing, marketing campaigns, facility locations, improvements, products, capacity, output, input costs, and/or innovation plans. This can provide evidence of competition between the merging firms, especially when they react by taking steps to preserve or enhance the competitiveness or profitability of their own products or services.

**Prior Merger, Entry, and Exit Events.** The Agencies may look to historical events to assess the presence and substantiality of direct competition between the merging firms. For example, the Agencies may examine the competitive impact of recent relevant mergers, entry, expansion, or exit events.

**Customer Substitution.** Customers' willingness to switch between different firms' products is an important part of the competitive process. Firms are closer competitors the more that customers are willing to switch between their products. The Agencies use a variety of tools, detailed in Section 4.2, to assess customer substitution.

**Impact of Competitive Actions on Rivals**. When one firm takes competitive actions to attract customers, this can benefit the firm at the expense of its rivals. The Agencies may gauge the extent of competition between the merging firms by considering the impact that competitive actions by one of the merging firms has on the other merging firm. The impact of a firm's competitive actions on a rival is generally greater when customers consider the firm's products and the rival's products to be closer substitutes, so that a firm's competitive action results in greater lost sales for the rival, and when the profitability of the rival's lost sales is greater.

**Impact of Eliminating Competition Between the Firms**. In some instances, evidence may be available to assess the impact of competition from one firm on the other's actions, such as firm choices

---

leads them to compete less aggressively with one another, other firms in the market can in turn compete less aggressively, decreasing the overall intensity of competition.

[18] *See also United States v. First Nat'l Bank & Trust Co. of Lexington*, 376 U.S. 665, 669-70 (1964) (per curiam) ("[I]t [is] clear that the elimination of significant competition between [merging parties] constitutes an unreasonable restraint of trade in violation of § 1 of the Sherman Act. . . . It [can be] enough that the two . . . compete[], that their competition [is] not insubstantial and that the combination [would] put an end to it."); *ProMedica Health Sys., Inc. v. FTC*, 749 F.3d 559, 568-70 (6th Cir. 2014), *cert. denied*, 575 U.S. 996 (2015).

7

about price, quality, wages, or another dimension of competition. Section 4.2 describes a variety of approaches to measuring such impacts.

**Additional Evidence, Tools, and Metrics.** The Agencies may use additional evidence, tools, and metrics to assess the loss of competition between the firms. Depending on the realities of the market, different evidence, tools, or metrics may be appropriate.

Section 4.2 provides additional detail about the approaches that the Agencies use to assess competition between or among firms.

## 2.3.    Guideline 3: Mergers Can Violate the Law When They Increase the Risk of Coordination.

The Agencies determine that a merger may substantially lessen competition when it meaningfully increases the risk of coordination among the remaining firms in a relevant market or makes existing coordination more stable or effective.[19] Firms can coordinate across any or all dimensions of competition, such as price, product features, customers, wages, benefits, or geography. Coordination among rivals lessens competition whether it occurs explicitly—through collusive agreements between competitors not to compete or to compete less—or tacitly, through observation and response to rivals. Because tacit coordination often cannot be addressed under Section 1 of the Sherman Act, the Agencies vigorously enforce Section 7 of the Clayton Act to prevent market structures conducive to such coordination.

Tacit coordination can lessen competition even when it does not rise to the level of an agreement and would not itself violate the law. For example, in a concentrated market a firm may forego or soften an aggressive competitive action because it anticipates rivals responding in kind. This harmful behavior is more common the more concentrated markets become, as it is easier to predict the reactions of rivals when there are fewer of them.

To assess the extent to which a merger may increase the likelihood, stability, or effectiveness of coordination, the Agencies often consider three primary factors and several secondary factors. The Agencies may consider additional factors depending on the market.

### 2.3.A.  Primary Factors

The Agencies may conclude that post-merger market conditions are susceptible to coordinated interaction and that the merger materially increases the risk of coordination if any of the three primary factors are present.

**Highly Concentrated Market.** By reducing the number of firms in a market, a merger increases the risk of coordination. The fewer the number of competitively meaningful rivals prior to the merger, the greater the likelihood that merging two competitors will facilitate coordination. Markets that are highly concentrated after a merger that significantly increases concentration (see Guideline 1) are presumptively susceptible to coordination. If merging parties assert that a highly concentrated market is not susceptible to coordination, the Agencies will assess this rebuttal evidence using the framework

---

[19] *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 229-30 (1993) ("In the § 7 context, it has long been settled that excessive concentration, and the oligopolistic price coordination it portends, may be the injury to competition the Act prohibits.").

described below. Where a market is not highly concentrated, the Agencies may still consider other risk factors.

***Prior Actual or Attempted Attempts to Coordinate.*** Evidence that firms representing a substantial share in the relevant market appear to have previously engaged in express or tacit coordination to lessen competition is highly informative as to the market's susceptibility to coordination. Evidence of failed attempts at coordination in the relevant market suggest that successful coordination was not so difficult as to deter attempts, and a merger reducing the number of rivals may tend to make success more likely.

***Elimination of a Maverick.*** A maverick is a firm with a disruptive presence in a market. The presence of a maverick, however, only reduces the risk of coordination so long as the maverick retains the disruptive incentives that drive its behavior. A merger that eliminates a maverick or significantly changes its incentives increases the susceptibility to coordination.

### 2.3.B.  Secondary Factors

The Agencies also examine whether secondary factors demonstrate that a merger may meaningfully increase the risk of coordination, even absent the primary risk factors. Not all secondary factors must be present for a market to be susceptible to coordination.

***Market Concentration.*** Even in markets that are not highly concentrated, coordination becomes more likely as concentration increases. The more concentrated a market, the more likely the Agencies are to conclude that the market structure suggests susceptibility to coordination.

***Market Observability.*** A market is more susceptible to coordination if a firm's behavior can be promptly and easily observed by its rivals. Rivals' behavior is more easily observed when the terms offered to customers are readily discernible and relatively observable (that is, known to rivals). Observability can refer to the ability to observe prices, terms, the identities of the firms serving particular customers, or any other competitive actions of other firms. Information exchange arrangements among market participants, such as public exchange of information through announcements or private exchanges through trade associations or publications, increase market observability. Regular monitoring of one another's prices or customers can indicate that the terms offered to customers are relatively observable. Pricing algorithms, programmatic pricing software or services, and other analytical or surveillance tools that track or predict competitor prices or actions likewise can increase the observability of the market.

***Competitive Responses.*** A market is more susceptible to coordination if a firm's prospective competitive reward from attracting customers away from its rivals will be significantly diminished by its rivals' likely responses. This is more likely to be the case the stronger and faster the responses from its rivals because such responses reduce the benefits of competing more aggressively. Some factors that increase the likelihood of strong or rapid responses by rivals include: (1) the market has few significant competitors, (2) products in the relevant market are relatively homogeneous, (3) customers find it relatively easy to switch between suppliers, (4) suppliers use algorithmic pricing, or (5) suppliers use meeting-competition clauses. The more predictable are rivals' responses to strategic actions or changing competitive conditions, and the more interactions firms have across multiple markets, the greater the susceptibility to coordination.

***Aligned Incentives.*** Removing a firm that has different incentives from most other firms in a market can increase the risk of coordination. For example, a firm with a small market share may have

9

less incentive to coordinate because it has more to gain from winning new business than other firms. The same issue can arise when a merger more closely aligns one or both merging firms' incentives with the other firms in the market. In some cases, incentives might be aligned or strengthened when firms compete with one another in multiple markets ("multi-market contact"). For example, firms might compete less aggressively in some markets in anticipation of reciprocity by rivals in other markets. The Agencies examine these and any other market realities that suggest aligned incentives increase susceptibility to coordination.

*Profitability or Other Advantages of Coordination for Rivals.* The Agencies regard coordinated interaction as more likely to occur when participants in the market stand to gain more from successful coordination. Coordination generally is more profitable or otherwise advantageous for the coordinating firms the less often customers substitute outside the market when firms offer worse terms.

*Rebuttal Based on Structural Barriers to Coordination Unique to the Industry.* When market structure evidence suggests that a merger may substantially lessen competition through coordination, the merging parties sometimes argue that anticompetitive coordination is nonetheless impossible due to structural market barriers to coordinating. The Agencies consider this rebuttal evidence using the framework in Section 3. In so doing, the Agencies consider whether structural market barriers to coordination are "so much greater in the [relevant] industry than in other industries that they rebut the normal presumption" of coordinated effects.[20] In the Agencies' experience, structural conditions that prevent coordination are exceedingly rare in the modern economy. For example, coordination is more difficult when firms are unable to observe rivals' competitive offerings, but technological change has made this situation less common than in the past and reduced many traditional barriers or obstacles to observing the behavior of rivals in a market. The greater the level of concentration in the relevant market, the greater must be the structural barriers to coordination in order to show that no substantial lessening of competition is threatened.

## 2.4.   Guideline 4: Mergers Can Violate the Law When They Eliminate a Potential Entrant in a Concentrated Market.

Mergers can substantially lessen competition by eliminating a potential entrant. For instance, a merger can eliminate the possibility that entry or expansion by one or both firms would have resulted in new or increased competition in the market in the future. A merger can also eliminate current competitive pressure exerted on other market participants by the mere perception that one of the firms might enter. Both of these risks can be present simultaneously.

A merger that eliminates a potential entrant into a concentrated market can substantially lessen competition or tend to create a monopoly.[21] The more concentrated the market, the greater the magnitude of harm to competition from any lost potential entry and the greater the tendency to create a monopoly. Accordingly, for mergers involving one or more potential entrants, the higher the market concentration, the lower the probability of entry that gives rise to concern.

---

[20] *See H.J. Heinz Co.*, 246 F.3d at 724.
[21] *United States v. Marine Bancorp.*, 418 U.S. 602, 630 (1974). A concentrated market is one with an HHI greater than 1,000 (See Guideline 1, n.15).

### 2.4.A.  Actual Potential Competition: Eliminating Reasonably Probable Future Entry

In general, expansion into a concentrated market via internal growth rather than via acquisition benefits competition.[22] Merging a current and a potential market participant eliminates the possibility that the potential entrant would have entered on its own—entry that, had it occurred, would have provided a new source of competition in a concentrated market.

To determine whether an acquisition that eliminates a potential entrant into a concentrated market may substantially lessen competition,[23] the Agencies examine (1) whether one or both[24] of the merging firms had a reasonable probability of entering the relevant market other than through an anticompetitive merger, and (2) whether such entry offered a substantial likelihood of ultimately producing deconcentration of the market or other significant procompetitive effects.[25]

*Reasonable Probability of Entry.* The Agencies' starting point for assessment of a reasonable probability of entry is objective evidence regarding the firm's available feasible means of entry, including its capabilities and incentives. Relevant objective evidence can include, for example, evidence that the firm has sufficient size and resources to enter; evidence of any advantages that would make the firm well-situated to enter; evidence that the firm has successfully expanded into similarly situated markets in the past or already participates in adjacent or related markets; evidence that the firm has an incentive to enter; or evidence that industry participants recognize the company as a potential entrant. This analysis is not limited to whether the company could enter with its pre-merger production facilities, but also considers overall capability, which can include the ability to expand or add to its capabilities on its own or in collaboration with someone other than the acquisition target.

Subjective evidence that the company considered entering absent the merger can also indicate a reasonable probability that the company would have entered without the merger. Subjective evidence that the company considered organic entry as an alternative to merging generally suggests that, absent the merger, entry would be reasonably probable.

*Likelihood of Deconcentration or Other Significant Procompetitive Effects.* New entry can yield a variety of procompetitive effects, including increased output or investment, higher wages or improved working conditions, greater innovation, higher quality, and lower prices. If the merging firm had a reasonable probability of entering a highly concentrated relevant market, this suggests benefits that would have resulted from its entry would be competitively significant, unless there is substantial direct evidence that the competitive effect would be *de minimis*. To supplement the suggestion that new entry yields procompetitive effects, the Agencies will consider projections of the potential entrant's

---

[22] *See Ford Motor Co. v. United States*, 405 U.S. 562, 587 (1972) (referring to the "typical[]" competitive concern when "a potential entrant enters an oligopolistic market by acquisition rather than internal expansion" as being "that such a move has deprived the market of the pro-competitive effect of an increase in the number of competitors").

[23] Harm from the elimination of a potential entrant can occur in markets that do not yet consist of commercial products, even if the market concentration of the future market cannot be measured using traditional means. Where there are few equivalent potential entrants, including one or both of the merging firms, that indicates that the future market, once commercialized, will be concentrated. The Agencies will consider other potential entrants' capabilities and incentives in comparison to the merging potential entrant to assess equivalence.

[24] *United States v. Penn-Olin Chemical Co.*, 378 U.S. 158 (1964) (holding that a merger between two firms, each or both of which might have entered the relevant market, could violate Section 7).

[25] *See id.* at 175-76; *Marine Bancorp.*, 418 U.S. at 622, 633 ("[T]he proscription expressed in § 7 against mergers 'when a "tendency" toward monopoly or [a] "reasonable likelihood" of a substantial lessening of competition in the relevant market is shown' applies alike to actual- and potential-competition cases." (quoting *Penn-Olin*, 378 U.S. at 171)); *see also Yamaha Motor Co. v. FTC*, 657 F.2d 971, 980-981 (8th Cir. 1981) (acquisition of potential entrant violated Section 7).

competitive significance, such as market share, its business strategy, the anticipated response of competitors, or customer preferences or interest.

A merger of two potential entrants can also result in a substantial lessening of competition. The merger need not involve a firm that has a commercialized product in the market or an existing presence in the same geographic market. The Agencies analyze similarly mergers between two potential entrants and those involving a current market participant and a potential entrant.

### 2.4.B.   Perceived Potential Competition: Lessening of Current Competitive Pressure

A perceived potential entrant can stimulate competition among incumbents. That pressure can prompt current market participants to make investments, expand output, raise wages, increase product quality, lower product prices, or take other procompetitive actions. The acquisition of a firm that is perceived by market participants as a potential entrant can substantially lessen competition by eliminating or relieving competitive pressure.

To assess whether the acquisition of a perceived potential entrant may substantially lessen competition, the Agencies consider whether a current market participant could reasonably consider one of the merging companies to be a potential entrant and whether that potential entrant has a likely influence on existing competition.[26]

***Market Participant Could Reasonably Consider a Firm to Be a Potential Entrant.*** The starting point for this analysis is evidence regarding the company's capability of entering or applying competitive pressure. Objective evidence is highly probative and includes evidence of feasible means of entry or communications by the company indicating plans to expand or reallocate resources in a way that could increase competition in the relevant market. Objective evidence can be sufficient to find that the firm is a potential entrant; it need not be accompanied by any subjective evidence of current market participants' internal perceptions or direct evidence of strategic reactions to the potential entrant. If such evidence is available, it can weigh in favor of finding that a current market participant could reasonably consider the firm to be a potential entrant.

***Likely Influence on Existing Rivals.*** Direct evidence that the firm's presence or behavior has affected or is affecting current market participants' strategic decisions is not necessary but can establish a showing of a likely influence. Even without such direct evidence, circumstantial evidence that the firm's presence or behavior had an effect on the competitive reactions of firms in the market may also show likely influence. Objective evidence establishing that a current market participant could reasonably consider one of the merging firms to be a potential entrant can also establish that the firm has a likely influence on existing market participants. Subjective evidence indicating that current market participants—including, for example, customers, suppliers, or distributors—internally perceive the merging firm to be a potential entrant can also establish a likely influence.

### 2.4.C.   Distinguishing Potential Entry from Entry as Rebuttal

When evaluating a potentially unlawful merger of current competitors, the Agencies will assess whether entry by other firms would be timely, likely, and sufficient to replace the lost competition using the standards discussed in Section 3.2. The existence of a perceived or actual potential entrant may not meet that standard when considering a merger between firms that already participate in the relevant market. The competitive impact of perceived and actual potential entrants is typically attenuated

---

[26] *See United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 533-36 (1973); *Marine Bancorp.*, 418 U.S. at 624-25.

compared to competition between two current market participants. However, because concentrated markets often lack robust competition, the loss of even an attenuated source of competition such as a potential entrant may substantially lessen competition in such markets. Moreover, because the Agencies seek to prevent threats to competition in their incipiency, the likelihood of potential entry that could establish that a merger's effect "may be" to substantially lessen competition will generally not equal the likelihood of entry that would rebut a demonstrated risk that competition may be substantially lessened.

## 2.5. Guideline 5: Mergers Can Violate the Law When They Create a Firm that May Limit Access to Products or Services That Its Rivals Use to Compete.

The Agencies evaluate whether a merger may substantially lessen competition when the merged firm can limit access to a product, service, or route to market[27] that its rivals may use to compete. Mergers involving products or services rivals may use to compete can threaten competition in several ways, for example: (A) the merged firm could limit rivals' access to the products or services, thereby weakening or excluding them, lessening competition; (B) the merged firm may gain or increase access to rivals' competitively sensitive information, thereby facilitating coordination or undermining their incentives to compete; or (C) the threat of limited access can deter rivals and potential rivals from investing.

These problems can arise from mergers involving access to any products, services, or routes to market that rivals use to compete, and that are competitively significant to those rivals, whether or not they involve a traditional vertical relationship such as a supplier and distributor relationship. Many types of related products can implicate these concerns, including products rivals currently or may in the future use as inputs, products that provide distribution services for rivals or otherwise influence customers' purchase decisions, products that provide or increase the merged firm's access to competitively sensitive information about its rivals, or complements that increase the value of rivals' products. Even if the related product is not currently being used by rivals, it might be competitively significant because, for example, its availability enables rivals to obtain better terms from other providers in negotiations. The Agencies refer to any product, service, or route to market that rivals use to compete in that market as a "related product."

The Agencies analyze competitive effects in the relevant market in which the merged firm competes with rivals that use the related product. The Agencies do not always define a market around the related product, although they may do so (see Section 2.5.A.2).

### 2.5.A. The Risk that the Merged Firm May Limit Access

A merger involving products, services, or routes to market that rivals use to compete may substantially lessen competition when the merged firm has both the ability and incentive to limit access to the related product so as to weaken or exclude some of its rivals (the "dependent" rivals) in the relevant market.

The merged firm could limit access to the related product in different ways. It could deny rivals access altogether, deny access to some features, degrade its quality, worsen the terms on which rivals

---

[27] A "route to market" refers to any way a firm accesses its trading partners, such as distribution channels, marketplaces, or customers.

can access the related product, limit interoperability, degrade the quality of complements, provide less reliable access, tie up or obstruct routes to market, or delay access to product features, improvements, or information relevant to making efficient use of the product. All these ways of limiting access are sometimes referred to as "foreclosure."[28]

Dependent rivals can be weakened if limiting their access to the related product would make it harder or more costly for them to compete; for example, if it would lead them to charge higher prices or offer worse terms in the relevant market, reduce the quality of their products so that they were less attractive to trading partners, or interfere with distribution so that those products were less readily available. Competition can also be weakened if the merger facilitates coordination among the merged firm and its rivals, for example by giving the merged firm the ability to threaten to limit access to uncooperative rivals.

Rivals or potential rivals may be excluded from the relevant market if limiting their access to the related product could lead them to exit the market or could deter them from entering. For example, potential rivals may not enter if the merged firm ties up or obstructs so many routes to market that the remaining addressable market is too small. Exclusion can arise when a new entrant would need to invest not only in entering the relevant market, but also in supplying its own substitute for the related product, sometimes referred to as two-stage entry or multi-level entry.

Because the merged firm could use its ability to limit access to the related product in a range of ways, the Agencies focus on the overall risk that the merged firm will do so, and do not necessarily identify which precise actions the merged firm would take to lessen competition.

### 2.5.A.1.    Ability and Incentive to Foreclose Rivals

The Agencies assess the merged firm's ability and incentive to substantially lessen competition by limiting access to the related product for a group of dependent rivals in the relevant market by examining four factors.

*1. Availability of Substitutes.* The Agencies assess the availability of substitutes for the related product. The merged firm is more able to limit access when there are few alternative options to the merged firm's related product, if these alternatives are differentiated in quality, price, or other characteristics, or if competition to supply them is limited.

*2. Competitive Significance of the Related Product.* The Agencies consider how important the related product is for the dependent firms and the extent to which they would be weakened or excluded from the relevant market if their access was limited.

*3. Effect on Competition in the Relevant Market.* The Agencies assess the importance of the dependent firms for competition in the relevant market. Competition can be particularly affected when the dependent firms would be excluded from the market altogether.

*4. Competition Between the Merged Firm and the Dependent Firms.* The merged firm's incentive to limit the dependent firms' access depends on how strongly it competes with them. If the dependent firms are close competitors, the merged firm may benefit from higher sales or prices in the relevant market when it limits their access. The Agencies may also assess the potential for the merged

---

[28] *See Illumina, Inc. v. FTC*, No. 23-60167, slip op. at 17 (5th Cir. Dec. 15, 2023) ("[T]here are myriad ways in which [the merged firm] could engage in foreclosing behavior . . . such as by making late deliveries or subtly reducing the level of support services.").

firm to benefit from facilitating coordination by threatening to limit dependent rivals' access to the related product. These benefits can make it profitable to limit access to the related product and thereby substantially lessen competition, even though it would not have been profitable for the firm that controlled the related product prior to the merger.

The Agencies assess the extent of competition with rivals and the risk of coordination using analogous methods to the ones described in Guidelines 2 and 3, and Section 4.2.

*  *  *

In addition to the evidentiary, analytical, and economic tools in Section 4, the following additional considerations and evidence may be important to this assessment:

*Barriers to Entry and Exclusion of Rivals*. The merged firm may benefit more from limiting access to dependent rivals or potential rivals when doing so excludes them from the market, for example by creating a need for the firm to enter at multiple levels and to do so with sufficient scale and scope (multi-level entry).

*Prior Transactions or Prior Actions*. If firms used prior acquisitions or engaged in prior actions to limit rivals' access to the related product, or other products its rivals use to compete, that suggests that the merged firm has the ability and incentive to do so. However, lack of past action does not necessarily indicate a lack of incentive in the present transaction because the merger can increase the incentive to foreclose.

*Internal Documents*. Information from business planning and merger analysis documents prepared by the merging firms might identify instances where the firms believe they have the ability and incentive to limit rivals' access. Such documents, where available, are highly probative. The lack of such documents, however, is less informative.

*Market Structure*. Evidence of market structure can be informative about the availability of substitutes for the related product and the competition in the market for the related product or the relevant market. (See Section 2.5.A.2)

### 2.5.A.2.  Analysis of Industry Factors and Market Structure

The Agencies also sometimes determine, based on an analysis of factors related to market structure, that a merger may substantially lessen competition by allowing the merged firm to limit access to a related product.[29] The Agencies' assessment can include evidence about the structure, history, and probable future of the market.

**Structure of the Related Market**. In some cases, the market structure of the related product market can give an indication of the merged firm's ability to limit access to the related product. In these cases, the Agencies define a market (termed the "related market") around the related product (see Section 4.3). The Agencies then define the "foreclosure share" as the share of the related market to which the merged firm could limit access. If the share or other evidence show that the merged firm is

---

[29] *See Brown Shoe*, 370 U.S. at 328-34; *Illumina*, slip op. at 20-22 ("There is no precise formula when it comes to applying these factors. Indeed, the Supreme Court has found a vertical merger unlawful by examining only three of the *Brown Shoe* factors." (cleaned up)); *Fruehauf Corp. v. FTC*, 603 F.2d 345, 353 (2d Cir. 1979); *U.S. Steel Corp. v. FTC*, 426 F.2d 592, 599 (6th Cir. 1970).

15

approaching or has monopoly power over the related product, and the related product is competitively significant, those factors alone are a sufficient basis to demonstrate that the dependent firms do not have adequate substitutes and the merged firm has the ability to weaken or exclude them by limiting their access to the related product. (See Considerations 1 and 2 in Section 2.5.A.1).[30]

**Structure of the Relevant Market.** Limiting rivals' access to the related product will generally have a greater effect on competition in the relevant market if the merged firm and the dependent rivals face less competition from other firms. In addition, the merged firm has a greater incentive to limit access to the dependent firms when it competes more closely with them. Market share and concentration measures for the merged firm, the dependent rivals, and the other firms, can sometimes provide evidence about both issues.

**Nature and Purpose of the Merger.** When the nature and purpose of the merger is to foreclose rivals, including by raising their costs, that suggests the merged firm is likely to foreclose rivals.

**Trend Toward Vertical Integration.** The Agencies will generally consider evidence about the degree of integration between firms in the relevant and related markets, as well as whether there is a trend toward further vertical integration and how that trend or the factors driving it may affect competition. A trend toward vertical integration may be shown through, for example: a pattern of vertical integration following mergers by one or both of the merging companies; or evidence that a merger was motivated by a desire to avoid having its access limited due to similar transactions among other companies that occurred or may occur in the future.

\* \* \*

If the parties offer rebuttal evidence, the Agencies will assess it under the approach laid out in Section 3.[31] When assessing rebuttal evidence focused on the reduced profits of the merged firm from limiting access from rivals, the Agencies examine whether the reduction in profits would prevent the full range of reasonably probable strategies to limit access. When evaluating whether this rebuttal evidence is sufficient to conclude that no substantial lessening of competition is threatened by the merger, the Agencies will give little weight to claims that are not supported by an objective analysis, including, for example, speculative claims about reputational harms. Moreover, the Agencies are unlikely to credit claims or commitments to protect or otherwise avoid weakening the merged firm's rivals that do not align with the firm's incentives. The Agencies' assessment will be consistent with the principle that firms act to maximize their overall profits and valuation rather than the profits of any particular business

---

[30] *See Brown Shoe*, 370 U.S. at 328 ("If the share of the market foreclosed is so large that it approaches monopoly proportions, the Clayton Act will, of course, have been violated . . . ."). The Agencies will generally infer, in the absence of countervailing evidence, that the merging firm has or is approaching monopoly power in the related product if it has a share greater than 50% of the related product market. A merger involving a related product with share of less than 50% may still substantially lessen competition, particularly when that related product is important to its trading partners.

[31] A common rebuttal argument is that the merger would lead to vertical integration of complementary products and as a result, "eliminate double marginalization," since in specific circumstances such a merger can confer on the merged firm an incentive to decrease prices to purchasers. The Agencies examine whether elimination of double marginalization satisfies the approach to evaluating procompetitive efficiencies in Section 3.3, including examining: (a) whether the merged firm will be more vertically integrated as a result of the merger, for example because it increases the extent to which it uses internal production of an input when producing output for the relevant market; (b) whether contracts short of a merger have eliminated or could eliminate double marginalization such that it would not be merger-specific, and (c) whether the merged firm has the incentive to reduce price in the relevant market given that such a reduction would reduce sales by the merged firm's rivals in the relevant market, which would in turn lead to reduced revenue and margin on sales of the related product to the dependent rivals.

16

unit. A merger may substantially lessen competition or tend to create a monopoly regardless of the claimed intent of the merging companies or their executives. (See Section 4.1)

If the merged firm has the ability and incentive to limit access to the related product and lessen competition in the relevant market, there are many ways it could act on those incentives. The merging parties may put forward evidence that there are no reasonably probable ways in which they could profitably limit access to the related product and thereby make it harder for rivals to compete, or that the merged firm will be more competitive because of the merger.

### 2.5.B.  Mergers Involving Visibility into Rivals' Competitively Sensitive Information

If rivals would continue to access or purchase a related product controlled by the merged firm post-merger, the merger can substantially lessen competition if the merged firm would gain or increase visibility into rivals' competitively sensitive information. This situation could arise in many settings, including, for example, if the merged firm learns about rivals' sales volumes or projections from supplying an input or a complementary product; if it learns about promotion plans and anticipated product improvements or innovations from its role as a distributor; or if it learns about entry plans from discussions with potential rivals about compatibility or interoperability with a complementary product it controls. A merger that gives the merged firm increased visibility into competitively sensitive information could undermine rivals' ability or incentive to compete aggressively or could facilitate coordination.

*Undermining Competition.* The merged firm might use visibility into a rival's competitively sensitive information to undermine competition from the rival. For example, the merged firm's ability to preempt, appropriate, or otherwise undermine the rival's procompetitive actions can discourage the rival from fully pursuing competitive opportunities. Relatedly, rivals might refrain from doing business with the merged firm rather than risk that the merged firm would use their competitively sensitive business information to undercut them. Those rivals might become less-effective competitors if they must rely on less-preferred trading partners or accept less favorable trading terms because their outside options have worsened or are more limited.

*Facilitating Coordination.* A merger that provides access to rivals' competitively sensitive information might facilitate coordinated interaction among firms in the relevant market by allowing the merged firm to observe its rivals' competitive strategies faster and more confidently. (See Guideline 3.)

### 2.5.C.  Mergers that Threaten to Limit Rivals' Access and Thereby Create Barriers to Entry and Competition

When a merger gives a firm the ability and incentive to limit rivals' access, or where it gives the merged firm increased visibility into its rivals' competitively sensitive information, the merger may create entry barriers as described above. In addition, the merged firm's rivals might change their behavior because of the risk that the merged firm could limit their access. That is, the risk that the merger will give a firm the ability and incentive to limit rivals' access or will give the merged firm increased visibility into sensitive information can dissuade rivals from entering the market or expanding their operations.

Rivals or potential rivals that face the threat of foreclosure, or the risk of sharing sensitive information with rivals, may reduce investment or adjust their business strategies in ways that lessen competition. Firms may be reluctant to invest in a market if their success is dependent on continued supply from a rival, particularly because the merged firm may become more likely to foreclose its

17

competitor as that competitor becomes more successful. Firms may use expensive strategies to try to reduce their dependence on the merged firm, weakening the competitiveness of their products and services. Even if the merged firm does not deliberately seek to weaken rivals, rivals or potential rivals may fear that their access will be limited if the merged firm decides to use its own products exclusively. These effects may occur irrespective of the merged firm's incentive to limit access and are greater as the merged firm gains greater control over more important inputs that those rivals use to compete.

## 2.6.   Guideline 6: Mergers Can Violate the Law When They Entrench or Extend a Dominant Position.

The Agencies consider whether a merger may entrench or extend an already dominant position. The effect of such mergers "may be substantially to lessen competition" or "may be . . . to tend to create a monopoly" in violation of Section 7 of the Clayton Act. Indeed, the Supreme Court has explained that a merger involving an "already dominant[] firm may substantially reduce the competitive structure of the industry by raising entry barriers."[32] The Agencies also evaluate whether the merger may extend that dominant position into new markets.[33] Mergers that entrench or extend a dominant position can also violate Section 2 of the Sherman Act.[34] At the same time, the Agencies distinguish anticompetitive entrenchment from growth or development as a consequence of increased competitive capabilities or incentives.[35] The Agencies therefore seek to prevent those mergers that would entrench or extend a dominant position through exclusionary conduct, weakening competitive constraints, or otherwise harming the competitive process.

To undertake this analysis, the Agencies first assess whether one of the merging firms has a dominant position based on direct evidence or market shares showing durable market power. For example, the persistence of market power can indicate that entry barriers exist, that further entrenchment may tend to create a monopoly, and that there would be substantial benefits from the emergence of new competitive constraints or disruptions. The Agencies consider mergers involving dominant firms in the context of evidence about the sources of that dominance, focusing on the extent to which the merger relates to, reinforces, or supplements these sources.

Creating or preserving dominance and the profits it brings can be an important motivation for a firm to undertake an acquisition as well as a driver of the merged firm's behavior after the acquisition. In particular, a firm may be willing to undertake costly short-term strategies in order to increase the chance that it can enjoy the longer-term benefits of dominance. A merger that creates or preserves dominance may also reduce the merged firm's longer-term incentives to improve its products and services.

A merger can result in durable market power and long-term harm to competition even when it initially provides short-term benefits to some market participants. Thus, the Agencies will consider not just the impact of the merger holding fixed factors like product quality and the behavior of other industry participants, but they may also consider the (often longer term) impact of the merger on market

---

[32] *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577-578 (1967); *see, e.g.*, *Fruehauf*, 603 F.2d at 353 (the "entrenchment of a large supplier or purchaser" can be an "essential" showing of a Section 7 violation).

[33] *Ford*, 405 U.S. at 571 (condemning acquisition by dominant firm to obtain a foothold in another market when coupled with incentive to create and maintain barriers to entry into that market).

[34] *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563 (1966) (acquisitions are among the types of conduct that may violate the Sherman Act).

[35] *See, e.g.*, *id.* at 570-71.

18

power and industry dynamics. Important dynamic competitive effects can arise through the entry, investment, innovation, and terms offered by the merged firm and other industry participants, even when the Agencies cannot predict specific reactions and responses with precision. If the ultimate result of the merger is to protect or preserve dominance by limiting opportunities for rivals, reducing competitive constraints, or preventing competitive disruption, then the Agencies will approach the merger with a heightened degree of scrutiny. The degree of scrutiny and concern will increase in proportion to the strength and durability of the dominant firm's market power.

### 2.6.A.  Entrenching a Dominant Position

*Raising Barriers to Entry or Competition.* A merger may create or enhance barriers to entry or expansion by rivals that limit the capabilities or competitive incentives of other firms. Barriers to entry can entrench a dominant position even if the nature of future entry is uncertain, if the identities of future entrants are unknown, or if there is more than one mechanism through which the merged firm might create entry barriers. Some examples of ways in which a merger may raise barriers to entry or competition include:

- *Increasing Switching Costs.* The costs associated with changing suppliers (often referred to as switching costs) can be an important barrier to competition. A merger may increase switching costs if it makes it more difficult for customers to switch away from the dominant firm's product or service, or when it gives the dominant firm control of something customers use to switch providers or of something that lowers the overall cost to customers of switching providers. For example, if a dominant firm merges with a complementary product that interoperates with the dominant firm's competitors, it could reduce interoperability, harming competition for customers who value the complement.

- *Interfering With the Use of Competitive Alternatives.* A dominant position may be threatened by a service that customers use to work with multiple providers of similar or overlapping bundles of products and services. If a dominant firm acquires a service that supports the use of multiple providers, it could degrade its utility or availability or could modify the service to steer customers to its own products, entrenching its dominant position. For example, a closed messaging communication service might acquire a product that allowed users to send and receive messages over several competing services through a single user interface, which facilitates competition. The Agencies would examine whether the acquisition would entrench the messaging service's market power by leading the merged firm to degrade the product or otherwise reduce its effectiveness as a cross-service tool, thus reducing competition.

- *Depriving Rivals of Scale Economies or Network Effects.* Scale economies and network effects can serve as a barrier to entry and competition. Depriving rivals of access to scale economies and network effects can therefore entrench a dominant position. If a merger enables a dominant firm to reduce would-be rivals' access to additional scale or customers by acquiring a product that affects access such as a customer acquisition channel, the merged firm can limit the ability of rivals to improve their own products and compete more effectively.[36] Limiting access by rivals to customers in the short run can lead to long run entrenchment of a dominant position and tend to create monopoly power.

---

[36] The Agencies' focus here is on the artificial acquisition of network participants that occurs directly as a result of the merger, as opposed to future network growth that may occur through competition on the merits.

For example, if two firms operate in a market in which network effects are significant but in which rivals voluntarily interconnect, their merger can create an entity with a large enough user base that it may have the incentive to end voluntary interconnection. Such a strategy can lessen competition and harm trading partners by creating or entrenching dominance in this market. This can be the case even if the merging firms did not appear to have a dominant position prior to the merger because their interoperability practices strengthened rivals.

***Eliminating a Nascent Competitive Threat.*** A merger may involve a dominant firm acquiring a nascent competitive threat—namely, a firm that could grow into a significant rival, facilitate other rivals' growth, or otherwise lead to a reduction in its power.[37] In some cases, the nascent threat may be a firm that provides a product or service similar to the acquiring firm that does not substantially constrain the acquiring firm at the time of the merger but has the potential to grow into a more significant rival in the future. In other cases, factors such as network effects, scale economies, or switching costs may make it extremely difficult for a new entrant to offer all of the product features or services at comparable quality and terms that an incumbent offers. The most likely successful threats in these situations can be firms that initially avoid directly entering the dominant firm's market, instead specializing in (a) serving a narrow customer segment, (b) offering services that only partially overlap with those of the incumbent, or (c) serving an overlapping customer segment with distinct products or services.

Firms with niche or only partially overlapping products or customers can grow into longer-term threats to a dominant firm. Once established in its niche, a nascent threat may be able to add features or serve additional customer segments, growing into greater overlap of customer segments or features over time, thereby intensifying competition with the dominant firm. A nascent threat may also facilitate customers aggregating additional products and services from multiple providers that serve as a partial alternative to the incumbent's offering. Thus, the success and independence of the nascent threat may both provide for a direct threat of competition by the niche or nascent firm and may facilitate competition or encourage entry by other, potentially complementary providers that may provide a partial competitive constraint. In this way, the nascent threat supports what may be referred to as "ecosystem" competition. In this context, ecosystem competition refers to a situation where an incumbent firm that offers a wide array of products and services may be partially constrained by other combinations of products and services from one or more providers, even if the business model of those competing services is different.

Nascent threats may be particularly likely to emerge during technological transitions. Technological transitions can render existing entry barriers less relevant, temporarily making incumbents susceptible to competitive threats. For example, technological transitions can create temporary opportunities for entrants to differentiate or expand their offerings based on their alignment with new technologies, enabling them to capture network effects that otherwise insulate incumbents from competition. A merger in this context may lessen competition by preventing or delaying any such beneficial shift or by shaping it so that the incumbent retains its dominant position. For example, a dominant firm might seek to acquire firms to help it reinforce or recreate entry barriers so that its dominance endures past the technological transition. Or it might seek to acquire nascent threats that might otherwise gain sufficient customers to overcome entry barriers. In evaluating the potential for entrenching dominance, the Agencies take particular care to preserve opportunities for more competitive markets to emerge during such technological shifts.

---

[37] The Agencies assess acquisitions of nascent competitive threats by non-dominant firms under the other Guidelines.

Separate from and in addition to its Section 7 analysis, the Agencies will consider whether the merger violates Section 2 of the Sherman Act. For example, under Section 2 of the Sherman Act, a firm that may challenge a monopolist may be characterized as a "nascent threat" even if the impending threat is uncertain and may take several years to materialize.[38] The Agencies assess whether the merger is reasonably capable of contributing significantly to the preservation of monopoly power in violation of Section 2, which turns on whether the acquired firm is a nascent competitive threat.[39]

### 2.6.B. Extending a Dominant Position into Another Market

The Agencies also examine the risk that a merger could enable the merged firm to extend a dominant position from one market into a related market, thereby substantially lessening competition or tending to create a monopoly in the related market. For example, the merger might lead the merged firm to leverage its position by tying, bundling, conditioning, or otherwise linking sales of two products. A merger may also raise barriers to entry or competition in the related market, or eliminate a nascent competitive threat, as described above. For example, prior to a merger, a related market may be characterized by scale economies but still experience moderate levels of competition. If the merged firm takes actions to induce customers of the dominant firm's product to also buy the related product from the merged firm, the merged firm may be able to gain dominance in the related market, which may be supported by increased barriers to entry or competition that result from the merger.

These concerns can arise notwithstanding that the acquiring firm already enjoys the benefits associated with its dominant position. The prospect of market power in the related market may strongly affect the merged firm's incentives in a way that does not align with the interests of its trading partners, both in terms of strategies that create dominance for the related product and in the form of reduced incentives to invest in its products or provide attractive terms for them after dominance is attained. In some cases, the merger may also further entrench the firm's original dominant position, for example if future competition requires the provision of both products.

*       *       *

If the merger raises concerns that its effect may be to entrench or extend a dominant position, then any claim that the merger also provides competitive benefits will be evaluated under the rebuttal framework in Section 3. For example, the framework of Section 3 would be used to evaluate claims that a merger would generate cost savings or quality improvements that would be passed through to make their products more competitive or would otherwise create incentives for the merged firm to offer better terms. The Agencies' analysis will consider the fact that the incentives to pass through benefits to customers or offer attractive terms are affected by competition and the extent to which entry barriers insulate the merged firm from effective competition. It will also consider whether any claimed benefits are specific to the merger, or whether they could be instead achieved through contracting or other means.

---

[38] *United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) (en banc) (per curiam).
[39] *See id.* at 79 ("[I]t would be inimical to the purpose of the Sherman Act to allow monopolists free reign to squash nascent, albeit unproven, competitors at will. . . .").

21

### 2.7. Guideline 7: When an Industry Undergoes a Trend Toward Consolidation, the Agencies Consider Whether It Increases the Risk a Merger May Substantially Lessen Competition or Tend to Create a Monopoly.

The recent history and likely trajectory of an industry can be an important consideration when assessing whether a merger presents a threat to competition. The Supreme Court has explained that "a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anticompetitive effect of a merger may be."[40] It has also underscored that "Congress intended Section 7 to arrest anticompetitive tendencies in their incipiency.[41] The Agencies therefore examine whether a trend toward consolidation in an industry would heighten the competition concerns identified in Guidelines 1-6.

The Agencies therefore closely examine industry consolidation trends in applying the frameworks above. For example:

**Trend Toward Concentration.** If an industry has gone from having many competitors to becoming concentrated, it may suggest greater risk of harm, for example, because new entry may be less likely to replace or offset the lessening of competition the merger may cause. Among other implications, in the context of a trend toward concentration, the Agencies identify a stronger presumption of harm from undue concentration (see Guideline 1), and a greater risk of substantially lessening competition when a merger eliminates competition between the merging parties (see Guideline 2) or increases the risk of coordination (see Guideline 3).

**Trend Toward Vertical Integration.** The Agencies will generally consider evidence about the degree of integration between firms in the relevant and related markets and whether there is a trend toward further vertical integration. If a merger occurs amidst or furthers a trend toward vertical integration, the Agencies consider the implications for the competitive dynamics of the industry moving forward. For example, a trend toward vertical integration could magnify the concerns discussed in Guideline 5 by making entry at a single level more difficult and thereby preventing the emergence of new competitive threats over time.

**Arms Race for Bargaining Leverage.** The Agencies sometimes encounter mergers through which the merging parties would, by consolidating, gain bargaining leverage over other firms that they transact with. This can encourage those other firms to consolidate to obtain countervailing leverage, encouraging a cascade of further consolidation. This can ultimately lead to an industry where a few powerful firms have leverage against one another and market power over would-be entrants or over trading partners in various parts of the value chain. For example, distributors might merge to gain leverage against suppliers, who then merge to gain leverage against distributors, spurring a wave of mergers that lessen competition by increasing the market power of both. This can exacerbate the problems discussed in Guidelines 1-6, including by increasing barriers to single-level entry, encouraging coordination, and discouraging disruptive innovation.

---

[40] *United States v. Pabst Brewing*, 384 U.S. 546, 552-53 (1966).
[41] *Phila. Nat'l Bank*, 374 U.S. at 362 (quoting *Brown Shoe*, 370 U.S. at 317).

***Multiple Mergers.*** The Agencies sometimes see multiple mergers at once or in succession by different players in the same industry. In such cases, the Agencies may examine multiple deals in light of the combined trend toward concentration.

## 2.8.   Guideline 8: When a Merger is Part of a Series of Multiple Acquisitions, the Agencies May Examine the Whole Series.

A firm that engages in an anticompetitive pattern or strategy of multiple acquisitions in the same or related business lines may violate Section 7.[42] In these situations, the Agencies may evaluate the series of acquisitions as part of an industry trend (see Guideline 7) or evaluate the overall pattern or strategy of serial acquisitions by the acquiring firm collectively under Guidelines 1-6.

In expanding antitrust law beyond the Sherman Act through passage of the Clayton Act, Congress intended "to permit intervention in a cumulative process when the effect of an acquisition may be a significant reduction in the vigor of competition, even though this effect may not be so far-reaching as to amount to a combination in restraint of trade, create a monopoly, or constitute an attempt to monopolize."[43] As the Supreme Court has recognized, a cumulative series of mergers can "convert an industry from one of intense competition among many enterprises to one in which three or four large [companies] produce the entire supply."[44] Accordingly, the Agencies will consider individual acquisitions in light of the cumulative effect of related patterns or business strategies.

The Agencies may examine a pattern or strategy of growth through acquisition by examining both the firm's history and current or future strategic incentives. Historical evidence focuses on the strategic approach taken by the firm to acquisitions (consummated or not), both in the markets at issue and in other markets, to reveal any overall strategic approach to serial acquisitions. Evidence of the firm's current incentives includes documents and testimony reflecting its plans and strategic incentives both for the individual acquisition and for its position in the industry more broadly. Where one or both of the merging parties has engaged in a pattern or strategy of pursuing consolidation through acquisition, the Agencies will examine the impact of the cumulative strategy under any of the other Guidelines to determine if that strategy may substantially lessen competition or tend to create a monopoly.

## 2.9.   Guideline 9: When a Merger Involves a Multi-Sided Platform, the Agencies Examine Competition Between Platforms, on a Platform, or to Displace a Platform.

Platforms provide different products or services to two or more different groups or "sides" who may benefit from each other's participation. Mergers involving platforms can threaten competition, even when a platform merges with a firm that is neither a direct competitor nor in a traditional vertical relationship with the platform. When evaluating a merger involving a platform, the Agencies apply Guidelines 1-6 while accounting for market realities associated with platform competition. Specifically,

---

[42] Such strategies may also violate Section 2 of the Sherman Act and Section 5 of the FTC Act. Fed. Trade Comm'n, *Policy Statement Regarding the Scope of Unfair Methods of Competition Under Section 5 of the Federal Trade Commission Act*, at 12-14 & nn.73 & 82 (Nov. 10, 2022) (noting that "a series of . . . acquisitions . . . that tend to bring about the harms that the antitrust laws were designed to prevent" has been subject to liability under Section 5).

[43] H.R. Rep. No. 81-1191, at 8 (1949).

[44] *See Brown Shoe*, 370 U.S. at 334 (citing S. Rep. No. 81-1775, at 5 (1950); H.R. Rep. No. 81-1191, at 8 (1949)).

23

the Agencies consider competition *between* platforms, competition *on* a platform, and competition to *displace* the platform.

Multi-sided platforms generally have several attributes in common, though they can also vary in important ways. Some of these attributes include:

- Platforms have multiple sides. On each side of a platform, platform participants provide or use distinct products and services.[45] Participants can provide or use different types of products or services on each side.

- A platform operator provides the core services that enable the platform to connect participant groups across multiple sides. The platform operator controls other participants' access to the platform and can influence how interactions among platform participants play out.

- Each side of a platform includes platform participants. Their participation might be as simple as using the platform to find other participants, or as involved as building platform services that enable other participants to connect in new ways and allow new participants to join the platform.

- Network effects occur when platform participants contribute to the value of the platform for other participants and the operator. The value for groups of participants on one side may depend on the number of participants either on the same side (direct network effects) or on the other side(s) (indirect network effects).[46] Network effects can create a tendency toward concentration in platform industries. Indirect network effects can be asymmetric and heterogeneous; for example, one side of the market or segment of participants may place relatively greater value on the other side(s).

- A conflict of interest can arise when a platform operator is also a platform participant. The Agencies refer to a "conflict of interest" as the divergence that can arise between the operator's incentives to operate the platform as a forum for competition and its incentive to operate as a competitor on the platform itself. As discussed below, a conflict of interest sometimes exacerbates competitive concerns from mergers.

Consistent with the Clayton Act's protection of competition "in any line of commerce," the Agencies will seek to prohibit a merger that harms competition within a relevant market for any product or service offered on a platform to any group of participants—i.e., around one side of the platform (see Section 4.3).[47]

---

[45] For example, on 1990s operating-system platforms for personal computer (PC) software, software developers were on one side, PC manufacturers on another, and software purchasers on another.

[46] For example, 1990s PC manufacturers, software developers, and consumers all contributed to the value of the operating system platform for one another.

[47] In the limited scenario of a "special type of two-sided platform known as a 'transaction' platform," under Section 1 of the Sherman Act, a relevant market encompassing both sides of a two-sided platform may be warranted. *Ohio v. American Express Co.*, 138 S. Ct. 2274, 2280 (2018). This approach to Section 1 of the Sherman Act is limited to platforms with the "key feature . . . that they cannot make a sale to one side of the platform without simultaneously making a sale to the other." *Id.* Because "they cannot sell transaction services to [either user group] individually . . . transaction platforms are better understood as supplying only one product—transactions." *Id.* at 2286. This characteristic is not present for many types of two-sided or multi-sided platforms; in addition, many platforms offer simultaneous transactions as well as other products and services, and further they may bundle these products with access to transact on the platform or offer quantity discounts.

24

The Agencies protect competition *between* platforms by preventing the acquisition or exclusion of other platform operators that may substantially lessen competition or tend to create a monopoly. This scenario can arise from various types of mergers:

A. Mergers involving two platform operators eliminate the competition between them. In a market with a platform, entry or growth by smaller competing platforms can be particularly challenging because of network effects. A common strategy for smaller platforms is to specialize, providing distinctive features. Thus, dominant platforms can lessen competition and entrench their position by systematically acquiring firms competing with one or more sides of a multi-sided platform while they are in their infancy. The Agencies seek to stop these trends in their incipiency.

B. A platform operator may acquire a platform participant, which can entrench the operator's position by depriving rivals of participants and, in turn, depriving them of network effects. For example, acquiring a major seller on a platform may make it harder for rival platforms to recruit buyers. The long-run benefits to a platform operator of denying network effects to rival platforms create a powerful incentive to withhold or degrade those rivals' access to platform participants that the operator acquires. The more powerful the platform operator, the greater the threat to competition presented by mergers that may weaken rival operators or increase barriers to entry and expansion.

C. Acquisitions of firms that provide services that facilitate participation on multiple platforms can deprive rivals of platform participants. Many services can facilitate such participation, such as tools that help shoppers compare prices across platforms, applications that help sellers manage listings on multiple platforms, or software that helps users switch among platforms.

D. Mergers that involve firms that provide other important inputs to platform services can enable the platform operator to deny rivals the benefits of those inputs. For example, acquiring data that helps facilitate matching, sorting, or prediction services may enable the platform to weaken rival platforms by denying them that data.

The Agencies protect competition *on* a platform in any markets that interact with the platform. When a merger involves a platform operator and platform participants, the Agencies carefully examine whether the merger would create conflicts of interest that would harm competition. A platform operator that is also a platform participant may have a conflict of interest whereby it has an incentive to give its own products and services an advantage over other participants competing on the platform. Platform operators must often choose between making it easy for users to access their preferred products and directing those users to products that instead provide greater benefit to the platform operator. Merging with a firm that makes a product offered on the platform may change how the platform operator balances these competing interests. For example, the platform operator may find it is more profitable to give its own product greater prominence even if that product is inferior or is offered on worse terms after the merger—and even if some participants leave the platform as a result.[48] This can harm competition in

---

[48] However, few participants will leave if, for example, the switching costs are relatively high or if the advantaged product is a small component of the overall set of services those participants access on the platform. Moreover, in the long run few participants will leave if scale economies, network effects, or entry barriers enable the advantaged product to eventually gain market power of its own, with rivals of the advantaged product exiting or becoming less attractive. After these dynamics play

the product market for the advantaged product, where the harm to competition may be experienced both on the platform and in other channels.

The Agencies protect competition to *displace* the platform or any of its services. For example, new technologies or services may create an important opportunity for firms to replace one or more services the incumbent platform operator provides, shifting some participants to partially or fully meet their needs in different ways or through different channels. Similarly, a non-platform service can lessen dependence on the platform by providing an alternative to one or more functions provided by the platform operators. When platform owners are dominant, the Agencies seek to prevent even relatively small accretions of power from inhibiting the prospects for displacing the platform or for decreasing dependency on the platform.

In addition, a platform operator that advantages its own products that compete *on* the platform can lessen competition *between* platforms and to *displace* the platform, as the operator may both advantage its own product or service, and also deprive rival platforms of access to it, limiting those rivals' network effects.

## 2.10.  Guideline 10: When a Merger Involves Competing Buyers, the Agencies Examine Whether It May Substantially Lessen Competition for Workers, Creators, Suppliers, or Other Providers.

A merger between competing buyers may harm sellers just as a merger between competing sellers may harm buyers.[49] The same—or analogous—tools used to assess the effects of a merger of sellers can be used to analyze the effects of a merger of buyers, including employers as buyers of labor. Firms can compete to attract contributions from a wide variety of workers, creators, suppliers, and service providers. The Agencies protect this competition in all its forms.

A merger of competing buyers can substantially lessen competition by eliminating the competition between the merging buyers or by increasing coordination among the remaining buyers. It can likewise lead to undue concentration among buyers or entrench or extend the position of a dominant buyer. Competition among buyers can have a variety of beneficial effects analogous to competition among sellers. For example, buyers may compete by raising the payments offered to suppliers, by expanding supply networks, through transparent and predictable contracting, procurement, and payment practices, or by investing in technology that reduces frictions for suppliers. In contrast, a reduction in competition among buyers can lead to artificially suppressed input prices or purchase volume, which in turn reduces incentives for suppliers to invest in capacity or innovation. Labor markets are important buyer markets. The same general concerns as in other markets apply to labor markets where employers are the buyers of labor and workers are the sellers. The Agencies will consider whether workers face a risk that the merger may substantially lessen competition for their labor.[50] Where a merger between

---

out, the platform operator could advantage its own products without losing as many participants, as there would be fewer alternative products available through other channels.

[49] *See, e.g.*, *Mandeville Island Farms, Inc. v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235-36 (1948) ("The [Sherman Act] does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.").
[50] *See, e.g.*, *Alston*, 141 S. Ct. 2141 (applying the Sherman Act to protect workers from an employer-side agreement to limit compensation).

employers may substantially lessen competition for workers, that reduction in labor market competition may lower wages or slow wage growth, worsen benefits or working conditions, or result in other degradations of workplace quality.[51] When assessing the degree to which the merging firms compete for labor, evidence that a merger may have any one or more of these effects can demonstrate that substantial competition exists between the merging firms.

Labor markets frequently have characteristics that can exacerbate the competitive effects of a merger between competing employers. For example, labor markets often exhibit high switching costs and search frictions due to the process of finding, applying, interviewing for, and acclimating to a new job. Switching costs can also arise from investments specific to a type of job or a particular geographic location. Moreover, the individual needs of workers may limit the geographical and work scope of the jobs that are competitive substitutes.

In addition, finding a job requires the worker and the employer to agree to the match. Even within a given salary and skill range, employers often have specific demands for the experience, skills, availability, and other attributes they desire in their employees. At the same time, workers may seek not only a paycheck but also work that they value in a workplace that matches their own preferences, as different workers may value the same aspects of a job differently. This matching process often narrows the range of rivals competing for any given employee. The level of concentration at which competition concerns arise may be lower in labor markets than in product markets, given the unique features of certain labor markets. In light of their characteristics, labor markets can be relatively narrow.

The features of labor markets may in some cases put firms in dominant positions. To assess this dominance in labor markets (see Guideline 6), the Agencies often examine the merging firms' power to cut or freeze wages, slow wage growth, exercise increased leverage in negotiations with workers, or generally degrade benefits and working conditions without prompting workers to quit.

If the merger may substantially lessen competition or tend to create a monopoly in upstream markets, that loss of competition is not offset by purported benefits in a separate downstream product market. Because the Clayton Act prohibits mergers that may substantially lessen competition or tend to create a monopoly in *any* line of commerce and in *any* section of the country, a merger's harm to competition among buyers is not saved by benefits to competition among sellers. That is, a merger can substantially lessen competition in one or more buyer markets, seller markets, or both, and the Clayton Act protects competition in any one of them.[52] If the parties claim any benefits to competition in a relevant buyer market, the Agencies will assess those claims using the frameworks in Section 3.

Just as they do when analyzing competition in the markets for products and services, the Agencies will analyze labor market competition on a case-by-case basis.

---

[51] A decrease in wages is understood as relative to what would have occurred in the absence of the transaction; in many cases, a transaction will not reduce wage levels, but rather slow wage growth. Wages encompass all aspects of pecuniary compensation, including benefits. Job quality encompasses non-pecuniary aspects that workers value, such as working conditions and terms of employment.

[52] Often, mergers that harm competition among buyers also harm competition among sellers as a result. For example, when a monopsonist lowers purchase prices by decreasing input purchases, they will generally decrease sales in downstream markets as well. (See Section 4.2.D)

## 2.11. Guideline 11: When an Acquisition Involves Partial Ownership or Minority Interests, the Agencies Examine Its Impact on Competition.

In many acquisitions, two companies come under common control. In some situations, however, the acquisition of less-than-full control may still influence decision-making at the target firm or another firm in ways that may substantially lessen competition. Acquisitions of partial ownership or other minority interests may give the investor rights in the target firm, such as rights to appoint board members, observe board meetings, influence the firm's ability to raise capital, impact operational decisions, or access competitively sensitive information. The Agencies have concerns with both cross-ownership, which refers to holding a non-controlling interest in a competitor, as well as common ownership, which occurs when individual investors hold non-controlling interests in firms that have a competitive relationship that could be affected by those joint holdings.

Partial acquisitions that do not result in control may nevertheless present significant competitive concerns. The acquisition of a minority position may permit influence of the target firm, implicate strategic decisions of the acquirer with respect to its investment in other firms, or change incentives so as to otherwise dampen competition. The post-acquisition relationship between the parties and the independent incentives of the parties outside the acquisition may be important in determining whether the partial acquisition may substantially lessen competition. Such partial acquisitions are subject to the same legal standard as any other acquisition.[53]

The Agencies recognize that cross-ownership and common ownership can reduce competition by softening firms' incentives to compete, even absent any specific anticompetitive act or intent. While the Agencies will consider any way in which a partial acquisition may affect competition, they generally focus on three principal effects:

First, a partial acquisition can lessen competition by giving the partial owner the ability to influence the competitive conduct of the target firm.[54] For example, a voting interest in the target firm or specific governance rights, such as the right to appoint members to the board of directors, influence capital budgets, determine investment return thresholds, or select particular managers, can create such influence. Additionally, a nonvoting interest may, in some instances, provide opportunities to prevent, delay, or discourage important competitive initiatives, or otherwise impact competitive decision making. Such influence can lessen competition because the partial owner could use its influence to induce the target firm to compete less aggressively or to coordinate its conduct with that of the acquiring firm.

Second, a partial acquisition can lessen competition by reducing the incentive of the acquiring firm to compete.[55] Acquiring a minority position in a rival might blunt the incentive of the partial owner to compete aggressively because it may profit through dividend or other revenue share even when it loses business to the rival. For example, the partial owner may decide not to develop a new product feature to win market share from the firm in which it has acquired an interest, because doing so will

---

[53] *See United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 592 (1957) ("[A]ny acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of [Section 7 of the Clayton Act] whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce.").

[54] *See United States v. Dairy Farmers of Am., Inc.*, 426 F.3d 850, 860-61 (6th Cir. 2005).

[55] *See Denver & Rio Grande v. United States*, 387 U.S. 485, 504 (1967) (identifying Section 7 concerns with a 20% investment).

reduce the value of its investment in its rival. This reduction in the incentive of the acquiring firm to compete arises even when it cannot directly influence the conduct or decision making of the target firm.

Third, a partial acquisition can lessen competition by giving the acquiring firm access to non-public, competitively sensitive information from the target firm. Even absent any ability to influence the conduct of the target firm, access to competitively sensitive information can substantially lessen competition through other mechanisms. For example, it can enhance the ability of the target and the partial owner to coordinate their behavior and make other accommodating responses faster and more targeted. The risk of coordinated effects is greater if the transaction also facilitates the flow of competitively sensitive information from the investor to the target firm. Even if coordination does not occur, the partial owner may use that information to preempt or appropriate a rival's competitive business strategies for its own benefit. If rivals know their efforts to win trading partners can be immediately appropriated, they may see less value in taking competitive actions in the first place, resulting in a lessening of competition.

*       *       *

The analyses above address common scenarios that the Agencies use to assess the risk that a merger may substantially lessen competition or tend to create a monopoly. However, they are not exhaustive. The Agencies have in the past encountered mergers that lessen competition through mechanisms not covered above. For example:

A. A merger that would enable firms to avoid a regulatory constraint because that constraint was applicable to only one of the merging firms;

B. A merger that would enable firms to exploit a unique procurement process that favors the bids of a particular competitor who would be acquired in the merger; or

C. In a concentrated market, a merger that would dampen the acquired firm's incentive or ability to compete due to the structure of the acquisition or the acquirer.

As these scenarios and these Guidelines indicate, a wide range of evidence can show that a merger may lessen competition or tend to create a monopoly. Whatever the sources of evidence, the Agencies look to the facts and the law in each case.

Whatever frameworks the Agencies use to identify that a merger may substantially lessen competition or tend to create a monopoly, they also examine rebuttal evidence under the framework in Section 3.

# *Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 701*

*Antitrust Law: An Analysis of Antitrust Principles and Their Application (Areeda and Hovenkamp) > Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp > CHAPTER 7 Monopolization: Particular Exclusionary Practices (700-787) > 7A Horizontal Acquisitions and Agreements (701-703)*

## 701. Mergers with Actual or Potential Competitors

**Last Updated: 8/2022**

**Mergers with Actual or Potential Competitors**

**701a.**

**Generally.**

Historically and today, merging viable competitors to create a monopoly is a clear §2 offense, as illustrated by the venerable *Standard Oil* and *American Tobacco* cases. [1] And whatever the original source of a monopoly, a monopolist's acquisition of the productive assets [2] or stock of an actual or likely potential competitor is properly classified as anticompetitive, for it tends to augment or reinforce the monopoly by means other than competition on the merits. This is particularly likely to be true when the smaller acquired firm threatens to become a substantial rival. In its decision sustaining the FTC's complaint against Facebook, the court cited this concern as important and well established. [3]

When *Standard Oil*, *American Tobacco,* and other early antitrust cases were decided, mergers could be analyzed only under the Sherman Act, and most such cases involved mergers that created either a monopoly or a dominant firm. By and large these early decisions found violations of both §1 of the Sherman Act, which condemns "combinations" in restraint of trade; and §2. Today, of course, most mergers that create or add to monopoly power are unlawful under Clayton Act §7, which also condemns many mergers that do not implicate §2 because the resulting market is not monopolized. An important concern of merger policy under §7 is the facilitation of collusion or the creation, maintenance, or strengthening of oligopoly, all presumably under circumstances where the structural requirements for single-firm monopolization could not be established. [4] Permissible relief under the two statutes is generally the same. [5]

--------

[1] *Standard Oil Co. v. United States* , *221 U.S. 1 (1911)*;  *United States v. American Tobacco Co* ., *221 U.S. 106 (1911)*. See P606 - P607.

[2] On the definition of "productive assets," see  P1202.

[3] *FTC v. Facebook, Inc* ., ___ F. Supp. 3d __, 2022 WL 103308 (D.D.C. Jan. 11, 2022), citing this Paragraph in the previous edition.

[4] See  WK-CHAP9 -  WK-CHAP11.

[5] Whether relief beyond divestiture of the acquired assets is appropriate is discussed in  701j. Section 7 remedies are not limited to divestiture of what was acquired, and merger actions for treble damages have often been approved.  *See*  Herbert Hovenkamp,  *Merger Actions for Damages* , *35 Hastings L.J. 937 (1984)*.

Given the overlap between Sherman Act and Clayton Act treatment of mergers, any full exposition here would involve much duplication with WK-CHAP9 through WK-CHAP11. Rather, this discussion focuses on the special case of mergers as unlawful monopolistic acts by firms with significant market power. We briefly address possible justifications after first considering the magnitude of the competition eliminated by the merger. Anticompetitive consequences are obvious enough when either the acquired business is substantial or the acquired firm has a realistic prospect of becoming a significant rival. Finally, the special case of intellectual property acquisitions is reserved for P707.

**701b.**

**Horizontal acquisition as "exclusionary."**

We often say that unlawful monopolization requires power plus one or more "exclusionary" practices. But treating mergers as "exclusionary" is somewhat idiosyncratic. An acquisition deters no one from entering the market. Indeed, if the dominant firm habitually purchases new rivals at attractive prices, investors would have an added incentive to enter. [6] And if the merger results in lower output and a high price, there is also a new incentive to enter. At the same time, however, the merger does eliminate a rival-so while the acquired firm's assets remain on the market, the second firm as a distinct entity can properly be said to be "excluded."

The case for treating mergers as "exclusionary" is stronger when the acquisition is accompanied by one or more collateral acts. For example, the acquiring firm might make "killer" acquisitions by purchasing rivals and then shutting down all or at least an important part of their operations. That transaction thus removes competitive or potentially competitive productive assets from the marketplace. [7] For example, in its initial dismissal of the FTC's complaint against Facebook, the district court noted allegations that Facebook acquired Instagram, a competing but differentiated social networking site, in order to obtain Instagram's photo-sharing technology. Having made the acquisition, Facebook then shut down its own competing photo-sharing technology, which was either inferior or not as well developed. [8] As a result of that acquisition, the FTC alleged, Facebook "effectively dominate[d] photo sharing. [9] Why the FTC had not alleged that photo sharing itself was a relevant market is unclear. In any event, the court allowed the FTC to re-plead, and an amended complaint was sustained. [10]

Alternatively, the dominant firm might require the owners of purchased rival firms to sign broad noncompetition agreements that effectively forbid them from re-entering the same market, thus "excluding" them. [11] Or the dominant firm might use predatory pricing or some other oppressive strategy to weaken rivals and then acquire them at depressed prices; if successful, entry into such a market would be quite unattractive.

---

[6] This is precisely what happened in the venerable *American Can* case, where it appeared that firms entered the market with antiquated machinery in order to be bought up by the defendant. *See United States v. American Can Co.* , 230 F. 859, 875 (D. Md. 1916), *appeal dismissed* , **256 U.S. 706 (1921)**.

[7] See 701c ; *and, e.g.* , *American Tobacco* , 221 U.S. at 182 ("... persistent expenditure of millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless ...."); *American Can* , 230 F. at 875 (two-thirds of numerous acquired plants closed within two years of purchase; many never operated at all).

[8] *FTC v. Facebook, Inc* ., 560 F. Supp. 3d 1 (D.D.C. 2021).

[9] *Id.* at 8, citing Complaint P99.

[10] *FTC v. Facebook, Inc* ., ___ F. Supp. 3d __, 2022 WL 103308 (D.D.C. Jan. 11, 2022).

[11] *E.g.* , *American Can* , 230 F. at 871 (purchased plants' owners signed noncompetition clause that forbade can making for 15 years within 3,000 miles of Chicago-effectively the entire United States; if acquired firm was incorporated, all principal officers bound themselves personally; in one case, defendant raised acquisition price from $300,000 to $700,000 in order to obtain noncompetition agreement).

But insisting that the merger be "exclusionary" in the short run before we can invoke §2 is too restrictive. Although we often say that §2 requires an "exclusionary" act, our real meaning is that §2 requires one or more forbidden *anticompetitive* acts that threatens to create or prolong monopoly. For example, the formation of a cartel excludes no one and its higher prices may encourage new entry; the cartel is anticompetitive because it eliminates competition by uniting former competitors, not because it necessarily excludes anyone from the market. The monopolist's acquisition of a rival must be treated the same way-not, strictly speaking, as *exclusionary*, but clearly as anticompetitive to the extent that it eliminates competition that might otherwise have dissipated the monopolist's power. As such, it is a strategy of monopoly maintenance.

**701c.**

**"Small" and "killer" acquisitions.**

Suppose that a monopolist who has long supplied 99 percent of its market acquired the one firm supplying the remainder of that market. The acquisition should be prevented even if we assume that the small firm would probably continue to play only a very minor role or, indeed, be shut down. To find a §2 monopoly is necessarily to declare the preciousness of any viable rival. Notwithstanding its minor position, such a rival offers an alternative source to buyers, an additional locus of decision making and possible innovation, an actual or possible check on the monopolist's pricing or other laxity, and a center of production or marketing experience that might come into more aggressive hands and thus facilitate a more substantial competitive challenge to the monopolist. These grounds for opposing the monopolist's acquisition remain decisive, although with somewhat less force, when the acquired firm is only one of several similar firms supplying the postulated 1 percent of the market. Reducing the number of decision makers and the possible sources of future aggressive incursions into the monopolist's position would trouble us enough to oppose the monopolist's expansion by merger, at least in the absence of strong countervailing considerations.

It necessarily follows that the case against acquiring small rivals becomes much stronger when the rival shows some potential for growth. In that case the acquisition deprives competitors of a genuine possibility that competition will be restored as the rival gradually increases its output. The case is also stronger as the capacity for the rival's rapid growth is stronger. For example, a producer of a manufactured good can expand only by adding plant capacity, which can be costly and time consuming. By contrast, a digital firm selling entirely digital products, such as Facebook, can expand very rapidly. As a result, a smaller firm could be a much more threatening rival.

That the acquiring firm was already a monopolist before the acquisition is no defense, for §2 clearly covers the "maintenance" as well as the creation of significant market power. [12] Acquisition of any firm with nontrivial potential as a substantial rival serves to maintain monopoly power.

Not infrequently a dominant firm's acquisition of a smaller rival is followed very quickly by a partial or complete shutdown of the acquired firm's production. [13] These "killer" acquisitions, as they are sometimes called, typically deserve harsher treatment than the acquisition and productive use of the acquired firm's capabilities. [14] The problem is not new. In 1916, American Can was condemned of monopolization for buying up rival can-

---

[12] *See, e.g., United States v. Grinnell Corp* ., [384 U.S. 563, 570-71 (1966)](#) (monopolization offense involves either the "willful acquisition or maintenance" of monopoly power);   *Aspen Skiing Co. v. Aspen Highlands Skiing Corp* ., [472 U.S. 585, 602 (1985)](#) ("purpose to create or maintain a monopoly," quoting   *United States v. Colgate & Co* ., [250 U.S. 300, 307 (1919)](#).   *See also Eastman Kodak Co. v. Image Technical Servs., Inc.* , [504 U.S. 451, 483 (1992)](#) (willful actions designed to maintain defendant's monopoly position when not supported by valid business justifications);   *Christianson v. Colt Indus. Operating Corp., Inc.* , [486 U.S. 800, 810 (1988)](#) (willful maintenance of monopoly power as opposed to growth or development that results from a superior product, business acumen, or historic accident);   *Hanover Shoe v. United Shoe Mach. Corp* ., [392 U.S. 481, 486 (1968)](#) (noting and approving lower court's conclusion that restrictive lease policies were designed to maintain defendant's monopoly);   *C.R. Bard, Inc. v. M3 Sys., Inc* ., [157 F.3d 1340, 1371 (Fed. Cir. 1998)](#),   *cert. denied* , **526 U.S. 1130 (1999)** (similar).

[13] On the use of such acquisitions by dominant digital platforms as exclusionary practices, see Herbert Hovenkamp, *Antitrust and Platform Monopoly* , [130 Yale L.J. 1952, 2039-49 (2021)](#).

making firms and promptly dismantling their assets in order to keep them off the market. [15] American Can acquired rivals who used older or less efficient technology. Today the opposite is likely to be true: a firm may acquire a startup's superior or differentiated technology and shut it down, simply to protect its own turf. [16] In the process, it denies society the benefits of the improvements.

In some cases, a firm acquires a small research firm in an area such as pharmaceuticals with promising research projects in the works, and then shuts them down. Often the acquired firm has a market share of zero because the acquired research projects have not yet been marketed. For example, the assets of an acquired pharmaceutical research firm may include drugs that are in development but not yet fully tested or brought to market. [17]

In its simple form the problem of killer acquisitions should be easy. Rather than treating them like mergers, we should treat them more like cartels. Any failure of the legal system to take a more aggressive position is largely a result of classification myopia. Further, liability should not be limited to acquisitions by monopolists-any significant firm that acquires a rival for purposes of removing it from the market has committed an anticompetitive act, although the statutory remedy may lie in §1 of the Sherman Act for restraint of trade or §7 of the Clayton Act for an unlawful acquisition.

The reason we permit most mergers rather than making them unlawful per se is because of their potential to generate efficiencies. [18] A killer acquisition yields no efficiencies, however, because the acquiring firm never puts the acquired assets to any use. They are simply removed from the market. Economically a merger-plus-shutdown is no different from the output reduction that attends a cartel. [19] Indeed, the only reason these acquisitions occur is because the alternative of agreeing with a firm to shut down a plant in exchange for a payment of money would be unlawful per se. [20] If a firm purchases a rival for $1 million and then shuts it

---

[14] *See, e.g.*, Complaint for Injunctive and Other Equitable Relief at 2, *FTC v. Mallinckrodt Ard Inc.*, 2017 WL 242849 (D.D.C. Jan. 25, 2017) (No. 1:17-cv-00120); *see also* Colleen Cunningham, Florian Ederer, & Song Ma, *Killer Acquisitions*, 129 J. Pol. Econ. 649 (2021) (giving several examples of killer acquisitions, mostly from the pharmaceutical industry; concluding that they account for 5 to 7 percent of all acquisitions and typically fall below thresholds for merger scrutiny; Amy C. Madl, *Killing Innovation?: Antitrust Implications of Killer Acquisitions*, 38 Yale J. on Reg. Bull. 28, 34-35 (2020) (defending some killer acquisitions in the pharmaceuticals industry).

[15] *United States v. American Can Co.*, 230 F. 859, 875 (D. Md. 1916) (noting the defendant's practice of shutting down rivals' plants almost immediately after acquisition whereby "[t]wo-thirds of the plants bought were abandoned within two years of their purchase. Many of them were never operated by the defendant at all."). For a discussion of market entrants' ability to disrupt incumbent industry rivals, see Tim Wu, The Master Switch: The Rise and Fall of Information Empires 20 (2010).

[16] *See* Mark A. Lemley & Mark P. McKenna, *Unfair Disruption*, 100 B.U. L. Rev. 71, 74-76 (2020).

[17] *See* Nils Behnke & Norbert Hültenschmidt, *New Path to Profits in Biotech: Taking the Acquisition Exit*, 13 J. Com. Biotechnology 78, 84 (2007).

[18] See 9E.

[19] *Cf.* Jonathan Cave & Stephen W. Salant, *Cartel Quotas Under Majority Rule*, 85 Am. Econ. Rev. 82, 94 & n.18 (1995) (noting monopolists tend to shut down the least efficient plants in order to reduce output while cartels rarely do).

[20] *See United States v. Socony-Vacuum Oil Co*., 310 F. 150 (1940) (holding that an agreement to reduce output is per se unlawful); Shubha Ghosh, *Relaxing Antitrust During Economic Downturns: A Real Options Analysis of* Appalachian Coals *and the Failing Firm Defense*, 68 Antitrust L.J. 111 (2000). For a discussion of the European Commission's selective allowance of output restrictions, see Andre Fiebig, *Crisis Cartels and the Triumph of Industrial Policy Over Competition Law in Europe*, 25 Brook. J. Int'l L. 607, 608 (1999), which discusses "crisis cartels"-or permissible "agreements between most or all competitors in a particular market to systematically restrict output and/or reduce capacity in response to a crisis in that particular industry." For a historically similar approach, see *National Ass'n of Window Glass Mfrs. v. United States*, 263 U.S. 403 (1923), which upheld an agreement to shut down production during wartime in alternating periods negotiated between manufacturers and labor. Such agreements were unenforceable under common law. *See*, *e.g.*, *Clemons v. Meadows*, 94 S.W. 13, 14 (Ky. 1906) (agreement between two hoteliers where one would shut down for a period of three years contravened public policy).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 701

down, the transaction is treated as a merger. However, if the firm pays a rival $1 million to shut down its plant, the transaction would be treated as a cartel.

Two qualifiers are important. One has to do with the acquiring firm's intentions at the time of the acquisition. The easy case is the one like *American Can*, where the purchasing firm acquired rivals for the purpose of removing their productive assets from the market and closed them immediately without ever operating them. [21] But other cases are harder to classify. Not all mergers work out. [22] An acquiring firm may make its best efforts to employ an acquired firm's assets but later determine that the acquisition is a failure. Antitrust policy should not have a per se rule against post-acquisition shutdowns where the acquiring firm has tried to put the acquired assets to productive use.

Another qualifier is the possibility of partial shutdowns. For example, a firm may acquire another firm in order to integrate and use some of its assets but not others. Such cases require an inquiry into relative substantiality and competitive effects. [23] The assets that are kept in production may be small or may be complements to the acquiring firm's production, indicating that the merger would not be challengeable if one looked only at those. However, the assets that are shut down may have posed a significant competitive threat if they were brought to production. Here one admonition is that significant harms in one market cannot be offset by benefits in a different market [24] -and certainly not in cases where the threat is substantial and the efficiencies in the integrated market are not merger specific. Further, enforcers and courts should consider whether a spinoff of the threatening assets is a plausible solution. While research projects typically include a significant intellectual property component, they also include employee talent and perhaps other assets. [25]

The externally acquired but later unpracticed patent is a variation on the killer acquisition story, which dates back to the Supreme Court's 1908 *Paper Bag* decision. [26] The dominant firm purchased a patent on technology that was different from its own, and then shelved the technology rather than practicing it. [27] Subsequently, the firm brought a successful infringement suit against a rival who entered the market with technology that infringed the unused patent. [28] The resolution in that decision effectively used the patent system to harm competition in both the short and the long run. [29] First, it removed the possibility of price

---

[21] *United States v. American Can Co.*, 230 F. 859, 875 (D. Md. 1916).

[22] *See* Wendy B. E. Davis, *The Importance of Due Diligence Investigations: Failed Mergers and Acquisitions of the United States' Companies*, 2 Ankara B. Rev. 5 (2009).

[23] For example, Disney, after it acquired 21st Century Fox in 2019, closed down Fox 2000, one of the acquired studios, while retaining 20th Century Fox and Fox Searchlight. Brent Lang, *Disney Retiring Fox 2000 Label*, Variety (Mar. 21, 2019, 2:35 p.m. PT), https://variety.com/2019/film/news/disney-retiring-fox-2000-label-1203169597.

[24] See P972.

[25] Sometimes such acquisitions occur so that the acquiring firm can hire the target firm's employees, rather than acquire other productive assets. *See* John F. Coyle & Gregg D. Polsky, *Acqui-Hiring*, 63 Duke L.J. 281, 287-301 (2013); *see also* Peter Lee, *Innovation and the Firm: A New Synthesis*, 70 Stan. L. Rev. 1431, 1435 (2018) (arguing that many such acquisitions are efforts to obtain both talented workers and the acquired technologies).

[26] *Continental Paper Bag Co. v. Eastern Paper Bag Co*., 210 U.S. 405, 422-26 (1908). See also P708; *and see* Herbert Hovenkamp, *The Emergence of Classical American Patent Law*, 58 Ariz. L. Rev. 263, 287-89 (2016).

[27] *Paper Bag*, 210 U.S. at 406. On the refusal to license as an antitrust violation, see P708.

[28] The defendant's use of the patent did not literally infringe the plaintiff's patent, but the Supreme Court found infringement by expanding the patent law doctrine of equivalents. *Paper Bag*, 210 U.S. at 415. On the relevance of this holding in the development of the doctrine of equivalents, see Brian J. Love, *Interring the Pioneer Invention Doctrine*, 90 N.C. L. Rev. 379, 392 (2012).

competition between the dominant firm and a prospective new entrant. Second, it restrained rather than furthered innovation, using patent law to deprive the market of new technology.

Limiting the dominant firm to a nonexclusive license can address the killer-acquisition problem to the extent that the acquired assets are intellectual property rights. Indeed, if the acquirer does not intend to use the acquired assets at all, then acquisition of a nonexclusive right has no value in the short run. [30]

**701d.**

**Potential competitor.**

Merger with a potential competitor acquires special significance when one of the firms is a monopolist. [31] The "potential competition" doctrines developed under §7 of the Clayton Act focus mainly on the danger of strengthened oligopoly resulting from the removal of disruptive potential entrants. Those doctrines are rightfully criticized for involving courts in undue speculation about likely consequences. [32]

But when one of the merging firms is a monopolist and the other is a potential entrant into the same market in which the monopolist has its power, anticompetitive concerns are much less speculative. In this case little conjecture is needed about the impact of a perceived entrant on an oligopoly whose members must coordinate their behavior. The single-firm monopolist is in a position to make unilateral decisions about the risk and impact of new entry and, where other forms of entry deterrence are not promising, acquisition is an alternative. As a general matter, a monopolist's acquisition of a "likely" entrant into the market in which monopoly power is held is presumptively anticompetitive. The case for condemnation is strongest where the acquired firm has actually made attempts to enter the monopolist's market, where its entry is imminent, or where the acquiring firm was clearly aware of the competitive threat posed by the acquired firm. Indeed, such a firm may be a present competitive force even though it has not yet made a single sale in the monopoly market. Such a merger may eliminate competition in much the same way as a simple horizontal merger.

This is illustrated by the *El Paso* case. [33] Pacific Northwest Pipeline Corporation had no pipeline into California and thus could not serve California buyers of natural gas. El Paso was the sole supplier of natural gas to southern California. Pacific Northwest made some preliminary moves indicating that it might well build pipelines into California. In response to these moves El Paso reduced prices and improved service to the buyers who might have dealt with Pacific Northwest. El Paso subsequently acquired Pacific Northwest, thereby eliminating a present competitive force and lessening competition.

Even if the acquired firm had not yet affected anybody in the market and had not decided to enter but was uniquely qualified to enter the monopolist's domain, its elimination by merger would remove any likelihood of entry. Again, it is important to preserve that unique prospect for competition in the future. For example, in the first *Facebook* decision, the court dismissed the FTC's challenge to Facebook's acquisition of Instagram, a competing but differentiated social networking site. It noted the FTC's allegations that Facebook had perceived Instagram as a competitive threat that it wished to foreclose. [34] In this case, however, the court also found the

---

[29] This was also the case in *Trebro Manufacturing, Inc. v. FireFly Equipment, LLC* , 748 F.3d 1159, 1172 (Fed. Cir. 2014) ("[A]s to the public interest, there is scant evidence on this record showing that an injunction would harm the public. The patent deals with sod harvesting and covers a small market that may not have a broad-reaching effect."). *See* Erik Hovenkamp & Thomas F. Cotter, *Anticompetitive Patent Injunctions* , 100 Minn. L. Rev. 871, 889-93 (2016).

[30] See 707g.

[31] See P913, discussing the Eighth Circuit's decision in *FTC v. Lundbeck, Inc.* , 650 F.3d 1236 (8th Cir. 2011), which involved a monopolist and an actual or potential rival.

[32] 11B-2 addresses these issues.

[33] *United States v. El Paso Natural Gas Co.* , 376 U.S. 651 (1964).

[34] *FTC v. Facebook, Inc* ., 560 F. Supp. 3d 1 (D.D.C. 2021).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 701

pleadings with respect to Facebook's dominant market position to be inadequate. The court subsequently sustained an amended complaint that contained substantially the same allegations about the acquisitions, but this time with improved pleadings of the relevant market and market power. [35]

If a non-unique firm had in fact decided to enter and would probably have established a modest foothold in the monopolist's domain, its acquisition by the monopolist would resemble the acquisition of an existing small rival. To be sure, others may still enter, but the elimination of a firm that had in fact decided to become a rival is independently troubling.

Where the acquired firm is neither unique nor has already decided on entry, speculation may become excessive-as has indeed occurred in applying Clayton Act §7 to mergers with "potential competitors." [36] Once the possible importance of firms not yet in the market is recognized, the idea tends to be overworked. The firm that once examined the monopolist's field, that recently entered a related field, or that seems to have the technical or marketing skills more or less relevant to the monopolist's field-such potential entrants can be seen everywhere.

Perhaps these dangers could be minimized by permitting the monopolist to acquire any firm not already in the market in the absence of satisfying proof that a unique and truly probable potential entrant was eliminated. But this approach seems much too narrow. It will commonly be difficult if not impossible to prove that a firm is a "unique" and "truly probable" potential entrant. And even if it seems clearly to be one of several firms that are "equally probable" potential entrants, it is important to preserve all those significant possibilities of eroding the monopoly and to prevent possible reinforcement of the monopolist's position via the assets acquired. Accordingly, we would adopt a relatively severe approach to holders of significant monopoly power: the acquisition of any firm that has the economic capabilities for entry and is a more-than-fanciful possible entrant is presumably anticompetitive, [37] unless the acquired firm is no different in these respects from many other firms.

**701e.**

**Acquired firm in related market.**

A variation on the preceding theme is the firm that is not at the core of the monopolist's domain. Suppose, for example, that a monopolist of shoemaking machine types $A$ through $S$ acquired a manufacturer of machine type $Y$, which is not a complete substitute for any of the $A$ through $S$ machines. In such a case, a court might describe the market as "shoemaking machines," hold the defendant a monopolist of that market, and then condemn the acquisition of another firm in that market as exclusionary. There is no great harm in basing this result on an inclusive market definition, so long as the several reasons for being concerned with the $Y$ acquisition are understood. First, to the extent that the $Y$ machine performs any functions performed by the $A$ through $S$ machines, the acquisition would eliminate that degree of competition and thereby reinforce the monopolist's power. Second, the related $Y$ technology and merchandising could provide a base for entry into some part of the monopolist's domain. Thus, the acquired firm could be reasonably described as a potential competitor to the monopolist. Third, other $Y$ producers, if there are any, might be prejudiced by the monopolist's entry-by-merger into their domain. Fourth, the acquisition might add another entry barrier protecting the monopolist. If the acquired firm were the only $Y$ producer or if any other $Y$ firms were significantly weakened, the future entrant might feel compelled to offer not only machines $A$ through $S$ but also machine $Y$ in order to provide customers with a complete line. If so, the difficulty and expense of new entry would be increased somewhat. The acquisition would thereby add something to the entry barriers confronting potential challengers to the monopoly power at issue.

---

[35] *FTC v. Facebook, Inc* ., __ F. Supp. 3d __, 2022 WL 103308 (D.D.C. Jan. 11, 2022).

[36] See P1120 - P1123.

[37] We say "presumably" because such a merger could still be saved by a showing of significant efficiencies that could not reasonably be attained by alternative means (see Ch. 9E) or by more specific defenses such as the failing firm defense (see 701i).

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 701

To state these grounds for concern is neither to define a "related" market nor to assert that any particular acquisition raises significant problems of the kind described. The difficulties are analogous to those just discussed in connection with potential competition-which would usually be the most significant aspect of a firm in a related market. But again, we would require relatively little proof to hold presumptively anticompetitive a monopolist's acquisition of closely related firms.

**701f.**

**Acquisition for diversification.**

A monopolist might acquire a firm in a related market in order to diversify its risks. But we need not appraise the social utility of diversification to see the vast number of alternative acquisitions that would achieve diversification without posing any of the competitive threats thus far considered.

**701g.**

**Acquisition for progressiveness.**

Just like any other firm, the monopolist faces loss of market to new innovations. Suppose, for example, that the slide rule monopolist observes the small firm developing and first selling electronic calculators and predicts that the calculator will in a few years substantially destroy the slide rule market. Should the slide rule monopolist be permitted to acquire the calculator firm?

The most difficult case arises when the calculator firm is also a likely monopolist, perhaps because the calculator is protected by patents. In time the calculator monopolist will completely displace the slide rule monopolist. In that case, one might say that no harm to competition occurs because the calculator firm will be a monopolist in any event, and the acquisition simply transfers the monopoly from the independent firm to the previous slide rule monopolist.

But the difficulty with this position is that we seldom have such perfect foresight. In fact, there may be a long competitive struggle between slide rules and calculators, which benefits consumers with lower prices and innovation in both products-and some of these benefits may obtain even if the slide rule firm is eventually driven out of business. Permitting the acquisition would thus significantly reduce present competition with no offsetting social benefit other than the preservation of the slide rule monopolist whose own product has become obsolete.

But suppose the acquired firm is not itself a monopolist or potential monopolist, but rather one of several firms developing innovative production techniques or products that, unless matched by the acquiring monopolist, will end its power. Such an acquisition might be approved if it were necessary for the defendant's survival, if internal development of the new technology were not available as an alternative to merger, [38] and if its entry by merger into the new process or product did not threaten to impair competition there. If the new process or product would create a new situation in which many firms participated without any advantage to the old monopolist, then the acquisition would do no harm. [39] For example, if calculators were simultaneously being introduced by ten firms, permitting the slide rule monopolist to acquire one of the ten would very likely be harmless and might produce more intensive competition among the calculator firms.

**701h.**

**Acquisition justified by changes in scale economies.**

An acquisition might be defended as a contribution to economic efficiency. Suppose, for example, that a new technology appeared in a several-firm market whereby one firm acting monopolistically could satisfy the whole market at lower costs and price than any combination of two or more firms. In that event, either one firm will

---

[38] For example, we would greatly prefer that the monopolist acquire a nonexclusive license permitting it to develop the new technology itself in competition with rivals. See  707f.

[39] Of course, such assumptions postulate a monopolist heading for the scrap heap and not, therefore, a probable target of government enforcement efforts.

adopt the new technology and expand while the others fail, or the several will merge. Monopoly will result in either case. Or suppose that an existing monopolist claims to need the acquired firm to achieve a larger and more efficient scale of production or distribution. It is conceivable, although unlikely, that complementary facilities possessed by the acquired firm could not be economically duplicated by the monopolist acting alone. Or if the monopolist could expand internally to achieve these economies, there might be some wasteful duplication of resources as the other firm fails.

We elaborate on these problems in our discussion of the "efficiency defense" in merger cases, [40] but three points may be briefly noted here.   *First* , if substantial efficiencies are truly involved, they will ordinarily be achieved independently if not by merger. To discourage or prevent the merger, therefore, is not usually to impede the achievement of economic efficiency.   *Second* , although there is clearly a social interest in preventing wasteful duplication and unnecessary business failures, there is a peculiarly strong interest in preventing unjustified mergers creating or reinforcing monopoly.   *Third* , to open up an efficiency defense invites a multiplication of unjustified mergers by parties hoping to persuade courts with dubious efficiency claims. Accordingly, an efficiency defense cannot be allowed in monopoly cases in the absence of an overwhelming demonstration that substantial efficiencies are involved and either cannot be achieved in other ways or will inevitably destroy the other firms.

**701i.**

**Failing company acquired.**

We shall see later that a merger otherwise unlawful under Clayton Act §7 may be held lawful when the acquired firm is a "failing company." [41]  The Clayton Act's failing company defense is a judicial gloss-legislatively accepted but not explicitly enacted. Historically, it rested on two ideas. First, the competitive effect of eliminating a competitor by merger is obviously reduced when that competitor would otherwise have "failed." Prospective failure does not, however, entirely eliminate our concern for competitive effects. Failure might not occur. Failure might occur but lead to reorganization rather than a withdrawal of the firm's assets from the market. Withdrawal might occur but result in a reallocation of business to firms generally, rather than primarily to the would-be acquirer. And finally, the failing firm might remain a competitive force or even become a stronger competitor through acquisition by someone other than the would-be acquirer. Thus, the prospective failure of an acquired firm does not eliminate our concern, especially when the acquirer is a monopolist.

Apart from competitive effects, however, is a second rationale for the failing company defense: a desire to minimize the painful consequences of failure for the acquired company's owners, employees, customers, and community. Not only does it seem "fair" to allow the owners to exit gracefully, but the prospective ability to minimize the cost of failure may favorably affect the general likelihood of entry, although the effect is speculative and probably of marginal significance. And if the acquirer keeps the acquired facilities in operation, its employees and their community and perhaps some customers may be saved an otherwise troublesome dislocation.

Problematically, this second rationale is not an antitrust rationale. Antitrust is concerned with preserving competition, not with harmful collateral dislocations that may occur when competition is preserved. Indeed, some of the "costs" of hard competition are lower profits, a constant search for efficiencies that result in loss of jobs or sales by suppliers, and some failures of firms. Antitrust rests on the principle that society is better off if competition is preserved notwithstanding these costs. As a result, such a rationale should not be read into a statute when it is not justified by the legislative history. Although Congress manifested a concern about the preservation of failing companies in the legislative history of Clayton Act §7, the Sherman Act contains no such manifestation.

Nevertheless, a failing firm defense may appropriately be accepted even where monopoly is involved. Consider a two-newspaper city in which one newspaper firm suffers losses for several years and then sells out to the

---

[40] Ch. 9E.

[41] See Ch. 9D-1.

Antitrust Law: An Analysis of Antitrust Principles and Their Application (CCH) 701

other, which thereby acquires a monopoly. [42] It might be absolutely certain that the failing firm's assets would, in the absence of this acquisition, be completely and finally withdrawn from this market. With no loss of competition involved, there is no good reason for preventing the expiring firm from obtaining whatever it can in excess of salvage value. [43]

But the prerequisites to the failing company defense developed under merger law generally are even more essential when the acquirer will be a monopolist; namely, (1) the prospect of failure must be grave; (2) the prospect of internal rehabilitation must be remote; and (3) there must be no alternative salvation-post-bankruptcy reorganization or alternative purchaser-that would preserve the entity as a competitive factor. Because these prerequisites are not usually knowable with certitude, the operational question in any case or class of cases is this: with what degree of probability must each element be shown? Because the danger is so great when a monopoly is involved, the enforcement authorities are not and should not be hospitable to acquisitions creating or reinforcing significant monopoly power. The defendant must prove each element of the failing company defense with considerable force. [44]

**701j.**

**Scope of equitable relief.**

The rather harsh approach to acquisitions of actual or potential competitors that we have suggested here should not be paralleled by an equally harsh approach in granting broad equitable relief. In general, maximum feasible relief against the monopoly should be reserved for cases in which the acquisition, or a series of acquisitions, probably increased monopoly power significantly. Otherwise, relief should be limited to that which is appropriate under Clayton Act §7: an injunction against consummation, or divestiture of whatever is necessary to create a firm with a position comparable to that which the acquired firm would have had. Any doubts would be resolved against the monopolist. And wherever the acquisition violated §7 and no relief beyond §7 is appropriate, a §2 action is unnecessary.

Antitrust Law: An Analysis of Antitrust Principles and Their Application
Copyright © 2024 by Wolters Kluwer. All Rights Reserved.

**End of Document**

---

[42] On such situations, and the Newspaper Preservation Act that addresses them, see P955.

[43] If failure were absolutely certain, the acquiring firm would have no reason to pay more than the salvage value of the acquired firm's assets. But perhaps the convenience of total transfer of the not-yet-collapsed firm is worth something to the acquiring firm, as is the assurance that rehabilitation will not occur.

[44] *See Reilly v. Hearst Corp.* , *107 F. Supp. 2d 1192 (N.D. Cal. 2000)*, which found that the elements of the failing company defense were satisfied; however, the court also expressed severe doubts that the merger of San Francisco's *Chronicle* and *Examiner* created a monopoly, suggesting that the relevant geographic market was in fact larger than San Francisco and that the relevant product market included other forms of media. *See id.* at 1200.