**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| **FEDERAL TRADE COMMISSION,**<br><br>      **Plaintiff,**<br><br>      **v.**<br><br>**U.S. ANESTHESIA PARTNERS, INC., et al.,**<br><br>      **Defendants.** | **Case No.: 4:23-CV-03560-KH** |

**Plaintiff Federal Trade Commission's Opposition to
the Welsh Carson Entities' Motion to Dismiss**

## Table of Contents

Summary of Argument ........................................................................................... 1

Nature and Stage of Proceedings ......................................................................... 2

Issues to be Decided by the Court ........................................................................ 2

Background ........................................................................................................... 3

Legal Standard ..................................................................................................... 8

Argument .............................................................................................................. 9

I.      The complaint states antitrust claims against Welsh Carson ....................... 9

      A.     Welsh Carson is plausibly liable as a single enterprise with USAP ..................... 9

            1.    Welsh Carson and USAP acted as a single enterprise ................................... 10

            2.    Welsh Carson and USAP's single enterprise violates the antitrust laws ........ 13

            3.    Welsh Carson independently participated in the alleged conduct ................. 13

            4.    Welsh Carson's other arguments fail ............................................................. 19

      B.     Even if USAP and Welsh Carson did not act as a single enterprise, the complaint plausibly establishes Welsh Carson's liability .................................... 21

            1.    Welsh Carson is plausibly liable for conspiring to monopolize ................... 21

            2.    Welsh Carson's conduct plausibly violates Section 7 of the Clayton Act ...... 22

            3.    Welsh Carson's conduct plausibly constitutes a violation arising under Section 1 of the Sherman Act .......................................................................... 23

            4.    Welsh Carson's conduct plausibly violates Section 5 of the FTC Act .......... 25

II.     The FTC's case is properly in federal court .................................................... 26

      A.     The complaint satisfies Section 13(b) because it plausibly alleges reason to believe that Welsh Carson is or is about to violate the law ............................... 26

      B.     The FTC alleges sufficient facts to prevail under *Shire* ..................................... 29

III.    The FTC has the authority to bring this action ............................................... 31

Conclusion .......................................................................................................... 33

i

# Table of Authorities

## Cases

*Abbott v. BP Expl. & Prod. Inc.*,
781 F. Supp. 2d 453 (S.D. Tex. 2011) ................................................................................. 8

*Arandell Corp. v. Centerpoint Energy Servs., Inc.*,
900 F.3d 623 (9th Cir. 2018) .............................................................................. 10, 12, 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 8

*Buckley v. Valeo*,
424 U.S. 1 (1976) ............................................................................................................. 33

*Chandler v. Phoenix Servs.*,
No. 7:19-CV-00014-O, 2020 WL 1848047 (N.D. Tex. Apr. 13, 2020) ....................... 10, 13

*Cherry Knoll, L.L.C. v. Jones*,
922 F.3d 309 (5th Cir. 2019) ........................................................................................... 22

*Cmty. Publishers, Inc. v. Donrey Corp.*,
882 F. Supp. 138 (W.D. Ark. 1995) ................................................................................. 23

*Collins v. Dep't of Treasury*,
83 F.4th 970 (5th Cir. 2023) ............................................................................................ 32

*Collins v. Yellen*,
141 S. Ct. 1761 (2021) ..................................................................................................... 31

*Colony Ins. Co. v. Peachtree Constr., Ltd.*,
647 F.3d 248 (5th Cir. 2011) ............................................................................................. 8

*Copperweld Corp. v. Indep. Tube Corp.*,
467 U.S. 752 (1984) .............................................................................................. 9, 10, 12

*Dairy, LLC v. Milk Moovement, Inc.*,
No. 2:21-CV-02233 WBS AC, 2023 WL 3437426 (E.D. Cal. May 12, 2023) .................... 21

*Financialapps, LLC v. Envestnet, Inc.*,
No. 19-1337-GBW-CJB, 2023 WL 4975373 (D. Del. July 31, 2023) ........................... 17, 18

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
561 U.S. 477 (2010) .................................................................................................. 31, 32

*FTC v. AdvoCare Int'l L.P.*,
No. 4:19-CV-715-SDJ, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) .............................. 29

*FTC v. Educare Ctr. Servs., Inc.*,
433 F. Supp. 3d 1008 (W.D. Tex. 2020) .......................................................... 27, 28, 29, 30

*FTC v. Facebook, Inc.*,
    560 F. Supp. 3d 1 (D.D.C. 2021) ............................................................. 30

*FTC v. Hornbeam Special Situations, LLC*,
    391 F. Supp. 3d 1218 (N.D. Ga. 2019) .................................................... 29

*FTC v. Kennedy*,
    574 F. Supp. 2d 714 (S.D. Tex. 2008) ..................................................... 19

*FTC v. Kochava, Inc.*,
    No. 2:22-CV-00377-BLW, 2023 WL 3249809 (D. Idaho May 4, 2023) ............... 33

*FTC v. Meta Platforms Inc.*,
    654 F. Supp. 3d 892 (N.D. Cal. 2023) ..................................................... 23

*FTC v. Neora LLC*,
    552 F. Supp. 3d 628 (N.D. Tex. 2021) ........................................ 27, 28, 29, 30

*FTC v. On Point Cap. Partners LLC*,
    17 F.4th 1066 (11th Cir. 2021) ............................................................... 19

*FTC v. Roomster Corp.*,
    654 F. Supp. 3d 244 (S.D.N.Y. 2023) ...................................................... 29

*FTC v. Shire ViroPharma, Inc.*,
    917 F.3d 147 (3d Cir. 2019) ............................................................. 29, 30

*FTC v. Shkreli*,
    581 F. Supp. 3d 579 (S.D.N.Y. 2022) ...................................................... 24

*FTC v. Sw. Sunsites, Inc.*,
    665 F.2d 711 (5th Cir. 1982) ............................................................. 27, 28

*FTC v. Syngenta Crop Prot. AG*,
    No. 1:22-cv-828, 2024 WL 149552 (M.D.N.C. Jan. 12, 2024) ................ 15, 16, 32

*FTC v. Tax Club, Inc.*,
    994 F. Supp. 2d 461 (S.D.N.Y. 2014) ...................................................... 19

*FTC v. Texaco, Inc.*,
    393 U.S. 223 (1968) .......................................................................... 26

*FTC v. Vyera Pharms., LLC*,
    479 F. Supp. 3d 31 (S.D.N.Y. 2020) .................................................. 27, 30

*FTC v. Walmart Inc.*,
    No. 22-cv-3372, 2023 WL 2646741 (N.D. Ill. Mar. 27, 2023) ................... 29, 33

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
    386 F.3d 485 (2d Cir. 2004) ................................................................ 23

iii

*Humphrey's Ex'r v. United States*,
   295 U.S. 602 (1935)...................................................................................... 31

*Illumina, Inc. v. FTC*,
   88 F.4th 1036 (5th Cir. 2023) ........................................................... 3, 23, 31

*Impax Labs., Inc. v. FTC*,
   994 F.3d 484 (5th Cir. 2021) ................................................................... 24

*In re Alper Holdings USA, Inc.*,
   398 B.R. 736 (S.D.N.Y. 2008) ................................................................. 18

*In re Aluminum Warehousing Antitrust Litig.*,
   95 F. Supp. 3d 419 (S.D.N.Y. 2015) ....................................................... 11

*In re Catfish Antitrust Litig.*,
   908 F. Supp. 400 (N.D. Miss. 1995)........................................................ 20

*In re Jim Walter Corp.*,
   90 F.T.C. 671 (1977) ............................................................................... 23

*In re Pa. Title Ins. Antitrust Litig.*,
   648 F. Supp. 2d 663 (E.D. Pa. 2009)....................................................... 15

*In re Packaged Seafood Prods. Antitrust Litig.*,
   No. 15-MD-2670 DMS (MDD), 2022 WL 836951 (S.D. Cal. Mar. 21, 2022) ............. passim

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
   566 F. Supp. 2d 363 (M.D. Pa. 2008)....................................................... 15

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
   No. 3:23-md-03071, 2023 WL 9004808 (M.D. Tenn. Dec. 28, 2023)...................... 20, 24, 25

*Jones v. Cain*,
   600 F.3d 527 (5th Cir. 2010) ................................................................... 22

*Jones v. Varsity Brands, LLC*,
   618 F. Supp. 3d 713 (W.D. Tenn. 2022) ............................................... passim

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*,
   847 F.3d 1221 (10th Cir. 2017) ...................................................... 10, 13, 14

*Nobody In Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.* ("*NIPP*"),
   311 F. Supp. 2d 1048 (D. Colo. 2004)............................................... 14, 16

*Off. Airline Guides, Inc. v. FTC*,
   630 F.2d 920 (2d Cir. 1980) .................................................................... 26

*OJ Commerce, LLC v. KidKraft, Inc.*,
   34 F.4th 1232 (11th Cir. 2022) .......................................................... 11, 12

*Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*,
   9 F.4th 247 (5th Cir. 2021) ................................................................ 8

*PostX Corp. v. Secure Data in Motion, Inc.*,
   No. C 02-04483, 2005 WL 8177634 (N.D. Cal. Aug. 17, 2005) ......................... 12

*Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*,
   317 F. Supp. 2d 301 (S.D.N.Y. 2003) .................................................. 20, 24, 25

*Regina Corp. v. FTC*,
   322 F.2d 765 (3d Cir. 1963) ............................................................ 25

*Rohlfing v. Manor Care, Inc.*,
   172 F.R.D. 330 (N.D. Ill. 1997) ....................................................... 11

*Seila Law LLC v. CFPB*,
   140 S. Ct. 2183 (2020) ............................................................... 31, 32

*Space Expl. Techs., Corp. v. Bell*,
   No. 1:23-cv-00137, 2023 WL 8885128 (S.D. Tex. Nov. 8, 2023) ...................... 32

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*,
   200 F.3d 307 (5th Cir. 2000) .......................................................... 21

*Top Rank, Inc. v. Haymon*,
   No. CV15-4961-JFW, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) .............. 11, 12

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
   No. 08-1498, 2014 WL 1766083 (W.D. Pa. May 2, 2014) .............................. 18

*Union Pac. R.R. Co. v. Oglebay Norton Mins., Inc.*,
   No. EP-17-CV-47-PRM, 2018 WL 1722175 (W.D. Tex. Apr. 9, 2018) .............. 18

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ............................................................. 16, 17, 18

*United States v. Cornerstone Wealth Corp.*,
   549 F. Supp. 2d 811 (N.D. Tex. 2008) ................................................ 28

*United States v. MyLife.com, Inc.*,
   499 F. Supp. 3d 757 (C.D. Cal. 2020) ................................................. 29

## **Statutes**

15 U.S.C. § 1 .............................................................................. 24

15 U.S.C. § 18 ......................................................................... 22, 23

15 U.S.C. § 2 .............................................................................. 21

15 U.S.C. § 45(a)(1) ................................................................... 25, 26

15 U.S.C. § 53(b) ................................................................................................................ 26

15 U.S.C. § 57 .................................................................................................................... 32

## SUMMARY OF ARGUMENT

Welsh Carson, a New York-based private equity firm, is the "primary architect" of U.S. Anesthesia Partners—a firm it created specifically to "roll up" independent anesthesia practices into a single dominant provider with the power to extract high prices from Texas employers and patients. Welsh Carson not only devised this decade-long "consolidation strategy," it participated in its execution by identifying USAP's acquisition targets, negotiating and approving the deals, and providing or securing hundreds of millions of dollars in funding to bankroll them. In addition, Welsh Carson helped to strike deals that let USAP clear its competitors out of the way or set their prices. Since 2012, Welsh Carson has acted, in its own words, as USAP's "control investors," maintaining a significant ownership stake, appointing USAP officers and directors, and handsomely profiting from its anticompetitive scheme.

Welsh Carson's motion to dismiss seeks to rewrite this history. Disputing or simply ignoring these detailed allegations, Welsh Carson reimagines itself as a hapless passive investor engaged in "typical" private equity behavior. But, on a motion to dismiss, the complaint's well-pleaded facts must be accepted as true. Unable to engage on the merits of the FTC's claims, Welsh Carson instead raises a series of tangential arguments about corporate law and the FTC's statutory and Constitutional authority. None of them, however, entitle Welsh Carson to evade responsibility for its unlawful conduct.

First, Welsh Carson claims that the complaint turns "decades of settled corporate law on its head" by seeking to hold an investor, like Welsh Carson, responsible for the conduct of its portfolio company. But it is well-established that investors can face liability if they participate in the company's antitrust violations. As the complaint sets forth, Welsh Carson devised an anticompetitive scheme, and then carried it out with USAP as a single enterprise. Welsh Carson is thus liable for the resulting violations. To the extent Welsh Carson and USAP are not a single

enterprise, Welsh Carson is instead liable for *conspiring* with USAP to monopolize anesthesia services and for participating in USAP's other antitrust violations. Either way, Welsh Carson cannot escape liability for its conduct.

Second, Welsh Carson argues that the FTC's claims are barred because the FTC lacks statutory authority to sue in federal court. But Welsh Carson erroneously bases this position on an out-of-circuit opinion and fails to apply the likelihood of recurrence standard required under Fifth Circuit precedent, *FTC v. Southwest Sunsites*. The FTC alleges more than sufficient facts to show that Welsh Carson's conduct is likely to recur because its anticompetitive scheme is not only intact, but still operational. Even applying Welsh Carson's improper standard, the FTC still may proceed in federal court because it alleges that Welsh Carson's conduct is ongoing.

Third, Welsh Carson recycles a constitutional challenge to the FTC's structure that was rejected last month by the Fifth Circuit as foreclosed by Supreme Court precedent.

The Court should deny Welsh Carson's motion.

## NATURE AND STAGE OF PROCEEDINGS

The FTC filed its complaint on September 21, 2023. ECF No. 1. USAP and Welsh Carson moved to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on November 20, 2023. ECF Nos. 97 ("USAP Mot."), 100 ("WC Mot."). The FTC now separately opposes Welsh Carson's and USAP's ("USAP Opp.") motions.

## ISSUES TO BE DECIDED BY THE COURT

1. Whether the complaint states valid claims for relief against Welsh Carson based on its development of and participation in the alleged anticompetitive scheme.

2. Whether the ongoing nature of the alleged anticompetitive scheme that Welsh Carson designed and implemented, along with the cognizable danger that Welsh Carson's conduct will recur, permits the FTC to bring this case in federal court under 15 U.S.C. § 53(b).

3.      Whether limitations on the President's authority over FTC Commissioners require dismissing this action, despite contrary Supreme Court precedent and the Fifth Circuit's decision in *Illumina, Inc. v. FTC*, 88 F.4th 1036 (5th Cir. 2023).

## BACKGROUND

### The Welsh Carson Firm

Welsh, Carson, Anderson & Stowe is a private equity firm based in New York City. Compl. ¶ 2, 23. Welsh Carson invests in and manages a portfolio of companies in the healthcare and technology sectors. *Id.* ¶ 23. It runs this business using various corporate entities that share personnel and resources. *See id.* ¶¶ 24-32. One set of entities, such as WCAS Management Corporation and WCAS Management, LLC, houses the firm's personnel and manages its investments. *See, e.g., id.* ¶¶ 25, 30-31. A second set, known as "funds," makes and holds Welsh Carson's investments. *Id.* ¶¶ 26, 28. A third set of Welsh Carson entities, including WCAS XII Associates, LLC, controls these funds as their general partner. *Id.* ¶¶ 27, 29.

This structure, complex on paper, is simple in practice: all these various corporate entities act together as a single company which Welsh Carson's employees and business partners refer to as "Welsh Carson" or "the Firm." *Id.* ¶¶ 32, 84, 94, 101. The same high-level Welsh Carson executives (or partners, using their terminology) manage and direct the activities of the seven Welsh Carson defendants. *Id.* ¶¶ 25, 27, 29-32. And all the entities use the same website, trademarks, and mailing address and instructions ("c/o Welsh, Carson, Anderson & Stowe"). *Id.* ¶ 32. The complaint names seven Welsh Carson entities as defendants because each of them either made or directed the firm's investments in USAP or housed the personnel who participated in USAP's conduct. Consistent with Welsh Carson's own nomenclature, and as explained further in Part I.A.3 below, this opposition refers to the seven defendants collectively as "Welsh Carson."

3

**Welsh Carson creates USAP to monopolize anesthesia services**

In early 2012, Welsh Carson devised a scheme to corner the market for hospital-based anesthesia services. *Id.* ¶¶ 77-79. It planned to create a company, buy up a critical mass of anesthesia practices in key markets, and then leverage the resulting market power to raise prices to those that pay for health care, including patients, employers, insurance companies, and others. *Id.* ¶¶ 2-3, 65, 79. Welsh Carson partner Brian Regan explained this plan clearly to his colleagues: The goal was to "consolidat[e] practices with high market share in a few key markets." This would in turn give the consolidated practice "[n]egotiating leverage with commercial payors." *Id.* ¶ 79. Convinced of the potential for higher prices and larger profits, Welsh Carson's partnership agreed to "devote real time and resources to . . . the anesthesiology consolidation strategy." *Id.* ¶ 80.

Over the next few months, Welsh Carson employees got to work setting up the company, eventually called USAP, that would be the vehicle for this anesthesia consolidation scheme. Welsh Carson hand-picked USAP's leadership. It chose Kristen Bratberg to be USAP's CEO—largely due to his experience rolling up (i.e., acquiring) more than 100 neonatology practices when he ran another company in Welsh Carson's investment portfolio. *Id.* ¶¶ 82-83. Welsh Carson also selected USAP's Chief Financial Officer, Chief Operating Officer, and head of Human Resources, each of whom, like Bratberg, had held similar jobs at other Welsh Carson portfolio companies. *Id.* ¶ 38. Regan and the Welsh Carson team also worked closely with a consultant to develop a modeling tool that would identify anesthesia practices to acquire—a tool that USAP used for years afterwards to carry out the alleged conduct. *Id.* ¶ 81. In its own words Welsh Carson was USAP's "primary architect." *Id.* ¶ 336.

After setting up the company, Welsh Carson chose and paid for USAP's first anesthesia acquisition: Greater Houston Anesthesiology, the largest practice in Houston at the time. *Id.* ¶ 84. A USAP executive signed the initial June 2012 "letter of interest", as did Brian Regan in his capacity as a "General Partner" of "Welsh, Carson, Anderson & Stowe." *Id.* Welsh Carson worked side-by-side with USAP to conduct due diligence on Greater Houston. *Id.* Then, they jointly submitted a formal Letter of Intent to acquire Greater Houston—signed both by USAP and by Regan on behalf of WCAS Associates XI, LLC. *Id.* ¶¶ 84-85. Over a hundred million dollars in consideration came directly from Welsh Carson. *Id.* Welsh Carson obtained the rest from third-party lenders with the same sales pitch that convinced Welsh Carson's own leadership: "consolidat[e] practices with high market share in a few key markets" to obtain "[n]egotiating leverage with commercial payors," and then charge higher prices for anesthesia care. *Id.* ¶¶ 91-93.

With the Greater Houston acquisition, Welsh Carson and USAP completed the first and essential step in their "roll-up strategy." *Id.* ¶ 93. Soon after, Welsh Carson announced USAP's debut with a press release: "Welsh, Carson forms U.S. Anesthesia Partners." *Id.* ¶ 94.

**Welsh Carson directs USAP's acquisitions and deals**

One day after the Greater Houston deal was signed, Brian Regan and other Welsh Carson employees met with USAP executives in New York to discuss further acquisitions. *Id.* ¶¶ 96-100. Within a few weeks, they aligned on a plan: USAP would "Roll Up Houston" through a series of "tuck-in acquisitions" of more anesthesia practices, focusing on groups that already had exclusive contracts with hospitals. *Id.* As it acquired new anesthesia groups and gained negotiating leverage—in Houston and beyond—USAP would raise the new groups' rates to the much higher ones used by USAP's Greater Houston practice, resulting in significant price

5

increases and "driv[ing] profitability." *Id.* ¶¶ 98, 153-56. USAP typically raised new groups' rates through "tuck-in" clauses that applied its higher rates to services provided by practices it acquired. *Id.*

After signing off on this plan, Welsh Carson continued to participate directly and extensively in the anesthesia consolidation scheme. USAP rules mandated that any proposed acquisition "must be reviewed and approved by Welsh Carson." *Id.* ¶ 101. USAP's "Business Development Playbook" emphasized that it was "important that [Welsh Carson] remains fully informed" and described how acquisitions "will typically involve multiple memos/presentation decks and discussions with [Welsh Carson]." *Id.* Welsh Carson personnel researched anesthesia practices for USAP to acquire and performed diligence on those potential targets. *Id.* ¶¶ 37, 39, 162, 170. Welsh Carson scoped out and negotiated USAP's first acquisition in Dallas. *Id.* ¶¶ 122-126, 129. Welsh Carson found and hired a consulting group to confirm that consolidating practices would allow USAP to charge payors higher rates. *Id.* ¶ 151. And Welsh Carson employees drafted the contractual language—the "tuck-in" clauses—used to charge USAP's higher rates for the services of its newly acquired anesthesia practices. *Id.* ¶ 154.

Brian Regan, the Welsh Carson partner who had initially pitched the anesthesia consolidation scheme and the Greater Houston acquisition, played an active role in managing the scheme. Signing in his capacity as a Welsh Carson partner, he co-executed deal documents for USAP's largest anesthesia acquisitions in Houston and in Dallas. *Id.* ¶¶ 84, 85, 126. USAP also needed Regan's approval for all its contracts with health insurers. *Id.* ¶ 154. And Welsh Carson, through Regan, encouraged and directed USAP's other unlawful conduct beyond acquisitions. Regan led the negotiations for USAP's market allocation agreement with Envision, proposing initially that USAP pay Envision $9 million annually to not provide anesthesia services in Texas.

*Id.* ¶¶ 211-14. Then, once Envision agreed to not provide anesthesia services in Dallas for the same amount, Regan directed his Welsh Carson team to finalize the agreement. *Id.* Similarly, when USAP found itself competing against Baylor College of Medicine for a hospital contract, Regan suggested "get[ting] us in a room with them" so "we could work something out." *Id.* ¶ 200. Rather than compete, USAP and Baylor entered into a price-setting agreement under which USAP charged its own rates for services provided by Baylor. *Id.* ¶¶ 201-03.

### Welsh Carson reaps significant profits and eyes other physician practices

After it founded USAP, Welsh Carson's "mandate" was "to be control investors" of the company. *Id.* ¶ 36. Welsh Carson initially owned 50.2% of USAP. *Id.* ¶ 35. From 2013 to 2017, Welsh Carson's stake dipped below 50%, but it continued to control USAP "in all practical respects" (its own words) since it held the voting rights for nearly all USAP's other shareholders. *Id.* ¶ 36. Moreover, until 2017, Welsh Carson had the right to appoint the majority of USAP's board of directors, including its chair. *Id.*

In late 2017, Welsh Carson sold about half its stake in USAP. *Id.* ¶¶ 35-36. Today, it owns approximately 23% of the company. *Id.* But nothing prevents Welsh Carson from re-acquiring a majority stake. *Id.* ¶ 337. And even now, according to USAP's former CEO and Chairman, Welsh Carson remains the "most influential" member of USAP's board. *Id.* ¶ 36. In addition, Welsh Carson has continued to participate in the alleged anticompetitive scheme. *Id.* ¶¶ 35-36, 337. For example, Welsh Carson personnel have "participat[ed] in commercial payor negotiations" for USAP to raise or maintain high prices, run "due diligence on potential tuck-in acquisitions" to further the consolidation scheme, and helped USAP to finance additional anticompetitive acquisitions since 2017. *Id.* ¶ 337. Throughout, Welsh Carson has reaped

enormous profits from the scheme: it has received over $350 million in dividend payments alone from USAP, including $85 million since reducing its share in 2017. *Id.*

Welsh Carson has also applied this consolidation playbook to other physician practices. Welsh Carson and USAP's CEO had prior experience rolling up more than 100 neonatology practices. *Id.* ¶¶ 82-83. In 2015, after launching USAP, Welsh Carson used a similar consolidation strategy in emergency medicine. *Id.* ¶ 339. Then, in 2017, it began preparations for yet another consolidation scheme, this time in radiology. *Id.* Welsh Carson explained in an investment committee memorandum that "[g]iven our success to date with USAP and [in emergency medicine], we would like to . . . deploy[] a similar strategy to consolidate the market . . . ." *Id.* Today, Welsh Carson is doing just that, consolidating radiology practices using "one of the nation's largest" groups. *Id.*

## LEGAL STANDARD

When a party moves to dismiss under Rule 12(b)(6), the court must "liberally construe the complaint," *Colony Ins. Co. v. Peachtree Constr., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011), "accept[ing] all well-pleaded facts as true [and] viewing them in the light most favorable to the plaintiff." *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 253 (5th Cir. 2021). Plaintiffs' factual allegations need only "be enough to raise a right to relief above the speculative level" and state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 570 (2007). "[T]he Court's task is limited to deciding whether the plaintiff is entitled to offer evidence in support of his claims, not whether the plaintiff will eventually prevail." *Abbott v. BP Expl. & Prod. Inc.*, 781 F. Supp. 2d 453, 459 (S.D. Tex. 2011) (Hoyt, J.).

## ARGUMENT

### I.      The complaint states antitrust claims against Welsh Carson

Under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), when one entity can control another, they form a single enterprise under the antitrust laws—and can be liable as one. The facts alleged in the complaint plausibly show that Welsh Carson is liable for the alleged anticompetitive scheme as a single enterprise with USAP. Indeed, Welsh Carson essentially concedes it forms a single enterprise with USAP by arguing that the two "were never 'separate economic actors'" under *Copperweld*. WC Mot. 30. Welsh Carson's arguments, primarily aimed at disputing its own participation, are unavailing.

Even without single enterprise liability, the complaint states plausible claims against Welsh Carson. First, if Welsh Carson is not a single enterprise with USAP then the two have conspired to monopolize in violation of the principles of Section 2 of the Sherman Act. Second, Welsh Carson is violating Section 7 of the Clayton Act because Welsh Carson took an active role in and indirectly acquired equity as part of USAP's unlawful acquisitions. Third, Welsh Carson is liable for a violation arising under Section 1 of the Sherman Act for facilitating USAP's price-setting arrangements and market allocation agreement. Finally, Welsh Carson's actions constitute unfair methods of competition and standalone violations of Section 5 of the FTC Act.

### A.      Welsh Carson is plausibly liable as a single enterprise with USAP

The concept of two entities forming a single enterprise for antitrust purposes originates with *Copperweld*. There, the Supreme Court held that a parent and its wholly owned subsidiary cannot conspire to violate the antitrust laws because their coordinated activity "must be viewed as that of a single enterprise." 467 U.S. at 771-72. The Court reached this result because a parent and its wholly owned subsidiary share "a complete unity of interest" since the parent may "assert full control at any moment if the subsidiary fails to act in the parent's best interests." *Id.* The

*Copperweld* Court recognized, however, that this very unity of interest that prevents conspiracy also means that under certain circumstances, the single enterprise—and its participants—is "fully subject" to antitrust liability. *See id.* at 777.

Since *Copperweld*, courts have confirmed that immunity from conspiracy liability and exposure to single enterprise liability are two sides of the same coin. If affiliated entities have a unity of interest, then they form a single enterprise; they are incapable of conspiring, but it "also follows" that they can be liable if their single enterprise violates the antitrust laws. *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1235-36 (10th Cir. 2017); *see also Arandell Corp. v. Centerpoint Energy Servs., Inc.*, 900 F.3d 623, 631-32 (9th Cir. 2018) (holding that affiliated companies are incapable of conspiracy but can be liable as a single enterprise). *Copperweld*'s same logic thus operates both defensively to prevent conspiracy liability and offensively to open the door to single enterprise liability.

Under the "single-enterprise theory of liability," a company that cooperates with its affiliates to violate the antitrust laws is liable where: (1) it forms a single enterprise with those affiliates; (2) the enterprise's conduct violates the antitrust laws; and (3) the company independently participated in the violation. *Lenox MacLaren*, 847 F.3d at 1230-31, 1234-37. Multiple courts, including one in the Fifth Circuit, have applied this theory of liability. *Chandler v. Phoenix Servs.*, No. 7:19-CV-00014-O, 2020 WL 1848047, at *14 (N.D. Tex. Apr. 13, 2020), *aff'd sub nom. Chandler v. Phoenix Servs., L.L.C.*, 45 F.4th 807 (5th Cir. 2022).

Each of these elements is met here.

### 1.  Welsh Carson and USAP acted as a single enterprise

Affiliated entities share a unity of interest and thus act as a single enterprise for antitrust purposes where one can control the other. *Copperweld*, 467 U.S. at 771-72 (holding that parents and wholly owned subsidiaries have a unity of interest because the parent "may assert full

control at any moment if the subsidiary fails to act in the parent's best interests."); *see also In re Aluminum Warehousing Antitrust Litig.*, 95 F. Supp. 3d 419, 445-46 (S.D.N.Y. 2015) (applying *Copperweld* because firms "had control over" their affiliates); *Rohlfing v. Manor Care, Inc.*, 172 F.R.D. 330, 344 (N.D. Ill. 1997) (parent and two subsidiaries could not conspire because all three were under common control). The ability to control can be shown through a variety of means, including whether a parent has a majority of a subsidiary's voting rights, a right to appoint a majority of the board, or a right to approve or veto particular transactions or personnel decisions. *See, e.g.*, *OJ Commerce, LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1243 (11th Cir. 2022); *Top Rank, Inc. v. Haymon*, No. CV15-4961-JFW, 2015 WL 9948936, at \*3, \*16 & n.13 (C.D. Cal. Oct. 16, 2015). While *Copperweld* focused on a parent company and its wholly owned subsidiary, subsequent cases have found the requisite ability to control between other affiliates—including a private equity firm and its portfolio company. *See, e.g.*, *OJ Commerce*, 34 F.4th at 1242-43.

The complaint plausibly alleges facts showing that Welsh Carson and USAP acted as a single enterprise. Welsh Carson described its own "mandate" as "to be control investors" of USAP. Compl. ¶ 36. From 2012 to 2017, Welsh Carson controlled USAP "in all practical respects." *Id.* It held a majority of the vote among USAP's shareholders—initially by owning 50.2% of USAP and after 2013, by continuing to own near 50% and holding the voting rights for nearly all other shareholders. *Id.* ¶¶ 35-36. During that same time, Welsh Carson held the right to appoint a majority of the board of directors. *Id.* ¶ 36. Welsh Carson chose most of USAP's original management team, *id.* ¶ 38, and had review and approval authority for USAP's acquisitions, *id.* ¶ 101.

Indeed, Welsh Carson all but concedes that it and USAP are a single enterprise when it argues that it cannot conspire with USAP under *Copperweld* because the two "were never

11

'separate economic actors.'" WC Mot. 30. But Welsh Carson "cannot have the *Copperweld* doctrine both ways." *Arandell*, 900 F.3d at 631-32. It cannot "insist both (1) that [it and USAP] are incapable of conspiring with each other . . . because they always share a unity of purpose, and (2) that [Welsh Carson] may escape liability for its own conduct . . . by disavowing" USAP's conduct. *Id.* at 631 (cleaned up).[1]

Welsh Carson's attempt to highlight facts that "counsel[] strongly against any finding of control by the Welsh Carson entities" is unavailing. *See* WC Mot. 8, 24 n.11, 25. First, the fact that Welsh Carson never exercised its right to appoint a majority of the USAP board is irrelevant. Single enterprise status turns on the ability to control, not the actual exercise of control. *Copperweld*, 467 U.S. at 771-72. A private equity firm's power to control its portfolio company, "whether or not apparently exercised on a day-to-day basis, creates a single entity for antitrust purposes." *OJ Commerce*, 34 F.4th at 1243 (quotations omitted). Second, as the Eleventh Circuit recently held, a private equity firm and its portfolio company were a single enterprise even though "decisions relating to [the company's] day-to-day operations are made by [its] own management team." *Id.* Finally, even though Welsh Carson no longer holds a majority voting share of USAP, the ability to control can be shown in a variety of ways. In Welsh Carson's own cited authority, *PostX*, 2005 WL 8177634, at *1, *3 (cited at WC Mot. 29-30), the court found a single enterprise after concluding that a 20% investor held "significant access to and influence" over a company through rights to "consult with and advise management" and to appoint a director or observer to the company's board.

---

[1] Although two cases cited by Welsh Carson, *Top Rank* and *PostX*, apply a somewhat different test to assess unity of interest—i.e., whether the affiliates share aligned interests and are neither actual nor potential competitors, *Top Rank*, 2015 WL 9948936, at *16; *PostX Corp. v. Secure Data in Motion, Inc.*, No. C 02-04483, 2005 WL 8177634, at *3-4 (N.D. Cal. Aug. 17, 2005)—the ultimate inquiry and result remain the same: Welsh Carson and USAP form a "single enterprise" under *Copperweld*.

### 2. Welsh Carson and USAP's single enterprise violates the antitrust laws

Single enterprise liability requires that the collective actions of the enterprise constitute an antitrust violation. *Arandell*, 900 F.3d at 630-32; *Lenox MacLaren*, 847 F.3d at 1237. In this case, the complaint plausibly alleges that Welsh Carson and USAP acted together to monopolize Texas anesthesia markets through acquisitions, price-setting arrangements, and a market allocation agreement. The complaint alleges facts that, if proven true, would establish that the collective conduct of the single enterprise supports claims arising under Sections 1 and 2 of the Sherman Act, and for violations of Section 7 of the Clayton Act and Section 5 of the FTC Act. *See* USAP Opp. Part II.

Welsh Carson is wrong when it asserts that it cannot be liable because it "does not participate" directly in the anesthesia services market and was not "a party to any USAP acquisitions [or] agreements." *See* WC Mot. 17, 26. Welsh Carson need not "independently satisfy every element [of a violation] in order to be held liable" as part of a single enterprise. *Lenox MacLaren*, 847 F.3d at 1236; *see also Jones v. Varsity Brands, LLC*, 618 F. Supp. 3d 713, 724 (W.D. Tenn. 2022) (extending single liability to private equity firm "even if [it] [is] not alleged to have participated in each act or transaction" (internal quotation omitted)). In the single enterprise context, "it is the affiliated corporations' collective conduct . . . that matters." *Lenox MacLaren*, 847 F.3d at 1236; *accord Chandler*, 2020 WL 1848047, at *13. The complaint plausibly alleges facts showing that the actions USAP and Welsh Carson took together violates the antitrust laws.

### 3. Welsh Carson independently participated in the alleged conduct

Liability does not extend automatically to every affiliate of an antitrust violator. To be liable as a part of a single enterprise, an affiliated company must independently participate in the

13

anticompetitive conduct.[2] *See Lenox MacLaren*, 847 F.3d at 1237. A company can independently participate in the anticompetitive conduct of a single enterprise if it controls, directs, or encourages that conduct, *Nobody In Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.* ("*NIPP*"), 311 F. Supp. 2d 1048, 1070 (D. Colo. 2004), or if it directly participates through its "own acts in furtherance," *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670 DMS (MDD), 2022 WL 836951, at *10 (S.D. Cal. Mar. 21, 2022). The affiliated company need not participate in each illegal act or transaction so long as it participates in the exclusionary scheme generally. *See Varsity Brands*, 618 F. Supp. 3d at 724.

The independent participation requirement is not exacting. For example, in *Jones v. Varsity Brands*, the court found sufficient participation where two private equity firms were alleged to have held seats on a portfolio company's board of directors, worked with its leadership to execute an unlawful strategy, and provided the necessary funding for the execution of a monopolization scheme. *Id.* The court held that these allegations supported a plausible inference that the private equity firms independently participated in the anticompetitive scheme "by playing a role in steering the organization, funding acquisitions, and maintaining and expanding [the organization's] market share throughout the years of their ownership." *Id.* at 725. Similarly, in *FTC v. Syngenta Crop Protection AG*, the court found sufficient participation where two parent entities had allegedly "directed, overseen, and approved" a subsidiary's anticompetitive strategy, approved budgets incorporating that strategy, and been involved in negotiating and managing a contract with a competitor that implemented the strategy. No. 1:22-cv-828, 2024 WL

---

[2] Welsh Carson erroneously suggests that it can be liable only if it independently participated in USAP's "day-to-day operations." WC Mot. 25. But the caselaw is clear that the independent participation element concerns the "challenged conduct" and not the operation of the business generally. *Lenox MacLaren*, 847 F.3d at 1237.

149552, at *24-25 (M.D.N.C. Jan. 12, 2024). The court held these allegations sufficed to state a claim against the two parent entities under a single enterprise liability theory. *Id.*[3]

Here, the FTC's complaint plausibly alleges that Welsh Carson participated in the anticompetitive scheme by controlling, directing, and encouraging USAP's conduct. Welsh Carson created USAP to pursue an "anesthesiology consolidation strategy" and Welsh Carson developed the "value maximization plan," branded with Welsh Carson's own logo, that USAP used to acquire competitors and raise prices. Compl. ¶¶ 79-80, 96-99. Each acquisition by USAP had to be documented in "multiple memos/presentation decks" so that it could "be reviewed and approved by Welsh Carson." *Id.* ¶ 101. Throughout, Welsh Carson also held seats on USAP's board of directors and worked side-by-side with its management team, most of whom Welsh Carson had hired. *Id.* ¶¶ 36, 38, 84-85, 96, 124. Welsh Carson provided "$1-2 million" to identify which competitors to acquire. *Id.* ¶ 80. It then funded the ensuing acquisitions with well over a hundred million dollars from Welsh Carson funds and helped USAP secure millions of dollars more in loans. *Id.* ¶¶ 91, 93, 127.

In addition, the complaint plausibly alleges that Welsh Carson directly participated through its own acts in furtherance of USAP's acquisitions, market allocation, and price-setting agreements. Welsh Carson employees furthered the acquisitions by running due diligence on acquisition targets and negotiating deal terms, and they also drafted the "tuck-in" clauses that raised the prices of the lower-cost competitors USAP acquired. *Id.* ¶¶ 39, 81, 101, 124-126, 154. Welsh Carson personnel negotiated USAP's market allocation agreement with Envision and

---

[3] Welsh Carson's cited cases confirm that liability requires participation, not only corporate relatedness. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 376 (M.D. Pa. 2008) (allegations that a parent considered a subsidiary "a valuable asset" did not suffice); *In re Pa. Title Ins. Antitrust Litig.*, 648 F. Supp. 2d 663, 688 (E.D. Pa. 2009) (dismissing where "'[a]pproval and assent' and 'ownership and control' constitute[d] the entirety of the plaintiffs' allegations of parents' participation").

came up with USAP's price-setting arrangement with Baylor College of Medicine as a way to avoid competing for the same hospital contract. *Id.* ¶¶ 200, 211-213. Taken together, these allegations plausibly establish Welsh Carson's participation in the alleged conduct. *See NIPP*, 311 F. Supp. 2d at 1071 (defendant controlled and directed conduct by setting subsidiaries' anticompetitive strategy and requiring reports on its execution); *Syngenta*, 2024 WL 149552, at *24-25; *Varsity Brands*, 618 F. Supp. 3d at 724-25; *Seafood Prods.*, 2022 WL 836951, at *10 (private equity firm "ratif[ying] and encourag[ing]" the alleged anticompetitive conduct plausibly established participation).

Welsh Carson nonetheless claims the complaint fails to "establish the independent conduct of any Welsh Carson entity" because Welsh Carson partner Brian Regan, who was closely involved with the anticompetitive scheme, was also a USAP director. WC Mot. 26-27. To be sure, under the Supreme Court's decision in *United States v. Bestfoods*, "dual-hatted" officers or directors like Regan—that is, individuals with roles at both a parent and its subsidiary—are typically presumed to act for the subsidiary. 524 U.S. 51, 69-70 (1998). But the FTC's allegations amply rebut that presumption with respect to Regan and show that he was acting on behalf of Welsh Carson. Even if that were not the case, the complaint also details extensive involvement by other Welsh Carson employees that were not USAP directors.

First, contrary to Welsh Carson's narrow interpretation (WC Mot. 27), *Bestfoods* made clear that the presumption that a dual-hatted director or officer acts on behalf of the subsidiary can be rebutted in numerous ways and expressly did "not attempt to recite the[m]" all. 524 U.S. at 70 n.13. Courts have thus held that the presumption can be rebutted, for example, where a dual-hatted director or officer "held himself out" as acting on the parent entity's behalf, *Seafood Prods.*, 2022 WL 836951, at *10, or used the parent entity's email address and worked together

with non-dual-hatted parent employees, *Financialapps, LLC v. Envestnet, Inc.*, No. 19-1337-GBW-CJB, 2023 WL 4975373, at *11 (D. Del. July 31, 2023) (recommending denial of motion for summary judgment). Ultimately, determining which of Regan's acts are attributable to Welsh Carson requires "a fact-specific analysis" that is not suitable to resolve on a motion to dismiss. *See Seafood Prods.*, 2022 WL 836951, at *9-10; *Bestfoods*, 524 U.S. at 72-73 & n.14 (remanding for post-trial factfinding on a parent's involvement in affiliate's conduct).

Here, Regan himself repeatedly claimed to act on behalf of Welsh Carson—not USAP—when he signed agreements necessary for the illegal conduct, including the letters of interest and letters of intent to acquire Greater Houston Anesthesiology and Pinnacle Anesthesia Consultants, and a confidentiality agreement for the market allocation with Envision. Compl. ¶¶ 84-85, 126, 211.[4] In addition, the complaint alleges that Regan took actions that were possible *only* in his capacity as a Welsh Carson partner. Before he was even a USAP director, Regan analyzed the "anesthesiology consolidation strategy" and presented it to his fellow partners at Welsh Carson. Compl. ¶¶ 78-80. After becoming a USAP director, he supervised other Welsh Carson personnel and directed them to aid in the consolidation scheme by identifying acquisitions, helping secure financing, and assisting with insurer contract negotiations. *Id.* ¶¶ 37, 93, 213. These allegations of Regan holding himself out as acting on Welsh Carson's behalf and directing Welsh Carson employees to assist in the consolidation scheme are sufficient to show Welsh Carson's participation. *See Seafood Prods.*, 2022 WL 836951, at *10 (denying motion to dismiss where a dual-hatted employee "held himself out" as acting for the parent); *Financialapps*, 2023 WL

---

[4] Welsh Carson questions whether these documents "had anything to do with any violation of the antitrust laws." WC Mot. 26 n.14. But these agreements execute the transactions challenged in the FTC's complaint.

4975373 at *9 (dual-hatted employees worked on parent entity's behalf when they worked with the parent entity's employees "in negotiations and transactions related to the claims at issue").[5]

Second, regardless of Regan's involvement, the complaint alleges that Welsh Carson participated in the alleged conduct through numerous other employees who were never USAP directors. The *Bestfoods* presumption simply "does not apply" to these non-dual-hatted employees. *Union Pac. R.R. Co. v. Oglebay Norton Mins., Inc.*, No. EP-17-CV-47-PRM, 2018 WL 1722175, at *8 (W.D. Tex. Apr. 9, 2018). Welsh Carson employees other than Regan (1) helped secure funding for the USAP consolidation scheme and supervised USAP's management as they developed and executed the scheme, Compl. ¶¶ 93, 96-99, 101; (2) ran due diligence on acquisition targets, *id.* ¶¶ 124-125, 337; (3) negotiated deal terms and drafted insurer contract terms relating to price increases, *id.* ¶¶ 126, 154; and (4) helped negotiate USAP's market allocation agreement with Envision, *id.* ¶ 213. These actions are "of necessity taken only on behalf of," and attributable to, Welsh Carson. *Bestfoods*, 524 U.S. at 72; *see also Seafood Prods.*, 2022 WL 836951, at *9 (*Bestfoods* inapplicable when defendant participates "'through the conduit of its own personnel and management'" (quoting *Bestfoods*, 524 U.S. at 64-65)); *Union Pac. R.R.*, 2018 WL 1722175, at *8. Thus, separate and apart from Regan's actions, the conduct of Welsh Carson's other employees is itself sufficient to establish Welsh Carson's independent participation.

Welsh Carson also erroneously argues that the FTC must allege specific individual participation by each of "the seven distinct Welsh Carson entities" named in the complaint, and

---

[5] The cases relied upon by Welsh Carson are readily distinguishable from the facts alleged here. *See In re Alper Holdings USA, Inc.*, 398 B.R. 736, 750-54 (S.D.N.Y. 2008) (parent company connected to the alleged conduct through only one dual-hatted employee); *Trinity Indus., Inc. v. Greenlease Holding Co.*, No. 08-1498, 2014 WL 1766083, at *7-11 (W.D. Pa. May 2, 2014) (no evidence that any dual-hatted director had held himself out as acting for the parent entity or that any other parent employees had participated in the unlawful conduct).

that treating the entities together constitutes "improper group pleading." WC Mot. 15, 21. "There is an exception to this rule [against group pleading], however, where multiple corporate defendants operate a 'common enterprise.'" *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014); *see also FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1082 (11th Cir. 2021) ("[The] common enterprise theory may [] be used to disregard corporateness when granting injunctive relief."); *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008) (explaining common enterprise doctrine). As the complaint details, the Welsh Carson entities operate as a common enterprise with "a complex maze of related entities." Compl. ¶ 24. They share officers and are under common control. *Id.* ¶ 32. They use the same office space and principal place of business. *Id.* They hold themselves out as one entity, using the same trademarks, the same website (which refers to "Welsh, Carson, Anderson & Stowe" as "the Firm"), and the same mailing instructions. *Id.* And in any event, even if they were not acting as a common enterprise, the complaint alleges enough facts to plausibly establish how each Welsh Carson defendant participated in the alleged violations.[6]

### 4.   Welsh Carson's other arguments fail

Welsh Carson's other attempts to evade liability lack merit.

First, Welsh Carson contradicts the complaint by trying to recast its participation in the alleged scheme as "typical" investment conduct akin to "advisory assistance" or exercising "basic stockholder rights." WC Mot. 24-25; *see also* Am. Invest. Council ("AIC") Br. 2, ECF No. 117. The complaint alleges that Welsh Carson devised a scheme for anticompetitive conduct, directed USAP to execute that scheme, helped it to do so through funding and participation by

---

[6] The Welsh Carson fund defendants—Welsh, Carson, Anderson & Stowe XI and XII, L.P.—provided financing to USAP to implement the consolidation scheme. Compl. ¶¶ 26, 28, 93, 127. The WCAS Associates defendants directed the Welsh Carson fund defendants to do so. *Id.* ¶¶ 27, 29. And the Welsh Carson Management defendants provided and oversaw the personnel that aided USAP. *Id.* ¶¶ 25, 30-31, 33, 39.

Welsh Carson personnel, and profited from the scheme. *See supra* Part I.A.3. These allegations, which must be taken as true at the pleading stage, hardly describe "typical" and "incidental" investment conduct. WC Mot. 24-25. Regardless, "simply because 'everyone else is doing it' is not an absolute defense and does not mean that [a company] can avoid the legal consequences of its actions." *See In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 417 (N.D. Miss. 1995).

Second, Welsh Carson and its *amicus* disregard the complaint's allegations when they wrongly insist that the Commission has singled out Welsh Carson simply for being a private equity firm. WC Mot. 21; AIC Br. 7-9. The conduct alleged in the complaint violates the antitrust laws, and, as Welsh Carson's *amicus* acknowledges, "[p]rivate equity investors have the same obligations as any market actor to abide by the antitrust laws." AIC Br. 10. The FTC simply seeks to hold Welsh Carson accountable for its unlawful behavior.

Finally, Welsh Carson and its *amicus* claim that holding Welsh Carson accountable will threaten "long-settled principles of corporate separateness." WC Mot. 4; AIC Br. 2. Such boilerplate invocations are nothing new, however. *See, e.g.*, *Varsity Brands*, 618 F. Supp. 3d at 724 (noting claim by private equity firms that "corporate separation would be eviscerated" if their motion to dismiss were denied). Courts have repeatedly denied motions to dismiss antitrust claims against defendants for allegedly participating in an affiliate's unlawful conduct, including where those defendants were private equity firms. *See, e.g.*, *id.*; *Seafood Prods.*, 2022 WL 836951, at *10; *In re RealPage, Inc., Rental Software Antitrust Litig.*, No. 3:23-md-03071, 2023 WL 9004808, at *5-6 (M.D. Tenn. Dec. 28, 2023); *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 322-23 (S.D.N.Y. 2003). Because the FTC's allegations plausibly establish Welsh Carson's liability, the same result is warranted here.

**B.    Even if USAP and Welsh Carson did not act as a single enterprise, the complaint plausibly establishes Welsh Carson's liability**

**1.    Welsh Carson is plausibly liable for conspiring to monopolize**

Counts III and VI of the complaint charge Welsh Carson with conspiring with USAP to monopolize the Dallas and Houston hospital-only anesthesia-services markets, which are violations arising under Section 2 of the Sherman Act, 15 U.S.C. § 2. The four elements of a conspiracy to monopolize are: "(1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce." *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Disc. Ctrs., Inc.*, 200 F.3d 307, 316 (5th Cir. 2000) (quotations omitted).

The complaint's allegations satisfy all four of those elements. Welsh Carson specifically intended for USAP to gain "[n]egotiating leverage with commercial payors" by "consolidating practices with high market share" and exclusive contracts with hospitals. Compl. ¶¶ 79, 92. *See Dairy, LLC v. Milk Moovement, Inc.,* No. 2:21-CV-02233 WBS AC, 2023 WL 3437426, at *13 (E.D. Cal. May 12, 2023) (allegations that a firm "acquired competitors" and used "exclusivity contracts" to retain customers sufficed to show specific intent). Welsh Carson formed a conspiracy with USAP to monopolize by creating USAP to pursue an anticompetitive scheme, selecting a CEO familiar with the chosen scheme, and aligning with USAP's executives in strategy documents and planning sessions on how to execute the scheme. Compl. ¶¶ 79, 82, 92, 96-100. Welsh Carson took overt acts in support of that conspiracy, such as providing funding and negotiating transactions. *See supra* Part I.A.3. And Welsh Carson and USAP's conspiracy has substantially affected interstate commerce by driving up the price of anesthesia care, including for multi-state health insurers. *See* Compl. ¶¶ 319-327.

21

Welsh Carson challenges only the second element—the existence of a conspiracy—and only on the basis that it and USAP share a unity of interest and are thus incapable of conspiring. WC Mot. 29-30.[7] To be sure, the complaint plausibly alleges facts showing that USAP and Welsh Carson share a unity of interest, and act as a single enterprise. *See supra* Part I.A.1. To the extent those facts are proven true, Welsh Carson can be held liable as part of the single enterprise. But if Welsh Carson and USAP did not act as a single enterprise, the FTC also alleges facts sufficient to show that they instead conspired to monopolize. Ultimately, whether Welsh Carson and USAP in fact share a unity of interest—and thus whether single enterprise or conspiracy liability is appropriate—is a fact-intensive inquiry not fit for resolution on a motion to dismiss. Because the complaint alleges facts plausibly supporting either form of liability, the Court should decline to dismiss the complaint's conspiracy counts and decide the appropriate basis for liability later, when it can consider a full evidentiary record. *See Cherry Knoll, L.L.C. v. Jones*, 922 F.3d 309, 317 n.14 (5th Cir. 2019) (allowing a plaintiff to proceed on two alternative theories of liability because the Federal Rules "allow[] for alternative pleading").

### 2.   Welsh Carson's conduct plausibly violates Section 7 of the Clayton Act

Separately, the FTC plausibly alleges that the acquisitions detailed in the complaint "may [] substantially [] lessen competition, or [] tend to create a monopoly." 15 U.S.C. § 18; *see* USAP Opp. Part II.B. Welsh Carson can be held independently liable for its role in those acquisitions regardless of whether it directly "acquired any of the anesthesia practices identified in the complaint." WC Mot. 18.

Section 7 bars any "person engaged in commerce" from making prohibited acquisitions "directly or indirectly." 15 U.S.C. § 18. The Clayton Act thus "forbids not only direct

---

[7] Welsh Carson has waived any additional arguments by not presenting them in its moving brief. *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived.").

acquisitions but also indirect acquisitions, whether through a subsidiary or an affiliate *or otherwise*." *Cmty. Publishers, Inc. v. Donrey Corp.*, 882 F. Supp. 138, 140 (W.D. Ark. 1995) (quoting H.R. Rep. No. 81-1191, at 9 (1949)). An entity therefore violates Section 7 if it (1) makes an unlawful acquisition indirectly through "parent/subsidiary relationships, or any other corporate structure" and (2) "had an active role in the acquisition." *See Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 510 (2d Cir. 2004).[8]

The complaint alleges that Welsh Carson controlled, directed, and encouraged USAP's acquisition strategy, directly participated in unlawful acquisitions, and acquired equity indirectly in each of USAP's acquisitions by holding equity in USAP. *See supra* Part I.A.3; Compl. ¶¶ 26, 28. These allegations suffice to state a Section 7 claim against Welsh Carson. *See Cmty. Publishers*, 882 F. Supp. at 140-41 (plaintiff stated Section 7 claim by alleging that a defendant made unlawful acquisitions through an "affiliated corporation[]"); *In re Jim Walter Corp.*, 90 F.T.C. 671, 737-38 (1977), *vacated on other grounds*, 625 F.2d 676 (5th Cir. 1980) (finding Section 7 liability where a parent entity "actively participated in direction of" unlawful acquisitions by its affiliate).

### 3. Welsh Carson's conduct plausibly constitutes a violation arising under Section 1 of the Sherman Act

Courts have found that an investor's conduct facilitating illegal agreements between its affiliate and the affiliate's competitor can violate Section 1 of the Sherman Act, 15 U.S.C. § 1. For instance, in *Reading International, Inc. v. Oaktree Capital Management LLC*, the court denied a motion to dismiss against an investor that allegedly used its 17% stake in the Regal

---

[8] Welsh Carson mischaracterizes Section 7 as barring only the acquisition of "a target competitor." WC Mot. 18. Section 7 prohibits *any* acquisition that "may [] substantially [] lessen competition, or [] tend to create a monopoly," including acquisitions of potential competitors, *see, e.g.*, *FTC v. Meta Platforms Inc.*, 654 F. Supp. 3d 892, 926-27 (N.D. Cal. 2023), or of non-competitors (e.g., vertical mergers), *see Illumina, Inc. v. FTC*, 88 F.4th 1036, 1051-55 (5th Cir. 2023).

movie theater chain to "coordinate" Regal's interactions with a competing chain. 317 F. Supp. 2d at 322-23. Similarly, in a recent decision in the *RealPage, Inc., Rental Software Antitrust Litigation*, the court held allegations showing that a private equity firm was "aware of and exercise[d] some degree of control over" a portfolio company's conspiratorial conduct stated an antitrust claim. 2023 WL 9004808, at *5.

The complaint alleges that USAP's price-setting arrangements and market allocation with Envision are illegal horizontal agreements in restraint of trade. *See* USAP Opp. Part II.C; *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021) (a market allocation agreement in which one firm "pay[s] a potential competitor not to compete is so detrimental to competition that normally it is a *per se* violation of the antitrust laws"). The complaint further alleges that Welsh Carson facilitated USAP's participation in these illegal agreements. As alleged, Welsh Carson partner Brian Regan, claiming to act on behalf of Welsh Carson, negotiated USAP's market allocation agreement with Envision. Compl. ¶ 211. Regan also set into motion USAP's price-setting arrangement with Baylor College of Medicine. *Id.* ¶ 200. In addition, Welsh Carson ran diligence for, and approved, the acquisitions through which USAP inherited its other price-setting arrangements. *Id.* ¶¶ 85-87, 124-126, 186, 194. These allegations suffice to state claims against Welsh Carson arising under Section 1.

Welsh Carson's counterarguments that it did not sign the agreements and is not an actual or potential competitor of USAP are unavailing. First, whether Welsh Carson formally "entered into any" of the price-setting or market allocation agreements is not dispositive. *See* WC Mot. 19. The "absence of [a defendant's] signature from a document does not immunize [it] from antitrust liability" when, as alleged here, it facilitated and ratified the unlawful agreements at issue. *See FTC v. Shkreli*, 581 F. Supp. 3d 579, 638 (S.D.N.Y. 2022); *see also RealPage*, 2023

24

WL 9004808, at *5 (private equity firm could be liable for facilitating Section 1 violations even if it had no "communications or agreements" with portfolio company's co-conspirators). Second, it makes no difference that Welsh Carson itself is not "a competitor in the relevant markets." *See* WC Mot. 19. For the price-setting and market allocation agreements, Welsh Carson facilitated a conspiracy between USAP and a market competitor. Compl. ¶¶ 184, 186, 193-94, 200-02, 214. Welsh Carson can, therefore, be held liable for its participation in the unlawful conspiracies.[9] *See Reading Int'l*, 317 F. Supp. 2d at 322-23 (holding allegations that investor facilitated a conspiracy between competitors stated a claim); *RealPage*, 2023 WL 9004808, at *5 (same).

### 4.   Welsh Carson's conduct plausibly violates Section 5 of the FTC Act

The complaint also states "standalone" claims under Section 5 of the FTC Act, 15 U.S.C. § 45(a)(1), for USAP and Welsh Carson's decade-long implementation of a deliberate and unlawful anesthesia consolidation scheme. While the FTC's Section 5 claims are broader than those arising under the Sherman or Clayton Acts, *see* USAP Opp. Part II.D, they are not unbounded or "too vague" as Welsh Carson wrongly asserts. *See* WC Mot. 20. The standalone Section 5 claim against Welsh Carson is based on Welsh Carson encouraging or facilitating anticompetitive conduct. As the Third Circuit recognized decades ago, "[o]ne who places in the hands of another a means of . . . competing unfairly in violation of the [FTC] Act is himself guilty of a violation of the Act." *Regina Corp. v. FTC*, 322 F.2d 765, 768 (3d Cir. 1963). Moreover, the fact that Welsh Carson is not a "market participant" is not relevant. WC Mot. 20. For example, in *FTC v. Texaco, Inc.*, the Supreme Court upheld the Commission's determination

---

[9] Welsh Carson is liable for violations arising under Section 1 even if it formed a single enterprise—and could not conspire—with USAP. That is because the FTC has "allege[d] a conspiracy that includes a separate entity" besides Welsh Carson: Envision and the three counterparties to USAP's price-setting arrangements. *See Varsity Brands*, 618 F. Supp. 3d at 722 (declining to dismiss Section 1 claim on *Copperweld* grounds where plaintiffs alleged additional conspirators).

that Texaco violated Section 5 by entering into agreements that harmed competition for car tires, batteries and accessories even though Texaco did not compete in that market.[10] *See* 393 U.S. 223, 224, 229-230 (1968). The complaint's allegations that Welsh Carson encouraged and facilitated the anesthesia consolidation scheme by designing, bankrolling, participating in, and profiting from the scheme plausibly state a claim for liability under Section 5.

## II.     The FTC's case is properly in federal court

When "the Commission has reason to believe that any person, partnership, or corporation . . . is violating, or is about to violate" the antitrust laws, it may seek a "permanent injunction" under Section 13(b) of the FTC Act. 15 U.S.C. § 53(b); *see also* USAP Opp. Part I.A. Welsh Carson contends that the complaint fails to meet this standard because it challenges only Welsh Carson's past conduct. WC Mot. 11-12. But this argument misapprehends the relevant legal standards and disregards the complaint allegations. Welsh Carson ignores Fifth Circuit precedent interpreting the "is . . . or is about to" language as requiring allegations that the conduct is ongoing or is likely to recur. The FTC's complaint easily satisfies that standard. Instead, Welsh Carson relies on the Third Circuit's often-distinguished *Shire* decision. But even under that out-of-circuit decision, the FTC's allegations suffice because Welsh Carson's anticompetitive scheme is ongoing.

### A.     The complaint satisfies Section 13(b) because it plausibly alleges reason to believe that Welsh Carson is or is about to violate the law

In *FTC v. Southwest Sunsites*, the Fifth Circuit held that the FTC can satisfy Section 13(b)'s "is violating, or is about to violate" requirement by alleging facts that give a "fair

---

[10] Welsh Carson's cited authority is not to the contrary. *See* 15 U.S.C. § 45(a)(1) (prohibiting any unfair method of competition "in or affecting commerce"); *Off. Airline Guides, Inc. v. FTC*, 630 F.2d 920, 926 (2d Cir. 1980) (declining to infer that a defendant's conduct had "anticompetitive motive or intent" since it "engaged in a different line of commerce").

inference of a reasonable expectation of continued violations." 665 F.2d 711, 723 (5th Cir. 1982). "Just as in *Sunsites*," the FTC here has "evidence of a large-scale [ ] scheme with intact infrastructure at the initiation of the litigation." *FTC v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020); *see also FTC v. Vyera Pharms., LLC*, 479 F. Supp. 3d 31, 44 (S.D.N.Y. 2020) ("The FTC is not required to bring suit at the exact moment contractual negotiations ripen into executed contracts. It is the extant scheme that provides the basis for the lawsuit."). As described in greater detail in the FTC's opposition to USAP's motion to dismiss, the complaint alleges that USAP continues to hold the illegally acquired practices, uses the resulting leverage to raise prices, and shares its profits with Welsh Carson. *See* USAP Opp. Part. I.B. Although Welsh Carson cherry-picks allegations from the complaint to claim that its conduct is "long-past", WC Mot. 11-12, it does not seriously dispute that the scheme it devised and implemented remains in place and that it continues to reap the rewards of the ongoing scheme. The complaint allegations satisfy the *Sunsites* standard. Indeed, Welsh Carson points to no case, and the FTC is aware of none, in which an FTC complaint challenging an ongoing scheme has been dismissed as improperly brought under Section 13(b).

Moreover, even if Welsh Carson's violations had ceased, "[c]ourts in the Fifth Circuit have concluded that allegations of past conduct can give rise to a reasonable inference of current or future violations, either in conjunction with other circumstances or where the past violations are extensive." *FTC v. Neora LLC*, 552 F. Supp. 3d 628, 637 (N.D. Tex. 2021) (collecting cases); *see also Educare,* 433 F. Supp. 3d at 1014 ("Following *Sunsites*, when applying § 13(b), district courts have analyzed whether the surrounding circumstances—in addition to the past violations alleged—create a reasonable expectation that violations will continue.").[11] The

---

[11] This "likelihood of recurrence" standard is the same standard used to evaluate whether a permanent injunction should issue. *See Neora*, 552 F. Supp. 3d at 637.

likelihood of recurrence analysis generally involves consideration of six factors:

> [1. T]he egregiousness of the defendant's actions, [2.] the isolated or recurrent nature of the infraction, [3.] the degree of scienter involved, [4.] the sincerity of the defendant's assurances against future violations, [5.] the defendant's recognition of the wrongful nature of his conduct, and [6.] the likelihood that the defendant's occupation will present opportunities for future violations.

*United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008) (quoting

*SEC v. Blatt*, 583 F.2d 1325, 1334 n.29 (5th Cir. 1978)); *see, e.g.*, *Neora,* 552 F. Supp. 3d at 638.

The FTC's allegations amply establish a likelihood of recurrence under the *Cornerstone Wealth* factors. First, Welsh Carson designed and implemented a "large-scale systematic scheme," *see Sunsites*, 665 F.2d at 723, that has lasted more than a decade, allowing Welsh Carson to profit by nearly $350 million at the expense of Texan consumers. Compl. ¶ 337. Second, Welsh Carson's conduct is recurrent. Not only did Welsh Carson repeatedly expand USAP's reach into new parts of Texas, it has also sought to repeat its conduct in other physician practice areas. *Id.* ¶ 339. Third, Welsh Carson acted with scienter: it founded USAP with the express purpose of anticompetitively consolidating anesthesia markets and overcharging consumers. *Id.* ¶¶ 79-80. Fourth and fifth, Welsh Carson has not provided *any* assurances against future violations or expressed any contrition. Instead, in its motion, it tries to avoid culpability by recasting itself as a mere passive investor and re-attributing the conduct of its own executive Brian Regan to USAP. WC Mot. 26-27. Sixth, Welsh Carson "remain[s] in positions that present[] opportunities for continued violations." *Educare*, 433 F. Supp. 3d at 1015. As a major investor in health care companies, it has the blueprint, finances, and personnel to continue this scheme not only in Texas anesthesia markets but in other health care markets across the country. *See* Compl. ¶¶ 23, 36-40, 336-39.

Welsh Carson largely ignores this caselaw, claiming that the Fifth Circuit's likelihood of recurrence test is "plainly not the statutory standard under Section 13(b)." WC Mot. 14. It asks the Court instead to follow an out-of-circuit decision, *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 149 (3d Cir. 2019), and require the FTC to allege that harm is "imminent" rather than likely to recur. WC Mot. 11, 14. But *Southwest Sunsites* is longstanding, "binding Fifth Circuit authority which takes a different approach from the *Shire* court to this issue." *Educare*, 433 F. Supp. 3d at 1013 & n.1 ("[T]he *Sunsites* court's § 13(b) standard is not dictum, but is a holding that binds this Court."); *see also Neora*, 552 F. Supp. 3d at 637 ( "[T]he Fifth Circuit in *Sunsites* applied the standard in an FTC enforcement case . . . .").[12] And Welsh Carson's lone authority from this circuit, *FTC v. AdvoCare Int'l L.P.*, confirms that the FTC may "state a plausible claim under Section 13(b) by showing that a past violation or series of past violations is likely to recur" and endorses the use of the *Cornerstone Wealth* factors. No. 4:19-CV-715-SDJ, 2020 WL 6741968, at *6 (E.D. Tex. Nov. 16, 2020) (cited at WC Mot. 14). Indeed, that court emphasized that the FTC may proceed under Section 13(b) when "the channels of misconduct utilized by the defendants remain[] open," meaning that they are "free and clear of government sanction" preventing the recurrence of the illegal conduct. *Id.* That is precisely what the FTC alleges here.

### B. The FTC alleges sufficient facts to prevail under *Shire*

Even under *Shire* (which is not the law in the Fifth Circuit), the FTC pleads sufficient facts that Welsh Carson "is" or is "about to" violate the law to proceed under Section 13(b*). Shire* did not adopt the "imminence" standard that Welsh Carson urges. Indeed, the Third Circuit

---

[12] Other courts outside of the Third Circuit have also rejected *Shire* and agreed with the Fifth Circuit's view that showing "that illegal conduct is likely to recur is the same as showing that someone 'is violating' or 'is about to violate' the law." *FTC v. Walmart Inc.*, No. 22-cv-3372, 2023 WL 2646741, at *21 (N.D. Ill. Mar. 27, 2023); *accord FTC v. Roomster Corp.*, 654 F. Supp. 3d 244, 258 (S.D.N.Y. 2023); *United States v. MyLife.com, Inc.*, 499 F. Supp. 3d 757, 767 (C.D. Cal. 2020); *FTC v. Hornbeam Special Situations, LLC*, 391 F. Supp. 3d 1218, 1223 (N.D. Ga. 2019).

"expressly did not opine on what *would* satisfy a showing of 'about to violate' under § 13(b)."

*Neora*, 552 F. Supp. 3d at 637. Instead, the *Shire* court "emphasized the factual confines" of its

ruling, and subsequent courts have frequently distinguished *Shire* on factual grounds. *Educare*,

433 F. Supp. 3d at 1016. The facts here bear little resemblance to those in *Shire*. In *Shire*, the

challenged conduct had undisputedly stopped five years earlier, the company that had engaged in

it had been acquired, and the conduct at issue was limited to a single drug with no realistic

prospect of being repeated. 917 F.3d at 160. By contrast, the unlawful scheme here is ongoing;

Welsh Carson is still invested in it; and the complaint alleges ample reason to believe Welsh

Carson will continue to direct and participate in the anticompetitive consolidation scheme with

USAP or in other healthcare markets. In similar circumstances, another district court analyzing

*Shire* held that two individuals were proper defendants because they "designed and

implemented" an anticompetitive system "and that system remains in place." *Vyera*, 479 F.

Supp. 3d at 45.

Welsh Carson's other main authority, *FTC v. Facebook, Inc.* (cited at WC Mot. 11-13),

also confirms that the FTC is properly in federal court. *See* 560 F. Supp. 3d 1 (D.D.C. 2021). As

discussed in greater detail in the FTC's opposition to USAP's motion to dismiss, the *Facebook*

court specifically held that "contrary to the company's main contention, an injunction under

Section 13(b) is a theoretically available remedy in a Section 2 challenge to long-ago mergers so

long as the defendant still holds the purchased assets or stock." 560 F. Supp. 3d at 32. Here, too,

USAP continues to hold the acquired companies, and Welsh Carson, through its equity in USAP,

also holds a stake in those companies. They therefore continue to violate the law by "holding"

these companies, "not just 'obtaining' them in the first place." *Id.* at 31 (quoting *United States v.*

*ITT Cont'l Baking Co.*, 420 U.S. 223, 241-42 (1975)); *see* USAP Opp. Part I.B.1.

30

### III.      The FTC has the authority to bring this action

Binding precedent forecloses Welsh Carson's argument that the Commissioners' protection from removal is unconstitutional. As Welsh Carson acknowledges, "the Supreme Court upheld the constitutionality of the FTC['s]" removal restrictions in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). WC Mot. 32. Welsh Carson nonetheless contends that the 1973 FTC Act Amendments in which Congress delegated the Commission new "executive" powers to seek injunctive relief in federal district court undercut the holding of *Humphrey's Executor*. *See* WC Mot. 32. But the Fifth Circuit squarely rejected this argument just last month in *Illumina, Inc. v. FTC*: "[A]lthough the FTC's powers may have changed since *Humphrey's Executor* was decided, the question of whether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court, not us, to answer." 88 F.4th at 1047. This Fifth Circuit decision, like *Humphrey's Executor* before it, is binding on this Court.[13]

Even if there were a constitutional problem, the remedy here would be to remove the "for cause" protection from the FTC Act, which would not affect this case. Since the Commissioners were "properly appointed," as shown below, an unconstitutional restriction on the President's removal power can void the agency's action only if the restriction itself caused harm. *See Collins*, 141 S. Ct. at 1787-88. As the Fifth Circuit explained, that is a high standard: a litigant must show that the President wanted to remove a Commissioner but believed he could not do so because of the removal restriction in the statute. *See Collins v. Dep't of Treasury*, 83 F.4th 970,

---

[13] Further, the Supreme Court has repeatedly declined to overrule *Humphrey's Executor*. *See e.g., Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2198 n.2 (2020) (considering and rejecting arguments to overrule); *Collins v. Yellen*, 141 S. Ct. 1761, 1783 (2021) (noting that in *Seila Law*, the Court "did 'not revisit [its] prior decisions allowing certain limitations on the President's removal power'") (quoting *Seila Law*, 140 S. Ct. at 2197); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 496 (2010) (similar).

982 (5th Cir. 2023) (affirming dismissal of removal claims). Welsh Carson does not and cannot make this showing.

Welsh Carson likewise is wrong in arguing that Section 13(b), rather than the Commissioner removal provisions, should be invalidated.[14] WC Mot. 34-35. There is no reason to believe that Congress would have preferred an FTC stripped of its 13(b) enforcement powers to an FTC "whose members are removable at will." *Free Enter.*, 561 U.S. at 513; *see Seila Law*, 140 S. Ct. at 2207-211. In both *Free Enterprise Fund* and *Seila Law*, the Supreme Court severed the unconstitutional removal provisions from the statute, rather than ordering the agencies to cease their enforcement activities. *Free Enter.*, 561 U.S. at 508-510; *Seila Law*, 140 S. Ct. at 2207-211. Here, similarly, even if the FTC Commissioners' removal protections were unconstitutional, the remedy would be to sever those provisions, leaving the agency's grant of authority—and this lawsuit—in place. *See Space Expl. Techs., Corp. v. Bell*, No. 1:23-cv-00137, 2023 WL 8885128, at *5 (S.D. Tex. Nov. 8, 2023) (declining to enjoin ALJ proceedings where severance would make ALJs accountable to the President). That is especially true here because the FTC Act contains an express severability clause. 15 U.S.C. § 57; *see Seila Law*, 140 S. Ct. at 2209 ("When Congress has expressly provided a severability clause, our task is simplified."). Multiple courts have adopted this reasoning in declining to dismiss FTC cases in which defendants asserted similar claims. *See Syngenta*, 2024 WL 149552, at *27 (rejecting argument that Section 13(b), rather than the removal provisions, should be invalidated); *FTC v. Kochava,*

---

[14] Welsh Carson's argument that the Department of Justice can substitute for the FTC's antitrust enforcement mission, WC Mot. 34-35, directly contradicts Congress's intention in creating the FTC: it desired an independent body charged with enforcing antitrust law, which the DOJ is not. *See Humphrey's Ex'r*, 295 U.S. at 625 (discussing the Senate's view that the FTC should be independent of executive authority to free it from "political domination or control," unlike "existing department[s] of the government").

*Inc.*, No. 2:22-CV-00377-BLW, 2023 WL 3249809, at *12 (D. Idaho May 4, 2023) (same);

*Walmart*, 2023 WL 2646741, at *25-26 (same).

Finally, Welsh Carson also attacks the constitutionality of the requirement that the President shall appoint at most three FTC Commissioners from the same political party. WC Mot. 32 (citing 15 U.S.C. § 41). But the sole requirements in the text of the Appointments Clause are appointment by the President with the advice and consent of the Senate. *See Buckley v. Valeo*, 424 U.S. 1, 132 (1976). Welsh Carson does not dispute this or argue that the President did not follow this process. Accordingly, "[t]he Commissioners were constitutionally appointed[.]" *Walmart*, 2023 WL 2646741 at *26.

## CONCLUSION

For the foregoing reasons, the Court should deny Welsh Carson's Motion to Dismiss.

Dated:  January 19, 2024

Respectfully submitted,

/s/ Kara Monahan
Kara Monahan
  Attorney-in-Charge
  NJ Bar No. 011392010 (*Pro Hac Vice*)
Bradley S. Albert (*Pro Hac Vice*)
Michael J. Arin (*Pro Hac Vice*)
Daniel W. Butrymowicz (*Pro Hac Vice*
  pending)
Timothy Grayson (*Pro Hac Vice*)
Dylan Herts (*Pro Hac Vice*)
Leah P. Hubinger (*Pro Hac Vice*)
Patrick Kennedy (*Pro Hac Vice*)
Neal Perlman (*Pro Hac Vice*)
Gary H. Schorr (*Pro Hac Vice*)
Eric. M. Sprague (*Pro Hac Vice*)

600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Tel: (202) 326-2018
Email: kmonahan@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused the foregoing Plaintiff Federal Trade

Commission's Opposition to the Welsh Carson Entities' Motion to Dismiss, Proposed Order, and

Appendix of Authorities in this opposition to be served on all counsel of record using the ECF

system of the United States District Court for the Southern District of Texas.

Dated: January 19, 2024                  _/s/ Kara Monahan_____
                                         Kara Monahan
                                         Attorney-in-Charge
                                         NJ Bar No. 011392010 (*Pro Hac Vice*)
                                         600 Pennsylvania Avenue, N.W.
                                         Washington, DC 20580
                                         Tel: (202) 326-2018

                                         *Counsel for Plaintiff*
                                         *Federal Trade Commission*