**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

---

**FEDERAL TRADE COMMISSION,**

        **Plaintiff,**

        **v.**

**U.S. ANESTHESIA PARTNERS, INC., et al.,**

        **Defendants.**

---

**Case No.: 4:23-CV-03560-KH**

 

**Appendix to
Plaintiff Federal Trade Commission's Opposition to
the Welsh Carson Entities' Motion to Dismiss**

# Table of Contents

## Cases

*Chandler v. Phoenix Servs.*,
  No. 7:19-CV-00014-O, 2020 WL 1848047 (N.D. Tex. Apr. 13, 2020) ..................................3

*Dairy, LLC v. Milk Moovement, Inc.*,
  No. 2:21-CV-02233 WBS AC, 2023 WL 3437426 (E.D. Cal. May 12, 2023)......................17

*Financialapps, LLC v. Envestnet, Inc.*,
  No. 19-1337-GBW-CJB, 2023 WL 4975373 (D. Del. July 31, 2023)..................................31

*FTC v. AdvoCare Int'l, LP*,
  No. 4:19-CV-715-SDJ, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020)...............................47

*FTC v. Kochava, Inc.*,
  No. 2:22-CV-00377-BLW, 2023 WL 3249809 (D. Idaho May 4, 2023)..............................53

*FTC v. Syngenta Crop Prot. AG*,
  No. 1:22-cv-828, 2024 WL 149552 (M.D.N.C. Jan. 12, 2024)...........................................71

*FTC v. Walmart Inc.*,
  No. 22-cv-3372, 2023 WL 2646741 (N.D. Ill. Mar. 27, 2023)  ...........................................99

*In re Jim Walter Corp.*, 90 F.T.C. 671 (1977) ...........................................................................132

*In re Packaged Seafood Prod. Antitrust Litig.*,
  No. 15-MD-2670 DMS (MDD), 2022 WL 836951 (S.D. Cal. Mar. 21, 2022) ..................170

*In re RealPage, Inc., Rental Software Antitrust Litig.*,
  No. 3:23-md-03071, 2023 WL 9004808 (M.D. Tenn. Dec. 28, 2023)................................181

*PostX Corp. v. Secure Data in Motion, Inc.*,
  No. C 02-04483, 2005 WL 8177634 (N.D. Cal. Aug. 17, 2005)  ........................................187

*Space Expl. Techs., Corp. v. Bell*,
  No. 1:23-cv-00137, 2023 WL 8885128 (S.D. Tex. Nov. 8, 2023) ......................................193

*Top Rank, Inc. v. Haymon*,
  No. CV15-4961-JFW, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ................................203

*Trinity Indus., Inc. v. Greenlease Holding Co.*,
  No. 08-1498, 2014 WL 1766083 (W.D. Pa. May 2, 2014)  .................................................222

*Union Pac. R.R. Co. v. Oglebay Norton Mins., Inc.*,
  No. EP-17-CV-47-PRM, 2018 WL 1722175 (W.D. Tex. Apr. 9, 2018)  ...........................236

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

2020 WL 1848047
United States District Court, N.D.
Texas, Wichita Falls Division.

Ronald CHANDLER, et al., Plaintiffs,

v.

PHOENIX SERVICES, et al., Defendants.

Civil Action No. 7:19-cv-00014-O

|

Signed 04/13/2020

**Attorneys and Law Firms**

Theodore G. Baroody, Carstens & Cahoon, LLP, Dallas, TX, Don Ross Malone, Malone Law Firm, Vernon, TX, for Plaintiffs.

DeVan V. Padmanabhan, Pro Hac Vice, Britta S. Loftus, Pro Hac Vice, Paul J. Robbennolt, Pro Hac Vice, Padmanabhan & Dawson P.L.L.C., Minneapolis, MN, for Defendants.

**MEMORANDUM OPINION AND ORDER**

Reed O'Connor, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are Plaintiffs Ronald Chandler's, Chandler Manufacturing, LLC's, Newco Enterprises, LLC's, and Supertherm Heating Services, LLC's (collectively, the "Chandler Plaintiffs") Motion for Partial Summary Judgment, Brief in Support, and Appendix in Support (ECF Nos. 61–63), filed February 13, 2020; Defendants Phoenix Services, LLC's and Mark H. Fisher's (collectively, the "Phoenix Defendants") Response, Brief in Support, and Appendix in Support (ECF Nos. 67–69), filed March 5, 2020; and the Chandler Plaintiffs' Reply (ECF No. 73), filed March 14, 2020. Also before the Court are the Phoenix Defendants' Motion for Summary Judgment, Brief in Support, and Appendix in Support (ECF Nos. 64–66), filed February 14, 2020; the Chandler Plaintiffs's Response, Brief in Support, and Appendix in Support (ECF Nos. 70–72), filed March 6, 2020; and the Phoenix Defendants' Reply and Appendix in Support (ECF Nos. 74–75), filed March 20, 2020. Having considered the motions, briefing, and applicable law, the Court **DENIES** the Chandler Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** the Phoenix Defendants' Motion for Summary Judgment.[1]

The Chandler Plaintiffs do not have standing to bring their claims against the Phoenix Defendants. Moreover, the Chandler Plaintiffs' claims are barred by the Clayton Act's four-year statute of limitations, and no exception applies to toll the limitations period. Finally, the Chandler Plaintiffs cannot establish Phoenix's or Fisher's liability for HOTF's allegedly anticompetitive conduct. Accordingly, the Chandler Plaintiffs' claims for *Walker Process* fraud and sham patent litigation are **DISMISSED with prejudice.**

**I. FACTUAL BACKGROUND**

After years of litigation regarding the validity and enforcement of 🚩 United States Patent No. 8,171,993 (the "'993 Patent"), the Federal Circuit affirmed the District of North Dakota's finding that the 🚩 '993 Patent is unenforceable due to patent owner Heat On-The-Fly's ("HOTF") inequitable conduct. *See Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291 (Fed. Cir. 2018). Relying on the Federal Circuit's ruling, the Chandler Plaintiffs then brought *Walker Process* fraud and sham patent litigation claims against the Phoenix Defendants. *See* First Am. Compl., ECF No. 23. The Chandler Plaintiffs allege that Phoenix and Fisher—HOTF's parent company and CEO, respectively—are liable for HOTF's and their own unlawful attempts to exploit the 🚩 '993 Patent and unlawfully gain monopoly power. *See id.* To adjudicate the parties' cross motions for summary judgment, the Court must first return to " 'the heart' of both this antitrust litigation ... and several related patent-infringement suits"—the acquisition and enforcement of the 🚩 '993 Patent. *Chandler v. Phoenix Servs., LLC*, 419 F. Supp. 3d 972, 977 (N.D. Tex. 2019) (quoting First Am. Compl. ¶ 11, ECF No. 23).

**A. HOTF Acquisition and Enforcement of the 🚩 '993 Patent**

**\*2** In 2006, HOTF founder Ransom Mark Hefley created a fracking [2] process to heat water "on demand or inline" or, as HOTF puts it, to heat water "on-the-fly." First Am. Compl. ¶ 11, ECF No. 23. HOTF began using the process on fracking jobs Hefley claimed were "experimental." Pls.' App. Supp. Resp. 17, ECF No. 72. When, on September 18, 2009, Hefley filed an application to patent his "Water Heating Apparatus for Continuous Heated Water Flow and Method for Use in Hydraulic Fracturing," Defs.' App. Supp. Resp. 155, ECF No. 69, Hefley knew he was required to "file within one year" of

2020-1 Trade Cases P 81,180

inventing the process, Pls.' App. Supp. Resp. 14, ECF No. 72. *See also* 35 U.S.C. § 102. Yet, when Hefley filed the first application for the 🚩'993 Patent, he failed to disclose the sixty-one frack jobs completed more than a year earlier. *See* Defs.' Br. Supp. Mot. Summ. J. 2, ECF No 65 (citing First Am. Compl. P 11, ECF No. 23); Pls.' App. Supp. Resp. 9, 14, ECF No. 72. On May 8, 2012, the United States Patent and Trademark Office ("USPTO") approved and issued the 🚩'993 Patent. Defs.' App. Supp. Resp. 155, ECF No. 69.

During September and October of 2013, HOTF determined that at least seventeen companies were using the patented process without obtaining licenses. Pls.' App. Supp. Mot. Partial Summ. J. 80–113, ECF No. 63. HOTF sent these non-licensed companies cease-and-desist letters stating that HOTF "received information that certain water heating contractors providing water heating services and equipment to [the companies] may be infringing the 🚩'993 Patent" and "ask[ing] that [the companies] undertake the necessary steps to ensure that any possible infringement by [their] water heating contractors or subcontractors ceases." Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66.

Hess Corporation ("Hess"), Supertherm's largest customer, received one such letter. *Id.* Hess informed Supertherm of the letter and continued to hire Supertherm to perform in-line frack water-heating jobs. *Id.* at 55, 117, 208. But Hess also hired two to three additional non-licensed vendors and gradually decreased its work with Supertherm. Pls.' App. Supp. Resp. 329, ECF No. 72. Supertherm was eager to make up the lost business, but it declined to perform jobs for new clients due to fear of potential patent-infringement litigation. *Id.* at 331. Supertherm went out of business in May of 2016, stating "[a] general business decline in that area ma[de] it impossible to justify keeping the office open." Defs.' App. Supp. Mot. Summ. J. 233, ECF No. 66.

### B. Phoenix's Purchase of HOTF and Continued Enforcement of the 🚩'993 Patent

On January 31, 2014, nearly two years after the 🚩'993 Patent issued, Phoenix acquired HOTF. *Id.* at 6. HOTF became a subsidiary of Phoenix Consolidated Oilfield Services, LLC ("Phoenix Consolidated"), which is fully owned by Phoenix. *Id.* at 2. As a Phoenix subsidiary, HOTF is a member-managed limited liability company, meaning "the Board of Directors can direct the business and affairs of, and make decisions

for" HOTF. Pls.' Br. Supp. Resp. 138, ECF No. 72. Fisher has remained the head of all three companies, and he and Danny Shurden ("Shurden"), the vice president of Phoenix, are the only two remaining officers of HOTF. Defs.' App. Supp. Mot. Summ. J. 4, ECF No. 66. Thus, though "Heat On-The-Fly legally still exists, ... it's controlled by Phoenix Services." Pls.' Br. Supp. Mot. Partial Summ. J. 11, ECF No. 62 (emphasis omitted) (quoting Pls.' App. Supp. Mot. Partial Summ. J. 132, ECF No. 63). Phoenix's, Phoenix Consolidated's, and HOTF's finances are all encompassed by a single financial statement. Pls.' App. Supp. Mot. Partial Summ. J. 177, ECF No. 72. Phoenix Consolidated funds HOTF—including by paying its attorneys' fees—because HOTF "has always been [in] a negative cash position" since the acquisition. *Id.* at 88.

**\*3** Under HOTF's new structure and leadership, HOTF and Phoenix employees continued discussions about the enforcement and validity of the 🚩'993 Patent. On February 8, 2014, Fisher emailed one of HOTF's licensees to suggest "having a meeting to discuss the near future of HOTF" and assuring the licensee, "we think very highly of the value of the Patent, and plan to enforce it vigorously." Pls.' Br. Supp. Mot. Partial Summ. J. 8, ECF No. 62 (citing Pls.' App. Supp. Mot. Partial Summ. J. 58–60, ECF No. 63). He signed the email, "Mark Fisher CEO Phoenix Services, LLC." *Id.* During his deposition, Fisher stated that he would "certainly" try to capture the highest market share possible. *Id.* at 9 (quoting Pls.' App. Supp. Mot. Partial Summ. J. 61, ECF No. 63).

On March 10, 2014, a licensee complained to Fisher, Shurden, Cole, and the HOTF attorneys about several non-licensed companies infringing the 🚩'993 Patent. Pls.' App. Supp. Resp. 78, ECF No. 72. "Other heating providers ... have no regard for the patent," the licensee wrote. *Id.* The licensee claimed its non-licensed competitors were "ruining the frac water heating business and ... making [licensees] look like [they we]re gouging [their] customers when [they] charge[d] standard market rates." *Id.* Given the licensee was "losing work from customers who use[d non-licensed competitors]," the licensee worried that "the longer this [went] on the harder it w[ould] be to get that work back." *Id.*

The patent litigation also continued under Phoenix's ownership. On July 14, 2014, HOTF filed a counterclaim in *Newco Enterprises, LLC v. Super Heaters North Dakota, LLC*, 7:14-CV-87-O [hereinafter *Newco*], alleging that Chandler and Newco had "been actively and knowingly

2020-1 Trade Cases P 81,180

inducing infringement of the 🚩993 Patent" by their customers. Defs.' App. Supp. Mot. Summ. J. 46, ECF No. 66. On October 24, 2014, the *Energy Heating* plaintiffs sought to amend their complaint—adding, for the first time, a claim that the 🚩'993 Patent was unenforceable due to Hefley's and HOTF's inequitable conduct. *Id.* at 118–29. HOTF also added claims for patent infringement against Energy Heating and against Supertherm in December 2014. *Newco*, 7:14-CV-87-O; *Energy Heating*, 4:13-CV-10-RRE-ARS.

Even after the Federal Circuit affirmed the 🚩'993 Patent's invalidity, HOTF and Phoenix continued to assert the 🚩'993 Patent. "The website of Phoenix Services, LLC, incorporated a logo for 'Heat On The Fly®' that referred to [the 🚩'993 Patent] ... from in or around February 2018 through approximately January 29, 2019." Pls.' App. Supp. Mot. Partial Summ. J. 27, ECF No. 72; *see also* Defs.' App. Supp. Mot. Summ. J. 149–52, ECF No. 66 (website screenshots). And the *Newco* patent-infringement claims remain stayed but pending in this Court.

## II. LEGAL STANDARD

### A. Summary Judgment

The Court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is not "a disfavored procedural shortcut," but rather an "integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." 📁 *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

"[T]he substantive law will identify which facts are material." 📁 *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the court of the basis of its motion and demonstrate from the record that no genuine dispute as to any material fact exists. *See* 📁 *Celotex*, 477 U.S. at 323. "The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

**\*4** When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant. *See* 📁 *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. 📁 *Anderson*, 477 U.S. at 255. If there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the court must deny the motion. 📁 *Id.* at 250.

### B. The Sherman Antitrust Act

#### 1. Standing

"Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." 📁 *Sanger Ins. Agency v. HUB Int'l, Ltd.*, 802 F.3d 732, 737 (5th Cir. 2015) (internal citation omitted). "Although the question of causation is generally a factual question for the jury, a court should direct a verdict where the plaintiff has failed to present substantial evidence that defendant's illegal practices were a material cause of plaintiff's injuries." *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 485 (5th Cir. 2000) [hereinafter *Taylor*] (internal citation omitted). "Though jury inferences of causation are in some cases permissible, 'the required causal link must be proved as a matter of fact with a fair degree of certainty.' " 📁 *El Aguila Food Prods., Inc. v. Gruma Corp.*, 131 F. App'x 450, 454 (5th Cir. 2005) [hereinafter *El Aguila*] (quoting 📁 *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 317 (5th Cir. 1978)). This is "especially so" when plaintiffs are damaged by other "salient factors distinct from the challenged conduct." *Id.*

#### 2. Statute of Limitations

Under the Clayton Act's statute of limitations, an antitrust plaintiff must file its complaint within four years of the date the cause of action accrued. *See* 📁 15 U.S.C. § 15(b); *Bell v. Dow Chem. Co.*, 847 F.2d 1179, 1186 (5th Cir. 1988). The

Case 4:23-cv-03560　Document 120-2　Filed on 01/19/24 in TXSD　Page 6 of 247

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

date of accrual is factual; therefore, to prevail on summary judgment, a defendant must establish there is no genuine issue regarding when the statute of limitations accrued. *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1170 (5th Cir. 1979).

The Fifth Circuit recognizes three exceptions to toll the Sherman Act's statute of limitations: (1) fraudulent concealment; (2) damages not initially ascertainable; and (3) continuing violation. *See id.*; *Kaiser Alum. & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1051 (5th Cir. 1982) [hereinafter *Kaiser*]. To demonstrate a defendant's fraudulent concealment, "an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that [it] failed, despite the exercise of due diligence on [its] part, to discover the facts that form the basis of [its] claim." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169. To prove that damages are not ascertainable, plaintiffs must prove that both the *existence* and the *amount* of damages are uncertain. *See Delta Produce, L.P. v. H.E. Butt Grocery Co.*, No. SA-12-CA-353, 2013 WL 12121118, at *4 (W.D. Tex. Jan. 17, 2013). And to invoke a continuing violation, a new injurious act must occur and its damages must be recoverable. *See Zenith Radio Corp. v. Hazeltine Res., Inc.*, 401 U.S. 321, 338 (1971) [hereinafter *Zenith*].

### 3. *Walker Process* Patent Fraud

**\*5**　To establish antitrust liability based on the unlawful enforcement of a patent, a claimant must either (1) "prove that the asserted patent was obtained through knowing and willful fraud within the meaning of *Walker Process*," or (2) "demonstrate that the infringement suit was a mere sham." *In re Indep. Serv. Orgs. Antitrust Litig.*, 203 F.3d 1322, 1326 (Fed. Cir. 2000) (internal citation omitted). The Supreme Court in *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corporation*, 382 U.S. 172 (1965) established that "the enforcement of a patent procured by fraud on the Patent Office may be violative of [§] 2 of the Sherman Act." *Id. at 174*. To succeed on a *Walker Process* claim, a plaintiff must prove two elements: (1) "the antitrust-defendant obtained the patent by knowing and willful fraud on the patent office and maintained and enforced that patent with knowledge of the fraudulent procurement" and (2) the plaintiff can satisfy "all other elements necessary to establish a Sherman Act monopolization claim." *TransWeb, LLC v. 3M Innovative Props. Co.*, 812 F.3d 1295, 1306 (Fed. Cir. 2016). As to the first element, the Supreme Court "made clear that the invalidity of the patent [i]s not sufficient; a showing of intentional fraud in its procurement [i]s required." *Ritz Camera & Image, LLC v. SanDisk Corp.*, 700 F.3d 503, 506 (Fed. Cir. 2012). As to the second, "the Court incorporated the rules of antitrust law generally. As Justice Harlan stated in his concurring opinion, 'as to this class of improper patent monopolies, antitrust remedies should be allowed room for full play.' " *Id.* (citing *Walker Process*, 382 U.S. at 180 (Harlan, J., concurring)).

Under § 2 of the Sherman Act, a defendant may be liable for monopolization, attempt to monopolize, or conspiracy to monopolize. *15 U.S.C. § 2*. When the plaintiff alleges monopolization, a court must "focus on the harm done, in the form of a monopolization which the defendant willfully creates or maintains," but when a plaintiff alleges attempted monopolization, the court must instead "focus on the harm that potentially *might* have been caused by the conduct in light of the state of the market." *Taylor*, 216 F.3d at 474 (emphasis added). "[T]o demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "The first element considers the conduct, the second looks to the motivation behind the conduct, and the third looks to the defendant's market power and commensurate ability to lessen or destroy competition in that market." *Taylor*, 216 F.3d at 474 (internal citation omitted). When the third, "dangerous probability" element is at issue, "courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.

### 4. Sham Patent Litigation

A plaintiff may also base its claim for antitrust liability on an allegation that defendant engaged in sham patent litigation. *Cf. Tyco Healthcare Grp. LP v. Mut. Pharm. Co., Inc.*, 762 F.3d 1338, 1343 (Fed. Cir. 2014) (noting that

while, "[a] party is ordinarily exempt from antitrust liability for bringing a lawsuit against a competitor ... [t]here is a recognized exception ... for 'sham litigation' " (internal citation omitted)). Indeed, antitrust law precludes a purported patent owner from "bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed" when "the litigation is conducted for anti-competitive purposes."

*C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1368 (Fed Cir. 1998). In *Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.* (*PRE*), 508 U.S. 49 (1993), the Supreme Court established the two-part test for "sham" litigation: "(1) the lawsuit must be objectively meritless such that 'no reasonable litigant could expect success on the merits' and (2) it must be found that 'the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor." ' " *C.R. Bard*, 157 F.3d at 1368 (quoting *PRE*, 508 U.S. at 60). Because "[f]raud in the procurement of a patent is governed by *Walker Process* ... the complainant 'must still prove a substantive antitrust violation.' " *Id.* (quoting *PRE*, 508 U.S. at 61).

## III. ANALYSIS

### A. Standing

**\*6** The Chandler Plaintiffs have failed to present substantial evidence that HOTF's or the Phoenix Defendants' own alleged antitrust violations were a material cause of Supertherm's business losses. Accordingly, they do not have standing to pursue their *Walker Process* and sham litigation claims for lost-profit damages.

"Standing to pursue an antitrust suit exists only if a plaintiff shows: 1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Sanger Ins. Agency*, 802 F.3d at 737 (internal citation omitted). The Phoenix Defendants raise only the first issue, claiming the Chandler Plaintiffs cannot prove that HOTF's unlawful conduct caused Supertherm to gradually lose business from its largest customer and eventually go out of business.

"Although the question of causation is generally a factual question for the jury, a court should direct a verdict where the plaintiff has failed to present substantial evidence that the defendant's illegal practices were a material cause of

plaintiff's injuries." *Taylor*, 216 F.3d at 485 (internal citation omitted); *see also H&B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978) ("To succeed, an antitrust plaintiff must show the defendants' wrongful actions materially contributed to an injury to the plaintiff's business, and must provide some indication of the amount of damage done."). In some instances, the jury can infer facts to establish causation, but "the required causal link must be proved as a matter of fact with a fair degree of certainty." *Blue Bird Body Co.*, 573 F.2d at 317. This is "especially so" when plaintiffs are damaged by other "salient factors distinct from the challenged conduct." *El Aguila*, 131 F. App'x at 454 (requiring more when there was "increased competition" and the plaintiffs refused to mitigate damages); *see also Taylor*, 216 F.2d at 485 (holding that the plaintiff "had to establish a tighter connection between the behavior and the damages" because the plaintiff "concededly also lost customers (i.e., suffered damage)" for reasons unrelated to the antitrust violation). And "[w]hen the fact of injury is in issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely." *H&B*, 577 F.2d at 247 (internal citation omitted).

In September 2013, HOTF sent a cease-and-desist letter to Hess, implying that Supertherm, its only in-line frack water-heating provider, was violating the ⚑'993 Patent. Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66. Hess immediately told Supertherm about the cease-and-desist letter; but following a brief conversation, Hess and the Chandler Plaintiffs never again discussed the letter or the ⚑'993 Patent. *Id.* at 55–69, 207–08. Over the next three years, Hess gradually reduced its work with Supertherm and hired other non-licensed vendors to complete some of its frack jobs. Pls.' App. Supp. Resp. 326–31, ECF No. 72. But Hess never hired HOTF or any of its licensees. Defs.' App. Supp. Mot. Summ. J. 147, ECF No. 66. Supertherm "tr[ied] to replace the business from Amerada Hess with other customers," but due to the cease-and-desist letter to Hess and pending lawsuits against other non-licensed companies, Supertherm was " 'scared' and 'hiding in the shadows.' " Pls.' Br. Supp. Resp. 21, ECF No. 71 (citing Pls.' App. Supp. Resp. 326–27, 330–31, ECF No. 72). This fear allegedly led Supertherm to decline business from other prospective in-line fracking customers. *Id.*

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 8 of 247

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

**\*7**   After the District of North Dakota concluded that the 🚩'993 Patent was unenforceable due to inequitable conduct, neither Supertherm nor the other Chandler Plaintiffs reached out to Hess to ask for more work. Defs.' App. Supp. Mot. Summ. J. 66–67, ECF No. 66. And by the end of 2015 and beginning of 2016, the market for oil bottomed out. *See id.* at 58, 217–18, 224–25, 231–32. In 2016, Supertherm ceased operations and sent out a memorandum stating that it was shutting down due to lack of business in the field. *Id.* at 57, 233.

The Chandler Plaintiffs provide evidence that HOTF sent Hess a cease-and-desist letter in 2013 and that Supertherm went out of business in 2016, but they do not provide evidence of any "causal link." 🚩 *Blue Bird Body Co.,* 573 F.2d at 317. If Hess was in fact influenced by the cease-and-desist letter, it would have stopped working with Supertherm and instead hired HOTF or a licensee authorized to use the patented process. It did neither. Instead, it defied HOTF's instructions—continuing to work with Supertherm and hiring other non-licensed vendors. Moreover, though Supertherm's manager testified he was scared to complete fracking projects for new customers, a plaintiff's deposition testimony cannot be the sole piece of "substantial evidence." *See* 🚩 *H&B,* 577 F.2d at 247 (internal citation omitted) ("When the fact of injury is at issue, the isolated self-serving statements of a plaintiff's corporate officers may not provide substantial evidence upon which a jury can rely."). Because Supertherm was also damaged by "salient factors distinct from the challenged conduct," 🚩 *El Aguila,* 131 F. App'x at 454—namely, the fluctuating oil market and increase in competition among non-licensed fracking providers—the Chandler Plaintiffs must "establish a tighter connection between the behavior and the damages," *Taylor,* 216 F.2d at 485. Viewing the evidence in the light most favorable to the Chandler Plaintiffs, they are unable to establish the necessary causal connection.

Without proving HOTF's cease-and-desist letter caused Supertherm's monetary damages, the Chandler Plaintiffs cannot satisfy the standing elements with regard to their claims for lost profits. Accordingly, the Court holds that the Chandler Plaintiffs lack standing to pursue these claims. Nevertheless, the Chandler Plaintiffs do have standing to pursue their *Walker Process* and sham patent litigation claims for fees expended in defending against HOTF's patent-infringement claims.

**B. Statute of Limitations**

Pursuant to the Clayton Act's four-year statute of limitations, the Chandler Plaintiffs must present evidence sufficient to prove either (1) a specific injurious act occurred within four years of the suit's inception or (2) an exception applies to toll the limitations period. *See* 🚩 15 U.S.C. § 15(b); *Bell,* 847 F.2d at 1186. At the summary-judgment stage, the Phoenix Defendants must prove there is no genuine issue of material fact regarding the date of accrual. 🚩 *In re Beef Indus. Antitrust Litig.,* 600 F.2d at 1170. If the Phoenix Defendants meet this initial burden, the burden shifts to the Chandler Plaintiffs to establish the applicability of a tolling doctrine. *See id.* Because the Chandler Plaintiffs' filed this suit on January 29, 2019, they must present evidence of a specific injurious act that the Phoenix Defendants or HOTF took on or after January 29, 2015. The Phoenix Defendants have established that the only two allegedly injurious acts occurred outside the limitations period, and the Chandler Plaintiffs have not established that an exception tolls the limitations period. Thus, the Chandler Plaintiffs' *Walker Process* fraud and sham patent litigation claims are barred as untimely.

1. Acts Within the Limitations Period

**\*8**   In their First Amended Complaint, the Chandler Plaintiffs pleaded three allegedly injurious acts: (1) HOTF's sending a cease-and-desist letter to Supertherm's largest customer, (2) HOTF's assertion of patent-infringement claims against the Chandler Plaintiffs, and (3) Phoenix's advertisement of the 🚩'993 Patent on its website. The first two actions occurred outside the limitations period, and the third is not actionable.

On September 13, 2013, HOTF sent Hess a cease-and-desist letter, ordering the company to "undertake the necessary steps to ensure that any possible infringement by [its] water heating contractors or subcontractors ceases." Defs.' App. Supp. Mot. Summ. J. 43, ECF No. 66. HOTF sent this letter—as well as the cease-and-desist letters to the other sixteen non-licensed vendors—more than four years before the Chandler Plaintiffs filed this suit. *Id.* at 80–113. "[A] newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *TCA Bldg. Co. Nw. Res. Co.,* 861 F. Supp. 1366, 1377 (S.D. Tex. 1994) (quoting 🚩 *Poster Exch. v.*

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 9 of 247

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

*Nat'l Screen Serv. Corp.*, 517 F.2d 117, 128 (5th Cir. 1975)). In this case, though the Chandler Plaintiffs allege the letter continued to harm Supertherm, the gradual decline in work is merely an "inertial consequence." *Id.* The injurious action itself occurred on September 13, 2013, when Hess received the letter and began decreasing its business to Supertherm.

Then, on July 18, 2014, HOTF filed patent-infringement claims against Newco and Chandler. Defs.' App. Supp. Mot. Summ. J. 46–47, ECF No. 66. HOTF added a claim against Supertherm on December 22, 2014. *Newco*, 7:14-CV-87-O. "Any injury ... resulting from the continued prosecution [of the lawsuit] relates back to the initial decision to file." *Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1274 (5th Cir. 1991) (internal citation omitted); *see also Internet Corporativo S.A. de C.V. v. Bus. Software All., Inc.*, No. Civ.A.H-04-2322, 2004 WL 3331843, at *5 ("The Fifth Circuit has specifically addressed the accrual of a cause of action based on allegations that the filing and prosecution of litigation violated the antitrust laws, rejecting the application of the continuing violation exception." (citing *Al George*, 939 F.2d 1271)). Thus, any injuries stemming from the litigation occurred on July 18, 2014 and December 22, 2014, when HOTF filed the patent-infringement claims against the Chandler Plaintiffs.

Finally, from January 2018 to January 2019, the Phoenix Defendants posted the HOTF logo in association with the '993 Patent on the Phoenix website. Pls.' App. Supp. Resp. 27, ECF No. 72. Unlike the first two actions, this action did occur within the limitations period. However, the Chandler Plaintiffs present no claim nor other evidence showing they were injured by the website. Rather, Supertherm CFO and the Chandler Plaintiffs' Rule 30(b)(6) designee Reanna Chandler Jones admitted that the Chandler Plaintiffs were *not* injured by the Phoenix Defendants' website. Defs.' App. Supp. Mot. Summ. J. 49–51, ECF No. 66. Because the action did not injure any plaintiff, it too may not be used as a specific act for purposes of the statute of limitations. *See Rx.com v. Medco Health Sol., Inc.*, 322 F. App'x 394, 396 (5th Cir. 2009).

## 2. Tolling the Limitations Period

**\*9** Both alleged injuries occurred outside the limitations period, so the Chandler Plaintiffs must show that one of three exceptions applies to toll the statute of limitations. The Chandler Plaintiffs argue that each of the Fifth Circuit's three exceptions applies: (1) fraudulent concealment; (2) damages

not initially ascertainable; and (3) continuing violation. Pls.' Br. Supp. Resp. 1–26, ECF No. 71 (citing *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169; *Kaiser*, 677 F.2d at 1051). Each argument fails.

### a. *Fraudulent Concealment*

"Fraudulent concealment tolls the Clayton Act's statute of limitations." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1169. To avail itself of the fraudulent-concealment exception, "an antitrust plaintiff must show that the defendants concealed the conduct complained of, and that [it] failed, despite the exercise of due diligence on [its] part, to discover the facts that form the basis of [its] claim." *Id.* The Chandler Plaintiffs may be able to prove that the Phoenix Defendants actively concealed HOTF's conduct, but the Chandler Plaintiffs cannot prove that they did not discover the facts that form the basis of their claims.

The Phoenix Defendants argue that the Chandler Plaintiffs may not raise the fraudulent-concealment argument because they did not plead the defense nor facts to support application of the defense. Defs.' Br. Supp. Mot. Summ. J. 8, ECF No. 65. The Chandler Plaintiffs need not have pleaded the defense, but they did need to plead the fraudulent facts with particularity. *See* FED. R. CIV. P. 9(b); *Colonial Penn. Ins. Co. v. Market Planners Ins. Agency*, 1 F.3d 374, 376 & n.2 (5th Cir. 1993); *Tangela Levels v. Merlino*, 969 F. Supp. 2d 704, 721 (N.D. Tex. 2013). The Chandler Plaintiffs only pleaded two relevant and potentially fraudulent facts with particularity: (1) the '993 Patent inventor's failure to "disclose any of the 61 frac jobs to the Patent Trademark Office ('PTO') during prosecution as potential on-sale or public uses of the invention that might have triggered the on-sale bar," and (2) HOTF's threatening of the Chandler Plaintiffs' customers via cease-and-desist letters. First Am. Compl. ¶¶ 12, 14, ECF No. 23.

The Chandler Plaintiffs argue that the Federal Circuit's holding that the '993 Patent is unenforceable due to inequitable conduct, and that the infringement claim was asserted in bad faith ... is ample evidence of acts by Defendants to conceal this *antitrust* cause of action, not merely an action based on inequitable conduct." Pls.' Br. Supp. Resp. 8, ECF No. 71. They also argue "there is further documentary evidence that the fraudulent nature of

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

the patent prosecution and the subsequent enforcement of the '993 Patent was expressly concealed by HOTF and its lawyers." *Id.* The record evidence does suggest HOTF and its attorneys knew of and actively concealed the prior use from the USPTO. *See* Pls.' App. Supp. Resp. 16–18, 21, 24, 573–81, 588–91, 597, ECF No. 72. And though the Phoenix Defendants differentiate between concealment from plaintiffs and concealment from third parties, Defs.' Reply 3, ECF No. 74, Fifth Circuit case law does not make this distinction. *See, e.g.,* State of Texas v. Allan Constr. Co., Inc., 851 F.2d 1526, 1529 (5th Cir. 1988) [hereinafter *Allan Construction*] (discussing affirmative acts of fraudulent concealment generally, not just as to the plaintiffs). Thus, a jury could find that this act constitutes an "affirmative act[ ] of concealment." *Id.* (internal citation omitted).

**\*10** However, the Chandler Plaintiffs cannot show that they did not and could not discover the actionable conduct through due diligence. Throughout the litigation, the Chandler Plaintiffs' counsel was in regular communication with patent-plaintiff Energy Heating's counsel. *See* Defs.' App. Supp. Mot. Summ. J. 131, ECF No. 66 (stating Energy Heating's counsel "was involved in very similar litigation and so it was helpful to talk to him about what he was experiencing in that litigation."). "Plaintiffs' privilege log shows extensive communications with Energy Heating's counsel," including "53 emails alone starting in starting in early September, right before Energy Heating sought to amend its complaint." Defs.' Br. Supp. Mot. Summ. J. 9–10, ECF No. 65 (internal emphasis omitted) (citing Defs.' App. Supp. Mot. Summ. J. 132–33, ECF No. 66).

On December 4, 2014, Energy Heating amended its complaint to add the inequitable-conduct claim. It listed "[s]pecific invalidating prior art public use and on-sale projects" as its invalidity contentions. *Id.* at 10 (quoting Defs.' App. Supp. Mot. Summ. J. 136, ECF No. 66). Given the Chandler Plaintiffs' knowledge of the *Energy Heating* litigation and their interactions with counsel, the Chandler Plaintiffs are presumed to be aware of the contents of the amended complaint and, therefore, aware of the actionable conduct. *Cf.* Allan Constr., 851 F.2d at 1533 (presuming the plaintiffs had knowledge of the basis for claims asserted in "a nearly identical antitrust claim against the same defendants[, which] had been filed several years earlier in California"). But even without the presumption of knowledge, the Chandler Plaintiffs would be unable to invoke the fraudulent-concealment exception because they have not and cannot

prove they "failed, *despite the exercise of due diligence* on [their] part, to discover the facts that form the basis of [their] claim[s]." In re Beef Indus. Antitrust Litig., 600 F.2d at 1169 (emphasis added).

Moreover, were the Court to accept the Chandler Plaintiffs' contention that they were unaware of the actionable conduct until the District of North Dakota issued its inequitable-conduct ruling, a key concession would still undercut their fraudulent-concealment argument. In their Response to the Phoenix Defendants' Motion for Summary Judgment, the Chandler Plaintiffs state they "*agree* with Defendants that actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants ... until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71 (emphasis in original). If the Phoenix Defendants did not know of their actionable conduct until the district court found it unlawful, they would not have the ability to fraudulently conceal it.

Finally, within their fraudulent-concealment argument, the Chandler Plaintiffs make two arguments based on fairness. First, they contend "[t]here is at least a triable issue of fact as to the reasonableness of tolling the statute of limitations as to Plaintiffs based on fraudulent concealment to further investigate a complex antitrust claim based on *Walker Process* fraud and sham litigation." *Id.* at 16. The Chandler Plaintiffs note they filed suit on January 29, 2019—only four years and about five weeks after HOTF filed the patent-infringement suit—and they argue a jury should consider whether Supertherm, "an unsophisticated 'Mom and Pop' family-run oilfield manufacturing and services business in Wichita Falls, Texas ... exercised sufficient due diligence as to both the *Walker Process* patent fraud claim and the sham patent litigation claim." *Id.* But they do not cite a single case in support of this argument, and they do not tie "reasonableness" to fraud. The Chandler Plaintiffs also argue that "[a]dequate notice to Plaintiffs of facts necessary to support an *antitrust* claim is a far more complex issue than even just the already complex issue of an inequitable conduct counterclaim." *Id.* (emphasis in original). They discuss details about the market share covered by the '993 Patent, which they did not discover until 2016. *See id.* at 17–19. But this argument also fails for two reasons. First, there is no indication that the Phoenix Defendants "fraudulently concealed" details regarding their engagement with the market or market power. And second, even if they did, the Chandler Plaintiffs did not

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 11 of 247

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

plead this at all—much less with the particularity required under 🚩 Rule 9(b). *See generally* First Am. Compl., ECF No. 23

**\*11** Each of the Chandler Plaintiffs' arguments regarding fraudulent concealment is unavailing. Thus, this exception does not toll the statute of limitations.

### b. *Damages Not Yet Ascertainable*

The Chandler Plaintiffs also contend the statute of limitations should be tolled because their damages were not ascertainable when HOTF sent Plaintiff Supertherm its cease-and-desist letter and when HOTF filed its patent-infringement claims against the Chandler Plaintiffs. *See* Pls.' Br. Supp. Resp. 20–22, ECF No. 71. They argue "Supertherm's damage claim thus did not accrue until the damages could be ascertained, which began in May, 2016 with the failure of the business." *Id.* at 22. But while Supertherm could not have known the exact amount of lost profits, it did know of their existence.

Antitrust plaintiffs may recover both past and future damages. *See* 🚩 *Zenith,* 401 U.S. at 338. "The fact that the act may inflict damages in the future, as opposed to at the time the acts are committed, does not prevent the cause of action from accruing." 🚩 *Astoria Entm't, Inc. v. Edwards,* 159 F. Supp. 2d 303, 316 (E.D. La. 2001) (quoting Julian O. van Kalinowski, Peter Sullivan & Maureen McGuirl, 8 ANTITRUST LAWS AND TRADE, § 162.02[1], at 162–5 (citations omitted)). Rather, to prove that damages are not ascertainable, plaintiffs must prove that both the *existence* and the *amount* of damages are uncertain. *See Delta Produce, L.P.,* 2013 WL 12121118, at \*4.

The Chandler Plaintiffs knew they were financially damaged as soon as Hess reduced its business with Supertherm. Thus, they knew damages existed well before January 2015, even if they did not yet know the monetary amount. In *Delta Produce,* the Western District of Texas considered nearly identical facts and concluded the damages-not-initially-ascertainable exception did not apply. 2013 WL 12121118, at \*4 ("While the amount of damages may have been speculative, the injury itself, assuming Delta's allegations are true, was not. Delta alleges that it first sustained injury in 2002, when it was prevented from selling products to an HEB competitor. Thus, Delta's cause of action under Section One of the Sherman Act is barred by limitations."). The Phoenix Defendants argue

this Court should do the same, as "[u]nder Plaintiffs' theory, if Supertherm has never gone out of business, Plaintiffs could wait to file suit indefinitely, always alleging that their damages were 'not ascertainable' because its business was ongoing." Defs.' Reply 10–11, ECF No. 74.

The Court finds the *Delta Produce* court's holding and the Phoenix Defendants' reasoning persuasive. Accordingly, the damages-not-yet-ascertainable exception does not apply.

### c. *Continuing Violation*

Finally, the Chandler Plaintiffs also argue the continuing-violation exception applies. They state that "[t]he key question is whether some injurious act actually occurred during the limitations period." Pls.' Br. Supp. Resp. 22, ECF No. 71 (quoting *Eurotec Vertical Flight Sols., LLC v. Safran Helicopter Engines S.A.S.,* No. 3:15-CV-3454, at \*14 (N.D. Tex. Aug. 1, 2019) (emphasis omitted)). And they contend "[t]he answer to this question for purposes of HOTF's conduct is 'yes' for two reasons: (1) HOTF filed a Response to the USPTO on April 13, 2015 in a reexamination proceeding ... and (2) in February, 2018 through January 29, 2019, Defendant Phoenix Services modified its website to reference the 🚩 '993 Patent and offer licensing." *Id.* at 22–23. However, these acts do not constitute continuing violations.

**\*12** There are two restrictions to the continuing-violation exception, both of which foreclose its application here. First, the act must actually injure the plaintiffs. *See* 🚩 *Edwards,* 159 F. Supp. 2d at 316 ("The key to this exception is that plaintiff itself, not some other third party, was injured by the continuing conspiratorial conduct."). Second, plaintiffs can only recover damages caused by the new act; the new act does not revive old damages occurring before the limitations period. *See* 🚩 *Zenith,* 401 U.S. at 338 ("In the context of a continuing conspiracy to violate the antitrust laws, ... each time plaintiff is injured by an act of the defendants, a cause of action accrues to him to recover those damages *caused by that act* and that, as to *those* damages, the statute of limitations runs from the commission of the act." (emphasis added)).

The Chandler Plaintiffs pleaded three allegedly injurious acts: (1) HOTF's sending the cease-and-desist letter to Hess, (2) HOTF filing patent-infringement claims against the Chandler Plaintiffs, and (3) Phoenix advertising the 🚩 '993 Patent

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 12 of 247

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

on its website. *See* Am. Compl. ¶¶ 14, 15, 19, ECF No. 23. As discussed, the first two indisputably occurred before the limitations period and the Chandler Plaintiffs were not injured by the third. *See supra* Section III.B.1. The only potentially injurious act occurring within the limitations period is HOTF's response to the USPTO. But the Chandler Plaintiffs did not plead the response in their Amended Complaint. *See generally* First Am. Compl., ECF No. 23. In fact, "[t]his is a brand new allegation." Defs.' Reply 14, ECF No. 74. And regardless, "[t]here is no evidence ... that this document caused any injury to the Plaintiffs. None of the Plaintiffs' deposition witnesses cited the reexamination as causing injury to the Plaintiffs, instead pointing solely [to] the cease and desist letter and litigation filings." *Id.* So, even if the Court did find that the response constituted a violation, it could not revive the actual damages—all of which allegedly stem from the cease-and-desist letter and patent-infringement claims. *See* ⚑*Zenith*, 401 U.S. at 338.

Thus, the continuing-violation exception also does not apply to toll the statute of limitations. Because none of the three exceptions applies, the Sherman Act's four-year statute of limitations bars the Chandler Plaintiffs *Walker Process* fraud and sham patent litigation claims.

## C. The Phoenix Defendants' Liability for HOTF's Conduct

Even if the Chandler Plaintiffs had standing and their claims were not barred by the statute of limitations, the Court would grant summary judgment in favor of the Phoenix Defendants because neither Phoenix nor Fisher may be held liable for HOTF's alleged antitrust violations. The Chandler Plaintiffs admit that they "*agree* with Defendants that actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants ... until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71 (emphasis in original). Given this concession, Phoenix and Fisher cannot be held liable under the applicable single-enterprise and the corporate-officer standards of liability.

### 1. Single-Enterprise Liability

Whether a parent may be liable for the attempted monopolization of its subsidiary is an issue of first impression in the Fifth Circuit. Accordingly, the Court looks to the single-enterprise-liability standard advanced by the Ninth Circuit

and the Tenth Circuit—the only two federal circuits to have addressed the issue. ⚑*Arandell Corp. v. Centerpoint Energy Servs.*, 900 F.3d 623 (9th Cir. 2018); ⚑*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221 (10th Cir. 2017) [hereinafter *Lenox*]. The Court finds the *Arandell Corp.* and *Lenox* opinions persuasive and, in adopting their approach, concludes that Phoenix may not be held liable for HOTF's allegedly anticompetitive conduct.

**\*13** Both circuits' opinions rely on the Supreme Court's opinion in ⚑*Copperweld Corporation v. Independence Tube Corporation*, 467 U.S. 752 (1984). In *Copperweld*, the Supreme Court concluded that a parent cannot conspire with its subsidiary in violation of § 1 of the Sherman Act. ⚑*Id.* at 771–72. The Supreme Court reasoned:

> [T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act. A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one. They are not unlike a multiple team of horses drawing a vehicle under the control of a single driver. With or without a formal "agreement," the subsidiary acts for the benefit of the parent, its sole shareholder.

*Id.* "For these reasons, the Court held that 'the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise.' " ⚑*Lenox*, 847 F.3d at 1233 (quoting ⚑*Copperweld*, 467 U.S. at 771). In the context of conspiracy claims, several courts have "held that affiliated entities which must be treated as a single enterprise for purposes of § 1 also must be treated as a single enterprise for purposes of ⚑§ 2." ⚑*Id.* at 1235 (collecting cases).

12

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 13 of 247

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

The Tenth Circuit was the first circuit court to address whether *Copperweld*'s reasoning also applies to 🚩 § 2 Sherman Act claims for monopolization or attempted monopolization. *See generally id.* "[A]lthough *Copperweld* did not expressly reach this issue, [the Tenth Circuit] conclude[d] *Copperweld*'s reasoning necessarily denounces [the defendants'] belief that [the plaintiff] could directly establish its non-conspiracy 🚩 § 2 claims only by proving that '*specific* Defendants' independently satisfied each necessary element of the claims." 🚩 *Id.* at 1236 (emphasis in original). Rather, the court reasoned, "in a single-enterprise situation, it is the affiliated corporations' collective conduct—i.e., the conduct of the *enterprise* they jointly compose—that matters; it is the *enterprise* which must be shown to satisfy the elements of a monopolization or attempted monopolization claim." *Id.* (emphasis in original) (citing 7 Phillip E. Areeda & Herbert Hovencamp, *Antitrust Law* ¶ 1464g, at 227 (3d ed. 2008) ("[A] single entity can violate 🚩 § 2 if the prerequisites of monopolization or attempted monopolization are met.")). "To hold otherwise—to require that each affiliated defendant independently satisfy every element in order to be held liable—would be difficult to justify ... in part because the enterprise they form 'is fully subject to § 2 of the Sherman Act.' " *Id.* (quoting 🚩 *Copperweld*, 467 U.S. at 776–77). And rejection of the single-enterprise theory "would all but eviscerate the statute with respect to sophisticated competitors," like Phoenix. *Id.* "So long as a corporation spreads its anticompetitive scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability, it could unlawfully monopolize with impunity." *Id.* The Tenth Circuit says "*Copperweld* forecloses this result." *Id.*

**\*14** The Ninth Circuit became the second circuit to address the issue, and it agreed with the Tenth Circuit's interpretation of *Copperweld*. *See* 🚩 *Arandell Corp.*, 900 F.3d 623 (Bea, J.). The Ninth Circuit noted that "Supreme Court precedent establishes that 'a parent and a wholly owned subsidiary *always* have a "unity of purpose" ' and thus act as a 'single enterprise' whenever they engage in 'coordinated activity.' " 🚩 *Id.* at 625 (citing 🚩 *Copperweld*, 467 U.S. 752). The court further reasoned that "[i]t would be inconsistent to insist" that, though the parent and subsidiary " 'always' share a 'unity of purpose,' " one can nevertheless escape liability "by disavowing the anticompetitive intent of the other, even where the two acted together." 🚩 *Id.* at 631–32. Accordingly,

Judge Bea, writing for the unanimous panel, concluded that "*Copperweld* supports the following rule: A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purpose of the single 'economic unit' of which it is a part." 🚩 *Id.* at 632.

The Phoenix Defendants do not address *Copperweld, Lenox,* or *Arandell Corp.*. Rather, they claim that "[b]ecause the Fifth Circuit has not recognized a single enterprise theory of antitrust liability, the Plaintiffs' claims against Phoenix are not viable." Defs.' Br. Supp. Resp. 5, ECF No. 68. And they reference, without explanation, the Texas Supreme Court's rejection of the theory in the context of tort claims. *Id.* (citing 🚩 *SSP Partners v. Gladstrong Invest. (USA) Corp.*, 275 S.W.3d 444 (Tex. 2008)). Given that both *Walker Process* and sham patent litigation are federal claims, and that the only two federal circuits to review the issue have endorsed the single-enterprise theory under like circumstances, the Phoenix Defendants' reliance on a state supreme court provides a weak refutation. Thus, the Court follows the Ninth and Tenth Circuit's lead and applies the single-enterprise theory of liability.

But the Court must also determine how to apply this theory—an issue that the appellate courts did not resolve. It is well established that a parent cannot be held liable for the anticompetitive conduct of its subsidiary "merely by virtue of its place in the same corporate family." 🚩 *Lenox*, 847 F.3d at 1237. Indeed, "*Copperweld* 'held that only "the coordinated activity" of [related entities] must be viewed as that of a single enterprise.' " *Id.* (quoting 🚩 *Copperweld*, 467 U.S. at 771). Thus, a plaintiff is "still required to come forward with evidence that each defendant independently participated in the enterprise's scheme, to justify holding that defendant liable as part of the enterprise." *Id.* But how involved must the parent-defendant be?

In *Lenox*, after observing that no circuit had "provided a clear answer to the question of what level of involvement is sufficient to meet that burden," the Tenth Circuit looked to two district court cases, in which the courts concluded that, "[w]hen the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 14 of 247

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

Act." *Id.* at 1237–38 (quoting *Climax Molybdenum Co. v. Molychem, LLC*, 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005) (quoting *Nobody in Particular Presents, Inc. v. Clear Channels Comm'cns, Inc.*, 311 F. Supp. 2d 1048, 1071 (D. Colo. 2004) [hereinafter *Nobody in Particular*])). Because the Tenth Circuit could resolve the issue on other grounds, it left the issue's "resolution for another day ... [and] express[ed] no opinion" on the test. *Id.* at 1239. Given this is still "uncharted territory at the federal circuit level," the Court applies the Colorado district courts' "control, dictates or encourages" test. *Id.* (internal citations omitted).

This brings the Court back to the Chandler Plaintiffs' concession, that "actual notice of facts to support a *Walker Process* fraud claim did not arise as to either Plaintiffs or Defendants ... until January 2016 when the District Court made its inequitable conduct finding." Pls.' Br. Supp. Resp. 15, ECF No. 71. The Chandler Plaintiffs argue that HOTF's inequitable conduct also satisfies the first two Sherman Act elements. Pls.' Br. Supp. Mot. Partial Summ. J. 4–5, ECF No. 62 (citing *TransWeb, LLC*, 812 F.3d at 1307). The Phoenix Defendants concede that when "the party that engaged in inequitable conduct is the same party that subsequently asserts the patent, it makes sense to hold that the inequitable conduct finding also established the 'anticompetitive conduct' and 'specific intent to monopolize' requirements." Defs.' Br. Supp. Resp. 19, ECF No. 68. Here, however, HOTF engaged in the inequitable conduct, but the Chandler Plaintiffs intend to hold Phoenix liable for asserting the patent.

**\*15** To be liable for its subsidiary's conduct, a parent must engage in "coordinated activity," *Copperweld*, 467 U.S. at 771, to "purposely advance the very same scheme ... for an illegal, anticompetitive purpose," *Arandell Corp.*, 900 F.3d at 631. Without knowledge that HOTF was engaging in inequitable conduct when it sent the seventeen cease-and-desist letters and filed several patent-infringement claims against non-licensed competitors, Phoenix could not have purposely "control[led], dictate[d] or encourage[d]" HOTF's anticompetitive conduct by continuing to enforce the '993 Patent. *Nobody in Particular*, 311 F. Supp. 2d at 1071. *Contra id.* at 1069 ("To conclude that a parent can direct and require anticompetitive conduct of its subsidiaries, like any principal directing the conduct of an agent, and then escape antitrust liability by hiding behind the

separate corporation is counterintuitive."). And the Chandler Plaintiffs provide no evidence that Phoenix shared HOTF's "intention of monopolizing the relevant market." *Climax Molybdenum Co.*, 414 F. Supp. 2d at 1013. Thus, given Phoenix's lack of knowledge, intent, and involvement in HOTF's injurious acts, Phoenix may not be held liable as part of a single enterprise.

### 2. Individual Liability

For similar reasons, Fisher also cannot be held liable for HOTF's anticompetitive conduct. In its Memorandum Opinion and Order denying Defendants' Motion to Dismiss, the Court addressed the issue of Fisher's potential individual liability. *Chandler*, 419 F. Supp. 3d at 986–89. There, the Court applied the reasoning from *MVConnect, LLC v. Recovery Database Network, Inc.*, No. 3:10-CV-1948, 2011 WL 13128799 (N.D. Tex. May 27, 2011). In *MVConnect*, this Court held that "a corporate officer or director can be held personally liable for damages arising out of an anti-trust violation where he participated in the unlawful acts, or where he acquiesced or ratified the actions of other officers or agents of the corporation which were in violation of the anti-trust law." *Id.* at \*10. The "essential principle" necessary to hold a director or officer individually liable for a company's alleged violation is the director's or officer's "direct, personal participation." *Id.* Accordingly, to survive a motion to dismiss a claim for individual liability based on an antitrust violation, a plaintiff must plead "factual allegations of some sort of conscious wrongdoing by [an] officer on the corporation's behalf" and that the officer had "some direct role" in the alleged violation. *Id.* at \*9 (citing *In re Morrison*, 555 F.3d 473, 481 (5th Cir. 2009); *Mozingo v. Correct Mfg. Corp.*, 752 F.2d 168, 174 (5th Cir. 1985)).

Applying this standard at the Rule 12(b)(6) stage, the Court found that "the Chandler Plaintiffs ha[d] pleaded facts sufficient to allege that Fisher had a direct role in the attempted monopolization and a specific intent to monopolize the in-line frac water-heating market." *Chandler*, 419 F. Supp. 3d at 988. But this only applied to Fisher's actions on behalf of HOTF. *See id.* at 988–89. Though the Chandler Plaintiffs also contended that Fisher should be held liable for his acts on behalf of Phoenix, the Court dismissed the claim because the Chandler Plaintiffs presented only a "mere suggestion of what Fisher *likely knew* or *should have known*—not a

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 15 of 247

Chandler v. Phoenix Services, Not Reported in Fed. Supp. (2020)

2020-1 Trade Cases P 81,180

factual allegation regarding his 'direct role.' " *Id.* (emphasis in original) (quoting *MVConnect*, 2011 WL 13128799, at *9).

Now, at the Rule 56 stage, the Court must consider whether the summary-judgment evidence creates a genuine issue of fact regarding whether Fisher had a direct role in HOTF's attempted monopolization. The Chandler Plaintiffs claim there is "no genuine issue of material fact that Mark Fisher had the requisite 'direct role' and 'conscious wrongdoing' in the enforcement of the 🚩'993 Patent against Plaintiff Supertherm as an attempted monopolization." Pls.' Br. Supp. Mot. Partial Summ. J. 25, ECF No. 62. The Phoenix Defendants respond that "there is substantial evidence in the record that Fisher did not know or have reason to know when he authorized the patent infringement claims against Plaintiffs that the 🚩'993 Patent was unenforceable due to inequitable conduct." Defs.' Br. Supp. Resp. 24, ECF No. 68.

 **\*16** Just as the Chandler Plaintiffs' concession that the Phoenix Defendants did not have "actual notice of facts to support a *Walker Process* fraud claim ... until January 2016 when the District Court made its inequitable conduct finding" negates Phoenix's corporate liability, it also negates Fisher's individual liability for his actions on behalf of HOTF. Pls.' Br. Supp. Resp. 15, ECF No. 71. The Chandler Plaintiffs list several ways in which Fisher participated in the enforcement of the 🚩'993 Patent after Phoenix acquired HOTF. *See* Pls.' Br. Supp. Mot. Partial Summ. J. 23–25, ECF No. 62. But given that the only two potentially injurious actions—HOTF's sending Hess a cease-and-desist letter and HOTF suing the Chandler Plaintiffs for patent infringement—

occurred before the District of North Dakota's ruling, Fisher did not previously have the requisite knowledge to engage in "conscious wrongdoing." *MVConnect*, 2011 WL 13128799, at *9. Arguably, Fisher could have consciously engaged in continuing the *Newco* litigation on behalf of HOTF, but given that the case has been stayed since 2015, the Chandler Plaintiffs should not have expended fees on litigation since the District of North Dakota's ruling. *See* 7:14-CV-87-O. Accordingly, because Fisher also did not have the requisite knowledge, intent, and direct involvement in HOTF's alleged anticompetitive injurious acts, Fisher also cannot be held liable for his role as an HOTF corporate officer.

## IV. CONCLUSION

Due to the Chandler Plaintiffs' lack of standing to bring antitrust claims for lost-profit damages, failure to file suit within the four-year limitations period, and inability to establish Phoenix's corporate liability and Fisher's individual liability, the Chandler Plaintiffs may not proceed on the merits of their *Walker Process* and sham patent litigation claims. Accordingly, the Court **DENIES** the Chandler Plaintiffs' Motion for Partial Summary Judgment and **GRANTS** the Phoenix Defendants' Motion for Summary Judgment. The Chandler Plaintiffs' claims are **DISMISSED with prejudice.**

**SO ORDERED** on this **13th day** of **April, 2020**.

## All Citations

Not Reported in Fed. Supp., 2020 WL 1848047, 2020-1 Trade Cases P 81,180

## Footnotes

1    Were the Court to reach the third and most contested Sherman Act element—dangerous probability of achieving monopoly power—it would deny both the Chandler Plaintiffs' and Phoenix Defendants' motions for summary judgment. Based on the differing market analyses of former HOTF employee James Cole ("Cole") and economic expert Allan Jacobs, a jury would need to determine whether the market was susceptible to monopolization and, if so, whether there was a dangerous probability that HOTF would unlawfully achieve market power. *Compare* Pls.' App. Supp. Mot. Partial Summ. J. 22–29, ECF No. 63, *with* Defs.' App. Supp. Mot. Summ. J. 162–88, ECF No. 66. However, due to the Chandler Plaintiffs' lack of standing, failure to file their claims within the Clayton Act's statute of limitations, and inability to establish Phoenix's corporate liability and Fisher's individual liability, the Court need not reach the merits of the Chandler Plaintiffs' antitrust claims.

2    In previous orders, the Court has adopted the parties' use of "frac" and "fracking" as the abbreviated forms of "fracture" and "fracturing." *See, e.g.*, Mem. Op. & Order, ECF No. 44; Mem. Op. & Order, ECF No. 52. Upon

further research, the Court adopts the alternative spelling of "frack." Though "frac" is more common among industry experts, most scientists and academics now use "frack." Jason Lavis, *Fracking Vs Fracing – The End of the Debate?*, DRILLERS.COM (Aug. 22, 2017), https://drillers.com/fracking-vs-fracing-end-debate/. And most persuasively, dictionaries uniformly recognize "frack" but not "frac." *See, e.g.*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/frac (stating that "the word ['frac'] isn't in the dictionary," and suggesting "frack" as an alternative); MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/frack ("The word *fracking* (sometimes spelled *fraccing* or *fracing*, particularly by those in the gas and oil industries) was created by shortening 'fracturing.' The addition of the 'k' brings the word into conformity with the inflected forms of similar English words ending in a vowel plus 'c,' such as *shellacking*, *panicking*, and *frolicking*."). Adopting the dictionary definition, the Court now uses "frack" except when quoting the parties.

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3437426
Only the Westlaw citation is currently available.
United States District Court, E.D. California.

DAIRY, LLC,   a Delaware Limited Liability
Company, Plaintiff/Counterdefendant,

v.

MILK MOOVEMENT, INC., a foreign Corporation,
and Milk Moovement LLC, a Delaware Limited
Liability Company, Defendants/Counterclaimants.

No. 2:21-cv-02233 WBS AC

|

Signed May 12, 2023

**Attorneys and Law Firms**

Christian Ellis, PHV, Pro Hac Vice, Bonds Ellis
Eppich Schafer Jones LLP, Fort Worth, TX, Christopher
Joshua Osborne, PHV, Daniel Patrick Martin, Erica
Symone Miranda, Jonathan A. Patchen, Simona Alessandra
Agnolucci, Willkie Farr & Gallagher LLP, San Francisco, CA,
for Plaintiff.

MEMORANDUM AND ORDER RE: DAIRY'S
MOTION TO STRIKE AND MOTION TO DISMISS
SECOND AMENDED COUNTERCLAIMS

WILLIAM B. SHUBB, UNITED STATES DISTRICT
JUDGE

**\*1** Dairy, LLC ("Dairy") initiated this action against Milk
Moovement, Inc. and Milk Moovement, LLC alleging trade
secret misappropriation under federal and California law, and
intentional interference with contractual relations. (First Am.
Compl. (Docket No. 48).) Milk Moovement then alleged
five counterclaims: four claims for declaratory judgment
under various trade secret laws and one antitrust claim
for sham litigation. (Docket No. 111.) The court dismissed
the sham litigation counterclaim twice, but permitted the
declaratory judgment counterclaims. (Docket Nos. 105, 134.)
Upon obtaining new information during discovery, Milk
Moovement requested leave to amend its counterclaims and
add six new antitrust related counterclaims. (Docket No. 204.)
The court granted Milk Moovement's request. (Docket No.
244.)

In its Second Amended Counterclaims, Milk Moovement
alleges new facts that Dairy engaged in various types
of anticompetitive conduct and asserts ten counterclaims,
including the four previously pled declaratory judgment
claims: (1) no protectable trade secret under the Defend Trade
Secrets Act, 🚩 18 U.S.C. § 1836; (2) declaratory judgment
of no misappropriation under the Defend Trade Secrets Act,
id.; (3) declaratory judgment of no protectable trade secret
under the California Uniform Trade Secrets Act, California
Civil Code § 3426 et seq.; (4) declaratory judgment of no
misappropriation under the California Uniform Trade Secrets
Act, id.; (5) conspiracy to monopolize under § 2 of the
Sherman Act, 🚩 15 U.S.C. § 2; (6) monopolization and
attempted monopolization under § 2 of the Sherman Act,
id.; (7) unlawful restraint of trade under § 1 of the Sherman
Act, 🚩 15 U.S.C. § 1; (8) unlawful restraint of trade under
California's Cartwright Act, Cal. Bus. & Prof. Code §§ 16700
et seq.; (9) unlawful mergers or acquisitions under § 7 of the
Clayton Act, 15 U.S.C § 18; and (10) unfair competition under
California's Unfair Competition Law ("UCL"), 🚩 Cal. Bus.
& Prof. Code §§ 17200 et seq. (Docket No. 249.)

Before the court are Dairy's motion to strike (Docket No. 270)
and motion to dismiss (Docket No. 266) the Second Amended
Counterclaims.

I. Factual Allegations [2]
Milk is an important and heavily regulated commodity in
the United States. (2d Am. Countercls. ¶ 96.) American
consumers collectively spend more than $15 billion on milk
each year. (Id. ¶ 80.) Participants in the dairy industry
manage a large amount of data including milk prices, quantity,
location, transit updates, quality testing, and invoices. (Id. ¶
96.)

Under federal law, the United States Department of
Agriculture ("USDA") issues Federal Milk Marketing Orders
("FMMOs"), which then set milk prices across statutorily
divided geographic regions. (Id. ¶ 103.) Pursuant to the
FMMOs, milk can be "pooled" and therefore subject to
regulated pricing. (Id. ¶ 104.) All Class I milk (liquid beverage
milk) must be pooled. (Id.) For every other class of milk, milk
producers can decide whether to participate in the pool. (Id.)

**\*2** FMMOs set the rules and conditions for producers
pooling milk. (Id. ¶ 108.) FMMOs consider many factors
including how much milk the producer "pooled" the previous

month and whether the producer diverted milk to other plants participating in the pool. (Id.) Depending on that month's uniform price for milk, some producers will have to pay into the pool while others will withdraw from the pool. (Id. ¶ 106.)

Milk processors are required to submit monthly reports detailing their total milk receipts by class and specifying how much milk was pooled. (Id. ¶ 109.) Milk processors must also send monthly reports to milk producers. (Id.) These reports must include a variety of metrics including the total pounds of milk received from that producer by date, the minimum payments required to be made to the producer under the FMMOs, and the net amount of payments to the producer. (Id.) The USDA uses these metrics to establish fixed minimum prices for milk and milk products. (Id. ¶ 110.)

Because producers try to obtain the highest possible price for milk, they make pooling decisions based on whether the market price for a particular class of milk is higher or lower than the uniform price. (Id. ¶ 107.) Milk producers also try to avoid paying into the pool. (Id. ¶ 112.) Because milk producers are often organized into cooperatives,[3] not paying into the pool allows a milk producer to use that money to pay member farms. (Id.) A cooperative only engaged in milk production is motivated to obtain the highest price for milk. (Id. ¶ 113.)

Historically, systems for tracking the dairy supply chain used pen and paper and thus were inefficient and prone to error. (Id. ¶ 96.) The advent of supply chain software in the dairy industry, including data processing services, modernized these systems. (Id.)

Dairy is the largest and most dominant provider of dairy software. (Id. ¶ 97.) Dairy advertises on its website that "over 80 percent of the 100 largest dairy companies in the country are Dairy customers." (Id. ¶ 81.) Dairy was co-founded by Dairy Farmers of America ("DFA"), which continues to have an ownership interest.[4] (Id. ¶ 94.)

DFA is the largest milk producer cooperative in the country as well as an owner and operator of numerous milk processors. (Id. ¶ 94.) As both a milk producer and processor, DFA's interest in the price of milk differs from the typical milk producer cooperative. (Id. ¶ 114.) Whereas milk cooperatives benefit from the highest possible price for milk, DFA — as a milk processor — benefits from lower milk prices. (Id.) When DFA sells milk at a low price, it does not impact its net income in the same way low prices impacts other milk producers

because DFA can recoup any losses through its profits as a milk processor. (Id. ¶ 117.)

DFA is Dairy's "most important customer." (Id. ¶ 94.) DFA will not work with any Dairy competitors. (Id. ¶ 125.) As a partial owner of Dairy, DFA has access to the data of other milk producers who utilize Dairy's software services. (Id. ¶ 121.) In prior litigation, a district court in Vermont found evidence that DFA indeed accessed the data of competing milk cooperatives. (Id. ¶¶ 119-20.) Further, as the largest milk producer in the country, DFA has the ability to manipulate FMMOs to suppress milk prices. (Id. ¶ 114.) Because of DFA's access to other milk producers' data and its ability to manipulate FMMOs, Dairy and DFA have an incentive to block competitors in the dairy software industry. (Id. ¶ 122.) Blocking competitors in the dairy software industry allows Dairy to maintain and grow its dominance in the dairy software industry. In turn, Dairy grants DFA access to the data of many of its competitors in the milk production and milk processing industry.

**\*3** Milk Moovement is a dairy software start-up and Dairy competitor. (Id. ¶ 97.) Milk Moovement created new methods for tracking and analyzing production data, including a cloud-based software platform which connects all entities in the dairy supply chain. (Id. ¶ 97-98.) Milk Moovement's software is used to keep track of data such as how much and when milk is picked up from producers. (Id. ¶ 99.) Its software allows its customers to access data in-real time via computer or mobile app. (Id. ¶¶ 99-100.)

In 2020, Dairy — through co-owner Banneker Partners — attempted to acquire Milk Moovement. (Id. ¶¶ 163-167.) Dairy had previously acquired two other entities: Data Specialists, Inc. in 2018 and Ever.Ag in 2022. (Id. ¶ 154.) In addition, Dairy also purchased a software system developed by a dairy cooperative, United Dairymen of Arizona ("United Dairymen"). (Id. ¶ 155.) However, Dairy never brought the software to market. (Id.)

Dairy has previously had relationships with other entities in the dairy industry, including California Dairies, Inc. ("California Dairies") — a milk marketing and processing cooperative in California. (First Am. Compl. ¶ 32.) In 2014, California Dairies began using Dairy's software. (Id. ¶ 33.) Because of issues with Dairy's software, California Dairies then entered into an agreement with Milk Moovement in or around September 2021. (Id. ¶ 37.) California Dairies subsequently gave Dairy notice that it was terminating its

agreement effective February 1, 2022. (Id. ¶ 41.) Dairy believes that California Dairies shared Dairy's trade secrets with Milk Moovement when it switched data processing service providers. (Id. ¶¶ 42-46.) That belief ultimately led Dairy to initiate this lawsuit in December 2021 for various trade secrets violations. (See Compl. (Docket No. 1).)

The provisions in Dairy's contract with Milk Moovement were not unique. Rather, Dairy's contracts impose exclusivity provisions on its customer which prevent the customers from leaving Dairy for one of its competitors. (2d Am. Countercls. ¶ 138.) These provisions convert a customer's raw data to into Dairy trade secrets. (Id. ¶¶ 139-143.) As a result, customers cannot disclose their own data as necessary to change service providers. (Id. ¶ 144.) If a customer decides to terminate its relationship with Dairy, they would be unable to transfer its own analytics and production data. (Id. ¶ 145.) This information is critical to both the customer as well as the new software provider. (Id. ¶¶ 145-47.) Moreover, these provisions have the effect of precluding a customer from complying with federal and state law relating to the historical accounting and auditing of that customer's milk pooling and milk pricing activities. (Id. ¶ 148.)

In addition to Dairy's conduct preventing customers from working with Milk Moovement, Dairy has also blocked Milk Moovement from marketing opportunities. In 2022, Dairy barred Milk Moovement from attending, sponsoring, or presenting at DairyTech — the milk industry's leading annual technology conference. (Id. ¶ 191.) The DairyTech is organized by the International Dairy Foods Association. (Id.) When Milk Moovement tried to become a sponsor of the event, a requirement for appearing and presenting at the conference, the conference organizers informed Milk Moovement that, due to the organizers' partnership with Ever.Ag (Dairy's new trade name), any Ever.Ag competitors were precluded as sponsors. (Id. ¶ 193.)

Dairy's efforts against Milk Movement eventually led Milk Movement to file its counterclaims against Dairy. The court will first address Dairy's motion to strike before addressing its motion to dismiss the amended counterclaims.

## II. Motion to Strike

### A. Legal Standard

**\*4** Federal Rule of Civil Procedure 12(f) authorizes the court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

Fed. R. Civ. P. 12(f). See Ready Transp., Inc. v. AAR Mfg., Inc., 627 F.3d 402, 404 (9th Cir. 2010) (a district court's "inherent power to control their docket .... includes the power to strike") (holding district court has power to strike an improperly filed confidential document) (citing Carrigan v. Cal. State Legislature, 263 F.2d 560, 564 (9th Cir. 1959) (discussing an appellate court's inherent power to strike briefs and pleadings "as either scandalous, impertinent, scurrilous, and/or without relevancy")) (additional citations omitted). Because motions to strike are "often used as delaying tactics," they are "generally disfavored" and are rarely granted in the absence of prejudice to the moving party. Rosales v. Citibank, FSB, 133 F. Supp. 2d 1177, 1180 (N.D. Cal. 2001); see also N.Y.C. Emps.' Ret. Sys. v. Berry, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009) ("Where the moving party cannot adequately demonstrate ... prejudice, courts frequently deny a motion to strike ....") (citation and internal quotation marks omitted).

### B. Discussion

Milk Moovement filed its proposed Second Amended Counterclaims attached as Exhibit 1 to its motion for leave to amend. (See Mot. Leave, Ex. 1 (Docket No. 204-3).) The proposed Second Amended Counterclaims included only Milk Moovement's factual allegations and its six new antitrust related claims. (See id.) The proposed Second Amended Counterclaims did not include Milk Moovement's answer, affirmative defenses, or prior declaratory judgment counterclaims from its Counterclaims and First Amended Counterclaims (Docket Nos. 79, 111), which survived two motions to dismiss. (See Docket Nos. 105, 134.) After being granted leave to amend by this court, Milk Moovement filed the Second Amended Counterclaims, which incorporated its previously filed answer, affirmative defenses, and declaratory judgment counterclaims with the new factual allegations and six counterclaims from the proposed Second Amended Counterclaims. (Docket No. 249.)

Dairy moves to strike the Second Amended Counterclaims by arguing that the "filing was inappropriate and objectively unreasonable" because it "was substantively and materially different" than the proposed counterclaims. (Mot. Strike at 1 (Docket No. 270).) Dairy contends that Milk Moovement's filing of its Second Amended Counterclaims was a violation of Federal Rules of Civil Procedure 15 and 16, Local Rules 137(c) and 220, and the court's order granting Milk Moovement leave to amend. (Id.) Dairy asks that

the court require Milk Moovement to either proceed with the proposed counterclaims or proceed with the First Amended Counterclaims, thereby abandoning its new antitrust counterclaims. (Mot. Strike at 16.) The court will decline Dairy's request.

As Milk Moovement explains: "Every single word in the [Second Amended Counterclaims] was either (i) already part of the case in the existing answer, defenses or claims, or (ii) the court had expressly authorized it to be added to the case by granting leave to amend." (Opp'n Mot. Strike at 3 (Docket No. 291).) As discussed below, the court rejects all of Dairy's arguments. The court sees Dairy's motion to strike as simply a second attempt to dismiss Milk Moovement's new antitrust counterclaims in the event its concurrently filed motion to dismiss (Docket No. 266) is unsuccessful.

First, Dairy argues that the court should strike the Second Amended Counterclaims because they were filed in violation of Local Rule 220, which states that "every pleading to which an amendment or supplement is permitted as a matter of right or has been allowed by court order shall be retyped and filed so that it is complete in itself without reference to the prior or superseded pleading." [5] But the Second Amended Counterclaims, as filed, complies with Rule 220 as it contains Milk Moovement's answer, affirmative defenses, and counterclaims. [6] See L.R. 220

**\*5** Next, Dairy argues that the Second Amended Counterclaims violate the court's order granting Milk Moovement leave to amend under Rules 15 and 16 of the Federal Rules of Civil Procedure because Milk Moovement was not granted leave to file a "synthesized" pleading. [7] (Mot. Strike at 11-13.) Again, the court disagrees. Unlike the cases upon which Dairy relies, [8] the Second Amended Counterclaims include no new facts or claims that were not already asserted in the First Amended Counterclaims or proposed Second Amended Counterclaims. Rather, the answer and affirmative defenses included in the Second Amended Counterclaims are identical to those in the First Amended Counterclaims. Dairy also argues that Milk Moovement abandoned the previously pled declaratory judgment counterclaims because they were not included in the proposed Second Amended Counterclaims. To the extent leave must be given to ensure the previously pled declaratory judgment counterclaims are properly included in the Second Amended Counterclaims, it is hereby granted.

Finally, Dairy argues that the court should strike the Second Amended Counterclaims because they were filed in violation of Local Rule 137(c). Local Rule 137(c) provides: "If filing a document requires leave of court, such as an amended complaint after the time to amend as a matter of course has expire, counsel shall attach the document proposed to be filed as an exhibit to moving papers seeking such leave and lodge a proposed order as required by these Rules." L.R. 137(c). Dairy is correct that Milk Moovement did not comply with the precise requirements of Local Rule 137(c) because it failed to incorporate its new counterclaims into its preexisting answer, affirmative defenses, and declaratory judgment counterclaims. Nevertheless, the court declines Dairy's invitation to strike the six new counterclaims where Dairy has not adequately shown that it will be prejudiced. [9]

See 🚩 Rosales, 133 F. Supp. 2d at 1180.

Moreover, to strike the Second Amended Counterclaims on any procedural ground would be futile. The court would strike these counterclaims without prejudice, allowing Milk Moovement to refile the exact same pleading as their currently filed Second Amended Counterclaims. Dairy would then refile their motion to dismiss. Thus, the case would be in the same position as it is today, except having endured a months long delay. The court therefore declines to strike the six new counterclaims, which it granted leave to amend, on a pure procedural technicality and for which Dairy cannot honestly claim it will suffer any prejudice.

**\*6** Dairy's motion is to strike is nothing more than a disfavored delay tactic. Such a motion is a waste of the court's time and resources. Accordingly, Dairy's motion to strike the Counterclaims (Docket No. 270) is denied.

### III. Motion to Dismiss

#### A. Legal Standard

Federal Rule of Civil Procedure 12(b)(6) allows for dismissal when the plaintiff's complaint fails to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6). "A Rule 12(b)(6) motion tests the legal sufficiency of a claim." Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001). The inquiry before the court is whether, accepting the allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor, the complaint has alleged "sufficient facts ... to support a cognizable legal theory," id., and thereby stated "a claim to relief that is plausible on its face," 🚩 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). In deciding

such a motion, all material allegations of the complaint are accepted as true, as well as all reasonable inferences to be drawn from them. Id.

"In order to survive a motion to dismiss under Rule 12(b)(6), an antitrust complaint 'need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws.' " Cost Mgmt. Servs. Inc. v. Washington Nat. Gas Co., 99 F.3d 937, 950 (9th Cir. 1996) (citation omitted). "A motion to dismiss a counterclaim brought pursuant to Rule 12(b)(6) is evaluated under the same standard as motion to dismiss a plaintiff's complaint." Niantic, Inc. v. Gobal++, 19-cv-03425 JST, 2020 WL 1548465, at *2 (N.D. Cal. Jan. 30, 2020).

#### B. Relevant Market

As the first step in any antitrust action, a "plaintiff must allege both that a relevant market exists and that the defendant have power within that market." Newcal Indus., Inc. v. Ikon Office Sols., 513 F.3d 1038, 1044 (9th Cir. 2008). See FTC v. Qualcomm Inc., 969 F.3d 974, 992 (9th Cir. 2020) ("A threshold step in any antitrust case is to accurately define the relevant market ...") (citations omitted); Netafirm Irrigation, Inc. v. Jain Irrigation, Inc., 562 F. Supp. 3d 1073, 1081 (E.D. Cal. 2021) (Ishii, J.) (citations omitted) ("Setting the relevant market boundaries is a critical first step as it enables the court to assess issues regarding market share, defendant's ability to lessen or destroy competition, and the alleged antitrust injury.").

A 'market' is the group of sellers or produces who have the 'actual or potential ability to deprive each other of significant levels of business.' " Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir. 1995) (citations and quotation omitted). "The relevant market must include both a geographic market and a product market." Hicks v. PGA Tour, Inc., 897 F.3d 1109, 1120 (9th Cir. 2019) (citation omitted).

#### 1. Product Market

"[T]he [product] market must encompass the product at issue as well as all economic substitutes for the product." Newcal, 513 F.3d at 1045 (citation omitted). "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Id. (quoting Brown Shoe v. United States, 370 U.S. 294, 325 (1962)). "The analysis looks to both 'whether two products can be used for the same purpose, and if so, whether and to what extent purchasers are willing to substitute one for the other." FTC v. Facebook, Inc., 560 F. Supp. 3d 1, 17 (D.D.C. 2021) (citation omitted).

**\*7** Here, Milk Moovement defines the relevant product market as "the market for data services for milk producers and processors." [10] (2d Am. Countercls. ¶ 124.) As Milk Moovement explains, "both Dairy and Milk Moovement package their supply chain data as integrated systems of software" for the dairy industry. (Opp'n Mot. Dismiss at 10.) The dairy industry's regulatory scheme limits the types of products which could offer these services. [11] See Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 411 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances or the industry at issue. Part of that attention to economic context is an awareness of the significance of regulation."). That both Dairy and Milk Moovement offer data processing services for the dairy industry is sufficient to define the product market at this stage. See Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1374 (9th Cir. 1989) ("The goods and services that sellers or producers offer provide the best indicia of who competes in the same market."). While identifying other competitors in the market would provide a clearer picture of the market, particularly given Milk Moovement's allegations that the market is heavily concentrated, there is no requirement that Milk Moovement identify every competitor. See Klein, 580 F. Supp. 3d at 765 ("A plaintiff is not required to identify every alleged competitor in its pleadings.") (citation and internal quotations omitted).

Similarly, the court finds no issue with Milk Moovement's limitation that the data services are "for milk producers and processors." Contrary to Dairy's argument, this limitation describes the product, not the consumers. See Brown Shoe, 370 U.S. at 325 (a market "may be determined by examining such practical indicia as ... the product's peculiar characteristics and uses ... [and] distinct customers"). Accordingly, the court finds Milk Moovement has sufficiently pled a relevant product market.

## 2. Geographic Market

"The geographic market extends to the area of effective competition where buyers can turn for alternative sources of supply." Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1063 (9th Cir. 2011) (citations and internal punctuation omitted). There are two ways that courts define a geographic market: (1) the location of the relevant suppliers, which "must include all the firms with the relevant production, sales, or service facilities in the specific region"; or (2) the location of the relevant customers, which must include "all the firms that sell to customers in the geographic region, regardless of the location of the supplier making those sales." Pacific Steel Grp. v. Com. Metals Co., 600 F. Supp. 3d 1056, 1068 (N.D. Cal. 2022) (citing 2010 Dep't of Justice and FTC Horizontal Merger Guidelines §§ 4.2.1, 4.2.2).

Here, Milk Moovement defines the geographic market as the United States or, in the alternative, the sub-national regions for milk purchasing established by the USDA: Northeast, Appalachian, Florida, Southeast, Upper Midwest, Central, Midwest, California, Pacific Northwest, Southwest, and Arizona. (2d Am. Countercls. ¶ 126-27.)

**\*8**  At this stage, the court finds both geographic markets are sufficiently pled. The dairy industry is heavily regulated by the federal government. Thus, while Milk Moovement and Dairy both operate overseas, federal regulation determines the geographic boundaries in which milk producers and processors must operate. Further, the FMMO system does not apply outside of the United States. Cf. Brown Shoe, 370 U.S. at 336-37 ("The geographic market selected must ... correspond to the commercial realities of the industry ....") (internal quotations omitted). The court finds it plausible that industry regulations control whether one sub-region could turn to another for alternative supply. Accordingly, the court finds Milk Moovement has sufficiently pled a relevant geographic market.

Because Milk Moovement has plausibly defined both a relevant product market and a relevant geographic market, it has sufficiently pled a relevant market at this stage.

See Newcal, 513 F.3d at 1045 ("[Because] the validity of the 'relevant market' is typically a factual element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial.") (citations omitted); Netafirm, 562 F. Supp. 3d at 1081

(relevant market allegations are often able to survive scrutiny under Rule 12(b)(6) because "relevant market determinations are typically fact-intensive, with actual inquiry into the commercial realities faced by consumers") (citations and internal quotations omitted).

### C. Market Power

"Along with a relevant market definition, a plaintiff must plead that the defendant has power within that market." Netafirm, 562 F. Supp. 3d at 1085 (citing Newcal) (additional citations omitted). "The essence of market power is a firm's 'ability to raise prices profitably by restricting output.' " Pacific Steel, 600 F. Supp. 3d at 1072 (quoting Ohio v. Am. Express Co., 138 S. Ct. 2274, 2288 (2018)). "[Courts] rely on market power to help distinguish between restraints that are likely to substantially impair competition and those that are not." Flaa v. Hollywood Foreign Press Ass'n, 55 F.4th 680, 693 (9th Cir. 2022) (citations omitted). "A plaintiff may prove that a restraint has anticompetitive effect either 'directly or indirectly.' " Qualcomm, 969 F.3d at 989 (quoting Am. Express, 138 S. Ct. at 2284).

### 1. Direct Evidence

"Direct evidence includes proof of actual detrimental effects on competition, such as reduced output, increased prices, or decreased quality in the relevant market." Qualcomm, 969 F.3d at 989 (citations and internal quotations omitted). Here, Milk Moovement alleges that Dairy "charge[s] supracompetitive prices and wrongly restricts customers' ability to freely choose their service providers." (2d Am. Countercls. ¶ 136.) Milk Moovement further alleges that Dairy "is able to charge [their] supracompetitive prices to its customers even while it provides poor, lackluster service." (Id. ¶ 137.)

In support of these allegations, Milk Moovement refers to documents produced in discovery which purport to show that: there were significant problems with Dairy's software that went uncorrected for years; Dairy did not have the software capacity that at least one customer, California Dairies, required; Dairy sought to charge California Dairies an additional $120,000 to provide the requested services; and Dairy's CEO not only knew about Dairy's failure to provide these services but also thought that charging for such services

should be Dairy's standard practice. (2d Am. Countercls. ¶¶ 169, 172, 176.)

Milk Moovement further alleges that the various exclusivity provisions in Dairy's customer contracts meant that any customer seeking to leave Dairy "would be forced to leave behind years of its own analytics and production data — information that Dairy knows forms the lifeblood of strategic decision making in the industry." (2d. Am. Countercls. ¶ 145.) Not only would such provisions deter any customer from leaving Dairy, but they would also deny any Dairy competitor "the functionality necessary to permit an 'apples to apples' comparison between different time periods." [12] (Id. ¶ 146.) Because its customers were barred from leaving, Dairy could provide lower quality services. See 📙 Qualcomm, 969 F.3d at 989.

## 2. Circumstantial Evidence

**\*9** "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." 📙 Rebel Oil, 51 F.3d at 1434 (citations omitted). As discussed above, Milk Moovement has sufficiently defined the relevant market.

### i. Market Share

"Measurement of market share is necessary to determine whether the defendant possesses sufficient leverage to influence marketwide output." 📙 Rebel Oil, 51 F.3d at 1437; see Pacific Steel, 600 F. Supp. 3d at 1073 ("[A] dominant share of the market often carries with it the power to control output across the market and in so doing control prices.") (citing 📙 Image Tech Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir. 1997)). Generally, a 65 percent market share is sufficient to establish a prima facie case of market power. Optronic Techs., Inc. v. Ningbo Sunny Elec. Co., 20 F.4th 466, 484 (9th Cir. 2021) (citation omitted). A lower market share is permissible for claims of attempted monopolization. See 📙 Rebel Oil, 51 F.3d at 1438 (finding 44 percent sufficient in an attempted monopolization case).

Here, Milk Moovement alleges that Dairy's market share exceeds 80 percent because, as Dairy advertises on its website, "over 80 percent of the 100 largest dairy companies in the country are Dairy.com customers." (2d. Am. Countercls. ¶ 134.) The court shares Dairy's concerns that Milk Moovement appears to have premised its market share allegation solely upon this 80 percent figure. However, plaintiffs are not required to plead market share with specificity or to explain how they arrived at their market share allegation. See 📙 United Energy Trading, LLC v. Pac. Gas & Elec., 200 F. Supp. 3d 1012, 1020 (N.D. Cal. 2016) (finding sufficient an alleged market share of 70 to 90 percent); 📙 Teradata Corp. v. SAP SE, No. 18-cv-03670 WHO, 2018 WL 6528009, at \*19 (N.D. Cal. Dec. 12, 2018) (finding sufficient an alleged market share of 60 to 90 percent "on information and belief"). Moreover, Dairy's arguments that Milk Moovement's market share allegation is insufficient are predominantly factual and thus not suitable at the motion to dismiss stage. [13] Because a market share of above 80 percent is more than sufficient to establish market power, see Optronic, 20 F.4th at 484, Milk Moovement has sufficiently alleged market power at this stage.

### ii. Entry Barriers

"Market power cannot be inferred solely from a dominant market share." Pacific Steel, 600 F. Supp. 3d at 1073 (citation omitted). "The plaintiff must show that new rivals are barred from entering the market and show that existing competitors lack the capacity to expand their output to challenge the predator's high price." 📙 Rebel Oil, 51 F.3d at 1439 (citation omitted). "Entry barriers are 'additional long-run costs that were not incurred by incumbent firms but must be incurred by new entrants,' or 'factors in the market that deter entry while permitting incumbent firms to earn monopoly returns.' " Id. at 1439 (citation omitted).

**\*10** "In evaluating entry barriers, we focus on their ability to constrain not those already in the market, but ... those who would enter but are prevented from doing so." Id. at 1439 (citation and internal quotation omitted). "The fact that entry has occurred does not necessarily preclude the existence of 'significant' entry barriers.... Barriers may still be 'significant' if the market is unable to correct itself despite the entry of small rivals." Id. at 1440.

"The main sources of entry barriers are: (1) legal license requirements; (2) control of an essential or superior resource; (3) entrenched buyer preferences for established brands; (4) capital evaluations imposing higher capital costs on new entrants; and, in some situations, (5) economies of scale." Id. at 1439 (citations omitted). See e.g., id. at 1439-40 (municipal regulations and state laws regarding oil and gas are entry barriers); United Energy, 200 F. Supp. 3d at 1021-23 (regulations regarding natural gas are entry barriers); Pacific Steel, 600 F. Supp. 3d at 1074 (environmental regulations, cost and time, and complexity involved in building and operating a steel mill are entry barriers); Klein, 580 F. Supp. 3d at 779 (the switching costs between social media networks are entry barriers).

Here, Milk Moovement alleges that there are substantial barriers to entry in the market for data services for milk producers and processors. Because the milk industry is heavily regulated, it is both more complicated and costly for new entrants to comply with those regulations than an existing competitor. (2d. Am. Countercls. ¶ 129.) Milk Moovement also alleges that Dairy has created multiple barriers including: (1) Dairy's de facto exclusive contracts, which restrict new entrants to the market; (2) Dairy's customer-owner relationship with DFA, the largest milk producer and one of the largest milk processors in the country; and (3) Dairy's confidentiality provisions, which frustrate a new entrant's ability to speak with a potential customer about their user requirements and data. (Id. ¶ 129-132.) Milk Moovement has thus alleged facts which plausibly show that Dairy charges supracompetitive prices, restricts customers from choosing their dairy data service provider, has a market share of over 80 percent, and has created multiple barriers to entry.

For the reasons stated above, the court finds Milk Moovement has sufficiently alleged both direct and circumstantial evidence showing anticompetitive restraint. Accordingly, Milk Moovement has sufficiently pled that Dairy has market power within the relevant market. The court will next address Milk Moovement's various antitrust claims.

### D. Sherman Act § 2

Section 2 of the Sherman Act provides: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty ...." 15 U.S.C. § 2. Here, Milk Moovement asserts two claims under § 2 of the Sherman Act: conspiracy to monopolize (Claim 5) and monopolization and attempted monopolization (Claim 6).

#### 1. Antitrust Injury

"A plaintiff may only pursue an antitrust action if it can show 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' " Am. Ad. Mgmt, Inc. v. Gen. Tel. Co. of Cal., 190 F.3d 1051, 1055 (9th Cir. 1999) (citations and internal quotations omitted). "[C]onduct that eliminates rivals reduces competition. But reduction of competition does not invoke the Sherman Act until it harms consumer welfare." Rebel Oil, 51 F.3d at 1433 (citations omitted). "[A] causal antitrust injury is a substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage." Somers v. Apple, Inc., 729 F.3d 953, 963 (9th Cir. 2013).

**\*11** An antitrust injury consists of five elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, ... (4) that is of the type that the antitrust laws were intended to prevent,' and (5) 'the injured party [is] a participant in the same market as the alleged malefactors.' Id. (citation omitted). "There can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct." Am. Ad., 190 F.3d at 1056 (citation omitted); see Reveal Chat Holdco, LLC v. Facebook, Inc., 471 F. Supp. 3d 981, 998 (N.D. Cal. 2020) ("An increase in market prices, 'though harmful to competition, actually benefit[s] competitors.' ") (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 583 (1986)).

Courts have recognized various types of antitrust injuries, including limiting consumer choice, reducing output and innovation, and increasing prices for lower quality and fewer services. See e.g., Glen Holly Ent., Inc. v. Tektronix Inc., 343 F.3d 1000, 1011 (9th Cir. 2003) ("One form of antitrust injury is '[c]oercive activity that prevents its victims from making free choices between market alternatives.' ") (citation omitted); Klein, 580 F. Supp. 3d at 804 ("[Plaintiffs] have suffered an injury because Facebook 'detrimentally changed

the market make-up and limited consumers' choice to one source of output.' ") (citation omitted); 🔖In re Juul Labs Labs, Inc. Antitrust Litig., 555 F. Supp. 3d 932, 959 (N.D. Cal. 2021) (antitrust injury plausible where plaintiff asserted allegations of "supracompetitive process, reduced output, and reduced innovation"); Sumotext Corp. v. Zoove, Inc., No. 16-cv-01370 BLF, 2017 WL 2774382, *10 (N.D. Cal. 2017) (allegations that customers "have been forced to pay supracompetitive prices while receiving lower quality and few services with more onerous and adhesive contract terms" and that the market has suffered "price increases, lower quality products, and few market alternatives" are sufficient to plead antitrust injury at the motion to dismiss stage).

Here, Milk Moovement alleges that Dairy's anticompetitive scheme included locking customers into de facto exclusive contracts, unlawfully acquiring competitors, and barring Milk Moovement from marketing opportunities. (2d Am. Countercls. ¶¶ 140-43, 151-67, 193.) Milk Moovement further alleges that "Dairy's conduct has inhibited Milk Moovement and other competitors from entering the market and deterred customers from freely switching service providers, all of which has increased prices, decreased consumer choice, and resulted in worse services than would otherwise exist." (Id. ¶ 168.)

Dairy's arguments that Milk Moovement failed to plausibly allege antitrust injury are unpersuasive. First, Dairy contends that any claims concerning its 2015 purchase of United Dairymen's software system and the 2018 acquisition of Data Specialists, Inc. are barred by the statute of limitations. (See Mot. Dismiss at 28-29.) Milk Moovement's antitrust claims all have a four-year statute of limitations. See 15 U.S.C. § 15b (Sherman Act and Clayton Act); Cal. Bus. & Prof. Code § 16750.1 (Cartwright Act); Cal. Bus. & Prof. Code § 17208 (UCL). The fact that some acquisitions occurred outside the four-year statute of limitations does not mean that Milk Moovement has failed to plausibly allege antitrust injury at this stage. Moreover, Milk Moovement notes that while only the 2022 acquisition of Ever.Ag can give rise to damages, there is no statute of limitations for injunctive relief claims under Section 16 of the Clayton Act. (Opp'n Mot. Dismiss at 24.) Thus, if the time-barred acquisition is found to violate antitrust laws, Dairy can be ordered to divest that acquisition.

See 🔖California v. Am. Stores Co., 495 U.S. 271, 282 (1990) ("[T]he plain text of § 16 [of the Clayton Act] authorizes divestiture decrees to remedy § 7 violations.").

**\*12** The court likewise rejects Dairy's argument that Milk Moovement failed to plausibly allege that the companies Dairy acquired were "competitors" of Dairy. (See Mot. Dismiss at 29-31.) For example, the press releases which explain how the acquisitions were intended to further develop Dairy's services plausibly suggest that the acquisitions were of competitors. [14] (See Opp'n Mot. Dismiss at 24-25 (Docket No. 289).) Dairy's arguments to the contrary involve factual determinations and therefore are not appropriate at the motion to dismiss stage. [15]

Milk Moovement has alleged facts showing that Dairy's conduct, including acquisition of competitors and exclusive contracts, prevented Milk Moovement from growing in the market for dairy data processing services, limited consumer choice, and increased prices. The court therefore finds that Milk Moovement has sufficiently alleged antitrust injury.

### 2. Conspiracy to Monopolize (Claim 5)

To state a claim for conspiracy to monopolize under § 2 of the Sherman Act, a plaintiff must show: "(1) an agreement or understanding [alleged conspirators]; (2) a specific intent to monopolize; and (3) overt acts in furtherance of the alleged conspiracy." Optronic, 20 F.4th at 482 (citation and internal quotations omitted).

Here, Milk Moovement alleges that Dairy and DFA conspired to monopolize the relevant market by virtue of their customer-owner relationship, DFA's refusal to work with Dairy's competitors in the dairy data processing market, and DFA's ability to restrict competition in the milk production market by suppressing milk prices. (2d Am. Countercls. ¶ 223.)

Contrary to Dairy's argument, the court does not read Milk Moovement's counterclaim as advancing a "shared monopoly" [16] theory because DFA does not operate in the relevant market. See 🔖Standfacts Credit Servs. Inc., v. Experian Info. Sol., 405 F. Supp. 2d 1141, 1152 (C.D. Cal. 2005) ("[A]n allegation of conspiracy to create a shared monopoly does not plead a claim of conspiracy under 🔖section 2.") (citation omitted); see also 🔖United Food & Com. Workers Local 1776, et al. v. Teikoku Pharma USA, Inc., 74 F. Supp. 3d 1052, 1076 (N.D. Cal. 2014) ("A monopoly, by definition, consists of a single firm, and both

monopolization and attempted monopolization are single-firm violations[.]") (citation omitted).

**\*13**  Rather, Milk Moovement's allegations plausibly show that Dairy and DFA "conspired to endow" Dairy with market power in the data processing market. See 🚩 United Food, 74 F. Supp. 3d at 1077 (dismissing claim because complaint "d[id] not allege that the parties conspired to endow either [party] with market power"). Milk Moovement's theory is that DFA's suppression of milk prices prevents other milk producers from entering or growing in the market for milk production. This limits the number of milk producers who could seek data processing services from a Dairy competitor. The limited number of milk producers thus blocks data processing companies from entering and growing in the relevant market. Dairy thus "leverage[s] [its] monopoly to prevent other market participants ... from reaching scale as a viable competitor." (Id. ¶ 223.) Accordingly, the court finds that Milk Moovement has alleged facts sufficient to support a claim for conspiracy under § 2 of the Sherman Act.

### 2. Monopolization and Attempt (Claim 6)

Milk Moovement also asserts a claim for monopolization and attempted monopolization under § 2 of the Sherman Act. To state a claim for monopolization under § 2 of the Sherman Act, "a plaintiff must show: (a) the possession of monopoly power in the relevant market; (b) the willful acquisition or maintenance of that power, and (c) causal antitrust injury." 🚩 Qualcomm, 969 F.3d at 990 (internal quotations and citations omitted); see also Verizon, 540 U.S. at 878-79 ("[T]he willful acquisition or maintenance of [monopoly] power ... distinguishe[s] [power] from growth or development as a consequence of a superior product, business acumen, or historic accident.") (citation and quotation omitted).

To state a claim for attempted monopolization under 🚩 § 2, a plaintiff must show: "(1) specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct to accomplish the monopolization; (3) dangerous probability of success; and (4) causal antirust injury." 🚩 Cost Mgmt. Servs., Inc. v. Wash. Nat. Gas Co., 99 F.3d 937, 949-50 (9th Cir. 1996); see also Optronic, 20 F.4th at 481-82. "A plaintiff may establish specific intent to monopolize through either direct evidence of unlawful design or circumstantial evidence

principally of illegal conduct." Optronic, 20 F.4th at 483 (citation and internal quotations omitted).

For reasons similar to those already discussed, the court finds Milk Moovement plausibly alleges its claim for monopolization and attempted monopolization under 🚩 § 2. Milk Moovement alleges that Dairy acquired competitors and used exclusivity contracts to prevent customers from leaving Dairy to work with its competitors. (2d. Am. Countercls. ¶¶ 138-45, 151-55.) Such allegations are sufficient to show that Dairy both acquired and maintained monopoly power as well as acted with the specific intent to destroy competition. Moreover, Milk Moovement's allegation of Dairy's market share is sufficient to show that Dairy had a high probability of success in monopolizing the market. See 🚩 Cost Mgmt., 99 F.3d at 949-50. Accordingly, Milk Moovement has alleged facts sufficient to support a claim for monopolization and attempted monopolization under § 2 of the Sherman Act.

### E. Sherman Act 🚩 § 1 (Claim 7)

In addition to its 🚩 § 2 conspiracy claim, Milk Moovement asserts a conspiracy claim under § 1 of the Sherman Act. "🚩 Section 1 'targets concerted anticompetitive conduct, [whereas] [🚩 Section 2] targets independent anticompetitive conduct.' " Optronic, 20 F.4th at 481 (citation omitted). Section 1 of the Sherman Act provides: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 🚩 15 U.S.C. § 1. [17] To state a claim under 🚩 § 1, a plaintiff must show: "(1) a contract, combination or conspiracy; (2) 'that unreasonably restrained trade ...; and (3) that restraint affected interstate commerce.' " Optronic, 20 F.4th at 479 (citation omitted).

**\*14**  Here, the court finds Milk Moovement's allegations are sufficient to support a conspiracy claim under 🚩 § 1. Milk Moovement alleges that DFA is both a co-founder and owner of Dairy and will not work with Dairy's competitors. (2d. Am. Countercls. ¶ 94.) As both a milk producer and milk processor, DFA is not only motivated to suppress milk prices, but also their market share in fact enables it to manipulate FMMOs and milk prices. (Id. ¶ 114.) Moreover, Milk Moovement alleged that evidence produced in prior litigation showed DFA had accessed competing producers' pricing data in an effort to manipulate milk prices. (Id. ¶

120.) By allegedly suppressing milk prices, DFA prevents other milk producers, who may seek data processing services from a Dairy competitor, from growing in the market for milk production. As a result, Dairy can "leverage [its] monopoly to prevent other market participants ... from reaching scale as a viable competitor." (Id. ¶ 223.)

The court finds these allegations constitute "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers, 795 F.3d 1124, 1129 (9th Cir. 2015) (quoting Twombly, 550 U.S. at 556). Accordingly, Milk Moovement has alleged facts sufficient to support a claim for conspiracy to monopolize under § 1 of the Sherman Act.

### F. Cartwright Act (Claim 8)

Milk Moovement also asserts a claim under California's Cartwright Act. The Cartwright Act is California's antitrust law. See Cal. Bus. & Prof. Code §§ 16700 et seq. The Cartwright Act "bans agreements that 'prevent competition in ... [the] sale or purchase of ... any commodity.' " Pacific Steel, 600 F. Supp. 3d at 1080 (quoting Cal. Bus. & Prof. Code § 16720(c)). The inquiry under the Cartwright Act is similar to that under Section 1 of the Sherman Act. See Jain Irrigation, Inc. v. Netafirm Irrigation, Inc., 386 F. Supp. 3d 1308, 1314 (E.D. Cal. 2019) (Drozd, J.) ("[T]he analysis under [the Cartwright Act] 'mirrors the analysis under Federal Law because the Cartwright Act ... was modeled after the Sherman Act.") (quoting Cnty of Tuolumne v. Sonora Cmty. Hosp., 236 F.3d 1148, 1160 (9th Cir. 2001)) (additional citation omitted). Here, as already discussed, Milk Moovement has alleged facts sufficient to support a claim under § 1 of the Sherman Act. Accordingly, it has also sufficiently alleged its claim under the Cartwright Act.

### G. Clayton Act § 7 (Claim 9)

Milk Moovement asserts a claim for unlawful mergers and acquisitions under § 7 of the Clayton Act. "Section 7 [of the Clayton Act] prohibits mergers that tend 'substantially to lessen competition' or 'create a monopoly.' " Optronic, 20 F.4th at 485 (citing 15 U.S.C. § 18). "To establish a prima face [Section 7] case, [a plaintiff] must (1) propose the proper relevant market and (2) that that the effect of the merger in that market is likely to be anticompetitive."

Id. (citation and quotations omitted); see Saint Alphonsus Med. Ctr.-Nampa Inc. v. Saint Luke's Health Sys. Ltd., 778 F.3d 775, 788 (9th Cir. 2015) ("Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future.") (citation and quotations omitted). "[T]he anticompetitive effect of [a] merger is further enhanced by high barriers to market entry." FTC v. H.J. Heinz Co., 246 F.3d 708, 718 (D.C. Cir. 2001) (explaining that high barriers to entry "eliminates the possibility that the reduced competition caused by the merger will be ameliorated by new competition from outsiders"); see also Saint Alphonsus Med., 778 F.3d at 788.

Here, Milk Moovement alleges that Dairy's various acquisitions of competing supply-chain software products and services, including of Data Specialists, Inc. and Ever.Ag, "substantially lessened competition in the market for data services to milk producers and processors in the United States ...." (2d Am. Countercls. ¶ 258.) Moreover, Milk Moovement alleges that Dairy terminated competition through acquisitions by purchasing United Dairymen's competing software system, but never bringing it to market. (Id. ¶ 155.)

**\*15** As already discussed, Milk Moovement has sufficiently pled a relevant market. The court also found plausible Milk Moovement's allegations that the relevant market has high barriers to entry, that Dairy's market power exceeds 80 percent, and that the companies Dairy acquired were competitors. Because these acquisitions limit the amount of available software providers in a market with high entry barriers, see H.J. Heinz Co., 246 F.3d at 718, the court finds it plausible that these acquisitions further concentrate an already concentrated market. Thus, the effect of the acquisitions "is likely to be anticompetitive." See Optronic, 20 F.4th at 485. Accordingly, Milk Moovement has alleged facts sufficient to support a claim under § 7 of the Clayton Act.

### H. UCL (Claim 10)

Finally, Milk Moovement asserts a claim under California's UCL. "California's UCL[ ] prohibits 'any unlawful, unfair, or fraudulent business act or practice.' This cause of action is generally derivative of some other illegal conduct or fraud ...."). Castaneda v. Saxon Mortg. Servs., Inc., 687 F.

Supp. 2d 1191, 1202 (E.D. Cal. 2009) (Shubb, J.) (quoting Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 187 (1999)). Here, Milk Moovement's asserts its UCL claim for Dairy's alleged violations of the Sherman Act and Clayton Act. (Id. ¶ 263.) Because Milk Moovement has adequately pled its antitrust claims, it has also adequately pled its unfair competition claim. See Name.Space, 795 F.3d at 1134 ("Statutory liability can be premised on antitrust or trademark violations.").

For the reasons stated above, the court finds that Milk Moovement has plausibly alleged facts sufficient to support its counterclaims for conspiracy to monopolize under §

2 of the Sherman Act, monopolization and attempted monopolization under § 2 of the Sherman Act, unlawful restraint of trade under § 1 of the Sherman Act, unlawful restraint of trade under California's Cartwright Act, unlawful mergers or acquisitions under § 7 of the Clayton Act, and unfair competition under California's UCL.

IT IS THEREFORE ORDERED that Dairy's motion to strike (Docket No. 270) and motion to dismiss (Docket No. 266) be, and the same hereby are, DENIED.

**All Citations**

Slip Copy, 2023 WL 3437426

## Footnotes

1    Dairy has changed its name to Ever.Ag. However, this order will continue to refer to Dairy for convenience.

2    While the court already discussed Milk Moovement's factual allegations as alleged in its Counterclaims and First Amended Counterclaims, (Docket Nos. 105, 134), the Second Amended Counterclaims contain new factual allegations in support of Milk Moovement's six new antitrust counterclaims. The court takes the allegations of the Second Amended Counterclaims as true.

3    Milk cooperatives are entities owned by its farmer-members.

4    Dairy is also partially owned by the private equity group, Banneker Partners. (2d Am. Countercls. ¶ 95.)

5    It appears that Dairy is attempting to argue that Exhibit 1 attached to its leave to amend — the proposed Counterclaims — is a pleading. However, as Milk Moovement points out, under Fed. R. Civ. P. 7(a), an exhibit is not a pleading. See Fed. R. Civ. P. 7(a) (listing types of pleadings allowed, including a complaint, an answer, and an answer to a counterclaim designated as a counterclaim).

6    Dairy also points out that the filed Second Amended Counterclaims incorporate by reference earlier pleadings, specifically references to the First Amended Counterclaims. (See Mot. Strike at 13-14.) Milk Moovement explains that these were typographical errors that were supposed to reference the Second Amended Counterclaims. (See Opp'n Mot. Strike at 11 n. 5). While counsel is cautioned to avoid such basic errors, the court declines to find the pleading violated Rule 220 on the basis of a typographical error.

7    Dairy suggests that a "synthesized pleading" is a pleading which is a "synthesis" of the operative parts of other pleadings. Thus, Dairy contends that Milk Moovement's Second Amended Counterclaims is a "synthesized pleading" as it contains the operative portions of Milk Moovement's Answer and First Amended Counterclaims as well as its proposed Second Amended Counterclaims.

8    The cases upon which Dairy relies in support of its motion to strike all involve instances where a party filed an amended pleading that greatly differed from the proposed pleading. See e.g., Hazdovac v. Mercedez-Benz USA, LLC, No. 20-cv-00377 RS, 2022 WL 2161506, at *2 (N.D. Cal. June 15, 2022) ("The new [c]omplaint

is littered with hundreds of changes compared to the proposed complaint, with paragraph after paragraph of new material in certain sections.").

9     Dairy argues it will be prejudiced because it "relied upon the proposed [Second Amended Counterclaims] in deciding whether to oppose and evaluating what arguments were available and should be made in opposition." (Mot. Strike at 8.) Dairy's argument is without merit. At the hearing for Milk Moovement's motion for leave to amend, Milk Moovement's counsel made clear its intentions to file one synthesized pleading which would contain its answer, affirmative defenses, and counterclaims. Moreover, counsel for Milk Moovement again informed Dairy's counsel that it was going to file a synthesized pleading by email prior to filing the Second Amended Counterclaims. (Opp'n Mot. Strike at 9.) Nothing in the Second Amended Counterclaims was new or a surprise to Dairy. Finally, Dairy cannot argue that it will be prejudiced by having to defend itself against "new and expansive antitrust claims." See Fru-Con Constr. Corp. v. Sacramento Mun. Util. Dist., No. CIV. S-05-583 LKK GGH, 2006 WL 3733815, at *5 (E.D. Cal. Dec. 15, 2006) (citation omitted) ("The fact that the amended counterclaim may cause more work does not constitute prejudice.").

10    Milk Moovement also alleges that the market for milk production and the market for milk processing are additional relevant markets because DFA — the largest milk producer and one of the largest milk processors in the United States — has an ownership interest in Dairy. (2d Am. Countercls. ¶ 125.)

11    Dairy attempts to argue that Milk Moovement was required to specifically identify other competitors because "data service providers" could include countless technology companies including Amazon's AWS and SAP. (Mot. Dismiss at 16). The court is unpersuaded. While presumably any company that provides data services could build the capabilities to provide data processing services for the dairy industry, the fact that they do not do so at this time means that they do not compete within the relevant product market. See 🚩 Facebook, 560 F. Supp. 3d at 17 ("[T]he fact that other services are not primarily used for the sort of personal sharing that is the hallmark of a [social media] service seems a plausible reason why little switching would occur."). Moreover, "the question of whether the market should include other products is better resolved at the summary judgment stage." Klein v. Facebook, Inc., 580 F. Supp. 3d 743, 765 (N.D. Cal. 2022) (citation and quotations omitted).

12    Dairy argues that the fact California Dairies left Dairy after Dairy tried to charge a higher price shows that Dairy could not in fact charge supracompetitive prices. (See Mot. Dismiss at 26.) Dairy, however, chooses to look at the factual allegations only in isolation. While California Dairies did leave Dairy for Milk Moovement, doing so led Dairy to initiate this action.

13    Dairy further argues that Milk Moovement failed to offer an explanation as to why the 80 percent figure is relevant to relevant geographic markets when three of the top ten companies on the list of the 100 largest dairy companies have locations outside of the United States. (Mot. Dismiss at 23.)

14    The press release announcing the acquisition of Data Specialists stated that the "[Data Specialists] manufacturing suite" was "a powerful solution that handles complex in-plant processing, further extending Dairy.com traceability capabilities across the supply chain." (Opp'n Mot. Strike at 24-25.) The press release for the Ever.Ag acquisition was similar: "[Dairy is] now even more capable of supporting the connected supply chain and ultimately empowering it to feed a growing world." (Id. at 25.)

15    In addition to arguing that Milk Moovement failed to allege that the acquisitions were of competitors, Dairy argues that (1) Milk Moovement failed to plead that it suffered a legally cognizable antitrust injury because Milk Moovement stood to gain from the alleged increase in prices, (2) Milk Moovement's allegations that Dairy had an inferior product in fact created Milk Moovement's business opportunity, (3) contractual restrictions in software and grant-base licenses are reasonable, and (4) enforcement of contractual rights is entitled to Noerr-Pennington protection. (Mot. Dismiss at 32-34.) The Noerr-Pennington doctrine "provides that those who petition any department of the government for redress," including the judicial branch, "are generally

immune from statutory liability for their petitioning conduct." B&G Foods N. Am., Inc. v. Embry, 29 F.4th 527, 535 (9th Cir. 2022).

16 A "shared monopoly" is an oligopoly. See Consol. Terminal Sys. Inc., v. ITT World Comms., Inc., 535 F. Supp. 225, 228-29 (S.D. N.Y. 1982).

17 "Although on its face, 🚩Section 1 appears to outlaw virtually all contracts, it has been interpreted as 'outlaw[ing] only unreasonable restraints' of trade." 🚩In re Nat'l Football League's Sunday Ticket Antitr. Lit., 933 F.3d 1136, 1149-50 (9th Cir. 2019) (quoting 🚩State Oil Co. v. Khan, 522 U.S. 3, 10 (1997)). "Because 🚩§ 1 ... only [prohibits] restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from an independent decision or from an agreement, tacit or express." 🚩Twombly, 550 U.S. at 553 (citations and internal quotations omitted); see Optronic, 20 F.4th at 479 ("To establish a conspiracy, the available evidence must tend 'to exclude the possibility that the alleged conspirators acted independently.' ") (citation and internal quotations omitted).

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4975373
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.

FINANCIALAPPS, LLC, Plaintiff,
v.
ENVESTNET, INC. and Yodlee, Inc., Defendants.

Civil Action No. 19-1337-GBW-CJB

|

Signed July 31, 2023

**Attorneys and Law Firms**

Comrie Barr Flinn, Pilar Gabrielle Kraman, Robert M. Vrana, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, for Plaintiff.

**REPORT AND RECOMMENDATION**

Christopher J. Burke, UNITED STATES MAGISTRATE JUDGE

**\*1** Plaintiff FinancialApps, LLC ("Plaintiff" or "FinApps") filed this action against Defendants Envestnet, Inc. ("Envestnet") and Yodlee, Inc. ("Yodlee" and collectively with Envestnet, "Defendants") asserting various federal and state law causes of action. (D.I. 2) Presently pending before the Court is Envestnet's motion for summary judgment No. 1, in which it moves for summary judgment on FinApps' Counts 1, 2, 4, 5, 8 and 14 pursuant to Federal Rule of Civil Procedure 56 (the "Motion"). (D.I. 446) FinApps opposes the Motion. For the reasons set forth below, the Court recommends that the District Court GRANT-IN-PART and DENY-IN-PART Envestnet's Motion.

**I. BACKGROUND**

**A. Factual Background**
FinApps is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida. (D.I. 2 at ¶ 22) Founded in 2014, FinApps is a software development company in the financial technology space—a technological area in which consumers can access financial services digitally. (Id. at ¶¶ 1-2, 31)

Defendant Envestnet is a publicly held Delaware corporation with its principal place of business in Berwyn, Pennsylvania.

(D.I. 448 at ¶ 1; D.I. 493 at ¶ 1) Defendant Yodlee is a California corporation with its principal place of business in San Mateo, California. (D.I. 448 at ¶ 3; D.I. 493 at ¶ 3) Yodlee provides consumer-permissioned financial data aggregation services. (D.I. 2 at ¶¶ 1, 70; D.I. 448, ex. 2 at ¶ 6) Yodlee has been a wholly-owned subsidiary of Envestnet since 2015. (D.I. 448, ex. 2 at ¶ 7)

FinApps alleges that by 2016, it had created a software platform (the "Platform") that was capable of analyzing vast amounts of consumer financial data in real time; the Platform was also able to generate credit risk reports for underwriters to use in making decisions on loan issuances and extensions of credit. (D.I. 2 at ¶¶ 4, 35-36) On January 31, 2017, FinApps and Yodlee executed a Software License and Master Services Agreement ("MSA") and other related agreements. (Id. at ¶¶ 7, 83 & exs. 1-3; D.I. 160 at ¶¶ 34-35) Pursuant to the MSA, FinApps would develop a product called Risk Insight 2.0 ("Risk Insight") that would generate financial reports for use by financial institutions in deciding whether to issue loans, and Yodlee would market and sell the product. (D.I. 2 at ¶¶ 6, 75; D.I. 160 at ¶¶ 36-37)

Over the next few years, the relationship between FinApps and Defendants deteriorated. The Court has previously set out the parties' allegations in that regard in its July 6, 2020 Report and Recommendation ("July 6 R&R") and July 30, 2020 Report and Recommendation ("July 30 R&R"). (D.I. 109 at 1-4; D.I. 113 at 1-3) The Court assumes familiarity with the factual background set out in its July 6 R&R and July 30 R&R. (D.I. 109 at 1-4; D.I. 113 at 1-3)

Further relevant facts related to resolution of the Motion will be discussed as needed in Section III.

**B. Procedural Background**
On July 17, 2019, FinApps filed its Complaint in this matter. (D.I. 2) The case was thereafter referred to the Court to conduct all proceedings and to hear and determine all motions, pursuant to 🔖 28 U.S.C. § 636(b). (D.I. 18; D.I. 437) Envestnet filed the instant Motion on January 6, 2023, (D.I. 446), and briefing was completed on April 13, 2023, (D.I. 547).

**\*2** Because FinApps waived its right to a jury trial against Yodlee by entering into the MSA, the case will be decided in two separate trials (both of which are to be scheduled): first, a jury trial on FinApps' claims against Envestnet, to be

Financialapps, LLC v. Envestnet, Inc., Slip Copy (2023)

followed by a bench trial on FinApps' claims against Yodlee. (D.I. 250 at 4, 10; *see also* D.I. 442; D.I. 445 at 5, 7)

**II. STANDARD OF REVIEW**
The Court incorporates by reference the standard of review for summary judgment motions set out in its July 25, 2023 Report and Recommendation in this case. (D.I. 582 at 2-3)

**III. DISCUSSION**
FinApps' Complaint alleges six remaining claims against Envestnet: Counts 1 and 2 (claims for misappropriation of trade secrets brought under federal and state law), Count 4 (tortious interference with prospective business opportunities), Counts 5 and 8 (unfair competition claims brought pursuant to common law and state statute) and Count 14 (unjust enrichment). (D.I. 2 at ¶¶ 207-40, 259-68, 280-85, 332-38; *see also* D.I. 126 at 9-10) As to these counts, FinApps contends that Envestnet is vicariously liable for the acts of its agent, Yodlee, and that Envestnet also directly engaged in the alleged misconduct. (*See* D.I. 447 at 1; D.I. 492 at 9-14)

Envestnet moves for summary judgment on all six of these claims. (D.I. 447 at 2) It asserts that it is the "wrong defendant"—i.e., that Envestnet was not a party to the MSA, that it did not enter into any other contract with FinApps, and that it was not involved in the Risk Insight project in any meaningful way. (*Id.* at 1-3)

In order to prevail on its claims against Envestnet, FinApps must either: (1) pierce the corporate veil to hold Envestnet vicariously liable for the misconduct of its subsidiary Yodlee; or (2) demonstrate that Envestnet directly participated in the misconduct. With its Motion, Envestnet first argues that FinApps cannot pierce the corporate veil to hold Envestnet vicariously liable for Yodlee's misconduct because Envestnet is merely a holding company that does not dominate Yodlee's actions. (*Id.* at 6-8; D.I. 547 at 5-6) It then argues that there can be no direct liability for Envestnet because: (1) there is no evidence that any Envestnet employee was involved in the alleged misconduct; (2) there is no evidence that an Envestnet employee forced Yodlee to engage in the misconduct; and (3) there is no evidence that an Envestnet employee held a position at Yodlee but was acting for Envestnet when engaging in the misconduct. (D.I. 447 at 8-20; D.I. 547 at 6-10) Finally, Envestnet makes more specific arguments about each of the counts against it. The Court will take up Envestnet's arguments in turn.

**A. Vicarious Liability**
It is well-settled that, as a general principle of corporate law that is "deeply ingrained in our economic and legal systems[,] ... a parent corporation ... is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (internal quotation marks and citations omitted). Piercing the corporate veil is an "extraordinary remedy." *Round Rock Rsch. LLC v. ASUSTeK Comput. Inc.*, 967 F. Supp. 2d 969, 978 (D. Del. 2013) (internal quotation marks and citation omitted). That said, courts at times have pierced the corporate veil (that is, disregarded the corporate form) and held a parent corporation responsible for the conduct of its subsidiary. One way courts have done so is pursuant to a particular type of agency theory; this agency theory considers the "amount of control the parent corporation exercises over the actions of the subsidiary." *Phx. Can. Oil Co. v. Texaco, Inc.*, 658 F. Supp. 1061, 1084 (D. Del. 1987), *aff'd in relevant part*, 842 F.2d 1466, 1477 (3d Cir. 1988). [1] If the parent corporation is found to "dominate[ ]" the activities of the subsidiary, then the parent corporation will be held liable for such activities. *Phx. Can. Oil*, 658 F. Supp. at 1084. [2] Factors to consider in determining whether "domination" exists can include "stock ownership, officers and directors, financing, responsibility for day-to-day operations, arrangements for payment of salaries and expenses, and origin of subsidiary's business and assets." *Id.* (internal quotation marks and citations omitted). The existence of an agency relationship is a question of fact. *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 840-41 (D. Del. 1978); *Lang v. Morant*, 867 A.2d 182, 186 (Del. 2005) ("Although a legal concept, agency depends on the presence of factual elements. It is thus a question usually reserved for the factfinder.") (footnotes omitted).

**\*3** Envestnet's primary argument is that FinApp's agency theory must fail because there is no evidence that Envestnet has "dominate[d]" Yodlee's activities. (D.I. 447 at 7-8; D.I. 547 at 6) [3] Instead, according to Envestnet, the evidence definitively demonstrates that:

- Envestnet is a holding company and does not sell products, (D.I. 448, ex. 2 at ¶¶ 4, 23; *id.*, ex. 3 at 20);

• Yodlee is a separate company with its own management structure that conducts business through its own departments, (*id.*, ex. 2 at ¶¶ 7, 9);

• Yodlee maintains its own corporate books, bank accounts and records and pays its own expenses, (*id.*, ex. 2 at ¶¶ 10, 14-16); and

• Envestnet has never provided financing to Yodlee, and Yodlee is responsible for payment of its own debts and liabilities and bears the expenses of employing its own personnel, (*id.*, ex. 2 at ¶¶ 15, 18, 21).

Envestnet's evidentiary support for these assertions is found in a declaration submitted by Envestnet's Deputy General Counsel, Patrick Marr (the "Marr Declaration"), as well as in Mr. Marr's deposition testimony. (*See* D.I. 447 at 8 n.2)

Mr. Marr asserts that beginning in January 2019, simply for purposes of Envestnet's public financial reporting, Envestnet organized its operating subsidiaries, including Yodlee, into two business segments: Envestnet Wealth Solutions and Envestnet Data & Analytics ("Envestnet Data & Analytics" or "Envestnet D&A"), with Yodlee and its subsidiaries falling under the latter segment. (D.I. 448, ex. 2 at ¶¶ 27-28; *see also id.*, ex. 3 at 27-28, 39-40)[4] Mr. Marr explains that this January 2019 organization effort "did not alter the corporate structure of Envestnet or any of its subsidiaries or the ways in which any of them operate[.]" (*Id.*, ex. 2 at ¶ 29; *see also id.*, ex. 3 at 28) "Envestnet Data & Analytics[,]" according to Mr. Marr, is just a "brand name" used to refer to Yodlee and Yodlee's subsidiaries, and sometimes that name was used in Yodlee employees' job titles. (*Id.*, ex. 2 at ¶ 28; *id.*, ex. 3 at 33-35; *see also* D.I. 547 at 1 (" 'Envestnet D&A' is just another name for Yodlee, Inc.")) For example, according to Mr. Marr, Yodlee's Chief Operating Officer is sometimes called the "Chief Operating Officer, Envestnet Data & Analytics"—though Mr. Marr states that such a title describes "the same single role" at Yodlee; he emphasizes that Yodlee personnel are not employed by Envestnet, nor do they hold any position there otherwise. (D.I. 448, ex. 2 at ¶ 28)

 **\*4**  FinApps, for its part, argues that there are genuine issues of material fact in the record as to each of these assertions. (D.I. 492 at 12-14)[5] And the Court agrees that there are.

For example, with respect to Envestnet's argument that Envestnet is merely a holding company that does not sell products, FinApps points to purportedly contrary evidence.

This includes documents indicating that Envestnet underwent its reorganization effort from 2017 through January 2019, by which it transitioned from a simple holding company into a company that would actively manage its business units, including Yodlee. (*Id.* at 12-13 (citing D.I. 494, ex. 11 at YOD12216431, -6441; *id.*, ex. 13, 19, 21); *see also* D.I. 494, ex. 15 at YOD02259151)[6]

Moreover, contrary to Envestnet's assertions that the reorganization leading to the creation of Envestnet D&A was done primarily "for purposes of Envestnet's public financial reporting[,]" (D.I. 448 at ¶¶ 23, 26), that the reorganization did not significantly alter Envestnet's corporate structure and that Envestnet D&A is simply a "brand name" used to refer to Yodlee:

• Certain documents suggest that the reorganization was not undertaken primarily for public reporting purposes, and instead was done to "enhance [*Envestnet's*] ability to collaborate across the business[.]" (D.I. 494, ex. 21 at YOD12232142; *see also id.*, ex. 20 at 3 (Envestnet's January 9, 2019 United States Securities and Exchange Commission ("SEC") Form 8-K stating that Envestnet aligned its operations into two business units "to drive innovation and continued growth"); *id.*, ex. 37 at YOD02286261-62);

• Similarly, according to Envestnet's Project Elevate plan, the "new" "[o]perating [m]odel" was said to "[u]nify non-client facing activities across the corporation" with "[c]orporate [s]hared [s]ervices" to include "[f]inance, HR, [and] [l]egal" and a "[c]ore [p]rocessing [u]nit" to include "[s]olutions [c]onsulting, [o]perations, [and e]ngineering[.]" (*Id.*, ex. 15 at YOD02259151);

 **\*5**  • In August 2018, Envestnet appeared to refer to the reorganization "[c]hanges" not as insignificant, but instead as "pretty radical" with regard to, for example, their impact on Envestnet and Yodlee "reporting relationships." (D.I. 496, ex. 109 at YOD02267058); and

• In its SEC Form 10-K for the fiscal year ended December 31, 2019, Envestnet noted that its Envestnet Data & Analytics business segment constituted "a leading data aggregation and data intelligence platform powering dynamic, cloud-based innovation for digital financial services, and

*includes* product offerings from Envestnet | Yodlee and Envestnet | Analytics." (D.I. 494, ex. 24 at 76 (emphasis added)) Envestnet also issued FAQs regarding the "[o]rganizational [u]pdate" on January 9, 2019 ("Envestnet's FAQs"), further explaining that Envestnet D&A was a key "business unit" that would continue to develop "*Envestnet's* data aggregation, enterprise data management and analytics offerings" and that "*includes* Envestnet | Yodlee." (*Id.*, ex. 37 at YOD02286259-62 (emphasis added)) And a January 2019 e-mail from Jud Bergman, then-Chairman and Chief Executive Officer ("CEO") of Envestnet, to Envestnet colleagues explained that Envestnet D&A would "focus on building out *our* data aggregation, enterprise data management and analytics offerings" and that "Yodlee will continue as *our* data aggregation and technology brand[.]" (*Id.*, ex. 21 at YOD12232143-44 (emphasis added)) [7] This evidence could suggest, as Plaintiff argues, that Envestnet D&A is not simply a synonym for Yodlee but is instead a business unit at Envestnet, while Yodlee, meanwhile, is a separate entity or "brand" within Envestnet D&A. (*See* D.I. 492 at 9-10)

FinApps also addressed Envestnet's assertion that <u>Yodlee is a separate company with its own independent management structure that conducts business entirely through its own departments</u>. For example, FinApps highlighted the following facts:

- FinApps notes that contrary to Envestnet's position that Yodlee had its own "discrete management structure[,]" there was at least some overlap in management between Yodlee and Envestnet. (*Id.* at 2-3, 13) Prior to January 2019, Stuart DePina was a member of Envestnet's senior management, serving as the President of "Envestnet | Tamarac." [8] (D.I. 494, ex. 22 at YOD1230638; *id.*, ex. 25 at 16) Envestnet's FAQs explained that Mr. DePina was then moving from his role as President of "Envestnet | Tamarac" to become Chief Executive of Envestnet D&A, "which *includes* Envestnet | Yodlee." (*Id.*, ex. 37 at YOD02286259 (emphasis added); *see also id.*, ex. 20 at 3, *id.*, ex. 21 at YOD 12233143-44; *id.*, ex. 24 at 5; *id.*, ex. 33 at YOD06456101; *id.*, ex. 34) Mr. DePina's new role as Chief Executive of Envestnet D&A was described as an "expanded leadership role[ ]" that would continue reporting to Mr. Bergman. (*Id.*, ex. 21 at YOD 12233143-44)

**\*6** • Although Envestnet insists that Envestnet D&A is just another name for Yodlee (and that therefore all personnel with Envestnet D&A in their titles are solely Yodlee personnel), (D.I. 547 at 1), and although there is record evidence supporting that assertion, (*see id.* at 3), there is also evidence to the contrary. For example, a March 2019 Form 144 Request Letter and Consent was sent from Mr. DePina with his "Title" listed as "Chief Executive, Envestnet Data & Analytics" and his "Company" listed as "*Envestnet Inc.*" (D.I. 494, ex. 31 (emphasis added)) And a document from a 2019 Envestnet Advisor Summit identifies Mr. DePina as: "Stuart DePina[,] Chief Executive, Envestnet Data & Analytics[,] *Envestnet*[.]" (*Id.*, ex. 34 (emphasis added)) These documents could suggest that Mr. DePina worked *for Envestnet*, not simply for Yodlee.

- In his role with Envestnet D&A, Mr. DePina's "executive leadership" team consisted of, *inter alia*, Arun Anur (Chief Operating Officer), Brandon Rembe (Senior Vice President of Products) and Julie Solomon (Senior Vice President of Financial Institution and Yodlee Interactive Sales). (*Id.*, ex. 21 at YOD12232143; *id.*, ex. 27 at 2-3; *id.*, ex. 28 at 219; *id.*, ex. 29 at 15, 17) [9] Thus, if FinApps' view of the facts is correct, these additional executives could be said to actively manage the day-to-day operations of an Envestnet entity (Envestnet D&A) while also playing an oversight role of the work of Yodlee.

- Yodlee has one board member, and in 2019 that sole board member was Mr. Bergman, who, again, was Envestnet's CEO at the time (he has since passed away). (*Id.*, ex. 38 at 86-87)

Taken together, this evidence could support the claim that: (1) executives who are associated with Envestnet (not simply Yodlee) oversee Yodlee's work; and (2) employees that are part of the Envestnet D&A team do not just work for Yodlee, but also work for its parent, Envestnet.

Lastly, FinApps takes on Envestnet's assertion that Yodlee <u>pays its own debts and bears the costs of employing its personnel</u>. (D.I. 492 at 13) It notes, for example, that Mr. Anur, Chief Operating Officer of Envestnet D&A, testified that the compensation for everyone employed by Yodlee comes from "Envestnet." (D.I. 494, ex. 28 at 21-23) [10]

In short, FinApps has pointed to evidence that establishes disputes of fact pertaining to many of Envestnet's key assertions regarding FinApps' agency theory. Envestnet's in-house counsel's declaration and deposition testimony paint a picture of Envestnet as a mere holding company that is entirely distinct from Yodlee. (*See* D.I. 447 at 1, 3-5) But FinApps musters contrary evidence suggesting that Envestnet is much more than a mere holding company, and that individuals associated with it did indeed have a fairly substantial role in managing Yodlee's operations. It is the province of the jury to weigh this competing evidence. The Court therefore recommends that the Motion be denied with respect to FinApp's vicarious liability theory. *See* 🚩 *J.E. Rhoads & Sons, Inc. v. Ammeraal, Inc.*, No. CIV.A. 83C-NO-98, 1988 WL 32012, at *7 (Del. Super. Ct. Mar. 30, 1988)* ("[P]laintiff has cited sufficient facts to the contrary to produce the small measure of evidence necessary to rebut summary judgment on the agency relationship.").

**B. Direct Liability**

Envestnet next argues that it is not directly liable for Yodlee's actions because there is no evidence that Envestnet employees were involved in the purported misconduct. Envestnet's arguments take a few different tacks here, which the Court will address in turn.

**1. Envestnet D&A and its Association with Envestnet and Yodlee**

 **\*7** Envestnet first (rightly) predicts that FinApps would argue that Envestnet is directly liable because: (1) Envestnet D&A is a business unit at Envestnet that is not merely another name for Yodlee; and (2) members of the Envestnet D&A executive leadership team were responsible for the wrongdoing. (*See* D.I. 447 at 8) To that, Envestnet reiterates its assertion that " 'Envestnet Data & Analytics' is not an entity but merely a business segment name used to refer to Yodlee and its subsidiaries in Envestnet's public filings." (*Id.*)

As described above, however, FinApps has pointed to potentially contrary evidence suggesting that:

- Envestnet D&A is a business unit *at Envestnet*, created as part of Project Scotland/Project Elevate, (*See* D.I. 492 at 9-10);

- Envestnet D&A is not just a name used to refer to Yodlee; instead, Yodlee is an entity (among others) *within Envestnet D&A*, (*see id.*); and

- Envestnet D&A is actively managed by an executive leadership team of *Envestnet* employees, including Mr. DePina, Mr. Rembe, Ms. Solomon and Mr. Anur, whom FinApps asserts is responsible for a significant amount of the purported misconduct, (*id.*). [11]

So there are disputed issues of fact in this regard.

**2. The Role of Envestnet D&A Executives, Including Mr. DePina and Mr. Rembe**

Envestnet next (again, rightly) predicted that FinApps would point to the actions of Mr. DePina and Mr. Rembe (along with others in the Envestnet D&A leadership team), in an effort to hold Envestnet directly liable for Yodlee's actions, on the alleged basis that the two worked for both Yodlee and Envestnet. (D.I. 447 at 9) And here again, Envestnet doubles down on its position that Mr. DePina and Mr. Rembe did not hold any positions with Envestnet during the relevant time period. (*Id.* at 9-10) But there is sufficient evidence in the record to establish a genuine dispute of material fact on both fronts.

With regard to Mr. DePina, for example, Envestnet contends that he served solely as Chief Executive of Yodlee/Envestnet D&A from January 2019 until March 2020. (D.I. 448, ex. 2 at ¶ 33; *id.*, ex. 3 at 29, 103-04, 196) It further notes that only in March 2020—eight months after the Complaint in this case was filed—did Mr. DePina become President of Envestnet (a role he held simultaneously with his Chief Executive role). (*Id.*, ex. 2 at ¶ 33) But as noted above, there is record evidence indicating that Envestnet D&A was *not* simply just another name for Yodlee and instead that it was a division of Envestnet itself. Were that true, then Mr. DePina's role as Chief Executive with Envestnet D&A would suggest that he *did* have a role at Envestnet during the relevant time period. (D.I. 492 at 10-11) And, as was noted above, in documents of record Mr. DePina was described in the relevant timeframe as working for or being associated not just with Envestnet D&A, but more broadly with "Envestnet" and "Envestnet Inc." (D.I. 494, ex. 31 at YOD10492182-83; *id.*, ex. 34 at YOD6456108; *id.*, ex. 36 at YOD12350336)

**\*8**  And with respect to Mr. Rembe, Envestnet asserts that: (1) he was Senior Vice President of Products and Strategy at Yodlee from June 2018 to September 2020; and (2) only in September 2020—over a year after the Complaint was filed —did Mr. Rembe leave that role to become Chief Product Officer of Envestnet. (D.I. 448, ex. 2 at ¶ 34; *id.*, ex. 3 at 83) But at a minimum, Mr. Rembe was also an executive leadership member of Envestnet D&A during the time period in question, which bolsters FinApps' argument here. (D.I. 494, ex. 21 at YOD12232143) [12]

Envestnet also makes another argument about the purported irrelevance of FinApps' reliance on the conduct of Mr. DePina and Mr. Rembe. It asserts that even if these two men did play a dual role at both Envestnet and Yodlee in the relevant period, then in order to hold Envestnet directly liable for Yodlee's actions, FinApps would have to overcome a presumption that the executives' actions in question were conducted on behalf of Yodlee, not Envestnet. (D.I. 447 at 10) Here, Envestnet is relying on caselaw from the Supreme Court of the United States, which explains that it is normal for a parent and its subsidiary to have identical directors and officers. *Bestfoods*, 524 U.S. at 69. In these circumstances, the Supreme Court has noted that it is a "well established principle" that such directors and officers "can and do change hats to represent the two corporations separately, despite their common ownership." *Id.* (internal quotation marks and citation omitted); *see also Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484 (3d Cir. 2001) ("[M]ere ownership of a subsidiary does not justify the imposition of liability on the parent.... Nor will liability be imposed on the parent corporation merely because directors of the parent corporation also serve as directors of the subsidiary."). Accordingly, "courts generally presume that the directors are wearing their subsidiary hats and not their parent hats *when acting for the subsidiary*," and it is error to automatically "attribut[e] the actions of dual officers and directors to the corporate parent" in order to impose direct liability on the parent. *Bestfoods*, 524 U.S. at 69-70 (internal quotation marks and citations omitted) (emphasis added). Instead, a plaintiff must put forth evidence to the contrary (i.e., that the dual officer was acting *for the parent* when engaging in the wrongful misconduct) in order to rebut the presumption. *Id.* at 64, 69-70; *Pearson*, 247 F.3d at 487 (explaining that parents may be directly liable for their subsidiaries' actions when the parent "has forced the subsidiary to take the complained-of action, in disregard of the subsidiary's distinct

legal personality"); *see also, e.g., Pennington v. Fluor Corp.*, 19 F.4th 589, 598 (4th Cir. 2021) (explaining that the direct liability test is "a narrow test, one that is designed to apply in the unusual case where a company commits a wrongful act through the legal form of a distinct entity"); *In re Maxus Energy Corp.*, 617 B.R. 806, 818 (Bankr. D. Del. 2020). [13]

**\*9**  In response, FinApps contends that "[a]mple record evidence demonstrates that [Mr.] DePina and [Mr.] Rembe acted on behalf of Envestnet, not Yodlee ... thus directly rebutting the *Bestfood[s]* presumption, and raising significant questions of fact for the jury." (D.I. 492 at 11) The Court again agrees that the record demonstrates issues of fact in this respect.

The Complaint alleges, *inter alia*, that Defendants secretly worked with Equifax to develop an alternative software product to Risk Insight, using FinApps' proprietary information and technology. (*See, e.g.*, D.I. 2 at ¶¶ 262, 278, 283) And the record regarding those allegations could help demonstrate that certain individuals engaging in that conduct were doing so on behalf of *Envestnet*, not simply on behalf of Yodlee. Below, the Court summarizes this evidence, noting where an actor's ties to Envestnet or an Envestnet entity appear to be prominent.

First, FinApps points to evidence suggesting that Envestnet itself was directly involved in cementing the partnership with Equifax and with the decision to unwind Defendants' relationship with FinApps. (D.I. 492 at 4-5 (cited at *id.* at 11)) This evidence includes the following:

- E-mails from late 2018 among Equifax, Yodlee, and Envestnet personnel (including Mr. DePina, who was then a member of Envestnet's senior management and Mr. Bergman, who was then Envestnet's CEO) regarding, *inter alia*, the "discussion around a partnership between Yodlee, *Envestnet*, and Equifax[,]" (D.I. 494, ex. 39 (emphasis added); *see also id.*, exs. 40-45);

- E-mails (mostly from the time period when Mr. DePina was still a member of Envestnet's senior management) demonstrating that Mr. DePina (using his Envestnet e-mail address) helped to secure the partnership, which extended to areas including "[i]ncome, [a]sset verification and enhanced credit scores[,]" (*id.*, ex. 46; *see also id.*, exs. 47-49);

- On February 1, 2019, Mr. DePina sent an e-mail (from a Yodlee e-mail address) copying Mr. Rembe (at an Envestnet e-mail address) [14] to update Mr. Bergman regarding "finalizing terms" for the partnership with Equifax, (*id.*, ex. 50);

- On February 10, 2019, Mr. Rembe sent an e-mail (from his Yodlee e-mail address) to, *inter alia*, Mr. DePina (at his Envestnet e-mail address) regarding their work with FinApps over the past two years to create Risk Insight, (D.I. 497, ex. 159);

- On February 20, 2019, Ms. Solomon sent an e-mail to Mr. DePina and Mr. Rembe regarding Equifax's latest proposal, including that that Equifax was seeking "all *E[nvestnet]* internal reviews/approvals" for the partnership," (D.I. 494, ex. 51 (emphasis added)), and she was involved in reviewing and finalizing open items—including walking "the *E[nvestnet]* technical accounting team through the proposed accounting treatment"—with respect to the contract between Equifax and Yodlee in May and June 2019 (with Mr. Rembe also in receipt of all such e-mails), (D.I. 496, ex. 52 (emphasis added)).

On March 8, 2019, Mr. DePina (signing as Chief Executive Officer of Yodlee) and Equifax's CEO executed a letter of intent regarding the distribution of Yodlee's Risk Insight Reports. (*Id.*, ex. 53)

 **\*10**  Second, record evidence regarding Defendants' efforts to purchase the rights to Risk Insight indicates Envestnet's involvement in that process. More specifically, in October 2018, Mr. Rembe recognized that Yodlee/Envestnet did not "really own the Risk Insight[ ] code or IP" and sought to either "completely unwind our relationship with [FinApps] and reverse engineer their app, or find a way [to] somehow 'purchase' the ability to own the code/IP" and asked if "we have anyone at Yodlee *or Envestnet* that we can bring in to help with this[.]" (*Id.*, ex. 55 (emphasis added)) While Envestnet and Yodlee "clos[ed] in" on the partnership with Equifax, Mr. DePina e-mailed then-Envestnet CEO Mr. Bergman regarding "challenges" that they faced given their current relationship with FinApps, which was problematic "in terms of distribution" of Risk Insight, a problem that the companies would be "forced to ultimately address[.]" (*Id.*, ex. 54) Mr. DePina reported to Mr. Bergman that they had "initiated discussions ... to purchase the rights to Risk Insight[.]" (*Id.*; *see also* D.I. 497, ex. 159) Mr. Bergman

was "[s]upportive[,]" (D.I. 496, ex. 56), and authorized up to $10 million to acquire the rights to Risk Insight, (*id.*, ex. 57). Mr. DePina and Viggy Mokkarala, Executive Vice President, Strategic Development *of Envestnet*, then engaged in negotiations with Bob Sullivan, President of FinApps, regarding the acquisition; these negotiations were ultimately unsuccessful. (*Id.*, exs. 58-65; *id.*, ex. 66 at 90-91; *id.*, ex. 67 at 340-41)

Third, record evidence relating to Defendants' transition from working with FinApps on Risk Insight to Defendants' partnership with Equifax demonstrates involvement not only from Yodlee personnel, but also from Envestnet D&A personnel like Mr. DePina and Mr. Rembe (and Mr. Anur and Ms. Solomon)—i.e., personnel who could plausibly be said to have been working on behalf of Envestnet. For example, on April 7, 2019, Mr. DePina alerted Mr. Sullivan that "Yodlee will cease marketing and selling the Risk Insight[ ]" product. (D.I. 497, ex. 145) On the same day, Mr. DePina sent an e-mail (from his Yodlee e-mail address) to, *inter alia*, Mr. Rembe (at his Envestnet e-mail address) regarding the letter that Mr. DePina sent to FinApps documenting the wind down of Risk Insight efforts. (*Id.*, ex. 160) An April 10, 2019 e-mail among Equifax personnel indicated that Equifax and Ms. Solomon had discussed utilizing an "exact replica of the Risk Insight" product ("Equifax MVP") that would be launched in May. (D.I. 496, ex. 68; *see also id.*, ex. 78) Melissa Monk of Equifax asked Envestnet D&A's executive team, including Mr. Rembe and Ms. Solomon, "to provide a deeper overview of" Risk Insight including "detailed technical and data flows" and a "detailed file layout of the report" as well as, potentially, "the API guide." (*Id.*, ex. 79) At least some of these materials were sent to Ms. Monk, (*id.*, exs. 80-85), and on April 16 and 17, Yodlee personnel, Ms. Solomon, and Equifax personnel met to discuss the new replacement product, (*id.*, ex. 86).

Meanwhile, Mr. DePina explained to Envestnet D&A's leadership (including Mr. Rembe and Ms. Solomon) that their "strategy is to get [Risk Insight] clients to leverage what we are doing with Equifax" and not to work with FinApps. (*Id.*, ex. 69; *see also id.*, exs. 70-74) On April 17, 2019, Ms. Solomon reported to Mr. DePina that $12 million of the Risk Insight "pipeline has been taken out" and all new Risk Insight deals are going to Equifax. (*Id.*, ex. 75 (emphasis omitted)) On that same date, pursuant to Mr. Rembe's instructions, all responsibility for Risk Insight and all Risk Insight clients was transitioned to a single Yodlee employee to allow others to be "completely focused" on the partnership with Equifax. (*Id.*, exs. 76-77) And on the same

date, Mr. Anur confirmed with Mr. DePina that they would be "taking on a significant portion of the Equifax solution build out" and would dedicate a Yodlee team to assist in the efforts. (*Id.*, ex. 88 at YOD02762001) Mr. Rembe instructed Michael Burger to "provide whatever support is needed" to Mr. Anur to ensure the new product was created "ASAP" with "scope to a MINIMUM and to get this work done as quickly as possible." (*Id.*, ex. 89) Mr. Burger confirmed his understanding that he was to "get[ ] this done as quickly as possible with a minimum amount of work[.]" (*Id.*) Mr. Anur reiterated to a team of Yodlee personnel assisting with the development of the new product that the "#1 priority is to get this done!" and that "we are under tremendous pressure to get this done very quickly!" (*Id.*, ex. 91 at YOD00668403) Mr. DePina was aware that a new Risk Insight product was being developed for Equifax that incorporated technology from FinApps. (D.I. 494, ex. 25 at 227-28) Equifax MVP used the same specification as Risk Insight to "save[ ] everybody's time so we need not develop it from scratch[,]" (D.I. 496, ex. 92 at 191, 199, 203, 211), used "similar attributes" as Risk Insight, (*id.*, ex. 93 at 180), and "was initially based off" of Risk Insight, (*id.* at 199-200). Mr. Anur's team appeared to admit to reverse engineering at least certain aspects of FinApps' technology in developing Equifax MVP. (*Id.*, ex. 93 at 253-57; *id.*, ex. 94; *id.*, ex. 95 at 91-94; *see also id.*, ex. 96; *id.*, ex. 97)

**\*11** In late March and early April 2019, FinApps learned that Yodlee had accessed another piece of FinApps' software known as "YProxy[.]" (*See* D.I. 2 at ¶¶ 16, 134, 139) FinApps suspended access to YProxy, prompting requests from Mr. DePina and Mr. Anur to restore that access. (D.I. 496, exs. 98-100; *see also id.*, ex. 67 at 328-29) Defendants are alleged to have utilized YProxy to assist in the development of competing products. (*Id.*, ex. 101 at ¶¶ 299-303; *id.*, ex. 102 at ¶¶ 702-07)

In sum, the evidence above could support the assertion that, during the key period, executives employed by Envestnet D&A (an entity affiliated with *Envestnet*), at times using their *Envestnet* e-mail addresses, worked together and with *Envestnet's* then-CEO and other *Envestnet* employees to play a lead role in negotiations and transactions related to the claims at issue in this case—such that they were involved in the process of finalizing "the effectuation of the alleged misconduct[.]" (D.I. 492 at 11-12) FinApps has thus established questions of fact regarding Envestnet's own involvement in the purported misconduct, which the jury must resolve. The Court therefore recommends that the

Motion be denied with respect to FinApp's direct liability theory. *See, e.g.*, *Snee v. Marriott Resorts Hosp. Corp.*, Case No. SACV 14-1745-JLS (JCGx), 2015 WL 13919138, at \*6 (C.D. Cal. Nov. 25, 2015) (denying Marriott Vacations' motion for summary judgment on the issue of direct liability, where the plaintiff "offered substantial evidence of Marriott Vacations' direct involvement in decisions and policies regarding her employment" including that she received e-mail messages regarding her employment from e-mail addresses that included "marriottvacationsworldwide" as part of the domain name, and where the relevant policy noted that the guidelines therein were subject to Marriott Vacations' management approval) (internal quotation marks and citations omitted); 🚩⚠️*United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 62-63 (D.D.C. 2007) (denying the defendant's motion for summary judgment, which in part claimed that the defendant could not be held directly liable for conduct committed by its indirect subsidiary, where the plaintiff put forth evidence establishing a factual dispute as to whether the defendant was involved in the misconduct "even though the corporate distinctions between the two were still observed").

### C. Specific Claims

Envestnet finally provides additional argument regarding the specific remaining claims against it. The Court will now take up the arguments that Envestnet made in this portion of its briefing.

#### 1. Counts 1 and 2

With respect to FinApps' trade secret misappropriation claims (Counts 1 and 2), Envestnet's primary argument [15] is that "there is no evidence that Envestnet participated in, directed, or orchestrated any purported misappropriation in connection with any Yodlee product." [16] (D.I. 447 at 11-12) This argument flows from its contentions that, *inter alia*, Envestnet is just a holding company and Envestnet D&A employees were solely Yodlee employees. (*Id.* at 12-14; D.I. 547 at 8-9) As discussed above, FinApps has identified competing evidence on that score—i.e., that Envestnet D&A executive leadership members (including Mr. DePina and Mr. Rembe) were involved in directing the development of Equifax MVP, an accused Yodlee product, and that this product was based on (and involved the alleged misappropriation of) FinApps' technology. (D.I. 492 at 14-16) [17]

**\*12**  Envestnet also argues that "no Envestnet personnel worked on Risk Insight 2.0—the project through which [FinApps] alleges Defendants gained access to its trade secrets." (D.I. 447 at 12) But FinApps points to record evidence establishing that, at least prior to the January 2019 reorganization, then Yodlee-employees that were later elevated to Envestnet D&A's executive leadership team (including Mr. Anur, Mr. Hempel, Ms. Hingley, Mr. Rembe and Ms. Solomon) all provided technical assistance regarding Risk Insight, and were involved with servicing Risk Insight customers. (D.I. 496, ex. 115 at 2, 7, 10; *id.*, exs. 116-28) Even though these employees would not have been acting for Envestnet at that time, it seems relevant that they once did work on Risk Insight—in light of FinApps' claim that Envestnet D&A later participated in the development of Equifax MVP, which was based on FinApps' technology used in Risk Insight.

For these reasons, genuine issues of material fact exist with respect to Counts 1 and 2. The Court therefore recommends that summary judgment be denied as to these counts.

### 2. Count 4

In Count 4, FinApps alleges tortious interference with prospective business opportunities. More specifically, it alleges, *inter alia*, that Envestnet "withh[eld] from Risk Insight clients ... the truth about FinApps' suspension of Yodlee's services, and fail[ed] to direct these clients to FinApps, who could have minimized their service interruption and reconnected them directly to FinApps' Platform." (D.I. 2 at ¶ 262)[18] Envestnet argues that this allegation fails because: (1) there is no evidence that Envestnet personnel "withh[eld]" anything from Risk Insight clients; (2) FinApps cannot prove a sufficiently developed prospective business relationship with any Risk Insight client; and (3) FinApps cannot prove intentional interference. (D.I. 447 at 15-16)

The Court disagrees with Envestnet here. FinApps points to evidence establishing genuine disputes of material fact on all three fronts.

With regard to Envestnet's first argument, relating to whether Envestnet personnel withheld allegedly key information from Risk Insight clients and affirmatively provided a false narrative to those clients, FinApps does identify

some evidence supporting the charge. It cites to documents demonstrating that Envestnet D&A leadership (such as Mr. Anur) came up with a "narrative" to convey to Risk Insight customers after Yodlee's access to Risk Insight had been suspended by FinApps: i.e., that "there is a component to the Risk Insight solution that is supported by a 3rd party and the service delivered through that 3rd party is down" and that they were "work[ing] on resolving the issue[.]" (D.I. 497, exs. 139-40; *see also id.*, exs. 138, 141-43)[19]  Meanwhile, as seen above, there is evidence that Envestnet D&A executive leadership were concurrently involved in developing the Equifax MVP product—and that information was withheld from Risk Insight customers so that they would not continue to use Risk Insight, and would instead use the Equifax MVP product once that product was ready. (*Id.*, exs. 144, 157-58; *see also* D.I. 496, ex. 103 at 1)

With respect to Envestnet's second argument, a tortious interference claim "generally requires a [potential] business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Maxi-Taxi of Fl., Inc. v. Lee Cnty. Port Auth.*, No. 2:07-cv-82-FtM-34SPC, 2008 WL 1925088, at \*12 (M.D. Fl. Apr. 29, 2008) (internal quotation marks and citation omitted);

*see also* Instant Tech., *LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014) ("[A] plaintiff must specifically identify the customers who actually contemplated entering into a business relationship with [the plaintiff].") (internal quotation marks and citation omitted).[20]  To this, FinApps responds that: (1) Equifax was a Risk Insight customer that generated revenues by which FinApps profited; but (2) in early 2019, Envestnet D&A "took steps to undermine that business relationship by seeking a new strategic partnership with Equifax, which deliberately excluded FinApps" and in connection with which Envestnet developed Equifax MVP from FinApps' technology; and (3) Envestnet D&A attempted to route Risk Insight's customer pipeline to the Equifax MVP product. (D.I. 492 at 17-18) Envestnet retorts that Equifax was Yodlee's customer (not FinApps' customer) and that FinApps' profits were a result of the contracts between FinApps and Yodlee. (D.I. 547 at 9 (citing D.I. 448, exs. 4-6)) It also complains that FinApps fails to point to any communications between FinApps and Equifax, nor to other evidence that Equifax or other Risk Insight customers "actually contemplated" entering into a business relationship with FinApps. (*Id.*)

**\*13** This is a difficult issue. There is certainly record evidence that the Risk Insight product involved a partnership between FinApps and Yodlee, one in which FinApps would develop the product and license it to Yodlee, and where Yodlee would market and sell the product. (*See, e.g.*, D.I. 448, ex. 4 at §§ 2-3; D.I. 496, ex. 54) But the Court is hindered in resolving this portion of the Motion in Envestnet's favor, because it simply does not have many facts before it about the extent to which Risk Insight customers like Equifax should have been considered solely "Yodlee[ ] customers" (as Envestnet alleges). [21] As it stands, the Court cannot say that the inference that FinApps would have it draw—i.e., that Risk Insight customers, who were subscribing to a service powered by FinApps' Platform in a manner that benefitted FinApps financially, and at least some of whom appear to have had contact with FinApps in this regard, (D.I. 497, ex. 156), could be rightly considered current and potential future customers of FinApps (at least at the point at which Yodlee was unable to provide access to Risk Insight)—is somehow legally incorrect or factually implausible.

From there, the record (as discussed above) can be read to indicate that Envestnet helped to secure the Yodlee partnership with Equifax, to include distribution of Risk Insight reports. Envestnet D&A leadership then recognized that its lack of ownership over Risk Insight was a problem, and after acquisition talks were unsuccessful, it informed Equifax that it would develop an "exact replica" of Risk Insight. (D.I. 496, ex. 68) It is a reasonable inference that but for Envestnet's improper interference, FinApps would have had a reasonable probability of maintaining a relationship with Risk Insight customers (via the customers' continued use of Risk Insight), to its financial benefit.

As for Envestnet's third argument, courts have held that for an intentional interference claim, the plaintiff must establish that the defendant had an intent to interfere with a business opportunity, as opposed to simply an "intent to act." *Maxi-Taxi of Fl., Inc.*, 2008 WL 1925088, at \*16; *see also* (D.I. 447 at 16). The above-referenced evidence also demonstrates a genuine dispute of material fact regarding Envestnet's intent to harm FinApps' business opportunities with Risk Insight customers. (*See* D.I. 492 at 18)

Therefore, the Court recommends that summary judgment be denied as to Count 4.

### 3. Counts 5 and 8

Envestnet next moves for summary judgment with respect to Counts 5 and 8: unfair competition claims brought under common law and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), respectively. (D.I. 447 at 16-20) The Court agrees with FinApps that genuine issues of material fact exist with respect to these claims. (*See* D.I. 492 at 18-20)

For example, while certain of the allegations in the claims may not still be viable, (*see* D.I. 447 at 17 (citing D.I. 109 at 17-18)), other allegations therein remain, (D.I. 109 at 20-21). And those remaining allegations are, *inter alia*, that Defendants "remov[ed] ... resources [needed to market and sell Risk Insight] once Yodlee had successfully stolen FinApps' proprietary information and technology" and they "withh[eld] from Risk Insight clients ... the truth about FinApps' suspension of Yodlee's services, and fail[ed] to direct these clients to FinApps[.]" (D.I. 2 at ¶¶ 267, 283) And although Envestnet argues that "there is no evidence that [it] engaged in any of this alleged conduct[,]" (D.I. 447 at 18), as discussed above, there is in fact some such evidence. Mr. Rembe removed Yodlee employees from Risk Insight to allow them to focus on the development of Equifax MVP, (D.I. 496, ex. 76-77), and Envestnet D&A leadership came up with an allegedly false "narrative" to convey to Risk Insight's clients about why their Risk Insight services had been suspended, (D.I. 497, ex. 139; *see also id.*, exs. 138, 140-44).

Envestnet also argues that Count 8 must be dismissed for two additional reasons that may be easily disposed of. First, it contends that FDUPTA claims may only be asserted by Florida residents with respect to conduct occurring in Florida, and that there is no evidence of Envestnet personnel engaging in any alleged misconduct in Florida. (D.I. 447 at 19 (citing cases)) However, courts have rejected the notion that the offending conduct must occur *exclusively* in Florida for the FDUPTA to apply. *See, e.g.*, *Bluegreen Vacations Unlimited, Inc. v. Timeshare Laws. P.A.*, Civil Action No. 20-24681-Civ-Scola, 2023 WL 4079381, at \*4 (S.D. Fla. June 20, 2023) (finding that the California-based defendants' conduct had a sufficient connection to Florida to fall within the FDUTPA's scope, where the defendants were targeting timeshare owners in Florida, both plaintiffs were Florida corporations with their principal places of business in Florida, and the contracts at issue arose under a Florida statute) (citing cases); *see also* *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, No. 10-23869, 2012 WL 1570057, at \*6 (S.D. Fla. May 2, 2012).

And here, there is evidence that: (1) FinApps was harmed in Florida where it resides; (2) Mr. DePina and Mr. Rembe met with Mr. Sullivan in Florida in January 2019 regarding the acquisition of FinApps; and (3) Mr. DePina communicated with Mr. Sullivan in Florida regarding the winding down of Risk Insight and regarding Yodlee's access to YProxy. (D.I. 455 at ¶ 4; D.I. 494, ex. 25 at 31-32; D.I. 496, ex. 67 at 328-29; D.I. 496, exs. 99-100; D.I. 497, exs. 145-46)

**\*14** Second, Envestnet argues that the FDUTPA is meant to protect *consumers* from deceptive trade practices, and FinApps was not a consumer of Envestnet. (D.I. 447 at 20) But, as FinApps correctly retorts, (D.I. 492 at 19-20), Florida courts have explained that the FDUTPA "broadly declares unlawful any unfair or deceptive acts or practices committed in the conduct of any trade or commerce" and have rejected arguments that "summary judgment is warranted ... because no consumer transaction is involved[,]" 🔖 *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1145-46 (M.D. Fla. 2007) (citing cases); *see also E A Tapping Servs., LLC v. CDM Constructors Inc.*, Case No. 6:19-cv-1190-CEM-LRH, 2021 WL 1985338, at \*8-9 (M.D. Fla. Feb. 23, 2021).

In light of the above, the Court recommends that summary judgment be denied as to Counts 5 and 8.

### 4. Count 14

In Count 14, FinApps asserted three unjust enrichment allegations, the first of which was made against both Yodlee and Envestnet ("paragraph 333"):

> [B]y stealing and misappropriating FinApps' proprietary software and trade secrets to create and use a competing credit software product, Defendants have unjustly received the benefit of FinApps' substantial time and investment into the development of its proprietary software and trade secrets. Defendants have avoided the expense and effort necessary to

independently develop a competing product through their scheme.

(D.I. 2 at ¶ 333)[22] In its opening brief, Envestnet argues that the Court has already concluded, in its July 6 R&R, that this allegation would be preempted (thus barring the Count against Envestnet). (D.I. 447 at 20; *see also* D.I. 547 at 10)

Envestnet is right. In the July 6 R&R, the Court explained that: (1) in Envestnet's opening brief in support of its motion to dismiss, its argument that FinApps' unjust enrichment claim is preempted by the Copyright Act and/or the Uniform Trade Secrets Act solely referenced paragraph 333; and (2) FinApps' responsive brief argued only that the next two allegations (found in paragraphs 334 and 335) were not preempted. (D.I. 109 at 23-24) The Court thus recommended that Defendants' motion to dismiss be denied since Defendants had forfeited any arguments regarding the viability of paragraphs 334 and 335, while also noting that "Plaintiff appears to (rightly) concede that an allegation premised on the first form of alleged enrichment [i.e., on paragraph 333] would be preempted." (*Id.* at 24)

FinApps' response here is only that "Defendants ignore ... that [then-presiding Chief District] Judge Connolly specifically overruled this finding[.]" (D.I. 492 at 20) In an August 25, 2020 Memorandum Opinion ruling on Defendants' objections to the July 6 R&R, Chief Judge Connolly addressed the Court's note in the July 6 R&R with respect to paragraph 333:

> I understand the Magistrate Judge to be saying in this sentence that *if* Plaintiff's unjust enrichment claim *had been* based *solely* on the first "form" or set of factual allegations, the Magistrate Judge *would have* deemed that claim to be preempted. Since Plaintiff's unjust enrichment claim was *not* based solely on the first "form," this dictum is of no moment and I will not adopt it.

**\*15** (D.I. 126 at 8 n.3 (emphasis in original))

We are still left without a substantive explanation from FinApps as to how its unjust enrichment claim in paragraph 333 would not be preempted, in light of the Court's prior ruling. And yet FinApps seems to acknowledge that paragraph 333 is based on the same facts as its misappropriation allegations. (D.I. 492 at 20; *see also* D.I. 547 at 10) Just as the Court indicated in the July 6 R&R (and as FinApps essentially conceded by not arguing otherwise at the motion to dismiss stage), FinApps' unjust enrichment claim against Envestnet in paragraph 333 is in fact preempted by the above-referenced statutes. *See, e.g.,* 🔖 *Ocimum Biosols. (India) Ltd. v. LG Corp.*, C.A. No. 19-2227 (MN), 2021 WL 931094, at *7 (D. Del. Mar. 11, 2021)* ("Ocimum's unjust enrichment claim is based entirely on the same facts as Ocimum's trade secret misappropriation claims and is thus preempted."). The Court therefore recommends that summary judgment be granted as to Count 14.

### IV. CONCLUSION

For the reasons set out above, the Court recommends that Envestnet's Motion be GRANTED-IN-PART and DENIED-IN-PART. Specifically, the Court recommends that the Motion be DENIED with respect to: (1) FinApp's vicarious liability theory; (2) FinApp's direct liability theory; and (3) Counts 1, 2, 4, 5 and 8. The Court recommends that the Motion be GRANTED solely with respect to Count 14.

This Report and Recommendation is filed pursuant to 🔖 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See* Sincavage v. Barnhart, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); 🔖 Henderson v. Carlson, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Because this Report and Recommendation may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Report and Recommendation. Any such redacted version shall be submitted no later than **August 3, 2023** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." 🔖 *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Report and Recommendation.

### All Citations

Slip Copy, 2023 WL 4975373

---

### Footnotes

1    The parties did not directly address what jurisdiction's law should apply to the vicarious liability issue. Envestnet cites to caselaw from this Court, from the United States Court of Appeals for the Third Circuit, and from the Delaware Court of Chancery. (D.I. 447 at 6-8; D.I. 547 at 5-6) FinApps cites to caselaw from Delaware state courts. (D.I. 492 at 14 n.10) Because Envestnet is a Delaware corporation, and because no one has suggested that another jurisdiction's law would apply here, the Court will apply Delaware law to the vicarious liability issue. *See, e.g.,* 🔖 *Phx. Can. Oil*, 842 F.2d at 1477 n.4; 🔖 *Phx. Can. Oil*, 658 F. Supp. at 1084 n.42.

2    There is a second theory under which courts will pierce the corporate veil, known as the alter ego theory; this theory will impose liability on the parent corporation when it is sufficiently demonstrated that: (1) the two

entities are not actually treated as separate entities in practice, and (2) there has been a showing of fraud or inequity in the misuse of the corporate form. *See* 🚩 *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 619 (D. Del. 2018); 🚩 *Phx. Can. Oil*, 658 F. Supp. at 1084. FinApps does not assert the alter ego theory here. (D.I. 492 at 12 n.8) Therefore, the Court need not address that theory further.

Some courts interpreting Delaware law have stated that when a party seeks to demonstrate vicarious liability by establishing an agency relationship between the parent and subsidiary in which the parent dominates the activities of the subsidiary, then there must also be a showing (as is required by the alter ego inquiry) that the parent/subsidiary have introduced an element of fraud or inequity into the equation in light of their conduct. *See, e.g.* 🚩 *Mobil Oil Corp. v. Linear Films, Inc.*, 718 F. Supp. 260, 271 n.15 (D. Del. 1989); *Otto Candies, LLC v. KPMG, LLP*, C.A. No. 2018-0435-MTZ, 2020 WL 4917596, at *14 n.140 (Del. Ch. Aug. 21, 2020); 🚩 *In re Sunstates Corp. S'holder Litig.*, 788 A.2d 530, 534 (Del. Ch. 2001). On the other hand, some cases referencing this agency/domination rationale for vicarious liability do not reference a separate "fraud" element that must be satisfied. *See, e.g.*, 🚩 *Phx. Can. Oil*, 658 F. Supp. at 1084; 🚩 *Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.*, 456 F. Supp. 831, 840-41 (D. Del. 1978); *Grasty v. Michail*, No. Civ.A. 02C-05-89 CLS, 2004 WL 396388, at *2 (Del. Super. Ct. Feb. 24, 2004). The court points this out because in its opening brief, when setting out the law on the agency/domination rationale for vicarious liability, Envestnet: (1) did not state that a fraud element was part of that legal test; and (2) focused solely on arguments as to why it did not "dominate" the activities of Yodlee. (D.I. 447 at 6-7) Then later in its reply brief, Envestnet for the first time explicitly argued that a showing of an element of fraud or injustice *was* required in order to demonstrate the applicability of the agency/domination rationale, and it faulted FinApps for not introducing evidence to that effect. (D.I. 547 at 5) A party cannot raise new arguments in its reply brief, *see* 🚩 *Versata Software, Inc. v. NetBrain Techs., Inc.*, Civil Action No. 13-676-LPS-CJB, Civil Action No. 13-678-LPS-CJB, 2015 WL 5768938, at *15 n.17 (D. Del. Sept. 30, 2015), and so even if the agency/domination rationale does require a showing of fraud or inequity, Envestnet has waived any argument at summary judgment that Plaintiff's vicarious liability allegation is deficient for failure to meet that element.

3   Envestnet also makes a two-sentence argument in its opening brief that FinApps cannot pursue an agency theory here because its Complaint "does not contain allegations that would suffice to carry an agency theory[.]" (D.I. 447 at 7; *see also* D.I. 547 at 6 & n.4) The Court acknowledges that the Complaint never uses the word "agent" or "agency." (D.I. 2) And to be sure, Plaintiff could have been much clearer that this basis for liability was being asserted therein. Nevertheless, the Court is not comfortable granting Envestnet's Motion on this basis. This is because there are a number of places in the Complaint where FinApps alleged that Yodlee was acting "together with, and at the direction of" Envestnet, (*id.* at ¶¶ 216, 233), and where FinApps otherwise described how Envestnet and Yodlee were said to have worked in harmony to engage in legal misconduct, (*id.* at ¶¶ 18-19, 71, 81, 140, 156-63, 219, 236); *cf. In re Generic Pharms. Pricing Antitrust Litig.*, MDL 2724, 2023 WL 2244685, at *7 (E.D. Pa. Feb. 27, 2023) (finding, at the motion to dismiss stage, that a plaintiff's complaint sufficiently pleaded an agency theory, where the complaint alleged that "[n]ot only does Pfizer [the parent entity] have to approve Greenstone's [the subsidiary] price increases, but it also directs Greenstone's strategy regarding the increases, and Greenstone always acts at the direction of Pfizer") (internal quotation marks omitted).

4   In June 2022, Envestnet further organized the services offered by its Wealth Solutions Segment into Envestnet Solutions and Envestnet WealthTech. (D.I. 448, ex. 2 at ¶ 27)

5   FinApps also asserts that Envestnet has failed to meet its initial burden of establishing an absence of a genuine issue of material fact because Envestnet's opening brief relies on: (1) a "conclusory" declaration from Mr. Marr that cites to no documentary evidence; (2) "unsubstantiated and conclusory" portions of Mr. Marr's

deposition testimony as Envestnet's corporate representative; and (3) FinApps' contracts with Yodlee. (D.I. 492 at 8-9, 13 & n.9) However, the Marr Declaration and Mr. Marr's related deposition testimony are based on Mr. Marr's personal knowledge. And they do convey plenty of facts (as opposed to merely conclusions). Thus, if FinApps were to have offered no evidence combating the Marr Declaration or Mr. Marr's testimony, then Envestnet's proffered evidence could indeed have won the day here. *See, e.g.,* *Maldonado v. Ramirez,* *757 F.2d 48, 50-51 (3d Cir. 1985)* (explaining that an affidavit made on personal knowledge that sets forth facts that would be admissible in evidence is adequate to satisfy the movant's burden, while an affidavit that is "essentially conclusory" would not) (internal quotation marks and citation omitted).

6       Envestnet engaged PricewaterhouseCoopers ("PWC") to assist with the reorganization project, which was initially referred to as "Project Scotland" and later renamed "Project Elevate." (D.I. 494, exs. 1-19)

7       In this e-mail, Mr. Bergman also noted that "within Envestnet Data & Analytics, reporting to [the Chief Executive thereof], we are creating Envestnet Technologies[,]" a "new group [that] will support the operations, technology, and data infrastructure needs *of Envestnet.*" (D.I. 494, ex. 21 at YOD 12232143 (emphasis added)) According to Mr. Marr, however, "Envestnet Technologies" was simply a plan to create a centralized "data utility" to service Yodlee and Envestnet Wealth Solutions; he asserts that "[t]here is no business, entity, or unit within the Envestnet D&A segment called Envestnet Technologies." (D.I. 548, ex. 12 at ¶ 7)

8       Tamarac, Inc. ("Tamarac") is a separate subsidiary of Envestnet. (D.I. 448 at ¶ 12)

9       Also among those elevated were Lisa Hingley and Tom Hempel. (D.I. 494, ex. 21 at YOD12232143)

10      Envestnet retorts that Yodlee's employees receive their paychecks from Envestnet Financial Technologies Inc., which is an operating subsidiary of Envestnet, and that Yodlee bears the expenses of employing its personnel. (D.I. 448, ex. 2 at ¶ 21; *id.,* ex. 3 at 34-35)

11      Envestnet claims that Mr. Anur and Ms. Solomon, *inter alia,* are Yodlee personnel that have never been employed by or worked for Envestnet in any way; in support of this claim, it points to the Marr Declaration. (D.I. 447 at 9; *see also* D.I. 448 at ¶ 11; *id.,* ex. 2 at ¶¶ 35-36) Envestnet's assertion here is based on its argument that people employed by "Envestnet D&A" are solely employed by Yodlee, not Envestnet, since " 'Envestnet Data & Analytics' often is used in the job titles of Yodlee personnel." (D.I. 447 at 4) But with FinApps pointing to evidence in the record suggesting that Envestnet D&A is not merely synonymous with Yodlee, there is a genuine dispute of fact with respect to this issue.

12      In interrogatory responses filed in May 2021 in the United States District Court for the Northern District of California in *Wesch v. Yodlee, Inc.,* Civil Case No. 20-5991-SK, Envestnet identified Mr. Rembe as Envestnet's Chief Product Officer, a "management-level" position at Envestnet—and asserted that he began in this role *on July 1, 2018,* not in September 2020. (D.I. 494, ex. 26 at 4) Envestnet seems to suggest that this interrogatory response was simply incorrect; in doing so, it points to a September 25, 2020 announcement stating that Mr. Rembe did not take on the Chief Product Officer role at Envestnet until that date. (D.I. 547 at 4 n.2 (citing D.I. 548, ex. 24 at YOD12391308); *see also id.,* ex. 25 (Mr. Rembe's LinkedIn bio stating that he served as the Chief Product Officer for Envestnet, Inc. from September 2020 to September 2022); *id.,* ex. 26)) Envestnet may well be correct as to this point, of course. But whether admissions Envestnet made in sworn interrogatory responses were or were not accurate is a fact question, one not suitable for resolution at the summary judgment stage.

13      FinApps suggests (in a footnote in its answering brief) that the *Bestfoods* presumption would not apply here because in *Bestfoods,* the Supreme Court was addressing a particular federal statute (one not at issue here). (D.I. 492 at 11 n.7) While it is true that the *Bestfoods* Court was examining direct liability in the context of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), *see*

⚑ *Bestfoods*, 524 U.S. at 55, the Supreme Court "held that CERCLA did not change the existing common law of direct liability that can apply when 'the alleged wrong can seemingly be traced to the parent through the conduct of its own personnel and management' and 'the parent is direct a participant in the wrong complained of[,]' " *A.O.A. v. Rennert*, 350 F. Supp. 3d 818, 844–45 (E.D. Mo. 2018) (quoting ⚑ *Bestfoods*, 524 U.S. at 64). Thus, courts apply the *Bestfoods* presumption even in cases where CERCLA is not at issue. *See, e.g.*, *Naghavi v. Belter Health Measurement & Analysis Tech. Co.*, Case No. 20-cv-01723-H-KSC, 2020 WL 6150431, at *7 (S.D. Cal. Oct. 20, 2020) (holding, at the motion to dismiss stage, that "[b]ecause the FAC does not include any allegations stating that Defendants Tong and Zhong were specifically acting on behalf of [the parent corporation] when the representations at issue were made, Plaintiffs have failed to adequately allege direct liability as to [the parent corporation] for the alleged misrepresentations").

14      Mr. Marr submitted a supplemental declaration in connection with Envestnet's reply brief in which he states that Mr. DePina and Mr. Rembe each had @envestnet.com e-mail addresses dating from their pre-Yodlee positions at Tamarac, Inc. (D.I. 548, ex. 12 at ¶ 15) However, at the same time in which they were occasionally using these Envestnet-related e-mail addresses after being elevated to Envestnet D&A leadership, the two men also had @yodlee.com e-mail addresses. It seems to the Court that one way that FinApps might demonstrate that Mr. DePina and Mr. Rembe were working on behalf of *Envestnet* (and not simply Yodlee) in certain respects, is to point out that they were not using Yodlee e-mail addresses when they were doing such work (and instead were using their *Envestnet*-related e-mail addresses). Indeed, in its briefing, Envestnet often pointed out when these individuals used *Yodlee*-related e-mail addresses to conduct relevant activity, as a way of arguing that the conduct at issue was *Yodlee*-related conduct, not Envestnet-related conduct. (D.I. 547 at 8-10) If the nature of an e-mail address is relevant when it helps Envestnet's argument, it must also be relevant when it helps FinApps' argument.

15      Envestnet also argues that it should be granted summary judgment because FinApps' purported trade secrets do not qualify for trade secret protection, "as laid out in Envestnet's concurrently-filed Motion for Summary Judgment No. 2." (D.I. 447 at 11) The Court will not be taking up any such argument in connection with the instant Motion.

16      In its Complaint, FinApps also alleges that Envestnet used FinApps' trade secrets to develop a software product called Credit Exchange. (D.I. 2 at ¶¶ 219, 236) In its opening brief, Envestnet contended that FinApps had abandoned any misappropriation of trade secret claims premised on Credit Exchange. (D.I. 447 at 12; *see also* D.I. 448, ex. 10 at 224 (FinApps' technical expert, Issac Pflaum, testifying that he "did not opine that Envestnet [C]redit [E]xchange relied on FinApps' proprietary information")) FinApps does not respond to this particular argument. (D.I. 492 at 14-16) Thus, the Court will not focus on Credit Exchange further herein.

17      In its reply brief, Envestnet asserts that Counts 1 and 2 also fail because FinApps "relies on purported evidence of reverse engineering, but reverse engineering is not misappropriation." (D.I. 547 at 9 (citing cases)) Because Envestnet did not make this argument in its opening brief—even though FinApps' Complaint is rife with references to reverse engineering, (D.I. 2 at ¶¶ 12, 46, 94, 100, 104-08, 195, 218, 235, 302), and even though FinApps has been highlighting this type of conduct throughout this case, (D.I. 134; D.I. 189)—the Court will not consider it here. *See, e.g.*, *Cohen v. Cohen*, C.A. No. 19-1219-MN, 2022 WL 952842, at *4 (D. Del. Mar. 30, 2022).

18      In its Complaint, FinApps also made three other allegations with respect to this Count. (D.I. 2 at ¶ 262) In its opening brief, Envestnet asserts that these three allegations fail because they are preempted by the Copyright Act and/or the Uniform Deceptive Trade Practices Act. (D.I. 447 at 14; *see also* D.I. 109 at 18-19) FinApps does not respond as to these three allegations and focuses only on the fourth. So FinApps only appears to be pressing a claim based on the fourth allegation (and facts reasonably relating thereto).

19     Pursuant to the Complaint, FinApps suspended Yodlee's access to Risk Insight in June 2019 (which caused Risk Insight clients to be unable to access the Platform) because Yodlee was in breach of the MSA. (D.I. 2 at ¶¶ 201-02)

20     Envestnet argues that either Florida law or Illinois law likely governs the tortious interference claim, and that the outcome would be the same under either state's law. (D.I. 447 at 15 n.3) FinApps does not dispute this. (D.I. 492 at 17-18)

21     It does appear that Yodlee alone entered into contracts between itself and Risk Insight customers. (D.I. 448, ex. 2 at ¶ 25)

22     The remaining two unjust enrichment allegations in the Complaint are asserted against Yodlee only. (D.I. 2 at ¶¶ 334-35) In its briefing, FinApps makes no argument that it could separately proceed on a claim against Envestnet based solely on these two allegations (and facts reasonably relating thereto).

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 47 of 247

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

KeyCite Yellow Flag - Negative Treatment

Distinguished by Federal Trade Commission v. Walmart Inc., N.D.Ill., March 27, 2023

2020 WL 6741968

United States District Court, E.D. Texas, Sherman Division.

FEDERAL TRADE COMMISSION

v.

ADVOCARE INTERNATIONAL, L.P., et al.

CIVIL NO. 4:19-CV-715-SDJ

Signed 11/16/2020

**Attorneys and Law Firms**

M. Hasan Aijaz, Pro Hac Vice, Thomas B. "Tom" Carter, Pro Hac Vice, Aaron J. Haberman, Federal Trade Commission - Dallas Dallas Regional Office, Dallas, TX, for Federal Trade Commission.

John Robert Robertson, DLA Piper LLP, Chicago, IL, Meagan Dyer Self, DLA Piper LLP, Dallas, TX, for AdvoCare International, L.P.

Baxter Ward Banowsky, Banowsky & Levine, PC, Dallas, TX, for Danny McDaniel, Diane McDaniel.

## MEMORANDUM OPINION AND ORDER

SEAN D. JORDAN, UNITED STATES DISTRICT JUDGE

*1 Before the Court are two motions: Defendants' Motion to Dismiss for failure to state a claim filed by Defendants Danny McDaniel and Diane McDaniel ("the McDaniels") pursuant to Federal Rule of Civil Procedure 12(b)(6), (Dkt. #17), and Plaintiff's Motion to Exclude, (Dkt. #23), certain factual allegations, documents, and legal arguments included in the McDaniels' Reply Brief, (Dkt. #20). For the following reasons, the Court **GRANTS** the McDaniels' Motion to Dismiss, (Dkt. #17), and **DENIES as moot** Plaintiff's Motion to Exclude, (Dkt. #23).

## I. BACKGROUND

In March 2017, consumers filed a class-action lawsuit in the Northern District of Texas against AdvoCare International, L.P. ("AdvoCare"), alleging that AdvoCare had been operating as an illegal pyramid scheme. *Ranieri v. AdvoCare Int'l, L.P.*, No. 3:17-cv-00691-B, 2017 WL 947224 (N.D. Tex. Mar. 9, 2017); *see also* (Dkt. #1 at 25, #17 at 12). That suit named, among others, Danny McDaniel—but not his wife, Diane McDaniel—as a defendant. *Ranieri*, 2017 WL 947224. However, the district court ultimately dismissed with prejudice the action against Danny McDaniel, holding that if AdvoCare indeed operated an illegal pyramid scheme, Danny McDaniel did not operate said scheme. *Ranieri v. AdvoCare Int'l, L.P.*, 336 F.Supp.3d 701, 718 (N.D. Tex. 2018);[1] *see also* (Dkt. #17 at 12).

Separately, the Federal Trade Commission ("FTC" or "Commission") began investigating AdvoCare for potential violations of consumer-protection law. (Dkt. #1 at 25). In July 2019, during negotiations with the FTC, AdvoCare terminated its "multi-level marketing" ("MLM") program, which was alleged to be an illegal pyramid scheme. (Dkt. #1 at 25–26).

On October 2, 2019, the FTC brought a complaint in this Court requesting a permanent injunction and other equitable relief against AdvoCare and at least five individual members thereof, including the McDaniels. (Dkt. #1). The Complaint alleges that Defendants engaged in unlawful business practices in violation of the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. *See, e.g.*, (Dkt. #1 at 26). In particular, the Complaint alleges that AdvoCare—which the FTC describes as "a multi-level marketing company that promotes health and wellness products"— deceived individuals into becoming "Distributors" and "Advisors," or salespeople for AdvoCare, the majority of whom never earned compensation for their sales. (Dkt. #1 at 4–6). The Complaint further alleges that Defendants consistently and deceptively portrayed AdvoCare as a "life-changing financial solution," (Dkt. #1 at 6–9), and trained recruits to do the same, (Dkt. #1 at 9). The Complaint thus asserts that AdvoCare operated an unlawful pyramid scheme whereby AdvoCare's compensation structure relied on the fraudulent recruitment of Distributors and Advisors who would unwittingly pass on profits to those higher up the chain of command. (Dkt. #1 at 16–23).

*2 Simultaneous to, or immediately after, the FTC's filing of the Complaint, on October 2, 2019, all named Defendants —except for the McDaniels—reached a settlement agreement

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 48 of 247

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

with the FTC. (Dkt. #2, #2-1, #2-2). Pursuant to the settlement agreement, the settling Defendants, including AdvoCare, submitted to a host of sanctions, including an outright ban on: multi-level marketing; operating "chain referral" programs or similar schemes; managing compensation for any business ventures unless certain criteria are satisfied; and making material misrepresentations regarding any business venture. (Dkt. #2-2 at 3–5, #15, #16). The settling Defendants also agreed to (a) provide equitable monetary relief and payment to the Commission, (b) cooperate in the settlement, and (c) record progress while otherwise submitting to wide-reaching compliance monitoring. (Dkt. #2-2 at 5–16, #15, #16). The FTC has continued to pursue the instant action against the McDaniels, which the McDaniels now move to dismiss under Rule 12(b)(6).

## II. LEGAL STANDARD

Under the relaxed pleading standards of Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement requires only that the plaintiff provide "enough facts to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility, under Twombly, means "more than a sheer possibility," but not necessarily a probability. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. Id. To determine whether the plaintiff has pleaded enough to "nudge[ ] [its] claims across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." Id. at 679–80 (first quoting Twombly, 550 U.S. at 570, then citing Iqbal v. Hasty, 490 F.3d 143, 157–58 (2nd Cir. 2007)) (internal quotation marks omitted). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556).

Further, when evaluating a Rule 12(b)(6) motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents

attached to the motion to dismiss that are central to the claim and referenced by the complaint." Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010). However, a district court may also consider any "matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011) (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Courts have taken judicial notice of the existence and content of settlement agreements when evaluating Rule 12(b)(6) motions to dismiss. See, e.g., ASARCO, LLC v. Union Pac. R.R. Co., 765 F.3d 999, 1008 n.2 (9th Cir. 2014) (holding that because the settlement agreement was filed with the court and is a publicly available record, it is properly subject to judicial notice and thus may be considered on a Rule 12(b)(6) motion); Estate of Brown v. Arc Music Grp., 523 F.App'x 407, 410 (7th Cir. 2013) (holding that the settlement agreement was a public record, of which the court could take judicial notice without converting the motion into one for summary judgment). Finally, a court may take judicial notice sua sponte. FED. R. CIV. P. 201(c)(1).

Here, the Court takes judicial notice of the settlement agreement between Plaintiff and all Defendants to the instant action besides the McDaniels, (Dkt. #2, #15, #16).[2] The Court thus considers the existence and content of the settlement agreement in its analysis.

## III. DISCUSSION

### A. The FTC's Complaint is Not Exempt from the Pleading Standards Prescribed by the Federal Rules of Civil Procedure.

**\*3** The Federal Trade Commission Act instructs the Commission to "prevent persons, partnerships, or corporations" from using "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The Commission has "multiple instruments in its toolbox" to accomplish this statutory directive, among which are administrative proceedings and litigation in federal court. FTC v. Shire Viropharma, Inc., 917 F.3d 147, 155 (3d Cir. 2019).

As relevant here, Section 13(b) of the FTC Act empowers the FTC to "bring suit in a district court of the United States"

Case 4:23-cv-03560  Document 120-2  Filed on 01/19/24 in TXSD  Page 49 of 247

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

to obtain a "temporary restraining order," a "preliminary injunction," or a "permanent injunction" against an "act or practice" that violates the FTC Act. 🚩 15 U.S.C. § 53(b). To bring such an action, the FTC must have "reason to believe" that the entity or person sued "is violating, or is about to violate" the Act. *Id.*

The McDaniels contend that the FTC's complaint must be dismissed under Rule 12(b)(6) because the Complaint fails to state a plausible claim under Section 13(b) that the McDaniels are violating or are "about to violate" the FTC Act. (Dkt. #17 at 6). Pointing to the FTC's Complaint itself, as well as the settlement agreement with AdvoCare and the other Defendants, the McDaniels assert that the FTC's suit recognizes that the alleged pyramid scheme operated by AdvoCare, and in which the McDaniels were allegedly involved, ended in July 2019. (Dkt. #17 at 7–8). The McDaniels further argue that there are no factual allegations supporting the FTC's conclusory contention that the McDaniels are presently violating the FTC Act or are "about to" violate the Act. [3]

The FTC's first response to the McDaniels' motion is to suggest that, because the agency has already made its own, internal determination that it has "reason to believe" that the McDaniels are violating or are "about to violate" the FTC Act, the Complaint before the Court is largely immunized from judicial scrutiny under Rule 12(b)(6). The FTC states that "[t]he Commission's determination that there is sufficient 'reason to believe' under Section 13(b) is left to the agency's discretion." (Dkt. #19 at 5). The FTC goes on to cite and quote 🚩 *Standard Oil Co. of California v. FTC,* 596 F.2d 1381, 1386 (9th Cir. 1979), *rev'd on other grounds,* 🚩 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), for the proposition that, "[i]f the district court finds as a fact that the FTC made the 'reason to believe' determination ... further review would be foreclosed." (Dkt. #19 at 5). Ultimately, the FTC asserts that, rather than engaging in a straightforward application of pleading standards under Rule 8, the Court is bound to deny the McDaniels' Rule 12(b)(6) motion unless it concludes that the FTC "abused its discretion" in making its internal "reason to believe" determination. (Dkt. #19 at 12–13). According to the Commission, limiting the Court's analysis to an "abuse of discretion" standard "fits with the broad prosecutorial discretion federal agencies have to bring suit." (Dkt. #19 at 6).

**\*4** The Court disagrees. Taken to its logical conclusion, the FTC's argument would mean that, no matter how insubstantial the factual allegations in an FTC complaint under Section 13(b), a court must accept that the complaint is sufficient to withstand a Rule 12(b) motion so long as the FTC avers that it has "reason to believe" that a defendant is "about to" engage in unfair methods of competition, or unfair or deceptive acts or practices. The FTC's position is contrary to accepted rules of pleading and finds no support in applicable case law.

First, Rule 8(a) of the Federal Rules of Civil Procedure requires that anyone filing a complaint must include a statement demonstrating "the grounds for the court's jurisdiction" and a "showing that the pleader is entitled to relief." In a Section 13(b) case, that requirement includes factual allegations from the FTC that there exist reasons to believe that the defendant is violating or "is about to violate" the FTC Act.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 🚩 *Iqbal,* 556 U.S. at 678. A bare allegation by the FTC that "we have reason to believe that the defendant is about to violate the law," when unaccompanied by supporting factual allegations, clearly does not "state a claim to [injunctive] relief that is plausible on its face." 🚩 *Twombly,* 550 U.S. at 570. This Court is fully capable of determining whether the FTC's factual allegations in a Section 13(b) complaint are sufficient to make the requisite "about-to-violate" showing. Therefore, there is no reason to conclude that Congress intended to eliminate judicial scrutiny under Rule 8.

The cases that the FTC cites do not support its argument that its internal, "reason to believe" determination is an effective "King's X" against a motion to dismiss a Section 13(b) complaint brought by the FTC in federal court. For example, *Standard Oil* addressed a challenge by an oil company to an administrative proceeding initiated by the FTC in connection with unfair trade practices. 🚩 596 F.2d at 1384. The oil company's challenge, brought under the Administrative Procedure Act ("APA"), was rejected by the Ninth Circuit based on the court's determination that the FTC's commencement of an administrative proceeding was not subject to challenge under the APA. *Id.* at 1385. *Standard Oil* did not involve a lawsuit brought by the FTC and it says nothing about deference to the FTC in cases in which the FTC, as the plaintiff in federal court, bears the threshold burden to

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 50 of 247

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

meet the requirements of Rule 8 and state a claim for relief that is plausible on its face.

The other cases cited by the FTC are equally unhelpful because they involve the inapposite circumstances of judicial review of agency action. *See* *Slough v. FTC*, 396 F.2d 870 (5th Cir. 1968) (suit seeking review of a cease and desist order issued by the FTC after an administrative hearing); *FTC v. Nat'l Urological Grp., Inc.*, No. 1:04-cv-3294-CAP, 2006 WL 8431977 (N.D. Ga. Jan. 9, 2006) (dismissing counterclaims brought under the APA challenging the FTC's decision to initiate a lawsuit); *Boise Cascade Corp. v. FTC*, 498 F.Supp. 772 (D. Del. 1980) (involving an APA action seeking an order that the FTC withdraw an administrative complaint).

Judicial review of agency action under the APA is governed by the APA itself, which expressly precludes judicial review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). No such review is at issue here. Instead, the McDaniels' motion raises a different issue: whether the FTC has stated a claim under the Federal Rules of Civil Procedure. The resolution of the McDaniels' motion is governed by Rule 8 of the Federal Rules of Civil Procedure, which mandates, rather than precludes, judicial review to ensure compliance with federal pleading requirements. "It is precisely the Court's duty under Rule 8 to scrutinize a party's right to proceed in federal court." *FTC v. Hornbeam Special Situations, LLC*, No. 1:17-cv-3094-TCB, 2018 WL 6254580, at *4 (N.D. Ga. Oct. 15, 2018).

**\*5** In sum, to avoid dismissal of its Section 13(b) action at the pleadings stage, the FTC must plausibly allege, in satisfaction of *Iqbal* and *Twombly*, that the McDaniels *are currently* violating the FTC Act *or are about to* do so.

**B. The FTC's Factual Allegations Pertain Only to *Past* Misconduct by the McDaniels and not to Present or Future Misconduct.**

Section 13(b) of the FTC Act empowers the Commission to file a claim in federal court "[w]henever the Commission has reason to believe ... that any person, partnership, or corporation *is violating*, or *is about to violate*, any provision of law enforced by the [FTC]...." 15 U.S.C. § 53(b) (emphasis added). Section 13(b) thus unambiguously requires plausible factual allegations supporting a reasonable belief of present or future misconduct. *Shire*, 917 F.3d at 156–

57 ("Section 13(b) requires that the FTC have reason to believe a wrongdoer 'is violating' or 'is about to violate' the law.... [T]his language is unambiguous; it prohibits existing or impending conduct ... [and] does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation.").

In *Shire*, the conduct in question was five years past. Here, the McDaniels' past conduct is more recent; at the time the FTC filed the Complaint, only three months had passed since the McDaniels ceased their alleged misconduct. However, like in *Shire*, the FTC identifies no ongoing misconduct and, in fact, appears to concede that the McDaniels' alleged misconduct continued only until July 2019. [4]

Further, even if the FTC had alleged ongoing or impending violations by the McDaniels, such allegations are implausible because, according to the FTC's own factual allegations, at the time the Complaint was filed, the primary mechanism of the McDaniels' alleged wrongdoing, the MLM program, had been permanently defunct for months. (Dkt. #1 at 26). Additionally, the sole business through which the McDaniels allegedly undertook such actions—AdvoCare—had, either before or simultaneous to the Complaint's filing, entered into a comprehensive agreement to halt AdvoCare's unlawful activities, reform its business practices, and submit to government compliance monitoring. (Dkt. #2, #2-1, #2-2).

The FTC has not alleged that the McDaniels are *currently* violating or *are about to* violate the law enforced by the FTC. Every factual allegation that the FTC presents refers to past misconduct by the McDaniels. Although this misconduct was extensive and longstanding—having taken place for "a period of more than 20 years"—all factual allegations indicate that the alleged violations ended entirely in July 2019 when AdvoCare's MLM program was permanently terminated. (Dkt. #1 at 25–26). And it is implausible that the McDaniels can commit ongoing violations because the MLM program is now defunct, (Dkt. #1 at 26), and AdvoCare has been extensively sanctioned, reformed, and monitored for compliance, (Dkt. #15, #16). Finally, the FTC has not alleged—either in the initial Complaint filed in October 2019 or in any amended pleadings since that time—that either the MLM is still operating or that the McDaniels are otherwise continuing to engage in misconduct after July 2019.

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

**C. Past Violations May Sometimes Give Rise to an Inference of Ongoing or Future Violations, but the FTC has not Plausibly Alleged that Such is the Case Here.**

**\*6** Section 13(b) generally cannot be used to remedy past violations. *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). However, a plaintiff may state a plausible claim under Section 13(b) by showing that a past violation or series of past violations is likely to recur. *Id.* In some instances, courts have found that an extensive history of past violations is itself sufficient to create an inference of ongoing violations. *See, e.g.*, *FTC v. GTP Mktg., Inc.*, No. 4-90-123-K, 1990 WL 54788, at *5 (N.D. Tex. Mar. 15, 1990) (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987)) ("An extensive history of violations does beget an inference that future violations are likely to occur."). The Fifth Circuit, however, has held merely that past violations may, but do not necessarily, support an inference of future substantive violations. *SEC v. First Fin. Grp. Tex.*, 645 F.2d 429, 434 (5th Cir. 1981) (holding in an analogous context that finding a reasonable likelihood of future securities-law violations requires "proof of past substantive violations *that indicate* a reasonable likelihood of future substantive violations." (emphasis added)).

In each of the above cases, the recurrence of violations was at least possible, and in some instances likely, because the channels of misconduct utilized by the defendants remained open—*i.e.*, free and clear of government sanction—upon filing of the litigation. *See, e.g.*, *Odessa*, 833 F.2d at 176–77. In *Odessa*, for instance, the defendant warehouse co-op was still fully operational at the outset of litigation. *Id.* Moreover, while the defendant stated an intent to comply with sanitation laws, it continued to manage its own sanitation practices free of government intervention. *Id.* Absent such intervention, and given the defendant's history of violations, the court held that "serious questions remain[ed]" as to whether the defendant's violations would recur or continue. *Id.*

Here, by contrast, at the outset of litigation and pursuant to FTC intervention, the McDaniels' channel of misconduct was either permanently defunct (in the case of the MLM program) or reformed, lawful, and monitored for compliance (in the case of AdvoCare more broadly). To this end, the FTC not only fails to adequately allege ongoing or future misconduct by the McDaniels but appears to affirmatively concede that the channels through which the McDaniels

engaged in misconduct are permanently closed. (Dkt. #1 at 26); *see also* (Dkt. #2, #15, #16). Therefore, under the circumstances, an inference of present or future violations by the McDaniels is unsupported.

**IV. CONCLUSION**

The FTC is authorized to bring an action under Section 13(b) of the FTC Act only when there is "reason to believe" that a defendant is currently engaged in, or about to engage in, conduct violating the Act. 15 U.S.C. § 53(b). Here, each of the FTC's factual allegations pertains only to *past* misconduct by the McDaniels. While courts may sometimes infer ongoing or future violations based on an extensive history of past violations, here such an inference is improper because the sole channel through which the McDaniels allegedly engaged in violations—AdvoCare—agreed to abandon its MLM program entirely (as well as all other allegedly unlawful practices) and subject itself to wide-ranging government monitoring for compliance. This fundamental transformation began with the termination of AdvoCare's MLM program in July 2019 and culminated in AdvoCare's settlement with the FTC on the day of the Complaint's filing, of which the Court takes judicial notice. Under the circumstances, the FTC has failed to provide plausible factual allegations that there is reason to believe that the McDaniels are currently violating the FTC Act or are about to violate the Act.

Finally, the FTC has filed with the Court a Motion to Exclude, (Dkt. #23), arguing that certain documents, legal arguments, and factual allegations presented in the McDaniels' Reply Brief, (Dkt. #20), should be excluded from consideration. In resolving the McDaniels' dismissal motion, the Court did not consider or rely upon any of the arguments, alleged facts, or documents complained of in the FTC's Motion to Exclude. For this reason, the Court finds that the FTC's Motion to Exclude should be DENIED as moot.

**\*7** It is therefore **ORDERED** that Defendants Diane McDaniel's and Danny McDaniel's Motion to Dismiss, (Dkt. #17), is **GRANTED**. The Federal Trade Commission's claims against the McDaniels, *see* (Dkt. #1), are hereby **DISMISSED without prejudice**. [5] It is further **ORDERED** that the FTC is granted leave to replead its claims by filing an amended complaint, with such amended complaint to be

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 52 of 247

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

filed within thirty (30) days from the date of the issuance of this Order.

It is further **ORDERED** that the FTC's Motion to Exclude is **DENIED as moot**.

It is further **ORDERED** that all other motions pending before the Court are **DENIED as moot**.

**So ORDERED and SIGNED this 16th day of November, 2020.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6741968, 2020-2 Trade Cases P 81,455

## Footnotes

1  "In the instant case, Plaintiffs have not shown that creating and disseminating promotional materials ... caused Plaintiffs' injuries, and they have not shown that the Individual Defendants operated the alleged pyramid scheme...." *Id.*

2  The Unopposed Motion for Settlement, (Dkt. #2), was filed with the Court the same day as the Complaint, (Dkt. #1), October 2, 2019, and the Court entered the stipulated orders, (Dkt. #15, #16), which collectively granted the motion, one week later.

3  The McDaniels have not challenged the Court's jurisdiction in this matter. Although their dismissal motion included some language suggesting a potential jurisdiction argument, *see* (Dkt. #17 at 8), the substance of the McDaniels' motion and briefing asserts only a Rule 12(b)(6) motion for failure to state a claim and does not contest the Court's jurisdiction. *See* (Dkt. #20 at 1 n.3) (the McDaniels' reply brief affirms that they are not raising a jurisdictional challenge). In any event, the Court concludes that it has jurisdiction because the FTC's claim arises under a law of the United States, 15 U.S.C. § 53(b), and therefore falls within the general grant of jurisdiction in 28 U.S.C. § 1331. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (confirming that a plaintiff obtains the "basic statutory grant[ ]" of subject matter jurisdiction in 28 U.S.C. § 1331 by pleading a colorable claim that arises under the Constitution or the laws of the United States).

4  "The McDaniels ... continued to engage in deception until AdvoCare abandoned its multi-level marketing structure in July 2019 during its negotiations with the FTC." (Dkt. #1 at 26).

5  Because the Court dismisses the claims asserted against the McDaniels by the FTC, the Court need not address the parties' arguments on the scope of the remedies that would be available if the FTC's claims against the McDaniels were successful.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3249809
Only the Westlaw citation is currently available.
United States District Court, D. Idaho.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

KOCHAVA INC., Defendant.

Case No. 2:22-cv-00377-BLW

Signed May 4, 2023

**Synopsis**

**Background:** Federal Trade Commission (FTC) brought action against data analytics company for violation of Federal Trade Commission Act alleging that company engaged in unfair act or practice by selling consumers' location data, and sought permanent injunction to prevent company from continuing to violation the Act. Company moved to dismiss.

**Holdings:** The District Court, B. Lynn Winmill, J., held that:

[1] FTC alleged that data analytics company was actively selling consumers' location data in violation of Federal Trade Commission Act, as required to state claim for permanent injunction under Act,

[2] FTC was not required to identify an underlying predicate violation of law or public policy to bring claim that company violated Act;

[3] allegations that company's sale of consumers' data to third parties could permit ill-intentioned third parties to identify, track, and harm consumers did not rise to level of probability required to state claim that company violated Act;

[4] allegations that company's sales of consumer location data posed unwarranted intrusion into private areas of consumers' lives were not sufficiently severe to constitute "substantial injury" to state claim that company violated Act;

[5] FTC adequately alleged that consumers lacked information necessary to avoid harms allegedly caused by company's practices of selling consumer location data, as required to state claim that company violated Act;

[6] FTC adequately alleged that purported injury to consumers was not outweighed by countervailing benefits of consumer location data, as required to state claim that company violated Act; and

[7] Act was not void for vagueness under due process principles.

Motion granted.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (36)

**[1]** **Evidence** 🔑 Newspaper articles and other published information

**Evidence** 🔑 Government press releases

**Evidence** 🔑 Public or government websites

District court would take judicial notice of Federal Trade Commission (FTC) press release, FTC webpage, and published newspaper article, in FTC's action against data analytics company to prevent company's sale of consumers' location data. Fed. R. Evid. 201(b).

1 Case that cites this headnote

**[2]** **Federal Civil Procedure** 🔑 Insufficiency in general

Dismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.

**[3]** **Federal Civil Procedure** 🔑 Insufficiency in general

The rule governing motions to dismiss for failure to state a claim does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the truth of the allegations. Fed. R. Civ. P. 12(b)(6).

**[4]**    **Federal Civil Procedure** 🏳 Pleading over

When a court dismisses a complaint for failure to state a claim, it should generally allow the plaintiff to file an amended complaint unless the complaint clearly could not be saved by any amendment. Fed. R. Civ. P. 12(b)(6), 15(a)(2).

**[5]**    **Antitrust and Trade Regulation** 🏳 Injunction

The Federal Trade Commission (FTC) cannot seek an injunction under the Federal Trade Commission Act based only upon past conduct.

Federal Trade Commission Act § 13, 🏳15 U.S.C.A. § 53(b).

**[6]**    **Antitrust and Trade Regulation** 🏳 Particular cases

Federal Trade Commission (FTC) alleged that data analytics company was actively selling consumers' location data in violation of Federal Trade Commission Act, as required to state claim for permanent injunction under Act, although complaint repeatedly referenced data sample that was no longer available, where complaint was replete with present and present perfect tense language alleging that company continued to engage in same practice of selling location data without restrictions near sensitive locations.

Federal Trade Commission Act §§ 5, 13, 🏳15 U.S.C.A. §§ 45(a), 🏳53(b).

**[7]**    **Antitrust and Trade Regulation** 🏳 Particular cases

Fact that data analytics company implemented new privacy feature did not mean that Federal Trade Commission (FTC) did not allege that company was actively selling consumers' location data in violation of Federal Trade Commission Act, as required to state claim for permanent injunction under Act; company offered almost no information about its new privacy feature, and it was not clear why implementation of feature, which was a readily

reversible step, made it unlikely that company would resume its former practices in the future.

Federal Trade Commission Act §§ 5, 13, 🏳15 U.S.C.A. §§ 45(a), 🏳53(b).

**[8]**    **Antitrust and Trade Regulation** 🏳 Grounds, Subjects, and Scope of Relief

Action for injunction under the Federal Trade Commission Act does not become moot merely because conduct complained of was terminated, if there is possibility of recurrence, since otherwise defendants would be free to return to their old ways. Federal Trade Commission Act § 13, 🏳15 U.S.C.A. § 53(b).

**[9]**    **Antitrust and Trade Regulation** 🏳 Particular cases

Federal Trade Commission (FTC) was not required to identify an underlying predicate violation of law or public policy to bring claim against data analytics company alleging that company violated Federal Trade Commission Act by selling consumers' data; Ninth Circuit precedent indicated that elements of claim were set forth in three-part test in Act without mentioning any requirement for underlying violation of law or public policy, and statutory text did not support imposing predicate-violation requirement. Federal Trade Commission Act § 5, 🏳15 U.S.C.A. §§ 45(a), 🏳45(n).

**[10]**    **Antitrust and Trade Regulation** 🏳 Powers, functions, jurisdiction, and authority

Congress enacted the Federal Trade Commission Act to prohibit "unfair" and "deceptive" business practices that harm competitors and consumers.

Federal Trade Commission Act § 1 et seq., 🏳15 U.S.C.A. § 41 et seq.

**[11]**    **Antitrust and Trade Regulation** 🏳 Particular cases

Federal Trade Commission (FTC) was not required to allege that data analytics company's practices of selling consumers' data were immoral, unethical, oppressive, or unscrupulous in order to bring its claim that company violated Federal Trade Commission Act by selling consumers' data; neither Ninth Circuit precedent nor statutory text supported adding elements to standard set forth in statute. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a), 🚩 45(n).

**[12]**  **Antitrust and Trade Regulation** 🔗 Particular cases

Allegations that data analytics company's sale of consumers' data to third parties could permit ill-intentioned third parties to identify, track, and harm consumers who visit certain sensitive locations did not rise to level of probability required to state claim that data analytics company violated Federal Trade Commission Act by selling consumers' data, although company arguably created foreseeable risk of concrete harm to consumers; complaint did no more than claim that such secondary harms were theoretically possible and did not allege that company's practices created significant risk that third parties would identify and harm consumers. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a), 🚩 45(n).

**[13]**  **Antitrust and Trade Regulation** 🔗 Persons liable

It is not required that the defendant be the one actually inflicting the underlying harm on consumers for the Federal Trade Commission (FTC) to state a claim for violation of the Federal Trade Commission Act; on the contrary, a defendant can "cause" substantial injury under the Act merely by creating a significant risk of concrete harm. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. § 45(n).

**[14]**  **Antitrust and Trade Regulation** 🔗 Private entities or individuals

An invasion of privacy could constitute "substantial injury" within meaning of Federal Trade Commission Act to give rise to liability under Act; any tangible or intangible invasion of legally protected interests could constitute "injury" within meaning of Act, privacy has been legally protected interest at local, state, and federal levels since founding of United States, and Congress did not include limitation in Act to limit Act's reach only to tangible harms. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a), 🚩 45(n).

**[15]**  **Statutes** 🔗 Technical terms, terms of art, and legal terms

When Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, courts presume that Congress knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken.

**[16]**  **Antitrust and Trade Regulation** 🔗 Particular cases

Allegations that data analytics company's sales of consumer location data posed unwarranted intrusion into private areas of consumers' lives were not sufficiently severe to constitute "substantial injury" to state claim that company violated Federal Trade Commission Act; data that company sold was not, on its face, sensitive or private, any private information revealed in company's data bank could only be ascertained by inference, information that could be inferred from company's data was generally accessible through other, lawful means, and Federal Trade Commission (FTC) did not indicate how many device users suffered privacy intrusions, and a consumer whose location data is used only for analytics but never tied back to him cannot have suffered any privacy injury. Federal Trade

Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a), 🚩 45(n).

**[17]**   **Antitrust and Trade Regulation** 👉 Particular cases

Federal Trade Commission (FTC) adequately alleged that consumers lacked information necessary to make informed choices and to avoid harms allegedly caused by data analytics company's practices of selling consumer location data, as required to state claim that company violated Federal Trade Commission Act, although FTC conceded that device users initially consent to collection of their data by other companies; FTC alleged that consumers were unaware that their data would be aggregated, linked to mobile advertising identifiers, and sold to the public. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a), 🚩 45(n).

1 Case that cites this headnote

**[18]**   **Antitrust and Trade Regulation** 👉 Particular cases

Federal Trade Commission (FTC) adequately alleged that purported injury to consumers was not outweighed by countervailing benefits of consumer location data, as required to state claim that data analytics company violated Federal Trade Commission Act by selling consumer location data; FTC only sought injunction requiring company to implement safeguards to remove data associated with sensitive locations from its data feeds, and social benefits of location data did not outweigh narrowness of FTC's requested remedy that would only bar disclosure of coordinates near certain sensitive locations. Federal Trade Commission Act §§ 5, 13, 🚩 15 U.S.C.A. §§ 45(a), 🚩 45(n), 🚩 53(b).

1 Case that cites this headnote

**[19]**   **Antitrust and Trade Regulation** 👉 Private entities or individuals

In conducting cost-benefit analysis under provision of Federal Trade Commission Act prohibiting unfair or deceptive acts or practices in or affecting commerce, courts consider potential costs that proposed remedy would impose on parties and society in general. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. § 45(n).

**[20]**   **Antitrust and Trade Regulation** 👉 Powers, functions, jurisdiction, and authority

**Constitutional Law** 👉 Particular Subjects and Regulations

District court would apply ordinary due process fair notice standard governing civil statutes that regulate economic activities to Federal Trade Commission's (FTC) action against data analytics company alleging violation of Federal Trade Commission Act for sale of consumer location data, where FTC sought to enforce Act as written. U.S. Const. Amend. 5; Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. § 45(a).

**[21]**   **Constitutional Law** 👉 Certainty and definiteness; vagueness

Under due process principles, laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. U.S. Const. Amend. 5.

**[22]**   **Constitutional Law** 👉 Certainty and definiteness; vagueness

Due process is violated whenever a law fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. U.S. Const. Amend. 5.

**[23]**   **Constitutional Law** 👉 Administrative Agencies and Proceedings in General

**Constitutional Law** 👉 Rules and regulations

Under due process principles, the standard for fair notice varies depending on whether an agency is enforcing its own regulation, filling statutory gaps, or simply enforcing a statute, as written. U.S. Const. Amend. 5.

**[24]** **Antitrust and Trade Regulation** 🔑 Validity

**Constitutional Law** 🔑 Particular Subjects and Regulations

Data analytics company could have reasonably foreseen that selling substantial quantities of consumers' precise location data without restrictions near sensitive locations could be construed as injurious under the Federal Trade Commission Act, and, thus, Act was not void for vagueness under due process principles, although section setting forth elements of claims for violations of Act was imprecise; Congress limited meaning of term "unfair" in those elements, and statute was comprehensible and set forth normative cost-benefit analysis for companies to use in assessing their compliance with the law. U.S. Const. Amend. 5; Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a), 🚩 45(n).

**[25]** **Constitutional Law** 🔑 Certainty and definiteness; vagueness

Civil statutes regulating economic activities are only void for vagueness, in violation of due process, if they create a standard so vague and indefinite as really to be no rule or standard at all. U.S. Const. Amend. 5.

**[26]** **Constitutional Law** 🔑 Certainty and definiteness; vagueness

A statute is not overly vague, in violation of due process, if it prohibits conduct according to an imprecise but comprehensible normative standard. U.S. Const. Amend. 5.

**[27]** **Antitrust and Trade Regulation** 🔑 Validity

**Constitutional Law** 🔑 Appointment, tenure and removal of public employees and officials

**Public Employment** 🔑 Authority to impose adverse action;  manner and mode of imposition

**Statutes** 🔑 Government property, facilities, and funds

**Statutes** 🔑 Trade or business

**United States** 🔑 In general;  power to remove

Section of Federal Trade Commission Act governing permanent injunctions did not violate separation of powers by giving executive litigation authority to agency whose members were not removable at-will by the President; Ninth Circuit precedent rejected that argument, and, even if section violated separation of powers, invalidation of section was not proper remedy, because Act's removal provision was severable from remainder of Act by severability clause and because remaining portions of Act were capable of functioning independently. Federal Trade Commission Act §§ 1, 13, 17, 🚩 15 U.S.C.A. §§ 41, 🚩 53(b), 57.

**[28]** **Public Employment** 🔑 Authority to impose adverse action;  manner and mode of imposition

**United States** 🔑 In general;  power to remove

President generally has authority to remove those who assist him or her in carrying out his or her duties. U.S. Const. art. 2, § 1.

**[29]** **Statutes** 🔑 Government property, facilities, and funds

When removal protections for federal officials violate separation of powers, courts first ask whether removal provisions are severable from remainder of statute; if severable, those provisions are invalidated while remainder of statute, including grant of agency authority, survives.

**[30]** **Antitrust and Trade Regulation** 🔑 Powers, functions, jurisdiction and authority

**Constitutional Law** 🔑 Unfair trade practices

Nondelegation doctrine did not apply to Federal Trade Commission's (FTC) actions to enforce Federal Trade Commission Act against data analytics company to make Act unconstitutional; Federal Trade Commission (FTC) was simply asking court to interpret a statute, as written.

Federal Trade Commission Act § 5, 🚩15 U.S.C.A. § 45(a).

**[31]**   **Constitutional Law** 👈 Delegation of Powers

The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government.

**[32]**   **Constitutional Law** 👈 To Executive, in General

Nondelegation doctrine does not limit Congress in granting agencies authority to seek judicial enforcement of laws they administer.

**[33]**   **Constitutional Law** 👈 Delegation of Powers

When delegating legislative powers, Congress must only provide a general policy and boundaries of authority.

**[34]**   **Antitrust and Trade Regulation** 👈 Powers, functions, jurisdiction, and authority

**Constitutional Law** 👈 Unfair trade practices

Major questions doctrine did not apply to Federal Trade Commission's (FTC) actions to enforce Federal Trade Commission Act against data analytics company to make Act unconstitutional; FTC was not flexing its regulatory muscles, but, rather, was asking a court to interpret and apply a statute enacted by Congress. Federal Trade Commission Act § 5, 🚩15 U.S.C.A. § 45(a).

1 Case that cites this headnote

**[35]**   **Administrative Law and Procedure** 👈 Statutory basis and limitation

Major questions doctrine requires Congress to speak clearly if it wishes to assign to agency decisions of vast economic and political significance.

1 Case that cites this headnote

**[36]**   **Administrative Law and Procedure** 👈 Statutory basis and limitation

Objective of major questions doctrine is to avoid enormous and transformative expansion in regulatory authority without clear congressional authorization.

1 Case that cites this headnote

**Attorneys and Law Firms**

Brian Shull, Federal Trade Commission, Washington, DC, Julia A. Horwitz, Federal Trade Commission, District of Columbia, DC, Elizabeth Scott, U.S. Federal Trade Commission, Chicago, IL, for Plaintiff.

Craig Joel Mariam, Gordon Rees Scully Mansukhani, LLP, Boise, ID, for Defendant.

**MEMORANDUM DECISION AND ORDER**

B. Lynn Winmill, United States District Court Judge

**INTRODUCTION**

 **\*1**   This case is about mobile devices, location data, and privacy. The underlying dispute is whether the defendant, Kochava, Inc., is engaging in an "unfair ... act or practice" by selling geolocation data that could enable third parties to track mobile device users to and from sensitive locations. At this early stage in the litigation, however, the Court must only decide whether the plaintiff, the Federal Trade Commission (FTC), has stated at least a plausible claim against Kochava.

 **[1]**   Before getting into the legal issues, the Court will review the factual allegations underlying the FTC's Complaint. [1]

## BACKGROUND

Kochava, Inc. is a data analytics company that offers various digital marketing and analytics services. One of its services involves aggregating and selling data collected from billions of mobile devices across the world. Among other things, Kochava's data includes timestamped location coordinates and unique device identifiers which, viewed together, reveal the past movements of mobile devices.

### 1. Geolocation Data

Geolocation data is a broad term for information about a mobile device's geographical location. It may reveal where a device currently is, as with Global Position Systems (GPS), or it may only reveal where a device has been in the past. Real-time and historical geolocation data are used by various commercial and governmental entities in many ways. Familiar uses include the use by emergency dispatch to track 9-1-1 callers and the use by cellphone applications that provide turn-by-turn driving directions and traffic alerts. A less visible but equally ubiquitous use of geolocation data is by data analytics companies who analyze consumer trends and develop targeted marketing strategies.

Kochava is one such data analytics company. It obtains geolocation data from third-party data brokers, such as app developers, who collect the data with consent directly from mobile device users. Kochava then aggregates the data in its proprietary data bank, called the Kochava Collective, and lets its paying customers access the data bank. The data bank contains data from "billions of devices globally" and includes around ninety-four billion coordinates per month, from thirty-five million daily active users, with each device generating an average of over ninety data points per day. *Compl.* ¶ 11, Dkt. 1. That means the location coordinates in the data bank reveal where each mobile device has been approximately every fifteen minutes.

**\*2**  Kochava does not, however, sell real-time location data. Instead, according to the FTC, Kochava's customers can only access "historical location data" collected during the seven days prior to the date they pay for access to the data bank. *Id.* ¶ 19. Thus, while Kochava's customers can see where a given mobile device has been, they cannot see where a device presently is.

### 2. Mobile Advertising IDs ("MAIDs")

Mobile Advertising IDs (MAIDs) are unique alphanumeric names that operating systems, such as IOS and Android, assign to mobile devices. Acting as virtual fingerprints, MAIDs are also called "unique persistent identifiers" because they remain unchanged unless proactively reset by device users. *Id.* ¶ 10. In the context of data analytics, MAIDs are used to link a series of otherwise unconnected data points, such as geolocation coordinates, and, hence, reveal the movements of a particular device. In short, by associating data points with MAIDs, analytics companies can identify patterns among specific devices, group devices into categories, and develop targeted marketing campaigns based on that information.

According to the FTC, each set of location coordinates in Kochava's data bank is paired with a MAID. This linking of coordinates to MAIDs, the FTC claims, enables Kochava's customers to plot coordinates on a map and trace a particular device's movements, and in doing so, to "associate each set of coordinates with a specific consumer." *Id.* ¶¶ 8, 20–21. It is this practice of selling both geolocation coordinates and MAIDs that the FTC challenges in this lawsuit.

### 3. This Lawsuit

The FTC filed this action in August of 2022, seeking a permanent injunction barring Kochava from continuing its sale of "precise location data associated with unique persistent identifiers that reveal consumers' visits to sensitive locations." *Id.* ¶ 36. The Complaint focuses on two components of the data Kochava sells: timestamped geolocation coordinates and MAIDs. According to the FTC, by aggregating and selling both data points, together, without any technical controls to prevent tracking device users to sensitive locations, Kochava violates device users' privacy and exposes them to risks of secondary harm. In doing so, the FTC alleges, Kochava engages in an "unfair ... act or practice" prohibited by Section 5(a) of the Federal Trade Commission Act, ⚑ 15 U.S.C. § 45(a)(1). To prevent Kochava from continuing to violate Section 5(a), the FTC seeks a permanent injunction under Section 13(b), ⚑ 15 U.S.C. § 53(b).

Instead of filing an answer to the FTC's Complaint, Kochava seeks dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. Kochava's Motion to Dismiss (Dkt. 7) is fully briefed and the Court heard oral argument on February 21, 2023. As explained below, the Court will grant the motion to dismiss,

but will allow the FTC to file an amended complaint in accordance with this Order.

### LEGAL STANDARD

**[2]** **[3]** To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "[D]ismissal may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121 (9th Cir. 2008) (cleaned up). However, Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" of the truth of the allegations. *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955.

**\*3** **[4]** When a court dismisses a complaint under Rule 12(b)(6), it should generally allow the plaintiff to file an amended complaint unless the complaint clearly "could not be saved by any amendment." *Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996), overruled on other grounds by *Odom v. Microsoft Corp.*, 486 F.3d 541 (9th Cir. 2007); *see also* Fed. R. Civ. P. 15(a)(2).

### ANALYSIS

The FTC's Complaint rests on two provisions of the Federal Trade Commission Act ("FTC Act"). First, Section 5(a) provides the underlying legal proscription the FTC seeks to enforce, prohibiting "unfair ... acts or practices in or affecting commerce." 15 U.S.C. § 45(a). Second, Section 13(b) provides the enforcement mechanism the FTC employs, authorizing it to seek injunctions in federal court whenever it "has reason to believe" that a person, partnership, or corporation "is violating, or is about to violate," a law enforced by the FTC. 15 U.S.C. § 53(b).

Kochava offers several reasons why the FTC has failed to make sufficient factual allegations to state a claim under Section 5(a) and 13(b). It also makes several constitutional arguments, asserting that even if the FTC made additional

factual allegations, its claim would not survive. Ultimately, the Court agrees that the FTC's complaint lacks sufficient allegations to state a claim under Section 5(a). It is not clear, however, that the deficiencies cannot be cured. The Court will therefore dismiss the Complaint with leave to amend in accordance with this Order.

### 1. The FTC adequately alleges that it has reason to believe Kochava "is violating, or is about to violate," Section 5(a) of the FTC Act.

**[5]** Under Section 13(b) of the FTC Act, the FTC may only seek injunctive relief when it "has reason to believe" that a defendant "is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission." 15 U.S.C. § 53(b). In other words, the FTC cannot seek an injunction based only upon past conduct.

**[6]** **[7]** **[8]** Kochava insists that the FTC is only challenging past practices. But in reading the Complaint so narrowly, Kochava misses the forest for the trees. Although the Complaint does repeatedly reference a data sample that is no longer available, it is replete with present and present perfect tense language clearly alleging that Kochava continues to engage in the same practice of selling geolocation data without restrictions near sensitive locations. *See Compl.* ¶¶ 8, 9, 11, 23, 30, 33, 36, 37 & 39, Dkt. 1; *see also Jones v. Liberty Mut. Fire Ins. Co.*, Civil Action No. 3:04-CV-137-MO, 2008 WL 490584, at \*2 (W.D. Ky. Feb. 20, 2008) ("The complaint ... uses the present perfect tense which can communicate a continuing situation."). Read properly, the FTC's Complaint alleges that Kochava is actively selling location data in violation of the FTC Act. At this stage, that allegation suffices. [2]

### 2. The FTC need not allege a predicate violation of law or policy to state a claim under Section 5(a) of the FTC Act.

**\*4** **[9]** Kochava argues that, to sue under Section 5(a), the FTC must identify some "underlying predicate violation" of law or public policy. The Court disagrees because neither the statutory language nor case law support adding such an element to Section 5(a).

**[10]** Congress enacted the FTC Act to prohibit "unfair" and "deceptive" business practices that harm competitors and consumers. If those terms seem broad, they are intentionally so. Indeed, Congress "explicitly considered, and rejected, the

notion that it reduce the ambiguity ... by enumerating the particular practices to which [Section 5(a)] was intended to apply." *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) (citing S. Rep. No. 63-597, at 13 (1914)). Instead, Congress authorized the FTC to use its expertise in guiding the law's application and development in different contexts.

For the first eighty years after enacting the FTC Act, Congress remained mostly on the sidelines and let the FTC develop the meaning of unfairness through policy statements and agency adjudications. But in 1994, spurred by growing criticisms of the FTC's liberal use of Section 5(a), Congress amended the FTC Act and added Section 5(n) to limit the FTC's authority to deem acts and practices "unfair" under Section 5(a). FTC Act Amendments of 1994, Pub. L. No. 103-312, § 9, 108 Stat. 1691, 1695 (1994). Namely, Section 5(n) prohibits the FTC from declaring an act or practice unfair unless "the act or practice [1] causes or is likely to cause substantial injury to consumers which is [2] not reasonably avoidable by consumers themselves and [3] not outweighed by countervailing benefits to consumers or to competition."

Kochava now asks this Court to hold that an act or practice cannot be unfair under Section 5(a) unless it also violates some other existing law or public policy. For support, Kochava cites a recent Eleventh Circuit case: *LabMD, Inc. v. F.T.C.*, 894 F.3d 1221 (11th Cir. 2018). There, the FTC claimed that a medical laboratory engaged in an unfair act or practice by failing to implement adequate data-security measures. *Id.* at 1225. The lab responded, as Kochava does here, by arguing that the Section 5(a) claim must be dismissed because the FTC had not identified any underlying violation of law or public policy. *Id.* at 1227. The Eleventh Circuit agreed, concluding that "an act or practice's 'unfairness' must be grounded in statute, judicial decisions—*i.e.*, the common law—or the Constitution." *Id.* at 1229.[3] Based on that conclusion, the court foraged for some existing legal standard to apply. Boiling the FTC's complaint down to its "gist," the court thought it "apparent" that the FTC was essentially claiming negligence. *Id.* at 1231. Applying the negligence standard, the court concluded that the FTC's complaint was sufficient to state a claim under Section 5(a). *Id.*

**\*5** For two reasons, this Court declines Kochava's invitation to follow the Eleventh Circuit and add a predicate-violation requirement to Section 5(a). First, that approach is inconsistent with Ninth Circuit precedent. *See F.T.C. v. Amazon, Inc.*, Case No. C14-1038-JCC, 2016 WL 10654030, at *6 (W.D. Wash. July 22, 2016) ("The three-part test for whether a practice is 'unfair' under the FTC Act, found in the statute itself, is followed without embellishment by courts in this Circuit."). In at least two cases, the Ninth Circuit has identified the elements of a Section 5(a) unfairness claim by simply stating the three-part test set forth in Section 5(n). In *F.T.C. v. Neovi, Inc.*, for example, the court declared that "an unfair practice or act is one that" satisfies each of the three elements set forth in Section 5(n). 604 F.3d 1150, 1155 (9th Cir. 2010), *as amended* (June 15, 2010); *see also Davis v. HSBC Bank Nevada*, 691 F.3d 1152, 1168 (9th Cir. 2012) (same). The court did not reference any additional requirement for a predicate violation of law or public policy.[4] Nor is this Court aware of any Ninth Circuit decision suggesting that such a requirement exists.

Second, the Eleventh Circuit's approach does not square with the text of the FTC Act. Neither Section 5(a) nor Section 5(n) makes any reference to underlying violations of existing law or policy. *Accusearch Inc.*, 570 F.3d at 1194 ("[T]he FTCA imposes no such constraint."). Congress easily could have added such a requirement when it enacted Section 5(n), but it did not. Instead, it specified that public policy may only serve as "evidence to be considered with all other evidence," but "may not serve as a primary basis," for deeming an act or practice unfair. *15 U.S.C. § 45(n)*. It is true that the three requirements set forth in Section 5(n) are written as negative limitations on the FTC's authority rather than as an exhaustive list of elements. *See F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244 (3d Cir. 2015); *but see F.T.C. v. Walmart Inc.*, No. 22 CV 3372, ––– F.Supp.3d ––––, ––––  – ––––, 2023 WL 2646741, at *15–16 (N.D. Ill. Mar. 27, 2023). Nevertheless, what the statute does definitively prohibit is courts giving mechanical deference to public policy in determining whether acts or practices are unfair. There is simply no support in the statutory text for imposing a predicate-violation requirement under Section 5(a).

In sum, to state a claim under Section 5(a), the FTC need not allege that Kochava's practices violate any underlying law or public policy. It must only allege that those practices (1) cause or are likely to cause substantial injury to consumers (2) that

is unavoidable by consumers and (3) is not outweighed by countervailing benefits to consumers. 🚩 15 U.S.C. § 45(n).

### 3. The FTC need not allege that Kochava's practices are immoral, unethical, oppressive, or unscrupulous.

[11] Kochava also argues that Section 5(a) of the FTC Act only prohibits acts and practices that are immoral, unethical, oppressive, or unscrupulous. For this proposition, Kochava relies on two decisions from the 1970s: *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) and 🚩 *Spiegel, Inc. v. F.T.C.*, 540 F.2d 287 (7th Cir. 1976). But both cases relied upon a 1964 policy statement that the FTC later expressly abandoned in 1980. 🚩 *Wyndham Worldwide Corp.*, 799 F.3d at 243–44 (citing 🚩 *Int'l Harvester Co.*, 104 F.T.C. 949, 1070 (1984)). Moreover, as discussed above, neither the statutory text nor Ninth Circuit precedent supports adding elements to the standard set forth in Section 5(n). The FTC therefore need not allege that Kochava's practices are immoral, unethical, oppressive, or unscrupulous in order to bring its Section 5(a) claim.

### 4. The FTC has not adequately alleged a likelihood of substantial consumer injury.

**\*6** To state a claim under Section 5(a), the FTC must allege that Kochava's practices cause or will likely cause "substantial injury to consumers." 🚩 15 U.S.C. § 45(n). In its Complaint, the FTC advances two theories of consumer injury. First, it claims that Kochava's geolocation data sales could enable third parties to track consumers' past movements to and from sensitive locations, and, based on inferences arising from that information, inflict secondary harms including "stigma, discrimination, physical violence, [and] emotional distress." *Compl.* ¶ 29, Dkt. 1. Second, the FTC claims that the disclosure of consumers' sensitive location information itself constitutes substantial injury to consumers' right to privacy. *Id.* ¶ 24.

The FTC's first theory of consumer injury is plausible: a company could substantially injure consumers by selling their sensitive location information and thereby subjecting them to a significant risk of suffering concrete harms at the hands of third parties. But here, the FTC has not alleged that consumers are suffering or are likely to suffer such secondary harms. It only alleges that secondary harms are

theoretically possible. The FTC's second theory also fails, but for a different reason: the purported privacy intrusion is not severe enough to constitute "substantial injury" under Section 5(n).

### A. Theory #1: Increased Risk of Secondary Harms

[12] As the FTC claims, ill-intentioned third parties could theoretically use Kochava's geolocation data to identify, track, and harm mobile device users who visit certain "sensitive locations." And by creating the risk of such harms, Kochava may indeed be inflicting a substantial injury on consumers within the meaning of Section 5(a) of the FTC Act. The problem, however, is that the FTC has not attached any degree of probability to those risks. Instead, the FTC claims only that secondary harms "could" occur as a result of Kochava's data sales.[5]

[13] Section 5(n) requires the FTC to allege more than a mere possibility of consumer injury. Rather, the defendant's acts or practices must actually cause or be likely to cause injury. 🚩 15 U.S.C. § 45(n). That is not to say that the defendant must be the one actually inflicting the underlying harm on consumers. On the contrary, a defendant can "cause" substantial injury under Section 5(n) merely by creating "a significant risk of concrete harm." *Neovi, Inc.*, 604 F.3d at 1157; *see also* 🚩 *id.* at 1156 ("Courts have long held that consumers are injured for purposes of the Act not solely through the machinations of those with ill intentions, but also through the actions of those whose practices facilitate, or contribute to, ill intentioned schemes if the injury was a predictable consequence of those actions."). Here, Kochava arguably creates a foreseeable risk of concrete harm to consumers by aggregating and selling location coordinates and MAIDs which, together, enable third parties to identify and harm device users who visit certain sensitive locations. Yet the FTC's Complaint does no more than claim that such secondary harms are theoretically possible.

The FTC asks the Court to simply infer that consumer injury is probable from its assertion that Kochava is disclosing "sensitive information" about device users. To support such an inference, the FTC points to Ninth Circuit dicta noting that a hypothetical disclosure of "personal facts," such as one's "HIV status, sexual orientation, or genetic makeup," may "lead directly to injury, embarrassment or stigma." 🚩 *In re Crawford*, 194 F.3d 954, 960 (9th Cir. 1999). But there is an important difference between the hypothetical disclosure of

"personal facts" referenced by the Ninth Circuit and this case. Namely, that hypothetical assumes that the disclosed facts are, on their face, tied to particular individuals. That is not true in our case: the FTC acknowledges that third parties must take additional steps to link Kochava's geolocation data to particular individuals. *See Compl.* ¶ 20, Dkt. 1. Accordingly, Kochava's disclosure of location data, alone, does not give rise to an inference of consumer injury. The FTC must go one step further and allege that Kochava's practices create a "significant risk" that third parties will identify and harm consumers. 📁 *Neovi, Inc.,* 604 F.3d at 1157. [6]

**\*7** In sum, although the FTC's first legal theory of consumer injury is plausible, the FTC has not made sufficient factual allegations to proceed. To do so, it must not only claim that Kochava's practices *could* lead to consumer injury, but that they are *likely* to do so, as required by the statute.

### B. Theory #2: Invasion of Privacy

The FTC's second theory of consumer injury raises two questions. First, can an invasion of privacy, alone, constitute "substantial injury" under Section 5(n) of the FTC Act? The Court concludes it can. And second, in this case, is the alleged privacy intrusion sufficiently severe to constitute substantial injury to consumers? The Court concludes it is not.

### (1) An invasion of privacy may constitute substantial injury under Section 5(n) of the FTC Act.

**[14]** An act or practice is only unfair under Section 5(a) if it causes "substantial injury" to consumers. 📁 15 U.S.C. § 45(n). The FTC claims that Kochava's data sales injure consumers by violating their privacy. The threshold question, then, is whether an invasion of privacy can constitute "substantial injury" within the meaning of Section 5(n).

**[15]** Beginning with the plain language the statute, Section 5(n) is not limited to tangible injuries, such as monetary or physical harm. Instead, Congress simply used the word "injury," which is a term of art in the legal field that refers broadly to any "actionable invasion of a legally protected interest." *Injury,* BLACK'S LAW DICTIONARY (11th ed. 2019). "[W]hen Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, we presume that Congress knows and adopts the cluster of ideas that were attached to each borrowed word in

the body of learning from which it was taken." *United States v. Ornelas,* 906 F.3d 1138, 1143 (9th Cir. 2018) (quoting 📁 *Carter v. United States,* 530 U.S. 255, 264, 120 S.Ct. 2159, 147 L.Ed.2d 203 (2000)). Thus, based on the plain language of Section 5(n), any tangible or intangible invasion of a legally protected interest may constitute "injury" within the meaning of Section 5(n).

Since our nation's founding, privacy has been a legally protected interest at the local, state, and federal levels. *See* 📁 *Patel v. Facebook, Inc.,* 932 F.3d 1264, 1271–72 (9th Cir. 2019) (quoting 📁 *Spokeo, Inc. v. Robins,* 578 U.S. 330, 341, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016)) ("Privacy rights have long been regarded 'as providing a basis for a lawsuit in English or American courts.' "); 📁 *Eichenberger v. ESPN, Inc.,* 876 F.3d 979, 983 (9th Cir. 2017) ("Violations of the right to privacy have long been actionable at common law."); 📁 *Stasi v. Inmediata Health Group Corp.,* 501 F.Supp.3d 898, 909 (S.D. Cal. 2020) (collecting cases). [7]

**\*8** More specifically, privacy protections against the disclosure of certain kinds of sensitive personal information are embedded in countless federal and state statutes, regulations, and common law doctrines. 📁 *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,* 489 U.S. 749, 763, 109 S.Ct. 1468, 103 L.Ed.2d 774 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person."). To name just a few: tort law in many states allows lawsuits based on the public disclosure of private facts; a host of federal statutes and regulations forbid the unauthorized disclosure of personal health information, *see, e.g.,* Health Insurance Portability and Accountability Act of 1996 (HIPAA), 📁 42 U.S.C. § 201 *et seq.*; numerous federal statutes protect internet users' privacy, *see, e.g.,* Children's Online Privacy Protection Act of 1998 (COPPA), 📁 15 U.S.C. §§ 6501–📁 6505; and the Fourth Amendment to the United States Constitution bars the federal government from violating reasonable expectations of privacy, *see* 📁 *Carpenter v. United States,* ––– U.S. ––––, 138 S.Ct. 2206, 2217–18, 201 L.Ed.2d 507 (2018). In short, privacy is—and has always been—a legally protected interest in many contexts, including specifically with regard to sensitive personal information.

*Federal Trade Commission v. Kochava Inc., --- F.Supp.3d ---- (2023)*

Stepping back and connecting the dots, then: if injury is the invasion of a legally protected interest, and privacy is a legally protected interest, then an invasion of privacy may constitute injury. Thus, under the plain language of the FTC Act, a defendant whose acts or practices violate consumer privacy may be said to inflict an "injury" upon consumers within the meaning of Section 5(n).

Looking beyond the statutory text, neither legislative history nor case law contradicts the plain meaning of Section 5(n).

*See* *F.T.C. v. Roca Labs, Inc.*, 345 F.Supp.3d 1375, 1395 (M.D. Fla. 2018) ("[N]either the legislative history nor the current law requires proof of tangible harm to the exclusion of intangible harm."). As the Ninth Circuit has explained, consumer injury can occur in "a variety of ways." *Neovi, Inc.*, 604 F.3d at 1156. Thus, although Congress has noted that consumer injury often involves monetary harm, and that mere "[e]motional impact and other more subjective types of harm" are ordinarily insufficient, these generalizations do not limit Section 5(n)'s reach only to tangible harms. S. Rep. No. 103-130, at 13, 1993 WL 322671 (1993). If Congress had intended such a limitation, it could have easily included one in the statute.

Neither the text of Section 5(n), the legislative history, nor case law indicates that a severe invasion of privacy cannot constitute substantial injury giving rise to liability under Section 5(a) of the FTC Act.

### (2) The alleged privacy intrusion is not sufficiently severe to constitute substantial injury.

**[16]** The next question is whether the privacy intrusion alleged by the FTC constitutes substantial injury to consumers. The Court concludes it does not.

The FTC claims that Kochava's data sales reveal "sensitive and private characteristics of consumers" and therefore "pose an unwarranted intrusion into the most private areas of consumers' lives." *Compl.* ¶¶ 24 & 29, Dkt. 1. It explains that "much can be inferred about the mobile device owners" by plotting their devices' timestamped location coordinates on a map. For example, using publicly available services like Google Maps, anyone with access to Kochava's data feeds can determine where a given device user lives, works, worships, and seeks medical treatment. *Id.* ¶ 22. To illustrate, using data it obtained from one of Kochava's free data samples, the

FTC identified a particular device user who visited a women's reproductive health clinic, spent nights at a certain residence, and visited another location on at least three evenings in the same week. *Id.* ¶ 25.

The privacy concerns raised by the FTC are certainly legitimate. Disclosing where a person has been every fifteen-minutes over a seven-day period could undoubtedly reveal information thatis the person would consider private, such as their travel habits, medical conditions, and social or religious affiliations. Be that as it may, the Court's job is to apply the law as it is, regardless of whether the Court thinks the law is too strict or not strict enough. The FTC Act only prohibits acts and practices that cause "substantial injury" to consumers. Where, as here, a privacy intrusion is the alleged injury, the Court must determine whether the privacy intrusion is sufficiently severe to constitute "substantial" injury.

**\*9** Here, at least three factors lessen the severity of the alleged privacy injury. First, the data Kochava sells is not, on its face, sensitive or private. On the contrary, any private information that is revealed in Kochava's data bank can be ascertained only by inference. But inferences are often unreliable. For example, geolocation data showing that a device visited an oncology clinic twice in one week could reveal that the device user suffers from cancer. Or it may instead reveal that the person has a friend or family member who suffers from cancer. Or that the person is a pharmacist or is in the business of selling or maintaining medical devices. The point is that the FTC does not actually claim that Kochava is disclosing private information, but rather that it is selling data from which private information might be inferred. Although this distinction does not eliminate all the privacy concerns voiced by the FTC in this lawsuit, it does lessen the severity of the alleged privacy injury.

Second, the information that can be inferred from Kochava's geolocation data is generally accessible through other, lawful means. A third party may, for example, observe a person's movements on public streets and sidewalks as they go to and from home or a medical facility. A third party may also discover a person's home address by reviewing publicly accessible property records. Privacy interests in the kind of location data Kochava sells are therefore weaker than, for example, privacy interests in confidential financial or medical information which is not otherwise publicly accessible. *See, e.g.,* *Wyndham Worldwide Corp.*, 799 F.3d at 240.

Federal Trade Commission v. Kochava Inc., --- F.Supp.3d ---- (2023)

Finally, the FTC has not even generally indicated how many device users may suffer privacy intrusions. This omission is important because the substantiality of a consumer injury depends, in part, on the number of consumers injured. *Neovi, Inc.*, 604 F.3d at 1157 (internal quotation omitted) ("An act or practice can cause substantial injury by doing a small harm to a large number of people."). The FTC concedes that Kochava's geolocation data can only be linked to particular device users if third parties take additional steps —steps requiring access to external, or "offline," information. But a consumer whose geolocation data is used only for analytics but never tied back to him cannot be said to have suffered any privacy injury. Ultimately, the FTC claims only that third parties *could* tie the data back to device users; not that they have done so or are likely to do so.

Although an invasion of privacy could theoretically constitute consumer injury under Section 5(a), the intrusion alleged by the FTC is not sufficiently severe to constitute "substantial" injury.

### C. Conclusion

In sum, the FTC's first theory of consumer injury is plausible, but the FTC has not adequately alleged that Kochava's data sales "cause or are likely to cause" the purported secondary harm. Put another way, the FTC has not alleged that Kochava's practices create a "significant risk" of concrete harm. *Id.* at 1157. This deficiency may, however, be cured through additional factual allegations in an amended complaint. The FTC's second theory of consumer injury fails because It has not adequately alleged how the privacy intrusion creates a "substantial injury" to consumers. Although the Court is somewhat skeptical that this deficiency can be cured through an amended complaint, it will give the FTC an opportunity to try. The Court will therefore dismiss the Complaint but give the FTC an opportunity to file an amended complaint in accordance with this Order. [8]

### 5. The FTC has adequately alleged that the purported injury is unavoidable by consumers themselves and not outweighed by countervailing benefits.

To state a claim under Section 5(a), the FTC must also allege that the consumer injury is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits. *See* 15 U.S.C. § 45(n). Kochava challenges the sufficiency of the Complaint on both grounds.

**\*10** [17] First, "[i]n determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." *Neovi, Inc.*, 604 F.3d at 1158. The FTC claims that Kochava's "collection and use" of consumers' location data is "opaque to consumers" who "have never heard of or interacted with" Kochava and have "no insight into how Kochava uses their data." *Compl.* ¶ 31, Dkt. 1. Conceding that device users initially consent to the collection of their data by other companies, the FTC claims that consumers are nevertheless unaware that their data will be aggregated, linked to MAIDs, and sold to the public. At this stage, the FTC has adequately alleged that consumers lack the information necessary to make informed choices and avoid the harms allegedly caused by Kochava's practices.

[18] [19] Second, in conducting the cost-benefit analysis under Section 5(n), courts consider "the potential costs that the proposed remedy would impose on the parties and society in general." *Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 975 (D.C. Cir. 1985). Here, the FTC seeks only an injunction requiring Kochava to "implement safeguards to remove data associated with sensitive locations from its data feeds." *Compl.* ¶ 32, Dkt. 1. Kochava responds by emphasizing the societal benefits of geolocation data, generally, but overlooks the narrowness of the FTC's requested remedy, which would only bar the disclosure of coordinates near certain "sensitive locations." [9] At this stage, the FTC has adequately alleged that the purported injury to consumers is not outweighed by the countervailing benefits of that relatively narrow subset of data.

### 6. Kochava had fair notice that unrestricted sales of geolocation data could fall within Section 5(a) of the FTC Act.

[20] [21] [22] [23] "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012). This principle, grounded in the concept of due process, is violated whenever a law "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* at 253, 132 S.Ct. 2307

(quoting United States v. Williams, 553 U.S. 285, 304, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008)). [10]

**[24] [25] [26]** Kochava claims it lacked fair notice that its sale of geolocation data without restrictions near sensitive locations could violate Section 5(a) of the FTC Act. In response, the FTC correctly points out that the standard for fair notice is especially low in cases, like this one, involving civil statutes regulating economic activities. Such laws are only void for vagueness if they create a standard "so vague and indefinite as really to be no rule or standard at all." Boutilier v. INS, 387 U.S. 118, 123, 87 S.Ct. 1563, 18 L.Ed.2d 661 (1967). A statute is not overly vague, however, if it "prohibits conduct according 'to an imprecise but comprehensible normative standard.' " Botosan v. Paul McNally Realty, 216 F.3d 827, 836 (9th Cir. 2000) (quoting Coates v. City of Cincinnati, 402 U.S. 611, 614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971)).

**\*11** Section 5(a)'s prohibition of "unfair and deceptive acts or practices" is not an island of its own. If it were, Kochava's void-for-vagueness argument might hold more water. On the contrary, Congress limited the meaning of the term "unfair" in 1994 when it added Section 5(n) to the FTC Act, which sets forth the three elements discussed above. [11] Admittedly, Section 5(n) is somewhat imprecise, using undefined terms like "substantial injury," "reasonably avoidable," and "countervailing benefits." Nevertheless, it is comprehensible and sets forth a normative cost-benefit analysis for companies to use in assessing their compliance with the law. See Wyndham Worldwide Corp., 799 F.3d at 255; see also Sperry & Hutchinson Co., 405 U.S. at 244, 92 S.Ct. 898; Walmart Inc., ___ F.Supp.3d at ___ – ___, 2023 WL 2646741, at \*22–24. Ultimately, applying the standard set forth in Section 5(n), Kochava could have reasonably foreseen that selling substantial quantities of precise geolocation data without restrictions near sensitive locations could be construed as injurious—and therefore unfair—to consumers. [12]

Indeed, even the 2014 FTC press release that Kochava offers as an exhibit bolsters this conclusion. FTC Testifies on Geolocation Privacy, *Exhibit A*, Dkt. 7-3. That release, published in June of 2014, highlighted "concerns raised by the tracking of information about consumers' location," reiterated that the FTC is "the federal government's leading

privacy enforcement agency," and confirmed that the FTC had already "used its enforcement authority under Section 5 of the FTC Act to take action against companies engaged in unfair or deceptive practices involving geolocation information." *Id.* at 1. If anything, that press release provided Kochava with additional notice that unrestricted sales of geolocation data and associated MAIDs could be construed as violating the FTC Act.

In sum, given the low bar for fair notice in this context and the comprehensible standard set forth in sections 5(a) and 5(n) of the FTC Act, Kochava had fair notice.

## 7. Section 13(b) of the FTC Act does not violate the separation of powers.

**[27]** Kochava next argues that Section 13(b) of the FTC Act violates the separation of powers by giving executive litigation authority to an agency whose members are not removable at-will by the president. The Court rejects Kochava's position for two reasons. First, the Ninth Circuit has squarely rejected this argument and upheld the constitutionality of Section 13(b). And second, even if the FTC Act's removal protections did violate the separation of powers, invalidating Section 13(b) would not be the proper remedy.

**[28]** The power to enforce the law is vested in the President of the United States. U.S. CONST. art. II, § 1. But because one person cannot be everywhere at once, it is "expected that the President w[ill] rely on subordinate officers for assistance." Seila Law LLC v. C.F.P.B., ___ U.S. ___, 140 S.Ct. 2183, 2191, 207 L.Ed.2d 494 (2020). To ensure that the buck stops in the oval office, however, the president generally has "the authority to remove those who assist him [or her] in carrying out his [or her] duties." Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 513–14, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010).

**\*12** One notable exception to the president's removal power was carved out in Humphrey's Executor v. United States, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). There, the United States Supreme Court upheld the constitutionality of Congress's for-cause removal protections for officers of the multi-member FTC who performed "quasi-legislative" and "quasi-judicial" functions. Id.

Kochava asserts that, since the time *Humphrey's Executor* was decided in 1935, Congress has expanded the FTC's toolbelt to include quintessentially executive powers. Namely, a 1973 amendment added Section 13(b) which authorizes the FTC to enforce the FTC Act by seeking injunctive relief in federal court. In passing that amendment, Kochava argues, Congress impermissibly granted executive enforcement power to an agency governed by officials who are not removable at-will by the president. As a result, Kochava contends, the FTC no longer falls within the narrow exception carved out in *Humphrey's Executor*.

For support, Kochava relies primarily upon a recent Supreme Court decision involving the president's power to remove the director of the Consumer Financial Protection Bureau (CFPB). *Seila Law LLC*, 140 S.Ct. 2183. In *Seila Law LLC v. C.F.P.B.*, the Court determined that the exception outlined in *Humphrey's Executor* did not apply to the CFPB due to several important differences between the single director of the CFPB and the multi-member commission governing the 1935-era FTC. [13] Kochava would have this Court follow the same path by distinguishing the modern-day FTC from the 1935-era FTC. For two reasons, however, the Court will not do so.

First, Ninth Circuit precedent forecloses Kochava's position. In *FTC v. American National Cellular*, the Ninth Circuit took up precisely the question raised here: whether Section 13(b) violates the "constitutional principle of separation of powers." 810 F.2d 1511, 1513 (9th Cir. 1987). The court concluded that "the FTC's current power to seek injunctive relief pursuant to section 13(b) does not so materially differ from the power to seek cease and desist orders as to render *Humphrey's Executor* inapposite. We hold, therefore, that the enforcement provisions of the Act are constitutional, under *Humphrey's Executor*." *Id.* at 1514. Ultimately, although the Supreme Court expressed some skepticism toward *Humphrey's Executor* in *Seila Law*, this Court is not persuaded that *Seila Law* invalidates the Ninth Circuit's clear holding in *American National Cellular*. [14]

[29] Kochava's argument also fails because the requested remedy—invalidation of Section 13(b)—would not follow even if the FTC Act did violate the separation of powers. When removal protections for federal officials violate the

separation of powers, courts first ask whether the removal provisions are severable from the remainder of the statute. If severable, those provisions are invalidated while the remainder of the statute—including the grant of agency authority—survives. *See, e.g.*, *Seila Law LLC*, 140 S.Ct. at 2192 (striking only the removal provision of the statute); *Collins v. Yellen*, ——— U.S. ———, 141 S.Ct. 1761, 1787–88 & n.23, 210 L.Ed.2d 432 (2021). The FTC Act's removal provision, 15 U.S.C. § 41, is severable from the remainder of the FTC Act by virtue of the separability clause set forth in Section 17, 15 U.S.C. § 57. *See Walmart Inc.*, ——— F.Supp.3d at ———, 2023 WL 2646741, at *26. [15] Therefore, even if the removal clause violated the separation of powers, the FTC's authority to bring this lawsuit would not be affected.

### 8. The nondelegation and major questions doctrines do not apply.

*13 Finally, Kochava argues that Section 5(a) of the FTC Act is unconstitutional under both the nondelegation doctrine and the major questions doctrine. At their core, both doctrines limit the amount of legislative authority delegated by Congress to administrative agencies. But neither doctrine applies here.

[30] [31] [32] [33] First, "[t]he nondelegation doctrine bars Congress from transferring its *legislative* power to another branch of Government." *Gundy v. United States*, ——— U.S. ———, 139 S.Ct. 2116, 2121, 204 L.Ed.2d 522 (2019) (emphasis added). It does not, however, limit Congress in granting agencies the authority to seek judicial enforcement of the laws they administer. *See United States v. Bruce*, 950 F.3d 173, 175 (3d Cir. 2020) ("[T]he non-delegation doctrine applies only to delegations by Congress of legislative power; it has no application to exercises of executive power."). Here, the FTC is simply asking a court to interpret and apply a statute, as written. Consequently, there is no relevant delegation of legislative authority to which the Court could apply nondelegation principles. [16]

[34] [35] [36] Relatedly, the major questions doctrine requires "Congress to speak clearly if it wishes to assign to an agency decisions of vast 'economic and political significance.' " *Mayes v. Biden*, 67 F.4th 921, 932–33 (9th Cir. 2023) (quoting *Util. Air. Regul. Grp. v. EPA*, 573 U.S. 302, 324, 134 S.Ct. 2427, 189 L.Ed.2d 372 (2014)).

As with the nondelegation doctrine, the objective is to avoid "an enormous and transformative expansion in ... regulatory authority without clear congressional authorization." 🚩 *Id.* at 933. But here, the FTC is not flexing its regulatory muscles—it is merely asking a court to interpret and apply a statute enacted by Congress. Accordingly, this doctrine, too, is inapplicable.

**ORDER**

**IT IS ORDERED that** Defendant's Motion to Dismiss (Dkt. 7) is **GRANTED with leave to amend.** Plaintiff shall file an amended complaint, if at all, within 30 days after entry of this Memorandum Decision and Order.

**All Citations**

--- F.Supp.3d ----, 2023 WL 3249809

## Footnotes

1   At this early stage in the litigation, the Court must assume the truth of the FTC's factual allegations. This does not mean, however, that the Court believes those allegations. Rather, the Court makes no determination whatever as to the truth or falsity of the factual assertions in the FTC's Complaint.

Relatedly, Kochava asks the Court to take judicial notice of the existence of three documents: (1) a 2014 FTC press release (Dkt. 7-3), (2) an FTC webpage (Dkt. 7-4), and (3) an article published by the Wall Street Journal (Dkt. 18-1). The Court grants these requests as proper under Federal Rule of Evidence 201(b). 🚩 *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001).

2   Kochava's passing footnote reference to a new Privacy Block feature does not change the Court's conclusion on this point. It is "well-settled that an action for an injunction does not become moot merely because the conduct complained of was terminated, if there is a possibility of recurrence, since otherwise the defendants would be free to return to [their] old ways." 🚩 *F.T.C. v. Affordable Media*, 179 F.3d 1228, 1237 (9th Cir. 1999) (internal quotation omitted) (emphasis in original). Kochava offers almost no information about its new Privacy Block feature, nor is it clear why implementation of this feature—a readily reversible step—makes it unlikely that Kochava will resume its former practices in the future. And, at any rate, more factual development is necessary to determine the impact the Privacy Block feature may have on the FTC's request for an injunction.

3   It is worth noting that other federal circuit courts have come to the opposite conclusion. In 🚩 *F.T.C. v. Accusearch Inc.*, for example, the Tenth Circuit rejected the premise that "a practice cannot be an unfair one unless it violates some law independent of the FTCA" because "the FTCA imposes no such constraint." 🚩 570 F.3d 1187, 1194 (10th Cir. 2009). On the contrary, the court explained, "the FTCA enables the FTC to take action against unfair practices that have not yet been contemplated by more specific laws." 🚩 *Id.*

4   Numerous district courts within the Ninth Circuit have also described the test under Section 5(a) as containing just three elements, without mentioning any requirement for an underlying violation of law or public policy. *See e.g.*, 🚩 *F.T.C. v. Johnson*, 96 F.Supp.3d 1110, 1151 (D. Nev. 2015); 🚩 *F.T.C. v. Elec. Payment Sol. of Am. Inc.*, 482 F.Supp.3d 921, 930 (D. Ariz. 2020); *F.T.C. v. LendingClub Corp.*, Case No. 18-cv-02454-JSC, 2020 WL 2838827, at *21 (N.D. Cal. June 1, 2020); *Beaver v. Tarsadia Hotels*, 29 F.Supp.3d 1294, 1314–

15 (S.D. Cal. July 2, 2014); *F.T.C. v. D-Link Systems, Inc.*, Case No. 3:17-cv-00039-JD, 2017 WL 4150873, at *5 (N.D. Cal. Sept. 19, 2017).

5    *See Compl.* ¶¶ 20 ("may be used," "it is possible," "it is also possible," "may be used"), 21 ("it is possible"), 22 ("can be used," "can be inferred," "may identify," "may be used"), 24 ("may be used"), 25 ("may be used," "it is possible," "may also be used"), 26 ("could be used"), 27 ("could be used," "could reveal," "could be used"), 28 ("could be used," "could show"), Dkt. 1.

6    The Northern District of California similarly required the FTC to include allegations of probability in *F.T.C. v. D-Link Systems, Inc.*, Case No. 3:17-cv-00039-JD, 2017 WL 4150873 (N.D. Cal. Sept. 19, 2017). There, the FTC brought a Section 5(a) unfairness claim against an internet service provider, claiming that deficiencies in its cybersecurity measures could theoretically enable third parties to commit data breaches. The court dismissed the claim because the FTC had alleged only a "mere possibility of injury at best." *Id.* at *5.

7    The Ninth Circuit has also repeatedly held that privacy intrusions may constitute "concrete injury" for purposes of Article III standing. *See, e.g.,* 🚩 *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–43 (9th Cir. 2017) (finding "concrete injury" where plaintiffs claimed that unsolicited telemarketing calls "invade the privacy and disturb the solitude of their recipients"); 🚩 *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020) (finding "concrete injury" where Facebook allegedly tracked users' "personally identifiable browsing history" on third party websites); 🚩 *Patel*, 932 F.3d at 1275 (finding "concrete injury" where plaintiffs claimed Facebook's facial-recognition technology violated users' privacy rights).

8    Because the FTC is granted leave to amend, the Court will address Kochava's remaining arguments for dismissal.

9    Kochava also argues that the terms of the FTC's requested injunction are "vague and uncertain on [their] face." *Def.'s Memo. in Supp.* at 21, Dkt. 7-1. But at this stage, the Court must only determine whether the FTC has stated a plausible claim against Kochava. The precise terms of the injunction—if the FTC ultimately obtains one—is a matter for another day.

10   The standard for fair notice varies depending on whether an agency is enforcing its own regulation, filling statutory gaps, or simply enforcing a statute, as written. 🚩 *Wyndham Worldwide Corp.*, 799 F.3d at 250–53. Here, the FTC seeks to enforce Section 5(a) of the FTC Act, as written. The Court will therefore apply the ordinary fair notice standard governing civil statutes that regulate economic activities.

11   Additionally, for more than a century, federal courts have been clarifying the meaning of Section 5(a)'s prohibition of "unfair or deceptive acts or practices." *C.F.P.B. v. D & D Mktg.*, Case No. CV 15-9692 PSG (Ex), 2016 WL 8849698, at *6 (C.D. Cal. Nov. 17, 2016) ("The FTCA is now more than a century old and Courts have given shape to the meaning of its ban on 'unfair or deceptive acts or practices.' ").

12   Kochava cites a 2012 White House release on Consumer Data Privacy which directed that "data brokers and other companies that collect personal data without direct consumer interactions ... should seek innovative ways to provide consumers with effective individual control." The White House, *Consumer Data Privacy in a Networked World: A Framework for Protecting privacy and Promoting Innovation in the Global Digital Economy*, Feb. 23, 2021, https://obamawhitehouse.archives.gov/sites/default/files/privacy-final.pdf. The Court is not persuaded that this release lends any support to Kochava's fair notice argument.

13   It is important to note, however, that although the 🚩 *Seila Law* Court emphasized the limited scope of 🚩 *Humphrey's Executor*, the Court expressly refrained from overruling that decision. 🚩 *Id.* at 2192.

14    It is also worth noting that both the U.S. Supreme Court and Ninth Circuit have recently entertained lawsuits by the FTC under Section 13(b). ⚑ *AMG Capital Management, LLC v. F.T.C.*, ⸻ U.S. ⸻, 141 S.Ct. 1341, 209 L.Ed.2d 361 (2021); *F.T.C. v. Elegant Solutions, Inc.*, No. 20-55766, 2022 WL 2072735, at *2 (9th Cir. June 9, 2022) (affirming the grant of injunctive relief under § 13(b)). Although neither court specifically took up the question of whether the FTC's structure violates the separation of powers, these cases indirectly reinforce the continued vitality of Section 13(b) after ⚑ *Seila Law*.

15    Even without the severability clause, the removal provisions of the FTC Act would be severable because the remaining portions of the Act are capable of "functioning independently," and there is no reason to believe that Congress "would have preferred no board at all to a Board whose members are removable at will." ⚑ *Free Enter. Fund*, 561 U.S. at 509, 130 S.Ct. 3138.

16    Even if the FTC's lawsuit was construed as an attempt to "make law" through litigation, the nondelegation doctrine would not require dismissal of this action. When delegating legislative powers, Congress must only provide a "general policy" and "boundaries of ... authority." *United States v. Melgar-Diaz*, 2 F.4th 1263, 1266–67 (9th Cir. 2021). Section 5(n) of the FTC Act provides both.

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 149552
Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

FEDERAL TRADE COMMISSION, STATE OF
CALIFORNIA, STATE OF COLORADO, STATE OF
ILLINOIS, STATE OF INDIANA, STATE OF IOWA,
STATE OF MINNESOTA, STATE OF NEBRASKA,
STATE OF OREGON, STATE OF TENNESSEE,
STATE OF TEXAS, STATE OF WASHINGTON,
and STATE OF WISCONSIN, Plaintiffs,
v.
SYNGENTA CROP PROTECTION AG, SYNGENTA
CORPORATION, SYNGENTA CROP PROTECTION,
LLC, and CORTEVA, INC., Defendants.

1:22CV828

Filed 01/12/2024

MEMORANDUM OPINION AND ORDER

Thomas D. Schroeder United States District Judge

 *1  In this action, the Federal Trade Commission and a dozen states allege that two major manufacturers of crop-protection products have employed anticompetitive loyalty discount programs. These programs allegedly exclude generic competition from the market even after the products' patent and other federal exclusivity protections have expired, thereby leading to supracompetitive prices for farmers. Before the court are the motions of Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, and Corteva, Inc., to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 94, 99.) Plaintiffs have responded in opposition (Doc. 150), and Defendants have replied (Docs. 130, 133). The court held argument on the motions on December 1, 2023. (Doc. 157.) For the reasons set forth below, the motions will be denied.

I. BACKGROUND

A. Factual Background

The facts outlined in Plaintiffs' amended complaint (the "complaint") (Doc. 149), [1] which are taken as true for the purpose of the present motion, show the following:

1. Crop-Protection Product Industry

The Syngenta Group is a global company comprised of businesses including Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively "Syngenta"). (Doc. 149 ¶ 30.) Syngenta Crop Protection AG oversees Syngenta's global crop protection business. (Id. ¶ 31.) Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG and is the top-level Syngenta business incorporated in the United States. (Id. ¶ 32.) Syngenta Crop Protection, LLC operates Syngenta's U.S. crop-protection manufacturing, which is the second largest by revenue among crop-protection product manufacturers in the United States. (Id. ¶¶ 33, 48.) Syngenta allegedly operates as a single enterprise. (Id. ¶ 35.)

Corteva, Inc. ("Corteva") was established to operate as an independent agriscience business through the merger of E.I. du Pont de Nemours and Dow Chemical Company. (Id. ¶ 38.) [2] Corteva is the third largest by revenue among crop-protection product manufacturers in the United States. (Id. ¶ 48.)

 *2  Defendants manufacture crop-protection products — commonly referred to by Plaintiffs as "pesticides" — to control diseases, weeds, insects, or other unwanted organisms that harm crops. (Id. ¶¶ 37, 39, 40.) These include herbicides, insecticides, and fungicides. (Id. ¶ 42.) Every crop-protection product contains at least one active ingredient ("AI"). (Id. ¶ 43.) Manufacturers may sell AIs in technical-grade form, which requires further processing before being sold in finished form, which is ready for use by farmers. (Id. ¶ 44.) AIs are distinguished by the pests they target, the effectiveness at controlling the target pest, and the crops upon which the AI is used and registered for use, among other characteristics. (Id. ¶ 45.) The AI's "mode of action" is the chemical and biological manner in which the crop-protection product kills or controls the target pest. (Id. ¶ 46.) Farmers' preferences for one AI over another may depend on variations in the mode of action. (Id.)

Developers of new AIs obtain exclusive use through two mechanisms. First, under the Federal Insecticide, Fungicide,

and Rodenticide Act ("FIFRA"), 📁7 U.S.C. § 136 et seq., a developer of crop-protection products must submit environmental impact data to the U.S. Environmental Protection Agency prior to sale or distribution in the United States. Upon approval, the developer obtains 10-year exclusive protection from others citing the data the developer used to support its FIFRA submission. (Id. ¶¶ 51, 52.) Second, under patent law, a developer can obtain 20-year patent protection. (Id. ¶ 51.) The timing of the FIFRA application can effectively extend the exclusive-use period beyond the date the patent expires. (Id. ¶ 52.) When both exclusive-use protections expire, however, a generic manufacturer may enter the market. (Id. ¶ 54.)

Manufacturers of crop-protection products traditionally sell to distributors, who then sell to retailers, who then sell to farmers. (Id. ¶ 55.) Approximately 90% of crop-protection products reach farmers through this traditional supply chain, and about 90% of the traditional supply chain is managed by seven distributors. (Id.) In other words, these seven distributors account for approximately 80% of all sales of crop-protection products in the United States. (Id.) This traditional channel of distribution is allegedly the most efficient because it provides access to retail and logistics networks and economies of scale, among other factors. (Id. ¶ 56.)

### 2. Defendants' Loyalty Programs

Plaintiffs allege that Defendants operate loyalty programs intended to limit the distribution of competing generic products. (Id. ¶ 59.) Under these programs, Defendants offer "substantial" payments as an end-of-year lump sum to distributors — allegedly up to millions of dollars — conditioned on the distributors limiting their purchases of generic crop-protection products containing specified post-patent AIs. (Id. ¶ 60.) The threshold to receive the loyalty payment is expressed as a percentage of the distributors' total purchases of the AI, and the permissible amount of generic AI a distributor may sell is referred to as "open space" or "head space." (Id. ¶ 61.) Typically, a distributor must source less than 15% of its total purchase of a certain AI from generic manufacturers to qualify to receive the loyalty payment. (Id.)

Syngenta implements its loyalty program, known as "Key AI," through written marketing agreements with distributors. (Id. ¶ 66.) Loyalty performance is calculated by dividing the amount of qualifying AI purchased or sold by the

distributor in the year by the total of the AI purchased or sold by the distributor, including generics. (Id. ¶ 68.) If the distributor's percentage is above the threshold for the specific AI, it will reap a "special marketing bonus." (Id. ¶ 69.) If not, the distributor will lose the entire loyalty payment. (Id.) Year-to-year, Syngenta can change the AIs included in distributor marketing agreements as well as the associated share thresholds and calculation methods. (Id. ¶ 70.) A similar program is offered for retailers as well, in which multiple top retailers nationally have participated. (Id. ¶¶ 71, 72; Doc. 81 ¶ 82.)

**\*3** Under Corteva's program — the Crops, Range & Pasture and Industrial Vegetation Management ("CRPIVM") Loyalty Program, a distributor generally receives an annual payment for sourcing a certain percentage of its purchases of an AI from Corteva. (Doc. 149 ¶¶ 75, 77.) The percentage that Corteva pays varies but could run as high as 11%. (Id. ¶ 77.) Corteva offers a second, higher payment when a distributor reaches a higher threshold for the AI. (Id. ¶ 75.) Moreover, the CRPIVM usually links together multiple active ingredients within each offer, thus requiring a distributor to hit the loyalty threshold for every AI in the offer to receive the payment for any one AI. (Doc. 81 ¶ 75.) Additionally, Corteva typically permits a portion of any payment to be deferred into subsequent years, which would otherwise be forfeited if the distributor missed the loyalty threshold for any AI in the offer. (Id. ¶ 78.) Further, Corteva conditions its Corporate Offer — another annual payment offer that covers a broader range of Corteva products – on meeting the CRPIVM figure. (Id. ¶ 79.) If a distributor fails to qualify, it could forfeit certain loyalty-dependent payments under the Corporate Offer. (Id.)

"[S]ubstantially all leading distributors" enter into loyalty program agreements, and Defendants promote broad participation allegedly to assure distributors that others are not partnering with generic manufacturers to undercut prices. (Doc. 149 ¶ 84.) Moreover, the structure of the program is designed to make it less likely that distributors will lower prices in anticipation of a future loyalty payment because of its complexity, uncertainty, and timing. (Id. ¶ 85.) Defendants "regularly" audit distributors, which has allegedly led to withheld loyalty payments. (Doc. 81 ¶ 87.) Defendants also "rarely" grant exceptions for missing the threshold without good cause. (Doc. 149 ¶ 87.) Additionally, they have allegedly retaliated against distributors who fail to reach the loyalty thresholds by canceling distribution contracts, delaying access to new products, and withholding product allocation during a supply shortage. (Id. ¶ 88.)

Plaintiffs focus on the following AIs:

Tabular or graphical material not displayable at this time.

3  4

(See id. ¶ 89-150; Doc. 81 ¶ 89-150.) Plaintiffs allege that distributors of each of these AIs have strictly managed their purchases and sales to ensure that they stay above the respective threshold to receive the payments. (Id.)

Further, Plaintiffs allege, generic manufacturers have attempted to enter the market for each AI — with demand from farmers — but have had little to no success because distributors would not purchase the generic. (Id.) As to azoxystrobin, two generics have exited the market entirely, and one that attempted to mix azoxystrobin was "hindered in its attempt to market" because of the Key AI program. (Doc. 149 ¶¶ 96-97.) As to mesotrione, two generics delayed or terminated entry, and a third that developed a mixture product dropped it due to the Key AI program. (Id. ¶ 105.) As to metolachlor, a generic manufacturer had considered bringing a mixture to market but chose not to do so because of the Key AI program. (Id. ¶ 120.) As to rimsulfuron, at least one generic canceled or deferred entry plans, despite apparent demand from farmers to bid on generics, because of the CRPIVM program. (Id. ¶ 132.) As to oxamyl, Corteva's production of oxamyl stopped for a span of roughly two years, generics entered the market with "relative[ ] success[ ]," but generic sales "plummeted" upon Corteva's re-entry into the market with the loyalty program applied to oxamyl. (Id. ¶¶ 136-38.) And as to acetochlor, the CRPIVM program has allegedly deterred generics from the market altogether, even though one generic firm has had success selling the AI overseas. (Id. ¶ 149.) For each AI, Plaintiffs allege that the presence of generics has imposed downward pricing pressure.

**\*4** The complaint further alleges that Syngenta supplies Corteva with mesotrione and metolachlor. (Id. ¶¶ 109, 122.) Defendants allegedly struck this agreement as an incentive to keep Corteva from purchasing generics of these two AIs. In exchange, Syngenta does not penalize distributors in the Key AI program who buy Corteva products containing these two Syngenta AIs. (Doc. 81 ¶¶ 109, 122.)

### 3. Alleged Market and Competitive Harm

Plaintiffs allege that Syngenta has had monopoly and market power as to azoxystrobin, mesotrione, and metolachlor, and that Corteva has had monopoly and market power as to rimsulfuron and oxamyl and market power to acetochlor. (Doc. 149 ¶¶ 151, 152.) Plaintiffs claim two relevant product markets:

(a) A relevant product market exists that is no broader than the active ingredient, consisting of (1) active ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States, and (2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States; and

(b) A relevant product market(s) also exists that is no broader than EPA-registered crop-protection products for sale in the United States that contain the active ingredient.

(Id. ¶ 155.) Syngenta's market share for azoxystrobin, mesotrione, and metolachlor exceeded 70% from at least 2017 through 2020. (Id. ¶ 161.) Corteva's market share for rimsulfuron and oxamyl also exceeded 70% for those same years, while its market share for acetochlor exceeded 40% (with another roughly 50% attributable to Bayer, its joint venture partner for that AI). (Id. ¶¶ 162, 163.) In all, Plaintiffs allege that Defendants have foreclosed generics from "approximately 70% or more" of the market. (Doc. 81 ¶ 171.)

Each AI has "particular characteristics and uses that differentiate it from other active ingredients." (Doc. 149 ¶ 157.) Azoxystrobin "can be used across all major row crops [and] has growth-enhancing effects not proven in other active ingredients." (Id.) Mesotrione has "superior efficacy and crop safety, and a low use rate." (Id.) Metolachlor has "superior water solubility, and so tends to perform better in dry conditions[, and it] outperforms other active ingredients in warmer conditions, is more 'crop friendly,' and can be used on a broader spectrum of crops." (Id.) Rimsulfuron "can be used on a broader range of crops, controls a wider spectrum of weeds, can be used on both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate." (Id.) Oxamyl can be "sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the root level or mixed into the soil[, and] is also safer for crops and better for soil health[.]" (Id.) Acetochlor "tends to perform better in wetter and cooler conditions, [and] tends to have better weed control early in

the growing season and is more effective against certain weed species." (Id.)

Plaintiffs allege that other AIs are not close enough substitutes to prevent Defendants from maintaining supracompetitive prices of their crop-protection products containing these six AIs. (Id. ¶ 158.) Moreover, substantial barriers exist to enter the market for these AIs notwithstanding the loyalty programs. (Id. ¶ 160.) These capital, technical, regulatory, and legal barriers include "obtaining registration from the EPA, developing manufacturing processes and sourcing [the] active ingredient, and paying data compensation costs to the initial active ingredient registrant." (Id.) The loyalty programs impose a substantial barrier by limiting generic manufacturers' access to the traditional distribution channel. (Id.)

**\*5** Plaintiffs contend that the loyalty programs cause anticompetitive harms. First, the programs "forclos[e] actual or potential competitors from access to distribution services," or to "efficient distribution services" (i.e., the traditional distribution channel). (Id. ¶¶ 169, 170.) Although the programs are nominally voluntary, Plaintiffs allege that the mere prospect of receiving a payment is sufficient incentive to induce distributors to participate and to limit or forego purchases from generic competitors. (Id. ¶ 173.) Allegedly, one generic manufacturer represented that "this dynamic is so well established in the industry that it is futile to even approach a large distributor that is subject to loyalty requirements." (Id. ¶ 178.) Absent the loyalty programs, Plaintiffs allege, sales of generics would be significantly higher and would exceed the open space presently allowed for each AI, thus decreasing prices overall for farmers. (Id. ¶ 180.)

Second, and relatedly, Plaintiffs charge that the loyalty programs have prevented, delayed, and diminished entry and expansion by generic manufacturers into, as well as caused the exit from, the market for products containing the AIs. (Id. ¶ 182; see also, e.g., id. ¶¶ 96-97 (demonstrating that generic manufacturer of azoxystrobin mixture was "hindered in its attempt to market"; id. ¶ 132 (alleging that at least one generic manufacturer of rimsulfuron canceled or deferred entry plans, despite apparent demand from farmers to bid on generics, because of the CRPIVM program).) Third, these programs have reduced the ability and incentive for generic manufacturers to innovate crop-protection products containing the AIs. (Id. ¶ 186.) Finally, the programs have resulted in supracompetitive prices for retailers and farmers

for products containing the AIs. (Id. ¶ 190.) Plaintiffs point to Defendants' internal studies that allegedly demonstrate that the loyalty programs have curtailed generic entry and sustained higher prices than would otherwise prevail. (Id. ¶¶ 195-99.)

### B. Procedural History

On September 29, 2022, Plaintiffs filed this action seeking declaratory, injunctive, equitable monetary relief, and civil penalties. (Doc. 1.) Defendants moved to dismiss the original complaint, after which Plaintiffs filed an amended complaint. (Doc. 79; Doc. 149 (lesser-redacted complaint).) Now before the court are Defendants' motions to dismiss the amended complaint. (Docs. 94, 99.) Following this court's order granting the parties' respective motions to seal (Doc. 148), the operative public complaint is at docket entry 149. [5]

Plaintiffs allege sixteen counts under state and federal law. Under federal law, Plaintiff Federal Trade Commission ("FTC") alleges violations of Section 5 of the FTC Act, 15 U.S.C. § 45(a), and all Plaintiffs allege violations of Section 3 of the Clayton Act, 15 U.S.C. § 14, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. (Doc. 149 ¶¶ 203-10.) The remaining claims arise under state law and are raised by the states of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Tennessee, Texas, Washington, and Wisconsin. [6] (Id. ¶¶ 212-76.)

**\*6** Following oral argument on the motions to dismiss, they are ready for resolution.

## II. ANALYSIS

### A. Legal Background

#### 1. Motion to Dismiss Standard

A Rule 12(b)(6) motion to dismiss is meant to "test[ ] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(quoting 🚩 Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," 🚩 Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, 🚩 Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). Rule 12(b)(6) must be read in light of Rule 8's standard that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

## 2. Federal Antitrust Statutes

Plaintiffs allege violations of the Sherman Act (🚩 sections 1 and 🚩 2) and Clayton Act (section 3), and Plaintiff FTC alleges violations of the Federal Trade Commission Act (section 5). Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 🚩 15 U.S.C. § 1. 🚩 Section 2 prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States." 🚩 15 U.S.C. § 2. A violation of 🚩 Section 2 consists of two elements: (1) possession of monopoly power and (2) "maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." 🚩 Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481 (1992). Monopoly power is defined as the ability "to control prices or exclude competition." 🚩 United States v. Grinnell Corp., 384 U.S. 563 (1966) (internal quotation marks omitted). Although evidence of such ability is "only rarely available," courts turn to circumstantial evidence — such as a company's share of the market — to determine whether monopoly power exists. 🚩 United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005) (quoting ⚠️ United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001)). Maintenance of that power requires some illegal conduct that forecloses competition, gains a competitive advantage, or destroys a competitor. 🚩 Eastman Kodak, 504 U.S. at 482-83.

Section 3 of the Clayton Act makes it unlawful for

> any person engaged in commerce ... to lease or make a sale or contract for sale of goods ... for use, consumption, or resale within the United States ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

**\*7** 15 U.S.C. § 14.

Section 5 of the FTC Act makes illegal "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 🚩 15 U.S.C. § 45(a)(1). The act, while not solely focused on antitrust, is "nonetheless linked to the antitrust laws." Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co., 810 F.2d 1289, 1293 (4th Cir. 1989). The Supreme Court has stated that the act was "designed to supplement and bolster the Sherman and the Clayton Act, [ ] — to stop in their incipiency acts and practices which, when full blown, would violate those Acts." 🚩 Fed. Trade Comm'n v. Motion Picture Advert. Serv. Co., 344 U.S. 392, 394-95 (1953) (internal citation omitted). The act "functions as a kind of penumbra around the federal antitrust statutes," Chuck's Feed, 810 F.2d at 1292-93, such that any practice that violates the Sherman Act or the Clayton Act also violates the FTC Act. See Fed. Trade Comm'n v. 🚩 Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986) ("The standard of 'unfairness' under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws, [ ] but also practices that the Commission determines are against public policy for other reasons." (internal citations omitted)). The extent to

which these four provisions impose varying requirements on a plaintiff is discussed in more detail below.

### 3. Exclusive Dealing

Plaintiffs allege that Defendants' loyalty rebate programs are illegal exclusive dealing arrangements. An exclusive dealing arrangement is one in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1800a (4th & 5th ed. 2023). Neither absolute exclusivity nor an express agreement is necessary for an exclusive dealing arrangement to violate antitrust laws. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 270, 282 (3d Cir. 2012); Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328 (1961) ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market." (emphasis added)). Although not "per se" illegal, exclusive dealing arrangements may give rise to cognizable claims under all four statutory provisions alleged here. See, e.g., Grinnell Corp., 384 U.S. at 576 (Sherman Act § 2); ZF Meritor, 696 F.3d at 281 (Sherman Act §§ 1 and 2, Clayton Act § 3); LePage's Inc. v. 3M, 324 F.3d 141, 157 & n.10 (3d Cir. 2003) (same); Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 996 (9th Cir. 2010) (Sherman Act § 1); McWane, Inc. v. Fed. Trade Comm'n, 783 F.3d 814, 827 (11th Cir. 2015) (FTC Act § 5).

Exclusive contracts serve many pro-competitive purposes. ZF Meritor, 696 F.3d at 270. On the demand side, they can assure supply, protect against rises in price, enable long-term planning based on known costs, and reduce the expense and risk of storing goods that have fluctuating demand. Standard Oil Co. v. United States, 337 U.S. 293, 306 (1949). On the supply side, they can substantially reduce selling expenses, protect against price fluctuations, justify and enable capital expenditures, and shield against counterattacks by competitors. Id. at 306-07. Indeed, "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought." Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 236 (1st Cir.

1983) (Breyer, J.) (emphasis removed). Accordingly, whether a contract rises to illegal exclusivity, "rather than merely a form of vigorous competition, can be difficult to discern[.]" Microsoft Corp., 253 F.3d at 58. "[T]he means of illicit exclusion, like the means of legitimate competition, are myriad," posing a challenge for an antitrust court in "stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it." Id.

*8 While exclusive dealing is formally a vertical restraint (e.g., as alleged here, a restraint between manufacturer and distributor), it has the potential to have adverse economic consequences on horizontal competition. Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring). More specifically, an exclusive dealing arrangement runs afoul of the antitrust laws when it unreasonably deprives other suppliers of a market for their goods or allows one buyer of goods unreasonably to deprive other buyers of a needed source of supply. Id. The potential collateral consequences of illegal exclusive dealing include higher prices, restricted output, reduced quality, or slower innovation. McWane, Inc., 783 F.3d at 827.

### B. Defendants' Grounds for Motion to Dismiss

Defendants argue two primary grounds to dismiss the complaint: first, they contend that Plaintiffs fail to allege a relevant product market; and second, they argue that Plaintiffs fail to allege anticompetitive conduct and injury. Syngenta further argues that the claims against Syngenta Crop Protection AG and Syngenta Corporation should be dismissed. Corteva argues that the FTC Act violates Article II of the U.S. Constitution, thus requiring dismissal of the complaint. And finally, all Defendants argue that the state law claims should be dismissed on a range of grounds.

The court turns first to the threshold question of whether Plaintiffs allege a relevant product market.

### 1. Relevant Product Market

Defendants contend that the complaint is defective because it fails to allege a cognizable product market. (Doc. 95 at 17; Doc. 100 at 37.) A relevant product market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes

for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Courts begin with a preliminary inquiry into market definition because it serves as the frame through which the court analyzes monopoly power and substantial market foreclosure. E.I. Du Pont De Nemours & Co. v. Kolon, 637 F.3d 435, 441 (4th Cir. 2011); Ind. Fed'n of Dentists, 476 U.S. at 460 ("[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition." (emphasis in original)).

Plaintiffs allege two product markets in the United States. One is the AI itself, in both its finished and technical-grade form. (Doc. 149 ¶ 155.) The other is crop-protection products that contain the active ingredient. (Id.) Defendants do not contest the markets' geographical scope or that Plaintiffs allege more than one market.

Corteva argues that Plaintiffs' market definitions are only two sentences that vaguely describe general characteristics of the AIs that amount to "alleged advantages they have over other products." (Doc. 95 at 19.) In Corteva's view, Plaintiffs have an obligation to do more — namely, to explain why products without those characteristics are not reasonably interchangeable. (Id. at 18 (citing Bayer Schering Pharm AG v. Sandoz, Inc., 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011); Todd v. Exxon Corp., 275 F.3d 191, 200 (2d. Cir. 2001)).) In support, Corteva points to several EPA label registrations outside of the record that, per Corteva, demonstrate that the alleged product markets are both too narrow and too broad. This follows, according to Corteva, because these EPA label registrations show that the EPA has registered crop-protection products that (1) contain AIs within Plaintiffs' alleged markets but have different uses, and (2) are products outside of Plaintiffs' alleged markets but share similar uses. (Id. at 19-20.) Syngenta argues that Plaintiffs' market definition is unreasonably narrow because each market is only a single AI. (Doc. 100 at 38-40.) In support, Syngenta points to other antitrust proceedings outside of the record where the FTC and the U.S. Department of Justice have alleged broader crop-protection product markets with multiple AIs. (Id. at 41-42.) For example, Syngenta cites United States v. Bayer AG, 83 Fed. Reg. 27652, 27653 (DOJ June 13, 2018), as "analyzing alleged 'foundational herbicides' and 'nematicidal seed treatment' markets," and Ciba-Geigy Ltd., 62 Fed. Reg. 409, 412 (FTC Jan. 3, 1997), as "analyzing alleged 'corn herbicides for pre-emergent control of grasses' market

— including metolachlor — and 'corn herbicides for post-emergent control of broadleaf weeds' market." (Id.) Syngenta contends that FTC's effort to allege narrower product markets here is not based on "different facts, but instead on the evolving philosophy of the FTC's Chair," and demonstrates that "FTC is attempting to gerrymander its way to an antitrust victory." (Id. at 42 (internal quotation marks omitted).)

**\*9** Plaintiffs respond that their product markets are supported by ample factual allegations. (Doc. 150 at 52.) Namely, Plaintiffs point to the conduct of Defendants, who design their loyalty programs around each individual AI. (Id.) Further, Plaintiffs allege "characteristics and uses" and "industry or public recognition" for each AI:

> Azoxystrobin has "growth-enhancing effects not proven in other active ingredients." Mesotrione has "superior efficacy and crop safety" "[c]ompared to other, similar herbicide active ingredients." Metolachlor "has superior water solubility," and "outperforms other active ingredients" in warmer and drier conditions. Rimsulfuron "has more application methods, no dormancy restrictions, and a lower use rate" than similar chemicals. Oxamyl, unlike "similar insecticide active ingredients," "can be sprayed directly onto crops." And acetochlor "tends to perform better" than similar herbicides "in wetter and cooler conditions," and has "better weed control early in the growing season."

(Id. (quoting Doc. 149 ¶ 157) (internal citations omitted).) Plaintiffs also allege that each AI is distinguishable enough that farmers "may prefer it over others." (Id. at 54 (citing Doc. 149 ¶ 46).) Finally, Plaintiffs contest that the court should take judicial notice of the EPA label registrations and prior FTC and DOJ antitrust proceedings at this stage. (Doc. 150 at 58-59.)

A relevant product market must include all reasonably interchangeable products. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956). The reasonable interchangeability of products is generally determined according to the cross-elasticity of demand for the product and its alternatives. It's My Party, Inc. v. Live Nation, Inc., 811 F.3d 676, 683 (4th Cir. 2016). In other words, courts look to the degree to which a defendant would sacrifice sales to alternative products by raising the price of its goods. Eastman Kodak, 504 U.S. at 469. It is therefore more than simply technical interchangeability. Rothery Storage

& Van Co. v. Atlas Van Lines, Inc._, 792 F.2d 210, 218 n.4 (D.C. Cir. 1986) (discussing functional substitutability as one factor among many as it relates to "the economic criteria that make one market distinct from another").

Market definition is a question of fact. Kolon, 637 F.3d at 442 (collecting cases). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." Id. (quoting Todd, 275 F.3d at 199-200). Nevertheless, there is "no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." Id. (quoting Todd, 275 F.3d at 199-200). "No party can expect to gerrymander its way to an antitrust victory without due regard for market realities." It's My Party, Inc., 811 F.3d at 683. "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Kolon, 637 F.3d at 442 (quoting Todd, 275 F.3d at 199-200).

Under this fact-intensive inquiry, the scope of the relevant product market differs on a case-by-case basis. For example, in Eastman Kodak, 504 U.S. at 481-82, the Supreme Court held that a properly constituted market may be comprised of a single product. In the pharmaceutical context, lower courts have ruled that a brand-name drug and its generic analogs can comprise a relevant product market. In re Zetia (Ezetimibe) Antitrust Litig., MDL No. 2:18-md-2836, 2021 WL 6689718, at *18-20 (E.D. Va. Nov. 1, 2021), adopted in full by 587 F. Supp. 3d 356 (E.D. Va. 2022); In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 388 (D. Mass. 2013); In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 680-81 (E.D. Mich. 2000) (accepting plaintiff's contention on motion to dismiss that branded and generic versions of heart medication constitute a single market), aff'd, 332 F.3d 896 (6th Cir. 2003). Whether a market is plausible when comprised of a single product — or many products — "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." Eastman Kodak, 504 U.S. at 482 (quoting Grinnell Corp., 384 U.S. at 572).

**\*10** Courts employ a variety of methods to determine if a product market is properly constituted. Plaintiffs urge the court to consider (1) the Defendants' own conduct; (2) the "hypothetical monopolist test"; and (3) the factors set out in Brown Shoe, 370 U.S. 294. (Doc. 150 at 49-52.) Courts generally consider Plaintiffs' first proposed methodology — the Defendants' own conduct and recognition of the market — under the assumption that "economic actors usually have accurate perceptions of economic realities." Todd, 275 F.3d at 205 (collecting cases) (quoting Rothery Storage, 792 F.2d at 218 n.4); Kolon, 637 F.3d at 442-43 (considering the "area within which the defendant and its competitors view themselves as competing").

Plaintiffs' second proposed methodology is the hypothetical monopolist test ("HMT"). The HMT is an aid in determining if the relevant product is properly constituted. The court begins by hypothesizing that every good as alleged in the product market is under the control of a hypothetical monopolist. United States v. Am. Express Co., 838 F.3d 179, 198-99 (2d. Cir. 2016). Under such conditions, if the hypothetical monopolist could profitably impose a small but significant and nontransitory increase in price ("SSNIP"), then the product market is properly defined. Id. By contrast, the product market is improperly defined when the hypothetical monopolist imposes the SSNIP unprofitably because the alleged market does not include reasonably interchangeable goods — i.e., goods that consumers will shift demand toward in light of the SSNIP. Id. While the Fourth Circuit has yet to endorse this test, other circuits have at least acknowledged it or outright embraced it as a viable methodology in the context of defining markets. See, e.g., Fed. Trade Comm'n v. Penn State Hershey Med. Ctr., 838 F.3d 327, 339-41 (3d Cir. 2016) (adopting HMT as proper test to define market); Fed. Trade Comm'n v. Sanford Health, 926 F.3d 959, 964 (8th Cir. 2019) (holding not clear error to define relevant market with HMT); Fed. Trade Comm'n v. Advocate Health Care Network, 841 F.3d 460, 473 (7th Cir. 2016) (endorsing HMT); Am. Express Co., 838 F.3d at 198-99 (2d Cir. 2016) ("[T]his Court often applies a 'hypothetical monopolist test[.]').

Plaintiffs' third proposed methodology is the Brown Shoe factors. In Brown Shoe, the Court endorsed considering the following factors when defining a product market:

"industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325. Notably, the D.C. Circuit has observed that some of these factors are merely "evidentiary proxies for direct proof of substitutability." Rothery Storage, 792 F.2d at 218. The Rothery court noted that while sensitivity to price changes, distinct prices, and unique production facilities "relate directly to the economic definition of the market," the other factors require inferential reasoning to draw economic conclusions and "may be helpful where the other indicia are ambiguous." Id. at 218 n.4.

Turning to Defendants' arguments, the court finds unpersuasive Defendants' contention that Plaintiffs must explain in their complaint why certain AIs or crop-protection products are excluded from the markets. To the extent Defendants' cases demonstrate a burden on antitrust plaintiffs to explain a negative, they are either anomalous or distinguishable. For example, in Bayer-Schering, 813 F. Supp. 2d 569, the court appeared to apply enhanced scrutiny to the alleged product market because the counterclaimant amended its product market inconsistently with its original counterclaim. Id. at 516-11 ("Sandoz's contradictory pleadings counsel that this Court closely scrutinize the amended counterclaims in ensuring that they meet Rule 12(b)(6) standards."). Through this lens, the court analyzed particular alternatives outside of the alleged market, many of which, it appears, the counterclaimant introduced into the record itself. Id. Whatever caused the Bayer-Schering court to impose this burden and analyze particular products, the Fourth Circuit has suggested that such scrutiny is misguided on a motion to dismiss. See, e.g., Kolon, 637 F.3d at 442 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." (quoting Todd, 275 F.3d at 199-200)).

*11 Defendants' other cases fare no better. For example, in Therapearl, LLC v. Rapid Aid Limited, Civil No. 13-2792, 2014 WL 4794905 (D. Md. Sept. 25, 2014), the court dismissed a Sherman Act claim for failure to plead a product market because the plaintiff did not even attempt an explanation of why the market was limited and "made no allegations concerning" reasonable interchangeability. In Global Discount Travel Services, LLC v. Trans World Airlines, Inc., 960 F. Supp. 702, 706 (S.D.N.Y. 1997), the court found the product market was improperly pleaded because the plaintiff included only its brand in the product market and made no plausible explanation as to why other competitors did not supply interchangeable products. And in Chapman v. New York State Division for Youth, 546 F.3d 230, 238 (2d Cir. 2008), the court found a product market too narrow where the plaintiff did not provide "any theoretically reasonable explanation for restricting the product market." Here, Plaintiffs have included such an explanation and include in the market products beyond just those of Defendants (namely, the generics).

Moreover, the court is unpersuaded that taking judicial notice of the EPA label registrations and FTC and DOJ antitrust matters would materially alter the court's analysis at this stage. While the court, under Federal Rule of Evidence 201, may take judicial notice of facts that are "matters of public record," Justice 360 v. Stirling, 42 F.4th 450, 455 (4th Cir. 2022), Defendants ask the court to also accept their interpretation of facts within the cited public records. The EPA registrations may be probative of interchangeability, but they appear to speak to interchangeable function, not whether and how these crop-protection products are interchangeable in the marketplace — i.e., cross-elasticity of demand. In re Nexium, 968 F. Supp. 2d at 388 (finding it "immaterial" on a motion to dismiss that other pharmaceuticals could be used to treat the same symptoms because function does not necessarily speak to cross-elasticity of demand among consumers). At a minimum, the EPA label registrations raise fact questions, which are ill-suited for determination at the pleading stage. And while the prior FTC and DOJ antitrust proceedings may suggest some inconsistency in how the government views the crop-protection product market, the court must consider each antitrust dispute on a case-by-case basis. Eastman Kodak, 504 U.S. at 467 (demonstrating preference to resolve antitrust claims "on a case-by-case" basis); (See Doc. 100 at 41-42 (citing Ciba-Geigy Ltd., 62 Fed. Reg. 409, 412 (FTC Jan. 3, 1997), because FTC alleged in merger action a broader product market of "corn herbicides").) As a result, even if the court took judicial notice of these facts outside of the record, they would not materially impact the court's analysis at this stage.

Defendants' other arguments fall short as well. Plaintiffs have alleged plausible, albeit narrow, product markets. The reasoning applied in cases analyzing the relevant product market for pharmaceuticals, specifically that a plausible

product market may consist of a brand chemical and its generic alternative, is instructive. See In re Nexium, 968 F. Supp. 2d at 388-89; In re Zetia, 2021 WL 6689718 at *19 (finding proper a product market consisting of brand drug and generic on summary judgment). Additionally, Plaintiffs have plausibly alleged facts that show that there is limited cross-elasticity between the products inside and outside of Plaintiffs' alleged markets. For example, Plaintiffs allege that Defendants' prices would fall significantly upon entry of a generic of the same AI. (See Doc. 149 ¶¶ 92, 121, 127, 144, 150, 158; Doc. 81 ¶¶ 101, 119 (demonstrating anticipated market devaluation upon generic entry).) The alleged effect on price resulting from generic entry plausibly suggests that the AI in each alleged product market does not already face substantial competition from products outside the alleged market. See Areeda & Hovenkamp, supra ¶ 561b2 ("[I]f the price of one incumbent product drops significantly in response to new entry, while the prices of other incumbents do not, then that first incumbent product, plus the new entrant, is very likely a market."). Moreover, Defendants' own alleged conduct, namely that Defendants' own loyalty programs cover only individual AIs, plausibly suggests that Defendants view the market as including only one AI but not others. (Doc. 149 ¶¶ 67, 76); Todd, 275 F.3d at 205 (crediting evidence of defendant's conduct as suggestive of scope of product market). Finally, Plaintiffs plausibly allege characteristics that make each AI unique in the marketplace, that alternatives are not considered by farmers as suitable, and that farmers prefer specific AIs. (Doc. 149 ¶¶ 46, 157.)

 *12 In sum, Plaintiffs have alleged a plausible explanation as to why the market should be limited as alleged. Cf. Kolon, 637 F.3d at 442. Whether, as Defendants argue, they have the better of the argument after the facts develop, and the evidence is weighed, must await another day. As a result, Defendants' motion to dismiss for failure to plausibly allege a product market will be denied.

### 2. Anticompetitive Conduct and Injury

Defendants argue that Plaintiffs have not plausibly alleged anticompetitive conduct and injury. (Doc. 95 at 21; Doc. 100 at 25.) The parties dispute first which legal test the court should apply to Defendants' loyalty programs, and second, depending on the test applied, whether Plaintiffs have alleged

anticompetitive conduct and injury. The court considers each in turn for the purposes of the instant motion.

### a. The Rule of Reason and Price-Cost Test

Defendants urge the court to apply the "price-cost" test, arguing that Plaintiffs failed to allege facts to survive this measure of anticompetitive conduct. (Doc. 95 at 24; Doc. 100 at 22-23.) As suggested by its name, where the price-cost test is applied, alleged conduct may only be illegal if the price is set below the cost. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993). Plaintiffs appear to concede that the complaint does not allege prices below cost. (Doc. 150 at 43 ("Plaintiffs do not bring a predatory-pricing claim.").) This concession would seemingly short-circuit Plaintiffs' antitrust claims if the price-cost test applies. Plaintiffs maintain, however, that the court would gravely err in applying the price-cost test, arguing instead that the court must apply the default "rule of reason." (Doc. 150 at 39-40.) Under that test, an exclusive dealing arrangement is unlawful only if its "probable effect" is to substantially lessen competition in the relevant market. Tampa Elec, 365 U.S. at 327-29.

As a matter of principle, antitrust law is not intended to prevent all price-cutting. Brooke Grp., 509 U.S. at 223 ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 (1990)). In fact, competitors should generally be enabled to cut prices to a certain extent — even to increase market share — without running afoul of the antitrust laws. Id. ("The antitrust laws require no such perverse result." (quoting Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 116 (1986)). Low prices that are still above-cost are generally procompetitive because "the exclusionary effect of prices above a relevant measure of cost [generally] reflects the lower cost structure of the alleged predator, and so represents competition on the merits." Id. at 222-24.

On the other hand, predatory pricing harms competition. Predatory pricing occurs where a company sets prices below cost to eliminate competitors in the short run and reduce competition in the long run. Cargill, 479 U.S. at 117.

Such a pricing scheme is "rarely tried, and even more rarely successful." 🚩 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 589 (1986). "For such a scheme to make economic sense, the firm must recoup the losses suffered during the below-cost phase in the supracompetitive phase." 🚩 ZF Meritor, 696 F.3d at 272 (citing 🚩 Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 318 (2007)).

 **\*13**  To separate the competitive wheat from the predatory chaff, the Supreme Court devised the price-cost test: to succeed on a predatory pricing claim, a plaintiff must demonstrate (1) "that the prices complained of are below an appropriate measure of [the defendant's] costs"; and (2) that the defendant had "a dangerous probability ... of recouping its investment in below-cost prices." Id. (quoting 🚩 Brooke Grp., 509 U.S. at 222-24). In fashioning this formalistic approach, the Court acknowledged that the price-cost test will miss some anticompetitive above-cost pricing, but that it "is beyond the practical ability of a judicial tribunal" to ascertain whether above-cost pricing is anticompetitive "without courting intolerable risks of chilling legitimate price-cutting." 🚩 Id. at 273.

Where the price-cost test does not apply, courts apply the rule of reason to exclusive dealing arrangements. [7] 🚩⚠️ Tampa Elec., 365 U.S. at 327. "[E]xclusive dealing arrangements violate the antitrust laws only if they are likely to foreclose the entry into a substantial part of the market of products that compete with the products benefitting from the exclusive dealing arrangement." Chuck's Feed, 810 F.2d at 1293 (citing 🚩 Standard Oil Co. v. United States, 337 U.S. 293, 314 (1949)). The Supreme Court set out the following considerations when analyzing an exclusive dealing arrangement:

> [T]he probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of

that share of the market might have on effective competition therein.

Tampa Elec, 365 U.S. at 32 9. The concern of the courts about exclusive dealing arrangements is "the possibility that a single manufacturer will control all or a substantial number" of the available options for a certain kind of product in a specified geographical area. Chuck's Feed, 810 F.2d at 1293 (addressing concern in the context of retail markets).

To succeed on an exclusive dealing claim, a plaintiff must prove (1) the relevant product market; (2) the geographical area of competition for the product market; and (3) that the arrangement at issue extends to a "substantial share of the relevant market." Id. (citing Tampa Elec., 365 U.S. 327-28). If a court finds substantial foreclosure, it must still consider "whether an otherwise unacceptable level of market foreclosure is justified by procompetitive efficiencies." Id. at 1294 (citing 🚩 Cont'l T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 57-58 (1977); 🚩 Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 343 (1982)). Substantial foreclosure has been found "even though the contracts foreclose[d] less than [a] roughly 40% or 50% share." ⚠️ Microsoft, 253 F.3d at 70 (Sherman Act § 2 claim).

 **\*14**  The Supreme Court's price-cost line of cases demonstrates that the price-cost test applies at least where a pricing practice itself operates as the exclusionary tool, regardless of how the plaintiff styles its allegations. In Pacific Bell Telephone Company v. Linkline Communications, Incorporated, for example, the defendant, which sold inputs at wholesale and finished goods at retail, allegedly drove competitors out of the market by raising the wholesale price while simultaneously lowering the retail price. 🚩 555 U.S. 438, 457 (2009). The Supreme Court analyzed this "price-squeezing" claim under Brooke Group, holding that the scheme was permissible because "the defendant's retail price remain[ed] above cost." 🚩 Id. at 451-52. In Cargill, Incorporated v. Monfort of Colorado, Incorporated, the Supreme Court rejected a plaintiff's theory of antitrust injury where the plaintiff alleged that the defendant's merger would lead to reduced prices that were still at or above cost. 🚩 479 U.S. at 114-16. And in Atlantic Richfield Company v. USA Petroleum Company, the plaintiff alleged that the defendant, a gasoline manufacturer, had engaged in price-fixing by offering its dealers discounts and rebates to stave off

competition from independent dealers. 495 U.S. at 331-32. The Supreme Court held that where a firm or group of firms lowers prices through a vertical agreement, but maintains prices above cost, competitors' losses are attributable to procompetitive forces, not anticompetitive predatory pricing. Id. at 337-38.

Lower courts have nevertheless grappled with the question of when to apply the price-cost test when it is not clear that a company engages merely in "price-cutting" — e.g., when a company offers discounts in exchange for purchasing a certain percentage of goods from that company. To be sure, courts have in some cases applied the test to above-cost discounting in such instances. For example, in NicSand Incorporated v. 3M Company, two suppliers of automotive sandpaper competed for business with six large retailers that controlled 80% of the retail market. 507 F.3d 442, 447 (6th Cir. 2007). Five out of the six retailers sold only one brand at a time, meaning each retailer sold only either NicSand or 3M, but not both. Id. In order to obtain that exclusive shelf-space, NicSand or 3M had to offer a favorable price and meet a number of additional terms, such as providing a full line of automotive sandpaper and providing the racks for the shelves. Id. at 448. For years, NicSand dominated the shelves in four of the five retailers that insisted on single-brand shelves. That is, until 3M offered retailers up-front payments worth hundreds of thousands of dollars in exchange for switching to 3M. Id. The Sixth Circuit applied the price-cost test in rejecting NicSand's claim. In doing so, the court reasoned that exclusivity was an essential feature of this specific retail market because the retailers (i.e., the buyers) required exclusivity, and that NicSand, as the market incumbent, could not now complain that 3M had knocked it from its perch using similar exclusive terms it had previously utilized. Id. at 456 ("When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury."). Ultimately, the court found that the up-front payments 3M offered were a pricing measure that the retailers "insisted on receiving" in order to switch suppliers. Id. at 453.

The Eighth Circuit, in Concord Boat Corporation v. Brunswick Corporation, 207 F.3d 1039 (8th Cir. 2000), applied the price-cost test to the plaintiffs' Sherman § 2 claim and the rule of reason to the plaintiffs' Sherman § 1 claim, albeit with little discussion as to why the court applied different tests to the different claims. The defendant, Brunswick, offered market-share discounts to boat builders and dealers in order to increase the sales of its engines. Id. at 1044. From 1995 to 1997, Brunswick offered a 3% discount if a buyer purchased 70% of its engines from the defendant, a 2% discount for 65% of its engines, and a 1% discount for 60% of its engines. Id. Brunswick also offered additional discounts to anyone who signed a multi-year market-share agreement and to those who purchased a higher volume of engines (i.e., a volume discount). Id. Analyzing the plaintiffs' section 1 claim under the rule of reason because the plaintiffs did not allege activity that would "trigger a per se analysis," the Eight Circuit held that the plaintiffs failed to establish that Brunswick's discount program was anticompetitive exclusive dealing because boat builders were not required to commit for a specified time period and many had switched to other sellers when offered superior discounts. Id. at 1058-59. Moreover, the court held that the plaintiffs did not show that "significant barriers to entry existed" in the market because firms had little difficulty entering the market. Id. Then, applying the price-cost test to plaintiffs' section 2 claim, the court held that Brunswick's loyalty program was a "normal competitive tool" because its prices remained above variable cost. Id. at 1062. Though not apparently necessary to justify this holding, the court reiterated that the discount program was not exclusive dealing, that the boat builders could walk away at any time (and did so), and that there were low barriers to entry. Id. at 1063.

**\*15** Equipped with these precedents, the Third Circuit in ZF Meritor dealt more explicitly with which of the two tests to apply when presented with another loyalty discount program. In that case, the defendant, Eaton, had about an 80% market share in the manufacture of heavy-duty truck transmissions and introduced loyalty contracts that provided both upfront payments and rebates to four major truck manufacturers that purchased truck transmissions. ZF Meritor, 696 F.3d at 265, 286 n.5. These contracts lasted for at least five years and would scale discounts based on the percentage of goods the manufacturers purchased from the defendant. Id. at 265. Generally, the market-share targets ranged from 85% to 95%. Id. Eaton included additional terms beyond the discounts. Notably, Eaton retained the right to terminate the agreements if the market share figures were not met, and if the manufacturers did not meet

the market-share figure for one year, Eaton could require "repayment of all contractual savings." Id. Moreover, direct-from-manufacturer truck buyers could customize certain equipment, including transmissions, and could browse options in the manufacturers' catalogues. Eaton's agreements required that its transmissions be featured as the standard offering in the catalogues and even required the removal of competitors' products in two of the four manufacturers' catalogues. Id. Further, the manufacturers were contractually required to price competitors' products above those of Eaton. Id. at 265-66.

The ZF Meritor court weighed whether to apply the price-cost test or the rule of reason to Eaton's agreements. Id. at 268. The court noted that the price-cost test "would control if this case presented solely a challenge to Eaton's pricing practices." Id. at 273-74. However, the court credited testimony that demonstrated that manufacturers were forced to meet the market-share targets, or else risk financial penalties, supply shortages, or severed ties with the market-dominant defendant entirely. Id. at 277. Because Eaton was a monopolist, the court reasoned, forgoing the rebates and "losing Eaton as a supplier was not an option." Id. at 278.

The court stated that "this is not a case in which the defendant's low price was the clear driving force behind the customer's compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price." Id. (citing Concord Boat, 207 F.3d at 1063 as a counter-analogy). Put another way, Eaton's de facto exclusive dealing arrangements drove out other firms "not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand." Id. at 281. The court held that when price itself is not the "clearly predominant mechanism of exclusion," the price-cost test does not apply. Id. at 277. [8]

A few years later, the Third Circuit revisited ZF Meritor in the pharmaceutical context. Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821 F.3d 394 (3d Cir. 2016). In that case, Eisai alleged that Sanofi Aventis engaged in three modes of anticompetitive conduct in the market for anticoagulant drugs in U.S. hospitals: "(1) market-share and volume discounts, (2) a restrictive formulary access clause, and (3) aggressive sales tactics used to market the program." Id. at 400.

Specifically, Sanofi offered a baseline 1% discount for a market-share below 75% and a scaled discount from 9% to 30% for market-shares above 75%. Id. The court ultimately held that Sanofi's program was distinguishable from that in ZF Meritor because the discounts were not de facto mandatory, did not threaten repayment of contractual savings, and did not threaten refusal to deal in the future. Id. at 406. The court nevertheless refrained from commenting on whether the price-cost test applied because, even under the rule of reason test applied in ZF Meritor, the plaintiff's claims failed due to insufficient evidence of market foreclosure. Id. at 408-09.

**\*16** The Third Circuit's approach suggests that loyalty discount arrangements may be pure (or nearly pure) pricing schema, and in such situations, the price-cost test applies neatly. See, e.g., NicSand, 507 F.3d at 453. However, an arrangement may include other allegedly coercive mechanisms that impose costs on competitors to enter the market such that price is not "clearly" doing the work of exclusion. Following the Third Circuit's formulation, other circuits have since relied upon and cited ZF Meritor where the defendant offers loyalty discounts. See, e.g., In re EpiPen (Epinephrine Injection, USP) Antitrust Litig., 545 F. Supp. 3d 922, 1016-17 (D. Kan. 2021) (explicitly applying the "clearly predominant mechanism of exclusion" analysis), aff'd, 44 F.4th 959 (10th Cir. 2022) (observing that ZF Meritor and other Third Circuit precedent "merit close consideration in this case"); McWane, 783 F.3d at 835 (citing ZF Meritor to justify a rule of reason approach to exclusive dealing cases); Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1182-83 (9th Cir. 2016) (citing ZF Meritor as a counter-analogy for situation with "extra-contractual conditions, or preferential treatment terms"); see also Dial Corp. v. News Corp., 165 F. Supp. 3d 25, 32 (S.D.N.Y. 2016) (citing and applying ZF Meritor's "clearly predominant method of exclusion" test in non-loyalty discount exclusive dealing case).

ZF Meritor appears to balance the important concerns the Supreme Court has identified in over-regulating price-cutting schema, see Matsushita, 475 U.S. at 594 ("[M]istaken inferences in [pricing cases] cases ... are especially costly, because they chill the very conduct the antitrust laws are designed to protect."), and under-regulating exclusive dealing, see Jefferson Par., 466 U.S. at 45 (O'Connor, J., concurring) ("Exclusive dealing can have adverse economic

consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods[.]"). The ZF Meritor approach counsels applying the price-cost test where a pricing practice is clearly doing the work of exclusion and the rule of reason where there are mechanisms beyond price-cutting that exclude competition by imposing unilateral costs on competitors.

The parties do not appear to disagree with the above analysis. (Doc. 100 at 25; Doc. 95 at 24-25; Doc. 150 at 41.) Rather, they depart on whether price clearly predominates over other mechanisms of exclusion in this case. Syngenta argues that Plaintiffs do not plead "any of the non-price coercive features that courts have required" before finding a market-share rebate program anticompetitive. (Doc. 100 at 27.) Further, Syngenta argues, the single-year and single-product scope of the rebates undermines Plaintiffs' claim that price clearly predominates. (🚩 Id. at 29.) Syngenta dismisses Plaintiffs' allegation that it terminated a distributor as an "isolated allegation" that is "simply not probative of the program itself." (🚩 Id. at 30 (emphasis removed).) Finally, Syngenta characterizes Plaintiffs' allegations regarding Defendants' agreement whereby Syngenta supplies mesotrione and s-metolachlor for Corteva's use as an "effort to muddy the waters." (🚩 Id. at 32.)

Corteva first argues that "Plaintiffs' allegations make clear that price is the primary means of exclusion, but do not allege that Corteva's programs fail the price-cost test." (Doc. 95 at 25.) Corteva specifically contends that Plaintiffs do not allege long-term contract terms or exclusions from supply based on noncompliance, which are recognized non-price conditions that would trigger the default rule of reason. (Id. at 26.) Second, Corteva claims that its term that defers a certain percentage of rebates into subsequent years and retracts unpaid rebates for noncompliance is "no more than a 'threat of a lost discount' " that is, in its view, not anticompetitive. (Doc. 98 at 26.)

Third, Corteva claims that conditioning the Corporate Offer on compliance with the CRPIVM is not anticompetitive "bundling." (Id. at 27-28.) Bundling occurs "when a firm sells a bundle of goods ... for a lower price than the seller charges for the goods ... purchased individually." 🚩 Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 894 (9th Cir. 2008). In Corteva's view, the Corporate Offer "just offers an additional discount to Corteva's customers who do buy products covered by the [Corporate Offer]." (Doc. 95 at

28.) Fourth, Corteva contends that the court "should not credit [P]laintiffs' unsupported, conclusory and nonspecific allegations that 'Defendants have retaliated and threatened to retaliate' against distributors that have failed to satisfy loyalty by cancelling distribution contracts or withholding access to supply." (Id.) [9]

**\*17** Plaintiffs argue in response that Defendants mischaracterize their own discount program as a pricing scheme. (Doc. 150 at 35.) Plaintiffs point to the complaint's allegations that "Defendants have 'threatened to retaliate ... against [disloyal] distributors ... by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage." (Id. at 36 (citing Doc. 149 ¶ 88).) Plaintiffs further maintain that they allege that each Defendant "follow[ed] through" on their threats by refusing to sell pesticides or limiting sales of an insecticide to two distributors. (Doc. 112 at 36 (citing Doc. 81 ¶ 88).) Plaintiffs respond to Defendants' argument — that these are isolated incidents that do not exemplify the program — by arguing that the reasonable inference which must be drawn in Plaintiffs' favor at this stage is that limited instances of retaliation are evidence of the loyalty program working as intended. (Id. at 37-38.) Plaintiffs also contend that the one-year length of the agreements triggers no presumption that the contracts are lawful and that looking to the practical effect of agreements demonstrates "long-term foreclosure." (Id. at 38-39.) Plaintiffs finally argue that even if the price-cost test applies to the Sherman Act and Clayton Act claims, it does not apply to the FTC Act claim. (Id. at 45-47.)

In other loyalty discount cases, courts have observed a number of non-price mechanisms of exclusion, such as provisions aggravating existing barriers to enter the market, 🚩 McWane, Inc., 783 F.3d at 836; In re Surescripts Antitrust Litig., 608 F. Supp. 3d 629, 645 (N.D. Ill. 2022); whether the buyer insists on exclusive dealing, 🚩 NicSand, 507 F.3d at 456; contractual obligations to purchase a set percentage of products from the defendant, 🚩 Allied Orthopedic, 592 F.3d at 997 n.2; discounts involving tying or bundling, 🚩 Eisai, 821 F.3d at 405; 🚩 LePage's, 324 F.3d at 157-58; threats to retract unpaid rebates or claw back discounts from prior years, 🚩 McWane, 783 F.3d at 820-21; threats to cut off supply from a monopolist, 🚩 ZF Meritor, 696 F.3d at 278; requirements to exclude competitors from marketing materials, id.; and the length of time of the discounting agreements, 🚩 McWane,

**FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA,..., Slip Copy (2024)**

783 F.3d at 820-21. While these cases are instructive, each antitrust case "must be determined upon the particular facts disclosed by the record, and ... the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied." Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 579 (1925).

Here, Plaintiffs have alleged sufficient non-price mechanisms of exclusion to foreclose application of the price-cost test as a matter of law at this pleading stage. First, the complaint plausibly alleges that the loyalty programs leverage the Defendants' monopolist status and the market's substantial barriers to entry to exclude competition for the AIs. (Doc. 149 ¶ 160.) Among the alleged "capital, technical, regulatory and legal barriers" are "obtaining registration from the EPA, developing manufacturing processes and sourcing active ingredient, and paying data compensation costs to the initial active ingredient registrant." (Id.) While entry barriers alone may not trigger the rule of reason, Plaintiffs have plausibly alleged that Defendants' use of the loyalty discounts — as alleged monopolists relating to production of the AIs — exacerbates the already high costs to enter the market by locking up access to the most efficient channel of distribution.

See McWane, 783 F.3d at 836; ZF Meritor, 696 F.3d at 284-85 (applying rule of reason where high barriers existed in high-concentration market); Eastman Kodak, 504 U.S. at 488 (Scalia, J., dissenting) ("Behavior that might otherwise not be of concern to the antitrust laws ... can take on exclusionary connotations when practiced by a monopolist.")

Second, the complaint alleges not only that Defendants threatened to cut off supply, but that each Defendant followed through on that threat, albeit in limited instances. (Doc. 149 ¶ 88.) While Defendants contend that these do not exemplify the program, the court must draw all reasonable inferences in Plaintiffs' favor at this stage. Such instances plausibly support the claim that Defendants' threats to restrict supply are effective deterrence against non-compliance. (See id. ¶ 84 (alleging that Defendants communicate adherence to loyalty thresholds to distributors).) The complaint plausibly alleges that the threats to restrict supply factors into distributors' purchasing decisions.

**\*18**  Third, while the length of the agreements is facially one year, the alleged yearly renewals and threat of retaliation are claimed to have a longer-term effect. (Id. ¶¶ 164, 172.)

Further, Corteva's agreements allegedly contain terms that defer payments into subsequent years and require forfeiture of unpaid discounts for non-compliance. (Doc. 81 ¶ 78.)

Fourth, Corteva's agreements allegedly share some features with bundling because Corteva offers terms that link discounts for any one AI to compliance with the loyalty threshold for all AIs in a distributor's offer and that link discounts under the Corporate Offer to compliance with the CPRIVM offer. (Id. ¶ 79.)

Finally, Plaintiffs plausibly allege that the Syngenta-Corteva supply agreement for mesotrione and metolachlor allegedly enhances the exclusive effect of the loyalty programs. (Doc. 149 ¶¶ 109, 122.)

Whether these non-price mechanisms have the alleged exclusive effect vis-à-vis price will depend on the development of the record. In light of these plausible allegations, Defendants have not demonstrated at this stage that price clearly predominates over non-price mechanisms of exclusion.

Defendants' other arguments do not alter this analysis. First, that the loyalty discounts cover a single product (i.e., each individual AI) does not necessarily mean that price clearly predominates. While Defendants cite to ZF Meritor and Eisai for this proposition, neither supports it. In ZF Meritor, the Third Circuit did state, "we join our sister circuits in holding that the price-cost test applies to market-share or volume rebates offered by suppliers within a single-product market."

ZF Meritor, 696 F.3d at 274 n.11 (citing NicSand, 507 F.3d at 452; Concord Boat, 207 F.3d at 1061; Barry Wright, 724 F.2d at 236). In making this observation, the Third Circuit was distinguishing LePage's v. 3M, 324 F.3d 131 (3d Cir. 2003), where the court did not apply the price-cost test because the alleged conduct involved "bundling" across multiple products. Id. The court reasoned that LePage's should not extend to the facts of ZF Meritor, where "only one product is at issue and the plaintiffs have not made any allegations of bundling." ZF Meritor, 696 F.3d at 274 n.11. Though the court stated that the price-cost test "applies" to a single-product discount, the ZF Meritor court itself applied the rule of reason — not the price-cost test — to a single-product discount. This indicates that the price-cost test can apply where there is a single-product market, not that it must. Defendants' reliance on Eisai fares no better, as the Third Circuit stated that pricing "usually" predominates

over other means of exclusivity when "a firm uses a single-product loyalty discount or rebate to compete with similar products." Eisai, 821 F.3d at 409. However, the court ultimately refrained from applying the price-cost test because the plaintiff's claim failed under Tampa Electric as well. Id. at 409 ("Because we have concluded that Eisai's claims are not substantiated and that they fail a rule of reason analysis, we will not opine on when, if ever, the price-cost test applies to this type of claim."). Notably, neither ZF Meritor nor Eisai was decided at the pleadings stage but after the development of a factual record. ZF Meritor was decided on post-trial motion, and Eisai was decided on motion for summary judgment. Though the price-cost test may apply to certain loyalty discount programs, the Supreme Court admonishes that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities" are "generally disfavored" and that courts should resolve antitrust cases on a case-by-case basis, "focusing on the 'particular facts disclosed by the record.' " Eastman Kodak, 504 U.S. at 466-67 (quoting Maple Flooring, 268 U.S. at 579).

 **\*19** Second, at least at this early stage, it is not clear that the single-year term of the loyalty discount agreements mandates application of the price-cost test as a matter of law. Defendants contend that the single-year term of their agreements in this case "are presumptively incapable of harming competition." (Doc. 100 at 29.) While long-term exclusive dealing has been found to factor in favor of finding anticompetitive injury, ZF Meritor, 696 F.3d at 286-87, Defendants have not demonstrated that any such presumption exists. Rather, the cases Defendants cite for this position show that courts have weighed short duration in determining anticompetitive effects, not presumed a lack of anticompetitive effects. See R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 391-93 (M.D.N.C 2002), aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc., 67 F. App'x 810 (4th Cir. 2003) (unpublished) (considering contract length along with percentage of foreclosure and costs of switching to other vendors); see also In re EpiPen Mktg., 44 F.4th at 988 ("It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination." (collecting cases)); Allied Orthopedic, 592 F.3d at 997 ("The 'easy terminability' of an exclusive dealing arrangement 'negate[s] substantially [its] potential

to foreclose competition.' " (quoting Omega Env't, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163-64 (9th Cir. 1997))). Here, Plaintiffs allege that Defendants' renewable single-year contracts create long-term competitive harms, including cutting off supply and, in Corteva's case, deferring rebates into subsequent years conditioned on further compliance with meeting market-share. See Dentsply, 399 F.3d at 193-94 (finding "strong economic incentive to continue" compliance with market-share agreement despite "legal ease with which the relationship can be terminated"); McWane, 783 F.3d at 833-34 (finding anticompetitive injury even though exclusive dealing was "short-term and voluntary"). Moreover, each of the AIs has been in a loyalty program for at least four years, and one has been included for almost two decades. (Doc. 149 ¶¶ 93, 102, 115, 127, 137, 146.) While the annual length of the agreements is generally a factor that favors Defendants, the court must draw all reasonable inferences from the complaint's allegations in Plaintiffs' favor at this early stage. As such, the court cannot say that the length of the agreements requires a finding at this time that price clearly predominates over other alleged non-price mechanisms of exclusion.

In sum, Plaintiffs have plausibly alleged sufficient facts, if believed, for the court to conclude that price is not the clearly predominant mechanism of exclusion. The complaint alleges that Defendants are dominant suppliers who have entered into de facto exclusive dealing arrangements that include plausibly significant mechanisms of exclusion beyond price-cutting. Accordingly, the court cannot conclude at this stage that the price-cost test must apply as a matter of law. Indeed, Defendants' cited cases demonstrate that courts have reached, or even closely considered, such a conclusion before discovery in only rare circumstances. NicSand, 507 F.3d 442 (price-cost applied on motion to dismiss where plaintiff did not have antitrust standing); Concord Boat, 207 F.3d 1039 (price-cost partially applied post-trial); ZF Meritor, 696 F.3d 254 (rule of reason applied post-trial after extensive discussion); Pac. Bell, 555 U.S. 438 (dismissing price-squeezing claim, not exclusive dealing claim). Depending on the facts adduced at a later stage, it remains to be seen whether the price-cost test or Tampa Electric's rule of reason and its progeny will ultimately be the proper test for Plaintiffs' claims. For purposes of the pending motions, therefore, the court turns to Defendants' contention that the complaint fails under the rule of reason.

**b. Allegations of Anticompetitive Conduct and Injury**

Defendants argue that Plaintiffs have failed to allege anticompetitive conduct and injury. Corteva contends that it is "entirely dispositive" that Plaintiffs have not pled any actual exclusivity because the loyalty programs are voluntary, do not cover all distributors in the market, and do not require 100% exclusivity. (Doc. 95 at 22-23.) Syngenta principally argues that any market foreclosure is the result of "lawful price competition," that Syngenta incentivized customers to "buy more of its products by lowering its prices," and that there is an absence of non-price mechanisms of exclusion present in other cases like ZF Meritor and Dentsply. (Doc. 100 at 33-35.) Syngenta further argues that Plaintiffs failed to explain why generic competitors do not lower their prices to make their products more profitable to distributors. (Id. at 35.) Finally, Syngenta claims that its exclusive dealing arrangement with Corteva is evidence of legal competitive conduct. (Id. at 36-37.)

Plaintiffs respond that they have plausibly alleged both indirect and direct evidence of harm to competition. (Doc. 150 at 26.) On the indirect side, Plaintiffs contend that they have alleged foreclosure of a "substantial part of the market." (Id. (citing Chuck's Feed, 810 F.2d at 1293-95).) Specifically, they contend that Defendants have foreclosed generics from "approximately 70% or more" of the market. (Doc. 112 at 27 (citing Doc. 81 ¶ 171).) Plaintiffs further argue that this estimate is likely conservative because it relies on the lowest market-share threshold available and conservatively assumes that distributors only narrowly hit the market-share threshold. (Doc. 150 at 27.) On the direct side, Plaintiffs argue that they have alleged three competitive harms: reduced choices for farmers, higher prices for farmers, and less innovation. (Id. at 28.) Plaintiffs further contend that Defendants' discounts may benefit participating distributors but do not get passed on to farmers. (Id. at 35.)

**\*20** As an initial matter, Defendants ask the court to apply the same mode of inquiry, i.e., the rule of reason or price-cost test — regardless of the antitrust statute at issue. (Doc. 157 at 33:7-13.) Indeed, courts have conducted the exclusive dealing inquiry in such a manner. See, e.g., ZF Meritor, 696 F.3d at 269 n.9 (stating that the rule of reason is applicable to the plaintiff's claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act); Microsoft, 253 F.3d

at 59 (applying rule of reason to Sherman Sections 1 and 2); Chuck's Feed, 810 F.3d at 1294 (applying rule of reason to exclusive dealing under the FTC Act and Clayton Section 3).

Moreover, Defendants do not argue that Plaintiffs' claims may survive under some antitrust statutes but not others, at least at this stage. Here, the relevant threshold requirements specific to the statutes are Sherman Section 1's contract requirement, 15 U.S.C. § 1 ("Every contract ..."), Sherman Section 2's monopoly power requirement, 15 U.S.C. § 2 ("Every person who shall monopolize ..."), and Clayton Section 3's conditional discount or rebate requirement, 15 U.S.C. § 14 ("... discount from, or rebate upon, such price, on the condition ..."). Defendants do not appear to contest that these requirements are alleged, so the court will treat them as uncontested for the purpose of these motions. Boles v. United States, 3 F. Supp. 3d 491, 507 n.10 (M.D.N.C. 2014). In any event, it appears that Plaintiffs have adequately pleaded these elements. Kolon, 637 F.3d at 450 ("[T]his Court has previously noted that when monopolization has been found the defendant controlled seventy to one hundred per cent of the relevant market." (internal quotation marks omitted); (Doc. 150 ¶¶ 81, 84, 161-63 (alleging agreements with substantially all leading distributors; market share in excess of 70% during relevant time period for five of six AIs and 40% for Corteva's acetochlor (based on its joint venture partner having approximately 50%); and conditional payments).)

To prevail, Plaintiffs must plausibly allege that Defendants' loyalty agreements constitute anticompetitive conduct and caused antitrust injury. Microsoft, 253 F.3d at 58-59. As to the first issue, there is no set formula to demonstrate anticompetitive conduct under the rule of reason. ZF Meritor 696 F.3d at 271. Courts have considered

a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, [ ] an analysis of likely or actual anticompetitive effects considered in light of

any procompetitive effects[,] whether there is evidence that the dominant firm engaged in coercive behavior, [ ] the ability of customers to terminate the agreements[, and t]he use of exclusive dealing by competitors of the defendant[.]

🚩 *ZF Meritor,* 696 F.3d at 271-72 (internal citations omitted) (collecting cases). An allegation of a percentage of market foreclosure is not required. 🚩 *Kolon,* 637 F.3d at 452 n.12. As to the second issue, an antitrust injury is "of the type that the statute was intended to forestall" 🚩⚠️ *Microsoft,* 253 F.3d at 59 (quoting 🚩 *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 487-88 (1977)) (internal quotation marks omitted). "[I]n a case brought by the Government, it must demonstrate that the monopolist's conduct harmed competition, not just a competitor." Id.

Section 1 and 2 of the Sherman Act and Section 3 of the Clayton Act require different degrees of substantiality. The Supreme Court has implied in dicta that Section 3 of the Clayton Act requires a lesser showing than the Sherman Act does: "[I]f [the contract] does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the [Sherman Act]." 🚩⚠️ *Tampa Elec.,* 365 U.S. at 335 (summarily rejecting Sherman claims after rejecting Clayton claim). The majority of courts have since followed Tampa Electric's dicta. See, e.g., 🚩⚠️ *Microsoft Corp.,* 253 F.3d at 69; see also Areeda & Hovenkamp, supra ¶ 1800c4 n.67 (collecting cases). As between Sections 1 and 2 of the Sherman Act, 🚩 *Section 2* may require less foreclosure to be substantial than 🚩 *Section 1.* 🚩⚠️ *Microsoft Corp.,* 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a 🚩 *§ 2* violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a 🚩 *§ 1* violation.").

 **\*21** Corteva lodges several arguments that it contends establish per se legality, namely that the agreements are voluntary and cover neither 100% of the distributors nor 100% of participating distributors' goods. It is true that courts have factored in whether customers were "free to

walk away from the discounts at any time." 🚩 *Concord Boat,* 207 F.3d at 1059; see also 🚩 *Allied Orthopedic,* 592 F.3d at 995 (affirming district court that found that agreements were "voluntary and [could] be ended at any time, and hospitals [were] thus free to switch to more competitively priced generics"); 🚩 *Omega Env't,* 127 F.3d at 1163 ("[T]he short duration and easy terminability of these agreements negate substantially their potential to foreclose competition."). However, these cases do not treat this fact as "entirely dispositive," as Corteva suggests. By contrast, courts are admonished to look to "the practical effect" of exclusive dealing agreements. 🚩⚠️ *Tampa Elec.,* 365 U.S. at 326. By doing so, courts have found de facto partial exclusive dealing arrangements to be cognizable violations under antitrust law. 🚩 *ZF Meritor,* 696 F.3d at 282; 🚩 *Concord Boat,* 207 F.3d at 1059 ("[C]laims that allege only de facto exclusive dealing may be viable.").

Assuming Defendants' agreements are formally voluntary, Plaintiffs have plausibly alleged that the Defendants' market-share targets combined with the schedule of payments and threat of non-price retaliation create de facto exclusivity. For example, the complaint alleges that the "complexity, uncertainty, and timing" of payments "make it less likely that a distributor will lower its prices" and that the threat of "canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage" instills strict compliance. (Doc. 149 ¶¶ 85-88.) The complaint also alleges that the loyalty discounts create an incentive for distributors to "strictly manage" their generic purchases and "steer" customers toward loyalty discount-qualifying products despite consumer demand for generics. (Id. ¶¶ 95, 104, 117, 147.) In other words, it is plausible that Defendants' loyalty discount programs are "as effective as express purchase requirements." See 🚩 *ZF Meritor,* 696 F.3d at 283 (recognizing voluntary agreement as de facto exclusive dealing because "no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market" (internal quotation marks omitted)); 🚩 *Dentsply,* 399 F.3d at 194 ("[I]n spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying [the defendant's product]."); 🚩 *McWane,* 783 F.3d at 833-34 (rejecting argument that short-term and voluntary exclusive dealing agreements are "presumptively legal").

Moreover, the lack of complete exclusivity is not fatal to Plaintiffs' claims, as Corteva argues. It contends that the ability of distributors to purchase some generics and the fact that some distributors (approximately 20%) do not participate creates a presumption of legality. This position appears at odds with <u>Tampa Electric</u>, which requires that Plaintiffs demonstrate the exclusive contract's probable effect is to "foreclose competition in a <u>substantial</u> share of the line of commerce affected." 365 U.S. at 327 (emphasis added); <u>see also</u> 15 U.S.C. § 14 ("... where the effect of ... such condition, agreement, or understanding may be to <u>substantially</u> lessen competition[.]" (emphasis added)). "[J]ust as 'total foreclosure' is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer." ZF Meritor, 696 F.3d at 283 (analyzing claim under the Sherman Act). Rather than treating lack of true exclusivity or voluntariness as legally dispositive, the court may weigh the relevance of these facts at a later stage. <u>See, e.g.,</u> Concord Boat, 207 F.3d at 1060 (weighing lack of true exclusivity on review of summary judgment order).

Syngenta's argument that dismissal is warranted because Plaintiffs did not explain why generic competitors do not lower their price to make their products more profitable to distributors is similarly unpersuasive at this stage. (Doc. 100 at 35.) Even assuming, without deciding, that Plaintiffs bear this burden at this stage, they have plausibly alleged that generic manufacturers' attempts to lower their prices would be futile in the presence of the loyalty programs. This follows from the allegation that distributors would not be willing to accept the risk of losing all supply from Defendants and because Defendants' foreclosure of the most efficient distribution channel imposes costs on generic manufacturers that has "harmed the[ir] effectiveness." (Doc. 149 ¶ 170, 173.)

 **\*22** This contention is supported by Plaintiffs' specific allegations regarding manufacturers of generics that have attempted to enter the market. Manufacturers of generics of Syngenta's azoxystrobin and metolachlor allegedly exited the market because of "constraints imposed by Syngenta's loyalty program." (<u>Id.</u> ¶¶ 96-97, 118, 120.) One generic manufacturer of azoxystrobin that sought to mix azoxystrobin with a fungicide failed because the distributor feared it could impact its ability to meet the market-share target. (<u>Id.</u> ¶¶ 96-97.) Manufacturers of generics of mesotrione were also hindered from entering the market, an issue Plaintiffs allege was exacerbated by Syngenta's agreement to supply Corteva

with mesotrione under the condition that Corteva's products containing mesotrione be treated neutrally under Syngenta's Key AI program. (<u>Id.</u> ¶ 105; Doc. 81 ¶ 109.)

Plaintiffs allege that a generic manufacturer of Corteva's rimsulfuron "canceled or deferred entry plans," despite farmer demand for lower-priced generics of rimsulfuron. (Doc. 149 ¶ 132.) According to the complaint, generics of oxamyl found some success in the market during a "plant outage" at Corteva from 2015 to 2017, but thereafter under Corteva's loyalty program, "generic sales plummeted, particularly at large distributors, and generic manufacturers could not retain distributor business even by lowering prices." (<u>Id.</u> ¶ 136-38.) One Corteva manager allegedly said of this pattern, "[O]ur team truly has done an A+ job blocking generics." (<u>Id.</u> ¶ 138.) Finally, a generic manufacturer of acetochlor that was priced "substantially below Corteva's prices" allegedly made "little headway" because major distributors declined to purchase the generic due to Corteva's loyalty program. (<u>Id.</u> ¶ 148.) At this preliminary stage, the court must accept these plausible factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. Through this lens, Defendants have not demonstrated that the widespread failure of generics to enter the market is due to competition on the merits rather than plausibly anticompetitive conduct by Defendants.

Finally, Plaintiffs have plausibly alleged anticompetitive conduct and injury. In <u>Kolon</u>, the Fourth Circuit, in reviewing a Sherman Act § 2 claim on motion to dismiss, held that an allegation of dominant market share and exclusionary conduct was sufficient at the pleading stage. 637 F.3d at 452 (citing Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 147 (4th Cir. 1990)). While the court also held that pleading a percentage of market foreclosure is not necessary, Plaintiffs have pleaded a foreclosure of "approximately 7 0% or more of each applicable market." (Doc. 81 ¶ 171); <u>see</u> Microsoft, 253 F.3d at 70 (finding substantial 40-50% of market foreclosure under Sherman Act § 2 claim). Under all of the antitrust statutes, Plaintiffs' allegations of substantial foreclosure are plausible and, at a minimum, "turn[ ] on a factual dispute ill suited for the pleadings stage." F.T.C. v. Surescripts, LLC, 424 F. Supp. 3d 92, 104 (D.D.C. 2020). Moreover, for the reasons noted above, Syngenta's argument — that Plaintiffs have not alleged anticompetitive conduct because they have not alleged predatory pricing — likewise fails. To

FEDERAL TRADE COMMISSION, STATE OF CALIFORNIA,..., Slip Copy (2024)

the extent these arguments apply under the rule of reason, they appear to speak to "whether an otherwise unacceptable level of market foreclosure is justified by procompetitive efficiencies." Chuck's Feed, 810 F.2d at 1294; (Doc. 100 at 34 (framing price reductions as procompetitive).) Simply put, the court is not equipped at this stage and on this record to weigh the merits of this procompetitive justification against the plausible allegations of market foreclosure.

Plaintiffs have also sufficiently alleged antitrust injury. They claim harm to farmers, growers, and generic manufacturers, and that Defendants' conduct "may substantially lessen competition or tend to create or maintain monopolies in the [r]elevant [m]arkets." (Doc. 149 ¶¶ 164-66.) Specifically, Plaintiffs allege that generic manufacturers have been substantially foreclosed from the most efficient channel of distribution (id. ¶¶ 170-71); that the structure of the payments over an extended period of time, and across multiple crop-protection products containing the same AI, make it less likely that discounts will pass on to end-consumers (id. ¶¶ 173-75); that distributors have "omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered retailers and farmers toward branded products" (id. ¶ 177); that the loyalty programs have caused generics to exit or never enter the market (id. ¶¶ 182-85); and that the loyalty programs have stunted innovation (id. ¶¶ St 186-89). The complaint also alleges that Defendants' internal analyses acknowledge that the loyalty programs lead to supracompetitive prices for end-consumers. (Id. ¶¶ 194-200.)

**\*23** In sum, Defendants' contention that their loyalty programs neither are anticompetitive nor cause anticompetitive injury depends on further factual development. At this stage, the complaint plausibly alleges both. [10]

### 3. Claims Against Syngenta Corporation and Syngenta Crop Protection AG

Syngenta argues that "Plaintiffs' allegations do not cognizably connect Syngenta Corporation or Syngenta Crop Protection AG to the challenged rebate program." (Doc. 100 at 44.) Consequently, Syngenta contends, the claims against those two entities should be dismissed. (Id.) As to Syngenta Corporation, Syngenta maintains that more is required than an allegation that Syngenta is a "single enterprise" and that one person is the president of both

Syngenta Corporation and Syngenta Crop Protection, LLC. (Id. at 44-45.) And as to Syngenta Crop Protection AG, Syngenta argues that Plaintiffs' "vague allegations of high-level oversight and strategic guidance" are insufficient in light of Plaintiffs' "conce[ssion] that the global parent is not responsible for 'implementation' of post-patent strategies in individual countries." (Id. at 45.)

Plaintiffs respond that their allegations with Syngenta Corporation's shared senior leadership with Syngenta Crop Protection, LLC, and management of contacts with Corteva regarding the mesotrione and metolachlor supply agreements suffice to state claims against Syngenta Corporation. (Doc. 150 at 65-66; Doc. 112 at 65-66.) Further, Plaintiffs contend that they have stated a claim against Syngenta Crop Protection AG because it "directs and oversees" the LLC's post-patent strategy, "reviews, modifies, and approves Syngenta's U.S. budget, which includes sales targets based on Syngenta's loyalty program," and was "directly involved in the negotiation of" the mesotrione supply agreement with Corteva. (Doc. 150 at 66.)

To be sure, Plaintiffs do not allege a conspiracy between the Syngenta entities. Parents and subsidiaries, as well as sister subsidiaries, are "incapable" of conspiring with one another under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. 🚩Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 777 (1984) (parent-subsidiary under Sherman 🚩Section 1); 🚩Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 847 F.3d 1221, 1234 (10th Cir. 2017) ("[S]ubsidiaries are incapable of conspiring under § 1 of the Sherman Act.... [W]e also conclude that Copperweld's reasoning with respect to 🚩§ 1 applies equally to 🚩§ 2."); 🚩Advanced Health-Care Servs., 910 F.2d at 146, 152 (extending Copperweld to sister subsidiaries under Sherman 🚩Section 1 and Clayton Section 3). Instead, "[t]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise[.]" 🚩Copperweld, 467 U.S. at 771.

**\*24** In Lenox MacLaren, the Tenth Circuit affirmed on other grounds but wrote at length on the district court's error in treating each corporate affiliate as a separate entity rather than a "single enterprise." 🚩847 F.3d at 1230-39. The court observed that requiring each corporate affiliate to independently satisfy every element of an antitrust violation

"would be difficult to justify" because the Supreme Court and other courts have sealed off access to the claim of conspiracy between corporate affiliates. Id. at 1236 (citing Copperweld, 467 U.S. at 776-77). Moreover, the court reasoned that Copperweld must foreclose sophisticated corporations from "spread[ing] its anticompetitive scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability." Id. But the Lenox MacLaren court was careful to cabin the reach of the single-enterprise theory by emphasizing Copperweld's restriction of intra-enterprise liability only to "coordinated activity" of affiliates. Id. at 1237 (emphasis in original).

Indeed, "[a]ntitrust law doesn't recognize guilt by mere association, imputing corporate liability to any affiliated company unlucky enough to be a bystander to its sister company's alleged misdeeds." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015). "[I]n the antitrust context, courts have held that absent allegations of anticompetitive conduct by the parent, there is no basis for holding a parent liable for the alleged antitrust violation of its subsidiary." Arnold Chevrolet LLC v. Tribune Co., 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) (citing Invamed. Inc. v. Barr. Lab'ys, Inc., 22 F. Supp. 2d 210, 219 (S.D.N.Y. 1998); see also United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries." (internal quotation marks omitted)). Accordingly, claims may properly be dismissed against parent corporations where "at least as to them, the 'complaint was vague, never explained its case, and lumped [them] together without sufficient detail.' " Black & Decker, 801 F.3d at 423 (quoting Bates v. City of Chicago, 726 F.3d 951, 958 (7th Cir. 2013)). Here, the complaint defines "Syngenta" as "Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC." (Doc. 149 ¶ 1.) Notwithstanding this definition, Plaintiffs still must allege sufficient independent but coordinated activity for each named corporate affiliate. Black & Decker, 801 F.3d at 422.

While the Lenox MacLaren court ultimately refrained from adopting either party's proposed definition of "coordinated activity," the court considered as tests (1) "[w]hen the parent controls, dictates or encourages the subsidiary's anticompetitive conduct"; and (2) "that each defendant

must have played a 'role' — or 'participated' — in the anticompetitive conduct of the enterprise as a whole." Id. at 1237-38 (quoting Climax Molybdenum Co. v. Molychem, L.L.C., 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005)). Plaintiffs appear to endorse the "controls, dictates, or encourages" test. (Doc. 150 at 65-66 (citing Intellectual Ventures I LLC v. Cap. One Fin. Corp., Case No. 14-111, 2016 WL 160263, at *5 (D. Md. 2015); Nobody in Particular Presents, Inc. v. Clear Channel Comme'ns, Inc., 311 F. Supp. 2d 1048, 1068-70 (D. Colo. 2004)).) Syngenta does not take a position on the proper articulation of the standard and relied on its briefs when questioned about it at the hearing. (See Doc. 100 at 44-45; Doc. 130 at 23; Doc. 157 at 98:18-23.)

At least at the time of the complaint, the same individual served as the president of both Syngenta Corporation and Syngenta Crop Protection, LLC. (Doc. 149 ¶ 35.) Further, Plaintiffs allege that Syngenta Crop Protection AG has "directed, overseen, and approved Syngenta's sales and marketing strategy, including its loyalty program." (Id. ¶ 36.) Moreover, Syngenta Crop Protection AG allegedly has "reviewed, modified, and approved" Syngenta's U.S. budget, which includes the sales targets associated with Key AI, and provides "generic defense" strategy to be "tailored for implementation in each country." (Doc. 81 ¶ 36 (quoting Syngenta Crop Protection AG's global post-patent strategy handbook).) Finally, Plaintiffs allege that executives of Syngenta Crop Protection AG were "directly involved in the negotiation" of the Syngenta-Corteva mesotrione supply agreement, that Syngenta Crop Protection AG is the Syngenta entity that signed the agreement, and that a Syngenta Corporation executive "manages Syngenta's contacts with Corteva regarding the agreement." (Doc. 149 ¶ 111.)

**\*25** Based on these allegations, Syngenta has not demonstrated that the complaint fails to plausibly allege "coordinated activity." As a result, the motion to dismiss Syngenta Crop Protection AG and Syngenta Corporation will be denied.

### 4. Article II Challenge to FTC Authority

Defendant Corteva argues that the "FTC's claims must be dismissed because the FTC lacks the constitutional authority to bring these claims." (Doc. 95 at 30.) Plaintiff FTC's alleged authority to bring this lawsuit arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). (Doc. 149 ¶ 2.)

Corteva contends that Congress' grant of authority to the FTC to pursue relief under these provisions amounts to a grant of executive law-enforcement power that is unconstitutional because its "members are not removable at will by the President." (Id. (citing Humphrey's Executor v. United States, 295 U.S. 602 (1935); Seila Law LLC v. Consumer Fin. Protection Bureau, 140 S. Ct. 2183 (2020).) Corteva maintains that because executive agencies must be subject to the President's removal power, the suit before this court cannot go forward. (Id. at 32.) The FTC responds that Corteva's Article II challenge is untimely because it was not raised in its motion to dismiss the original complaint. (Doc. 150 at 61.) Moreover, in the FTC's view, Corteva "grossly misinterpret[s] binding Supreme Court precedent" by misstating the FTC's historical powers and ignoring features of the FTC that distinguish it from other agencies. (Id. (quoting Fed. Trade Comm'n v. Roomster Corp., No. 22 Civ. 7389, 2023 WL 1438718, at *8 (S.D.N.Y. Feb. 1, 2023)).) Finally, the FTC contends that even if Corteva were correct, dismissal of the action would be the improper remedy. (Id.) In reply, Corteva contends that its claim is not waivable because it is akin to a subject matter jurisdiction challenge. (Doc. 133 at 17-18.)

As to timeliness, the FTC cites to Federal Rule of Civil Procedure 12(g)(1). (Doc. 150 at 61.) But this rule does not support the FTC's position that Corteva waived its argument by omitting it in an earlier motion to dismiss. Rule 12(g)(1) applies to joinder of motions and is thus inapplicable here. In any event, the Federal Rules do not otherwise support the FTC's position. Rule 12(h)(1) provides that a party waives any defense available under Rules 12(b)(2) through (5) if the defense was available to the party at the time of an earlier motion. Fed. R. Civ. P. 12(h)(1) (providing for waiver through omission as described in Rule 12(g)(2)[11]). Notably, these include motions to challenge personal jurisdiction, venue, and service of process, not a motion to dismiss for failure to state a claim upon which relief can be granted (Rule 12(b)(6)) or lack of subject matter jurisdiction (Rule 12(b)(1)). Fed. R. Civ. P. 12(h)(1) and (3). In fact, the 1966 Advisory Committee note to Rule 12(h) states that, "while the defenses specified in subdivision (h)(1) are subject to waiver as there provided, the more substantial defense[ ] of failure to state a claim upon which relief can be granted ... [is] expressly preserved against waiver by amended subdivision (h)(2) and (3)." Fed. R. Civ. P. 12(h) advisory comm. note (1966 amend.) (emphasis added).

**\*26** Similarly, the FTC's citation to Rowley v. McMillan, 502 F.2d 1326 (4th Cir. 1974) is misguided. In Rowley, the court interpreted Rule 12(g) to mean that "an amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading." Id. at 1333. Despite this broad language covering "defenses," the issue before the court was a waiver of a personal jurisdiction defense pursuant to Rule 12(b)(2), which is covered by Rule 12(h)(1)'s strict waiver rules. Id. at 1333. Cases that approvingly cite Rowley deal similarly with the 12(b)(2) through (5) defenses that Rule 12(h) (1) covers. See, e.g., Hand Held Prods., Inc. v. Code Corp., 265 F. Supp. 3d 640, 643 (D.S.C. 2017) (challenging venue); Maxtena, Inc. v. Marks, Civ. No. 11-0945, 2012 WL 113386 (D. Md. Jan. 12, 2012) (same); Lederman v. United States, 131 F. Supp. 2d 46, 58 (D.D.C. 2001) (challenging service of process). Moreover, Rule 12(h)(2) clearly authorizes Corteva to raise this same constitutional argument in its answer, so "little would be gained by preventing a defense under Rule[ ] 12(b)(6)." Wright and Miller, Fed. Prac. & Proc. § 1388 (2023) ("[E]arly determination of [12(b) (6) arguments] is to be encouraged."). While Corteva argues that its constitutional challenge is akin to non-waivable subject matter jurisdiction, such an analogy is both unnecessary to save its argument and appears to be an improper characterization in any event. See Holloway v. Pagan River Dockside Seafood Inc., 669 F.3d 448, 453 (4th Cir. 2012) ("If a plaintiff invoking § 1331 pleads a colorable claim 'arising under' the Constitution or laws of the United States, he invokes federal subject matter jurisdiction, and deficiencies of the claim should be addressed by the other mechanisms provided by the federal rules." (internal quotation marks and citations omitted)). This is a long way of explaining that the court must turn to the merits of Corteva's constitutional challenge.

The power to enforce the law is vested in the President of the United States. U.S. Const. art. II, § 1. "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." Seila Law, 140 S. Ct. at 2191. "[A]s a general matter," the Constitution gives the President the power to remove subordinate officers so that the President can be held "fully accountable for discharging his own responsibilities." Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 514 (2010).

There are "only two exceptions" to the President's otherwise unrestricted removal power. Seila Law, 140 S. Ct. at 2192. First, Congress may create "expert agencies led by a group of principal officers removable by the President only for good cause." Id. (citing Humphrey's Executor, 295 U.S. 602) (emphasis in original). Second, Congress may provide "tenure protections to certain inferior officers with narrowly defined duties." Id. (citing United States v. Perkins, 116 U.S. 483 (1886); Morrison v. Olson, 487 U.S. 654 (1988)) (emphasis in original). The parties agree that this case implicates only the first exception. (Doc. 95 at 31; Doc. 150 at 61.)

Under the FTC Act, commissioners are removable only for "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41. Five members sit on the Commission and are appointed by the President and confirmed by the U.S. Senate. Id. The FTC Act includes a "separability clause" that states that the other provisions of the FTC Act "shall not be affected" by a court's holding that finds any provision invalid. 15 U.S.C. § 57.

The constitutionality of the FTC commissioner's for-cause protection was first addressed in Humphrey's Executor, 295 U.S. 602 (1935). In 1933, President Franklin Delano Roosevelt sought the removal of Commissioner William E. Humphrey, who was appointed by President Herbert Hoover. Id. at 618. After Humphrey rebuffed his resignation request, President Roosevelt wrote him: "Effective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." Id. at 619. Reviewing the constitutionality of the President's action, the Supreme Court observed that the FTC is "charged with the enforcement of no policy except the policy of the law," adding that "[i]ts duties are neither political nor executive, but predominantly quasi judicial and quasi legislative." Id. at 624. The court reasoned that the authority of Congress to create quasi legislative or quasi judicial agencies "cannot well be doubted" and includes the power to "forbid their removal except for cause." Id. at 629. In supporting Congress' authority to restrict removal, the Court observed that its holding would not offend the separation of powers because the FTC was created by Congress "as a means of carrying into operation legislative and judicial powers" and was "wholly disconnected from the executive department." Id. at 630.

*27 The Supreme Court has since questioned the holding of Humphrey's Executor. See, e.g., Seila Law, 140 S. Ct. at 2198 n.2 ("The Court's conclusion [in Humphrey's Executor] that the FTC did not exercise executive power has not withstood the test of time."); Morrison, 487 U.S. at 690 n.28 ("[I]t is hard to dispute that the powers of the FTC at the time of Humphrey's Executor would at the present time be considered 'executive,' at least to some degree."). Nevertheless, the Court has declined to overrule this "entrenched Supreme Court precedent, protected by stare decisis." In re Aiken Cnty., 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring); see also Collins v. Yellen, 141 S. Ct. 1761, 1786-87 (2021) (citing Humphrey's Executor as a counter-analogy and striking down removal restriction as violation of separation of powers).

Congress added the FTC's authority to file suit under section 13(b) in 1973 — decades after the Court decided Humphrey's Executor in 1935. See Pub. L. No. 93-153, § 408, 87 Stat. 592 (1973). While Corteva is correct that the FTC's authority under section 13(b) is executive in nature, that is about where the merit of its constitutional challenge ends. First, Corteva effectively asks this court to overrule Supreme Court precedent. But the role of a lower court is clear: "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237 (1997) (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 485 (1989)). Humphrey's Executor directly addresses whether Congress may restrict the removal power of FTC commissioners, so the court could stop its analysis here. [12]

Second, even were the court to accept Corteva's position that the FTC commissioners must be removable, Corteva's requested relief — dismissal of the suit — would be inappropriate. Corteva contends that the FTC cannot "both enjoy its removal protections as upheld in Humphrey's Executor and exercise the 'quintessentially executive' powers granted to it by Congress in 1973." (Doc. 95 at 32 (citing Seila Law, 140 S. Ct. at 2200).) But no case cited by Corteva suggests that the appropriate remedy would be

to excise the FTC's executive power. To the contrary, the Supreme Court's cases on removal suggest the exact opposite. In Seila Law, the Court held the CFPB director must be removable, severed the provision restricting removal, and declined to strike down the Consumer Financial Protection Bureau's enforcement authority. 140 S. Ct. at 2199. In Free Enterprise Fund, the Court held that the removal restrictions of the Public Company Accounting Oversight Board violated the separation of powers, but it explicitly upheld the board's regulatory authority. 561 U.S. at 508-09. And in Collins, the Court struck down the removal protections for the Federal Housing Finance Agency director, but it nevertheless stated that "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office." 141 S. Ct. at 1788. Thus, even if Congress oversteps its authority to restrict the President's removal power, a principal officer may still "undertake the [ ] responsibilities of his office." Id. at 1788 n.23.

**\*28** In sum, Corteva's position that section 13(b) was void when enacted is unpersuasive, and even if it were not, dismissal would not be the proper remedy. As a result, Corteva's motion to dismiss based on its constitutional challenge will be denied.

### 5. State Law Claims

Defendants argue that all of the state Plaintiffs' claims should be dismissed. (Doc. 95 at 34; Doc. 100 at 43.) First, Defendants contend that each state's (except Tennessee's and Wisconsin's) antitrust laws are "harmonized — by statute or by common law — with the federal antitrust laws." (Doc. 95 at 34; Doc. 100 at 43.) Consequently, Defendants maintain that the state Plaintiffs' claims should be dismissed on the same grounds as the federal claims. (Doc. 95 at 34; Doc. 100 at 43.) With respect to Tennessee and Wisconsin, Corteva argues that the complaint fails to allege "substantial effects that were felt in each respective state." (Doc. 95 at 35.) Second, Corteva contends that Texas and Indiana cannot recover civil damages under state antitrust laws because those states are "prevent[ed] ... from bringing damages claims on behalf of end-consumers." (Doc. 95 at 34-35.) Third, Defendants argue that California, Indiana, and Iowa fail to adequately allege violations of their state unfair competition and consumer fraud laws. (Doc. 95 at 36; Doc. 100 at 43-44.)

In response, Plaintiffs first argue that state and federal laws are not "automatically harmonized, and vary from state to state." (Doc. 150 at 68.) As to Tennessee and Wisconsin, Plaintiffs contend, they have met the substantial effects burden, which they characterize as "low." (Doc. 150 at 71-72.) Second, Plaintiffs argue that Texas and Indiana are not seeking damages on behalf of "end-consumers," and, in any event, these states are not barred from recovering civil penalties. Third, Plaintiffs contend that the California unfair competition claim and Indiana and Iowa consumer protection claims are sufficiently pleaded.

As to the state antitrust laws that Defendants contend are harmonized with federal law, in light of the court's rulings on the federal antitrust claims, Defendants have not demonstrated that these claims should be dismissed. As to Tennessee and Wisconsin, Defendants' arguments similarly fail. Tennessee and Wisconsin courts require plaintiffs to allege that a defendant's anticompetitive conduct had a "substantial effect" on intrastate commerce." See Meyers v. Bayer AG, Bayer Corp., 735 N.W.2d 448, 461 (Wis. 2007) ("[A] complaint under the Wisconsin Antitrust Act ... is sufficient if it alleges [anticompetitive conduct] that substantially affected the people of Wisconsin and had impacts in [Wisconsin].");  Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 523 (Tenn. 2005) ("[C]ourts must decide whether the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree."). "The [substantial effects] test is pragmatic, turning on the particular facts of the case." Freeman Indus. 172 S.W.3d at 523. Under Wisconsin law, a plaintiff need not allege that the impact of the conduct is "distinguishable from or disproportionate to its impacts on other states." Meyers, 735 N.W.2d at 320. [13] Under Tennessee law, a plaintiff need not allege that the anticompetitive conduct "threaten[s] the demise of Tennessee business or affect[s] market price to substantially affect intrastate commerce," but a plaintiff must show more than a "bare allegation" of substantial effects. Freeman Indus., 172 S.W.3d at 524 (finding allegation insufficient where lone plaintiff with ties to Tennessee did not allege that he purchased goods from defendant).

**\*29** Corteva claims that these Plaintiffs did no more than recite each state's legal requirement regarding substantial effects. (Doc. 95 at 35-36.) But Tennessee's and Wisconsin's claims incorporated, by re-alleging, every preceding allegation in the complaint, Tennessee alleged

that Defendants sold the crop-protection products at issue to Tennessee businesses and individual customers, and Wisconsin alleged "substantial foreclosure of generic competitors" within the state and that "many hundreds of farmers" in the state have purchased crop-protection products at supracompetitive prices due to the loyalty programs. (Doc. 149 ¶¶ 253-54, 272, 274-75.) Accepting these facts as true, as the court must at this stage, Tennessee and Wisconsin plausibly allege substantial effects.

As to Texas's and Indiana's claims, Corteva argues that the indirect purchaser rule bars Texas and Indiana from recovering on behalf of end-consumers. The indirect purchaser rule restricts indirect purchasers from recovering compensatory damages, except in limited circumstances not relevant here. See Dickson v. Microsoft Corp., 309 F.3d 193, 214 (4th Cir. 2002) (citing Illinois Brick Co. v. Illinois, 431 U.S. 720, 730-33 (1977)). However, Defendants have not demonstrated that Illinois Brick extends to a state seeking civil penalties. See, e.g., Fed. Trade Comm'n v. Mylan Lab'ys, Inc., 62 F. Supp. 2d 25, 46 (D.D.C. 1999) (dismissing state claims for actual damages under Illinois Brick but maintaining claims for civil penalties); Apple Inc. v. Pepper, 139 S. Ct. 1514, 1520 n.1 ("Illinois Brick held that the direct-purchaser requirement applies to claims for damages." (emphasis added)). Additionally, the cases that Corteva cites to support Texas's and Indiana's prohibitions on parens patriae suits do not support extending Illinois Brick to those state's civil penalties provisions. See Berghausen v. Microsoft Corp., 765 N.E.2d 592, 596 (Ind. Ct. App. 2002) (acknowledging application of Illinois Brick to Indiana antitrust law but not discussing civil penalties or suits brought by the state); Abbott Lab'ys, Inc. v. Segura, 907 S.W.2d 503, 503-04 (Tex. 1995) (barring parens patriae suit under state DTPA to recover damages, but not civil penalties, on behalf of consumers). Moreover, while all Plaintiffs identify harm to end-consumers, (Doc. 149 ¶ 166), the claims for civil penalties are not damages compensation for consumers. (Doc. 149 ¶¶ 228, 264.) Accordingly, on this record Texas's and Indiana's requests for civil penalties survive the motion to dismiss.

As to California's unfair competition claim, Corteva argues that because Plaintiffs' antitrust claim should fail, so should the California unfair competition claim. The California Unfair Competition Law covers conduct that "violates the policy or spirit" of the antitrust laws "or otherwise significantly threatens or harms competition." Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180-87 (1999). Because California re-alleged and incorporated by reference all allegations in the complaint, (Doc. 149 ¶ 212), the court will deny the motion to dismiss on the same bases that it has denied Defendants' motions with respect to the federal antitrust claims.

As to Indiana's consumer protection claim, Defendants argue that Indiana did not specify an "incurable deceptive act" which, in Corteva's view, must be alleged with particularity "as part of a scheme, artifice, or device with intent to defraud or mislead." (Doc. 95 at 36 (citing Fed. R. Civ. P. 9(b); Thunander v. Uponor, Inc., 887 F. Supp. 2d 850, 873 (D. Minn. 2012); Ind. Code § 24-5-0.5-2(a)(8)).) Syngenta also argues that the theory of wrongdoing is not illegal for the same reasons it offered to dismiss the federal antitrust claims, which the court has now rejected at this stage. (Doc. 100 at 43.) Indiana responds that reliance on Thunander is improper because the case predates an amendment to Indiana's consumer protection law that expanded the scope of the statute covering "deceptive" acts to also preclude "unfair" acts. (Doc. 150 at 70.) In Indiana's view, this amendment likens its law to the California unfair competition law. (Id.) Lastly, Indiana maintains that it does not need to show an "incurable deceptive act" because only private plaintiffs are subject to this requirement, not the state attorney general. (Id.)

**\*30** In 2014, Indiana amended its consumer protection statute to prohibit "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." 2014 Ind. Acts 736, Ind. P.L. 65-2014, § 7 (codified as amended at Ind. Code § 24-5-0.5-3(a)). Under section 4(a), "a person" may file suit to recover damages for an "uncured or incurable deceptive act." Ind. Code § 24-5-0.5-4(a). An "incurable deceptive act" is one that is "done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(a)(8). Under sections 4(c) and (g), the state attorney general may file suit for an injunction and civil penalties against "a deceptive act." Ind. Code § 24-5-0.5-4(c), 4(g).

First, Corteva has not provided any authority to support the contention that "unfair" or "abusive" should be read more narrowly than under the FTC Act, so the court will not read it so at this time. Second, it appears that Indiana

is correct that section 4(c), which grants authority to the state attorney general to enjoin "a deceptive act," does not impose a requirement to show that the deceptive act is "uncured" or "incurable." By contrast, the private party provision does. Compare ⚑ Ind. Code. § 24-5-0.5-4 (a) ("A person relying upon an uncured or incurable deceptive act may bring an action ....." (emphasis added)), with ⚑ id. § 24-5-0.5-4(c) ("The attorney general may bring an action to enjoin a deceptive act ...." (emphasis added)). If this additional requirement were read into section 4(c), the claim would apparently sound in fraud and require pleading with particularity. See ⚑ Ind. Code § 24-5-0.5-2(a)(8) ("act done ... with intent to defraud or mislead."); ⚑ Fed. R. Civ. P. 9(b). While it appears that Indiana has the better of the argument, this question of statutory interpretation is inadequately briefed to facilitate a definitive resolution at this stage, so the court will simply hold that Defendants have not demonstrated for the purposes of this motion that Indiana has not stated a claim for relief.

Finally, as to Iowa's consumer protection claim, Corteva argues that Iowa did not allege a "misrepresentation of material fact." (Doc. 95 at 37 (citing Cota v. Ralph Lauren Corp., No. 21-C-1089, 2022 WL 1597631, at *3 (E.D. Wis. May 19, 2022).) Syngenta agrees and adds that Iowa also did not allege an "unfair practic[e]." (Doc. 100 at 44 (citing ⚑ Iowa Code § 714.16.) Iowa argues that the Iowa consumer protection law covers both deceptive and unfair practices, and that Iowa has alleged an unfair practice. (Doc. 150 at 70-71.)

The Iowa Consumer Fraud Act, ⚑ Iowa Code § 714.16, makes it unlawful for a person to "act, use or employ[ ]" an "unfair practice." ⚑ Iowa Code § 714.16(2)(a). For the same reasons stated above, Defendants have not demonstrated that the court should read "unfair" any more narrowly than under the FTC Act. As a result, Defendants' motion to dismiss the Iowa consumer protection claim will be denied.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendants' motions to dismiss (Docs. 94, 99) are DENIED.

**All Citations**

Slip Copy, 2024 WL 149552

---

### Footnotes

1    Limited portions of the complaint and briefs remain under seal. (See Doc. 148 (granting parties' motions to seal).) Citations are to the unsealed versions, except where the court references sealed and redacted material. While the court preliminarily granted motions to seal portions of the complaint in this case, the court discloses here those portions of the pleadings necessary for a full understanding of the allegations and legal issues raised. ⚑ Courthouse News Serv. v. Schaefer, 2 F.4th 318, 327 (4th Cir. 2021) ("[A]ccess to [allegations in] complaints ... is crucial to 'not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary.' " (quoting ⚑ Doe v. Pub. Citizen, 749 F.3d 246, 266 (4th Cir. 2014)); ⚑ Doe, 749 F.3d at 271 ("When parties call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials." (internal quotation marks omitted)).

2    To the extent the complaint includes allegations involving Corteva's predecessor corporations, the court will simply refer to all such entities as "Corteva."

3  Syngenta produces "s-metolachlor," which was phased in by 2001 over the original metolachlor. (Doc. 149 ¶ 114.) However, Syngenta allegedly includes sales of generic original metolachlor in the denominator of its calculation of a distributor's loyalty figure. (Id. ¶ 115.)

4  Acetochlor is manufactured by a joint venture of Corteva and Bayer. (Doc. 149 ¶ 142.) Corteva apparently treats the sale or purchase of Bayer acetochlor as it would a sale or purchase of Corteva acetochlor. (Doc. 81 ¶ 146.)

5  Separate similar actions brought by farmers have been consolidated by the United States Judicial Panel on Multidistrict Litigation and transferred to this court for pretrial proceedings. (See Doc. 78 in I:23-md-3062 (amended consolidated complaint); In re Crop Protection Prods. Loyalty Program Antitrust Litig., 655 F. Supp. 3d 1380 (J.P.M.L. 2023).)

6  Specifically, the state law claims arise under California's Cartwright Act, California Business and Professions Code § 16700 et seq., and California's Unfair Competition Law, ⚑California Business and Professions Code § 17200 et seq.; the Colorado Antitrust Act, C.R.S. § 6-4-104 and C.R.S. § 6-4-105; Section 7 of the Illinois Antitrust Act, ⚑740 ILCS 10/1 et seq.; the Indiana Deceptive Consumer Sales Act, ⚑Ind. Code § 24-5-0.5-1 et seq. and the Indiana Antitrust Act, Ind. Code § 24-1-2-1; the Iowa Competition Law, Iowa Code Chapter 553, and the Iowa Consumer Fraud Act, ⚑Iowa Code § 714.16; the Minnesota Antitrust Law of 1971, Minnesota Statutes Sections 325D.49-.66; the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1602 et seq., and Neb. Rev. Stat. § 84-212; the Oregon Antitrust Law, Oregon Revised Statutes 646.705 to 646.836; the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.; Sections 15.20(a) and 15.20(b) of the Texas Business and Commerce Code and Section 402.006 of the Texas Government Code; the Washington Consumer Protection Act, ⚑RCW 19.86.030 et seq.; and the Wisconsin Antitrust Act, Wis. Stat. Ch. § 133.03 et seq.

7  The ZF Meritor court indicated that the price-cost test is a "specific application of the rule of reason" when applied in the context of exclusive dealing. ⚑ZF Meritor, 696 F.3d at 273; see also In re EpiPen (Epinephrine Injection, USP) Antitrust Litig., 44 F.4th 959, 983 n.7 (10th Cir. 2022) (quoting ZF Meritor's "specific application" language and referring to the Tampa Electric analysis as the "full rule of reason analysis"); UniStrip Techs., LLC v. LifeScan, Inc., 153 F. Supp. 3d 728, 736 (determining whether to apply the " 'price cost test' or the 'rule of reason' "); In re Surescripts Antitrust Litig., ⚑608 F. Supp. 2d 629, 636 (N.D. Ill. 2022) (describing the "apt test" as the "rule of reason," as opposed to the "price-cost test"); cf. ⚑Atl. Richfield, 495 U.S. at 342 ("Per se and rule-of-reason analysis are but two methods of determining whether a restraint is "unreasonable," i.e., whether its anticompetitive effects outweigh its procompetitive effects.").

8  In dissent, Judge Greenberg disagreed with the majority's view that the agreements were exclusive dealing and instead would have applied the price-cost test. ⚑ZF Meritor, 696 F.3d at 349 (Greenberg, J., dissenting). He principally disagreed with the majority's characterization of Eaton's conduct as coercive, as he viewed the agreements as neither exclusive nor mandatory and contended that there was no evidence "that Eaton would have refused to supply transmissions to the [manufacturers]" if they failed to meet the market share targets. ⚑Id. at 312. Moreover, Judge Greenberg took the position that the price-cost test should apply in a situation such as this because the agreements themselves — with or without non-price features — would not exist "without the reduced prices that Eaton offered" as an incentive to enter the agreement in the first place. ⚑Id. at 321.

9      Corteva argues that this litigation was filed well over four years after the loyalty programs were allegedly put in place, outside the four-year statute of limitations provided for in the Sherman Act and Clayton Act. (Doc. 95 at 29-30.) In its briefing on its motion to dismiss the original complaint, Corteva argued that those claims therefore "long ago expired." (Doc. 70 at 23-24.) Though Corteva does not claim that now, and while Plaintiffs responded to Corteva's suggestion by noting, among other bases, the continuing violation doctrine, (Doc. 150 at 67-68), the court concludes that the issue is not fairly raised in Corteva's brief and therefore does not consider it.

10     Plaintiff FTC argues that its section 5 claim is a "standalone" claim. (Doc. 150 at 45.) In particular, the FTC argues that the price-cost test should not apply to its section 5 claim, regardless of how the court rules on the Sherman Act and Clayton Act claims. (Id. at 47.) Because Plaintiffs plausibly allege violations of the Sherman Act and Clayton Act, the court will deny Defendants' motion to dismiss Plaintiff FTC's section 5 claim for the same reasons as for the Sherman Act and Clayton Act claims. Therefore, whether or not the court may find it necessary to parse distinctions between the statutes at a later stage in this action, it need not do so now.

11     Rule 12(g) (2) provides:

       Except as provided in Rule 12(h) (2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

12     Even so, there is hardly a consensus, as Corteva contends, that Humphrey's Executor is wrong in light of the FTC's greater scope of authority since the case was decided. See, e.g., Seila Law, 140 S. Ct. at 2198 ("Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.' " (quoting Humphrey's Executor, 295 U.S. at 628)); id. at 2200 n.4 ("Perhaps the FTC possessed broader rulemaking, enforcement, and adjudicatory powers than the Humphrey's Court appreciated. Perhaps not. Either way, what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court."); id. at 2239 n. 10 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part) (describing the FTC's authority in 1935 as including the power to "run investigations, bring administrative charges, and conduct adjudications"). Simply put, this court is not at liberty to "read the tea leaves" of the Supreme Court with respect to settled precedent. Stewart v. Justice, 518 F. Supp. 3d 911, 917 (S.D.W. Va. 2021).

13     While the Meyers court announced this rule in light of its self-described "liberal pleadings standard," Meyers, 735 N.W.3d at 320, Defendants have not provided any authority to suggest that a different result should obtain under the federal rules.

---

                     © 2024 Thomson Reuters. No claim to original U.S. Government Works.

   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2646741
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

WALMART INC., Defendant.

No. 22 CV 3372

|

Signed March 27, 2023

**Synopsis**
**Background:** Federal Trade Commission (FTC) filed
enforcement action suit against money transfer services
provider, claiming violation of FTC Act and Telemarketing
Sales Rule (TSR) by allegedly knowingly processing
fraudulent money transfers to and from consumers conned
by telemarketers, sellers, and con artists, and by failing to
implement and maintain effective policies to prevent fraud
and money laundering, properly train and oversee employees,
warn consumers, or address suspicious transactions. Provider
moved to dismiss for failure to state claim.

**Holdings:** The District Court, Manish S. Shah, J., held that:

[1] underlying TSR violation was not plausibly alleged for
accessory liability claim;

[2] knowledge was not plausibly alleged for TSR accessory
liability claim;

[3] substantial assistance was not plausibly alleged for TSR
accessory liability claim;

[4] violation of FTC Act by unfair acts or practices was
plausibly alleged;

[5] ongoing or imminent misconduct under FTC Act was
plausibly alleged;

[6] FTC Act was not unconstitutionally vague as applied to
provider; and

[7] Commissioners of FTC were constitutionally appointed
and authorized to bring suit.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to
State a Claim.

West Headnotes (43)

**[1]** **Federal Civil Procedure** 🔑 **Fraud, mistake
and condition of mind**

Under the heightened pleading rule for claims
sounding in fraud, plaintiff must describe the
who, what, when, where, and how of the fraud.

🔖 Fed. R. Civ. P. 9(b).

**[2]** **Federal Civil Procedure** 🔑 **Construction and
operation**

A consent order can never bind, either explicitly
by applying through its terms to the agents of a
signatory or through the operation of contracts
law, a non-party to the consent order.

**[3]** **Antitrust and Trade
Regulation** 🔑 **Telecommunications;
telemarketing**

To state a claim for assisting and facilitating
under the Telemarketing Sales Rule (TSR), the
Federal Trade Commission (FTC) must allege an
underlying violation of the rule by a seller or
telemarketer. 16 C.F.R. §§ 310.3(a)(4), 310.3(b).

**[4]** **Antitrust and Trade
Regulation** 🔑 **Particular cases**

Federal Trade Commission's (FTC) allegations
of breadth of alleged misconduct by fraudsters
using provider's money transfer services did
not plausibly allege claim against provider for
underlying violation of Telemarketing Sales
Rule (TSR) by telemarketer or seller, as
would be required to state claim for assisting
and facilitating under TSR's accessory liability
provision, since FTC alleged that provider
knowingly processed fraudulent money transfers

to and from consumers on behalf of criminal fraud rings that perpetrated telemarketing scams, but FTC did not plausibly allege that fraud fit TSR's definitions of seller, telemarketer, and telemarketing and did not allege with particularity details of alleged fraudulent scams.

📁 Fed. R. Civ. P. 9(b); 16 C.F.R. §§ 310.2(dd), 310.2(ff), 310.2(gg), 310.3(a)(4), 310.3(b).

**[5]** **Antitrust and Trade Regulation** 👉 Telecommunications; telemarketing

**Antitrust and Trade Regulation** 👉 Persons liable

Knowledge required to support an accessory liability claim, under the Telemarketing Sales Rule (TSR), prohibiting giving substantial assistance to a seller or telemarketer when someone knows or consciously avoids knowing about an underlying TSR violation by a telemarketer or seller, can be inferred from a combination of suspicion and indifference to the truth. 16 C.F.R. § 310.3(b).

**[6]** **Antitrust and Trade Regulation** 👉 Particular cases

Federal Trade Commission (FTC) did not plausibly allege that money transfer services provider had knowledge or consciously avoided knowing that subset of its business involved violations of Telemarketing Sales Rule (TSR) by fraudulent telemarketing schemes transferring money to and from consumers, as would be required to state claim against provider for assisting and facilitating violation under TSR's accessory liability provision, since FTC did not allege with particularity that any alleged fraud fell within prohibitions of TSR and only alleged that provider processed tens of millions of money transfers each year about which hundreds of thousands of complaints were filed, but not how many transactions could have raised red flags so that provider would have had reason for suspicion. 16 C.F.R. § 310.3(b).

**[7]** **Antitrust and Trade Regulation** 👉 Persons liable

Under the Telemarketing Sales Rule's (TSR) accessory liability provision, substantial assistance requires more than casual or incidental help to a telemarketer; there must be some link between the third party's actions and the telemarketer's actions, but not necessarily a direct connection. 16 C.F.R. § 310.3(b).

**[8]** **Antitrust and Trade Regulation** 👉 Persons liable

Aiding and abetting principles, as seen in tort and securities case law, are relevant in understanding substantial assistance under the Telemarketing Sales Rule's (TSR) accessory liability provision. 16 C.F.R. § 310.3(b).

**[9]** **Antitrust and Trade Regulation** 👉 Persons liable

Processing routine transactions is not "substantial assistance," within the meaning of Telemarketing Sales Rule's (TSR), accessory liability provision, which prohibits giving substantial assistance to a seller or telemarketer when someone knows or consciously avoids knowing about an underlying TSR violation. 16 C.F.R. § 310.3(b).

**[10]** **Antitrust and Trade Regulation** 👉 Persons liable

If a defendant knows enough about the underlying fraud, an ordinary transaction becomes extraordinary, and processing it can constitute "substantial assistance," within the meaning of Telemarketing Sales Rule's (TSR) accessory liability provision, which prohibits giving substantial assistance to a seller or telemarketer when someone knows or consciously avoids knowing about an underlying TSR violation. 16 C.F.R. § 310.3(b).

[11]   **Antitrust and Trade Regulation** 🔑 **Particular cases**

Federal Trade Commission (FTC) failed to plausibly allege that money transfer services provider gave substantial assistance to telemarketers in violating Telemarketing Sales Rule (TSR) by fraudulent telemarketing schemes transferring money to and from consumers, as would be required to state claim against provider for assisting and facilitating violation under TSR's accessory liability provision, since FTC's allegations were not sufficiently particularized to connect provider's general awareness of red flags and fraud with its specific knowledge about vast majority of money transfers, such that processing those transfers became something other than merely routine. 🚩 Fed. R. Civ. P. 9(b); 16 C.F.R. § 310.3(b).

[12]   **Action** 🔑 **Statutory rights of action**

**Antitrust and Trade Regulation** 🔑 **Private entities or individuals**

There is no private right of action under Federal Trade Commission Act's unfair acts or practices provision. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. § 45(a)(1).

[13]   **Antitrust and Trade Regulation** 🔑 **Powers, functions, jurisdiction, and authority**

After the Federal Trade Commission (FTC) has brought suit in federal court, it is the court, not the agency, that decides whether a practice is unfair in violation of the FTC Act; but an unfair practice only arrives in federal court if the agency brings suit. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. § 45(a)(1).

[14]   **Antitrust and Trade Regulation** 🔑 **Powers, functions, jurisdiction, and authority**

Given the Federal Trade Commission's (FTC) unique power to enforce the FTC Act's unfair acts or practices provision, Congress did not authorize the FTC to declare an act unfair

under the later-codified flexible cost-benefit approach that was not also unfair under the FTC Act's earlier provision itself. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a) (1), 🚩 45(n).

1 Case that cites this headnote

[15]   **Antitrust and Trade Regulation** 🔑 **In general; unfairness**

Public policy considerations can be relevant to an unfairness finding, but offending public policy is not necessary to violate Federal Trade Commission Act's unfair acts or practices provision. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a)(1), 🚩 45(n).

[16]   **Antitrust and Trade Regulation** 🔑 **In general; unfairness**

Under the Federal Trade Commission Act's unfair acts or practices provision, limiting public policy to a relevant, but not sole or primary ground for an unfairness determination does not leave defendants or courts at sea in uncharted waters; unfairness tied to substantial consumer injury is a knowable, judicially administrable concept. Federal Trade Commission Act § 5, 🚩 15 U.S.C.A. §§ 45(a)(1), 🚩 45(n).

[17]   **Statutes** 🔑 **Defined terms; definitional provisions**

Congress may define terms outside their usual meanings in statutes.

[18]   **Antitrust and Trade Regulation** 🔑 **In general; unfairness**

Under the Federal Trade Commission Act, an act or practice is "unfair" when it (1) causes or is likely to cause, (2) substantial injury to consumers, (3) which is not reasonably avoidable by consumers themselves, and (4) not outweighed by countervailing benefits to consumers or to competition. Federal Trade

Commission Act § 5, 🚩15 U.S.C.A. §§ 45(a)(1), 🚩45(n).

1 Case that cites this headnote

**[19]** **Antitrust and Trade Regulation** 🔑 Source of prohibition or obligation; lawfulness

**Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

Under the Federal Trade Commission Act's unfair acts or practices provision, public policy can inform the kind or degree of injury at issue, namely, an expression of the types of harms or burdens that ought not to be borne by consumers, or public policy can express some of the costs or benefits of an act or practice; but the Act's focus remains on whether a practice causes substantial injury to consumers. Federal Trade Commission Act § 5, 🚩15 U.S.C.A. §§ 45(a)(1), 🚩45(n).

**[20]** **Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

If consumers had a free and informed choice in the matter, their injury is reasonably avoidable, and thus does not violate the Federal Trade Commission Act's unfair acts or practices provision. Federal Trade Commission Act § 5, 🚩15 U.S.C.A. §§ 45(a)(1), 🚩45(n).

**[21]** **Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

Consumers may act to avoid injury before it occurs, and thus, the injury does not violate the Federal Trade Commission Act's unfair acts or practices provision, if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end. Federal Trade Commission Act § 5, 🚩15 U.S.C.A. §§ 45(a)(1), 🚩45(n).

**[22]** **Antitrust and Trade Regulation** 🔑 Reliance; causation; injury, loss, or damage

The requirement that a substantial injury not be reasonably avoidable in order to constitute a violation of the Federal Trade Commission Act's unfair acts or practices provision preserves the default rule that consumer choice governs the market; but when someone unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decision-making, an injury is not reasonably avoidable. Federal Trade Commission Act § 5, 🚩15 U.S.C.A. §§ 45(a)(1), 🚩45(n).

**[23]** **Antitrust and Trade Regulation** 🔑 Particular cases

Federal Trade Commission (FTC) plausibly alleged that consumers' injury from inadequacies in money transfer services provider's fraud prevention program was not reasonably avoidable, as required to state claim against provider for violating FTC Act's unfair acts or practices provision; FTC alleged that consumers complained of $200 million lost from fraudulent money transfers processed by provider, that provider failed to establish or follow effective anti-fraud program, train or adequately supervise employees, adequately monitor suspicious activity, or adequately report fraud, that consumers did not know money transfers were riskier than other payments, that provider insufficiently warned of fraud, and that recovery of transferred funds and tracing fraudsters was difficult. Federal Trade Commission Act § 5, 🚩15 U.S.C.A. §§ 45(a)(1), 🚩45(n).

**[24]** **Injunction** 🔑 Injury to or restraint of trade or business in general

Under the Federal Trade Commission Act's provision authorizing permanent injunctive

relief, the requirement that a defendant "is violating" or "is about to violate" the law mirrors the common law requirement that a plaintiff seeking injunctive relief show that it will suffer irreparable harm if a preliminary injunction is denied; a showing that illegal conduct is likely to recur is the same as showing that someone "is violating" or "is about to violate" the law. Federal Trade Commission Act § 13, 🚩15 U.S.C.A. § 53(b).

**[25]**    **Injunction** 👈 Trade or Business

The Federal Trade Commission Act's provision authorizing permanent injunctive relief focuses upon relief that is prospective, not retrospective; yet the power to grant injunctive relief survives the discontinuance of the illegal conduct. Federal Trade Commission Act § 13, 🚩15 U.S.C.A. § 53(b).

**[26]**    **Injunction** 👈 Injury to or restraint of trade or business in general

Under the Federal Trade Commission Act's provision authorizing permanent injunctive relief, to show that injunctive relief is needed when a violation has ceased, a party must demonstrate some cognizable danger of recurrent violation, and the court should consider all of the circumstances, including the bona fides of the expressed intent to comply, the effectiveness of discontinuance, and, in some cases, the character of the past violations. Federal Trade Commission Act § 13, 🚩15 U.S.C.A. § 53(b).

**[27]**    **Injunction** 👈 Financial institutions, transactions, and services

Federal Trade Commission (FTC) plausibly alleged that money transfer services provider was violating or was about to violate FTC Act's unfair acts or practices provision, as required for FTC to request permanent injunction to remedy ongoing or imminent unfair practices due to consumers' injury, that was not reasonably avoidable, from inadequacies in provider's fraud prevention program; FTC plausibly alleged some likelihood that provider's unlawful conduct would recur in that it repeatedly failed to train employees or institute robust fraud prevention systems, despite waves of consumer complaints, repeated audits by money transfer providers that reported deficiencies, and receipt of consent orders requiring more prevention. Federal Trade Commission Act §§ 5, 13, 🚩15 U.S.C.A. §§ 45(a)(1), 🚩45(n), 🚩53(b).

**[28]**    **Constitutional Law** 👈 Certainty and definiteness; vagueness

Under the Due Process Clause of the Fifth Amendment, laws which regulate persons or entities must give fair notice of conduct that is forbidden or required. U.S. Const. Amend. 5.

**[29]**    **Constitutional Law** 👈 Certainty and definiteness; vagueness

Due process does not mean perfect clarity and precise guidance; but a statute is impermissibly vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement. U.S. Const. Amend. 5.

**[30]**    **Constitutional Law** 👈 Certainty and definiteness; vagueness

A statute can be unconstitutionally vague under the Due Process Clause either facially, in the abstract, or as-applied, meaning in light of the facts of the particular case. U.S. Const. Amend. 5.

**[31]**    **Constitutional Law** 👈 Invalidity as applied

Generally, the constitutionality of a statute is determined as applied to a litigant.

**[32]**   **Constitutional Law**   Certainty and definiteness; vagueness

The degree of vagueness that the Due Process Clause tolerates, as well as the relative importance of fair notice and fair enforcement, depends in part on the nature of the enactment. U.S. Const. Amend. 5.

**[33]**   **Constitutional Law**   Vagueness

In determining whether a statute is unconstitutionally vague under the Due Process Clause, criminal statutes must be clearer than laws that carry only civil penalties, and laws must be clearest when constitutional rights are at stake. U.S. Const. Amend. 5.

**[34]**   **Constitutional Law**   Certainty and definiteness; vagueness

**Courts**   Previous Decisions as Controlling or as Precedents

In deciding whether a statute is vague in violation of the Due Process Clause, courts look to the words of the law itself, the interpretations of other courts, and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it. U.S. Const. Amend. 5.

**[35]**   **Antitrust and Trade Regulation**   In general; unfairness

**Constitutional Law**   Antitrust regulation in general

In deciding whether a statute is vague in violation of the Due Process Clause, the Federal Trade Commission Act's unfair acts or practices provision does not implicate any constitutional rights, regulates economic behavior, and is a civil statute, not a criminal one; that means a defendant accused of violating that provision is entitled to the lowest level of notice under the Due Process Clause. U.S. Const. Amend. 5; Federal Trade Commission Act § 5, 15 U.S.C.A. § 45.

**[36]**   **Antitrust and Trade Regulation**   In general; unfairness

The Federal Trade Commission Act's unfair acts or practices provision sets up a cost-benefit analysis in which regulated parties must compare a substantial injury that they have caused to consumers with countervailing benefits to consumers or to competition, while also considering whether injuries were reasonably avoidable. Federal Trade Commission Act § 5, 15 U.S.C.A. § 45(n).

**[37]**   **Constitutional Law**   Certainty and definiteness; vagueness

In deciding whether a statute is vague in violation of the Due Process Clause, flexible laws often require people to correctly judge how a standard applies to their conduct, and such flexible laws may still comply with due process requirements. U.S. Const. Amend. 5.

**[38]**   **Antitrust and Trade Regulation**   Validity

**Constitutional Law**   Antitrust regulation in general

Federal Trade Commission Act's unfair acts or practices provision, setting up cost-benefit analysis in which regulated parties were required to compare substantial injury that they had caused to consumers with countervailing benefits to consumers or to competition, while also considering whether injuries were reasonably avoidable, was not unconstitutionally vague in violation of Due Process Clause, as applied to money transfer services provider that allegedly committed unfair practices due to consumers' injury, that was not reasonable avoidable, from inadequacies in provider's fraud prevention program; provider had fair notice that lax fraud prevention injuring consumers was forbidden, but provider failed to take basic steps to prevent fraud despite knowing of enormous consumer losses. U.S. Const. Amend. 5; Federal Trade Commission Act § 5, 15 U.S.C.A. § 45(n).

[39]   **Antitrust and Trade Regulation**  👉  Officers and Employees

**Public Employment**  👉  Authority to impose adverse action; manner and mode of imposition

Under the Federal Trade Commission Act, the Commissioners' for-cause protections from removal stand in contrast to the general rule that the President may remove most executive officials from office for any reason. U.S. Const. art. 2, §§ 1, 3; Federal Trade Commission Act § 1, 🚩 15 U.S.C.A. § 41.

[40]   **Antitrust and Trade Regulation**  👉  Powers, functions, jurisdiction, and authority

Federal Trade Commission (FTC) was authorized to bring suit seeking permanent injunctive relief without agency adjudication and civil penalties against money transfer services provider that allegedly committed unfair practices in violation of FTC Act due to consumers' injury, that was not reasonably avoidable, from inadequacies in provider's fraud prevention program, even though FTC Act contained potentially unconstitutional limit on President's authority to remove Commissioners, since Commissioners were constitutionally appointed in that Act's grant of executive power to FTC in order to sue for penalties or injunctive relief was not unconstitutional standing on its own. U.S. Const. art. 2, § 2, cl. 2; Federal Trade Commission Act §§ 1, 5, 17, 🚩 15 U.S.C.A. §§ 41, 🚩 45(n), 57.

[41]   **Statutes**  👉  Trade or business

The Federal Trade Commission Act includes a severability clause, which means Congress did not want it to rise or fall on any single provision, absent strong evidence to the contrary. Federal Trade Commission Act § 17, 15 U.S.C.A. § 57.

[42]   **Statutes**  👉  Effect of Partial Invalidity; Severability

When confronting a constitutional flaw in a statute, courts should try to limit the solution to the problem.

[43]   **Federal Civil Procedure**  👉  Complaint

Ordinarily, a plaintiff should be given at least one opportunity to amend a complaint.

**Attorneys and Law Firms**

Karen D. Dodge, Matthew Gene Schiltz, Rachel F. Sifuentes, Purba Mukerjee, Federal Trade Commission, Midwest Region, Chicago, IL, for Plaintiff.

Hashim M. Mooppan, Pro Hac Vice, Krista Perry Heckmann, Pro Hac Vice, Jones Day, Washington, DC, Drew R. Wisniewski, Jessica Lynn Saba, Pro Hac Vice, Roman Martinez, Pro Hac Vice, Blake Stafford, Pro Hac Vice, Latham & Watkins LLP, Washington, DC, Sean M. Berkowitz, Johanna Margaret Spellman, Latham & Watkins LLP, Chicago, IL, for Defendant.

Jennifer Lee Mascott, Pro Hac Vice, Separation of Powers Clinic, Scalia Law School, Arlington, VA, R. Trent McCotter, Pro Hac Vice, Separation of Powers Clinic, George Mason University, Antoni, Arlington, VA, Robert Kry, Pro Hac Vice, MoloLamken LLP, Washington, DC, Steven Francis Molo, MoloLamken LLP, Chicago, IL, for Amicus Jennifer L. Mascott.

Linda T. Coberly, Kevin Benjamin Goldstein, Winston & Strawn LLP, Chicago, IL, for Amici Chamber of Commerce of the United States of America, Retail Litigation Center, Inc.

Gregory Dolin, New Civil Liberties Alliance, Washington, DC, for Amicus New Civil Liberties Alliance.

**MEMORANDUM OPINION AND ORDER**

Manish S. Shah, United States District Judge

**\*1** Walmart Inc. provided money transfer services, allowing customers to send and receive funds from its stores.

Telemarketers conned consumers into sending money using Walmart's services. The Federal Trade Commission alleges that Walmart knew that it was processing fraudulent money transfers and failed to do enough to protect consumers. The FTC claims that Walmart failed to implement and maintain effective policies, properly train and oversee its employees, warn consumers, or address suspicious transactions. The agency brings claims against Walmart for violations of the Federal Trade Commission Act and the Telemarketing Sales Rule. Defendant moves to dismiss under Rule 12(b)(6). For the reasons discussed below, the motion is granted in part and denied in part.

## I. Legal Standards

To survive a motion to dismiss under Rule 12(b)(6), a complaint must state a claim upon which relief may be granted. Fed. R. Civ. P. 12(b)(6). The complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). In reviewing a motion to dismiss, a court must construe all factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Sloan v. Am. Brain Tumor Ass'n*, 901 F.3d 891, 893 (7th Cir. 2018) (citing *Deppe v. NCAA*, 893 F.3d 498, 499 (7th Cir. 2018)).

**[1]** A plaintiff alleging fraud must do so with particularity. Fed. R. Civ. P. 9(b); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citations omitted) (Claims that sound in fraud—meaning premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements). *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011) (citation omitted) (Rule 9(b) applies to "allegations of fraud, not claims of fraud."). They must describe the "who, what, when, where, and how" of the fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

## II. Background

### A. Walmart's Money Transfer Services

Walmart offered a variety of financial products to its customers, driving traffic to the company's stores and generating significant revenue. [1] ¶¶ 6, 8, 22. [1] Among those products were money transfer services. *Id.* ¶ 8. Walmart relied on other companies' systems—including those belonging to MoneyGram International, Inc., RIA Financial Services, and The Western Union Company—to facilitate money transfers. *Id.* ¶¶ 9–11, 13. Walmart acted as an agent of those companies. *Id.* ¶ 9.

Consumers who wanted to send or receive money at Walmart visited the company's Customer Service Desks and MoneyCenters. [1] ¶ 18. Customers could also begin a money transfer online and then finalize the transaction at a Walmart store. *Id.* For some time, money transfer senders at Walmart were required to complete a "send form." *Id.* ¶ 20. [2] In 2019, however, Walmart stopped using the forms, and instead provided senders with a printout including consumer fraud warnings in small print. *Id.* For years, Walmart didn't ask senders to present identification unless their transfers exceeded limits set by the money transfer provider. *Id.* ¶ 21. Walmart began verifying and recording sender ID information for all transactions in January 2018. *Id.* Customers who sent $3,000 or more were required to provide their social security number, tax identification number, or other identifying information. *Id.*

**\*2** Walmart's money transfers were intended to be person-to-person, and weren't meant for business transactions. [1] ¶ 19. The company didn't limit the amount that a consumer could send or receive, and instead relied on its money transfer providers—MoneyGram, Ria, and Western Union—to impose limits. *Id.* [3] Consumers sending a money transfer from Walmart had to pay with cash or a PIN-based debit card. *Id.* Consumers also had to pay either a variable or flat fee to Walmart. *See id.* ¶ 22. Money transfer senders at Walmart were given a unique reference number to track their transfers, and the money being sent was typically available within minutes. *Id.*

Walmart's providers required that money transfer recipients complete a "receive form" before accessing transferred funds. [1] ¶ 23. Recipients had to provide the transaction reference number, the receive amount, their name, address, telephone number, and information about the sender. *Id.* Recipients were also required to present government-issued photo ID, but Walmart recorded recipient ID information only for certain transactions. *Id.* For transfers of $3,000 or more, U.S. recipients were required to provide a social security number,

tax identification number, or other identifying information. *Id.* In 2016, Walmart began requiring ID for all recipients, and the company stopped using the receive forms. *Id.*

Walmart used its own point-of-sale system to process money transfers and to communicate with its providers. [1] ¶ 12. Walmart also designed and controlled the systems that its employees used to record information about money transfers and to prevent fraud-induced transactions. *Id.*

### B. Fraudulent Money Transfers at Walmart

For more than a decade, fraudsters used money transfers to steal from their victims, especially U.S. customers. [1] ¶ 14; *see id.* ¶ 48. Victims of fraud often sent their money from Walmart, *id.* ¶ 42, and fraud-induced money transfers at Walmart often involved large amounts of money picked up using out-of-state IDs. *Id.* ¶ 97. Using Walmart's money transfer services, perpetrators of common telemarketing scams (including, in some cases, Walmart employees) received millions of dollars from victimized consumers, many of whom were elderly. *See id.* ¶¶ 25, 42. By allowing them access to its providers' money transfer systems, Walmart provided an essential service to fraudulent telemarketers, sellers, and con artists. *Id.* ¶ 25; *see id.* ¶¶ 41, 48. Fraudsters liked using Walmart because the company's many locations made it convenient for victims, Walmart paid recipients in cash, transferred funds were available within minutes, and recipients could operate anonymously, either because Walmart didn't require an ID check or because fraudsters used fake IDs. *Id.* ¶ 26.

Consumers who had been deceived by a fraudulent scheme weren't usually in a position to prevent fraud. [1] ¶ 29. Based on false promises or fear of financial or legal consequences, victims felt compelled to complete money transfers. *Id.* Many consumers also weren't aware that fraud detection and transaction reversal were less likely with money transfers than with other payment mechanisms. *Id.* Once cash was paid to a money transfer recipient, fraud victims were usually unable to get their money back. *Id.* ¶ 24. After MoneyGram and Western Union reached agreement with the FTC and many states in 2016 and 2018, customers could receive refunds on fraudulent transactions if money transfer providers or their agents (including Walmart) failed to follow certain anti-fraud policies and procedures. *Id.*

**\*3** Walmart told consumers to report fraud to its money transfer providers, who maintained databases of complaints. [1] ¶ 30. Ria, Western Union, and MoneyGram shared

complaints with Walmart. *Id.* Between 2013 and 2018, those companies received at least 226,679 complaints about fraud-induced money transfers sent or received at Walmart, transactions involving at least \$197,316,611. *See id.* ¶¶ 30, 43–45. [4] Many of those complaints involved telemarketing scams. *Id.* ¶ 43. The complaints made to Walmart's providers represented only a small percentage of the actual fraud perpetrated through money transfers at Walmart. *Id.* ¶ 30. There were more complaints about fraud-induced money transfers at Walmart than at any of the money transfer providers' other agents. *Id.* ¶ 31.

Walmart knew that its services were used by fraudsters. *See* [1] ¶¶ 14, 27, 46, 48. MoneyGram, Ria, and Western Union told Walmart about suspicious activity, and alerted the company to certain Walmart stores where twenty-five, fifty, or even seventy-five percent of money transfer activity was fraudulent. *See id.* ¶ 46. [5] Between 2015 and 2019, at least 101 Walmart stores were responsible for paying out over \$100,000 in fraudulent transfers that were complained about, including at least eleven stores that paid out more than \$200,000. *Id.* ¶ 98. The company also knew that many scams that made use of its services—including person-in-need, government agent impersonator, and lottery, sweepstakes, and prize scams—often involved telemarketing. *See id.* ¶¶ 14, 41. [6]

Walmart learned about prosecutions involving fraud perpetrated in its stores. Criminal authorities across the country charged individuals in connection with mass marketing and telemarketing schemes that obtained millions of dollars sent or received at Walmart. [1] ¶ 28; *United States v. Caballero*, No. 16-cr-0124 (E.D. Ark.); *United States v. Caballero*, No. 16-cr-0201 (D. Minn); *United States v. Mirabel*, No. 16-cr-0269 (N.D. Tex.); *United States v. Pando*, No. 17-cr-0046 (N.D. Miss); *United States v. Labra*, No. 17-cr-0314 (D. Md.); *United States v. Gohill*, No. 17-cr-0212 (E.D. Wis.); *United States v. Patel*, No. 17-cr-0094 (E.D. Wis.); *United States v. Marcks*, No. 19-cr-0315 (D. Nev.); *United States v. Parmar*, No. 19-cr-0160 (E.D. Va.); *United States v. Hines*, No. 17-cr-1038 (N.D. Iowa); *United States v. Smith*, No. 21-cr-0372 (M.D. Pa.); *United States v. Budhadev*, No. 20-cr-0252 (M.D. Pa.). For instance, in May 2016, Walmart learned about an Internal Revenue Service impersonation scam conducted over the telephone that made use of the defendant's money transfer services. [1] ¶ 27. That scam ultimately resulted in at least fifteen prosecutions. *See id.*

Walmart knew or should have known that its stores were susceptible to fraud because the company had thousands of associates authorized to provide money transfers, associate turnover rates were high, the company had heavy customer traffic, and multiple shifts of associates worked at a single store. [1] ¶ 48. There's an allegation that Walmart's contracts with Western Union and MoneyGram, along with court orders obtained by the FTC against those companies, gave Walmart notice about its obligations to detect and prevent fraud. *Id.* ¶ 14; *see FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20 (N.D. Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12 (M.D. Pa. Jan. 20, 2017).

### C. Walmart's Fraud Prevention Efforts

**\*4** As the agent of money transfer providers dealing directly with consumers, Walmart was well positioned to detect and prevent fraud. [1] ¶ 32. Walmart controlled its own fraud policies and procedures, the training and supervision of its employees, warnings provided to consumers, monitoring and investigation of suspicious activity, and other actions designed to prevent fraudulent transfers. *Id.* ¶ 33.

Walmart's written agreements with MoneyGram, Ria, and Western Union required Walmart to comply with the providers' policies and procedures, maintain records, train its employees, allow only authorized persons to access money transfer systems, and prevent unauthorized use. [1] ¶ 34. The agreements also said that Walmart was to maintain its own anti-fraud policies and procedures, and that the company needed to comply with any court orders that applied to its money transfer providers. *Id.* ¶¶ 34, 39.

 **[2]** The FTC entered into consent orders with MoneyGram in 2009 and 2018. *See* [1] ¶¶ 35, 38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20 (N.D. Ill. Nov. 13, 2018). The Commission also entered into a consent order with Western Union in 2017. [1] ¶ 37; *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12 (M.D. Pa. Jan. 20, 2017). The orders bound Western Union, MoneyGram and their agents (including Walmart). *See* [1] ¶¶ 35, 37–38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13, p. 5 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20, p. 7 (N.D. Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 6 (M.D. Pa. Jan. 20, 2017). [7] Walmart was required to implement and

maintain a comprehensive anti-fraud program designed to prevent fraudulent money transfers. *See FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 13, p. 7 (N.D. Ill. Oct. 19, 2009); *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 20, p. 11 (N.D. Ill. Nov. 13, 2018); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 11 (M.D. Pa. Jan. 20, 2017). The Western Union order also required Walmart to identify and prevent cash-to-cash money transfers from being used as a form of payment in telemarketing transactions. *See FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 12, p. 7 (M.D. Pa. Jan. 20, 2017). Walmart received all three orders, and told the FTC that the company had implemented a comprehensive anti-fraud program. *See* [1] ¶¶ 35, 37–38. [8]

 **\*5** Despite its obligations, Walmart failed to effectively detect and prevent fraud at its stores. *See* [1] ¶¶ 14, 40, 49. Walmart didn't have a written anti-fraud and consumer protection plan until November 2014. *Id.* ¶ 51. The company failed to implement and maintain a comprehensive and effective anti-fraud program, properly train and supervise its employees, warn consumers, adequately monitor and investigate unusual or suspicious activity, stop transfers that Walmart should have known or suspected were fraud-induced, adequately collect, record, and report consumer fraud, or take other reasonable steps to prevent fraudulent use of Walmart's money transfer services. *Id.* ¶¶ 15–16, 40, 51. [9]

Walmart failed to adopt effective policies, failed to adhere to existing policies, and didn't fix those problems in a timely manner. *See* [1] ¶¶ 40, 50. For example, while Walmart's anti-fraud program said that employees who worked at stores with a heightened risk of fraud were to receive special training, many stores failed to offer that training on time. *Id.* ¶ 52. Similarly, the company's program called for consumer warnings and pamphlets, but many Walmart stores didn't offer those materials, and versions of Walmart's anti-fraud systems included no instructions for associates who suspected that money transfer recipients were fraudsters. *Id.* ¶¶ 52–53.

### 1. Receive-Side Fraud

In 2015, Walmart employees who suspected that the recipient of a money transfer was involved in fraud were supposed to complete the transaction, not deny or reject payouts. [1] ¶ 55. [10] Walmart's employees were to report suspected receive-side fraud by faxing a report to the company's home office. *Id.* Without consistent policies and procedures

requiring employees to deny suspected receive-side fraud, Walmart money transfers were more susceptible to consumer fraud, including by telemarketers and sellers. *Id.* ¶ 56. For much of the period between September 2015 and May 2019, Walmart's receive-side fraud rate by volume using MoneyGram's systems was higher than the rates for the rest of MoneyGram's combined agent network. *Id.*

Walmart changed course with respect to receive-side fraud in May 2017, after MoneyGram began suspending Walmart stores from its services. [1] ¶ 57. MoneyGram required the company to offer remedial training to Walmart employees at stores with higher rates of fraud. *Id.* This remedial training included instructions about Walmart's new fraud reporting system, but didn't solve the problem. *Id.* ¶ 58. For instance, the company's new reporting system included a "scam" button, but the scam button was only to be used during the send-side of the transaction, not for potential fraudsters collecting a payment. *Id.* Walmart's fraud-monitoring system included an option for "Suspicious Behavior During a Money Transfer Receive," but indicated that associates were only to use that option when a recipient had received more than five different transactions in a day. *Id.* The company's system also didn't instruct employees to cancel suspected receive-side fraud, merely to report it. *Id.*

**\*6** In November 2017, Walmart changed its systems again, instructing some associates to cancel suspicious transactions on the receive-side of a money transfer. [1] ¶ 59. Walmart told associates to cancel transactions when a customer received multiple large money transfers or when a customer presented different IDs during different visits. *Id.* Employees who suspected fraud that didn't fit those parameters were instructed to report the suspicious transaction, but not to cancel it. *Id.* Even after it made this change, however, Walmart continued to tell other employees to complete fraudulent transactions. *Id.* ¶ 61. The company didn't update its annual associate training on receive-side fraud until late 2018, and even then gave mixed signals about when transactions were to be cancelled. *Id.* ¶ 62.

Even when a transaction was cancelled, Walmart sometimes failed to do so effectively. *See* [1] ¶ 60. From May 2017 until late 2018, even if a Walmart employee cancelled a transaction, suspected fraudsters could go to another Walmart employee or to a different location to complete the transaction. *Id.* Although Walmart told associates to call the money transfer provider about the fraud—which would

have killed a transaction once and for all—many Walmart employees failed to make those calls. *Id.*

When Walmart's system became better at automatically cancelling transactions, Walmart's fraud prevention continued to be ineffective because the company provided inconsistent training on how to handle receive-side fraud and use the fraud-prevention system, the company's prevention efforts didn't capture certain frauds, and managers sometimes override associate decisions not to complete a transaction. [1] ¶ 64. Walmart also didn't routinely train its employees to ask questions about the nature of money transfer transactions and whether consumers were receiving telemarketing-related payments. *Id.* ¶ 65.

### 2. Send-Side Fraud

Walmart failed to provide clear and consistent instructions to its employees about how to effectively report and stop fraudulent telemarketing-related money transfers. [1] ¶ 66. As a result, Walmart failed to prevent fraud victims, especially the elderly, from being victimized through various scams, including grandparent, Good Samaritan, lottery, prize, and romance scams. *Id.* In some cases, fraudsters specifically directed consumers to use Walmart's money transfer services because of the company's lack of safeguards. *Id.*

Certain characteristics of money transfers suggested fraud, including when multiple transfers were made in a short period of time, transfers were sent to high-risk countries, transfers of above average amounts of money, and transfers that were sent to different individuals. *See* [1] ¶ 67. In many cases when these characteristics were present, however, Walmart failed to step in. *Id.* For example, from February to March 2017, Walmart sent fifty-two transfers totaling $51,000 for one older consumer to seven different receivers in Ghana and the United States. *Id.* In March and April 2017, Walmart sent $54,550 in thirty-three transfers on behalf of another consumer to a recipient in Ghana. *Id.* In a third example, Walmart sent forty-two transfers totaling $71,235.16 for a customer to ten recipients in Ghana, the United States and Turkey, despite the customer saying that he was sending money to buy millions of dollars in gold. *Id.* Walmart waited until all of these transfers were completed to report the incidents to law enforcement and Walmart's providers. *Id.*

Walmart failed in many cases to provide warnings to senders about common money transfer frauds. [1] ¶¶ 68, 99–101.

While FTC orders required Walmart to use send forms with a warning on the front page, Walmart stores were often missing those forms, or used forms without warnings. *Id.* In other cases, Walmart stores didn't have fraud warning signs and failed to provide consumers with brochures or pamphlets. *Id.* Until at least March 2019, Walmart employees didn't ask senders whether their transfers were related to telemarketing, or warn consumers that cash-to-cash money transfers were illegal as a form of payment for telemarketing transactions. *Id.* ¶¶ 69, 99. As a result, consumers were often unaware of the risks associated with money transfers. *Id.* ¶ 99.

### 3. Employee Training and Oversight

 **\*7** Walmart employees could process hundreds of thousands of dollars in money transfers during a single shift. [1] ¶ 70. Walmart and its money transfer providers knew that employees processing transactions were the first line of defense to detect and prevent fraud. *Id.* Yet the company failed to ensure that its employees were trained and knowledgeable about anti-fraud and anti-money-laundering policies and procedures. *Id.*

Walmart's written policies and contracts said that training was important and that all Walmart associates who processed money transfers would be trained. [1] ¶ 71. The company primarily trained employees through annual computer learning sessions. *Id.* For years, however, Walmart failed to ensure that its employees actually completed the training. *Id.* ¶¶ 15, 71. Although MoneyGram required Walmart to provide remedial training at high-risk locations, Walmart failed to ensure that all employees at those locations promptly received the training. *Id.* ¶ 70. [11]

The training itself was inadequate, too. *See* [1] ¶ 72. For years, Walmart's annual training included limited information about how to detect and prevent fraudulent money transfers. *Id.* Walmart's materials focused only on preventing send-side fraud (protecting victims), rather than stopping fraudsters, and while the company knew that fraudsters often used fake IDs, Walmart didn't adequately train its employees on how to detect or prevent that practice. *Id.* ¶¶ 78–79. Until 2019, Walmart didn't train its employees about telemarketing rules, or advise associates to ask consumers whether they were sending money as a result of telemarketing. *Id.* ¶¶ 15, 80.

During audits and reviews of Walmart stores, money transfer providers found that Walmart employees lacked proper training and knowledge about how to prevent fraud and money laundering. [1] ¶ 73. For instance, a 2014 MoneyGram audit found that 1,863 employees at 397 stores had not received either initial or ongoing fraud-prevention training, and that overall thirty-nine percent of Walmart locations had untrained primary employees, with sixty percent of stores having untrained secondary employees (those who filled in for those primarily responsible for providing money transfer services). *See id.* ¶¶ 71, 74. Subsequent MoneyGram and Ria reviews continued to find significant percentages of stores with untrained or undertrained employees. *See id.* ¶ 75. Even after Walmart locked untrained employees out of the money transfer system, Walmart's providers continued to find untrained, undertrained, or unknowledgeable employees providing money transfer services at Walmart. *Id.* ¶ 76. [12]

Walmart had control over background checks on its employees, the credentials for the money transfer systems, which resource materials employees received, whether employees complied with policies and procedures, and how the company monitored the areas in Walmart stores where money transfers were provided. [1] ¶ 81; *see id.* ¶ 84. Because some 60,000 Walmart employees processed tens of millions of money transfers each year at more than 4,700 stores, oversight was important. *Id.* ¶ 82.

 **\*8** Walmart's failure to properly supervise and monitor employees at its Customer Service Desks and MoneyCenters allowed Walmart associates to become complicit in fraud. [1] ¶ 90. For years, employees received cash tips for their assistance in processing fraud, allowed individuals to use multiple names or IDs to receive money transfers, used the same personal information for different customers, structured transfers for customers to avoid ID requirements, made up fictitious information, or conducted suspicious money transfers themselves. *Id.* While Walmart didn't routinely share information about its employees with its providers, Walmart relied on MoneyGram, Ria, and Western Union to identify corrupt or complicit Walmart employees. *Id.* ¶ 84.

### 4. Walmart's Fraud Monitoring, Investigation, and Mitigation

Walmart failed to adequately monitor, investigate, or address suspicious money transfers. [1] ¶¶ 16, 91. Instead, the company relied on its money transfer providers. *Id.* ¶ 91. Because Walmart used both MoneyGram and Ria for its money transfer services, however, Walmart was the only party

able to see money transfers that went through both systems. *Id.* ¶ 92. Fraudsters exploited Walmart's use of two money transfers systems, along with the company's shift structure, workforce size, high turnover of associates, heavy customer traffic, and lax anti-fraud program. *Id.* ¶ 93.

MoneyGram, Ria, and Western Union had security systems that blocked use by fraudsters. *See* [1] ¶ 94. But those systems, as Walmart knew, were vulnerable: they sometimes broke down, could be circumvented by consumers changing biographical information, using fake IDs, or switching to another money transfer provider at Walmart. *Id.* Instead of using its own blocking system, however, Walmart relied on those of its providers, making fraud-induced money transfers at Walmart more likely. *Id.*

Walmart didn't effectively use its providers' blocking systems, either. *See* [1] ¶ 95. The company didn't give Ria lists of consumers to be blocked until 2016. *Id.* And while Walmart maintained an internal list of potential victims or fraudsters and could cancel transactions at the point of sale, the company didn't permit communicate that information to its providers so that future fraud could be stopped. *Id.* Rather than tell all of its providers about a suspected fraudster, Walmart only identified suspicious customers to the provider who had been used by that customer. *Id.* [13]

Walmart didn't monitor certain suspicious behaviors, including consumers receiving money transfers at multiple Walmart stores in the same area or visiting stores across state lines. [1] ¶ 96. The company didn't stop consumers or even its own employees from sending or receiving money transfers that it knew or had reason to believe were related to consumer fraud, or that had suspicious characteristics. *Id.* Walmart also didn't take other measures to mitigate consumer fraud, such as verifying and validating consumer IDs, limiting the associates responsible for providing money transfer services, providing a point-of-sale system that could effectively address suspicious activities, or imposing a limit on the amount of money that could be paid out in cash. *Id.* ¶ 104. The FTC alleges that Walmart is violating or is about to violate the laws enforced by the FTC. *Id.* ¶ 105.

## III. Analysis

### A. Substantial Assistance Under the Telemarketing Sales Rule

The Telemarketing Sales Rule prohibits sellers and telemarketers from (1) making false or misleading statements

to induce someone to pay for goods, services, or a charitable contribution, (2) requesting or receiving payment in advance of obtaining credit when the seller or telemarketer has guaranteed or represented a high likelihood of success of obtaining credit, and (3) accepting a "cash-to-cash money transfer" [14] as payment for goods or services offered or sold through telemarketing or "as a charitable contribution solicited or sought through telemarketing." 16 C.F.R. §§ 310.3(a)(4), 310.4(a)(4), (10).

**\*9** The FTC doesn't allege that Walmart directly violated these prohibitions, but instead invokes the TSR's accessory liability provision. *See* [1] at 57–58. That part of the rule says that a person violates the TSR by providing "substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer" is violating the rule. 16 C.F.R. § 310.3(b). The FTC claims that by processing ill-gotten payments despite many red flags, failing to institute an effective anti-fraud program, and allowing some of its employees to participate in fraudulent schemes, Walmart provided an essential service —and substantial assistance or support—to telemarketers. *See* [43] at 39–42. The FTC also alleges that Walmart knew or consciously avoided knowing about the underlying violations. *See id.* at 42–44.

Some of the FTC's theories of underlying TSR violations require deceptive conduct, *see* 16 C.F.R. § 310.3(a)(4), and the complaint itself repeatedly alleges that Walmart processed fraud-induced money transfers. A plaintiff alleging fraud must do so with particularity. Fed. R. Civ. P. 9(b); *see Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citations omitted) (holding that claims that sound in fraud—meaning premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 446–47 (7th Cir. 2011) (citation omitted) (Rule 9(b) applies to "allegations of fraud, not claims of fraud."). [15] They must describe the "who, what, when, where, and how" of the fraud. *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019) (quoting *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019)).

**[3]** To state a claim for assisting and facilitating under the TSR, the FTC must allege an underlying violation of the rule by a seller or telemarketer. *See* 16 C.F.R. § 310.3(b). The TSR includes definitions of seller, telemarketer, and telemarketing. A seller is "any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration." 16 C.F.R. § 310.2(dd). A telemarketer is "any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor." 16 C.F.R. § 310.2(ff). Telemarketing is "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

**[4]** This is a case about a lot of fraud: hundreds of thousands of allegedly fraudulent money transfers involving many millions of dollars. *See* [1] ¶¶ 30, 43–45. And while the complaint lays out the breadth of the alleged misconduct by fraudsters making use of Walmart's services, the FTC hasn't plausibly alleged that any of this fraud fits the TSR's definitions of seller, telemarketer, and telemarketing.

**\*10** For instance, while the complaint says that Walmart processed money transfers on behalf of criminal ring that perpetrated telemarketing scams, *see* [1] ¶ 27, the FTC hasn't alleged the details of those scams: whether they involved a "a plan, program, or campaign" using telephones, involved more than one interstate call, or whether the scams traded in goods, services, or charitable contributions. *See* 16 C.F.R. § 310.2(gg). That thousands of complaints about money transfers at Walmart were filed by consumers, and that consumers complained they were swindled by common telemarketing schemes (such as "grandparent," "loan-grant," and "romance" scams), *see* [1] ¶¶ 43, 98, doesn't show that the fraud at issue fits a pattern of prohibited conduct under the TSR. Plaintiff points to criminal cases involving telemarketing fraud at Walmart, *see id.* ¶¶ 27–28, but those cases don't show that the transactions *in this case* were made by telemarketers or sellers and involved telemarketing. 16 The TSR doesn't prohibit fraud generally or all fraud involving phone calls, and so it's not enough that a large number of fraudulent transfers at Walmart made use of phones, or that Walmart associates were told to process some suspicious transactions. *See id.* ¶¶ 55, 80, 98. Allegations about allegations make it difficult to know what it is the FTC intends to prove—that people complained about or were

accused of telemarketing fraud, or that specific telemarketing fraud occurred in fact? The former does not prove a TSR violation, and the latter is not alleged with particularity.

That's not to say that the FTC must allege the details of thousands of TSR violations to state a claim. The agency could have plausibly alleged underlying TSR violations through examples of transactions that fit the TSR's definitions, or by describing in more detail categories of fraud that hit all the elements of a TSR violation perpetrated using Walmart's services. But repeatedly using the words telemarketer, seller, and telemarketing, and making conclusory allegations of underlying TSR violations, isn't enough. *See* [1] ¶¶ 112, 119; 16 C.F.R. § 310.3(b); *Pierce v. Zoetis, Inc.*, 818 F.3d 274, 279–80 (7th Cir. 2016) (calling statements "injurious" doesn't make them injurious); *Tierney v. Advoc. Health and Hospitals Corp.*, 797 F.3d 449, 451–52 (7th Cir. 2015) (finding that a plaintiff must plausibly allege that conduct fits within the meaning of terms defined in a statute). 17 The FTC hasn't plausibly alleged an underlying violation of the TSR such that a claim for accessory liability will lie. Even if the agency had overcome this initial hurdle, the complaint also fails to allege either the knowledge or substantial assistance required to state a claim.

### 1. Knowledge

**[5]** The TSR prohibits giving substantial assistance to a seller or telemarketer when someone "knows or consciously avoids knowing" about an underlying TSR violation. 16 C.F.R. § 310.3(b). A person consciously avoids knowing about a violation when "there are facts and evidence that support an inference of deliberate ignorance." Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,852 n.106 (Aug. 23, 1995) (citing *United States v. Williams*, 32 F.3d 570, 1994 WL 463430, at \*6 (7th Cir. 1994)); *see* *FTC v. Chapman*, 714 F.3d 1211, 1219 (10th Cir. 2013) (quoting *FTC, Complying with the Telemarketing Sales Rule*, available at https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule (Feb. 2011)) ("[T]aking deliberate steps to ensure one's own ignorance of a seller or telemarketer's Rule violations is an ineffective strategy to avoid liability."). Knowledge can be inferred from a combination of suspicion and indifference to the truth. *See* *United States v. Salinas*, 763 F.3d 869, 875 (7th Cir. 2014) (discussing the "ostrich instruction"); *Global-Tech*

*Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769, 131 S.Ct. 2060, 179 L.Ed.2d 1167 (2011) (finding that a willfully blind defendant takes deliberate actions to avoid confirming a high probability of wrongdoing).

**\*11**   The FTC argues that Walmart had both direct knowledge of and consciously avoided knowing about TSR violations. *See* [43] at 42–44. First, the FTC points to an instruction Walmart gave to some of its employees, telling them to complete transactions even when they suspected fraud. *See* [1] ¶ 55. Walmart also knew that fraudsters involved in telemarketing used the company's money transfer system. *See id.* ¶¶ 27–28, 37, 105. Plaintiff contends that Walmart consciously avoided knowing about violations of the TSR by failing to take basic steps to detect fraud, like training its associates to ask for IDs. *See* [1] ¶ 16.

[6]   To support an inference of the requisite knowledge, the complaint must suggest that Walmart consciously avoided facts about an identifiable telemarketer's fraudulent act or practice: substantial assistance liability attaches to one who consciously avoids knowing that "*the* seller or telemarketer" is violating the TSR. 16 C.F.R. § 310.3(b) (emphasis added). In this case, the FTC hasn't alleged enough about the circumstances of the money transfers at issue to show that Walmart knew or consciously avoided knowing about TSR violations. For one thing, as discussed above, the complaint doesn't allege that any of the alleged fraud fell within the prohibitions of the TSR. A second problem is that the FTC hasn't alleged the kinds of details about the majority of transactions in this case that would show that Walmart knew or consciously avoided knowing about underlying TSR violations. For instance, while the complaint says that the company processed "tens of millions of money transfers" each year, [1] ¶ 82, and hundreds of thousands of complaints were filed about Walmart's money transfers, *see id.* ¶¶ 43–45, there's no allegation suggesting how many of these transactions may have raised red flags, such as when customers presented different IDs during different visits, received multiple large transfers in a short period of time, or when a transaction involved suspicious statements, patterned activity, or other indications of fraud. *See id.* ¶¶ 59, 96.[18] Without more information about why Walmart should have suspected specific transactions, Walmart's failure to ask questions and processing of suspected fraud, *see id.* ¶¶ 55, 65, isn't evidence of conscious avoidance of TSR violations. *See*

🚩 *United States v. L.E. Myers Co.*, 562 F.3d 845, 854 (7th

Cir. 2009) (quoting 🚩 *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir. 1990)).[19]

Without an allegation of an underlying violation and more detail about why Walmart knew or consciously avoided knowledge that a subset of its money transfer business involved TSR violations, the complaint hasn't alleged the knowledge required.

### *2. Substantial Assistance*

**\*12**   [7]   Substantial assistance requires more than casual or incidental help to a telemarketer. *See* 16 C.F.R. § 310.3(b);

🚩 *FTC v. Chapman*, 714 F.3d 1211, 1216 (10th Cir. 2013) (quoting *FTC, Complying with the Telemarketing Sales Rule*, available at http://business.ftc.gov/documents/bus27-complying-telemarketing-sales-rule#assisting (Feb. 2011)); *Consumer Financial Protection Bureau v. Nesheiwat*, No. 21-56052, 2022 WL 17958636, at \*1 (9th Cir. Dec. 27, 2022); *FTC v. Consumer Health Benefits Ass'n*, No. 10-CV-3551 (ILG), 2011 WL 3652248, at \*5 (E.D.N.Y. Aug. 18, 2011) (quoting Telemarketing Sales Rule, 60 Fed. Reg. 43842-01, 43852 (Aug 23, 1995)). There must be some link between the third party's actions and the telemarketer's, but not necessarily a direct connection. *See* 🚩 *Chapman*, 714 F.3d at 1216 (citations omitted).[20]

Agency guidance includes some examples of what conduct is and isn't enough to constitute substantial assistance. On the one hand, someone who provides lists of contacts to a seller or telemarketer, drafts the language used for telemarketing, or makes available incentives to be used in the telemarketing, provides substantial assistance. *See* Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,852 (Aug. 23, 1995). On the other hand, providing services like cleaning or food delivery to telemarketers, "or engaging in some other activity with little or no relation to the conduct that violates the Rule" would not be enough to show substantial assistance. *See FTC, Complying with the Telemarketing Sales Rule* (Feb. 2011), available at https://www.ftc.gov/business-guidance/resources/complying-telemarketing-sales-rule.

[8]   Aiding and abetting principles (as seen in tort and securities case law) are relevant in understanding substantial assistance under the TSR. *See FTC v. WV Universal Mgmt.,*

*LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017) (In a dispute about joint and several liability under the TSR, the FTC argued and the Eleventh Circuit agreed that the TSR emerged from "comparable tort and securities concepts."); Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851–52 & nn.96–98 (Aug. 23, 1995) (comparing substantial assistance under the TSR with substantial assistance in tort and securities cases, and noting that "the ordinary understanding of the qualifying word 'substantial' " should apply under the TSR). *But see*

*C.F.P.B. v. Daniel A. Rosen, Inc.*, Case No. 2:21-cv-07492-VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022).[21]

**\*13** Walmart processed large numbers of fraud-induced money transfers, and it knew that the proceeds of fraud were being transferred using its services. *See* [1] ¶¶ 42–43, 46, 50. Walmart made it easier for fraudulent transactions to succeed by failing to provide consumer fraud warnings, verify or accurately record the IDs of money transfer recipients, and by processing some suspicious transactions. *Id.* ¶¶ 24–26, 55. The complaint also says that some Walmart associates were complicit in fraudulent transactions. *See id.* ¶ 50.

**[9]** Processing routine transactions isn't substantial assistance. *See Grijalva v. Kevin Mason, P.A.*, Case No. 8:18-cv-02010-JLS-DFM, 2019 WL 8221076, at *5 (C.D. Cal. Dec. 30, 2019) (deciding that processing payments for other defendants and accepting a fee for those transactions was not substantial assistance under the TSR); *Berdeaux v. OneCoin Ltd.*, 561 F.Supp.3d 379, 416 n.35 (S.D.N.Y. 2021) (considering a claim for aiding and abetting fraud and gathering cases); *PLB Investments LLC v. Heartland Bank and Tr. Co.*, No. 20 C 1023, 2021 WL 492901, at *9 (N.D. Ill. Feb. 9, 2021) (discussing a claim of aiding and abetting fraud and breach of fiduciary duty); *Bane v. Sigmundr Expl. Corp.*, 848 F.2d 579, 582 (5th Cir. 1988) (discussing aider and abettor liability under Rule 10b-5); *Rosner v. Bank of China*, 528 F.Supp.2d 419, 426–27 (S.D.N.Y. 2007) (considering a common-law fraud claim against a bank); *see also Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003) (citing *United States v. Pino-Perez*, 870 F.2d 1230 (7th Cir. 1989)) (noting that the ordinary understanding of culpable assistance requires a desire to promote the wrongful venture's success).

**[10]** But an ordinary transaction becomes extraordinary—and processing it can constitute substantial assistance—if a defendant knows enough about the underlying fraud.

*See S.E.C. v. Apuzzo*, 689 F.3d 204, 212–14 (2d Cir. 2012) (holding that a chief financial officer of a corporation provided substantial assistance when he participated in extraordinary transactions and knew of underlying violations of the securities laws); *In re First All. Mortg. Co.*, 471 F.3d 977, 995–96 (9th Cir. 2006) (considering a state-law fraud claim); *Damian v. Heartland Bank and Tr. Co.*, No. 20 C 7819, 2021 WL 5937153, at *11 (N.D. Ill. Dec. 15, 2021) (citations omitted) (finding that a bank that processed payments provided substantial assistance in breaching a fiduciary duty when the bank knew of a Ponzi scheme underlying the transactions and its inaction allowed a fraudster to continue the scheme); *El Camino Res., Ltd. v. Huntington Nat'l Bank*, 722 F.Supp.2d 875, 910–14 (W.D. Mich. 2010) (holding that a bank's provision of routine banking services wasn't enough to show substantial assistance of fraud and conversion "unless the bank actually knew that those services were assisting the customer in committing a specific tort"); Restatement (2d) Torts § 876(b), comment d (noting that assistance can be tortious depending on (1) the nature of the act encouraged, (2) the amount of assistance given, (3) a defendant's presence or absence at the time of the tort, (4) his relation to the other, and (5) his state of mind).[22]

**\*14** **[11]** Walmart may have known enough about transactions at stores where a large majority of money transfers were fraudulent, such that defendant's continued processing constituted substantial assistance. *See* [1] ¶ 46.[23] But, as discussed above, the complaint doesn't connect Walmart's general awareness of red flags and fraud with its specific knowledge about the vast majority of money transfers at issue in this case, such that processing those transactions became something other than routine. *Cf. Damian*, 2021 WL 5937153, at *11; *Apuzzo*, 689 F.3d at 214–15; *FTC v. HES Merch. Services Co., Inc.*, No. 6:12-cv-1618-Orl-22KRS, 2014 WL 6863506, at *8 n.5 (M.D. Fla. Nov. 18, 2014); *FTC v. Chapman*, 714 F.3d 1211, 1216–17 (10th Cir. 2013). While Walmart may have provided an essential service to fraudsters by delivering the proceeds of their misconduct, the FTC hasn't alleged that Walmart's awareness of fraud rose to the level that would transform the

processing of money transfers into substantial assistance of TSR violations.

Without a showing of underlying TSR violations or details about how Walmart knew that the majority of transactions at issue were extraordinary, the complaint doesn't state a claim for substantial assistance.

Count Two is dismissed without prejudice.

### B. Unfair Acts or Practices

The FTC alleges that Walmart violated § 5(a) of the Federal Trade Commission Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce." 🚩 15 U.S.C. § 45(a)(1); *see* 🚩 *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 768 (7th Cir. 2019); 🚩 *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–44, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). Plaintiff claims that Walmart violated § 5 in two ways: by failing to effectively prevent fraudulent money transfers and by violating the TSR. *See* [1] ¶¶ 108–18. Because the FTC hasn't stated a claim for a violation of the TSR, as discussed above, it cannot pursue that theory of liability under § 5.[24] The parties disagree about the elements of a § 5 claim as applied to Walmart's failure to stop consumer injury.

### *1. The Unfairness Standard*

The FTC Act of 1914 prohibited "unfair methods of competition in commerce." Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (codified as amended at 🚩 15 U.S.C. § 45(a)). In drafting that provision, Congress declined to specify the meaning of "unfair methods of competition." *See* 🚩 *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) (citing S. Rep. No. 63-597, at 13 (1914)); 🚩 *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015). Instead, unfairness was left as a "flexible concept with evolving content," one whose development was intentionally left to the Commission. 🚩 *FTC v. Bunte Bros.*, 312 U.S. 349, 353, 61 S.Ct. 580, 85 L.Ed. 881 (1941); 🚩 *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 367, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965).

In 1964, the Commission issued a statement describing three factors relevant to deciding whether an act or practice was unfair. Statement of Basis and Purpose of Trade Regulation Rule 408, Unfair or Deceptive Advertising and Labeling of Cigarettes in Relation to the Health Hazards of Smoking, 29 Fed. Reg. 8324, 8355 (July 2, 1964). While the FTC drafted those factors to assess conduct by the tobacco industry, the Supreme Court in 🚩 *Sperry* appeared to approve of the more general use of that three-part analysis to decide whether any act or practice was unfair. *See* 🚩 *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).

The Seventh Circuit addressed § 5's prohibition on unfair conduct in 🚩 *Spiegel, Inc. v. FTC*, 540 F.2d 287 (7th Cir. 1976). The FTC brought suit against a corporation, alleging unfair practices. 🚩 *Id.* at 290. Approving of the FTC's conclusion that the conduct at issue was unfair, the court noted that the Commission's analysis of unfairness "remained faithful to its previously announced criteria," and (repeating that criteria, as cited in 🚩 *Sperry*) that a practice is unfair "when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." 🚩 *Spiegel*, 540 F.2d at 293–94.

**\*15** In 1980, the FTC issued a second policy statement that changed the Commission's approach to § 5. *See* FTC Policy Statement on Unfairness, Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Senate Comm. on Commerce, Sci., and Transp. (Dec. 17, 1980) (available at https://www.ftc.gov/legal-library/browse/ftc-policy-statement-unfairness) (hereinafter 1980 FTC Unfairness Policy Statement). The Commission wrote that public policy considerations were relevant, abandoned reliance on "immoral or unscrupulous conduct" as an independent basis for an unfairness finding, and said that unjustified consumer injury was the "primary focus" of the Act and could by itself "warrant a finding of unfairness." *Id.*

In 1994, Congress codified the FTC's 1980 approach to unfairness in 🚩 15 U.S.C. § 45(n):

> The Commission shall have no authority under this section ... to declare unlawful an act or practice on the grounds that such act or practice

is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination.

Walmart argues that in this circuit, *Spiegel* provides the applicable standard for unfair practices under § 5. *See* [24] at 40. *Spiegel* remains good law, but neither that case nor *Sperry* adopted a test for § 5 liability. "*Sperry* did not adopt [a test for unfair conduct], but rather was merely quoting, in a footnote, the test that the FTC uses to determine whether a practice that is neither in violation of the antitrust laws nor deceptive could still be unfair." *McMillan v. Collection Professionals Inc.*, 455 F.3d 754, 764 n.13 (7th Cir. 2006). Similarly, the *Spiegel* court reviewed an unfairness finding made by the Commission and paraphrased the FTC's then-approach to § 5, as quoted in *Sperry. See Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 & n.8 (7th Cir. 1976); *see also CFPB v. ITT Educ. Services, Inc.*, 219 F.Supp.3d 878, 903 (S.D. Ind. 2015) (discussing *Spiegel*, 540 F.2d at 293); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945 (N.D. Ill. 2008) (applying a three-part test derived from 15 U.S.C. § 45(n), not the FTC's earlier standard); *United States v. Dish Network LLC*, 256 F.Supp.3d 810, 965–66 (C.D. Ill. 2017) *aff'd in part, vacated in part, remanded on other grounds sub nom*, 954 F.3d 970 (7th Cir. 2020) (recognizing the same three-part test as the current rule for unfair conduct under § 5). Like *Sperry*, *Spiegel* described the FTC's approach but did not settle on an exclusive definition of unfairness (and seems to have rested its decision not on any articulable public policy but on the substantial harm to debtors from cost-

prohibitive but lawful debt-collection suits filed in a distant forum). *Spiegel*, 540 F.2d at 293–94. [25]

Both the *Sperry* and *Spiegel* courts looked to the FTC's interpretation of unfairness at that time. But in 1994, Congress offered further guidance. It's true that § 5(n) is a limitation on the FTC's power to "declare unlawful an act or practice" because it is unfair, not an explicit definition of unfairness under § 5(a). *See* 15 U.S.C. § 45(n). But the FTC's exclusive role in enforcing the Act, the text of the statute, and the history of the prohibition on unfair conduct show that § 5(n) sets the standard for unfairness, both for the court and for the Commission.

**\*16** **[12]** **[13]** There is no private right of action under the Act. *See Marquette Cement Mfg. Co. v. FTC*, 147 F.2d 589, 594 (7th Cir. 1945) (holding that only the FTC has the power to protect the public against unfair methods of competition); *Moore v. New York Cotton Exch.*, 270 U.S. 593, 603, 46 S.Ct. 367, 70 L.Ed. 750 (1926) (noting that relief for unfair methods of competition "must be afforded in the first instance by the commission"); *J.R. v. Walgreens Boots All., Inc.*, No. 20-1767, 2021 WL 4859603, at *8 (4th Cir. Oct. 19, 2021) (gathering cases). That means that the FTC is the only party capable of bringing suit based on an unfair act or practice. *See Sperry*, 405 U.S. at 249, 92 S.Ct. 898 ("A court cannot label a practice 'unfair' under 15 U.S.C. § 45(a)(1). It can only affirm or vacate an agency's judgment to that effect."). Limitations imposed by Congress on the agency's power to declare an act unfair, then, also restrict the circumstances when an act can be found unfair in court. Of course, after the FTC has brought suit in federal court, it is the court—not the agency—that decides whether a practice violates § 5. But an unfair practice only arrives in federal court if the agency brings suit. *See Marquette Cement Mfg. Co.*, 147 F.2d at 594. A limitation on the FTC's power to bring suit under § 5, then, is in effect a limitation on the court's power to find a practice unfair.

**[14]** Through § 5(n), Congress told the FTC that the Commission had no power to declare conduct unfair unless certain conditions were met. *See* 15 U.S.C. § 45(n). One implication of that restriction is that, when the conditions under § 5(n) *are* met, the FTC *has* power to find unfairness. And when the FTC has power to find unfairness under § 5(n), it makes sense that the act or practice at issue is also unfair

under § 5(a). In other words, given the FTC's unique power to enforce § 5, Congress did not authorize the FTC to declare an act unfair under § 5(n) that wasn't also unfair under § 5(a).

*See* 15 U.S.C. § 45; *see also White v. United Airlines, Inc.*, 987 F.3d 616, 623 (7th Cir. 2021) (quoting *Sullivan v. Stroop*, 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990)) (discussing the presumption that "identical words used in different parts of the same act are intended to have the same meaning"). [26]

The history of § 5 supports this approach, and perhaps explains why Congress declined to define unfairness in a more direct way. When Congress first banned unfair competition in commerce, it considered and decided against identifying particular practices that were unfair. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 239–40, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972) (citing S. Rep. No. 63-597, at 13 (1914)). Instead, Congress chose to make unfairness a flexible concept, and left its development to the Commission. *See FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 243 (3d Cir. 2015) (quoting *FTC v. Bunte Bros.*, 312 U.S. 349, 353, 61 S.Ct. 580, 85 L.Ed. 881 (1941) and *Atl. Refin. Co. v. FTC*, 381 U.S. 357, 367, 85 S.Ct. 1498, 14 L.Ed.2d 443 (1965)). Given that legislative history, it's unsurprising that Congress provided further guidance on the meaning of unfairness in 1994 by codifying the FTC's flexible cost-benefit approach, rather than (for instance) enumerating a list of prohibited practices or using definitional language. *See id.* at 244.

Relying on *Spiegel*, Walmart argues that § 5(n) clarifies only the substantial injury requirement under § 5(a), and also that § 5(n)'s requirements are necessary but not sufficient conditions to find unfairness. *See* [44] at 22–23; *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 259 (3d Cir. 2015); *LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 & n.24 (11th Cir. 2018). In addition to the requirements of § 5(n), Walmart argues that the FTC must show that conduct violates established public policy, and that a showing of immoral, unethical, oppressive, or unscrupulous conduct is also relevant. *See* [24] at 40–46.

**\*17** Behind Walmart's interpretation is the assumption that *Spiegel* and *Sperry* set a standard for unfairness, one

that wasn't fundamentally altered by the addition of § 5(n). As discussed above, however, neither of those cases established a test. *See also Wyndham Worldwide Corp.*, 799 F.3d at 244–45, 255–56 (treating the § 5(n) factors as the test for unfairness under § 5(a)); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009) (same); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (same).

**[15]** Section 5(n) is more than an elaboration of the substantial injury requirement: it also addresses the importance of public policy. *See* 15 U.S.C. § 45(n). And while one might understand *Spiegel* to mean that conduct must violate established public policy to be unfair, *see Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976), Congress in § 5(n) directed that "public policy considerations may not serve as a primary basis for [an unfairness] determination." *Id.* Public policy considerations can be relevant to an unfairness finding, but § 5(n) (and the FTC's 1980 policy statement) show that offending public policy isn't necessary to violate of § 5(a). *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement. [27]

**[16]** Walmart contends that without a requirement that unfair conduct violate public policy, § 5 might run afoul of the void-for-vagueness, non-delegation, or major-questions doctrines. *See* [24] at 40–41 & nn.9–10 (citing *Skilling v. United States*, 561 U.S. 358, 405–06, 407–09, 412–13, 130 S.Ct. 2896, 177 L.Ed.2d 619 (2010), *Mistretta v. United States*, 488 U.S. 361, 371–73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), and *West Virginia v. E.P.A.*, ––– U.S. ––––, 142 S. Ct. 2587, 2609, 213 L.Ed.2d 896 (2022)). But limiting public policy to a relevant, but not sole or primary ground for an unfairness determination does not leave defendants or courts at sea in uncharted waters. Unfairness tied to substantial consumer injury is a knowable, judicially administrable concept. In any event, as discussed below at ––– – –––, § 5 isn't unconstitutionally vague as applied in this case, which is all that need be said here. *See also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255–59 (3d Cir. 2015) (citation omitted) ("While far from precise, [the standard in § 5(n)] informs parties that the relevant inquiry here is a cost-benefit analysis ... that considers a number of relevant factors."). And even before Congress further defined § 5's coverage, the Supreme Court held that the FTC did

not "arrogate excessive power to itself" by assessing unfair conduct under a broad and flexible standard. *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972).

**\*18** **[17]** That Congress in § 5(n) chose to omit reference to immoral, unethical, oppressive, or unscrupulous conduct means that such a showing isn't necessary, either. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement (finding that this requirement was duplicative and noting that the Commission would no longer rely on it as an independent basis for a finding of unfairness); *Wyndham*, 799 F.3d at 244–45 (rejecting a requirement that unfair conduct must be unscrupulous or unethical). Even under the FTC's earlier approach, as discussed in *Spiegel*, evidence that conduct was wrongful wasn't required because the FTC could also show that the practice was "substantially injurious to consumers." *Spiegel, Inc. v. FTC*, 540 F.2d 287, 293 (7th Cir. 1976). [28]

The conditions of § 5(n) are sufficient and necessary for a finding of unfairness. Section 5(n) implicitly authorizes the Commission to find unfairness when conduct meets certain requirements. Congress would not have authorized the FTC to declare conduct unfair that was not, in fact, unfair under § 5(a). Given the expression of four requirements in § 5(n) and considering the 1980 policy statement that it grew from, Congress excluded additional requirements. *See Nat'l Lab. Relations Bd. v. SW Gen., Inc.*, 580 U.S. 288, 302, 137 S.Ct. 929, 197 L.Ed.2d 263 (2017) (quoting *Chevron USA Inc. v. Echazabal*, 536 U.S. 73, 80, 122 S.Ct. 2045, 153 L.Ed.2d 82 (2002)) (discussing the canon of *expressio unius est exclusio alterius*). [29]

**[18]** **[19]** Under § 5, then, an act or practice is unfair when it (1) causes or is likely to cause, (2) substantial injury to consumers, (3) which is not reasonably avoidable by consumers themselves, and (4) not outweighed by countervailing benefits to consumers or to competition. *See* 15 U.S.C. § 45(a), (n); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244–45, 255–56 (3d Cir. 2015); *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1193 (10th Cir. 2009); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010). Whether an act or practice violates an established public policy or is wrongful are relevant, but not necessary

conditions to finding unfairness. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement. Public policy can inform the kind or degree of injury at issue—an expression of the types of harms or burdens that ought not to be borne by consumers. Or, public policy can express some of the costs or benefits of an act or practice. *See* 15 U.S.C. § 45(n); 1980 FTC Unfairness Policy Statement. But the statute's focus remains on whether a practice causes substantial injury to consumers.

### 2. Walmart's Fraud-Prevention Practices

The FTC's theory of § 5 liability in this case is that Walmart's failure to effectively prevent fraud caused consumers to lose millions of dollars to fraudsters. *See* [43] at 29–30. Walmart waived argument as to causation, substantial injury, and whether the injury to consumers was outweighed by countervailing benefits. *See* [24] at 39–48; [43] at 31–34; [44] at 21–24. The FTC waived argument that Walmart's fraud-prevention practices were immoral, unethical, oppressive, or unscrupulous. *See* [43] at 29–34. The only public policy the FTC invokes is negligence, *see* [43] at 31 n.15, but negligence liability is predicated on a cost-benefit analysis, and so negligence policy doesn't provide any additional evidence of unfairness beyond what's already considered under § 5(n). *See Navarro v. Fuji Heavy Indus., Ltd.*, 117 F.3d 1027, 1029 (7th Cir. 1997) (discussing negligence and cost-benefit analysis). The only issue remaining, then, is whether the injury to consumers caused by inadequacies in Walmart's fraud-prevention program is reasonably avoidable by consumers. *See* 15 U.S.C. § 45(n).

**\*19** **[20]** **[21]** **[22]** If consumers had a free and informed choice in the matter, an injury is reasonably avoidable. *See American Fin. Services Ass'n v. FTC*, 767 F.2d 957, 976–78 (D.C. Cir. 1985); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945 (N.D. Ill. 2008). "Consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end." *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (quoting *FTC v. Orkin Exterminating Co.*, 108 F.T.C. 263, 1986 WL 722153, at \*8 (1986)); *see Neovi, Inc.*, 604 F.3d at 1158; *IFC Credit Corp.*, 543 F.Supp.2d at 945. The requirement that a

substantial injury not be reasonably avoidable preserves the default rule that consumer choice governs the market. *See* 1980 FTC Unfairness Policy Statement. But when someone "unreasonably creates or takes advantage of an obstacle to the free exercise of consumer [decision-making]," an injury isn't reasonably avoidable. *See id.*

 **[23]** Consumers complained of nearly $200 million they lost through fraud-related money transfers processed at Walmart, and there's reason to believe that the total harm may have been much higher. [1] ¶¶ 30, 43. The complaint lays out a series of failings in Walmart's fraud prevention and mitigation systems. Walmart either didn't establish or failed to follow an effective antifraud program, didn't train or adequately supervise its employees, failed to adequately monitor suspicious activity, and didn't adequately report fraud to others. *See, e.g.,* [1] ¶¶ 40, 50–53, 71, 86. Victims of fraud who used Walmart's services felt compelled—based on false promises or fear of financial or legal consequences—to send money to fraudsters. *Id.* ¶ 29. Consumers didn't know that money transfers were riskier than other forms of payment, *id.* ¶¶ 29, 69, 99, and Walmart routinely either didn't warn consumers about fraud at all or provided insufficient warnings. *See id.* ¶¶ 15–16, 24, 49, 52, 68, 85, 99–101. [30] Getting the money back after it had been transferred was hard, too, because fraud detection and transaction reversals were more challenging with money transfers, Walmart didn't do enough to stop fraudsters from picking up money, and the company didn't communicate well with its money transfer providers (which meant fraudsters weren't effectively blocked from using money transfer systems). *Id.* ¶¶ 29, 55–65, 91–96.

It's reasonable to infer that victims of fraud who used Walmart's services were not making fully informed choices. *See Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("Fraud is an intentional tort, and victims need not take precautions against such torts in order to preserve their rights."); *Ellis v. DHL Express Inc. (USA)*, 633 F.3d 522, 527 (7th Cir. 2011) (quoting *Henn v. Nat'l Geographic Soc'y*, 819 F.2d 824, 828–29 (7th Cir. 1987)) (finding that, in the context of early retirement officers, the voluntariness of a choice turned on (among other things) whether "the choice [was] free from fraud or other misconduct"); *Restatement (2d) of Torts § 481 (1965)* (noting that a plaintiff's contributory negligence does not bar recovery for damages associated with an intentional tort). [31] Walmart didn't warn or adequately warn consumers about the possibility of fraud, and so victims didn't have reason to anticipate the loss,

either. *See Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (affirming a finding that an injury was not reasonably avoidable when contracts gave consumers no warning of impending harm); *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010) (finding that an issue of material fact existed as to whether injuries were reasonably avoidable when it was likely that some consumers never noticed unauthorized withdrawals and, even if they had noticed, recovering the lost funds "required a substantial investment of time, trouble, aggravation, and money"); *FTC v. IFC Credit Corp.*, 543 F.Supp.2d 925, 945–48 (N.D. Ill. 2008). *Cf. Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (holding that an injury was avoidable when an advertisement included a disclaimer which would have motivated a reasonable consumer to consult the terms and conditions, giving consumers reason to anticipate a potential loss). [32] And because it was hard to recover funds sent through money transfers and difficult to trace fraudsters, consumers didn't have the means to avoid the injury. *See Orkin Exterminating Co., Inc.*, 849 F.2d at 1365; *Neovi, Inc.*, 604 F.3d at 1158.

 **\*20** Relying on the FTC's 1980 policy statement, Walmart argues that the injuries in this case weren't reasonably avoidable unless Walmart's conduct created an obstacle to the free exercise of consumer decision-making. *See* [24] at 47 (citing 1980 FTC Unfairness Policy Statement). But the policy statement says that injuries aren't reasonably avoidable when someone either "unreasonably creates *or takes advantage* of an obstacle to the free exercise of consumer [decision-making]." 1980 FTC Unfairness Policy Statement (emphasis added). In this case, the complaint says that Walmart took advantage of an obstacle in the market —scams that caused consumers (lacking the knowledge or ability to protect themselves) to send money to fraudsters. Put differently, by failing to warn consumers or provide avenues to mitigate their losses, Walmart withheld crucial information from consumers, leaving fraud victims with insufficient information. *See id.* (noting that a seller may unjustifiably hinder a free-market decision by failing to give buyers critical information). Walmart wasn't required to overrule consumer choices, and the Commission may ultimately fail to demonstrate that inserting more detailed and onerous fraud prevention would be reasonably successful. But for now, it's plausible that the company took advantage of defrauded consumers by profiting from transactions while withholding reasonably available information.

The FTC has alleged a violation of § 5.

### 3. On-going or Imminent Misconduct

Even if the FTC has stated a claim under § 5, Walmart argues that the FTC's request for relief should be dismissed because the FTC hasn't alleged any ongoing misconduct. *See* [24] at 38–39. To remedy Walmart's unfair practices under § 5, the FTC seeks a permanent injunction, as authorized by 15 U.S.C. § 53(b). *See* [1] ¶ 121(A). [33] That portion of the Act says that:

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted ... *Provided further,* That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.

The parties seem to agree that the two requirements at the head of § 13(b)—a showing that someone "is violating, or is about to violate" a law enforced by the FTC and that an injunction would be in the public interest—also apply to requests for a permanent injunction authorized in the statute. *See* [24] at 38–39; [43] at 44. [34]

Walmart argues that past conduct is irrelevant to a request for a permanent injunction under § 13(b), relying on *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 155–59 (3d Cir. 2019).

*See* [44] at 19–21. In *Shire*, the Third Circuit found that the FTC had to show that a wrongdoer "is violating" or "is about to violate" the law to secure an injunction. *See Shire ViroPharma, Inc.*, 917 F.3d at 156. The Third Circuit held that this requirement was antecedent to and separate from the common law standard for an award of injunctive relief, and (relatedly) that a likelihood of recurrent illegal conduct wasn't relevant to whether a defendant "is violating" or "is about to violate" the law. *See id.* at 157.

**\*21** **[24]** I disagree with the Third Circuit's approach, and decline to distinguish between the requirements of § 13(b)(1) and the common law standard for injunctive relief. The requirement that a defendant "is violating" or "is about to violate" the law mirrors the common law requirement that a plaintiff seeking injunctive relief show that it will "suffer irreparable harm if a preliminary injunction is denied." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011); *see also Swanigan v. City of Chicago*, 881 F.3d 577, 583 & n.2 (7th Cir. 2018) (citations omitted) (noting that injunctions are forward-looking, and a plaintiff must show that the injury is certainly impending or that there is a substantial risk of harm). And a showing that illegal conduct is likely to recur is the same as showing that someone "is violating" or "is about to violate" the law. *See also FTC v. Accusearch Inc.*, 570 F.3d 1187, 1201 (10th Cir. 2009) (applying the common law likelihood of recurrence to a request for an injunction under § 13(b)); *FTC v. Evans Products Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) (same); *FTC v. Lifewatch, Inc.*, 176 F.Supp.3d 757, 785–86 (N.D. Ill. 2016) (same); *FTC v. Roomster Corp.*, No. 22 Civ. 7389 (CM), ––– F.Supp.3d ––––, ––––, 2023 WL 1438718, at *7 (S.D.N.Y. Feb. 1, 2023) (same); *FTC v. AdvoCare Int'l, L.P.*, CIVIL NO. 4:19-CV-715-SDJ, 2020 WL 6741968, at *5–6 (E.D. Tex. Nov. 16, 2020) (same).

**[25]** **[26]** Section 13(b) "focuses upon relief that is prospective, not retrospective." *AMG Cap. Mgmt., LLC v. FTC*, ––– U.S. ––––, 141 S. Ct. 1341, 1348, 209 L.Ed.2d 361 (2021); *see also Credit Bureau Ctr., LLC*, 937 F.3d at 772. Yet the power "to grant injunctive relief survives the discontinuance of the illegal conduct." *Accusearch Inc.*, 570 F.3d at 1201 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)) (applying the rule to a request for permanent

injunctive relief under § 13(b)); *Lifewatch Inc., 176 F.Supp.3d at 785–86* (same); 🚩 *Espenscheid v. DirectSat USA, LLC, 705 F.3d 770, 773 (7th Cir. 2013)*. To show that relief is needed when a violation has ceased, a party must demonstrate "some cognizable danger of recurrent violation," and the court should consider all of the circumstances, including "the bona fides of the expressed intent to comply, the effectiveness of the discontinuance, and, in some cases, the character of the past violations." 🚩 *W.T. Grant Co., 345 U.S. at 633, 73 S.Ct. 894*; *see also* 🚩 *United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l, 563 F.3d 257, 275–76 (7th Cir. 2009)* (finding that voluntary cessation of wrongful conduct is a factor to consider when deciding if an injunction is necessary, and that the court may also consider what led to the cessation and how easily former practices may be resumed); *Wilk v. American Med. Ass'n, 895 F.2d 352, 367 (7th Cir. 1990)*.

**[27]** The complaint says that Walmart is violating is or is about to violate § 5. **[1]** ¶ 105. And beyond that conclusory allegation, the FTC has plausibly alleged some likelihood that Walmart's unlawful conduct will recur. For instance, the complaint says that Walmart repeatedly failed to train its employees or institute robust fraud-prevention systems, despite waves of consumer complaints, repeated audits by its money transfer providers that reported deficiencies, and receipt of consent orders requiring more. *See id.* ¶¶ 35, 37–38, 40, 43, 46, 48–52, 105. While the complaint doesn't date all of its allegations (suggesting that the underlying conduct continues), *see, e.g., id.* ¶¶ 40, 46, the FTC identifies problems with Walmart's inadequate fraud-prevention efforts as recently as 2019. *See id.* ¶¶ 15, 17, 56, 100. Walmart corrected some of its practices only after the FTC began investigating in 2017. *See id.* ¶¶ 57, 62, 64, 76, 85, 100, 105. And the company has opportunity and incentive to continue its lax security practices: Walmart still processes large amounts of money transfers and makes millions of dollars in related fees. *See id.* ¶¶ 8–14, 22. [35]

**\*22** The FTC has shown some reason to believe that Walmart is or is about to violate § 5. If it prevails in this case, a permanent injunction may be available.

### *4. Due Process*

**[28]   [29]   [30]   [31]** Walmart argues that § 5 is unconstitutionally vague as applied in this case. *See* **[24]**

at 48–50. [36]   Under the Due Process Clause of the Fifth Amendment, "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." 🚩 *Midwest Fence Corp. v. United States Dep't of Transp., 840 F.3d 932, 947 (7th Cir. 2016)* (quoting 🚩 *FCC v. Fox Television Stations, Inc., 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012)*). Due Process doesn't mean "perfect clarity and precise guidance." *Hegwood v. City of Eau Claire, 676 F.3d 600, 603 (7th Cir. 2012)* (quoting 🚩 *Ward v. Rock Against Racism, 491 U.S. 781, 794, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989)*). But a statute is impermissibly vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." 🚩 *Ctr. for Individual Freedom v. Madigan, 697 F.3d 464, 478–79 (7th Cir. 2012)* (quoting 🚩 *Fox Television Stations, Inc., 567 U.S. at 253, 132 S.Ct. 2307*).

**[32]   [33]   [34]** "[T]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." 🚩 *Karlin v. Foust, 188 F.3d 446, 458 (7th Cir. 1999)* (quoting 🚩 *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)*). Criminal statutes must be clearer than laws that carry only civil penalties, and laws must be clearest when constitutional rights are at stake. *See* 🚩 *Vill. of Hoffman Estates, 455 U.S. at 498–99, 102 S.Ct. 1186*; 🚩 *Fuller ex rel. Fuller v. Decatur Public Sch. Bd. of Educ. Sch. Dist. 61, 251 F.3d 662, 667 (7th Cir. 2001)*. In deciding whether a statute is vague, courts look to the words of the law itself, the interpretations of other courts, "and, perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it." 🚩 *Grayned v. City of Rockford, 408 F.3d 104, 110, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)*; 🚩 *United States v. Cook, 970 F.3d 866, 874 (7th Cir. 2020)* (considering an earlier construction of a statute by the Seventh Circuit in assessing a vagueness challenge); 🚩 *Pleasureland Museum, Inc. v. Beutter, 288 F.3d 988, 995–96 (7th Cir. 2002)* (quoting 🚩 *Vill. of Hoffman Estates, 455 U.S. at 494 n.5, 102 S.Ct. 1186*) (ruling that, in assessing vagueness "a federal court must, of course, consider any limiting construction that a state court or enforcement agency has offered").

[35]   [36]   [37]   Section 5 of the Act doesn't implicate any constitutional rights, regulates economic behavior, and is a civil statute (not a criminal one). *See* 15 U.S.C. § 45; *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 255 (3d Cir. 2015). That means that Walmart is entitled to the lowest level of notice under the Due Process Clause. *See Fuller ex rel. Fuller*, 251 F.3d at 667 (citing *Vill. of Hoffman Estates*, 455 U.S. at 497, 102 S.Ct. 1186); *United States v. Walton*, 36 F.3d 32, 35 (7th Cir. 1994) (citations omitted). The statute sets up a cost-benefit analysis: regulated parties must compare a substantial injury that they have caused to consumers with "countervailing benefits to consumers or to competition," while also considering whether injuries were reasonably avoidable. 15 U.S.C. § 45(n); *see also FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010); *American Fin. Services Ass'n v. FTC*, 767 F.2d 957, 975–76 (D.C. Cir. 1985); *Orkin Exterminating Co., Inc. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (citation omitted); *Wyndham Worldwide Corp.*, 799 F.3d at 255 (citations omitted). This flexible standard isn't unusual: laws often require people to correctly judge how a standard applies to their conduct, *see Benner v. Carlton*, 58 F.4th 923, 927 (7th Cir. 2023) (quoting *Johnson v. United States*, 576 U.S. 591, 603–04, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015)), and flexible rules may still comply with the requirements of Due Process. *See Midwest Fence Corp.*, 840 F.3d at 947–48.

**\*23**   [38]   The complaint alleges that Walmart knew about a substantial injury to consumers. MoneyGram, Western Union, and Ria told Walmart repeatedly about the hundreds of thousands of complaints about fraud involving Walmart's money transfers, and about hundreds of millions of dollars in related consumer losses. *See* [1] ¶¶ 30–31, 43. While Walmart hasn't contested causation yet, it seems likely that not all of those losses were attributable to deficiencies in Walmart's anti-fraud programs. But it's reasonable to infer that some of these injuries *were* caused by Walmart's conduct. The complaint says that Walmart failed to take basic steps to prevent or mitigate fraud, such as implementing and maintaining effective policies and procedures, consistently training its employees, requiring IDs for all money transfer recipients, warning consumers about the risk of fraud, and communicating with its providers so that fraudsters would be

blocked from making future transfers. *See, e.g., id.* ¶¶ 49, 51–54, 56, 70–80, 88–89, 95–101.

Walmart's as-applied challenge fails when considering the magnitude of the consumer injury at issue. Section 5 required to Walmart to weigh the benefits of non-existent or lax security measures against the substantial harm to consumers who were defrauded as a result. As a sophisticated corporation, defendant was well-positioned to conduct that analysis. The FTC alleges that Walmart knew that its customers were losing millions to fraudsters making use of it services, but the company failed to implement and maintain its own policies and procedures and violated those of its money transfer providers. *See* [1] ¶¶ 16, 26, 30–31, 40, 43, 49, 50–51. As a result, consumers suffered millions of dollars in losses which were, as discussed above, not avoidable by the consumers themselves. Walmart hasn't argued that its conduct met the balancing test, and § 5 was clear enough as applied in this case to "provide a person of ordinary intelligence fair notice" that Walmart needed to do more. *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 132 S.Ct. 2307, 183 L.Ed.2d 234 (2012).

Walmart argues that the FTC's complaint needed to tell the company what it had to do so as to avoid liability. *See* [24] at 49. "Do better," is not meaningful guidance. Fair enough. But plaintiff wasn't required to guide Walmart's conduct in its complaint. The FTC was required to articulate a plausible set of allegations demonstrating that Walmart engaged in a practice that caused substantial consumer injury, that consumers could not reasonably avoid, and that was not justified by a cost-benefit analysis. That much the FTC has done.

Walmart also argues that the law didn't provide a sufficient standard against which the company was to compare its anti-fraud efforts. *See* [24] at 49. The FTC has targeted a set of practices, and Walmart argues that without more specific guidance, the company couldn't have known it would run afoul of § 5. *See id.* But in addition to the text of the statute, Walmart also had the benefit of cases considering similar issues and practices. *See Grayned*, 408 U.S. at 110, 92 S.Ct. 2294 (holding that court interpretations of a statute are relevant to a void-for-vagueness analysis); *United States v. Plummer*, 581 F.3d 484, 488–89 (7th Cir. 2009). In *Wells*, the FTC alleged that defendants—a payment processing company and an officer of that company—failed to follow security guidelines, ignored a high rate of expected fraud,

ignored related consumer and bank complaints, and instead processed related transactions, causing harm to consumers. *See* Complaint ¶¶ 5–6, 8–17, *FTC v. InterBill Ltd. and Thomas Wells*, No 2:06-cv-01644-JCM-PAL, 2006 WL 4062458 (D. Nev. Dec. 26, 2006). The district court found that those allegations were supported by the uncontroverted evidence, and granted summary judgment to the FTC on its § 5 claim. *See FTC v. InterBill, Ltd.*, No. CV-S-06-01644-JCM-PA, 2009 WL 10267504, at \*1 (D. Nev. April 30, 2009). The Ninth Circuit affirmed, noting that, when a defendant received reports of fraud and reversed transactions at "10 to 20 times" the generally permitted rates, failed to conduct "reasonable due diligence," ignored other red flags, and knew or should have known that transactions were unauthorized, carrying out the related transactions was an unfair practice. *FTC v. Wells*, 385 Fed. App'x. 712, 713 (9th Cir. 2010).

**\*24** In Neovi, the FTC brought suit under § 5 against a software maker. *See FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010). Fraudsters took advantage of the defendant's vulnerable systems, leading to fraudulent transactions totaling more than $402,750,000 in losses. *See id.* at 1154. Despite receiving thousands of complaints, the software maker didn't effectively utilize its anti-fraud systems or otherwise solve the problem, and continued processing the fraudulent transactions, legitimizing them in the eyes of consumers. *See id.* at 1154–57. The Ninth Circuit affirmed a district court's grant of summary judgment to the FTC on the question of liability. *Id.* at 1153.

That the courts in Neovi and *Wells* found defendants liable under § 5 for a set of deficiencies in their anti-fraud programs and for allowing business to go forward as usual despite notice of significant consumer losses, is further reason to believe that Walmart had fair notice. *See FTC v. Wells*, 385 Fed. App'x. 712, 713 (9th Cir. 2010); *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015). While Walmart complains that it was surprised to find itself in hot water over such a broad set of practices, these cases and those filed against Walmart's money transfer providers (discussed below) should have alerted the company that a set of decisions and practices that, together, failed the cost-benefit analysis and substantially injured consumers, could be prohibited under § 5. [37]

As further reason to find that Due Process was met, the FTC cites the complaints it filed against MoneyGram and Western Union and the related consent orders it reached with those companies. *See* [43] at 35–36. While weaker evidence, these sources also suggest that Walmart had fair notice of what § 5 required. [38] Considering the complaints filed against Walmart's money transfer providers and the resulting consent orders, the FTC alleged similar theories of liability under § 5, suggesting that the agency itself thought that lax security practices related to money transfers could fail the test. *See* [1] ¶¶ 35, 37–38; *FTC v. MoneyGram Int'l, Inc.*, No. 09-cv-6576, at Dkt. 1, 13, 20 (N.D. Ill. Oct. 19, 2009); *FTC v. The Western Union Co.*, No. 17-cv-0110, at Dkt. 1, 12 (M.D. Pa. Jan. 19, 2017); *see also* 16 C.F.R. § 3.11(a) (The FTC Commissioners must vote on whether to issue a complaint.).

Walmart failed to take basic steps to prevent fraud in its money transfers, despite knowledge of enormous consumer losses. While § 5 sets up a flexible rule, considering the economic context, the balancing test set up by § 5(n), and cases imposing and suggesting liability under similar circumstances, Walmart had fair notice that lax fraud prevention that injured consumers was forbidden.

## C. Removal Protections and Agency Authority

**\*25** Walmart argues that the Commission, by virtue of the removal protections for its commissioners, is unconstitutionally exercising executive power with this complaint. *See* [24] at 18–23. Defendant identifies a potentially unconstitutional limit on the President's removal authority, but that's not a reason to dismiss plaintiff's claims.

The FTC is led by a commission of five members, who are appointed by the President and confirmed by the Senate. *See* 15 U.S.C. § 41; *Humphrey's Ex'r v. United States*, 295 U.S. 602, 619–20, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). No more than three of the FTC's members can come from the same political party, and the Commissioners' staggered, seven-year terms enable the agency to accumulate technical expertise that outlasts changes in leadership. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 2198–99, 207 L.Ed.2d 494 (2020) (quoting *Humphrey's Ex'r*, 295 U.S. at 624, 55 S.Ct. 869); 15 U.S.C. § 41. The President can remove a Commissioner— a principal officer of this independent agency—but only for good cause: "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41; *see Free Enter. Fund v. Public*

*Co. Acct. Oversight Bd.*, 561 U.S. 477, 493, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010) (discussing *Humphrey's Ex'r*, 295 U.S. at 620, 55 S.Ct. 869).

[39]  The Commissioners' for-cause protections stand in contrast to the general rule: the President may remove most executive officials from office for any reason. *See* Art. II, §§ 1, 3 ("The executive Power shall be vested in a President" who must "take Care that the Laws be faithfully executed."); *Seila Law LLC*, 140 S. Ct. at 2197–98 (citing *Myers v. United States*, 272 U.S. 52, 163–64, 47 S.Ct. 21, 71 L.Ed. 160 (1926) and *Free Enter. Fund*, 561 U.S. at 483, 130 S.Ct. 3138). The Court has recognized two exceptions, however. *See Seila Law LLC*, 140 S. Ct. at 2198–2200. The first exception—at issue here—applies to "multimember expert agencies that do not wield substantial executive power." *Id.* at 2199–2200.

In *Humphrey's Executor*, the Court upheld for-cause removal protection for the FTC's Commissioners. 295 U.S. at 631–32, 55 S.Ct. 869. The *Humphrey's Executor* Court reasoned that the Commission was an administrative body that performed executive functions as part of its "quasi-legislative or quasi-judicial powers." *Id.* at 628, 55 S.Ct. 869. The Court also stressed the Commission's non-partisan and staggered term structure, and saw the agency as exercising "no part of the executive power." *Id.* at 624, 628, 55 S.Ct. 869; *see Seila Law LLC*, 140 S. Ct. at 2199.

[40]  Decades after *Humphrey's Executor* was decided, Congress granted the FTC new powers, which the agency has invoked in this case. *See* 15 U.S.C. §§ 45(m), 53(b), 57b. These provisions allow the FTC to seek permanent injunctive relief (without agency adjudication) and civil penalties in federal court. *See id.* While the FTC's removal protections were lawful in 1935 (when *Humphrey's Executor* was decided), Walmart argues that the subsequent grant of litigation authority took the FTC out of *Humphrey's Executor* exception. *See* [24] at 18–23. Walmart reasons that the litigation authority granted to the Commission is substantial executive power that wasn't considered in *Humphrey's Executor*. *See id.*

The litigation authority given to the FTC in the 1970s may have taken the Commission's for-cause protections past "the outermost constitutional limits" on the President's removal power. *See Seila Law LLC*, 140 S. Ct. at 2199–2200 (quoting then-Judge Kavanaugh's dissent in *PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 196 (D.C. Cir. 2018)) (noting that the power to seek monetary penalties against private parties on behalf of the United States is "a quintessentially executive power not considered in *Humphrey's Executor*"). [39] But it doesn't follow that plaintiff cannot pursue this lawsuit.

*26  [41]  The Act includes a severability clause, which means Congress didn't want it to rise or fall on any single provision, absent strong evidence to the contrary. *See* 15 U.S.C. § 57; *Seila Law LLC*, 140 S. Ct. at 2209 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686, 107 S.Ct. 1476, 94 L.Ed.2d 661 (1987)). Since the agency's structure was lawful before Congress granted it the litigation powers invoked in this case, Walmart argues that the solution is to strike the FTC's litigation authority, rather than the removal protections. *See* [24] at 23 (citing *Barr v. American Ass'n of Political Consultants, Inc.*, ––– U.S. ––––, 140 S. Ct. 2335, 2353, 207 L.Ed.2d 784 (2020) and *Bowsher v. Synar*, 478 U.S. 714, 734–35, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986)). But the constitutional problem at issue centers on the interaction of the Commissioners' removal protections with the subsequent litigation authority given to the agency, not an unconstitutional amendment to an earlier law. *Cf. Barr*, 140 S. Ct. at 2353. In other words, the grant of executive power to the FTC, standing on its own, isn't unconstitutional: executive agencies often have power to sue for penalties or injunctive relief. *See, e.g.*, 7 U.S.C. § 13a-1(b), (d) (Commodity Futures Trading Commission); 15 U.S.C. § 78u(d) (Securities Exchange Commission); *see also Free Enter. Fund*, 561 U.S. at 508–09, 130 S.Ct. 3138 (holding that an agency's regulatory authority didn't violate the separation of powers, but the removal protections for its officers did). The real problem here is a potentially unconstitutional limit on the President's removal power. The best solution would be to target that limit.

[42]  In cases when the Court has confronted similar issues, the remedy has been to strike the offending removal

protections. *See* 🚩 *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 508–09, 130 S.Ct. 3138, 177 L.Ed.2d 706 (2010); 🚩 *Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 2207–11, 207 L.Ed.2d 494 (2020); *see also* 🚩 *Collins v. Yellen*, —— U.S. ——, 141 S. Ct. 1761, 1787–88 & n.23, 210 L.Ed.2d 432 (2021) ("Settled precedent ... confirms that the unlawfulness of [a] removal provision does not strip the [officer] of the power to undertake the ... responsibilities of his office.").[40] That makes sense, given that "when confronting a constitutional flaw in a statute," courts should "try to limit the solution to the problem." 🚩 *Free Enter. Fund*, 561 U.S. at 508, 130 S.Ct. 3138 (quoting 🚩 *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 328–29, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006)).

Another reason not to strike the agency's litigation authority is that it might not resolve the issue. As Walmart notes, the 🚩 *Humphrey's Executor* Court may not have accurately assessed the FTC's executive powers as they existed in 1935. *See* [24] at 23; 🚩 *Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 2198–00 & nn.2, 4, 207 L.Ed.2d 494 (2020). Striking the FTC's ability to sue for injunctive and monetary relief, then, might not be enough. The sure solution, as in *Seila Law*, would be to target the offending removal provision. *See* 🚩 *Seila Law LLC*, 140 S. Ct. at 2209 ("If the Director were removal at will by the President, the constitutional violation would disappear.").

The Commissioners were constitutionally appointed, and an unconstitutional removal restriction isn't a reason to void the FTC's action in this case. *See* U.S. Const. art. II, § 2, cl. 2; 🚩 *Collins*, 141 S. Ct. at 1787–88 & n.23. The FTC has authority to bring this suit.

## IV. Conclusion

 **[43]**  Defendant's motion to dismiss, [23], is granted in part and denied in part. Count One is not dismissed. Count Two is dismissed without prejudice.[41]

## All Citations

--- F.Supp.3d ----, 2023 WL 2646741

## Footnotes

1  Bracketed numbers refer to entries on the district court docket. Page numbers are taken from the CM/ECF header placed at the top of filings. The facts are taken from the complaint. [1].

2  First-time senders had to give their name, address, telephone number, the name of the recipient, and the state or province and country where the money was headed, but repeat customers weren't required to complete the full form. [1] ¶ 20.

3  Before 2018, the most a customer could send through MoneyGram was $20,000 per day, with a maximum single transaction of $10,000. [1] ¶ 19. In early 2018, MoneyGram lowered the single transaction limit to $8,000. *Id.* Ria money transfers through the Walmart2Walmart service were capped at $900, but that limit was raised to $2,500 in October 2016. *Id.* Before 2018, there were no limits on the amount of money that a customer could receive in a single day through either MoneyGram or Ria. *Id.* In Canada, Walmart customers could send a maximum of $7,500 (CAD) in a single transfer, and could receive no more than $5,000 (CAD). *Id.*

4  Money transfers that were related to complaints (and could have been fraud-induced) totaled over $1.3 billion. [1] ¶ 43.

5  A 2018 Walmart analysis identified 317 instances when Walmart stores met a court-established criteria for an Elevated Fraud Risk Agent Location based on the number of complaints made at certain Walmart stores. [1] ¶ 47; *see FTC v. The Western Union Co.*, 17-cv-0110, at Dkt. 12, ¶ F (M.D. Pa. Jan. 1, 2017).

6    There's an allegation that these and similar scams violated 🚩15 U.S.C. § 45(a), and that many of the same scams violated 16 C.F.R. § 310. *See* [1] ¶ 41. Consumers in such scams were instructed to send money transfers, and were induced to pay for goods or services or to make payments as a result of circumstances that did not actually exist. *See id.*

7    The cases cited by defendant don't show that a consent order can never bind—either explicitly (by applying through its terms to the agents of a signatory) or through the operation of contracts law—a non-party to the consent order. In 🚩*Altria Group, Inc.*, the Supreme Court noted that "a consent order is ... only binding on the parties to the agreement," but didn't consider the situation alleged in this case: a consent order that allegedly ran to the agent of a party to the order. 🚩*Altria Group, Inc. v. Good*, 555 U.S. 70, 89 n.13, 129 S.Ct. 538, 172 L.Ed.2d 398 (2008). 🚩*Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland* doesn't disagree, because the Court in that case reasoned that parties to a consent decree could not impose obligations on a third party "without that party's agreement." 🚩478 U.S. 501, 529, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). In this case, the complaint says that Walmart entered contracts that required Walmart to comply with orders that applied to MoneyGram and Western Union. *See* [1] ¶¶ 34, 39. At this point in the case, it's reasonable to infer that these consent orders applied to Walmart as the agent of its money transfer providers. *See also* 🚩*Consumer Fin. Prot. Bureau v. TransUnion*, No. 22 C 1880, 2022 WL 17082529, at *5–7 (N.D. Ill. Nov. 18, 2022) (holding that an officer of a corporation was bound by a consent order binding the corporation); 🚩*Ferrell v. Pierce*, 743 F.2d 454, 461 (7th Cir. 1984) (citation omitted) (noting that contract principles apply to the interpretation of a consent decree).

8    As a licensed money service business, Walmart was subject to the Bank Secrecy Act, which required the company to prevent certain types of fraud. *See* [1] ¶ 39; 🚩31 U.S.C. § 5311 *et seq.*

9    A 2017 MoneyGram review of Walmart's anti-fraud program identified several problems, including that defendant hadn't effectively prevented fraud, kept required transaction records, and had failed to report, file, or refer suspicious activity reports. [1] ¶ 54. MoneyGram told Walmart that its main concern was that Walmart wasn't rejecting potentially fraudulent transactions at the receive end of the transaction. *Id.*

10   A quick reference guide for Walmart associates said that if associates suspected fraud on the receiving end, they should complete the transaction. *See* [45-1] at 26. Employees were then to immediately report the fraud. *Id.* Elsewhere in the guide, employees were told not to process suspicious transactions. *Id.* at 24, 27.

11   Along the same lines, MoneyGram's 2009 consent order with the FTC required its agents to offer mandatory training at high-risk locations. [1] ¶ 77. Yet in many cases Walmart didn't promptly train employees after MoneyGram identified stores where fraud was prevalent. *Id.*

12   Ria identified many Walmart stores from 2017 to 2019 as being at a high risk for fraud. [1] ¶ 83. Some Walmart stores didn't have the right resources for employees. *Id.* ¶ 85. And compliance reviews by MoneyGram and Ria found other problems: Walmart employees weren't properly trained and didn't accurately keep records, report suspicious actives, or verify customer identities. *Id.* ¶¶ 86–89.

13   Walmart didn't provide information to its money transfer providers about all of the fraud complaints and reports it received. [1] ¶ 102. By failing to report some fraud to Ria, MoneyGram, and Western Union, Walmart made it harder for those companies to mitigate consumer fraud. *Id.* ¶ 103.

14   A cash-to-cash money transfer is the electronic transfer of cash from one person to another "sent by a money transfer provider and received in the form of cash." 16 C.F.R. § 310.2(f).

15   *AFD Advisors, LLC* is distinguishable, because the allegations in that case didn't involve fraud. *See* *FTC v. AFD Advisors, LLC*, No. 13 CV 6420, 2014 WL 274097, at *2 (N.D. Ill. Jan. 24, 2014). The complaint in this case sounds repeatedly in fraud. Because plaintiff's TSR claims are premised on a course of deceptive or fraudulent conduct, I disagree with *FTC v. Student Aid Center, Inc.* insofar as that case suggests that *Rule 9* can never apply to a TSR claim. *281 F.Supp.3d 1324, 1331–32 (S.D. Fla. 2016)*; *see* *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007); *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019) (allegations of deception trigger *Rule 9(b)*).

16   *See United States v. Caballero*, No. 16-cr-0124 (E.D. Ark.); *United States v. Caballero*, No. 16-cr-0201 (D. Minn); *United States v. Mirabel*, No. 16-cr-0269 (N.D. Tex.); *United States v. Pando*, No. 17-cr-0046 (N.D. Miss); *United States v. Labra*, No. 17-cr-0314 (D. Md.); *United States v. Gohill*, No. 17-cr-0212 (E.D. Wis.); *United States v. Patel*, No. 17-cr-0094 (E.D. Wis.); *United States v. Marcks*, No. 19-cr-0315 (D. Nev.); *U.S. v. Parmar*, No. 19-cr-0160 (E.D. Va.); *United States v. Hines*, No. 17-cr-1038 (N.D. Iowa); *United States v. Smith*, No. 21-cr-0372 (M.D. Pa.); *United States v. Budhadev*, No. 20-cr-0252 (M.D. Pa.).

17   The cases cited by the FTC are distinguishable. *Glob. Mktg. Grp., Inc.*, involved the evidence supporting a monetary judgment under the TSR, not the pleading standard for a violation of the rule. *FTC v. Glob. Mktg. Grp., Inc.*, 594 F.Supp.2d 1281, 1290 (M.D. Fla. 2008). The court in *Figgie Int'l Inc.* found that a showing of individual reliance on misrepresentations wasn't required to secure an injunction to prevent unfair practices, but didn't assess what was required to allege a violation of the TSR. *FTC v. Figgie Int'l Inc.*, 994 F.2d 595, 605–06 (9th Cir. 1993).

18   That Walmart associates were told to process certain suspicious transactions, [1] ¶ 55, doesn't show that the company knew that those transactions were violating the TSR. Similarly, Walmart's general awareness of criminal prosecutions involving money transfers at its stores, *id.* ¶¶ 27–28, receipt of consent orders, *id.* ¶¶ 35, 37–38, 105, and the language of the TSR's preamble—describing the general use of money transfers by telemarketers—aren't sufficient, either.

19   The facts here aren't like those in *HES* and *Chapman*, cases involving detailed awareness of red flags related to particular set of accounts and transactions. *See* *FTC v. HES Merch. Services Co., Inc.*, No. 6:12-cv-1618-ORL-22KRS, 2014 WL 6863506, at *8 n.5 (M.D. Fla. Nov. 18, 2014); *FTC v. Chapman*, 714 F.3d 1211, 1217–19 (10th Cir. 2013). Here, by contrast, Walmart isn't alleged to have had reason to suspect any particular transactions or subset of transactions, but was generally aware of fraud in its (extensive) money transfer business.

20   In its original version of the rule, the FTC would have required more of a direct connection between a third party's assistance and an underlying violation, but the FTC rejected that requirement in the final rule. *See* Revised Notice of Proposed Rulemaking, Telemarketing Sales Rule, 60 Fed. Reg. 30,406, 30,414 (June 8, 1995); Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995). Explaining the change, the FTC cited a concern that the additional element of proof "would burden law enforcement." Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851 (Aug. 23, 1995).

21   Because the FTC rejected a direct-relation requirement for substantial assistance, the *Rosen* court concluded that aider-abettor principles under securities law weren't persuasive as to what constitutes substantial assistance under the TSR. *See* *C.F.P.B. v. Daniel A. Rosen, Inc.*, Case No. 2:21-cv-07492-

VAP-(JDEx), 2022 WL 1514439, at *4 (C.D. Cal. Apr. 5, 2022) (citations omitted). I disagree with *Rosen*'s conclusion that these background principles aren't relevant. The agency removed the direct-connection requirement to avoid burdening law enforcement (not to signal deviation from aiding-and-abetting principles) and, in the same explanation for the rule, cited tort and securities laws and referenced an "ordinary" understanding of the word "substantial." *See* Statement of Basis and Purpose and Final Rule, Telemarketing Sales Rule, 60 Fed. Reg. 43,842, 43,851–52 & nn.96–98 (Aug. 23, 1995).

22   Processing extraordinary transactions, given the right amount of knowledge, can be active participation in the underlying fraud. *See Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1025–26 (7th Cir. 2018) (citations omitted) (applying Illinois law and noting that, under Restatement (2d) of Torts § 876, in-

concert liability requires active participation in the tortious conduct of another); *JP Morgan Chase Bank v. Winnick*, 406 F.Supp.2d 247, 257 (S.D.N.Y. 2005) (citation omitted) (executing an ordinary transaction can be substantial assistance if it "made a substantial contribution to the perpetration of the fraud"); *see*

also *Aluminicaste Fundicion De Mex. S. De RL CV v. Shen*, Case No. 2:17-cv-002255-CAS( ), 2017 WL 6453276, at *10 (C.D. Cal. Dec. 11, 2017) (deciding that performance of an ordinary business transaction when a bank knows it's assisting in the commission of a tort is active participation).

23   When Walmart employees actively participated in fraud, *see* [1] ¶ 50, Walmart may have crossed the culpability line, but those transactions need to be alleged with particularity.

24   Any violation of the TSR would constitute a violation of Section 5. *See* 15 U.S.C. §§ 6102(c), 57a(d)(3).

25   *Samuels* is distinguishable because that case involved Illinois law, which applies the factors from *Sperry*

(and *Spiegel*). *See Samuels v. Old Kent Bank*, No. 96 C 6667, 1997 WL 458434, at *9 (N.D. Ill. Aug. 1, 1997); *see also Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014) (citing *Robinson v. Toyota Motor Credit Corp.*, 201 Ill.2d 403, 417–18, 266 Ill.Dec. 879, 775 N.E.2d 951 (2002)). Insofar as

*Samuels* or other cases applying Illinois law suggest that *Spiegel* or *Sperry* define the test under the Federal Trade Commission Act, I disagree.

26   That the Supreme Court in *Sperry* referred to the FTC's approach to unfairness underscores the one-to-one relationship between how the FTC must approach unfairness under § 5 and how that term is reviewed in

a court. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972). In arguing that § 5(n)'s requirements are necessary conditions for a finding of unfairness, *see* [44] at 22, Walmart admits that there's overlap between § 5(n)'s approach and the definition of unfairness under § 5(a).

27   The *LabMD* court understood the FTC's 1980 policy statement, combined with *Sperry*, to establish a

requirement that to be unfair an act must violate an established public policy. *See LabMD, Inc. v. FTC*, 894 F.3d 1221, 1229 & n.24, 1231 & n.28 (11th Cir. 2018). I decline to follow the Eleventh Circuit's approach. While acknowledging that public policy considerations were relevant, neither *Sperry* nor the 1980 policy

statement specified that a violation of public policy was required to find unfairness. *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5, 92 S.Ct. 898, 31 L.Ed.2d 170 (1972); 1980 FTC Unfairness Policy

Statement. The *LabMD* court found § 5(n)'s discussion of public policy to be "ambiguous." *LabMD, Inc.*, 894 F.3d at 1229 n.24. While § 5(n) could perhaps have been clearer about the role of public policy considerations, it undermines the proposition that a violation of an established public policy is a requirement for finding unfairness. In fact, § 5(n) suggests that public policy considerations are an optional analysis. *See*

🚩15 U.S.C. § 45(n) (emphasis added) ("[T]he Commission *may* consider established public policies as evidence."); *see also* 🚩*Sperry & Hutchinson Co.*, 405 U.S. at 245 n.5, 92 S.Ct. 898 (discussing the possibility that an act or practice could be unfair based only on a finding of substantial injury); 🚩*FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 244 (3d Cir. 2015) ("[Section 5(n)] acknowledges the potential significance of public policy."); *Miner v. Gov't Payment Serv., Inc.*, Case No. 1:14-cv-07474, 2015 WL 3528243, at *6 (N.D. Ill. June 4, 2015). A public policy analysis under § 5 began with the FTC's 1964 approach, as discussed in 🚩*Sperry*. But Congress has now addressed the subject, and under § 5(n) a violation of public policy is no longer required.

28    That the word unfair sometimes means injustice or wrongfulness, *see, e.g.,* 🚩*Zablocki v. Merchants Credit Guide Co.*, 968 F.3d 620, 627 (7th Cir. 2020), isn't a reason to import additional requirements into the § 5 standard. Congress may define terms outside their usual meanings, and § 5(n) adequately defines unfairness without excluding wrongfulness as a relevant consideration.

29    The 🚩*Wyndham* court discussed the possibility that § 5(n)'s conditions may be necessary, rather than sufficient conditions for finding unfairness. *See* 🚩*FTC v. Wyndham Worldwide Corp,* 799 F.3d 236, 259 (3d Cir. 2015). The Third Circuit declined to decide the issue, and was unpersuaded by additional requirements proposed by a defendant. *See* 🚩*id.* Here, Walmart has failed to show additional requirements (beyond those specified in § 5(n)) that must be met before conduct qualifies as unfair. As discussed above, the two requirements that defendant proposes—a violation of established public policy and some version of wrongfulness—run counter to the text of § 5(n) and the FTC's 1980 policy statement.

30    Walmart argues that because the FTC is seeking an injunction to remedy violations of § 5, past conduct isn't relevant. *See* [44] at 24 n.8. But past violations of § 5 matter here because they can show that there remains a risk of future violations. *See* 🚩*United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); *see also* 🚩*United Air Lines, Inc. v. Air Line Pilots Ass'n, Int'l*, 563 F.3d 257, 275–76 (7th Cir. 2009).

31    That victims consciously chose to send money and that other people didn't send funds to fraudsters doesn't show that the injuries in this case were reasonably avoidable. *See* 🚩*Mayer v. Spanel Int'l Ltd.*, 51 F.3d 670, 675 (7th Cir. 1995) ("Tolerating fraud by excusing deceit when the victim is too easily gulled increases both the volume of fraud and expenditures on self-defense. Society is better off with less fraud and fewer precautions against it.").

32    That Walmart provided some warnings to consumers, *see* [1] ¶ 20, doesn't show that consumers had an informed choice. The FTC has alleged that Walmart's warnings were non-existent or insufficient in many circumstances. *See id.* ¶¶ 15–16, 49, 52, 68, 85, 99–101.

33    The FTC also asks for civil penalties for each violation of the TSR. *See* [1] ¶ 118; 🚩15 U.S.C. § 45(m)(1)(A). Because the complaint fails to allege any TSR violations, the request for related civil penalties is dismissed without prejudice. I decline to decide whether Walmart knew or should have known that its conduct was prohibited by the rule. *See* 🚩15 U.S.C. § 45(m)(1)(A).

34    *But see* 🚩*United States v. JS & A Grp., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983); 🚩*FTC v. Credit Bureau Ctr., LLC,* 937 F.3d 764, 773 (7th Cir. 2019) (noting that not every one of § 13(b)'s requirements apply to a request

for a permanent injunction). Even if some of § 13(b)'s requirements don't apply to permanent injunctions, however, they "inform the meaning of 'injunction' " in the statute. *Credit Bureau Ctr.*, 937 F.3d at 773.

35   Walmart argues that the agency needed to allege that Walmart could resume "a specific act or practice" that the company ceased because of the FTC's investigation, not a general set of practices that violate the law. *See* [44] at 20–21 (citing *FTC v. Elec. Payment Solutions of America Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at \*9–10 (D. Ariz. Aug. 28, 2019)). But violations of the law can include diffuse actions, and whether Walmart ceased its conduct because the FTC began investigating is just one relevant factor. That the court in *Electric Payment Solutions* considered a single scheme doesn't mean that only discrete actions can violate § 5. *See FTC v. Elec. Payment Solutions of America Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at \*9–10 (D. Ariz. Aug. 28, 2019). The other cases cited by Walmart are distinguishable. Unlike in *Shire* and *Facebook*, the complaint says that Walmart's conduct continues to violate § 5 and that the company changed course only after the FTC intervened. *See FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 159–60 (3d Cir. 2019); *FTC v. Facebook, Inc.*, 560 F.Supp.3d 1, 26–27 (D.D.C. 2021). This case isn't like the situation in *AdvoCare* because Walmart continues to process large numbers of money transfers, *see* [1] ¶¶ 8, 82, which means the "channels of misconduct utilized by" Walmart remain open. *FTC v. AdvoCare Int'l, L.P.*, CIVIL NO. 4:19-CV-715-SDJ, 2020 WL 6741968, at \*6 (E.D. Tex. Nov. 16, 2020).

36   A statute can be vague either facially—in the abstract—or as-applied, meaning "in light of the facts of the particular case." *United States v. Cook*, 970 F.3d 866, 873 (7th Cir. 2020) (citing *Maynard v. Cartwright*, 486 U.S. 356, 361, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) and *United States v. Johnson*, 875 F.3d 360, 370 (7th Cir. 2017)). Generally, the constitutionality of a statute is determined as applied to a litigant. *Id.* (citing *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19, 130 S.Ct. 2705, 177 L.Ed.2d 355 (2010) and *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

37   *LabMD, Inc.*, is distinguishable, because that case discussed the clarity required in a cease-and-desist order, not what was required to put a party on notice under the Due Process Clause. *See LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235–36 (11th Cir. 2018).

38   Walmart is right that consent orders are not precedential and do not reflect merits determinations as to liability under § 5. But the complaints and consent orders in this case are relevant to what § 5 requires because they provide a signal of the FTC's interpretation of that law. *See Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *see also FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 256–58 & n.23 (3d Cir. 2015). Recall that the FTC is the only party that can bring an action under § 5, making its interpretation a signal to potential defendants.

39   There's reason to believe that the FTC may still fall within the exception. The *Humphrey's Executor* exception is premised not only on the amount of executive power an agency wields but also on organizational features that show an agency to be non-executive. *See Humphrey's Executor v. United States*, 295 U.S. 602, 624, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). And, even after *Seila Law*, it's not clear how much executive power is too much, such that the removal protections of an independent agency, formed like the FTC, offend Article II. *See Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 2199–2200 & nn.2, 4, 207 L.Ed.2d 494 (2020). That the Supreme Court has repeatedly declined to overturn *Humphrey's*

*Executor*, even after the agency was granted additional litigation authority by Congress, may also show that the agency's removal protections continue to fall under the exception.

40    Walmart argues that *Seila Law* and ⚑*Collins* are distinguishable because those cases considered agencies that had executive powers from the outset, and so accompanying removal restrictions were never enforceable. *See* [24] at n.3 (discussing ⚑*Seila Law LLC v. Consumer Fin. Prot. Bureau*, —— U.S. ——, 140 S. Ct. 2183, 2207–11, 207 L.Ed.2d 494 (2020) and ⚑*Collins v. Yellen*, —— U.S. ——, 141 S. Ct. 1761, 1788–89 & n.23, 210 L.Ed.2d 432 (2021)). But those cases are helpful insofar as they considered—and remedied—statutes that unconstitutionally limited the President's removal power. That the potential removal problem in this case began with a grant of litigation authority doesn't change the underlying problem, which is about the President's removal power, not about a principal officer's use of executive power.

41    Ordinarily a plaintiff should be given at least one opportunity to amend a complaint. *See* 🚩*Saint Anthony Hosp. v. Eagleson*, 40 F.4th 492, 517 (7th Cir. 2022) (quoting ⚑*Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Northwest Indiana*, 786 F.3d 510, 519 (7th Cir. 2015)).

---

**End of Document**      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.




DATE DOWNLOADED: Thu Jan 18 15:23:01 2024
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred
citation format's style manual for proper citation formatting.

Bluebook 21st ed.
90 F.T.C. 1 (1977).

ALWD 7th ed.
, , 90 F.T.C. 1 (1977).

APA 7th ed.
(1977). Federal Trade Commission Decisions, 90, 1-979.

Chicago 17th ed.
"," Federal Trade Commission Decisions 90 (1977): 1-979

AGLC 4th ed.
'' (1977) 90 Federal Trade Commission Decisions 1

OSCOLA 4th ed.
'' (1977) 90 FTC 1        Please note: citations are provided as a general
guideline. Users should consult their preferred citation format's style manual for
proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

subsidiaries', brand names or labels, or (2) whereby such concern discontinues its participation in the asphalt and tar roofing industry and thereafter transfers to JWC, [67] or its subsidiaries, its customer lists or in any other way makes available to JWC its customers or customer accounts.

7. *It is further ordered,* That respondent shall periodically, within sixty (60) days from the date this order becomes final and every sixty (60) days thereafter, submit to the Federal Trade Commission a detailed, written report of its actions, plans and progress in complying with the provisions of this order, and fulfilling its objectives. All compliance reports shall include, among other things that are periodically required, a summary of all serious discussions and negotiations with any persons who are potential owners or managers of the assets to be divested, the identity of all such persons as well as all internal memoranda, reports and recommendations concerning divestiture.

8. *It is further ordered,* That JWC is to notify the Federal Trade Commission at least thirty (30) days prior to any proposed change in the corporate structure such as dissolution of subsidiaries or any change in the corporation which may affect compliance obligations arising out of the order.

## OPINION OF THE COMMISSION

BY CLANTON, *Commissioner:*

The Commission issued its complaint in this matter on July 29, 1974, charging respondent Jim Walter Corporation (hereafter "JWC") with violating Section 7 of the Clayton Act (15 U.S.C. 18) by virtue of its April 1972 acquisition of Panacon Corporation (hereafter "Panacon"). The complaint alleged that the acquisition would have the probable effect of substantially lessening competition in the manufacture and distribution of "all asphalt roofing materials and of built-up roofing and shingles in the United States as a whole, and in certain states" by, *inter alia,* eliminating actual competition between JWC and Panacon in the relevant markets, discouraging entry of other firms, reducing the probability of independent pricing and enhancing the dominant position of JWC in the relevant market. JWC's asphalt roofing operations are conducted through its wholly-owned subsidiary, the Celotex Corporation (hereafter "Celotex"); and prior to the merger Panacon manufactured asphalt roofing products through the [2] Philip Carey Company (hereafter "Philip Carey"), a division of Panacon. (I.D. 15–16, 37)[1] A brief

_____
[1] The following abbreviations will be used throughout this opinion:

*(Continued)*

review of the history of the merging firms and the acquisition places this merger in perspective.

JWC, one of the nation's largest building and construction materials companies, is a publicly held corporation chartered and operated under the laws of the State of Florida with headquarters in Tampa, Florida. (I.D. 1–2) For its fiscal year ending August 31, 1972, the year of the merger, the firm reported consolidated revenues of $885,172,000; total assets of $983,217,000; and net income of $44,568,000. (I.D. 6) The origins of JWC trace back to 1946 when Jim Walter, now Chairman of the Board, formed a small partnership engaged in the construction of partially finished (or shell) homes. This activity constituted the principal business of the firm through its incorporation as JWC in 1955 until the early 1960's. (CX–28, p. 20) However, beginning with its purchase of a 34 percent stock interest in Celotex in 1962 (and the remainder of the stock in 1964), JWC's most dramatic growth resulted from a series of more than 20 acquisitions during the ten-year period preceding issuance of the complaint. Many of these acquired companies were merged into subsidiaries of JWC, including Celotex. (I.D. 7) As of the time of the instant acquisition, JWC conducted its operations through a large number of subsidiary corporations[2] which were organized into nine operating groups: mineral and fiber products; pipe products; home building; metal and wood products; stone and concrete products; paper; sugar; savings and loan operations; and oil and gas operations. (I.D. 3, 5) [3]

Significantly, JWC's entry and expansion in the asphalt and tar roofing market have been achieved through acquisition. The Celotex purchase gave JWC a one-plant capacity which was increased to eight plants by the acquisition of the Barrett Building Materials Division of Allied Chemical Corporation in 1967. (I.D. 18–19) The Panacon merger added yet five more roofing facilities previously operated by the Philip Carey Division. (I.D. 39)

Celotex is a wholly–owned JWC subsidiary incorporated under Delaware law; the firm shares headquarters with its parent in Tampa, Florida. (I.D. 15, 33) Apart from its asphalt roofing business, Celotex also produces a variety of other building materials including

---

I.D.     - Initial Decision, Finding No.
I.D.     p. - Initial Decision, Page No.
CX       - Complaint Counsel's Exhibit No.
RX       - Respondent's Exhibit No.
Tr.      - Transcript, Page No.
RAB      - Respondent's Appeal Brief
CAB      - Complaint Counsel's Answering Brief
RPF      - Respondent's Proposed Finding No.
CPF      - Complaint Counsel's Proposed Finding No.
[2] As of August 31, 1972, JWC had 28 wholly–owned or controlled subsidiaries. (CX–35M)

gypsum wallboard insulation, acoustical products and siding. (I.D. 16) The company's sales of asphalt roofing products amounted to $60,151,000 in 1971 and positioned it as the fifth ranking firm in an industry with total shipments valued at $680,980,400. (I.D. 20, 112; CX–15B *in camera*)[3] In addition to its existing roofing plants, Celotex had under construction at the time of the Panacon merger a new asphalt roofing plant in Goldsboro, North Carolina, estimated to cost $9–12 million. (I.D. 21)

Prior to its merger with JWC, Panacon was a corporation chartered under Michigan law, with its principal place of business at Cincinnati, Ohio. (I.D. 34) The Glen Alden Corporation held 89 percent of the stock in Panacon, the surviving entity of a 1970 merger between the Philip Carey Corporation and Briggs Manufacturing Company. (I.D. 35, 36) For calendar year 1971, Panacon reported revenues of $181,129,000; total assets of $106,008,000; and net profits of $10,591,293. (I.D. 37)

As did JWC, Panacon manufactured a wide range of building products through six operating divisions, including [4] Philip Carey. (I.D. 37) The latter was a major producer of asphalt and tar roofing products, with sales of $59,852,000 in 1971, a volume which made it the number six firm nationally in that market. (CX–15B, *in camera*) Philip Carey also was contemplating construction of a new roofing plant in Hopewell, Virginia at the time of the acquisition. In contrast to Celotex' Goldsboro facility, the Hopewell plant was estimated to cost only about $2 million, with less capacity and no felt mill. Plans for the Hopewell plant were scrapped after the merger. (I.D. 42, 43)

The acquisition of Glen Alden's 89 percent stock in Panacon on April 17, 1972, culminated several months of negotiations between officials of JWC and Glen Alden. (I.D. 46–51) Although Celotex ultimately purchased the stock, the deal was planned, negotiated and approved by JWC. (I.D. 65) The total purchase price, including the price paid for the remaining 11 percent interest, was $73 million. (I.D. 59) Following Panacon's merger into Celotex on June 30, 1972, the various divisions of Panacon were placed under different operating groups of JWC, although Philip Carey continued to be operated by Celotex. (I.D. 63–64) The merger propelled Celotex into the number two position in the asphalt and tar roofing market in 1972, with a market share of 17.2 percent and sales of $131,633,000. (CX–15C, *in camera*)

The administrative law judge, in his Initial Decision, determined that the acquisition violated Section 7 by intensifying concentration

[3] References to *in camera* data and testimony in this opinion reflect the fact that various orders issued by the ALJ providing for such protection expired by their terms on October 80, 1977.

671                                    Opinion

in the already highly concentrated asphalt and tar roofing industry, contributing significantly to an industry trend toward concentration and eliminating Philip Carey as a substantial competitive force in the market. (I.D. 139, 143) The law judge found the relevant line of commerce to be asphalt and tar roofing products and the geographic markets to consist of a national market and a 26–state (plus D.C.) regional market extending from Texas to Maine. (I.D. 80, 114) As relief the ALJ ordered divestiture of the Philip Carey assets and a ten-year ban on future acquisitions without prior Commission approval. Respondent appeals from the Initial Decision on both jurisdictional and substantive grounds. Complaint counsel, although not filing a cross appeal, urge the Commission in their answering brief to modify the ALJ's proposed order to require a spin-off of Panacon plus Celotex' Goldsboro, North Carolina plant. Our review of the issues follows. [5]

## I. JURISDICTION

### A. Proper Party

Before reviewing the legality of the acquisition, we must address a threshold issue raised by respondent as to the Commission's jurisdiction in this matter. Respondent contends that the complaint should be dismissed because (1) the Commission failed to name JWC's wholly owned subsidiary, Celotex, which bought the stock of Panacon, as a party to the proceeding, and (2) JWC is not "engaged in commerce" within the meaning of Section 7. It is argued that Celotex is an indispensable party, indeed the proper party, since the ALJ's order would require the divestiture of properties owned by Celotex. At most, respondent argues, the Commission's jurisdiction over JWC is only "ancillary" and cannot be exercised without the presence of the party which has committed the alleged wrongdoing, Celotex. (RAB at 12) As for the "commerce" requirement, respondent takes the position that JWC is a holding company which does not engage in the production, distribution or acquisition of goods or services in interstate commerce. We will deal with each of these issues in turn.

The ALJ concluded it was proper to name only JWC as the respondent, stating that:

When the pattern and framework of the whole enterprise are taken into consideration (*see Art National Manufacturers Distributing Co.* v. *Federal Trade Commission,* 298 F.2d 476, 477 (2d Cir. 1962), *cert. denied,* 370 U.S. 939 (1962)), it is clear that naming JWC as the respondent in this matter is proper. The evidence is persuasive that

Celotex and JWC were alter egos in many respects and that JWC is the corporation which played the dominant role in the acquisition. (I.D. p. 41)

Even in the absence of the kind of direct involvement shown here, the law judge noted that a parent corporation, such as JWC, is liable for the acts of its subsidiaries where the facts demonstrate latent control by the former over the latter, citing *P. F. Collier & Son Corp.* v. *FTC,* 427 F.2d 261 (6th Cir. 1970), *cert. denied,* 400 U.S. 926 (1970) and [6] *Beneficial Corp.,* 86 F.T.C. 119 (1975), *aff'd in part and rev'd in part on other grounds,* 542 F.2d 611 (3d Cir. 1976), *cert. denied,* 430 U.S. 983 (1977).

We agree that JWC is properly named and Celotex is not an indispensable party to these proceedings. Where the public interest is at stake, the courts and the Commission have consistently looked to the relevant statutory framework and its underlying policy in determining whether separate corporate identities should be respected. *E.g., Zale Corp. and Corrigan-Republic, Inc.* v. *FTC,* 473 F.2d 1317 (5th Cir. 1973); *P. F. Collier, supra; Bowater Steamship* v. *Patterson,* 303 F.2d 369 (2d Cir. 1962), *cert. denied,* 371 U.S. 860 (1962); *Beneficial Corp., supra; Great Lakes Carbon Corp.,* 82 F.T.C. 1529 (1973). In *Bowater,* a case interpreting the Norris-LaGuardia Act, Judge Friendly explained the kind of analysis required in such situations:

Whether a subsidiary corporation is to be considered a separate entity "cannot be asked, or answered, *in vacuo.*" Latty, The Corporate Entity as a Solvent of Legal Problems, 34 Mich. L. Rev. 597, 603 (1936); the issues in each case must be resolved in the light of the policy underlying the applicable legal rule, whether of statute or common law . . . . As the Supreme Court has repeatedly taught, the policy behind the Norris-LaGuardia Act was a strong one; we cannot think Congress would have meant this to be defeated by the fragmentation of an integrated business into a congeries of corporate entities, however much these might properly be respected for other purposes. (303 F.2d at 372–73)

Similarly, in the context of Section 5 of the Federal Trade Commission Act, separate incorporation has not prevented inquiry into the overall nature and operation of a business enterprise. Thus, in *Zale* (a Truth in Lending/Section 5 action), the Fifth Circuit upheld the Commission's finding of liability as to the parent and entry of an order against unnamed subsidiaries, concluding that:

The integrated operation, interlocking directorate and unified advertising strongly militate for finding the enterprise to be the appropriate subject for the Commission's order and for application of the exceptions to recognition of separate corporate entities where to do so frustrates a statutory policy. (473 F.2d at 1321)

[7] In *Beneficial,* the Commission specifically rejected the contention

671                                    Opinion

advanced by respondent here that the common law rule for piercing
the corporate veil should govern, quoting the following language
from *P. F. Collier:*

"Manifestly, where the public interest is involved, as it is in the enforcement of
Section 5 of the Federal Trade Commission Act, a strict adherence to common law
principles is not required in the determination of whether a parent should be held for
the acts of its subsidiary, where strict adherence would enable the corporate device to
be used to circumvent the policy of the statute. *P. F. Collier, supra,* 427 F.2d at 267. *See
also, e.g., Goodman* v. *Federal Trade Commission,* 244 F.2d 584, 590 (9th Cir. 1957)."
(86 F.T.C. at 159)

The Commission not only found the parent, Beneficial Corporation,
responsible for the acts of its subsidiaries but also issued an order
running to its unnamed subsidiaries.[4]

In light of these principles we will examine the language and
purposes of Section 7 of the Clayton Act as well as the relationship
between JWC and Celotex in connection with the instant acquisition.
Section 7 provides, in part, that "no corporation engaged in
commerce shall acquire, *directly or indirectly,* the whole or any part
of the stock or other share [8] capital . . . ." (emphasis added) The
House Report on legislation leading to passage of the 1950
amendments to Section 7 explains why the words "directly or
indirectly" were originally included in the statute:

The bill retains the language of the present statute which is broad enough to prevent
evasion of the central purpose . . . . It forbids not only direct acquisitions, but also
indirect acquisitions, whether through a subsidiary or an affiliate or otherwise. H.R.
Rep. No. 1191, 81st Cong., 1st Sess. 8–9 (1949).

When viewed in the context of the evils which Section 7 was
designed to prevent, the reach of this provision is understandable. In
fact, the principal purpose for enactment of the original version of
Section 7, prior to its amendment in 1950, was to get at stock
acquisitions of competitors by holding companies, a device Congress
rightly feared could be used to escape the strictures of the Sherman
Act. Underlying consideration of the 1950 amendments was a "fear
of what was considered to be a rising tide of economic concentration
in the American economy." *Brown Shoe Co.* v. *U.S.,* 370 U.S. 294, 315
(1962). To aid in stemming that tide, the 1950 legislation, among

---

[4] We reject respondent's contention that these cases require some showing that the corporate device is being
used to evade the policy of the statute before separate incorporation can be disregarded. Although there may have
been some basis for such a conclusion in *Collier,* neither that case nor the decision in *Beneficial* was premised on a
showing of wrongful intent. A similar view was expressed in *Kavanaugh* v. *Ford Motor Co.,* 353 F.2d 710 (7th Cir.
1965), a case interpreting The Automobile Dealers' Franchise Act. In concluding there that the individual dealer
had standing to sue under that Act, apart from any standing the corporate dealership might have, the court
recognized that the purposes of the statute "would be subverted if the corporate format adopted by the parties were
given recognition." The court further noted that "[i]ntention is not controlling when the fiction of corporate entity
defeats a legislative purpose." *Id.* at 717. *See also, Anderson* v. *Abbott,* 321 U.S. 349, 357–58 (1944).

other things, extended coverage to asset acquisitions and clarified that all mergers—horizontal, vertical and conglomerate—were subject to the statute's prohibitions.[5]

Enactment of the Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. Law 94-435, 15 U.S.C. 18 a, adding Clayton Act Section 7A, provides further support of Congress' intent to focus upon the realities, rather than the form, of the challenged acquisition. Section 7A(b)(3)(B) of the Clayton Act, 15 U.S.C. 18a(b)(3)(B), requires that:

The amount or percentage of voting securities or assets of a person which are acquired or held by another person shall be determined by aggregating the amount or percentage of such [9] voting securities or assets held or acquired by such other person *and each affiliate thereof.* (Emphasis added)[6]

Clearly, then, any assessment of the legality of a merger must take account of the relationship between the acquiring and acquired firms, and the probable impact on competition, from the perspective of their overall operations.

To suggest, as respondent now does, that a far-flung corporate enterprise should be carved up into its component legal entities for purposes of Section 7 merger analysis flies in the face of the express language of the statute and the legislative policy supporting it. The dangers of treating Celotex as the primary respondent, and joining JWC for purposes of relief only, are rather plain. Should JWC desire to acquire other asphalt roofing firms, it presumably could do so through its other non-roofing subsidiaries, thereby excluding from merger scrutiny the horizontal effects of competing sister firms.[7] Even apart from such an obvious loophole, looking only to the operations of the acquiring subsidiary ignores the competitive effects of the parent's resources and market power in other related areas which may bear upon the legality of the [10] merger. Such considerations are fundamental in actions premised on vertical or potential competition theories.[8]

---

[5] *Brown Shoe, supra,* at 317. Of course, the Supreme Court subsequently ruled that the original Section 7 in fact did apply to acquisitions other than those involving actual competitors. *United States* v. *E. I. DuPont de Nemours & Co.,* 353 U.S. 586 (1957).

[6] Although the House bill originally defined the term "affiliate" as "any person who controls, is controlled by, or is under common control with, a corporation," the final version adopted by Congress left the task of defining this and other terms to the Commission, with the concurrence of the Attorney General. *Compare* H.R. Rep. No. 94-1373, 94th Cong., 2d Sess. 2 (1976) *with* Clayton Act Section 7A(d)(2)(A), 15 U.S.C. 18a(d)(2)(B).

[7] Respondent further argues that even a direct acquisition by a parent holding company of a competitor of the parent's subsidiary can be reached under Section 7 only by suing the subsidiary as the indirect purchaser of the acquired firm. That kind of situation, it is claimed, is what the indirect acquisition language in Section 7 was designed to cover since the holding company by definition would not be engaged in commerce and therefore could not be challenged directly under the statute. (RAB at 16–17) Such an interpretation of Section 7 is so patently illogical as to require no further discussion.

[8] The vertical implications are evident in *Permanente Cement Co.,* 65 F.T.C. 410 (1964), where the Commission deemed the parent, Permanente, to be the acquiring firm although the acquisition was actually made by its wholly owned subsidiary, Glacier. The Commission noted that the critical factor was the supplier-customer relationship

*(Continued)*

Thus, given the purposes of Section 7, we believe it permissible without more to consider JWC and its wholly-owned subsidiary Celotex a single entity for purposes of assessing the legality of the merger and ordering appropriate relief, even though Celotex has not been joined as a party to this proceeding. In our view the statutory policy at stake here transcends the legal distinctions that might be relevant in other contexts.[9] Nevertheless, despite the strong basis for this conclusion, there is more here which bolsters our decision to hold JWC exclusively responsible for the acquisition of Panacon.

The record is clear that "JWC actively participated in direction of the course of events leading up to and following the acquisition by Celotex of the Panacon stock." (I.D. 65) Such participation, of course, is sufficient by itself to establish that JWC is independently liable for the merger.[10]

[11] The facts, which are largely undisputed, reveal that the negotiations with the Glen Alden Corporation for the purchase of Panacon were initially handled by JWC officials. (I.D. 46, 47) During these negotiations, the representatives of Panacon understood that JWC would acquire Panacon (I.D. 51) and the contract would be assigned to Celotex. Such an assignment provision was included in the draft agreement between JWC and Glen Alden (I.D. 55), and a press release issued jointly by JWC and Glen Alden two weeks prior to the acquisition announced that JWC, not Celotex, would acquire Glen Alden's interest in Panacon. (I.D. 52) The record further shows that on April 14, three days prior to the acquisition, the Board of Directors of each firm met separately to approve the transaction. (I.D. 57, 58) Finally, on April 17, 1972, Celotex purchased a controlling interest in the stock of Panacon from Glen Alden using funds borrowed from JWC. The press release of the same date did not mention Celotex. (I.D. 59)

Furthermore, JWC exercises considerable control and influence over the financial, legal and promotional affairs of Celotex. For example, JWC appointed or elected all of the Celotex' Board of Directors and, in April 1972, there was a substantial overlap between the officers and directors of the two corporations. (I.D. 29, 30) In addition, Celotex could not contract to borrow funds (I.D. 32) or

---

between Permanente and the acquired firm. Readymix Concrete Company, rather than any competitive relationships between Glacier and Readymix. (*Id.* at 492, n. 7) Although Glacier was named as a respondent there, the Commission's decision did not hinge on that fact.

[9] We do not imply that the separate incorporation of JWC and Celotex should be disregarded for all purposes; that must be determined in light of the applicable facts and legal principles in each case.

[10] By analogy, under Section 5 of the FTC Act, liability for supporting an unlawful scheme or placing in the hands of another the means for committing an unfair or deceptive practice is well established. *See, e.g., FTC v. Winsted Hosiery Co.,* 258 U.S. 483, 494 (1922); *Regina Corp. v. FTC,* 322 F.2d 765, 768 (3d Cir. 1963); *C. Howard Hunt Pen Co. v. FTC,* 197 F.2d 273, 281 (3d Cir. 1952).

arrange for legal services (I.D. 26) without going through JWC. JWC also set general employment policies for Celotex, had a centralized research operation and promoted the JWC name over that of its subsidiaries. (I.D. 24, 27–28)

From this description of the relationship between JWC and Celotex and the circumstances surrounding the Panacon acquisition, there can be little doubt as to which firm "called the shots" and orchestrated the negotiations. JWC's role in this merger appears to be similar to the role it played in previous acquisitions by its subsidiaries. (I.D. 55) As in *Zale* and *Beneficial Corp.*, the facts here indicate that, *insofar as the merger is concerned,* there was, in effect, a "single enterprise." The ALJ was quite correct in concluding that JWC played the dominant role and JWC and Celotex were for all practical purposes alter egos. Indeed, the relationship between JWC and Celotex in the context of this merger suggests that even the more stringent common law standard urged by respondent has been met. *See Beneficial Corp., supra,* 86 F.T.C. at 162.

Accordingly, in light of the facts of this case and the public policy underpinning Section 7, there is ample justification for naming JWC as the only party in this proceeding [12] and for issuing an order that is binding upon Celotex.[11]

However, even were it construed that an order running against JWC does not bind Celotex, it does not follow that Celotex is an indispensable party. Where the proceeding involves "the protection and enforcement of public rights, there is little scope or need for the traditional rules governing the joinder of parties in litigation determining private rights." *Nat'l Licorice Co.* v. *NLRB,* 309 U.S. 350, 363 (1940). There the Court upheld the NLRB's authority to strike down an employer-employee contract to waive provisions of the National Labor Relations Act without joining the employees who were parties to the contract. In so holding, the Court took note of numerous cases under the antitrust laws where offenders have been restrained from carrying out contracts with persons not parties to suits. (*Id.* at 365–66) More recently, the Second Circuit in *Pepsico,*

---

[11] The uniform absence of any countervailing legislative policy clearly distinguishes those cases cited by respondent where the courts have been hesitant to disregard separate incorporation of related entities in various contexts. For example, respondent cites *Gulf Oil Corp.* v. *Copp Paving Co.,* 419 U.S. 186 (1974) as evidence of the Court's desire to adhere to legal corporate separation in the context of Sections 2(a), 3 and 7 of the Clayton Act. That case is characterized by respondent as one where Clayton Act jurisdiction did not reach to the acts of a wholly-owned subsidiary which was not engaged in interstate commerce, although its parent was so engaged. The argument is off the mark for several reasons. In the first place, the issue as to whether interstate sales by the parent could be imputed to the subsidiary was not before the Court. Moreover, the specific language of Sections 2(a) and 3 not only requires that the person charged be engaged in commerce but that the allegedly illegal activity be "in the course of such commerce," an arguably narrower inquiry than would occur under Section 7. Section 2(a) further specifies that one of the purchases involved in an alleged price discrimination be "in commerce." As for the Section 7 issue in that case, it is wholly irrelevant to respondent's argument in this case that a parent's interstate activity cannot be imputed to its subsidiary prior to their merger.

*Inc.* v. *FTC,* 472 F.2d 179 (1972), reaffirmed the principle that respondents in public proceedings, such as those before the Commission, may be subject to orders preventing them from carrying out contractual obligations to unnamed third parties. In disputing the argument that such respondents might be held liable to [13] an unjoined third party for complying with an FTC cease and desist order, the court further noted that in agency proceedings "seeking to vindicate public rights against a respondent, the private rights of other parties can be concluded if they have had notice and an opportunity to intervene." (*Id.* at 188, n. 10 and accompanying text)

In the instant proceeding, there are no third party rights in the sense that those rights existed in *Nat'l Licorice.* Whatever rights Celotex has in terms of the merger are derived from the specific authority granted by JWC. There is no contention that Celotex has any interest different from that of JWC or that it has been disadvantaged in any way by not being a party. Counsel for respondents have looked after the interests of Celotex; indeed, Celotex cannot hire counsel without permission from JWC. (I.D. 26)

Furthermore, it cannot be seriously contended that complete relief is feasible only by joining Celotex. As the architect of the acquisition, JWC has complete control over Celotex and there is no reason to believe that it lacks any authority to undo what it created in the first place.[12] Moreover, as the court indicated in *Pepsico,* the Commission's ruling in this matter would appear to be binding on Celotex in any event since it has not attempted to intervene in this matter after having ample opportunity to do so.

For the above reasons, the Commission concludes that JWC is the proper party to this proceeding and there is no necessity to join Celotex. [14]

### B. "In Commerce" Requirement

A second challenge to the Commission's jurisdiction advanced by respondent is that it is not "engaged in commerce" within the meaning of Section 7. Relying upon the Supreme Court's decision in *United States* v. *American Building Maintenance Industries,* 422 U.S. 271 (1975), JWC contends that a holding company, with offices located only in Florida, is not "directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce." (*Id.* at 283) The ALJ held to the contrary citing, *inter alia,* the interstate character of JWC's activities in acquiring Panacon and other corporations (including the financing of such

---

[12] Although the Federal Rules of Civil Procedure are not applicable to administrative proceedings, the facts of this case suggest that joinder is unnecessary even under the criteria set forth in Rule 19(a).

acquisitions), the issuance and sale of securities on public exchanges, and JWC's supervision of the activities of its subsidiaries which are located in various states.

There is no dispute that Celotex is engaged in commerce for Section 7 purposes. (Resp. Admissions, para. 12) Whether JWC is so engaged requires little more discussion. As previously noted, JWC was directly and substantially involved in the affairs of its subsidiaries, exercising control through extensive director/management interlocks, serving as the vehicle for those entities to obtain necessary financing and providing legal services. Given the history of JWC's origin, growth and present activities, it is clear that respondent is more than a mere bystander with respect to its subsidiaries; it is the guiding, indeed dominant, force throughout the entire corporate organization.

Under such circumstances, there can be no question but that JWC is engaged in commerce within the meaning of Section 7 of the Clayton Act. Respondent's rather crabbed interpretation of the Court's language in *American Building,* that "a corporation must itself be directly engaged. . . in interstate commerce," finds no support in that decision. Nowhere in that case is there the slightest hint that a corporation operating through its subsidiaries, which in turn are admittedly involved in interstate commerce, falls outside the reach of Section 7 because it is not deemed to be "engaged in commerce." While Celotex' interstate activities alone suffice to bring its parent, JWC, within the jurisdictional ambit of Section 7, the latter's own activities [15] provide a separate basis for concluding that jurisdiction exists.[13]

In a different but analogous context, the Supreme Court has looked behind the facade of a holding company for purposes of determining jurisdiction under the Public Utility Holding Company Act of 1935. In *North American Co.* v. *SEC,* 327 U.S. 686 (1946), the Court found that the parent's relationship to its subsidiaries justified imputing the interstate activities of the subsidiaries to the parent:

In view of North American's very substantial stock interest and its domination as to the affairs of its subsidiaries, as well as its latent power to exercise even more affirmative influence, it cannot hide behind the facade of a mere investor. These acts are its acts in the sense that what is interstate as to them is interstate as to North American. These subsidiaries thus accentuate and add materially to the interstate character of North American. (Citation omitted.) (*Id.* at 695)

---

[13] It should also be noted that the Court in *American Building* did not decide whether jurisdiction would have been triggered had there been a showing that the acquired firm purchased supplies from out-of-state suppliers or obtained contracts through interstate solicitation or negotiations. (*Id.* at 285) Even had those factors been present in that case, it is distinguishable from the instant proceeding where the interstate nature of the activities of both JWC and Celotex was far more substantial.

671                          Opinion

While the issues there were grounded in constitutional terms, the Court concluded that the parent "bears not only a 'highly important relation to interstate commerce and the national economy' (citation omitted), *but is actually engaged in interstate commerce.* " (*Id.* at 695–6) (Emphasis added.) The reasoning in that case seems apropos here in view of the close relationship between JWC and Celotex.[14]

From the foregoing, we conclude that JWC is properly subject to the jurisdiction of the Commission. [16]


## II. PRODUCT MARKET

Applying the familiar criteria set forth in *Brown Shoe Co., supra*[15] the Administrative Law Judge concluded that asphalt and tar roofing products constituted the relevant line of commerce for assessing the competitive effects of the merger.[16] Respondent vigorously contests the Administrative Law Judge's finding, asserting instead that the appropriate market consists of all roofing products.

Obviously, in the broadest sense all roofing products serve the same basic purpose of sheltering the interior of a structure from the elements, whether the structure is residential or commercial. Within the confines of factors such as the slope of the roof, fire and wind resistance, aesthetics, price and durability, consumers of roofing products can choose among a variety of goods.[17] Nevertheless, the "outer boundaries" of a roofing market do not preclude the existence of "well-defined" submarkets for antitrust purposes. *Brown Shoe, supra,* 370 U.S. at 325. Of course, in ascertaining the proper market, the Supreme Court has cautioned that the *Brown Shoe* criteria "offer no precise formula for judgment and they necessitate, rather than avoid, careful consideration based on the entire record." *United States* v. *Continental Can,* 378 U.S. 441, 449 (1964).

After reviewing the record within this framework, we conclude that asphalt and tar roofing products are a distinct submarket for purposes of assessing the legality of this merger.

---

[14] We do not reach the alternative grounds urged by complaint counsel for exercising jurisdiction under the second paragraph of Section 7 which makes no reference to the acquiring corporation's engagement in interstate commerce. Whatever circumstances might necessitate invoking that provision, there is sufficient evidence here for finding JWC to be engaged in interstate commerce.

[15] Those criteria include "[i]ndustry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct prices, sensitivity to price changes, and specialized vendors . . . ." *Id.* at 325.

[16] No offer of proof was made as to the separate submarkets of built-up roofing and shingles alleged in the complaint. (Para. 15)

[17] Roofing products other than asphalt and tar include such products as wood shingles and shakes, clay and cement tile, slate, and plastic shingles and sheets. (I.D. 66)

These products consist of three basic types of materials--asphalt or tar saturated felts, asphalt roll roofing and [17] asphalt shingles.[18] (I.D. 70) Saturated felts are often used as an underlayment for other types of asphalt roofing; they consist of dry felt impregnated with asphalt or coal tar. (CX–1, p. 12) The felt can either be organic (made from wood chips, newspapers, cartons, rags, wood flour, and other cellulose materials) or inorganic (made from asbestos or fiberglass fibers). (I.D. 73) Roll roofing is basically saturated felt which has been sealed by an application of a harder, more viscous coating of asphalt than that used for the saturation process. (CX–1, p. 5) Some roll roofing is surfaced with mineral granules. (CX–1, p. 12) Shingles are basically mineral surfaced roll roofing cut into strips or patterns. All three categories of asphalt and tar roofing products come in different weights and patterns.

Asphalt and tar roofing products can be used on almost every type of roof in the United States. Shingles, which do not completely seal the surface of the roof from water, are used on roofs sufficiently steep so that water runs off, i.e., normally roofs pitched at 4 inches or more per horizontal foot. (CX–1, p. 20) Built-up roofing, consisting of successive piles of asphalt or tar saturated felts, and roll roofing bonded with asphalt or coal tar pitch are used on flat or less-steeply sloped roofs.

In 1972 the asphalt and tar roofing industry included 32 firms operating approximately 108 roofing plants scattered throughout the United States. (I.D. 123; CX–68C) An estimated 80 percent of all residential, commercial and industrial roofing is made from asphalt and tar products.[19] A closer [18] examination of the industry in light of the indicia described in *Brown Shoe*, with particular emphasis upon production considerations and prices, reveals more clearly its commercial significance as a separate market.

Considering the *Brown Shoe* criteria as set forth in that decision, we find that the record confirms industry recognition of asphalt and tar products as a distinct market, based on testimony of industry members as well as the existence of a trade association with regular membership restricted to domestic manufacturers of asphalt and/or tar roofing products. For example, Mr. Snow, a Johns-Manville

---

[18] Accessory items, such as coatings, cements, fasteners and adhesives, used in connection with the installation of asphalt and tar products (I.D. 70) are excluded from the relevant product market. Although asphalt coatings, for example, are used in the repair or resurfacing of existing roofs (RPF III A.17), and are produced by firms not engaged in the manufacture of asphalt and tar roofing products (RX 53), such materials are properly excluded from the product market because they are not suitable substitutes for original installation.

[19] The 80 percent figure was supplied by the Asphalt Roofing Manufacturers Association, the industry trade organization. (CX–1, p.1) Even higher estimates were provided by two Celotex witnesses who indicated that asphalt roofing products had gained anywhere from 85 to 90 percent of the residential market. (Tr. 1274, 1646) Another witness, Mr. Snow, a vice president of Johns-Manville, estimated asphalt and tar roofing's share of total commercial roofing to be 95 percent. (Tr. 800)

representative, recognized the asphalt and tar roofing industry as a separate industry. (Tr. 699) Even one of respondent's witnesses, Michael Malarkey, president of Herbert Malarkey Roofing Co., an asphalt roofing manufacturer, admitted that he did not run into "any great amount" of competition from other forms of roofing materials. (Tr. 1958) Another industry member was unable to recall any pricing discount policies of non-asphalt manufacturers. (I.D. 101)

The existence of a trade association—the Asphalt Roofing Manufacturers Association (ARMA)—reflects even broader recognition by industry of asphalt and tar roofing products as a separate economic market. (I.D. 82) *See also United States* v. *Pennzoil,* 252 F.Supp. 962, 970 (W.D. Pa. 1965); *United States* v. *Aluminum Co. of America,* 233 F. Supp. 718, 724 (E.D. Mo. 1964), *aff'd per curiam,* 382 U.S. 12 (1965). In addition to promotional activities, ARMA helps finance industry research, assists in the development of product performance standards, and provides tecnhical assistance to roofing contractors (I.D. 82, Tr. 124–25) The managing director of ARMA, Mr. Whittemore, also noted that the organization's compilation of shipping data of member firms was designed to inform them as to how they were faring in the market in relation to each other. (Tr. 128)[20]

[19] The record also justifies the conclusion that asphalt and tar roofing products have peculiar characteristics and uses. The most obvious distinguishing features of these products are their physical appearance and composition. (I.D. 87)[21] Separate standards for weight, composition, fire retardancy and wind resistance, established by the American Society for Testing Materials (ASTM) and Underwriters Laboratories (UL), attest to the unique nature of these products.

More importantly, these characteristics suggest differences in use that are of significance to consumers. For example, asphalt shingles can achieve a higher UL rating (Class A) as to fire retardancy than wood shingles or shakes, the most popular non-asphalt roofing product for homes. (I.D. 90) As the ALJ noted, wood shingles and shakes must be specially treated to merit a Class B or C rating, a process that substantially increases their cost. (I.D. 91) Although

---

[20] Respondent, however, argues that the trade association here, as in *United States* v. *Amsted Industries, Inc.,* 1974–2 Trade Cases ¶75,208 (N.D. Ill. 1974), exists primarily to assist members in competing with producers of non-asphalt products. *Amsted* affords little support for respondent's contention. There, other factors overshadowed the significance of the trade association, including a steadily dwindling market share for producers of cast iron pipe, considerable efforts by such producers to expand into other lines of pipe and the absence of any significant price advantage for cast iron products. In the face of such evidence, it may be appropriate to discount the importance of a trade association. By contrast, in this case the existence of a trade association, rather than conflicting with other evidence drawn from analysis of supply and demand considerations, bolsters the conclusion that asphalt and tar roofing products constitute a distinct market.

[21] *See General Foods* v. *FTC,* 386 F.2d 936 (3d Cir. 1967), *cert. denied* 391 U.S. 919 (1968); *United States* v. *Kennecott Copper Corp.,* 231 F. Supp. 95 (S.D.N.Y. 1964) *aff'd per curiam,* 381 U.S. 414 (1965).

respondent points out that some roofing products (*e.g.*, metal, clay, concrete) may be equally or more fire resistant than asphalt and tar, the latter have other advantages owing to greater architectural (I.D. 69; Tr. 1261–62) and structural (Tr. 470) flexibility. Slate, for instance, because of its weight, high transportation costs and localized production, is sold primarily in the Northeast. (Tr. 1238–40)

It is true that in particular areas (*e.g.*, the West Coast, Texas and Florida) sales of non-asphalt roofing [20] products, especially for residential purposes, command a greater share of the overall roofing market than they do in other areas. So too have there been efforts by non-asphalt roofing manufacturers to make products which imitate asphalt or tar roofing, and vice versa. (Tr. 1443, 1722, 2102–04) To illustrate, both JWC and Philip Carey were prompted to design asphalt shingles to compete with wood shakes in a premium market. (Tr. 1722, 1798–1802)[22] Yet, as one roofing contractor indicated, the price of asphalt shingles simulated to look like wood shakes was approximately twice that of a standard asphalt shingle. (Tr. 1443)

That some overlapping of competition has occurred in certain segments of the market does not negate the overall significance of asphalt and tar roofing products as an economically meaningful market. The boundaries of any product market are likely to be blurred to some degree on the fringes by cross-competition from substitutes. Here, the wide diversity of uses for which asphalt and tar roofing products can be used, including industrial and commercial applications, sets this industry off as a separate economic entity.

Supply side considerations play an important role in market analysis. If manufacturers can readily switch production from one product to another in response to changing market conditions, those products may be appropriately included in the same market.[23] Conversely, unique production facilities used in the manufacture of a product or class of products suggest that those products may properly be treated as a separate market for antitrust purposes.

In this case, the same basic machinery is used to manufacture all asphalt and tar roofing products, including saturated felts, roll roofing and shingles. The products are run on one continuous line with the termination point determining the end [21] product. The changes necessary to the production machinery to use tar instead of asphalt are not extensive (I.D. 95) and in Celotex' Perth Amboy, New Jersey and Chicago, Illinois plants tar felt is regularly run on the same machinery as asphalt felt. (Tr. 1503) Although additional alterations are required for the production of fiberglass-based

---

[22] The principal attraction of wood shakes and shingles is their aesthetic appeal. (Tr. 1869)

[23] *See Budd Co.*, 86 F.T.C. 518, 572 (1975).

JIM WALTER CORP.                    745

671                              Opinion

asphalt roofing, they do not require major modifications (I.D. 95), and at least four major asphalt roofing firms also have fiberglass capability. (RX–53) One witness indicated that in order to run a fiberglass mat, as opposed to an organic mat, it would be necessary to remove the saturator, which accounts for about 20 percent of the existing equipment, and modify an additional 10 percent of the machinery. (Tr. 2142–43) The evidence further indicates that asphalt roofing companies generally produce only asphalt and tar roofing products. (I.D. 97)

In contrast, wood shakes and shingles, clay tiles, cement-asbestos shingles, cement tile, plastic shingles, metal shingles, slate, metal sheet roofing, rubber and plastic sheets, and all other forms of roofing materials must be produced on or by machinery which is completely different from that used to manufacture asphalt and tar roofing. (I.D. 96)

Whether allegedly competing products have distinct prices is a particularly significant issue in determining the bounds of the relevant market. Substantial price differences suggest that the cross-elasticity of demand among such products is relatively low, at least in the near term. In *Reynolds Metals Co.* v. *FTC,* 309 F.2d 223, 229 (D.C. Cir. 1962), the court stated: "We think price differentials have an important if not decisive bearing in the quest to delimit a submarket." The court there went on to find that a difference in price between florist foil at $.75–.85 a unit and decorative foil at $1.15–1.22 a unit was substantial enough to justify treating florist foil as a distinct submarket.

The record here shows that prices for asphalt and tar roofing, like florist foil, are separate and distinct from other kinds of roofing. The ALJ cited the following price ranges for different kinds of roofing products in two states, Illinois and Florida, to show the wide differential [22] in price between asphalt and non-asphalt roofing:[24]

|                    | *Illinois*<br>(Belleville/St. Louis) | *Florida*<br>(Tampa) |
| ------------------ | ------------------------------------ | -------------------- |
| Asphalt Shingles   | $ 40 – $ 80                          | $ 40 – $ 90          |
| Clay Tile          | 120 – 130                            | 200 – 250            |
| Slate              | 140 – 150                            | 300 – 360            |
| Wood Shingles      | 105 – 125                            | 90 – 120             |

(Source: I.D. 93)

[24] The variations between the two states in the price of individual non-asphalt roofing products indicate the relatively greater impact of plant site location and transportation costs on these products. One witness pointed out that prices for such products as slate, wood shingles and clay tile drop substantially as a customer gets closer to the points of production. (Tr. 1641) The location of natural resources used in the manufacture of these products places greater constraints on pricing and distribution patterns than is true for asphalt roofing products.

Opinion                    90 F.T.C.

Price data contained in respondent's exhibit, RX-73A, and compiled from testimony in the record, corroborates the fact that asphalt and tar roofing products are, for the most part, considerably more economical than other forms of roofing.[25]

[23] An examination of the average prices of asphalt shingles reveals a considerable disparity with the prices of the largest category of non-asphalt residential roofing products, wood shakes and shingles, even at their lower levels. Mr. McMurry of Celotex testified that average asphalt shingle prices were approximately $45–$55 (Tr. 1240), or about 56–68 percent of the lowest reported price ($80) for wood shingles. Where a similar price gap existed between insulated aluminum and copper conductors, the Supreme Court concluded that to ignore price under such circumstances was "to ignore the single, most important, practical factor in the business." *U.S.* v. *Alcoa*, 377 U.S. 271, 276 (1964). There is nothing in this proceeding that persuades us to follow a different course.

Respondent, however, argues that the price of roofing materials must be examined in terms of the installed cost per year over the life of the product, pointing to evidence that the lifespan of other roofing products is longer than for asphalt and tar roofing. The Commission and the Third Circuit specifically rejected a similar argument in *General Foods, supra*, with the court commenting as follows:

Appellant, however, urges that the proper test is one of comparing the life expectancy of a 28 cent package of steel wool soap pads with the longevity of a similarly priced package of a non-steel wool product. We agree with the Commission's view that the very necessity of resorting to such estimates in order to compare prices tends, by itself, to demonstrate the distinctiveness of the prices of the household steel wool products. (*Id.* at 492)

For similar reasons, we reject that argument here as well. Rather than looking to lifetime costs in setting prices, the record indicates

---

[25] The following data derived from RX-73A are based on installed costs per 100 square feet:

| Shingle and Tile Products | |
|---|---|
| * Asphalt Shingles | $ 40 – 90 |
| Cedar Shingles/Shakes | 80 – 120 |
| Asbestos-Cement Shingles | 90 – 110 |
| Aluminum Shingles | 100 |
| Clay Tile | 100 – 125 |
| Cement Tile | 60 – 100 |
| Slate | 140 – 360 |
| Metal | 25 – 250 |
| *Built-Up Roofing Products* | |
| * Asphalt-Saturated (organic) | 38 – 44 |
| * Tar-Saturated (organic) | 42 – 55 |
| * Saturated Asbestos | 47 – 53 |
| * Fiberglass Sheet Elastomeric | 38 – 43 |
| | 110 – 166 |

* Included in product market.

that the prime consideration for suppliers and customers alike at any given time was the price differential among competing asphalt roofing manufacturers. (I.D. 98, 100, 102–03) Further evidence that asphalt roofing prices are not particularly sensitive to changes in prices of other roofing products is suggested by price data prepared by respondent's economist depicting price trends for various roofing products between 1970 and 1975. (I.D. 104)

[24] Thus, weighing all of the evidence, especially the distinct methods of production and prices of asphalt and tar roofing products, we believe the record fully justifies the ALJ's finding that these products constitute a relevant market within which to assess the effects of the merger on competition. [25]

### III. GEOGRAPHIC MARKET

The ALJ concluded that both the United States as a whole and a belt of 26 states (plus the District of Columbia) extending from Texas to Maine constitute relevant geographic markets for Section 7 purposes. (I.D. 114) In determining that a national market exists, the law judge noted that JWC and Panacon shipped their products to 47 and 42 states, respectively, in 1971, and that asphalt and tar roofing products are distributed nationally by the major firms. (I.D. p. 51) The contours of the area found by the judge to be an appropriate regional market for testing the effects of the merger encompass those states between Texas and Maine which lie wholly or substantially within a 250-mile radius of JWC and Panacon plants. (I.D. 111) The ALJ observed that this region was where the two companies had most of their plants, did the bulk of their business, and competed to a significant degree. (I.D. pp. 52–53)

Respondent contends that the ALJ erred in finding a national market. JWC asserts that the proper test for defining the geographic market is set forth by the Supreme Court in *U.S.* v. *Marine Bancorporation, Inc.,* 418 U.S. 602 (1974), and is "the area in which the goods or services at issue are marketed to a significant degree by the acquired firm." (*Id.* at 621) Respondent argues that this test has not been met since "there is nothing in the record and no finding to the effect that the Philip Carey Division 'marketed to a significant degree' in all 42 states." (RAB at 29)

Respondent likewise contests the regional market determination, claiming there is no evidence as to the economic significance of the proposed boundaries or any data, such as market shares or concentration ratios, which could be used to measure the competitive effect of the merger in the Texas-Maine region. Furthermore, JWC argues that since complaint counsel presented the case on the basis

of a national market, the law judge's determination violated due
process and Section 5(b)(3) of the Administrative Procedure Act, 5
U.S.C. 554(b)(3).

We agree with the ALJ that the appropriate "section of the
country" is the nation as a whole. As characterized by the Supreme
Court, the relevant market must " 'correspond to the commercial
realities' . . . of the industry and be economically significant."
*Brown Shoe, supra,* 370 U.S. at 336–37 (footnote omitted). The Court
has also described the relevant market as the area where "the effect
of the [26] merger on competition will be direct and immediate."
*United States* v. *Philadelphia Nat'l Bank,* 374 U.S. 321, 357 (1963).

Applying this test in the instant case, we believe the evidence
clearly establishes the existence of a national market within which
both JWC and Panacon were effective competitors. To begin with,
the largest firms have widely scattered plants, sell their products
throughout all or most of the United States, view themselves as
national competitors and consider JWC and Panacon to be among
their primary competitors. (I.D. 112: Tr. 580, 782–83) Likewise, JWC
and Panacon distributed their products in the vast majority of states
from plants situated in various parts of the country.[26] Further
examination of such factors as transportation costs, shipping
distances and consumption patterns reflect the interregional charac-
ter of competition and point to the reality of competition on a
national scale.

While transportation costs are an important consideration, the
record reveals a number of other factors significantly influence the
distance a product is shipped. (I.D. 106, 109) A representative of
Johns-Manville, the fourth largest firm in the industry in 1972,
testified that the geographic areas served by his firm's plants are
determined by —

The demand in the various markets, the ability of the producing plants to supply a
given quantity, the manufacturing costs of the products, and the freight rates from
the plants to reach the given areas.[27]

[27] That freight is not necessarily the most important element in
the equation is reflected in the testimony of the President of Tamko

---

[26] Panacon plants were located in Houston, Tex.; Lockland, Ohio; Memphis, Tenn.; Perth Amboy, N.J.; and
Wilmington, Ill. (I.D. 89) JWC had plants in Birmingham, Ala.; Fairfield, Ala.; Camden, Ark.; Chester, W.Va.;
Chicago, Ill.; Edgewater, N.J.; Los Angeles, Cal.; Philadelphia, Pa.; and San Antonio, Tex. (I.D. 19).

[27] Tr. 796. To similar effect is JWC's response to the Commission's 6(b) request for a description of the
company's marketing areas: "Market areas for the products produced by a given plant may vary from time to time
and are generally determined and/or limited by a number of variables such as product availability, service, need
for additional sales volume, manufacturing cost, freight absorption, competitors' activities and relative demand."
(CX-70Z-76, *in camera*)

Asphalt Products, a manufacturer of asphalt roofing products in the Midwest and South:

> Q: As a matter of preference you prefer to sell closer to your plants?
> A: Oh, yes.
> Q: Do you direct your sales efforts to the area closest to your plant in order to avoid the freight charges?
> A: That is not critical, no.
> Q: Is it a factor?
> A: It is a factor. The most critical factor is to make the wheels turn.
> Q: Make sales?
> A: Keep the plant running.
> Q: For what purposes now?
> A: Simply because if the wheels aren't turning, then you have tremendous overhead and sales costs that are not being applied to any factor of roofing and that is more important than paying excess for the freight in my judgment. (Tr. 2006–07)

Although industry witnesses generally expressed a preference for shipping within a few hundred miles of a plant, shipping distances vary considerably among firms and with respect to individual plants. (I.D. 107, 109–110) For example, despite Panacon's desire to confine shipments as much as possible within a 250-mile radius of its plants (I.D. 111), shipment data shows that substantial output of several Philip Carey plants was shipped beyond that distance, [28] and at times considerably further.[28] In addition to the deliveries to Middle Atlantic states from the Lockland, Ohio plant (I.D. 111), the Memphis, Tennessee plant shipped 41 percent of its production (by value of shipment) in 1971 and 51 percent in 1972 to states completely outside the 250-mile range. (CX–70Z–37–38, 68–69, *in camera*) Philip Carey's Houston plant shipped 20.5 percent of its highest dollar volume product, strip shingles, to Arizona in 1971 and 22.5 percent in 1972. (CX–70X–33, 64, *in camera*) Similarly, Celotex' Los Angeles facility shipped 36.7 percent of its strip shingle output in 1972 to states outside California, mostly well beyond the 250-mile range.[29]

It is not particularly surprising that JWC and Panacon sell a large portion of their output in the eastern half of the United States and compete most intensely in that area. Since that part of the country is

---

[28] Tr. 423. Mr. Tennesson, the former president of Panacon, testified:
"We like to operate on the golden-circle concept by which we could make most of our sales as close as possible to our plants. Somewhere, I would say, around 250 miles was about the optimum. However, we did, in many instances, ship well beyond that distance particularly from the vicinity of the Lockland plant and the plant in Perth Amboy."

[29] CX–70Z–54, *in camera*. JWC's special report also confirms the interregional nature of competition in this industry. For example, their report indicates Philip Carey's Houston plant and JWC's San Antonio facility both competed with numerous firms in California. Philip Carey's Perth Amboy plant and JWC's Philadelphia plant both competed in Georgia and North Carolina, and Philip Carey's Houston plant and JWC's Los Angeles plant were both in competition with plants in Colorado and Utah. (CX–70A–77–82, *in camera*)

considerably more densely populated and industrialized, it can be expected to account for a large percentage of total demand for asphalt and tar roofing products. In fact, an examination of state-by-state shipments prepared for the Asphalt Roofing Manufacturers Association, reveals that about 67 percent of all [29] shipments of reporting firms in 1972 were to the 26 states and the District of Columbia where the ALJ found that JWC and Panacon had a significant competitive overlap and made a high percentage of their sales.[30] Although the percentage of industry shipments in the 26-state area is somewhat less than it is for JWC and Panacon (which made 78.1 and 86.7 percent, respectively, of their sales in these states),[31] there can be little doubt that these figures provide further proof that both firms were substantial factors in the major marketing areas of the country prior to their merger.[32] That they did not ship extensively [30] to all states does not lessen the significance of their presence on competition throughout the country. *See United States* v. *Jos. Schlitz Brewing Co.,* 253 F. Supp. 129, 134–5 (N.D. Cal. 1966), *aff'd* 385 U.S. 37 (1966), *rehearing denied* 385 U.S. 1021 (1967); *United States* v. *Bethlehem Steel Corp.,* 168 F. Supp. 576, 601 (S.D.N.Y. 1958); *Kennecott Copper Corp.* v. *FTC,* 467 F.2d 67, 71 (1972).

In view of the extensive shipments by JWC and Panacon throughout the country, and the substantial competition between these firms and other industry members in the major consuming areas of the country, we conclude that there is a national market for asphalt and tar roofing and that JWC and Panacon compete directly and substantially in this market. Whatever barriers freight costs pose to shipping asphalt and tar roofing long distances, factors other than transportation prevent sellers in one area from being insulated from competitive forces in other areas.[33] The industry's practice of absorbing freight charges by equalizing to the customer's nearest supplier further reflects the existence of interregional competition.

---

[30] I.D. 111. The ARMA figures are derived from CX-4-13 and are based on unit shipments (in squares), rather than dollar volume, for roll roofing and shingles. Although ARMA data does not include all industry shipments, it provides a reasonable approximation of relative demand for asphalt and tar roofing products in various regions of the country. ARMA members account for about 85 percent of industry shipments. (I.D. 82)

[31] The figures for JWC and Panacon have also been calculated in terms of unit shipments (in squares) of roll roofing and shingles so as to correspond to the industrywide data cited above. As such, these percentages vary slightly from those shown in I.D. 111, which are based on the value of shipments and include felt products.

[32] By adding the seven surrounding states—Georgia, Florida, Oklahoma, Missouri, Iowa, Minnesota and Maine—to the 26-state region depicted in CX-14, the percentage of all shipments reported by ARMA within this expanded area rises to more than 83 percent. As CX-14 indicates, many JWC and Panacon plants were within close shipping range of large portions of these additional states and in fact the two firms made substantial shipments to some of them, thereby further underscoring the extent of their impact in a market which is national in scope.

[33] *See United States* v. *Bethlehem Steel Corporation, supra,* where the court cited legislative history in support of the proposition that the geographic market in merger cases "can include all areas where the trade in a product is affected by, and is not independent of, the trade in that product in other areas . . ." (footnote omitted). *See also* Bock, *Mergers and Markets,* 39, 42 (1960).

671                                   Opinion

Even Dr. Lanzilotti, the economist called by respondent as an expert witness, agreed that the two firms were competing in a national market:

> Q: You talked yesterday about a national market and interregional competition?
> A: Yes.
> Q: Were the Philip Carey and Celotex Corporations in the national market? [31]
> A: I think that their plants were shipping varying distances within the U.S. from the different plants.
> Q: Do you consider them as part of a national market?
> A: Yes, I would consider them competing in the national market.
> Q: Would you consider them competing interregionally?
> A: Yes, they were shipping interregionally.
> Q: Would you consider that they are competing with each other?
> A: Yes, they were competing with each other.
> Q: Throughout the nation?
> A: Generally, I don't know that in each and every nook and cranny, in each and every village in the U.S., I don't recall that from memory. (Tr. 2478)

In *FTC* v. *Procter & Gamble Co.,* 386 U.S. 568, 571 (1967), the Supreme Court agreed with the Commission that a national market existed in the manufacture and sale of household liquid bleach, even though it was not feasible to ship the product more than 300 miles from its point of manufacture because of high shipping costs, and Clorox, the acquired firm, was the only company having plants located throughout the country. By contrast, in this case freight costs are less significant, interregional competition is substantial, and the merged partners ship throughout most of the country. National markets have also been found by the courts and the Commission in other cases notwithstanding distribution restrictions imposed by high transportation costs. *See, e.g., Kennecott Copper Corp.* v. *FTC, supra; United States* v. *Jos. Schlitz Brewing Co., supra; Bethlehem Steel, supra; British Oxygen Co. Ltd.,* 86 F.T.C. 1241 (1975), *rev'd on other grounds,* 558 F.2d 24 (2d Cir. 1977); *RSR Corp.,* 88 F.T.C. 800 (1976).

[32] Relying upon *Marine Bancorporation, supra,* respondent insists, however, that a national market is inappropriate since Panacon, the acquired firm, did not market its products "to a significant degree" in all 42 states that it shipped to in 1971. We disagree with respondent's characterization of the Court's holding in that case. Such an interpretation would lead to a rather mechanical, one-dimensional approach to market delineation which ignores commercial realities. Not only did *Marine Bancorporation* involve the issue of potential competition, thus making it logical that the Court would focus its analysis on the market in which the acquired firm participated, but the Court recognized that the unique nature of

banking services effectively seals off local markets from outside competitive forces. *Marine Bancorporation, supra* at 622. For individual or small commercial customers, factors of convenience and cost make it totally impracticable for them to turn elsewhere for their banking needs; on the supply side, legal restrictions on bank entry into new markets also serve to diminish to some degree whatever restraining influence the more distant producer may have on competition in the local market. We rejected a similar argument in *RSR, supra,* a case involving a factual context somewhat similar to the one here, noting that in the bank merger cases,

[r]estriction of the permissible geographic market to the area of the country in which the acquired bank was marketing its services to a significant degree was thus underpinned by the economic realities of the situation. We do not believe that in taking the approach it did the Supreme Court meant to set forth a standard requiring that in widely differing industries economic realities justifying broader markets be ignored. (*Id.* at p. 886), n. 16)

In sum, the commercial realities present here lead us to conclude that the appropriate market for examining the competitive effects of the merger is national in scope. Furthermore, even if the geographical market in this case were to be measured exclusively by the area in which Panacon sold its products, we would reach the same result. While JWC distributed more widely than Panacon, the record evidence, including shipping data, [33] clearly indicates that both firms were competing in a national market.[34]

Having established a national market, we turn to the ALJ's finding that a regional market also exists, consisting of 26 states and the District of Columbia extending from Texas to Maine. Keeping in mind the Supreme Court's admonishment in *United States* v. *Pabst Brewing Co.,* 384 U.S. 546 (1966), that the relevant market need not be marked off by "metes and bounds," we are unable to conclude from the record which, if any, regional markets are appropriate for Section 7 purposes. Although JWC and Panacon shipped a substantial portion of their products within the proposed market, available data is insufficient, for example, to show the extent of shipments into and out of the area by other industry members, or to otherwise establish the degree to which competition within the region is insulated from outside competitive forces. Indeed, the economic feasibility of shipments by the two firms into surrounding states, the location of plants of other competitors within the region and

[34] Respondent appears to suggest there is some inconsistency in our issuance of a complaint and consent order involving another merger in this industry, *Bird & Son, Inc.,* 87 F.T.C. 411 (1976), wherein it is alleged that the relevant market is the Southeastern United States. (RAB at 29–30) That issue, of course, was never litigated and a host of decisions have found both national and regional markets to exist in a particular case. *E.g., United States* v. *Pabst,* 384 U.S. 546 (1966); *United States* v. *Bethlehem Steel Corp., supra.*

adjacent thereto, and ARMA shipment figures, by state, for the industry all suggest that the parameters of an appropriate regional market, or markets, might very well differ from the one selected by the ALJ.[35] Furthermore, there is no market share concentration data for measuring the effect of the acquisition in that region. For these reasons, we reject the ALJ's finding as to the regional market.[36] [34]

## IV. PROBABLE EFFECTS ON COMPETITION

Having determined the relevant markets, our task is to ascertain whether the probable effect of the merger "may be substantially to lessen competition" in the asphalt and tar roofing industry. The ALJ found the acquisition violates Section 7 because it increased concentration in an already concentrated industry, eliminated an independent and vigorous competitor, and more firmly established JWC in the relevant product market.

Our analysis must commence with an examination of concentration in the relevant industry and the market shares possessed by the leading firms and parties to the merger. Statistical data relating to concentration levels and changes thereto resulting from a merger is easily obtained and often is the most objective information available about possible competitive effects. "Market shares are the primary indicia of market power," *United States* v. *Continental Can Co., supra*, 378 U.S. at 458, although the Court went on to note that a further examination of the structure, history and probable future of the applicable market would be necessary.

Under certain circumstances, concentration and market share data may alone suffice to establish illegality in the absence of convincing proof to the contrary. Thus, a merger is presumptively unlawful if it "produces a firm controlling an undue share of the relevant market, and results in a significant increase in concentration. . . ." *United States* v. *Philadelphia National Bank*, 374 U.S. 321, 363 (1963). In *Continental Can, supra*, the Court reaffirmed its intention to rely primarily on market share data in such cases, stating that "[w]here a merger is of such a size as to be inherently suspect, elaborate proof of market structure, market behavior and probable anti-competitive effects may be dispensed with. . . ." (*Id.* at 458) Particular focus has been directed at two kinds of horizontal mergers: those which contribute to a trend toward concentration and those which increase, however slight, already high levels of

---

[35] In fact, the use of a national market probably favors respondent by broadening the scope of the comparative analysis. *Procter & Gamble Co.*, 63 F.T.C. 1465, 1561 (1963), *aff'd* 386 U.S. 568 (1967).

[36] In view of our resolution of the regional market issue we find it unnecessary to reach the due process argument raised by respondent.

concentration. As described in *United States* v. *General Dynamics,*
415 U.S. 486, 497 (1974),

[t]he effect of adopting this approach to a determination of a "substantial" lessening
of competition is to allow the government to rest its case on a showing of even small
increases of market share or market concentration in those industries or markets
where concentration is already great or has been recently increasing, since "if
concentration is already great, the [35] importance of preventing even slight increases
in concentration and so preserving the possibility of eventual deconcentration is
correspondingly great." (citations omitted)

In *General Dynamics,* however, after a further examination of the
"structure, history and probable future" of the coal industry, the
Court concluded that despite high levels of concentration in the
industry other factors justified the conclusion that the acquisition
would not have the requisite anticompetitive effect.

As shown in the following table, the acquisition here combined the
fifth largest firm in the industry, JWC, with 8.83 percent of the
market, and the sixth largest firm, Panacon, with a market share of
8.79 percent. The resulting firm ranked second with a market share
of 17.20 percent in 1972.[37] [36]

| *1971* *Market Share* | | *1972* *Market Share* | |
|---|---|---|---|
| GAF | 18.22% | GAF | 18.50% |
| Certain-Teed | 11.62 | JWC | 17.20 |
| Johns-Manville | 11.34 | Certain-Teed | 11.96 |
| Bird & Son | 10.59 | Johns-Manville | 11.56 |
| JWC (Celotex) | 8.83 | Bird & Son | 9.89 |
| Panacon (Philip Carey) | 8.79 | Lloyd A. Fry | 7.76 |
| Lloyd A. Fry | 7.89 | Flintkote | 5.38 |
| Flintkote | 5.50 | U.S. Gypsum | 2.55 |

(Source: CX-15B-C, *in camera*)

---

[37] I.D. 124, *in camera.* Respondent also attacks the validity of complaint counsel's 6(b) survey used in obtaining universe figures on the basis of errors in methodology and inclusion of inaccurate information. We are not persuaded by respondent's argument. The procedure employed here of surveying known firms and following up with questionnaires to additional competitors identified by those firms is a time-tested device for developing reliable aggregate industry shipment data. The survey universe exceeds that constructed from census data (I.D. 119, 122) and respondent does not cite to the exclusion of any domestic asphalt and tar roofing firms. There is also little significance in the failure to include imports in the statistical portrait since they amounted to no more than one percent of the domestic market in 1972. (I.D. 117) In short, we conclude that the size of the market depicted by the data is generally accurate. "[P]recision in detail is less important than the accuracy of the broad picture." *Brown Shoe, supra,* 370 U.S. at 342, n. 69. *See also Avnet,* 82 F.T.C. 391, 465 (1973), *aff'd* 511 F.2d 70 (7th Cir. 1975); *Papercraft Corp.,* 78 F.T.C. 1352, 1405-06 (1971), *aff'd* 472 F.2d 927 (7th Cir. 1973).

671                              Opinion

Two-firm, four-firm and eight-firm concentration ratios for 1971 and
1972 were as follows:

|          | 2-firm | 4-firm | 8-firm |
|----------|--------|--------|--------|
| 1971     | 29.84% | 51.76% | 82.78% |
| 1972     | 35.70  | 59.21  | 84.78  |
| Increase | 5.86   | 7.45   | 2.00   |

(Source: CX-15B-C, *in camera*)

By combining two strong, viable competitors, with substantial
market shares, the merger propelled JWC into the number two
position, with a market share only slightly less than the industry
leader, GAF Corp., and approximately 44 percent higher in relative
terms than the third-ranked firm. The merger thus substantially
increased both two- and four-firm concentration—by 5.82 percent
and 7.45 percent, respectively—in an industry already experiencing
high levels of concentration.[38]

[37] While the relevant market share figures here are not as high
as those in *Philadelphia Nat'l Bank, supra*, the Court cautioned
there that it was not attempting to specify the smallest market share
which would threaten undue concentration, only that "30%
presents that threat." (*Id.* at 364) Following *Philadelphia Nat'l
Bank*, other mergers with somewhat lower combined market shares
and concentration levels were also struck down in *United States* v.
*Alcoa, supra*, and *United States* v. *Continental Can Co., supra*. In
*Alcoa*, where the top five firms in the aluminum conducter market
controlled 76 percent, Alcoa, the leading producer with 27.8 percent
of the market, purchased Rome, the ninth ranking firm with 1.3
percent. Despite Rome's small market share, the Court concluded
that the firm represented the type of "small but significant
competitor" which Section 7 was designed to preserve. (*Id.* at 280–81)
In *Continental Can*, 4-firm concentration in the combined container
market stood at 63.7 percent prior to the merger of the number two
firm, Continental, having a 21.9 percent market share, and Hazel-
Atlas, the sixth ranking firm, with 3.1 percent. In finding that a
*prima facie* anticompetitive effect had been established, the Court
highlighted, among other concerns, the intrinsic effect of a merger
between the second and sixth largest firms, the 14 percent increase

[38] Industry structure in this case, as depicted in the statistical data, generally conforms to the "tight oligopoly"
model of Professors Kaysen & Turner in their well-known work, Antitrust Policy: An Economic and Legal Analysis
72 (1959). In the view of another commentator, the industry here can be viewed as one having a "high-moderate"
degree of concentration, with characteristics just short of those industries classified as "highly concentrated."
Bain, Industrial Organization, 189–41 (2d ed. 1968). Post-merger concentration is also well above the 40 percent,
four-firm figure that Scherer suggests is the level at which "it is fair to assume that oligopoly is beginning to rear
its head." Industrial Market Structure and Economic Performance 60 (1970).

in Continental's own market share which boosted its share to 25 percent, and the possibility that the merger might "trigger . . . other mergers by companies seeking the same competitive advantages . . . ." (*Id.* at 461, 464)

More recently, the Second Circuit in *Stanley Works* v. *FTC,* 469 F.2d 498 (2d Cir. 1972), *cert. denied,* 412 U.S. 928 (1973), agreed with the Commission's finding of a Section 7 violation involving a merger in the cabinet hardware market (top-4 concentration of 49–51 percent) between the tenth ranked firm, Stanley Works, with 1 percent of the market, and the leading manufacturer, Amerock Corp., with 22–24 percent. In dismissing the contention that Stanley's market share was *de minimus,* the court noted the firm's similarity to Rome as a significant independent competitor and concluded that:

[t]he law is clear in its teaching that in an already concentrated industry with few sellers, in which the four leading companies dominate approximately 50% of the market, a merger involving the leading four, controlling 22-24% of the market, with a firm like Stanley, would seriously threaten substantial anticompetitive consequences. (*Id.* at 508)

[38] Just last year, in *Liggett & Myers, Inc.,* 87 F.T.C. 1074 (1976), *appeal pending* No. 76–1771 (4th Cir.), the Commission found a Section 7 violation where 4-firm concentration in the all dog food market increased from 54.44 percent before the merger to 59.01 percent thereafter. Eight-firm concentration rose on account of the merger from 71.96 percent to 76.54 percent. The merger combined the number four and six firms in the industry with market shares of 10.99 percent and 4.41 percent, respectively, into a number two firm controlling 15.76 percent. That decision, grounded as it was in large measure on statistical data, provides a close analogy to the facts in this proceeding.[39]

Measuring this case against the above decisions leads us to conclude that the market positions of JWC and Panacon before and after the merger, together with the substantial increase in concentration among the leading asphalt roofing companies, clearly suffice to establish a *prima facie* violation of Section 7. In *Alcoa* and *Stanley Works,* notwithstanding the relatively small market share of one party to the merger, the courts stressed the importance of preserving small viable competitors in concentrated markets where their presence might have a restraining influence on the conduct of the dominant firms. Yet the justification for preventing the disappear-

[39] *See also Warner-Lambert Co.,* 87 F.T.C. 812 (1976)(merger violated Section 7 in cough remedies market by combining firms with 4.4 and 4.2 percent of the market, respectively, and increasing 4-firm concentration from 45 to 48 percent).

671                              Opinion

ance of a Rome or a Stanley from the market applies *a fortiori* to this case where both JWC and Panacon were major, well-established competitive factors in the relevant market. Eliminating Panacon from the scene removed not just a firm with the potential for eroding the market power of the leading firms at some time in the future; it foreclosed a substantial degree of existing competition involving a company having a direct and extensive presence in the market.[40]

[39] Moreover, with the exception of *Philadelphia Nat'l Bank,* the combination of JWC and Panacon increased two- and four-firm concentration more significantly than the other mergers. As a result, JWC leapfrogged from its sixth ranking position in the market to the number two slot. The disruptive effect of such a substantial merger is reflected in the relative market shares of the eight leading firms before and after the merger. Whereas in 1971 the spread in market shares between the number two and number eight firms was only 6.12 percent, that margin increased to 14.65 percent in 1972 following the merger. The impact of eliminating a competitor of Panacon's size is further revealed by the fact that the eighth ranking firm in 1972, U.S. Gypsum, had a market share of only 2.55 percent, less than half that of Flintkote, the number eight firm in 1971.

The heightened disparity among the leading asphalt roofing companies, with two firms rather than one commanding market shares substantially higher than their nearest rivals, poses the danger, described in *Continental Can, supra,* of triggering other mergers by firms intent upon keeping pace with the industry leaders. Indeed, that danger was more than a probability here. The record indicates that following JWC's acquisition of Panacon, two other mergers involving leading firms in the industry were consummated: fifth ranking Bird & Sons' acquisition of Logan-Long,[41] and the purchase by Flintkote (number seven in 1972) of two of the three plants of U.S. Gypsum, the eighth ranking firm in 1972. (I.D. 125) (CX–15B–C, *in camera*) While evidence is lacking as to the quantitative impact of these acquisitions on concentration levels, they do suggest the kind of spawning effect that may result if a merger of the size involved here is approved. [40]

---

[40] The anticompetitive effects of the merger here are exacerbated by the considerable overlap in competition between the two firms in the immediate marketing areas surrounding each of their plants. An examination of plant location (CX–14), shipping data (CX–70J–70Z74, *in camera*) and testimony of customers (I.D. 141–42) clearly reveals the extent to which JWC and Panacon were competing for each other's business. One scholar has suggested that in addition to proscribing mergers which substantially increase concentration, acquisitions of substantial competitors (with market shares of 5 percent or more) should also be banned because such firms are generally large enough to take advantage of production scale economics and usually are major factors in the market. Bok, "Section 7 of the Clayton Act and the Merging of Law and Economics," 74 *Harv. L. Rev.* 226, 327–29 (1960). Putting aside the increase in concentration which actually occurred, that test is more than met here.

[41] The Commission issued a consent order against Bird & Son, note 34, *supra,* requiring divestiture of one of the three plants acquired from Logan-Long.

It is also useful to bear in mind, as we noted earlier, *supra,* p. 2, that JWC's entry and growth in the asphalt roofing business have been achieved primarily through acquisition. Whatever justification exists as to those earlier acquisitions—first, the 1962 purchase of Celotex and its Los Angeles roofing plant, and later, the 1967 acquisition of Barrett Building Materials Division of Allied Chemical Corporation with its seven roofing plants—fails here in the context of this substantial horizontal merger. As the *Brown Shoe* Court pointed out, "expansion through merger is more likely to reduce available consumer choice while providing no increase in industry capacity, jobs or output. It was for these reasons, among others, Congress expressed its disapproval of successive acquisition." (*Id.* at 345, n. 72)

Thus, there is ample evidence in our view for concluding that the instant acquisition falls within that class of mergers deemed presumptively unlawful where concentration is already great, and "the importance of preventing even slight increases in concentration and so preserving the possibility of eventual deconcentration is correspondingly great" *Alcoa, supra,* 377 U.S. at 279. Concentration is undeniably high in the asphalt roofing market and the increase caused by the merger can hardly be characterized as slight.

The significance of the market share data in this case is further underscored when viewed alongside statistical evidence presented in a number of other cases involving mergers found unlawful under Section 7. Although those decisions were premised in part on evidence of a trend toward increasing concentration,[42] a comparison is useful to show the substantially higher market shares and concentration levels present here. [41]

For example, in *United States* v. *Von's Grocery,* 384 U.S. 294 (1966), market shares of the acquiring and acquired firms were 4.7 and 4.2 percent, respectively. There the acquisition boosted four-firm concentration from 24.4 percent to 28.8 percent, and increased the eight-firm ratio by 3.1 percent to 44 percent. The contrast with the pending case is rather striking. Similarly, in *United States* v. *Pabst, supra* where the Court found a violation of Section 7 in three separate markets, the combined share held by the two merging firms, Pabst and Blatz, was only 4.49 percent in the national market.

---

[42] The ALJ found a trend toward concentration in the asphalt roofing industry, citing the fact that six other mergers were consummated between 1969 and the time of trial, including the acquisitions by Bird & Son and Flintkote cited above. (I.D. 125) The absence of quantitative evidence demonstrating the effect of these mergers on concentration levels precludes us from ascertaining the precise dimensions of this trend. Nevertheless, we believe that acquisitions by major firms have a significant anticompetitive impact above and beyond the backdrop of a trend toward concentration in the industry. Temporal comparisons of concentration levels are helpful but unnecessary where the record shows, as it does here, that the market is already concentrated and the acquisition substantially enhances the share of one of the leading firms.

In the three-state market, Pabst's market share stood at 5.48 percent prior to the merger and Blatz held 5.84 percent. Ten-firm concentration in the national market stood at 45.06 percent in 1957, the year prior to the merger, and eight-firm concentration in the three state market was 58.93 percent in 1957. Even in the more highly concentrated Wisconsin market, four-firm concentration of 47.74 percent was somewhat lower than the level in the pending case. (*Id.* at 550–51)

The market share data in *Beatrice Foods Co.,* 86 FTC 1 (1975), *aff'd,* 540 F.2d 303 (7th Cir. 1976), also reveals a less concentrated market than is presented in the case now before us. The acquiring and acquired firms there possessed 7.6 and 2.3 percent, respectively, of the brush and roller market. As a result of the merger, four-firm concentration rose from 41.3 percent to 43.6 percent, after having increased from 36.6 percent in 1967, two years prior to the merger. In our recent decision in *American General Ins. Co.,* 89 F.T.C. 557, (1977), four-firm concentration in the fidelity bond market rose from 31.3 percent to 34.6 percent as a result of the merger; in the surety market concentration climbed from 30.6 percent to 35 percent. Combined shares of the merging firms in the two markets were 10.7 percent and 12.4 percent, respectively. Taken together, the effect of the merger and the pre-existing trend boosted concentration 8.65 and 9.64 percentage points in the two markets. JWC's acquisition of Panacon is well [42] within the statistical range established by these cases inasmuch as the acquisition itself increased four-firm concentration by 7.45 percentage points.[43]

However viewed, we can only conclude that the statistical evidence presented establishes a *prima facie* violation of Section 7. This conclusion is bolstered by JWC's own tendency to expand through acquisition as well as the acquisitions by other leading firms in the industry.

Unlike the defendant in *General Dynamics,* however, JWC has failed to present evidence pertaining to the structure, history, and probable future of the asphalt and tar roofing industry sufficient to overcome the presumption that the merger threatens a substantial lessening of competition. [43]

---

[43] Even the statistical data in *General Dynamics, supra,* which the Court indicated would have established a *prima facie* violation in the absence of countervailing factors, is not inconsistent with the figures in this case. There, the combined shares of the two firms at the time of the acquisition in 1959 were 12.4 percent. Although concentration in the Illinois market was somewhat greater than exists here, concentration in the broader Eastern Interior Coal Province market was less with a four-firm level of 43 percent before the merger. The increase in the share of the top two firms in the Province in 1959 also is similar to that which occurred as a result of the JWC/Panacon merger: two-firm concentration in the Province market rose 4.8 percentage points to 37.9 percent; in contrast, two-firm concentration in the asphalt and tar roofing industry jumped as a result of the instant merger 5.86 percentage points to a level of 85.7 percent. (*Id.* at 495)

Opinion                              90 F.T.C.

Respondent argues that no anticompetitive effects have resulted from the merger, citing testimony of its competitors and expert witness, Dr. Lanzilotti, that prices did not rise significantly and that smaller firms in the market have been successful. (RAB at 33) JWC also contends that low entry barriers, the entry of new firms in the market after the acquisition, the growth rate of smaller firms and the presence of potential competition provide further evidence that the merger will not adversely affect competition. We will take these arguments in turn.

The absence of any discernible effect on pricing[44] or the lack of small company failures attributable to the merger can be given little weight in analyzing the merger's probable effect on competition. At best such effects are difficult to measure, particularly if prices are already at non-competitive levels. Indeed, a high survival rate among firms on the fringe of the market may actually signal the existence of anticompetitive behavior, with smaller inefficient firms sharing some of the benefits derived from collusive arrangements among the industry leaders. *American General Ins. Co., supra,* 86 F.T.C. at 636.

More significantly, the merger's actual impact on competition is to a large extent within the control of the parties. As the courts and the Commission have repeatedly emphasized, if such evidence were allowed as a defense to a Section 7 suit, violators would be able to escape the law's reach by simply exercising restraint until the litigation is [44] concluded. So too, testimony by competitors must be viewed with skepticism since they may be interested in making acquisitions the legality of which could be affected by the pending suit. *See, e.g., General Dynamics, supra,* 415 U.S. at 504; *American General Ins. Co., supra,* 89 F.T.C. at 632–33. Futhermore, as the Court noted in *General Dynamics,* "the mere non-occurrence of a substantial lessening of competition in the interval between acquisition and trial does not mean that no substantial lessening will develop thereafter; the essential question remains whether the probability of such *future* impact exists at the time of trial." (*Id.* at 505) There is also no assurance that the state of competition following the merger is an accurate indicator of the competitive environment that would

---

[44] Dr. Lanzilotti, the economist called by respondent, testified that after factoring out cost increases due to higher petroleum prices and inflation, net prices for asphalt roofing rose only slightly during the period from early 1973 to mid-1975 (Tr. 2402–05; RX 94). Aside from the reservations noted below about relying on such pricing trends, and the fact that the figures were based upon estimated changes in cost rather than actual data, we have some concern regarding the foundation for Dr. Lanzilotti's conclusion that the net change in roofing prices was only 1.8 percent from March 1973 to August 1975. His assumption that asphalt represented 25 percent of the cost of asphalt roofing during this period is contradicted by first-hand testimony of an industry witness showing that when labor costs are properly included the percentage was as low as 15 percent. (Tr. 2237, 2239, 2406–2413) Reworking RX–94 using the 15 percent figure results in a net increase for roofing prices of 10.2 percent.

JIM WALTER CORP.                    761

671                          Opinion

have existed but for the merger. *See FTC* v. *Consolidated Foods,* 380 U.S. 592, 598 (1965).

As for entry barriers, the ALJ found that the principal hurdle is the capital investment required for production facilities. Such factors as patents, technology, trained personnel and advertising do not appear to pose significant obstacles to would-be entrants. (I.D. 126, 132–33) Insofar as capital costs are concerned, the record reveals some divergence among industry witnesses as to the cost of an efficient size plant. For example, the Board Chairman of Bird & Son (Mr. Jenkins) testified that the kind of roofing plant his firm would build would cost about $6.75 to $7 million, with an additional $7.5 to $8 million required for a felt mill. (I.D. 127) Another estimate provided by Mr. Snow of Johns-Manville was somewhat higher—$8 to $10.35 million for a roofing plant, with the higher figure including production of both fiberglass and organic based asphalt roofing products, and $12 to $15 million for a dry felt mill. (CX–71, *in camera;* Tr. 711–12, *in camera*) Perhaps a more reliable cost indicator is the $9 to $12 million estimate for Celotex' Goldsboro, N.C. plant, a combination roofing/felt facility completed after the acquisition of Panacon. (I.D. 129; Tr. 1825)

Yet, representatives of smaller firms in the industry testified that their companies successfully built facilities for as little as $1.8 million in one instance (Consolidated Fiberglass), and $2.4 million in another (Tamko), excluding the cost of adding felt (or fiberglass mat) production capacity and additional lines. (I.D. 130) Although the ALJ concluded that it was not essential that a firm produce its own felt (I.D. 131), most firms have such capacity (CX–2,3) [45] and it is not clear whether supplies are readily available from non-roofing sources.[45] In fact, Tamko had a felt plant (Tr. 1987), the cost of which was unspecified, and Consolidated at the time of trial was planning to construct a fiberglass mat facility. (Tr. 2261–62) In describing the plans for Panacon's proposed Hopewell, Va. roofing plant, which would not have had a felt mill, the former president of Panacon indicated that "an optimum roofing plant has a paper [or felt] mill and a roofing plant together." (Tr. 468)

Apart from the cost of individual plants, there is also disagreement as to the advantages and disadvantages of single- vs. multi-plant operations. (I.D. 136) While small one-plant firms may have some advantages over their larger rivals, as the ALJ noted, there is evidence that multi-plant locations enable the latter to penetrate the

---

[45] While Mr. DiSalvo, a vice president of Celotex, testified that non-roofing firms, such as paper companies, can produce roofing felt (Tr. 1727–30), he also acknowledged that the asphalt roofing industry, including those members with felt capacity, periodically experiences shortages of dry felt. (Tr. 1817–19)

major markets more effectively through expanded capacity, more
direct access to customers and relative savings in distribution costs.
(Tr. 432, 1396) Further, given the fluctuations in housing demand,
both seasonally and regionally, multi-plant capability would appear
to afford manufacturers greater flexibility in responding to shifting
market conditions. The importance of multi-plant capability is
reflected by the fact that the 8 largest firms in the industry all have
multi-plant operations (CX–68) and own more than 70 percent of the
asphalt and tar roofing plants in the United States. Such an industry
structure is consistent with Professor Scherer's conclusion that
"multi-plant operation is a crucial contributor to high concentra-
tion." *Industrial Market Structure, supra* note 38, at 93.

The record, on balance, however, affords only a rough estimate of
the costs associated with *de novo* entry. More precise comparisons of
the relative cost advantages of different size plants and/or firms
were not provided. Nevertheless, in our view the resource commit-
ment required for a new entrant to challenge the major firms
successfully on a national scale is not insignificant. Though perhaps
not high, entry barriers here are at least in the moderate range.
More importantly, relative ease of entry and the concomitant [46]
prospects for potential competition are not a substitute for the loss of
substantial actual competition. As we have said before, "even proof
of low entry barriers . . . can be at most of slight exculpatory value
in the face of probable anticompetitive effects, since all it suggests is
that such effects may be smaller or shorter lived, not that they are
unlikely to occur." *RSR, supra,* 88 F.T.C. at 289.[46]

Respondents also advance a related argument by contending that
actual entry by several new firms, both before and after the merger,
satisfactorily rebuts any inference of probable anticompetitive effect
based on the market share data alone. There have been eight new
entrants in the industry since 1960, including two subsequent to the
JWC-Panacon acquisition. (I.D. 137) There is no evidence, however,
that these new firms have eroded the market position of the industry
leaders. Their combined market share in 1972 was 3.9 percent, with
only one company, Royal Brand, having a share in excess of 1
percent of the market. Nor has the entry of the two firms after the
acquisition had a significant impact. (I.D. 138, *in camera*) Although
respondent points to the faster growth rate of the smaller firms
during 1970–72 as further evidence that the instant merger is

[46] Respondent's assertion that the large number of potential entrants serves to nullify any anticompetitive
effect is likewise rejected since it is highly unlikely that potential competition would restore the actual competition
eliminated by this acquisition. *Ekco Products Co.,* 65 F.T.C. 1163, 1207–08 (1964), *aff'd.* 347 F.2d 745 (7th Cir. 1965);
*Beatrice Foods Co.* 67 F.T.C. 473, 718 (1965); *American Brake Shoe Co.,* 73 F.T.C. 610, 684 (1968), *modified* 77 F.T.C.
148, (1970).

JIM WALTER CORP.                         763

671                          Opinion

unlikely to have any anticompetitive effects, we do not draw the
same conclusion. Although market shares of the leading firms
dropped slightly during this period, overall concentration increased
and sales of four of the top eight firms rose faster than overall
industry sales. (CX–15A–C, *in camera;* RX 83) Given an expanding
market,[47] the rise in sales of smaller firms is not particularly
surprising. And, as noted earlier, the success of smaller firms could
also be facilitated by an umbrella of weakened competition resulting
from the high levels of concentration in the market.

Thus, we find nothing in the record here that contradicts the
*prima facie* case established by the statistical data. We conclude,
therefore, that the acquisition has the probable effect of substantial-
ly lessening competion in violation of Section 7 of the Clayton Act.
[47]

## V. The Remedy

Noting that the appropriate remedy for a Section 7 violation is to
"restore competition to the state of health it might have enjoyed but
for the acquisition," the ALJ ordered divestiture of the stock and
assets of Panacon's Philip Carey Division, while rejecting complaint
counsel's request for total divestiture of the Panacon assets. The ALJ
determined on the basis that the roofing and non-roofing lines of the
Panacon business are severable and inclusion of the latter is not
essential to the viability of the roofing operation. The law judge also
turned down complaint counsel's call for a mandated "spin-off" of
the acquired assets, expressing instead a preference that the
divestiture be accomplished by sale of each Philip Carey plant as a
going concern to separate buyers. Finally, the law judge disagreed
with complaint counsel that divestiture of Celotex' Goldsboro, North
Carolina plant (under construction at the time of the acquisition)
was necessary to compensate for the plant that Panacon contemplat-
ed building in Hopewell, Virginia. On appeal, Commission counsel
renew their request for a spin-off of the Panacon assets, including
the Goldsboro plant.

Respondent, for its part argues that the relief granted by the ALJ
is excessive and not reasonably related to the violation. If any relief
is granted in this matter, respondent urges that the maximum
corrective action should be a five-year injunction against future
acquisitions without prior Commission approval. To support its
claim, respondent relies on the Commission's decision in *National
Tea Co.,* 69 F.T.C. 226 (1966), and a series of consent agreements.

---

[47] Shipments rose 58 percent between 1970 and 1972—a substantial figure even after taking inflation into
account.

We agree with the ALJ that divestiture is the proper remedy in this case. As we have said previously, "[t]he most appropriate remedy to redress a Section 7 violation is generally divestiture. It is specified in the enforcement provisions of the amended Clayton Act and normally commends itself as a rational course in restoring competition to the condition which obtained prior to the merger." *Diamond Alkali Co.*, 72 F.T.C. 700, 742 (1967). Divestiture is particularly desirable where, as here, the Section 7 violation is premised in part on the elimination of a substantial independent competitor. No other form of relief can compensate for such loss as well as the restoration of that competitive force in the market. [48]

It is also clear that a ban on future acquisition, by itself is inadequate.[48] Unlike *National Tea*, barriers to entry here are not so low as to obviate the need for something stronger than a merger ban to restore competition. To the contrary, the fact that entry by a few small firms has not diminished the market power of the leading firms in the asphalt and tar roofing industry suggests that it will take some time before natural market forces can replace the competition lost by the acquisition of Panacon. More importantly, actual, or horizontal, competition was involved in only a fraction of the store acquisitions in *National Tea*, not to mention the enormous difficulties inherent in the divestiture of 485 stores. *National Tea, supra* at 266. We believe, however, that in addition to divestiture the record of this case, particularly as it indicates respondent's history of growth in this industry by acquisition, justifies a 10-year ban on further acquisitions by JWC in the asphalt and tar roofing industry.

We also concur in the ALJ's conclusion that it is not essential to mandate divestiture of all the Panacon assets in order to remedy the violation of Section 7 that has occurred here. While it is certainly within our power to order divestiture of assets unrelated to the asphalt roofing business, particularly if such action is needed to assure the viability and attractiveness to would-be purchasers of the divested entity, the evidence indicates that reestablishing the original Panacon operation is unnecessary. Complaint counsel's assertion that only a restored Panacon can provide sufficient diversification to afford corporate earnings stability is undercut. Philip Carey's record as part of Panacon, and prior thereto, suggests that it can be successfully operated on an independent basis. Indeed, complaint counsel in their proposed findings paint a bright picture of the Philip Carey operation, noting that it has been in the roofing

---

[48] Respondent's reliance on negotiated consent orders is likewise inappropriate. Each consent order was negotiated in light of the facts of the case at hand and the likelihood of success if litigation were pursued. Such orders have no bearing on the type of order which the Commission can impose when it finds that Section 7 has been violated.

671                                      Opinion

business for nearly a century, produces more than 200 different building and industrial products, and in terms of profitability contrasts favorably with the losses experienced by Briggs Manufacturing Company before their merger and the formation of Panacon. (CPF 32–50) Even after creation of Panacon, [49] there is evidence that Philip Carey contributed more to the profitability of the parent firm than did its merging partner. (CPF 37; Tr. 440) Under Panacon, Philip Carey operated as a separate profit center with a separate sales force and separate plants. (RPF I–A 8–12) For these reasons, we decline to order divestiture of the former Panacon organization in its entirety.

We do, however, include within our divestiture order the assets of Carey-Canadian Mines, Ltd., a former subsidiary of Panacon engaged in asbestos mining operations in the Quebec area. This operation supplied between 40 and 55 percent of Philip Carey's asbestos fibre requirements during the four years preceding the acquisition by JWC. (CX–39P) Conversely, Philip Carey's purchases accounted for approximately 13 percent of the total value of fibre sales by Carey-Canadian in 1971. (CX–39S) While the availability of alternate sources of supply or the volume of Philip Carey's business dependent on these supplies is unclear, inclusion of Carey-Canadian is relevant to the line of commerce in question here and should assist in the restoration of Philip Carey as a viable competitive force in the market.

Turning to complaint counsel's call for a spin-off of the divested entity, we agree with the ALJ that a spin-off of JWC stockholders should not be the only permissible form of divestiture. Notwithstanding the desirability of having an independent Philip Carey reestablished, the difficulties involved in spin-offs plus the possibility that purchase by a non-roofing firm might expedite Philip Carey's successful reentry into the market persuade us that a more flexible divestiture order should be issued.

As for complaint counsel's request for divestiture of Celotex' Goldsboro, N.C. plant, we are not convinced such action is necessary to assure a viable new Philip Carey. As we have noted, *supra,* plans for Philip Carey's Hopewell, Va. plant were abandoned by JWC after the merger in view of its ongoing construction of the proximate Goldsboro facility. Nevertheless, the former president of Panacon testified that the Hopewell plant would have been built in a "very cheap fashion" and would have had a significantly smaller capacity than JWC's Goldsboro plant and no felt mill. (Tr. 442, 467–69) Given the lack of evidence in the record as to the significance of the

Hopewell facility to Philip Carey, we see no compelling basis for divestiture of the Goldsboro plant. [50]

Our order here requires divestiture of the Philip Carey and Carey-Canadian assets as a going concern, rather than through piecemeal sale of the individual plants as recommended by the ALJ. While we have no quarrel with the proposition that more, rather than fewer, competitors would be desirable, our choice of relief is dictated by the fact that we have found a violation of Section 7 in the nation as a whole, rather than in smaller submarkets. We repeat our earlier observation that an effective challenge to the major firms in the industry requires a large, multi-plant operation capable of doing business on a national scale. Even were that not essential, there is nothing in the record which enables us to evaluate the prospects of each plant operating successfully as an independent going concern. Not only does output among the plants vary considerably but there are also differences in the age and product mix of the various plants. (CX–39U) An infusion of outside capital, of course, might readily correct whatever deficiencies, if any, may exist; but it is likely that the efforts (in time and cost) required to make five separate firms as effective as one unified company will assist JWC and other leading firms to entrench further their positions in this already concentrated market.

An appropriate order is appended.

## FINAL ORDER

This matter having been heard by the Commission upon the appeal of respondent from the initial decision, and upon briefs and oral argument in support thereof and opposition thereto, and the Commission for the reasons stated in the accompanying opinion having determined to deny the appeal of respondent:

*It is ordered,* That the initial decision of the administrative law judge, pages 1–64 be adopted as the findings of fact and conclusions of law of the Commission, except to the extent inconsistent with, and as indicated in, the accompanying opinion.

*It is further ordered,* That the following order to divest and to cease and desist be, and it hereby is, entered: [2]

I

*It is ordered,* That respondent Jim Walter Corporation (hereinafter "JWC"), a corporation, and its officers, directors, agents, representatives, employees, subsidiaries, affiliates, successors and assigns, divest all stock, assets, title, properties, interests, rights and

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)
2022-1 Trade Cases P 82,039

2022 WL 836951
United States District Court, S.D. California.

IN RE: PACKAGED SEAFOOD
PRODUCTS ANTITRUST LITIGATION
This Document Relates to: All Actions.

Case No.: 15-MD-2670 DMS (MDD)

Signed 03/21/2022

ORDER (1) GRANTING PLAINTIFFS' MOTION
FOR RECONSIDERATION; (2) VACATING
ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS; (3) DENYING DEFENDANTS'
MOTION TO DISMISS; AND (4) DENYING
AS MOOT PLAINTIFFS' MOTION FOR
CERTIFICATION OF RULE 54(b) JUDGMENT
AND THE PARTIES' JOINT MOTION TO SEAL

(ECF Nos. 2281, 2285, 2471)

Dana M. Sabraw, Chief Judge

**\*1** Pending before the Court are Plaintiffs' Motion for
Certification of a Rule 54(b) Judgment ("Rule 54(b) Mot.,"
ECF No. 2281-1) and Direct Action Plaintiffs' ("DAP")
Motion for Reconsideration of the Court's Order Granting
Lion Capital's Motion to Dismiss or, in the Alternative,
for Entry of Final Judgment Under Rule 54(b) ("Mot. for
Reconsideration," ECF No. 2284.) Plaintiff W. Lee Flowers
& Co. separately joined in the Rule 54(b) Motion. (ECF
No. 2282.) Defendants Lion Capital LLP ("Lion Capital")
and Big Catch Cayman LP ("Big Catch") opposed, ("54(b)
Opp'n," ECF No. 2289; "Reconsideration Opp'n," ECF No.
2291), and Plaintiffs replied, ("54(b) Reply," ECF No. 2300;
"Reconsideration Reply," ECF No. 2302.) [1] The parties also
jointly filed a motion to seal. ("Mot. to Seal," ECF No.
2471.) For the reasons set forth below, Plaintiffs' Motion for
Reconsideration is granted, the Order Granting Defendants'
Motion to Dismiss ("Second Lion Order," ECF No. 2270) is
vacated, and Defendants' motion to dismiss (ECF No. 1631) is
denied. In light of those rulings, Plaintiffs' Rule 54(b) motion
and the parties' Motion to Seal are denied as moot.

I.

BACKGROUND

The general background and history of this litigation is well
documented and extensively discussed in prior orders. (ECF
Nos. 2454, 2654.) For purposes of the present motions, the
Court sets out only the relevant facts.

In July 2015, the Antitrust Division of the United States
Department of Justice ("DOJ") announced its investigation
into the packaged tuna industry. Criminal charges for price
fixing in violation of the Sherman Act, 🚩 15 U.S.C. § 1, were
filed against the three largest domestic producers of packaged
tuna products—Tri-Union Seafoods LLC d/b/a Chicken of
the Sea International ("COSI"), Bumble Bee Foods LLC
("Bumble Bee"), StarKist Company ("StarKist"), and their
executives. Bumble Bee's CEO Christopher Lischewski [2]
was convicted after a jury trial. *United States v. Lischewski*,
860 Fed. Appx. 512, 2021 WL 2826474 (9th Cir. Jul. 7,
2021) (affirming conviction). He is serving a prison sentence
for his "leadership role in the conspiracy." *United States v.
Lischewski*, U.S. Dist. Ct. N.D. Cal. Case No. 18cr203-EMC,
Am. Crim. Minutes of Jun. 16, 2020, sentencing, ECF No.
692. All other defendants pled guilty.

In the wake of the DOJ announcement of its investigation,
dozens of plaintiffs initiated civil actions alleging price fixing
against the three tuna producers and their parent companies:
(1) COSI and its owner Thai Union Group PCL ("TUG");
(2) StarKist and its owner Dongwon Industries Co. Ltd.
("Dongwon"); and (3) Bumble Bee and its owners Lion
Capital, Lion Capital (Americas), Inc. ("Lion Americas") and
Big Catch (collectively the "Lion Entities"). The civil actions
were consolidated in a multidistrict litigation ("MDL") for
pretrial proceedings before this Court.

**\*2** The Lion Entities moved to dismiss the claims alleged
against them. In the order disposing of the motion, the Court
concluded it had personal jurisdiction over the Lion Entities,
but that Plaintiffs stated a claim only against Lion Americas.
(Order Granting in Part and Denying in Part Defs.' Mots. to
Dismiss ("First Lion Order") at 90, ECF No. 1362.) [3] The
complaint was sufficient to allege that Lion Americas directly
participated in the price fixing conspiracy. (*Id.* at 79-86.)
Plaintiffs were granted leave to amend the claims against Lion
Capital and Big Catch. (*Id.* at 90.) When Plaintiffs filed their

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

amended complaints,[4] Lion Capital and Big Catch again moved to dismiss, which motion was granted without leave to amend.

DAPs filed a Motion for Reconsideration of the Second Lion Order or, alternatively, for entry of a final judgment against Lion Capital and Big Catch under Rule 54(b) of the Federal Rules of Civil Procedure.[5] All Plaintiffs, including DAPs, also joined in a separately filed Rule 54(b) Motion.[6] Finally, the parties jointly filed a Motion to Seal requesting the sealing of eight documents filed in support of and in opposition to Plaintiffs' Motion for Reconsideration.

## II.

### MOTION FOR RECONSIDERATION

"Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." School Dist. No. IJ, Multnomah County, Oregon v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993).[7] Here, Plaintiffs argue reconsideration is warranted based on newly discovered evidence and because the Court committed clear error in the Second Lion Order.[8]

In support of their argument of clear error, Plaintiffs raise the issue of the Court's application of United States v. Bestfoods, 524 U.S. 51, 69 (1998), in reaching the conclusion that Plaintiffs failed sufficiently to allege that Eric Lindberg, Jacob Capps, and Jeff Chang, dual agents of Lion Capital and Lion Americas, acted on behalf of Lion Capital when they participated in the conspiracy. (Cf. Second Lion Order at 16-17 with Mot. for Reconsideration at 8-12.) The Lion Entities counter that Plaintiffs should be precluded from seeking reconsideration because they failed to address this issue in their opposition to the Second Lion 12(b)(6) Motion. (Reconsideration Opp'n at 2, 4.)

**\*3** The Court disagrees. In their moving papers the Lion Entities quoted Bestfoods for the hornbook proposition that "a parent corporation ... is not liable for the acts of its subsidiaries." (Mem. of P.&A. in Supp. of Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second

Lion 12(b)(6) Mot.") at 31, ECF No. 1630-1.)[9] It was only in the reply that they argued for dismissal based on the "Bestfoods presumption," which they articulated as follows, "The Supreme Court has held that 'dual status' agents of a parent corporation and its subsidiary are presumed to be acting for the subsidiary if, as here, they are employed by that subsidiary." (Reply in Supp. of Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second Lion 12(b)(6) Reply") at 2 (citing Bestfoods, 524 U.S. at 69-70), ECF No. 1759.)[10] Raising the "Bestfoods presumption" for the first time in the reply deprived Plaintiffs of an opportunity to respond. Accordingly, Plaintiffs' request to reconsider the Second Lion Order on this basis is granted. See Dietz v. Bouldin, 579 U.S. 40, 45-46 (2016).

The issue of Lion Capital's liability was raised in the context of a Rule 12(b)(6) motion to dismiss. Plaintiffs' allegations must therefore meet the pleading standard of Rule 8(a)(2). The Rule

requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds for his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). The Court must accept as true all allegations of material fact in the complaint and construe them in the light most favorable to the party opposing dismissal. Id.

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

On a Rule 12(b)(6) motion courts generally may not consider material outside the complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 988 F.3d 988, 998 (9th Cir. 2018). "There are two exceptions to this rule: the incorporation-by-reference doctrine, and judicial notice under Federal Rule of Evidence 201." *Id.* In determining whether Plaintiffs stated a claim, the Court considers neither the evidence offered by Plaintiffs nor affidavits offered by the Lion Entities insofar as they fall outside these exceptions.

As set out in the First Lion Order, Plaintiffs sufficiently alleged Lion Americas' direct participation in the conspiracy. (First Lion Order at 86.) The finding was based on detailed allegations that Lindberg, Capps, and Chang communicated with Lischewski and other Bumble Bee executives regarding pricing agreements with StarKist and COSI and cooperated in Bumble Bee's efforts to police and enforce them. (*Id.* at 81-84.) The principal issue on reconsideration is whether Plaintiffs also sufficiently alleged participation by Lion Americas' parent entity Lion Capital.

### A. Plaintiffs' Allegations

At all relevant times, Lion Capital was a British private equity firm specializing in investments in the consumer sector. (Compl. ¶ 189; *see also* Am. and Restated Limited Liability Partnership Deed Relating to Lion Capital LLP ("LLP Agreement"), ECF No. 1630-3; *see also* ECF No. 1721-1.) [11] Its founder and Managing Partner was Lydon Lea. (Compl. ¶ 189; LLP Agreement §§ 1.1, 9.1.) Lindberg, Capps, and Chang were among its Members. (Compl. ¶¶ 189, 192; *see also* LLP Agreement, Schedule 1.) Lea, Lindberg, and Capps were also among its Executive Officers. [12]

**\*4** Lion Americas was a Delaware corporation and Lion Capital's wholly owned subsidiary. (Compl. ¶ 190; *see also* Lion Americas Form ADV ("Form ADV"), ECF No. 2291-2, pages 97-117, Items 2, 3 & Schedule A.) [13] Lion Americas was an SEC-registered investment advisor with one client— Lion Capital. (Form ADV, Items 2, 5, 7.) Capps served as Lion Americas' President, Lindberg was one of its directors, and Chang was an employee. (Compl. ¶¶ 189-97.) Plaintiffs adopted the Lion Entities' position that although Lea was an officer of Lion Americas, he was not a Lion Americas employee but was exclusively a Lion Capital employee. (*Id.* ¶ 215 & n.13.)

Lion Capital's business model was to acquire companies, increase their market value, and sell them at a profit.

(First Lion Order at 78.) Lion Capital held itself out to potential investors as "focus[sed] solely on retail and consumer businesses" and possessing "a team with an intimate knowledge of the way consumers and brands interact[.]" (Compl. ¶ 216.) It distinguished itself from "average" private equity firms by its philosophy of getting "down to the very granular knowledge" of the businesses it owned. (*Id.* ¶¶ 215, 216.)

Lion Capital acquired Bumble Bee in December 2010 (Compl. ¶¶ 189, 210, 240; *see also* First Lion Order at 4) and became Bumble Bee's equitable owner. (First Lion Order at 33.) The equitable ownership finding encapsulates the convoluted ownership structure of the Bumble Bee investment (*see id.* at 31-33 & n.21; *see also* Compl. ¶¶ 200-05) and is based on the facts that Lion Capital exercised control over the investment fund, Lion Capital Fund III, L.P. (the "Fund"), which invested in Bumble Bee, and that Lion Capital was the Fund's "managing agent." [14] (First Lion Order at 33; Form D (identifying Lion Capital as the Fund's "manager").)

Plaintiffs contend that Lion Capital learned of Bumble Bee's participation in the conspiracy before the acquisition. (Compl. ¶¶ 208-09.) During the due diligence process, Lion Capital had access to Bumble Bee's financial records and executives who are now known to have participated in the conspiracy. (*Id.* ¶ 208.) Specifically, Lion Capital inquired about the increase in Bumble Bee's per-can profit margins since 2006, and learned it was the result of a price increase and the can downsize in 2008. (*Id.*) It can reasonably be inferred that, as a "sophisticated investment firm" (First Lion Order at 81) and in keeping with its claims of expertise in the consumer sector and "granular knowledge" of the companies it acquired, Lion Capital knew of the contemporaneous industry-wide downward pressure on product pricing due to the falling price of raw tuna and decreasing market demand for canned tuna. (Compl. ¶¶ 208, 55-60; *see also* First Lion Order at 77-79, 81.) In a competitive market canned tuna prices would have decreased. Bumble Bee prices increased.

Just weeks before completing the acquisition, Lion Capital separately met with Dongwon and TUG executives. (Compl. ¶¶ 210, 211.) In arranging the meeting with Dongwon Chairman Jae-chul Kim on November 15, 2010, Lindberg explained he wanted to meet on an "owner to owner" basis. (*Id.* ¶ 211.) Accordingly, Lindberg held himself out as a representative of Lion Capital, soon-to-be owner of Bumble Bee.

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 173 of 247

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)
2022-1 Trade Cases P 82,039

**\*5**  In preparing Lindberg for the meeting, Lischewski told him that a "key message is to ensure Dongwon that Lion will support rational[ ] market behavior by Bumble Bee." (Compl. ¶¶ 210, 223.) Defendants have argued that "rational" meant just that and nothing more. However, after the guilty pleas and Lischewski's conviction, in the context of the pre-acquisition meetings with competitors, and in light of other allegations in the Complaint which shed additional light on the issue (*see, e.g., id.* ¶¶ 210, 221, 234), it can reasonably be inferred that "rational market behavior" was a euphemism for collusive pricing agreements among Bumble Bee, StarKist, and COSI. (*See also* First Lion Order at 49.) Prior to the meeting, Lindberg reviewed the "talking points" with Lea and others at Lion Capital. (Compl. ¶ 211.)

Plaintiffs alleged sufficient material facts to support a reasonable inference that Lion Capital learned prior to completing the acquisition that Bumble Bee's profits were the product of pricing actions which would be untenable in a competitive market and were in fact the product of anticompetitive agreements. Lion Capital proceeded to acquire Bumble Bee anyway.

The "primary purpose" of Lion Capital was "to carry on, directly or indirectly through its Associates, the business of the provision of investment management (and/or advisory) services to the Funds[,]" including the Fund which invested in Bumble Bee. (LLP Agreement ¶ 3.3.) Lion Americas was a Lion Capital "Associate." (LLP Agreement § 1.1.)

Lion Capital used Lion Americas to carry out some of its management duties and paid Lion Americas on a "cost plus fee" basis. (*See* Form ADV, Item 5; Compl. ¶¶ 195, 196.) Lion Capital was Lion Americas' only client, Lion Americas was not involved in any other business other than advising Lion Capital, and it had no direct or indirect affiliation with the Fund. (*See* Form ADV, Items 5-7; Compl. ¶ 199.) Lion Americas had no other source of income and was entirely dependent on Lion Capital for funding. (Compl. ¶ 199; Form ADV, Item 5.) Based on the foregoing, the allegations support a reasonable inference that Lion Americas had no direct ability to manage Bumble Bee, and that Lion Capital, as Bumble Bee's equitable owner and managing agent of the Fund, had the ability to manage Bumble Bee.

The Lion Entities' website stated that Lion Capital "closely managed the business affairs of the companies in which it invests." (Compl. ¶ 216.) Specifically, it claimed, "*We work closely with management* to see exactly what a brand is capable of achieving, and then take it to new heights," and, based on the consumer brand focus, "our team is uniquely positioned to *work with management* to identify the right strategies for revitalizing operations. (*Id.*) (emphases added). Lion Capital "ensure[s] that [its] companies have the best management talent to execute the vision that we develop in a *collaborative partnership*" while never forgetting "the responsibility for successful outcomes in our companies rests with us [Lion Capital]." (*Id.*) (emphasis added). At the time of the acquisition, Lischewski disseminated an internal memorandum to Bumble Bee employees stating that "the Lion Entities team planned to be 'actively involved' in the business." (*Id.* ¶ 217.) Lion Capital installed Lea, Lindberg, and Capps on Bumble Bee's board of directors, thus controlling three of its four seats. (*Id.* ¶¶ 217, 205.)

Lion Capital oversaw the Bumble Bee investment from its office in Los Angeles, California, near Bumble Bee's headquarters and principal place of business in San Diego. (Compl. ¶¶ 189, 31.) Lion Americas operated out of the same office. (*Id.* ¶ 190.) Dual agents Lindberg, Capps, and Chang also worked out of the Los Angeles office. (*Id.* ¶¶ 189, 190.)

As the sole Managing Partner of Lion Capital, Lea had the discretion and authority to admit new Members, determine their duties and compensation, and expel them from Lion Capital. (LLP Agreement ¶¶ 11, 12.1(b), 14.1, 1.1.) Further, the LLP Agreement sets out the "Members' Obligations[,]" as follows:

> **\*6**  Each Member shall, unless the Managing Partner otherwise agrees, devote the whole of his time and attention to the performance of his obligations on behalf of the LLP and its Associates, as required by the Managing Partner and shall not engage in other business activities without the consent of the Managing Partner. The Managing Partner may determine the duties, role and obligations of each of the Members from time to time.

(LLP Agreement ¶¶ 14 & 14.1.) The Lion Entities have argued that this provision does not mean that Lindberg, Capps, or Chang had to devote their entire time to duties

2022-1 Trade Cases P 82,039

as assigned by Lea. (Second Lion 12(b)(6) Reply at 6.) They point to the language that the Members had to devote their time to obligations on behalf of Lion Capital *and its Associates*, Lion Americas included, and that Lea would determine their duties merely *from time to time* and not necessarily all of the time. (Second Lion 12(b)(6) Reply at 6) (second emphasis added).

The Court does not consider the LLP Agreement in the abstract but in the context of other factual allegations. Plaintiffs alleged that Lea assigned Lindberg to be principally responsible for managing the Bumble Bee investment and that he assigned Capps and Chang to assist Lindberg. (Compl. ¶ 194; *see also id.* ¶ 191.) These assignments were consistent with the LLP Agreement. No facts have been alleged or are discernible from judicially noticed documents to suggest that Lindberg, Capps, or Chang engaged in any business activities other than as assigned by Lea. In context, it is apparent that Lea directed Lindberg, Capps, and Chang's actions with regard to Bumble Bee to meet Lion Capital's objectives as the managing agent of the Bumble Bee investment.

Lion Capital closely monitored Bumble Bee's performance as well as competitors' compliance with the pricing agreements and set ambitious goals for Bumble Bee (Compl. ¶¶ 213, 221, 232), as it wanted to ensure Bumble Bee's continued "supra-competitive" profits and "investment grade returns" to the Fund. (*Id.* ¶¶ 202, 213.) Lion Capital "incentivized and rewarded" Bumble Bee executives [15] with Big Catch shares [16] to meet the goals it set for the benefit of its investors. (*Id.* ¶ 202.)

Lea attended most Bumble Bee board meetings, which were often followed by off-the-record "executive sessions." (Compl. ¶¶ 218, 220, 194; *see also id.* ¶ 217.) When Lea was unable to attend, he received detailed private briefings. (*Id.* ¶ 220.) Lea's briefing included competitor information and developments which revealed collusive dealings with Bumble Bee's competitors. (*Id.* ¶¶ 217, 228.) To the extent Lea did not himself directly communicate with Bumble Bee executives, Lindberg, Capps, and Chang provided reports. (*Id.* ¶ 220.) For example, on March 28, 2012, Chang reported to Lea about a board meeting the day before. His report included non-public information about StarKist and COSI profitability and plans for Bumble Bee to closely align its list pricing with them as of April 1, 2012. (*Id.*)

Plaintiffs cite another example from July 2012, when Lea "complained" to Lindberg that Bumble Bee had missed

earnings projections for the first half of 2012 and asked for some "good news" to report to the investors. (Compl. ¶ 221.) Lindberg responded that the failure to meet the goal would not repeat itself because it was the result of pricing issues "caused by StarKist's dysfunctional management team which was fired by Dongwon," and that StarKist was "now in lockstep with us in setting pricing rationally." (*Id.*) These specific allegations support Plaintiffs' assertion that Lion Capital knew of and encouraged Bumble Bee's collusive activities.

**\*7** The allegations of Lion Capital's involvement in the conspiracy are underscored by Bumble Bee's Plea Agreement, which suggests that Lion Capital was not merely passively involved but had meaningful contribution to the then-ongoing investigation. The Plea Agreement required Bumble Bee's "parent companies," including Lion Capital, to provide full cooperation with the government investigation and potentially pay additional fines on behalf of Bumble Bee. (*U.S. v. Bumble Bee*, N.C. Cal. Case No. 17cr00249, Am. Plea Agreement ¶¶ 9, 13, 14, ECF No. 32; *see also id.* Tr. of Proceedings ("Tr.") at 10-11, ECF No. 36; *see also* Compl. ¶ 205.) The Lion Entities were represented at Bumble Bee's change of plea hearing and sentencing by the firm representing them in this MDL. (*See* Tr. at 3.) Moreover, in this MDL, it was Lion Capital that produced "crucial" email communications between Lischewski and the Lion Entities. (Compl. ¶ 181.)

Consistent with its objective to achieve maximum investor returns for its Fund, Lion Capital was involved in policing compliance and enforcing collusive pricing agreements. For example, in early 2012, TUG President and CEO Thiraphong Chansiri contacted Lindberg asking how they could "work together on the owner level" to help "improve" the industry. (Compl. ¶ 230.) Lindberg heartily agreed with Chansiri's "sentiments about the negative industry atmosphere." (*Id.*) This exchange was followed by a meeting between them to discuss the issues. (*Id.* ¶ 231.)

The Court has already determined that the alleged email exchange supports a reasonable inference that TUG and Lion Capital sought to clamp down on what they perceived as "cheating" on the pricing agreements. (First Lion Order at 82-83.) In this instance, the Court focuses on the fact that Chansiri reached out to Lindberg "on the owner level." Lindberg had previously held himself out as a representative of Bumble Bee's owner (*Cf.* Compl. ¶ 211), and in fact was a Lion Capital Executive Officer (Form D). It is therefore not surprising that he was contacted in that capacity.

These specific allegations support a reasonable inference that Lindberg acted on behalf of Lion Capital when he engaged in the policing and enforcement of the collusive agreements.

Continuing to secure Bumble Bee's high profit margins, achievable only through collusion, by perpetuating and enforcing pricing agreements was to Lion Capital's benefit. (First Lion Order at 78.) This strategy was poised to pay off when Lion Capital announced plans to sell Bumble Bee to TUG in 2014. Lion Capital acquired Bumble Bee for $980 million in December 2010 and had entered into an agreement to sell it to TUG in late 2014 for $1.51 billion—an increase of approximately $530 million in just four years. (Compl. ¶¶ 189, 209, 213, 240.) Upon announcing the transaction, Lea issued a statement:

> We are proud to have played a significant role in the evolution of Bumble Bee over the last 4 years and would like to thank our partners, Chris [Lischewski] and the management team, for helping us achieve such a successful return on our investment.

(*Id.* ¶ 215.) The deal fell apart after the DOJ "informed the companies it had serious concerns that the proposed transaction would harm competition." (DOJ Press Release dated Dec. 3, 2015, cited in Compl. ¶ 209 n.12.)

**B. Legal Arguments and Authorities**

In their opposition to the Second Lion 12(b)(6) Motion Plaintiffs argued that Lindberg, Capps, and Chang acted as agents of Lion Capital. (Pls' Resp. to Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second Lion 12(b)(6) Opp'n,") at 6-15, ECF No. 1721.) [17] The parties agree that the federal common law of agency, as stated in the Restatement (Third) of Agency, applies to the question whether Lion Americas agents were also agents of Lion Capital. (*Cf. id.* at 12 *with* Second Lion 12(b)(6) Reply at 3-4.) The Lion Entities do not dispute that Plaintiffs sufficiently alleged facts to meet the agency elements under federal common law. (*See* Second Lion 12(b)(6) Reply at 4.) They argue, however, that more is required for dual agents like Lindberg, Capps, and Chang. They point to *Bestfoods* for the proposition that in the absence of additional facts, the law presumes dual agents acted on behalf of the subsidiary

rather than the parent corporation. (*Id.* at 2.) Plaintiffs counter that their Complaint overcomes the presumption. (Mot. for Reconsideration at 8 n.16.)

**\*8** Plaintiffs rely on *Arandell v. CenterPoint Energy Services*, 900 F.3d 623 (9th Cir. 2018), for the proposition that Lion Capital and Lion Americas were a single enterprise for purposes of the price-fixing conspiracy so that "the knowledge of ... dual officers and directors is imputed to Lion Capital, which is in turn liable for its own conduct in furtherance of the conspiracy." [18] (Mot. for Reconsideration at 7.) *Arandell* addressed the issue of a subsidiary's direct liability for collusion based on participation in coordinated activity with its parent and affiliate entities. 900 F.3d at 625. The case was part of an MDL alleging an industry-wide conspiracy. *See Arandell*, 900 F.3d at 627-28. At the time of the relevant motions, the existence of the conspiracy had already been established because the parent and affiliate entities had admitted to their participation. *See id.* at 627-28, 629, 634 n.11. Here, Bumble Bee and its executives have been convicted of collusion with competitors. Further, the Court has found that Plaintiffs sufficiently alleged Lion Americas' collusion with Bumble Bee.

In *Arandell* the plaintiffs' theory against the subsidiary was that it had played a vital part in the scheme orchestrated by its parent. 900 F.3d at 628. There was a substantial overlap between the directors and managers of the subsidiary, affiliate, and parent entities. *Id.* at 629, 632. The parent and affiliates colluded with other natural gas conglomerates to manipulate prices. *Id.* at 630. In furtherance of the conspiracy, the parent entity's officers and directors instructed the affiliate to manipulate retail prices and directed the subsidiary, which purchased gas from the affiliate, to sell it to consumers and return profits to the parent. *Id.* at 628.

In support of its summary judgment motion, the subsidiary argued plaintiffs failed to raise a genuine issue whether the subsidiary engaged in any anticompetitive activity. *Id.* The subsidiary argued its liability could not rest solely on the facts that its affiliate and parent entities were involved in the conspiracy and that the subsidiary sold natural gas to consumers. *Id.* The district court agreed and granted summary judgment reasoning that the plaintiffs failed to present evidence that the subsidiary knowingly engaged in price manipulation or knew that its parent and affiliate were

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 176 of 247

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

engaged in such behavior. *Id.* The Court of Appeals reversed. *Id.* at 629.

As to anticompetitive intent, the court ruled,

> A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single "economic unit" of which it is a part.

*Id.* at 632; *see also* discussion at 630-32. The plaintiffs' evidence that the activities of the commonly owned entities were coordinated and furthered the conspiracy, *i.e.*, the subsidiary's claimed unwitting distribution to consumers at artificially inflated prices, obviated the need for a separate showing of the subsidiary's knowledge. *Id.* at 632. The commonly owned enterprise's illegal purpose was imputed to the subsidiary. *Id.*

The "unity of *purpose* ... does not supply a theory of unbounded vicarious liability for the *acts* of legally distinct entities." *Id.* at 633. "A defendant may be held liable under § 1 of the Sherman Act if that person *acted* either with the knowledge that the action would have unreasonable anticompetitive effects or with the purpose of producing those effects." *Id.* at 629 (emphasis added). To hold any defendant directly liable as part of a common scheme, a plaintiff "must come forward with evidence that each defendant independently participated." *Id.* at 633. The plaintiffs' showing in *Arandell* that the subsidiary sold gas at inflated prices and distributed the profits to its parent was adequate circumstantial evidence to raise a genuine issue regarding the subsidiary's own participation in the scheme. *Id.* at 634-35.

**\*9** Accordingly, to state a claim against Lion Capital, Plaintiffs must allege Lion Capital's knowledge or anticompetitive purpose. The state of mind can be either imputed from allegations of coordinated activity in furtherance of the conspiracy or alleged separately. In addition, Plaintiffs must allege Lion Capital's participation in

any part of the scheme. [19] Defendants rely on *Bestfoods* to argue that Plaintiffs' allegations were insufficient.

*Bestfoods* addressed the issue of "the extent to which parent corporations may be held liable under CERCLA [the Comprehensive Environmental Response, Compensation, and Liability Act] for operating facilities ostensibly under the control of their subsidiaries." 524 U.S. at 60; *see also* at 69-70. There, as here, the parent entities placed their own high-level officials on the subsidiary's board and in key management positions. *Id.* at 68; *see also id.* at 59. Those individuals made major policy decisions and conducted relevant day-to-day operations. *Id.* at 68-69. Furthermore, a parent entity official who was not an employee, officer, or director of the subsidiary "played a significant role in shaping [the subsidiary's] environmental compliance policy." *Id.* at 59; *see also id.* at 72.

After a bench trial, the district court found the parent entities directly liable for CERCLA violations as operators at the facilities operated by the subsidiary. *Id.* at 59, 67. The Court of Appeals reversed. *Id.* at 59-60. The Supreme Court vacated and remanded for further fact finding on the issue of the parent entities' direct liability. *Id.* at 72-73.

Generally, "a parent corporation ... is not liable for the acts of its subsidiaries." *Id.* at 61. However, "the parent corporation is itself responsible for the wrongs committed by its agents in the course of its business." *Id.* at 65; *see also id.* at 64. This occurs when

> the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of. In such instances, the parent is directly liable for its own actions.

*Id.* at 64-65. Nevertheless, when parent entity personnel are also acting at the management or directorial levels of the subsidiary, this does not automatically expose the parent to direct liability for the subsidiary's actions. *Id.* at 69-70.

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)
2022-1 Trade Cases P 82,039

It is not inappropriate for parent entity personnel to hold important positions with the subsidiary and "change hats to represent the two corporations separately, despite their common ownership." *Id.* at 69. The "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.*

To overcome the presumption, a party must show that the dual agents were acting on behalf of the parent. *Id.* at 70. The focus of the inquiry is on the parent company's role in the alleged wrongdoing. *See id.* at 67-68. This is a fact-specific analysis "call[ing] for line-drawing," as the acts "that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary." *Id.* at 71. For example,

> [a]ctivities that ... are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures should not give rise to direct liability.

**\*10** *Id.* at 72. On the other hand, participation in the subsidiary's wrongdoing supports a finding of the parent company's liability. *See id.* at 67-68, 70-71.

In *Bestfoods*, evidence that a parent entity agent was actively involved in dealing with the toxic risks emanating from the operation of the subsidiary's facility, and evidence suggesting that the subsidiary's actions in operating the facility were "dictated by, and thus taken on behalf of," a parent entity was sufficient to overcome reversal of a plaintiffs' judgment and warranted remand for further fact finding. *Id.* at 72-73 & n.14. Accordingly, Plaintiffs can allege Lion Capital's participation by alleging that Lion Capital participated in the conspiracy through its agents who were not also agents of Lion Americas, or alternatively, that dual agents Lindberg, Capps, and Chang acted on behalf of Lion Capital.

## C. Antitrust Claim Against Lion Capital

Plaintiffs have sufficiently alleged that Lion Capital knew prior to the acquisition that Bumble Bee participated in an ongoing industry-wide price-fixing conspiracy. It can

reasonably be inferred from the allegations that Lion Capital knew that Bumble Bee's profits were untenable in a competitive market and were in fact the product of collusive price agreements. Lion Capital proceeded to acquire Bumble Bee with this knowledge.

Plaintiffs have also sufficiently alleged that Lion Capital and Lion Americas engaged in coordinated activity as a single enterprise. Lion Capital, with knowledge of Bumble Bee's ongoing participation in the conspiracy and as the managing agent of the Bumble Bee investment, used Lion Americas to assist in managing Bumble Bee with the objective of maintaining supra-competitive profits. The coordinated activity furthered the conspiracy by encouraging Bumble Bee's continued participation and perpetuating the collusive agreements by policing and enforcing them.

The allegations of Lion Capital's knowledge and the coordinated activity with Lion Americas in furtherance of the conspiracy are sufficient under *Arandell* to raise a reasonable inference of Lion Capital's own participation in the conspiracy. *Cf.* 🔖 *Arandell*, 900 F.3d at 634-35. As equitable owner with knowledge of Bumble Bee's participation, Lion Capital could have directed Bumble Bee to disassociate itself from the conspiracy. Lion Capital's role in knowingly encouraging Bumble Bee's collusion was crucial to the continued viability of the conspiracy.

Alternatively, Plaintiffs have sufficiently alleged Lion Capital's own acts in furtherance of the conspiracy. Plaintiffs alleged that Lion Capital directly participated through Lindberg, its Member and Executive Officer. Lindberg held himself out as acting on behalf of Lion Capital when he assured, on an "owner to owner" basis, to Dongwon and TUG executives that Lion Capital would support and enforce the collusive pricing agreements. In this regard, Lindberg's ostensible capacity was that of an agent of Lion Capital. *Cf.* 🔖 *Bestfoods*, 524 U.S. at 71-72. Lion Americas had no ownership, equitable or otherwise, of Bumble Bee. Accordingly, Plaintiffs' allegations support a reasonable inference that Lindberg acted on behalf of Lion Capital. The allegations regarding Lindberg's actions on behalf of Lion Capital are sufficient to state a claim against Lion Capital.

**\*11** Finally, Plaintiffs alleged sufficient facts to raise a reasonable inference that Lion Capital participated through Lea, its General Manager who was not employed by Lion Americas, as well as through the dual agents he directed.

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 178 of 247

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

Lea assigned Lindberg, Capps, and Chang to manage the Bumble Bee investment. After the acquisition, their reports to Lea indicated that Bumble Bee continued to collude with its competitors. Contrary to discouraging continued support of Bumble Bee's collusion, Lea ratified and encouraged it by knowingly setting Bumble Bee's financial goals at levels which were untenable in the absence of collusion. In this regard, Plaintiffs sufficiently alleged that Lion Capital participated in the conspiracy by directing dual agents Lindberg, Capps, and Chang, and that the dual agents furthered the conspiracy at Lea's direction. *Id.* at 72-73 & n.14.

Based on the foregoing, Plaintiffs have alleged adequate facts to state an antitrust claim under 15 U.S.C. § 1 against Lion Capital.

**D. Antitrust Claim Against Big Catch**

The Court has previously found Plaintiffs sufficiently alleged that Big Catch was Lion Capital's alter ego. (First Lion Order at 62, 87; *see also* Second Lion Order at 18.) Accordingly, Plaintiffs have stated an antitrust claim under 15 U.S.C. § 1 against Big Catch on the alter ego theory. [20]

### III.

### MOTION TO SEAL

The parties jointly filed a Motion to Seal portions of eight documents filed in support of and in opposition to Plaintiffs' Motion for Reconsideration. (Mot. to Seal Exs. A-H, lodged at ECF No. 2472.) The documents consist of Kroger Plaintiffs' proposed fifth amended complaint, charts of new allegations in the proposed fifth amended complaint, including the Lion Entities' arguments in opposition and Plaintiffs' reply, a report on Lion Companies' and Lion Americas' annual performance, tax liabilities, and payroll, excerpts from three depositions, and an internal whistleblower communication.

The Motion for Reconsideration was decided based on the allegations in the operative Complaint. Further, because the Motion for Reconsideration is granted and the Second Lion 12(b)(6) Motion is denied, Plaintiffs' request for leave to amend is moot. Accordingly, none of the documents sought to

be sealed is relevant to the decision on Plaintiffs' Motion for Reconsideration. The Joint Motion to Seal is therefore denied as moot.

The parties do not request the sealing of any portion of the parties' briefs in support of and in opposition to the Motion for Reconsideration. (*See* ECF No. 2472 (listing documents for sealing).) Accordingly, the parties will refile without redactions their briefs filed at ECF Nos. 2285, 2295, and 2303.

### IV.

### CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1. Plaintiffs' Motion for Reconsideration (ECF No. 2285) is granted. The Order Granting Defendants' Motion to Dismiss (ECF No. 2270) is vacated. Lion Capital and Big Catch's Renewed Consolidated Motion to Dismiss the Complaints of the Indirect Purchaser End Payer Plaintiffs, Commercial Food Preparer Plaintiffs, Direct Purchaser Plaintiffs, Direct Purchaser Class Plaintiffs, and Direct Action Plaintiffs and the Cherokee Nation (ECF No. 1631) is denied.

2. No later than the time set forth in Federal Rule of Civil Procedure 12(a)(4)(A) Defendants Lion Capital and Big Catch shall file their respective answers, if any.

3. Plaintiffs' Rule 54(b) Motion (ECF No. 2281) is denied as moot.

4. The parties' Joint Renewed Motion to File Documents Under Seal (ECF No. 2471) is denied as moot. The parties shall forthwith refile without redactions their briefs filed at ECF Nos. 2285, 2295, and 2303.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 836951, 2022-1 Trade Cases P 82,039

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 179 of 247

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

## Footnotes

1      The Motion for Reconsideration briefing was filed under seal. The public redacted briefs can be found at ECF Nos. 2285, 2295, and 2303. This Order cites to the sealed briefs.

2      Unless otherwise noted, individuals are referred to by full names only when first introduced. Subsequently, they are referenced by last name only.

3      The public redacted version of the First Lion Order can be found at ECF No. 1358.

4      The parties have stipulated, and the Court ordered, that the Fourth Amended Complaint filed by the Kroger Plaintiffs (Compl., ECF No. 1475), is "in all material respects representative" for purposes of the Lion Entities' motion to dismiss. (ECF Nos. 1524, 1529, 2270.) The public redacted version of the Complaint can be found at ECF No. 1423.

5      All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure.

6      The Rule 54(b) Motion, as well as the related opposition and reply, are incorporated by reference into the Motion for Reconsideration briefing, which does not add any substantive arguments regarding Rule 54(b) certification. (See Mot. for Reconsideration at 12; Reconsideration Opp'n at 1 n.1; Reconsideration Reply at 10.)

7      Unless otherwise noted internal quotation marks, citations, ellipses, brackets, and footnotes are omitted from citations.

8      Although Plaintiffs' substantive arguments are clear, the procedural vehicle for their motion is less so. Plaintiffs appear to be relying on Rule 59 as the basis for their motion, but that Rule governs motions to alter or amend a judgment, and no judgment has been entered here. Regardless, the substantive standard for reconsideration is the same, whatever the procedural vehicle. As stated above, that standard requires a showing of (1) newly discovered evidence, (2) clear error or manifest injustice, or (3) an intervening change in controlling law, and that is the standard that applies to the present Motion for Reconsideration.

9      The public redacted version can be found at ECF No. 1631-1.

10      The public redacted version can be found at ECF No. 1760.

11      The Court considers the LLP Agreement because it is referenced in the Complaint. (Compl. ¶¶ 192-93.) See Khoja, 988 F.3d at 1002.

12      To the extent they provide background and undisputed facts, the Court takes judicial notice of the SEC Form D, Stock/Securities Offering, filed Oct. 21, 2010, and Form D as amended, filed October 17, 2011, by the Lion Capital Fund III, L.P. (the "Fund") (collectively "Form D"), found at https://sec.report/ Document/0001498249-10-000001 and https://sec.report/Document/0001498249-11-000001, respectively.

     See 🚩 Khoja, 899 F.3d at 999; Fed. R. Evid. 201. According to Form D, the persons related to the Fund were Lea, Capps, and Lindberg, among others, each identified as "Executive Officer ... of Lion Capital LLP – manager of Issuer[.]" Form D defines "Issuer" as the Fund.

13      The Court takes judicial notice of Lion Americas' Form ADV dated March 30, 2018, which was filed with the Securities and Exchange Commission ("SEC"). See 🚩 Khoja, 899 F.3d at 999; Fed. R. Evid. 201. By virtue of his majority stake in Lion Capital, Lea indirectly owned nearly all of Lion Americas' shares. (Form ADV,

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 180 of 247

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

Schedule B.) Because Form ADV itself does not contain page numbers, page references are to the numbers generated by the CM/ECF System.

14    Like Lion Capital, the Fund was established in the United Kingdom. Its address was "c/o Lion Capital LLP." It was registered with the SEC in the United States. (*See* https://sec.report/CIK0001498249.)

15    The executives included Lischewski, Kenneth Worsham, and Walter Scott Cameron, all of whom have either pleaded guilty to, or were found guilty of, participating in the conspiracy.

16    Big Catch was the Lion Entity whose purpose was to hold Bumble Bee stock. (Compl. ¶ 200.)

17    The public redacted version can be found at ECF No. 1721.

18    The Court in this Order expresses no opinion whether Plaintiffs have stated a claim against Lion Capital on indirect liability theories such as veil-piercing or alter ego.

19    None of the conspirators need participate in every act or transaction of the conspiracy to be liable. *Id.* at 634.

20    In light of these rulings, the Court denies as moot Plaintiffs' alternative request and the separate motion for entry of judgment against Lion Capital and Big Catch pursuant to Rule 54(b).

---

**End of Document**          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 9004808
Only the Westlaw citation is currently available.
United States District Court, M.D.
Tennessee, Nashville Division.

IN RE: REALPAGE, INC., RENTAL
SOFTWARE ANTITRUST LITIGATION (NO. II)

This Document Relates to:

NO. 3:23-md-03071

MDL No. 3071

3:23-cv-00326, 3:23-cv-00378, 3:23-
cv-00391, 3:23-cv-00445, 3:23-cv-00742,
3:23-cv-00979, 3:23-cv-00757, 3:23-cv-00792

Filed December 28, 2023

## MEMORANDUM OPINION

WAVERLY D. CRENSHAW, JR., CHIEF UNITED STATES
DISTRICT JUDGE

 *1  Thoma Bravo Fund XIII, L.P., Thomas Bravo Fund
XIV, L.P., and Thoma Bravo, L.P. (the "Thoma Bravo
Defendants") filed Motions to Dismiss the Multifamily
Plaintiffs' Second Amended Complaint (Doc. No. 570) and
the Student Plaintiffs' First Amended Complaint (Doc. No.
572). The Multifamily and Student Plaintiffs responded
jointly (Doc. No. 614), and the Thoma Bravo Defendants filed
a Reply (Doc. No. 642). The motions are now ripe for review.
For the reasons that follow, the Court will deny the Thoma
Bravo Defendants' Motions.

## BACKGROUND

The following allegations are taken from Multifamily
Plaintiffs' Second Amended Complaint ("Multifamily
Complaint") (Doc. No. 530) and Student Plaintiffs' First
Amended Complaint ("Student Complaint") (Doc. No. 527)
and are considered to be true to resolve the pending motion.[1]

RealPage, Inc. ("RealPage") developed an "integrated
technology platform that provides software solutions for the
multifamily [and student] housing markets," which enables

horizontal competitors who rent multifamily and student
housing "to coordinate and agree upon rental housing pricing
and supply." (Doc. No. 530 ¶ 2; see also Doc. No. 527
¶ 5). RealPage rolled out its first revenue management
software, YieldStar, after acquiring it from Camden Property
Trust in 2002. (Doc. No. 530 ¶ 209). In 2009, RealPage
started YieldStar Student Housing ("YieldStar Student").
(Doc. No. 527 ¶ 40). From 2002 to early 2016, YieldStar
operated as a rent advisory service. (Doc. No. 530 ¶ 212).
In early 2016, RealPage transitioned YieldStar to become a
"rent-setting software." (Id. ¶ 212). RealPage then acquired
Lease Rent Options ("LRO") from Rainmaker Group in
2017. (Id. ¶ 26). It integrated LRO and YieldStar into a
"unified platform." (Id. ¶ 221). In 2020, RealPage launched
AI Revenue Management ("AIRM"), a "combination of
its legacy revenue management platforms [YieldStar and
LRO] and a super-charged price optimization and revenue
management tool." (Id. ¶ 221). Today RealPage operates a
full suite of revenue management services, which includes
RealPage Revenue Management ("RPRM"), RealPage
Student Revenue Management ("Student RPRM"), and
Student Lease Rent Options ("Student LRO") (collectively
with YieldStar, YieldStar Student, LRO, and AIRM, the
"Revenue Management Solutions" or "RMS"). (Id. ¶ 2; Doc.
No. 527 ¶ 4).

RealPage's clients include owners of residential properties
("Owners"), companies that serve as both owners and
operators of residential properties ("Owner-Operators"), and
property management companies ("Managers"), including
large property managers and lessors of student housing
("Lessors"). (Doc. No. 530 ¶ 3; Doc. No. 527 ¶ 3). These
companies are horizontal competitors. (Doc. No. 530 ¶ 6;
Doc. No. 527 ¶ 230). As of December 2020, RealPage
"had over 31,700 clients, including each of the 10 largest
multifamily property management companies in the United
States." (Doc. No. 527 ¶ 21; see also Doc. No. 530 ¶ 61).

 *2  Multifamily and Student Plaintiffs allege that RealPage
and its clients have formed an illegal price-fixing cartel. (See
Doc. No. 530 ¶ 6; Doc. No. 527 ¶¶ 118, 156). It begins when
RealPage touts its ability to help clients obtain the optimal
price for multifamily and student housing units regardless
of market forces. RealPage's clients each separately contract
with RealPage, paying RealPage periodic fees and, critically,
providing RealPage their independent commercially sensitive
pricing and supply data. (Doc. No. 530 ¶¶ 5, 13; Doc. No. 527
¶ 9). Then, on an annual basis, RealPage's clients re-affirm
their commitment when they "renew their software licensing"

In re RealPage, Inc., Rental Software Antitrust Litigation (No. II), --- F.Supp.3d ---- (2023)

agreements. (Doc. No. 530 ¶ 276. See also Doc. No. 527 ¶ 93 (stating that RealPage's software is "typically licensed over one year terms")). RealPage applies its revenue management algorithm to this data pool of competitor information to determine optimal rent prices for each of RealPage's clients, which is then available for each RealPage client to apply to multifamily and student apartment units in each of the markets where those clients are located. (Doc. No. 530 ¶ 4; Doc. No. 527 ¶ 9). To be sure, not all RealPage clients utilize RealPage's entire RMS suite; for example, some multifamily clients use only LRO while others have used YieldStar, LRO, and AIRM. (See, e.g., Doc. No. 530 ¶¶ 70, 85, 88, 124). Likewise, while Student Plaintiffs allege most student housing clients use only YieldStar Student, they allege that at least Greystar uses other student housing RMS through RealPage in addition to YieldStar Student. (Doc. No. 527 ¶¶ 56, 58-60). But regardless of which services a client subscribes to, by "no later than 2020, ... all RealPage RMS were combined into a single unified database." (Doc. No. 530 ¶ 222; see also Doc. No. 527 ¶ 63 ("RealPage offers a product that creates one unified platform ...")).

By using the RMS, RealPage's clients are able to "price their units according to their collective goal of securing revenue lifts by increasing rents without regard for the typical market forces that drive supply and demand in a competitive environment." (Doc. No. 530 ¶ 11; Doc. No. 527 ¶ 9). They do this by collectively agreeing to price their rental units in accordance with RealPage's RMS pricing recommendations. (Doc. No. 530 ¶ 11, 15; Doc. No. 527 ¶ 6). Clients with multifamily properties also artificially control the supply of rental units by "allow[ing] a larger share of their units to remain vacant," (Doc. No. 530 ¶ 31), and staggering lease renewals to "minimize naturally occurring periods of oversupply," (id. ¶ 36). This collective behavior, driven by RealPage pricing recommendations, has resulted in "parallel pricing that cannot be explained by typical economic factors" among the multifamily housing Owners, Owner-Operators, and Managers who use RealPage's RMS. (Id. ¶ 22). Additionally, between March 2015 and March 2023, "increased usage of RealPage's RMS corresponds with increasing [multifamily] rents over th[e] same period." (Doc. No. 530 ¶ 21). As for student housing, a regression analysis conducted on student housing in four cities of properties using RealPage RMS "estimated an average overcharge of 10.9% on properties that were priced using YieldStar Student ..." (Doc. No. 527 ¶ 141).

RealPage was a public company from 2010 to 2020. (Doc. No. 530 ¶ 61). In December 2020, investment funds of Thoma Bravo L.P., Thoma Bravo Fund XIII L.P. and Thoma Bravo XIV L.P, (collectively, "Thoma Bravo"), acquired RealPage for $10.2 billion in a transaction that made RealPage a privately-owned company. (Id.). "Thoma Bravo had been closely following RealPage's growth as a company since RealPage went public in 2010." (Id. ¶ 62). Following the acquisition, Thoma Bravo appointed its Operating Partner, Charles Goodman, as the Chairman of RealPage's board of directors. (Id. ¶ 66). Thoma Bravo also screened and recommended two new RealPage corporate suite employees, both of whom had formerly worked for Thoma Bravo owned entities. (Id.). Dana Jones became RealPage's new Chief Executive Officer ("CEO") and Vinit Doshi became RealPage's Chief Operating Officer ("COO"). (Id.).

## LEGAL STANDARD

To survive a motion to dismiss for failure to state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In reviewing a motion to dismiss, the Court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." Courtright v. City of Battle Creek, 839 F.3d 513, 518 (6th Cir. 2016). However, the Court will "disregard bare legal conclusions and naked assertions" and "afford[ ] the presumption of truth only to genuine factual allegations." Dakota Girls, LLC v. Philadelphia Indem. Ins. Co., 17 F.4th 645, 648 (6th Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal quotations omitted). Nor can the Court "credit a threadbare recital of the elements of a cause of action ... supported by mere conclusory statements." Dakota Girls, 17 F.4th at 648 (citing Iqbal, 556 U.S. at 678, 129 S.Ct. 1937) (internal quotations omitted). To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of each claim. Wittstock v. Mark A. Van Sile, Inc., 330 F.3d 899, 902 (6th Cir. 2003).

## DISCUSSION

**\*3** To state a plausible claim under Section 1 of the Sherman Act, a plaintiff must allege three elements: 1) the existence of a contract, combination, or conspiracy among two or more separate entities that 2) unreasonably restrains trade and 3) affects interstate or foreign commerce. See Hobart-Mayfield, Inc. v. National Operating Committee on Standards for Athletic Equipment, 48 F.4th 656, 663 (6th Cir. 2022). A plaintiff must specifically allege each defendant's participation in the conspiracy. Jones v. Varsity Brands, LLC, 618 F. Supp. 3d 713, 723 (W.D. Tenn. 2022). "[T]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." A conspiracy cannot exist solely between a parent and its wholly owned subsidiary because they have "a complete unity of interest."

Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984). A parent corporation may, however, be accountable for Sherman Act violations of its subsidiary if it participated in the conspiracy beyond "mere ownership." Jones, 618 F. Supp. 3d at 722-23, 725.

As an initial matter, the Court addresses the specific Thoma Bravo entities that Plaintiffs have sued—Thoma Bravo L.P., Thoma Bravo Fund XIII L.P., and Thoma Bravo XIV L.P. The Thoma Bravo Defendants claim that "RealPage was in fact acquired by Mirasol Parent, LLC and Mirasol Merger Sub, Inc., affiliates of Thoma Bravo Fund XIII, L.P. and Thoma Bravo Fund XIV, L.P., investment funds which are themselves affiliates of Thoma Bravo." (See Doc. No. 571 at 1 n.2; Doc. No. 573 at 1 n.3). This assertion is relegated to a footnote in the Thoma Bravo Defendants' briefs, and they do not otherwise argue that Plaintiffs have named the wrong Thoma Bravo entities. (Id.). The Thoma Bravo Defendants' failure to argue that Plaintiffs have named the wrong entities constitutes a waiver of that argument. Moat v. Metropolitan Government of Nashville, 2023 WL 4035909, at \*12 n.9 (M.D. Tenn. Jun. 15, 2023) ("The court typically will not consider arguments asserted only in footnotes, and such arguments are often deemed to be waived."). [2] See also United States v. Johnson, 440 F.3d 832, 846 (6th Cir. 2006) ("it is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived") (quoting United States v. Elder, 90 F.3d 1110, 1118 (6th Cir. 1996)).

Regardless, the relevant inquiry in an antitrust case is not which entity owns the alleged conspirator, but which entity's

independent action joined and contributed to the conspiracy. See Cupp v. Alberto-Culver USA, Inc., 310 F. Supp. 2d 963, 971 (W.D. Tenn. 2004) ("If Plaintiff named SBC only because of its corporate relationship to BSG, that relationship, without more, is insufficient to implicate SBC in any allegedly unlawful actions of the other Defendants."). As explained below, Plaintiffs allege that the Thoma Bravo entities, not the Mirasol entities, conducted due diligence, selected a new RealPage Chief Executive Officer ("CEO") and Chief Operations Officer ("COO"), and made a Thoma Bravo Managing Partner the Chairman of RealPage's Board of Directors. Therefore, the named Thoma Bravo entities, not the Mirasol entities, are the correct defendants.

Turning to the arguments actually made, the Thoma Bravo Defendants argue that Plaintiffs have not alleged any participation in the alleged conspiracy aside from Thoma Bravo's ownership of RealPage. (Doc. No. 571 at 1-2; Doc. No. 573 at 1-2). They further argue that Thoma Bravo cannot be held liable for RealPage's conduct because parent corporations are not liable for the acts of their subsidiaries. (Doc. No. 571 at 9; Doc. No. 573 at 9). Thus, because Plaintiffs have not pleaded any direct involvement by the Thoma Bravo Defendants, the claims against them should be dismissed. (Doc. No. 571 at 12; Doc. No. 573 at 12). In response, Plaintiffs argue that they have sufficiently pleaded Thoma Bravo's involvement in the alleged conspiracy, (Doc. No. 614 at 3), and that under the "single enterprise" framework, "if a plaintiff's allegations of anticompetitive conduct (read holistically) are well-pled as to a single economic entity, then each constituent piece of that entity that participated in the anticompetitive conduct can be included as a defendant," (id.).

**\*4** The Motions and Response raise two questions: 1) whether Plaintiffs have adequately pleaded the Thoma Bravo Defendants' involvement in the alleged conspiracy, and 2) whether the Thoma Bravo Defendants may be held accountable for the conduct of their subsidiary even if they were not directly involved in the conspiracy. Because the Court finds that Plaintiffs have adequately alleged Thoma Bravo's involvement, the Court need not reach the second question. [3]

### I. Allegations Specific to The Thoma Bravo Defendants

The Multifamily and Student Complaints make the following allegations specific to the Thoma Bravo Defendants: Thoma

Bravo acquired RealPage in April 2021 for 10.2 billion dollars. (Doc. No. 530 ¶ 61; Doc. No. 527 ¶ 22). Thoma Bravo conducted due diligence prior to the acquisition, which gave it access to RealPage's data and the ability to "identify the sources of RealPage's growth." (Doc. No. 530 ¶ 64). Thoma Bravo also knew prior to acquiring RealPage that RealPage's founder and Chief Executive Officer, Steve Winn, "was preparing to step back from the day-to-day control of RealPage ... and Thoma Bravo acquired RealPage aware that Thoma Bravo would be hiring a new leadership team." (Id. ¶ 63). Thoma Bravo's Founder and Managing Partner, Orlando Bravo, was quoted in a press release disclosing the transaction:

> As a firm, we embrace these fundamental shifts in industries where software driven solutions are making meaningful advancements and we have the expertise and resources to help grow these capabilities at companies like RealPage. We believe our partnership can accelerate RealPage's momentum as it innovates on behalf of its customers.

(Doc. No. 530 ¶ 65; Doc. No. 527 ¶ 23). Steve Winn, RealPage's exiting Chief Executive Officer, stated:

> Thoma Bravo brings significant expertise from its deep experience with software companies, and together we are committed to helping our customers innovate, grow and serve the next generation of multifamily operators and residents.

(Doc. No. 530 ¶ 65; Doc. No. 527 ¶ 23).

After acquiring RealPage, Thoma Bravo selected a new CEO and COO for RealPage, both of whom were known to Thoma Bravo because they were previously employed by a Thoma Bravo subsidiary, Sparta Systems. (Doc. No. 530 ¶ 66; Doc. No. 527 ¶ 24). Additionally, Thoma Bravo's Operating Partner, Charles Goodman, became the Chairman of RealPage's Board of Directors. (Doc. No. 530 ¶ 66; Doc.

No. 527 ¶ 24). Since the acquisition, Thoma Bravo has aided RealPage in completing four acquisitions of smaller companies and has also helped RealPage adopt new policies to "drive ... operational efficiencies." (Doc. No. 530 ¶ 66 and n.76; Doc. No. 527 ¶ 24). Plaintiffs further allege that "On information and belief, Thoma Bravo was aware of RealPage's anticompetitive activities and acquired RealPage with the intent to maintain and enhance its cartel profits, which RealPage, with Thoma Bravo's active guidance and participation, has done." (Doc. No. 530 ¶ 62; Doc. No. 527 ¶ 22).

## II. Discussion

**\*5** Plaintiffs' allegations specific to the Thoma Bravo Defendants are sufficient to support their claims against those Defendants at this early stage of the case. The Court acknowledges that "price fixing conspiracy[ies] would be expected to leave little publicly available evidence of [their] existence ... [and] [i]f private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available information." In re Broiler Chicken Antitrust Litigation, 290 F. Supp. 3d 772, 804 (N.D. Ill. 2017). See also In re Lantus Direct Purchaser Antitrust Litigation, 2021 WL 8016913, at \*5 (D. Mass Jun. 11, 2021) (delaying resolution of "the question whether the plaintiffs may pursue claims against Sanofi P.R. under a single economic enterprise theory ... following further development of the relevant facts.").

Considering Plaintiffs' lack of access to the inner workings of RealPage and the relationship between RealPage and Thoma Bravo, Plaintiffs have adequately alleged that Thoma Bravo is involved in the operation and control of RealPage today. Indeed, Thoma Bravo selected the new CEO and COO and made one of its Managing Partners the Chairman of RealPage's Board. While "[a] sole seat on the Board of Directors does not mean that ... [Thoma Bravo] directed [RealPage] to take every action," Jones, 618 F. Supp. 3d at 724, Plaintiffs do not allege a "sole seat." Instead, they allege that Thoma Bravo has infiltrated RealPage's corporate suite in addition to putting itself in charge of the company's Board. This, combined with the $10.2 billion price Thoma Bravo paid for RealPage, certainly entitles Plaintiffs to an inference that Thoma Bravo is aware of and exercises some degree of control over the operation of RealPage's revenue management software. (See Doc. No. 530 ¶ 61; Doc. No. 527 ¶ 21).

To further credit this inference, Plaintiffs allege RMS is a significant product among RealPage's offerings. Specifically, at the end of 2022, four million of the approximately 19.7 million total units for which RealPage provides software used RMS, meaning more than twenty percent of the total units using any RealPage product are specifically using the software at issue in this case. (Doc. No. 530 ¶ 224). Moreover, RealPage is the "primary price-setting vendor to the multifamily housing rental software market." (Id. ¶ 213).

It is true that Plaintiffs have not alleged any communications or agreements between Thoma Bravo and any of RealPage's RMS clients. But they need not do so. After all, it is Plaintiffs' theory that RealPage is the common denominator between otherwise horizonal competitors that allows them to "coordinate and agree upon rental housing pricing and supply." (Doc. No. 530 ¶ 2. See also Doc. No. 527 ¶ 4 ("The Lessor Defendants used RealPage's RMS to stop making independent pricing and supply decisions.")). Thoma Bravo's contribution to the conspiracy, as alleged by Plaintiffs, is its influence and control over RealPage's operations, including its RMS. Courts have found such action to be sufficient to allege a role in the conspiracy. See Jones, 618 F. Supp.3d 713, 722 (W.D. Tenn. 2022); In re Outpatient Medical Center Employee Antitrust Litigation, 630 F. Supp. 3d 968, 991 (N.D. Ill. 2022); 🔖In re Capacitors Antitrust Litigation, 106 F. Supp. 3d 1051, 1069 (N.D. Cal. 2015).

The Court also acknowledges that, as alleged, significant events in support of the conspiracy—the 2016 transition of RealPage's RMS from price-recommending to price-setting (Doc. No. 530 ¶ 212); the 2017 acquisition of LRO (Id. ¶ 26); and the 2020 launch of AIRM (Id. ¶ 221)—all occurred prior to Thoma Bravo's purchase of RealPage. But these allegations just lend more credence to Plaintiffs' allegation that "Thoma Bravo was aware of RealPage's anticompetitive activities" prior to the acquisition. (Doc. No. 530 ¶ 62; Doc. No. 527 ¶ 22). Furthermore, the Multifamily and Student Complaints allege an ongoing conspiracy and one of their requested remedies is an injunction, (see Doc. No. 530 at 297 (Prayer for Relief C); Doc. No. 527 at 107 (Prayer for Relief D–E)), so it is clear that Plaintiffs' claims include conduct after Thoma Bravo's acquisition of RealPage.

**\*6** The Court finds Thoma Bravo's position virtually indistinguishable from Bain Capital's position in Jones v. Varsity Brands, LLC, 618 F. Supp.3d 713 (W.D. Tenn. 2022). In that case, the plaintiffs alleged that Varsity Brands, LLC,

an organization that produces cheerleading competitions, and its parent companies engaged in anticompetitive conduct in violation of the Sherman Act. Id. at 717-18. Bain Capital, a private equity firm, acquired Varsity Brands, LLC in 2018. Id. at 718. Bain, which was also named in the lawsuit, sought dismissal because "Plaintiffs insufficiently allege[d] conduct specifically engaged in by ... Bain that violates the antitrust laws." Id. at 719. The Court denied Bain's motion, finding the plaintiffs' allegations that "Bain provid[ed] funding for Varsity to acquire rivals, s[at] on the Board of Directors, and maintain[ed] control of USASF and other rule making bodies while in its position of power" were sufficient to state a claim against Bain. Id. at 724. Thoma Bravo argues that here, unlike Jones, Plaintiffs have not alleged "any strategic acquisition which has any nexus to the allege price-fixing conspiracy." (Doc. No. 642 at 4). They need not do so, particularly because their claims concern a conspiracy to fixes prices and not monopolization. Cf. Jones, 618 F. Supp. 3d at 717 (bringing both Sherman Act Section 1 and Section 2 claims). Instead, like the plaintiffs in Jones, Plaintiffs have alleged enough facts concerning Thoma Bravo's control of RealPage for the Court to infer that Thoma Bravo has independently acted in furtherance of the conspiracy.

Discovery may not bear the fruit that Plaintiffs expect it to yield. If that is the case, the Thoma Bravo Defendants are free to renew their motion at summary judgment. See Jones, 618 F. Supp. 3d at 725 ("Discovery may elucidate further facts as to Bain['s] ... direct participation in the scheme, which will be required at later litigation phases. But, for now, Plaintiffs allege sufficient facts for the Court to plausibly conclude that these Defendants independently participated in the enterprise ..."). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that recovery is very remote and unlikely." 🔖Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). Here, Plaintiffs have met the threshold of "sufficient factual matter to render the legal claim plausible." Cabinets to Go, LLC, 605 F. Supp. 3d at 1057 (M.D. Tenn. 2022) (internal quotation marks omitted).

An appropriate order will be entered.

**All Citations**

--- F.Supp.3d ----, 2023 WL 9004808

## Footnotes

1     Throughout this Opinion, references to "Plaintiffs" pertain to both the Student and Multifamily Plaintiffs.

2     In Moat, the court ultimately did exercise its discretion to consider the arguments from a footnote because "the plaintiff's Response addresses the defendant's footnoted arguments, and the defendant addresses them again in its Reply (albeit partially, again, in footnotes). The court finds the footnoted arguments to be sufficiently briefed." 2023 WL 4035909, at *12 n.9.

3     The Court does, however, discuss Plaintiffs' argument concerning "single entity" liability pursuant to Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), in its Memorandum Opinion addressing TREV's Motion to Dismiss. TREV's Motion to Dismiss is Doc. No. 576, and Student Plaintiffs' Response, which raises similar arguments to those raised at pages 5–7 of Plaintiffs' Response to the Thoma Bravo Defendants' Motions, is Doc. No. 615.

---

**End of Document**          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Order Amended on Reconsideration by   PostX Corporation v. Secure Data in Motion,  N.D.Cal.,  August 31, 2005

2005 WL 8177634

Only the Westlaw citation is currently available.

United States District Court, N.D. California.

POSTX CORPORATION, Plaintiff,

v.

SECURE DATA IN MOTION, INC.,
d/b/a Sigaba, et al., Defendants.
and Related Counterclaims.

No. C 02-04483 SI

Signed 08/16/2005

Filed 08/17/2005

**Attorneys and Law Firms**

David A. Jakopin, Joseph R. Tiffany, II, Mark J. Danielson, Chang H. Kim, Dianne L. Sweeney, Theodore K. Bell, Pillsbury Winthrop Shaw Pittman LLP, William Frederick Abrams, Steptoe & Johnson LLP, Palo Alto, CA, John M. Grenfell, Pillsbury Winthrop Shaw PittmanLLP, San Francisco, CA, Nicole Townsend Bartow, Atmel Corporation, San Jose, CA, for Plaintiff.

John L. Cooper, Eric W. Bass, James W. Morando, Jeffrey M. Fisher, Stephanie Powers Skaff, Farella Braun & Martel LLP, San Francisco, CA, Heather S. Tewksbury, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, CA, for Defendant Secure Data In Motion, Inc.

Heather S. Tewksbury, Wilmer Cutler Pickering Hale and Dorr LLP, Palo Alto, CA, Stephanie Powers Skaff, Farella Braun and Martel LLP, San Francisco, CA, for Defendant Clearswift Corporation.

**ORDER GRANTING PLAINTIFF'S AND COUNTERDEFENDANTS' MOTION FOR SUMMARY ADJUDICATION OF ANTITRUST CONSPIRACY CLAIMS**

SUSAN ILLSTON, United States District Judge

**\*1**  On April 22, 2005, the Court heard oral argument on counterdefendants PostX and Mayfield's motion for summary adjudication of Sigaba's first, third, and fifth counterclaims. Having carefully considered the arguments of counsel and the papers submitted, the Court hereby GRANTS the motion for the reasons set forth below.

**BACKGROUND**

OnSeptember 13, 2002, PostX Corporation ("PostX") filed a complaint for patent infringement against Secure Data In Motion, d/b/a Sigaba ("Sigaba"). On September 29, 2003 and November 25, 2003, the Court granted Sigaba's motions for summary judgment of non-infringement of United States Patent No. 6,477,647 ("the '647 Patent") and U.S. Patent No. 6,014,688 ("the '688 patent"). The Federal Circuit affirmed without opinion on November 15, 2004. On February 4, 2004, the Court granted summary judgment for defendants on PostX's claim for misappropriation of trade secrets under the UniformTrade Secrets Act ("UTSA") because of PostX's failure to adequately disclose the trade secrets at issue in that claim. This left for resolution defendant's three antitrust counterclaims and one false advertising counterclaim.

In its counterclaims, Sigaba alleges that PostX initiated the patent suit against it for improper and anticompetitive purposes. Sigaba's Answer and Counterclaims ¶ 20. In August 2000, officers of both companies met to explore business opportunities and entered into a Non-Disclosure Agreement. Id. at ¶ 14. After these discussions ended, PostX and Sigaba remained competitors in the market for "non-PKI-based Secure Document Delivery Systems," particularly for the business of Bank of America. Id. at ¶ 10, 16. On about August 28, 2002, Bank of America signed a contract to purchase Sigaba's secure document delivery system. Id. at ¶ 16.

According to the counterclaims, PostX learned that it had lost the Bank of America contract to Sigaba and, on September 12, 2002, sent a fax to Bank of America informing the bank that it had filed a patent infringement suit against Sigaba, and posted a press release on its website announcing the filing of its suit. Id. at ¶ 18-19. PostX did not actually file the patent infringement suit until September 13, 2002. Id. at ¶ 19. Sigaba alleges that, because of the 2000 meeting between the companies, PostX knew that Sigaba's products did not infringe the '688 patent, and in fact PostX's Chief Technology Officer admitted that the suit had no technical merit. Id. at ¶ 21-22. After a second patent, the '647 patent,

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 188 of 247

PostX Corporation v. Secure Data in Motion, Inc., Not Reported in Fed. Supp. (2005)

was issued to PostX in November 2002, PostX filed a second patent infringement suit against Sigaba, which Sigaba also claims is sham litigation. Id. at ¶ 23. According to Sigaba's counterclaims, PostX conspired with counterdefendant the Mayfield Funds ("Mayfield" or "the Mayfield Funds") and attempted to monopolize the market for "non-PKI-based Secure Document Delivery Systems." Id. at ¶¶ 10-11.

The Mayfield Funds are the investment vehicles for a venture capital firm that invested in PostX multiple times since 1998 and has owned approximately 20% of PostX's stock during this time. Decl. of Yogen Dalal ("Dalal Decl.") at ¶ 4. Mayfield has the right to appoint a director of PostX, and Mayfield managing director Yogen Dalal served on PostX's board from November 1998 to September 2002. PostX and Mayfield also entered into a Management Rights Agreement ("MRA") which gave Mayfield the right, among others, to: "consult with and advise management of PostX on significant business issues, including management's proposed annual and quarterly operating plans," and stated that "if [Mayfield] is not represented on PostX's Board of Directors, PostX shall invite a representative of [Mayfield] to attend all meetings of its Board of Directors in a non-voting observer capacity ... [who] may participate in discussions of matters brought to the Board provided that the representative will recuse himself or herself from discussions that involve conflict of interest between PostX and Mayfield." Dalal Decl., Ex. A at PXT 0089751. According to Sigaba, this MRA granted unique rights to Mayfield that exceeded those guaranteed other PostX investors. Def.'s Opp'n at 2:22-24.

 **\*2** According to PostX, Dr. Dalal took a sabbatical from late June through September 2002. Dalal Decl. ¶ 8; Decl. of Allen Morgan ("Morgan Decl.") ¶ 8. Allen Morgan, a managing director of Mayfield, had been attending PostX board meetings as a non-voting observer during the late spring and summer of 2002. Before Dalal's departure, Sigaba alleges that Dalal led the PostX board in its decision to fire the current CEO and replace him with Thampy Thomas in June 2002. Def.'s Opp'n at 4:19;5:3. Thomas developed a "counteroffensive" strategy to win the Bank of America business, which included the patent lawsuit. According to Sigaba, PostX sought the "agreement, approval and backing of Mayfield" to initiate the lawsuit by involving Allen Morgan in the decision-making process. Specifically, Thomas, Morgan, and PostX CTO Cayce Ullman held a one-hour conference call on September 12, 2002, during which they reached agreement that PostX would file the sham suit. Decl. of John L. Cooper, Ex. P (Thomas Depo.) at

335:20-336:18. No other PostX board members participated in this call. Id. at 304:1-9.

Then, on September 13, 2002, at 9:00 a m., the PostX board voted to (1) remove Dalal as the Mayfield representative on the PostX board and appoint Mr. Morgan as a PostX director, and (2) approve the filing of the lawsuit. Cooper Decl., Ex. CC at PXT 0087030. The PostX board made Morgan's appointment effective September 11, 2002 by a resolution stating "[t]hat all actions taken by Allen Morgan from and after September 11, 2002, and his participation in all deliberations of the Board from and after that date, are hereby ratified, approved and confirmed as taken in his capacity as a member of the Board." Id. at 0087029. Morgan states that he attended the board meetings prior to September 13, 2002 as a non-voting observer, and became a director of PostX on September 11, 2002, "for the purpose of casting a vote at the September 13, 2002 PostX Board meeting." Morgan Decl. ¶ 8. When Dr. Dalal returned from sabbatical at the beginning of October 2002, he replaced Morgan as a director of PostX. Id. at ¶ 11.

Sigaba alleges that this conduct by PostX and Mayfield reveals their anticompetitive objectives in filing the sham litigation. In addition, it contends that Mayfield materially contributed to the anticompetitive conduct "pledg[ing] continuing support" to PostX and thereby helping to finance the litigation. Cooper Decl., Ex. G (Dean Mayer Depo.) at 428:20-22. Mayfield provided $1 million in PostX's December 2002 round of financing and $1.5 million in an August 2003 financing for PostX's operating expenses, which would include the litigation expenses for the Sigaba suit. Id., Ex. A (Dalal Depo.) at 274:15-275:8.

Now before the Court is a motion by PostX and the Mayfield Funds for summary adjudication of three of defendant's counterclaims: (1) for "restraint of trade" under Section 1 of the Sherman Act; (2) for "conspiracy to attempt monopolization" under Section 2 of the Sherman Act; and (3) for declaratory relief as to these claims.

## LEGAL STANDARD

Summary judgment or adjudicatio n is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any materialfact and that the

Case 4:23-cv-03560  Document 120-2  Filed on 01/19/24 in TXSD  Page 189 of 247

PostX Corporation v. Secure Data in Motion, Inc., Not Reported in Fed. Supp. (2005)

moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

In a motion for summary judgment, "[if] the moving party for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrate the absence of any genuine issues of material fact, the burden of production then shifts so that the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." See T.W. Elec. Service, Inc., v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 317 (1986)). In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and draws all inferences in the light most favorable to the non-moving party. See T.W. Electric, 809 F.2d at 630-31 (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986)); Ting v. United States, 927 F.2d 1504, 1509 (9th Cir. 1991). The evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. Thornhill Publ'g Co., Inc. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

**\*3** PostX and Mayfield bring this motion for summary adjudication of Sigaba's first and third counterclaims, which allege a conspiracy to violate §§ 1 and 2 of the Sherman Act, and the fifth counterclaim, which seeks declaratory relief. The gravamen of Sigaba's allegations is that PostX's patent suit constituted sham litigation prosecuted for an anticompetitive purpose, and that Mayfield and PostX together conspired to initiate and finance the suit. PostX and Mayfield contend that these counterclaims must be dismissed because, under the "intracorporate conspiracy doctrine," PostX and Mayfield were legally incapable of an antitrust conspiracy because Mayfield's nominees to the PostX board do not have an independent personal stake in the antitrust violation and because Mayfield does not compete with PostX in the relevant market.

**A. Application of the intracorporate conspiracy doctrine**

Under the intracorporate conspiracy doctrine, certain actors who "operate within and for the benefit of a single economic enterprise" do not meet the "concerted action" requirement of Section 1 of the Sherman Act. Podiatrist Ass'n, Inc. v. La Cruz Azul de Puerto Rico, Inc., 332 F.3d 6, 13 (1st Cir. 2003). [1] The doctrine precludes antitrust claims where the officers or employees of a company are alleged to have conspired with the corporation. See Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 769 (1984) ("officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not bring together economic power that was previously pursuing divergent goals"). The doctrine also applies generally to the "internally coordinated conduct of a corporation and one of its unincorporated divisions." Id. at 770. In Copperweld, the Supreme Court extended this doctrine to a claim that a corporation conspired with its wholly-owned subsidiary. Id. at 771. Many courts have recognized an exception for "corporate officers acting on their own behalf," see Copperweld, 476 U.S. at 770 n. 15, which applies when an officer has "an independent personal stake in achieving the corporation's illegal objective." Greenville Publ'g Co. v. Daily Reflector, Inc., 496 F.2d 1391, 1399 (4th Cir. 1974).

In two recent decisions, the Ninth Circuit has clarified the general principles to guide the inquiry when separate entities with a common economic interest are alleged to have conspired. In Freeman v. San Diego Ass'n of Realtors, 322 F.3d 1133, 1148-49 (9th Cir.), cert. denied, 540 U.S. 940 (2003), the Court of Appeals stated:

> Although the single-entity inquiry is fact-specific, a few general guidelines emerge. First, in the absence of economic unity, the fact that joint venturers pursue the common interests of the whole is generally not enough, by itself, to render them a single entity ... Second, in the absence of economic unity, the fact that firms are not actual competitors is also usually not enough, by itself, to render them a single entity. Absence of actual competition may simply be a manifestation of the

Case 4:23-cv-03560  Document 120-2  Filed on 01/19/24 in TXSD  Page 190 of 247

PostX Corporation v. Secure Data in Motion, Inc., Not Reported in Fed. Supp. (2005)

anticompetitive agreement itself ... Cases have required instead that the constituent entities be neither actual nor *potential* competitors. Finally, where firms are not an economic unit and are at least potential competitors, they are usually not a single entity for antitrust purposes.

322 F.3d at 1148-49 (italics in original).

Since Freeman, the Ninth Circuit has reaffirmed these general principles and held that "[t]he crucial question is whether the entities alleged to have conspired maintain an 'economic unity,' and whether the entities were either actual or potential competitors. Our inquiry is a functional one." Jack Russell Terrier Network of Northern Cal. v. Amer. Kennel Club, Inc., 407 F.3d 1027, 1034 (9th Cir. 2005), citing Freeman, 322 F.3d at 1148-49, and Copperweld, 467 U.S. at 773 n.21 ("substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1"). [2]

**\*4** Sigaba cites several cases for the propositions that (1) entities may share one aligned economic interest but not be entitled to single entity status, and (2) there need not be any competitive relationship between the conspiring parties for a conspiracy to exist. See Minpeco, S.A. v. ContiCommodity Services, Inc., 673 F. Supp. 684 (S.D.N.Y. 1987) (finding conspiracy between investors and silver traders, despite their aligned interest in the restraint of trade); Pinhas v. Summit Health Ltd., 894 F.2d 1024 (9th Cir. 1989) (finding no immunity from conspiracy for an attorney and client allegedly engaging in anticompetitive behavior); Agron, Inc. v. Chien-Lu Lin, 2004 WL 555377 (C.D. Cal. March 16, 2004) (applying Pinhas and finding a cognizable conspiracy claim against a lawyer and patent holder who agreed to bring baseless patent suits). According to Sigaba, the question of actual or potential competition is "*not the only method* to determine whether the entities economic interests are diverse," see Def.s' June 3, 2005 Letter Br. at 2 (italics in original), citing City of Mt. Pleasant v. Associated Elec. Coop., Inc. 838 F.2d 268, 276 (8th Cir. 1988) ("By 'diverse,' we mean interests which tend to show that any two of the defendants are, or have been, actual or potential competitors, or, at the very least, interests which are sufficiently divergent

so that a reasonable juror could conclude that the entities have not always worked together for a common cause.").

While in some contexts, courts have apparently recognized antitrust conspiracies among individuals or entities without a competitive relationship, like lawyers and their clients, the Court finds that the general principles enunciated in Freeman and Jack Russell apply in this case, where the alleged conspiracy is between two economic actors with independent – though not necessarily diverse – economic interests. Copperweld teaches that the fundamental issue is whether the entities are "separate economic actors pursuing separate economic interests [such that] agreements among them ... suddenly bring together economic power that was previously pursuing divergent goals." In the context of an investor and an investee like PostX and Mayfield, the appropriate inquiry is whether the two maintain an economic unity and whether they are actual or potential competitors.

**B. Economic unity and competition between PostX and Mayfield**

In conducting the fact-specific inquiry under the principles of Freeman and Jack Russell, the Court considers whether PostX and Mayfield possessed economic unity at the time of their agreement and whether they are actual or even potential competitors.

Mayfield was the most important PostX investor, holding 20% ofits shares, and had significant access to and influence over PostX, including a Management Rights Agreement that was favorable to Mayfield. While Sigaba suggests that this level of access and involvement was somehow illicit, it is difficult to see how such substantialinfluence would make the two entities more capable of conspiring rather than less. See Fresh Made, Inc. v. Lifeway Foods, Inc., 2002 WL 31246922 at \*7 (E.D. Pa. Aug. 9, 2002). At the same time, PostX and Sigaba are separate economic entities, and of course they do not have identical economic interests in all circumstances. Nonetheless, their interests in PostX's success were one and the same, and the Court cannot conceive of how Mayfield's interest in obtaining a favorable return on its investment in PostX constitutes a "separate" interest from that of PostX's other shareholders or of PostX itself. [3] The aligned interest of PostX and Mayfield in PostX's success is not the "commonality of interest" that "exists in every cartel,"

L.A. Memorial Coliseum Comm'n v. N.F.L., 726 F.2d 1381, 1389 (9th Cir. 1984), but rather the unity of economic

Case 4:23-cv-03560  Document 120-2  Filed on 01/19/24 in TXSD  Page 191 of 247

PostX Corporation v. Secure Data in Motion, Inc., Not Reported in Fed. Supp. (2005)

interest shared between any shareholder and the company in which it invests. Sigaba's only concrete suggestion of how those interests might diverge is that Dr. Dalale mailed the PostX board on May 16, 2002, suggesting a possible merger of PostX with another company:

> I have been thinking about what the future holds for PostX and I don't feel good ... Mayfield has a lot invested and I can't watch it get wasted without doing all I can to make this investment return something for us ... We must consolidate or we will find ourselves with no cash at the end of the year and then its lights out. Mike has been unsuccessful in raising any money and it's not surprising why – no revenues and high valuation at PostX! I suggest we cut the company back and merge it with Boldfish ASAP ... I had a long chat with John Shoch today and he is supportive as both Mayfield and Alloy have a lot of money in both companies and we need to get some returns now ... We need to salvage all our work quickly.

**\*5**  Cooper Decl., Ex. O (Dalal Depo.), Depo. Ex. 1034.

Sigaba argues that this email is proof that Mayfield sought return on its investment regardless of the consequences for PostX. But, as Thampy Thomas testified, that merger never occurred because the PostX board, including Dalal, and together with Thomas, "decided against it." Cooper Decl., Ex. P (Thomas Depo.) at 848:18. As PostX points out, Dalal's suggestion does not so much reflect an interest diverse from PostX's as the interest in maximizing PostX's shareholder value. In addition, while Sigaba suggests that Mayfield was the animating force behind the strategy to eliminate competition from Sigaba, it is clear that PostX's "counteroffensive" plan to defeat Sigaba was initiated by PostX CEO Thampy Thomas.

Rather than indicating divergent or potentially competing interests coming together for a single anticompetitive objective, these facts weigh in favor of a finding that PostX and Mayfield shared a common interest in PostX's financial success before the decision to file the patent suit. In addition, there is no evidence that they were or might be competitors previously pursuing separate interests "sudden[ly] joining economic power." Copperweld, 467 U.S. at 771. Rather, at all times, the two entities and their representatives were engaged in corporate governance decisions regarding PostX, a company in which they have shared an economic interest since 1998. Accordingly, they are entitled to the protection of the intracorporate conspiracy doctrine.

## C. Morgan's director status

Because the Court finds that PostX and Mayfield were legally incapable of an antitrust conspiracy, the matter of Allen Morgan's precise status on September 12, 2002 is not dispositive of this motion. Sigaba contends that Allen Morgan was not a board member at the time of his September 12, 2002 conversation with Thampy Thomas, during which they agreed that PostX should file suit. Sigaba characterizes the board's retroactive appointment of Morgan as "backdating" his directorship precisely to avoid liability for conspiracy, and it argues that Morgan was acting on Mayfield's behalf, not PostX's, at the time of the allegedly conspiratorial agreement. In addition, Sigaba contends that Morgan was capable of conspiring with PostX even when he was a director, because Mayfield had independent economic interests which Morgan was protecting.

PostX contends that this issue is a red herring, because Thomas could consult with Morgan under the terms of the Management Rights Agreement between PostX and Mayfield both before and after his appointment to the board, and the board's retroactive ratification of Morgan as a director was entirely effective under California law. In addition, PostX and Mayfield apparently seek a broader holding from the Court that corporate directors and the minority shareholders who appoint them are legally incapable of conspiring with the corporation in which the shareholder invests.

**\*6**  As PostX points out, counterdefendants do not dispute that Mayfield's representative on the PostX board, Allen Morgan, participated in and supported the decision to sue Sigaba. The Court agrees that the application of the intracorporate conspiracy doctrine rests on the above analysis of PostX and Mayfield's corporate relationships, not "on dispute issues of who knew what when, or who said what to whom." Pls.' Reply at 2:18-19. Both parties correctly recognize that, regardless of Morgan's director status on September 12, 2002, the intracorporate conspiracy

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 192 of 247

PostX Corporation v. Secure Data in Motion, Inc., Not Reported in Fed. Supp. (2005)

doctrine looks to economic reality, not corporate form. Copperweld, 467 U.S. at 772; City of Mt. Pleasant, supra, 838 F.2d at 275. Viewing the evidence in the light most favorable to Sigaba, the Court declines to hold that Allen Morgan's director status itself on September 12, 2002, makes PostX and Mayfield legally incapable of antitrust conspiracy.

However, the Court also declines to adopt a broader holding that would suggest that a corporate director and the shareholder he or she represents are always shielded under the intracorporate conspiracy doctrine. Under the circumstances of this case, and on the record before the Court, Mayfield and PostX enjoyed an economic unity, were neither actual nor potential competitors, and were legally incapable of the alleged conspiracy. Sigaba has not established a triable issue of fact on any of these issues.

**D. Objections to evidence**

PostX has filed a series of objections to statements in Sigaba's Opposition brief and evidence submitted.

The Court finds that, even assuming all statements and evidence are admissible, Sigaba has not established that a triable issue of material fact exists to defeat summary judgment. Accordingly, it does not rule on PostX's objections individually.

### CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby GRANTS PostX and Mayfield's motion for summary adjudication of Sigaba's antitrust counterclaims. [Docket # 509].

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2005 WL 8177634

### Footnotes

1    According to PostX, the concerted action requirement for Section 1 claims also applies to Section 2 claims of conspiracy to monopolize.

2    The parties have briefed the significance of the Jack Russell decision in letter briefs to the Court filed since the hearing.

3    According to Dr. Dalal's deposition, Mayfield would now no longer be considered the "lead investor" in PostX (which is the term for an investor that provides the largest dollar amount and sets the terms of the company's financings), because another firm led the investment and set the terms of the most recent financing, and that firm now owns the same percentage of PostX as Mayfield. Cooper Decl., Ex. O (Dalal Depo.) at 23:8-24:15.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 8885128
Only the Westlaw citation is currently available.
United States District Court, S.D.
Texas, Brownsville Division.

SPACE EXPLORATION TECHNOLOGIES,
CORP. aka SpaceX, "Plaintiff,"
v.
Carol BELL, et al., "Defendants."

Civil Action No. 1:23-cv-00137

Signed November 8, 2023

**Synopsis**
**Background:** Space exploration corporation filed lawsuit against administrative law judge (ALJ) of the Office of the Chief Administrative Hearing Officer (OCAHO), the Chief Administrative Hearing Officer, and the United States Attorney General, alleging that administrative action brought against corporation by the Department of Justice's (DOJ) Immigrant and Employee Rights Section (IER), asserting a violation of statute prohibiting unfair immigration-related employment practices, violated the Appointment Clause, notwithstanding interim final rule (IFR) published by the Executive Office of Immigration Review (EOIR) providing that the Attorney General had the discretion to review decisions and orders in such actions. Corporation moved for a preliminary injunction to halt the administrative proceeding.

**Holdings:** The District Court, Rolando Olvera, J., held that:

[1] corporation had Article III standing;

[2] corporation was likely to succeed on the merits of its claim that statute prohibiting unfair immigration-related employment practices violated the Appointments Clause;

[3] corporation was likely to succeed on the merits of its claim that IFR allowing Attorney General to review OCAHO ALJ decisions was unlawful under the Appointments Clause;

[4] corporation was likely to obtain the remedy it sought, supporting its motion for preliminary injunction;

[5] corporation was likely to suffer irreparable harm absent a preliminary injunction staying administrative action;

[6] the balance of harms and public interest weighed in favor of granting preliminary injunction;

[7] corporation was not likely to succeed on its claim that OCAHO ALJs were unconstitutionally insulated from removal at will in violation of the Appointments Clause; and

[8] corporation was not likely to succeed on its claim that action brought by IER was a suit at common law required under the Seventh Amendment to be heard by an Article III court with right to trial by jury.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion for Preliminary Injunction.

West Headnotes (28)

**[1]**   **Injunction**   Extraordinary or unusual nature of remedy

Granting a preliminary injunction is the exception rather than the rule. Fed. R. Civ. P. 65(a).

**[2]**   **Injunction**   Grounds in general;  multiple factors

**Injunction**   Clear showing or proof

A plaintiff seeking a preliminary injunction must clearly show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest. Fed. R. Civ. P. 65(a).

**[3]**   **Injunction**   Presumptions and burden of proof

The party moving for a preliminary injunction bears the burden of proving each element. Fed. R. Civ. P. 65(a).

**[4]**   **Injunction**   🗝   Right or necessity

The District Court rules on opposed motions by submission, and it need not hold a hearing on a motion for preliminary injunction if there is no dispute of fact. Fed. R. Civ. P. 65(a).

**[5]**   **Federal Civil Procedure**   🗝   In general; injury or interest

To establish Article III standing, a plaintiff must show, among other things, that it has suffered an injury in fact. U.S. Const. art. 3, § 1.

**[6]**   **Federal Civil Procedure**   🗝   In general; injury or interest

An "injury-in-fact," as required to establish Article III standing, constitutes an invasion of a legally protected interest which is (1) concrete and particularized, and (2) actual or imminent, not conjectural or hypothetical. U.S. Const. art. 3, § 1.

**[7]**   **Public Employment**   🗝   Actions

**United States**   🗝   Actions and relief

Corporation had Article III standing to bring its claim that Office of the Chief Administrative Hearing Officer (OCAHO) administrative law judges (ALJ) were unconstitutionally insulated from removal; requiring corporation to face unlawful agency authority by proceeding before an unaccountable ALJ in administrative action brought against it by Department of Justice's (DOJ) Immigrant and Employee Rights Section (IER) for alleged unfair immigration and employment practices was a here-and-now injury in fact which flowed directly from the allegedly unlawful administrative proceedings and which was impossible to remedy once the proceeding was over. U.S. Const. art. 3, § 1; Immigration and Nationality Act § 274B, 🚩8 U.S.C.A. § 1324b.

**[8]**   **Public Employment**   🗝   Actions

**United States**   🗝   Actions and relief

To have Article III standing to bring a removal claim involving an ALJ, the plaintiff must show that the unconstitutional removal provision inflicted harm. U.S. Const. art. 3, § 1.

**[9]**   **Public Employment**   🗝   Selection of officers

**United States**   🗝   Power to appoint

Under the Appointments Clause, Congress may allow the head of a department to appoint inferior officers, but an inferior officer must be directed and supervised by a principal officer appointed by the President with the advice and consent of the Senate. U.S. Const. art. 2, § 2, cl. 2.

**[10]**   **Public Employment**   🗝   Creation and duration of employment relationship

**United States**   🗝   Power to appoint

Office of the Chief Administrative Hearing Officer's (OCAHO) administrative law judges (ALJ) are appointed by the Attorney General, a principal officer, so under the Apportionment Clause they are inferior officers who must be directed and supervised by the Attorney General; in other words, the Attorney General must be able to review the decisions of OCAHO ALJs to comply with the Appointments Clause. U.S. Const. art. 2, § 2, cl. 2.

**[11]**   **Injunction**   🗝   Aliens, immigration, and citizenship

Corporation was likely to succeed on the merits of its claim that statute prohibiting unfair immigration-related employment practices violated the Appointments Clause, as required for preliminary injunction staying administrative action against corporation under the statute, where Office of the Chief Administrative Hearing Officer (OCAHO) administrative law judges' (ALJ) decisions under the statute were not subject to administrative appellate review by the Attorney General as a principal officer. U.S. Const. art. 2, § 2, cl. 2; Immigration and Nationality Act § 274B, 🚩8 U.S.C.A. § 1324b.

**[12]**    **Injunction** 🔑 Aliens, immigration, and citizenship

Corporation was likely to succeed on the merits of its claim that interim final rule (IFR) published by the Executive Office of Immigration Review (EOIR) which provided that the United States Attorney General may, in his discretion, review decisions and orders of administrative law judges (ALJ) in the Office of the Chief Administrative Hearing Officer (OCAHO) in cases arising under statute prohibiting unfair immigration-related employment practices was unlawful under the Appointments Clause, as required for preliminary injunction staying administrative action against corporation under the statute; the IFR conflicted with the plain language of the statute which provided for review only by an Article III court. U.S. Const. art. 2, § 2, cl. 2; Immigration and Nationality Act § 274B, 🚩8 U.S.C.A. § 1324b.

**[13]**    **Injunction** 🔑 Aliens, immigration, and citizenship

Corporation was likely to obtain the remedy it sought, supporting its motion for preliminary injunction staying administrative action against it by the Department of Justice's (DOJ) Immigrant and Employee Rights Section (IER) asserting violations of statute prohibiting unfair immigration-related employment practices; the statute contained no express severability clause and provided for review only by a United States Court of Appeals, and there was no provision that could be severed to enable discretionary review by the Attorney General as contemplated by interim final rule (IFR) published by the Executive Office of Immigration Review (EOIR). Immigration and Nationality Act § 274B, 🚩8 U.S.C.A. § 1324b.

**[14]**    **Constitutional Law** 🔑 Judicial rewriting or revision

Court cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole.

**[15]**    **Statutes** 🔑 Absent terms; silence; omissions

A textual judicial supplementation to a statute is particularly inappropriate when Congress has shown it knows how to adopt the omitted language or provision.

**[16]**    **Injunction** 🔑 Aliens, immigration, and citizenship

Corporation was likely to suffer irreparable harm absent a preliminary injunction staying administrative action against it by the Department of Justice's (DOJ) Immigrant and Employee Rights Section (IER) asserting violations of statute prohibiting unfair immigration-related employment practices; corporation was subjected to unconstitutional agency authority which was impossible to remedy once the proceeding was over. Immigration and Nationality Act § 274B, 🚩8 U.S.C.A. § 1324b.

**[17]**    **Injunction** 🔑 Irreparable injury

**Injunction** 🔑 Adequacy of remedy at law

"Irreparable" harm, as an element of a request for a preliminary injunction, refers to harm for which there is no adequate remedy at law.

**[18]**    **Injunction** 🔑 Clear, likely, threatened, anticipated, or intended injury

**Injunction** 🔑 Irreparable injury

The party seeking a preliminary injunction must prove irreparable harm is likely, not merely possible.

**[19]**    **Civil Rights** 🔑 Preliminary Injunction

Deprivation of a constitutional right unquestionably constitutes irreparable injury for purposes of obtaining a preliminary injunction.

[20]  **Injunction** 👉 Injunctions against government entities in general

The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—merge when the government is the opposing party.

[21]  **Injunction** 👉 Aliens, immigration, and citizenship

The balance of harms weighed in favor of granting corporation's motion for preliminary injunction staying administrative action against it by the Department of Justice's (DOJ) Immigrant and Employee Rights Section (IER) asserting violations of statute prohibiting unfair immigration-related employment practices; government defendants did not allege any harm that they would suffer if an injunction were issued, but corporation would have to participate in unconstitutional proceedings. Immigration and Nationality Act § 274B, 🏴 8 U.S.C.A. § 1324b.

[22]  **Injunction** 👉 Aliens, immigration, and citizenship

The public interest factor weighed in favor of granting corporation's motion for preliminary injunction staying administrative action against it by the Department of Justice's (DOJ) Immigrant and Employee Rights Section (IER) asserting violations of statute prohibiting unfair immigration-related employment practices; decisions by Office of the Chief Administrative Hearing Officer (OCAHO) administrative law judges (ALJ) were not subject to the Attorney General's review and thus there was no public interest in the resulting unlawful agency action. Immigration and Nationality Act § 274B, 🏴 8 U.S.C.A. § 1324b.

[23]  **Injunction** 👉 Administrative Agencies and Proceedings in General

As a factor for a preliminary injunction, there is generally no public interest in perpetuation of unlawful agency action.

[24]  **Public Employment** 👉 Authority to impose adverse action; manner and mode of imposition

**United States** 👉 In general; power to remove

The Constitution gives the President general authority to remove executive branch officers at will, but Congress may provide tenure protections to certain inferior officers with narrowly defined duties. U.S. Const. art. 2, § 1, cl. 1.

[25]  **Injunction** 👉 Aliens, immigration, and citizenship

Corporation was not likely to succeed on its claim that the Office of the Chief Administrative Hearing Officer (OCAHO) administrative law judges (ALJ) were unconstitutionally insulated from removal at will by the President in violation of the Appointments Clause, as required to support corporation's motion for a preliminary injunction staying administrative proceedings against it by the Department of Justice's (DOJ) Immigrant and Employee Rights Section (IER) asserting violations of statute prohibiting unfair immigration-related employment practices, where district court could sever any restrictions on removal such that OCAHO ALJs were accountable to the President. U.S. Const. art. 2, § 2, cl. 2; 5 U.S.C.A. §§ 1202(d), 🚩7521(a); Immigration and Nationality Act § 274B, 🏴 8 U.S.C.A. § 1324b; 28 C.F.R. § 68.26.

[26]  **Statutes** 👉 Effect of Partial Invalidity; Severability

Statutes are generally severable if the remainder of the law is capable of functioning independently and thus would be fully operative

as a law; it is unusual for the remaining law to be inoperative.

**[27]    Jury** 🔑 Common law or statutory actions, in general

Congress may create new statutory duties for civil penalties to enforce public rights that are not subject to the Seventh Amendment. U.S. Const. Amend. 7.

**[28]    Injunction** 🔑 Aliens, immigration, and citizenship

Corporation was not likely to succeed on its claim that action brought by the Department of Justice's (DOJ) Immigrant and Employee Rights Section (IER) for alleged violations of statute prohibiting unfair immigration-related employment practices was a suit at common law required under the Seventh Amendment to be heard by an Article III court with right to trial by jury, as required to support corporation's motion for a preliminary injunction staying the administrative proceedings, where the statute concerned both immigration and employment law by prohibiting national origin discrimination in employment and thus was excepted from the Seventh Amendment as protecting public rights. U.S. Const. art. 3, § 1; U.S. Const. Amend. 7; Immigration and Nationality Act § 274B, 🚩 8 U.S.C.A. § 1324b.

**Attorneys and Law Firms**

Charles Connolly, Pro Hac Vice, James Tysse, Pro Hac Vice, Akin Gump Strauss Hauer & Feld LLP, Washington, DC, Laura Page Warrick, Akin Gump Strauss Hauer & Feld LLP, Dallas, TX, for Plaintiff.

Christopher D. Pineda, United States Attorneys Office, Brownsville, TX, Kuntal Cholera, Cynthia Liao, DOJ-Civ, Civil Division, Washington, DC, for Defendants.

**ORDER**

Rolando Olvera, United States District Judge

**\*1**   Before the Court is Plaintiff's "Motion for Preliminary Injunction" ("Motion") (Dkt. No. 11), Defendant's "Response to Plaintiff's Motion" (Dkt. No. 20), Plaintiff's "Reply in Support of its Motion" (Dkt. No. 24), and Defendant's "Surreply in Opposition to Plaintiffs Motion" (Dkt. No. 26). Plaintiff's Motion (Dkt. No. 11) is **GRANTED in part** for these reasons:

**I. BACKGROUND**

Congress made it unlawful for an employer to discriminate based on national origin or citizenship status in the hiring or firing of any applicant or employee in 🚩 8 U.S.C. § 1324b. The Department of Justice's ("DOJ") Immigrant and Employee Rights Section ("IER") enforces 🚩 § 1324b by bringing administrative proceedings against an alleged wrongdoer. Dkt. No. 11 at 10; Dkt. No. 20 at 3. The Office of the Chief Administrative Hearing Officer ("OCAHO") administrative law judges ("ALJ") adjudicate 🚩 § 1324b proceedings. Dkt. No. 11 at 10; Dkt. No. 20 at 3. The U.S. Attorney General appoints OCAHO ALJs. Dkt. No. 11 at 10; Dkt. No. 20 at 3. An ALJ assigned to hear a 🚩 § 1324b action has "all appropriate powers necessary to conduct fair and impartial hearings." 28 C.F.R. § 68.28. After a hearing ends, the ALJ issues a "final" decision that may be appealed only to a U.S. court of appeals. 🚩 8 U.S.C. § 1324b(g)(1); 28 C.F.R. § 68.57.

The IER filed an administrative complaint (Dkt. No. 11-2) against Plaintiff in August 2023 alleging Plaintiff violated 🚩 8 U.S.C. § 1324b. *Id.* OCAHO ALJ Defendant Carol Bell presides over these administrative proceedings. Dkt. No. 11-1 at ¶ 18. The IER seeks civil penalties, backpay, and the reinstatement of aggrieved applicants from Plaintiff. Dkt. No. 11-2 at 16.

In October 2023, almost a month after Plaintiff sued, the Executive Office of Immigration Review ("EOIR") published an interim final rule ("IFR") "to provide that the Attorney General may, in his discretion, review decisions and orders of ALJs in the OCAHO in cases arising under 🚩 § 1324b".

88 Fed. Reg. 70,586-01 (Oct. 12, 2023) (to be codified at 28 C.F.R. pt. 68). The IFR became effective immediately. *Id.*

Plaintiff now moves for a preliminary injunction to halt the administrative proceedings.

## II. LEGAL STANDARD

**[1]** **[2]** **[3]** Granting a preliminary injunction is the "exception rather than the rule." *House of the Homeless, Inc. v. Widnall*, 94 F.3d 176, 180 (5th Cir. 1996). "A plaintiff seeking a preliminary injunction must clearly show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest." *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 457 (5th Cir. 2017). The moving party bears the burden of proving each element. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

## III. DISCUSSION

### a. Plaintiff's request for a hearing is denied.

**[4]** Plaintiff requests that the Court hold a hearing. The Court rules on opposed motions by submission, L.R. 6(B), and it need not hold a hearing on a motion for preliminary injunction if there is no dispute of fact. *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996). Finding no dispute of fact, Plaintiff's request for a hearing is **DENIED.**

### b. Plaintiff has standing to bring its Appointments Clause and removal claims.

**\*2** Defendants argue Plaintiff lacks standing to bring its Appointments Clause and removal claims because Plaintiff has failed to show an injury-in-fact. Dkt. Nos. 20 & 26.

**[5]** **[6]** To establish Article III standing, Plaintiff must show, among other things, that it has suffered an injury in fact. *Wendt v. 24-Hour Fitness USA, Inc.*, 821 F.3d 547, 550 (5th Cir. 2016). An injury-in-fact constitutes "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural

or hypothetical." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

**[7]** **[8]** To have standing to bring Plaintiff's removal claim, Plaintiff must show that "the unconstitutional removal provision inflicted harm." *Collins v. Yellen*, —— U.S. ——, 141 S. Ct. 1761, 1783, 1788-89, 210 L.Ed.2d 432 (2021). Proceeding before "an unaccountable ALJ" "is a here-and-now injury" "that is impossible to remedy once the proceeding is over." *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 191, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023). Thus, if Plaintiff can show that OCAHO ALJs are unconstitutionally insulated from removal, Plaintiff will be harmed by having to proceed before an unaccountable ALJ. Plaintiff therefore has standing to bring its removal claim.

Similarly, Plaintiff's injury-in-fact in its Appointments Clause claim is also facing unlawful agency authority because § 1324b does not provide for the Attorney General's review of OCAHO ALJs' decisions. Defendants argue that the IFR cures the constitutional defect with § 1324b, and thus Plaintiff is not harmed by the IFR. Dkt. No. 20. But Plaintiff alleges the IFR expressly conflicts with § 1324b, and thus Plaintiff is still ultimately subjected to unconstitutional agency authority. *Id.* Plaintiff's injury must be traceable "to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." *Collins*, 141 S. Ct. at 1779. Plaintiff's "concrete injury flows directly from" the allegedly unlawful administrative proceedings, and the IFR does not "operate independently" from those proceedings. *Id.; Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 301, 142 S.Ct. 1638, 212 L.Ed.2d 654 (2022). Plaintiff has therefore alleged an injury-in-fact and has standing to bring its Appointments Clause claim.

### c. Plaintiff is entitled to an injunction on its Appointments Clause claim.

#### i. Plaintiff is likely to succeed on the merits of its claim that Section 1324b violates the Appointments Clause because OCAHO ALJs' decisions are not subject to review by the Attorney General.

**[9]**  Under the Appointments Clause, the President must appoint all federal "principal officers" with the advice and consent of the Senate. U.S. Const. art. II, § 2, cl. 2. But Congress may allow the head of a department to appoint "inferior officers." 🔖 United States v. Arthrex, Inc., --- U.S. ----, 141 S. Ct. 1970, 1979, 210 L.Ed.2d 268 (2021) (quoting 🔖 Edmond v. United States, 520 U.S. 651, 660, 117 S.Ct. 1573, 137 L.Ed.2d 917 (1997)). An inferior officer must be "directed and supervised" by a principal officer. 🔖 Arthrex, Inc., 141 S. Ct. at 1980 (citing 🔖 Edmond, 520 U.S. at 662, 117 S.Ct. 1573).

**[10]**  OCAHO ALJs are appointed by the Attorney General (a principal officer), so they are "inferior officers" who must be "directed and supervised" by the Attorney General. Dkt. No. 11 at 5; Dkt. No. 20 at 3. In other words, the Attorney General must be able to review the decisions of OCAHO ALJs to comply with the Appointments Clause. 🔖 Arthrex, Inc., 141 S. Ct. at 1980-82 (holding that it violated the Appointments Clause for inferior adjudicative officials to render decisions that are not subject to review by a principal officer). Based on 🔖 § 1324b's plain language, broader context, and legislative history, it is clear the decisions of OCAHO ALJs are not subject to the Attorney General's review.

**\*3  [11]**  🔖 Section 1324b requires an OCAHO ALJ to issue "an order, which shall be final unless appealed as provided under subsection (i)." 8 U.S.C. § 1324b(g)(1). Subsection (i) provides that the forum for an aggrieved party to "seek a review of such order" lies exclusively "in the United States court of appeals" "60 days after the entry of such final order." 🔖 Id. § 1324b(i). It does not affirmatively provide for the Attorney General to review OCAHO ALJ decisions. Id.

The broader context of the statute also reinforces the plain text interpretation. 🔖 Section 1324b is between Sections 1324a (governing unlawful employment of aliens) and 1324c (governing document fraud), which specifically provide for "administrative appellate review" of ALJ decision by the Attorney General. 🔖 8 U.S.C. §§ 1324a(e)(7), 1324c(d)(4). Congress' decision not to provide for "administrative appellate review" by the Attorney General in 1324b must therefore be viewed as intentional. See, e.g., Ysleta Del Sur Pueblo v. Texas, --- U.S. ----, 142 S. Ct. 1929, 1939, 213 L.Ed.2d 221 (2022).

The statute's legislative history also clarifies that Congress did not intend for the Attorney General to have the authority to review OCAHO ALJ decisions. H.R. Rep. No. 99-682, 14 (1986) ("[T]he amendment makes clear that an [ALJ]'s order in a discrimination case ... is a final agency order and is enforceable immediately unless appealed in accordance with provisions specified."). Congress made clear that "once an ALJ issues his/her order, it becomes a final agency order," and it did not mention further review by the Attorney General. Id.

**[12]**  Indeed, until recently the DOJ advised that ALJ orders in 🔖 § 1324b cases were not subject to the Attorney General's review. 88 Fed. Reg. 70,586-01; see Amazon Web Servs. Inc., 14 OCAHO no. 1381h, 2 (2021). Defendants argue that the recently published IFR saves 🔖 § 1324b because it advises that 🔖 § 1324b should be read to "expressly account for review of ALJ decisions by the Attorney General." Dkt. No. 20; 88 Fed. Reg. 70586-01. But the new IFR conflicts with the plain language of 🔖 § 1324b, which only provides for review in an Article III court. [1] Thus, the IFR is unlawful, and 🔖 § 1324b proceedings are unconstitutional because the Attorney General is not allowed to review OCAHO ALJs' decisions. Cf. 🔖 Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 472, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) (holding that an agency could not "cure" an unlawful statute "by adopting in its discretion a limiting construction of the statute").

For these reasons, Plaintiff has shown that it is likely to succeed on the merits of its Appointments Clause claim.

### ii. Plaintiff is likely to obtain the remedy it seeks because the unconstitutional provisions of 🔖 § 1324b are not severable.

**[13]  [14]**  Plaintiff has also shown that it is necessary to stay the administrative proceedings because the unconstitutional provisions of 🔖 § 1324b are not severable. Section 1342b contains no express severability clause. The Court "cannot rewrite a statute and give it an effect altogether different from that sought by the measure viewed as a whole." 🔖 Murphy v. Nat'l Collegiate Athletic Ass'n, --- U.S. ----, 138 S. Ct. 1461, 1482, 200 L.Ed.2d 854 (2018) (quoting 🔖 R.R. Ret.

*Bd. v. Alton R. Co.*, 295 U.S. 330, 362, 55 S.Ct. 758, 79 L.Ed. 1468 (1935)).

Section 1324b provides for "Review of final orders." 8 U.S.C. § 1324b(i). "[A]ny person aggrieved by such final order may seek review of such order in the United States court of appeals." *Id.* There is no provision that affirmatively authorizes the Attorney General to review OCAHO ALJ decisions under Section 1324b. Thus, no provision exists that could be severed to enable administrative review. *Compare with* Arthrex, Inc., 141 S. Ct. at 1987 (holding that the appropriate remedy for administrative patent judges whose decisions were not subject to review by the Director of the Patent and Trademark Office was to sever the provision of the statute that affirmatively provided for review by Patent Trial and Appeal Board members).

**\*4** **[15]** Interpreting § 1324b to not provide for further administrative review also reflects Congress' intent. H.R. Rep. No. 99-682, 14 (1986) ("[T]he amendment makes clear that an [ALJ]'s order in a discrimination case ... is a final agency order and is enforceable immediately unless appealed in accordance with provisions specified."). Congress made clear that "once an ALJ issues [their] order, it becomes a final agency order" and did not mention further review by the Attorney General. *Id.* "A textual judicial supplementation is particularly inappropriate when, as here, Congress has shown it knows how to adopt the omitted language or provision." *Rotkiske v. Klemm*, —— U.S. ——, 140 S. Ct. 355, 361, 205 L.Ed.2d 291 (2019).

For these reasons, Plaintiff has shown it is likely the statute cannot be severed in a way to provide for further administrative review. Thus, an injunction is an appropriate remedy.

### iii. Plaintiff will likely suffer irreparable injury if the administrative proceedings are not enjoined.

**[16]** **[17]** **[18]** Plaintiff has also shown that without an injunction it is "likely to suffer irreparable harm." *Daniels Health Scis., LLC v. Vascular Health Scis., LLC*, 710 F.3d 579, 585 (5th Cir. 2013). Irreparable harm refers to harm for which there is no adequate remedy at law. *Id.* The party seeking a preliminary injunction must prove irreparable harm is likely,

not merely possible. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

**[19]** Deprivation of a constitutional right "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *see* 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice, and Procedure § 2948.1 at 160-161 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Plaintiff is being subjected "to unconstitutional agency authority," which "is impossible to remedy once the proceeding is over." *Axon Enterprise, Inc.*, 598 U.S. at 191, 143 S.Ct. 890.

For these reasons, Plaintiff has shown it is likely to suffer irreparable harm absent an injunction.

### iv. The balance of the harms and the public interest weigh in Plaintiff's favor.

**[20]** The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest —"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009).

**[21]** Defendants do not allege any harm that they would suffer if an injunction were issued. Dkt. No. 20. By contrast, Plaintiff will have to participate in unconstitutional proceedings. The balance of harms thus weighs Plaintiff's favor.

**[22]** **[23]** The public interest factor also weighs in Plaintiff's favor. "There is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016); *Burgess v. Fed. Deposit Ins. Corp.*, 639 F. Supp. 3d 732, 749 (N.D. Tex. 2022) (quoting *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 840 (N.D. Tex. 2022)) ("An injunction does not disserve the public interest when it prevents constitutional deprivations."). Because OCAHO ALJ decisions are not subject to the Attorney General's review, Plaintiff is being subjected to unlawful agency action.

There is thus no public interest in the ALJ administrative hearing.

For these reasons, the Court finds that Plaintiff is entitled to an injunction staying the ALJ administrative proceedings.

### d. Plaintiff is not entitled to an injunction on its removal claims because the unconstitutional provisions, if any, are severable.

**[24]** The Constitution gives the President the general authority to remove executive branch officers at will. *Seila*, 140 S. Ct. at 2191 (quoting *Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 130 S. Ct. 3138, 177 L.Ed.2d 706 (2010)). But Congress may provide tenure protections to certain inferior officers with narrowly defined duties. *Id.* at 2129.

**\*5** **[25]** OCAHO ALJs are removable "by the agency in which the [ALJ] is employed only for good cause established and determined by the Merit Systems Protection Board ["MSPB"] on the record after opportunity for hearing before the Board." 5 U.S.C. § 7521(a); *see* 28 C.F.R. § 68.26. The MSPB members "may be removed by the President only for inefficiency, neglect of duty, or malfeasance in office." 5 U.S.C. § 1202(d). Plaintiff argues this unconstitutionally insulates OCAHO ALJs from removal because they are the types of officers the President must be able to remove at will.

**[26]** Even if this is true,[2] the Court can sever the unconstitutional statutory provisions. *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, ––– U.S. ––––, 140 S. Ct. 2335, 2350, 207 L.Ed.2d 784 (2020); *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006). Statutes are generally severable if "the remainder of the law is capable of functioning independently and thus would be fully operative as a law." *Barr*, 140 S. Ct. at 2353. It is "unusual" for the remaining law to be inoperative. *Id.* at 2352.

Severing both removal restrictions would make OCAHO ALJs accountable to the President, so there is no need to stay proceedings an OCAHO ALJ may conduct. Dkt. No. 11 at 27. *See Collins*, 141 S. Ct. at 1788 (holding that a

properly appointed officer's insulation from removal does not undermine the officer's authority "to carry out the functions of the office.").

For these reasons, the Court finds that Plaintiff has not shown it is entitled to an injunction instead of severance on its removal claim.

### e. Plaintiff is not entitled to an injunction on its Article III and Seventh Amendment claims because it is unlikely to succeed on the merits of these claims.

**[27]** Under Article III, the judicial power of the United States is vested in the Supreme Court, "and in such inferior Courts" Congress may establish. U.S. Const. art. III, § 1. The Seventh Amendment guarantees a right to civil jury trials over "suits at common law" where the value in controversy exceeds twenty dollars. U.S. Const. amend. VII. But Congress may create new statutory duties for civil penalties to enforce "public rights" that are not subject to the Seventh Amendment. *Atlas Roofing Co., Inc. v. OSHA*, 430 U.S. 442, 450, 460-61, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977).

**[28]** Even if claims under § 1324b are "suits at common law," Congress created a new statutory duty that protects public rights. Finding that existing statutory and common law remedies were insufficient, Congress enacted § 1324b to "augment the goals found in Title VII of the Civil Rights Act" "by extending the prohibition against national origin discrimination to employers with less than fifteen, but more than three, employees." *Gen. Dynamics Corp. v. United States*, 49 F.3ed 1384, 1385 (9th Cir. 1995). Section 1324b also "prohibits employer discrimination based on citizenship status, a proscription not encompassed by other anti-discrimination statutes." *Id.*

Section 1324b also protects public rights. Other courts have found that administrative claims in which immigration and employment laws are intertwined, like § 1324b claims, implicate public rights. *E.g., Frank's Nursery, LLC v. Walsh*, No. CV H-21-3485, 2022 WL 2757373, at *8 (S.D. Tex. July 14, 2022) (rejecting Article III challenge to agency adjudication of alleged violations of immigrant workplace protections); *Sun Valley Orchards, LLC v. U.S. Dep't of Lab.*, No. 1:21-CV-16625, 2023 WL 4784204, at *6 (D.N.J.

July 27, 2023) (same); *Noriega-Perez v. United States*, 179 F.3d 1166, 1175 (9th Cir. 1999) (rejecting Article III challenge to agency adjudication of violations of 8 U.S.C. § 1324c); *see also* Curtis, 415 U.S. at 193, 94 S.Ct. 1005 (recognizing that the Seventh Amendment does not apply to Title VII cases). Because § 1324b proceedings concern both immigration and employment law, the Court finds § 1324b proceedings protect public rights and are thus excepted from the Seventh Amendment.

**\*6** For these reasons, Plaintiff is not likely to succeed on the merits of its Article III and Seventh Amendment claims.

**IV. CONCLUSION**

For these reasons, Plaintiff's Motion (Dkt. No. 11) is **GRANTED in part and DENIED in part.** The Court holds that 8 U.S.C. § 1324b does not allow "administrative appellate review" by the Attorney General of OCAHO ALJ final orders. The Court **STAYS** the following administrative proceedings: *United States of America v. Space Exploration Technologies Corp. d/b/a SpaceX*, 2023-B-00082. The injunction becomes effective immediately and remains in effect pending the final disposition of this lawsuit. The Court waives the security requirement of Fed. R. Civ. P. 65(c).[3]

**All Citations**

--- F.Supp.3d ----, 2023 WL 8885128

**Footnotes**

1    "Review outside Article II ... cannot provide the necessary [executive] supervision" to comply with the Appointments Clause. *Arthrex*, 141 S. Ct. at 1982.

2    *See K&R Contractors, LLC v. Keene*, 86 F.4th 135, 148–149 (4th Cir.2023) (recognizing the split between the Fifth and Ninth circuits about whether the dual for-cause limitations on the removal of ALJs in 5 U.S.C. §§ 1202(d) and 7521 are constitutional).

3    Neither party raised the security requirement, so no security is ordered. *See Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, —— F.Supp.3d ——, ——, 2023 WL 6613080, at *22 (N.D. Tex. Oct. 7, 2023).

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

2015 WL 9948936
United States District Court, C.D. California.

TOP RANK, INC.

v.

Alan HAYMON, et al.

CV 15–4961–JFW (MRWx)

Signed 10/16/2015

**Attorneys and Law Firms**

Daniel M. Petrocelli, David Marroso, James Michael Pearl, Stephen Mcintyre, O'Melveny and Myers LLP, Los Angeles, CA, for Plaintiffs.

Howard Weitzman, Jeremiah Tracy Reynolds, Kinsella Weitzman Iser Kump and Aldisert LLP, Santa Monica, CA, Barry H. Berke, Marjorie E. Sheldon, Norman C. Simon, Kramer Levin Naftalis and Frankel LLP, New York, NY, Russell F. Sauer, Monica R. Klosterman, Robin A. Kelley, Thomas Rickeman, Latham & Watkins LLP, Los Angeles, CA, Brendan A. McShane, Christopher S. Yates, Latham and Watkins LLP, San Francisco, CA, for Defendants.

**PROCEEDINGS (IN CHAMBERS): ORDER GRANTING IN PART THE HAYMON DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6) [filed 8/31/2015; Docket No. 60];**

**ORDER GRANTING WADDELL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) [filed 8/31/2015; Docket No. 61]**

HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

**\*1** On August 31, 2015, Defendants Alan Haymon, Haymon Boxing LLC ("Haymon Boxing"), Haymon Sports LLC ("Haymon Sports"), Haymon Holdings LLC ("Haymon Holdings"), and Alan Haymon Development, Inc. ("Haymon Development") (collectively, the "Haymon Defendants") filed a Motion to Dismiss Pursuant to FRCP 12(b)(6) ("Motion to Dismiss") [Docket No. 60]. On September 18, 2015, Plaintiff Top Rank, Inc. ("Plaintiff" or "Top Rank")

filed its Opposition [Docket No. 79]. On September 25, 2015, the Haymon Defendants filed a Reply [Docket No. 81].

On August 31, 2015, Defendants Waddell & Reed Financial, Inc. ("W & R Financial"), Waddell & Reed Investment Management Company ("WRIMCO"), Ivy Investment Management Company ("IICO"), and Media Group Holdings, LLC ("MGH") (collectively, the "Waddell Defendants") filed a Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss") [Docket No. 61]. On September 18, 2015, Top Rank filed its Opposition [Docket No. 78]. On September 25, 2015, the Waddell Defendants filed a Reply [Docket No. 80].

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7–15, the Court found these matters appropriate for submission on the papers without oral argument. The matters were, therefore, removed from the Court's October 5, 2015 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I. FACTUAL AND PROCEDURAL BACKGROUND**

In its First Amended Complaint filed on August 3, 2015, Top Rank alleges that the Haymon Defendants, "[w]ith the financial backing, complicity, strategic planning, and material assistance" of the Waddell Defendants, are seeking to monopolize and restrain trade in the markets for managing and promoting "Championship–Caliber Boxers" in the United States. First Amended Complaint ("FAC") at ¶¶ 1, 3, 137–155. Top Rank alleges that the Haymon Defendants' and Waddell Defendants' conduct violates the Sherman Act, the Muhammad Ali Boxing Reform Act, and other federal and state laws. FAC at ¶¶ 137–184.

**A. The Parties**

Plaintiff Top Rank is a boxing promoter licensed in the States of California and Nevada, among others. FAC at ¶ 9.

Defendant Alan Haymon, and the other Haymon Defendants, are allegedly engaged in the business of professional boxing management as well as the business of professional boxing promotion throughout the United States. FAC at ¶ 122. The Haymon Defendants have approximately 200 fighters in their management stable, including current and former world champions Adonis Stevenson, Danny Garcia, Adrien Broner,

2015-2 Trade Cases P 79,332

Anthony Dirrell, Peter Quillin, and Keith Thurman. FAC at ¶ 45.

The Waddell Defendants are asset management and investment advisory firms. Specifically, W & R Financial is a "publicly traded asset management and financial planning company." FAC at ¶ 15. WRIMCO and IICO, subsidiaries of W & R Financial, are a "national investment advisory business" and a "registered investment advisor for [W & R Financial's] 'Ivy Funds,' " respectively. FAC at ¶¶ 16–17. MGH, a Delaware series LLC, is alleged to be a subsidiary of W & R Financial and the vehicle through which the Waddell Defendants invested in the Haymon Defendants. FAC at ¶¶ 18, 57. MGH is allegedly a member of Haymon Holdings. FAC at ¶ 18. According to the First Amended Complaint, the Waddell Defendants are allegedly agents and alter egos of one another. FAC at ¶ 19.

### B. The Haymon Defendants' Alleged Conduct

**\*2** As discussed in greater detail below, Top Rank alleges that the Haymon Defendants have engaged in at least four types of anticompetitive and tortious behavior: (1) inducing professional boxers to enter unlawful "tie out" agreements, which prevent the boxers from "freely" or "independently" contracting with legitimate promoters (FAC at ¶¶ 63–66, 137–144); (2) illegally acting as a promoter and fraudulently operating in the promotion business through a network of "sham promoters;" (FAC at ¶¶ 72–82, 147); (3) blocking legitimate promoters' access to major venues through fraud, overbooking, and other unlawful means (FAC at ¶¶ 97–100, 147); and (4) utilizing predatory "payola" practices, i.e., preventing legitimate promoters from access to television broadcasters through exclusive dealing, overbooking, and other unlawful means (FAC at ¶¶ 83-96).

#### 1. *"Tie Out" Contracts and "Sham Promoters"*

The Haymon Defendants allegedly require boxers to sign long-term, exclusive management agreements, which prevent boxers from entering into contracts with "legitimate" promoters without the Haymon Defendants' express consent. FAC at ¶¶ 63–66. Top Rank alleges that the Haymon Defendants, on one occasion, withheld their consent and refused to allow Roc Nation to promote a bout involving one of the Haymon Defendants' boxers. FAC at ¶ 80. In addition, Top Rank alleges that "in at least some instances," the Haymon Defendants employ the services of "sham promoters" that are controlled by the Haymon Defendants. FAC at ¶¶ 73, 82. Top Rank alleges that the use of these "tie out" contracts and "sham promoters" excludes legitimate promoters from accessing and promoting many of the industry's top boxers and allows the Haymon Defendants to act illegally as both manager and promoter in violation of the "firewall" provisions of the Muhammad Ali Boxing Reform Act. FAC at ¶¶ 65, 82.

#### 2. *Predatory "Payola" Practices*

The Haymon Defendants have allegedly reversed the ordinary flow of money between television broadcasters and promoters by purchasing air time with over half a dozen leading broadcasters to air fights involving Haymon-contracted boxers under the "Premier Boxing Champions" ("PBC") brand. FAC at ¶¶ 6, 86, 87, 92. Top Rank alleges that the Haymon Defendants have obtained "exclusive commitments," from broadcasters, either tacit or express, and have locked up over 100 different dates, allegedly leaving no room, dates, or opportunities for other promoters or fighters. FAC at ¶¶ 6, 87, 94. Top Rank alleges that, between paying the broadcasters for air time and the expenses of promoting each televised match, the Haymon Defendants are operating significantly below cost in the short term so that they can expand their presence in the boxing promotion business, eliminate competition from promoters, build a monopoly, and ultimately charge supracompetitive prices. FAC at ¶¶ 6, 92, 93.

#### 3. *Venue Blocking*

Top Rank alleges that the Haymon Defendants have used their dominant position in the management market to block legitimate promoters from obtaining favorable dates at top venues. FAC at ¶¶ 4, 97–100. Specifically, Top Rank alleges that two promoters, Golden Boy and Banner Promotions, recently attempted to stage a fight between Ruslan Provodnikov and Lucas Matthyse at the StubHub Center in Carson, California. FAC at ¶ 97. The fight was originally scheduled for March 28, 2015. FAC at ¶ 97. However, Top Rank alleges that the Haymon Defendants "locked up" the desired date for the Provodnikov–Matthyse fight at the StubHub Center (as well as other Southern California venues), ostensibly to host a fight between Jhonny Gonzalez and Garry Russell Jr. FAC at ¶¶ 97–98. Because the StubHub Center and other Southern California venues were

2015-2 Trade Cases P 79,332

booked, Golden Boy and Banner Promotions were forced to move the fight to another location. FAC at ¶ 98. As soon as the Provodnikov–Matthyse fight was relocated, the Haymon Defendants allegedly moved the Gonzalez–Russell fight to The Palms in Las Vegas. FAC at ¶ 98. Top Rank alleges that the Haymon Defendants' purpose in "locking up" the StubHub Center and alternative Southern California venues was to "lock out" the Provodnikov–Matthyse fight and prevent any possible cannibalization of tickets sales in the same local area for the Haymon Defendants' bout between Julio Cesar Chavez, Jr. and Andrzej Fonfara, which was scheduled to take place at the StubHub Center just three weeks later, on April 18, 2015. FAC at ¶ 98.

### C. The Waddell Defendants' Alleged Conduct

**\*3** Top Rank alleges that Ryan Caldwell, a senior executive and portfolio manager of W & R Financial, WRIMCO, and IICO, had ambitions to "own live sports." FAC at ¶ 56. After discussions with Alan Haymon, he allegedly agreed that the Waddell Defendants would "commit funding, business expertise, and operational supervision" to the Haymon Defendants. FAC at ¶ 56 Pursuant to that agreement, the Waddell Defendants arranged for at least four investment funds, under the management of WRIMCO and IICO, to collectively purchase hundreds of millions of dollars of "Series H" stock in MGH. FAC at ¶ 57. MGH in turn invested these funds in Haymon Holdings on August 29, 2013 and October 31, 2013. FAC at ¶ 57.

On August 29, 2013, concurrent with its investment, MGH entered into an Amended and Restated Limited Liability Company Agreement with respect to Haymon Holdings (which is, in turn, the managing member of Haymon Sports). FAC at ¶ 58. The Agreement provided that MGH would become a "member" of Haymon Holdings, along with Haymon Development and at least one other member. FAC at ¶ 58. Pursuant to the Agreement, MGH is allegedly entitled to appoint two "Observers" to Haymon Holdings' Board of Directors, who receive all of the information provided to any Board member, and who, in the past, had the power to convene special meetings of the Board of Directors. FAC at ¶ 59. In addition, MGH allegedly possesses approval rights (or veto power) over Haymon Holdings' and its subsidiaries' "Major Decisions," including those related to material contracts, any material change in business, adoption of annual budgets and business plans, and any material action or material expenditure. FAC at ¶ 61.

In addition to the Waddell Defendants' alleged investment in Haymon Holdings, Top Rank alleges that Ryan Caldwell, and other representatives of the Waddell Defendants: (1) attended meetings and engaged in negotiations for the possible acquisition of Golden Boy Promotions, one of the industry's premier promoters (FAC at ¶¶ 67–71); [1] and (2) attended meetings and engaged in negotiations with broadcasters to reassure them that the Haymon Defendants had adequate funding for their new PBC boxing venture and alleged "payola" scheme (FAC at ¶¶ 91, 95).

The remainder of the allegations concerning the Waddell Defendants consist of impermissible group pleading, i.e., lumping the Waddell Defendants and the Haymon Defendants together, or are bare legal conclusions cleverly disguised as factual allegations.

### D. Top Rank's Claims

In its First Amended Complaint filed on August 3, 2015, Top Rank alleges the following claims for relief against all defendants: (1) unlawful "tie out" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (3) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (4) injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26; (5) violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 et seq.; (6) violation of the California Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200 et seq.; and (7) tortious interference with prospective economic advantage.

The Haymon Defendants and the Waddell Defendants move to dismiss all of the claims asserted against them for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " *Summit Technology, Inc. v. High–Line Medical Instruments Co., Inc.,* 922 F.Supp. 299, 304 (C.D.Cal.1996) (quoting *Balistreri v. Pacifica Police*

*Dept.,* 901 F.2d 696, 699 (9th Cir.1988)). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

**\*4** In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.,* 135 F.3d 658, 661 (9th Cir.1998). "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Technology,* 922 F.Supp. at 304 (citing *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981) *cert. denied,* 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g., id.*; *Branch v. Tunnel,* 14 F.3d 449, 454 (9th Cir.1994).

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend. Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. *See, e.g., DeSoto v. Yellow Freight System, Inc.,* 957 F.2d 655, 658 (9th Cir.1992). However, a Court does not need to grant leave to amend in cases where the Court determines that permitting a plaintiff to amend would be an exercise in futility. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

## III. THE HAYMON DEFENDANTS' MOTION TO DISMISS

### A. The Sherman Act Claims

Top Rank alleges three claims for violation of the Sherman Act—two claims for violation of Section 1, which governs unreasonable restraints of trade and tying,[2] and one claim for violation of Section 2, which governs attempted monopolization.[3] The Haymon Defendants move to dismiss Top Rank's three Sherman Act claims, arguing that they suffer from certain common pleading defects, including Top Rank's (1) failure to adequately plead antitrust injury; (2) failure to adequately define the relevant markets; (3) failure to adequately allege market power; and (4) impermissible reliance on group pleading.

In addition, the Haymon Defendants move to dismiss each Sherman Act claim on individual grounds. The Court addresses the common pleading requirements first, and then the pleading requirements for each individual claim.

#### 1. *Common pleading requirements*

##### a. *Antitrust injury*

**\*5** The Haymon Defendants move to dismiss Top Rank's antitrust claims on the grounds that Top Rank has failed to allege "antitrust injury." Specifically, the Haymon Defendants argue that Top Rank has failed to allege injury to itself or to competition.

A plaintiff may only pursue an antitrust action if it can show "antitrust injury," i.e., "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) (quoting *Brunswick v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977)). The four requirements for antitrust injury are: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California,* 190 F.3d 1051, 1055 (9th Cir.1999). "Injury of the type antitrust laws were intended to prevent" means harm to competition,

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 207 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

not harm to individual competitors. *See* Brunswick, 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962)) ("The antitrust laws ... were enacted for 'the protection of competition not competitors.' "). In order to plead harm to competition sufficiently to withstand a motion to dismiss, a claimant "may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 507–08 (9th Cir.1989). "Rather, a claimant must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail." *Id.* at 508.

The Court concludes that Top Rank has not adequately alleged injury to itself, which is not only an element of antitrust injury, but also of Article III standing. As discussed, Top Rank alleges that the Haymon Defendants engage in unlawful conduct in the form of exclusionary "tie out" contracts, the use of "sham" promoters, predatory "payola practices," and venue blocking. However, as the Haymon Defendants point out, Top Rank has failed to allege how it has been injured by the alleged conduct. Indeed, it has not identified a single bout that it has attempted to promote but was precluded from promoting by the Haymon Defendants, a single venue from which it has been blocked, or a single network that has refused to broadcast a fight promoted by Top Rank. Top Rank correctly argues that competitors who are "frozen out" of a market by an antitrust violation have suffered antitrust injury and possess antitrust standing. However, Top Rank has failed to allege any facts demonstrating that it has actually been "frozen out" by any of the Haymon Defendants' conduct.

With respect to the alleged "tie out," for example, Top Rank only alleges that the Haymon Defendants, on one occasion, withheld their consent and refused to allow Roc Nation to promote a bout involving one of the Haymon Defendants' boxers. FAC at ¶ 80. With respect to venue blocking, Top Rank only alleges that the Haymon Defendants blocked Golden Boy and Banner Promotions from booking a venue for a single fight. FAC at ¶¶ 97–98. With respect to the alleged "payola practice," Top Rank merely alleges that the Haymon Defendants have booked "over 100 different show dates" on "over half a dozen major broadcasters" and that the Haymon Defendants obtained undefined "exclusivity commitments (tacit or express)". FAC at ¶ 94. These alleged actions may not have affected all promoters equally, may not have affected certain promoters at all, and in fact, may have even helped certain promoters. Without any additional factual allegations,

the Court cannot determine whether Top Rank has alleged an injury-in-fact, let alone whether that injury flows from that which makes the conduct unlawful.

### b. *Market definition*

**\*6** The Haymon Defendants also move to dismiss Top Rank's Sherman Act claims on the grounds that Top Rank has not adequately defined the relevant markets.

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." *Newcal Indus., Inc. v. Ikon Office Sol.,* 513 F.3d 1038, 1044 (9th Cir.2008). Allegations concerning the relevant market and the defendant's market power are required under both Section 1 and Section 2 of the Sherman Act. *Id.* at 1044 n.3 ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the [Sherman] Act....").

The relevant market definition must include both a product market and a geographic market. *Id.* at 1045 n.4. The product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* at 1045. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States,* 370 U.S. 294, 325 (1962).

As the Ninth Circuit has held, "there is no requirement that [the relevant market and defendant's market power] ... be pled with specificity." *Newcal,* 413 F.3d at 1045. "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. And since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Id.* A complaint, however, may be dismissed under Rule 12(b)(6) if the complaint's "relevant market" definition is "facially unsustainable." *Id.*

In this case, Top Rank identifies two relevant markets: (1) the market for the management of Championship–

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 208 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

Caliber Boxers [4] in the United States; and (2) the market for the promotion of Championship–Caliber Boxers in the United States. The Court cannot conclude that these market definitions are facially unsustainable, especially given that the Supreme Court upheld a market definition for the "promotion of championship boxing contests" in the United States (albeit over 50 years ago). *See Int'l Boxing Club of New York, v. United States, 358 U.S. 242, 249–52 (1959); United States v. Int'l Boxing Club of New York, 150 F.Supp.397, 418–21 (S.D.N.Y.1957).* Although these market definitions may prove to be unsustainable on a motion for summary judgment, the Court concludes that they survive scrutiny on a motion to dismiss under Rule 12(b)(6).

### c. Market power

*\*7* Although the Court concludes that Top Rank's definitions of the relevant markets survive the pleading stage, the Court concludes that Top Rank has failed to adequately allege market power or economic power within those markets.

Each of Top Rank's Sherman Act claims requires Top Rank to allege market power or economic power in the relevant market. *Newcal, 513 F.3d at 1044 n.3 (9th Cir.2008)* ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the [Sherman] Act."). The relevant market for the tying claim is the alleged market for management of Championship–Caliber Boxers. *See Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 46 (2006)* ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."); FAC at ¶ 141 (alleging that the tying product is the management of Championship–Caliber Boxers). The relevant markets for the conspiracy claim are the alleged markets for the management and promotion of Championship–Caliber Boxers. [5] *See Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 768 (1984)* (equating analysis under "rule of reason" for alleged unreasonable restraints under Section 1 to "an inquiry into market power and market structure designed to assess the combination's actual effect"); FAC at ¶ 147 (alleging an unreasonable restraint of trade in both the management and promotion markets). And, finally, the relevant market for the attempted monopolization claim is the alleged market for the promotion of Championship–Caliber Boxers. *Spectrum Sports, Inc. v.*

*McQuillan, 506 U.S. 447, 459 (1993)* ("[D]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."); FAC at ¶ 152 (alleging attempted monopolization of the promotion market).

Market power is the ability "(1) to price substantially above the competitive level and (2) to persist in doing so for a significant period without erosion by new entry or expansion." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501. Market power may be demonstrated through either of two types of proof: (1) "direct evidence of the injurious exercise of market power," i.e., "evidence of restricted output and supracompetitive prices;" or (2) more commonly, "circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co., Inc. v. Atl. Richfield Co., 51 F.3d 1421, 1434 (9th Cir.1995).* "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* Although market power need not be pled with specificity, the allegations must be sufficiently detailed "to raise a right to relief above the speculative level." *Rick–Mik Enters., Inc. v. Equilon Enters. LLC, 532 F.3d 963, 973 (9th Cir.2008)* (quoting *Twombly, 550 U.S. at 555*).

*\*8* In this case, the Court concludes that Top Rank has failed to adequately allege that the Haymon Defendants possess market power or economic power in either of the relevant markets. With respect to the management market, Top Rank's allegations of the Haymon Defendants' market power are completely disconnected from the relevant market definition. Top Rank defines the relevant market as the market for the management of "Championship–Caliber Boxers" in the United States. FAC at ¶ 104. Yet, Top Rank's allegations supposedly reflecting the Haymon Defendants' "dominant share" of that market are not limited to Championship–Caliber Boxers, but encompass *all* boxers. Specifically, Top Rank alleges that:

> Haymon's stable includes approximately 200 fighters, including numerous Championship–Caliber Boxers. No other boxing manager

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 209 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

represents more than a handful of boxers. While Plaintiff does not have access to precise figures, Plaintiff alleges that Haymon's share of this relevant market is greater than 50%.

FAC at ¶ 119. As the Haymon Defendants point out, "Top Rank alleges no such facts or figures concerning *Championship–Caliber Boxers* : how many of them there are, how many promoters promote them, how many managers manage them, or how many of them the Haymon Defendants manage." Reply [Docket No. 81] at 5. Moreover, although Top Rank alleges that "Haymon's share of this relevant market is greater than 50%," the Court has no idea how Top Rank arrived at this figure, or whether it is limited to the management of Championship–Caliber Boxers. Top Rank's Opposition, rather than clarifying the issue, merely repeats the same confusing allegations, and, in fact, creates additional confusion. *See, e.g.,* Opposition [Docket No. 79] at p. 25 ("Top Rank did allege the approximate number of boxers Defendants manage, averred that their control exceeds 50% of the overall market, and is at least 15 times greater than any other manager."). Although the Court agrees with Top Rank that it does not have to allege an exact, percentage-based market share, Top Rank must include enough facts to raise its right to relief above the speculative level. The Court concludes that Top Rank has failed to do so. *See* 🔖 *Rick–Mik Enters., Inc.,* 532 F.3d at 972–73 (finding the allegations of market power inadequate where the allegations related to the retail gasoline market and not the relevant market for franchises).

Top Rank's allegations with respect to the Haymon Defendants' market power or economic power in the promotion market are even weaker, more speculative, and virtually non-existent. Indeed, although Top Rank contends that it has alleged the Haymon Defendants' economic power circumstantially, Top Rank utterly fails to allege any facts concerning the Haymon Defendants' market share in the promotion market, and instead relies on the same flawed allegations concerning the Haymon Defendants' power in the management market. *See* FAC at ¶¶ 119–121 (only alleging that the Haymon Defendants possess market power in the management market); Opposition [Docket No. 79] at p. 26 (relying on allegations related to Defendants' power in the management market).

Although Top Rank argues that it has also alleged direct evidence of the Haymon Defendants' market power, based on, for example, their ability to elicit "exclusionary" terms from broadcasters and to make "exclusionary demands" of venues, these conclusory allegations are insufficient. Although Top Rank may allege market power through "direct evidence of the injurious exercise of market power," i.e., "evidence of restricted output and supracompetitive prices," *see* 🔖 *Rebel Oil,* 51 F.3d at 1434, Top Rank fails to allege any evidentiary facts plausibly suggesting restricted output or supracompetitive prices in the promotion market.

**\*9** Accordingly, the Court concludes that Top Rank has failed to allege market power in either the management market or promotion market for Championship–Caliber Boxers.

### d. *Group pleading*

The Haymon Defendants also move to dismiss Top Rank's antitrust claims on the grounds that Top Rank's allegations draw no meaningful distinctions between or among the nine defendants against whom they are collectively asserted.

The Court agrees that Top Rank has impermissibly relied on group pleading, *especially* by lumping the Waddell Defendants and the Haymon Defendants together. Accordingly, in its Second Amended Complaint, Top Rank shall allege the specific conduct engaged in by each of the remaining defendants.

### 2. *Pleading Requirements for Individual Claims*

### a. *Tying in violation of Section 1 of the Sherman Act (Count I)*

In its first claim for relief, Top Rank alleges that the Haymon Defendants have violated Section 1 of the Sherman Act by entering into unlawful "tying" or "tie out" arrangements. Specifically, Top Rank alleges that the Haymon Defendants condition the provision of their management services on the boxers' agreement "to not contract with legitimate boxing promoters without [the Haymon Defendants'] consent." FAC at ¶ 139. The Haymon Defendants move to dismiss the tying claim on the grounds that the alleged "tie out" does not, on its face, constitute a tie out. [6]

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 210 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 912 (9th Cir.2008). "To accomplish this objective, the competitor agrees 'to sell one product (the tying product) but only on the condition that the buyer also purchase a different product (the tied product), or at least agrees that he will not purchase the tied product from any other supplier.' " *Paladin Assocs., Inc. v. Mont. Power Co.,* 328 F.3d 1145, 1159 (9th Cir.2003) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 461 (1992)). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to *force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 (1984) (emphasis added). "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Cascade,* 515 F.3d at 912.

**\*10** A tying arrangement is a *per se* violation[7] of Section 1 of the Sherman Act if the plaintiff establishes that: "(1) the defendant tied together the sale of two distinct products or services; (2) the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *See Cascade,* 515 F.3d at 912; *Paladin Assocs.,* 328 F.3d at 1159 (citing *Eastman Kodak,* 504 U.S. at 461–62).

The Court concludes that Top Rank has failed to allege sufficient facts to support its per se tying claim. As previously discussed, Top Rank has failed to adequately allege that the Haymon Defendants possess market or economic power in the management market and has failed to allege injury to itself. Moreover, although Top Rank's allegations are carefully and creatively worded, Top Rank has failed to allege that the Haymon Defendants tied together the sale of two distinct services. Indeed, Top Rank merely alleges that the Haymon Defendants' management agreement provides that boxers cannot contract with promoters without the

Haymon Defendants' consent. *See* FAC at ¶ 64 ("These purported management agreements – which Haymon often styles as 'advisor contracts' – not only lock up managerial rights, but also restrict boxers from entering into any other agreement, including those related to promotional rights, without Haymon's express consent."); FAC at ¶ 139 ("Haymon's 'advisor' contracts with Championship–Caliber Boxers contain exclusionary provisions that condition his professional services on the boxers' agreement to not contract with legitimate boxing promoters without his consent. These agreements constitute unlawful 'tying' or 'tie out' arrangements."). Contrary to Top Rank's argument, this "consent" provision does not, on its face, tie two services together (management services and promotion services). *See Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 712 (11th Cir.1984) ("An approved source requirement is not, alone, illegal. Only if a franchisee is coerced into purchasing products from a company in which the franchisor has a financial interest does an illegal tie exist." ); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1753g ("And when there are many approved suppliers in which the defendant lacks a financial interest, the products should not be deemed tied together because buyers have not been denied a competitive market in the tied product.").

Top Rank correctly argues that illegal tying arrangements need not be express, and that "consent" clauses may practically function as unlawful tying arrangements. *See, e.g.,* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1753g ("To be sure, a tie-in would exist if the willingness to approve others is merely a charade."); *Tix–X–Press, Inc. v. Omni Promotions Co. of Ga.,* 815 F.2d 1407, 1416 (11th Cir1987) ("Where a contract ... provides that buyers shall use only the seller or a source 'approved' by the seller to purchase the tied product, the courts have looked to see if the approval clause was reasonable and permitted the buyer meaningful freedom of choice, or whether it is manipulated by the seller to force the buyer to purchase the tied product from the seller."). However, Top Rank's First Amended Complaint is devoid of any factual allegations demonstrating that the consent clause functioned, in practice, as a tying arrangement or "tie out," at least with respect to Top Rank. Indeed, Top Rank does not allege, for example, that it was generally understood that boxers in the Haymon Defendants' management stable were not allowed to contract with all or even certain legitimate promoters or that they were required to use one of the Haymon Defendants' alleged sham promoters.[8] Rather, all that Top Rank alleges is that "in at least some instances," the Haymon

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 211 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

Defendants' boxers have used "sham promoters" who are in fact controlled by the Haymon Defendants, and, on *one* occasion, the Haymon Defendants withheld their consent and did not allow one of their boxers to fight in a bout promoted by Roc Nation. Without any additional factual allegations supporting the existence of a de facto tying arrangement, these allegations fail to state a plausible tying claim. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1755c ("Absent an announced or reasonably understood tying condition, ... two products have not been tied together.");

🚩 *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 722 (7th Cir.1979) ("Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause.").

**\*11** For the foregoing reasons, the Haymon Defendants' Motion to Dismiss Top Rank's claim for an unlawful "tie out" in violation of Section 1 of the Sherman Act (Count I) is **GRANTED.**

### b. *Conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II)*

In its second claim for relief, Top Rank alleges that the Haymon Defendants entered into a contract, combination, or conspiracy (with the Waddell Defendants, Championship–Caliber Boxers, boxing venues, television broadcasters, advertisers, sponsors and/or "sham promoters") in restraint of trade in violation of Section 1 of the Sherman Act, 🚩 15 U.S.C. § 1. FAC at ¶¶ 145–150. In addition to the grounds previously discussed, the Haymon Defendants move to dismiss this claim on the grounds that it lacks the requisite factual specificity.

"To state a claim under Section 1 of the Sherman Act, 🚩 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." 🚩 *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir.2008).

As discussed, Top Rank fails to state a claim for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act because it fails to adequately allege that the Haymon Defendants possess market power in either the management market or promotion market and has failed to adequately allege injury to itself. [9] Accordingly, the Haymon Defendants' Motion to Dismiss Top Rank's claim for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II) is **GRANTED.** However, with the exception of these defects, the Court concludes that, although Top Rank's First Amended Complaint is short on factual detail and clarity, Top Rank's allegations, for the most part, [10] sufficiently answer the basic questions of "who, did what, to whom (or with whom), where, and when?" 🚩 *Kendall,* 518 F.3d at 1048.

### c. *Attempted monopolization in violation of Section 2 of the Sherman Act (Count III)*

In its third claim for relief, Top Rank alleges that the Haymon Defendants "orchestrated a predatory and anticompetitive scheme to leverage Haymon's monopoly power in the market for management of Championship–Caliber Boxers, in an attempt to obtain a monopoly in the market for promotion of Championship–Caliber Boxers, in violation of Section 2 of the Sherman Act." FAC at ¶ 152.

**\*12** "A claim for attempted monopolization has three elements: 1) a specific intent to monopolize a relevant market; 2) predatory or anticompetitive conduct; and 3) a dangerous probability of success." 🚩 *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 542 (9th Cir.1991). In the Ninth Circuit, leveraging of a monopoly does not constitute an independent 🚩 Section 2 claim. 🚩 *Id.* at 546–49. However, "[i]f there is a dangerous probability that a monopoly will be created by leveraging conduct, then the conduct will be reached under the doctrine of attempted monopoly." 🚩 *Id.* at 549.

"[D]emonstrating the dangerous probability of monopolization in an attempt case [ ] requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." 🚩 *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993). In this case, Top Rank

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 212 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

alleges attempted monopolization of the promotion market. Although a lower percentage of market share can support a claim for attempted monopolization than that required for actual monopolization, as the Court has already concluded, Top Rank fails to allege *any* facts regarding the Haymon Defendants' economic power in the promotion market and thus has not alleged any facts to demonstrate that the Haymon Defendants' economic power meets even this lower threshold. Accordingly the Court concludes that Top Rank has failed to state a claim for attempted monopolization. *See, e.g.,*

🏳 *ChriMar Sys., Inc v. Cisco Sys., Inc.,* 72 F.Supp.3d 1012, 1019–20 (N.D.Cal.2014) ("[A]lthough a lower percentage is required for an attempted monopoly claim, as opposed to an actual monopoly claim, HP must still allege sufficient market power."); 🏳 *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.,* 2013 WL 5694452, at \*15–16 (N.D.Cal. Oct. 18, 2013) (dismissing attempted monopolization claim for failure to adequately allege market power in the relevant market).

Accordingly, the Haymon Defendants' Motion to Dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act (Count III) is **GRANTED**.

### B. Injunctive Relief Under Section 16 of the Clayton Act (Count IV)

Section 16 of the Clayton Act "does not furnish an independent cause of action." 🏳 *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1051 (9th Cir.2008). "Rather, it allows the court to fashion relief upon a showing of a separate violation of the antitrust laws." *Id.* Because Top Rank has failed to state a claim for relief under Section 1 or Section 2 of the Sherman Act, the Haymon Defendants' Motion to Dismiss Top Rank's claim for injunctive relief under Section 16 of the Clayton Act (Count IV) is **GRANTED**.

### C. State Law Claims

The Haymon Defendants also move to dismiss Top Rank's claims for violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 et seq. (Count V), violation of the California Unfair Competition Law, 🏳 Cal. Bus. & Prof Code §§ 17200 et seq. (Count VI), and tortious interference with prospective economic advantage (Count VII).

The Court declines to address the Haymon Defendants' arguments relating to Top Rank's state law claims for relief

at this time. If Top Rank is able to cure the pleading defects with respect to its Sherman Act claims and states viable claims for relief under the Sherman Act (and Clayton Act), many of the pleading defects raised by the Haymon Defendants with respect to the state law claims will also be cured. On the other hand, if Top Rank ultimately fails to allege a viable federal claim for relief under the Sherman Act (or Clayton Act), the Court will likely decline to exercise supplemental jurisdiction over Top Rank's state law claims for relief. Accordingly, the Court **DEFERS** ruling on the Haymon Defendants' Motion to Dismiss Top Rank's claims for violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 et seq. (Count V), violation of the California Unfair Competition Law, 🏳 Cal. Bus. & Prof Code §§ 17200 et seq. (Count VI), and tortious interference with prospective economic advantage (Count VII).

### IV. THE WADDELL DEFENDANTS' MOTION TO DISMISS

### A. Claims for Violation of Section 1 of the Sherman Act (Counts I and II)

**\*13** The Waddell Defendants move to dismiss Top Rank's claims for violation of Section 1 of the Sherman Act, in relevant part, on the grounds that: (1) there are no allegations which plausibly suggest that the Waddell Defendants entered into an "illegal agreement;" (2) the Waddell Defendants are incapable of conspiring with the Haymon Defendants; and (3) there is no recognized claim for "aiding and abetting" a Sherman Act violation.

> *1. The allegations regarding the Waddell Defendants do not plausibly suggest an illegal agreement.*

As previously stated, "[t]o state a claim under Section 1 of the Sherman Act, 🏳 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition."

🏳 *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir.2008).

Whether a restraint is analyzed under the rule of reason or a per se rule, a claim for violation of Section 1 of the Sherman Act, "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007). In other words, the pleaded facts must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 555–56. "[T]erms like 'conspiracy,' or even 'agreement,' are borderline: they might well be sufficient in conjunction with a more specific allegation— for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint." *Id.* at 557 (quoting *DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 56 (1st Cir.1999)). Indeed, "[a] bare allegation of conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements daily." *Kendall,* 518 F.3d at 1047. Importantly, "[a]llegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Id.* at 1049.

When the First Amended Complaint is stripped of conclusory statements, legal conclusions disguised as factual allegations, and group pleading allegations, the allegations regarding the Waddell Defendants can be summarized as follows: (1) the Waddell Defendants are investment advisors; (2) the Waddell Defendants made an investment in Haymon Holdings through MGH; (3) as a result of that investment and pursuant to the "Amended and Restated Limited Liability Company Agreement," MGH allegedly possesses approval rights (or veto power) over Haymon Holdings' and its subsidiaries' "Major Decisions;" (4) Ryan Caldwell, and other representatives of the Waddell Defendants, attended meetings and engaged in negotiations for the possible acquisition of Golden Boy Promotions, which ultimately failed; and (5) Ryan Caldwell attended meetings and engaged in negotiations with broadcasters to reassure them that the Haymon Defendants had adequate funding for their new PBC boxing venture.

The Court concludes that these allegations do not plausibly suggest that the Waddell Defendants entered into a conspiracy or agreement to restrain trade. Indeed, the only agreements allegedly entered into by the Waddell Defendants (and supported by the facts alleged in the First Amended Complaint) are the alleged investment in Haymon Holdings and the corresponding Amended and Restated Limited Liability Company Agreement. [11] However, there is nothing about these agreements, standing alone, that suggest or hint of an agreement to restrain trade in the management or promotion markets, and these agreements are entirely consistent with rational, legal business behavior. "The antitrust laws are not offended by agreements as such, but only by those with an anticompetitive content." *49er Chevrolet, Inc. v. Gen. Motors Corp.,* 803 F.2d 1463, 1467 (9th Cir.1986).

**\*14** Top Rank has not alleged that the Waddell Defendants signed, or entered into, any of the other allegedly anticompetitive agreements described in the First Amended Complaint. Instead, Top Rank argues that it has adequately alleged that the Waddell Defendants entered into an "overarching" conspiracy or agreement to "eliminate competition in the markets for managing and promoting Championship–Caliber Boxers," and seeks to hold the Waddell Defendants liable for acts taken by the Haymon Defendants in furtherance of that alleged conspiracy. However, before the Waddell Defendants can be liable for acts taken by the Haymon Defendants in furtherance of the alleged conspiracy, Top Rank must allege sufficient facts, taken as true, to plausibly suggest that the Waddell Defendants were in fact members of the alleged conspiracy. As the Waddell Defendants point out in their Reply [Docket No. 80 at 3– 4], Top Rank's "overarching" conspiracy theory relies almost exclusively on paragraph 56 of the First Amended Complaint, which states in its entirety:

> The Waddell & Reed Defendants' *involvement in the conspiracy* began when a senior executive and portfolio manager with WRF, WRIMCO, and IICO named Ryan Caldwell was presented with an opportunity to meet Al Haymon. An avid boxing fan with ambitions to "own live sports," Caldwell leapt at the chance. Haymon first spoke with Caldwell from an office in Burbank, California. In the course of this and later discussions, Caldwell agreed that

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 214 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

the Waddell & Reed Defendants would commit funding, business expertise, and operational supervision to Haymon's *illegal scheme* — which was, in substantial part, directed at the State of California and at California businesses and consumers. From that time forward, the Waddell & Reed Defendants *actively participated in, and materially furthered, the plot to take over the boxing promotion business*.

FAC at ¶ 56 (emphasis added); Opposition [Docket No. 78] at 1, 6, 9, 10, 11, 12, 18, 24, 27 (relying on paragraph 56 of the First Amended Complaint). The allegations that the Waddell Defendants were involved in a "conspiracy", agreed to enter into an "illegal scheme," and "actively participated in, and materially furthered, the plot to take over the boxing promotion business" are conclusory statements coupled with legal conclusions that cannot support the existence of an agreement to restrain trade in violation of Section 1 of the Sherman Act.[12] *See Kendall*, 518 F.3d at 1048 ("Although appellants allege the Banks 'knowingly, intentionally and actively participated in an individual capacity in the alleged scheme' to fix the interchange fee or the merchant discount fee, this allegation is nothing more than a conclusory statement."). In fact, stripped of its conclusory statements, paragraph 56 merely alleges that Caldwell desired to "own live sports" and agreed that the Waddell Defendants would commit "funding, business expertise, and operational supervision" to the Haymon Defendants, which is consistent with and suggests rational, legal business behavior rather than an illegal conspiracy.

Top Rank also relies heavily on the Waddell Defendants' participation in meetings and negotiations regarding the failed acquisition of Golden Boy Promotions and their participation in meetings and negotiations with broadcasters regarding the Haymon Defendants' new PBC venture. However, this alleged conduct is also entirely consistent with the Waddell Defendants' ordinary business activities as asset management and investment advisory firms, and does not plausibly suggest that the Waddell Defendants entered into an "overarching conspiracy" to eliminate competition in the markets for the management and promotion of Championship–Caliber Boxers.

**\*15** Accordingly, the Court concludes that Top Rank has failed to allege sufficient facts to suggest that the Waddell Defendants entered into an illegal agreement to restrain trade.

### 2. *The Waddell Defendants cannot conspire with the Haymon Defendants as a matter of law.*

Moreover, even if the Waddell Defendants "agreed" to participate in the Haymon Defendants' alleged anticompetitive scheme, the Court concludes that the Waddell Defendants are not legally capable of conspiring with the Haymon Defendants under Section 1 of the Sherman Act. Rather, the Court concludes that the conduct of the Haymon Defendants and the Waddell Defendants must be viewed as that of a single enterprise.

"The Sherman Act contains a 'basic distinction between concerted and independent action.' " *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761 (1984)). "Sherman Act § 1 reaches concerted action in unreasonable restraint of trade, while § 2 covers unilateral action only when monopoly power is present or attempted." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1402a. "Concerted activity subject to § 1 is judged more sternly than unilateral activity under § 2." *Copperweld*, 467 U.S. at 768.

Accordingly, in analyzing any Section 1 claim, the Court must first determine whether the alleged contract, combination, or conspiracy constitutes "concerted action." Although the Waddell Defendants and the Haymon Defendants are legally distinct entities, that does not automatically result in the conclusion that there is concerted action for the purposes of Section 1 of the Sherman Act. As the Supreme Court explained:

[S]ubstance, not form, should determine whether a[n] ... entity is capable of conspiring under § 1. This inquiry is sometimes described as asking whether the alleged conspirators are a single entity.

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 215 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

That is perhaps a misdescription, however, because the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged 'contract, combination ..., or conspiracy' is concerted action – that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a 'contract, combination ... or conspiracy' amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition.

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (internal quotations and citations omitted). Two Supreme Court cases – Copperweld and American Needle – demonstrate the application of these principles. In Copperweld, the Supreme Court held that a parent corporation and its wholly owned subsidiary were not legally capable of conspiring, reasoning:

A parent and its wholly owned subsidiary have a complete unity of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.... With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different

interests, and there is no justification for § 1 scrutiny.

**\*16** *Copperweld*, 467 U.S. at 771. In contrast, in American Needle, the Supreme Court held that the licensing activities of National Football League Properties ("NFLP") —a corporate joint venture formed by thirty-two National Football League teams to manage their intellectual property —constituted "concerted activity." *Am. Needle, 560 U.S. at 196–202.* The Supreme Court partially relied on the fact that the teams compete in the market for intellectual property, and concluded that, "[a]lthough NFL teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned." *Id. at 198.* Accordingly, "[t]hirty-two teams operating independently through the vehicle of the NFLP are not like the components of a single firm that act to maximize the firm's profits. The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's well-being." *Id. at 201.*

Applying these principles, the Court concludes that the Waddell Defendants' alleged "agreement" with the Haymon Defendants does not constitute "concerted action" for the purposes of Section 1. As pled by Top Rank, the Waddell Defendants and the Haymon Defendants share a complete unity of economic interest in the venture's success, and have no alleged separate interest, at least as it relates to the relevant management and promotion markets. Indeed, as investors, the Waddell Defendants are similar to the "components of single firm that act to maximize the firm's profits." [13] *Am. Needle, 560 U.S. at 201.* Moreover, the Waddell Defendants, as asset management and investment advisory firms, are not actual or potential competitors of the Haymon Defendants. [14] Accordingly, their alleged venture with the Haymon Defendants does not "deprive[ ] the marketplace of independent centers of decisionmaking," or of a "diversity of entrepreneurial interests," and "thus of actual or potential competition." *Am. Needle, 560 U.S. at 195.*

Accordingly, the Court concludes that the Waddell Defendants cannot, as a matter of law, conspire with the Haymon Defendants.

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 216 of 247

**Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)**

2015-2 Trade Cases P 79,332

### 3. *The Waddell Defendants cannot be held liable as "aiders and abetters."*

Top Rank contends that, even if the Waddell Defendants are not members of the conspiracy, they can be held liable as "aiders and abetters" of that conspiracy. However, the Court concludes that aiding and abetting is not an independent theory of civil liability under the Sherman Act. *See* *MCI Telecomms. Corp. v. Graphnet, Inc.,* 881 F.Supp. 126, 129 (D.N.J.1995)* ("Because the Sherman Act is a statute providing for civil damages for violative conduct and fails to explicitly provide for aiding and abetting liability, none will be presumed unless there is sufficient evidence of congressional intent to the contrary."). Moreover, even if it is an independent theory of civil liability under the Sherman Act, for the same reasons that the Waddell Defendants are not capable of conspiring with the Haymon Defendants, the Court concludes that the Waddell Defendants are not capable of aiding and abetting the Haymon Defendants. *Cf* *id.* at 131 (noting that the "Graphnet's efforts to allege antitrust aiding and abetting against MCIT seem ... to be primarily an attempt to circumvent the limitation on intraenterprise conspiracy claims" and dismissing the antitrust counterclaim).

**\*17** For the foregoing reasons, the Waddell Defendants' Motion to Dismiss Top Rank's claims for unlawful 'tie out' in violation of Section 1 of the Sherman Act (Count I) and for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II) is **GRANTED**.

### B. Attempted Monopolization in Violation of Section 2 of the Sherman Act (Count III)

The Waddell Defendants move to dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act, on the grounds that the Waddell Defendants are not competitors in the relevant market.

The Court agrees. *See, e.g.,* *name.space, Inc. v. Internet Corp. for Assigned Names and Numbers,* 795 F.3d 1124, 1131 (9th Cir.2015) ("Because ICANN is not a competitor in any of the three markets, they cannot serve as the basis for a § 2 monopoly claim."); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1075 (11th Cir.2004) ("There is no question that CC does not participate in the Spanish-language radio market. Thus, CC cannot attempt to monopolize that market.") (cited favorably by *name.space, Inc.,* 795 F.3d at 1131); *Transphase Sys., Inc. v. S. Cal. Edison Co.,* 839 F.Supp. 711, 717 (C.D.Cal.1993) ("It is axiomatic in antitrust law that a defendant may not be found liable under the Sherman act for monopolizing or attempting or conspiring to monopolize a market unless that defendant is a competitor in the relevant market and his conduct creates a dangerous probability that he will gain a dominant share of the market.").

Top Rank argues that it has sufficiently alleged that the Waddell Defendants are competitors in the relevant market. However, as stated in footnote 14, those allegations are solely based on the Waddell Defendants' investment and alleged management and control over Haymon Holdings via their veto or approval power over "Major Decisions." The Court concludes that these allegations are insufficient to find that the Waddell Defendants are competitors in the relevant markets. "[O]ne company's minority ownership interest in another company is not sufficient by itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiaries rivals. To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.,* 148 F.3d 1080, 1088 (D.C.Cir.1998); *see also* *Spanish Broad. Sys. of Fla., Inc.,* 376 F.3d at 1075 ("Absent allegations of significant control over the policies of a subsidiary, a minority ownership share does not convert a parent corporation into a competitor."). In other words, Top Rank would have to allege a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. *See* *Caribbean Broad. Sys., Ltd.,* 148 F.3d at 1088–89. However, Top Rank disavows any reliance whatsoever on a a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. *See* Opposition [Docket No. 78] at 7 n.3. Accordingly, because the Waddell Defendants are not competitors in the relevant market, Top Rank cannot state a claim for attempted monopolization in violation of Section 2 of the Sherman Act against the Waddell Defendants.

**\*18** In addition, to the extent Top Rank seeks to assert a claim for "conspiring to attempt to monopolize" under Section 2 of the Sherman Act, no such claim exists. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 809 ("An occasional complaint has alleged that the defendant conspired

to attempt to monopolize. Courts have correctly held that 🚩 § 2 states no such offense.").

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act (Count III) is **GRANTED**.

### C. Injunctive Relief Under Section 16 of the Clayton Act (Count IV)

Because Top Rank has failed to state a claim for relief under Section 1 or Section 2 of the Sherman Act, the Waddell Defendants' Motion to Dismiss Top Rank's claim for injunctive relief under Section 16 of the Clayton Act (Count IV) is **GRANTED**. 🚩 *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1051 (9th Cir.2008).

### D. State Law Claims

#### 1. *Violation of the California Unfair Practices Act as to the Waddell Defendants (Count V)*

In its fifth claim for Relief, Top Rank alleges that the Waddell Defendants sold "boxing broadcast rights" at less than the cost thereof, and/or gave away that product to television broadcasters, as a "loss leader" in violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17043 and 17044. FAC at ¶¶ 161–168.

In order to be liable under Section 17043 or 17043, a defendant must have sold an article or product at less than cost of the article or product or given away that article or product. *See* Cal. Bus. & Prof.Code § 17043, ("It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."); Cal. Bus. & Prof Code §§ 17044, 17030 (making it unlawful for any person engaged in business in California to sell or use any article or product as a "loss leader," i.e., any article or product sold at less than cost where the purpose is to induce, promote, or encourage the purchase of other merchandise, or where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers, or where the effect is to divert trade from or otherwise injure competitors). However, Top Rank fails to allege any facts demonstrating that the Waddell Defendants sold any article or product at less than cost, or gave away an article or product. Indeed, Top Rank's allegations solely relate to the Haymon Defendants, not the Waddell Defendants.

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for violation of the California Unfair Practices Act (Count V) is **GRANTED**.

#### 2. *Violation of California's Unfair Competition Law (Count VI)*

In its sixth claim for relief, Top Rank alleges that the Waddell Defendants violated California's Unfair Competition Law ("UCL"), 🚩 Cal. Bus. & Prof.Code § 17200 *et seq*. The Waddell Defendants move to dismiss the UCL claim on the grounds that the alleged conduct underlying this claim does not relate to any business practices engaged in by the Waddell Defendants. The Court agrees.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." 🚩 Cal. Bus. & Prof.Code § 17200. "Each prong of the UCL is a separate and distinct theory of liability." 🚩 *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1127 (9th Cir.2009). "As to the unlawful prong, the UCL incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law." *See* 🚩 *Clark v. Countrywide Home Loans, Inc.,* 732 F.Supp.2d 1038, 1049 (E.D.Cal.2010) (citing 🚩 *Chabner v. United Omaha Life Ins. Co.,* 225 F.3d 1042, 1048 (9th Cir.2000)). An "unfair" business practice is one "that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." 🚩 *Cel–Tech Commc'ns, Inc. v. LA. Cellular Tel. Co.,* 20 Cal.4th 163, 187 (1999). In addition, a business practice is "unfair" when that practice "either offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." 🚩 *McDonald v. Coldwell Banker,* 543 F.3d 498, 506 (9th Cir.2008) (quotations and citations omitted). Finally, a business practice is "fraudulent" if members of the public are likely to be deceived. 🚩⚠️ *Prata v. Superior Court,* 91 Cal.App. 4th 1128, 1146 (2001). If the claim is grounded in fraud, the pleading of that claim must satisfy the

2015-2 Trade Cases P 79,332

heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *See, e.g., Ward v. Wells Fargo Home Mortg., Inc.,* 2015 WL 1744235, at *9 (N.D.Cal. Apr. 13, 2015). Although Top Rank appears to allege in its First Amended Complaint that the Waddell Defendants violated all three prongs of the UCL, Top Rank solely relies on the "unlawful" prong in its Opposition. [15]

**\*19** Top Rank's UCL claim based on the "unlawful" prong is premised on alleged violations of the following laws: (1) Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; (2) the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et seq.,* which prohibits, in relevant part, a manager from having a direct or indirect financial interest in the promotion of a boxer; (3) California Code of Regulations, title 4, § 396, which prohibits, in relevant part, a promoter from acting directly or indirectly as a manager of a boxer; and (4) the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 *et seq.* However, as previously discussed, the Court concludes that Top Rank has failed to state a claim against the Waddell Defendants for violation of Sections 1 or 2 of the Sherman Act or the California Unfair Practices Act. In addition, the Court concludes that Top Rank fails to allege that the Waddell Defendants violated the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et seq.* or California Code of Regulations § 396 because the Waddell Defendants have never acted as boxing managers or promoters. Accordingly, because Top Rank fails to allege that the Waddell Defendants committed a predicate violation of another law, Top Rank fails to state a UCL claim against the Waddell Defendants based on the "unlawful" prong. *See Dorado v. Shea Homes Ltd. Partnership,* 2011 WL 3875626, at *19 (E.D.Cal. Aug. 31, 2011) ("Where a plaintiff cannot state a claim under the 'borrowed' law, she cannot state a UCL claim either.").

Top Rank also fails to state a claim against the Waddell Defendants premised on the "unfair" or "fraudulent" prongs of the UCL. Indeed, Top Rank has failed to allege any "unfair" or "fraudulent" conduct specifically committed by the Waddell Defendants. Apparently recognizing its inability to plead a UCL claim against the Waddell Defendants based on the "unfair" or "fraudulent" prongs, Top Rank failed to oppose the Waddell Defendants' Motion to Dismiss the UCL claim based on these prongs.

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for violation of the UCL (Count VI) is **GRANTED**.

### 3. *Tortious Interference with Prospective Economic Advantage (Count VII)*

In its seventh claim for relief, Top Rank alleges a claim against the Waddell Defendants for tortious interference with prospective economic advantage.

In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must plead the following elements: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1153 (2003) (quotations and citations omitted). In addition, a plaintiff must allege that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 393 (1995); *see also Korea Supply Co.,* 29 Cal.4th at 1158 ("To establish a claim for interference with prospective economic advantage, ... a plaintiff must plead that the defendant engaged in an independently wrongful act."). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co.,* 29 Cal.4th at 1159.

As the Court previously concluded, Top Rank has failed to allege any independently wrongful or unlawful conduct committed specifically by the Waddell Defendants. Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for tortious interference with prospective economic advantage (Count VII) is **GRANTED**.

### V. CONCLUSION

For the foregoing reasons, the Haymon Defendants' Motion to Dismiss is **GRANTED in part**. The Haymon Defendants' Motion to Dismiss Counts I, II, III, and IV is **GRANTED**.

**Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)**

2015-2 Trade Cases P 79,332

The Court will grant Top Rank an opportunity to amend these claims, and, thus, Counts I, II, III, and IV as to the Haymon Defendants are **DISMISSED with leave to amend.** Top Rank shall file its Second Amended Complaint on or before **October 30, 2015.** The Court **DEFERS** ruling on the Haymon Defendants' Motion to Dismiss Counts V, VI, and VII.

**\*20** The Waddell Defendants' Motion to Dismiss is **GRANTED** in its entirety. Because the Court concludes that granting leave to amend as to the Waddell Defendants would be futile, the First Amended Complaint against the Waddell Defendants is **DISMISSED without leave to amend.** Although the Court recognizes that this Circuit has a liberal policy favoring amendments and that leave to amend should be freely granted, the Court is not required to grant leave to amend if the Court determines that permitting Top Rank to amend would be an exercise in futility. *See, e.g.,*

⚑ *Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile."). In this case, Top Rank has already had an opportunity to file an amended pleading and has failed to provide the Court with any facts or arguments in its Opposition that indicate leave to amend with respect to the Waddell Defendants would not be futile. Accordingly, the Court denies leave to amend as to the Waddell Defendants.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2015 WL 9948936, 2015-2 Trade Cases P 79,332

---

### Footnotes

1    Due to Top Rank's reliance on group pleading, it is impossible to determine which entity that Top Rank claims attempted to acquire Golden Boy Promotions.

2    Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." ⚑ 15 U.S.C. § 1. Despite the literal language of the statute, ⚑ Section 1 "outlaw[s] only unreasonable restraints." ⚑ *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997).

3    Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations ... " ⚑ 15 U.S.C. § 2.

4    "Championship–Caliber Boxers" are defined as "professional boxers who, within the past three years, have demonstrated through such quantitative factors as purse size, television rights, viewership, ticket revenue, and other objective criteria that they belong to the 'cream' of the boxing business." FAC at ¶ 104 (quotations and citations omitted).

5    Top Rank argues that it need not allege dominance in the promotion market for its conspiracy in restraint of trade claim, relying on cases concerning tying arrangements. However, Top Rank's conspiracy claim does not appear to limit itself to tying arrangements. *See* FAC at ¶ 147.

6    The Haymon Defendants also move to dismiss the tying claim on the grounds that their alleged market power cannot be premised on a voluntary contractual relationship. *See, e.g.,* ⚑ *Rik–Mik Enters. Inc. v. Equilon Enters., LLC,* 532 F.3d 963, 973 (9th Cir.2008) ("A tying claim generally requires that the defendant's economic power be derived from the market, not from a contractual relationship that the plaintiff has entered into voluntarily."). However, contrary to the Haymon Defendants' argument, Top Rank alleges that

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 220 of 247

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)
2015-2 Trade Cases P 79,332

the Haymon Defendants' economic power is derived from the market, not from a voluntary contractual relationship.

7    "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.'" 🏳 *Texaco v. Dagher,* 547 U.S. 1, 5 (2006) (quoting 🏳 *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692 (1978)).

8    In its Opposition, Top Rank contends that it has alleged that the Haymon Defendants have "never consented" to allowing boxers in their management stable to sign with "legitimate" promoters, citing to paragraph 65 of the First Amended Complaint. *See* Opposition at p. 26. However, paragraph 65 does not so allege. If Top Rank can, in good faith, allege facts showing that the Haymon Defendants have never consented to allowing boxers in their management stable to sign with "legitimate promoters," Top Rank may be able to state a viable tying claim.

9    In addition, although Top Rank alleges the existence of several other allegedly anticompetitive agreements, as discussed *infra,* the Court concludes that Top Rank has failed to adequately allege an agreement between the Waddell Defendants and the Haymon Defendants.

10   Although Top Rank's allegations, for the most part, meet the applicable pleading standard, Top Rank's allegations with respect to, for example, the "exclusivity commitments" with unspecified broadcasters are vague and lack the requisite factual detail. *See* FAC at ¶ 94.

11   Although it initially appeared to the Court that Top Rank was attempting to hold the Waddell Defendants vicariously or indirectly liable for the conduct of the Haymon Defendants (based on their investment in the Haymon Defendants and their approval power or veto power over the Haymon Defendants' major decisions), Top Rank adamantly disavows any attempt to impose "indirect or vicarious liability" on the Waddell Defendants based on a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. See Opposition [Docket No. 78] at 7 n. 3.

12   Top Rank's First Amended Complaint is littered with such conclusory statements and hyperbole regarding the Waddell Defendants. *See, e.g.,* FAC at ¶ 55 ("The Waddell & Reed Defendants have played an active, complicit, and indispensable role in bringing the anticompetitive scheme to fruition."); ¶ 57 ("The Waddell & Reed Defendants orchestrated an elaborate business arrangement to facilitate—and to try to conceal—their involvement in the conspiracy.").

13   This unity of interest is further supported by Top Rank's allegations that Waddell Defendants and Haymon Defendants are, at least to some extent, under common control. *See, e.g.,* FAC at ¶ 15 (alleging that W & R Financial actively manages and controls Haymon Holdings, which is "exercised by its President and General Counsel who sit as MGH's 'Observer' representatives on the Haymon Holdings Board of Directors"); ¶ 16 (alleging that WRIMCO's senior officers actively manage and control Haymon Holdings); ¶ 18 (alleging that MGH is a member of Haymon Holdings and "exercises strategic and operational control" over Haymon Holdings' business activities).

14   Top Rank argues that it has alleged that the Waddell Defendants are actual competitors in the relevant markets. However, those allegations are solely based on the Waddell Defendants' investment and alleged management and control over Haymon Holdings. *See* FAC at ¶ 15 ("[W & R Financial] participates in the managerial and promotional market in California through its active management and control over Haymon Holdings, exercised by its President and General Counsel who sit as MGH's 'Observer' representatives on the Haymon Holdings Board of Directors."); ¶ 16 ("WRIMCO also participates in the managerial and promotional

2015-2 Trade Cases P 79,332

market in California through its senior officers' active management and control over and direct financial interest in Haymon Holdings.").

15    Top Rank does not address any of the state law claims in its Opposition to the Waddell Defendants' Motion to Dismiss, but merely incorporates its Opposition to the Haymon Defendants' Motion to Dismiss (even though the Waddell Defendants and Haymon Defendants primarily moved to dismiss on different grounds). *See* Opposition to Waddell Defendants' Motion to Dismiss [Docket No. 78] at 20. In its Opposition to the Haymon Defendants' Motion to Dismiss, Top Rank only argues that its UCL claim is sufficient based on the "unlawful" prong.

---

**End of Document**                                      © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 1766083
Only the Westlaw citation is currently available.
United States District Court,
W.D. Pennsylvania.

TRINITY INDUSTRIES, INC., Trinity
Industries Railcar Corporation, Plaintiffs,
v.
GREENLEASE HOLDING COMPANY,
Ampco–Pittsburgh Corporation, Defendants.

Civil Action No. 08–1498.

|

Signed May 2, 2014.

**Attorneys and Law Firms**

Frederick W. Addison, III, Nolan C. Knight, Munsch Hardt
Kopf & Harr, Dallas, TX, Leonard G. Ambrose, III, Ambrose
Law Firm, Erie, PA, for Plaintiffs.

Steven F. Baicker-McKee, Marc J. Felezzola, Mark K.
Dausch, Babst, Calland, Clements & Zomnir, Paul D.
Steinman, Eckert, Seamans, Cherin & Mellott, Pittsburgh,
PA, for Defendants.

*OPINION*

CONTI, Chief Judge.

### I. *Introduction*

**\*1** The issues before the court in this opinion are whether
defendant Ampco–Pittsburgh Corporation ("Ampco") can
be held *directly* liable for *its* actions or *derivatively* liable
for the actions of its subsidiary, defendant Greenlease
Holding Company ("Greenlease") with respect to enumerated
claims raised in connection with a manufacturing plant,
located at 60 Union Street, Greenville, Mercer County,
Pennsylvania (the "North Plant"), which previously was
owned by Greenlease and currently is owned by plaintiffs
Trinity Industries, Inc. ("Trinity Industries") and Trinity
Industries Railcar Corporation ("Trinity Railcar") (together,
"Trinity" or "plaintiffs"). These issues were raised in cross-
motions for summary judgment filed by Trinity (ECF No.
151), and Ampco (ECF No. 147).

### II. *Procedural History*

On October 24, 2008, Trinity filed a complaint against
Greenlease and Ampco setting forth the following claims:

- count I seeking cost recovery under § 107
  under the Comprehensive Environmental Response,
  Compensation and Liability Act ("CERCLA"), 42
  U.S.C. § 9601 *et seq.;*

- count II seeking contribution under §§ 113(f)(1) and
  113(f)(3)(B) of the CERCLA;

- count III seeking recovery under § 7002(a)(1)(B) of the
  Resource Conservation and Recovery Act ("RCRA"),
  42 U.S.C. § 6901 *et seq.;*

- count IV seeking recovery under section 1101 of the
  Pennsylvania Hazardous Sites Cleanup Act ("HSCA"),
  35 PA. CONS.STAT. § 6020.101 *et seq.;*

- count V seeking recovery under sections 701 and 702 of
  the HSCA;

- count VI seeking contribution under section 705(c)(2) of
  the HSCA;

- count VII seeking contribution under Pennsylvania state
  law; and

- count VIII setting forth a state law claim for negligence
  per se.

(ECF No. 1.)

On October 30, 2013, Ampco filed a motion for summary
judgment seeking a judgment in its favor with respect to all
counts of the complaint arguing that as a matter of law, it is
not directly liable under any claim or derivatively liable for
the alleged acts of Greenlease with respect to North Plant.
(ECF No. 143.) On the same day, Trinity filed a partial motion
for summary judgment arguing, among other things, that it is
entitled to summary judgment on its claims against Ampco
because Ampco operated the North Plant and piercing of the
corporate veil is warranted under the applicable statutes and
case law. (ECF No. 151.) On November 4, 2013, Ampco
filed a response in opposition to Trinity's partial motion
for summary judgment, (ECF No. 209), and Trinity filed
a response in opposition to Ampco's motion for summary
judgment, (ECF No. 212). On November 7, 2013, Trinity
filed a reply brief to Ampco's brief in opposition to its partial
motion for summary judgment, (ECF No. 219), and Ampco
filed a reply brief to Trinity's brief in opposition to its motion

for summary judgment, (ECF No. 221). On November 12, 2013, Ampco filed a combined concise statement of facts with respect to its motion for summary judgment, (ECF No. 223), and Trinity filed a combined concise statement of fact with respect to plaintiffs' motion for summary judgment, (ECF No. 224).

**\*2** On December 19, 2013, the court held a hearing with respect to the Ampco's and Trinity's motions for summary judgment limited to the issue whether Ampco may be held liable to Trinity as a matter of law. The court—based upon its review of the submissions of Ampco and Trinity and the arguments presented at the hearing—determined Ampco's motion for summary judgment should be granted and Trinity's motion for summary judgment should be denied. This opinion sets forth the reasoning for the court's decision.

### III. *Background* [1]

#### A. Greenville and Ampco

In or about 1910, Greenville Steel Car Company ("Greenville") began operating a railcar manufacturing facility at the North Plant. (Ampco's Combined Statement of Fact ("ACSOF") ¶ 1.) Greenville was originally organized as the Greenville Metal Products Company. (*Id.* ¶ 2.) In 1914, the company adopted the name Greenville Steel Car Company. (*Id.*) In 1924, Greenville Steel Car Company was formally chartered in the Commonwealth of Pennsylvania. (*Id.*) In August 1937, Pittsburgh Forging Company ("PFC") purchased all Greenville's stock. (*Id.* ¶ 3.)

In or about October 1979, Ampco acquired all PFC's stock through a wholly-owned acquisition subsidiary, Ampco–Pittsburgh Securities I Corporation. (ACSOF ¶ 4.) On December 29, 1983, Greenville declared a dividend to PFC of the stock of Greenville's then subsidiary, Greenville Leasing Company, which was an entity that leased railcars. (*Id.* ¶ 6.) On that same day, PFC declared a dividend to Ampco–Pittsburgh Securities I Corporation of the stock of PFC's then subsidiary, Greenville, making Ampco–Pittsburgh Securities I Corporation the sole shareholder of Greenville. (*Id.* ¶ 5.) In January 1984, PFC changed its name to GLC Holding Company. (*Id.* ¶ 7.) On December 21, 1984, the stock of GLC Holding Company was purchased by GATLX Leasing Corporation. (*Id.* ¶ 8.) In 1985, Ampco–Pittsburgh Securities I Corporation was merged into Ampco, making Ampco the sole shareholder of Greenville. (ACSOF ¶ 10.)

#### B. Greenville's Operation of the North Plant

Greenville's employees were responsible for all day-to-day operations at the North Plant, including any waste disposal, waste handling, painting, abrasive blasting, welding, and fabrication operations. (ACSOF ¶ 20.) For example, Greenville's management met with paint manufacturers to discuss what changes needed to be made to the paint that Greenville used in order to ensure the paint would meet new standards and regulations coming into effect. (*Id.* ¶ 21.) William C. Bubeck ("Bubeck"), director of safety and security for Greenville, communicated with the Pennsylvania Department of Environmental Protection (the "DEP"), formerly known as the Pennsylvania Department of Environmental Resources, with respect to environmental matters including air toxics emissions, PCB transformers, hazardous waste inspections, and alleged violations of the solid waste management act. (*Id.* ¶ 22.) George Fisher ("Fisher"), plant maintenance engineer for Greenville, communicated with the DEP with respect to environmental matters, including air emissions calculations from the paint booths and hazardous waste notification forms. (*Id.* ¶ 23.) Fisher was responsible for obtaining information about the DEP's volatile organic compound ("VOC") regulations and disseminating it to the plant. (*Id.*)

**\*3** Albert Beers ("Beers") was a Greenville employee from 1965 until 1986. (ACSOF ¶ 24.) While a plant engineer for Greenville, Beers communicated with the DEP with respect to environmental matters, including hazardous waste generator inspections and a permit to construct and use an on-site solid waste incinerator. (*Id.* ¶ 25.) Beers communicated with outside contractors with respect to off-site disposal of used paint mixtures. (*Id.* ¶ 26 .) After the North Plant was sold in 1986, Gottschall provided documentation to the Environmental Protection Agency with respect to waste Greenville may have sent to an offsite landfill known as the River Road Landfill. (*Id.* ¶ 33.)

#### C. Ampco's Parent–Subsidiary Relationship with Greenville

At all relevant times, Ampco held an ownership interest in various entities, including companies engaged in manufacturing diversified engineered products or industrial equipment, employed only a professional staff, e.g., accountants, actuaries, and lawyers, and did not employ any engineers or persons with technical experience in manufacturing. (ACSOF ¶ 34.)

Between 1979 and 1986, Ampco and Greenville had overlapping board members, but did not share formal corporate office space. (ACSOF ¶¶ 36, 38.) Gottschall, Ed Moores, and John R. Young were overlapping board members from 1979 to 1986, and Ernest Siddons was an overlapping officer from 1984 to 1986. (*Id.* ¶ 38.) No employees, other than officers and directors, were employees both of Greenville and Ampco. (*Id.* ¶ 37.) Greenville adopted a resolution that said "any action which the [Ampco] Board, or its Executive Committee, may think necessary and desirable to take on behalf of [Greenville] shall be deemed to be the action of [Greenville's Board]." (*Id.* ¶ 39.)

Ampco retained the right to approve Greenville's expenditures that exceeded a certain threshold. (ACSOF ¶ 42.) Ampco provided certain high level services to its subsidiaries in the areas of insurance, legal, banking, and accounting. (*Id.* ¶ 43.) In 1985, Greenville's pension plan for salaried employees was merged into Ampco's retirement plan. (*Id.* ¶ 44.) Ampco's retirement plan covered all its subsidiaries for purposes of administration. (*Id.*) Each subsidiary maintained its separate identity and separate individual plans. (*Id.*) Ampco used a centralized banking system for all its subsidiaries in order to maximize the amount on which it could obtain interest and either maximize or minimize borrowing amounts. (*Id.* ¶ 45.) Greenville had its own banking account, account number, and all checks were signed and approved by officers of Greenville. (*Id.*) Ampco had master insurance policies in order to obtain lower costs and better coverage, in which all subsidiaries, including Greenville, were named insureds. (*Id.* ¶ 46.) The individual subsidiaries were charged for their pro rata portion of the premium payment. (*Id.*)

**\*4** Ampco had bulk services agreements on behalf of its subsidiaries in order to obtain lower prices due to the bulk purchasing capability of the group. (ACSOF ¶ 47.) The actual order placement and payment for such orders would be made in the normal course by the subsidiary, such as Greenville. (*Id.*) Ampco had a revolving credit agreement with several banks to benefit the entire organization as a whole and on occasion, used the value of its investment in Greenville to guaranty these lines of credit. (*Id.* ¶ 48.)

### D. The Sale of the North Plant from Greenville to Trinity

As of December 1986, Greenville was solvent. (ACSOF ¶ 52.) On December 9, 1986, Trinity purchased the North Plant from Greenville, pursuant to a Purchase and Sale Agreement,

for an $8,000,000 cash payment and in consideration of Trinity's execution of a promissory note in the face amount of $6,075,120 for the benefit of Greenville. (*Id.* ¶¶ 11, 49.) Ampco, as the sole shareholder of Greenville, authorized the Greenville board of directors to proceed with negotiations and sell the North Plant on terms deemed by Greenville's board to be in the best interest of Greenville and Ampco. (*Id.* ¶ 51.) From 1986 until 2000, Trinity operated a railcar manufacturing business at the North Plant as its Greenville Steel Car Division. (*Id.* ¶ 50.)

### E. Greenville After the Sale of the North Plant to Trinity

In February 1987, following the sale of the North Plant to Trinity, Greenville maintained a reserve for liabilities in the amount of $250,000 and amended its articles of incorporation to change its name to Greenlease Holding Company. (ACSOF ¶¶ 13, 54; ECF No. 150–1 at 22–23; ECF No. 150–40 at 2.) In or about May 1987, Ampco authorized Greenlease to sell the promissory note directly to Principal Mutual Life Insurance. (ACSOF ¶ 56.) On August 1, 1989, and October 15, 1990, respectively three and four years after Trinity purchased the North Plant from Greenlease, Greenlease issued dividends to Ampco. (*Id.* ¶ 57.)

### F. The Criminal Complaint against Trinity with respect to the North Plant

The Commonwealth of Pennsylvania and the DEP, began an investigation at the North Plant based upon allegations that Trinity illegally dumped and disposed of hazardous waste on the site. (ACSOF ¶ 16.) In April 2006—twenty years after Trinity purchased the North Plant from Greenlease —the Commonwealth of Pennsylvania filed a criminal complaint against Trinity asserting three felony counts related to the illegal management of hazardous waste and eight misdemeanor counts related to the illegal dumping and disposal of solid hazardous waste. (*Id.* ¶ 17.) On October 31, 2006, Trinity [2] entered into a plea agreement with the Pennsylvania Office of Attorney General. (ECF No. 150– 19 at 2.) Pursuant to the plea agreement, Trinity was to: (i) plead nolo contendere to five counts of the criminal information filed at CP–43–1655–2006; (ii) reimburse the DEP in the amount of $54,502.55 for investigative costs; (iii) pay a $200,000 fine to Pennsylvania's Solid Waste Abatement Fund; (iv) make a $50,000 contribution to a nonprofit organization; and (v) remediate all environmental contamination at the North Plant as set forth in the consent order and agreement attached to the plea agreement. (*Id.*)

Trinity was sentenced on December 21, 2006, in the Court of Common Pleas of Mercer County, pursuant to the consent order and agreement ("Consent Order") entered into by DEP and Trinity on the same day. [3] (ECF No. 150–19 at 5.)

**\*5**  The Consent Order, in pertinent part, provided:

> 6. a. *The North Plant and South Plant* [4]. Trinity shall obtain prior approval from [the DEP] and conduct the Response Actions in accordance with [the DEP]-approved schedule to fully investigate and respond to the release of hazardous substances at the North Plant and South Plant to attain one or a combination of the Background, Statewide Health, or Site Specific cleanup standards selected by Trinity and approved by [the DEP] pursuant to Chapter 3 of the Land Recycling Act, 35 P.S. §§ 6026.302–6026.303, for non-residential use.

> b. *Contamination migrating from the North Plant or South Plant*. For any release of hazardous substances in groundwater or soil that is migrating from the North Plant and/or South Plant, Trinity shall attain one or a combination of the Background or Statewide Health cleanup standards selected by Trinity, and approved by [the DEP] pursuant to Chapter 3 of the Land Recycling Act, 35 P.S. §§ 6026.302–6026.303, for non-residential use.

> c. The Response Actions [5] required by Paragraph 6.a. and 6.b., above, shall include, without limitation: paying all fees required under the Land Recycling Act; publishing notices; submitting, revising, and finalizing all required documents for [the DEP]'s approval; and completing and maintaining the Response Actions, including the investigations, remediation, and post-remediation care activities at each Plant, if necessary, in accordance with the Land Recycling Act, any other applicable environmental laws and Regulations, and the requirements of this Consent Order and Agreement.

(ECF No. 150–19 at 11.)

### G. Greenlease and the North Plant—2009 to the Present

As of 2009, Greenlease had positive reserves and equity. (*Id.* ¶ 58.) Greenlease exists today as a shell holding company and it does not have any employees, business activities, for profit activities, or other commercial undertakings. (*Id.* ¶ 14.)

The North Plant currently is a non-operating facility held by Trinity's subsidiary Waldorf Properties, Inc. and is contaminated with substances that include, *inter alia,* iron, lead, trichloroethene, xylene, and polychlorinated bi-phenyls ("PCBs") such as "Aroclor." (Trinity's Combined Statement of Facts ("TCSOF") ¶ 1.)

### IV. *Standard of Review*

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Se. Pa. Transp. Auth.,* 479 F.3d 232, 238 (3d Cir.2007) ("In considering the evidence, the court should draw all reasonable inferences against the moving party.").

**\*6**  The United States Court of Appeals for the Third Circuit has stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id.* The court may consider material evidence that would be admissible or usable at trial in deciding the merits of a motion for summary judgment. *Horta v. Sullivan,* 4 F.3d 2, 8 (1st Cir.1993) (citing 10A CHARLES ALAN WRIGHT,

ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2721, at 40 (2d ed.1983)); *Pollack v. Newark,* 147 F.Supp. 35, 39 (D.N.J.1956), *aff'd,* 248 F.2d 543 (3d Cir.1957) ("[I]n considering a motion for summary judgment, the court is entitled to consider exhibits and other papers that have been identified by affidavit or otherwise made admissible in evidence.").

### V. *Discussion*

Trinity is suing Ampco *directly* for "operating" the North Plant and *derivatively* for Greenlease's actions in operating the North Plant by piercing the corporate veil.[6] The Supreme Court of the United States in *United States v. Bestfoods,* 524 U.S. 51, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), discussed the law applicable to a parent corporation's *direct* liability for *operating* a plant and *derivative* liability for its *subsidiary's actions* in operating a plant.

With respect to distinguishing a parent corporation's *direct* liability for its *own* action from derivative liability, the Supreme Court explained:

[D]erivative liability cases are to be distinguished from those in which "the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management" and "the parent is directly a participant in the wrong complained of." Douglas 207, 208. In such instances, the parent is directly liable for its own actions. *See* H. Henn & J. Alexander, Laws of Corporations 347 (3d ed.1983) (hereinafter Henn & Alexander) ("Apart from corporation law principles, a shareholder, whether a natural person or a corporation, may be liable on the ground that such shareholder's activity resulted in the liability"). The fact that a corporate subsidiary happens to own a polluting facility operated by its parent does nothing, then, to displace the rule that the parent "corporation is [itself] responsible for the wrongs committed by its agents in the course of its business," *Mine Workers v. Coronado Coal Co.,* 259 U.S. 344, 395, 42 S.Ct. 570, 577, 66 L.Ed. 975 (1922), and whereas the rules of veil piercing limit derivative liability for the actions of another corporation, CERCLA's "operator" provision is concerned primarily with direct liability for one's own actions. *See, e.g.,* *Sidney S. Arst Co. v. Pipefitters Welfare Ed. Fund,* 25 F.3d 417, 420 (C.A.7 1994) ("[T]he direct, personal liability provided by CERCLA is distinct from the derivative liability that results from piercing the corporate veil" (internal quotation marks omitted)).

**\*7** *Id.* at 64–65.

The Court noted with respect to a corporation's protection from liability for acts of its subsidiary:

It is a general principle of corporate law deeply "ingrained in our economic and legal systems" that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries. Douglas & Shanks, Insulation from Liability Through Subsidiary Corporations, 39 Yale L.J. 193 (1929) (hereinafter Douglas)

...

Thus it is hornbook law that "the exercise of the 'control' which stock ownership gives to the stockholders ... will not create liability beyond the assets of the subsidiary. That 'control' includes the election of directors, the making of by-laws ... and the doing of all other acts incident to the legal status of stockholders. Nor will a duplication of some or all of the directors or executive officers be fatal." Douglas 196 (footnotes omitted).

*Bestfoods,* 524 U.S. at 60. The Court, however, explained:

[T]here is an equally fundamental principle of corporate law, applicable to the parent-subsidiary relationship as well as generally, that the corporate veil may be pierced and the shareholder held liable for the corporation's conduct when, inter alia, the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf.

...

The Court of Appeals was accordingly correct in holding that when (but only when) the corporate veil may be pierced, may a parent corporation be charged with derivative CERCLA liability for its subsidiary's actions. *Id.* at 64. Whether Ampco can be *directly* or *derivatively* liable to Trinity will be addressed below.

### A. *Direct Liability*

Trinity asserts Ampco is directly liable to Trinity under the following provision of 🏳 42 U.S.C. § 9607:

> (1) the owner and **operator** of ... a facility, [or] (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ... shall be liable for ... any ... necessary costs of response incurred by any other person consistent with the national contingency plan.

🏳 42 U.S.C. § 9607(a)(4)(B) (emphasis added). In *Bestfoods,* the Supreme Court explained:

> [U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

*Id.* at 66–67. The Supreme Court gave the following guidance to aide a court in determining whether a parent "operated" its subsidiary's facility:

**\*8** Identifying such an occurrence calls for line-drawing yet again, since the acts of direct operation that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary. Again norms of corporate behavior (undisturbed by any CERCLA provision) are crucial reference points. Just as we may look to such norms in identifying the limits of the presumption that a dual

officeholder acts in his ostensible capacity, so here we may refer to them in distinguishing a parental officer's oversight of a subsidiary from such an officer's control over the operation of the subsidiary's facility. "[A]ctivities that involve the facility but which are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability." [Oswald, Bifurcation of the Owner and Operator Analysis under CERCLA, 72 Wash. U.L.Q. 223, 282 (1994) ]. The critical question is whether, in degree and detail, actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility.

*Id.* at 71–72. The Supreme Court identified three possible scenarios in which a parent corporation could be held directly liable for operating its subsidiary's facility:

> In our enquiry into the meaning Congress presumably had in mind when it used the verb "to operate," we recognized that the statute obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate "operation" as including the exercise of direction over the facility's activities. See *supra,* at [67– 8]. The Court of Appeals recognized this by indicating that *a parent can be held directly liable when the parent operates the facility in the stead of its subsidiary or alongside the subsidiary in some sort of a joint venture. See* [🏴 *U.S. v. Cordova Chemical Co. of Michigan,* 113 F.3d 572, 579 (1997) ]. We anticipated a further possibility above, however, when we observed that *a dual officer or director might depart so far from the norms of parental influence exercised through dual officeholding as to serve the parent, even when ostensibly acting on behalf of the subsidiary in operating the facility. See* n. 13, supra. Yet another possibility, suggested by

the facts of this case, is that ***an agent of the parent with no hat to wear but the parent's hat might manage or direct activities at the facility.***

*Id.* at 71–72 (emphasis added).

Here, Trinity argues that "Ampco's involvement with relevant North Plant operations exceeded anything that could be characterized as a 'normal relationship between parent and subsidiary.' " (ECF No. 152 at 12) (quoting 🚩 *Bestfoods,* 524 U.S. at 71). Trinity argues Ampco:

**\*9** • advised Greenlease regarding the operation of laws and regulations related to Greenlease's waste generation practices;

• monitored Greenlease's waste generation practices;

• authorized its personnel to seek funding for and assist with portions of Greenlease's effort to 'modernize' painting operations at the North Plant after it was evident the operations were causing product releases into the environment;

• had its officers or directors that constituted Greenlease's board make decisions regarding Greenlease's core manufacturing activities by approving leases or customer financing for railcars that were manufactured at the North Plant; and

• had its officers submit filings to the Commonwealth wherein they acted as if they did not recognize a meaningful distinction between Ampco and Greenlease, because Ampco referred to the changing of *"our* name from Greenville Steel Car Company to Greenlease Holding Company."

(ECF Nos. 212; 224.) Trinity argues that Ampco personnel —Fisher and Beers—believed Ampco owned the North Plant or "otherwise had an intimate connection to operations at the North Plant." (ECF No. 212 at 3.) Based upon the foregoing evidence, Trinity asserts that Ampco "operated" the North Plant and can be held *directly* liable for its actions in doing so. Ampco argues that the evidence of record is insufficient for a reasonable jury to conclude that Ampco's involvement with the North Plant was "eccentric under accepted norms of parental oversight of a subsidiary's facility." 🚩 *Bestfoods,* 524 U.S. at 72.

The arguments and evidence presented by the parties do not support the argument that Ampco's involvement with the North Plant was outside the bounds of a normal parent-subsidiary relationship. First, there is no dispute that Greenville employees were responsible for all day-to-day operations at the North Plant, including any waste disposal, waste handling, painting, abrasive blasting, welding, and fabrication operations. (ACSOF ¶ 20.) Beers communicated with outside contractors regarding off-site disposal of used paint mixtures. (*Id.* ¶ 26.) Bubeck, director of safety and security for Greenville, communicated with the DEP regarding environmental matters including air toxics emissions, PCB transformers, hazardous waste inspections and alleged violations of the solid waste management act. (*Id.* ¶ 22.) Fisher, plant maintenance engineer for Greenville, communicated with the DEP regarding environmental matters, including air emissions calculations from the paint booths and hazardous waste notification forms. (*Id.* ¶ 23.) Fisher was responsible for obtaining information about the Environmental Protection Agency's VOC regulations and disseminating it to Greenville employees. (*Id.*) Beers, as plant engineer for Greenville, communicated with the DEP regarding environmental matters, including hazardous waste generator inspections and a permit to construct and use an on-site solid waste incinerator. (*Id.* ¶ 25.) Most significantly, during the relevant time period, Ampco employed only a professional staff, such as accountants, actuaries, and lawyers, and did not employ any engineers or persons with technical experience in manufacturing that could make decisions for Greenville with respect to environmental compliance or waste management. (*Id.* ¶ 34.)

**\*10** There is no dispute that Gotschall provided free legal advice to Greenville during the relevant time period. Courts have recognized, however, that it is within the normal bounds of a parent-subsidiary relationship for a parent corporation to provide in-house legal counsel to its subsidiaries. 🚩 *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,* Civ. Action No. 00–2447, 2003 WL 21542491, at \*5 (N.D.Ill. July 3, 2003) ("It is also common practice that certain functions, such as accounting and legal services, be shared within a corporate family."); 🚩 *Schiavone v. Pearce,* 77 F.Supp.2d 284, 290 (D.Conn.1999) (finding that a parent was not directly liable under CERCLA where the subsidiary used the parent's legal department).

With respect to Ampco's monitoring of Greenlease's waste generation services, the Supreme Court in *Bestfoods* noted that a parent corporation's monitoring of its subsidiary's performance does not give rise to direct liability for the parent corporation. 🚩 *Bestfoods,* 524 U.S. at 72. Ampco being interested in and paying close attention to Greenlease's waste disposal, therefore, is not sufficient to support Ampco being directly liable for the activities of the North Plant. As noted, Ampco only employed a professional staff and under that circumstance, its involvement in the waste generation services could not give rise to an *eccentric* parent-subsidiary relationship.

The approval by Ampco's officers or directors, who served on Greenlease's board of directors, of leases or customer financing for railcars that were manufactured at the North Plant is insufficient evidence to support Ampco's direct liability for the North Plant. In *Bestfoods,* the court noted that "[s]ince courts generally presume 'that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary'... it cannot be enough to establish liability [where] dual officers and directors made policy decisions and supervised activities at the facility." 🚩 *Bestfoods,* 524 U.S. at 69 (quoting PHILLIP I. BLUMBERG, THE LAW OF CORPORATION GROUPS: PROCEDURAL PROBLEMS IN THE LAW OF PARENT AND SUBSIDIARY CORPORATIONS § 1.02.1 at 12 (1983)). In order to prevail at the summary judgment stage, Trinity would have to adduce evidence to show that the dual officers and directors were acting only in their capacities as directors and officers of Ampco when they committed those acts. 🚩 *Bestfoods,* 524 U.S. at 70 ("The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott II officers and directors, when they committed those acts."). The Court in *Bestfoods* did not describe in detail how a party could rebut the presumption, but explained:

> We do not attempt to recite the ways in which the Government could show that dual officers or directors were in fact acting on behalf of the parent. Here, it is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer

claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

**\*11** 🚩 *Bestfoods,* 524 U.S. at 70 n. 13. Here, Trinity did not point to evidence to show that Ampco's officers or directors acted on Greenlease's board in any way that was "plainly contrary to the interests of [Greenlease] yet nonetheless advantageous to [Ampco]." *Id.* Trinity, therefore, failed to rebut the presumption that the dual officers and directors acted in their capacity as Greenlease board members and to show they acted solely as officers or directors of Ampco.

The reference by John Young, an Ampco officer, to the name Greenlease as "our name" in a letter to the Commonwealth of Pennsylvania is not sufficient to support a direct liability claim against Ampco. Ampco owned all shares of Greenlease. It is not out of the bounds of a normal parent-subsidiary relationship for an Ampco officer to use a possessive to refer to the subsidiary's name.

The authorization by Ampco personnel to seek funding for and to assist with portions of Greenlease's effort to 'modernize' painting operations at the North Plant after it was evident the operations were causing product releases into the environment, is likewise not sufficient to support a direct liability claim against Ampco. Trinity cites to exhibits 315, 316, 317, and 318 in support of this evidence.

With respect to exhibits 315 and 316, Ampco argues:

> Trinity's characterization [of the documents cited] is misleading because Trinity conflates two separate projects. Trinity's Exhibits 315 and 316 refer to Greenville minutes approving an appropriation request for a spray booth project that was part of an overall modernization that was approved by the Greenville board in 1976, prior to the acquisition by Ampco of Greenville's parent PFC's stock in 1979. Neither exhibit evidences that "Ampco authorized and allowed its personnel to seek funding for and assist" Greenville's effort in this spray booth project.

(ECF No. 224 at 27–28.) To the extent Greenville approved the modernization plan, Ampco's subsequent approval of the expenditure to fund the spray booth and modernization plan is not a basis to find Ampco directly liable for operating the North Plant. 🚩 *Fletcher v. Atex, Inc.,* 68 F.3d 1451, 1459 (2d Cir.1995) (finding a parent's approval for major capital expenditures was "typical of a majority shareholder or parent corporation") (citing 🚩 *Phoenix Canada Oil Co. v. Texaco,* 842 F.2d 1466, 1476 (3d Cir.1988)). Exhibit 315, board minutes of Greenville from August 31, 1979 (prior to its acquisition by a subsidiary of Ampco), shows that the board on August 15, 1979, approved an expenditure of $330,000 for a spray paint booth improvement at Greenville. (ECF No. 193–3 at 6.) The approval of the spray paint booth expenditure was part of an overall modernization project the Greenville's board of directors approved totaling $1,394,000. (*Id.* at 7.) Exhibit 316 is the board minutes from the August 15, 1979, board meeting at which the board approved the expenditure for the spray paint booth. (ECF No. 193–4.) Ampco's subsequent approval of the major capital expenditure, i.e., the spray paint booth and the modernization as a whole, was within the bounds of a normal parent-subsidiary relationship and does not support a reasonable jury finding that Ampco operated the North Plant.

**\*12** Exhibit 317 is a "Plan to Increase Production Capacity." (ECF No. 193–5.) Exhibit 318 is an inter-office correspondence showing Gottschall—an officer of both Ampco and Greenville—attended a meeting and told the meeting participants, which included at least three other persons from Greenville, about the plan to increase Greenville's production capacity. (ECF No. 194–1.) With respect to exhibits 317 and 318, Ampco argues:

> Trinity's Exhibits 317 and 318 refer to a 'Greenville Steel Car Company Plan to Increase Production Capacity.' ***This plan was never implemented. Trinity's Exh. 7 at p. 62.*** Further, Mr. Gottschall, a dual officer for both Greenville and Ampco, was the only person with a connection to Ampco who attended a meeting in Washington DC regarding Greenville's Plan. Trinity's App. Exh. 318; Ampco's App. Exhs. 30 and 31.

(ECF No. 224 at 29) (emphasis added.) The parties did not provide the court the page of Siddons' deposition, i.e., Trinity's exhibit 7, page 62, that Ampco refers to as evidence that the plan to increase capacity was never implemented. Trinity provided page 61 of Siddons' deposition. The last

question on that page reads: "Whatever came of that process? Was it something that was implemented? Help me understand?" (ECF No. 155–4 at 15.) The very next page of the deposition, i.e., page 62, is not included in the record. It is difficult to understand how exhibits 317 and 318 support Trinity's position. The plan to increase capacity appears to be authored by Greenville. Although Gottschall is listed as a representative of Ampco in the meeting notes in exhibit 318, he is an officer of Greenville. Under those circumstances, exhibits 317 and 318 are insufficient to show Ampco operated the North Plant.

A reasonable jury based upon the evidence of record could not conclude that Ampco's actions with respect to North Plant were "eccentric under accepted norms of parental oversight of a subsidiary's facility." 🚩 *Bestfoods,* 524 U.S. at 72. For this reason, Ampco's motion for summary judgment with respect to Trinity's direct liability claims will be granted and Trinity's partial motion for summary judgment with respect to Trinity's direct liability claims will be denied.

## B. *Derivative Liability* [7]

The second issue before the court is whether Ampco may be held derivatively liable for Greenlease's actions in operating the North Plant. "Corporate veil-piercing has been approved in the context of CERCLA actions. The contours of alter ego liability in this context are determined by federal common law." *United States v. Union Corp.,* 259 F.Supp.2d 356, 388 (E.D.Pa.2003) (citing 🚩 *Bestfoods,* 524 U.S. at 63–64.) Under the Court of Appeals for the Third Circuit's alter ego test, a parent company's derivative liability is determined in light of eight non-exclusive factors: (i) its subsidiary's gross undercapitalization for its purpose, (ii) failure to observe corporate formalities; (iii) nonpayment of dividends; (iv) the insolvency of the subsidiary; (v) siphoning of funds of the corporation by the dominant stockholder; (vi) nonfunctioning of other officers or directors; (vii) absence of corporate records; and (viii) whether the corporation is merely a facade for the operations of the dominant stockholder or stockholders. 🚩 *United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981). The situation "must present an element of injustice or fundamental unfairness, but a number of these factors can be sufficient to show such unfairness." *Id.* No single factor is dispositive; rather, a determination on veil-piercing is to be made based on the totality of the circumstances. *Id.* Piercing the corporate veil "does not require proof of actual fraud." 🚩 *Trustees of Nat. Elevator Indus. Pension, Health Benefit &*

*Educ. Funds v. Lutyk*, 332 F.3d 188, 194 (3d Cir.2003). Alter ego theory, however, "has elements of fraud theory, [so] it too must be shown by clear and convincing evidence." *Id.* at 192. The alter ego factors relevant to this case that were addressed by Trinity and Ampco and the evidence of record with respect to those factors are discussed below.

### 1. *Subsidiary's gross undercapitalization for its purpose; siphoning of funds of the corporation by the dominant stockholder*

**\*13** Trinity argues that "Ampco's siphoning of funds from Greenlease once Greenlease became a non-operating subsidiary warrants veil piercing" in this case because it left Greenlease undercapitalized and shows Ampco's dominion and control over Greenlease. (ECF No. 152 at 20; ECF No. 212 at 7.) Ampco argues that at all relevant times, Greenlease was adequately capitalized in light of the liabilities known to Ampco, and, therefore, veil piercing is not warranted in this case. (ECF No. 209 at 7.)

The general rule is gross undercapitalization is to be analyzed according to the subsidiary's initial capitalization. *Trustees of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk*, 332 F.3d 188, 197 (3d Cir.2003) ("[T]he inquiry into corporate capitalization is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business"). The relevant inquiry with respect to whether a subsidiary is grossly undercapitalized is whether the corporation's "resources [are] reasonable 'in relation to the nature of the business of the corporation and the risks attendant to such businesses.' " *Pharmacia Corp. v. Motor Carrier Servs. Corp.*, 309 F. App'x 666, 672 (3d Cir.2009). Trinity argues that veil piercing is warranted "when a non-operating subsidiary is drained of assets that could have been used to satisfy its liabilities—particularly when the assets could have been used to satisfy environmental liabilities." (ECF No. 152 at 19–20.) As pointed out by Ampco, however, piercing the corporate veil is warranted based upon the siphoning of a subsidiary's assets only when the parent has *knowledge* of the subsidiary's liabilities when the assets are siphoned from the subsidiary. *ITT Corp. v. Borgwarner Inc.*, Civ. Action No. Civ. Action No. 05–674, 2009 WL 2242904, at \*7 (W.D.Mich. July 22, 2009) ("Evidence that a parent corporation drained a subsidiary of its assets so that the subsidiary could not meet its known

environmental liabilities might well provide a basis for piercing the corporate veil. However, Plaintiff would have to show both knowledge of environmental liabilities and a removal of assets to avoid those liabilities.").

Here, the undisputed evidence of record in this case shows:

- Greenlease operated the North Plant until it was sold to Trinity in 1986. Up until that time, the company was solvent;

- After the sale of the North Plant to Trinity, Greenlease existed as a shell holding company without any business activities, for profit activities, or other commercial undertakings, did not have any employees, and held $250,000 in reserve for liabilities;

- In 1989 and 1990, respectively three and four years after Greenlease sold the North Plant to Trinity, Greenlease issued dividends to Ampco, leaving the $250,000 in reserve. At that time, Greenlease's alleged liability with respect to the North Plant was not *known* to Ampco or Greenlease.

**\*14** This evidence shows that Greenlease was not knowingly grossly undercapitalized because at the time it issued dividends to Ampco, it was a shell corporation, and there is no evidence of record that at a time of the issuance of the dividends, Ampco knew about the liabilities at issue in this case. As Ampco points out, the facts of this case are unlike the facts in the decisions cited by Trinity. In those decisions, the parent corporations were *aware* of the liabilities of the subsidiary corporations at the time the parent corporations siphoned funds from the subsidiary corporations. *Pharmacia*, 309 F. App'x at 672 (holding the subsidiary's assets were not reasonable in relation to the nature of its business "given its lack of revenue and acknowledged responsibility under the Agreement for (at least some) environmental contamination"); *Bernardin, Inc. v. Midland Oil Corp.*, 520 F.2d 771, 775 (7th Cir.1975) (affirming district court's decision that "the equities among the parties required and dictated [the plaintiff's] recovery from [the parent corporation defendant] which had taken over and acquired all that [its subsidiary] had had to offer its creditors."); *Union Corp.*, 259 F.Supp.2d at 390 ("Where the conduct of a dominant corporation is deliberate, with the specific intent to escape liability for a specific tort or class of torts, corporate veil piercing is justified. The court finds that Union's actions were a deliberate attempt to

evade anticipated liability for contamination of the Cottman Property." (internal quotations marks and citations omitted));

*Waykesha v.* Viacom, Int'l Inc., 404 F.Supp.2d 1112, 1119 (E.D.Wis.2005) (holding piercing the corporate veil was warranted because "[parent corporation] evaded its obligation to pay for its share of liability at the West Avenue Landfill by manipulating [the subsidiary] during the 1996 asset sale.");

AT & T Global Info. Solutions Co. v. Union Tank Car Co., 29 F .Supp.2d 857, 869 (S.D.Ohio 1998) (finding piercing the corporate veil was warranted where the parent corporation "owned all the relevant assets of [the subsidiary] from whom they profited for many years" when the subsidiary violated the CERCLA); *see* Crane v. Green & Freedman Baking Co., 134 F.3d 17, 23 (1st Cir.1998) ("wrongful diversion of corporate assets to or for controlling individuals at a time when the corporation is in financial distress ... can justify piercing the corporate veil"); United States v. Golden Acres, 702 F.Supp. 1097, 1106 (D.Del.1988) ("[D]efendants were siphoning funds out of the corporation at regular intervals ... [d]espite a mounting mortgage debt and an insolvent corporate shell.").

As noted, there is no evidence of record that Ampco knew about the environmental liabilities at issue in this case at the time the dividends were issued. Greenlease was not a operating company at the time it paid dividends to Ampco, and it was not knowingly grossly undercapitalized by Ampco. There is no evidence of at that time Greenlease or Ampco knew about liabilities of Greenlease that could exceed the $250,000 in reserve. Based upon the foregoing, the issuance of the dividends by Greenlease to Ampco approximately eighteen years prior to the commencement of this litigation is not a sufficient basis for piercing the corporate veil in this case.

**\*15** Trinity cites Atateks Foreign Trade, Ltd. v. Private Label Sourcing, LLC, 402 F. App'x 623 (2d Cir.2010), in support of its argument that "the siphoning off of funds from on entity to another can be probative of the domination exerted by one entity over another, especially when there is no commercially reasonable explanation for the transfer of assets." (ECF No. 212 at 7.) In this case, however, the undisputed evidence of record shows that Greenelease made the dividend payments to Ampco and left $250,000 in reserve for liabilities following the sale of the North Plant because Greenlease was a nonoperating company with no *known* liabilities exceeding the $250,000 in reserve at that time. Trinity did not point to evidence of record to show Ampco

"siphoned" any of Greenlease's funds during the time when Greenlease operated North Plant. The payments which Trinity is concerned about in this case, i.e., the dividend payments issued approximately eighteen years prior to the initiation of this case *and* after Greenlease sold all its assets, do not qualify as payments for which the is no commercially reasonable explanation. To the contrary, it would be unreasonable for Ampco to leave Greenlease's earnings from the sale of the North Plant in an account when at the time the dividends were issued Greenlease was a nonoperating company with no *known* liabilities exceeding the $250,000 in reserve. Accordingly, no reasonable jury could find Greenlease was grossly undercapitalized or that Ampco siphoned funds from Greenlease at any time relevant to this case.

### 2. *Nonfunctioning of other officers or directors*

Trinity alleges that Ampco dominated Greenlease because it "stocked" the Greenlease board of directors with people from the pool of Ampco's directors and officers. (ECF No. 152 at 20.) The Supreme Court has made clear, however, "that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."

Bestfoods, 524 U.S. at 69. Since courts generally presume "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary, ... it cannot be enough to establish liability ... that dual officers and directors made policy decisions and supervised activities at the [subsidiary]." [8] *Id.* A party arguing in favor of piercing the corporation veil must point to evidence to show the directors purportedly acting for the benefit of the subsidiary corporation were—in actuality—acting solely for the benefit of the parent corporation. The Supreme Court in *Bestfoods* did not "attempt to recite the ways in which [a party] could show that dual officers or directors were in fact acting on behalf of the parent[,]" but, as previously noted, stated:

Here, it is prudent to say only that the presumption that an act is taken on behalf of the corporation for whom the officer claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent.

**\*16** Bestfoods, 524 U.S. at 70 n. 13.

Greenlease's board of directors was comprised entirely of persons from the pool of Ampco's directors and officers; indeed, several of Greenlease's officers came from that pool as well. Greenlease's board of directors passed a resolution providing that Greenlease would be deemed to have adopted any action Ampco thought necessary and desirable to take on behalf of Greenlease. Notably, there is no evidence that Greenlease in fact deemed adopted any such action or that Ampco exercised any power under that resolution.

As stated by the Supreme Court, "it cannot be enough to establish liability ... that dual officers and directors made policy decisions and supervised activities at the [subsidiary]." *Bestfoods,* 524 U.S. at 69. Trinity has the burden to show that the directors of both corporations were acting solely for the benefit of Ampco when they made decisions for Greenlease. Trinity did not point to any evidence of record to show that any measure adopted by Greenlease ran contrary to Greenlease's best interests or that the conduct of the directors was contrary to "norms of corporate behavior." [9] *Bestfoods,* 524 U.S. at 70 n. 13. Under those circumstances, this factor, i.e., the nonfunctioning of other officers or directors, does not weigh in favor of piercing the corporate veil in this case.

### 3. *Whether the corporation is merely a facade for the operations of the dominant stockholder or stockholders.*

Trinity argues that Greenlease and Ampco "comingled" their assets and that Ampco provided Greenlease with several "free" services, such as legal and accounting services, insurance policies, and employee benefit plans. Plaintiffs did not cite to any decision that suggests the provision of these services from a parent to a subsidiary runs afoul of normal corporate behavior. To the contrary, courts have held legal and accounting services, *Catalina Mktg.,* 2003 WL 21542491, at *5, the provision of employee benefit plants, *Wehner v. Syntex Agribusiness, Inc.,* 616 F.Supp. 27, 30 (E.D.Mo.1985), and a centralized cash management system where accounting records reflect the indebtedness of one entity to another, *In re Acushnet River & New Bedford Harbour Proceedings,* 675 F.Supp. 22, 34 (D.Mass.1987), are consistent with the normal parent-subsidiary relationship. No reasonable jury could, therefore, find that based upon Ampco providing Greenlease with legal and accounting services, insurance policies, and employee benefit plans warrants piercing the corporate veil in this case.

### 4. *Policy Considerations*

Trinity argues that "Ampco's actions threaten to circumvent the fundamental purposes of CERCLA, HSCA, and RCRA." (ECF No. 212 at 9.) Trinity argues those statutes are meant to reach as far back into the past as necessary to identify those responsible for the harm, and, therefore, Ampco should be held responsible for the alleged harm in this case. Trinity's argument lacks merit, however, because based upon the foregoing discussion, Ampco is not *directly* responsible or *derivatively* responsible for the harm caused at the North Plant. Piercing of the corporate veil is, therefore, not warranted in this case.

### 5. *Conclusion*

**\*17** Based upon the foregoing discussion, Trinity failed to show by *clear and convincing* evidence that Greenville was an alter ego of Ampco. Ampco may have, among other things, retained oversight over Greenville, shared officers and directors between the two corporations, and approved large expenditures for Greenville, but the evidence of record is insufficient for a reasonable jury to find an element of injustice or fundamental unfairness in this case warranting piercing of the corporate veil. Greenville—while an active corporation—was never knowingly grossly undercapitalized by Ampco or was insolvent. Greenlease had its own employees, separate bank account number, and carried on its responsibilities as an entity separate and apart from Ampco. There is no evidence of record to show Ampco knew about North Plant's liabilities when Greenlease, a nonoperating company with no employees, paid Ampco dividends in 1989 and 1990. Under those circumstances, Trinity's motion for summary judgment will be denied with respect to its claims against Ampco. Ampco's motion for summary judgment will be granted with respect to those claims.

### C. *Common Law Claims—Negligence Per Se and Contribution*

The law concerning negligence per se "is so well established as to be beyond cavil." *C.C.H. v. Phila. Phillies, Inc.,* 596 Pa. 23, 940 A.2d 336, 347 n. 17 (Pa.2008). In *In re Reglan/Metoclopramide Litigation,* 81 A.3d 80, 94 n. 13 (Pa.Super.Ct.2013), the court explained:

> Pennsylvania recognizes that the standard of care may be prescribed by legislative enactment so that "a violation of the statute or ordinance may serve as the basis for

negligence per se." 🔖 *Wagner v. Anzon, Inc.,* 453 Pa.Super. 619, 684 A.2d 570, 574 (1996). The plaintiff must show: (1) that the purpose of the statute is "at least in part, to protect the interest of a group of individuals, as opposed to the public generally;" (2) that the statute clearly applies to the conduct of the defendant; (3) that the defendant violated the statute; and (4) that the violation was the proximate cause of the plaintiff's injuries." 🔖 684 A.2d at 574.

*Id.*

Here, Trinity argues Ampco was negligent because it violated the HSCA. In other words, the HSCA establishes the "duty" owed by Ampco, and the violation of that provision constitutes a breach of Ampco's duty of care. *See* 🔖 *Keifer v. Reinhart Foodservices, LLC,* Civ. Action Nos. 09–1187, 09–1558, 2012 WL 368047, at *5 (W.D.Pa. Feb.1, 2012) (citing 🔖 *Cabiroy v. Scipione,* 767 A.2d 1078, 1079 (Pa.Super.Ct.2001)). Summary judgment will be entered in favor of Ampco with respect to Trinity's claims for negligence per se because Ampco—based upon the foregoing discussion —cannot be found to have violated the HSCA [10] as a matter of law. Trinity's negligence per se claim, therefore, fails as a matter of law because Trinity is unable to establish liability on the part of Ampco.

Because Trinity cannot establish Ampco was either directly or derivatively liable for the harm alleged in this case, a reasonable jury could not find Ampco responsible for contribution to Trintiy. *United States v. Zarra,* Civ. Action No. 10–811, 2011 WL 3667313, at *4 (W.D.Pa. Aug.22, 2011) ("A claim for contribution based upon negligence is only proper when it arises between joint tortfeasors.") (citing *Nat'l R.R. Passenger Corp. v. URS Corp.,* 528 F.Supp.2d 525, 531 (E.D.Pa.2007). In other words, a reasonable jury could not find Trinity and Ampco are joint tortfeasors with respect to the North Plant. Under those circumstances, Trinity is not entitled to contribution from Ampco as a matter of law. Summary judgment will be entered in favor of Ampco with respect to Trinity's claim for negligence per se and the request for contribution.

### VI. *Conclusion*

**\*18** For the reasons stated in this opinion and on the record at the hearing on December 19, 2013, Ampco's motion for summary judgment (ECF No. 147) will be GRANTED, and Trinity's partial motion for summary judgment (ECF No. 151) will be DENIED with respect to its claims against Ampco.

An appropriate order will be entered.

### All Citations

Not Reported in F.Supp.3d, 2014 WL 1766083

---

### Footnotes

1 Other factual matters of record will be discussed in context when pertinent to a particular issue.

2 The designation of the parties involved in the criminal matter is inconsistent. The plea agreement was entered between the Pennsylvania Attorney General and Trinity Railroad. (ECF No. 150–19.) The Consent Order was entered into between the DEP and Trinity Industries. (ECF No. 150–19 at 31.) The sentence, imposed on December 21, 2006, was against Trinity Industries. (ECF No. 150–19 at 42.)

3 The parties agreed that the Consent Order "is an Order of [the DEP] authorized and issued pursuant to Section 1102 of HSCA, 35 P.S. § 6020.1102; Section 104(b) of the Land Recycling Act, 35 P.S. § 6026.104(b); and Section 1917–A of the Administrative Code, 71 P.S. §§ 510–17." (ECF No. 150–19 at 5.)

4 The Consent Order involves, in addition to the North Plant, the "South Plant," which is not part of this litigation. (*See* ECF No. 150–19 at 6.)

5 Under the Consent Order, the term "Response Actions" is defined as follows:

"Response Actions" shall mean any and all of the actions taken or to be taken by [the DEP], Trinity, and/or any other responsible persons under the direction of [the DEP], relating to and addressing the release and threatened release of any hazardous substances at the North Plant and South Plant. Response Actions include, but are not limited to: investigations of responsible persons; investigations of environmental conditions at the North Plant and South Plant; investigations of contaminated groundwater, if any, at and potentially migrating from the Plants, including groundwater (if any) that has migrated and contaminated drinking water; actions to respond to the release and threatened release of any hazardous substance at and/or potentially migrating from the North Plant and South Plant; and maintenance of those actions.

(ECF No. 150–19 at 9–10.)

6   The foregoing discussion refers only to the CERCLA claims (counts I and II) and not the RCRA claim (count III) or the HSCA claims (counts IV and V). The discussion is equally applicable to the RCRA claim and the HSCA claims, however, because those statutes have the same liability schemes as the CERCLA with respect to owners and operators. *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.,* 602 F.3d 204, 236 (3d Cir.2010) ("The District Court correctly held that Carpenter's liability "is neither greater nor lesser under the HSCA."... Indeed, the cost recovery and contribution provisions in HSCA are virtually identical to those in CERCLA....Thus, on remand, the District Court should continue to address the CERCLA and HSCA issues in this case identically.); *Bd. of Cnty. Commissioners v. Brown Grp. Retail, Inc.,* Civ. Action 08–855, 2009 WL 1108463, at *4 (D.Colo. April 24, 2009) ("As the definition of "operator" under RCRA is substantially the same as the definition under CERCLA, a finding that Plaintiff meets the former is sufficient to show Plaintiff meets the latter.").

7   The veil piercing principles are similar under federal and Pennsylvania law. *See United States v. Union Corp.,* 259 F.Supp.2d 356, 389 (E.D.Pa.2003) (citing *Ashley v. Ashley,* 482 Pa. 228, 393 A.2d 637, 641 (Pa.1978)). The foregoing discussion is, therefore, equally applicable with respect to Trinity's state law claims.

8   While this statement was made in the context of a direct liability analysis, courts have applied this principle when determining derivative liability as well, making this distinction inconsequential. *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484 (3d Cir.2001).

9   It is "assumed to be the norm that a parent will have not only ... the potential to exercise control [over the subsidiary], but to exercise it to a substantial degree." *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 150 (3d Cir.1988).

10  *See* footnote 6 *supra.*

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 236 of 247

Union Pacific Railroad Company v. Oglebay Norton..., Not Reported in Fed....

2018 WL 1722175
Only the Westlaw citation is currently available.
United States District Court, W.D. Texas, El Paso Division.

UNION PACIFIC RAILROAD COMPANY, Plaintiff,
v.
OGLEBAY NORTON MINERALS, INC.
and Oglebay Norton Company (n/k/a
Oglebay Norton Company LLC), Defendants.

EP–17–CV–47–PRM

Signed 04/08/2018

Filed 04/09/2018

**Attorneys and Law Firms**

Marisa Y. Ybarra, David S. Jeans, Ray, McChristian & Jeans, P.C., El Paso, TX, Michael Wayne Dobbs, AttorWilliam Creeger Petit, Kelley Drye & Warren, LLP, Houston, TX, Melissa E. Byroade, Kelley Drye & Warren LLP, New York, NY, for Plaintiff.

Keith E. Whitson, Stephanie A. Short, Schnader Harrison Segal & Lewis LLP, Pittsburgh, PA, Mark N. Osborn, Shelly W. Rivas, Kemp Smith LLP, El Paso, TX, for Defendants.

**ORDER GRANTING MOTION FOR
PARTIAL SUMMARY JUDGMENT**

PHILIP R. MARTINEZ, UNITED STATES DISTRICT JUDGE

 **\*1** On this day, the Court considered Plaintiff Union Pacific Railroad Company's [hereinafter "UPRR"] "Motion for Partial Summary Judgment" (ECF No. 44) [hereinafter "Motion"] filed on January 16, 2018, Defendants Oglebay Norton Minerals, Inc. [hereinafter "ONMI"] and Oglebay Norton Company's [hereinafter "ONC"] "Response to Plaintiff's Motion for Partial Summary Judgment" (ECF No. 45) [hereinafter "Response"] filed on January 30, 2018, and UPRR's "Reply in Support of its Motion" (ECF No. 46), filed on February 6, 2018, in the above-captioned cause.

After due consideration, the Court concludes that ONC is a "potentially responsible person" pursuant to the Comprehensive Environmental Response, Compensation,

and Liability Act ("CERCLA"),[1] and thus that UPRR's Motion should be granted.

**I. BACKGROUND**

 **A. History of the El Paso Site and the Slag**
This dispute revolves around which parties are liable for environmental cleanup efforts at a metal processing facility located in El Paso, Texas. UPRR claims that ONC, ONMI's corporate parent, is liable due to its prior operation of the facility. ONC[2] denies such liability. It claims that while a few of its employees assisted with remediation efforts purely on behalf of ONMI, ONC was not involved in operating the facility. Thus, the Court must decide whether ONMI was independently operating the facility, or whether ONC is liable as an operator.

Before the Court makes this determination, some historical context is necessary. This dispute dates back to 1975, when a company called "Parker Brothers" purchased copper "slag"[3] from the American Smelting and Refining Company ("ASARCO"), which operated a smelter in El Paso, Texas. Mot. Ex. 1, "Plaintiff's Proposed Undisputed Facts" ¶1 [hereinafter "UF"].[4] Parker Brothers stored its slag on a piece of property located adjacent to ASARCO's smelter, which property [hereinafter "the Site"] was owned by UPRR's predecessor, Southern Pacific. *Id.* at ¶2. When UPRR merged with Southern Pacific in 1997, UPRR became the owner of the Site, and assumed the lease agreement with Parker Brothers. *Id.* at ¶3.

 **\*2** On April 19, 1999, ONMI was incorporated in Delaware as a wholly-owned subsidiary of Norton Industrial Sands, Inc., which itself was a wholly-owned subsidiary of ONC. *Id.* at ¶4. ONMI was incorporated for the purpose of acquiring Parker Brothers' assets, including all of the slag material that was being stored at the Site. *Id.* at ¶¶4–7. On April 20, 1999, ONMI purchased the slag material on the Site and took possession of it from Parker Brothers. *Id.* at ¶7. Further, ONMI entered into a new agreement to lease the Site from UPRR for "the purpose of operating a plant for the processing of slag." *Id.* at ¶9. ONMI had no other operations than those it conducted at the El Paso Site. *Id.* at ¶11.

On December 11, 2001, ONMI received a Notice of Violation ("NOV") from the Texas Commission on Environmental Quality ("TCEQ")[5] that outlined two different environmental violations and demanded compliance

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 237 of 247

Union Pacific Railroad Company v. Oglebay Norton..., Not Reported in Fed....

within thirty days. *Id.* at ¶16. Specifically, the TCEQ took issue with the "unauthorized discharges of baghouse dust and undersize slag product" on the soil and unpaved surfaces at the Site, as well as those substances' storage in a "tote bag." [6] Mot. Ex. 16 at Defs_2915. Coincidentally, around the same time as the NOV, "Oglebay Norton closed the El Paso site as part of its 2001 restructuring" on an undisclosed day in December of 2001. UF ¶13. Thus, ONMI ceased active operations at the Site, and immediately thereafter became insolvent. UF ¶14.

### B. Initial Cleanup Efforts

The course of events following ONMI's cessation of active operations at the Site comprises the heart of the current dispute. The parties paint a drastically different picture regarding which party, ONMI or ONC, controlled the post–2001 cleanup activities undertaken in an attempt to address the environmental violations alleged by TCEQ. This is because the party that "operated" the facility during the remediation efforts is liable under CERCLA for costs stemming from cleanup of that operation.

There is no dispute that in 2002, Steve Herron, the Manager of Technical Services and Regulatory Affairs for ONMI, applied to TCEQ's "Voluntary Cleanup Program" [hereinafter "the Program"]. The Program "provides administrative, technical, and legal incentives to encourage the cleanup of contaminated sites in Texas." Voluntary Cleanup Program, https://www.TCEQ.Texas.Gov (last visited Mar. 26, 2018). ONMI was accepted into the Program, and Herron appears to have initially been the lead contact between ONMI and TCEQ. *See, e.g.*, Resp. Ex. 30 (letter from Herron to TCEQ); Resp. Ex. 33 (same). It is unclear how much cleanup of the Site was actually accomplished under Herron's supervision.

The evidence suggesting ONC's control of operations at the Site begins in 2005. In that year, Darlene Bray—ONC's Senior Environmental, Health, and Safety Manager—took over as "project manager" of the Site. UF ¶18. The reason for the switch from Herron, an ONMI employee, to Bray, an ONC employee, is unclear. Bray provided services to ONMI pursuant to ONC's "shared services" program with ONMI. Resp. 2. Pursuant to this arrangement (the contours of which are not clearly defined), ONC provided legal services, tax services, financial services, human resources, and, importantly, environmental services to ONMI and other subsidiaries. *See* Resp. Ex. 1, 7 (Excerpts of Daniel Rose and Rochelle Walk deposition transcripts). ONC's subsidiaries

shared these services because it was not cost-effective for each subsidiary to pay for its own full-time employees in each of these fields. *See* Resp. Ex. 7, Walk Dep. 216:6–21. ONMI allegedly paid ONC for these services. Resp. 2. ONC claims its employees worked "on behalf of" ONMI pursuant to this shared services arrangement.

**\*3** However, there is almost no evidence that ONMI was involved in remediation efforts on the Site after 2004 once Bray got involved. Bray was employed solely by ONC, never by any other ONC affiliate including ONMI. UF ¶19. She reported directly to ONC's Corporate Director of Environmental Health and Safety, Timothy Adkins. *Id.* Adkins appears to be the most senior Environmental Health & Safety officer at ONC, and reported to ONC's Board of Directors. In 2005, Adkins reported to the Board that because of the "high profile nature of the El Paso site," remediation was being "very closely monitored and managed by" Bray. Mot. Ex. 20. ONC does not contest that Bray made environmental, health, and safety recommendations for the Site, subject to approval only by Adkins, who had final decision-making authority over the Site. UF ¶21. UPRR lists numerous uncontested facts detailing both Bray and Adkins's involvement in remediating the Site and working with TCEQ to bring the Site into compliance. *See* UF ¶¶22–23.

In July 2005, TCEQ informed Bray, now the lead contact in the environmental cleanup effort at the Site, that the piles of slag on the Site constituted "solid waste" and required a response action. UF ¶25. In August 2005, Bray and Adkins retained Environmental Resources Management ("ERM"), an environmental consulting firm. ERM responded to TCEQ that the slag had various beneficial purposes and that it was not waste. *Id.* at ¶26. After receiving this response, TCEQ changed its position and stated that "[i]f the slag at the site is being used in a beneficial manner as described in the response letter, it will not be considered waste. However, if it is not being used, is just stockpiled, or otherwise left at the site, it will be considered a solid waste[.]" UF ¶28. Because TCEQ did not require an immediate response action for the slag piles, Bray's sole focus became addressing the previous outstanding NOV rather than removing the slag.

To that end, Bray undertook various measures to bring the Site into compliance. Specifically, she worked with ERM to conduct various soil treatments that lowered the elevated lead content in the soil on the Site. *Id.* at ¶29. In March 2006, Bray submitted a request to TCEQ for a "no further action" letter, indicating that she believed there were no

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 238 of 247

Union Pacific Railroad Company v. Ogleby Norton..., Not Reported in Fed....

longer environmental violations on the Site. *Id.* In April 2006, TCEQ issued a no further action letter and removed the Site from TCEQ's Voluntary Cleanup Program. *Id.* at ¶30.

#### C. Efforts to Remove the Slag from the El Paso Site

Despite being in compliance with TCEQ's initial NOV, Bray continued environmental cleanup efforts and attempted to remove the remaining piles of slag from the Site. *Id.* at ¶31. As it had done with the previous cleanup, ONC paid for all of the efforts to remove the slag. *Id.* at ¶32. Bray, along with Adkins and other ONC employees, extensively contemplated how to remove the slag piles from the Site. According to Bray, there were three options for removing the slag, which she ranked in order of economic preference: sell the slag to a buyer, give the slag away, or pay to dispose of the slag. *Id.* at ¶36. While Bray and other ONC employees considered multiple buyers for the slag, *id.* at ¶37, the ONC Board of Directors was assured that the slag would be removed by the end of 2006, *see* Mot. Exs. 35–36. There is some evidence that Bray found a buyer and sold a small portion of the slag, but ONC claims there is no evidence to support that this sale took place. Resp Ex. 1 at 19. Regardless, on March 1, 2007 (very close to the expiration of ONMI's lease on the Site), Adkins reported to ONC's Board of Directors that efforts to sell or give away the slag had been unsuccessful, and he suggested that if they could not reach a deal with their "final potential customer[,]" "disposal at a significantly higher cost is the only remaining option for removal." Mot. Ex. 39.

Shortly before Adkins's report to the Board, ONC employees discovered that UPRR had allegedly removed a "rail spur"[7] that serviced the leased Site. UF ¶41. UPRR admits that it removed the rail spur without consulting ONC or ONMI, but claims that ONMI's lease did not include use of the rail spur and that UPRR had a unilateral right to remove the spur. UF ¶41 n.5; *see also* Mot. Ex. 37 (email between UPRR employees suggesting an unrelated motive for removing the spur and indicating their belief that the spur belonged to UPRR). Viewing the evidence in a light most favorable to ONC, the removal of the rail spur seriously hindered Bray and others' ability to find a buyer for the slag. As Bray stated in a memo to ONC Vice President–Law Dan Rose (ONC's chief legal officer),[8] the rail spur had offered the most economical form of removing the slag. Mot. Ex. 40.

**\*4** On May 10, 2007, Rose sent UPRR a letter declaring that UPRR's "unilateral action and interference [by removing the rail spur] with [ONMI's] operations on the Premises"

had "frustrated" ONMPs efforts to wind down operations at the Site. Mot. Ex. 41. Rose stated that despite UPRR's "interference with [ONMI]'s use of the premises," ONMI had continued to attempt to find a buyer for the slag but had been unsuccessful. *Id.* Rose then notified UPRR that ONMI thereby terminated the lease and surrendered possession of the Site "as is," with the piles of slag still present. *Id.* ONMI then vacated the Site.

UPRR responded to Rose's letter and disputed his claims about its interference with the property and ownership of the rail spur. UF ¶46. Neither Rose nor any other ONC or ONMI employee followed up or investigated UPRR's response. *Id.* at ¶46.

#### D. UPRR's Disposal of the Slag

After receiving the letter allegedly terminating the lease agreement, UPRR came into possession of the Site, which included the slag piles. UPRR removed the slag piles and slag-containing materials from across the Site and disposed of them at a "Texas Custodial Trust Site." UF ¶52. ONC does not contest that some of the slag material was properly considered "solid waste" and contained hazardous substances.[9] UF ¶50–51. UPRR claims that it has incurred over four million dollars in expenses to clean up the slag and remediate the Site. Mot. 1. Accordingly, it seeks reimbursement from ONC for its expenses pursuant to CERCLA and the Texas Solid Waste Disposal Act. *Id.*

### II. LEGAL STANDARD

#### A. Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(a), a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute will be found to exist "if the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Rogers v. Bromac Title Servs., LLC*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting 🚩 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ). "A dispute 'is material if its resolution could affect the outcome of the action.' " 🚩 *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 504 (S.D. Tex. 2015) (quoting 🚩 *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) ).

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 239 of 247

Union Pacific Railroad Company v. Ogilby Norton..., Not Reported in Fed....

"Under Federal Rule of Civil Procedure 56(c), the party moving for summary judgment bears the initial burden of ... 'identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact.' " *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ). When the moving party has met its initial burden, "the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). In adjudicating a motion for summary judgment, a court "consider[s] evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in favor of that party." *Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014).

### B. CERCLA Liability

**\*5** CERCLA was enacted in 1980 as a broad, remedial response to environmental harm. *See Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664, 667 (5th Cir. 1989). The statute encourages a timely response to environmental hazards and ensures the "costs of such cleanup efforts [a]re borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009). As such, courts agree that CERCLA should be construed liberally to effectively implement its goals. *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 242 (5th Cir. 1998); *Asarco LLC v. Cemex, Inc.*, 21 F. Supp. 3d 784, 800 (W.D. Tex. 2014) (citing *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 258 (3d Cir. 1992) ).

Unfortunately, courts also agree that CERCLA, a hastily enacted legislative compromise, is poorly drafted, ambiguous, and difficult to interpret. *Amoco Oil*, 889 F.2d at 667 ("[B]ecause [CERCLA] was enacted as a 'last-minute compromise' between three competing bills, it has 'acquired a well-deserved notoriety for vaguely drafted provisions and an indefinite, if not contradictory, legislative history.' " (quoting *United States v. Mottolo*, 605 F. Supp. 898, 902, 905 (D.N.H. 1985) ) ). [10] CERCLA imposes strict liability for environmental contamination upon four broad classes of potentially responsible parties:

(1) the owner and operator of a vessel or a facility,

(2 )any person [11] who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of ["owner" or "operator"],

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances ["arranger"], and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance ....

*Burlington*, 556 U.S. at 609–10 (quoting 42 U.S.C. § 9607(a) ). CERCLA further provides that those parties are specifically liable for

(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan;

(B) any other necessary costs of response incurred by any other person consistent with the national contingency plan;

(C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and

(D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

42 U.S.C. § 9607(a).

**\*6** UPRR brings the current Motion solely for the purpose of determining whether ONC is an "operator" or "arranger" pursuant to CERCLA § 9607(a). To determine operator liability, the Court must determine whether ONC "operated" the El Paso Site "at the time of disposal of any hazardous

Union Pacific Railroad Company v. Oglebay Norton..., Not Reported in Fed....

substance." Because the Court concludes that ONC was an "operator" of the El Paso Site when the slag was disposed of, which is sufficient to impose CERCLA liability on ONC, it declines to analyze whether ONC was also an arranger.

### C. Operator Liability

CERCLA imposes liability on both "owners" and "operators" of a polluting facility. A parent company may only be derivatively liable as an "owner" for the actions of a subsidiary when a plaintiff can pierce the subsidiary company's corporate veil pursuant to principles of corporate law. *United States v. Bestfoods*, 524 U.S. 51, 63–64 (1998). However, a plaintiff need not pierce the subsidiary's veil to hold a parent liable "for its own actions in *operating* a facility owned by its subsidiary." *Id.* at 64 (emphasis added). Thus, "derivative liability cases are to be distinguished from those in which 'the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management' and 'the parent is directly a participant in the wrong complained of' "—i.e., the parent "operated" the facility. *Id.* (quoting Douglas & Shanks, *Insulation from Liability Through Subsidiary Corporations*, 39 Yale L.J. 193 (1929) ).

UPRR here seeks summary judgment on the question of whether ONC was an operator of the Site, but does not seek judgment on whether ONC was an owner of the Site. Mot. 5 ("The sole element of UPRR's CERCLA claim before the Court is whether ONC is an "operator" and an "arranger."). Thus, the Court's inquiry is limited to ONC's interaction with the Site, and the Court need not analyze broader questions related to whether ONMI was a sufficiently independent/legitimate entity such that its parent corporations are shielded from liability.

"[U]nder CERCLA, an operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility." *Bestfoods*, 524 U.S. at 66. The statute "obviously meant something more than mere mechanical activation of pumps and valves, and must be read to contemplate 'operation' as including the exercise of direction over the facility's activities." *Id.* at 71. However, the term "operator" is limited in the sense that it refers to "operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations." *Id.* Thus, for an entity to be considered an operator under

CERCLA, "there must be some nexus between that ... entity's control and the hazardous waste contained in the facility." *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 520 (S.D. Tex. 2015) (quoting *Geraghty & Miller, Inc. v. Conoco Inc.*, 234 F.3d 917, 928 (5th Cir. 2000) ).

The Supreme Court has suggested situations in which a parent company's control over the offending facility might suggest the parent's own CERCLA liability. On the one hand, operator liability usually attaches where the parent company operates "in the stead of its subsidiary or alongside its subsidiary in some sort of joint venture." *Bestfoods*, 524 U.S. at 71. Further, parent companies are liable as operators where "actions directed to the facility by an agent of the parent alone are eccentric under accepted norms of parental oversight of a subsidiary's facility." *Id.* at 72. On the other hand "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts." *Id.* at 69. Further, it is never sufficient for liability that "dual officers and directors made policy decisions and supervised activities at the facility[.]" *Id.* at 69–70.

### III. ANALYSIS

**\*7** Because determining operator liability depends so heavily on the facts of each case, it is difficult to draw concise analogies between this case and other CERCLA operator cases within the Fifth Circuit and in other circuits. The *Bestfoods* opinion remains the clearest guiding doctrine in resolving this dispute. Thus, the Court relies mainly on that decision in the following analysis.

### A. Whether ONC was an Operator

To determine whether ONC was an operator of the Site, the Court must determine whether ONC "directed the [environmental] workings of," "managed," or "conducted the [environmental] affairs of" the Site. *Bestfoods*, 524 U.S. at 66. This occurs when a parent company "operates the facility in the stead of its subsidiary [.]" *Id.* at 71. Here, the summary judgment evidence adduced by UPRR and the dearth of relevant evidence produced by Defendants are sufficient to conclude that ONC was an operator of the El Paso Site.

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 241 of 247

Union Pacific Railroad Company v. Oglebay Norton..., Not Reported in Fed....

There is clear, uncontested evidence that Darlene Bray and Timothy Adkins were the individuals mainly responsible for environmental decision-making and compliance from 2005 until the termination of the lease. After becoming the project manager for the TCEQ voluntary cleanup program in 2005, Bray worked closely with ERM (the environmental consulting firm) and TCEQ (the Texas regulatory body) and oversaw the treatment of soil at the Site to reduce lead content and bring the Site into TCEQ compliance. Mot. Ex. 18, Bray Dep. 39:6–40:22. After that project, Bray spearheaded the effort to sell or give away the slag piles on the property. *Id.* at 90:6–10. Over the course of two years, Bray admits that she spent over sixty days at the Site working on remediation projects. *Id.* at 59:13–15. Adkins had final decision-making authority over all of Bray's activity during this period. Mot. Ex. 13, Adkins Dep. 74:24–75:10.

Bray and Adkins were exclusively ONC employees, and were never employed or paid by ONMI. Bray and Adkins made exhaustive efforts to bring the Site into compliance with TCEQ requirements, and then to sell or give away the slag. ONC has presented almost no evidence that ONMI employees, managers, or directors were involved in environmental decision-making for the bulk of these remediation efforts. [12] There is virtually no correspondence between Bray, Adkins, and any ONMI employees. There are no ONMI board-meeting minutes discussing environmental activities. There are no internal emails between ONMI employees regarding environmental cleanup. There is no evidence that ONMI employees, managers, or directors took any action or made any decisions regarding soil contamination or attempts to sell the stockpiled slag after 2005. Instead, every piece of evidence produced indicates that Bray managed the vast majority of remediation activities, Adkins supervised Bray and had final decision-making authority, and both reported to ONC's Board of Directors with periodic updates about remediation. Thus, the Court concludes that ONC, not ONMI, managed, directed, and conducted the environmental cleanup activities at the Site.

**\*8** Although the Court comfortably concludes that ONC has failed to raise a fact issue regarding its status as an operator, any doubts about this status are quelled by CERCLA's statutory purpose. Specifically, courts should construe CERCLA's "broad remedial" provisions to ensure that parties responsible for environmental damage bear the cost of remediation. *MEMC Pasadena, Inc. v. Goodgames Indus. Sols., LLC*, 143 F. Supp. 3d 570, 577 (S.D. Tex.

2015), *opinion modified on reconsideration*, No. 4:13–CV–599, 2015 WL 9259088 (S.D. Tex. Dec. 18, 2015) (citing *Uniroyal Chem. Co. v. Deltech Corp.*, 160 F.3d 238, 242 (5th Cir. 1998) ). ONC's agents were the parties responsible for ensuring environmental compliance at the Site. They attempted repeatedly to remove the slag from the property, but ultimately decided to remove none of it and walk away from the removal effort due largely to cost. UPRR, the lessor of the Site, was then forced to remove all of its lessee's hazardous waste and bear the full cost of that removal. Shifting at least some of the cleanup costs here from UPRR to ONC is consistent with CERCLA's purpose of ensuring that any responsible parties pay their share for cleanup efforts. Thus, the Court's conclusion that ONC is liable here is bolstered by the policy undergirding CERCLA.

ONC proffers two main theories for why it should not be considered an operator. [13] First, it claims that ONC employees acted solely "on behalf of, and for the benefit of, ONMI, rather than ONC[.]" Resp. 1. Second, it claims that a parent company is not an "operator" of a facility where the parent only becomes involved in the facility to take remedial action and address environmental concerns. *Id.* at 8. Adopting a much narrower view of the term "operator," ONC claims that an operator must be part of environmental decision-making during the facility's active operation, as opposed to once it has ceased operations and the only ongoing concern is remediation. *Id.* For the following reasons, the Court rejects both of these arguments.

### 1. Whether ONC Employees Worked on Behalf of ONMI

ONC leans heavily on its shared services model to contest its own liability. ONC argues that "where an employee of the parent is providing services to the subsidiary, that employee is working on behalf of the subsidiary, not the parent." Resp. 6. Further, regardless of who actually pays the employee's salary, an employee of a parent company need only "purport" to "represent the subsidiary or act for the subsidiary's benefit" to be acting "on behalf of" the subsidiary. *Id.* at 5–6. Thus, by providing environmental services to ONMI and claiming to represent ONMI, ONC acted on behalf of ONMI pursuant to their shared services arrangement. *Id.*

This argument is based on a contorted reading of *Bestfoods*. *Bestfoods* did not indicate that corporate officers of a parent company can avoid CERCLA liability by working as self-

Union Pacific Railroad Company v. Oglebay Norton..., Not Reported in Fed....

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 242 of 247

proclaimed "representatives" of a subsidiary and purporting to work for its benefit. While that case did hold that there is a presumption that *dual* officers who work for both the parent and subsidiary are presumed to be working on behalf of the subsidiary when making decisions for the subsidiary, that presumption does not apply here, where the entities claiming to work "on behalf" of the subsidiary are not employees thereof. Instead, *Bestfoods* specifically noted that where an entity is employed solely by the parent company, and not the subsidiary, the actions of that employee are "of necessity taken only on behalf of" the parent. 📙 *Bestfoods*, 524 U.S. at 72. The *Bestfoods* Court remanded the case to develop the factual record on the issue of whether "an agent" of the parent—"who played a conspicuous part in dealing with" environmental operations of the subsidiary—was sufficiently involved to confer liability on the parent company. 📙 *Id.* at 72–73.

**\*9** Thus, in this case ONC needed to provide evidence that raised an issue of fact as to whether its own agents were working on behalf of ONMI rather than ONC itself. To do this, ONC provides the following evidence: (1) a letter written by a dual ONC/ONMI officer indicating that the officer believed that Timothy Adkins was an "authorized representative" of ONMI (Resp. Ex. 25); (2) correspondence from ERM indicating that it believed it was working for ONMI, not ONC (*see, eg.*, Resp. Exs. 27, 28, 34, 36); (3) correspondence between TCEQ and various entities indicating that TCEQ believed it was working with ONMI, not ONC (*see, e.g.*, Resp. Exs. 5, 45, 46, 50); (4) correspondence from Adkins and Bray purporting to be ONMI representatives in communications with third parties [14] (*see, e.g.*, Exs. 41, 44, 55); and (5) submissions to TCEQ regarding environmental cleanup that came from ONMI, not ONC. *See* Resp. Ex. 1 at ¶¶61–65. The Court finds that this evidence does not raise a fact issue as to whether the ONC employees were working on behalf of ONMI.

Rudimentary principles of agency law guide the Court's conclusion. "At the core of agency is a 'fiduciary relation' arising from the 'consent by one person to another that the other shall act on his behalf and *subject to his control*[.]'" 📙 *Arguello v. Conoco, Inc.*, 207 F.3d 803, 807 (5th Cir. 2000) (quoting 📙 *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 392 (1982) ) (emphasis added). Accordingly, claiming to be someone's agent and/or purporting to work on their behalf is not equivalent to actually establishing a principal-agent relationship. *See* Restatement (Third) Of Agency § 1.02 Cmt. A (2006) ("[H]ow the parties to any given relationship label it is not dispositive [in determining the nature of the relationship.]"). Indeed, "courts consistently emphasize that the most important factor [in determining an agency relationship] is the extent to which the alleged principal has a 'right of control' over the alleged agent[.]" *Cardinal Health Sols., Inc. v. Valley Baptist Med. Ctr.*, 643 F. Supp. 2d 883, 892 (S.D. Tex. 2008).

Here, ONC's claim to be acting "on behalf of" ONMI is missing a crucial element—evidence that ONMI had any control over ONC employees' decisions after 2005, or that ONC's officers had an obligation to work in ONMI's interest. [15] ONC provides no evidence that its employees had an obligation to follow ONMI direction, include ONMI employees in decision-making, request ONMI approval for decisions, or protect ONMI's interests as a fiduciary or otherwise. While there is extensive evidence that Adkins, Bray, and other ONC employees *claimed* to work for ONMI and that various third parties believed them, there is no evidence that they actually did work on ONMI's behalf. [16]

**\*10** Further, ONC has provided no evidence of a legally enforceable agreement between ONMI and ONC demonstrating that ONC was working on ONMI's behalf. ONC's evidence of a "shared services model" does not suffice in this regard. ONC argues that while it paid for remediation expenses at the Site, those expenses were "allocated to ONMI." Resp. Ex. 1 at ¶32. Thus, ONC claims that ONMI was paying for ONC's services, and therefore that ONC's agents worked on behalf of ONMI. Resp. 2. However, ONC admits that these remediation expenses were merely "allocated" to ONMI using ONC's "shared treasury services." *Id.* ONC's expert explained that ONC would pay for the services out of its own coffers but allocate the debt on ONMI's balance sheet. Resp. Ex. 24 at 15–16. Thus, ONMI apparently had no autonomy to control the services it paid for. ONC fails to explain how its own decision to allocate remediation expenses to a non-operational, insolvent subsidiary indicates that its own employees worked on behalf of the subsidiary. By all accounts, it appears ONC functionally paid for the services itself and became a creditor to ONMI with no expectation to be paid back. In sum, the shared services model does not indicate that ONC employees were working for ONMI, or that ONMI had any control whatsoever over remediation operations.

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 243 of 247

Union Pacific Railroad Company v. Oglebay Norton..., Not Reported in Fed....

The Court finds that ONC has not brought forth any compelling evidence that its employees were agents of ONMI, or that ONMI retained any authority to manage, direct, or implement environmental decisions at the Site at the time that the lease agreement with UPRR was terminated. This is sufficient for the Court to impose CERCLA operator liability upon ONC. [17]

### 2. Whether Remediation Constitutes Operation

Next, ONC argues that it never "operated" the Site because ONMF's operations ceased in 2001, and any activities that occurred on the premises were related solely to environmental cleanup. ONC claims that "cleaning up the property and attempting to remove potentially hazardous substances" is not the type of "environmental operations decisions contemplated by *Bestfoods*[.]" Resp. 8. Significantly, ONC cites no cases to support this proposition, and relies mainly on a policy argument regarding why an opposite conclusion would discourage Good Samaritans from assisting with remediation. [18] *Id.* at 10.

However, the statutory language of CERCLA and the *Bestfoods* decision foreclose this argument. Neither of these sources of law indicate that former operator liability can only attach where the putative operator was involved with the facility while other operations besides remediation were still active. The statute simply requires that a putative former operator conduct activities sometime in the past and "at the time of disposal" of any hazardous substances. As discussed further *infra*, the "disposal" of the slag piles occurred when ONC ceased its attempts to sell them and abandoned them at the Site. Thus, ONC operated the facility in the past at the time of disposal, which satisfies the statute.

Further, a past operator must only "manage, direct, or conduct operations specifically *related to* pollution" such as "decisions about compliance with environmental regulations." 🚩 *Bestfoods*, 524 U.S. at 66–67 (emphasis added). This broad language undoubtedly encompasses an operator that makes decisions solely about remediation after a facility has ceased other operations. [19] *Cf.* 🚩 *Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Prot.*, 725 F.3d 369, 381 (3d Cir. 2013) (rejecting a similar argument that a current operator should not be held liable because the operator "ha[d] only managed remedial activities on the

site"). Thus, the fact that ONC had no involvement in ONMI's main operations from 1999–2001 is of no consequence.

### B. Whether the Slag was a Hazardous Substance and Whether it was "Disposed of"

**\*11** In order to determine that ONC is a potentially responsible person under CERCLA, the Court must also determine whether the slag was a "hazardous substance" and whether there was a "disposal" of the slag when ONC operated it. First, ONC does not contest that at least some of the slag removed from the Site contained material that satisfied the CERCLA definition of "hazardous substance." *See* Resp. Ex. 1 at 24 ("... [C]ertain material on the premises included hazardous substances[.]"). UPRR also provides evidence that supports this conclusion. *See* Mot. Ex. 46 (agreement between UPRR and a third party for disposal of the slag indicating that the slag would include hazardous substances). Thus, the Court concludes that the slag that UPRR ultimately removed from the Site contained some hazardous substances.

Second, UPRR argues that ONC's decision to leave the slag as it was and terminate the lease with UPRR constitutes "disposal" of the slag. UPRR alleges that ONC knew that "any unused slag would need to be removed from the Site or otherwise remediated" and still decided to "abandon" the material. Mot. 2–3. UPRR reasons that failing to take action to remediate or remove the slag when ONC had possession or authority over it constitutes disposal of the slag at the Site. The Court agrees.

> "The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

🚩 *Joslyn Mfg. Co. v. Koppers Co.*, 40 F.3d 750, 761 (5th Cir. 1994). Some of the terms in this definition, such as "deposit" or "inject," imply that that an operator must take affirmative steps to alter the previous condition of or transport the hazardous substance. However, other terms, such as "leak" or "spill," imply that the *failure* to take action or exercise due care can constitute a disposal as well. *See* 🚩 *id.* at 761–62. The definition of disposal does not explicitly refer to situations where an operator of leased property

Union Pacific Railroad Company v. Oglebay Norton..., Not Reported in Fed....

Case 4:23-cv-03560 Document 120-2 Filed on 01/19/24 in TXSD Page 244 of 247

abandons hazardous material, leaving the lessor responsible for removing it.

Here, the Court has already held that ONC took extensive remedial action on the Site. This included efforts to sell the stockpiled slag. *See* Mot. Ex. 32 (email from Darlene Bray to ONC employees detailing her efforts to sell the slag). This strongly suggests that ONC had control of the slag and authority to remove it. When those efforts were unsuccessful, ONC left the slag (which did not belong to UPRR) on the property and terminated ONMI's lease agreement. [20] It is undisputed that both Bray and Adkins knew that if the slag were "stockpiled, or otherwise left at the [S]ite, it [would] be considered a solid waste." Mot. Ex. 23 (letter from TCEQ to Darlene Bray). Under these facts, it seems clear that ONC "disposed of" the slag by abandoning it on the premises ONMI had leased from UPRR. *See* Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 847 (4th Cir. 1992) ("[W]e think there clearly was a disposal in 1962 when the [defendant] closed down the [facility] and abandoned the [waste]. At that point, the mineral spirits [which were not considered waste before the defendant abandoned the property] clearly became "waste," as they were abandoned and were apparently never again used."). Thus, cognizant of the directive to construe CERCLA's provisions liberally to effectuate its goal of ensuring responsible parties pay for environmental cleanup, the Court holds that ONC's actions constitute a disposal here.

### C. Texas Solid Waste Disposal Act ("SWDA") Liability

**\*12** ONC admits that "UPRR's SWDA claim rises and falls with its CERCLA claim." Resp. 19. The Texas Supreme Court has characterized the SWDA as Texas's "counterpart" to CERCLA. R.R. St. & Co. Inc. v. Pilgrim Enterprises,

Inc., 166 S.W.3d 232, 238 (Tex. 2005). Like CERCLA, the SWDA imposes liability upon those who "operated a solid waste facility at the time of processing, storage, or disposal of any solid waste[.]" Tex. Health & Safety Code Ann. § 361.271 (West). The Court holds that the SWDA operator liability provision is, at a minimum, coextensive with CERCLA's operator provision. [21] Thus, for the reasons previously discussed, ONC is additionally liable under SWDA as an operator. *See* Zumwalt v. City of San Antonio, No. 03–11–00301–CV, 2012 WL 1810962, at \*6 (Tex. App.—Austin May 17, 2012, no pet.) (mem. op.) (The court "assum[es] without deciding that the scope of operator liability under the TSWDA is essentially coextensive with operator liability under CERCLA"); MEMC Pasadena, Inc. v. Goodgames Indus. Sols., LLC, 143 F. Supp. 3d 570, 582 (S.D. Tex. 2015) ("[B]ecause the Court has found that GIS is liable under CERCLA as an arranger, the Court likewise finds that GIS is liable under the TSWDA."), *opinion modified on reconsideration*, No. 4:13–CV–599, 2015 WL 9259088 (S.D. Tex. Dec. 18, 2015).

### IV. CONCLUSION

Based on the foregoing, the Court concludes that UPRR has shown that there are no issues of material fact concerning ONC's liability for cleanup costs as a prior operator pursuant to CERCLA and the Texas SWDA. Thus, the Court is of the opinion that UPRR's Motion should be granted.

Accordingly, **IT IS ORDERED** that Plaintiff Union Pacific Railroad Company's "Motion for Partial Summary Judgment" (ECF No. 44) is **GRANTED.**

### All Citations

Not Reported in Fed. Supp., 2018 WL 1722175

## Footnotes

1   Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C.A. § 9601 (West).

2   Because this Motion seeks a determination only that ONC is liable pursuant to CERCLA, the Court will refer only to ONC instead of "Defendants" when discussing any response arguments to the Motion.

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 245 of 247

Union Pacific Railroad Company v. Ogleby Norton..., Not Reported in Fed....

3    "Slag" is defined as the scoria of metal, meaning the refuse from the melting of metals. *Slag*, Merriam–Webster Online Dictionary (2017).

4    ONC responds directly to each of UPRR's proposed undisputed fact statements, admitting to many statements and contesting others. *See* Resp. Ex. 1. When the Court refers to ONC's "admitting" or "conceding" certain facts, or other similar phrases, ONC either explicitly agreed with or did not contest UPRR's description/ characterization of those facts. To the extent ONC disagrees with UPRR's facts, the Court adopts ONC's accounting of events and draws all reasonable inferences in its favor.

5    For purposes of simplicity, the Court will refer to TCEQ in the Order, even though it was TCEQ's predecessor, the Texas Natural Resources Conservation Commission, that issued the NOV.

6    Neither party has explained what exactly these substances are, or how exactly their presence at the Site violated environmental laws. Thus, the Court assumes a functional knowledge of these substances is unnecessary to deciding this Motion.

7    A rail spur is a "railroad track that branches off from a main line," *Rail Spur*, Merriam–Webster Online Dictionary (2017), which railroad operators use to allow the loading and unloading of railcars at a particular location without interfering with other railroad operations.

8    Although he was ONC's chief legal officer, Rose claims that he also provided legal services to ONMI as part of their shared services model. *See* Resp. Ex. 11, Aff. of Daniel Rose.

9    ONC strenuously highlights differences between "subsurface" and "stockpile" slag in an attempt to limit its liability only to the stockpile slag. Resp. Ex. 1 at ¶¶69–70. Further, ONC discusses different categories of slag material that UPRR removed, some of which was considered hazardous and some of which was not. *Id.* at ¶¶50–51. However, these issues concern the scope of ONC's liability, not the threshold question of whether ONC is a potentially responsible person. Thus, these issues are outside the bounds of UPRR's Motion, which seeks a determination as to whether ONC is liable under CERCLA. The Court will allow the parties to explain these distinctions and argue their respective points at trial on the issue of damages.

10   Other courts have called CERCLA a "legislative nightmare," *Rhodes v. County of Darlington*, S.C., 833 F. Supp. 1163, 1190 n.18 (D.S.C. 1992), with a "legislative history [that] is unusually riddled by self-serving and contradictory statements," *United States v. Wade*, 577 F. Supp. 1326, 1331 (E.D. Penn. 1983). The Ninth Circuit suggested that CERCLA's "baffling language" might have been prevented had the court been present, along "with a red pen and a copy of Strunk & White's *Elements of Style*," at the time of the statute's drafting. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 883 (9th Cir. 2001).

11   CERCLA defines "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body." 42 U.S.C. § 9601(21) (2006); *see also* *United States v. Bestfoods*, 524 U.S. 51, 56 (1998) (recognizing that the definition of "person" includes corporate entities).

12   ONC has offered evidence that Steve Herron, ONMI's Technical Services and Regulatory Affairs Manager, was involved in early remediation efforts. *See* Resp. Exs. 5, 30, 35, 37, 38, 45. However, it provides no evidence that Herron was involved after 2005, and no evidence that Herron had oversight or authority over, or even worked alongside, Bray and Adkins.

Case 4:23-cv-03560   Document 120-2   Filed on 01/19/24 in TXSD   Page 246 of 247

Union Pacific Railroad Company v. Oglebay Norton..., Not Reported in Fed....

13    ONC argues in the alternative that even if it is liable, its liability should be limited only to the stockpiled slag. Resp. 19. The Court will not pass on that question at the moment, as it relates more to damages than the issue at hand.

14    ONC points to only one document, a "proposed bill of sale" unaccompanied by any correspondence, for its assertion that Timothy Adkins "interacted with other third parties as a representative of ONMI." Resp Ex. 1 at 29. While it is unclear whether this evidence alone raises a fact issue as to whether Adkins held himself out as a representative of ONMI, this fact does not have a particularly strong bearing on whether Adkins actually worked on behalf of ONMI. Thus, the Court assumes without deciding that this evidence indicates that Adkins held himself out as an ONMI representative.

15    ONC claims that its employees *must* have been working in ONMI's interest because ONC was not benefitted by the cleanup effort. Resp. 7. This argument falls flat. ONC's alleged altruism is not equivalent to a fiduciary responsibility or some other arrangement that might serve as the basis for an agency relationship.

16    No evidence suggests that ONC employees informed any ONMI officers, directors, or managers when ONC made the decision to terminate ONMI's lease and abandon the slag at the Site. That those ONC employees found it appropriate to take this action without so much as an email to an ONMI representative is indicative of the pervasive control that ONC retained over the Site.

17    Some courts have suggested that "CERCLA liability may attach to an agent acting within the scope of his agency responsibilities to the principal." *Mainline Contracting Corp. v. Chopra–Lee, Inc.*, 109 F. Supp. 2d 110, 121 (W.D.N.Y. 2000). Thus, even if ONC's employees were working on behalf of ONMI, it is not entirely clear that ONC could avoid derivative liability for the actions of those employees.

18    ONC argues that remedial actions in general are exempt from CERCLA if they are consistent with the National Contingency Plan ("NCP"), a set of federal regulations setting forth guidelines and procedures for preparing for and responding to discharges of oil and releases of hazardous substances. Resp. 10 (citing ⚑ 42 U.S.C. § 9607(d)(1) ). Notwithstanding the fact that ONC has not explained how its actions were consistent with the NCP regulations, it fails to mention the "Savings Provision" in ⚑ § 9607(d)(3). This Savings Provision specifically precludes owners and operators from utilizing the NCP defense. *Id.* Thus, ONC's argument fails.

19    The Court makes no judgment about whether this reasoning could be extended to an innocent third party who is hired to conduct remediation activities. In such a situation, the third party would presumably form an agency relationship with the landowner and therefore be working on his or her behalf. Here, as explained previously, there is no agency relationship: ONC acted as the principal to its own agents, who directed remediation. Thus, the fact that ONC was not involved in processing the slag while ONMI was active does not absolve it of liability.

20    ONC spends a great deal of its Response explaining that it was unable to sell the slag because UPRR removed the rail spur that serviced the Site. *See, e.g.*, Resp. 16. Once the slag could not be removed by rail, ONC argues that it was "economically unfeasible" to remove the slag from the property. This argument has no bearing on whether or not there was a disposal or whether ONC is liable in general. While this may be a relevant fact during the Court's determination of an appropriate damages award, it is largely a collateral matter for the purposes of determining liability.

21    The Court makes no determination about whether SWDA liability is actually broader than CERCLA liability, as UPRR argues.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.