**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. ANESTHESIA PARTNERS, INC., | § | |
| | § | |
| and | § | |
| | § | Civil Action No. 4:23-cv-03560 |
| WELSH, CARSON, ANDERSON & | § | |
| STOWE XI, L.P., et al., | § | |
| | § | |
| Defendants. | § | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF
MOTION TO DISMISS OF THE WELSH CARSON ENTITIES**

Dated: February 26, 2024

R. Paul Yetter
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Telephone: (713) 632-8000
Facsimile: (713) 632-8002

David B. Hennes (admitted *pro hac vice*)
david.hennes@ropesgray.com
Jane E. Willis (admitted *pro hac vice*)
jane.willis@ropesgray.com
C. Thomas Brown (admitted *pro hac vice*)
thomas.brown@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

Kenneth Field (admitted *pro hac vice*)
ken.field@hoganlovells.com
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Douglas Hallward-Driemeier (admitted *pro hac vice*)
douglas.hallward-driemeier@ropesgray.com
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

Perry A. Lange (*pro hac vice* forthcoming)
perry.lange@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 633-6493
Facsimile: (202) 663-6363

Kathryn Caldwell (admitted *pro hac vice*)
kathryn.caldwell@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

*Counsel for Defendants Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC*

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT AND AUTHORITIES................................................................... 3

I.   THE OPPOSITION CONFIRMS THE FTC'S FAILURE TO ALLEGE FACTS
     SUFFICIENT TO SATISFY SECTION 13(B). ................................................ 3

II.  THE OPPOSITION CONFIRMS THE FTC'S FAILURE TO ALLEGE ANY
     WELSH CARSON ENTITY'S LIABILITY UNDER ANY THEORY. ......................... 10

     A.   The Opposition Is Wrong to Suggest *Copperweld* Supports Limitless
          Liability for Corporate Affiliates. ........................................................ 11

     B.   The Opposition Does Not Cure the Complaint's Failure to Plausibly
          Establish the Welsh Carson Entities' Liability Independent of USAP................. 14

          1.   The Opposition Confirms that the FTC Does Not Plausibly
               Allege a Section 1 Violation Against any Welsh Carson Entity
               [Counts IX and X]...................................................................... 14

          2.   The FTC Misreads the "Indirectly" Language of Section 7 and
               Fails to State a Claim under Section 7 [Counts II, V, VII]....................... 17

          3.   The FTC Cannot Rely on Section 5 to Cure Its Inability to
               Properly Allege a Violation of the Antitrust Laws [Count VIII].............. 18

III. THE FTC'S ASSERTION OF AUTHORITY TO SEEK AN INJUNCTION
     AGAINST THE WELSH CARSON ENTITIES PRESENTS A SUBSTANTIAL
     CONSTITUTIONAL PROBLEM THAT CAN BE AVOIDED ONLY BY
     REJECTING THE FTC'S OVERREACH. ...................................................... 19

CONCLUSION ................................................................................................. 20

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AMG Capital Mgmt., LLC v. Fed Trade Comm'n,*
593 U.S. 67 (2021)...................................................................................................5

*Brown Shoe Co. v. United States,*
370 U.S. 294 (1962).................................................................................................18

*Butterick Pub. Co. v. Fed. Trade Comm'n,*
85 F.2d 522 (2d Cir. 1936).......................................................................................19

*Cmty. Publishers, Inc. v. Donrey Corp.,*
882 F. Supp. 138 (W.D. Ark. 1995)..........................................................................18

*Copperweld Corp. v. Indep. Tube Corp.,*
467 U.S. 752 (1984)....................................................................................10, 11, 12

*State ex rel. Dixon v. Missouri-Kansas Pipe Line Co.,*
36 A.2d 29 (Del. Super. Ct. 1944) ...........................................................................13

*E.I. du Pont de Nemours & Co. v. Fed. Trade Comm'n,*
729 F.2d 128 (2d Cir. 1984).....................................................................................18

*Fed. Trade Comm'n v. AdvoCare Int'l, L.P.,*
2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) ...............................................3, 9, 22

*Fed. Trade Comm'n v. Educare Ctr. Servs., Inc.,*
433 F. Supp. 3d 1008 (W.D. Tex. 2020)....................................................................9

*Fed. Trade Comm'n v. Facebook,*
560 F. Supp. 3d 1 (D.D.C. 2021)................................................................................7

*Fed. Trade Comm'n v. Paramount Famous-Lasky Corp.,*
57 F.2d 152 (2d Cir. 1932).......................................................................................19

*Fed. Trade Comm'n v. Shire ViroPharma, Inc.,*
917 F.3d 147 (3d Cir. 2019)............................................................................ *passim*

*Fed. Trade Comm'n v. Sw. Sunsites, Inc.,*
665 F.2d 711 (5th Cir. 1982) ...........................................................................8, 9, 10

*Fed. Trade Comm'n v. Syngenta Crop Prot. AG,*
2024 WL 149552 (M.D.N.C. Jan. 12, 2024) .....................................................12, 14

*Fed. Trade Comm'n v. Traffic Jam Events, LLC*,
  2020 WL 3490434 (E.D. La. June 26, 2020)..........................................................9

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
  386 F.3d 485 (2d Cir. 2004)............................................................................18

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
  758 F. App'x 392 (6th Cir. 2018) ...................................................................15

*Henson Patriot Co., LLC v. Medina*,
  2014 WL 4546973 (W.D. Tex. Sept. 11, 2014)...............................................15

*Heritage Operating, L.P. v. Rhine Bros., LLC*,
  2012 WL 2344864 (Tex. App. June 21, 2012) ................................................16

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935)........................................................................................20

*Hyde Park Venture Partners Fund III, L.P. v. FairXchange, LLC*,
  292 A.3d 178 (Del. Ch. 2023)........................................................................13

*Illumina, Inc. v. Fed. Trade Comm'n*,
  88 F.4th 1036 (5th Cir. 2023) ...............................................................2, 19, 20

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010)............................................................................11

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
  311 F. Supp. 2d 1048 (D. Colo. 2004)............................................................14

*Pace Indus., Inc. v. Three Phoenix Co.*,
  813 F.2d 234 (9th Cir. 1987) .............................................................................6

*In re Packaged Seafood Prods. Antitrust Litig.*,
  2022 WL 836951 (S.D. Cal. Mar. 21, 2022) ..................................................14

*In re Pressure Sensitive Labelstock Antitrust Litig.*,
  566 F. Supp. 2d 363 (M.D. Pa. 2008)..............................................................16

*In re Processed Egg Prods. Antitrust Litig.*,
  821 F. Supp. 2d 709 (E.D. Pa. 2011) ..............................................................12

*Search Int'l, Inc. v. Snelling & Snelling, Inc.*,
  168 F. Supp. 2d 621 (N.D. Tex.),
  *aff'd*, 31 F. App'x 151 (5th Cir. 2001) (per curiam)......................................11

*Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*,
  2020 WL 881544 (Del. Ch. Feb. 24, 2020) ....................................................14

*In re Suboxone (Burprenorphine Hydochloride and Naloxone) Antitrust Litig.*,
    2017 WL 4642285 (E.D. Pa. Oct. 17, 2017)..............................................................17

*Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa
Par.*,
    309 F.3d 836 (5th Cir. 2002) ...................................................................................11

*Top Rank, Inc. v. Haymon*,
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015)..........................................................11

*United States v. Am. Airlines Grp. Inc.*,
    2023 WL 4766220 (D. Mass. July 26, 2023)............................................................7

*United States v. Bestfoods*,
    524 U.S. 51 (1998)..........................................................................................4, 12, 13

*United States v. Celanese Corp. of Am.*,
    91 F. Supp. 14 (S.D.N.Y. 1950)..............................................................................18

*United States v. Cornerstone Wealth Corp.*,
    549 F. Supp. 2d 811 (N.D. Tex. 2008) .................................................................9, 10

*United States v. JetBlue Airways Corp.*,
    2024 WL 162876 (D. Mass. Jan. 16, 2024)...............................................................7

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) ....................................................................................6

**Statutes**

15 U.S.C. § 53(b) ...........................................................................................................3, 10

**Other Authorities**

Fed. R. Civ. P. Rule 12(b)(6) ...............................................................................................10

51 Cong. Rec. 14312 (1914) ................................................................................................17

FTC, Market Division or Customer Allocation, https://www.ftc.gov/advice-
    guidance/competition-guidance/guide-antitrust-laws/dealings-
    competitors/market-division-or-customer-allocation ............................................16

H.R. Rep. No. 63-627 (1914).............................................................................................17

## INTRODUCTION

The FTC's Opposition confirms what has been clear from the start: the Complaint fails to allege *any* conduct by *any* Welsh Carson entity that violated, is violating, or is about to violate the antitrust laws.  The FTC conflates the alleged conduct of seven distinct Welsh Carson entities, each of which played different roles and took different actions at different times.  Even worse, the FTC conflates the alleged actions of the Welsh Carson entities with those of USAP.  Ultimately, the FTC invites the Court to infer past, present, and future unlawful conduct by the Welsh Carson entities from *USAP's* alleged conduct, and to impute that alleged conduct to *all* of the Welsh Carson entities named as defendants without pleading any actionable conduct by any specific Welsh Caron entity.  The law does not support pleading that requires such counter-factual inferential leaps, and this central defect in the Complaint compels dismissal on multiple grounds.

***First***, the FTC has no statutory basis for this action.  The Opposition confirms that there is no factual basis to claim that any Welsh Carson entity "is violating, or is about to violate" the antitrust laws, as Section 13(b) requires.  The Complaint admits and the Opposition concedes that no Welsh Carson entity has owned a majority stake in USAP in more than six years, and Welsh Carson has never appointed more than two directors to USAP's board.  Indeed, the FTC alleges no act by any Welsh Carson entity in the last *six* years, instead confirming its reliance on conclusory allegations conflating the Welsh Carson entities with USAP.  Section 13(b), by its plain terms, requires ongoing or imminent conduct by each of the Welsh Carson entities, which is not pleaded in the Complaint.  The FTC also doubles down on rank speculation, hypothesizing that some Welsh Carson entity might, someday, regain control of USAP through some unspecified means.  The FTC then compounds its speculation with irrelevancy, pointing to conclusory allegations about Welsh Carson investments in entirely different industries and unrelated markets having nothing to do with the subject matter of this case—anesthesia in Texas.  The FTC's

hodgepodge of arguments come nowhere close to meeting the Section 13(b) statutory standard with respect to any Welsh Carson entity, which alone compels dismissal.

***Second***, the Opposition fails to justify liability based on a "single enterprise" theory as between the Welsh Carson entities and USAP and cannot overcome the FTC's failure to plead facts suggesting that any Welsh Carson entity violated the antitrust laws.  The FTC cannot escape the reality that, as a matter of settled corporate law, the Welsh Carson entities cannot be liable for the conduct of a separate corporate entity merely by virtue of its investment in USAP.  Instead, it offers a "single enterprise" theory of antitrust liability and misapplies case law in an attempt to evade its burden to plead specific unlawful conduct by each specific defendant entity.  The FTC concedes, and even embraces, that its claims depend on improper group pleading.  But its argument in support of group pleading is entirely without any legal support.  And the FTC's argument is undermined by its own admission that a plaintiff must plead facts showing each defendant's independent participation in the unlawful conduct to hold that defendant liable.  The FTC has not alleged independent participation here.  It has not even tried.

***Finally***, the Opposition's back-of-the-hand attempt to minimize the constitutional hurdle to its authority to bring this action for injunctive relief wholly ignores its substance and the serious question that it presents.  It is the FTC's overreach of its statutory authority that *creates* the substantial constitutional problem, an issue that was not addressed by the Fifth Circuit in *Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036 (5th Cir. 2023), as the FTC wrongly claims.  It is the agency's claim of quintessentially executive power pursuant to Section 13(b) to attempt to punish the Welsh Carson entities for past acts in creating USAP—as opposed to restraining ongoing anticompetitive activity—that violates Congress's intent and creates a serious constitutional problem: an agency independent of presidential control seizing core executive authority.  The

Court can and should avoid having to address this serious issue by rejecting the FTC's attempt to expand Section 13(b) beyond its intended scope, as expressed in the plain language of the statute.

In the end, the Opposition confirms that this lawsuit is a legally unsustainable effort to advance a misguided antitrust policy agenda intended to chill legitimate investments in healthcare, ultimately at the expense of patients.[1]  All claims against the Welsh Carson entities should be dismissed with prejudice.

## ARGUMENT AND AUTHORITIES[2]

### I.    THE OPPOSITION CONFIRMS THE FTC'S FAILURE TO ALLEGE FACTS SUFFICIENT TO SATISFY SECTION 13(B).

The Complaint's conclusory allegations of long-stale conduct coupled with speculation about hypothetical and unrelated future events are insufficient to allege that any Welsh Carson entity "is violating, or is about to violate" a law enforced by the FTC.  *See* 15 U.S.C. § 53(b)(1). "[T]o avoid dismissal of its Section 13(b) action at the pleadings stage, the FTC must plausibly allege . . . that [defendants] *are currently* violating the FTC Act *or are about to* do so." *Fed. Trade Comm'n v. AdvoCare Int'l, L.P.*, 2020 WL 6741968, at *5 (E.D. Tex. Nov. 16, 2020) (emphases in original).  The FTC—which buries this threshold statutory issue in the last pages of its 33-page Opposition—makes little effort to show otherwise, offering only a hodgepodge of disjointed, conclusory, and speculative allegations that confirm its failure to satisfy the statutory standard.

The Opposition concedes that no Welsh Carson entity currently controls, has controlled, or was capable of controlling USAP in the past six years.  *See* Opp'n at 7.  It also fails to point to a single act violative of the antitrust laws by any Welsh Carson entity in that same six-year period.

---

[1] Indeed, the FTC makes no effort to rebut the positions taken in the brief submitted by the American Investment Council ("AIC") as amicus curiae.  As the AIC explained, investments like those made by the Welsh Carson entities power the growth of the U.S. and Texas economies.  The FTC's pursuit of its unsupported theories of liability would chill beneficial investment activity and, perversely, risk undermining the very competition the FTC claims to protect.
[2] Unless noted, alterations, citations and internal quotation marks are omitted and emphases are added.  Capitalized terms not defined in this reply have the meanings ascribed to them in the Welsh Carson entities' opening brief.

Instead, the FTC claims that Section 13(b) can be satisfied based on allegations of decade-old conduct, conflation of the Welsh Carson entities with USAP, and speculation that Welsh Carson entities are "likely" to engage in conduct that violates the antitrust laws because they supposedly "sought to repeat [this] conduct" in *different* businesses and *different* geographies.  *Id.* at 28.  The FTC also quibbles about the applicable legal standard, *id.* at 27–29, an irrelevant distinction without a difference.  In this case, the Complaint fails to satisfy any interpretation of the plain language of Section 13(b).  None of the FTC's arguments have merit, so the claims against the Welsh Carson entities should be dismissed.

**Stale Conduct.**  To the extent it identifies any involvement at all by any Welsh Carson entity in the alleged "scheme," the Opposition relies on conduct pre-dating 2017, the year Fund XI sold its entire 44.8% minority stake in USAP and Fund XII acquired a new 23% minority stake.  The Opposition leans heavily on Fund XI's alleged early involvement in the establishment, funding, and initial development of USAP over a decade ago.  *See, e.g.*, Opp'n at 28 ("Welsh Carson designed and implemented a 'large-scale systematic scheme'"); *id.* at 4–5 (alleging "Welsh Carson" "set[] up the company," "hand-picked USAP's leadership," and "chose and paid for USAP's first anesthesia acquisition").  But the FTC identifies no alleged conduct by any Welsh Carson entity in the past six years that would constitute a violation of the antitrust laws.  Nor does it argue that any Welsh Carson entity was a party to any physician practice acquisitions.[3]

The FTC's theory boils down to the idea of strict liability for investors.  In its view, an investor (even a former investor) holding equity (even minority equity) in a company that has acquired other companies allegedly in violation of the antitrust laws "is violating, or is about to

---

[3] To the extent the FTC relies on alleged actions by a USAP director affiliated with the Welsh Carson entities, those actions are legally presumed to be actions taken on behalf and for the benefit of USAP, as detailed below.  *See United States v. Bestfoods*, 524 U.S. 51, 69–70 (1998).

violate," those laws. *See id.* at 30. This extreme and unsupported interpretation of Section 13(b) would allow the FTC to sue every investor (including former and minority investors) whenever it thinks an underlying acquisition violates Section 7. This is not what Congress intended when it enacted Section 13(b), which was to prevent harm to competition *while* the FTC's administrative process unfolded. As the Supreme Court has explained, "the words 'is violating' and 'is about to violate' (not 'has violated') . . . reflect that the provision addresses a specific problem, namely, that of stopping seemingly unfair practices from taking place while the Commission determines their lawfulness." *AMG Capital Mgmt., LLC v. Fed Trade Comm'n*, 593 U.S. 67, 76 (2021); *see also Fed. Trade Comm'n v. Shire ViroPharma, Inc*., 917 F.3d 147, 155 (3d Cir. 2019) (Section 13(b) was intended "to solve one of the main problems of the FTC's relatively slow-moving administrative regime—the need to quickly enjoin ongoing or imminent illegal conduct").

Even assuming a prior and long-stale acquisition could satisfy Section 13(b) (which it cannot), no Welsh Carson entity acquired equity in any of the allegedly unlawful transactions. The FTC offers an extreme and unsupported interpretation of Section 13(b) that would attach antitrust liability to individual investors for the alleged antitrust violations of companies in which they hold minority investments. This is wrong. And even if the Welsh Carson entities engaged in an ongoing violation merely by "indirectly" holding equity, Section 13(b) still would not allow the FTC to seek an injunction against any entity other than Fund XII, which the Complaint admits is the only current USAP equityholder. *See* Compl. ¶¶ 26, 28.

***Improper Conflation.*** Left with no actionable Welsh Carson conduct to point to, the Opposition (like the Complaint) relies heavily on the conclusory allegation that "Welsh Carson controlled, directed, and encouraged USAP's acquisition strategy," Opp'n at 23, and is replete with the casual conflation of USAP with Welsh Carson entities (alongside its failure to recognize

distinctions among the seven Welsh Carson entities named as defendants). *See, e.g.*, *id.* at 18, 28. None of the FTC's allegations supports any claim that the Welsh Carson entities are violating, or are about to violate, any antitrust law.

The FTC concedes that it pleads no ongoing Welsh Carson conduct. Instead, it claims that the Complaint "alleges that *USAP* continues to hold the illegally acquired practices, uses the resulting leverage to raise prices, and shares its profits with Welsh Carson." *Id.* at 27. This confirms that the FTC's only allegation of ongoing participation by the Welsh Carson entities in a continuing so-called "scheme"[4] is the Welsh Carson entities' receipt of investment proceeds. *See* Compl. ¶ 337. But the FTC cites no authority for the proposition that the mere receipt of investment distributions violates the antitrust laws, let alone satisfies Section 13(b). Nor could it, because "profits, sales, and other benefits accrued as the result of an initial wrongful act are not treated as 'independent acts.'" *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014); *see also Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) (the "passive receipt of profits" from allegedly anticompetitive conduct is not a new and distinct antitrust violation). The FTC's allegation about the Welsh Carson entities' receipt of distributions in respect of a minority investment in USAP is irrelevant.

**Speculation.** The FTC attempts to fill the gaps in its non-factual pleading with unsupported speculation about hypothetical actions the Welsh Carson entities *might* take at some unspecified future date. *See* Opp'n at 7 (citing the Complaint's conclusory allegation that "nothing prevents Welsh Carson from reacquiring a majority stake" in USAP); *id.* at 30. Such non-factual speculation cannot satisfy Section 13(b), particularly since the FTC makes no factual allegation of

---

[4] The FTC engages in the same sleight of hand in the Opposition as in the Complaint by labeling ordinary acquisitions, administrative services agreements, and non-compete provisions in an agreement ancillary to an acquisition as a "scheme." *See, e.g.*, Opp'n at 6, 7. But this labelling does not excuse it from pleading specific ongoing or imminent conduct by the Welsh Carson entities that is actually unlawful.

any plan or steps by a Welsh Carson entity to actually engage in this hypothetical course of conduct.[5]  Even if "nothing prevent[ed]" the Welsh Carson entities from reacquiring a majority stake in USAP (even though many objective, commercial facts do) and such an investment would somehow violate the antitrust laws (which it would not), this allegation clearly fails to meet the statutory "is violating, or about to violate the law" standard.  The FTC's mere assertion that a defendant "is not prevented" from violating the law at some point in the future does not pass statutory muster.  *See Fed. Trade Comm'n v. Facebook*, 560 F. Supp. 3d 1, 26-27 (D.D.C. 2021) (hypothetical reinstatement of a years-old, challenged policy was too "conditional and conclusory" and thus "insufficient to establish the requisite imminence").

*Irrelevant Activity.*  Finally, the FTC resorts to conclusory allegations about purported Welsh Carson entities' conduct outside the Complaint's defined relevant market.  The Opposition points to vague allegations that Welsh Carson "sought to repeat its conduct in other physician practice areas."  Opp'n at 28.  But the Welsh Carson entities' supposed conduct in entirely *different* practice areas in *different* geographies is irrelevant to the Section 13(b) analysis.  The FTC's tactic is particularly unpersuasive where, as here, the Complaint fails to allege that the Welsh Carson entities' alleged investments in those other practice areas and geographies in any way violate the antitrust laws.

*Shire* is directly analogous, because the FTC predicates its ability to bring this action for injunctive relief against the Welsh Carson entities on the same supposed hypothetical opportunity to violate the antitrust laws that the Third Circuit rejected as "woefully inadequate to state a claim

---

[5] Recent decisions confirm that courts will not enjoin hypothetical conduct whose competitive effects are speculative. *See United States v. JetBlue Airways Corp.*, 2024 WL 162876, at *37 (D. Mass. Jan. 16, 2024) (declining to enjoin "any *other* transaction in any form that would combine JetBlue and Spirit," because doing so "would be prospectively to interfere with the free market with unknown, and perhaps harmful, competitive effects"); *United States v. Am. Airlines Grp. Inc.*, 2023 WL 4766220, at *2 (D. Mass. July 26, 2023) (declining to prohibit entering any agreements "substantially similar" to the challenged agreement with *other* air carriers, reasoning it is "not necessary to achieve the appropriate aims of antitrust relief, which depend considerably on the particular circumstances of the case").

under Section 13(b)." 917 F.3d at 160.  In *Shire*, the FTC sued a drug manufacturer for five-year-old conduct that allegedly delayed generic competition for a drug that the manufacturer had since divested.  There, like here, the FTC alleged "a cognizable danger" that Shire "will engage in similar conduct causing future harm to competition and consumers" because it "marketed and developed drug products for commercial sale in the United States . . . and ha[d] the incentive to obstruct or delay competition to these or other products."  *Id*.  In affirming dismissal, the Third Circuit ruled that the allegations failed to satisfy Section 13(b) because they did not establish that Shire was "about to" commit misconduct, and rejected the FTC's argument that it may satisfy Section 13(b) by alleging "a reasonable likelihood that past violations will recur."  *Id.* at 156–57.

The FTC now tries to recharacterize its pleading in *Shire* as a case where the "company that had engaged in [the anticompetitive conduct] had been acquired, and the conduct at issue was limited to a single drug with no realistic prospect of being repeated."  Opp'n at 30.  But that renders the facts in *Shire* just like this case, where it is undisputed that Fund XII (the only Welsh Carson entity holding USAP stock) is and has always been a minority investor in USAP, with no ability to direct USAP's conduct in any relevant market.  The only allegations the FTC offers as to the Welsh Carson entities are precisely the type of hypothetical "motive and opportunity" claims the Third Circuit in *Shire* found "woefully" failed to meet the Section 13(b) standard.

*     *     *

***Wrong Standard.***  Bereft of any factual allegations that could satisfy the statutory standard, the FTC spends most of its Section 13(b) argument quibbling about the differences between *Shire*—which analyzed whether conduct is "existing or impending"—and *Fed. Trade Comm'n v. Sw. Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982), which asked whether a "reasonable expectation of continued violations" was pleaded.  But the FTC's claims fail under either standard.

-8-

First, the FTC misconstrues the effect of *Sunsites* on the applicable standard.  Indeed, courts in this Circuit, post-*Sunsites*, have endorsed *Shire*'s interpretation of Section 13(b) as consistent with its plain statutory text, *see AdvoCare Int'l*, 2020 WL 6741968, at *5 (Section 13(b) "unambiguously requires plausible factual allegations supporting a reasonable belief of present or future misconduct"), and have rejected the argument that *Sunsites* excuses the FTC from pleading continuing or future violations, *see Fed. Trade Comm'n v. Traffic Jam Events, LLC*, 2020 WL 3490434, at *5, *9 (E.D. La. June 26, 2020) (denying temporary restraining order under Section 13(b) where allegedly wrongful conduct had ceased and no new alleged violation had been "conceived, attempted, or contemplated").  In any event, *Sunsites* is fully consistent with dismissal here.  *Sunsites* involved a "large-scale systematic scheme tainted by fraudulent and deceptive practices," where potentially fraudulent sales were still "continuing."  665 F.2d at 723.  There are no such allegations about any Welsh Carson entity in this case.

Second, as Texas courts, including the FTC's own cited authority, have recognized, the *Sunsites* decision "did not provide extensive guidance to district courts on applying § 13(b)'s threshold requirement."  *Fed. Trade Comm'n v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020).  This has left district courts to grapple with the showing required for a "reasonable expectation of continued violations."  The FTC relies on district court decisions that have adopted the *Cornerstone* factors for issuing an injunction "based on past violations of the law."  Opp'n at 28 (quoting *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008)).  But even if the *Cornerstone* factors were an appropriate framework in the Section 13(b) context—an issue never decided by the Fifth Circuit and explicitly rejected by the Third Circuit[6]—those factors do not support an injunction against any Welsh Carson entity.

---

[6] The court in *Shire* rejected as inconsistent with the plain language of the statute the "likelihood of recurrence" standard as the pleading standard in Section 13(b) cases; that standard, like the *Cornerstone* factors, "applies when a

The FTC's allegations of long-stale conduct and hypothetical future conduct do not come close to the "egregious," recurrent "infractions" weighing in favor of an injunction. The FTC gripes that the Welsh Carson entities are not sufficiently contrite about these alleged violations, Opp'n at 28, but cites no authority for the notion that a defendant must admit liability and beg forgiveness to avoid an injunction.[7] And the FTC's continued insistence that the Welsh Carson entities are in a position to commit violations of the antitrust laws simply by existing, *see id.* (alleging Welsh Carson is "a major investor in health care companies" and "has the blueprint, finances, and personnel to continue this scheme"), likewise is entitled to no weight. Taken together, the FTC's allegations do not plead any facts that the Welsh Carson entities are "about to violate" the antitrust laws.

In short, the Complaint fails to satisfy Section 13(b) under both *Sunsites* and *Shire.* There is no non-stale, non-conclusory, non-hypothetical allegation made against any Welsh Carson entity. The Complaint offers no grounds for a "fair inference of a reasonable expectation of continued violations," *Sunsites*, 665 F.2d at 723, or a finding that any violation of the antitrust laws by any Welsh Carson entity is "existing or impending," *Shire*, 917 F.3d at 156.

## II. THE OPPOSITION CONFIRMS THE FTC'S FAILURE TO ALLEGE ANY WELSH CARSON ENTITY'S LIABILITY UNDER ANY THEORY.

The Opposition also confirms that the Complaint fails on its merits. The FTC all but concedes that the Welsh Carson entities and USAP are incapable of conspiring under *Copperweld.*[8]

---

court is considering whether to grant or deny injunctive relief" for *past* conduct, not as a way to assess whether the defendant "is violating, or is about to violate" the antitrust laws. *See* 15 U.S.C. § 53(b)(1); *Shire,* 917 F.3d at 157–58.
[7] In this regard, *Cornerstone* factors such as "the sincerity of the defendant's assurances against future violations" and "the defendant's recognition of the wrongful nature of his conduct," 549 F. Supp. 2d at 816, are further proof that the preliminary injunction factors are a poor fit in the statutory Section 13(b) context. They presume a precedent determination of likelihood of success on the merits and of culpability, whereas the Section 13(b) analysis is a threshold inquiry.
[8] This concession is fatal to the FTC's Section 2 conspiracy claims (Counts III and VI). *See* Opening Br. at 29-30. And, contrary to FTC's suggestion, courts routinely dismiss claims based on *Copperweld* on a Rule 12(b)(6) motion.

It embraces instead the theory that they are liable as a single enterprise. But, as the FTC acknowledges, even a single enterprise analysis requires well-pleaded, factual allegations of independent participation by the Welsh Carson entities, which do not exist here. And the Complaint fails to plead direct independent liability for any Welsh Carson entity.

### A.     The Opposition Is Wrong to Suggest *Copperweld* Supports Limitless Liability for Corporate Affiliates.

In *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984), the Supreme Court held that a parent and subsidiary cannot conspire for purposes of Section 1.[9] The FTC misapplies dicta in that decision to claim that entities found unable to conspire are necessarily jointly liable for antitrust violations under a single enterprise theory. Opp'n at 10. But the language on which the FTC mistakenly relies simply reflects the Supreme Court's note that its holding did not leave a gap in the antitrust laws because other statutes (specifically Section 2 of the Sherman Act and Section 5 of the FTC Act) remained available to "police[] adequately" anticompetitive conduct "without resort to an intra-enterprise conspiracy doctrine." 467 U.S. at 777.

Contrary to the FTC's interpretation, *Copperweld* does not stand for the proposition that a parent is generally liable for the anticompetitive conduct of a subsidiary—a proposition that would be entirely inconsistent with well-settled corporate law. As the Third Circuit has recognized, "it does not follow from *Copperweld* that subsidiary entities are automatically liable under § 1 for any agreements to which the parent is a party. As a matter of well-settled common law, a subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 341 n.44

---

*See, e.g.*, *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *3, *16 (C.D. Cal. Oct. 16, 2015); *Search Int'l, Inc. v. Snelling & Snelling, Inc.*, 168 F. Supp. 2d 621, 627 (N.D. Tex.), *aff'd*, 31 F. App'x 151 (5th Cir. 2001) (per curiam).
[9] *Copperweld* has since been extended to apply to Section 2 conspiracy claims. *See, e.g.*, *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Par.*, 309 F.3d 836, 841 (5th Cir. 2002) (affirming dismissal of Section 2 conspiracy claim on *Copperweld* grounds).

(3d Cir. 2010); *see also In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709, 748 (E.D. Pa. 2011) ("[C]ourts have . . . rejected this attempt to draw a 'single enterprise' theory from *Copperweld*."). The FTC therefore offers no basis on which to disregard the corporate form here and to impute liability to the Welsh Carson entities for the supposed conduct of USAP.

More fundamentally, the FTC admits that—even under its misinterpretation of *Copperweld*—it must plead each of the Welsh Carson entities' independent participation in the alleged violations. *See* Opp'n at 13-14; *see also Fed. Trade Comm'n v. Syngenta Crop Prot. AG*, 2024 WL 149552, at *24 (M.D.N.C. Jan. 12, 2024). The FTC has failed to allege any such independent anticompetitive conduct by any Welsh Carson entity.

As a threshold matter, the Complaint itself affirmatively alleges that Fund XI is distinct from Fund XII; Fund XI divested from USAP in 2017; and Fund XII (which currently holds an investment in USAP) has only ever been a minority investor in USAP and only since 2017. *See* Compl. ¶¶ 26, 28. The Complaint alleges no independent anticompetitive conduct whatsoever by Fund XII. The FTC's claims therefore fail as against the only Welsh Carson entity that could be subject to the injunctive relief the agency seeks.

As to the other Welsh Carson entities, the FTC points to various allegations concerning Mr. Regan, a USAP director affiliated with the Welsh Carson entities. But the FTC concedes that he was a dual-hatted agent *presumed* to act on behalf of USAP under the Supreme Court's *Bestfoods* decision. *See* Opp'n at 16. None of the FTC's allegations with respect to his conduct comes close to rebutting the *Bestfoods* presumption. Although *Bestfoods* did not exhaustively describe the showing necessary to rebut the presumption (Opp'n at 16), the Court made clear that:

> [T]he presumption that an act is taken on behalf of the corporation for whom the [director] claims to act is strongest when the act is perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms

> approaches the point of action by a dual [director] plainly contrary to the interests
> of the subsidiary yet nonetheless advantageous to the parent.

524 U.S. at 70 n.13.  The Complaint is devoid of any allegations of conduct by the USAP director

"plainly contrary" to USAP's interests "yet nonetheless advantageous" to Welsh Carson entities.

Rather, the conduct alleged is entirely consistent with norms of corporate governance and USAP's

interests.[10] *See, e.g.*, Compl. ¶ 37 (the USAP director "helped strike deals integral to *USAP's*

*consolidation strategy*"); *id.* ¶¶ 124, 126 (alleging that the USAP director "called [a potential

transaction] 'an interesting opportunity'" and assisted with diligence and negotiations for it).

The fact that certain other Welsh Carson employees performed services relating to USAP

is irrelevant.  To the extent that such work was performed "[p]ursuant to a series of management

agreements" with USAP, as the Complaint affirmatively alleges (Compl. ¶ 39), such advisory

services were unquestionably performed on behalf of USAP.  The FTC points to other supposed

work performed by "Welsh Carson personnel," but concedes that those employees were acting in

a supporting role to USAP and Mr. Regan as he fulfilled his fiduciary duties to USAP.  Opp'n at

17 ("After becoming a USAP director, [Mr. Regan] supervised other Welsh Carson personnel . . .

.").  The conventional support offered by these employees is attributable to the director and

therefore entitled to the same presumption that these employees were acting on USAP's behalf.

*Cf. State ex rel. Dixon v. Missouri-Kansas Pipe Line Co.*, 36 A.2d 29, 32 (Del. Super. Ct. 1944)

(directors may rely on agents in carrying out duties and obligations as directors because doing so

"is merely the employment of assistance in acquiring the information requisite in one in a position

of trust and responsibility"); *Hyde Park Venture Partners Fund III, L.P. v. FairXchange, LLC*, 292

---

[10] The FTC also references letters of interest and a confidentiality agreement signed by the USAP director on behalf of a Welsh Carson entity in connection with two of the early transactions.  Opp'n at 17.  But the Welsh Carson entity that signed those documents did so as a source of partial financing for transactions directed by USAP, much like a bank would be for another company's investments.  The acts were entirely consistent with USAP's interests.

A.3d 178, 196 (Del. Ch. 2023) (designated director had "the right to share information with the [designating entity], and he necessarily shared information in light of his dual roles"). Indeed, well-established agency principles also make clear that the actions of employees "supervised" or "direct[ed]" by Mr. Regan (Opp'n at 17) are imputed to Mr. Regan as a USAP director and not to any Welsh Carson entity. *See Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *29 (Del. Ch. Feb. 24, 2020) ("[T]he knowledge of an agent acquired while acting within the scope of his or her authority and the acts of agents within that scope are imputed to the principal.").

The irrelevant cases cited by the FTC cannot overcome its failure to plead facts showing any independent conduct by the Welsh Carson entities in connection with USAP's alleged violations. Opp'n at 13-14; *cf. Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1071 (D. Colo. 2004) (parent independently "coerce[d]" artists to use subsidiaries' concert promotion services or "risk losing airplay" on subsidiary radio stations); *Syngenta*, 2024 WL 149552, at *24 (FTC must "allege sufficient independent but coordinated activity *for each named corporate affiliate*"; parent entities signed allegedly unlawful agreement and managed relationship with alleged co-conspirator); *In re Packaged Seafood Prods. Antitrust Litig.*, 2022 WL 836951, at *10 (S.D. Cal. Mar. 21, 2022) (dual agent held himself out as acting on behalf of the investor when he assured the portfolio company's co-conspirators "on an 'owner to owner' basis" that the investor would "support and enforce the collusive pricing agreements").

The failure of the FTC to plead independent conduct compels dismissal of its claims.

**B.    The Opposition Does Not Cure the Complaint's Failure to Plausibly Establish the Welsh Carson Entities' Liability Independent of USAP.**

The FTC has not properly and factually alleged the Welsh Carson entities' independent liability for any antitrust violations.

1.    *The Opposition Confirms that the FTC Does Not Plausibly Allege a Section 1 Violation Against any Welsh Carson Entity [Counts IX and X].*

-14-

The Opposition confirms that the Complaint has not adequately alleged a Section 1 violation against any Welsh Carson entity.  As a threshold matter, the FTC's labeling of the agreements at issue as "price-setting" and "market allocation" is entitled to no weight because the Complaint's factual allegations themselves show that they are nothing of the sort.  As detailed in USAP's opening brief, the so-called "price-setting" arrangements were routine agreements to provide billing services for other anesthesiology practices, in connection with which those practices typically assign to USAP the "right to bill and receive payment from patients and payors for services rendered."  Compl. ¶ 184; USAP's Mot. Dismiss, Dkt. No. 99, at 32-35.  USAP then "us[es] [its] own provider or tax information" to obtain reimbursement from payors for those practices, and retains "some portion" as compensation for the services performed.  Compl. ¶ 176.  Contrary to the FTC's inflammatory labeling, none of the Complaint's allegations establishes the existence of agreements to set prices for anesthesia services or an inference that the parties to these agreements charged the same rates for anesthesia services.  *See id.* (the agreements "made it appear to payors as if USAP was doing the work of the other group's anesthesia providers"); *id.* ¶ 196 (USAP "collects a nice margin" on these services).  These allegations fail even as to USAP, but none even remotely connects the Welsh Carson entities to the alleged wrongdoing.

Likewise, the so-called "market allocation" is nothing more than a non-competition provision in an agreement ancillary to the Pinnacle acquisition.  *See id.* ¶¶ 210, 214 (as part of transaction, "Envision agreed not to compete against USAP for anesthesiology services in the Dallas-Fort Worth area").  Courts have confirmed that such covenants are common, permissible features of transactions like the sale of a business.  *See Hall v. Edgewood Partners Ins. Ctr., Inc.*, 758 F. App'x 392, 395-96 (6th Cir. 2018) (where a "restrictive covenant is bargained for as part of an asset sale . . . the courts will typically enforce it"); *Henson Patriot Co., LLC v. Medina*, 2014

WL 4546973, at *3 (W.D. Tex. Sept. 11, 2014) (noting appropriateness of long non-competes in the purchase agreement context); *Heritage Operating, L.P. v. Rhine Bros., LLC*, 2012 WL 2344864, at *6 (Tex. App. June 21, 2012) (rejecting argument that "a ten-year noncompete period is unreasonable as a matter of law when ancillary to a contract for the sale of a business"). Indeed, the FTC itself has stated that such covenants are "a common feature" of corporate acquisitions:

> A limited non-compete clause is a common feature of deals in which a business is sold, and courts have generally permitted such agreements . . . .[11]

In any event, the Opposition identifies no alleged overt acts *by the Welsh Carson entities* that would allow any inference of a Section 1 violation. Rather, it claims only that Welsh Carson entities "facilitated" the allegedly unlawful agreements by "[running] diligence for, and approv[ing], the acquisitions through which USAP inherited its other price-setting arrangements." Opp'n at 24. This comes nowhere close to alleging participation in a conspiracy. *See In re Pressure Sensitive Labelstock Antitrust Litig.*, 566 F. Supp. 2d 363, 376 (M.D. Pa. 2008) (parent's knowledge that its subsidiary agreed with a competitor to restrain competition did not support inference that parent was a co-conspirator). And the paragraphs of the Complaint to which the Opposition cites impermissibly conflate USAP and the Welsh Carson entities, and fail to specify how the conduct alleged is unlawful. *See* Compl. ¶¶ 85–87 (relating to 2012 acquisition by New Day, before USAP's formation); *id.* ¶¶ 124–26 (alleging that Welsh Carson expressed interest in and assisted in diligence for the Pinnacle transaction, when in fact Fund XI signed a letter of intent as a financing source, not a party); *id.* ¶¶ 186, 194 (failing to mention Welsh Carson entities at all).

Nor can the alleged conduct of the dual-hatted director establish a conspiracy when he is presumed to have acted on USAP's behalf. The FTC cites an out-of-context quote from the USAP

---

[11] FTC, Market Division or Customer Allocation, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/market-division-or-customer-allocation.

director to suggest some kind of nefarious involvement in one of the so-called price-setting agreements (Compl. ¶ 200), but nothing in that alleged statement suggests any type of agreement to set prices. *See In re Suboxone (Burprenorphine Hydochloride and Naloxone) Antitrust Litig.*, 2017 WL 4642285, at *10 & n.6 (E.D. Pa. Oct. 17, 2017) (affiliated company's alleged "participat[ion] in discussions" regarding anticompetitive plan does not state Section 1 violation).

2. *The FTC Misreads the "Indirectly" Language of Section 7 and Fails to State a Claim under Section 7 [Counts II, V, VII].*

The FTC claims that the Welsh Carson entities are liable under Section 7 for "indirect acquisitions" of practices acquired by USAP because they "acquired equity indirectly in each of USAP's acquisitions by holding equity in USAP." Opp'n at 23. But the FTC's argument is based on a misreading of Section 7. Section 7's reference to "indirectly" does not extend to hold an investor generally liable for anticompetitive acquisitions by a company in which it invests.

The legislative history of Section 7 establishes that, by prohibiting "indirect[]" stock acquisitions, Congress targeted acquisitions by "holding companies" or other acquisition vehicles that would allow those companies to amass market power by acquiring and operating competing companies without merging or integrating them. *See* H.R. Rep. No. 63-627, at 17 (1914) ("Section 8 [later known as Section 7] deals with what is commonly known as the 'holding company,' which is . . . a company whose primary purpose is to hold stocks of other companies."); *see also* 51 Cong. Rec. 14312, 14313 (1914) (observing that the language is meant to target holding companies). The case law confirms that the "indirect" language was meant to prohibit the accumulation of market power through the undisclosed ownership of entities that ostensibly remain competitors. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 313-14 (1962) (Clayton Act was "conceived to be directed primarily at the development of holding companies and at the *secret acquisition of competitors* through the purchase of all or parts of such competitors' stock"); *United States v.*

*Celanese Corp. of Am.*, 91 F. Supp. 14, 17 (S.D.N.Y. 1950) ("[Section 7] was designed primarily to deal with the evil of the *secret acquisition* by one corporation of the stock of another corporation, principally those acquisitions by '*holding companies.*'").[12]   Here, no Welsh Carson entity has common ownership or control of separate, ostensibly competing entities; rather, USAP is alleged to have directly acquired each allegedly competing practice.  *See, e.g.*, Compl. ¶ 343.  And there is no suggestion that any Welsh Carson entity invested in any other entity competing with USAP.

In short, Section 7's "indirectly" language does *not* apply to investors like the Welsh Carson entities, who are not alleged to have holdings that compete with USAP.  Had Congress's intent been to so drastically expand the scope of liability to such investors, contrary to long-settled corporate law, it most certainly would have said so clearly and directly.

### 3. *The FTC Cannot Rely on Section 5 to Cure Its Inability to Properly Allege a Violation of the Antitrust Laws [Count VIII].*

The FTC attempts to "bootstrap" a Section 5 violation by alleging that USAP's acquisitions and agreements were "unfair" because they supposedly enhanced USAP's position in negotiations with insurers.  Compl. ¶ 398.  According to the FTC, the "Section 5 claim against Welsh Carson is based on Welsh Carson encouraging or facilitating anticompetitive conduct."  Opp'n at 25.

The Opposition confirms that the Complaint offers no workable framework for determining what conduct is prohibited by that statute.  *See E.I. du Pont de Nemours & Co. v. Fed. Trade Comm'n*, 729 F.2d 128, 138 (2d Cir. 1984) ("[S]tandards for determining whether [conduct] is 'unfair' within the meaning of § 5 must be formulated to discriminate between normally acceptable business behavior and conduct that is unreasonable or unacceptable."); *Butterick Pub. Co. v. Fed.*

---

[12] The FTC's cited authority confirms this reading of Section 7.  *See Cmty. Publishers, Inc. v. Donrey Corp.*, 882 F. Supp. 138, 139–40 (W.D. Ark. 1995) (acquisition of newspaper by company that had significant shareholders in common with media group that owned competing newspaper); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 510-12 (2d Cir. 2004) (acquisition of supplier by entity whose sole owner was substantial shareholder of a purchaser, with the concern being purchaser's ability, due to common ownership, to control supply of valuable input).

*Trade Comm'n*, 85 F.2d 522, 526 (2d Cir. 1936) (Section 5 does not authorize the FTC "to prevent those trade practices which merely are offensive to a suitable standard of business morality"); *Fed. Trade Comm'n v. Paramount Famous-Lasky Corp.*, 57 F.2d 152, 157 (2d Cir. 1932) (Section 5 was not intended "to equalize opportunity or insure an equal degree of success upon the part of all [participants] in a given industry"). The FTC's "I'll know it when I see it" approach to Section 5 does not articulate a cognizable legal theory of unfair methods of competition.

## III.  THE FTC'S ASSERTION OF AUTHORITY TO SEEK AN INJUNCTION AGAINST THE WELSH CARSON ENTITIES PRESENTS A SUBSTANTIAL CONSTITUTIONAL PROBLEM THAT CAN BE AVOIDED ONLY BY REJECTING THE FTC'S OVERREACH.

The Opposition minimizes the Welsh Carson entities' constitutional challenge to the FTC's authority to bring this action for injunctive relief by labeling it "tangential." Opp'n at 1. But that approach ignores the serious constitutional issue that it presents. The FTC offers no meaningful explanation as to how its attempt to impose liability solely based on past conduct—a quintessential executive *enforcement* power—is a constitutional use of its power under Section 13(b).

The FTC wrongly claims that the Fifth Circuit's decision in *Illumina*, 88 F.4th at 1044, "squarely rejected" the constitutional argument here. Unlike the challenge in *Illumina*, the challenge here concerns the FTC's executive power to seek injunctive relief in federal court under Section 13(b) based entirely on long-past conduct, an issue the Fifth Circuit's decision did not address or purport to address. By contrast, the type of authority that the FTC was exercising in *Illumina*—which involved an administrative adjudication before the FTC in which the FTC made the final agency determination as to the lawfulness of the transaction and the remedy imposed— was much closer to the type that the Supreme Court upheld in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).

Unlike in *Illumina*, the source of the constitutional problem here is the grant of enforcement authority.  As such, the solution is not, as the FTC suggests (and as Illumina's argument required, *see Illumina*, 88 F.4th at 1047), overruling *Humphrey's Executor* (which neither the Fifth Circuit nor this Court could do) or severing the removal protections for Commissioners.  Rather, the appropriate remedy is to sever the subsequently added, unconstitutional executive authority under Section 13(b).  That is because the FTC's authority to bring an action for injunctive relief in court—the source of the constitutional problem here—was added in the 1970s and converted the FTC into an executive agency.  Congress intended the FTC to serve as an independent agency, and attached limitations on the executive's authority to appoint and remove FTC Commissioners.  Invalidating the added executive authority hews much closer to that intent than invalidating the removal restrictions.

At the very least, the constitutional challenge here is a substantial and serious one that the Court can only avoid by rejecting the FTC's overreach of its statutory authority.  By its plain language, Congress limited the FTC under Section 13(b) to restraining ongoing violations, not punishing past violations—a quintessential executive function.  Footnote 14 of the Opposition exemplifies the constitutional problem:  The FTC asserts there an authority to exercise core prosecutorial functions independent of "political" influence, that is, independent of the President.  But even Congress cannot grant the FTC that authority, and the FTC certainly cannot seize that power for itself.  By dismissing the FTC's claims against the Welsh Carson entities, this Court would reject the FTC's overreach and limit its authority to genuinely ongoing violations.  That outcome would also allow the Court to avoid resolving this significant constitutional question.

## CONCLUSION

For these reasons, the Welsh Carson entities respectfully request that the Court dismiss all claims against them with prejudice.

Dated: February 26, 2024          Respectfully submitted,

By:   */s/ R. Paul Yetter*
        R. Paul Yetter
        State Bar No. 22154200
        Fed I.D. 3639
        pyetter@yettercoleman.com
        YETTER COLEMAN LLP
        811 Main Street, Suite 4100
        Houston, Texas 77002
        Telephone: (713) 632-8000
        Facsimile: (713) 632-8002

        David B. Hennes (*pro hac vice*)
        david.hennes@ropesgray.com
        Jane E. Willis (*pro hac vice*)
        jane.willis@ropesgray.com
        C. Thomas Brown (*pro hac vice*)
        thomas.brown@ropesgray.com
        ROPES & GRAY LLP
        1211 Avenue of the Americas
        New York, New York 10036
        Telephone: (212) 596-9000
        Facsimile: (212) 596-9090

        Douglas Hallward-Driemeier (*pro hac vice*)
        douglas.hallward-driemeier@ropesgray.com
        ROPES & GRAY LLP
        2099 Pennsylvania Avenue, NW
        Washington, DC 20006
        Telephone: (202) 508-4600
        Facsimile: (202) 508-4650

        Kathryn Caldwell (*pro hac vice*)
        kathryn.caldwell@ropesgray.com
        ROPES & GRAY LLP
        Prudential Tower
        800 Boylston Street
        Boston, Massachusetts 02199
        Telephone: (617) 951-7000
        Facsimile: (617) 951-7050

Kenneth Field (*pro hac vice*)
ken.field@hoganlovells.com
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Perry A. Lange (*pro hac vice* forthcoming)
perry.lange@wilmerhale.com
WILMER CUTLER PICKERING HALE AND
DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 633-6493
Facsimile: (202) 663-6363

*Counsel for Defendants Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC*

# CERTIFICATE OF SERVICE

I certify that on February 26, 2023, a copy of this document was served on all counsel of record using the Court's e-filing system.

*/s/ R. Paul Yetter*
R. Paul Yetter