**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| U.S. ANESTHESIA PARTNERS, INC., | § | |
| | § | |
| and | § | |
| | § | Civil Action No. 4:23-cv-03560 |
| WELSH, CARSON, ANDERSON & | § | |
| STOWE XI, L.P., et al., | § | |
| | § | |
| Defendants. | § | |

**APPENDIX TO WELSH CARSON ENTITIES' REPLY MEMORANDUM OF LAW IN
SUPPORT OF THEIR MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

**Cases**

*Fed. Trade Comm'n v. AdvoCare Int'l, L.P.*,
No. 4:19-CV-715, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) .......................... WCAS001

*Fed. Trade Comm'n v. Syngenta Crop Prot. AG*,
No. 1:22CV828, 2024 WL 149552 (M.D.N.C. Jan. 12, 2024) ................................ WCAS007

*Fed. Trade Comm'n v. Traffic Jam Events, LLC*,
No. 20-1740, 2020 WL 3490434 (E.D. La. June 26, 2020) ...................................... WCAS034

*Hall v. Edgewood Partners Ins. Ctr., Inc.*,
Nos. 18-3481/3482, 758 F. App'x 392 (6th Cir. 2018) ........................................... WCAS046

*Henson Patriot Co., LLC v. Medina*,
No. SA-14-CV-534, 2014 WL 4546973 (W.D. Tex. Sept. 11, 2014) ...................... WCAS051

*Heritage Operating, L.P. v. Rhine Bros., LLC*,
No. 02-10-00474-CV, 2012 WL 2344864 (Tex. App. June 21, 2012) ..................... WCAS056

*Hyde Park Venture Partners Fund III, L.P. v. FairXchange, LLC*,
292 A.3d 178 (Del. Ch. 2023) ................................................................................. WCAS066

*In re Packaged Seafood Products Antitrust Litigation*,
No. 15-MD-2670, 2022 WL 836951 (S.D. Cal. Mar. 21, 2022) .............................. WCAS093

*In re Suboxone (Burprenorphine Hydochloride and Naloxone) Antitrust Litig.*,
No. 16-5073, 2017 WL 4642285 (E.D. Pa. Oct. 17, 2017) ...................................... WCAS104

*Search Int'l, Inc. v. Snelling & Snelling, Inc.*,
No. 01-10561, 31 F. App'x 151 (5th Cir. 2001) ..................................................... WCAS117

*Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*,
No. 2018-0059, 2020 WL 881544 (Del. Ch. Feb. 24, 2020) ................................... WCAS119

*State ex rel. Dixon v. Missouri-Kansas Pipe Line Co.*,
36 A.2d 29 (Del. Super. Ct. 1944) .......................................................................... WCAS165

*Top Rank, Inc. v. Haymon*,
No. CV 15-4961, 2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) .............................. WCAS170

*United States v. Am. Airlines Grp. Inc.*,
No. 21-11558, 2023 WL 4766220 (D. Mass. July 26, 2023) ................................... WCAS188

*United States v. JetBlue Airways Corp.*,
    No. 23-10511, 2024 WL 162876 (D. Mass. Jan. 16, 2024)......................................WCAS191

**Other Cited Documents**

51 Cong. Rec. 14312, 14313 (1914) ...............................................................................WCAS237

FTC, Market Division or Customer Allocation, https://www.ftc.gov/advice-
    guidance/competition-guidance/guide-antitrust-laws/dealings-
    competitors/market-division-or-customer-allocation. ...............................................WCAS240

H.R. Rep. No. 63-627, at 17 (1914)...............................................................................WCAS242

Dated: February 26, 2024       Respectfully submitted,

By:   */s/ R. Paul Yetter*

R. Paul Yetter
State Bar No. 22154200
Fed I.D. 3639
pyetter@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas 77002
Telephone: (713) 632-8000
Facsimile: (713) 632-8002

David B. Hennes (*pro hac vice*)
david.hennes@ropesgray.com
Jane E. Willis (*pro hac vice*)
jane.willis@ropesgray.com
C. Thomas Brown (*pro hac vice*)
thomas.brown@ropesgray.com
ROPES & GRAY LLP
1211 Avenue of the Americas
New York, New York 10036
Telephone: (212) 596-9000
Facsimile: (212) 596-9090

Douglas Hallward-Driemeier (*pro hac vice*)
douglas.hallward-driemeier@ropesgray.com
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 508-4600
Facsimile: (202) 508-4650

Kathryn Caldwell (*pro hac vice*)
kathryn.caldwell@ropesgray.com
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199
Telephone: (617) 951-7000
Facsimile: (617) 951-7050

Kenneth Field (*pro hac vice*)
ken.field@hoganlovells.com
HOGAN LOVELLS US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910

Perry A. Lange (*pro hac vice* forthcoming)
perry.lange@wilmerhale.com
WILMER CUTLER PICKERING HALE AND
DORR LLP
2100 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 633-6493
Facsimile: (202) 663-6363

*Counsel for Defendants Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC*

## CERTIFICATE OF SERVICE

I certify that on February 26, 2023, a copy of this document was served on all counsel of record using the Court's e-filing system.

*/s/ R. Paul Yetter*
R. Paul Yetter

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 6 of 250

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

KeyCite Yellow Flag - Negative Treatment

Distinguished by Federal Trade Commission v. Walmart Inc., N.D.Ill., March 27, 2023

2020 WL 6741968

United States District Court, E.D. Texas, Sherman Division.

FEDERAL TRADE COMMISSION

v.

ADVOCARE INTERNATIONAL, L.P., et al.

CIVIL NO. 4:19-CV-715-SDJ
|
Signed 11/16/2020

**Attorneys and Law Firms**

M. Hasan Aijaz, Pro Hac Vice, Thomas B. "Tom" Carter, Pro Hac Vice, Aaron J. Haberman, Federal Trade Commission - Dallas Dallas Regional Office, Dallas, TX, for Federal Trade Commission.

John Robert Robertson, DLA Piper LLP, Chicago, IL, Meagan Dyer Self, DLA Piper LLP, Dallas, TX, for AdvoCare International, L.P.

Baxter Ward Banowsky, Banowsky & Levine, PC, Dallas, TX, for Danny McDaniel, Diane McDaniel.

**MEMORANDUM OPINION AND ORDER**

SEAN D. JORDAN, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court are two motions: Defendants' Motion to Dismiss for failure to state a claim filed by Defendants Danny McDaniel and Diane McDaniel ("the McDaniels") pursuant to Federal Rule of Civil Procedure 12(b)(6), (Dkt. #17), and Plaintiff's Motion to Exclude, (Dkt. #23), certain factual allegations, documents, and legal arguments included in the McDaniels' Reply Brief, (Dkt. #20). For the following reasons, the Court **GRANTS** the McDaniels' Motion to Dismiss, (Dkt. #17), and **DENIES as moot** Plaintiff's Motion to Exclude, (Dkt. #23).

**I. BACKGROUND**

In March 2017, consumers filed a class-action lawsuit in the Northern District of Texas against AdvoCare International, L.P. ("AdvoCare"), alleging that AdvoCare had been operating as an illegal pyramid scheme. *Ranieri v. AdvoCare Int'l, L.P.*, No. 3:17-cv-00691-B, 2017 WL 947224 (N.D. Tex. Mar. 9, 2017); *see also* (Dkt. #1 at 25, #17 at 12). That suit named, among others, Danny McDaniel—but not his wife, Diane McDaniel—as a defendant. *Ranieri, 2017 WL 947224.* However, the district court ultimately dismissed with prejudice the action against Danny McDaniel, holding that if AdvoCare indeed operated an illegal pyramid scheme, Danny McDaniel did not operate said scheme. *Ranieri v. AdvoCare Int'l, L.P.*, 336 F.Supp.3d 701, 718 (N.D. Tex. 2018);[1] *see also* (Dkt. #17 at 12).

Separately, the Federal Trade Commission ("FTC" or "Commission") began investigating AdvoCare for potential violations of consumer-protection law. (Dkt. #1 at 25). In July 2019, during negotiations with the FTC, AdvoCare terminated its "multi-level marketing" ("MLM") program, which was alleged to be an illegal pyramid scheme. (Dkt. #1 at 25–26).

On October 2, 2019, the FTC brought a complaint in this Court requesting a permanent injunction and other equitable relief against AdvoCare and at least five individual members thereof, including the McDaniels. (Dkt. #1). The Complaint alleges that Defendants engaged in unlawful business practices in violation of the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. *See, e.g.*, (Dkt. #1 at 26). In particular, the Complaint alleges that AdvoCare—which the FTC describes as "a multi-level marketing company that promotes health and wellness products"— deceived individuals into becoming "Distributors" and "Advisors," or salespeople for AdvoCare, the majority of whom never earned compensation for their sales. (Dkt. #1 at 4–6). The Complaint further alleges that Defendants consistently and deceptively portrayed AdvoCare as a "life-changing financial solution," (Dkt. #1 at 6–9), and trained recruits to do the same, (Dkt. #1 at 9). The Complaint thus asserts that AdvoCare operated an unlawful pyramid scheme whereby AdvoCare's compensation structure relied on the fraudulent recruitment of Distributors and Advisors who would unwittingly pass on profits to those higher up the chain of command. (Dkt. #1 at 16–23).

**\*2** Simultaneous to, or immediately after, the FTC's filing of the Complaint, on October 2, 2019, all named Defendants —except for the McDaniels—reached a settlement agreement

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 7 of 250

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

with the FTC. (Dkt. #2, #2-1, #2-2). Pursuant to the settlement agreement, the settling Defendants, including AdvoCare, submitted to a host of sanctions, including an outright ban on: multi-level marketing; operating "chain referral" programs or similar schemes; managing compensation for any business ventures unless certain criteria are satisfied; and making material misrepresentations regarding any business venture. (Dkt. #2-2 at 3–5, #15, #16). The settling Defendants also agreed to (a) provide equitable monetary relief and payment to the Commission, (b) cooperate in the settlement, and (c) record progress while otherwise submitting to wide-reaching compliance monitoring. (Dkt. #2-2 at 5–16, #15, #16). The FTC has continued to pursue the instant action against the McDaniels, which the McDaniels now move to dismiss under Rule 12(b)(6).

## II. LEGAL STANDARD

Under the relaxed pleading standards of Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement requires only that the plaintiff provide "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility, under *Twombly*, means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[ ] [its] claims across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." *Id.* at 679–80 (first quoting *Twombly*, 550 U.S. at 570, then citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2nd Cir. 2007)) (internal quotation marks omitted). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

Further, when evaluating a Rule 12(b)(6) motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.),*

*L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). However, a district court may also consider any "matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Courts have taken judicial notice of the existence and content of settlement agreements when evaluating Rule 12(b)(6) motions to dismiss. *See, e.g.*, *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1008 n.2 (9th Cir. 2014) (holding that because the settlement agreement was filed with the court and is a publicly available record, it is properly subject to judicial notice and thus may be considered on a Rule 12(b)(6) motion); *Estate of Brown v. Arc Music Grp.*, 523 F.App'x 407, 410 (7th Cir. 2013) (holding that the settlement agreement was a public record, of which the court could take judicial notice without converting the motion into one for summary judgment). Finally, a court may take judicial notice sua sponte. FED. R. CIV. P. 201(c)(1).

Here, the Court takes judicial notice of the settlement agreement between Plaintiff and all Defendants to the instant action besides the McDaniels, (Dkt. #2, #15, #16).[2] The Court thus considers the existence and content of the settlement agreement in its analysis.

## III. DISCUSSION

### A. The FTC's Complaint is Not Exempt from the Pleading Standards Prescribed by the Federal Rules of Civil Procedure.

**\*3** The Federal Trade Commission Act instructs the Commission to "prevent persons, partnerships, or corporations" from using "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The Commission has "multiple instruments in its toolbox" to accomplish this statutory directive, among which are administrative proceedings and litigation in federal court. *FTC v. Shire Viropharma, Inc.*, 917 F.3d 147, 155 (3d Cir. 2019).

As relevant here, Section 13(b) of the FTC Act empowers the FTC to "bring suit in a district court of the United States" to obtain a "temporary restraining order," a "preliminary injunction," or a "permanent injunction" against an "act or practice" that violates the FTC Act. 15 U.S.C. § 53(b). To bring such an action, the FTC must have "reason to believe" that the entity or person sued "is violating, or is about to violate" the Act. *Id.*

WCAS002

The McDaniels contend that the FTC's complaint must be dismissed under Rule 12(b)(6) because the Complaint fails to state a plausible claim under Section 13(b) that the McDaniels are violating or are "about to violate" the FTC Act. (Dkt. #17 at 6). Pointing to the FTC's Complaint itself, as well as the settlement agreement with AdvoCare and the other Defendants, the McDaniels assert that the FTC's suit recognizes that the alleged pyramid scheme operated by AdvoCare, and in which the McDaniels were allegedly involved, ended in July 2019. (Dkt. #17 at 7–8). The McDaniels further argue that there are no factual allegations supporting the FTC's conclusory contention that the McDaniels are presently violating the FTC Act or are "about to" violate the Act. [3]

The FTC's first response to the McDaniels' motion is to suggest that, because the agency has already made its own, internal determination that it has "reason to believe" that the McDaniels are violating or are "about to violate" the FTC Act, the Complaint before the Court is largely immunized from judicial scrutiny under Rule 12(b)(6). The FTC states that "[t]he Commission's determination that there is sufficient 'reason to believe' under Section 13(b) is left to the agency's discretion." (Dkt. #19 at 5). The FTC goes on to cite and quote *Standard Oil Co. of California v. FTC,* 596 F.2d 1381, 1386 (9th Cir. 1979), *rev'd on other grounds,* 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), for the proposition that, "[i]f the district court finds as a fact that the FTC made the 'reason to believe' determination ... further review would be foreclosed." (Dkt. #19 at 5). Ultimately, the FTC asserts that, rather than engaging in a straightforward application of pleading standards under Rule 8, the Court is bound to deny the McDaniels' Rule 12(b)(6) motion unless it concludes that the FTC "abused its discretion" in making its internal "reason to believe" determination. (Dkt. #19 at 12–13). According to the Commission, limiting the Court's analysis to an "abuse of discretion" standard "fits with the broad prosecutorial discretion federal agencies have to bring suit." (Dkt. #19 at 6).

**\*4** The Court disagrees. Taken to its logical conclusion, the FTC's argument would mean that, no matter how insubstantial the factual allegations in an FTC complaint under Section 13(b), a court must accept that the complaint is sufficient to withstand a Rule 12(b) motion so long as the FTC avers that it has "reason to believe" that a defendant is "about to" engage in unfair methods of competition, or unfair or deceptive acts or practices. The FTC's position is contrary to accepted rules of pleading and finds no support in applicable case law.

First, Rule 8(a) of the Federal Rules of Civil Procedure requires that anyone filing a complaint must include a statement demonstrating "the grounds for the court's jurisdiction" and a "showing that the pleader is entitled to relief." In a Section 13(b) case, that requirement includes factual allegations from the FTC that there exist reasons to believe that the defendant is violating or "is about to violate" the FTC Act.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678. A bare allegation by the FTC that "we have reason to believe that the defendant is about to violate the law," when unaccompanied by supporting factual allegations, clearly does not "state a claim to [injunctive] relief that is plausible on its face." *Twombly,* 550 U.S. at 570. This Court is fully capable of determining whether the FTC's factual allegations in a Section 13(b) complaint are sufficient to make the requisite "about-to-violate" showing. Therefore, there is no reason to conclude that Congress intended to eliminate judicial scrutiny under Rule 8.

The cases that the FTC cites do not support its argument that its internal, "reason to believe" determination is an effective "King's X" against a motion to dismiss a Section 13(b) complaint brought by the FTC in federal court. For example, *Standard Oil* addressed a challenge by an oil company to an administrative proceeding initiated by the FTC in connection with unfair trade practices. 596 F.2d at 1384. The oil company's challenge, brought under the Administrative Procedure Act ("APA"), was rejected by the Ninth Circuit based on the court's determination that the FTC's commencement of an administrative proceeding was not subject to challenge under the APA. *Id.* at 1385. *Standard Oil* did not involve a lawsuit brought by the FTC and it says nothing about deference to the FTC in cases in which the FTC, as the plaintiff in federal court, bears the threshold burden to meet the requirements of Rule 8 and state a claim for relief that is plausible on its face.

The other cases cited by the FTC are equally unhelpful because they involve the inapposite circumstances of judicial review of agency action. *See Slough v. FTC,* 396 F.2d 870 (5th Cir. 1968) (suit seeking review of a cease and desist order issued by the FTC after an administrative hearing); *FTC v. Nat'l Urological Grp., Inc.,* No. 1:04-cv-3294-CAP, 2006 WL 8431977 (N.D. Ga. Jan. 9, 2006) (dismissing counterclaims

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 9 of 250

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

brought under the APA challenging the FTC's decision to initiate a lawsuit); *Boise Cascade Corp. v. FTC*, 498 F.Supp. 772 (D. Del. 1980) (involving an APA action seeking an order that the FTC withdraw an administrative complaint).

Judicial review of agency action under the APA is governed by the APA itself, which expressly precludes judicial review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). No such review is at issue here. Instead, the McDaniels' motion raises a different issue: whether the FTC has stated a claim under the Federal Rules of Civil Procedure. The resolution of the McDaniels' motion is governed by Rule 8 of the Federal Rules of Civil Procedure, which mandates, rather than precludes, judicial review to ensure compliance with federal pleading requirements. "It is precisely the Court's duty under Rule 8 to scrutinize a party's right to proceed in federal court." *FTC v. Hornbeam Special Situations, LLC*, No. 1:17-cv-3094-TCB, 2018 WL 6254580, at *4 (N.D. Ga. Oct. 15, 2018).

**\*5** In sum, to avoid dismissal of its Section 13(b) action at the pleadings stage, the FTC must plausibly allege, in satisfaction of *Iqbal* and *Twombly*, that the McDaniels *are currently* violating the FTC Act *or are about to* do so.

**B. The FTC's Factual Allegations Pertain Only to *Past* Misconduct by the McDaniels and not to Present or Future Misconduct.**

Section 13(b) of the FTC Act empowers the Commission to file a claim in federal court "[w]henever the Commission has reason to believe ... that any person, partnership, or corporation *is violating*, or *is about to violate*, any provision of law enforced by the [FTC]...." 15 U.S.C. § 53(b) (emphasis added). Section 13(b) thus unambiguously requires plausible factual allegations supporting a reasonable belief of present or future misconduct. *Shire*, 917 F.3d at 156–57 ("Section 13(b) requires that the FTC have reason to believe a wrongdoer 'is violating' or 'is about to violate' the law.... [T]his language is unambiguous; it prohibits existing or impending conduct ... [and] does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation.").

In *Shire*, the conduct in question was five years past. Here, the McDaniels' past conduct is more recent; at the time the FTC filed the Complaint, only three months had passed since the McDaniels ceased their alleged misconduct. However, like in *Shire*, the FTC identifies no ongoing misconduct and, in fact,

appears to concede that the McDaniels' alleged misconduct continued only until July 2019. [4]

Further, even if the FTC had alleged ongoing or impending violations by the McDaniels, such allegations are implausible because, according to the FTC's own factual allegations, at the time the Complaint was filed, the primary mechanism of the McDaniels' alleged wrongdoing, the MLM program, had been permanently defunct for months. (Dkt. #1 at 26). Additionally, the sole business through which the McDaniels allegedly undertook such actions—AdvoCare—had, either before or simultaneous to the Complaint's filing, entered into a comprehensive agreement to halt AdvoCare's unlawful activities, reform its business practices, and submit to government compliance monitoring. (Dkt. #2, #2-1, #2-2).

The FTC has not alleged that the McDaniels are *currently* violating or *are about to* violate the law enforced by the FTC. Every factual allegation that the FTC presents refers to past misconduct by the McDaniels. Although this misconduct was extensive and longstanding—having taken place for "a period of more than 20 years"—all factual allegations indicate that the alleged violations ended entirely in July 2019 when AdvoCare's MLM program was permanently terminated. (Dkt. #1 at 25–26). And it is implausible that the McDaniels can commit ongoing violations because the MLM program is now defunct, (Dkt. #1 at 26), and AdvoCare has been extensively sanctioned, reformed, and monitored for compliance, (Dkt. #15, #16). Finally, the FTC has not alleged—either in the initial Complaint filed in October 2019 or in any amended pleadings since that time—that either the MLM is still operating or that the McDaniels are otherwise continuing to engage in misconduct after July 2019.

**C. Past Violations May Sometimes Give Rise to an Inference of Ongoing or Future Violations, but the FTC has not Plausibly Alleged that Such is the Case Here.**

**\*6** Section 13(b) generally cannot be used to remedy past violations. *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). However, a plaintiff may state a plausible claim under Section 13(b) by showing that a past violation or series of past violations is likely to recur. *Id.* In some instances, courts have found that an extensive history of past violations is itself sufficient to create an inference of ongoing violations. *See, e.g., FTC v. GTP Mktg., Inc.*, No. 4-90-123-K, 1990 WL 54788, at *5 (N.D. Tex. Mar. 15, 1990) (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987)) ("An extensive history of

violations does beget an inference that future violations are likely to occur."). The Fifth Circuit, however, has held merely that past violations may, but do not necessarily, support an inference of future substantive violations. *SEC v. First Fin. Grp. Tex.*, 645 F.2d 429, 434 (5th Cir. 1981) (holding in an analogous context that finding a reasonable likelihood of future securities-law violations requires "proof of past substantive violations *that indicate* a reasonable likelihood of future substantive violations." (emphasis added)).

In each of the above cases, the recurrence of violations was at least possible, and in some instances likely, because the channels of misconduct utilized by the defendants remained open—*i.e.*, free and clear of government sanction—upon filing of the litigation. *See, e.g., Odessa*, 833 F.2d at 176–77. In *Odessa*, for instance, the defendant warehouse co-op was still fully operational at the outset of litigation. *Id.* Moreover, while the defendant stated an intent to comply with sanitation laws, it continued to manage its own sanitation practices free of government intervention. *Id.* Absent such intervention, and given the defendant's history of violations, the court held that "serious questions remain[ed]" as to whether the defendant's violations would recur or continue. *Id.*

Here, by contrast, at the outset of litigation and pursuant to FTC intervention, the McDaniels' channel of misconduct was either permanently defunct (in the case of the MLM program) or reformed, lawful, and monitored for compliance (in the case of AdvoCare more broadly). To this end, the FTC not only fails to adequately allege ongoing or future misconduct by the McDaniels but appears to affirmatively concede that the channels through which the McDaniels engaged in misconduct are permanently closed. (Dkt. #1 at 26); *see also* (Dkt. #2, #15, #16). Therefore, under the circumstances, an inference of present or future violations by the McDaniels is unsupported.

## IV. CONCLUSION

The FTC is authorized to bring an action under Section 13(b) of the FTC Act only when there is "reason to believe" that a defendant is currently engaged in, or about to engage in, conduct violating the Act. 15 U.S.C. § 53(b). Here, each of the FTC's factual allegations pertains only to *past* misconduct by the McDaniels. While courts may sometimes infer ongoing or future violations based on an extensive history of past violations, here such an inference

is improper because the sole channel through which the McDaniels allegedly engaged in violations—AdvoCare—agreed to abandon its MLM program entirely (as well as all other allegedly unlawful practices) and subject itself to wide-ranging government monitoring for compliance. This fundamental transformation began with the termination of AdvoCare's MLM program in July 2019 and culminated in AdvoCare's settlement with the FTC on the day of the Complaint's filing, of which the Court takes judicial notice. Under the circumstances, the FTC has failed to provide plausible factual allegations that there is reason to believe that the McDaniels are currently violating the FTC Act or are about to violate the Act.

Finally, the FTC has filed with the Court a Motion to Exclude, (Dkt. #23), arguing that certain documents, legal arguments, and factual allegations presented in the McDaniels' Reply Brief, (Dkt. #20), should be excluded from consideration. In resolving the McDaniels' dismissal motion, the Court did not consider or rely upon any of the arguments, alleged facts, or documents complained of in the FTC's Motion to Exclude. For this reason, the Court finds that the FTC's Motion to Exclude should be DENIED as moot.

**\*7** It is therefore **ORDERED** that Defendants Diane McDaniel's and Danny McDaniel's Motion to Dismiss, (Dkt. #17), is **GRANTED**. The Federal Trade Commission's claims against the McDaniels, *see* (Dkt. #1), are hereby **DISMISSED without prejudice**.[5] It is further **ORDERED** that the FTC is granted leave to replead its claims by filing an amended complaint, with such amended complaint to be filed within thirty (30) days from the date of the issuance of this Order.

It is further **ORDERED** that the FTC's Motion to Exclude is **DENIED as moot**.

It is further **ORDERED** that all other motions pending before the Court are **DENIED as moot**.

**So ORDERED and SIGNED this 16th day of November, 2020.**

### All Citations

Not Reported in Fed. Supp., 2020 WL 6741968, 2020-2 Trade Cases P 81,455

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   5

## Footnotes

1    "In the instant case, Plaintiffs have not shown that creating and disseminating promotional materials ... caused Plaintiffs' injuries, and they have not shown that the Individual Defendants operated the alleged pyramid scheme...." *Id.*

2    The Unopposed Motion for Settlement, (Dkt. #2), was filed with the Court the same day as the Complaint, (Dkt. #1), October 2, 2019, and the Court entered the stipulated orders, (Dkt. #15, #16), which collectively granted the motion, one week later.

3    The McDaniels have not challenged the Court's jurisdiction in this matter. Although their dismissal motion included some language suggesting a potential jurisdiction argument, *see* (Dkt. #17 at 8), the substance of the McDaniels' motion and briefing asserts only a Rule 12(b)(6) motion for failure to state a claim and does not contest the Court's jurisdiction. *See* (Dkt. #20 at 1 n.3) (the McDaniels' reply brief affirms that they are not raising a jurisdictional challenge). In any event, the Court concludes that it has jurisdiction because the FTC's claim arises under a law of the United States, 15 U.S.C. § 53(b), and therefore falls within the general grant of jurisdiction in 28 U.S.C. § 1331. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (confirming that a plaintiff obtains the "basic statutory grant[ ]" of subject matter jurisdiction in 28 U.S.C. § 1331 by pleading a colorable claim that arises under the Constitution or the laws of the United States).

4    "The McDaniels ... continued to engage in deception until AdvoCare abandoned its multi-level marketing structure in July 2019 during its negotiations with the FTC." (Dkt. #1 at 26).

5    Because the Court dismisses the claims asserted against the McDaniels by the FTC, the Court need not address the parties' arguments on the scope of the remedies that would be available if the FTC's claims against the McDaniels were successful.

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2024 WL 149552
Only the Westlaw citation is currently available.
United States District Court, M.D. North Carolina.

FEDERAL TRADE COMMISSION, State of California,
State of Colorado, State of Illinois, State of Indiana,
State of Iowa, State of Minnesota, State of Nebraska,
State of Oregon, State of Tennessee, State of Texas,
State of Washington, and State of Wisconsin, Plaintiffs,
v.

SYNGENTA CROP PROTECTION AG,
Syngenta Corporation, Syngenta Crop
Protection, LLC, and Corteva, Inc., Defendants.

1:22CV828
|
Signed January 12, 2024

**Attorneys and Law Firms**

Edward Takashima, Elizabeth Gillen, Eric Brooks, Geoffrey Green, Joseph Raymond Baker, Lauren Patterson, Mark J. Woodward, Michael J. Turner, Philip Kehl, Rachel Frank, Wesley Carson, James Harris Weingarten, Federal Trade Commission, Washington, DC, for Plaintiff Federal Trade Commission.

Nicole Gordon, Brian Wang, Office of the Attorney General Of California, San Francisco, CA, for Plaintiff State of California.

Paul Harper, Illinois Attorney General's Office, Chicago, IL, for Plaintiff State of Illinois.

Patrick Michael Kane, Fox Rothschild LLP, Greensboro, NC, Chui-Lai Cheung, David Brendan Toscano, Paul Mishkin, Davis Polk & Wardwell LLP, New York, NY, for Defendants.

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

**\*1** In this action, the Federal Trade Commission and a dozen states allege that two major manufacturers of crop-protection products have employed anticompetitive loyalty discount programs. These programs allegedly exclude generic competition from the market even after the products' patent and other federal exclusivity protections have expired,

thereby leading to supracompetitive prices for farmers. Before the court are the motions of Defendants Syngenta Crop Protection AG, Syngenta Corporation, Syngenta Crop Protection, LLC, and Corteva, Inc., to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). (Docs. 94, 99.) Plaintiffs have responded in opposition (Doc. 150), and Defendants have replied (Docs. 130, 133). The court held argument on the motions on December 1, 2023. (Doc. 157.) For the reasons set forth below, the motions will be denied.

## I. BACKGROUND

### A. Factual Background

The facts outlined in Plaintiffs' amended complaint (the "complaint") (Doc. 149),[1] which are taken as true for the purpose of the present motion, show the following:

#### 1. Crop-Protection Product Industry

The Syngenta Group is a global company comprised of businesses including Defendants Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC (collectively "Syngenta"). (Doc. 149 ¶ 30.) Syngenta Crop Protection AG oversees Syngenta's global crop protection business. (Id. ¶ 31.) Syngenta Corporation is a corporate affiliate of Syngenta Crop Protection AG and is the top-level Syngenta business incorporated in the United States. (Id. ¶ 32.) Syngenta Crop Protection, LLC operates Syngenta's U.S. crop-protection manufacturing, which is the second largest by revenue among crop-protection product manufacturers in the United States. (Id. ¶¶ 33, 48.) Syngenta allegedly operates as a single enterprise. (Id. ¶ 35.)

Corteva, Inc. ("Corteva") was established to operate as an independent agriscience business through the merger of E.I. du Pont de Nemours and Dow Chemical Company. (Id. ¶ 38.)[2] Corteva is the third largest by revenue among crop-protection product manufacturers in the United States. (Id. ¶ 48.)

**\*2** Defendants manufacture crop-protection products — commonly referred to by Plaintiffs as "pesticides" — to control diseases, weeds, insects, or other unwanted organisms that harm crops. (Id. ¶¶ 37, 39, 40.) These include herbicides, insecticides, and fungicides. (Id. ¶ 42.) Every crop-protection product contains at least one active ingredient ("AI"). (Id.

WCAS007

¶ 43.) Manufacturers may sell AIs in technical-grade form, which requires further processing before being sold in finished form, which is ready for use by farmers. (Id. ¶ 44.) AIs are distinguished by the pests they target, the effectiveness at controlling the target pest, and the crops upon which the AI is used and registered for use, among other characteristics. (Id. ¶ 45.) The AI's "mode of action" is the chemical and biological manner in which the crop-protection product kills or controls the target pest. (Id. ¶ 46.) Farmers' preferences for one AI over another may depend on variations in the mode of action. (Id.)

Developers of new AIs obtain exclusive use through two mechanisms. First, under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., a developer of crop-protection products must submit environmental impact data to the U.S. Environmental Protection Agency prior to sale or distribution in the United States. Upon approval, the developer obtains 10-year exclusive protection from others citing the data the developer used to support its FIFRA submission. (Id. ¶¶ 51, 52.) Second, under patent law, a developer can obtain 20-year patent protection. (Id. ¶ 51.) The timing of the FIFRA application can effectively extend the exclusive-use period beyond the date the patent expires. (Id. ¶ 52.) When both exclusive-use protections expire, however, a generic manufacturer may enter the market. (Id. ¶ 54.)

Manufacturers of crop-protection products traditionally sell to distributors, who then sell to retailers, who then sell to farmers. (Id. ¶ 55.) Approximately 90% of crop-protection products reach farmers through this traditional supply chain, and about 90% of the traditional supply chain is managed by seven distributors. (Id.) In other words, these seven distributors account for approximately 80% of all sales of crop-protection products in the United States. (Id.) This traditional channel of distribution is allegedly the most efficient because it provides access to retail and logistics networks and economies of scale, among other factors. (Id. ¶ 56.)

## 2. Defendants' Loyalty Programs

Plaintiffs allege that Defendants operate loyalty programs intended to limit the distribution of competing generic products. (Id. ¶ 59.) Under these programs, Defendants offer "substantial" payments as an end-of-year lump sum to distributors — allegedly up to millions of dollars —

conditioned on the distributors limiting their purchases of generic crop-protection products containing specified post-patent AIs. (Id. ¶ 60.) The threshold to receive the loyalty payment is expressed as a percentage of the distributors' total purchases of the AI, and the permissible amount of generic AI a distributor may sell is referred to as "open space" or "head space." (Id. ¶ 61.) Typically, a distributor must source less than 15% of its total purchase of a certain AI from generic manufacturers to qualify to receive the loyalty payment. (Id.)

Syngenta implements its loyalty program, known as "Key AI," through written marketing agreements with distributors. (Id. ¶ 66.) Loyalty performance is calculated by dividing the amount of qualifying AI purchased or sold by the distributor in the year by the total of the AI purchased or sold by the distributor, including generics. (Id. ¶ 68.) If the distributor's percentage is above the threshold for the specific AI, it will reap a "special marketing bonus." (Id. ¶ 69.) If not, the distributor will lose the entire loyalty payment. (Id.) Year-to-year, Syngenta can change the AIs included in distributor marketing agreements as well as the associated share thresholds and calculation methods. (Id. ¶ 70.) A similar program is offered for retailers as well, in which multiple top retailers nationally have participated. (Id. ¶¶ 71, 72; Doc. 81 ¶ 82.)

**\*3** Under Corteva's program — the Crops, Range & Pasture and Industrial Vegetation Management ("CRPIVM") Loyalty Program, a distributor generally receives an annual payment for sourcing a certain percentage of its purchases of an AI from Corteva. (Doc. 149 ¶¶ 75, 77.) The percentage that Corteva pays varies but could run as high as 11%. (Id. ¶ 77.) Corteva offers a second, higher payment when a distributor reaches a higher threshold for the AI. (Id. ¶ 75.) Moreover, the CRPIVM usually links together multiple active ingredients within each offer, thus requiring a distributor to hit the loyalty threshold for every AI in the offer to receive the payment for any one AI. (Doc. 81 ¶ 75.) Additionally, Corteva typically permits a portion of any payment to be deferred into subsequent years, which would otherwise be forfeited if the distributor missed the loyalty threshold for any AI in the offer. (Id. ¶ 78.) Further, Corteva conditions its Corporate Offer — another annual payment offer that covers a broader range of Corteva products – on meeting the CRPIVM figure. (Id. ¶ 79.) If a distributor fails to qualify, it could forfeit certain loyalty-dependent payments under the Corporate Offer. (Id.)

"[S]ubstantially all leading distributors" enter into loyalty program agreements, and Defendants promote broad

participation allegedly to assure distributors that others are not partnering with generic manufacturers to undercut prices. (Doc. 149 ¶ 84.) Moreover, the structure of the program is designed to make it less likely that distributors will lower prices in anticipation of a future loyalty payment because of its complexity, uncertainty, and timing. (Id. ¶ 85.) Defendants "regularly" audit distributors, which has allegedly led to withheld loyalty payments. (Doc. 81 ¶ 87.) Defendants also "rarely" grant exceptions for missing the threshold without good cause. (Doc. 149 ¶ 87.) Additionally, they have allegedly retaliated against distributors who fail to reach the loyalty thresholds by canceling distribution contracts, delaying access to new products, and withholding product allocation during a supply shortage. (Id. ¶ 88.)

Plaintiffs focus on the following AIs:

[**Editor's Note:** The preceding image contains the reference for footnote [3], [4]

(See id. ¶ 89-150; Doc. 81 ¶ 89-150.) Plaintiffs allege that distributors of each of these AIs have strictly managed their purchases and sales to ensure that they stay above the respective threshold to receive the payments. (Id.)

Further, Plaintiffs allege, generic manufacturers have attempted to enter the market for each AI — with demand from farmers — but have had little to no success because distributors would not purchase the generic. (Id.) As to azoxystrobin, two generics have exited the market entirely, and one that attempted to mix azoxystrobin was "hindered in its attempt to market" because of the Key AI program. (Doc. 149 ¶¶ 96-97.) As to mesotrione, two generics delayed or terminated entry, and a third that developed a mixture product dropped it due to the Key AI program. (Id. ¶ 105.) As to metolachlor, a generic manufacturer had considered bringing a mixture to market but chose not to do so because of the Key AI program. (Id. ¶ 120.) As to rimsulfuron, at least one generic canceled or deferred entry plans, despite apparent demand from farmers to bid on generics, because of the CRPIVM program. (Id. ¶ 132.) As to oxamyl, Corteva's production of oxamyl stopped for a span of roughly two years, generics entered the market with "relative[ ] success[ ]," but generic sales "plummeted" upon Corteva's re-entry into the market with the loyalty program applied to oxamyl. (Id. ¶¶ 136-38.) And as to acetochlor, the CRPIVM program has allegedly deterred generics from the market altogether, even though

one generic firm has had success selling the AI overseas. (Id. ¶ 149.) For each AI, Plaintiffs allege that the presence of generics has imposed downward pricing pressure.

**\*4** The complaint further alleges that Syngenta supplies Corteva with mesotrione and metolachlor. (Id. ¶¶ 109, 122.) Defendants allegedly struck this agreement as an incentive to keep Corteva from purchasing generics of these two AIs. In exchange, Syngenta does not penalize distributors in the Key AI program who buy Corteva products containing these two Syngenta AIs. (Doc. 81 ¶¶ 109, 122.)

### 3. Alleged Market and Competitive Harm

Plaintiffs allege that Syngenta has had monopoly and market power as to azoxystrobin, mesotrione, and metolachlor, and that Corteva has had monopoly and market power as to rimsulfuron and oxamyl and market power as to acetochlor. (Doc. 149 ¶¶ 151, 152.) Plaintiffs claim two relevant product markets:

(a) A relevant product market exists that is no broader than the active ingredient, consisting of (1) active ingredient included as a component of an EPA-registered finished crop-protection product for sale in the United States, and (2) technical-grade or manufacturing-use active ingredient to be formulated into an EPA-registered finished crop-protection product for sale in the United States; and

(b) A relevant product market(s) also exists that is no broader than EPA-registered crop-protection products for sale in the United States that contain the active ingredient.

(Id. ¶ 155.) Syngenta's market share for azoxystrobin, mesotrione, and metolachlor exceeded 70% from at least 2017 through 2020. (Id. ¶ 161.) Corteva's market share for rimsulfuron and oxamyl also exceeded 70% for those same years, while its market share for acetochlor exceeded 40% (with another roughly 50% attributable to Bayer, its joint venture partner for that AI). (Id. ¶¶ 162, 163.) In all, Plaintiffs allege that Defendants have foreclosed generics from "approximately 70% or more" of the market. (Doc. 81 ¶ 171.)

Each AI has "particular characteristics and uses that differentiate it from other active ingredients." (Doc. 149 ¶ 157.) Azoxystrobin "can be used across all major row crops [and] has growth-enhancing effects not proven in other active ingredients." (Id.) Mesotrione has "superior efficacy

WCAS009

and crop safety, and a low use rate." (Id.) Metolachlor has "superior water solubility, and so tends to perform better in dry conditions[, and it] outperforms other active ingredients in warmer conditions, is more 'crop friendly,' and can be used on a broader spectrum of crops." (Id.) Rimsulfuron "can be used on a broader range of crops, controls a wider spectrum of weeds, can be used on both pre- and post-emergence, and has more application methods, no dormancy restrictions, and a lower use rate." (Id.) Oxamyl can be "sprayed directly onto crops, whereas other, similar insecticide active ingredients must be applied at the root level or mixed into the soil[, and] is also safer for crops and better for soil health[.]" (Id.) Acetochlor "tends to perform better in wetter and cooler conditions, [and] tends to have better weed control early in the growing season and is more effective against certain weed species." (Id.)

Plaintiffs allege that other AIs are not close enough substitutes to prevent Defendants from maintaining supracompetitive prices of their crop-protection products containing these six AIs. (Id. ¶ 158.) Moreover, substantial barriers exist to enter the market for these AIs notwithstanding the loyalty programs. (Id. ¶ 160.) These capital, technical, regulatory, and legal barriers include "obtaining registration from the EPA, developing manufacturing processes and sourcing [the] active ingredient, and paying data compensation costs to the initial active ingredient registrant." (Id.) The loyalty programs impose a substantial barrier by limiting generic manufacturers' access to the traditional distribution channel. (Id.)

**\*5** Plaintiffs contend that the loyalty programs cause anticompetitive harms. First, the programs "forclos[e] actual or potential competitors from access to distribution services," or to "efficient distribution services" (i.e., the traditional distribution channel). (Id. ¶¶ 169, 170.) Although the programs are nominally voluntary, Plaintiffs allege that the mere prospect of receiving a payment is sufficient incentive to induce distributors to participate and to limit or forego purchases from generic competitors. (Id. ¶ 173.) Allegedly, one generic manufacturer represented that "this dynamic is so well established in the industry that it is futile to even approach a large distributor that is subject to loyalty requirements." (Id. ¶ 178.) Absent the loyalty programs, Plaintiffs allege, sales of generics would be significantly higher and would exceed the open space presently allowed for each AI, thus decreasing prices overall for farmers. (Id. ¶ 180.)

Second, and relatedly, Plaintiffs charge that the loyalty programs have prevented, delayed, and diminished entry and expansion by generic manufacturers into, as well as caused the exit from, the market for products containing the AIs. (Id. ¶ 182; see also, e.g., id. ¶¶ 96-97 (demonstrating that generic manufacturer of azoxystrobin mixture was "hindered in its attempt to market"; id. ¶ 132 (alleging that at least one generic manufacturer of rimsulfuron canceled or deferred entry plans, despite apparent demand from farmers to bid on generics, because of the CRPIVM program).) Third, these programs have reduced the ability and incentive for generic manufacturers to innovate crop-protection products containing the AIs. (Id. ¶ 186.) Finally, the programs have resulted in supracompetitive prices for retailers and farmers for products containing the AIs. (Id. ¶ 190.) Plaintiffs point to Defendants' internal studies that allegedly demonstrate that the loyalty programs have curtailed generic entry and sustained higher prices than would otherwise prevail. (Id. ¶¶ 195-99.)

### B. Procedural History

On September 29, 2022, Plaintiffs filed this action seeking declaratory, injunctive, equitable monetary relief, and civil penalties. (Doc. 1.) Defendants moved to dismiss the original complaint, after which Plaintiffs filed an amended complaint. (Doc. 79; Doc. 149 (lesser-redacted complaint).) Now before the court are Defendants' motions to dismiss the amended complaint. (Docs. 94, 99.) Following this court's order granting the parties' respective motions to seal (Doc. 148), the operative public complaint is at docket entry 149.[5]

Plaintiffs allege sixteen counts under state and federal law. Under federal law, Plaintiff Federal Trade Commission ("FTC") alleges violations of Section 5 of the FTC Act, 15 U.S.C. § 45(a), and all Plaintiffs allege violations of Section 3 of the Clayton Act, 15 U.S.C. § 14, and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2. (Doc. 149 ¶¶ 203-10.) The remaining claims arise under state law and are raised by the states of California, Colorado, Illinois, Indiana, Iowa, Minnesota, Nebraska, Oregon, Tennessee, Texas, Washington, and Wisconsin.[6] (Id. ¶¶ 212-76.)

**\*6** Following oral argument on the motions to dismiss, they are ready for resolution.

## II. ANALYSIS

### A. Legal Background

WCAS010

## 1. Motion to Dismiss Standard

A Rule 12(b)(6) motion to dismiss is meant to "test[ ] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992). To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). In considering a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the non-moving party's favor, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997). Rule 12(b)(6) must be read in light of Rule 8's standard that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

## 2. Federal Antitrust Statutes

Plaintiffs allege violations of the Sherman Act (sections 1 and 2) and Clayton Act (section 3), and Plaintiff FTC alleges violations of the Federal Trade Commission Act (section 5). Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Section 2 prohibits "monopoliz[ing], or attempt[ing] to monopolize, or combin[ing] or conspir[ing] with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2. A violation of Section 2 consists of two elements: (1) possession of monopoly power and (2) "maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 481 (1992). Monopoly power is defined as the ability "to control prices or exclude competition." United States v. Grinnell Corp., 384 U.S. 563 (1966) (internal quotation marks omitted). Although evidence of such ability is "only rarely available," courts turn to circumstantial evidence — such as a company's share of the market — to determine whether monopoly power exists. United States v. Dentsply Int'l, Inc., 399 F.3d 181, 187 (3d Cir. 2005) (quoting United

States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001)). Maintenance of that power requires some illegal conduct that forecloses competition, gains a competitive advantage, or destroys a competitor. Eastman Kodak, 504 U.S. at 482-83.

Section 3 of the Clayton Act makes it unlawful for

> any person engaged in commerce ... to lease or make a sale or contract for sale of goods ... for use, consumption, or resale within the United States ... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods ... of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

**\*7** 15 U.S.C. § 14.

Section 5 of the FTC Act makes illegal "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). The act, while not solely focused on antitrust, is "nonetheless linked to the antitrust laws." Chuck's Feed & Seed Co., Inc. v. Ralston Purina Co., 810 F.2d 1289, 1293 (4th Cir. 1989). The Supreme Court has stated that the act was "designed to supplement and bolster the Sherman Act and the Clayton Act, [ ] — to stop in their incipiency acts and practices which, when full blown, would violate those Acts." Fed. Trade Comm'n v. Motion Picture Advert. Serv. Co., 344 U.S. 392, 394-95 (1953) (internal citation omitted). The act "functions as a kind of penumbra around the federal antitrust statutes," Chuck's Feed, 810 F.2d at 1292-93, such that any practice that violates the Sherman Act or the Clayton Act also violates the FTC Act. See Fed. Trade Comm'n v. Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986) ("The standard of 'unfairness' under the FTC Act is, by necessity, an elusive one, encompassing not only practices that violate the Sherman Act and the other antitrust laws, [ ] but also practices that

WCAS011

the Commission determines are against public policy for other reasons." (internal citations omitted)). The extent to which these four provisions impose varying requirements on a plaintiff is discussed in more detail below.

### 3. Exclusive Dealing

Plaintiffs allege that Defendants' loyalty rebate programs are illegal exclusive dealing arrangements. An exclusive dealing arrangement is one in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time. Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1800a (4th & 5th ed. 2023). Neither absolute exclusivity nor an express agreement is necessary for an exclusive dealing arrangement to violate antitrust laws. ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 270, 282 (3d Cir. 2012); Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 328 (1961) ("[T]he competition foreclosed by the contract must be found to constitute a substantial share of the relevant market." (emphasis added)). Although not "per se" illegal, exclusive dealing arrangements may give rise to cognizable claims under all four statutory provisions alleged here. See, e.g., Grinnell Corp., 384 U.S. at 576 (Sherman Act § 2); ZF Meritor, 696 F.3d at 281 (Sherman Act §§ 1 and 2, Clayton Act § 3); LePage's Inc. v. 3M, 324 F.3d 141, 157 & n.10 (3d Cir. 2003) (same); Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP, 592 F.3d 991, 996 (9th Cir. 2010) (Sherman Act § 1); McWane, Inc. v. Fed. Trade Comm'n, 783 F.3d 814, 827 (11th Cir. 2015) (FTC Act § 5).

Exclusive contracts serve many pro-competitive purposes. ZF Meritor, 696 F.3d at 270. On the demand side, they can assure supply, protect against rises in price, enable long-term planning based on known costs, and reduce the expense and risk of storing goods that have fluctuating demand. Standard Oil Co. v. United States, 337 U.S. 293, 306 (1949). On the supply side, they can substantially reduce selling expenses, protect against price fluctuations, justify and enable capital expenditures, and shield against counterattacks by competitors. Id. at 306-07. Indeed, "virtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought." Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.) (emphasis removed). Accordingly, whether a contract rises to illegal exclusivity, "rather than merely a form of vigorous competition, can be difficult to discern[.]" Microsoft Corp., 253 F.3d at 58. "[T]he means of illicit exclusion, like the means of

legitimate competition, are myriad," posing a challenge for an antitrust court in "stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it." Id.

**\*8** While exclusive dealing is formally a vertical restraint (e.g., as alleged here, a restraint between manufacturer and distributor), it has the potential to have adverse economic consequences on horizontal competition. Jefferson Par. Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring). More specifically, an exclusive dealing arrangement runs afoul of the antitrust laws when it unreasonably deprives other suppliers of a market for their goods or allows one buyer of goods unreasonably to deprive other buyers of a needed source of supply. Id. The potential collateral consequences of illegal exclusive dealing include higher prices, restricted output, reduced quality, or slower innovation. McWane, Inc., 783 F.3d at 827.

### B. Defendants' Grounds for Motion to Dismiss

Defendants argue two primary grounds to dismiss the complaint: first, they contend that Plaintiffs fail to allege a relevant product market; and second, they argue that Plaintiffs fail to allege anticompetitive conduct and injury. Syngenta further argues that the claims against Syngenta Crop Protection AG and Syngenta Corporation should be dismissed. Corteva argues that the FTC Act violates Article II of the U.S. Constitution, thus requiring dismissal of the complaint. And finally, all Defendants argue that the state law claims should be dismissed on a range of grounds.

The court turns first to the threshold question of whether Plaintiffs allege a relevant product market.

### 1. Relevant Product Market

Defendants contend that the complaint is defective because it fails to allege a cognizable product market. (Doc. 95 at 17; Doc. 100 at 37.) A relevant product market is defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962). Courts begin with a preliminary inquiry into market definition because it serves as the frame through which the court analyzes monopoly power and substantial market foreclosure. E.I. Du Pont De Nemours & Co. v. Kolon, 637 F.3d 435, 441 (4th Cir. 2011); Ind. Fed'n of Dentists,

476 U.S. at 460 ("[T]he purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition." (emphasis in original)).

Plaintiffs allege two product markets in the United States. One is the AI itself, in both its finished and technical-grade form. (Doc. 149 ¶ 155.) The other is crop-protection products that contain the active ingredient. (Id.) Defendants do not contest the markets' geographical scope or that Plaintiffs allege more than one market.

Corteva argues that Plaintiffs' market definitions are only two sentences that vaguely describe general characteristics of the AIs that amount to "alleged advantages they have over other products." (Doc. 95 at 19.) In Corteva's view, Plaintiffs have an obligation to do more — namely, to explain why products without those characteristics are not reasonably interchangeable. (Id. at 18 (citing Bayer Schering Pharm AG v. Sandoz, Inc., 813 F. Supp. 2d 569, 575 (S.D.N.Y. 2011); Todd v. Exxon Corp., 275 F.3d 191, 200 (2d. Cir. 2001)).) In support, Corteva points to several EPA label registrations outside of the record that, per Corteva, demonstrate that the alleged product markets are both too narrow and too broad. This follows, according to Corteva, because these EPA label registrations show that the EPA has registered crop-protection products that (1) contain AIs within Plaintiffs' alleged markets but have different uses, and (2) are products outside of Plaintiffs' alleged markets but share similar uses. (Id. at 19-20.) Syngenta argues that Plaintiffs' market definition is unreasonably narrow because each market is only a single AI. (Doc. 100 at 38-40.) In support, Syngenta points to other antitrust proceedings outside of the record where the FTC and the U.S. Department of Justice have alleged broader crop-protection product markets with multiple AIs. (Id. at 41-42.) For example, Syngenta cites United States v. Bayer AG, 83 Fed. Reg. 27652, 27653 (DOJ June 13, 2018), as "analyzing alleged 'foundational herbicides' and 'nematicidal seed treatment' markets," and Ciba-Geigy Ltd., 62 Fed. Reg. 409, 412 (FTC Jan. 3, 1997), as "analyzing alleged 'corn herbicides for pre-emergent control of grasses' market — including metolachlor — and 'corn herbicides for post-emergent control of broadleaf weeds' market." (Id.) Syngenta contends that FTC's effort to allege narrower product markets here is not based on "different facts, but instead on the evolving philosophy of the FTC's Chair," and demonstrates that "FTC is attempting to gerrymander its way to an antitrust victory." (Id. at 42 (internal quotation marks omitted).)

*9 Plaintiffs respond that their product markets are supported by ample factual allegations. (Doc. 150 at 52.) Namely, Plaintiffs point to the conduct of Defendants, who design their loyalty programs around each individual AI. (Id.) Further, Plaintiffs allege "characteristics and uses" and "industry or public recognition" for each AI:

> Azoxystrobin has "growth-enhancing effects not proven in other active ingredients." Mesotrione has "superior efficacy and crop safety" "[c]ompared to other, similar herbicide active ingredients." Metolachlor "has superior water solubility," and "outperforms other active ingredients" in warmer and drier conditions. Rimsulfuron "has more application methods, no dormancy restrictions, and a lower use rate" than similar chemicals. Oxamyl, unlike "similar insecticide active ingredients," "can be sprayed directly onto crops." And acetochlor "tends to perform better" than similar herbicides "in wetter and cooler conditions," and has "better weed control early in the growing season."

(Id. (quoting Doc. 149 ¶ 157) (internal citations omitted).) Plaintiffs also allege that each AI is distinguishable enough that farmers "may prefer it over others." (Id. at 54 (citing Doc. 149 ¶ 46).) Finally, Plaintiffs contest that the court should take judicial notice of the EPA label registrations and prior FTC and DOJ antitrust proceedings at this stage. (Doc. 150 at 58-59.)

A relevant product market must include all reasonably interchangeable products. United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956). The reasonable interchangeability of products is generally determined according to the cross-elasticity of demand for the product and its alternatives. It's My Party, Inc. v. Live Nation, Inc., 811 F.3d 676, 683 (4th Cir. 2016). In other words, courts look to the degree to which a defendant would sacrifice sales to alternative products by raising the price of its goods. Eastman Kodak, 504 U.S. at 469. It is therefore more than simply technical interchangeability. Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 218 n.4 (D.C. Cir. 1986) (discussing functional substitutability as one factor among many as it relates to "the economic criteria that make one market distinct from another").

Market definition is a question of fact. Kolon, 637 F.3d at 442 (collecting cases). "Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." Id. (quoting Todd, 275 F.3d at 199-200). Nevertheless, there is

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

"no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market." Id. (quoting Todd, 275 F.3d at 199-200). "No party can expect to gerrymander its way to an antitrust victory without due regard for market realities." It's My Party, Inc., 811 F.3d at 683. "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Kolon, 637 F.3d at 442 (quoting Todd, 275 F.3d at 199-200).

Under this fact-intensive inquiry, the scope of the relevant product market differs on a case-by-case basis. For example, in Eastman Kodak, 504 U.S. at 481-82, the Supreme Court held that a properly constituted market may be comprised of a single product. In the pharmaceutical context, lower courts have ruled that a brand-name drug and its generic analogs can comprise a relevant product market. In re Zetia (Ezetimibe) Antitrust Litig., MDL No. 2:18-md-2836, 2021 WL 6689718, at *18-20 (E.D. Va. Nov. 1, 2021), adopted in full by 587 F. Supp. 3d 356 (E.D. Va. 2022); In re Nexium (Esomeprazole) Antitrust Litig., 968 F. Supp. 2d 367, 388 (D. Mass. 2013); In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 680-81 (E.D. Mich. 2000) (accepting plaintiffs' contention on motion to dismiss that branded and generic versions of heart medication constitute a single market), aff'd, 332 F.3d 896 (6th Cir. 2003). Whether a market is plausible when comprised of a single product — or many products — "can be determined only after a factual inquiry into the 'commercial realities' faced by consumers." Eastman Kodak, 504 U.S. at 482 (quoting Grinnell Corp., 384 U.S. at 572).

 **\*10**  Courts employ a variety of methods to determine if a product market is properly constituted. Plaintiffs urge the court to consider (1) the Defendants' own conduct; (2) the "hypothetical monopolist test"; and (3) the factors set out in Brown Shoe, 370 U.S. 294. (Doc. 150 at 49-52.) Courts generally consider Plaintiffs' first proposed methodology — the Defendants' own conduct and recognition of the market — under the assumption that "economic actors usually have accurate perceptions of economic realities." Todd, 275 F.3d at 205 (collecting cases) (quoting Rothery Storage, 792 F.2d at 218 n.4); Kolon, 637 F.3d at 442-43 (considering the "area within which the defendant and its competitors view themselves as competing").

Plaintiffs' second proposed methodology is the hypothetical monopolist test ("HMT"). The HMT is an aid in determining if the relevant product is properly constituted. The court begins by hypothesizing that every good as alleged in the product market is under the control of a hypothetical monopolist. United States v. Am. Express Co., 838 F.3d 179, 198-99 (2d. Cir. 2016). Under such conditions, if the hypothetical monopolist could profitably impose a small but significant and nontransitory increase in price ("SSNIP"), then the product market is properly defined. Id. By contrast, the product market is improperly defined when the hypothetical monopolist imposes the SSNIP unprofitably because the alleged market does not include reasonably interchangeable goods — i.e., goods that consumers will shift demand toward in light of the SSNIP. Id. While the Fourth Circuit has yet to endorse this test, other circuits have at least acknowledged it or outright embraced it as a viable methodology in the context of defining markets. See, e.g., Fed. Trade Comm'n v. Penn State Hershey Med. Ctr., 838 F.3d 327, 339-41 (3d Cir. 2016) (adopting HMT as proper test to define market); Fed. Trade Comm'n v. Sanford Health, 926 F.3d 959, 964 (8th Cir. 2019) (holding not clear error to define relevant market with HMT); Fed. Trade Comm'n v. Advocate Health Care Network, 841 F.3d 460, 473 (7th Cir. 2016) (endorsing HMT); Am. Express Co., 838 F.3d at 198-99 (2d Cir. 2016) ("[T]his Court often applies a 'hypothetical monopolist test[.]'").

Plaintiffs' third proposed methodology is the Brown Shoe factors. In Brown Shoe, the Court endorsed considering the following factors when defining a product market: "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325. Notably, the D.C. Circuit has observed that some of these factors are merely "evidentiary proxies for direct proof of substitutability." Rothery Storage, 792 F.2d at 218. The Rothery court noted that while sensitivity to price changes, distinct prices, and unique production facilities "relate directly to the economic definition of the market," the other factors require inferential reasoning to draw economic conclusions and "may be helpful where the other indicia are ambiguous." Id. at 218 n.4.

Turning to Defendants' arguments, the court finds unpersuasive Defendants' contention that Plaintiffs must explain in their complaint why certain AIs or crop-protection products are excluded from the markets. To

WCAS014

the extent Defendants' cases demonstrate a burden on antitrust plaintiffs to explain a negative, they are either anomalous or distinguishable. For example, in Bayer-Schering, 813 F. Supp. 2d 569, the court appeared to apply enhanced scrutiny to the alleged product market because the counterclaimant amended its product market inconsistently with its original counterclaim. Id. at 516-11 ("Sandoz's contradictory pleadings counsel that this Court closely scrutinize the amended counterclaims in ensuring that they meet Rule 12(b)(6) standards."). Through this lens, the court analyzed particular alternatives outside of the alleged market, many of which, it appears, the counterclaimant introduced into the record itself. Id. Whatever caused the Bayer-Schering court to impose this burden and analyze particular products, the Fourth Circuit has suggested that such scrutiny is misguided on a motion to dismiss. See, e.g., Kolon, 637 F.3d at 442 ("Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." (quoting Todd, 275 F.3d at 199-200)).

**\*11** Defendants' other cases fare no better. For example, in Therapearl, LLC v. Rapid Aid Limited, Civil No. 13-2792, 2014 WL 4794905 (D. Md. Sept. 25, 2014), the court dismissed a Sherman Act claim for failure to plead a product market because the plaintiff did not even attempt an explanation of why the market was limited and "made no allegations concerning" reasonable interchangeability. In Global Discount Travel Services, LLC v. Trans World Airlines, Inc., 960 F. Supp. 702, 706 (S.D.N.Y. 1997), the court found the product market was improperly pleaded because the plaintiff included only its brand in the product market and made no plausible explanation as to why other competitors did not supply interchangeable products. And in Chapman v. New York State Division for Youth, 546 F.3d 230, 238 (2d Cir. 2008), the court found a product market too narrow where the plaintiff did not provide "any theoretically reasonable explanation for restricting the product market." Here, Plaintiffs have included such an explanation and include in the market products beyond just those of Defendants (namely, the generics).

Moreover, the court is unpersuaded that taking judicial notice of the EPA label registrations and FTC and DOJ antitrust matters would materially alter the court's analysis at this stage. While the court, under Federal Rule of Evidence 201, may take judicial notice of facts that are "matters of public record," Justice 360 v. Stirling, 42 F.4th 450, 455 (4th Cir. 2022), Defendants ask the court to also accept their interpretation of

facts within the cited public records. The EPA registrations may be probative of interchangeability, but they appear to speak to interchangeable function, not whether and how these crop-protection products are interchangeable in the marketplace — i.e., cross-elasticity of demand. In re Nexium, 968 F. Supp. 2d at 388 (finding it "immaterial" on a motion to dismiss that other pharmaceuticals could be used to treat the same symptoms because function does not necessarily speak to cross-elasticity of demand among consumers). At a minimum, the EPA label registrations raise fact questions, which are ill-suited for determination at the pleading stage. And while the prior FTC and DOJ antitrust proceedings may suggest some inconsistency in how the government views the crop-protection product market, the court must consider each antitrust dispute on a case-by-case basis. Eastman Kodak, 504 U.S. at 467 (demonstrating preference to resolve antitrust claims "on a case-by-case" basis); (See Doc. 100 at 41-42 (citing Ciba-Geigy Ltd., 62 Fed. Reg. 409, 412 (FTC Jan. 3, 1997), because FTC alleged in merger action a broader product market of "corn herbicides").) As a result, even if the court took judicial notice of these facts outside of the record, they would not materially impact the court's analysis at this stage.

Defendants' other arguments fall short as well. Plaintiffs have alleged plausible, albeit narrow, product markets. The reasoning applied in cases analyzing the relevant product market for pharmaceuticals, specifically that a plausible product market may consist of a brand chemical and its generic alternative, is instructive. See In re Nexium, 968 F. Supp. 2d at 388-89; In re Zetia, 2021 WL 6689718 at *19 (finding proper a product market consisting of brand drug and generic on summary judgment). Additionally, Plaintiffs have plausibly alleged facts that show that there is limited cross-elasticity between the products inside and outside of Plaintiffs' alleged markets. For example, Plaintiffs allege that Defendants' prices would fall significantly upon entry of a generic of the same AI. (See Doc. 149 ¶¶ 92, 121, 127, 144, 150, 158; Doc. 81 ¶¶ 101, 119 (demonstrating anticipated market devaluation upon generic entry).) The alleged effect on price resulting from generic entry plausibly suggests that the AI in each alleged product market does not already face substantial competition from products outside the alleged market. See Areeda & Hovenkamp, supra ¶ 561b2 ("[I]f the price of one incumbent product drops significantly in response to new entry, while the prices of other incumbents do not, then that first incumbent product, plus the new entrant, is very likely a market."). Moreover, Defendants' own alleged conduct, namely that Defendants' own loyalty

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

programs cover only individual AIs, plausibly suggests that Defendants view the market as including only one AI but not others. (Doc. 149 ¶¶ 67, 76); Todd, 275 F.3d at 205 (crediting evidence of defendant's conduct as suggestive of scope of product market). Finally, Plaintiffs plausibly allege characteristics that make each AI unique in the marketplace, that alternatives are not considered by farmers as suitable, and that farmers prefer specific AIs. (Doc. 149 ¶¶ 46, 157.)

*12 In sum, Plaintiffs have alleged a plausible explanation as to why the market should be limited as alleged. Cf. Kolon, 637 F.3d at 442. Whether, as Defendants argue, they have the better of the argument after the facts develop, and the evidence is weighed, must await another day. As a result, Defendants' motion to dismiss for failure to plausibly allege a product market will be denied.

### 2. Anticompetitive Conduct and Injury

Defendants argue that Plaintiffs have not plausibly alleged anticompetitive conduct and injury. (Doc. 95 at 21; Doc. 100 at 25.) The parties dispute first which legal test the court should apply to Defendants' loyalty programs, and second, depending on the test applied, whether Plaintiffs have alleged anticompetitive conduct and injury. The court considers each in turn for the purposes of the instant motion.

### a. The Rule of Reason and Price-Cost Test

Defendants urge the court to apply the "price-cost" test, arguing that Plaintiffs failed to allege facts to survive this measure of anticompetitive conduct. (Doc. 95 at 24; Doc. 100 at 22-23.) As suggested by its name, where the price-cost test is applied, alleged conduct may only be illegal if the price is set below the cost. Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993). Plaintiffs appear to concede that the complaint does not allege prices below cost. (Doc. 150 at 43 ("Plaintiffs do not bring a predatory-pricing claim.").) This concession would seemingly short-circuit Plaintiffs' antitrust claims if the price-cost test applies. Plaintiffs maintain, however, that the court would gravely err in applying the price-cost test, arguing instead that the court must apply the default "rule of reason." (Doc. 150 at 39-40.) Under that test, an exclusive dealing arrangement is unlawful only if its "probable effect" is to substantially lessen competition in the relevant market. Tampa Elec, 365 U.S. at 327-29.

As a matter of principle, antitrust law is not intended to prevent all price-cutting. Brooke Grp., 509 U.S. at 223 ("Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 340 (1990)). In fact, competitors should generally be enabled to cut prices to a certain extent — even to increase market share — without running afoul of the antitrust laws. Id. ("The antitrust laws require no such perverse result." (quoting Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 116 (1986)). Low prices that are still above-cost are generally procompetitive because "the exclusionary effect of prices above a relevant measure of cost [generally] reflects the lower cost structure of the alleged predator, and so represents competition on the merits." Id. at 222-24.

On the other hand, predatory pricing harms competition. Predatory pricing occurs where a company sets prices below cost to eliminate competitors in the short run and reduce competition in the long run. Cargill, 479 U.S. at 117. Such a pricing scheme is "rarely tried, and even more rarely successful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 589 (1986). "For such a scheme to make economic sense, the firm must recoup the losses suffered during the below-cost phase in the supracompetitive phase." ZF Meritor, 696 F.3d at 272 (citing Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., 549 U.S. 312, 318 (2007)).

*13 To separate the competitive wheat from the predatory chaff, the Supreme Court devised the price-cost test: to succeed on a predatory pricing claim, a plaintiff must demonstrate (1) "that the prices complained of are below an appropriate measure of [the defendant's] costs"; and (2) that the defendant had "a dangerous probability ... of recouping its investment in below-cost prices." Id. (quoting Brooke Grp., 509 U.S. at 222-24). In fashioning this formalistic approach, the Court acknowledged that the price-cost test will miss some anticompetitive above-cost pricing, but that it "is beyond the practical ability of a judicial tribunal" to ascertain whether above-cost pricing is anticompetitive "without courting intolerable risks of chilling legitimate price-cutting." Id. at 273.

Where the price-cost test does not apply, courts apply the rule of reason to exclusive dealing arrangements. [7] Tampa Elec., 365 U.S. at 327. "[E]xclusive dealing arrangements violate the antitrust laws only if they are likely to foreclose

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

the entry into a substantial part of the market of products that compete with the products benefitting from the exclusive dealing arrangement." Chuck's Feed, 810 F.2d at 1293 (citing Standard Oil Co. v. United States, 337 U.S. 293, 314 (1949)). The Supreme Court set out the following considerations when analyzing an exclusive dealing arrangement:

> [T]he probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein.

Tampa Elec, 365 U.S. at 32 9. The concern of the courts about exclusive dealing arrangements is "the possibility that a single manufacturer will control all or a substantial number" of the available options for a certain kind of product in a specified geographical area. Chuck's Feed, 810 F.2d at 1293 (addressing concern in the context of retail markets).

To succeed on an exclusive dealing claim, a plaintiff must prove (1) the relevant product market; (2) the geographical area of competition for the product market; and (3) that the arrangement at issue extends to a "substantial share of the relevant market." Id. (citing Tampa Elec, 365 U.S. 327-28). If a court finds substantial foreclosure, it must still consider "whether an otherwise unacceptable level of market foreclosure is justified by procompetitive efficiencies." Id. at 1294 (citing Cont'l T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 57-58 (1977); Arizona v. Maricopa Cnty. Med. Soc'y, 457 U.S. 332, 343 (1982)). Substantial foreclosure has been found "even though the contracts foreclose[d] less than [a] roughly 40% or 50% share." Microsoft, 253 F.3d at 70 (Sherman Act § 2 claim).

**\*14** The Supreme Court's price-cost line of cases demonstrates that the price-cost test applies at least where a pricing practice itself operates as the exclusionary tool, regardless of how a plaintiff styles its allegations. In Pacific Bell Telephone Company v. Linkline Communications, Incorporated, for example, the defendant, which sold inputs

at wholesale and finished goods at retail, allegedly drove competitors out of the market by raising the wholesale price while simultaneously lowering the retail price. 555 U.S. 438, 457 (2009). The Supreme Court analyzed this "price-squeezing" claim under Brooke Group, holding that the scheme was permissible because "the defendant's retail price remain[ed] above cost." Id. at 451-52. In Cargill, Incorporated v. Monfort of Colorado, Incorporated, the Supreme Court rejected a plaintiff's theory of antitrust injury where the plaintiff alleged that the defendant's merger would lead to reduced prices that were still at or above cost. 479 U.S. at 114-16. And in Atlantic Richfield Company v. USA Petroleum Company, the plaintiff alleged that the defendant, a gasoline manufacturer, had engaged in price-fixing by offering its dealers discounts and rebates to stave off competition from independent dealers. 495 U.S. at 331-32. The Supreme Court held that where a firm or group of firms lowers prices through a vertical agreement, but maintains prices above cost, competitors' losses are attributable to procompetitive forces, not anticompetitive predatory pricing. Id. at 337-38.

Lower courts have nevertheless grappled with the question of when to apply the price-cost test when it is not clear that a company engages merely in "price-cutting" — e.g., when a company offers discounts in exchange for purchasing a certain percentage of goods from that company. To be sure, courts have in some cases applied the test to above-cost discounting in such instances. For example, in NicSand Incorporated v. 3M Company, two suppliers of automotive sandpaper competed for business with six large retailers that controlled 80% of the retail market. 507 F.3d 442, 447 (6th Cir. 2007). Five out of the six retailers sold only one brand at a time, meaning each retailer sold only either NicSand or 3M, but not both. Id. In order to obtain that exclusive shelf-space, NicSand or 3M had to offer a favorable price and meet a number of additional terms, such as providing a full line of automotive sandpaper and providing the racks for the shelves. Id. at 448. For years, NicSand dominated the shelves in four of the five retailers that insisted on single-brand shelves. That is, until 3M offered retailers up-front payments worth hundreds of thousands of dollars in exchange for switching to 3M. Id. The Sixth Circuit applied the price-cost test in rejecting NicSand's claim. In doing so, the court reasoned that exclusivity was an essential feature of this specific retail market because the retailers (i.e., the buyers) required exclusivity, and that NicSand, as the market incumbent, could not now complain that 3M had knocked it from its perch using similar exclusive terms it had previously

utilized. Id. at 456 ("When one exclusive dealer is replaced by another exclusive dealer, the victim of the competition does not state an antitrust injury."). Ultimately, the court found that the up-front payments 3M offered were a pricing measure that the retailers "insisted on receiving" in order to switch suppliers. Id. at 453.

The Eighth Circuit, in Concord Boat Corporation v. Brunswick Corporation, 207 F.3d 1039 (8th Cir. 2000), applied the price-cost test to the plaintiffs' Sherman § 2 claim and the rule of reason to the plaintiffs' Sherman § 1 claim, albeit with little discussion as to why the court applied different tests to the different claims. The defendant, Brunswick, offered market-share discounts to boat builders and dealers in order to increase the sales of its engines. Id. at 1044. From 1995 to 1997, Brunswick offered a 3% discount if a buyer purchased 70% of its engines from the defendant, a 2% discount for 65% of its engines, and a 1% discount for 60% of its engines. Id. Brunswick also offered additional discounts to anyone who signed a multi-year market-share agreement and to those who purchased a higher volume of engines (i.e., a volume discount). Id. Analyzing the plaintiffs' section 1 claim under the rule of reason because the plaintiffs did not allege activity that would "trigger a per se analysis," the Eight Circuit held that the plaintiffs failed to establish that Brunswick's discount program was anticompetitive exclusive dealing because boat builders were not required to commit for a specified time period and many had switched to other sellers when offered superior discounts. Id. at 1058-59. Moreover, the court held that the plaintiffs did not show that "significant barriers to entry existed" in the market because firms had little difficulty entering the market. Id. Then, applying the price-cost test to plaintiffs' section 2 claim, the court held that Brunswick's loyalty program was a "normal competitive tool" because its prices remained above variable cost. Id. at 1062. Though not apparently necessary to justify this holding, the court reiterated that the discount program was not exclusive dealing, that the boat builders could walk away at any time (and did so), and that there were low barriers to entry. Id. at 1063.

**\*15** Equipped with these precedents, the Third Circuit in ZF Meritor dealt more explicitly with which of the two tests to apply when presented with another loyalty discount program. In that case, the defendant, Eaton, had about an 80% market share in the manufacture of heavy-duty truck transmissions and introduced loyalty contracts that provided both upfront payments and rebates to four major truck manufacturers that purchased truck transmissions. ZF Meritor, 696 F.3d at 265, 286 n.5. These contracts lasted for at least five years and would scale discounts based on the percentage of goods the manufacturers purchased from the defendant. Id. at 265. Generally, the market-share targets ranged from 85% to 95%. Id. Eaton included additional terms beyond the discounts. Notably, Eaton retained the right to terminate the agreements if the market share figures were not met, and if the manufacturers did not meet the market-share figure for one year, Eaton could require "repayment of all contractual savings." Id. Moreover, direct-from-manufacturer truck buyers could customize certain equipment, including transmissions, and could browse options in the manufacturers' catalogues. Eaton's agreements required that its transmissions be featured as the standard offering in the catalogues and even required the removal of competitors' products in two of the four manufacturers' catalogues. Id. Further, the manufacturers were contractually required to price competitors' products above those of Eaton. Id. at 265-66.

The ZF Meritor court weighed whether to apply the price-cost test or the rule of reason to Eaton's agreements. Id. at 268. The court noted that the price-cost test "would control if this case presented solely a challenge to Eaton's pricing practices." Id. at 273-74. However, the court credited testimony that demonstrated that manufacturers were forced to meet the market-share targets, or else risk financial penalties, supply shortages, or severed ties with the market-dominant defendant entirely. Id. at 277. Because Eaton was a monopolist, the court reasoned, forgoing the rebates and "losing Eaton as a supplier was not an option." Id. at 278.

The court stated that "this is not a case in which the defendant's low price was the clear driving force behind the customer's compliance with purchase targets, and the customers were free to walk away if a competitor offered a better price." Id. (citing Concord Boat, 207 F.3d at 1063 as a counter-analogy). Put another way, Eaton's de facto exclusive dealing arrangements drove out other firms "not because they cannot compete on a price basis, but because they are never given an opportunity to compete, despite their ability to offer products with significant customer demand." Id. at 281. The court held that when price itself is not the "clearly predominant mechanism of exclusion," the price-cost test does not apply. Id. at 277.[8]

A few years later, the Third Circuit revisited ZF Meritor in the pharmaceutical context. Eisai, Inc. v. Sanofi Aventis U.S., LLC, 821 F.3d 394 (3d Cir. 2016). In that case,

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Eisai alleged that Sanofi Aventis engaged in three modes of anticompetitive conduct in the market for anticoagulant drugs in U.S. hospitals: "(1) market-share and volume discounts, (2) a restrictive formulary access clause, and (3) aggressive sales tactics used to market the program." Id. at 400. Specifically, Sanofi offered a baseline 1% discount for a market-share below 75% and a scaled discount from 9% to 30% for market-shares above 75%. Id. The court ultimately held that Sanofi's program was distinguishable from that in ZF Meritor because the discounts were not de facto mandatory, did not threaten repayment of contractual savings, and did not threaten refusal to deal in the future. Id. at 406. The court nevertheless refrained from commenting on whether the price-cost test applied because, even under the rule of reason test applied in ZF Meritor, the plaintiff's claims failed due to insufficient evidence of market foreclosure. Id. at 408-09.

**\*16** The Third Circuit's approach suggests that loyalty discount arrangements may be pure (or nearly pure) pricing schema, and in such situations, the price-cost test applies neatly. See, e.g., NicSand, 507 F.3d at 453. However, an arrangement may include other allegedly coercive mechanisms that impose costs on competitors to enter the market such that price is not "clearly" doing the work of exclusion. Following the Third Circuit's formulation, other circuits have since relied upon and cited ZF Meritor where the defendant offers loyalty discounts. See, e.g., In re EpiPen (Epinephrine Injection, USP) Antitrust Litig., 545 F. Supp. 3d 922, 1016-17 (D. Kan. 2021) (explicitly applying the "clearly predominant mechanism of exclusion" analysis), aff'd, 44 F.4th 959 (10th Cir. 2022) (observing that ZF Meritor and other Third Circuit precedent "merit close consideration in this case"); McWane, 783 F.3d at 835 (citing ZF Meritor to justify a rule of reason approach to exclusive dealing cases); Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1182-83 (9th Cir. 2016) (citing ZF Meritor as a counter-analogy for situation with "extra-contractual conditions, or preferential treatment terms"); see also Dial Corp. v. News Corp., 165 F. Supp. 3d 25, 32 (S.D.N.Y. 2016) (citing and applying ZF Meritor's "clearly predominant method of exclusion" test in non-loyalty discount exclusive dealing case).

ZF Meritor appears to balance the important concerns the Supreme Court has identified in over-regulating price-cutting schema, see Matsushita, 475 U.S. at 594 ("[M]istaken inferences in [pricing cases] cases ... are especially costly, because they chill the very conduct the antitrust laws are designed to protect."), and under-regulating exclusive

dealing, see Jefferson Par., 466 U.S. at 45 (O'Connor, J., concurring) ("Exclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods[.]"). The ZF Meritor approach counsels applying the price-cost test where a pricing practice is clearly doing the work of exclusion and the rule of reason where there are mechanisms beyond price-cutting that exclude competition by imposing unilateral costs on competitors.

The parties do not appear to disagree with the above analysis. (Doc. 100 at 25; Doc. 95 at 24-25; Doc. 150 at 41.) Rather, they depart on whether price clearly predominates over other mechanisms of exclusion in this case. Syngenta argues that Plaintiffs do not plead "any of the non-price coercive features that courts have required" before finding a market-share rebate program anticompetitive. (Doc. 100 at 27.) Further, Syngenta argues, the single-year and single-product scope of the rebates undermines Plaintiffs' claim that price clearly predominates. (Id. at 29.) Syngenta dismisses Plaintiffs' allegation that it terminated a distributor as an "isolated allegation" that is "simply not probative of the program itself." (Id. at 30 (emphasis removed).) Finally, Syngenta characterizes Plaintiffs' allegations regarding Defendants' agreement whereby Syngenta supplies mesotrione and s-metolachlor for Corteva's use as an "effort to muddy the waters." (Id. at 32.)

Corteva first argues that "Plaintiffs' allegations make clear that price is the primary means of exclusion, but do not allege that Corteva's programs fail the price-cost test." (Doc. 95 at 25.) Corteva specifically contends that Plaintiffs do not allege long-term contract terms or exclusions from supply based on noncompliance, which are recognized non-price conditions that would trigger the default rule of reason. (Id. at 26.) Second, Corteva claims that its term that defers a certain percentage of rebates into subsequent years and retracts unpaid rebates for noncompliance is "no more than a 'threat of a lost discount'" that is, in its view, not anticompetitive. (Doc. 98 at 26.)

Third, Corteva claims that conditioning the Corporate Offer on compliance with the CRPIVM is not anticompetitive "bundling." (Id. at 27-28.) Bundling occurs "when a firm sells a bundle of goods ... for a lower price than the seller charges for the goods ... purchased individually." Cascade Health Sols. v. PeaceHealth, 515 F.3d 883, 894 (9th Cir. 2008). In Corteva's view, the Corporate Offer "just offers an additional discount to Corteva's customers who do buy

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

products covered by the [Corporate Offer]." (Doc. 95 at 28.) Fourth, Corteva contends that the court "should not credit [P]laintiffs' unsupported, conclusory and nonspecific allegations that 'Defendants have retaliated and threatened to retaliate' against distributors that have failed to satisfy loyalty by cancelling distribution contracts or withholding access to supply." (Id.) [9]

**\*17**  Plaintiffs argue in response that Defendants mischaracterize their own discount program as a pricing scheme. (Doc. 150 at 35.) Plaintiffs point to the complaint's allegations that "Defendants have 'threatened to retaliate ... against [disloyal] distributors ... by canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage." (Id. at 36 citing Doc. 149 ¶ 88.) Plaintiffs further maintain that they allege that each Defendant "follow[ed] through" on their threats by refusing to sell pesticides or limiting sales of an insecticide to two distributors. (Doc. 112 at 36 (citing Doc. 81 ¶ 88.) Plaintiffs respond to Defendants' argument — that these are isolated incidents that do not exemplify the program — by arguing that the reasonable inference which must be drawn in Plaintiffs' favor at this stage is that limited instances of retaliation are evidence of the loyalty program working as intended. (Id. at 37-38.) Plaintiffs also contend that the one-year length of the agreements triggers no presumption that the contracts are lawful and that looking to the practical effect of agreements demonstrates "long-term foreclosure." (Id. at 38-39.) Plaintiffs finally argue that even if the price-cost test applies to the Sherman Act and Clayton Act claims, it does not apply to the FTC Act claim. (Id. at 45-47.)

In other loyalty discount cases, courts have observed a number of non-price mechanisms of exclusion, such as provisions aggravating existing barriers to enter the market, McWane, Inc., 783 F.3d at 836; In re Surescripts Antitrust Litig., 608 F. Supp. 3d 629, 645 (N.D. Ill. 2022); whether the buyer insists on exclusive dealing, NicSand, 507 F.3d at 456; contractual obligations to purchase a set percentage of products from the defendant, Allied Orthopedic, 592 F.3d at 997 n.2; discounts involving tying or bundling, Eisai, 821 F.3d at 405; LePage's, 324 F.3d at 157-58; threats to retract unpaid rebates or claw back discounts from prior years, McWane, 783 F.3d at 820-21; threats to cut off supply from a monopolist, ZF Meritor, 696 F.3d at 278; requirements to exclude competitors from marketing materials, id.; and the length of time of the discounting agreements, McWane, 783 F.3d at 820-21. While these cases are instructive, each antitrust case "must be determined upon the particular facts disclosed by the

record, and ... the opinions in those cases must be read in the light of their facts and of a clear recognition of the essential differences in the facts of those cases, and in the facts of any new case to which the rule of earlier decisions is to be applied." Maple Flooring Mfrs. Ass'n v. United States, 268 U.S. 563, 579 (1925).

Here, Plaintiffs have alleged sufficient non-price mechanisms of exclusion to foreclose application of the price-cost test as a matter of law at this pleading stage. First, the complaint plausibly alleges that the loyalty programs leverage the Defendants' monopolist status and the market's substantial barriers to entry to exclude competition for the AIs. (Doc. 149 ¶ 160.) Among the alleged "capital, technical, regulatory and legal barriers" are "obtaining registration from the EPA, developing manufacturing processes and sourcing active ingredient, and paying data compensation costs to the initial active ingredient registrant." (Id.) While high entry barriers alone may not trigger the rule of reason, Plaintiffs have plausibly alleged that Defendants' use of the loyalty discounts — as alleged monopolists relating to production of the AIs — exacerbates the already high costs to enter the market by locking up access to the most efficient channel of distribution. See McWane, 783 F.3d at 836; ZF Meritor, 696 F.3d at 284-85 (applying rule of reason where high barriers existed in high-concentration market); Eastman Kodak, 504 U.S. at 488 (Scalia, J., dissenting) ("Behavior that might otherwise not be of concern to the antitrust laws ... can take on exclusionary connotations when practiced by a monopolist.")

Second, the complaint alleges not only that Defendants threatened to cut off supply, but that each Defendant followed through on that threat, albeit in limited instances. (Doc. 149 ¶ 88.) While Defendants contend that these do not exemplify the program, the court must draw all reasonable inferences in Plaintiffs' favor at this stage. Such instances plausibly support the claim that Defendants' threats to restrict supply are effective deterrence against non-compliance. (See id. ¶ 84 (alleging that Defendants communicate adherence to loyalty thresholds to distributors).) The complaint plausibly alleges that the threats to restrict supply factors into distributors' purchasing decisions.

**\*18**  Third, while the length of the agreements is facially one year, the alleged yearly renewals and threat of retaliation are claimed to have a longer-term effect. (Id. ¶¶ 164, 172.) Further, Corteva's agreements allegedly contain terms that defer payments into subsequent years and require forfeiture of unpaid discounts for non-compliance. (Doc. 81 ¶ 78.)

WCAS020

Fourth, Corteva's agreements allegedly share some features with bundling because Corteva offers terms that link discounts for any one AI to compliance with the loyalty threshold for all AIs in a distributor's offer and that link discounts under the Corporate Offer to compliance with the CPRIVM offer. (Id. ¶ 79.)

Finally, Plaintiffs plausibly allege that the Syngenta-Corteva supply agreement for mesotrione and metolachlor allegedly enhances the exclusive effect of the loyalty programs. (Doc. 149 ¶¶ 109, 122.)

Whether these non-price mechanisms have the alleged exclusive effect vis-à-vis price will depend on the development of the record. In light of these plausible allegations, Defendants have not demonstrated at this stage that price clearly predominates over non-price mechanisms of exclusion.

Defendants' other arguments do not alter this analysis. First, that the loyalty discounts cover a single product (i.e., each individual AI) does not necessarily mean that price clearly predominates. While Defendants cite to ZF Meritor and Eisai for this proposition, neither supports it. In ZF Meritor, the Third Circuit did state, "we join our sister circuits in holding that the price-cost test applies to market-share or volume rebates offered by suppliers within a single-product market." ZF Meritor, 696 F.3d at 274 n.11 (citing NicSand, 507 F.3d at 452; Concord Boat, 207 F.3d at 1061; Barry Wright, 724 F.2d at 236). In making this observation, the Third Circuit was distinguishing LePage's v. 3M, 324 F.3d 131 (3d Cir. 2003), where the court did not apply the price-cost test because the alleged conduct involved "bundling" across multiple products. Id. The court reasoned that LePage's should not extend to the facts of ZF Meritor, where "only one product is at issue and the plaintiffs have not made any allegations of bundling." ZF Meritor, 696 F.3d at 274 n.11. Though the court stated that the price-cost test "applies" to a single-product discount, the ZF Meritor court itself applied the rule of reason — not the price-cost test — to a single-product discount. This indicates that the price-cost test can apply where there is a single-product market, not that it must. Defendants' reliance on Eisai fares no better, as the Third Circuit stated that pricing "usually" predominates over other means of exclusivity when "a firm uses a single-product loyalty discount or rebate to compete with similar products." Eisai, 821 F.3d at 409. However, the court ultimately refrained from applying the price-cost test because the plaintiff's claim failed under Tampa

Electric as well. Id. at 409 ("Because we have concluded that Eisai's claims are not substantiated and that they fail a rule of reason analysis, we will not opine on when, if ever, the price-cost test applies to this type of claim."). Notably, neither ZF Meritor nor Eisai was decided at the pleadings stage but after the development of a factual record. ZF Meritor was decided on post-trial motion, and Eisai was decided on motion for summary judgment. Though the price-cost test may apply to certain loyalty discount programs, the Supreme Court admonishes that "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities" are "generally disfavored" and that courts should resolve antitrust cases on a case-by-case basis, "focusing on the 'particular facts disclosed by the record.'" Eastman Kodak, 504 U.S. at 466-67 (quoting Maple Flooring, 268 U.S. at 579).

**\*19** Second, at least at this early stage, it is not clear that the single-year term of the loyalty discount agreements mandates application of the price-cost test as a matter of law. Defendants contend that the single-year term of their agreements in this case "are presumptively incapable of harming competition." (Doc. 100 at 29.) While long-term exclusive dealing has been found to factor in favor of finding anticompetitive injury, ZF Meritor, 696 F.3d at 286-87, Defendants have not demonstrated that any such presumption exists. Rather, the cases Defendants cite for this position show that courts have weighed short duration in determining anticompetitive effects, not presumed a lack of anticompetitive effects. See R.J. Reynolds Tobacco Co. v. Philip Morris Inc., 199 F. Supp. 2d 362, 391-93 (M.D.N.C 2002), aff'd sub nom. RJ Reynolds Tobacco Co. v. Philip Morris USA, Inc., 67 F. App'x 810 (4th Cir. 2003) (unpublished) (considering contract length along with percentage of foreclosure and costs of switching to other vendors); see also In re EpiPen Mktg., 44 F.4th at 988 ("It is axiomatic that short, easily terminable exclusive agreements are of little antitrust concern; a competitor can simply wait for the contracts to expire or make alluring offers to initiate termination." (collecting cases)); Allied Orthopedic, 592 F.3d at 997 ("The 'easy terminability' of an exclusive dealing arrangement 'negate[s] substantially [its] potential to foreclose competition.'" (quoting Omega Env't, Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163-64 (9th Cir. 1997))). Here, Plaintiffs allege that Defendants' renewable single-year contracts create long-term competitive harms, including cutting off supply and, in Corteva's case, deferring rebates into subsequent years conditioned on further compliance with meeting market-share. See Dentsply, 399 F.3d at 193-94 (finding "strong economic incentive to continue" compliance

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   15

with market-share agreement despite "legal ease with which the relationship can be terminated"); McWane, 783 F.3d at 833-34 (finding anticompetitive injury even though exclusive dealing was "short-term and voluntary"). Moreover, each of the AIs has been in a loyalty program for at least four years, and one has been included for almost two decades. (Doc. 149 ¶¶ 93, 102, 115, 127, 137, 146.) While the annual length of the agreements is generally a factor that favors Defendants, the court must draw all reasonable inferences from the complaint's allegations in Plaintiffs' favor at this early stage. As such, the court cannot say that the length of the agreements requires a finding at this time that price clearly predominates over other alleged non-price mechanisms of exclusion.

In sum, Plaintiffs have plausibly alleged sufficient facts, if believed, for the court to conclude that price is not the clearly predominant mechanism of exclusion. The complaint alleges that Defendants are dominant suppliers who have entered into de facto exclusive dealing arrangements that include plausibly significant mechanisms of exclusion beyond price-cutting. Accordingly, the court cannot conclude at this stage that the price-cost test must apply as a matter of law. Indeed, Defendants' cited cases demonstrate that courts have reached, or even closely considered, such a conclusion before discovery in only rare circumstances. NicSand, 507 F.3d 442 (price-cost applied on motion to dismiss where plaintiff did not have antitrust standing); Concord Boat, 207 F.3d 1039 (price-cost partially applied post-trial); ZF Meritor, 696 F.3d 254 (rule of reason applied post-trial after extensive discussion); Pac. Bell, 555 U.S. 438 (dismissing price-squeezing claim, not exclusive dealing claim). Depending on the facts adduced at a later stage, it remains to be seen whether the price-cost test or Tampa Electric's rule of reason and its progeny will ultimately be the proper test for Plaintiffs' claims. For purposes of the pending motions, therefore, the court turns to Defendants' contention that the complaint fails under the rule of reason.

**b. Allegations of Anticompetitive Conduct and Injury**

Defendants argue that Plaintiffs have failed to allege anticompetitive conduct and injury. Corteva contends that it is "entirely dispositive" that Plaintiffs have not pled any actual exclusivity because the loyalty programs are voluntary, do not cover all distributors in the market, and do not require 100% exclusivity. (Doc. 95 at 22-23.) Syngenta principally argues that any market foreclosure is the result of "lawful

price competition," that Syngenta incentivized customers to "buy more of its products by lowering its prices," and that there is an absence of non-price mechanisms of exclusion present in other cases like ZF Meritor and Dentsply. (Doc. 100 at 33-35.) Syngenta further argues that Plaintiffs failed to explain why generic competitors do not lower their prices to make their products more profitable to distributors. (Id. at 35.) Finally, Syngenta claims that its exclusive dealing arrangement with Corteva is evidence of legal competitive conduct. (Id. at 36-37.)

Plaintiffs respond that they have plausibly alleged both indirect and direct evidence of harm to competition. (Doc. 150 at 26.) On the indirect side, Plaintiffs contend that they have alleged foreclosure of a "substantial part of the market." (Id. (citing Chuck's Feed, 810 F.2d at 1293-95).) Specifically, they contend that Defendants have foreclosed generics from "approximately 70% or more" of the market. (Doc. 112 at 27 (citing Doc. 81 ¶ 171).) Plaintiffs further argue that this estimate is likely conservative because it relies on the lowest market-share threshold available and conservatively assumes that distributors only narrowly hit the market-share threshold. (Doc. 150 at 27.) On the direct side, Plaintiffs argue that they have alleged three competitive harms: reduced choices for farmers, higher prices for farmers, and less innovation. (Id. at 28.) Plaintiffs further contend that Defendants' discounts may benefit participating distributors but do not get passed on to farmers. (Id. at 35.)

**\*20** As an initial matter, Defendants ask the court to apply the same mode of inquiry, i.e., the rule of reason or price-cost test — regardless of the antitrust statute at issue. (Doc. 157 at 33:7-13.) Indeed, courts have conducted the exclusive dealing inquiry in such a manner. See, e.g., ZF Meritor, 696 F.3d at 269 n.9 (stating that the rule of reason is applicable to the plaintiff's claims under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act); Microsoft, 253 F.3d at 59 (applying rule of reason to Sherman Sections 1 and 2); Chuck's Feed, 810 F.3d at 1294 (applying rule of reason to exclusive dealing under the FTC Act and Clayton Section 3).

Moreover, Defendants do not argue that Plaintiffs' claims may survive under some antitrust statutes but not others, at least at this stage. Here, the relevant threshold requirements specific to the statutes are Sherman Section 1's contract requirement, 15 U.S.C. § 1 ("Every contract ..."), Sherman Section 2's monopoly power requirement, 15 U.S.C. § 2 ("Every person who shall monopolize ..."), and Clayton Section 3's conditional discount or rebate requirement, 15

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   16

Federal Trade Commission v. Syngenta Crop Protection AG, Slip Copy (2024)

U.S.C. § 14 ("... discount from, or rebate upon, such price, on the condition ..."). Defendants do not appear to contest that these requirements are alleged, so the court will treat them as uncontested for the purpose of these motions. Boles v. United States, 3 F. Supp. 3d 491, 507 n.10 (M.D.N.C. 2014). In any event, it appears that Plaintiffs have adequately pleaded these elements. Kolon, 637 F.3d at 450 ("[T]his Court has previously noted that when monopolization has been found the defendant controlled seventy to one hundred per cent of the relevant market." (internal quotation marks omitted)); (Doc. 150 ¶¶ 81, 84, 161-63 (alleging agreements with substantially all leading distributors; market share in excess of 70% during relevant time period for five of six AIs and 40% for Corteva's acetochlor (based on its joint venture partner having approximately 50%); and conditional payments).)

To prevail, Plaintiffs must plausibly allege that Defendants' loyalty agreements constitute anticompetitive conduct and caused antitrust injury. Microsoft, 253 F.3d at 58-59. As to the first issue, there is no set formula to demonstrate anticompetitive conduct under the rule of reason. ZF Meritor 696 F.3d at 271. Courts have considered

> a showing of significant market power by the defendant, substantial foreclosure, contracts of sufficient duration to prevent meaningful competition by rivals, [ ] an analysis of likely or actual anticompetitive effects considered in light of any procompetitive effects[,] whether there is evidence that the dominant firm engaged in coercive behavior, [ ] the ability of customers to terminate the agreements[, and t]he use of exclusive dealing by competitors of the defendant[.]

ZF Meritor, 696 F.3d at 271-72 (internal citations omitted) (collecting cases). An allegation of a percentage of market foreclosure is not required. Kolon, 637 F.3d at 452 n.12. As to the second issue, an antitrust injury is "of the type that the statute was intended to forestall" Microsoft, 253 F.3d at 59 (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487-88 (1977)) (internal quotation marks omitted). "[I]n a case brought by the Government, it must demonstrate

that the monopolist's conduct harmed competition, not just a competitor." Id.

Section 1 and 2 of the Sherman Act and Section 3 of the Clayton Act require different degrees of substantiality. The Supreme Court has implied in dicta that Section 3 of the Clayton Act requires a lesser showing than the Sherman Act does: "[I]f [the contract] does not fall within the broader proscription of § 3 of the Clayton Act it follows that it is not forbidden by those of the [Sherman Act]." Tampa Elec., 365 U.S. at 335 (summarily rejecting Sherman claims after rejecting Clayton claim). The majority of courts have since followed Tampa Electric's dicta. See, e.g., Microsoft Corp., 253 F.3d at 69; see also Areeda & Hovenkamp, supra ¶ 1800c4 n.67 (collecting cases). As between Sections 1 and 2 of the Sherman Act, Section 2 may require less foreclosure to be substantial than Section 1. Microsoft Corp., 253 F.3d at 70 ("[A] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.").

**\*21** Corteva lodges several arguments that it contends establish per se legality, namely that the agreements are voluntary and cover neither 100% of the distributors nor 100% of participating distributors' goods. It is true that courts have factored in whether customers were "free to walk away from the discounts at any time." Concord Boat, 207 F.3d at 1059; see also Allied Orthopedic, 592 F.3d at 995 (affirming district court that found that agreements were "voluntary and [could] be ended at any time, and hospitals [were] thus free to switch to more competitively priced generics"); Omega Env't, 127 F.3d at 1163 ("[T]he short duration and easy terminability of these agreements negate substantially their potential to foreclose competition."). However, these cases do not treat this fact as "entirely dispositive," as Corteva suggests. By contrast, courts are admonished to look to "the practical effect" of exclusive dealing agreements. Tampa Elec., 365 U.S. at 326. By doing so, courts have found de facto partial exclusive dealing arrangements to be cognizable violations under antitrust law. ZF Meritor, 696 F.3d at 282; Concord Boat, 207 F.3d at 1059 ("[C]laims that allege only de facto exclusive dealing may be viable.").

Assuming Defendants' agreements are formally voluntary, Plaintiffs have plausibly alleged that the Defendants' market-share targets combined with the schedule of payments and threat of non-price retaliation create de facto exclusivity. For example, the complaint alleges that the "complexity,

WCAS023

uncertainty, and timing" of payments "make it less likely that a distributor will lower its prices" and that the threat of "canceling distribution contracts, delaying access to new products, or withholding product allocation during a supply shortage" instills strict compliance. (Doc. 149 ¶¶ 85-88.) The complaint also alleges that the loyalty discounts create an incentive for distributors to "strictly manage" their generic purchases and "steer" customers toward loyalty discount-qualifying products despite consumer demand for generics. (Id. ¶¶ 95, 104, 117, 147.) In other words, it is plausible that Defendants' loyalty discount programs are "as effective as express purchase requirements." See ZF Meritor, 696 F.3d at 283 (recognizing voluntary agreement as de facto exclusive dealing because "no risk averse business would jeopardize its relationship with the largest manufacturer of transmissions in the market" (internal quotation marks omitted)); Dentsply, 399 F.3d at 194 ("[I]n spite of the legal ease with which the relationship can be terminated, the dealers have a strong economic incentive to continue carrying [the defendant's product]."); McWane, 783 F.3d at 833-34 (rejecting argument that short-term and voluntary exclusive dealing agreements are "presumptively legal").

Moreover, the lack of complete exclusivity is not fatal to Plaintiffs' claims, as Corteva argues. It contends that the ability of distributors to purchase some generics and the fact that some distributors (approximately 20%) do not participate creates a presumption of legality. This position appears at odds with Tampa Electric, which requires that Plaintiffs demonstrate the exclusive contract's probable effect is to "foreclose competition in a substantial share of the line of commerce affected." 365 U.S. at 327 (emphasis added); see also 15 U.S.C. § 14 ("... where the effect of ... such condition, agreement, or understanding may be to substantially lessen competition[.]" (emphasis added)). "[J]ust as 'total foreclosure' is not required for an exclusive dealing arrangement to be unlawful, nor is complete exclusivity required with each customer." ZF Meritor, 696 F.3d at 283 (analyzing claim under the Sherman Act). Rather than treating lack of true exclusivity or voluntariness as legally dispositive, the court may weigh the relevance of these facts at a later stage. See, e.g., Concord Boat, 207 F.3d at 1060 (weighing lack of true exclusivity on review of summary judgment order).

Syngenta's argument that dismissal is warranted because Plaintiffs did not explain why generic competitors do not lower their price to make their products more profitable to distributors is similarly unpersuasive at this stage. (Doc.

100 at 35.) Even assuming, without deciding, that Plaintiffs bear this burden at this stage, they have plausibly alleged that generic manufacturers' attempts to lower their prices would be futile in the presence of the loyalty programs. This follows from the allegation that distributors would not be willing to accept the risk of losing all supply from Defendants and because Defendants' foreclosure of the most efficient distribution channel imposes costs on generic manufacturers that has "harmed the[ir] effectiveness." (Doc. 149 ¶ 170, 173.)

**\*22** This contention is supported by Plaintiffs' specific allegations regarding manufacturers of generics that have attempted to enter the market. Manufacturers of generics of Syngenta's azoxystrobin and metolachlor allegedly exited the market because of "constraints imposed by Syngenta's loyalty program." (Id. ¶¶ 96-97, 118, 120.) One generic manufacturer of azoxystrobin that sought to mix azoxystrobin with a fungicide failed because the distributor feared it could impact its ability to meet the market-share target. (Id. ¶¶ 96-97.) Manufacturers of generics of mesotrione were also hindered from entering the market, an issue Plaintiffs allege was exacerbated by Syngenta's agreement to supply Corteva with mesotrione under the condition that Corteva's products containing mesotrione be treated neutrally under Syngenta's Key AI program. (Id. ¶ 105; Doc. 81 ¶ 109.)

Plaintiffs allege that a generic manufacturer of Corteva's rimsulfuron "canceled or deferred entry plans," despite farmer demand for lower-priced generics of rimsulfuron. (Doc. 149 ¶ 132.) According to the complaint, generics of oxamyl found some success in the market during a "plant outage" at Corteva from 2015 to 2017, but thereafter under Corteva's loyalty program, "generic sales plummeted, particularly at large distributors, and generic manufacturers could not retain distributor business even by lowering prices." (Id. ¶ 136-38.) One Corteva manager allegedly said of this pattern, "[O]ur team truly has done an A+ job blocking generics." (Id. ¶ 138.) Finally, a generic manufacturer of acetochlor that was priced "substantially below Corteva's prices" allegedly made "little headway" because major distributors declined to purchase the generic due to Corteva's loyalty program. (Id. ¶ 148.) At this preliminary stage, the court must accept these plausible factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. Through this lens, Defendants have not demonstrated that the widespread failure of generics to enter the market is due to competition on the merits rather than plausibly anticompetitive conduct by Defendants.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Finally, Plaintiffs have plausibly alleged anticompetitive conduct and injury. In Kolon, the Fourth Circuit, in reviewing a Sherman Act § 2 claim on motion to dismiss, held that an allegation of dominant market share and exclusionary conduct was sufficient at the pleading stage. 637 F.3d at 452 (citing Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 147 (4th Cir. 1990)). While the court also held that pleading a percentage of market foreclosure is not necessary, Plaintiffs have pleaded a foreclosure of "approximately 7 0% or more of each applicable market." (Doc. 81 ¶ 171); see Microsoft, 253 F.3d at 70 (finding substantial 40-50% of market foreclosure under Sherman Act § 2 claim). Under all of the antitrust statutes, Plaintiffs' allegations of substantial foreclosure are plausible and, at a minimum, "turn[ ] on a factual dispute ill suited for the pleadings stage." F.T.C. v. Surescripts, LLC, 424 F. Supp. 3d 92, 104 (D.D.C. 2020). Moreover, for the reasons noted above, Syngenta's argument — that Plaintiffs have not alleged anticompetitive conduct because they have not alleged predatory pricing — likewise fails. To the extent these arguments apply under the rule of reason, they appear to speak to "whether an otherwise unacceptable level of market foreclosure is justified by procompetitive efficiencies." Chuck's Feed, 810 F.2d at 1294; (Doc. 100 at 34 (framing price reductions as procompetitive).) Simply put, the court is not equipped at this stage and on this record to weigh the merits of this procompetitive justification against the plausible allegations of market foreclosure.

Plaintiffs have also sufficiently alleged antitrust injury. They claim harm to farmers, growers, and generic manufacturers, and that Defendants' conduct "may substantially lessen competition or tend to create or maintain monopolies in the [r]elevant [m]arkets." (Doc. 149 ¶¶ 164-66.) Specifically, Plaintiffs allege that generic manufacturers have been substantially foreclosed from the most efficient channel of distribution (id. ¶¶ 170-71); that the structure of the payments over an extended period of time, and across multiple crop-protection products containing the same AI, make it less likely that discounts will pass on to end-consumers (id. ¶¶ 173-75); that distributors have "omitted generic products from their price lists, refused customer requests for generics, declined generic companies' offers to supply, and systematically steered retailers and farmers toward branded products" (id. ¶ 177); that the loyalty programs have caused generics to exit or never enter the market (id. ¶¶ 182-85); and that the loyalty programs have stunted innovation (id. ¶¶ St 186-89). The complaint also alleges that Defendants' internal

analyses acknowledge that the loyalty programs lead to supracompetitive prices for end-consumers. (Id. ¶¶ 194-200.)

**\*23** In sum, Defendants' contention that their loyalty programs neither are anticompetitive nor cause anticompetitive injury depends on further factual development. At this stage, the complaint plausibly alleges both. [10]

### 3. Claims Against Syngenta Corporation and Syngenta Crop Protection AG

Syngenta argues that "Plaintiffs' allegations do not cognizably connect Syngenta Corporation or Syngenta Crop Protection AG to the challenged rebate program." (Doc. 100 at 44.) Consequently, Syngenta contends, the claims against those two entities should be dismissed. (Id.) As to Syngenta Corporation, Syngenta maintains that more is required than an allegation that Syngenta is a "single enterprise" and that one person is the president of both Syngenta Corporation and Syngenta Crop Protection, LLC. (Id. at 44-45.) And as to Syngenta Crop Protection AG, Syngenta argues that Plaintiffs' "vague allegations of high-level oversight and strategic guidance" are insufficient in light of Plaintiffs' "conce[ssion] that the global parent is not responsible for 'implementation' of post-patent strategies in individual countries." (Id. at 45.)

Plaintiffs respond that their allegations of Syngenta Corporation's shared senior leadership with Syngenta Crop Protection, LLC, and management of contacts with Corteva regarding the mesotrione and metolachlor supply agreements suffice to state claims against Syngenta Corporation. (Doc. 150 at 65-66; Doc. 112 at 65-66.) Further, Plaintiffs contend that they have stated a claim against Syngenta Crop Protection AG because it "directs and oversees" the LLC's post-patent strategy, "reviews, modifies, and approves Syngenta's U.S. budget, which includes sales targets based on Syngenta's loyalty program," and was "directly involved in the negotiation of" the mesotrione supply agreement with Corteva. (Doc. 150 at 66.)

To be sure, Plaintiffs do not allege a conspiracy between the Syngenta entities. Parents and subsidiaries, as well as sister subsidiaries, are "incapable" of conspiring with one another under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 768, 777 (1984) (parent-

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   19

subsidiary under Sherman Section 1); Lenox MacLaren Surgical Corp. v. Medtronic, Inc., 847 F.3d 1221, 1234 (10th Cir. 2017) ("[S]ubsidiaries are incapable of conspiring under § 1 of the Sherman Act.... [W]e also conclude that Copperweld's reasoning with respect to § 1 applies equally to § 2."); Advanced Health-Care Servs., 910 F.2d at 146, 152 (extending Copperweld to sister subsidiaries under Sherman Section 1 and Clayton Section 3). Instead, "[t]he coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise[.]" Copperweld, 467 U.S. at 771.

**\*24** In Lenox MacLaren, the Tenth Circuit affirmed on other grounds but wrote at length about the district court's error in treating each corporate affiliate as a separate entity rather than a "single enterprise." 847 F.3d at 1230-39. The court observed that requiring each corporate affiliate to independently satisfy every element of an antitrust violation "would be difficult to justify" because the Supreme Court and other courts have sealed off access to the claim of conspiracy between corporate affiliates. Id. at 1236 (citing Copperweld, 467 U.S. at 776-77). Moreover, the court reasoned that Copperweld must foreclose sophisticated corporations from "spread[ing] its anticompetitive scheme over multiple subsidiaries, such that no one entity met all the requirements for individual antitrust liability." Id. But the Lenox MacLaren court was careful to cabin the reach of the single-enterprise theory by emphasizing Copperweld's restriction of intra-enterprise liability only to "coordinated activity" of affiliates. Id. at 1237 (emphasis in original).

Indeed, "[a]ntitrust law doesn't recognize guilt by mere association, imputing corporate liability to any affiliated company unlucky enough to be a bystander to its sister company's alleged misdeeds." SD3, LLC v. Black & Decker (U.S.) Inc., 801 F.3d 412, 422 (4th Cir. 2015). "[I]n the antitrust context, courts have held that absent allegations of anticompetitive conduct by the parent, there is no basis for holding a parent liable for the alleged antitrust violation of its subsidiary." Arnold Chevrolet LLC v. Tribune Co., 418 F. Supp. 2d 172, 178 (E.D.N.Y. 2006) (citing Invamed. Inc. v. Barr. Lab'ys, Inc., 22 F. Supp. 2d 210, 219 (S.D.N.Y. 1998); see also United States v. Bestfoods, 524 U.S. 51, 61 (1998) ("It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries." (internal quotation marks omitted)). Accordingly, claims may properly be dismissed against parent corporations where "at least as to them, the 'complaint was vague, never explained

its case, and lumped [them] together without sufficient detail.' " Black & Decker, 801 F.3d at 423 (quoting Bates v. City of Chicago, 726 F.3d 951, 958 (7th Cir. 2013)). Here, the complaint defines "Syngenta" as "Syngenta Crop Protection AG, Syngenta Corporation, and Syngenta Crop Protection, LLC." (Doc. 149 ¶ 1.) Notwithstanding this definition, Plaintiffs still must allege sufficient independent but coordinated activity for each named corporate affiliate. Black & Decker, 801 F.3d at 422.

While the Lenox MacLaren court ultimately refrained from adopting either party's proposed definition of "coordinated activity," the court considered as tests (1) "[w]hen the parent controls, dictates or encourages the subsidiary's anticompetitive conduct"; and (2) "that each defendant must have played a 'role' — or 'participated' — in the anticompetitive conduct of the enterprise as a whole." Id. at 1237-38 (quoting Climax Molybdenum Co. v. Molychem, L.L.C., 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005)). Plaintiffs appear to endorse the "controls, dictates, or encourages" test. (Doc. 150 at 65-66 (citing Intellectual Ventures I LLC v. Cap. One Fin. Corp., Case No. 14-111, 2016 WL 160263, at \*5 (D. Md. 2015); Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc., 311 F. Supp. 2d 1048, 1068-70 (D. Colo. 2004)).) Syngenta does not take a position on the proper articulation of the standard and relied on its briefs when questioned about it at the hearing. (See Doc. 100 at 44-45; Doc. 130 at 23; Doc. 157 at 98:18-23.)

At least at the time of the complaint, the same individual served as the president of both Syngenta Corporation and Syngenta Crop Protection, LLC. (Doc. 149 ¶ 35.) Further, Plaintiffs allege that Syngenta Crop Protection AG has "directed, oversaw, and approved Syngenta's sales and marketing strategy, including its loyalty program." (Id. ¶ 36.) Moreover, Syngenta Crop Protection AG allegedly has "reviewed, modified, and approved" Syngenta's U.S. budget, which includes the sales targets associated with Key AI, and provides "generic defense" strategy to be "tailored for implementation in each country." (Doc. 81 ¶ 36 (quoting Syngenta Crop Protection AG's global post-patent strategy handbook).) Finally, Plaintiffs allege that executives of Syngenta Crop Protection AG were "directly involved in the negotiation" of the Syngenta-Corteva mesotrione supply agreement, that Syngenta Crop Protection AG is the Syngenta entity that signed the agreement, and that a Syngenta Corporation executive "manages Syngenta's contacts with Corteva regarding the agreement." (Doc. 149 ¶ 111.)

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**\*25** Based on these allegations, Syngenta has not demonstrated that the complaint fails to plausibly allege "coordinated activity." As a result, the motion to dismiss Syngenta Crop Protection AG and Syngenta Corporation will be denied.

### 4. **Article II** Challenge to FTC Authority

Defendant Corteva argues that the "FTC's claims must be dismissed because the FTC lacks the constitutional authority to bring these claims." (Doc. 95 at 30.) Plaintiff FTC's alleged authority to bring this lawsuit arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b). (Doc. 149 ¶ 2.) Corteva contends that Congress' grant of authority to the FTC to pursue relief under these provisions amounts to a grant of executive law-enforcement power that is unconstitutional because its "members are not removable at will by the President." (Id. (citing Humphrey's Executor v. United States, 295 U.S. 602 (1935); Seila Law LLC v. Consumer Fin. Protection Bureau, 140 S. Ct. 2183 (2020).) Corteva maintains that because executive agencies must be subject to the President's removal power, the suit before this court cannot go forward. (Id. at 32.) The FTC responds that Corteva's Article II challenge is untimely because it was not raised in its motion to dismiss the original complaint. (Doc. 150 at 61.) Moreover, in the FTC's view, Corteva "grossly misinterpret[s] binding Supreme Court precedent" by misstating the FTC's historical powers and ignoring features of the FTC that distinguish it from other agencies. (Id. (quoting Fed. Trade Comm'n v. Roomster Corp., No. 22 Civ. 7389, 2023 WL 1438718, at *8 (S.D.N.Y. Feb. 1, 2023)).) Finally, the FTC contends that even if Corteva were correct, dismissal of the action would be the improper remedy. (Id.) In reply, Corteva contends that its claim is not waivable because it is akin to a subject matter jurisdiction challenge. (Doc. 133 at 17-18.)

As to timeliness, the FTC cites to Federal Rule of Civil Procedure 12(g)(1). (Doc. 150 at 61.) But this rule does not support the FTC's position that Corteva waived its argument by omitting it in an earlier motion to dismiss. Rule 12(g)(1) applies to joinder of motions and is thus inapplicable here. In any event, the Federal Rules do not otherwise support the FTC's position. Rule 12(h)(1) provides that a party waives any defense available under Rules 12(b)(2) through (5) if the defense was available to the party at the time of an earlier motion. Fed. R. Civ. P. 12(h)(1) (providing for waiver through omission as described in Rule 12(g)(2)[11]). Notably, these include motions to challenge personal jurisdiction, venue, and

service of process, not a motion to dismiss for failure to state a claim upon which relief can be granted (Rule 12(b)(6)) or lack of subject matter jurisdiction (Rule 12(b)(1)). Fed. R. Civ. P. 12(h)(1) and (3). In fact, the 1966 Advisory Committee note to Rule 12(h) states that, "while the defenses specified in subdivision (h)(1) are subject to waiver as there provided, the more substantial defense[ ] of failure to state a claim upon which relief can be granted ... [is] expressly preserved against waiver by amended subdivision (h)(2) and (3)." Fed. R. Civ. P. 12(h) advisory comm. note (1966 amend.) (emphasis added).

**\*26** Similarly, the FTC's citation to Rowley v. McMillan, 502 F.2d 1326 (4th Cir. 1974) is misguided. In Rowley, the court interpreted Rule 12(g) to mean that "an amendment to the pleadings permits the responding pleader to assert only such of those defenses which may be presented in a motion under Rule 12 as were not available at the time of his response to the initial pleading." Id. at 1333. Despite this broad language covering "defenses," the issue before the court was a waiver of a personal jurisdiction defense pursuant to Rule 12(b)(2), which is covered by Rule 12(h)(1)'s strict waiver rules. Id. at 1333. Cases that approvingly cite Rowley deal similarly with the 12(b)(2) through (5) defenses that Rule 12(h) (1) covers. See, e.g., Hand Held Prods., Inc. v. Code Corp., 265 F. Supp. 3d 640, 643 (D.S.C. 2017) (challenging venue); Maxtena, Inc. v. Marks, Civ. No. 11-0945, 2012 WL 113386 (D. Md. Jan. 12, 2012) (same); Lederman v. United States, 131 F. Supp. 2d 46, 58 (D.D.C. 2001) (challenging service of process). Moreover, Rule 12(h)(2) clearly authorizes Corteva to raise this same constitutional argument in its answer, so "little would be gained by preventing a defense under Rule[ ] 12(b)(6)." Wright and Miller, Fed. Prac. & Proc. § 1388 (2023) ("[E]arly determination of [12(b) (6) arguments] is to be encouraged."). While Corteva argues that its constitutional challenge is akin to non-waivable subject matter jurisdiction, such an analogy is both unnecessary to save its argument and appears to be an improper characterization in any event. See Holloway v. Pagan River Dockside Seafood Inc., 669 F.3d 448, 453 (4th Cir. 2012) ("If a plaintiff invoking § 1331 pleads a colorable claim 'arising under' the Constitution or laws of the United States, he invokes federal subject matter jurisdiction, and deficiencies of the claim should be addressed by the other mechanisms provided by the federal rules." (internal quotation marks and citations omitted)). This is a long way of explaining that the court must turn to the merits of Corteva's constitutional challenge.

WCAS027

The power to enforce the law is vested in the President of the United States. U.S. Const. art. II, § 1. "Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance," Seila Law, 140 S. Ct. at 2191. "[A]s a general matter," the Constitution gives the President the power to remove subordinate officers so that the President can be held "fully accountable for discharging his own responsibilities." Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 514 (2010). There are "only two exceptions" to the President's otherwise unrestricted removal power. Seila Law, 140 S. Ct. at 2192. First, Congress may create "expert agencies led by a group of principal officers removable by the President only for good cause." Id. (citing Humphrey's Executor, 295 U.S. 602) (emphasis in original). Second, Congress may provide "tenure protections to certain inferior officers with narrowly defined duties." Id. (citing United States v. Perkins, 116 U.S. 483 (1886); Morrison v. Olson, 487 U.S. 654 (1988)) (emphasis in original). The parties agree that this case implicates only the first exception. (Doc. 95 at 31; Doc. 150 at 61.)

Under the FTC Act, commissioners are removable only for "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41. Five members sit on the Commission and are appointed by the President and confirmed by the U.S. Senate. Id. The FTC Act includes a "separability clause" that states that the other provisions of the FTC Act "shall not be affected" by a court's holding that finds any provision invalid. 15 U.S.C. § 57.

The constitutionality of the FTC commissioner's for-cause protection was first addressed in Humphrey's Executor, 295 U.S. 602 (1935). In 1933, President Franklin Delano Roosevelt sought the removal of Commissioner William E. Humphrey, who was appointed by President Herbert Hoover. Id. at 618. After Humphrey rebuffed his resignation request, President Roosevelt wrote him: "Effective as of this date you are hereby removed from the office of Commissioner of the Federal Trade Commission." Id. at 619. Reviewing the constitutionality of the President's action, the Supreme Court observed that the FTC is "charged with the enforcement of no policy except the policy of the law," adding that "[i]ts duties are neither political nor executive, but predominantly quasi judicial and quasi legislative." Id. at 624. The court reasoned that the authority of Congress to create quasi legislative or quasi judicial agencies "cannot well be doubted" and includes the power to "forbid their removal except for cause." Id. at 629. In supporting Congress' authority to restrict

removal, the Court observed that its holding would not offend the separation of powers because the FTC was created by Congress "as a means of carrying into operation legislative and judicial powers" and was "wholly disconnected from the executive department." Id. at 630.

*27 The Supreme Court has since questioned the holding of Humphrey's Executor. See, e.g., Seila Law, 140 S. Ct. at 2198 n.2 ("The Court's conclusion [in Humphrey's Executor] that the FTC did not exercise executive power has not withstood the test of time."); Morrison, 487 U.S. at 690 n.28 ("[I]t is hard to dispute that the powers of the FTC at the time of Humphrey's Executor would at the present time be considered 'executive,' at least to some degree."). Nevertheless, the Court has declined to overrule this "entrenched Supreme Court precedent, protected by stare decisis." In re Aiken Cnty., 645 F.3d 428, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring); see also Collins v. Yellen, 141 S. Ct. 1761, 1786-87 (2021) (citing Humphrey's Executor as a counter-analogy and striking down removal restriction as violation of separation of powers).

Congress added the FTC's authority to file suit under section 13(b) in 1973 — decades after the Court decided Humphrey's Executor in 1935. See Pub. L. No. 93-153, § 408, 87 Stat. 592 (1973). While Corteva is correct that the FTC's authority under section 13(b) is executive in nature, that is about where the merit of its constitutional challenge ends. First, Corteva effectively asks this court to overrule Supreme Court precedent. But the role of a lower court is clear: "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237 (1997) (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 485 (1989)). Humphrey's Executor directly addresses whether Congress may restrict the removal power of FTC commissioners, so the court could stop its analysis here. [12]

Second, even were the court to accept Corteva's position that the FTC commissioners must be removable, Corteva's requested relief — dismissal of the suit — would be inappropriate. Corteva contends that the FTC cannot "both enjoy its removal protections as upheld in Humphrey's Executor and exercise the 'quintessentially executive' powers granted to it by Congress in 1973." (Doc. 95 at 32 (citing

Seila Law, 140 S. Ct. at 2200).) But no case cited by Corteva suggests that the appropriate remedy would be to excise the FTC's executive power. To the contrary, the Supreme Court's cases on removal suggest the exact opposite. In Seila Law, the Court held the CFPB director must be removable, severed the provision restricting removal, and declined to strike down the Consumer Financial Protection Bureau's enforcement authority. 140 S. Ct. at 2199. In Free Enterprise Fund, the Court held that the removal restrictions of the Public Company Accounting Oversight Board violated the separation of powers, but it explicitly upheld the board's regulatory authority. 561 U.S. at 508-09. And in Collins, the Court struck down the removal protections for the Federal Housing Finance Agency director, but it nevertheless stated that "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office." 141 S. Ct. at 1788. Thus, even if Congress oversteps its authority to restrict the President's removal power, a principal officer may still "undertake the [ ] responsibilities of his office." Id. at 1788 n.23.

**\*28** In sum, Corteva's position that section 13(b) was void when enacted is unpersuasive, and even if it were not, dismissal would not be the proper remedy. As a result, Corteva's motion to dismiss based on its constitutional challenge will be denied.

### 5. State Law Claims

Defendants argue that all of the state Plaintiffs' claims should be dismissed. (Doc. 95 at 34; Doc. 100 at 43.) First, Defendants contend that each state's (except Tennessee's and Wisconsin's) antitrust laws are "harmonized — by statute or by common law — with the federal antitrust laws." (Doc. 95 at 34; Doc. 100 at 43.) Consequently, Defendants maintain that the state Plaintiffs' claims should be dismissed on the same grounds as the federal claims. (Doc. 95 at 34; Doc. 100 at 43.) With respect to Tennessee and Wisconsin, Corteva argues that the complaint fails to allege "substantial effects that were felt in each respective state." (Doc. 95 at 35.) Second, Corteva contends that Texas and Indiana cannot recover civil damages under state antitrust laws because those states are "prevent[ed] ... from bringing damages claims on behalf of end-consumers." (Doc. 95 at 34-35.) Third, Defendants argue that California, Indiana, and Iowa fail to adequately allege violations of their state unfair competition and consumer fraud laws. (Doc. 95 at 36; Doc. 100 at 43-44.)

In response, Plaintiffs first argue that state and federal laws are not "automatically harmonized, and vary from state to state." (Doc. 150 at 68.) As to Tennessee and Wisconsin, Plaintiffs contend, they have met the substantial effects burden, which they characterize as "low." (Doc. 150 at 71-72.) Second, Plaintiffs argue that Texas and Indiana are not seeking damages on behalf of "end-consumers," and, in any event, these states are not barred from recovering civil penalties. Third, Plaintiffs contend that the California unfair competition claim and Indiana and Iowa consumer protection claims are sufficiently pleaded.

As to the state antitrust laws that Defendants contend are harmonized with federal law, in light of the court's rulings on the federal antitrust claims, Defendants have not demonstrated that these claims should be dismissed. As to Tennessee and Wisconsin, Defendants' arguments similarly fail. Tennessee and Wisconsin courts require plaintiffs to allege that a defendant's anticompetitive conduct had a "substantial effect" on intrastate commerce." See Meyers v. Bayer AG, Bayer Corp., 735 N.W.2d 448, 461 (Wis. 2007) ("[A] complaint under the Wisconsin Antitrust Act ... is sufficient if it alleges [anticompetitive conduct] that substantially affected the people of Wisconsin and had impacts in [Wisconsin]."); Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 523 (Tenn. 2005) ("[C]ourts must decide whether the alleged anticompetitive conduct affects Tennessee trade or commerce to a substantial degree."). "The [substantial effects] test is pragmatic, turning on the particular facts of the case." Freeman Indus. 172 S.W.3d at 523. Under Wisconsin law, a plaintiff need not allege that the impact of the conduct is "distinguishable from or disproportionate to its impacts on other states." Meyers, 735 N.W.2d at 320. [13] Under Tennessee law, a plaintiff need not allege that the anticompetitive conduct "threaten[s] the demise of Tennessee business or affect[s] market price to substantially affect intrastate commerce," but a plaintiff must show more than a "bare allegation" of substantial effects. Freeman Indus., 172 S.W.3d at 524 (finding allegation insufficient where lone plaintiff with ties to Tennessee did not allege that he purchased goods from defendant).

**\*29** Corteva claims that these Plaintiffs did no more than recite each state's legal requirement regarding substantial effects. (Doc. 95 at 35-36.) But Tennessee's and Wisconsin's claims incorporated, by re-alleging, every preceding allegation in the complaint, Tennessee alleged that Defendants sold the crop-protection products at issue to Tennessee businesses and individual customers,

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

and Wisconsin alleged "substantial foreclosure of generic competitors" within the state and that "many hundreds of farmers" in the state have purchased crop-protection products at supracompetitive prices due to the loyalty programs. (Doc. 149 ¶¶ 253-54, 272, 274-75.) Accepting these facts as true, as the court must at this stage, Tennessee and Wisconsin plausibly allege substantial effects.

As to Texas's and Indiana's claims, Corteva argues that the indirect purchaser rule bars Texas and Indiana from recovering on behalf of end-consumers. The indirect purchaser rule restricts indirect purchasers from recovering compensatory damages, except in limited circumstances not relevant here. See Dickson v. Microsoft Corp., 309 F.3d 193, 214 (4th Cir. 2002) (citing Illinois Brick Co. v. Illinois, 431 U.S. 720, 730-33 (1977)). However, Defendants have not demonstrated that Illinois Brick extends to a state seeking civil penalties. See, e.g., Fed. Trade Comm'n v. Mylan Lab'ys, Inc., 62 F. Supp. 2d 25, 46 (D.D.C. 1999) (dismissing state claims for actual damages under Illinois Brick but maintaining claims for civil penalties); Apple Inc. v. Pepper, 139 S. Ct. 1514, 1520 n.1 ("Illinois Brick held that the direct-purchaser requirement applies to claims for damages." (emphasis added)). Additionally, the cases that Corteva cites to support Texas's and Indiana's prohibitions on parens patriae suits do not support extending Illinois Brick to those state's civil penalties provisions. See Berghausen v. Microsoft Corp., 765 N.E.2d 592, 596 (Ind. Ct. App. 2002) (acknowledging application of Illinois Brick to Indiana antitrust law but not discussing civil penalties or suits brought by the state); Abbott Lab'ys, Inc. v. Segura, 907 S.W.2d 503, 503-04 (Tex. 1995) (barring parens patriae suit under state DTPA to recover damages, but not civil penalties, on behalf of consumers). Moreover, while all Plaintiffs identify harm to end-consumers, (Doc. 149 ¶ 166), the claims for civil penalties are not damages compensation for consumers. (Doc. 149 ¶¶ 228, 264.) Accordingly, on this record Texas's and Indiana's requests for civil penalties survive the motion to dismiss.

As to California's unfair competition claim, Corteva argues that because Plaintiffs' antitrust claim should fail, so should the California unfair competition claim. The California Unfair Competition Law covers conduct that "violates the policy or spirit" of the antitrust laws "or otherwise significantly threatens or harms competition." Cel-Tech Comm'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163, 180-87 (1999). Because California re-alleged and incorporated by reference all allegations in the complaint, (Doc. 149 ¶ 212), the court

will deny the motion to dismiss on the same bases that it has denied Defendants' motions with respect to the federal antitrust claims.

As to Indiana's consumer protection claim, Defendants argue that Indiana did not specify an "incurable deceptive act" which, in Corteva's view, must be alleged with particularity "as part of a scheme, artifice, or device with intent to defraud or mislead." (Doc. 95 at 36 (citing Fed. R. Civ. P. 9(b); Thunander v. Uponor, Inc., 887 F. Supp. 2d 850, 873 (D. Minn. 2012); Ind. Code § 24-5-0.5-2(a)(8)).) Syngenta also argues that the theory of wrongdoing is not illegal for the same reasons it offered to dismiss the federal antitrust claims, which the court has now rejected at this stage. (Doc. 100 at 43.) Indiana responds that reliance on Thunander is improper because the case predates an amendment to Indiana's consumer protection law that expanded the scope of the statute covering "deceptive" acts to also preclude "unfair" acts. (Doc. 150 at 70.) In Indiana's view, this amendment likens its law to the California unfair competition law. (Id.) Lastly, Indiana maintains that it does not need to show an "incurable deceptive act" because only private plaintiffs are subject to this requirement, not the state attorney general. (Id.)

**\*30** In 2014, Indiana amended its consumer protection statute to prohibit "an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction." 2014 Ind. Acts 736, Ind. P.L. 65-2014, § 7 (codified as amended at Ind. Code § 24-5-0.5-3(a)). Under section 4(a), "a person" may file suit to recover damages for an "uncured or incurable deceptive act." Ind. Code § 24-5-0.5-4(a). An "incurable deceptive act" is one that is "done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(a)(8). Under sections 4(c) and (g), the state attorney general may file suit for an injunction and civil penalties against "a deceptive act." Ind. Code § 24-5-0.5-4(c), 4(g).

First, Corteva has not provided any authority to support the contention that "unfair" or "abusive" should be read more narrowly than under the FTC Act, so the court will not read it so at this time. Second, it appears that Indiana is correct that section 4(c), which grants authority to the state attorney general to enjoin "a deceptive act," does not impose a requirement to show that the deceptive act is "uncured" or "incurable." By contrast, the private party provision does. Compare Ind. Code. § 24-5-0.5-4 (a) ("A person relying upon an uncured or incurable deceptive act may bring an action ...." (emphasis added)), with id. § 24-5-0.5-4(c) ("The

WCAS030

attorney general may bring an action to enjoin a <u>deceptive</u> act ....” (emphasis added)). If this additional requirement were read into section 4(c), the claim would apparently sound in fraud and require pleading with particularity. See Ind. Code § 24-5-0.5-2(a)(8) (“act done ... with intent to defraud or mislead.”); Fed. R. Civ. P. 9(b). While it appears that Indiana has the better of the argument, this question of statutory interpretation is inadequately briefed to facilitate a definitive resolution at this stage, so the court will simply hold that Defendants have not demonstrated for the purposes of this motion that Indiana has not stated a claim for relief.

Finally, as to Iowa's consumer protection claim, Corteva argues that Iowa did not allege a “misrepresentation of material fact.” (Doc. 95 at 37 (citing Cota v. Ralph Lauren Corp., No. 21-C-1089, 2022 WL 1597631, at *3 (E.D. Wis. May 19, 2022).) Syngenta agrees and adds that Iowa also did not allege an “unfair practic[e].” (Doc. 100 at 44 (citing Iowa Code § 714.16).) Iowa argues that the Iowa consumer protection law covers both deceptive and unfair practices, and that Iowa has alleged an unfair practice. (Doc. 150 at 70-71.)

The Iowa Consumer Fraud Act, Iowa Code § 714.16, makes it unlawful for a person to “act, use or employ[ ]” an “unfair practice.” Iowa Code § 714.16(2)(a). For the same reasons stated above, Defendants have not demonstrated that the court should read “unfair” any more narrowly than under the FTC Act. As a result, Defendants' motion to dismiss the Iowa consumer protection claim will be denied.

### III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that Defendants' motions to dismiss (Docs. 94, 99) are DENIED.

**All Citations**

Slip Copy, 2024 WL 149552

---

### Footnotes

1    Limited portions of the complaint and briefs remain under seal. (See Doc. 148 (granting parties' motions to seal).) Citations are to the unsealed versions, except where the court references sealed and redacted material. While the court preliminarily granted motions to seal portions of the complaint in this case, the court discloses here those portions of the pleadings necessary for a full understanding of the allegations and legal issues raised. Courthouse News Serv. v. Schaefer, 2 F.4th 318, 327 (4th Cir. 2021) (“[A]ccess to [allegations in] complaints ... is crucial to ‘not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary.’ ” (quoting Doe v. Pub. Citizen, 749 F.3d 246, 266 (4th Cir. 2014)); Doe, 749 F.3d at 271 (“When parties call on the courts, they must accept the openness that goes with subsidized dispute resolution by public (and publicly accountable) officials.” (internal quotation marks omitted)).

2    To the extent the complaint includes allegations involving Corteva's predecessor corporations, the court will simply refer to all such entities as “Corteva.”

3    Syngenta produces “s-metolachlor,” which was phased in by 2001 over the original metolachlor. (Doc. 149 ¶ 114.) However, Syngenta allegedly includes sales of generic original metolachlor in the denominator of its calculation of a distributor's loyalty figure. (Id. ¶ 115.)

4    Acetochlor is manufactured by a joint venture of Corteva and Bayer. (Doc. 149 ¶ 142.) Corteva apparently treats the sale or purchase of Bayer acetochlor as it would a sale or purchase of Corteva acetochlor. (Doc. 81 ¶ 146.)

5    Separate similar actions brought by farmers have been consolidated by the United States Judicial Panel on Multidistrict Litigation and transferred to this court for pretrial proceedings. (See Doc. 78 in l:23-md-3062

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(amended consolidated complaint); In re Crop Protection Prods. Loyalty Program Antitrust Litig., 655 F. Supp. 3d 1380 (J.P.M.L. 2023).

6    Specifically, the state law claims arise under California's Cartwright Act, California Business and Professions Code § 16700 et seq., and California's Unfair Competition Law, California Business and Professions Code § 17200 et seq.; the Colorado Antitrust Act, C.R.S. § 6-4-104 and C.R.S. § 6-4-105; Section 7 of the Illinois Antitrust Act, 740 ILCS 10/1 et seq.; the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 et seq. and the Indiana Antitrust Act, Ind. Code § 24-1-2-1; the Iowa Competition Law, Iowa Code Chapter 553, and the Iowa Consumer Fraud Act, Iowa Code § 714.16; the Minnesota Antitrust Law of 1971, Minnesota Statutes Sections 325D.49-.66; the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1602 et seq., and Neb. Rev. Stat. § 84-212; the Oregon Antitrust Law, Oregon Revised Statutes 646.705 to 646.836; the Tennessee Trade Practices Act, Tenn. Code Ann. §§ 47-25-101 et seq.; Sections 15.20(a) and 15.20(b) of the Texas Business and Commerce Code and Section 402.006 of the Texas Government Code; the Washington Consumer Protection Act, RCW 19.86.030 et seq.; and the Wisconsin Antitrust Act, Wis. Stat. Ch. § 133.03 et seq.

7    The ZF Meritor court indicated that the price-cost test is a "specific application of the rule of reason" when applied in the context of exclusive dealing. ZF Meritor, 696 F.3d at 273; see also In re EpiPen (Epinephrine Injection, USP) Antitrust Litig., 44 F.4th 959, 983 n.7 (10th Cir. 2022) (quoting ZF Meritor's "specific application" language and referring to the Tampa Electric analysis as the "full rule of reason analysis"); UniStrip Techs., LLC v. LifeScan, Inc., 153 F. Supp. 3d 728, 736 (determining whether to apply the " 'price cost test' or the 'rule of reason' "); In re Surescripts Antitrust Litig., 608 F. Supp. 2d 629, 636 (N.D. Ill. 2022) (describing the "apt test" as the "rule of reason," as opposed to the "price-cost test"); cf. Atl. Richfield, 495 U.S. at 342 ("Per se and rule-of-reason analysis are but two methods of determining whether a restraint is "unreasonable," i.e., whether its anticompetitive effects outweigh its procompetitive effects.").

8    In dissent, Judge Greenberg disagreed with the majority's view that the agreements were exclusive dealing and instead would have applied the price-cost test. ZF Meritor, 696 F.3d at 349 (Greenberg, J., dissenting). He principally disagreed with the majority's characterization of Eaton's conduct as coercive, as he viewed the agreements as neither exclusive nor mandatory and contended that there was no evidence "that Eaton would have refused to supply transmissions to the [manufacturers]" if they failed to meet the market share targets. Id. at 312. Moreover, Judge Greenberg took the position that the price-cost test should apply in a situation such as this because the agreements themselves — with or without non-price features — would not exist "without the reduced prices that Eaton offered" as an incentive to enter the agreement in the first place. Id. at 321.

9    Corteva argues that this litigation was filed well over four years after the loyalty programs were allegedly put in place, outside the four-year statute of limitations provided for in the Sherman Act and Clayton Act. (Doc. 95 at 29-30.) In its briefing on its motion to dismiss the original complaint, Corteva argued that those claims therefore "long ago expired." (Doc. 70 at 23-24.) Though Corteva does not claim that now, and while Plaintiffs responded to Corteva's suggestion by noting, among other bases, the continuing violation doctrine, (Doc. 150 at 67-68), the court concludes that the issue is not fairly raised in Corteva's brief and therefore does not consider it.

10   Plaintiff FTC argues that its section 5 claim is a "standalone" claim. (Doc. 150 at 45.) In particular, the FTC argues that the price-cost test should not apply to its section 5 claim, regardless of how the court rules on the Sherman Act and Clayton Act claims. (Id. at 47.) Because Plaintiffs plausibly allege violations of the Sherman Act and Clayton Act, the court will deny Defendants' motion to dismiss Plaintiff FTC's section 5 claim for the same reasons as for the Sherman Act and Clayton Act claims. Therefore, whether or not the court may find it necessary to parse distinctions between the statutes at a later stage in this action, it need not do so now.

WCAS032

11    Rule 12(g) (2) provides:

> Except as provided in Rule 12(h) (2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

12    Even so, there is hardly a consensus, as Corteva contends, that Humphrey's Executor is wrong in light of the FTC's greater scope of authority since the case was decided. See, e.g., Seila Law, 140 S. Ct. at 2198 ("Rightly or wrongly, the Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.' " (quoting Humphrey's Executor, 295 U.S. at 628)); id. at 2200 n.4 ("Perhaps the FTC possessed broader rulemaking, enforcement, and adjudicatory powers than the Humphrey's Court appreciated. Perhaps not. Either way, what matters is the set of powers the Court considered as the basis for its decision, not any latent powers that the agency may have had not alluded to by the Court."); id. at 2239 n. 10 (Kagan, J., concurring in the judgment with respect to severability and dissenting in part) (describing the FTC's authority in 1935 as including the power to "run investigations, bring administrative charges, and conduct adjudications"). Simply put, this court is not at liberty to "read the tea leaves" of the Supreme Court with respect to settled precedent. Stewart v. Justice, 518 F. Supp. 3d 911, 917 (S.D.W. Va. 2021).

13    While the Meyers court announced this rule in light of its self-described "liberal pleadings standard," Meyers, 735 N.W.3d at 320, Defendants have not provided any authority to suggest that a different result should obtain under the federal rules.

---

**End of Document**    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 39 of 250

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,314

2020 WL 3490434
United States District Court, E.D. Louisiana.

FEDERAL TRADE COMMISSION

v.

TRAFFIC JAM EVENTS, LLC, et al.

CIVIL ACTION NO. 20-1740-WBV-DMD
|
Signed 06/26/2020

**Attorneys and Law Firms**

Sanya Shahrasbi, Thomas Widor, Federal Trade Commission, Washington, DC, for Federal Trade Commission.

Etienne Balart, Jennifer A. David, Lauren Courtney Mastio, Taylor Katherine Wimberly, Jones Walker LLP, New Orleans, LA, for Traffic Jam Events, LLC, David J. Jeansonne, II.

SECTION: D (3)

ORDER AND REASONS

WENDY B. VITTER, United States District Judge

*1 Before the Court is the Federal Trade Commission's Motion for A Temporary Restraining Order, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue against defendants, David J. Jeansonne, II (hereinafter, "Mr. Jeansonne"), individually and as an officer of Traffic Jam Events, LLC, and Traffic Jam Events, LLC (collectively, "Defendants").[1] Defendants oppose the Motion.[2]

The Court held an initial hearing on June 23,2020, to determine whether the Federal Trade Commission (hereinafter, "FTC" or "the Commission") is entitled to a temporary restraining order. At the request of counsel, that initial hearing was converted to a status conference with the Court. A follow-up hearing was held on June 25, 2020. After careful consideration of the Motion, the testimony and arguments presented during the hearing, the record and the applicable law, the Motion is **DENIED**.

I. FACTUAL AND PROCEDURAL BACKGROUND

**A. The Complaint**

On June 16, 2020, the FTC, an independent agency of the United States government, filed suit under Section 13(b) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 53(b), against Defendants.[3] In the Complaint, the FTC alleges that Traffic Jam Events, LLC "offers direct mail marketing services and staffed tent sales events to automotive dealerships."[4] The FTC further alleges that David Jeansonne, II is the owner, managing member, and president of Traffic Jam Events, LLC[5] and that, "Since at least March 2020, Defendants have mailed or caused to be mailed deceptive advertisements purporting to provide COVID-19 stimulus relief to consumers."[6] The FTC asserts that Traffic Jam Events, LLC used the deceptive ads to "lure individuals and families to auto sales events under the guise that valuable stimulus relief was available at designated locations for a short period of time."[7]

The FTC claims that the mailing included statements such as, "URGENT: COVID-19 ECONOMIC AUTOMOTIVE STIMULUS PROGRAM RELIEF FUNDS AVAILABLE ALL PAYMENTS DEFERRED FOR 120 DAYS,"[8] and repeatedly described the location as, "your designated temporary 10-day site," "designated local headquarters," and "relief headquarters."[9] The FTC further alleges that the mailing represented that consumers "must claim these stimulus incentives at your designated temporary 10-day site: 5925 SW 20th Street, Bushnell, FL 33513."[10] A check allegedly issued by the "Stimulus Relief Program" was included in the mailing.[11] The Complaint further alleges that, "The Florida Attorney General also sued Defendants on April 23, 2020 over the Florida mailers, yet Defendants continue to provide advertising and marketing services to the automotive industry nationwide."[12] The FTC points out that Defendants have been the subject of prior law enforcement actions allegedly based on misleading advertising, two from Kansas (2010 and 2012) and one from Indiana (2018).[13]

*2 Based on the foregoing facts, the FTC alleges that Defendants are violating or are about to violate laws enforced by the Commission, including unfair or deceptive acts or practices in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).[14] Pursuant to Section

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 1

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,314

13(b) of the FTC Act, 15 U.S.C. § 53(b), the FTC seeks the following relief:

- preliminary injunctive and ancillary relief, including a temporary and preliminary injunction, to prevent consumer injury during the pendency of this action;

- a permanent injunction to prevent future violations of the FTC Act;

- such relief that the Court finds necessary to redress injury to consumers, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

- litigation costs incurred by the FTC in bringing the action. [15]

### B. The Motion for Temporary Restraining Order

On the same day it filed the Complaint, June 16, 2020, the FTC filed the instant Motion for a Temporary Restraining Order, and Other Equitable Relief, and Order to Show Cause by a Preliminary Injunction Should Not Issue (the "Motion"). [16] The FTC asserts that, "through its advertising in direct-mail marketing, Defendants have been misrepresenting that (i) their mailers concern official COVID-19 stimulus information, (ii) consumers will receive stimulus relief, including checks, by visiting a designated site, and (iii) the mailers involve a stimulus program associated with, or approved by, the government." [17] The FTC asserts that Defendants are not providing official COVID-19 stimulus information or relief and are not affiliated, or approved by, the United States government or any government agency. [18] The FTC argues that Defendants' acts and practices violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). [19]

The FTC asserts that this Court has jurisdiction to enjoin violations of the FTC Act and to provide appropriate equitable relief, including restitution and disgorgement, according to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) (hereafter, "Section 13(b)"). [20] The grounds asserted by the FTC in its Motion track the language of its Complaint, namely that Defendants "since at least March 2020 ... have mailed or caused to be mailed deceptive advertisements purporting to provide COVID-19 stimulus

relief to consumers." [21] The description of the mailer is identical to the description provided in the Complaint, including that the mailer contained statements indicating that it contained "Important COVID-19 economic stimulus documents," with the notice stating, "URGENT: COVID-19 ECONOMIC AUTOMOTIVE STIMULUS PROGRAM RELIEF FUNDS AVAILABLE." [22] The mailers also included a mock check issued by the "Stimulus Relief Program." [23]

The FTC asserts that none of the information provided in the mailer is supported or authorized by the United States government or any governmental agency. Quoting the Fifth Circuit in *EEOC v. Cosmair, Inc.,* the FTC argues that, "[w]hen an injunction is expressly authorized by statute and the statutory conditions are satisfied, the movant need not establish specific irreparable injury to obtain a preliminary injunction." [24] The FTC then provides a detailed analysis of why it believes it is likely to succeed on the merits of its underlying claim that Defendants' actions violate Section 5(a) of the FTC Act, asserting that this Court need only find "some chance of probable success on the merits" to grant an injunction. [25] The FTC also argues that Mr. Jeansonne is individually liable because the FTC has proven "he either participated in the unlawful activities or had some control over those activities." [26] In support of this argument, the FTC alleges that Mr. Jeansonne possesses the authority to control Traffic Jam Event, LLC's operations and organizes Traffic Jam Events, LLC as its owner, president and manager. [27] The FTC also mentions that Traffic Jam Events, LLC has been subject to at least three prior enforcement actions in Indiana and Kansas dating back to 2010, for using deceptive advertising campaigns promising incentives and prizes to lure consumers to auto sales events. [28] The FTC argues that it would likely succeed on the merits because Mr. Jeansonne signed three prior consent judgments on behalf of Traffic Jam Events, LLC, as a result of those prior proceedings. [29] The FTC then balances the equities between the public and private interests in granting the requested injunctive relief, and argues that the public interest in halting Defendants' unlawful conduct outweighs any interest Defendants may have in continuing their unlawful marketing services. [30]

**\*3** The following day, June 17, 2020, the Court set a telephone status conference for June 19, 2020, to discuss the Motion. [31] On June 18, 2020, Defendants filed into the record Defendants' Memorandum Submitted in Advance of

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 41 of 250

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,314

June 19, 2020 Status Conference, seeking to "address gross misrepresentations and omissions of fact and law" contained in the FTC's Complaint and Motion. [32] During the June 19th telephone status conference, the Court discussed with counsel the status of the case and the pending Motion, and set the matter for a hearing on June 23, 2020. [33]

Thereafter, on June 22, 2020, Plaintiffs filed a Motion For Leave to File Supplemental Authority and Amended Proposed Temporary Restraining Order, [34] which the Court granted. [35]

That same day, June 22, 2020, Defendants filed an Opposition to the FTC's Motion for Temporary Restraining Order, asserting that the relief sought by the FTC is "extreme, unnecessary, and not justified by the law or the facts." [36] Attached to the Opposition brief is a Declaration from Mr. Jeansonne, which Defendants assert "is submitted in lieu of live testimony upon agreement of the parties and the Court during the June 19, 2020 Status Conference." [37] Defendants assert that Mr. Jeansonne's Declaration "makes clear that the Mailer at issue was past conduct that has not been repeated and will not be repeated in the future, and importantly, is the subject of a pending action in Florida state court." [38] Defendants further assert that, since this involves "past conduct that has not been repeated and will not be repeated in the future" this case does not satisfy the express statutory requirement of Section 13(b) of the FTC Act that the Commission has reason to believe that an entity is violating or is about to violate any provision of the law. [39] Defendants point out that the purpose of Section 13(b) was to address the need to quickly enjoin ongoing or imminent illegal conduct. [40]

Defendants also assert that the issuance of a temporary restraining order will not serve the public interest, as required by Section 13(b), because there is no continuing or future harm. [41] Relying on Mr. Jeansonne's Declaration, Defendants assert that the mailer was part of a single mailing event distributed in two locales (Florida and Alabama), and that the sales associated with the mailer were one-time tent sales (one in Florida and one in Alabama) that took place over a single week. [42] Defendants claim that, since these one-time sales, "no subsequent advertising programs of a similar nature have been used and Defendants have not distributed any other solicitation in substantially the same

form as the Mailer." [43] Defendants argue that this was an "isolated event" that "occurred in the past," and, therefore, does not justify a temporary restraining order. [44] Regarding the previous consent judgments mentioned in the FTC's Motion, Defendants argue that those matters were completely distinct and unrelated to the COVID mailer at issue in the present suit. [45] Defendants further argue that the Fifth Circuit's decision in *Southwest Sunsites* is distinguishable from this case and should not be interpreted to read out the express language of Section 13(b) that requires a continuing violation. [46] Defendants point out that *Southwest Sunsites* involved a large-scale systematic scheme, which the Fifth Circuit found gave rise to a "fair inference of a reasonable expectation of continued violations absent restraint." [47]

**\*4** The Court held a hearing on the Motion for Temporary Restraining Order on June 25, 2020. With the consent of all parties, the FTC introduced copies of the mailer into evidence, and Defendants introduced Mr. Jeansonne's Declaration into evidence in lieu of live testimony. At the request of the Court, Mr. Jeansonne testified during the hearing.

### II. LEGAL STANDARD

Both the FTC and Defendants cite *Federal Trade Commission v. Southwest Sunsites, Inc.*, [48] as the leading authority on the issues raised in the FTC's Motion for Temporary Restraining Order. The Court finds that case controlling and instructive on a number of issues. First, the Court notes that *Southwest Sunsites* makes clear that the Commission can seek, and this Court has the authority to order, equitable relief, including injunctive relief, under Section 13(b) of the FTC Act. This Court adheres to that binding precedent and initially finds that it has the authority to enter an order of equitable relief in this matter.

This Court's analysis then proceeds to determine whether the FTC has satisfied the requirements set forth in Section 13(b) of the FTC Act to support the issuance of a temporary restraining order. Section 13(b) provides, in pertinent part, the following:

Whenever the Commission has reason to believe,

(1) That any person, partnership, or corporation is violating or is about to violate, any provision of law enforced by the Federal Trade Commission, and

WCAS036

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 42 of 250

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,314

(2) That the enjoining thereof pending the issuance of the complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the Court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public --

the Commission ... may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond ... and in proper cases the Commission may seek, and after proper proof, the Court may issue a permanent injunction. [49]

The threshold analysis for a temporary restraining order under Section 13(b), therefore, is whether the Commission has reason to believe that Defendants are violating or about to violate any provision of law enforced by the Federal Trade Commission. One of the issues before the Fifth Circuit in *Southwest Sunsites* was whether there was a continuing violation of the FTC Act to support the district court's issuance of injunctive relief under Section 13(b). [50] Although the Magistrate Judge in that case found that there was no promotional or sales campaign currently in place, the Fifth Circuit affirmed the district court's granting of a temporary restraining order. In doing so, the Fifth Circuit reasoned that, "the evidence developed to date suggests a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint." [51]

**\*5** As recognized by our sister court, however, "the *Sunsite* court did not provide extensive guidance to district courts on applying § 13(b)'s threshold requirement," namely, a finding of Section 13(b) statutory compliance. [52] Thus, "Following *Sunsites*, when applying § 13(b), district courts have analyzed whether the surrounding circumstances – in addition to the past violations alleged – create a reasonable expectation that violations will continue." [53] In determining whether the evidence supports a reasonable expectation of continuing violations, courts in this Circuit consider the following non-exclusive factors: (1) the egregiousness of the defendant's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of the defendant's assurances against future violations; (5) the

defendant's recognition of the wrongful nature of his conduct; and (6) and the likelihood that the defendant's occupation will present opportunities for future violations. [54]

## III. ANALYSIS

**A. The FTC has failed to show that it has reason to believe that Defendants are violating or are about to violate any provision of law enforced by the FTC, as required by Section 13(b) of the FTC Act and Fifth Circuit precedent.**

The Court begins its analysis with the crux of the case as put forth by the FTC. The evidence presented at the hearing reflects that Defendants created and mailed an advertising mailer in an official-looking envelope in March of 2020, which specifically referenced "COVID-19 automotive stimulus program relief funds," and, "COVID-19 economic stimulus documents." [55] The mailer included a document that appeared to be a check from the "Stimulus Relief Program." [56] According to the evidence before the Court, there were 45,000 mailings that occurred for a one-time sales event which occurred over a one week period in Florida and Alabama. [57] There was no evidence presented that future mailings offering COVID-19 stimulus relief were conceived, attempted, or contemplated.

The Court further notes the significant factual distinctions between *Southwest Sunsites* [58] and this case. The facts established in *Southwest Sunsites* showed that the appellee began acquiring large tracts of land in Southwest Texas in 1973. [59] After subdividing the land, the appellees conducted an extensive nationwide advertising and sales effort to offer parcels of between five and forty acres for sale for approximately $600 to $700 per acre, with representations that the property had good potential for both commercial and private owners. [60] These representations were proven to be false. The evidence further showed that the appellee's efforts were financially successful as "the total balance of outstanding accounts receivable on purchase contracts as of June 1979," some six years later, "was approximately $10,000,000." [61] As noted earlier, the Fifth Circuit concluded that the district court acted "well within its discretion" in ordering appellee to cease and desist from further violations of the FTC Act. [62] The Fifth Circuit explained that, "This is particularly true when the evidence developed

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 43 of 250

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,314

to date suggests a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a 'fair inference of a reasonable expectation of continued violations' absent restraint." [63]

It is clear from the evidence presented in this case that the mailer at issue was not part of a large-scale systematic scheme, but was part of "one advertising program," [64] which was ultimately unsuccessful. [65] The evidence shows that less than 40 people, combined, attended the Florida and Alabama events. [66] The evidence before the Fifth Circuit in *Southwest Sunsites* showed a continuing, multi-year, fraudulent scheme that reaped at least ten million dollars. [67] In contrast, the evidence before this Court shows that the mailer at issue was an unsuccessful, one-time mailing. Mr. Jeansonne testified during the June 25, 2020 hearing that the mailer was "beyond a flop" [68] because only approximately nine or ten vehicles were sold at the Florida sales event, while zero vehicles were sold at the Alabama sales event. [69] He further testified that Defendants lost $52,000 as a result of the unsuccessful mailer since they paid for the advertising at issue in this matter. [70] The FTC did not offer any evidence to contradict Mr. Jeansonne's testimony. Apparently, the targeted consumers were wiser than the Defendants who conceived this mailer.

**\*6** The Court further notes that, during the June 25th hearing, counsel for the FTC stated, "We do not currently have evidence of other COVID-specific mailers that since have gone out since the Florida investigation." [71] Counsel for the FTC then asserted, for the first time, "We do have additional evidence that suggests they may be continuing other deceptive advertising." [72] The Court questioned counsel extensively regarding this newly provided information, during which counsel further stated, "We have found at least one complaint now involving one other mailer for events that took place as recently as June 3rd that resembles the same mailer that resulted in law enforcement action in Kansas." [73] When asked whether this recent mailer involved "representation about COVID-19 stimulus relief" or anything similar to the representations at issue in this case, counsel answered, "No, Your Honor, but we do have additional potential deceptive representations that potentially violate the FTC Act." [74] When the Court pressed counsel a second time as to whether the recent mailer involved any references to COVID-19 stimulus relief, FTC's counsel responded, "Your Honor, it does not—it does not involve specific COVID

claims as I indicated. It is still we think relevant because it still leads to deceptive advertising that's potentially in violation of the FTC Act." [75]

Later in the hearing, the Court asked counsel for the FTC a few follow-up questions about the new information regarding a June 3, 2020 mailer. Specifically, the Court inquired, "Where is the information that you stated regarding possible sales in June or discussions of mailers in June of this year?" [76] Counsel for the FTC responded, "So, your Honor, that was what I was discussing earlier of other potentially deceptive conduct in violation of the FTC Act. We are happy to make that available to the court. We have just identified it as of yesterday." [77] The Court then asked counsel if the information was in evidence at the time of the hearing, to which counsel responded, "No, this was done in response to the questions that you had posed to the parties on Tuesday. As I mentioned earlier, we are still trying to collect information but it would certainly be information in defendant's possession." [78]

The Court finds that this new information does not establish that the FTC had reason to believe that Defendants were violating or were about to violate a provision of the FTC Act at the time it filed the instant Motion, as required under Section 13(b) of the FTC Act. Even if accepted on its face as true, the FTC's counsel was clear in stating that he was bringing *potential*, not established, violations to the Court's attention. As evidenced by the foregoing colloquy during the June 25, 2020 hearing, counsel for the FTC repeatedly confirmed that the recent mailer did not involve any references to COVID-19 stimulus relief or anything similar to the representations at issue in this case. Further, counsel for the FTC confirmed during the hearing that this new information was only prompted by questioning from the Court during a hearing that occurred two days earlier, on June 22, 2020. The FTC filed its Complaint and the instant Motion on June 16, 2020. [79] Thus, it is abundantly clear to Court that at the time the FTC filed the instant Motion on June 16, 2020, it was not aware of any additional mailers sent by Defendants after March 2020. Accordingly, the Court is not persuaded that the new information offered by the FTC during the June 25th hearing shows that the FTC had reason to believe that Defendants were violating or were about to violate the FTC Act when it sought injunctive relief under Section 13(b) of the FTC Act.

WCAS038

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,314

Based upon the foregoing evidence and the binding precedent set by *Southwest Sunsites*, the Court finds that the FTC has not proven that the Commission has reason to believe that Defendants are violating or are about to violate any provision of law enforced by the Federal Trade Commission.

### B. The FTC has failed to establish a likelihood of continued violations under the *Cornerstone* factors.

The Court further finds that the FTC has failed to establish a likelihood of continued violations by Defendants based upon their past violations, as reflected in prior consent judgments, under the six non-exclusive factors set forth by our sister court in *FTC v. Cornerstone Wealth Corp., Inc.* [80] Regarding the egregiousness of Defendants' actions, the Court finds that this factor squarely weighs in favor of the FTC and in the Court granting the Motion for Temporary Restraining Order. Defendants' actions, as alleged by the FTC, using a mailer which purported to provide financial relief during this global pandemic, preying upon people at a particularly vulnerable time not only for those people, but for the world, all in an attempt to make an automobile sale, are clearly egregious. Were the Court not analyzing this matter under factors enunciated by other courts, this Court would use stronger words to describe the egregiousness of this mailer.

**\*7** Turning to the second factor, the isolated or recurrent nature of the infraction, the Court finds this factor weighs in favor of Defendants and against granting injunctive relief. The evidence presented by both the FTC and Defendants reflect that this was a one-time mailing of 45,000 mailers within Florida and Alabama. [81] There has been no evidence presented that there was any subsequent mailing related to potential COVID-19 stimulus relief since that one-time mailing. The evidence also shows that this mailing occurred in March 2020. [82] There has been no evidence presented to the Court indicating that Defendants were in preparation of, or intended to send, any subsequent mailing using similar language, and Mr. Jeansonne has submitted a Declaration stating that no subsequent mailing or similar mailing is intended or will be undertaken. [83] In response to the Court's question, "Since this mailing we're talking about, have you contemplated or had any discussions with anyone about any other mailing including such language as COVID-19, stimulus, and stimulus recovery program," Mr. Jeansonne testified, "Absolutely not.... Since this one isolated incident,

I've never used even the word, much less any type of factual information, never and never will." [84]

The FTC has brought to the Court's attention three prior consent agreements entered into by Defendants that resulted from three prior state court proceedings, two in Kansas and one in Indiana. [85] The Court notes that the Fifth Circuit in *Southwest Sunsites* appeared to read the phrases "reason to believe" and "is violating" or "about to violate," as set forth in Section 13(b) of the FTC Act, as covering situations where defendants claim that the violations have ceased, but the FTC provides evidence that the violations will continue absent injunctive relief. [86] Such is the FTC's argument in this matter, relying on the past consent agreements entered into by Defendants. The Court has reviewed all of the consent agreements and notes that the Kansas agreements are from 2010 and 2013, respectively, [87] and the Indiana consent agreement, while signed in 2019, is in reference to Traffic Jam Events, LLC's actions from 2015 and 2016. [88] The Court also notes that the facts of those purported violations in Kansas and Indiana, which led to the consent agreements, differ from the facts of the case before this Court. In almost each of those matters, Defendants purportedly offered prizes or the chance to win a prize to consumers if they appeared at some sales or marketing event. None of those matters involved or included language related to any disaster or tragedy as shown in this case. Based upon the length of time between the three prior consent judgments and the actions in this case, which occurred in March 2020, and perhaps even more importantly, the significant factual differences between the three prior matters and the instant case, the Court finds that the second factor, the isolated or recurrent nature of the infraction, weighs in favor of the Defendants.

The Court finds that the third factor, the degree of scienter involved, weighs in favor of the FTC. Although not stated directly in Mr. Jeansonne's Declaration, the Court inquired during the June 25, 2020 hearing whether Mr. Jeansonne was aware of the contents of the March 2020 mailing. Mr. Jeansonne testified during the hearing that he was indeed aware of the mailer's content, testifying that he "takes full responsibility" and that the mailer was his idea. [89] The Court has not been presented with any evidence that Defendants lacked knowledge of the mailer's content. As a result, this factor weighs in favor of the FTC.

WCAS039

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 45 of 250

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,314

Regarding the fourth factor, the sincerity of Defendants' assurances against future violations, Mr. Jeansonne has provided a Declaration stating the following:

> Traffic Jam and David Jeansonne, II will not represent or imply to any consumers that official COVID-19 government stimulus funds, including but not limited to funds available under the Coronavirus Aid, Relief, and. [sic] Economic Security ("CARES") Act, are being offered by Traffic Jam and/or David Jeansonne, II, or any car dealership with which they work or provide advertising and marketing services to. [90]

**\*8** The Declaration further provides that:

> Traffic Jam and David Jeansonne, II will not represent or imply to any consumers that Defendants or any car dealership with which they work are affiliated with, are supported, endorsed, certified, or licensed by, or are working in partnership with or as an agent of any government agency, for the purpose of providing official, government-issued COVID-19 stimulus relief funds or other government relief funds related to COVID-19 as currently enacted. [91]

Additionally, this Court had the opportunity to question Mr. Jeansonne directly regarding his assurances against future violations during the June 25, 2020 hearing. In doing so, the Court was able to observe his demeanor and evaluate the sincerity of his testimony, and the Court finds that this factor weighs in favor of Defendants. While Mr. Jeansonne did not acknowledge the wrongful nature of his conduct, the Court is satisfied that Mr. Jeansonne's assurances regarding future violations are sincere. Mr. Jeansonne acknowledged that his

business suffered financial losses as a result of his decision to use this advertising campaign. He further testified that his 21-year reputation in the advertising business, past awards, and engagements as a motivational speaker had been damaged as a result of his actions. [92] While it was clear that those matters which affected him personally weighed significantly in Mr. Jeansonne's determination not to have future violations, the Court is convinced of his sincerity, even if for selfish reasons. Further, there has been no evidence presented to the Court that Mr. Jeansonne has been insincere. Accordingly, the fourth factor weighs in favor of Defendants.

The Court finds that the fifth factor, Defendants' recognition of the wrongful nature of their conduct, weighs in favor of the FTC. During the June 25, 2020 hearing, the Court explicitly asked Mr. Jeansonne if he thought the mailer in question preyed on consumers' vulnerabilities, to which he responded, "I absolutely do not." [93] Mr. Jeansonne also testified that he still believes the mailer was legal and the intent was to use catchy phrases to get the attention of consumers. [94] As such, the Court finds that the fifth factor weighs in favor of the FTC and in granting injunctive relief.

The Court further finds that the sixth and final *Cornerstone* factor, the likelihood that Defendants' occupation will present opportunities for future violations, appears, at least on its face, to weigh in favor of the FTC. Mr. Jeansonne remains the president and owner of Traffic Jam Events, LLC, and defense counsel confirmed during the June 25, 2020 hearing that Traffic Jam Events, LLC remains in the business of direct mail advertising. The Court questioned defense counsel about the extent of Traffic Jam Events, LLC's current business during the hearing, and counsel stated that the entity is in the advertising business, describing advertising as its "bread and butter." [95]

**\*9** However, the evidence before the Court also shows that the Attorney General of the State of Florida has instituted legal proceedings against Defendants involving the same mailer at issue in the instant case. [96] That suit has been pending since April 2020. Counsel for both parties confirmed during the June 25, 2020 hearing that those legal proceedings remain pending. [97] Defendants are also aware that at least one automotive dealer in Florida is in discussions to cooperate with the Attorney General of Florida to pay restitution to customers who appeared at the tent sale and to hold some other amount of money for "future enforcement efforts." [98] Counsel for the FTC has also informed the Court that

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)

2020-2 Trade Cases P 81,314

Defendants' mailer has become the topic of several news stories, and Mr. Jeansonne testified to the many news stories associated with his actions. [99] In light of the evidence that Defendants are in a legal action currently pending in state court in Florida, that the Attorney General of Florida is seeking, or has obtained, the cooperation of automobile dealers from Florida with whom Defendants worked, and that there is media coverage of Defendants' actions, the Court finds the sixth factor is either neutral, or weighs slightly in favor of Defendants. The Court would not be going out on a limb to suggest that ongoing legal action, media coverage, and the potential for additional automobile dealers to be cooperating with legal authorities would very likely curtail any opportunities for future violations.

Having analyzed the evidence adduced at the hearing and on the record in this case using the *Cornerstone* factors, the Court finds that the factors do not clearly weigh in favor of the FTC or Defendants. As set forth above, three factors weigh in favor of the FTC and three factors weigh in favor of Defendants. Nonetheless, the Court finds that injunctive relief is not warranted in this case. First, the Court has already determined that the facts of this case are significantly distinguishable from the facts in *Southwest Sunsites*, and that the FTC has not borne its burden of proving that, at the time it filed this Motion, it had reason to believe that Defendants were violating, or were about to violate, any provision of law enforced by the FTC, as required to obtain injunctive relief under Section 13(b). Second, and more importantly, the Fifth Circuit has made clear that, "A preliminary injunction is an extraordinary remedy," and that, "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." [100] Thus, injunctive relief remains an extraordinary measure, and one not to be ordered lightly.

The sole issue before the Court is whether, based on the evidence in the record today, the FTC has met the statutory requirements set forth in Section 13(b) for the issuance of a temporary restraining order. [101] The Court finds that it has not. The FTC has failed to prove that it has reason to believe that Defendants are violating or are about to violate any provision of law enforced by the FTC. The Court

agrees with defense counsel's assertion during the June 25, 2020 hearing that the instant Motion constitutes an overreach by the FTC of its authority to seek injunctive relief under Section 13(b). This may be due, at least in part, to the FTC's fundamental misunderstanding of the Fifth Circuit's decision in *Southwest Sunsites*, and its assertion that, "the Fifth Circuit explicitly rejected the defendant's argument that the FTC needed to show continuing or future violations for the case to be heard in federal court." [102] As previously discussed, the Fifth Circuit in *Southwest Sunsites* affirmed the district court's decision to grant injunctive relief, concluding that the evidence "suggests a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a 'fair inference of a reasonable expectation of *continued violations*' absent restraint." [103] The FTC has failed to present the Court with evidence showing that it has a reasonable expectation of continued violations absent injunctive relief.

**\*10** While the Court finds that the FTC has not sustained its burden of proving that it has reason to believe that Defendants are violating or are about to violate any provision of law enforced by the FTC, the Court specifically makes no finding regarding whether the FTC will succeed on the merits of its Complaint, or whether the FTC will succeed in proving that Defendants have previously violated any provision of law enforced by the FTC. That determination, which carries its own penalties, is not before the Court at this time. While the well-known phrase is "buyer beware," the Court would suggest that advertiser beware.

### IV. CONCLUSION

**IT IS HEREBY ORDERED** that the Motion for A Temporary Restraining Order, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue [104] is **DENIED.**

### All Citations

Not Reported in Fed. Supp., 2020 WL 3490434, 2020-2 Trade Cases P 81,314

### Footnotes

WCAS041

2020-2 Trade Cases P 81,314

1    R. Doc. 3.

2    R. Doc. 11.

3    R. Doc. 1.

4    *Id.* at ¶ 6.

5    *Id.* at ¶ 7.

6    *Id.* at ¶ 9.

7    *Id.* at ¶ 12.

8    *Id.* at ¶ 14.

9    *Id.* at ¶ 16.

10   *Id.*

11   *Id.* at ¶ 18.

12   *Id.* at ¶ 20.

13   *Id.*

14   *Id.* at ¶¶ 21 & 26.

15   *Id.* at pp. 8-9.

16   R. Doc. 3.

17   *Id.* at 1.

18   *Id.* at p. 2.

19   *Id.*

20   R. Doc. 3-1 at p. 2.

21   *Id.* at p. 3; *See* R. Doc. 1 at ¶ 9.

22   R. Doc. 3-1 at pp. 3-4; R. Doc. 1 at ¶¶ 13-14.

23   R. Doc. 3-1 at p. 5.

24   *Id.* at p. 8 (quoting *Cosmair, Inc.*, 821 F.2d 1085,1090 (5th Cir. 1987)) (internal quotation marks omitted).

25   R. Doc. 3-1 at p. 9 (citing cases).

26   *Id.* at p. 11 (quotation and quotation marks omitted).

27   *Id.* at p. 12.

28   *Id.* at p. 2 (*citing* R. Doc. 3-2 at ¶¶ 11-16; R. Doc. 3-3).

WCAS042

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 48 of 250
Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,314

29    R. Doc. 3-1 at p. 13.

30    *Id.* at pp. 14-15.

31    R. Doc. 6.

32    R. Doc. 8.

33    R. Doc. 9.

34    R. Doc. 10.

35    R. Doc. 18.

36    R. Doc. 11 at p. 2.

37    *Id.* at pp. 1-2.

38    *Id.* at p. 2.

39    *Id.*

40    *Id.* at p. 3.

41    *Id.*

42    *Id.*

43    *Id.* at pp. 3-4.

44    *Id.* at p. 4.

45    *Id.* at p. 6.

46    *Id.* at p 4 (citing *Federal Trade Com. v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982)).

47    R. Doc. 11 at pp. 4-5 (quoting *Southwest Sunsites, Inc.*, 665 F.2d at 723) (quotation marks omitted).

48    665 F.2d 711 (5th Cir. 1982).

49    15 U.S.C. § 53(b).

50    *Southwest Sinsites, Inc.*, 665 F.2d at 723-724.

51    *Id.* at 723 (quoting *Securities and Exchange Commission v. Manor Nursing Center, Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)).

52    *Federal Trade Commission v. Educare Centre Services, Inc.*, 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020).

53    *Id.* (citing *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008); *FTC v. Hughes*, 710 F. Supp. 1524, 1531 (N.D. Tex. 1989)).

54    549 F. Supp. 2d at 816.

55    R. Doc. 3-2 at pp. 32-38.

WCAS043

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    10

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 49 of 250

Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,314

56   *Id.* at pp. 37-38.

57   R. Doc. 11-1 at ¶¶ 6 & 9.

58   665 F.2d 711 (5th Cir. 1982).

59   *Id.* at 714-15.

60   *Id.* at 715.

61   *Id.*

62   *Id.* at 723.

63   *Id.* (quoting *Securities and Exchange Commission v. Manor Nursing Center, Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)).

64   R. Doc. 11-1 at ¶ 9.

65   *Id.* at ¶ 11.

66   *Id.*

67   665 F.2d at 714-15.

68   Draft transcript of June 25, 2020 hearing, p. 41.

69   *Id.* at pp. 37-38.

70   *Id.* at pp. 40-41.

71   *Id.* at p. 8.

72   *Id.*

73   *Id.* at p. 9.

74   *Id.*

75   *Id.* at p. 10.

76   *Id.* at p. 27.

77   *Id.*

78   *Id.*

79   R. Docs. 1 & 3.

80   549 F. Supp. 2d 811, 816 (N.D. Tex. 2008) (citation omitted).

81   R. Doc. 11-1 at ¶¶ 6 & 9.

82   *Id.* at ¶ 9; R. Doc. 3-2 at pp. 32-38.

83   R. Doc. 11-1.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 50 of 250
Federal Trade Commission v. Traffic Jam Events, LLC, Not Reported in Fed. Supp. (2020)
2020-2 Trade Cases P 81,314

84      Draft Transcript of June 25, 2020 hearing, p. 46.

85      R. Doc. 3-3 at pp. 2-13, 15-20 & 60-66.

86      *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 722-23 (5th Cir. 1982).

87      R. Doc. 3-3 at pp. 2-13 & 15-20.

88      *Id.* at pp. 60-66.

89      Draft transcript of June 25, 2020 hearing, p. 39.

90      R. Doc. 11-1 at ¶ 19.

91      *Id.* at ¶ 20.

92      Draft transcript of June 25, 2020 hearing, pp. 43-44.

93      Draft transcript of June 25, 2020 hearing, pp. 42-43.

94      *Id.*

95      *Id.* at p. 33.

96      R. Doc. 3-2 at pp. 40-58.

97      Draft transcript of June 25, 2020 hearing, pp. 26-27 & 49-50.

98      R. Doc. 11-1 at ¶ 14.

99      Draft transcript of June 25, 2020 hearing, pp. 40-42, 44-45.

100     *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621-22 (5th Cir. 1985) (citation omitted).

101     *See* 15 U.S.C. § 53(b).

102     R. Doc. 10-1 at p. 1 (citing *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982)).

103     665 F.2d at 723 (quoting *Securities and Exchange Commission v. Manor Nursing Center, Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)) (emphasis added).

104     R. Doc. 3.

---

**End of Document**                                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

WCAS045

758 Fed.Appx. 392
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Brian K. HALL, Plaintiff,
and
Michael G. Thompson, Plaintiff-Appellee,
v.
EDGEWOOD PARTNERS INSURANCE
CENTER, INC., Defendant-Appellant.

Case Nos. 18-3481/3482
|
FILED December 14, 2018

**Synopsis**

**Background:** Buyer of equipment rental insurance business, including employment contracts, sought preliminary injunction barring former employees, upon their termination, from breaching their non-solicitation agreements. The United States District Court for the Northern District of Ohio, Jeffrey J. Helmick, J., 2017 WL 2869364, granted buyer's motion for the injunction. Employees appealed. The Court of Appeals, Thapar, Circuit Judge, 878 F.3d 524, affirmed in part, reversed in part, and remanded. On remand, the District Court, Helmick, J., modified injunction. Buyer appealed.

**[Holding:]** The Court of Appeals, Nalbandian, Circuit Judge, held that Court of Appeals' prior decision was law of the case on proper standard for enforcing agreement.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion to Modify Order or Judgment.

West Headnotes (1)

**[1]    Federal Courts** 👉 Law of the case in general

Court of Appeals' prior decision that buyer of business had no legitimate interest in barring former employee from soliciting clients who came to prior employers solely to avail themselves of employee's services and only as result of his own independent recruitment efforts was law of the case treating non-solicitation agreement as part of ordinary employment agreement, not part of a business sale, thus barring argument that district court applied wrong legal standard on remand; prior decision implicitly treated non-solicitation agreement as part of ordinary employment contract and ordered district court to follow standard for such agreements.

1 Case that cites this headnote
More cases on this issue

**\*393**  ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

**Attorneys and Law Firms**

Gregory H. Wagoner, Shumaker, Loop & Kendrick Litigation, Toledo, OH, for Plaintiff-Appellee

Steven D. Pearson, Freeborn & Peters, Chicago, IL, for Defendant-Appellant

BEFORE: COLE, Chief Judge; WHITE and NALBANDIAN, Circuit Judges.

**OPINION**

NALBANDIAN, Circuit Judge.

This is the second appeal in a case about the scope of a non-solicitation agreement. The first time around, the district court enjoined Michael Thompson from soliciting clients in contravention of an agreement with his former employer, Edgewood Partners Insurance Center. Thompson appealed, and this court reversed, directing the district court to "modify the preliminary injunction to exclude clients that Thompson recruited and developed solely on his own." *Hall v. Edgewood Partners Ins. Ctr., Inc.*, 878 F.3d 524, 530 (6th Cir. 2017) ("*Hall I*"). The district court complied with these instructions. It held an evidentiary hearing and modified its injunction to exclude thirty-seven of Thompson's former

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                                                          1

clients. Edgewood then filed this appeal, arguing that the district court applied the wrong legal standard in modifying the injunction.

But the district court applied exactly the standard this court told it to. Edgewood's argument is the same one rejected during the first appeal, and for that reason, we reject it again today. The district court's order modifying the preliminary injunction is therefore affirmed.

## I.

Michael Thompson sells insurance—or at least he did. He started in 1988, and about ten years later formed a company with his friend and fellow litigant, Brian Hall. The two worked for that company—Hylant Specialty Programs, or HSP—for about sixteen years. Then, in 2012, a company **\*394** called USI Insurance Services purchased HSP.

As part of the acquisition, the companies executed an asset purchase agreement (the "APA"). The APA included two important features. First, USI required Hall, Thompson, and five other producers to execute employment agreements containing two-year non-solicitation clauses. Second, HSP agreed to sell its clients, client accounts, and associated goodwill to USI. Together, these two provisions presumably operated to transfer HSP's valuable book of business to USI and prevent HSP's employees from immediately soliciting those clients to a different firm after resigning.

But USI—perhaps unknowingly—had a problem. Thompson had a large list of clients at HSP, but he was only an employee and had no equity in the company. As a result, he did not participate in the sale of the company—he neither signed the APA nor received proceeds from the sale.

Edgewood disagrees with some of this narrative. It contends that Thompson sold HSP to USI, even though Thompson lacked any ownership interest in the company. In fact, Edgewood goes so far as to say that "Thompson voluntarily sold his book of business to USI for valuable consideration." That argument apparently arises from the fact that USI conditioned its purchase on Thompson signing an employment contract (for which he received compensation) that included a restrictive covenant. But Thompson did not own HSP, and he was not a party to the APA. While USI surely viewed Thompson as a valuable part of the company —and thus necessary to the deal—its belief in his value did

not transform Thompson from an employee into an owner. And nothing in the record suggests that he sold his book of business to USI.

Things went south about four years after the USI acquisition when Edgewood entered the picture. Edgewood purchased USI, and as part of that transaction, USI transferred its assets—including its employment agreements with Hall and Thompson—to Edgewood. But Hall and Thompson could not agree on the terms of their continued employment, and both left the company in early 2017.

Almost immediately, Hall and Thompson started soliciting their former clients. They also sued for a declaratory judgment that their non-solicitation agreements are unenforceable. Edgewood responded with a countersuit and moved for a preliminary injunction. The district court granted that motion and enjoined Hall and Thompson from further solicitation. Both Hall and Thompson appealed.

In that first appeal the parties sparred over whether Edgewood could enforce the non-solicitation agreement against Thompson. Front and center of the debate was *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 690 N.Y.S.2d 854, 712 N.E.2d 1220 (1999), a New York [1] case governing the enforceability of restrictive covenants between employers and employees. *BDO Seidman* laid out a simple rule: an employer cannot prevent its employee from soliciting clients that the employee acquired on his own. *Id.*, 690 N.Y.S.2d 854, 712 N.E.2d at 1225. Those clients belong to the employee, so to speak, and employers have no legitimate interest in protecting such clients from competition. *Id.* Because Thompson acquired most of his clients without assistance from his employer, he argued, Edgewood cannot use the non-solicitation agreement to stop him from continuing to work with them. But Edgewood disagreed. *BDO Seidman* applies only to ordinary employment agreements, **\*395** which— Edgewood argued—this is not. According to Edgewood, Thompson executed the agreement as part of a business sale. And in those circumstances, courts will generally enforce the restrictive covenant.

This court agreed with Thompson in *Hall I*. Citing *BDO Seidman*, we held that "Edgewood has no legitimate interest in barring Thompson from soliciting clients 'who came to [Hylant and USI] solely to avail themselves of [Thompson's] services and only as a result of his own independent recruitment efforts.' " *Hall I*, 878 F.3d at 529 (quoting *BDO Seidman*, 690 N.Y.S.2d 854, 712 N.E.2d at 1225). The court

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

then directed the district court to "make factual findings as to which of Thompson's clients he recruited and developed solely on his own accord, and which clients Hylant and USI expended their own resources on recruiting and developing." *Id.* at 529–30.

On remand, the district court held an evidentiary hearing. Thompson testified and produced evidence that he acquired thirty-seven of his former clients independently—that is, without financial assistance from either HSP or USI. Edgewood did not try to rebut that testimony with any evidence of its own. Instead, it focused on establishing that Thompson knowingly sold his interest in his former clients to USI. Thompson denied that he knew anything about the APA when he signed his employment agreement, and he denied that he sold anything to USI.

Edgewood then made the same argument as before: the non-solicitation clause is enforceable because this was a business sale, not an ordinary employment agreement. The district court rejected that argument—either implicitly on the merits or simply because our mandate directed otherwise—and instead found that the thirty-seven clients identified by Thompson were exempt from the non-solicitation agreement because Thompson "recruited and developed [those clients] solely of his own accord." Edgewood then filed this appeal.

## II.

Parties enter into restrictive covenants—like a non-solicitation agreement—primarily in two circumstances. Most commonly, an employee agrees to certain restrictions on his ability to compete after his employment. These kinds of agreements are "carefully scrutinized by the courts." *BDO Seidman,* 690 N.Y.S.2d 854, 712 N.E.2d at 1222. But the second kind of agreement faces much less scrutiny. Those arise when a seller of a business agrees not to compete with the buyer. Courts will enforce these sale-of-business agreements without as much reservation. *See Purchasing Assocs., Inc. v. Weitz,* 13 N.Y.2d 267, 246 N.Y.S.2d 600, 196 N.E.2d 245, 247 (1963).

For ordinary employment agreements, the employer must show that a restrictive covenant is "reasonable"—a term of art that categorically excludes some restrictions. *BDO Seidman,* 690 N.Y.S.2d 854, 712 N.E.2d at 1223 (citing *Technical Aid Corp. v. Allen,* 134 N.H. 1, 591 A.2d 262, 265–66 (1991) ). *BDO Seidman* articulated one such exclusion. There,

the court held that an employer cannot prevent its former employee from soliciting clients that the employee acquired or developed independently. *Id.* at 1225. The rule protects an employee, like Thompson, who joins a company and brings along his own book of business.

But *BDO Seidman* does not apply to the second class of cases in which we find restrictive covenants. "Where ... there is a sale of a business, involving ... the transfer of its good will as a going concern, the courts will enforce an incidental covenant by the seller not to compete with the **\*396** buyer after the sale." *Purchasing Assocs.* 246 N.Y.S.2d 600, 196 N.E.2d at 247. This rule protects the integrity of the transaction. A buyer has no incentive to purchase the client goodwill of a business if it cannot restrict the seller from soliciting those clients after the sale closes. So where the restrictive covenant is bargained for as part of an asset sale—rather than an employment agreement—the courts will typically enforce it.

Edgewood and Thompson disagree over what kind of non-solicitation agreement this is. Was it part of an ordinary employment agreement or a business sale? Fortunately, our task here is easy because the court answered that question during the first appeal. Relying on *BDO Seidman,* *Hall I* held that "Edgewood has no legitimate interest in barring Thompson from soliciting clients 'who came to [Hylant and USI] solely to avail themselves of [Thompson's] services and only as a result of his own independent recruitment efforts.' " *Hall I,* 878 F.3d at 529 (quoting *BDO Seidman,* 690 N.Y.S.2d 854, 712 N.E.2d at 1225). The decision, in other words, implicitly treated the non-solicitation agreement as part of an ordinary employment contract. And because of that, the court explained, Edgewood cannot enforce it with respect to clients Thompson acquired on his own. *Id.*

Parties cannot typically relitigate issues resolved by the court at a prior stage of the litigation. *United States v. Moored,* 38 F.3d 1419, 1421 (6th Cir. 1994). Under the law-of-the-case doctrine, "findings made at one point in the litigation become the law of the case for subsequent stages of the same litigation." *Id.* The rule restrains courts from reconsidering issues already decided, *Keith v. Bobby,* 618 F.3d 594, 599 (6th Cir. 2010), and it applies to "the trial court before an appeal, after the case has been remanded to the trial court by an appellate court, or in a later appeal." Bryan A. Garner, et al., *The Law of Judicial Precedent* 441 (2016). *See also Caldwell v. City of Louisville,* 200 F. App'x 430, 432–33 (6th Cir. 2006).

WCAS048

Courts can establish the law of the case either explicitly or implicitly. *Keith*, 618 F.3d at 599; *In re Purdy*, 870 F.3d 436, 442–43 (6th Cir. 2017). There is no precise formula for determining whether a court resolved an issue implicitly, but the inquiry generally turns on whether "resolution of the issue was a necessary step in resolving the earlier appeal." *See In re Purdy*, 870 F.3d at 443 (quoting *Waste Mgmt. of Ohio, Inc. v. City of Dayton*, 169 F. App'x 976, 986 (6th Cir. 2006) ). Other examples of an implicit decision arise when "resolution of the issue would abrogate the prior decision" or when "the issue is so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated." *Id.* (quoting *Waste Mgmt. of Ohio*, 169 F. App'x at 986). Generally, though, the question is simply whether the first decision "necessarily indicated" that the court decided the issue. *See Keith*, 618 F.3d at 600.

This court's prior decision leaves no doubt on whether it resolved this issue during the first appeal. *Hall I* adopted the standard from *BDO Seidman* after extensive briefing from both parties on the issue and directed the district court to determine which clients fall under that case. Because *BDO Seidman* applies only to ordinary employment contracts and does not affect agreements executed as part of the sale of a business, the decision implicitly rejected Edgewood's contrary theory. *Hall I* held that *BDO Seidman* controls, which means that the non-solicitation agreement does not fall within New York's sale-of-business standard.

A counterfactual illustrates this point well. The court could have remanded this **\*397** case to the district court to make factual findings about whether Thompson sold any client goodwill to USI. That kind of mandate would leave open the possibility that Edgewood's sale-of-business argument could still carry the day. And in fact, Edgewood erroneously suggests that the *Hall I* opinion did just that. But the decision was much narrower. The court ordered the district court to apply *BDO Seidman*, and it left no room for it to do anything else.

Of course, the law-of-the-case doctrine is not without exception. This court has recognized "three exceptional circumstances under which [we] will reconsider a previously decided issue: (1) where substantially different evidence is

raised on subsequent trial; (2) where a subsequent contrary view of the law is decided by the controlling authority; or (3) where a decision is clearly erroneous and would work a manifest injustice." *United States v. Rayborn*, 495 F.3d 328, 337 (6th Cir. 2007) (citations and internal quotation marks omitted). But none of these exceptions fit the circumstances here. This is not a case in which the parties raised substantially different evidence. In fact, the evidence elicited at the evidentiary hearing on remand—that Thompson was not an owner of HSP and did not know about the APA—supports the prior decision. And Edgewood has not identified a contrary controlling authority that was decided after our first decision. Finally, we have no reason to believe that the decision to apply *BDO Seidman* to Thompson's employment contract was clearly erroneous or that implementing the original decision would work a manifest injustice.

Because of that, the law of the case bars Edgewood's argument that the court applied the wrong legal standard. [2] We therefore affirm the district court's decision exempting thirty-seven clients from the preliminary injunction. [3]

### III.

Finally, we decline Thompson's request to sanction Edgewood or award him his costs and fees for this appeal. Although we agree that the court already rejected Edgewood's argument, we do not find that Edgewood brought this appeal with "no reasonable expectation" of prevailing. **\*398** *Wilton Corp. v. Ashland Castings Corp.*, 188 F.3d 670, 677 (6th Cir. 1999). The court's first decision adopted *BDO Seidman* without expressly rejecting Edgewood's contrary theory. The implicit nature of our decision does not diminish its impact, but it does weigh against sanctioning Edgewood for this second appeal.

\* \* \*

For the above-stated reasons, we **AFFIRM**.

**All Citations**

758 Fed.Appx. 392

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   4

# Footnotes

1    Both parties agree New York law governs the enforceability of the agreement.

2    Although Thompson argues that we already rejected Edgewood's argument on the first appeal, he does not explicitly contend that Edgewood's argument is barred by the law-of-the-case doctrine. Nevertheless, we may raise the doctrine sua sponte. *See United States v. Wallace*, 573 F.3d 82, 90 n.6 (1st Cir. 2009) (reserving the right to "raise the law of the case issue sua sponte if [the court] deem[s] it appropriate"); 18B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure: Jurisdiction and Related Matters § 4478 (2d ed. 2002) ("[T]he purposes to conserve judicial resources and to preserve the integrity of judicial processes means that a court may raise the law of the case on its own."); *see also Arizona v. California*, 530 U.S. 392, 412, 120 S.Ct. 2304, 147 L.Ed.2d 374 (2000) ("[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte*, even though the defense has not been raised." (citations and internal quotation marks omitted) ).

3    Our decision today should not be construed as altering the otherwise interlocutory nature of the preliminary injunction. The law-of-the-case doctrine does not prevent Edgewood or Thompson from raising similar arguments down the road. *See William G. Wilcox, D.O., P.C. Employees' Defined Benefit Pension Trust v. United States*, 888 F.2d 1111, 1114 (6th Cir. 1989). New facts uncovered during discovery might alter the analysis, or the controlling law might shift. But those issues are for another day. Edgewood's appeal centers on the same preliminary injunction we analyzed before, and our prior decision constitutes the law of the case for this particular issue. *See* Garner, *supra*, at 441.

---

End of Document          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4546973
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas,
San Antonio Division.

HENSON PATRIOT LIMITED
COMPANY, LLC, Plaintiff,
v.
Andrew MEDINA, Clara Calderas
Medina, Calderas Custom Printing, LLC,
and Marcel Masukawa, Defendants.

Civil Action No. SA–14–CV–534–XR.
|
Signed Sept. 11, 2014.

**Attorneys and Law Firms**

Charles W. Hanor, Hanor Law Firm, P.C., San Antonio, TX, for Plaintiff.

George B. Dombart, Attorney At Law, Matthew M. Cowart, Cowart Cace, LLC, Nathan C. Cace, The Law Offices of Nathan C. Cace, P.C., San Antonio, TX, for Defendants.

**ORDER**

XAVIER RODRIGUEZ, District Judge.

**\*1** On this day the Court considered Plaintiff's Motion for Preliminary Injunction (docket no. 26). For the following reasons the preliminary injunction is GRANTED in part and DENIED in part.

## I. BACKGROUND

### A. Factual Background

Henson Patriot Limited Company ("Plaintiff") purchased a specialty printer, America Color Labs (ACL), in December 2010. Defendant Andrew Medina was a partner at ACL and signatory to the purchase agreement. Defendants Andrew Medina and Marcel Masukawa were employees at ACL and continued working there after Plaintiff purchased ACL. Defendant Clara Calderas Medina, Andrew Medina's wife and former low-level employee at ACL, formed Texas corporation Calderas Custom Printing LLC on April 4, 2012.

Calderas Custom Printing is the general partner in South Texas Digital, LP (STD). Clara Medina and Masukawa are partners in defendants Calderas Custom Printing and STD.

Plaintiff completed and memorialized its ACL stock purchase in a purchase agreement ("Purchase Agreement") negotiated between Daren Henson, partner at Plaintiff, and Cordell Gardner, majority partner at ACL prior to the purchase. Purchase Agreement ¶¶ 1–4 provide for a five-year non-compete in Bexar County and its contiguous counties for all sellers (Exhibit 1); of whom only Andrew Medina is relevant to this case. Clara Medina and Masukawa were not signatories to the Purchase Agreement. Purchase Agreement ¶ 5 sets forth an agreement between Plaintiff and sellers that a breach of the non-compete would be irreparable harm and an injunction is a proper remedy for breach.

After selling his stake in ACL to Plaintiff, Andrew Medina continued to work at the company first as a production manager, then in the sales department. While in sales, Andrew Medina had three accounts, Susan Komen Foundation, Color Concepts, and Alamo Group. Eventually, in June 2012, Andrew Medina left ACL to work as a salesman at Fellers, Inc., a printer-supply company. Clara Medina was formerly a low-level employee at ACL prior to Plaintiff's purchase of ACL. Masukawa worked in production at ACL for over ten years before departing April 16, 2012 to work at STD.

In early 2013, Plaintiff found Andrew Medina's old work phone that was never deactivated. On it, Plaintiff discovered several messages creating suspicion that Andrew Medina was aiding and advising STD in the launch and conduct of its business. Carla Aden, in her capacity as a Color Concepts representative, left voice messages for Andrew Medina referring to "opportunities" for STD. Aden copied Andrew Medina on emails that also carbon copied "orders@stxdigital.com." Andrew Medina discussed financing STD with his brother-in-law, Jose Elizondo. And on multiple occasions Clara Medina urged Andrew Medina to talk about STD when he was out of his office at ACL. Lastly, Andrew Medina appears to have discussed retrieving specific work product from ACL for STD's use with his daughter. Andrew Medina has also visited STD's storefront on multiple occasions, and all three of Andrew Medina's accounts at ACL, Susan Komen, Color Concepts, and Alamo Group, have used STD's services since the company formed, largely abandoning ACL.

### B. Procedural History

WCAS051

**\*2** Plaintiff filed the Complaint on June 12, 2014. Plaintiff then moved for a preliminary injunction on July 28, 2014. The Court held an evidentiary hearing on the preliminary injunction on September 4, 2014, where Daren Henson and Andrew Medina gave live testimony. The Court gave an oral order granting the preliminary injunction as to Andrew Medina, and denying as to the other defendants. This written order further explains the oral order.

## II. JURISDICTION

This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331 because Plaintiff raises a federal question by asserting a 15 U.S.C. § 1125(a) violation in the Complaint. This court has personal jurisdiction over the Defendants because they are residents or citizens of Texas.

## III. ANALYSIS

The grant of injunctive relief is an extraordinary remedy which requires the movant to unequivocally show the need for its issuance. *Opulent Life Church v. City of Holly Springs, Miss.,* 697 F.3d 279, 288 (5th Cir.2012); *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir.1997). A preliminary injunction should not be granted unless the movant demonstrates by a clear showing: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any harm that may result from the injunction to the non-movant; and (4) that the injunction will not undermine the public interest. *Lindsay v. City of San Antonio,* 821 F.2d 1103, 1107 (5th Cir.1987); *Valley,* 118 F.3d at 1051. At the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence. *Sierra Club, Lone Star Chapter v. F.D.I.C.,* 992 F.2d 545, 551 (5th Cir.1993).

## A. Substantial Likelihood of Success on the Merits

To determine the likelihood of success on the merits, the Fifth Circuit looks to the standards provided by the substantive law. *Valley,* 118 F.3d at 1051; *see Miss. Power & Light Co. v. United Gas Pipe Line Co.,* 760 F.2d 618, 622 (5th Cir.1985). Therefore, to succeed on its motion for preliminary injunction, Plaintiff must show there was a valid non-

compete, the non-compete applied to each defendant, and each defendant violated the non-compete.

### 1. Validity of the Contractual Non–Compete

"A covenant not to compete is enforceable ... to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM.CODE § 15.50; *Marsh USA Inc. v. Cook,* 354 S.W.3d 764, 777 (Tex.2011); *see Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644 (Tex.2006) (foreshadowing the focus on reasonability and the time, geography, and scope aspects in *Marsh,* while ignoring the "ancillary to" inquiry). The statute thus imposes a reasonableness test where time, geography, and scope of activity are the main factors. *Oliver v. Rogers,* 976 S.W.2d 792, 800 (Tex.App.-Houston 1st Dist.1998). The three are factors, not elements. Indefinite time or unlimited geographic scope are not automatic bars. *Oliver,* 976 S.W.2d at 800. Texas courts have upheld five-year non-competes when the non-compete was necessary to protect the purchaser's goodwill, and the covenant was not oppressive to the promisor. *See Chandler v. Mastercraft Dental Corp. of Texas Inc.,* 739 S.W.2d 460, 464 (Tex.App.-Ft. Worth 1987, writ denied); *Oliver,* 976 S.W.2d at 800 (5–year non-compete upheld). Texas courts have upheld four-year non-competes that cover five entire states. *Vaughn v. Intrepid Directional Drilling Specialists, Ltd.,* 288 S.W.3d 931, 938 (Tex.App.-Eastland 2009).

**\*3** Plaintiff argues the non-compete is valid as applied to Andrew Medina because it is a reasonable restraint on trade. Here, the non-compete lasts five years. It encompasses Bexar County and all contiguous counties, and only includes activities related to specialty printing and other services provided by ACL. In addition, ACL's goodwill and other business interests are protected by the non-compete because it only covers this specific printing industry, protects contracts and relationships with existing clients, and the asserted violation of the non-compete coincides with loss of business to STD. Plaintiff also argues that, in the context of a purchase agreement, the non-compete should more likely be upheld because it was bargained for with valuable consideration, as opposed to an employee contract. Texas courts are more amenable to long non-competes in the purchase agreement context than the employer-employee context. *See, e.g., Heritage Operating, LP v. Rhine Brothers, LLC,* 2012 WL 2344864 (Tex.App.-Ft. Worth 2012, no pet.). The non-

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 58 of 250
Henson Patriot Ltd. Co., LLC v. Medina, Not Reported in F.Supp.3d (2014)
39 IER Cases 31

compete here is a reasonable restraint on trade because in the course of the sale of a business, a five-year non-compete limited to the small industry and a relatively small geographic scope is reasonable.

## 2. Applicability of the Contractual Non–Compete to Non–Signatories

In the context of the sale of a business, Texas courts extend a non-compete to a non-signatory in two scenarios: (1) an entity is created by a signatory for the purpose of competing to circumvent, or perpetuate a "fraud" on, the non-compete, *see Texas Shop Towel, Inc. v. Haire,* 246 S.W.2d 482, 484 (Tex.Civ.App.-San Antonio 1952, no writ), or (2) a signatory significantly aids, abets, consults, or advise another entity or person's competition with the buyer when the non-compete forbids aiding, abetting, consulting or advising. *See Barrett v. Curtis,* 407 S.W.2d 359, 362 (Tex.Civ.App.Dallas 1966, no writ); *see Pitts v. Ashcraft,* 586 S.W.2d 685, 692 (Tex.Civ.App.-Corpus Christi 1979) ("[T]he covenantor must also undertake a more active participation in the competing enterprise, such as giving the competitor the benefit of his experience, knowledge, and/or influence to assist the competitor in the conduct of his competing business;" mere financial assistance is not enough.). [1]

Here, Andrew Medina's non-compete clearly forbids aiding, abetting, consulting, or advising in competition with Plaintiff. [2] Therefore, Texas law would allow an extension of Andrew Medina's non-compete to entities or persons he significantly aided, abetted, consulted, or advised to compete with Plaintiff in some circumstances.

Given the evidence currently available, however, the Court cannot say Plaintiff clearly met its burden to demonstrate Andrew Medina significantly aided, abetted, consulted or advised the other defendants' competition with Plaintiff. The facts are approaching enough to show Andrew Medina significantly aided, abetted, and consulted with the other Defendants. Andrew Medina: 1) was aware of his wife's formation of STD prior to his departure from ACL but did not tell ACL or anyone affiliated with ACL, 2) visited STD's storefront on several occasions, 3) communicated with former clients at ACL after leaving his duties at ACL, 4) received communications from STD customers regarding orders from STD, and 5) generally acted in a suspicious manner when dealing with people affiliated with STD during and after employment at ACL, including acknowledging his daughter taking work-product from ACL to give to STD.

**\*4** Yet, Plaintiff has not shown enough for the Court to conclude Andrew Medina *significantly* aided, consulted, or advised the other defendants. Defendants maintained at the evidentiary hearing Andrew Medina plays no role in STD's business; and any apparent business communication with him included was accidental. They insist his visits to the STD storefront were either personal or in his capacity as a salesman for Fellers. While the Court is not convinced Andrew Medina did not aid, consult, or advise STD, the Court exercises caution at this time due to the extraordinary nature of a preliminary injunction. The Court cannot find that Plaintiff has met its burden of demonstrating that Andrew Medina significantly aided, abetted, consulted, or advised the other Defendants in their competition with Plaintiff given the available evidence. Therefore, the Court does not find that the non-compete should be extended to defendants Clara Medina, Marcel Masukawa, STD, and Calderas Custom Printing. The preliminary injunction as to those defendants is denied because Plaintiff, at this time, has failed to establish a substantial likelihood of success on the merits.

## B. Irreparable Harm

A plaintiff must be threatened with irreparable injury for a court to issue a preliminary injunction. *Univ. of Texas v. Camenisch,* 451 U.S. 390, 392, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). To show a threat of irreparable injury, a plaintiff must demonstrate that "a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm." *Humana, Inc. v. Jacobson,* 804 F.2d 1390, 1394 (5th Cir.1986). In Texas, injury resulting from the breach of a non-compete "is the epitome of irreparable injury, so enforcement appears to be the rule rather than the exception." *Travelhost, Inc. v. Brady,* 3:11–CV–454–M–BK, 2012 WL 555191 (N.D.Tex. Feb.1, 2012) report and recommendation adopted as modified, 3:11–CV–454–M–B K, 2012 WL 556036 (N.D.Tex. Feb.17, 2012). "Proof that a highly trained employee is continuing to breach a non-competition covenant gives rise to a rebuttable presumption that the applicant is suffering irreparable injury." *Cardinal Health Staffing Network, Inc. v. Bowen,* 106 S.W.3d 230, 236 (Tex.App.-Houston 14th Dist.2003, no pet.).

Texas Courts have held incalculable damages, *Miller Paper Co. v. Roberts Paper Co.,* 901 S.W.2d 593, 602 (Tex.App.-Amarillo 1995, no writ), and immeasurable loss off goodwill, *T–N–T Motorsports, Inc. v. Hennessey Motorsports, Inc.,* 965 S.W.2d 18, 24 (Tex.App.Houston 1st Dist.1998, pet. denied), are irreparable harms for which an injunction can issue.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 3

Though a contractual provision declaring irreparable harm is evidence of irreparable harm, a provision alone is insufficient for a court to definitively conclude irreparable harm. *See, e.g., Smith, Bucklin & Assocs., Inc. v. Sonntag,* 83 F.3d 476, 481 (D.C.Cir.1996) ("Although there is a contractual provision that states that the company has suffered irreparable harm if the employee breaches the covenant and that the employee agrees to be preliminarily enjoined, this by itself is an insufficient prop.").

**\*5** Plaintiff argues it would suffer incalculable damages and the loss of goodwill from a violation of the non-compete. The Purchase Agreement's language presumes a violation of a non-compete is "irreparable harm." Plaintiff has specifically lost three contracts or projects of varying sizes, but the extent of the lost business is unknown for the past and future. Additionally, Plaintiff cannot know the extent of the loss of goodwill it has suffered from the non-compete violation.

Plaintiff's complained of harm is the "epitome" of irreparable. Defendant cannot overcome the rebuttable presumption that Plaintiff is suffering irreparable injury due to Andrew Medina's status as a highly trained employee who is continuing to violate his non-compete. Plus, the contractual language is good evidence to support irreparable harm, and the damage suffered from lost clients is largely incalculable, especially when lost goodwill is considered. Plaintiff is threatened with irreparable harm.

### C. Balancing the Hardships

"The third factor requires the plaintiff to establish that his irreparable harm is greater than the hardship that the preliminary injunction would cause the defendant." *DS Waters of Am., Inc. v. Princess Abita Water, L.L.C.,* 539 F.Supp.2d 853, 863 (E.D.La.2008) (citing *Valley,* 118 F.3d at 1051). Courts engage in a traditional balancing test on this factor. *See, e.g., Am. Exp. Fin. Advisors, Inc. v. Scott,* 955 F.Supp. 688, 693 (N.D.Tex.1996) (holding the hardships to a signatory to a non-compete from the preliminary injunction do not outweigh those to the company if the signatory were allowed to violate his non-compete and work with former clients for the period covered in the agreement); *Baker Hughes Inc. v. Nalco Co.,* 676 F.Supp.2d 547, 556 (S.D.Tex.2009), *aff'd,* 374 F. App'x 979 (Fed.Cir.2010) (holding a patent holder's hardships outweigh those of a non-holder competitor that has not yet entered the market).

Plaintiff argues 1) it paid fair value for Andrew Medina's non-compete and would suffer hardship to have it circumvented;

and 2) Texas courts consistently hold the harm to the company outweighs the harm to the non-compete signatory. The loss of business and goodwill is also significant for Plaintiff's side of the balancing. The reasonableness of the restriction on Andrew Medina's activity works against hi m; Andrew Medina could engage in any other business of his choice, and indeed has by working at Fellers, or even print solutions outside Bexar County and the contiguous counties.

Defendants argue they would lose their whole business if the injunction issued against all Defendants. STD is the only source of income for the Medinas and Masukawa. STD may continue doing business without Andrew Medina's aid or advice. Presumably that will not cause STD to stop operating or making money considering Defendants maintain Andrew Medina has not aided or advised STD to this point. Therefore there is no harm to the other defendants to consider in the balancing.

**\*6** The harm caused by the violation of a non-compete outweighs the harm to Andrew Medina and all other Defendants. Plaintiff paid a substantial sum to acquire ACL and the noncompetes like Andrew Medina signed. The restriction on Andrew Medina's conduct is reasonable. The harm caused by the violation of the reasonable and bargained for non-compete far outweighs the harm of enforcing it here.

### D. The Injunction will not Undermine the Public Interest

Non-compete clauses are disfavored as a restraint on business in Texas. Still, the Fifth Circuit and courts in Texas uphold them and grant injunctions enforcing them in some circumstances. Upholding reasonable non-competes is within the public interest. *See, e.g., TransPerfect Translations, Inc. v. Leslie,* 594 F.Supp.2d 742, 758 (S.D.Tex.2009).

Defendants argue that their business is threatened, and restricting others' right to choose their service provider undermines public interest. They also argue a threat to another business. None of these are compelling or unique to this particular non-compete. Courts continuously grant injunctions in the face of these exact "public interest" concerns.

The Court finds that a preliminary injunction in this case would not undermine the public interest. The fourth prong is satisfied.

WCAS054

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's motion for a preliminary injunction is GRANTED in part and DENIED in part. The Court finds that Plaintiff has satisfied each of the prerequisites for obtaining a preliminary injunction against Andrew Medina, but at this time fails to show a substantial likelihood of success on the merits against Clara Medina, Marcel Masukawa, South Texas Digital, and Calderas Custom Printing. It is hereby ORDERED that:

1. Andrew Medina shall be immediately preliminarily enjoined and restrained during the pendency of this action, and up to five years from the closing date from:

a. directly or indirectly, either as employee, employer, consultant, advisor, agent, principal, partner, stockholder, corporate officer, director, or in any individual or representative capacity, engaging, consulting with, advising or otherwise participating in any business that is in competition in any manner whatsoever with ACL within Bexar County, Texas, and the counties contiguous to Bexar County.

b. either directly or indirectly, either as employee, employer, consultant, advisor, agent, principal, partner, stockholder, corporate officer, director, or in any individual or representative capacity, soliciting any employee of Plaintiff, or any employee of ACL retained by Plaintiff after December 31, 2010, to leave employment with Plaintiff.

c. soliciting or approaching, or causing to be solicited or approached, with regard to any services or products provided by the Plaintiff as of the Closing Date, any person who was a customer or client of ACL.

2. It is further ordered that Plaintiff shall maintain the bond previously posted in the amount of $500.00 for this Order.

**\*7**  It is so ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 4546973, 39 IER Cases 31

## Footnotes

1    The existence of a familial relationship does not greatly impact Texas courts' analysis of applying non-competes to non-signatories, as they have ruled in both directions with close family members. *Compare Barrett v. Curtis,* 407 S.W.2d at 363 (holding a defendant's brother's new business enjoined) *with Owen v. Willis,* 20 S.W.2d 338 (Tex.Civ.App.-Amarillo 1929, writ dism'd w.o.j) (holding a defendant's brother's business free to continue competing, even with the defendant's wife as an employee).

2    Andrew Medina "shall not either directly or indirectly, either as employee, employer, consultant, advisor ... engage, consultant with, advise or otherwise participate in any business that s in competition" with ACL. Purchase Agreement ¶ 1.

---

**End of Document**                                          © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by Richards Energy Compression, LLC v. Dick Glover, Inc., D.N.M., September 16, 2013

2012 WL 2344864

Only the Westlaw citation is currently available.

SEE TX R RAP RULE 47.2 FOR DESIGNATION AND SIGNING OF OPINIONS.

MEMORANDUM OPINION

Court of Appeals of Texas, Fort Worth.

HERITAGE OPERATING, L.P. d/b/ a Metro Lift Propane of Dallas, Appellant

v.

RHINE BROTHERS, LLC, DFW Propane Exchange, LLC, Kendall L. Rhine, Kendall T. Rhine, Anthony L. Rhine, Janice Rhine, and James Marcus Withers, Appellees.

No. 02–10–00474–CV.
|
June 21, 2012.

From the 153rd District Court of Tarrant County. Ken Curry, Judge.

**Attorneys and Law Firms**

R. Charles Wilkin III, Glass Wilkin P.C., Tulsa, OK and Michael L. Jones, Henry & Jones, L.L.P., Dallas, TX., for appellant.

Jerry D. Bullard, Adams, Lynch & Loftin, P.C., Grapevine, TX and Chad J. Sullivan, Jackson Kelly PLLC, Evansville, IN, for appellee.

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

**MEMORANDUM OPINION** [1]

LEE GABRIEL, Justice.

**\*1** We have considered appellant Heritage Operating, L.P. d/b/a Metro Lift Propane of Dallas's (Heritage) motion for rehearing and appellees Rhine Brothers, LLC, DFW Propane Exchange, LLC, Kendall L. Rhine, Kendall T. Rhine,

Anthony L. Rhine, Janice Rhine, and James Marcus Withers's motion for rehearing and motion for reconsideration en banc. We deny the motions but withdraw our March 15, 2012 opinion and substitute the following.

Heritage appeals the trial court's take-nothing judgment in this case concerning breach of a covenant not to compete. We reverse and remand.

**Background Facts**

Appellee Kendall L. Rhine became an officer, director, and shareholder of Metro Lift Propane in 1997. At that time, Metro Lift had locations in Atlanta and Nashville. By 2003, Metro Lift had ten locations, including one in Grand Prairie. Kendall L.'s son, Anthony Rhine, ran the Grand Prairie Metro Lift location.

On January 1, 2004, Kendall L. and the other owners of Metro Lift sold Metro Lift's ten locations to Heritage. Heritage and the Metro Lift owners were all represented by counsel during the sales negotiations. Heritage paid $15,464,663.44 for the company. Kendall L. and the other former owners were offered positions with Heritage. Kendall L. declined.

As part of the sale, Kendall L. and the other former owners were asked to sign noncompetition agreements. Heritage agreed to pay Kendall L. $500,000 to sign the noncompete, paid out over five years. The agreement stated, in part,

> [Kendall L.] agrees that for a period of ten (10) years, commencing with the date of this Agreement, he will not:
>
> (a) Engage in the business of the propane cylinder exchange business within a 75–mile radius of ... any of the operations of [Metro Lift locations] (the "Restricted Area").
>
> ....
>
> (d) Furnish, divulge, or make accessible to anyone any confidential or proprietary information or trade secrets ("Confidential Information") concerning the Metro Lift Business including, but not limited to, customer identification, customer lists, business records and supply cost and pricing data. Notwithstanding the foregoing, such Confidential Information shall not include: (i) information that is or becomes generally available to [Kendall L.] on a non-confidential basis from a source other than Heritage or

its affiliates provided that such source is not bound by an agreement of non-disclosure to Heritage.

(e) Provide to, arrange for, guarantee funds, or arrange for product supply or consumer tank or cylinder purchases to any person who engages [in the propane cylinder exchange business] in the Restricted Area.

(f) Be a member of a partnership or a stockholder, investor, officer, director, employee, agent, associate, or consultant, of any person, partnership, or corporation which does any of the acts described in the foregoing subparagraphs.

In "[l]ate 2008, early 2009," Kendall L.'s wife, Janice Rhine, began investing in propane cylinder exchange businesses owned and operated by Kendall L.'s sons, Kendall T. and Anthony Rhine, including DFW Propane, in Grand Prairie. [2] Kendall L. testified that his wife has not worked outside their home in forty years and does not possess much knowledge about running a cylinder exchange business. Janice Rhine testified that at least one check she signed for DFW Propane came from a joint account she shared with Kendall L. She also testified that Kendall L. would write checks out of her living trust and that she would reimburse him by putting money back in his account. Kendall L. also wired $221,062.95 to a title company for the purchase of property for DFW Propane. Kendall L. wrote checks out to DFW Propane and had his wife sign them.

**\*2** Heritage sued Kendall L., his sons, and his wife, among others, for breach of contract, trade secret misappropriation, interference with contract, tortious interference with contract and prospective business relations, civil conspiracy, and aiding and abetting. Heritage also sought an injunction against the Rhines. A jury found that Kendall L. violated his noncompete, that all of the defendants intentionally interfered with Kendall L.'s noncompete, and that the defendants conspired against Heritage, but that Heritage had suffered zero dollars in lost profits or loss of goodwill or reputation. [3]

The trial court then entered a judgment finding that the noncompete was unreasonable and thus, void. The trial court granted judgment in favor of the defendants and denied injunctive relief. The trial court made the following relevant findings of fact and conclusions of law:

> 6. The confidential information of [Metro Lift] consisted of customer identification and history, sales, inventory[,] and operational procedure.

7. The confidential information of [Metro Lift] was neither complex nor difficult to independently obtain or create.

8. The value, if any, of the confidential information of [Metro Lift] quickly eroded after the sale of [Metro Lift] to [Heritage] and was essentially non-existent two (2) years after the sale.

9. The enforcement of Kendall L. Rhine's non-competition agreement beyond five years after the sale of [Metro Lift] to [Heritage] was not necessary to protect any legitimate business interest of [Heritage].

10. The Kendall L. Rhine non-competition agreement was unreasonable in scope and time and greater than necessary to protect the goodwill and business interests of [Heritage].

11. [The] Kendall L. Rhine non-competition agreement would be reasonable if limited to a time period not to exceed five (5) years.

12. Kendall L. Rhine did not take any action prior to the fifth year anniversary of the non-competition agreement which violated its terms.

....

1. Kendall L. Rhine's non-competition agreement is reformed in that its term is reduced to five (5) years from the date of its execution.

2. Permanent injunctive relief is neither warranted nor equitable under the facts of this case.

This appeal followed.

### Discussion

#### 1. The reasonableness of the noncompete

In its first issue, Heritage complains of the legal and factual sufficiency of the evidence supporting the trial court's finding that the limitations of the noncompete are unreasonable.

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital

WCAS057

fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 Tex. L.Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas,* 228 S.W.3d 649, 651 (Tex.2007); *City of Keller v. Wilson,* 168 S.W.3d 802, 807, 827 (Tex.2005).

**\*3** When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986) (op. on reh'g); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965).

In his motion for rehearing and motion for consideration en banc, Kendall L. Rhine argues that this court erroneously applied Texas law. The noncompete agreement contains a choice of law provision that states, "The laws of the State of Delaware shall govern this Agreement. The parties hereto agree and consent to the jurisdiction of the courts in the city and state in which [Kendall L. Rhine] resides to adjudicate all claims and controversies arising under this Agreement." As Rhine pointed out in his brief on appeal, Texas courts will enforce a choice of law provision unless it is contrary to Texas public policy. *See DeSantis v. Wackenhut Corp.,* 793 S.W.2d 670, 677 (Tex.1990), *cert. denied,* 498 U.S. 1048, 111 S.Ct. 755, 112 L.Ed.2d 775 (1991). The court must determine

first, whether there is a state the law of which would apply under section 188 of the Restatement absent an effective choice of law by the parties, or in other words, whether a state has a more significant relationship with the parties and their transaction than the state they chose; second, whether that state has a materially greater interest than the chosen state in deciding whether

this noncompetition agreement should be enforced; and third, whether that state's fundamental policy would be contravened by the application of the law of the chosen state in this case.

*Id.* at 678.

Delaware has a substantial relationship to the parties because Heritage's corporate offices are located there. However, Texas has a more significant relationship to the parties and the transaction because two of the ten Metro Lift locations from which Kendall L. Rhine was restricted were located in Texas and none of the locations were in Delaware.[4] Second, Texas has a materially greater interest than does Delaware in "protecting the justifiable expectations of entities doing business" in this state. *Id.* at 679 (refusing to apply a choice of law provision because Texas had a materially greater interest than Florida because Florida's interest in the contract was "limited to protecting a national business headquartered in that state"). Finally, in *DeSantis,* the supreme court explicitly stated that "the law governing enforcement of noncompetition agreements is fundamental policy in Texas." *Id.* at 681. Based on the factors outlined in *DeSantis,* we decline to apply Delaware law in this case.

**\*4** The Covenants Not to Compete Act states,

[A] covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

Tex. Bus. & Com.Code Ann. § 15.50(a) (West 2011). A covenant not to compete is a restraint of trade and unenforceable as a matter of public policy unless it meets a reasonableness standard. *Juliette Fowler Homes, Inc. v. Welch Assocs.,* 793 S.W.2d 660, 662 (Tex.1990); *Martin v. Credit*

*Prot. Ass'n,* 793 S.W.2d 667, 668 (Tex.1990). Whether an agreement not to compete is a reasonable restraint of trade is a question of law for the court. *Peat Marwick Main & Co. v. Haass,* 818 S.W.2d 381, 388 (Tex.1991); *Martin,* 793 S.W.2d at 668–69. Restraints are unreasonable if they are broader than necessary to protect the legitimate interests of the employer. *DeSantis,* 793 S.W.2d at 681–82; *Henshaw v. Kroenecke,* 656 S.W.2d 416, 418 (Tex.1983).

The trial court found that the noncompete was unreasonable in both scope and time. The only reformation the trial court made, however, was to the time period, and the trial court found that the noncompete would be reasonable if it were reduced to five years.[5] Thus, we will evaluate only whether the ten-year prohibition period is unreasonable.

We first note that it was Kendall L.'s burden to establish that the noncompete limitations were greater than was necessary. Tex. Bus. & Com.Code Ann. § 15.51(b) (West 2011) (stating that it is the promisor's burden to establish that the noncompete is not reasonable when the primary purpose of the agreement to which the covenant is ancillary is not to obligate the promisor to render personal services). To meet this burden, Kendall L. argued that the evidence was that any confidential information eroded in value quickly. However, Kendall L. has not addressed Heritage's claim that it also bought Metro Lift's goodwill.

Goodwill is a protectable, valuable interest, and parties may determine its value and contract for its sale. *Marsh USA Inc. v. Cook,* 354 S.W.3d 764, 777 (Tex.2011) ("Texas law has long recognized that goodwill, although intangible, is property and is an integral part of the business just as its physical assets are."). Goodwill is defined as a "business's reputation, patronage, and other intangible assets that are considered when appraising the business, esp[ecially] for purchase; the ability to earn income in excess of the income that would be expected from the business viewed as a mere collection of assets." Black's Law Dictionary 763 (9th ed.2009).

Kendall L. presented evidence through a number of witnesses that some intangible interests (specifically, customer and pricing lists) eroded in the first five years after the sale, but he did not present evidence that *all* of Metro Lift's intangible interests eroded in the first five years. Tom Harlan, another former owner of Metro Lift, testified that any customer and pricing lists that were sold with Metro Lift would have no value after five years. Harlan was not asked about the value of

Metro Lift's goodwill. The only evidence on goodwill came from Eric Beatty, chief legal officer of Heritage, who testified,

> **\*5** [O]ne of those critical assets that Heritage can purchase is the future patronage of those customers. Goodwill. And one of the most critical concerns that I—I feel comfortable saying on behalf of Heritage is that we have the ability to ensure that we can protect that future patronage. And the only way to do that is to ensure that our seller, who knows that business infinitely better than we do for that location, will not come back in and take that goodwill right back.

Beatty testified that the parties valued Metro Lift's goodwill and other intangible assets at the time of closing and attributed $7 million of the purchase price to them.

A noncompete signed by an owner selling a business is quite different than one signed by an employee. *Marsh USA Inc.,* 354 S.W.3d at 790 n. 5 (noting that section 15.50 does not address the "distinction between what type of agreement is enforceable to protect goodwill in the context of the sale of a business and the context of a post-employment restriction"); *see Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d 168, 177 (Tex.1987) (Gonzalez, J., dissenting) (noting that courts "scrutinize covenants not to compete in employment relationships more closely than covenants not to compete associated with the sale of a business"), *superseded by statute,* Tex. Bus. & Com.Code Ann. § 15.50(a). Courts have been more inclined to enforce a long or limitless time period barring competition after a sale of a business. *See, e.g., Oliver v. Rogers,* 976 S.W.2d 792, 801 (Tex.App.-Houston [1st Dist.] 1998, pet. denied) (holding that a lack of a time limitation did not render noncompete unreasonable as a matter of law); *Greenstein v. Simpson,* 660 S.W.2d 155, 159 (Tex.App.-Waco 1983, writ ref'd n.r.e.) ("[A] person may agree [ ] in connection with the sale of his business[ ] not to re-enter a similar competitive business for the remainder of his life."); *York v. Dotson,* 271 S.W.2d 347, 348 (Tex.Civ.App.-Fort Worth 1954, writ ref'd n.r.e.) ("One may lawfully agree not to compete in a particular business, in a reasonably limited territory, during the remainder of his life. Such contracts are held not to be in restraint of trade."); *Clay v. Richardson,* 290

WCAS059

S.W. 235, 236 (Tex.Civ.App.-Fort Worth 1926, writ dism'd w.o.j.) (upholding covenant of theater seller never to open a theater again in town where theater was located).

Kendall L. is "semiretired," does not live in Texas, and he has ownership interests in propane cylinder exchange companies in locations across the country, including Florida, Illinois, Indiana, and Alabama. Kendall L. presented no evidence of any great hardship borne by him by staying out of the Grand Prairie area, nor did he demonstrate any injury to the public that outweighs the legitimate benefits that the negotiated noncompete granted to Heritage. *See DeSantis,* 793 S.W.2d at 681–82 (noting that a noncompete is reasonable if neither hardship to the promisor nor public injury outweighs the covenant's legitimate benefits to the promisee).

**\*6** Kendall L. was represented by counsel during the sale negotiations. He testified that although Heritage drafted the contracts, he and his attorney negotiated terms of the sale. He was aware that if he did not agree to a noncompete, there would be no deal with Heritage, and he did not think there was anything unfair about Heritage's request that he sign a noncompete. Kendall L. testified that he fully understood he would be bound by the noncompete and that he could open up propane cylinder exchange businesses anywhere in the country except within seventy-five miles of the listed prohibited cities. When asked at trial if he thought it was fair to him that he sign the noncompete, he responded, "Yeah, I got money for it." Heritage valued the intangible assets of Metro Lift at $7 million and had the former owners sign noncompete agreements to protect the value of those intangibles, including Metro Lift's goodwill. Kendall L. was paid half a million dollars separately from the sale of the business to agree to the ten-year noncompete period, and Heritage has paid Kendall L. the agreed-to price. [6]

Based on the evidence described above, we do not believe that Kendall L. demonstrated that it was unreasonable of Heritage to protect its $7 million investment for a period of ten years. Nor, as discussed above, do we believe that a ten-year noncompete period is unreasonable as a matter of law when ancillary to a contract for the sale of a business. *See Oliver,* 976 S.W.2d at 801; *Greenstein,* 660 S.W.2d at 159. We hold that the evidence is legally and factually insufficient to support the trial court's finding that the limitations of the noncompete are unreasonable. We sustain Heritage's first issue.

**2. Permanent injunction**

In its second issue, Heritage argues that the trial court erred by refusing to enter a permanent injunction against Kendall L. to enforce the noncompete.

The noncompete agreement included a provision that allowed for injunctive relief. The provision read,

> [Kendall L. Rhine] agrees that the covenants contained in this section relate to matters which are of special and unique character which give Heritage peculiar value impossible of replacement, and for the lack of which Heritage cannot be reasonably or adequately compensated in damages.... [I]f [Kendall L. Rhine] should breach this Agreement, Heritage's damages will be difficult to determine, if not impossible to determine. Therefore, [Kendall L. Rhine] expressly agrees that in addition to the right to recover damages, Heritage shall be entitled to injunctive and/or equitable relief to prevent a breach hereof, and to secure the enforcement hereof.

The decision to grant or deny a permanent injunction is ordinarily within the sound discretion of the trial court. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002).

Under the common law, a party seeking an injunction must show that without injunctive relief he will suffer irreparable injury for which he has no adequate legal remedy. *Tom James Co. v. Mendrop,* 819 S.W.2d 251, 252 (Tex.App.-Fort Worth 1991, no writ). However, in its motion for rehearing, Heritage notes that if a party relies on a statute that defines the requirements for injunctive relief, then the express statutory language supersedes common law requirements. *Butler v. Arrow Mirror & Glass, Inc.,* 51 S.W.3d 787, 795 (Tex.App.-Houston [1st Dist.] 2001, no pet.). The Covenants Not to Compete Act provides for "damages, injunctive relief, or both" for a breach of a noncompete by the promisor. Tex. Bus. & Com.Code Ann. § 15.51(a). Thus, a party seeking injunctive relief under the Covenants Not to Compete act

WCAS060

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

does not have to show irreparable injury for which he has no adequate legal remedy as a prerequisite to injunctive relief. *See Letkeman v. Reyes,* 299 S.W.3d 482, 486 (Tex.App.-Amarillo 2009, no pet.) ("It is enough simply to prove a distinct or substantial breach."); *see also* Tex. Bus. & Com.Code Ann. § 15.52 (stating that "the procedures and remedies ... provided by Section 15.51 ... are exclusive and preempt any other criteria for enforceability of a covenant not to compete or procedures and remedies in an action to enforce a covenant not to compete under common law or otherwise").

 **\*7** We acknowledge that Heritage is correct that it did not have to show irreparable injury for which it has no adequate legal remedy in order to secure an injunction. However, because we are remanding the case for a new trial, we do not reach a conclusion on Heritage's second issue. On remand, the trial court will have the opportunity to review Heritage's request for injunctive relief again.

### 3. Damages

In its third issue, Heritage argues that the jury's finding that it suffered zero damages is against the great weight and preponderance of the evidence and is manifestly unjust. In response to four questions on damages, the jury awarded zero dollars. After trial, Heritage moved for the entry of judgment, requesting that the trial court disregard the jury's answers to the damages questions. Heritage also moved for a judgment notwithstanding the verdict and a new trial on the grounds that the $0 damage award was manifestly too small.

In reviewing an issue asserting that the jury's failure to make a finding is "against the great weight and preponderance" of the evidence, we must consider and weigh all of the evidence and set aside the finding only if the evidence is so weak or the finding is so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001); *In re King's Estate,* 150 Tex. 662, 665, 244 S.W.2d 660, 661 (1951). When there is objective evidence of injury, a jury's award of zero damages is against the great weight and preponderance of the evidence. *Horton v. Denny's Inc.,* 128 S.W.3d 256, 260 (Tex.App.-Tyler 2003, pet. denied); *Davis v. Davison,* 905 S.W.2d 789, 791 (Tex.App.-Beaumont 1995, no writ).

Heritage presented the testimony of Mark Rambin, a certified public accountant. Rambin reviewed the sales transactions and financial statements of Metro Lift from 2004 to mid–2010 and "certain financial information" from DFW Propane, and he rendered an opinion on Heritage's lost net profits from

2009 through the end of the noncompete period in 2013. DFW Propane produced in discovery eighteen sales contracts it had with former Heritage customers. In 2008, Heritage had made a net profit of $72,000 from those customers. Rambin then made a projection of what the future sales to those eighteen customers would have been from 2010 through 2013. He estimated that Heritage lost $287,970 in net profit from the loss of those customers. Rambin then applied a "discount" to "account[ ] for the risk that a business activity may not happen as it was projected to happen." The discount accounts for lost customers, changes in the economy, and "any variable that might impact the ability of the business to achieve its objectives." Rambin's adjusted lost net profit estimation was $235,202.

Kendall L. did not present a competing expert, but he did challenge Rambin's calculations because one of the companies with a contract with DFW Propane, Ram Tool, did not ultimately buy its propane from DFW Propane. Rambin responded,

> **\*8** I'm not certain it impacts [the projected lost net profits], because as I was able to see, those sales [to Ram Tool] did tail off. So Heritage lost that business. There's a contract showing that DFW [Propane] somehow had some contact with them and ultimately Heritage lost that business. So I'm not certain it has an impact on that calculation.

Kendall L. also implied that another former customer, Big D Clutch, was no longer in business. Rambin explained that it would not affect his calculation because "that's the type of thing that the discount rate and the fact that I didn't increase the sales adjusts for. Those types of business risks are part of that calculation." This "discount" he applied to his projection "takes into consideration the time value of money, the interest factor, as well as the business risk factor." He defined the business risk factor as "[a]ny type of uncertainty[ ] that a business might go out of business, the economy might change, different things might happen." Thus, he explained the discount rate accounted for companies like Big D Clutch going out of business.

WCAS061

Kendall L. presented testimony from five former customers of Metro Lift who had signed contracts with DFW Propane. All five former customers testified that they left Metro Lift for DFW Propane because DFW Propane offered a better price. Only two customers testified that they were actively looking for a new provider, and only one of those could testify that he recalled that he contacted DFW Propane before DFW Propane contacted him. The other three testified that DFW Propane solicited them. That DFW Propane offered a lower rate might explain why a customer might have left Metro Lift for DFW Propane, but it is not any defense to Metro Lift's contention that it lost business because of DFW Propane's presence in its area. DFW Propane's own witnesses demonstrated that Metro Lift lost customers because DFW Propane took them. Even if Kendall L. challenged Rambin's methodology in making his future lost profit projections, Kendall L. did not challenge the evidence, including signed contracts produced by DFW Propane, that Metro Lift's former customers left Metro Lift for DFW Propane.

Thus, while there was evidence that not all of the contracts DFW Propane provided resulted in sales, there was uncontroverted evidence that Metro Lift did lose some sales to DFW Propane. *See D/FW Commercial Roofing Co. v. Mehra,* 854 S.W.2d 182, 187 (Tex.App.-Dallas 1993, no writ) ("A party must show either a history of profitability or the actual existence of future contracts from which lost profits can be calculated with reasonable certainty."). Those contracts, along with Rambin's testimony on Metro Lift's financial records, also provided some evidence of how much profit Metro Lift lost from those customers. *See ERI Consulting Eng'rs, Inc. v. Swinnea,* 318 S.W.3d 867, 876 (Tex.2010) ("Recovery for lost profits does not require that the loss be susceptible of exact calculation.") (quoting *Holt Atherton Indus., Inc. v. Heine,* 835 S.W.2d 80, 84 (Tex.1992)). There is therefore some objective evidence of the damages Heritage suffered. *See Horton,* 128 S.W.3d at 260. Thus, after having considered the evidence admitted, we hold that the evidence is factually insufficient to support a finding of zero damages, so as to be manifestly unjust, and we sustain that part of Heritage's third issue.[7] We do not, however, hold that Heritage proved the amount of its damages as a matter of law. *See Dow Chem. Co.,* 46 S.W.3d at 241 (noting that a "matter of law" issue "should be sustained only if the contrary proposition is conclusively established"). Although the contracts provide reasonably certain evidence of lost profits, Kendall L. disputed that all of the contracts led to sales. A lost profits calculation "is a fact intensive determination," *Holt Atherton Indus.,* 835 S.W.2d at 84, and

it is not our province to "find facts," *Pool,* 715 S.W.2d at 634. Because we cannot say that Heritage established its damages as a matter of law, we cannot render a damages award. *See Guevara v. Ferrer,* 247 S.W.3d 662, 670 (Tex.2007) (nothing that when there is evidence to support some damages it is not appropriate to render judgment but it is appropriate to remand for a new trial).

**\*9** On rehearing, Kendall L. Rhine argues that the trial court abused its discretion in failing to exclude Rambin's testimony. Rhine argues that Rambin's testimony was not reliable because it was based on speculation and not on objectively verifiable data. To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Low v. Henry,* 221 S.W.3d 609, 614 (Tex.2007); *Cire v. Cummings,* 134 S.W.3d 835, 838–39 (Tex.2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *E.I. du Pont de Nemours & Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995); *see also Low,* 221 S.W.3d at 620. Expert testimony is admissible when the expert is qualified and the testimony is relevant and based on a reliable foundation. *See Robinson,* 923 S.W.2d at 554. Rhine only challenges Rambin's testimony on the grounds that it was not based on a reliable foundation.

Prior to trial, Rhine moved to exclude Rambin's testimony as unreliable because Rambin's opinion was based on "illustrations of potential lost profits" and based on clients that Heritage believed, but had not verified, that it had lost to Metro Lift. Rambin's deposition testimony, attached to Rhine's motion to exclude and Heritage's response to the motion, shows that he had received historical sales information from Heritage and had requested sales information from DFW Propane, but had not yet received it. Prior to his deposition, Rambin produced documents to Rhine demonstrating "how [he] would intend to calculate [a lost profit estimate] if—based on if we got the complete information." He explained, "I have not been provided with the detailed sales information for DFW Propane, and that—I believe that information is going to be more determinative of what DFW Propane has actually done and that would be more indicative of the lost profits that Metro Lift would have incurred relative to the matters at issue in this lawsuit." Rambin testified that he

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   7

got the detailed sales information by customer, by transaction, for—I believe going back to sometime in 2005 to essentially the present and analyzed that information on a customer-by-customer basis, including the cost of sales, and analyzed persistency of customer relationships, the profitability of customer relationships, the volume of customer relationships.

The trial court overruled Rhine's objections. Right before trial, Rambin submitted revised calculations that included the "discount" rate. Rhine objected again, and the trial court overruled Rhine's objection again, stating, "If the only difference between his opinion as of before 30 days prior to trial and the supplement ... is discount, I anticipate that that will probably be an area of cross-examination or rebuttal." On rehearing, Rhine objects to Rambin's testimony on the grounds that (1) Rambin's opinions were projections and not based on hard facts; (2) Rambin could not verify which customers actually moved their business to DFW Propane; and (3) Rambin "did not know the cost of propane in 2011, 2012, and 2013 or what Heritage's margins would be in the future."

 **\*10** Rambin's methodology of using Metro Lift's historical sales data before and after DFW Propane's entry into the market and then projecting Heritage's lost future profits is an acceptable method for calculating lost profits. *See Swinnea,* 318 S.W.3d at 877 ("Contrasting revenue from a time period immediately before the period at issue is an established method of proving revenue for a lost profit damages calculation."); *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 505 (Tex.2001) (noting that damages can be shown with reasonable certainty by a profit history or some other objective data such as future contracts); *White v. Sw. Bell Telephone Co.,* 651 S.W.2d 260, 262 (Tex.1983) (noting that pre-existing profits are admissible to show projected lost profits with reasonable certainty). That Rambin, when he testified on October 22, 2010, could not foretell the cost of propane in 2011, 2012, or 2013 does not mean that his calculations are unreliable. Rambin used competent, historical data to compute past trends and to make estimations about future sales. This is more than mere speculation. *See*

*Helena Chem. Co.,* 47 S.W.3d at 506 (holding that evidence of past net profits coupled with facts and circumstances of future costs was sufficient to support award of estimated future profits). It is true that Rambin's calculations included customers that Heritage believed it lost because of Kendall L. Rhine's breach of the noncompete but, in fact, had not lost because of the breach. "Weaknesses of the facts, however, in support of an expert's opinion go to the weight of his testimony not its admissibility." *Tenngasco Gas Gathering Co. v. Bates,* 645 S.W.2d 496, 498 (Tex.App.-Corpus Christi 1982, writ ref'd n.r.e.) (holding that trial court did not err in admitting expert testimony on value of property when expert based his opinion on the value of other, arguably similar property). On cross-examination, Rhine properly challenged whether the customers in question left Heritage because of Rhine's breach of the noncompete. *See Swinnea,* 318 S.W.3d at 878 (noting that the defendant bears the burden of proving that "an otherwise complete lost profits calculation is in fact missing relevant credits"). Thus, we cannot say the trial court abused its discretion in admitting Rambin's expert testimony. We overrule Rhine's cross issue. Because we have sustained Heritage's third issue as to factual insufficiency, we do not need to address Heritage's fourth issue (regarding nominal damages) or fifth issue (regarding the exclusion of evidence). *See* Tex.R.App. P. 47.1; *see also MBM Fin. Corp. v. Woodlands Operating Co.,* 292 S.W.3d 660, 665 (Tex.2009) ("[N]ominal damages are not for compensation; they are for cases in which there are no damages, or none that could ever be proved.").

## Conclusion

Having sustained Heritage's first issue and part of its third issue, and having declined to reach its fourth and fifth issues, we reverse the trial court's judgment as to the reasonableness of the noncompete and as to damages. Our resolution does not disturb the jury's findings on liability. However, we are required to remand this proceeding for a new trial on liability and damages. *See* Tex.R.App. P. 44.1(b) (prohibiting a separate trial solely on unliquidated damages when liability is contested); *see also Estrada v. Dillon,* 44 S.W.3d 558, 562 (Tex.2001) (stating party's failure to present on appeal an additional discrete challenge to liability when party challenges damages does not defeat plain language of rule 44.1(b)). We therefore reverse the trial court's judgment and remand for a new trial.

WCAS063

**All Citations**

Not Reported in S.W.3d, 2012 WL 2344864

## Footnotes

1     *See* Tex.R.App. P. 47.4.

2     Kendall T. and Anthony Rhine, as managers of Metro Lift locations, had also signed noncompetes in conjunction with the Metro Lift sale. Kendall T. had been restricted from North Carolina for five years, and Anthony was restricted from Texas for five years. Janice Rhine did not have a noncompete.

3     The jury also found that Anthony did not violate his noncompete and that no defendant misappropriated trade secrets. Heritage does not challenge these findings on appeal.

4     The locations were Charlotte and Mooresville, North Carolina; Dallas and Grand Prairie, Texas; Houston, Texas; Louisville, Kentucky; Nashville, Tennessee; Epping, New Hampshire; Boston and Taunton, Massachusetts; New Orleans, Louisiana; St. Louis, Missouri; and Greensboro, North Carolina.

5     In his motion for rehearing and motion for reconsideration en banc, Kendall L. Rhine claims that the trial court "also reformed the agreement so as to specifically limit the scope of activity being restricted therein." But, as Rhine notes, the trial court's judgment states

> The Court ... finds that the limitations set forth in the Non–Competition Agreement between [Heritage] and [Kendall L. Rhine] is unreasonable as to time and scope of activity and is greater than would be necessary to protect the goodwill and business interests of [Heritage]. [The] Non–Competition Agreement is reformed by reducing the period of limitation to five (5) years. The Court further finds that the scope of activity in Section 1(e) of the Non–Competition Agreement is partially ambiguous and should be construed to include the language "engages in the propane cylinder exchange business" so that it reads as follows:
>
> (e) Provide to, arrange for, guarantee funds, or arrange for product supply or customer tank or cylinder purchases to any person who engages *in the propane cylinder exchange business* in the Restricted Area.

> The judgment clearly states that the only reformation made was to the time period. The trial court construed the scope of activity to include language that was unintentionally omitted from one of the six prohibited activities, but was identical to language in all of the other noncompete agreements. This change did not reduce the scope of activity.

6     It would seem that if the noncompete were unenforceable, then the price paid for the unenforceable promise would also be unenforceable. *See Sheline v. Dun & Bradstreet Corp.,* 948 F.2d 174, 177 (5th Cir.1991) ("The covenant not to compete and the severance compensation clause were mutually dependent promises, and as such, the unenforceability of one necessarily rendered the other unenforceable.").

7     In his motion for rehearing and motion for reconsideration en banc, Kendall L. Rhine argues that by so holding, this court "has chosen to essentially act as 'jury number two' and substitute [our] judgment for that of the jury." Rhine assumes that the jury failed to award damages because it did not find Heritage's witnesses' testimony credible and that no evidence presented at trial establishes a causal link between Rhine's breach and Heritage's lost profits. Taking Rhine's assumption as true that the jury awarded zero damages because

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.     9

Heritage did not demonstrate causation, the testimony of Rhine's own witnesses who stated that they left Metro Lift for DFW Propane and Rambin's testimony that Metro Lift would have made a certain profit from those customers is evidence that DFW Propane caused Metro Lift to lose profits.

---

**End of Document** <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

WCAS065

KeyCite Yellow Flag - Negative Treatment

Distinguished by Manti Holdings, LLC v. The Carlyle Group Inc., Del.Ch., June 2, 2023

292 A.3d 178

Court of Chancery of Delaware.

HYDE PARK VENTURE PARTNERS

FUND III, L.P. and Hyde Park Venture

Partners Fund III Affiliates, L.P., Petitioners,

v.

FAIRXCHANGE, LLC, a Delaware limited liability

company, as successor in liability to FairXchange,

Inc., a Delaware Corporation, Respondents.

C.A. No. 2022-0344-JTL

|

Date Submitted: February 14, 2023

|

Date Decided: March 9, 2023

**Synopsis**

**Background:** Investment funds, which had invested in corporation and which were managed by corporation's former director, filed share appraisal proceeding after corporation, which operated futures exchange, was acquired in merger. Funds moved to compel discovery, and post-merger entity cross-moved for order compelling funds to destroy material allegedly subject to attorney-client privilege.

**Holdings:** The Court of Chancery, J. Travis Laster, Vice Chancellor, held that:

[1] during his tenure, former director was joint client of corporation's counsel, for purpose of attorney-client privilege;

[2] during same period, funds were within circle of confidentiality with directors and corporation, for purpose of privilege;

[3] statute governing interests of constituent company upon merger did not permit corporation to invoke privilege against former director's firms;

[4] statute allowing current directors to access corporate books and records did not preclude funds' motion; and

[5] funds did not waive right to discovery of otherwise-privileged materials by failing to contest corporation's position immediately.

Motion granted; cross-motion denied.

**Procedural Posture(s):** Motion to Compel Discovery; Other.

West Headnotes (30)

**[1]** **Privileged Communications and Confidentiality** 🔑 Presumptions and burden of proof

The burden of proving that the attorney-client privilege applies to a particular communication is on the party asserting the privilege. Rule of Evidence 502(b).

**[2]** **Corporations and Business Organizations** 🔑 Authority of directors

**Privileged Communications and Confidentiality** 🔑 Miscellaneous privileges; particular cases

A corporate director's right to information is essentially unfettered in nature, and that right includes access to privileged material.

**[3]** **Corporations and Business Organizations** 🔑 Authority of directors

Directors of Delaware corporations are generally entitled to share in legal advice the corporation receives; the rationale for this rule is that all directors are responsible for the proper management of the corporation and thus a director should be treated as a "joint client," not in his or her individual capacity, but as a member of the collective body, when legal advice is rendered to the corporation through one of its officers or directors.

1 Case that cites this headnote

WCAS066

**[4]**   **Privileged Communications and Confidentiality** 👈 Corporations, partnerships, associations, and other entities

Because a corporation has no expectation of confidentiality as to a director, the general rule is that a corporation cannot assert the attorney-client privilege to deny a director access to legal advice furnished to the board during the director's tenure.

1 Case that cites this headnote

**[5]**   **Privileged Communications and Confidentiality** 👈 Corporations, partnerships, associations, and other entities

The fact that corporate directors function as joint clients with each other and the corporation means that the expectation of confidentiality that is essential to invoking the attorney-client privilege does not exist among the joint clients; on the matters of common interest upon which joint clients sought the attorney's assistance, none can have a reasonable expectation of confidentiality relative to the other clients for his communications with the shared attorney. Del. R. Evid. 502(d)(6).

**[6]**   **Privileged Communications and Confidentiality** 👈 Corporations, partnerships, associations, and other entities

During their tenure, all corporate directors sit with the corporation inside the circle of confidentiality, and the corporation therefore cannot invoke the attorney-client privilege against any of the directors; when a director's tenure ends, the director leaves the circle of confidentiality for purposes of any subsequent communications, but that does not retroactively alter the fact that the director was within the circle of confidentiality for purposes of communications during his tenure. Del. R. Evid. 502(d)(6).

**[7]**   **Privileged Communications and Confidentiality** 👈 Corporations, partnerships, associations, and other entities

For materials prepared during a corporate director's term, the corporation has no expectation of confidentiality from the director and cannot assert the attorney-client privilege against the director. Del. R. Evid. 502(d)(6).

**[8]**   **Privileged Communications and Confidentiality** 👈 Corporations, partnerships, associations, and other entities

During his tenure on board, former member of board of corporation's board of directors was within circle of confidentiality with corporation, other directors, and corporation's law firm, as necessary for "joint client" doctrine to permit disclosure of attorney-client privileged materials created during member's directorship, in subsequent share appraisal proceeding brought by investment funds managed by former member; law firm expressly told former member he was joint client of firm together with corporation, there was no prior confidentiality agreement between directors, board did not form transaction committee excluding former member, and former member was not on notice his interests were adverse to any topic. Del. R. Evid. 502.

More cases on this issue

**[9]**   **Privileged Communications and Confidentiality** 👈 Corporations, partnerships, associations, and other entities

Investment funds which invested in corporation and which were managed by then-member of corporation's board of directors were within circle of confidentiality with member, other directors, and corporation with respect to attorney-client communications, and, thus, in funds' share appraisal action against corporation's post-merger successor, attorney-client privilege did not preclude funds' motion to compel discovery of information provided to other directors during member's tenure on board; as joint client with corporation and

WCAS067

other directors, member, who had served on board as funds' representative, had right to obtain and share information with funds, and member, having only one brain, necessarily shared information in light of his dual roles as director and fund manager. Del. R. Evid. 502(d)(6).

1 Case that cites this headnote
More cases on this issue

[10] **Privileged Communications and Confidentiality** 🔑 Common interest doctrine; joint clients or joint defense

When former joint clients of an attorney sue one another, the default rule is that all communications made in the course of the joint representation are discoverable, as against an assertion of the attorney-client privilege. Del. R. Evid. 502(d)(6).

[11] **Privileged Communications and Confidentiality** 🔑 Common interest doctrine; joint clients or joint defense

Where an attorney jointly represents two clients who later become adversarial parties in litigation, one party cannot assert attorney-client privilege to avoid disclosure of communications which were made during the joint representation. Del. R. Evid. 502(d)(6).

[12] **Corporations and Business Organizations** 🔑 Succession to rights of original corporations

**Privileged Communications and Confidentiality** 🔑 Persons entitled to assert privilege in general

Because any privilege that a constituent company held before a merger passes to the company surviving the merger as a matter of statute, parties must contract for a different outcome. Del. Code § 259(a).

[13] **Corporations and Business Organizations** 🔑 Succession to rights of original corporations

**Privileged Communications and Confidentiality** 🔑 Persons entitled to assert privilege in general

Absent an express carve-out, a constituent company's privilege over all pre-merger communications, including those relating to the negotiation of the merger itself, passes to the surviving corporation in the merger, by plain operation of the statute governing the effect of a merger on a constituent company's property, rights, privileges, and other interests. Del. Code § 259.

[14] **Corporations and Business Organizations** 🔑 Succession to rights of original corporations

**Privileged Communications and Confidentiality** 🔑 Persons entitled to assert privilege

Statute providing that, by default, privileges and other interests held by a constituent company before a merger would pass to the surviving company after the merger did not create any expanded rights or interests beyond those possessed by constituent company, and, thus, did not allow post-merger entity to invoke attorney-client privilege as basis for withholding discovery, in investment funds' action against entity for share appraisal, of documents that funds were entitled to access at time they were created, where funds' manager was constituent corporation's director at time documents were created, such that funds, manager, and corporation were all within circle of confidentiality with respect to attorney-client communications. Del. Code § 259; Del. R. Evid. 502(d)(6).

More cases on this issue

[15] **Corporations and Business Organizations** 🔑 Right to inspect

WCAS068

**Privileged Communications and Confidentiality** 🔑 Subject Matter; Particular Cases

Statute allowing corporate directors, but not former directors, to access corporate books and records for directorship-related purposes was distinct from general civil discovery procedures, and, thus, fact that manager of investment funds was no longer director of corporation in which funds had invested did not preclude funds, in their share appraisal action against corporation's post-merger successor, from obtaining discovery of attorney-client privileged materials created when manager held such privilege as director of corporation; firms did not bring action to inspect books and records for directorship-related reasons, but, rather, sought discovery in furtherance of substantive claims, such that normal rules of discovery and privilege applied and statute did not. 8 Del. Code § 220(d); Del. R. Evid. 502(d)(6); Del. Ch. Ct. R. 26.

1 Case that cites this headnote
More cases on this issue

**[16]** **Pretrial Procedure** 🔑 Discretion of court

**Privileged Communications and Confidentiality** 🔑 Determination

Discovery rulings, including rulings about privilege, require discretionary determinations based on the facts of the case.

**[17]** **Privileged Communications and Confidentiality** 🔑 Corporations, partnerships, associations, and other entities

The joint client approach to determining whether a corporate director is a holder of the attorney-client privilege with respect to a communication looks at the facts and circumstances that existed when the privileged communication was made; if adversity of interests did not exist between the director and the corporation, then the director is treated as a joint client of the corporation's counsel who was within the circle of confidentiality, such that the attorney-client privilege has no purchase. Del. R. Evid. 502(d)(6).

**[18]** **Privileged Communications and Confidentiality** 🔑 Relation of Attorney and Client

As a general principle, the existence of the attorney-client privilege is determined as of the time the communication is made, not at the time when discovery of the communication is sought. Del. R. Evid. 502.

**[19]** **Pretrial Procedure** 🔑 Relevancy and materiality

**Privileged Communications and Confidentiality** 🔑 Privileged Communications and Confidentiality

A party can obtain relevant discovery in a civil case unless a valid claim of privilege exists.

**[20]** **Privileged Communications and Confidentiality** 🔑 Corporations, partnerships, associations, and other entities

In the analysis of whether the attorney-client privilege precludes disclosure to a corporate director of communications with the corporation's counsel, the director starts within the circle of confidentiality as a joint client; the corporation resisting production must show that a situation existed sufficient to cut off joint-client status and place the director outside the circle of confidentiality, such as sufficient adversity to have put the director on notice so that the director knew or should have known that he could not rely on company counsel. Del. R. Evid. 502.

**[21]** **Corporations and Business Organizations** 🔑 Acting within scope of employment or authority

Directors, in the ordinary course of their service as directors, do not act as agents of the corporation.

WCAS069

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   4

**[22]** **Corporations and Business Organizations** 🔑 Fiduciary Duties as to Management of Corporate Affairs in General

**Corporations and Business Organizations** 🔑 Application of Principle of Agency to Corporations

A board of directors, in fulfilling its fiduciary duty, controls the corporation, not vice versa; it would be an analytical anomaly, therefore, to treat corporate directors as agents of the corporation when they are acting as fiduciaries of the stockholders in managing the business and affairs of the corporation.

**[23]** **Attorneys and Legal Services** 🔑 Persons entitled to assert or benefit from relationship

The fact that the board of directors governs the corporation and comprises multiple individuals means that to the extent there is a corporation that can be a client of corporate counsel, the board of directors is the decisionmaker for the client. 8 Del. Code § 141(a).

**[24]** **Privileged Communications and Confidentiality** 🔑 Corporations, partnerships, associations, and other entities

Because the members of a corporation's board of directors jointly comprise the corporation and the client of corporate counsel, it follows that the joint client rule, which recognizes that corporate counsel represents the corporation and the directors jointly, should apply when determining whether a corporation can invoke the attorney-client privilege against one of the members of the board. 8 Del. Code § 141(a); Del. R. Evid. 502.

**[25]** **Privileged Communications and Confidentiality** 🔑 Corporations, partnerships, associations, and other entities

For purposes of the attorney-client privilege, the individuals comprising a corporation's board of directors jointly constitute corporate counsel's client and are within the circle of confidentiality, unless the corporation follows one of the three methods for excluding a director from the circle. Del. R. Evid. 502.

**[26]** **Privileged Communications and Confidentiality** 🔑 Corporations, partnerships, associations, and other entities

The joint client rule, under which a corporation's directors and the corporation itself are joint clients of corporate counsel, only renders the attorney-client privilege unavailable as to the joint client; the privilege remains intact for parties outside the circle of confidentiality. Del. R. Evid. 502.

**[27]** **Privileged Communications and Confidentiality** 🔑 Corporations, partnerships, associations, and other entities

The joint client approach to the attorney-client privilege, under which a corporation and its directors are joint clients of corporate counsel, guarantees that a current director cannot secretly be excluded from discussions or denied access to materials, and it ensures a former director is not treated like a banished outsider, but rather as someone who previously held an important role and was inside the circle of confidentiality. Del. R. Evid. 502.

**[28]** **Privileged Communications and Confidentiality** 🔑 Corporations, partnerships, associations, and other entities

Unlike the entity approach to the attorney-client privilege in the context of the representation of corporations, which inverts the power structure by putting corporate directors in the subservient role as agents of the corporation, thus enabling lawyers to assert the dominant role as the representative of the organization, the joint client approach, under which the directors and the corporation are joint clients of corporate counsel, prevents lawyers from claiming the authority to tell directors what to do. Del. R. Evid. 502.

WCAS070

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 5

**[29]** **Attorneys and Legal Services** 👈 Nature of Client

**Corporations and Business Organizations** 👈 Fiduciary Duties as to Management of Corporate Affairs in General

Lawyers can and should give advice when representing a corporation, can and should tell corporate directors if they believe a course of action could result in a breach of fiduciary duty, and can and should explain the potential consequences to the corporation, but lawyers should not be giving orders to directors; if a director determines that fiduciary principles mandate a particular course of action, then the director has a duty to act.

**[30]** **Privileged Communications and Confidentiality** 👈 Waiver of privilege

**Privileged Communications and Confidentiality** 👈 Objections; claim of privilege

In investment funds' action for appraisal of shares, failure of funds and their manager, who was former director of corporation, to immediately challenge corporation's assertion of attorney-client privilege after corporation produced redacted minutes for meeting manager had attended did not, under laches-like principles, constitute waiver of funds' right to obtain communications for which manager held attorney-client privilege as former joint client of corporation's counsel; discovery rules did not require immediate challenges to positions taken in discovery, funds timely moved to compel discovery of communications, discovery was ongoing, and corporation's reliance on argument that ran counter to Delaware's joint client doctrine was not sort of prejudice that supported waiver. Del. R. Evid. 502.

More cases on this issue

**Attorneys and Law Firms**

**\*183** A. Thompson Bayliss, Daniel J. McBride, Anthony R. Sarna, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Attorneys for Funds Hyde Park Venture Partners Fund III, L.P. and Hyde Park Venture Partners Fund III Affiliates, L.P.

Paul J. Lockwood, Jenness E. Parker, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Patricia L. Enerio, Jamie L. Brown, Aaron M. Nelson, Elizabeth A. DeFelice, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Stephen J. Senderowitz, DENTONS, Chicago, Illinois; Douglas W. Henkin, DENTONS, New York, New York; Attorneys for Respondent FairXchange, LLC.

**MEMORANDUM OPINION**
**GRANTING MOTION TO COMPEL**

LASTER, V.C.

While Ira Weiss was serving as a director of FairXchange, Inc. ("FairX" or the "Company"), Coinbase Global, Inc. made an acquisition proposal. Weiss wanted to retain an investment banker and explore alternatives. The other two members of the Company's board of directors (the "Board") wanted to pursue a transaction with Coinbase. They began excluding Weiss from the deal process, and they later arranged for a group of preferred stockholders to remove him from the Board.

Weiss was a partner in a venture capital firm. Two investment funds sponsored by the firm had made significant investments in the Company. While serving as a director, Weiss also managed the funds. He could not avoid sharing information about the Company with the funds, because Weiss (like all humans) has only one brain. Humans cannot partition their brains so that they only use particular knowledge for particular purposes. Weiss drew on a unitary store of knowledge when carrying out his dual roles as corporate director and fund manager.

After the Coinbase transaction closed, the funds filed this appraisal proceeding. During discovery, the Company asserted the attorney-client privilege to withhold information created during Weiss's tenure as a director. The funds have moved to compel production of the information.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 6

The issue presented by the motion is not whether Weiss has the ability to access materials in his capacity as a former director. **\*184**  That issue is immaterial in the context of this litigation, because the funds have the ability to access materials through the discovery process. The question instead is whether the Company can invoke the attorney-client privilege against the funds to withhold documents that they otherwise would be required to produce. Whether the Company can assert privilege depends on whether the Company had a reasonable expectation of confidentiality as to Weiss and the funds during Weiss's tenure as a director.

Since 1987, Delaware law has treated the corporation and the members of its board of directors as joint clients for purposes of privileged material created during a director's tenure. Joint clients have no expectation of confidentiality as to each other, and one joint client cannot assert privilege against another for purposes of communications made during the period of joint representation. Under this longstanding precedent, a Delaware corporation cannot invoke privilege against the director to withhold information generated during the director's tenure. All of the joint clients were within the circle of confidentiality when the privileged communications were made, so there is no privilege to invoke.

Since 1992, Delaware law has recognized that when a director represents an investor, there is an implicit expectation that the director can share information with the investor. Many investors appoint director representatives to monitor corporate performance—think of controlling stockholders, venture capital firms, and private equity firms—and information sharing is part of that process. Information sharing necessarily happens when a director representative serves dual roles because, to reiterate, a human has only one brain. Of course, director representatives use and share information at their own risk, and they can be liable for breach of fiduciary duty if they use the information or permit it to be used for an improper purpose. The bottom line for the attorney-client privilege is that under the joint client approach, the investor presumptively joins the director within the circle of confidentiality, and the corporation cannot invoke the privilege against the investor for materials created during the director's tenure.

Three recognized methods exist by which a corporation can alter these default rules. First, as frequently happens, the parties can address the matter by contract, such as through a confidentiality agreement. Second, the board of directors can form a committee that excludes the director, at which point the committee can retain and consult confidentially with counsel. Third, once a sufficient adversity of interests has arisen and becomes known to the director, the director cannot reasonably rely on corporate counsel as to the matters where the interests of the director and corporation are adverse. At that point, the corporation can assert the attorney-client privilege as to the director. If a corporation believes that a sufficient adversity of interests exists, the corporation can put the director on notice of that fact, enabling the director to retain his own counsel and, if he wishes, call the question of information access through litigation.

In this case, the Company did not take any of the steps necessary to preserve the privilege. Weiss and the funds were inside the circle of confidentiality during his tenure as a director. Without the expectation of confidentiality on which the attorney-client privilege depends, the Company has no basis for asserting the privilege against the funds in this action. Their motion to compel is granted.

## I. FACTUAL BACKGROUND

The facts are drawn from the parties' submissions in connection with the motion **\*185**  to compel. [1]  Given the procedural posture, this decision does not make formal findings of fact. Instead, the following summary reflects how the record appears at this stage of the proceedings for purposes of the discovery ruling.

### A. The Company
The Company was a Delaware corporation that operated a futures exchange. The Company's founders included Neal Brady and Clifford Lewis. Brady served as CEO, and Lewis served as Chairman of the Board.

The Company issued preferred stock to a group of investors. Two of the investors were Hyde Park Venture Partners Fund III, L.P. and Hyde Park Venture Partners Fund III Affiliates, L.P. (the "Funds"). Both are sponsored by Hyde Park Venture Partners, an early-stage venture capital firm that invests in high-growth technology startups. Together, the Funds owned approximately 15% of the Company's equity.

### B. The Preferred Stock Director
The preferred stockholders held the right to designate a member of the Board. They selected Weiss, who was a partner

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

with Hyde Park Venture Partners. Weiss joined the Board on November 14, 2019. The other two members were Brady and Lewis.

As a director, Weiss received privileged communications from DLA Piper LLP, the Company's counsel. DLA Piper also provided advice to Company management that Weiss did not receive contemporaneously.

## C. The Coinbase Transaction

Beginning in the summer of 2021, the Company explored an investment from Coinbase. After conducting due diligence, Coinbase proposed an acquisition rather than an investment (the "Potential Transaction").

By letter dated October 28, 2021, Coinbase provided the Company with a letter of intent. Brady discussed the Potential Transaction with Coinbase that same day.

The following day, Coinbase sent the Company a revised letter of intent which increased the overall purchase price from $285 million to $330 million and increased the amount of cash consideration from $50 million to $65 million. The revised letter of intent also increased the portion of total consideration paid to key employees at closing from 25% to 35%, while lowering the portion of consideration paid to key employees one year after closing from 25% to 15%. The new letter of intent thus improved the aggregate consideration, while also benefitting the employees.

By email dated November 4, 2021, Weiss wrote to his fellow directors and DLA Piper with his "thoughts on a possible sales process." Dkt. 43 Ex. B at '546.

> As we know, FairX received a surprise unsolicited offer from Coinbase on October 29th (Friday night). This surprise offer is an incredible validation of the model for FairX, and all the amazing work that has been put in by the team to build FairX from scratch. I have never been involved in any other company that has executed as flawlessly as this one, and FairX has consistently exceeded my wildest expectations.
>
> **\*186** While we should be flattered by this surprise offer, I believe we have to take a step back and make sure that (1) selling now would maximize shareholder value, and (2) if we do sell now, that we are getting a market price for the company.

> We are all fiduciaries on the board, and while we might view the same information differently, we all are tasked with maximizing value. I am not yet comfortable that the current process is maximizing shareholder value, and I would not vote in favor of this offer. We do not yet have a consensus at the board level for this acquisition, and we should strive to secure board consensus before involving other parties such as shareholders.

> FairX is currently well-capitalized with >$10M in the bank, so there is no need for us to rush into this offer.

*Id.* The email expressed concern about the timing of the deal (*e.g.*, "I think we should be particularly cautious about selling now because we have upcoming launches that could significantly enhance our value."), and whether the transaction price maximized value (*e.g.*, "If we choose to look for an acquirer now, we need to ensure there is an objective process that others can look at and know that we have taken the right steps to maximize shareholder value."). *Id.*

Weiss proposed that the Company retain an investment banker and continue to explore a financing round as an alternative. He explained that he wanted a better understanding of the Company's value. He recommended that an investment banker or other neutral party be present in any discussions between management and Coinbase that might touch on management incentives. He also identified other potential acquirers that the Company could consider approaching. *See id.* at '547.

On November 8, 2021, the Board met to consider the Potential Transaction. Weiss stated that he would not vote in favor of it and would advise the Funds to do the same. He explained that he opposed moving forward with Coinbase because he (i) wanted the Company to conduct a market check and (ii) was concerned about the amount of Coinbase equity in the deal. *Id.* at '535. He reiterated his recommendation that the Company retain an investment banker. The Board rejected Weiss's proposal.

During the back and forth over the Coinbase proposal, DLA Piper made clear to Weiss that the firm represented him as a director. The lead DLA Piper attorney wrote in an email, "As I have now repeatedly told you, I'm happy to talk with you, but at this point, not with Hyde Park's outside counsel and you. I represent the board and shareholders of FairX, which includes your firm and you as a board member." Dkt. 75 Ex. N.

WCAS073

**D. Weiss Sends A Demand Letter.**

During the balance of November 2021, the Company and Coinbase worked on the Potential Transaction. Weiss contends that he was excluded from large portions of those discussions.

By letter dated December 7, 2021, Weiss formally asked for information about the Potential Transaction in his capacity as a director. *See* Dkt. 34 Ex. D. Among other items, he requested:

- All documents reflecting the negotiations between the Company and Coinbase.

- All documents reflecting the prospective employment, consulting, or other arrangements between the Company's current officers and directors and any Coinbase representatives.

- All documents relating to any unique benefit that any of the Company's current officers and directors would receive **\*187** as a result of the Potential Transaction.

- All documents related to the Company or Board's consideration of hiring an investment banker or financial advisor to assist the Company or Board in connection with the Potential Transaction.

- All documents reflecting any evaluation or consideration of any merger, sale, or asset disposition involving the Company since January 1, 2021.

- All documents reflecting any valuation of the Company's capital stock since January 1, 2021.

- All documents relating to any proposed debt or equity financing transaction since January 1, 2021.

- All projections or forecasts, including drafts, prepared by members of the Company's management since January 1, 2021, irrespective of whether they were submitted to the Board.

*Id.*

Brady and Lewis knew that Coinbase wanted the Board to provide a unanimous recommendation in favor of the sale of the Company. They viewed Weiss as a problem, and they had been working with a group of preferred stockholders to remove Weiss. On December 8, 2021, one day after Weiss sent his demand letter, holders of a majority of the Company's preferred stock acted by written consent to remove Weiss from the Board. *See* Dkt. 43 Ex. F. The Company informed Weiss that his books and records request was "no longer relevant" because he was no longer a director. Dkt. 43 Ex. H.

**E. The Merger Closes.**

On January 11, 2022, the Board unanimously approved a merger between the Company and Coinbase (the "Merger"). The Company subsequently sent the Funds a package of documents that included a Confidential Information Statement, a Notice of Action by Written Consent Without a Meeting Pursuant to Section 228 of the Delaware General Corporation Law (the "DGCL"), and a Notice of Statutory Appraisal Rights Under Section 262 of the DGCL, all dated as of January 25, 2022.

The Merger closed on February 1, 2022. The Company merged with a limited liability company wholly owned by Coinbase. The latter emerged from the Merger as the surviving company.

**F. The Appraisal Proceeding And The Discovery Dispute**

On February 3, 2022, the Funds demanded an appraisal of their shares. The Funds subsequently commenced this appraisal proceeding.

In discovery, the Company asserted the attorney-client privilege for materials prepared during Weiss's tenure as a director. DLA Piper echoed the Company's objections. The Company and DLA Piper refused to produce the materials.

The Company also went on offense. Believing that the Funds possessed privileged material that they had received from Weiss during his tenure, the Company instructed the Funds to destroy the information.

After efforts to resolve the dispute failed, the Funds filed a motion to compel. The Company filed an opposition and a cross-motion to compel the Funds to destroy any privileged material that they possess.

## II. LEGAL ANALYSIS

Court of Chancery Rule 26(b) governs the scope of discovery. Under Rule 26(b)(1):

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Parties may obtain discovery regarding any non-privileged matter that is relevant **\*188** to any party's claim or defense and proportional to the needs of the case, including the existence, description, nature, custody, condition and location of any documents, electronically stored information, or tangible things and the identity and location of persons having knowledge of any discoverable matter.

No one disputes that the Funds seek relevant information. The Company argues that it can withhold the information because discovery only extends to "non-privileged matter."

 **[1]**   Delaware has codified the attorney-client privilege. Rule of Evidence 502(b) provides as follows:

A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

D.R.E. 502(b). "Paraphrasing the language of D.R.E. 502(b), the privilege extends to a (1) communication, (2) which is confidential, (3) which was made for the purpose of

facilitating the rendition of professional legal services to the client, (4) between the client and it's attorney." *Deutsch v. Cogan*, 580 A.2d 100, 104 (Del. Ch. 1990) (cleaned up). "The burden of proving that the privilege applies to a particular communication is on the party asserting the privilege." *Moyer v. Moyer*, 602 A.2d 68, 72 (Del. 1992). The current dispute turns on the element of confidentiality.

**A. Delaware's Longstanding Approach: The Joint Client Rule**

 **[2]**     **[3]**   A director's ability to access corporate information affects whether a corporation can claim that a communication was confidential as to the director and thereby invoke the attorney-client privilege. A director's right to information is "essentially unfettered in nature," and that right includes access to privileged material.[2] "Directors of Delaware corporations are generally entitled to share in legal advice the corporation receives." *In re WeWork Litig.*, 250 A.3d 901, 908 (Del. Ch. 2020). The rationale for this rule is that "all directors are responsible for the proper management of the corporation, and thus, should be treated as a 'joint client'—'not in his or her individual capacity, but as a member of the collective body'—when legal advice is rendered to the corporation through one of its officers or directors." 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 7.02[d], 7-46 (2d ed. 2021) (footnote omitted); *accord Moore Bus. Forms, Inc. v. Cordant Hldgs. Corp.*, 1996 WL 307444, at \*4 & n.4 (Del. Ch. June 4, 1996) (explaining joint client principle); *Kirby v. Kirby*, 1987 WL 14862, at \*7 (Del. Ch. July 29, 1987) (same).

 **\*189**   **[4]**   Because the corporation has no expectation of confidentiality as to a director, the general rule is that "a corporation cannot assert the privilege to deny a director access to legal advice furnished to the board during the director's tenure." *Moore Bus. Forms*, 1996 WL 307444, at \*4; *see id.* at \*6 ("Mr. Rogers was a member of that board, having the same status as the other directors. No basis exists to assert the privilege against him ....").

 **[5]**   The fact that directors function as joint clients with each other and the corporation means that the expectation of confidentiality that is essential to invoking the privilege does not exist among the joint clients. "On the matters of common interest upon which [joint clients] sought the attorney's assistance, none can have a reasonable expectation of confidentiality relative to the other clients for his communications with the shared attorney ...." 1 Paul R.

WCAS075

Rice, *Attorney-Client Privilege In The United States* § 4:33, Westlaw (database updated Dec. 2022). The Delaware Rules of Evidence address this point expressly by stating that "there is no privilege ... [a]s to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients." D.R.E. 502(d)(6). Rule 502 defines the "client" for purposes of the rule as "without limitation, officers, *directors*, and employees of (a) any business entity that is organized under the laws of this State, and (b) any business entity organized under the laws of any nation other than the United States that owns or controls a business entity that is organized under the laws of this State." D.R.E. 502(a) (1) (emphasis added).

 [6]    [7]   When a joint client relationship terminates, the absence of confidentiality that is essential to the privilege does not change. During their tenure, all directors sit with the corporation inside the circle of confidentiality, and the corporation therefore cannot invoke the attorney-client privilege against any of the directors. When a director's tenure ends, the director leaves the circle of confidentiality for purposes of any subsequent communications, but that does not retroactively alter the fact that the director was within the circle of confidentiality for purposes of communications during his tenure. For materials prepared during the director's term, the corporation has no expectation of confidentiality and cannot assert the privilege against the director.

### 1. *Kirby*

The joint client approach is nothing new. Justice Berger, then a Vice Chancellor, adopted the approach nearly forty years ago in *Kirby v. Kirby*, 1987 WL 14862 (Del. Ch. July 29, 1987). There, four siblings served as directors of a closely held, nonstock corporation. One of the four siblings was named sole member of the corporation after their father's death. Thirteen years later, three of the siblings learned that the sole member had named his wife and children as additional members of the corporation. The three siblings acted at the board level to amend the bylaws to provide that only directors could be members. The member-sibling responded at the member level by removing the other siblings from the board. The three siblings filed an action under Section 225 of the DGCL in which they asked this court to determine that they remained directors of the corporation.

During discovery, the removed directors sought the production of documents generated before their removal that

the corporation had withheld on the basis of the attorney-client privilege. Although the former **\*190** directors challenged the validity of their removal, Justice Berger analyzed the question as if the directors had been removed. She granted the motion on the grounds that the removed directors were joint clients with the corporation and their sibling director for purposes of privileged material created during their tenure, reasoning as follows:

> As to those documents prepared prior to [the plaintiffs' removal], I am not persuaded that the attorney-client privilege may be invoked against plaintiffs. The issue is not whether the documents are privileged or whether plaintiffs have shown sufficient cause to override the privilege. Rather, the issue is whether the directors, collectively, were the client at the time the legal advice was given. Defendants offer no basis on which to find otherwise, and I am aware of none. The directors are all responsible for the proper management of the corporation, and it seems consistent with their joint obligations that they be treated as the "joint client" when legal advice is rendered to the corporation through one of its officers or directors.

*Id.* at \*7. Because the directors were joint clients, the corporation had no expectation of confidentiality as to the removed directors and could not invoke the attorney-client privilege to withhold documents created during their tenure. *Id.*

### 2. *AOC Limited Partnership*

The next significant decision in Delaware's application of the joint client approach came approximately five years later when then-Vice Chancellor Chandler issued his decision in *AOC Limited Partnership v. Horsham Corp.*, 1992 WL 97220 (Del. Ch. May 5, 1992). The corporation at the heart of the dispute was Clark Oil & Refining Corp., a wholly owned subsidiary of AOC Holdings, Inc. ("Holdings"). Two entities jointly owned Holdings: Horsham Corp., with a controlling 60% interest, and AOC Limited Partnership (the "AOC

WCAS076

Fund"), with the remaining 40%. Paul A. Novelly and Samuel R. Goldstein indirectly owned 100% of the AOC Fund, and Peter Munk held 83.1% voting control of Horsham. Novelly, Goldstein, Munk, and two unaffiliated individuals comprised the board of Clark Oil.

After the board discussed a potential initial public offering of Clark Oil's equity, the AOC Fund sued to enforce a stockholders agreement with Horsham and Holdings and also asserted a claim for breach of fiduciary duty against Horsham, Munk, and the two unaffiliated directors. Mayer Brown & Platt ("Mayer") had represented Clark Oil and the board, and during discovery, the AOC Fund sought production of purportedly privileged communications. The court held that the defendants could not invoke privilege to prevent the AOC Fund from accessing the purportedly privileged material:

> Clark Oil is a client of [Mayer]. Plaintiff [the AOC Fund], in effect, is a member of Clark Oil's board since its two constituents are members of its board. Therefore, plaintiff is just as much the "client" of Mayer as defendants are. Thus, they should have access to the same information to which the defendants have access with respect to legal advice given to Clark Oil.

*Id.* at *1. Put differently, Clark Oil had no expectation of confidentiality as to its directors, including Novelly and Goldstein. Because Novelly and Goldstein managed the AOC Fund, they necessarily shared information with the fund as human beings who could not partition their brains. Clark Oil therefore had no expectation of confidentiality as to the AOC Fund either, and the defendants could not invoke the attorney-client privilege to withhold advice provided to the Clark Oil board.

**\*191  3. *Moore Business Forms***

After another five years, the next landmark decision on the joint client approach arrived when Justice Jacobs, then serving as a Vice Chancellor, issued his decision in *Moore Business Forms, Inc. v. Cordant Holdings Corp.*, 1996 WL 307444 (Del. Ch. June 4, 1996). The plaintiff (Moore) had financed a management buyout that was implemented

through the defendant, Cordant Holdings Corp. ("Holdings"). Moore purchased shares of Holdings preferred stock, and Moore and Holdings entered into a stockholders agreement that gave Moore the right to designate a director on the Holdings board. After Moore rejected an offer from Holdings to repurchase its shares, the Holdings board began excluding Moore's designee from its deliberations about the repurchase. When litigation ensued, Moore sought to compel production of the materials that the other directors received. *Moore Bus. Forms*, 1996 WL 307444, at *4.

Relying on *Kirby*, Justice Jacobs held that Moore's designee was a joint client with his fellow directors and Holdings. Justice Jacobs explained that because directors are joint clients with the corporation, the corporation has no expectation of confidentiality as to the director designee and "cannot assert the [attorney-client] privilege to deny a director access to legal advice furnished to the board during the director's tenure." *Id.* at *4. Elaborating on *Kirby*'s rationale, Justice Jacobs explained that

> [a]lthough the *Kirby* Court described the directors as a "joint client," a more accurate description of the relationship is that there was a single "client," namely, the entire board, which includes all its members. That is, a director seeking information furnished to the board that is the subject of the privilege claim is a "client" not in his or her individual capacity, but as a member of the collective body (the board) of which the director is one member.

*Id.* at *4 n.4. That clarification does not change the fact that the corporation has no expectation of confidentiality as to the entire board, including all of its members. Justice Jacobs' reference to the "collective body (the board) of which the director is one member" explains *why* the directors are within the circle of confidentiality for purposes of the joint client rule.

Justice Jacobs next discussed two ways a corporation could create an expectation of confidentiality as to a director that would support an assertion of privilege. One way was through "an *ex ante* agreement among the contracting parties." *Id.* at

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    12

*5. Today, corporations commonly enter into confidentiality agreements to address the use of information, with particular emphasis on information sharing.

A second way to create the necessary expectation of confidentiality was for the board to act "pursuant to 8 Del. C. § 141(c) and openly with the knowledge of [the excluded director], to appoint a special committee." Id. at *6. Having done so, the committee is "free to retain separate legal counsel," and its communications with counsel are "properly protected" to the extent necessary for the committee's ongoing work. Id.

In Moore Business Forms, Holdings had not established an expectation of confidentiality using either method. Moore's designee was therefore within the circle of confidentiality as a joint client, and Holdings could not invoke the attorney-client privilege against him.

Finally, Justice Jacobs addressed whether it made any difference that the plaintiff in the lawsuit was Moore, the stockholder that had exercised a right to appoint the director designee, rather than the director **192** himself (Rogers). Justice Jacobs saw no distinction between the two:

> The relationship between Moore and Holdings is defined by the Stockholders' Agreement. Mr. Rogers' position as a Holdings director derived entirely from his status as Moore's designee pursuant to that Agreement. All parties understood that Mr. Rogers would be acting as Moore's representative on the Holdings Board and that his tenure as a director would be at Moore's pleasure. The Stockholders Agreement cannot reasonably be construed otherwise. Nothing in the Stockholders Agreement precludes Moore from receiving any information imparted to Mr. Rogers. It therefore follows that if Mr. Rogers was entitled to the disputed communications by virtue of his position as a Holdings director, then Moore would also be entitled to

these communications by virtue of the Stockholders' Agreement.

Id. at *4. The ability of the stockholder to obtain discovery in the litigation with Holdings therefore turned on and was co-extensive with "Mr. Rogers' information rights as a director of Holdings." Id.

In holding that Holdings could not more invoke privilege against Moore than it could against Moore's designee, Vice Chancellor Jacobs relied on the AOC case, describing the situation in Moore Business Forms as "strongly analogous to AOC." Id. at *5. The outcome in Moore Business Forms did not turn on a contractual right to information in the Stockholders Agreement, but rather on the fact that Moore could appoint a designee and was presumed to share information with its designee, just as the AOC Fund and its representatives on the Clark Oil board were presumed to share information. That in turn meant that Holdings had no expectation of confidentiality as to Moore and could not assert the attorney-client privilege.

### 4. SBC Interactive

One year after Moore Business Forms, while still serving as a Vice Chancellor, Justice Jacobs returned to the joint client regime in SBC Interactive, Inc. v. Corporate Media Partners, 1997 WL 770715 (Del. Ch. Dec. 9, 1997). The plaintiff (SBC) was a partner in a Delaware general partnership. After SBC gave formal notice of its intent to exercise a contractual withdrawal right, the partnership's in-house counsel contacted SBC's outside counsel and instructed that any communications about the withdrawal be routed to him. Afterward, the other partners consulted with the partnership's general counsel about their rights and obligations. Litigation ensued over the withdrawal, and SBC moved to compel production of privileged communications created before the service of its withdrawal notice.

Applying the joint client framework, Justice Jacobs held that SBC could not have thought that it had an attorney-client relationship with the partnership's in-house counsel for purposes of the exercise of its withdrawal right because as soon as SBC served the withdrawal notice, its interests and the partnership's became adverse. Id. at *4. The court distinguished Moore Business Forms as a situation where advice was given "before any open dispute had arisen, under circumstances where the director being excluded from access

to that advice had a reasonable expectation that he was a client of the board's counsel, having the same information access rights as the other board members." *Id.* at *5. Under those circumstances, the corporation had no expectation of confidentiality as to the director, and the corporation could not assert the attorney-client privilege. *Id.* at *6.

**\*193**  In *SBC Interactive*, however, the partnership put the partner on notice that the partnership viewed its interests as adverse. After the dispute arose, the partnership's counsel asked for all communications to be routed through him, making clear that the partner was outside the circle of confidentiality. Once the partnership's counsel took that step, the partner could no longer have a reasonable expectation that it was a joint client of the partnership's in-house counsel. Having excluded the partner from the circle of confidentiality, the partnership could invoke privilege as to advice regarding the withdrawal right. *See id.* at *6.

The *SBC Interactive* decision established a third method by which a corporation can establish the expectation of confidentiality necessary to invoke privilege under the joint client paradigm. If the corporation puts the director on notice that an adversity of interests exists, then the director cannot expect to be within the circle of confidentiality as to those matters. At that point, the director can either accept the situation and obtain separate counsel or challenge the corporation's position by asserting a right to information under Section 220(d) of the DGCL, which gives sitting directors a presumptive right to obtain information from the corporation. 8 *Del. C.* § 220(d).

### 5. The Consistent Application Of The Joint Client Approach

Over the past quarter century, the principles articulated in *Kirby*, *AOC*, *Moore Business Forms*, and *SBC Interactive* have governed the ability of a corporation to invoke privilege against a director and an affiliated stockholder. A series of written decisions, as well as numerous transcript rulings, have applied the joint client approach.

One example is *Kalisman v. Friedman*, 2013 WL 1668205 (Del. Ch. Apr 17, 2013). The plaintiff, Jason Taubman Kalisman, was a director of Morgans Hotel Group Co. *Id.* at *1. Kalisman also was a founding member of OTK Associates, LLC, the company's largest stockholder. After OTK announced that it would nominate candidates for election and present items of business at the company's annual meeting, the other directors began meeting in secret to

consider strategic alternatives. They concealed their activities from Kalisman, and "[w]hen he asked for information, he was told nothing was in the works." *Id.* Kalisman only learned the truth when company counsel notified him that the board would meet the next day to consider and approve a recapitalization of the company. The email attached eleven documents spanning hundreds of pages. *Id.*

Kalisman filed suit against his fellow directors. When the defendants sought to assert the attorney-client privilege against him, Kalisman moved to compel. Following *Kirby* and *Moore Business Forms*, the court held that Kalisman was a joint client with the corporation and his fellow directors, which meant he was entitled to receive the same information they received and that the corporation had no expectation of confidentiality against him. *Id.* at *6. The court then analyzed whether any of the three exceptions recognized in *Moore Business Forms* and *SBC Interactive* applied to the case. There was no *ex ante* agreement, the board had not put Kalisman on notice that the board viewed his interests as adverse on any subject, and the board had not taken formal steps to establish an expectation of confidentiality as to Kalisman until March 20, 2013, when a committee on which Kalisman served formed a subcommittee that excluded him. *Id.* at *4–5. The court held that as to events prior to March 20, the corporation  **\*194**  had no expectation of confidentiality as to Kalisman and could not assert the attorney-client privilege against him. The court also observed that the defendants were not well-positioned to invoke privilege against OTK, the entity Kalisman represented, because "[w]hen a director serves as the designee of a stockholder on the board, and when it is understood that the director acts as the stockholder's representative, then the stockholder is generally entitled to the same information as the director." *Id.* at *6 (citing *Moore Bus. Forms*, 1996 WL 307444, at *4).

A more recent example is *In re CBS Corp. Litigation*, 2018 WL 3414163 (Del. Ch. July 13, 2018). There, a controlling stockholder and its affiliated directors sought to obtain a broad ruling at the beginning of discovery that would prevent the corporation from asserting the attorney-client privilege against them. Summarizing the principles articulated in *Kirby*, *Moore Business Forms*, and *SBC Interactive*, Chancellor Bouchard explained that the directors affiliated with the controlling stockholder were joint clients with their fellow directors and the corporation such that the corporation had no expectation of confidentiality against them and could not invoke privilege. *CBS*, 2018 WL 3414163, at *4–5.

WCAS079

Following precedent, Chancellor Bouchard held that the controlling stockholder could receive the same discovery as its director designees, noting that one of the director designees controlled the controlling stockholder, and it was "simply not realistic or practical to believe that any information to which she may become privy as a result of this ruling could be segregated from her thought process as an adversary of CBS in this case." *Id.* In other words, she only had one brain, and she could not avoid sharing information with the entity she controlled, which was permissible under the weight of precedent. *Id.* Chancellor Bouchard also followed precedent in holding that two special committees formed by the board had established an expectation of confidentiality as to the controlling stockholder and its affiliated directors such that they could assert privilege as to matters falling within their purview. *Id.* at *7. Otherwise, he declined to make broad rulings about privilege, noting that there were periods when adversity had existed between the corporation and the controlling stockholder and its designees that could be sufficient to support the assertion of privilege under *SBC Interactive*.

An even more recent example is *In re WeWork Litigation*, 250 A.3d 901 (Del. Ch. 2020). There, a corporation's management team sought to preclude a director from obtaining production of the corporation's privileged information. *Id.* at 910. Applying the joint client approach, Chancellor Bouchard held that "directors of a Delaware corporation are presumptively entitled to obtain the corporation's privileged information as a joint client of the corporation." *Id.* at 911. He rejected the notion that senior management could invoke the privilege against a sitting director. *Id.*

*Kalisman*, *CBS*, and *WeWork* are but three of the many decisions that have applied the joint client approach and considered whether a corporation had a sufficient expectation of confidentiality to invoke the attorney-client privilege against a director. [3] Numerous decisions have also considered **\*195** whether a corporation can invoke privilege against a stockholder affiliated with a director in light of the expectation that a director acting as a stockholder's designee will share information with the stockholder, as well as the practical reality that sharing necessarily occurs when a single person acts in a dual role. [4] This framework has been settled law in Delaware for nearly four decades.

**6. The Joint Client Approach Applied To This Case**

**[8]** Under the joint client approach, the Company cannot assert the attorney-client privilege to withhold information generated while Weiss was a director. During his tenure, Weiss, the other members of the Board, and the Company were joint clients. Weiss was therefore within the circle of confidentiality for purposes of privilege. The Company had no expectation of confidentiality as to Weiss, and the Company cannot assert privilege against him or his affiliates.

During his tenure as a director, Weiss received numerous communications from the Company and its counsel. DLA Piper communicated directly with Weiss and his fellow directors about the Merger. *See, e.g.*, Dkt. 75 Exs. N, O, P, Q. In an email dated as of November 8, 2021, DLA Piper expressly told Weiss that he was a joint client of the firm, stating: "I represent the board and shareholders of FairX, which includes your firm and you as a board member." Dkt. 75 Ex. N at '886. Weiss had a reasonable expectation that he was a joint client and within the circle of confidentiality for purposes of privilege.

After Weiss voiced his desire to retain an investment banker and explore alternatives to the Coinbase offer, the Company's management team and its counsel secretly began to exclude him from communications. Their efforts to withhold information did not alter his informational rights. **\*196** Weiss remained inside the circle of confidentiality and had the right to receive all of the same information that was provided to his fellow directors.

The Company did not take any of the recognized steps that would have created an expectation of confidentiality as to Weiss and provided the factual predicate for asserting privilege. There was no *ex ante* agreement. The Board did not form a transaction committee. No one put Weiss on notice that his interests were adverse as to any topic. True, Weiss had the sense that he was getting the cold shoulder, and that led him to send a demand for information on December 7, 2021. He was removed the next day.

The Funds agree that Weiss became adverse to the Company when he sent his books and records request for purposes of the Company's response to his request, and they do not seek privileged communications concerning that request. The Funds agree that Weiss no longer remained within the circle of confidentiality after his removal on December 8, and they accept that the Company can assert the attorney-client privilege against them from that point.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          15

**[9]**  No one disputes that Weiss served on the Board as a representative of the Funds. Under *AOC*, *Moore Business Forms*, *Kalisman*, and *CBS*, Weiss had the right to share information with the Funds, and he necessarily shared information in light of his dual roles as director and fund manager. Having only one brain, Weiss could not avoid sharing information. The Funds were therefore inside the circle of confidentiality as well.

**[10]**  **[11]**  When former joint clients sue one another "the default rule is that all communications made in the course of the joint representation are discoverable." *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 366 (3d Cir. 2007) (applying Delaware law). In other words, "where an attorney jointly represents two clients who later become adversarial parties in litigation, one party cannot assert attorney-client privilege to avoid disclosure of communications which were made during the joint representation." *In re Sutton*, 1996 WL 659002, at *5 (Del. Super. Aug. 30, 1996). Delaware Rule of Evidence 502(d)(6) states that "there is no privilege ... [a]s to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients." Delaware Rule of Evidence 502(a)(1) defines the term "client" to include, without limitation, the "directors ... of any business entity that is organized under the laws of this state."

Weiss and the Funds were within the circle of confidentiality. The fact that the Funds have now sought appraisal does not change the scope of the circle as it existed before December 8, 2021. The Company therefore cannot invoke the attorney-client privilege to withhold materials created between November 14, 2019, and December 8, 2021, during Weiss's tenure as a director, except that the Company can assert the attorney-client privilege for communications relating to Weiss's books-and-records request, after he sent it on December 7.

**B. The Company's Responses**

Faced with these long-settled principles of law, the Company makes three arguments. First, the Company invokes a related but distinct body of law that governs how a transaction affects who can direct an entity to assert the attorney-client privilege. Second, the Company invokes the law governing Section 220(d) of the DGCL and  **\*197**  seeks to apply it to discovery in a plenary action. Third, the Company contends

that the Funds waived their ability to challenge the Company's invocation of privilege. None of those arguments succeed.

**1. The Post-Merger Entity As The Successor To The Privilege**

The Company first argues that as the surviving entity that resulted from the Merger, the Company succeeded to the constituent entities' rights to assert privilege. That is true, but the Company then leaps to the conclusion that because the merger agreement did not carve out any rights for former directors to access privileged information, the Company gained the right to invoke privilege against Weiss and the Funds. The second part is wrong.

When a corporation engages in a transformative transaction that divides or combines the corporate form—think of a spinoff, a sale of assets, or a merger—questions arise as to which entity controls the privilege. In a spinoff, does the privilege travel with the spun-off entity, or does it remain with the former parent? In a sale of assets, is the privilege an asset that the buyer acquires, or does the seller retain it? And in a merger, does the surviving corporation control the privilege?

For a merger, the answer is easy. Section 259(a) of the DGCL provides that when constituent corporations combine in a merger, "all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation." The statute uses the word "privileges," and this court has held that the plain language of that word encompasses the attorney-client privilege.[5]

 **\*198**  **[12]**  **[13]**  Because any privilege that a constituent company held before the merger passes to the surviving company, parties must contract for a different outcome. "Absent ... an express carve out, the privilege over all pre-merger communications—including those relating to the negotiation of the merger itself—passe[s] to the surviving corporation in the merger, by plain operation of clear Delaware statutory law under § 259 of the DGCL." *Great Hill*, 80 A.3d at 162.

**[14]**  The Company seeks to use the law governing which entity holds the privilege to argue that the Merger divested Weiss of his status as a former joint client and deprived him of his ability to obtain privileged information. The former body of law answers a different question: What entity controls the privilege to the extent the entity has the right to invoke it?

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   16

The latter question turns on the scope of the privilege and the fact that the director as a former client was within the circle of confidentiality. *Cf. McKee v. Specialty Benefits LLC*, C.A. No. 2019-0646-JTL, at 39–40, 2020 WL 5577929 (Del. Ch. Sep. 10, 2020) (TRANSCRIPT) ("[W]e're conceptually talking about ... whether privilege can be validly invoked in litigation where the documents are responsive in litigation and it is someone who previously was a sender, a recipient, or a copy recipient, et cetera, of the document, and hence the document was, by definition, not confidential as to them. I view the allocation of rights in the agreement as dealing with a separate concept that isn't implicated here."). Section 259 provides that the surviving corporation gains the right to invoke privilege to the same degree as the constituent corporations. Section 259 does not create an expanded right that goes beyond the rights that a constituent corporation possessed.

In this case, the ability of the Company as the surviving entity to invoke privilege against Weiss after the Merger is no greater than the ability of the Company as a constituent entity to invoke privilege **\*199** against Weiss before the Merger. For the reasons already discussed, Weiss was within the circle of confidentiality during his tenure on the Board, and thus, the Company cannot invoke the attorney-client privilege to withhold information generated during that period. The same is true for the Company as the surviving entity that succeeded to the Company's privilege under Section 259.

The Merger did not give the Company any greater rights than it possessed before the Merger. The Company's first argument for invoking privilege therefore fails.

### 2. The Attempt To Rely On Section 220(d)

In its second argument, the Company focuses on Weiss's status as a former director and argues that because his tenure ended, Weiss can no longer obtain privileged information from the corporation. In making this argument, the Company improperly takes principles that govern a director's request for information under Section 220(d) and attempts to apply them to civil discovery.

#### a. The Company's Reliance On Section 220(d) Precedent

To advance its argument that a corporation can treat a former director like any other outsider once the director's tenure ends, the Company relies on cases interpreting Section 220(d). That statute provides that "[a]ny director shall have the

right to examine the corporation's stock ledger, a list of its stockholders and its other books and records for a purpose reasonably related to the director's position as a director." 8 Del. C. § 220(d). Delaware cases hold that because the statute uses the term "director," it only grants rights to a current director. *See, e.g.*, *Prokupek v. Consumer Cap. P'rs LLC*, 2014 WL 7452205, at \*6 (Del. Ch. Dec. 30, 2014). Delaware cases also hold that because the statute only authorizes a director to access materials "for a purpose reasonably related to the director's position as a director," a director cannot use Section 220(d) if the corporation proves that the primary purpose for the inspection is unrelated to the director's duties. Applying this standard, this court has held that a director would not be permitted to use section 220(d) to conduct "back-door discovery" on a personal claim. [6]

The Company argues that the same principles govern a director's efforts to obtain discovery in litigation, such that the director must be pursuing the litigation as a fiduciary to be able to access privileged information. The upshot of the Company's approach is that a former director cannot obtain privileged information created during his tenure through discovery in litigation, because the former director no longer acts in a fiduciary capacity.

 [15] In taking these positions, the Company recycles arguments that Justice Berger rejected nearly forty years ago in *Kirby*. After removing his three siblings from the board, the member-director in **\*200** *Kirby* argued that his siblings lost any right to access information under Section 220(d). The court disagreed, explaining that "[p]laintiffs' rights under [Section] 220, whatever they may be, are irrelevant. Plaintiffs are seeking discovery in support of a colorable claim and are entitled to the documents unless they are protected from disclosure by a valid claim of privilege." *Id.* at \*7. Justice Berger thus recognized that a director's ability to access information under Section 220(d) flows from the statutory language. A party's ability to obtain discovery in litigation is governed by the Court of Chancery Rules, including Rule 26. The former does not affect the latter.

Since *Kirby*, this court has applied the discovery rules to discovery and the language of Section 220(d) to Section 220(d) actions. The court has likewise rejected a converse attempt by a former director to apply the discovery rules to a Section 220(d) action. When a former director argued that he had standing to invoke informational rights under Section 220(d) because of language in *Kirby* and *Moore Business Forms*, the court explained that the plaintiff's position

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.　　17

"erroneously conflates a director's right to access corporate books and records under Section 220(d) with a director's or former director's right to discovery of corporate documents when he personally is involved in litigation either as a plaintiff or a defendant." *King v. DAG SPE Managing Member, Inc.*, 2013 WL 6870348, at *9 (Del. Ch. Dec. 23, 2013). Pointing out that "[t]he two procedures are separate and distinct," the court explained that in *Kirby* and *Moore Business Forms*, "the former directors in [discovery disputes] were pursuing or defending substantive claims and, as litigants in that context, had the right to pursue discovery under the applicable court rules." *Id.* at *7, *9. Those cases did not apply to a Section 220(d) action, just as the law of Section 220(d) did not apply to discovery.

As in *Kirby* and *King*, the issue in this case is not whether Weiss, as a former director, can obtain information under Section 220(d). The question is whether the Company can withhold discovery from the Funds by invoking privilege even though Weiss and the Funds were within the circle of confidentiality when the materials were created. The Company's Section 220(d) cases are inapposite. The motion to compel is governed by Rule 26, with the privilege questions governed by *Kirby* and its progeny.

### b. The Company's Reliance On *ServVaas*

The Company next fixates on a case that it interprets as applying Section 220(d)-style considerations to a discovery dispute. In *ServVaas v. Ford Smart Mobility LLC*, 2021 WL 5226487 (Del. Ch. Nov. 9, 2021), this court issued a letter ruling that reached a logical result on the facts presented. The decision did not purport to change the law or depart from the joint client approach. Yet the Company construes the decision as contemplating a fundamental reorientation of Delaware law regarding how a director can access information. That is not how I read *ServVaas*, nor is the Company's reliance on that decision persuasive.

The plaintiffs in *ServVaas* were former executives who had served on the defendant entity's governing board. The two executives had sold their companies to the defendant and had rights to deferred compensation related to those transactions. One month before their rights to the deferred compensation vested, the entity terminated the executives for cause, citing fraud and misappropriation. The executives sued for wrongful termination and, in discovery, sought access to

the investigations on which the entity relied. After the entity invoked privilege, the executives moved to compel.

**\*201**  The court denied the motion. In the course of explaining its rationale, the court cited a series of considerations, namely that the executives (i) were "not acting to further the interests of [the companies] or their stockholders," (ii) were "not invoking their former fiduciary capacities in this action," (iii) did "not contend that the documents at issue would have allowed them to act as fully-informed directors," (iv) were "not claiming that certain documents were shared with other board members during their tenure but withheld from them," and (v) had no reason to believe that they were " 'joint clients' of company counsel with regard to the issues." *Id.* at *4–5.

[16]  Discovery rulings—including rulings about privilege—require discretionary determinations based on the facts of the case. The *ServVaas* decision identified these considerations when making a discretionary decision. Yet as Company counsel conceded at oral argument, the Company interprets *ServVaas* as establishing a new regime in which a director's ability to access privileged information resembles a stockholder's qualified right to overcome privilege for good cause shown under *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).[7] Like *Garner*, the Company's approach would allow the corporation to assert privilege, with the party requesting discovery having the burden to overcome the privilege by showing that various factors are present.

A *Garner*-style regime rests on a conceptual foundation that is categorically different from the joint client regime. Under *Garner*, the stockholder starts outside the circle of confidentiality, enabling the corporation to invoke privilege against the stockholder. By showing good cause under *Garner*, the stockholder can penetrate the privilege and gain access to otherwise confidential materials.

Under the joint client approach, the director starts inside the circle of confidentiality. Without the expectation of confidentiality on which privilege depends, the corporation cannot invoke the privilege against the director. Having started inside the circle, the director remains there unless and until excluded. Only for matters post-dating the director's tenure—or where the corporation follows one of the three acknowledged exceptions—is the director outside the circle of confidentiality. When it comes time for discovery, there is no invasion of the privilege because the director starts on

WCAS083

the inside and remains there, unless and until the corporation excludes him.

Under the joint client approach, confidentiality and privilege do not spring into being when the director's tenure ends. All that happens when the director's tenure ends is that the joint client relationship ends. That does not mean that one former joint client (the corporation) can now invoke privilege against another former joint client (the former director), any more than former joint clients can invoke privilege **\*202** against each other in litigation between them. The rule is precisely the opposite: "There is no privilege ... [a]s to a communication relevant to a matter of common interest between or among 2 or more clients if the communication was made by any of them to a lawyer retained or consulted in common, when offered in an action between or among any of the clients." D.R.E. 502(d)(6); *accord Sutton*, 1996 WL 659002, at \*5 ("[W]here an attorney jointly represents two clients who later become adversarial parties in litigation, one party cannot assert attorney-client privilege to avoid disclosure of communications which were made during the joint representation.").

The Company's big-picture reading of *SerVaas* thus starts from a doctrinally flawed position. The Company fares no better when it tries to turn the fact-specific considerations that the *SerVaas* court identified into elements of a *Garner*-style test.

The Company interprets the first two considerations— whether the plaintiffs were acting to further the interests of the corporation or invoking their fiduciary capacities— as implicating concepts from Section 220(d). As discussed previously, Section 220(d) requires that a director pursue informational rights for a proper purpose, which means for a purpose that would further the interests of the corporation or the director's fiduciary duties. If the corporation can show that the director is acting with an improper purpose, then the director cannot access information under Section 220(d).

As Justice Berger explained in *Kirby*, a former director who seeks to obtain information in discovery is not relying on Section 220(d). The source of the right to obtain information is the discovery rules themselves. The question is whether the corporation can invoke privilege to withhold information from discovery. That issue is governed by the law of privilege, including the effect of joint client status on the element of confidentiality. The rules governing access to information under Section 220(d) do not apply.

The closest analog to how the Company interprets these considerations is the exception to the joint client rule recognized in *SBC Interactive*. Under that exception, once a director is on notice of an adversity of interests, then the director cannot reasonably regard himself as a joint client of the corporation's counsel and within the circle of confidentiality. But the temporal framing under *SBC Interactive* differs from the Company's proposed regime.

**[17]** **[18]** The joint client approach looks at the facts and circumstances that existed when the privileged communication was made. If adversity did not exist, then the director is treated as a joint client who was within the circle of confidentiality such that the attorney-client privilege has no purchase. Focusing on the point when the attorney-client communication was made comports with the general principle that "[t]he existence of the attorney-client privilege ... is determined as of the time the communication is made, not at the time when discovery of the communication is sought." *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 623 A.2d 1118, 1123 (Del. Super. Ct. 1992). Under the Company's proposed test, the court would ask whether adversity exists at the time of the lawsuit in which the discovery is sought. If the director's lawsuit is adverse —and it typically will be—then the director cannot obtain the discovery. In taking that different view of adversity, the Company's proposed test resembles what one commentator describes as a separate approach to privilege, distinct from *Kirby*, which "focuses on whether the directors' interests are adverse to the corporation's." **\*203** John W. Gergacz, *Attorney-Corporate Client Privilege* § 2:5, Westlaw (database updated Aug. 2022). Delaware does not follow that approach. Delaware follows *Kirby* and its progeny.

**[19]** The Company attempts the same analytical move when it focuses on the reference in *SerVaas* to whether accessing the documents at issue would have allowed the plaintiffs to act as fully informed directors. As framed by the Company, that is another way of asking whether a director has a proper purpose for an inspection, which Section 220(d) requires. As the *Kirby* case explained, the issue in discovery is not access to information under Section 220(d), but rather whether a corporation can withhold discovery under Rule 26. When a party pursues discovery in a plenary lawsuit, a party generally is not seeking information to become fully informed as a director, but rather to litigate a case. A party can obtain relevant discovery in a civil case unless a valid claim of privilege exists. Whether the responding party can invoke

WCAS084

privilege turns on the law of privilege, not principles under Section 220(d). If the requesting party was within the circle of confidentiality when the communication was created, then the responding party cannot invoke privilege. A former director was within the circle of confidentiality for purposes of communications created during the director's tenure, so privilege is unavailable.

The Company thus attempts to use each of the first three case-specific considerations cited in *SerVaas* as means of injecting elements of the analysis under Section 220(d) into the separate context of civil discovery. That attempt fails.

 [20]   The Company fares no better when it turns to the last two case-specific considerations that the *SerVaas* decision mentioned—whether the documents in question were shared with other board members but withheld from the plaintiff, and whether the director had reason to believe that he was a joint client of company counsel. The Company claims that unless a director can establish one or both of those factors, a director cannot overcome the privilege. Those considerations are indeed pertinent to whether a director was within the circle of confidentiality, but here—as with the entirety of its *Garner*-style analysis—the Company flips the burden of proof. Under *Kirby* and its progeny, a director starts within the circle of confidentiality as a joint client. The corporation resisting production must show that a situation existed sufficient to cut off joint client status and place the director outside the circle of confidentiality, such as sufficient adversity to have put the director on notice so that director knew or should have known that he could not rely on company counsel. Under the Company's approach, the burden rests on the director to identify factors that would enable the director to access the privilege information. For the factors that the Company draws from Section 220(d), that burden shift is also inconsistent with the statutory structure, which places the burden on the corporation to show that the director has an improper purpose. *See 8 Del. C. § 220(d)* ("The burden of proof shall be upon the corporation to establish that the inspection such director seeks is for an improper purpose.").

Although the Company claims to favor its proposed *Garner*-style framework, what the Company really wants is a rule where the ability to access information ceases when a director's tenure ends. At that point, as the Company's counsel conceded at oral argument, a former director by definition would not be able to claim that he needed the information in a fiduciary capacity or to become fully informed about his role. Dkt. 89 at 32. Such a rule would create problems for

a former director **\*204**  who wants to rely on expert legal advice as a defense under Section 141(e) of the DGCL. *See 8 Del. C. § 141(e)* (providing that "a member of the board of directors ... shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation."). The Company's stance continues to ignore the fact that the Court of Chancery Rules, including Rule 26, govern whether a party can obtain information in a civil proceeding. The question is not whether the former director has an independent right to obtain the information, such as under Section 220(d), but rather whether a corporation can invoke privilege to withhold information from someone against whom the corporation had no expectation of confidentiality.

Forced to search even further afield for support, the Company drew an analogy during oral argument to recent disputes involving former Presidents and Vice Presidents of the United States improperly retaining documents after their terms of office ended. Dkt. 89 at 21. The Company argued that just as a President or Vice President loses the ability to possess confidential information after leaving office, a former director likewise should lose the ability to conduct discovery into privileged material created during the director's tenure. The analogy falls short because the inability of Presidents and Vice Presidents to retain materials is a function of the Presidential Records Act, which provides that for materials created or received after January 20, 1981, the United States retains "complete ownership, possession, and control of Presidential records." 44 U.S.C. § 2202. Before the enactment of that statute, Presidents and Vice Presidents could and did retain official papers: "Beginning with George Washington," Presidents had, "without notable exception, treated their presidential papers as personal property." *Nixon v. United States, 978 F.2d 1269, 1277–78 (D.C. Cir. 1992)*. After President Washington removed his papers to Mount Vernon, "he ensured that they would pass by descent within his family by bequeathing them to his nephew, Mr. Justice Bushrod Washington." *Id.* at 1278. Presidents Jefferson, Madison, and Monroe likewise passed their papers by testamentary gift. *Id.* The presidential analogy would mean that former directors could take everything with them and keep it indefinitely.

WCAS085

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          20

The Company seeks to use *SerVaas* to reject the joint client approach and argue in its place for a *Garner*-like framework for current directors and a rule of no access for former directors. The Company's proposed regime would change the law dramatically. The *SerVaas* decision did not purport to do that. This decision follows the weight of Delaware precedent and hews to the joint client regime.

### c. The Company's Reliance On Federal Precedent

In addition to citing Section 220(d) and *SerVaas*, the Company relies on two federal cases: *Wychocki v. Franciscan Sisters of Chi.*, 2011 WL 2446426 (N.D. Ill. June 15, 2011), and *Milroy v. Hanson*, 875 F. Supp. 646 (D. Neb. 1995). Based on those decisions, the Company states that "[f]ederal courts have similarly held that one's status as a former director or officer 'does not entitle her to see privileged documents that she saw, or to which she had access, during the time she was employed.' " Dkt. **\*205** 57 ¶ 21 (quoting *Wychocki*, 2011 WL 2446426, at \*9). Previously, the Company recycled arguments rejected in *Kirby*. This time, the Company recycles an argument rejected in *Moore Business Forms*, where Justice Jacobs distinguished *Milroy v. Hanson* as taking a different approach to privilege than Delaware. 1996 WL 307444, at \*5 n.5. In *Kalisman*, the court again distinguished *Milroy v. Hanson* and cases adopting a similar rule, noting that "[t]hose decisions do not accurately describe the law of this State." 2013 WL 1668205, at \*4.

The federal courts trace their approach to privilege to *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985). That decision addressed who controlled the corporation's privilege after the filing of a bankruptcy petition. The parties agreed that for a solvent corporation, "the power to waive corporate attorney-client privilege rests with the corporation's management and is normally exercised by its officers and directors." *Id.* at 348, 105 S.Ct. 1986. The parties also agreed that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349, 105 S.Ct. 1986. As a consequence, "[d]isplaced managers may not assert the privilege over the wishes of current managers." *Id.* If the current managers waived the privilege, it was waived. *Id.* The Supreme Court of the United States applied these principles to a corporation that had filed bankruptcy, holding the bankruptcy trustee has the power to waive the attorney-client privilege with respect to pre-

bankruptcy communications. *Id.* at 353, 105 S.Ct. 1986. If the bankruptcy trustee waived the privilege, then former managers could not assert it. *Id.* at 353–54, 105 S.Ct. 1986.

Like *Great Hill*, the *Weintraub* decision concerned who controls the corporation's right to assert privilege following a transformative event, whatever the scope of the privilege might be. The *Weintraub* decision did not address whether the corporation could assert privilege against someone who started out within the circle of confidentiality, such as a director who had access to the privileged materials during his tenure. Yet subsequent decisions, such as those on which the Company relies, have ignored that distinction and extended the *Weintraub* rule to hold that former directors cannot obtain discovery of privileged materials created during their tenure because only the entity is the client and holder of the privilege. Candor requires acknowledging that the entity approach currently represents the majority rule in the United States. *See, e.g.*, John K. Villa, *Confusion in the Boardroom*, 24 No. 9 ACC Docket 104, at \*104 (Oct. 2006). In blackletter form, it appears in Section 73 of the Restatement (Third) of the Law Governing Lawyers. [8]

**[21]** **[22]** "[C]ourts which apply [the entity approach] emphasize that it is only current management through which the corporation acts." Villa, *supra*, at \*104. To reach this result, the entity approach treats directors as the corporation's agents. The Restatement explains this oddment as follows:

> Directors of a corporation are not its agents for many legal purposes, because they are not subject to the control of the corporation (see Restatement Second, Agency § 14C). However, in communications with the organization's counsel, a director who communicates in the interests **\*206** and for the benefit of the corporation is its agent for the purposes of this Section. Depending on the circumstances, a director acts in that capacity both when participating in a meeting of directors and when communicating individually with a lawyer for the corporation about the corporation's affairs.

*Id.* § 73 cmt. d. Delaware law does not view directors as agents. "Directors, in the ordinary course of their service as directors, do not act as agents of the corporation ...." *Arnold v. Soc'y for Sav. Bancorp, Inc.,* 678 A.2d 533, 539 (Del. 1996). "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa.* It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." [9]

**[23] [24] [25]** The fact that the board of directors governs the corporation and comprises multiple individuals means that to the extent there is a corporation that can be a client, the board of directors is the decisionmaker for the client. 8 *Del. C.* § 141(a). As *Kirby* and *Moore Business Forms* recognize, the members of the board jointly comprise the client and the corporation. It follows that the joint client rule should apply when determining whether a corporation can invoke privilege against one of the members of the board. The Restatement nods in the direction of these realities by acknowledging that directors can be joint clients:

> Communications involving an organization's director, officer, or employee may qualify as privileged, but it is a separate question whether such a person has authority to invoke or waive the privilege on behalf of the organization. *If the lawyer was representing both the organization and the individual as co-clients, the question of invoking and waiving the* **\*207** *privilege is determined under the rule for co-clients.*

*Id.* § 73 cmt. j (emphasis added) (citation omitted). But the Restatement treats a joint representation as the exception rather than the rule. Delaware's approach correctly recognizes that the individuals comprising the board jointly constitute the client and are within the circle of confidentiality for purposes of privilege, unless the corporation follows one of the three acknowledged methods for excluding a director from the circle.

When courts reject the joint client approach in favor of the entity approach, they typically assert that adopting the joint client approach "would have a perverse chilling effect on candid communications between corporate managers and counsel" because of the risk that a former fiduciary might be able to use the information in litigation. *E.g., Las Vegas Sands v. Eighth Jud. Dist. Ct.,* 130 Nev. 643, 331 P.3d 905, 913 (2014) (internal citation omitted). In the abstract, that sounds like a valid concern, but it does not hold up against real-world considerations.

Evaluating whether the joint client approach might deter boards from consulting with counsel requires weighing (i) the benefits of consultation against (ii) the likelihood of losing privilege. The advantages of consultation are extensive. The directors benefit from legal advice about what course of action to take, and they gain a potential affirmative defense in the form of reliance on advice of counsel, which renders them "fully protected" under Delaware law. 8 *Del. C.* § 141(e). Perhaps more important are the advantages of invoking privilege in discovery. Experience teaches that corporations invoke privilege aggressively and widely, and it is not too extreme to say that the starting point is often to assert privilege whenever an attorney is copied on a communication. *E.g., Thermo Fisher Sci. PSG Corp. v. Arranta Bio MA, LLC,* 2023 WL 300150, at *6 (Del. Ch. Jan. 18, 2023) ("The evidence presented by Defendant, coupled with my *in camera* review, strongly indicates that Plaintiff repeatedly and unthinkingly claimed privilege over non-privileged communications simply due to the presence of a lawyer in preparing its log."). Corporations even invoke privilege when a lawyer is *not* a part of the communication. *Id.* at *3 (collecting examples). And corporations invoke privilege when a lawyer is not acting in a legal capacity, is giving business advice, or is relaying facts. [10] In this court, corporations regularly generate privilege logs spanning hundreds of pages, with scores of entries per page. Why does this happen? Because information is power, and privilege provides a basis for withholding power from an adversary.

The counterbalancing risk is that on occasion, litigation will arise with a director. How often does that happen, and what are the consequences? Not often and not much.

Evidencing the infrequency of the issue, the number of cases involving director **\*208** privilege is few. *See* Gergacz, *supra*, § 2:5 (collecting cases). Given the number of corporations (both public and private), the number of directors, and the amount of litigation, that yield suggests a trivial risk.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**[26]** Evidencing the insignificance of the effect, the joint client rule only renders privilege unavailable *as to the joint client.* The privilege remains intact for parties outside the circle of confidentiality. Not only that, but corporations can mitigate any risk from the joint client approach with a modicum of planning. Corporations can use contract, committees, or clear notices of adversity to control the aperture of confidentiality. And even without advanced planning, all is not lost. In litigation in this court, a judicial officer can enter an order under Delaware Rule of Evidence 510(f), which provides that "[n]otwithstanding anything in these rules to the contrary, a court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other proceeding." A similar procedure is available in federal court. *See* F.R.E. 502(d). Joint client materials can be produced under such an order. The inability to invoke privilege against a joint client who was within the circle of confidentiality does not mean that privilege is lost as to the world.

This balancing so dramatically favors consultation with counsel that the real-world effect of the joint client rule is undoubtedly nil. Delaware's experience proves the point. Despite following the joint client approach since 1987, there has been no perceptible decline in the invocation of privilege. Like Topsy, it grew.

**[27]** On the other side of the ledger are clear advantages to the joint client approach. It guarantees that a current director cannot secretly be excluded from discussions or denied access to materials, and it ensures a former director is not treated like a banished outsider, but rather as someone who previously held an important role and was inside the circle of confidentiality. A former director should not have to fight through a thicket of privilege to obtain materials created during the director's tenure. The stockholder who appointed the director and who had access to that information should not have to fight through a thicket of privilege either. If a corporation wants to limit the sharing of information, there are recognized means available.

**[28]** Most importantly, the joint client approach prevents lawyers from claiming the authority to tell directors what to do. The entity approach inverts the power structure by putting the directors in the subservient role as agents of the corporation, thus enabling lawyers to assert the dominant role as the representative of the organization. This case provides

a clear example. When Weiss disagreed about the proper way to proceed, Company's counsel gave Weiss the following instruction:

> I'm now directing you, as company counsel, not to reach out to investment bankers for the purposes that you describe below because, in my opinion, your proposed actions may or would violate the exclusivity terms of the letter of intent, and could result in a breach which could subject the company, the board and you to liability.

Dkt. 75 Ex. Q at '597. Company counsel later reiterated this directive, stating: "Please allow this email to serve as clear instructions to you that you may not reach out to bankers." *Id.* at '594.

**[29]** Lawyers can and should give advice. Lawyers can and should tell directors if they believe a course of action could result in a breach of fiduciary duty. And lawyers can and should explain the potential **\*209** consequences to the Company. But lawyers should not be giving orders to directors. If a director determines that fiduciary principles mandate a particular course of action, then the director has a duty to act.

If the Delaware courts had never addressed how the attorney-client privilege applied to a director, then there could be reasons to follow the entity rule. Delaware, however, has adopted the joint client rule, and there are good reasons for it. This decision adheres to the joint client regime.

## C. The Quasi-Laches Argument

The Company's last argument is that the Funds waived their right to obtain privileged communications because they waited too long to assert it. The Company points out that Weiss and the Funds did not immediately challenge the Company's assertion of privilege after the Company produced a redacted set of minutes for a meeting of the Board that Weiss attended on November 8, 2021. Invoking a laches-like concept, the Company argues that the Funds cannot challenge its privilege assertions now.

WCAS088

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

 **[30]**  Obtaining information in discovery is not like filing a cause of action. Accepting for purposes of analysis that a substantial delay in mounting a challenge could warrant denying a discovery motion in an appropriate case, this is not it. Having properly filed an appraisal proceeding, the Funds may seek discovery to pursue their claim.

Under Rule 26(c), a court may issue "any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." The Company has not relied on Rule 26(c). The Company seeks to create a new rule in which a party must mount a challenge to a position taken in discovery when the opponent first asserts it, or the party forever loses the opportunity. That is not how discovery works. This court is busy enough that it does not need to create incentives for hair-trigger challenges to discovery positions.

Nothing about the progression of this case suggests that the Funds waived their right to challenge the Company's assertion of privilege. Discovery remains ongoing. The Funds filed a timely motion to compel.

The Company argues that it has been prejudiced by the manner in which the Funds proceeded because the Company "has conducted its document review, served third party subpoenas, interviewed witness [sic], made decisions about counterclaims or third party claims and performed other litigation planning all based on the existence of a privilege." Dkt. 57 ¶ 31. The Company made a tactical decision to assert privilege in a manner that runs contrary to the joint client approach that Delaware courts have followed for nearly forty years. The consequences of that choice do not constitute the kind of prejudice that could support a waiver.

## D. The Company's Cross-Motion For A Destruction Order

The Company has asked the court to order the Funds to destroy any privileged material they received from Weiss. For the reasons already discussed, the material was not privileged as to Weiss. He was within the circle of confidentiality as a joint client. He was free to share the information he received with the Funds, and there was an expectation that he would do so. If the Company had wanted to establish a different framework, then it was incumbent on the Company to (i) enter into a confidentiality agreement with Weiss and the Funds making clear that Weiss could not pass along certain types of information, (ii) form a committee, or (iii)  **\*210**  put Weiss on notice as to an issue where the Company believed his interests were adverse. The Company did none of those things. Its cross-motion for a destruction order is therefore denied.

## III. CONCLUSION

The Funds' motion to compel is granted. The Company cannot invoke the attorney-client privilege to withhold materials created between November 14, 2019, and December 8, 2021, except that the Company can assert the attorney-client privilege regarding communications relating to Weiss's books-and-records request after he sent it on December 7. The Company's request for a destruction order is denied.

**All Citations**

292 A.3d 178

## Footnotes

1    Citations in the form "Dkt. — Ex. — at —" refer to exhibits to the parties' submission in relation to the plaintiffs' motion to compel production of company-privileged information. Page citations refer to the internal pagination or, if there is none, then to the last three digits of the control number.

2    *Schoon v. Troy Corp.*, 2006 WL 1851481, at *1 n.8 (Del. Ch. June 27, 2006) (quoting *Milstein v. DEC Ins. Brokerage Corp.*, C.A. Nos. 17586, 17587, at 3 (Del. Ch. Feb. 1, 2000) (TRANSCRIPT); *accord Intrieri v. Avatex*, 1998 WL 326608, at *1 (Del. Ch. June 12, 1998); *Belloise v. Health Mgmt., Inc.*, 1996 Del. Ch. LEXIS 127, at *36 (Del. Ch. June 11, 1996) (Allen, C.).

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

3    *E.g.*, *Police & Fire Ret. Sys. of City of Detroit v. Musk*, 2023 WL 1525022, at *2 n.21 (Del. Ch. Jan. 31, 2023) ("[D]irectors are treated as joint clients with the corporations they run ...."); *In re Aerojet Rocketdyne Hldgs., Inc.*, 2022 WL 1446782, at *5 (Del. Ch. May 5, 2022) (finding one faction of the board suing another faction had "no greater claim to the Company's privilege" because each faction was a joint client with the Company); *Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co., Inc.*, 2021 WL 3237114, at *8 (Del. Ch. July 30, 2021) (subsequent history omitted) ("In recognition of the reality that a corporation may only assert the privilege through its agents, *i.e.*, its officers and directors, legal advice rendered to the corporation through one of its officers or directors is typically privileged as though given to a 'joint client.' " (cleaned up)); *Schnatter v. Papa John's Int'l, Inc.*, 2019 WL 939205, at *1 (Del. Ch. Feb. 25, 2019) (same). Other cases apply the framework established in *Kirby*, *Moore Business Forms*, and *SBC Interactive* by looking to see if one of the exceptions to the joint client rule exists. *E.g.*, *Bruckel v. TAUC Hldgs., LLC*, 2023 WL 116483, at *4 (Del. Ch. Jan. 6, 2023); *In re Howard Midstream Energy P'rs, LLC*, 2021 WL 4314111, at *2 (Del. Ch. Sept. 22, 2021); *Pearl City Elevator, Inc. v. Gieseke*, 2020 WL 5640268, at *2 (Del. Ch. Sept. 21, 2020); *Lynch v. Gonzalez*, 2019 WL 6125223, at *10 (Del. Ch. Nov. 18, 2019); *Gilmore v. Turvo, Inc.*, 2019 WL 3937606, at *2 (Del. Ch. Aug. 19, 2019).

4    *See In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *43–44 (Del. Ch. Aug. 27, 2015); *Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 121 (Del. Ch. 2000); *KLM v. Checchi*, 1997 WL 525861, at *2–3 (Del. Ch. July 23, 1997); *see also Schoon v. Smith*, 953 A.2d 196, 208 (Del. 2008) (holding that director lacked standing to sue derivatively because stockholder he represented could bring suit, which only could happen if director was able to share information with affiliated stockholder). For discussions of the nuanced issues raised by information sharing and the difficulties of a bright-line rule that either permits or prohibits sharing, see J. Travis Laster & John Mark Zeberkiewicz, *The Rights and Duties of Blockholder Directors*, 70 Bus. Law. 33, 54–57 (2015); Cyril Moscow, *Director Confidentiality*, 74 L. & Contemp. Probs. 197 (2011); and Catherine G. Dearlove & Jennifer J. Barrett, *What To Do About Informational Conflicts Involving Designated Directors*, 57 Prac. Law. 45 (2011).

5    *Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 158 (Del. Ch. 2013). I suspect that the plain language interpretation of the word "privilege" in *Great Hill* is anachronistic and that the concept of "privileges" as used in Section 259 refers to the rights, powers, and privileges that a corporation can exercise under the DGCL. Section 259 has a pedigree stretching back to the original enactment of the DGCL, and cases have consistently used the word "privileges" in that manner. *E.g.*, *Bubenzer v. Philadelphia, B. & W.R. Co.*, 61 A. 270, 275 (Del. Ch. 1905) (quoting 1903 version of DGCL which provided that following a consolidation, "the corporation created thereby shall be possessed of, exercise and enjoy all the rights, powers and privileges which this act confers upon consolidated companies; and it shall likewise be possessed of, exercise and enjoy all the franchises, rights, powers, privileges, immunities and benefits, which any corporation of this state constituent thereof was possessed of or was entitled to exercise under its charter or any law of this state"). Cases predating the DGCL used the concept of "privileges" in the same way to refer to what the corporation's special charter authorized it to do. *See State v. Bank of Smyrna*, 7 Del. 99, 110 (Ct. App. & Err. 1859) (noting that a canal company "was authorized by a supplement to its original charter to extend its canal subject to the same rights, powers and privileges as contained in its original charter. By the original charter the Company was exempted from taxation and it was held that under the term *privileges*, the exemption extended to the new part, or the extension of the canal"); *Swift v. Richardson*, 32 A. 143, 144 (Del. Super. Ct. 1886) ("Corporations are created, and their rights, powers, and privileges are granted, for the public good."). Other authorities likewise use the word "privileges" to refer to legal rights, such as a right associated with and exercisable by the owner of a share of stock. *See, e.g.*, *Adams v. Clearance Corp.*, 121 A.2d 302, 305 (Del. 1956) (noting Section 123 of the DGCL granted a corporation the power to own the stock of another and to "exercise all the rights, powers and privileges of ownership including the right to vote thereon"); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *2 (Del. Ch. Aug. 27, 1987) ("INA's common stock is of two classes. The rights, powers and privileges of each class are identical except that the

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    25

holders of Class B are entitled to elect 2/3 of the board of directors of the Company."); *Aldridge v. Franco Wyo. Oil. Co.*, 7 A.2d 753, 765 (Del. Ch. 1939) (interpreting charter provision that referred to a corporation having the ability "to exercise all the rights, powers and privileges of ownership" of stock, "including the right to vote thereon" and citing similar language in the 1935 version of the DGCL); *Philadelphia, Wilmington & B.R. Co. v. Kent Cnty. R. Co.*, 1875 WL 1949, at *2 (Del. Super. Ct. 1875) (noting that corporation crated under Maryland law was given the authority to "exercise and enjoy all the rights, powers, and privileges properly appertaining to the" the purchasing and holding, leasing, mortgaging, and selling of real estate); *see also State ex. Re. James v. Schorr*, 65 A.2d 810, 823 (Del. 1948) (citing act creating Department of Elections and noting that it gave the department the power to exercise "such other rights, powers and privileges as by this Act conferred"). A more familiar use of the term "privileges" that deploys the word in similar fashion appears in the Privileges or Immunities Clause of the United States Constitution, which provides that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States." U.S. Const. amend. XIV, § 1. The parallel is unsurprising, as the drafters of the United States Constitution drew on precedents that included the corporate charters used to establish the colonies, and the foundational document bears striking similarities to a corporate charter. *See, e.g.*, John Mikhail, *Is the Constitution a Power of Attorney or a Corporate Charter? A Commentary on* "A Great Power of Attorney": Understanding the Fiduciary Constitution *by Gary Lawson and Guy Seidman*, 17 Geo. J. L. & Pub. Pol. 407 (2019); David Ciepley, *Is The U.S. Government a Corporation? The Corporate Origins of Modern Constitutionalism*, 111 Am. Pol. Sci. R. 418 (2017); John Mikhail, *The Necessary and Proper Clauses*, 102 Geo. L.J. 1045 (2014). But while I quibble with *Great Hill*'s plain meaning interpretation of the word "privileges," I concur with the outcome of the case. To avoid the anachronism, I would have introduced an additional analytical step and held that the right to assert privilege is a "right" or "power" of the constituent corporations that passes to the surviving corporation under Section 259. The endpoint is the same.

6    *Henshaw v. Am. Cement Corp.*, 252 A.2d 125, 130 (Del. Ch. 1969) (declining to permit a director to use Section 220(d) as a method for "back-door discovery unbound by work-product, privilege or any other limitation upon discovery"); *see Chappell v. FCB I Hldgs. Inc.*, C.A. No. 8817-VCP, at 8–9 (Aug. 28, 2013) (TRANSCRIPT) (following *Henshaw* in holding that director could not use litigation attorneys from personal litigation to obtain information under Section 220(d)); *Gunther v. 5iSciences, Inc.*, C.A. No. 5800-CC, at 4–6 (Dec. 3, 2010) (TRANSCRIPT) (rejecting effort of current director to obtain records under Section 220(d) where the request was "excessive" and director made the request for the benefit of his venture capital firm that was an investor in and wanted to acquire the corporation, creating a clear conflict of interest).

7    The *Garner* factors include: (1) the number of stockholders and the percentage of stock they represent; (2) the bona fides of the stockholders; (3) the nature of the stockholders' claim and whether it is obviously colorable; (4) the apparent necessity or desirability of the stockholders having the information and the availability of it from other sources; (5) whether, if the stockholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; (6) whether the communication is of advice concerning the litigation itself; (7) the extent to which the communication is identified versus the extent to which the stockholders are blindly fishing; the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons. 430 F.2d at 1104.

8    *See* Restatement (Third) of the Law Governing Lawyers § 73 cmt. c (Am. L. Inst. 2000) [hereinafter Restatement], Westlaw (database updated Oct. 2022).

9    *Id.* at 540 (footnote omitted); *see also Firefighters' Pension Sys. of City of Kans. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 286 (Del. Ch. 2021) ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous to trustees for the stockholders."); Ellen Taylor, *New and Unjustified Restrictions on Delaware Directors' Authority*, 21 Del. J. Corp. L. 837, 872 (1996) ("[D]irectors are not agents

of either the corporation or its shareholders, because they are not subject to the control of a principal." (footnote omitted)).

There are isolated cases that loosely refer to stockholders as principals and directors as their agents, but those references allude to the well-known concept of the principal-agent problem from economic theory. They are metaphorical, not doctrinal. *See, e.g., In re Invs. Bancorp, Inc. S'holder Litig.*, 177 A.3d 1208, 1223 n.83 (Del. 2017); (asserting that requiring directors to specify the precise amount and form of their compensation when seeking stockholder ratification "ensure[s] integrity in the underlying principal-agent relationship between stockholders and directors" (quoting *Desimone v. Barrows*, 924 A.2d 908, 917 (Del. Ch. 2007))); *Calma v. Templeton*, 114 A.3d 563, 579 (Del. Ch. 2015) ("In the corporate law context, stockholders (as principal) can, by majority vote, retrospectively and, at times, prospectively, act to validate and affirm the acts of the directors (as agents)." (footnote omitted)); *Unisuper Ltd. v. News Corp.*, 2005 WL 3529317, at *8 (Del. Ch. Dec. 20, 2005) (analogizing directors to agents and stockholders to principals). Given that Section 141(a) of the DGCL confers statutory authority on the board of directors to manage the business and affairs of the corporation, "[c]learly, directors are not mere agents." Julian Velasco, *Fiduciary Duties and Fiduciary Outs*, 21 Geo. Mason L. Rev. 157, 164 (2013); *see* Stephen M. Bainbridge, *Director Primacy: The Means and Ends of Corporate Governance*, 97 Nw. U. L. Rev. 547, 605 (2003) (reviewing authorities and concluding that "the board of directors is not a mere agent of the shareholders"); Deborah A. DeMott, *The Mechanisms of Control*, 13 Conn. J. Int'l L. 233, 253 (1999) ("Even when the parent owns all the stock in the subsidiary, its directors are not agents of the parent.").

10    *See, e.g., MPEG LA, L.L.C. v. Dell Glob. B.V.*, 2013 WL 6628782, at *2 (Del. Ch. Dec. 9, 2013) (applying rule that "attorney-client privilege protects legal advice only, and not business or personal advice" to reject certain assertions of privilege); *PharmAthene, Inc. v. SIGA Techs., Inc.*, 2009 WL 2031793, at *2 (Del. Ch. July 10, 2009) (same); *In re Circon Corp. S'holders Litig.*, 1998 WL 409166, at *5 (Del. Ch. July 6, 1998) (overruling assertion of privilege for business strategies; noting that the privilege "covers only legal advice and, where appropriate, even facts delivered to an attorney for the purpose of forming a legal opinion can be discovered"); *Hoechst*, 623 A.2d at 1122 ("The privilege only protects the communications themselves and does not prevent disclosure of the underlying facts which are the substance of the communications ....").

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WCAS092

2022-1 Trade Cases P 82,039

2022 WL 836951

United States District Court, S.D. California.

IN RE: PACKAGED SEAFOOD
PRODUCTS ANTITRUST LITIGATION
This Document Relates to: All Actions.

Case No.: 15-MD-2670 DMS (MDD)
|
Signed 03/21/2022

ORDER (1) GRANTING PLAINTIFFS' MOTION
FOR RECONSIDERATION; (2) VACATING
ORDER GRANTING DEFENDANTS' MOTION
TO DISMISS; (3) DENYING DEFENDANTS'
MOTION TO DISMISS; AND (4) DENYING
AS MOOT PLAINTIFFS' MOTION FOR
CERTIFICATION OF RULE 54(b) JUDGMENT
AND THE PARTIES' JOINT MOTION TO SEAL

(ECF Nos. 2281, 2285, 2471)

Dana M. Sabraw, Chief Judge

**\*1** Pending before the Court are Plaintiffs' Motion for
Certification of a Rule 54(b) Judgment ("Rule 54(b) Mot.,"
ECF No. 2281-1) and Direct Action Plaintiffs' ("DAP")
Motion for Reconsideration of the Court's Order Granting
Lion Capital's Motion to Dismiss or, in the Alternative,
for Entry of Final Judgment Under Rule 54(b) ("Mot. for
Reconsideration," ECF No. 2284.) Plaintiff W. Lee Flowers
& Co. separately joined in the Rule 54(b) Motion. (ECF
No. 2282.) Defendants Lion Capital LLP ("Lion Capital")
and Big Catch Cayman LP ("Big Catch") opposed, ("54(b)
Opp'n," ECF No. 2289; "Reconsideration Opp'n," ECF No.
2291), and Plaintiffs replied, ("54(b) Reply," ECF No. 2300;
"Reconsideration Reply," ECF No. 2302.) [1] The parties also
jointly filed a motion to seal. ("Mot. to Seal," ECF No.
2471.) For the reasons set forth below, Plaintiffs' Motion for
Reconsideration is granted, the Order Granting Defendants'
Motion to Dismiss ("Second Lion Order," ECF No. 2270) is
vacated, and Defendants' motion to dismiss (ECF No. 1631) is
denied. In light of those rulings, Plaintiffs' Rule 54(b) motion
and the parties' Motion to Seal are denied as moot.

I.

BACKGROUND

The general background and history of this litigation is well
documented and extensively discussed in prior orders. (ECF
Nos. 2454, 2654.) For purposes of the present motions, the
Court sets out only the relevant facts.

In July 2015, the Antitrust Division of the United States
Department of Justice ("DOJ") announced its investigation
into the packaged tuna industry. Criminal charges for price
fixing in violation of the Sherman Act, 15 U.S.C. § 1, were
filed against the three largest domestic producers of packaged
tuna products—Tri-Union Seafoods LLC d/b/a Chicken of
the Sea International ("COSI"), Bumble Bee Foods LLC
("Bumble Bee"), StarKist Company ("StarKist"), and their
executives. Bumble Bee's CEO Christopher Lischewski [2]
was convicted after a jury trial. *United States v. Lischewski*,
860 Fed. Appx. 512, 2021 WL 2826474 (9th Cir. Jul. 7,
2021) (affirming conviction). He is serving a prison sentence
for his "leadership role in the conspiracy." *United States v.
Lischewski*, U.S. Dist. Ct. N.D. Cal. Case No. 18cr203-EMC,
Am. Crim. Minutes of Jun. 16, 2020, sentencing, ECF No.
692. All other defendants pled guilty.

In the wake of the DOJ announcement of its investigation,
dozens of plaintiffs initiated civil actions alleging price fixing
against the three tuna producers and their parent companies:
(1) COSI and its owner Thai Union Group PCL ("TUG");
(2) StarKist and its owner Dongwon Industries Co. Ltd.
("Dongwon"); and (3) Bumble Bee and its owners Lion
Capital, Lion Capital (Americas), Inc. ("Lion Americas") and
Big Catch (collectively the "Lion Entities"). The civil actions
were consolidated in a multidistrict litigation ("MDL") for
pretrial proceedings before this Court.

**\*2** The Lion Entities moved to dismiss the claims alleged
against them. In the order disposing of the motion, the Court
concluded it had personal jurisdiction over the Lion Entities,
but that Plaintiffs stated a claim only against Lion Americas.
(Order Granting in Part and Denying in Part Defs.' Mots. to
Dismiss ("First Lion Order") at 90, ECF No. 1362.) [3] The
complaint was sufficient to allege that Lion Americas directly
participated in the price fixing conspiracy. (*Id.* at 79-86.)
Plaintiffs were granted leave to amend the claims against Lion
Capital and Big Catch. (*Id.* at 90.) When Plaintiffs filed their

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 99 of 250

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

amended complaints,[4] Lion Capital and Big Catch again moved to dismiss, which motion was granted without leave to amend.

DAPs filed a Motion for Reconsideration of the Second Lion Order or, alternatively, for entry of a final judgment against Lion Capital and Big Catch under Rule 54(b) of the Federal Rules of Civil Procedure.[5] All Plaintiffs, including DAPs, also joined in a separately filed Rule 54(b) Motion.[6] Finally, the parties jointly filed a Motion to Seal requesting the sealing of eight documents filed in support of and in opposition to Plaintiffs' Motion for Reconsideration.

## II.

### MOTION FOR RECONSIDERATION

"Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *School Dist. No. IJ, Multnomah County, Oregon v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).[7] Here, Plaintiffs argue reconsideration is warranted based on newly discovered evidence and because the Court committed clear error in the Second Lion Order.[8]

In support of their argument of clear error, Plaintiffs raise the issue of the Court's application of *United States v. Bestfoods*, 524 U.S. 51, 69 (1998), in reaching the conclusion that Plaintiffs failed sufficiently to allege that Eric Lindberg, Jacob Capps, and Jeff Chang, dual agents of Lion Capital and Lion Americas, acted on behalf of Lion Capital when they participated in the conspiracy. (*Cf.* Second Lion Order at 16-17 *with* Mot. for Reconsideration at 8-12.) The Lion Entities counter that Plaintiffs should be precluded from seeking reconsideration because they failed to address this issue in their opposition to the Second Lion 12(b)(6) Motion. (Reconsideration Opp'n at 2, 4.)

**\*3** The Court disagrees. In their moving papers the Lion Entities quoted *Bestfoods* for the hornbook proposition that "a parent corporation ... is not liable for the acts of its subsidiaries." (Mem. of P.&A. in Supp. of Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second Lion 12(b)(6) Mot.") at 31, ECF No. 1630-1.)[9] It was only

in the reply that they argued for dismissal based on the "*Bestfoods* presumption," which they articulated as follows, "The Supreme Court has held that 'dual status' agents of a parent corporation and its subsidiary are presumed to be acting for the subsidiary if, as here, they are employed by that subsidiary." (Reply in Supp. of Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second Lion 12(b) (6) Reply") at 2 (*citing Bestfoods*, 524 U.S. at 69-70), ECF No. 1759.)[10] Raising the "*Bestfoods* presumption" for the first time in the reply deprived Plaintiffs of an opportunity to respond. Accordingly, Plaintiffs' request to reconsider the Second Lion Order on this basis is granted. *See Dietz v. Bouldin*, 579 U.S. 40, 45-46 (2016).

The issue of Lion Capital's liability was raised in the context of a Rule 12(b)(6) motion to dismiss. Plaintiffs' allegations must therefore meet the pleading standard of Rule 8(a)(2). The Rule

> requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds for his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court must accept as true all allegations of material fact in the complaint and construe them in the light most favorable to the party opposing dismissal. *Id.*

On a Rule 12(b)(6) motion courts generally may not consider material outside the complaint. *Khoja v. Orexigen Therapeutics, Inc.*, 988 F.3d 988, 998 (9th Cir. 2018). "There are two exceptions to this rule: the incorporation-by-reference

WCAS094

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    2

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 100 of 250

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

doctrine, and judicial notice under Federal Rule of Evidence 201." *Id.* In determining whether Plaintiffs stated a claim, the Court considers neither the evidence offered by Plaintiffs nor affidavits offered by the Lion Entities insofar as they fall outside these exceptions.

As set out in the First Lion Order, Plaintiffs sufficiently alleged Lion Americas' direct participation in the conspiracy. (First Lion Order at 86.) The finding was based on detailed allegations that Lindberg, Capps, and Chang communicated with Lischewski and other Bumble Bee executives regarding pricing agreements with StarKist and COSI and cooperated in Bumble Bee's efforts to police and enforce them. (*Id.* at 81-84.) The principal issue on reconsideration is whether Plaintiffs also sufficiently alleged participation by Lion Americas' parent entity Lion Capital.

## A. Plaintiffs' Allegations

At all relevant times, Lion Capital was a British private equity firm specializing in investments in the consumer sector. (Compl. ¶ 189; *see also* Am. and Restated Limited Liability Partnership Deed Relating to Lion Capital LLP ("LLP Agreement"), ECF No. 1630-3; *see also* ECF No. 1721-1.) [11] Its founder and Managing Partner was Lydon Lea. (Compl. ¶ 189; LLP Agreement §§ 1.1, 9.1.) Lindberg, Capps, and Chang were among its Members. (Compl. ¶¶ 189, 192; *see also* LLP Agreement, Schedule 1.) Lea, Lindberg, and Capps were also among its Executive Officers. [12]

 **\*4** Lion Americas was a Delaware corporation and Lion Capital's wholly owned subsidiary. (Compl. ¶ 190; *see also* Lion Americas Form ADV ("Form ADV"), ECF No. 2291-2, pages 97-117, Items 2, 3 & Schedule A.) [13] Lion Americas was an SEC-registered investment advisor with one client— Lion Capital. (Form ADV, Items 2, 5, 7.) Capps served as Lion Americas' President, Lindberg was one of its directors, and Chang was an employee. (Compl. ¶¶ 189-97.) Plaintiffs adopted the Lion Entities' position that although Lea was an officer of Lion Americas, he was not a Lion Americas employee but was exclusively a Lion Capital employee. (*Id.* ¶ 215 & n.13.)

Lion Capital's business model was to acquire companies, increase their market value, and sell them at a profit. (First Lion Order at 78.) Lion Capital held itself out to potential investors as "focus[sed] solely on retail and consumer businesses" and possessing "a team with an intimate knowledge of the way consumers and brands

interact[.]" (Compl. ¶ 216.) It distinguished itself from "average" private equity firms by its philosophy of getting "down to the very granular knowledge" of the businesses it owned. (*Id.* ¶¶ 215, 216.)

Lion Capital acquired Bumble Bee in December 2010 (Compl. ¶¶ 189, 210, 240; *see also* First Lion Order at 4) and became Bumble Bee's equitable owner. (First Lion Order at 33.) The equitable ownership finding encapsulates the convoluted ownership structure of the Bumble Bee investment (*see id.* at 31-33 & n.21; *see also* Compl. ¶¶ 200-05) and is based on the facts that Lion Capital exercised control over the investment fund, Lion Capital Fund III, L.P. (the "Fund"), which invested in Bumble Bee, and that Lion Capital was the Fund's "managing agent." [14] (First Lion Order at 33; Form D (identifying Lion Capital as the Fund's "manager").)

Plaintiffs contend that Lion Capital learned of Bumble Bee's participation in the conspiracy before the acquisition. (Compl. ¶¶ 208-09.) During the due diligence process, Lion Capital had access to Bumble Bee's financial records and executives who are now known to have participated in the conspiracy. (*Id.* ¶ 208.) Specifically, Lion Capital inquired about the increase in Bumble Bee's per-can profit margins since 2006, and learned it was the result of a price increase and the can downsize in 2008. (*Id.*) It can reasonably be inferred that, as a "sophisticated investment firm" (First Lion Order at 81) and in keeping with its claims of expertise in the consumer sector and "granular knowledge" of the companies it acquired, Lion Capital knew of the contemporaneous industry-wide downward pressure on product pricing due to the falling price of raw tuna and decreasing market demand for canned tuna. (Compl. ¶¶ 208, 55-60; *see also* First Lion Order at 77-79, 81.) In a competitive market canned tuna prices would have decreased. Bumble Bee prices increased.

Just weeks before completing the acquisition, Lion Capital separately met with Dongwon and TUG executives. (Compl. ¶¶ 210, 211.) In arranging the meeting with Dongwon Chairman Jae-chul Kim on November 15, 2010, Lindberg explained he wanted to meet on an "owner to owner" basis. (*Id.* ¶ 211.) Accordingly, Lindberg held himself out as a representative of Lion Capital, soon-to-be owner of Bumble Bee.

 **\*5** In preparing Lindberg for the meeting, Lischewski told him that a "key message is to ensure Dongwon that Lion will support rational[ ] market behavior by Bumble Bee." (Compl.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.                3

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 101 of 250

*In re* Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

¶¶ 210, 223.) Defendants have argued that "rational" meant just that and nothing more. However, after the guilty pleas and Lischewski's conviction, in the context of the pre-acquisition meetings with competitors, and in light of other allegations in the Complaint which shed additional light on the issue (*see, e.g., id.* ¶¶ 210, 221, 234), it can reasonably be inferred that "rational market behavior" was a euphemism for collusive pricing agreements among Bumble Bee, StarKist, and COSI. (*See also* First Lion Order at 49.) Prior to the meeting, Lindberg reviewed the "talking points" with Lea and others at Lion Capital. (Compl. ¶ 211.)

Plaintiffs alleged sufficient material facts to support a reasonable inference that Lion Capital learned prior to completing the acquisition that Bumble Bee's profits were the product of pricing actions which would be untenable in a competitive market and were in fact product of anticompetitive agreements. Lion Capital proceeded to acquire Bumble Bee anyway.

The "primary purpose" of Lion Capital was "to carry on, directly or indirectly through its Associates, the business of the provision of investment management (and/or advisory) services to the Funds[,]" including the Fund which invested in Bumble Bee. (LLP Agreement ¶ 3.3.) Lion Americas was a Lion Capital "Associate." (LLP Agreement § 1.1.)

Lion Capital used Lion Americas to carry out some of its management duties and paid Lion Americas on a "cost plus fee" basis. (*See* Form ADV, Item 5; Compl. ¶¶ 195, 196.) Lion Capital was Lion Americas' only client, Lion Americas was not involved in any other business other than advising Lion Capital, and it had no direct or indirect affiliation with the Fund. (*See* Form ADV, Items 5-7; Compl. ¶ 199.) Lion Americas had no other source of income and was entirely dependent on Lion Capital for funding. (Compl. ¶ 199; Form ADV, Item 5.) Based on the foregoing, the allegations support a reasonable inference that Lion Americas had no direct ability to manage Bumble Bee, and that Lion Capital, as Bumble Bee's equitable owner and managing agent of the Fund, had the ability to manage Bumble Bee.

The Lion Entities' website stated that Lion Capital "closely managed the business affairs of the companies in which it invests." (Compl. ¶ 216.) Specifically, it claimed, "*We work closely with management* to see exactly what a brand is capable of achieving, and then take it to new heights," and, based on the consumer brand focus, "our team is uniquely positioned to *work with management* to identify the right

strategies for revitalizing operations. (*Id.*) (emphases added). Lion Capital "ensure[s] that [its] companies have the best management talent to execute the vision that we develop in a *collaborative partnership*" while never forgetting "the responsibility for successful outcomes in our companies rests with us [Lion Capital]." (*Id.*) (emphasis added). At the time of the acquisition, Lischewski disseminated an internal memorandum to Bumble Bee employees stating that "the Lion Entities team planned to be 'actively involved' in the business." (*Id.* ¶ 217.) Lion Capital installed Lea, Lindberg, and Capps on Bumble Bee's board of directors, thus controlling three of its four seats. (*Id.* ¶¶ 217, 205.)

Lion Capital oversaw the Bumble Bee investment from its office in Los Angeles, California, near Bumble Bee's headquarters and principal place of business in San Diego. (Compl. ¶¶ 189, 31.) Lion Americas operated out of the same office. (*Id.* ¶ 190.) Dual agents Lindberg, Capps, and Chang also worked out of the Los Angeles office. (*Id.* ¶¶ 189, 190.)

As the sole Managing Partner of Lion Capital, Lea had the discretion and authority to admit new Members, determine their duties and compensation, and expel them from Lion Capital. (LLP Agreement ¶¶ 11, 12.1(b), 14.1, 1.1.) Further, the LLP Agreement sets out the "Members' Obligations[,]" as follows:

> **\*6** Each Member shall, unless the Managing Partner otherwise agrees, devote the whole of his time and attention to the performance of his obligations on behalf of the LLP and its Associates, as required by the Managing Partner and shall not engage in other business activities without the consent of the Managing Partner. The Managing Partner may determine the duties, role and obligations of each of the Members from time to time.

(LLP Agreement ¶¶ 14 & 14.1.) The Lion Entities have argued that this provision does not mean that Lindberg, Capps, or Chang had to devote their entire time to duties as assigned by Lea. (Second Lion 12(b)(6) Reply at 6.) They point to the language that the Members had to devote their time to obligations on behalf of Lion Capital *and its Associates*, Lion Americas included, and that Lea would

WCAS096

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 102 of 250

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

determine their duties merely *from time to time* and not necessarily all of the time. (Second Lion 12(b)(6) Reply at 6) (second emphasis added).

The Court does not consider the LLP Agreement in the abstract but in the context of other factual allegations. Plaintiffs alleged that Lea assigned Lindberg to be principally responsible for managing the Bumble Bee investment and that he assigned Capps and Chang to assist Lindberg. (Compl. ¶ 194; *see also id.* ¶ 191.) These assignments were consistent with the LLP Agreement. No facts have been alleged or are discernible from judicially noticed documents to suggest that Lindberg, Capps, or Chang engaged in any business activities other than as assigned by Lea. In context, it is apparent that Lea directed Lindberg, Capps, and Chang's actions with regard to Bumble Bee to meet Lion Capital's objectives as the managing agent of the Bumble Bee investment.

Lion Capital closely monitored Bumble Bee's performance as well as competitors' compliance with the pricing agreements and set ambitious goals for Bumble Bee (Compl. ¶¶ 213, 221, 232), as it wanted to ensure Bumble Bee's continued "supra-competitive" profits and "investment grade returns" to the Fund. (*Id.* ¶¶ 202, 213.) Lion Capital "incentivized and rewarded" Bumble Bee executives [15] with Big Catch shares [16] to meet the goals it set for the benefit of its investors. (*Id.* ¶ 202.)

Lea attended most Bumble Bee board meetings, which were often followed by off-the-record "executive sessions." (Compl. ¶¶ 218, 220, 194; *see also id.* ¶ 217.) When Lea was unable to attend, he received detailed private briefings. (*Id.* ¶ 220.) Lea's briefing included competitor information and developments which revealed collusive dealings with Bumble Bee's competitors. (*Id.* ¶¶ 217, 228.) To the extent Lea did not himself directly communicate with Bumble Bee executives, Lindberg, Capps, and Chang provided reports. (*Id.* ¶ 220.) For example, on March 28, 2012, Chang reported to Lea about a board meeting the day before. His report included non-public information about StarKist and COSI profitability and plans for Bumble Bee to closely align its list pricing with them as of April 1, 2012. (*Id.*)

Plaintiffs cite another example from July 2012, when Lea "complained" to Lindberg that Bumble Bee had missed earnings projections for the first half of 2012 and asked for some "good news" to report to the investors. (Compl. ¶ 221.) Lindberg responded that the failure to meet the goal would not repeat itself because it was the result of pricing issues "caused

by StarKist's dysfunctional management team which was fired by Dongwon," and that StarKist was "now in lockstep with us in setting pricing rationally." (*Id.*) These specific allegations support Plaintiffs' assertion that Lion Capital knew of and encouraged Bumble Bee's collusive activities.

**\*7** The allegations of Lion Capital's involvement in the conspiracy are underscored by Bumble Bee's Plea Agreement, which suggests that Lion Capital was not merely passively involved but had meaningful information to contribute to the then-ongoing investigation. The Plea Agreement required Bumble Bee's "parent companies," including Lion Capital, to provide full cooperation with the government investigation and potentially pay additional fines on behalf of Bumble Bee. (*U.S. v. Bumble Bee*, N.C. Cal. Case No. 17cr00249, Am. Plea Agreement ¶¶ 9, 13, 14, ECF No. 32; *see also id.* Tr. of Proceedings ("Tr.") at 10-11, ECF No. 36; *see also* Compl. ¶ 205.) The Lion Entities were represented at Bumble Bee's change of plea hearing and sentencing by the firm representing them in this MDL. (*See* Tr. at 3.) Moreover, in this MDL, it was Lion Capital that produced "crucial" email communications between Lischewski and the Lion Entities. (Compl. ¶ 181.)

Consistent with its objective to achieve maximum investor returns for its Fund, Lion Capital was involved in policing compliance and enforcing collusive pricing agreements. For example, in early 2012, TUG President and CEO Thiraphong Chansiri contacted Lindberg asking how they could "work together on the owner level" to help "improve" the industry. (Compl. ¶ 230.) Lindberg heartily agreed with Chansiri's "sentiments about the negative industry atmosphere." (*Id.*) This exchange was followed by a meeting between them to discuss the issues. (*Id.* ¶ 231.)

The Court has already determined that the alleged email exchange supports a reasonable inference that TUG and Lion Capital sought to clamp down on what they perceived as "cheating" on the pricing agreements. (First Lion Order at 82-83.) In this instance, the Court focuses on the fact that Chansiri reached out to Lindberg "on the owner level." Lindberg had previously held himself out as a representative of Bumble Bee's owner (*Cf.* Compl. ¶ 211), and in fact was a Lion Capital Executive Officer (Form D). It is therefore not surprising that he was contacted in that capacity. These specific allegations support a reasonable inference that Lindberg acted on behalf of Lion Capital when he engaged in the policing and enforcement of the collusive agreements.

WCAS097

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 103 of 250

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

Continuing to secure Bumble Bee's high profit margins, achievable only through collusion, by perpetuating and enforcing pricing agreements was to Lion Capital's benefit. (First Lion Order at 78.) This strategy was poised to pay off when Lion Capital announced plans to sell Bumble Bee to TUG in 2014. Lion Capital acquired Bumble Bee for $980 million in December 2010 and had entered into an agreement to sell it to TUG in late 2014 for $1.51 billion—an increase of approximately $530 million in just four years. (Compl. ¶¶ 189, 209, 213, 240.) Upon announcing the transaction, Lea issued a statement:

> We are proud to have played a significant role in the evolution of Bumble Bee over the last 4 years and would like to thank our partners, Chris [Lischewski] and the management team, for helping us achieve such a successful return on our investment.

(*Id.* ¶ 215.) The deal fell apart after the DOJ "informed the companies it had serious concerns that the proposed transaction would harm competition." (DOJ Press Release dated Dec. 3, 2015, cited in Compl. ¶ 209 n.12.)

## B. Legal Arguments and Authorities

In their opposition to the Second Lion 12(b)(6) Motion Plaintiffs argued that Lindberg, Capps, and Chang acted as agents of Lion Capital. (Pls' Resp. to Lion Capital and Big Catch Renewed Consol. Mot. to Dismiss ("Second Lion 12(b)(6) Opp'n,") at 6-15, ECF No. 1721.)[17] The parties agree that the federal common law of agency, as stated in the Restatement (Third) of Agency, applies to the question whether Lion Americas agents were also agents of Lion Capital. (*Cf. id.* at 12 *with* Second Lion 12(b)(6) Reply at 3-4.) The Lion Entities do not dispute that Plaintiffs sufficiently alleged facts to meet the agency elements under federal common law. (*See* Second Lion 12(b)(6) Reply at 4.) They argue, however, that more is required for dual agents like Lindberg, Capps, and Chang. They point to *Bestfoods* for the proposition that in the absence of additional facts, the law presumes dual agents acted on behalf of the subsidiary rather than the parent corporation. (*Id.* at 2.) Plaintiffs counter that their Complaint overcomes the presumption. (Mot. for Reconsideration at 8 n.16.)

**\*8** Plaintiffs rely on *Arandell v. CenterPoint Energy Services*, 900 F.3d 623 (9th Cir. 2018), for the proposition that Lion Capital and Lion Americas were a single enterprise for purposes of the price-fixing conspiracy so that "the knowledge of ... dual officers and directors is imputed to Lion Capital, which is in turn liable for its own conduct in furtherance of the conspiracy."[18] (Mot. for Reconsideration at 7.) *Arandell* addressed the issue of a subsidiary's direct liability for collusion based on participation in coordinated activity with its parent and affiliate entities. 900 F.3d at 625. The case was part of an MDL alleging an industry-wide conspiracy. *See Arandell*, 900 F.3d at 627-28. At the time of the relevant motions, the existence of the conspiracy had already been established because the parent and affiliate entities had admitted to their participation. *See id.* at 627-28, 629, 634 n.11. Here, Bumble Bee and its executives have been convicted of collusion with competitors. Further, the Court has found that Plaintiffs sufficiently alleged Lion Americas' collusion with Bumble Bee.

In *Arandell* the plaintiffs' theory against the subsidiary was that it had played a vital part in the scheme orchestrated by its parent. 900 F.3d at 628. There was a substantial overlap between the directors and managers of the subsidiary, affiliate, and parent entities. *Id.* at 629, 632. The parent and affiliates colluded with other natural gas conglomerates to manipulate prices. *Id.* at 630. In furtherance of the conspiracy, the parent entity's officers and directors instructed the affiliate to manipulate retail prices and directed the subsidiary, which purchased gas from the affiliate, to sell it to consumers and return profits to the parent. *Id.* at 628.

In support of its summary judgment motion, the subsidiary argued plaintiffs failed to raise a genuine issue whether the subsidiary engaged in any anticompetitive activity. *Id.* The subsidiary argued its liability could not rest solely on the facts that its affiliate and parent entities were involved in the conspiracy and that the subsidiary sold natural gas to consumers. *Id.* The district court agreed and granted summary judgment reasoning that the plaintiffs failed to present evidence that the subsidiary knowingly engaged in price manipulation or knew that its parent and affiliate were engaged in such behavior. *Id.* The Court of Appeals reversed. *Id.* at 629.

As to anticompetitive intent, the court ruled,

WCAS098

Case 4:23-cv-03560  Document 125  Filed on 02/26/24 in TXSD  Page 104 of 250

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)

2022-1 Trade Cases P 82,039

> A wholly owned subsidiary that engages in coordinated activity in furtherance of the anticompetitive scheme of its parent and/or commonly owned affiliates is deemed to engage in such coordinated activity with the purposes of the single "economic unit" of which it is a part.

*Id.* at 632; *see also* discussion at 630-32. The plaintiffs' evidence that the activities of the commonly owned entities were coordinated and furthered the conspiracy, *i.e.*, the subsidiary's claimed unwitting distribution to consumers at artificially inflated prices, obviated the need for a separate showing of the subsidiary's knowledge. *Id.* at 632. The commonly owned enterprise's illegal purpose was imputed to the subsidiary. *Id.*

The "unity of *purpose* ... does not supply a theory of unbounded vicarious liability for the *acts* of legally distinct entities." *Id.* at 633. "A defendant may be held liable under § 1 of the Sherman Act if that person *acted* either with the knowledge that the action would have unreasonable anticompetitive effects or with the purpose of producing those effects." *Id.* at 629 (emphasis added). To hold any defendant directly liable as part of a common scheme, a plaintiff "must come forward with evidence that each defendant independently participated." *Id.* at 633. The plaintiffs' showing in *Arandell* that the subsidiary sold gas at inflated prices and distributed the profits to its parent was adequate circumstantial evidence to raise a genuine issue regarding the subsidiary's own participation in the scheme. *Id.* at 634-35.

**\*9** Accordingly, to state a claim against Lion Capital, Plaintiffs must allege Lion Capital's knowledge or anticompetitive purpose. The state of mind can be either imputed from allegations of coordinated activity in furtherance of the conspiracy or alleged separately. In addition, Plaintiffs must allege Lion Capital's participation in any part of the scheme. [19] Defendants rely on *Bestfoods* to argue that Plaintiffs' allegations were insufficient.

*Bestfoods* addressed the issue of "the extent to which parent corporations may be held liable under CERCLA [the Comprehensive Environmental Response, Compensation,

and Liability Act] for operating facilities ostensibly under the control of their subsidiaries." 524 U.S. at 60; *see also* at 69-70. There, as here, the parent entities placed their own high-level officials on the subsidiary's board and in key management positions. *Id.* at 68; *see also id.* at 59. Those individuals made major policy decisions and conducted relevant day-to-day operations. *Id.* at 68-69. Furthermore, a parent entity official who was not an employee, officer, or director of the subsidiary "played a significant role in shaping [the subsidiary's] environmental compliance policy." *Id.* at 59; *see also id.* at 72.

After a bench trial, the district court found the parent entities directly liable for CERCLA violations as operators at the facilities operated by the subsidiary. *Id.* at 59, 67. The Court of Appeals reversed. *Id.* at 59-60. The Supreme Court vacated and remanded for further fact finding on the issue of the parent entities' direct liability. *Id.* at 72-73.

Generally, "a parent corporation ... is not liable for the acts of its subsidiaries." *Id.* at 61. However, "the parent corporation is itself responsible for the wrongs committed by its agents in the course of its business." *Id.* at 65; *see also id.* at 64. This occurs when

> the alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management and the parent is directly a participant in the wrong complained of. In such instances, the parent is directly liable for its own actions.

*Id.* at 64-65. Nevertheless, when parent entity personnel are also acting at the management or directorial levels of the subsidiary, this does not automatically expose the parent to direct liability for the subsidiary's actions. *Id.* at 69-70. It is not inappropriate for parent entity personnel to hold important positions with the subsidiary and "change hats to represent the two corporations separately, despite their common ownership." *Id.* at 69. The "courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.*

To overcome the presumption, a party must show that the dual agents were acting on behalf of the parent. *Id.* at 70. The focus of the inquiry is on the parent company's role in the

WCAS099

2022-1 Trade Cases P 82,039

alleged wrongdoing. *See id.* at 67-68. This is a fact-specific analysis "call[ing] for line-drawing," as the acts "that give rise to parental liability must necessarily be distinguished from the interference that stems from the normal relationship between parent and subsidiary." *Id.* at 71. For example,

> [a]ctivities that ... are consistent with the parent's investor status, such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures should not give rise to direct liability.

 **\*10** *Id.* at 72. On the other hand, participation in the subsidiary's wrongdoing supports a finding of the parent company's liability. *See id.* at 67-68, 70-71.

In *Bestfoods*, evidence that a parent entity agent was actively involved in dealing with the toxic risks emanating from the operation of the subsidiary's facility, and evidence suggesting that the subsidiary's actions in operating the facility were "dictated by, and thus taken on behalf of," a parent entity was sufficient to overcome reversal of a plaintiffs' judgment and warranted remand for further fact finding. *Id.* at 72-73 & n.14. Accordingly, Plaintiffs can allege Lion Capital's participation by alleging that Lion Capital participated in the conspiracy through its agents who were not also agents of Lion Americas, or alternatively, that dual agents Lindberg, Capps, and Chang acted on behalf of Lion Capital.

### C. Antitrust Claim Against Lion Capital
Plaintiffs have sufficiently alleged that Lion Capital knew prior to the acquisition that Bumble Bee participated in an ongoing industry-wide price-fixing conspiracy. It can reasonably be inferred from the allegations that Lion Capital knew that Bumble Bee's profits were untenable in a competitive market and were in fact the product of collusive price agreements. Lion Capital proceeded to acquire Bumble Bee with this knowledge.

Plaintiffs have also sufficiently alleged that Lion Capital and Lion Americas engaged in coordinated activity as a single enterprise. Lion Capital, with knowledge of Bumble Bee's ongoing participation in the conspiracy and as the managing

agent of the Bumble Bee investment, used Lion Americas to assist in managing Bumble Bee with the objective of maintaining supra-competitive profits. The coordinated activity furthered the conspiracy by encouraging Bumble Bee's continued participation and perpetuating the collusive agreements by policing and enforcing them.

The allegations of Lion Capital's knowledge and the coordinated activity with Lion Americas in furtherance of the conspiracy are sufficient under *Arandell* to raise a reasonable inference of Lion Capital's own participation in the conspiracy. Cf. *Arandell*, 900 F.3d at 634-35. As equitable owner with knowledge of Bumble Bee's participation, Lion Capital could have directed Bumble Bee to disassociate itself from the conspiracy. Lion Capital's role in knowingly encouraging Bumble Bee's collusion was crucial to the continued viability of the conspiracy.

Alternatively, Plaintiffs have sufficiently alleged Lion Capital's own acts in furtherance of the conspiracy. Plaintiffs alleged that Lion Capital directly participated through Lindberg, its Member and Executive Officer. Lindberg held himself out as acting on behalf of Lion Capital when he assured, on an "owner to owner" basis, to Dongwon and TUG executives that Lion Capital would support and enforce the collusive pricing agreements. In this regard, Lindberg's ostensible capacity was that of an agent of Lion Capital. Cf. *Bestfoods*, 524 U.S. at 71-72. Lion Americas had no ownership, equitable or otherwise, of Bumble Bee. Accordingly, Plaintiffs' allegations support a reasonable inference that Lindberg acted on behalf of Lion Capital. The allegations regarding Lindberg's actions on behalf of Lion Capital are sufficient to state a claim against Lion Capital.

 **\*11** Finally, Plaintiffs alleged sufficient facts to raise a reasonable inference that Lion Capital participated through Lea, its General Manager who was not employed by Lion Americas, as well as through the dual agents he directed. Lea assigned Lindberg, Capps, and Chang to manage the Bumble Bee investment. After the acquisition, their reports to Lea indicated that Bumble Bee continued to collude with its competitors. Contrary to discouraging continued support of Bumble Bee's collusion, Lea ratified and encouraged it by knowingly setting Bumble Bee's financial goals at levels which were untenable in the absence of collusion. In this regard, Plaintiffs sufficiently alleged that Lion Capital participated in the conspiracy by directing dual agents Lindberg, Capps, and Chang, and that the dual agents

WCAS100

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 106 of 250

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)
2022-1 Trade Cases P 82,039

furthered the conspiracy at Lea's direction. *Id.* at 72-73 & n.14.

Based on the foregoing, Plaintiffs have alleged adequate facts to state an antitrust claim under 15 U.S.C. § 1 against Lion Capital.

**D. Antitrust Claim Against Big Catch**
The Court has previously found Plaintiffs sufficiently alleged that Big Catch was Lion Capital's alter ego. (First Lion Order at 62, 87; *see also* Second Lion Order at 18.) Accordingly, Plaintiffs have stated an antitrust claim under 15 U.S.C. § 1 against Big Catch on the alter ego theory. [20]

### III.

### MOTION TO SEAL

The parties jointly filed a Motion to Seal portions of eight documents filed in support of and in opposition to Plaintiffs' Motion for Reconsideration. (Mot. to Seal Exs. A-H, lodged at ECF No. 2472.) The documents consist of Kroger Plaintiffs' proposed fifth amended complaint, charts of new allegations in the proposed fifth amended complaint, including the Lion Entities' arguments in opposition and Plaintiffs' reply, a report on Lion Companies' and Lion Americas' annual performance, tax liabilities, and payroll, excerpts from three depositions, and an internal whistleblower communication.

The Motion for Reconsideration was decided based on the allegations in the operative Complaint. Further, because the Motion for Reconsideration is granted and the Second Lion 12(b)(6) Motion is denied, Plaintiffs' request for leave to amend is moot. Accordingly, none of the documents sought to be sealed is relevant to the decision on Plaintiffs' Motion for Reconsideration. The Joint Motion to Seal is therefore denied as moot.

The parties do not request the sealing of any portion of the parties' briefs in support of and in opposition to the Motion

for Reconsideration. (*See* ECF No. 2472 (listing documents for sealing).) Accordingly, the parties will refile without redactions their briefs filed at ECF Nos. 2285, 2295, and 2303.

### IV.

### CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1. Plaintiffs' Motion for Reconsideration (ECF No. 2285) is granted. The Order Granting Defendants' Motion to Dismiss (ECF No. 2270) is vacated. Lion Capital and Big Catch's Renewed Consolidated Motion to Dismiss the Complaints of the Indirect Purchaser End Payer Plaintiffs, Commercial Food Preparer Plaintiffs, Direct Purchaser Plaintiffs, Direct Purchaser Class Plaintiffs, and Direct Action Plaintiffs and the Cherokee Nation (ECF No. 1631) is denied.

2. No later than the time set forth in Federal Rule of Civil Procedure 12(a)(4)(A) Defendants Lion Capital and Big Catch shall file their respective answers, if any.

3. Plaintiffs' Rule 54(b) Motion (ECF No. 2281) is denied as moot.

4. The parties' Joint Renewed Motion to File Documents Under Seal (ECF No. 2471) is denied as moot. The parties shall forthwith refile without redactions their briefs filed at ECF Nos. 2285, 2295, and 2303.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2022 WL 836951, 2022-1 Trade Cases P 82,039

### Footnotes

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 9

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 107 of 250

In re Packaged Seafood Products Antitrust Litigation, Not Reported in Fed. Supp. (2022)
2022-1 Trade Cases P 82,039

1    The Motion for Reconsideration briefing was filed under seal. The public redacted briefs can be found at ECF Nos. 2285, 2295, and 2303. This Order cites to the sealed briefs.

2    Unless otherwise noted, individuals are referred to by full names only when first introduced. Subsequently, they are referenced by last name only.

3    The public redacted version of the First Lion Order can be found at ECF No. 1358.

4    The parties have stipulated, and the Court ordered, that the Fourth Amended Complaint filed by the Kroger Plaintiffs (Compl., ECF No. 1475), is "in all material respects representative" for purposes of the Lion Entities' motion to dismiss. (ECF Nos. 1524, 1529, 2270.) The public redacted version of the Complaint can be found at ECF No. 1423.

5    All further references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure.

6    The Rule 54(b) Motion, as well as the related opposition and reply, are incorporated by reference into the Motion for Reconsideration briefing, which does not add any substantive arguments regarding Rule 54(b) certification. (*See* Mot. for Reconsideration at 12; Reconsideration Opp'n at 1 n.1; Reconsideration Reply at 10.)

7    Unless otherwise noted internal quotation marks, citations, ellipses, brackets, and footnotes are omitted from citations.

8    Although Plaintiffs' substantive arguments are clear, the procedural vehicle for their motion is less so. Plaintiffs appear to be relying on Rule 59 as the basis for their motion, but that Rule governs motions to alter or amend a judgment, and no judgment has been entered here. Regardless, the substantive standard for reconsideration is the same, whatever the procedural vehicle. As stated above, that standard requires a showing of (1) newly discovered evidence, (2) clear error or manifest injustice, or (3) an intervening change in controlling law, and that is the standard that applies to the present Motion for Reconsideration.

9    The public redacted version can be found at ECF No. 1631-1.

10    The public redacted version can be found at ECF No. 1760.

11    The Court considers the LLP Agreement because it is referenced in the Complaint. (Compl. ¶¶ 192-93.) *See Khoja*, 988 F.3d at 1002.

12    To the extent they provide background and undisputed facts, the Court takes judicial notice of the SEC Form D, Stock/Securities Offering, filed Oct. 21, 2010, and Form D as amended, filed October 17, 2011, by the Lion Capital Fund III, L.P. (the "Fund") (collectively "Form D"), found at https://sec.report/Document/0001498249-10-000001 and https://sec.report/Document/0001498249-11-000001, respectively. *See Khoja*, 899 F.3d at 999; Fed. R. Evid. 201. According to Form D, the persons related to the Fund were Lea, Capps, and Lindberg, among others, each identified as "Executive Officer ... of Lion Capital LLP – manager of Issuer[.]" Form D defines "Issuer" as the Fund.

13    The Court takes judicial notice of Lion Americas' Form ADV dated March 30, 2018, which was filed with the Securities and Exchange Commission ("SEC"). *See Khoja*, 899 F.3d at 999; Fed. R. Evid. 201. By virtue of his majority stake in Lion Capital, Lea indirectly owned nearly all of Lion Americas' shares. (Form ADV, Schedule B.) Because Form ADV itself does not contain page numbers, page references are to the numbers generated by the CM/ECF System.

WCAS102

2022-1 Trade Cases P 82,039

14    Like Lion Capital, the Fund was established in the United Kingdom. Its address was "c/o Lion Capital LLP." It was registered with the SEC in the United States. (*See* https://sec.report/CIK0001498249.)

15    The executives included Lischewski, Kenneth Worsham, and Walter Scott Cameron, all of whom have either pleaded guilty to, or were found guilty of, participating in the conspiracy.

16    Big Catch was the Lion Entity whose purpose was to hold Bumble Bee stock. (Compl. ¶ 200.)

17    The public redacted version can be found at ECF No. 1721.

18    The Court in this Order expresses no opinion whether Plaintiffs have stated a claim against Lion Capital on indirect liability theories such as veil-piercing or alter ego.

19    None of the conspirators need participate in every act or transaction of the conspiracy to be liable. *Id.* at 634.

20    In light of these rulings, the Court denies as moot Plaintiffs' alternative request and the separate motion for entry of judgment against Lion Capital and Big Catch pursuant to Rule 54(b).

---

**End of Document**                                            © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 109 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

KeyCite Yellow Flag - Negative Treatment

Distinguished by  MSP Recovery Claims, Series, LLC v. Sanofi Aventis U.S. LLC,  D.N.J.,  March 29, 2019

2017 WL 4642285

United States District Court, E.D. Pennsylvania.

IN RE SUBOXONE (BUPRENORPHINE
HYDROCHLORIDE AND NALOXONE)
ANTITRUST LITIGATION

This Document Relates to:

Wisconsin, et al. v. Indivior
Inc. et al. Case No. 16-cv-5073

State of Wisconsin By Attorney General
Brad D. Schimel, et al., Plaintiffs,

v.

Indivior Inc. f/k/a Reckitt Benckiser
Pharmaceuticals, Inc., et al., Defendants.

MDL NO. 2445
|
13-MD-2445
|
CIV. A. NO. 16-5073
|
Filed 10/17/2017

**MEMORANDUM OPINION**

Goldberg, District Judge

*1  The Defendants in this multi-district litigation—Indivior Inc., f/k/a Reckitt Benckiser Pharmaceuticals, Inc.; Reckitt Benckiser Healthcare (UK) Ltd.; Indivior PLC, f/k/a/ Reckitt Benckiser Group, plc; and MonoSol Rx, LLC—each play some role in the manufacture, production, and/or sale of Suboxone, a medication used for the treatment of opioid addiction. Plaintiffs, a collection of states, [1] have brought suit against these Defendants alleging violations of federal and state antitrust statutes and state unfair trade and consumer protection laws.

Defendant Reckitt Benckiser Healthcare (UK) Ltd. ("RBH") now moves to dismiss all claims against it, arguing that I do not have jurisdiction and that the Amended Complaint does not sufficiently allege any antitrust or state law cause of action. While I disagree with RBH regarding lack of

jurisdiction, because a plausible antitrust claim has not been pled, I will grant the motion in its entirety.

**I. ALLEGATIONS IN THE AMENDED COMPLAINT**

**A.** **The Defendant Entities**
Moving Defendant RBH is a British company incorporated under the laws of England and Wales. According to the Amended Complaint, RBH is engaged in the development and manufacture of pharmaceuticals, including Suboxone, as well as other health care products made and sold subject to FDA approval. RBH is a subsidiary of Reckitt Benckiser Group PLC ("RB Group"), a non-party. (Am. Compl. ¶ 12.)

RB Group also previously owned Defendant Indivior, Inc., formerly known as Reckitt Benckiser Pharmaceuticals, Inc. ("RBPI"). In December 2014, RB Group sold the assets of RBPI to a British company known as Defendant Indivior PLC ("I-PLC"). As a result, RBPI was demerged from its prior parent, the RB Group, into I-PLC. By the terms of the sale, the ownership of all assets and operations related to the production of Suboxone was transferred to I-PLC. (Id. ¶¶ 11, 13.) According to the Certificate of Amendment from the State of Delaware, RBPI simply changed its name to Indivior, Inc. [2] (Def. I-PLC's Mot. to Dismiss, ECF No. 139, Ex. 1.)

Defendant MonoSol Rx, LLC is a Delaware limited liability company with its principal place of business in Indiana. (Am. Compl. ¶ 14.) MonoSol produces PharmFilm drug technology, which allows pharmaceuticals to be converted into a sublingual film form. (Id. ¶ 48.)

**B.** **Conduct Underlying the Litigation**
In broad terms, the Amended Complaint alleges that Defendants engaged in a "product hopping" scheme designed to prevent or delay less expensive generic versions of its drug Suboxone from entering the market. Plaintiff States assert that the primary Defendant Indivior, faced with the impending loss of exclusivity on its Suboxone tablet, developed a new "film" version of Suboxone, which would not be AB-rated, or pharmaceutically equivalent, with a generic version of the Suboxone tablet. Plaintiffs claim that Indivior, in conjunction with RBH and MonoSol, launched the sale of the film in 2010, while simultaneously taking steps to (a) convert the market's prescription base from tablets to film and (b) delay the entry of generic tablets by refusing to participate in a joint REMS safety program and filing a baseless citizen petition. Ultimately, the FDA approved the first generic alternatives

WCAS104

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 110 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

to Suboxone tablets in February 2013, and the generics were initially marketed to the public in March 2013. [3]

### C. Reckitt Benckiser Healthcare (UK) Limited's Role

**\*2** The defendant at issue in the current motion is RBH. Plaintiffs allege that RBH is responsible for some or all of the antitrust conduct challenged in the Amended Complaint, including the joint venture to create and manufacture Suboxone film, establishment of the parameters for the timing of the launch and formulation of Suboxone film, gathering and investigating all consumer complaints as to Suboxone products, trademarking the names for the financial programs to encourage the switch from Suboxone tablets to film, and obtaining patents with MonoSol related to Suboxone film development. (Am. Compl. ¶ 12.) They further allege that RBH monitored the taste and quality of Suboxone film, prepared materials for regulatory approval of Suboxone film, manufactured and supplied the ingredients for Suboxone film, and provided grants for the study of Suboxone. Id.

### D. Procedural History

In June 2013, several putative classes initiated litigation against Defendants alleging anticompetitive behavior with respect to the marketing and sale of Suboxone. These cases were consolidated into a multi-district litigation ("MDL") assigned to this Court. Among those cases was the class action complaint brought by Direct Purchaser Plaintiffs and End-Payor Plaintiffs alleging that Defendants unlawfully delayed and impeded competition from generic versions of Suboxone tablets, resulting in ongoing overpayments by consumers. On December 3, 2014, I issued an opinion dismissing one of the Direct Purchaser Plaintiffs' stand-alone antitrust claims, a variety of state law claims by the End-Payor Plaintiffs, and claims against several of the other Defendant entities. In re Suboxone, 64 F. Supp. 3d 665 (E.D. Pa. 2014). I allowed the remaining federal and state law claims to proceed.

On December 23, 2015, Amneal Pharmaceuticals LLC ("Amneal"), a generic manufacturer and competitor of Indivior, filed a complaint regarding Indivior's alleged anticompetitive conduct with respect to Suboxone. That case was consolidated with the MDL currently before me. On January 4, 2017, I dismissed part of Amneal's claims that Indivior improperly delayed entry of generic tablets, all claims against Reckitt Benckiser Pharmaceuticals, Inc., and all claims against Indivior PLC. In re Suboxone, 13-MD-2445, 2017 WL 36371 (E.D. Pa. Jan. 4, 2017).

On September 22, 2016, the Plaintiff States initiated the current litigation against Defendants, including RBH. The States filed a First Amended Complaint on November 23, 2016, setting forth five causes of action as follows: (1) monopolization under the Sherman Act § 2 against Indivior, Indivior PLC, and RBH; (2) attempted monopolization under the Sherman Act § 2 against Indivior, Indivior PLC, and RBH; (3) conspiracy to monopolize under the Sherman Act § 2 against all Defendants; (4) illegal restraint of trade under the Sherman Act § 1 against all Defendants; and (5) individual state law claims against all Defendants. On September 8, 2017, I denied Indivior's Motion to Dismiss these claims. In re Suboxone, No. 16-5073, 2017 WL 3967911 (E.D. Pa. Sept. 8, 2017).

On December 12, 2016, RBH filed a separate motion to dismiss the Amended Complaint, arguing: (1) Plaintiffs failed to set forth sufficient grounds for the exercise of personal jurisdiction over RBH and (2) Plaintiffs failed to state a claim against RBH. The States responded on January 30, 2017, and RBH filed a reply brief on February 21, 2017.

## II. MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

### A. Standard of Review

Motions to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) require the court to accept as true the allegations of the pleadings and all reasonable inferences therefrom, and to resolve all factual disputes in favor of the plaintiff. Fed. R. Civ. P. 12(b)(2); see also Pinker v. Roche Holdings Ltd., 292 F.3d 361, 368 (3d Cir. 2002). The Rule, however, "does not limit the scope of the court's review to the face of the pleadings"; rather the court must also consider any affidavits submitted by the parties. Scott v. Lackey, No. 02-1586, 2005 WL 2035598, at \*1 (M.D. Pa. Aug. 11, 2005). "Where, as here, the Court resolves the jurisdictional issue in the absence of an evidentiary hearing and without the benefit of discovery, the plaintiff need only establish a prima facie case of personal jurisdiction." Otsuka Pharm. Co., Ltd. v. Mylan Inc., 106 F. Supp. 3d 456, 461 (D.N.J. 2015) (citing Avocent Huntsville Corp. v. Aten Int'l Co., Ltd., 552 F.3d 1324, 1328–29 (Fed. Cir. 2008)). The court may always revisit the issue of personal jurisdiction if later revelations indicate that the facts alleged in support of jurisdiction remain in dispute. See Metcalfe v. Renaissance Marine, Inc., 566 F.3d 324, 331 (3d Cir. 2009) (citing Carteret Sav. Bank, FA v. Shushan, 954 F.2d 141, 142 n. 1 (3d Cir. 1992)).

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    2

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 111 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

**\*3** Although a defendant has the initial burden of raising the defense of lack of personal jurisdiction, once such a defense is raised, the burden shifts to the plaintiff to demonstrate facts that suffice to support an exercise of personal jurisdiction. Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987); Cumberland Truck Equip. Co. v. Detroit Diesel Corp., 401 F. Supp. 2d 415, 418 (E.D. Pa. 2005). Plaintiff may do so through affidavits or competent evidence that show sufficient contacts with the forum state. De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP, No. 08-0533, 2008 WL 4822033, at \*3 (E.D. Pa. Nov. 4, 2008). Such contacts must be established with "reasonable particularity," to present a prima facie case. Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1223 (3d Cir. 1992) (quoting Provident Nat'l Bank, 819 F.2d at 437). If the plaintiff meets this burden, the defendant must then establish the presence of other considerations that would render personal jurisdiction unreasonable. De Lage Landen, 2008 WL 4822033, at \*3 (citing Carteret Sav. Bank, 954 F.2d at 150).

### B. Discussion

RBH argues that Plaintiffs have failed to establish either general or specific jurisdiction. I disagree and find that the Amended Complaint and Plaintiffs' evidence of record sufficiently set forth grounds for the exercise of specific jurisdiction.

Under Federal Rule of Civil Procedure 4(k)(2), a court may look to a foreign defendant's contacts with the United States in the aggregate to determine whether the exercise of jurisdiction is consistent with the due process clause of the Fifth Amendment. In re Automotive Refinishing Paint Antitrust Litig., 358 F.3d 288, 298–99 (3d Cir. 2004); TruePosition, Inc. v. LM Ericsson Tel. Co., 844 F. Supp. 2d 571, 586 (E.D. Pa. 2012). "Personal jurisdiction therein is not limited to the defendant's contacts with a particular federal judicial district or the forum state." Automotive Refinishing, 358 F.3d at 299. Pursuant to such constitutional considerations, physical presence within the forum is not required to establish personal jurisdiction over a nonresident defendant. IMO Indus., Inc. v. Kiekert AG, 155 F.3d 254, 259 (3d Cir. 1998). Instead, personal jurisdiction may be based on either a defendant's general contacts or his specific contacts with the forum. Gen. Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001).

Plaintiffs do not assert that the Court has general jurisdiction over RBH. [4] Rather, they claim that RBH has minimum contacts with the United States, from which the present dispute arises, such that this Court's exercise of jurisdiction over it will not violate traditional notions of fair play and substantial justice.

A plaintiff may rely on "specific jurisdiction" where the cause of action is related to or arises out of the defendant's contacts with the forum. IMO Indus., 155 F.3d at 259 (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 n.8 (1984)). Proper establishment of specific jurisdiction under the Due Process Clause requires satisfaction of a three-part test. Louis A. Grant, Inc. v. Hurricane Equip., Inc., No. 07-438, 2008 WL 892152, at \*3 (W.D. Pa. Apr. 2, 2008). First, the plaintiff needs to show that the defendant has "constitutionally sufficient 'minimum contacts' with the forum." IMO Indus., 155 F.3d at 259 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985)). Second, the plaintiff's claim must "arise out of or relate to those activities." Helicopteros, 466 U.S. at 414. Third, the reviewing court should consider additional factors to ensure that the exercise of jurisdiction otherwise "comport[s] with 'fair play and substantial justice.' " Burger King, 471 U.S. at 476 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 320 (1945)); see also O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 317 (3d Cir. 2007) (enumerating the three elements of specific jurisdiction).

**\*4** To satisfy the first two components of the specific jurisdiction test, the acts identified by plaintiff must be "such that [the defendant] should reasonably anticipate being haled into court [in the forum state]." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). The minimum contacts necessary to support specific jurisdiction exist only where the defendant "has purposefully directed its activities toward the residents of the forum state ... or otherwise 'purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " IMO Indus, 155 F.3d at 259 (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958) (other internal quotations omitted)). "This test is intended to protect a non-resident defendant from jurisdiction based on contacts that are 'random, fortuitous,' or 'attenuated,' or that result from the unilateral activity of another party or a third person." Pullman Fin. Corp. v. Hotaling, No. 07-1703, 2008 WL 2563372, at \*4 (W.D. Pa. June 24, 2008) (quoting Burger King, 471 U.S. at 475). "[I]n the course of this necessarily fact-sensitive inquiry, the analysis should hew closely to the

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 112 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

reciprocity principle upon which specific jurisdiction rests.... With each purposeful contact by an out-of-state resident, the forum state's laws will extend certain benefits and impose certain obligations ... specific jurisdiction is the cost of enjoying the benefits." O'Connor, 496 F.3d at 323 (internal citations omitted). Contacts with a state's citizens that take place outside the state are not purposeful contacts with the state itself. Id. Nonetheless, a "substantial connection" with a forum arising out of a "single act can support jurisdiction." Burger King, 471 U.S. at 475 n.18 (citing McGee v. Int'l Life Ins. Co., 355 U.S. 220, 223 (1957)).

Here, the Amended Complaint alleges that RBH is a British Corporation incorporated under the laws of England and Wales, with its registered office in Berkshire. (Id. ¶ 12.) RBH signed an agreement with American company MonoSol to develop the film version of Suboxone and bring it to market in the United States. (Am. Compl. ¶ 46.) In addition, "employees of [RBH] participated in discussion regarding the plan to remove Tablets from the market." (Id. ¶ 71.) While these allegations alone are insufficient to establish specific jurisdiction against RBH, Plaintiffs set forth—both in the remainder of the Amended Complaint and in exhibits attached to their response to the Motion to Dismiss—multiple additional contacts by RBH with the United States, as follows:

- RBH approved and paid for each stage of MonoSol's development of the Suboxone film in the United States, evaluated film samples for MonoSol, and provided MonoSol with active ingredients, data, and information. (Decl. of Cheryl Lee Johnson ("Johnson Decl."), Ex. 1.)

- RBH worked on responses to the United States' concerns about buprenorphine's environmental impact. (Id., Exs. 4, 7.)

- RBH prosecuted patents on Suboxone in the United States Patent Office. (Id., Exs. 4, 7.)

- RBH secured at least four United States trademarks on the name Suboxone and the patient assistance program designed to coerce the switch from tablets to film. (Am. Compl. ¶ 12.)

- RBH scheduled meetings with the FDA and prepared filings to secure U.S. regulatory approval of the Suboxone film. (Id.; Johnson Decl. Exs. 7, 9, 11, 13, 15, 18, 19, 20.)

- RBH had numerous interactions with MonoSol in the United States via email and telephone, including weekly teleconferences, concerning the strength of MonoSol's patents, and timing, quality, and U.S. approval of Suboxone film. (Johnson Decl. Exs. 7, 9–15, 19.)

Taking these allegations as true and viewing inferences from the exhibits in the light most favorable to Plaintiffs, such contacts reflect efforts by RBH to purposefully avail itself of the privilege of doing business in the United States. While RBH itself may not have sold Suboxone film within the United States, it is alleged that RBH acted with both MonoSol and Indivior to have the products placed into a national distribution network. See LG.Phillips LCD Co., Ltd. v. Chi Mei Optoelectronics Corp., 551 F. Supp. 2d 333, 339 (D. Del. 2008) (finding specific jurisdiction when a company, although not directly selling products in the forum state, has acted to consistently place its products into a national distribution network where they eventually were sold in the forum state). I find that these contacts involving the development of Suboxone film are sufficient for the exercise of personal jurisdiction over RBH.

**\*5** Moreover, at this juncture of the case, the exercise of jurisdiction "comport[s] with 'fair play and substantial justice.' " Burger King, 471 U.S. at 476 (quoting Int'l Shoe, 326 U.S. at 320). The United States Supreme Court has identified five factors that courts should consider when balancing jurisdictional reasonableness, including: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate and international judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest for the several states in furthering fundamental substantive social policies. O'Connor, 496 F.3d at 324 (citing Burger King, 471 U.S. at 477; Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987)).

RBH does not mention any of these factors or address how they weigh against the exercise of personal jurisdiction. As Plaintiffs have demonstrated facts that support an exercise of personal jurisdiction, RBH's silence as to the constitutional considerations neglects its burden of "establish[ing] the presence of other considerations that would render personal jurisdiction unreasonable." De Lage Landen, 2008 WL 4822033, at \*3 (citing Carteret Sav. Bank v. Shushan, 954 F.2d 141, 150 (3d Cir. 1992)). Accordingly, I decline to grant RBH's motion to dismiss for lack of personal jurisdiction.

WCAS107

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 113 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

## III. MOTION TO DISMISS UNDER FEDERAL RULE 12(b)(6)

### A. Standard of Review

Under Federal Rule of Civil Procedure 12(b)(6), a defendant bears the burden of demonstrating that the plaintiff has not stated a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6); see also Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotations omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and "only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint does not show an entitlement to relief when the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct. Id.

The Third Circuit Court of Appeals has detailed a three-step process to determine whether a complaint meets the pleadings standard. Bistrian v. Levi, 696 F.3d 352 (3d Cir. 2014). First, the reviewing court outlines the elements a plaintiff must plead to state a claim for relief. Id. at 365. Next, the court must "peel away those allegations that are no more than conclusions and thus not entitled to the assumption of truth." Id. Finally, the court "look[s] for well-pleaded factual allegations, assume[s] their veracity, and then 'determine[s] whether they plausibly give rise to an entitlement to relief.' " Id. (quoting Iqbal, 556 U.S. at 679). The last step is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (quoting Iqbal, 556 U.S. at 679) (internal quotation marks omitted).

### B. Discussion

RBH puts forth three general arguments in support of its Motion to Dismiss. First, it asserts that Plaintiffs' monopolization and attempted monopolization causes of action (Counts I and II) do not state a claim as to RBH. Second, it contends that Plaintiffs have not sufficiently stated a conspiracy claim (Counts III and IV) as to RBH. Finally, RBH alleges that all of Plaintiffs' state law claims (Count V)

fail to plead plausible causes of action. I will address each argument individually.

### 1. Monopolization and Attempted Monopolization Claims

**\*6** Section 2 of the Sherman Act "makes it unlawful to monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce." Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297, 306 (3d Cir. 2007) (citing 15 U.S.C. § 2). To succeed on a claim for actual monopolization under § 2, a party must prove: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." Id. at 307 (quoting U.S. v. Grinnell Corp., 384 U.S. 563, 570–71 (1966)). A monopolization claim does not require proof of the specific intent to monopolize, demanding only proof of "a general intent to do the act, for no monopolist monopolizes unconscious of what he is doing." Times–Picayune Publ'g Co. v. United States, 345 U.S. 594, 626 (1953) (internal quotations and citations omitted). Nonetheless, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive *conduct*." Verizon Commc'ns v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407 (2004) (emphasis in original). This is so because the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993). It is well established that "[i]n order to sustain their claims of monopolization and attempted monopolization, Plaintiffs must ... prove the required elements against each individual defendant." In re Mushroom Direct Purchaser Antitrust Litig., 514 F. Supp. 2d 683, 699 (E.D. Pa. 2007) (quotations omitted).

RBH contends that Plaintiffs have not plausibly pled either monopoly power or anticompetitive conduct. Because I agree, I will dismiss Counts I and II against RBH.

#### a. Monopoly Power

The first element of "monopoly power" is "the ability to control prices and exclude competition in a given market." Broadcom Corp., 501 F.3d at 307. Although monopoly power

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 114 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

can be demonstrated through direct evidence, id., the "more common way that a party may prove monopoly power is by providing indirect evidence, which includes 'structural evidence of a monopolized market.' " Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co., 838 F.3d 421, 435 (3d Cir. 2016) (quoting Harrison Aire, Inc. v. Aerostar Int'l, Inc., 423 F.3d 374, 381 (3d Cir. 2005)). To support a claim of monopoly power through indirect evidence, a plaintiff must show that (1) the defendant had market power in the relevant market and (2) there were barriers to entry into the market. Id. The Third Circuit "generally require[s] a plaintiff alleging antitrust injury under Section 2 to show that [the] [d]efendant[ ] maintained a market share 'significantly larger than 55%' to establish antitrust liability." Id. at 437 (citations omitted).

Plaintiffs contend that the Amended Complaint adequately alleges RBH's possession of monopoly power in the relevant market. Plaintiffs press a "single economic entity" theory and posit that RBH and Indivior were, at the relevant time, sister companies under non-defendant RB Group. (Pls.' Resp. Opp'n Mot. to Dismiss 5 (citing Copperweld v. Independence Tube Corp., 467 U.S. 752, 770 (1984)).) Because RBH controlled the production of Suboxone, held patents for film, and manufactured Suboxone tablets and the ingredients for the film, Plaintiffs assert that RBH directly possessed market power within the United States. (Am. Compl. ¶ 132 ("From 2002 until the present, Indivior Inc. ... and [RBH] have possessed monopoly power in the relevant market of co-formulated buprenorphine/naloxone in the United States as owners or licensees to use Suboxone intellectual property, or their role in the development, manufacture, and sale of Suboxone.").)

Plaintiffs' argument relies on faulty assumptions that: (a) Indivior and RBH may be treated as a "single economic entity" and (b) their individual acts may be considered collectively for purposes of an antitrust claim. For this first proposition, Plaintiffs mistakenly rely upon the United States Supreme Court's decision in Copperweld v. Independence Tube Corp., 467 U.S. 752 (1984). In Copperweld, the Court only addressed the issue of whether a parent and its wholly owned subsidiary are capable of *conspiring* in violation of *Section 1* of the Sherman Act. Id. at 759. Rejecting the "intra-enterprise conspiracy doctrine," the Court stated that "the coordinated activity of a parent and its wholly-owned subsidiary must be viewed as a single enterprise for purposes of § 1 of the Sherman Act." Id. at 771. Importantly, Copperweld "did not address a parent corporation's liability

under Section 2 of the Sherman Act." Climax Molybdenum Co. v. Molychem, L.L.C., 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005). In fact, the Court's rejection of the intra-enterprise conspiracy doctrine was based, in part, on the Court's understanding that liability under Section 1 was unnecessary because concerted anti-competitive activity of a parent and subsidiary could be reached under Section 2 of the Sherman Act. Id. (citing Copperweld, 467 U.S. at 777). Accordingly, Copperweld does not support Plaintiffs' argument that Indivior and RBH are a "single economic entity" for purposes of Section 2 liability.

**\*7** The inapplicability of Copperweld also highlights Plaintiffs' second faulty assumption that the individual acts of Indivior may be imputed to RBH for purposes of an antitrust claim. I addressed a similar argument by the Class Action Plaintiffs against RB Group as the former parent company of Indivior f/k/a Reckitt. Quoting from the United States District Court for the District of Colorado's pronouncement in Climax Molybdenum Co. v. Molychem, L.L.C., I reasoned that:

> A Section 2 claim brought against a parent corporation based on anticompetitive activity occurring at the subsidiary level is sufficient if there are factual allegations showing that the subsidiary is the alter ego of the parent, ... or showing independent conduct on the part of the parent.... "When the parent controls, dictates or encourages the subsidiary's anticompetitive conduct, the parent engages in sufficient independent conduct to be held directly liable as a single enterprise with the subsidiary under the Sherman Act."

In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., 13-MD-2445, 2015 WL 12910728, at \*3 (E.D. Pa. Apr. 14, 2015) (quoting Climax Molybdenum Co. v. Molychem, L.L.C., 414 F. Supp. 2d 1007, 1012 (D. Colo. 2005) (internal citations omitted)). Adopting that standard, I concluded that "the degree of control necessary to attribute [Indivior's] market share to RBG [the parent company of Indivior and RBH] is pervasive domination.... [A]pproval and consent is not enough as these allegations reflect a typical parent-subsidiary relationship." Suboxone, 2015 WL 12910728, at \*3. Ultimately, I held that the Class Action Plaintiffs "failed to allege that [RB Group] exercised sufficient control or pervasive domination over [Indivior] to support attributing [Indivior's] market power to [RB Group]." Id.

Applying that same standard here, the conclusion is even more clear-cut. RBH is simply a sister company to Indivior.

WCAS109

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 115 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

The Amended Complaint does not contain a single allegation from which I can reasonably infer that RBH exercised any control or pervasive domination over Indivior. Absent such control, or at least some showing that the companies were alter egos, Indivior's market power cannot be attributed to RBH for purposes of establishing the first element of a Sherman Act § 2 claim.

Having rejected Plaintiffs' "single economic entity" theory and Plaintiffs' efforts to impute Indivior's actions to RBH, I must now inquire whether the Amended Complaint allows the plausible inference that RBH as an individual entity, separate and apart from Indivior, possessed the requisite market power. The relevant market, as defined in the Amended Complaint is the co-formulated buprenorphine/naloxone market in the United States and its territories. (Am. Compl. ¶¶ 19, 21.) Plaintiffs contend that before October 8, 2009, Suboxone was the only co-formulated buprenorphine/naloxone opioid treatment because of its orphan drug status, thereby allowing "Reckitt"—defined as including Indivior, Indivior PLC, and RBH—to enjoy 100 percent of the market share in the United States and its territories. (Id. ¶ 22.) Plaintiffs point out that even after the exclusivity period expired, "Reckitt"-branded Suboxone products, including the film introduced in September 2010, remained the sole source of buprenorphine/naloxone until two generic manufacturers introduced generic tablets in March 2013. (Id.)

As noted above however, allegations that the "Reckitt" entities collectively maintained monopoly power are insufficient to establish that RBH individually maintained the requisite monopoly power. See In re Wellbutrin XL Antitrust Litig., No. 08-2431, 2009 WL 678631, at *7 (E.D. Pa. Mar. 13, 2009) (dismissing claims against the producer of a drug and allowing the monopolization claims to proceed against the distributor because the complaint specifically alleged that the distributor alone "was able to maintain 100% control of the U.S. market for" the drug); see also United Food and Com. Workers Loc. 1776 & Participating Employers Health and Welfare Fund v. Teikoku Pharma USA, Inc., 74 F. Supp. 3d 1052, 1077 (N.D. Cal. 2014) (holding that a monopolization claim could not stand against two defendants referred to collectively in the complaint where only one marketed and sold the product at issue in the United States, while the other defendant simply manufactured the product in Japan).

**\*8** In an effort to cure this deficiency, Plaintiffs assert that RBH manufactures Suboxone tablets and the ingredients for Suboxone film, and that RBH contracted with MonoSol to

develop the film and obtain patents relative to the film. (Pls.' Resp. Opp'n Mot. to Dismiss 6 (citing Am. Compl. ¶ 12).) Plaintiffs do not allege that RBH held the primary patents over the tablets and the film or controlled production of the film. Indeed, the Amended Complaint is devoid of any allegations that RBH sold Suboxone in any form in the United States or participated in the United States market in any respect such that it could maintain monopoly power.

As possession of monopoly power is a required element for a claim of monopolization, a Sherman Act § 2 claim against RBH cannot survive.

### b. *Anticompetitive Conduct*

Even assuming that Plaintiffs could establish that RBH had monopoly power, their Section 2 claim against RBH would still fail because they have not adequately pled that RBH individually engaged in any anticompetitive conduct. Under the "rule of reason" burden-shifting framework set forth by the D.C. Circuit in United States v. Microsoft Corp., the party seeking to impose antitrust liability must initially provide evidence of the anticompetitive nature of a defendant's conduct. 253 F.3d 34, 58–59 (D.C. Cir. 2001). Once the plaintiff has met its burden of pleading or establishing the anticompetitive nature of a defendant's conduct, the burden shifts to the defendant to proffer a "nonpretextual claim that its conduct is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." Id. at 59; see also Mylan Pharms., 838 F.3d at 438. The plaintiff may then "either rebut those justifications or demonstrate that the anticompetitive harm outweighs the procompetitive benefit." Id. (quoting Microsoft Corp., 253 F.3d at 58–59) (internal quotation marks omitted).

In general terms, "a firm engages in anticompetitive conduct when it attempts 'to exclude rivals on some basis other than efficiency' or when it competes 'on some basis other than the merits.' " W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 108 (3d Cir. 2010), (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985) and LePage's, Inc. v. 3M, 324 F.3d 141, 147 (3d Cir. 2003)). "Conduct that impairs the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive." Broadcom Corp., 501 F.3d at 308. Mere harm to competitors will not suffice; rather the

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

alleged exclusionary acts must harm the competitive process and must actually have the requisite anticompetitive effect. Microsoft Corp., 253 F.3d at 58. "The challenge for an antitrust court lies in stating a general rule for distinguishing between exclusionary acts, which reduce social welfare, and competitive acts, which increase it." Id.

Here, the Amended Complaint alleges that RBH executed the initial contract with MonoSol in December 2006, which in turn "initiated the joint venture to create and manufacture Suboxone Film." (Am. Compl. ¶ 12.) It also alleges that RBH engaged in various activities geared toward furthering the ultimate launch of Suboxone film including ensuring the regulatory approval, manufacturing and supplying the ingredients, trademarking the names, obtaining patents, and addressing safety concerns. (Id.) RBH's only other role in the alleged anticompetitive scheme was "participat[ing] in discussions regarding the plan to remove Tablets from the market." (Id. ¶ 71.)

**\*9** Even viewing all of these allegations as true, RBH's actions cannot be deemed to rise to the level of anticompetitive conduct. "As a general rule, 'any firm, even a monopolist, may ... bring its products to market whenever and however it chooses.' " Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc., 171 F.3d 912, 925 n.7 (3d Cir. 1999) (quoting Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 286 (2d Cir. 1979)). Indeed, "neither product withdrawal nor product improvement alone is anticompetitive." New York ex rel. Schneiderman v. Actavis PLC ("Namenda"), 787 F.3d 638, 653–54 (2d Cir.), cert. dismissed, 136 S. Ct. 581 (2015). The introduction of new products may become anticompetitive where "a pharmaceutical company makes modest reformulations to a brand name drug prior to the expiration of its market exclusivity for the purposes of stymieing generic competition and preserving monopoly profits." In re Suboxone Antitrust Litigation, No 13-2445, 2016 WL 3519618, at \*1 (E.D. Pa. June 28, 2016). But in order for such "product hopping" to be illegal, a monopolist must "*combine[ ]* product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits." Namenda, 787 F.3d at 654 (emphasis in original) (internal citations omitted).

While the Amended Complaint alleges RBH's participation in the first part of an illegal product-hopping scheme—development and introduction of a new product—those acts alone are not exclusionary. The Amended Complaint lacks allegations setting forth RBH's participation in any other anticompetitive conduct, such as falsely disparaging the safety of the tablets, coordinating the removal of the tablets from the market to effectuate a "hard switch" from the legacy product to the new product, filing a sham citizen petition against the generic manufacturers, or engaging in other activity to delay the entry of generics into the market. Plaintiffs' effort to impute Indivior's conduct to RBH by including it in the collective entity known as "Reckitt,"—merely as a result of the alleged corporate relationship between the two entities—is not only factually unsupported by the Amended Complaint, but again is legally impermissible. See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 341 n.44 (3d Cir. 2010) ("As a matter of well-settled common law, a subsidiary is a distinct legal entity and is not liable for the actions of its parent or sister corporations simply by dint of the corporate relationship.").

### 2. Conspiracy Claims

Counts III and IV of the Amended Complaint allege a conspiracy between the Reckitt Defendants and MonoSol to monopolize under Sherman Act § 2 and to restrain trade under Sherman Act § 1 respectively. A Section 2 conspiracy claim has four elements: (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged. Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc., 602 F.3d 237, 253 (3d Cir. 2010) (citing United States v. Yellow Cab Co., 332 U.S. 218, 224–25 (1947); Am. Tobacco Co. v. United States, 328 U.S. 781, 788, 809 (1946)). "A plaintiff asserting a Section 1 claim also must allege four elements: '(1) concerted action by the defendants; [ (2) ] that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.' " Id. (quoting Gordon v. Lewistown Hosp., 423 F.3d 184, 207 (3d Cir. 2005)).

"To prevail on a section 1 claim or a section 2 conspiracy claim, a plaintiff must establish the existence of an agreement, sometimes also referred to as a 'conspiracy' or 'concerted action.' " W. Penn Allegheny Health System, Inc. v. UPMC, 627 F.3d 85, 99 (3d Cir. 2010) (quoting Twombly, 550 U.S. at 553; Gordon, 423 F.3d at 207 & n.16). "An agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 8

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 117 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

commitment to a common scheme." Id. (citing Copperweld, 467 U.S. at 771 (1984); Howard Hess, 602 F.3d at 254; Gordon, 423 F.3d at 208). To plead an agreement, a plaintiff may allege direct or circumstantial evidence, or a combination of the two. Id. "If a complaint includes non-conclusory allegations of direct evidence of an agreement, a court need go no further on the question whether an agreement has been adequately pled." Id.

 *10 Here, the allegations regarding RBH and its participation in concerted action are sparse at best. The Amended Complaint states that after meeting in December 2006, MonoSol and RBH signed a development agreement granting Reckitt the right to use MonoSol's patented sublingual film technology to manufacture Suboxone in a film version and bring it to market "for the purpose of extending Reckitt's exclusivity in the co-formulated buprenorphine/naloxone market." (Am. Compl. ¶¶ 46, 150.) Thereafter, when MonoSol made the initial suggestion that withdrawal of Suboxone tablets could provide further protection from generic incursion, "employees of [RBH] participated in discussions regarding the plan to remove Tablets from the market." [5] (Id. ¶ 71.)

Neither of these allegations suffice to plead an actionable antitrust conspiracy against RBH. Taking the latter allegation first—RBH employees' participation in discussions regarding the removal of tablets from the market—such an assertion does not rise to the level of an agreement. The Third Circuit has held that the "allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the Sherman Act." Garshman v. Univ. Res. Holding Inc., 824 F.2d 223, 230 (3d Cir. 1987). Rather, as noted above, "[a]n agreement exists when there is a unity of purpose, a common design and understanding, a meeting of the minds, or a conscious commitment to a common scheme." W. Penn Allegheny, 627 F.3d at 99; see also VI Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1402b (noting that courts may infer agreements among non-competitors where there is "an unambiguously express promise on the point of the challenged action, usually for a quid pro quo."). The simple allegation that RBH "participat[ed] in discussions" among unnamed entities regarding a plan to remove tablets does not allow a reasonable inference that RBH entered into any agreement with MonoSol to do so. [6] Indeed, at no point does the Amended Complaint allege even an informal promise

or understanding between MonoSol and RBH specifically to remove tablets. [7]

As to the allegation that RBH and MonoSol entered into a development agreement to create Suboxone film and bring it to market, this assertion does not describe any illegal, concerted antitrust activity. "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588 (1986). The Sherman Act only prohibits conspiracies that unreasonably restrain trade. In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 315 (3d Cir. 2010). As I previously explained, "simply introducing a new product on the market, whether it is a superior product or not, does not, by itself, constitute exclusionary conduct." In re Suboxone, 64 F. Supp. 3d 665, 682 (E.D. Pa. 2014). "Product innovation generally benefits consumers and inflicts harm on competitors, so courts look for evidence of 'exclusionary or anticompetitive effects' in order to 'distinguish between conduct that defeats a competitor because of efficiency and consumer satisfaction' and conduct that impedes competition through means other than competition on the merits." Namenda, 787 F.3d at 652 (some internal quotation marks omitted). While RBH's agreement with MonoSol to develop the film may have been one step in the broader product-hopping scheme perpetuated by Indivior, the Amended Complaint does not allege RBH's participation in any other exclusionary activity that could render its agreement with MonoSol an unlawful antitrust conspiracy.

 *11 In an effort to bolster the minimal allegations against RBH individually, Plaintiffs again attempt to group RBH in with its sister company of Reckitt Benckiser Pharmaceuticals (now Indivior), referring to them jointly as "Reckitt," and argue that the illegal conspiracy was between MonoSol and "Reckitt." (Pls.' Resp. Opp'n Mot. to Dismiss 8.) But again, such collective pleading is insufficient to impute the actions of Indivior to RBH. The Third Circuit has rejected efforts to hold multiple defendants liable under a conspiracy claim where the complaint's allegations lump defendants together by nature of their corporate relationship, but set forth specific facts as to only some defendants. Ins. Brokerage Antitrust Litig., 618 F.3d at 341 n.44 (citing 1 William Meade Fletcher, Cyclopedia of Law of Private Corporations § 33, at 89 (perm. ed. rev. vol. 2006) (observing that "the mere fact that there exists a parent-subsidiary relationship between two corporations [does not] make the one liable for the torts of its affiliates")). Plaintiffs do not suggest that RBH played any role in the disparagement

WCAS112

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 118 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

of Suboxone tablets, the filing of the citizen petition, or the other delay tactics used to thwart generic entry. Therefore, I will grant RBH's motion to dismiss the conspiracy claims against it.

### 3. State Law Claims

In the final portion of its motion to dismiss, RBH asserts that the antitrust and consumer protection state law claims against it must be dismissed for two reasons. First, because each of the state antitrust laws at issue is interpreted consistently with federal antitrust laws, those claims must be dismissed for the same reasons as the federal antitrust claims. Second, RBH contends that Plaintiffs have improperly used state consumer protection statutes and unfair trade practices to reassert deficient federal antitrust claims.

#### a. *State Antitrust Claims*

RBH first contends that the thirty-five state antitrust laws at issue are either explicitly aligned or interpreted consistently with federal antitrust laws, meaning that Plaintiffs' failure to state viable federal antitrust claims against it is fatal to the corresponding state antitrust claims. In response, Plaintiffs assert that ten of the States' antitrust laws—those from Wisconsin, North Carolina, Utah, Vermont, New York, California, Kansas, Iowa, Maine, and Connecticut—differ from federal law and require a separate analysis.

Plaintiffs' argument, however, rests on a string cite of cases that do nothing more than reaffirm that the state antitrust laws exist independently of the Sherman Act. These state antitrust laws, however, continue to be consistently interpreted in parallel, if not identically, with the Sherman Act. See Ut. St. § 76-10-3118 ("The Legislature intends that the courts, in construing th[e] [Utah Antitrust Act], will be guided by interpretations given by the federal courts to comparable federal antitrust statutes and by other state courts to comparable state antitrust statutes."); In re Tamoxifen Citrate Antitrust Litig., 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (holding that since the plaintiffs failed to state a claim under the Sherman Act, "and since the state antitrust law claims [including claims under California and Kansas law] are based on the same allegations," those claims must also be dismissed), aff'd, 466 F.3d 187 (2d Cir. 2006); Yankees Entm't and Sports Network, LLC v. Cablevision Sys. Corp., 224 F. Supp. 2d 657, 677 (S.D.N.Y. 2002) ("The [Donnelly

Act was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act."); Microsoft Corp. v. Computer Support Servs. of Carolina, Inc., 123 F. Supp. 2d 945, 955 (W.D.N.C. 2000) ("[B]ecause the North Carolina antitrust statutes track the language of the Sherman Act, the North Carolina Supreme Court has described the Sherman Act as 'instructive in determining the full reach' of the statutes.") (quoting Rose v. Vulcan Materials Co., 194 S.E.2d 521, 530 (N.C. 1973)); Lerma v. Univision Commc'n, Inc., 52 F. Supp. 2d 1011, 1016 (E.D. Wis. 1999) ("Wisconsin courts have held that the state version is generally controlled by federal court decisions regarding the Sherman Act."); Davies v. Genesis Med. Ctr. Anesthesia & Analgesia, P.C., 994 F. Supp. 1078, 1103 (S.D. Iowa 1998) ("When interpreting Iowa antitrust statutes, Iowa courts are required by section 553.2 to give considerable weight to federal cases construing similar sections of the Sherman Act.") (citing Neyens v. Roth, 326 N.W.2d 294, 297–98 (Iowa 1932)); Tri-State Rubbish, Inc. v. Waste Mgt., Inc., 998 F.2d 1073, 1081 (1st Cir. 1993) ("The Maine antitrust statutes parallel the Sherman Act."); Miller's Pond Co., LLC v. City of New London, 873 A.2d 965 (Conn. 2005) (holding that when interpreting the Connecticut antitrust law, the courts will follow federal precedent "unless the text of our antitrust statutes, or other pertinent state law, requires us to interpret it differently."); Carter v. Gugliuzzi, 716 A.2d 17, 21 (Vt. 1998) (holding that in construing the Vermont Consumer Fraud Act, the state looks to the interpretations accorded federal antitrust laws). [8]

**\*12** In light of these cases, Plaintiffs' state antitrust claims premised on the identical actions that form the basis of the Sherman Act claims are similarly deficient. Therefore, for the same reasons I dismissed the Sherman Act claims against RBH, I dismiss the state law antitrust claims against RBH. [9]

#### b. *State Unfair Trade Practices/ Consumer Protection Statute Claims*

RBH's final argument contends that all of the state unfair trade practices claims must be dismissed. It reasons that each of the identified unfair trade practices/consumer protection statutes asserted mirror and are construed consistently with Section 5 of the FTC Act, which is analyzed under the same principles as Sherman Act claims. In turn, RBH argues that courts in antitrust cases have dismissed "tagalong claims" based on the same factual allegations under state unfair practices/consumer

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 10

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 119 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

protection statutes where the complaint failed to state a federal antitrust claim.

To the extent the state laws are commensurable with federal antitrust law and the Amended Complaint's allegations are insufficient to state a federal cause of action, the state law claims must also be dismissed. Multiple courts have dismissed state consumer protection and unfair trade practices claims that simply mirror deficient federal antitrust laws. See, e.g., In re Aluminum Warehousing Antitrust Litig., MDL No.13-2481, 2014 WL 4743415, at *1 (E.D. Pa. Sept. 15, 2014) (dismissing twenty-nine state law consumer protection, unfair competition, and unfair trade practices claims for the same reason that the claims relied on the same allegations that were deficient to state Sherman Act and Clayton Act claims); In re Tamoxifen Citrate Antitrust Litig., 277 F. Supp. 2d 121, 139 (E.D.N.Y. 2003) (dismissing twenty-one state law consumer protection and unfair competition claims where the claims track the allegations underlying the deficient federal antitrust claims), aff'd, 466 F.3d 187 (2d Cir. 2006); R.J. Reynolds Tobacco Co. v. Philip Morris, Inc., 199 F. Supp. 2d 362, 396 (M.D.N.C. 2002) ("Because Plaintiffs do not allege any facts that suggest that Defendant's conduct is unlawful beyond the conduct that is the basis for their failed federal claims, Plaintiffs' state common law and statutory claims fail as well."), aff'd, 67 Fed.Appx. 810 (4th Cir. 2003).

Plaintiffs do not seem to contest this point, but rather argue that the state consumer protection law claims are not co-extensive with either the Sherman Act or the FTC Act, and most go beyond condemnation of unfair methods of competition to include prohibitions on unfair or deceptive conduct. Plaintiffs further contend that many of their state law claims are based on plausible allegations of fraud and/or deception, including that "Reckitt" (1) voiced unfounded safety concerns about the tablets in order to convince prescribers and payors that Suboxone film was safer; (2) issued a press release advising the public and prescribing physicians that it intended to withdraw tablets from the market due to the pediatric safety issue; and (3) represented to the FDA and Buprenorphine Products Manufacturers Group that it would cooperate in the shared REMS process, even though it never intended to, for the sole purpose of delaying generic approval. (Pls.' Resp. Opp'n 15.)

**\*13** The flaw in Plaintiffs' argument is two-fold. First, Plaintiffs again attempt to premise liability against RBH by grouping it in with its sister corporation Indivior. Plaintiffs' claims about "Reckitt" voicing unfounded safety

concerns about tablets, issuing misleading press releases, and misrepresenting a willingness to cooperate in the shared REMS process are actions taken by Indivior and, as noted above, not attributable to RBH merely as a result of their corporate relationship. [10] The limited conduct ascribed specifically to RBH includes:

> [T]he execution of the initial contract with MonoSol Rx, LLC in December 2006 that initiated the joint venture to create and manufacture Suboxone Film. [RBH] also established the parameters for the timing of the launch and the formulation of Suboxone film, gathers, and investigates all consumer complaints as to Suboxone products, trademarked the names for the financial programs to encourage the switch from Suboxone tablets to film, and obtained patents together with MonoSol related to Suboxone film development. [RBH] monitored the taste and quality of Suboxone film, prepared materials for regulatory approval of Suboxone film, manufactured and supplied the ingredients for Suboxone film, and provided grants for the study of Suboxone.

(Am. Compl. ¶ 12; see also id. ¶ 46.) Further, employees of RBH are alleged to have "participated in discussions regarding the plan to remove Tablets from the market." (Id. ¶ 71.) None of these activities give rise to any fraud or deception on the part of RBH.

Second, Plaintiffs fail to identify any activities by RBH, aside from those set forth in support of the federal antitrust claims, that would invoke liability under any of the identified state statutes. While Plaintiffs tout the distinctions among the various states' laws, each of the state law claims in the Amended Complaint follows the same format of "repeat[ing] and reallege[ing] every preceding allegation" and then adding the conclusory statement that the "[t]he aforementioned practices by Defendants," are in violation of a particular state law. (Am. Compl. ¶¶ 166–297.) "The complaint does not contain specific reference to the various state standards

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

under which the claims are made or tailor facts to suit the '*significant* differences among States' consumer protection laws." Avenarius v. Eaton Corp., 898 F. Supp. 2d 729, 739 (D. Del. 2012) (quoting Thompson v. Jiffy Lube Int'l Inc., 250 F.R.D. 607, 625 (D. Kan 2008)) (emphasis in original). "Several courts have held that merely listing statutes that could provide possible causes of action without explaining even the broadest contours of how those statutes were violated 'is insufficient to state a claim.' " Aluminum Warehousing, 2014 WL 4743425, at *1 (quoting In re Trileggiant Corp., No. 12-00396, 2014 WL 1315244, at *35 (D. Conn. Mar. 28, 2014)) (further quotations omitted); see also McGarvey v. Penske Auto Grp., Inc., 639 F. Supp. 2d 450, 465 (D.N.J. 2009) (granting motion to dismiss state consumer fraud acts claim for relief because "[p]laintiffs do not even set forth the elements of the fifteen causes of action they assert ... or explain how the fifteen listed statutes apply to the facts of this case"), vacated in part on other grounds on reconsideration, No. 08–5610, 2010 WL 1379967 (D.N.J. Mar. 29, 2010).

**\*14** Peeling away the allegations that are no more than legal conclusions, I find that the state law claims contain no well-pled factual allegations that could plausibly give rise to an entitlement to relief against RBH under the state consumer protection and unfair competition statutes. Accordingly, I will dismiss all of these state law claims against RBH.

## IV. CONCLUSION

While the Amended Complaint sets forth a plausible product-hopping scheme and related conspiracy claims, it fails to properly attribute any of the allegedly illegal conduct to RBH. RBH cannot be held liable simply due to its former corporate relationship to Indivior. In light of the foregoing, I grant RBH's Motion to Dismiss in its entirety and dismiss all claims against it.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 4642285, 2017-2 Trade Cases P 80,168

## Footnotes

1    These states include Wisconsin, Alabama, Alaska, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Hawaii, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, Nebraska, New York, North Carolina, Ohio, Oklahoma, Rhode Island, South Carolina, Tennessee, Utah, Vermont, and Washington; the Commonwealths of Kentucky, Massachusetts, Pennsylvania, and Virginia; and the District of Columbia, by their Attorneys General (collectively, "States" or "Plaintiffs").

2    To avoid confusion as to the appropriate defendant, I will refer only to "Indivior" instead of "Reckitt."

3    For a more comprehensive statement of the factual allegations underlying this lawsuit, I incorporate by reference my opinion in In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig., No. 16-5073, 2017 WL 3967911, at *1–6 (E.D. Pa. Sept. 8, 2017). For purposes of the present motion, I focus solely on RBH and the facts relevant to the issues before me.

4    "General jurisdiction depends on a defendant having maintained 'continuous and systematic contacts' with the forum state." D'Jamoos ex rel. Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 107 (3d Cir. 2009) (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415–16 (1984)). Proof of such contact requires a showing of extensive and pervasive activity in the forum state. See Reliance Steel Prods. Co. v. Watson, Ess, Marshall, & Engass, 675 F.2d 587, 589 (3d Cir. 1982) (quotations omitted).

Nothing in the Amended Complaint allows any inference that RBH had continuous and systematic contacts with the United States such that the Court may exercise general jurisdiction over it.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 121 of 250

In re Suboxone (Buprenorphine Hydrochloride and..., Not Reported in Fed....

2017-2 Trade Cases P 80,168

5    Notably, the Amended Complaint does not allege a conspiracy between RBH and Indivior, and Plaintiffs concede that, under Copperweld, these two sister companies could not engage in a conspiracy for antitrust purposes. (Pls.' Resp. Opp'n. Mot. to Dismiss 8.)

6    In their opposition brief, Plaintiffs allege that "RBH, with the help of MonoSol, an independent company, also engaged in a plan to withdraw Tablets from the market—to ensure generic manufacturers were unable to compete upon market entry." (Pls.' Resp. Opp'n Mot. to Dismiss 10.) The Amended Complaint, however, only states that RBH "participated in discussions" regarding the removal of the tablets. (Am. Compl. ¶¶ 71, 118.) Such pleading does not amount to an allegation that MonoSol and RBH had any type of express plan or agreement. Plaintiffs may not now supplement their Amended Complaint with their briefing.

7    Plaintiffs allege that "at the motion to dismiss stage[,] allegations need not make any unlawful agreement 'more likely than independent action nor need they rule out the possibility of independent action.' " (Pls.' Resp. Opp'n Mot. to Dismiss 10 (quoting Evergreen Partnering Group, Inc. v. Pactiv Corp., 720 F.3d 33, 47 (1st Cir. 2013)).) While it is true that the determination of the motives behind alleged actions is improper at the motion to dismiss stage, the allegations of the complaint must, at minimum, allow the inference of concerted action done for an illegal anticompetitive purpose.

8    The sole exception to this ruling is the claim brought under Connecticut General Statute §§ 35-28 and 35-29. "Section 35–28 has no specific counterpart in the federal antitrust statutes but is a codification of federal case law concerning 'per se' violations of the Sherman Act, 15 U.S.C. § 1 et seq." Bridgeport Harbour Place I, LLC v. Ganim, 958 A.2d 210, 216 (Conn. App. 2008), aff'd, 32 A.3d 296 (Conn. 2011). General Statute § 35-29 is patterned after § 3 of the Clayton Act, a federal statute not raised by the Amended Complaint. State v. Hossan-Maxwell, Inc., 436 A.2d 284, 288 (Conn. 1980).

     Nevertheless, the Connecticut legislature has explicitly directed that the judiciary should be guided by interpretation of federal antitrust statutes, providing that: "It is the intent of the General Assembly that in construing sections 35–24 to 35–46, inclusive, the courts of this state shall be guided by interpretations given by the federal courts to federal antitrust statutes." Conn. Gen. Stat. § 35-44b; see also Miller's Pond, 873 A.2d at 978. To the extent Plaintiffs allege that a particular action by RBH violated a unique provision of the Connecticut antitrust statute, the burden fell on Plaintiffs to articulate, in the Amended Complaint, the elements of that provision and RBH's violations. They have failed to do so.

9    Plaintiffs do not contend that the state antitrust laws not specifically addressed in their brief differ from the Sherman Act analysis. Therefore, I dismiss those claims as well.

10   Indeed, any effort by Plaintiffs to impute conduct to RBH by grouping it in under the name "Reckitt" is disingenuous, as evidenced by their personal jurisdiction argument. When describing RBH's contacts with the United States in an effort to establish specific jurisdiction, Plaintiffs make no mention of any of the allegedly fraudulent conduct such as issuing press releases in the U.S., disparaging tablets in the U.S., or false participation in the shared REMS process in the U.S.

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

31 Fed.Appx. 151

This case was not selected for
publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed.
Rule of Appellate Procedure 32.1 generally governing
citation of judicial decisions issued on or after Jan.
1, 2007. See also Fifth Circuit Rules 28.7, 47.5.3,
47.5.4. (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.

SEARCH INTERNATIONAL, INC.;
Kent Little, Plaintiffs-Appellants,

v.

SNELLING & SNELLING, INC., Defendant-Appellee.

No. 01-10561.
|
Summary Calendar
|
Dec. 5, 2001.

Appeal from the United States District Court for the Northern
District of Texas, (USDC No. 3:00-CV-2598-R).

Before REAVLEY, HIGGINBOTHAM and WIENER,
Circuit Judges.

**Opinion**

PER CURIAM: [*]

**\*1** Plaintiffs-Appellants Search International, Inc. (Search)
and Kent Little appeal the district court's Rule 12(b)(6)
dismissal of their complaint. Kent Little and his company,
Search, own a franchise of a national employee placement
company called Snelling & Snelling (Snelling). The franchise
agreement between Search and Snelling provides that Search
is authorized to operate a Snelling placement service at the
single location provided for in the agreement, in Arlington,
Texas. Looking to expand its business, Search asked Snelling
for permission to open an office at a new location in
Richardson, Texas, near north Dallas. Snelling denied the
request, and allegedly began preparations to open its own
directly owned and operated placement offices ("company
stores") in the north Dallas area.

Search filed the present suit against Snelling, alleging a
number of state law claims and a violation of § 1 of the

Sherman Act, which prohibits unreasonable agreements in
restraint of trade. 15 U.S.C. § 1. Snelling filed a 12(b)(6)
motion to dismiss the federal and state antitrust claims, which
were the only claims not subject to the franchise agreement's
arbitration provisions. The district court granted Snelling's
motion to dismiss because (1) as franchisor and franchisee,
Snelling and Search are a single enterprise incapable of
conspiring within the meaning of the Sherman Act and,
alternatively, (2) Snelling's refusal to grant Search the right
to operate in a new location was a unilateral decision, not an
agreement.

Dismissals pursuant to Rule 12(b)(6) are reviewed *de novo*.
*Lowrey v. Texas A & M Univ. Sys.,* 117 F.3d 242, 246 (5th
Cir.1997). A motion to dismiss "is viewed with disfavor and is
rarely granted." *Kaiser Aluminum & Chem. Sales v. Avondale
Shipyards,* 677 F.2d 1045, 1050 (5th Cir.1982). Rule 12(b)(6)
motions to dismiss may be granted only if "it appears beyond
doubt that the plaintiff can prove no set of facts in support of
his claim which would entitle him to relief." *Conley v. Gibson,*
355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The district court properly dismissed the Sherman Act claim
because Search's pleaded facts show only a unilateral decision
by Snelling not to grant Search the right to operate an
additional location under the Snelling mark in Richardson. [1]
To prevail on a § 1 claim, a plaintiff "must show that the
defendants (1) engaged in a conspiracy (2) that produced
some anti-competitive effect (3) in the relevant market.
Section one applies only to concerted action; unilateral
conduct is excluded from its purview." *Johnson v. Hosp.
Corp. of America,* 95 F.3d 383, 392 (5th Cir.1996) (citations
omitted).

Search's opening brief asserts, without authority, that "any
action taken by one party in accordance with an unlawful
conspiracy to restrain trade that requires the initial agreement
of the other party is not a unilateral action." But Search
fails to explain why Snelling's refusal to allow Search to
open a new office in the franchise system required Search's
initial agreement. [2] Without being licensed to do so under the
franchise agreement, Search would not have had the right to
use the Snelling name or system in Richardson or anywhere
else. *See Tidmore Oil Co., Inc. v. BP Oil Co.,* 932 F.2d 1384,
1388-89 (11th Cir.1991) (finding no agreement where oil
company refused to approve plaintiff's use of the "Gulf" logo
at a new gas station site); *Midwestern Waffles, Inc. v. Waffle
House, Inc.,* 734 F.2d 705, 722 (11th Cir.1984) (holding that
there was no restraint of trade when a franchisor refused to

WCAS117

allow a franchisee to open a new Waffle House outside of its assigned territory); *St. Martin v. KFC Corp.,* 935 F.Supp. 898, 906 (W.D.Ky.1996) (finding that KFC's decision not to authorize a new restaurant to a franchisee was unilateral). Search's own First Amended Complaint acknowledges that "SNELLING may act unilaterally in making its decisions regarding franchise locations." Search only bargained for the right to a single franchise location. The portion of the franchise agreement identifying that physical location is better characterized as a recitation of the scope of the license than an agreement in restraint of trade.

**\*2** Search also argues that the district court erred by failing to consider Search's motion for leave to amend in event that the motion to dismiss was granted. As Snelling notes, this motion was one line of Search's response to the motion to dismiss, and unsupported by substantive briefing. *Confederate Mem'l Ass'n, Inc. v. Hines,* 995 F.2d 295, 299 (D.C.Cir.1993) (citations omitted) (holding that such a "bare request" is not a motion within the contemplation of Rule 15(a)). Even if a request of this sort qualifies as a motion for leave to amend, the Court can only conclude from the lack of particularity in Search's briefs on appeal about what facts it would add, its failure to add such facts in its First Amended Complaint, and its admission that location decisions are unilateral, that amendment would be futile.

AFFIRMED.

**All Citations**

31 Fed.Appx. 151, 2001 WL 1747635

## Footnotes

* Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1 Because there was no agreement, the Court does not reach the issue of whether the arrangement between Search and Snelling was horizontal or vertical, or whether franchisors and franchisees are always a common enterprise, incapable of conspiring under the Sherman Act.

2 Although the district court's order expressly identified the absence of an agreement as a basis for dismissal, Search's opening brief makes no attempt to identify the agreement at issue, and its reply brief identifies only "the contractual right to limit franchise locations" as the illegal agreement. Although the amended complaint cited Snelling's unfair use of Search's client information as an agreement in restraint of trade, Search has never explained how that conduct violates § 1 of the Sherman Act.

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Distinguished by Miracle Ventures I, LP v. Spear, S.D.N.Y., May 4, 2023

2020 WL 881544
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

SKYE MINERAL INVESTORS, LLC and
Clarity Copper, LLC, directly and derivatively on
behalf of Skye Mineral Partners, LLC, Plaintiffs,
v.

DXS CAPITAL (U.S.) LIMITED, PacNet
Capital (U.S.) Limited, Marshall Cooper, Sanjiv
Noronha, Waterloo Street Limited, Lippo
China Resources Ltd., Michael Riady, Stephen
Riady, and Noble Americas Corp., Defendants,
and

Skye Mineral Partners LLC, Nominal Defendant.

C.A. No. 2018-0059-JRS
|
Date Submitted: November 25, 2019
|
Date Decided: February 24, 2020

**Attorneys and Law Firms**

Rudolf Koch, Esquire and Kevin M. Gallagher, Esquire of Richards, Layton & Finger, P.A., Wilmington, Delaware and Jason Cyrulnik, Esquire, Edward Normand, Esquire and Marc Ayala, Esquire of Boies Schiller Flexner LLP, Armonk, New York, Attorneys for Plaintiffs Skye Mineral Investors, LLC and Clarity Copper, LLC.

Thomas W. Briggs, Jr., Esquire and Aubrey J. Morin, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware and Pedro A. Jimenez, Esquire, Kevin C. Logue, Esquire, Kevin P. Broughel, Esquire, Nicholas Bassett, Esquire, Katherine K. Solomon, Esquire, Katherine Rookard, Esquire of Paul Hastings LLP, New York, New York, Attorneys for Defendants DXS Capital (U.S.) Limited, PacNet Capital (U.S.) Limited, Marshall Cooper, Sanjiv Noronha, Waterloo Street Limited, Lippo China Resources Ltd., Michael Riady and Stephen Riady.

Brett M. McCartney, Esquire and Elizabeth A. Powers, Esquire of Bayard, P.A., Wilmington, Delaware and James W. Anderson, Esquire, Walter A. Romney, Jr., Esquire and Shaunda L. McNeill, Esquire of Clyde Snow & Sessions, Salt Lake City, Utah, Attorneys for Defendant Noble Americas Corp.

**MEMORANDUM OPINION**

SLIGHTS, Vice Chancellor

This dispute is among members of a Delaware limited liability company, Skye Mineral Partners, LLC ("SMP" or the "Company"). SMP's majority members allege that its minority members orchestrated a scheme wrongfully to divest SMP of its lone asset, a wholly owned operating subsidiary, CS Mining, LLC ("CSM"), by driving CSM into bankruptcy and then buying its assets at a steep discount in an auction sale conducted under Section 363 of the United States Bankruptcy Code. According to SMP's majority members, the scheme worked; their substantial investment in SMP has been looted by their one-time partners.

The scenario described above, at first glance, lacks intuitive congruence. How do minority members possess the means to ace the majority members out of their investment? The answer, according to Plaintiffs, lies in SMP's contractual governance scheme. SMP's constitutive documents granted the minority members certain blocking rights. It is alleged the minority members exercised those rights to drive CSM into bankruptcy, and then pounced on the opportunity to acquire CSM's valuable assets on the cheap when they came up for sale as part of the debtor's bankruptcy plan.

This scheme to divest SMP of its interests in CSM has prompted the majority members to bring a fifteen-count complaint in this Court. In their Second Amended Verified Complaint (the "Complaint"), now the operative complaint, Plaintiffs bring various iterations of claims against the minority members for breach of contract, breach of the implied covenant of good faith and fair dealing (the "implied covenant"), breach of fiduciary duty, aiding and abetting breach of fiduciary duty, tortious interference with contract, civil conspiracy and fraud. [1] They also bring claims for fraud, breach of contract, breach of the implied covenant and aiding and abetting breach of fiduciary duty against one of CSM's lenders for assisting the minority members in their scheme to chouse Plaintiffs out of their ownership interests in CSM.

WCAS119

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 125 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

All Defendants have moved to dismiss. Before getting to whether Plaintiffs have well pled their various claims, Defendants maintain that Plaintiffs confront a legal challenge at the threshold because claims belonging to the bankrupt CSM were discharged and released as part of the confirmation of CSM's bankruptcy sale. According to Defendants, all of the claims asserted here belonged to CSM, have now been released and cannot be revived on the pretense that SMP and its members have also suffered harm. Beyond this potentially dispositive threshold barrier, Defendants argue the Complaint fails for want of proper service and personal jurisdiction over certain Defendants and for failure to state viable claims under Court of Chancery Rule 12(b)(6).

For reasons I explain below, I reserve my ruling on Defendants' service and related jurisdictional defenses for another day. As for Defendants' Rule 12(b)(6) arguments, my ruling is a mixed bag. Plaintiffs have failed to plead viable claims against CSM's lender. Their attempt to hold individuals and entities who sit atop the minority members' ownership structure directly accountable for the minority members' actions based on strained agency theories also fails as a matter of law. Plaintiffs, however, have adequately stated claims against the minority members of SMP for intentionally using their blocking rights to cause harm to SMP in a manner that was not exculpated by the clear terms of SMP's constitutive documents. This alleged conduct supports both the direct and derivative contract-based and fiduciary-based claims asserted against the minority members in the Complaint. Plaintiffs have also well pled that entities and individuals within the minority members' ownership group conceivably aided and abetted the fiduciary breaches. They have not, however, met the heightened burden imposed by our rules to plead fraud. Thus, as explained below, the Motions to Dismiss must be granted in part and denied in part.

# I. BACKGROUND

 **\*2** I have drawn the facts from the allegations in the Complaint, documents incorporated by reference or integral to the Complaint and judicially noticeable facts. [2] In resolving the Motions to Dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor. [3]

**A. Parties and Relevant Non-Parties**

SMP is a Delaware LLC. [4] Virtually all of SMP's assets consisted of its ownership interest in CSM. [5] At all times relevant here, SMP owned more than 99% of CSM and was its managing and majority member. [6]

SMP's Board of Managers (the "Board") comprised three members, each appointed by SMP's members. [7] Plaintiffs, Skye Mineral Investors, LLC ("SMI") and Clarity Copper, LLC ("CC") appointed two Board members while Defendants, DXS Capital (U.S.) Limited ("DXS") and PacNet Capital (U.S.) Limited ("PacNet"), appointed the third, Defendant, Marshall Cooper. [8] Cooper is an individual residing in Jakarta, Indonesia. [9]

Defendant, Sanjiv Noronha, is an individual residing in Singapore. [10] Plaintiffs allege Noronha is "affiliated" with Defendant, Lippo China Resources Ltd. ("LCR"), and "represented" Defendant, Waterloo Street Limited ("Waterloo"), in various matters relating to the claims. [11]

Defendant, Stephen Riady, is an individual residing in Singapore. [12] He is a son of non-party, Mochtar Riady (the alleged "patriarch" of the Riady family), and is the Executive Chairman of LCR. [13] Defendant, Michael Riady, is an individual residing in Florida. [14] He is a grandson of Mochtar Riady. [15]

The Complaint refers to Defendants DXS, PacNet, Waterloo, LCR, Stephen Riady, Michael Riady, Noronha and Cooper as the "Lippo Group" or "Lippo." [16] Under the umbrella of the "Lippo Group," the Complaint describes a hierarchical structure established to manage the Riady family's investments. [17] Together, the Lippo Group "generates approximately $8 billion in revenue annually," contributing to Mochtar Riady's $2.3 billion personal net worth. [18]

 **\*3** Within the Lippo Group, the Complaint alleges (on information and belief) that "the Riady family, and/or its affiliates and controlled parties" own and control LCR. [19] It is also alleged that Cooper "has been an employee of the Lippo Group for 18 years" and "reported to" Michael Riady and LCR's board of directors. [20] Noronha "worked for" and "reported to" Stephen Riady. [21] According to Plaintiffs, Cooper, Noronha, PacNet and DXS are "agents" of Michael

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 2

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 126 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

Riady, Stephen Riady and LCR.[22]  As for Cooper, the Complaint alleges he made clear to the other members of the Board that he would need to confer with "the family" before making any decision respecting SMP.[23]

Defendant, Noble Americas Corp. ("Noble"), was a lender to CSM. It is alleged that Noble's loan to CSM was a necessary instrument in the Lippo Group's scheme to divest SMP of its ownership interests in CSM.[24]

For clarity, I illustrate the relevant entities and their relationship to each other in the chart below:[25]

### B. The SMP Agreement

The operative foundational agreement for SMP is the Third Amended and Restated Limited Liability Company Agreement (the "SMP Agreement").[26]  I summarize the relevant provisions of that agreement below.

### 1. Managers' Fiduciary Duties

SMP is a manager-managed LLC.[27]  As a baseline, the SMP Agreement did *not* eliminate SMP's managers' fiduciary duties. Instead, it provides, in relevant part, "[e]xcept as otherwise set forth in this Agreement, a Manager has a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders."[28]

In further refinement of the governance standard for managers, Section 5.1(f) of the SMP Agreement makes clear that SMP's managers' duties are analogous to those owed by directors of Delaware corporations with exculpatory charter provisions as authorized under 8 *Del. C.* § 102(b)(7):

> Each Manager will not be liable or obligated to the Members for any mistake of fact or judgment ... unless such act or failure to act involved such Manager's breach of fiduciary duty or a breach of this Agreement, in which case such Manager will cease to be

exempt from liability to the Company and the other Members for any such loss to the same extent such exemption from liability is not permitted by the General Corporation Law of the State of Delaware [ (the "DGCL") ]. A Manager does not, in any way, guarantee the return of the Members' Capital Contributions or a Profit for the Members from the operations of the Company. A Manager will not be responsible to any Member because of a loss of their investment or a loss in operations unless such loss is the result of such Manager's breach of this Agreement, in which event such Manager will cease to be exempt from liability to the Company and the other Members for any such loss to the same extent such exemption from liability is not permitted by the [DGCL].[29]

With respect to corporate opportunities, the SMP Agreement provides that SMP's managers "may have other business interests."[30]  Specifically, "[e]ach Manager and its respective affiliates may, notwithstanding the existence of this Agreement, engage in whatever activities such Manager or its Affiliates may choose, without having or incurring any obligation to offer any such interest in such activities to the Company or to the Members."[31]

### 2. Members' Fiduciary Duties and Control Rights

**\*4**  As for the members of SMP, the SMP Agreement provides, "[i]n view of the limited purposes of the Company, no Member or any of its Affiliates shall have any fiduciary obligations with respect to the Company or to the other Members *insofar as making other investment opportunities available to the Company or to the other Members*."[32]  Relatedly, SMP's members can give or withhold, condition or delay their "votes, approvals, or consents" in their "sole and absolute discretion."[33]  This right is potent because Section 4.6(b) of the SMP Agreement prohibits SMP and CSM from taking certain actions unless 75% of the holders of

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 127 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

SMP's outstanding class A units approve. [34]  Among the acts requiring 75% approval are:

- Granting or pledging any security interest, lien or encumbrance; [35]

- Issuing units of any class to an existing member or a new member; [36] and

- Entering into a merger or a sale of substantially all the Company's assets [37] (collectively, the "Blocking Rights").

In short, given that together they held greater than 25% of SMP's outstanding class A units, DXS and PacNet, even as minority members, possessed significant control rights under the SMP Agreement. [38]

On top of the Blocking Rights, DXS negotiated additional negative control rights. Relevant here, with the exception of a few narrow carve outs, the Company could not approve an annual budget or take on material debt without DXS's approval. [39]

### 3. Observer Rights

The SMP Agreement gave DXS special observer rights. Specifically, DXS could "appoint a representative" who would "attend all meetings of the [Board] in a nonvoting observer capacity." [40]  In exchange for this right, DXS promised to secure its representative's promise "to hold in confidence and trust all information provided to it or learned by it in connection with its rights under this Agreement." [41] DXS appointed Noronha as its "representative." [42]

### 4. Member Loans

Section 3.5 of the SMP Agreement authorized the Board to cause the Company to borrow from the members. [43]  In the event any member made a loan to the Company, the other members had a right to participate in the loan on a *pro rata* basis. [44]  As alleged, Section 3.5 requires Board authorization before "a member [can be] a lender to the [C]ompany." [45]

### C. CSM's Business Prior to the Alleged "Divestiture"

CSM owned valuable mineral deposits. [46]  Even so, SMP appreciated that 75% of CSM's mineral deposits would remain in the ground unless and until CSM expanded its processing facility. [47]  To accomplish this required expansion of its processing capacity, SMP and CSM initiated a capital project known as "Phase II." [48]  In the run-up to Phase II, Cooper discovered key information regarding the full value of CSM's mineral deposits while acting as a SMP manager. [49] Specifically, non-party Newmont Mining advised Cooper that CSM possessed "world class" (albeit untapped) mineral deposits worth at least $600 million. [50]  Even though he learned this information as a member of the Board, Cooper shared it with only DXS and PacNet; he kept it from SMI and CC. [51]

### D. The Noble Loan

**\*5**  In August 2014, Noble loaned $30 million to CSM (the "Noble Loan") to finance CSM's Phase II capital project. [52] The contract governing the Noble Loan (the "NLA") stated, in its recitals, that it was an agreement "by and between" CSM (as borrower) and Noble (as lender). [53]  And CSM and Noble were the only signatories to the NLA. [54]  Because it was a part of a broader transaction between Noble, CSM and SMP, the NLA references SMP in its definition of "Loan Parties." [55] That definition, in turn, references *other* agreements to which SMP was a party. [56]  One of those separate agreements was the "Intercreditor Agreement" whereby SMP agreed to subordinate its loans to CSM to the Noble Loan. [57] Notwithstanding the NLA's references to other agreements and non-parties, Noble and CSM agreed that "nothing in [the NLA], express or implied, shall be construed to confer upon any Person (other than the parties hereto,[) ] ... any legal or equitable right, remedy or claim under or by reason of [the NLA]." [58]

The NLA was not a typical commercial financing agreement in that Noble did not extend credit under the NLA as a traditional lender but as the exclusive purchaser of CSM's copper. [59]  Because of the significant leverages Noble enjoyed as CSM's senior secured creditor and exclusive customer, Noble was prohibited from selling the Noble Loan to a member of the Lippo Group (the "Insider Sale Prohibition"). [60]  SMP's members negotiated the Insider Sale

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 128 of 250

Prohibition specifically "to prevent one of SMP's members from benefitting from a default by [CSM]." [61]

As explained below, CSM fell behind on its Noble Loan payments. This delinquency eventually prompted Noble to declare an event of default. [62] Under the NLA, upon declaring an event of default, Noble could accelerate payments, foreclose on CSM's assets or sell the Noble Loan without CSM's consent. [63] Following Noble's declaration of default, on December 7, 2015, CSM and Noble negotiated a fourth amendment to the NLA (the "Fourth Amendment") to forestall Noble's acceleration of the debt. [64] The Fourth Amendment, in turn, waived the Insider Sale Prohibition. [65] Thus, once CSM defaulted and the parties signed the Fourth Amendment, Noble was free to sell the Noble Loan to whomever it wanted, including members of the Lippo Group. [66]

### E. The Lippo Group's Alleged Scheme

Plaintiffs allege the Lippo Group hatched a scheme in 2014 to wrest control of SMP's valuable assets from CC and SMI. [67] Step one of the scheme began in late 2014, when DXS and PacNet began to block "reasonable financing proposals" for SMP. [68] For instance, they blocked a *pro rata* equity round for SMP in 2015 despite knowing that SMP needed capital to fund CSM's obligations under the NLA and Phase II. [69] SMI and CC tried to save the Company with a $5 million equity investment. [70] In response, DXS and PacNet filed a declaratory judgment action in this court, where they sought to enforce the Blocking Rights in order to prevent the $5 million investment. [71] In their complaint, DXS and PacNet alleged, "pursuant to the SMP [Agreement], DXS and PacNet's prior written approval is required before (i) SMP issues any Membership interest to any existing Member or new Member of SMP, or (ii) SMP or [CSM] enters into any agreement with respect to incurring significant debt or pledging its assets as security to any creditor." [72]

**\*6** With step one of the scheme in full swing, and CSM withering on the vine, the Lippo Group initiated step two in the summer of 2015. [73] As revealed in an October 2015 email from Cooper to Noronha (the "Cooper/Noronha Email"), the Lippo Group commenced discussions with Noble to buy the Noble Loan notwithstanding the Insider Sale Prohibition:

> Then I would at request of Noble, consider buying that debt at a large discount, which the [Riady] family would then have full security and take some upside on debt. **Then we can sit back and hold our position and when this collapses we have the first lien and can buy it out of bankruptcy very cheap.** [74]

Because of CSM's deteriorating condition, Noble notified SMP and all of its members that it would be interested in selling the Noble Loan. [75] But, "contrary to what [Noble] actually had been negotiating with the Lippo Group behind Plaintiffs' backs," Noble did not tell Plaintiffs "that it would be willing to [sell its loan] at a substantial discount." [76] Plaintiffs now allege Noble was motivated to keep its discussions with the Lippo Group hidden from Plaintiffs because Noble had significant commercial relationships with the Lippo Group apart from its dealings with SMP and CSM. [77]

Noble had loaned real money to CSM. [78] When CSM defaulted, therefore, it came as little surprise that Noble insisted that CSM agree to the Fourth Amendment. [79] Plaintiffs now dispute whether it was in Noble's interest actually to foreclose on CSM's assets, but Noble at least had the right to accelerate the $30 million loan and foreclose— which would have doomed CSM. [80]

On December 7, 2015, CSM and Noble executed the Fourth Amendment, thereby waiving CSM's event of default while also deleting the Insider Sale Prohibition from the NLA. [81] At about this time, Cooper "flat-out lied" when he stated to the other Board members that he was not involved in any discussions to purchase the Noble Loan. [82] Even so, Plaintiffs *knew* this was false given the Lippo Group's prior revelation "that they had been negotiating with Noble" as early as 2015. [83]

While the Fourth Amendment gave SMP a reprieve from the impending Noble Loan default, DXS and PacNet advanced

WCAS123

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 129 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

their scheme to the third step by inducing SMI and CC to infuse more equity capital into SMP in order to keep CSM afloat while intending to seize CSM's assets when it "collapsed." [84] In late 2015, SMI and CC invested another $6.8 million in SMP. [85] They agreed to make this investment knowing the Lippo Group had been in discussions to acquire the Noble Loan and that the Insider Sale Prohibition was gone. [86]

On December 24, 2015, Plaintiffs learned Lippo was on the brink of acquiring the Noble Loan when they were "mistakenly" copied on an email between Noble and the Lippo Group. [87] Plaintiffs objected and sought to stop the sale, but on December 31, 2015, Noble sold the Noble Loan to Waterloo (a Lippo affiliate) for $23 million, a substantial loss for Noble. [88] LCR (an entity for which Stephen Riady served as Executive Chairman) specifically approved Waterloo's acquisition of the Noble Loan. [89]

**\*7** After acquiring the Noble Loan, Noronha represented Waterloo in its dealings with CSM. [90] Noronha, in turn, "worked for" and "reported to" Stephen Riady. [91] Through this web of relationships, Plaintiffs allege the "Lippo Group" caused "its agents," Cooper and Noronha, to take harmful actions in furtherance of the divestiture scheme that were not approved by SMP's Board. [92] Specifically, Cooper and Noronha:

- "directed SMP management how to spend [ ] funds to advance Lippo's self-interest[ ]" and "depress[ed] the value and financial abilities of SMP" [93] and

- "instructed SMP management" to cause CSM to ramp-up borrowing under the Noble Loan and directed SMP's management "as to which account payables to satisfy" (collectively, the "Unauthorized Acts"). [94]

The Unauthorized Acts improved the Lippo Group's position in CSM's looming bankruptcy. [95] And, as the Lippo Group had planned, CSM entered bankruptcy in June 2016. [96]

### F. The CSM Bankruptcy

On August 18, 2017, the United States Bankruptcy Court for the District of Utah (the "Utah Bankruptcy Court") issued an order (the "Sale Order") approving the sale of CSM's assets under Section 363 of the Bankruptcy Code. [97] Non-party,

Tamra Mining Company, LLC (the "Buyer"), acquired all of CSM's assets for $40 million in a court-supervised sale. [98] The Buyer is not a party to this litigation, but it is affiliated with the Lippo Group. [99]

The Sale Order provided that the Buyer purchased CSM's assets "free and clear of all Interests of any kind or nature whatsoever." [100] Among the purchased assets were any claims CSM had against Lippo. [101] But the Sale Order said nothing about claims *SMP* might have against Lippo. Indeed, during the hearing to approve the Sale Order, the parties represented to the Utah Bankruptcy Court that the Sale Order contained "no releases with respect to any direct claims at any other third parties or any impairment of any other third party's legal rights and recoveries against anyone else in connection with this particular sale of claims." [102]

### G. Procedural Posture

Plaintiffs filed their original complaint on January 24, 2018. [103] Later, on February 16, 2018, PacNet, DXS and Cooper removed the case to the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). [104]

Meanwhile, the Utah Bankruptcy Court had entered the Sale Order, but litigation between Lippo and Plaintiffs dragged on in that court as well. On February 15, 2018, the Buyer sought to enjoin Plaintiffs from proceeding in this court on grounds that the claims asserted here are barred by the Sale Order. On June 1, 2018, the Utah Bankruptcy Court held it lacked jurisdiction to issue such an injunction. [105] And, on December 3, 2018, the Delaware Bankruptcy Court remanded the case to this court. [106]

**\*8** On January 14, 2019, Plaintiffs amended their original complaint. [107] After Defendants filed Motions to Dismiss, Plaintiffs filed the now operative Complaint. [108] Defendants have again filed Motions to Dismiss under Court of Chancery Rules 12(b)(2), 12(b)(4), 12(b)(5) and 12(b)(6). [109]

### II. ANALYSIS

While the arguments raised in the Motions to Dismiss are multi-layered, as one might expect when several defendants

WCAS124

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 130 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

seek dismissal of a fifteen-count Complaint, the arguments can be placed into four broad categories:

- Stephen Riady and Noronha have not been properly served, so the claims against them should be dismissed under Rule 12(b)(4) & (5); [110]

- This Court lacks personal jurisdiction over Noronha, LCR, Waterloo, Stephen Riady and Michael Riady, so the claims against them should be dismissed under Rule 12(b)(2); [111]

- Plaintiffs have failed to meet the heightened pleading standard of Rule 9(b) required to state a claim for fraud; [112]

- Plaintiffs' other claims should be dismissed under Rule 12(b)(6) for failure to plead viable claims. [113]

During the hearing on Defendants' Motions to Dismiss, I observed that Lippo's Motions concerning inadequate service of process had not been properly joined for decision. [114] That issue turns on a foreign sovereign's legal standards concerning which the record, as it stands, contains directly competing affidavits from foreign law experts. [115] I am reserving judgment on Lippo's Rule 12(b)(4) and (5) Motions until the record on foreign law is further developed. [116] I address the remaining grounds stated in Defendants' Motions below.

### A. Personal Jurisdiction

The Lippo Group contends this Court lacks personal jurisdiction over Noronha, Stephen Riady, Michael Riady, Waterloo and LCR. [117] When responding to a motion to dismiss under Court of Chancery Rule 12(b)(2), "the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction." [118] "In ruling on a 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery record. If [as here] ... no evidentiary hearing has been held, plaintiffs need only make a *prima facie* showing of personal jurisdiction, and the record is construed in the light most favorable to the plaintiff." [119]

**\*9** Determining whether a Delaware court may exercise personal jurisdiction over a non-resident involves a two-step inquiry. [120]

The court must determine, first, whether an applicable Delaware statute provides a means of exercising personal jurisdiction over a nonresident, and second, whether "subjecting the nonresident defendant to jurisdiction would violate due process." Due process requires that the "nonresident defendant ... have sufficient minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." [121]

Plaintiffs assert jurisdiction is proper under several theories. [122] As to Noronha, Stephen Riady, Michael Riady, Waterloo and LCR, Plaintiffs assert jurisdiction over these defendants under the Delaware long-arm statute, 10 *Del. C.* § 3104(c), and the conspiracy theory of jurisdiction, among other theories. [123] Because I find Plaintiffs have made a *prima facie* showing to establish personal jurisdiction under both theories, I end the analysis there.

The conspiracy theory of jurisdiction "is based on the legal principle that one conspirator's acts are attributable to the other conspirators." [124] Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court." [125] The conspiracy theory is not an independent basis to demonstrate personal jurisdiction; it is, rather, a means by which a plaintiff may advance his case for personal jurisdiction under the long-arm statute. [126]

As our Supreme Court explained in *Instituto Bancario*, the conspiracy theory of personal jurisdiction requires the satisfaction of a five-part test:

> [A] conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 131 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy. [127]

This five-part test "functionally encompass[es]" both prongs of the Delaware long-arm statute—which requires both a statutorily defined nexus to the state as well as compliance with constitutional notions of due process. [128] "Therefore, if a plaintiff can address satisfactorily all five elements of the conspiracy theory, then the plaintiff will have met both prongs of the jurisdictional test." [129]

**\*10** Plaintiffs maintain they have met the *Instituto Bancario* test with well-pled allegations in their Complaint. Defendants disagree, arguing the Complaint fails adequately to allege that (i) a conspiracy was formed, and (ii) members of the supposed-conspiracy knew of and participated in substantial acts in furtherance of the conspiracy in Delaware. [130] I reject both challenges below.

### 1. The Conspiracy Among the Lippo Group

Under the *Instituto Bancario* test, I must first ask whether Plaintiffs have carried their *prima facie* burden to demonstrate a conspiracy existed and that each Lippo defendant was a member of the conspiracy. Although the first element of the test specifically mentions "a conspiracy to defraud," the test is not limited to that particular tort, and has been found to apply to conspiracies to breach fiduciary duties and aid and abet such breaches. [131] The existence of a conspiracy is tested by reference to an additional five elements: "(1) two or more persons; (2) some object to be accomplished; (3) a meeting of the minds between or among such persons relating to the object or a course of action; (4) one or more unlawful acts; and (5) resulting proximate damages." [132]

As discussed in greater detail below when addressing the viability of Plaintiffs' pled claims, the conspiracy that fairly can be gleaned from the record is that the members of the Lippo Group implemented a plan to starve SMP of capital and then drive CSM into bankruptcy so that Lippo could

"buy [CSM's assets] out of bankruptcy very cheap." [133] This conspiracy, as alleged, meets the five requisite elements under Delaware law.

Lippo cites *In re Transamerica Airlines*, for the proposition that "a corporation generally cannot be deemed to have conspired with its wholly owned subsidiary, or its officers and agents." [134] But *Transamerica*, itself, noted that "this general rule does not apply [ ] when the officer or agent of the corporation steps out of her corporate role and acts pursuant to personal motives." [135] With this in mind, "[Lippo's] argument —that entities with common equity ownership can never conspire illegally with one another—is not one that convinces me," at least not at this stage. [136]

**\*11** I am also unpersuaded by Lippo's argument that the Complaint does not "include the necessary factual allegations reflecting a 'meeting of the minds.' " [137] "A plaintiff does not need to prove the existence of an explicit agreement; a conspiracy can be inferred from the pled behavior of the alleged conspirators." [138] The Cooper/Noronha Email, by itself and on its own terms, supports a strong inference of an agreement between Cooper, Noronha, Stephen and Michael Riady and the entities they controlled (LCR, DXS, PacNet and Waterloo) to engage in the scheme at the heart of the alleged conspiracy. [139] The email uses the collective pronoun "we" to refer to Noronha, Cooper and the Riady family. [140] It is also reasonable to infer that the email describes, in detail, the Lippo Group's plan to tank SMP. [141] After the email was sent, Stephen and Michael Riady allegedly "directed" Cooper and Noronha as they implemented the Lippo Group's scheme while Waterloo acquired the Noble Loan (an acquisition LCR's board formally approved). [142] Given these acts, on top of the aligned incentives created by the Lippo Group's common ownership and direction under the Riady family, I find Plaintiffs have pled facts supporting a reasonable inference that Stephen Riady, Michael Riady, LCR, Cooper, Noronha and Waterloo agreed intentionally to scuttle SMP by divesting it of its ownership of CSM.

### 2. The Acts in Delaware

The third, fourth and fifth elements of the *Instituto Bancario* test focus on acts committed in Delaware to advance the alleged conspiracy about which members of the conspiracy

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 8

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 132 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

either knew or had reason to know. [143] The test does not require that any specific defendant perform such acts; instead, "one conspirator's acts are attributable to the other conspirators." [144] Ultimately, I am persuaded each member of the Lippo Group knew or had reason to know that members of the conspiracy acted in Delaware to further the conspiracy.

DXS and PacNet sued in Delaware to enforce their Blocking Rights. [145] Lippo cannot reasonably contend, at this stage, that this was not an act in furtherance of the group's plan. [146] Based on the scheme described in the Complaint, it is reasonable to infer that each member of the Lippo Group knew about the Delaware lawsuit, especially given Cooper's frequent consultation with "the [Riady] family." [147]

As for LCR and Waterloo's knowledge, "[w]hen a corporation empowers managers with the discretion to handle certain matters and to deal with third parties, the corporation is charged with the knowledge of those managers when the corporation is sued by innocent parties." [148] Cooper and Noronha allegedly were agents and representatives for both LCR and Waterloo, so their knowledge is imputed to their principals. [149] Moreover, since a central purpose of the alleged conspiracy was to drive SMP into insolvency by employing the Blocking Rights, it was foreseeable that DXS and PacNet would have to file suit in SMP's home (Delaware) to enforce their rights.

### 3. Due Process

**\*12** Finally, this Court's exercise of personal jurisdiction over the members of the Lippo Group comports with due process (assuming proper service of process). Because it is reasonable to infer that the Lippo Group voluntarily participated in a conspiracy to harm SMP knowing that the scheme would require DXS, PacNet and Cooper to breach the fiduciary duties they owed to SMP, a Delaware LLC, it is fair and reasonable to require them to defend their conduct here, in the same forum the Lippo Group chose to adjudicate its declaratory judgment claims in the first place. [150] Put differently, by any reasonable measure, the Lippo Group should have expected that its plan might well lead Plaintiffs to haul them into this court to answer, at least, for their role in allegedly aiding and abetting breaches of fiduciary duty by Cooper as DXS and PacNet's Board designee.

\* \* \* \* \* \*

For the reasons explained above, I conclude Plaintiffs have made a *prima facie* showing that all of the *Instituto Bancario* factors are satisfied such that this Court has personal jurisdiction over the Lippo Group's members (assuming proper service of process) under Delaware's long-arm statute and the conspiracy theory of jurisdiction.

### B. Defendants' Rule 12(b)(6) Arguments

In considering a motion to dismiss under Court of Chancery Rule 12(b)(6), the Court applies a well-settled standard:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are 'well-pleaded' if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof. [151]

I first take up Defendants' arguments that the Sale Order bars Plaintiffs' claims. I then address, in turn, Plaintiffs' breach of contract, breach of fiduciary duty, aiding and abetting, civil conspiracy, tortious interference with contract and fraud claims.

### 1. The Preclusive Effect of CSM's Bankruptcy Sale

Defendants argue the Sale Order precludes Plaintiffs' claims on three separate grounds: the claims are barred by *res judicata*; the *en rem* protections expressly provided for in the Sale Order bar the claims; and the claims are derivative on behalf of CSM, a now discharged bankrupt debtor, and cannot be brought by or on behalf of SMP. I address each ground below.

WCAS127

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 133 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

### a. *Res Judicata*

*Res judicata* will bar a claim if the party asserting the defense can establish each of the following elements: (1) the court making the prior determination had jurisdiction; (2) the parties in the present action are either the same parties or are in privity with the parties from the prior adjudication; (3) the prior adjudication was final; (4) the causes of action were the same in both cases or the issues decided in the prior action were the same as those raised in the present case; and (5) the issues in the prior action were decided adversely to the party's contention in the instant action. [152] Lippo's *res judicata* argument fails to satisfy either the fourth or fifth element.

In their effort to demonstrate the requisite consonance between the bankruptcy proceedings and the claims advanced here, Lippo vaguely points to certain objections Plaintiffs lodged with the Utah Bankruptcy Court before that court approved the Sale Order. [153] In those objections, Plaintiffs leveled many of the same factual allegations against Defendants they now raise in the Complaint. [154] According to the Complaint, however, the Utah Bankruptcy Court never reached the merits of Plaintiffs' allegations because it did not have to. [155] The allegations were deemed irrelevant to the question before the court—was the sale of assets procedurally proper? [156] In other words, as alleged here, the Utah Bankruptcy Court did not consider, much less adjudicate, the merits of Plaintiffs' allegations that the Lippo Group had executed a plan wrongfully to divest SMP of its ownership interest in CSM. Thus, it is not clear from the Complaint that Plaintiffs "can prove no set of facts to avoid" the *res judicata* defense. [157]

### b. *En Rem* Protections Under 11 *U.S.C.* § 363

**\*13** Lippo's next argument is that the Bankruptcy Code "comes with inherent protections designed to ensure [the] finality [of the bankruptcy proceedings]." [158] Specifically, according to Lippo, the Sale Order "judicially sanctioned" the transfer of assets "free and clear" of all interests, including litigation claims. [159] While not entirely clear, Lippo's theory seems to be that the Bankruptcy Code grants the Buyer certain *en rem* protections from collateral attack thereby cleansing

any wrongdoing arising out of, or related to, the purchase of CSM's assets. [160]

Lippo's *en rem* argument leaves them well short of where they are trying to go. At most, the Bankruptcy Code protects the *Buyer* from collateral attacks; it does not protect others. [161] In this regard, a case Lippo cites, *In re Christ Hospital*, is instructive. [162] There, it was alleged that the successful bidder in a Section 363 sale had "forced" the debtor into bankruptcy and had committed various torts "in connection with" the 363 sale. [163] Nevertheless, the court held Section 363 barred the plaintiff from bringing its tort claims against the defendant-bidder because the claims were "obviously intertwined" with the sale. [164] But the court stopped noticeably short of suggesting that Section 363 protected any party *other than the buyer* from collateral attacks. [165] Because the Buyer is not a party to this case, Section 363 does not, on its face, bar the Complaint.

### c. The Claims, As Pled, Belong to SMP, Not CSM

In a last-ditch effort to salvage a defense to the claims *sub judice* out of CSM's bankruptcy, Defendants argue the Complaint brings claims that were sold to the Buyer, as reflected in the Sale Order. [166] In other words, Defendants claim Plaintiffs are misappropriating the Buyer's property— the litigation asset acquired under the Sale Order. Yet, the Complaint acknowledges that Plaintiffs "do[ ] not assert any legal claims that CSM ever owned itself." [167] According to the Complaint, while "Defendants' misconduct also may have harmed other parties, including CSM, [ ] Plaintiffs are not asserting claims to recover for the harm suffered exclusively by those other parties." [168] Indeed, Plaintiffs acknowledge any claims CSM ever owned have been "disposed of" through CSM's asset sale under 11 *U.S.C.* § 363. [169]

Defendants cannot bar the Complaint with the Sale Order. That document only purports to transfer *CSM*'s assets. [170] It says nothing of assets belonging to SMP. Moreover, the parties represented to the Utah Bankruptcy Court that the Sale Order did not release "any direct claims of any other third parties" or impair "any other party's legal rights." [171]

**\*14** To be sure, CSM could not have sold any claims belonging to SMP in the bankruptcy proceedings or

Case 4:23-cv-03560  Document 125  Filed on 02/26/24 in TXSD  Page 134 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

otherwise. In this regard, this court's decision in *Case Financial, Inc. v. Alden* is directly on point. [172] There, the court addressed whether a parent corporation had standing to sue for breach of fiduciary duty arising out of transactions entered into by its wholly owned subsidiary. [173] The defendant, "Alden," was a director and officer of both the parent and the subsidiary, yet the subsidiary had not sued Alden even though he had allegedly misappropriated the subsidiary's assets. [174] In a post-trial decision, the court observed that, in a parent-subsidiary context, each entity has its own set of fiduciaries. [175] Thus, even though the subsidiary probably had derivative claims that it could have brought against Alden, the parent had its own standing to sue Alden for breach of fiduciary duty. The court wrote:

> Alden, as a director of [the parent], had a duty not to intentionally or knowingly participate in conduct that would injure [the parent]. Because Alden owed this duty to [parent] directly, [the parent's] ability to pursue a suit against Alden directly would not depend, in this sense, on whether the entirety of the damage was sustained directly by [parent] or derivatively through [the subsidiary]. To the contrary, if Alden was substantially certain his conduct would injure [parent] unjustifiably, regardless of how far down the causal chain the injury would occur, Alden should have refrained from the conduct. [176]

Similarly, SMP is owed fiduciary obligations from the fiduciaries named as defendants here that are separate from duties that may have been owed to CSM. Plaintiffs only purport to bring SMP's claims. [177] Whether Plaintiffs will be able to prove up claims and damages separate and apart from the claims belonging to CSM is a question for another day. [178] For now, Plaintiffs have standing to prosecute SMP's derivative and their direct claims as pled.

## 2. Breach of Contract/Implied Covenant (Counts 2, 3, 5, 13 and 14)

Plaintiffs bring the following breach of contract claims:

- Count 2 alleges DXS and Noronha breached their confidentiality obligations under the SMP Agreement; [179]

- Count 5 alleges DXS and PacNet breached the SMP Agreement when the Lippo Group acquired the Noble Loan without approval from SMP's Board; [180] and

- Count 13 alleges Noble breached the NLA when it sold the Noble Loan to the Lippo Group. [181]

Relatedly, Plaintiffs assert the following breaches of the implied covenant:

- Count 3 alleges DXS and PacNet breached the implied covenant by exercising the Blocking Rights in bad faith; [182] and

- Count 14 alleges Noble breached the implied covenant by not notifying Plaintiffs that Noble was planning to sell the Noble Loan until it was too late. [183]

Under Delaware law, "the elements of a breach of contract claim are: (1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) a resulting damage to the plaintiff." [184] When addressing whether a plaintiff has well pled the first two elements, the court must consider, and often construe, the proffered contract at the heart of the claim of breach. The construction of a contract is a question of law, and Defendants have no right to dismissal under Rule 12(b)(6) unless "the interpretation of the contract on which their theory of the case rests is the only reasonable construction as a matter of law." [185] On the other hand, if there is more than one "reasonable construction" of contractual language, then the contract is ambiguous, and Defendants' Motions to Dismiss cannot be granted. [186] Of course, "[a] contract is not rendered ambiguous simply because the parties do not agree upon its proper construction." [187] Instead, the court will apply standard canons of contract interpretation in construing the contract to ascertain whether the contract is ambiguous. [188]

WCAS129

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 135 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

### a. DXS and Noronha's
### Confidentiality Obligations (Count 2)

**\*15**  In Count 2, Plaintiffs allege DXS and Noronha breached Section 5.1(l)(ii) of the SMP Agreement. [189]  Section 5.1(l)(i) grants DXS and Noronha observation rights on the SMP Board. [190]  But Section 5.1(l)(ii) conditions those rights on DXS and Noronha's promise to "hold in confidence and trust all information" they learned "in connection with [their] rights under [the SMP Agreement.]" [191]

According to Plaintiffs, Noronha and DXS breached Section 5.1(l)(ii) in two steps. [192]  *First*, they used their observation rights to learn about the significant inherent value of CSM's "world class" assets. [193]  *Second*, Noronha and DXS "leaked their knowledge, in breach of the SMP Agreement, to non-SMP members." [194]  The non-SMP members (Waterloo, Stephen and Michael Riady and LCR), in turn, were "positioned" to value and later acquire the Noble Loan based on confidential information and then exploit the Noble Loan to harm SMP. [195]

Lippo counters that Plaintiffs have not well pled "what" confidential information DXS and Noronha wrongfully discovered, "how or when" they obtained such information or "to whom" they wrongfully leaked the information. [196]  I disagree. While Count 2 is not a paragon of specificity, it adequately provides "general notice of the claim asserted." [197]

Reading the Complaint holistically, Plaintiffs have well pled the following facts:

- The Lippo Group "secretly hatched a plan" to "depress the value of SMP and its assets" and then take those assets for itself—to SMP's detriment. [198]

- Stephen Riady is LCR's Chairman—one of the key entities in the Lippo Group. [199]

- Besides his role as DXS's "representative" on the SMP Board, Noronha was hired by, reports to and worked for Stephen Riady while also "representing" Waterloo. [200]

- Noronha and Cooper kept Michael Riady "regularly informed" of the Lippo Group's investment in SMP. [201]

- As a member of the Board, Cooper learned, on a confidential basis outside of a Board meeting, that CSM's assets were worth at least $600 million. Rather than share that information with the Board, he secretly told DXS and PacNet about the valuation. [202]

**\*16**  • Cooper and Noronha would negotiate with SMI and CC on behalf of the broader Lippo Group. [203]

- The Cooper/Noronha Email uses the pronoun "we" to include Noronha, Cooper and the Riady family while also discussing the Lippo Group's larger plan to tank SMP and scoop up its assets. [204]

- LCR's subsidiary, Waterloo (which Noronha represents), eventually acquired the Noble Loan, over SMI and CC's objections, as the penultimate step in the Lippo Group's plan to harm SMP. [205]

In light of these allegations, I find it reasonably conceivable that Noronha and DXS used their rights under the SMP Agreement to learn the true value of CSM's assets, and then shared that information with LCR and its managers in breach of Section 5.1(l)(ii). The Cooper/Noronha Email, specifically, supports a reasonable inference that Noronha was actively trying to advance the Lippo Group's interest at SMP's expense. [206]  Given Noronha's access to SMP's confidential information and his allegiance to the Lippo Group, as alleged, it is reasonable to infer he breached his confidentiality obligations. Defendants' Motions to Dismiss Count 2 must be denied.

### b. Breach of Section 3.5 Relating
### to SMP Member Loans (Count 5)

In Count 5, Plaintiffs allege DXS and PacNet breached Section 3.5 of the SMP Agreement when Waterloo acquired the Noble Loan. [207]  Section 3.5 provides: "the [Board] is authorized to cause [SMP] to [borrow funds from members]." [208]  In the event a member makes a loan to SMP, "each Member [is] entitled ... to make its *pro rata* share ... of any such loans." [209]

Plaintiffs and Lippo proffer dueling interpretations of Section 3.5. While not entirely clear, Plaintiffs seem to argue Section 3.5 prohibits SMP's members and any member's affiliate

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 136 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

from "possess[ing]" any loan made to SMP or CSM absent SMP Board approval. [210]   In contrast, Lippo argues Section 3.5 requires SMP Board approval only when a member makes a loan *to SMP*. [211]   Lippo offers the only reasonable interpretation of Section 3.5.

Section 3.5's plain meaning speaks only of "*the Company*" (i.e., SMP) "borrowing funds *from Members*" and members' rights to participate when "any *Member* is making any such loan *to [SMP]*." [212]   Other provisions in the SMP Agreement reveal that the SMP Agreement's drafters knew how to prohibit loans at the CSM level, but they did not include parallel language in Section 3.5. [213]   Plaintiffs' construction stretches the SMP Agreement's plain language beyond reason and cannot support its claims of breach related to Section 3.5. [214]   Count 5 must be dismissed.

### c. Breach of the NLA (Count 13 and 14)

**\*17**   In Counts 13 and 14, Plaintiffs assert derivative claims on behalf of SMP against Noble for breach of the NLA. [215]   Specifically, Plaintiffs allege Noble breached the NLA when it agreed to sell the Noble Loan to Waterloo without "prior notice" or "approval." [216]   Count 14 alleges Noble breached the NLA's implied covenant by "concealing its agreement to sell the Noble Loan to Waterloo until the day before it was effectuated, thereby ... depriving SMP ... of the benefit of the notice requirement in Section 9.07(b) of the [NLA]." [217]   New York substantive law governs the NLA. [218]

As for Count 13, Plaintiffs' theory of breach rests on at least two key axioms. *First*, Plaintiffs argue the Fourth Amendment, which deleted the Insider Sale Prohibition, was void because it was procured by fraudulent means. [219]   If true, this would leave the Insider Sale Prohibition intact. [220]   Plaintiffs argue Noble violated the Insider Sale Prohibition when it sold the Noble Loan to Waterloo. [221]   *Second*, Plaintiffs assert SMP has standing to enforce the NLA (and its Insider Sale Prohibition) either (i) as a party or (ii) as an intended third-party beneficiary. [222]   As I explain below, even assuming Plaintiffs' first axiom is solid, their breach of contract claim against Noble still fails because they lack standing to enforce the NLA. Because Plaintiffs cannot enforce the NLA, their implied covenant claim in Count 14 also fails. [223]   Counts 13 and 14 must be dismissed.

#### i. SMP Has No Direct Party Standing Under the NLA

To have standing to enforce a contract, a plaintiff must be a contract party, assignee or an intended third-party beneficiary. [224]   As Noble correctly observes, the NLA unambiguously states that the only parties to the NLA are CSM and Noble. [225]   Even so, Plaintiffs argue the definition of "Loan Party" in the NLA somehow contradicts the contract's clear identification of the parties and thus creates an ambiguity regarding who, exactly, are the parties to the contract. [226]   As in all questions of contract interpretation, the "parties' intent" guides the court's determination of standing under the NLA. [227]   And "[t]he best evidence of what parties to a written agreement intend is what they say in their writing." [228]

**\*18**   Plaintiffs correctly observe that the NLA mentions SMP in its definition of Loan Parties and contains a cross-default provision related to the Intercreditor Agreement to which SMP *was* a party. [229]   These references reflect that the NLA was a component of a larger financing arrangement between a lender and an operating subsidiary for which a parent provided collateral support. [230]   That is a far cry, however, from reflecting an intent by the actual parties to the NLA to include SMP as an additional party to whom rights and obligations under the NLA would directly flow.

Plaintiffs cite *This Is Me, Inc. v. Taylor*, for the sweeping proposition that "each party to [an] integrated transaction has standing to enforce the transaction's constituent documents." [231]   The premise appears to be that a party to one contract among a suite of related contracts has direct party standing to enforce other contracts within the suite to which it is not a party. The United States District Court for the Southern District of New York has squarely rejected such a broad reading of *This Is Me*, writing, "[t]he mere fact that a document is an 'integral part' of a larger transaction does not mean that any provision contained in that document must be applied to all other documents." [232]   The court then made clear:

> [E]ven though several instruments relating to the same subject and

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 137 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

executed at the same time should be considered in order to ascertain the intention of the parties, it does not necessarily follow that those instruments constitute *one contract* or that *one contract was accordingly merged in or unified with another* so that every provision in one becomes a part of every other. [233]

With respect to who are, and who are not, parties to the NLA, Noble offers the only reasonable construction of the contract. On its face, the NLA makes clear that the "parties" to the contract are CSM and Noble. [234] For example: (i) the NLA's cover page lists only CSM and Noble; [235] (ii) the NLA's recitals describe the agreement as one "entered into ... by and between [CSM] ... (the 'Borrower') and Noble ... (the 'Lender')"; [236] (iii) in Article II, titled "THE COMMITMENT AND LOANS," Noble was obligated to "make loans" to CSM while CSM had a corresponding obligation to "repay" Noble; [237] and (iv) the NLA's signature page was "executed" by "the parties hereto" and signed by only CSM and Noble. [238]

Even though the NLA was a part of a larger relationship between Noble, CSM and SMP, I must give effect to the parties' choice to structure the NLA as an agreement "between" CSM and Noble. [239] If a parent entity wishes to provide security for a subsidiary's loan, it can either (i) become a party to the subsidiary's loan agreement and promise to repay the subsidiary's debt, or (ii) form a separate guarantee agreement with the subsidiary's lender. [240] SMP chose the latter, so it is not a party to the NLA. [241]

### ii. SMP Has No Third-Party Beneficiary Standing Under the NLA

**\*19** Even if SMP is not a party to the NLA, Plaintiffs contend SMP has standing to enforce the NLA as its intended third-party beneficiary. [242] To demonstrate SMP enjoys third-party beneficiary status, Plaintiffs must plead facts that allow a reasonable inference that (i) the NLA "was intended for [SMP]'s benefit" and (ii) "the benefit to [SMP] is sufficiently immediate, rather than incidental." [243] "Mere intent to confer

third-party rights is insufficient; there must be a benefit that is explicit and direct." [244] In this regard, "a benefit received through corporate ownership is insufficient to establish rights as a third-party beneficiary." [245]

Predictably, the parties proffer conflicting interpretations of the NLA with respect to its conferral of third-party beneficiary status upon SMP. Plaintiffs argue Section 9.07 of the NLA evinces an intent to confer a "clear" and "direct" benefit upon SMP. [246] Noble disagrees. By Noble's lights, Plaintiffs have not identified "an independent duty [that] run[s] from [Noble] to [SMP] that bears on the claims." [247] In my view, Noble, once again, has offered the only reasonable construction of the NLA.

Plaintiffs' proffered contract construction cannot be squared with the NLA's plain language. Section 9.07(a) states, "nothing in this Agreement, express or implied, shall be construed to confer upon any Person (other than the parties hereto,[] ) ... any legal or equitable right." [248] New York law, like Delaware's, is clear that "[t]he best evidence of the intent to bestow a benefit upon a third party is the language of the contract itself," and a court will be reluctant to find third-party beneficiary status when, as here, "a provision of the agreement expressly negates enforcement by third parties." [249]

Staggering, but undeterred, Plaintiffs clinch on to the Intercreditor Agreement in search of a mutual statement of intent by Noble and CSM to confer third-party beneficiary status upon SMP. [250] That agreement, in its recitals, states, "*[SMP] anticipates* to benefit directly from the [NLA]." [251] Even if it were appropriate to look beyond the NLA to establish an intent to benefit SMP with the NLA, a dubious proposition of New York law, a unilateral statement that SMP "anticipates" benefits from the NLA cannot reflect a mutual intent to provide third-party benefits under the NLA. *Both* parties to a contract must "specifically intend to confer benefits on a third party" to create third-party beneficiary status. [252] SMP's unilateral, extra-contractual statement that it "anticipates" benefits is hardly an expression of mutual intent.

**\*20** Plaintiffs also fail to identify a direct benefit to SMP in the NLA. "Mere intent to confer third-party rights is insufficient; there must be a benefit that is explicit and direct." [253] By its own terms, Section 9.07 contains no

WCAS132

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 138 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

"independent duty [that] run[s] from [Noble] to [SMP] that bears on the claims." [254] Instead, Section 9.07 contains two relevant promises that Noble made *to CSM*. *First*, Noble promised CSM not to assign or transfer the Noble Loan to a member of the Lippo Group. [255] *Second*, Noble promised to give CSM "prior notice" before assigning the Noble Loan. [256] On their face, these are obligations Noble owed *to CSM*. [257] Any benefit SMP received from these provisions is an indirect result of its investment in CSM and is, therefore, insufficient to confer third-party beneficiary status upon SMP. [258] Of course, SMP could have caused CSM to bargain for SMP's third-party beneficiary rights. For example, SMP could have caused CSM to bargain for notice or approval rights for SMP before Noble could sell or assign the Noble Loan. But, again, it bargained for no such thing.

\* \* \* \* \*

SMP is neither a party to the NLA nor a third-party beneficiary of that contract. Thus, it lacks standing to enforce the NLA, and Count 13 must be dismissed.

This holding has two consequences. *First*, because Plaintiffs lack standing to enforce the NLA, Plaintiffs' Count 14, alleging breach of the NLA's implied covenant, must also be dismissed. [259] *Second*, because Plaintiffs have failed to allege an underlying breach of the NLA, Plaintiffs' Count 12, alleging tortious interference with the NLA, must also be dismissed. [260]

### 3. Breach of Fiduciary Duty Claims (Counts 6–8)

Three Counts in the Complaint assert breach of fiduciary duty claims:

- Count 6 alleges Cooper breached his contractual and common law fiduciary duties and that Cooper's breaches are attributable to Noronha, Michael Riady, Stephen Riady and LCR as Cooper's principals. [261]

- Count 7 alleges DXS and PacNet owed fiduciary duties because they exercised "actual control" over SMP, and further alleges these breaches are attributable to Noronha, Michael Riady, Stephen Riady and LCR as DXS and PacNet's principals. [262]

**\*21** • Count 8 alleges Michael Riady, Stephen Riady and LCR owed fiduciary duties as SMP's controllers. [263]

SMP is a Delaware LLC and, as such, the Delaware Limited Liability Company Act permits its members to "expand or restrict" the "member's or manager's ... duties." [264] Given the centrality of the operating agreement in governance disputes involving alternative entities, "it is frequently impossible to decide fiduciary duty claims without close examination and interpretation of the governing instrument of the entity giving rise to what would be, under default law, a fiduciary relationship." [265] And, because a LLC agreement is a contract, its interpretation is generally subject to ordinary contract law principles. [266]

Without language in an LLC agreement to the contrary, the managers of a Delaware LLC owe traditional fiduciary duties of care and loyalty. [267] "Although fiduciary duties may be disclaimed, agreements' drafters must do so clearly, and should not be incentivized to obfuscate or surprise investors by ambiguously stripping away the protections investors would ordinarily receive." [268] Thus, this court has consistently found that removal of default fiduciary duties through an LLC agreement must be clear and unambiguous. [269]

With these basic principles in mind, the first step in my analysis of each of the fiduciary duty claims is to construe the terms of the SMP Agreement against the backdrop of the applicable default rules to discern (i) which, if any, of the Defendants owe fiduciary duties, (ii) the scope of those fiduciary duties and (iii) whether the Complaint well pleads a breach of those duties.

#### a. Count 6

In Count 6, Plaintiffs allege Cooper owed SMP and its members fiduciary duties of care, loyalty and candor as a manager of SMP. [270] Plaintiffs also claim Cooper breached those duties when he used his position to leak confidential information and help the Lippo Group cut off SMP from capital in furtherance of its scheme to acquire the Noble Loan and ultimately CSM's assets. [271] According to Plaintiffs, because Cooper was acting as an agent for Noronha, Michael Riady, Stephen Riady and LCR (the "Count 6 Defendants")

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 15

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 139 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

when he breached his duties, these Lippo Group members are also liable for his fiduciary breaches. [272]

The parties draw the battle lines regarding Count 6 around the scope of Cooper's fiduciary duties. [273] Lippo seizes on Section 5.1(h), which allows SMP's managers to "engage in whatever activities such Manager or its Affiliates may choose" without having an obligation to share opportunities with SMP. [274] According to Lippo, because SMP's managers need not share corporate opportunities with the Company, "[t]he Noble Loan was not a corporate opportunity that needed to be presented to SMP." [275] Thus, Cooper's efforts to help the Lippo Group acquire the Noble Loan could not be a breach of fiduciary duty. [276]

**\*22** Plaintiffs' riposte rests on Sections 5.1(f) and (g), which provide that SMP's managers are not exempt from liability any more than would be "permitted by the [DGCL]," and emphasize that "a Manager has a fiduciary duty to the Company and the Members that is the same as the duty that a director of a Delaware corporation owes to a corporation and its stockholders." [277] According to Plaintiffs, these provisions clearly express the parties' intent to hold SMP's managers to the same fiduciary duties they would owe if they were directors of a Delaware corporation. [278]

After carefully reviewing the SMP Agreement, I am satisfied that it unambiguously holds SMP's managers to contractual fiduciary duties that are the same as common law fiduciary duties in all regards, except with respect to corporate opportunities. [279] When viewed through this lens, Lippo's arguments that Plaintiffs have failed to state viable breach of fiduciary duty claims, at least as against some members of the Lippo Group, miss the mark.

Considering the Complaint as a whole, Cooper allegedly:

- learned CSM's assets were worth $600 million through his role as a SMP Board member and shared that information with the Lippo Group while concealing it from SMP's other Board members; [280]

- filed a lawsuit along with DXS and PacNet seeking to cut off SMP from capital in order to harm SMP and increase the Lippo Group's leverage; [281]

- lied to SMP's other Board members when they asked whether he was involved in any discussions regarding purchasing the Noble Loan; [282]

- refused to attend SMP Board meetings to prevent SMP from responding to the liquidity crisis; [283] and

- used his position on the Board to engage in the Unauthorized Acts—harming SMP and benefitting the Lippo Group. [284]

Lurking behind each of these allegations is the Cooper/Noronha Email where Cooper, referring to himself, Noronha and the Riady family stated, "... then we can sit back and hold our position and when this [i.e., CSM] collapses we have the first lien and can buy it out of bankruptcy very cheap." [285]

In sum, Plaintiffs have pled facts supporting a reasonable inference that Cooper used his status as a SMP fiduciary to harm SMP and benefit the Lippo Group. [286] When a fiduciary, in his own words, intentionally "sit[s] back" while his company "collapses" so that another to whom he is beholden can buy the company's assets "out of bankruptcy very cheap," it is reasonably conceivable that he has breached the fiduciary duty of loyalty. [287] It is also reasonably conceivable that his breach exceeds the scope of behavior the corporate opportunity doctrine prohibits such that the contractual corporate opportunity carve-out does not bar the claim. [288] Even if Cooper was not obliged to "share" the Noble Loan with Plaintiffs, that allowance did not give him license to harm SMP by conspiring to drive CSM into bankruptcy through the acquisition of the Noble Loan or otherwise. [289] As a result, Lippo's Motions to Dismiss Count 6 against Cooper must be denied. [290]

**\*23** Having found that Plaintiffs have well pled Count 6 against Cooper, I must address Plaintiffs' theory that Cooper breached his fiduciary duties as an agent for the Count 6 Defendants such that those defendants are also answerable for Cooper's breach(es). [291] To establish a principal's liability for the acts of his agent, a plaintiff must allege facts supporting a reasonable inference that a principal-agent relationship existed. [292] "An agency relationship, as a matter of law, is a fiduciary relationship ... that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 140 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

to the principal's control, and the agent manifests assent or otherwise consents so to act." [293]

Lippo argues Plaintiffs have failed to allege that the Count 6 Defendants "consented to have [Cooper] act on [their] behalf." [294] Plaintiffs counter that they deserve a "reasonable inference" that "Noronha, the Riadys, and LCR consented to Cooper, DXS, and PacNet acting on their behalves where ... these defendants directed and controlled Cooper, DXS, and PacNet in connection with the conduct at issue." [295]

The problem with Plaintiffs' principal-agent theory is that it misconstrues the fundamentals of agency law. A defining feature of the principal-agent relationship is the principal's *right to control* the agent's conduct. [296] Plaintiffs have not well pled that the Count 6 Defendants had any right to force Cooper to take the actions that allegedly comprise his breach of fiduciary duties. Instead, what Plaintiffs have alleged is that Cooper breached his fiduciary duties when he exercised *his own* rights and obligations as a SMP Board member. [297] Cooper derived these rights from Section 5.1 of the SMP Agreement—not from any alleged principal-agency relationship. [298]

**\*24** Plaintiffs ask me to "infer" a principal-agent relationship based on the Count 6 Defendants' ability to "direct[ ] and control[ ] Cooper, DXS, and PacNet in connection with the conduct at issue." [299] But "effective power to control" is not enough to establish a principal-agent relationship. [300] Indeed, "[e]ven when the parent owns all the stock in the subsidiary, [the subsidiary's directors] are not agents of the parent." [301] As our Supreme Court explained in *Weinstein Enterprises, Inc. v. Orloff*:

> The parent, once having elected directors, does not have a right thereafter to intervene. To impose a duty of obedience on directors, moreover, would conflict with the fundamental point that corporate law assigns ultimate managerial power and responsibility to directors. The parent thus lacks the right to assert control through interim instructions, a defining hallmark of

a legal relationship of agency. This is not a point of merely formal or definitional significance. As the preceding discussion illustrates, the distinction between a *right* of control and the *effective power* to control often has practical consequences. In the absence of a right to control the directors it elects, the parent must either disregard their existence, a move disrespectful of the corporate paraphernalia that jeopardizes the corporate veil, ... or the parent must take steps to exercise its power by coercing the directors or removing them, moves that have drawbacks of their own. [302]

If a 100% controlling stockholder lacks the requisite rights and authority to establish a principal-agent relationship with the directors of its subsidiary, then, *a fortiori*, the Count 6 Defendants (who held no SMP units) cannot be held liable under a principal-agent theory for Cooper's alleged fiduciary breaches. The Count 6 Defendants' efforts to coerce Cooper may expose them to liability based on other applications of Delaware law, but that liability, if it exists, cannot arise from a principal-agent relationship.

\* \* \* \* \*

For these reasons, Lippo's Motions to Dismiss Count 6 must be denied as to the claims against Cooper, but granted as to the direct claims for breach of fiduciary duty brought against Noronha, Michael Riady, Stephen Riady and LCR.

### b. Counts 7 and 8

In Counts 7 and 8, Plaintiffs bring direct and derivative breach of fiduciary duty claims against DXS, PacNet, Noronha, Michael Riady, Stephen Riady and LCR (the "Alleged Controllers"). [303] Plaintiffs argue the Alleged Controllers owed fiduciary duties to SMP and its members even though they were neither SMP's managers nor holders of a majority of its outstanding membership units. [304] Indeed, of the Alleged Controllers, only DXS and PacNet held *any* SMP units. [305] For reasons explained below, I find Plaintiffs have well pled

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 141 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

contractual breach of fiduciary duty claims against PacNet and DXS, but not against the other Alleged Controllers.

**\*25** Because Delaware law recognizes the primacy of contract when addressing governance issues in the alternative entity space, Plaintiffs may not saddle the Alleged Controllers with common law fiduciary duties if doing so would contradict the SMP Agreement's plain language. [306] On the other hand, if the SMP Agreement does not unambiguously disavow common law fiduciary duties, I must look to corporate law principles by analogy when determining whether and to what extent fiduciary duties are owed. [307]

The parties have identified two relevant provisions in the SMP Agreement. *First*, Section 4.3 addresses members' fiduciary duties: "In view of the limited purposes of the Company, no Member nor any of its Affiliates shall have any fiduciary obligations with respect to the Company or to the other Members insofar as making other investment opportunities available to the Company or to the other Members." [308] *Second*, Section 4.6 provides that "except as otherwise specifically provided in this Agreement, all votes, approvals, or consents of a Member may be given or withheld, conditioned or delayed, as such Member may determine in such Member's sole and absolute discretion." [309]

The clear import of both Sections 4.3 and 4.6 is that the SMP Agreement modifies, but does not eliminate, common law fiduciary duties for members. [310] Section 4.3 unambiguously "eschews the corporate opportunity doctrine." [311] Section 4.6, however, is more complicated. As noted, that provision affords members the right to "vote, approve or consent," or not, in that member's "sole and absolute discretion." [312] According to the Alleged Controllers, the "sole discretion" language in Section 4.6 is an unambiguous waiver of any "Member-level fiduciary duty." [313] I disagree.

**\*26** If the SMP Agreement's drafters wished to exempt members from the fiduciary duty of loyalty, they could do so only with express disclaimer language, not "by implication." [314] Plaintiffs have alleged member fiduciaries took a "bad faith action to injure [SMP] for [their] own personal advantage." [315] This allegation implicates the "core aspect of the duty of loyalty," which the "sole discretion" language cannot "coyly" eliminate. [316] "To the extent that an Agreement purports to insulate a [fiduciary] from liability even for acts of bad faith ... it should do so in the most

painstakingly clear terms." [317] The day may come when this court must decide whether to enforce express language that "permits a [fiduciary]—by its unmistakable terms—to exercise its discretion in bad faith," but today is not that day. [318]

Having determined the SMP Agreement imposes a contractual governance standard that leaves open the possibility that a member fiduciary breached its common law duty of loyalty by acting in bad faith to injure SMP, the next analytical step is to consider whether it is reasonably conceivable the Alleged Controllers actually were member fiduciaries by virtue of their status as conflicted controlling members. As a general rule, stockholders owe no fiduciary duties to their fellow stockholders. [319] Under Delaware law, however, a stockholder may owe fiduciary duties if he is a "controlling stockholder," a status that is acquired when the stockholder (1) "owns more than 50% of the company's voting power" or (2) "owns less than 50% of the voting power of the corporation but *exercises control* over the business affairs of the corporation." [320]

Plaintiffs concede the Alleged Controllers held less than 50% of SMP's outstanding membership units. [321] Thus, Plaintiffs must plead facts that allow a reasonable inference that the Alleged Controllers "exercise[d] such formidable voting and managerial power that, as a practical matter, [they were] no differently situated than if [they] had majority voting control." [322]

As pled, it is reasonably conceivable that DXS and PacNet possessed actual control over SMP. [323] Multiple factors can support such a finding, but the focal point of my analysis is DXS and PacNet's Blocking Rights *in context with* the Noble Loan. [324] A reasonable inference can be drawn from the Complaint that the Blocking Rights amounted to a self-destruct button which allowed DXS and PacNet to "wield control" by driving SMP into the ground if it suited their interests. [325] Once SMP's operating subsidiary took on the Noble Loan and started Phase II, Plaintiffs deserve an inference that SMP would require imminent, substantial and ongoing capital contributions to fund that all-important project and service that debt. [326] Under these circumstances, it is reasonably conceivable that the Blocking Rights amounted to an on/off switch for SMP that could be, and allegedly was, manipulated by DXS and PacNet to serve their interests at the expense of SMP.

WCAS136

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 142 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

**\*27** Citing *Basho Technologies v. Georgetown Basho Investors*, Lippo argues that a mere "blocking right standing alone is highly unlikely to support either a finding or a reasonable inference of control."[327] I agree. But Plaintiffs have alleged more. Specifically, they have alleged DXS and PacNet participated in a concerted effort to place SMP in a precarious financial condition (i.e. a conspiracy to harm, as discussed below), and then exercised their leverage with the Blocking Rights to steer CSM off the cliff into the bankruptcy ravine below.[328] The Complaint well-pleads that the Blocking Rights allowed DXS and PacNet to block *all* of SMP's efforts to finance *any* of its ongoing operations —with either debt or equity.[329] That, in turn, prompted the Noble Loan default, the Fourth Amendment and the subsequent acquisition of the Noble Loan by Waterloo. When blocking rights empower a minority investor to "channel the corporation into a particular outcome," they contribute to an inference of control.[330] Here, Plaintiffs make an even stronger case as the Blocking Rights did more than "channel" SMP to a particular outcome.[331] Instead, as pled, the Blocking Rights gave DXS and PacNet the unilateral power to shut SMP down—full stop.[332]

Indeed, DXS and PacNet *did* exercise the Blocking Rights to prevent capital contributions by SMI and CC (even at levels of $2.5 million and $3.75 million), which, predictably, bankrupted SMP's sole asset.[333] Giving all reasonable inferences to Plaintiffs, I am persuaded the Complaint pleads a reasonably conceivable claim that DXS and PacNet exercised actual control over SMP. The Complaint also supports a reasonable inference that DXS and PacNet breached their duties by exercising their Blocking Rights in bad faith intending to harm SMP.

As for the remaining Alleged Controllers, however, it is not reasonably conceivable they exercised "actual control" over SMP.[334] Noronha, Michael Riady, Stephen Riady and LCR owned *no* SMP units, appointed *none* of SMP's Board members and held *no* contractual blocking rights.[335]

Plaintiffs' arguments concerning Noronha, Michael Riady, Stephen Riady and LCR ask me to lash the individual rights of the separate entities and individuals comprising the "Lippo Group" together when assessing the degree of control exercised by each non-member.[336] The Lippo Group is not, itself, a business organization recognized as such

under Delaware Law.[337] In the absence of some legally cognizable association, I must show "respect for corporate separateness," and analyze each *individual* Lippo Group member's control over SMP separately.[338] Through this lens, Plaintiffs' arguments concerning Noronha, Michael and Stephen Riady and LCR fail for two reasons.

**\*28** *First*, any influence these Alleged Controllers had over Cooper cannot, by itself, support an inference of actual control.[339] This must be the case because the ability to control Cooper does not amount to influence over a *majority* of SMP's Board.[340]

*Second*, any attempts either to (i) hold these defendants liable as DXS and PacNet's "principals" or (ii) attribute DXS and PacNet's Blocking Rights to the Lippo Group, conflict with fundamental corporate law.[341] As to the former, as explained above, without more, Plaintiffs cannot rely on principal-agent theory to attribute DXS and PacNet's exercise of control to their alleged principals. To the extent DXS and PacNet owed fiduciary duties to SMP and its other members, no person or entity had a *right* to direct their actions as SMP fiduciaries.[342] The lack of such a right undermines a principal-agent relationship for purposes of imputing fiduciary duties to non-fiduciaries.[343] Likewise, Plaintiffs cannot somehow impute the Blocking Rights possessed by DXS and PacNet to other members of the Lippo Group. Put simply, a conclusory statement that someone is a "controller of a controller," without more, does not get Plaintiffs where they want to go.[344] Delaware respects "corporate separateness, which recognizes that because a subsidiary is a separate entity, a parent and its subsidiary are not regarded as a single economic unit."[345] Thus, in the absence of other allegation of "control of the controllers," any control rights DXS and PacNet held as parties to the SMP Agreement belong to DXS and PacNet alone, not to LCR, Noronha or the Riadys.[346]

**\*29** In summary, the Motions to Dismiss Count 7 are denied as to DXS and PacNet. The Motions to Dismiss Counts 7 and 8 are granted as to Noronha, Michael Riady, Stephen Riady and LCR. By extension, Count 9, which is pled in the alternative to Count 7 against DXS and PacNet, is dismissed. Count 3, alleging DXS and PacNet exercised their Blocking Rights in breach of the implied covenant, also must be dismissed.[347]

WCAS137

#### 4. Aiding and Abetting (Count 10)

In Count 10, Plaintiffs allege aiding and abetting breaches of fiduciary duty against Noronha, Waterloo, Michael Riady, Stephen Riady, LCR and Noble. [348] To state a claim of aiding and abetting, a complaint must plead facts in support of four elements: (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary duty, (3) defendant's knowing participation in that breach and (4) damages proximately caused by the breach. [349] I addressed the first two elements in my previous findings that the Complaint states a reasonably conceivable claim of breach of fiduciary duty against Cooper, DXS and PacNet. Defendants do not attack the Complaint's causation allegations. Thus, as is often the case in aiding and abetting litigation, given the Court's finding that Plaintiffs have pled breach claims, the parties focus their arguments on whether Plaintiffs have adequately pled "knowing participation" by the alleged aiders and abettors. [350]

An adequate pleading of "knowing participation" requires the plaintiff to well plead scienter. [351] "To establish scienter, the plaintiff must demonstrate that the aider and abettor had actual or constructive knowledge that their conduct was legally improper," and that he acted with "an illicit state of mind." [352] "[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to [plead and] prove." [353] Yet it is not impossible.

"A claim of knowing participation need not be pled with particularity." [354] There must, however, "be factual allegations in the complaint from which knowing participation can be reasonably inferred." [355] Under Delaware law, "the knowledge of an agent acquired while acting within the scope of his or her authority [and the acts of agents within that scope] [are] imputed to the principal." [356]

#### a. Noronha, Michael Riady, Stephen Riady, Waterloo and LCR

**\*30** The Complaint alleges that a complex web of principal-agent relationships existed inside the Lippo Group. A careful study of the Complaint reveals well-pled allegations that Cooper, DXS and PacNet were "agents" acting for each of the other members of the Lippo Group. [357]

In *Metropolitan Life Insurance Company v. Tremont Group Holdings*, the court applied agency law to find that plaintiffs had stated a claim against a corporate parent for aiding and abetting its subsidiary's breach of fiduciary duty. [358] The court based this holding on three allegations: (i) the parent "dominated and controlled" its subsidiary, (ii) the parent "was aware of the existence of" its subsidiary's fiduciary duty and (iii) the parent was aware "that [it] exerted exclusive control over" the subsidiary. [359] Indeed, as noted, under general tenets of principal-agent law, an agent's knowledge is imputed to its principal. [360]

As in *Metropolitan Life*, the Complaint alleges DXS and PacNet's principals—Michael Riady, Stephen Riady and LCR—were aware of their agents' fiduciary obligations. [361] Because it is reasonably conceivable that DXS, PacNet and Cooper were each of Michael Riady, Stephen Riady and LCR's agents, the knowing participation element has been well pled since an agent's knowledge is imputed to its principal. [362]

**\*31** Noronha and Waterloo, however, present a different story, albeit with the same ending. The Complaint alleges Noronha was Cooper, DXS and PacNet's principal, but no facts corroborate that conclusory assertion. [363] If anything, the Complaint depicts Noronha more as DXS's agent and Cooper's peer since he was DXS's Board observer. [364] While Noronha may not have been a principal, I am satisfied Plaintiffs have well pled his knowing participation since Noronha personally assisted Cooper as he engaged in the Unauthorized Acts. [365] Similarly, I find it reasonably conceivable Waterloo knowingly participated in Cooper's breach since it was the entity the Lippo Group used to acquire the Noble Loan. [366]

Lippo argues the Complaint fails to plead facts in support of an inference that Stephen and Michael Riady and LCR consented to DXS, PacNet and Cooper acting as agents on their behalf. [367] I disagree. Given the overall ownership and organizational structure, as alleged, it is reasonable to infer this consent. [368]

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   20

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 144 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

### b. Noble

Plaintiffs assert they deserve an inference that Noble knowingly participated in DXS, PacNet and Cooper's breaches of fiduciary duties. [369] I disagree. After reading the Complaint as a whole and granting Plaintiffs all reasonable inferences, it is not reasonably conceivable that Noble knowingly "attempt[ed] to create or exploit conflicts of interest" at the SMP level. [370] Noble was not in a principal-agent relationship with any constituents of the Lippo Group and, therefore, there is no basis to impute knowledge of DXS, PacNet and Cooper's breaches to Noble on that ground. Noble was an arm's length lender and customer to CSM; it was in no way affiliated with the Lippo Group. And Noble sold the Noble Loan at a substantial loss—undercutting any inference it was exploiting conflicts of interest. [371]

Plaintiffs' speculative allegations that Noble was motivated to sell the Noble Loan to the Lippo Group out of some self-interest, at best, recount an arms-length contractual counter-party's commercial incentives. [372] Reading the Complaint as a whole, Noble was a third-party lender (and customer) that got stiffed for $30 million. [373] When CSM defaulted, Noble negotiated the Fourth Amendment and told all parties (including Plaintiffs) that it "may be willing to sell the Noble Loan." [374] Plaintiffs' conclusory allegations that Noble was obliged to open the bidding process for the Noble Loan by advising Plaintiffs it was willing to sell "at a substantial discount" are not well pled. [375] More to the point, Noble's alleged "failure" to tell Plaintiffs it was willing to discount is a far cry from "knowing participation" in a breach of fiduciary duty. [376]

\* \* \* \* \*

Defendants' Motions to Dismiss Count 10 are denied as to Noronha, Michael Riady, Stephen Riady, Waterloo and LCR, but granted as to Noble.

### 5. Civil Conspiracy (Count 11)

In Count 11, Plaintiffs bring a civil conspiracy claim against Cooper, Noronha, DXS, PacNet, Waterloo, Michael Riady, Stephen Riady and LCR. [377] "Delaware law imposing

liability for civil conspiracy is well settled." [378] Plaintiffs must allege "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage." [379]

**\*32** I have already determined that Plaintiffs have well pled a conspiracy among Stephen Riady, Michael Riady, LCR, Cooper, Noronha and Waterloo—satisfying the first element. Lippo has not challenged the third element (actual damage), so I focus on the sufficiency of Plaintiffs' pleading of the second element (an unlawful act in furtherance of the conspiracy).

Lippo argues Plaintiffs have failed to allege a "wrong by *each* defendant individually which would be actionable absent the conspiracy." [380] Even if this were a legal requirement to state a civil conspiracy claim, I disagree with the argument as a matter of pleading. I have already determined the Complaint pleads facts supporting a reasonable inference the members of the Lippo Group agreed to harm SMP. [381] To advance this plan, it is reasonably conceivable DXS, PacNet and Cooper breached their fiduciary duties, while Stephen Riady, Michael Riady, Noronha, Waterloo and LCR aided and abetted those breaches. [382] As a result, Lippo's Motion to Dismiss Count 11 must be denied.

### 6. Tortious Interference (Count 4)

In Count 4, Plaintiffs allege Cooper, Noronha, Waterloo, Michael Riady, Stephen Riady and LCR were aware of DXS and PacNet's obligations under the SMP Agreement, yet these defendants "caused" DXS and PacNet to breach their obligations. [383] According to Plaintiffs, taken together, these actions constitute tortious interference with the SMP Agreement. [384]

"Under Delaware law, the elements of a claim for tortious interference with a contract are: (1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury." [385] The tort is "intended to protect a promisee's economic interest in the performance of a contract by making actionable 'improper' intentional interference with the promisor's performance." [386] I have already determined the Complaint well pleads the existence of a contract (the SMP Agreement)

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 21

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 145 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

and reasonably conceivable breaches of the contract (DXS, PacNet and Cooper's breach of contractual fiduciary duties). I address the issues that remain in dispute below.

**\*33** *First*, Lippo rightly asserts "employees or directors of a contracting corporation cannot be held personally liable for inducing a breach of contract by their corporations when they act within their role." [387] Plaintiffs do not allege Cooper exceeded the scope of his authority. To the contrary, Plaintiffs allege Cooper, as agent for DXS and PacNet, implemented their exercise of contractual Blocking Rights. [388] Under these pled facts, Lippo is correct that Cooper, as an agent of two parties to the SMP Agreement, cannot be held liable for tortiously interfering with the SMP Agreement.

*Second*, Lippo makes several arguments based on the "affiliate exception" to tortious interference with contract to support dismissal of the claim as to other members of the Lippo Group. [389] The affiliate exception "requires that the defendant be a stranger to both the contract and the business relationship giving rise to and underpinning the contract." [390] When, as here, the alleged interference comes from individuals or entities that share common "economic interests" with a party to the contract, plaintiffs must "demonstrate that an interference by an affiliated entity was motivated by some malicious or other bad faith purpose." [391] Our courts have characterized this standard as a "stringent bad faith standard." [392] And, in this context, a defendant acts in bad faith when it is not "pursuing [ ] the legitimate profit seeking activities of the affiliated enterprises." [393] Because the affiliate exception turns on the same bad-faith standard as Lippo's third argument (justification), for the sake of efficiency, I address both, together, below.

*Third*, Lippo asserts that Plaintiffs have not pled that the Lippo Group's "sole motive" was to interfere with the SMP Agreement with no business purpose. [394] This is an attempt to invoke the "justification defense" to tortious interference with contract. [395] To determine whether an interference is improper, or unjustified, Delaware courts turn to the RESTATEMENT (SECOND) OF TORTS and employ a multi-factor balancing test. [396] One of the factors in the test is the alleged interferer's *motive* for interference. [397] In this regard, our law seeks to preserve a parent's ability to cause its subsidiaries to breach contracts when doing so would "increase[ ] societal wealth by enabling parties to exit from inefficient contracts and transfer assets or services to a

higher valued use." [398] In other words, Delaware preserves a corporate parent's ability to engage (or cause its subsidiary to engage) in efficient breach of contract. As a result, "the relevant inquiry in the parent-subsidiary context is whether the parent was pursuing in good faith the legitimate profit-seeking activities of the subsidiary that was a party to contract." [399]

The affiliate exception and the justification defense both turn on good faith, or more precisely, the absence of bad faith. Given my findings with respect to other aspects of the Complaint, it should come as no surprise that I find it reasonably conceivable from the pled facts that Noronha, Michael Riady, Stephen Riady and LCR "intended to injure [SMP] maliciously or in bad faith" in a manner that goes beyond mere efficient breach of contract. [400] Efficient breach assumes the breach of contract will "increase societal wealth." [401] Here, in stark contrast, as pled, the Lippo Group's plan was to "sit back," cause SMP to "collapse[ ]," and then "buy [CSM] out of bankruptcy very cheap." [402] In short, as pled, the Lippo Group was engaging in a zero-sum-game that is inconsistent with a pleading-stage justification defense or application of the affiliate exception.

**\*34** For reasons explained at length elsewhere in this Opinion, I am satisfied Plaintiffs have pled facts supporting a reasonable inference that Noronha, Waterloo, Michael Riady, Stephen Riady and LCR each committed an "intentional act" that was "a significant factor" in DXS and PacNet's alleged breach. [403] For these reasons, the Motions to Dismiss Count 4 must be granted as to Cooper, but denied as to Noronha, Michael Riady, Stephen Riady, Waterloo, and LCR.

### C. Fraud (Counts 1 and 15)

In Counts 1 and 15, Plaintiffs bring fraud claims against Noble, Cooper, Noronha, PacNet, DXS, Michael Riady, Stephen Riady and LCR (the "Fraud Defendants"). [404] To state a prima facie case for fraud under Delaware law, [405] Plaintiffs must allege:

> (1) A false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 146 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance. [406]

Under Court of Chancery Rule 9(b), Plaintiffs must plead fraud with particularity. [407] "To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representations." [408] Plaintiffs must also plead their reasonable reliance on allegedly fraudulent misstatements and omissions with particularity. [409]

Plaintiffs allege all three types of common law fraud: affirmative misstatements, silence in the face of a duty to speak and active concealment of facts to prevent their discovery. [410] In response, the Fraud Defendants fault the Complaint for, *inter alia*, failure to plead reasonable reliance on any of the allegedly fraudulent statements. [411] Specifically, they argue the Complaint acknowledges the Plaintiffs knew all the facts the Fraud Defendants allegedly omitted or misstated. In support of this argument, the Fraud Defendants cite the following language from the Complaint:

- "In early April 2015, the **Lippo Group ... revealed that they had been negotiating with Noble in a series of meetings in Jakarta and Singapore to encourage Noble to cooperate with the Lippo Group in furtherance of its plan to try to forcibly take over the company under imminent threat of declared default.**" [412]

- **\*35** • On January 15, 2015, Cooper "refused to sign" a written consent SMP Board action "authorizing a straightforward pro rata equity financing by the SMP members. **Instead, the Lippo Group began pushing for a transaction whereby they**, through their affiliate PacNet, would lead a contribution of $18 million, but **would** in exchange **demand full operational and strategic control of the company.**" [413]

- "In a March 2015 pleading" DXS and PacNet **filed suit to prevent SMI and CC from making capital**

**contributions** to SMP—including contributions as little as $2.5 million. [414]

Against this backdrop, Plaintiffs say the Fraud Defendants made both intentional misrepresentations and intentional omissions of material facts about: "(i) Noble's willingness to sell the [Noble Loan] at a substantial discount; (ii) their negotiations and agreement with Noble to acquire the Noble Loan through Waterloo [and] (iii) the preparation of the Fourth Amendment. ..." [415] Plaintiffs allege they *justifiably* relied on these misstatements and omissions by "contribut[ing] funds to SMP" and not acting "to prevent these Defendants from executing their plan." [416]

Even after affording Plaintiffs all reasonable inferences, they cannot make a reasonably conceivable case for justifiable reliance given what they admit they already knew when the alleged fraud occurred. In their efforts to plead claims for breach of contractual fiduciary duty and breach of contract, Plaintiffs have alleged the Lippo Group brazenly used the Blocking Rights to starve SMP of capital and then acquire its assets on the cheap. [417] As the Complaint acknowledges, this plan was hardly a secret. Indeed, Plaintiffs allege the Lippo Group "revealed" they had been "negotiating with Noble" "in furtherance of its plan to try to forcibly take over the company under imminent threat of a declared default" as early as 2015. [418] When Plaintiffs contributed capital after the Fourth Amendment, they did so *knowing* the Lippo Group was trying to tank SMP. [419] The Complaint states that the very *purpose* of the Insider Sale Prohibition (which the Fourth Amendment deleted) was to "prevent one of SMP's members from benefitting from a default by [CSM]." [420] Thus, Plaintiffs contributed capital *knowing* (i) the Lippo Group was trying to strong arm SMP by acquiring the Noble Loan and (ii) they had lost their only contractual means to prevent this outcome. [421]

Plaintiffs argue they relied on the misstatements and omissions by not acting "to prevent" Lippo's "plan." [422] Yet, here again, the Complaint contradicts this claim. When Plaintiffs "promptly and vehemently objected" to Noble selling the Noble Loan, "Defendants ignored Plaintiffs' objections, and the Lippo Group ... closed on its acquisition of the Noble Loan the next day." [423] In other words, as Plaintiffs have pled it, there was nothing they *could have done* to stop the Lippo Group.

WCAS141

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 147 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

**\*36** As I have decided elsewhere in this Opinion, Plaintiffs have pled actionable wrongdoing. They, however, have not pled actionable *fraud*. As relates to the fraud claims, this is an example of a complaint that pleads itself "out of court by alleging information that defeats [its] claim." [424] Plaintiffs have not pled justifiable reliance with particularity under Court of Chancery Rule 9(b). As a result, Counts 1 and 15 must be dismissed.

### III. CONCLUSION

For the foregoing reasons Defendants' Motions to Dismiss are **GRANTED** in part and **DENIED** in part. Defendants' Motions to Dismiss Counts 1, 3, 5, 8–9 and 12–15 are **GRANTED**. Defendants' Motions to Dismiss Counts 2 and 11 are **DENIED**. As for the remaining counts:

• Defendants' Motions to Dismiss Count 4 are **GRANTED** as to Cooper but **DENIED** as to Noronha, Michael Riady, Stephen Riady, Waterloo and LCR.

• Defendants' Motions to Dismiss Count 6 are **GRANTED** as to Noronha, Michael Riady, Stephen Riady and LCR but **DENIED** as to Cooper.

• Defendants' Motions to Dismiss Count 7 are **GRANTED** as to Noronha, Michael Riady, Stephen Riady and LCR but **DENIED** as to DXS and PacNet.

• Defendants' Motions to Dismiss Count 10 are **GRANTED** as to Noble but **DENIED** as to Noronha, Michael Riady, Stephen Riady, Waterloo and LCR.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Atl. Rptr., 2020 WL 881544

### Footnotes

1    D.I. 52.

2    *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that the Court may consider documents "incorporated by reference" or "integral" to the complaint on a motion to dismiss).

3    *Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006).

4    *See* Defs.' Mot. to Dismiss Pls.' Second Verified Am. Compl. Pursuant to Ct. Ch. R. 12(b)(2), 12(b)(4), 12(b)(5) and 12(b)(6) (D.I. 60) ("MTD") Ex. 1 ("SMP Agreement"), Recital D. This Court may take judicial notice of Exhibits 1–12 attached to the MTD as documents publicly filed in the courts of other jurisdictions. *See In re Career Educ. Corp. Deriv. Litig.*, 2007 WL 2875203, at \*9 (Del. Ch. Sept. 28, 2007); *see also In re Gardner Denver, Inc.*, 2014 WL 715705, at \*4 (Del. Ch. Feb. 21, 2014) (observing that, under Rule 12(b)(6), a court may consider documents integral to a complaint without converting a motion to dismiss into a motion for summary judgment).

5    Compl. ¶ 33.

6    Compl. ¶ 34.

7    Compl. ¶ 23.

8    Compl. ¶¶ 23, 27, 37.

9    Compl. ¶ 27.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 24

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 148 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

10  Compl. ¶ 28.

11  Compl. ¶¶ 28, 123.

12  Compl. ¶ 30.

13  *Id.*

14  Compl. ¶ 2

15  *Id.*

16  Compl. ¶ 2. I refer to the Lippo Defendants as "Lippo" or the "Lippo Group." I refer to all Defendants (including Noble Americas Corp.) collectively as "Defendants."

17  Compl. ¶¶ 10, 12–14, 128.

18  Compl. ¶ 82.

19  Compl. ¶ 26.

20  Compl. ¶¶ 128(a), (c), (g) ("Michael Riady had the ability to fire Cooper."), (h) ("Cooper ... would not go against [the Lippo Group's] direction.").

21  Compl. ¶ 128(n).

22  Compl. ¶ 137.

23  Compl. ¶ 128(h).

24  Compl. ¶¶ 50–51.

25  Chart compiled from Compl. ¶¶ 1, 9, 22–32, 34–35.

26  Compl. ¶ 36; MTD (D.I. 60) Ex. 1. The SMP Agreement is governed by Delaware law. Compl. ¶ 36.

27  SMP Agreement § 5.1.

28  SMP Agreement § 5.1(g).

29  SMP Agreement § 5.1(f).

30  SMP Agreement § 5.1(h).

31  SMP Agreement § 5.1(h).

32  SMP Agreement § 4.3 (emphasis supplied).

33  SMP Agreement § 4.6.

34  SMP Agreement § 4.6(b)(i); SMP Agreement (definition of "Requisite Holders").

35  SMP Agreement § 4.6(b)(i)(7).

36  SMP Agreement § 4.6(b)(i)(10).

WCAS143

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 149 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

37    SMP Agreement § 4.6(b)(i)(12), (13).

38    *See* Compl. ¶ 35 (DXS and PacNet held 13.8% and 14.27% of the Company's class A units.).

39    SMP Agreement § 4.6(b)(ii); Compl. ¶ 44.

40    SMP Agreement § 5.1(l)(i).

41    SMP Agreement § 5.1(l)(ii).

42    Compl. ¶ 143.

43    SMP Agreement § 3.5.

44    SMP Agreement § 3.5.

45    Compl. ¶ 43.

46    Compl. ¶¶ 48–49.

47    Compl. ¶ 49.

48    *Id.*

49    Compl. ¶ 71.

50    *Id.*

51    *Id.*

52    MTD (D.I. 60) Ex. 8; Compl. ¶¶ 50–51.

53    NLA at CSMining0033526 (recitals).

54    NLA at CSMining0033580–81.

55    NLA § 1.01 (definition of "Loan Parties" and "Loan Documents"); Compl. ¶ 55.

56    NLA § 1.01 (definition of "Loan Parties" and "Loan Documents").

57    Compl. ¶ 55; NLA §§ 1.01 (definition of "Loan Documents"), 8.01(m) (Under the NLA, the voiding, repudiation or suspension of any Loan Document constituted an event of default.).

58    NLA § 9.07(a).

59    Compl. ¶ 56.

60    Compl. ¶ 92.

61    *Id.*

62    Compl. ¶ 95.

63    *Id.*; NLA § 8.02.

64    Compl. ¶¶ 93, 98, 102.

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 150 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

65     Compl. ¶ 93.

66     *Id.*

67     Compl. ¶ 9.

68     Compl. ¶ 57.

69     *Id.*

70     Compl. ¶ 64.

71     *Id.*

72     Compl. ¶ 45 (citing Verified Compl. for Declaratory J. ¶ 30, *DXS Capital (U.S.) Ltd. v. Skye Mineral Inv'rs LLC*, C.A. No. 10794-VCG (Del. Ch. May 15, 2015)).

73     Compl. ¶¶ 69, 77.

74     Compl. ¶ 80 (emphasis in original).

75     Compl. ¶ 82.

76     *Id.*

77     *Id.*

78     Compl. ¶ 50.

79     Compl. ¶¶ 93, 95.

80     NLA § 8.02; Compl. ¶¶ 96, 102.

81     NLA at CSMining0033692–93; Compl. ¶ 102.

82     Compl. ¶ 104.

83     Compl. ¶ 66.

84     Compl. ¶¶ 91, 107.

85     *Id.*

86     Compl. ¶¶ 54, 66–68.

87     Compl. ¶ 108.

88     Compl. ¶ 111.

89     Compl. ¶¶ 30, 128(p)

90     Compl. ¶ 123.

91     Compl. ¶ 128(n).

92     Compl. ¶ 115.

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 151 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

93    Compl. ¶¶ 115 (alleging the Lippo Group caused its agents to take harmful actions such as "substantial staff reductions, directing payments to specific vendors, suggested modifications to equipment loans, and material changes to operational plans"), 121 (alleging Cooper and Noronha "instructed SMP management to cause CSM to draw down the full principal amount of the Noble Loan and caused CSM to undertake a $5 million high-interest-rate loan" and then "directed SMP management how to spend the funds").

94    Compl. ¶¶ 116, 120, 121–22, 128(r).

95    Compl. ¶¶ 116, 120, 121–22.

96    Compl. ¶ 126.

97    11 *U.S.C.* § 363; Transmittal Aff. of Aubrey J. Morin in Supp. of Defs.' Opening Br. in Supp. of Mot. to Dismiss Pls.' Second Am. Verified Compl. Pursuant to Ct. Ch. R. 12(b)(2), 12(b)(4), 12(b)(5) and 12(b)(6) ("Morin Aff.") (D.I. 60) Ex. 2 (the "Sale Order").

98    Compl. ¶ 126.

99    *Id.*

100   Sale Order at 21.

101   Morin Aff. Ex. 3 at 96.

102   Morin Aff. Ex. 3 at 100.

103   D.I. 1.

104   D.I. 11.

105   *In re CS Mining, LLC*, 2018 WL 2670457, at *8–9 (Bankr. D. Utah. June 1, 2018).

106   D.I. 17.

107   D.I. 18.

108   D.I. 52.

109   D.I. 60.

110   Opening Br. in Supp. of Defs.' Mot. to Dismiss the Verified Second Am. Compl. ("DOB") (D.I. 60) at 10–12.

111   DOB at 13–17.

112   Def. Noble Am. Corp.'s Opening Br. in Supp. of Mot. to Dismiss Second Am. Verified Compl. ("NOB") (D.I. 59) at 36; DOB at 42.

113   DOB at 18–58. I note that Lippo does not raise Rule 23.1 in the Motions to Dismiss even though Plaintiffs purport to bring derivative claims on behalf of SMP. As a result, I do not analyze whether the Complaint meets the heightened pleading standards of Rule 23.1.

114   *See* Tr. of Oral Arg. on Defs.' Mot. to Dismiss ("Tr.") (D.I. 95) at 109.

115   Tr. at 109.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    28

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 152 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

116   *See Germaninvestments AG v. Allomet Corp.*, 2020 WL 414426 (Del. Jan. 27, 2020) (reversing trial court for failing to develop adequate record of foreign law before applying that law to decide a motion to dismiss under Rule 12(b)(3)).

117   D.I. 60.

118   *Konstantino v. AngioScore, Inc.*, 2015 WL 5770582, at *6 (Del. Ch. Oct. 2, 2015).

119   *Id.* (internal citation and quotation omitted).

120   *Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *5–6 (Del. Ch. Jan. 31, 2013), *revised* (Feb. 7, 2013).

121   *Boulden*, 2013 WL 396254, at *5 (quoting *Matthew v. Fläkt Woods Gp. S.A.*, 56 A.3d 1023, 1027 (Del. 2012)) (quotations omitted).

122   *See* Pls.' Corrected Answering Br. in Opp'n to Defs.' Mots. to Dismiss ("PAB") (D.I. 77) at 15–24.

123   *See id.* at 20.

124   *Matthew*, 56 A.3d at 1027.

125   *Instituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210, 222 (Del. 1982).

126   *Virtus Capital L.P. v. Eastman Chem. Co.*, 2015 WL 580553, at *12 (Del. Ch. Feb. 11, 2015).

127   449 A.2d at 225.

128   *Konstantino*, 2015 WL 5770582, at *7 (citing *Virtus*, 2015 WL 580553, at *12).

129   *Id.* (quoting *Virtus*, 2015 WL 580553, at *12).

130   *See* Reply Br. in Supp. of Defs.' Mot. to Dismiss the Verified Second Am. Compl. ("DRB") (D.I. 82) at 32; DOB at 55.

131   *See Virtus*, 2015 WL 580553, at *13; *Carsanaro v. Bloodhound Techs., Inc.*, 65 A.3d 618, 636 (Del. Ch. 2013), *abrogated on other grounds*, *El Paso Pipeline GP Co. v. Brinckerhoff*, 152 A.3d 1248, 1264 (Del. 2016) (noting that theory encompasses claims of breach of fiduciary duty and aiding and abetting); *Hamilton P'rs v. England*, 11 A.3d 1180, 1197 (Del. Ch. 2010) (same); *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 977 (Del. Ch. 2000) (rejecting construction of *Instituto Bancario* that would require a "specific allegation that [the defendants] agreed to conspire 'to defraud' minority stockholders").

132   *Hartsel v. Vanguard Gp., Inc.*, 2011 WL 2421003, at *10 (Del. Ch. June 15, 2011).

133   Compl. ¶ 80.

134   DOB at 57 (citing 2006 WL 587846, at *6 (Del. Ch. Feb. 28, 2006)).

135   *In re Transamerica*, 2006 WL 587846, at *6.

136   *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1044 (Del. Ch. 2006). In *Allied Capital*, then-Vice Chancellor Strine rejected the notion "that a parent and its subsidiary cannot conspire with one another because they don't possess two separate corporate consciousnesses (*i.e.*, that they have but one mind) and are thus incapable of agreement." *Id.* Instead, he held, "[t]he fact that a corporation owns all of the equity of another corporation and that both corporations have the same directors and officers does not mean the separate corporations cannot collaborate on a common illegal scheme. It is precisely because the

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 153 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

corporations have, as a presumptive matter, a separate legal existence irrespective of their common control, that doctrines like conspiracy and aiding and abetting may have a policy purpose." *Id.*

137    DRB at 24.

138    *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *22 (Del. Ch. June 23, 2015) (internal quotation omitted).

139    Compl. ¶ 80 ("[T]he [Riady] family would then have full security and take some upside on debt. Then *we* can sit back and hold our position and when this collapses, *we* have the first lien and can buy it out of bankruptcy very cheap.") (emphasis supplied).

140    Compl. ¶ 80.

141    *Id.*

142    Compl. ¶ 128(f), (k), (n), (p), (q).

143    449 A.2d at 225.

144    *Id.* at 222; *accord Fläkt Woods*, 56 A.3d at 1027; *Virtus*, 2015 WL 580553, at *13.

145    Compl. ¶ 64.

146    *See Mobil Oil Corp. v. Advanced Envtl. Recycling Techs., Inc.*, 833 F. Supp. 437, 446 (D. Del. 1993) ("By authorizing and directing the filing of Mobil's declaratory judgment lawsuit in Delaware, Mr. Herbst and Mr. Ferguson purposefully availed themselves of the benefits and protections of Delaware.").

147    Compl. ¶ 128(h).

148    *In re Am. Int'l Gp., Inc., Consol. Deriv. Litig.*, 976 A.2d 872, 887 (Del. Ch. 2009); *see also* 3 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 790 (Sept. 2019) ("[T]he general rule is well established that a corporation is charged with constructive knowledge ... of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation.").

149    Compl. ¶¶ 123, 137.

150    *See Konstantino*, 2015 WL 5770582, at *10 (reaching a similar conclusion).

151    *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (citations omitted).

152    *Banet v. Fonds de Regulation et de Contro le Café Cacao*, 2010 WL 1066993, at *3 (Del. Ch. Mar. 12, 2010).

153    DOB at 21 (citing Morin Aff. Ex. 4 at 7).

154    *See, e.g.*, Morin Aff. Ex. 4 at 7 ("Lippo is, upon approval and closing of the Tamra Mining APA, on the cusp of successfully executing this illegal plan [of] ... acquir[ing] the [Noble Loan] using inside information obtained from [the SMP Board] meetings and several hundred days on site at [CSM], us[ing] it as a leverage point to drive [CSM] into bankruptcy, and [ ] acquir[ing] the assets of [CSM] cheaply.").

155    Compl. ¶ 4 (Plaintiffs are only bringing SMP's claims); *see also* Morin Aff. Ex. 4 at 5 (The objection quoted in the language, above, is found in a document titled "Objection to Sale Conducted by Auction on August

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 154 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

7, 2017" and a section titled "The Debtor Lacked Authority to Assign, Sell, or Release Certain Fiduciary Claims."); Morin Aff. Ex. 3 at 14, 16, 20–25, 28–31, 36–37 (alleging before the Utah Bankruptcy Court that the Lippo Group "embarked on a secret plan in violation of the Corporate Opportunity Doctrine"), 41–42, 45 (Plaintiffs arguing "there wasn't proper notice that the sale would include the sale of litigation assets"), 47 (the Utah Bankruptcy Court responding to Plaintiffs' allegations by granting the debtor's *motion to strike* testimony from a SMP witness who would support the allegations).

156    As noted, the Utah Bankruptcy Court responded to Plaintiffs' allegations about Lippo's plan by granting a *motion to strike* and denying a motion that challenged the Sale Order. Morin Aff. Ex. 3 at 36–37, 47, 64–65, 67. Plaintiffs challenged the Sale Order because they "were excluded from bidding," which Plaintiffs alleged was inconsistent "with the business judgment rule." *Id.* The Utah Bankruptcy Court acknowledged Plaintiffs had made "strong representations." *Id.* at 69. But, because Plaintiffs failed to present any competent evidence at the hearing, the Utah Bankruptcy Court granted a motion to exclude Plaintiffs' objections without addressing them on the merits. *Id.* at 70.

157    *Reid v. Spazio*, 970 A.2d 176, 183–84 (Del. 2009) (observing that "affirmative defenses ... are not ordinarily well-suited for treatment" on a motion to dismiss).

158    DOB at 22.

159    *Id.*

160    *See id.* at 22–23; DRB at 5–6.

161    *In re Farmland Indus. Inc.*, 376 B.R. 718, 729 (Bankr. W.D. Mo. 2007), *aff'd*, 408 B.R. 497 (B.A.P. 8th Cir. 2009) (Section 363 "provides *purchasers* ... protections from attacks.") (emphasis supplied); *In re Christ Hosp.*, 502 B.R. 158, 173 (Bankr. D.N.J. 2013) (same).

162    502 B.R. at 163.

163    *Id.* at 163, 166.

164    *Id.* at 163.

165    *Id.*; *see also In re NE Opco, Inc.*, 513 B.R. 871, 873, 876 (Bankr. D. Del. 2014) (granting a Section 363 purchaser protection from claims related to its pre-bankruptcy conduct because such claims were "related to [the purchaser's] impending purchase of assets").

166    DOB at 19, 26–27; DRB at 2–3; NOB at 15–21.

167    Compl. ¶ 4.

168    *Id.*

169    *Id.*; *see also* Compl. ¶ 19 n.1 ("This action does not challenge the bankruptcy sale itself, which was conducted in the wake of the destruction in value [at the SMP level] that Defendants' actions had caused.").

170    Morin Aff. Ex. 2 at 2.

171    Morin Aff. Ex. 3 at 100.

172    2009 WL 2581873 (Del. Ch. Aug. 21, 2009).

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 155 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

173   *Id.*, at *3.

174   *Id.*, at *3–7.

175   *Id.*, at *7.

176   *Id.*

177   Compl. ¶ 4.

178   Plaintiffs also bring direct breach of contract and fraud claims that could not have been sold under the Sale Order. *See NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 176 (Del. 2015) (citing *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) (holding that *Tooley* "has no bearing on whether a party with its own rights as a signatory to a commercial contract may sue directly to enforce those rights"); *In re Activision Blizzard, Inc. S'holder Litig.*, 124 A.3d 1025, 1056 (Del. Ch. 2015) ("[F]raud in connection with the purchase or sale of shares" is a "[q]uintessential example[ ] of [a] personal claim.").

179   Compl. ¶¶ 139–45.

180   Compl. ¶¶ 155–62.

181   Compl. ¶¶ 205–11.

182   I address Count 3 in Section II.B.3.b (below).

183   Compl. ¶¶ 212–17.

184   *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).

185   *CSH Theatres, LLC v. Nederlander of San Francisco Assoc.*, 2015 WL 1839684, at *8 (Del. Ch. Apr. 21, 2015).

186   *Id.*, at *8.

187   *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

188   *CSH Theatres*, 2015 WL 1839684, at *8.

189   Compl. ¶¶ 139–45.

190   SMP Agreement § 5.1(l)(i).

191   SMP Agreement § 5.1(l)(ii).

192   PAB at 90–91.

193   *Id.* at 90 (citing Compl. ¶¶ 70, 71); SMP Agreement § 5.1(l)(ii).

194   PAB at 90–91 (citing Compl. ¶¶ 84, 142, 144).

195   *Id.* at 91 (citing Compl. ¶¶ 10, 84, 114, 126).

196   DOB at 47–48 (citing *Savor, Inc. v. FMR Corp.*, 2001 WL 541484, at *3 (Del. Super. Ct. Apr. 24, 2001) (dismissing a *trade secret misappropriation claim* in part because plaintiff failed to allege what information was misappropriated)). Lippo's citation to *Savor* is inapt since that case reviewed a claim under the Uniform Trade Secrets Act. *Savor*, 2001 WL 541484, at *3. There, the court rightly reviewed whether the complaint

WCAS150

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 156 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

had well pled the defendant had "misappropriated" a "trade secret"—which required an analysis of multiple statutory elements and definitions. *Id.* In this case, the question is simply whether Plaintiffs have pled facts supporting a reasonable inference that DXS and Noronha shared confidential information in breach of the SMP Agreement. *See UtiliSave, LLC v. Miele,* 2015 WL 5458960, at *10 (Del. Ch. Sept. 17, 2015).

197   *Ramunno v. Cawley,* 705 A.2d 1029, 1034 (Del. 1998); *see also McDonald v. Baldy,* 2014 WL 7009715, at *1 (Del. Com. Pl. Nov. 25, 2014) (To survive a motion to dismiss, a breach of contract claim need only "plead enough facts to plausibly suggest" that the plaintiff will ultimately be entitled to relief.) (internal quotation omitted).

198   Compl. ¶ 8.

199   Compl. ¶ 128(c).

200   Compl. ¶¶ 123, 128(n).

201   Compl. ¶ 128(d); *see also* Compl. ¶ 143 ("Noronha revealed confidential information that he obtained in his capacity as DXS Representative to Waterloo.").

202   Compl. ¶¶ 10, 71.

203   Compl. ¶ 78.

204   Compl. ¶ 80.

205   Compl. ¶¶ 30, 108, 111, 123, 128(q).

206   Compl. ¶ 80.

207   Compl. ¶¶ 155–62.

208   SMP Agreement § 3.5.

209   SMP Agreement § 3.5.

210   Compl. ¶ 158; PAB at 88–89.

211   DOB at 46 (I do not address Lippo's other arguments).

212   SMP Agreement § 3.5 (emphasis supplied).

213   *See, e.g.,* SMP Agreement § 4.6(b)(i)(7), (17) (The Company "shall not ... cause or permit any Subsidiary to undertake any action in the nature of the foregoing" including "grant[ing] or pledg[ing] of any security interest."); *Norton v. K-Sea Transp. P'rs L.P.,* 67 A.3d 354, 360, 364 (Del. 2013) (interpreting a contract according to its "plain meaning" when read "as a whole" and declining to infer that the challenged language resulted from "sloppy drafting" when the agreement's drafters "knew how to impose an affirmative obligation when they so intended").

214   Compl. ¶¶ 9, 31.

215   Compl. ¶¶ 205–17.

216   Compl. ¶ 210.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 157 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

217   Compl. ¶ 216.

218   NLA § 9.15(a). New York and Delaware share many, if not most, of the same principles of substantive contract law. *Viking Pump, Inc. v. Century Indem. Co.*, 2 A.3d 76, 90 (Del. Ch. 2009). Like Delaware, New York requires the plaintiff alleging breach of contract to prove: "(1) formation of a contract between plaintiff and defendant, (2) performance by plaintiff, (3) defendant's failure to perform, (4) resulting damage." *U.S. Nonwovens Corp. v. Pack Line Corp.*, 4 N.Y.S.3d 868, 872 (N.Y. Sup. Ct. 2015).

219   Compl. ¶ 209.

220   Compl. ¶ 92.

221   Compl. ¶ 210.

222   Compl. ¶ 206.

223   *511 W. 232 Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (N.Y. Ct. App. 2002) (The implied covenant "embraces a pledge that *neither party* shall do anything which will have the effect of destroying or injuring the right of *the other party* to receive the fruits of the contract.") (emphasis supplied) (internal quotation omitted). Because I find Plaintiffs lacked standing to bring Count 14, I do not consider whether they have otherwise well pled a breach of the implied covenant under Rule 12(b)(6).

224   *Decolator, Cohen & DiPrisco, LLP v. Lysaght, Lysaght & Kramer, P.C.*, 304 A.D.2d 86, 90 (N.Y. Ct. App. 2003).

225   NLA at CSMining0033526 (recitals); NOB at 27.

226   NOB at 27–31; PAB at 96–101.

227   *Buchovecky v. S & J Morrell, Inc.*, 175 A.D.3d 945, 946 (N.Y. Sup. Ct. App. Div. 2019).

228   *Id.*

229   PAB at 96–97; NLA §§ 9.12 (referencing "Loan Documents") 1.01 (definitions of "Loan Party" and "Loan Documents").

230   Compl. ¶¶ 55–56.

231   PAB at 96 (citing 157 F.3d 139, 143 (2d Cir. 1998)).

232   *See Rosen v. Mega Bloks Inc.*, 2007 WL 1958968, at *4–5 (S.D.N.Y. July 6, 2007).

233   *Id.*, at *5 (citing 11 WILLISTON ON CONTRACTS § 30:26 (4th ed.)) (emphasis supplied).

234   NLA at CSMining0033526 (recitals).

235   NLA at CSMining0033522.

236   NLA at CSMining0033526 (recitals).

237   NLA §§ 2.01, 2.06.

238   NLA at CSMining0033580–81.

239   NLA at CSMining0033526 (recitals).

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 158 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

240   *Midland Steel Warehouse Corp. v. Godinger Silver Art Ltd.*, 276 A.D.2d 341, 343 (N.Y. Sup. Ct. App. Div. 2000) ("A guarantee is an agreement to pay a debt owed by another which creates a secondary liability and thus is collateral to the contractual obligation. The principal debtor is *not* a party to the guarantee and the guarantor is *not* a party to the principal obligation.").

241   *Id.* (SMP's rights and obligations as a guarantor are "distinct.").

242   PAB at 98.

243   *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 274 (S.D.N.Y. 2009); *Strauss v. Belle Realty Co.*, 98 A.D.2d 424, 426 (N.Y. App. Div. 1983) ("An incidental beneficiary is a third party who may derive benefit from the performance of a contract though he is neither the promisee nor the one to whom performance is to be rendered.").

244   *Solutia Inc. v. FMC Corp.*, 385 F. Supp. 2d 324, 337–38 (S.D.N.Y. 2005); *Del Norte v. WorldBusiness Capital, Inc.*, 2017 WL 4334005, at *12 (S.D.N.Y. Apr. 5, 2017) ("Even when the contracting parties specifically intend to confer benefits on a third party, not all consequential damages which flow from a breach of the contract are recoverable by the third party. The contract must evince a discernible intent to allow recovery for the specific damages to the third party that result from a breach thereof before a cause of action is stated.").

245   *Solutia*, 385 F. Supp. 2d at 338; *United Int'l Hldgs., Inc. v. Wharf (Hldgs.) Ltd.*, 988 F. Supp. 367, 372 (S.D.N.Y. 1997) (To be a third-party beneficiary of a contract with its subsidiary, a parent must establish a benefit "beyond that provided to any parent corporation from assets held by its wholly owned subsidiaries.").

246   PAB at 100.

247   NOB at 31 (quoting *Solutia*, 385 F. Supp. 2d at 338).

248   NLA § 9.07(a).

249   *767 Third Ave. LLC v. Orix Capital Mkts., LLC*, 26 A.D.3d 216, 218 (N.Y. Sup. Ct. App. Div. 2006); *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co., Inc.*, 485 N.E.2d 208, 212 (N.Y. Ct. App. 1985) (To confer third-party beneficiary status, a contract must "clearly evidence[ ] an intent to permit enforcement by the third party.").

250   PAB at 99.

251   *Id.* (citing NOB at Ex. C (the Intercreditor Agreement)).

252   *Strauss*, 98 A.D.2d at 427.

253   *Solutia*, 385 F. Supp. 2d at 337.

254   *Id.* In their Answering Brief, Plaintiffs vaguely reference certain duties Noble owed to SMP under the NLA. Specifically, Plaintiffs reference duties "in connection with loan documentation, amending other related contracts (*e.g.*, the "Skye Credit Agreement" to which SMP was a party), events of default, amendments to the [NLA], and confidentiality." PAB at 99. But a vague reference to these unrelated rights has nothing to do with the specific provision SMP now seeks to enforce. *See, e.g.*, *Tradition Chile Agentes de Valores Ltda. v. ICAP Sec. USA LLC*, 2010 WL 4739938, at *9 (S.D.N.Y. Nov. 5, 2010) (holding a parent lacked standing to enforce its subsidiary's rights when its subsidiary signed a contract that "expressly [made] reference to" the parent, but the specific provision the parent sought to enforce (related to employment obligations) "makes no reference to [the parent]").

WCAS153

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 159 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

255    NLA § 9.07(a).

256    NLA § 9.07(b).

257    It is appropriate to observe here that Plaintiffs cannot have it both ways—they have emphasized they are asserting derivative claims only on behalf of SMP, not CSM, in order to avoid the preclusive effect of the Sale Order. They cannot attempt to have SMP slide back into CSM's shoes to assert claims under the NLA with a weak assertion of third-party beneficiary status.

258    *United Int'l Hldgs.*, 988 F. Supp. at 372 ("[Plaintiff] has not established that receipt of the payments provided a direct benefit to the [parent] beyond that provided to any parent corporation from assets held by its wholly owned subsidiaries, and this indirect benefit is insufficient to establish third-party beneficiary status.").

259    *See OptimisCorp. v. Waite*, 2015 WL 5147038, at *76 (Del. Ch. Aug. 26, 2015) ("Only parties to an agreement can assert a claim for breach of the implied covenant.").

260    *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *37 (Del. Ch. Sept. 30, 2013) (One of the elements of a claim for tortious interference with a contract is a viable claim for "a breach of [ ] contract.").

261    Compl. ¶¶ 163–69.

262    Compl. ¶¶ 170–76.

263    Compl. ¶¶ 177–82.

264    6 *Del. C.* §§ 18-1101(c), 18-1104; *CHS Theatres*, 2015 WL 1839684, at *11; *Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1149–50 (Del. Ch. 2006).

265    *Douzinas*, 888 A.2d at 1149–50.

266    *Domain Assocs., L.L.C. v. Saha*, 2018 WL 3853531, at *18 (Del. Ch. Aug. 13, 2018).

267    6 *Del. C.* § 18-1104; *CHS Theatres*, 2015 WL 1839684, at *11.

268    *Ross Hldg. & Mgmt. Co. v. Advance Realty Gp., LLC*, 2014 WL 4374261, at *15 (Del. Ch. Sept. 4, 2014).

269    *CelestialRX Invs., LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017) (citing *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 664 (Del. Ch. 2012)).

270    Compl. ¶ 164.

271    Compl ¶¶ 163–69.

272    Compl ¶ 168.

273    PAB at 42; DOB at 35.

274    DRB at 19; SMP Agreement § 5.1(h).

275    DRB at 20.

276    *Id.*

277    SMP Agreement §§ 5.1(f), (g).

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 160 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

278   PAB at 47–48.

279   *See CelestialRX*, 2017 WL 416990, at *17–18 (interpreting similar language to "eschew[ ] the corporate opportunity doctrine"); *Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 683 (Del. 2013) (observing that under Delaware law, courts "interpret clear and unambiguous contract terms according to their plain meaning").

280   Compl. ¶¶ 70–71.

281   Compl. ¶ 64.

282   Compl. ¶ 104.

283   Compl. ¶¶ 81, 85.

284   Compl. ¶¶ 121–22.

285   Compl. ¶ 80.

286   Compl. ¶¶ 64, 70–71, 80–81, 85, 104, 121–22.

287   *See Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *decision modified on reargument*, 636 A.2d 956 (Del. 1994) ("Essentially, the duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally."); *Obeid v. Hogan*, 2016 WL 3356851, at *6 (Del. Ch. June 10, 2016) ("If the drafters [of an LLC agreement] have opted for manager-managed entity, created a board of directors, and adopted other corporate features, then the parties to the agreement should expect a court to draw on analogies to corporate law.").

288   *See Broz v. Cellular Info. Sys., Inc.*, 673 A.2d 148, 154–55 (Del. 1996) ("The corporate opportunity doctrine ... holds that a [fiduciary] may not take a business opportunity for his own if: (1) the corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation."); *see also Feeley*, 62 A.3d at 664 (If they seek to eliminate fiduciary duties, an LLC agreement's drafters "must make their intent ... plain and unambiguous.").

289   *See, e.g.*, Compl. ¶¶ 121–22 (Cooper allegedly took specific actions as a SMP manager to help the Lippo Group "divest SMP of its interest" in CSM.).

290   Lippo misplaces its arguments that Plaintiffs' allegations "have nothing to do with Cooper's role as SMP's Manager" and that "Cooper had no ability to control the Board." *See* DOB at 35. *First*, a fiduciary cannot simply "change hats" and thereby shed himself of fiduciary obligations. *See Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983) ("There is no dilution of [fiduciary] obligation[s] where one holds dual or multiple directorships."); *Emerald P'rs v. Berlin*, 787 A.2d 85, 90 (Del. 2001) ("[F]iduciary responsibilities do not operate intermittently."). *Second*, while Cooper's ability to control a majority of the Board might be relevant at times, such as when undertaking a demand futility analysis under Court of Chancery Rule 23.1, it does not change whether Cooper owed fiduciary duties in the first instance or whether it is reasonably conceivable that he breached those duties.

291   Compl. ¶ 168 ("[A]t all relevant times, Cooper was an agent of Noronha, Michael Riady, Stephen Riady, and LCR, who acted on their behalves and at their direction in pursuing the interests of the Lippo Group.").

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 161 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

292   *See, e.g., Baccellieri v. HDM Furniture Indus., Inc.,* 2013 WL 1088338, at *3–4 (Del. Super. Ct. Feb. 28, 2013),* aff'd, 74 A.3d 653 (Del. 2013) (reviewing whether plaintiffs had adequately alleged facts supporting an inference that a principal-agent relationship existed).

293   *NAMA Hldgs., LLC v. Related WMC LLC,* 2014 WL 6436647, at *20 (Del. Ch. Nov. 17, 2014) (internal quotation omitted). "There are three distinct bases on which the common law of agency attributes the legal consequences of one person's action to another person: actual authority, apparent authority, and respondeat superior." *Hospitalists of Del., LLC v. Lutz,* 2012 WL 3679219, at *17 n.102 (Del. Ch. Aug. 28, 2012) (citing RESTATEMENT (THIRD) OF AGENCY ch. 2, intro. note (2006)) (internal quotation omitted). While not entirely clear, in their Answering Brief, Plaintiffs appear to argue Cooper acted with the Count 6 Defendants' *actual authority* when he breached his fiduciary duties. *See* PAB at 64 ("Under Delaware law, a principal is liable for the torts of his agent when the agent acts with the principal's *actual authority, i.e.,* that authority which a principal expressly or implicitly grants to an agent.") (emphasis supplied) (internal quotation omitted). "Actual authority, then, is created by a principal's manifestation to an agent that, as reasonably understood by the agent, expresses the principal's assent that the agent take action on the principal's behalf." *Sarissa Capital Domestic Fund LP v. Innoviva, Inc.,* 2017 WL 6209597, at *16 (Del. Ch. Dec. 8, 2017) (internal quotation omitted). Ultimately, for the reasons I explain below, it makes no difference whether one analyzes Plaintiffs' claims under actual authority, apparent authority or respondeat superior.

294   DOB at 40.

295   PAB at 64.

296   3 AM. JUR. 2D AGENCY § 18 ("Fundamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to him or her."); RESTATEMENT (THIRD) OF AGENCY § 1.01(c) ("An agent who has actual authority holds power as a result of a voluntary conferral by the principal and is privileged, in relation to the principal, to exercise that power.").

297   *See, e.g.,* Compl. ¶¶ 60 ("Cooper refused to sign a January 15, 2015, written consent [Board] action.").

298   SMP Agreement §§ 4.5 ("[T]he day-to-day management of the Company is vested in the [Board]. The Members shall have no power, as Members, to participate in the management of the Company."), 5.1 ("The business and affairs of the Company will be managed and all Company power will be exercised by or under the direction of the [Board]."); PAB at 64.

299   PAB at 64.

300   *Weinstein Enters., Inc. v. Orloff,* 870 A.2d 499, 509 (Del. 2005).

301   *Cochran v. Stifel Fin. Corp.,* 2000 WL 286722, at *17 n.70 (Del. Ch. Mar. 8, 2000), *rev'd on other grounds,* 809 A.2d 555 (Del. 2002).

302   *Weinstein,* 870 A.2d at 509 (citing Deborah A. DeMott, *The Mechanisms of Control,* 13 CONN. J. OF INT. L. 233, 253 (1999) ("DeMott")). In her thoughtful article, Professor DeMott provides a helpful explanation of the agency relationships created when a parent places directors on a subsidiary's board. Concerning such directors, she writes, "[t]o the extent they serve as the parent's agents, the scope of their agency is limited to the faithful expression of the parent's instructions and, if so instructed, faithful reporting back to the parent. The scope of the agency does *not encompass decisions directors make that implicate the interests of the corporation.* A broader scope is inconsistent with deeply entrenched assumptions about corporate governance." DeMott at 254 (emphasis supplied).

303   Compl. ¶¶ 163–76.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          38

Case 4:23-cv-03560  Document 125  Filed on 02/26/24 in TXSD  Page 162 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

304    Compl. ¶¶ 172, 179.

305    Compl. ¶ 35. Three theories animate the allegations in Counts 7 and 8. *First*, Plaintiffs allege DXS and PacNet exercised actual control over SMP, albeit from a minority position, by virtue of their Blocking Rights. In turn, this actual control gives DXS and PacNet fiduciary duties, which they breached by starving SMP of capital and "diverting to Waterloo a corporate opportunity belonging to SMP." Compl. ¶ 173. *Second*, DXS and PacNet allegedly are "agents" of the remaining Alleged Controllers such that they are liable for DXS and PacNet's alleged breaches of fiduciary duty. Compl. ¶ 175. *Third*, Plaintiffs summarily allege Michael Riady, Stephen Riady, and LCR exercised actual control over SMP such that *they* owe fiduciary duties. *See* Compl. ¶¶ 173, 178.

306    *See* 6 *Del. C.* §§ 18-1101(c), (e); *Fisk Ventures LLC v. Segal et al.*, 2008 WL 1961156, at *8 (Del. Ch. May 7, 2008) ("In the context of [LLCs], which are creatures ... of contract, those duties or obligations [among parties] must be found in the LLC Agreement or some other contract."); *Related Westpac LLC v. JER Snowmass LLC*, 2010 WL 2929708, at *8 (Del. Ch. July 23, 2010) ("When ... parties ... cover a particular subject in an express manner, their contractual choice governs and cannot be supplanted by the application of inconsistent fiduciary duty principles that might otherwise apply as a default.").

307    *Obeid*, 2016 WL 3356851, at *6.

308    SMP Agreement § 4.3. The SMP Agreement defines "Affiliate" to mean "any Person, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with, a Member, Manager, or any other entity, as applicable." SMP Agreement § 1.01 (definition of "Affiliate"). Thus, the term "Affiliate" would include all of the Alleged Controllers. *See* Compl. ¶ 6 ("Defendant LCR is an entity that owns and controls DXS and PacNet and, on information and belief, is owned and controlled by the Riady family, and/or its affiliates and controlled parties.").

309    SMP Agreement § 4.6(a).

310    *See, e.g., Norton*, 67 A.3d at 361 (discussing agreements in the alternative entity space that "attempt to modify, rather than eliminate, fiduciary duties" and holding that a controller's "sole discretion" approval right was inconsistent with the duties a controlling shareholder would owe under corporate law principles).

311    *CelestialRX*, 2017 WL 416990, at *18 (interpreting similar language).

312    *See Norton*, 67 A.3d at 362 (construing similar language).

313    DOB at 29.

314    *Miller v. Am. Real Estate P'rs, L.P.*, 2001 WL 1045643, at *7 (Del. Ch. Sept. 6, 2001).

315    *Id.*, at *11; Compl. ¶¶ 76 ("The Lippo Group ... use[d] its blocking rights over any financing proposals to hold SMP hostage."), 173 (DXS and PacNet "plac[ed] their own and the Lippo Group's interests, to control and own CSM or its assets, above the interests of SMP."), 180 ("Michael Riady, Stephen Riady, and LCR breached their fiduciary duties to SMP ... by ... using DXS's and PacNet's blocking rights to starve SMP of capital.").

316    *Miller*, 2001 WL 1045643, at *9, *11.

317    *Id.*, at *11.

318    *Id.* (noting that such a provision could conflict with Delaware public policy.).

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 163 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

319  *Basho Tech. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *25 (Del. Ch. July 6, 2018).

320  *In re KKR Fin. Hldgs. LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (emphasis in original) (internal quotation omitted). A collection of stockholders, acting in concert, may be deemed to exercise a "control block" and, together, may be deemed controlling stockholders even if, alone, that label would not fit. *See Buttonwood Tree Value P'rs, LP v. R.L. Polk & Co., Inc.*, 2017 WL 3172722, at *6 (Del. Ch. July 24, 2017).

321  Compl. ¶ 35.

322  *In re Morton's Rest. Gp., Inc. S'holders Litig.*, 74 A.3d 656, 665 (Del. Ch. 2013) (internal citations and quotations omitted); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006).

323  *See Basho*, 2018 WL 3326693, at *25 ("If a defendant wields control over a corporation" either "generally or with regard to a particular transaction," then "the defendant takes on fiduciary duties, even if the defendant is a stockholder who otherwise would not owe duties in that capacity.").

324  *Id.*, at *26 (noting that a plaintiff can show a minority blockholder's domination and control in various ways including personal relationships with board members, contractual rights, commercial relationships, de facto ability to remove directors or the company's own characterizations of the minority blockholder's influence).

325  *Id.*, at *25.

326  Compl. ¶¶ 49–50.

327  DRB at 12 (citing *Id.*, at *26 n.315). In *Basho*, this court held it was reasonably conceivable that a minority stockholder owed fiduciary duties when, among other factors, it "used its contractual rights to cut off the Company's access to *other sources* of financing." *Id.*, at *29. Then, when the company was in a "position of maximum financial distress," the company was forced to accept financing from the minority stockholder. *Id.*

328  Compl. ¶¶ 6, 27, 37, 45–45, 57, 68–69, 85–87, 115–20, 126, 128.

329  Compl. ¶¶ 44–46, 76; SMP Agreement §§ 4.6(b)(i)(1)–(18).

330  *Basho*, 2018 WL 3326693, at *29; *see also Thermopylae Capital P'rs, L.P. v. Simbol, Inc.*, 2016 WL 368170, at *14 (Del. Ch. Jan. 29, 2016) (discussing the difference between "operat[ing] the decision-making machinery of the corporation" (a "classic fiduciary") and "an individual who owns a contractual right, and who exploits that right," forcing a corporation to "react[ ]" (which does not support a fiduciary status)).

331  *Basho*, 2018 WL 3326693, at *26.

332  SMP's sole asset was its investment in CSM, and without access to capital, CSM would fail given its obligations under the Noble Loan and need to complete Phase II. Compl. ¶¶ 9, 48–51, 57–58.

333  Compl. ¶ 46.

334  *Basho*, 2018 WL 3326693, at *26.

335  *See* Compl. ¶¶ 27 (DXS and PacNet appointed Cooper to the SMP Board.), 35 (The remaining Alleged Controllers held no SMP membership units.); SMP Agreement §§ 1.01 (definition of "Requisite Holders"), 4.6(b)(i) (The Blocking Rights were held by the holders of 75% of SMP's class A units.). Waterloo held the Noble Loan (which could be considered a lender relationship supporting an inference of control), but Waterloo

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 164 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

is not named among the Alleged Controllers. Compl. ¶¶ 163–76. As for Noronha, his observation rights gave him no power to control SMP's actions. *See* SMP Agreement § 5.1(l).

336   *See, e.g.*, Compl. ¶ 6 ("During the relevant period, the Lippo Group effectively controlled SMP's and (through SMP) [CSM's] operations.").

337   Compl. ¶ 5 ("The Lippo Group consists of a global network of entities primarily owned and operated by, and primarily for the benefit of, the Riady family.").

338   *NAMA Hldgs.*, 2014 WL 6436647, at *26.

339   *See, e.g.*, Compl. ¶¶ 128(f) ("Michael Riady had the ability to fire Cooper."), (h) ("Before making decisions, Cooper would check with 'the family' or the 'group.' ").

340   *Calesa Assocs. L.P. v. Am. Capital, Ltd.*, 2016 WL 770251, at *11 (Del. Ch. Feb. 29, 2016) (finding it was reasonably conceivable that a minority stockholder exercised actual control over a specific transaction when a plaintiff pled facts supporting a reasonable inference that "a majority of the Board was not independent or disinterested, but rather was under the influence of, or shared a special interest with [the minority stockholder]"); *Thermopylae*, 2016 WL 368170, at *14 ("It is, of course, conceivable that [a minority stockholder] was a fiduciary controller at the time of the re-pricing transaction, assuming it had achieved control or influence over a majority of directors through non-contractual means.").

341   While *Weinstein* only addressed principal-agent law in context of a principal's relationship to her agent as a member of a board of directors, the same reasoning applies to a controlling stockholder's fiduciary duties. That is, fiduciary responsibilities are "independent" duties. *Weinstein*, 870 A.2d at 509. Once a principal places her agent in a position of fiduciary responsibility, whether as a director or a controlling stockholder, she no longer has the *right* to tell the agent-fiduciary how to make decisions implicating those fiduciary duties. *Id.*

342   *Weinstein*, 870 A.2d at 509.

343   3 AM. JUR. 2D AGENCY § 18 ("Fundamental to the existence of an agency relationship is the right to control the conduct of the agent with respect to the matters entrusted to him or her.").

344   *Hospitalists of Del.*, 2012 WL 3679219, at *10. Plaintiffs cite three cases in their Answering Brief for the proposition that "[c]ourts have repeatedly imposed fiduciary duties on the persons who ultimately control the entity, including those who ultimately control the entities' fiduciaries, such as its managers, board members, general partners, or controlling stockholders." PAB at 62. None of the cases Plaintiffs cite stand for the proposition that a controller of a controller owes fiduciary duties to its indirect subsidiaries based on its ownership interests alone. *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 173 (Del. 2002) (holding certain individuals liable for *aiding and abetting* a breach of fiduciary duty); *Glidepath Ltd. v. Beumer Corp.*, 2019 WL 855660, at *18 (Del. Ch. Feb. 21, 2019) (involving an individual who both (i) controlled a controlling LLC's member *and* was designated veto rights, in his *individual capacity*, to veto certain actions); *Virtus*, 2015 WL 580553, at *4, *17–18 (involving an individual who both (i) controlled entities that controlled the corporation at issue *and* (ii) had personal relationships with the corporation's board of directors so that it was not the individual's ownership of a controller, alone, that subjected him to breach of fiduciary duty claims).

345   *NAMA Hldgs.*, 2014 WL 6436647, at *35.

346   *See* SMP Agreement § 4.6.

347   Count 3 alleges DXS and PacNet "exercise[ed] their [B]locking [R]ights under the SMP Agreement" in bad faith by "starving SMP of timely capital." Compl. ¶¶ 147–48. As I have found Plaintiffs have well pled a breach of a *contractual* fiduciary duty based on the same underlying conduct, Count 3 is duplicative of Count 7 and

WCAS159

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 165 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

must be dismissed. *See Edinburgh Hldgs., Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *8 (Del. Ch. June 6, 2018) (dismissing an implied covenant claim "based upon the same conduct as [a] contract claim[ ]").

348    Compl. ¶¶ 188–92.

349    *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001).

350    *See* DOB at 53 ("Plaintiffs fail the 'high bar' heightened aiding and abetting pleading standard that a defendant must have 'acted with scienter.' ").

351    *See RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861–62 (Del. 2015) (quoting *Malpiede*, 780 A.2d at 1097) ("As an example, this Court has said that 'a bidder may be liable to the target's stockholders if the bidder attempts to create or exploit conflicts of interest in the board.' ").

352    *Id.* at 862 (internal quotation omitted).

353    *Id.*

354    *Carr v. New Enter. Assocs., Inc.*, 2018 WL 1472336, at *16 (Del. Ch. Mar. 26, 2018) (internal citation and quotation omitted).

355    *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990).

356    *Metro. Life Ins. Co. v. Tremont Gp. Hldgs., Inc.*, 2012 WL 6632681, at *19 (Del. Ch. Dec. 20, 2012).

357    Compl. ¶¶ 65 ("Michael Riady, Stephen Riady, LCR, and Noronha directed DXS, PacNet, and Cooper to file the declaratory judgment action in Delaware."), 72 ("Stephen and Michael Riady ... directed and controlled Cooper, Noronha, DXS and PacNet as their agents at all relevant times."), 122 ("The Riadys ... directed Cooper and Noronha to" take the Unauthorized Acts.), 137 ("Cooper, Noronha, PacNet, and DXS were agents of Michael Riady, Stephen Riady and LCR."), 168 ("Cooper was an agent of Noronha, Michael Riady, Stephen Riady, and LCR."), 175 ("DXS and PacNet were agents of Noronha, Michael Riady, Stephen Riady, and LCR."), 128(c), (g) (Michael Riady was Cooper's boss and could fire Cooper.), 128(h) (Stephen Riady hired Noronha and directed him to participate in SMP's management.), 128(h) (Cooper would check with the "family" before making decisions.), 128(p), (f) (The LCR board approved the Lippo Group's acquisition of the Noble Loan and selected Cooper as DXS and PacNet's representative on the SMP Board.), 35 (DXS and PacNet were LCR's wholly owned subsidiaries.).

358    2012 WL 6632681, at *19.

359    *Id.*, at *19; *see also In re Emerging Commc'ns, Inc. S'holders Litig.*, 2004 WL 1305745 (Del. Ch. May, 3, 2004) (same).

360    *In re Am. Int'l Gp.*, 976 A.2d at 887; *see also* 3 WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS § 790 ("[T]he general rule is well established that a corporation is charged with constructive knowledge ... of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority, even though the officer or agent does not in fact communicate the knowledge to the corporation.").

361    Compl. ¶ 151.

362    *Metro. Life*, 2012 WL 6632681, at *19. At first glance, it might appear inconsistent to impute DXS, PacNet and Cooper's knowledge up to their principals for purposes of aiding and abetting liability but *not* to impute fiduciary duties that may lie with the agent/controller up to that fiduciary's principal. The key distinction lies in

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 166 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

the scope of DXS, PacNet and Cooper's agency. While the Alleged Controllers may not have had a right to force fiduciaries to breach their duties, "[t]o the extent they serve as [agents of the Lippo Group], the scope of their agency [could include] the faithful expression of the [Lippo Group's] instructions and, if so instructed, faithful reporting back to the parent." DeMott at 254. Accordingly, it is reasonably conceivable that DXS, PacNet and Cooper agreed to serve as agents for Michael and Stephen Riady and LCR by keeping them informed, and that the knowledge the acquired as fiduciaries, therefore, can, as a matter of law, be imputed to their principals.

363   Compl. ¶¶ 168, 175.

364   Compl. ¶ 28.

365   Compl. ¶¶ 121, 128(r).

366   Compl. ¶ 17.

367   DOB at 40; PAB at 64.

368   Compl. ¶¶ 72, 128, 137, 168, 175.

369   Compl. ¶¶ 188–92.

370   *Malpiede*, 780 A.2d at 1097.

371   Compl. ¶ 111.

372   Compl. ¶ 82. *See Malpiede*, 780 A.2d at 1097 (noting that a putative contractual counter-party is entitled to negotiate in furtherance of its self-interest without facing aiding and abetting liability) (citations omitted).

373   Compl. ¶ 50.

374   Compl. ¶ 82.

375   *Id.*

376   *RBC Capital*, 129 A.3d at 862 ("[T]he requirement that the aider and abettor act with scienter makes an aiding and abetting claim among the most difficult to [plead and] prove.").

377   Compl. ¶¶ 193–97. At the outset, I observe the similarity between Plaintiffs' aiding and abetting claims and their civil conspiracy claims renders the Motions to Dismiss Count 11 "almost without real-world purpose." *Allied Capital*, 910 A.2d at 1039. This is because "the prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in wrongful activity [while] aiding-abetting focuses on whether a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct." *Anderson v. Airco, Inc.*, 2004 WL 2827887, at *2 (Del. Super. Ct. Nov. 30, 2004). Given my holding that Plaintiffs have stated a claim for aiding and abetting, it is unclear what the real-world distinction between Counts 10 and 11 will be. *See Malpiede*, 780 A.2d at 1098 n.82 (questioning whether there is a "meaningful" distinction between aiding and abetting and civil conspiracy under similar circumstances). But, for the sake of completeness, I address Plaintiffs' civil conspiracy claim separately.

378   *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

379   *Id.* at 149–50.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 167 of 250

Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

380   DOB at 56 (citing *Atlantis Plastics Corp. v. Sammons*, 558 A.2d 1062, 1066 (Del. Ch. 1989)); DRB at 25 (citing *Abbott v. Gordon*, 2008 WL 821522 (Del. Super. Ct. Mar. 27, 2008), *aff'd*, 957 A.2d 1 (Del. 2008)).

381   I address the Lippo Group's conspiracy in Section II.A.1. *CMS Inv. Hldgs.*, 2015 WL 3894021, at *22 (The existence of a conspiracy "can be inferred from the pled behavior of the alleged conspirators."). For reasons stated above, Plaintiffs have stated a claim (i) against PacNet, DXS and Cooper for breaches of contractual fiduciary duties and (ii) against Stephen Riady, Michael Riady, Noronha and LCR for aiding and abetting breaches of fiduciary duties.

382   *Hamilton P'rs*, 11 A.3d at 1198 ("Sufficiently pleading a claim for aiding and abetting a breach of fiduciary duty satisfies the first and second elements of the *Instituto Bancario* test" which requires pleading that "a conspiracy existed."); *Triton Const. Co., Inc. v. Eastern Shore Elec. Serv., Inc.*, 2009 WL 1387115, at *17 (Del. Ch. May 18, 2009) ("[T]he underlying conduct that might give rise to a civil conspiracy is identical to that which forms the basis for the claims against Elliott and Eastern for aiding and abetting a breach of Kirk's fiduciary duty. Kirk is liable for the underlying breach of fiduciary duty, and Elliot and Eastern are liable for aiding and abetting that breach.").

383   Compl. ¶¶ 150–54.

384   PAB at 91–93.

385   *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013).

386   *Shearin v. E.F. Hutton Gp., Inc.*, 652 A.2d 578, 589 (Del. Ch. 1994).

387   DOB at 50 (quoting *Shearin*, 652 A.2d at 590; DRB at 26).

388   Compl. ¶ 69.

389   *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2013 WL 5863010, at *12 (Del. Ch. Oct. 31, 2013); DOB at 51.

390   *AM Gen. Hldgs.*, 2013 WL 5863010, at *12 (internal quotation omitted).

391   *Id.* (internal quotation omitted).

392   *Allied Capital*, 910 A.2d at 1039; *see also NAMA Hldgs.*, 2014 WL 6436647, at *26–36.

393   *AM Gen. Hldgs. LLC*, 2013 WL 5863010, at *12.

394   DOB at 51; DRB at 26.

395   *NAMA Hldgs.*, 2014 WL 6436647, at *25–36; DOB at 51; DRB at 26.

396   *NAMA Hldgs.*, 2014 WL 6436647, at *26.

397   *Id.*, at *29–30.

398   *Id.*, at *30.

399   *Id.* (internal quotation omitted).

400   *Id.*

401   *Id.*

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 168 of 250

Skye Mineral Investors, LLC v. DxS Capital (U.S.) Limited, Not Reported in Atl. Rptr....

402    Compl. ¶ 80.

403    *Bhole*, 67 A.3d at 453.

404    Compl. ¶¶ 133–38.

405    In its Opening Brief, Noble asserts Utah substantive law governs Count 15 because "Utah is the center of the conduct surrounding the negotiation and sale of the [NLA]." NOB at 44 n.32. Plaintiffs do not challenge this assertion. *See* PAB at 69–72. I need not decide which state's law governs Count 15, however, because I find no relevant substantive differences between Utah and Delaware law. *Ameritrans Capital Corp. v. XL Specialty Ins. Co.*, 2015 WL 13697702, at *6 (Del. Super. Ct. Nov. 30, 2015) (If there is a "false conflict" in which "a court's decision would be the same under either choice of law," then "a court does not need to conduct a choice of law analysis.").

406    *Gaffin v. Teledyne, Inc.*, 611 A.2d 467, 472 (Del. 1992) (internal quotation marks and citation omitted).

407    Ct. Ch. R. 9(b); *Trusa v. Nepo*, 2017 WL 1379594, at *9 (Del. Ch. Apr. 13, 2017).

408    *Abry P'rs V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (internal citation omitted).

409    *Mooney v. Pioneer Nat. Res. Co.*, 2017 WL 4857133, at *8 (Del. Super. Ct. Oct. 24, 2017).

410    Compl. ¶ 134; *see Corp. Prop. Assocs. 14 Inc. v. CHR Hldg. Corp.*, 2008 WL 963048, at *6 (Del. Ch. Apr. 10, 2008) ("A claim of common law fraud can arise from three types of conduct: (1) a representation of false statements as true; (2) active concealment of facts that prevents their discovery; or (3) remaining silent in the face of a duty to speak."). *See also KnightTek, LLC v. Jive Commc'ns, Inc.*, 2020 WL 414434, at *7–8 (Del. Jan. 27, 2020) (holding under Utah law that plaintiff must plead justifiable reliance under one of these three theories).

411    *See* DOB at 44–45.

412    Compl. ¶ 66 (emphasis supplied).

413    Compl. ¶ 60 (emphasis supplied).

414    Compl. ¶¶ 45–46 (emphasis supplied).

415    Compl. ¶¶ 134, 219.

416    Compl. ¶¶ 135, 220.

417    Compl. ¶¶ 45–46, 60, 66, 80.

418    Compl. ¶ 66.

419    *Id.*

420    Compl. ¶ 92.

421    Compl. ¶¶ 66, 92.

422    Compl. ¶ 135.

423    Compl. ¶ 17.

424    *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 249 (S.D.N.Y. 2003), *aff'd*, 80 F. App'x 722 (2d Cir. 2003).

---

**End of Document**                                  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WCAS164

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 170 of 250

State ex rel. Dixon v. Missouri-Kansas Pipe Line Co., 3 Terry 423 (1944)

42 Del. 423, 36 A.2d 29

3 Terry 423

Superior Court of Delaware, New Castle County.

STATE ex rel. DIXON

v.

MISSOURI-KANSAS PIPE LINE CO.

Jan. 24, 1944.

**Synopsis**

Mandamus by the State, on the relation of Abner Faison Dixon, against Missouri-Kansas Pipe Line Company to compel defendant to allow relator, by his agents, to examine books of defendant. On defendant's motion to dismiss petition.

Motion denied.

West Headnotes (13)

**[1]**  **Corporations and Business Organizations** 🔑  **Right to Inspection**

Basis of stockholders' right to inspect corporate books is right of ownership of corporate property held through medium of ownership of shares.

**[2]**  **Corporations and Business Organizations** 🔑  **Right to Inspection**

**Corporations and Business Organizations** 🔑  **Right to inspect**

A stockholder has a qualified right to examine corporate books while director's right so to do is absolute.

**[3]**  **Corporations and Business Organizations** 🔑  **Proper purposes**

Board of directors has no right to require a stockholder to state reasons for examination of such books as a stockholder may examine.

**[4]**  **Corporations and Business Organizations** 🔑  **Right to Inspection**

**Corporations and Business Organizations** 🔑  **Exercise of right of inspection**

**Corporations and Business Organizations** 🔑  **Right to inspect**

The right of examination of corporate books existing in directors and stockholders carries with it means of making examination effective.

1 Case that cites this headnote

**[5]**  **Corporations and Business Organizations** 🔑  **Persons Entitled to Inspection**

A stockholder, having right to examine certain corporate books, may avail himself of assistance in such examination so as to make examination effective and personal attendance of stockholder is not required during examination.

**[6]**  **Corporations and Business Organizations** 🔑  **Pleading**

A stockholder is not required to allege his purpose in original request to corporation for permission to examine stock ledger and thereby subject himself to examination and cross-examination by corporate officials.

1 Case that cites this headnote

**[7]**  **Corporations and Business Organizations** 🔑  **Right to inspect**

Right of director to examine corporate books grows out of fact that a "director" is a representative of all stockholders and, in a sense, a managing partner of corporation.

**[8]**  **Corporations and Business Organizations** 🔑  **Right to inspect**

A corporate director is not required to give fellow directors reason for a desired examination of corporate records, and fellow directors cannot require such reasons.

WCAS165

Case 4:23-cv-03560  Document 125  Filed on 02/26/24 in TXSD  Page 171 of 250

State ex rel. Dixon v. Missouri-Kansas Pipe Line Co., 3 Terry 423 (1944)

42 Del. 423, 36 A.2d 29

**[9]**  **Corporations and Business Organizations**  🔑  Right to inspect

A director may have the assistance of other persons in conducting an examination of corporate books.

**[10]**  **Corporations and Business Organizations**  🔑  Right to inspect

A corporate director need not be personally present at an examination of corporate books by director's authorized representatives.

**[11]**  **Mandamus**  🔑  Refusal or default

Where director's request for examination of corporate records was explicit, answer disclosing that corporation would not grant examination until director appeared at a directors' meeting and personally explained reasons for request, which condition other directors had no right to impose, was equivalent to a refusal of requested examination warranting resort to mandamus.

**[12]**  **Mandamus**  🔑  Right of petitioner, and authority, duty, or power of respondent, in general

In mandamus by stockholder to compel corporation to permit examination of stock ledger, it is only necessary to allege ownership of shares, a request for examination, and a refusal of such request, and impropriety of purpose is a matter of defense.

2 Cases that cite this headnote

**[13]**  **Mandamus**  🔑  Right of petitioner, and authority, duty, or power of respondent, in general

Petition for writ of mandamus to enforce director's right to examine corporate records was sufficient.

**\*\*29  \*425**  RODNEY and SPEAKMAN, JJ.

**Attorneys and Law Firms**

Edwin D. Steel, Jr., of Wilmington, for relator.

C. Stewart Lynch, of Wilmington, for defendant.

**Opinion**

Superior Court, New Castle County, No. 148 November Term, 1943.

Motion to dismiss petition for mandamus.

This is a petition for a Writ of Mandamus on behalf of the Relator, a director of the defendant company, to compel the defendant to allow the Relator, by his agents, to examine the books of the company.

**\*\*30**  A former petition was filed by the same Relator on September 20, 1943, wherein certain books were desired to be inspected concerning five matters enumerated in paragraph 5 of said petition. When the cause came on to be heard it appeared that the defendant company at a director's meeting on September 29, 1943, expressly disaffirmed any intention of "denying any director proper access to the books and records of the company at reasonable times and under reasonable conditions." These conditions were stated to be (1) that such examination shall be made without expense to the company; (2) that it shall be during reasonable hours at the office of the company, and (3) that a representative of the company may be present at all times during such examination. Upon the showing of this corporate action the Court merely stayed the proceedings, and the examination was begun by the agent for the petitioner.

During the course of the examination the petitioner was denied access to items desired to be examined, as not coming within the matters covered by the petition.

On December 2, 1943, the Relator by letter to the Respondent requested that it permit him, by his agents, to make  **\*426**  a complete examination of all records of the corporation from October 1, 1937 to the present time. After some correspondence, filed as exhibits in the present proceedings, and on December 15, 1943, a special meeting of the directors of the respondent company was held, after which a communication was sent to the Relator. In this communication the desired permission was neither expressly granted or denied. The material portion of the letter was:

WCAS166

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.  2

"The directors are most anxious to hear from you personally the reasons which impelled you to make a request for a complete examination of the books and records at this time especially in view of your long and active participation in the affairs of the company and also the reasons for your failure to make such request at the meeting of the Board which you attended on December 1, 1943 which was only one day prior to the date of your request. Under these circumstances the Board adjourned the meeting to reconvene at the call of the Chairman at such time as you and the other Directors may be able to attend, for the purpose of giving consideration to and taking action upon your request. Please therefore advise us promptly when you may be able to attend, so that the convenience of the other Directors may be ascertained and reasonable notice of the date for the reconvening of the meeting may be given to you and the other Directors."

This apparent attitude of non-action on the part of the Respondent was treated by the Relator as a refusal of the demand, and so stated in the present petition filed December 27, 1943.

On January 10, 1944, the present motion to dismiss the petition was filed. In this motion four questions are presented, the numerical arrangement being transposed by us:

1. Can the Board of Directors of a Delaware corporation require one of its members to state his reasons for a complete examination of corporate books and records?

**\*427** 2. Does Relator's petition allege facts tending to show a refusal on the part of the Respondent as to Relator's demand that his agents be permitted a complete examination of all the books and records of Respondent?

3. Is the Relator's petition pleaded properly?

4. Was the demand made by Relator that his agents be permitted to make a complete examination of all Respondent's books and records, a demand which the corporation was under a duty to grant?

RODNEY, Judge, delivering the opinion of the Court:

We shall attempt to answer the questions presented in the order we have adopted.

1. Can a Board of Directors of a Delaware Corporation require one of its members to state his reasons for examination of books and records?

[1] [2] [3] [4] [5] [6] Unfortunately, there are no decisions in this State considering the right of inspection of books by a Director of a corporation. There are, however, a number of cases dealing with the right of inspection by stockholders, and between the two classes there exists such an analogy as to make the consideration of these latter cases have pertinency. While the relative rights of inspection by stockholders and Directors may be somewhat different, and these rights be based upon different principles, yet there is much in common between them. The real basis of the right of stockholders to inspect books is the right of ownership of corporate property held by such stockholder through the medium of **\*\*31** his ownership of shares: the right of a Director to examine books grows out of the fact that he is a representative of all the stockholders and, in a sense, a managing partner of the corporation. 2 Machen on Corp. Sec. 1101. Every administrative employee of the company is an agent of the Directors, and it is such Director's right and, perhaps, his duty to satisfy **\*428** himself of the correctness of corporate procedure and to familiarize himself with the company's affairs. The rights of a stockholder to examine books is often called a qualified right, while the right of a Director is usually termed an absolute one. A stockholder in his examination of books represents himself alone; a Director represents not only himself as a Director or Trustee, but the interests of all stockholders of the company. The question can then be asked as to whether a Board of Directors may require a stockholder to state his reasons for examination of such books as a stockholder may examine. The answer, we think, must be in the negative. In a petition for mandamus filed by a stockholder to enforce a right to examine a stock ledger it is only necessary to allege the ownership of shares, a request for examination and a refusal of such request. The petitioning stockholder need not set up the legality and nature of the purpose of examination. Impropriety of purpose is a matter to be set up in corporate answer to the petition, and the burden of the Respondent, and cannot be raised on a motion to dismiss the petition for Mandamus. Insurance Shares Corporation v. Kirchner, 40 Del. 105, 1 Terry 105, 5 A.2d 519, 521. If a stockholder need not affirmatively allege in a petition for Mandamus the purpose of a desired examination, then surely he need not allege his purpose in his original request to the corporation itself, and thus subject himself to the examination and cross-examination of the corporate officials.

[7] We think a Director need not state to his fellow Directors the reason for a desired examination by him of the corporate records, and that such fellow Directors cannot require such reasons.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   3

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 173 of 250

State ex rel. Dixon v. Missouri-Kansas Pipe Line Co., 3 Terry 423 (1944)

42 Del. 423, 36 A.2d 29

[8] 2. We think the Relator's petition, with exhibits filed therewith, were sufficient to show a refusal of the requested examination. The request was explicit. The answer of the company clearly showed that it intended not to grant the requested examination until the Relator, a Director, **\*429** appeared at a Director's meeting and personally explained the reasons impelling the Relator to make the request. This we think they had no legal right to do. The plainest indication is that the request would not be granted until the Relator subjected himself to the examination of the other Directors. This we think was equivalent to a refusal without such personal explanation by the Director.

[9] 3. We see no objection to the present petition from the standpoint of pleading.

[10] [11] 4. We now come to the last contention of the defendant in its motion to dismiss the petition and, indeed, the one chiefly relied upon at the argument. The defendant company concedes that a stockholder having the right to examine certain corporate books may avail himself of assistance in such examination, so as to make such examination effective. This assistance may be furnished by attorney, accountant or other agency as may be requisite. It concedes that this examination may be made by the properly accredited and responsible agents of the stockholder without the personal attendance of the stockholder. It concedes that a Director has a right to examine the books of the company, and for this purpose may have the assistance of other persons. It insists, however, that when the Director avails himself of assistance in such examination that the Director must be personally present at all times of the investigation. It is this narrow question then that we must now consider. To sustain its contention the defendant cites two cases, Dandini v. Superior Court, 38 Cal.App.2d 32, 100 P.2d 535, and People ex rel. Bartels v. Borgstede, 169 App.Div. 421, 155 N.Y.S. 322.

Any language of the first cited case as bearing out the contention of the defendant may, we think, be readily classified as mere dicta. In that case, a Judge by his order had given a limited and restricted right to a Director to examine books: he had carefully stricken out the right of the Director **\*430** to act through agents. The cited case was one of contempt and the Court held that because the original order was limited in its nature, no contempt had been committed, and its language in sustaining the Court in its reasons for making the order of a limited nature had nothing to do with the existence of such contempt.

In People ex rel. Bartels v. Borgstede, 169 App.Div. 421, 155 N.Y.S. 322, 323, the Court conceded that a stockholder, with **\*\*32** whom rested a right but no duty, could examine certain corporate records, and for that purpose could appoint an agent: it conceded that the right of a Director to examine the corporate books was unquestioned, and that an attorney or accountant might aid such Director. The Court, however, said that the Director upon whom was placed a right and upon whom was impliedly cast a duty to acquire a knowledge of company affairs must himself make "the search through the corporate books." The Court impliedly holds that the Director must be personally present and, perhaps, join in the actual search for information.

With this conclusion we are not in accord.

[12] To a stockholder, as we have seen, is given, under ordinary circumstances, a right of examination of certain books of a corporation in which said stockholder has an interest. This right may be exercised or not as the stockholder sees fit. To a Director of the company is given a somewhat similar right of examination, but in view of his position there may be cast upon him the duty of making such examination if it be necessary to give him the proper knowledge of the affairs of the company. Both rights of examination carry with them the means of making the examination effective, viz., the right to avail themselves of the requisite assistance in order to ascertain the desired facts. Indeed, this right must operate more strongly in favor of one who acts as a Director or Trustee for others, and upon whom may be cast individual responsibility and personal liability. We think **\*431** that, at least, those same rights which exist in a stockholder concerning the books or records which may be subject to his examination exist also in a Director concerning those books or records as to which he has the right of examination.

[13] What reason can exist to require the personal presence of a Director at an examination to which he may contribute nothing whatever? That "reason is the soul of the law" has ever been a maxim adopted by the Courts and its continuance, as such, has become a chief objective of judicial effort.

There is no question of any delegation of authority or duty resting upon the Director. That authority and duty still remain. There is merely the employment of assistance in acquiring the information requisite in one in a position of trust and responsibility. Our Courts in recent years have seen the directorate of a corporation include those of a foreign nation without any ability to speak or read the English language and

WCAS168

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 174 of 250

State ex rel. Dixon v. Missouri-Kansas Pipe Line Co., 3 Terry 423 (1944)
42 Del. 423, 36 A.2d 29

to whom, without assistance the corporate books would have no meaning. We have seen a Director totally unable to see. Any requirement that these Directors be personally present at any examination of corporate books or records would, we think, be wholly devoid of reason.

From the nature of the present proceeding, being a motion to dismiss the petition, we have not considered the exact nature of a Director's right to examine books, nor any limitation thereon, for such matters can more properly be considered when an answer, if any, be filed.

The conclusions herein reached are supported in reasoning by the text and cases cited in 5 Fletcher on Corporations

(Perm. Ed.) Sec. 2235; 2 Cook on Corporations, Sec. 511; 2 Thompson on Corporations (3d Ed.) Sec. 1282; 6 Thompson on Corp. Sec. 4530; 2 Machen on Corp. Sec. 1101; Annotations in 22 A.L.R. 59; 80 A.L.R. 1510.

**\*432**  The present motion to dismiss the petition must be denied.

**All Citations**

3 Terry 423, 42 Del. 423, 36 A.2d 29

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

2015 WL 9948936
United States District Court, C.D. California.

TOP RANK, INC.

v.

Alan HAYMON, et al.

CV 15–4961–JFW (MRWx)
|
Signed 10/16/2015

**Attorneys and Law Firms**

Daniel M. Petrocelli, David Marroso, James Michael Pearl, Stephen Mcintyre, O'Melveny and Myers LLP, Los Angeles, CA, for Plaintiffs.

Howard Weitzman, Jeremiah Tracy Reynolds, Kinsella Weitzman Iser Kump and Aldisert LLP, Santa Monica, CA, Barry H. Berke, Marjorie E. Sheldon, Norman C. Simon, Kramer Levin Naftalis and Frankel LLP, New York, NY, Russell F. Sauer, Monica R. Klosterman, Robin A. Kelley, Thomas Rickeman, Latham & Watkins LLP, Los Angeles, CA, Brendan A. McShane, Christopher S. Yates, Latham and Watkins LLP, San Francisco, CA, for Defendants.

**PROCEEDINGS (IN CHAMBERS): ORDER GRANTING IN PART THE HAYMON DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(b)(6) [filed 8/31/2015; Docket No. 60];**

**ORDER GRANTING WADDELL DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) [filed 8/31/2015; Docket No. 61]**

HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE

**\*1** On August 31, 2015, Defendants Alan Haymon, Haymon Boxing LLC ("Haymon Boxing"), Haymon Sports LLC ("Haymon Sports"), Haymon Holdings LLC ("Haymon Holdings"), and Alan Haymon Development, Inc. ("Haymon Development") (collectively, the "Haymon Defendants") filed a Motion to Dismiss Pursuant to FRCP 12(b)(6) ("Motion to Dismiss") [Docket No. 60]. On September 18, 2015, Plaintiff Top Rank, Inc. ("Plaintiff" or "Top Rank")

filed its Opposition [Docket No. 79]. On September 25, 2015, the Haymon Defendants filed a Reply [Docket No. 81].

On August 31, 2015, Defendants Waddell & Reed Financial, Inc. ("W & R Financial"), Waddell & Reed Investment Management Company ("WRIMCO"), Ivy Investment Management Company ("IICO"), and Media Group Holdings, LLC ("MGH") (collectively, the "Waddell Defendants") filed a Motion to Dismiss Plaintiff's First Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss") [Docket No. 61]. On September 18, 2015, Top Rank filed its Opposition [Docket No. 78]. On September 25, 2015, the Waddell Defendants filed a Reply [Docket No. 80].

Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7–15, the Court found these matters appropriate for submission on the papers without oral argument. The matters were, therefore, removed from the Court's October 5, 2015 hearing calendar and the parties were given advance notice. After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I. FACTUAL AND PROCEDURAL BACKGROUND**
In its First Amended Complaint filed on August 3, 2015, Top Rank alleges that the Haymon Defendants, "[w]ith the financial backing, complicity, strategic planning, and material assistance" of the Waddell Defendants, are seeking to monopolize and restrain trade in the markets for managing and promoting "Championship–Caliber Boxers" in the United States. First Amended Complaint ("FAC") at ¶¶ 1, 3, 137–155. Top Rank alleges that the Haymon Defendants' and Waddell Defendants' conduct violates the Sherman Act, the Muhammad Ali Boxing Reform Act, and other federal and state laws. FAC at ¶¶ 137–184.

**A. The Parties**
Plaintiff Top Rank is a boxing promoter licensed in the States of California and Nevada, among others. FAC at ¶ 9.

Defendant Alan Haymon, and the other Haymon Defendants, are allegedly engaged in the business of professional boxing management as well as the business of professional boxing promotion throughout the United States. FAC at ¶ 122. The Haymon Defendants have approximately 200 fighters in their management stable, including current and former world champions Adonis Stevenson, Danny Garcia, Adrien Broner,

WCAS170

Anthony Dirrell, Peter Quillin, and Keith Thurman. FAC at ¶ 45.

The Waddell Defendants are asset management and investment advisory firms. Specifically, W & R Financial is a "publicly traded asset management and financial planning company." FAC at ¶ 15. WRIMCO and IICO, subsidiaries of W & R Financial, are a "national investment advisory business" and a "registered investment advisor for [W & R Financial's] 'Ivy Funds,'" respectively. FAC at ¶¶ 16–17. MGH, a Delaware series LLC, is alleged to be a subsidiary of W & R Financial and the vehicle through which the Waddell Defendants invested in the Haymon Defendants. FAC at ¶¶ 18, 57. MGH is allegedly a member of Haymon Holdings. FAC at ¶ 18. According to the First Amended Complaint, the Waddell Defendants are allegedly agents and alter egos of one another. FAC at ¶ 19.

**B. The Haymon Defendants' Alleged Conduct**

**\*2** As discussed in greater detail below, Top Rank alleges that the Haymon Defendants have engaged in at least four types of anticompetitive and tortious behavior: (1) inducing professional boxers to enter unlawful "tie out" agreements, which prevent the boxers from "freely" or "independently" contracting with legitimate promoters (FAC at ¶¶ 63–66, 137–144); (2) illegally acting as a promoter and fraudulently operating in the promotion business through a network of "sham promoters;" (FAC at ¶¶ 72–82, 147); (3) blocking legitimate promoters' access to major venues through fraud, overbooking, and other unlawful means (FAC at ¶¶ 97–100, 147); and (4) utilizing predatory "payola" practices, i.e., preventing legitimate promoters from access to television broadcasters through exclusive dealing, overbooking, and other unlawful means (FAC at ¶¶ 83-96).

### 1. *"Tie Out" Contracts and "Sham Promoters"*

The Haymon Defendants allegedly require boxers to sign long-term, exclusive management agreements, which prevent boxers from entering into contracts with "legitimate" promoters without the Haymon Defendants' express consent. FAC at ¶¶ 63–66. Top Rank alleges that the Haymon Defendants, on one occasion, withheld their consent and refused to allow Roc Nation to promote a bout involving one of the Haymon Defendants' boxers. FAC at ¶ 80. In addition, Top Rank alleges that "in at least some instances," the Haymon Defendants employ the services of "sham

promoters" that are controlled by the Haymon Defendants. FAC at ¶¶ 73, 82. Top Rank alleges that the use of these "tie out" contracts and "sham promoters" excludes legitimate promoters from accessing and promoting many of the industry's top boxers and allows the Haymon Defendants to act illegally as both manager and promoter in violation of the "firewall" provisions of the Muhammad Ali Boxing Reform Act. FAC at ¶¶ 65, 82.

### 2. *Predatory "Payola" Practices*

The Haymon Defendants have allegedly reversed the ordinary flow of money between television broadcasters and promoters by purchasing air time with over half a dozen leading broadcasters to air fights involving Haymon-contracted boxers under the "Premier Boxing Champions" ("PBC") brand. FAC at ¶¶ 6, 86, 87, 92. Top Rank alleges that the Haymon Defendants have obtained "exclusive commitments," from broadcasters, either tacit or express, and have locked up over 100 different dates, allegedly leaving no room, dates, or opportunities for other promoters or fighters. FAC at ¶¶ 6, 87, 94. Top Rank alleges that, between paying the broadcasters for air time and the expenses of promoting each televised match, the Haymon Defendants are operating significantly below cost in the short term so that they can expand their presence in the boxing promotion business, eliminate competition from promoters, build a monopoly, and ultimately charge supracompetitive prices. FAC at ¶¶ 6, 92, 93.

### 3. *Venue Blocking*

Top Rank alleges that the Haymon Defendants have used their dominant position in the management market to block legitimate promoters from obtaining favorable dates at top venues. FAC at ¶¶ 4, 97–100. Specifically, Top Rank alleges that two promoters, Golden Boy and Banner Promotions, recently attempted to stage a fight between Ruslan Provodnikov and Lucas Matthyse at the StubHub Center in Carson, California. FAC at ¶ 97. The fight was originally scheduled for March 28, 2015. FAC at ¶ 97. However, Top Rank alleges that the Haymon Defendants "locked up" the desired date for the Provodnikov–Matthyse fight at the StubHub Center (as well as other Southern California venues), ostensibly to host a fight between Jhonny Gonzalez and Garry Russell Jr. FAC at ¶¶ 97–98. Because the StubHub Center and other Southern California venues were

2015-2 Trade Cases P 79,332

booked, Golden Boy and Banner Promotions were forced to move the fight to another location. FAC at ¶ 98. As soon as the Provodnikov–Matthyse fight was relocated, the Haymon Defendants allegedly moved the Gonzalez–Russell fight to The Palms in Las Vegas. FAC at ¶ 98. Top Rank alleges that the Haymon Defendants' purpose in "locking up" the StubHub Center and alternative Southern California venues was to "lock out" the Provodnikov–Matthyse fight and prevent any possible cannibalization of tickets sales in the same local area for the Haymon Defendants' bout between Julio Cesar Chavez, Jr. and Andrzej Fonfara, which was scheduled to take place at the StubHub Center just three weeks later, on April 18, 2015. FAC at ¶ 98.

#### C. The Waddell Defendants' Alleged Conduct

**\*3** Top Rank alleges that Ryan Caldwell, a senior executive and portfolio manager of W & R Financial, WRIMCO, and IICO, had ambitions to "own live sports." FAC at ¶ 56. After discussions with Alan Haymon, he allegedly agreed that the Waddell Defendants would "commit funding, business expertise, and operational supervision" to the Haymon Defendants. FAC at ¶ 56 Pursuant to that agreement, the Waddell Defendants arranged for at least four investment funds, under the management of WRIMCO and IICO, to collectively purchase hundreds of millions of dollars of "Series H" stock in MGH. FAC at ¶ 57. MGH in turn invested these funds in Haymon Holdings on August 29, 2013 and October 31, 2013. FAC at ¶ 57.

On August 29, 2013, concurrent with its investment, MGH entered into an Amended and Restated Limited Liability Company Agreement with respect to Haymon Holdings (which is, in turn, the managing member of Haymon Sports). FAC at ¶ 58. The Agreement provided that MGH would become a "member" of Haymon Holdings, along with Haymon Development and at least one other member. FAC at ¶ 58. Pursuant to the Agreement, MGH is allegedly entitled to appoint two "Observers" to Haymon Holdings' Board of Directors, who receive all of the information provided to any Board member, and who, in the past, had the power to convene special meetings of the Board of Directors. FAC at ¶ 59. In addition, MGH allegedly possesses approval rights (or veto power) over Haymon Holdings' and its subsidiaries' "Major Decisions," including those related to material contracts, any material change in business, adoption of annual budgets and business plans, and any material action or material expenditure. FAC at ¶ 61.

In addition to the Waddell Defendants' alleged investment in Haymon Holdings, Top Rank alleges that Ryan Caldwell, and other representatives of the Waddell Defendants: (1) attended meetings and engaged in negotiations for the possible acquisition of Golden Boy Promotions, one of the industry's premier promoters (FAC at ¶¶ 67–71); [1] and (2) attended meetings and engaged in negotiations with broadcasters to reassure them that the Haymon Defendants had adequate funding for their new PBC boxing venture and alleged "payola" scheme (FAC at ¶¶ 91, 95).

The remainder of the allegations concerning the Waddell Defendants consist of impermissible group pleading, i.e., lumping the Waddell Defendants and the Haymon Defendants together, or are bare legal conclusions cleverly disguised as factual allegations.

#### D. Top Rank's Claims

In its First Amended Complaint filed on August 3, 2015, Top Rank alleges the following claims for relief against all defendants: (1) unlawful "tie out" in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (2) conspiracy in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; (3) attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2; (4) injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26; (5) violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 et seq.; (6) violation of the California Unfair Competition Law, Cal. Bus. & Prof.Code §§ 17200 et seq.; and (7) tortious interference with prospective economic advantage.

The Haymon Defendants and the Waddell Defendants move to dismiss all of the claims asserted against them for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).

## II. LEGAL STANDARD

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.' " Summit Technology, Inc. v. High–Line Medical Instruments Co., Inc., 922 F.Supp. 299, 304 (C.D.Cal.1996) (quoting Balistreri v. Pacifica Police Dept., 901 F.2d 696, 699 (9th Cir.1988)). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation

WESTLAW  © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 178 of 250

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal citations and alterations omitted). "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

**\*4** In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.,* 135 F.3d 658, 661 (9th Cir.1998). "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Technology,* 922 F.Supp. at 304 (citing *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981) *cert. denied,* 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.,* 896 F.2d 1542, 1555 n. 19 (9th Cir.1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g., id.*; *Branch v. Tunnel,* 14 F.3d 449, 454 (9th Cir.1994).

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend. Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted. *See, e.g., DeSoto v. Yellow Freight System, Inc.,* 957 F.2d 655, 658 (9th Cir.1992). However, a Court does not need to grant leave to amend in cases where the Court determines that permitting a plaintiff to amend would be an exercise in futility. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

## III. THE HAYMON DEFENDANTS' MOTION TO DISMISS

### A. The Sherman Act Claims

Top Rank alleges three claims for violation of the Sherman Act—two claims for violation of Section 1, which governs unreasonable restraints of trade and tying, [2] and one claim for violation of Section 2, which governs attempted monopolization. [3] The Haymon Defendants move to dismiss Top Rank's three Sherman Act claims, arguing that they suffer from certain common pleading defects, including Top Rank's (1) failure to adequately plead antitrust injury; (2) failure to adequately define the relevant markets; (3) failure to adequately allege market power; and (4) impermissible reliance on group pleading.

In addition, the Haymon Defendants move to dismiss each Sherman Act claim on individual grounds. The Court addresses the common pleading requirements first, and then the pleading requirements for each individual claim.

### 1. *Common pleading requirements*

#### a. *Antitrust injury*

**\*5** The Haymon Defendants move to dismiss Top Rank's antitrust claims on the grounds that Top Rank has failed to allege "antitrust injury." Specifically, the Haymon Defendants argue that Top Rank has failed to allege injury to itself or to competition.

A plaintiff may only pursue an antitrust action if it can show "antitrust injury," i.e., "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334 (1990) (quoting *Brunswick v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489 (1977)). The four requirements for antitrust injury are: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California,* 190 F.3d 1051, 1055 (9th Cir.1999). "Injury of the type antitrust laws were intended to prevent" means harm to competition, not harm to individual competitors. *See Brunswick,* 429 U.S. at 488 (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320 (1962)) ("The antitrust laws ... were enacted for 'the protection of competition not competitors.' "). In order to plead harm to competition sufficiently to withstand a motion to dismiss, a claimant "may not merely recite the bare legal conclusion that competition has been restrained unreasonably." *Les Shockley*

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

*Racing, Inc. v. Nat'l Hot Rod Ass'n,* 884 F.2d 504, 507–08 (9th Cir.1989). "Rather, a claimant must, at a minimum, sketch the outline of [the injury to competition] with allegations of supporting factual detail." *Id.* at 508.

The Court concludes that Top Rank has not adequately alleged injury to itself, which is not only an element of antitrust injury, but also of Article III standing. As discussed, Top Rank alleges that the Haymon Defendants engage in unlawful conduct in the form of exclusionary "tie out" contracts, the use of "sham" promoters, predatory "payola practices," and venue blocking. However, as the Haymon Defendants point out, Top Rank has failed to allege how it has been injured by the alleged conduct. Indeed, it has not identified a single bout that it has attempted to promote but was precluded from promoting by the Haymon Defendants, a single venue from which it has been blocked, or a single network that has refused to broadcast a fight promoted by Top Rank. Top Rank correctly argues that competitors who are "frozen out" of a market by an antitrust violation have suffered antitrust injury and possess antitrust standing. However, Top Rank has failed to allege any facts demonstrating that it has actually been "frozen out" by any of the Haymon Defendants' conduct.

With respect to the alleged "tie out," for example, Top Rank only alleges that the Haymon Defendants, on one occasion, withheld their consent and refused to allow Roc Nation to promote a bout involving one of the Haymon Defendants' boxers. FAC at ¶ 80. With respect to venue blocking, Top Rank only alleges that the Haymon Defendants blocked Golden Boy and Banner Promotions from booking a venue for a single fight. FAC at ¶¶ 97–98. With respect to the alleged "payola practice," Top Rank merely alleges that the Haymon Defendants have booked "over 100 different show dates" on "over half a dozen major broadcasters" and that the Haymon Defendants obtained undefined "exclusivity commitments (tacit or express)". FAC at ¶ 94. These alleged actions may not have affected all promoters equally, may not have affected certain promoters at all, and in fact, may have even helped certain promoters. Without any additional factual allegations, the Court cannot determine whether Top Rank has alleged an injury-in-fact, let alone whether that injury flows from that which makes the conduct unlawful.

b. *Market definition*

**\*6** The Haymon Defendants also move to dismiss Top Rank's Sherman Act claims on the grounds that Top Rank has not adequately defined the relevant markets.

"In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.' That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has market power within that market." *Newcal Indus., Inc. v. Ikon Office Sol.,* 513 F.3d 1038, 1044 (9th Cir.2008). Allegations concerning the relevant market and the defendant's market power are required under both Section 1 and Section 2 of the Sherman Act. *Id.* at 1044 n.3 ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the [Sherman] Act....").

The relevant market definition must include both a product market and a geographic market. *Id.* at 1045 n.4. The product market "must encompass the product at issue as well as all economic substitutes for the product." *Id.* at 1045. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe v. United States,* 370 U.S. 294, 325 (1962).

As the Ninth Circuit has held, "there is no requirement ... that [the relevant market and defendant's market power] ... be pled with specificity." *Newcal,* 413 F.3d at 1045. "An antitrust complaint therefore survives a Rule 12(b)(6) motion unless it is apparent from the face of the complaint that the alleged market suffers a fatal legal defect. And since the validity of the 'relevant market' is typically a factual element rather than a legal element, alleged markets may survive scrutiny under Rule 12(b)(6) subject to factual testing by summary judgment or trial." *Id.* A complaint, however, may be dismissed under Rule 12(b)(6) if the complaint's "relevant market" definition is "facially unsustainable." *Id.*

In this case, Top Rank identifies two relevant markets: (1) the market for the management of Championship–Caliber Boxers [4] in the United States; and (2) the market for the promotion of Championship–Caliber Boxers in the United States. The Court cannot conclude that these market definitions are facially unsustainable, especially given that the Supreme Court upheld a market definition for the "promotion of championship boxing contests" in the United States (albeit over 50 years ago). *See Int'l Boxing Club of New York, v. United States,* 358 U.S. 242, 249–52 (1959); *United States v. Int'l Boxing Club of New York,* 150 F.Supp. 397, 418–

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

21 (S.D.N.Y.1957). Although these market definitions may prove to be unsustainable on a motion for summary judgment, the Court concludes that they survive scrutiny on a motion to dismiss under Rule 12(b)(6).

### c. *Market power*

**\*7**  Although the Court concludes that Top Rank's definitions of the relevant markets survive the pleading stage, the Court concludes that Top Rank has failed to adequately allege market power or economic power within those markets.

Each of Top Rank's Sherman Act claims requires Top Rank to allege market power or economic power in the relevant market. *Newcal,* 513 F.3d at 1044 n.3 (9th Cir.2008) ("The 'relevant market' and 'market power' requirements apply identically under the two different sections of the [Sherman] Act."). The relevant market for the tying claim is the alleged market for management of Championship–Caliber Boxers. *See Ill. Tool Works Inc. v. Indep. Ink, Inc.,* 547 U.S. 28, 46 (2006) ("[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."); FAC at ¶ 141 (alleging that the tying product is the management of Championship–Caliber Boxers). The relevant markets for the conspiracy claim are the alleged markets for the management and promotion of Championship–Caliber Boxers. [5]  *See Copperweld Corp. v. Indep. Tube Corp.,* 467 U.S. 752, 768 (1984) (equating analysis under "rule of reason" for alleged unreasonable restraints under Section 1 to "an inquiry into market power and market structure designed to assess the combination's actual effect"); FAC at ¶ 147 (alleging an unreasonable restraint of trade in both the management and promotion markets). And, finally, the relevant market for the attempted monopolization claim is the alleged market for the promotion of Championship–Caliber Boxers. *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993) ("[D]emonstrating the dangerous probability of monopolization in an attempt case also requires inquiry into the relevant product and geographic market and the defendant's economic power in that market."); FAC at ¶ 152 (alleging attempted monopolization of the promotion market).

Market power is the ability "(1) to price substantially above the competitive level and (2) to persist in doing so for a significant period without erosion by new entry or expansion." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 501. Market power may be demonstrated

through either of two types of proof: (1) "direct evidence of the injurious exercise of market power," i.e., "evidence of restricted output and supracompetitive prices;" or (2) more commonly, "circumstantial evidence pertaining to the structure of the market." *Rebel Oil Co., Inc. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir.1995). "To demonstrate market power circumstantially, a plaintiff must: (1) define the relevant market, (2) show that the defendant owns a dominant share of that market, and (3) show that there are significant barriers to entry and show that existing competitors lack the capacity to increase their output in the short run." *Id.* Although market power need not be pled with specificity, the allegations must be sufficiently detailed "to raise a right to relief above the speculative level." *Rick–Mik Enters., Inc. v. Equilon Enters. LLC,* 532 F.3d 963, 973 (9th Cir.2008) (quoting *Twombly,* 550 U.S. at 555).

**\*8**  In this case, the Court concludes that Top Rank has failed to adequately allege that the Haymon Defendants possess market power or economic power in either of the relevant markets. With respect to the management market, Top Rank's allegations of the Haymon Defendants' market power are completely disconnected from the relevant market definition. Top Rank defines the relevant market as the market for the management of "Championship–Caliber Boxers" in the United States. FAC at ¶ 104. Yet, Top Rank's allegations supposedly reflecting the Haymon Defendants' "dominant share" of that market are not limited to Championship–Caliber Boxers, but encompass *all* boxers. Specifically, Top Rank alleges that:

> Haymon's stable includes approximately 200 fighters, including numerous Championship–Caliber Boxers. No other boxing manager represents more than a handful of boxers. While Plaintiff does not have access to precise figures, Plaintiff alleges that Haymon's share of this relevant market is greater than 50%.

FAC at ¶ 119. As the Haymon Defendants point out, "Top Rank alleges no such facts or figures concerning *Championship–Caliber Boxers* : how many of them there are, how many promoters promote them, how many managers manage them, or how many of them the Haymon Defendants manage." Reply [Docket No. 81] at 5. Moreover, although

Case 4:23-cv-03560   Document 125   Filed on 02/26/24 in TXSD   Page 181 of 250

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)
2015-2 Trade Cases P 79,332

Top Rank alleges that "Haymon's share of this relevant market is greater than 50%," the Court has no idea how Top Rank arrived at this figure, or whether it is limited to the management of Championship–Caliber Boxers. Top Rank's Opposition, rather than clarifying the issue, merely repeats the same confusing allegations, and, in fact, creates additional confusion. *See, e.g.,* Opposition [Docket No. 79] at p. 25 ("Top Rank did allege the approximate number of boxers Defendants manage, averred that their control exceeds 50% of the overall market, and is at least 15 times greater than any other manager."). Although the Court agrees with Top Rank that it does not have to allege an exact, percentage-based market share, Top Rank must include enough facts to raise its right to relief above the speculative level. The Court concludes that Top Rank has failed to do so. *See Rick–Mik Enters., Inc.,* 532 F.3d at 972–73 (finding the allegations of market power inadequate where the allegations related to the retail gasoline market and not the relevant market for franchises).

Top Rank's allegations with respect to the Haymon Defendants' market power or economic power in the promotion market are even weaker, more speculative, and virtually non-existent. Indeed, although Top Rank contends that it has alleged the Haymon Defendants' economic power circumstantially, Top Rank utterly fails to allege any facts concerning the Haymon Defendants' market share in the promotion market, and instead relies on the same flawed allegations concerning the Haymon Defendants' power in the management market. *See* FAC at ¶¶ 119–121 (only alleging that the Haymon Defendants possess market power in the management market); Opposition [Docket No. 79] at p. 26 (relying on allegations related to Defendants' power in the management market).

Although Top Rank argues that it has also alleged direct evidence of the Haymon Defendants' market power, based on, for example, their ability to elicit "exclusionary" terms from broadcasters and to make "exclusionary demands" of venues, these conclusory allegations are insufficient. Although Top Rank may allege market power through "direct evidence of the injurious exercise of market power," i.e., "evidence of restricted output and supracompetitive prices," *see Rebel Oil,* 51 F.3d at 1434, Top Rank fails to allege any evidentiary facts plausibly suggesting restricted output or supracompetitive prices in the promotion market.

**\*9** Accordingly, the Court concludes that Top Rank has failed to allege market power in either the management

market or promotion market for Championship–Caliber Boxers.

### d. *Group pleading*

The Haymon Defendants also move to dismiss Top Rank's antitrust claims on the grounds that Top Rank's allegations draw no meaningful distinctions between or among the nine defendants against whom they are collectively asserted.

The Court agrees that Top Rank has impermissibly relied on group pleading, *especially* by lumping the Waddell Defendants and the Haymon Defendants together. Accordingly, in its Second Amended Complaint, Top Rank shall allege the specific conduct engaged in by each of the remaining defendants.

### 2. *Pleading Requirements for Individual Claims*

#### a. *Tying in violation of Section 1 of the Sherman Act (Count I)*

In its first claim for relief, Top Rank alleges that the Haymon Defendants have violated Section 1 of the Sherman Act by entering into unlawful "tying" or "tie out" arrangements. Specifically, Top Rank alleges that the Haymon Defendants condition the provision of their management services on the boxers' agreement "to not contract with legitimate boxing promoters without [the Haymon Defendants'] consent." FAC at ¶ 139. The Haymon Defendants move to dismiss the tying claim on the grounds that the alleged "tie out" does not, on its face, constitute a tie out. [6]

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Cascade Health Solutions v. PeaceHealth,* 515 F.3d 883, 912 (9th Cir.2008). "To accomplish this objective, the competitor agrees 'to sell one product (the tying product) but only on the condition that the buyer also purchase a different product (the tied product), or at least agrees that he will not purchase the tied product from any other supplier.' " *Paladin Assocs., Inc. v. Mont. Power Co.,* 328 F.3d 1145, 1159 (9th Cir.2003) (quoting *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 461 (1992)). "[T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control

WCAS176

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 182 of 250

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

over the tying product to *force* the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12 (1984) (emphasis added). "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Cascade,* 515 F.3d at 912.

**\*10** A tying arrangement is a *per se* violation [7] of Section 1 of the Sherman Act if the plaintiff establishes that: "(1) the defendant tied together the sale of two distinct products or services; (2) the defendant possesses enough economic power in the tying product market to coerce its customers into purchasing the tied product; and (3) the tying arrangement affects a 'not insubstantial volume of commerce' in the tied product market." *See Cascade,* 515 F.3d at 912; *Paladin Assocs.,* 328 F.3d at 1159 (citing *Eastman Kodak,* 504 U.S. at 461–62).

The Court concludes that Top Rank has failed to allege sufficient facts to support its per se tying claim. As previously discussed, Top Rank has failed to adequately allege that the Haymon Defendants possess market or economic power in the management market and has failed to allege injury to itself. Moreover, although Top Rank's allegations are carefully and creatively worded, Top Rank has failed to allege that the Haymon Defendants tied together the sale of two distinct services. Indeed, Top Rank merely alleges that the Haymon Defendants' management agreement provides that boxers cannot contract with promoters without the Haymon Defendants' consent. *See* FAC at ¶ 64 ("These purported management agreements – which Haymon often styles as 'advisor contracts' – not only lock up managerial rights, but also restrict boxers from entering into any other agreement, including those related to promotional rights, without Haymon's express consent."); FAC at ¶ 139 ("Haymon's 'advisor' contracts with Championship–Caliber Boxers contain exclusionary provisions that condition his professional services on the boxers' agreement to not contract with legitimate boxing promoters without his consent. These agreements constitute unlawful 'tying' or 'tie out' arrangements."). Contrary to Top Rank's argument, this "consent" provision does not, on its face, tie two services together (management services and promotion services). *See Midwestern Waffles, Inc. v. Waffle House, Inc.,* 734 F.2d 705, 712 (11th Cir.1984) ("An approved source requirement is not, alone, illegal. Only if a franchisee is coerced into

purchasing products from a company in which the franchisor has a financial interest does an illegal tie exist." ); Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1753g ("And when there are many approved suppliers in which the defendant lacks a financial interest, the products should not be deemed tied together because buyers have not been denied a competitive market in the tied product.").

Top Rank correctly argues that illegal tying arrangements need not be express, and that "consent" clauses may practically function as unlawful tying arrangements. *See, e.g.,* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1753g ("To be sure, a tie-in would exist if the willingness to approve others is merely a charade."); *Tic–X–Press, Inc. v. Omni Promotions Co. of Ga.,* 815 F.2d 1407, 1416 (11th Cir1987) ("Where a contract ... provides that buyers shall use only the seller or a source 'approved' by the seller to purchase the tied product, the courts have looked to see if the approval clause was reasonable and permitted the buyer meaningful freedom of choice, or whether it is manipulated by the seller to force the buyer to purchase the tied product from the seller."). However, Top Rank's First Amended Complaint is devoid of any factual allegations demonstrating that the consent clause functioned, in practice, as a tying arrangement or "tie out," at least with respect to Top Rank. Indeed, Top Rank does not allege, for example, that it was generally understood that boxers in the Haymon Defendants' management stable were not allowed to contract with all or even certain legitimate promoters or that they were required to use one of the Haymon Defendants' alleged sham promoters. [8] Rather, all that Top Rank alleges is that "in at least some instances," the Haymon Defendants' boxers have used "sham promoters" who are in fact controlled by the Haymon Defendants, and, on *one* occasion, the Haymon Defendants withheld their consent and did not allow one of their boxers to fight in a bout promoted by Roc Nation. Without any additional factual allegations supporting the existence of a de facto tying arrangement, these allegations fail to state a plausible tying claim. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1755c ("Absent an announced or reasonably understood tying condition, ... two products have not been tied together."); *Photovest Corp. v. Fotomat Corp.,* 606 F.2d 704, 722 (7th Cir.1979) ("Given the contractual language, which at least provides for the possibility of purchasing processing from non-Fotomat sources, we are reluctant to find a tying arrangement without some evidence that Fotomat applied the contract language so restrictively as to constitute a de facto tying clause.").

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2015-2 Trade Cases P 79,332

**\*11**  For the foregoing reasons, the Haymon Defendants' Motion to Dismiss Top Rank's claim for an unlawful "tie out" in violation of Section 1 of the Sherman Act (Count I) is **GRANTED.**

b. *Conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II)*

In its second claim for relief, Top Rank alleges that the Haymon Defendants entered into a contract, combination, or conspiracy (with the Waddell Defendants, Championship–Caliber Boxers, boxing venues, television broadcasters, advertisers, sponsors and/or "sham promoters") in restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. FAC at ¶¶ 145–150. In addition to the grounds previously discussed, the Haymon Defendants move to dismiss this claim on the grounds that it lacks the requisite factual specificity.

"To state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir.2008).

As discussed, Top Rank fails to state a claim for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act because it fails to adequately allege that the Haymon Defendants possess market power in either the management market or promotion market and has failed to adequately allege injury to itself. [9] Accordingly, the Haymon Defendants' Motion to Dismiss Top Rank's claim for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II) is **GRANTED**. However, with the exception of these defects, the Court concludes that, although Top Rank's First Amended Complaint is short on factual detail and clarity, Top Rank's allegations, for the most part, [10] sufficiently answer the basic questions of "who, did what, to whom (or with whom), where, and when?" *Kendall,* 518 F.3d at 1048.

c. *Attempted monopolization in violation of Section 2 of the Sherman Act (Count III)*

In its third claim for relief, Top Rank alleges that the Haymon Defendants "orchestrated a predatory and anticompetitive scheme to leverage Haymon's monopoly power in the market for management of Championship–Caliber Boxers, in an attempt to obtain a monopoly in the market for promotion of Championship–Caliber Boxers, in violation of Section 2 of the Sherman Act." FAC at ¶ 152.

**\*12**  "A claim for attempted monopolization has three elements: 1) a specific intent to monopolize a relevant market; 2) predatory or anticompetitive conduct; and 3) a dangerous probability of success." *Alaska Airlines, Inc. v. United Airlines, Inc.,* 948 F.2d 536, 542 (9th Cir.1991). In the Ninth Circuit, leveraging of a monopoly does not constitute an independent Section 2 claim. *Id.* at 546–49. However, "[i]f there is a dangerous probability that a monopoly will be created by leveraging conduct, then the conduct will be reached under the doctrine of attempted monopoly." *Id.* at 549.

"[D]emonstrating the dangerous probability of monopolization in an attempt case [ ] requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 459 (1993). In this case, Top Rank alleges attempted monopolization of the promotion market. Although a lower percentage of market share can support a claim for attempted monopolization than that required for actual monopolization, as the Court has already concluded, Top Rank fails to allege *any* facts regarding the Haymon Defendants' economic power in the promotion market and thus has not alleged any facts to demonstrate that the Haymon Defendants' economic power meets even this lower threshold. Accordingly the Court concludes that Top Rank has failed to state a claim for attempted monopolization. *See, e.g., ChriMar Sys., Inc v. Cisco Sys., Inc.,* 72 F.Supp.3d 1012, 1019–20 (N.D.Cal.2014) ("[A]lthough a lower percentage is required for an attempted monopoly claim, as opposed to an actual monopoly claim, HP must still allege sufficient market power."); *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.,* 2013 WL 5694452, at \*15–16 (N.D.Cal. Oct. 18, 2013) (dismissing attempted monopolization claim for failure to adequately allege market power in the relevant market).

Accordingly, the Haymon Defendants' Motion to Dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act (Count III) is **GRANTED**.

WCAS178

**Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)**

2015-2 Trade Cases P 79,332

### B. Injunctive Relief Under Section 16 of the Clayton Act (Count IV)

Section 16 of the Clayton Act "does not furnish an independent cause of action." *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1051 (9th Cir.2008). "Rather, it allows the court to fashion relief upon a showing of a separate violation of the antitrust laws." *Id.* Because Top Rank has failed to state a claim for relief under Section 1 or Section 2 of the Sherman Act, the Haymon Defendants' Motion to Dismiss Top Rank's claim for injunctive relief under Section 16 of the Clayton Act (Count IV) is **GRANTED**.

### C. State Law Claims

The Haymon Defendants also move to dismiss Top Rank's claims for violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 *et seq.* (Count V), violation of the California Unfair Competition Law, Cal. Bus. & Prof Code §§ 17200 *et seq.* (Count VI), and tortious interference with prospective economic advantage (Count VII).

The Court declines to address the Haymon Defendants' arguments relating to Top Rank's state law claims for relief at this time. If Top Rank is able to cure the pleading defects with respect to its Sherman Act claims and states viable claims for relief under the Sherman Act (and Clayton Act), many of the pleading defects raised by the Haymon Defendants with respect to the state law claims will also be cured. On the other hand, if Top Rank ultimately fails to allege a viable federal claim for relief under the Sherman Act (or Clayton Act), the Court will likely decline to exercise supplemental jurisdiction over Top Rank's state law claims for relief. Accordingly, the Court **DEFERS** ruling on the Haymon Defendants' Motion to Dismiss Top Rank's claims for violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 *et seq.* (Count V), violation of the California Unfair Competition Law, Cal. Bus. & Prof Code §§ 17200 *et seq.* (Count VI), and tortious interference with prospective economic advantage (Count VII).

## IV. THE WADDELL DEFENDANTS' MOTION TO DISMISS

### A. Claims for Violation of Section 1 of the Sherman Act (Counts I and II)

**\*13** The Waddell Defendants move to dismiss Top Rank's claims for violation of Section 1 of the Sherman Act, in relevant part, on the grounds that: (1) there are no allegations

which plausibly suggest that the Waddell Defendants entered into an "illegal agreement;" (2) the Waddell Defendants are incapable of conspiring with the Haymon Defendants; and (3) there is no recognized claim for "aiding and abetting" a Sherman Act violation.

#### 1. *The allegations regarding the Waddell Defendants do not plausibly suggest an illegal agreement.*

As previously stated, "[t]o state a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1, claimants must plead not just ultimate facts (such as conspiracy), but evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce among the several States, or with foreign nations; (3) which actually injures competition." *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir.2008).

Whether a restraint is analyzed under the rule of reason or a per se rule, a claim for violation of Section 1 of the Sherman Act, "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556 (2007). In other words, the pleaded facts must "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 555–56. "[T]erms like 'conspiracy,' or even 'agreement,' are borderline: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint." *Id.* at 557 (quoting DM Research, Inc. v. College of Am. Pathologists, 170 F.3d 53, 56 (1st Cir.1999)). Indeed, "[a] bare allegation of conspiracy is almost impossible to defend against, particularly where the defendants are large institutions with hundreds of employees entering into contracts and agreements daily." *Kendall,* 518 F.3d at 1047. Importantly, "[a]llegations of facts that could just as easily suggest rational, legal business behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a violation of the antitrust laws." *Id.* at 1049.

When the First Amended Complaint is stripped of conclusory statements, legal conclusions disguised as factual allegations, and group pleading allegations, the allegations regarding the Waddell Defendants can be summarized as follows:

Case 4:23-cv-03560  Document 125  Filed on 02/26/24 in TXSD  Page 185 of 250

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

(1) the Waddell Defendants are investment advisors; (2) the Waddell Defendants made an investment in Haymon Holdings through MGH; (3) as a result of that investment and pursuant to the "Amended and Restated Limited Liability Company Agreement," MGH allegedly possesses approval rights (or veto power) over Haymon Holdings' and its subsidiaries' "Major Decisions;" (4) Ryan Caldwell, and other representatives of the Waddell Defendants, attended meetings and engaged in negotiations for the possible acquisition of Golden Boy Promotions, which ultimately failed; and (5) Ryan Caldwell attended meetings and engaged in negotiations with broadcasters to reassure them that the Haymon Defendants had adequate funding for their new PBC boxing venture.

The Court concludes that these allegations do not plausibly suggest that the Waddell Defendants entered into a conspiracy or agreement to restrain trade. Indeed, the only agreements allegedly entered into by the Waddell Defendants (and supported by the facts alleged in the First Amended Complaint) are the alleged investment in Haymon Holdings and the corresponding Amended and Restated Limited Liability Company Agreement. [11] However, there is nothing about these agreements, standing alone, that suggest or hint of an agreement to restrain trade in the management or promotion markets, and these agreements are entirely consistent with rational, legal business behavior. "The antitrust laws are not offended by agreements as such, but only by those with an anticompetitive content." *49er Chevrolet, Inc. v. Gen. Motors Corp.,* 803 F.2d 1463, 1467 (9th Cir.1986).

**\*14** Top Rank has not alleged that the Waddell Defendants signed, or entered into, any of the other allegedly anticompetitive agreements described in the First Amended Complaint. Instead, Top Rank argues that it has adequately alleged that the Waddell Defendants entered into an "overarching" conspiracy or agreement to "eliminate competition in the markets for managing and promoting Championship–Caliber Boxers," and seeks to hold the Waddell Defendants liable for acts taken by the Haymon Defendants in furtherance of that alleged conspiracy. However, before the Waddell Defendants can be liable for acts taken by the Haymon Defendants in furtherance of the alleged conspiracy, Top Rank must allege sufficient facts, taken as true, to plausibly suggest that the Waddell Defendants were in fact members of the alleged conspiracy. As the Waddell Defendants point out in their Reply [Docket No. 80 at 3–4], Top Rank's "overarching" conspiracy theory relies almost

exclusively on paragraph 56 of the First Amended Complaint, which states in its entirety:

> The Waddell & Reed Defendants' *involvement in the conspiracy* began when a senior executive and portfolio manager with WRF, WRIMCO, and IICO named Ryan Caldwell was presented with an opportunity to meet Al Haymon. An avid boxing fan with ambitions to "own live sports," Caldwell leapt at the chance. Haymon first spoke with Caldwell from an office in Burbank, California. In the course of this and later discussions, Caldwell agreed that the Waddell & Reed Defendants would commit funding, business expertise, and operational supervision to Haymon's *illegal scheme* — which was, in substantial part, directed at the State of California and at California businesses and consumers. From that time forward, the Waddell & Reed Defendants *actively participated in, and materially furthered, the plot to take over the boxing promotion business.*

FAC at ¶ 56 (emphasis added); Opposition [Docket No. 78] at 1, 6, 9, 10, 11, 12, 18, 24, 27 (relying on paragraph 56 of the First Amended Complaint). The allegations that the Waddell Defendants were involved in a "conspiracy," agreed to enter into an "illegal scheme," and "actively participated in, and materially furthered, the plot to take over the boxing promotion business" are conclusory statements coupled with legal conclusions that cannot support the existence of an agreement to restrain trade in violation of Section 1 of the Sherman Act. [12] *See Kendall,* 518 F.3d at 1048 ("Although appellants allege the Banks 'knowingly, intentionally and actively participated in an individual capacity in the alleged scheme' to fix the interchange fee or the merchant discount fee, this allegation is nothing more than a conclusory statement."). In fact, stripped of its conclusory statements, paragraph 56 merely alleges that Caldwell desired to "own live sports" and agreed that the Waddell Defendants would commit "funding, business expertise, and operational

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 186 of 250

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)
2015-2 Trade Cases P 79,332

supervision" to the Haymon Defendants, which is consistent with and suggests rational, legal business behavior rather than an illegal conspiracy.

Top Rank also relies heavily on the Waddell Defendants' participation in meetings and negotiations regarding the failed acquisition of Golden Boy Promotions and their participation in meetings and negotiations with broadcasters regarding the Haymon Defendants' new PBC venture. However, this alleged conduct is also entirely consistent with the Waddell Defendants' ordinary business activities as asset management and investment advisory firms, and does not plausibly suggest that the Waddell Defendants entered into an "overarching conspiracy" to eliminate competition in the markets for the management and promotion of Championship–Caliber Boxers.

**\*15** Accordingly, the Court concludes that Top Rank has failed to allege sufficient facts to suggest that the Waddell Defendants entered into an illegal agreement to restrain trade.

### 2. The Waddell Defendants cannot conspire with the Haymon Defendants as a matter of law.

Moreover, even if the Waddell Defendants "agreed" to participate in the Haymon Defendants' alleged anticompetitive scheme, the Court concludes that the Waddell Defendants are not legally capable of conspiring with the Haymon Defendants under Section 1 of the Sherman Act. Rather, the Court concludes that the conduct of the Haymon Defendants and the Waddell Defendants must be viewed as that of a single enterprise.

"The Sherman Act contains a 'basic distinction between concerted and independent action.' " *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767 (1984) (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761 (1984)). "Sherman Act § 1 reaches concerted action in unreasonable restraint of trade, while § 2 covers unilateral action only when monopoly power is present or attempted." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1402a. "Concerted activity subject to § 1 is judged more sternly than unilateral activity under § 2." *Copperweld*, 467 U.S. at 768.

Accordingly, in analyzing any Section 1 claim, the Court must first determine whether the alleged contract, combination, or conspiracy constitutes "concerted action." Athough the

Waddell Defendants and the Haymon Defendants are legally distinct entities, that does not automatically result in the conclusion that there is concerted action for the purposes of Section 1 of the Sherman Act. As the Supreme Court explained:

> [S]ubstance, not form, should determine whether a[n] ... entity is capable of conspiring under § 1. This inquiry is sometimes described as asking whether the alleged conspirators are a single entity. That is perhaps a misdescription, however, because the question is not whether the defendant is a legally single entity or has a single name; nor is the question whether the parties involved 'seem' like one firm or multiple firms in any metaphysical sense. The key is whether the alleged 'contract, combination ..., or conspiracy' is concerted action – that is, whether it joins together separate decisionmakers. The relevant inquiry, therefore, is whether there is a 'contract, combination ... or conspiracy' amongst separate economic actors pursuing separate economic interests, such that the agreement deprives the marketplace of independent centers of decisionmaking, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition.

*Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (internal quotations – and citations omitted). Two Supreme Court cases – Copperweld and American Needle – demonstrate the application of these principles. In Copperweld, the Supreme Court held that a parent corporation and its wholly owned subsidiary were not legally capable of conspiring, reasoning:

> A parent and its wholly owned subsidiary have a complete unity

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 187 of 250

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

of interest. Their objectives are common, not disparate; their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one.... With or without a formal 'agreement,' the subsidiary acts for the benefit of the parent, its sole shareholder. If a parent and a wholly owned subsidiary do 'agree' to a course of action, there is no sudden joining of economic resources that had previously served different interests, and there is no justification for § 1 scrutiny.

**\*16** *Copperweld,* 467 U.S. at 771. In contrast, in American Needle, the Supreme Court held that the licensing activities of National Football League Properties ("NFLP")—a corporate joint venture formed by thirty-two National Football League teams to manage their intellectual property—constituted "concerted activity." Am. Needle, 560 U.S. at 196–202. The Supreme Court partially relied on the fact that the teams compete in the market for intellectual property, and concluded that, "[a]lthough NFL teams have common interests such as promoting the NFL brand, they are still separate, profit-maximizing entities, and their interests in licensing team trademarks are not necessarily aligned." Id. at 198. Accordingly, "[t]hirty-two teams operating independently through the vehicle of the NFLP are not like the components of a single firm that act to maximize the firm's profits. The teams remain separately controlled, potential competitors with economic interests that are distinct from NFLP's well-being." Id. at 201.

Applying these principles, the Court concludes that the Waddell Defendants' alleged "agreement" with the Haymon Defendants does not constitute "concerted action" for the purposes of Section 1. As pled by Top Rank, the Waddell Defendants and the Haymon Defendants share a complete unity of economic interest in the venture's success, and have no alleged separate interest, at least as it relates to the relevant management and promotion markets. Indeed, as investors, the Waddell Defendants are similar to the "components of single firm that act to maximize the firm's profits." [13] Am. Needle, 560 U.S. at 201. Moreover, the Waddell Defendants, as asset management and investment advisory firms, are not actual or potential competitors of the Haymon Defendants. [14] Accordingly, their alleged venture

with the Haymon Defendants does not "deprive[ ] the marketplace of independent centers of decisionmaking," or of a "diversity of entrepreneurial interests," and "thus of actual or potential competition." Am. Needle, 560 U.S. at 195.

Accordingly, the Court concludes that the Waddell Defendants cannot, as a matter of law, conspire with the Haymon Defendants.

### 3. *The Waddell Defendants cannot be held liable as "aiders and abetters."*

Top Rank contends that, even if the Waddell Defendants are not members of the conspiracy, they can be held liable as "aiders and abetters" of that conspiracy. However, the Court concludes that aiding and abetting is not an independent theory of civil liability under the Sherman Act. *See MCI Telecomms. Corp. v. Graphnet, Inc.,* 881 F.Supp. 126, 129 (D.N.J.1995) ("Because the Sherman Act is a statute providing for civil damages for violative conduct and fails to explicitly provide for aiding and abetting liability, none will be presumed unless there is sufficient evidence of congressional intent to the contrary."). Moreover, even if it is an independent theory of civil liability under the Sherman Act, for the same reasons that the Waddell Defendants are not capable of conspiring with the Haymon Defendants, the Court concludes that the Waddell Defendants are not capable of aiding and abetting the Haymon Defendants. Cf id. at 131 (noting that the "Graphnet's efforts to allege antitrust aiding and abetting against MCIT seem ... to be primarily an attempt to circumvent the limitation on intraenterprise conspiracy claims" and dismissing the antitrust counterclaim).

**\*17** For the foregoing reasons, the Waddell Defendants' Motion to Dismiss Top Rank's claims for unlawful 'tie out' in violation of Section 1 of the Sherman Act (Count I) and for conspiracy in restraint of trade in violation of Section 1 of the Sherman Act (Count II) is **GRANTED**.

### B. Attempted Monopolization in Violation of Section 2 of the Sherman Act (Count III)

The Waddell Defendants move to dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act, on the grounds that the Waddell Defendants are not competitors in the relevant market.

WCAS182

Case 4:23-cv-03560 Document 125 Filed on 02/26/24 in TXSD Page 188 of 250

Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)

2015-2 Trade Cases P 79,332

The Court agrees. *See, e.g., name.space, Inc. v. Internet Corp. for Assigned Names and Numbers,* 795 F.3d 1124, 1131 (9th Cir.2015) ("Because ICANN is not a competitor in any of the three markets, they cannot serve as the basis for a § 2 monopoly claim."); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1075 (11th Cir.2004) ("There is no question that CC does not participate in the Spanish-language radio market. Thus, CC cannot attempt to monopolize that market.") (cited favorably by *name.space, Inc.,* 795 F.3d at 1131); *Transphase Sys., Inc. v. S. Cal. Edison Co.,* 839 F.Supp. 711, 717 (C.D.Cal.1993) ("It is axiomatic in antitrust law that a defendant may not be found liable under the Sherman act for monopolizing or attempting or conspiring to monopolize a market unless that defendant is a competitor in the relevant market and his conduct creates a dangerous probability that he will gain a dominant share of the market.").

Top Rank argues that it has sufficiently alleged that the Waddell Defendants are competitors in the relevant market. However, as stated in footnote 14, those allegations are solely based on the Waddell Defendants' investment and alleged management and control over Haymon Holdings via their veto or approval power over "Major Decisions." The Court concludes that these allegations are insufficient to find that the Waddell Defendants are competitors in the relevant markets. "[O]ne company's minority ownership interest in another company is not sufficient by itself to make the owner a competitor, for purposes of the antitrust laws, of the subsidiaries rivals. To be a competitor at the level of the subsidiary, the parent must have substantial control over the affairs and policies of the subsidiary." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.,* 148 F.3d 1080, 1088 (D.C.Cir.1998); *see also Spanish Broad. Sys. of Fla., Inc.,* 376 F.3d at 1075 ("Absent allegations of significant control over the policies of a subsidiary, a minority ownership share does not convert a parent corporation into a competitior."). In other words, Top Rank would have to allege a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. *See Caribbean Broad. Sys., Ltd.,* 148 F.3d at 1088–89. However, Top Rank disavows any reliance whatsoever on a a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. *See* Opposition [Docket No. 78] at 7 n.3. Accordingly, because the Waddell Defendants are not competitors in the relevant market, Top Rank cannot state a claim for attempted monopolization in violation of Section 2 of the Sherman Act against the Waddell Defendants.

**\*18** In addition, to the extent Top Rank seeks to assert a claim for "conspiring to attempt to monopolize" under Section 2 of the Sherman Act, no such claim exists. *See* Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 809 ("An occasional complaint has alleged that the defendant conspired to attempt to monopolize. Courts have correctly held that § 2 states no such offense.").

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for attempted monopolization in violation of Section 2 of the Sherman Act (Count III) is **GRANTED**.

## C. Injunctive Relief Under Section 16 of the Clayton Act (Count IV)

Because Top Rank has failed to state a claim for relief under Section 1 or Section 2 of the Sherman Act, the Waddell Defendants' Motion to Dismiss Top Rank's claim for injunctive relief under Section 16 of the Clayton Act (Count IV) is **GRANTED.** *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1051 (9th Cir.2008).

## D. State Law Claims

### 1. *Violation of the California Unfair Practices Act as to the Waddell Defendants (Count V)*

In its fifth claim for Relief, Top Rank alleges that the Waddell Defendants sold "boxing broadcast rights" at less than the cost thereof, and/or gave away that product to television broadcasters, as a "loss leader" in violation of the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17043 and 17044. FAC at ¶¶ 161–168.

In order to be liable under Section 17043 or 17043, a defendant must have sold an article or product at less than cost of the article or product or given away that article or product. *See* Cal. Bus. & Prof.Code § 17043, ("It is unlawful for any person engaged in business within this State to sell any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."); Cal. Bus. & Prof Code §§ 17044, 17030 (making it unlawful for any person engaged in business in California to sell or use any article or product as a "loss leader," i.e., any article or product sold at less than cost where the purpose is to induce, promote, or encourage the purchase of other merchandise, or where the effect is a tendency or capacity to mislead or deceive purchasers or prospective purchasers, or where the effect is to

**Top Rank, Inc. v. Haymon, Not Reported in Fed. Supp. (2015)**

2015-2 Trade Cases P 79,332

divert trade from or otherwise injure competitors). However, Top Rank fails to allege any facts demonstrating that the Waddell Defendants sold any article or product at less than cost, or gave away an article or product. Indeed, Top Rank's allegations solely relate to the Haymon Defendants, not the Waddell Defendants.

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for violation of the California Unfair Practices Act (Count V) is **GRANTED**.

### 2. *Violation of California's Unfair Competition Law (Count VI)*

In its sixth claim for relief, Top Rank alleges that the Waddell Defendants violated California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.Code § 17200 *et seq.* The Waddell Defendants move to dismiss the UCL claim on the grounds that the alleged conduct underlying this claim does not relate to any business practices engaged in by the Waddell Defendants. The Court agrees.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. "Each prong of the UCL is a separate and distinct theory of liability." *Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1127 (9th Cir.2009). "As to the unlawful prong, the UCL incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law." *See Clark v. Countrywide Home Loans, Inc.,* 732 F.Supp.2d 1038, 1049 (E.D.Cal.2010) (citing *Chabner v. United Omaha Life Ins. Co.,* 225 F.3d 1042, 1048 (9th Cir.2000)). An "unfair" business practice is one "that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." *Cel–Tech Commc'ns, Inc. v. LA. Cellular Tel. Co.,* 20 Cal.4th 163, 187 (1999). In addition, a business practice is "unfair" when that practice "either offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *McDonald v. Coldwell Banker,* 543 F.3d 498, 506 (9th Cir.2008) (quotations and citations omitted). Finally, a business practice is "fraudulent" if members of the public are likely to be deceived. *Prata v. Superior Court,* 91 Cal.App. 4th 1128, 1146 (2001). If the claim is grounded in fraud, the pleading of that claim must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure

9(b). *See, e.g., Ward v. Wells Fargo Home Mortg., Inc.,* 2015 WL 1744235, at *9 (N.D.Cal. Apr. 13, 2015).* Although Top Rank appears to allege in its First Amended Complaint that the Waddell Defendants violated all three prongs of the UCL, Top Rank solely relies on the "unlawful" prong in its Opposition.[15]

**\*19** Top Rank's UCL claim based on the "unlawful" prong is premised on alleged violations of the following laws: (1) Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; (2) the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et seq.,* which prohibits, in relevant part, a manager from having a direct or indirect financial interest in the promotion of a boxer; (3) California Code of Regulations, title 4, § 396, which prohibits, in relevant part, a promoter from acting directly or indirectly as a manager of a boxer; and (4) the California Unfair Practices Act, Cal. Bus. & Prof.Code §§ 17000 *et seq.* However, as previously discussed, the Court concludes that Top Rank has failed to state a claim against the Waddell Defendants for violation of Sections 1 or 2 of the Sherman Act or the California Unfair Practices Act. In addition, the Court concludes that Top Rank fails to allege that the Waddell Defendants violated the Muhammad Ali Boxing Reform Act, 15 U.S.C. § 6301 *et seq.* or California Code of Regulations § 396 because the Waddell Defendants have never acted as boxing managers or promoters. Accordingly, because Top Rank fails to allege that the Waddell Defendants committed a predicate violation of another law, Top Rank fails to state a UCL claim against the Waddell Defendants based on the "unlawful" prong. *See Dorado v. Shea Homes Ltd. Partnership,* 2011 WL 3875626, at *19 (E.D.Cal. Aug. 31, 2011) ("Where a plaintiff cannot state a claim under the 'borrowed' law, she cannot state a UCL claim either.").

Top Rank also fails to state a claim against the Waddell Defendants premised on the "unfair" or "fraudulent" prongs of the UCL. Indeed, Top Rank has failed to allege any "unfair" or "fraudulent" conduct specifically committed by the Waddell Defendants. Apparently recognizing its inability to plead a UCL claim against the Waddell Defendants based on the "unfair" or "fraudulent" prongs, Top Rank failed to oppose the Waddell Defendants' Motion to Dismiss the UCL claim based on these prongs.

Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for violation of the UCL (Count VI) is **GRANTED**.

2015-2 Trade Cases P 79,332

### 3. *Tortious Interference with Prospective Economic Advantage (Count VII)*

In its seventh claim for relief, Top Rank alleges a claim against the Waddell Defendants for tortious interference with prospective economic advantage.

In order to state a claim for tortious interference with prospective economic advantage, a plaintiff must plead the following elements: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co. v. Lockheed Martin Corp.,* 29 Cal.4th 1134, 1153 (2003) (quotations and citations omitted). In addition, a plaintiff must allege that the defendant's conduct was "wrongful by some legal measure other than the fact of interference itself." *Della Penna v. Toyota Motor Sales, U.S.A., Inc.,* 11 Cal.4th 376, 393 (1995); *see also Korea Supply Co.,* 29 Cal.4th at 1158 ("To establish a claim for interference with prospective economic advantage, ... a plaintiff must plead that the defendant engaged in an independently wrongful act."). "[A]n act is independently wrongful if it is unlawful, that is, if it is proscribed by some constitutional, statutory, regulatory, common law, or other determinable legal standard." *Korea Supply Co.,* 29 Cal.4th at 1159.

As the Court previously concluded, Top Rank has failed to allege any independently wrongful or unlawful conduct committed specifically by the Waddell Defendants. Accordingly, the Waddell Defendants' Motion to Dismiss Top Rank's claim for tortious interference with prospective economic advantage (Count VII) is **GRANTED**.

### V. CONCLUSION

For the foregoing reasons, the Haymon Defendants' Motion to Dismiss is **GRANTED in part**. The Haymon Defendants' Motion to Dismiss Counts I, II, III, and IV is **GRANTED**. The Court will grant Top Rank an opportunity to amend these claims, and, thus, Counts I, II, III, and IV as to the Haymon Defendants are **DISMISSED with leave to amend**. Top Rank shall file its Second Amended Complaint on or before **October 30, 2015**. The Court **DEFERS** ruling on the Haymon Defendants' Motion to Dismiss Counts V, VI, and VII.

**\*20** The Waddell Defendants' Motion to Dismiss is **GRANTED** in its entirety. Because the Court concludes that granting leave to amend as to the Waddell Defendants would be futile, the First Amended Complaint against the Waddell Defendants is **DISMISSED without leave to amend.** Although the Court recognizes that this Circuit has a liberal policy favoring amendments and that leave to amend should be freely granted, the Court is not required to grant leave to amend if the Court determines that permitting Top Rank to amend would be an exercise in futility. *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery,* 829 F.2d 729, 738 (9th Cir.1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile."). In this case, Top Rank has already had an opportunity to file an amended pleading and has failed to provide the Court with any facts or arguments in its Opposition that indicate leave to amend with respect to the Waddell Defendants would not be futile. Accordingly, the Court denies leave to amend as to the Waddell Defendants.

IT IS SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2015 WL 9948936, 2015-2 Trade Cases P 79,332

### Footnotes

1   Due to Top Rank's reliance on group pleading, it is impossible to determine which entity that Top Rank claims attempted to acquire Golden Boy Promotions.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   16

2015-2 Trade Cases P 79,332

2  Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. Despite the literal language of the statute, Section 1 "outlaw[s] only unreasonable restraints." *State Oil Co. v. Khan,* 522 U.S. 3, 10 (1997).

3  Section 2 of the Sherman Act makes it illegal to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations ... " 15 U.S.C. § 2.

4  "Championship–Caliber Boxers" are defined as "professional boxers who, within the past three years, have demonstrated through such quantitative factors as purse size, television rights, viewership, ticket revenue, and other objective criteria that they belong to the 'cream' of the boxing business." FAC at ¶ 104 (quotations and citations omitted).

5  Top Rank argues that it need not allege dominance in the promotion market for its conspiracy in restraint of trade claim, relying on cases concerning tying arrangements. However, Top Rank's conspiracy claim does not appear to limit itself to tying arrangements. *See* FAC at ¶ 147.

6  The Haymon Defendants also move to dismiss the tying claim on the grounds that their alleged market power cannot be premised on a voluntary contractual relationship. *See, e.g., Rick–Mik Enters. Inc. v. Equilon Enters., LLC,* 532 F.3d 963, 973 (9th Cir.2008) ("A tying claim generally requires that the defendant's economic power be derived from the market, not from a contractual relationship that the plaintiff has entered into voluntarily."). However, contrary to the Haymon Defendants' argument, Top Rank alleges that the Haymon Defendants' economic power is derived from the market, not from a voluntary contractual relationship.

7  "*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality.' " *Texaco v. Dagher,* 547 U.S. 1, 5 (2006) (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 692 (1978)).

8  In its Opposition, Top Rank contends that it has alleged that the Haymon Defendants have "never consented" to allowing boxers in their management stable to sign with "legitimate" promoters, citing to paragraph 65 of the First Amended Complaint. *See* Opposition at p. 26. However, paragraph 65 does not so allege. If Top Rank can, in good faith, allege facts showing that the Haymon Defendants have never consented to allowing boxers in their management stable to sign with "legitimate promoters," Top Rank may be able to state a viable tying claim.

9  In addition, although Top Rank alleges the existence of several other allegedly anticompetitive agreements, as discussed *infra,* the Court concludes that Top Rank has failed to adequately allege an agreement between the Waddell Defendants and the Haymon Defendants.

10  Although Top Rank's allegations, for the most part, meet the applicable pleading standard, Top Rank's allegations with respect to, for example, the "exclusivity commitments" with unspecified broadcasters are vague and lack the requisite factual detail. *See* FAC at ¶ 94.

11  Although it initially appeared to the Court that Top Rank was attempting to hold the Waddell Defendants vicariously or indirectly liable for the conduct of the Haymon Defendants (based on their investment in the Haymon Defendants and their approval power or veto power over the Haymon Defendants' major decisions), Top Rank adamantly disavows any attempt to impose "indirect or vicarious liability" on the Waddell Defendants based on a principal-agent relationship between the Waddell Defendants and the Haymon Defendants. See Opposition [Docket No. 78] at 7 n. 3.

WCAS186

2015-2 Trade Cases P 79,332

12    Top Rank's First Amended Complaint is littered with such conclusory statements and hyperbole regarding the Waddell Defendants. *See, e.g.,* FAC at ¶ 55 ("The Waddell & Reed Defendants have played an active, complicit, and indispensable role in bringing the anticompetitive scheme to fruition."); ¶ 57 ("The Waddell & Reed Defendants orchestrated an elaborate business arrangement to facilitate—and to try to conceal—their involvement in the conspiracy.").

13    This unity of interest is further supported by Top Rank's allegations that Waddell Defendants and Haymon Defendants are, at least to some extent, under common control. *See, e.g.,* FAC at ¶ 15 (alleging that W & R Financial actively manages and controls Haymon Holdings, which is "exercised by its President and General Counsel who sit as MGH's 'Observer' representatives on the Haymon Holdings Board of Directors"); ¶ 16 (alleging that WRIMCO's senior officers actively manage and control Haymon Holdings); ¶ 18 (alleging that MGH is a member of Haymon Holdings and "exercises strategic and operational control" over Haymon Holdings' business activities).

14    Top Rank argues that it has alleged that the Waddell Defendants are actual competitors in the relevant markets. However, those allegations are solely based on the Waddell Defendants' investment and alleged management and control over Haymon Holdings. *See* FAC at ¶ 15 ("[W & R Financial] participates in the managerial and promotional market in California through its active management and control over Haymon Holdings, exercised by its President and General Counsel who sit as MGH's 'Observer' representatives on the Haymon Holdings Board of Directors."); ¶ 16 ("WRIMCO also participates in the managerial and promotional market in California through its senior officers' active management and control over and direct financial interest in Haymon Holdings.").

15    Top Rank does not address any of the state law claims in its Opposition to the Waddell Defendants' Motion to Dismiss, but merely incorporates its Opposition to the Haymon Defendants' Motion to Dismiss (even though the Waddell Defendants and Haymon Defendants primarily moved to dismiss on different grounds). *See* Opposition to Waddell Defendants' Motion to Dismiss [Docket No. 78] at 20. In its Opposition to the Haymon Defendants' Motion to Dismiss, Top Rank only argues that its UCL claim is sufficient based on the "unlawful" prong.

---

**End of Document**                              © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4766220
Only the Westlaw citation is currently available.
United States District Court, D. Massachusetts.

UNITED STATES of America et al., Plaintiffs,
v.
AMERICAN AIRLINES GROUP INC. and
Jetblue Airways Corporation, Defendants.

Civil No. 21-11558-LTS
|
Signed July 26, 2023

**Attorneys and Law Firms**

William H. Jones, II, Bonny E. Sweeney, Brandon Storm, Craig Louis Briskin, Daniel S. Guarnera, Edward William Duffy, Eric Dunn, Grant A. Bermann, James H. Congdon, James Moore, III, John R. Doidge, John J. Hogan, Justin T. Heipp, Kate M. Riggs, Maisie A. Baldwin, Michael DeRita, Patricia C. Corcoran, Patricia L. Sindel, Seth J. Wiener, United States Department of Justice, Washington, DC, John Staige Davis, DOJ-USAO, Concord, NH, Sarah P. McDonough, United States Department of Justice, New York, NY, for Plaintiff United States of America.

Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, Robert Bernheim, Arizona Attorney General's Office, Tucson, AZ, for Plaintiff State of Arizona.

Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, Jamie L. Miller, Robert B. McNary, California Department of Justice, Los Angeles, CA, for Plaintiff State of California.

Adam Gitlin, Arthur Thomas Durst, Catherine A. Jackson, Pro Hac Vice, Office of the Attorney General for the District of Columbia, Washington, DC, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff District of Columbia.

Colin G. Fraser, Liz A. Brady, Rachel S. Brackett, Attorney General's Office/ Antitrust, Tallahassee, FL, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff State of Florida.

William T. Matlack, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff Commonwealth of Massachusetts.

Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, Jennifer Ann Thomson, Joseph Stephen Betsko, Sr., Tracy Wright Wertz, Pennsylvania Office of Attorney General, Harrisburg, PA, for Plaintiff Commonwealth of Pennsylvania.

Tyler Henry, Office of the Attorney General of Virginia, Richmond, VA, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff Commonwealth of Virginia.

Alfred C. Pfeiffer, Christopher S. Yates, Pro Hac Vice, Daniel M. Wall, Pro Hac Vice, Elizabeth C. Gettinger, Pro Hac Vice, Elise Nelson, Nitesh Lokesh Daryanani, Latham & Watkins LLP, San Francisco, CA, Allyson M. Maltas, Pro Hac Vice, Farrell J. Malone, Pro Hac Vice, Ian R. Conner, Pro Hac Vice, Marguerite M. Sullivan, Pro Hac Vice, Michael G. Egge, Pro Hac Vice, Seung Wan Paik, Pro Hac Vice, Tara L. Tavernia, Pro Hac Vice, Jesse Aaron Vella, Latham & Watkins LLP, Washington, DC, Marc Robert Lewis, Olivia Bona, Lewis & Llewellyn LLP, San Francisco, CA, David C. Tolley, Latham & Watkins LLP, Boston, MA, for Defendant American Airlines Group Inc.

Glenn A. MacKinlay, McCarter & English, LLP, Boston, MA, Matthew L. Craner, Pro Hac Vice, Richard F. Schwed, Pro Hac Vice, Jessica K. Delbaum, Leila Rashida Siddiky, Martha Elena Vega-Gonzalez, Shearman & Sterling LLP, New York, NY, Brian Hauser, Ryan Leske, Shearman & Sterling LLP, Washington, DC, Matthew Adams McGee, Shearman & Sterling LLP, Dallas, TX, for Defendant JetBlue Airways Corporation.

<u>ORDER</u>

SOROKIN, United States District Judge

**\*1** On May 19, 2023, the Court issued its Findings of Fact and Conclusions of Law in this action. Doc. No. 344. Three weeks later, the parties filed dueling motions proposing terms the Court should include in its final judgment and permanent injunction ("FJPI"). Doc. Nos. 353, 354. The parties subsequently responded to one another's motions. Doc. Nos. 358, 359-1. [1] The Court observed that the parties' papers raised meaningful disputes regarding the injunction's terms, resolved a disagreement about when the eventual FJPI would take effect, and scheduled a hearing on the two motions for July 14, 2023. Doc. Nos. 355, 361.

WCAS188

A series of events led to a change in that hearing date. Days after the Court's hearing notice, JetBlue informed American that it wished to invoke the termination provisions of the Northeast Alliance ("NEA"). Pursuant to that notice and the terms of the NEA, the termination will take effect on July 29, 2023. The day after receiving the notice from JetBlue, American's counsel contacted the Court to request that the hearing date be continued, citing a scheduling conflict. The Court allowed American's request, to which no party objected, and reset the hearing for July 26, 2023. Doc. No. 366.

JetBlue publicly disclosed its decision on July 7, 2023, via a press release and a filing with the Securities and Exchange Commission, and JetBlue's counsel promptly brought those disclosures to the Court's attention. See Doc. No. 368. In response, the Court directed the parties to supplement their submissions to address "what, if any, impact [the NEA's] termination has on the proposed terms" of the FJPI. Id. The parties made such submissions, which reflected their success in eliminating some, but not all, disputes about the proposed terms. Doc. Nos. 369, 370. On the eve of the rescheduled hearing, the parties notified the Court that they had reached agreement about two more terms, and they submitted revised proposals incorporating the result of their continued negotiations. Doc. No. 371. The Court has heard them on the remaining disputes, Doc. No. 372, which the Court now resolves. [2]

In crafting the terms of the FJPI, the Court "is clothed with large discretion to fit the decree to the special needs of [this] case." Ford Motor Co. v. United States, 405 U.S. 562, 573 (1972) (cleaned up). Such needs include, but are not limited to, effectively ending the violation the Court found. Id. As the plaintiffs note, relief in an antitrust case must also serve the important functions of "avoid[ing] a recurrence of the violation" and "eliminat[ing] its consequences." Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 697 (1978). However, the Court is not licensed, by virtue of these general objectives or the breadth of its equitable discretion, to implement "harsh measures when less severe ones will do," "overly regulatory requirements which involve the judiciary in the intricacies of business management," or vague prohibitions on "all future violations of the antitrust laws." New York v. Microsoft Corp., 224 F. Supp. 2d 76, 100 (D.D.C. 2002) (cleaned up). Rather, the Court must identify reasonable measures that will "cure the ill effects of the [defendants'] illegal conduct, and assure the public freedom

from its continuance." United States v. U.S. Gypsum Co., 340 U.S. 76, 88 (1950).

**\*2** Guided by these standards and its familiarity with the conduct and violations presented by this case, the Court turns to the terms as to which the parties have been unable to reach agreement. See Doc. No. 371-3 (showing in redline terms and language as to which disagreements persist). There are four remaining disputes the parties characterize as substantive, which the Court will address first, and a trio of smaller disagreements about phrasing the Court will resolve thereafter.

First, the plaintiffs propose a provision prohibiting each defendant from entering any new agreements that are "substantially similar to the NEA" with other domestic carriers. [3] The Court finds such a prohibition is not necessary to achieve the appropriate aims of antitrust relief, which depend considerably on the particular circumstances of the case. Here, those circumstances include the nature of the defendants' business models, the characteristics of the NEA agreements, and the specific geographic region and markets for air travel that were impacted by the defendants' conduct. Thus, the Court DENIES the plaintiffs' request to include such a prohibition in the FJPI and REJECTS their proposed Section III(H).

Second, and relatedly, the plaintiffs propose a provision requiring notice and a waiting period if either defendant enters any new agreements with other domestic carriers. For the same reasons the Court rejected the prohibition on certain agreements with other carriers, the Court DENIES the plaintiffs' requested notice provision and REJECTS their proposed Section V(B).

Third, though the parties have reached general agreement about a provision requiring notice and a waiting period if the defendants enter any new agreements with one another, they disagree about language describing when the proscribed waiting period would end if such notice led a government agency to issue a Civil Investigative Demand ("CID"). The plaintiffs propose requiring that the defendants "submit[ ] all information required" by the CID as a prerequisite to ending the waiting period, while the defendants propose requiring "substantial compliance" with the CID. See Doc. No. 370-3 at 4. The Court finds that the language proposed by the defendants is reasonable and grounded in the settled statutory procedure upon which the notice provision is modeled, and it will be more easily understood and applied by the parties

and the Court going forward. Thus, the Court REJECTS the plaintiffs' proposed language and ADOPTS the defendants' proposed language in this regard.

Fourth, the plaintiffs propose that the Court appoint an independent monitoring trustee, at the defendants' expense, who would broadly oversee the unwinding of the defendants' relationship over the next five years. The Court DENIES that request based on its conclusion that, in the circumstances presented, appointment of a monitor is unnecessary. The defendants entered the NEA openly, disclosed it to regulators at the outset, cooperated with the resulting investigations, and have now terminated the relationship without waiting for the Court's final judgment. Thus, the Court REJECTS Section VI of the plaintiffs' proposed FJPI.

Finally, other differences between the parties' proposals will be resolved as follows: 1) in the preamble, the language the plaintiffs propose that includes "preventing the recurrence of similar anticompetitive conduct" is reasonable and grounded in the law, and the Court will include it; 2) in Section II, Applicability, the language the plaintiffs propose that would reach "any successor to any substantial part of the business" is ambiguous and appears largely superfluous in light of the standard preceding language and, thus, the Court will not include it; and 3) the language the plaintiffs propose at the end of Section III(B) ordering the defendants to cease "any effort to allocate markets" is reasonable and grounded in the circumstances and violations found here, and the Court will include it. Additionally, subsection references in the FJPI will be adjusted to reflect the deletion of the provisions the Court has rejected and to ensure internal cross-references point to the correct places, as the defendants' proposal generally appears to do.

**\*3** Accordingly, the parties' Motions for Entry of Final Judgment and Permanent Injunction (Doc. Nos. 353, 354, and 369) are ALLOWED in part and DENIED in part as described herein. The plaintiffs shall file, on or before the close of business on July 28, 2023, a clean copy of a FJPI including all terms to which the parties have agreed and reflecting the determinations conveyed in this Order as to the terms that were subject to dispute. The Court will promptly review, sign, and enter that FJPI.

**All Citations**

Slip Copy, 2023 WL 4766220

## Footnotes

1    The defendants' motion for leave to respond, Doc. No. 359, is ALLOWED.

2    In this Order, the Court addresses only the terms, substantive and otherwise, that remain in dispute. Having reviewed the terms on which the parties agree, the Court finds them all reasonable and appropriate, and it will adopt and include them in its FJPI.

3    The defendants have assented to a provision prohibiting such agreements with one another for the next ten years, and that term will be included in the Court's FJPI.

**End of Document**                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    3

🏳 KeyCite Blue Flag – Appeal Notification

Appeal Filed by  US, ET AL v. JETBLUE AIRWAYS CORPORATION, ET AL,  1st Cir.,  January 23, 2024

2024 WL 162876

Only the Westlaw citation is currently available.

United States District Court, D. Massachusetts.

UNITED STATES of America, Commonwealth of Massachusetts, District of Columbia, State of California, State of Maryland, State of New Jersey, State of New York, and State of North Carolina, Plaintiffs,

v.

JETBLUE AIRWAYS CORPORATION, and Spirit Airlines, Inc., Defendants.

CIVIL ACTION NO. 23-10511-WGY

|

Signed January 16, 2024

**Synopsis**

**Background:** Department of Justice, as well as several states, brought action seeking to enjoin merger of two airlines on basis that proposed merger violated Clayton Act.

**Holdings:** After bench trial, the District Court, Young, Senior Judge, held that:

[1] appropriate geographic scope of relevant "service market" for assessing the competitive effects of proposed merger was each individual origin-and-destination pair, or route, on which each of airlines competed;

[2] government established prima facie case alleging proposed merger violated Clayton Act;

[3] airlines proposing merger established entry into markets by potential competitors would be "timely" and "likely," as required to rebut government's prima facie case that proposed merger violated Clayton Act provision;

[4] airlines were not entitled to invoke "failing company," "weakened competitor" or "flailing firm" doctrines to rebut government's prima facie case;

[5] airlines established that combined post-merger airline would be efficient, procompetitive and result in substantial

benefits for consumers, as required for airlines to rebut government's prima facie case;

[6] proposed merger violated Clayton Act provision prohibiting mergers that could substantially lessen competition; and

[7] issuance of injunction was appropriate to enjoin proposed merger.

Ordered accordingly.

**Procedural Posture(s):** Judgment.

West Headnotes (57)

**[1]**   **Antitrust and Trade Regulation** 🔑 Constitutional and Statutory Provisions

The fundamental purpose of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition is to arrest the trend toward concentration, the tendency to monopoly, before the consumer's alternatives disappear through merger. Clayton Act § 7, 15 U.S.C.A. § 18.

**[2]**   **Antitrust and Trade Regulation** 🔑 Mergers and Acquisitions

Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition does not require proof that merger or other acquisition has caused higher prices in affected market; all that is necessary is that merger create appreciable danger of such consequences in future. Clayton Act § 7, 15 U.S.C.A. § 18.

**[3]**   **Antitrust and Trade Regulation** 🔑 Mergers and Acquisitions

Probabilistic standard of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition creates a relatively expansive definition of antitrust

WCAS191

liability and subjects mergers to searching scrutiny; courts, however, must judge the likelihood of anticompetitive effects in the context of the structure, history, and probable future of the particular markets that the merger will affect. Clayton Act § 7, 15 U.S.C.A. § 18.

**[4]    Antitrust and Trade Regulation** 🔑 Relevant market in general

To establish a prima facie case under Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, the government must: (1) propose the proper relevant market; and (2) show that the effect of the merger in that market is likely to be anticompetitive. Clayton Act § 7, 15 U.S.C.A. § 18.

**[5]    Antitrust and Trade Regulation** 🔑 Presumptions and burden of proof

If the government establishes a prima facie case under Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, the "relatively low" burden of production falls to the defendant to rebut that case, by showing either that the combination would not have anticompetitive effects or that the anticompetitive effects of the merger will be offset by extraordinary efficiencies resulting from the merger. Clayton Act § 7, 15 U.S.C.A. § 18.

**[6]    Antitrust and Trade Regulation** 🔑 Presumptions and burden of proof

If the defendant successfully rebuts the government's prima facie case of violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, the burden shifts back to the government and merges with the ultimate burden of persuasion, which remains with the government. Clayton Act § 7, 15 U.S.C.A. § 18.

**[7]    Antitrust and Trade Regulation** 🔑 Presumptions and burden of proof

The government has the ultimate burden of proving a violation of the Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition by a "preponderance of the evidence," which means more likely not than true. Clayton Act § 7, 15 U.S.C.A. § 18.

**[8]    Antitrust and Trade Regulation** 🔑 Presumptions and burden of proof

The government's ultimate burden of proving a violation of the Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition is to prove that a merger or acquisition, more likely than not, may substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

**[9]    Antitrust and Trade Regulation** 🔑 Relevant market in general

"Relevant markets," for purposes of determining whether merger violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, are the areas of effective competition within which competition may be lessened. Clayton Act § 7, 15 U.S.C.A. § 18.

**[10]    Antitrust and Trade Regulation** 🔑 Relevant market in general

Defining "relevant markets," when determining whether merger violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, helps ascertain where effect of merger on competition will be direct and immediate. Clayton Act § 7, 15 U.S.C.A. § 18.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**[11]**   **Antitrust and Trade Regulation** 🖎 Relevant market in general

Courts should apply a pragmatic, factual approach to definition of the relevant market and not a formal, legalistic one, for purposes of determining whether there is a violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

**[12]**   **Antitrust and Trade Regulation** 🖎 Relevant market in general

"Market definition," for purposes of determining whether there is a violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, is a factual determination that must consider the commercial realities of the marketplace. Clayton Act 7, 15 U.S.C.A. § 18.

**[13]**   **Antitrust and Trade Regulation** 🖎 Relevant market in general

Markets, for purposes of deciding whether there is a violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, may be defined from the perspective of consumers because it is the consumer's options and the consumer's choices among them on which relevant market analysis depends. Clayton Act § 7, 15 U.S.C.A. § 18.

**[14]**   **Antitrust and Trade Regulation** 🖎 Geographical market; section of country

Under Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, a "relevant geographic market" consists of geographic area in which defendant faces competition and to which consumers can practically turn for alternative sources of product; therefore, if customers would not consider firm viable alternative because it operates exclusively outside geographic area to

which customers can practically turn for relevant product, then that firm is outside relevant geographic market. Clayton Act § 7, 15 U.S.C.A. § 18.

**[15]**   **Antitrust and Trade Regulation** 🖎 Transportation

For purposes of determining whether airline has or could acquire monopoly power in market in violation of Clayton Act, origin-and-destination pairs are the relevant geographic areas within which consumers can practically turn for alternative sources of scheduled air passenger service. Clayton Act § 7, 15 U.S.C.A. § 18.

**[16]**   **Antitrust and Trade Regulation** 🖎 Transportation

Appropriate geographic scope of relevant "service market" for assessing the competitive effects of the proposed merger of two airlines, for purposes of government's prima facie case alleging proposed merger violated Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, was each individual origin-and-destination pair, or route, on which each of airlines competed; such routes included nonstop overlap routes that both airlines currently flew, "connect routes," which were routes on which airlines flew connecting service, "mixed routes," which were routes on which one of airlines flew direct service and other provided connective service, and routes currently flown by airline subject to acquisition under proposed merger, but not by acquiring airline. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[17]**   **Antitrust and Trade Regulation** 🖎 Presumptions and burden of proof

**Antitrust and Trade Regulation** 🖎 Mergers and acquisitions

Was prima facie case of anticompetitive merger or acquisition established?**No**

WCAS193

Proposed merger between two airlines did not presumptively establish prima facie case of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, thereby requiring examination of government's direct evidence of anticompetitive effects to determine whether government established prima facie case of Clayton Act violation in connection with proposed merger. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[18] Antitrust and Trade Regulation** 👈 Transportation

**Antitrust and Trade Regulation** 👈 Mergers and acquisitions

Proposed merger of two airlines would eliminate head-to-head competition on multiple routes serviced by those airlines and, thus, such elimination constituted requisite direct evidence of anticompetitive effects for government to establish prima facie case alleging proposed merger violated Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition; loss of potentially acquired airline's influence on acquiring airline as head-to-head competitor would likely result in less competition to both discipline the prices and spur the innovation of acquiring airline as a smaller, more competitive market participant. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[19] Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral anti-competitive effects, for purposes of determining whether merger violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

**[20] Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

Acquisitions that eliminate head-to-head competition between close competitors often result in a lessening of competition, when determining whether proposed acquisition or merger violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

**[21] Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

When determining whether proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, if the collaborating parties are particularly close competitors, the unilateral anti-competitive effects are especially acute. Clayton Act § 7, 15 U.S.C.A. § 18.

**[22] Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

When determining whether proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, parties need not be each other's closest competitors to raise a threat to competition; being close competitors is enough for an acquisition to result in upward pricing pressure and potential anti-competitive effects. Clayton Act § 7, 15 U.S.C.A. § 18.

**[23] Antitrust and Trade Regulation** 👈 Transportation

**Antitrust and Trade Regulation** 👈 Mergers and acquisitions

Proposed merger of two airlines would eliminate acquired airline's competition with other airlines in the market and, thus, constituted requisite direct evidence of anticompetitive effects for government to establish prima facie case alleging proposed merger violated Clayton Act

WCAS194

provision prohibiting mergers and acquisitions that could substantially lessen competition; acquired airline, as first domestic "ultra low cost carrier," was uniquely disruptive competitor that consistently put pressure on other airlines, both to lower their prices and to innovate, whether through introduction of basic economy fares or other cost-saving measures, and loss of acquired airline's innovation would be loss for all consumers in national scheduled airline passenger market. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[24]** **Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

Anticompetitive effects are more likely, so as to violate Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, when the merger would result in the elimination of a particularly aggressive competitor in a highly concentrated market. Clayton Act § 7, 15 U.S.C.A. § 18.

**[25]** **Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

Reduction in product innovation resulting from acquisition is cognizable "harm" to competition, as required for violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

**[26]** **Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

The key question in determining whether a transaction may substantially lessen competition by dampening a firm's disruptive force, in violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, is whether the firm plays a special role in the market that constrains prices. Clayton Act § 7, 15 U.S.C.A. § 18.

**[27]** **Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

A merger's elimination of a product option that consumers value is a cognizable "harm" to competition, as required for violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

**[28]** **Antitrust and Trade Regulation** 👈 Transportation

**Antitrust and Trade Regulation** 👈 Mergers and acquisitions

Elimination of airline, to be acquired in proposed merger of two airlines, as choice for consumers constituted requisite direct evidence of anticompetitive effects of merger, for government to establish prima facie case alleging proposed merger violated Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition; consumers valued flights provided by airline to be acquired as unique, economical product option. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[29]** **Antitrust and Trade Regulation** 👈 Presumptions and burden of proof

Though defendant's burden of showing that proposed merger will not substantially lessen competition or tend to create monopoly in violation of Clayton Act is low, the stronger the plaintiff's prima facie case, the heavier the rebuttal burden becomes. Clayton Act § 7, 15 U.S.C.A. § 18.

**[30]** **Antitrust and Trade Regulation** 👈 Presumptions and burden of proof

If a government's prima facie case establishing that a proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially

WCAS195

lessen competition anticipates and addresses defendant's rebuttal evidence, the prima facie case is very compelling and significantly strengthened, and defendant's burden of production on rebuttal is also heightened. Clayton Act § 7, 15 U.S.C.A. § 18.

**[31]** **Antitrust and Trade Regulation** 🖙 Presumptions and burden of proof

Defendants may meet their burden to rebut the government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition either by affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor. Clayton Act § 7, 15 U.S.C.A. § 18.

**[32]** **Antitrust and Trade Regulation** 🖙 Mergers and Acquisitions

Entry by potential competitors may be considered in appraising whether merger will substantially lessen competition, for purposes of violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

**[33]** **Antitrust and Trade Regulation** 🖙 Mergers and Acquisitions

When determining whether proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, whether entry by potential competitors is included as part of the market definition or in the ease of entry evaluation, practically, is of no consequence; in either event, the result is the same, as the exercise of market power will be thwarted and collusive behavior will not be possible. Clayton Act § 7, 15 U.S.C.A. § 18.

**[34]** **Antitrust and Trade Regulation** 🖙 Mergers and acquisitions

Defendant need not show competitors will enter relevant markets or precisely when entry will occur in order to rebut prima facie case that acquisition or merger will lessen competition in relevant market under Clayton Act; instead, defendant need only show that potential competitors could enter relevant markets, and that barriers to that entry are low. Clayton Act § 7, 15 U.S.C.A. § 18.

**[35]** **Antitrust and Trade Regulation** 🖙 Mergers and acquisitions

In order to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, defendant must demonstrate that entry into relevant markets by potential competitors would be timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract competitive effects of concern. Clayton Act § 7, 15 U.S.C.A. § 18.

**[36]** **Antitrust and Trade Regulation** 🖙 Mergers and Acquisitions

Entry into relevant markets by potential competitors is "timely," as required to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, when it is soon enough to offset anticompetitive effects of the merger. Clayton Act § 7, 15 U.S.C.A. § 18.

**[37]** **Antitrust and Trade Regulation** 🖙 Transportation

The use of two-to-three year timeline, rather than "as fast as possible" or "possibly immediate," was appropriate timeframe to use when determining whether entry into relevant markets by potential competitors was "timely,"

WCAS196

as was required for two airlines proposing merger to rebut government's prima facie case that proposed merger violated Clayton Act provision prohibiting mergers that could substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[38]    Antitrust and Trade Regulation** 👈 Transportation

**Antitrust and Trade Regulation** 👈 Mergers and acquisitions

Entry into relevant markets by potential competitors was "timely," as required for two airlines proposing merger to rebut government's prima facie case that proposed merger violated Clayton Act provision prohibiting mergers that could substantially lessen competition; entry barriers on routes were very low, aircraft were mobile, entry onto routes happened almost constantly, and potential competitors had both ability and incentive to enter profitable routes vacated within two to three years by airline to be acquired in proposed merger. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[39]    Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

Entry into relevant markets by potential competitors is "likely," as required to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition only if it would be profitable and feasible, accounting for all the attendant costs and difficulties. Clayton Act § 7, 15 U.S.C.A. § 18.

**[40]    Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

As a matter of economic reality, companies do not simply enter any market they can; the likelihood of entry into relevant markets by potential competitors, as required to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, depends on whether entrants have the requisite ability to enter, whether entry into the relevant markets is within their strategy, and whether entry would be financially attractive to entrants, considering the risks of entry and the economic trade-offs of entering the relevant markets compared to using those same resources to enter other markets or pursue other business opportunities. Clayton Act § 7, 15 U.S.C.A. § 18.

**[41]    Antitrust and Trade Regulation** 👈 Mergers and acquisitions

Mere threat of entry into relevant markets by potential competitors is insufficient to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition; rather, there is high threshold applied to assertions as to whether company can be considered potential entrant, and defendants must provide evidence that likelihood of entry reaches threshold ranging from reasonable probability to certainty. Clayton Act § 7, 15 U.S.C.A. § 18.

**[42]    Antitrust and Trade Regulation** 👈 Geographical market; section of country

For entry into relevant markets by potential competitors to be "likely," as required to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, entry must be tied to the relevant geography, because entry outside the relevant markets cannot counteract a merger's anticompetitive effects. Clayton Act § 7, 15 U.S.C.A. § 18.

WCAS197

**[43]** **Antitrust and Trade Regulation** 👉 Transportation

**Antitrust and Trade Regulation** 👉 Mergers and acquisitions

Entry into relevant markets by potential competitors was "likely," as required for two airlines proposing merger to rebut government's prima facie case that proposed merger violated Clayton Act provision prohibiting mergers that could substantially lessen competition; other "ultra low cost carriers" would likely consider previous routes used by airline to be acquired in merger immediately as they were proven to be profitable, and some of those carriers had started entering routes that airline to be acquired exited within past year. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[44]** **Antitrust and Trade Regulation** 👉 Mergers and Acquisitions

For entry into relevant markets by potential competitors to be "sufficient," as required to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, entry has to be of a sufficient scale adequate to constrain prices and break entry barriers. Clayton Act § 7, 15 U.S.C.A. § 18.

**[45]** **Antitrust and Trade Regulation** 👉 Mergers and Acquisitions

When assessing the sufficiency of entry into relevant markets by potential competitors, as required to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, the relevant question is whether the potential entrants would enter and expand beyond their own existing growth plans to replace the void created by the elimination of the competitive intensity of the acquired firm. Clayton Act § 7, 15 U.S.C.A. § 18.

**[46]** **Antitrust and Trade Regulation** 👉 Mergers and Acquisitions

The appraisal of the impact of a proposed merger upon competition, when determining whether proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, must take into account potential competition from firms not presently active in the relevant product and geographic markets. Clayton Act § 7, 15 U.S.C.A. § 18.

**[47]** **Antitrust and Trade Regulation** 👉 Failing company doctrine

The "failing company doctrine," used to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, takes a lesser of two evils approach; the rationale is that, if a company is on the brink of failing, the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business. Clayton Act § 7, 15 U.S.C.A. § 18.

**[48]** **Antitrust and Trade Regulation** 👉 Transportation

**Antitrust and Trade Regulation** 👉 Failing company doctrine

Two airlines seeking to merge were not entitled to invoke "failing company doctrine" to rebut government's prima facie case that proposed merger or acquisition violated Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition; although the airline which was to be acquired in proposed merger sustained financial losses for four years, it had a long-term plan to return to profitability, and acquiring airline in proposed merger was not only available purchaser if airline to be acquired found itself in dire need. Clayton Act § 7, 15 U.S.C.A. § 18.

WCAS198

More cases on this issue

**[49]**   **Antitrust and Trade Regulation** 👉 Failing company doctrine

**Antitrust and Trade Regulation** 👉 Presumptions and burden of proof

Defendant asserting the "failing company" doctrine, in order to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, bears the burden of proving: (1) the acquired company faces the grave probability of a business failure; (2) the prospects of reorganization under the bankruptcy laws are dim or nonexistent; and (3) the company that acquires the failing company is the only available purchaser. Clayton Act § 7, 15 U.S.C.A. § 18.

**[50]**   **Antitrust and Trade Regulation** 👉 Failing company doctrine

**Antitrust and Trade Regulation** 👉 Mergers and acquisitions

Courts credit the "weakened competitor" or "flailing firm" defense, used to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, only in rare cases, when the defendant makes a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to reduce to a level that would undermine the government's prima facie case. Clayton Act § 7, 15 U.S.C.A. § 18.

**[51]**   **Antitrust and Trade Regulation** 👉 Transportation

Two airlines seeking to merge were not entitled to invoke "weakened competitor" or "flailing firm" doctrine to rebut government's prima facie case that proposed merger or acquisition violated Clayton Act provision prohibiting mergers

and acquisitions that could substantially lessen competition, absent evidence that airline to be acquired in proposed merger was in such a dire financial situation it had no hope for future; instead, airline's executives indicated it had a multiple-year plan to return to profitability. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**[52]**   **Antitrust and Trade Regulation** 👉 Mergers and acquisitions

The requirement that an acquired firm's weakness cannot be resolved by any competitive means, for purposes of "weakened competitor" or "flailing firm" defense used to rebut government's prima facie case that proposed merger or acquisition violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition, means the weakness cannot merely involve poor financial performance; it must involve a firm no longer able to access resources that are necessary to compete. Clayton Act § 7, 15 U.S.C.A. § 18.

**[53]**   **Antitrust and Trade Regulation** 👉 Transportation

**Antitrust and Trade Regulation** 👉 Mergers and acquisitions

Two airlines seeking to merge established that combined post-merger airline would be efficient, procompetitive and result in substantial benefits for consumers, as required for airlines to rebut government's prima facie case that proposed merger violated Clayton Act provision prohibiting mergers that could substantially lessen competition; expansion of all aspects of acquiring airline would allow for more vigorous competition with industry's "big four" airlines, which carried most passengers in the country, and if acquiring airline was to expand, the increased revenue available could also post-merger airline to innovate further and create an even stronger customer experience. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

WCAS199

[54]   **Antitrust and Trade Regulation** 👈 Presumptions and burden of proof

**Antitrust and Trade Regulation** 👈 Mergers and acquisitions

Evidence establishing prima facie case of violation of Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition carries forward even if presumption is rebutted; that evidence establishes presumption of middle ground, meaning that it establishes presumed fact unless credible evidence is introduced which tends to rebut that fact. Clayton Act § 7, 15 U.S.C.A. § 18.

[55]   **Antitrust and Trade Regulation** 👈 Mergers and Acquisitions

If anticompetitive effects of merger are probable in any significant market, merger violates Clayton Act provision prohibiting mergers and acquisitions that could substantially lessen competition. Clayton Act § 7, 15 U.S.C.A. § 18.

[56]   **Antitrust and Trade Regulation** 👈 Transportation

Proposed merger of two airlines would substantially lessen competition in at least some of airlines' relevant markets and, thus, proposed merger violated governing Clayton Act provision; consumers relying on low cost services provided by airline to be acquired in proposed merger would not avoid harm due to merger, and it would take from five to fifteen years for other "ultra low cost carriers" to replace acquired airline's capacity nationally. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

[57]   **Antitrust and Trade Regulation** 👈 Injunction

Issuance of injunction was appropriate to enjoin proposed merger of two airlines on basis that merger violated Clayton Act provision prohibiting mergers and acquisitions that

could substantially lessen competition; however, injunction did not extend to any future proposed merger of airlines. Clayton Act § 7, 15 U.S.C.A. § 18.

More cases on this issue

**Attorneys and Law Firms**

Edward William Duffy, Arianna Markel, Brian Hanna, Craig Louis Briskin, Don P. Amlin, James Moore, III, John R. Doidge, Katherine Celeste Speegle, Maisie A. Baldwin, Michael Battaglia, Michael DeRita, Michelle Livingston, Patricia C. Corcoran, Sarah V. Riblet, Aaron Teitelbaum, Brendan Sepulveda, Daniel A. Loevinsohn, John M. Briggs, John DiMarco, Garrett Windle, John R. Thornburgh, II, U.S. Department of Justice, Antitrust Division, Washington, DC, Washington, DC, Stephanie Elise Pearl, District of Columbia, Washington, DC, for Plaintiff United States of America.

Robert B. McNary, Pro Hac Vice, California Department of Justice, Los Angeles, CA, William T. Matlack, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff Commonwealth of Massachusetts.

C. William Margrabe, Estefania Yulianny Torres Paez, Office of the Attorney General for the District of Columbia, Public Advocacy Division, Washington, DC, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff District of Columbia.

Morgan J. Feder, Pro Hac Vice, Amy Elizabeth McFarlane, Christopher Michael D'Angelo, Olga Kogan, Elinor Hoffmann, Office of the New York Attorney General, New York, NY, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff State of New York.

Jamie L. Miller, Robert B. McNary, Pro Hac Vice, Komal Patel, California Department of Justice Office of the Attorney General, Los Angeles, CA, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff State of California.

Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, Jessica Vance Sutton, North Carolina Department of Justice, Raleigh, NC, for Plaintiff State of North Carolina.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

Byron Warren, Gary Honick, Maryland Attorney Generals Office, Baltimore, MD, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff State of Maryland.

Ana Atta-Alla, Bryan Steven Sanchez, The New Jersey Office of the Attorney General, Newark, NJ, Daniel H. Leff, Massachusetts Attorney General's Office, Boston, MA, for Plaintiff State of New Jersey.

Beatriz Mejia, Cooley LLP, San Francisco, CA, Daniel P. Culley, Pro Hac Vice, David I. Gelfand, Pro Hac Vice, Ryan Shores, Pro Hac Vice, Charles Balaan, Isabel Tuz, Jeremy Newman, Matt Rosenthal, Cleary Gottlieb Steen & Hamilton LLP, Washington, DC, Ethan Glass, Matt Nguyen, Pro Hac Vice, Cooley LLP - Library Business Litigation, Washington, DC, Ryan Leske, Pro Hac Vice, Brian Hauser, Jacob Kotler, Michael Mitchell, Samuel Guggenheimer, Shearman & Sterling LLP, Washington, DC, Deepti Bansal, Cooley LLP - Library Business/Antitrust, Washington, DC, Jessica K. Delbaum, Pro Hac Vice, Leila Rashida Siddiky, Pro Hac Vice, Richard F. Schwed, Pro Hac Vice, David Garfinkel, Grace Song, Harlan Rosenson, Sheyla D. Soriano, Elizabeth Robinson, Shearman & Sterling LLP, New York, NY, Joseph M. Kay, Cleary, Gottlieb, Steen & Hamilton, New York, NY, Joyce Victoria Rodriguez-Luna, Cooley LLP, New York, NY, Noni Nelson, New York, NY, Elizabeth M. Wright, Zachary Hafer, Zachary Sisko, Cooley LLP, Boston, MA, Laura Rodgers, Rumson, NJ, Michael Tetreault, Pro Hac Vice, Cooley LLP, San Diego, CA, Rachel Mossman Zieminski, Shearman & Sterling LLP, Dallas, TX, Tina Asgharian, Shearman & Sterling LLP, London, UK, for Defendant JetBlue Airways Corporation.

Andrew C. Finch, Pro Hac Vice, Eyitayo St. Matthew-Daniel, Jay Cohen, Pro Hac Vice, Jackson Cory Yates, Jared Nagley, Kate Wald, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, NY, Meredith Dearborn, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, San Francisco, CA, Thomas Rucker, Pro Hac Vice, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Washington, DC, John Calhoun, Samuel Newland Rudman, Choate, Hall & Stewart, Boston, MA, for Defendant Spirit Airlines, Inc.

Holly Ellen Oliva-Van Horsten, Kathleen M. Phillips, Phillips, Richard & Rind, P.A., Miami, FL, Peter J. Perroni, Nolan Perroni, PC, N Chelmsford, MA, for Amicus Transport Workers Union Local 570, AFL-CIO.

Glenn A. MacKinlay, Dean Elwell, McCarter & English, LLP, Boston, MA, for Amicus Travelers United Inc.

Jamie Roy Lynn, Baker Botts LLP, Washington, DC, for Amicus Association of Flight Attendants-CWA, AFL-CIO.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

YOUNG, JUDGE of the UNITED STATES [1]

**\*1** I. INTRODUCTION...——

II. FINDINGS OF FACT...——

A. The Industry...——

B. The Defendants...——

   1. JetBlue...——

   2. Spirit...——

C. The Relevant Airports...——

   1. Orlando, Florida – Orlando(MCO) and Sanford(SFB)...——

   2. San Juan, Puerto Rico - San Juan(SJU)...——

   3. Miami/Fort Lauderdale – Miami(MIA) and Fort Lauderdale(FLL)...——

   4. New York City - LaGuardia(LGA) and Newark(EWR)...——

   5. Boston, Massachusetts - Boston(BOS)...——

D. The Merger Agreement...——

E. The Divestitures Offered...——

   1. Divestitures to Allegiant...——

   2. Divestitures to Frontier...——

F. The Potential Effects of the Proposed Merger...——

   1. Decreased Airline Seats...——

   2. Increased Concentration...——

     a. "Spirit-Only" Routes...——

WCAS201

b. "Spirit-Entry" Routes...———

c. "Econometric" Routes...———

d. Connect Routes...———

e. Mixed Routes...———

f. Nonstop Overlap Routes...———

3. Increased Debt for JetBlue...———

4. Increased Prices for Customers...———

a. Loss of Spirit's Prices as an Option for Consumers...———

b. Loss of Spirit's Discipline on Other Airline's Prices...———

G. The Experts...———

1. Dr. Gowrisankaran...———

2. Dr. Chipty...———

3. Dr. Hill...———

4. Mr. Scheff...———

H. The Litigation...———

III. CONCLUSIONS OF LAW
A. The Clayton Act...———

B. Mode of Analysis...———

C. Market Definition...———

1. Legal Framework...———

2. Defining the Market...———

D. Prima Facie Case...———

1. Presumption of Illegality...———

2. Direct Evidence of Anticompetitive Effects...———

a. Elimination of Head-to-Head Competition Between JetBlue and Spirit...———

b. Elimination of Spirit's Competition with Other Airlines...———

c. Elimination of Spirit's as a Choice for Consumers...———

3. The Government Has Established a Prima Facie Case...———

E. The Defendant Airlines' Rebuttal...———

1. Ease of Entry...———

a. Timely Entry...———

b. Likely Entry...———

c. Sufficient Entry...———

2. The Government's Data...———

3. Pro-competitive Effects of the Proposed Acquisition...———

F. Additional Anticompetitive Effect...———

IV. THE INJUNCTIVE REMEDY...———

V. CONCLUSION...———

VI. ORDER...———

"[I]t's 'tough to make predictions, especially about the future.'" Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd., 778 F.3d 775, 783 (9th Cir. 2015). Perhaps apocryphal, this statement has been attributed to New York Yankees catcher Yogi Berra, the physicist Niels Bohr, and others.[2] The statement, however, also rings true when attempting to predict the future of the airline industry; as a fast-moving enterprise, with portable assets and dynamic growth cycles, the industry's potential responses to changes in economic conditions are almost impossible to predict. Yet, federal antitrust law aims to preserve the free functioning of markets and participation of diverse competitors by attempting to do just that: predict the future. Here, based on a robust review of evidence presented over four weeks of trial, this Court makes its best attempt.

**\*2** There are no "bad guys" in this case. The two corporations are -- as they are expected to -- seeking to maximize shareholder value. The Department of Justice is --

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

as the law requires -- speaking for consumers who otherwise would have no voice. Their forthrightness, civility, and zealous advocacy have immeasurably assisted the Court in reaching out for justice.

### I. INTRODUCTION

On July 28, 2022, Jet Blue Airways Corporation ("JetBlue") and Spirit Airlines, Inc. ("Spirit") (collectively, the "Defendant Airlines") executed a final merger agreement. JetBlue, the sixth largest airline in the United States, agreed to pay $3.8 billion to acquire Spirit, the seventh largest airline in the United States. The proposed merger would create the nation's fifth largest airline, accounting for 10.2% of the domestic market. Immediately after the merger agreement was signed, speculation began regarding the merger's antitrust implications. [3]

JetBlue is a so-called low-cost carrier ("LCC"), relying on point-to-point flying using fewer types of aircraft. Spirit is known as an "Ultra-Low-Cost Carrier" ("ULCC"), meaning that its offerings target budget-conscious passengers with low-cost, often unbundled flight options. The proposed merger would transfer all Spirit's assets to JetBlue and remove Spirit from the market.

Invoking the Clayton Act, 15 U.S.C. § 18, the United States Department of Justice, joined by the District of Columbia, the Commonwealth of Massachusetts, and the states of California, Maryland, New Jersey, New York, and North Carolina (collectively hereinafter, "the Government"), filed this action to enjoin the Defendant Airlines from proceeding with the merger. The resulting 17-day bench trial on the merits featured testimony by twenty-two witnesses, over 900 exhibits, and thousands of pages of evidence. The Court also traveled to a nearby location to take in a view of both Defendant Airlines' seat configurations. The trial transcript exceeds 2,500 pages, accompanied by over eighty binders containing exhibits presented to witnesses. Post-trial submissions exceed 700 pages. [4]

The parties' thorough presentation, as well as a careful review of the parties' voluminous submissions, illumines certain key findings: The airline industry is an oligopoly that has become more concentrated due to a series of mergers in the first decades of the twenty-first century, with a small group of firms in control of the vast majority of the market. See In re Dom. Airline Travel Antitrust Litig., No. MC 15-1404 (CKK), ---- F.Supp.3d ----, ----, 2023 WL 5930973, at *10

(D.D.C. Sept. 12, 2023). JetBlue and Spirit are not two of the largest airlines, though were they to merge, they would grow in size to further compete with the larger airlines.

From the Defendant Airlines' perspective, organic growth is too slow, as there are too few new aircraft available to meet industry demand. JetBlue's inorganic growth through acquisition of Spirit's sizable fleet of retrofittable aircraft -- of the same type -- largely solves this problem and is a tried-and-true growth strategy in this industry.

**\*3** A post-merger, combined firm of JetBlue and Spirit would likely place stronger competitive pressure on the larger airlines in the country. At the same time, however, the consumers that rely on Spirit's unique, low-price model would likely be harmed. The Defendant Airlines currently compete head-to-head throughout the country, and that competition, particularly Spirit's downward pressure on prices, benefits all consumers. Spirit's unique position in the domestic scheduled passenger airline industry would be exceedingly difficult for another airline, or a combination of other airlines, to replicate, even with low barriers to entry and the dynamic nature of the industry inasmuch as they face the same, industry-wide aircraft sourcing issues.

The Clayton Act was designed to prevent anticompetitive harms for consumers by preventing mergers or acquisitions the effect of which "may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18. Summing it up, if JetBlue were permitted to gobble up Spirit -- at least as proposed -- it would eliminate one of the airline industry's few primary competitors that provides unique innovation and price discipline. It would further consolidate an oligopoly by immediately doubling JetBlue's stakeholder size in the industry. Worse yet, the merger would likely incentivize JetBlue further to abandon its roots as a maverick, low-cost carrier. While it is understandable that JetBlue seeks inorganic growth through acquisition of aircraft that would eliminate one of its primary competitors, the proposed acquisition, in this Court's attempt to predict the future in murky times, does violence to the core principle of antitrust law: to protect the United States' markets -- and its market participants -- from anticompetitive harm.

Accordingly, for the reasons below, the Court rules that the proposed merger, as it stands, would substantially lessen competition in violation of the Clayton Act. The July 28, 2022 proposed merger, therefore, is enjoined.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   13

## II. FINDINGS OF FACT [5]

### A. The Industry

The United States passenger airline industry is dominated by four major airlines, often referred to as the "Big Four": Delta Airlines ("Delta"), American Airlines ("American"), United Airlines ("United"), and Southwest Airlines ("Southwest"). These four airlines control 80% of the industry with the next largest airline, Alaska Airlines, garnering 6% of airline revenue in the United States. The Big Four have built their strength over the past two decades through a series of mergers and consolidations of the industry. [6]

The largest three carriers, Delta, United, and American are what the industry refers to as "legacy carriers" (or "network carriers"), having been in operation prior to the 1978 deregulation of the airline industry. See In re Dom. Airline Travel Antitrust Litig., ── F.Supp.3d at ── , 2023 WL 5930973, at *5 (describing legacy carriers as "airlines that existed prior to the Airline Deregulation Act of 1978[ ] in the United States domestic airline industry[,] includ[ing] ... American, Delta, and United ...."). These legacy carriers utilize global networks based upon a "hub-and-spoke" model, concentrating operations in "hub" cities in order to then offer travelers connecting flights to numerous domestic and international destinations. Legacy carriers offer multiple classes of service (basic economy, economy, premium economy, business class, first class, etc.) and a broad range of amenities to cater to as many different types of travelers as possible. Legacy carriers have wide-ranging membership, frequent-flyer, and loyalty programs, with connected credit card and travel partners, in order to attract and retain customers. These programs alone are worth billions of dollars. Legacy carriers also often hold contracts with large businesses throughout the country to ensure their business travel needs are covered.

**\*4** Southwest, though a member of the Big Four, is not a legacy carrier. Instead, it is commonly referred to as a "low-cost carrier" ("LCC"). Other LCCs include New Pacific Airlines and JetBlue. [7] A low-cost carrier is able to offer lower fares than its competitors by keeping its operating costs lower, typically through the use of fewer types of aircraft (enabling labor, maintenance, training, and other cost efficiencies), operating out of less-costly airports, and through the use of a smaller point-to-point network. A point-to-point network is characterized by flying a greater proportion of

passengers on nonstop rather than connecting itineraries. With lower overall operating costs, low-cost carriers are also sometimes able to offer more or better quality amenities; JetBlue, for instance, offers free Wi-Fi for all customers, seatback entertainment in all seats, and free, name-brand refreshment offerings for all customers to enjoy.

Some airlines, such as Alaska Airlines and Hawaiian Airlines, [8] operate as hybrids of the low-cost model and the legacy model (commonly referred to as "hybrid carriers"). JetBlue has, at times, also been referred to as a hybrid carrier, though it views itself as a "maverick" and "uniquely disruptive" low-cost carrier. Tr. 11/6/23 (Robin Hayes) 124:23 – 125:1-4; 126:11-15. Hybrid carriers often operate a hub-and-spoke network at the regional level and are thereby able to keep costs down while offering the level of service generally attributed to the legacies. For example, Alaska Airlines and Hawaiian Airlines both have a "first-class" product, and JetBlue has, in certain markets, a "Mint" product, comparable to a first-class product.

ULCCs include Spirit, Frontier Airlines ("Frontier"), [9] Allegiant Air ("Allegiant"), [10] Avelo Airlines ("Avelo"), [11] Breeze Airways ("Breeze"), [12] and Sun Country Airlines ("Sun Country"). [13] ULCCs make up a small fraction of the market overall, with approximately 7% of total revenue attributable to ULCCs. ULCCs tend to offer travelers even lower fares than low-cost carriers by lowering their cost structures further (often through the use of a single type of aircraft), offering simplified onboard experiences, and removing some features traditionally included in the price of an airline ticket. A passenger on an ULCC might pay extra to check or even carry-on a bag, access Wi-Fi in the air, receive basic refreshments (food or drink) on the plane, or to receive additional legroom. These types of basic fares, with add-on costs for additional amenities, are referred to as "unbundled fares." [14] Like LCCs, ULCCs generally operate point-to-point networks, and ULCCs are often characterized by high seat density (number of seats on a plane) and high utilization (how many flights a plane might make per day). ULCCs are the fastest growing segment of the domestic airline industry. In attempting to compete with ULCCs, other airlines (legacies, LCCs, and hybrid carriers) have introduced unbundled fare options, known as "basic economy."

**\*5** The different airline types generally cater to different types of customers. While airlines tend to categorize customers as "leisure" and "business" travelers (some

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   14

leisure customers are even further categorized as "visiting friends and relatives" ("VFR")), customers exist on a "continuum" and there are no "firm boundaries" around customer segments. Thus, even within the "business" and "leisure" categories, consumer preferences differ. For example, some business customers -- i.e., people traveling for work or corporate clients -- are cost-conscious, particularly if traveling on behalf of a small business or for self-employment.

The legacy carriers segment their onboard offerings in order to cater to as many different types of customers as possible, offering fares ranging from a lower-end basic economy product to premium products like business class or first class, while also offering a traditional main cabin ticket. JetBlue similarly offers a segmented product, with five fare classes. ULCCs, in comparison, target cost-conscious, often leisure and VFR customers, with their unbundled, less differentiated product. A carrier's network plan is designed with its target consumer in mind; a ULCC might focus more on leisure destinations like Orlando, Florida, while a legacy carrier or even a LCC will have a more expansive network to cater to a broader range of consumers.

Since the COVID-19 pandemic, demand for leisure travel has increased. Accordingly, airlines have continued to shift capacity to leisure markets following the COVID-19 pandemic. As a dynamic industry, airlines are constantly responding to consumer demand and frequently shift route plans based on which they believe will be the most profitable. [15] Entry onto a route is rapid. [16] Once a carrier decides to enter a route, it can do so within two weeks or up to six months, depending on whether it already has a presence at an endpoint (one of the airports on the route).

Multiple industry-wide problems are constraining the growth of individual airlines. First, airlines are experiencing significant delays in delivery of aircraft from manufacturers following the pandemic. [17] Airbus, the manufacturer for both Spirit and JetBlue, is facing significant delivery delays and does not expect to allow airlines to add to their order books prior to 2029. [18] Engine issues have resulted in smaller growth plans for multiple Airbus customers in the industry including JetBlue, Hawaiian Airlines, Frontier, and Spirit. Second, and similarly, engine issues have also forced airlines, including Spirit, to prematurely and temporarily ground aircraft in their fleets to accommodate inspections. JetBlue expects its number of temporarily grounded aircraft to increase in 2024.

**\*6** Third, the Federal Aviation Administration ("FAA") is facing a dire shortage of Air Traffic Controllers. [19] During the COVID-19 pandemic, many of the FAA's experienced Air Traffic Controllers retired. As air travel demand rebounded, Air Traffic Control ("ATC") centers could not keep up with the increased flying capacity across the country. As a result, ATC centers have struggled to support scheduled air traffic, at times forcing airlines to limit the number of flights operating certain routes to/from affected airports.

Finally, pilot staffing issues have recently artificially constrained airlines' growth. As with ATC, during the COVID-19 pandemic, many legacy airline pilots retired; as demand bounced back, legacy airlines scrambled to hire pilots, including recruiting pilots from competing airlines. This pilot shortage caused pilot attrition issues for Spirit and other airlines in 2022, which persisted until at least the first half of 2023. In late 2022 and the first half of 2023, pilot attrition was described by Spirit executives as one of, if not the "main driver[s]" of constraints Spirit faced to increasing its utilization.

### B. The Defendants

The Defendant Airlines in this litigation, JetBlue and Spirit, are two of the fastest growing airlines in the nation. JetBlue is the sixth largest airline by revenue in the United States, with an approximately 5% market share based on revenue. Spirit is the seventh largest airline in the United States as measured by available seat miles, with an approximately 4% market share based upon revenue.

### 1. JetBlue

JetBlue primarily serves the East Coast, with 93% of its routes touching at least one of its six focus cities: New York, Boston, Miami/Fort Lauderdale, [20] Orlando, Los Angeles, and San Juan. JetBlue's focus cities differ from the hubs of legacy carriers by catering primarily to travel by the local population of the city as opposed to connecting customers. As of December 31, 2022, JetBlue served 108 cities in 32 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and 24 countries in the Caribbean and Latin America, Canada, and Europe. Fifty percent of JetBlue's routes touch New York, where

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   15

JetBlue is only the fourth largest carrier on a revenue basis (following Delta, American, and United). At Boston Logan International Airport ("Boston(BOS)"), JetBlue and Delta are the two largest airlines by total passengers carried; at Fort Lauderdale(FLL), JetBlue and Spirit are the two largest airlines by passengers carried.

JetBlue was founded in 1998 and commenced operations in 2000 with the mission to "bring humanity back to air travel." Tr. Ex. 612 at 1226–27. JetBlue has implemented innovative cost-saving strategies that help enable it to profit without increases in fares. JetBlue prides itself as a "maverick" and "unique disruptor" in the airline industry, often taking an aggressive approach to competing with legacy and other low-cost carriers. When JetBlue enters a market, fares tend to decrease, and when JetBlue exits a market, fares tend to increase. This pro-consumer phenomenon is known as the "JetBlue Effect," a term coined by an academic study from the Massachusetts Institute of Technology. Because the JetBlue Effect forces other airlines to lower their fares, air travelers do not need to be JetBlue customers to benefit from the JetBlue Effect.

**\*7** Despite its lower cost base and lower fares, JetBlue offers the most legroom in coach, with a seat pitch (the space between rows of seats, generally referred to as legroom by passengers) of at least 32 inches, and, in some of its airplanes, it offers the widest seat in coach. JetBlue is the only domestic airline offering seatback entertainment on every seat, including up to 100 channels of free live TV, and a library of recorded video media, available for all customers free of charge. JetBlue was the first airline to provide free high-speed Wi-Fi on its domestic flights and is still the only U.S. airline offering free high-speed Wi-Fi across its entire fleet. Finally, JetBlue offers all its customers free, unlimited brand-name snacks and soft drinks.

JetBlue's business model has evolved over time and continues to evolve today. It originally offered a coach-only product, but by 2014 was offering the first domestic lie-flat business class product, called "Mint". Since 2014, JetBlue has expanded Mint to international routes. During November 2019, JetBlue also adjusted its offerings to introduce an unbundled product called "Blue Basic," which unbundles the JetBlue base fare from other ancillary items, to better compete with Spirit's and other ULCCs' standard products as well as with legacy airlines' basic economy products. [21] In total, JetBlue offers five classes of service: an unbundled, basic economy seat ("Blue Basic"), a main cabin seat ("Blue"), a main cabin seat

with priority security and boarding ("Blue Extra"), an "Even More Space" option (with, as the name suggests, an increased seat pitch for even more space), and Mint, its premium offering. Blue Basic is available on all JetBlue flights.

As of December 31, 2022, JetBlue had a fleet of 290 aircraft, consisting of 230 Airbus and 60 Embraer aircraft. Without the merger, JetBlue will have approximately 335 aircraft in 2027, but with the merger, JetBlue would have 600 aircraft in 2027. JetBlue asserts that in order to increase its relevance and scale, and therefore compete with larger airlines, it must merge with another airline. [22]

Since 2015, JetBlue has sought a merger transaction to grow its scale and better compete with the Big Four carriers. It first unsuccessfully sought to acquire Virgin America in 2015 and 2016. In 2017, JetBlue again considered a potential acquisition transaction, this time focusing on Spirit and one other airline as potential candidates. As part of its exploration of a potential transaction in 2017, JetBlue spent roughly two to three weeks investigating the potential synergies that could be generated through a transaction with either of the two carriers. JetBlue ultimately did not pursue a transaction with Spirit in 2017, primarily because it determined that it could not afford to purchase Spirit in light of its then-current share price and the expected premium to be paid based on Alaska Airlines' acquisition of Virgin America.

JetBlue, however, was undeterred, and again considered acquiring Spirit as soon as late 2019. JetBlue viewed Spirit as an ideal target because of its fleet and engine commonality, which would allow for cost savings and efficient operations. Ultimately, in February 2020, JetBlue's Board of Directors authorized its CEO, Robin Hayes, to approach Spirit about a potential merger. However, the COVID-19 pandemic intervened, and no approach was made.

### 2. Spirit

**\*8** Spirit is the largest ULCC in the United States in terms of both seat capacity, measured in available seat miles ("ASMs") and number of aircraft. [23] Spirit has grown faster on a percentage basis than legacy carriers and low-cost carriers, and is among the fastest growing ULCCs. Today, Spirit accounts for about 46% of domestic ULCC capacity (as measured in ASMs) and Spirit accounts for 71% of domestic ULCC capacity on the routes it serves. As of year-end 2022, Spirit "served 92 destinations in 16 countries throughout the

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.          16

United States, Latin America[,] and the Caribbean." Spirit "offers low-fare service across the lower 48 [states of the United States] and Latin America." Christie (Spirit) Lit. Dep. 6/6/2023, 17:20-22. Spirit's network is primarily comprised of routes in the Eastern half of the United States, but Spirit is working toward becoming "a more national carrier" by serving cities in the West. Tr. 11/7/23 (John Kirby/Spirit) 130:12-25. Spirit's three largest cities, called "core" cities, are Fort Lauderdale, Florida; Orlando, Florida; and Las Vegas, Nevada -- all major leisure destinations. In addition, Spirit identifies Los Angeles, California and the metropolitan area of New York City, New York ("New York City") as part of its growing network "foundation."

Spirit's "objective is to deliver low fares so that more people have the ability to travel," and Spirit "strive[s] to be recognized by [its] guests and potential guests as the low-fare leader in the markets [it] serves." Christie (Spirit) Dep. 6/6/23, 18:5-6,; Tr. Ex. 39 at 447. Specifically, Spirit's 2022 10-K explains that Spirit focuses on "price-sensitive travelers," for whom Spirit's "low fares and unbundled service offering" are particularly appealing. Tr. Ex. 39 at 448. Spirit's "business model allows [Spirit] to compete principally by offering customers unbundled base fares that remove components traditionally included in the price of an airline ticket." Id. at 444.

Spirit is known as an innovator in the airline industry, both in terms of pioneering the ULCC business model (Spirit was the first airline to introduce unbundled fares to the United States) and through its innovation in technology (Spirit was the first domestic airline to introduce self-check baggage and handicap-accessible lavatories on most aircraft).

When deciding where to fly, Spirit -- like other airlines -- primarily seeks profitability. One consideration in deciding where to fly is the extent to which Spirit can stimulate demand in the marketplace by offering lower fares -- the so-called "Spirit Effect." [24] When deciding which new routes to enter, Spirit typically looks to enter high-fare markets with fares that are lower than the pre-Spirit average fare to stimulate or increase passenger demand. Increased passenger demand can mean either "more travelers or more frequent travelers" on not just Spirit flights on a route, but across all carriers flying that route. Tr. 10/31/23 (Edward Christie/Spirit) 103:22-25; 104 1-8. Spirit has found that, typically, once Spirit enters a route, passenger demand increases and the average fare on that route decreases.

The Spirit Effect on a route does not always lead to a profit for Spirit. Sometimes to stimulate demand, Spirit has to lower fares to an unsustainable level, causing Spirit to exit that route. Like all airlines, Spirit makes changes to its network "constantly." Tr. 11/8/23 (John Kirby/Spirit) 52:21–53:1. Spirit can add routes to its network in as little as five weeks (or three months if it is not already present in at least one of the airports in the origin-destination pair).

Spirit's unbundled model means the base price of an airline ticket is separate from the price of additional items. These additional items, called "ancillaries," include things like checked and carry-on bags, advance seat assignments, priority boarding, and refreshments. Customers can also pay for an ancillary titled the "Big Front Seat", Spirit's front-of-cabin, larger seating most similar to the domestic first-class seat product on legacy airlines. [25]

**\*9** Spirit typically has higher aircraft -- and gate -- utilization rates than its competitors. Spirit operates its aircraft for more hours each day (13.7 hours on average), allowing the airline to attain more ASMs out of a single aircraft. Spirit's predominately point-to-point network helps Spirit increase the daily use of its aircraft as Spirit's planes do not have to wait for connecting flights, as with a hub network. Spirit also lowers its costs by highly utilizing its gates; Spirit strives to turn a higher number of airplanes per day per gate than "an average airline." Tr. 10/31/23 (Edward Christie/Spirit) 88:16-23. Spirit's current goal is to operate eight flights per day, per gate at the airports it serves. Spirit, therefore, strongly prefers to enter an airport using a preferential gate versus a common-use gate, in order to have more flexibility and control over gate use. [26] Spirit's utilization is also increased by operating higher-density aircraft; its narrower seat pitch allows for more seats, and therefore more customers, per aircraft.

As of December 31, 2022, Spirit operated a fleet of 194 Airbus aircraft. Between 2010 and 2023, Spirit's ASMs grew 6-fold. Such growth has slowed, however, and Spirit does not expect its historic ASM growth rate to continue in the near future.

Spirit has not been profitable since 2019, resulting in a cumulative net loss of close to $2,000,000,000 since the onset of the COVID-19 pandemic. The causes for Spirit's decline in financial outlook are complex, as various risks materialized, while opportunities did not. First, since the COVID-19 pandemic, as the increase in demand for leisure

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works. 17

capacity has grown, so has the increase in competition for leisure travelers from other airlines. Second, Spirit's financial outlook has been impacted significantly by issues with Pratt & Whitney's NEO engines. At the beginning of 2023, Spirit had to ground three of its 200-or-so aircraft; today, Spirit has twelve grounded aircraft. The issues with Pratt & Whitney's engines uniquely affect Spirit: Spirit is the largest operator of the impacted GTF-powered Pratt & Whitney NEO engines in the United States. Other challenges that have affected Spirit's profitability have included disruptions flowing from understaffing at air traffic control centers in Jacksonville, Florida, and increased costs of pilots and flight attendants.

As a result of these cumulative operational and financial challenges, Spirit has already taken steps to slow its growth, exit routes, and revise its business plans. Spirit currently has no prediction as to when it will return to profitability. In pre-pandemic years, Spirit tended to exit one or two dozen routes per year. By contrast, Spirit exited 70 routes in 2022, and 40 routes in the first half of 2023, representing more than 20% of its network. Spirit also does not plan to enter the routes or cities it hoped to enter as recently as mid-2023. As a result of its financial difficulties, Spirit recently renegotiated its contract for aircraft deliveries with Airbus, Spirit's manufacturer, to grow at a slower pace.

Spirit began to explore the idea of merging with another airline as early as 2016. Over the years, it has considered Frontier, Sun Country, Viva Colombia, Allegiant, and JetBlue as potential merger partners. Spirit has consistently considered a merger to be advantageous because it does not believe it could achieve competitive significance by independent growth alone.

### C. The Relevant Airports

The airports that Spirit flies from most frequently are Fort Lauderdale(FLL); Orlando, Florida (Orlando(MCO)); Las Vegas(LNV); Los Angeles(LAX); the New York City, New York metropolitan area (including LGA and EWR); and San Juan, Puerto Rico (San Juan(SJU)). On the 73 nonstop routes on which JetBlue and Spirit currently overlap, the most common cities to fly out of are Miami/Fort Lauderdale, Orlando, San Juan, Boston, and New York City.

### 1. Orlando, Florida – Orlando(MCO) and Sanford(SFB)

**\*10**   There are two airports in the greater Orlando area: Orlando(MCO) and Sanford(SFB). Sanford(SFB), a secondary airport to Orlando(MCO), is located approximately thirty to forty-five minutes away by ground transportation from MCO and about thirty to forty-five minutes away from the theme parks in Orlando. Orlando(MCO) is a competitive and fragmented market; no airline has a more than 21% share, and approximately seven airlines are at or above a 10% share. Orlando(MCO) is not slot or gate constrained. [27] It recently opened a new terminal and is in the process of constructing even more gates.

Low-cost carriers like Spirit, Frontier, Avianca, WestJet, Volaris, Norse, Lynx, Swoop and Avelo have increased passenger service volumes at Orlando(MCO) in the last few years. Avelo, for example, operates a "base" in Orlando(MCO), meaning that it parks its aircraft and employs essential personnel at the airport. Frontier also has a base at Orlando(MCO). Frontier has a 14% revenue share in Orlando(MCO) and operates at least 44 routes out of Orlando(MCO). As of June 2023, Frontier served more destinations than any other airline at Orlando(MCO). Breeze initiated service at Orlando(MCO) in 2022, flying just one route, and in 2023 flies nine routes. Allegiant flies out of Sanford(SFB) and recently announced that it would be offering service to and from Orlando(MCO).

### 2. San Juan, Puerto Rico - San Juan(SJU)

In San Juan, Puerto Rico, there are no constraints on entry at Luis Muñoz Marin International Airport(SJU). San Juan is a fragmented and competitive market; six competitors have a roughly 10% share. Several ULCCs have entered or expanded their presence in San Juan in recent years. Frontier, for instance, has had "no issues growing in San Juan." Tr. 11/14/23 (Barry Biffle/Frontier) 97:18–24. Indeed, Frontier has made San Juan a focus city, offering 15 routes to and from the metro area -- more than any other airline. Avelo currently flies from two destinations to San Juan, Puerto Rico and is evaluating opportunities to expand the routes it flies to San Juan. Allegiant previously operated routes out of Puerto Rico and would consider returning to Puerto Rico if it were to become profitable.

### 3. Miami/Fort Lauderdale – Miami(MIA) and Fort Lauderdale(FLL)

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   18

There are two major airports in the greater Miami/Fort Lauderdale area (referred to as "South Florida" throughout trial): Miami(MIA) and Fort Lauderdale(FLL). Miami(MIA) is not constrained and has an ongoing construction project that, when completed, will allow for "11 gates' worth of growth potential." Tr. 11/8/23 (John Kirby/Spirit) 96:8–13.

At Fort Lauderdale(FLL), there are minimal constraints for new entrants. Broward County Aviation Department ("BCAD"), the controlling airport authority at FLL, has a plan ("Master Plan") to expand the airport. The Master Plan includes the addition of 29 gates -- for a total of 95 gates -- over the course of a number of years, to ensure the airport can accommodate future demand. Fort Lauderdale(FLL) currently has enough gates to meet demand, but demand is projected to increase past beyond the airport's current capacity of 66 gates. Phase 1 of the Master Plan will add 11 gates. The initial part of Phase 1 is to add Terminal 5, and it is already underway. Since 2016, BCAD has been able to accommodate every new entrant carrier that has requested access to FLL.

 **\*11** BCAD regularly solicits ULCCs to begin or expand service at FLL, with five domestic LCCs or ULCCs currently providing service at the airport. Indeed, Frontier's "largest operation," with well over "80 routes collectively," is in Florida, approximately 19 of which fly from Miami(MIA) or Fort Lauderdale(FLL). See Tr. 11/14/23 (Barry Biffle/Frontier) 97:13–17, 98:24–99:4. Allegiant also has established operations at Fort Lauderdale(FLL), operating three gates at the airport. Fort Lauderdale(FLL) has also been able to accommodate the entrance of four new international carriers, El Al from Israel, Flair from Canada, Porter Airlines from Canada, and Bermuda Air from Bermuda.

BCAD's lease agreements include a "use-it-or-lose-it" provision that allows BCAD to recapture preferential-use gates if "the airline[ ] is not meeting the stated demand or the utilization of that particular gate." Tr. 11/15/23 (Mark Gale/BCAD) 76:4–12. This policy is applied on an aggregate, not route-by-route level: if a carrier "has 10 preferential-use gates and after [BCAD] run[s] the formula at the year end and they only qualify for 9, [BCAD] would look to recapture one of those gates, and ..., because of their shifting of their international traffic, [BCAD] would look to, more likely than not, recapture one of the international-capable gates." Id. at 77:20–78:8. Accordingly, the minimum use requirement operates to remove barriers on capacity by ensuring turnover of underutilized gates to other airlines -- unlike at other

airports, carriers flying out of Fort Lauderdale(FLL) cannot take a loss of revenue in order to keep control of their gates.

### 4. New York City - LaGuardia(LGA) and Newark(EWR)

Both LaGuardia and Newark are slot- and gate-constrained airports.

### 5. Boston, Massachusetts - Boston(BOS)

While Boston(BOS) has some infrastructure constraints, Spirit has been able to grow and secure additional gates. Other ULCCs, such as Allegiant and Sun Country, have similarly "tak[en] advantage of common use capacity to grow in Boston." Tr. 11/8/23 (John Kirby/Spirit) 97:2–3.

### D. The Merger Agreement

In the summer of 2021, Spirit's and Frontier's respective management teams became involved in negotiations which culminated in a merger agreement signed on February 5, 2022, and publicly announced on February 7, 2022. Spirit's Board of Directors and Chief Executive Officer, Ted Christie, supported the proposed transaction with Frontier in February 2022. After learning about Frontier's bid to acquire Spirit, JetBlue CEO Robin Hayes had discussions with JetBlue's Board of Directors, as well as Mr. Christie, about making a competing bid for Spirit.

On March 29, 2022, JetBlue submitted a proposal to acquire Spirit, offering Spirit shareholders a cash bid of $33 per share, amounting to $3,600,000,000. JetBlue indicated in its March 29, 2022, offer letter a willingness to agree to a reverse break-up fee payable to Spirit if an acquisition by JetBlue were not consummated for antitrust reasons, but JetBlue did not propose a dollar figure for that fee. In April 2022, Spirit conveyed to JetBlue that it was concerned that JetBlue's Northeast Alliance with American Airlines could impede the regulatory process for a potential merger between JetBlue and Spirit, and requested additional protections for Spirit shareholders including a reverse termination fee. Toward the end of April 2022, before Spirit publicly responded to the March 29 offer, JetBlue sent Spirit a revised acquisition offer. This revised offer included a reverse break-up fee of $200,000,000, representing the amount JetBlue would pay

Spirit's shareholders if the contemplated deal ultimately did not pass regulatory scrutiny.

**\*12**  Spirit first determined that it was "reasonably likely that [JetBlue's offer] could lead to a superior proposal" to Frontier's offer, and with the assistance of Barclays and Morgan Stanley as financial advisors, Spirit began evaluating JetBlue's proposed acquisition. Tr. 10/31/23 (Edward Christie/Spirit) 118:8–119:7. On May 2, 2022, however, Spirit's Board of Directors unanimously rejected JetBlue's revised proposal to purchase Spirit for $33 per share. On that same day, Spirit issued a press release attaching a letter from Mr. Christie and H. McIntyre Gardner, the Chairman of Spirit's Board, to Mr. Hayes, setting forth Spirit's concerns about a JetBlue acquisition of Spirit. Shortly thereafter, on May 5, 2022, Spirit held an earnings call and filed with the SEC a related presentation titled "Rejected Proposal from JetBlue Is Illusory and Not Superior".

On May 16, 2022, JetBlue responded to the Spirit Board of Directors' rejection of its proposal by going directly to Spirit's shareholders with a tender offer to buy outstanding Spirit shares. Spirit's Board continued to oppose an acquisition by JetBlue and to support the proposed transaction with Frontier.

Throughout June 2022, JetBlue made a series of revised offers to acquire Spirit, with increases in per-share price, increases in the reverse termination fee, and commitments to divestitures. Spirit continued to resist, citing continued concerns about the anticompetitive nature of such an acquisition. On June 6, 2022, Mr. Christie received an email from Mr. Hayes with an attached new, revised offer for Spirit Airlines. On June 27, 2022, JetBlue made a further amended offer to purchase Spirit; the Spirit Board did not view this amended offer as better and did not accept it. Instead, Spirit issued another press release on June 28, 2022, reaffirming its commitment to the transaction with Frontier and noting that the "[l]atest offer from JetBlue does nothing to address our Board's serious concerns that a combination with [JetBlue] would not receive regulatory approval." Tr. Ex. 93 at 998.

As late as July 12, 2022, Spirit's Board was still unanimously in favor of the Frontier-Spirit transaction. Nevertheless, seeing the direction its shareholders were likely to vote, Spirit chose to resume negotiations with JetBlue on a potential acquisition of Spirit,[28] and on July 27, 2022, Spirit and Frontier terminated their merger agreement. This was done before Spirit shareholders could participate in a much-delayed final vote on the deal. By then, however, it was clear

Spirit shareholders would not vote in favor of the Frontier-Spirit agreement.

On July 28, 2022, JetBlue and Spirit entered into the merger agreement at issue here ("merger agreement" or "acquisition agreement"). The final per-share price JetBlue agreed to pay for Spirit represented a more than 50-percent premium over the trading price of Spirit's shares just before the Frontier bid. The proposed merger cost totals approximately $3,800,000,000. JetBlue will pay Spirit's shareholders $33.50 per share in cash.

If the proposed acquisition is not consummated by or before December 2023, the amount JetBlue will pay Spirit shareholders will increase over time to an ultimate $34.15 per share, so long as the proposed acquisition is consummated by July 24, 2024. At the time of the trial, Spirit shareholders had already received a $2.50-per-share prepayment in cash upon their approval of the proposed acquisition. Since January 2023, Spirit shareholders have also received payment in the form of a $0.10-per-month ticking fee, which will continue until closing.[29]

**\*13**  The acquisition agreement contains a combined reverse break-up fee (a combination of both the fee paid to Spirit and to its shareholders) of $470,000,000. The reverse break-up fee compensates Spirit shareholders if the proposed acquisition is not consummated for antitrust reasons. The acquisition agreement includes a retention program, which uses monetary awards to incentivize Spirit management to remain at the company through the course of the transaction-review process. The retention program covers senior executives as well as other persons deemed critical to the management team. Mr. Christie expects to receive over $1,000,000 in additional payments through the retention program if he remains employed at Spirit through the closing of the proposed acquisition. Other Spirit executives also have bonus agreements through the retention program, including many who testified at trial.

### E. The Divestitures Offered

Divestitures have historically been used in airline industry mergers to address competitive concerns raised by the Government. JetBlue itself has been the beneficiary of prior DOJ-mandated divestitures. For instance, when American and U.S. Airways merged, JetBlue acquired a number of slot pairs at Ronald Reagan International

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    20

Airport ("Reagan(DCA)") that allowed it to expand its service to Washington, D.C. JetBlue also acquired slots at LaGuardia(LGA) as a result of a slot swap by Delta and U.S. Airways. In order to attempt to obtain regulatory approval for the proposed merger here, JetBlue has agreed with Spirit to make robust divestitures. Under its agreement with Spirit, JetBlue is required to divest assets of JetBlue and Spirit up to a material adverse effect on the potential combined JetBlue and Spirit airline.

In addition to this broad commitment, JetBlue specifically agreed to certain proactive divestiture commitments (the "Divestiture Agreements") of select assets in Boston, the New York metropolitan area, and Fort Lauderdale. Frontier, another ULCC, agreed to acquire Spirit's 22 slots, 6 gates, and the associated ground facilities at LaGuardia(LGA). Allegiant, yet another ULCC, agreed to acquire (1) Spirit's 2 gates and the associated ground facilities at Boston(BOS); (2) Spirit's 43 runway authorizations, 2 gates, and the associated ground facilities at Newark(EWR); [30] and, (3) 5 of JetBlue's gates and the associated ground facilities at Fort Lauderdale(FLL).

The transfer of the divestiture assets is subject to approval by the local airport authorities. Historically, these authorities have approved divestitures associated with airline mergers and other transactions; such approval, however, has not yet been obtained and is not guaranteed. For Fort Lauderdale(FLL), in particular, the BCAD, the actual owner of the gates, will not consent to JetBlue's request to transfer or sublease the gates to Allegiant, per BCAD's current policy and agreement with the FAA. Rather, under both BCAD's Competition Plan and agreement with the FAA, after JetBlue relinquishes the gates and other FLL assets to BCAD, the availability of the gates will be advertised for any interested airline "so that other potential airlines that might have an interest in serving [Fort Lauderdale(FLL)] would be aware of those gates." Tr. 11/15/23 (Mark Gale/BCAD) 58:2–10. Mark Gale, the CEO and Director of Aviation at BCAD, acknowledged that the gates could be awarded to a legacy carrier such as American, Delta, or United, instead of Allegiant or another ULCC.

The Divestiture Agreements do not include a commitment to replace Spirit's capacity on all routes that it would stop serving should the merger be consummated, nor does it require Frontier or Allegiant to maintain a particular level of service from the divestiture airports. [31] The Divestiture Agreements also only pertain to airport-level assets; through

the agreements, Allegiant and Frontier are not provided with, for example, additional aircraft or pilots to use on their new routes.

### 1. Divestitures to Allegiant

**\*14**  As just stated, under the Divestiture Agreements Allegiant would acquire (1) Spirit's 2 gates and the associated ground facilities at Boston(BOS); (2) Spirit's 43 runway authorizations, 2 gates, and the associated ground facilities at Newark(EWR); and (3) 5 of JetBlue's gates and the associated ground facilities at Fort Lauderdale(FLL). With the divestiture assets at Fort Lauderdale(FLL), Allegiant would more than double its presence at the airport. At Newark(EWR), the runway authorizations, in particular, would provide Allegiant with the ability not only to access a highly constrained airport, but also expand its presence on preferred flight times. Finally, Allegiant's divestiture acquisitions at Boston(BOS) would provide the airline with gates it has previously failed to obtain.

Allegiant, as a planned recipient of some divestitures, has acknowledged that it may not be able to use all of the divestitures to their fullest capacity, particularly right away. First, Allegiant might not be able to use all of the runway authorizations it is attempting to acquire at Newark because some of "the earliest time slots are a challenge" for Allegiant, which does not currently have aircraft or crew based in Newark. (Drew Wells/Allegiant) Tr. 11/14/23 145-12-19. Second, Allegiant does not currently fly internationally or to Puerto Rico. Spirit currently serves international destinations out of Fort Lauderdale(FLL) and serves destinations in Puerto Rico out of Fort Lauderdale(FLL), Newark(EWR), and Boston(BOS). Allegiant's business model is not, as of now, equipped to replace these routes, but it plans to add international service and has an "application out to do so" through a joint venture with VivaAerobus in Mexico. Tr. 11/14/23 (Drew Wells/Allegiant) 134:19–135:8. Allegiant currently "believe[s it] can be selling within probably 30 days with about a 3-month window to begin operations" in international markets. Tr. 11/15/23 (Drew Wells/Allegiant) 24:12–22. Finally, Allegiant's business model generally focuses on unserved or underserved markets, with less overlap with other airlines, unlike Spirit, which competes directly on routes with legacy airlines and low-cost carriers.

### 2. Divestitures to Frontier

Frontier and JetBlue have entered into a binding divestiture agreement that provides Frontier with six gates and 22 slot-pairs at LaGuardia(LGA). These assets are "[e]xtremely valuable," both because of the slot constraints at LaGuardia(LGA) and because the assets are located in the Marine Air Terminal, which allows the recipient to "keep [its] costs down." Tr. 11/8/23 (John Kirby/Spirit) 101:13–102:6. Frontier envisions using the assets to "probably first" "fill Spirit's former routes out of New York." Tr. 11/14/23 (Barry Biffle/Frontier) 104:3–7, 105:18–23. At trial, a Frontier executive testified that the airline would not "have to pull from existing flying" to utilize the LGA divested assets due to Frontier's expansive order book. Tr. 11/14/23 (Barry Biffle/Frontier) 87:7–9 (Frontier will have "50 airplanes, brand new airplanes delivered at the time. So [we] don't have to pull from existing flying to do that."); see also id. at 96:8–14 (explaining Frontier has "the aircraft to chase" Spirit's routes post-merger while serving existing routes).

Concerns also exist, however, regarding Frontier's ability to use its proposed divestitures at LaGuardia(LGA) to their full potential. Spirit flies more frequently than Frontier, on average, with two to three more average flights per day in New York City alone.

### F. The Potential Effects of the Proposed Merger

### 1. Decreased Airline Seats

As the proposed merger stands, JetBlue would acquire, and thereby eliminate, Spirit from the market. Although Spirit's yellow aircraft livery would not immediately be repainted as JetBlue planes, at the moment the merger is consummated, Spirit and JetBlue would no longer be competitors. Instead, JetBlue would have the ability and incentive to reconfigure Spirit pricing and network planning to support JetBlue's profitability. At trial, JetBlue executives testified that "nothing is going to change on Day 1," but rather the Defendant Airlines would still "be operating as two separate entities." Tr. 11/17/23 (Ursula Hurley/JetBlue) 14:15–20. That might be true for the customer experience, as airline websites and plane configurations would not change immediately. In reality, however, Spirit pricing and route decisions are immediately likely to shift.

**\*15**  As for those more obvious changes, JetBlue estimates that the process of retrofitting Spirit aircraft to JetBlue specifications would take between four and five years to complete. As the JetBlue aircraft configuration involves less seats per plane, total seat reductions across Spirit's fleet are estimated to total 11%. JetBlue will not, however, begin the retrofit process until after it obtains a Single Operating Certificate from the FAA. [32] JetBlue estimates that each aircraft would take approximately 30-35 days to retrofit. Given the regulatory requirements and the amount of time needed to reconfigure the Spirit aircraft to JetBlue's specifications, there would not be any seat reductions until at least early 2025, with reconfigurations complete no earlier than 2029.

JetBlue argues that after the merger it will have the ability and incentive to increase utilization of its aircraft to offset this seat reduction. This could be done by upgauging the Spirit aircraft, [33] increasing aircraft utilization through more flights per day, reducing seasonal changes in flight schedules, and adding additional red-eye flights. Some of these changes are likely, as JetBlue's strategy regarding seasonality results in more flights than Spirit's current strategy, and it is likely JetBlue would increase Spirit's seasonal offerings to match those of the JetBlue fleet. There is no credible evidence -- rather only speculation -- that JetBlue has any plans to implement the other options, such as increased redeye flights and upgauging. Once the reconfiguration of Spirit's aircraft is complete, annual seat departures will decrease by more than 6,100,000.

### 2. Increased Concentration

The Defendant Airlines already have high combined market shares in numerous markets. As measured by metropolitan area, JetBlue and Spirit have 99 nonstop overlap routes; between 30% and 40% of JetBlue and Spirit's nonstop routes overlap. The Government argues that due to the increase in concentration that would occur should the merger be allowed, JetBlue's market power would increase past a "presumptively anticompetitive" threshold on 183 passenger routes, including 51 nonstop overlap routes that both JetBlue and Spirit serve. [34] Among these 183 routes the Government identifies, the post-merger HHI would be greater than 1,500, with a change in HHI of at least 200. Overall, the Government asserts that there are 562 routes that will suffer harm

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

due to the proposed transaction. These routes fall into six categories: (1) "Spirit-only" routes, (2) "Spirit-entry" routes, (3) "econometric" routes, (4) connect routes, (5) mixed routes, and (6) nonstop overlap routes.

### a. "Spirit-Only" Routes

**\*16**  The Government identifies 115 Spirit-only routes. A Spirit-only route is a route on which "Spirit is present and JetBlue is not," meaning there is no current competition between JetBlue and Spirit. Tr. 11/27/23 (Dr. Nicholas Hill) 57:23 – 58:1-7. The Government does not assert a structural presumption on the 115 Spirit-only routes, and does not assert, nor could it, that the merger would result in any loss of head-to-head competition on these routes.

### b. "Spirit-Entry" Routes

The Government identifies 168 Spirit-entry routes; as of November 2023, JetBlue was present on 23 of these 168. A Spirit-entry route is "a route that Spirit planned to enter [by 2027] according to its 2027 network plan" but that is not currently served by Spirit. Tr. (Dr. Nicholas Hill) 63:10-24. Again, the Government does not assert a structural presumption on the Spirit-entry routes. Given its financial condition and other headwinds, it is highly unlikely that Spirit would be able to enter all of the 168 routes identified in its 2027 network plan.

### c. "Econometric" Routes

The Government asserts 96 "econometric" routes, which it defines as a nonstop overlap route on which the Government does not assert a structural presumption but does anticipate a significant reduction in competition. Primarily, such harm is anticipated due to the substitution of JetBlue's aircraft configuration for Spirit's aircraft configuration, not from a loss of head-to-head competition.

### d. Connect Routes

The Government also asserts 117 connect routes, which it defines as a route on which both JetBlue and Spirit serve on a connecting, but not nonstop, basis. JetBlue and Spirit typically set fares for connect flights by summing the fares

for the individual nonstop legs. This method of setting fares is known as "sum-of-locals" pricing. On all 117 connect routes at issue, at least half of the ticket fares are set using sum of locals pricing; on the vast majority of the 117 connect routes (84%), either JetBlue or Spirit prices at least 80% of their fares using sum-of-locals pricing. Sum-of-locals pricing on connect routes is "driven by underlying routes" and "not primarily [ ] driven by competition between connect carriers or nonstop carriers," as that pricing structure simply adds together fares from two otherwise unrelated nonstop routes. Tr. 11/27/23 (Dr. Nicholas Hill) 69:3–10. Many of the connect routes are also not a competitive focus for JetBlue and Spirit because they have low total passenger volume each year; seventy-five of the 117 routes have fewer than 5,000 passengers a year across all carriers. Given their predominantly sum-of-locals pricing and low passenger volume, JetBlue and Spirit do not meaningfully compete on the Government's 117 connect routes, and thus these routes are unlikely to see a substantial lessening of competition.

### e. Mixed Routes

The Government identifies 15 "mixed" routes, which it defines as a route on which either JetBlue or Spirit provides nonstop service while the other carrier provides connecting service. On each of the 15 mixed routes, the connect carrier -- either JetBlue or Spirit -- serves less than 10% of total passengers. As explained above, when operating as the connect carrier, JetBlue and Spirit set most fares on these routes using sum-of-locals pricing. Accordingly, on the mixed routes where either JetBlue or Spirit flies a connecting itinerary, the connect carrier typically does not set its fares based on competition with the nonstop carriers. Further, on mixed routes for which the connect fare is significantly higher than the nonstop fare, it is unlikely that the connect fare was set with respect to the nonstop carriers' fares. On these 15 mixed routes, when Spirit is the connect carrier, a high percentage of its passengers pay a sum-of-local fare, meaning Spirit sets the fare based on the competition of the underlying individual routes rather than the connect route itself. On the mixed routes where JetBlue is the connect carrier, JetBlue "is charging a significantly higher fare than the nonstop carrier, which is a sign there's unlikely to be substantial competition [ ] between the connect carrier and the nonstop carrier." Tr. 11/27/23 (Dr. Nicholas Hill) 74:7–17.

#### f. Nonstop Overlap Routes

**\*17**  Finally, the Government identifies 51 nonstop overlap routes, which are the most potent of those it challenges. These routes are identified as those on which both Defendant Airlines offered nonstop service between Q3 2021 and Q2 2022. As previously stated, the Government asserts that a structural presumption applies to these routes. Since Q2 2022, Spirit and JetBlue have exited a combined 14 of the Government's 51 nonstop "presumption" routes (i.e., nearly 30%). [35] The Government and the Defendant Airlines agree that those routes where a Defendant Airline has exited are no longer facing harm should the merger occur.

Consistent with the frequency of exit, entry, and expansion in the airline industry, many of the nonstop "presumption" routes have experienced exit, entry, or expansion by the parties or other carriers since Q2 2022. Thirty-five of the 51 nonstop "presumption" routes on which the Government relies have either been exited by at least one party or have experienced an entry or addition in service by another carrier during or after this time period. Both Frontier and Allegiant already operate on one or both endpoints of all 51 nonstop overlap routes identified by the Government, and both carriers currently serve over 20 of these routes. In addition, 36 of the 51 nonstop presumption routes involve an endpoint at which JetBlue has proposed divestitures of assets. Of the 15 remaining routes that do not involve a divestiture endpoint, four are no longer nonstop overlap routes because either Spirit or JetBlue exited in the normal course of business. On the remaining 11 routes that do not involve a divestiture endpoint and where exit has not occurred -- across which Spirit only has approximately 25 total departures per day -- there are ULCCs and LCCs that are either already present or have substantial presence at one or both endpoints of each of the 11 routes.

#### 3. Increased Debt for JetBlue

Should the merger be consummated, JetBlue would also take on significant debt. JetBlue has, historically, managed its debt and liquidity levels very conservatively, and it historically targeted a debt-to-capital ("debt-to-cap") ratio of 30% to 40%. This conservatism has enabled JetBlue to borrow and raise money and to secure better financing terms for new aircraft acquisitions. JetBlue's debt-to-cap ratio has increased recently, however, rising to approximately 50% in 2022. Without the proposed merger, in 2022, JetBlue

planned to reduce its debt-to-cap ratio closer to its historical targets: about 44% in 2023, 40% by 2024, and roughly 30% from 2025 to 2027. If the proposed acquisition is consummated, JetBlue's indebtedness will increase. JetBlue's current debt-to-cap ratio stands at 56%, and, if the proposed acquisition proceeds, JetBlue not only plans to raise about $3,500,000,000 in debt to fund the acquisition of Spirit but will also take on Spirit's nearly $4,000,000,000 in debt. As such, should the proposed acquisition occur, JetBlue's post-acquisition debt-to-cap ratio will rise to between 83% and 111%. This debt-to-cap ratio is most similar to those of the legacy airlines.

#### 4. Increased Prices for Customers

The proposed merger has the potential to increase prices for customers in two ways: 1) with the elimination of Spirit from the market, consumers would no longer have Spirit's low prices as an option; 2) with the elimination of Spirit from the market, consumers would no longer benefit from Spirit's downward pressure on other airline's prices.

#### a. Loss of Spirit's Prices as an Option for Consumers

**\*18**  As discussed above, cost-conscious travelers are the core of Spirit's target market, and many such travelers would not be able to fly with higher-priced fares. JetBlue plans to convert Spirit's planes to the JetBlue layout and charge JetBlue's higher average fares to its customers. The elimination of Spirit would harm cost-conscious travelers who rely on Spirit's low fares. Spirit has, since 2017, offered prices consistently lower than JetBlue and the legacy airlines.

#### b. Loss of Spirit's Discipline on Other Airline's Prices

As Spirit has grown over the years, it has posed an increasingly competitive threat to JetBlue and the Big Four airlines, to the benefit of Spirit passengers and other traveling consumers alike. Consumers have benefitted both directly from Spirit's low prices and indirectly because Spirit's prices place downward pressure on JetBlue's and other airlines' prices. If the proposed acquisition proceeds, these consumer benefits would not only disappear from Spirit's existing routes, but also not reach consumers in markets in which Spirit planned to enter in the foreseeable future.

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

First, consumers will lose the benefit they had received from head-to-head competition between Spirit and JetBlue, as JetBlue's prices would rise after Spirit's removal from the market. Many of Spirit and JetBlue's overlap routes are to/from Los Angeles, New York City, San Juan, and Boston, given Spirit's recent growth in these cities. JetBlue and Spirit's overlaps have also increased significantly on routes touching Florida and Latin America. By October 2019, Spirit's growing competitive threat to JetBlue in markets between New York City and the Caribbean was also "raising a red flag" within the JetBlue Pricing Team.[36] Tr. 11/1/2023 (David Clark/JetBlue) 134:15-135:16. The aggressive response of legacy airlines to Spirit's low fares compounds the pressure that Spirit puts on JetBlue. For example, in 2019, low ULCC fares led United Airlines to take "aggressive" action in lowering its fares to protect its markets, such as by filing "extraordinarily low" $29 walkup fares from Newark to Santo Domingo.[37] Tr. Ex. 644 at 461; Tr. 11/1/2023 (David Clark/JetBlue) 135:22-136:1. Delta, in turn, matched those $29 fares from JFK airport, and JetBlue, which served the market from JFK, matched in turn and was "unsuccessful[ ]" in raising those low fares. Tr. Ex. 644 at 461; Tr. 11/1/2023 (David Clark/JetBlue) 136:10-20. As a result, JetBlue's walkup fares were more than $100 lower than before Spirit entered the market. Overall, JetBlue has found that, when Spirit enters a market in which JetBlue operates, JetBlue's fares and revenue decrease by more than 10%. When JetBlue lowers its fares to match Spirit's, Spirit generally lowers its fares even further.

Spirit's presence -- the Spirit Effect -- also lowers other airline's fares. The record contains numerous examples of Spirit undercutting and putting other pressure legacy airlines' and other LCC's fares. When Spirit enters a market, its rivals reduce their prices by between 7% and 11%, on average.[38]

### G. The Experts

**\*19** Each party presented the testimony of two experts: for the Government, Dr. Gautam Gowrisankaran ("Dr. Gowrisankaran") and Dr. Tasneem Chipty ("Dr. Chipty"); and for the Defendant Airlines, Dr. Nicholas Hill ("Dr. Hill") and Mr. Richard Scheff ("Mr. Scheff"). Throughout the trial, the Court carefully observed and assessed each witness, considering their credibility generally and as to the specific matters about which they testified. The Court's in-person evaluation of these witnesses, as well as an evaluation of

the substance of their testimony and reports, influences the weight accorded to each.

### 1. Dr. Gowrisankaran

The Government's primary expert was Dr. Gowrisankaran, a Professor of Economics at Columbia University. He received his Ph.D. in Economics from Yale University, where his dissertation was titled "A Dynamic Analysis of Mergers," and specializes in industrial organization, health and education, applied econometrics,[39] and energy economics. Dr. Gowrisankaran's preparation included an examination of ordinary course documents produced by the Defendant Airlines, industry participants' testimony, and his own analyses. Dr. Gowrisankaran provided the market definition on which the Government bases its case. He also analyzed the competitive effects of the merger, including by identifying the "harmed routes" upon which the Government relies for anticompetitive effects, though he did not take into account the effects of any divestitures proposed by the Defendant Airlines.[40]

Dr. Gowrisankaran's testimony was thoughtful and credible, and he was a well-credentialed witness who candidly responded to questions from the Government, the Defendant Airlines, and the Court. He was also methodical and articulate in explaining his analysis and the conclusions that he drew from it. The Defendant Airlines raise some limitations that exist in his analysis and their objections are correct; Dr. Gowrisankaran failed to 1) group airports from the same metropolitan area for the purpose of comparing routes, 2) update his analysis to reflect changes in Spirit's plans since 2022, 3) evaluate whether other carriers, particularly ULCCs, would, post-merger, enter any routes he identified as harmed, and 4) compare prices of the same fare class against each other (for instance, comparing specifically an unbundled "Blue Basic" fare with a ULCC fare). Overall, however, Dr. Gowrisankaran's testimony was useful to the Court in understanding the effects of the proposed merger; the Court finds that his opinions are entitled to significant weight.

### 2. Dr. Chipty

Dr. Tasneem Chipty is the founder and managing principal of Chipty Economics, where she provides expertise in industrial organization, antitrust economics, and econometrics. Dr.

Chipty received her Ph.D. in Economics from the Massachusetts Institute of Technology. Dr. Chipty examined the Defendant Airlines' current networks and standalone growth plans, the current networks and standalone growth plans of the divestiture buyers and other ULCCs, JetBlue's combined network plan for the firm post-merger, JetBlue's deal modeling, and the deposition testimony of multiple industry participants. Dr. Chipty analyzed whether entry of other airlines into the harmed routes would be likely, timely, and sufficient to offset the anticipated anticompetitive effects of the merger. She also analyzed whether JetBlue's post-merger plans for the management of the combined company's assets suggest that the merger will produce efficiencies that might enhance competition and create benefits for consumers, thereby reversing the merger's potential harms.

**\*20**  Though Dr. Chipty is also well-credentialed, her testimony was less thorough or methodical than that of Dr. Gowrisankaran, and her credibility suffered accordingly. This was in large part due to the questions the Government asked her to answer. Much of Dr. Chipty's testimony was a recital of evidence already in the record and was thus notably lacking analysis. It would be a stretch to refer to such testimony as "expert." Instead, her analysis was, in large part, a collection of inferences derived from the evidence assembled for presentation to the Court, oftentimes from JetBlue's ordinary-course documents. Dr. Chipty's calculations regarding the growth other airlines would need to exhibit in order to backfill the removal of Spirit from the market is, however, most useful to the Court and shall be given its due weight. The rest of her testimony lacks evidentiary value, and therefore is entitled to no weight.

### 3. Dr. Hill

Dr. Nicholas Hill is a partner with Bates White Economic Consulting, where he provides expertise in antitrust issues. He received his Ph.D. in Economics from Johns Hopkins University. Dr. Hill has testified on behalf of the Department of Justice in multiple antitrust cases, most recently in 2022.[41]  Dr. Hill was the Defendant Airlines' expert economist, and his testimony mostly responded to that of Dr. Gowrisankaran. Dr. Hill's charge was to evaluate the likely competitive effects of the merger, and he examined data and documents produced through discovery, legal filings, deposition transcripts, industry research, and other publicly available data.

Like Dr. Gowrisankaran, Dr. Hill was a well-credentialed, credible, and thoughtful witness, who thoroughly and candidly answered every question posed to him by the Government, the Defendant Airlines, and the Court. Perhaps unsurprisingly, unlike Dr. Gowrisankaran, Dr. Hill's analysis focused on the national market,[42] demonstrating how the proposed acquisition would allow JetBlue to increase competition with the Big Four, providing benefits to consumers. Unlike Dr. Chipty, Dr. Hill also found through his analysis that entry by other carriers is likely to ameliorate any anticompetitive effects, should they occur. The Government argues that Dr. Hill's opinions are flawed, both because his model ignores nonstop overlap markets in which JetBlue and Spirit currently compete and because Dr. Hill did not do any significant quantitative analysis to determine the ability of ULCCs to fulfill their standalone network plans while also replacing the competition that would be lost post-merger. Dr. Hill also did not undertake any empirical analysis to understand how much consumers value any of the individual JetBlue product amenities (legroom, Wi-Fi, refreshments, seatback screens, etc.), and his model assumed that JetBlue would continue to fly its new, post-merger acquired aircraft on the same routes Spirit flies today. The Government is correct that these limitations on Dr. Hill's data exist; he acknowledged them and was honest in his testimony about the reasons for them. Overall, however, Dr. Hill's testimony and report were useful to the Court in understanding the effects of this merger; the Court finds that his opinions are entitled to significant weight.

### 4. Mr. Scheff

**\*21**  Finally, the Defendant Airlines' second expert was Mr. Richard Scheff. Mr. Scheff is the Managing Director at Airline Strategy Group, Inc., a strategic global airline consulting firm. Mr. Scheff has more than thirty years of experience in the airline industry, working for both domestic and international airlines. His expertise is in network planning, fleet planning, demand forecasting, and operations research. Mr. Scheff holds a M.S. in Industrial Engineering from the Georgia Institute of Technology. In preparation, Mr. Scheff reviewed both publicly available and proprietary airline data, deposition testimony, discovery materials, and financial filings from both JetBlue and Spirit. Mr. Scheff was retained to evaluate whether the combined, post-merger airline is likely to have a higher utilization than JetBlue or Spirit has on a standalone basis, and if so, to what extent will any such increased utilization affect the output

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

of the combined airline, as measured by seats available for departure.

Like Dr. Chipty, much of Mr. Scheff's analysis and testimony lacked credibility or usefulness for the Court. Faced with the decrease in seats guaranteed by the proposed reconfiguration of Spirit aircraft, Mr. Scheff attempted to calculate two utilization changes that he speculated the combined airline would make, both of which might offset the harm from the seat loss. First, Mr. Scheff calculated how increasing Spirit's flying patterns to match those of JetBlue's would increase utilization. Second, Mr. Scheff calculated how using aircraft more efficiently, through "pooling", would increase utilization. Mr. Scheff did not rely on any evidence that JetBlue plans to implement either utilization changes (though, as stated previously, increasing Spirit's flying patterns to match those of JetBlue's current fleet is more likely than others). Mr. Scheff also suggested that the combined airline would increase utilization by: 1) increasing route length for larger aircraft, 2) reducing its number of operational spares, [43] and 3) increasing redeye service. Again, however, Mr. Scheff did not rely on any support for these claims. Although Mr. Scheff's analysis provides the Court with a potential plan for JetBlue post-merger, because Mr. Scheff cannot cite any evidence to support the likelihood of such plans, his testimony lacks credibility, and therefore must be given no weight.

### H. The Litigation

The Department of Justice, joined by the Plaintiff States, filed this lawsuit on March 7, 2023. See Compl., ECF No. 1. An amended complaint followed on March 31, 2023, adding more Plaintiff States. See Am. Compl., ECF No. 69. The amended complaint alleges that the proposed merger violates Section 15 of the Clayton Act, as amended, 15 U.S.C. § 25, and requests that the Court restrain the Defendant Airlines from consummating the merger. [44] Less than a week later, the parties submitted a joint proposal for case management, see Joint Mot. Entry Case Management Order, ECF No. 77, which the Court adopted in its entirety, see Scheduling Order, ECF No. 79. Trial was originally scheduled to begin on October 16, 2023. [45]

**\*22** Trial commenced on October 31, 2023 and ran for seventeen days. Twenty-two witnesses appeared and testified at trial. The list included five executives of Spirit, eight

executives from JetBlue, executives from Avelo, Frontier, Allegiant, and United, as well as the Chief Executive Officer of the BCAD and the expert witnesses. The parties supplemented their live testimony with excerpts from depositions from a number of additional witnesses. Closing arguments occurred on December 5, 2023, and the parties submitted post-trial submissions on December 13, 2023.

### III. CONCLUSIONS OF LAW [46]

#### A. The Clayton Act

**[1]** Section 7 of the Clayton Act prohibits mergers and acquisitions "where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition." 15 U.S.C. § 18. The "fundamental purpose" of Section 7 is "to arrest the trend toward concentration, the tendency to monopoly -, before the consumer's alternatives disappear[ ] through merger ...." United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 367, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Congress therefore "sought to assure ... the courts the power to brake this force at its outset and before it gathered momentum." Brown Shoe Co. v. United States, 370 U.S. 294, 317–18, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

**[2]** **[3]** "Congress used the words 'may be substantially to lessen competition' ... to indicate that its concern was with probabilities, not certainties." F.T.C. v. Hackensack Meridian Health, Inc., 30 F.4th 160, 166 (3rd Cir. 2022) (quoting Brown Shoe Co., 370 U.S. at 323, 82 S.Ct. 1502). "Section 7 does not require proof that a merger or other acquisition has caused higher prices in the affected market. All that is necessary is that the merger create an appreciable danger of such consequences in the future." Saint Alphonsus Med. Ctr.-Nampa Inc., 778 F.3d at 788 (quoting Hospital Corp. of Am. v. F.T.C., 807 F.2d 1381, 1389 (7th Cir. 1986)). Section 7's probabilistic standard "creates a relatively expansive definition of antitrust liability" and "subjects mergers to searching scrutiny." California v. American Stores Co., 495 U.S. 271, 284-285, 110 S.Ct. 1853, 109 L.Ed.2d 240 (1990). Courts, however, must judge the likelihood of anticompetitive effects in the context of the "structure, history, and probable future" of the particular markets that the merger will affect. United States v. General Dynamics Corp., 415 U.S. 486, 498, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974) (quoting Brown Shoe Co., 370 U.S. 294, 322 n.38, 82 S.Ct. 1502 (1962)).

## B. Mode of Analysis

In United States v. Baker Hughes, Inc., 908 F.2d 981, 982-83 (D.C. Cir. 1990), the Court of Appeals for the District of Columbia Circuit established a three-part, burden-shifting framework for evaluating antitrust cases under Section 7 of the Clayton Act. As one court recently described the framework:

> Typically the [plaintiff] establishes a prima facie case by showing that the transaction in question will significantly increase market concentration, thereby creating a presumption that the transaction is likely to substantially lessen competition. Once the [plaintiff] establishes the prima facie case, the [defendant] may rebut it by producing evidence to cast doubt on the accuracy of the [plaintiff]'s evidence as predictive of future anti-competitive effects. Finally, if the [defendant] successfully rebuts the prima facie case, the burden of production shifts back to the [plaintiff] and merges with the ultimate burden of persuasion, which is incumbent on the [plaintiff] at all times.

**\*23** New York v. Deutsche Telekom AG, 439 F. Supp. 3d 179, 198–99 (S.D.N.Y. 2020) (quoting Chicago Bridge & Iron Co. N.V. v. F.T.C., 534 F.3d 410, 423 (5th Cir. 2008) (internal citations omitted)). [47]

[4]  [5]  [6]  [7]  [8]  "To establish a prima facie case, the Government must (1) propose the proper relevant market and (2) show that the effect of the merger in that market is likely to be anticompetitive." Fed. Trade Comm'n v. Penn State Hershey Med. Ctr., 838 F.3d 327, 337-338 (3d Cir. 2016). If the Government establishes a prima facie case, the burden of production falls to the Defendant Airlines to rebut that case, by showing "either that the combination would not have anticompetitive effects or that the anticompetitive effects of the merger will be offset by extraordinary efficiencies

resulting from the merger." Id. at 347 (citing F.T.C. v. H.J. Heinz Co., 246 F.3d 708, 718 (D.C. Cir. 2001)). The burden of production on the Defendant Airlines at this step is "relatively low." United States v. Anthem, Inc., 236 F. Supp. 3d 171, 213 (D.D.C. 2017), aff'd, 855 F.3d 345 (D.C. Cir. 2017). If the Defendant Airlines successfully rebut the prima facie case, the burden shifts back to the Government in the third step "and merges with the ultimate burden of persuasion, which remains with the government at all times." United States v. Bertelsmann SE & Co. KGaA, 646 F. Supp. 3d 1, 23 (D.D.C. 2022) (quoting Baker Hughes, 908 F.2d at 983). "The [G]overnment has the ultimate burden of proving a Section 7 violation by a preponderance of the evidence." See, e.g., United States v. Aetna Inc., 240 F. Supp. 3d 1, 19 (D.D.C. 2017) (quoting United States v. H & R Block, Inc., 833 F. Supp. 2d 36, 49 (D.D.C. 2011)). A " 'preponderance of the evidence' means 'more likely true than not.' " Diaz-Alarcon v. Flandez-Marcel, 944 F.3d 303, 305 n.2 (1st Cir. 2019) (quoting United States v. Marino, 833 F.3d 1, 8 (1st Cir. 2016)). An acquisition violates Section 7 if it the result "may be substantially to lessen competition." 15 U.S.C. § 18. The Government's ultimate burden, therefore, is to prove that a merger or acquisition more likely than not "may be substantially to lessen competition." Id.; see Illumina, Inc., 88 F.4th at 1059.

## C. Market Definition

### 1. Legal Framework

**\*24** [9]  [10]  Relevant markets are the "area of effective competition" within which competition may be lessened. Brown Shoe, 370 U.S. at 324, 82 S.Ct. 1502. They are defined "by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country')." Id. (citation and quotation omitted). Defining relevant markets helps ascertain where "the effect of the merger on competition will be direct and immediate." Philadelphia Nat'l Bank, 374 U.S. at 357, 83 S.Ct. 1715; see Vazquez-Ramos v. Triple-S Salud, Inc., 55 F.4th 286, 296 (1st Cir. 2022) ("The relevant market is 'the area of effective competition....' ") (quoting Ohio v. American Express Co., 585 U.S. ——, 138 S. Ct. 2274, 2285, 201 L.Ed.2d 678 (2018)).

[11]  [12]  [13]  Courts should apply "a pragmatic, factual approach to definition of the relevant market and not a formal, legalistic one." Brown Shoe, 370 U.S. at 336, 82 S.Ct. 1502. Market definition is a factual determination that

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.                    28

must consider the "commercial realities" of the marketplace. Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 482, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (quoting United States v. Grinnell, 384 U.S. 563, 572, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). Markets may be defined from "the perspective of consumers" because "[i]t is the consumer's options and the consumer's choices among them on which relevant market analysis depends." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 855 (1st Cir. 2016); see also United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) ("In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers ....").

 [14]  These consumer-centric principles apply specifically in defining the relevant geographic market. A relevant geographic market "consists of 'the geographic area in which the defendant faces competition and to which consumers can practically turn for alternative sources of the product.' " Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 196 (1st Cir. 1996) (quoting Baxley-DeLamar v. American Cemetery Assn., 938 F.2d 846, 850 (8th Cir. 1991)); accord Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961) (geographic market is the "area in which the seller operates, and to which the purchaser can practicably turn for supplies"). Therefore, if customers "would not consider [a firm] a viable alternative" because it operates exclusively outside the geographic area to which the customers can practically turn for the relevant product, then that firm is outside the relevant geographic market. Home Placement Servs., Inc. v. Providence J. Co., 682 F.2d 274, 280 (1st Cir. 1982).

Of course, in defining the relevant market, the Court may and should also consider the competitive effects on industry participants -- it would be "erroneous" to "defin[e] a market on the basis of demand considerations alone." Rebel Oil Co. v. Atlantic Richfield Co., 51 F.3d 1421, 1436 (9th Cir. 1995); see also American Express Co., 138 S. Ct. at 2285 (explaining in the Sherman Act context that the "area of effective competition" is typically the "arena within which significant substitution in consumption or production occurs" (emphasis added)); see also United States Healthcare, Inc. v. Healthsource, Inc., 986 F.2d 589, 599 (1st Cir. 1993) ("Usage patterns, customer surveys, actual profit levels, comparison of features, ease of entry, and many other facts are pertinent in answering the question [of market definition].").

### 2. Defining the Market

 **\*25**  Although the parties here agree that the relevant service market for assessing the competitive effects of the proposed acquisition is scheduled air passenger service, the parties dispute the appropriate geographic scope of the market: the Government argues that every route on which Spirit or JetBlue currently flies (or intends to fly absent the merger) is, in isolation, a relevant market; the Defendant Airlines advocate for a national geographic market. Both parties make a compelling case.

As previously explained, the airline industry is incredibly dynamic, with mobile assets (aircraft, pilots, crews, etc.) and constant exit and entry of new routes by airlines. Participants in the airline industry also compete vigorously at the national level: among other things, routes and flight frequencies change constantly in accordance with nationally planned route networks, airlines choose their business model and on-board product offerings at the national level, and airlines compete nationwide through valuable customer loyalty programs. An airline's relevance and value to consumers often hinges not just on the price and specific route, but also its nationwide loyalty program, airport presence, national and international route network, and product offerings.

Airlines also make many of their decisions on the route-by-route level, themselves oftentimes referring to an O&D pair as a "market." Airlines consistently plan pricing and network planning at the route level, and decisions to enter or exit a route are made with the specific, local customers in mind. The Defendant Airlines concede that airlines compete at the route level and that they track other airlines' actions on a route-by-route level.

 [15]  Origin-and-destination pairs are the geographic areas within which "consumers can practically turn for alternative sources of" scheduled air passenger service. Coastal Fuels, 79 F.3d at 198 (quoting Baxley-DeLamar, 938 F.2d at 850). The purpose of scheduled air passenger service is to travel from one place to another. For consumers originating in one metropolitan area and purchasing scheduled air passenger service to travel to another metropolitan area, such consumers "would not consider it a viable alternative" to purchase scheduled air passenger service between a different origin-and-destination pair. Home Placement Servs., 682 F.2d at 280.

WCAS219

Historically, O&D pairs have also been considered relevant geographic markets for evaluating competition between airlines in the market for scheduled air passenger service. See United States v. American Airlines Grp. Inc., —— F.Supp.3d at ——, 2023 WL 3560430, at *36 ("Here the parties agree, and the Court finds, that the relevant product market is 'scheduled air passenger service,' and the relevant geographic markets are O&Ds 'in which Defendants compete or would likely compete absent the NEA.' "); see also Spirit Airlines, Inc. v. Northwest Airlines, Inc., 431 F.3d 917, 933 (6th Cir. 2005) (accepting Spirit's position that routes are relevant geographic markets: "It is at the route level, after all, that airlines actually compete with one another.") (internal citation omitted); Fjord v. AMR Corp., 502 B.R. 23, 40 (Bankr. S.D.N.Y. 2013) (noting that both parties accepted that "city-pairs are the properly defined market," and rejecting a national market because "[a] product market contemplates products that are viable substitutes for each other" and plaintiffs had not explained how "a flight from Los Angeles to New York would compete with a flight from Detroit to Seattle"); Malaney v. UAL Corp., No. 3:10-CV-02858-RS, 2010 WL 3790296, at *12 (N.D. Cal. Sept. 27, 2010), aff'd, 434 F. App'x 620 (9th Cir. 2011) (finding city-pair markets persuasive and rejecting national market because "plaintiffs have not shown how, for example, a flight from San Francisco to Newark would compete with a flight from Seattle to Miami"); In re Nw. Airlines Corp. Antitrust Litig., 197 F. Supp. 2d 908, 915 (E.D. Mich. 2002) ("[C]ity-pairs seem to comport with the ordinary and natural understanding of consumers as they contemplate the purchase of this industry's product—namely, such a consumer typically would survey the options for travel between the desired origin and destination cities."). [48]

**\*26**  [16] This Court, therefore, defines the relevant geographic market in this case as each individual O&D pair, otherwise known as a route, on which the Defendant Airlines currently compete. In doing so, the Court will continue to consider the impact of the national geographic market and those factors relevant to it.

In ruling the relevant market as the individual O&D pairs upon which the Defendant Airlines compete, the Court dismisses as immaterial, for the purposes of the Government's prima facie case, the "Spirit-entry routes" that the Government has put forth. Spirit is not currently present on these routes and instead has only considered entering these routes absent the merger. Neither of the merging Defendant Airlines currently compete on these routes, and therefore they are not relevant under Section 7. [49]  See, e.g., Philadelphia

Nat'l Bank, 374 U.S. at 357, 83 S.Ct. 1715 ("The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate.").

The Court accepts as relevant markets the following routes: nonstop overlap routes that both JetBlue and Spirit currently fly (both those identified by the Government as "presumptively illegal" and those identified by the Government as "econometric"); "connect routes", which are the routes on which both Spirit and JetBlue fly connecting service; "mixed routes", which are the routes on which one of the Defendant Airlines flies direct service and the other provides connective service, and "Spirit-only routes", which are routes that Spirit currently flies, but JetBlue does not.

### D. Prima Facie Case

#### 1. Presumption of Illegality

The Government argues that the proposed acquisition at bar is "presumptively illegal" because it results in "a merger which produces a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market." Philadelphia Nat'l Bank, 374 U.S. at 363, 83 S.Ct. 1715; see also United States v. Continental Can Co., 378 U.S. 441, 458, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964) ("Where a merger is of such a size as to be inherently suspect, elaborate proof of market structure, market behavior and probable anticompetitive effects may be dispensed with in view of [Section] 7's design to prevent undue concentration."). As previously stated, see supra Section II.F.2., the proposed acquisition would result in a combined firm market share of either over 2,500 HHI, or an increase in HHI of over 200, in multiple relevant markets. An HHI over 2,500, or an increase in HHI of over 200, is considered "highly concentrated" and has been presumed illegal. Aetna, 240 F. Supp. 3d at 42; see also ProMedica Health System, Inc. v. F.T.C., 749 F.3d 559, 568 (6th Cir. 2014) (noting that a 1,078-point increase to 4,391 and a 1,323-point increase to 6,854 "blew through [the presumption] barriers in spectacular fashion"); Heinz, 246 F.3d at 716–17 (510-point increase from 4,775 created a presumption of illegality "by a wide margin"); F.T.C. v. Sysco Corp., 113 F. Supp. 3d 1, 61 (D.D.C. 2015) (economic and other evidence "has shown that a merged Sysco-USF will significantly increase concentrations" and that the Government "therefore

has made its prima facie case and established a rebuttable presumption that the merger will lessen competition in the local markets"); H & R Block, 833 F. Supp. 2d at 71–72 (enjoining a transaction that would have given the combined firm only a 28.4 percent market share because the transaction would have resulted in an increase in the HHI of more than 200 and a post-acquisition HHI that would have exceeded 2,500).

**\*27** **[17]** The Government identifies 183 relevant routes, each of which is its own relevant market, in which this presumption applies.[50] The Court finds that this presumption, spurred by the Department of Justice's own Horizontal Merger Guidelines, does not, on its own, sustain a prima facie case. "[P]resumptions are not self-executing." Deutsche Telekom, 439 F. Supp. 3d at 206. The Court, therefore, moves on to the direct evidence of anticompetitive effects presented by the Government. See Saint Alphonsus, 778 F.3d at 785-86 ("[P]laintiffs in [Section] 7 cases generally present other evidence as part of their prima facie case.").

### 2. Direct Evidence of Anticompetitive Effects

#### a. Elimination of Head-to-Head Competition Between JetBlue and Spirit

**[18]** **[19]** **[20]** First, the Government has clearly demonstrated that the merger will cause unilateral anticompetitive effects, as JetBlue and Spirit currently compete head-to-head on multiple routes. "The extent of direct competition between the products sold by the merging parties is central to the evaluation of unilateral effects." ProMedica, 749 F.3d at 569 (quoting Horizontal Merger Guidelines § 6.1).[51] Acquisitions "that eliminate head-to-head competition between close competitors often result in a lessening of competition." F.T.C. v. Staples, Inc., 190 F. Supp. 3d 100, 131 (D.D.C. 2016) ("Staples II") (citing Horizontal Merger Guidelines § 6); see also, e.g., Heinz, 246 F.3d at 716–17 (ruling that the Government's prima facie case was "bolstered by the indisputable fact that the merger will eliminate competition between the two merging parties"); H & R Block, 833 F. Supp. 2d at 81–82 (noting the likelihood of unilateral anticompetitive effects given evidence of H & R Block lowering its prices in response to direct competition from TaxACT, including H & R Block documents that "appear to acknowledge that TaxACT has put downward pressure on HRB's pricing ability").

**[21]** **[22]** If the collaborating parties are particularly close competitors, the unilateral effects are especially acute. See Bertelsmann, 646 F. Supp. 3d at 39 ("The analysis of unilateral effects focuses on how closely the merging firms currently compete, in order to extrapolate the effects of eliminating that competition."); F.T.C. v. Libbey, 211 F. Supp. 2d 34, 47-48 (D.D.C. 2002) (discussing evidence of head-to-head competition between the merging parties, including taking customers from each other); F.T.C. v. Swedish Match, 131 F. Supp. 2d 151, 169 (D.D.C. 2000) ("[T]he weight of the evidence demonstrates that a unilateral price increase by Swedish Match is likely after the acquisition because it will eliminate one of Swedish Match's primary direct competitors."). The parties need not be each other's closest competitors to raise a threat to competition; being close competitors is enough for an acquisition to result in upward pricing pressure. Anthem, 236 F. Supp. 3d at 216 ("Anthem's insistence that United, not Cigna, is its 'closest' competitor, is beside the point. The acquired firm need not be the other's closest competitor to have an anticompetitive effect; the merging parties only need to be close competitors.").

**\*28** The loss of Spirit's influence on JetBlue as a head-to-head competitor would likely result in less competition to both discipline the prices and spur the innovation of JetBlue as a smaller, maverick -- more competitive -- market participant.

#### b. Elimination of Spirit's Competition with Other Airlines

**[23]** **[24]** Along with Spirit's influence on JetBlue as a competitor in the scheduled airline passenger market, the proposed acquisition would eliminate Spirit as a competitor to all other airlines in the market, resulting in less pressure on all other airlines to compete. Spirit, as the first domestic ULCC, is a uniquely disruptive competitor that consistently puts pressure on other airlines, both to lower their prices and to innovate (whether through the introduction of basic economy fares or other cost-saving measures). "Anticompetitive effects are more likely still when 'the merger would result in the elimination of a particularly aggressive competitor in a highly concentrated market.' " Aetna, 240 F. Supp. 3d at 43, 74 (quoting F.T.C. v. Staples, Inc., 970 F. Supp. 1066, 1083 (D.D.C. 1997) ("Staples I")) (enjoining merger in part because Aetna was a "particularly aggressive" Medicare Advantage competitor); see also United States v. Alcoa, 377 U.S. 271, 281, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964)

("The record shows indeed that Rome was an aggressive competitor.... Preservation of Rome, rather than its absorption by one of the giants, will keep it 'as an important competitive factor' .... Rome seems to us the prototype of the small independent that Congress aimed to preserve by [Section] 7."); American Airlines, ---- F.Supp.3d at ----, ----, 2023 WL 3560430, at *34, 36 (finding that anticompetitive effects of joint venture between direct competitors JetBlue and American Airlines were amplified because "JetBlue has sacrificed a degree of its independence and weakened its status as an important 'maverick' competitor in the [highly concentrated airlines] industry").

[25]  The loss of Spirit's innovation, in particular, would be a loss for all consumers in the national scheduled airline passenger market. A reduction in product innovation resulting from an acquisition is a cognizable harm to competition. See, e.g., Hackensack, 30 F.4th at 172 (recognizing that anticompetitive effects can include reduced product innovation); Viamedia, Inc. v. Comcast Corp., 951 F.3d 429, 475 (7th Cir. 2020) (same); Anthem, 855 F.3d at 361 (a "threat to innovation is anticompetitive in its own right").

[26]  The key question in determining whether a transaction may substantially lessen competition by dampening the firm's disruptive force is whether the firm "play[s] a special role in th[e] market that constrains prices." H & R Block, 833 F. Supp. 2d at 80; see also Hackensack, 30 F.4th at 172 (recognizing that anticompetitive effects can include reduced product innovation). In eliminating Spirit from the marketplace, the proposed transaction would, by definition, dampen Spirit's disruptive force. As Spirit plays a special role in the market, both to constrain prices and spur innovation, the proposed transaction would substantially lessen competition among other, non-party airlines.

#### c. Elimination of Spirit's as a Choice for Consumers

[27]  A merger's elimination of a product option that consumers value is a cognizable harm to competition. See, e.g., Anthem, 855 F.3d at 366 ("[I]f merging firms would withdraw a product that a significant number of customers strongly prefer to those products that would remain available, this can constitute a harm to customers over and above any effects on the price or quality of any given product.") (internal citations omitted) (quoting Horizontal Merger Guidelines § 6.4); see also F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986)

(ruling that consumers can be harmed by an agreement to "withhold from customers a particular service that they desire" since it "limit[s] consumer choice by impeding the ordinary give and take of the market place") (internal citations omitted); MacDermid Printing Sols. LLC v. Cortron Corp., 833 F.3d 172, 183 (2d Cir. 2016) ("We have suggested that actions that reduce consumer choice are inherently anticompetitive."); Realcomp II, Ltd. v. F.T.C., 635 F.3d 815, 829–31 (6th Cir. 2011) (affirming finding that "restrictions on consumer choice," specifically "restricting consumer access to discount listings," is "likely to have an adverse impact on competition"); United States v. Dentsply Int'l, Inc., 399 F.3d 181, 194 (3d Cir. 2005); Glen Holly Ent., Inc. v. Tektronix Inc., 352 F.3d 367, 374 (9th Cir. 2003).

*29  [28]  The Government has demonstrated that consumers value Spirit flights as a unique, economical product option. The removal of Spirit as an option for consumers, therefore, would constitute a cognizable harm.

### 3. The Government Has Established a Prima Facie Case

The increased concentration that would occur in relevant markets if proposed acquisition were to succeed, as well as the other anticompetitive effects demonstrated by the Government -- each independently sufficient -- establishes a prima facie case of harm under Section 7.

### E. The Defendant Airlines' Rebuttal

The "quantum of evidence defendants must produce to shift the burden back is relatively low." Anthem, 236 F. Supp. 3d at 213 ("[D]efendants are not required to 'clearly disprove anticompetitive effect,' but rather to make 'a showing.' ") (citing Baker Hughes, 908 F.2d at 991). The Defendant Airlines' burden is necessarily low because "[i]f the burden of production imposed on a defendant is unduly onerous, the distinction between that burden and the ultimate burden of persuasion -- always an elusive distinction in practice -- disintegrates completely." Baker Hughes, 908 F.2d at 991. "A defendant required to produce evidence 'clearly' disproving future anticompetitive effects must essentially persuade the trier of fact on the ultimate issue in the case—whether a transaction is likely to lessen competition substantially. Absent express instructions to the contrary, [the Court is] loath to depart from settled principles and impose such a heavy burden." Id.

WCAS222

**[29]** **[30]** Though a defendant's burden is low, the stronger a plaintiff's prima facie case, the heavier the rebuttal burden becomes. In Baker Hughes, the court reasoned that the defendants' rebuttal bar was relatively low in that instance because the plaintiff in that case relied only on a structural presumption, Baker Hughes, 908 F.2d at 983, but that reasoning "does not control" when a plaintiff, like the Government here, bolsters its prima facie case by taking on the defendants' rebuttal arguments in its prima facie case. Olin Corp. v. F.T.C., 986 F.2d 1295, 1305 (9th Cir. 1993). Rather, "if a Government's prima facie case anticipates and addresses the respondent's rebuttal evidence, ... the prima facie case is very compelling and significantly strengthened," and "the [defendants'] burden of production on rebuttal is also heightened." Chicago Bridge, 534 F.3d at 426; see also Hackensack, 30 F.4th at 173 ("[D]irect evidence strengthens the probability that the merger will likely lead to anticompetitive effects and, thus, the [plaintiff's] prima facie case."); ProMedica, 749 F.3d at 571; Heinz, 246 F.3d at 717 (evidence of head-to-head competition "bolster[s]" plaintiff's prima facie case).

**[31]** Defendants may meet their burden to rebut the Government's prima facie case either by "affirmatively showing why a given transaction is unlikely to substantially lessen competition, or by discrediting the data underlying the initial presumption in the government's favor." Baker Hughes, 908 F.2d at 991. The Defendant Airlines here attempt to do both and have also provided other evidence regarding the potential pro-competitive effects of the proposed acquisition.

### 1. Ease of Entry

**\*30** **[32]** **[33]** The Defendant Airlines first point to the ease of entry by potential competitors into the relevant markets that may be harmed, particularly other ULCCs (but also LCCs and legacy airlines with unbundled, basic economy offerings). Courts have long held that "entry by potential competitors may be considered in appraising whether a merger will 'substantially lessen competition.'" United States v. Waste Mgmt., Inc., 743 F.2d 976, 983 (2d Cir. 1984). "Whether entry is included as part of the market definition or in the ease of entry evaluation, practically, is of no consequence. In either event, the result is the same. The exercise of market power will be thwarted and collusive behavior will not be possible." F.T.C. v. Occidental Petroleum Corp., No. 86-900, 1986 WL 952, at \*8 (D.D.C. Apr. 29,

1986) (internal citation omitted); see also Deutsche Telekom, 439 F. Supp. 3d at 207 (courts may include "ease of entry into the market" in assessing the totality of the circumstances under Step Two of Baker Hughes).

**[34]** The Defendant Airlines need not show competitors will enter the relevant markets or precisely when the entry will occur. Baker Hughes, 908 F.2d at 983 ("The government argues that, as a matter of law, section 7 defendants can rebut a prima facie case only by a clear showing that entry into the market by competitors would be quick and effective.... We find no merit in the legal standard propounded by the government. It is devoid of support in the statute, in the case law, and in the government's own Merger Guidelines."); United States v. Syufy Enters., 903 F.2d 659, 667 n.13 (9th Cir. 1990) ("We cannot and should not speculate as to the details of a potential competitor's performance; we need only determine whether there are barriers to the entry of new faces into the market."). Instead, a defendant need only show that potential competitors could enter relevant markets, and that barriers to that entry are low.

**[35]** There is no requirement, therefore, to prove that entry would replace Spirit one-for-one, on each route that it may exit post-merger. The Government is correct that the Defendant Airlines must demonstrate that entry into the relevant markets would be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern." F.T.C. v. Sanford Health, 926 F. 3d 959, 965 (8th Cir. 2019) (quoting Horizontal Merger Guidelines § 9).[52] The Defendant Airlines, however, have done that successfully, as explained below.

### a. Timely Entry

**[36]** Entry is "timely" when it is "soon enough to offset anticompetitive effects of the merger." Sanford Health, 926 F.3d at 965; accord Energy Sols., 265 F. Supp. 3d at 443 ("Entry is timely only if it rapid enough to deter or render insignificant the anticompetitive effects of the merger") (citing Anthem, 236 F. Supp. 3d at 221–22). When entry will take a period of several years, it likely will not deter anticompetitive activity by the merged firm. See F.T.C. v. Elders Grain Inc., 868 F.2d 901, 905 (7th Cir. 1989) ("And since entry into the [dry corn] industry is slow -- it takes three to nine years to design, build, and start operating a new mill -- colluding sellers need not fear that any attempt to restrict output in order to drive up price would be promptly nullified

WCAS223

by new production."); Visa, 163 F. Supp. 2d at 342 ("The higher the barriers to entry, and the longer the lags before new entry, the less likely it is that potential entrants would be able to enter the market in a timely, likely, and sufficient scale to deter or counteract any anticompetitive restraints.").

**\*31** **[37]** The Government argues that here the appropriate timeframe to evaluate future competitive entry is as fast as possible, "possibly immediate," due to the dynamic characteristics of the airline industry. See Pls.' Proposed Conclusions of Law ¶ 82, ECF No. 448 ("In some markets, this may mean entry has to occur within weeks or month...."). Such a timeframe is both unrealistic and a walk-back from the Government's concession in its pretrial brief that entry is timely if it is "rapid enough to deter or render insignificant the anticompetitive effects of the merger within two to three years." Pls.' Pretrial Br. at 23, ECF No. 289. Two-to-three years is the timeline the Defendant Airlines propose. Considering the parties at one time agreed and based upon the record of this case -- including the unique circumstances of the post-pandemic's profound effects on the airline industry -- the Court rules that a two-to-three year timeframe of reference controls.

**[38]** Using two-to-three years as the timeframe in which to situate the Court's analysis, the Defendant Airlines demonstrated that entry would be "timely." In particular, entry barriers on routes are very low, aircraft are mobile, and entry onto routes, including the 35 routes on which the Government most focused, happens almost constantly. Not only that, but the Defendant Airlines adduced evidence directly from potential entrants who cogently testified that they had both the ability and incentive to enter profitable routes vacated by Spirit. [53] Two-to-three years after the merger would likely be just as JetBlue is making headway in converting Spirit aircraft, as the Defendant Airlines expect it to take 18 months simply to receive their FAA Combined Operating Certificate. Within that timeframe, the Court could reasonably expect some entry by other ULCCs, LCCs, and/or legacy airlines with unbundled, basic economy offerings into almost any of the markets vacated by Spirit.

### b. Likely Entry

**[39]** **[40]** Entry is "likely" only "if it would be profitable and feasible, accounting for all the attendant costs and difficulties." Energy Sols., 265 F. Supp. 3d at 443; accord Anthem, 236 F. Supp. 3d at 222 ("[E]ntry must be 'profitable,

accounting for the assets, capabilities, and capital needed and the risks involved, including the need for the entrant to incur costs that would not be recovered if the entrant later exits.' " (quoting Horizontal Merger Guidelines § 9.2)). "As a matter of economic reality, companies do not simply enter any market they can." Bazaarvoice, 2014 WL 203966, at \*71. The likelihood of entry depends on whether entrants "have the requisite ability" to enter, whether entry into the relevant markets is "within their strategy," and whether entry would be financially attractive to entrants, considering the risks of entry and the economic trade-offs of entering the relevant markets compared to using those same resources to enter other markets or pursue other business opportunities. Id.

**[41]** **[42]** The "mere threat of entry" is insufficient. Chicago Bridge, 534 F.3d at 430 n.10. Rather, "there is a high threshold applied to assertions as to whether a company can be considered a potential entrant," and Defendants "must provide evidence that the likelihood of entry reaches a threshold ranging from 'reasonable probability' to 'certainty.' " Id. To be "likely," entry must also be "tied to the relevant geography" because entry outside the relevant markets cannot "counteract a merger's anticompetitive effects." Anthem, 236 F. Supp. 3d at 222; see also Cardinal Health, 12 F. Supp. 2d at 56 ("The history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future.").

**\*32** **[43]** Again, the Defendant Airlines have successfully demonstrated that entry by other airlines is likely. As referenced previously, see footnote 50, supra, other ULCCs would likely consider previous Spirit routes immediately, as they are proven to be profitable. The proposed divestitures would particularly assist in this entry; of the five cities in which Spirit and JetBlue currently compete most heavily, either low barriers to entry and the already strong presence of other airlines (Orlando, San Juan) or divestitures (Miami/Fort Lauderdale, Boston, New York City) make such entry exceedingly likely. The evidence on entry is consistent with or stronger in this case than many of the other cases that have found entry sufficient to offset or deter any anticompetitive effects. In those cases, the courts found mergers did not violate Section 7 based on evidence of low barriers to entry and some evidence of historical entry that showed competitors were able to chase profit opportunities. See Baker Hughes, 908 F.2d at 988-89 (no Section 7 violation where some entry barriers existed but were not high enough to deter entry in the event of "supracompetitive pricing" given evidence of recent entry into the market and other competitors that could potentially enter); Syufy Enters., 903 F.2d at 665

WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(no Section 7 violation where there were low barriers to entry and significant expansion by remaining competitor); Waste Mgmt., 743 F.2d at 983 (no Section 7 violation where there were low barriers to entry, assets were mobile, and there was evidence of a competitor from a neighboring city entering the market).

While the Court is tasked with a forward-looking exercise, recent entry by competitors can undermine claims of competitive harms. See F.T.C. v. Qualcomm Inc., 969 F.3d 974, 996 (9th Cir. 2020). This "history of entry into the relevant market is a central factor in assessing the likelihood of entry in the future." Cardinal Health Inc., 12 F. Supp. 2d at 56. The Government's expert, Dr. Chipty, evaluated more than 4,700 entry events from just four ULCCs that she identified over the course of five-and-a-half years, from 2017 to 2022. Numerous fact witnesses also confirmed the large number of entries and exits that regularly occur in the airline industry as airlines chase profitable routes. Evidence in the record even reflects that other ULCCs have started already entering routes that Spirit exited this year. There is no evidence in the record that suggests that this recent history of entry will not continue in the future. The Court, therefore, finds that entry of other ULCCs is likely, particularly under the low burden of proof the Defendant Airlines currently face.

### c. Sufficient Entry

The closer question before the Court, therefore, is whether entry by other ULCCs, as well as LCCs and unbundled offerings from the legacy airlines, will be sufficient to replace Spirit. It is this issue that the Defendant Airlines have the most difficult time grappling, though the Court recognizes that at this, the second step of the Baker Hughes framework, a defendant's burden is low.

[44]  To be "sufficient," "entry has to be of a 'sufficient scale' adequate to constrain prices and break entry barriers." Chicago Bridge, 534 F.3d at 429; accord Penn State Hershey, 838 F.3d at 352 (entrants must "have the ability to constrain post-merger prices" in the relevant markets) (citation omitted); Energy Sols., 265 F. Supp. 3d at 443 ("[E]ntry is sufficient only if it can 'affect pricing' and 'scale to compete on the same playing field' as the merged firm.") (citation omitted); see also Wilh. Wilhelmsen, 341 F. Supp. 3d at 67 (entry is sufficient where "the entering competitors provide products that 'are close enough substitutes to the products offered by the merged firm to render a price increase

unprofitable' and there are limited constraints on entrants' 'competitive effectiveness,' such that one firm can replicate the scale and strength of a merging firm, or one or more firms can operate without competitive disadvantage") (cleaned up) (citing Horizontal Merger Guidelines §§ 9.1–9.3); Cardinal Health, 12 F. Supp. 2d at 58 (lack of another national wholesaler after the merger was "too great a competitive loss --which the regional wholesalers cannot sufficiently replace").

[45]  When assessing the sufficiency of entry, the relevant question is whether the potential entrants would enter and expand beyond their own existing growth plans to replace the void created by the elimination of the competitive intensity of the acquired firm. See F.T.C. v. Tronox, Ltd., 332 F. Supp. 3d 187, 214 (D.D.C. 2018) (rejecting argument regarding entry by foreign producers because proposed entrants would need to expand rapidly and, even if they did, would first fulfill existing and unmet domestic demand before entering the relevant (foreign) markets); see also Sysco Corp., 113 F. Supp. 3d at 80–81 (rejecting entry and expansion arguments because, despite evidence of competitors opening new facilities and having existing plans to grow, distributors had no plans to reposition or increase planned expansion to compete in the relevant markets that would be harmed by the merger).

*33  Entry must build upon, rather than supersede, potential entrants' existing business plans, because merger analysis considers the future world with and without the merger. Anthem, 236 F. Supp. 3d at 191 ("In essence, in a merger trial, the Court is making a prediction about the future."). Potential entrants' existing plans to compete are already baked into the world without the merger; therefore, those pre-existing growth or entry plans do not count toward filling the void created by the merger. If entrants try to enter relevant markets without growing beyond their pre-existing plans, they would need to abandon existing markets or markets where they would have otherwise entered or grown but-for the merger. That entry cannot offset anticompetitive effects of the merger because it would create new harms to competition. Sanford Health, 926 F.3d at 965 (to offset anticompetitive effects, entry must "counteract the competitive effects of concern"); cf. Hackensack, 30 F.4th at 176 (for efficiencies to rebut a prima facie case they must "not arise from anticompetitive reductions in output or service").

Sufficient entry is even more difficult to prove when, as here, the competitor being eliminated is a unique disruptor in the

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.   35

industry. Entry by members of an industry's existing oligopoly may not be sufficient to fill a competitive void left by the elimination of a disruptive competitor that had historically disciplined those larger firms. See Bertelsmann, 646 F. Supp. 3d at 53 (rejecting argument that expansion of existing "Big Five" would be sufficient due to lack of evidence that others in the Big Five "could or would compete more aggressively with the merged company"). Likewise, entry by competitors unable to replicate the competitive intensity of the acquired firm is insufficient. Staples II, 190 F. Supp. 3d at 133-37 (rejecting potential entrants who lack the existing ability to compete of the acquired firm); Cardinal Health, 12 F. Supp. 2d at 58 (regional competitors unlikely to replicate the competitive vigor of national competitors).

With the elimination of Spirit, it would fall to other ULCCs not only to backfill Spirit routes, but also both to continue their own growth and to succeed in disciplining other, larger airlines as to both price and innovation -- a tough row to hoe. As explained above, see supra Section II.A., airlines are facing obstacles to growth in the post-pandemic world. Aircraft manufacturing delays, ATC issues, pilot staffing issues, and engine problems are currently making airline growth more difficult. Frontier's CEO estimated that it would take Frontier at least five to eight years to replace Spirit and operate its existing schedule, and this estimate does not even include maintaining Frontier's pre-existing growth plan. See Supra n.8. These constraints on airline growth suggest that although other airlines are likely to enter markets left by Spirit and might even enter some within two to three years, such entry might not be sufficient to replace Spirit's current presence in the industry. The Court, therefore, must continue its analysis before it can determine whether the Defendant Airlines have successfully rebutted the Government's prima facie case.

### 2. The Government's Data

The Defendant Airlines attempt to undermine the Government's market share data as unreliable, arguing: 1) such route-level, static market share statistics ignore the particularities of the airline industry; and 2) such statistics ignore potential entrants. The Defendant Airlines are correct that the airline industry is dynamic, with routes shifting weekly, if not daily, and this dynamism does lead to robust, ever-changing competition on routes. Due to these constant changes, "it cannot be concluded from market statistics alone that an acquisition will lessen competition."

Occidental Petroleum, 1986 WL 952, at *7–8 (holding that ongoing "vigorous price competition" and ease of entry for potential competitors "lessen[ed] the probative value of the Commission's market concentration statistics").

*34  [46]  Ignoring potential entrants can also result in misleading market shares. "In the present case, a market definition artificially restricted to existing firms competing at one moment may yield market share statistics that are not an accurate proxy for market power when substantial potential competition able to respond quickly to price increases exists." Waste Mgmt., 743 F.2d at 982. The "appraisal of the impact of a proposed merger upon competition must take into account potential competition from firms not presently active in the relevant product and geographic markets." Id. The Government and its experts do not fully take that potential competition into account in their calculation of market shares on routes, and that calls into question the predictive value of current shares and undermines their reliance on the presumption. [54] Id.

### 3. Pro-competitive Effects of the Proposed Acquisition

Finally, the Defendant Airlines present various pieces of evidence to establish that the proposed acquisition is in fact pro-competitive. Again, they do this in two ways: 1) with evidence that Spirit is struggling financially, suggesting that the proposed acquisition would in fact protect consumers from facing a weakened, failing Spirit; and 2) with evidence that the combined firm would provide a stronger competitive counterpart to the Big Four, who control 80% of the market, than either JetBlue or Spirit could do on its own.

[47]  There are two legal doctrines relevant to an acquired firm's financial performance. The first is the "failing company" doctrine. This defense, as explained above, takes a "lesser of two evils approach." General Dynamics, 415 U.S. at 507, 94 S.Ct. 1186. The rationale is that, if a company is on the brink of failing, "the possible threat to competition resulting from an acquisition is deemed preferable to the adverse impact on competition and other losses if the company goes out of business." Id.; accord Energy Sols., Inc., 265 F. Supp. 3d at 444. Numerous Spirit witnesses explained at trial that Spirit is struggling financially -- including that Spirit anticipates a $467,000,000 loss for 2023 (on top of prior losses over $1,000,000,000) and has not been profitable since 2019. These losses, though significant, do not, on their own,

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

provide an affirmative defense to the Government's prima facie case.

 [48]   [49]   A defendant asserting the failing firm defense bears the "burden of proving" three distinct elements: (1) the acquired firm "face[s] the grave probability of a business failure," (2) "[t]he prospects of reorganization" under the bankruptcy laws are "dim or nonexistent," and (3) "the company that acquires the failing company ... is the only available purchaser." Citizen Publ'g Co. v. United States, 394 U.S. 131, 137–38, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) (internal citations and quotations omitted); accord Dr. Pepper/ Seven-Up Cos. v. F.T.C., 991 F.2d 859, 864–65 (D.C. Cir. 1993); Steves & Sons, Inc. v. JELD-WEN, Inc., 290 F. Supp. 3d 507, 511–12 (E.D. Va. 2018). These requirements reflect the "strict limits placed on [the] defense" by the Supreme Court in several of its cases. See General Dynamics, 415 U.S. at 506, 94 S.Ct. 1186 (citing cases). Although Spirit is struggling, its executives testified that the airline had a long-term plan to return to profitability. See, e.g., Tr. Ex. 678 at 2; Tr. 11/7/2023 (Gardner/Spirit) 75:2-10. JetBlue is also far from the only available purchaser, should Spirit find itself in dire need.

 [50]   The second doctrine that can be relevant to an acquired firm's financial performance is the so-called "weakened competitor" or "flailing firm" defense. Courts view such a defense skeptically, in part because a " 'weak company' defense would expand the failing company doctrine, a defense which has strict limits." F.T.C. v. Warner Commc'ns, Inc., 742 F.2d 1156, 1164 (9th Cir. 1984) (citations omitted). One court has described this defense as "probably the weakest ground of all for justifying a merger," Kaiser Alum. & Chem. Corp. v. F.T.C., 652 F.2d 1324, 1339–41 (7th Cir. 1981), and another dismissed it as "the Hail-Mary pass of presumptively doomed mergers," ProMedica, 749 F.3d at 572. Courts credit the weakened-competitor defense "only in rare cases, when the defendant makes a substantial showing that the acquired firm's weakness, which cannot be resolved by any competitive means, would cause that firm's market share to reduce to a level that would undermine the Government's prima facie case." F.T.C. v. University Health, Inc., 938 F.2d 1206, 1221 (11th Cir. 1991). "This argument is disfavored because it fails to account for the fact that 'financial difficulties not raising a significant threat of failure are typically remedied in a moderate length of time,' whereas a merger is a relatively permanent action that eliminates the potential for future competition between the merging parties." Aetna, 240 F. Supp. 3d at 92 (citing Phillip E. Areeda & Herbert

Hovenkamp, Antitrust Law ¶ 963a3 (4th ed. 2016) ("Areeda & Hovenkamp")).

 *35   [51]   [52]   The Defendant Airlines argue that because Spirit is struggling financially, its "market share [is reduced] to a level that would undermine the Government's prima facie case." University Health, 938 F.2d at 1221. But as the ProMedica Court observed, this argument is a "Hail-Mary pass," and it misses the mark. The requirement that an acquired firm's weakness "cannot be resolved by any competitive means," University Health, 938 F.2d at 1221, means that the weakness cannot merely involve poor financial performance. It must involve a firm no longer able to access resources that are necessary to compete. See, e.g., General Dynamics, 415 U.S. at 501–04, 94 S.Ct. 1186 (coal producer had "neither the possibility of acquiring more reserves nor the ability to develop deep coal reserves, and thus was not in a position to increase its reserves"); F.T.C. v. Arch Coal, Inc., 329 F. Supp. 2d 109, 155–57 (D.D.C. 2004) (noting that the acquired firm's mines would produce less than they had in the past, and there were not good prospects for acquiring new mines); Deutsche Telekom, 439 F. Supp. 3d at 218–24 (wireless provider had "no clear path to obtaining" necessary assets, including no alternative acquirer, and therefore had "no convincing prospects for improvement") (internal citations omitted). The Defendant Airlines presented no evidence that Spirit was in such a dire financial situation that it had no hope for the future; instead, multiple Spirit executives testified that the airline had a plan to return to profitability.

 [53]   Though their arguments regarding Spirit's profitability lack merit, the Defendant Airlines provide strong evidence that the combined, post-merger airline would be procompetitive and result in substantial benefits for consumers. This is a so-called efficiency defense. As one court has noted,

> It remains unclear whether and how a court may consider evidence of a merger's efficiencies. While the Supreme Court has previously stated that "[p]ossible economies cannot be used as a defense to illegality," F.T.C. v. Procter & Gamble Co., 386 U.S. 568, 580, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), lower courts have since considered whether possible economies might serve not as justification for an illegal merger but as evidence that a merger would not actually be illegal. The trend among lower courts has thus been to recognize or at least assume that evidence of efficiencies may rebut the presumption that a merger's effects will be anticompetitive, even if such evidence could

WCAS227

not be used as a defense to an actually anticompetitive merger.

Deutsche Telekom, 439 F. Supp. 3d at 207.

Courts have recognized efficiencies in several forms. The merged firms' ability to offer new or enhanced services is itself a procompetitive benefit. See, e.g., Deutsche Telekom, 439 F. Supp. 3d at 207-209 (recognizing efficiencies such as the accelerated introduction of cellular service based on new technology); United States v. M.P.M., Inc., 397 F. Supp. 78, 93 (D. Colo. 1975) ("service offered" by the new firm "was superior to that offered by either of the previously independent companies alone"); F.T.C. v. Tenet Health Care Corp., 186 F.3d 1045, 1054-55 (8th Cir. 1999)(explaining that in analysis of "the competitive effects of the merger" the district court should have considered evidence that the merger of two smaller hospitals would create "a hospital that is larger and more efficient" than the standalone hospitals and that "will provide better medical care than either of those hospitals could separately."). Cost savings and increased output are also cognizable benefits that demonstrate a merger is procompetitive. See United States v. Country Lake Foods, Inc., 754 F. Supp. 669, 674 (D. Minn. 1990) (the merger would allow the combined company to "increase its capacity substantially," "lower [ ] costs," and achieve "other savings," enabling it to "compete head-to-head" with its "top selling" rival).

The Defendant Airlines have demonstrated that an expansion of all aspects of JetBlue's business -- including network, fleet, and loyalty program -- would allow for more vigorous competition with the Big Four, which carry most passengers in the country. The size of an airline, the number of routes it serves, the number of options it offers to consumers -- all of these aspects add to an airline's relevance to consumers, and were JetBlue to become more relevant, it would immediately place more pressure on its greatest competitors, the Big Four. This pressure would benefit consumers. The Defendant Airlines have also demonstrated that the product JetBlue offers, though more expensive on average, is higher quality, and provides consumers with an enhanced flying experience. Were JetBlue to expand via the proposed acquisition, not only would that product become more widely available to more consumers, but the increased revenue available could also allow JetBlue to innovate further and create an even stronger customer experience.

**\*36** Overall, the Defendant Airlines have successfully met their relatively low burden to rebut the Government's prima

facie case. The combination of the likely, timely entrants into the harmed markets and the potential procompetitive benefits of the proposed merger provides the Court with enough substantial evidence to conclude that the prima facie case may inaccurately predict the proposed acquisition's probable effect on future competition. See Baker Hughes, 908 F.2d at 991.

### F. Additional Anticompetitive Effect

**[54]** The evidence establishing a prima facie case carries forward even if the presumption is rebutted. The evidence constituting the prima facie case establishes a "presumption of the middle ground," meaning that it establishes the presumed fact "unless credible evidence is introduced which tends to rebut" that fact. Terry v. Electronic Data Sys. Corp., 940 F. Supp. 378, 381–82 (D. Mass. 1996); accord United States v. Jessup, 757 F.2d 378, 382–83 (1st Cir. 1985), abrogated on other grounds by United States v. O'Brien, 895 F.2d 810 (1st Cir. 1990) (discussing this "middle ground position"). Thus, "even when contrary evidence is presented, prima facie evidence maintains its force and is accorded any weight that the fact-finder sees fit." SEC v. Sargent, 589 F. Supp. 3d 173, 196 & n.16 (D. Mass. 2022). The Court, therefore, must now carefully consider all available evidence to determine whether the Government has proven by a fair preponderance of the evidence that the acquisition threatens competition. See, e.g., Chicago Bridge, 534 F.3d at 424 (noting how evidence can both establish a prima facie case and "serve[ ] as a redoubt" against rebuttal evidence offered by defendants); Anthem, 236 F. Supp. 3d at 214–16 (even where defendant successfully rebutted the presumption with evidence of entry, plaintiff successfully carried ultimate burden of persuasion through evidence of anticompetitive effects).

**[55]** A merger is unlawful under Section 7 if it is reasonably probable that it will result in a substantial lessening of competition in "any line of commerce or in any section of the country." 15 U.S.C. § 18. Thus, "if anticompetitive effects of a merger are probable in 'any' significant market," the merger violates Section 7. Brown Shoe, 370 U.S. at 337, 82 S.Ct. 1502; see also Anthem, Inc., 855 F.3d at 368 (threat of anticompetitive effects in one local market "provides an independent basis for the injunction" prohibiting merger); Areeda & Hovenkamp ¶ 972a ("[Section 7] plainly contemplates that mergers may involve more than one market, yet it bases legality on a separate market-by-market appraisal."). "The Government may introduce evidence which shows that as a result of a merger competition may

be substantially lessened throughout the country, or on the other hand it may prove that competition may be substantially lessened only in one or more sections of the country. In either event a violation of [Section] 7 would be proved." United States v. Pabst Brewing Co., 384 U.S. 546, 549, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966).

 [56]  Although the Defendant Airlines provide ample evidence at the rebuttal stage that the anticompetitive harms of the proposed acquisition will be offset, both by new entries into the harmed markets and potential pro-competitive benefits, this evidence fails to establish that the proposed merger would not substantially lessen competition in at least some of the relevant markets. Throughout trial, the Government invoked the experience of the average Spirit consumer: a college student in Boston hoping to visit her parents in San Juan, Puerto Rico; a large Boston family planning a vacation to Miami that can only afford the trip at Spirit's prices. It is this large category consumers, those who must rely on Spirit, that this merger would harm; the Defendant Airlines, though exceedingly well-represented, simply cannot demonstrate that these consumers would avoid harm. Even if other ULCCs entered former Spirit routes at an unprecedented rate of growth (which, given the current restraints on airline growth, is unlikely), their entry is unlikely to be sufficient to protect every consumer, in every relevant market from harm.

 *37  As Dr. Chipty's analysis demonstrates, it would take five years for other ULCCs to replace Spirit's capacity nationally. Were other ULCCs to attempt to replace Spirit's capacity specifically on Spirit routes (and thereby serve Spirit customers), it would take over fifteen years to do so. To replace just half of Spirit's capacity on its Boston routes, Allegiant, which is receiving Spirit divestitures at Boston(BOS), would have to grow by 412%. That number rises to 757% for Miami(MIA). Allegiant's average annual growth rate from 2013-2022 was 10%; it is not only unlikely, but practically impossible that its growth rate would increase to the 249% annual rate Dr. Chipty estimates would be necessary. Frontier's average growth rate is not much higher; at 12.8%, the odds of Frontier growing even over 100% are minimal. Even with other, new ULCCs growing and expanding and legacy airline expanding their basic offerings, there is simply no way such astronomical need could be supplied.

The Government, therefore, has proven by a fair preponderance of the evidence that the merger would substantially lessen competition in a relevant market.

## IV. THE INJUNCTIVE REMEDY

 [57]  In its amended complaint, the Government requested, as a remedy, that the "Defendants be permanently enjoined and restrained from carrying out this acquisition, or any other transaction in any form that would combine JetBlue and Spirit." Am. Compl. at 35, ECF No. 69. Such a broad injunction would prevent not only the proposed merger of JetBlue and Spirit as it currently stands, but also any future merger of the two companies. At closing arguments, upon question from the Court, the Government properly recognized that such a request asks too much. See Tr. 12/7/2023 51:3-10. [55] Today's decision, therefore, narrowly applies only to the proposed merger of JetBlue and Spirit as it currently stands as agreed to by the Defendant Airlines on July 28, 2022.

The Government argues that "another bite at the apple" would be of no use to the Defendant Airlines, and that therefore, the Court ought enjoin any future combination of the two airlines. Pl.'s Post-Tr. Br. at 45, ECF No. 451. To rule in such a way, however, would be prospectively to interfere with the free market with unknown, and perhaps harmful, competitive effects. Indeed, the Defendant Airlines and others in the market, in the context of the unique and dynamic market forces of the airline industry may decide to take another run at a merger at any time. The Government will no doubt make its determination -- as it is duty-bound to do -- as to whether such a proposed merger sufficiently protects competition. Of course, while the Court always encourages parties to resolve their differences without judicial intervention, the courthouse doors remain open should the Defendant Airlines decide to try again, and the Government then wishes to prevent such an attempt.

## V. CONCLUSION

In sum, the Court has made its best attempt, applying the law to the evidence in this case, to predict the future of a dynamic market recovering from the COVID-19 pandemic, in markedly uncertain times. [56] For the reasons set forth above, therefore, the Court rules that the proposed acquisition violates Section 7 of the Clayton Act.

Spirit is a small airline.

WCAS229

But there are those who love it.

To those dedicated customers of Spirit, this one's for you.

Why?

Because the Clayton Act, a 109-year-old statute requires this result -- a statute that continues to deliver for the American people.

**VI. ORDER**

**\*38** In light of the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED** that the Defendant Airlines, their agents, servants, employees, and all persons acting in concert with either of them, are **PERMANENTLY ENJOINED** from executing the proposed merger as agreed on July 28, 2022.

**SO ORDERED.**

**All Citations**

--- F.Supp.3d ----, 2024 WL 162876

---

## Footnotes

1    This is how my predecessor, Peleg Sprague (D. Mass. 1841-1865), would sign official documents. Now that I'm a Senior District Judge I adopt this format in honor of all the judicial colleagues, state and federal, with whom I have had the privilege to serve over the past 45 years.

2    As Judge Hurwitz notes in Saint Alphonsus, "[t]his quotation is not included in the definitive book of Berra quotations, see Yogi Berra, The Yogi Book: "I Really Didn't Say Everything I Said!" (1998), and its provenance is at best unclear, see, e.g., The Yale Book of Quotations 92 (Fred R. Shapiro ed., 2006) (attributing a variant to Niels Bohr, but noting that the exact authorship is disputed)." 778 F.3d at 783 n.7.

3    See, e.g., Mary Schlangenstein & Leah Nylen, JetBlue's $3.8 Billion Spirit Deal Faces Tricky Antitrust Review, Bloomberg News (July 29, 2022), https://www.bnnbloomberg.ca/jetblue-s-3-8-billion-spirit-deal-faces-tricky-antitrust-review-1.1798883.

4    The Court also received submissions from amici, including the Association of Flight Attendants-CWA, Transport Workers Union Local 570, and Travelers United. The Court is grateful for these helpful, educational submissions.

5    The findings of fact are largely taken from the parties' respective proposed findings of fact; citations and quotations are omitted for readability.

6    For example, between 2001 and 2013, Delta absorbed Northwest Airlines; United absorbed Continental Airlines; American merged with TWA, America West, and U.S. Airways; and Southwest bought Air-Tran Airways.

7    Alaska Airlines has sometimes been referred to as a low-cost carrier. See infra p. ——— (discussion of Alaska Airline's offerings).

8    On December 3, 2023, Alaska Airlines and Hawaiian Airlines announced their agreement to combine, with Alaska Airlines to acquire Hawaiian Airlines. As per their agreement, both airlines would continue to operate as separate brands. The merger agreement is valued at approximately $1,900,000,000. See Niraj Chokshi & Ivan Penn, Alaska Airlines Plans to Buy Hawaiian Airlines, N.Y. Times (Dec. 3, 2023), https://www.nytimes.com/2023/12/03/business/alaska-airlines-hawaiian-airlines-deal.html.

WCAS230

9    Frontier has approximately a 2% market share of domestic airline travel. It currently has bases in Orlando International ("Orlando (MCO)"), Harry Reid International Airport ("Las Vegas (LAS)"), Denver International Airport ("Denver (DEN)"), Dallas-Fort Worth International Airport ("Dallas (DFW)"), Phoenix Sky Harbor International Airport ("Phoenix (PHX)"), Tampa International Airport ("Tampa (TPA)"), Hartsfield-Jackson Atlanta International Airport ("Atlanta (ATL)"), Philadelphia International Airport ("Philadelphia (PHL)") and Miami International Airport ("Miami (MIA)"). For ease of reference, the three letter Federal Aviation Administration ("FAA") location identifier codes of airports are included throughout. See Encodes/Decodes, FAA, https://www.faa.gov/air_traffic/flight_info/aeronav/aero_data/loc_id_search/Encodes_Decodes/ (last visited Dec. 29, 2023). Frontier's current fleet comprises 134 planes, and as of September 30, 2023, it had an order book of 214 planes. Frontier is the lowest cost -- as in, it has the lowest operating cost -- airline in the United States. Frontier's CEO estimated it would take Frontier five to eight years to replace Spirit and operate its existing schedule based on its current plan of 15-20 percent annual growth. This estimate does not, however, include maintaining Frontier's pre-existing growth plan in addition to serving Spirit's routes.

10   Allegiant has a revenue share approximately between 1% and 2%. Allegiant serves the third-highest number of destinations (125) out of any U.S. airline and serves close to 600 unique routes based on its network diversification strategy. Allegiant also competes in metropolitan regions by providing service to secondary airports that compete with primary airports in the same area. Allegiant currently has 127 aircraft in its fleet and estimates having 230 aircraft by 2029.

11   In 2021, Avelo operated 3 planes; now, only two years later, it operates 16 airplanes and 68 routes. Avelo has "all of the regulatory approvals and designations it needs to fly commercially internationally" and "could support flights, for instance, to Mexico or the Caribbean." Tr. 11/3/23 (Trevor Yealy/Avelo) 38:25–39:20.

12   Breeze Airways operated its first flight on May 27, 2021, with a fleet of eight aircraft. Since then, Breeze has grown rapidly, and as of September 6, 2022, had a fleet of 21 aircraft and 150 routes. As of September 6, 2022, Breeze had plans to add the following aircraft to its fleet: 12 in 2023, 18 in 2024, 18 in 2025, and 10 in 2026.

13   Sun Country's aircraft are almost entirely based out of Minneapolis-St. Paul International Airport ("Minneapolis (MSP)"); over 70% of its routes include MSP in the city pair.

14   Spirit recognizes that one way this unbundled fare structure generates revenue is through these ancillary amenities; Spirit estimates that two-thirds of Spirit's customers purchase at least one. Approximately half of Spirit's revenue in 2022 came from ancillary amenities (as opposed to the fare for travel).

Such offerings bring to mind the classic farce "Master of the House," from the musical Les Miserables:

    Reasonable charges

    Plus some little extras on the side!

    Charge 'em for the lice

    Extra for the mice

    Two percent for looking in the mirror twice

    Here a little slice

    There a little cut

WCAS231

Three percent for sleeping with the window shut

When it comes to fixing prices

There are a lot of tricks he knows

How it all increases

All those bits and pieces

Jesus! It's amazing how it grows!

Les Miserables, Lyrics by Herbet Kretzmer.

15    "[E]ach carrier has significant turnover in its route structure from year to year." Tr. 11/27/23 (Nicholas Hill) 15:12–16:3. In 2023, Spirit, for example, entered and exited approximately 33% of its 2022 route network structure. Legacies, LCCs, and ULCCs have entered a significant number of routes in 2023. In 2023 alone, the "aggregate total number of routes entered [by all carriers] is going to be somewhere between 300 or 400 routes." Tr. 11/27/23 (Nicholas Hill) 15:1–7. Other ULCCs also had a high percentage of entries and exits in 2023 as compared to their 2022 networks: Breeze, Avelo, Sun Country, and Frontier entered and exited 110%, 81%, 45%, and 38% of their 2022 route networks, respectively. Tr. Ex. 886. Legacies entered and exited between 8% and 11% of their 2022 route networks this year. Id.

16    "Route" refers to a one-way, scheduled airline passenger service origin and destination ("O&D") pair. For instance, a direct flight from Boston, Massachusetts to San Diego, California is a "route."

17    The recent grounding of all Boeing 737 Max 9 planes by the FAA, in response to an emergency landing on Friday, January 5th, 2024, is likely to exacerbate aircraft shortages. See Christopher F. Schuetze, Keith Bradsher & Melissa Eddy, What to Know About Boeing's 737 Max 9 and the Alaska Airlines Grounding, N.Y. Times (Jan. 8, 2024), https://www.nytimes.com/2024/01/06/business/alaska-airlines-boeing-737-max-9.html.

18    Airbus' delays stem mostly from engine problems. Pratt & Whitney, the manufacturer of the engines for the Airbus new engine option aircraft ("NEO"), has had engine issues since 2016. In July 2023, Pratt & Whitney announced that the geared turbo engine fans ("GTFs") of the NEOs had new problems requiring accelerated engine inspections. Specifically, one issue concerns contaminated powdered metal, which required planes to be pulled prematurely from the schedule for maintenance. The powdered-metal issue requires almost 300 days of maintenance per plane, as Pratt & Whitney has to remove engines for X-rays and reassembly.

19    See, e.g., Emily Steel & Sydney Ember, Drunk and Asleep on the Job: Air Traffic Controllers Pushed to the Brink, N.Y. Times (Dec. 3, 2023), https://www.nytimes.com/2023/12/02/business/air-traffic-controllers-safety.html.

20    Airlines often refer to a metropolitan area as one city for the purposes of network planning because customers in those markets have the choice to fly out of more than one airport. For instance, the Miami/Fort Lauderdale "market" includes flights departing from both Miami(MIA) and flights departing from Fort Lauderdale (FLL). Other common examples include the New York City metropolitan area, where customers could choose to fly out of LaGuardia Airport ("LaGuardia(LGA)"), Newark Liberty International Airport ("Newark(EWR)"), and John F. Kennedy International Airport ("New York (JFK)"), and the Orlando metropolitan area, where customers could choose to fly out of either Orlando(MCO) or Orlando Sanford International Airport ("Sanford (SFB)").

WCAS232

21    Not surprisingly, the same customers that fly ULCCs, including Spirit, tend to purchase Blue Basic fares. An analysis of average income data shows that customers purchasing Blue Basic fares (JetBlue's unbundled, lowest fare offering) and Spirit fares have similar average annual incomes.

22    JetBlue Chief Executive Officer Robin Hayes testified that Jetblue would "never get to the size that [the legacies] are based on organic growth." Tr. 11/6/23 (Robin Hayes/JetBlue) 85:14–18.

23    Capacity in the airline industry is generally measured in terms of "available seat miles," or "ASMs." One ASM is one seat on one plane flying one mile. Thus, an airline can increase its ASMs by operating more planes, offering more seats, or flying longer routes.

24    The Spirit Effect is similar to the JetBlue Effect. Much of this litigation, in fact, centered on whether the JetBlue Effect is as strong as the Spirit Effect.

25    Though the seats are larger, "Big Front Seat" accommodation does not include the added amenities common in a first class cabin, such as free premium refreshments and tailored service. By foregoing such amenities, Spirit lowers costs further.

26    Preferential gates are typically leased by an airport to a specific carrier, which is then free to use the gates as desired, provided the carrier does not underutilize the gate. In contrast, common-use gates are not exclusive to a given carrier and can be used by any airline.

27    "Slots" are specific day and time authorizations during which certain airports and the FAA grant permission to an airline to take off or land a flight. Slots can be sold or leased by the carriers holding the rights to them. It is possible to operate to some extent at an airport without obtaining slots, but only during limited (and often unappealing) time periods.

28    In light of Spirit management's desire for additional information on the nature of the proposed divestitures, JetBlue and Spirit engaged in discussions with respect to regulatory matters, and Spirit's management eventually became comfortable that it "did in fact have a significant covenant" and that it "had satisfied [Spirit's] concerns with regard to the regulatory matters." Tr. 11/1/23 (Edward Christie/Spirit) 81:6–82:22.

29    A "ticking fee" is an "increase in the per-share cash consideration payable to seller stockholders as the time period between signing and closing passes certain milestones. Classic ticking fees are flexible devices that can be tailored to the specific circumstances at hand—for example, the increase can start at signing, at a later specified date or upon the occurrence (or non-occurrence) of a specified event. Similarly, the amount can go up on a straight line basis over the course of the relevant period or can be structured to fluctuate over time as certain dead-lines are passed or events occur." Daniel Wolf, Time is Money-Ticking Fees, Harvard L. Sch. F. on Corp. Governance (Oct. 18, 2013), https://corpgov.law.harvard.edu/2013/10/18/time-is-money-ticking-fees/.

30    Runway authorizations are a specific type of takeoff and landing control, similar to a slot, that is used at Newark(EWR) to limit the amount of aircraft flying in and out of the airport at any specific time of day.

31    Each airline executive questioned about this possibility bristled at such an idea; for a divestiture agreement to require an airline only to utilize certain routes or timelines would be deeply out of pace with the fast-changing dynamics of the industry.

32    A Single Operating Certificate is a mandatory safety-related FAA regulatory clearance only received after the FAA undergoes an in-depth examination of an airline's operation. This examination is designed to ensure an effective transition of the merged entities and that one set of management personnel is in place with operational control of the entire new organization. See How Does That Work? The FAA's Safety Role in

Airline Mergers, FAA, https://www.faa.gov/sites/faa.gov/files/2022-07/Airline-Merger-Fact-Sheet_0.pdf (last visited Dec. 29, 2023). JetBlue estimates receiving a Single Operating Certificate 12-18 months after the merger closes.

33 "Upgauging" is the process by which an airline increases seats per departure by acquiring and flying larger aircraft on domestic routes.

34 A merger or an acquisition that produces certain changes in concentration and ultimately results in concentration levels above a certain threshold is presumed likely to enhance market power. This threshold is measured in post-transaction "HHI" (amount on the Herfindahl-Hirschman Index) greater than 2,500; a transaction resulting in change of HHI greater than 200 in a highly concentrated market is also considered presumptively anticompetitive. HHI is "a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers. For example, for a market consisting of four firms with shares of 30, 30, 20, and 20 percent, the HHI is 2,600 ($30^2 + 30^2 + 20^2 + 20^2$ = 2,600)." See Herfindahl-Hirschman Index, U.S. Dep't of Just., Antitrust Div., https://www.justice.gov/atr/herfindahl-hirschman-index (last visited Dec. 29, 2023).

35 Spirit has exited Fort Myers-Hartford, Boston-New Orleans, LaGuardia-San Juan, Hartford-Tampa, New York City-Tampa, New Orleans-New York City, Austin-Cancun, Orlando-Ponce, Orlando-Aguadilla, and Miami-Aguadilla. JetBlue has exited Cleveland-Miami, Aruba-Miami, Cartagena-Miami, Philadelphia-San Juan, Austin-Cancun, and Miami-St. Maarten.

36 Eventually, in late 2019, JetBlue began developing an integrated strategy specifically to compete more effectively with Spirit, titled the "Spirit Competitive Strategy."

37 "Walkup fares" are fares with no advance purchase restriction, called walkup because a customer could literally walk up to the airline desk at the airport and buy a ticket at this fare.

38 The Government argues that the proposed acquisition would also increase the risk of coordination. Such coordination can arise in multiple ways, including parallel accommodating conduct, resulting from a history of observing rivals' reactions, or implicit agreements reached through signaling or punishments. For example, an airline can accommodate one airline's price increase by increasing its own prices, and if a third airline refuses to play along, one of the coordinating airlines can punish that airline by reducing its prices on a separate route, undercutting the uncooperative airline. As airline pricing is largely transparent, airlines engage with one another across many markets, and there are only a small number of dominant competitors, the industry is vulnerable to coordination. The Government points to four instances of such alleged coordination by JetBlue in 2019 and 2020 that it argues demonstrate the airline's willingness to coordinate with other airlines, hurting consumers (unlike Spirit, which tends to disrupt coordination). Such evidence is unpersuasive, however, particularly when combined with the testimony of multiple JetBlue pricing employees who credibly testified that such coordinating actions were against JetBlue policy.

39 Econometrics is the application of statistical methods to economics.

40 This analysis was left to Dr. Chipty.

41 The Defendant Airlines were quick to highlight this fact, likely due to the deficiencies found in other experts hired in a previous antitrust litigation involving the airline industry, where one of the Defendant Airlines was a party. See United States v. American Airlines Grp. Inc., No. CV 21-11558-LTS, ―― F.Supp.3d ――, ――, 2023 WL 3560430, at *23 (D. Mass. May 19, 2023) (Sorokin, J.) ("Based on the combination of their historical ties to powerful airlines and the manner in which they expressed their opinions from the witness stand, the Court finds as a general matter that the defense experts' testimony ... was tainted by bias.").

42    To be clear, Dr. Hill did not propose a national market as the relevant market upon which the Court ought analyze the merger; instead, he focused on the aggregate of all routes the Government alleged harms, as well as an analysis of the competitive effects of the merger outside of JetBlue and Spirit's head-to-head competition.

43    Operational spares are aircraft that airlines keep in reserve at base airports in case there is a mechanical issue with an aircraft currently in use. Fact witnesses did testify that with a combined fleet, a post-merger JetBlue would have incentive to keep less operational spares than the standalone JetBlue and Spirit because, instead of each airline separately keeping spares ready, the combined airline could use fewer to support more planes. This comports with the economic principle of economies of scale; an airline with more planes would need less spares per plane, because the risk that multiple planes would need spares at once is likely low, the airline can spread that risk across more planes. Mr. Scheff's analysis, however, simply speculates that a decrease in operational spares would occur; he relies on no evidence to support that contention and provides no specificity in the number of operational spares the combined airline would keep.

44    The United States brings this action under Section 15 of the Clayton Act. The Plaintiff States bring this action under Section 16 of the Clayton Act as <u>parens patriae</u> on behalf of their residents.

45    The Court, however, was forced to delay the start of trial by two weeks due to other matters.

46    Portions of both parties' proposed conclusions of law are adopted and incorporated herein; citations and quotations are omitted for readability.

47    Of course, this framework, at first blush appears "somewhat artificial" and the "shifting of the burdens of production, with the ultimate burden of persuasion remaining always with the government, conjures up images of a tennis match, where the government serves up its prima facie case, the defendant returns with evidence undermining the government's case, and then the government must respond to win the point." <u>Illumina, Inc.</u> v. <u>Fed. Trade Comm'n</u>, 88 F.4th 1036, 1057 (5th Cir. 2023). As the Fifth Circuit and others have observed -- and as the case was tried to this Court -- "[i]n practice, ... the government usually introduces all of its evidence at one time, and the defendant responds in kind. Thus, the evidence is often considered all at once and the burdens are often analyzed together." <u>Id.</u> (citations and quotations omitted).

48    The Defendant Airlines cite to previous airline antitrust cases in which the Government has posited broader geographic markets than O&D pairs. In both cases cited, however, the market proposed by the Government was still not a national market, but instead a market encompassing all flights in and out of a certain airport. <u>See, e.g.</u>, Compl. ¶¶ 31-32, <u>United States</u> v. <u>United Continental Holdings, Inc.</u>, No. 2:15-cv-07992 (D.N.J. Nov. 10, 2015), ECF No. 1 (Government asserting that all air passenger service "to and from Newark [Liberty Airport] constitutes a relevant antitrust market," and that "it is appropriate to aggregate all routes that either originate or terminate in Newark for the purpose of defining a relevant market in which the transaction will cause anticompetitive harm"); Am. Compl. ¶ 31, <u>United States</u> v. <u>US Airways Grp., Inc.</u>, Case No. 1:13-cv-01236 (D.D.C. Sep. 5, 2013), ECF No. 73 (defining a geographic market for slots at Reagan National Airport in Washington, D.C.).

49    The Government cannot request a geographic market of specific O&D pairs and then simultaneously request the inclusion of markets in which Spirit only competes with non-party airlines. To do so would be to amplify the national geographic market in which both Spirit and JetBlue compete -- the Government cannot have its cake and eat it too.

50    The 183 routes can be broken down into: 51 nonstop overlap routes, 15 mixed overlap routes, and 117 connect overlap routes. The Government does not, nor could it, identify any routes on which the presumption

WCAS235

applies in the "Spirit-only" category. Of these 51 nonstop routes, 35 have met the presumption of illegality consistently over the last 3 years.

51   The Court is aware that after the trial concluded, on December 18, 2023, the F.T.C. and DOJ issued a revised set of Merger Guidelines. See Justice Department and Federal Trade Commission Release 2023 Merge Guidelines, U.S. Dep't of Just., Off. of Pub. Affs., https://www.justice.gov/opa/pr/justice-department-and-federal-trade-commission-release-2023-merger-guidelines (last visited Jan. 12, 2024); 2023 Merger Guidelines, U.S. Dep't of Just., Antitrust Div., https://www.justice.gov/atr/2023-merger-guidelines (last visited Jan. 12, 2024).

52   See also, e.g., Penn State Hershey, 838 F. 3d at 351–52; Chicago Bridge, 534 F.3d at 429–30; Bertelsmann, 646 F. Supp. 3d at 51; Deutsche Telekom, 439 F. Supp. 3d at 226; F.T.C. v. Wilh. Wilhelmsen Holding ASA, 341 F. Supp. 3d 27, 66–67 (D.D.C. 2018); United States v. Energy Sols., Inc., 265 F. Supp. 3d 415, 443 (D. Del. 2017); Aetna, 240 F. Supp. 3d at 52–53; Saint Alphonsus Med. Ctr.-Nampa, Inc. v. St. Luke's Health Sys., Ltd., Nos. 1:12-CV-00560-BLW; 1:13-CV-00116-BLW, 2014 WL 272339, at *19 (D. Idaho Jan. 24, 2014), aff'd, 778 F.3d 775 (9th Cir. 2015); United States v. Bazaarvoice, Inc., No. 13-cv-00133, 2014 WL 203966, at *39 (N.D. Cal. Jan. 8, 2014); F.T.C. v. ProMedica Health Sys., No. 3:11 CV 47, 2011 WL 1219281, at *57 (N.D. Ohio Mar. 29, 2011); United States v. Visa U.S.A., Inc., 163 F. Supp. 2d 322, 342 (S.D.N.Y. 2001); F.T.C. v. Cardinal Health, Inc., 12 F. Supp. 2d 34, 54–58 (D.D.C. 1998).

53   For instance, when an airline exits or reduces capacity on a "proven" route, other airlines seek quickly to enter or expand to fill any unmet demand. Tr. 11/14/23 (Biffle/Frontier) 104:3–13 (explaining that if Spirit exits routes, Frontier "would look [to enter] those probably first because they're proven"); Tr. 11/3/23 (Yeally/Avelo) 39:21–40:18 (explaining Avelo began commercial service from Dubuque, Iowa following American's exit from the airport); Dep. 7/17/23 (Neeleman/Breeze) 215:21–216:18 (explaining Breeze monitors Frontier's entries and exits because "those are potential markets that we can go in. These are all, you know, either backfill opportunities or areas that we have to take a look at").

54   In calculating the number of presumptively anticompetitive routes, the Government's experts also were looking at data that, by the time of trial, was out of date. Further demonstrating the dynamism of the airline industry, by the time of trial either Spirit or JetBlue had exited some of the routes the Government's experts originally identified.

55   "GOVERNMENT COUNSEL: [T]he injunction would be limited to the deal that is presently in front of the Court....

   THE COURT: So another deal is another case?

   GOVERNMENT COUNSEL: Another deal would be another case, right, your Honor, I think that's definitely fair to say."

56   As the Court expressed to the parties at the conclusion of trial, this case is an exceptional example of how a complex antitrust case ought be tried. The Court is grateful and commends counsel and their staff for their professionalism in robustly and efficiently presenting their respective cases to the Court.

---

**End of Document**                                © 2024 Thomson Reuters. No claim to original U.S. Government Works.

---

Also (by request), petition of N. C. Newerf, relative to bill for Government merchant and naval marine; to the Committee on the Merchant Marine and Fisheries.

By Mr. BAILEY (by request): Petition of sundry citizens of New York City, favoring enactment of a measure prohibiting the export of food and clothing during the European war; to the Committee on Foreign Affairs.

By Mr. BELL of California: Petition of the General Contractors' Association of San Francisco, Cal., protesting against the passage of House bill 14288, relative to mechanical equipment of Government buildings being segregated; to the Committee on Public Buildings and Grounds.

Also, petition of the Pasadena (Cal.) Board of Labor, relative to the establishment of food stations in all the important cities of the United States; to the Committee on Agriculture.

Also, petition of the Building Trades Employers' Association, the Sheet Metal Contractors' Association, the Master Housesmiths' Association, the Master Roofers and Manufacturers' Association, all of San Francisco, Cal., protesting against the passage of the Clayton bill; to the Committee on the Judiciary.

Also, petitions of Montezuma Tribe, No. 77, Improved Order of Red Men, of San Francisco, and San Francisco Parlor, No. 49, Native Sons of the Golden West, and Ralph W. Black, of Monrovia, all in the State of California, favoring the passage of House bill 5139, relative to retirement of aged employees of the Government; to the Committee on Reform in the Civil Service.

By Mr. BRUCKNER: Petition of William Hickey, of New York City, favoring passage of American merchant-marine bill; to the Committee on the Merchant Marine and Fisheries.

Also, petition of the Champion Iron Co., of Merton, Ohio, protesting against the passage of Senate bill 5147, to investigate the claims of the Clinton-Marshall Construction Co.; to the Committee on Claims.

By Mr. DAVENPORT: Petition of the Keetonah Society of Cherokee Indians, asking for an accounting between the Indians and the United States; to the Committee on Indian Affairs.

By Mr. GARDNER: Petition of Patrick F. Creed and 50 other citizens, of Haverhill, Mass., protesting against the rise in the price of foodstuffs; to the Committee on Agriculture.

By Mr. GRAHAM of Pennsylvania: Memorial of the Federal Council of the Churches of Christ in America, expressing to President Wilson its profound gratitude of his action in offering the services of the United States in mediation between the European powers; to the Committee on Foreign Affairs.

By Mr. GRIEST: Memorial of the Ephrata (Pa.) Branch of the Socialist Party, protesting against European war, etc.; to the Committee on Foreign Affairs.

By Mr. KENNEDY of Rhode Island: Petition of Alva E. Belmont, of Newport, R. I., favoring the submitting of amendment for woman suffrage at this session of Congress; to the Committee on Rules.

By Mr. LONERGAN: Petition of the city council of the city of Bristol, Conn., for thorough investigation regarding the high prices of foodstuffs since the commencement of the European war; to the Committee on Agriculture.

By Mr. O'SHAUNESSY: Petition of William Pestel, of Providence, R. I., protesting against the passage of House bill 17353, relating to use of the mails in effecting insurance on persons and property, etc.; to the Committee on the Post Office and Post Roads.

By Mr. RAKER: Petition of the General Contractors' Association of San Francisco, Cal., protesting against the passage of House bill 14288, relative to segregating mechanical equipment of United States Government buildings; to the Committee on Public Buildings and Grounds.

Also, memorial of San Francisco Parlor, No. 49, Native Sons of the Golden West, and Montezuma Tribe, No. 77, Improved Order of Red Men, favoring the passage of House bill 5139, relative to retirement of aged employees of the Government; to the Committee on Reform in the Civil Service.

Also, petition of the Western Association of Retail Cigar Dealers, protesting against any further taxation on cigars, tobacco, or cigarettes; to the Committee on Ways and Means.

By Mr. WATSON: Petitions of sundry citizens of Dinwiddie, Sussex, Amelia, Greensville, Lunenberg, and Prince Edward Counties, all in the State of Virginia, relative to rural credits; to the Committee on Banking and Currency.

By Mr. WEAVER: Petitions of sundry citizens of Gracemont, Yeager, Lookeba, Walter, Colbert, Lamar, Coalton, Allen, and Dewar, and of the counties of Ottawa, Oklahoma, and Lincoln, all in the State of Oklahoma, favoring national prohibition; to the Committee on Rules.

# SENATE.

## THURSDAY, August 27, 1914.

(Legislative day of Tuesday, August 25, 1914.)

The Senate reassembled at 11 o'clock a. m. on the expiration of the recess.

### PROPOSED ANTITRUST LEGISLATION.

The VICE PRESIDENT. The Senate resumes the consideration of the unfinished business, which is House bill 15657.

The Senate, as in Committee of the Whole, resumed the consideration of the bill (H. R. 15657) to supplement existing laws against unlawful restraints and monopolies, and for other purposes.

Mr. SMOOT. Mr. President, there are about half a dozen Senators in the Chamber, and I think we ought to have a quorum. I therefore suggest the absence of a quorum.

The VICE PRESIDENT. The Secretary will call the roll.

The Secretary called the roll, and the following Senators answered to their names:

| | | | |
|---|---|---|---|
| Ashurst | Dillingham | Myers | Sterling |
| Bankhead | Fletcher | Norris | Thornton |
| Brady | Gallinger | Overman | Vardaman |
| Bryan | Jones | Perkins | Walsh |
| Burton | Kenyon | Pittman | West |
| Camden | Kern | Poindexter | White |
| Clapp | McLean | Sheppard | |
| Culberson | Martin, Va. | Smith, Ga. | |
| Cummins | Martine, N. J. | Smoot | |

Mr. THORNTON. I was requested to announce the necessary absence of the junior Senator from New York [Mr. O'GORMAN] and to state that he is paired with the senior Senator from New Hampshire [Mr. GALLINGER]. I ask that this announcement may stand for the day.

The VICE PRESIDENT. Thirty-three Senators have answered to the roll call. There is not a quorum present. The Secretary will call the roll of absentees.

The Secretary called the names of the absent Senators, and Mr. RANSDELL, Mr. SIMMONS, and Mr. THOMPSON answered to their names when called.

Mr. SMOOT. I desire to announce the unavoidable absence of my colleague [Mr. SUTHERLAND]. He has a general pair with the senior Senator from Arkansas [Mr. CLARKE]. I will allow this announcement to stand for the day.

Mr. CHILTON, Mr. SHIELDS, and Mr. REED entered the Chamber and answered to their names.

Mr. DILLINGHAM. I desire to announce the continued absence of my colleague [Mr. PAGE], he being detained in Vermont on account of illness in his family.

Mr. GORE entered the Chamber and answered to his name.

The VICE PRESIDENT. Forty Senators have answered to the roll call. There is no quorum present. The Sergeant at Arms will carry out the instructions of the Senate heretofore given and request the attendance of absent Senators.

Mr. SMITH of Michigan, Mr. HUGHES, Mr. FALL, Mr. SHAFROTH, Mr. HOLLIS, Mr. THOMAS, Mr. McCUMBER, Mr. LANE, Mr. POMERENE, Mr. LEE of Maryland, and Mr. HITCHCOCK entered the Chamber and answered to their names.

The VICE PRESIDENT. Fifty-one Senators have answered to the roll call. There is a quorum present. The Secretary will state the pending amendment.

Mr. CULBERSON. On page 10 of the bill, an amendment, proposed by the committee, to strike out the penalty clause, was passed over at the suggestion of the Senator from Tennessee [Mr. SHIELDS].

The VICE PRESIDENT. It will be stated.

The SECRETARY. In section 8, on page 10, the committee amendment proposing to strike out lines 22, 23, 24, and 25 was passed over. The lines read as follows:

A violation of any of the provisions of this section shall be deemed a misdemeanor, and shall be punishable by a fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both, in the discretion of the court.

Mr. REED. Mr. President, I have just returned to the Chamber, and I heard only the latter part of the proposition now before the Senate read, but as I understand that proposition it is to strike out the language on lines 22 to 25, on page 10, which reads:

A violation of any of the provisions of this section shall be deemed a misdemeanor and shall be punishable by a fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both, in the discretion of the court. .

Mr. WHITE. Mr. President——

Mr. REED. I wish to inquire if that is the proposition before the Senate.

The VICE PRESIDENT. It is the pending question. Does the Senator from Missouri yield to the Senator from Alabama?

Mr. REED. I do.

Mr. WHITE. I ask the Senator to yield to me long enough to offer an amendment that I shall propose when section 4 of the bill is reached in the Senate.

Mr. REED. I yield for that purpose.

Mr. WHITE. I am afraid I did not make myself clearly understood yesterday in my suggestions with reference to section 4. I should like to submit an amendment as a substitute for section 4, and have it printed, that Senators may consider it before the bill is finally disposed of. I also ask that the amendment may be printed in the RECORD.

The VICE PRESIDENT. The amendment will be printed and lie on the table for the present, and will also be printed in the RECORD, at the request of the Senator from Alabama.

The amendment is as follows:

Amendment intended to be proposed by Mr. WHITE to the bill (H. R. 15657) to supplement existing laws against unlawful restraints and monopolies, and for other purposes, viz: On page 4, line 13, strike out all of section 4 and insert in lieu thereof the following:

"SEC. 4. That it shall not be lawful to embody a condition in any contract relating to the sale or lease of or license to use any article or process protected by a patent or patents the effect of which will be to prohibit or restrict the purchaser, lessee, or licensee from using any article or class of articles, whether patented or not, or any patented process, supplied or owned by any person whomsoever, or the effect of which will be to require the purchaser, lessee, or licensee to acquire from any person whomsoever any article or class of articles not protected by the patent, and all contracts embracing any such conditions shall be null and void; and any person other than the purchaser, lessee, or licensee violating the provisions of this section shall be deemed guilty of misdemeanor, and upon conviction thereof shall be fined not exceeding $5,000 or by imprisonment not exceeding one year, or by both, in the discretion of the court."

Mr. REED. I understand the proposition now is to strike out the language I have referred to. Mr. President, I am opposed to striking out that penalty clause. I am opposed to it for all the reasons advanced in the argument regarding section 4.

To my mind a corporation ought not to be permitted to own the capital stock of another corporation, with the single exception that a corporation might be permitted to become the owner of capital stock in the same way that corporations are permitted to become the owners of real estate, where they are obliged to take it for debt; but in such an instance the corporation ought not to be permitted to vote the stock in the other corporation. We are not dealing with that specific question now, because the immediate amendment relates simply to the question of penalty.

I shall occupy the attention of the Senate only a few moments. I want to know that this proposition is thoroughly understood, and to make it understood is about all that I intend to attempt to do.

Section 8 provides in effect that no corporation engaged in commerce shall directly or indirectly acquire the capital stock of "another corporation engaged also in commerce where the effect of such acquisition is to eliminate or substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to create a monopoly of any line of commerce."

The committee agrees to that doctrine; and you will observe that it is limited in its operation simply to the acquisition of stock where the effect of it is to eliminate or substantially lessen competition or to create monopoly. I do not know why we should not as to that kind of act prescribe the same kind of penalty as we do for the commission of those acts prohibited by the Sherman law. The Sherman law makes every combination in restraint of trade, every attempt to restrain trade, punishable by fine and imprisonment. The right is also reserved to the civil court to prevent the wrong. My attention has also been called to the fact that the second paragraph of section 8 covers holding companies. The provision is:

No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, is to eliminate or substantially lessen competition between such corporations, or any of them—

And so forth.

If it is right to retain in the Sherman law a provision that any attempt to restrain commerce shall be punished by fine and imprisonment, why should not that same penalty be attached to these particular acts, the necessary and inevitable effect of which, if carried to any considerable extent, is to lessen competition? Why should we make a different classification here? Why should we, as to these particular practices, deal with them any differently than we do with the other practices or devices, all of which are employed by those seeking to restrain commerce? I do not intend to take the time of the Senate to repeat all that was said yesterday in regard to section 4, but every word of it with reference to section 4 is equally applicable here.

There is no chance for a mistake. The corporation that goes out and acquires the capital of another corporation, and begins to use it for the purpose of controlling that other corporation and lessening the competition between itself and that other corporation knows exactly what it is doing, just as much as men know what they are doing when they engage in any conspiracy in restraint of trade. The gentlemen who goes out and organizes a holding company, and gathers into that holding company a large number of competitive corporations, knows that by and through the organization of that holding company he is building a monopoly in this land; he knows that he is doing it for the very purpose of restraining trade; and that that is about the only reason why he ever adopts such a device.

This proposed law does not apply to the holding company for one corporation; that is permissible; it applies only when there is brought together in a holding company two or more corporations, the object being, through the holding company, to control two or more corporations and thus build up a monopoly.

I do not know to what extent Senators have studied the question of holding companies; but I say to the Senate that it is one of the favorite methods now employed by those who build monopoly. Instead of combining them together in one corporation, or instead of pooling the stock of a number of corporations and putting it in the hands of voting trustees—instead of resorting to the old, crude device of the builder of monopoly—they have now adopted the method of the holding company. I could by sending to my office and getting my memoranda and documents, I think, make this so plain that no one would doubt it, and I will do so if it is necessary; but I will say that the common practice that is now being employed is this: Here are two or three competing concerns in one community, two or three competing concerns in another community, and a half dozen other competing concerns in other communities, all of them to a greater or lesser extent in competition with each other. Accordingly, some enterprising gentleman proceeds to organize what is known as a holding company. It is a separate corporation, and its assets consist of the stock of these various independent and competing companies. It gathers a majority of that stock in these competing companies into its treasury, and against that capital thus acquired it proceeds to issue its own stock and its own bonds.

It follows, therefore, that the officers of the holding company become the dominant force in each one of the companies, the majority of the stock of which has been covered into the treasury of the holding company; and at once the competition has been ended between those companies, because the common stockholder of the majority of the stock of each of the formerly competing companies is not going to permit competition to go on which will lessen profits.

Why should that not be punished? Why should we deal gently with this device? Why should we not meet it by a penalty that will arrest it? We have started in here saying that we were going to select these well-known devices employed by monopolists the natural effect of which is to restrain trade, and that we propose to stop those practices. As I said yesterday, the President has told us in his message of last January that certain of these practices are now well known, and none is better known than the one to which I refer.

I know of an instance in the State of Iowa, so well and so ably represented by my friend upon the other side, where one of these holding companies, having acquired large interests in various cities in the State, has through its agents threatened with annihilation institutions that have refused to sell to it. I understand it to be a fact that something like 200 concerns in the State of Michigan have been united under one management in this way; but I do not care to take the time more than to state the facts in this brief way.

I insist, Mr. President, that as to this section the penalty clause should be retained. It was put here by the House of Representatives and ought to stay here, and I shall at the proper time ask for the yeas and nays on the amendment striking it out.

Mr. CUMMINS. Mr. President, I can not concur with the Senator from Missouri with respect to this section, for several reasons, which I will state with the utmost brevity. Wherever a stockholding interest amounts to a restraint of trade or is an attempt to monopolize or is a monopolization of any trade or commerce the offense is already punishable under the antitrust act, with which the section now under consideration does not interfere in any way.

The Senator from Missouri was not quite accurate in saying that the antitrust law condemned and made criminal an attempt to restrain trade. I do not recall the statute in that way. I

think it makes unlawful any restraint of trade or commerce, and it makes unlawful any attempt to monopolize or any monopolization, but does not include the attempt to restrain trade, unless it is also an attempt to create a monopoly. Therefore, wherever intercorporate stockholding results in a restraint of trade or results in monopoly it is already punishable in the criminal courts.

I have always very much doubted whether we needed any additional legislation with regard to what are ordinarily known as holding companies; that is, where one company holds the stock or controls the stock of two or more corporations which are engaged in a competitive business. The decision of the Supreme Court of the United States in the Northern Securities case, which presented directly the simplest form of a holding company, seems to have put that question in a position where it can be little helped by any additional legislation.

Mr. POINDEXTER. Mr. President——

The VICE PRESIDENT. Does the Senator from Iowa yield to the Senator from Washington?

Mr. CUMMINS. I yield.

Mr. POINDEXTER. I should like to ask the Senator if the Supreme Court in that case held that any holding by a corporation of the stock of two other competing corporations was illegal under the Sherman Antitrust Act?

Mr. CUMMINS. It did not so declare in express terms.

Mr. POINDEXTER. So, it seems to me, when we remember the rule laid down by the Supreme Court in the Standard Oil and the Tobacco Trust cases, in which they expressly held that every restraint of trade was not a violation of the Sherman Antitrust Act, but that some of them were reasonable and some were unreasonable, and that the restraint condemned was an unreasonable restraint of trade, that the rule laid down in this proposed statute is quite a different one from the rule of the Sherman antitrust law as construed by the Supreme Court. This proposed statute would make any holding, whether it was reasonable or unreasonable, of the stock of competing corporations by a holding company unlawful. It may not be unlawful under the Sherman Antitrust Act.

Mr. CUMMINS. No; the Senator from Washington is entirely mistaken with regard to the section that we are now considering, although that is what the section ought to do. I am not opposing additional legislation with regard to holding companies. The Northern Securities case presented this situation: A company organized under the laws of New Jersey, called the Northern Securities Co., became the owner of a controlling interest in the stock of the Northern Pacific Railroad Co. and the Great Northern Railroad Co., and the Supreme Court held that, inasmuch as these two railroads were and are competing companies, it was a restraint of trade for one company, even though it did not enter into the operation at all of the property, to own a controlling interest in both. I only suggest that for the purpose of indicating that wherever a holding company does actually restrain trade or does establish a monopoly or attempts to establish a monopoly we have a penal statute which applies to it.

That, however, is not my chief reason for believing that it is not wise to attach a criminal penalty to this section. I intend to offer a substitute for this section, and I necessarily argue the case from the standpoint of the substitute I shall offer. I do not believe in the section as it is; and I would have a good deal of trouble in voting for it, although I suppose I might as a last resort. I believe that instead of strengthening the law it rather weakens the law.

The amendment which I shall propose includes the existing situation as well as the future situation; that is to say, it makes it unlawful for one corporation to own the stock of another, the two being competing corporations, no matter when the stock was acquired.

We shall do very little to help the business of this country unless we can readjust the holdings which now exist; for, as I said yesterday, the business of this country is so completely crystallized, the lines have been so thoroughly established, that unless we can introduce competition where it is now substantially suppressed we shall not afford the people of the country the relief for which they are asking, and to which they are entitled. If the Senate adopts the amendment which I shall offer and which will apply to existing holdings as well as to future acquisitions, then, of course, it is clear that we ought not to make those holdings criminal offenses if they were lawful at the time they were acquired. Indeed, we probably could not if we would, and it would not be fair and just to do it if we could.

I believe that with the section as it is now proposed it would be unjust to attach a criminal penalty. See how it reads:

That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of

another corporation engaged also in commerce where the effect of such acquisition is to eliminate or substantially lessen competition * * * or to create a monopoly of any line of commerce.

Of course, that is already absolutely taken care of, and it would be absurd, if I may be permitted to use that word, to retain that phrase, "or to create a monopoly of any line of commerce." If we are to put that in, of course there ought to be a penalty, because we already have penalized that offense, and we must not disturb the antitrust law. I am anticipating, however, the argument which I shall briefly make when I shall come to offer my amendment. It ought to be obvious to anybody that if we redeclare the very offense that is declared in the antitrust law, and do not attach a penalty to it, we shall have repealed the antitrust law to that extent; and I think no one desires to do that.

But the further difficulty about the section as it is, as I view it, arises from the paragraph on page 9: If we are to give that latitude to this practice, I am not willing to say that a man who makes this mistake in applying it to his own affairs shall become a criminal.

This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition.

That is reasonably clear.

Nor shall anything contained in this section prevent a corporation engaged in commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business—

I challenge anybody to give such an illustration or definition of the clause I have just read as will make it clear so that it furnishes any real guide to men in conducting their business—or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to eliminate or substantially lessen competition.

When we attach a penalty to an act, it ought to be much more clearly understood than it would be understood under the language of this section.

Mr. WALSH. Mr. President——

Mr. CUMMINS. I yield to the Senator from Montana.

Mr. WALSH. It occurred to me that the framer of the bill doubtless had in mind the very common case of the establishment of branch stores. The parent corporation would like to establish a branch store in some distant city. Suppose they are engaged in the dry-goods trade, for instance. Claflin & Co. are an instance of what we have in mind.

Mr. CUMMINS. Yes.

Mr. WALSH. They have a store in Chicago, as I understand. They have a store in St. Louis. Those two stores, I take it, do not substantially compete.

Mr. CUMMINS. I can not quite appreciate that view, although it undoubtedly was the view of the authors of the section. We forbid, in the first place, intercorporate stockholding where the effect would be to substantially lessen competition as between two corporations. We proceed to make an exception to that rule in this proviso that eliminates subsidiary corporations. Therefore it is evident that the framers of the section thought there were some subsidiary corporations which would fall within the operation of the first part of the section unless expressly withdrawn. I do not understand that phase of it.

Mr. WALSH. No; let me show the Senator that is not quite accurate, because that likewise is qualified in the same way:

Nor shall anything contained in this section prevent a corporation engaged in commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to eliminate or substantially lessen competition.

If it is, the subsidiary corporations are equally condemned.

Mr. CUMMINS. If the effect is not to eliminate or substantially lessen competition, it does not come within the original condemnation.

Mr. WALSH. I agree with the Senator.

Mr. CUMMINS. Then why should there be the exception? I have been utterly at a loss, in endeavoring to discover the application of the paragraph to which we have just referred, to know to what case it would apply. I assume it must be intended to apply to a case or a class of cases; but it is unnecessary for me to extend my remarks upon that subject. If the amendment I shall propose is adopted—and I hope it will be—then I do not think there ought to be, and probably there could not be, a penal provision attached to it, and I intend to work in my votes toward the accomplishment of that purpose.

Mr. REED. Mr. President——

The VICE PRESIDENT. Does the Senator from Iowa yield to the Senator from Missouri?



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

# Market Division or Customer Allocation

Plain agreements among competitors to divide sales territories or assign customers are almost always illegal. Similarly, plain agreement among competing employers to not solicit or hire each other's employees are an unlawful allocation of employees in a labor market. These arrangements are essentially agreements not to compete: "I won't sell in your market if you don't sell in mine," or "I won't poach your employees if you don't poach mine." Individuals and companies that knowingly enter unlawful market-allocation agreements are routinely investigated by the FBI and other federal law enforcement agencies and can be criminally prosecuted. Potential penalties include lengthy terms of imprisonment (up to ten years) and large fines (up to $1 million for individuals, $100 million for companies, or twice the gain or loss from the offense). Where appropriate, the FTC may also bring civil enforcement action.

The FTC uncovered such an agreement when two chemical companies agreed that one would not in North America if the other would not sell in Japan. Illegal market sharing may involve allocating a specific percentage of available business to each producer, dividing sales territories on a geographic basis, assigning certain customers to each seller, or agreeing not to solicit one another's customers or employees.

Q: I want to sell my business, and the buyer insists that I sign a non-compete clause? Isn't this illegal?

A: A limited non-compete clause is a common feature of deals in which a business is sold, and courts have generally permitted such agreements when they were ancillary to the main transaction, reasonably necessary to protect the value of the assets being sold, and appropriately limited in time and area covered. There are other situations, however, in which non-compete clauses may be anticompetitive. For instance, the FTC stopped the operator of dialysis clinics from buying five clinics and paying its competitor to close three more. The purchase agreement also contained a non-compete clause that prevented the seller from opening a new clinic in the same local area for five

years, and required the seller to enforce non-compete clauses in its contracts with the medical directors of the closed facilities. In this situation, the non-compete clause prevented those doctors from serving as medical directors for any new clinic in the area and reduced the chance that a new clinic would open for five years. The FTC concluded that the agreement to close the clinics, reinforced by the agreement not to compete for five years, was an illegal agreement to eliminate competition between rivals.

Previous:                                        Up:                                        Next:
Group Boycotts                                                                    Other Agreements Among Competitors

Give Feedback

WCAS241

| 63D CONGRESS, | HOUSE OF REPRESENTATIVES. | REPORT |
| 2d Session. | | No. 627. |

## ANTITRUST LEGISLATION.

MAY 6, 1914.—Referred to the House Calendar and ordered to be printed.

Mr. CLAYTON, from the Committee on the Judiciary, submitted the following

# REPORT.

### [To accompany H. R. 15657.]

The Committee on the Judiciary, having had under consideration the bill (H. R. 15657) to supplement existing laws against unlawful restraints and monopolies, and for other purposes, report the same back with the recommendation that the bill be amended as follows, and that, as amended, it do pass.

Amendment: Strike out all after the enacting clause and insert in lieu of the language stricken out the following:

That "antitrust laws," as used herein, includes the act entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July second, eighteen hundred and ninety; sections seventy-three to seventy-seven, inclusive, of an act entitled "An act to reduce taxation, to provide revenue for the Government, and for other purposes," of August twenty-seventh, eighteen hundred and ninety-four; an act entitled "An act to amend sections seventy-three and seventy-six of the act of August twenty-seventh, eighteen hundred and ninety-four, entitled 'An act to reduce taxation, to provide revenue for the Government, and for other purposes,'" approved February twelfth, nineteen hundred and thirteen; and also this act.

"Commerce," as used herein, means trade or commerce among the several States and with foreign nations, or between the District of Columbia or any Territory of the United States and any State, Territory, or foreign nation, or between any insular possessions or other places under the jurisdiction of the United States, or between any such possession or place and any State or Territory of the United States or the District of Columbia or any foreign nation, or within the District of Columbia or any Territory or any insular possession or other place under the jurisdiction of the United States.

The word "person" or "persons" wherever used in this act shall be deemed to include corporations and associations existing under or authorized by the laws of either the United States, the laws of any of the Territories, the laws of any State, or the laws of any foreign country.

SEC. 2. That any person engaged in commerce who shall either directly or indirectly discriminate in price between different purchasers of commodities in the same or different sections or communities, which commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, with the purpose or intent to thereby destroy or wrongfully injure the business of a

★

the Attorney General should proceed to dissolve any of your labor organizations they could be dissolved. Is that your proposition?

Mr. GOMPERS. Yes, sir.

Mr. FLOYD. And that your existence, therefore, depends upon the sufferance of the administration which happens to be in power for the time being?

Mr. GOMPERS. Yes, sir.

Mr. FLOYD. What you desire is for us to give you a legal status under the law?

Mr. GOMPERS. Yes, sir.

Mr. FLOYD. So you can carry on this cooperative work on behalf of the laborers of the country and of the different organizations without being under the ban of the existing law?

Mr. GOMPERS. Yes, sir.

In the light of previous decisions of the courts and in view of a possible interpretation of the law which would empower the courts to order the dissolution of such organizations and associations, your committee feels that all doubt should be removed as to the legality of the existence and operations of these organizations and associations, and that the law should not be construed in such a way as to authorize their dissolution by the courts under the antitrust laws or to forbid the individual members of such associations from carrying out the legitimate and lawful objects of their associations. This will be accomplished by the provisions of section 7 of this bill, which recognize as legal the existence and operations of fraternal, labor, consumers, agricultural, or horticultural organizations, orders, or associations organized for purposes of mutual help, and not having capital stock or conducted for profit, and forbids the danger and possibility of the dissolution of such organizations, orders, or associations by a decree of the courts as unlawful combinations in restraint of trade or commerce under the provisions of the antitrust laws. It also guarantees to individual members of such organizations, orders, or associations, the right to pursue without molestation or legal restraint the legitimate objects of such association. This section should be construed in connection with sections 15 to 22, inclusive, which regulate the issuance of injunctions and provide for jury trials in certain cases of contempts in Federal courts. The sections relating to injunctions and contempts constitute for labor a complete bill of rights in equitable proceedings in United States courts.

This section further provides that nothing contained in the antitrust laws shall be construed to forbid associations of traffic, operating, accounting, or other officers of common carriers for the purpose of conferring among themselves or of making any lawful agreement as to any matter which is subject to the regulating or supervisory jurisdiction of the Interstate Commerce Commission. In actual practice the officers of common carriers in the interest of the public and to avoid complications must necessarily confer with the officers of other railroad companies, but as all agreements or arrangements made between them are subject to the jurisdiction of the Interstate Commerce Commission, your committee consider it but just to make clear that such associations are not in violation of the Sherman Act. When the desirability of this provision was brought to the attention of the committee, the question was referred to the Interstate Commerce Commission by the chairman of the committee for its opinion in regard to the proposed legislation, and this provision as drawn is in keeping with the views of the Interstate Commerce Commission.

ANTITRUST LEGISLATION.    **17**

## VIII.

### HOLDING COMPANIES.

Section 8 deals with what is commonly known as the "holding company," which is a common and favorite method of promoting monopoly. "Holding company" is a term, generally understood to mean a company that holds the stock of another company or companies, but as we understand the term a "holding company" is a company whose *primary* purpose is to hold stocks of other companies. It has usually issued its own shares in exchange for these stocks, and is a means of holding under one control the competing companies whose stocks it has thus acquired. As thus defined a "holding company" is an abomination and in our judgment is a mere incorporated form of the old-fashioned trust. Most of the corporations engaged in interstate commerce are organized under the laws of one or the other of the States. It is right that this should be so, and it is right that the various States, each of which has the right to exclude corporations of any other State from its borders, should exhibit comity to these other States, and that the Federal Government, which perhaps has the right to exclude corporations of any State from interstate commerce, should exhibit comity to all the States.

At common law a corporation had no right to own stock in another corporation, but from time to time the various States have, by special statutes, permitted it, until now certainly more than a majority of all the States permit corporate stockholding either generally or of certain kinds and under certain conditions. This legislation in its early operation may have served a useful, economic purpose. Trade and commerce could do as well without steam and electricity as without the idea of the commercial unit which is embodied in the word "corporation." Hence there are certain corporations which may properly be interested with individuals other than its own stockholders, but experience has taught us that the "holding company" as above described no longer serves any purpose that is helpful to either business or the community at large when it is operated purely as a "holding company." Section 8 is intended to eliminate this evil so far as it is possible to do so, making such exceptions from the law as seem to be wise, which exceptions have been found necessary by business experience and conditions, and the exceptions herein made are those which are not deemed monopolistic and do not tend to restrain trade.

## IX.

### INTERLOCKING DIRECTORATES.

Section 9 of the bill deals with the general subject of interlocking directorates. The President, in his message delivered before Congress on January 20, 1914, on the subject of trusts and monopolies, among other things, said:

We are all agreed that "private monopoly is indefensible and intolerable," and our program is founded upon that conviction. It will be a comprehensive but

18                             ANTITRUST LEGISLATION.

not a radical or unacceptable program, and these are its items, the changes which opinion deliberately sanctions and for which business waits:

It waits with acquiescence, in the first place, for laws which will effectually prohibit and prevent such interlockings of the *personnel* of the directorates of great corporations—banks and railroads, industrial, commercial, and public-service bodies—as in effect result in making those who borrow and those who lend practically one and the same, those who sell and those who buy but the same persons trading with one another under different names and in different combinations, and those who affect to compete in fact partners and masters of some whole field of business. Sufficient time should be allowed, of course, in which to effect these changes of organization without inconvenience or confusion.

Such a prohibition will work much more than a mere negative good by correcting the serious evils which have arisen because, for example, the men who have been the directing spirits of the great investment banks have usurped the place which belongs to independent industrial management working in its own behoof. It will bring new men, new energies, a new spirit of initiative, new blood, into the management of our great business enterprises. It will open the field of industrial development and origination to scores of men who have been obliged to serve when their abilities entitled them to direct. It will immensely hearten the young men coming on and will greatly enrich the business activities of the whole country.

In drafting the provisions of section 9 your committee has endeavored to carry out the recommendations of the President. In order that the corporations affected may have ample time in which to readjust their boards of directors in keeping with the requirements of this act, it is expressly provided that the provisions of this section shall not become effective until two years after the date of the approval of the act. This section is divided into three paragraphs, each of which relates to the particular class of corporations described, and the provisions of each paragraph are limited in their application to the corporations belonging to the class named herein.

The first paragraph deals with the eligibility of directors in interstate-railroad corporations, and provides that no person who is engaged as an individual or who is a member of a partnership or is a director or other officer of a corporation engaged in the business of producing or selling equipment, materials, or supplies, or in the construction or maintenance of railroads or other common carriers engaged in commerce, shall act as a director or other officer or employee of any other corporation or common carrier engaged in commerce to which he or such partnership or corporation sells or leases, directly or indirectly, equipment, material, or supplies, or for which he or such partnership or corporation, directly or indirectly, engages in the work of construction or maintenance. It is further provided in this paragraph that no person who is engaged as an individual or who is a member of a partnership, or is a director or other officer of a corporation which is engaged in the conduct of a bank or trust company, shall act as a director or other officer or employee of any common carrier for which he or such partnership, or bank, or trust company, acts, either separately or in connection with others, as agent for or underwriter of the sale or disposal by such common carrier of issues or parts of issues of its securities, or from which he or such partnership or bank or trust company purchases, either separately or in connection with others, issues or parts of issues of securities of such common carriers. The provisions of this paragraph prevent absolutely common directors or interlocking directors between corporations occupying relations to each other described therein, without any reference to the capital, surplus, and undivided profits of the corporations dealing with each other.