**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

FEDERAL TRADE COMMISSION,

       Plaintiff,

       v.

U.S. ANESTHESIA PARTNERS, INC. et al.

       Defendants.

Case No.: 4:23-CV-03560-KH

**ORAL ARGUMENT REQUESTED**

**REPLY IN SUPPORT OF DEFENDANT U.S. ANESTHESIA PARTNERS, INC.'S
<u>MOTION TO DISMISS THE FTC'S COMPLAINT</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................................ ii

INTRODUCTION ...........................................................................................................1

ARGUMENT ..................................................................................................................1

I.     THIS LAWSUIT EXCEEDS THE FTC'S STATUTORY AUTHORITY .......................1

      A.    The FTC Lacks Authority To Seek Injunctive Relief Independent Of
            Administrative Proceedings .....................................................................................2

      B.    The FTC Lacks Authority To Seek Injunctive Relief For Past Conduct ................6

II.    THE COMPLAINT FAILS TO ALLEGE PLAUSIBLE ANTITRUST CLAIMS ..........12

      A.    The Complaint Does Not Plausibly Allege A Relevant Product Market ..............12

      B.    The Complaint Does Not Plausibly Allege That USAP Has Monopoly Power ....14

      C.    The Complaint Does Not Plausibly Allege Conduct Violating Section 2 .............15

      D.    The Complaint Fails To State A Claim Under Section 7 Of The Clayton Act ......18

      E.    The Complaint Fails To State A Claim Under Section 1 Of The Sherman Act ....19

      F.    The FTC Has No "Standalone" Claim Under Section 5 Of The FTC Act ............20

CONCLUSION ................................................................................................................20

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

## CASES

*1-800 Contacts, Inc. v. FTC*, 1 F.4th 102 (2d Cir. 2021) ............................................................. 20

*Abbott v. United States*, 562 U.S. 8 (2010) .................................................................................... 3

*AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67 (2021) .................................................................. 3, 4

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620 (5th Cir. 2002) ................................... 12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................................................. 10, 17

*Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263 (2d Cir. 1979) ..................................... 15

*BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022) ............... 13

*Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643 (1980) ........................................................... 20

*Citizen Publ'g Co. v. United States*, 394 U.S. 131 (1969) .......................................................... 20

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984) ........................................ 18

*David B. Turner Builders LLC v. Weyerhaeuser Co.*,
603 F. Supp. 3d 459 (S.D. Miss. 2022) ................................................................................. 19

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*,
2002 WL 31164482 (S.D.N.Y. Sept. 30, 2002) ............................................................. 16, 17

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016), *aff'd*,
724 F. App'x 556 (9th Cir. 2018) .......................................................................................... 16

*Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F. App'x 186 (2d Cir. 2012) ................ 16

*FTC v. AbbVie Inc.*, 976 F.3d 327 (3d Cir. 2020) ......................................................................... 6

*FTC v. AdvoCare Int'l, L.P.*, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) ......................... 8, 10

*FTC v. Brown Shoe Co.*, 384 U.S. 316 (1966) ............................................................................. 20

*FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764 (7th Cir. 2019) .................................................... 6

*FTC v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008 (W.D. Tex. 2020) .................................. 8

*FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985) ...................................................... 6, 8-9

*FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447 (1986)......................................................... 20

*FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011)................ 13

*FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147 (3d Cir. 2019)............................................. 6, 10, 11

*FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982)........................................... 7

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004)............................ 14

*Hicks v. PGA Tour, Inc.*, 897 F.3d 1109 (9th Cir. 2018)...................................................... 14

*Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327 (11th Cir. 2010)........................................ 12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007).................................... 19

*Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998).............................. 4

*Madison 92nd St. Assocs. v. Courtyard Mgmt. Corp.*, 624 F. App'x 23 (2d Cir. 2015) .............. 13

*Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004).................................. 9

*New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026 (5th Cir. 2023) ...................................................................... 12

*North Texas Specialty Physicians v. FTC*, 528 F.3d 346 (5th Cir. 2008)...................................... 19

*Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064 (10th Cir. 2013) .................................................. 16

*Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) .......................................................... 19

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430 (3d Cir. 1997) ............................ 12

*Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421 (9th Cir. 1995) ................................................. 14

*Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873 (2019)........................................................ 5

*Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994)............................... 17

*SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978)................................................................... 11

*SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082 (2d Cir. 1972) .................................................. 7

*Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450 (5th Cir. 2021).................................... 13

*Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023)........................................................... 2

*Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir. 1999).............................. 15-16

*Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827 (5th Cir. 2023) .................................................. 6

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264 (9th Cir. 1975) ..... 13, 14

*United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811 (N.D. Tex. 2008)............. 10, 11

*United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957) ........................................ 9

*United States v. Google LLC*, 2023 WL 4999901 (D.D.C. Aug. 4, 2023) .................................. 16

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223 (1975) ..................................................... 10

*United States v. Moore*, 71 F.4th 392 (5th Cir. 2023) ..................................................................... 3

*United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940)................................................... 20

*Va. Excelsior Mills, Inc. v. FTC*, 256 F.2d 538 (4th Cir. 1958) ................................................... 20

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004) .............. 15, 18

*Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014) ................................................... 9

## STATUTES

15 U.S.C. § 18 ................................................................................................................................ 18

15 U.S.C. § 45(c) ............................................................................................................................. 6

15 U.S.C. § 53(b) ................................................................................................... 1, 2, 3, 5, 6, 7, 8, 9, 10, 11

## OTHER AUTHORITIES

IV Phillip E. Areeda et al., *Antitrust Law* (1998) .................................................................... 16-17

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law (2023) ................................................. 17

S. Rep. No. 93-151 (1973) ............................................................................................................... 5

U.S. Dep't of Justice & FTC, *Merger Guidelines* (Dec. 18, 2023) .............................................. 18

## INTRODUCTION

This lawsuit presents this Court with a case study of a government agency acting as if it were unbound by law.  Nearly every section of the FTC's opposition brief reflects its assertion of unconstrained legal authority in disregard of clear statutory limitations on its power.  With regard to procedure, Congress passed clear legislation defining the means by which the FTC may enforce its mandate, but the FTC disregards its terms.  Preferring district court litigation, the FTC contorts an obscure proviso to excuse foregoing the administrative proceedings required by statute.  And it attempts to litigate expired contracts and closed acquisitions in the face of an explicit prohibition on suing over past conduct.  With regard to substance, the FTC's claims would remake antitrust law, setting precedents for:  a market definition that excludes doctors of the same specialty; monopolization claims based solely on acquisitions without supracompetitive prices to follow; and a price-fixing claim without any agreement on prices.  Then, the FTC concludes its brief with the breathtaking claim that the FTC Act proscribes any and all practices that the FTC declares to be against public policy.  The FTC's self-aggrandizing theories defy credulity and threaten the rule of law.  They should be rejected and the Complaint dismissed.

## ARGUMENT

## I.  THIS LAWSUIT EXCEEDS THE FTC'S STATUTORY AUTHORITY

Section 13(b) of the FTC Act limits the FTC's authority to litigate in district court.  That provision requires that the FTC have "reason to believe" that an entity "is violating, or is about to violate" a provision of law enforced by the FTC, and that "the enjoining thereof pending the issuance of a complaint by the [FTC] . . . would be in the interest of the public."  15 U.S.C. § 53(b).  USAP's motion explained (at 11-22) why the FTC's lawsuit violates both requirements. The FTC offers no persuasive response.

1

### A.     The FTC Lacks Authority To Seek Injunctive Relief Independent Of Administrative Proceedings

The text of Section 13(b) is clear.  The FTC may seek injunctive relief against unlawful conduct in federal district court only when it concludes that "the enjoining thereof *pending the issuance of a complaint by the Commission* . . . would be in the interest of the public."  15 U.S.C. § 53(b) (emphasis added).  In such cases, the district court may grant a temporary restraining order or a preliminary injunction pending the FTC's filing of an administrative complaint.  *See id.*  The statute also provides that "*if a complaint is not filed* within . . . 20 days . . . after issuance of the temporary restraining order or preliminary injunction, the order or injunction shall be dissolved by the court and be of no further force and effect."  *Id.* (emphasis added).  Section 13(b) thus unambiguously makes the FTC's authority to obtain injunctive relief in federal court contingent upon the pendency of administrative proceedings within the agency.

The final clause of that same sentence states, after a colon:  "*Provided further*, That in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  *Id.*  The FTC relies exclusively on this subordinate proviso for its claim that the statute "allows the FTC to litigate its entire case in federal court without initiating an administrative proceeding."  Opp. at 8.  That claim of authority is irreconcilable with the statutory text.  Congress expressly tied the "permanent injunction" option to the foregoing "preliminary injunction" authority in several respects.  Those two possible forms of relief are grammatically linked—not only with a colon, but with the "Provided further" phrase placing additional emphasis on the linkage.  And the permanent injunction proviso refers to "*the* court," as in the already-specified court before whom the request for preliminary relief was filed.  *See, e.g.*, *Slack Techs., LLC v. Pirani*, 598 U.S. 759, 766-67 (2023) ("The statute uses the definite article to reference *the particular* registration statement alleged to be misleading . . . ." (emphasis

2

added)).  The FTC is therefore simply wrong that "Section 13(b) contains two separate grants of authority" with no functional relationship, Opp. at 8, despite Congress's decision to combine them within a single sentence.  To the contrary, in both its "grammatical and logical scope," the permanent injunction proviso carries with it the terms of the preliminary injunction authority "to which it is attached," *Abbott v. United States*, 562 U.S. 8, 25-26 (2010)—including the requirement of parallel administrative proceedings within the FTC.

The FTC's aggrandizing interpretation of its own authority not only defies the text of Section 13(b); it is at war with the provision's structure and context.  Section 13(b) is entitled "Temporary restraining orders; preliminary injunctions."  That title strongly suggests that the permanent injunction proviso is not a freestanding grant of authority, but rather appurtenant to the provision's principal subject—the FTC's authority to seek TROs and preliminary injunctions. *See United States v. Moore*, 71 F.4th 392, 397 (5th Cir. 2023) ("Titles . . . can be a helpful tool for statutory interpretation.").  Even more glaringly, the FTC's construction would render nugatory the majority of the provision in many if not most circumstances.  Simply by unilaterally choosing to seek a permanent injunction, the FTC would obviate the requirement to conclude that "enjoining [the unlawful conduct] pending the issuance of a complaint by the Commission . . . would be in the interest of the public," 15 U.S.C. § 53(b), and would foreclose any possibility that "the order or injunction . . . be dissolved by the court" in the event "a complaint is not filed," *id.*  To allow the 21 words of this proviso to trump the 200+ that precede them would epitomize the Supreme Court's warning against "allow[ing] a small statutory tail to wag a very large dog." *AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 77-78 (2021).

With the entire thrust of the provision against it, the FTC attempts to dredge some support from the Supreme Court's opinion in *AMG Capital*.  But *AMG Capital* expressly

reserved this question.  The Court first observed, on the one hand, that "the appearance of the words 'permanent injunction' (as a proviso) suggests that those words are directly related to a previously issued preliminary injunction."  *AMG Cap.*, 593 U.S. at 76.  The Court then acknowledged, on the other hand, that the provision "*might* also be read, *for example*, as granting authority for the Commission to go one step beyond the provisional and ('*in proper case*s') dispense with administrative proceedings."  *Id.* (emphasis added).  Resolution of these alternative readings was not necessary for the Court to reach its holding that Section 13(b) did not authorize an award of equitable monetary relief.  The FTC's out-of-context citations to the Court's caveat-laden dicta thus shed no light on the question at issue here.  Instead, the important takeaway from *AMG Capital* is that the Court unanimously rejected the FTC's claim of authority, in the face of a consensus in the courts of appeals blessing that authority, because the FTC's interpretation contradicted the text of the statute.  *See also Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998) ("If we do our job of reading the statute whole, we have to give effect to this plain command, even if doing that will reverse the longstanding practice under the statute and the rule."  (citations omitted)).  The question at issue here—which the Fifth Circuit has yet to address—should yield the same result.

As a last resort, the FTC points to the supposed inefficiency of complying with the statute as Congress drafted it, claiming that a permanent injunction would be redundant with an administrative cease-and-desist order.  But initiating administrative proceedings as the statute commands would not render the court's permanent-injunction authority superfluous.  Consistent with the proviso's location as Section 13(b)'s final, subordinate clause, the legislative history suggests that Congress likely intended the permanent injunction option to play no more than a minor docket-management role.  In circumstances "when a court is reluctant to grant a temporary

injunction because it cannot be assured of a[n] early hearing on the merits," the proviso would allow the court (on the FTC's motion) to "set a definite hearing date," S. Rep. No. 93-151, at 30-31 (1973), at which point the court could convert the preliminary injunction into a permanent one and dispose of the case, rather than allowing it to languish on the docket indefinitely.  Moreover, Congress further circumscribed the permanent injunction option by limiting it to "proper cases." 15 U.S.C. § 53(b).  Congress failed to elaborate on the meaning of that term, which might refer to obvious scams where the showing of liability is overwhelming, or cases where the scope of the FTC's cease-and-desist order requires additional court-ordered relief as a backstop, or cases where the defendant agrees to such relief at an early stage of the proceedings.[1]  But whatever its meaning, Congress's inclusion of that limitation further reflects an expectation that district courts would exercise their permanent-injunction authority in a discrete subset of cases, rather than allowing it to duplicate the FTC's administrative process wholesale.

More fundamentally, the FTC's appeal to the canon against superfluity (which applies with even greater force to the FTC's own reading, given the vast superfluities it generates) does not excuse the FTC from compliance with the statute.  Congress may have many reasons, or no reason at all, for establishing overlapping procedures, but "[r]edundancy is not a silver bullet," because "[s]ometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019).  And in any event, regardless of whether the two parallel proceedings would ultimately accomplish the same end, Congress designed the FTC's administrative process to include unique protections for litigants that are not

---

[1] That limitation may also make sense of the cryptic snippet of legislative history on which the FTC relies, which links the permanent injunction option to the "routine fraud case" in which the FTC finds it unnecessary "to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order."  S. Rep. No. 93-151, at 31.

present in district court litigation.  Most notably, a party before the agency's internal tribunal retains an ultimate right of appeal to a court of appeals of that party's choosing in the event the FTC prevails.  *See* 15 U.S.C. § 45(c).  The mere possibility that a permanent injunction could diminish the practical import of administrative proceedings to some limited extent does not justify allowing the FTC to unilaterally sidestep such proceedings whenever it chooses, and thereby revoke the procedural rights that Congress conferred.

Section 13(b) simply does not authorize the FTC to seek a permanent injunction in the absence of parallel administrative proceedings.  In the end, the FTC's only defense for proceeding *ultra vires* in this manner is the agency's longstanding practice of doing so, and the blessing of prior courts that "assume[d] the Commission's authority without analyzing the statute."  *Texas v. Nuclear Regul. Comm'n*, 78 F.4th 827, 840-42 (5th Cir. 2023).  This Court should follow the law and dismiss the FTC's complaint for its failure to initiate administrative proceedings as required by Section 13(b).

**B.     The FTC Lacks Authority To Seek Injunctive Relief For Past Conduct**

Section 13(b) also unambiguously limits the FTC's litigating authority to circumstances when the defendant "is violating, or is about to violate" a law enforced by the FTC.  15 U.S.C. § 53(b).  The phrase "is violating" refers to a present or ongoing violation; the phrase "is about to violate" refers to an imminent or impending future violation.  Courts across the country have thus repeatedly recognized that the statute limits the FTC's ability to proceed in district court to violations that are "imminent or ongoing."  *See FTC v. AbbVie Inc.*, 976 F.3d 327, 376 (3d Cir. 2020); *FTC v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 772, 774 (7th Cir. 2019) ("ongoing and imminent future violations"); *see also FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019) ("existing or impending").  Conversely, the FTC cannot invoke Section 13(b) "to remedy a past violation."  *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1089 (9th Cir. 1985).

The FTC contends that it possesses a uniquely broad litigating authority in the Fifth Circuit due to the interpretation supposedly given to Section 13(b) in *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711 (5th Cir. 1982). That is incorrect. *Sunsites* involved the FTC's prosecution of a scheme of misrepresentations made in connection with the sale of real estate holdings in Southwest Texas. The FTC's complaint had "allege[d] that the defendants were *continuing to misrepresent and failing to disclose* material facts to purchasers." *Id.* at 722 (emphasis added). Unlike in this case, the FTC had sought and obtained a preliminary injunction, which the district court deemed "necessary to restrain [the] alleged unfair practices, pending a Section 5 administrative proceeding," given the ongoing threat posed by the defendant's deceptive practices. *Id.* at 717. The Fifth Circuit affirmed the preliminary injunction, relying on the magistrate's factual finding that "sales on-site are continuing" and that the defendant's practices were "still in place." *Id.* at 723. In other words, the unlawful conduct that the FTC sought to enjoin was clearly ongoing, and there was no serious question that the FTC had plausibly alleged that Southwest Sunsites was "violating, or . . . about to violate" the law. 15 U.S.C. § 53(b).

The FTC focuses exclusively on a brief discussion in the final section of the *Sunsites* opinion, in which the court rejected the defendant's cross-appeal arguing that the FTC had failed to allege any "continuing or future violations" justifying an injunction. 665 F.2d at 723. The court disposed of that argument with precisely two sentences of analysis. The first sentence concluded that the district court "acted well within its discretion" in issuing its order. *Id.* The second, quoting a Second Circuit opinion from before the passage of Section 13(b), noted that the evidence in the case gave rise to a "fair inference of a reasonable expectation of continued violations" absent injunctive relief. *Id.* (quoting *SEC v. Manor Nursing Ctr., Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)).

From this snippet of dicta, the FTC attempts to manufacture a bespoke Fifth Circuit standard that broadens its Section 13(b) authority beyond the statutory text and the interpretation of every other court of appeals.  But nowhere did the *Sunsites* court purport to loosen the requirement that the defendant be "violating, or . . . about to violate" the law for the FTC to proceed in court.  15 U.S.C. § 53(b).  And the post-*Sunsites* district court opinions the FTC cites involve similarly ongoing conduct that clearly satisfied the statute.  *See*, *e.g.*, *FTC v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020) (noting that the "allegedly unlawful payment processing was continuing in the months and weeks leading up to the original complaint's filing, and even into the days after").  To the extent these courts interpreted *Sunsites*' dicta to authorize a broadening of the statutory standard, that aspect of their opinions should be disregarded.  As other courts within the Fifth Circuit have recently and properly recognized, Section 13(b) requires the FTC to plausibly allege "ongoing or impending violations" of law. *E.g.*, *FTC v. AdvoCare Int'l, L.P.*, 2020 WL 6741968, at *5 (E.D. Tex. Nov. 16, 2020).  *Sunsites* is entirely consistent with that understanding.

When the proper statutory standard is applied, the FTC's complaint plausibly alleges only two instances of conduct by USAP that is ongoing or imminent:  the two billing agreements that USAP inherited from the practices it acquired and that the FTC alleges "remain[] active today." Compl. ¶ 189 (TMHPO); 196 (Dallas Anesthesiology Associates).[2]  Those agreements, which the FTC describes in six pages of its 106-page complaint, are the principal basis for one of the FTC's claims (Count IX) and tangentially invoked in support of three others (Counts I, IV, and VIII).  The remaining conduct recounted in the complaint—including USAP's acquisitions and its non-compete agreement with Envision—has "completely ceased," and "injunctive relief

---

[2] USAP terminated the latter agreement in November 2023.

under § 13(b) is therefore precluded." *Evans*, 775 F.2d at 1088.  At a minimum, the FTC's

Clayton Act claims, which exclusively concern USAP's acquisitions (Counts II, V, and VII), and

its Section 1 market-allocation claim, which exclusively concerns USAP's non-compete with

Envision (Count X), exceed the FTC's authority under Section 13(b) and thus require dismissal.

       **USAP's Acquisitions Are Neither Imminent Nor Ongoing.**  The pattern of acquisitions

detailed in the FTC's complaint took place over the course of just over seven years—beginning

with USAP's acquisition of GHA in December 2012, and concluding with its acquisition of

Guardian Anesthesia Services in January 2020.  *See* Compl. ¶¶ 95 (GHA); 112 (Guardian).  The

complaint does not allege any actual or contemplated acquisitions since January 2020.  "[A]

merger is a discrete act, not an ongoing scheme."  *Midwestern Mach. Co. v. Nw. Airlines, Inc.*,

392 F.3d 265, 271 (8th Cir. 2004).  The FTC has failed to plausibly allege that USAP's series of

acquisitions constitutes a means by which USAP "is violating" the law.  15 U.S.C. § 53(b).

       In response, the FTC first appears to contend (at 15) that whenever any entity makes a

supposedly unlawful acquisition, that entity "is violating" the antitrust laws in perpetuity for

purposes of a Section 13(b) lawsuit.  That theory, once again, attempts to balloon the FTC's

authority at the expense of the statute's clear teams.[3]  The FTC claims support for this reading

from two Supreme Court cases (and one out-of-circuit district court case that relied principally

on them), but both are far afield.  In *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S.

586, 603-05 (1957), the Department of Justice—not subject to Section 13(b)—alleged ongoing

wrongful conduct involving du Pont's use of a non-controlling stock interest to steer supply

contracts to its subsidiaries and away from its competitors, foreclosing a substantial share of the

---

[3] It also threatens to create considerable uncertainty for companies, "raising the risks associated with mergers and thereby discouraging companies from merging."  *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 604 (6th Cir. 2014).

market.  And in *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 225-26 (1975), the Court upheld a fine for ongoing violation of a consent decree—not federal antitrust law—because the consent order covered "both the initial transaction and the maintaining of the rights" acquired in that transaction.  Both cases concern materially different factual circumstances and therefore fail to justify the FTC's proposed elimination of Section 13(b)'s clear limits.

The FTC also fails to plausibly allege that USAP is "about to violate" the law with additional acquisitions.  15 U.S.C. § 53(b).  The complaint contains the single, bare allegation that "USAP continues to plan for acquisitions in Texas, as well as elsewhere, and is well-positioned to continue its conduct."  Compl. ¶ 335.  But such "a naked assertion . . . without some further factual enhancement . . . stops short of the line between possibility and plausibility."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  It is not enough for the FTC to plead "a vague and generalized likelihood of recurrent conduct"; rather, it must "*make a showing* that a defendant is violating or is about to violate the law."  *Shire*, 917 F.3d at 159 (emphasis added); *see also AdvoCare*, 2020 WL 6741968, at *4 ("A bare allegation by the FTC that 'we have reason to believe that the defendant is about to violate the law,' when unaccompanied by supporting factual allegations, clearly does not 'state a claim to [injunctive] relief that is plausible on its face.'"  (quoting *Twombly*, 550 U.S. at 570)).

Yet again, the FTC urges this Court to loosen Section 13(b)'s requirements, this time by applying the six "non-exclusive factors" from *United States v. Cornerstone Wealth Corp.*, 549 F. Supp. 2d 811, 816 (N.D. Tex. 2008).  *See* Opp. at 18.  But the Fifth Circuit has never adopted this six-factor test, and for good reason, as it bears almost no resemblance to the statutory text it purports to implement.  The FTC never explains how factors like "the egregiousness of the defendant's actions," "the degree of scienter involved," or "the defendant's recognition of the

wrongful nature of his conduct" correspond to the simple inquiry that Congress directed: whether the FTC can plausibly allege that USAP is "about to violate" the law. 15 U.S.C. § 53(b). Nor can it. These factors, and the "holistic and contextual analysis" that they require, Opp. at 18, derive from the SEC enforcement context, *see* 549 F. Supp. 2d at 816 (citing *SEC v. Blatt*, 583 F.2d 1325 (5th Cir. 1978)), and *Cornerstone Wealth* incorporated them wholesale in defiance of Section 13(b)'s straightforward text. The FTC lacks statutory authority to litigate its claims concerning USAP's acquisitions, and this Court should therefore dismiss Counts II, V, and VII.

**USAP's Non-Compete with Envision is Neither Imminent Nor Ongoing.** The FTC does not venture a serious defense of its authority to litigate Count X, regarding USAP's non-compete agreement with Envision, under Section 13(b). That agreement expired in December 2019, over four years ago, *see* Compl. ¶ 214, so there can be no dispute that any violation of law is no longer ongoing. And the FTC does not even attempt to plausibly allege that USAP is "about to violate" the statute in any similar manner. The USAP-Envision non-compete is exactly the sort of "violation in the distant past" that the FTC may not use Section 13(b) to litigate. *Shire*, 917 F.3d at 159. The Court should therefore dismiss Count X.

Finally, the FTC attempts to argue that even purely backward-looking claims like Count X are fair game under Section 13(b) because the complaint "plausibly alleges an ongoing consolidation scheme" of which all the purported misconduct is part. Opp at 17. But as explained above, the only plausible allegations of ongoing or imminent conduct pertain to the two billing agreements that USAP inherited from other practices, one of which has now been terminated. This Court should reject the FTC's attempt to bootstrap a single legacy billing agreement into a sprawling lawsuit attacking every aspect of USAP's foundation and operations

11

over the past 15 years.  Congress enacted Section 13(b) to allow the FTC to obtain speedy injunctive relief against present or imminent violations of law.  The FTC is bound to stay within that statutory mandate, and this Court should ensure that it does so.

## II.    THE COMPLAINT FAILS TO ALLEGE PLAUSIBLE ANTITRUST CLAIMS

USAP's motion also showed that the FTC's antitrust claims are implausible for multiple reasons—principally, that the asserted market improperly excludes important competitors (at 22-26) and that the challenged conduct harmed neither competition nor consumers (at 26-35).  The FTC's opposition overcomes neither showing.

### A.    The Complaint Does Not Plausibly Allege A Relevant Product Market

The FTC's claims largely depend on its contention (at 21-25) that USAP has a high share of an asserted market for "hospital-only" anesthesia services.  But the FTC fails to overcome the fatal flaw USAP identified (at 22-26):  the asserted market implausibly excludes physicians (as well as CRNAs and CAAs) that currently perform identical services and could perform them in hospitals if USAP were to raise its prices above competitive levels.

Contrary to the FTC's suggestion (at 21), no black-letter principle bars the Court from dismissing the case on that ground now.  As the Fifth Circuit and many other courts have recognized, a plaintiff cannot state an antitrust claim if the pleaded market arbitrarily excludes potential substitutes.  *See*, *e.g.*, *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1038 (5th Cir. 2023) (affirming dismissal of antitrust complaint because market did not include "reasonably interchangeable substitutes" and thus was "unduly narrow and legally insufficient").  *See also Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002) (affirming dismissal on the pleadings); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436-47 (3d Cir. 1997).  The Court should decline the FTC's

12

invitation (at 21) to speculate that discovery might yield a stronger basis for the FTC's market definition than its years-long, pre-suit investigation did.

On the merits, the FTC does not claim that the anesthesia services provided to hospitalized patients inherently differ from those provided to patients in other settings. *Cf. Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453-54 (5th Cir. 2021) (asserted market for "pediatric anesthesia services" provided within an eight-county radius "insufficient as a matter of law" because it failed to "encompass all interchangeable substitute products"). The FTC instead reiterates the obvious (at 23-25): patients who must be hospitalized must receive anesthesia services in a hospital. But the FTC fails to connect this tautology about *physicians'* treatment of *patients* to the market-definition question that matters on its theory of competitive harm: whether, when *USAP* negotiates with *insurers*, competition from non-hospital anesthesiologists constrains USAP's "ability to raise prices above the competitive level." *Madison 92nd St. Assocs. v. Courtyard Mgmt. Corp.*, 624 F. App'x 23, 28 (2d Cir. 2015) (citation omitted); *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 512 F.2d 1264, 1274 (9th Cir. 1975) (setting aside market definition as legally erroneous because the district court had misidentified the relevant buyers and sellers).[4]

Indeed, even granting for argument's sake that insurers distinguish between "hospital-only" and other anesthesia services, the FTC's allegations would remain insufficient because they fail to account for the common pool of physicians (and CRNAs and CAAs) that can work in either setting. Citing nothing, the FTC dismisses this as "miss[ing] the point" (at 24), suggesting

---

[4] The FTC's cases (at 24) are beside the point: setting aside that they are against hospitals (making a hospital-limited market more plausible than here), in neither case did the defendant challenge the relevant product market. *See BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 530 (5th Cir. 2022); *FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281, at *9 (N.D. Ohio Mar. 29, 2011).

that *only* buyer-side substitution is legally relevant.  That is incorrect.  As the FTC itself explains, "[t]he goal" of market definition "is to 'identify the market participants and competitive pressures that restrain an individual firm's ability to raise prices or restrict output.'"  Opp. at 22 (quoting *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 496 (2d Cir. 2004)).  The FTC's own quoted authority recognizes that a firm's "ability to raise prices or reduce output is not only constrained by current substitutes but also by actual or potential competitors capable of providing new competition quickly with little sunk costs."  *Geneva Pharms.*, 386 F.3d at 499 (defining narrow market only after finding absence of supply substitution); *see also Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1436 (9th Cir. 1995) ("A reasonable market definition must also be based on 'supply elasticity,'" not only demand elasticity.); *Twin City*, 512 F.2d at 1271 ("Where the degree of substitutability in production is high, cross-elasticities of supply will also be high, and again the two commodities in question should be treated as part of the same market.").

The FTC's attempt to address supply substitution (at 25) fails.  The Court will search the cited paragraphs in vain for well-pleaded *facts* alleging that only those anesthesiologists currently practicing in a hospital constrain USAP's prices.  The FTC's alleged market thus does not (as the FTC concedes (at 22) it must) "encompass[ ] the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business."  *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018) (citation omitted).

## B.    The Complaint Does Not Plausibly Allege That USAP Has Monopoly Power

Even accepting the FTC's implausible product market allegations, the FTC fails to allege that USAP has monopoly power in this market.  As USAP explained, the rates the FTC complains about *already* had been negotiated by USAP's predecessor.  *See*, *e.g.*, Compl. ¶¶ 107, 111, 115.  The FTC nowhere alleges that USAP otherwise raised rates in real terms.  And as for

the FTC's principal pricing allegation—that USAP employed "tuck-in clauses" to raise the rates of newly acquired practices to USAP's own—the FTC cites no authority for the notion that this standard practice of post-acquisition consolidation demonstrates monopoly power.

The FTC suggests (at 26) that monopoly power is present because USAP's predecessor had the power to charge "supracompetitive prices" and (*id.*) USAP's counterparties want to pay less. Of course, every counterparty wants to pay less. But the FTC never alleges that USAP's predecessor charged monopoly rates. The FTC also does not allege that USAP's predecessor unlawfully acquired or maintained any monopoly power it supposedly had in any (unidentified) market, so even monopoly rates concededly would have been lawful. *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) ("The mere possession of monopoly power, and the concomitant charging of monopoly prices, is not only not unlawful; it is an important element of the free-market system."). If the FTC were correct that USAP subsequently acquired a monopoly its predecessor did not have, then USAP's prices would have *exceeded* those of its predecessor—and only those further increases could constitute anticompetitive effects of USAP's acquisitions. *Cf. Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297-98 (2d Cir. 1979) (antitrust plaintiff may "recover" as damages "only for the price increment that 'flows from' the distortion of the market caused by the monopolist's anticompetitive conduct," rather than legitimately acquired power). The FTC alleges no well-pleaded facts supporting such an incremental price increase, undermining any claim that USAP has monopoly power in any well-defined market.

## C.  The Complaint Does Not Plausibly Allege Conduct Violating Section 2

The Complaint also should be dismissed because it fails to allege that USAP "acquired or maintained [monopoly] power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or

historic accident." *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 522 (5th Cir. 1999); *see* Mot. at 28-31.

**1.** The FTC primarily relies (at 27) on the notion that "a series of acquisitions of direct competitors" can constitute anticompetitive conduct even if no one of those acquisitions is even alleged to harm consumers.  That is not the law:  again, if none of the categories of conduct is individually anticompetitive, "they are not cumulatively anti-competitive either." *Eatoni Ergonomics, Inc. v. Rsch. in Motion Corp.*, 486 F. App'x 186, 191 (2d Cir. 2012); *see also United States v. Google LLC*, 2023 WL 4999901, at *12 (D.D.C. Aug. 4, 2023) ("[W]hen determining whether plaintiffs have met their *prima facie* burden, courts can only aggregate conduct that is itself deemed anticompetitive (even if only minimally so).").  The FTC's cases (at 27) do not hold otherwise; they instead stand for the proposition that courts may consider the aggregate effects of conduct *already shown to be anticompetitive*—not that a court may aggregate conduct that does not violate any of the established "specific rules for common forms of alleged misconduct," *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013) (Gorsuch, J.), and declare that zero plus zero is more than zero.

The FTC further fails to substantiate its claim (at 28) that USAP's conduct "harm[ed] the competitive process."  On the FTC's telling (*id.*) the fact of the acquisition is itself harm to the competitive process.  That is not the law either:  acquisitions often increase competition and benefit consumers. *See Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) ("plaintiffs cannot rely on the fact of the acquisitions alone"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018); *Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) ("[T]he mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality.") (quoting IV Phillip E.

Areeda et al., *Antitrust Law* ¶ 901a (1998)).  This is particularly true when (as is true of the later acquisitions at issue here) an established firm acquires a fledgling competitor:  there are obvious opportunities for benefits not only to the acquiring company, but also to consumers.  *See Dresses for Less*, 2002 WL 31164482, at *12 ("horizontal mergers are much more likely to be procompetitive than anticompetitive"); *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 901a (2023).

The FTC makes only the most minimal effort (at 28) to allege that these acquisitions in particular harmed the competitive process and consumers.  To the extent that the FTC makes any concrete allegations of consumer harm, it once again asserts that USAP's "tuck-in clauses" were the mechanism by which it raised rates for anesthesia services.  But the tuck-in clauses did not raise *USAP's* rates; they merely raised the rates of *the practices USAP acquired* to USAP's own, and the FTC fails to allege that *those* prices were supracompetitive.  More importantly, the FTC points to no case in which a court has held that an acquirer's effort to conform its newly acquired subsidiary's prices with its own constitutes exclusionary conduct.  The FTC therefore asks this Court to break new ground in finding such bare allegations sufficient to constitute a violation of the antitrust laws.

Aside from the tuck-in clauses, the FTC can only speculate that anesthesia prices might have been lower but for the acquisitions.  But that speculation is not enough to make its claim plausible.  *See Twombly*, 550 U.S. at 555 (conclusory allegations must be disregarded); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects is not enough.").[5]

---

[5] The FTC also briefly points (at 29) to its challenges to certain of USAP's agreements. As the FTC makes no independent argument that they constitute exclusionary conduct, USAP addresses them below.

17

**2.**   The FTC also fails to meaningfully address the federal No Surprises Act and related Texas legislation.   As USAP explained (at 27 n.9), these statutes make implausible the claim that USAP could exercise monopoly power in the future.   *Cf. Trinko*, 540 U.S. at 412 (affirming dismissal of Section 2 claim) ("Where [a regulatory structure designed to deter and remedy anticompetitive harm] exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny.").

To this the FTC's only answer (at 26 n.9) is to speculate that the effects of the statute are uncertain.   But a federal agency's guess that a federal statute might not achieve its intended goal—supported by no well-pleaded *facts*—is not a well-pleaded allegation that USAP in fact has any exploitable power to charge supracompetitive prices.   Because this legislation prevents USAP from exercising any apparent monopoly power, the pre-enactment price increases the FTC invokes (at, e.g., 26) cannot show that the acquisitions in question have ongoing anticompetitive effects.   As explained above, such allegations are required under Section 13(b).

**3.**   The FTC defends its conspiracy-to-monopolize theory (at 29) with one paragraph pointing to its opposition to Welsh Carson's motion to dismiss.   For the reasons explained in Welsh Carson's reply brief, the FTC's conspiracy claim cannot be squared with *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), and should be dismissed.

**D.**     **The Complaint Fails To State A Claim Under Section 7 Of The Clayton Act**

The Complaint fails to state a Section 7 claim for the above reasons, and also because the record of the years since these acquisitions closed belies any notion that the effect of those acquisitions "may be substantially to lessen competition."   15 U.S.C. § 18.   In answer to this (at 30), the FTC invokes the analytical framework developed principally for *pre-consummation* merger challenges.   *See* Opp. at 30 (citing, *e.g.*, U.S. Dep't of Justice & FTC, *Merger Guidelines*

(Dec. 18, 2023)).  As USAP explained (at 31-32), however, that framework makes little sense as applied here:  the mergers in question closed long ago, so the Court can assess their *actual* effects rather than attempt to *predict* them.  *Cf. David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 466 (S.D. Miss. 2022) (dismissing section 7 claim where complaint did "not provide any facts to plausibly suggest the probability of anticompetitive results" from the acquisitions in question).  For the reasons already explained, even as pleaded, those effects make the FTC's Section 7 claim implausible.

### E.      The Complaint Fails To State A Claim Under Section 1 Of The Sherman Act

The FTC's Section 1 claim should be dismissed because the agreement the FTC describes is not an agreement to engage in "price-fixing" (or, to use the FTC's euphemism (at 31), "price-setting").  *See* Mot. at 32-35.  Unlike agreements between competitors not to compete, agreements that are fundamentally *vertical* (that is, between firms playing different, complementary roles within a given market) are presumptively procompetitive and subject to antitrust scrutiny only under the Rule of Reason.  *See*, *e.g.*, *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2285 (2018) (explaining that plaintiffs must shoulder a higher burden of proof in challenging a vertical restraint).

The FTC does not argue that it can prevail under the Rule of Reason, instead invoking (at 33-34) the *per se* rule (and, in passing, the "quick look" standard discussed in *North Texas Specialty Physicians v. FTC*, 528 F.3d 346, 360, 363-71 (5th Cir. 2008)).  But most of the cases on which it relies (at 32-34) were decided long before the Supreme Court modernized antitrust law's treatment of vertical restraints.  *See*, *e.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877 (2007) (holding that vertical price restraints are not *per se* illegal, but instead are subject to Rule of Reason review).  More to the point, the only relevant principle for which those cases stand is that whether an agreement constitutes horizontal price fixing of the sort

unlawful under *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150 (1940), turns on

economic substance (not form).[6]  For the reasons USAP explained (at 33-35), the agreements the

FTC challenges are not price-fixing agreements, and its Section 1 claim is implausible.

### F.      The FTC Has No "Standalone" Claim Under Section 5 Of The FTC Act

The FTC asserts (at 34) that, even if it has failed to state violations of the antitrust laws, it

still may proceed under Section 5 of the FTC Act, on the astonishing ground that that provision

proscribes any and all "practices the Commission determines are against public policy."  Opp. at

34.  None of its authorities so holds.  Instead, they stand for the unremarkable proposition that

Section 5 is not strictly limited to "practices that violate the Sherman Act and the other antitrust

laws," *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 454-55 (1986), and none of its other cases

finds a Section 5 violation absent either harm to competition or an incipient practice "that, when

full blown, would violate" the antitrust laws.  *E.g.*, *FTC v. Brown Shoe Co.*, 384 U.S. 316, 321

(1966); *cf. 1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 122 (2d Cir. 2021) (where conduct does

"not constitute a violation of the Sherman Act . . . an asserted violation of the FTC Act fails of

necessity").  There is no evidence that Congress intended to grant the FTC the boundless

authority it claims.  And no court in the Fifth Circuit has ever permitted a "freestanding" Section

5 challenge to conduct held lawful under the antitrust laws.  This Court should not be the first.

### CONCLUSION

The Court should dismiss the FTC's complaint in its entirety.

---

[6] *See*, *e.g.*, *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (competing wholesalers agreed not to extend credit); *Citizen Publ'g Co. v. United States*, 394 U.S. 131, 134 (1969) (multi-part "agreement" among competing newspapers with a "purpose . . . to end any business or commercial competition"); *Va. Excelsior Mills, Inc. v. FTC*, 256 F.2d 538 (4th Cir. 1958) (similar agreement among producers of wood product).

Dated: February 26, 2024

Respectfully submitted,

 /s/ *Mark C. Hansen*

David J. Beck (TX Bar No. 00000070)
  (Federal I.D. No. 16605)
Garrett S. Brawley (TX Bar No. 24095812)
  (Federal I.D. No. 3311277)
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX  77010
Tel: (713) 951-3700
Fax: (713) 951-3720
dbeck@beckredden.com
gbrawley@beckredden.com

Mark C. Hansen (D.C. Bar No. 425930)
  (*Pro Hac Vice*)
Attorney-in-Charge
Geoffrey M. Klineberg (D.C. Bar No. 444503)
  (*Pro Hac Vice*)
David L. Schwarz (D.C. Bar No. 471910)
  (*Pro Hac Vice*)
Kevin J. Miller (D.C. Bar No. 478154)
  (*Pro Hac Vice*)
Dennis D. Howe (D.C. Bar No. 90011114)
  (*Pro Hac Vice*)
Derek C. Reinbold (D.C. Bar No. 1656156)
  (*Pro Hac Vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
dschwarz@kellogghansen.com
kmiller@kellogghansen.com
dhowe@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Defendant U.S. Anesthesia Partners, Inc.*

21

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2024, I filed the foregoing document with the Court and served it on opposing counsel through the Court's CM/ECF system.  All counsel of record are registered ECF users.

Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen