**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | Case No.: 4:23-CV-03560-KH |
| U.S. ANESTHESIA PARTNERS, INC. et al. | |
| Defendants. | |

**APPENDIX TO REPLY IN SUPPORT OF DEFENDANT U.S. ANESTHESIA
PARTNERS, INC.'S MOTION TO DISMISS THE FTC'S COMPLAINT**

## TABLE OF CONTENTS

Page

**CASES**

*Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482
(S.D.N.Y. Sept. 30, 2002) ........................................................................... USAP162

*Eastman v. Quest Diagnostics Inc.*, 2016 WL 1640465 (N.D. Cal. Apr. 26, 2016),
*aff'd*, 724 F. App'x 556 (9th Cir. 2018) ..................................................... USAP175

*FTC v. AdvoCare Int'l, L.P.*, 2020 WL 6741968 (E.D. Tex. Nov. 16, 2020) ................. USAP187

*FTC v. ProMedica Health Sys., Inc.*, 2011 WL 1219281 (N.D. Ohio Mar. 29, 2011)..... USAP193

*United States v. Google LLC*, 2023 WL 4999901 (D.D.C. Aug. 4, 2023) ...................... USAP236

**OTHER AUTHORITIES**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2023) (excerpt)..................... USAP261

S. Rep. No. 93-151 (1973) (excerpt)................................................................. USAP273

Dated: February 26, 2024

Respectfully submitted,

/s/ *Mark C. Hansen*

David J. Beck (TX Bar No. 00000070)
  (Federal I.D. No. 16605)
Garrett S. Brawley (TX Bar No. 24095812)
  (Federal I.D. No. 3311277)
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX  77010
Tel: (713) 951-3700
Fax: (713) 951-3720
dbeck@beckredden.com
gbrawley@beckredden.com

Mark C. Hansen (D.C. Bar No. 425930)
  (*Pro Hac Vice*)
Attorney-in-Charge
Geoffrey M. Klineberg (D.C. Bar No. 444503)
  (*Pro Hac Vice*)
David L. Schwarz (D.C. Bar No. 471910)
  (*Pro Hac Vice*)
Kevin J. Miller (D.C. Bar No. 478154)
  (*Pro Hac Vice*)
Dennis D. Howe (D.C. Bar No. 90011114)
  (*Pro Hac Vice*)
Derek C. Reinbold (D.C. Bar No. 1656156)
  (*Pro Hac Vice*)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
dschwarz@kellogghansen.com
kmiller@kellogghansen.com
dhowe@kellogghansen.com
dreinbold@kellogghansen.com

*Counsel for Defendant U.S. Anesthesia Partners, Inc.*

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

2002 WL 31164482

United States District Court, S.D. New York.

DRESSES FOR LESS, INC., DFL Management
Inc., the DFL Apparel Group, an unincorporated
association, Allison Che' Fashions, Inc., Bicci
Studio Ltd., Garden City Dresses for Less, Inc.,
Donald Weiner and Barbara Weiner, individually
and derivatively as a shareholder of Stella N. Bishop
Fashion Corp., and I.S.B. Fashions Corp., Plaintiffs,
v.
CIT GROUP/COMMERCIAL SERVICES, INC. and
THE UPTOWN CREDIT GROUP, INC., Defendants.

No. 01 CIV. 2669(WHP).
|
Sept. 30, 2002.

**Synopsis**

Garment manufacturers and related entities or their principles
brought action against domestic factor for garment industry,
alleging price-fixing and monopoly claims under the Sherman
Act and New York law Donnelly Act and common law
contract claims. Defendant moved to dismiss. The District
Court, Pauley, J., held that: (1) allegations supported group
boycott claims; (2) manufacturers failed to state price-fixing
claim against factor; (3) issues of fact regarding relevant
product market could not be resolved at motion to dismiss;
(4) allegations supported monopoly claims; (5) allegations
supported good faith and fair dealing contract claims against
factor; and (6) lack of contractual privity precluded certain
good faith and fair dealing contract claims.

Motion granted in part and denied in part.

**Attorneys and Law Firms**

Alexander H. Schmidt, Esq., Wolf Haldenstein Adler
Freeman & Herz LLP, New York, for Plaintiffs.

Robert A. Atkins, Esq., Paul, Weiss, Rifkind, Wharton &
Garrison, New York, for Defendant CIT Group/Commercial
Services, Inc.

Bernard Beitel, Esq., Otterbourg, Steindler, Houston &
Rosen, P.C. , New York, for Defendant CIT Group/
Commercial Services, Inc.

Harlan M. Lazarus, Esq., Larazus & Lazarus, P.C., New York,
for Defendant The Uptown Credit Group, Inc.

MEMORANDUM AND ORDER

PAULEY, District J.

**\*1** Plaintiffs are garment manufacturers and related
entities or their principals. Defendant CIT Group/Commercial
Services, Inc. ("CIT") is the largest domestic factor for the
garment industry.

Plaintiffs assert that CIT and its predecessors conspired with
other factoring companies to deny credit to certain garment
manufacturers. Plaintiffs claim that the factors illegally
boycotted their businesses and unlawfully fixed prices in
violation of the Sherman Antitrust Act, 15 U.S.C. § 1
("Section 1"). Plaintiffs further allege that CIT, by merging
with or acquiring its competitors, obtained monopoly power
in the garment factoring industry, in violation of the Sherman
Antitrust Act, 15 U.S.C. § 2 ("Section 2"). Plaintiffs also
assert common law claims for breach of contractual good faith
and fair dealing and breach of fiduciary duty.

Defendants move to dismiss the amended complaint pursuant
to Rule 12(b) of the Federal Rules of Civil Procedure. For the
following reasons, defendants' motion is granted in part and
denied in part.

*Background*

Factoring is a business relationship in which companies
known as "factors" purchase at a discount other businesses'
rights to collect accounts receivable. The discount usually
ranges from approximately 0.5 to 0.9 percent of the
accounts. The factor then collects the accounts receivable.
(Am.Compl.¶¶ 38-39.)

Without the ability to quickly convert accounts receivable into
cash through factoring, a factor's clients could be exposed
to a liquidity crunch that would threaten their businesses.
When a factor purchases an account receivable, it assumes the
risk of collecting the receivable. (Am.Compl.¶ 39.) However,
a factor assumes that credit risk only after it has checked
whether its customer is selling to a creditworthy purchaser.
(Am.Compl.¶¶ 39, 42.) Moreover, factors like CIT may refuse
to credit check a client's purchaser for any reason, even if

Case 4:23-cv-03560 Document 126-1 Filed on 02/26/24 in TXSD Page 5 of 119

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

that customer is creditworthy. (Am.Compl.¶ 41.) Because a manufacturer usually cannot afford to risk sales that are not acceptable to the factor, the factor's credit check decision often determines whether a sale is made. (Am. Compl ¶ 39.)

In the garment industry, a factor's clients may include the "piece goods" vendors that manufacture raw materials such as fabric, buttons, trim and other accessories, or garment manufacturers who purchase materials from piece good vendors. (Am. Compl. ¶ 41; Transcript from Oral Argument dated Nov. 16, 2001 ("Tr."), at 3.) Thus, when a factor's clients include both a piece goods vendor and a garment manufacturer who purchases from the piece goods vendor, the factor faces credit checking a purchaser who is also its own client. (Am.Compl. ¶ 41.)

Accepting the allegations in the amended compliant as true, the facts are as follows. Plaintiffs Allison Che' Fashions, Inc., Bicci Studio Ltd. ("Bicci"), and I.S.B. Fashions Corp. ("ISB"), Stella N. Bishop Fashion Corp. ("Stella Bishop") are defunct clothing manufacturers. (Am.Compl.¶¶ 12-15.) They grossed sales of $30,206,570, 48,492,233, and 53,800,273 for the fiscal years ending June 1998, 1999, and 2000 respectively. (Am.Compl.¶ 16.) Each manufacturer used CIT, or its predecessor Congress Talcott Corporation ("Congress"), as their factor for some period between 1996 and 2000. (Am.Com pl.¶¶ 12-15, 24.) Dresses For Less, Inc. ("Dresses For Less") is a garment manufacturer that was denied credit by CIT. (Am.Compl.¶ 18, 245) (collectively, Bicci Studio, ISB, Stella Bishop, and Dresses for Less are referred to as the "DFL Apparel companies"). Dresses For Less guaranteed some of the DFL Apparel companies' debts to CIT. (Am.Compl.¶ 18.)

**\*2** Plaintiff DFL Management Inc. operated the DFL Apparel companies. (Am.Compl.¶ 10.) Plaintiff DFL Apparel Group is an unincorporated business association comprised of the DFL Apparel companies, and previously included other manufacturers who are not parties to this litigation. (Am.Compl.¶ 11.) Plaintiffs Donald and Barbara Weiner are principals of the DFL Apparel companies and their related entities and also personally guaranteed several of the DFL Apparel companies' debts to CIT. The Weiners have lost approximately $2,600,000 in personal assets as a result of defaults. (Am.Compl.17.) Barbara Weiner owns fifty percent of ISB and forty-five percent of Stella Bishop. (Am.Compl.¶¶ 14-15.)

Plaintiff Garden City Dresses For Less ("GC Dresses For Less") leased property to DFL Apparel companies and lost more than $750,000 in annual rental income as a consequence of their defaults. (Am.Compl.¶ 19.)

CIT emerged as a dominant domestic factor after merging with its former competitors Congress and Heller Financial, Inc. in 1999 and 2000 respectively. (Am.Compl.¶ 28.) Those acquisitions caused CIT's market share in the factored retail garment industry to grow from nineteen to forty-one percent and its share of piece goods factoring to rise from fifty to ninety percent. (Am.Compl. ¶¶ 27, 60.) CIT factored approximately $26 billion of the entire domestic garment manufacturing industry. (Am.Compl.¶ 26.) CIT's largest competitor factors twenty-two percent of the market. (Am.Compl.¶ 26.)

Plaintiffs allege that CIT and several other factors formed an illegal cartel in 1924 and to this day operate as the single entity, currently known as defendant Uptown Credit Group, Inc. ("UCG"). (Am.Compl.¶¶ 25, 44.) Factors comprising the UCG include GMAC Commercial Credit LLC ("GMAC"), HSBC Business Credit (USA) Inc. ("HSBC"), the Receivable Capital Management Division of Sun Trust Banks, Inc. ("SunTrust"), Rosenthal & Rosenthal, Inc. ("Rosenthal"), Capital Factors, Inc. ("Capital"), Finova Capital Corp. ("Finova") and Sterling Factors Corp. ("Sterling") (Am.Compl.¶¶ 30-37.)

The UCG members account for approximately 80 to 85 percent of domestic garment manufacturer factoring. (Am.Compl.¶ 37.) Through acquisitions made between 1999 and 2001, including Finova, GMAC became the second largest factor in the industry with $14 billion in receivables purchased annually or twenty-two percent of the garment manufacturer factoring industry. (Am.Compl.¶ 30.) Finova previously factored $800 million, or 1.2 percent of the domestic garment manufacturing market. (Am.Compl.¶ 35.)

HSBC factors approximately $7 billion in annual receivables, or eleven percent of the industry. (Am.Compl.¶ 31.) Rosenthal controls 2.4 percent of the domestic garment manufacturing market with $1.5 billion in annual receivables. (Am.Compl.¶ 33.) Capital factors $800 million, or 1.2 percent, of the domestic garment manufacturing industry. (Am.Compl.¶ 34.) In recent years, Sterling also captured $800 million, or 1.2 percent, of the domestic garment manufacturer factoring industry. (Am. Compl. ¶ 36 .)

2002-2 Trade Cases P 73,828

**\*3** Plaintiffs allege that the other factors have agreed with CIT that they will not credit check customers that CIT has refused to credit check even though they contracted to assume those customers' credit risks in factoring agreements. (Am.Compl.¶¶ 42, 54.) Plaintiffs also contend that CIT has refused to credit check customers due to its dislike of management or other reasons that are not related to their customers' creditworthiness. (Am. Compl. ¶ 41 .)

Once CIT refuses to credit check a sale from a piece goods vendor to a garment manufacturer, it stops checking every proposed sale to that manufacturer by any piece goods vendor. (Am.Comp.¶¶ 43, 49.) A manufacturer's inability to make credit purchases from a piece goods vendor will increase its costs, inhibit cash flow, and can within weeks disable the manufacturer's ability to fill existing orders from retailers. (Am.Compl.¶¶ 44, 53, 61.) Moreover, because CIT controls ninety percent of domestically factored piece goods vendors, other factors quickly realize that a manufacturer who is not being credit checked by CIT cannot obtain enough credit to purchase the materials it requires. (Am.Compl.¶¶ 43, 61, 62.) Realizing that economic urgency, the other factors will quickly follow CIT's lead and refuse to check credit. (Am.Compl.¶¶ 61, 62, 63.) In addition, through its dominance in the garment manufacturing market via control over the piece goods vendors, CIT can also discourage garment manufacturers from purchasing from specific piece goods vendors. (Am.Compl.¶ 63.)

Plaintiffs allege that over the past two decades, CIT and its fellow factors conducted two highly secretive meetings every week. (Am.Compl.¶ 44.) The first meeting, known as the "Uptown meeting" is conducted every Wednesday by conspiring factors' account officers; the second, known as the "credit manager's meeting," is conducted every Thursday by the factors' credit managers. (Am.Comp.¶ 46.) At those meetings, the factors share not only publicly available information about their clients' creditworthiness, but also highly confidential information about their clients, including whether and why they have stopped credit checking a particular client. (Am.Compl.¶¶ 48, 51.) Thus, the factors' collective decision not to credit check a certain manufacturer assures that none of them will incur a credit risk for a customer who might be creditworthy but potentially faces insolvency due to one factor's decision to deny further credit for any reason. (Am.Compl.¶ 50.)

Beginning in February 1997, Kenwin Shops Incorporated ("Kenwin"), a company controlled by Donald Weiner, was

defending a civil action by the Bank of Louisiana ("BOL") in the Eastern District of Louisiana. See *In re: Bank of Louisiana / Kenwin Shoes Inc.,* No. 97 Civ. 1193(MDL), 1998 Lexis 11680, at \*2 (E.D.La. July 27, 1998). That action resulted from Kenwin's failure to make payments to BOL in accord with their regular course of dealing. *Bank of Louisiana,* 1998 Lexis 11680, at \*3. "Kenwin was collecting and holding money paid by customers of Kenwin that was due to BOL under the Contract Agreement between them." *Bank of Louisiana,* 1998 Lexis 11680, at \*3. In the course of that litigation, D & A Funding Corporation, another company controlled by Donald Weiner, asserted that it had priority to the monies owed to BOL.

**\*4** Both parties filed motions for injunctive relief. In support of an application for a continuance on the motions, counsel for Kenwin represented that the claimed funds were sequestered precluding any harm to BOL. *Bank of Louisiana,* 1998 Lexis 11680, at \*3. After several months, the parties entered settlement discussions with the aid of the court to resolve their motions for injunctive relief. The parties stipulated that each would post a bond and thereafter voluntarily dismiss the motions. *Bank of Louisiana,* 1998 Lexis 11680, at \*6. In October 1997, Kenwin filed for Chapter 11 bankruptcy without informing BOL. *Bank of Louisiana,* 1998 Lexis 11680, at \*6. On November 3, 1997, Kenwin offered a draft bond to BOL, but eleven days later, Kenwin's counsel informed BOL that it would not file it. *Bank of Louisiana,* 1998 Lexis 11680, at \*7. At that time, the court first learned of Kenwin's bankruptcy petition. *Bank of Louisiana,* 1998 Lexis 11680, at \*8.

The court conducted a hearing regarding Weiner's apparent "material misrepresentations and omissions" regarding the sequestered funds and the timing of Kenwin's bankruptcy. *Bank of Louisiana,* 1998 Lexis 11680, at \*9. On July 27, 1998, the court sanctioned Donald Weiner after finding his testimony to be "disingenuous, obviously evasive and obfuscatory" and his memory to be "transparently convenient." *Bank of Louisiana,* 1998 Lexis 11680, at \*9.

The *Bank of Louisiana* decision, however, had no adverse impact on the creditworthiness of the DFL Apparel companies. (Am.Compl.¶ 57.) By late 1998, the DFL Apparel companies were generating net sales of approximately $10 million per month. (Am.Compl. ¶ 56.) As of September 1998, DFL Apparel companies had never been denied credit. (Am.Compl.¶ 56.) Nevertheless, CIT ceased approving credit to each DFL Apparel company shortly after the issuance of

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

the *Bank of Louisiana* opinion and advised its co-conspirator factors of its decision. (Am.Compl.¶ 57.) Each of the co-conspirator factors stopped credit checking DFL Apparel companies the next day. (Am.Compl.¶ 57.) Although CIT eventually continued to extend credit, the DFL Apparel companies suffered millions of dollars in lost sales in the interim. (Am. Compl. ¶ 57 .)

In addition to colluding with the other factors, plaintiffs further allege that CIT engaged in bad faith conduct throughout their relationship that damaged the manufacturing plaintiffs. Plaintiffs contend that starting in 1996, Donald Weiner advised CIT and numerous piece goods vendors orally and in writing that, as a condition to the guaranties of Donald Weiner, Barbara Weiner and Dresses for Less, no DFL Apparel company purchase order should be honored unless it bore his signature. (Am.Compl.¶ 69.) Despite expressly acknowledging that requirement in writing, CIT approved millions of dollars of sales to the DFL Apparel companies by CIT's factored piece goods vendors that were not supported by signed purchase orders. (Am.Compl.¶ 69.) As a result, the DFL Apparel companies suffered millions of dollars in losses and incurred millions in debt to CIT. (Am.Compl.¶ 69.)

**\*5** Moreover, although CIT had separate factoring agreements with each DFL Apparel company, CIT treated them as if they were one company by penalizing every member when one company was delinquent on its payments. Thus, a DFL Apparel company with no credit or payment problems might nevertheless have its credit reduced or refused. (Am.Compl.¶ 70.) By treating the DFL Apparel Group as a single entity instead of several companies, CIT applied one "collective credit limit" to the entire group. Thus, if the group limit had been exceeded, CIT directed all DFL Apparel members to reduce their sales volumes and denied credit for piece goods purchases by DFL Apparel companies with remaining credit under their individual factoring agreements. (Am.Compl.¶ 71.)

At some time in 2000, CIT orchestrated a boycott where the factors ceased authorizing piece goods vendors to sell goods to Dresses For Less and DFL Apparel companies. (Am.Compl.¶ 73.) Between September 30, 2000 and January 31, 2001, the DFL Apparel companies went out of business. (Am.Compl.¶ 73.)

Plaintiffs also assert that before those failures, CIT compelled certain DFL Apparel companies to accept substantial "overadvances of credit" that bore higher interest charges

than normal advances. (Am Compl. ¶ 72.) Normally, a DFL Apparel company could obtain credit advances of up to 80 to 90 percent of the sales that it assigned to CIT. However, CIT had the discretion to extend overadvances for as much as 95 to 100 percent of assigned sales. (Am.Compl.¶ 72.) CIT regularly refused to approve credit for piece goods purchases by solvent DFL Apparel companies unless a fiscally unstable DFL company accepted an overadvance with a higher than normal interest rate and then applied the extra funds to debts it owed to piece goods vendors factored by CIT. (Am.Compl. ¶ 72.) As a result, the weaker DFL company could not purchase the piece goods and would face losing millions in sales or borrowing more at increased interest charges. (Am.Compl.¶ 72.)

Lastly, plaintiffs allege that CIT prolonged the failure of the DFL Apparel companies for several months in order to extract additional interest. (Am.Compl.¶ 75.) In June 2000, Donald Weiner discovered that CIT had approved several piece goods vendors' sales to DFL Apparel companies without first obtaining purchase orders signed by him. Concerned about his and other guarantors' exposure arising from the DFL Apparel companies' debts to CIT, Donald Weiner advised CIT that he was closing the DFL Apparel companies. (Am.Compl.¶ 75.) At that time, the DFL Apparel companies' inventories and accounts receivable exceeded their debts by 50 percent. (Am.Compl.¶ 75.) After receiving CIT's assurances that it would continue to finance and support the DFL Apparel companies, Weiner continued the businesses. (Am.Compl.¶ 75.) As a result, CIT received interest payments throughout 2000. Nevertheless, CIT stopped checking the DFL Apparel companies' credit causing them to fail. (Am.Compl.¶ 76.)

*Discussion*

I. *Motion to Dismiss Standards*

**\*6** On a motion to dismiss pursuant to Rule 12(b)(6), a court typically must accept the material facts alleged in the complaint as true and construe all reasonable inferences in a plaintiff's favor. *Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir.1998). A court should not dismiss a complaint for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995).

There are no heightened pleading requirements for antitrust cases. *Todd v. Exxon Corp.,* 275 F.3d 191, 198 (2d Cir.2001).

USAP165

Case 4:23-cv-03560   Document 126-1   Filed on 02/26/24 in TXSD   Page 8 of 119

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

Further, dismissals of antitrust cases "prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Todd,* 275 F.3d at 198 (quoting *Hosp. Bldg. Co. v. Trs. of Rex Hosp.,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976)). However, it is improper " 'to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." ' *Todd,* 275 F.3d at 198 (citing *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)).

## II. *Section One Violations*

Plaintiffs allege that CIT conspired with other factors to boycott credit checks of plaintiff companies in violation of Section One, and that their boycott resulted in the price fixing of piece goods also in violation of Section One. (Am.Compl.¶¶ 80, 86, 87.)

Section One prohibits all combinations and conspiracies that unreasonably restrain trade among the states. 15 U.S.C. § 1. To establish a Section One violation, a plaintiff must produce evidence sufficient to show: "(1) a combination or some form of concerted action between at least two legally distinct economic entities, and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 273 (2d Cir.2001); *see also Tops Mkts., Inc., v. Quality Mkts. ., Inc.,* 142 F.3d 90, 96 (2d Cir.1998).

*Per se* illegal conduct is that which is so egregious as to constitute a violation of law without the necessity of showing an effect on competition. *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 133-34, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Bogan,* 166 F.3d at 513. Among conduct falling within the *per se* rule are price fixing, territorial market division and certain group boycotts involving concerted refusals to deal. *NYNEX Corp.,* 525 U.S. at 133; *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs.,* 996 F.2d 537, 542-43 (2d Cir.1993). Only conduct that is "manifestly anticompetitive" is designated as per se illegal. Most cases do not fall within the *per se* category. *Bogan,* 166 F.3d at 514; *see also CDC Techs., Inc. v. IDEXX Laboratories, Inc.,* 186 F.3d 74, 79 (2d Cir.1999) (only a "handful" of practices are per se illegal); *National Camp Assoc., Inc. v. Am. Camping Assoc., Inc.,* No. 99 Civ. 11853(DLC), 2000 WL 1844764, at *5 (S.D.N.Y. Dec.15, 2000) (noting Supreme Court's refusal to extend the class of agreements to which a per se analysis applies).

*7 Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Application of this doctrine requires a plaintiff to prove not mere injury to plaintiff as a competitor but antitrust injury, i.e., actual damage to competition within the relevant market. *Capital Imaging,* 996 F.2d at 542-43. The injury to a relevant market requirement assures that the Sherman Act protects competition as a whole in the relevant market, and "not the individual competitors within that market, so that a plaintiff may succeed only when the loss he asserts derives from activities that have a 'competition-reducing' " effect. *Tops Mkts., Inc.,* 142 F.3d at 96 (citing *Atl. Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 342-44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)).

A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. Such power is defined as the power to "raise prices significantly above the competitive level without losing all of one's business." *CDC Technologies,* 186 F.3d at 81 (quoting *Capital Imaging,* 996 F.2d at 546); *see also Primetime 24 Joint Venture v. Nat. Broad. Co., Inc.,* 219 F.3d 92, 103-04 (2d Cir.2000).

## III. *Group Boycott*

Plaintiffs allege group boycott conduct as *per se* and rule of reason violations. (Am.Comp.¶¶ 80, 86); *see AD/SAT v. Associated Press,* 181 F.3d 216, 232 (2d Cir.1999) (Section 1 group boycotting claim may be alleged as either a *per se* or rule of reason violation); *accord Bogan v. Hodgkins,* 166 F.3d 509, 514 (2d Cir.1999). [1] CIT contends that plaintiffs have not adequately pleaded a boycotting claim because the amended complaint fails to allege facts to support an inference of an agreement among the factors or that plaintiffs suffered an antitrust injury.

[1]    Although defendants have not argued that the alleged conspiracy cannot be considered illegal *per se,* plaintiffs contended at oral argument that any boycott of credit is *per se* illegal. (Tr. at 13.) However, this Court notes that not all horizontal group boycotts are *per se* illegal. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 294, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985); *Bogan,* 166 F.3d at 514. "The scope of the *per se* rule against group boycotts is a recognized source of confusion in antitrust

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

law." *Bogan,* 166 F.3d at 514 (citation omitted). Moreover, the agreement alleged here does not reflect "the classic model of a group boycott-that is, a 'concerted attempt by a group of competitors at one level to protect themselves from competition from non-group members who seek to compete at that level.' " *Bogan,* 166 F.3d at 514 (citing *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 (D.C.Cir.1978)); *see also Capital Imaging,* 996 F.2d 537, 542 (2d Cir.1993) ("Conduct considered illegal *per se* is invoked only in a limited class of cases, where a defendant's actions are so plainly harmful to competition and so obviously lacking in any redeeming pro-competitive values that they are conclusively presumed illegal without further examination.").

### 1. *Existence of an Agreement*

CIT asserts that plaintiffs' conclusory allegations regarding a boycotting agreement among the several factors to cut off plaintiffs' credit are inadequate as a matter of law. (CIT's Mem. in Supp. at 6-7.) CIT further contends that inferring such an agreement would be nonsensical because it contradicts CIT's economic interests. (CIT's Mem. in Supp. at 9.)

"The plaintiff must do more than allege the existence of a conspiracy-it must allege some facts in support of the claim." *Floors-N-More, Inc. v. Freight Liquidators,* 142 F.Supp.2d 496, 501 (S.D.N.Y.2001); *see also Heart Disease Research Found. v. General Motors Corp.,* 463 F.2d 98, 100 (2d Cir.1972) ("[A] bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal."); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 687 F.Supp. 832, 837 (S.D.N.Y.1988) (dismissing complaint which alleged that the defendants "conspired and contracted with [each other] ... to restrain trade").

**\*8** Here, plaintiffs allege that CIT and the other factors collectively decided whether to deny credit to a particular manufacturer. Plaintiffs contend that the factors' agreement regarding credit checks is evidenced by the factors' biweekly meetings and by the factors' unanimity in refusing to check the DFL Apparel companies' credit between September 2000 and January 2001. (Pls.' Mem. in Opp. at 5.)

Viewing the amended complaint liberally, plaintiffs have alleged sufficient facts to assert that the conspiring factors'

conduct was not simply parallel but was the product of collusion. *See Todd,* 275 F.3d at 198 (citations omitted) (finding that an inference of a horizontal price-fixing agreement could be drawn in the absence of direct "smoking gun" evidence "when such interdependent conduct is accompanied by circumstantial evidence and plus factors such as defendants' use of facilitating practices. Information exchange is an example of a facilitating practice that can help support an inference of a price fixing agreement").

CIT further argues that the existence of an agreement among the factors cannot be inferred because plaintiffs' theory lacks any economic rationality. (CIT's Mem. in Supp. at 8.) Without great detail, plaintiffs allege that defendants' conspiracy sought to minimize their costs, stabilize prices, preserve market shares, and maintain monopoly power. (Am.Compl.¶ 47.) While, CIT acknowledges that refusing to check a purchaser can limit its own exposure, it argues that encouraging other factors also to deny credit to the DFL Apparel companies would only hasten their insolvencies preventing their continued payments to CIT. (CIT's Mem. in Supp. at 8.) Thus, CIT maintains that it lacks any incentive to collude with the other factors because the alleged conspiracy hurts its economic interests. (CIT's Mem. in Supp. at 8.)

Even if the scheme alleged was economically implausible, a conspiracy may nevertheless be proven "by strong direct or strong circumstantial evidence, [although] the implausibility of a scheme will reduce the range of inferences that may permissibly be drawn from ambiguous evidence." *Apex Oil Co. v. DiMauro,* 822 F.2d 246, 253 (2d Cir.1987) (citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Moreover, plaintiffs have proposed a reasonable economic motive for the conspiracy. Plaintiffs contend that by "weeding out" creditworthy albeit financially weaker companies, at the "slightest inkling" of their insolvency, CIT assured that it would recover fully by collecting from the guarantors. (Pls.' Mem. in Opp. at 7.) Plaintiffs further allege that the agreement to reduce credit risk stabilizes prices and the competing factors' market shares. (Am.Compl.¶ 64.) Whether any of these motives can be established and are served by the alleged conspiracy are factual questions.

### 2. *Antitrust Injury*

Section 4 of the Clayton Act provides that "any person who shall be injured ... by reason of anything forbidden in the antitrust laws may sue." 15 U.S.C. § 15(a). Despite this broad

USAP167

Case 4:23-cv-03560   Document 126-1   Filed on 02/26/24 in TXSD   Page 10 of 119

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

language, plaintiffs must nevertheless demonstrate that they have suffered an "antitrust injury," and that they are otherwise proper plaintiffs to bring the action at issue. *Todd,* 275 F.3d at 213 ("An antitrust plaintiff must not only allege cognizable harm to [it]self, but an adverse effect on competition market wide.") (citing *Elecs. Communications Corp. v. Toshiba Am. Consumer Prods., Inc.,* 129 F.3d 240, 242 (2d Cir.1997)); *see also Volvo No. Am. Corp. v. Men's Int'l Prof'l Tennis Council,* 857 F.2d 55, 66 (2d Cir.1988).

**\*9** An "antitrust injury" is an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977); *see also Intellective v. Massachusetts Mut. Life Ins. Co.,* 190 F.Supp.2d 600, 609 (S.D.N.Y.2002).

To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging,* 996 F.2d at 543; *see also Brunswick Corp.,* 429 U.S. at 488 ("The antitrust laws ... were enacted for 'the protection of competition, not competitors.' ") (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Even when a *per se* violation of the antitrust laws occurs, a plaintiff is still required to demonstrate antitrust injury as an element of a successful claim. *See Atlantic Richfield Co.,* 495 U.S. at 341-45 (1990) ("[I]nsofar as the *per se* rule permits the prohibition of efficient practices in the name of simplicity, the need for the antitrust injury requirement is underscored."). As the Supreme Court explained, the antitrust injury requirement:

> ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place, and it prevents losses that stem from competition from supporting suits by private plaintiffs .... The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior.

*Atl. Richfield Co.,* 495 U.S. at 345.

CIT argues that the amended complaint lacks any factual allegations of anticompetitive behavior to support its "vague and conclusory" claims of "horizontal and vertical anticompetitive impacts." (CIT's Mem. in Supp. at 12.) However, the gravamen of plaintiffs' amended complaint is that CIT and the other factors agreed that once CIT refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well. By participating in the alleged conspiracy, CIT's co-conspirators protected their own market shares. (Am.Compl.¶ 47.) Moreover, if a co-conspirator abandoned the conspiracy and financed a garment manufacturer that CIT refused to credit check, CIT could nevertheless cripple that garment manufacturer through its alleged control of the piece goods vendors' purchases. (Am.Compl.¶ 63.) Thus, plaintiffs contend that CIT forged an agreement with its competitors that restricted the supply of factoring to garment manufacturers. That allegation sufficiently pleads injury to the garment manufacturing market. *Primetime 24 Joint Venture,* 219 F.3d at 102 (plaintiff "clearly alleged injury" to competition where it pleading that competitors had eliminated "potential price competition," restricted output, and diminished the quality of service to customers).

### IV. *Price Fixing*

**\*10** CIT argues that plaintiffs' claim of price fixing is inadequate because it lacks any allegation that the factors ever discussed, much less agreed on, any prices or terms for their factoring services. (CIT's Mem. in Supp. at 11.) Plaintiffs respond that the conduct alleged in their boycotting claim

2002-2 Trade Cases P 73,828

resulted in illegal price-fixing *per se*. (Pls.' Mem. in Opp. at 11.)

A horizontal price fixing conspiracy is a *per se* unreasonable restraint of trade. *See United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 218, 60 S.Ct. 811, 84 L.Ed. 1129 ("Under the Sherman Act, a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*.").

While the alleged conspiracy in this case was the product of a horizontal agreement, it was not a price fixing agreement. Plaintiffs argue that the factors' denial of credit is analogous to the facts of *Catalano v. Target Sales, Inc.,* 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980). In *Catalano,* beer wholesalers agreed not to extend credit to any retailers and to sell their product only when they received payment in advance or on delivery. *Catalano,* 446 U.S. at 644. The Court held that

> [i]t is virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time. Thus, credit terms must be characterized as an inseparable part of price. An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing.

*Catalano,* 446 U.S. at 648. However, unlike *Catalano,* plaintiffs do not allege that CIT and its co-conspirators terminated the practice of providing credits to their customers. Instead, plaintiffs claim that defendants singled out the DFL Apparel companies in denying their credit.

Moreover, the amended complaint states that the factors entered the agreement to assure that "none of conspiring factors [would] incur a credit risk for a customer that appears to be worthy of credit but whose ability to remain in business is [threatened] by a competing factor's decision to deny credit." (Am Compl. ¶ 54.) From that allegation, plaintiffs add

in conclusory fashion that the denial of credit also served to stabilize the factors' prices due to the uniform reduction of credit risk. However, at no time do they state how the market-wide denial of credit to specific companies affected market prices. In addition, as noted by CIT, there is no allegation that the factors ever discussed "any prices or terms for their factoring services-*e.g.,* interest rates, payment terms, credit limits or any aspects of the 'price' of the services." (CIT's Mem. in Supp. at 11.)

Plaintiffs' amended complaint fails to allege facts to state a claim for price fixing. Accordingly, plaintiffs' price fixing claim is dismissed.

### V. *Monopolization*

**\*11** Section 2 of the Sherman Act prohibits persons from combining or conspiring to monopolize trade or commerce among the several States ...." 15 U.S.C. § 2; *see also AD/SAT,* 181 F.3d at 232. To state a claim under Section 2, a plaintiff must plead two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). Monopoly power is defined "as the power to control prices in the relevant market or to exclude competitors." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.,* 472 U.S. 585, 596, n. 20, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). CIT argues that plaintiffs have failed to allege a relevant product market or that CIT abused its monopoly power. [2]

[2] CIT also alleged that plaintiffs Section 2 claims should be dismissed because they failed to allege an antitrust injury. As discussed above, plaintiffs have sufficiently pleaded an antitrust injury at this stage.

#### 1. *Relevant Market*

"A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* No. 00 Civ. 5663(MBM), 2001 WL 1468168 (S.D.N.Y. Nov.19, 2001) (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 29, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984)). Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. *Todd,* 275 F.3d at 199; *see also Hayden Publ'g Co. v. Cox Broad. Corp.,* 730 F.2d 64,

Case 4:23-cv-03560   Document 126-1   Filed on 02/26/24 in TXSD   Page 12 of 119

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

70 n. 8 (2d Cir.1984) ("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unexpected. It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact ....' ").

"To survive a Rule 12(b)(6) motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Todd,* 275 F.3d at 199 (internal citations omitted); *accord Hack v. President & Fellows of Yale Coll.,* 237 F.3d 81, 86 (2d Cir.2000); *see also Yellow Page Solutions,* 2001 WL 1468168, at *12. "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way ." *Todd,* 275 F.3d at 199.

Here, the relevant markets alleged are factoring in the domestic garment manufacturing industry and factoring in the domestic piece goods industry. (Am.Compl.¶ 65.) Moreover, plaintiffs distinguish factoring from other forms of credit financing on the ground that factors "bear any and all losses stemming from [their] customers' insolvency or other financial inability to pay for goods that are sold and shipped by the client." (Am.Compl.¶ 39.) Whether that market definition is appropriate for plaintiffs' antitrust claim is a fact-intensive inquiry that cannot be resolved at this juncture.

### 2. Abuse of Monopoly Power

**\*12**  Possession of monopoly power does not violate Section 2 of the Sherman Act. Plaintiffs must demonstrate that defendants abused their market power in either its acquisition or maintenance. *Berkey Photo Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275 (2d Cir.1979) ("defendant must refrain from conduct directed at smothering competition."); *see also Olympia Equip. Leasing Co. v. Western Union Telegraph Co.,* 797 F.2d 370, 376-77 (7th Cir.1986) (Posner, J.). A Section 2 monopolization claim requires an allegation that defendants willfully acquired or maintained monopoly power, "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 481, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *see also Am. Academic Suppliers, Inc. v. Beckley-Cardy, Inc.,* 922 F.2d

1319, 1322 (7th Cir.1999) (citing *United States v. Aluminum Co. of Am.,* 148 F.2d 416 (2d Cir.1945)) (monopolization by improper methods usually involves repelling or intimidating new entrants into a market through predatory pricing). To demonstrate attempted monopolization, plaintiffs must prove that defendant engaged in predatory or anticompetitive conduct with a specific intent to monopolize and a dangerous possibility of achieving monopoly power. *Spectrum Sports v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Anticompetitive conduct is "the use of monopoly power, however lawfully acquired, to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Covad Comms. Co. v. BellSouth Corp.,* No. 01-16064, 2002 WL 1777009 (11th Cir. Aug.2, 2002). Both monopolization and attempted monopolization claims require anticompetitive behavior by the defendant. *Invamed Inc. v. Barr Labs., Inc.,* 22 F.Supp.2d 210, 218 (S.D.N.Y.1998).

CIT contends that plaintiffs allege no abuse of market power because their one allegation, "that [CIT] decided to stop credit checking the manufacturing plaintiffs," was not anticompetitive conduct. (CIT's Mem. in Supp. at 17.) However, CIT construes plaintiffs' claim too narrowly.

Plaintiffs assert that CIT increased its market share of domestic piece goods manufacturing to 90 percent through the acquisition of several competitors, giving it a "near stranglehold on garment manufacturers" because its unilateral decisions equate to "blacklisting a manufacturer among factors." (Pls.' Mem. in Supp. at 15-16.) Thus, plaintiffs adequately plead CIT's market power in the piece goods factoring market. *Moore U.S.A., Inc. v. Standard Register Co.,* 139 F.Supp.2d 348, 364 (W.D.N.Y.2001) (alleging market share that SRC alleges in this action: 65 percent) (citing *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,* 627 F.2d 919, 924 (9th Cir.1980)).

Plaintiffs further contend that CIT engaged in anticompetitive behavior through its aggressive mergers. However, "the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality." IV Phillip E. Areeda et al., *Antitrust Law* ¶ 901a (1998) (hereinafter "Areeda"); *see also* Irving Scher, *Antitrust Adviser* § 3.61 at 3-167 (4th ed.2001) (horizontal mergers are much more likely to be procompetitive than anticompetitive.). "Competing firms typically merge for reasons entirely unrelated to effects on marketwide output or price-for example, to achieve economies of scale or integration, to put inefficiently run assets into the hands

Case 4:23-cv-03560   Document 126-1   Filed on 02/26/24 in TXSD   Page 13 of 119

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

of superior management, to resolve management succession for an individually owned enterprise, or for tax or other reasons." Areeda ¶ 901a. Plaintiffs also assert that CIT's alleged illegal boycotts constitute anticompetitive behavior to plead a monopolization claim.

**\*13** As stated above, plaintiffs allege that through its control of the piece goods market, CIT influenced other factors to deny credit checks, and therefore financing, to garment manufacturers that could have been financed under normal market conditions. Thus, CIT, through its control of piece goods factoring, discouraged other factors from their participation in factoring for the garment industry. *See, e.g., United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 224 n. 59, 60 S.Ct. 811, 84 L.Ed. 1129 (1940) (Sections 1 and 2 "overlap" in the sense that a monopoly under section 2 is a "species of restraint" under section 1.). That contention sufficiently alleges anticompetitive conduct to support plaintiffs' Section 2 claim. Accordingly, CIT's motion to dismiss plaintiffs' Section 2 monopolization claim is denied.

## VI. *Standing*

### 1. *Antitrust Claims*

CIT moves to dismiss plaintiffs Donald and Barabra Weiner, Dresses for Less, Inc., Garden City Dresses for Less, Inc., and DFL Management for lack of standing because their injuries are "merely derivative" and do not constitute an antitrust injury. (CIT's Mem. in Supp. at 19.) As stated above, an antitrust plaintiff's injury must be the kind of injury at which the antitrust laws were directed. *Brunswick Corp.,* 429 U.S. at 489. Thus, "[m]erely derivative injuries sustained by employees, officers, stockholders, and creditors of an injured company do not constitute 'antitrust injury' sufficient to confer antitrust standing." *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 766 (2d Cir.1995) (citing *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,* 830 F.2d 1374, 1378 (7th Cir.1987)). "It follows naturally that a party in a business relationship with an entity that failed as a result of an antitrust violation has not suffered the antitrust injury necessary for antitrust standing." *G.K.A. Beverage Corp.,* 55 F.3d at 766-67 (8th Cir.1992) (denying antitrust standing where sole shareholder's injury stemmed from failure of corporation)); *accord Lovett v. Gen. Motors Corp.,* 975 F.2d 518, 520 (8th Cir.1992) (dismissing car dealership owner's antitrust claims because he was not the target of anticompetitive conduct but rather suffered a consequential injury). This prerequisite necessitates that the injured party be a participant in the same market as the alleged malefactors. *Automated Salvage Transport, Inc. v. Wheelabrator Env't Sys., Inc.,* 155 F.3d 59, 78 (2d Cir.1998) (quoting *Bhan v. NME Hosps., Inc.,* 772 F.2d 1467, 1470 (9th Cir.1985); *see also Knevelbaard Dairies v. Kraft Foods, Inc.,* 232 F.3d 979, 989 (9th Cir.2000) ("Antitrust injury requires that the 'injured party be a participant in the same market as the alleged malefactors.' "); *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (denying antitrust standing to party that was "neither a consumer nor a competitor in the market in which trade was restrained").

**\*14** The DFL Apparel companies participate in the factoring market as consumers and therefore, their injury is a direct consequence of the alleged antitrust violations. However, the injuries suffered by Donald and Barbara Weiner, Garden City Dresses for Less, Inc., and DFL Management as a result of the alleged antitrust violations are entirely derivative of the direct antitrust injury suffered by the DFL Apparel companies. Accordingly, CIT's motion to dismiss the antitrust claims asserted by Donald and Barabra Weiner, Dresses for Less, Inc., Garden City Dresses for Less, Inc., and DFL Management for lack of standing is granted.

### 2. *Shareholder Derivative Claims*

CIT contends that Barbara Weiner's derivative shareholder claims asserted on behalf of ISB and Stella Bishop should be dismissed because she has failed to allege the reason that she did not secure initiation of those claims with the boards of those companies. (CIT's Mem. in Supp. at 19.)

The amended complaint states that Barbara Weiner owns a 50 percent stake in ISB and a 45 percent of Stella Bishop. (Am.Compl.¶¶ 20, 22.) Plaintiffs allege that ISB's other 50 percent shareholder refused to consent to this lawsuit, and that Stella Bishop's other 45 percent [3] shareholder "would plainly never consent [to this action]" because he and the Weiners are involved in several bitter lawsuits. (Am.Compl.¶ 23.) In addition, Stella Bishop's other 45 percent shareholder owns companies that are currently being factored by CIT. (Am.Compl.¶ 24.)

[3]      The remaining 10 percent of Stella Bishop is owned by a third shareholder. Any dissenting shareholder of Stella Bishop could block a corporate action

Case 4:23-cv-03560   Document 126-1   Filed on 02/26/24 in TXSD   Page 14 of 119

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

based its by-laws require unanimous shareholder consent for corporate actions. (Am.Compl.¶ 22.)

When a shareholder brings a derivative lawsuit, her complaint must set forth either the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort. *See* Fed. R. Civ. Proc. 23.1; Business Corporation Law § 626(c). "[W]here the directors and controlling shareholders are antagonistic, adversely interested, or involved in the transaction attracted, a demand on them is presumptively futile and need not be made. *Cathedral Estates v. Taft Realty Corp.,* 228 F.2d 85, 88 (2d Cir.1955); *see also Galef v. Alexander,* 615 F.2d 51 (2d Cir.1980); *General Elec. Co. v. Bucyrus-Erie Co.,* 563 F.Supp. 970, 974 (S.D.N.Y.1983).

The amended complaint's allegations regarding ISB's other shareholder's refusal to consent and the animosity between Stella Bishop's major shareholders sufficiently plead that demand would be futile. Accordingly, CIT's motion to dismiss the shareholder derivative claims is denied.

3. *DFL Apparel Group*

 CIT asserts that the DFL Apparel Group has no standing to sue on behalf of the companies it represents. An association may assert the rights of its members under the doctrine of associational standing. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343-45, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *accord Irish Lesbian and Gay Org. v. Guiliani,* 143 F.3d 638, 649 (2d Cir.1998). To bring suit on behalf of its membership, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt,* 432 U.S at 343; *see Rent Stabilization Ass'n v. Dinkins,* 5 F.3d 591, 596 (2d Cir.1993) (applying *Hunt* test).

 **\*15** An organization lacks standing to sue for money damages on behalf of its members if the damages "are not common to the entire membership, nor shared by all in equal degree," so that "the fact and extent of injury require[s] individualized proof." *Warth v. Seldin,* 422 U.S. 490, 515-16, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *accord Sun City Taxpayers' Ass'n v. Citizens Utils. Co.,* 45 F.3d 58, 61 (2d Cir.1995).

DFL Apparel fails the third prong of the *Hunt* test. Recovery in this case would require individualized proof by each of the companies affected by CIT's alleged anticompetitive behavior. Accordingly, CIT's motion to dismiss DFL Apparel as a plaintiff is granted.

VII. *State Law Claims*

 1. *Donnelly Act Claims*

CIT moves to dismiss plaintiffs' Donnelly Act claims on the same grounds that it moved to dismiss the Sherman Act claims. The Donnelly Act, N.Y. Gen. Bus. Law § 340, prescribes that "[e]very contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. N.Y. Gen. Bus. Law § 340(1). "The Act was closely patterned after the Sherman Act and has been narrowly construed to encompass only those causes of action falling within the Sherman Act." *Yankees Entertainment and Sports Network, LLC v. Cablevision Systems Corp.,* No. 02 Civ. 3242(DAB), 2002 WL 31010490, at \*14 (S.D.N.Y. Sept.4, 2002) (citing *State v. Mobil Oil Corp.,* 38 N.Y.2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976)); *accord Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton,* 997 F.Supp. 340 (E.D.N.Y.1998) (finding Donnelly Act is modeled after the Sherman Antitrust Act and is generally interpreted in accordance with federal precedent); *Anheuser-Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988) (Donnelly Act was modeled on the Sherman Act and is to be construed in accord with it). Thus, CIT's motion to dismiss the Donnelly Act claims is granted in part and denied in part in accord with this Court's rulings set forth above.

 2. *Contractual Good Faith and Fair Dealing*

Plaintiffs contend that CIT breached its duty of good faith when it deliberately inflated the DFL Apparel companies' debts by authorizing piece goods vendors to ship unordered merchandise to those companies. (Am.Compl.¶ 69.) Plaintiffs further contend that CIT breached its duty of good faith when it refused to credit check one DFL Apparel company because a separate DFL Apparel company was in arrears (Am.Compl.¶ 70); enforced a combined credit limit for the DFL Apparel companies instead of a separate limit for each company (Am.Compl.¶ 71); coerced the DFL Apparel companies to accept excessive advances on its credit bearing higher interest charges and fees (Am.Compl.¶ 72); orchestrated the group boycotts that cut off the DFL Apparel

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

companies' credit (Am.Compl.¶ 73); and induced the DFL Apparel companies to stay in business after June 2000 by falsely promising that it would continue to finance the companies (Am.Compl.¶¶ 74-75).

**\*16** Under New York law, every contract contains an implied covenant of good faith and fair dealing. *Gelder Med. Group v. Webber,* 41 N.Y.2d 680, 684, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *see also* Restatement (Second) of Contracts § 205 comment a (1981) ("Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party ....").

With respect to plaintiffs' claim regarding the precondition of Donald Weiner's signature on purchase orders, factual issues exist including whether Weiner and CIT had a guarantee agreement giving rise to an obligation of good faith dealing and whether his signature was a condition of that agreement. At this stage, however, plaintiffs have sufficiently alleged breach of good faith dealing with respect to the unauthorized shipments approved by CIT. Accordingly, CIT's motion to dismiss the good faith and fair dealing claims of the amended complaint is denied.

With respect to the remainder of the good faith claims, however, those allegations concern CIT's extension or refusal of credit to DFL Apparel companies. The factoring agreements ran between CIT and a piece goods vendor. Thus, the lack of contractual privity between CIT and the DFL Apparel companies precludes any good faith claim. In addition, plaintiffs further concede that CIT's agreements with the piece goods vendors permitted them to refuse credit checks for any reason or no reason at all. Thus, plaintiffs cannot claim that CIT failed to perform those contracts in good faith.

3. *Breach of Fiduciary Duty*

Plaintiffs argue that CIT breached a fiduciary duty when it advised Donald Weiner that it would continue to extend him credit and failed to do so. (Pls. Mem. in Opp. at 23.) To state a claim for aiding and abetting a breach of fiduciary duty under New York law, plaintiffs must allege (1) a breach by a fiduciary of obligations to another, and (2) that the defendant knowingly induced or participated in the breach. *Wight v. Bankamerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000). The existence of a fiduciary duty is often "a fact-specific inquiry reserved for a jury." *Official Comm. of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Securities Corp.,* No. 00

Civ. 8688(WHP), 2002 WL 362794, \*9 (S.D.N.Y. Mar.6, 2002). Under New York Law, " 'a fiduciary relationship exists from the assumption of control and responsibility, and is founded upon trust reposed by one party in integrity and fidelity of another .' " *Deleu v. Scaife,* 775 F.Supp. 712, 715 (S.D.N.Y.1991) (quoting *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.,* 601 F.Supp. 770, 772 (S.D.N.Y.1985)); *see also* Restatement (Second) of Torts § 874 cmt. a (1977) (fiduciary relationship exists "when one [party] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation"). Moreover, fiduciary relationships can arise when a party "trusts or relies on another or where confidence is based on prior business dealings." *Olshansky v. Sutton,* No. 00 Civ. 3539(LAP), 2001 WL 99857, at \*5 (S.D.N.Y. Feb.6, 2001). Claims alleging the existence of a fiduciary duty are usually not subject to dismissal in a 12(b)(6) motion. *Olshansky,* 2001 WL 99857, at \*5.

**\*17** Given the factually intensive nature of a fiduciary duty inquiry, CIT's opposition to plaintiffs' fiduciary claim is better addressed on summary judgment. Accordingly, CIT's motion to dismiss the breach of fiduciary duty claim is denied.

VIII. *Uptown Credit Group's Motion To Dismiss*
In the amended complaint's first, second and fourth causes of action, plaintiffs allege that UCG violated Section 1 of the Sherman act and the Donnelly Act by participating in the agreement to deny credit to the DFL Apparel companies.

In addition to joining CIT's 12(b) motions, UCG moves to dismiss those causes of action on the ground that plaintiffs have not sufficiently alleged facts that tie UCG to the factoring conspiracy. (UCG's Mem. in Supp. at 5-6.) Plaintiffs allege that CIT combined with its co-conspirators to act as a cartel under the auspices of the UCG. (Am.Compl.¶¶ 4-5.) Through the UCG, the conspirators assured that the DFL Apparel companies would not be extended credit on purchases from piece goods vendors. (Am.Compl.¶ 48.) Those allegations adequately allege that UCG participated in the antitrust violations. *See* 15 U.S.C. § 1 (liable persons may include associations); *Hydrolevel Corp. v. Am. Soc. of Mech. Eng'rs, Inc.,* 635 F.2d 118, 126 (2d Cir.1980) ("It is difficult to see how a trade association should be treated any differently than a business competitor, especially when it is the association's standing and influence that makes the conspiracy effective and possible. In a variety of contexts, [associations] are obligated to take suitable precautions to avoid antitrust violations."); *Vandervelde v.*

USAP173

Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., Not Reported in...

2002-2 Trade Cases P 73,828

*Put & Call Brokers & Dealers Ass'n,* 344 F.Supp. 118, *155 (S.D.N.Y.1972) (an association found liable "as an independent legal entity"). Accordingly, UCG's motion to dismiss the amended complaint is denied.

### Conclusion

For the reasons set forth above, CIT's motion to dismiss the first cause of action is granted with respect to plaintiffs' price fixing claim and denied with respect to the boycotting claim.

CIT's motions to dismiss the second, third, fourth, fifth, and sixth causes of action are denied. UCG's motion to dismiss is also denied.

SO ORDERED:

### All Citations

Not Reported in F.Supp.2d, 2002 WL 31164482, 2002-2 Trade Cases P 73,828

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

USAP174

2016-1 Trade Cases P 79,611

2016 WL 1640465
United States District Court, N.D. California.

Colleen EASTMAN, et al., Plaintiffs,

v.

QUEST DIAGNOSTICS INCORPORATED, Defendant.

Case No. 15-cv-00415-WHO
|
Signed 04/26/2016

**Attorneys and Law Firms**

Robert Stephen Berry, Berry Law PLLC, Washington, DC, Colleen Duffy-Smith, Morgan Tidalgo Sukhodrev & Azzolino LLP, San Jose, CA, J. Ross Wallin, Silvia Noemi Ostrower, Grais and Ellsworth LLP, New York, NY, for Plaintiffs.

Allison Winifred Reimann, Richard Raskin, Sidley Austin LLP, Chicago, IL, Ryan M. Sandrock, Sidley Austin, LLP, San Francisco, CA, for Defendant.

**ORDER GRANTING MOTION TO DISMISS SECOND AMENDED COMPLAINT**

Re: Dkt. No. 69

WILLIAM H. ORRICK, United States District Judge

**INTRODUCTION**

**\*1** This is the third time I have addressed plaintiffs Colleen Eastman, Christi Cruz, and Carmen Mendez's claims against Quest Diagnostics Incorporated ("Quest"), a provider of clinical laboratory testing services. Plaintiffs accuse Quest of monopoly overpricing in violation of the Sherman Act, California's Cartwright Act, and California's Unfair Competition Law, and seek to represent a class defined as

> health plans and outpatients residing in Northern California who have paid Quest directly for routine diagnostic testing on or after January 29, 2011...under plan/outpatient billing [1] arrangements where the payment to

Quest was not entirely comprised of a fixed, per-visit copayment amount, but depended at least in part on the total amount due Quest.

Second Amended Complaint ¶ 61 ("SAC"). I previously dismissed plaintiffs' original and first amended complaints for failure to state a claim, and the SAC recycles many of their unsuccessful claims. They also assert new "tying" claims, but there are no plausible allegations indicating either that the products are tied or that medical providers are coerced. For the reasons discussed below, and in my prior orders in this case, Quest's motion to dismiss is GRANTED.

[1] Plaintiffs define "plain/outpatient billing" as "routine diagnostic testing for which a private health insurance plan, the State of California, or an outpatient has paid a fee directly to Quest." SAC ¶ 61.

**BACKGROUND**

**I. ORIGINAL COMPLAINT**
Plaintiffs filed this action on January 29, 2015. Dkt. No. 1 ("Compl."). Their original complaint brought claims under section 2 of the Sherman Act, the Cartwright Act, the Unfair Competition Law ("UCL"), and the below-cost and loss-leader sales provisions of California's Unfair Practices Act ("UPA"). *Id.*

Quest moved to dismiss, and, following briefing and oral argument, I issued an order on June 9, 2015 dismissing the original complaint with leave to amend. Dkt. No. 42 ("First Dismissal Order"). I found that plaintiffs had not established either Article III or antitrust standing because they had not alleged facts plausibly demonstrating that they had been harmed by Quest's alleged anticompetitive conduct. First Dismissal Order at 3-5. Further, plaintiffs could not bring claims on behalf of health plans because they had not alleged facts plausibly establishing that they and health plans had suffered identical harms. *Id.* at 5-6.

I also addressed and rejected each of plaintiffs' theories of liability. The original complaint alleged that Quest competes in two markets for routine diagnostic testing in Northern California: (1) the plan/outpatient market and (2) the physician billing market. Compl. ¶¶ 3-4; *see also* First

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

Dismissal Order at 6. Plaintiffs alleged that Quest has monopolized the plan/outpatient market and has thus "been able to charge above-competitive prices to [class members] while providing inferior quality service." Compl. ¶ 20. They asserted that Quest has done this through the use of three exclusionary practices:

**\*2**  (1) "pa[ying] kickbacks to medical providers...in the relevant market for physician billing to induce them to refer all other routine diagnostic testing done in the relevant market for plan/outpatient billing to Quest exclusively regardless of Quest's pricing or its testing quality."

(2) "collud[ing]with two major private health insurers [ – i.e., Aetna, Inc. and Blue Shield of California – ] to suppress its competition in the relevant market for plan/outpatient billing."

(3) "acquir[ing] its competitors for plan/outpatient billing in order to eliminate their competition."

*Id.*; *see also* First Dismissal Order at 6. [2]

[2]     Each of these alleged exclusionary practices was also previously raised in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847 (N.D. Cal. filed July 10, 2012), a related case brought against Quest by a group of competing laboratories alleging monopolization claims similar to those at issue here. Judge Tigar dismissed the plaintiffs' section 2 claims with leave to amend in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-JST, 2013 WL 3242245, \*13-15 (N.D. Cal. June 25, 2013) ("*Rheumatology I*"). After the matter was transferred to me, I dismissed the section 2 claims with leave to amend a second time in *Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2013 WL 5694452, \*14-16 (N.D. Cal. Oct. 18, 2013) ("*Rheumatology II*"). The plaintiffs did not allege section 2 claims in their second amended complaint, although I discussed certain aspects of their collusion theory in dismissing the second amended complaint's cause of action for violations of section 1 of the Sherman Act. *See Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc.*, No. 12-cv-05847-WHO, 2014 WL 524076, at \*10-14 (N.D. Cal. Feb. 6, 2014) ("*Rheumatology III*").

I held that none of these theories, as alleged in the original complaint, could support plaintiffs' monopolization claims. The kickback/leveraging theory failed because plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers resulted in Quest charging above-competitive prices in the plan/outpatient market. First Dismissal Order at 8-10. The collusion theory failed because plaintiffs had not shown that the three competitors that were allegedly eliminated as a result of Quest's agreements with Aetna and Blue Shield – i.e., Hunter Laboratories, Inc. ("Hunter"), Western Health Sciences Medical Laboratory ("Western Health"), and Westcliff Medical Laboratories ("Westcliff") – constituted a substantial share of the relevant market. *Id.* at 10-11. The acquisition theory failed because plaintiffs' allegations did not provide any reason to doubt the FTC's conclusion that, following the divestitures, Quest's acquisition of Unilab in 2003 would leave competition in Northern California "virtually unchanged." *Id.* at 11-12. Further, Quest's acquisition of Dignity Health in 2013 allegedly increased Quest's market share by a mere three percent – a "relatively insubstantial" amount that was not enough to raise concern under the antitrust laws. *Id.*

The allegations in support of the below-cost and loss-leader pricing claims under the UPA were insufficient because plaintiffs had not pleaded the prices and costs for the relevant testing services, and the UCL claims failed as derivative of the monopolization and UPA claims. *Id.* at 12-14.

## II. FIRST AMENDED COMPLAINT
**\*3**  Plaintiffs filed their first amended complaint on July 6, 2015. Dkt. No. 46 ("FAC"). Like the original complaint, the FAC brought claims under section 2 of the Sherman Act, the Cartwright Act, plus derivative claims under the UCL. FAC ¶¶ 166-84. It dropped the below-cost and loss-leader pricing claims. *Id.*

The FAC identified the same two Northern California markets as the original complaint (the plan/outpatient market and the physician billing market) and the same three exclusionary practices in the plan/outpatient market (the kickback/leveraging theory, the collusion theory, and the acquisition theory). *See, e.g., id.* ¶¶ 3-4, 20. Its most significant additions were to its allegations regarding monopoly overpricing and the named plaintiffs' individual experiences purchasing testing from Quest. Specifically, the FAC included pricing data compiled by the Truven Corporation ("Truven") for routine diagnostic testing performed in Northern California and in five other regions around the United States (New

*Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)*

2016-1 Trade Cases P 79,611

York City, Portland, Seattle, Tampa, and Southern California). *See, e.g., id.* ¶ 140. It also included allegations regarding the named plaintiffs' respective health insurance providers and their payments to Quest for testing. *See, e.g., id.* ¶¶ 129-31. In addition, with respect to their acquisition theory, plaintiffs identified a third acquisition, this one of Berkeley HeartLab in 2011, which allegedly added another 4.6 percent to Quest's market share in the plan/outpatient market. *Id.* ¶ 67.

On November 25, 2015, I issued an order granting Quest's motion to dismiss the FAC. Dkt. No. 59 ("Second Dismissal Order"). I held that each of plaintiffs' three theories of liability failed for essentially the same reasons as before. *See* Second Dismissal Order at 10-23. Plaintiffs still had not adequately alleged the monopoly overpricing necessary to support their kickback/leveraging theory. *Id.* at 11-16. They still had not alleged sufficient facts showing that Quest's alleged agreements with Aetna and Blue Shield have foreclosed competition in a substantial share of the plan/outpatient market. *Id.* at 16-20. And they still had not alleged facts plausibly indicating that Quest's acquisitions have unreasonably restricted competition. *Id.* at 20-23. I dismissed the FAC with leave to amend. *Id.* at 23.

Plaintiffs appealed the Second Dismissal Order to the Ninth Circuit but voluntarily dismissed the appeal on December 23, 2015, within two weeks of filing it, after the Ninth Circuit noted that its jurisdiction over the appeal was questionable. Dkt. Nos. 60, 63. Plaintiffs then returned to this Court and renewed their request for pre-complaint discovery of Quest's fee-for-service test pricing. Dkt. No. 62. They sought fee-for-service test pricing for the years 2013 and 2015 for six geographic areas (Northern California, Southern California, New York, Portland, Seattle, and Tampa) and for twenty-one different routine diagnostic testing codes. *Id.* at 2. [3] I denied the request. Dkt. No. 65.

[3]      Plaintiffs made a similar request shortly after I issued the First Dismissal Order. Dkt. No. 43. I also denied that request. Dkt. No. 45.

### III. SECOND AMENDED COMPLAINT

Plaintiffs filed the SAC on January 13, 2016. Dkt. No. 66. Their new allegations are largely identical to those in the original complaint and the FAC, but there are some material differences.

**\*4** Most significantly, plaintiffs now identify four, instead of three, exclusionary practices. *See, e.g.,* SAC ¶ 85. They

continue to allege the collusion theory (regarding Quest's alleged exclusive dealing arrangements with Aetna and Blue Shield) and the acquisition theory (regarding Quest's acquisitions of Unilab, Berkeley HeartLab, and Dignity Health). But they have repackaged the alleged misconduct underlying the kickback/leveraging theory into two separate, but very similar, alleged exclusionary practices. *See id.* ¶¶ 105-21. The first accuses Quest of illegal tying, on the theory that Quest "sells to medical providers capitated testing in the physician billing market at very low rates (often below its costs) on the condition that they also purchase [its] fee-for-service testing sold in the separate plan/outpatient market." *Id.* ¶ 105. The second accuses Quest of "exclud[ing] competition throughout the plan/outpatient market with economic arrangements with medical providers which constitute exclusive dealing practices." *Id.* ¶ 115. Plaintiffs assert that Quest

> enters into express exclusive dealing contracts with medical providers where they receive capitated testing at very low rates often below Quest's costs. In return for these rates it obtains exclusivity commitments from the providers under which they send all or nearly all of their fee-for-service business to Quest. The latter commitments are not necessarily contained in the express exclusive capitated contracts. Nonetheless Quest makes it clear that, to obtain the low capitated rates and increase their profits, the medical providers must exclusively provide all or nearly all their capitated and fee-for service business to Quest.

*Id.* ¶ 116. Plaintiffs also assert, as they have throughout this case, that "medical providers have a strong preference for one-stop test shopping," and that medical providers' capitated testing agreements with Quest thus "encourage[ ] them further to deal exclusively with Quest for fee-for-service testing as well as capitated testing." *Id.* ¶ 119. [4]

[4]      Plaintiffs explain this "one-stop test shopping" dynamic in more detail elsewhere in the SAC:

USAP177

2016-1 Trade Cases P 79,611

[D]ue to ease of administration and familiarity, a medical provider in Northern California (or elsewhere) overwhelmingly will prefer to direct all or nearly all of its routine testing to a single diagnostic testing company once the medical provider reaches a "tipping point" with a particular testing company. In other words, a medical provider that is sending a substantial percentage of its routine testing to one diagnostic testing company (whether or not the testing is done in the plan/out-patient or physician billing relevant market) will likely send all of its testing to that testing company because "one-stop shopping" is much more convenient for the medical provider. As a result, when Quest, as the dominant provider in the physician billing market, obtains as little as 50 percent of all routine tests ordered by the provider in both relevant markets, it is likely to obtain all or nearly all of the provider's testing in the plan/outpatient market.

Quest routinely documents that, when it obtains the exclusive capitated business of a medical provider in the physician billing relevant market, it will also receive the provider's fee-for-service business in the plan/outpatient business. Its records show that it expressly sets its capitated pricing to ensure that this tie between capitated and fee-for-service testing is accomplished

SAC ¶¶ 51-52 (internal numbering omitted). Plaintiffs included substantially similar descriptions of the "one-stop test shopping" dynamic in their FAC and original complaint. *See* FAC ¶ 18; Compl. ¶ 18.

Plaintiffs continue to bring monopolization claims under section 2 of the Sherman Act and the Cartwright Act, as well as derivative claims under the UCL. *Id.* ¶¶ 188-93, 199-211. In addition, they now allege a separate cause of action titled, "Tying," under both section 1 and section 2 of the Sherman Act. *Id.* ¶¶ 194-198.

Quest filed this motion to dismiss on February 10, 2016. Dkt. No. 69. I heard argument from the parties on April 6, 2015. Dkt. No. 75.

**LEGAL STANDARD**

**\*5** Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the claim is and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and alterations omitted).

A motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). While a complaint "need not contain detailed factual allegations" to survive a Rule 12(b)(6) motion, "it must plead enough facts to state a claim to relief that is plausible on its face." *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009) (internal quotation marks and citations omitted). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

In considering whether a claim satisfies this standard, the court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marines Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). However, "conclusory allegations of law and unwarranted inferences are insufficient to avoid a Rule 12(b)(6) dismissal." *Cousins*, 568 F.3d at 1067 (internal quotation marks omitted). A court may "reject, as implausible, allegations that are too speculative to warrant further factual development." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1076 (9th Cir. 2013).

**DISCUSSION**

**I. MONOPOLIZATION CLAIMS**

Section 2 of the Sherman Act applies to "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. A monopolization claim under section 2 has three elements: "(a) the possession of monopoly power in the relevant market; (b) the willful

USAP178

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

acquisition or maintenance of that power; and (c) causal antitrust injury." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) (internal quotation marks omitted).

With respect to the second element, the willful acquisition or maintenance of monopoly power must be "distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 481 (1992); *accord Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1132 (9th Cir. 2015). "The test of willful maintenance or acquisition of monopoly power is whether the acts complained of unreasonably restrict competition." *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 739 (9th Cir. 1985); *accord Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 370 (9th Cir. 1988). To establish this element, the plaintiff must show that the defendant used its monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman*, 504 U.S. at 482-83 (internal quotation marks omitted). In other words, the defendant's conduct must be "exclusionary." *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001). "[T]o be condemned as exclusionary, a monopolist's act must have an anticompetitive effect. That is, it must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more *competitors* will not suffice." *Id.* at 58 (internal quotation marks omitted; emphasis in original).

 **\*6**  The third element, causal antitrust injury, requires a showing of "injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the defendant's] acts unlawful."[5] *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To establish such injury, the plaintiff must show "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 352 F.3d 367, 372 (9th Cir. 2003). In addition, "the injured party [must] be a participant in the same market as the alleged malefactor[ ]." *Id.* (internal quotation marks omitted). "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator in the restrained market." *Id.* (internal quotation marks omitted).[6]

[5]    In contrast with the inquiry into whether the defendant's acts are exclusionary, the inquiry into causal antitrust injury is viewed from the "perspective of the plaintiff's position in the marketplace," not from the "perspective of the impact of a defendant's conduct on overall competition." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 305 (5th Cir. 1997).

[6]    A showing of antitrust injury is "necessary, but not always sufficient," to establish antitrust standing. *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 110 n.5 (1986). Factors relevant to whether a plaintiff that has established antitrust injury also has antitrust standing include "the directness of the injury," "the speculative measure of the harm," "the risk of duplicative recovery," and "the complexity in apportioning damages." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of California*, 190 F.3d 1051, 1054 (9th Cir. 1999); *accord Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000).

The Ninth Circuit has stated that "[t]he analysis under [the Cartwright Act] mirrors the analysis under federal law because [it] was modeled after the Sherman Act." *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001); *accord Name.Space*, 795 F.3d at 1131 n.5 ("Because the analysis under the Cartwright Act is identical to that under the Sherman Act, we also affirm the district court's dismissal of the Cartwright Act claim.") (internal citations omitted). Plaintiffs do not dispute that their claims under the Sherman Act and the Cartwright Act rise and fall together.

Quest contends that despite the repackaging of the kickback/leveraging theory, the exclusionary practices alleged by plaintiffs remain insufficient to support their monopolization claims.[7] I agree.

[7]    Again, plaintiffs' claims are based on exclusionary practices within the plan/outpatient market, not within the physician billing market.

## A. Exclusive Dealing (or Kickback/Leveraging) Theory

The repackaging of the kickback/leveraging theory as an exclusive dealing theory does not help plaintiffs.

Case 4:23-cv-03560   Document 126-1   Filed on 02/26/24 in TXSD   Page 22 of 119

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

In the First and Second Dismissal Orders, I rejected the kickback/leveraging theory on the ground that plaintiffs had not plausibly alleged how Quest's economic inducements to medical providers in the physician billing market resulted in Quest charging above-competitive prices in the plan/outpatient billing market. *See* First Dismissal Order at 8-10; Second Dismissal Order at 11-16.

Plaintiffs have changed the label for this theory. They have also slightly modified their description of the alleged misconduct underlying the theory. Previously, they accused Quest of giving economic inducements to medical providers in the physician billing market that organically result in those medical providers referring their patients to Quest in the plan/outpatient market, due to their natural preference for "one-stop test shopping." *See, e.g.,* FAC ¶ 81 ("Quest offers medical providers sharply reduced capitated rates in the physician billing market...to achieve the one-stop shop tipping points it needs to obtain all or the vast majority of [medical providers'] plan/outpatient business."). Plaintiffs continue to describe this "one-stop test shopping" dynamic, but they now also allege, for the first time in this case, that Quest "conditions" its discounted prices in the physician billing market on "exclusivity commitments from [medical providers] under which they send all or nearly all of their fee-for-service business to Quest." SAC ¶ 116. Plaintiffs admit that these exclusivity commitments are "not necessarily contained" in the capitated contracts Quest enters with medical providers but assert that "Quest makes it clear that, to obtain the low capitated rates and increase their profits, medical providers must exclusively provide all or nearly all their capitated *and* fee-for-service business to Quest." *Id.* (emphasis in original).

**\*7** Crucially, however, plaintiffs have not changed those aspects of this theory that were found lacking in the First and Second Dismissal Orders. They have not changed their allegations regarding Quest's monopolistic overcharging in the plan/outpatient market – those allegations remain essentially identical to those in the FAC. *Compare* SAC ¶¶ 168-76 *with* FAC ¶¶ 136-43. Nor have they materially changed their allegations regarding Quest's "substantial economies of scale" and "large cost advantages," or explained why these factors, rather than support a plausible inference that Quest overprices in the plan/outpatient market, "indicate that Quest underprices its competitors in that market, much as plaintiffs explicitly allege that it does in the patient billing market." Second Dismissal Order at 14; *see also* SAC ¶ 80 (alleging, with respect to the plan/outpatient market, that

Quest "benefits from very substantial economies of scale," "has significantly lower unit costs than smaller regional laboratories because it processes a larger volume of tests," "is able to reduce its unit costs by negotiating volume discounts on supplies," and "minimize[s] the costly outsourcing of low-volume tests"). Accordingly, for the reasons stated in the First and Second Dismissal Orders, this theory continues to fail to support a monopolization claim against Quest.[8]

[8] Although Quest does not frame its argument in this way, I note that plaintiffs' failure to adequately plead causal antitrust injury is fatal not only to their exclusive dealing theory, but to all of their claims, because it means that they lack antitrust standing. *See* Cargill, 479 U.S. at 110-11, 110 n.5, 110 n.6 (showing of antitrust injury is necessary to establish antitrust standing under both section 4 and section 16 of the Clayton Act); *see also* Somers v. Apple, Inc., 729 F.3d 953, 962-65 (9th Cir. 2013) (affirming dismissal of section 2 claims for failure to adequately plead antitrust injury). Further weighing against plaintiffs' antitrust standing in this case is the highly speculative measure of their alleged harm, in that (1) it is unclear how plaintiffs have been cognizably harmed by Quest's alleged overcharging unless that overcharging has caused plaintiffs to pay higher portions of their deductibles than they otherwise would have paid (and plaintiffs do not allege that this was the case); and (2) Cruz and Mendez allege that their only relevant purchases were made while they were insured by Blue Shield, and plaintiffs specifically allege that Blue Shield members receive *discounted* prices from Quest. *See* SAC ¶ 140.

Further, plaintiffs' recharacterization of Quest's economic inducements in the physician billing market as exclusive dealing arrangements highlights an additional flaw in these allegations.[9] As I explained in the First and Second Dismissal Orders in discussing plaintiffs' collusion theory, and as both Judge Tigar and I explained in *Rheumatology*, "an exclusive dealing arrangement does not violate the antitrust laws unless its probable effect is to foreclose competition in a 'substantial share' of the relevant market."[10] Second Dismissal Order at 18; *see also* First Dismissal Order at 10-11; Rheumatology II, 2013 WL 5694452, at \*11-14, \*15; Rheumatology I, 2013 WL 3242245, at \*10-13. To determine whether the foreclosure amounts to a substantial share,

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

**\*8**  it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved..., and the probable immediate and future effects which preemption of that share of the market might have on effective competition.

*Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 329 (1961). The degree of foreclosure "is important because, for the contract to adversely affect competition, the opportunities for other traders to enter into or remain in that market must be significantly limited." *Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co.*, 748 F.3d 160, 175 (4th Cir. 2014) (internal quotation marks omitted); *accord Microsoft*, 253 F.3d at 69.

9    Plaintiffs previously characterized Quest's economic inducements in the physician billing market as simply anticompetitive below-cost price discounts, *see* FAC ¶¶ 71-88; Compl. ¶¶ 71-81, but explicitly disclaimed any reliance on a predatory pricing theory, *see* Dkt. No. 25 at 10, and did not allege that the economic inducements amounted to illegal bundled discounts. As before, plaintiffs do not raise a predatory pricing or bundled discounts theory in the SAC or their opposition brief.

10    This use of "probable effect" is probably too generous to plaintiffs. The Ninth Circuit has held that "although a Clayton Act violation may be found where an [exclusive dealing arrangement] has the probable effect of foreclosing competition,...in a case under section 1 of the Sherman Act, the plaintiff must prove that the exclusive dealing arrangement actually foreclosed competition." *Allied Orthopedic*, 592 F.3d at 996 n.1; *see also Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1304 n.9 (9th Cir. 1982) ("[A] greater showing of anticompetitive effect is required to establish a Sherman Act

violation than a...Clayton Act violation in exclusive dealing cases.").

Plaintiffs have not alleged facts from which it can be plausibly inferred that Quest's alleged exclusive dealing arrangements with medical providers have foreclosed a substantial share of the plan/outpatient market. Plaintiffs have not identified, for example, the approximate number of medical providers that have entered into such arrangements with Quest, the approximate number and/or characteristics of the other laboratories operating in the physician billing and plan/outpatient markets, or what competing laboratories have been adversely affected by the arrangements or the extent to which they have been affected. [11] This is the same basic deficiency in pleading substantial foreclosure that has repeatedly resulted in the dismissal of plaintiffs' collusion theory, both in this case and in *Rheumatology*. *See* Second Dismissal Order at 20 ("[A]bsent additional details regarding the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition."); First Dismissal Order at 11 ("Plaintiffs cannot...establish foreclosure of a substantial share of the plan/outpatient market in Northern California without accounting for other players who significantly impact competition in the market."); *Rheumatology II*, 2013 WL 5694452, at \*15 ("[P]laintiffs do not provide any context against which the Court may evaluate the extent to which competition has been restricted."); *Rheumatology I*, 2013 WL 3242245, at \*13 ("Plaintiffs fail to quantify the actual market effect of this alleged activity – i.e., the percentage of physicians who drop other laboratories, or the percentage of laboratories who are foreclosed from the market – even in gross terms."). As before, plaintiffs have not provided sufficient details about the dynamics of the relevant market to gauge whether Quest's alleged exclusive dealing arrangements have resulted in substantial foreclosure. [12]

11    Plaintiffs' allegations regarding Hunter, Western Health, and Westcliff are focused on Quest's agreements with Aetna and Blue Shield, not on Quest's capitated contracts with medical providers.

12    Also weighing against the plausibility of substantial foreclosure here is the absence of facts about the agreements Quest enters with medical providers. Plaintiffs do not provide any information regarding, for example, the approximate length of the agreements or the process by which they

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

can be terminated. *See Omega Envtl., Inc. v. Gilbarco, Inc.,* 127 F.3d 1157, 1163 (9th Cir. 1997) (finding that "the short duration and easy terminabilityof these [alleged exclusive dealing] agreements negate substantially their potential to foreclose competition") (internal footnotes omitted). Nor do plaintiffs make clear the extent to which any medical providers have actually agreed, either explicitly or implicitly, to refer any portion of their fee-for-service testing to Quest. The SAC sends mixed messages on this issue, alleging both (1) that Quest "conditions" its discounted prices on capitated contracts on medical providers' referral of their fee-for-service testing, *see, e.g.,* SAC ¶ 196; and (2) that the "pull-through" business obtained by Quest in the plan/outpatient market is merely the organic result of medical providers' natural preference for "one-stop test shopping," *see, e.g.,* SAC ¶¶ 51-52, 119. Plaintiffs do not clarify in their opposition brief whether they mean to allege one or the other of these dynamics, or some combination of the two. *See, e.g.,* Oppo. at 14 ("[Physicians] have a strong economic incentive to continue buying Quest's fee-for-service testing even though they are not contractually committed to do so.") (internal quotation marks omitted).

**B. Collusion Theory**

 **\*9** The factual allegations in the SAC in support of this theory are not materially different from those in the FAC. *Compare* SAC ¶¶ 122-151 *with* FAC ¶¶ 89-120. The theory remains based on Quest's exclusive dealing arrangements with Aetna and Blue Shield. Plaintiffs still identify just three particular competing laboratories in the relevant market that have been harmed as a result of the arrangements – Hunter, Western Health, and Westcliff[13] – and still specifically allege that "approximately 1.54 million persons are enrolled in Aetna and Blue Shield plans in Northern California – 10 percent of the available enrollees in the relevant market." SAC ¶ 145. Plaintiffs also still "fail to describe the prior market shares of Hunter, Western Health, and Westcliff, the number of other competitors in the plan/outpatient market, or the circumstances of health plans other than Aetna and Blue Shield operating in Northern California." Second Dismissal Order at 19. As I held in the Second Dismissal Order, these allegations are not sufficient to plausibly establish that Quest's exclusive dealing arrangements with Aetna and Blue Shield have foreclosed a substantial share of the plan/outpatient market. *Id.* at 19-20. "[A]bsent additional details regarding

the competing laboratories and other health plans that operate in the plan/outpatient market, plaintiffs' collusion theory allegations amount at most to alleged harm to three particular competitors, not to competition." *Id.* at 20.

[13] In addition to Hunter, Western Health, and Westcliff, plaintiffs also allege that John Muir Health has also "exited the plan/outpatient market, in large part because of Quest's other exclusionary conduct." SAC ¶ 34. But plaintiffs allege nothing more about John Muir Health. There are no allegations regarding, e.g., its previous market share, when or why it exited the market, or whether/ how it was impacted by Quest's agreements with Aetna and Blue Shield.

**C. Acquisition Theory**

Like their collusion theory, plaintiffs' acquisition theory has not changed materially since the FAC. *Compare* SAC ¶¶ 86-104 *with* FAC ¶¶ 55-70. It remains based on three acquisitions in Northern California between 2003 and 2013: (1) Unilab in 2003, adding 48.8 percent to Quest's share of the plan/outpatient market in Northern California; (2) Berkeley HeartLab in 2011, adding another 4.6 percent; and (3) Dignity Health in 2013, adding another 2.0 percent. SAC ¶¶ 59, 67, 69. Plaintiffs allege no new facts regarding how the three acquisitions have unreasonably restricted competition. The most significant change in their allegations concerns the FTC's decision to clear Quest's acquisition of Unilab upon requiring Quest to divest certain Northern California assets to Laboratory Corporation of America, another provider of clinical laboratory testing services that at that time had a minimal presence in Northern California. Plaintiffs now emphasize that the FTC's decision "does not immunize [Quest's] sustained march to market power over the next decade using various additional exclusionary practices." *Id.* ¶ 96.

I agree with plaintiffs that the FTC's decision is far from dispositive (although it does weigh against the conclusion that Quest's acquisition of Unilab can be plausibly characterized as an unreasonable restriction on competition). What is dispositive is that the SAC, like the FAC, "fail[s] to plausibly allege any specific anticompetitive effects of any of the three acquisitions, whether viewed in isolation or in combination." Second Dismissal Order at 22. "In these circumstances, merely pleading the occurrence of one acquisition that was cleared by the FTC upon the divestiture of assets to a

2016-1 Trade Cases P 79,611

significant competitor, and two others that resulted in minimal market share increases, is not enough to state a claim." *Id.*

In other words, plaintiffs cannot rely on the fact of the acquisitions alone. In and of themselves, the acquisitions may help plaintiffs show the "possession of monopoly power in the relevant market," but they do not plausibly establish "the willful acquisition or maintenance of that power." *Allied*, 592 F.3d at 998. To satisfy that element, plaintiffs must plead facts showing the particular ways in which the acquisitions have unreasonably restricted competition. For the third time, they have not done so.

### D. Combined Effect

Plaintiffs dedicate much of their opposition brief to arguing that Quest's alleged exclusionary practices must be considered in combination, not in isolation. *See, e.g.,* Oppo. at 6. I agree. As I stated in the Second Dismissal Order, however, viewing Quest's alleged exclusionary practices in combination does not push plaintiffs' claims over the line:

   **\*10**   Plaintiffs are correct that a court must look to the aggregate or "synergistic" effect of the alleged exclusionary practices to determine whether the allegations plausibly establish a violation of the antitrust laws. *City of Anaheim v. S. California Edison Co.*, 955 F.2d 1373, 1376 (9th Cir. 1992). "[I]t would not be proper to focus on specific individual acts of an accused monopolist while refusing to consider their overall combined effect." *Id.* Nevertheless, it is "much more difficult" to find wrongdoing where the plaintiff alleges only "a number of perfectly legal acts," and allegations that establish "some slight wrongdoing in certain areas" need not by themselves amount to a violation. *Id.* Here, plaintiffs have alleged price discounts without establishing any overcharging as a result, exclusive dealing arrangements without establishing that they impact more than a minor fraction of the relevant market, and three acquisitions, one of which was cleared by the FTC and resulted in a new significant competitor entering the market, and the other two of which account for a combined 6.6 percent increase in market share. Whether viewed in isolation or in the aggregate, these allegations do not support plaintiffs' monopolization claims against Quest.

Second Dismissal Order at 22-23. The new allegations in the SAC do not materially change this analysis, except to highlight that plaintiffs' "price discounts" theory (i.e., their exclusive dealing or kickback/leveraging theory) also fails

on the ground that plaintiffs' have not adequately alleged substantial foreclosure of the plan/outpatient market based on Quest's agreements with medical providers. Quest's motion to dismiss plaintiffs' monopolization claims is GRANTED.

## II. TYING CLAIMS

For the first time in this case, plaintiffs bring a separate cause of action accusing Quest of an illegal tying arrangement. SAC ¶¶ 194-98. The cause of action states in relevant part that

   Quest has tied fee-for-service sales sold to medical providers in the relevant market for plan/outpatient billing to its sales of separately sold capitated testing in the physician billing relevant market.

   Quest has market power in the physician billing relevant market and has conditioned its sales of capitated testing upon referral to Quest of the medical providers' fee-for-service testing as well. Such referral is the only viable economic option for the medical providers seeking to avoid substantial increased capitated costs.

   As a consequence of its conduct, Quest has caused substantial price injury in the sale of fee-for-service testing and actual damages to members of the Class, as well as denied them competitive choice.

SAC ¶¶ 195-97 (paragraph numbering omitted). Elsewhere in the SAC, plaintiffs allege that Quest has

         committed a per se tying violation to deny its rivals in the plan/outpatient market distribution of their fee-for-service routine testing to medical providers. Quest sells to medical providers capitated testing in the physician billing market at very low rates (often below its costs) on the condition they also purchase Quest's fee-for-service testing sold in the separate plan/outpatient market.

SAC ¶ 105.

"A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Rick-Mik Enterprises,*

Case 4:23-cv-03560 Document 126-1 Filed on 02/26/24 in TXSD Page 26 of 119
Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)
2016-1 Trade Cases P 79,611

*Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971 (9th Cir. 2008) (internal quotation marks omitted). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Id.* (internal quotation marks omitted). "The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Eastman Kodak*, 504 U.S. at 464 n.9 (internal quotation marks and alterations omitted). "When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* (internal quotation marks omitted).

**\*11** Plaintiffs appear to accuse Quest of a *per se* tying violation under section 1 of the Sherman Act. *See, e.g.,* Oppo. at 11. [14] "A plaintiff must prove three elements to prevail on an illegal tying claim: (1) that there exist two distinct products or services in different markets whose sales are tied together; (2) that the seller possesses appreciable economic power in the tying product market sufficient to coerce acceptance of the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Paladin Associates, Inc. v. Montana Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (internal quotation marks omitted).

[14] To the extent that plaintiffs also rely on their tying allegations to support their monopolization claims, those allegations do not meaningfully impact the analysis above, because they are essentially identical to the allegations in support of plaintiffs' exclusive dealing (or kickback/leveraging) theory.

Quest identifies four flaws in plaintiffs' tying theory. Mot. at 11-13. First, Quest argues that plaintiffs do not allege that a single buyer purchases the tying and tied products. According to plaintiffs' tying theory, medical providers purchase the tying product (capitated testing in the physician billing market) while health plans and patients purchase the tied product (fee-for-service testing in the plan/outpatient market). Quest quotes *Waldo v. N. Am. Van Lines, Inc.*, 669 F. Supp. 722 (W.D. Pa. 1987), for the proposition that "an illegal tying arrangement requires that at least two products and/or services be purchased by the same individual." *Id.* at 731. Plaintiffs respond that "[t]here is one buyer here, medical providers buying capitated testing [ – i.e., the tying product

– ] from Quest." Oppo. at 11 n.7. Plaintiffs do not dispute that, according to their tying theory, medical providers do not also purchase the tied product – i.e., fee-for-service testing – from Quest.

Second, Quest argues that plaintiffs have not plausibly alleged coercion. Quest contends that because there are different buyers for the tying product versus the tied product, coercion cannot possibly be established here. Mot. at 11. Further, Quest argues, plaintiffs have not alleged that the tying and tied products cannot be purchased separately. That is, plaintiffs have not alleged either (1) that medical providers who enter capitated testing agreements with Quest must refer their fee-for-service business to Quest, or (2) that medical providers who do not enter capitated testing agreements with Quest cannot refer their fee-for-service business to Quest. *Id.* at 12. Plaintiffs do not dispute this characterization of their allegations. They argue instead that they have adequately alleged coercion because Quest's pricing policy "makes purchase of the tying and tied products together the only viable economic option." Oppo. at 12. In support of this argument, plaintiffs point to paragraph 113 of the SAC, which states that "Quest's conditioning is also effective because, by accepting Quest's very low capitated rates, medical providers measurably increase their profits on their capitated business, and since cost minimization is their goal accepting tying conditionality is their only viable economic option." SAC ¶ 113; *see also id.* ¶ 196 ("Such referral [of fee-for-service testing] is the only viable economic option for medical providers seeking to avoid substantial increased capitated costs.").

Third and fourth, Quest argues that plaintiffs do not plausibly allege either that "the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Paladin*, 328 F.3d at 1159, or that Quest "has market power" in the tying product market, Mot. at 13. With respect to the volume of commerce affected in the tied product market, plaintiffs contend that they have "alleged that an appreciable number of buyers have accepted capitated/fee-for-service terms." Oppo. at 13. They point to paragraph 109 of the SAC, which includes the following quote from a former Quest salesperson:

**\*12** In order to secure the fee-for-service business and referral of these medical providers, Quest offers deeply discounted prices, often below cost,

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

for those capitated tests the medical providers pay for directly. The medical providers thereby lower their costs, and can increase profits on capitated business paid for by the providers. In exchange for these discounts, with very rare exceptions the medical providers refer all of their fee-for-service patients to Quest, including Medi-Cal patients. These referrals, obtained in exchange for discounts, are referred to industry insiders as pull-through. Medical providers paying capitated rates were told that they would have to support Quest with their Medi-Cal, Medicare and third-party insurance patients to maintain the deeply discounted capitated prices. The sales force was required to justify the discounts based on the amount of pull-thorough and track the amount of pull-through of the account to ensure that the pull-through of the account resulted in an overall profit from the client.

SAC ¶ 109 (internal emphasis and alterations omitted).[15] With respect to whether Quest's market power in the tying product market, plaintiffs allege that Quest's share of the physician billing market is 71.8 percent. *Id.* ¶ 107.

[15]   At oral argument, Quest pointed out, and plaintiffs did not dispute, that paragraph 109 of the SAC is taken from a declaration attached to a complaint filed by the California Attorney General against Quest, and that the declarant is describing conduct from 2003 to 2004, when the declarant worked for Quest.

I agree with Quest that plaintiffs have not adequately alleged coercion. Plaintiffs' only stated basis for a finding of coercion is that medical providers' "only viable economic option" is to purchase capitated testing at the discounted rates offered to those medical providers who also refer their fee-for-service testing to Quest. *See* Oppo. at 12; SAC ¶¶ 113, 196. But plaintiffs allege no facts indicating how this is the case.[16] For example, they do not allege the difference in pricing between capitated testing agreements with medical providers who

do refer their fee-for-service testing to Quest, and capitated testing agreements with medical providers who do not. *See Synopsys, Inc. v. ATopTech, Inc.*, No. 13-cv-02965-MMC, 2015 WL 4719048, at *7 (N.D. Cal. Aug. 7, 2015)* (dismissing tying claim where counterclaimant's theory of coercion was that counterdefendant's prices "render[ed] it economically unviable" to purchase the tying and tied products separately, and counterclaimant had not stated facts showing "how the alleged discounting practice was coercive, e.g., the amount of the difference between the price of [the tying product] when purchased separately and its price when purchased together with [the tied product]"). Nor do they allege the approximate number of medical providers who have obtained "deeply discounted prices" on capitated testing in exchange for referring their patients to Quest for fee-for-service testing, or how Quest's prices on fee-for-service testing compare to the prices of its competitors. *Cf. Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 914-15 (9th Cir. 2008) (finding triable issues on coercion where there was evidence that, among other things, only 14 percent of relevant purchasers bought the tied products separately, and a competitor's prices for the tied product were lower than defendant's, indicating that "a rational customer would not purchase [defendant's] allegedly overpriced product in the absence of a tie").

[16]   Quest does not dispute that this could be a meritorious theory of coercion if properly alleged. *See* Reply at 9 (Dkt. No. 73) ("It is not enough to allege that there is some discount on Product A that is only available with the purchase of Product B...A plaintiff...must allege that the discount on Product A is so dramatic (or that the non-discounted price is so punitive) that the only economically viable option is for a plaintiff to purchase both Products A and B.").

A bundled discount does not necessarily equal an illegal tying arrangement. *See id.* at 914-15, 915 n.27; *see also Robert's Waikiki U-Drive, Inc. v. Budget Rent-a-Car Sys., Inc.*, 732 F.2d 1403, 1407 (9th Cir. 1984). Accordingly, merely alleging the existence of a discount on capitated testing for those medical providers who also refer their fee-for-service testing to Quest, without also stating facts indicating how this discount "le[aves] [medical providers] with no rational economic choice" but to commit to Quest for both capitated and fee-for-service testing, *Cascade Health,* 515 F.3d at 915 n.27, does not plausibly establish coercion.[17] Quest's motion to dismiss plaintiffs' tying cause of action is GRANTED.

Case 4:23-cv-03560 Document 126-1 Filed on 02/26/24 in TXSD Page 28 of 119

Eastman v. Quest Diagnostics Incorporated, Not Reported in Fed. Supp. (2016)

2016-1 Trade Cases P 79,611

17 In addition, as noted above with respect to plaintiffs' exclusive dealing theory, plaintiffs do not make clear the extent to which any medical providers have actually entered capitated agreements with Quest under which they also agree, either explicitly or implicitly, to refer to Quest some or all of their fee-for-service testing. To the extent that plaintiffs have not plausibly alleged that such agreements exist, their tying claims are further deficient.

## III. UCL CLAIMS

**\*13** Plaintiffs allege that Quest has violated the "unlawful" and "unfair" prongs of the UCL. *See* FAC ¶¶ 199-205. These claims are derivative of the Sherman Act and Cartwright Act claims discussed above, and plaintiffs make no arguments specific to them in their opposition brief. They will also be dismissed.

## CONCLUSION

Despite the benefit of a prior related case bringing substantially similar claims against Quest, three opportunities to flesh out their claims, and two dismissal orders pointing out the deficiencies in their complaints, plaintiffs have been unable to state a plausible claim for relief, and have persisted in accusing Quest of the same basic misconduct without meaningfully adding to the facts stated in support. There is no indication that another chance to amend would yield a different result. Accordingly, and for the reasons discussed above and in my prior orders in this case, Quest's motion to dismiss the SAC is GRANTED, and plaintiffs' claims are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1640465, 2016-1 Trade Cases P 79,611

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 12

USAP186

Case 4:23-cv-03560  Document 126-1  Filed on 02/26/24 in TXSD  Page 29 of 119

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

2020 WL 6741968

United States District Court, E.D. Texas, Sherman Division.

FEDERAL TRADE COMMISSION

v.

ADVOCARE INTERNATIONAL, L.P., et al.

CIVIL NO. 4:19-CV-715-SDJ
|
Signed 11/16/2020

**Attorneys and Law Firms**

M. Hasan Aijaz, Pro Hac Vice, Thomas B. "Tom" Carter, Pro Hac Vice, Aaron J. Haberman, Federal Trade Commission - Dallas Dallas Regional Office, Dallas, TX, for Federal Trade Commission.

John Robert Robertson, DLA Piper LLP, Chicago, IL, Meagan Dyer Self, DLA Piper LLP, Dallas, TX, for AdvoCare International, L.P.

Baxter Ward Banowsky, Banowsky & Levine, PC, Dallas, TX, for Danny McDaniel, Diane McDaniel.

## MEMORANDUM OPINION AND ORDER

SEAN D. JORDAN, UNITED STATES DISTRICT JUDGE

*1 Before the Court are two motions: Defendants' Motion to Dismiss for failure to state a claim filed by Defendants Danny McDaniel and Diane McDaniel ("the McDaniels") pursuant to Federal Rule of Civil Procedure 12(b)(6), (Dkt. #17), and Plaintiff's Motion to Exclude, (Dkt. #23), certain factual allegations, documents, and legal arguments included in the McDaniels' Reply Brief, (Dkt. #20). For the following reasons, the Court **GRANTS** the McDaniels' Motion to Dismiss, (Dkt. #17), and **DENIES as moot** Plaintiff's Motion to Exclude, (Dkt. #23).

## I. BACKGROUND

In March 2017, consumers filed a class-action lawsuit in the Northern District of Texas against AdvoCare International, L.P. ("AdvoCare"), alleging that AdvoCare had been operating as an illegal pyramid scheme. *Ranieri v. AdvoCare Int'l, L.P.*, No. 3:17-cv-00691-B, 2017 WL 947224 (N.D. Tex.

Mar. 9, 2017); *see also* (Dkt. #1 at 25, #17 at 12). That suit named, among others, Danny McDaniel—but not his wife, Diane McDaniel—as a defendant. *Ranieri*, 2017 WL 947224. However, the district court ultimately dismissed with prejudice the action against Danny McDaniel, holding that if AdvoCare indeed operated an illegal pyramid scheme, Danny McDaniel did not operate said scheme. *Ranieri v. AdvoCare Int'l, L.P.*, 336 F.Supp.3d 701, 718 (N.D. Tex. 2018);[1] *see also* (Dkt. #17 at 12).

[1] "In the instant case, Plaintiffs have not shown that creating and disseminating promotional materials ... caused Plaintiffs' injuries, and they have not shown that the Individual Defendants operated the alleged pyramid scheme...." *Id.*

Separately, the Federal Trade Commission ("FTC" or "Commission") began investigating AdvoCare for potential violations of consumer-protection law. (Dkt. #1 at 25). In July 2019, during negotiations with the FTC, AdvoCare terminated its "multi-level marketing" ("MLM") program, which was alleged to be an illegal pyramid scheme. (Dkt. #1 at 25–26).

On October 2, 2019, the FTC brought a complaint in this Court requesting a permanent injunction and other equitable relief against AdvoCare and at least five individual members thereof, including the McDaniels. (Dkt. #1). The Complaint alleges that Defendants engaged in unlawful business practices in violation of the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. *See, e.g.*, (Dkt. #1 at 26). In particular, the Complaint alleges that AdvoCare—which the FTC describes as "a multi-level marketing company that promotes health and wellness products"— deceived individuals into becoming "Distributors" and "Advisors," or salespeople for AdvoCare, the majority of whom never earned compensation for their sales. (Dkt. #1 at 4–6). The Complaint further alleges that Defendants consistently and deceptively portrayed AdvoCare as a "life-changing financial solution," (Dkt. #1 at 6–9), and trained recruits to do the same, (Dkt. #1 at 9). The Complaint thus asserts that AdvoCare operated an unlawful pyramid scheme whereby AdvoCare's compensation structure relied on the fraudulent recruitment of Distributors and Advisors who would unwittingly pass on profits to those higher up the chain of command. (Dkt. #1 at 16–23).

*2 Simultaneous to, or immediately after, the FTC's filing of the Complaint, on October 2, 2019, all named Defendants

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

—except for the McDaniels—reached a settlement agreement with the FTC. (Dkt. #2, #2-1, #2-2). Pursuant to the settlement agreement, the settling Defendants, including AdvoCare, submitted to a host of sanctions, including an outright ban on: multi-level marketing; operating "chain referral" programs or similar schemes; managing compensation for any business ventures unless certain criteria are satisfied; and making material misrepresentations regarding any business venture. (Dkt. #2-2 at 3–5, #15, #16). The settling Defendants also agreed to (a) provide equitable monetary relief and payment to the Commission, (b) cooperate in the settlement, and (c) record progress while otherwise submitting to wide-reaching compliance monitoring. (Dkt. #2-2 at 5–16, #15, #16). The FTC has continued to pursue the instant action against the McDaniels, which the McDaniels now move to dismiss under Rule 12(b)(6).

## II. LEGAL STANDARD

Under the relaxed pleading standards of Federal Rule of Civil Procedure 8(a)(2), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement requires only that the plaintiff provide "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The Supreme Court has instructed that plausibility, under *Twombly*, means "more than a sheer possibility," but not necessarily a probability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When assessing a motion to dismiss under Rule 12(b)(6), the facts pleaded are entitled to a presumption of truth, but legal conclusions that lack factual support are not entitled to the same presumption. *Id.* To determine whether the plaintiff has pleaded enough to "nudge[ ] [its] claims across the line from conceivable to plausible," a court draws on its own "judicial experience and common sense." *Id.* at 679–80 (first quoting *Twombly*, 550 U.S. at 570, then citing *Iqbal v. Hasty*, 490 F.3d 143, 157–58 (2nd Cir. 2007)) (internal quotation marks omitted). This threshold is surpassed when "a plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

Further, when evaluating a Rule 12(b)(6) motion to dismiss, "[t]he court's review is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim

and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). However, a district court may also consider any "matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007)). Courts have taken judicial notice of the existence and content of settlement agreements when evaluating Rule 12(b)(6) motions to dismiss. *See, e.g.*, *ASARCO, LLC v. Union Pac. R.R. Co.*, 765 F.3d 999, 1008 n.2 (9th Cir. 2014) (holding that because the settlement agreement was filed with the court and is a publicly available record, it is properly subject to judicial notice and thus may be considered on a Rule 12(b)(6) motion); *Estate of Brown v. Arc Music Grp.*, 523 F.App'x 407, 410 (7th Cir. 2013) (holding that the settlement agreement was a public record, of which the court could take judicial notice without converting the motion into one for summary judgment). Finally, a court may take judicial notice sua sponte. FED. R. CIV. P. 201(c)(1).

Here, the Court takes judicial notice of the settlement agreement between Plaintiff and all Defendants to the instant action besides the McDaniels, (Dkt. #2, #15, #16). [2] The Court thus considers the existence and content of the settlement agreement in its analysis.

2    The Unopposed Motion for Settlement, (Dkt. #2), was filed with the Court the same day as the Complaint, (Dkt. #1), October 2, 2019, and the Court entered the stipulated orders, (Dkt. #15, #16), which collectively granted the motion, one week later.

## III. DISCUSSION

**A. The FTC's Complaint is Not Exempt from the Pleading Standards Prescribed by the Federal Rules of Civil Procedure.**

**\*3** The Federal Trade Commission Act instructs the Commission to "prevent persons, partnerships, or corporations" from using "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a). The Commission has "multiple instruments in its toolbox" to accomplish this statutory directive, among which are administrative proceedings and litigation in federal court. *FTC v. Shire Viropharma, Inc.*, 917 F.3d 147, 155 (3d Cir. 2019).

USAP188

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

As relevant here, Section 13(b) of the FTC Act empowers the FTC to "bring suit in a district court of the United States" to obtain a "temporary restraining order," a "preliminary injunction," or a "permanent injunction" against an "act or practice" that violates the FTC Act. 15 U.S.C. § 53(b). To bring such an action, the FTC must have "reason to believe" that the entity or person sued "is violating, or is about to violate" the Act. *Id.*

The McDaniels contend that the FTC's complaint must be dismissed under Rule 12(b)(6) because the Complaint fails to state a plausible claim under Section 13(b) that the McDaniels are violating or are "about to violate" the FTC Act. (Dkt. #17 at 6). Pointing to the FTC's Complaint itself, as well as the settlement agreement with AdvoCare and the other Defendants, the McDaniels assert that the FTC's suit recognizes that the alleged pyramid scheme operated by AdvoCare, and in which the McDaniels were allegedly involved, ended in July 2019. (Dkt. #17 at 7–8). The McDaniels further argue that there are no factual allegations supporting the FTC's conclusory contention that the McDaniels are presently violating the FTC Act or are "about to" violate the Act. [3]

[3]      The McDaniels have not challenged the Court's jurisdiction in this matter. Although their dismissal motion included some language suggesting a potential jurisdiction argument, *see* (Dkt. #17 at 8), the substance of the McDaniels' motion and briefing asserts only a Rule 12(b)(6) motion for failure to state a claim and does not contest the Court's jurisdiction. *See* (Dkt. #20 at 1 n.3) (the McDaniels' reply brief affirms that they are not raising a jurisdictional challenge). In any event, the Court concludes that it has jurisdiction because the FTC's claim arises under a law of the United States, 15 U.S.C. § 53(b), and therefore falls within the general grant of jurisdiction in 28 U.S.C. § 1331. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 513, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (confirming that a plaintiff obtains the "basic statutory grant[ ]" of subject matter jurisdiction in 28 U.S.C. § 1331 by pleading a colorable claim that arises under the Constitution or the laws of the United States).

The FTC's first response to the McDaniels' motion is to suggest that, because the agency has already made its own, internal determination that it has "reason to believe" that the McDaniels are violating or are "about to violate" the FTC

Act, the Complaint before the Court is largely immunized from judicial scrutiny under Rule 12(b)(6). The FTC states that "[t]he Commission's determination that there is sufficient 'reason to believe' under Section 13(b) is left to the agency's discretion." (Dkt. #19 at 5). The FTC goes on to cite and quote *Standard Oil Co. of California v. FTC*, 596 F.2d 1381, 1386 (9th Cir. 1979), *rev'd on other grounds*, 449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980), for the proposition that, "[i]f the district court finds as a fact that the FTC made the 'reason to believe' determination ... further review would be foreclosed." (Dkt. #19 at 5). Ultimately, the FTC asserts that, rather than engaging in a straightforward application of pleading standards under Rule 8, the Court is bound to deny the McDaniels' Rule 12(b)(6) motion unless it concludes that the FTC "abused its discretion" in making its internal "reason to believe" determination. (Dkt. #19 at 12–13). According to the Commission, limiting the Court's analysis to an "abuse of discretion" standard "fits with the broad prosecutorial discretion federal agencies have to bring suit." (Dkt. #19 at 6).

**\*4** The Court disagrees. Taken to its logical conclusion, the FTC's argument would mean that, no matter how insubstantial the factual allegations in an FTC complaint under Section 13(b), a court must accept that the complaint is sufficient to withstand a Rule 12(b) motion so long as the FTC avers that it has "reason to believe" that a defendant is "about to" engage in unfair methods of competition, or unfair or deceptive acts or practices. The FTC's position is contrary to accepted rules of pleading and finds no support in applicable case law.

First, Rule 8(a) of the Federal Rules of Civil Procedure requires that anyone filing a complaint must include a statement demonstrating "the grounds for the court's jurisdiction" and a "showing that the pleader is entitled to relief." In a Section 13(b) case, that requirement includes factual allegations from the FTC that there exist reasons to believe that the defendant is violating or "is about to violate" the FTC Act.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678. A bare allegation by the FTC that "we have reason to believe that the defendant is about to violate the law," when unaccompanied by supporting factual allegations, clearly does not "state a claim to [injunctive] relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This Court is fully capable of determining whether the FTC's factual allegations in a Section 13(b) complaint are sufficient to make the

USAP189

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

requisite "about-to-violate" showing. Therefore, there is no reason to conclude that Congress intended to eliminate judicial scrutiny under Rule 8.

The cases that the FTC cites do not support its argument that its internal, "reason to believe" determination is an effective "King's X" against a motion to dismiss a Section 13(b) complaint brought by the FTC in federal court. For example, *Standard Oil* addressed a challenge by an oil company to an administrative proceeding initiated by the FTC in connection with unfair trade practices. 596 F.2d at 1384. The oil company's challenge, brought under the Administrative Procedure Act ("APA"), was rejected by the Ninth Circuit based on the court's determination that the FTC's commencement of an administrative proceeding was not subject to challenge under the APA. *Id.* at 1385. *Standard Oil* did not involve a lawsuit brought by the FTC and it says nothing about the level of deference to the FTC in cases in which the FTC, as the plaintiff in federal court, bears the threshold burden to meet the requirements of Rule 8 and state a claim for relief that is plausible on its face.

The other cases cited by the FTC are equally unhelpful because they involve the inapposite circumstances of judicial review of agency action. *See Slough v. FTC*, 396 F.2d 870 (5th Cir. 1968) (suit seeking review of a cease and desist order issued by the FTC after an administrative hearing); *FTC v. Nat'l Urological Grp., Inc.*, No. 1:04-cv-3294-CAP, 2006 WL 8431977 (N.D. Ga. Jan. 9, 2006) (dismissing counterclaims brought under the APA challenging the FTC's decision to initiate a lawsuit); *Boise Cascade Corp. v. FTC*, 498 F.Supp. 772 (D. Del. 1980) (involving an APA action seeking an order that the FTC withdraw an administrative complaint).

Judicial review of agency action under the APA is governed by the APA itself, which expressly precludes judicial review of actions "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). No such review is at issue here. Instead, the McDaniels' motion raises a different issue: whether the FTC has stated a claim under the Federal Rules of Civil Procedure. The resolution of the McDaniels' motion is governed by Rule 8 of the Federal Rules of Civil Procedure, which mandates, rather than precludes, judicial review to ensure compliance with federal pleading requirements. "It is precisely the Court's duty under Rule 8 to scrutinize a party's right to proceed in federal court." *FTC v. Hornbeam Special Situations, LLC*, No. 1:17-cv-3094-TCB, 2018 WL 6254580, at *4 (N.D. Ga. Oct. 15, 2018).

**\*5** In sum, to avoid dismissal of its Section 13(b) action at the pleadings stage, the FTC must plausibly allege, in satisfaction of *Iqbal* and *Twombly*, that the McDaniels *are currently* violating the FTC Act *or are about to* do so.

## B. The FTC's Factual Allegations Pertain Only to *Past* Misconduct by the McDaniels and not to Present or Future Misconduct.

Section 13(b) of the FTC Act empowers the Commission to file a claim in federal court "[w]henever the Commission has reason to believe ... that any person, partnership, or corporation *is violating*, or *is about to violate*, any provision of law enforced by the [FTC]...." 15 U.S.C. § 53(b) (emphasis added). Section 13(b) thus unambiguously requires plausible factual allegations supporting a reasonable belief of present or future misconduct. *Shire*, 917 F.3d at 156–57 ("Section 13(b) requires that the FTC have reason to believe a wrongdoer 'is violating' or 'is about to violate' the law.... [T]his language is unambiguous; it prohibits existing or impending conduct ... [and] does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation.").

In *Shire*, the conduct in question was five years past. Here, the McDaniels' past conduct is more recent; at the time the FTC filed the Complaint, only three months had passed since the McDaniels ceased their alleged misconduct. However, like in *Shire*, the FTC identifies no ongoing misconduct and, in fact, appears to concede that the McDaniels' alleged misconduct continued only until July 2019. [4]

[4]    "The McDaniels ... continued to engage in deception until AdvoCare abandoned its multi-level marketing structure in July 2019 during its negotiations with the FTC." (Dkt. #1 at 26).

Further, even if the FTC had alleged ongoing or impending violations by the McDaniels, such allegations are implausible because, according to the FTC's own factual allegations, at the time the Complaint was filed, the primary mechanism of the McDaniels' alleged wrongdoing, the MLM program, had been permanently defunct for months. (Dkt. #1 at 26). Additionally, the sole business through which the McDaniels allegedly undertook such actions—AdvoCare—had, either before or simultaneous to the Complaint's filing, entered into a comprehensive agreement to halt AdvoCare's unlawful activities, reform its business practices, and submit to government compliance monitoring. (Dkt. #2, #2-1, #2-2).

Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....

2020-2 Trade Cases P 81,455

The FTC has not alleged that the McDaniels are *currently* violating or *are about to* violate the law enforced by the FTC. Every factual allegation that the FTC presents refers to past misconduct by the McDaniels. Although this misconduct was extensive and longstanding—having taken place for "a period of more than 20 years"—all factual allegations indicate that the alleged violations ended entirely in July 2019 when AdvoCare's MLM program was permanently terminated. (Dkt. #1 at 25–26). And it is implausible that the McDaniels can commit ongoing violations because the MLM program is now defunct, (Dkt. #1 at 26), and AdvoCare has been extensively sanctioned, reformed, and monitored for compliance, (Dkt. #15, #16). Finally, the FTC has not alleged—either in the initial Complaint filed in October 2019 or in any amended pleadings since that time—that either the MLM is still operating or that the McDaniels are otherwise continuing to engage in misconduct after July 2019.

### C. Past Violations May Sometimes Give Rise to an Inference of Ongoing or Future Violations, but the FTC has not Plausibly Alleged that Such is the Case Here.

**\*6**  Section 13(b) generally cannot be used to remedy past violations. *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). However, a plaintiff may state a plausible claim under Section 13(b) by showing that a past violation or series of past violations is likely to recur. *Id.* In some instances, courts have found that an extensive history of past violations is itself sufficient to create an inference of ongoing violations. *See, e.g., FTC v. GTP Mktg., Inc.*, No. 4-90-123-K, 1990 WL 54788, at \*5 (N.D. Tex. Mar. 15, 1990) (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 176 (9th Cir. 1987)) ("An extensive history of violations does beget an inference that future violations are likely to occur."). The Fifth Circuit, however, has held merely that past violations may, but do not necessarily, support an inference of future substantive violations. *SEC v. First Fin. Grp. Tex.*, 645 F.2d 429, 434 (5th Cir. 1981) (holding in an analogous context that finding a reasonable likelihood of future securities-law violations requires "proof of past substantive violations *that indicate* a reasonable likelihood of future substantive violations." (emphasis added)).

In each of the above cases, the recurrence of violations was at least possible, and in some instances likely, because the channels of misconduct utilized by the defendants remained open—*i.e.*, free and clear of government sanction—upon filing of the litigation. *See, e.g., Odessa*, 833 F.2d at 176–77. In *Odessa*, for instance, the defendant warehouse co-op was still fully operational at the outset of litigation. *Id.* Moreover, while the defendant stated an intent to comply with sanitation laws, it continued to manage its own sanitation practices free of government intervention. *Id.* Absent such intervention, and given the defendant's history of violations, the court held that "serious questions remain[ed]" as to whether the defendant's violations would recur or continue. *Id.*

Here, by contrast, at the outset of litigation and pursuant to FTC intervention, the McDaniels' channel of misconduct was either permanently defunct (in the case of the MLM program) or reformed, lawful, and monitored for compliance (in the case of AdvoCare more broadly). To this end, the FTC not only fails to adequately allege ongoing or future misconduct by the McDaniels but appears to affirmatively concede that the channels through which the McDaniels engaged in misconduct are permanently closed. (Dkt. #1 at 26); *see also* (Dkt. #2, #15, #16). Therefore, under the circumstances, an inference of present or future violations by the McDaniels is unsupported.

### IV. CONCLUSION

The FTC is authorized to bring an action under Section 13(b) of the FTC Act only when there is "reason to believe" that a defendant is currently engaged in, or about to engage in, conduct violating the Act. 15 U.S.C. § 53(b). Here, each of the FTC's factual allegations pertains only to *past* misconduct by the McDaniels. While courts may sometimes infer ongoing or future violations based on an extensive history of past violations, here such an inference is improper because the sole channel through which the McDaniels allegedly engaged in violations—AdvoCare—agreed to abandon its MLM program entirely (as well as all other allegedly unlawful practices) and subject itself to wide-ranging government monitoring for compliance. This fundamental transformation began with the termination of AdvoCare's MLM program in July 2019 and culminated in AdvoCare's settlement with the FTC on the day of the Complaint's filing, of which the Court takes judicial notice. Under the circumstances, the FTC has failed to provide plausible factual allegations that there is reason to believe that the McDaniels are currently violating the FTC Act or are about to violate the Act.

Finally, the FTC has filed with the Court a Motion to Exclude, (Dkt. #23), arguing that certain documents, legal arguments, and factual allegations presented in the McDaniels' Reply Brief, (Dkt. #20), should be excluded from consideration. In

Case 4:23-cv-03560   Document 126-1   Filed on 02/26/24 in TXSD   Page 34 of 119
Federal Trade Commission v. AdvoCare International, L.P., Not Reported in Fed. Supp....
2020-2 Trade Cases P 81,455

resolving the McDaniels' dismissal motion, the Court did not consider or rely upon any of the arguments, alleged facts, or documents complained of in the FTC's Motion to Exclude. For this reason, the Court finds that the FTC's Motion to Exclude should be DENIED as moot.

 **\*7** It is therefore **ORDERED** that Defendants Diane McDaniel's and Danny McDaniel's Motion to Dismiss, (Dkt. #17), is **GRANTED**. The Federal Trade Commission's claims against the McDaniels, *see* (Dkt. #1), are hereby **DISMISSED without prejudice**. [5] It is further **ORDERED** that the FTC is granted leave to replead its claims by filing an amended complaint, with such amended complaint to be filed within thirty (30) days from the date of the issuance of this Order.

[5]     Because the Court dismisses the claims asserted against the McDaniels by the FTC, the Court need

not address the parties' arguments on the scope of the remedies that would be available if the FTC's claims against the McDaniels were successful.

It is further **ORDERED** that the FTC's Motion to Exclude is **DENIED as moot**.

It is further **ORDERED** that all other motions pending before the Court are **DENIED as moot**.

**So ORDERED and SIGNED this 16th day of November, 2020.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 6741968, 2020-2 Trade Cases P 81,455

---

**End of Document**                                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

2011 WL 1219281
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio,
Western Division.

FEDERAL TRADE COMMISSION, et al., Plaintiff,

v.

PROMEDICA HEALTH SYSTEM, INC., Defendant.

No. 3:11 CV 47.
|
March 29, 2011.

**Attorneys and Law Firms**

Janelle Filson, Jeffrey H. Perry, Matthew J. Reilly, Sara Y. Razi, Willard K. Tom, Stephanie L. Reynolds, U.S. Federal Trade Commission, Washington, DC, Edward J. Olszewski, Jennifer L. Pratt, Beth A. Finnerty, Office of the Attorney General, Columbus, OH, for Plaintiffs.

Amy J. Carletti, David Marx, Jr., Erin C. Arnold, Stephen Y. Wu, McDermott, Will & Emery, Chicago, IL, Amy E. Hancock, Jennifer L. Westbrook, Vincent Van Panhuys, McDermott, Will & Emery, Washington, DC, Marshall A. Bennett, Jr., Marshall & Melhorn, Toledo, OH, for Defendant.

*FINDINGS OF FACT AND CONCLUSION OF LAW*

KATZ, District Judge.

**BRIEF OVERVIEW**

**\*1** The Federal Trade Commission ("FTC") and the State of Ohio ("Ohio") initiated this action against ProMedica Health System, Inc. ("ProMedica") seeking a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act, 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining ProMedica from further consolidating its operations with those of St. Luke's Hospital ("St.Luke's") pursuant to a Joinder Agreement executed on August 31, 2010.

This matter is now before the Court following a hearing on Plaintiffs' motion for a preliminary injunction (Doc. No.4), which took place on February 10–11, 2011. Also before the Court are Plaintiffs' Supplemental Memorandum

in Support (Doc. No. 83), Defendant's Pre–Trial Brief in Opposition (Doc. No. 85), Defendant's Post–Trial Brief in Opposition (Doc. No. 103), Plaintiff's Post–Hearing Brief in Support (Doc. No. 104), Defendant's Notice of Supplemental Authority (Doc. No. 109), Defendant's Supplemental Post–Trial Brief in Opposition (Doc. No. 111), and Plaintiffs' Supplemental Post–Hearing Memorandum (Doc. No. 113).

It must be remembered that at this stage the Court has heard only summaries of testimony and neither party has had the benefit of presenting live witnesses subjected to extensive cross-examination. The Administrative Law Judge has scheduled over 200 hours beginning May 31, 2011, for a trial and will have the opportunity to hear live testimony and judge the credibility of witnesses, both fact and expert.

Initially, the Court acknowledges the difficulty of this determination because of the possible adverse impact on the contracting parties. However, following the one and a half-day hearing and reviewing hundreds of pages of briefs and exhibits, the Court is driven to the conclusion that the Plaintiffs have satisfied their burden of proof and will grant the preliminary injunction.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and 1345. Pursuant to Fed.R.Civ.P. 52 and Fed.R.Civ.P. 65, the Court sets forth the following findings of facts and conclusions of law.

**FINDINGS OF FACT**

**I. THE RELEVANT PARTIES AND HISTORY**

**A. Procedural History**

1. ProMedica Health System, Inc. ("ProMedica" or "PHS") and St. Luke's Hospital ("St.Luke's") entered into a Joinder Agreement on May 25, 2010. PX 00058.

2. On September 1, 2010, St. Luke's became a part of ProMedica pursuant to the Joinder Agreement.

3. In July 2010, the FTC and Ohio ("Plaintiffs") opened investigations into ProMedica's acquisition of St. Luke's. The FTC and ProMedica subsequently entered into a voluntary Hold Separate Agreement ("HSA") that, to date, restricted ProMedica from making certain changes to St. Luke's.

USAP193

4. On January 6, 2011, the FTC filed an administrative complaint alleging the consummated joinder violates Section 7 of the Clayton Act, as amended 15 U.S.C. § 18.

5. On January 7, 2011, Plaintiffs filed a Complaint for a Temporary Restraining Order ("TRO") and Preliminary Injunction, arguing that this relief was necessary to maintain the *status quo* during the pendency of the FTC's administrative proceeding. (Doc. No. 1.) Plaintiffs also filed Motions for a TRO (Doc. No. 3) as well as for a Preliminary Injunction (Doc. No. 4).

**\*2** 6. The Court held a hearing on Plaintiff's Motion for TRO on January 13, 2011. (Doc. No. 52.) The parties agreed to an extension of an existing voluntary HSA until two days after the Court rules on Plaintiff s Motion for Preliminary Injunction. (Doc. No. 61–1.) Based upon that agreement, Plaintiffs requested and the Court granted withdrawal of the Motion for TRO. (Doc. No. 62.)

7. The parties conducted limited fact discovery until February 4, 2011 (Doc. No. 69), and this Court held a two-day hearing on the Motion for Preliminary Injunction on February 10 and February 11, 2011. (Doc. Nos. 101 and 102.)

8. A full administrative trial on the merits will begin on May 31, 2011, before Administrative Law Judge Chappell, and will include up to 210 hours of live testimony.

**B. ProMedica Health System, Inc.**

9. Defendant ProMedica is a not-for-profit integrated healthcare delivery system serving northwestern and west central Ohio and southeast Michigan., DX–ZZ (Guerin–Calvert Supp. Decl.) ¶ 4, which includes Lucas County.

10. Excluding St. Luke's, ProMedica operates three general acute-care hospitals in Lucas County: The Toledo Hospital ("TTH"); Flower Hospital ("Flower"); and Bay Park Hospital ("Bay Park").

11. TTH is a 794–bed facility but staffed for only 660, and offers primary, secondary, and some tertiary-level services, including high-level obstetrics services, a NICU, cardiovascular surgery, and trauma care.

12. Flower Hospital is staffed to use 257 out of its 292 licensed beds and provides primary, secondary, as well as some sophisticated services, particularly for oncology.

13. Bay Park Community Hospital, which is licensed and staffed for 86 beds, is a community hospital, located in the eastern part of Toledo, across the Maumee River.

14. TTH, Flower and Bay Park offer inpatient obstetrics services.

15. Flower and Bay Park do not offer tertiary level services.

16. ProMedica also operates the Toledo Children's Hospital, which is located on the same campus as TTH and houses 151 beds in its facility.

17. ProMedica also operates an insurance company, ProMedica Insurance Group or Paramount Health Care ("Paramount"). Paramount is a commercial insurance plan that markets a Health Maintenance Organization ("HMO"), a Preferred Provider Organization ("PPO") and a Medicare managed plan. DX–DDD ¶ 10.

18. ProMedica also operates a multi-speciality physician group, ProMedica Physicians Group, or PPG, which employs approximately 250 primary care physicians and specialists located throughout the Toledo area.

19. In 2009, ProMedica's revenues totaled approximately $1.6 billion. (Doc. No. 29 at ¶ 13.); PX 15 at 6.

20. ProMedica is a dominant hospital system in Lucas County. PX 270 at 25; PX 221 at 2; and PX 319.

21. ProMedica accounted for almost 50 percent of patient days for general acute-care services in Lucas County from July 2009 through March 2010. PX 2125 at 29; PX 2150 at 1.

**\*3** 22. In obstetrics services, ProMedica accounted for 71.2 percent of patient days for services from July 2009 through March 2010. PX 2125 at 29; PX 2150 at 2.

23. ProMedica receives the highest commercial reimbursement rates in Lucas County. PX 2125 at 27; PX 153; and PX 2072 at ¶ 16.

24. In 2009, ProMedica's hospitals in Lucas County had lower quality measures and outcomes than St. Luke's. PX 1172; PX 1030 at 18–19; and PX 1016 at 6.

**C. St. Luke's Hospital**

2011-1 Trade Cases P 77,395

25. St. Luke's is a formerly independent, non-profit general acute-care community hospital, located in Maumee, Ohio, the southwestern portion of Lucas County, Ohio.

26. St. Luke's has 178 staffed beds and provides a full array of general acute-care services and some tertiary cardiac services through its Heart Center.

27. Prior to the acquisition by ProMedica, St. Luke's was broadly recognized as a low-cost, high-quality hospital. PX 380; PX 1072 at 1; PX 2065; TRO Tr. At 54:9–10.

28. St. Luke's is located in a desirable and strategically important southwestern suburb in Lucas County. PX 2008 at 52:14–20; PX 2005 at 117:6–13, 118:3–5; PX 2016 at 61:7–62:17, 76:5–18. St. Luke's is easily accessible from major highways, and its location provides it with access to a growing population of employed and commercially-insured patients. PX 2008 at 53:25–55:24; PX 1132; PX 2065 at ¶ 8.

29. St. Luke's revenues for 2009 were approximately $156 million. PX 1006 at 5; (Doc. No. 26 at ¶ 13).

**D. The Acquisition**

30. On May 25, 2010, ProMedica entered into a Joinder Agreement with OhioCare Health System, Inc. ("OHS"), St. Luke's and St. Luke's Foundation, Inc. ("SLF") to acquire St. Luke's, SLF, and other affiliates. Prior to the acquisition, OHS was the parent company of St. Luke's, SLF, and other affiliates. Upon consummation of the acquisition, ProMedica became the sole corporate member or shareholder of St. Luke's and other OHS affiliates. PX 58.

31. The Joinder Agreement vests ProMedica with economic and decision-making control over St. Luke's and other OHS Affiliates. Among other things, and subject only to certain limited qualifications, ProMedica has the right to: (a) appoint ProMedica nominees to the boards of directors of St. Luke's and other OHS affiliates; (b) approve members from the boards of St. Luke's and other OHS Affiliates; (d) remove members from the boards of St. Luke's and other OHS Affiliates; (d) adopt and approve strategic plans and annual operating and capital budgets for St. Luke's and other OHS Affiliates; (e) authorize and approve non-budgeted operaring expenses and capital expenditures above certain amounts for them; (f) authorize and approve the incurrence or assumption of debt above certain amounts; (g) authorize and approve contracts for expenditures above certain amounts; (h) authorize and approve any merger, consolidation, sale or lease

of St. Luke's and other OHS Affiliates; and (i) appoint and remove the President, Secretary, and Treasurer of St. Luke's and other OHS Affiliates. PX 58 at 16–18. ProMedica also has the exclusive right to negotiate contracts with managed care organizations on behalf of St. Luke's. PX 58 at 25, 58.

**\*4** 32. The Agreement requires ProMedica to add St. Luke's to the provider network of its health-insurance subsidiary, Paramount, at rates comparable to other general acute-care hospitals in the ProMedica system. PX 58 at 22–23. After the consummation of the Acquisition, Paramount added St. Luke's to its network. PX 2021 at 73:14–19.

33. The Agreement requires ProMedica to provide $5 million to SLF, and also to provide St. Luke's with a $10 million per year for three years for capital projects. PX 140 at 1. This capital commitment is an absolute obligation of ProMedica as long as St. Luke's and the other OHS Affiliates remain in the ProMedica system (and survives if ProMedica removes them from its system) and cannot be reduced or delayed for any reason. PX 58 at 22. The Agreement also envisions return of these dollars in the event a federal court rescinds the Agreement. PX 140 at 1.

34. The Agreement requires ProMedica to maintain St. Luke's as an acute-care hospital providing six general categories of services in its current location for ten years, but does not require ProMedica to maintain or provide any other services at St. Luke's that are not specified in the Agreement, including but not limited to oncology, cardiology, orthopedics, spinal neurosurgery, pediatrics, or diabetes care, and does not require any minimum service levels. PX 58 at 23, 45–46.

35. The Agreement prohibited ProMedica from terminating OHS Affiliates' employees for 90 days after consummation of the Acquisition. This obligation has since expired, and as a result, ProMedica is free to reduce staff levels at St. Luke's without limitation. PX 58 at 46. ProMedica intends to reduce staffing levels at St. Luke's. PX 20 at 15.

36. ProMedica's acquisition of St. Luke's and other OHS Affiliates was not reportable under the Hart–Scott–Rodino Antitrust Improvements Act of 1976. PX 57 at 1.

**E. The Voluntary Hold–Separate Agreement**

37. On August 18, 2010, the FTC and ProMedica entered into a limited, 60–day Hold–Separate Agreement ("HSA") to allow the expedited FTC investigation to continue. PX 69.

2011-1 Trade Cases P 77,395

38. The HSA includes several key provisions designed to temporarily preserve St. Luke's viability, competitiveness, and marketability. The HSA prevents, among other things: (1) ProMedica's termination of St. Luke's health-plan contracts (while allowing health plans the option to extend their contracts with St. Luke's past the termination date, if a new agreement is not reached); (2) the elimination, transfer, or consolidation of any clinical service at St. Luke's; and (3) the termination of employees at St. Luke's without cause. PX 69 at ¶¶ 1–5.

39. On October 15, 2010, ProMedica agreed to extend the HSA to expire 15 days after ProMedica substantially complied with subpoenas and civil investigative demands. On the same day, the FTC granted ProMedica's request for a modification to the HSA to allow ProMedica to move inpatient rehabilitation beds at St. Luke's to Flower to create additional medical/surgical rooms at St. Luke's.

 **\*5** 40. After the TRO hearing on January 13, 2011 ProMedica agreed to extend the HSA (with one modification) until 5:00 p.m. on the second day following the Court's ruling on Plaintiffs' Motion for Preliminary Injunction. Dkt. # 61–1 at 2.

# II. FUNDAMENTALS OF HOSPITAL COMPETITION AND PRICING

### A. Reimbursements for Hospital Services

41. Privately-insured patients obtain health insurance coverage primarily through commercial health plans. PX 2124 at ¶ 7 (Town Decl.). Health plans negotiate with hospitals to determine the scope of coverage for their members and the reimbursement rates for services. PX 2065 at ¶ 3; PX 2067 at ¶ 11; PX 2072 at ¶ 8.

42. For patients covered by Medicare or Medicaid, the government sets the reimbursement rates for hospital services. PX 2117 at ¶ 7 n. 1 (Wachsman (PHS) Decl.); PX 2027 at 134:11–134:13 (Town Dep.).

43. Self-pay patients, including indigent patients, pay hospitals directly for services received. *See* PX 2124 at ¶ 6 (Town Decl.); PX 2027 at 99:7–101:7 (Town Dep.). Hospitals often provide indigent and charity care at a discount or at the hospitals' own expense. *See* PX 2117 at ¶ 4 (Wachsman (PHS) Decl.).

### B. Relationships Between Employees, Employers, Health Plans, and Hospitals

44. Employers offer their employees health insurance as part of compensation packages. PX 2124 at ¶ 8 (Town Decl.).

45. Employers that offer health insurance negotiate with health plans and select the combination of rates, benefit structures, and healthcare provider networks that best meets the needs of the employer and its employees. PX 2124 at ¶ 11 (Town Decl.); PX 2070 at ¶ 3, 6; PX 2058 at ¶ 5; PX 2059 at ¶ 4.

46. Employers generally do not negotiate directly with hospitals; instead, employers rely on health plans to do so. PX 2053 at ¶ 4; PX 2059 at ¶ 5; PX 2061 at ¶ 5.

47. Hospitals compete with each other for inclusion in health plans' provider networks and, once included, for the use of their hospital by health plans' members. *See infra* § II.C.3.

48. Similarly, health plans compete with one another to be offered by employers in the menu of plans that are available to employees. PX 2124 at ¶ 9 (Town Decl.). Once on the employer's menu, health plans compete with one another to attract enrollees. PX 2124 at ¶ 9 (Town Decl.).

49. Health plans regularly survey members and review consumer preferences in order to maintain marketable and attractive provider networks that appeal to employers and employees. *See* PX 2067 at ¶ 6; PX 2072 at ¶ 6; PX 2013 at 49:19–51:2.

50. Health plans offer two broad classes of insurance arrangements to employers: self-insured and fully-insured. PX 2124 at ¶ 10 (Town Decl.). Under self-insured plans, employers collect premiums from their employees and pay the full costs of employees' healthcare, bearing the risk that healthcare costs may exceed premiums. PX 2124 at ¶ 10 (Town Decl.); PX 2072 at ¶ 3; PX 2067 at ¶ 4; PX 2013 at 34:14–35:4. Under self-insured plans, the employers pay the health plan in exchange for administration of its employees' claims. PX 2124 at ¶ 10 (Town Decl.); PX 2072 at ¶ 3; PX 2013 at 34:14–35:4. Under fully-insured plans, a health plan collects premiums from employers and pays the cost of the employees' healthcare, bearing the risk that healthcare costs may exceed premiums. PX 2124 at ¶ 10 (Town Decl.); PX 2013 at 34:8–13; PX 2072 at ¶ 3.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

**C. Rate Negotiations Between Health Plans and Hospitals**

**1. Bargaining Dynamics**

**\*6** 51. Rates for hospital services are determined through contract negotiations between hospitals and health plans. PX 2124 at ¶ 16 (Town Decl.). Health plans negotiate rates for hospital services on behalf of their customers, who are both self-insured and fully-insured employers. PX 2124 at ¶ 17 (Town Decl.); PX 2013 at 49:15–18; PX 2072 at ¶ 12. These negotiations typically involve a series of offers and counteroffers, and result in either the inclusion of a hospital in a health plan's network or the failure of the health plan and hospital to reach an agreement. PX 2124 at ¶ 7 (Town Decl.); PX 2065 at ¶ 11.

52. The rates and terms of the contracts that are negotiated by a hospital and a health plan are a function of each party's bargaining leverage in negotiations. PX 2013 at 53:1–7; PX 2065 at ¶ 11. The respective degrees of bargaining leverage are determined by how each party would fare if no agreement were reached. PX 2124 at ¶ 18 (Town Decl.); PX 2067 at ¶ 13.

53. Failure to reach an agreement depends on the hospital's and health plan's respective "walk-away" points. PX 2124 at ¶ 18 (Town Decl.); PX 2013 at 51:11–53:7. If a hospital demands rates above a health plan's walk-away point, the health plan will refuse to contract with the hospital. PX 2124 at ¶ 18 (Town Decl.) If a health plan only offers to pay rates below a hospital's walk-away point, the hospital will refuse to contract with the health plan. PX 2124 at ¶ 18 (Town Decl.) Each party's walk-away point is a function of that party's bargaining leverage. PX 2124 at ¶ 18 (Town Decl.)

54. The bargaining power of a hospital is tied to the value that the health plan's current and potential members place on having in-network access to that hospital. PX 2124 at ¶ 19 (Town Decl.); PX 2013 at 50:5–9. This is reflected in the number of the health plan's members that use or would use the hospital. PX 2072 at ¶ 9; PX 2067 at ¶ 12. The more a health plan's members value a hospital, the more bargaining leverage the hospital possesses in its negotiations with the health plan. PX 2124 at ¶ 19 (Town Decl.); PX 2065 at ¶ 13; PX 2067 at ¶ 13. If failing to reach an agreement with a particular hospital would make a health plan's network substantially less attractive to the health plan's members, then that hospital would have substantial bargaining leverage against the health plan. PX 2124 at ¶ 19 (Town Decl.)

55. In Lucas County, there is a strong, positive correlation between a hospital's market share and the rates that the hospital succeeds in negotiating with health plans. PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl., Ex. 4). In other words, the higher a hospital's market share, the higher the rate it is able to demand and receive from health plans: St. Luke's has the smallest market share in Lucas County 11.5% for GAC and receives the lowest rates; UTMC has a 13% GAC market share and its average rates are X[1] % greater than St. Luke's; Mercy has a 29% GAC market share and its average rates are X% greater than St. Luke's; and ProMedica has a 46.8% GAC market share, with average rates exceeding St. Luke's by X%. PX 2139 at 13 (Town Supp. Decl. Exhs.). ProMedica's economic expert did not calculate or even estimate the rate differentials among the various Lucas County hospitals and therefore Dr. Town's calculation of rate differentials is unrebutted.

[1] Due to the confidential nature of information in this litigation and consistent with the Stipulated Interim Protective Order (Doc. No. 16), the Court will refer to such information as X, Y, or Z, as necessary, in these Findings of Fact.

**\*7** 56. A hospital's bargaining power with health plans also depends in part on the availability of alternatives that could serve as substitutes for the hospital in the eyes of the health plan's current and prospective members. PX 2072 at ¶ 9; PX 2067 at ¶ 12; PX 2006 at 121:10–121:19 (Wachsman (PHS) IH). The larger the number of such alternatives and the more closely substitutable they are in the eyes of health plan members, the lower the hospital's bargaining leverage against the health plan. PX 2013 at ¶ 54:9–25; PX 2065 at ¶ 11; PX 2124 at ¶ 22 (Town Decl.).

57. If a hospital is able to negotiate with a health plan to exclude competing hospitals from the health plan's network, the remaining in-network hospitals benefit from the reduced competition for the health plan's members. PX 2124 at ¶ 14 (Town Decl.).

58. As the corollary of the hospitals' bargaining leverage, a health plan's bargaining power in negotiations is determined by how much the hospital values being included in the health plan's network. PX 2124 at ¶ 20 (Town Decl.); PX 2065 at ¶ 12. This depends on the size of the health plan's membership, or patient volume, that the health plan can offer the hospital. PX 2072 at ¶ 9; PX 2067 at ¶ 12; PX 2124 at ¶ 20 (Town Decl.). The more patient volume that a hospital stands to lose if it

*F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)*

2011-1 Trade Cases P 77,395

fails to reach an agreement with the health plan, the greater the bargaining leverage the health plan will have with the hospital. PX 2124 at ¶ 20 (Town Decl.); PX 2072 at ¶ 9.

59. In the past, hospitals and health plans in Lucas County have sometimes failed to reach agreement in contract negotiations, resulting in the health plans offering narrower or exclusive provider networks. PX 2138 at ¶ 15 (Town Supp. Decl.); PX 2136 at ¶ 27 (Guerin–Calvert Supp. Decl.). The threat of termination is implicit, if not explicit, in negotiations between hospitals and health plans. PX 2016 at 41:8–41:12, 93:17–94:16; PX 2017 at 21:16–23. Thus, in Lucas County, the threat of failing to reach an agreement, resulting in the exclusion of a hospital from a health plan's network, is a significant factor in the negotiations between hospital and health plans. PX 2124 (Town Decl.) at ¶ 21; PX 2016 at 94:4–25; PX 2013 at 51:23–52:25.

## 2. Health Plans' Criteria for Creating Hospital Networks

60. Health plans generally value a broad network of providers, desiring to have in-network access to physicians and hospitals that span the geographic areas in which their members work and reside. PX 2124 at ¶ 9 (Town Decl.). Health plans that do not have sufficient geographic coverage in a market will have difficulty marketing their insurance products to employers and their employees. PX 2124 at ¶ 9 (Town Decl.).

61. A hospital's market share, geographic location, and breadth of services are important criteria for inclusion in the health plan's provider network. PX 2072 at ¶ 9; PX 2016 at 72:7–74:18.

**\*8** 62. Health plans will find it difficult to market products to employers if their networks do not include the hospitals desired by current and potential members. PX 2124 at ¶ 9 (Town Decl.).

63. In deciding whether to add a hospital to its network, a health plan balances the value its current and prospective members place on having in-network access to the hospital against the costs of adding that hospital to the network. PX 2124 at ¶ 12 (Town Decl.).

## 3. Hospitals Compete for Network Inclusion, as well as for Selection by Health–Plan Members

64. Hospitals compete with one another on multiple levels. PX 2124 at ¶ 13 (Town Decl.). First, hospitals compete

with one another for inclusion in health plans' provider networks. PX 2124 at ¶¶ 12, 13, 18 (Town Decl.). Health plan members have access to in-network hospitals at rates substantially lower than out-of-network hospitals. PX 2124 at ¶ 11 (Town Decl.). Because of this cost difference experienced by members, a hospital's volume of patients from a specific health plan is determined largely by whether the hospital is part of the health plan's provider network. PX 2124 at ¶ 15 (Town Decl.). All things being equal, an out-of-network hospital will treat significantly fewer patients from that health plan than an in-network hospital, because members bear higher out-of-pocket costs to use out-of-network hospitals. PX 2124 at ¶ 15 (Town Decl.).

65. Second, hospitals in a particular health plan network compete with each other to attract the health plan's members. PX 2124 at ¶ 14 (Town Decl.). Because members generally face little or no out-of-pocket price difference between in-network hospitals, in-network hospitals compete primarily on non-price dimensions, such as location, quality, patient experience, and other factors. PX 2124 at ¶ 14 (Town Decl.). This type of competition is reduced if a hospital successfully negotiates with the health plan to have one or more of its competitors excluded from the health plan's network. PX 2124 at ¶ 14 (Town Decl.).

## 4. Hospital Rates Reflect Relative Bargaining Power with Health Plans

66. If a health plan's network is substantially less attractive or marketable to employers due to the exclusion of a hospital, that hospital will be able to command higher rates for its inclusion in the health plan's network than a less-valued hospital. PX 2124 at ¶¶ 19, 23 (Town Decl.); PX 2067 at ¶¶ 12–13.

67. A hospital may have greater bargaining power with respect to some of its services by virtue of the attractiveness of its offerings and/or the lack of alternative providers for those services. PX 2124 at ¶¶ 19, 22–23 (Town Decl.). A hospital can impose a separate rate structure on health plans for these particular services by negotiating a "carve-out," also referred to as a "case rate." PX 2124 at ¶ 23 (Town Decl.); PX 2026 at 73:19–21 (Guerin–Calvert Dep.). A hospital with enhanced bargaining power for certain services can also exploit the bargaining power across additional services, leading to higher rates for any number of the hospital's services. PX 2124 at ¶ 23 (Town Decl.).

2011-1 Trade Cases P 77,395

## III. GENERAL ACUTE–CARE INPATIENT HOSPITAL SERVICES SOLD TO COMMERCIAL HEALTH PLANS CONSTITUTE A RELEVANT PRODUCT MARKET

**\*9** 68. General acute-care ("GAC") inpatient hospital services sold to commercial health plans are a relevant product market in which to evaluate the effects of the Acquisition. PX 2124 at ¶ 29 (Town Decl.). GAC services are a broad "cluster market" of inpatient surgical, medical, and supporting services provided in a hospital setting to commercially-insured patients. PX 2124 at ¶ 27 (Town Decl.); *see also* PX 2013 at 18:7–19:5; PX 2012 at 94:20–95:7. "[T]he purpose of the cluster market is to formulate aggregates across products in order to do the analysis in a practical way." PX 2027 at 45:3–11 (Town Dep.).

69. The GAC product market excludes services that St. Luke's currently does not perform, such as most complex "tertiary" and "quaternary" services. PX 2124 at ¶ 29 (Town Decl.); *see also* PX 2002 at 78:1–25 (Hanley (PHS) IH); PX02067 at ¶ 7.

70. The GAC market also excludes outpatient services. Patients would not substitute outpatient services in response to price increases for inpatient services, because such substitution is instead based on clinical considerations. PX 2067 at ¶ 8; PX 2013 at 21:9–22:3; PX 2124 at ¶ 31 (Town Decl.).

71. ProMedica has conceded that GAC services constitute an appropriate relevant market for this case. Dkt. # 26 (Answer) at ¶ 19 ("ProMedica admits that general acute-care inpatient hospital services sold to commercial health plans constitutes a valid service market.").

## IV. INPATIENT OBSTETRICAL SERVICES SOLD TO COMMERCIAL HEALTH PLANS CONSTITUTE A RELEVANT PRODUCT MARKET

72. Inpatient obstetrical ("OB") services are a cluster of procedures relating to pregnancy, labor, and post-delivery care provided to patients for the labor and delivery of newborns. PX 2075 at ¶ 4; PX 2081 at ¶ 3. No other hospital services are reasonably interchangeable with inpatient obstetrical services. PX 2124 at ¶ 30 (Town Decl.); PX 2075 at ¶ 4; PX 2081 at ¶ 3; PX 2013 at 65:19–66:9.

73. In this case, it would be inappropriate to analyze OB services as part of the cluster market of GAC services because OB services are offered by a different set of providers in

Lucas County and, thus, are subject to different competitive conditions than are GAC services. Specifically, two other Lucas County hospitals, UTMC and Mercy St. Anne Hospital, do not provide OB services. PX 2124 at ¶¶ 28, 30 (Town Decl.); PX 2064 at ¶ 9; PX 2068 at ¶¶ 6, 8, 11.

74. ProMedica and St. Luke's acknowledge this reality by obtaining and tracking separate market shares and other data for OB services. *See, e.g.,* PX 1016 at 3 (Dec.2009 SLH Affiliation Update); PX 1077 at 3, 5 (2008 SLH Market Report); PX 9 at 22 (PHS Credit Presentation).

75. Moreover, hospitals often "carve out" OB services from other GAC services and negotiate separate rates for OB services. *See, e.g.,* PX 365 at 30; PX 363 at 19, 22.

## V. LUCAS COUNTY IS THE RELEVANT GEOGRAPHIC MARKET

**\*10** 76. The relevant geographic market is no broader than Lucas County. This conclusion is compelled by the fact that a hypothetical monopolist controlling every hospital in Lucas County could increase the price of inpatient general acute-care services and obstetrics services in Lucas County by at least 5–10 percent, a small but significant amount. PX 2124 at ¶¶ 26, 32 (Town Decl.). Health plans agree that an overwhelming number of patients are unwilling to travel outside of Lucas County for general acute-care services. PX 2013 at 30:10–34:1, 66:10–19; PX 2065 at ¶ 9. ProMedica's expert also acknowledged that it is more likely than not that Lucas County is the relevant geographic market for GAC services under the hypothetical monopolist test. PX 2026 at 51:4–53:16 (Guerin–Calvert Dep.). Indeed, Defendant has not seriously disputed that Lucas County is the relevant geographic market for GAC.

77. With extremely rare exception, Lucas County residents do not use more distant providers of GAC or OB services. PX 2124 at ¶ 36 (Town Decl.); *see also* PX 2125 at 40–41 (Town Decl., Ex. 7). Only 2.1% of Lucas County residents leave the county for GAC services, and only 0.6% leave the county for OB services. PX 2124 at ¶ 36 (Town Decl.).

78. Defendant has suggested that inpatient OB services are the one service for which Lucas County residents are willing to drive outside of Lucas County, pointing to Wood County Hospital as a possible alternative. However, Defendant has not pointed to evidence in the record to support this claim. Rather, the evidence shows that *fewer* OB patients (0.6%) leave Lucas County for care than do patients in need of other

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

hospital services (2.1%), which is not surprising in light of the nature of OB services (delivering babies). PX 2124 at ¶ 36 (Town Decl.). 95 percent of Lucas County residents drive fewer than 24.5 minutes for OB services and residents' average drive time is just 11.5 minutes. PX 2125 at 24–25 (Town Decl., Ex. 3). Wood County Hospital is approximately 30 minutes from Toledo, and so it is not a realistic competitor in the market for OB services.

79. Health plans have testified that the residents of Lucas County are not willing to travel outside of Lucas County for inpatient hospital care, and that they would not be able to market health plan networks to Lucas County residents that consist solely of hospitals outside of Lucas County. *See, e.g.,* PX 2013 at 29:6–30:23, 33:1–34:1, 66:10–19; PX 2065 at ¶ 9; PX 2016 at 26:20–27:5.

80. Physicians in Lucas County have testified that their patients seek inpatient hospital care close to home, especially for obstetric services. It is more convenient for them, as well as for friends and family who want to come to visit. PX 2081 at ¶ 6; PX 2075 at ¶¶ 6–8; PX 2082 at ¶ 5. Further, physicians testified that even if hospitals in Lucas County were to raise their prices significantly, their patients would rather pay higher prices than travel to hospitals outside of Lucas County to receive inpatient hospital care. PX 2081 at ¶ 6; PX 2075 at ¶ 7; PX 2082 at ¶ 5.

**\*11** 81. ProMedica acknowledges that it competes only with other Lucas County hospitals for GAC services. PX 2002 at 22:10–22, 72:20–73:15 (Hanley (PHS) IH). ProMedica's counsel noted at the TRO hearing: "[P]ayers and their patients have alternative hospitals to turn to that are conveniently located in the market. And those alternative hospitals are Mercy's three hospitals and UTMC." TRO Hearing Tr. at 50:11–14.

82. Neither X nor Y views itself as a competitor with the Lucas County hospitals. PX 2056 at ¶¶ 4–6; PX 2057 at ¶ 7.

# VI. EXTRAORDINARILY HIGH MARKET CONCENTRATION LEVELS ESTABLISH A STRONG PRESUMPTION OF HARM TO COMPETITION IN BOTH RELEVANT MARKETS

83. The calculation and the examination of market concentration is an important tool for performing merger analysis, as it provides relevant information regarding the current competitive conditions in a market. PX 2124 at ¶ 48 (Town Decl.).

84. Markets that are more highly concentrated are presumed to be less competitive than less concentrated markets. In less competitive markets, firms will charge higher prices to consumers, and generally have less incentive to innovate and offer higher quality goods and services. PX 2124 at ¶ 48 (Town Decl.). Indeed, in Lucas County, market shares of the hospital systems are an accurate predictor of each hospital's relative rates. *See infra* Section II.C.l.

## A. Market Structure

### 1. Additional Market Participants

85. In addition to ProMedica and St. Luke's, there are only two other general acute-care competitors in Lucas County: Mercy Health Partners ("Mercy") and the University of Toledo Medical Center ("UTMC"). *See supra* Section V.

#### a. Mercy

86. Mercy is a not-for-profit health system providing inpatient and outpatient hospital services in northwestern Ohio and southeastern Michigan. In Lucas County, Mercy has three general acute-care hospitals: Mercy St. Vincent Medical Center ("St.Vincent"), Mercy St. Charles Hospital ("St.Charles"), and Mercy St. Anne Hospital ("St.Anne"). PX 2068 at ¶¶ 12–3.

87. St. Vincent is a 445–bed critical-care regional referral and teaching center near downtown Toledo. St. Vincent is a tertiary facility that also houses a children's hospital on its campus. PX 2068 at ¶¶ 3–4. St. Charles is a 294–bed, full-service community hospital located in an eastern suburb of Toledo. *Id.* at ¶ 5. St. Anne is a small community hospital with 100 beds in northwestern Toledo. *Id.* at ¶ 6.

88. St. Anne, which is the closest Mercy hospital to ProMedica's Flower Hospital, does not provide obstetrical services. PX 2068 at ¶ 8; *see also* PX 2006 at 128:10–11 (Wachsman (PHS) IH).

89. Mercy has a GAC market share of 28.7%, and an OB market share of 19.5% by patient days. PX 2125 at 29 (Town Decl. Ex. 5); *see also* PX 2150 (market share chart). ProMedica's market share is 60% higher than Mercy's for GAC services and three times larger for OB services. PX 2124 at ¶ 43 (Town Decl.). Immediately prior to the Acquisition, ProMedica's severity-adjusted rates were X percent higher

than Mercy's rates, on average. PX 2138 at ¶ 3 (Town Supp. Decl.).

### b. UTMC

**\*12** 90. UTMC was formed when the University of Toledo and the Medical Center of Ohio merged in 2006. UTMC is the only academic medical center in the area, and provides GAC services as well as tertiary and quaternary hospital services. PX 2064 at ¶¶ 1–3.

91. UTMC does not provide inpatient obstetrical services. PX 2064 at ¶ 9.

92. UTMC has a 13% market share for GAC services in Lucas County, which is less than one-third of ProMedica's market share. *See* PX 2125 at 29 (Town Decl. Ex. 5); PX 2150 (Market share chart). Immediately prior to the Acquisition, ProMedica's severity-adjusted rates were 51% higher than UTMC's rates, on average. PX 2138 at ¶ 3 (Town Supp. Decl.).

### 2. The Acquisition Left Only Three Competitors in the Lucas County GAC Services Market

93. ProMedica concedes that the Acquisition reduced the number of general acute-care competitors in Lucas County from four to three-leaving only ProMedica, Mercy, and UTMC. 2/10 PI Hearing Tr. at 122:6–7; 1/13 TRO Hearing Tr. at 50:9–14.

### 3. The Acquisition Results in a Duopoly in the Lucas County OB Services Market

94. In the relevant market for inpatient OB services, the Acquisition is a merger to duopoly with Mercy being the only remaining competitor. 2/10 PI Hearing Tr. at 122:20–22; PX 2000 at 132:24–133:11 (Steele (PHS) IH).

### B. Market Shares, Concentration, and the Presumption of Competitive Harm

95. The Acquisition significantly increases concentration in the already highly-concentrated Lucas County markets for GAC and OB services. ProMedica's post-Acquisition market share is 58.3% in the GAC market, where only two competitors remain, and 80.5% in the OB market, where only one competitor remains. PX 2124 at ¶¶ 51–52 (Town Decl.); PX 2125 at 29 (Town Decl., Ex. 5); PX 2150 (market share charts).

96. Under the U.S. Department of Justice and the Federal Trade Commission Horizontal Merger Guidelines (*"Merger Guidelines"*), which guide federal courts for merger analysis, a transaction that increases concentration by 200 points and results in a highly-concentrated market (HHI over 2,500) is presumed likely to enhance market power. PX 2214 at § 5.3 (*Merger Guidelines*). This Acquisition far exceeds these thresholds: in the GAC market, concentration rises 1,078 points to 4,391; in OB, concentration rises 1,323 points to 6,854. PX 2124 at ¶ 52 (Town Decl.); PX 2125 at 29 (Town Decl., Ex. 5); PX 2150 (GAC and OB market share charts based on Town Decl. data).

97. By a wide margin, therefore, viewed from the above-cited thresholds, the Acquisition is presumptively anticompetitive in both relevant markets based on these high levels of market concentration, and is presumed likely to enhance ProMedica's market power in both markets. PX 2214 at § 5.3 (*Merger Guidelines); see* Conclusions of Law at Section II.D.

### VII. PROMEDICA AND ST. LUKE'S WERE SIGNIFICANT COMPETITORS PRIOR TO THE ACQUISITION

### A. Because ProMedica's Lucas County Hospitals and St. Luke's Hospital Were Close Substitutes, the Acquisition Eliminates Significant Competition

### 1. Independent St. Luke's Hospital and ProMedica's Lucas County Hospitals Were Close Substitutes

**\*13** 98. St. Luke's provides care to a significant number of commercial patients in the Lucas County market. PX 2139 at 17 (Town Supp. Decl., Ex. 7); PX 2023 at 49:11–51:13 (Wakeman (SLH) Dep.); PX 1409 (July 2010 Wakeman e-mail).

99. St. Luke's is the third-largest hospital in the market based on commercial volume: St. Luke's had 2,846 commercial discharges between July 1, 2009 and March 31, 2010, exceeded only by St. Vincent and TTH. PX 2139 at 17 (Town Supp. Decl., Ex. 7). By July 2010, St. Luke's had surpassed UTMC, Flower Hospital, and St. Charles Hospital to serve the third-largest number of patients in the market based on total discharges and outpatient visits. PX 2023 at 49:11–51:13 (Wakeman (SLH) Dep.); PX 1409 (July 2010 Wakeman e-mail).

2011-1 Trade Cases P 77,395

100. Prior to the Acquisition, ProMedica was St. Luke's "most significant competitor." PX 2008 at 245:23–246:23 (Wakeman (SLH) IH) (using inpatient market shares in SLH core service area); PX 2009 at 172:10–19 (Dewey (SLH) IH) (in obstetrics).

101. According to internal documents, in St. Luke's core service area (St. Luke's top eight zip codes), St. Luke's and ProMedica had the first—and second-largest market shares, respectively, for GAC. PX 1235 at 3 ("Total Inpatient Market Share 1997–2010"). ProMedica and St. Luke's had the first- and second-largest market shares, respectively, for OB in St. Luke's core service area. PX 1235 at 5 ("Total Inpatient Market Share 1997–2010").

102. Based on Ms. Guerin–Calvert's data, in St. Luke's top ten zip codes by volume, (accounting for 64% of admissions), ProMedica (43%) and St. Luke's (26%) rank first and second in market share. PX 2138 at ¶ 25 (Town Supp. Decl.); PX 2123 at 41–42 (Guerin–Calvert Decl.). In eight of St. Luke's top ten zip codes, and in all of St. Luke's "core" zip codes, St. Luke's and ProMedica had the first—and second-highest shares of the GAC market. PX 2123 at 42 (Guerin–Calvert Supp. Decl. at 25); PX 2138 at ¶ 5 (Town Supp. Decl.); PX 2139 at 3 (Town Supp. Decl., Ex. 1).

103. In a 2008 survey conducted by St. Luke's in the ordinary course of business, respondents ranked St. Luke's and TTH first and second in patient preference and awareness within St. Luke's primary service area. PX 1077 at 9–14 ("St. Luke's Market Report 2008"). For obstetrics ("maternity"), TTH, St. Luke's, and Flower ranked as the top three preferred hospitals. PX 1077 at 13 ("St. Luke's Market Report 2008").

104. Testimony by executives of ProMedica and St. Luke's, third-party hospitals, and health plans all confirm the similarities in size and service offerings between St. Luke's and Flower Hospital. PX 2068 at ¶ 12; PX 2013 at 56:20–57:14; PX 2075 at ¶ 12; PX 2005 at 183:14–20 (Oostra (PHS) IH); PX 2008 at 184:11–16 (Wakeman (SLH) IH); *see also* PX 291 at 1 (March 2010 Steele and Sattler e-mails).

105. ProMedica's and St. Luke's market shares in southwestern Lucas County are significantly greater than Mercy's in both relevant product markets. PX 2138 at ¶¶ 5–6 (Town Supp. Decl.); PX 2125 at 38–41 (Town Decl. Ex. 7). See also, PX 2290 at 2–3

### 2. Independent St. Luke's Impacted ProMedica's Bottom Line

**\*14** 106. A 2010 ProMedica report concluded that "[m]arket share continued to wane early in 2009" and that "[a]dding St. Luke's would 'recapture' a substantial portion of recent losses." PX 159 at 5 (ProMedica 2010 Environmental Assessment). The same report noted, "[I]n metro Toledo, ProMedica's share of the inpatient market declined 1% through nine months of 2009, with St. Luke's Hospital picking up half of that share[.]" PX 159 at 12 (ProMedica 2010 Environmental Assessment). One percent of ProMedica's 2009 gross revenue represents tens of millions of dollars. PX 322 at 1 (PHS Gross Revenues 1Q2009).

107. Real-world natural experiments in the marketplace confirm that St. Luke's successfully competed with ProMedica for a significant number of patients. For example, ProMedica estimated that St. Luke's readmission to X's network in 2009, after being excluded since 2005, would cost ProMedica X dollars in gross margin annually. PX 333 at 2. After St. Luke's was readmitted in July 2009, St. Luke's market share in its core service area rose from 36 percent to 43.1 percent in 2010, while ProMedica's market share in the same area declined. PX 1235 at 3. Mercy's and UTMC's shares during this period changed little in comparison. PX 1235 at 3.

108. ProMedica estimated that St. Luke's readmission to Paramount's network, after being excluded since 2001, would lead to a reduction of 255–344 commercial inpatient admissions (and hundreds of outpatient procedures) at ProMedica hospitals each year. PX 40 at 7–8 (ProMedica 2010 analysis); *see also* PX 236 at 2 (ProMedica 2008 analysis). ProMedica estimated that the impact on Flower Hospital alone would be $2.8 million of lost margin annually. PX 240 at 2; PX 291 at 1. The loss of admissions and "the potential for the acute care impact (loss) to be bigger over time" concerned ProMedica executives. PX 236 at 1. ProMedica estimated that some of the losses would be offset by an increase in membership for Paramount—up to 15,000 new members solely—from the addition of St. Luke's into the Paramount network. PX 40 at 8 (ProMedica 2010 analysis); *see also* PX 236 at 2 (ProMedica 2008 analysis).

### B. ProMedica Took Aim at St. Luke's as a Significant Marketplace Competitor

109. St. Luke's was significant enough in the marketplace that ProMedica sought to have third-party health plans

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

exclude St. Luke's from their hospital provider networks and ProMedica refused to admit St. Luke's into Paramount's provider network. *See, e.g.,* PX 1127 at 1 (St. Luke's Competitor Assessment 2000–2008); PX 231 at 15 (X's 2008 Letter of Agreement); PX 1233 at 5 (St. Luke's 2009 Presentation).

110. ProMedica's 2008 Letter of Agreement with X contained a provision preventing X from adding St. Luke's (referred to in the agreement as the "participating network provider in western Lucas County") until July 1, 2009. PX 231 at 15. The Letter of Agreement also specified a X% rate increase for all ProMedica hospitals to be paid by X to ProMedica upon adding St. Luke's to its network. PX 231 at 15.

 **\*15** 111. A ProMedica executive noted in a May 7, 2008 e-mail that X "would add [St. Luke's] as soon as they are able" but that they "will have to pay PHS for the privilege." PX 380 at 1 (May 2008 Wachsman e-mail). The issue of St. Luke's exclusion from X's network was the "main deal breaker" for ProMedica in its negotiations with X and required a "huge effort" to accomplish. PX 295 at 1 (February 2008 Wachsman e-mail). ProMedica wanted to exclude St. Luke's in order to prevent a loss of volume to St. Luke's. PX 2017 at 60:7–60:23; PX 328 at 1 (ProMedica notes re: X).

112. ProMedica sought to exclude St. Luke's from X's network and indicated to X that this would be "an advantage to them." PX 2267 at 1 (X e-mail).

113. ProMedica evaluated opportunities to exclude St. Luke's from X's network. PX 407 at 1 (ProMedica Managed Care Strategy Recommendations).

114. St. Luke's noted that "Paramount leaders want SLH in; ProMedica leaders want to keep SLH out." PX 1233 at 5 (St. Luke's 2009 Presentation). A 2008 St. Luke's internal document stated that Paramount would "only let us back in when we give them [ProMedica] the keys." PX 1119 at 4 (St. Luke's Growth Pillar Update).

### C. St. Luke's Executives Knew St. Luke's Was Being Targeted by ProMedica and Feared Retaliation if St. Luke's Chose Other Affiliation Partners

115. In 2007, St. Luke's considered filing an antitrust suit against ProMedica, in response to perceived efforts by ProMedica to exclude or disadvantage St. Luke's in the market. PX 1144 at 3 (2007 Notes, Rupley, VP of Marketing

and Planning); PX 1207 at 3 (2007 Mem. to Board of Directors).

116. A St. Luke's competitor assessment observed that "ProMedica desires the SLH geographic area, so they will continue to starve SLH through exclusive managed care contracts and owned physicians. They will do this until we sign up with them or are weakened[.]" PX 1127 at 1 (St. Luke's Competitor Assessment 2000–2008).

117. A St. Luke's document noted that ProMedica is "continuing an aggressive strategy to take over St. Luke's or put us out of business." PX 1152 at 1 (Notes re: Paramount negotiations).

118. In a speech to the Perrysburg Chamber of Commerce in 2008, St. Luke's CEO Daniel Wakeman stated that in order to "provide the best value to employers and consumers," hospitals should compete on "price, quality and service," but instead were competing on "how well you can lock out hospitals and other healthcare providers [from] health insurance networks." PX 1380 at 1; PX 2023 at 137:11–140:17 (Wakeman (SLH) Dep.) (confirming that speech referred to ProMedica and X and that St. Luke's was at the time excluded from X and Paramount). Unlike ProMedica, there is no evidence in the record that Mercy ever attempted to persuade a health plan to exclude St. Luke's.

119. In 2008, Mr. Wakeman described ProMedica as "[t]he organization that has taken the greatest resources from the community, made the best bottom line and perform[ed] poorly in terms of costs and outcomes." PX 1378 at 1 (December 2008 Wakeman e-mail); PX 2023 at 98:14–22 (Wakeman (SLH) Dep.) (confirming that reference is to ProMedica).

 **\*16** 120. After years of competing vigorously against ProMedica, St. Luke's decided to become part of the ProMedica system, primarily to gain access to ProMedica's extraordinary health plan rates and out of fear of ProMedica's retaliation. In October 2009, in describing a possible affiliation with ProMedica, Mr. Wakeman advised leaders of the St. Luke's Board of Directors that ProMedica would bring "strong market/capital position" and "incredible access to outstanding pricing on managed care agreements" to St. Luke's. PX 1125 at 2. Mr. Wakeman concluded: "Taking advantage of these strengths may not be the best thing for the community in the long run. Sure would make life easier right now though." PX 1125 at 2.

2011-1 Trade Cases P 77,395

121. St. Luke's feared that ProMedica would retaliate if St. Luke's affiliated with X or Y. PX 1030 at 21 (St. Luke's 2009 Affiliation Analysis Update); PX 1232 at 3 (August 2009 Wakeman e-mail to Board of Directors); PX 1130 at 6 (August 2009 Due Diligence Notes). St. Luke's determined that choosing ProMedica "[w]ould reduce or eliminate significant ProMedica actions that are bound to happen if St. Luke's partners with X or Y." PX 1030 at 16 (St. Luke's 2009 Affiliation Analysis Update). If St. Luke's partnered with X, St. Luke's expected a "[s]corched [e]arth [r]esponse" from ProMedica and "the wrath of Alan [Brass, then-CEO of ProMedica]." PX 1030 at 21 (St. Luke's 2009 Affiliation Analysis Update); PX 1232 at 3 (August 2009 Wakeman e-mail to Board of Directors).

122. St. Luke's suspected that ProMedica was "threatening **[X]**" in order to "keep St. Luke's Hospital out of potential affiliations[.]" PX 1130 at 6 (Notes from Due Diligence Meetings, August 26, 2009).

## VIII. THE ACQUISITION ENABLES PROMEDICA TO RAISE RATES FOR ST. LUKE'S AND PROMEDICA'S OTHER LUCAS COUNTY HOSPITALS

### A. By Joining a Dominant System, St. Luke's Can Obtain Higher Rates Than It Could On Its Own

### 1. ProMedica and St. Luke's Understood that the Acquisition Would Increase St. Luke's Bargaining Leverage and Rates

123. ProMedica clearly was aware of its bargaining leverage before the Acquisition, as it even advertised this strength to entice potential affiliation partners. PX 226 at 8 (PHS presentation to potential hospital partners) ("Why ProMedica? ... Payer System Leverage").

124. SLH's own ordinary-course documents show that St. Luke's was fully aware that its acquisition by ProMedica would increase SLH's bargaining leverage and result in higher healthcare prices to health plans, employers, and patients.

125. A presentation to SLH's Board of Directors, regarding potential affiliation partners, states: "An SLH affiliation with ProMedica has the greatest potential for higher hospital rates. A ProMedica–SLH partnership would have a lot of negotiating clout." PX 1030 at 20 (Affiliation Analysis Update, October 30, 2009).

126. Formal notes, distributed among SLH's executives and assessing potential affiliation scenarios, point out that a "ProMedica or Mercy affiliation could still stick it to employers, that is, to continue forcing high rates on employers and insurance companies." PX 1130 at 5 (Notes from Due Diligence Meetings, August 26, 2009).

**\*17** 127. In an email to SLH's Board of Directors on October 11, 2009, SLH's CEO, Daniel Wakeman, wrote that "incredible access to outstanding pricing on managed care agreements" is among the important "things Pro[M]edica brings to the table" as an affiliation partner, and that "[t]aking advantage" of this strength "may not be the best thing for the community in the long run" but that it "[s]ure would make life much easier right now though." PX 1125 at 2; *see also* PX 1130 at 4 ("Concern that U .T.[M.C.] does/may not have as high of [sic] reimbursement rates as ProMedica and/or Mercy.").

128. A presentation from SLH's top executives to SLH's Board of Directors in early 2009 states: "[I]n essence, the message [to payors] would be pay us now (a little bit more) or pay us later (at the other hospital system contractual rates)." PX 1018 at 9 (Options for St. Luke's: St. Luke's is now at a cross-roads); PX 2008 at 182:1–15 (Wakeman (SLH) IH). This same presentation states: "Option 3: Affiliate with ProMedica. What do they bring? Strong managed care contracts." PX 1018 at 14 (Options for St. Luke's: St. Luke's is now at a cross-roads).

129. SLH's CEO, Daniel Wakeman, and its Director of Marketing & Strategic Planning, Scott Rupley, both noted that an independent St. Luke's acts as a competitive constraint in the market and that SLH's merger with a larger system would lead to higher rates. PX 1144 at 3 (Rupley Notes from Planning Session, January 9, 2007) (Health plans should care about SLH's independence because "St. Luke's Hospital keeps the systems a little more honest. The [health plans] lose clout if St. Luke's is no longer independent."); *see also* PX 1229 (Email from Wakeman (SLH) to Oppenlander (SLH), August 20, 2009) ("[W]e need to show [X] that we intend to merge with another system, and all the value we produce will [be] diluted, as our payments skyrocket.").

130. St. Luke's anticipated as much as X to Y in additional revenues from X, Y, and Paramount as a result of joining ProMedica. PX 1231 ("Yes we asked X for X dollars, but if we go over to the dark green side [i.e., PHS] ... we may pick up as much as Y dollars in additional X, Y and Paramount fees").

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

131. St. Luke's anticipated that the transaction with ProMedica, and its potential for higher prices, would undergo antitrust scrutiny. PX 1228 at 2 (Email from Oppenlander (SLH) to Rupley (SLH), October 15, 2009) ("Slides 6, 11 and 17 will need some modification in your discussion of managed care rates/leverage. Unfortunately we can't talk about raising rates, managed care leverage and the like due to anti-trust issues."); PX 1030 at 17 ("significant legal, regulatory considerations ... ProMedica: HHI with St. Luke's is 34.7% and 29.9% without.... Any obstetrics affiliation may need to be carefully reviewed. Note: Anything [referring to HHIs] over 18% throws up a red flag.")

**2. Health Plans Expect the Acquisition to Result in Increased Bargaining Leverage and Higher Rates**

**\*18** 132. Health plans testified that the Acquisition has enhanced the bargaining leverage of St. Luke's and ProMedica.

a. X's representative testified that the Acquisition eliminates competition between ProMedica and St. Luke's and increases ProMedica's bargaining leverage against X. PX 2067 at ¶ 20. The increased bargaining leverage results from the fact that the Acquisition has made the prospect of walking away from PHS far less economically feasible for X than it was before the Acquisition. *Id.* at ¶ 21 ("Without St. Luke's and ProMedica, X's network would be much less attractive and we would lose members, particularly in southwestern Lucas County."); *see also* PX 2016 at 86:5–20 ("If ProMedica walked away, we would be devastated, business-wise.").

b. X's executive testified that the Acquisition increases ProMedica's bargaining leverage against X. PX 2017 at 51:14–20.

c. X's representative testified that the addition of St. Luke's to ProMedica's hospital network in Lucas County likely increased ProMedica's bargaining leverage and that this increase is potentially significant. PX 2013 at 61:6–23.

d. X's representative testified that X used its negotiated rates with St. Luke's as a benchmark in negotiations with ProMedica. PX 2073 at ¶ 11. However, as a result of the Acquisition, "what little leverage we had in negotiations with PHS has all but disappeared, and PHS's ability to demand higher rates from X and our clients has increased even further." PX 2073 at ¶ 15.

e. X's executive testified that SLH's merger with a larger system might give SLH the ability to negotiate higher rates. PX 2001 at 56:4–11. X's executive testified that, as a result the Acquisition, X will "[a]bsolutely" find it harder to serve its members in Lucas County without ProMedica in its network. *Id.* at 63:11–19. The executive also testified that if a contract was not reached with ProMedica, X would cease to operate in Lucas County. *Id.* at 64:12–65:4.

133. Health plans also testified that the Acquisition will likely allow ProMedica to demand and obtain higher reimbursement rates for not only St. Luke's but also ProMedica's other Lucas County hospitals.

a. X's representative testified that X expects ProMedica, "at a minimum," to increase SLH's reimbursement rates to the rates received by PHS's other hospitals. PX 2067 at ¶¶ 20, 22. In fact, since the Acquisition, PHS has already presented X with a proposal to increase SLH's rates to those received by PHS's other hospitals, resulting in an estimated rate increase of 22 percent. PX 2016 at 96:6–15. X is also concerned that the Acquisition could give ProMedica enough leverage to increase rates at PHS's other Lucas County hospitals. PX 2067 at ¶ 22.

b. An X executive, testified that, based on his experience, hospital mergers in which a large system acquires an independent community hospital typically cause the community hospital's rates to rise to the rates of the acquiring system. PX 2072 at ¶ 18("This occurs in large part because the community hospital gains increased leverage to negotiate with health plans by having a larger hospital system in a local area to use as leverage"). The executive likened these past mergers to ProMedica's acquisition of St. Luke's. PX 2072 at ¶ 18. X's current reimbursement rates at SLH are approximately 40 percent to 55 percent lower than its rates to PHS's Flower and Bay Park. PX 2072 at ¶ 16.

**\*19** c. X's representative testified that the Acquisition reduced competition in the market for general acute-care services in Lucas County. PX 2013 at 60:21–25. When competition is reduced in a market, healthcare costs and the reimbursement rates that X has to pay typically rise. PX 2013 at 61:1–5. The increased bargaining leverage that ProMedica obtained as a result of the Acquisition creates the potential for ProMedica to increase its reimbursement rates to X. PX 2013 at 61:18–23.

2011-1 Trade Cases P 77,395

d. X's representative testified that, as a result of the bargaining leverage that ProMedica gained by acquiring St. Luke's, X "will have no choice but to accept these [increased] rates or consider exiting Lucas County altogether. As a direct result of this change in leverage, I expect PHS to increase SLH's rates significantly by at least 20% and also to increase the rates at its existing hospitals." PX 2073 at ¶ 15.

e. X's executive testified that X expects SLH's reimbursement rates to rise as a result of the Acquisition. PX 2001 at 62:6–12.

f. X's executive testified that "[a] hospital's relative bargaining leverage against X is based on the hospital's importance and desirability" in the eyes of X's members. PX 2065 at ¶ 13. X's executive also testified that "the greater the hospital's relative bargaining leverage, the higher the prices and the less favorable the contract terms it will be able to demand from X." PX 2065 at ¶ 11.

g. ProMedica's economic expert, Margaret Guerin–Calvert, testified that an independent St. Luke's could obtain virtually the same rates as it could as part of ProMedica's system. PX 2026 at 216:11–217:23 (Guerin–Calvert Dep.). This claim, which was not supported by any ordinary course documents or testimony, or empirical support, is contradicted by numerous ProMedica and St. Luke's documents, as well as testimony from dozens of third-party witnesses.

134. Health plan executives testified that their firms will have little choice but to share with both their self—and fully-insured members any rate increases at St. Luke's or ProMedica's legacy hospitals after the Acquisition. PX 2067 at ¶ 26 ("When hospitals increase rates, health plans like X are forced to pass on the cost increase to employers and individuals, which results in significant increases in premiums."); PX 2013 at 14:20–15:20 (X must pass on any healthcare cost savings or increases to its members); PX 2072 at ¶ 20 increases in healthcare costs will fall directly on X's self-insured members and indirectly, via higher premiums, on X's fully-insured members); PX 2065 at ¶ 3("any discounts or rate increases that result from X's negotiations with healthcare providers flow directly and fully to our plan sponsors"); PX 2001 at 60:20–61:10; PX 2004 at 39:7–40:14; PX 2073 at ¶ 16.

**B. Already Dominant and High–Priced, ProMedica Becomes a Must–Have System With the Acquisition**

**1. ProMedica Becomes Even More Dominant Than Before**

**\*20**  135. Prior to the Acquisition, ProMedica acknowledged its dominance in the Lucas County market through ordinary course documents.

a. A Standard & Poor's credit presentation stated: "ProMedica Health System has market dominance in the Toledo MSA." PX 270 at 25 (ProMedica "Credit Presentation" to Standard & Poor's on 04/02/2008).

b. A 2010 presentation noted ProMedica's "leading market position within the Toledo metropolitan area" celebrating "dominant market share[s]" in oncology, orthopedics, and women's services. PX 320 at 3 (Kaufman Hall Presentation on ProMedica's Credit and Capital Position).

c. In its "2010 Environmental Assessment," ProMedica noted its status as a "clear market leader" in cancer services and orthopedics. PX 159 at 12–13. Regarding obstetrics services, the document states: "ProMedica has expanded on its already commanding share of the women's product line in metro Toledo, growing from 65% to 65.9% through nine months of 2009." PX 159 at 12–13 (ProMedica "2010 Environmental Assessment").

d. In a 2009 document, ProMedica noted that it was the "clear market leader" in obstetrics for the metro Toledo area, with a "commanding and largely stable market share" of 65% as of June 2008. PX 265 at 60 (ProMedica "2009 Environmental Assessment Draft").

e. In a strengths, weaknesses, opportunities and threats ("SWOT") analysis, ProMedica listed its "[d]ominant market share" as a strength. PX 319 ("TTH Medical Executive Committee SWOT Analysis Results 2007").

136. ProMedica's pre-Acquisition dominance was evident in its ability to successfully negotiate St. Luke's exclusion from X's network for 16 months. See VII B ¶¶ 109–111.

137. Prior to the Acquisition, ProMedica had the highest market shares for inpatient general acute-care and obstetrics services and the highest prices in Lucas County. PX 2125 at 27, 29 (Town Decl. Exhs.); PX 2139 at 13 (Town Supp. Decl. Exhs.); see also PX 153 (Email from Oostra (PHS) to Steele (PHS), Jan. 14, 2009) ("we hear from payors we are among the most expensive in ohio [sic]").

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

138. Market shares correlate with a hospital's market power. PX 2138 at ¶ 32 (Town Supp. Decl.). Professor Town's examination of hospital prices in Lucas County prior to the Acquisition demonstrates a high correlation between market shares and prices. PX 2138 at ¶ 33 (Town Supp. Decl.). ProMedica, the system with the highest market shares, had the highest prices. *Id.* Mercy, the system with the second-highest share, had the second-highest prices. *Id.* UTMC, with the third-highest share, had the third-highest prices. *Id.* And St. Luke's, with the smallest share, had the lowest prices. *Id.*

139. Professor Town's analysis of willingness-to-pay demonstrates that consumers place 28 percent more value on having access to ProMedica hospitals in their networks than Mercy hospitals. PX 2138 at ¶ 6 (Town Supp. Decl.).

140. The Acquisition increases ProMedica's market shares for inpatient general acute-care services and obstetrics and its bargaining leverage with health plans. PX 2124 at ¶ 52, 55 (Town Decl.). The Acquisition increases ProMedica's market share among Lucas County hospitals from 47 percent to 58 percent for inpatient general acute-care services, and from 71 percent to over 80 percent for inpatient obstetrics services. PX 2125 at 29 (Town Decl., Ex. 5). The increases in ProMedica's market shares create a strong presumption of enhanced market power. PX 2124 at ¶ 53 (Town Decl.).

**\*21** 141. Patients in southwest Lucas County prefer to receive inpatient general acute-care and obstetrics services from ProMedica or St. Luke's. PX 2124 at ¶ 59 (Town Decl.); PX 2125 at 38–39 (Town Decl. Exs.). St. Luke's and ProMedica have the first—and second-largest market shares for general acute-care services in 11 of St. Luke's top drawing zip codes and for obstetrics services in 10 of St. Luke's top drawing zip codes. *See* PX 2125 at 38–39 (Town Decl. Exs.). Because St. Luke's was critical to health plans serving southwestern Lucas County residents that did not contract with ProMedica, the Acquisition removes consumers' ability to choose an independent St. Luke's and increases PHS's bargaining power in the Toledo area. PX 2016 at 75:18–76:10. X's own ordinary course calculations demonstrate that in the southwestern portion of the market St. Luke's maintained a 40 percent share, ProMedica a 36 percent share, UTMC all percent share, and Mercy a 10 percent share. PX 2290 at 2,3 (X Business Development Committee Meeting Minutes, March 9, 2010).

142. Ownership of St. Luke's—the only community hospital in southwest Lucas County—increases ProMedica's

bargaining leverage with health plans. PX 2016 at 75:10–76:10; PX 2017 at 51:14–20. Development of proposed health care facilities by others were a response to growth in Lucas County's southwest quadrant. PX 2005 at 80:17–82:20 (Oostra (PHS) IH); PX 2018 at 54:14–57:6; PX 1148 at 10 (Health Leaders: Toledo Market Overview, 2008). These developments, near St. Luke's, were motivated by a "void" in ProMedica's hospital coverage in Lucas County. PX 2005 at 81:3–82:20 (Oostra (PHS) IH). As Ms. Guerin–Calvert, ProMedica's expert, stated: "St. Luke's would serve as ProMedica's principle [sic] access to the southern and western portions of the Toledo MSA." PX 2136 at ¶ 94 (Guerin–Calvert Supp. Decl.).

#### 2. Health Plans Expect It Will Be Far More Difficult to Market a Hospital Network Without ProMedica

143. The acquisition of St. Luke's increases ProMedica's market share and, in turn, its bargaining power with health plans, by a significant amount, because ProMedica now owns the only community hospital located in Maumee, in the southwestern portion of Lucas County. PX 2016 at 75:10–77:10.

144. The Acquisition increases ProMedica's importance to X. PX2016 at 76:11–14. X's representative stated that "it would be exponentially more difficult to market a network in Lucas County without ProMedica *and* St. Luke's." PX 2067 at ¶ 21. The representative testified that post-Acquisition: "If [ProMedica] decided to walk away, it would be significantly detrimental to [X's] business." PX 2016 at 76:17–18.

145. X's executive testified that the Acquisition would "absolutely" make it harder to serve its membership in Lucas County without ProMedica. PX 2001 at 63:11.

146. X's representative testified that the acquisition of St. Luke's has increased PHS' bargaining power and given PHS the ability to demand higher rates. PX 2073 at ¶ 15. Further, the representative testified that X has no choice but to accept the rate increases or consider exiting the market all together. PX 2073 at ¶ 15.

**\*22** 147. X's executive testified that X added St. Luke's to its network in 2008 because it concluded that it needed St. Luke's to be competitive in the market. PX 2017 at 56:4–11. The executive also testified that he expects ProMedica's acquisition of St. Luke's to increase ProMedica's bargaining leverage with X. PX 2017 at 51:14–20.

USAP207

148. X's representative testified that the addition of St. Luke's to ProMedica's network likely increases ProMedica's bargaining leverage. PX 2013 at 61:6–14.

149. No health plan in at least the last ten years has offered a network without both ProMedica and St. Luke's. PX 2022 at 69:3–6 (Wachsman (PHS) Dep.); PX 2138 at ¶ 17 (Town Supp. Decl.).

### C. ProMedica Will Exercise its Increased Leverage to Extract Higher Rates

#### 1. ProMedica is Particularly Aggressive in Seeking Highest Rates Possible

150. ProMedica's CEO, Randall Oostra, concedes that PHS exercises its bargaining leverage to obtain the most favorable reimbursement rates possible from commercial health plans. PX 2005 at 259:22–24 (Oostra (PHS) IH) ("Q: Is one of ProMedica's goals to increase or to maximize revenue? A: Yes."), 260:20–22 ("Q: Is ProMedica happy with the rates that they have with managed care organizations? A: No. We would always like more."). ProMedica's own expert, Ms. Guerin–Calvert, concedes that PHS seeks to obtain the highest rates possible from commercial health plans. PX 2026 at 220:2–12 (Guerin–Calvert Dep.) ("Q: Are you aware of ProMedica ever saying to any health plan, 'That's too much?' A: I have never heard of-there may be an exception, but I do not recall any small, medium, or large hospital ever saying, 'Please, no, it's too much.' ").

151. ProMedica claims that it attempts to obtain a cost-coverage ratio of only X percent from commercial health plans, PX 2117 at ¶ 8 (Wachsman (PHS) Decl.). However, PHS's documents and testimony tell a different story. ProMedica's cost-coverage ratios for significant third-party, commercial health plans range from X percent (X) to Y percent (Y). PX 233 (PHS's Annualized Cost–Coverage Ratios for 2009); *see also* PX 2022 at 37:6–40:9 (Wachsman (PHS) Dep.) (supporting the view that PHS seeks to maximize cost-coverage ratios with third-party, commercial health plans, given the bargaining dynamic between PHS and each health plan); PX 381 (explanation of the cost-coverage ratio as a calculation of operating margin that—is, net revenue as a percentage of cost).

152. ProMedica's aggressiveness in seeking the highest rates possible was evidenced during X's last round of contract negotiations with PHS in 2009. X's representative testified that PHS "sought a rate increase of approximately X–Y% plus

an annual inflation adjustment[,] ... substantially greater than that sought by St. Luke's and other hospitals in Lucas County in our last round of negotiations." PX 2067 at ¶ 18.

153. In Lucas County, there is a strong, positive correlation between a hospital's market share and the rates that the hospital is able to negotiate with commercial health plans. PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl. Exhs.). ProMedica's market share and rates are the highest in Lucas County. PX 2138 at ¶ 33 (Town Supp. Decl.); PX 2139 at 13 (Town Supp. Decl. Exhs.).

#### 2. ProMedica's Ownership of Paramount May Further Enhance ProMedica's Incentive to Seek Post–Acquisition Rate Increases

**\*23** 154. Paramount pays lower reimbursement rates to ProMedica's hospitals, relative to the rates that third-party health plans pay to PHS's hospitals. PX 2006 at 60:6–11 (Wachsman (PHS) IH); PX 2013 at 62:11–15.

155. ProMedica's ownership of Paramount may increase PHS's incentive to bargain more aggressively with health plans for higher rates. PX 2067 at ¶ 24; PX 2016 at 49:6–13; PX 2124 at ¶ 82 (Town Decl.).

156. If ProMedica raised reimbursement rates to third-party health plans, these health plans' insurance products would become more expensive and, thus, less attractive to employers relative to Paramount's products. PX 2013 at 62:19–63:5; PX 2067 at ¶ 24. As a result, such a rate increase would benefit PHS not only by increasing revenues at its hospitals (because of the higher rates) but also by attracting more customers to Paramount's insurance products. PX 2013 at 63:6–15; PX 2067 at ¶ 24.

157. If a third-party health plan were unable to offer a network that included ProMedica, Paramount would benefit because its network would become more attractive relative to the other health plan's network. PX 2067 at ¶ 24; PX 2016 at 98:18–22, 98:25–99:1; *cf.* PX 2013 at 63:16–25.

158. ProMedica's ownership of Paramount makes a health plan's failure to contract with PHS more costly for the health plan because walking away from PHS would cause the health plan to become less attractive to current and potential members, relative to other health plans (including Paramount) that include ProMedica in its network. PX 2067 at ¶ 24; PX 2124 at ¶ 82 (Town Decl.); *cf.* PX 2013 at 63:16–25.

USAP208

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

159. The cost to ProMedica of failing to reach an agreement with a health plan is diminished by the increased revenue Paramount will receive from patients switching from that health plan to Paramount as a result of PHS being out of that health plan's network. PX 2067 at ¶ 24; PX 2124 at ¶ 82 (Town Decl.); *cf.* 2013 at 63:16–25.

160. Adding St. Luke's to ProMedica and, thus, to Paramount's network increases the attractiveness of Paramount's products to customers in Lucas County. PX 2013 at 64:1–6; PX 2067 at ¶ 24.

161. ProMedica's acquisition of St. Luke's makes failing to contract with PHS even more costly to third-party health plans and less costly to PHS, because walking away from PHS creates a much wider disparity than before the Acquisition: the third-party health plan's network becomes significantly less attractive *without* both PHS and SLH, while Paramount's network becomes significantly more attractive *with* both PHS and SLH. PX 2067 at ¶ 24; PX 2124 at ¶ 82 (Town Decl.); *cf.* PX 2013 at 64:15–65:5.

**D. Health Plans Cannot Constrain ProMedica's Price Increases**

**1. Mercy's Presence in the Relevant Market Will Not Constrain ProMedica's Exercise of Increased Market Power Resulting From the Acquisition**

162. Mercy has not been a sufficiently strong competitive constraint before the Acquisition against ProMedica's exercise of market power. Despite the geographic proximity of Mercy's three Toledo-area hospitals and PHS's three legacy Toledo-area hospitals, and the relative similarity of their service offerings, PHS maintained a substantial advantage in terms of its Lucas County market share prior to the Acquisition. PX 2138 at ¶ 2 (Town Supp. Decl.). Prior to the Acquisition, PHS's market share for inpatient GAC services was 63 percent larger than that of Mercy. For inpatient obstetrics services, PHS's share was 266 percent larger than Mercy's. *Id.;* PX 2125 at 29 (Town Decl. Exhs.). The difference in shares between PHS and Mercy prior to the Acquisition demonstrates that consumers do not view the hospital systems as interchangeable. PX 2138 at ¶ 2 (Town Supp. Decl.); PX 2016 at 87:11–88:2.

 **\*24** 163. The Acquisition has further increased the disparity between ProMedica's and Mercy's market shares in both relevant markets. PX 2138 at ¶ 7 (Town Supp. Decl.). PHS's post-Acquisition market share in inpatient GAC services

is roughly twice as large as Mercy's. *Id.;* PX 2125 at 29 (Town Decl. Exhs.). PHS's post-Acquisition market share in inpatient obstetrics services is more than four times greater than Mercy's. PX 2138 at ¶ 7 (Town Supp. Decl.).

164. Prior to the Acquisition, Mercy's presence in the market did not limit ProMedica's ability to charge the highest rates, by far, in Lucas County. PHS's severity-adjusted (i.e., apples-to-apples) prices were X percent higher than Mercy's, X percent higher than UTMC's, and X percent higher than SLH's. PX 2138 at ¶ 3 (Town Supp. Decl.); *see also* PX 2125 at 27 (Town Decl. Exhs.). There is no evidence before the Court suggesting that these price disparities are due to differences in costs of care or quality of care. PX 2138 at ¶ 3 (Town Supp. Decl.). If, prior to the Acquisition, Mercy served as a very close substitute to PHS and constrained it accordingly, one would expect ProMedica's rates to be much lower and much closer to Mercy's. *Id.*

165. The Acquisition has given PHS a significant locational advantage over Mercy because Mercy offers no direct counterpart to St. Luke's in southwestern Lucas County. PX 2138 at ¶ 7 (Town Supp. Decl.); PX 2016 at 61:23–62:17. *See also* PX 2290 at 2–3.

166. In southwestern Lucas County, the combined market share of ProMedica and St. Luke's in both inpatient GAC services and inpatient obstetrics services is much larger than Mercy's corresponding share. PX 2138 at ¶¶ 5–6 (Town Supp. Decl.); PX 2139 at 3 (Town Supp. Decl. Exhs.); PX 2125 at 38–41 (Town Decl. Exhs.); PX 2290 at 2–3.

167. Econometric analysis of willingness-to-pay shows that, prior to the Acquisition, commercially-insured patients placed 28 percent more value on having in-network access to ProMedica than on having in-network access to Mercy. PX 2138 at ¶ 6 (Town Supp. Decl.); PX 2139 at 8 (Town Supp. Decl. Exhs.). This same analysis shows that the Acquisition has increased by 58 percent the value that commercially-insured patients place on having in-network access to PHS. PX 2139 at 8 (Town Supp. Decl. Exhs.). In other words, as a result of the Acquisition, consumers value in-network access to ProMedica nearly twice as much as they value in-network access to Mercy. *Id.* Thus, the Acquisition has rendered Mercy a significantly more distant substitute for PHS in the eyes of health plans and their members. PX 2138 at If 7 (Town Supp. Decl.).

168. Mercy did not provide a sufficiently strong competitive constraint to prevent ProMedica from exercising its market power before the Acquisition. PX 2138 at ¶ 8 (Town Supp. Decl.). In light of the fact that the Acquisition has made ProMedica more dominant and has made Mercy less competitive against ProMedica, there is no reason to believe that Mercy will be able to constrain ProMedica's post-acquisition exercise of enhanced market power. PX 2138 at ¶ 8 (Town Supp. Decl.).

### 2. A Hospital Network Consisting of Mercy and UTMC is Not a Viable Substitute for One Including ProMedica

**\*25** 169. No health plan in the last 10 years has ever offered a network comprised of only UTMC and Mercy. PX 2022 at 69:3–5 (Wachsman (PHS) Dep.); PX 2138 at ¶ 17 (Town Supp. Decl.).

170. ProMedica's post-Acquisition market share is significantly higher than the combined market share of Mercy and UTMC. PX 2138 at ¶ 17 (Town Supp. Decl.). A Mercy and UTMC network is not a viable or close substitute for a ProMedica–St. Luke's network, as evidenced by relative market shares, and patient draw by zip codes, which indicate each hospital's relative desirability among patients. PX 2138 at ¶ 17 (Town Supp. Decl.).

171. In particular with respect to obstetrics services, a network comprised of Mercy and UTMC would not be nearly as attractive as a network comprised of ProMedica and St. Luke's because Mercy's St. Anne, located proximally to ProMedica's Flower Hospital, and UTMC, located proximally to St. Luke's, do not offer obstetrics services. PX 2124 at ¶ 30 n. 22 (Town Decl.).

172. An X executive testified that prior to the Acquisition, marketing a network consisting of St. Luke's, Mercy, and UTMC would have been feasible. PX 2067 at ¶ 21. However, post-Acquisition, marketing a network that excludes ProMedica would be "detrimental to X's business." PX 2016 at 76:17–18. X would try to find any solution other than marketing a network comprised of only Mercy and UTMC because employers strongly prefer a network that includes ProMedica. PX 2016 at 89:5–23.

173. An X executive testified that marketing a network without ProMedica post-Acquisition makes it much more difficult to serve its members. PX 2001 at 63:11–19.

174. X testified that it cannot create a viable hospital network in Lucas County that consists only of Mercy and UTMC. PX 2073 at ¶ 15.

175. Employers testified that a network comprised of UTMC and Mercy would not be suitable to employees. PX 2070 at ¶ 8; PX 2069 at ¶ 8; PX 2062 at ¶ 8; PX 2058 at ¶ 7.

### 3. Health Plans Cannot Defeat ProMedica's Price Increases By Steering Members to Less Expensive Hospitals

176. Health plans are currently placing greater emphasis on open-access networks than they did prior to 2008. PX 2138 at ¶ 16 (Town Supp. Decl.); PX 2067 at ¶ 15. For example, an X executive testified that it added Mercy in 2008 and St. Luke's in 2009 in response to member preferences for access to all Lucas County hospitals. PX 2072 at ¶ 13; *see also* PX 2067 at ¶ 15.

177. Employers testified that their employees prefer health plan networks that include all Lucas County hospitals. PX 2054 at ¶ 5; PX 2059 at ¶ 4; PX 2052 at ¶ 3.

178. It is not practical to steer members to lower cost providers because members prefer full access to their health plan's network and find steering mechanisms inconvenient and difficult to understand. PX 2124 at ¶ 39 (Town Decl.). ProMedica's economic expert could only identify one employer in Lucas County, X, who engages in any steering by providing incentives to its employees to use Mercy hospitals. PX 2026 at 147:24–150:15 (Guerin–Calvert Dep.).

**\*26** 179. An X executive testified that there generally is member resistance to steering mechanisms in a network plan. PX 2016 at 68:21–25.

180. Despite the existence of excess capacity in the Lucas County market prior to the Acquisition, health plans did not attempt to steer patients from ProMedica to lower priced hospitals, such as St. Luke's. PX 2138 at ¶ 13 (Town Supp. Decl.); PX 2124 at ¶ 39 (Town Decl.).

181. An X executive testified that, "[a]s of today, X does not have a mechanism in place to steer its members from high-cost hospitals to lower-cost hospitals." PX 2067 at ¶ 17.

182. It would be even more difficult for health plans to steer Lucas County residents to hospitals outside of Lucas County, such as Fulton County Health Center or Wood County

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

Hospital, even if these hospitals have available capacity, in an effort to resist a price increase. PX 2124 at ¶ 39 (Town Decl.).

183. An X executive testified that it is probable that hospital systems like ProMedica, with substantial bargaining leverage, can reject a health plan's attempt to negotiate terms that would steer patients to low-cost providers. PX 2016 at 65:22–68:8.

184. An X executive testified that although it provides online tools that allow members to access quality and cost information about hospitals, it does not provide economic incentives for members to use any particular hospitals, and its online tools have not resulted in any shifts in the hospitals its members utilize. PX 2017 at 12:4–13:10.

### 4. A High Degree of Overlap in Physicians' Admitting Privileges Has Not And Will Not Constrain ProMedica's Exercise of Increased Market Power Resulting From the Acquisition

185. It is not uncommon for physicians to maintain admitting privileges at hospitals where they rarely admit patients. PX 2138 at ¶ 28 (Town Supp. Decl.); *see, e.g.,* PX 2056 at ¶ 3 ("X has a total of approximately X physicians on its staff. However, many of these physicians visit X only three to four times per year.").

186. Admitting privileges across hospitals is a misleading measure of physician preferences or a physician's actual admission patterns. PX 2138 at ¶ 28 (Town Supp. Decl.). Market shares are a much better measure of physician (and patient) preferences and admission patterns. *Id.*

187. Hospitals in Lucas County are differentiated by location and other characteristics, and, therefore, patients face costs associated with hospital switching independent of the physicians' cost of shifting their patients. PX 2138 at ¶ 28 (Town Supp. Decl.).

188. The fact that many physicians in Lucas County had admitting privileges at both PHS and SLH before the Acquisition, if anything, supports the conclusion that PHS and SLH directly competed with one another before the Acquisition. *Id.; see* PX 2136 at ¶ 42 (Guerin–Calvert Supp. Decl.). This is because, in addition to competing for inclusion in health plan networks, PHS and SLH competed prior to the Acquisition to attract patients based on variables such as quality and patient satisfaction while also competing to convince physicians to refer to their hospitals rather than a competitor's hospital. PX 2138 at ¶ 28 (Town Supp. Decl.).

*27 189. The high degree of overlap in physician's admitting privileges prior to the Acquisition did not constrain ProMedica from charging among the highest prices in Lucas County and some of the highest in the state. PX 153 (Oostra (PHS) January 2009 e-mail).

## IX. LUCAS COUNTY EMPLOYERS AND RESIDENTS WILL BE HARMED BY HIGHER HOSPITAL REIMBURSEMENT RATES

### A. Local Employers and Physicians are Concerned About the Competitive Harm From the Acquisition

190. Local employers and physicians recognize that ProMedica is the dominant healthcare provider in Lucas County. PX 2062 at ¶ 8; PX 2061 at ¶ 6; PX 2051 at ¶ 9; PX 2053 at ¶ 5; PX 2076 at ¶ 10. An employer explained the reasons behind ProMedica's dominance: "ProMedica already has substantial leverage in the Toledo area due to its ownership of several hospitals and numerous physicians, as well as its ownership of Paramount, a dominant local health plan." PX 2062 at ¶ 8.

191. Local employers testified that they are concerned that the Acquisition will provide ProMedica with increased bargaining leverage against health plans, enabling ProMedica to raise rates at St. Luke's and ProMedica's other Lucas County hospitals. PX 2070 at ¶ 8; PX 2052 at ¶ 4; PX 2051 at ¶ 9; PX 2062 at ¶ 8; PX 2058 at ¶ 7; PX 2053 at ¶ 5; PX 2061 at ¶ 6; PX 2066 at ¶ 7. This would result in higher healthcare costs for employers and their employees. *Id.*

192. Local employers and physicians are concerned that the Acquisition may diminish St. Luke's quality of care and patient-centered approach. PX 2075 at ¶ 14 (St. Luke's provides "an intimate, family-like atmosphere"); PX 2055 at ¶ 6 ("I would be concerned if St. Luke's quality and community health programs were compromised after its merger with ProMedica"); PX 2074 at ¶ 9. One physician testified: "I am concerned that PHS will change the quality-driven, patient-focused gestalt of SLH and that SLH's distinct community feel will diminish, as occurred at DRMC after it was taken over by PHS." PX 2076 at ¶ 11. An employer stated: "St. Luke's provides high-quality patient care and a personal touch that our employees appreciate. I hope that St. Luke's warm atmosphere and attentive patient care will not lessen or disappear after its acquisition by ProMedica." PX 2058 at ¶ 5.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

193. Local employers and physicians are concerned that the Acquisition will result in the elimination or transfer of service lines from St. Luke's to other less-preferred and less-convenient ProMedica facilities. PX 2074 at ¶ 9; PX 2077 at ¶ 8. As a local physician testified, "[t]he elimination of services will result not only in less patient choice but in longer wait times for appointments, as the same number of patients try to utilize a smaller number of facilities." PX 2077 at ¶ 8.

#### B. Self-insured Employers' Costs Will Increase Directly and Immediately

194. Unlike fully-insured employers who pay fixed monthly premiums to health plans, selfinsured employers directly pay the full cost of their employees' healthcare claims to healthcare providers. PX 2124 at ¶ 10 (Town Decl.); PX 2070 at ¶¶ 3, 8; PX 2069 at ¶¶ 2, 8; PX 2054 at ¶ 8. Thus, when hospital reimbursement rates increase, self-insured employers immediately and directly must pay these higher costs. *Id.*

**\*28** 195. In Lucas County, approximately 70 percent of the commercially insured business is selfinsured. PX 2124 at ¶ 10 (Town Decl.).

#### C. Fully-insured Employers' Premiums Will Increase

196. Under a fully-insured plan, an employer pays a premium to a health plan and the health plan absorbs all of the costs for the medical care that the employees receive. PX 2124 at ¶ 10 (Town Decl.). Thus, the health plan bears the risk that the employees' medical expenses will exceed the amount collected from premiums. *Id.*

197. When a health plan incurs a rate increase from a hospital, it must pass down the increased costs to employers in the form of higher premiums. PX 2067 at ¶ 26; PX 2013 at 15:16–20; PX 2073 at ¶ 16.

198. Increased premiums can lead some employers to drop or reduce health care coverage. PX 2124 at ¶ 105 (Town Decl.); PX 2055 at ¶ 4 ("lower funding combined with rising healthcare costs forced us to drop our insurance coverage"). Reducing or dropping health care coverage adversely impacts Lucas County residents' access to important medical services and, as a result, adversely impacts their overall health and well-being. *See, e.g.,* PX 2070 at ¶ 8; PX 2054 at ¶ 8.

#### D. Employees' Premiums and Out–of–Pocket Costs Will Increase

199. Employers cite healthcare costs as one of their largest expenses. PX 2060 at ¶ 8 ("Healthcare is X's largest overhead expenditure"); PX 2061 at ¶ 6 ("[h]ealth insurance costs are one of X's largest expenditures, second only to employee salaries"); PX 2063 at ¶ 2 ("X spends a significant portion of our budget on healthcare costs"); PX 2069 at ¶ 8 ("Healthcare costs are already a significant expense for X").

200. When healthcare costs rise due to hospital rate increases, employers generally must increase employees' premiums, co-payments, deductibles, and out-of-pocket costs. PX 2061 at ¶ 6 ("X already has had to pass along health insurance premium increases to employees" in recent years); PX 2059 at ¶ 7 ("X cannot absorb increased healthcare costs, therefore, we would be forced to pass on these additional costs to our employees by raising their deductibles and co-payments ... or increasing the percentage of the health insurance premium that our employees pay"); PX 2069 at ¶ 8 ("we will have few options but to share these increased costs with our employees through higher deductibles and co-payments"); PX 2074 at ¶ 8; PX 2058 at ¶ 7 ("X may have to start making our employees pay for 10 to 20 percent of the premium costs."); PX 2051 at ¶ 9; PX 2063 at ¶ 7; PX 2069 at ¶ 8.

201. Higher healthcare costs may force employers to offer more restrictive health insurance plans, with fewer provider choices. PX 2060 at ¶ 8; PX 2069 at ¶ 8 (a limited provider network would be "extremely unpopular and burdensome to our employees"); PX 2066 at ¶ 7. Less provider choice would force some employees to travel farther for services, and to lose access to their preferred physician or hospital unless they are able to pay higher, out-of-network rates. *Id.* "[I]f our employees wanted to continue to use St. Luke's [and it was no longer in our health plan's network], they would have to pay double the cost of their current deductibles, and their out-of-pocket maximum costs would be exponentially higher than before the merger." PX 2060 at ¶ 8.

#### X. THE ACQUISITION WILL ELIMINATE BENEFICIAL NON–PRICE COMPETITION AND RESULT IN LOWER QUALITY OF CARE AND SERVICE LEVELS

**\*29** 202. Hospitals compete on the basis of clinical quality, amenities, overall patient experience, and price. PX 2124 at ¶ 84 (Town Decl.).

2011-1 Trade Cases P 77,395

**A. Pre–Acquisition Competition Between ProMedica and St. Luke's Resulted in Improved Hospital Quality and Service Offerings**

203. The Acquisition eliminates important non-price competition between ProMedica and St. Luke's. Post–Acquisition, "with lessened competition, ProMedica will have diminished incentives to provide better services or improved quality." PX 2082 at ¶ 13; *see also* PX 2077 at ¶ 7–8); *see* PX 1170 at 20 (Draft SLH Presentation to employers) (St. Luke's as an independent hospital: "Challenges [other hospital] systems to keep service levels up.").

204. Testimony of ProMedica executives confirms that hospital competition within Lucas County has led to increased quality of care, additional service offerings, and other non-financial benefits for the residents of Lucas County. PX 2006 at 127:5–20 (Wachsman (PHS) IH); PX 2005 at 174:2–180:18 (Oostra (PHS) IH).

205. Health plan executives have testified that non-price dimensions, including clinical quality and patient satisfaction levels, are important factors to consider when negotiating for a hospital's inclusion in the health plan's network. PX 2001 at 43:12–44:1; PX 2067 at ¶¶ 6, 13; PX 2072 at ¶ 9.

206. Local employers have noted that competition among healthcare providers has led to higher quality of care and better healthcare services for their employees. PX 2066 at ¶ 7; PX 2052 at ¶ 4; PX 2062 at ¶ 8.

**B. St. Luke's Recognized as Providing High Quality Services**

207. St. Luke's ranks as a high quality, low cost hospital in the Toledo market. PX 1018 at 12 (Options for SLH); PX 1072 at 11 (SLH Key Messages); PX 2009 at 56:16–58:24, 115:20–22 (Dewey (SLH) IH).

208. Despite St. Luke's rapid growth in patient volume in 2010, patient satisfaction and quality were unaffected and remained at very high levels. PX 2023 at 17:15–24; 55:9–18; 90:21–91:2 (Wakeman (SLH) Dep.). In fact, several quality measures improved, such as myocardial infarction (i.e., heart attack) care, emergency and obstetrical satisfaction levels, and door to artery time for cardiac intervention. PX 2023 at 53:25–54:7 (Wakeman (SLH) Dep).

209. St. Luke's achievements in clinical quality exceed those of TTH and Flower, its closest competitors in the ProMedica

system for inpatient hospital services. ProMedica's flagship hospital, TTH, ranked *last* in the Toledo market and below the state average for quality. PX1172 (SLH e-mail, Kathy Connell, Corp. Comm'ns Director, to Scott Rupley, August 28, 2009) ("[I]n the Commonwealth scoring on quality, SLH was the best, just a hair shy of the top 10% nationally, with Toledo Hospital dead last and well below the state average."); PX 1030 at 18–19 (SLH Affiliation Analysis Update, Oct. 2009); PX 1016 at 6 (SLH Board Meeting Affiliation Update, Dec. 2009). Flower ranked sixth in Lucas County for overall quality. PX 1030 at 18–19 (SLH Affiliation Analysis Update, Oct. 2009).

 **\*30** 210. ProMedica has acknowledged that SLH is a high quality hospital. PX 2015 at 119:1–4 (Hammerling (PHS) IH) (St. Luke's has a "good reputation historically" for quality and patient care); PX 2002 at 123:3–5 (Hanley (PHS) IH) ("I think St. Luke's has strong quality of care [.]"); TRO Hearing Tr. at 54:6–10.

211. ProMedica documents reflect patients' awareness that St. Luke's was a high-quality hospital, often scoring better than ProMedica in quality rankings. PX 399 (PHS Central Region, Great Lakes Marketing Presentation); PX 272 (Commonwealth Fund 2007 scores); PX 2299 (CareChex Hospital Quality Ratings). ProMedica also has admitted that St. Luke's scored higher than TTH and Flower in patient satisfaction scores. PX 2000 at 131:13–18 (Steele (PHS) IH).

212. Health plans have testified that St. Luke's is an attractive and valuable hospital to their Lucas County provider networks because it provides high-quality services. *See* PX 2013 at 55:17–56:2; PX 2280 (X document on SLH quality); PX2065 at ¶ 8 (; PX 2073 at ¶ 11.

213. Both X and Y view St. Luke's as a high-quality competitor. PX 2018 at 89:21–23 ("St. Luke's is a high-quality hospital. I mean, their numbers prove that out."); PX 2068 at ¶ 27; PX 2019 at 43:10(describing St. Luke's as a "historically excellent, small, community hospital").

214. St. Luke's "is regularly recognized by third-party quality ratings organizations that rank St. Luke's within the top 10% of hospitals nationally, based on outcomes, cost and patient satisfaction." PX 390 (ProMedica News Release May 26, 2010), *see also* PX 1073 (SLH Press Release *Healthgrades.com* ). Third-party quality ranking organizations also regularly praise St. Luke's for its value, *i.e.*, its combination of high quality and low costs. PX 2300 (Leap

Frog 2008) (Leap Frog recognized St. Luke's as one of only 13 hospitals across the nation to be rated "Highest Value"); PX 1138 (Quality Scoring from hospitalbenchmark.com).

215. Independent physicians testified that St. Luke's quality was higher than ProMedica's, and expressed concern that St. Luke's quality would decrease after the Acquisition. PX 2077 at ¶ 7; PX 2081 at ¶¶ 10–11; PX 2075 at ¶¶ 11–13.

216. Employers and community organizations have testified that St. Luke's is committed to delivering high-quality, patient-minded care. PX 2055 at ¶ 6; PX 2054 at ¶ 6; PX 2058 at ¶ 6; PX 2069 at ¶ 3; PX 2074 at ¶ 9.

### C. ProMedica Cannot Be Expected to Improve St. Luke's Quality

217. In an internal analysis of potential acquisition options, St. Luke's noted that its "well maintained facilities," "strong clinical quality outcomes," "strong patient/employee satisfaction and loyalty," and "positive working relationships with affiliated physicians" were all important points of leverage "to secure the best offer" for St. Luke's from several possible affiliation partners. PX 1018 at 18 (Options for SLH).

**\*31** 218. Delivering high-quality service is an important part of St. Luke's culture. According to Barbara Machin, former Chairman of St. Luke's board, "Our motto has always been 'Patients First Always.' Quality and patient service and patient care has been our mantra." PX 2007 at 54:19–21 (Machin (SLH) IH).

219. St. Luke's feared that the Acquisition by ProMedica would lower St. Luke's quality. PX 1130 at 2 (Notes from Due Diligence Meetings, August 26, 2009) ("Some of ProMedica's quality outcomes/measures are not very good. Would not want them to bring poor quality to St. Luke's."); PX 1016 at 23 (SLH Affiliation Update Dec. 2009); PX 2008 at 237:2–5 (Wakeman (SLH) IH) (acknowledging concern that affiliating with a lower quality institution might have an adverse impact on St. Luke's.).

220. ProMedica acknowledged the need to improve its clinical quality. PX 1030 at 18; *see* PX 153 (Oostra (PHS) January 2009 e-mail re: ProMedica's "subpar quality scores"); PX 2000 at 129:10–15 (Steele (PHS) IH) (TTH struggled to be patient-centered). Mr. Wakeman informed the St. Luke's Board of Directors that ProMedica "acknowledges they need to improve" quality measures. PX 1030 at 18 (SLH Oct. 2009

Affiliation Analysis Update); *see also* PX 2023 at 92:14–93:9 (Wakeman (SLH) Dep.).

## XI. NEW ENTRY AND EXPANSION WILL NOT COUNTERACT OR DETER THE ANTICOMPETITIVE EFFECTS OF THE ACQUISITION

### A. Entry or Expansion Will Not Be Timely, Likely, or Sufficient

221. It would take significantly longer than the two-year timeframe prescribed by the *Merger Guidelines* to plan, obtain zoning, licensing, and regulatory permits, and construct a new hospital in Lucas County. ProMedica's CEO Randall Oostra testified that building even a small hospital the size of Bay Park—which has approximately 72 staffed beds and is far smaller than St. Luke's—would be a "several-year project." PX 2005 at 92:17–93:7 (Oostra (PHS) IH). X's executive testified that it took X more than two years to construct and open its facility. PX 2068 at ¶ 25.

222. Constructing a new obstetrics unit and encouraging a sufficient number of obstetricians to utilize and support it would take a substantial amount of time as well. X's executive testified that it would be very challenging to encourage obstetricians to utilize a new unit since most obstetricians tend to deliver at the hospital that employs them, and it is difficult to recruit new obstetricians. PX 2068 at ¶¶ 20, 21. X of Y testified that it would be necessary to build both an obstetrics unit and a NICU unit and to ensure sufficient emergency department capacity, at a cost of tens of millions of dollars. PX 2064 at ¶ 10.

223. The *Merger Guidelines* explain that for entry to be considered likely, it must be a profitable endeavor, in light of the associated costs and risks. Constructing a new hospital requires an extraordinarily large, up-front capital investment, and the pay-off is risky and deferred into the future, which makes it highly unlikely that a new hospital competitor will enter the Lucas County hospital market. PX 2124 at ¶ 97 (Town Decl.).

**\*32** 224. It would cost a substantial amount of money to construct even a basic 35–bed general acute-care hospital in Lucas County. X's executive testified that it would require at least $55 million in up-front, initial capital to build this type of basic general-acute care hospital. PX 2068 at ¶¶ 25, 26. By comparison, the executive stated that, in the early 2000s, it cost over $61 million to construct X's facility. PX 2068 at 25.

225. ProMedica's CEO Randall Oostra testified that it would cost $350 million or more in today's market to build a hospital with 300 licensed beds similar to St. Luke's. PX 2005 at 86:13–22 (Oostra (PHS) IH). Charles Kanthak, SLH's Facilities Services Director, estimated that to build a new hospital identical to St. Luke's in northwest Ohio in 2009 would cost $165 million "on the cheap" and over $200 million to "do it right." PX 1257 (October 2009 email describing SLH's buildings and departments and estimating how much it would cost to build a "replacement" St. Luke's in 2009). Although ProMedica purchased land in southwest Lucas County around 2000, ProMedica has not budgeted any money for constructing a new hospital and no construction has taken place. *See* PX 2005 at 82:21–25 (Oostra (PHS) IH) (stating that ProMedica purchased property approximately ten years prior); PX 2132 at ¶ 113 (Dagen Supp. Decl.). The most recent discussions about developing the property took place over two years ago and no plans for the project appear in ProMedica's 2010–2012 Strategic Plans. PX 2005 at 93:21–94:18; PX 6 (PHS Hospitals' 2010–2012 Strategic Goals and Objectives); *see infra* Section XV.A.2.

226. Access to necessary capital is a significant barrier to entry for the vast majority of potential entrants to Lucas County. PX 2124 at ¶ 97 (Town Decl.). Current economic conditions make it particularly challenging to obtain the necessary capital to undertake significant hospital expansions or to construct a new hospital in Lucas County. David Dewey, SLH's VP of Business Development, testified that "it would be more difficult to get [ ] capital" and establish a new hospital in today's economic environment. PX 2009 at 174:12–25 (Dewey (SLH) IH). A 2009 presentation created by SLH's senior executives and presented to SLH's Board explains how the tight capital markets have made new hospital construction or expansion in Toledo highly unlikely: "ProMedica and Mercy do not want to build in the [southwest] area due to lack of capital access. Also, both have taken on large amounts of debt due to recent major construction projects. [UTMC does] not want to build either." PX 1018 at 6. In his May 2009 planning notes, Scott Rupley, SLH's Marketing and Planning Director, declared, "Nobody is going to be able to build anything for awhile. Can't borrow money." PX 1120 at 2.

227. The fact that Lucas County already has ample general acute-care inpatient beds to fulfill the needs of the community makes entry or expansion even more unlikely. ProMedica's economic expert, Margaret Guerin–Calvert, testified that

there is "substantial excess hospital bed capacity in Toledo." PX 2122 at ¶ 20 (Guerin–Calvert Decl.). David Dewey, SLH's VP of Business Development, testified that "there is enough [hospital service] capacity" in "northwest Ohio as a whole." PX 2009 at 176:8–10, 176:22–177:1 (Dewey (SLH) IH). X's executive shared his perspective that "there are already more than enough hospital beds to serve the community and utilization rates remain low." PX 2068 at ¶ 26.

 **\*33** 228. Lucas County's population currently is flat or declining, making it economically unattractive to add more hospital beds. SLH's CEO, Dan Wakeman, testified that "the general metropolitan Toledo area has seen a population decline in the last ten years." PX 2008 at 54:19–21 (Wakeman (SLH) IH). ProMedica's documents also project a flat or declining population for Lucas County. ProMedica's 2010 Environmental Assessment states that "Overall demographics indicate little or no growth for [the] next five years." PX 159 at 5. One of the key assumptions in ProMedica's Strategic Plan for 2009 through 2011 is "flat demographics overall." PX 324 at 5.

229. A potential entrant into the Lucas County obstetrics services market would face significant costs and risks associated with constructing and operating a new obstetrics unit, thus making it highly unlikely that such entry or expansion will occur. X's executive estimated that establishing a new, financially viable labor-and-delivery unit inside a hospital's existing space would cost at least $10 to $12.6 million. PX 2068 at ¶ 20. Further, X's executive testified that constructing a neonatal intensive care unit ("NICU") for high-risk births, in addition to establishing a labor-and-delivery unit, would cost tens of millions of dollars. PX 2064 at ¶ 10. X's executive also noted that Toledo-area hospitals with a NICU and Level II perinatal referral center are "required by law to have an in-house obstetrician and in-house anesthesiologist that can provide obstetrical coverage, two costly resources." PX 2068 at ¶ 19.

230. In addition, obstetrics services typically do not generate sufficient revenue to cover their costs, making it economically undesirable to expand or build an obstetrics unit. David Dewey, SLH's Vice President of Business Development, testified that SLH's obstetrics unit "does not financially cover its costs." PX 2009 at 243:21–25 (Dewey (SLH) IH). X's executive affirmed that "[o]bstetrics is often a money-loser for hospitals because payments tend to be low, but expenses are high." PX 2068 at ¶ 19. X's representative also asserted

that it is difficult to operate a profitable labor-and-delivery unit. PX 2064 at 10.

231. The decline in the overall birthrate over the last decade in Lucas County makes entry or expansion into obstetrics particularly unappealing. David Dewey, SLH's Vice President of Business Development, testified that "[t]he overall OB business in northwest Ohio is going down." PX 2009 at 171:14–15 (Dewey (SLH) IH). The Project Director of PHS's Regional Perinatal Center Program sent an email in September 2010 that provided the statistics for total deliveries in Lucas County, noting that deliveries decreased from 2000 through 2009 and explaining that this downward trend has continued through June 2010. PX 1107. X's executive testified that "we're looking at [ ] a decrease, continually predictable decrease, in the number of births in and about Lucas County." PX 2018 at 37:12–14.

 **\*34** 232. Under the *Merger Guidelines,* for entry or expansion to be sufficient, it must replace at least the scale and strength of one of the merging firms in order to replace the lost competition from the Acquisition. PX 2214 at § 9.3 (*Merger Guidelines* ). Here, any entry that does occur will not be sufficient under the *Merger Guidelines,* for many of the same reasons that entry is unlikely in the first place. Due to the time and significant expense it takes to become established in the market and earn a sufficient return on investment, an entrant would have a difficult time competing successfully in the market and replacing the competition eliminated from the Acquisition. PX 2124 at ¶ 98 (Town Decl.).

233. Establishing a new hospital, let alone obtaining sufficient market share to earn a sufficient return on investment, is challenging. David Dewey, SLH's Vice President of Business Development, testified that if another hospital entered Lucas County, it "would have to establish its own market share. It would have to hire its own staff, get its own medical staff support," all of which he stated would be difficult because of the tight capital markets. PX 2009 at 174:12–25 (Dewey (SLH) IH).

234. A new entrant also would have a difficult time establishing a new obstetrics unit that would sufficiently replace the competition eliminated by the Acquisition. X's executive stated that "[t]oday, it would take a substantial monetary commitment to construct a birthing center and hire a sufficient number of obstetricians to generate enough deliveries to break even." PX 2068 at ¶ 23. The executive also testified: "One of the most significant difficulties with

creating a financially viable obstetrics unit is the ability to encourage obstetricians to utilize the new unit." PX 2068 at ¶ 21. The executive noted that "many obstetricians are employed by ProMedica, which instructs its obstetricians to direct expectant mothers to use ProMedica hospitals," making it difficult to gain market share. PX 2068 at ¶ 19. Therefore, any new obstetrics entry is highly unlikely to be sufficient to restore the competition lost by the Acquisition.

**B. No Planned Expansion by Existing Lucas County Firms**

235. Neither X nor Y has plans to construct a new hospital in Lucas County. Several years ago, X purchased land in southwest Lucas County and considered building a small, 34–bed hospital that would have provided limited general medical/surgical care, and would not have offered services such as obstetrics or pediatrics. PX 2068 at ¶ 24. However, X's executive recently testified that X has "no plans to [build a hospital] now, if ever" in Lucas County. PX 2068 at ¶ 24. The executive stated that "X only considered opening a new hospital" through a "50–50 joint venture with participating physicians" so that "X could align objectives with the physicians and share ownership risks." PX 2068 at ¶ 24. The executive testified that because the recently enacted 2010 Healthcare Reform Act prohibits physicians from holding a financial investment in a hospital, X no longer plans to build a hospital on its southwest land. PX 2068 at ¶ 24.

 **\*35** 236. Similarly, X's representative testified that "X does not currently have any plans to construct a new hospital in the greater Toledo area." PX 2064 at ¶ 11. In particular, X does not have plans to adjust or expand its general acute-care inpatient services in response to ProMedica's acquisition of St. Luke's. PX 2064 at ¶ 11. X's representative testified that a five-percent rate increase would not cause X to rededicate registered beds from their current usage to general acute-care inpatient beds. PX 2019 at 69:24–71:7.

237. X has no plans to expand, and Y has no plans to offer, obstetrics services in Lucas County, even if rates for obstetrics services rose by a significant amount as a result of the Acquisition. X's executive asserted that it is not "worthwhile to open a new birthing center at X or another location." PX 2068 at ¶ 23. X's executive further testified that X "would not build obstetrics." PX 2018 at 56:3–10. Y's representative also testified that "it is highly unlikely that Y will build a new obstetrics or delivery unit in the greater Toledo area in the next few years, if ever" even if rates for obstetrics services increased by "10 to 15 percent." PX 2064 at ¶ 10.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

## XII. THE ACQUISITION PRODUCES NO CREDIBLE MERGER–SPECIFIC EFFICIENCIES TO REBUT THE PRESUMPTION OF COMPETITIVE HARM

238. The *Horizontal Merger Guidelines* ("*Merger Guidelines*") provide a framework within which to assess the efficiencies that PHS alleges may result from the Acquisition. PX 2214 at § 10 (*Merger Guidelines*).

### A. The Asserted Efficiencies Are Not Credible

239. The May 6, 2010 "Efficiencies Analysis of the Proposed Joinder of PHS Health System and OhioCare Health System" ("Compass Lexecon Report") is a summary of work done primarily by PHS management, under the oversight of Compass Lexecon, an economic consulting firm specializing in antitrust merger litigation. PX 20 at 1–39 (Compass Lexecon Report); PX 2005 at 293:17–21 (Oostra (PHS) IH). The Compass Lexecon Report was created to present the alleged efficiencies that may result from the Acquisition. PX 20 at 3–4.

240. The proposed efficiencies in the Compass Lexecon Report represent an "initial plan." PX 2005 at 291:16–19 (Oostra (PHS) IH). Mr. Oostra, PHS's CEO, testified about the contents of the report: "if we don't find those efficiencies, we will find other efficiencies." PX 2005 at 294:15–25 (Oostra (PHS) IH).

241. PHS's CFO Kathleen Hanley testified that the conclusions in the Compass Lexecon Report were based on a mere "gut feeling" that the Acquisition would generate efficiencies. PX 2002 at 206:14–207:3 (Hanley (PHS) IH).

242. The Compass Lexecon Report itself acknowledges: "estimates ... are preliminary and subject to further analysis, revision, and substantiation." PX 20 at 3 (Compass Lexecon Report).

243. Key St. Luke's personnel who would be best-positioned to consider possible efficiencies had little or no input into the efficiencies calculations. Douglas Deacon, Vice President of Professional Services at SLH, never saw the Compass Lexecon Report before his investigational hearing in September 2010. PX 2010 at 191:16–192:4. His involvement with the development of the analysis was "nil," even though the analysis was "something [he] should be involved with." PX 2010 at 193:5–194:3 (Deacon (SLH) IH).

**\*36** 244. Dennis Wagner, SLH's Interim Treasurer at the time of the Acquisition, had never before seen the Compass Lexecon Report when he was presented with a copy during his investigational hearing in September 2010. PX 2014 at 156:4–18 (Wagner (SLH) IH). Mr. Wagner testified that the report's alleged savings for supply chain efficiencies involved "no[ ] or very little analysis." PX 2014 at 204: 19–22 (Wagner (SLH) IH). He said of the speech-and-hearing services efficiency claim, "I don't believe this claim." PX 2014 at 173:1–8 (Wagner (SLH) IH).

245. In her two declarations, Ms. Guerin–Calvert does not discuss most of the efficiency claims contained in the Compass Lexecon Report. *See* PX 2122 (Guerin–Calvert Decl.); PX2136 (Guerin–Calvert Supp. Decl.). Indeed, Ms. Guerin–Calvert admitted that she had not conducted an efficiencies analysis. PX 2026 at 42:18–24 (Guerin–Calvert Dep.). ProMedica has put forth no other expert testimony on the issue of efficiencies.

### 1. Revenue Enhancements Are Not Cognizable Efficiencies

246. The numerous claimed revenue enhancement opportunities are not true efficiencies because they merely shift revenue among the participants in the market and, in effect, do nothing more than increase PHS's bottom-line. PX 2132 at ¶¶ 99–110 (Dagen Supp. Decl.) To be credited, an efficiency must either reduce costs or increase output. PX 2132 at ¶ 100 (Dagen Supp. Decl.); PX 20 at 29–33 (description of revenue enhancement efficiencies in Compass Lexecon Report). The claimed revenue enhancements do neither.

### 2. Capital Cost Avoidance Opportunities Are Not Cognizable Efficiencies

247. The bulk of the claimed efficiencies from the Acquisition are avoided capital costs. *See* PX 20 at 6–7 (summary of efficiencies). In general, capital cost avoidance claims are not cognizable efficiencies. PX 2138 at ¶ 62 (Town Supp. Decl.). Firms invest in their businesses to better compete and thus enhance consumer welfare, and if these competition-driven investments are "avoided," consumers generally are left worse off. PX 2138 at ¶ 62 (Town Supp. Decl.). Moreover, ProMedica's claims of capital cost avoidance are suspect because ProMedica had no plans to invest the capital that it claims it would have spent without the Acquisition. PX 2132 at ¶¶ 113–114 (Dagen Supp. Decl.)

2011-1 Trade Cases P 77,395

248. ProMedica alleges that, as a result of the Acquisition, it may be able to avoid spending $90–100 million on constructing and equipping a new hospital at its "Arrowhead" property (located less than three miles away from SLH). PX 20 at 35 (Compass Lexecon Report); PX 2104 at ¶ 30 (Akenberger Decl.). In the course of describing the asserted Arrowhead hospital capital cost avoidance, Ms. Hanley testified that PHS joined with SLH "instead of investing millions of dollars in a competing facility." PX 2002 at 243:22–244:22 (Hanley (PHS) IH).

249. Even if cognizable in theory, the alleged capital cost avoidance savings from not constructing and equipping a new hospital on ProMedica's Arrowhead property cannot be credited under the facts here. PX 2132 at ¶ 111–113 (Dagen Supp. Decl.); PX 2138 at ¶¶ 63–64 (Town Supp. Decl.). Mr. Oostra testified that ProMedica has owned the Arrowhead land for a decade. PX 2005 at 82:21–25 (Oostra (PHS) IH). Yet PHS has not broken ground, obtained permits, or even undertaken site planning at Arrowhead in recent years. PX 2132 at ¶ 113 (Dagen Supp. Decl.). The Arrowhead project does not appear in PHS's 2010–2012 Strategic Plans. PX 6 (PHS Hospitals' 2010–2012 Strategic Goals and Objectives); PX 7 (PHS 2010–2012 Strategic Goals and Objectives). Aside from PHS' arguments in court, there is no evidence to suggest that PHS was likely to construct a new hospital at Arrowhead in the next few years, if ever.

*37 250. ProMedica also alleges that the Acquisition may enable it to avoid spending $25 to 30 million to construct a second bed tower at Flower Hospital. PX 20 at 36 (Compass Lexecon Report); PX 2104 at ¶ 31 (Akenberger Decl.). Mr. Dagen concluded that PHS's capital cost avoidance claim relating to the Flower Hospital bed tower is unsubstantiated. PX 2132 at ¶ 114 (Dagen Supp. Decl.). PHS's Strategic Plans do not include plans to construct a second bed tower at Flower any time in the near future. PX 6 (PHS Hospitals' 2010–2012 Strategic Goals and Objectives); PX 7 (PHS 2010–2012 Strategic Goals and Objectives). Ms. Hanley testified that PHS's plans for financing the expansion were "premature until we really get to a point where we prioritize, authorize ..." and said that plans had not yet reached the Board level. PX 2002 at 248:24–246:4, 249:14–15 (Hanley (PHS) IH). Scott Fought, SLH's Administrative Director of Finance, stated in an email that he had "no basis" for the costs he assigned to building the Flower bed tower (which were used as the basis for the capital cost avoidance savings alleged in the Compass Lexecon Report). PX 394 at 2.

251. ProMedica alleges that the Acquisition may save St. Luke's approximately $7.6 to $15.6 million in avoided costs relating to implementation of an Electronic Medical Records ("EMR") system and other information technology upgrades. PX 20 at 38 (Compass Lexecon Report); PX 2104 at ¶ 32 (Akenberger Decl.). These claims overstate any savings that might be achieved relating to EMR. PX 2132 at ¶ 116 (Dagen Supp. Decl.). In particular, the Compass Lexecon Report asserts a higher price than what is indicated in ordinary course documents for implementing an EMR at SLH absent the joinder. PX 2132 at ¶ 116 (Dagen Supp. Decl.). The Compass Lexecon Report also overstates any potential savings because it fails to deduct over $6 million in expected federal subsidies from SLH's total expected costs relating to EMR implementation. PX 2132 at ¶ 116 (Dagen Supp. Decl.).

252. Mr. Deacon's testimony and a St. Luke's presentation on EMR indicate that a standalone St. Luke's would receive significant subsidies to fund the project through the American Recovery and Reinvestment Act of 2009. PX 2010 at 213:9–23 (Deacon (SLH) IH); PX 1281 at 12 (Finance Pillar Challenge Presentation). The Compass Lexecon Report also fails to take these subsidies into account when estimating how much St. Luke's would have spent on EMR absent the Acquisition. PX 2132 at ¶ 116 (Dagen Supp. Decl.). And a declaration filed by the Chairman of the St. Luke's Board suggests that SLH's costs on a standalone basis for implementing "necessary" EMR and information technology upgrades would be substantially lower than the costs asserted in the Compass Lexecon Report. PX 2106 ¶ 10 (Black (SLH) Decl.) (describing total information technology cost of $12 to $14 million); PX 20 at 38 (Compass Lexecon Report alleges costs of $5 to $9 million on information technology application upgrades, and $11 to $15 million on EMR).

**B. The Asserted Efficiencies Are Speculative**

*38 253. The *Merger Guidelines* state that "[e]fficiency claims will not be considered if they are vague, speculative, or otherwise cannot be verified by reasonable means." PX 2214 at § 10 (*Merger Guidelines*).

254. Virtually all of the claimed efficiencies in the Compass Lexecon Report contain the caveat that they "may" be accomplished by the Acquisition. PX 20 (Compass Lexecon Report).

255. The Compass Lexecon Report alleges that the Acquisition may generate $1.3 million in savings from shifting SLH's inpatient rehabilitation services to Flower

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

Hospital, a figure that subsequently was reduced to $200,000. PX 20 at 11 (Compass Lexecon Report); PX 2104 at ¶ 9 (Akenberger Decl.).

256. The inpatient rehabilitation efficiency claim involves only a few hundred thousand dollars of cost reductions, and the remaining $1 million in alleged savings actually constitutes a price increase to consumers. PX 2132 at ¶¶ 74–75 (Dagen Supp. Decl.).

257. The Compass Lexecon Report asserts that the Acquisition may generate $1.45 million in savings from consolidating Heart/Vascular, Orthopedics, Women's, Neuro/Stroke, Cancer and Pulmonary services at either a PHS or SLH facility. PX 20 at 13 (Compass Lexecon Report). These asserted savings are unsubstantiated because PHS has not conducted a detailed analysis of clinical consolidation opportunities that might result from the Acquisition. PX 2132 at ¶ 78–79 (Dagen Supp. Decl.). Mr. Akenberger, PHS's Senior Vice President of Finance, confirmed in his December 23, 2010 declaration that the consolidation of clinical services is still "not yet quantified." PX 2104 at ¶ 10 (Akenberger (PHS) Decl).

258. In January 2011, Navigant Consulting completed a preliminary "Executive Summary" of clinical service consolidation recommendations but did not provide details of how St. Luke's would be impacted by clinical consolidations. The summary primarily addresses relocating existing ProMedica services to existing ProMedica facilities. PX 396 at 8–10 (Clinical Integration Strategy Executive Summary).

259. The Compass Lexecon Report states that approximately $1.4 million in savings may arise from lowering St. Luke's physician coverage costs in General Surgery, Obstetrics, and Interventional Services to a median benchmark rate. PX 20 at 23. Mr. Dagen concluded that these claims are unsubstantiated because ProMedica assumed that St. Luke's could lower its physician coverage costs to the benchmark median rate without any consideration of why St. Luke's rates might be higher in the first place. PX 2132 at ¶¶ 93–94 (Dagen Supp. Decl.). Ms. Steele testified that the physician coverage contracts discussed in the Compass Lexecon Report "aren't apples to apples" because they contain different duties. PX 2000 at 182:1–183:8 (Steele (PHS) IH).

260. ProMedica mistakenly used the benchmark median rate for the lower-priced restricted (part-time) obstetrics coverage, when St. Luke's was paying for the high-priced unrestricted

obstetrics coverage prior to the Acquisition, leading to an overstatement of alleged savings. PX 33 at 1, 8 (PHS back-up materials for physician coverage efficiency); PX 2132 at ¶ 95 (Dagen Supp. Decl.).

*39 261. Mr. Dagen concluded that many other efficiency claims asserted by ProMedica are unsubstantiated and speculative because the back-up materials submitted by ProMedica lacked details about how prices paid by St. Luke's and ProMedica differ and omitted analyses of ProMedica's capacity to absorb St. Luke's volumes. These claims include: lowering the prices that St. Luke's pays for its supplies, cost savings from transferring St. Luke's pathology lab testing services to TTH, eliminating interventional services contracts at St. Luke's, lowering obstetrics coverage costs, and moving St. Luke's speech and hearing services from a third party provider to in-house at PHS. PX 2132 at ¶¶ 88, 91, 95–98 (Dagen Supp. Decl.).

**C. The Proposed Efficiencies Are Not Merger–Specific**

262. The *Merger Guidelines* "credit only those efficiencies likely to be accomplished with the proposed merger and unlikely to be accomplished in the absence of either the proposed merger or another means having comparable anticompetitive effects. These are termed merger-specific efficiencies." PX 2214 at § 10 (*Merger Guidelines* ).

263. A substantial portion of the claimed efficiencies could be achieved by St. Luke's through an affiliation with UTMC. PX 2132 at ¶ 121 (Dagen Supp. Decl.) *See also* PX 2206 at 3–4.

264. A 2009 St. Luke's Board presentation described various "clinical consolidation" opportunities that could result from a UTMC affiliation. PX 1035 at 9 (SLH 2009 "Affiliation Analysis Update"); *cf.* PX 20 at 12 (description of clinical consolidation efficiency in Compass Lexecon Report). In early 2009, SLH's CFO at the time, David Oppenlander, sent an email to St. Luke's CEO Dan Wakeman that stated: "X has a Y agreement ... [i]f we were to move down that pathway, that would be [an] inexpensive way to get into one of the big 6 [Health Information Management] systems." PX 1317 at 1; *cf.* PX 20 at 38 (description of EMR efficiency in Compass Lexecon Report). St. Luke's CEO noted that "[t]he community and organizational benefits of [a] partnership [with UTMC] are endless" and that "[i]n terms of reduction of expense, a closer relationship with [UTMC] would provide just as much value as the two systems [Mercy and ProMedica]." PX 1406 (July 2009 Wakeman (SLH) e-mail to Dr. Gold(UTMC)); PX 1407 at 1 (Oct.2009 Wakeman

(SLH) e-mail to Dr. Gold (UTMC)); *see also* PX 2023 at 148:5–149:21 (Wakeman (SLH) Dep.).

265. In addition to concluding that St. Luke's could attain many of the alleged efficiencies by merging with UTMC, Mr. Dagen also determined that several of the cost savings, and all of the revenue enhancement efficiencies, alleged in the Compass Lexecon Report are not merger-specific because they could be achieved unilaterally by either SLH or PHS absent the Acquisition. For instance, PHS intends to reduce SLH's staffing level to reflect PHS's practices at Flower Hospital. PX 20 at 15 (Compass Lexecon Report). However, this alleged efficiency could be accomplished without the Acquisition because there is nothing proprietary about PHS's "best practices" with respect to "proper" staffing levels, meaning that SLH could have cut staff on its own if it believed doing so was appropriate. PX 2132 at ¶ 82 (Dagen Supp. Decl.). Furthermore, testimony by SLH and PHS executives revealed that cutting staff at SLH could lower its quality of care, but no such analysis was performed when calculating the savings from this alleged efficiency. PX 2009 at 188:20–189:3 (Dewey (SLH) IH) (stating that SLH is "a pretty lean organization" and that cutting staff "would be impacting our service, our quality"); PX 2011 at 199:1–7 (Akenberger (PHS) IH).

**\*40** 266. The Compass Lexecon Report also states that the Acquisition may generate \$4.5 million in savings from eliminating a family practice residency program and replacing it with a regular physician's practice. PX 20 at 16 (Compass Lexecon Report). ProMedica's CFO Kathleen Hanley testified that there is an excess of family practice doctors in Toledo, and that ProMedica intends to close a family practice residency program housed at a PHS (not SLH) facility after the Acquisition. PX 2002 at 211:25–213:6 (Hanley (PHS) IH). As a result, this efficiency is not merger-specific because PHS could have eliminated one of its residency programs on its own absent the Acquisition. PX 2132 at ¶ 86 (Dagen Supp. Decl.).

267. Defendant asserts approximately \$2.1 million of efficiencies relating to implementing new coding and charge capture practices at SLH, and \$467,000 from increasing referrals between PHS and SLH facilities. PX 20 at 30, 32–33 (Compass Lexecon Report). SLH could have improved its coding and charge capture "best practices" on its own, and SLH and PHS each could have unilaterally increased referral of patients to each other without the Acquisition in place. PX 2132 at ¶¶ 102–106, 110 (Dagen Supp. Decl.). Dennis

Wagner, SLH's Finance Director, testified about the coding and charge capture efficiency claim: "I would not think there was that much opportunity, because I believe our routines are proper and correct right now." PX 2014 at 209:15–24 (Wagner (SLH) IH).

268. The final asserted revenue enhancement is the addition of St. Luke's to the Paramount provider network. PX 20 at 31 (Compass Lexecon Report). This alleged efficiency also could have been accomplished absent the Acquisition. PX 2132 at ¶ 109 (Dagen Supp. Decl.). SLH's executives expressed interest in participating in Paramount's provider network prior to the Acquisition. PX 2008 at 135:1–14 (Wakeman (SLH) IH) ("we'd really like to get back in"). Ron Wachsman, PHS's Vice President of Managed Care, testified that it was PHS's reluctance that prevented SLH from being a part of the Paramount provider network prior to the Acquisition. PX 2006 at 203:16–22 (Wachsman (PHS) IH).

**D. The Proposed Efficiency Projections Appear Designed for Litigation**

269. Projections of efficiencies may be viewed with skepticism, particularly if they are generated outside of the usual business planning process. PX 2214 at § 10 (*Merger Guidelines* ).

270. By late 2009, SLH leadership was aware that a transaction with PHS would generate an antitrust review. PX 1030 at 17 (SLH 2009 "Affiliation Analysis Update" to the St. Luke's Board containing HHI calculations). Even before Plaintiffs' investigation began, PHS had budgeted hundreds of thousands of dollars for the anticipated antitrust review, which it expected would last at least several months. PX 77 (PHS "High Level Timeline"); PX 2021 at 86:19–87:7 (Oostra (PHS) Dep.). A January 2010 document planning for the Acquisition includes references to "[e]fficiency [e]xperts" and "[e]fficiency expert reports" under the column "Antitrust Review." PX 77 at 1 (PHS "High Level Timeline"). And a PHS executive testified that they hired Compass Lexecon, in part, to present an efficiencies analysis of the Acquisition during regulatory review. PX 2005 (Oostra (PHS) IH) at 284:14–285:12; PX 2002 (Hanley (PHS) IH) at 225:15–24.

**\*41** 271. The Compass Lexecon Report that contains PHS's alleged efficiencies includes a summary of the underlying process used to generate and document the asserted efficiencies. The report's summary states that the process was "supervised by antitrust counsel" and that "Compass

USAP220

Lexecon's role ... was to provide antitrust guidance." PX 20 at 3 (Compass Lexecon Report).

272. After ProMedica received "[u]nfavorable responses from Compass Lex[e]con because it had not "accomplished enough in savings," PHS concluded that it would "need to be more aggressive with a timeline of the first 3–5 years" because the *"FTC discounts [the] value of [efficiencies] each year the farther out you go."* PX 1136 at 1 (PHS "Joinder Efficiencies Opportunities") (emphasis added).

### E. The Proposed Efficiencies Do Not Outweigh the Anticompetitive Harm Resulting From the Acquisition

273. Dr. Town concurred with Mr. Dagen's analysis of PHS's alleged efficiencies, and concluded that the alleged benefits of the Acquisition would not outweigh the significant competitive harm that would result from the Acquisition. PX 2138 at ¶ 61 (Town Supp. Decl.).

### F. Healthcare Reform Measures Do Not Justify the Acquisition

274. Ongoing healthcare reform provides incentives for providers to form Accountable Care Organizations ("ACO"). PX 1449 at 14–15 (Nov.2009 Reform Readiness Assessment by Kaufman Hall). Another component of healthcare reform is the installation of Electronic Medical Records ("EMR" or "EHR") systems at hospitals. PX 2102 at ¶ 38 (Wakeman (SLH) Decl.).

275. Because SLH was, prior to the Acquisition, a low-cost and high-quality provider, it was well-positioned to take advantage of pending healthcare reform. PX 1072 at 1 ("Key Messages from St. Luke' Hospital"). Furthermore, it was in a financial position to implement an EMR system and appeared motivated prior to the Acquisition to do so in time to receive federal subsidies. PX 2132 at ¶ 28 (Dagen Supp. Decl.); PX 2010 at 213:9–12 (Deacon (SLH) IH).

### 1. ACO Requirements Have Not Yet Been Finalized

276. Providers in an ACO agree to be accountable for quality, cost, and overall care in exchange for a share of the savings achieved. PX 1449 at 14–15 (Nov.2009 "Reform Readiness Assessment" by Kaufman Hall). The savings achieved by an ACO can be shared via contractual relationships, joint ventures, and other methods besides mergers, joinders, or acquisitions. PX 2023 at 111:3–8 (Wakeman (SLH) Dep.); PX 1449 at 20–22 (Reform Readiness Assessment by Kaufman

Hall). Indeed, it is likely that, absent this Acquisition, an independent St. Luke's would participate both in ProMedica's and Mercy's ACOs if invited rather than being limited to only ProMedica's. PX 2023 at 111:14–16 (Wakeman (SLH) Dep.).

277. Healthcare reform remains in flux, and the nature and form of ACOs remain undetermined. SLH's CEO, Mr. Wakeman, noted: "I think we know there's going to be ACOs. Exactly what they're going to look like and who's going to be in them and how they're going to perform has yet to be defined." PX 2023 at 114:17–20 (Wakeman (SLH) Dep.). Mr. Wakeman added: "[i]t's all speculation at this point because again ACO rules haven't been finalized yet." PX 2023 at 111:24–112:1 (Wakeman (SLH) Dep.). As a result of the ACO rules not yet being clearly defined, SLH's CEO has not studied them in depth. PX 2023 at 114:8–9 (Wakeman (SLH) Dep.).

**\*42** 278. Another component of healthcare reform is the implementation of an EMR system at all hospitals. Under the American Recovery and Reinvestment Act of 2009, hospitals receive incentives for meeting certain "meaningful use" targets for degrees of implementation. PX 1281 at 10–12 (SLH "Financial Pillar Challenge").

### 2. Independent St. Luke's Was Well–Positioned for Healthcare Reform

279. In November 2009, St. Luke's concluded that it was "uniquely positioned for a smooth transition to expected health care reform. The hospital already focuses on quality and cost—key components of reform." PX 1072 at 1 ("Key Messages from St. Luke's Hospital"). Further, St. Luke's could have participated in Lucas County ACOs without the Acquisition. *See* PX 2023 at 111:14–16 (Wakeman (SLH) Dep.).

280. In a "Competitive Profile Matrix" conducted in the ordinary course of business, St. Luke's concluded that its "low cost position" and "[i]nformation flow and infrastructure" meant that it had "much already in place to deal with possible upcoming changes" related to healthcare reform. PX 1132 at 4–5.

281. At the time of the Acquisition, St. Luke's had adequate reserves and cash from operations to fully fund the installation of an EMR system, and still have money left over to fund other capital projects, pay off its debt, and retain sufficient reserves for future use. PX 2132 at ¶¶ 29, 64 (Dagen Supp. Decl.).

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

282. SLH's ordinary course of business documents indicated that the cost of implementing an EMR system would be approximately $12.5 million. PX 1281 at 17 (SLH "Financial Pillar Challenge"). St. Luke's already had placed a $6 million "placeholder" on its capital budget for EMR. PX 22 at 2. Furthermore, St. Luke's concluded that it would qualify for $6.3 million in federal subsidies to help fund its EMR system. PX 1281 at 12 (SLH "Financial Pillar Challenge").

283. Doug Deacon, SLH's Vice President of Professional Services, testified that SLH "would have to move forward" with implementing an EMR system absent the Acquisition. PX 2010 at 213:9–12 (Deacon (SLH) IH).

### XIII. PROMEDICA CANNOT MEET ITS BURDEN TO SHOW ST. LUKE'S IS A FAILING- OR FLAILING–FIRM

#### A. Factual Predicates for Failing–Firm Defense are Lacking

284. ProMedica cannot meet its burden to demonstrate that St. Luke's faced imminent failure and that St. Luke's adequately pursued less harmful alternatives, nor has ProMedica asserted a failing-firm defense in this proceeding.

#### 1. St. Luke's Not in Grave Danger of Imminent Failure

285. St. Luke's Hospital was not in grave danger of imminent failure. PX 2023 at 141:25–142:12 (Wakeman (SLH) Dep.); PX 2014 at 211:12–21 (Wagner (SLH) IH); PX 2021 at 45:19–24 (Oostra (PHS) Dep.).

286. The CEO of St. Luke's, Dan Wakeman, instituted a turnaround plan in 2008 that has been successful and has enabled St. Luke's to improve its financial condition significantly, as evidenced by numerous objective financial indicators. PX 2023 at 13:13–22 (Wakeman (SLH) Dep.); PX 1235 (Toledo Market Share Data); *see infra* Section XVI.B.

**\*43**  287. Plaintiffs' financial expert, Mr. Dagen, concluded that SLH's reserve fund and positive EBITDA have enabled it to make all necessary debt payments, pay its bills on time, and make necessary capital expenditures throughout the last decade. PX 2132 at ¶ 11 (Dagen Supp. Decl.). Mr. Dagen also concluded that focusing solely on SLH's operating margin or cost coverage ratios does not capture its ability to make investments to maintain facilities and quality of care, as well

as grow its business. PX 2132 at ¶¶ 20–21 (Dagen Supp. Decl.).

#### a. Pension Fund Loss is Misleading

288. Mr. Dagen noted that the 2008 financial crisis precipitated a decline in SLH's pension fund that resulted in an anomalous "paper loss" of X dollars to SLH's operating income in 2009 compared to the year before. PX 2132 at ¶ 40 n. 46 (Dagen Supp. Decl.). Focusing solely on the pension shortfall in 2009 ignores the cyclical nature of financial markets and SLH's demonstrated ability to rebound from such events. *Id.* at ¶ 41.

289. The pension fund has since increased in value from its 2008 levels. Between 2007 and 2008, the fair market value of the plan assets declined from X dollars to Y dollars. PX 2132 at ¶ 40 (Dagen Supp. Decl.); PX 1060 at 15 (Feb.2010 SLH Retirement Plan Actuarial Valuation Report). As of September 2010, the fair market value was X dollars. PX 1288 at 18 (SLH Sep. 2010 interim financial statements). Increases in the equity markets since September 2010 likely have resulted in additional increases in the value of SLH's pension fund. Between August and September 2010 alone, the pension fund increased by over X dollars. *Compare* PX 1288 at 18 (SLH Sep. 2010 interim financial statements) *with* PX 1287 at 16 (SLH Aug. 2010 interim financial statements)).

290. As the pension fund value has increased, so has the pension funding level. In 2009, the pension was X percent funded, on par with large companies such as Exxon Mobil, CBS, Disney, and Motorola. PX 2132 at ¶ 42 (Dagen Supp. Decl.); PX 1060 at 15 (Feb.2010 SLH Retirement Plan Actuarial Valuation Report). The pension fund is now Y percent funded. PX 2023 at 14:22–15:3 (Wakeman (SLH) Dep.). Further, based on the current value of its pension fund and the average annual pension payments to SLH retirees, St. Luke's has sufficient funds to meet its obligations for the next decade and beyond, even assuming no increase in the value of fund assets. PX 2132 at ¶ 42 (Dagen Supp. Decl.).

#### b. SLH's Credit Rating is Not a Sign of a Firm in Distress

291. Moody's Investors Service, Inc. ("Moody's") assigns a credit rating by performing a holistic qualitative and quantitative analysis of the borrower. PX 1370 at 1 (Moody's Rating Methodology); PX 2130 at ¶ 13 (Brick Decl.). Moody's examines certain variables over time and in relation

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

to the industry generally. PX 1370 at 5 (Moody's Rating Methodology); PX 2130 at ¶ 13 (Brick Decl.).

**\*44** 292. Immediately before the Acquisition by ProMedica, St. Luke's had a medium-grade, "Baa2" credit rating from Moody's. PX 1372 at 1 (Moody's Rating Update: SLH, February 3, 2010); PX 1371 at 4 (Moody's Rating Symbols and Definitions); PX 2130 at ¶ 9 (Brick Decl.). This is in the same category of credit rating as 28 percent of other hospitals. PX 2130 at ¶ 9 (Brick Decl.). As the Plaintiffs' bond-rating expert, Mr. Errol Brick, testified, "If Moody's felt that this hospital was not going to be able to survive, [it] would be more than a medium grade risk, ..." PX 2024 at 76:9–17 (Brick Dep.).

293. Investors and the capital markets have an appetite from debt issuers of medium grade risk, with "Baa" rated hospitals and healthcare systems issuing $2.6 billion in debt from January 2010 through January 2011. PX 2130 at ¶ 9 (Brick Decl.); PX 2131 (Appendix 1 to Brick Decl.).

294. In its last ratings update for an independent St. Luke's, Moody's identified certain factors that "could change the rating-UP[,]" including: "[c]ontinued growth and stability of inpatient and outpatient volume trends; significantly improved and sustainable operating performance for multiple years; strengthening of debt coverage measures and liquidity balance; improved market share." PX 1372 at 3 (Moody's Rating Update: SLH, February 3, 2010). Based on these factors, SLH's recent financial turnaround has produced results that would have led Moody's to upgrade SLH's credit rating. PX 2130 at ¶ 13–16 (Brick Decl.).

295. St. Luke's had experienced growth and stability of inpatient and outpatient volume in the period before the Acquisition and expected to continue this trend as an independent hospital. PX 170 at 1–2, 6 (SLH Board Monthly Report); PX 2014 at 73:17–74:15 (Wagner (SLH) IH).

296. SLH's operating performance was steady with positive cash flows and, as Mr. Dagen concludes, this trend would have improved even more with time. PX 2132 at ¶ 20, 57 (Dagen Supp. Decl.); PX 2122 at ¶¶ 67, 69, 71–72 (Guerin–Calvert Decl.); PX 2129 at 2 (Hanley (PHS) Decl., Ex. 1).

297. SLH's debt coverage measures and liquidity balance had also strengthened before the Acquisition. PX 2130 at ¶ 16, n. 32 (Brick Decl.). SLH's maximum annual debt service ratio had improved from X in 2009 to Y in 2010. PX 2129 at 2

(Ex. 1 to Hanley Decl.). Even in 2009, St. Luke's cash to debt ratio was X%, compared with a median of 102% for all hospitals rated by Moody's. PX 1372 at 4 (Moody's Rating Update: SLH, February 3, 2010); PX 1368 at 10 (Moody's 2009 Median Report).

298. Finally, SLH's market share had increased from 36 percent in 2009 to 43 percent in 2010 for its core service area, PX 1235 at 3 (Toledo Market Share Analysis), along with occupancy rates and expected volumes. PX 2129 (Hanley (PHS) Decl., Ex. 1).

### 2. St. Luke's Had Alternatives to ProMedica

299. ProMedica was not St. Luke's only option. St. Luke's considered alternative purchasers to ProMedica, including Mercy, UTMC, and out-of-area systems. PX 1016 at 22–24 (Affiliation Update Board Presentation); PX 2008 at 209:18–210:10 (Wakeman (SLH) IH).

**\*45** 300. St. Luke's and UTMC had discussed several factors as part of a potential affiliation. PX 1030 at 11 (St. Luke's Affiliation Analysis Update); PX 1035 at 9 (St. Luke's Affiliation Analysis Update); PX 2206 at 3–4. St. Luke's and UTMC even drafted an X before St. Luke's ended discussions with UTMC. PX 2205; PX 2019 at 66:23–67:19.

301. Partnering with UTMC would have been an option which could have benefitted the community and would have fit within SLH's mission. PX 1112 (SLH Integration Decision Grid). "St. Luke's leadership believes this affiliation is in the best interests of the community with the potential partnership leading the way for economic change." PX 1030 at 20 (SLH Affiliation Update). St. Luke's directors and executives saw substantial benefits to partnering with UTMC. PX 2023 at 148:5–149:2 (Wakeman (SLH) Dep.); PX 1321 at 2 (SLH Dec. 2009 e-mail); PX 1130 at 5 (SLH Recovery/Strategic Plan). *See also* PX 1406 (July 2009 Wakeman (SLH) e-mail) (benefits to UTMC partnership are "endless"); PX 1407 at 1 (Oct.2009 Wakeman (SLH) e-mail to Dr. Gold (UTMC)) (a UTMC affiliation "would provide just as much [expense reduction] as the two systems [Mercy and ProMedica].").

302. St. Luke's was concerned that UTMC would not be able to deliver sufficient pricing leverage with health plans, however. PX 1018 at 17 (SLH Partnership Options Presentation) ("Would ... [UTMC] give us ... enough managed care clout?"); PX 1130 at 4 (SLH Aug. 2009 Due Diligence Meeting Notes) ("Concern that [UTMC] does/may not have as high of reimbursement rates as ProMedica or Mercy").

St. Luke's also feared retaliation by ProMedica if it affiliated with UTMC. *See infra* at Section VII.C. UTMC does not offer OB services, and thus a merger of SLH and UTMC would not increase market share or market concentration in the Lucas County OB services market. PX 2064 at ¶ 9. In GAC, the combination of UTMC and St. Luke's would result in a smaller combined share than Mercy, and a combined share more than 60 percent smaller than ProMedica. PX 2125 at 29 (Town Decl., Ex. 5); PX 2150 at 1 (GAC market share chart reflecting data in Town Decl.).

303. Mr. Wakeman acknowledges that it was St. Luke's that ended discussions with UTMC. PX 2102 at ¶ 32 (Wakeman Decl.).

304. For their part, St. Luke's and Mercy had discussed clinical consolidation as well as information technology and administration integration as part of a potential affiliation. PX 1030 at 11 (St. Luke's Affiliation Analysis Update); PX 1035 at 9 (St. Luke's Affiliation Analysis Update). St. Luke's ended discussions with Mercy. PX 2018 at 80:18–19, 89:6–13.

### B. SLH's Successful Rebound Rebuts ProMedica's "Flailing Firm" Claims

305. SLH's new CEO as of early 2008, Dan Wakeman, had been involved in improving the operating performance of several hospitals before coming to SLH. PX 2008 at 27:1–20, 37:1–38:16, 45:2–12, 51:13–21 (Wakeman (SLH) IH). Mr. Wakeman testified that, at his previous three hospital positions, his leadership led to a "positive trajectory in terms of revenue and operation." PX 2008 at 51:22–52:1 (Wakeman (SLH) IH).

**\*46** 306. When first assessing St. Luke's, Mr. Wakeman concluded that it had "huge potential" because a "decline in revenue, in itself, in an area where you have growth, means opportunity." PX 2008 at 59:25–61:16 (Wakeman (SLH) IH).

### 1. Wakeman Three–Year Growth Plan, Sustainable Improvements

307. Mr. Wakeman instituted a "Three Year Plan" in June 2008 that contained several goals, including: increasing inpatient and outpatient net revenues, growing SLH's market share to 40 percent within its "core service area," hiring "core physicians" in various specialties, and attaining "access" to 90 percent of the managed care enrollees in the Toledo area. PX 1026 at 1–2 (SLH Three Year Plan).

308. By April 2009, one year into the three year plan, St. Luke's already had achieved its goals for increasing inpatient and outpatient net revenue. PX 2008 at 161:18–162:21 (Wakeman (SLH) IH). SLH's total net patient service revenues increased X percent from X million in 2007 to approximately Y million in 2010 (calculated by annualizing figures as of August 31, 2010). PX 1265 at 4 (OhioCare Consolidated Statement of Operations as of August 31, 2010). Mr. Wakeman testified that SLH's inpatient and outpatient revenue growth was "significant" during the twelve months prior to the Acquisition's consummation on August 31, 2010. PX 2023 at 30:16–31:12 (Wakeman (SLH) Dep.).

309. By the end of the first quarter of 2010, two years into the three year plan, St. Luke's had surpassed its market-share goal by achieving a X percent share in its core service area (compared to Y percent in 2007). PX 1235 at 3 (SLH market-share reports).

310. Between 2008 and 2009, St. Luke's employed 21 new physicians. PX 1278 at 7 ("Growth" presentation). According to Ms. Guerin–Calvert, as of January 2011, St. Luke's had 27 employed physicians. PX 2136 at ¶ 7(e) (Guerin–Calvert Supp. Decl.). SLH's strategy for employing physicians was projected to generate a positive return on investment by 2013. PX 1080 at 3 ("Physician Strategy Investments").

311. St. Luke's successfully re-negotiated its participation in the Anthem provider network as of July 2009. PX 1016 at 5 (presentation to SLH Board of Directors); PX 2276 at 2–3 (amendment to the Anthem–SLH "Provider Agreement," effective July 2, 2009). As a result, St. Luke's achieved access to 83 percent of the managed care enrollees in the Toledo area. PX 1289 at 3 ("Strategic Plan/Pillar Update"). Although St. Luke's also had sought readmission to Paramount's hospital network, after a long period of nonparticipation, PHS made a "business decision" to decline St. Luke's pleas. PX 2002 at 229:8–14; 230:18–231:7 (Hanley (PHS) IH).

312. Based on his experience at other hospitals, Mr. Wakeman also made it a goal to increase SLH's outpatient ratio to X percent, meaning that St. Luke's was to earn X percent of its revenues from outpatient procedures. PX 2008 at 68:10–19; 115:24–116:3 (Wakeman (SLH) IH). Increasing a hospital's outpatient ratio is beneficial because outpatient procedures typically generate higher margins than inpatient procedures. PX 2132 at ¶ 46 (Dagen Supp. Decl.). St. Luke's increased its outpatient ratio from approximately X percent in 2008 to nearly Y percent as of September 2010. PX

2008 at 115:13–23 (Wakeman (SLH) IH). St. Luke's acquired four offsite imaging centers, formerly known as "X–Ray Associates," at the close of 2008. PX 2010 at 24:16–25:2, 26:24–27:10 (Deacon (SLH) IH). The X–Ray Associates facilities generated X dollars in profits in 2009. PX 1359 at 43 ("Our Missions" presentation).

**\*47** 313. St. Luke's acquired another imaging center, Regency Medical Imaging, on August 31, 2010. PX 2010 at 24:11–15 (Deacon (SLH) IH). SLH's former CFO, David Oppenlander, called the Regency acquisition a "no brainer," projecting that it would generate approximately X dollars in annual profits. PX 1162 at 1, 3 (Dec.2009 SLH e-mail).

314. Mr. Dagen concluded that accounting for the "marked improvement in SLH's financial performance in 2010" is necessary to properly assess SLH's financial condition at the time of its acquisition by ProMedica. PX 2132 at ¶ 23 (Dagen Supp. Decl.). As a result, Mr. Dagen concluded that Ms. Guerin–Calvert's analysis, which instead focuses on 2009, "provides a misleading picture of SLH's financial condition because she captures SLH's financial results at [their] lowest point during the decade." PX 2136 at ¶ 23 (Guerin–Calvert Supp. Decl.).

### 2. Increases in Volume and Occupancy

315. SLH's total acute inpatient admissions were projected to be X in 2010, an increase of X percent from Y in 2007. PX 2129 (Hanley (PHS) Decl., Ex. 1) (annualized projection). Its patient days increased X percent from Y in 2007 to a projected Z during the same time period (2010 calculated by annualizing figures as of August 31, 2010). PX 2129 (Hanley (PHS) Decl., Ex. 1).

316. Total outpatient visits at St. Luke's increased X from 2007 (X number) to 2010 (a projected Y visits based on annualizing figures as of August 31, 2010). PX 2129 (Hanley (PHS) Decl. Ex. 1). A SLH "2010 Strategic Planning" summary through August 2010 shows that, in the first eight months of 2010, outpatient visits increased X percent over the previous year. PX 1199 at 1 (SLH Top Three Strategic Issues (Growth)).

317. The number of cases treated at SLH's Ambulatory Surgery Center, Surgi–Care, increased from X in 2007 to Y as of August 31, 2010 (which would annualize to X cases for all of 2010). PX 1214 at 6 ("Surgi–Care Board of Manager Meeting").

318. SLH's overall occupancy rate in the twelve months prior to the Acquisition increased by approximately X%. PX 2023 at 31:13–23 (Wakeman (SLH) Dep.).

319. In September 2009, David Oppenlander, SLH's CFO at the time, noted that "the hospital is close to capacity with inpatients ." PX 1292 at 3 (SLH Board Minutes 9/22/09). A March 2010 letter to the Ohio Department of Health described a "surge in obstetrical patients" that caused the maternity unit to be "full." PX 1086 (Konwinski Letter to OH Dep't of Health 3/19/10). By August 2010, Mr. Wakeman noted in a monthly update to the St. Luke's Board: "inpatient capacity is limited except for weekends." PX 170 at 1 (Sept.2010 Wakeman Memo to SLH Board).

### 3. Solid and Improving Financials

320. St. Luke's volume growth in 2010 led to decreasing losses and positive EBITDA. PX 2026 at 209:20–210:13 (Guerin–Calvert Dep.); PX 2129 (Hanley (PHS) Decl., Ex. 1). St. Luke's did not, as Defendant asserts, lose money on the commercial patients who received services at St. Luke's. Based on St. Luke's own ordinary-course-of-business accounting documents, as adopted and verified by ProMedica's expert, Ms. Guerin–Calvert, St. Luke's was covering by a substantial margin its direct costs for each X and Y patient it served, with excess to cover its fixed costs. PX 2136 at 56 (Guerin–Calvert. Supp. Decl. at 54, Table 11); PX 2025 at 173:8–174:9 (Dagen Dep.). This analysis is confirmed by Mr. Wakeman's statement in an August 2010 monthly update to the St. Luke's Board-the last update to the Board before the Acquisition-that St. Luke's "positive margin confirms that we can run in the black if activity stays high." PX 170 at 1 (Sept.2010 Wakeman Memo to SLH Board).

**\*48** 321. SLH's operating performance improved in the first eight months of 2010 compared to 2008 and 2009. According to PHS's CFO, Kathleen Hanley, SLH's operating cash flow margin improved from X percent in 2009 to positive Y percent as of August 31, 2010, and its operating margin improved from X percent to Y percent during the same time period. PX 2129 (Hanley (PHS) Decl. Ex. 1).

322. SLH's total net revenues for its hospital and all subsidiaries increased X percent from X dollars in 2007 to a projected Y dollars in 2010 (calculated by annualizing August 31, 2010 figures). PX 1003 at 5 (2007 OhioCare Consolidated Financial Report); PX 1265 at 4 (OhioCare Consolidated Statement of Operations as of August 31, 2010).

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

323. As of August 31, 2010, St. Luke's had approximately X dollars in cash and reserves (incorporating both the assets limited as to use and the assets of SLF). PX 1265 at 1 (OhioCare Consolidated Balance Sheet as of August 31, 2010: sum of "Assets Limited As to Use" and "Cash and Cash Equivalents" lines). Mr. Dagen concluded that, based on a review of ordinary course of business documents, it was appropriate to include assets from SLF and board-designated funds when calculating SLH's total "reserves." PX 2132 at ¶ 26 n. 19 (Dagen Supp. Decl.).

324. Ms. Guerin–Calvert described SLH's "Days Cash on Hand" as of August 31, 2010 as "slightly above its comparables." PX 2136 at ¶ 74 (Guerin–Calvert Supp. Decl.); *see also* PX 1372 at 2 (Moody's Rating Update: SLH, February 3, 2010).

325. SLH's total outstanding debt as of August 31, 2010 was X dollars. PX 1265 at 2 (OhioCare Consolidated Balance Sheet as of August 31, 2010: sum of "Current Portion of Long-term Debt" and "Long-term Debt, less current portions"). St. Luke's has never missed or been late on any debt payment. PX 2023 at 100:13–25 (Wakeman (SLH) Dep.). Notes from a February 2010 Finance Committee meeting described the bond payments as "a car payment" and not a risk to St. Luke's because "we have [ ] enough cash to completely defease these." PX 1204 at 11 (SLH Finance Committee Notes).

326. Mr. Wakeman stated, "[a]s bond issues go for not-for-profit organizations, it wasn't a large bond issue for a hospital of our size." PX2023 at 107:4–6 (Wakeman (SLH) Dep.)

327. Consistent with its historical use, St. Luke's could draw X dollars from its reserve fund "to invest ... in appropriate capital projects as needed." PX 2132 at ¶ 28 (Dagen Supp. Decl.). In particular, Mr. Dagen found that St. Luke's reserves were sufficient to fund implementation of an Electronic Medical Records system and completion of a private room conversion project. PX 2132 at ¶ 28 (Dagen Supp. Decl.). SLH's positive trajectory in 2010 would have caused it to reach increasingly higher levels of EBITDA in the next several years, including positive EBITDA in 2011, 2012, and 2013. PX 2132 at ¶¶ 63–64 (Dagen Supp. Decl.). This positive trajectory would have resulting in SLH improving operating income every year for at least the next few years, with positive operating income in 2013. PX 2132 at ¶¶ 63–64 (Dagen Supp. Decl.).

### 4. Last Words to the Board as an Independent Hospital

**\*49** 328. On September 24, 2010, Mr. Wakeman sent a "Monthly Report" to the St. Luke's Board that analyzed SLH's operating performance. PX 170 (Sept.2010 Wakeman Memo to SLH Board). In this memo he advised SLH's Board that:

a. "[I]n the past three years ... [w]e went from an organization with declining activity to near capacity." PX 170 at 7.

b. "[W]e have built our volume up to a point where we can produce an operating margin and keep our variable expenses under control." PX 170 at 1.

c. "Even with our increased activity, the patient satisfaction scores improved ..." PX 170 at 4.

d. "Our leadership status in quality, service and low cost stayed firmly in place." PX 170 at 7.

e. "In the past six months our financial performance has improved significantly. The volume increase and awareness of expense control were key." PX 170 at 7.

### C. Even in the Worst Case Scenario, St. Luke's Would Have Been Financially Viable for at Least Four to Seven Years

329. In the worst case scenario, at St. Luke's worst financial point in the last decade, St. Luke's CEO told its Board that St. Luke's would stay open for four to seven years without partnering with another hospital, even without the significant financial and economic improvements of 2010. PX 2023 at 141:25–142:12 (Wakeman (SLH) Dep.); *see also* PX 2014 at 211:12–21 (Wagner (SLH) IH). Improvements in equities markets and cash-flow operating margins in 2009 to 2010 extend this timeframe even further, PX2023 at 145:3–146:19 (Wakeman (SLH) Dep.), or, even more likely, ensure St. Luke's long-term financial viability.

330. St. Luke's had access to its reserve fund, which held approximately X dollars as of August 31, 2010. PX 1273 (unaudited interim financial statements); PX 1274 at 1 (Wakeman e-mail) (noting in mid–2009: "[w]e are blessed to have reserves.").

331. The reserve fund has been, and can continue to be, used for appropriate capital projects as needed. St. Luke's "established its investment policy to provide a

USAP226

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

financial reserve for long-term replacement, modernization and expansion of hospital facilities." PX 1275 at 47 (SLH Credit Presentation). St. Luke's has spent an average of X dollars annually on capital projects over the past ten years, including a heart center in 2001, a physical rehabilitation center in 2003, and the acquisitions of multiple physician groups and five freestanding imaging centers since December 2008. PX 2132 at ¶ 27 (Dagen Supp. Decl.).

332. Currently, St. Luke's has sufficient funds to complete its high priority capital projects, including EMR implementation and private room conversions. PX 2132 at ¶¶ 28–31 (Dagen Supp. Decl .); *see also* PX 2010 at 216:4–14 (Deacon (SLH) IH); PX 1156 (Scott Rupley's handwritten notes).

333. Mr. Dagen's analysis confirms that St. Luke's would be able to continue to make growth-minded investments, eliminate its outstanding debt, and still have approximately X dollars in cash and reserves. PX 2132 at ¶ 57 (Dagen Supp. Decl.)

### XIV PURPORTED EQUITIES ASSERTED BY PROMEDICA DO NOT OUTWEIGH THE PUBLIC'S INTEREST IN EFFECTIVE ANTITRUST ENFORCEMENT

**\*50** 334. ProMedica and St. Luke's entered into their transaction with full knowledge of the applicable antitrust laws, and a recognition that the Acquisition raised serious antitrust issues. *See* PX 2021 at 86:19–87:7 (Oostra (PHS) Dep.) (testifying that ProMedica budgeted hundreds of thousands of dollars for an antitrust review of the Acquisition that was expected to take a minimum of several months to complete); PX 1136 at 1 (ProMedica–Ohio Care Efficiency Opportunities) (efficiencies made for FTC review); PX 2002 (Hanley (PHS) IH) at 225:15–24) (stating that the "secondary" purpose of commissioning consultants was for dealing with FTC regulatory review); PX 2008 at 234:17–235:17 (Wakeman (SLH) IH) (presentation to St. Luke's Board about increased antitrust risk of ProMedica affiliation); PX 1030 at 17 (St. Luke's Board Affiliation Analysis Update) (stating that "[a]ny obstetrics affiliation may need to be carefully reviewed.").

335. ProMedica now claims that the Plaintiffs' requested relief—a narrowly-tailored hold-separate order ("HSO")—precludes its investment in St. Luke's. ProMedica's claim is without merit. Under the HSO, ProMedica is fully permitted to make investments it had agreed to make under the Joinder Agreement. In addition, the order *explicitly and*

*unambiguously permits* coordination of patient care and sharing of information that is lawful and reasonably necessary to comply with healthcare reform. *See infra* Section XV.D.

### XV. PRELIMINARY INJUNCTION IS NECESSARY TO PREVENT INTERIM HARM AND TO PRESERVE THE FTC'S ABILITY TO RESTORE BENEFICIAL PRE–ACQUISITION COMPETITION

336. The strong public interest in the effective enforcement of the antitrust laws weighs in favor of a preliminary injunction in the instant case. A preliminary injunction, continuing the HSA, is necessary to maintain the *status quo* and ensure availability of relief, if warranted, after the full administrative proceeding on the merits. Absent a preliminary injunction, ProMedica will be free to implement its plans to increase hospital rates, terminate employees at St. Luke's, and eliminate important clinical services currently offered at SLH. These actions will cause immediate harm to the community and will make it difficult, if not impossible, to restore competition to pre-Acquisition levels should the FTC ultimately prevail in its administrative challenge.

#### A. The Joinder Agreement Does Not Maintain the Competitive Viability of St. Luke's as an Independent Hospital

337. Under the Joinder Agreement ("Agreement"), ProMedica must retain only six specified service categories at St. Luke's. PX 58 at 23 (Joinder Agreement § 7.1) (the covered service categories are: emergency room, ambulatory surgery, inpatient surgery, obstetrics, inpatient nursing, and a CLIA-certified laboratory). Even for these basic service categories, the Agreement does not include minimum operational or quality standards.

338. Under the Agreement, ProMedica faces no obligation whatsoever to preserve other critical services at St. Luke's, such as oncology, cardiology, orthopedics, radiology and imaging, spinal neurosurgery, pediatrics, and diabetes care, among others. *Compare* PX 58 at 23 (Joinder Agreement § 7.1) *with* PX 2102 at ¶ 5 (Wakeman (SLH) Decl.) (listing current services); PX 2023 at 152:5–153:20 (Wakeman (SLH) Dep.); *see also* PX 396 at 2–3 (Navigant Consulting, Clinical Integration Strategy: Executive Summary, Jan. 11, 2011) (seven areas analyzed for potential consolidation or "reconfiguration"). Even if ProMedica were to eliminate or transfer a subset of services within a clinical service line, this could have serious negative implications. For example, if ProMedica were to discontinue open-heart surgery at St.

USAP227

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)

2011-1 Trade Cases P 77,395

Luke's (which is permissible under the Agreement), this could undermine the overall viability of St. Luke's Heart Center and interventional cardiology program.

**\*51** 339. ProMedica can amend the Agreement with approval from SLH's Board, which is now subject to the exercise of PHS's reserve powers. PX 58 at 51–52 (Joinder Agreement § 17.3); PX 2023 at 155:8–156:2 (Wakeman (SLH) Dep.).

### B. ProMedica Plans to Increase Hospital Reimbursement Rates

340. Under the Agreement, ProMedica will take over the management and negotiation of SLH's contracts with health plans. PX 58 at 58 (Joinder Agreement, Ex. 9); PX 2006 at 162:2–5 (Wachsman (PHS) IH). ProMedica already has taken steps to raise rates immediately if the Court does not impose preliminary injunctive relief. PX 2021 at 33:25–35:21 (Oostra (PHS) Dep).

341. Health plans expect ProMedica to increase SLH's rates significantly. *See supra* Section VIII. A.2 ["Health Plans Expect the Acquisitions to Result in Increased Bargaining Leverage and Higher Rates"]. If SLH's rates increase to the rates at ProMedica's hospitals, as health plans expect, this would represent a rate increase of more than X percent, on average. PX 2125 at 27 (Town Decl., Ex. 4) (severity adjusted price differential between ProMedica and St. Luke's).

342. Without a Court order preserving competition pending the full administrative trial on the merits, Lucas County employers and their employees clearly could suffer substantial, immediate and irreversible harm from higher healthcare-insurance prices, as PHS plans to raise SLH's rates as soon as possible. PX 2022 at 82:10–83:17, 85:25–86:11, 87:18–25 (Wachsman (PHS) Dep.). Ultimately, higher healthcare costs will be borne by Lucas County residents, many of whom already are struggling financially. *See supra* Section IX. In response, some Lucas County employers may reduce healthcare benefits for their employees, and some insured employees may drop their healthcare coverage altogether and/or forgo medical treatment due to higher out-of-pocket expenses. *See supra* Section IX. There is no means for redressing this harm once it has occurred.

343. A preliminary injunction is the only meaningful method for preventing this competitive harm, because it is virtually impossible to make consumers whole once such harm has occurred.

### C. ProMedica Plans to Close and Consolidate Hospital Services and to Reduce Staffing at St. Luke's

344. ProMedica's CEO, Mr. Oostra, acknowledged that ProMedica plans to close and consolidate several of SLH's service lines. PX 2021 at 98:5–9 (Oostra (PHS) Dep.).

345. The Compass Lexecon report initially identified several of SLH's service lines as candidates for consolidation, including heart/vascular, orthopedics, women's, neuro/stroke, cancer, and pulmonary services for consolidation. PX 20 at 13 (Compass Lexecon Report). ProMedica then hired Navigant specifically to determine which services to transfer or consolidate. PX 222 at 2 (Navigant Service Line and Clinical Integration Report); *see also* PX 2011 at 122:10–125:4, 162:15–164:4 (Akenberger (PHS) IH). In January 2011, Navigant analyzed seven service lines for consolidation, including open-heart surgery, and it also looked at integration opportunities in psychiatry and rehabilitation services. PX 396 at 3, 8–10 (Navigant Consulting, Clinical Integration Strategy: Executive Summary, Jan. 11, 2011) (the seven service lines were cancer, heart and vascular, neuroscience, orthopedics, obstetrics, pediatrics, gastroenterology/urology).

**\*52** 346. The same process of service consolidation took place at Flower following its acquisition by ProMedica in 1996. ProMedica's CFO, Ms. Hanley, testified that Flower had a significant number of redundant practices, and ProMedica consolidated service lines and department heads. PX 2002 at 172:2–13 (Hanley (PHS) IH). ProMedica's consolidation of services at Flower included downsizing the number of operating rooms from twelve to three following a sharp reduction in the number of hospital anesthesiologists. PX 2081 at ¶ 12.

347. ProMedica also plans to reduce staffing at St. Luke's. The Compass Lexecon report indicates that ProMedica plans to lower SLH's overall staffing levels to those of Flower Hospital. PX 20 at 15 (Compass Lexecon Report). The Agreement does not prevent ProMedica from immediately reducing the number of St. Luke's employees.

348. St. Luke's ranks highly in quality and patient satisfaction scores, and patient satisfaction levels at St. Luke's have increased further, relative to last year. PX 2023 at 16:17–17:4, 89:17–21 (Wakeman (SLH) Dep.); PX 390 at 1 (May 2010 ProMedica Press Release); PX 1072 at 1 (Key Messages from St. Luke's). Such high quality and patient satisfaction levels

USAP228

2011-1 Trade Cases P 77,395

are made possible by St. Luke's employees and the overall staffing levels that St. Luke's has maintained. Providing uninterrupted, high-quality patient care and patient safety were the precise reasons for which St. Luke's chose not to lay off employees and in fact *continued hiring* over the past two years. PX 2023 at 22:13–27:6 (Wakeman (SLH) Dep.). *See also* PX 1274 at 1 (Wakeman e-mail). If ProMedica reduces St. Luke's staffing levels thereby eliminating employees who currently contribute to the attentive, high-quality care the hospital offers quality, and as a result, patients, appear likely suffer. *See* PX 2077 at ¶ 8.

349. Absent a preliminary injunction, it will be extremely difficult, if not impossible, to restore clinical service lines to St. Luke's and fully restore St. Luke's to its pre-Acquisition status. Thus, a preliminary injunction is necessary for the FTC to achieve meaningful relief, if warranted, following the administrative trial on the merits and exhaustion of all appeals.

## CONCLUSIONS OF LAW

### I. APPLICABLE LAW

1. Section 7 of the Clayton Act states:

> No person ... shall acquire, directly or indirectly, the whole or any part of the stock or other share capital ... of another person ... Where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or ten to create a monopoly.

18 U.S.C. § 18.

Section 7 is "designed to arrest in its incipiency ... the substantial lessening of competition from the acquisition by one corporation of the whole or any part of the stock" or assets of a competing corporation. *United States v. E.I. du Pont de Nemours & Co.,* 353 U.S. 586, 589, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957). The Supreme Court has explained that "Congress used the words ' *may* be substantially to lessen competition' (emphasis supplied), to indicate that

its concern was with probabilities, not certainties." *Brown Shoe Co. v. United States,* 370 U.S. 294, 323, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). *The government can satisfy its burden by establishing a "reasonable probability" of substantial anticompetitive effects. Du Pont,* 353 U.S. at 589, 77 S.Ct. 872, 1 L.Ed.2d 1057. Section 7 "can *deal only with probabilities, not with certainties.* And there is certainly no requirement that the anticompetitive power manifest itself in anticompetitive action before § 7 can be called into play. If the enforcement of § 7 turned on the existence of actual anticompetitive practices, the congressional policy of thwarting such practices in their incipiency would be frustrated." *FTC v. Procter & Gamble Co.,* 386 U.S. 568, 577, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) (citations omitted). However, "ephemeral possibilities" will not satisfy the requirement of a reasonable probability. *United States v. Marine Bancorporation, Inc.,* 418 U.S. 602, 623, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

**\*53** In perhaps the seminal case on Section 7, the Supreme Court explained that where an acquisition would "produce[ ] a firm controlling an undue percentage share of the relevant market, and results in a significant increase in the concentration of firms in that market," the likelihood that competition will be substantially lessened is so great "that it must be enjoined in the absence of evidence clearly showing that the [acquisition] is not likely to have such anticompetitive effects." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 363, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). Thus, where the government shows that the acquisition in question would result in a firm controlling an undue percentage of the relevant market and a significant increase in the concentration of firms in that market, a presumption of illegality arises because there is a presumption of anticompetitive effects.

*United States v. Dairy Farmers of America, Inc.,* 426 F.3d 850, 848 (6th Cir.2005). (Emphasis added.)

2. Section 13(b) of the FTC Act authorizes the Court to grant a preliminary injunction if, upon "weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). As such, this Court should: (1) determine the likelihood that the FTC will ultimately succeed on the merits in its case under Section 7 of the Clayton Act; and (2) balance the equities. *FTC v. H.J. Heinz Co.,* 246 F.3d 708, 714 (D.C.Cir.2001).

USAP229

3. The "only purpose of a proceeding under Section 13[ (b) ] is to preserve the status quo until the FTC can perform its function. *FTC v. Food Town Stores, Inc.,* 539 F.2d 1339, 1342 (4th Cir.1976). The ultimate determination as to a Section 7 violation of the Clayton Act is an "adjudicatory function [ ] vested in the FTC." *Id.*

4. To show a likelihood of success in a 13(b) proceeding, Plaintiffs must only "raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *FTC v. Butterworth Health Corp.,* 946 F.Supp. 1285, 1289 (W.D.Mich.1996), *aff'd,* 121 F.3d 708, 1997 WL 420543 (6th Cir.1997). (Citations omitted.)

5. While the FTC need not establish irreparable harm under § 13(b) to secure a preliminary injunction, a burden shifting analysis is appropriate:

> First, the FTC must make *a prima facie* showing that the merger would lead to undue concentration in the product market in the geographical area in question; such a showing gives rise to a presumption of illegality. *University Health,* 938 F.2d at 1218. If a *prima facie* case is made out, the burden of producing evidence to rebut the presumption shifts to the defendants. *Id.* If the defendants produce such evidence, the FTC has the burden of producing additional evidence to show the anticompetitive effects of the merger. *Baker Hughes,* 908 F.2d at 983. The ultimate burden of persuasion remains with the FTC at all times. *Id.*

**\*54** *Id.* 121 F.3d 708, 1997 WL 420543 at *2, citing, *FTC v. University Health, Inc.,* 938 F.2d 1206, 1218–1219 (11th Cir.1991); *United States v. Baker Hughes, Inc.,* 908 F.2d 981, 983 (D.C.Cir.1990); *United States v. Waste Management, Inc.,* 743 F.2d 976, 981 (2d Cir.1984).

## II. LEGAL CONCLUSIONS

6. ProMedica's statements of market dominance may be construed as an admission against interest. Fed.R.Evid. 801(d)(2).

### A. GENERAL ACUTE–CARE INPATIENT HOSPITAL SERVICES CONSTITUTE A RELEVANT PRODUCT MARKET

7. A relevant product market is one in which a hypothetical monopolist could increase prices profitably by a "small but significant" amount for a meaningful period of time. (U.S. Department of Justice and Federal Trade Commission, Horizontal Merger Guidelines (2010) § 4.1.1 (*"Merger Guidelines"*)). Defining the product market generally focuses on "demand substitution factors, *i.e.,* on customers' ability and willingness to substitute away from one product to another in response to a price increase or ... reduction in product quality or service." *Id.* at § 4. Courts frequently have relied on the *Merger Guidelines* framework to assess how acquisitions impact competition. *See, e.g., Butterworth,* 946 F.Supp. at 1294; *Chicago Bridge & Iron Co. N.V. v. FTC,* 534 F.3d 410, 432 n. 11 (5th Cir.2008); *Heinz,* 246 F.3d at 716 n. 9; *FTC v. Univ. Health Inc.,* 938 F.2d 1206, 1211 n. 12 (11th Cir.1991).

8. Evidence that predicts a price increase for a group of products "can itself establish that those products form a relevant [product] market." *Merger Guidelines* § 4; *see also Whole Foods,* 548 F.3d at 1046–47 (Tatel, J., concurring) (CEO's statement that it was buying company to "avoid nasty price wars" was relevant evidence of market definition); *In re Evanston Nw. Healthcare,* No. 9315, 2007 WL 2286195, at 60–61 (F.T.C. Aug.6, 2007).

9. The first relevant product market in this case is general acute-care inpatient services ("GAC") sold to commercial health plans. This is a "cluster market" of services that courts consistently have found when analyzing hospital mergers. *See, e.g., Butterworth,* No. 96–2440, 1997 U.S.App. LEXIS 17422; *Univ. Health Inc.,* 938 F.2d at 1210–11; *United States v. Rockford Mem. 'l Corp.,* 898 F.2d 1278, 1284 (7th Cir.1990); *Evanston,* No. 9315, 2007 WL 2286195, at 55–57.

10. The inpatient services included in the cluster market are not substitutes for one another (*i.e.,* appendectomies and coronary bypass surgery are not interchangeable). However, the cluster market is used "as a matter of analytical convenience [because] there is no need to define separate markets for a large number of individual hospital services ... when market shares and entry conditions are similar for each." *Emigra Group v. Fragomen,* 612 F.Supp.2d 330, 353 (S.D.N.Y.2009) (citing Jonathan B. Baker, *Market Definition: An Analytical Overview,* 74 ANTITRUST L.J. 129, 157–59 (2007)).

**\*55** 11. The specific inpatient services included in the cluster market are those that both ProMedica and St. Luke's offer, and therefore those for which competition will be affected by the Acquisition. *See Little Rock Cardiology Clinic v. Baptist Health,* 573 F.Supp.2d 1125 n. 46 (E.D.Ar.2008)

(excluding cardiologists' services from market definition because "[defendant] does not compete in the cardiologists' service market; it has no market share and therefore no market power in [that market].").

12. Outpatient services are excluded from the GAC market because they are not substitutes for inpatient services and because they are subject to different competitive conditions (including a different set of providers) than are inpatient services. *See Rockford Mem'l Hosp.,* 898 F.2d at 1284 (excluding outpatient services from a GAC product market).

## B. INPATIENT OBSTETRICAL SERVICES CONSTITUTE A RELEVANT PRODUCT MARKET

13. Inpatient obstetrical services constitute a separate relevant product market in which the competitive effects of the Acquisition must be analyzed. A separate product market for this service line is necessary because "market shares and entry conditions" are different for obstetrics than for the overall cluster of GAC services: UTMC and Mercy St. Anne do not offer obstetrical services. *See Emigra Group,* 612 F.Supp.2d at 353. As such, it would be inappropriate and misleading to include obstetrical services in the GAC cluster market; the effect of the Acquisition on the provision of obstetrical services in Lucas County must be separately analyzed.

14. Inpatient obstetrical services need not be included in the overall general acute-care inpatient services market simply because they are offered within the same facilities as the other services. *Rockford Mem. 'l Hosp.,* 898 F.2d at 1284 (Posner, J.) ("Hospitals can and do distinguish between the patient who wants a coronary bypass and the patient who wants a wart removed from his foot; these services are not in the same product market merely because they have a common provider.").

15. Courts in the Sixth Circuit have recognized different product markets with different market structures and competitive conditions in hospital mergers. *Butterworth,* 946 F.Supp. at 1290–91 (accepting two market definitions-general acute care inpatient hospital services and primary care inpatient hospital services-each with different competitors); *Defiance Hosp. v. Fouster–Cameron, Inc.,* 344 F.Supp.2d 1097, 1109 (N.D.Ohio 2004) (finding narrower market of anesthesia services where, *inter alia,* only certain providers perform the service).

## C. THE RELEVANT GEOGRAPHIC MARKET IS LUCAS COUNTY

16. Section 7 of the Clayton Act prohibits acquisitions that are likely to lessen competition in "any section of the country," otherwise known as a geographic market. *Phila. Nat'l Bank,* 374 U.S. at 356.

17. Under the case law and *Merger Guidelines,* the relevant question to define the geographic market is whether a hypothetical monopolist controlling *all* Lucas County hospitals could profitably implement a small but significant non-transitory increase in price ("SSNIP"). *Merger Guidelines* § 4.2. Defining the geographic market is a "pragmatic" undertaking and the Plaintiffs must "present evidence of practical alternative sources to which consumers ... would turn if the merger were consummated." *Butterworth,* 946 F.Supp. at 1291; *see generally Phila. Nat'l Bank,* 374 U.S. at 358–62. Therefore, the relevant geographic market within which to analyze the competitive effects of the Acquisition is no broader than Lucas County.

## D. THE ACQUISITION IS PRESUMED UNLAWFUL BASED ON CONCENTRATION THRESHOLDS

**\*56** 18. "A transaction resulting in a high concentration of market power and creating, enhancing, or facilitating a potential that such market power could be exercised in anticompetitive ways is presumptively unlawful." *Butterworth,* 946 F.Supp. at 1294 (citations omitted); *see also Phila. Nat'l Bank,* 374 U.S. at 363; *Baker Hughes,* 908 F.2d at 982–83.

19. Market concentration can be measured using the Herfindahl–Hirschman Index ("HHI"), as adopted by the federal antitrust enforcement agencies. *Merger Guidelines* § 5.3. Courts have likewise adopted and relied on the HHI as a measure of market concentration. *See, e.g., Univ. Health Inc.,* 938 F.2d at 1211 n. 12 (HHI is "most prominent method" of measuring market concentration) *FTC v. PPG Indus.,* 798 F.2d 1500, 1503 (D.C.Cir.1986); *FTC v. Cardinal Health,* 12 F.Supp.2d 34, 53–54 (D.D.C.1998); *FTC v. Staples,* 970 F.Supp. 1066, 1081–82 (D.D.C.1997). The HHI is calculated by summing the squares of the market shares of all firms in the market. A transaction that increases concentration by 200 points and results in a highly-concentrated market (HHI over 2,500) is *presumed* likely to enhance market power. *Merger Guidelines* § 5.3.

F.T.C. v. ProMedica Health System, Inc., Not Reported in F.Supp.2d (2011)
2011-1 Trade Cases P 77,395

20. Sufficiently large HHI figures establish the FTC's *prima facie* case that a merger is anti-competitive. *Heinz,* 246 F.3d at 716 (citing *Phila. Nat'l Bank,* 374 U.S. at 363); *Baker Hughes,* 908 F.2d at 982–83.

21. The market shares and HHI levels here far exceed levels found to be unlawful by the Supreme Court and other courts. (See ¶ 96) In *Philadelphia National Bank,* the Supreme Court found that a combined market share of 30 percent, with many remaining competitors, violated the Clayton Act. 374 U.S. at 364. In *University Health Inc.,* the Court found that the FTC had "clearly established a *prima facie* case of anticompetitive effect" when it proved that a merger of two nonprofit hospitals would have reduced the number of competitors from five to four and resulted in a combined share of about 43 percent, an increase in HHI of over 630, and a post-merger HHI of 3200. 938 F.2d at 1211 n. 12, 1219; *see also FTC v. Bass Bros. Enters., Inc.,* No. C84–1304, 1984 U.S. Dist. LEXIS 16122, at *65 (N.D. Ohio June 6, 1984) (enjoining two mergers that would have resulted in 200 and 300 point increases in HHI); *Cardinal Health,* 12 F.Supp. at 52–53 (enjoining two mergers that would have resulted in 600 and 800 point increases in HHI).

22. A duopoly, as in the inpatient obstetrical services market here, is presumptively unlawful in and of itself. There is "by a wide margin, a presumption that [a three-totwo] merger will lessen competition ..." *Heinz,* 246 F.3d at 716; *PPG,* 798 F.2d at 1503; *Cardinal Health,* 12 F.Supp.2d at 52–53.

### E. DEFENDANT HAS FAILED TO REBUT THE PRESUMPTION OF LIKELY HARM

23. Proof that the acquisition will increase concentration in one or more relevant markets with significant barriers to entry establishes a *prima facie* case that a merger is anticompetitive. *Heinz,* 246 F.3d at 716 (likelihood of success demonstrated by showing that market concentration would increase substantially). The burden shifts to the Defendant to rebut the *prima facie* case by attempting to show that market-share statistics do not accurately reflect the market. *Id.* at 715; *Baker Hughes,* 908 F.2d at 982–83. "The more compelling the *prima facie* case, the more evidence the defendant must present to rebut it successfully." *Heinz,* 246 F.3d at 725 (quoting *Baker Hughes,* 908 F.2d at 991).

### 1. There Will Be No Timely, Likely, or Sufficient Entry or Expansion in the Relevant Markets

*57 24. Entry must be "timely, likely, and sufficient in its magnitude, character and scope to deter or counteract the competitive effects" of a proposed transaction. *Merger Guidelines* § 9; *FTC v. Procter & Gamble, Co.,* 386 U.S. 568, 579, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967); *Bass Bros.,* No. C84–1304, 1984 U.S. Dist. LEXIS 16122, at *32 (noting unlikelihood of entry due to regulatory and cost barriers); *see also Cardinal Health,* 12 F.Supp.2d at 55–58 (adopting "timely, likely, and sufficient" test). Defendants must show both that entry is *likely*—meaning both technically possible —and economically feasible-and that it will *replace* the competition that existed prior to the merger. *See Cardinal Health,* 12 F.Supp.2d at 56 (quotation omitted); *In re Chicago Bridge & Iron Co.,* 138 F.T.C. 1024, 1067 (2005) (noting "new entrants and fringe competitors" might not replace lost competition), *aff'd sub nom. Chicago Bridge & Iron Co. N.V. v. FTC,* 534 F.3d 410 (5th Cir.2008).

25. The higher the barriers to entry, as in this case, the less likely it is that the "timely, likely, and sufficient" test can be met. *United States v. Visa U.S.A., Inc.,* 163 F.Supp.2d 322, 342 (S.D.N.Y.2001), *aff'd,* 344 F.3d 229, 240 (2d Cir.2003). (See ¶¶ 221–234).

### 2. Defendant's Efficiencies Claims Fail

26. Defendant has failed in its burden of proving that its asserted efficiencies are: (1) verifiable; (2) not attributable to reduced output or quality; (3) merger-specific; and (4) sufficient to outweigh the transaction's anticompetitive effects. *See Heinz,* 246 F.3d at 721 (evidence cannot be "mere speculation and promises about post-merger behavior"); *Univ. Health Inc.,* 938 F.2d at 1223 ("defendant [cannot] overcome a presumption of illegality based solely on speculative, self-serving assertions"); *Staples,* 970 F.Supp. at 1089; *see also Merger Guidelines* § 10.

27. Efficiencies must be "extraordinary" to overcome high concentration levels. *Heinz,* 246 at 721–22.

28. No court in a 13(b) proceeding, or otherwise, has found efficiencies sufficient to rescue an otherwise illegal merger. *See Phila. Nat'l Bank,* 374 U.S. at 371 (noting that where a merger substantially lessens competition, it "is not saved because, on some ultimate reckoning of social or economic debits or credits, it may be deemed beneficial."); *Procter & Gamble,* 386 U.S. at 580 ("[P]ossible economies cannot be used as a defense to illegality. Congress was aware that some mergers which lessen competition may also result in

economies but it struck the balance in favor of protecting competition").

### 3. St. Luke's Is Not a Failing Firm

29. Defendant cannot meet the requirements of the failing-firm defense, under which ProMedica must prove that it was St. Luke's only available purchaser and that St. Luke's was in imminent danger of business failure. *See Citizen Publ'g Co. v. United States,* 394 U.S. 131, 136–37, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969) (citing *Int'l Shoe Co. v. FTC,* 280 U.S. 291, 302, 50 S.Ct. 89, 74 L.Ed. 431 (1930)); *see also U.S. Steel Corp. v. FTC,* 426 F.2d 592, 608 (6th Cir.1970); *Merger Guidelines* § 11.

**\*58** 30. The failing-firm defense has "strict limits[.]" *Warner Commc 'ns, Inc.,* 742 F.2d at 1156; *see also United States v. General Dynamics Corp.,* 415 U.S. 486, 507, 94 S.Ct. 1186, 39 L.Ed.2d 530 (1974) (failing-firm defense is "lesser of two evils approach"); *Citizen Publ'g Co.,* 394 U.S. at 137 (failing-firm defense should be confined to its "narrow scope").

31. The failing-firm defense has never succeeded in a 13(b) proceeding.

### 4. St. Luke's Is Not a "Flailing Firm"

32. A defense based on the financial weakness of the acquired company-sometimes referred to as a "flailing-firm defense" is an even more tenuous ground on which to justify the Acquisition. Courts have viewed the defense with extreme skepticism, describing it as "probably the weakest ground of all for justifying a merger." *Kaiser Alum. & Chem. Corp. v. FTC,* 652 F.2d 1324, 1338–41 (7th Cir.1981) (noting further that it "certainly cannot be the primary justification of a merger"). *Id.* The Ninth Circuit rejected the defense, explaining that it inappropriately expands the "strict limits" of the failing-firm defense. *Warner Commc 'ns, Inc.,* 742 F.2d at 1165 (quoting and citing *Kaiser Alum. & Chem. Corp.,* 652 F.2d at 1339).

33. To the limited extent that courts consider the defense, it requires a "substantial showing that the acquired firm's weakness, *which cannot be resolved by any other means,* would cause the firm's market share to reduce to a level that would undermine the government's *prima facie* case." *Univ. Health Inc.,* 938 F.2d at 1221 (emphasis added). Thus, to succeed, Defendant must make a "substantial showing" of an imminent, steep plummet in St. Luke's market share (from

11.5 percent to less than 2 percent for GAC services and from 9.3 percent to less than 1.3 percent for OB services) such that market concentration falls below levels that trigger the presumption of anticompetitive harm.

34. The strength of the FTC's *prima facie* case here differs greatly from the circumstances in *FTC v. Arch Coal, Inc.,* 329 F.Supp.2d 109 (D.D.C.2004), the only case in which a court has relied on financial weakness (and only in part) to deny relief in a 13(b) proceeding. In *Arch Coal,* the FTC "just barely" raised competitive concerns with "an increase in HHI of only 49." *Id.* at 158. The court noted that less of a showing was required from the defendant to rebut the "less-than-compelling *prima facie* case" and further cautioned that it was "important to note that this case is *not* one in which the post-merger increase in FTHI produces an overwhelming statistical case." *Id.* at 129, 158 (emphasis added). [2]

[2]     *Arch Coal* is distinguishable in numerous other ways: *inter alia,* the transaction at issue involved coal reserves that, once depleted, could never be replenished, making the financial decline of the acquired company irreversible; and the transaction did not result in a decrease in the number of competitors in the market.

### 5. Defendant's Other Novel Defenses Are Entitled to Little Weight

35. No court has ever denied relief in a 13(b) proceeding despite an acknowledgment by the defendant that prices will increase by double-digits. The Court cannot accept Defendant's argument that recent rate negotiations prove that it will only seek "reasonable" price increases in the future: "[p]ost-acquisition evidence that is subject to manipulation by the party seeking to use it is entitled to little or no weight." *Hosp. Corp. of Am. v. FTC,* 807 F.2d 1381, 1384 (7th Cir.1986) (Posner, J.).

**\*59** 36. Furthermore, the Court declines Defendant's invitation to delve into whether St. Luke's current prices are "subcompetitive" or otherwise unreasonable in some way. Section 7 of the Clayton Act does not prevent *St. Luke's* from seeking better rates as an independent hospital, but it does prohibit any transaction that may "substantially lessen competition" and allow higher rates to result from an unlawful exercise of market power. 15 U.S.C. § 18 (2006).

37. Indeed, no court has ever engaged in an inquiry into the reasonableness of pre-merger or post-merger prices in a 13(b)

proceeding. To do so "is to set sail on a sea of doubt" because courts are "ill-suited to act as central planners, identifying the proper price, quantity and other terms of dealing." *Pac. Bell. Tel. Co. v. linkLine Commc'ns, Inc.,* 555 U.S. 438, 129 S.Ct. 1109, 1121, 172 L.Ed.2d 836 (2009) (quotations and citations omitted). Rather, "the normal assumption in examining assertions of market power is that the current price is at least the competitive price." *CF Indus., Inc. v. Surface Transp. Bd.,* 255 F.3d 816, 824 (D.C.Cir.2001) (citing IIA Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 537b (1995)). As the leading antitrust treatise states: "[T]he market is presumably behaving competitively, or at least nearly so, prior to the merger. The concern is whether the merger may lead to a further price increase *above current levels.*" IIB Phillip E. Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION ¶ 539a2 (2009) (emphasis added). No court has ever concluded that significant price increases resulting from an acquisition are fair and reasonable. [3]

[3]   Defendant relies on *United States v. Long Island Jewish Med. Ctr.,* 983 F.Supp. 121 (E.D.N.Y.1997) to argue that this Court may accept price increases because they are purportedly not "supracompetitive." However, the court in *Long Island Jewish Medical Center* did not condone price increases; rather, it concluded that prices would not increase at all as a result of the merger. *Id.* at 145 ("In sum, the evidence in this case indicates that, in the event the merger is consummated, it is unlikely that there will be a price increase.").

38. Defendant cites to prior hospital merger cases in which courts denied preliminary injunctive relief despite allegations of high post-merger market shares. However, in all but one of those cases (discussed below), either the court held that the government did not meet its burden of proving the high market shares or the court did not reach the issue. For example, in *United States v. Mercy Health Servs.,* 902 F.Supp. 968 (N.D.Iowa 1995), the Department of Justice alleged that the parties had a combined 86 percent share. However, the government failed to prove that the relevant geographic market extended beyond an area in which the parties' held only a 10 percent share, which even the government acknowledged would not violate § 7. *Id.; see also FTC v. Tenet Health Care Corp.,* 186 F.3d 1045 (8th Cir.1999),

(government did not meet burden of proving geographic market that supported an alleged 84 percent market share); *FTC v. Freeman Hosp.,* 69 F.3d 260 (8th Cir.1995) (FTC alleged market with post-merger HHIs between 3088 and 3417, but court found broader geographic market with post-merger HHIs between 1322 and 1496 and combined shares between 21 and 24 percent); *FTC v. Hosp. Bd. of Dirs.,* 38 F.3d 1184 (11th Cir.1994) (court never reached market shares because acquisition immune under state action doctrine).

**\*60** 39. The only case in which the court permitted a hospital merger despite apparently large market shares, *Butterworth,* 946 F.Supp. 1285, involved two key issues that are not relevant here: first, the Court credited arguments that a non-profit hospital was not likely to raise prices, in part because the hospital's Board of Directors, composed of local community members, would not allow it; and second, the Court relied on the merging hospitals' commitment to freeze prices at both of the merging hospitals for three years and limit price increases for the following four years. *Id.* at 1302–1304. Neither fact fits the evidence in this case. *See* Findings of Fact at Section VI.

### III. THE EQUITIES FAVOR A PRELIMINARY INJUNCTION

40. No court has denied relief to the FTC in a 13(b) proceeding in which the FTC has demonstrated a likelihood of success on the merits. "The equities will often weigh in favor of the FTC because 'the public interest in effective enforcement of the antitrust laws' was Congress's specific 'public equity consideration' in enacting Section 13(b)." *CCC Holdings,* 605 F.Supp.2d at 36 (citing *Heinz,* 246 F.3d at 726).

41. Private equities "are not proper considerations for granting or withholding injunctive relief under section 13(b)"—instead, public equities are paramount. *Food Town,* 539 F.2d at 1346. Moreover, if the benefits of a merger are available after the trial on the merits, they do not constitute public equities weighing against a preliminary injunction. *Heinz,* 246 F.3d at 726 ("If the merger makes economic sense now, the appellees have offered no reason why it would not do so later.").

42. In a preliminary injunction action under Section 13(b), the FTC is not required to show irreparable harm. *See Heinz,* 246 F.3d at 714; *Elders Grain,* 868 F.2d at 903; *Warner Commc 'ns,* 742 F.2d at 1159.

USAP234

2011-1 Trade Cases P 77,395

## IV. COURT–ORDERED RELIEF IS NECESSARY TO PRESERVE THE POSSIBILITY OF MEANINGFUL PERMANENT RELIEF AND TO PREVENT INTERIM HARM

43. The very purpose of a Section 13(b) proceeding is to preserve the FTC's ability to achieve meaningful relief, if it succeeds on the merits, by preventing the difficulty of splitting up operations that have become commingled. *Whole Foods,* 548 F.3d at 1034 ("[E]ven with the considerable flexibility of equitable relief, the difficulty of 'unscrambl[ing] merged assets' often precludes 'an effective order of divestiture' " (citation omitted)); *FTC v. Libbey, Inc.,* 211 F.Supp.2d 34 (D.D.C.2002) ("Preserving the status quo so that meaningful relief will be available to the FTC, is another equity that weighs in favor of issuing the preliminary injunction. 'Unscrambling the eggs' after the fact may not be a realistic option in [the] case." (citations omitted)); *FTC v. Ill. Cereal Mills, Inc.,* 691 F.Supp. 1131, 1146 (N.D.Ill.1988) ("This persistent problem [of unscrambling assets] has been long recognized by courts, and is the underlying reason for the Commission's authority to seek preliminary relief under Section 13(b) of the FTC Act.").

 **\*61** 44. Another principal reason for preliminary relief is to prevent interim harm to consumers while the merits trial and any appeals are underway, even if a suitable divestiture remedy could later be devised. *Bass Bros.,* No. C84–1304,

1984 U.S. Dist. LEXIS 16122, at \*70 (failure to halt illegal acquisitions causes interim harm and "later remedies cannot remove retroactively the harm that has already occurred.").

45. Accordingly, and for the reasons stated above, the FTC's Motion for Preliminary Injunction (Doc. No. 4) is hereby Granted.

46. The parties are to abide by terms of the current Hold Separate Agreement until either (1) the completion of all legal proceedings by the Commission challenging the Acquisition, including all appeals, or (2) further order of the Court, including upon the request of the Commission before completion of such legal proceedings.

47. The Court envisions a relatively short stay of the completion of the relationship between Plaintiffs and SLH, pursuant to the HSA of August 2010. Toward that end, if the FTC has not completed actions before it by November 30, 2011, this Court will entertain taking additional steps to insure that all parties are treated fairly and expeditiously.

IT IS SO ORDERED.

## All Citations

Not Reported in F.Supp.2d, 2011 WL 1219281, 2011-1 Trade Cases P 77,395

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 4999901
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

UNITED STATES of America, et al., Plaintiffs,
v.
GOOGLE LLC, Defendant.
State of Colorado, et al., Plaintiffs,
v.
Google LLC, Defendant.

Case No. 20-cv-3010 (APM),
Case No. 20-cv-3715 (APM)
|
Signed August 3, 2023
|
Filed August 4, 2023

**Synopsis**

**Background:** United States and attorneys general of 38 states brought separate actions against operator of internet search engine, alleging operator unlawfully maintained monopolies through exclusionary practices in various markets in violation of the Sherman Act. Actions were consolidated, and operator filed motions for summary judgment as to all claims in both cases.

**Holdings:** The District Court, Amit P. Mehta, J., held that:

operator failed to establish its entitlement to judgment as matter of law on basis that its user agreements were not de facto exclusive;

operator failed to establish its entitlement to judgment as matter of law on basis that its user agreements were not anticompetitive;

operator failed to establish its entitlement to judgment as matter of law on basis that its mobile application distribution agreements were not exclusive contracts;

fact issue remained whether operator's agreements with browser developers and original equipment manufacturers substantially foreclosed substantial part of markets;

operator's restriction of visibility of search results for companies focused on niche markets and data requirements did not have anticompetitive effect;

fact issue remained whether operator's proprietary search engine marketing tool had anticompetitive effects; but

operator's decisions regarding which applications to develop on open-source or proprietary basis did not have anticompetitive effect.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion for Summary Judgment.

**MEMORANDUM OPINION**

Amit P. Mehta, United States District Judge

**I. INTRODUCTION**

**\*1** Google LLC operates the largest Internet general search engine in the United States. Its brand name has become so ubiquitous that dictionaries recognize it as a verb. [1]

[1]     *See, e.g., Google*, DICTIONARY.COM, https://www.dictionary.com/browse/google (last visited July 31, 2023) ("to search the internet for information about (a person, topic, etc.)"); *Google*, OXFORD ENGLISH DICTIONARY, https://www.oed.com/dictionary/google_v2?tab=meaning_and_use#10568538 (last visited July 31, 2023) ("To use the Google search engine to find information on the internet."); *Google*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/google (last visited July 31, 2023) ("to use the Google search engine to obtain information about (someone or something) on the World Wide Web.").

A Google search can be performed in a variety of ways—through (1) web browsers, like Apple's Safari, Microsoft's Edge, Mozilla's Firefox, and Google's Chrome; (2) search widgets that appear on the face of Android devices; (3) the Google Search application, available through various app stores; and (4) Google's webpage. Users can search using Google on a host of devices, including personal

computers, mobile phones, tablets, and Internet-of-Things ("IoT") devices such as smart speakers, home appliances, and cars.

There are other search engines, of course: Microsoft's Bing, Yahoo!, and DuckDuckGo, to name a few. But their market penetration pales in comparison to Google's. In 2020, Google's share of the U.S. general search services market was nearly 90%, and even higher on mobile devices. The market share of Google's closest competitor, Bing, was roughly 6%.

Google, like most search engines, generates revenue from digital advertising. Digital advertising is incredibly lucrative. Advertisers spend over $80 billion annually just to reach general search users (and billions more on other forms of digital advertising). Not surprisingly, because of its large market share in general search services, Google also holds a superior market position in various search-related advertising markets.

A dominant firm like Google does not violate the law, however, merely because it occupies a monopoly market position. It must act in a manner that produces anticompetitive effects in the defined markets. That is, a company with monopoly power acts unlawfully only when its conduct stifles competition.

In these consolidated cases, the United States and the Attorneys General of 38 states have accused Google of doing just that. They contend that Google has violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by unlawfully maintaining monopolies through exclusionary practices in four relevant markets. The United States and Attorneys General jointly allege anticompetitive conduct in the markets for (1) general search services and (2) general search text advertising. The United States identifies another relevant market for (3) search advertising, and the Attorneys General assert one more, (4) general search advertising. [2]

[2]      The relevant markets are discussed in Section III.A.

**\*2** Both sets of plaintiffs allege that Google has unlawfully maintained its monopoly power through a set of exclusive contracts. These agreements make Google the default search engine on a range of products in exchange for a share of the advertising revenue generated by searches run on Google. Google has such agreements with (1) web browser developers, most notably Apple and Mozilla, and (2) original equipment manufacturers (like Samsung) and

wireless carriers (like Verizon) who sell Android devices. So, for example, when a purchaser buys a new iPad, Google will be the out-of-the-box default search engine on Apple's Safari web browser. Similarly, if a user prefers Android devices, the search widget that appears on the home screen typically is preloaded with Google's search engine. Occupying the default search engine position on these products, Plaintiffs contend, is exclusionary conduct that unlawfully prevents Google's rivals from effectively competing in the relevant markets.

The Attorneys General also charge Google with two other forms of anticompetitive conduct, which they contend reinforce Google's monopolies. First, the Attorneys General claim that Google's conduct has weakened Specialized Vertical Providers ("SVPs"), which are companies focused on niche markets—like Expedia or Tripadvisor for travel, OpenTable for restaurant reservations, and Amazon or eBay for shopping. Google has harmed SVPs, the Attorneys General allege, by (1) limiting the visibility of SVPs on Google's Search Engine Results Page, and (2) demanding that SVPs make their data available to Google on terms no less favorable than it does to others. The weakening of SVPs, the Attorneys General say, harms competition in the general search and general search-related advertising markets.

Second, the Attorneys General claim that Google uses its proprietary search engine marketing tool—SA360—to thwart competition. Buyers use SA360 to purchase digital advertisements across multiple platforms, including on Google (through Google Ads) and its closest rival Bing (through Microsoft Ads). The Attorneys General accuse Google of harming competition by delaying the implementation of various SA360 product features for Microsoft Ads that have long been available for Google Ads, thus harming Microsoft's ability to compete.

Before the court are Google's motions for summary judgment as to all claims in both cases. At this stage, Google is not contesting the markets as Plaintiffs have defined them. Nor does it dispute that it possesses monopoly power in those markets. What Google challenges is the accusation that its alleged conduct has harmed competition in the relevant markets.

After having considered the parties' briefing and the extensive record, and for the reasons explained below, the court grants Google's motions in part and denies them in part. With respect to the complaint filed by the United States, and joined by the Attorneys General, the court

denies summary judgment as to the claim that Google's alleged exclusive dealing arrangements violate Section 2 of the Sherman Act. There remain genuine disputes of material fact that warrant a trial. Google's motion is granted, however, insofar as the United States' claims rest on (1) Google's Android Compatibility Commitments and Anti-Fragmentation Agreements; (2) Google's agreements relating to Google Assistant and IoT devices; and (3) Google's management of its Android Open Source Project. Plaintiffs have not offered any opposition as to those three parts of their claims.

As for the Attorneys General's additional claims, the court grants judgment in favor of Google insofar as those claims rely on Google's alleged weakening of SVPs. With respect to those allegations, Plaintiffs have not demonstrated the requisite anticompetitive effect in the relevant markets to make out a Section 2 *prima facie* case. However, there remains a genuine dispute of material fact with regard to the anticompetitive effect of Google's disparate development of SA360's ad-buying features. Summary judgment is therefore denied as to that part of the Attorneys General's claims.

## II. PROCEDURAL HISTORY

**\*3** On October 20, 2020, the United States Department of Justice ("DOJ") and the Attorneys General of eleven states [3] (collectively, "DOJ Plaintiffs") filed a complaint ("DOJ Action") against Google asserting violations of Section 2 of the Sherman Act. DOJ Compl., ECF No. 1. The DOJ Plaintiffs accused Google of unlawful monopoly maintenance "in the markets for general search services, search advertising, and general search text advertising in the United States through anticompetitive and exclusionary practices." *Id.* at 2. Its Complaint contained three Section 2 claims, each corresponding to one of the alleged markets. *Id.* ¶¶ 173–193.

[3]       The 11 states that initially joined DOJ are Arkansas, Florida, Georgia, Indiana, Kentucky, Louisiana, Mississippi, Missouri, Montana, South Carolina, and Texas. *See* DOJ Compl. at 1–2.

Two months later, the Attorneys General of 38 states and territories, [4] led by the State of Colorado ("Colorado Plaintiffs"), filed a separate complaint ("Colorado Action") against Google alleging unlawful monopoly maintenance in the markets for "general search services, general search text advertising, and general search advertising in the United States." Compl., *Colorado v. Google*, No. 20-cv-3715

(APM) (D.D.C.) [hereinafter *Colorado* Docket], ECF No. 3 [hereinafter Colorado Compl.], ¶ 1. The Colorado Action incorporated "[t]he search advertising market defined in the DOJ Complaint" and the claims made by the DOJ Plaintiffs, *id.* at 22 n.3, and "allege[d] additional facts demonstrating a broader pattern of Google's anticompetitive conduct," *id.* ¶ 58. The Colorado Plaintiffs also asserted three Section 2 claims, each corresponding to one of the alleged markets. *Id.* ¶¶ 212–232.

[4]       The 38 states and territories in the Colorado Action are Colorado, Nebraska, Arizona, Iowa, New York, North Carolina, Tennessee, Utah, Alaska, Connecticut, Delaware, the District of Columbia, Guam, Hawaii, Idaho, Illinois, Kansas, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Dakota, Vermont, Virginia, Washington, West Virginia, and Wyoming. Colorado Compl. at 4–5.

On January 7, 2021, the court consolidated the two cases under Federal Rule of Civil Procedure 42(a) "for pretrial purposes, including discovery and related proceedings." Order Granting in Part and Denying in Part Pls.' Mot. to Consolidate, *Colorado* Docket, ECF No. 67, at 1; *see* FED. R. CIV. P. 42(a)(1). On January 15, 2021, the DOJ Plaintiffs filed an Amended Complaint, adding California, Michigan, and Wisconsin as plaintiffs. DOJ Am. Compl., ECF No. 94, at 2.

After a rigorous period of discovery, Google moved for summary judgment as to all claims in both cases. Def.'s Mot. Summ. J., ECF No. 421 (DOJ Action); Def.'s Mot. for Summ. J., ECF No. 426 (Colorado Action).

## III. BACKGROUND

The following recitation of background facts is largely undisputed by the parties.

### A. Relevant Markets

*General Search Services.* The general search services market consists of "general search engines, which are 'one-stop shops' consumers can use to search the internet for answers to a wide range of queries." Pls.' Mem. in Opp'n to Def.'s Mot., ECF No. 476 [hereinafter DOJ Opp'n], Pls.' Ctstmt. of Mat. Facts, ECF No. 476-2 [hereinafter DOJ CSMF], ¶ 400.

Google and Bing are the two leading general search engines in the United States. Smaller players in the market include Yahoo!, DuckDuckGo, Brave, Ecosia, and Neeva. *Id.* ¶ 405.

**\*4** *General Search Text Advertising.* The general search text advertising market is a subset of the general search advertising market described below. It consists of a specific type of advertisement sold by general search engines that are "typically placed just above or below the organic search results on a Search Engine Results Page ("SERP"), and resemble the organic results that appear on a general search engine's SERP, with a subtle notation that they are 'ads' or 'sponsored.' " DOJ Am. Compl. ¶ 101. Figure 1 is an example of a general search text ad.

Ad · www.toboot.com/ ▾
**To Boot New York - Handcrafted Men's Dress Shoes**
Look Your **Best** With Our Handcrafted **Shoes**, Boots, And Sneakers. Free Shipping Available. Dress Up With Our Handcrafted **Shoes**, Boots, And Sneakers. Free Shipping On All Orders.

**Figure 1**

*General Search Advertising.* The general search advertising market includes all advertisements sold "by a general search engine in connection with a general search query." Colorado Compl. ¶ 82. Only the Colorado Plaintiffs allege unlawful monopoly maintenance in this market. *Id.* ¶ 59.

The general search advertising market encompasses not only search text ads, but other types of ads that appear on Google's SERP, such as "vertically-focused search ads" and "universals." Pl. States' Mem. in Opp'n to Def.'s Mot., ECF No. 465, Pl. States' Stmt. of Mat. Facts as to Which There is No Genuine Issue, ECF No. 465-1 [hereinafter Colorado SMF], ¶¶ 23–26. Vertically focused search ads include product listings, local search ads, and hotel ads. *Id.* ¶ 25. Google also has universals for hotels, flights, shopping, and vacation rentals, to name a few. *Id.* ¶ 26. Figure 2 illustrates the different types of general search ads.



**Figure 2**

"Google has also developed its own specialized vertical sites that are separate but reachable from the SERP, such as immersive and business listing ... pages." *Id.* ¶ 27. An immersive page can be reached by clicking on the search universal. *Id.* ¶ 29. An example of a Google immersive page for a hotel search in New York City is included below as Figure 3.



**Figure 3**

*Search Advertising.* "The search advertising market consists of all types of ads generated in response to online search queries, including general search text ads (offered by general search engines such as Google and Bing) and other, specialized search ads (offered by general search engines and specialized search providers such as Amazon, Expedia, or Yelp)." DOJ Am. Compl. ¶ 97; *see also* DOJ CSMF ¶ 413 ("There is a search ads market that consists of advertising that is displayed on the SERP that general or specialized search engines return in response to consumer real-time queries."). Only the DOJ Plaintiffs allege that Google unlawfully monopolizes the search advertising market. DOJ Am. Compl. ¶ 108; Colorado Compl. ¶¶ 59–89.

### B. Distribution Agreements

Both the DOJ Plaintiffs and Colorado Plaintiffs contend that "Google has unlawfully maintained its monopolies by implementing and enforcing a series of exclusionary agreements with distributors over at least the last decade." DOJ Am. Compl. ¶ 112; Colorado Compl. ¶ 58. Plaintiffs [5] take issue with two types of contracts: Browser Agreements and Android Agreements. The court provides a brief summary of these agreements before discussing them in detail.

[5]     References to "Plaintiffs" when discussing the Distribution Agreements in Section III.B. and V.A. refer to both the DOJ Plaintiffs and the

Colorado Plaintiffs. References to "Plaintiffs" when discussing allegations in the Colorado Action in Section III.C. and V.B refer to the Colorado Plaintiffs only.

Browser Agreements are between Google and web browser developers, primarily Apple and Mozilla. Under these arrangements, the developers have agreed to make Google the default search engine for all search access points on their browsers in exchange for a share of the search advertising revenue generated by Google. The Browser Agreements do not, however, prohibit a user from changing the default to a different search engine. So, a user who types a query into Safari's integrated search bar will search the Internet using Google, unless the user changes the default setting. The same is true on Firefox.

**\*5**  Android Agreements are between Google and original equipment manufacturers ("OEMs") of Android devices, like Samsung, or phone carriers that sell Android devices, like Verizon. These contracts—there are two—(1) require OEMs that choose to pre-install any of Google's proprietary apps to pre-install 11 Google apps (including Google Search and Chrome) and place the Google search widget on the device's home screen; and (2) as part of a separate revenue share agreement, prohibit OEMs and carriers from preinstalling or otherwise promoting an alternative general search engine. As a result of these agreements, an Android device user that enters a search query on a new device will default to Google, unless the user first changes that setting.

### 1. Browser Agreements

Web browsers, like Apple's Safari and Mozilla's Firefox, have built-in search access points that automatically route user queries to a default search engine. In Plaintiffs' view, "[b]eing the preset default search engine for a search access point on a preinstalled and prominently placed app is the most efficient and effective way for a search engine to reach users." DOJ CSMF ¶ 445.

*Apple.* In 2005, Google and Apple entered into an agreement where, [Redacted] Def.'s Stmt. of Mat. Facts as to Which There is No Genuine Issue in Supp. of Mot., ECF No. 423 [hereinafter Google DOJ SMF], ¶ 14; *see* Google 429 Exs., [6] ECF No. 429, Ex. 7, ECF No. 429-7 [hereinafter Apple Agreement]. Importantly, Safari is the only web browser that is pre-installed on Apple devices. *See* Google 429 Exs., Ex.

2, ECF No. 429-2, at 126:3–17. Thus, under the Browser Agreement with Apple, [Redacted] Apple Agreement at 4. [7] [Redacted] Def.'s Mem. of P. & A. in Supp. of Def.'s Mot. for Summ. J., ECF No. 422 [hereinafter Google DOJ Mot.], at 9. [Redacted] *Id.*

[6]  Citations to "Google 429 Exs." refer to Google's exhibits filed under ECF No. 429. Similarly, citations to "Colorado 470 Exs." refers to Colorado Plaintiffs' exhibits filed under ECF No. 470. This citing convention will be used for exhibits throughout the Memorandum Opinion.

[7]  ECF pagination is used for all exhibits.

*Mozilla.* The year before it entered into a browser agreement with Apple, Google reached a similar agreement with Mozilla. Under that contract, [Redacted] Google DOJ Mot. at 14; Google DOJ SMF ¶ 109; Google 430 Exs., ECF No. 430, Ex. 32, ECF No. 430-7. In 2014, Mozilla decided to change the default search engine on its Firefox web browser in the United States from Google Search to Yahoo!. *See* Google 430 Exs., Ex. 31, ECF No. 430-6, at 69:12–19. Two years later it switched back to Google. *Id.*, Ex. 39, ECF No. 430-14. As with Google's agreements with Apple, the contract with Mozilla did "not limit or preclude" users from changing the default search engine. *Id.* at 3.

*Smaller Web Browser Developers.* Google also has agreements with two smaller browser developers, Opera and UCWeb, which "provide revenue-share payments in exchange for being the default search engine upon first use, without preventing the promotion of rival search services or user's ability ... to change the default." Google DOJ Mot. at 18–19.

### 2. Android Agreements: MADAs and RSAs

The Android Operating System ("Android OS") is a mobile phone operating system that Google acquired in 2005. DOJ CSMF ¶ 570. It is now the "second most widely used mobile phone operating system in the U.S." behind Apple's iOS. Google DOJ SMF ¶ 198. Unlike iOS, which can only be used on Apple devices, Android OS is open source, meaning that numerous OEMs can use Android OS on their smartphones and other devices. *Id.* ¶ 199. In the United States, "consumers purchase Android devices directly from OEMs (such as

Samsung or Motorola) as well as from carriers (such as Verizon or AT&T)." *Id.* ¶ 223.

**\*6**  The DOJ and Colorado Plaintiffs take issue with two types of agreements between Google and OEMs/carriers—Mobile Application Distribution Agreements ("MADAs") and Revenue Share Agreements ("RSAs").

*MADAs.* Google has entered into MADAs with OEMs, whereby Google provides the OEMs a non-exclusive, royalty-free license to 11 proprietary Google applications. *Id.* ¶¶ 212–13. [8] If an OEM chooses to download any of the proprietary apps, absent an exemption, the OEM must "(i) preload on that device [the 11] applications licensed pursuant to the MADA and (ii) place on the device's default home screen the Google Search widget, the Google Play application, and a folder containing the other MADA applications." *Id.* ¶ 217. Among the 11 applications are the Google Search App and Chrome browser. DOJ CSMF ¶ 584. The MADA prohibits OEMs from "encouraging, teaching, or helping end users to change an Android device's out-of-the-box default settings if Google apps are preinstalled on the device." *Id.* ¶ 585. MADAs do not, however, "restrict an OEM from preloading a search application, widget, or browser provided by a search engine other than Google on any of its devices, including devices on which it chooses to install the MADA applications." DOJ Opp'n, Pls.' Stmt. of Genuine Issues, ECF No. 476-1, [hereinafter DOJ SGI], ¶ 219.

[8]  The 11 applications are Google Search, Google Play Store, Google Chrome, YouTube, Google Maps, Gmail, Google Photos, YouTube Music, Google Duo, Google Drive, and Google Play Movies and TV. DOJ 480 Exs., ECF No. 480, Ex. 160, ECF No. 480-12, at 21.

*RSAs.* Under its RSAs with "carriers and OEMs, Google makes monthly payments to the counterparty in exchange for Google being (1) the exclusive general search engine preinstalled on Android devices covered by the RSA, as well as (2) the search default for all search access points on such devices." DOJ CSMF ¶ 602. That generally includes search access points on non-Chrome browsers. *Id.* ¶ 605. The RSA prohibits the carrier or OEM from preinstalling or otherwise including a search engine substantially similar to Google's. *Id.* ¶ 604. Some RSAs permit the party to earn Google revenue share on a device-by-device basis, [9] [Redacted] *Id.* ¶ 610. OEMs and carriers can choose among multiple tiers that provide varying levels of "promotion" of Google Search.

DOJ SGI ¶ 227. [10] "Except for a small number of Android devices ... the overwhelming majority of Android devices sold in the United States are subject to the search default rules established in Google's RSAs." DOJ CSMF ¶ 611.

[9]  A device-by-device agreement means that Samsung, for example, can have different out-of-the-box configurations under its RSA for the Samsung Galaxy Note20 and Samsung Galaxy S10, if it so chooses.

[10]  For example, [Redacted] Google DOJ SMF ¶ 228.

### C. The Colorado Plaintiffs' Allegations: SVPs and SA360

The Colorado Plaintiffs' claims against Google overlap with the DOJ Plaintiffs' claims with respect to the Browser and Android Agreements, but also involve two additional types of alleged exclusionary conduct. That conduct concerns Specialized Vertical Providers ("SVPs") and Google's development of SA360—Google's search engine marketing tool.

### 1. Specialized Vertical Providers

**\*7**  SVPs are websites or applications that provide search results in a limited number of commercial segments that serve a common group of customers. Colorado SMF ¶ 127. For example, Amazon and Etsy are SVPs that sell products to shoppers, and Expedia and Bookmg.com are SVPs that sell airline, hotel, and car rental reservations. *Id.* ¶ 128. The commercial segments for which SVPs provide search results are referred to as "verticals." *Id.* ¶ 127. So, Amazon and Etsy are part of the "shopping vertical," while Expedia and Booking are part of both the "flight vertical" and "hotel vertical." SVPs differ from general search engines "because of their much narrower commercial focus and because many of them afford users the convenience of completing transactions on their websites, such as purchasing a pair of shoes (Amazon) or reserving a hotel room (Booking)." *Id.* ¶ 129.

*Limited Visibility in Google's SERP.* To understand the Colorado Plaintiffs' theory of how Google's monopoly power affects SVPs, it is critical to understand how Google designs its Search Engine Results Page ("SERP"). Google's SERP includes three types of search results that appear in response to a query: (1) organic web results, which are the blue "plain text hyperlinks to webpages for which Google does not receive any payment, ranked according to relevancy and quality"; (2) search text ads, which look like the organic web results but are actually "paid advertisements relevant to a query that has been entered"; and (3) specialized search results in various commercial segments ("universals" or "verticals"), including " 'vertical' units for certain categories of information." Def.'s Stmt. of Mat. Facts as to Which There is No Genuine Issue in Supp. of Def.'s Mot., ECF No. 428 [hereinafter Google Colorado SMF], ¶¶ 3–5, 8.

The third category, specialized vertical units, refers to results organized around a particular search query. For example, when a user searches for "hotels in Washington, DC," in addition to organic web results and search text ads, Google "offers a hotels unit organized around hotel listings in a specified location in response to the query." *Id.* ¶ 6; *see* Figure 4. "Unlike text ads, vertically-focused search ads look less like algorithmic results and may include photos and information such as prices, customer ratings, and business hours." Colorado SMF ¶ 24. "Google has universals that can appear on its SERP for hotels, flights, shopping, and vacation rentals, among others." *Id.* ¶ 26. "Over time, Google has altered its SERP for commercial queries to increasingly display Google's own search universals above the unpaid blue links," and the blue links often appear "below the fold" requiring users to scroll down to see them. *Id.* ¶¶ 33–34.



Figure 4

Plaintiffs take issue with Google's imposition of "visibility restrictions on SVPs" in certain commercial segments. Errata Pl. States Mem. in Opp'n to Def.'s Mot., ECF No. 491 [hereinafter Colorado Opp'n], at 18. For example, "SVPs cannot appear in results in the free listings in Google's hotel universal, flights universal, or in the local universal triggered by searches for nearby businesses" and "cannot purchase ads in their own name" or "appear prominently in the tile of local services ads on Google's SERP." *Id.*; *see* Figure 4. However, SVPs can and do appear in other universals, like vacation

rentals. Colorado SMF ¶ 154; *see* Figure 5 (listing SVPs Vio.com, Evolve, and Sojourn).



**Figure 5**

*Data-acquisition Agreements.* The Colorado Plaintiffs' allegations concerning SVPs also center on how Google obtains data from them. Google collects information in two primary ways: (1) "by crawling and indexing websites throughout the internet," Colorado SMF ¶ 6, and (2) by acquiring "structured data" (such as flight availability on a given day or a restaurant's hours of operation) from third parties, information that "is not otherwise available through Google's internet crawling and indexing." *Id.* ¶¶ 7, 173.

**\*8** Google acquires "structured data" from SVPs. "[A]s a condition of participating in its vertically-focused search advertising, Google requires certain SVPs to provide access to their data." *Id.* ¶ 175. "Google uses SVP data for its own purposes in its hotels, flights, and local universals, in local services ads, and in the hotel and flights immersive pages." *Id.* ¶ 180. SVPs who share data with Google are not restricted from providing that same data to Google's rivals. *Id.* ¶ 183. However, SVPs are required to give Google "data equivalent to any competitor." *Id.*

### 2. SA360

The Colorado Plaintiffs' claims also concern Google's development and use of its search engine marketing ("SEM") tool, SA360. Advertisers can purchase online advertisements in a variety of ways. The three most notable are: (1) directly from online content publishers, like *The New York Times*, (2) directly from online platforms like Google, Amazon, Facebook, and Microsoft through "native tools" or "interface tools," and (3) through an SEM tool. *See* Google Colorado SMF ¶ 243. Native advertising tools allow advertisers to place ads directly on a single general search engine or platform. Colorado SMF ¶ 75. For example, an advertiser

could use Google's native tool—Google Ads—to place an ad on Google, and Microsoft's native tool—Microsoft Ads—to place an ad on Bing. *Id.* Alternatively, advertisers can use SEM tools, which "allow advertisers to plan and manage search advertising campaigns across multiple" general search engines. *Id.* ¶ 76.

"SEM tools are popular because they save advertisers time and effort by allowing them to use a single product to manage and compare ad campaigns across multiple native tools, evaluate the relative performance of ad campaigns across multiple platforms, and use powerful tools to assist with ad placement and bidding strategies." *Id.* ¶ 81. Google's SEM tool—SA360—is the most used SEM tool, accounting for [Redacted] of general search ad revenue among ads placed through SEM tools. *Id.* ¶ 80. Rival SEM tools include Skai, Marin, and Adobe. Google Colorado SMF ¶ 253.[11] "When an advertiser places ads through an SEM tool, including SA360, the tool earns a commission on the dollar it manages." Colorado SMF ¶ 78.

[11]    SA360 allows advertisers to place ads across multiple search engines, including Google, Bing, Yahoo! Japan, and Baidu. Google Colorado SMF ¶ 252. Some SEM tools like Skai, Marin, and Adobe "allow advertisers to buy ads on search engines, social media, and other sites, and, unlike SA360, integrate not just with search engines like Google and Bing, but also with sites like Amazon, Facebook, Twitter, and Pinterest." Google Colorado Mot. at 13; Google Colorado SMF ¶ 254.

*Feature Parity.* SEM tools offer various features that make ad buying campaigns more efficient, such as "language targeting" and "location search specific targeting." Google 436 Exs., ECF No. 436, Ex. 87, ECF No. 436-7 at 5 [hereinafter Google Ex. 87]. Historically, SA360 has supported more features on Google Ads than Microsoft Ads, meaning users of SA360 could buy ads more efficiently on Google Ads than Microsoft Ads. Colorado SMF ¶¶ 117, 125. The absence of "feature parity"—which "refers to parity between Google Ads features and Microsoft Ads features offered by SA360," Google Colorado SMF ¶ 268—is not unique amongst SEM tools. "SA360, Marin, Skai, and Adobe offer differing levels of support for Microsoft Ads and other ad platforms." *Id.* ¶ 250.

In November 2019, [Redacted] *Id.* Plaintiffs' Complaint identifies five [Redacted] SA360 features that "Google either delayed support for, or failed to support: auction-time bidding, call extensions, dynamic search ads, responsive search ads, and local inventory ads." Google Colorado SMF ¶ 272; *see also* Colorado Compl. ¶¶ 152, 160.

**\*9**  A new version of SA360 launched in February 2022, less than two years after Plaintiffs filed the instant complaint. Google Colorado SMF ¶ 291. The new version supported four of the five features for Microsoft Ads that Plaintiffs had identified as lacking: "call extensions, dynamic search ads, responsive search ads, and local inventory ads." *Id.* Google began working on developing the fifth feature—auction-time bidding—in early 2021, and it "is currently in the testing phase." Google Colorado SMF ¶ 308–09; Hr'g Tr., ECF No. 580, at 180:15–181:18 (counsel for the Colorado Plaintiffs conceding that "it is undisputed that Google is going to install the very auction time bidding that [Plaintiffs] have complained" of).

## IV. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *FED. R. CIV. P. 56*. A material fact is one that is capable of affecting the outcome of the litigation, and a genuine dispute exists when "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. The party seeking summary judgment must demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)*. When determining whether a genuine issue of material fact exists, the trier of fact must view all facts, and reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)*.

### B. Monopolization: *Microsoft* Burden-Shifting Framework

Section 2 of the Sherman Act makes it unlawful for a person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons[ ] to monopolize any part of the trade or commerce among the several States." *15 U.S.C. § 2*. The offense of monopolization has two elements: (1) "the possession of monopoly power in the relevant market" and (2) "the willful acquisition or maintenance of that power" through "exclusionary conduct 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.' " *United States v. Microsoft Corp., 253 F.3d 34, 50, 58 (D.C. Cir. 2001)* (per curiam) (internal quotation marks omitted) (quoting *United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)*). For purposes of summary judgment, Google does not contest element one—monopoly power in the relevant markets. Hr'g Tr. at 6:11–12. The sole issue for the court to resolve is whether Google has maintained monopoly power in the relevant markets through "exclusionary conduct" as opposed to procompetitive means. *Microsoft*, 253 F.3d at 58.

The D.C. Circuit in *Microsoft* established a burden-shifting framework for determining "[w]hether any particular act of a monopolist is exclusionary, rather than merely a form of vigorous competition." *Id.* First, the plaintiff bears the burden of establishing a *prima facie* case that the monopolist's conduct has an "anticompetitive effect." *Id.* at 58–59. "That is, [the alleged conduct] must harm the competitive *process* and thereby harm consumers. In contrast, harm to one or more competitors will not suffice." *Id.* at 58; *id.* at 59 (stating that the plaintiff "must demonstrate that the monopolist's conduct harmed competition, not just a competitor").

Second, "if a plaintiff successfully establishes a *prima facie* case under *§ 2* by demonstrating anticompetitive effect, then the monopolist may proffer a 'procompetitive justification' for its conduct." *Id.* Conduct is procompetitive if it "is indeed a form of competition on the merits because it involves, for example, greater efficiency or enhanced consumer appeal." *Id.* If the defendant offers a procompetitive justification, the burden shifts back to the plaintiff to rebut it. *Id.*

**\*10**  Finally, "if the monopolist's procompetitive justification stands unrebutted, then the plaintiff must demonstrate that the anticompetitive harm of the conduct outweighs the procompetitive benefit." *Id.* In carrying out this balancing, which resembles a "rule of reason" analysis, courts must focus "upon the effect of [the] conduct, not upon the intent behind it." *Id.* Evidence of intent is relevant only insofar as it bears on the "likely effect of the monopolist's conduct." *Id.*

Google's motion for summary judgment targets the first step of the burden-shifting framework. Hr'g Tr. at 13:6–12.

United States v. Google LLC, --- F.Supp.3d ---- (2023)

In other words, it has not asked the court to evaluate the procompetitive justification for its alleged conduct nor rule that any procompetitive benefit outweighs the anticompetitive harm. Its argument is simply that "plaintiffs have not made out their *prima facie* case." *Id.*

Though the *Microsoft* burden-shifting framework would seem straightforward, the parties disagree on precisely how to apply it. They contest two points: (1) the constituent elements of the *prima facie* case, and (2) whether the challenged conduct should be considered in the aggregate or independently. The court addresses each in turn.

*1. Prima Facie Case*

The parties disagree about what the *prima facie* case entails. Google contends that establishing a *prima facie* case is a "two-step process." *Id.* at 14:19–25. First, Plaintiffs must show that the conduct is by nature anticompetitive, as opposed to conduct that is "competition on the merits." *Id.* Second, Plaintiffs must proffer evidence of substantial anticompetitive effects in the relevant market. *Id.* Plaintiffs disagree with Google's bifurcation of the *prima facie* burden. *Id.* at 50:3–51:5. In their view, establishing a *prima facie* case is a one-step inquiry that considers only whether the conduct at issue has an anticompetitive effect in the relevant market. *Id.*

Despite their apparent differences, there is not much daylight between the parties on what the *prima facie* showing requires. All parties agree that there are categories of conduct that generally do not harm competition. *Id.* at 51:1–22 (DOJ counsel agreeing that "[t]here are certain things that generally don't harm competition" like "cutting your price or improving your product," and "[s]ome conduct is generally not problematic"); Def.'s Mem. of P. &. A in Supp. of Def.'s Mot., ECF No. 427 [hereinafter Google Colorado Mot.], at 20 ("[I]f a product design change improves a product, the conduct reflects 'competition on the merits,' and cannot [standing alone] form the basis for an antitrust violation."). Where they part ways is that Plaintiffs contend that even conduct that is typically thought of as competition on the merits still could be anticompetitive depending on the circumstances. *See* Hr'g Tr. at 51:15–22. For example, price cutting, though ordinarily procompetitive, can be anticompetitive if done for a predatory purpose. So, Plaintiffs say, the court must determine whether there are anticompetitive effects regardless of the "nature" of the conduct.

Whether conceived as a one-step or two-step inquiry, the *prima face* case boils down to one fundamental question: Has the plaintiff shown that the monopolist's conduct harmed competition? Plaintiffs are not required to make a further showing that the challenged conduct by its nature is anticompetitive.

*2. Individual v. Aggregation of Harm*

The parties' more significant disagreement is over how the court should go about determining whether Google's "conduct indeed has the requisite anticompetitive effect." *Microsoft,* 253 F.3d at 58–59. Google maintains that the court should not "consider[ ] the challenged conduct in the aggregate without first considering whether each category of conduct is exclusionary and in fact has some anticompetitive effect on its own." Reply in Supp. of Def.'s Mot., ECF No. 523 [hereinafter Google Colorado Reply], at 6.

**\*11** Plaintiffs take a different view. They insist that "anticompetitive effects are analyzed contextually, not through the formalistic granularity proposed by Google." DOJ Opp'n at 17. Plaintiffs ask the court to instead aggregate the anticompetitive effects of Google's conduct —including conduct that is not anticompetitive on its own —when determining whether the conduct has an overall anticompetitive effect. *See id.* at 20 n.10 ("Google's agreements are anticompetitive when the effects of each type of agreement are viewed in light of each other and cumulatively. They are mutually reinforcing, not discrete acts that should be 'isolatedly viewed.' ") (internal citations omitted); Colorado Opp'n at 24 ("Google wants to rewrite the States' Complaint to assert three independent claims, thus sidestepping and leaving unchallenged the States' assertion that the totality of conduct harms competition."); Hr'g Tr. at 52:18–53:25 (DOJ Plaintiffs' counsel asserting in response to a hypothetical that the court *would* be required to consider the Apple Browser Agreement in assessing anticompetitive effect, even if the court were to conclude that the agreement on its own is not anticompetitive).

The Colorado Plaintiffs, in particular, insist that their SA360 and SVP allegations cannot be viewed independently of each other or the exclusive distribution agreements. "[T]aken together," they assert, "Google's SA360 and SVP tactics weaken its rivals, amplifying Google's ability to secure

United States v. Google LLC, --- F.Supp.3d ---- (2023)

distribution agreements, and creating [a] monopoly feedback loop." Colorado Opp'n at 27.

Not surprisingly then, the parties offer different interpretations of how the D.C. Circuit measured anticompetitive harm in *Microsoft*. Plaintiffs contend that "the *Microsoft* Court illustrated in its careful review of the multiple forms of conduct" that trial courts must conduct "a fact-intensive inquiry that considers whether 'the monopolist's conduct on balance harms competition.' " *Id.* at 22 (quoting *Microsoft*, 253 F.3d at 59). *Microsoft* "analyzed five forms of conduct that together constituted the offense of monopoly maintenance under Section 2 of the Sherman Act," and "[i]n assessing liability, the Court examined the interaction among different contracts and categories of conduct." *Id.* at 21–22. In Plaintiffs' view, "the D.C. Circuit did not analyze each of Microsoft's acts in isolation; instead, it examined them in light of each other" and "in light of market realities, including the role that scale played in reinforcing [Microsoft's] operating systems monopoly." DOJ Opp'n at 17–18. As an example, Plaintiffs point to the court's analysis of Microsoft's agreements with independent software vendors (ISVs). *Id.* at 17. ISVs represented "a relatively small channel for browser distribution" but Microsoft's agreements with ISVs were nevertheless found anticompetitive because "Microsoft had largely foreclosed the two primary channels [for browser distribution] to its rivals," *Microsoft*, 253 F.3d at 72, and thus "the anticompetitive effect of the ISV agreements took on 'greater significance' " and "amplified the effect that Microsoft's conduct had on distorting the competitive process," DOJ Opp'n at 17–18 (quoting *Microsoft*, 253 F.3d at 72). [12]

[12]    In *Microsoft*, the trial court had found that Microsoft, through various anticompetitive means, had maintained its monopoly in personal computer operating systems (Windows) by suppressing competition with Netscape's Navigator web browser. *See* 253 F.3d at 50. Among other things, Microsoft sought to block distribution channels for Navigator through various agreements. The most cost-effective of those were exclusive agreements with OEMs to install Microsoft's Internet Explorer as the default web browser. *Id.* at 60. The second prominent agreement involved bundling its browser with internet access software distributed by Internet Access Providers, like America Online. *See id.* at 67–68. These two exclusionary arrangements "largely foreclosed the two primary

channels [of distribution] to its rivals." *Id.* at 72. The third, and smallest, of the distribution channels was through ISVs. *Id.* It is in this context that the court held the exclusive arrangements with ISVs "amplified" Microsoft's monopoly power. *Id.*

**\*12**    Google responds that "the *Microsoft* court did not, as Plaintiffs do here, lump together both exclusionary and non-exclusionary conduct in assessing whether there was an anticompetitive effect," and "expressly *rejected* the approach Plaintiffs urge here." Google Colorado Reply at 6–7. When "assessing whether the [*Microsoft*] plaintiffs had met their *prima facie* burden of showing harm to competition," Google argues, "[t]he court considered only" the particular exclusionary conduct. *Id.* at 7. Google points to the "range of challenged conduct in the [Internet Access Provider (IAP)] distribution channel" and argues that the D.C. Circuit "analyzed the conduct separately to determine whether it was competitive or exclusionary, and effects from competitive acts were thereafter excluded from the analysis." *Id.* at 7.

The court agrees with Google that, under *Microsoft*, courts must evaluate whether each type of alleged exclusionary practice has the requisite anticompetitive effect. In other words, when determining whether plaintiffs have met their *prima facie* burden, courts can only aggregate conduct that is itself deemed anticompetitive (even if only minimally so). This approach is best illustrated, as Google notes, by the D.C. Circuit's evaluation of IAP distribution channels in *Microsoft*. The district court had "condemned as exclusionary Microsoft's agreements with various IAPs," and had determined that five challenged "actions" were anticompetitive. *Microsoft*, 253 F.3d at 67–68. On appeal, the Circuit analyzed each of the five actions separately and held that only one—an exclusive dealing arrangement—was anticompetitive. *Id.* at 67–71. And, only as to that conduct did the burden shift to Microsoft "to defend its exclusive dealing contracts with IAPs by providing a procompetitive justification for them." *Id.* at 71. Notably, the Circuit did *not* evaluate whether the practices deemed separately not to violate Section 2 were in fact anticompetitive when viewed alongside the exclusive dealing arrangement. The other four allegations—which the Circuit found did not harm competition—were not considered further. [13]

[13]    The D.C. Circuit's analysis of "course of conduct" liability is also instructive. *Microsoft*, 253 F.3d at 78. Under this theory, a plaintiff must "point to any series of acts, each of which *harms competition*

USAP246

*only slightly* but the cumulative effect of which is significant enough to form an independent basis for liability." *Id.* (emphasis added). Thus, even "course of conduct" liability must be premised on forms of conduct that are, at least, "slightly" anticompetitive. *Id. Microsoft* did not suggest that conduct deemed procompetitive could be included in that calculus. The court notes that the Colorado Plaintiffs have eschewed a course-of-conduct theory. *See* Colorado Opp'n at 25 n.9 ("So, there is no need to consider a separate 'course of conduct.' ").

Plaintiffs' reliance on the D.C. Circuit's analysis of Microsoft's agreements with ISVs is misplaced. DOJ Opp'n at 17–18. In those agreements, Microsoft "promised to give preferential support" to ISVs that agreed to, among other things, "use Internet Explorer as the default browsing software." *Microsoft*, 253 F.3d at 71. The D.C. Circuit found that these were "exclusive deals," and when determining "what share of the market for browser distribution the exclusive deals with the ISVs foreclose[d]," the Circuit reasoned that "[a]lthough the ISVs are a relatively small channel for browser distribution, they take on greater significance because, as discussed above, Microsoft had largely foreclosed the two primary channels to its rivals." *Id.* at 72. In other words, the court held that, although the ISV market foreclosure on its own was not significant, the exclusive arrangements with the ISVs were anticompetitive when aggregated with the foreclosure occurring through the two main channels of browser distribution.

**\*13** *Microsoft*'s aggregation of harm—which aggregates *foreclosure* in the exclusive dealing context—is different than what Plaintiffs, most notably the Colorado Plaintiffs, have asked the court to do here. They argue that three different *types* of monopolistic conduct—exclusive distribution agreements, denied or delayed functionality of SA360, and the suppression and exploitation of SVPs—must effectively be viewed as one in order to evaluate harm in the relevant markets. Colorado Opp'n at 25–28. But that is not the approach the *Microsoft* court took, and it is contrary to how other appeals courts generally have proceeded. *See, e.g.,* *Covad Commc'ns Co. v. Bell Atl. Corp.*, 398 F.3d 666, 672 (D.C. Cir. 2005) (evaluating separately "five types of conduct" alleged to have violated the Sherman Act); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th 959, 982 (10th Cir. 2022) (When "[r]eal-world monopolists ... engage in allegedly exclusionary conduct which does not fit within a single paradigm[,] ...

the courts disaggregate the exclusionary conduct into its component parts before applying the relevant law."; "For the sake of accuracy, precision, and analytical clarity, we must evaluate [the defendant's] allegedly exclusionary conduct separately. Only then can we evaluate the evidence in totality to see if any synergistic effect saves [the plaintiff's] case.") (internal quotation marks omitted); *Retractable Techs., v. Becton Dickinson & Co.*, 842 F.3d 883, 891 (5th Cir. 2016) (stating that a jury's finding of anticompetitive conduct that rested on "three types of 'deception' " "must be separately analyzed in light of settled principles of antitrust law").

The Supreme Court's decision in *Continental Ore*, on which the Colorado Plaintiffs rely, is inapposite. Colorado Opp'n at 24. In *Continental Ore*, six defendants were accused of "conspiring to restrain, by monopolizing, and by attempting and conspiring to monopolize, trade and commerce" in the vanadium industry. *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 693, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). The court of appeals had "examined seriatim" the conduct of various defendants and "ruled separately upon [each defendant's] alleged damage to Continental." *Id.* at 698, 82 S.Ct. 1404. The Supreme Court found this analysis "improper," explaining—in language that the Colorado Plaintiffs highlight in their opposition—that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore*, 370 U.S. at 699, 82 S.Ct. 1404; *see* Colorado Opp'n at 24.

But the Colorado Plaintiffs fail to cite both what precedes that quotation—"In cases such as this"—and what follows it—"The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore*, 370 U.S. at 699, 82 S.Ct. 1404 (cleaned up). The full context thus shows that the Court's statement concerned proof of antitrust conspiracy, not, as here, an alleged monopolist's "unilateral conduct." *Eaton Ergonomics, Inc. v. Rsch. In Motion Corp.*, 826 F. Supp. 2d 705, 710 (S.D.N.Y. 2011); *see also Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1366–67 (Fed. Cir. 1999) ("*Continental Ore* did not hold ... that the degrees of support for each legal theory should be added up. Each legal theory must be examined for its sufficiency and applicability, on the entirety of the relevant facts.") (citing *City of Groton v. Conn. Light & Power Co.*, 662 F.2d 921, 929 (2d Cir. 1981) ("Even though many of the issues the municipalities raise are interrelated and interdependent, however, we must,

like the municipalities' briefs, analyze the various issues individually.")).

The other out-of-circuit cases cited by the Colorado Plaintiffs (*Conwood, Actavis*, and *LePage's*) do not instruct otherwise. Colorado Opp'n at 24–25. In *Conwood Company v. United States Tobacco Company*, the Sixth Circuit determined that the defendant "began a systematic effort to exclude competition" and "sought to achieve its goals of excluding competition and competitors' products by numerous avenues." 290 F.3d 768, 783 (6th Cir. 2002). The court evaluated the various kinds of anticompetitive conduct and, in so doing, cited to an earlier Sixth Circuit decision, *Byars v. Bluff City News Co.*, 609 F.2d 843 (6th Cir. 1979). *See Conwood*, 290 F.3d at 784. In *Byars*, the Sixth Circuit observed that, "[i]n a § 2 case, only a thorough analysis of each fact situation will reveal whether the monopolist's conduct is unreasonably anti-competitive and thus unlawful." *Byars*, 609 F.2d at 860.

**\*14** In *New York v. Actavis*, the Second Circuit affirmed that "when a monopolist combines product withdrawal with some other conduct, the overall effect of which is to coerce consumers rather than persuade them on the merits, and to impede competition, its actions are anticompetitive under the Sherman Act." *N.Y. ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 654 (2d Cir. 2015) (internal citations omitted). There, the defendant company had introduced a new product and withdrawn the old one relatively close in time. *Id.* While acknowledging that "neither product withdrawal nor product improvement alone is anticompetitive," the Second Circuit reasoned that the combination of the two created a singular "hard switch" that resulted in anticompetitive effects in the relevant market. *Id.* at 653–54.

And in *LePage's v. 3M*, while the Third Circuit did state that "[t]he relevant inquiry is the anticompetitive effect of 3M's exclusionary practices considered together," it did so only after separately finding that 3M's bundled rebates and exclusive dealing practices were themselves anticompetitive. 324 F.3d 141, 157, 159, 162 (3d Cir. 2003).

None of these cases support the proposition that the court must combine the anticompetitive effects across different types of monopolistic behavior, when deciding whether any particular type of conduct has anticompetitive effects. Rather, the court must "disaggregate the exclusionary conduct into its component parts before applying the relevant law." *EpiPen*, 44 F.4th at 982.

# V. DISCUSSION

## A. Joint Claims: Browser Agreements & Android Agreements

Having established the proper framework, the court first addresses Plaintiffs' allegations concerning Google's Browser Agreements and Android Agreements. Recall, Plaintiffs claim that both agreements are exclusive contracts that foreclose a substantial part of the relevant markets. DOJ Opp'n at 18–19. Google concedes that the Android RSAs are exclusive but contests the exclusive nature of the Browser Agreements and the Android MADAs. Google DOJ Mot. at 26, 39. Additionally, the parties disagree on how to measure "substantial foreclosure" and the extent of foreclosure. Google Reply in Supp. of Google Mot., ECF No. 522, at 22–25. The court first addresses whether the Browser Agreements and MADAs are exclusive or *de facto* exclusive agreements, and then turns to the proper measure of substantial foreclosure.

### 1. Exclusive Dealing

"An exclusive dealing arrangement is an agreement in which a buyer agrees to purchase certain goods or services only from a particular seller for a certain period of time." *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 270 (3d Cir. 2012). "Despite some initial confusion, today exclusive dealing contracts are not disfavored by the antitrust laws." *E. Food Servs., Inc. v. Pontifical Cath. Univ. Servs. Ass'n*, 357 F.3d 1, 8 (1st Cir. 2004). In many circumstances, exclusive dealing contracts are understood to "pose no competitive threat at all." *Id.*; *see also Microsoft*, 253 F.3d at 70 ("[I]mposing upon a firm with market power the risk of an antitrust suit every time it enters into [an exclusive dealing] contract, no matter how small the effect, would create an unacceptable and unjustified burden upon any such firm."). Such contracts, however, "are of special concern when imposed by a monopolist." *ZF Meritor*, 696 F.3d at 271; *Microsoft*, 253 F.3d at 70 (acknowledging that a lower foreclosure rate may give rise to a Section 2 violation by a monopolist). The primary worry is that the monopolist might use such agreements "to strengthen its position, which may ultimately harm competition." *ZF Meritor*, 696 F.3d at 270.

"The legality of [an exclusive] arrangement ultimately depends on whether the agreement foreclosed a substantial share of the relevant market such that competition was

harmed." *Id.* at 283 (citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 326–28, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961)). "The share of the market foreclosed is important because, for the contract to have an adverse effect upon competition, 'the opportunities for other traders to enter into or remain in that market must be significantly limited.' " *Microsoft*, 253 F.3d at 69 (quoting *Tampa Elec.*, 365 U.S. at 328, 81 S.Ct. 623). The D.C. Circuit has not conclusively determined what constitutes substantial foreclosure under § 2 of the Sherman Act, but in *Microsoft* said that "a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Id.* at 70. Plaintiffs "must both define the relevant market and prove the degree of foreclosure." *Id.* at 69.

### a. Browser Agreements

**\*15** Google's Browser Agreements require the developers to set Google as the default search engine on their web browsers but allow end users to change the default. *See e.g.*, Apple Agreement at 4. Still, Plaintiffs contend the agreements constitute exclusive dealing because they make Google "the *de facto* exclusive general search engine." DOJ Am. Compl. ¶ 119. Plaintiffs' argument centers on the "stickiness" of the default position—they argue that "[b]eing the default search engine on a preinstalled and prominently placed app is *by far* the most efficient and effective way for a general search engine to reach users." DOJ Opp'n at 8. "Even where search users might want to switch defaults, the effort and knowledge required to make that change biases them towards sticking with the default option," and "[d]efaults are particularly powerful on mobile devices." *Id.* at 9.

Google responds that their "agreements with browser developers such as Apple and Mozilla are *not* 'exclusive' or '*de facto* exclusive' under any established meaning of those concepts" for two reasons: (1) the agreements "have never prevented [Apple, Mozilla, and other browser developers] from promoting rival search engines to consumers in the same browsers," and (2) web browser developers "have decided to design their browsers with a single search engine set as the default upon first use" and Google simply "supplied a superior product in response to a customer's product design demands." Google DOJ Mot. at 26–27. Alternatively, even if the Browser Agreements were exclusive, Google argues that they "are the product of customer-driven 'competition on the

merits,' which antitrust law protects rather than condemns," and therefore could not result in any anticompetitive effect. *Id.* at 27.

*Exclusivity.* The court first addresses Google's argument that the Browser Agreements are not *de facto* exclusive because the agreements do not restrict web browser developers from promoting rival search engines. Google asserts that, "[g]enerally speaking, '[e]xclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor.' " Google DOJ Mot. at 28 (quoting *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 996 (9th Cir. 2010)). Plaintiffs' claims regarding the Browser Agreements "fail at the threshold," Google maintains, "because the contracts indisputably do **not** prevent Apple, Mozilla, or other browser developers from integrating and promoting any other search engine, or users from otherwise accessing search rivals via these browsers." *Id.* In Google's view, "agreements 'are not exclusive dealing arrangements, de facto or actual, *unless they prevent the buyer from purchasing a given good from any other vendor.*' " *Id.* (quoting *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1004 (9th Cir. 2020)). "Apple and Mozilla not only are permitted to promote other search engines under the terms of their agreements with Google, but **actually do** promote rival search engines in Safari and Firefox in exchange for revenue-share payments from those rivals." *Id.* at 28–29. Furthermore, they "have **no** obligation to ensure that any particular volume of search traffic flows to Google, and the revenue share percentage that Google pays does **not** vary based on the number or percentage of queries submitted to Google instead of rival search engines." *Id.* at 30.

Plaintiffs respond that "an agreement need not close off *all* channels of distribution to be considered exclusive." DOJ Opp'n at 45. In Plaintiffs' view, the Browser Agreement with Apple is "exclusive because it requires Apple to make Google the preset default search engine on the only preinstalled search access point on its devices—the address bar in Safari —[Redacted] and [Redacted] *Id.* at 44. Google's Browser Agreements with browser developers Mozilla, Opera, and UCWeb—"which require [them] to make Google the preset default search engine [on their browsers] and cover nearly all search access points on nearly all versions of third-party browsers in the United States"—are also *de facto* exclusive for the same reason. *Id.* at 47. At a minimum, Plaintiffs contend, "Google's argument that its distribution agreements

are not exclusive ... raises factual disputes about whether these agreements are actually or de facto exclusive." *Id.* at 44.

**\*16** The court finds that there is a genuine dispute of material fact as to whether Google's Browser Agreements are, at least, *de facto* exclusive. Google is, of course, correct that its Browser Agreements do not prevent users from switching the default search engine, and do not prohibit browser developers from promoting and entering into revenue-share agreements with other search engines. In fact, developers have entered into such agreements. *See* Google DOJ SMF ¶ 64. But that is not dispositive. "Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP,* 540 U.S. 398, 411, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). And "[l]egal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law." *Eastman Kodak Co. v. Image Tech. Servs., Inc.,* 504 U.S. 451, 466–67, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992).

The Browser Agreements do lock in Google as the default search engine for years at a time. In the case of Apple products, that means Google is a purchaser's out-of-the-box search engine. That is arguably a form of exclusivity —rivals are prevented from occupying default position in the browser's integrated search bar at the time of purchase. *Cf. Microsoft,* 253 F.3d at 68 (finding that Microsoft's arrangement with AOL that required AOL not to "promote any non-Microsoft browser, nor provide software using any non-Microsoft browser *except at the customer's request*" qualified as an exclusive contract) (emphasis added); [14] *ZF Meritor,* 696 F.3d at 283 ("[W]e decline to adopt [the defendant's] view that a requirements contract covering less than 100% of the buyer's needs can *never* be an unlawful exclusive dealing arrangement.").

[14] The court acknowledges that there are differences between the Browser Agreements and Microsoft's agreement with AOL. The Browser Agreements do not, for example, foreclose the browser developers from entering into promotional arrangements with other search engines. *See e.g.,* Google DOJ SMF ¶ 61. In fact, they permit it. *Id.* ¶ 64 However, the legal significance of that factual distinction is a matter left to resolve after a trial.

Critically, the competitive effects of holding default status, when combined with Google's scale advantage, is a hotly

disputed issue in this case. Even Google's own positions reflect that dispute. *Compare* Redacted Reply in Supp. of Google's Mot., ECF No. 560, Google's Resp. to DOJ CSMF, ECF No. 560-1 [hereinafter Google DOJ CSMF], ¶ 445 (Google denying that "[b]eing the preset default search engine for a search access point on a preinstalled and prominently placed app is the most efficient and effective way for a search engine to reach users."), *with id.* ¶ 454 (Google agreeing that "search defaults can increase search volume for the default search provider."). It is best to await a trial to determine whether, as a matter of actual market reality, Google's position as the default search engine across multiple browsers is a form of exclusionary conduct.

Google's second argument against exclusivity fares no better. The fact that the single-preset default search "is a consequence of Apple, Mozilla, and other companies having ***chosen to design*** their browsers with a single search engine set as the default upon first use," Google DOJ Mot. at 32, does not change the fact that Google has *exclusive* rights to the default across multiple web browsers. A purchaser of an Apple device is not, for example, given the out-of-the-box option to select a default search engine. Google occupies that space by agreement. Again, the competitive market effects of holding the default is a disputed issue. Accordingly, the court finds that Google has not shown as a matter of law that the Browser Agreements are not exclusive contracts.

**\*17** *Competition for the Contract.* In the alternative, Google says that, even if the Browser Agreements are exclusive or *de facto* exclusive, they are lawful because they are " 'merely a form of vigorous competition' that the antitrust laws encourage rather than condemn." *Id.* at 38 (quoting *Microsoft,* 253 F.3d at 58). Google contends that it "has prevailed in the ongoing competition to be the default search engine in most third-party browsers in the U.S. since the mid-2000s because companies such as Mozilla and Apple have repeatedly determined it is the best option for creating a compelling search experience for their customers." *Id.* at 36. Rival search engines "can and do compete with Google to be the default search engine in Safari, Firefox, and other third-party browsers," and "[w]hen Google wins this competition, it has done so on the merits as established and judged by its customers, not through anticompetitive or exclusionary conduct." *Id.* at 35. Google cites the example of Mozilla, which in 2014 switched to Yahoo! as the default search engine for Firefox, only to return to Google soon after. *Id.* at 37. "Any 'concern' that may potentially arise under other circumstances involving allegations of 'exclusive dealing'

is wholly absent here," Google argues, "as there is no evidence of coercive conduct, and Google has won based on considerations of quality and price." *Id.* at 38.

Plaintiffs respond that "[t]he existence of multiple bidders does not transform an anticompetitive agreement into a permissible one." DOJ Opp'n at 27. Under Google's approach, Plaintiffs warn that "a monopolist could enter into *any* contract—no matter its effects on competition—so long as one rival existed and made some feeble attempt to secure the business, or the buyer had another option," and would be insulated from any "Section 2 challenge[ ] to [an] exclusionary agreement[ ] until the dominant firm had managed to wipe out all vestiges of present or future competition." *Id.* at 27–28. "What matters here is whether the terms of Google's contracts harm competition, not whether Google beat out a rival in imposing those terms," and "competitors are at a distinct disadvantage relative to a monopolist in the bidding process, which means that a monopolist's offer will often be the winning bid." *Id.* at 28. Finally, Plaintiffs contend that "Google fails to cite a single case supporting the proposition that a showing of 'competition for the contract' is sufficient to warrant summary judgment against a claim that the contract is exclusionary." *Id.*

The court thinks that Google's "competition for the contract" defense cannot be resolved on summary judgment at the *prima facie* stage and is better left for the procompetitive prong of the *Microsoft* analysis. *See Microsoft,* 253 F.3d at 59 (describing a procompetitive justification as "a nonpretextual claim that [the monopolist's] conduct is indeed a form of competition on the merits because it involves, for example, ... *enhanced consumer appeal*") (emphasis added).

*Microsoft* is instructive here. The D.C. Circuit encountered three types of agreements that were either explicitly exclusive or "exclusive as a practical matter"—Microsoft's deals with ISVs (independent software vendors), IAPs (internet access providers), and Apple. *Id.* at 71, 76. For each exclusive agreement, at the *prima facie* stage, the Circuit simply determined whether the exclusive agreement foreclosed a substantial share of the market. *Id.* at 71–74. If it did, the court looked to Microsoft to provide a procompetitive justification. *Id.* For instance, when it analyzed the exclusive agreements between Microsoft and ISVs, the D.C. Circuit held that the plaintiff had met its *prima facie* burden because "Microsoft's exclusive deals with the ISVs had a substantial effect in further foreclosing rival browsers from

the market" and "in preserving Microsoft's monopoly." *Id.* at 72. Similarly, the Circuit held that Microsoft's exclusive contract with Apple "ha[d] a substantial effect upon the distribution of rival browsers," and because it "serve[d] to protect Microsoft's monopoly, its deal with Apple must be regarded as anticompetitive." *Id.* at 73–74. The analysis was the same for IAPs. *Id.* at 71.

At no point did the D.C. Circuit, at the *prima facie* stage, consider whether the exclusive agreements were the result of a lawful "competition for the contract" or something akin to that. *Id.* at 71–74. Only after satisfying itself that these agreements were anticompetitive did the court turn to asking whether there was a procompetitive justification for the exclusive arrangements. *See id.* at 71 (IAPs), 72 (ISVs), 74 (Apple). Because Microsoft had offered none, the agreements were deemed exclusionary and therefore violated Section 2. *Id.* Here, Google will have the opportunity to proffer a procompetitive justification and show that the Browser Agreements resulted from "competition for the contract"—it will just have to wait until trial.

**\*18** The out-of-circuit cases Google cites (*Menasha, Balaklaw, Race Tires,* and *EpiPen*) do not entitle it to judgment as a matter of law at this stage. Google DOJ Mot. at 35–38. Google quotes *Menasha* to argue that "competition for the contract" is "a vital form of rivalry ... which the antitrust laws encourage rather than suppress." *Id.* at 35 (quoting *Menasha Corp. v. News Am. Mktg. In-Store, Inc.,* 354 F.3d 661, 663 (7th Cir. 2004)). *Menasha,* however, merely confirms that exclusive agreements are not *per se* anticompetitive. *Menasha,* 354 F.3d at 663 ("In the district court Menasha argued that these contractual devices, which it deems exclusionary, are unlawful *per se.* That argument has been abandoned on appeal—sensibly so, as competition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress."). In *Balaklaw*—a Section 1 case—the Second Circuit did state that exclusive agreements "may actually encourage, rather than discourage, competition," but clarified that "[t]his is not to say that under proper pleading and proof exclusive-dealing contracts could not still be scrutinized under the antitrust laws." *Balaklaw v. Lovell,* 14 F.3d 793, 799–800 (2d Cir. 1994). And in *Race Tires,* the Third Circuit observed that "[i]t is well established that competition among businesses to serve as an exclusive supplier should actually be *encouraged,*" but emphasized that "such exclusive agreements are not exempt from antitrust scrutiny." *Race*

*Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 76, 83 (3d Cir. 2010).

Google also cites to *EpiPen* to argue that customer-instigated exclusive dealing eases "any anticompetitive concern arising from a monopolist's use of exclusive dealing contracts," and that "rival search engines need only 'offer a better product or a better deal to reverse' " Google's default status in Safari, Firefox, and other third-party browsers. Google DOJ Mot. at 38 (quoting *EpiPen*, 44 F.4th at 995). While *EpiPen* does state that customer-instigated exclusivity "*sometimes* eases any anticompetitive concern arising from a monopolist's use of exclusive dealing contracts," it caveated that observation: "This does not mean that exclusive dealing arrangements instigated by the monopolist cannot be procompetitive or that exclusive dealing arrangements instigated by the customer cannot be anticompetitive." *EpiPen*, 44 F.4th at 995 n.14 (emphasis added). Ultimately, the Tenth Circuit made clear that to "analyze the legality of exclusive dealing contracts, we apply the rule of reason," and under that approach, courts must "conduct a fact-specific assessment of market power and market structure to assess the challenged restraint's actual effect on competition." *Id.* at 983–84 (citing *Ohio v. Am. Express Co.*, ⸺ U.S. ⸺, 138 S. Ct. 2274, 2284, 201 L.Ed.2d 678 (2018)) (internal quotation marks omitted); *see also Menasha*, 354 F.3d at 663 (stating that even exclusive deals preferred by retailers and manufacturers must be subject to a rule-of-reason analysis). That is an inquiry better left for trial.

Accordingly, Google cannot prevail at this stage based on a "competition for the contract" theory. Importantly, the court is not taking the position that Google's "competition for the contract" argument is irrelevant to the ultimate Section 2 question. Rather, as stated, the argument is better suited for the procompetitive prong of the *Microsoft* analysis.

Having determined that Plaintiffs have carried their burden of showing that the Browser Agreements are, at least, *de facto* exclusive contracts, they still must be subject to a market foreclosure analysis to determine whether they are anticompetitive. *See Microsoft*, 253 F.3d at 69 ("Following *Tampa Electric*, courts considering antitrust challenges to exclusive contracts have taken care to identify the share of the market foreclosed."). The court addresses foreclosure in Section V.A.2.

b. Android Agreements

The court now considers the Android MADAs and whether they are exclusive dealing arrangements. Plaintiffs argue that Google's Android Agreements—MADAs and RSAs— are exclusive because they work together as a "belt and suspenders" in order to "guarantee Google is the only preset default search engine on any Android preinstalled search access point." DOJ Opp'n at 45. "[A]lmost all Android devices sold in the United States" are subject to a MADA, *id.* at 30, and Plaintiffs argue that "[m]arket realities require OEMS to sign MADAs" because, "[f]or an Android mobile device to be successful in the United States, it must have proprietary Google Software preinstalled," like the Google Play Store, which is only available to MADA signatories. DOJ SGI at 132. MADAs require OEMs to preinstall the Google Search App and Chrome browser, and to place Google's search widget on the device home screen, all of which default to Google Search. DOJ Opp'n at 32. The RSA then "ensures that all preinstalled search access points will have Google as the preset default and no rival search will be preinstalled." *Id.* at 46. "When viewed collectively," Plaintiffs say, "the MADAs and Android RSAs ensure all roads on Android lead to Google. That is exclusivity." *Id.* at 47.

**\*19** Google concedes that RSAs are exclusive but argues that MADAs are not because "MADA licensees can preinstall other browsers and search apps and set them as the default upon first use." Google DOJ Mot. at 39. "Any purported 'exclusivity' arguably arises only if an OEM or wireless carrier choose to earn revenue from Google on its Android device by signing an RSA." *Id.* And, like the Browser Agreements, nothing in the MADA or the RSA prevents the end user from downloading a rival's search engine from the Google Play Store or changing the default search engine on the preinstalled Chrome browser. *Id.* at 40.

The court finds that although, by its terms, the MADA is not an exclusive contract, there is a dispute of fact as to whether market realities make it one. For instance, Google's expert Dr. Kevin Murphy admits that OEMs "can't sign an RSA unless [they have] also signed the MADA," therefore "thinking about the advantages of the RSA would be relevant for deciding whether to sign a MADA." DOJ 478 Exs., ECF No. 478, Ex. 87, ECF No. 478-22, at 220:19–22. Indeed, it would seem contrary to an OEM's economic self-interest to sign a MADA but not an RSA. Further, Google admits that, "[i]n the past three years, no manufacturer has sold

an Android phone into the United States, preinstalled with Google's search widget and an additional search widget for a different search engine." Google DOJ CSMF ¶ 591. So, even though the MADA permits an OEM to install a second search widget, OEMs have declined to do so. Google says that is by choice, but it may be that market realities are such that once Google occupies the default search widget, a rival cannot realistically hope to compete for another place on an Android device's home screen. So, as with the Browser Agreement, the mere fact that the MADA does not prohibit an OEM from engaging with competitors does not mean the MADA is not an exclusive agreement.

### 2. Substantial Foreclosure

As discussed, the Sherman Act does not make it per se unlawful for a monopolist to secure an exclusive contract. *Microsoft*, 253 F.3d at 70. To determine whether such a deal is anticompetitive, courts must ask how much of the relevant market the agreement forecloses from competition. *Id.* at 69. In other words, courts must "identify the share of the market foreclosed." *Id.* "[W]hat is 'significant' may vary depending upon the antitrust provision under which an exclusive deal is challenged." *Id.* The *Microsoft* decision declined to adopt a rigid test of what degree of foreclosure is required for a successful Section 2 challenge but observed "that a monopolist's use of exclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation." *Id.* at 70. Plaintiffs have the burden of proving "a significant degree of foreclosure." *Id.* at 69. The court therefore must inquire whether Plaintiffs here have met their burden, as part of their *prima facie* case, of showing that the Browser Agreements and Android Agreements have caused "a significant degree of foreclosure." *Id.*

Plaintiffs contend that substantial foreclosure "is measured by looking at the percentage of the market that is 'tied up' by the exclusive-dealing contract, and thus by considering how much of the market is available to rival sellers." DOJ Opp'n at 47 (quoting 7D-2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 768b4 n.39 (5 th ed. 2022)). In other words, "the foreclosure created by exclusive contracts is equal to the percentage of the market those contracts cover." *Id.* So, Plaintiffs ask the court to aggregate the foreclosure numbers resulting from the Browser Agreements and Android Agreements. Their expert's analysis shows that the Browser

Agreements and Android Agreements "cover almost 50% of all U.S. general search traffic ... 45% of U.S. general search text ads, and 36% of U.S. search ads." *Id.* at 47–48. "These coverage numbers—especially when viewed in light of the [Redacted] of searches controlled by the Google default on Chrome for Windows and Apple devices—easily qualify as 'significant foreclosure' under *Microsoft*." *Id.* at 48 (internal citations omitted). [15]

[15]
> Google rejects Plaintiffs' attempt to include in the foreclosure analysis any Google searches made through Chrome on Windows and Apple devices, because the default browser on Windows devices is Edge and on Apple devices is Safari. Hr'g Tr. at 41 ("Our getting search[es] from Chrome on Windows should be counted in a foreclosure analysis? That's crazy. Or Chrome on Apple devices. We're not preloaded on Apple devices any more than Apple is not preloaded on Android devices."). Plaintiffs seem to implicitly concede that the foreclosure analysis should not include searches through Chrome on Windows and Apple devices, *id.* at 56–60 (DOJ counsel stating that "generally speaking, doing what you want with your own products and making them better, that is not exclusionary conduct, and that's certainly not being challenged here"), but argue that "it's a market reality the Court needs to consider," *id.* at 97.

**\*20** Google's foreclosure argument focuses only on the Android Agreements. *See* Google DOJ Mot. at 40–43; Hr'g Tr. at 39:8–18 (Google counsel clarifying that a foreclosure analysis was done with respect to the Apple Agreement but noting that it wasn't "focused on" in the briefing). As to the Android Agreements, Google argues that the appropriate way to measure foreclosure is to identify "the impact of those agreements relative to a but-for world in which the alleged unlawful agreements do not exist." Google DOJ Mot. at 41. Plaintiffs' expert, Professor Whinston, "has offered no opinion about what a but-for world without Google's Android MADA or RSA agreements would look like," but he "has opined that if all Android OEMs and carriers were to choose to display a choice screen prompting their customers in the U.S. to select a default search engine from a list of options ... Google would be selected more than 90% of the time." *Id.* at 41–42. "The estimated 'shift' from Google to other search engines in this mandatory choice screen world would ***total approximately 1%*** of all search queries in the U.S." *Id.* at 42.

Google further argues that there is no evidence of substantial foreclosure even if a rival search engine were the "exclusive preinstalled default search engine on all search access points on Android devices in the U.S." because even Plaintiffs' expert estimated that, in that scenario, only "approximately 11.6% to 13.5% of total U.S. search queries may have shifted from Google to other general search engines." Google DOJ SMF ¶ 251; Google 430 Exs., Ex. 40, ECF No. 430-15, ¶ 905 (opining that between 18.2% to 21.2% of U.S. mobile phone queries may shift in such scenario).

As the above summary of the parties' positions shows, there is sufficient conflict about the extent of foreclosure—and, importantly, the proper way to measure it—to preclude a finding of summary judgment. Among the questions the court will have to consider at trial are: (1) what channels of distribution are included in the foreclosure analysis; (2) whether either the Browser Agreements or Android Agreements, or both, are part of the foreclosure calculus; and (3) whether a but-for approach is the appropriate way to measure foreclosure. Accordingly, Plaintiffs' claims regarding the Browser Agreements and Android Agreements survive summary judgment.

## B. The Colorado Plaintiffs' Claims: SVPs & SA360

The court now turns to the allegations raised only by the Colorado Plaintiffs related to Google's treatment of SVPs and Google's development of SA360, which they contend has anticompetitive effects in three markets: general search services, general search text advertising, and general search advertising. Colorado Opp'n at 2 (citing Colorado Compl. ¶ 59).

### 1. Google's Conduct Directed at SVPs

"SVPs deal with Google in two ways." Colorado Opp'n at 16. "First, SVPs depend on Google as a source of customers, especially new customers, through unpaid results (like the blue links) and advertising." *Id.* "Second, SVPs are important suppliers to Google of structured data—proprietary information that SVPs create that is not available to be crawled on the web," such as hotel and flight availability and prices. *Id.* Plaintiffs take issue with Google (1) placing "visibility limitations" on SVPs, and (2) requiring SVPs to share data with Google to the same extent they share it with Google's rivals. *Id.* at 17–20.

*Visibility Limitations.* Plaintiffs argue that Google "imposes visibility restrictions on SVPs in certain strategically important commercial arenas such as hotels, flights, and local services." *Id.* at 18. For example, (1) "SVPs cannot appear in results in the free listings in Google's hotel universal, flights universal, or in the local universal triggered by searches for nearby businesses," (2) "SVPs cannot purchase ads in their own name and cannot appear prominently in the tile of local services ads on Google's SERP," and (3) "when a user clicks on an ad paid for by the SVP featuring the name of a supplier, the consumer is directed to another Google site, not the SVP's site." *Id.* Because Google "insert[s] the restricted universals in a prominent place on the SERP, typically above the fold, Google demotes the blue [organic web result] links, in which SVPs often appear, making it less likely users will click on them." *Id.* "The demotion of blue links magnifies the impact of Google's visibility restrictions on SVPs that are excluded from its universals." *Id.* at 19. Plaintiffs allege that "Google's visibility-limitation practices, in combination with its demotion of the unpaid blue links, have raised customer acquisition costs for the affected SVPs, often by inducing them to purchase more advertising in an effort to restore their visibility." *Id.*

**\*21** *Data Sharing.* Plaintiffs also contend that "Google abuses its monopoly power to acquire valuable proprietary data [from SVPs] that it cannot obtain by crawling the web." *Id.* at 42. "Google mandates that SVPs ... provide it with data equivalent to what they provide to any of Google's competitors, robbing SVPs of control over their valuable assets and potentially foreclosing a differentiated data deal with a [general search engine] rival." *Id.* at 44. Furthermore, "Google uses SVP data within SERP features where SVPs are not permitted to appear, such as in the restricted universals on its SERP, and also uses data without attribution to SVPs in immersives that link to the SERP." *Id.* at 19.

Plaintiffs' theory of competitive harm in the relevant markets arising from these practices is as follows: (1) search-related advertising on Google is the primary way users get to SVPs because "Google's monopoly makes SVPs depend almost entirely on Google," Colorado Opp'n at 27; (2) because Google has reduced SVPs' visibility in key selected verticals in multiple ways—i.e., the anticompetitive conduct—SVPs have had to spend more on customer acquisition in the form of higher advertising costs, *see id.* at 16–19; (3) the limited visibility and increased customer acquisition costs weaken SVPs, *see id.*; (4) by weakening SVPs, Google discourages "stronger content partnerships and other arrangements"

between its rivals and SVPs, *id.* at 45; (5) if there were there stronger partnerships between Google's rivals and SVPs, other search engines would be more attractive to end users, leading to greater competition in the search and general search-related ad markets, *id.* at 45; and (6) at the same time, Google's demand for parity, or "most favored nation status," with respect to SVPs' data "disincentivizes SVPs from investing in the creation of valuable structured data," which forecloses "differentiated data deal[s]" with Google's rivals. *Id.* at 44. In Plaintiffs' view, "[u]nhampered growth of partnerships" between SVPs and Google's rivals would "facilitate competition in the Relevant Markets" and "aid the growth of innovative challengers to Google's monopoly." *Id.* at 45.

Google responds that Plaintiffs "cannot meet either element of their *prima facie* burden" for two primary reasons. Google Colorado Mot. at 23. First, Google argues that "the challenged [SVP] conduct is a genuine product improvement," *id.*, and where a "product design improve[s] [a] product ... it is lawful procompetitive conduct and not exclusionary conduct as a matter of law," Google Colorado Reply at 12. Second, Plaintiffs fail to "raise a triable issue with respect to the requisite anticompetitive effects." Google Colorado Mot. at 23. "Plaintiffs have painted themselves into a corner by proposing markets fundamentally disconnected from the harms they allege," and because SVPs "are outside the proffered general search services and derivative [general-]search advertising markets," "[t]here is no basis to conclude that the alleged harm to SVPs harms competition in the alleged markets." *Id.* at 31–32. "Most fundamentally, Plaintiffs have no answer to the question at the core of their harm-to-competition theory: What basis is there to believe that ***stronger*** SVPs would somehow increase competition among general search engines?" Google Colorado Reply at 20.

The court agrees with Google's second argument. [16] Plaintiffs' theory of anticompetitive harm rests on a multi-linked causal sequence that relies not on evidence but almost entirely on the opinion and speculation of its expert, Professor Jonathan Baker. Plaintiffs cite Professor Baker's report for the following propositions:

**\*22**  • Google's conduct "make[s] SVPs less attractive and less valuable partners for general search firms." Colorado SMF ¶ 188 (citing Colorado 466 Exs., ECF No. 466, Baker Opening Rep., ECF No. 466-1, ¶ 325; *id.*, Baker Rebuttal Rep., ECF No. 466-2, ¶¶ 62–66).

• "Google's data requirements disincentivize SVPs from using their data to strike better deals with Google rivals by, for example, providing some of their data to only select [general search engines]." Colorado Opp'n at 45 (citing Baker Opening Rep. ¶¶ 324–25); *see* Colorado SMF ¶ 187 (citing Colorado 466 Exs, Baker Reply Rep., ECF No. 466-3, ¶ 165).

• "Google's data restrictions disincentivize SVPs from investing in their data further, as they cannot realize a meaningful return on these investments." Colorado Opp'n at 44 (citing Baker Opening Rep. ¶ 278; Baker Reply Rep. ¶ 163).

• "[B]y requiring SVPs to provide Google all data provided to any other [general search engine], these mandates appear to prevent SVPs from granting exclusive access to some data to Google's rivals." Colorado Opp'n at 44 (citing Colorado SMF ¶ 186 (citing Baker Reply Rep. ¶¶ 166–67)).

Remarkably, not one of Professor Baker's opinions, on which these fact assertions are based, cites to any record evidence.

[16]  Because the court agrees that Plaintiffs' SVP claim fails due to the absence of factual dispute showing injury in any of the relevant markets, it does not reach the issue of whether a product design improvement is actionable under Section 2.

Indeed, a closer inspection of Professor Baker's reports shows that he has largely theorized the anticompetitive effects in the relevant markets of Google's conduct towards SVPs.

• "Google's visibility restrictions *can reasonably be expected* to discourage investment by the affected SVPs." Baker Rebuttal Rep. ¶ 61 [17] (emphasis added).

• "The terms on which Google often obtains access to structured data *can reasonably be expected* to discourage the SVPs that invest in assembling such data from using their data in ways that would aid their own expansion and growth." Baker Opening Rep. ¶ 51 (emphasis added); *see also id.* ¶ 278 (again stating that Google's terms of access to data can "reasonably be expected" to discourage SVPs' investment in such data); *id.* ¶ 324 (stating that Google's data requirements have "*likely discouraged* SVPs from using then data to aid then own expansion and growth") (emphasis added).

- Opining that, absent Google's "most favored nation" data provision, "an SVP specializing in hotels *might* reach an agreement with a search firm rival to Google by which the SVP makes available its lower-priced, lower-quality hotel room inventory through the rival only," and that "[c]ompetition of this form *could potentially* be discouraged by the type of contractual provision found in Google's contracts with Expedia." Baker Reply Rep. ¶ 167; *id.* at 88 n.463.

Speculation that Google's conduct "can reasonably be expected," "might," or "could potentially" degrade SVPs and make them less attractive partners to Google's rivals is not evidence of anticompetitive effects in the relevant markets. Plaintiffs are required to show with proof "that the monopolist's conduct *indeed* has the requisite anticompetitive effect," and they have fallen well short. *Microsoft*, 253 F.3d at 58–59 (emphasis added). [18]

[17]    Professor Baker does provide some factual support for this opinion, but it is not a material fact. He cites to [Redacted] *See* Baker Rebuttal Rep. ¶ 61. But Professor Baker does not explain how [Redacted] but not harm in the relevant product markets, because SVPs are not competitors in those markets. And. if there were harm, it would be a European market and thus outside the relevant geographic market in this case (the United States). *See* DOJ Am. Compl. ¶ 107.

[18]    Ironically, Professor Baker does offer record support for one material fact: [Redacted] Baker Opening Rep. ¶ 278 (emphasis added). That fact undermines the notion that Google's conduct has weakened the ability of SVPs to partner with Google's rivals, or diminished the incentives for SVPs to invest in structured data.

**\*23**  The Colorado Plaintiffs confirmed this state of evidence at oral argument. The court asked if there was "any evidence" that Google's conduct makes SVPs less attractive partners for rival search engines. Hr'g Tr. at 197–98 ("All you need is one SVP representative who says, 'Before Google made the change, we were a much more attractive partner to Microsoft. But since then, we have been degraded in the following ways that makes us less attractive to Microsoft [Bing], DuckDuckGo, or me or whoever it may be.' "). Plaintiffs identified none. [19] They did not point the court to any evidence showing that any of Google's rivals viewed

SVPs as less desirable partners once SVPs became less visible on Google's SERP—and Plaintiffs do not dispute that there are many such partnerships. Nor have they cited any evidence that an SVP has reduced or altered in any way its investments in structured data as a result of Google's data demands, or that an SVP has sought a deal with a Google competitor based on unique structured data only to be stymied because it was also required to provide such data to Google. Simply put, there is no record evidence of anticompetitive harm in the relevant markets resulting from Google's treatment of SVPs.

[19]    In response to the court's question. Plaintiffs pointed to a quote from [Redacted] Hr'g Tr. at 198, who was asked, [Redacted] Colorado 470 Exs., Ex 187, ECF No. 470-27, at 245:20–22. [Redacted] *Id.* at 246:5–14 (emphasis added). This answer does not say anything about how Google's *alleged conduct* towards SVPs has harmed competition in the relevant markets. Rather, it is simply a response to a hypothetical question that is unconnected to the actual alleged anticompetitive conduct targeting SVPs and. if anything, appears directed at the market for SEM tools.
        The Colorado Plaintiffs' opposition also quotes a [Redacted] Colorado Opp'n at 5 (citing Colorado 466 Exs., Ex. 14, ECF No. 466-16). But the [Redacted] said no such thing. In response to a question about whether [Redacted]. This testimony does not support the theory that Google's conduct towards SVPs had degraded SVPs so as to make them less desirable partners to Google's rivals.

That leaves Professor Baker, but Plaintiffs cannot survive summary judgment on his unsupported opinions alone. "To hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than [the expert's] theoretical speculations would seriously undermine the policies of Rule 56." *Merit Motors, Inc. v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C. Cir. 1977). Put more simply, "[i]n this circuit, a party cannot avoid summary judgment when it offers an expert opinion that is speculative and provides no basis in the record for its conclusions." *Martin v. Omni Hotels Mgmt. Corp.*, 321 F.R.D. 35, 40 (D.D.C. 2017); *see also Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("[A] party may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations."). Professor Baker's opinions do not rest on facts; only his ruminations about the market effects of Google's conduct.

Plaintiffs' various other arguments do not help establish a *prima facie* case. First, Plaintiffs assert that Google has a motive to diminish SVPs to prevent users from skipping over Google and going directly to the SVPs for specialized information. Colorado Opp'n at 38–39. Such consumer behavior would threaten "Google's monopoly revenues." *Id.* That argument does not, however, describe harm to competition in the relevant markets. If a user bypasses Google to go directly to an SVP, the user would presumably also bypass a rival search engine. In other words, greater navigation directly to SVPs does not depress *competition* in the relevant markets because SVPs do not compete with Google in general search or the general search-related ad markets.

Second, Plaintiffs takes Google to task for failing to produce evidence showing that the visibility limits actually benefit users. Colorado Opp'n at 39–40. But that argument puts the cart before the horse. Google need only establish a procompetitive justification for the visibility limits if Plaintiffs first show them to be anticompetitive in the general search or the derivative general search advertising markets. *See Microsoft*, 253 F.3d at 59. They have not done so.

 **\*24**  Third, Plaintiffs contend that Google's inclusion of SVPs in some verticals—Vacation Rentals and Shopping, for example—undercuts Google's claim of user benefit. Colorado Opp'n at 40–41. But differential treatment of SVPs among various verticals does not, once again, prove anticompetitive harm in the relevant markets.

Fourth, Plaintiffs point to documented complaints from SVPs about Google's data demands. *Id.* at 43–44. The court accepts these statements at face value. The relevant inquiry here, however, is not whether Google is leveraging its monopoly position to unfairly extract data from SVPs, but instead whether that practice harms competition in the marketplaces for general search services and general-search related advertising. Plaintiffs offer only Professor Baker's speculation that Google's "data requirements disincentivize SVPs from investing in the creation of valuable structured data," *id.* at 44, which in turn makes them "less attractive, and less valuable, as partners" to Google's rivals, *id.* at 45. They offer no proof to support those contentions or the chain of causation.

Fifth, Plaintiffs rely on the fact that Google requires SVPs to "provide it with data equivalent to what they provide to any

of Google's competitors" to argue that this "rob[s] SVPs of control over their valuable assets and potentially foreclosing a differentiated deal with a [general search engine] rival." *Id.* at 44. But, once more, Plaintiffs cite only to Professor Baker's hypothesis that this requirement translates into a weakening of competition in general search and the related general-search advertising markets. *Id.* Google may be acting heavy-handed with respect to SVPs' data, but the Colorado Action is not about competition in the marketplace for search advertising (which would include SVPs). Only the DOJ Plaintiffs allege a Section 2 violation in that market. DOJ Compl. ¶ 97.

Finally, Plaintiffs rely on two case studies to support their theory of harm, but neither move the dial. Plaintiffs point to internal Google communications about the "importance of developing strategic partnerships" with SVPs in Japan to compete with Yahoo! Japan. *Id.* at 45. From that evidence, Plaintiffs assert that "[j]ust as partnerships with SVPs facilitate Google's competition with Japanese rivals, so too would the unhampered growth of partnerships between SVPs and [general search engines] in the U.S. facilitate competition in the Relevant Market." *Id.* No one disputes, however, that partnerships with SVPs are "important." There is ample evidence that Google's rivals have entered into partnerships with SVPs. The question is whether Google's treatment of domestic SVPs has diminished their attractiveness to Google's general search rivals, and there is no proof to support that proposition.

Plaintiffs also cite the example of [Redacted] *Id.* at 46. Google does not dispute this factual assertion. *See* Google Colorado Reply, Def.'s Resp. to Colorado SMF, ECF No. 523-1 [hereinafter Google Colorado CSMF], ¶ 70. [Redacted] Colorado Opp'n at 45–46. But again, conduct that discourages users from navigating directly to SVPs for information does not harm competition in general search and related general-search ad markets. As previously observed, if a user looks to an SVP for specialized information instead of Google, the user is not using Google's rivals, either.

 **\*25**  In sum, the court holds that Plaintiffs have not shown that there is a genuine dispute of material fact that would warrant a trial to determine whether Google's treatment of SVPs has anticompetitive effects in the general search and related general-search ad markets. Accordingly, the court grants Google summary judgment as to those portions of the Colorado Plaintiffs' claims that rest on Google's conduct directed at SVPs. *See* FED. R. CIV. P. 56 (authorizing

entry of summary judgment as to a "part" of a claim); *id.*, Committee Notes on Rules—2010 Amend. (stating that summary judgment may be requested not only as to an entire case but also as to each "claim, defense, *or part of a claim* or defense") (emphasis added).

*2. Google's Conduct Directed at Rivals as it Relates to SVPs*

Plaintiffs argue that Google degrades partnerships between SVPs and its rivals in another way. They write: "One cannot fully understand harm to competition without examining the continuing interrelationship among harmful acts .... Google's SVP conduct weakens SVPs, making them less attractive as partners to Google rivals. *In the other direction, Google's distribution agreements deprive its rivals of users, making them less attractive to SVPs.*" Colorado Opp'n at 28 (emphasis added); *see also id.* at 4 ("Consider the ripple effects of the distribution agreements. By pushing rivals to the edges of the marketplace, these agreements effectively eliminate the ability of ... SVPs to substitute Google rivals for Google as a way to attract users."). "Google has thus degraded both sides of the bargaining table." *Id.* at 28.

Plaintiffs' theory seems to be that (1) Google's distribution agreements limit its rivals' ability to attract users, (2) this weakens Google's rivals, and make *them* less attractive partners to SVPs, and (3) the inability to form better partnerships with SVPs depresses Google's rivals' ability to compete for general search users. There is arguably some evidence to support the theory. *See supra* note 19 (testimony from [Redacted]).

Nevertheless, it remains unclear to the court whether Plaintiffs contend that this is a different form of exclusionary conduct, or it is merely a downstream effect of Google's distribution agreements. It would seem to be the later. Plaintiffs' papers do not give this theory much airtime, instead focusing on how Google's conduct allegedly weakens SVPs. The court therefore will defer ruling on what role, if any, this theory will play at trial.

*3. SA360*

The court now turns to the Colorado Plaintiffs' allegations regarding Google's development of SA360 and the lack of "feature parity" between Google Ads and Microsoft Ads.

Google argues that summary judgment is appropriate on Plaintiffs' SA360 theory because "[t]he record contains no support for Plaintiffs' only theory of anticompetitive harm —that SA360s feature design and development process has foreclosed advertisers from running campaigns on Microsoft Bing's search advertising platform." Google Colorado Mot. at 36–37. [20] "Plaintiffs have identified *no* advertiser who was prevented or even dissuaded from buying search ads on Microsoft Ads because of SA360's feature (un)availability," Google argues, "[n]or can they show that any purported feature delay, individually or collectively, caused advertisers to buy less search advertising on Microsoft Ads, which is their theory of anticompetitive harm." *Id.* at 37. "There is literally no record evidence that any lack of specific features for Microsoft Ads on SA360 affects advertisers' ability or propensity to buy search ads .... Nor is there any evidence that advertising spend in the alleged markets would have increased on Microsoft Ads had SA360 developed features for Microsoft Ads *sooner*." *Id.* at 38.

[20] Google further argues that "Plaintiffs have not even *attempted* to estimate the market foreclosure caused by Google's [SA360] feature development decisions, much less quantify it." Google Colorado Mot. at 37. Plaintiffs correctly note that Google's foreclosure argument "conflates exclusive dealing and exclusionary conduct," and that "[t]he 'substantial foreclosure' test applies only to exclusive dealing contracts." Colorado Opp'n at 36. "The difference between the traditional rule of reason and the rule of reason for exclusive dealing is that in the exclusive dealing context, courts are bound by *Tampa Electric*'s requirement to consider substantial foreclosure." *McWane, Inc. v. F.T.C.*, 783 F.3d 814, 835 (11th Cir. 2015) (citing *Microsoft*, 253 F.3d at 69). Plaintiffs are not required to proffer evidence of substantial foreclosure resulting from Google's SA360 conduct because it is not an exclusive dealing contract.

**\*26** Plaintiffs respond that "by offering 'day zero support' for new SA360 features for Google Ads—but not for rival advertising platforms—[Google] makes ad campaigns more efficient on Google than on Bing (and other actual or potential competitors)," and thus "steers ad spend towards Google and away from its competitors." Colorado Opp'n at 34. "When advertisers cannot access Microsoft Ads features that would make their ad campaigns more efficient and

productive, they spend less on Microsoft Ads, which widens the scale gap." *Id.* Furthermore, advertisers are compelled to use SA360 because "Google's undisputed general search monopoly makes Google Search a 'must have' for digital advertisers" and "all other advertising alternatives—such as using native advertising tools, switching SEM tools, or using multiple SEM tools—are costly and burdensome for advertisers that place ads on multiple online channels." *Id.* Plaintiffs argue that "Google's claim that advertisers can simply switch SEM tools or avoid SEM tools altogether ignores these market realities." *Id.*

The court finds that there is a genuine dispute of material fact as to anticompetitive effects in the alleged markets that precludes summary judgment. Specifically, Plaintiffs point to [Redacted] Colorado SMF ¶ 124; *see* Colorado 470 Exs., ECF No. 470, Ex. 168, ECF No. 470-8 [hereinafter Colorado Ex. 168], at 3; Colorado 466 Exs., ECF No. 466, Ex. 21, ECF No. 466-21, at 241:2–5 (testimony from [Redacted] Google responds that Plaintiffs' "entire causation theory hangs on" this "back of the napkin" calculation, Hr'g Tr. at 145–46, and [Redacted] Google Colorado CSMF ¶ 124). Maybe so. But Google's effort to discount this evidence goes to its weight and, at this stage, the court must draw all reasonable inferences in Plaintiffs' favor. Summary judgment is not appropriate in the circumstances.

Google further contends that this "unsubstantiated claim of 'spend shift' from Bing to Google on SA360" is not relevant because "the antitrust laws were not designed to ... protect particular competitors, as opposed to competition itself." Google Colorado Mot. at 39. Google is right that the antitrust laws are not meant to protect competitors, but that is not the salient issue here. The issue is whether Google's delayed rollout of SA360 support for Microsoft Ads inhibited or dissuaded advertisers from placing ads on its competitor's search engine, thereby harming competition in the general search advertising market. Plaintiffs offer some evidence that it has. Colorado Ex. 168 at 3. The issue of whether advertiser spending actually shifted from Microsoft Ads to Google Ads due to the lack of full feature parity on SA360 is a disputed material fact that precludes a finding of summary judgment.

Finally, Google argues that, at most, Plaintiffs have established a "transitory delay" in providing parity of services in SA360 that does not rise to a Section 2 violation. Google Colorado Mot. at 45. It contends that "building complex features like automated bidding for Google Ads and Microsoft Ads takes substantial time and resources,"

and notes that "SA360's integration of Google Ads' auction-time bidding feature took at least three years to build." *Id.* at 44. Yet, Google admits to evidence suggesting that it was "technically feasible" for Google to have introduced auction-time bidding for Microsoft Ads sooner, but it did not do so because achieving parity was not a priority. Google Colorado CSMF ¶¶ 114–115. It also does not dispute that [Redacted] *Id.* ¶¶ 112–113. Thus, there remains a genuine dispute of material fact as to whether the time it took Google to create feature parity for Microsoft Ads on SA360 was a mere "transitory delay," or whether the delay was intended to harm competition. *See Microsoft,* 253 F.3d at 59 ("Evidence of the intent behind the conduct of a monopolist is relevant only to the extent it helps us understand the likely effect of the monopolist's conduct."). Accordingly, the SA360 component of the Colorado Plaintiffs' claims survive summary judgment.

### C. Additional Theories of Anticompetitive Effect

**\*27** Finally, Google asks the court to grant summary judgment as to those elements of Plaintiffs' claims related to Google's Android Compatibility Commitments ("ACCs") and Anti-Fragmentation Agreements ("AFAs"), Google Assistant, Internet-of-Things ("IoT") Devices, and the Android Open-Source Project ("AOSP"). Google DOJ Mot. at 43–50.

### 1. ACCs and AFAs

Google's ACCs (previously known as AFAs) prohibit manufacturers from distributing devices that do not comply with Google's hardware and software specifications." *See* Google DOJ SMF ¶ 270 (ACCs specify that " '[a]ll devices based on Android that [an OEM] manufactures, distributes or markets will be Android Compatible Devices,' which are defined as devices that comply with the [Android Compatibility Definition Document]."). Plaintiffs allege that the ACCs and AFAs "restrict manufacturers' ability to build and distribute innovative versions of mobile phones ... smart TVs, watches, and automotive devices" and "inhibit the development of an operating system based on an Android fork that could serve as a viable path to market for a search competitor." DOJ Am. Compl. ¶¶ 71, 126–32. Google argues that summary judgment is appropriate because Plaintiffs provide no evidence that "limitations on OEMs' marketing of incompatible Android devices has a substantial anticompetitive effect in a search or search advertising market." Google DOJ Mot. at 44.

Plaintiffs' opposition mentions ACCs and AFAs once in passing in a footnote, and simply states that "[o]n top of the MADA's own compatibility requirements, the MADA also generally requires OEMs to have signed either an Antifragmentation Agreement (AFA) or an Android Compatibility Commitment (ACC), which separately prevent OEMs from distributing Android devices (with limited exceptions) that do not comply with Google's [Compatibility Definition Document], regardless of whether the OEM preinstalls [Google's proprietary apps] or not." DOJ Opp'n at 13 n.7. Because Plaintiffs offer no evidence showing that ACCs and AFAs have an anticompetitive effect in the relevant markets, summary judgment is granted with respect to those parts of the claims.

### 2. Google Assistant and IoT Devices

Plaintiffs' Complaint alleges anticompetitive conduct related to the promotion of Google Assistant in IoT devices, which are "internet-enabled devices such as smart speakers, home appliances, and automobiles." DOJ Am. Compl. ¶¶ 12, 139–41, 163. "Google's Assistant, like Apple's Siri or Amazon's Alexa, is a virtual assistant that can respond to voice commands" to perform various tasks. Google DOJ Mot. at 47. "Google's MADAs have recently included the Google Assistant and made it the out-of-the-box default assistant; and Google's Android RSAs with OEMs and carriers provide for forms of increased promotion for Google Assistant." *Id.*

Google argues that summary judgment is warranted on claims related to Google Assistant because "[n]one of Plaintiffs' experts opine on Google's IoT Agreements" and "Google's Assistant agreements lack any substantial anticompetitive effect in search." *Id.* at 47–48. Plaintiffs' opposition does not address the Google Assistant arguments. *See generally* DOJ Opp'n. Accordingly, summary judgment is granted to the extent Plaintiffs' claims rest on conduct relating to Google Assistant. *See Wilkins v. Jackson*, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) ("It is well established that if a plaintiff fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded."); *Sykes v. Dudas*, 573 F. Supp. 2d 191, 202 (D.D.C. 2008) ("[W]hen a party responds to some but not all arguments raised on a Motion for Summary Judgment, a court may fairly view the unacknowledged arguments as conceded.").

### 3. Android Open-Source Project (AOSP)

**\*28**  Finally, Google asks this court to grant summary judgment on the parts of Plaintiffs' claims relating to "Google's decisions regarding which Android apps to develop on an open-source or proprietary basis." Google DOJ Mot. at 26. Plaintiffs' Complaint does not allege that Google's decision-making regarding the AOSP had an anticompetitive effect in the relevant markets. Plaintiffs do allege, however, that "[o]ver time, Google has chosen to include important features and functionality in Google's own ecosystem of proprietary apps and [application program interfaces], rather than the open-source Android code," DOJ Am. Compl. ¶ 73, and "as the functionality gap between open-source Android apps and Google's proprietary apps grows, developers are more dependent on [Google Play Services]," *id.* ¶ 75.

In their opposition brief, Plaintiffs repeat that "[o]ver time, Google has removed or deprecated many AOSP apps (e.g., calendar, camera, email) and placed newly developed features exclusively within its proprietary apps and services." DOJ Opp'n at 12. Yet, they offer no proof of any anticompetitive effect in the relevant markets. Accordingly, summary judgment is entered in Google's favor to the extent Plaintiffs' claims rest on AOSP development decisions.

## VI. CONCLUSION

For the stated reasons, Google's Motion for Summary Judgment in the DOJ Action, ECF No. 421, is granted in part with respect to the parts of Plaintiffs' claims that rest on allegations relating to ACCs, AFAs, Google Assistant, IoT Devices, and AOSP. Google's Motion for Summary Judgment in the Colorado Action, ECF No. 426, is granted insofar as it is premised on Google's conduct directed against SVPs. Google's motions are otherwise denied.

### All Citations

--- F.Supp.3d ----, 2023 WL 4999901

---

**End of Document**                    © 2024 Thomson Reuters. No claim to original U.S. Government Works.

VitalLaw®



## Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp, ¶901. The Antitrust Concern with Horizontal Mergers: An Overview; Government Guidelines

Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp
Phillip E. Areeda (late) & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶901. (Fourth and Fifth Editions 2018-2023)
Fourth and Fifth Editions
Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and Hovenkamp ¶901.

Click to open document in a browser

**Last Updated: 8/2023**

**901a. Generally..—**The reason for antitrust concern with horizontal mergers is plain enough: they eliminate competition between the parties and can lessen competition between the post-merger firm and other market rivals. In extreme cases they can even produce a monopoly. Indeed, a series of mergers, virtually monopolizing several leading industries, was primarily responsible for the passage of the Sherman Act. [1]

Nevertheless, in contrast to horizontal price-fixing agreements, the mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality. [2] The explanation lies in the lesser danger to competition and the greater potential for procompetitive benefits.

The typical horizontal price-fixing agreement involves firms with a collective power to determine or substantially to affect market price; otherwise, the agreement would be pointless. The classic rationalizations for price fixing assume that price will be raised but contend that the harm to consumers from higher prices is outweighed by some public or private benefit. The courts have rejected such contentions as beyond their power to assess under a statute that condemns anticompetitive agreements. [3] Accordingly, such unjustified combinations with price-affecting power are condemned. Nor has it been necessary to prove market power or price effects. They may be reasonably inferred from the fact that the parties have made the agreement; and there is no good reason to require further proof merely to protect parties who miscalculated their capacities to harm the public. [4] In addition, of course, such a "per se" rule has superior administrative and deterrent characteristics. [5]

Horizontal mergers differ in critical respects. Competing firms typically merge for reasons entirely unrelated to effects on marketwide output or price—for example, to achieve economies of scale or integration, to achieve synergies in the production or distribution of complementary goods, to put inefficiently run assets into the hands of superior management, to resolve management succession for an individually owned enterprise, or for tax or other reasons.

As a result, one cannot reasonably presume from every horizontal merger—as one can from a price-fixing agreement—that the merging firms have the power to affect market price or that the merger will have any anticompetitive effect at all. Many of the gains from mergers result from cost savings that are achievable completely apart from any impact of the merger on the participants' market power. For example, a merger of two firms in an unconcentrated industry, and having market shares of 1 percent each, almost certainly creates no discernible power to reduce market output or increase price. But such a merger can easily facilitate efficiencies, assign assets to a superior manager, eliminate duplication, or have other effects that benefit the firms and that antitrust generally regards as beneficial to society.

Thus many of the rationales for merger are fully consistent with the aims of antitrust policy and are themselves procompetitive, at least in the absence of market power. Indeed, a major benefit of competition is the efficient organization and management of productive resources. A merger that improves efficiency enables the merged

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Antitrust Law: An Analysis of Antitrust Principles and Their Application - Areeda and…



firm to compete more effectively and, perhaps, to induce more efficient performance among its competitors; once one firm in a market attains certain efficiencies, other firms must either achieve equivalent efficiencies themselves or else face loss of their own market shares.

In dealing with horizontal mergers, therefore, the courts and other authorities cannot escape the necessity of assessing anticompetitive effects and of determining the kinds of proof that reasonably may be taken as sufficient to establish them.

**901b. Basic competitive concerns summarized..—**

**1.  *Creation or maintenance of monopolist or dominant firm; facilitation of unilateral price increases..***

—Among [6] the most anticompetitive consequences of mergers is the creation of a monopoly or dominant firm where none had existed before. [7] Presumably, however, such mergers are rare today, for mergers are necessarily public acts, and such mergers are so obviously unlawful. Of course, there can always be disputes about market definition: a merger might look like a merger to monopoly in a narrowly defined market but quite harmless in a more broadly defined market. [8]

But mergers can facilitate unilateral price increases without creating either a monopoly or a dominant firm. By "unilateral " in this context, we mean a situation where the post-merger firm but not necessarily others in the market is able to increase its price as a consequence of the merger. [9]

Without elaborating a rationale, the 1984 merger guidelines had indicated that challenge to a horizontal merger was likely when a 35 percent (or larger) firm acquired a 1 percent (or larger) firm. [10] The 1992 Horizontal Merger Guidelines omitted this "leading firm proviso" and substituted more limited but more articulate attention to the possibility that the merged firm may itself become able to increase prices unilaterally—that is, even when other firms in the market do not increase their prices significantly. [11] The currently in force 2010 Guidelines, which are treated at length in Subchapter 9B-1, elaborate considerably on what is now commonly called "unilateral effects" theories of merger illegality.

The Guidelines' concern is easily explained. Suppose a market contains six firms with substantial product differentiation. The products of four of them differ modestly from each other but substantially from those of the other two firms. The products of the latter two firms differ only modestly from each other. [12] (Or suppose that transportation costs are significant and that two firms are located in one region that is rather far from, though in the same market as, the remaining firms.) Although the two firms that are nearest each other in product (or geographic) space "compete" with each other and with everyone else in the same market, the degree of competition varies with their proximity. Merging the two proximate firms eliminates the closest competition that each had faced and may enable them to raise prices to customers with a particular preference for their products, whether or not other firms raise their prices.

**901b2.  *Express collusion and tacit coordination resulting in increased prices.* [13]**—Every horizontal merger eliminates competition between the merging parties and increases market concentration. Elevated concentration threatens competition in two ways: as ¶b1 notes, the post-merger firm might itself so dominate the market as to control price, such as where a merger unites all or most of the firms in the market. Today, the more typical merger simply reduces the number of significant firms in the market and thereby helps them coordinate their prices, either expressly or tacitly, at supracompetitive levels. As the market contains fewer significant firms, maintenance of a cartel becomes easier. The high profit levels generated by a cartel tempt its members to try to expand sales by occasional or secret concessions, which naturally tend to destroy the cartel. To avoid such self-destruction, a cartel seeks both to assure each member that others are not "cheating " and to confront each with prompt detection and matching of its own concessions. The fewer the members, the more likely such monitoring will be effective and the greater the stability of the cartel. Although the proved cartel can be punished under Sherman Act §1, detection is not certain. [14]

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Feb 26, 2024 from VitalLaw®

Antitrust Law: An Analysis of Antitrust Principles and Their Application -
Areeda and…



The more frequent danger associated with mergers, however, is not the express cartel but tacit coordination. If the significant actors in a market are few enough, they may recognize their interdependence and succeed in coordinating their prices tacitly in the manner described elsewhere. [15] Such "oligopoly" pricing is feared by antitrust policy even more than express collusion, for tacit coordination, even when observed, cannot easily be controlled directly by the antitrust laws. A central objective of merger policy is to obstruct the creation or reinforcement by merger of such oligopolistic market structures in which tacit coordination can occur. [16]

**901b3. *Facilitation of exclusionary practices, especially predatory pricing.*.—**On principle, a horizontal merger could make predatory pricing or other exclusionary practices [17] a more rational strategy for the post-merger firm than it had been for either of the pre-merger firms acting alone. For example, the post-merger firm would have a larger market share; [18] it might operate in more markets; [19] it might have a deeper pocket; or the merger might have eliminated the strongest rival, who would have been in the best position to resist predatory pricing. [20]

Nevertheless, an otherwise lawful horizontal merger should not be condemned solely on the ground that it might facilitate predatory pricing. *First,* condemnation under this rationale would rarely be necessary, for virtually any horizontal merger creating a significant danger of future predation would already be condemned under the usual market concentration standards. Predatory pricing is unlikely to succeed and therefore unlikely to be attempted unless the post-merger firm has a very large market share—say, 40 to 60 percent—and faces insubstantial rivals in a market protected by high entry barriers. [21] Even the 1992 Horizontal Merger Guidelines, which were somewhat more tolerant of mergers than the cases, would almost surely have condemned a merger creating a 40 percent firm unless the acquired firm were tiny or entry barriers were extremely low. But a tiny acquisition would hardly facilitate predatory pricing, and very low entry barriers make successful predation impossible. [22]

*Second,* even with large firms and apparent entry barriers, predatory pricing is an uncommon strategy. Two decades of litigation have shown that predation is often alleged but seldom proved. [23] Of course, this might mean only that the cost-based tests used by the courts have been faulty, that predation occurs more often than detected, and that condemning mergers increasing its likelihood would serve the prophylactic purpose of Clayton Act §7. However, there is no general consensus that such predation tests have been systematically generous to predators.

*Third,* condemning mergers merely on proof of a large share and significant entry barriers could prove a socially costly form of overdeterrence. An indefinite prospective price reduction is not capable of being tested for its relationship to costs or other future circumstances and cannot therefore be distinguished from procompetitive reductions resulting from improved efficiency. Indeed, many claims of predation have been based on prices lower than the costs of the plaintiff who, for all that appears, was less efficient. Especially where the plaintiff is a competitor of the merged firm, the very cost reductions that make a merger socially valuable may become the basis for condemning it by speculating about future predation.

The *Cargill* decision is illustrative. [24] The Tenth Circuit enjoined a merger at the suit of a competitor on the conventional ground that it increased concentration unduly, raising the defendant's post-merger share to around 20 percent where the largest four firms held about half of the rather narrow market defined by the court. The court did not seem to find the merger independently unlawful on any other ground, although it relied upon a potential for predatory pricing in order to find that the competitor was sufficiently threatened with "antitrust injury" to be entitled to an injunction. The defendant's market share and second-place rank in the market made predation unlikely, but the court seemed to think that a "deep pocket" made predation a sufficient threat for this purpose. [25]

In reversing, the Supreme Court refused to go so far as to hold that the fear of post-merger predation should never justify enjoining a horizontal merger. [26] Rather, it noted that although ample evidence suggests that predatory pricing sometimes occurs and that sometimes mergers could facilitate it, the *Cargill* plaintiff had failed to allege it, and the challenged merger did not seem to make predation likely.

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



In *Intellectual Ventures*  the district court concluded that a non-practicing entity's external acquisitions of some 3,500 complementary patents from outside inventors allegedly intended to blanket an entire portion of the financial services market could not be unlawful under §7, because the only harm to competition would come from their subsequent assertion via an infringement action, and this would be protected by *Noerr* . [S1] But §7 prohibits only the acquisition, and it is precisely where the subsequent conduct of the post-merger entity is difficult or impossible to reach under antitrust law that merger law has its bite.

Under the court's reasoning, the acquisition of *any*  patent (or an exclusive right to it) would be lawful, no matter what the competitive consequences, because the subsequent enforcement action is protected. Indeed, the acquisition of a valid patent presents an even greater likelihood that it would subsequently be asserted. Beyond that, the acquisition of any traditional productive asset, such as a plant or land, would create the same situation. For example, once a firm had acquired a production facility, it would have a right protected by the petitioning immunity to bring a lawsuit against trespassers. [S2] But that fact would not serve to make the original acquisition of the plant immune from the merger laws. In this case, it was alleged that the aggregate patent acquisitions from outside firms tended to blanket the entire market for digital commercial banking services.

**901c. Public and private rationales for merger challenges distinguished; Guidelines ignore exclusionary practices..—**As ¶b indicates, under appropriate circumstances mergers can facilitate unilateral price increases or various forms of collusion or oligopoly interaction leading to higher prices. In theory, mergers can also facilitate exclusionary practices such as predatory pricing, but our presumptive thresholds for condemning them on price-increasing grounds generally reach them long before they make monopolization or even attempt to monopolize a plausible threat. Further, while oligopoly can be predicted on the basis of structure alone, exclusionary practices cannot be, at least not with anything like the same degree of assurance that they will occur.

By contrast, most private merger plaintiffs, such as in the *Cargill*  case, [27] allege unlawful exclusionary practices or refusals to deal [28]—an area that the government enforcement agencies have not emphasized. This undoubtedly explains why private merger plaintiffs rarely succeed in fully adjudicated cases. It is also consistent with our view, which is that while mergers may be said to "facilitate" exclusionary practices, condemning a merger merely on the ground that it makes such practices more likely is seriously overdeterrent, particularly since the practices themselves are independently actionable once they occur. [29]

**901d. Merger policy and the 2010 Horizontal Merger Guidelines..—**

**1. *Introduction..*—**In August 2010, the Antitrust Division and the Federal Trade Commission issued new Guidelines for the assessment of mergers between competitors under the antitrust laws. [30] These Guidelines were long awaited not merely because of the lengthy interval between them and previous Guidelines [31] but also because enforcement policy had drifted from the standards articulated in the previous Guidelines. This Subparagraph gives a brief overview of the approach taken by the enforcement agencies in these Guidelines. Subsequent Paragraphs then go into greater detail on various components of the merger evaluation process.

The 2010 Guidelines are distinctive mainly for two things. One is notably briefer and less detailed treatment of market delineation. The other is an expanded set of theories of harm that justify preventing mergers or reversing mergers that have already occurred. These are both positive developments. Older Guidelines were overly technocratic and excessively wed to methodologies that were at the forefront of applied merger analysis when they were drafted but that tended to make the Guidelines obsolete as new methodologies became available. Not only do methodologies change, they are also specific to the situation. [32] They also tend to be well developed in the literature and accessible to experts consulted by those defending a merger as well as to the government economists who employ them. As a result, detailed treatment of the technological methodologies that will be used is generally unnecessary. The 2010 Guidelines are more flexible than previous Guidelines and also more catholic about the types of harms that mergers might cause and the techniques that can be used to assess them. [33]

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Antitrust Law: An Analysis of Antitrust Principles and Their Application -
Areeda and…



To be sure, there is a tradeoff between flexibility and guidance. Often we can have more of one only by giving up some of the other, and that tradeoff is clearly present in the 2010 Guidelines. In general, however, they seem to have struck the balance in about the right place. One hesitates to compare the 2010 Merger Guidelines to the 1968 Guidelines, given that the 1968 Guidelines are so strongly identified with the excesses of a past era. Even so, at the time the 1968 Guidelines were a considerable improvement over the then existing case law. [34] And the concerns expressed in the 2010 Guidelines are fundamentally very different from those discussed in the 1968 Guidelines. Nevertheless, to a large extent the 2010 Guidelines end a trend toward defining the scope of antitrust concern with mergers more narrowly and more technically. The 1968 Guidelines were also more eclectic in their approach, although they were also very ambiguous. They never spoke of "collusion" as such or even of "coordinated interaction" or "oligopoly." In this sense the theory of the 1968 Guidelines was pure structuralism. They did not insist on a high degree of specification of the possible modes of anticompetitive behavior but only on a showing of a structure that was deemed to be anticompetitive in and of itself. [35] The 2010 Guidelines are equally eclectic, but they have departed from the structuralism of the 1960s further than any intervening set of Guidelines.

The unifying theme of the 2010 Guidelines, as of previous Guidelines, is to prevent the enhancement of market power that might result from mergers. The 2010 Guidelines state that "[a] merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives." [36] Clearly the focus on enhancement of market power is not limited to price. Both the 1992 and 2010 Guidelines expressed a concern about mergers that might restrain innovation, but the emphasis in the 2010 Guidelines is greatly expanded. While the 1992 Guidelines stated in a footnote that sellers with market power may also lessen competition in other areas, such as innovation, the 2010 Guidelines contain an entire section on innovation and product variety. [37] The Guidelines worry that a merger might curtail innovation, such as when the acquired firm is engaged in innovation activities that are likely to capture revenues from the acquiring firm and a merger might serve to diminish those efforts. [38] For the most part these are "long run" effects, perhaps not showing up until years after a merger occurred (or was prevented from occurring). The 2010 Guidelines reflect a growing belief that in markets where product differentiation is minimal, competition tends to be robust, and the structural presumptions stated in all the previous Guidelines were too harsh. By contrast, where product differentiation is substantial, the Guidelines' approach tended to define markets too broadly, overlooking significantly anticompetitive possibilities.

**901d2. *Exclusion.*.**—The 2010 Guidelines state that the relevant statutory provisions covered include not only the antimerger provision, §7 of the Clayton Act, but also §§1 and 2 of the Sherman Act and §5 of the Federal Trade Commission Act. [39] Section 2 of the Sherman Act reaches only "exclusionary" practices. The 2010 Guidelines state that "[e]nhanced market power may also make it more likely that the merged entity can profitably and effectively engage in exclusionary conduct." [40]

Consideration of exclusionary practices as a rationale for condemning mergers is not particularly well developed in the 2010 Guidelines, but it was not present at all in the 1992 Guidelines. Exclusionary practices were mentioned briefly in the much more aggressive 1968 Guidelines. One of the stated concerns of horizontal merger policy at that time was "preventing any company or small group of companies from obtaining a position of dominance in a market." [41] The 1968 Guidelines elaborated that "the larger the market share held by the acquiring firm, the more likely it is that an acquisition will move it toward, or further entrench it in, a position of dominance or of shared market power." [42] However, the 1968 Guidelines went on to state thresholds that would prohibit acquisitions creating post-merger firms with minimum market shares as little as 8 percent to 16 percent, provided that the market was regarded as "highly concentrated," which meant a CR4 of 75 percent or more. [43] Those Guidelines also required elevated scrutiny of markets exhibiting a "trend toward concentration." [44] The 1968 Guidelines also expressed concern about the acquisitions of competitors that had been particularly "disruptive" in the market, as well as acquisitions of firms that possessed "an unusual competitive potential" or

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



"an asset that confers an unusual competitive advantage," which included "a patent on a significantly improved product or production process." [45]

While renewing this concern for exclusionary conduct, the 2010 Guidelines do not appear to suggest a broad mandate for using §2 of the Sherman Act to prohibit mergers simply because they increase the likelihood of exclusionary practices. [46] The Sherman Act does not contain the incipiency "may substantially lessen competition" language of §7 of the Clayton Act and presumably requires an actual or at least intended exclusionary practice, not the mere creation of a structure that is conducive to one. On the other hand, §7 of the Clayton Act can be brought to bear. The theory would be that an acquisition could be the means by which a firm attempts to acquire or perhaps to maintain a dominant position. [47] The 2010 Guidelines give this example:

> Merging Firms A and B operate in a market in which network effects are significant, implying that any firm's product is significantly more valuable if it commands a large market share or if it is interconnected with others that in aggregate command such a share. Prior to the merger, they and their rivals voluntarily interconnect with one another. The merger would create an entity with a large enough share that a strategy of ending voluntary interconnection would have a dangerous probability of creating monopoly power in this market. The interests of rivals and of consumers would be broadly aligned in preventing such a merger. [48]

This suggested application to networks and dominance is novel in the 2010 Merger Guidelines, but hardly unwarranted. As a general matter, nondominant firms in networks require compatibility in order to compete. By contrast, dominant firms may be in a position to profit from incompatibility. [49] As the Guidelines observe, the interests of consumers are almost always aligned with compatibility, which tends to make networked markets larger overall and more competitive internally.

**901d3. *Restraints on innovation.*—**Practices that restrain innovation can be either collusive [50] or exclusionary [51] or sometimes both. [52] The 1968 Guidelines stated that

> the Department has used Section 7 to prevent mergers which may diminish long-run possibilities of enhanced competition resulting from technological developments that may increase interproduct competition between industries whose products are presently relatively imperfect substitutes. [53]

The 1984 Guidelines noted briefly that market-share figures might overstate a firm's competitive significance if rivals had access to a technology that it did not. [54] The 1992 Guidelines' treatment of innovation was limited to a single footnote in its opening statement on market power: "Sellers with market power also may lessen competition on dimensions other than price, such as product quality, service, or innovation." [55] They never returned to the subject. However, the Guidelines for the Licensing of Intellectual Property, which were issued in 1995, focused a great deal of attention on licensing practices in innovation-intensive markets and occasionally referenced situations where the nature of a license or joint venture implied that the transaction should be treated more like a merger than a contract. [56] The Licensing Guidelines also developed the idea of an "innovation market," a concept that the 2010 Horizontal Merger Guidelines do not repeat. The 2006 Commentary on the 1992 Merger Guidelines also spoke in several places about the relevance of innovation, although they also do not return to the subject of innovation markets. [57]

Restraints on innovation are addressed in the 2010 Horizontal Merger Guidelines, mainly in the category of unilateral effects. The Guidelines have a separate section on mergers limiting "innovation and product variety,"

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



[58] which is concerned with "unilateral effects arising from diminished innovation or reduced product variety." As the Guidelines state:

> The Agencies may consider whether a merger is likely to diminish innovation competition by encouraging the merged firm to curtail its innovative efforts below the level that would prevail in the absence of the merger. That curtailment of innovation could take the form of reduced incentive to continue with an existing product-development effort or reduced incentive to initiate development of new products.
>
> The first of these effects is most likely to occur if at least one of the merging firms is engaging in efforts to introduce new products that would capture substantial revenues from the other merging firm. The second, longer-run effect is most likely to occur if at least one of the merging firms has capabilities that are likely to lead it to develop new products in the future that would capture substantial revenues from the other merging firm. The Agencies therefore also consider whether a merger will diminish innovation competition by combining two of a very small number of firms with the strongest capabilities to successfully innovate in a specific direction.
>
> The Agencies evaluate the extent to which successful innovation by one merging firm is likely to take sales from the other, and the extent to which post-merger incentives for future innovation will be lower than those that would prevail in the absence of the merger. [59]

In sum, the story closely resembles that of diverted sales on the demand side, except that in this case the emphasis is on diversion of supply through innovation. The concern is hardly fanciful, and some version of it has been known in antitrust since the beginning of the twentieth century. For example, in the *Paper Bag* patent litigation, which reached the Supreme Court in 1908, the dominant firm had acquired a patent in a technology that competed with technology that it was already using. It did not use the patent at all, preferring to stick with its existing technology, but also refused to license it to others and filed a successful infringement action against a rival firm that developed technology that infringed the acquired patent. [60]

We have also expressed a similar concern and believe that an appropriate remedy in most such cases is to permit dominant firms to acquire *non* exclusive licenses in patents that lie at the heart of their power, but not exclusive licenses. [61] Prohibiting such acquisitions altogether often precludes firms from keeping their own technology up to date. In order to accomplish this, however, they do not need the patent's power to exclude; they need only access to patented technology developed by others. As a result, permitting the acquisition of nonexclusive licenses strikes about the right balance between denying a dominant firm access to essential technology and permitting it to exclude others from its market.

Both the acquisition and the nonuse of a patent are lawful acts in and of themselves. [62] However, the combination of acquisition and nonuse represents a different concern—a practice that is not authorized by the Patent Act and that can result in the suppression of competition. Indeed, the acquisition and nonuse of a patent can be far more threatening to competition than the acquisition of a production facility, whether or not it is shut down. When an acquired plant or other productive facility is taken off the market or out of production by a merger, others can build a rival plant, depending on the height of entry barriers and other market factors. But a patent forecloses all technologies covered by its claims whether or not it is actually being practiced. For example, if a dominant firm with Alpha technology sees a close rival with incipient Beta technology that threatens to compete with Alpha, acquisition of the firm with the Beta technology not only eliminates that firm as a competitive threat but also takes the Beta technology and any technology covered by the Beta patent claims off the market altogether. In the *Paper Bag* decision discussed above, the patentee acquired the competing technology and did not practice the patent at all. Further, the rival was guilty of infringement under the doctrine of equivalents, which

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



in that case meant that his technology did not literally infringe the acquired patent at all but merely reached the
same result.

Patents are unquestionably "assets" reachable by §7 of the Clayton Act. [63] At the time that a patent is acquired,
neither the government nor anyone else may know whether the acquiring firm intends to practice it. But the
exclusive or nonexclusive nature of the assignment is knowable, and exclusive assignments in areas subject to
dominance should be regarded as highly suspicious. Further, exclusivity is almost never essential to protect any
legitimate interest of the acquiring firm. Its legitimate interest is to be able to practice the best technology itself
but not to prevent others from using technology that it did not develop itself.

Of course, a nonexclusive license may be worth less to the acquirer than an exclusive license, and this may
injure the inventor/assignor of the patent. Indeed, an exclusive right to the patent in the hands of a dominant
firm that does not intend to use it could be worth more than a nonexclusive right held by that firm or others. But
patents do not create entitlements to market monopolies any more than ownership of a production plant entitles
one to a monopoly in its product market, or to sell it subject to an anticompetitive noncompetition agreement.
That is, the general rule that assets can be freely transferred to the highest bidder clearly applies to patents, but
it is just as clearly subject to the constraint that anticompetitive transactions can be enjoined when they fall within
the prohibitions of the antitrust laws.

---

**Footnotes**

1   See ¶¶102 – 103 ; Herbert Hovenkamp, Enterprise and American Law, 1836–1937, at 241–68 (1991); Naomi
    Lamoreaux, The Great Merger Movement in American Business, 1895–1904 (1985); Ralph L. Nelson, Merger
    Movements in American Industry, 1895–1956, at 78–89 (1959).

2   Dicta in the Supreme Court's very first merger decision on the merits suggested to the contrary. *See Northern
    Sec. Co. v. United States* , 193 U.S. 197, 326–27 (1904), in which Justice Harlan's opinion for the Court
    concluded that

> the constituent companies ceased, under such a combination, to be in active competition for
> trade and commerce along their respective lines, and have become, practically, one powerful
> consolidated corporation….This combination is, within the meaning of the act, a "trust; " but if not, it
> is *a combination in restraint of interstate and international commerce* ; and that is enough to bring it
> under the condemnation of the act.

(Emphasis in original.)

3   See ¶¶1902, 1906.

4   Rational use of enforcement resources might suggest a discretionary decision not to prosecute every powerless
    price-fixing conspiracy, but that is a different issue.

5   See Ch. 15 and, with particular reference to horizontal price-fixing agreements, ¶¶1910, 2003 – 2004.

6   See Ch. 9B-1.

7   See ¶911.

8   *E.g., FTC v. Whole Foods Mkt., Inc* ., 548 F.3d 1028 (D.C. Cir. 2008) (siding with FTC and concluding that there
    could be a much narrower market of premium natural and organic foods supermarkets in which the merger
    created a dominant firm, even though it would have been inconsequential in a broader market that included all
    supermarkets; see the opinion on remand, in which the district court concluded that the dispute turns almost
    entirely on market definition. *FTC v. Whole Foods Mkt., Inc* ., 592 F. Supp. 2d 107 (D.D.C. 2009)). The case
    finally settled on March 6, 2009, by an agreement which required some divestment of individual stores to one or
    more FTC-approved buyers, as well as of the "Wild Oats " brand.

---

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



9   As a general matter, however, even the so-called "unilateral " price increase is not completely unilateral; smaller firms will likely respond to the larger firm's price increase by increasing their own prices as well. See ¶914a.

10   U.S. Dep't of Justice, 1984 Merger Guidelines §3.12. The 1984 Merger Guidelines can be found at 49 Fed. Reg. 26,824 (1984), 4 Trade Reg. Rep. ¶13,103.

11   1992 Guidelines §2.2.

12   One might imagine, for example, a market containing dozens of manufacturers of "IBM-compatible " personal computers, and two firms, Apple and Franklin, who manufacture computers that resemble one another closely but that use a different operating system from the IBM-compatible computers.

13   See Ch. 9B-2.

14   On the general economics of price fixing, see ¶2002.

15   See ¶¶404, 1429 – 1431.

16   See ¶916.

17   Exclusionary practices by the dominant firm, including predatory pricing, are the subject of Chapters 6 – 8, on monopolization and attempt to monopolize. Predatory pricing is treated in Subchapter 7C.

18   On the relationship between market share and the plausibility of predatory pricing, see ¶728b.

19   On the relevance of operation in multiple markets to predation strategies, see ¶727.

20   Cf. Pearl Brewing Co. v. Miller Brewing Co.,  1993 WL 424236, 1993-2 Trade Cas. ¶70,370 (W.D. Tex. Mar. 31, 1993), aff'd,  52 F.3d 1066 (5th Cir. 1995) (acknowledging that merger between two brewers might facilitate exclusive dealing or similar vertical arrangements designed to control grocers' shelf space).

21   See ¶728.

22   See ¶729.

23   See generally Ch. 7C.

24   Cargill, Inc. v. Monfort of Colo., Inc.,  479 U.S. 104 (1986).

25   For additional discussion of this case, see ¶337a – c. See also Ernest W. Hahn v. Codding,  615 F.2d 830 (9th Cir. 1980), in which a plaintiff competitor challenged a joint venture under Sherman Act §1, alleging that the venture would lead to various predatory practices against the plaintiff.

26   Cargill , 479 U.S. at 495. The Court expressly declined the invitation of the United States as amicus  to deny "competitors standing to challenge acquisitions on the basis of predatory pricing theories. "

S1   Intellectual Ventures I LLC v. Capital One Fin. Corp ., 280 F. Supp. 3d 691 (D. Md. 2017), aff'd on other grounds , 937 F.3d 1359 (Fed. Cir. 2019):

> And, while patent acquisition and aggregation is the focus of the Clayton Act claim, acquisition is actionable under the Clayton Act only where "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. §18. To establish this effect, Capital One relies on IV's purported "campaign," which could not succeed absent the allegedly sham litigation. See  Third Am. Countercl. (Sealed) ¶218 ("IV combines [its patent acquisitions] in a way that 'gives [IV] market power,' because, now that IV has eliminated alternative licensing sources by acquiring the patents, banks 'can not avoid' paying a hold-up demand (which IV styles as a 'license') if they want to avoid repeated meritless litigation and uncertainty.") Clearly, the allegation of sham litigation is an integral component of IV's alleged strategy underlying all of Capital One's claims.

280 F. Supp. 3d at 706. The Federal Circuit affirmed on grounds of collateral estoppel and did not reach the Noerr  issue. 937 F.3d at 1381.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



On the *Noerr* doctrine generally, see Subchapter 2A; on its relevance to patent litigation, see ¶706. On Intellectual Venture's alleged strategy of purchasing all patents to close off an entire area of commerce, see Erik Hovenkamp & Herbert Hovenkamp, *Buying Monopoly: Antitrust Limits on Damages for Externally Acquired Patents* , 25 Tex. Intell. Prop. L.J. 39 (2017), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2767098 ; and Herbert Hovenkamp, *Prophylactic Merger Policy* , 70 Hastings L.J. 45 (2018).

S2   *See, e.g., Venetian Casino Resort, LLC v. NLRB* , 793 F.3d 85 (D.C. Cir. 2015) (casino owner's summoning of police officers to enforce state law of trespass to land protected by *Noerr* , provided that the walkway in question was really a part of casino owner's private property).

27   *Cargill,* 479 U.S. at 104.

28   *See, e.g., Florida Seed Co. v. Monsanto Co.* , 915 F. Supp. 1167 (M.D. Ala. 1996), *aff'd,* 105 F.3d 1372 (11th Cir.), *cert. denied,* 522 U.S. 913 (1997) (herbicide distributor terminated as a consequence of supplier's acquisition not a victim of "antitrust injury, " whether or not acquisition itself was lawful).

29   See generally ¶¶337, 348b, 350c, 356. For a generally contrary view, see Joseph Brodley, *Antitrust Standing in Private Merger Cases: Reconciling Private Incentives and Public Enforcement Goals,* 94 Mich. L. Rev. 1, 49–51 (1995).

30   U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines (2010), *available at* https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, *and reprinted in* Appendix A of the Supplement to *Antitrust Law* .

31   Guidelines were issued in 1968, 1982 (revised in 1984), 1992, and now 2010. The Agencies also revised the 1992 Guidelines in 1997 with an updated statement on efficiencies, and in 2006 they issued a "Commentary " on the 1992 Guidelines. The 2010 Guidelines state in a footnote that the Commentary "remains a valuable supplement " to the 2010 Guidelines. The Commentary is available at http://www.justice.gov/atr/public/guidelines/215247.htm. The 2010 Guidelines themselves are available at https://www.justice.gov/atr/horizontal-merger-guidelines-08192010, and are reprinted in Appendix A of the Supplement to *Antitrust Law* .

32   *See* Dennis W. Carlton, *Revising the Horizontal Merger Guidelines* , 6 J. Competition L. & Econ. 619 (2010).

33   *See* Carl Shapiro, *The 2010 Horizontal Merger Guidelines: From Hedgehog to Fox in Forty Years* , 77 Antitrust L.J. 49 (2010).

34   *See* Robert H. Lande, *Resurrecting Incipiency: From* Von's Grocery *to Consumer Choice* , 68 Antitrust L.J. 875, 884–85 (2001); Donald I. Baker & William Blumenthal, *The 1982 Guidelines and Preexisting Law* , 71 Cal. L. Rev. 311, 337–38 (1983); Thomas B. Leary, *The Essential Stability of Merger Policy in the United States* , 70 Antitrust L.J. 105, 129 n.95 (2002).

35   *See, e.g.,* Carl Kaysen & Donald F. Turner, Antitrust Policy: An Economic and Legal Analysis 104, 104 (1959) (anticompetitive performance and "joint maximization " inherent in concentrated markets).

36   2010 Horizontal Merger Guidelines §1.

37   See ¶901d3.

38   2010 Horizontal Merger Guidelines §6.4.

39   2010 Horizontal Merger Guidelines §1, citing 15 U.S.C. §18, 15 U.S.C. §§1 and 2, and 15 U.S.C. §45. The Statement about §5 of the Federal Trade Commission Act, which is enforceable only by the Federal Trade Commission, is interesting. In this case the FTC has authority to enforce the Clayton Act directly, so it is also unclear what adding §5 of the FTCA does anything unless there is a basis for thinking that §5 reaches conduct that neither the Sherman Act nor §7 of the Clayton Act reaches.

40   2010 Horizontal Merger Guidelines §1.

41   U.S. Dep't of Justice, 1968 Merger Guidelines §4, *available at* http://www.justice.gov/atr/hmerger/11247.htm.

42   *Ibid.*

43   *Id.* §5. The CR4, or four-firm concentration ratio, is the sum of the market shares of the largest four firms in the market.

44   *Id.* §7.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.                   Feb 26, 2024 from VitalLaw®



45  *Id.*  §8.

46  *Cf. Cargill, Inc. v. Monfort of Colo., Inc.* , 479 U.S. 104 (1986) (refusing to enjoin merger at request of private plaintiff claiming that merger would enable post-merger firm to engage in aggressive anticompetitive pricing). See ¶¶335, 337, 348, 772h.

47  Section 6 of the 2010 Guidelines also speaks of "exclusionary unilateral effects, " although without adding any substance to that concern. 2010 Horizontal Merger Guidelines §6.

48  *Id.*  §2.2.3, ex. 2.

49  See ¶¶776, 777. The concern is expanded and specifically related to innovation-intensive markets in Christina Bohannan & Herbert Hovenkamp, Creation Without Restraint: Promoting Liberty and Rivalry in Innovation ch. 7 (2012).

50  *See, e.g., United States v. Automobile Mfrs. Ass'n* , 307 F. Supp. 617 (C.D. Cal. 1969), *appeal dismissed sub nom* . *City of New York v. United States* , 397 U.S. 248 (1970), *modified sub nom* . *United States v. Motor Vehicle Mfrs. Ass'n of the United States* , 1982 WL 1919, 1982–83 Trade Cas. ¶65,088 (C.D. Cal. Nov. 19, 1982) (cartel to restrain development of automobile air pollution control equipment).

51  *E.g.* , *United States v. Microsoft Corp* ., 253 F.3d 34, 77–78 (D.C. Cir. 2001) (Microsoft pressure on Intel to abandon development of multiplatform chip).

52  *E.g.* , *Allied Tube & Conduit Corp. v. Indian Head, Inc.* , 486 U.S. 492, 496–97 (1988) (standard-setting organization captured by manufacturers of steel conduit boycotts maker of PVC conduit).

53  U.S. Dep't of Justice, 1968 Merger Guidelines §20, *available at*  http://www.justice.gov/atr/hmerger/11247.htm. The 1968 Guidelines also indicated that traditional market definition criteria might not be used in markets subject to rapid technological change but did not provide details. *See id.*  §2.

54  U.S. Dep't of Justice, 1984 Merger Guidelines §3.21, *available at*  http://www.justice.gov/atr/hmerger/11249.htm.

55  U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines §0.1 n.6 (1992, rev. 1997). These Guidelines are available at http://www.justice.gov/atr/public/guidelines/hmg.htm.

56  U.S. Dep't of Justice & FTC, Antitrust Guidelines for the Licensing of Intellectual Property §3.2.3 (1995), *available at*  http://www.justice.gov/atr/public/guidelines/0558.htm.

57  *See*  U.S. Dep't of Justice & FTC, *Introduction,*  Commentary on the Horizontal Merger Guidelines (2006), *available at*  http://www.justice.gov/atr/public/guidelines/215247.htm (noting that market power may be exercised by slowing down innovation and that reduced innovation is an anticompetitive effect). *See also id.* ch. 4 (innovation and efficiencies defense).

58  U.S. Dep't of Justice & FTC, Horizontal Merger Guidelines §6.4 (2010), *available at*  https://www.justice.gov/atr/horizontal-merger-guidelines-08192010. The 2010 Guidelines also state in the opening section that "[a] merger enhances market power if it is likely to encourage one or more firms to raise price, reduce output, diminish innovation, or otherwise harm customers as a result of diminished competitive constraints or incentives. " *Id.* §1.

59  *Id.*  §6.4.

60  *Continental Paper Bag Co. v. Eastern Paper Bag Co.* , 210 U.S. 405, 429 (1908). For more on the litigation, see Christina Bohannan & Herbert Hovenkamp, Creation Without Restraint: Promoting Liberty and Rivalry in Innovation ch. 7 (2011).

61  See ¶707g.

62  Patents are freely assignable. 35 U.S.C. §261. Under the *Paper Bag*  case a patentee need not practice it in order to bring an infringement action. However, under the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.* , 547 U.S. 388, 391–94 (2006), *on remand,*  467 F. Supp. 2d 608 (E.D. Va. 2006), *on remand,*  500 F. Supp. 2d 556 (E.D. Va. 2007), non-practicing patentees may see their remedies limited to damages rather than an injunction. *See*  Christina Bohannan & Herbert Hovenkamp, Creation Without Restraint: Promoting Liberty and Rivalry in Innovation 295–300 (2011); Herbert Hovenkamp, *Notice and Patent*

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



*Remedies* , 88 Tex. L. Rev. *See also*  221 (2011), *available at*  http://www.texaslrev.com/sites/default/files/seealso/vol88/pdf/88TexasLRevSeeAlso221.pdf.

63    See ¶1202f.

NCLC

Calendar No. 143

| 93D CONGRESS<br>*1st Session* } | SENATE | { REPORT<br>No. 93–151 |
|---|---|---|

# MAGNUSON-MOSS WARRANTY-FEDERAL TRADE COMMISSION IMPROVEMENT ACT

---

## REPORT

OF THE

## SENATE COMMITTEE ON COMMERCE

ON

## S. 356

TO PROVIDE DISCLOSURE STANDARDS FOR WRITTEN CONSUMER PRODUCT WARRANTIES AGAINST DEFECT OR MALFUNCTION; TO DEFINE FEDERAL CONTENT STANDARDS FOR SUCH WARRANTIES; TO AMEND THE FEDERAL TRADE COMMISSION ACT IN ORDER TO IMPROVE ITS CONSUMER PROTECTION ACTIVITIES; AND FOR OTHER PURPOSES.



MAY 14, 1973.—Ordered to be printed

U.S. GOVERNMENT PRINTING OFFICE

83-010                          WASHINGTON : 1973

29

It is anticipated that a final cease-and-desist order will be given the same effect in a subsequent action for redress under section 203 that a government obtained antitrust decree is given in a subsequent private treble damage action. In that situation, the government obtained decree (including an FTC order) is given only prima facie effect and is thus at least rebuttable. It is not the intent of the Committee to encourage respondents to resist the finalization of cease-and-desist orders because of fear of the effects of an FTC order in a possible consumer redress action under section 203. This effect would be both unfortunate for the Federal Trade Commission, resulting in further delays in FTC proceedings, and unfair to the respondents, who would have to conduct themselves before the FTC with too strong an eye on the possible effect of the FTC cease and desist order in a subsequent consumer redress action under section 203. Thus, it is anticipated that a final cease-and-desist order would be given prima facie effect in a subsequent action under section 203, as is already the case under section 5(a) of the Clayton Act (see 15 U.S.C. 16(a)).

Finally, section 203 makes clear that the court has the power to consolidate an action under section 203 with any other action requesting the same or substantially the same relief upon motion of any party.

*Penalty for Violation of Cease and Desist Order (section 204)*

This section increases the potential penalty for violation of an order of the Commission from $5,000 to $10,000. The FTC may seek such penalty through its own attorneys rather than relying upon the Justice Department. In addition to increasing the penalty, this section authorizes the Commission to seek mandatory injunctions against persons in violation of a Commission order for whom the threat of economic penalty is more apparent than real because they have no available resources with which to pay the penalty.

*Commission Self-Representation (section 205)*

This section insures that the Commission will be able to represent itself in any civil proceeding involving the Federal Trade Commission Act. At the present time, the Commission must, in many situations, rely on the Department of Justice, which has been sluggish in the past in enforcing regulatory agency decisions in Federal courts. Similar authority to litigate to enforce independent agency determinations is already enjoyed by the National Labor Relations Board (see 29 U.S.C. 154(a)).

In addition to the representational authority specifically provided the Commission by sections 202, 203, 204, 207, 208, and 210 in actions to redress consumer grievances, and to enforce Commission orders, penalties, and subpoenas, the Committee intends to permit the Commission to conduct and control all other litigation involving Commission action under the FTC Act, whether the Commission be acting as plaintiff or defendant. Without intending any limitation, the Committee has in mind, for instance, actions seeking injunctions, declaratory judgments or other relief.

*Expansion of Jurisdiction (section 206)*

See discussion in section 201 supra.

30

*Securing of Documentary Evidence (section 207)*

This section is basically designed to simplify the securing of documentary evidence and testimony. It authorizes the Commission to seek documentary evidence from any "party"; under the present terms of the Federal Trade Commission Act such evidence may be obtained only from "corporations".

As authorized in sections 202 and 205, the Commission may act through its own attorneys to enforce the Federal Trade Commission Act. Section 207 permits the FTC to use its own attorneys "to invoke the aid of a court in requiring the attendance and testimony of witnesses and the production of documentary evidence" and authorizes the Commission to go to court in its own behalf to seek "writs of mandamus commanding any person or corporation to comply with the provisions of this Act or any order of the Commission issued under this Act."

*Reporting Requirements (section 208)*

This section streamlines reporting requirements under the Federal Trade Commission Act. The Commission is authorized to seek a civil penalty against any corporation which fails to file any annual or special report required by the Federal Trade Commission Act. Currently, a more complicated procedure involving the Department of Justice is necessary.

*Expansion of Jurisdiction (section 209)*

See discussion in section 201 supra.

*Injunctions (section 210)*

This section would permit the Commission to obtain either a preliminary or permanent injunction through court procedures initiated by its own attorneys against any act or practice which is unfair or deceptive to a consumer, and thus prohibited by section 5 of the Federal Trade Commission Act. The purpose of section 210 is to permit the Commission to bring an immediate halt to unfair or deceptive acts or practices when to do so would be in the public interest. At the present time such practices might continue for several years until agency action is completed. Victimization of American consumers should not be so shielded.

Section 210 authorizes the granting of a temporary restraining order or a preliminary injunction without bond pending the issuance of a complaint by the Commission under section 5, and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final within the meaning of section 5. The test the Commission would have to meet in order to secure this injunctive relief is similar to the test it must already meet when attempting to secure an injunction against false advertising of food, drugs, devices, or cosmetics. (See 15 USC 53(a).)

Provision is also made in section 210 for the Commission to seek and, after a hearing, for a court to grant a permanent injunction. This will allow the Commission to seek a permanent injunction when a court is reluctant to grant a temporary injunction because it cannot be

31

assured of a early hearing on the merits. Since a permanent injunction could only be granted after such a hearing, this will assure the court of the ability to set a definite hearing date. Furthermore, the Commission will have the ability, in the routine fraud case, to merely seek a permanent injunction in those situations in which it does not desire to further expand upon the prohibitions of the Federal Trade Commission Act through the issuance of a cease-and-desist order. Commission resources will be better utilized, and cases can be disposed of more efficiently.

*Enforcement Proceedings (section 211)*

This section permits the Commission to enforce penalties under the Federal Trade Commission Act. It is similar in concept to sections 202 and 205.

*Financial Institutions (section 212)*

This section removes from the Federal Trade Commission Act the presently existing exemption for banks insofar as unfair or deceptive acts or practices affecting commerce are concerned. The intent of the Committee in taking this action is to remove the anticompetitive situation which exists at present because some financial institutions are regulated for consumer protection purposes by the Federal Trade Commission and some are not, even though both types of institutions are offering substantially the same services to consumers. Second, presently existing Federal financial regulatory agencies either do not have the power or the desire to promulgate and enforce strong and uniform rules and regulations prohibiting unfair or deceptive acts or practices in the consumer credit field. The report of the National Commission on Consumer Finance has recommended that a single agency be given the power to promulgate rules and regulations in this area. It makes little sense to have agencies whose primary duty is to insure the solvency and liquidity of the institutions under their jurisdiction promulgating rules and regulations the violation of which may provide for potentially substantial civil penalties. The assumption of an active consumer protection role by such an agency could have a detrimental effect on the very solvency of the institution which the agency is required to protect. Furthermore, just as the Federal Reserve Board is authorized under the Truth In Lending Act to prescribe rules and regulations dealing with credit cost disclosure which apply to all creditors, it makes sense that the Commission should be empowered to issue rules and regulations to prevent unfair or deceptive acts or practices on the part of all business enterprises, including financial institutions.

The Federal Trade Commission would not issue rules or regulations in areas which are already adequately covered by the Federal Reserve Board's regulations under the Truth in Lending Act. If the Commission's legislative rulemaking authority is affirmed, then such rules would apply to financial institutions in the same manner as they would to all business enterprises. (See discussion of rulemaking, infra.)

Section 212 requires that the Commission consult with the various Federal financial regulatory agencies listed therein prior to prescribing rules and regulations. Furthermore, section 212 requires the Commission to delegate the power to enforce these rules and regulations to the

**CERTIFICATE OF SERVICE**

I hereby certify that on February 26, 2024, I filed the foregoing document with the Court and served it on opposing counsel through the Court's CM/ECF system.  All counsel of record are registered ECF users.


Respectfully submitted,

/s/ *Mark C. Hansen*
Mark C. Hansen