United States District Court
Southern District of Texas
**ENTERED**
May 13, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:23-CV-03560 |
| | § | |
| U.S. ANESTHESIA PARTNERS, INC., | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

### I.    INTRODUCTION

Before the Court are the defendants', U.S. Anesthesia Partners, Inc. ("USAP")

and Welsh Carson,[1] motions to dismiss (DEs 99 & 100). The plaintiff, the Federal Trade

Commission ("FTC"), has responded to the motions (DEs 119 & 120), and the

defendants have replied (DEs 124 & 126). After reviewing the filings and the applicable

law, the Court determines that Welsh Carson's motion should be **GRANTED**, and

USAP's motion should be **DENIED**.

### II.    FACTUAL BACKGROUND

This antitrust case concerns the monopolization of Texas' hospital anesthesia

market. We begin with a brief explanation of the hospital anesthesia market, as provided

by the FTC. Hospitals need anesthesiologists on-hand 24/7 for surgical procedures.

---

[1] Seven defendants are Welsh Carson entities. Because their distinction is not crucial to this analysis, the Court frequently refers to them all as "Welsh Carson" for ease of reference.

Some hospitals directly employ anesthesiologists, but many contract with outside groups to be their exclusive providers. Anesthesiologists are primarily compensated through reimbursement by insurers or insurers' clients (employers). Insurers' main leverage while negotiating reimbursement rates is the threat of network exclusion. Insurers select favored anesthesia groups to join their networks. Anesthesia groups strive to participate in these networks because network exclusion can endanger hospital relationships and make it more difficult to obtain payment. Thus, if groups raise their rates too high, the insurance company will remove them from the network. But this threat is credible only if the insurer has feasible alternatives with which to replace them. If a group grows so large that it becomes indispensable, the threat of network removal loses its bite, leaving patients with the burden of paying higher rates. That is what the FTC alleges has happened regarding USAP.

*USAP*

In 2012, USAP was created by a private equity firm called Welsh Carson and several physician partners. USAP's goal was to drive profits by consolidating Texas' hospital anesthesia market. Accordingly, USAP quickly began an aggressive acquisition strategy. Its first target, Greater Houston Anesthesiology, was the largest practice in Houston, billing itself as "20 times the size of the second largest local competitor." Welsh Carson put $100 million toward the purchase, with third-party lenders providing the rest. After this first acquisition, USAP started planning more,

targeting groups that already had exclusive contracts with hospitals. Through "tuck-in clauses," USAP would apply its higher rates to the same services already offered by its acquisitions.

Thus, USAP soon bought three other practices in Houston. Each had strong relationships with important hospitals, and each had previously competed with USAP. After each acquisition, USAP raised the acquired group's rates to match its own higher rates. In 2014, USAP took this strategy to Dallas, buying the area's largest practice, followed by six more. USAP soon expanded to Tyler, Austin, Amarillo, and San Antonio. In each of these markets, the FTC alleges that USAP used its dominance to raise prices at patients' expense. To date, USAP has acquired at least fifteen anesthesia groups in Texas.

Apart from USAP's acquisitions and price increases, the FTC also alleges that USAP maintains price-setting agreements with several competitors. Under these agreements, USAP bills for work that its competitors perform, but it bills under USAP's higher rates, as if the competitors' anesthesiologists were USAP's. This practice has the effect of increasing USAP's bargaining power and eliminating potential savings for patients. USAP inherited two such ongoing agreements and executed a third agreement that has since expired.

Finally, the FTC alleges that USAP paid Envision Healthcare to stay out of the Dallas market. Envision is a national healthcare company that also provides anesthesia

services to hospitals. While USAP initially sought to persuade Envision not to compete anywhere in Texas, Envision limited its agreement to not competing in Dallas for five years in return for $9 million.

Today, USAP is the largest anesthesia practice in Texas, including in many of its metro areas.[2] It controls nearly 70% of the commercially insured, hospital-only anesthesia market in Houston, a similar share in Dallas, and over 52% in Austin. USAP handles nearly half of all hospital-only anesthesia cases in Texas, and earns almost 60% of all hospital anesthesia revenue paid by Texas insurers, employers, and patients. USAP's negotiating leverage has grown along with its market share, and USAP has used this leverage to raise prices across Texas. The FTC alleges that this has resulted in patients and their employers paying tens of millions of dollars more each year for anesthesia than they otherwise would pay.

*Welsh Carson*

The mastermind behind USAP is allegedly Welsh Carson, a private equity firm that invests in healthcare and technology. Welsh Carson operates through various corporate entities that share personnel and resources. Hence, one set of entities houses the firm's employees and manages its investments, while another set, known as "funds," makes and holds Welsh Carson's investments, while a separate set controls these funds.

---

[2] USAP currently operates in eight states, with Texas remaining its largest market.

The FTC alleges that all of these corporations operate together, as a single company, to hatch and carry out USAP's monopolization scheme.

In early 2012, Welsh Carson decided to enter Texas' hospital-based anesthesia market. Brian Regan, a partner at Welsh Carson, spearheaded this strategy. He explained that the plan was to "consolidate practices with high market share in a few key markets," which would offer "negotiating leverage with commercial payors." Over the next few months, Welsh Carson employees set up the company that would effect this scheme—USAP. Welsh Carson initially owned 50.2% of USAP, and saw itself as USAP's "control investors." Welsh Carson chose USAP's leadership, including its CEO, CFO, COO, and head of human resources. Each of these officers had previously been employed at other Welsh Carson entities. USAP's CEO, Kristen Bratberg, had led a previous Welsh Carson consolidation strategy in the neonatology sector. Brian Regan, himself, served as a USAP director from its creation until 2022.

After creating USAP, Welsh Carson actively participated in its acquisitions. USAP's internal rules required that proposed acquisitions be approved by Welsh Carson. Welsh Carson employees researched anesthesia practices for USAP to acquire. Welsh Carson also worked with a consultant to develop a modeling tool for identifying promising acquisition targets. Welsh Carson funded USAP's first acquisition. Welsh Carson negotiated USAP's first acquisition in Dallas, and Brian Regan led the negotiations for USAP's agreement with Envision, initially proposing that USAP pay

5

Envision $9 million annually to not provide anesthesia services in Texas. This ultimately became the price tag for Envision's exclusion from Dallas.

In 2017, Welsh Carson sold about half its stake in USAP. A Welsh Carson entity This left Fund XII, a Welsh Carson entity with 23% ownership of USAP. Fund XII appoints two of the fourteen board seats in USAP. In 2021, the FTC began a two-year investigation of Welsh Carson and USAP. It brought this suit on September 21, 2023 to permanently enjoin the defendants' anticompetitive conduct under Section 13(b) of the FTC Act. The Court held a hearing on the present motions to dismiss on April 8, 2024.

## III.   CONTENTIONS OF THE PARTIES

Welsh Carson argues that the FTC cannot bring this suit under Section 13(b) of the FTC Act because Welsh Carson is not violating antitrust laws, nor is it about to. USAP makes the same argument, adding that Section 13(b) requires a concomitant administrative proceeding, which the FTC has not begun. USAP further asserts that the FTC is unconstitutional because its commissioners are not removable at will by the President. Finally, USAP argues that the FTC's claims are based on a myopic market definition, and that USAP has not raised prices above competitive levels.

The FTC responds that both Welsh Carson and USAP are currently violating antitrust laws, and that both are about to violate antitrust laws. The FTC insists that 13(b) does not require an administrative proceeding before a suit can be filed.

6

Regarding the argument that it is unconstitutional, the FTC points to Fifth Circuit precedent holding otherwise. The FTC defends its market definition of commercially insured hospital-only anesthesia, asserting that non-hospital anesthesia is not an available substitute. Finally, the FTC maintains that it has alleged super-competitive pricing due to the defendants' uncompetitive behavior.

## IV.    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) authorizes a motion to dismiss for "failure to state a claim upon which relief can be granted." Under the difficult standard of a Rule 12(b)(6) motion, "[t]he plaintiff's complaint is to be construed in a light most favorable to the plaintiff, and the allegations contained therein are to be taken as true." *Oppenheimer v. Prudential Sec., Inc.*, 94 F.3d 189, 194 (5th Cir. 1996). Dismissal is appropriate only if the "[f]actual allegations [are not] enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A court's review is limited to the allegations in the complaint and any documents attached to a defendant's motion to dismiss, if they are both referred to in the complaint and central to the claims. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004).

## V.     ANALYSIS & DISCUSSION

*Section 13(b)*

The FTC's statutory authority for seeking this injunction lies in 15 U.S.C. § 53(b) (commonly referred to as "Section 13(b)"). Section 13(b) allows the FTC to "bring suit in a district court of the United States to enjoin" allegedly unlawful conduct only where it has "reason to believe . . . that any person, partnership, or *corporation is violating, or is about to violate*, any provision of law enforced by the [FTC]." (Emphasis added). Section 13(b) is not a catch-all statute. Rather, Section 13(b) "addresses a specific problem, namely, that of stopping seemingly unfair practices from taking place while the [FTC] determines their lawfulness [through its own administrative proceedings]." *AMG Cap. Mgmt.,* 593 U.S. at 76. *See* S. Rep. No. 93-151, at 30 (1973). The FTC is authorized to conduct its agency actions through Section 5(b) of the FTC Act, which is a much broader grant of antitrust authority, and looks backward, while Section 13(b) looks forward. Section 13(b) therefore "does not permit the FTC to bring a claim based on long-past conduct without some evidence that the defendant 'is' committing or 'is about to' commit another violation." *Federal Trade Commission v. Shire ViroPharma, Inc.*, 917 F.3d 147, 156 (3d Cir. 2019). If "the FTC wants to recover for a past violation — where an entity 'has been' violating the law — it must use Section 5(b)." *Id*. at 159 (quoting 15 U.S.C. § 45(b)).[3] What the FTC cannot do is "use the most advantageous

---

[3] Of course, the FTC is not alone in enforcing antitrust law. The Department of Justice has broad authority to enforce antitrust law, including for past acts. *See* 15 U.S.C. §§ 4, 25.

aspects of each statutory provision—to punish [a defendant] for a past violation using the less onerous enforcement mechanism [of Section 13(b)]." *Id*.

A) *Welsh Carson*

A) 1) *The FTC Has Not Adequately Alleged that Welsh Carson "is violating" Antitrust Law*

The FTC argues that Welsh Carson is currently violating antitrust laws. The FTC insists that "USAP continues to hold the illegally acquired practices, uses the resulting leverage to raise prices, and shares its profits with Welsh Carson." But the FTC does not cite any authority for the proposition that receiving profits from an entity that may be violating antitrust laws is itself a violation of antitrust laws. Indeed, "profits, sales, and other benefits accrued as the result of an initial wrongful act are not treated as 'independent acts.'" *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014). Thus, the act of receiving profits from USAP is not an ongoing antitrust violation.

The FTC also argues that Welsh Carson commits ongoing antitrust violations by continuing to hold stock in USAP. The FTC insists that "an injunction under Section 13(b) is a theoretically available remedy in a Section 2 challenge to long-ago mergers so long as the defendant still holds the purchased assets or stock." *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 32 (D.D.C. 2021). Thus, the FTC's argument that

Welsh Carson is committing ongoing antitrust violations boils down to this: 1) Welsh Carson holds stock in USAP; 2) holding assets that result in reduced competition is an ongoing violation of antitrust laws; and 3) Section 13(b) permits the FTC to address ongoing violations.

The first and third steps are not in serious dispute. The substance therefore is in the second step of the argument. The FTC is correct that holding assets can constitute an ongoing violation of antitrust laws: "[A]ny acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of [Section 2] whenever the reasonable likelihood appears that the acquisition will result in a restraint of commerce or in the creation of a monopoly of any line of commerce." *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586, 592 (1957). Section 7 of the Clayton Act prohibits mergers or acquisitions, "directly or indirectly," if the effect "may be substantially to lessen competition, or to tend to create a monopoly." 15 U.S.C. § 18 (2000). In *du Pont*, the Court determined that a supplier to General Motors leveraged stock that it had bought to entrench itself as General Motors' primary supplier. 353 U.S. at 592. The differences between *du Pont* and the present case, though, are that *du Pont* involved a direct acquisition, Section 13(b) was not in play, and *du Pont* did not involve a defendant with a minority, noncontrolling stake in the purchasing entity.

Since 2017, only one of the Welsh Carson entities—Fund XII—has owned stock in USAP. Fund XII's 23% ownership entitles it to appoint two of the fourteen directors to the USAP board: one-seventh of the board, disproportionately small compared to its almost one-quarter ownership. The FTC does not explain how Fund XII's minority stake—as distinct from USAP's acquisitions of anesthesiology practices—is a violation of Section 2 of the Sherman Act or Section 7 of the Clayton Act. Indeed, at oral argument, the FTC conceded "we still have to prove that Welsh Carson's conduct substantially lessens competition . . . we are not seeking to hold Welsh Carson liable merely because they have an ownership stake." But that ownership stake is the FTC's only hook for an "ongoing violation" under Section 13(b). Section 13(b) requires more than the FTC's concession; *Welsh Carson's ongoing* conduct must reduce competition. It is not clear how owning a minority share in a company that reduces competition satisfies the statute.

What *du Pont* and *Facebook* indicate is that if an acquisition was *itself* a violation of antitrust laws, the FTC may use Section 13(b) to address it. Indeed, the "Clayton Act is concerned with whether an acquisition or merger *itself* may cause antitrust injury." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 511 (2d Cir. 2004) (citing *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 115–17 (1986)). The FTC's authorities discuss only one merger to roll back, where rolling back the merger resolves the ongoing violation. Not so here; The FTC's theory would require rolling

back Welsh Carson's acquisition of USAP stock and USAP's *own* acquisitions. The analogous merger to *du Pont* is not USAP's acquisitions, but Fund XII's 2017 purchase of 23% of USAP. And there is no allegation that that acquisition itself violated antitrust laws. Thus, the FTC's conflation of Fund XII's stake in USAP with USAP's acquisitions of anesthesia groups is unavailing.

The closest case to the present one appears to be *Cmty. Publishers, Inc. v. Donrey Corp.*, 882 F. Supp. 138 (W.D. Ark. 1995). There, the court determined that Section 7 applied to a parent company that acquired stock through its subsidiarity. The key difference, though, is that the parent and subsidiary had "substantially overlapping ownership." *Id.* at 139. Indeed, 99% of the parent stock was owned by an entity called "SGI," which was owned entirely by a family trust. The subsidiary, meanwhile, was owned 95.5% by the very same family trusts. Furthermore, the parent, the subsidiary, and SGI were all chaired by the same man, who was a member of the family who owned the trusts.

There is a stark contrast between *Donrey* and the present case, in which Fund XII owns 23% of USAP and has only two out of fourteen board seats. The fact that other Welsh Carson entities that do not own stock in USAP helped create both USAP and its acquisition strategy does not change the analysis. The FTC has not cited a case in which a minority, noncontrolling investor—however hands-on—is liable under Section 13(b) because the company it partially owned made anticompetitive acquisitions. Such a

construal of Sections 7 and 13(b) would expand the FTC's reach further than any court has yet seen fit; it would also expand liability to minority investors whose subsidiaries reduce competition. This Court will not adopt this novel interpretation.

A) 2) *The FTC Has Not Adequately Alleged that Welsh Carson Is "About To Violate" Antitrust Law*

The second stage of the Section 13(b) analysis is whether the FTC has adequately pled that Welsh Carson is "about to" violate antitrust law.  The FTC alleges that nothing "prevent[s] Welsh Carson from re-upping its investment in USAP, retaking formal control of the company, and directing yet more anticompetitive positions." The FTC also points to Welsh Carson's investments in the emergency medicine and radiology markets as evidence of intent to further consolidate the anesthesia market.

The parties disagree as to the proper interpretation of Section 13(b)'s "about to violate." The FTC insists that the Fifth Circuit held that Section 13(b)'s "about to violate" requirement can be satisfied by alleging facts that give a "fair inference of a reasonable expectation of continued violations." *F.T.C. v. Sw. Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982) (citing *Securities and Exchange Commission v. Manor Nursing Center, Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972)). It is not clear that this was the holding of *Sunsites*. The court mentioned this standard without analysis, discussion of the statute, or any other support. The entire relevant paragraph reads:

> The district court acted well within its discretion in ordering appellees to
> cease and desist from further violations of the Act. This is particularly true

when the evidence developed to date suggests a large-scale systematic scheme tainted by fraudulent and deceptive practices, giving rise to a "fair inference of a reasonable expectation of continued violations" absent restraint.

*Id.* Regardless, it is unclear how much light is shined by interpreting "about to violate" as "giving rise to a fair inference of a reasonable expectation of continued violations." Indeed, the consensus is that "[a]side from analyzing the facts at issue, the *Sunsites* court did not provide extensive guidance to district courts on applying § 13(b)'s threshold requirement." *Fed. Trade Comm'n v. Educare Ctr. Servs., Inc.*, 433 F. Supp. 3d 1008, 1014 (W.D. Tex. 2020). The facts at issue in *Sunsites* were quite distinct from those before this Court. There, the FTC sought to enjoin a party from *persisting* in a "continuing" fraudulent scheme executed *by that party*. Here, there is no allegation of fraud, and Welsh Carson's activity is not continuing. Indeed, the FTC does not allege any conduct by Welsh Carson in the past six years that is a plausible antitrust violation.

Instead, the FTC argues that Welsh Carson designed and implemented a large, systematic scheme that still exists. This argument is to mean, if anything, that the violation is ongoing, rather than likely to recur. The only sense in which the scheme still exists is that USAP still exists, and that USAP still consolidates the market and reduces competition. But that goes to USAP's violations, not Welsh Carson's; *Sunsites* said nothing about derivate liability for another company's actions.

Besides, this long-past conduct does not raise a fair inference that Welsh Carson will soon do so again, even if such conduct were an antitrust violation. Indeed, it is

.

unclear what an act of recurrence would mean: creating another vehicle for anesthesia consolidation to compete with USAP? The FTC insists that Welsh Carson's having the "blueprints, finances, and personnel to continue this scheme" satisfy Section 13(b)'s "about to violate" standard. But the mere capacity to do something does not meet the requirement that the thing is likely to recur. As in *Facebook*, "[t]here are no facts alleged . . . suggesting that the antitrust 'scrutiny' the company is facing is 'about to' pass or indeed will pass at any time in the foreseeable future." *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F. Supp. 3d 1, 26–27 (D.D.C. 2021). *See Shire ViroPharma*, 917 F.3d at 153, 160 (finding allegation that "[a]bsent an injunction, there is a cognizable danger that [defendant] will engage in similar conduct" because it has the "incentive and opportunity" to do so. Such an argument, without evidence, is "woefully inadequate to state a claim under Section 13(b).").

The Court will quickly address two more arguments from the FTC. First, comments from Welsh Carson executives indicating a desire to consolidate other healthcare markets do not show that Welsh Carson is about to violate antitrust laws. The FTC has not sufficiently pled information about those plans to pursue a Section 13(b) case to enjoin Welsh Carson from activities in those non-anesthesia markets. Second, Welsh Carson's "lack of contrition" does not indicate an impending violation, either; the law does not require defendants to admit liability and apologize in order to avoid an injunction.

The Court repeats that Congress' purpose in enacting Section 13(b) was to "address[] a specific problem, namely, that of stopping seemingly unfair practices from taking place while the [FTC] determines their lawfulness." *AMG Cap. Mgmt.,* 593 U.S. at 76. Again, this Court will not be the first to use this specialized statute to expand antitrust liability to reach active investors in companies that are alleged to violate antitrust law. The FTC does not articulate why it cannot return with a new lawsuit under Section 13(b) if and when Welsh Carlson signals—beyond mere speculation and conjecture—that it is actually about to violate the law. The Court's analysis should not be construed to offer any opinion on Welsh Carson's conduct except as Section 13(b) applies to it.

### B) USAP

### B) 1) The FTC Need Not Bring A Concomitant Administrative Proceeding

USAP's first argument is that the FTC overreached its authority under Section 13(b) by bringing this suit without initiating a concomitant administrative proceeding. USAP marshals eloquent and thorough arguments of statutory interpretation to this end. But as far as the Court is aware, every court to consider this issue has disagreed that such a proceeding is necessary, including three circuit courts. As the Seventh Circuit explained:

> The statutory language of section 13(b) limits the availability of preliminary injunctive relief to situations 'pending issuance of a complaint by the Commission.' No similar language is found in the second proviso relating to permanent injunctive relief . . . Had Congress intended the

initiation or not of an administrative cease and desist proceeding to affect the ability of the Commission to seek permanent injunctive relief, it undoubtedly would have included language similar to that found in the provision governing preliminary injunctive relief.

*United States v. JS & A Grp., Inc.*, 716 F.2d 451, 456 (7th Cir. 1983). *See F.T.C. v. H. N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) & *F.T.C. v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984).

USAP invokes *AMG* to argue that this Court should resist these authorities. *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 593 U.S. 67 (2021). The problem is that *AMG* indicates the opposite. There, the Supreme Court held that the FTC may not use Section 13(b) to authorize monetary relief. While the Court thus focused on a different issue than the present one, its analysis included several observations on the FTC's injunction authority. Interpreting Section 13(b), the Court opined that the words "permanent injunction" "might also be read, for example, as granting authority for the Commission to . . . dispense with administrative proceedings to seek what the words literally say (namely, an *injunction*)." *Id.* at 76. Lest there be any doubt, two pages later, the Court declared: "the Commission may use § 13(b) to obtain injunctive relief while administrative proceedings are foreseen or in progress, *or when it seeks only injunctive relief*." *Id.* at 78 (emphasis added). The FTC seeks only injunctive relief in this case.

Undaunted, USAP brushes this aside as dicta. Even if it is dicta, dicta acquires a certain luster when it comes from the U.S. Supreme Court. Indeed, "we are generally bound by Supreme Court dicta, especially when it is 'recent and detailed.'" *Hollis v.*

17

*Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) (quoting *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013)). *AMG* is only three years old, and the Court repeated the point twice. This Court will not gainsay it.

### B) 2) The FTC Alleges Ongoing Violations Under Section 13(b)

Next, like Welsh Carson, USAP argues that the FTC has not alleged that USAP is currently or about to violate antitrust laws. USAP therefore argues that Section 13(b) is not the appropriate vehicle for these claims, and that the FTC has exceeded its statutory authority. The Court has already laid out the framework of this analysis above with regard to Welsh Carson. Applying it to USAP, however,  yields a different result.

The FTC alleges multiple instances of ongoing conduct: USAP continues to own the anesthesia groups it unlawfully acquired and continues to charge high prices; USAP currently maintains two price-setting arrangements that result in higher prices; and USAP's overall monopolization scheme remains intact.

USAP's acquisitions constitute ongoing conduct. USAP acquired at least 15 anesthesia groups over the last 12 years. USAP continues to hold these companies. Even though the acquisitions themselves have closed, maintaining the assets of these companies could constitute a violation of antitrust law appropriately pursued under Section 13(b). As explained above, "an injunction under Section 13(b) is a theoretically available remedy in a Section 2 challenge to long-ago mergers so long as the defendant still holds the purchased assets or stock." *Fed. Trade Comm'n v. Facebook, Inc.*, 560 F.

18

Supp. 3d 1, 32 (D.D.C. 2021). This is because, for antitrust purposes, acquisitions do

not always end with the close of the deal:

> We need not go beyond the Clayton Act itself to conclude that
> 'acquisition' as used in [§] 7 of the Act means holding as well as obtaining
> assets. The Act provides that the FTC, if it finds a violation of [§] 7, can
> require a party to 'divest itself of the stock, or other share capital, or assets,
> held . . . contrary to the provisions of ([§] 7).' Thus, the framers of the Act
> did not regard the terms 'acquire' and 'acquisition' as unambiguously
> banning only the initial transaction of acquisition; rather, they read the ban
> against 'acquisition' to include a ban against holding certain assets.

*United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 240–41 (1975) (cleaned up).

USAP seeks to distinguish *ITT* because it concerned "materially different factual

circumstances." USAP highlights that *ITT* upheld a fine for an ongoing violation of a

consent decree, rather than an antitrust violation. The consent decree is different, USAP

says, because it covered "both the initial transaction and the maintenance of the rights"

acquired in the transaction. But this is misleading, and indeed begs the whole question.

The consent decree did not say that it covered the maintenance of the rights. Rather, the

Supreme Court *decided* that it covered the maintenance of those rights based on its own

definition of "acquisition" in *Du Pont*. *United States v. ITT Cont'l Baking Co.*, 420 U.S.

223, 241 (1975) (citing *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586,

592 (1957)). Thus, the distinction USAP points to is not a valid difference.

On the other hand, USAP's authorities illustrate a distinction with a true

difference. USAP points to cases from the 8th and 6th circuits for the proposition that

mergers do not constitute continuing violations once they are complete: *Midwestern*

*Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594 (6th Cir. 2014). How do these cases coexist with *Du Pont* and *ITT*? The titles of these cases provide the answer: they do not involve the FTC. Instead, they feature private plaintiffs, and thus implicate the statute of limitations. The government, however, is not constrained by a statute of limitations. *See Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 783 (7th Cir. 2019) ("[S]ection 13b has no statute of limitations."). Thus, these cases are neither binding nor superior to the United States Supreme Court's opinion. Moreover, their reasoning was based on a statutory mechanism not in play here.

Because these acquisitions constitute ongoing activity and plausibly contribute to the monopoly power and unfair competition that the FTC's complaint alleges, the FTC is within its statutory authority to bring claims I-VIII. The FTC's ninth claim of price fixing and tenth claim of market allocation are plausibly part of the "large-scale systematic scheme" alleged by the FTC and supported by the alleged acquisitions. *F.T.C. v. Sw. Sunsites, Inc.*, 665 F.2d 711, 723 (5th Cir. 1982). Thus, the FTC is within its statutory authority to bring these claims.[4]

*B) 3) The FTC Is Not An Unconstitutionally Constituted Entity*

---

[4] It is worth distinguishing USAP's conduct from Welsh Carson's. Welsh Carson owned a noncontrolling piece of a company that acquired another company; the acquisitions at issue here were thus derivative of a company in which one Welsh Carson entity owned 23% and had disproportionally few board seats. That is very different from the direct, wholesale acquisition of one company by its competitor.

The Court need not spend many words on the constitutional argument.[5] The defendants ask this Court to declare the FTC is unconstitutionally constituted because its commissioners are not removable at will by the President. Precedent forecloses this argument.

Almost 90 years ago, the Supreme Court held that the President's inability to remove FTC commissioners at will was constitutional. *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935). The defendants argue that the FTC's authority has grown such that *Humphrey's* no longer makes sense. But just last year, the Fifth Circuit rejected this argument: "[A]lthough the FTC's powers may have changed since *Humphrey's Executor* was decided, the question of whether the FTC's authority has changed so fundamentally as to render *Humphrey's Executor* no longer binding is for the Supreme Court, not us, to answer." *Illumina, Inc. v. Fed. Trade Comm'n*, 88 F.4th 1036, 1047 (5th Cir. 2023). *See also Consumers' Rsch. v. Consumer Prod. Safety Comm'n*, 91 F.4th 342 (5th Cir. 2024). It is not for this Court to answer, either.

*C) The Merits*

On the merits, USAP argues that the FTC's market definition of "hospital-only anesthesia services" is improper and unsupported by the factual allegations. Specifically, USAP argues that the FTC does not address interchangeability or cross-elasticity of demand, and that the market should also include out-of-hospital

---

[5] USAP did not spend many words, either. Instead, USAP incorporated Welsh Carson's constitutional argument into its own brief with no elaboration.

anesthesiologists. But the FTC's complaint does address this by saying that hospital patients get no say in their anesthesiologist; "Patients requiring hospital care cannot switch to outpatient anesthesia regardless of price." Thus, it does not matter if, theoretically, out-of-patient anesthesiologists could perform the same services within the hospital, because as a practical matter once a patient requires treatment in a hospital, out-of-hospital anesthesiology services are off the table. The complaint alleges that industry participants, including USAP and insurers, recognize the distinctions between in- and out-patient anesthesia care. The complaint also alleges that out-patient anesthesia services do not adequately constrain prices for in-patient care because anesthesiologists face significantly different working conditions in hospitals, and hospitals often have sticky and exclusive anesthesia services contracts. At this stage, the Court cannot say the FTC has failed to allege a plausible market definition.

Next, USAP argues that the FTC has not sufficiently alleged that USAP enjoys monopoly power. The FTC quotes an insurance executive describing USAP's consolidation strategy as "tak[ing] the highest rate of all . . . and then peanut butter spread that across the entire state of Texas." The FTC alleges that USAP has raised prices significantly, charging the highest rates in Houston and Dallas, and double the median rate in Texas. No anesthesia group could achieve this before USAP began its consolidation strategy. USAP also alleges that payors tried to constrain USAP's high rates but failed due to insufficient alternatives. Whether USAP charges above a

competitive price or enjoys monopoly power are factual disputes. These considerations also apply to USAP's argument that the FTC has failed to allege anticompetitive conduct under the Sherman Act or the Clayton Act. The FTC has plausibly alleged acquisitions resulting in higher prices for consumers, along with a market allocation and price-setting scheme. It would be premature to dismiss these claims at this stage.

## VI.    CONCLUSION

Based on the foregoing analysis and discussion, the Court **GRANTS** Welsh Carson's motion to dismiss and **DENIES** USAP's motion to dismiss.

It is so **ORDERED**.

SIGNED on May 13, 2024, at Houston, Texas.

Kenneth M. Hoyt
United States District Judge