# EXHIBIT E

to Second Arin Declaration in Support of Plaintiff Federal Trade Commission's Motion for Entry of Protective Order

FILED
8/22/2023 4:31 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Jenifer Trujillo DEPUTY

CAUSE NO. DC-22-15482

| | | |
|---|---|---|
| U.S. ANESTHESIA PARTNERS OF TEXAS, P.A., a Texas Professional Corporation, | § § § § | IN THE DISTRICT COURT |
| Plaintiff, | § § | |
| VS. | § § | 116th JUDICIAL DISTRICT |
| GISELLE CONLIN, M.D., JANNA HARTMAN, M.D., VICTOR LAI, M.D. BRIAN SEASTRUNK, M.D., ANDREW ZUROVEC, JENNIFER ZUROVEC and ORTHOMED STAFFING, LLC | § § § § § § § | |
| Defendants. | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S FIRST AMENDED PETITION

COMES NOW, Plaintiff U.S. ANESTHESIA PARTNERS OF TEXAS, P.A. ("Plaintiff"), and files this First Amended Petition against Defendants Giselle Conlin, M.D. ("Conlin"), Janna Hartman, M.D. ("Hartman"), Victor Lai, M.D. ("Lai"), Brian Seastrunk, M.D. ("Seastrunk"), Andrew Zurovec, M.D. ("A. Zurovec"), Jennifer Zurovec, M.D. ("J. Zurovec"),[1] and OrthoMed Staffing, LLC ("OrthoMed") (collectively "Defendants") and respectfully shows the Court as follows:

## I. DISCOVERY LEVEL

1.     Plaintiff asks that this case be designated as "Level 3" for purposes of discovery pursuant to Rule 190.4 of the Texas Rules of Civil Procedure.

## II. STATEMENT OF RELIEF SOUGHT

2.     Plaintiff seeks monetary relief in excess of $250,000, but not more than $1,000,000, excluding interest, statutory punitive damages or penalties and attorneys' fees and costs. The damages sought are within the jurisdictional limits of this Court.

---

[1] Conlin, Hartman, Lai, Seastrunk, A. Zurovec, and J. Zurovec are collectively referred to herein as the "Individual Defendants."

### III. <u>PARTIES AND VENUE</u>

3.     Plaintiff U.S. Anesthesia Partners of Texas, P.A. is a professional association organized under the laws of the state of Texas and located in Dallas, Texas.

4.     Conlin is an individual residing at 210 Thelma Dr., San Antonio, TX 78212.

5.     Hartman is an individual residing at 8602 Terra Dale, San Antonio, TX 78255.

6.     Lai is an individual residing at 211 Bentley Manor, Shavano Park, TX 78249.

7.     Seastrunk is an individual residing at 22939 Central Prairie, San Antonio, TX 78255.

8.     A. Zurovec is an individual residing at 3535 Ivory Creek, San Antonio, TX 78258.

9.     J. Zurovec is an individual residing at 17838 Salado Draw, San Antonio, TX 78258.

10.     OrthoMed is a medical staffing company specializing in health care professionals providing anesthesiology services. OrthoMed is a Texas limited liability company. OrthoMed may be served by serving its registered agent: Alex Doa, 5601 Champions Dr., Plano, Texas.

11.     Venue is appropriate in Dallas County as the Individual Defendants contractually agreed (in Section 10.10.1 of the Agreement and Plan of Merger among U.S. Anesthesia Partners Holdings, Inc., U.S. Anesthesia Partners of Texas, P.A., Star Merger Sub, PLLC, and Star Anesthesia, P.A. ("Star"), dated June 11, 2019, relevant portions of which are attached as Exhibit A (the "Merger Agreement")) to exclusive venue in the federal and state courts located in Dallas County for any claims arising under the Merger Agreement.

### IV. <u>BACKGROUND FACTS</u>

12.     The Individual Defendants are partners and former employees of Plaintiff.

13.     Prior to employment by Plaintiff, the Individual Defendants were shareholders of Star.

14.     Pursuant to the Merger Agreement, the Individual Defendants were provided with certain consideration in exchange for their ownership interest in Star.

15.     Pursuant to the Merger Agreement, the Individual Defendants are bound by certain restrictive covenants, as follows:

9(a). Section 5.10.1 of the Merger Agreement provides:

> For a period of five (5) years beginning on the Closing Date, except with respect to activities performed in furtherance of a Seller's obligations under a Seller's employment agreement with any Subject Company or the Buyer, each Seller shall not, directly or indirectly, either individually or as a partner, joint venturer, employee, agent, representative, officer, director, or member of any Person: (i) except for the Permitted Pain Services by the Pain Physicians, solicit or otherwise attempt to contact any past or current patient of a Subject Company, or immediate family member of such patient, for purposes of inducing that patient or family member of such patient to become a patient of such Seller or the patient of any medical practice in which Seller practices or otherwise has a financial interest; (ii) except for the Permitted Pain Services by the Pain Physicians, provide Anesthesia Business Services within five (5) miles of any of the Facilities serviced by a Subject Company within the twenty-four (24) month period prior to the date hereof; (iii) call on, solicit or attempt to solicit any Facility serviced by a Subject Company within the twenty-four month period prior to the date hereof for the purpose of persuading or attempting to persuade any such Facility to cease doing business with, or materially reduce the volume of, or adversely alter the terms with respect to, the business such Facility does with such Subject Company or in any way interfere with the relationship between any such Facility and a Subject Company; (iv) except for the Permitted Pain Services by the Pain Physicians, solicit any of the Facilities for the purpose of obtaining any contractual relationship with the Facility for such Seller or any medical practice in which such Seller practices or otherwise has a financial interest; (v) except for the Permitted Pain Services by the Pain Physicians, solicit or otherwise attempt to contact any physician (including surgeons) for which licensed physicians, CRNAs, AAs and other authorized health care providers who are employed by or providing services on behalf of a Subject Company currently provide, or have provided as of the date hereof or during the twelve month period prior to the date hereof consultative services or anesthesia services, for purposes of inducing such physician to consult with such Seller or consult with any medical practice in which such Seller practices or otherwise has a financial interest; or (vi) solicit for employment, or employ or engage any individual who is or was employed by a Subject Company during the twenty-four (24) month period prior to the date hereof.

9(b). Section 5.10.2 of the Merger Agreement provides:

For a period of five (5) years beginning on the Closing Date, except with respect to activities performed in furtherance of a Seller's obligations under a Seller's employment agreement with any Subject Company or the Buyer and for the Permitted Pain Services by the Pain Physicians, each Seller shall not, directly or indirectly, either individually or as a partner, joint venturer, employee, agent, representative, officer, director, or member of any Person, provide Anesthesia Services within five (5) miles of any of the Facilities serviced by a Subject Company within the twenty-four (24) month period prior to the date hereof. The provisions of this Section 5.10.2 are for the benefit of the Buyer only.

16.     The Merger Agreement defines "Facilities" as "any facility or location where any of the Subject Companies provides or arranges for the provision of Anesthesia Services." *See* Exhibit A, §1 (Definitions).

17.     The Merger Agreement defines "Subject Companies" as meaning Star and any of its subsidiaries. See Exhibit A, §1 (Definitions).

18.     The restrictive covenants in the Merger Agreement were ancillary to the merger of Star with Plaintiff, are reasonable in scope and duration, and were designed to maintain the value of the goodwill being transferred by Star to Plaintiff.

19.     The Merger Agreement provides for recovery of attorneys' fees to a successful or prevailing party in a suit to enforce the Merger Agreement. *See* Exhibit A, §10.16.

20.     As a result of the Merger Agreement, the Individual Defendants were paid monetary consideration for their interest in Star.

21.     As a result of the merger, which closed on or about June 11, 2019, the Individual Defendants became employees of Plaintiff pursuant to Physician Partner Employment Agreements ("Employment Agreement"), copies of which are attached as Exhibits B-G.

22.     Pursuant to Section 7(b) of the Employment Agreement, the Individual Defendants could only terminate the Employment Agreement without cause if they gave Plaintiff 180 days' prior written notice.

23. The Employment Agreement provides for liquidated damages for failure to provide the requisite notice in the amount of "all costs and expenses Group incurs in obtaining locum tenens coverage as an interim replacement for Physician in recruiting a permanent replacement" (the "Early Termination Damages"). *See* Exhibit B, §7(l).

24. On November 30, 2021, Seastrunk provided Plaintiff with 54 days' notice of his intention to resign from employment with Plaintiff. Such notice failed to give the required notice under Section 7(b) by 126 days.

25. On December 20, 2021, Lai provided Plaintiff with 87 days' notice of his intention to resign from employment with Plaintiff. Such notice failed to give the required notice under Section 7(b) by 93 days.

26. On April 28, 2022, Conlin provided Plaintiff with 60 days' notice of her intention to resign from employment with Plaintiff. Such notice failed to give the required notice under Section 7(b) by 120 days.

27. On May 10, 2022, Hartman provided Plaintiff with 60 days' notice of her intention to resign from employment with Plaintiff. Such notice failed to give the required notice under Section 7(b) by 120 days.

28. On May 10, 2022, A. Zurovec provided Plaintiff with approximately 50 days' notice of his intention to resign from employment with Plaintiff. Such notice failed to give the required notice under Section 7(b) by 130 days.

29. On May 10, 2022, J. Zurovec provided Plaintiff with 62 days' notice of her intention to resign from employment with Plaintiff. Such notice failed to give the required notice under Section 7(b) by 118 days.

30.     On June 1, 2022, Plaintiff wrote letters to the Individual Defendants and demanded that they either extend her intended separation date to provide the requisite notice or pay Plaintiff Early Termination Damages under the Employment Agreement. *See* letter dated June 1, 2022, from Ki'Jhana R. Friday, Esq., to Conlin, attached hereto as Exhibit H.

31.     In addition, Ms. Friday's June 1, 2022, letter to Seastrunk demanded that he repay $92,289.48 in excess compensation that had been paid him.  Under Plaintiff's Plan Regarding Compensation for Services (USAP South Texas) ("PRCS") (attached hereto as Exhibit I), Physician Partners such as Seastrunk are not allowed to maintain a "negative balance" upon termination (in other words, compensation owed must reflect a zero balance).

32.     Lai had previously, through his counsel, via letter dated March 18, 2022, denied owing Plaintiff Early Termination Damages.

33.     Conlin responded, through her counsel, via letter dated June 2, 2022, rejecting the options presented to her.

34.     Seastrunk responded via letter dated June 30, 2022, refusing to pay the Early Termination Damages, and refusing to return the repayment.

35.     J. Zurovec responded, through her counsel, via letter dated June 30, 2022, rejecting the options presented to her.

36.     A. Zurovec responded, through his counsel, via letter dated July 8, 2022, rejecting the options presented to him.

37.     Hartman responded, through her counsel, via letter dated August 23, 2022, rejecting the options presented to her.

38.     Upon information and belief, the Individual Defendants have accepted employment with OrthoMed, one of Plaintiff's major competitors, to perform anesthesiology services.

39.     Upon further information and belief, the Individual Defendants are providing anesthesiology services within five (5) miles at one or more of the Facilities that was serviced by Star during the twenty-four-month period prior to the effective date of the Merger Agreement in violation of Sections 5.10.1(ii) and 5.10.2 of the Merger Agreement, including, but not limited to:

a.  Conlin: Texas Center for Athletes, Methodist Ambulatory Surgery Center-North Central, Methodist Hospital, and Stone Oak Surgery Center.

b.  Hartman: Christus Alamo Heights Surgery Center, Methodist Ambulatory Surgery Center-North Central, Legent Orthopedic and Spine, and Methodist Hospital Stone Oak.

c.  Lai: Methodist Hospital, Methodist Ambulatory Surgery Center-North Central, and Stone Oak Surgery Center.

d.  Seastrunk: Methodist Hospital and Surgery Center of Boerne.

e.  A. Zurovec: Methodist Ambulatory Surgery Center-North Central, Stone Oak Surgery Center, and Legent Orthopedic and Spine.

f.  J. Zurovec: Methodist Hospital Stone Oak and Methodist Hospital.

40.     Upon additional information and belief, the Individual Defendants are soliciting surgeons on behalf of OrthoMed who received consultative or anesthesia services from USAP employees as of the date of the close of the merger or in the twelve-month period prior to the merger in violation of Section 5.10.1(v) of the Merger Agreement.

41.     Upon information and belief, OrthoMed has knowledge of the restrictive covenants contained in the Merger Agreement and the Individual Defendants' violations of the restrictive covenants are with OrthoMed's knowledge and consent.

## V. <u>FIRST CAUSE OF ACTION – BREACH OF CONTRACT</u>

### (Against each Individual Defendant as to Merger Agreement)

42.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein.

43.     The Merger Agreement is a valid and enforceable written contract.

44.     The Individual Defendants have breached their contractual obligation to Plaintiff by providing anesthesiology services within five miles of one or more Facilities, as that term is defined by the Merger Agreement.

45.     The Individual Defendants have further breached their contractual obligations to Plaintiff by soliciting physicians to whom employees of Plaintiff provided consulting or anesthesia services as of the date of the close of the merger or in the twelve-month period prior to the merger.

46.     Plaintiff has suffered economic damages by the Individual Defendants' breach of their contractual obligation.

47.     Plaintiff also seeks to recover its reasonable attorneys' fees in this matter as this is a claim on a written contract. Because of the Individual Defendants' breach of their contractual obligations, Plaintiff has been required to obtain the service of the undersigned counsel to prosecute this action.

48.     Plaintiff has performed all conditions precedent to recovery herein, or all such conditions precedent are excused by the doctrines of waiver, estoppel, laches, or unclean hands.

## VI. <u>SECOND CAUSE OF ACTION – BREACH OF CONTRACT</u>

### (Against each Individual Defendant as to his or her Employment Agreement)

49.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein.

PLAINTIFF'S FIRST AMENDED PETITION                                    PAGE 8

50.     The Employment Agreements are valid and enforceable written contracts.

51.     Each Individual Defendant has breached his or her contractual obligation to Plaintiff by failing to provide the required notice for a termination without cause under the Employment Agreements.

52.     Demand has been made for the Individual Defendants to comply with the Employment Agreement's notice requirement or to pay Early Termination Damages. they have refused this demand.

53.     Plaintiff has therefore been damaged in the following amounts by each Individual Defendant's breach of his or her contractual obligations under the Employment Agreement:

      a.     Conlin: $162,614.33

      b.     Hartman: $165,374.08.

      c.     Lai: $163,438.42.

      d.     Seastrunk: $226,912.22.

      e.     A. Zurovec: $163,438.42.

      f.     J. Zurovec: $163,438.42.

54.     Plaintiff also seeks to recover its reasonable attorneys' fees in this matter as this is a claim on a written contract. Because of the Individual Defendants' breach of their contractual obligations, Plaintiff has been required to obtain the service of the undersigned counsel to prosecute this action.

55.     Plaintiff has performed all conditions precedent to recovery herein, or all such conditions precedent are excused by the doctrines of waiver, estoppel, laches, or unclean hands.

## VII. <u>THIRD CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACT</u>

### (OrthoMed)

56.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as if set forth herein.

57.     The Merger Agreement is a valid and enforceable written contract.

58.     OrthoMed knows or should have known about the restrictive covenants contained in the Merger Agreement.

59.     OrthoMed has induced the Individual Defendants to violate the restrictive covenants in the Merger Agreement and has interfered with the contract (the Merger Agreement) between Plaintiff and the Individual Defendants.

60.     OrthoMed's interference with the Merger Agreement was willful and intentional and without justification.

61.     Plaintiff has suffered economic damages by OrthoMed's interference with the Individual Defendants' obligations under the Merger Agreement.

## VIII. <u>FOURTH CAUSE OF ACTION – CONSPIRACY</u>

### (All Defendants)

62.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as set forth herein.

63.     As described above, Defendants, in a combination of two or more persons, sought to accomplish an unlawful purpose and/or a lawful purpose by unlawful means. Defendants acted in concert to unlawfully compete with Plaintiff for the purpose of depriving Plaintiff of business for the financial benefit of Defendants.

64.     Upon information and belief, Defendants discussed, planned, schemed, and ultimately had a meeting of the minds to unfairly compete with Plaintiff and to interfere with its contracts with Individual Defendants and contracts with Facilities.

65.     Each of the Defendants has committed an unlawful, overt act (such as breach of contractual obligations and/or tortious interference with contractual obligations) to further the object or course of action.

66.     As a direct and proximate result of Defendants' conspiracy, Plaintiff has suffered, and will continue to suffer, substantial monetary losses and other harm.

67.     In committing these acts, Defendants acted with malice toward Plaintiff, in that Defendants had knowledge of the restrictive covenants contained in the Merger Agreement signed by the Individual Defendants and nonetheless proceeded to willfully and intentionally violate, or induce other Defendants to violate, the restrictive covenants contained in the Merger Agreement with the specific intent to cause substantial injury or harm to Plaintiff. Plaintiff is thus entitled to recover exemplary damages from Defendants.

## IX. <u>FIFTH CAUSE OF ACTION – BREACH OF CONTRACT (PRCS)</u>

### (Seastrunk)

68.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs for all purposes the same as set forth herein.

69.     The PRCS is a valid and enforceable written contract.

70.     Seastrunk has breached his contractual obligation to Plaintiff by maintaining a negative compensation balance and failing to repay Plaintiff to achieve the requisite negative compensation balance.

71.     Demand has been made for Seastrunk to comply with the PRCS.  Seastrunk has refused this demand.

72.     Plaintiff has therefore been damaged in the amount $92,289.48 by Seastrunk's breach of his contractual obligations under the Employment Agreement.

73.     Plaintiff also seeks to recover its reasonable attorneys' fees in this matter as this is a claim on a written contract.  Because of Seastrunk's breach of his contractual obligations, Plaintiff has been required to obtain the service of the undersigned counsel to prosecute this action.

74.     Plaintiff has performed all conditions precedent to recovery herein, or all such conditions precedent are excused by the doctrines of waiver, estoppel, laches, or unclean hands.

## X. **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully requests the following relief:

a.     That Defendants be served with process and be required to answer in the time and manner prescribed by law;

b.     General damages in an amount in excess of $1,000,000;

c.     Exemplary damages in an amount to be determined by the Court;

d.     Pre-Judgment interest as provided by law;

e.     Attorneys' fees and costs of court;

f.     Post-Judgment interest as provided by law;

g.     Such other and further relief, general and special, at law or in equity, to which the Plaintiff may be entitled.

Respectfully submitted,

By: *Jacqueline C. Johnson*
Jacqueline C. Johnson
Texas Bar No. 00790973
Email: jjohnson@constangy.com
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
1201 Elm Street, Suite 2550
Dallas, Texas 75270

Lara C. de Leon
Texas Bar No. 24006957
Email: ldeleon@constangy.com
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
1100 NW Loop 410, Suite 700
San Antonio, TX 78213
Telephone: (210) 920-2310

**ATTORNEYS FOR PLAINTFF**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby acknowledges that a true and correct copy of the above-mentioned document was sent via this Court's electronic filing system on this the 22nd day of August 2023, to counsel of record as follows:

Lu Pham
Caroline Harrison
Spencer Mainka
PHAM HARRISON, LLP
505 Pecan St., Suite 200
Fort Worth, Texas 76102

**ATTORNEYS FOR DEFENDANTS**

_/s/ Jacqueline C. Johnson_
Jacqueline C. Johnson

PLAINTIFF'S FIRST AMENDED PETITION                                    PAGE 13

# EXHIBIT A

AGREEMENT AND PLAN OF MERGER

among

U.S. ANESTHESIA PARTNERS HOLDINGS, INC.,

U.S. ANESTHESIA PARTNERS OF TEXAS, P.A.,

STAR MERGER SUB, PLLC and

STAR ANESTHESIA, P.A.

Dated as of June 11, 2019

"Estimated Company Transaction Expenses" means the estimated Company Transaction Expenses of the Subject Companies, as set forth on the Closing Certificate.

"Exchange Agreement" is defined in the recitals to this Agreement.

"Facilities" means any facility or location where any of the Subject Companies provides or arranges for the provision of Anesthesia Services.

"Final Closing Cash Amount" means the Closing Cash Amount of the Subject Companies as finally determined pursuant to Section 2.12.

"Final Closing Debt Amount" means the Closing Debt Amount of the Subject Companies as finally determined pursuant to Section 2.12.

"Final Closing Statement" is defined in Section 2.12.1.

"Final Company Transaction Expenses" means the Company Transaction Expenses of the Subject Companies as finally determined pursuant to Section 2.12.

"Financials" is defined in Section 3.6.1(b).

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time.

"Government Contract" means any Contractual Obligation between any Subject Company and (a) any Governmental Authority, (b) any prime contractor or grantee of a Governmental Authority in its capacity as prime contractor or grantee, and (c) any subcontractor or sub-award at any tier with respect to any Contractual Obligation of a type described in (a) or (b) above.

"Governmental Authority" means any federal, state, local or any foreign government, or political subdivision thereof; or any multinational organization or authority; or any authority, agency or commission entitled to exercise any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power; or any court or tribunal (or any department, bureau or division thereof); or any arbitrator or arbitral body.

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, ruling, determination or award entered by or with any Governmental Authority.

"Group Holdings" is defined in the recitals to this Agreement.

"Group Holdings Common Stock" is defined in the recitals to this Agreement.

"Guarantee" means, with respect to any Person, (a) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Debt or other Liability of any other Person, (b) any other arrangement whereby credit is extended to any obligor (other than such Person) on the basis of any promise or undertaking of such Person (i) to pay the Debt or other Liability of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to

-9-

"<u>Sellers</u>" means all of the members of the Company (other than the Conroe Partners).

"<u>Sellers' Joinder Agreement</u>" is defined in Section 6.11.

"<u>Sellers' Knowledge</u>" means any of the persons set forth on the attached Schedule II who has actual knowledge of the fact or other matter at issue assuming that each such person has made, consistent with such person's position with a Subject Company, as applicable, all reasonable inquiries of the employees of such Subject Company reasonably expected to have actual knowledge of such fact or matter.

"<u>Sellers' Representative</u>" is defined in Section 5.13.1.

"<u>Sellers' Representative Fund</u>" means any and all cash from time to time held by the Sellers' Representative with respect to the Sellers' Representative Fund Amount.

"<u>Sellers' Representative Fund Amount</u>" means $150,000 in cash funded by the Subject Companies to the Sellers' Representative prior to the Closing Date which is to be held by the Sellers' Representative as an advance towards any fees or expenses incurred by the Sellers' Representative pursuant to this Agreement or otherwise on the Sellers' behalf.

"<u>Shares</u>" is defined in the recitals to this Agreement.

"<u>Star IT</u>" is defined in Section 6.19.

"<u>Stockholders Agreement</u>" means the Stockholders Agreement dated as of November 30, 2017 by and among Parent and the other parties thereto, as amended.

"<u>Straddle Period</u>" means any taxable period that includes (but does not end on) the Closing Date.

"<u>Straddle Period Return</u>" is defined in Section 5.14.3.

"<u>Subject Companies</u>" means, collectively, the Company and each of its Subsidiaries.

"<u>Subsidiary</u>" means with respect to any Person (the "<u>Owner</u>"), any corporation or other Person of which securities or interests having the power to elect a majority of the corporation or other Person's board of directors or similar governing body are held by the Owner or one or more of its Subsidiaries.

"<u>Surviving Entity</u>" is defined in Section 2.2.

"<u>Tax</u>" or "<u>Taxes</u>" means (a) any and all federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar, including FICA), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind or any charge of any kind in the nature of (or similar to) taxes whatsoever, including any interest, penalty, or addition thereto, whether disputed or not and (b) any liability

Documents of a Subject Company) or any indemnification agreement between any of the Subject Companies and/or any Company Agent shall survive the transactions contemplated hereby, and for a period of six (6) years from and after the Closing Date, shall not be amended, repealed or otherwise modified in any manner that would adversely affect the rights thereunder of any such Company Agent, unless an alteration or modification of such document is required by Legal Requirement or the Company Agent affected thereby otherwise consents in writing thereto.

(b)     The Subject Companies shall (i) have paid in full prior to the Closing and have in effect at the Closing "tail" insurance policies with a claims period of six (6) years from and after the Closing Date with respect to the insurance policies identified on Schedule 5.8.1(b)(i) for acts or omissions occurring prior to the Closing Date ("Claims Made Policies") covering the persons who are currently covered by the Claims Made Policies on terms (as to coverage and amount) no less advantageous in the aggregate to such persons than under such current Claims Made Policies and (ii) add the Buyer as an "Additional Named Insured" under the insurance policy identified on Schedule 5.8.1(b)(ii).

(c)     In the event that the Subject Companies or any of their respective successors or assigns (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers all or substantially all of its properties and assets to any Person, the Surviving Entity shall ensure that such Person assumes the obligations set forth in this Section 5.8.

5.9     Publicity.   The Company shall not, and shall not permit any other Subject Company to, make any public announcement or disclosure with respect to the subject matter of this Agreement or the Contemplated Transactions without the prior written consent of Parent and prior to the Closing, no public announcement or disclosure will be made by Parent, the Buyer or Merger Sub with respect to the subject matter of this Agreement or the Contemplated Transactions without the prior written consent of the Company; provided, that the provisions of this Section 5.9 will not prohibit (a) any disclosure required by any applicable Legal Requirements (in which case the disclosing party will provide the other parties with the opportunity to review in advance the disclosure) or (b) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement or the Contemplated Transactions.

5.10     Restrictions on Competition and Solicitation.

5.10.1     For a period of five (5) years beginning on the Closing Date, except with respect to activities performed in furtherance of a Seller's obligations under a Seller's employment agreement with any Subject Company or the Buyer, each Seller shall not, directly or indirectly, either individually or as a partner, joint venturer, employee, agent, representative, officer, director, or member of any Person: (i) except for the Permitted Pain Services by the Pain Physicians, solicit or otherwise attempt to contact any past or current patient of a Subject Company,

-63-

or immediate family member of such patient, for purposes of inducing that patient or family member of such patient to become a patient of such Seller or the patient of any medical practice in which Seller practices or otherwise has a financial interest; (ii) except for the Permitted Pain Services by the Pain Physicians, provide Anesthesia Business Services within five (5) miles of any of the Facilities serviced by a Subject Company within the twenty-four (24) month period prior to the date hereof; (iii) call on, solicit or attempt to solicit any Facility serviced by a Subject Company within the twenty-four month period prior to the date hereof for the purpose of persuading or attempting to persuade any such Facility to cease doing business with, or materially reduce the volume of, or adversely alter the terms with respect to, the business such Facility does with such Subject Company or in any way interfere with the relationship between any such Facility and a Subject Company; (iv) except for the Permitted Pain Services by the Pain Physicians, solicit any of the Facilities for the purpose of obtaining any contractual relationship with the Facility for such Seller or any medical practice in which such Seller practices or otherwise has a financial interest; (v) except for the Permitted Pain Services by the Pain Physicians, solicit or otherwise attempt to contact any physician (including surgeons) for which licensed physicians, CRNAs, AAs and other authorized health care providers who are employed by or providing services on behalf of a Subject Company currently provide, or have provided as of the date hereof or during the twelve month period prior to the date hereof consultative services or anesthesia services, for purposes of inducing such physician to consult with such Seller or consult with any medical practice in which such Seller practices or otherwise has a financial interest; or (vi) solicit for employment, or employ or engage any individual who is or was employed by a Subject Company during the twenty-four (24) month period prior to the date hereof.

5.10.2    For a period of five (5) years beginning on the Closing Date, except with respect to activities performed in furtherance of a Seller's obligations under a Seller's employment agreement with any Subject Company or the Buyer and for the Permitted Pain Services by the Pain Physicians, each Seller shall not, directly or indirectly, either individually or as a partner, joint venturer, employee, agent, representative, officer, director, or member of any Person, provide Anesthesia Services within five (5) miles of any of the Facilities serviced by a Subject Company within the twenty-four (24) month period prior to the date hereof.  The provisions of this Section 5.10.2 are for the benefit of the Buyer only.

5.10.3    A Seller may be released from the non-competition provision contained in Section 5.10.2 upon payment by such Seller to the Buyer of a reasonable price prior to a breach by such Seller.  The Buyer, on the one hand, and each Seller, on the other hand, acknowledge, and hereby decline, their option to have the reasonable price of the buy-out determined by an arbitrator.  The Buyer, on the one hand, and each Seller, on the other hand, agree that a reasonable price shall be an amount in cash equal to such Seller's Pro Rata Share of the sum of (i) the Closing Equity Value, plus (ii) the Indemnity Escrow Amount.

matter, or other items or matters, are or are not in the Ordinary Course of Business, and no party hereto shall use the fact of the setting forth or the inclusion of any such item or matter in any dispute or controversy between the parties as to whether any obligation, item or matter not described herein or included in the Disclosure Schedule is or is not in the Ordinary Course of Business for purposes of this Agreement.

10.14   No Rescission.   Except with respect to claims based upon fraud or intentional misrepresentation, no party hereto shall be entitled to rescind the transactions contemplated hereby by virtue of any failure of any such party's representations and warranties herein to have been true or any failure by any party hereto to perform its obligations hereunder.

10.15   Expenses.   Except as otherwise provided herein, each party hereto will pay all costs and expenses incident to its negotiation and preparation of this Agreement and to its performance and compliance with all agreements and conditions contained herein on its part to be performed or complied with, including the fees, expenses and disbursements of its counsel, accountants, advisors and consultants.

10.16   Attorneys' Fees.   If any Action for the enforcement of this Agreement is brought, or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions hereof, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that proceeding, in addition to any other relief to which it may be entitled.

10.17   Certain Matters Regarding Representation of the Sellers and the Subject Companies.

(a)      Company Counsel has acted as counsel for the Sellers and the Subject Companies in connection with this Agreement (the "Acquisition Engagement") and in that connection not as counsel for any other Person, including without limitation, Parent, the Buyer or Merger Sub. Company Counsel may also represent the Subject Companies in respect of other matters ("Company Engagements"). Only the Sellers and the Subject Companies shall be considered clients of Company Counsel in the Acquisition Engagement. All communications between the Sellers or the Subject Companies and Company Counsel in the course of the Acquisition Engagement shall be deemed to be attorney-client confidences that belong solely to the Sellers and not the Subject Companies. Accordingly, none of Parent, the Buyer or Merger Sub shall have access to any such communications, or to the files of Company Counsel relating to the Acquisition Engagement, whether or not the Closing occurs. Without limiting the generality of the foregoing, upon and after the Closing, (i) the Sellers and Company Counsel shall be the sole holders of the attorney-client privilege with respect to the Acquisition Engagement, and neither the Subject Companies nor the Buyer shall be a holder thereof, (ii) to the extent that files of Company Counsel in respect of the Acquisition Engagement constitute property of the client, only the Sellers shall hold such property rights, and (iii) Company Counsel shall have no duty whatsoever to reveal or disclose any such attorney-client communications or

-88-

# EXHIBIT B

Execution Version

## PHYSICIAN PARTNER EMPLOYMENT AGREEMENT

This PHYSICIAN PARTNER EMPLOYMENT AGREEMENT (the "**Agreement**") is entered into by and between U.S. Anesthesia Partners of Texas, P.A., a Texas professional association ("**Group**") and Giselle Conlin, M.D. ("**Physician**").

RECITALS

A.      Group is a Texas professional association authorized to practice medicine in the State of Texas (the "**State**") that provides professional anesthesiology services (including any specialty thereof), pain management, anesthesia related consulting, management and administrative services ("**Services**") to patients at inpatient and outpatient facilities.

B.      Physician is a licensed physician authorized to practice medicine in the State and Group desires to hire Physician to perform the Services at some or all of the Facilities (as defined below) on behalf of Group as set forth herein.

C.      Certain clinical operations of Group including, but not limited to, making certain determinations and decisions regarding the modification and termination of this Agreement, are managed and overseen by the USAP South Texas Clinical Governance Board (the "**CGB**") established by the Plan Regarding Compensation for Services (USAP South Texas) dated as of September 6, 2019, as such plan may be amended, modified, replaced or superseded (the "**PRCS**").

D.      Physician is acknowledged as a "Physician-Partner" (as such term is defined in the PRCS) within the CGB.

E.      It is determined to be to the mutual advantage of Group and Physician to enter into this Agreement as set out herein.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and Physician's specific agreement to the terms of Schedule 9, attached hereto and incorporated herein by reference, and the monies to be paid hereunder, Group agrees to hire Physician and Physician agrees to work for Group upon the following terms and conditions:

1.      Recitals Approved; Schedules Incorporated; CGB Authority.  The above recitals are true and correct and are made a part hereof.  Schedule 4, Schedule 9 and Exhibit 9-A, which are attached hereto, are hereby incorporated into this Agreement by reference.  Notwithstanding any provision or provisions to the contrary, the parties agree that the rights and duties of the Group are limited by the USAP South Texas Clinical Governance Board Charter, and specifically, but not limited to, Group's exercise of its right related to the termination of the Physician, Physician's staffing obligations at Facilities, Physicians use of mid-level or other clinical providers, Physician's paid time off, call obligations and Physician's scheduling.  Accordingly, any reference to the Group herein, includes and requires, where applicable, the Group to obtain the CGB's specific consent as provided in the USAP South Texas Clinical Governance Board Charter before Group may exercise its rights hereunder.

2.      Qualifications; Notifications.

(a)      At all times during the Term (as defined in Section 7) of this Agreement, Physician shall meet the following qualifications:  (i) maintain an unrestricted license to practice medicine in the State (including an "Office Based Anesthesia" permit if required by Group); (ii) maintain an unrestricted DEA permit; (ii) maintain board certification or eligibility with the American Board of Anesthesiology; and (iii) be eligible to be a participating provider with Medicare and Medicaid.  The foregoing shall collectively be referred to as the "**Qualifications**".    Physician agrees and acknowledges that Physician's employment by Group is contingent upon Physician continuously meeting the Qualifications.  In addition, Physician shall maintain unrestricted medical staff membership and clinical privileges in good standing on the Medical Staff of each Facility as directed by Group.

(b)      Physician shall notify Group, no later than forty-eight (48) hours of: (i) the initiation of any action to suspend, restrict, deny, relinquish or revoke (A) Physician's  license to practice medicine in the State or any other state in which Physician holds a license to practice medicine; (B) Physician's medical staff privileges at any Facility; or (C) Physician's DEA permit; or (ii) Physician's receipt of notice of (A) the initiation of any disciplinary proceeding or adverse action involving Physician with respect to any medically related matter before any administrative agency or governmental body; (B) the intent to file or the actual filing of any medically related liability action involving Physician in any capacity; or (C) any arrest, indictment, conviction, guilty plea or plea of nolo contendere for any criminal conduct or other crime involving dishonesty or moral turpitude naming Physician.  Physician shall provide Group with copies of any such complaints, notices, charges, lawsuits and related non-privileged documents promptly upon request of Group.

(c)      For purposes of this Agreement, "**Facilities**" mean all hospitals, facilities and other locations (i) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group and who are or were assigned to a Star Division (as defined in the PRCS (as defined below)) (individually an "**Star Clinician**") provided Services during the Term, (ii) that are located in the same county as a hospital, facility or other location described in the foregoing clause (i) or in any county contiguous to such county and at which clinicians who are or were employed by or have or had an independent contractor relationship with Group (individually a "**Related Star Clinician**" and collectively with the Star Clinicians the "**Affiliated  Clinicians**") provided Services during the Term, (iii) at which Group had a contract in effect for any (x) Star Clinicians to render Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iii)(x) or in any county contiguous to such county, and (iv) at which Group has been in active negotiations for (x) Star Clinicians to provide Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iv)(x) or in any county contiguous to such county.

3.      Duties of Physician.

(a)      Physician is employed by Group to use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to

time to maintain full-time status for a Physician-Partner (which requirements will be set forth on Schedule II to the PRCS); provided that if Physician notifies Group in writing that Physician desires to work part-time from after a specified date that is at least twelve (12) months after the date that such notice is delivered (the "**Part-Time Start Date**") and the CGB approves Physician working part-time, then from and after the Part-Time Start Date, in lieu of Physician rendering such Services on a full-time basis, Physician shall use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to time to maintain part-time status for a Physician-Partner (which requirements will be set forth on Schedule I to the PRCS). Physician shall not, without the prior written consent of the CGB and Group, which may in the CGB's and Group's sole discretion be withheld or conditioned upon Physician meeting other requirements, engage in the provision of professional medical services other than Services provided pursuant to this Agreement. Physician acknowledges and agrees that, except as otherwise agreed by the CGB and Group, Physician must meet the minimum requirements of a Physician-Partner as defined by the PRCS from time to time in order for Physician to maintain Physician's status as a Physician-Partner. At all times while Physician is an employee of Group, Physician shall retain independent discretion and shall exercise professional judgment consistent with generally accepted medical practices, the ethical standards of the Texas and American Medical Associations and the professional standards of Group, in the provision of Services at the Facilities. Physician's duties shall include but not be limited to (i) examination, evaluation and treatment of patients; (ii) participation in Group's on-call rotation for after-hours coverage; (iii) participation in Group's indigent and charity care programs; and (iv) such other duties as may reasonably be assigned by Group from time to time.

(b)       Physician shall perform all Services in accordance with (i) this Agreement; (ii) the bylaws, rules and regulations of the Medical Staff of each Facility at which Physician renders Services; (iii) the terms and conditions of any contractual arrangement regarding the performance of Services between Group and the applicable Facility (upon written request, a summary of the material and relevant terms of any such agreement shall be provided to Physician); and (iv) any applicable policies and procedures established by the CGB and/or Group, including but not limited to the Group's Clinical Code of Conduct and Conflict of Interest Policy.

(c)       Physician agrees and acknowledges that the CGB may conduct a review of Physician's ability to safely perform Services at any time ("**Review**").

(d)       Physician shall assist in providing supervision of physician assistants, nurses, nurse anesthetists, anesthesiology assistants and other non-physician health care personnel providing services on behalf of Group. All such non-physician personnel shall be under Physician's control and direction in the performance of health care services for patients treated by Physician.

(e)       Physician shall provide Services on a nondiscriminatory basis and may not refuse to provide medical services to any patient accepted by Group.

(f)       Physician shall participate in, and cooperate with Group in connection with, the quality assurance and risk management program(s) developed by Group. Physician shall also be subject to and actively participate in any utilization review program(s) developed by or on behalf of Group.

(g)      Physician agrees and acknowledges that many of the contractual arrangements Group holds with the Facilities are exclusive in nature and, as a result, require the automatic termination of medical staff membership and clinical privileges for all of Group's providers upon termination of the contractual arrangement.  Physician hereby agrees and consents to the foregoing and further waives any due process, notice, hearing and review rights he/she may have under such Facility's medical staff bylaws upon termination of Group's contractual relationship with Facility or upon Physician's termination of employment with Group for any reason.

4.      Compensation, Benefits, and Expense Reimbursement.  Group shall pay to or for the benefit of Physician as compensation and/or benefits for the Services performed by Physician the amounts set forth on Schedule 4.  In addition, Group shall provide Physician benefits and business expense reimbursements as set forth on Schedule 4.  Group shall provide, or cause to be provided, all space, equipment, supplies, non-physician health care personnel and clerical, administrative and other personnel as are reasonably necessary and appropriate, consistent with Group's past practices and the CGB's recommendations, for Physician's performance of Services on behalf of Group.

5.      Fees.  Group shall have exclusive authority to determine the fees, or a procedure for establishing the fees, to be charged to patients by Group.  All sums paid by any patient of Group in the way of fees, salary, or otherwise for medical services rendered by Physician shall be and remain payments of Group and shall be included in Group's income.  Physician hereby assigns to Group all rights to bill for Services rendered by Physician and shall execute any additional documentation as may be requested by Group documenting such assignment.  In the event Physician receives any amounts from any patients, third party payors or other third parties which are the property of Group, Physician shall immediately endorse and deliver the same to Group.

6.      Patients, Medical Records.  Group shall have the authority to determine who will be accepted as patients of Group.  Group also shall have the authority to designate, or to establish a procedure for designating, which professional physician of Group will handle each such patient.  Physician shall, in accordance with policies developed by or on behalf of Group, timely prepare all medical records in respect of patients treated by Physician. All medical records generated in respect of patients treated by Physician or any other physician engaged by Group during the Term shall be and remain the property of Group or Facilities, as appropriate, and shall be maintained at the Facilities; provided, however, that Physician shall have such right of access to such medical records as shall be provided by law.  In addition, Physician shall timely prepare and deliver such other records and reports relating to the operations of Group as Group may reasonably request.  Physician shall abide by all state and federal laws regarding the confidentiality of patient health information, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, and all rules and regulations promulgated thereunder, including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transaction Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164), and the Health Information Technology for Economic and Clinical Health Act of 2009 enacted as part of the American Recovery and Reinvestment Act of 2009.

7.      Term and Termination.  The term of this Agreement will commence on the September 6, 2019 and will continue thereafter until terminated as provided herein (the "**Term**").

(a)      This Agreement may be terminated upon the mutual written agreement of the parties.

(b)      Physician may terminate this Agreement without cause upon the delivery of one hundred eighty (180) days prior written notice to Group. Group may terminate this Agreement

without cause upon the delivery of ninety (90) days prior written notice to Physician; provided that during such ninety (90) day notice period, Group may elect, in its sole discretion, to remove Physician from the schedule and to pay any remaining amounts due to Physician for the remainder of such notice period.

(c)     Group may terminate this Agreement for good and sufficient cause.  Such termination shall be effective upon the delivery of written notice thereof to Physician or at such later time as may be designated in said notice, and Physician shall cease performance of Services hereunder and vacate the offices of Group and the Facilities on or before such effective date.  The written notice shall specify the cause for termination.  For purposes of this Section 7.c, the term "good and sufficient cause" shall include, but not be limited to, any one or more of the following:

(1)     Physician's failure to maintain any of the Qualifications.

(2)     A determination is made by the CGB that there is an immediate and significant threat to the health or safety of any patient as a result of the services provided by Physician, or as a result of Physician's medical misconduct or other gross neglect in the provision of professional services.

(3)     Any felony indictment naming Physician or conviction of a felony by Physician.

(4)     Any investigation for any alleged violation or violation by Physician of any Medicare or Medicaid statutes, 42 U.S.C. § 1320a-7b (the "**Anti-Kickback Statute**"), 31 U.S.C. § 3729 (the "**False Claims Act**"), 42 U.S.C. § 1395nn (the "**Stark Law**"), or the regulations promulgated pursuant to such statutes, or any similar federal, state or local statutes or regulations promulgated pursuant to such statutes.

(5)     Physician's ineligibility to be insured against medical malpractice.

(6)     Physician does not satisfactorily pass the Review, except in the instance where Physician satisfies the remedial action requested.

(7)     Any dishonest or unethical behavior by Physician that results in damage to or discredit upon Group.

(8)     Any intentional conduct or action by Physician that negatively affects the ability of Group to deliver Services to any Facility or any other facility.

(9)     Physician's violation of the Clinician Code of Conduct of Group or failure to comply with any clinical practice guidelines as may be established by Group from time to time.

(10)     Physician no longer meets the requirements to be a Physician-Partner as such requirements may, from time to time, be established or modified by the CGB.

(11)     Physician's violation of Section 9.

(d)     In the event either party shall give written notice to the other party that such other party has substantially defaulted in the performance of any material duty or material obligation imposed upon it by this Agreement, and such default shall not have been cured within thirty (30)

days following receipt of such notice, the non-defaulting party shall have the right to immediately terminate this Agreement. For purposes of this subsection (d), a default shall include Physician ceasing to be a member in good standing of the Medical Staff of any of the Facilities at which Physician is assigned to render Services by the CGB.

(e)     In the event that there shall be a change in federal or state law, the Medicare or Medicaid statutes, regulations, or general instructions (or in the application thereof), the adoption of new legislation or regulations applicable to this Agreement, or the initiation of an enforcement action with respect to legislation, regulations, or instructions applicable to this Agreement, any of which affects the continuing viability or legality of this Agreement or the ability of Group to obtain reimbursement for Services rendered by Physician, then either party may by notice propose an amendment to conform this Agreement to existing laws.  If notice of such a change or an amendment is given and if Group and Physician are unable within ninety (90) days thereafter to agree upon the amendment, then either party may terminate this Agreement by ninety (90) days' notice to the other, unless a sooner termination is required by law or circumstances.

(f)     This Agreement shall automatically terminate upon the death of Physician.

(g)     This Agreement shall terminate upon written notice by either party in the event Physician becomes disabled, as further described in Section 8.

(h)     Upon termination of this Agreement for any reason whatsoever, Physician shall submit to Group within five (5) days of such termination all outstanding charges for professional services rendered by Physician on behalf of Group.  Group shall have the right to withhold any earned, but unpaid compensation for services rendered by Physician through the effective date of termination, until such time as Physician has submitted to Group all outstanding charges for professional services rendered by Physician on behalf of Group.

(i)     Except as otherwise provided herein, upon termination of this Agreement for any reason, Physician shall be entitled to Physician's earned, but unpaid compensation for Services rendered by Physician through the effective date of termination, as determined in accordance Schedule 4.  In the event of the death of Physician, such amounts shall be paid to Physician's estate.

(j)     Immediately upon termination of this Agreement, Physician shall surrender all keys, identification badges, telephones, pagers, computers and any other property of Group in the possession of Physician.

(k)     Physician agrees and acknowledges that upon termination of this Agreement for any reason, Group shall submit Physician's Resignation (as such term is defined in Schedule 9) to any Facility at which Physician maintains medical staff privileges.

(l)     Physician agrees and acknowledges that Group will suffer significant damages if Physician terminates his or her employment without cause with less than one hundred eighty (180) days advance notice to Group as a result of, among other things, the difficulty and associated costs of recruiting and credentialing a new replacement physician.  Physician agrees that if Physician terminates this Agreement with less than one hundred eighty (180) days advance notice to Group, Physician shall pay to Group all costs and expenses Group incurs in obtaining locum tenens coverage as an interim replacement for Physician in recruiting a permanent replacement.

8.      Disability of Physician.  Upon determination by the CGB of the Disability of Physician that no reasonable accommodation may be made to perform the essential functions of a physician as stated in Section 3, this Agreement may be immediately terminated by Group upon written notice to Physician.  The term "Disability of Physician" shall have the same meaning as that type of disability that entitled Physicians to payments for permanent disability pursuant to the disability policy covering Physician.  In the event no disability policy exists covering Physician, the term "Disability of Physician," as used herein, shall mean that point in time when Physician is unable to resume the essential functions required of Physician under this Agreement, as performed prior to such time, within one hundred and eighty (180) days after the disabling event.  If the disabling event is not a separate and distinct happening, the 180-day period shall begin at the time Physician is unable to perform the essential functions of the position as stated in Section 3 for thirty (30) consecutive work days. Additionally, Physician shall be considered disabled if he/she does not perform his/her duties for one-hundred and eighty (180) days during a three hundred sixty (360) day period.  If the CGB determines that Physician is not performing his/her duties because of a physical or medical condition, then Physician shall submit to a physical and/or mental examination of two (2) independent physicians selected by the CGB reasonably in good faith to determine the nature and extent of such condition and Physician agrees to be bound by such determination.

9.      Non-Disclosure, Non-Solicitation and Non-Competition.  Physician shall comply with the non-disclosure, non-solicitation and non-competition covenants set forth on Schedule 9.

10.     Assignment of Intellectual Property.  Physician shall promptly and fully disclose all Intellectual Property to Group.  Physician hereby assigns and agrees to assign to Group (or as otherwise directed by Group) Physician's full right, title and interest in and to all Intellectual Property.  At Group's sole cost and expense, Physician agrees to execute any and all applications for patents, copyrights and/or other proprietary rights, and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by Group to assign all Intellectual Property to Group and to permit Group to enforce any patents, copyrights and/or other proprietary rights to the Intellectual Property.  All copyrightable works that Physician creates shall be considered "work made for hire" for the sole benefit of Group.  For purposes of this Section 10, "**Intellectual Property**" shall mean inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by Physician (whether alone or with others, whether or not during normal business hours or on or off Group premises) during Physician's employment with Group that either (a) relates  to the business of Group (including administering anesthesia to patients) or (b) makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities). Physician may exclude from the definition of Intellectual Property and any obligations relating thereto, inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) developed by Physician (i) prior to the date of this Agreement, which are identified on Schedule 10 attached hereto and (ii) after the date of this Agreement in connection with Physician's engagement in outside professional activities that have been approved by the CGB or that have been undertaken entirely on Physician's own time unless, in the case of this clause (ii), Physician makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities) in connection with such development (collectively, "**Excluded IP**").   Physician will promptly advise Group in writing of any Excluded IP that Physician develops or proposes to develop after the date of this Agreement that is not set forth on Schedule 10 and provide such information and assurances as Group may reasonably request to determine whether or not such Intellectual Property

constitutes Excluded IP hereunder.  If Group determines that such Intellectual Property does not constitute Excluded IP hereunder, Group will notify Physician in writing thereof within 30 days after receiving such notice, information and assurances, provided, that if Group does not notify Physician in writing within 30 days after receiving such notice, information and assurances, then such Intellectual Property shall be considered Excluded IP hereunder to the extent such Intellectual Property satisfies the requirements of Excluded IP set forth above.

11.     <u>Right of Offset</u>. If Physician's employment with Group is terminated for any reason, Group shall have the right to offset against any compensation (earned, but unpaid or otherwise) or other amounts due to Physician under this Agreement or otherwise, any indebtedness, whether or not evidenced by a promissory note and whether or not mature or due and payable, owed by Physician to Group.

12.     <u>Miscellaneous</u>.

(a)     <u>Factual Information</u>:  Physician represents and warrants that any and all factual information furnished by Physician to Group will be true and accurate in every material respect as of the date on which such information is furnished.

(b)     <u>Authority</u>:  Physician has full power and authority to enter into this Agreement and perform all obligations under this Agreement.  The execution and performance of this Agreement by Physician will not constitute a breach or violation of any covenant, agreement or contract to which Physician is a party or by which Physician is bound.

(c)     <u>Assignment; Benefit</u>:  This Agreement and the rights and duties of Physician hereunder may not be assigned by Physician without the prior written consent of Group.  Group may assign this Agreement or any and all rights or obligations hereunder, without the prior written consent of Physician, to any legal entity owned or controlled by or under common control with Group if, as a mandatory condition to such assignment, the assignee entity, commiserate with the assignment, adopt and agree in writing to be bound to and by the then current USAP South Texas Clinical Governance Board Charter and PRCS.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns.

(d)     <u>Compliance</u>:  Group and Physician expressly agree that nothing contained in this Agreement shall require Group or Physician to refer or admit any patients to any of the Facilities or to any other individual entities.  Physician agrees to use Physician's best efforts to ensure Physician's activities are in full compliance with all rules and regulations including, but not limited to, the rules and regulations relative to the Medicare and Medicaid programs, and the rules and regulations relative to any applicable private payor programs.  Physician further agrees to immediately report any violations of such rules or regulations observed by Physician to the person(s) designated in Group's compliance policies and procedures.

(e)     <u>Invalid Provision</u>:  The invalidity or unenforceability of a particular provision, paragraph, subparagraph, sentence or term of this Agreement shall not affect the other provisions, paragraphs, subparagraphs, sentences or terms hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision, paragraph, subparagraph, sentence or term was omitted.

(f)     Modification:  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto; provided, however, if Physician no longer qualifies as a Physician-Partner and the CGB has elected to change such Physician's designation from being a Physician-Partner, then without any action required by Physician (i) all references herein to Physician-Partner (other than such references in Schedule 9) shall mean a physician other than a Physician-Partner, (ii) such Physician shall no longer have the right to serve on the Clinical Governance Board or any other voting rights associated with being a Physician-Partner, (iii) Recital D herein shall be deemed to be intentionally omitted and (iv) such Physician shall receive a new compensation plan from Group pursuant to which Physician shall receive compensation for the services provided hereunder, to be attached hereto as a revised Schedule 4.

(g)     Waiver:  The waiver by either party or the CGB of a breach or violation of any provision of this Agreement will not operate as, or be construed to constitute, a waiver by such party of any subsequent breach of the same or other provision hereof.

(h)     Third Party Beneficiary:  The CGB is an express third-party beneficiary of this Agreement and shall have the right to enforce its rights hereunder in accordance with the applicable laws of the State as if it was a party hereto.

(i)     Notice:  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally delivered, or if sent by certified return receipt mail, postage prepaid, to the addresses set forth below, unless otherwise notified in writing:

GROUP:                                          w/a copy to:

U.S. Anesthesia Partners of Texas, P.A.         U.S. Anesthesia Partners, Inc.
1500 City West Blvd, Suite 300                  12222 Merit Drive, Suite 700
Houston, TX 72042                               Dallas, TX  75251
Attn:  Sr. Vice President – Operations          Attn:  General Counsel

PHYSICIAN:

Current address on file with Human Resources

(j)     Applicable Law and Venue:  This Agreement shall be governed, construed, enforced and regulated under and by the laws of the State.  Each of the parties to this Agreement hereby irrevocably and unconditionally submits, for itself and its assets and properties, to the exclusive jurisdiction of the state and Federal courts of Bexar County, Texas, and any appellate court from such court, in any action or proceeding arising out of or relating to this Agreement.

(k)     Legal Fees and Costs:  In the event that either party elects to incur legal expenses to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover such legal expenses, including without limitation, reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

(l)     Entire Agreement:  This Agreement, the Schedules attached hereto and the PRCS constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces any prior employment agreements and/or arrangements, oral or otherwise, between the parties hereto and any prior statements, representations or warranties not

expressly incorporated herein.  The parties specifically acknowledge that, in entering into and executing this Agreement, each is relying solely upon the statements, representations and agreements contained in this Agreement and no others.

(m)    <u>Survivability</u>:  The provisions of <u>Sections 3(g)</u>, <u>4</u>, <u>5</u>, <u>9</u>, <u>10</u>, <u>11</u> and <u>12</u>, <u>Schedule 4</u> and <u>Schedule 9</u> shall survive the termination or expiration of this Agreement for any reason whatsoever.  Notwithstanding the foregoing, except as otherwise expressly set forth on <u>Schedule 9</u>, the non-compete and non-solicit covenants of Physician with respect to <u>Schedule 9</u> shall terminate upon Physician's payment of the Buy-Out Amount as further described in <u>Schedule 9</u>.  In addition, the duration of the covenants contained in this Agreement shall be tolled during the continuation of any breach or violation and will continue or commence again only upon Physician's strict compliance with such covenants.

(n)    <u>Rule of Interpretation</u>:  The general rule that an agreement is to be interpreted against the drafter of an agreement in the case of an ambiguity is not to be recognized hereunder, as this Agreement was developed by the mutual consent and negotiation of the parties.  The fact that this Agreement was actually prepared by counsel for one of the parties was merely as a matter of convenience for all of the parties.  For purposes of this Agreement, the term "affiliate" shall mean means, with respect to any person or entity, any other person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified person or entity; provided that U.S. Anesthesia Partners, Inc. and its affiliates shall be deemed an Affiliate of Group, the term "control" when used with respect to any person or entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

(o)    Effective Date.  For the avoidance of doubt, this Agreement shall only be effective upon the date of the occurrence of the Effective Time (as defined in the Agreement and Plan of Merger (the "**Merger Agreement**") dated as June 11, 2019 among U.S. Anesthesia Partners Holdings, Inc., the Practice and the other parties thereto) (the "**Effective Date**").  In the event that the Merger Agreement is terminated, this Agreement shall automatically terminate and be of no further force and effect.

[Signature Page to Follow]

.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

U.S. ANESTHESIA PARTNERS OF TEXAS, P.A.

By: _____

Name: Hector Herrera, M.D.

Title:   President

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

GROUP:                                        PHYSICIAN:

                                              Giselle Conlin
U.S. ANESTHESIA PARTNERS OF TEXAS,            _____
P.A.

                                              DocuSigned by:
                                              _Giselle Conlin_
By:_____          6D2B790B3B0C404
Name:
Title:

[Signature Page to Physician-Partner Employment Agreement]

**Schedule 10**

**Carved-Out Intellectual Property**

**Intellectual Property developed prior to the Agreement and excluded from Section 10:**

None.

SCHEDULE 4

COMPENSATION, PHYSICIAN BENEFITS, BUSINESS EXPENSES
AND PROFESSIONAL LIABILITY INSURANCE

Compensation

Group shall pay to or for the benefit of Physician compensation for the Services in an amount determined under the USAP South Texas Compensation Plan, as such plan may be amended from time to time.  Physician agrees and acknowledges that Group shall only be required to exercise its normal billing procedures with respect to collecting Group's accounts receivable and will not be required to institute judicial or other procedures or any other action to collect any accounts receivable.

Physician Benefits

Physician shall be entitled to those benefits and time off which are customarily offered to similarly situated Physician-Partners under Group's employee benefits plans, subject to meeting any eligibility requirements imposed by such plans.  Physician agrees and acknowledges that Group may modify its benefits plans from time to time, provided such modifications apply to all similarly situated Physician-Partners.

Business Expenses

Group shall reimburse Physician for business expenses incurred by Physician in fulfilling his or her responsibilities under this Agreement and as set forth in Group's separate business expense reimbursement policy, as such policy may be amended by Group from time to time.

Professional Liability Insurance

Group shall purchase, maintain and pay all premiums for malpractice insurance insuring Group and Physician, with such limits of coverage and with such insurer as shall be determined by Group from time to time.

In the event Group changes to a "claims made" policy in the future, upon the termination of Physician's employment with Group for any reason, Physician shall be responsible for purchasing "tail" coverage to ensure continuous coverage to Physician and Group for the Services rendered by Physician under this Agreement.

SCHEDULE 9

NON-DISCLOSURE OF INFORMATION CONCERNING BUSINESS
AND NON-COMPETE AND NON-SOLICIT AGREEMENT

Physician recognizes that Group's decision to enter into this Agreement is induced primarily because of the covenants and assurances made by Physician in this Agreement, that Physician's covenant not to compete and not to solicit is necessary to ensure the continuation of the business of Group and the reputation of Group, as well as to protect Group from unfair business competition, including but not limited to, the improper use of Confidential Information (as defined below), and that irrevocable harm and damage will be done to Group if Physician unlawfully competes with Group.  Therefore, in consideration of the promises contained herein, including without limitation those related to Confidential Information, except as may be otherwise expressly provided in this Agreement, the Physician agrees as follows:

1.      Non-Competition:  During the Term and for a period of two (2) years following termination of this Agreement (for whatever reason) (the "**Restricted Period**"), Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services within five (5) miles of any Facility.  For purposes of this Schedule 9, "**Person**" shall mean any individual (including Physician), any association, corporation, company, trust, partnership or other entity.

2.      Non-Competition (Group): During Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services at any hospitals, facilities or other locations (other than a Facility) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group provided Services during the Term.

3.      Non-Solicit:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) solicit any past or current patient to whom Physician or any other Affiliated Clinician provided Services during the Term ("**Patient**"), or immediate family member of such Patient, for purposes of inducing the Patient to become a patient of Physician or any other Person; (ii) solicit any physician (including surgeons) for which Physician or any other Affiliated Clinician provided Services to such physician's patients at any time during the Term, for purposes of inducing such physician to consult with or utilize Physician or any other Person in the care of such physician's patients; (iii) solicit any Facility for the purpose of obtaining any contractual relationship with such Facility for Physician or any other Person; or (iv) solicit for employment, or employ or engage, any individual who is employed by Group (1) in the case of each day during the Term, within the twelve (12) month period prior to such day and (2) in the case of the period following the termination of this Agreement, within the twelve (12) month period prior to the date of

such termination, to perform services on behalf of Physician or any other Person that provides Services.  Notwithstanding the foregoing, Group shall (x) permit Physician to have access to a list of the Patients whom Physician has seen or treated within one (1) year of termination of this Agreement; and (y) provide Physician (A) access to the medical records of the Patients whom Physician has seen or treated upon authorization of the Patient in the same form as maintained or available to Group; and (B) any copies of the medical records for a reasonable fee as established by the Texas State Board of Medical Examiners under the Texas Medical Practice Act (Texas Occupations Code Section 159.008).  Any access to a list of Patients or to Patients' medical records after termination of this Agreement shall not include such list or records to be provided in a format different than that by which such records are maintained except by mutual consent of the parties to this Agreement.

4.      Non-Interference; Administrative Services:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) call on or solicit any Facility, employee, independent contractor or other Person who has a contractual relationship with Group for the purpose of persuading or attempting to persuade such Person to cease doing business with or performing services for, or materially reduce the volume of, or adversely alter the terms with respect to, the business or services that such Person does with or performs for Group or any affiliate thereof or in any way otherwise interfere with the relationship between any such Facility, employee, independent contractor or other Person, on the one hand, and Group or any affiliate thereof, on the other hand, or (ii) provide management, administrative or consulting services to any Person that provides Services within five (5) miles of any of the Facilities. This provision shall survive the payment of the Buy-Out Amount.

5.      Continuing Care.  Physician shall not be prohibited from providing continuing care and treatment to a specific Patient or Patients during the course of an acute illness at any time, including following termination of this Agreement or Physician's employment.  Following such termination, Physician understands and agrees that Physician will not be permitted to utilize Facility premises, staff, supplies and/or any other Facility-owned resource, unless failure to do so would compromise an acute patient's health and well-being, in which case Group, in its sole discretion, will provide written authorization to Physician on a case-by-case basis so that Physician may treat such Patient at the appropriate Facility, and even then, only to the extent and of such duration, that the acute nature of the Patient's condition requires.

6.      Buy-Out Exception.  Physician may be released of the non-competition and non-solicitation provisions contained in Section 1, Section 2 and Section 3 of this Schedule 9 upon payment by Physician to Group of a reasonable price prior to a breach by Physician. The parties acknowledge, and hereby decline and waive, their option to have the reasonable price of the buy-out determined by an arbitrator, whether selected by the parties or a court of competent jurisdiction.  The parties agree that a reasonable price shall be the amount equal to 200% of the Net Revenue per Physician Partner (the "**Buy-Out Amount**"). For purposes of this Schedule 9, "**Net Revenue per Physician Partner**" shall mean a dollar amount equal to (a) the total net revenue of the Star Divisions for the most recent twelve (12) month period (and for any period within twelve (12) months of the Effective Date the product obtained by multiplying (a) the quotient obtained by dividing (x) the total net revenue of the Star Division from the Effective Date to the determination date by (y) the number of days in the period from the Effective Date to the determination date by (b) 365), as determined in accordance with generally accepted accounting principles and reflected on the financial statements for Star

Divisions maintained by Group divided by (b) the average number of Physician-Partners employed by Group who are assigned to Star Divisions during the most recent twelve (12) month period. Physician and Group agree that the Buy-Out Amount is reasonable because it reflects the lost productivity and profit opportunity of Group during the Restricted Period during which Physician would otherwise not be competing with Group, and additionally compensates Group for the risk that Physician recruits away from Group physicians or other clinical staff or Facilities in which Group has made a significant investment.  The parties further agree that the Buy-Out Amount is reasonable because Group's physician-partners practice in groups, are more likely to depart in groups, oversee other employed physicians and CRNAs and have developed practice patterns, relationships, protocols and the Confidential Information in a group setting that together support a Buy-Out Amount calculated on the basis of all physician-partner revenues in particular divisions, not just the individual Physician's revenues or compensation.

7.      <u>Resignation of Privileges</u>.  Physician further agrees to relinquish Physician's privileges to practice anesthesiology and to treat chronic pain at each of the Facilities upon termination of this Agreement for any reason.  In connection herewith, Physician shall execute the resignation attached hereto and incorporated herein by reference as <u>Exhibit 9-A</u> (the "**Resignation**"), and in the event of termination of this Agreement for any reason whatsoever, Physician hereby authorizes Group to deliver such Resignation to the Facilities.  Notwithstanding the foregoing, if such Resignation would result in a reportable event to the State Board of Medical Examiners or the National Practitioner Data Bank, Group will forgo delivering the Resignation to the applicable Facility and the termination of Physician's privileges at such Facility shall be conducted in conformance with any applicable fair hearing rights set forth in the then current medical staff bylaws at the applicable Facility, or shall be delivered after the conclusion of investigation or other inquiry that would result in the Resignation becoming a reportable event.

8.      <u>Confidentiality</u>.  As of the date of the execution of this Agreement and during the course of the Physician's employment, in order to allow Physician to carry out Physician's duties hereunder, Group has provided and will continue during the Term to provide to Physician Confidential Information. Physician agrees to keep confidential and to not use or disclose to others during the Term and thereafter, except as expressly consented to in writing by Group, required by law or authorized under this Agreement, any Confidential Information. This restriction shall not apply to such information if Physician can establish that such information (i) has become generally available to and known by the public (other than as a result of an unpermitted disclosure directly or indirectly by Physician or Physician's affiliates, advisors, or representatives), (ii) has become available to Physician on a non-confidential basis from a source other than Group and its affiliates, advisors, or representatives, provided that such source is not and was not bound by a confidentiality agreement with or other obligation of secrecy of Group of which Physician has knowledge, or (iii) has already been or is hereafter independently acquired or developed by Physician without use of or reference to any Confidential Information.  Should Physician leave the employment of Group, Physician will neither take nor retain, without prior written authorization from Group, any Confidential Information. Physician further agrees to destroy any paper or electronic copies of Confidential Information, including information contained on any personal device, upon the request of Group.  For purposes of this <u>Schedule 9</u>, "**Confidential Information**" shall mean any financial, accounting and statistical information, marketing plans, business plans, feasibility studies, fee schedules or books, reimbursement rates, billing information, patient files, confidential technology, proprietary information, patient lists, policies and procedures or trade secrets of Group or U.S. Anesthesia Partners, Inc., its affiliates or managed practices ("**USAP**"), or other papers, reports, records, memoranda, documents, files, discs, or copies thereof pertaining to Group's patients or Group's or

USAP's business, sales, financial condition or products, or any matter or thing ascertained by Physician through Physician's affiliation with Group, the use or disclosure of which matter or thing might reasonably be construed to be contrary to the best interests of Group or USAP.

9.     Exceptions to Confidentiality.

a.     It shall not be a breach of Physician's covenants under Schedule 9 if a disclosure is made pursuant to a court order, a valid administrative agency subpoena, or a lawful request for information by an administrative agency.  Physician shall give Group prompt notice of any such court order, subpoena, or request for information.

b.     Physician shall not be prohibited from releasing any Confidential Information to Physician's legal counsel or financial advisors, provided that such advisors are under a legal obligation of confidentiality with respect to the Confidential Information.

c.     Nothing in this Agreement prohibits Physician from reporting an event that Physician reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as Securities and Exchange Commission or Department of Justice), requires notice to or approval from Group before doing so, or prohibits Physician from cooperating in an investigation conducted by such a government agency.  This may include disclosure of trade secret or confidential information provided the disclosure complies with the limitations set forth in the 2016 Defend Trade Secrets Act (DTSA).  Physician is hereby provided notice that under the DTSA, (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (a) is made in confident to a Federal, State or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (b) is made in a complaint or other documented filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

10.     Enforcement.  Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action asserted by Physician against Group, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of Section 1, Section 2, Section 3, Section 4 or Section 8 of this Schedule 9. It is understood by and between the parties hereto that the covenants set forth in Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 are essential elements of this Agreement, and that, but for the agreement of Physician to comply with such covenants, Group would not have agreed to enter into this Agreement.  Group and Physician agree that the foregoing covenants are appropriate and reasonable when considered in light of the nature and extent of the practice conducted by Group.  If any provision or subdivision of this Agreement, including, but not limited to, the time or limitations specified in or any other aspect of the restraints imposed under Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9, is found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such portion shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such portion in order to make it enforceable.  In the event of such judicial reformation, the parties agree to be bound by Section 1,

Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 as reformed in the same manner and to the same extent as if they had agreed to such reformed Sections in the first instance.  Without limiting other possible remedies to Group for the breach of any covenant contained in this Schedule 9, Physician agrees that injunctive or other equitable relief shall be available to enforce such covenant, such relief to be without the necessity of posting a bond, cash, or otherwise.

EXHIBIT 9-A

RESIGNATION

By signing below, I, _____ hereby agree to automatically resign my medical staff privileges at _____ ("Facility") effective as of the termination of my employment with U.S. Anesthesia Partners of Texas, P.A. for any reason or upon the termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility.  In such event, I further waive any due process, notice, hearing and review rights I may have under the Facility's medical staff Bylaws.  Upon termination of my employment or termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility, U.S. Anesthesia Partners of Texas, P.A. is hereby authorized to complete a copy of this resignation for the Facility and deliver a copy of this resignation to the medical staff office of such Facility.

_____

Name: _____

Date: _____

# EXHIBIT C

Execution Version

# PHYSICIAN PARTNER EMPLOYMENT AGREEMENT

This PHYSICIAN PARTNER EMPLOYMENT AGREEMENT (the "**Agreement**") is entered into by and between U.S. Anesthesia Partners of Texas, P.A., a Texas professional association ("**Group**") and Janna Hartman, M.D. ("**Physician**").

## RECITALS

A.      Group is a Texas professional association authorized to practice medicine in the State of Texas (the "**State**") that provides professional anesthesiology services (including any specialty thereof), pain management, anesthesia related consulting, management and administrative services ("**Services**") to patients at inpatient and outpatient facilities.

B.      Physician is a licensed physician authorized to practice medicine in the State and Group desires to hire Physician to perform the Services at some or all of the Facilities (as defined below) on behalf of Group as set forth herein.

C.      Certain clinical operations of Group including, but not limited to, making certain determinations and decisions regarding the modification and termination of this Agreement, are managed and overseen by the USAP South Texas Clinical Governance Board (the "**CGB**") established by the Plan Regarding Compensation for Services (USAP South Texas) dated as of September 6, 2019, as such plan may be amended, modified, replaced or superseded (the "**PRCS**").

D.      Physician is acknowledged as a "Physician-Partner" (as such term is defined in the PRCS) within the CGB.

E.      It is determined to be to the mutual advantage of Group and Physician to enter into this Agreement as set out herein.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and Physician's specific agreement to the terms of Schedule 9, attached hereto and incorporated herein by reference, and the monies to be paid hereunder, Group agrees to hire Physician and Physician agrees to work for Group upon the following terms and conditions:

1.      Recitals Approved; Schedules Incorporated; CGB Authority.  The above recitals are true and correct and are made a part hereof.  Schedule 4, Schedule 9 and Exhibit 9-A, which are attached hereto, are hereby incorporated into this Agreement by reference.  Notwithstanding any provision or provisions to the contrary, the parties agree that the rights and duties of the Group are limited by the USAP South Texas Clinical Governance Board Charter, and specifically, but not limited to, Group's exercise of its right related to the termination of the Physician, Physician's staffing obligations at Facilities, Physicians use of mid-level or other clinical providers, Physician's paid time off, call obligations and Physician's scheduling.  Accordingly, any reference to the Group herein, includes and requires, where applicable, the Group to obtain the CGB's specific consent as provided in the USAP South Texas Clinical Governance Board Charter before Group may exercise its rights hereunder.

2.      Qualifications; Notifications.

(a)      At all times during the Term (as defined in Section 7) of this Agreement, Physician shall meet the following qualifications:  (i) maintain an unrestricted license to practice medicine in the State (including an "Office Based Anesthesia" permit if required by Group); (ii) maintain an unrestricted DEA permit; (ii) maintain board certification or eligibility with the American Board of Anesthesiology; and (iii) be eligible to be a participating provider with Medicare and Medicaid.  The foregoing shall collectively be referred to as the "**Qualifications**".     Physician agrees and acknowledges that Physician's employment by Group is contingent upon Physician continuously meeting the Qualifications.  In addition, Physician shall maintain unrestricted medical staff membership and clinical privileges in good standing on the Medical Staff of each Facility as directed by Group.

(b)      Physician shall notify Group, no later than forty-eight (48) hours of: (i) the initiation of any action to suspend, restrict, deny, relinquish or revoke (A) Physician's  license to practice medicine in the State or any other state in which Physician holds a license to practice medicine; (B) Physician's medical staff privileges at any Facility; or (C) Physician's DEA permit; or (ii) Physician's receipt of notice of (A) the initiation of any disciplinary proceeding or adverse action involving Physician with respect to any medically related matter before any administrative agency or governmental body; (B) the intent to file or the actual filing of any medically related liability action involving Physician in any capacity; or (C) any arrest, indictment, conviction, guilty plea or plea of nolo contendere for any criminal conduct or other crime involving dishonesty or moral turpitude naming Physician.  Physician shall provide Group with copies of any such complaints, notices, charges, lawsuits and related non-privileged documents promptly upon request of Group.

(c)      For purposes of this Agreement, "**Facilities**" mean all hospitals, facilities and other locations (i) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group and who are or were assigned to a Star Division (as defined in the PRCS (as defined below)) (individually an "**Star Clinician**") provided Services during the Term, (ii) that are located in the same county as a hospital, facility or other location described in the foregoing clause (i) or in any county contiguous to such county and at which clinicians who are or were employed by or have or had an independent contractor relationship with Group (individually a "**Related Star Clinician**" and collectively with the Star Clinicians the "**Affiliated  Clinicians**") provided Services during the Term, (iii) at which Group had a contract in effect for any (x) Star Clinicians to render Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iii)(x) or in any county contiguous to such county, and (iv) at which Group has been in active negotiations for (x) Star Clinicians to provide Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iv)(x) or in any county contiguous to such county.

3.      Duties of Physician.

(a)      Physician is employed by Group to use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to

time to maintain full-time status for a Physician-Partner (which requirements will be set forth on Schedule II to the PRCS); provided that if Physician notifies Group in writing that Physician desires to work part-time from after a specified date that is at least twelve (12) months after the date that such notice is delivered (the "**Part-Time Start Date**") and the CGB approves Physician working part-time, then from and after the Part-Time Start Date, in lieu of Physician rendering such Services on a full-time basis, Physician shall use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to time to maintain part-time status for a Physician-Partner (which requirements will be set forth on Schedule I to the PRCS). Physician shall not, without the prior written consent of the CGB and Group, which may in the CGB's and Group's sole discretion be withheld or conditioned upon Physician meeting other requirements, engage in the provision of professional services other than Services provided pursuant to this Agreement. Physician acknowledges and agrees that, except as otherwise agreed by the CGB and Group, Physician must meet the minimum requirements of a Physician-Partner as defined by the PRCS from time to time in order for Physician to maintain Physician's status as a Physician-Partner. At all times while Physician is an employee of Group, Physician shall retain independent discretion and shall exercise professional judgment consistent with generally accepted medical practices, the ethical standards of the Texas and American Medical Associations and the professional standards of Group, in the provision of Services at the Facilities. Physician's duties shall include but not be limited to (i) examination, evaluation and treatment of patients; (ii) participation in Group's on-call rotation for after-hours coverage; (iii) participation in Group's indigent and charity care programs; and (iv) such other duties as may reasonably be assigned by Group from time to time.

(b)     Physician shall perform all Services in accordance with (i) this Agreement; (ii) the bylaws, rules and regulations of the Medical Staff of each Facility at which Physician renders Services; (iii) the terms and conditions of any contractual arrangement regarding the performance of Services between Group and the applicable Facility (upon written request, a summary of the material and relevant terms of any such agreement shall be provided to Physician); and (iv) any applicable policies and procedures established by the CGB and/or Group, including but not limited to the Group's Clinical Code of Conduct and Conflict of Interest Policy.

(c)     Physician agrees and acknowledges that the CGB may conduct a review of Physician's ability to safely perform Services at any time ("**Review**").

(d)     Physician shall assist in providing supervision of physician assistants, nurses, nurse anesthetists, anesthesiology assistants and other non-physician health care personnel providing services on behalf of Group. All such non-physician personnel shall be under Physician's control and direction in the performance of health care services for patients treated by Physician.

(e)     Physician shall provide Services on a nondiscriminatory basis and may not refuse to provide medical services to any patient accepted by Group.

(f)     Physician shall participate in, and cooperate with Group in connection with, the quality assurance and risk management program(s) developed by Group. Physician shall also be subject to and actively participate in any utilization review program(s) developed by or on behalf of Group.

(g)     Physician agrees and acknowledges that many of the contractual arrangements Group holds with the Facilities are exclusive in nature and, as a result, require the automatic termination of medical staff membership and clinical privileges for all of Group's providers upon termination of the contractual arrangement.  Physician hereby agrees and consents to the foregoing and further waives any due process, notice, hearing and review rights he/she may have under such Facility's medical staff bylaws upon termination of Group's contractual relationship with Facility or upon Physician's termination of employment with Group for any reason.

4.      Compensation, Benefits, and Expense Reimbursement.  Group shall pay to or for the benefit of Physician as compensation and/or benefits for the Services performed by Physician the amounts set forth on Schedule 4.  In addition, Group shall provide Physician benefits and business expense reimbursements as set forth on Schedule 4.  Group shall provide, or cause to be provided, all space, equipment, supplies, non-physician health care personnel and clerical, administrative and other personnel as are reasonably necessary and appropriate, consistent with Group's past practices and the CGB's recommendations, for Physician's performance of Services on behalf of Group.

5.      Fees.  Group shall have exclusive authority to determine the fees, or a procedure for establishing the fees, to be charged to patients by Group.  All sums paid by any patient of Group in the way of fees, salary, or otherwise for medical services rendered by Physician shall be and remain payments of Group and shall be included in Group's income.  Physician hereby assigns to Group all rights to bill for Services rendered by Physician and shall execute any additional documentation as may be requested by Group documenting such assignment.  In the event Physician receives any amounts from any patients, third party payors or other third parties which are the property of Group, Physician shall immediately endorse and deliver the same to Group.

6.      Patients, Medical Records.  Group shall have the authority to determine who will be accepted as patients of Group.  Group also shall have the authority to designate, or to establish a procedure for designating, which professional physician of Group will handle each such patient.  Physician shall, in accordance with policies developed by or on behalf of Group, timely prepare all medical records in respect of patients treated by Physician. All medical records generated in respect of patients treated by Physician or any other physician engaged by Group during the Term shall be and remain the property of Group or Facilities, as appropriate, and shall be maintained at the Facilities; provided, however, that Physician shall have such right of access to such medical records as shall be provided by law.  In addition, Physician shall timely prepare and deliver such other records and reports relating to the operations of Group as Group may reasonably request.  Physician shall abide by all state and federal laws regarding the confidentiality of patient health information, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, and all rules and regulations promulgated thereunder, including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transaction Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164), and the Health Information Technology for Economic and Clinical Health Act of 2009 enacted as part of the American Recovery and Reinvestment Act of 2009.

7.      Term and Termination.  The term of this Agreement will commence on the September 6, 2019 and will continue thereafter until terminated as provided herein (the "**Term**").

(a)     This Agreement may be terminated upon the mutual written agreement of the parties.

(b)     Physician may terminate this Agreement without cause upon the delivery of one hundred eighty (180) days prior written notice to Group. Group may terminate this Agreement

without cause upon the delivery of ninety (90) days prior written notice to Physician; provided that during such ninety (90) day notice period, Group may elect, in its sole discretion, to remove Physician from the schedule and to pay any remaining amounts due to Physician for the remainder of such notice period.

(c)     Group may terminate this Agreement for good and sufficient cause.  Such termination shall be effective upon the delivery of written notice thereof to Physician or at such later time as may be designated in said notice, and Physician shall cease performance of Services hereunder and vacate the offices of Group and the Facilities on or before such effective date.  The written notice shall specify the cause for termination.  For purposes of this Section 7.c, the term "good and sufficient cause" shall include, but not be limited to, any one or more of the following:

(1)     Physician's failure to maintain any of the Qualifications.

(2)     A determination is made by the CGB that there is an immediate and significant threat to the health or safety of any patient as a result of the services provided by Physician, or as a result of Physician's medical misconduct or other gross neglect in the provision of professional services.

(3)     Any felony indictment naming Physician or conviction of a felony by Physician.

(4)     Any investigation for any alleged violation or violation by Physician of any Medicare or Medicaid statutes, 42 U.S.C. § 1320a-7b (the "**Anti-Kickback Statute**"), 31 U.S.C. § 3729 (the "**False Claims Act**"), 42 U.S.C. § 1395nn (the "**Stark Law**"), or the regulations promulgated pursuant to such statutes, or any similar federal, state or local statutes or regulations promulgated pursuant to such statutes.

(5)     Physician's ineligibility to be insured against medical malpractice.

(6)     Physician does not satisfactorily pass the Review, except in the instance where Physician satisfies the remedial action requested.

(7)     Any dishonest or unethical behavior by Physician that results in damage to or discredit upon Group.

(8)     Any intentional conduct or action by Physician that negatively affects the ability of Group to deliver Services to any Facility or any other facility.

(9)     Physician's violation of the Clinician Code of Conduct of Group or failure to comply with any clinical practice guidelines as may be established by Group from time to time.

(10)     Physician no longer meets the requirements to be a Physician-Partner as such requirements may, from time to time, be established or modified by the CGB.

(11)     Physician's violation of Section 9.

(d)     In the event either party shall give written notice to the other party that such other party has substantially defaulted in the performance of any material duty or material obligation imposed upon it by this Agreement, and such default shall not have been cured within thirty (30)

days following receipt of such notice, the non-defaulting party shall have the right to immediately terminate this Agreement. For purposes of this subsection (d), a default shall include Physician ceasing to be a member in good standing of the Medical Staff of any of the Facilities at which Physician is assigned to render Services by the CGB.

(e)     In the event that there shall be a change in federal or state law, the Medicare or Medicaid statutes, regulations, or general instructions (or in the application thereof), the adoption of new legislation or regulations applicable to this Agreement, or the initiation of an enforcement action with respect to legislation, regulations, or instructions applicable to this Agreement, any of which affects the continuing viability or legality of this Agreement or the ability of Group to obtain reimbursement for Services rendered by Physician, then either party may by notice propose an amendment to conform this Agreement to existing laws.  If notice of such a change or an amendment is given and if Group and Physician are unable within ninety (90) days thereafter to agree upon the amendment, then either party may terminate this Agreement by ninety (90) days' notice to the other, unless a sooner termination is required by law or circumstances.

(f)     This Agreement shall automatically terminate upon the death of Physician.

(g)     This Agreement shall terminate upon written notice by either party in the event Physician becomes disabled, as further described in Section 8.

(h)     Upon termination of this Agreement for any reason whatsoever, Physician shall submit to Group within five (5) days of such termination all outstanding charges for professional services rendered by Physician on behalf of Group.  Group shall have the right to withhold any earned, but unpaid compensation for services rendered by Physician through the effective date of termination, until such time as Physician has submitted to Group all outstanding charges for professional services rendered by Physician on behalf of Group.

(i)     Except as otherwise provided herein, upon termination of this Agreement for any reason, Physician shall be entitled to Physician's earned, but unpaid compensation for Services rendered by Physician through the effective date of termination, as determined in accordance Schedule 4.  In the event of the death of Physician, such amounts shall be paid to Physician's estate.

(j)     Immediately upon termination of this Agreement, Physician shall surrender all keys, identification badges, telephones, pagers, computers and any other property of Group in the possession of Physician.

(k)     Physician agrees and acknowledges that upon termination of this Agreement for any reason, Group shall submit Physician's Resignation (as such term is defined in Schedule 9) to any Facility at which Physician maintains medical staff privileges.

(l)     Physician agrees and acknowledges that Group will suffer significant damages if Physician terminates his or her employment without cause with less than one hundred eighty (180) days advance notice to Group as a result of, among other things, the difficulty and associated costs of recruiting and credentialing a new replacement physician.  Physician agrees that if Physician terminates this Agreement with less than one hundred eighty (180) days advance notice to Group, Physician shall pay to Group all costs and expenses Group incurs in obtaining locum tenens coverage as an interim replacement for Physician in recruiting a permanent replacement.

8. <u>Disability of Physician</u>.  Upon determination by the CGB of the Disability of Physician that no reasonable accommodation may be made to perform the essential functions of a physician as stated in <u>Section 3</u>, this Agreement may be immediately terminated by Group upon written notice to Physician.  The term "Disability of Physician" shall have the same meaning as that type of disability that entitled Physicians to payments for permanent disability pursuant to the disability policy covering Physician.  In the event no disability policy exists covering Physician, the term "Disability of Physician," as used herein, shall mean that point in time when Physician is unable to resume the essential functions required of Physician under this Agreement, as performed prior to such time, within one hundred and eighty (180) days after the disabling event.  If the disabling event is not a separate and distinct happening, the 180-day period shall begin at the time Physician is unable to perform the essential functions of the position as stated in <u>Section 3</u> for thirty (30) consecutive work days. Additionally, Physician shall be considered disabled if he/she does not perform his/her duties for one-hundred and eighty (180) days during a three hundred sixty (360) day period.  If the CGB determines that Physician is not performing his/her duties because of a physical or medical condition, then Physician shall submit to a physical and/or mental examination of two (2) independent physicians selected by the CGB reasonably in good faith to determine the nature and extent of such condition and Physician agrees to be bound by such determination.

9. <u>Non-Disclosure, Non-Solicitation and Non-Competition</u>.  Physician shall comply with the non-disclosure, non-solicitation and non-competition covenants set forth on <u>Schedule 9</u>.

10. <u>Assignment of Intellectual Property</u>.  Physician shall promptly and fully disclose all Intellectual Property to Group.  Physician hereby assigns and agrees to assign to Group (or as otherwise directed by Group) Physician's full right, title and interest in and to all Intellectual Property.  At Group's sole cost and expense, Physician agrees to execute any and all applications for patents, copyrights and/or other proprietary rights, and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by Group to assign all Intellectual Property to Group and to permit Group to enforce any patents, copyrights and/or other proprietary rights to the Intellectual Property.  All copyrightable works that Physician creates shall be considered "work made for hire" for the sole benefit of Group.  For purposes of this <u>Section 10</u>, "**Intellectual Property**" shall mean inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by Physician (whether alone or with others, whether or not during normal business hours or on or off Group premises) during Physician's employment with Group that either (a) relates  to the business of Group (including administering anesthesia to patients) or (b) makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities). Physician may exclude from the definition of Intellectual Property and any obligations relating thereto, inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) developed by Physician (i) prior to the date of this Agreement, which are identified on <u>Schedule 10</u> attached hereto and (ii) after the date of this Agreement in connection with Physician's engagement in outside professional activities that have been approved by the CGB or that have been undertaken entirely on Physician's own time unless, in the case of this clause (ii), Physician makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities) in connection with such development (collectively, "**Excluded IP**").  Physician will promptly advise Group in writing of any Excluded IP that Physician develops or proposes to develop after the date of this Agreement that is not set forth on <u>Schedule 10</u> and provide such information and assurances as Group may reasonably request to determine whether or not such Intellectual Property

constitutes Excluded IP hereunder.  If Group determines that such Intellectual Property does not constitute Excluded IP hereunder, Group will notify Physician in writing thereof within 30 days after receiving such notice, information and assurances, provided, that if Group does not notify Physician in writing within 30 days after receiving such notice, information and assurances, then such Intellectual Property shall be considered Excluded IP hereunder to the extent such Intellectual Property satisfies the requirements of Excluded IP set forth above.

11.     <u>Right of Offset</u>. If Physician's employment with Group is terminated for any reason, Group shall have the right to offset against any compensation (earned, but unpaid or otherwise) or other amounts due to Physician under this Agreement or otherwise, any indebtedness, whether or not evidenced by a promissory note and whether or not mature or due and payable, owed by Physician to Group.

12.     <u>Miscellaneous</u>.

(a)     <u>Factual Information</u>:  Physician represents and warrants that any and all factual information furnished by Physician to Group will be true and accurate in every material respect as of the date on which such information is furnished.

(b)     <u>Authority</u>:  Physician has full power and authority to enter into this Agreement and perform all obligations under this Agreement.  The execution and performance of this Agreement by Physician will not constitute a breach or violation of any covenant, agreement or contract to which Physician is a party or by which Physician is bound.

(c)     <u>Assignment; Benefit</u>:  This Agreement and the rights and duties of Physician hereunder may not be assigned by Physician without the prior written consent of Group.  Group may assign this Agreement or any and all rights or obligations hereunder, without the prior written consent of Physician, to any legal entity owned or controlled by or under common control with Group if, as a mandatory condition to such assignment, the assignee entity, commiserate with the assignment, adopt and agree in writing to be bound to and by the then current USAP South Texas Clinical Governance Board Charter and PRCS.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns.

(d)     <u>Compliance</u>:  Group and Physician expressly agree that nothing contained in this Agreement shall require Group or Physician to refer or admit any patients to any of the Facilities or to any other individual entities.  Physician agrees to use Physician's best efforts to ensure Physician's activities are in full compliance with all rules and regulations including, but not limited to, the rules and regulations relative to the Medicare and Medicaid programs, and the rules and regulations relative to any applicable private payor programs.  Physician further agrees to immediately report any violations of such rules or regulations observed by Physician to the person(s) designated in Group's compliance policies and procedures.

(e)     <u>Invalid Provision</u>:  The invalidity or unenforceability of a particular provision, paragraph, subparagraph, sentence or term of this Agreement shall not affect the other provisions, paragraphs, subparagraphs, sentences or terms hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision, paragraph, subparagraph, sentence or term was omitted.

(f)     Modification:  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto; provided, however, if Physician no longer qualifies as a Physician-Partner and the CGB has elected to change such Physician's designation from being a Physician-Partner, then without any action required by Physician (i) all references herein to Physician-Partner (other than such references in Schedule 9) shall mean a physician other than a Physician-Partner, (ii) such Physician shall no longer have the right to serve on the Clinical Governance Board or any other voting rights associated with being a Physician-Partner, (iii) Recital D herein shall be deemed to be intentionally omitted and (iv) such Physician shall receive a new compensation plan from Group pursuant to which Physician shall receive compensation for the services provided hereunder, to be attached hereto as a revised Schedule 4.

(g)     Waiver:  The waiver by either party or the CGB of a breach or violation of any provision of this Agreement will not operate as, or be construed to constitute, a waiver by such party of any subsequent breach of the same or other provision hereof.

(h)     Third Party Beneficiary:  The CGB is an express third-party beneficiary of this Agreement and shall have the right to enforce its rights hereunder in accordance with the applicable laws of the State as if it was a party hereto.

(i)     Notice:  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally delivered, or if sent by certified return receipt mail, postage prepaid, to the addresses set forth below, unless otherwise notified in writing:

GROUP:                                          w/a copy to:

U.S. Anesthesia Partners of Texas, P.A.         U.S. Anesthesia Partners, Inc.
1500 City West Blvd, Suite 300                  12222 Merit Drive, Suite 700
Houston, TX 72042                               Dallas, TX  75251
Attn:  Sr. Vice President – Operations          Attn:  General Counsel

PHYSICIAN:

Current address on file with Human Resources

(j)     Applicable Law and Venue:  This Agreement shall be governed, construed, enforced and regulated under and by the laws of the State.  Each of the parties to this Agreement hereby irrevocably and unconditionally submits, for itself and its assets and properties, to the exclusive jurisdiction of the state and Federal courts of Bexar County, Texas, and any appellate court from such court, in any action or proceeding arising out of or relating to this Agreement.

(k)     Legal Fees and Costs:  In the event that either party elects to incur legal expenses to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover such legal expenses, including without limitation, reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

(l)     Entire Agreement:  This Agreement, the Schedules attached hereto and the PRCS constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces any prior employment agreements and/or arrangements, oral or otherwise, between the parties hereto and any prior statements, representations or warranties not

expressly incorporated herein. The parties specifically acknowledge that, in entering into and executing this Agreement, each is relying solely upon the statements, representations and agreements contained in this Agreement and no others.

      (m)    <u>Survivability</u>:  The provisions of <u>Sections 3(g)</u>, <u>4</u>, <u>5</u>, <u>9</u>, <u>10</u>, <u>11</u> and <u>12</u>, <u>Schedule 4</u> and <u>Schedule 9</u> shall survive the termination or expiration of this Agreement for any reason whatsoever. Notwithstanding the foregoing, except as otherwise expressly set forth on <u>Schedule 9</u>, the non-compete and non-solicit covenants of Physician with respect to <u>Schedule 9</u> shall terminate upon Physician's payment of the Buy-Out Amount as further described in <u>Schedule 9</u>. In addition, the duration of the covenants contained in this Agreement shall be tolled during the continuation of any breach or violation and will continue or commence again only upon Physician's strict compliance with such covenants.

      (n)    <u>Rule of Interpretation</u>:  The general rule that an agreement is to be interpreted against the drafter of an agreement in the case of an ambiguity is not to be recognized hereunder, as this Agreement was developed by the mutual consent and negotiation of the parties.  The fact that this Agreement was actually prepared by counsel for one of the parties was merely as a matter of convenience for all of the parties.  For purposes of this Agreement, the term "affiliate" shall mean means, with respect to any person or entity, any other person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified person or entity; provided that U.S. Anesthesia Partners, Inc. and its affiliates shall be deemed an Affiliate of Group, the term "control" when used with respect to any person or entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

      (o)    Effective Date.  For the avoidance of doubt, this Agreement shall only be effective upon the date of the occurrence of the Effective Time (as defined in the Agreement and Plan of Merger (the "**Merger Agreement**") dated as June 11, 2019 among U.S. Anesthesia Partners Holdings, Inc., the Practice and the other parties thereto) (the "**Effective Date**").  In the event that the Merger Agreement is terminated, this Agreement shall automatically terminate and be of no further force and effect.

[Signature Page to Follow]

.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.


U.S. ANESTHESIA PARTNERS OF TEXAS, P.A.

By: _____
Name: Hector Herrera, M.D.
Title:   President

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

GROUP:                                        PHYSICIAN:

U.S. ANESTHESIA PARTNERS OF TEXAS,            Janna Hartman
P.A.                                          _____

                                              DocuSigned by:

                                              Janna Hartman
By:_____            _____
Name:                                         1F9E6866DE4741A...
Title:

**Schedule 10**

**Carved-Out Intellectual Property**

**Intellectual Property developed prior to the Agreement and excluded from Section 10:**

None.

SCHEDULE 4

COMPENSATION, PHYSICIAN BENEFITS, BUSINESS EXPENSES
AND PROFESSIONAL LIABILITY INSURANCE

Compensation

Group shall pay to or for the benefit of Physician compensation for the Services in an amount determined under the USAP South Texas Compensation Plan, as such plan may be amended from time to time.  Physician agrees and acknowledges that Group shall only be required to exercise its normal billing procedures with respect to collecting Group's accounts receivable and will not be required to institute judicial or other procedures or any other action to collect any accounts receivable.

Physician Benefits

Physician shall be entitled to those benefits and time off which are customarily offered to similarly situated Physician-Partners under Group's employee benefits plans, subject to meeting any eligibility requirements imposed by such plans.  Physician agrees and acknowledges that Group may modify its benefits plans from time to time, provided such modifications apply to all similarly situated Physician-Partners.

Business Expenses

Group shall reimburse Physician for business expenses incurred by Physician in fulfilling his or her responsibilities under this Agreement and as set forth in Group's separate business expense reimbursement policy, as such policy may be amended by Group from time to time.

Professional Liability Insurance

Group shall purchase, maintain and pay all premiums for malpractice insurance insuring Group and Physician, with such limits of coverage and with such insurer as shall be determined by Group from time to time.

In the event Group changes to a "claims made" policy in the future, upon the termination of Physician's employment with Group for any reason, Physician shall be responsible for purchasing "tail" coverage to ensure continuous coverage to Physician and Group for the Services rendered by Physician under this Agreement.

SCHEDULE 9

NON-DISCLOSURE OF INFORMATION CONCERNING BUSINESS
AND NON-COMPETE AND NON-SOLICIT AGREEMENT

Physician recognizes that Group's decision to enter into this Agreement is induced primarily because of the covenants and assurances made by Physician in this Agreement, that Physician's covenant not to compete and not to solicit is necessary to ensure the continuation of the business of Group and the reputation of Group, as well as to protect Group from unfair business competition, including but not limited to, the improper use of Confidential Information (as defined below), and that irrevocable harm and damage will be done to Group if Physician unlawfully competes with Group. Therefore, in consideration of the promises contained herein, including without limitation those related to Confidential Information, except as may be otherwise expressly provided in this Agreement, the Physician agrees as follows:

1.      Non-Competition:  During the Term and for a period of two (2) years following termination of this Agreement (for whatever reason) (the "**Restricted Period**"), Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services within five (5) miles of any Facility.  For purposes of this Schedule 9, "**Person**" shall mean any individual (including Physician), any association, corporation, company, trust, partnership or other entity.

2.      Non-Competition (Group): During Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services at any hospitals, facilities or other locations (other than a Facility) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group provided Services during the Term.

3.      Non-Solicit:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) solicit any past or current patient to whom Physician or any other Affiliated Clinician provided Services during the Term ("**Patient**"), or immediate family member of such Patient, for purposes of inducing the Patient to become a patient of Physician or any other Person; (ii) solicit any physician (including surgeons) for which Physician or any other Affiliated Clinician provided Services to such physician's patients at any time during the Term, for purposes of inducing such physician to consult with or utilize Physician or any other Person in the care of such physician's patients; (iii) solicit any Facility for the purpose of obtaining any contractual relationship with such Facility for Physician or any other Person; or (iv) solicit for employment, or employ or engage, any individual who is employed by Group (1) in the case of each day during the Term, within the twelve (12) month period prior to such day and (2) in the case of the period following the termination of this Agreement, within the twelve (12) month period prior to the date of

such termination, to perform services on behalf of Physician or any other Person that provides Services. Notwithstanding the foregoing, Group shall (x) permit Physician to have access to a list of the Patients whom Physician has seen or treated within one (1) year of termination of this Agreement; and (y) provide Physician (A) access to the medical records of the Patients whom Physician has seen or treated upon authorization of the Patient in the same form as maintained or available to Group; and (B) any copies of the medical records for a reasonable fee as established by the Texas State Board of Medical Examiners under the Texas Medical Practice Act (Texas Occupations Code Section 159.008). Any access to a list of Patients or to Patients' medical records after termination of this Agreement shall not include such list or records to be provided in a format different than that by which such records are maintained except by mutual consent of the parties to this Agreement.

4.      Non-Interference; Administrative Services:   During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) call on or solicit any Facility, employee, independent contractor or other Person who has a contractual relationship with Group for the purpose of persuading or attempting to persuade such Person to cease doing business with or performing services for, or materially reduce the volume of, or adversely alter the terms with respect to, the business or services that such Person does with or performs for Group or any affiliate thereof or in any way otherwise interfere with the relationship between any such Facility, employee, independent contractor or other Person, on the one hand, and Group or any affiliate thereof, on the other hand, or (ii) provide management, administrative or consulting services to any Person that provides Services within five (5) miles of any of the Facilities. This provision shall survive the payment of the Buy-Out Amount.

5.      Continuing Care.   Physician shall not be prohibited from providing continuing care and treatment to a specific Patient or Patients during the course of an acute illness at any time, including following termination of this Agreement or Physician's employment.  Following such termination, Physician understands and agrees that Physician will not be permitted to utilize Facility premises, staff, supplies and/or any other Facility-owned resource, unless failure to do so would compromise an acute patient's health and well-being, in which case Group, in its sole discretion, will provide written authorization to Physician on a case-by-case basis so that Physician may treat such Patient at the appropriate Facility, and even then, only to the extent and of such duration, that the acute nature of the Patient's condition requires.

6.      Buy-Out Exception.   Physician may be released of the non-competition and non-solicitation provisions contained in Section 1, Section 2 and Section 3 of this Schedule 9 upon payment by Physician to Group of a reasonable price prior to a breach by Physician. The parties acknowledge, and hereby decline and waive, their option to have the reasonable price of the buy-out determined by an arbitrator, whether selected by the parties or a court of competent jurisdiction.  The parties agree that a reasonable price shall be the amount equal to 200% of the Net Revenue per Physician Partner (the "**Buy-Out Amount**"). For purposes of this Schedule 9, "**Net Revenue per Physician Partner**" shall mean a dollar amount equal to (a) the total net revenue of the Star Divisions for the most recent twelve (12) month period (and for any period within twelve (12) months of the Effective Date the product obtained by multiplying (a) the quotient obtained by dividing (x) the total net revenue of the Star Division from the Effective Date to the determination date by (y) the number of days in the period from the Effective Date to the determination date by (b) 365), as determined in accordance with generally accepted accounting principles and reflected on the financial statements for Star

76688245_2

Divisions maintained by Group divided by (b) the average number of Physician-Partners employed by Group who are assigned to Star Divisions during the most recent twelve (12) month period. Physician and Group agree that the Buy-Out Amount is reasonable because it reflects the lost productivity and profit opportunity of Group during the Restricted Period during which Physician would otherwise not be competing with Group, and additionally compensates Group for the risk that Physician recruits away from Group physicians or other clinical staff or Facilities in which Group has made a significant investment.  The parties further agree that the Buy-Out Amount is reasonable because Group's physician-partners practice in groups, are more likely to depart in groups, oversee other employed physicians and CRNAs and have developed practice patterns, relationships, protocols and the Confidential Information in a group setting that together support a Buy-Out Amount calculated on the basis of all physician-partner revenues in particular divisions, not just the individual Physician's revenues or compensation.

7.      <u>Resignation of Privileges</u>.  Physician further agrees to relinquish Physician's privileges to practice anesthesiology and to treat chronic pain at each of the Facilities upon termination of this Agreement for any reason.  In connection herewith, Physician shall execute the resignation attached hereto and incorporated herein by reference as <u>Exhibit 9-A</u> (the "**Resignation**"), and in the event of termination of this Agreement for any reason whatsoever, Physician hereby authorizes Group to deliver such Resignation to the Facilities.  Notwithstanding the foregoing, if such Resignation would result in a reportable event to the State Board of Medical Examiners or the National Practitioner Data Bank, Group will forgo delivering the Resignation to the applicable Facility and the termination of Physician's privileges at such Facility shall be conducted in conformance with any applicable fair hearing rights set forth in the then current medical staff bylaws at the applicable Facility, or shall be delivered after the conclusion of investigation or other inquiry that would result in the Resignation becoming a reportable event.

8.      <u>Confidentiality</u>.  As of the date of the execution of this Agreement and during the course of the Physician's employment, in order to allow Physician to carry out Physician's duties hereunder, Group has provided and will continue during the Term to provide to Physician Confidential Information. Physician agrees to keep confidential and to not use or disclose to others during the Term and thereafter, except as expressly consented to in writing by Group, required by law or authorized under this Agreement, any Confidential Information. This restriction shall not apply to such information if Physician can establish that such information (i) has become generally available to and known by the public (other than as a result of an unpermitted disclosure directly or indirectly by Physician or Physician's affiliates, advisors, or representatives), (ii) has become available to Physician on a non-confidential basis from a source other than Group and its affiliates, advisors, or representatives, provided that such source is not and was not bound by a confidentiality agreement with or other obligation of secrecy of Group of which Physician has knowledge, or (iii) has already been or is hereafter independently acquired or developed by Physician without use of or reference to any Confidential Information.  Should Physician leave the employment of Group, Physician will neither take nor retain, without prior written authorization from Group, any Confidential Information. Physician further agrees to destroy any paper or electronic copies of Confidential Information, including information contained on any personal device, upon the request of Group.  For purposes of this <u>Schedule 9</u>, "**Confidential Information**" shall mean any financial, accounting and statistical information, marketing plans, business plans, feasibility studies, fee schedules or books, reimbursement rates, billing information, patient files, confidential technology, proprietary information, patient lists, policies and procedures or trade secrets of Group or U.S. Anesthesia Partners, Inc., its affiliates or managed practices ("**USAP**"), or other papers, reports, records, memoranda, documents, files, discs, or copies thereof pertaining to Group's patients or Group's or

USAP's business, sales, financial condition or products, or any matter or thing ascertained by Physician through Physician's affiliation with Group, the use or disclosure of which matter or thing might reasonably be construed to be contrary to the best interests of Group or USAP.

9.    Exceptions to Confidentiality.

      a.    It shall not be a breach of Physician's covenants under Schedule 9 if a disclosure is made pursuant to a court order, a valid administrative agency subpoena, or a lawful request for information by an administrative agency.  Physician shall give Group prompt notice of any such court order, subpoena, or request for information.

      b.    Physician shall not be prohibited from releasing any Confidential Information to Physician's legal counsel or financial advisors, provided that such advisors are under a legal obligation of confidentiality with respect to the Confidential Information.

      c.    Nothing in this Agreement prohibits Physician from reporting an event that Physician reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as Securities and Exchange Commission or Department of Justice), requires notice to or approval from Group before doing so, or prohibits Physician from cooperating in an investigation conducted by such a government agency.  This may include disclosure of trade secret or confidential information provided the disclosure complies with the limitations set forth in the 2016 Defend Trade Secrets Act (DTSA).  Physician is hereby provided notice that under the DTSA, (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (a) is made in confident to a Federal, State or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (b) is made in a complaint or other documented filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

10.    Enforcement.  Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action asserted by Physician against Group, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of Section 1, Section 2, Section 3, Section 4 or Section 8 of this Schedule 9. It is understood by and between the parties hereto that the covenants set forth in Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 are essential elements of this Agreement, and that, but for the agreement of Physician to comply with such covenants, Group would not have agreed to enter into this Agreement.  Group and Physician agree that the foregoing covenants are appropriate and reasonable when considered in light of the nature and extent of the practice conducted by Group.  If any provision or subdivision of this Agreement, including, but not limited to, the time or limitations specified in or any other aspect of the restraints imposed under Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9, is found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such portion shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such portion in order to make it enforceable.  In the event of such judicial reformation, the parties agree to be bound by Section 1,

Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 as reformed in the same manner and to the same extent as if they had agreed to such reformed Sections in the first instance.  Without limiting other possible remedies to Group for the breach of any covenant contained in this Schedule 9, Physician agrees that injunctive or other equitable relief shall be available to enforce such covenant, such relief to be without the necessity of posting a bond, cash, or otherwise.

EXHIBIT 9-A

RESIGNATION

By signing below, I, _____ hereby agree to automatically resign my medical staff privileges at _____ ("Facility") effective as of the termination of my employment with U.S. Anesthesia Partners of Texas, P.A. for any reason or upon the termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility.  In such event, I further waive any due process, notice, hearing and review rights I may have under the Facility's medical staff Bylaws.  Upon termination of my employment or termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility, U.S. Anesthesia Partners of Texas, P.A. is hereby authorized to complete a copy of this resignation for the Facility and deliver a copy of this resignation to the medical staff office of such Facility.


_____

Name: _____

Date: _____

# EXHIBIT D

Execution Version

## PHYSICIAN PARTNER EMPLOYMENT AGREEMENT

This PHYSICIAN PARTNER EMPLOYMENT AGREEMENT (the "**Agreement**") is entered into by and between U.S. Anesthesia Partners of Texas, P.A., a Texas professional association ("**Group**") and Victor Lai, M.D. ("**Physician**").

RECITALS

A.      Group is a Texas professional association authorized to practice medicine in the State of Texas (the "**State**") that provides professional anesthesiology services (including any specialty thereof), pain management, anesthesia related consulting, management and administrative services ("**Services**") to patients at inpatient and outpatient facilities.

B.      Physician is a licensed physician authorized to practice medicine in the State and Group desires to hire Physician to perform the Services at some or all of the Facilities (as defined below) on behalf of Group as set forth herein.

C.      Certain clinical operations of Group including, but not limited to, making certain determinations and decisions regarding the modification and termination of this Agreement, are managed and overseen by the USAP South Texas Clinical Governance Board (the "**CGB**") established by the Plan Regarding Compensation for Services (USAP South Texas) dated as of September 6, 2019, as such plan may be amended, modified, replaced or superseded (the "**PRCS**").

D.      Physician is acknowledged as a "Physician-Partner" (as such term is defined in the PRCS) within the CGB.

E.      It is determined to be to the mutual advantage of Group and Physician to enter into this Agreement as set out herein.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and Physician's specific agreement to the terms of Schedule 9, attached hereto and incorporated herein by reference, and the monies to be paid hereunder, Group agrees to hire Physician and Physician agrees to work for Group upon the following terms and conditions:

1.      Recitals Approved; Schedules Incorporated; CGB Authority.  The above recitals are true and correct and are made a part hereof.  Schedule 4, Schedule 9 and Exhibit 9-A, which are attached hereto, are hereby incorporated into this Agreement by reference.  Notwithstanding any provision or provisions to the contrary, the parties agree that the rights and duties of the Group are limited by the USAP South Texas Clinical Governance Board Charter, and specifically, but not limited to, Group's exercise of its right related to the termination of the Physician, Physician's staffing obligations at Facilities, Physicians use of mid-level or other clinical providers, Physician's paid time off, call obligations and Physician's scheduling.  Accordingly, any reference to the Group herein, includes and requires, where applicable, the Group to obtain the CGB's specific consent as provided in the USAP South Texas Clinical Governance Board Charter before Group may exercise its rights hereunder.

2.      Qualifications; Notifications.

(a)      At all times during the Term (as defined in Section 7) of this Agreement, Physician shall meet the following qualifications:  (i) maintain an unrestricted license to practice medicine in the State (including an "Office Based Anesthesia" permit if required by Group); (ii) maintain an unrestricted DEA permit; (ii) maintain board certification or eligibility with the American Board of Anesthesiology; and (iii) be eligible to be a participating provider with Medicare and Medicaid.  The foregoing shall collectively be referred to as the "**Qualifications**".    Physician agrees and acknowledges that Physician's employment by Group is contingent upon Physician continuously meeting the Qualifications.  In addition, Physician shall maintain unrestricted medical staff membership and clinical privileges in good standing on the Medical Staff of each Facility as directed by Group.

(b)      Physician shall notify Group, no later than forty-eight (48) hours of: (i) the initiation of any action to suspend, restrict, deny, relinquish or revoke (A) Physician's  license to practice medicine in the State or any other state in which Physician holds a license to practice medicine; (B) Physician's medical staff privileges at any Facility; or (C) Physician's DEA permit; or (ii) Physician's receipt of notice of (A) the initiation of any disciplinary proceeding or adverse action involving Physician with respect to any medically related matter before any administrative agency or governmental body; (B) the intent to file or the actual filing of any medically related liability action involving Physician in any capacity; or (C) any arrest, indictment, conviction, guilty plea or plea of nolo contendere for any criminal conduct or other crime involving dishonesty or moral turpitude naming Physician.  Physician shall provide Group with copies of any such complaints, notices, charges, lawsuits and related non-privileged documents promptly upon request of Group.

(c)      For purposes of this Agreement, "**Facilities**" mean all hospitals, facilities and other locations (i) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group and who are or were assigned to a Star Division (as defined in the PRCS (as defined below)) (individually an "**Star Clinician**") provided Services during the Term, (ii) that are located in the same county as a hospital, facility or other location described in the foregoing clause (i) or in any county contiguous to such county and at which clinicians who are or were employed by or have or had an independent contractor relationship with Group (individually a "**Related Star Clinician**" and collectively with the Star Clinicians the "**Affiliated   Clinicians**") provided Services during the Term, (iii) at which Group had a contract in effect for any (x) Star Clinicians to render Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iii)(x) or in any county contiguous to such county, and (iv) at which Group has been in active negotiations for (x) Star Clinicians to provide Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iv)(x) or in any county contiguous to such county.

3.      Duties of Physician.

(a)      Physician is employed by Group to use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to

time to maintain full-time status for a Physician-Partner (which requirements will be set forth on Schedule II to the PRCS); provided that if Physician notifies Group in writing that Physician desires to work part-time from after a specified date that is at least twelve (12) months after the date that such notice is delivered (the "**Part-Time Start Date**") and the CGB approves Physician working part-time, then from and after the Part-Time Start Date, in lieu of Physician rendering such Services on a full-time basis, Physician shall use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to time to maintain part-time status for a Physician-Partner (which requirements will be set forth on Schedule I to the PRCS). Physician shall not, without the prior written consent of the CGB and Group, which may in the CGB's and Group's sole discretion be withheld or conditioned upon Physician meeting other requirements, engage in the provision of professional medical services other than Services provided pursuant to this Agreement. Physician acknowledges and agrees that, except as otherwise agreed by the CGB and Group, Physician must meet the minimum requirements of a Physician-Partner as defined by the PRCS from time to time in order for Physician to maintain Physician's status as a Physician-Partner. At all times while Physician is an employee of Group, Physician shall retain independent discretion and shall exercise professional judgment consistent with generally accepted medical practices, the ethical standards of the Texas and American Medical Associations and the professional standards of Group, in the provision of Services at the Facilities. Physician's duties shall include but not be limited to (i) examination, evaluation and treatment of patients; (ii) participation in Group's on-call rotation for after-hours coverage; (iii) participation in Group's indigent and charity care programs; and (iv) such other duties as may reasonably be assigned by Group from time to time.

(b)     Physician shall perform all Services in accordance with (i) this Agreement; (ii) the bylaws, rules and regulations of the Medical Staff of each Facility at which Physician renders Services; (iii) the terms and conditions of any contractual arrangement regarding the performance of Services between Group and the applicable Facility (upon written request, a summary of the material and relevant terms of any such agreement shall be provided to Physician); and (iv) any applicable policies and procedures established by the CGB and/or Group, including but not limited to the Group's Clinical Code of Conduct and Conflict of Interest Policy.

(c)     Physician agrees and acknowledges that the CGB may conduct a review of Physician's ability to safely perform Services at any time ("**Review**").

(d)     Physician shall assist in providing supervision of physician assistants, nurses, nurse anesthetists, anesthesiology assistants and other non-physician health care personnel providing services on behalf of Group. All such non-physician personnel shall be under Physician's control and direction in the performance of health care services for patients treated by Physician.

(e)     Physician shall provide Services on a nondiscriminatory basis and may not refuse to provide medical services to any patient accepted by Group.

(f)     Physician shall participate in, and cooperate with Group in connection with, the quality assurance and risk management program(s) developed by Group. Physician shall also be subject to and actively participate in any utilization review program(s) developed by or on behalf of Group.

(g)     Physician agrees and acknowledges that many of the contractual arrangements Group holds with the Facilities are exclusive in nature and, as a result, require the automatic termination of medical staff membership and clinical privileges for all of Group's providers upon termination of the contractual arrangement.  Physician hereby agrees and consents to the foregoing and further waives any due process, notice, hearing and review rights he/she may have under such Facility's medical staff bylaws upon termination of Group's contractual relationship with Facility or upon Physician's termination of employment with Group for any reason.

4.      <u>Compensation, Benefits, and Expense Reimbursement.</u>  Group shall pay to or for the benefit of Physician as compensation and/or benefits for the Services performed by Physician the amounts set forth on <u>Schedule 4</u>.  In addition, Group shall provide Physician benefits and business expense reimbursements as set forth on <u>Schedule 4</u>.  Group shall provide, or cause to be provided, all space, equipment, supplies, non-physician health care personnel and clerical, administrative and other personnel as are reasonably necessary and appropriate, consistent with Group's past practices and the CGB's recommendations, for Physician's performance of Services on behalf of Group.

5.      <u>Fees.</u>  Group shall have exclusive authority to determine the fees, or a procedure for establishing the fees, to be charged to patients by Group.  All sums paid by any patient of Group in the way of fees, salary, or otherwise for medical services rendered by Physician shall be and remain payments of Group and shall be included in Group's income.  Physician hereby assigns to Group all rights to bill for Services rendered by Physician and shall execute any additional documentation as may be requested by Group documenting such assignment.  In the event Physician receives any amounts from any patients, third party payors or other third parties which are the property of Group, Physician shall immediately endorse and deliver the same to Group.

6.      <u>Patients, Medical Records.</u>  Group shall have the authority to determine who will be accepted as patients of Group.  Group also shall have the authority to designate, or to establish a procedure for designating, which professional physician of Group will handle each such patient.  Physician shall, in accordance with policies developed by or on behalf of Group, timely prepare all medical records in respect of patients treated by Physician. All medical records generated in respect of patients treated by Physician or any other physician engaged by Group during the Term shall be and remain the property of Group or Facilities, as appropriate, and shall be maintained at the Facilities; <u>provided, however,</u> that Physician shall have such right of access to such medical records as shall be provided by law.  In addition, Physician shall timely prepare and deliver such other records and reports relating to the operations of Group as Group may reasonably request.  Physician shall abide by all state and federal laws regarding the confidentiality of patient health information, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, and all rules and regulations promulgated thereunder, including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transaction Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164), and the Health Information Technology for Economic and Clinical Health Act of 2009 enacted as part of the American Recovery and Reinvestment Act of 2009.

7.      <u>Term and Termination.</u>  The term of this Agreement will commence on the September 6, 2019 and will continue thereafter until terminated as provided herein (the "**Term**").

(a)     This Agreement may be terminated upon the mutual written agreement of the parties.

(b)     Physician may terminate this Agreement without cause upon the delivery of one hundred eighty (180) days prior written notice to Group. Group may terminate this Agreement

without cause upon the delivery of ninety (90) days prior written notice to Physician; provided that during such ninety (90) day notice period, Group may elect, in its sole discretion, to remove Physician from the schedule and to pay any remaining amounts due to Physician for the remainder of such notice period.

(c)    Group may terminate this Agreement for good and sufficient cause.  Such termination shall be effective upon the delivery of written notice thereof to Physician or at such later time as may be designated in said notice, and Physician shall cease performance of Services hereunder and vacate the offices of Group and the Facilities on or before such effective date.  The written notice shall specify the cause for termination.  For purposes of this Section 7.c, the term "good and sufficient cause" shall include, but not be limited to, any one or more of the following:

(1)    Physician's failure to maintain any of the Qualifications.

(2)    A determination is made by the CGB that there is an immediate and significant threat to the health or safety of any patient as a result of the services provided by Physician, or as a result of Physician's medical misconduct or other gross neglect in the provision of professional services.

(3)    Any felony indictment naming Physician or conviction of a felony by Physician.

(4)    Any investigation for any alleged violation or violation by Physician of any Medicare or Medicaid statutes, 42 U.S.C. § 1320a-7b (the "**Anti-Kickback Statute**"), 31 U.S.C. § 3729 (the "**False Claims Act**"), 42 U.S.C. § 1395nn (the "**Stark Law**"), or the regulations promulgated pursuant to such statutes, or any similar federal, state or local statutes or regulations promulgated pursuant to such statutes.

(5)    Physician's ineligibility to be insured against medical malpractice.

(6)    Physician does not satisfactorily pass the Review, except in the instance where Physician satisfies the remedial action requested.

(7)    Any dishonest or unethical behavior by Physician that results in damage to or discredit upon Group.

(8)    Any intentional conduct or action by Physician that negatively affects the ability of Group to deliver Services to any Facility or any other facility.

(9)    Physician's violation of the Clinician Code of Conduct of Group or failure to comply with any clinical practice guidelines as may be established by Group from time to time.

(10)    Physician no longer meets the requirements to be a Physician-Partner as such requirements may, from time to time, be established or modified by the CGB.

(11)    Physician's violation of Section 9.

(d)    In the event either party shall give written notice to the other party that such other party has substantially defaulted in the performance of any material duty or material obligation imposed upon it by this Agreement, and such default shall not have been cured within thirty (30)

days following receipt of such notice, the non-defaulting party shall have the right to immediately terminate this Agreement. For purposes of this subsection (d), a default shall include Physician ceasing to be a member in good standing of the Medical Staff of any of the Facilities at which Physician is assigned to render Services by the CGB.

(e)     In the event that there shall be a change in federal or state law, the Medicare or Medicaid statutes, regulations, or general instructions (or in the application thereof), the adoption of new legislation or regulations applicable to this Agreement, or the initiation of an enforcement action with respect to legislation, regulations, or instructions applicable to this Agreement, any of which affects the continuing viability or legality of this Agreement or the ability of Group to obtain reimbursement for Services rendered by Physician, then either party may by notice propose an amendment to conform this Agreement to existing laws.  If notice of such a change or an amendment is given and if Group and Physician are unable within ninety (90) days thereafter to agree upon the amendment, then either party may terminate this Agreement by ninety (90) days' notice to the other, unless a sooner termination is required by law or circumstances.

(f)     This Agreement shall automatically terminate upon the death of Physician.

(g)     This Agreement shall terminate upon written notice by either party in the event Physician becomes disabled, as further described in Section 8.

(h)     Upon termination of this Agreement for any reason whatsoever, Physician shall submit to Group within five (5) days of such termination all outstanding charges for professional services rendered by Physician on behalf of Group.  Group shall have the right to withhold any earned, but unpaid compensation for services rendered by Physician through the effective date of termination, until such time as Physician has submitted to Group all outstanding charges for professional services rendered by Physician on behalf of Group.

(i)     Except as otherwise provided herein, upon termination of this Agreement for any reason, Physician shall be entitled to Physician's earned, but unpaid compensation for Services rendered by Physician through the effective date of termination, as determined in accordance Schedule 4.  In the event of the death of Physician, such amounts shall be paid to Physician's estate.

(j)     Immediately upon termination of this Agreement, Physician shall surrender all keys, identification badges, telephones, pagers, computers and any other property of Group in the possession of Physician.

(k)     Physician agrees and acknowledges that upon termination of this Agreement for any reason, Group shall submit Physician's Resignation (as such term is defined in Schedule 9) to any Facility at which Physician maintains medical staff privileges.

(l)     Physician agrees and acknowledges that Group will suffer significant damages if Physician terminates his or her employment without cause with less than one hundred eighty (180) days advance notice to Group as a result of, among other things, the difficulty and associated costs of recruiting and credentialing a new replacement physician.  Physician agrees that if Physician terminates this Agreement with less than one hundred eighty (180) days advance notice to Group, Physician shall pay to Group all costs and expenses Group incurs in obtaining locum tenens coverage as an interim replacement for Physician in recruiting a permanent replacement.

8.      Disability of Physician.  Upon determination by the CGB of the Disability of Physician that no reasonable accommodation may be made to perform the essential functions of a physician as stated in Section 3, this Agreement may be immediately terminated by Group upon written notice to Physician.  The term "Disability of Physician" shall have the same meaning as that type of disability that entitled Physicians to payments for permanent disability pursuant to the disability policy covering Physician.  In the event no disability policy exists covering Physician, the term "Disability of Physician," as used herein, shall mean that point in time when Physician is unable to resume the essential functions required of Physician under this Agreement, as performed prior to such time, within one hundred and eighty (180) days after the disabling event.  If the disabling event is not a separate and distinct happening, the 180-day period shall begin at the time Physician is unable to perform the essential functions of the position as stated in Section 3 for thirty (30) consecutive work days. Additionally, Physician shall be considered disabled if he/she does not perform his/her duties for one-hundred and eighty (180) days during a three hundred sixty (360) day period.  If the CGB determines that Physician is not performing his/her duties because of a physical or medical condition, then Physician shall submit to a physical and/or mental examination of two (2) independent physicians selected by the CGB reasonably in good faith to determine the nature and extent of such condition and Physician agrees to be bound by such determination.

9.      Non-Disclosure, Non-Solicitation and Non-Competition.  Physician shall comply with the non-disclosure, non-solicitation and non-competition covenants set forth on Schedule 9.

10.      Assignment of Intellectual Property.  Physician shall promptly and fully disclose all Intellectual Property to Group.  Physician hereby assigns and agrees to assign to Group (or as otherwise directed by Group) Physician's full right, title and interest in and to all Intellectual Property.  At Group's sole cost and expense, Physician agrees to execute any and all applications for patents, copyrights and/or other proprietary rights, and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by Group to assign all Intellectual Property to Group and to permit Group to enforce any patents, copyrights and/or other proprietary rights to the Intellectual Property.  All copyrightable works that Physician creates shall be considered "work made for hire" for the sole benefit of Group.  For purposes of this Section 10, "**Intellectual Property**" shall mean inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by Physician (whether alone or with others, whether or not during normal business hours or on or off Group premises) during Physician's employment with Group that either (a) relates  to the business of Group (including administering anesthesia to patients) or (b) makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities). Physician may exclude from the definition of Intellectual Property and any obligations relating thereto, inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) developed by Physician (i) prior to the date of this Agreement, which are identified on Schedule 10 attached hereto and (ii) after the date of this Agreement in connection with Physician's engagement in outside professional activities that have been approved by the CGB or that have been undertaken entirely on Physician's own time unless, in the case of this clause (ii), Physician makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities) in connection with such development (collectively, "**Excluded IP**").   Physician will promptly advise Group in writing of any Excluded IP that Physician develops or proposes to develop after the date of this Agreement that is not set forth on Schedule 10 and provide such information and assurances as Group may reasonably request to determine whether or not such Intellectual Property

constitutes Excluded IP hereunder. If Group determines that such Intellectual Property does not constitute Excluded IP hereunder, Group will notify Physician in writing thereof within 30 days after receiving such notice, information and assurances, provided, that if Group does not notify Physician in writing within 30 days after receiving such notice, information and assurances, then such Intellectual Property shall be considered Excluded IP hereunder to the extent such Intellectual Property satisfies the requirements of Excluded IP set forth above.

11.     <u>Right of Offset</u>. If Physician's employment with Group is terminated for any reason, Group shall have the right to offset against any compensation (earned, but unpaid or otherwise) or other amounts due to Physician under this Agreement or otherwise, any indebtedness, whether or not evidenced by a promissory note and whether or not mature or due and payable, owed by Physician to Group.

12.     <u>Miscellaneous</u>.

(a)     <u>Factual Information</u>:  Physician represents and warrants that any and all factual information furnished by Physician to Group will be true and accurate in every material respect as of the date on which such information is furnished.

(b)     <u>Authority</u>:  Physician has full power and authority to enter into this Agreement and perform all obligations under this Agreement.  The execution and performance of this Agreement by Physician will not constitute a breach or violation of any covenant, agreement or contract to which Physician is a party or by which Physician is bound.

(c)     <u>Assignment; Benefit</u>:  This Agreement and the rights and duties of Physician hereunder may not be assigned by Physician without the prior written consent of Group.  Group may assign this Agreement or any and all rights or obligations hereunder, without the prior written consent of Physician, to any legal entity owned or controlled by or under common control with Group if, as a mandatory condition to such assignment, the assignee entity, commiserate with the assignment, adopt and agree in writing to be bound to and by the then current USAP South Texas Clinical Governance Board Charter and PRCS.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns.

(d)     <u>Compliance</u>:  Group and Physician expressly agree that nothing contained in this Agreement shall require Group or Physician to refer or admit any patients to any of the Facilities or to any other individual entities.  Physician agrees to use Physician's best efforts to ensure Physician's activities are in full compliance with all rules and regulations including, but not limited to, the rules and regulations relative to the Medicare and Medicaid programs, and the rules and regulations relative to any applicable private payor programs.  Physician further agrees to immediately report any violations of such rules or regulations observed by Physician to the person(s) designated in Group's compliance policies and procedures.

(e)     <u>Invalid Provision</u>:  The invalidity or unenforceability of a particular provision, paragraph, subparagraph, sentence or term of this Agreement shall not affect the other provisions, paragraphs, subparagraphs, sentences or terms hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision, paragraph, subparagraph, sentence or term was omitted.

(f)    Modification:  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto; provided, however, if Physician no longer qualifies as a Physician-Partner and the CGB has elected to change such Physician's designation from being a Physician-Partner, then without any action required by Physician (i) all references herein to Physician-Partner (other than such references in Schedule 9) shall mean a physician other than a Physician-Partner, (ii) such Physician shall no longer have the right to serve on the Clinical Governance Board or any other voting rights associated with being a Physician-Partner, (iii) Recital D herein shall be deemed to be intentionally omitted and (iv) such Physician shall receive a new compensation plan from Group pursuant to which Physician shall receive compensation for the services provided hereunder, to be attached hereto as a revised Schedule 4.

(g)    Waiver:  The waiver by either party or the CGB of a breach or violation of any provision of this Agreement will not operate as, or be construed to constitute, a waiver by such party of any subsequent breach of the same or other provision hereof.

(h)    Third Party Beneficiary:  The CGB is an express third-party beneficiary of this Agreement and shall have the right to enforce its rights hereunder in accordance with the applicable laws of the State as if it was a party hereto.

(i)    Notice:  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally delivered, or if sent by certified return receipt mail, postage prepaid, to the addresses set forth below, unless otherwise notified in writing:

GROUP:                                          w/a copy to:

U.S. Anesthesia Partners of Texas, P.A.         U.S. Anesthesia Partners, Inc.
1500 City West Blvd, Suite 300                  12222 Merit Drive, Suite 700
Houston, TX 72042                               Dallas, TX  75251
Attn:  Sr. Vice President – Operations          Attn:  General Counsel

PHYSICIAN:

Current address on file with Human Resources

(j)    Applicable Law and Venue:  This Agreement shall be governed, construed, enforced and regulated under and by the laws of the State.  Each of the parties to this Agreement hereby irrevocably and unconditionally submits, for itself and its assets and properties, to the exclusive jurisdiction of the state and Federal courts of Bexar County, Texas, and any appellate court from such court, in any action or proceeding arising out of or relating to this Agreement.

(k)    Legal Fees and Costs:  In the event that either party elects to incur legal expenses to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover such legal expenses, including without limitation, reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

(l)    Entire Agreement:  This Agreement, the Schedules attached hereto and the PRCS constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces any prior employment agreements and/or arrangements, oral or otherwise, between the parties hereto and any prior statements, representations or warranties not

expressly incorporated herein.  The parties specifically acknowledge that, in entering into and executing this Agreement, each is relying solely upon the statements, representations and agreements contained in this Agreement and no others.

(m)      Survivability:  The provisions of Sections 3(g), 4, 5, 9, 10, 11 and 12, Schedule 4 and Schedule 9 shall survive the termination or expiration of this Agreement for any reason whatsoever.  Notwithstanding the foregoing, except as otherwise expressly set forth on Schedule 9, the non-compete and non-solicit covenants of Physician with respect to Schedule 9 shall terminate upon Physician's payment of the Buy-Out Amount as further described in Schedule 9.  In addition, the duration of the covenants contained in this Agreement shall be tolled during the continuation of any breach or violation and will continue or commence again only upon Physician's strict compliance with such covenants.

(n)      Rule of Interpretation:  The general rule that an agreement is to be interpreted against the drafter of an agreement in the case of an ambiguity is not to be recognized hereunder, as this Agreement was developed by the mutual consent and negotiation of the parties.  The fact that this Agreement was actually prepared by counsel for one of the parties was merely as a matter of convenience for all of the parties.  For purposes of this Agreement, the term "affiliate" shall mean means, with respect to any person or entity, any other person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified person or entity; provided that U.S. Anesthesia Partners, Inc. and its affiliates shall be deemed an Affiliate of Group, the term "control" when used with respect to any person or entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

(o)      Effective Date.  For the avoidance of doubt, this Agreement shall only be effective upon the date of the occurrence of the Effective Time (as defined in the Agreement and Plan of Merger (the "**Merger Agreement**") dated as June 11, 2019 among U.S. Anesthesia Partners Holdings, Inc., the Practice and the other parties thereto) (the "**Effective Date**").  In the event that the Merger Agreement is terminated, this Agreement shall automatically terminate and be of no further force and effect.

[Signature Page to Follow]

.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

U.S. ANESTHESIA PARTNERS OF TEXAS, P.A.

By: _____

Name: Hector Herrera, M.D.

Title:   President

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

GROUP:                                          PHYSICIAN:

U.S. ANESTHESIA PARTNERS OF TEXAS,              Victor Lai
P.A.                                            _____

By:_____    _____
Name:                                   DocuSigned by:
Title:                                  1EA1DF223D64467

## Schedule 10

## Carved-Out Intellectual Property

**Intellectual Property developed prior to the Agreement and excluded from Section 10:**

None.

SCHEDULE 4

COMPENSATION, PHYSICIAN BENEFITS, BUSINESS EXPENSES
AND PROFESSIONAL LIABILITY INSURANCE

Compensation
Group shall pay to or for the benefit of Physician compensation for the Services in an amount determined under the USAP South Texas Compensation Plan, as such plan may be amended from time to time.  Physician agrees and acknowledges that Group shall only be required to exercise its normal billing procedures with respect to collecting Group's accounts receivable and will not be required to institute judicial or other procedures or any other action to collect any accounts receivable.

Physician Benefits
Physician shall be entitled to those benefits and time off which are customarily offered to similarly situated Physician-Partners under Group's employee benefits plans, subject to meeting any eligibility requirements imposed by such plans.  Physician agrees and acknowledges that Group may modify its benefits plans from time to time, provided such modifications apply to all similarly situated Physician-Partners.

Business Expenses
Group shall reimburse Physician for business expenses incurred by Physician in fulfilling his or her responsibilities under this Agreement and as set forth in Group's separate business expense reimbursement policy, as such policy may be amended by Group from time to time.

Professional Liability Insurance
Group shall purchase, maintain and pay all premiums for malpractice insurance insuring Group and Physician, with such limits of coverage and with such insurer as shall be determined by Group from time to time.

In the event Group changes to a "claims made" policy in the future, upon the termination of Physician's employment with Group for any reason, Physician shall be responsible for purchasing "tail" coverage to ensure continuous coverage to Physician and Group for the Services rendered by Physician under this Agreement.

SCHEDULE 9

NON-DISCLOSURE OF INFORMATION CONCERNING BUSINESS
AND NON-COMPETE AND NON-SOLICIT AGREEMENT

Physician recognizes that Group's decision to enter into this Agreement is induced primarily because of the covenants and assurances made by Physician in this Agreement, that Physician's covenant not to compete and not to solicit is necessary to ensure the continuation of the business of Group and the reputation of Group, as well as to protect Group from unfair business competition, including but not limited to, the improper use of Confidential Information (as defined below), and that irrevocable harm and damage will be done to Group if Physician unlawfully competes with Group.  Therefore, in consideration of the promises contained herein, including without limitation those related to Confidential Information, except as may be otherwise expressly provided in this Agreement, the Physician agrees as follows:

1.      Non-Competition:  During the Term and for a period of two (2) years following termination of this Agreement (for whatever reason) (the "**Restricted Period**"), Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services within five (5) miles of any Facility.  For purposes of this Schedule 9, "**Person**" shall mean any individual (including Physician), any association, corporation, company, trust, partnership or other entity.

2.      Non-Competition (Group): During Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services at any hospitals, facilities or other locations (other than a Facility) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group provided Services during the Term.

3.      Non-Solicit:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) solicit any past or current patient to whom Physician or any other Affiliated Clinician provided Services during the Term ("**Patient**"), or immediate family member of such Patient, for purposes of inducing the Patient to become a patient of Physician or any other Person; (ii) solicit any physician (including surgeons) for which Physician or any other Affiliated Clinician provided Services to such physician's patients at any time during the Term, for purposes of inducing such physician to consult with or utilize Physician or any other Person in the care of such physician's patients; (iii) solicit any Facility for the purpose of obtaining any contractual relationship with such Facility for Physician or any other Person; or (iv) solicit for employment, or employ or engage, any individual who is employed by Group (1) in the case of each day during the Term, within the twelve (12) month period prior to such day and (2) in the case of the period following the termination of this Agreement, within the twelve (12) month period prior to the date of

such termination, to perform services on behalf of Physician or any other Person that provides Services.  Notwithstanding the foregoing, Group shall (x) permit Physician to have access to a list of the Patients whom Physician has seen or treated within one (1) year of termination of this Agreement; and (y) provide Physician (A) access to the medical records of the Patients whom Physician has seen or treated upon authorization of the Patient in the same form as maintained or available to Group; and (B) any copies of the medical records for a reasonable fee as established by the Texas State Board of Medical Examiners under the Texas Medical Practice Act (Texas Occupations Code Section 159.008).  Any access to a list of Patients or to Patients' medical records after termination of this Agreement shall not include such list or records to be provided in a format different than that by which such records are maintained except by mutual consent of the parties to this Agreement.

4.      Non-Interference; Administrative Services:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) call on or solicit any Facility, employee, independent contractor or other Person who has a contractual relationship with Group for the purpose of persuading or attempting to persuade such Person to cease doing business with or performing services for, or materially reduce the volume of, or adversely alter the terms with respect to, the business or services that such Person does with or performs for Group or any affiliate thereof or in any way otherwise interfere with the relationship between any such Facility, employee, independent contractor or other Person, on the one hand, and Group or any affiliate thereof, on the other hand, or (ii) provide management, administrative or consulting services to any Person that provides Services within five (5) miles of any of the Facilities. This provision shall survive the payment of the Buy-Out Amount.

5.      Continuing Care.  Physician shall not be prohibited from providing continuing care and treatment to a specific Patient or Patients during the course of an acute illness at any time, including following termination of this Agreement or Physician's employment.  Following such termination, Physician understands and agrees that Physician will not be permitted to utilize Facility premises, staff, supplies and/or any other Facility-owned resource, unless failure to do so would compromise an acute patient's health and well-being, in which case Group, in its sole discretion, will provide written authorization to Physician on a case-by-case basis so that Physician may treat such Patient at the appropriate Facility, and even then, only to the extent and of such duration, that the acute nature of the Patient's condition requires.

6.      Buy-Out Exception.  Physician may be released of the non-competition and non-solicitation provisions contained in Section 1, Section 2 and Section 3 of this Schedule 9 upon payment by Physician to Group of a reasonable price prior to a breach by Physician. The parties acknowledge, and hereby decline and waive, their option to have the reasonable price of the buy-out determined by an arbitrator, whether selected by the parties or a court of competent jurisdiction.  The parties agree that a reasonable price shall be the amount equal to 200% of the Net Revenue per Physician Partner (the "**Buy-Out Amount**"). For purposes of this Schedule 9, "**Net Revenue per Physician Partner**" shall mean a dollar amount equal to (a) the total net revenue of the Star Divisions for the most recent twelve (12) month period (and for any period within twelve (12) months of the Effective Date the product obtained by multiplying (a) the quotient obtained by dividing (x) the total net revenue of the Star Division from the Effective Date to the determination date by (y) the number of days in the period from the Effective Date to the determination date by (b) 365), as determined in accordance with generally accepted accounting principles and reflected on the financial statements for Star

Divisions maintained by Group divided by (b) the average number of Physician-Partners employed by Group who are assigned to Star Divisions during the most recent twelve (12) month period. Physician and Group agree that the Buy-Out Amount is reasonable because it reflects the lost productivity and profit opportunity of Group during the Restricted Period during which Physician would otherwise not be competing with Group, and additionally compensates Group for the risk that Physician recruits away from Group physicians or other clinical staff or Facilities in which Group has made a significant investment.  The parties further agree that the Buy-Out Amount is reasonable because Group's physician-partners practice in groups, are more likely to depart in groups, oversee other employed physicians and CRNAs and have developed practice patterns, relationships, protocols and the Confidential Information in a group setting that together support a Buy-Out Amount calculated on the basis of all physician-partner revenues in particular divisions, not just the individual Physician's revenues or compensation.

7.     <u>Resignation of Privileges</u>.  Physician further agrees to relinquish Physician's privileges to practice anesthesiology and to treat chronic pain at each of the Facilities upon termination of this Agreement for any reason.  In connection herewith, Physician shall execute the resignation attached hereto and incorporated herein by reference as <u>Exhibit 9-A</u> (the "**Resignation**"), and in the event of termination of this Agreement for any reason whatsoever, Physician hereby authorizes Group to deliver such Resignation to the Facilities.  Notwithstanding the foregoing, if such Resignation would result in a reportable event to the State Board of Medical Examiners or the National Practitioner Data Bank, Group will forgo delivering the Resignation to the applicable Facility and the termination of Physician's privileges at such Facility shall be conducted in conformance with any applicable fair hearing rights set forth in the then current medical staff bylaws at the applicable Facility, or shall be delivered after the conclusion of investigation or other inquiry that would result in the Resignation becoming a reportable event.

8.     <u>Confidentiality</u>.  As of the date of the execution of this Agreement and during the course of the Physician's employment, in order to allow Physician to carry out Physician's duties hereunder, Group has provided and will continue during the Term to provide to Physician Confidential Information. Physician agrees to keep confidential and to not use or disclose to others during the Term and thereafter, except as expressly consented to in writing by Group, required by law or authorized under this Agreement, any Confidential Information. This restriction shall not apply to such information if Physician can establish that such information (i) has become generally available to and known by the public (other than as a result of an unpermitted disclosure directly or indirectly by Physician or Physician's affiliates, advisors, or representatives), (ii) has become available to Physician on a non-confidential basis from a source other than Group and its affiliates, advisors, or representatives, provided that such source is not and was not bound by a confidentiality agreement with or other obligation of secrecy of Group of which Physician has knowledge, or (iii) has already been or is hereafter independently acquired or developed by Physician without use of or reference to any Confidential Information.  Should Physician leave the employment of Group, Physician will neither take nor retain, without prior written authorization from Group, any Confidential Information. Physician further agrees to destroy any paper or electronic copies of Confidential Information, including information contained on any personal device, upon the request of Group.  For purposes of this <u>Schedule 9</u>, "**Confidential Information**" shall mean any financial, accounting and statistical information, marketing plans, business plans, feasibility studies, fee schedules or books, reimbursement rates, billing information, patient files, confidential technology, proprietary information, patient lists, policies and procedures or trade secrets of Group or U.S. Anesthesia Partners, Inc., its affiliates or managed practices ("**USAP**"), or other papers, reports, records, memoranda, documents, files, discs, or copies thereof pertaining to Group's patients or Group's or

USAP's business, sales, financial condition or products, or any matter or thing ascertained by Physician through Physician's affiliation with Group, the use or disclosure of which matter or thing might reasonably be construed to be contrary to the best interests of Group or USAP.

9.      Exceptions to Confidentiality.

        a.      It shall not be a breach of Physician's covenants under Schedule 9 if a disclosure is made pursuant to a court order, a valid administrative agency subpoena, or a lawful request for information by an administrative agency.  Physician shall give Group prompt notice of any such court order, subpoena, or request for information.

        b.      Physician shall not be prohibited from releasing any Confidential Information to Physician's legal counsel or financial advisors, provided that such advisors are under a legal obligation of confidentiality with respect to the Confidential Information.

        c.      Nothing in this Agreement prohibits Physician from reporting an event that Physician reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as Securities and Exchange Commission or Department of Justice), requires notice to or approval from Group before doing so, or prohibits Physician from cooperating in an investigation conducted by such a government agency.  This may include disclosure of trade secret or confidential information provided the disclosure complies with the limitations set forth in the 2016 Defend Trade Secrets Act (DTSA).  Physician is hereby provided notice that under the DTSA, (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (a) is made in confident to a Federal, State or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (b) is made in a complaint or other documented filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

10.     Enforcement.  Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action asserted by Physician against Group, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of Section 1, Section 2, Section 3, Section 4 or Section 8 of this Schedule 9. It is understood by and between the parties hereto that the covenants set forth in Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 are essential elements of this Agreement, and that, but for the agreement of Physician to comply with such covenants, Group would not have agreed to enter into this Agreement.  Group and Physician agree that the foregoing covenants are appropriate and reasonable when considered in light of the nature and extent of the practice conducted by Group.  If any provision or subdivision of this Agreement, including, but not limited to, the time or limitations specified in or any other aspect of the restraints imposed under Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9, is found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such portion shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such portion in order to make it enforceable.  In the event of such judicial reformation, the parties agree to be bound by Section 1,

Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 as reformed in the same manner and to the same extent as if they had agreed to such reformed Sections in the first instance.  Without limiting other possible remedies to Group for the breach of any covenant contained in this Schedule 9, Physician agrees that injunctive or other equitable relief shall be available to enforce such covenant, such relief to be without the necessity of posting a bond, cash, or otherwise.

EXHIBIT 9-A

RESIGNATION

By signing below, I, _____ hereby agree to automatically resign my medical staff privileges at _____ ("Facility") effective as of the termination of my employment with U.S. Anesthesia Partners of Texas, P.A. for any reason or upon the termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility.  In such event, I further waive any due process, notice, hearing and review rights I may have under the Facility's medical staff Bylaws.  Upon termination of my employment or termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility, U.S. Anesthesia Partners of Texas, P.A. is hereby authorized to complete a copy of this resignation for the Facility and deliver a copy of this resignation to the medical staff office of such Facility.

_____

Name:  _____

Date:  _____

# EXHIBIT E

Execution Version

## PHYSICIAN PARTNER EMPLOYMENT AGREEMENT

This PHYSICIAN PARTNER EMPLOYMENT AGREEMENT (the "**Agreement**") is entered into by and between U.S. Anesthesia Partners of Texas, P.A., a Texas professional association ("**Group**") and Brian Seastrunk, M.D. ("**Physician**").

<u>RECITALS</u>

A.      Group is a Texas professional association authorized to practice medicine in the State of Texas (the "**State**") that provides professional anesthesiology services (including any specialty thereof), pain management, anesthesia related consulting, management and administrative services ("**Services**") to patients at inpatient and outpatient facilities.

B.      Physician is a licensed physician authorized to practice medicine in the State and Group desires to hire Physician to perform the Services at some or all of the Facilities (as defined below) on behalf of Group as set forth herein.

C.      Certain clinical operations of Group including, but not limited to, making certain determinations and decisions regarding the modification and termination of this Agreement, are managed and overseen by the USAP South Texas Clinical Governance Board (the "**CGB**") established by the Plan Regarding Compensation for Services (USAP South Texas) dated as of September 6, 2019, as such plan may be amended, modified, replaced or superseded (the "**PRCS**").

D.      Physician is acknowledged as a "Physician-Partner" (as such term is defined in the PRCS) within the CGB.

E.      It is determined to be to the mutual advantage of Group and Physician to enter into this Agreement as set out herein.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and Physician's specific agreement to the terms of <u>Schedule 9</u>, attached hereto and incorporated herein by reference, and the monies to be paid hereunder, Group agrees to hire Physician and Physician agrees to work for Group upon the following terms and conditions:

1.      <u>Recitals Approved; Schedules Incorporated; CGB Authority</u>.  The above recitals are true and correct and are made a part hereof.  <u>Schedule 4</u>, <u>Schedule 9</u> and <u>Exhibit 9-A</u>, which are attached hereto, are hereby incorporated into this Agreement by reference.  Notwithstanding any provision or provisions to the contrary, the parties agree that the rights and duties of the Group are limited by the USAP South Texas Clinical Governance Board Charter, and specifically, but not limited to, Group's exercise of its right related to the termination of the Physician, Physician's staffing obligations at Facilities, Physicians use of mid-level or other clinical providers, Physician's paid time off, call obligations and Physician's scheduling.  Accordingly, any reference to the Group herein, includes and requires, where applicable, the Group to obtain the CGB's specific consent as provided in the USAP South Texas Clinical Governance Board Charter before Group may exercise its rights hereunder.

2.    Qualifications; Notifications.

(a)    At all times during the Term (as defined in Section 7) of this Agreement, Physician shall meet the following qualifications:  (i) maintain an unrestricted license to practice medicine in the State (including an "Office Based Anesthesia" permit if required by Group); (ii) maintain an unrestricted DEA permit; (ii) maintain board certification or eligibility with the American Board of Anesthesiology; and (iii) be eligible to be a participating provider with Medicare and Medicaid.  The foregoing shall collectively be referred to as the "**Qualifications**".    Physician agrees and acknowledges that Physician's employment by Group is contingent upon Physician continuously meeting the Qualifications.  In addition, Physician shall maintain unrestricted medical staff membership and clinical privileges in good standing on the Medical Staff of each Facility as directed by Group.

(b)    Physician shall notify Group, no later than forty-eight (48) hours of: (i) the initiation of any action to suspend, restrict, deny, relinquish or revoke (A) Physician's  license to practice medicine in the State or any other state in which Physician holds a license to practice medicine; (B) Physician's medical staff privileges at any Facility; or (C) Physician's DEA permit; or (ii) Physician's receipt of notice of (A) the initiation of any disciplinary proceeding or adverse action involving Physician with respect to any medically related matter before any administrative agency or governmental body; (B) the intent to file or the actual filing of any medically related liability action involving Physician in any capacity; or (C) any arrest, indictment, conviction, guilty plea or plea of nolo contendere for any criminal conduct or other crime involving dishonesty or moral turpitude naming Physician.  Physician shall provide Group with copies of any such complaints, notices, charges, lawsuits and related non-privileged documents promptly upon request of Group.

(c)    For purposes of this Agreement, "**Facilities**" mean all hospitals, facilities and other locations (i) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group and who are or were assigned to a Star Division (as defined in the PRCS (as defined below)) (individually an "**Star Clinician**") provided Services during the Term, (ii) that are located in the same county as a hospital, facility or other location described in the foregoing clause (i) or in any county contiguous to such county and at which clinicians who are or were employed by or have or had an independent contractor relationship with Group (individually a "**Related Star Clinician**" and collectively with the Star Clinicians the "**Affiliated  Clinicians**") provided Services during the Term, (iii) at which Group had a contract in effect for any (x) Star Clinicians to render Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iii)(x) or in any county contiguous to such county, and (iv) at which Group has been in active negotiations for (x) Star Clinicians to provide Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iv)(x) or in any county contiguous to such county.

3.    Duties of Physician.

(a)    Physician is employed by Group to use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to

time to maintain full-time status for a Physician-Partner (which requirements will be set forth on Schedule II to the PRCS); provided that if Physician notifies Group in writing that Physician desires to work part-time from after a specified date that is at least twelve (12) months after the date that such notice is delivered (the "**Part-Time Start Date**") and the CGB approves Physician working part-time, then from and after the Part-Time Start Date, in lieu of Physician rendering such Services on a full-time basis, Physician shall use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to time to maintain part-time status for a Physician-Partner (which requirements will be set forth on Schedule I to the PRCS). Physician shall not, without the prior written consent of the CGB and Group, which may in the CGB's and Group's sole discretion be withheld or conditioned upon Physician meeting other requirements, engage in the provision of professional medical services other than Services provided pursuant to this Agreement.  Physician acknowledges and agrees that, except as otherwise agreed by the CGB and Group, Physician must meet the minimum requirements of a Physician-Partner as defined by the PRCS from time to time in order for Physician to maintain Physician's status as a Physician-Partner. At all times while Physician is an employee of Group, Physician shall retain independent discretion and shall exercise professional judgment consistent with generally accepted medical practices, the ethical standards of the Texas and American Medical Associations and the professional standards of Group, in the provision of Services at the Facilities.  Physician's duties shall include but not be limited to (i) examination, evaluation and treatment of patients; (ii) participation in Group's on-call rotation for after-hours coverage; (iii) participation in Group's indigent and charity care programs; and (iv) such other duties as may reasonably be assigned by Group from time to time.

(b)     Physician shall perform all Services in accordance with (i) this Agreement; (ii) the bylaws, rules and regulations of the Medical Staff of each Facility at which Physician renders Services; (iii) the terms and conditions of any contractual arrangement regarding the performance of Services between Group and the applicable Facility (upon written request, a summary of the material and relevant terms of any such agreement shall be provided to Physician); and (iv) any applicable policies and procedures established by the CGB and/or Group, including but not limited to the Group's Clinical Code of Conduct and Conflict of Interest Policy.

(c)     Physician agrees and acknowledges that the CGB may conduct a review of Physician's ability to safely perform Services at any time ("**Review**").

(d)     Physician shall assist in providing supervision of physician assistants, nurses, nurse anesthetists, anesthesiology assistants and other non-physician health care personnel providing services on behalf of Group.  All such non-physician personnel shall be under Physician's control and direction in the performance of health care services for patients treated by Physician.

(e)     Physician shall provide Services on a nondiscriminatory basis and may not refuse to provide medical services to any patient accepted by Group.

(f)     Physician shall participate in, and cooperate with Group in connection with, the quality assurance and risk management program(s) developed by Group.  Physician shall also be subject to and actively participate in any utilization review program(s) developed by or on behalf of Group.

(g)      Physician agrees and acknowledges that many of the contractual arrangements Group holds with the Facilities are exclusive in nature and, as a result, require the automatic termination of medical staff membership and clinical privileges for all of Group's providers upon termination of the contractual arrangement.  Physician hereby agrees and consents to the foregoing and further waives any due process, notice, hearing and review rights he/she may have under such Facility's medical staff bylaws upon termination of Group's contractual relationship with Facility or upon Physician's termination of employment with Group for any reason.

4.      <u>Compensation, Benefits, and Expense Reimbursement.</u>  Group shall pay to or for the benefit of Physician as compensation and/or benefits for the Services performed by Physician the amounts set forth on <u>Schedule 4</u>.  In addition, Group shall provide Physician benefits and business expense reimbursements as set forth on <u>Schedule 4</u>.  Group shall provide, or cause to be provided, all space, equipment, supplies, non-physician health care personnel and clerical, administrative and other personnel as are reasonably necessary and appropriate, consistent with Group's past practices and the CGB's recommendations, for Physician's performance of Services on behalf of Group.

5.      <u>Fees.</u>  Group shall have exclusive authority to determine the fees, or a procedure for establishing the fees, to be charged to patients by Group.  All sums paid by any patient of Group in the way of fees, salary, or otherwise for medical services rendered by Physician shall be and remain payments of Group and shall be included in Group's income.  Physician hereby assigns to Group all rights to bill for Services rendered by Physician and shall execute any additional documentation as may be requested by Group documenting such assignment.  In the event Physician receives any amounts from any patients, third party payors or other third parties which are the property of Group, Physician shall immediately endorse and deliver the same to Group.

6.      <u>Patients, Medical Records.</u>  Group shall have the authority to determine who will be accepted as patients of Group.  Group also shall have the authority to designate, or to establish a procedure for designating, which professional physician of Group will handle each such patient.  Physician shall, in accordance with policies developed by or on behalf of Group, timely prepare all medical records in respect of patients treated by Physician. All medical records generated in respect of patients treated by Physician or any other physician engaged by Group during the Term shall be and remain the property of Group or Facilities, as appropriate, and shall be maintained at the Facilities; <u>provided, however,</u> that Physician shall have such right of access to such medical records as shall be provided by law.  In addition, Physician shall timely prepare and deliver such other records and reports relating to the operations of Group as Group may reasonably request.  Physician shall abide by all state and federal laws regarding the confidentiality of patient health information, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, and all rules and regulations promulgated thereunder, including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transaction Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164), and the Health Information Technology for Economic and Clinical Health Act of 2009 enacted as part of the American Recovery and Reinvestment Act of 2009.

7.      <u>Term and Termination</u>.  The term of this Agreement will commence on the September 6, 2019 and will continue thereafter until terminated as provided herein (the "**Term**").

(a)      This Agreement may be terminated upon the mutual written agreement of the parties.

(b)      Physician may terminate this Agreement without cause upon the delivery of one hundred eighty (180) days prior written notice to Group. Group may terminate this Agreement

without cause upon the delivery of ninety (90) days prior written notice to Physician; provided that during such ninety (90) day notice period, Group may elect, in its sole discretion, to remove Physician from the schedule and to pay any remaining amounts due to Physician for the remainder of such notice period.

(c)     Group may terminate this Agreement for good and sufficient cause.  Such termination shall be effective upon the delivery of written notice thereof to Physician or at such later time as may be designated in said notice, and Physician shall cease performance of Services hereunder and vacate the offices of Group and the Facilities on or before such effective date.  The written notice shall specify the cause for termination.  For purposes of this Section 7.c, the term "good and sufficient cause" shall include, but not be limited to, any one or more of the following:

(1)     Physician's failure to maintain any of the Qualifications.

(2)     A determination is made by the CGB that there is an immediate and significant threat to the health or safety of any patient as a result of the services provided by Physician, or as a result of Physician's medical misconduct or other gross neglect in the provision of professional services.

(3)     Any felony indictment naming Physician or conviction of a felony by Physician.

(4)     Any investigation for any alleged violation or violation by Physician of any Medicare or Medicaid statutes, 42 U.S.C. § 1320a-7b (the "**Anti-Kickback Statute**"), 31 U.S.C. § 3729 (the "**False Claims Act**"), 42 U.S.C. § 1395nn (the "**Stark Law**"), or the regulations promulgated pursuant to such statutes, or any similar federal, state or local statutes or regulations promulgated pursuant to such statutes.

(5)     Physician's ineligibility to be insured against medical malpractice.

(6)     Physician does not satisfactorily pass the Review, except in the instance where Physician satisfies the remedial action requested.

(7)     Any dishonest or unethical behavior by Physician that results in damage to or discredit upon Group.

(8)     Any intentional conduct or action by Physician that negatively affects the ability of Group to deliver Services to any Facility or any other facility.

(9)     Physician's violation of the Clinician Code of Conduct of Group or failure to comply with any clinical practice guidelines as may be established by Group from time to time.

(10)     Physician no longer meets the requirements to be a Physician-Partner as such requirements may, from time to time, be established or modified by the CGB.

(11)     Physician's violation of Section 9.

(d)     In the event either party shall give written notice to the other party that such other party has substantially defaulted in the performance of any material duty or material obligation imposed upon it by this Agreement, and such default shall not have been cured within thirty (30)

days following receipt of such notice, the non-defaulting party shall have the right to immediately terminate this Agreement. For purposes of this subsection (d), a default shall include Physician ceasing to be a member in good standing of the Medical Staff of any of the Facilities at which Physician is assigned to render Services by the CGB.

(e)     In the event that there shall be a change in federal or state law, the Medicare or Medicaid statutes, regulations, or general instructions (or in the application thereof), the adoption of new legislation or regulations applicable to this Agreement, or the initiation of an enforcement action with respect to legislation, regulations, or instructions applicable to this Agreement, any of which affects the continuing viability or legality of this Agreement or the ability of Group to obtain reimbursement for Services rendered by Physician, then either party may by notice propose an amendment to conform this Agreement to existing laws.  If notice of such a change or an amendment is given and if Group and Physician are unable within ninety (90) days thereafter to agree upon the amendment, then either party may terminate this Agreement by ninety (90) days' notice to the other, unless a sooner termination is required by law or circumstances.

(f)     This Agreement shall automatically terminate upon the death of Physician.

(g)     This Agreement shall terminate upon written notice by either party in the event Physician becomes disabled, as further described in <u>Section 8</u>.

(h)     Upon termination of this Agreement for any reason whatsoever, Physician shall submit to Group within five (5) days of such termination all outstanding charges for professional services rendered by Physician on behalf of Group.  Group shall have the right to withhold any earned, but unpaid compensation for services rendered by Physician through the effective date of termination, until such time as Physician has submitted to Group all outstanding charges for professional services rendered by Physician on behalf of Group.

(i)     Except as otherwise provided herein, upon termination of this Agreement for any reason, Physician shall be entitled to Physician's earned, but unpaid compensation for Services rendered by Physician through the effective date of termination, as determined in accordance <u>Schedule 4</u>.  In the event of the death of Physician, such amounts shall be paid to Physician's estate.

(j)     Immediately upon termination of this Agreement, Physician shall surrender all keys, identification badges, telephones, pagers, computers and any other property of Group in the possession of Physician.

(k)     Physician agrees and acknowledges that upon termination of this Agreement for any reason, Group shall submit Physician's Resignation (as such term is defined in <u>Schedule 9</u>) to any Facility at which Physician maintains medical staff privileges.

(l)     Physician agrees and acknowledges that Group will suffer significant damages if Physician terminates his or her employment without cause with less than one hundred eighty (180) days advance notice to Group as a result of, among other things, the difficulty and associated costs of recruiting and credentialing a new replacement physician.  Physician agrees that if Physician terminates this Agreement with less than one hundred eighty (180) days advance notice to Group, Physician shall pay to Group all costs and expenses Group incurs in obtaining locum tenens coverage as an interim replacement for Physician in recruiting a permanent replacement.

8.      Disability of Physician.  Upon determination by the CGB of the Disability of Physician that no reasonable accommodation may be made to perform the essential functions of a physician as stated in Section 3, this Agreement may be immediately terminated by Group upon written notice to Physician.  The term "Disability of Physician" shall have the same meaning as that type of disability that entitled Physicians to payments for permanent disability pursuant to the disability policy covering Physician.  In the event no disability policy exists covering Physician, the term "Disability of Physician," as used herein, shall mean that point in time when Physician is unable to resume the essential functions required of Physician under this Agreement, as performed prior to such time, within one hundred and eighty (180) days after the disabling event.  If the disabling event is not a separate and distinct happening, the 180-day period shall begin at the time Physician is unable to perform the essential functions of the position as stated in Section 3 for thirty (30) consecutive work days. Additionally, Physician shall be considered disabled if he/she does not perform his/her duties for one-hundred and eighty (180) days during a three hundred sixty (360) day period.  If the CGB determines that Physician is not performing his/her duties because of a physical or medical condition, then Physician shall submit to a physical and/or mental examination of two (2) independent physicians selected by the CGB reasonably in good faith to determine the nature and extent of such condition and Physician agrees to be bound by such determination.

9.      Non-Disclosure, Non-Solicitation and Non-Competition.  Physician shall comply with the non-disclosure, non-solicitation and non-competition covenants set forth on Schedule 9.

10.      Assignment of Intellectual Property.  Physician shall promptly and fully disclose all Intellectual Property to Group.  Physician hereby assigns and agrees to assign to Group (or as otherwise directed by Group) Physician's full right, title and interest in and to all Intellectual Property.  At Group's sole cost and expense, Physician agrees to execute any and all applications for patents, copyrights and/or other proprietary rights, and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by Group to assign all Intellectual Property to Group and to permit Group to enforce any patents, copyrights and/or other proprietary rights to the Intellectual Property.  All copyrightable works that Physician creates shall be considered "work made for hire" for the sole benefit of Group.  For purposes of this Section 10, "**Intellectual Property**" shall mean inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by Physician (whether alone or with others, whether or not during normal business hours or on or off Group premises) during Physician's employment with Group that either (a) relates  to the business of Group (including administering anesthesia to patients) or (b) makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities). Physician may exclude from the definition of Intellectual Property and any obligations relating thereto, inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) developed by Physician (i) prior to the date of this Agreement, which are identified on Schedule 10 attached hereto and (ii) after the date of this Agreement in connection with Physician's engagement in outside professional activities that have been approved by the CGB or that have been undertaken entirely on Physician's own time unless, in the case of this clause (ii), Physician makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities) in connection with such development (collectively, "**Excluded IP**").  Physician will promptly advise Group in writing of any Excluded IP that Physician develops or proposes to develop after the date of this Agreement that is not set forth on Schedule 10 and provide such information and assurances as Group may reasonably request to determine whether or not such Intellectual Property

constitutes Excluded IP hereunder.  If Group determines that such Intellectual Property does not constitute Excluded IP hereunder, Group will notify Physician in writing thereof within 30 days after receiving such notice, information and assurances, provided, that if Group does not notify Physician in writing within 30 days after receiving such notice, information and assurances, then such Intellectual Property shall be considered Excluded IP hereunder to the extent such Intellectual Property satisfies the requirements of Excluded IP set forth above.

11.      <u>Right of Offset</u>. If Physician's employment with Group is terminated for any reason, Group shall have the right to offset against any compensation (earned, but unpaid or otherwise) or other amounts due to Physician under this Agreement or otherwise, any indebtedness, whether or not evidenced by a promissory note and whether or not mature or due and payable, owed by Physician to Group.

12.      <u>Miscellaneous</u>.

(a)      <u>Factual Information</u>:  Physician represents and warrants that any and all factual information furnished by Physician to Group will be true and accurate in every material respect as of the date on which such information is furnished.

(b)      <u>Authority</u>:  Physician has full power and authority to enter into this Agreement and perform all obligations under this Agreement.  The execution and performance of this Agreement by Physician will not constitute a breach or violation of any covenant, agreement or contract to which Physician is a party or by which Physician is bound.

(c)      <u>Assignment; Benefit</u>:  This Agreement and the rights and duties of Physician hereunder may not be assigned by Physician without the prior written consent of Group.  Group may assign this Agreement or any and all rights or obligations hereunder, without the prior written consent of Physician, to any legal entity owned or controlled by or under common control with Group if, as a mandatory condition to such assignment, the assignee entity, commiserate with the assignment, adopt and agree in writing to be bound to and by the then current USAP South Texas Clinical Governance Board Charter and PRCS.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns.

(d)      <u>Compliance</u>:  Group and Physician expressly agree that nothing contained in this Agreement shall require Group or Physician to refer or admit any patients to any of the Facilities or to any other individual entities.  Physician agrees to use Physician's best efforts to ensure Physician's activities are in full compliance with all rules and regulations including, but not limited to, the rules and regulations relative to the Medicare and Medicaid programs, and the rules and regulations relative to any applicable private payor programs.  Physician further agrees to immediately report any violations of such rules or regulations observed by Physician to the person(s) designated in Group's compliance policies and procedures.

(e)      <u>Invalid Provision</u>:  The invalidity or unenforceability of a particular provision, paragraph, subparagraph, sentence or term of this Agreement shall not affect the other provisions, paragraphs, subparagraphs, sentences or terms hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision, paragraph, subparagraph, sentence or term was omitted.

(f)     Modification:  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto; provided, however, if Physician no longer qualifies as a Physician-Partner and the CGB has elected to change such Physician's designation from being a Physician-Partner, then without any action required by Physician (i) all references herein to Physician-Partner (other than such references in Schedule 9) shall mean a physician other than a Physician-Partner, (ii) such Physician shall no longer have the right to serve on the Clinical Governance Board or any other voting rights associated with being a Physician-Partner, (iii) Recital D herein shall be deemed to be intentionally omitted and (iv) such Physician shall receive a new compensation plan from Group pursuant to which Physician shall receive compensation for the services provided hereunder, to be attached hereto as a revised Schedule 4.

(g)     Waiver:  The waiver by either party or the CGB of a breach or violation of any provision of this Agreement will not operate as, or be construed to constitute, a waiver by such party of any subsequent breach of the same or other provision hereof.

(h)     Third Party Beneficiary:  The CGB is an express third-party beneficiary of this Agreement and shall have the right to enforce its rights hereunder in accordance with the applicable laws of the State as if it was a party hereto.

(i)     Notice:  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally delivered, or if sent by certified return receipt mail, postage prepaid, to the addresses set forth below, unless otherwise notified in writing:

GROUP:                                                w/a copy to:

U.S. Anesthesia Partners of Texas, P.A.               U.S. Anesthesia Partners, Inc.
1500 City West Blvd, Suite 300                        12222 Merit Drive, Suite 700
Houston, TX 72042                                     Dallas, TX  75251
Attn:  Sr. Vice President – Operations                Attn:  General Counsel

PHYSICIAN:

Current address on file with Human Resources

(j)     Applicable Law and Venue:  This Agreement shall be governed, construed, enforced and regulated under and by the laws of the State.  Each of the parties to this Agreement hereby irrevocably and unconditionally submits, for itself and its assets and properties, to the exclusive jurisdiction of the state and Federal courts of Bexar County, Texas, and any appellate court from such court, in any action or proceeding arising out of or relating to this Agreement.

(k)     Legal Fees and Costs:  In the event that either party elects to incur legal expenses to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover such legal expenses, including without limitation, reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

(l)     Entire Agreement:  This Agreement, the Schedules attached hereto and the PRCS constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces any prior employment agreements and/or arrangements, oral or otherwise, between the parties hereto and any prior statements, representations or warranties not

expressly incorporated herein. The parties specifically acknowledge that, in entering into and executing this Agreement, each is relying solely upon the statements, representations and agreements contained in this Agreement and no others.

(m)    <u>Survivability</u>:  The provisions of <u>Sections 3(g)</u>, <u>4</u>, <u>5</u>, <u>9</u>, <u>10</u>, <u>11</u> and <u>12</u>, <u>Schedule 4</u> and <u>Schedule 9</u> shall survive the termination or expiration of this Agreement for any reason whatsoever. Notwithstanding the foregoing, except as otherwise expressly set forth on <u>Schedule 9</u>, the non-compete and non-solicit covenants of Physician with respect to <u>Schedule 9</u> shall terminate upon Physician's payment of the Buy-Out Amount as further described in <u>Schedule 9</u>. In addition, the duration of the covenants contained in this Agreement shall be tolled during the continuation of any breach or violation and will continue or commence again only upon Physician's strict compliance with such covenants.

(n)    <u>Rule of Interpretation</u>:  The general rule that an agreement is to be interpreted against the drafter of an agreement in the case of an ambiguity is not to be recognized hereunder, as this Agreement was developed by the mutual consent and negotiation of the parties. The fact that this Agreement was actually prepared by counsel for one of the parties was merely as a matter of convenience for all of the parties. For purposes of this Agreement, the term "affiliate" shall mean means, with respect to any person or entity, any other person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified person or entity; provided that U.S. Anesthesia Partners, Inc. and its affiliates shall be deemed an Affiliate of Group, the term "control" when used with respect to any person or entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

(o)    Effective Date.  For the avoidance of doubt, this Agreement shall only be effective upon the date of the occurrence of the Effective Time (as defined in the Agreement and Plan of Merger (the "**Merger Agreement**") dated as June 11, 2019 among U.S. Anesthesia Partners Holdings, Inc., the Practice and the other parties thereto) (the "**Effective Date**"). In the event that the Merger Agreement is terminated, this Agreement shall automatically terminate and be of no further force and effect.

[Signature Page to Follow]

.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

U.S. ANESTHESIA PARTNERS OF TEXAS, P.A.

By: _____
Name: Hector Herrera, M.D.
Title:   President

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

GROUP:                                               PHYSICIAN:

U.S. ANESTHESIA PARTNERS OF TEXAS,          Brian Seastrunk
P.A.                                                 _____

                                                     DocuSigned by:

By:_____          _Brian Seastrunk_____
Name:                                                3F1728539201454...
Title:

**Schedule 10**

**Carved-Out Intellectual Property**

**Intellectual Property developed prior to the Agreement and excluded from Section 10:**

None.

SCHEDULE 4

COMPENSATION, PHYSICIAN BENEFITS, BUSINESS EXPENSES
AND PROFESSIONAL LIABILITY INSURANCE

Compensation
Group shall pay to or for the benefit of Physician compensation for the Services in an amount determined under the USAP South Texas Compensation Plan, as such plan may be amended from time to time.  Physician agrees and acknowledges that Group shall only be required to exercise its normal billing procedures with respect to collecting Group's accounts receivable and will not be required to institute judicial or other procedures or any other action to collect any accounts receivable.

Physician Benefits
Physician shall be entitled to those benefits and time off which are customarily offered to similarly situated Physician-Partners under Group's employee benefits plans, subject to meeting any eligibility requirements imposed by such plans.  Physician agrees and acknowledges that Group may modify its benefits plans from time to time, provided such modifications apply to all similarly situated Physician-Partners.

Business Expenses
Group shall reimburse Physician for business expenses incurred by Physician in fulfilling his or her responsibilities under this Agreement and as set forth in Group's separate business expense reimbursement policy, as such policy may be amended by Group from time to time.

Professional Liability Insurance
Group shall purchase, maintain and pay all premiums for malpractice insurance insuring Group and Physician, with such limits of coverage and with such insurer as shall be determined by Group from time to time.

In the event Group changes to a "claims made" policy in the future, upon the termination of Physician's employment with Group for any reason, Physician shall be responsible for purchasing "tail" coverage to ensure continuous coverage to Physician and Group for the Services rendered by Physician under this Agreement.

76688245_2

SCHEDULE 9

NON-DISCLOSURE OF INFORMATION CONCERNING BUSINESS
AND NON-COMPETE AND NON-SOLICIT AGREEMENT

Physician recognizes that Group's decision to enter into this Agreement is induced primarily because of the covenants and assurances made by Physician in this Agreement, that Physician's covenant not to compete and not to solicit is necessary to ensure the continuation of the business of Group and the reputation of Group, as well as to protect Group from unfair business competition, including but not limited to, the improper use of Confidential Information (as defined below), and that irrevocable harm and damage will be done to Group if Physician unlawfully competes with Group. Therefore, in consideration of the promises contained herein, including without limitation those related to Confidential Information, except as may be otherwise expressly provided in this Agreement, the Physician agrees as follows:

1.      <u>Non-Competition</u>:  During the Term and for a period of two (2) years following termination of this Agreement (for whatever reason) (the "**Restricted Period**"), Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services within five (5) miles of any Facility.  For purposes of this <u>Schedule 9</u>, "**Person**" shall mean any individual (including Physician), any association, corporation, company, trust, partnership or other entity.

2.      <u>Non-Competition (Group)</u>: During Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services at any hospitals, facilities or other locations (other than a Facility) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group provided Services during the Term.

3.      <u>Non-Solicit</u>:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) solicit any past or current patient to whom Physician or any other Affiliated Clinician provided Services during the Term ("**Patient**"), or immediate family member of such Patient, for purposes of inducing the Patient to become a patient of Physician or any other Person; (ii) solicit any physician (including surgeons) for which Physician or any other Affiliated Clinician provided Services to such physician's patients at any time during the Term, for purposes of inducing such physician to consult with or utilize Physician or any other Person in the care of such physician's patients; (iii) solicit any Facility for the purpose of obtaining any contractual relationship with such Facility for Physician or any other Person; or (iv) solicit for employment, or employ or engage, any individual who is employed by Group (1) in the case of each day during the Term, within the twelve (12) month period prior to such day and (2) in the case of the period following the termination of this Agreement, within the twelve (12) month period prior to the date of

such termination, to perform services on behalf of Physician or any other Person that provides Services.  Notwithstanding the foregoing, Group shall (x) permit Physician to have access to a list of the Patients whom Physician has seen or treated within one (1) year of termination of this Agreement; and (y) provide Physician (A) access to the medical records of the Patients whom Physician has seen or treated upon authorization of the Patient in the same form as maintained or available to Group; and (B) any copies of the medical records for a reasonable fee as established by the Texas State Board of Medical Examiners under the Texas Medical Practice Act (Texas Occupations Code Section 159.008).  Any access to a list of Patients or to Patients' medical records after termination of this Agreement shall not include such list or records to be provided in a format different than that by which such records are maintained except by mutual consent of the parties to this Agreement.

4.      Non-Interference; Administrative Services:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) call on or solicit any Facility, employee, independent contractor or other Person who has a contractual relationship with Group for the purpose of persuading or attempting to persuade such Person to cease doing business with or performing services for, or materially reduce the volume of, or adversely alter the terms with respect to, the business or services that such Person does with or performs for Group or any affiliate thereof or in any way otherwise interfere with the relationship between any such Facility, employee, independent contractor or other Person, on the one hand, and Group or any affiliate thereof, on the other hand, or (ii) provide management, administrative or consulting services to any Person that provides Services within five (5) miles of any of the Facilities. This provision shall survive the payment of the Buy-Out Amount.

5.      Continuing Care.  Physician shall not be prohibited from providing continuing care and treatment to a specific Patient or Patients during the course of an acute illness at any time, including following termination of this Agreement or Physician's employment.  Following such termination, Physician understands and agrees that Physician will not be permitted to utilize Facility premises, staff, supplies and/or any other Facility-owned resource, unless failure to do so would compromise an acute patient's health and well-being, in which case Group, in its sole discretion, will provide written authorization to Physician on a case-by-case basis so that Physician may treat such Patient at the appropriate Facility, and even then, only to the extent and of such duration, that the acute nature of the Patient's condition requires.

6.      Buy-Out Exception.  Physician may be released of the non-competition and non-solicitation provisions contained in Section 1, Section 2 and Section 3 of this Schedule 9 upon payment by Physician to Group of a reasonable price prior to a breach by Physician. The parties acknowledge, and hereby decline and waive, their option to have the reasonable price of the buy-out determined by an arbitrator, whether selected by the parties or a court of competent jurisdiction.  The parties agree that a reasonable price shall be the amount equal to 200% of the Net Revenue per Physician Partner (the "**Buy-Out Amount**"). For purposes of this Schedule 9, "**Net Revenue per Physician Partner**" shall mean a dollar amount equal to (a) the total net revenue of the Star Divisions for the most recent twelve (12) month period (and for any period within twelve (12) months of the Effective Date the product obtained by multiplying (a) the quotient obtained by dividing (x) the total net revenue of the Star Division from the Effective Date to the determination date by (y) the number of days in the period from the Effective Date to the determination date by (b) 365), as determined in accordance with generally accepted accounting principles and reflected on the financial statements for Star

Divisions maintained by Group divided by (b) the average number of Physician-Partners employed by Group who are assigned to Star Divisions during the most recent twelve (12) month period. Physician and Group agree that the Buy-Out Amount is reasonable because it reflects the lost productivity and profit opportunity of Group during the Restricted Period during which Physician would otherwise not be competing with Group, and additionally compensates Group for the risk that Physician recruits away from Group physicians or other clinical staff or Facilities in which Group has made a significant investment.  The parties further agree that the Buy-Out Amount is reasonable because Group's physician-partners practice in groups, are more likely to depart in groups, oversee other employed physicians and CRNAs and have developed practice patterns, relationships, protocols and the Confidential Information in a group setting that together support a Buy-Out Amount calculated on the basis of all physician-partner revenues in particular divisions, not just the individual Physician's revenues or compensation.

7.      <u>Resignation of Privileges</u>.  Physician further agrees to relinquish Physician's privileges to practice anesthesiology and to treat chronic pain at each of the Facilities upon termination of this Agreement for any reason.  In connection herewith, Physician shall execute the resignation attached hereto and incorporated herein by reference as <u>Exhibit 9-A</u> (the "**Resignation**"), and in the event of termination of this Agreement for any reason whatsoever, Physician hereby authorizes Group to deliver such Resignation to the Facilities.  Notwithstanding the foregoing, if such Resignation would result in a reportable event to the State Board of Medical Examiners or the National Practitioner Data Bank, Group will forgo delivering the Resignation to the applicable Facility and the termination of Physician's privileges at such Facility shall be conducted in conformance with any applicable fair hearing rights set forth in the then current medical staff bylaws at the applicable Facility, or shall be delivered after the conclusion of investigation or other inquiry that would result in the Resignation becoming a reportable event.

8.      <u>Confidentiality</u>.  As of the date of the execution of this Agreement and during the course of the Physician's employment, in order to allow Physician to carry out Physician's duties hereunder, Group has provided and will continue during the Term to provide to Physician Confidential Information.  Physician agrees to keep confidential and to not use or disclose to others during the Term and thereafter, except as expressly consented to in writing by Group, required by law or authorized under this Agreement, any Confidential Information. This restriction shall not apply to such information if Physician can establish that such information (i) has become generally available to and known by the public (other than as a result of an unpermitted disclosure directly or indirectly by Physician or Physician's affiliates, advisors, or representatives), (ii) has become available to Physician on a non-confidential basis from a source other than Group and its affiliates, advisors, or representatives, provided that such source is not and was not bound by a confidentiality agreement with or other obligation of secrecy of Group of which Physician has knowledge, or (iii) has already been or is hereafter independently acquired or developed by Physician without use of or reference to any Confidential Information.  Should Physician leave the employment of Group, Physician will neither take nor retain, without prior written authorization from Group, any Confidential Information.  Physician further agrees to destroy any paper or electronic copies of Confidential Information, including information contained on any personal device, upon the request of Group.  For purposes of this <u>Schedule 9</u>, "**Confidential Information**" shall mean any financial, accounting and statistical information, marketing plans, business plans, feasibility studies, fee schedules or books, reimbursement rates, billing information, patient files, confidential technology, proprietary information, patient lists, policies and procedures or trade secrets of Group or U.S. Anesthesia Partners, Inc., its affiliates or managed practices ("**USAP**"), or other papers, reports, records, memoranda, documents, files, discs, or copies thereof pertaining to Group's patients or Group's or

USAP's business, sales, financial condition or products, or any matter or thing ascertained by Physician through Physician's affiliation with Group, the use or disclosure of which matter or thing might reasonably be construed to be contrary to the best interests of Group or USAP.

9.      Exceptions to Confidentiality.

      a.      It shall not be a breach of Physician's covenants under Schedule 9 if a disclosure is made pursuant to a court order, a valid administrative agency subpoena, or a lawful request for information by an administrative agency.  Physician shall give Group prompt notice of any such court order, subpoena, or request for information.

      b.      Physician shall not be prohibited from releasing any Confidential Information to Physician's legal counsel or financial advisors, provided that such advisors are under a legal obligation of confidentiality with respect to the Confidential Information.

      c.      Nothing in this Agreement prohibits Physician from reporting an event that Physician reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as Securities and Exchange Commission or Department of Justice), requires notice to or approval from Group before doing so, or prohibits Physician from cooperating in an investigation conducted by such a government agency.  This may include disclosure of trade secret or confidential information provided the disclosure complies with the limitations set forth in the 2016 Defend Trade Secrets Act (DTSA).  Physician is hereby provided notice that under the DTSA, (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (a) is made in confident to a Federal, State or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (b) is made in a complaint or other documented filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

10.     Enforcement.  Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action asserted by Physician against Group, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of Section 1, Section 2, Section 3, Section 4 or Section 8 of this Schedule 9. It is understood by and between the parties hereto that the covenants set forth in Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 are essential elements of this Agreement, and that, but for the agreement of Physician to comply with such covenants, Group would not have agreed to enter into this Agreement.  Group and Physician agree that the foregoing covenants are appropriate and reasonable when considered in light of the nature and extent of the practice conducted by Group.  If any provision or subdivision of this Agreement, including, but not limited to, the time or limitations specified in or any other aspect of the restraints imposed under Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9, is found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such portion shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such portion in order to make it enforceable.  In the event of such judicial reformation, the parties agree to be bound by Section 1,

Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 as reformed in the same manner and to the same extent as if they had agreed to such reformed Sections in the first instance.  Without limiting other possible remedies to Group for the breach of any covenant contained in this Schedule 9, Physician agrees that injunctive or other equitable relief shall be available to enforce such covenant, such relief to be without the necessity of posting a bond, cash, or otherwise.

EXHIBIT 9-A

RESIGNATION

By signing below, I, _____ hereby agree to automatically resign my medical staff privileges at _____ ("Facility") effective as of the termination of my employment with U.S. Anesthesia Partners of Texas, P.A. for any reason or upon the termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility.  In such event, I further waive any due process, notice, hearing and review rights I may have under the Facility's medical staff Bylaws.  Upon termination of my employment or termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility, U.S. Anesthesia Partners of Texas, P.A. is hereby authorized to complete a copy of this resignation for the Facility and deliver a copy of this resignation to the medical staff office of such Facility.


_____

Name: _____

Date: _____

# EXHIBIT F

Execution Version

## PHYSICIAN PARTNER EMPLOYMENT AGREEMENT

This PHYSICIAN PARTNER EMPLOYMENT AGREEMENT (the "**Agreement**") is entered into by and between U.S. Anesthesia Partners of Texas, P.A., a Texas professional association ("**Group**") and Andrew Zurovec, M.D. ("**Physician**").

<u>RECITALS</u>

A.      Group is a Texas professional association authorized to practice medicine in the State of Texas (the "**State**") that provides professional anesthesiology services (including any specialty thereof), pain management, anesthesia related consulting, management and administrative services ("**Services**") to patients at inpatient and outpatient facilities.

B.      Physician is a licensed physician authorized to practice medicine in the State and Group desires to hire Physician to perform the Services at some or all of the Facilities (as defined below) on behalf of Group as set forth herein.

C.      Certain clinical operations of Group including, but not limited to, making certain determinations and decisions regarding the modification and termination of this Agreement, are managed and overseen by the USAP South Texas Clinical Governance Board (the "**CGB**") established by the Plan Regarding Compensation for Services (USAP South Texas) dated as of September 6, 2019, as such plan may be amended, modified, replaced or superseded (the "**PRCS**").

D.      Physician is acknowledged as a "Physician-Partner" (as such term is defined in the PRCS) within the CGB.

E.      It is determined to be to the mutual advantage of Group and Physician to enter into this Agreement as set out herein.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and Physician's specific agreement to the terms of <u>Schedule 9</u>, attached hereto and incorporated herein by reference, and the monies to be paid hereunder, Group agrees to hire Physician and Physician agrees to work for Group upon the following terms and conditions:

1.      <u>Recitals Approved; Schedules Incorporated; CGB Authority</u>.  The above recitals are true and correct and are made a part hereof.  <u>Schedule 4</u>, <u>Schedule 9</u> and <u>Exhibit 9-A</u>, which are attached hereto, are hereby incorporated into this Agreement by reference.  Notwithstanding any provision or provisions to the contrary, the parties agree that the rights and duties of the Group are limited by the USAP South Texas Clinical Governance Board Charter, and specifically, but not limited to, Group's exercise of its right related to the termination of the Physician, Physician's staffing obligations at Facilities, Physicians use of mid-level or other clinical providers, Physician's paid time off, call obligations and Physician's scheduling.  Accordingly, any reference to the Group herein, includes and requires, where applicable, the Group to obtain the CGB's specific consent as provided in the USAP South Texas Clinical Governance Board Charter before Group may exercise its rights hereunder.

2.    Qualifications; Notifications.

(a)    At all times during the Term (as defined in Section 7) of this Agreement, Physician shall meet the following qualifications:  (i) maintain an unrestricted license to practice medicine in the State (including an "Office Based Anesthesia" permit if required by Group); (ii) maintain an unrestricted DEA permit; (ii) maintain board certification or eligibility with the American Board of Anesthesiology; and (iii) be eligible to be a participating provider with Medicare and Medicaid.  The foregoing shall collectively be referred to as the "**Qualifications**".    Physician agrees and acknowledges that Physician's employment by Group is contingent upon Physician continuously meeting the Qualifications.  In addition, Physician shall maintain unrestricted medical staff membership and clinical privileges in good standing on the Medical Staff of each Facility as directed by Group.

(b)    Physician shall notify Group, no later than forty-eight (48) hours of: (i) the initiation of any action to suspend, restrict, deny, relinquish or revoke (A) Physician's  license to practice medicine in the State or any other state in which Physician holds a license to practice medicine; (B) Physician's medical staff privileges at any Facility; or (C) Physician's DEA permit; or (ii) Physician's receipt of notice of (A) the initiation of any disciplinary proceeding or adverse action involving Physician with respect to any medically related matter before any administrative agency or governmental body; (B) the intent to file or the actual filing of any medically related liability action involving Physician in any capacity; or (C) any arrest, indictment, conviction, guilty plea or plea of nolo contendere for any criminal conduct or other crime involving dishonesty or moral turpitude naming Physician.  Physician shall provide Group with copies of any such complaints, notices, charges, lawsuits and related non-privileged documents promptly upon request of Group.

(c)    For purposes of this Agreement, "**Facilities**" mean all hospitals, facilities and other locations (i) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group and who are or were assigned to a Star Division (as defined in the PRCS (as defined below)) (individually an "**Star Clinician**") provided Services during the Term, (ii) that are located in the same county as a hospital, facility or other location described in the foregoing clause (i) or in any county contiguous to such county and at which clinicians who are or were employed by or have or had an independent contractor relationship with Group (individually a "**Related Star Clinician**" and collectively with the Star Clinicians the "**Affiliated Clinicians**") provided Services during the Term, (iii) at which Group had a contract in effect for any (x) Star Clinicians to render Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iii)(x) or in any county contiguous to such county, and (iv) at which Group has been in active negotiations for (x) Star Clinicians to provide Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iv)(x) or in any county contiguous to such county.

3.    Duties of Physician.

(a)    Physician is employed by Group to use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to

time to maintain full-time status for a Physician-Partner (which requirements will be set forth on Schedule II to the PRCS); provided that if Physician notifies Group in writing that Physician desires to work part-time from after a specified date that is at least twelve (12) months after the date that such notice is delivered (the "**Part-Time Start Date**") and the CGB approves Physician working part-time, then from and after the Part-Time Start Date, in lieu of Physician rendering such Services on a full-time basis, Physician shall use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to time to maintain part-time status for a Physician-Partner (which requirements will be set forth on Schedule I to the PRCS). Physician shall not, without the prior written consent of the CGB and Group, which may in the CGB's and Group's sole discretion be withheld or conditioned upon Physician meeting other requirements, engage in the provision of professional services other than Services provided pursuant to this Agreement.  Physician acknowledges and agrees that, except as otherwise agreed by the CGB and Group, Physician must meet the minimum requirements of a Physician-Partner as defined by the PRCS from time to time in order for Physician to maintain Physician's status as a Physician-Partner. At all times while Physician is an employee of Group, Physician shall retain independent discretion and shall exercise professional judgment consistent with generally accepted medical practices, the ethical standards of the Texas and American Medical Associations and the professional standards of Group, in the provision of Services at the Facilities.  Physician's duties shall include but not be limited to (i) examination, evaluation and treatment of patients; (ii) participation in Group's on-call rotation for after-hours coverage; (iii) participation in Group's indigent and charity care programs; and (iv) such other duties as may reasonably be assigned by Group from time to time.

(b)     Physician shall perform all Services in accordance with (i) this Agreement; (ii) the bylaws, rules and regulations of the Medical Staff of each Facility at which Physician renders Services; (iii) the terms and conditions of any contractual arrangement regarding the performance of Services between Group and the applicable Facility (upon written request, a summary of the material and relevant terms of any such agreement shall be provided to Physician); and (iv) any applicable policies and procedures established by the CGB and/or Group, including but not limited to the Group's Clinical Code of Conduct and Conflict of Interest Policy.

(c)     Physician agrees and acknowledges that the CGB may conduct a review of Physician's ability to safely perform Services at any time ("**Review**").

(d)     Physician shall assist in providing supervision of physician assistants, nurses, nurse anesthetists, anesthesiology assistants and other non-physician health care personnel providing services on behalf of Group.  All such non-physician personnel shall be under Physician's control and direction in the performance of health care services for patients treated by Physician.

(e)     Physician shall provide Services on a nondiscriminatory basis and may not refuse to provide medical services to any patient accepted by Group.

(f)     Physician shall participate in, and cooperate with Group in connection with, the quality assurance and risk management program(s) developed by Group.  Physician shall also be subject to and actively participate in any utilization review program(s) developed by or on behalf of Group.

(g)    Physician agrees and acknowledges that many of the contractual arrangements Group holds with the Facilities are exclusive in nature and, as a result, require the automatic termination of medical staff membership and clinical privileges for all of Group's providers upon termination of the contractual arrangement.  Physician hereby agrees and consents to the foregoing and further waives any due process, notice, hearing and review rights he/she may have under such Facility's medical staff bylaws upon termination of Group's contractual relationship with Facility or upon Physician's termination of employment with Group for any reason.

4.    Compensation, Benefits, and Expense Reimbursement.  Group shall pay to or for the benefit of Physician as compensation and/or benefits for the Services performed by Physician the amounts set forth on Schedule 4.  In addition, Group shall provide Physician benefits and business expense reimbursements as set forth on Schedule 4.  Group shall provide, or cause to be provided, all space, equipment, supplies, non-physician health care personnel and clerical, administrative and other personnel as are reasonably necessary and appropriate, consistent with Group's past practices and the CGB's recommendations, for Physician's performance of Services on behalf of Group.

5.    Fees.  Group shall have exclusive authority to determine the fees, or a procedure for establishing the fees, to be charged to patients by Group.  All sums paid by any patient of Group in the way of fees, salary, or otherwise for medical services rendered by Physician shall be and remain payments of Group and shall be included in Group's income.  Physician hereby assigns to Group all rights to bill for Services rendered by Physician and shall execute any additional documentation as may be requested by Group documenting such assignment.  In the event Physician receives any amounts from any patients, third party payors or other third parties which are the property of Group, Physician shall immediately endorse and deliver the same to Group.

6.    Patients, Medical Records.  Group shall have the authority to determine who will be accepted as patients of Group.  Group also shall have the authority to designate, or to establish a procedure for designating, which professional physician of Group will handle each such patient.  Physician shall, in accordance with policies developed by or on behalf of Group, timely prepare all medical records in respect of patients treated by Physician. All medical records generated in respect of patients treated by Physician or any other physician engaged by Group during the Term shall be and remain the property of Group or Facilities, as appropriate, and shall be maintained at the Facilities; provided, however, that Physician shall have such right of access to such medical records as shall be provided by law.  In addition, Physician shall timely prepare and deliver such other records and reports relating to the operations of Group as Group may reasonably request.  Physician shall abide by all state and federal laws regarding the confidentiality of patient health information, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, and all rules and regulations promulgated thereunder, including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transaction Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164), and the Health Information Technology for Economic and Clinical Health Act of 2009 enacted as part of the American Recovery and Reinvestment Act of 2009.

7.    Term and Termination.  The term of this Agreement will commence on the September 6, 2019 and will continue thereafter until terminated as provided herein (the "**Term**").

(a)    This Agreement may be terminated upon the mutual written agreement of the parties.

(b)    Physician may terminate this Agreement without cause upon the delivery of one hundred eighty (180) days prior written notice to Group. Group may terminate this Agreement

without cause upon the delivery of ninety (90) days prior written notice to Physician; provided that during such ninety (90) day notice period, Group may elect, in its sole discretion, to remove Physician from the schedule and to pay any remaining amounts due to Physician for the remainder of such notice period.

(c)     Group may terminate this Agreement for good and sufficient cause.  Such termination shall be effective upon the delivery of written notice thereof to Physician or at such later time as may be designated in said notice, and Physician shall cease performance of Services hereunder and vacate the offices of Group and the Facilities on or before such effective date.  The written notice shall specify the cause for termination.  For purposes of this Section 7.c, the term "good and sufficient cause" shall include, but not be limited to, any one or more of the following:

(1)     Physician's failure to maintain any of the Qualifications.

(2)     A determination is made by the CGB that there is an immediate and significant threat to the health or safety of any patient as a result of the services provided by Physician, or as a result of Physician's medical misconduct or other gross neglect in the provision of professional services.

(3)     Any felony indictment naming Physician or conviction of a felony by Physician.

(4)     Any investigation for any alleged violation or violation by Physician of any Medicare or Medicaid statutes, 42 U.S.C. § 1320a-7b (the "**Anti-Kickback Statute**"), 31 U.S.C. § 3729 (the "**False Claims Act**"), 42 U.S.C. § 1395nn (the "**Stark Law**"), or the regulations promulgated pursuant to such statutes, or any similar federal, state or local statutes or regulations promulgated pursuant to such statutes.

(5)     Physician's ineligibility to be insured against medical malpractice.

(6)     Physician does not satisfactorily pass the Review, except in the instance where Physician satisfies the remedial action requested.

(7)     Any dishonest or unethical behavior by Physician that results in damage to or discredit upon Group.

(8)     Any intentional conduct or action by Physician that negatively affects the ability of Group to deliver Services to any Facility or any other facility.

(9)     Physician's violation of the Clinician Code of Conduct of Group or failure to comply with any clinical practice guidelines as may be established by Group from time to time.

(10)     Physician no longer meets the requirements to be a Physician-Partner as such requirements may, from time to time, be established or modified by the CGB.

(11)     Physician's violation of Section 9.

(d)     In the event either party shall give written notice to the other party that such other party has substantially defaulted in the performance of any material duty or material obligation imposed upon it by this Agreement, and such default shall not have been cured within thirty (30)

days following receipt of such notice, the non-defaulting party shall have the right to immediately terminate this Agreement. For purposes of this subsection (d), a default shall include Physician ceasing to be a member in good standing of the Medical Staff of any of the Facilities at which Physician is assigned to render Services by the CGB.

(e)     In the event that there shall be a change in federal or state law, the Medicare or Medicaid statutes, regulations, or general instructions (or in the application thereof), the adoption of new legislation or regulations applicable to this Agreement, or the initiation of an enforcement action with respect to legislation, regulations, or instructions applicable to this Agreement, any of which affects the continuing viability or legality of this Agreement or the ability of Group to obtain reimbursement for Services rendered by Physician, then either party may by notice propose an amendment to conform this Agreement to existing laws.  If notice of such a change or an amendment is given and if Group and Physician are unable within ninety (90) days thereafter to agree upon the amendment, then either party may terminate this Agreement by ninety (90) days' notice to the other, unless a sooner termination is required by law or circumstances.

(f)     This Agreement shall automatically terminate upon the death of Physician.

(g)     This Agreement shall terminate upon written notice by either party in the event Physician becomes disabled, as further described in <u>Section 8</u>.

(h)     Upon termination of this Agreement for any reason whatsoever, Physician shall submit to Group within five (5) days of such termination all outstanding charges for professional services rendered by Physician on behalf of Group.  Group shall have the right to withhold any earned, but unpaid compensation for services rendered by Physician through the effective date of termination, until such time as Physician has submitted to Group all outstanding charges for professional services rendered by Physician on behalf of Group.

(i)     Except as otherwise provided herein, upon termination of this Agreement for any reason, Physician shall be entitled to Physician's earned, but unpaid compensation for Services rendered by Physician through the effective date of termination, as determined in accordance <u>Schedule 4</u>.  In the event of the death of Physician, such amounts shall be paid to Physician's estate.

(j)     Immediately upon termination of this Agreement, Physician shall surrender all keys, identification badges, telephones, pagers, computers and any other property of Group in the possession of Physician.

(k)     Physician agrees and acknowledges that upon termination of this Agreement for any reason, Group shall submit Physician's Resignation (as such term is defined in <u>Schedule 9</u>) to any Facility at which Physician maintains medical staff privileges.

(l)     Physician agrees and acknowledges that Group will suffer significant damages if Physician terminates his or her employment without cause with less than one hundred eighty (180) days advance notice to Group as a result of, among other things, the difficulty and associated costs of recruiting and credentialing a new replacement physician.  Physician agrees that if Physician terminates this Agreement with less than one hundred eighty (180) days advance notice to Group, Physician shall pay to Group all costs and expenses Group incurs in obtaining locum tenens coverage as an interim replacement for Physician in recruiting a permanent replacement.

8.      Disability of Physician.  Upon determination by the CGB of the Disability of Physician that no reasonable accommodation may be made to perform the essential functions of a physician as stated in Section 3, this Agreement may be immediately terminated by Group upon written notice to Physician.  The term "Disability of Physician" shall have the same meaning as that type of disability that entitled Physicians to payments for permanent disability pursuant to the disability policy covering Physician.  In the event no disability policy exists covering Physician, the term "Disability of Physician," as used herein, shall mean that point in time when Physician is unable to resume the essential functions required of Physician under this Agreement, as performed prior to such time, within one hundred and eighty (180) days after the disabling event.  If the disabling event is not a separate and distinct happening, the 180-day period shall begin at the time Physician is unable to perform the essential functions of the position as stated in Section 3 for thirty (30) consecutive work days. Additionally, Physician shall be considered disabled if he/she does not perform his/her duties for one-hundred and eighty (180) days during a three hundred sixty (360) day period.  If the CGB determines that Physician is not performing his/her duties because of a physical or medical condition, then Physician shall submit to a physical and/or mental examination of two (2) independent physicians selected by the CGB reasonably in good faith to determine the nature and extent of such condition and Physician agrees to be bound by such determination.

9.      Non-Disclosure, Non-Solicitation and Non-Competition.  Physician shall comply with the non-disclosure, non-solicitation and non-competition covenants set forth on Schedule 9.

10.      Assignment of Intellectual Property.  Physician shall promptly and fully disclose all Intellectual Property to Group.  Physician hereby assigns and agrees to assign to Group (or as otherwise directed by Group) Physician's full right, title and interest in and to all Intellectual Property.  At Group's sole cost and expense, Physician agrees to execute any and all applications for patents, copyrights and/or other proprietary rights, and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by Group to assign all Intellectual Property to Group and to permit Group to enforce any patents, copyrights and/or other proprietary rights to the Intellectual Property.  All copyrightable works that Physician creates shall be considered "work made for hire" for the sole benefit of Group.  For purposes of this Section 10, "**Intellectual Property**" shall mean inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by Physician (whether alone or with others, whether or not during normal business hours or on or off Group premises) during Physician's employment with Group that either (a) relates  to the business of Group (including administering anesthesia to patients) or (b) makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities). Physician may exclude from the definition of Intellectual Property and any obligations relating thereto, inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) developed by Physician (i) prior to the date of this Agreement, which are identified on Schedule 10 attached hereto and (ii) after the date of this Agreement in connection with Physician's engagement in outside professional activities that have been approved by the CGB or that have been undertaken entirely on Physician's own time unless, in the case of this clause (ii), Physician makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities) in connection with such development (collectively, "**Excluded IP**").   Physician will promptly advise Group in writing of any Excluded IP that Physician develops or proposes to develop after the date of this Agreement that is not set forth on Schedule 10 and provide such information and assurances as Group may reasonably request to determine whether or not such Intellectual Property

constitutes Excluded IP hereunder.  If Group determines that such Intellectual Property does not constitute Excluded IP hereunder, Group will notify Physician in writing thereof within 30 days after receiving such notice, information and assurances, provided, that if Group does not notify Physician in writing within 30 days after receiving such notice, information and assurances, then such Intellectual Property shall be considered Excluded IP hereunder to the extent such Intellectual Property satisfies the requirements of Excluded IP set forth above.

11.   <u>Right of Offset</u>. If Physician's employment with Group is terminated for any reason, Group shall have the right to offset against any compensation (earned, but unpaid or otherwise) or other amounts due to Physician under this Agreement or otherwise, any indebtedness, whether or not evidenced by a promissory note and whether or not mature or due and payable, owed by Physician to Group.

12.   <u>Miscellaneous</u>.

(a)   <u>Factual Information</u>:  Physician represents and warrants that any and all factual information furnished by Physician to Group will be true and accurate in every material respect as of the date on which such information is furnished.

(b)   <u>Authority</u>:  Physician has full power and authority to enter into this Agreement and perform all obligations under this Agreement.  The execution and performance of this Agreement by Physician will not constitute a breach or violation of any covenant, agreement or contract to which Physician is a party or by which Physician is bound.

(c)   <u>Assignment; Benefit</u>:  This Agreement and the rights and duties of Physician hereunder may not be assigned by Physician without the prior written consent of Group.  Group may assign this Agreement or any and all rights or obligations hereunder, without the prior written consent of Physician, to any legal entity owned or controlled by or under common control with Group if, as a mandatory condition to such assignment, the assignee entity, commiserate with the assignment, adopt and agree in writing to be bound to and by the then current USAP South Texas Clinical Governance Board Charter and PRCS.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns.

(d)   <u>Compliance</u>:  Group and Physician expressly agree that nothing contained in this Agreement shall require Group or Physician to refer or admit any patients to any of the Facilities or to any other individual entities.  Physician agrees to use Physician's best efforts to ensure Physician's activities are in full compliance with all rules and regulations including, but not limited to, the rules and regulations relative to the Medicare and Medicaid programs, and the rules and regulations relative to any applicable private payor programs.  Physician further agrees to immediately report any violations of such rules or regulations observed by Physician to the person(s) designated in Group's compliance policies and procedures.

(e)   <u>Invalid Provision</u>:  The invalidity or unenforceability of a particular provision, paragraph, subparagraph, sentence or term of this Agreement shall not affect the other provisions, paragraphs, subparagraphs, sentences or terms hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision, paragraph, subparagraph, sentence or term was omitted.

(f)     Modification:  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto; provided, however, if Physician no longer qualifies as a Physician-Partner and the CGB has elected to change such Physician's designation from being a Physician-Partner, then without any action required by Physician (i) all references herein to Physician-Partner (other than such references in Schedule 9) shall mean a physician other than a Physician-Partner, (ii) such Physician shall no longer have the right to serve on the Clinical Governance Board or any other voting rights associated with being a Physician-Partner, (iii) Recital D herein shall be deemed to be intentionally omitted and (iv) such Physician shall receive a new compensation plan from Group pursuant to which Physician shall receive compensation for the services provided hereunder, to be attached hereto as a revised Schedule 4.

(g)     Waiver:  The waiver by either party or the CGB of a breach or violation of any provision of this Agreement will not operate as, or be construed to constitute, a waiver by such party of any subsequent breach of the same or other provision hereof.

(h)     Third Party Beneficiary:  The CGB is an express third-party beneficiary of this Agreement and shall have the right to enforce its rights hereunder in accordance with the applicable laws of the State as if it was a party hereto.

(i)     Notice:  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally delivered, or if sent by certified return receipt mail, postage prepaid, to the addresses set forth below, unless otherwise notified in writing:

GROUP:                                                w/a copy to:

U.S. Anesthesia Partners of Texas, P.A.        U.S. Anesthesia Partners, Inc.
1500 City West Blvd, Suite 300                 12222 Merit Drive, Suite 700
Houston, TX 72042                              Dallas, TX  75251
Attn:  Sr. Vice President – Operations         Attn:  General Counsel

PHYSICIAN:

Current address on file with Human Resources

(j)     Applicable Law and Venue:  This Agreement shall be governed, construed, enforced and regulated under and by the laws of the State.  Each of the parties to this Agreement hereby irrevocably and unconditionally submits, for itself and its assets and properties, to the exclusive jurisdiction of the state and Federal courts of Bexar County, Texas, and any appellate court from such court, in any action or proceeding arising out of or relating to this Agreement.

(k)     Legal Fees and Costs:  In the event that either party elects to incur legal expenses to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover such legal expenses, including without limitation, reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

(l)     Entire Agreement:  This Agreement, the Schedules attached hereto and the PRCS constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces any prior employment agreements and/or arrangements, oral or otherwise, between the parties hereto and any prior statements, representations or warranties not

expressly incorporated herein.  The parties specifically acknowledge that, in entering into and executing this Agreement, each is relying solely upon the statements, representations and agreements contained in this Agreement and no others.

(m)     Survivability:  The provisions of Sections 3(g), 4, 5, 9, 10, 11 and 12, Schedule 4 and Schedule 9 shall survive the termination or expiration of this Agreement for any reason whatsoever.  Notwithstanding the foregoing, except as otherwise expressly set forth on Schedule 9, the non-compete and non-solicit covenants of Physician with respect to Schedule 9 shall terminate upon Physician's payment of the Buy-Out Amount as further described in Schedule 9.  In addition, the duration of the covenants contained in this Agreement shall be tolled during the continuation of any breach or violation and will continue or commence again only upon Physician's strict compliance with such covenants.

(n)     Rule of Interpretation:  The general rule that an agreement is to be interpreted against the drafter of an agreement in the case of an ambiguity is not to be recognized hereunder, as this Agreement was developed by the mutual consent and negotiation of the parties.  The fact that this Agreement was actually prepared by counsel for one of the parties was merely as a matter of convenience for all of the parties.  For purposes of this Agreement, the term "affiliate" shall mean means, with respect to any person or entity, any other person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified person or entity; provided that U.S. Anesthesia Partners, Inc. and its affiliates shall be deemed an Affiliate of Group, the term "control" when used with respect to any person or entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

(o)     Effective Date.  For the avoidance of doubt, this Agreement shall only be effective upon the date of the occurrence of the Effective Time (as defined in the Agreement and Plan of Merger (the "**Merger Agreement**") dated as June 11, 2019 among U.S. Anesthesia Partners Holdings, Inc., the Practice and the other parties thereto) (the "**Effective Date**").  In the event that the Merger Agreement is terminated, this Agreement shall automatically terminate and be of no further force and effect.

[Signature Page to Follow]

.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

U.S. ANESTHESIA PARTNERS OF TEXAS, P.A.

By: _____

Name: Hector Herrera, M.D.

Title:   President

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

GROUP:                                          PHYSICIAN:
                                                 Andrew J. Zurovec
U.S. ANESTHESIA PARTNERS OF TEXAS,               _____
P.A.

                                                 DocuSigned by:

By:_____                   _____
Name:                                            1A60B7D5C1154EE...
Title:

**Schedule 10**

**Carved-Out Intellectual Property**

**Intellectual Property developed prior to the Agreement and excluded from Section 10:**

None.

SCHEDULE 4

COMPENSATION, PHYSICIAN BENEFITS, BUSINESS EXPENSES
AND PROFESSIONAL LIABILITY INSURANCE

Compensation

Group shall pay to or for the benefit of Physician compensation for the Services in an amount determined under the USAP South Texas Compensation Plan, as such plan may be amended from time to time.  Physician agrees and acknowledges that Group shall only be required to exercise its normal billing procedures with respect to collecting Group's accounts receivable and will not be required to institute judicial or other procedures or any other action to collect any accounts receivable.

Physician Benefits

Physician shall be entitled to those benefits and time off which are customarily offered to similarly situated Physician-Partners under Group's employee benefits plans, subject to meeting any eligibility requirements imposed by such plans.  Physician agrees and acknowledges that Group may modify its benefits plans from time to time, provided such modifications apply to all similarly situated Physician-Partners.

Business Expenses

Group shall reimburse Physician for business expenses incurred by Physician in fulfilling his or her responsibilities under this Agreement and as set forth in Group's separate business expense reimbursement policy, as such policy may be amended by Group from time to time.

Professional Liability Insurance

Group shall purchase, maintain and pay all premiums for malpractice insurance insuring Group and Physician, with such limits of coverage and with such insurer as shall be determined by Group from time to time.

In the event Group changes to a "claims made" policy in the future, upon the termination of Physician's employment with Group for any reason, Physician shall be responsible for purchasing "tail" coverage to ensure continuous coverage to Physician and Group for the Services rendered by Physician under this Agreement.

SCHEDULE 9

NON-DISCLOSURE OF INFORMATION CONCERNING BUSINESS
AND NON-COMPETE AND NON-SOLICIT AGREEMENT

Physician recognizes that Group's decision to enter into this Agreement is induced primarily because of the covenants and assurances made by Physician in this Agreement, that Physician's covenant not to compete and not to solicit is necessary to ensure the continuation of the business of Group and the reputation of Group, as well as to protect Group from unfair business competition, including but not limited to, the improper use of Confidential Information (as defined below), and that irrevocable harm and damage will be done to Group if Physician unlawfully competes with Group.  Therefore, in consideration of the promises contained herein, including without limitation those related to Confidential Information, except as may be otherwise expressly provided in this Agreement, the Physician agrees as follows:

1.      Non-Competition:  During the Term and for a period of two (2) years following termination of this Agreement (for whatever reason) (the "**Restricted Period**"), Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services within five (5) miles of any Facility.  For purposes of this Schedule 9, "**Person**" shall mean any individual (including Physician), any association, corporation, company, trust, partnership or other entity.

2.      Non-Competition (Group):  During Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services at any hospitals, facilities or other locations (other than a Facility) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group provided Services during the Term.

3.      Non-Solicit:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) solicit any past or current patient to whom Physician or any other Affiliated Clinician provided Services during the Term ("**Patient**"), or immediate family member of such Patient, for purposes of inducing the Patient to become a patient of Physician or any other Person; (ii) solicit any physician (including surgeons) for which Physician or any other Affiliated Clinician provided Services to such physician's patients at any time during the Term, for purposes of inducing such physician to consult with or utilize Physician or any other Person in the care of such physician's patients; (iii) solicit any Facility for the purpose of obtaining any contractual relationship with such Facility for Physician or any other Person; or (iv) solicit for employment, or employ or engage, any individual who is employed by Group (1) in the case of each day during the Term, within the twelve (12) month period prior to such day and (2) in the case of the period following the termination of this Agreement, within the twelve (12) month period prior to the date of

such termination, to perform services on behalf of Physician or any other Person that provides Services.  Notwithstanding the foregoing, Group shall (x) permit Physician to have access to a list of the Patients whom Physician has seen or treated within one (1) year of termination of this Agreement; and (y) provide Physician (A) access to the medical records of the Patients whom Physician has seen or treated upon authorization of the Patient in the same form as maintained or available to Group; and (B) any copies of the medical records for a reasonable fee as established by the Texas State Board of Medical Examiners under the Texas Medical Practice Act (Texas Occupations Code Section 159.008).  Any access to a list of Patients or to Patients' medical records after termination of this Agreement shall not include such list or records to be provided in a format different than that by which such records are maintained except by mutual consent of the parties to this Agreement.

4.      Non-Interference; Administrative Services:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) call on or solicit any Facility, employee, independent contractor or other Person who has a contractual relationship with Group for the purpose of persuading or attempting to persuade such Person to cease doing business with or performing services for, or materially reduce the volume of, or adversely alter the terms with respect to, the business or services that such Person does with or performs for Group or any affiliate thereof or in any way otherwise interfere with the relationship between any such Facility, employee, independent contractor or other Person, on the one hand, and Group or any affiliate thereof, on the other hand, or (ii) provide management, administrative or consulting services to any Person that provides Services within five (5) miles of any of the Facilities. This provision shall survive the payment of the Buy-Out Amount.

5.      Continuing Care.  Physician shall not be prohibited from providing continuing care and treatment to a specific Patient or Patients during the course of an acute illness at any time, including following termination of this Agreement or Physician's employment.  Following such termination, Physician understands and agrees that Physician will not be permitted to utilize Facility premises, staff, supplies and/or any other Facility-owned resource, unless failure to do so would compromise an acute patient's health and well-being, in which case Group, in its sole discretion, will provide written authorization to Physician on a case-by-case basis so that Physician may treat such Patient at the appropriate Facility, and even then, only to the extent and of such duration, that the acute nature of the Patient's condition requires.

6.      Buy-Out Exception.  Physician may be released of the non-competition and non-solicitation provisions contained in Section 1, Section 2 and Section 3 of this Schedule 9 upon payment by Physician to Group of a reasonable price prior to a breach by Physician. The parties acknowledge, and hereby decline and waive, their option to have the reasonable price of the buy-out determined by an arbitrator, whether selected by the parties or a court of competent jurisdiction.  The parties agree that a reasonable price shall be the amount equal to 200% of the Net Revenue per Physician Partner (the "**Buy-Out Amount**"). For purposes of this Schedule 9, "**Net Revenue per Physician Partner**" shall mean a dollar amount equal to (a) the total net revenue of the Star Divisions for the most recent twelve (12) month period (and for any period within twelve (12) months of the Effective Date the product obtained by multiplying (a) the quotient obtained by dividing (x) the total net revenue of the Star Division from the Effective Date to the determination date by (y) the number of days in the period from the Effective Date to the determination date by (b) 365), as determined in accordance with generally accepted accounting principles and reflected on the financial statements for Star

Divisions maintained by Group divided by (b) the average number of Physician-Partners employed by Group who are assigned to Star Divisions during the most recent twelve (12) month period. Physician and Group agree that the Buy-Out Amount is reasonable because it reflects the lost productivity and profit opportunity of Group during the Restricted Period during which Physician would otherwise not be competing with Group, and additionally compensates Group for the risk that Physician recruits away from Group physicians or other clinical staff or Facilities in which Group has made a significant investment.  The parties further agree that the Buy-Out Amount is reasonable because Group's physician-partners practice in groups, are more likely to depart in groups, oversee other employed physicians and CRNAs and have developed practice patterns, relationships, protocols and the Confidential Information in a group setting that together support a Buy-Out Amount calculated on the basis of all physician-partner revenues in particular divisions, not just the individual Physician's revenues or compensation.

7.     Resignation of Privileges.  Physician further agrees to relinquish Physician's privileges to practice anesthesiology and to treat chronic pain at each of the Facilities upon termination of this Agreement for any reason.  In connection herewith, Physician shall execute the resignation attached hereto and incorporated herein by reference as Exhibit 9-A (the "**Resignation**"), and in the event of termination of this Agreement for any reason whatsoever, Physician hereby authorizes Group to deliver such Resignation to the Facilities.  Notwithstanding the foregoing, if such Resignation would result in a reportable event to the State Board of Medical Examiners or the National Practitioner Data Bank, Group will forgo delivering the Resignation to the applicable Facility and the termination of Physician's privileges at such Facility shall be conducted in conformance with any applicable fair hearing rights set forth in the then current medical staff bylaws at the applicable Facility, or shall be delivered after the conclusion of investigation or other inquiry that would result in the Resignation becoming a reportable event.

8.     Confidentiality.  As of the date of the execution of this Agreement and during the course of the Physician's employment, in order to allow Physician to carry out Physician's duties hereunder, Group has provided and will continue during the Term to provide to Physician Confidential Information.  Physician agrees to keep confidential and to not use or disclose to others during the Term and thereafter, except as expressly consented to in writing by Group, required by law or authorized under this Agreement, any Confidential Information. This restriction shall not apply to such information if Physician can establish that such information (i) has become generally available to and known by the public (other than as a result of an unpermitted disclosure directly or indirectly by Physician or Physician's affiliates, advisors, or representatives), (ii) has become available to Physician on a non-confidential basis from a source other than Group and its affiliates, advisors, or representatives, provided that such source is not and was not bound by a confidentiality agreement with or other obligation of secrecy of Group of which Physician has knowledge, or (iii) has already been or is hereafter independently acquired or developed by Physician without use of or reference to any Confidential Information.  Should Physician leave the employment of Group, Physician will neither take nor retain, without prior written authorization from Group, any Confidential Information.  Physician further agrees to destroy any paper or electronic copies of Confidential Information, including information contained on any personal device, upon the request of Group.  For purposes of this Schedule 9, "**Confidential Information**" shall mean any financial, accounting and statistical information, marketing plans, business plans, feasibility studies, fee schedules or books, reimbursement rates, billing information, patient files, confidential technology, proprietary information, patient lists, policies and procedures or trade secrets of Group or U.S. Anesthesia Partners, Inc., its affiliates or managed practices ("**USAP**"), or other papers, reports, records, memoranda, documents, files, discs, or copies thereof pertaining to Group's patients or Group's or

USAP's business, sales, financial condition or products, or any matter or thing ascertained by Physician through Physician's affiliation with Group, the use or disclosure of which matter or thing might reasonably be construed to be contrary to the best interests of Group or USAP.

9.      Exceptions to Confidentiality.

        a.      It shall not be a breach of Physician's covenants under Schedule 9 if a disclosure is made pursuant to a court order, a valid administrative agency subpoena, or a lawful request for information by an administrative agency.  Physician shall give Group prompt notice of any such court order, subpoena, or request for information.

        b.      Physician shall not be prohibited from releasing any Confidential Information to Physician's legal counsel or financial advisors, provided that such advisors are under a legal obligation of confidentiality with respect to the Confidential Information.

        c.      Nothing in this Agreement prohibits Physician from reporting an event that Physician reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as Securities and Exchange Commission or Department of Justice), requires notice to or approval from Group before doing so, or prohibits Physician from cooperating in an investigation conducted by such a government agency.  This may include disclosure of trade secret or confidential information provided the disclosure complies with the limitations set forth in the 2016 Defend Trade Secrets Act (DTSA).  Physician is hereby provided notice that under the DTSA, (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (a) is made in confident to a Federal, State or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (b) is made in a complaint or other documented filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

10.     Enforcement.  Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action asserted by Physician against Group, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of Section 1, Section 2, Section 3, Section 4 or Section 8 of this Schedule 9. It is understood by and between the parties hereto that the covenants set forth in Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 are essential elements of this Agreement, and that, but for the agreement of Physician to comply with such covenants, Group would not have agreed to enter into this Agreement.  Group and Physician agree that the foregoing covenants are appropriate and reasonable when considered in light of the nature and extent of the practice conducted by Group.  If any provision or subdivision of this Agreement, including, but not limited to, the time or limitations specified in or any other aspect of the restraints imposed under Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9, is found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such portion shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such portion in order to make it enforceable.  In the event of such judicial reformation, the parties agree to be bound by Section 1,

Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 as reformed in the same manner and to the same extent as if they had agreed to such reformed Sections in the first instance.  Without limiting other possible remedies to Group for the breach of any covenant contained in this Schedule 9, Physician agrees that injunctive or other equitable relief shall be available to enforce such covenant, such relief to be without the necessity of posting a bond, cash, or otherwise.

EXHIBIT 9-A

RESIGNATION

By signing below, I, _____ hereby agree to automatically resign my medical staff privileges at _____ ("Facility") effective as of the termination of my employment with U.S. Anesthesia Partners of Texas, P.A. for any reason or upon the termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility.  In such event, I further waive any due process, notice, hearing and review rights I may have under the Facility's medical staff Bylaws.  Upon termination of my employment or termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility, U.S. Anesthesia Partners of Texas, P.A. is hereby authorized to complete a copy of this resignation for the Facility and deliver a copy of this resignation to the medical staff office of such Facility.


_____

Name: _____

Date: _____

# EXHIBIT G

Execution Version

## PHYSICIAN PARTNER EMPLOYMENT AGREEMENT

This PHYSICIAN PARTNER EMPLOYMENT AGREEMENT (the "**Agreement**") is entered into by and between U.S. Anesthesia Partners of Texas, P.A., a Texas professional association ("**Group**") and Jennifer Zurovec, M.D. ("**Physician**").

<u>RECITALS</u>

A.      Group is a Texas professional association authorized to practice medicine in the State of Texas (the "**State**") that provides professional anesthesiology services (including any specialty thereof), pain management, anesthesia related consulting, management and administrative services ("**Services**") to patients at inpatient and outpatient facilities.

B.      Physician is a licensed physician authorized to practice medicine in the State and Group desires to hire Physician to perform the Services at some or all of the Facilities (as defined below) on behalf of Group as set forth herein.

C.      Certain clinical operations of Group including, but not limited to, making certain determinations and decisions regarding the modification and termination of this Agreement, are managed and overseen by the USAP South Texas Clinical Governance Board (the "**CGB**") established by the Plan Regarding Compensation for Services (USAP South Texas) dated as of September 6, 2019, as such plan may be amended, modified, replaced or superseded (the "**PRCS**").

D.      Physician is acknowledged as a "Physician-Partner" (as such term is defined in the PRCS) within the CGB.

E.      It is determined to be to the mutual advantage of Group and Physician to enter into this Agreement as set out herein.

NOW, THEREFORE, in consideration of the covenants and agreements herein contained, and Physician's specific agreement to the terms of <u>Schedule 9</u>, attached hereto and incorporated herein by reference, and the monies to be paid hereunder, Group agrees to hire Physician and Physician agrees to work for Group upon the following terms and conditions:

1.      <u>Recitals Approved; Schedules Incorporated; CGB Authority</u>.  The above recitals are true and correct and are made a part hereof.  <u>Schedule 4</u>, <u>Schedule 9</u> and <u>Exhibit 9-A</u>, which are attached hereto, are hereby incorporated into this Agreement by reference.  Notwithstanding any provision or provisions to the contrary, the parties agree that the rights and duties of the Group are limited by the USAP South Texas Clinical Governance Board Charter, and specifically, but not limited to, Group's exercise of its right related to the termination of the Physician, Physician's staffing obligations at Facilities, Physicians use of mid-level or other clinical providers, Physician's paid time off, call obligations and Physician's scheduling.  Accordingly, any reference to the Group herein, includes and requires, where applicable, the Group to obtain the CGB's specific consent as provided in the USAP South Texas Clinical Governance Board Charter before Group may exercise its rights hereunder.

2.    Qualifications; Notifications.

(a)    At all times during the Term (as defined in Section 7) of this Agreement, Physician shall meet the following qualifications:  (i) maintain an unrestricted license to practice medicine in the State (including an "Office Based Anesthesia" permit if required by Group); (ii) maintain an unrestricted DEA permit; (ii) maintain board certification or eligibility with the American Board of Anesthesiology; and (iii) be eligible to be a participating provider with Medicare and Medicaid.  The foregoing shall collectively be referred to as the "**Qualifications**".    Physician agrees and acknowledges that Physician's employment by Group is contingent upon Physician continuously meeting the Qualifications.  In addition, Physician shall maintain unrestricted medical staff membership and clinical privileges in good standing on the Medical Staff of each Facility as directed by Group.

(b)    Physician shall notify Group, no later than forty-eight (48) hours of: (i) the initiation of any action to suspend, restrict, deny, relinquish or revoke (A) Physician's  license to practice medicine in the State or any other state in which Physician holds a license to practice medicine; (B) Physician's medical staff privileges at any Facility; or (C) Physician's DEA permit; or (ii) Physician's receipt of notice of (A) the initiation of any disciplinary proceeding or adverse action involving Physician with respect to any medically related matter before any administrative agency or governmental body; (B) the intent to file or the actual filing of any medically related liability action involving Physician in any capacity; or (C) any arrest, indictment, conviction, guilty plea or plea of nolo contendere for any criminal conduct or other crime involving dishonesty or moral turpitude naming Physician.  Physician shall provide Group with copies of any such complaints, notices, charges, lawsuits and related non-privileged documents promptly upon request of Group.

(c)    For purposes of this Agreement, "**Facilities**" mean all hospitals, facilities and other locations (i) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group and who are or were assigned to a Star Division (as defined in the PRCS (as defined below)) (individually an "**Star Clinician**") provided Services during the Term, (ii) that are located in the same county as a hospital, facility or other location described in the foregoing clause (i) or in any county contiguous to such county and at which clinicians who are or were employed by or have or had an independent contractor relationship with Group (individually a "**Related Star Clinician**" and collectively with the Star Clinicians the "**Affiliated Clinicians**") provided Services during the Term, (iii) at which Group had a contract in effect for any (x) Star Clinicians to render Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iii)(x) or in any county contiguous to such county, and (iv) at which Group has been in active negotiations for (x) Star Clinicians to provide Services during the preceding twelve (12) month period or (y) Related Star Physicians to render Services during the preceding twelve (12) month period that are located in the same county as a hospital, facility or other location described in the foregoing clause (iv)(x) or in any county contiguous to such county.

3.    Duties of Physician.

(a)    Physician is employed by Group to use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to

time to maintain full-time status for a Physician-Partner (which requirements will be set forth on Schedule II to the PRCS); provided that if Physician notifies Group in writing that Physician desires to work part-time from after a specified date that is at least twelve (12) months after the date that such notice is delivered (the "**Part-Time Start Date**") and the CGB approves Physician working part-time, then from and after the Part-Time Start Date, in lieu of Physician rendering such Services on a full-time basis, Physician shall use Physician's best efforts and attention to render Services on behalf of Group as a Doctor of Medicine or Doctor of Osteopathic Medicine, as the case may be, at some or all of the Facilities in accordance with such schedule as determined by the CGB on a basis that satisfies the minimum requirements established by the CGB from time to time to maintain part-time status for a Physician-Partner (which requirements will be set forth on Schedule I to the PRCS). Physician shall not, without the prior written consent of the CGB and Group, which may in the CGB's and Group's sole discretion be withheld or conditioned upon Physician meeting other requirements, engage in the provision of professional medical services other than Services provided pursuant to this Agreement.  Physician acknowledges and agrees that, except as otherwise agreed by the CGB and Group, Physician must meet the minimum requirements of a Physician-Partner as defined by the PRCS from time to time in order for Physician to maintain Physician's status as a Physician-Partner. At all times while Physician is an employee of Group, Physician shall retain independent discretion and shall exercise professional judgment consistent with generally accepted medical practices, the ethical standards of the Texas and American Medical Associations and the professional standards of Group, in the provision of Services at the Facilities.  Physician's duties shall include but not be limited to (i) examination, evaluation and treatment of patients; (ii) participation in Group's on-call rotation for after-hours coverage; (iii) participation in Group's indigent and charity care programs; and (iv) such other duties as may reasonably be assigned by Group from time to time.

(b)    Physician shall perform all Services in accordance with (i) this Agreement; (ii) the bylaws, rules and regulations of the Medical Staff of each Facility at which Physician renders Services; (iii) the terms and conditions of any contractual arrangement regarding the performance of Services between Group and the applicable Facility (upon written request, a summary of the material and relevant terms of any such agreement shall be provided to Physician); and (iv) any applicable policies and procedures established by the CGB and/or Group, including but not limited to the Group's Clinical Code of Conduct and Conflict of Interest Policy.

(c)    Physician agrees and acknowledges that the CGB may conduct a review of Physician's ability to safely perform Services at any time ("**Review**").

(d)    Physician shall assist in providing supervision of physician assistants, nurses, nurse anesthetists, anesthesiology assistants and other non-physician health care personnel providing services on behalf of Group.  All such non-physician personnel shall be under Physician's control and direction in the performance of health care services for patients treated by Physician.

(e)    Physician shall provide Services on a nondiscriminatory basis and may not refuse to provide medical services to any patient accepted by Group.

(f)    Physician shall participate in, and cooperate with Group in connection with, the quality assurance and risk management program(s) developed by Group.  Physician shall also be subject to and actively participate in any utilization review program(s) developed by or on behalf of Group.

(g)     Physician agrees and acknowledges that many of the contractual arrangements Group holds with the Facilities are exclusive in nature and, as a result, require the automatic termination of medical staff membership and clinical privileges for all of Group's providers upon termination of the contractual arrangement.  Physician hereby agrees and consents to the foregoing and further waives any due process, notice, hearing and review rights he/she may have under such Facility's medical staff bylaws upon termination of Group's contractual relationship with Facility or upon Physician's termination of employment with Group for any reason.

4.     Compensation, Benefits, and Expense Reimbursement.  Group shall pay to or for the benefit of Physician as compensation and/or benefits for the Services performed by Physician the amounts set forth on Schedule 4.  In addition, Group shall provide Physician benefits and business expense reimbursements as set forth on Schedule 4.  Group shall provide, or cause to be provided, all space, equipment, supplies, non-physician health care personnel and clerical, administrative and other personnel as are reasonably necessary and appropriate, consistent with Group's past practices and the CGB's recommendations, for Physician's performance of Services on behalf of Group.

5.     Fees.  Group shall have exclusive authority to determine the fees, or a procedure for establishing the fees, to be charged to patients by Group.  All sums paid by any patient of Group in the way of fees, salary, or otherwise for medical services rendered by Physician shall be and remain payments of Group and shall be included in Group's income.  Physician hereby assigns to Group all rights to bill for Services rendered by Physician and shall execute any additional documentation as may be requested by Group documenting such assignment.  In the event Physician receives any amounts from any patients, third party payors or other third parties which are the property of Group, Physician shall immediately endorse and deliver the same to Group.

6.     Patients, Medical Records.  Group shall have the authority to determine who will be accepted as patients of Group.  Group also shall have the authority to designate, or to establish a procedure for designating, which professional physician of Group will handle each such patient.  Physician shall, in accordance with policies developed by or on behalf of Group, timely prepare all medical records in respect of patients treated by Physician. All medical records generated in respect of patients treated by Physician or any other physician engaged by Group during the Term shall be and remain the property of Group or Facilities, as appropriate, and shall be maintained at the Facilities; provided, however, that Physician shall have such right of access to such medical records as shall be provided by law.  In addition, Physician shall timely prepare and deliver such other records and reports relating to the operations of Group as Group may reasonably request.  Physician shall abide by all state and federal laws regarding the confidentiality of patient health information, including, without limitation, the Health Insurance Portability and Accountability Act of 1996, and all rules and regulations promulgated thereunder, including the Privacy Standards (45 C.F.R. Parts 160 and 164), the Electronic Transaction Standards (45 C.F.R. Parts 160 and 162) and the Security Standards (45 C.F.R. Parts 160, 162 and 164), and the Health Information Technology for Economic and Clinical Health Act of 2009 enacted as part of the American Recovery and Reinvestment Act of 2009.

7.     Term and Termination.  The term of this Agreement will commence on the September 6, 2019 and will continue thereafter until terminated as provided herein (the "**Term**").

(a)     This Agreement may be terminated upon the mutual written agreement of the parties.

(b)     Physician may terminate this Agreement without cause upon the delivery of one hundred eighty (180) days prior written notice to Group. Group may terminate this Agreement

without cause upon the delivery of ninety (90) days prior written notice to Physician; provided that during such ninety (90) day notice period, Group may elect, in its sole discretion, to remove Physician from the schedule and to pay any remaining amounts due to Physician for the remainder of such notice period.

(c)     Group may terminate this Agreement for good and sufficient cause.  Such termination shall be effective upon the delivery of written notice thereof to Physician or at such later time as may be designated in said notice, and Physician shall cease performance of Services hereunder and vacate the offices of Group and the Facilities on or before such effective date.  The written notice shall specify the cause for termination.  For purposes of this <u>Section 7.c</u>, the term "good and sufficient cause" shall include, but not be limited to, any one or more of the following:

(1)     Physician's failure to maintain any of the Qualifications.

(2)     A determination is made by the CGB that there is an immediate and significant threat to the health or safety of any patient as a result of the services provided by Physician, or as a result of Physician's medical misconduct or other gross neglect in the provision of professional services.

(3)     Any felony indictment naming Physician or conviction of a felony by Physician.

(4)     Any investigation for any alleged violation or violation by Physician of any Medicare or Medicaid statutes, 42 U.S.C. § 1320a-7b (the "**Anti-Kickback Statute**"), 31 U.S.C. § 3729 (the "**False Claims Act**"), 42 U.S.C. § 1395nn (the "**Stark Law**"), or the regulations promulgated pursuant to such statutes, or any similar federal, state or local statutes or regulations promulgated pursuant to such statutes.

(5)     Physician's ineligibility to be insured against medical malpractice.

(6)     Physician does not satisfactorily pass the Review, except in the instance where Physician satisfies the remedial action requested.

(7)     Any dishonest or unethical behavior by Physician that results in damage to or discredit upon Group.

(8)     Any intentional conduct or action by Physician that negatively affects the ability of Group to deliver Services to any Facility or any other facility.

(9)     Physician's violation of the Clinician Code of Conduct of Group or failure to comply with any clinical practice guidelines as may be established by Group from time to time.

(10)    Physician no longer meets the requirements to be a Physician-Partner as such requirements may, from time to time, be established or modified by the CGB.

(11)    Physician's violation of <u>Section 9</u>.

(d)     In the event either party shall give written notice to the other party that such other party has substantially defaulted in the performance of any material duty or material obligation imposed upon it by this Agreement, and such default shall not have been cured within thirty (30)

days following receipt of such notice, the non-defaulting party shall have the right to immediately terminate this Agreement. For purposes of this subsection (d), a default shall include Physician ceasing to be a member in good standing of the Medical Staff of any of the Facilities at which Physician is assigned to render Services by the CGB.

(e)     In the event that there shall be a change in federal or state law, the Medicare or Medicaid statutes, regulations, or general instructions (or in the application thereof), the adoption of new legislation or regulations applicable to this Agreement, or the initiation of an enforcement action with respect to legislation, regulations, or instructions applicable to this Agreement, any of which affects the continuing viability or legality of this Agreement or the ability of Group to obtain reimbursement for Services rendered by Physician, then either party may by notice propose an amendment to conform this Agreement to existing laws.  If notice of such a change or an amendment is given and if Group and Physician are unable within ninety (90) days thereafter to agree upon the amendment, then either party may terminate this Agreement by ninety (90) days' notice to the other, unless a sooner termination is required by law or circumstances.

(f)     This Agreement shall automatically terminate upon the death of Physician.

(g)     This Agreement shall terminate upon written notice by either party in the event Physician becomes disabled, as further described in <u>Section 8</u>.

(h)     Upon termination of this Agreement for any reason whatsoever, Physician shall submit to Group within five (5) days of such termination all outstanding charges for professional services rendered by Physician on behalf of Group.  Group shall have the right to withhold any earned, but unpaid compensation for services rendered by Physician through the effective date of termination, until such time as Physician has submitted to Group all outstanding charges for professional services rendered by Physician on behalf of Group.

(i)     Except as otherwise provided herein, upon termination of this Agreement for any reason, Physician shall be entitled to Physician's earned, but unpaid compensation for Services rendered by Physician through the effective date of termination, as determined in accordance <u>Schedule 4</u>.  In the event of the death of Physician, such amounts shall be paid to Physician's estate.

(j)     Immediately upon termination of this Agreement, Physician shall surrender all keys, identification badges, telephones, pagers, computers and any other property of Group in the possession of Physician.

(k)     Physician agrees and acknowledges that upon termination of this Agreement for any reason, Group shall submit Physician's Resignation (as such term is defined in <u>Schedule 9</u>) to any Facility at which Physician maintains medical staff privileges.

(l)     Physician agrees and acknowledges that Group will suffer significant damages if Physician terminates his or her employment without cause with less than one hundred eighty (180) days advance notice to Group as a result of, among other things, the difficulty and associated costs of recruiting and credentialing a new replacement physician.  Physician agrees that if Physician terminates this Agreement with less than one hundred eighty (180) days advance notice to Group, Physician shall pay to Group all costs and expenses Group incurs in obtaining locum tenens coverage as an interim replacement for Physician in recruiting a permanent replacement.

8.    Disability of Physician.  Upon determination by the CGB of the Disability of Physician that no reasonable accommodation may be made to perform the essential functions of a physician as stated in Section 3, this Agreement may be immediately terminated by Group upon written notice to Physician.  The term "Disability of Physician" shall have the same meaning as that type of disability that entitled Physicians to payments for permanent disability pursuant to the disability policy covering Physician.  In the event no disability policy exists covering Physician, the term "Disability of Physician," as used herein, shall mean that point in time when Physician is unable to resume the essential functions required of Physician under this Agreement, as performed prior to such time, within one hundred and eighty (180) days after the disabling event.  If the disabling event is not a separate and distinct happening, the 180-day period shall begin at the time Physician is unable to perform the essential functions of the position as stated in Section 3 for thirty (30) consecutive work days. Additionally, Physician shall be considered disabled if he/she does not perform his/her duties for one-hundred and eighty (180) days during a three hundred sixty (360) day period.  If the CGB determines that Physician is not performing his/her duties because of a physical or medical condition, then Physician shall submit to a physical and/or mental examination of two (2) independent physicians selected by the CGB reasonably in good faith to determine the nature and extent of such condition and Physician agrees to be bound by such determination.

9.    Non-Disclosure, Non-Solicitation and Non-Competition.  Physician shall comply with the non-disclosure, non-solicitation and non-competition covenants set forth on Schedule 9.

10.    Assignment of Intellectual Property.  Physician shall promptly and fully disclose all Intellectual Property to Group.  Physician hereby assigns and agrees to assign to Group (or as otherwise directed by Group) Physician's full right, title and interest in and to all Intellectual Property.  At Group's sole cost and expense, Physician agrees to execute any and all applications for patents, copyrights and/or other proprietary rights, and to do such other acts (including without limitation the execution and delivery of instruments of further assurance or confirmation) requested by Group to assign all Intellectual Property to Group and to permit Group to enforce any patents, copyrights and/or other proprietary rights to the Intellectual Property.  All copyrightable works that Physician creates shall be considered "work made for hire" for the sole benefit of Group.  For purposes of this Section 10, "**Intellectual Property**" shall mean inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) conceived, made, created, developed or reduced to practice by Physician (whether alone or with others, whether or not during normal business hours or on or off Group premises) during Physician's employment with Group that either (a) relates  to the business of Group (including administering anesthesia to patients) or (b) makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities). Physician may exclude from the definition of Intellectual Property and any obligations relating thereto, inventions, discoveries, developments, methods, processes, compositions, works, concepts and ideas (whether or not patentable or copyrightable or constituting trade secrets) developed by Physician (i) prior to the date of this Agreement, which are identified on Schedule 10 attached hereto and (ii) after the date of this Agreement in connection with Physician's engagement in outside professional activities that have been approved by the CGB or that have been undertaken entirely on Physician's own time unless, in the case of this clause (ii), Physician makes use of Confidential Information or any equipment or premises of Group or any of its affiliates (including the Facilities) in connection with such development (collectively, "**Excluded IP**").   Physician will promptly advise Group in writing of any Excluded IP that Physician develops or proposes to develop after the date of this Agreement that is not set forth on Schedule 10 and provide such information and assurances as Group may reasonably request to determine whether or not such Intellectual Property

constitutes Excluded IP hereunder.  If Group determines that such Intellectual Property does not constitute Excluded IP hereunder, Group will notify Physician in writing thereof within 30 days after receiving such notice, information and assurances, provided, that if Group does not notify Physician in writing within 30 days after receiving such notice, information and assurances, then such Intellectual Property shall be considered Excluded IP hereunder to the extent such Intellectual Property satisfies the requirements of Excluded IP set forth above.

11.     <u>Right of Offset</u>. If Physician's employment with Group is terminated for any reason, Group shall have the right to offset against any compensation (earned, but unpaid or otherwise) or other amounts due to Physician under this Agreement or otherwise, any indebtedness, whether or not evidenced by a promissory note and whether or not mature or due and payable, owed by Physician to Group.

12.     <u>Miscellaneous</u>.

        (a)     <u>Factual Information</u>:  Physician represents and warrants that any and all factual information furnished by Physician to Group will be true and accurate in every material respect as of the date on which such information is furnished.

        (b)     <u>Authority</u>:  Physician has full power and authority to enter into this Agreement and perform all obligations under this Agreement.  The execution and performance of this Agreement by Physician will not constitute a breach or violation of any covenant, agreement or contract to which Physician is a party or by which Physician is bound.

        (c)     <u>Assignment; Benefit</u>:  This Agreement and the rights and duties of Physician hereunder may not be assigned by Physician without the prior written consent of Group.  Group may assign this Agreement or any and all rights or obligations hereunder, without the prior written consent of Physician, to any legal entity owned or controlled by or under common control with Group if, as a mandatory condition to such assignment, the assignee entity, commiserate with the assignment, adopt and agree in writing to be bound to and by the then current USAP South Texas Clinical Governance Board Charter and PRCS.  Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the parties hereto and their heirs, personal representatives, successors and assigns.

        (d)     <u>Compliance</u>:  Group and Physician expressly agree that nothing contained in this Agreement shall require Group or Physician to refer or admit any patients to any of the Facilities or to any other individual entities.  Physician agrees to use Physician's best efforts to ensure Physician's activities are in full compliance with all rules and regulations including, but not limited to, the rules and regulations relative to the Medicare and Medicaid programs, and the rules and regulations relative to any applicable private payor programs.  Physician further agrees to immediately report any violations of such rules or regulations observed by Physician to the person(s) designated in Group's compliance policies and procedures.

        (e)     <u>Invalid Provision</u>:  The invalidity or unenforceability of a particular provision, paragraph, subparagraph, sentence or term of this Agreement shall not affect the other provisions, paragraphs, subparagraphs, sentences or terms hereof, and this Agreement shall be construed in all respects as if such invalid or unenforceable provision, paragraph, subparagraph, sentence or term was omitted.

(f)     Modification:  No change or modification of this Agreement shall be valid unless the same is in writing and signed by the parties hereto; provided, however, if Physician no longer qualifies as a Physician-Partner and the CGB has elected to change such Physician's designation from being a Physician-Partner, then without any action required by Physician (i) all references herein to Physician-Partner (other than such references in Schedule 9) shall mean a physician other than a Physician-Partner, (ii) such Physician shall no longer have the right to serve on the Clinical Governance Board or any other voting rights associated with being a Physician-Partner, (iii) Recital D herein shall be deemed to be intentionally omitted and (iv) such Physician shall receive a new compensation plan from Group pursuant to which Physician shall receive compensation for the services provided hereunder, to be attached hereto as a revised Schedule 4.

(g)     Waiver:  The waiver by either party or the CGB of a breach or violation of any provision of this Agreement will not operate as, or be construed to constitute, a waiver by such party of any subsequent breach of the same or other provision hereof.

(h)     Third Party Beneficiary:  The CGB is an express third-party beneficiary of this Agreement and shall have the right to enforce its rights hereunder in accordance with the applicable laws of the State as if it was a party hereto.

(i)     Notice:  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and if personally delivered, or if sent by certified return receipt mail, postage prepaid, to the addresses set forth below, unless otherwise notified in writing:

GROUP:                                          w/a copy to:

U.S. Anesthesia Partners of Texas, P.A.         U.S. Anesthesia Partners, Inc.
1500 City West Blvd, Suite 300                  12222 Merit Drive, Suite 700
Houston, TX 72042                               Dallas, TX  75251
Attn:  Sr. Vice President – Operations          Attn:  General Counsel

PHYSICIAN:

Current address on file with Human Resources

(j)     Applicable Law and Venue:  This Agreement shall be governed, construed, enforced and regulated under and by the laws of the State.  Each of the parties to this Agreement hereby irrevocably and unconditionally submits, for itself and its assets and properties, to the exclusive jurisdiction of the state and Federal courts of Bexar County, Texas, and any appellate court from such court, in any action or proceeding arising out of or relating to this Agreement.

(k)     Legal Fees and Costs:  In the event that either party elects to incur legal expenses to enforce or interpret any provision of this Agreement, the prevailing party shall be entitled to recover such legal expenses, including without limitation, reasonable attorneys' fees, costs and necessary disbursements, in addition to any other relief to which such party shall be entitled.

(l)     Entire Agreement:  This Agreement, the Schedules attached hereto and the PRCS constitute the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes and replaces any prior employment agreements and/or arrangements, oral or otherwise, between the parties hereto and any prior statements, representations or warranties not

expressly incorporated herein.  The parties specifically acknowledge that, in entering into and executing this Agreement, each is relying solely upon the statements, representations and agreements contained in this Agreement and no others.

(m)     <u>Survivability</u>:  The provisions of <u>Sections 3(g)</u>, <u>4</u>, <u>5</u>, <u>9</u>, <u>10</u>, <u>11</u> and <u>12</u>, <u>Schedule 4</u> and <u>Schedule 9</u> shall survive the termination or expiration of this Agreement for any reason whatsoever.  Notwithstanding the foregoing, except as otherwise expressly set forth on <u>Schedule 9</u>, the non-compete and non-solicit covenants of Physician with respect to <u>Schedule 9</u> shall terminate upon Physician's payment of the Buy-Out Amount as further described in <u>Schedule 9</u>.  In addition, the duration of the covenants contained in this Agreement shall be tolled during the continuation of any breach or violation and will continue or commence again only upon Physician's strict compliance with such covenants.

(n)     <u>Rule of Interpretation</u>:  The general rule that an agreement is to be interpreted against the drafter of an agreement in the case of an ambiguity is not to be recognized hereunder, as this Agreement was developed by the mutual consent and negotiation of the parties.  The fact that this Agreement was actually prepared by counsel for one of the parties was merely as a matter of convenience for all of the parties.  For purposes of this Agreement, the term "affiliate" shall mean means, with respect to any person or entity, any other person or entity that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with, such specified person or entity; provided that U.S. Anesthesia Partners, Inc. and its affiliates shall be deemed an Affiliate of Group, the term "control" when used with respect to any person or entity means the power to direct the management and policies of such person or entity, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have correlative meanings.

(o)     Effective Date.  For the avoidance of doubt, this Agreement shall only be effective upon the date of the occurrence of the Effective Time (as defined in the Agreement and Plan of Merger (the "**Merger Agreement**") dated as June 11, 2019 among U.S. Anesthesia Partners Holdings, Inc., the Practice and the other parties thereto) (the "**Effective Date**").  In the event that the Merger Agreement is terminated, this Agreement shall automatically terminate and be of no further force and effect.

[Signature Page to Follow]

.

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

U.S. ANESTHESIA PARTNERS OF TEXAS, P.A.

By: _____
Name: Hector Herrera, M.D.
Title:   President

IN WITNESS WHEREOF, the parties have executed this Agreement to be effective as of the Effective Date.

GROUP:                                          PHYSICIAN:

U.S. ANESTHESIA PARTNERS OF TEXAS,              Jennifer Zurovec
P.A.                                            _____

By:_____
Name:
Title:

[Signature Page to Physician-Partner Employment Agreement]

## Schedule 10

## Carved-Out Intellectual Property

**Intellectual Property developed prior to the Agreement and excluded from Section 10:**

None.

SCHEDULE 4

COMPENSATION, PHYSICIAN BENEFITS, BUSINESS EXPENSES
AND PROFESSIONAL LIABILITY INSURANCE

Compensation

Group shall pay to or for the benefit of Physician compensation for the Services in an amount determined under the USAP South Texas Compensation Plan, as such plan may be amended from time to time. Physician agrees and acknowledges that Group shall only be required to exercise its normal billing procedures with respect to collecting Group's accounts receivable and will not be required to institute judicial or other procedures or any other action to collect any accounts receivable.

Physician Benefits

Physician shall be entitled to those benefits and time off which are customarily offered to similarly situated Physician-Partners under Group's employee benefits plans, subject to meeting any eligibility requirements imposed by such plans. Physician agrees and acknowledges that Group may modify its benefits plans from time to time, provided such modifications apply to all similarly situated Physician-Partners.

Business Expenses

Group shall reimburse Physician for business expenses incurred by Physician in fulfilling his or her responsibilities under this Agreement and as set forth in Group's separate business expense reimbursement policy, as such policy may be amended by Group from time to time.

Professional Liability Insurance

Group shall purchase, maintain and pay all premiums for malpractice insurance insuring Group and Physician, with such limits of coverage and with such insurer as shall be determined by Group from time to time.

In the event Group changes to a "claims made" policy in the future, upon the termination of Physician's employment with Group for any reason, Physician shall be responsible for purchasing "tail" coverage to ensure continuous coverage to Physician and Group for the Services rendered by Physician under this Agreement.

SCHEDULE 9

NON-DISCLOSURE OF INFORMATION CONCERNING BUSINESS
AND NON-COMPETE AND NON-SOLICIT AGREEMENT

Physician recognizes that Group's decision to enter into this Agreement is induced primarily because of the covenants and assurances made by Physician in this Agreement, that Physician's covenant not to compete and not to solicit is necessary to ensure the continuation of the business of Group and the reputation of Group, as well as to protect Group from unfair business competition, including but not limited to, the improper use of Confidential Information (as defined below), and that irrevocable harm and damage will be done to Group if Physician unlawfully competes with Group.  Therefore, in consideration of the promises contained herein, including without limitation those related to Confidential Information, except as may be otherwise expressly provided in this Agreement, the Physician agrees as follows:

1.      Non-Competition:  During the Term and for a period of two (2) years following termination of this Agreement (for whatever reason) (the "**Restricted Period**"), Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services within five (5) miles of any Facility.  For purposes of this Schedule 9, "**Person**" shall mean any individual (including Physician), any association, corporation, company, trust, partnership or other entity.

2.      Non-Competition (Group): During Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person, provide anesthesiology services (including any specialty thereof) or pain management services at any hospitals, facilities or other locations (other than a Facility) at which clinicians who are or were employed by or have or had an independent contractor relationship with Group provided Services during the Term.

3.      Non-Solicit:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) solicit any past or current patient to whom Physician or any other Affiliated Clinician provided Services during the Term ("**Patient**"), or immediate family member of such Patient, for purposes of inducing the Patient to become a patient of Physician or any other Person; (ii) solicit any physician (including surgeons) for which Physician or any other Affiliated Clinician provided Services to such physician's patients at any time during the Term, for purposes of inducing such physician to consult with or utilize Physician or any other Person in the care of such physician's patients; (iii) solicit any Facility for the purpose of obtaining any contractual relationship with such Facility for Physician or any other Person; or (iv) solicit for employment, or employ or engage, any individual who is employed by Group (1) in the case of each day during the Term, within the twelve (12) month period prior to such day and (2) in the case of the period following the termination of this Agreement, within the twelve (12) month period prior to the date of

such termination, to perform services on behalf of Physician or any other Person that provides Services.  Notwithstanding the foregoing, Group shall (x) permit Physician to have access to a list of the Patients whom Physician has seen or treated within one (1) year of termination of this Agreement; and (y) provide Physician (A) access to the medical records of the Patients whom Physician has seen or treated upon authorization of the Patient in the same form as maintained or available to Group; and (B) any copies of the medical records for a reasonable fee as established by the Texas State Board of Medical Examiners under the Texas Medical Practice Act (Texas Occupations Code Section 159.008).  Any access to a list of Patients or to Patients' medical records after termination of this Agreement shall not include such list or records to be provided in a format different than that by which such records are maintained except by mutual consent of the parties to this Agreement.

4.      Non-Interference; Administrative Services:  During the Restricted Period, Physician shall not, without the prior written consent of Group (which consent may be withheld in Group's discretion), directly or indirectly, either individually or as a partner, joint venturer, employee, independent contractor, agent, representative, officer, director, manager, owner or member of any Person (i) call on or solicit any Facility, employee, independent contractor or other Person who has a contractual relationship with Group for the purpose of persuading or attempting to persuade such Person to cease doing business with or performing services for, or materially reduce the volume of, or adversely alter the terms with respect to, the business or services that such Person does with or performs for Group or any affiliate thereof or in any way otherwise interfere with the relationship between any such Facility, employee, independent contractor or other Person, on the one hand, and Group or any affiliate thereof, on the other hand, or (ii) provide management, administrative or consulting services to any Person that provides Services within five (5) miles of any of the Facilities. This provision shall survive the payment of the Buy-Out Amount.

5.      Continuing Care.  Physician shall not be prohibited from providing continuing care and treatment to a specific Patient or Patients during the course of an acute illness at any time, including following termination of this Agreement or Physician's employment.  Following such termination, Physician understands and agrees that Physician will not be permitted to utilize Facility premises, staff, supplies and/or any other Facility-owned resource, unless failure to do so would compromise an acute patient's health and well-being, in which case Group, in its sole discretion, will provide written authorization to Physician on a case-by-case basis so that Physician may treat such Patient at the appropriate Facility, and even then, only to the extent and of such duration, that the acute nature of the Patient's condition requires.

6.      Buy-Out Exception.  Physician may be released of the non-competition and non-solicitation provisions contained in Section 1, Section 2 and Section 3 of this Schedule 9 upon payment by Physician to Group of a reasonable price prior to a breach by Physician. The parties acknowledge, and hereby decline and waive, their option to have the reasonable price of the buy-out determined by an arbitrator, whether selected by the parties or a court of competent jurisdiction.  The parties agree that a reasonable price shall be the amount equal to 200% of the Net Revenue per Physician Partner (the "**Buy-Out Amount**"). For purposes of this Schedule 9, "**Net Revenue per Physician Partner**" shall mean a dollar amount equal to (a) the total net revenue of the Star Divisions for the most recent twelve (12) month period (and for any period within twelve (12) months of the Effective Date the product obtained by multiplying (a) the quotient obtained by dividing (x) the total net revenue of the Star Division from the Effective Date to the determination date by (y) the number of days in the period from the Effective Date to the determination date by (b) 365), as determined in accordance with generally accepted accounting principles and reflected on the financial statements for Star

Divisions maintained by Group divided by (b) the average number of Physician-Partners employed by Group who are assigned to Star Divisions during the most recent twelve (12) month period. Physician and Group agree that the Buy-Out Amount is reasonable because it reflects the lost productivity and profit opportunity of Group during the Restricted Period during which Physician would otherwise not be competing with Group, and additionally compensates Group for the risk that Physician recruits away from Group physicians or other clinical staff or Facilities in which Group has made a significant investment.  The parties further agree that the Buy-Out Amount is reasonable because Group's physician-partners practice in groups, are more likely to depart in groups, oversee other employed physicians and CRNAs and have developed practice patterns, relationships, protocols and the Confidential Information in a group setting that together support a Buy-Out Amount calculated on the basis of all physician-partner revenues in particular divisions, not just the individual Physician's revenues or compensation.

7.    <u>Resignation of Privileges</u>.  Physician further agrees to relinquish Physician's privileges to practice anesthesiology and to treat chronic pain at each of the Facilities upon termination of this Agreement for any reason.  In connection herewith, Physician shall execute the resignation attached hereto and incorporated herein by reference as <u>Exhibit 9-A</u> (the "**Resignation**"), and in the event of termination of this Agreement for any reason whatsoever, Physician hereby authorizes Group to deliver such Resignation to the Facilities.  Notwithstanding the foregoing, if such Resignation would result in a reportable event to the State Board of Medical Examiners or the National Practitioner Data Bank, Group will forgo delivering the Resignation to the applicable Facility and the termination of Physician's privileges at such Facility shall be conducted in conformance with any applicable fair hearing rights set forth in the then current medical staff bylaws at the applicable Facility, or shall be delivered after the conclusion of investigation or other inquiry that would result in the Resignation becoming a reportable event.

8.    <u>Confidentiality</u>.  As of the date of the execution of this Agreement and during the course of the Physician's employment, in order to allow Physician to carry out Physician's duties hereunder, Group has provided and will continue during the Term to provide to Physician Confidential Information. Physician agrees to keep confidential and to not use or disclose to others during the Term and thereafter, except as expressly consented to in writing by Group, required by law or authorized under this Agreement, any Confidential Information. This restriction shall not apply to such information if Physician can establish that such information (i) has become generally available to and known by the public (other than as a result of an unpermitted disclosure directly or indirectly by Physician or Physician's affiliates, advisors, or representatives), (ii) has become available to Physician on a non-confidential basis from a source other than Group and its affiliates, advisors, or representatives, provided that such source is not and was not bound by a confidentiality agreement with or other obligation of secrecy of Group of which Physician has knowledge, or (iii) has already been or is hereafter independently acquired or developed by Physician without use of or reference to any Confidential Information.  Should Physician leave the employment of Group, Physician will neither take nor retain, without prior written authorization from Group, any Confidential Information. Physician further agrees to destroy any paper or electronic copies of Confidential Information, including information contained on any personal device, upon the request of Group.  For purposes of this <u>Schedule 9</u>, "**Confidential Information**" shall mean any financial, accounting and statistical information, marketing plans, business plans, feasibility studies, fee schedules or books, reimbursement rates, billing information, patient files, confidential technology, proprietary information, patient lists, policies and procedures or trade secrets of Group or U.S. Anesthesia Partners, Inc., its affiliates or managed practices ("**USAP**"), or other papers, reports, records, memoranda, documents, files, discs, or copies thereof pertaining to Group's patients or Group's or

USAP's business, sales, financial condition or products, or any matter or thing ascertained by Physician through Physician's affiliation with Group, the use or disclosure of which matter or thing might reasonably be construed to be contrary to the best interests of Group or USAP.

9.      Exceptions to Confidentiality.

a.      It shall not be a breach of Physician's covenants under Schedule 9 if a disclosure is made pursuant to a court order, a valid administrative agency subpoena, or a lawful request for information by an administrative agency.  Physician shall give Group prompt notice of any such court order, subpoena, or request for information.

b.      Physician shall not be prohibited from releasing any Confidential Information to Physician's legal counsel or financial advisors, provided that such advisors are under a legal obligation of confidentiality with respect to the Confidential Information.

c.      Nothing in this Agreement prohibits Physician from reporting an event that Physician reasonably and in good faith believes is a violation of law to the relevant law-enforcement agency (such as Securities and Exchange Commission or Department of Justice), requires notice to or approval from Group before doing so, or prohibits Physician from cooperating in an investigation conducted by such a government agency.  This may include disclosure of trade secret or confidential information provided the disclosure complies with the limitations set forth in the 2016 Defend Trade Secrets Act (DTSA).  Physician is hereby provided notice that under the DTSA, (1) no individual will be held criminally or civilly liable under Federal or State trade secret law for the disclosure of a trade secret (as defined in the Economic Espionage Act) that: (a) is made in confident to a Federal, State or local government official, either directly or indirectly, or to an attorney; and made solely for the purpose of reporting or investigating a suspected violation of law; or, (b) is made in a complaint or other documented filed in a lawsuit or other proceeding, if such filing is made under seal so that it is not made public; and (2) an individual who pursues a lawsuit for retaliation by an employer for reporting a suspected violation of the law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual files any document containing the trade secret under seal, and does not disclose the trade secret, except as permitted by court order.

10.     Enforcement.  Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 shall be construed as an agreement independent of any other provision in this Agreement, and the existence of any claim or cause of action asserted by Physician against Group, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement of Section 1, Section 2, Section 3, Section 4 or Section 8 of this Schedule 9. It is understood by and between the parties hereto that the covenants set forth in Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 are essential elements of this Agreement, and that, but for the agreement of Physician to comply with such covenants, Group would not have agreed to enter into this Agreement.  Group and Physician agree that the foregoing covenants are appropriate and reasonable when considered in light of the nature and extent of the practice conducted by Group.  If any provision or subdivision of this Agreement, including, but not limited to, the time or limitations specified in or any other aspect of the restraints imposed under Section 1, Section 2, Section 3, Section 4 and Section 8 of this Schedule 9, is found by a court of competent jurisdiction to be unreasonable or otherwise unenforceable, any such portion shall nevertheless be enforceable to the extent such court shall deem reasonable, and, in such event, it is the parties' intention, desire and request that the court reform such portion in order to make it enforceable.  In the event of such judicial reformation, the parties agree to be bound by Section 1,

Section 2, Section 3, Section 4 and Section 8 of this Schedule 9 as reformed in the same manner and to the same extent as if they had agreed to such reformed Sections in the first instance.  Without limiting other possible remedies to Group for the breach of any covenant contained in this Schedule 9, Physician agrees that injunctive or other equitable relief shall be available to enforce such covenant, such relief to be without the necessity of posting a bond, cash, or otherwise.

EXHIBIT 9-A

RESIGNATION

By signing below, I, _____ hereby agree to automatically resign my medical staff privileges at _____ ("Facility") effective as of the termination of my employment with U.S. Anesthesia Partners of Texas, P.A. for any reason or upon the termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility.  In such event, I further waive any due process, notice, hearing and review rights I may have under the Facility's medical staff Bylaws.  Upon termination of my employment or termination of U.S. Anesthesia Partners of Texas, P.A.'s contractual relationship with the Facility, U.S. Anesthesia Partners of Texas, P.A. is hereby authorized to complete a copy of this resignation for the Facility and deliver a copy of this resignation to the medical staff office of such Facility.


_____

Name: _____

Date: _____

# EXHIBIT H

12222 Merit Drive Suite 700
Dallas, TX 75251
www.USAP.com

US ANESTHESIA
PARTNERS

June 1, 2022                                            **VIA Electronic Mail & Fed-Ex**

Giselle Conlin
210 Thelma Dr.
San Antonio, TX 78212
210-250-1089
conlingiselle@gmail.com
Giselle.conlin@usap.com

**RE:  Notice of Breach & Demand to Cure**

Dear Dr. Conlin:

As you are aware, you and U.S. Anesthesia Partners of Texas, P.A., ("USAP") are parties to a Physician Employment Agreement dated September 6, 2019 ("Employment Agreement") which sets forth certain requirements for termination and post-employment obligations. Specifically, Section 7(b) states "[You] may terminate this Agreement without cause upon the delivery of one hundred eighty (180) days prior written notice to [USAP]".  Our records indicate that on April 28, 2022 (the "Notice Date") you provided notice to terminate the Employment Agreement without cause, to be effective on June 27, 2022 (the "Requested Separation Date"). This Requested Separation Date is 120 days short of the notice required under the Employment Agreement. In order to meet your contractual obligations under the Employment Agreement, your Separation Date should be October 25, 2022, (the "Compliant Separation Date") or 180 days from the Notice Date. Should you proceed with the Requested Separation Date you will be in breach of the Employment Agreement and such breach has and will continue to cause significant and material damage to USAP.

As such, you have the following options available to you:

- **Option 1** – Extend the Requested Separation Date to the Compliant Separation Date listed above; or
- **Option 2** – Breach the Employment Agreement and keep the Requested Separation Date and pay to USAP damages[1] in the amount of $225,128.58 (the "Early Termination Damages").

---

[1] These damages were calculated based on a blended rate of coverage averages multiplied by the number of weeks you have remaining under the Employment Agreement from the Requested Separation Date through the Compliant Separation Date (i.e., the number of weeks you are short from meeting your notice obligations under Section 7(b).)



12222 Merit Drive Suite 700
Dallas, TX 75251
www.USAP.com

Please contact me or Tony Smith (SVP, USAP South Texas) **no later than Friday, July 1, 2022,** regarding your payment of the Early Termination Damages indicated above and your Negative Balance (if applicable).

Except solely with respect to your obligation to cure the aforementioned breach and/or to repay overpaid wages and benefits specifically addressed herein, this letter does not modify the terms of your Employment Agreement with USAP or any obligations that you have to USAP pursuant to the terms of that agreement, including obligations with respect to confidentiality, non-competition and non-solicitation contained therein.

USAP, on behalf of itself and its affiliates, expressly reserves all rights to pursue any and all legal and equitable remedies which may be available to prevent or cure any breach by you.

We wish the best of luck in your future endeavors and look forward to you abiding by your contractual obligations.

Yours Truly,

*Ki'Jhana Friday*

**Ki'Jhana R. Friday, Esq.**
Vice President, Deputy General Counsel

Cc: Tony Smith, SVP – USAP South Texas
     Ed Myslik, VP - Finance
        Jessica Gonzalez, Human Resources

# EXHIBIT I

EXHIBIT C

USAP South Texas COMPENSATION PLAN

Defined terms used herein shall have the meanings given to them in the Plan Regarding Compensation for Services (USAP South Texas) ("PRCS") adopted by the Clinical Governance Board effective as of [ ], 2019 and employment agreements entered into by each PhysicianPartner, on the one hand, and U.S. Anesthesia Partners of Texas, P.A., a Texas professional association (the "Practice") on the other hand (each a "Provider Services Agreement"). The PRCS established the basis upon which Physician-Partners will be paid PhysicianPartner Compensation for Anesthesia Services rendered as Physician-Partners.

This USAP South Texas Compensation Plan (the "Plan"), effective as of the Effective Time (as defined in the Merger Agreement), sets forth the methodology of allocation of the Physician-Partner Compensation and the Clinician Compensation Expenses of individual Physician-Partners in each USAP South Texas Division. The Plan, together with the new Provider Services Agreements effective concurrently with the Plan, replaces in its entirety all prior compensation programs and arrangements of USAP South Texas with respect to the Physician-Partners. The Plan will be the basis for determining the compensation allocated to each USAP South Texas Division and paid to Physician-Partners pursuant to their individual Provider Service Agreements, and may be amended from time to time by the Practice and USAP, subject in all cases to the approval of the Clinical Governance Board set forth in the Charter.

Subject to the Clinical Governance Board, USAP, and established company guidelines and policies, Physician-Partner Compensation shall be paid at least monthly on estimated or "draw" basis to individual Physician-Partners as set forth in the Plan attached hereto as Appendix A, and in accordance with the quarterly allocation reconciliation process described below. Each Physician-Partner will also be entitled to receive a quarterly payment payable as soon as reasonably practicable but in no event later than the thirtieth (30th) day of the calendar month following the end of each quarter (which payment shall subtract the draws previously received during the quarter). Notwithstanding the foregoing, in no event shall the estimate or draw in any quarterly period exceed a pro-rated portion of 85% of the physician's projected taxable income for such period, subject to the Clinical Governance Board.

The quarterly reconciliation shall be calculated as follows:

1. The Practice shall prepare an income statement for each USAP South Texas Division (each, a "USAP South Texas Division P&L"), which shall reflect the Net Revenues and Expenses directly generated or incurred by each USAP South Texas Division. The Practice shall also make a reasonable allocation of any shared or common Expenses incurred by USAP South Texas. Any allocation of Allocated Expenses shall be (a) consistently applied across all USAP South Texas Divisions and (b) consistent with the methodology utilized by USAP to calculate Deemed Expenses. For the avoidance of doubt, each USAP South Texas Division P&L shall reflect any Expenses specifically identified with individual PhysicianPartners in that USAP South Texas Division. Based on the above methodology, each USAP South Texas Division P&L shall calculate EBCC for each USAP EXHIBIT C 74129669_15 South Texas Division. For the avoidance of doubt, the sum of the EPBC for the USAP South Texas Divisions shall equal 100% of the EBCC for USAP South Texas calculated pursuant to the PRCS.

2. The calculation of Physician-Partner Compensation for a USAP South Texas Division shall be set forth on the USAP South Texas Division P&L for such USAP South Texas Division. For the avoidance of doubt,

the sum of the Physician-Partner Compensation for the USAP South Texas Divisions shall equal 100% of the Physician-Partner Compensation for USAP South Texas calculated pursuant to the PRCS. Physician-Partner Compensation for each USAP South Texas Division shall be allocated to the Physician-Partners in such USAP South Texas Division based upon the Plan.

Physician-Partners are not permitted to carry a negative balance at any time. If, at any time, an individual carries a negative balance, the Practice reserves the right to withhold amounts payable to such individual until the negative balance is cured.

In addition, within thirty (30) days following the delivery of the audited financial statements of Holdings, USAP shall reconcile the actual amounts due to Physician-Partners for the prior fiscal year and such physician's compensation may be adjusted upwards or downwards to reflect such reconciliation.

If at any time after the date hereof, there are any issues with the operation of the Plan or the interaction of the Plan with the PRCS, then the Clinical Governance Board and the Practice shall work together in good faith to make sure adjustments to the Plan as are necessary or desirable to achieve the original intent and economics of the effectiveness of the Plan.

Additionally, Clinician Compensation will be reduced by any amounts owed and outstanding to Holdings or any of Holdings' affiliates (but more than ninety (90) days in arrears) by any Physician-Partner in final settlement of such amounts pursuant to such PhysicianPartner's indemnification or other obligations to the extent Holdings or any of Holdings' affiliates are finally determined to be entitled to such amounts (whether through mutual agreement of the parties thereto, or as a result of dispute resolution provisions) in accordance with the terms of Section 2.12, Section 2.14 or Article IX the Merger Agreement for any claims owed by individual Physician-Partners pursuant thereto.

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Roberta  Moreno on behalf of Jacqueline Johnson
Bar No. 790973
rmoreno@constangy.com
Envelope ID: 78805286
Filing Code Description: Amended Petition
Filing Description: 1ST
Status as of 8/22/2023 5:21 PM CST

Associated Case Party: U. S. ANESTHESIA PARTNERS OF TEXAS, P.A.,

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lara de Leon | | ldeleon@constangy.com | 8/22/2023 4:31:35 PM | SENT |
| Roberta Moreno | | rmoreno@constangy.com | 8/22/2023 4:31:35 PM | SENT |
| Aarika Johnson | | anjohnson@constangy.com | 8/22/2023 4:31:35 PM | SENT |
| Jacqueline CJohnson | | jjohnson@constangy.com | 8/22/2023 4:31:35 PM | SENT |
| Cassandra  Cottrell | | ccottrell@constangy.com | 8/22/2023 4:31:35 PM | SENT |

Associated Case Party: ORTHOMED STAFFING, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Lu Pham | | lpham@phamharrison.com | 8/22/2023 4:31:35 PM | SENT |
| Caroline Harrison | | charrison@phamharrison.com | 8/22/2023 4:31:35 PM | SENT |
| Spencer Mainka | | smainka@phamharrison.com | 8/22/2023 4:31:35 PM | SENT |

Associated Case Party: GISELLE CONLIN

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Monica Chandler | | MChandler@phamharrison.com | 8/22/2023 4:31:35 PM | SENT |
| Karen Marchman | | kmarchman@phamharrison.com | 8/22/2023 4:31:35 PM | SENT |