UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
**F I L E D**

**NOV 2 7 2024**

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | § |
| *Plaintiff* | § § § |
| v. | § § |
| U.S. ANESTHESIA PARTNERS, INC. | § § § |
| *Defendant* | § § |

Case No.  4:23-CV-03560-KH

**NONPARTY, TEXANS ANESTHESIA ASSOCIATES, PLLC'S**
**<u>MOTION TO QUASH AND FOR PROTECTIVE ORDER</u>**

Nonparty, Texans Anesthesia Associates, PLLC ("TAA") files this motion to quash and

motion for protective order, and asks the Court to protect TAA from U.S. Anesthesia Partners, Inc.

("USAP") and the Federal Trade Commission's ("FTC") unduly burdensome, harassing, and

unreasonable subpoenas for documents, and would respectfully show the Court as follows:

**A. INTRODUCTION**

1.       USAP and the FTC served subpoenas for documents on TAA. The subpoenas seek

27 categories of documents, including all agreements TAA has with hospitals and other facilities

where it provides anesthesia services, all employment agreements, and numerous other categories

staring on January 1, 2012 to present, and all agreements TAA has with health insurance

companies starting on January 1, 2010 to present. Basically, the subpoenas seek all of TAA's

business records for more than twelve years. Texans Anesthesia asks this Honorable Court to quash

the subpoenas because the subpoenas subject TAA, which is not a party to this case, to an undue

burden of time and expense to search for responsive information. The subpoenas seek information

that is overly broad, information that is not relevant and not likely to lead to the discovery of

relevant information, information that is proprietary and confidential, and violates TAA's right to privacy.

2.    TAA attempted to confer with USAP and the FTC in a good-faith effort to resolve the dispute without court action, as required by Federal Rule of Civil Procedure 26(c)(1) and as shown in the attached certificate of conference.

3.    Plaintiff, Federal Trade Commission ("FTC") filed suit against Defendants, USAP, and others, alleging an anticompetitive scheme to consolidate anesthesia practices in Texas, which involves acquiring or conspiring with competitors, thereby driving up the price of anesthesia services provided to Texas patients. (Doc. 1, ¶¶ 1-7). "As of 2021, USAP was at least four times larger than the second-largest group in Houston". (Doc. 1, ¶ 8).

4.    The FTC describes USAP's alleged actions of acquiring smaller anesthesia groups in the Houston, Texas market (Doc. 1, ¶¶ 101-119, 261-273), such that today USAP "handles about 60% of the hospital-only anesthesia cases and accounts for almost 70% of payors' hospital-only anesthesia costs" (Doc. 1, ¶ 117) and its 2021 Houston market share by revenue of hospital-only anesthesia services is 69.5% versus TAA's 3.1% (Doc. 1, ¶ 272).

**B. ARGUMENTS**

5.    On November 1 and 13, 2024, USAP served subpoenas for documents on TAA, both subpoenas include the same requests. Ex. 1 and 2. On November 13, 2024, the FTC served a subpoena for documents on TAA which requests all documents requested by USAP's subpoena. Ex. 3.

6.    In addition to providing the guidelines for discovery and disclosures, Rule 26 also provides parties with the ability to seek protection from certain discovery upon demonstrating the necessity for such a safeguard. See generally Fed. R. Civ. P. 26(c). A Court "may, for good cause,

issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). The burden is upon the party seeking the protective order to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements. *In re Terra Int'l*, 134 F.3d 302, 306 (5th Cir. 1998). A protective order is warranted in those instances in which the party seeking it demonstrates good cause and a specific need for protection. *Landry v. Air Line Pilots Ass'n*, 901 F.2d 404, 435 (5th Cir. 1990). The Court has broad discretion in determining whether to grant a motion for a protective order. *Harris v. Amoco Prod. Co.*, 768 F.2d 669, 684 (5th Cir. 1985).

7.      In this case, there is good cause for the Court to protect TAA with a protective order because the discovery is too broad and basically requests all of non-party TAA's business records without any showing that the requested information is relevant to the lawsuit. The subpoenas were issued by USAP which is a competing anesthesiology services provider that is more than twenty times larger than TAA, and the discovery seeks TAA's confidential and competitive information. Moreover, the discovery imposes an undue burden on TAA.

8.      The following requests are at issue in this motion:

**REQUEST FOR PRODUCTION NO. 2:**

All contracts or Agreements with Hospitals, ASCs, or other facilities in the State of Texas where You have provided Anesthesia Services, including, but not limited to, the following:

  a.  Documents sufficient to show any Subsidy You received from a Hospital, ASC, or other facility for the provision of Anesthesia Services;
  b.  Documents sufficient to show Your coverage obligations between You and any Hospital, ASC, or other facility, including any obligations relating to the availability of physicians or CRNAs; whether in-house or on-call coverage is needed; and whether specialized coverage is required for specific departments within Your facility/facilities (e.g., trauma or cardiac care);

    c.  Documents sufficient to show any nonmedical or administrative services (including, but not limited to, scheduling and billing) provided by You to any Hospital, ASC, or other facility, including any changes over time;

    d.  Documents sufficient to identify whether You acted as the exclusive Anesthesia Provider at any Hospital, ASC, or other facility; and

    e.  Documents sufficient to show the identity of each Hospital, ASC, or other facility at which You provided Anesthesia Services, including its address, zip code, and facility identification number (e.g., Medicare Provider Number), and whether it offered Inpatient Services, Outpatient Services, or both.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and Communications relating to the termination of any contractual relationship between You and a Hospital, ASC, or other facility located in the State of Texas. This request includes, but is not limited to, Documents or Communications discussing, analyzing, or assessing the reason(s) why any such contractual relationship ended (and if You terminated the relationship, the reasons why You did so), as well as feedback or complaints You have received relating to (i) Your Network Status, (iii) any Subsidy You requested or required, or (iii) the quality of Your Anesthesia Services or other services You provided.

**REQUEST FOR PRODUCTION NO. 6:**

Documents and Communications with Hospitals, ASCs, or other facilities relating to any Subsidy You or the Hospital, ASC, or other facility negotiated, calculated, requested, or agreed to between January 1, 2010, and the present.

**REQUEST FOR PRODUCTION NO. 7:**

Documents concerning any evaluation or analysis (whether conducted by You or by a consultant or other third party) of the Subsidies You receive, have requested, or plan to request from any Hospital, ASC, or other facility, or of how those Subsidies compare to those received or requested by any other Anesthesia Service Provider.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show the time period(s) when You have been In Network and when You have been Out of Network in the State of Texas (or any MSA within the State of Texas) with any Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to show Your employment Agreements with Clinicians, including any changes in those Agreements over time.

**REQUEST FOR PRODUCTION NO. 25:**

Documents sufficient to show Your efforts to recruit Clinicians to Your practice, including Documents sufficient to show online job postings, email campaigns, or showcases at medical schools or nursing schools that You participated in in order to recruit Clinicians.

**REQUEST FOR PRODUCTION NO. 26:**

Documents sufficient to show the ownership interest in Your practice, including changes overtime.

A search by TAA for information responsive to Requests No. 2, 3, 6, 7, 15, 23, 25, and 26 would

take many hours to several days of staff time to search for responsive information going back to

January 1, 2012, if it still exists. See Ex. 4, declaration of Diane Dinh, Practice Manager of Texans

Anesthesia Associates, PLLC.

9.    **REQUEST FOR PRODUCTION NO. 4:**

Documents sufficient to show, on an annual basis, the number of Clinicians who worked at Your practice and the number of Clinicians who were physicians, CRNAs, and CAAs.

Regarding Request No. 4, there is no fixed number of physician anesthesiologists, CRNAs, CAAs,

nurse practitioners, and registered nurses who work at Texans Anesthesia on any given day, and

TAA estimates it would take at least an entire day of work to compile responsive information. Id.

10.    **REQUEST FOR PRODUCTION NO. 5:**

Documents Relating to any attempt You have made to establish a new relationship with a Hospital, ASC, or other facility or to maintain any existing relationship, including, but not limited to, the following:

a.    Any bids or responses to requests for proposals from Hospitals, ASCs, or other facilities that You prepared or submitted; and
b.    Documents or Communications reflecting any challenges or competition You face in seeking to establish or maintain a relationship with a Hospital, ASC, or other facility.

Regarding Request No. 5, TAA estimates it would require multiple staff members to look for responsive materials, such as Texans Anesthesia submitting bids and responding to requests for proposals, going back to January 1, 2012. Id.

11.    **REQUEST FOR PRODUCTION NO. 8:**

Documents or data sufficient to identify how You track, measure, or assess the quality of Your Anesthesia Services, including, but not limited to, the following:

      a.      Documents assessing or reflecting Your performance under those metrics;

      b.      Documents and Communications with Hospitals, ASCs, or other facilities concerning the quality of Your Services or Your quality reporting; and

      c.      Documents and data from third parties assessing the quality of Your Anesthesia Services or Your quality reporting practices, protections, and protocols, including Communications, presentations, audits, and reports from any third party reflecting any such evaluation or assessment.

Regarding Request No. 8, TAA does not maintain any information related to assessing quality. Id.

12.    **REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to identify all complaints You have received concerning the Anesthesia Services You have provided in the State of Texas.

Regarding Request No. 9, TAA estimates it would take several weeks or even months to follow up with each provider for the information. Id.

13.    **REQUEST FOR PRODUCTION NO. 18:**

All Agreements between You and any Commercial Healthcare Insurer between January 1, 2010, and the present.

**REQUEST FOR PRODUCTION NO. 22:**

Documents sufficient to identify each acquisition (of or by You), partnership, or merger You have made or considered making with another Anesthesia Service Provider, including: (i) the purpose of the acquisition, partnership, or merger; (ii) the amount You paid or accepted, or considered paying or accepting, in connection with the acquisition, partnership, or merger; and (iii) any analyses relating to potential acquisitions, partnerships, or mergers.

Requests No. 18 and 22 seek agreements between Texans Anesthesia and health insurance entities, and documents related to acquisitions of other providers. Such material is confidential and proprietary and no anesthesia services provider would disclose such information or share it with competitors. Id.

### C. AUTHORITIES

14.    USAP and the FTC request information that is outside the scope of discovery allowed under Federal Rule of Civil Procedure 26(b)(1). Fed. R. Civ. P. 26(b)(2)(C)(iii). The issues at stake are not of sufficient importance to justify discovery of the requested information. *See* Fed. R. Civ. P. 26(b)(1). The requests within the subpoenas to TAA essentially ask TAA to produce any and all documents TAA has and has had since 2010/2012. These documents contain confidential, highly confidential, and privileged information that is not relevant to the issues of this case. USAP is being sued for antitrust practices including but not limited to monopolizing the world of anesthesia. If TAA were to comply fully with the subpoenas, it would essentially be handing over TAA's entire business to USAP that would then allow USAP to continue any unethical and antitrust business practices.

15.    The requested discovery is not proportional to TAA's resources. *See* Fed. R. Civ. P. 26(b)(1); Fed. R. Civ. P. 26(b) advisory committee's note (2015). The time, money, and effort required for TAA to attempt to provide USAP with every document requested is set out in TAA's attached declaration. The burden and expense of searching for and gathering the requested information outweighs the likely benefit of the discovery. *See* Fed. R. Civ. P. 26(b)(1).

16.    TAA seeks to quash the subpoenas because they subject TAA, a nonparty, to an undue burden and the parties to this lawsuit did not take reasonable steps to avoid imposing that undue burden. A Court has broad discretion in determining whether a subpoena is unduly

burdensome. *See* FED. R. CIV. P. 45(d)(1), (d)(3)(A)(iv); *Linder v. Nat'; Sec. Agency,* 94 F.3d

693, 695 (D. C. Cir. 1996); *In re Subpoena Duces Tecum to AOL, L.L.C.,* 550 F. Supp 2d 606,

612-613 (E. D. Va. 2008). If a subpoena compels disclosure of information that is not properly

discoverable, then the burden it imposes, however slight, is unnecessarily undue. *See AF Holdings,*

*LLC v. Does 1-1058,* 752 F.3d 990, 995 (D.C. Cir. 2014). Courts have found that a subpoena for

documents from a nonparty is facially overbroad where the subpoena's document requests seek all

documents concerning the parties to the underlying action, regardless of whether those documents

relate to that action and regardless of date; the requests are not particularized; and the period

covered by the requests is excessive. *See Am. Fed'n of Musicians of the United States & Canada*

*v. Skodam Films, LLC,* 313 F.R.D. 39, 44 (N.D. Tex. 2015); *Wiwa v. Royal Dutch Petroleum Co.,*

392 F.3d 812, 818 (5th Cir. 2004); *In re Subpoena Duces Tecum to AOL, LLC,* 550 F. Supp 2d at

612. The subject subpoenas are unduly burdensome and would create an undue hardship on a

nonparty to compile such documents that are not relevant to the underlying action.

Specifically, USAP and the FTC request information that is not relevant to any party's

claim or defense. Fed. R. Civ. P. 26(b)(1).

> (a) Request No. 1 is not relevant because it requests "all documents and
> communications" for topics outside the scope of this litigation. Any documents
> and/or communications related to "any investigation…or any related action." is
> irrelevant as those documents and communications relate to matters outside of this
> case.
> (b) Request No. 2 and No. 3 are not relevant because whole contracts, agreements, and
> communications with other hospitals and/or facilities are not relevant to this case
> as TAA is a nonparty and information held within these contracts and agreements
> outlining relationships between TAA and other facilities has no bearing or effect
> on this case.
> (c) Request No. 4 is not relevant because the number of physicians, CRNAs, and CAAs
> have no relevance in an antitrust case. The number nor the individuals have any
> role in this case and are therefore irrelevant.
> (d) Request No. 5 is not relevant because TAA's attempts to establish or maintain
> relationships with hospitals and/or facilities has no relevance or helpful information

to aid either the FTC or USAP in defending or prosecuting their case. TAA's relationships outside of USAP are irrelevant to this case.

(e) Request No. 6 and No. 7 are not relevant because as a nonparty, information regarding TAA's subsidies have no bearing, weight, or relevance on this case.

(f) Request No. 9 is not relevant because complaints concerning anesthesia services TAA provides for the state of Texas have no connection and or relevance to issues with USAP that are at the basis of this lawsuit.

(g) Request No. 15 is not relevant because whether TAA is in network or out of network is irrelevant to this case. Additionally, past time periods of when TAA was in or out of network is not relevant because past behavior and positions of TAA have no relevance to this case.

(h) Request No. 18 is not relevant because "all agreements" between TAA and "any" commercial healthcare insurer from 2010 to present is so broad and vague it broadens past what can be argued or considered to be relevant to this case. An agreement with an insurer in 2011 has no weight, bearing, or relevance to this case.

(i) Request No. 22 and No. 26 are not relevant because the business and management structure of TAA has no relevance to this case. Documents evidencing mergers, ownership, and partnerships have no effect or relevance on TAAs operation, which is also irrelevant to this case.

(j) Request No. 23 is not relevant because employment agreements and the specifics of an employee's contract are irrelevant to an antitrust case that TAA is not a party to.

(k) Request No. 25 is not relevant because how TAA hires and recruits employees, has no relation to this case. Online postings, showcases, and campaigns are materials that TAA uses to gain staff, this has no place in an antitrust case that TAA is not a party to.

**D. OBJECTION TO PRODUCTION OF CONFIDENTIAL MATERIAL TO U.S. ANESTHESIA'S DESIGNATED IN-HOUSE COUNSEL**

17.    TAA objects, pursuant to paragraph 8 of the Protective Order in this case (Doc. 149-1), to disclosure of Confidential Material to Defendant's designated In-House Counsel, because it includes proprietary and competitive information about TAA's business and for all reasons outlined above.

**E. OBJECTION TO MEMORIAL HERMANN HEALTH SYSTEM'S PRODUCTION OF CONFIDENTIAL MATERIAL IN RESPONSE TO SUBPOENAS**

18.    Although TAA does not know what information may be produced, TAA objects, pursuant to paragraph 14 of the Protective Order in the above referenced case (Doc. 149-1), to

Memorial Hermann's disclosure of TAA's confidential information in response to subpoenas Memorial Hermann received in the referenced litigation. Ex. 5.

WHEREFORE, Nonparty, Texans Anesthesia Associates, PLLC respectfully requests that the Court grant its Motion to Quash Subpoenas Issued by US Anesthesia Partners and the Federal Trade Commission, enter an order quashing said Subpoenas, grant nonparty, Texans Anesthesia Associates, PLLC, protection from responding to the Subpoenas, and grant it such other relief to which it may be justly entitled.

Respectfully submitted,

MAYER LLP

*Robert Smith*

Robert G. Smith, Jr.
TBN: 00794661
2900 North Loop West, Ste. 500
Houston, Texas 77092
713.868.5560
E-MAIL: rsmith@mayerllp.com
E-SERVICE: bgamboa@mayerllp.com
**ATTORNEY FOR NONPARTY,**
**TEXANS ANESTHESIA ASSOCIATES,**
**PLLC**

## CERTIFICATE OF CONFERENCE

On November 27th, 2024, via email, I emailed a copy of this motion and did not receive any responses, therefore, it is assumed that this motion is opposed.

*Robert Smith*

Robert G. Smith, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on 27th day of November 2024 a copy of the foregoing instrument was served on all counsel of record, pursuant to the Federal Rules of Civil Procedure.

Kara Monahan
Attorney-in-Charge
Brad Albert
Michael Arin
Dylan Herts
Leah Hubinger
Garth Huston
Tim Kamal-Grayson
Patrick Kennedy
Neal Perlman
Gary Schorr
Eric Sprague
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, DC 20580
Tel.: (202) 326-2018
Email: kmonahan@ftc.gov
*Counsel for Federal Trade Commission*

Geoffrey M. Klineberg
Kenneth Fetterman
Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C.
1615 M Street, NW, Suite 400
Washington, D.C. 20036
Tel: (202) 326-7928
Email: gklineberg@kellogghansen.com
Email: kfetterman@kellogghansen.com
*Counsel for U.S. Anesthesia Partners, Inc.*

Ken Field
Hogan Lovells US LLP
555 Thirteenth Street, NW
Washington, D.C. 20004
Tel: (202) 637-5869
Email: ken.field@hoganlovells.com
*Counsel for Welsh, Carson, Anderson & Stowe XI, L.P.; WCAS Associates XI, LLC; Welsh, Carson, Anderson & Stowe XII, L.P.; WCAS Associates XII, LLC; WCAS Management Corporation; WCAS Management, L.P.; WCAS Management, LLC*

Carol Yolande Kennedy
Cooksey Marcin Huston PLLC
25511 Budde Rd.
Suite 2202
Spring, TX 77380
Email: carol@cmh.legal
*Counsel for Defendant, Horizon Medical Center*

Benjamin Gruenstein
Gregg Jeffrey Costa
Noah Phillips
Cravath, Swaine & Moore LLP
375 Ninth Avenue
Two Manhattan West
New York, NY 10001
Email: bgruenstein@cravath.com
Email: gcosta@gibsondunn.com
Email: nphillips@cravath.com
*Counsel for Amicus, American Investment Council*

Gary Y. Gould
Norton Rose Fulbright US LLP
1301 McKinney St.
Suite 5100
Houston, TX 77010-3095
Email: gary.gould@nortonrosefulbright.com
*Counsel for Interested Parties, Envision Healthcare Corporation and Envision Physician Services LLC*

Robert Smith

_____

Robert G. Smith, Jr.

12

# EXHIBIT 1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Texas

CAME TO HAND: 09/10/2024

DELIVERED: ᶠᶠ ，Ｏᶫ，Ꝺᵁ

| Federal Trade Commission | ) |
|---|---|
| *Plaintiff* | ) |
| v. | ) |
| U.S. Anesthesia Partners, Inc. | ) |
| | ) |
| *Defendant* | ) |

BY:

Civil Action No. 4:23-CV-03560-KH

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Texans Anesthesia Associates, PLLC c/o
Diane Dinh, 9525 Katy Freeway, Suite 130, Houston, Texas 77024

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Appendix A

| Place: Veritext Houston 3811 Main Street, Suite 4675 Houston, Texas 77002 | or a mutually agreed-upon location | Date and Time: 10/09/2024 |
|---|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 09/09/2024

*CLERK OF COURT*

OR

_____          /s/ Kenneth M. Fetterman
*Signature of Clerk or Deputy Clerk*          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
U.S. Anesthesia Partners, Inc. _____, who issues or requests this subpoena, are:

Kenneth M. Fetterman, 1615 M Street, N.W., Suite 400, Washington, D.C. 20036, kfetterman@kellogghansen.com, (202) 326-7988

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:23-CV-03560-KH

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## APPENDIX A

## DEFINITIONS

1.      "Action" means the case captioned *Federal Trade Commission v. U.S. Anesthesia Partners, Inc.*, No. 23-cv-03560 (S.D. Tex.), including any related discovery, pretrial, trial, post-trial, or appellate proceedings.

2.      "Acquired Practices" means and includes each of Greater Houston Anesthesiology, P.A.; Lake Travis Anesthesiology; Pinnacle Anesthesia Consultants; North Houston Anesthesiology; Anesthesia Consultants of Dallas; Excel Anesthesia, P.A.; BMW Physicians; Medical City Physicians; East Texas Anesthesiology Associates, P.A.; Sugarland Anesthesia PLLC; Metrowest Anesthesia Care PLLC; Capital Anesthesiology Association; Amarillo Anesthesia Consultants, P.A.; Star Anesthesia P.A.; Guardian Anesthesia Services, Inc.; and Guardian Anesthesia Services, PLLC.

3.      "Agreement" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more Persons, together with all addendum or amendments thereto.

4.      "Ambulatory Surgical Center" or "ASC" means a facility licensed by the State of Texas as an ASC to provide surgical and endoscopic procedures, including facilities that are operated by or affiliated with Hospitals, in which procedures that do not require admission to a Hospital as an inpatient or an overnight stay are performed on an outpatient basis.

5.      "Anesthesia Services" means all services offered by physician anesthesiologists, certified registered nurse anesthetists ("CRNA"), or certified anesthesiologist assistants ("CAAs") to patients undergoing surgical or nonsurgical procedures in an outpatient or inpatient setting requiring the administration of an anesthetic or analgesic. These types of services include preoperative visits, the administration of medication, fluids, and/or blood during surgery,

1

monitoring services during surgery, and postoperative visits. The type of anesthesia offered during surgery includes general anesthesia, regional anesthesia, and local anesthesia. The term "Anesthesia Services" also includes any pain management services offered to a patient by a physician anesthesiologist or CRNA, including postoperative pain management services, or services designed to manage pain resulting from acute or chronic injuries or conditions.

6.      "Anesthesia Service Provider" means an entity engaged in providing, by or under the supervision of physicians, Anesthesia Services in either an inpatient or outpatient setting.

7.      "Balance Billing" means the practice of a healthcare service provider (including any Anesthesia Services Provider) billing a patient for the difference between the provider's charge for a service and the amount the patient's insurance has paid. This includes when a patient receives care from an Out-of-Network provider, and the Commercial Healthcare Insurer pays only a portion of the billed amount based on their Out-of-Network Reimbursement Rates.

8.      "Clinicians" means physician anesthesiologists, CRNAs, CAAs, nurse practitioners, or registered nurses.

9.      "Coinsurance" means the set percentage of covered charges (i.e., the charges recognized by the Health Plan) that a Health Plan enrollee must pay out-of-pocket for each episode of healthcare covered by the enrollee's Health Plan.

10.     "Commercial Healthcare Insurer" means a publicly or privately held entity that provides businesses and individuals with healthcare insurance coverage and/or administrative services necessary to utilize the healthcare insurance coverage it offers. Such administrative services may include benefits enrollment, premiums collection, claims processing and adjudication, healthcare provider network establishment, negotiation of Reimbursement Rates with healthcare providers, and compliance measures.

11.     "Communication" means the transmittal of information or request for information, including, but not limited to, any written contact between two or more people by such means as letters, memoranda, facsimile transmissions, text messages, instant messages, and emails, as well as any oral discussion by such means as face-to-face meetings and telephone or video conversations.

12.     "Complaint" means the Complaint filed in this Action by Plaintiff Federal Trade Commission on September 21, 2023.

13.     "Concern" or "Concerning" means relating to, in relation to, comprising, constituting, containing, regarding, referring to, describing, discussing, embodying, evidencing, exhibiting, identifying, memorializing, mentioning, recording, showing, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to a given subject matter.

14.     "Copay" means the set fee that a Health Plan enrollee must pay out-of-pocket for each episode of healthcare covered by the enrollee's Health Plan."

15.     "Date" means the exact day, month, and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations, or matters.

16.     "Deductible" means the set amount that a Health Plan enrollee must pay out-of-pocket each year for healthcare services before the enrollee's Health Plan benefits go into effect.

17.     "Document" or "Documents" means all documents or Electronically Stored Information or data as defined in Federal Rule of Civil Procedure 34(a), including all copies where the copy is not identical to the original. For the avoidance of doubt, "Document" or "Documents" shall be construed to include Communications.

18.    "Electronically Stored Information" or "ESI" means all Documents or data that are stored in any electronic medium from which information can be obtained.

19.    "Episode of Care" means the healthcare services provided to a patient at a particular facility to treat a health condition, for the period from the patient's first encounter with the health care provider through discharge from the facility.

20.    "Federal No Surprises Act" refers to the legislation enacted by Congress in 2020, at Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-2890 (2020), and codified at 42 U.S.C. §§ 300gg-11, 300gg-131, 300gg-132, with implementing regulations at 45 C.F.R. § 149.

21.    "FTC Investigation" means the Federal Trade Commission's investigation undertaken pursuant to the July 1, 2021 Resolution of the Commissioners, File No. P210100, pursuant to which it issued Civil Investigative Demand ("CID") No. 2010031 to USAP, and includes all activities taken in connection with that investigation, including obtaining information and testimony from non-parties to the investigation.[1]

22.    "Fully Insured" means any arrangement by which a Health Plan is directly responsible for paying the provider claims generated by the healthcare consumption of its members.

23.    "Health Plan" means any health maintenance organization, managed healthcare organization, preferred provider arrangement or organization, managed healthcare plan of any kind, Fully Insured health benefit plan, Self-Insured health benefit plan, other employer or union health benefit plan, Medicare, Medicaid, TRICARE, or private or governmental healthcare plan, or health insurance of any kind.

---

[1] The FTC has at times referred to the FTC Investigation as File Nos. 201003 and 20100031. For the avoidance of doubt, the definition of "FTC Investigation" includes those file numbers, whether or not they describe matters that differ from that authorized through the July 1, 2021 Resolution of the Commissioners.

4

24.    "Hospital" means an institution or group of institutions engaged in providing, by or under the supervision of physicians, inpatient and outpatient diagnostic, therapeutic, and rehabilitation services.

25.    "Inpatient Services" (as characterized in the FTC's Complaint and for purposes of this litigation only) means the provision of medical services that require at least one overnight stay in a Hospital or other facility, including observation stays, or at least 24-hour nursing care.

26.    "In-Network" means that a healthcare provider has an Agreement with a Commercial Healthcare Insurer under which the healthcare provider agrees to provide services to the Commercial Healthcare Insurer's members at pre-negotiated rates and are part of the Commercial Healthcare Insurer's healthcare provider network.

27.    "Network Status" means an a healthcare provider's status with Commercial Healthcare Insurers, and whether the healthcare provider is In Network or Out of Network with a particular Commercial Healthcare Insurer.

28.    "Outpatient Services" (as characterized in the FTC's Complaint and for purposes of this litigation only) means the provision of medical services that do not require an overnight stay in a Hospital or other facility.

29.    "Out-of-Network" means that a healthcare provider does not have an Agreement with a Commercial Healthcare Insurer under which the healthcare provider agrees to provide services to the Commercial Healthcare Insurer's members at pre-negotiated rates and are not part of the Commercial Healthcare Insurer's healthcare provider network.

30.    "Payor" means any Person that pays or reimburses in whole or in part for the administration, provision, or sale of healthcare services (including Anesthesia Services), including, but not limited to, federal and state government programs such as TRICARE,

Medicare, and Medicaid, Commercial Healthcare Insurers, employee health and welfare plans, and individual patients that are Self-Insured.

31.     "Person" means any person and includes natural persons, corporations, firms, partnerships, proprietorships, associations, joint ventures, States, Territories, government agencies or entities, and other enterprises or legal entities.

32.     "Reimbursement Rates" mean the amount of money a Payor provides to an healthcare provider to compensate the healthcare provider for providing services to patients.

33.     "Relating to," "relate to," "related to," or "in relation to" mean concerning, constituting, regarding, referring to, describing, discussing, embodying, evidencing, memorializing, mentioning, recording, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to.

34.     "Self-Insured" means any arrangement by which an employer or other Health Plan customer is directly responsible for paying provider claims generated by the healthcare consumption of its employees or other members.  The term includes and refers to, without limitation, Administrative Services Only ("ASO") arrangements.

35.     "Subsidy" means an amount paid by a Hospital to an Anesthesia Service Provider to cover shortfalls or anticipated shortfalls between the provider's revenue and the costs of providing the Anesthesia Services required by the Hospital, whether paid annually, semi-annually, quarterly, or monthly, including any financial arrangement under which a hospital agrees to ensure that the Anesthesia Service Provider receives a minimum level of net revenue.

36.     "Texas Surprise Billing Law" means the legislation entitled Elimination of Surprise Billing for Certain Health Benefit Plans, S.B. No. 1264 (2019), Act of June 14, 2019, 86th Leg., R.S., ch. 1342 § 5.01, 2019 Tex. Sess. Law Serv. 3977.

37.    "Tier" and "Tiering" means the classification of some or all of a Health Plan's in-network providers into two or more Tiers based on each provider's costs, quality, other attributes, or some combination of the foregoing, such that each Health Plan member faces different out-of-pocket costs across the various Tiers for the same Treatment, service, or procedure.

38.    "Tuck-in Clause" means a contractual provision negotiated between a healthcare service provider or Hospital, on the one hand, and a Commercial Healthcare Insurer, on the other, pursuant to which the parties agree that, should the healthcare service provider or Hospital acquire or merge with another entity, the acquired or merged group will, at a contractually agreed-upon time, begin to provide services pursuant to the terms negotiated and agreed to by the healthcare service provider or Hospital and the Commercial Healthcare Insurer.

39.    "USAP" means U.S. Anesthesia Partners, Inc., and any predecessors thereof, including, but not limited to, the Acquired Practices.

40.    "Welsh Carson" means Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC, any and all of them, and to any and all of their respective subsidiaries, divisions, affiliates, predecessors and successors, their past and present directors, officers, employees, agents, representatives, consultants, attorneys and assignees, and to all Persons either acting or purporting to act on their behalf.

41.    "You" or "Your" refers to Texans Anesthesia Associates, PLLC, including, but not limited to, any predecessors, components, subsidiaries, joint ventures, agents,

representatives, consultants, contractors, employees, attorneys, experts, economists, and any other Person(s) acting or purporting to act with or on its behalf.

The definitions set forth above shall apply to all requests.

## GENERAL INSTRUCTIONS

1.    In answering each request, You shall produce all responsive Documents, however held or obtained, that are in Your possession, custody, or control, including, but not limited to, legal (de jure), actual (de facto), constructive, and practical possession, custody, or control of Your officers, directors, employees, contractors, counsel, auditors, insurers, investigators, consultants, agents, or other representatives acting for or on Your behalf, or that are maintained in Your records, including, but not limited to, Documents obtained through discovery or pre-suit investigation in this or any other proceeding. A Document is deemed to be in Your possession, custody, or control if You have possession of the Document, have the right to secure such Document or Communication from another Person having possession thereof, or the Document or Communication is reasonably available to You (including those Documents and Communications in the custody or control of Your present employees, attorneys, agents, or other Persons acting on Your behalf).

2.    Each request that seeks Documents concerning Communications to, from, or within a governmental, business, or corporate entity means all Communications to, from, between, or among representatives, officers, officials, directors, employees, agents, servants, and anyone acting on behalf of such entity.

3.    The singular form shall include the plural and vice versa wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

8

4.    The words "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

5.    The words "any," "each," and "every" shall be construed to mean individually and collectively wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

6.    The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of a request all information that might otherwise be construed to be outside of its scope.

7.    Each request seeks production of all Documents and things described, along with any addenda, attachments, appendices, drafts, and non-identical copies, as found or located in Your files, together with a copy of the descriptive file folder or database category in its entirety.

8.    All Documents should be produced in the order in which they appear in Your files, organized by source, and should contain a clear indication of where each Document ends and the next begins. Documents that are found in boxes, file folders, bindings, or other containers are to be left intact as kept. Documents maintained in a file folder or binding should be preceded by the file folder or binding label, if one exists, and should contain a clear indication of where the file folder or binding begins and ends. All attachments to a Document should be produced with the Document. A unique Bates number should be affixed to each page, except as otherwise provided for by any protocols ordered by the Court in this Action.

9.      If any request cannot be responded to completely, respond to it to the extent possible, specify the portion(s) that cannot be responded to, and explain why any such portion(s) cannot be responded to.

10.      If Documents are withheld under any claim of privilege, including, but not limited to, attorney-client privilege, work product doctrine, deliberative process privilege, investigative files privilege, and/or law enforcement privilege, provide a privilege log that complies with Federal Rule of Civil Procedure 26(b)(5) and any protocols ordered by the Court in this Action. Such log shall, at a minimum, identify each such Document, state the specific basis for the claim of privilege for each Document withheld, and provide the following information: (1) the date appearing on the Document; (2) a description of the subject matter and general nature of the Document (e.g., whether it is a letter, memorandum, email, etc.); (3) the author of the Document; and (4) the identity of each Person to whom the Document was addressed and the identity of each Person to whom a copy was sent.

11.      If You object to any request made herein as unduly broad, identify the categories of Documents within the scope of the request that You believe are properly discoverable, produce all such Documents, and state, with particularity, Your reason for asserting that the remainder of the request seeks Documents that are beyond the scope of permissible discovery.

12.      Each request shall be construed independently and, therefore, no request shall be construed to limit any other request.

13.      All Documents produced should comply with the ESI Protocol attached hereto as Exhibit 1 or otherwise adhere to any Order entered in this Action, with the exception that any responsive ESI that has already been produced to any government agency or entity by a third

10

party may be produced in the same format in which it was produced to that government agency or entity and with the same confidentiality designation.

14.     These requests are continuing in nature. If further information, evidence, or documentation comes into Your possession, custody, or control or is brought to the attention of You or Your attorneys or agents at any time subsequent to the service of any responses to these requests or the production of any Documents, prompt and complete supplementation of the responses to these requests and the corresponding production is required pursuant to the Federal Rules of Civil Procedure.

15.     Unless otherwise stated, the relevant time period for all requests is from January 1, 2012, to the present.

16.     Please contact USAP counsel Kenneth Fetterman of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. at kfetterman@kellogghansen.com or (202) 326-7988 to discuss how You intend to produce the Documents.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All Documents and Communications – including, but not limited to, Communications between You and Your representatives, on the one hand, and any third party, including governmental entities, on the other – relating to the Complaint, the Action, the FTC Investigation, or any purported anticompetitive conduct by USAP or Welsh Carson. This request includes, but is not limited to, all Documents produced in response to any subpoena, civil investigative demand, information request, informal request, or document request or any other request for information (voluntary or compelled) issued or made in any investigation, the FTC Investigation, the Action, or any related action.

11

**REQUEST FOR PRODUCTION NO. 2:**

All contracts or Agreements with Hospitals, ASCs, or other facilities in the State of Texas

where You have provided Anesthesia Services, including, but not limited to, the following:

a. Documents sufficient to show any Subsidy You received from a Hospital, ASC, or other facility for the provision of Anesthesia Services;

b. Documents sufficient to show Your coverage obligations between You and any Hospital, ASC, or other facility, including any obligations relating to the availability of physicians or CRNAs; whether in-house or on-call coverage is needed; and whether specialized coverage is required for specific departments within Your facility/facilities (e.g., trauma or cardiac care);

c. Documents sufficient to show any nonmedical or administrative services (including, but not limited to, scheduling and billing) provided by You to any Hospital, ASC, or other facility, including any changes over time;

d. Documents sufficient to identify whether You acted as the exclusive Anesthesia Provider at any Hospital, ASC, or other facility; and

e. Documents sufficient to show the identity of each Hospital, ASC, or other facility at which You provided Anesthesia Services, including its address, zip code, and facility identification number (e.g., Medicare Provider Number), and whether it offered Inpatient Services, Outpatient Services, or both.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and Communications relating to the termination of any contractual

relationship between You and a Hospital, ASC, or other facility located in the State of Texas.

This request includes, but is not limited to, Documents or Communications discussing,

analyzing, or assessing the reason(s) why any such contractual relationship ended (and if You

terminated the relationship, the reasons why You did so), as well as feedback or complaints You

have received relating to (i) Your Network Status, (iii) any Subsidy You requested or required,

or (iii) the quality of Your Anesthesia Services or other services You provided.

**REQUEST FOR PRODUCTION NO. 4:**

Documents sufficient to show, on an annual basis, the number of Clinicians who worked

at Your practice and the number of Clinicians who were physicians, CRNAs, and CAAs.

12

**REQUEST FOR PRODUCTION NO. 5:**

Documents Relating to any attempt You have made to establish a new relationship with a

Hospital, ASC, or other facility or to maintain any existing relationship, including, but not

limited to, the following:

     a.     Any bids or responses to requests for proposals from Hospitals, ASCs, or other facilities that You prepared or submitted; and

     b.     Documents or Communications reflecting any challenges or competition You face in seeking to establish or maintain a relationship with a Hospital, ASC, or other facility.

**REQUEST FOR PRODUCTION NO. 6:**

Documents and Communications with Hospitals, ASCs, or other facilities relating to any

Subsidy You or the Hospital, ASC, or other facility negotiated, calculated, requested, or agreed

to between January 1, 2010, and the present.

**REQUEST FOR PRODUCTION NO. 7:**

Documents concerning any evaluation or analysis (whether conducted by You or by a

consultant or other third party) of the Subsidies You receive, have requested, or plan to request

from any Hospital, ASC, or other facility, or of how those Subsidies compare to those received

or requested by any other Anesthesia Service Provider.

**REQUEST FOR PRODUCTION NO. 8:**

Documents or data sufficient to identify how You track, measure, or assess the quality of

Your Anesthesia Services, including, but not limited to, the following:

     a.     Documents assessing or reflecting Your performance under those metrics;

     b.     Documents and Communications with Hospitals, ASCs, or other facilities concerning the quality of Your Services or Your quality reporting; and

     c.     Documents and data from third parties assessing the quality of Your Anesthesia Services or Your quality reporting practices, protections, and protocols, including Communications, presentations, audits, and reports from any third party reflecting any such evaluation or assessment.

13

**REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to identify all complaints You have received concerning the Anesthesia Services You have provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 10:**

All Merit-based Incentive System ("MIPS") performance reports You have received for Anesthesia Services You provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 11:**

All data You provided to the Centers for Medicare & Medicaid as part of the Physician Quality Reporting System, MIPs, or MIPS Value Pathways relating to Anesthesia Services You provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 12:**

All data related to quality measures and quality reporting You provided to the Anesthesia Quality Institute relating to Anesthesia Services You provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to show the results of any patient surveys, including, but not limited to, those generated by SurveyVitals (Qualtrics), that You have performed or solicited relating to Your Anesthesia Services or other services You provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 14:**

Documents concerning actual or potential competition You face in the provision of Anesthesia Services in the State of Texas, including:

    a.    Documents sufficient to show who You view as actual or potential competitors;

    b.    Documents concerning Your share of any market for Anesthesia Services in the State of Texas, including Documents identifying or discussing third-party estimates or analyses of Your market share;

14

c.    Documents sufficient to identify all methods and metrics You use to assess whether and to what extent other Anesthesia Service Providers are actual and/or potential competitors;

d.    Documents concerning actual or perceived barriers to entry or expansion for Anesthesia Service practices; and

e.    Documents and Communications reflecting any analysis, evaluation, or assessment of how often and why any Hospital, ASC, or other facility selected You or a competing Anesthesia Service Provider.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show the time period(s) when You have been In Network and when You have been Out of Network in the State of Texas (or any MSA within the State of Texas) with any Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 16:**

Documents and Communications discussing or evaluating any potential benefits or downsides of being In Network or Out of Network State of Texas (or any MSA within the State of Texas) with any Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 17:**

Documents or data sufficient to show whether and, if so, under what circumstances, You engaged in Balance Billing.

**REQUEST FOR PRODUCTION NO. 18:**

All Agreements between You and any Commercial Healthcare Insurer between January 1, 2010, and the present.

**REQUEST FOR PRODUCTION NO. 19:**

Documents and Communications relating to Tuck-in Clauses, including, but not limited to, any Documents and Communications concerning negotiations with Commercial Healthcare Insurers about Tuck-in Clauses in a contract or Agreement.

15

**REQUEST FOR PRODUCTION NO. 20:**

All Documents and Communications analyzing, evaluating, measuring, or assessing the actual or potential impact of the Federal No Surprises Act or the Texas Surprise Billing Law on You, other Anesthesia Service Providers, Hospitals, ASCs, other facilities and/or Commercial Healthcare Insurers, including, but not limited to, any impact on Your negotiations or negotiating strategy with Commercial Healthcare Insurers and/or Hospitals, ASCs, or other facilities.

**REQUEST FOR PRODUCTION NO. 21:**

Documents sufficient (i) to identify each arbitration or independent dispute resolution proceeding involving You and a Commercial Healthcare Insurer in the State of Texas that raises claims under the Federal No Surprises Act or the Texas Surprise Billing Law; (ii) to show which side prevailed in the proceeding; and (iii) to show the time period (in days) between the issuance of any award and Your receipt of payment from the Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 22:**

Documents sufficient to identify each acquisition (of or by You), partnership, or merger You have made or considered making with another Anesthesia Service Provider, including: (i) the purpose of the acquisition, partnership, or merger; (ii) the amount You paid or accepted, or considered paying or accepting, in connection with the acquisition, partnership, or merger; and (iii) any analyses relating to potential acquisitions, partnerships, or mergers.

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to show Your employment Agreements with Clinicians, including any changes in those Agreements over time.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents and Communications relating to any shortage of Clinicians or Anesthesia Service Providers in the State of Texas.

**REQUEST FOR PRODUCTION NO. 25:**

Documents sufficient to show Your efforts to recruit Clinicians to Your practice, including Documents sufficient to show online job postings, email campaigns, or showcases at medical schools or nursing schools that You participated in in order to recruit Clinicians.

**REQUEST FOR PRODUCTION NO. 26:**

Documents sufficient to show the ownership interest in Your practice, including changes over time.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents and Communications discussing or referring to USAP, including, but not limited to, Documents and Communications concerning the pricing or quality of USAP's Anesthesia Services.

# EXHIBIT 2

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215

(202) 326-7900
FACSIMILE:
(202) 326-7999

November 4, 2024

*Via Electronic Mail*

Texans Anesthesia Associates, PLLC
c/o Diane Dinh
1317 Mark Street
Stafford, Texas 77477

      Re:    *FTC v. U.S. Anesthesia Partners, Inc.*, No. 4:23-cv-03560-KH (S.D. Tex.)

Dear Sir/Madam:

      I write on behalf of my client U.S. Anesthesia Partners, Inc., which is a defendant in the above-captioned litigation. Enclosed is a subpoena that USAP has served concurrent with the transmission of this letter. USAP appreciates that responding to this subpoena may impose a burden, but it has determined that the requested information is important to its defenses. We hope to work with you to simplify the process associated with your response to the subpoena as much as possible, and we stand ready to discuss these matters with you at your convenience.

                    Sincerely,

                    /s/ *Kenneth M. Fetterman*

                    Kenneth M. Fetterman

Enclosures

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of Texas

CAME TO HAND: 11 / 5 / 2024

DELIVERED: 11 / 13 / 2024

BY: Paul Brannan PSC-21957

| Federal Trade Commission | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. 4:23-CV-03560-KH |
| U.S. Anesthesia Partners, Inc. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:           Texans Anesthesia Associates, PLLC
              c/o Diane Dinh, 1317 Mark Street, Stafford, Texas 77477

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Appendix A

| Place: Veritext Houston<br>3811 Main Street, Suite 4675<br>Houston, Texas 77002 | or a mutually<br>agreed-upon<br>location | Date and Time:<br><br>12/04/2024 |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     11/04/2024

                    *CLERK OF COURT*

                                                          OR

_____                    /s/ Kenneth M. Fetterman
   *Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
U.S. Anesthesia Partners, Inc. _____ , who issues or requests this subpoena, are:

Kenneth M. Fetterman, 1615 M Street, N.W., Suite 400, Washington, D.C. 20036, kfetterman@kellogghansen.com, (202) 326-7988

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:23-CV-03560-KH

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

    ❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

                                      _____
                                          *Server's signature*

                                      _____
                                        *Printed name and title*

                                        _____
                                        *Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  (A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
  (A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  (B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
  (A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  (B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
  (A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  (B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    (i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  (C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  (A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  (B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  (C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  (D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
  (A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  (B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## APPENDIX A

## DEFINITIONS

1.      "Action" means the case captioned *Federal Trade Commission v. U.S. Anesthesia Partners, Inc.*, No. 23-cv-03560 (S.D. Tex.), including any related discovery, pretrial, trial, post-trial, or appellate proceedings.

2.      "Acquired Practices" means and includes each of Greater Houston Anesthesiology, P.A.; Lake Travis Anesthesiology; Pinnacle Anesthesia Consultants; North Houston Anesthesiology; Anesthesia Consultants of Dallas; Excel Anesthesia, P.A.; BMW Physicians; Medical City Physicians; East Texas Anesthesiology Associates, P.A.; Sugarland Anesthesia PLLC; Metrowest Anesthesia Care PLLC; Capital Anesthesiology Association; Amarillo Anesthesia Consultants, P.A.; Star Anesthesia P.A.; Guardian Anesthesia Services, Inc.; and Guardian Anesthesia Services, PLLC.

3.      "Agreement" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more Persons, together with all addendum or amendments thereto.

4.      "Ambulatory Surgical Center" or "ASC" means a facility licensed by the State of Texas as an ASC to provide surgical and endoscopic procedures, including facilities that are operated by or affiliated with Hospitals, in which procedures that do not require admission to a Hospital as an inpatient or an overnight stay are performed on an outpatient basis.

5.      "Anesthesia Services" means all services offered by physician anesthesiologists, certified registered nurse anesthetists ("CRNA"), or certified anesthesiologist assistants ("CAAs") to patients undergoing surgical or nonsurgical procedures in an outpatient or inpatient setting requiring the administration of an anesthetic or analgesic.  These types of services include preoperative visits, the administration of medication, fluids, and/or blood during surgery,

1

monitoring services during surgery, and postoperative visits. The type of anesthesia offered during surgery includes general anesthesia, regional anesthesia, and local anesthesia. The term "Anesthesia Services" also includes any pain management services offered to a patient by a physician anesthesiologist or CRNA, including postoperative pain management services, or services designed to manage pain resulting from acute or chronic injuries or conditions.

6.      "Anesthesia Service Provider" means an entity engaged in providing, by or under the supervision of physicians, Anesthesia Services in either an inpatient or outpatient setting.

7.      "Balance Billing" means the practice of a healthcare service provider (including any Anesthesia Services Provider) billing a patient for the difference between the provider's charge for a service and the amount the patient's insurance has paid. This includes when a patient receives care from an Out-of-Network provider, and the Commercial Healthcare Insurer pays only a portion of the billed amount based on their Out-of-Network Reimbursement Rates.

8.      "Clinicians" means physician anesthesiologists, CRNAs, CAAs, nurse practitioners, or registered nurses.

9.      "Coinsurance" means the set percentage of covered charges (i.e., the charges recognized by the Health Plan) that a Health Plan enrollee must pay out-of-pocket for each episode of healthcare covered by the enrollee's Health Plan.

10.     "Commercial Healthcare Insurer" means a publicly or privately held entity that provides businesses and individuals with healthcare insurance coverage and/or administrative services necessary to utilize the healthcare insurance coverage it offers. Such administrative services may include benefits enrollment, premiums collection, claims processing and adjudication, healthcare provider network establishment, negotiation of Reimbursement Rates with healthcare providers, and compliance measures.

2

11.    "Communication" means the transmittal of information or request for information, including, but not limited to, any written contact between two or more people by such means as letters, memoranda, facsimile transmissions, text messages, instant messages, and emails, as well as any oral discussion by such means as face-to-face meetings and telephone or video conversations.

12.    "Complaint" means the Complaint filed in this Action by Plaintiff Federal Trade Commission on September 21, 2023.

13.    "Concern" or "Concerning" means relating to, in relation to, comprising, constituting, containing, regarding, referring to, describing, discussing, embodying, evidencing, exhibiting, identifying, memorializing, mentioning, recording, showing, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to a given subject matter.

14.    "Copay" means the set fee that a Health Plan enrollee must pay out-of-pocket for each episode of healthcare covered by the enrollee's Health Plan."

15.    "Date" means the exact day, month, and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations, or matters.

16.    "Deductible" means the set amount that a Health Plan enrollee must pay out-of-pocket each year for healthcare services before the enrollee's Health Plan benefits go into effect.

17.    "Document" or "Documents" means all documents or Electronically Stored Information or data as defined in Federal Rule of Civil Procedure 34(a), including all copies where the copy is not identical to the original. For the avoidance of doubt, "Document" or "Documents" shall be construed to include Communications.

18.     "Electronically Stored Information" or "ESI" means all Documents or data that are stored in any electronic medium from which information can be obtained.

19.     "Episode of Care" means the healthcare services provided to a patient at a particular facility to treat a health condition, for the period from the patient's first encounter with the health care provider through discharge from the facility.

20.     "Federal No Surprises Act" refers to the legislation enacted by Congress in 2020, at Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-2890 (2020), and codified at 42 U.S.C. §§ 300gg-11, 300gg-131, 300gg-132, with implementing regulations at 45 C.F.R. § 149.

21.     "FTC Investigation" means the Federal Trade Commission's investigation undertaken pursuant to the July 1, 2021 Resolution of the Commissioners, File No. P210100, pursuant to which it issued Civil Investigative Demand ("CID") No. 2010031 to USAP, and includes all activities taken in connection with that investigation, including obtaining information and testimony from non-parties to the investigation.[1]

22.     "Fully Insured" means any arrangement by which a Health Plan is directly responsible for paying the provider claims generated by the healthcare consumption of its members.

23.     "Health Plan" means any health maintenance organization, managed healthcare organization, preferred provider arrangement or organization, managed healthcare plan of any kind, Fully Insured health benefit plan, Self-Insured health benefit plan, other employer or union health benefit plan, Medicare, Medicaid, TRICARE, or private or governmental healthcare plan, or health insurance of any kind.

---

[1] The FTC has at times referred to the FTC Investigation as File Nos. 201003 and 20100031. For the avoidance of doubt, the definition of "FTC Investigation" includes those file numbers, whether or not they describe matters that differ from that authorized through the July 1, 2021 Resolution of the Commissioners.

4

24.     "Hospital" means an institution or group of institutions engaged in providing, by or under the supervision of physicians, inpatient and outpatient diagnostic, therapeutic, and rehabilitation services.

25.     "Inpatient Services" (as characterized in the FTC's Complaint and for purposes of this litigation only) means the provision of medical services that require at least one overnight stay in a Hospital or other facility, including observation stays, or at least 24-hour nursing care.

26.     "In-Network" means that a healthcare provider has an Agreement with a Commercial Healthcare Insurer under which the healthcare provider agrees to provide services to the Commercial Healthcare Insurer's members at pre-negotiated rates and are part of the Commercial Healthcare Insurer's healthcare provider network.

27.     "Network Status" means an a healthcare provider's status with Commercial Healthcare Insurers, and whether the healthcare provider is In Network or Out of Network with a particular Commercial Healthcare Insurer.

28.     "Outpatient Services" (as characterized in the FTC's Complaint and for purposes of this litigation only) means the provision of medical services that do not require an overnight stay in a Hospital or other facility.

29.     "Out-of-Network" means that a healthcare provider does not have an Agreement with a Commercial Healthcare Insurer under which the healthcare provider agrees to provide services to the Commercial Healthcare Insurer's members at pre-negotiated rates and are not part of the Commercial Healthcare Insurer's healthcare provider network.

30.     "Payor" means any Person that pays or reimburses in whole or in part for the administration, provision, or sale of healthcare services (including Anesthesia Services), including, but not limited to, federal and state government programs such as TRICARE,

Medicare, and Medicaid, Commercial Healthcare Insurers, employee health and welfare plans, and individual patients that are Self-Insured.

31.    "Person" means any person and includes natural persons, corporations, firms, partnerships, proprietorships, associations, joint ventures, States, Territories, government agencies or entities, and other enterprises or legal entities.

32.    "Reimbursement Rates" mean the amount of money a Payor provides to an healthcare provider to compensate the healthcare provider for providing services to patients.

33.    "Relating to," "relate to," "related to," or "in relation to" mean concerning, constituting, regarding, referring to, describing, discussing, embodying, evidencing, memorializing, mentioning, recording, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to.

34.    "Self-Insured" means any arrangement by which an employer or other Health Plan customer is directly responsible for paying provider claims generated by the healthcare consumption of its employees or other members.  The term includes and refers to, without limitation, Administrative Services Only ("ASO") arrangements.

35.    "Subsidy" means an amount paid by a Hospital to an Anesthesia Service Provider to cover shortfalls or anticipated shortfalls between the provider's revenue and the costs of providing the Anesthesia Services required by the Hospital, whether paid annually, semi-annually, quarterly, or monthly, including any financial arrangement under which a hospital agrees to ensure that the Anesthesia Service Provider receives a minimum level of net revenue.

36.    "Texas Surprise Billing Law" means the legislation entitled Elimination of Surprise Billing for Certain Health Benefit Plans, S.B. No. 1264 (2019), Act of June 14, 2019, 86th Leg., R.S., ch. 1342 § 5.01, 2019 Tex. Sess. Law Serv. 3977.

6

37.    "Tier" and "Tiering" means the classification of some or all of a Health Plan's in-network providers into two or more Tiers based on each provider's costs, quality, other attributes, or some combination of the foregoing, such that each Health Plan member faces different out-of-pocket costs across the various Tiers for the same Treatment, service, or procedure.

38.    "Tuck-in Clause" means a contractual provision negotiated between a healthcare service provider or Hospital, on the one hand, and a Commercial Healthcare Insurer, on the other, pursuant to which the parties agree that, should the healthcare service provider or Hospital acquire or merge with another entity, the acquired or merged group will, at a contractually agreed-upon time, begin to provide services pursuant to the terms negotiated and agreed to by the healthcare service provider or Hospital and the Commercial Healthcare Insurer.

39.    "USAP" means U.S. Anesthesia Partners, Inc., and any predecessors thereof, including, but not limited to, the Acquired Practices.

40.    "Welsh Carson" means Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC, any and all of them, and to any and all of their respective subsidiaries, divisions, affiliates, predecessors and successors, their past and present directors, officers, employees, agents, representatives, consultants, attorneys and assignees, and to all Persons either acting or purporting to act on their behalf.

41.    "You" or "Your" refers to Texans Anesthesia Associates, PLLC, including, but not limited to, any predecessors, components, subsidiaries, joint ventures, agents,

7

representatives, consultants, contractors, employees, attorneys, experts, economists, and any other Person(s) acting or purporting to act with or on its behalf.

The definitions set forth above shall apply to all requests.

## GENERAL INSTRUCTIONS

1.     In answering each request, You shall produce all responsive Documents, however held or obtained, that are in Your possession, custody, or control, including, but not limited to, legal (de jure), actual (de facto), constructive, and practical possession, custody, or control of Your officers, directors, employees, contractors, counsel, auditors, insurers, investigators, consultants, agents, or other representatives acting for or on Your behalf, or that are maintained in Your records, including, but not limited to, Documents obtained through discovery or pre-suit investigation in this or any other proceeding.  A Document is deemed to be in Your possession, custody, or control if You have possession of the Document, have the right to secure such Document or Communication from another Person having possession thereof, or the Document or Communication is reasonably available to You (including those Documents and Communications in the custody or control of Your present employees, attorneys, agents, or other Persons acting on Your behalf).

2.     Each request that seeks Documents concerning Communications to, from, or within a governmental, business, or corporate entity means all Communications to, from, between, or among representatives, officers, officials, directors, employees, agents, servants, and anyone acting on behalf of such entity.

3.     The singular form shall include the plural and vice versa wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

8

4.     The words "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

5.     The words "any," "each," and "every" shall be construed to mean individually and collectively wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

6.     The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of a request all information that might otherwise be construed to be outside of its scope.

7.     Each request seeks production of all Documents and things described, along with any addenda, attachments, appendices, drafts, and non-identical copies, as found or located in Your files, together with a copy of the descriptive file folder or database category in its entirety.

8.     All Documents should be produced in the order in which they appear in Your files, organized by source, and should contain a clear indication of where each Document ends and the next begins. Documents that are found in boxes, file folders, bindings, or other containers are to be left intact as kept. Documents maintained in a file folder or binding should be preceded by the file folder or binding label, if one exists, and should contain a clear indication of where the file folder or binding begins and ends. All attachments to a Document should be produced with the Document. A unique Bates number should be affixed to each page, except as otherwise provided for by any protocols ordered by the Court in this Action.

9

9.    If any request cannot be responded to completely, respond to it to the extent possible, specify the portion(s) that cannot be responded to, and explain why any such portion(s) cannot be responded to.

10.    If Documents are withheld under any claim of privilege, including, but not limited to, attorney-client privilege, work product doctrine, deliberative process privilege, investigative files privilege, and/or law enforcement privilege, provide a privilege log that complies with Federal Rule of Civil Procedure 26(b)(5) and any protocols ordered by the Court in this Action. Such log shall, at a minimum, identify each such Document, state the specific basis for the claim of privilege for each Document withheld, and provide the following information: (1) the date appearing on the Document; (2) a description of the subject matter and general nature of the Document (e.g., whether it is a letter, memorandum, email, etc.); (3) the author of the Document; and (4) the identity of each Person to whom the Document was addressed and the identity of each Person to whom a copy was sent.

11.    If You object to any request made herein as unduly broad, identify the categories of Documents within the scope of the request that You believe are properly discoverable, produce all such Documents, and state, with particularity, Your reason for asserting that the remainder of the request seeks Documents that are beyond the scope of permissible discovery.

12.    Each request shall be construed independently and, therefore, no request shall be construed to limit any other request.

13.    All Documents produced should comply with the ESI Protocol attached hereto as Exhibit 1 or otherwise adhere to any Order entered in this Action, with the exception that any responsive ESI that has already been produced to any government agency or entity by a third

10

party may be produced in the same format in which it was produced to that government agency or entity and with the same confidentiality designation.

14.    These requests are continuing in nature. If further information, evidence, or documentation comes into Your possession, custody, or control or is brought to the attention of You or Your attorneys or agents at any time subsequent to the service of any responses to these requests or the production of any Documents, prompt and complete supplementation of the responses to these requests and the corresponding production is required pursuant to the Federal Rules of Civil Procedure.

15.    Unless otherwise stated, the relevant time period for all requests is from January 1, 2012, to the present.

16.    Please contact USAP counsel Kenneth Fetterman of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. at kfetterman@kellogghansen.com or (202) 326-7988 to discuss how You intend to produce the Documents.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All Documents and Communications – including, but not limited to, Communications between You and Your representatives, on the one hand, and any third party, including governmental entities, on the other – relating to the Complaint, the Action, the FTC Investigation, or any purported anticompetitive conduct by USAP or Welsh Carson. This request includes, but is not limited to, all Documents produced in response to any subpoena, civil investigative demand, information request, informal request, or document request or any other request for information (voluntary or compelled) issued or made in any investigation, the FTC Investigation, the Action, or any related action.

**REQUEST FOR PRODUCTION NO. 2:**

All contracts or Agreements with Hospitals, ASCs, or other facilities in the State of Texas where You have provided Anesthesia Services, including, but not limited to, the following:

  a.    Documents sufficient to show any Subsidy You received from a Hospital, ASC, or other facility for the provision of Anesthesia Services;

  b.    Documents sufficient to show Your coverage obligations between You and any Hospital, ASC, or other facility, including any obligations relating to the availability of physicians or CRNAs; whether in-house or on-call coverage is needed; and whether specialized coverage is required for specific departments within Your facility/facilities (e.g., trauma or cardiac care);

  c.    Documents sufficient to show any nonmedical or administrative services (including, but not limited to, scheduling and billing) provided by You to any Hospital, ASC, or other facility, including any changes over time;

  d.    Documents sufficient to identify whether You acted as the exclusive Anesthesia Provider at any Hospital, ASC, or other facility; and

  e.    Documents sufficient to show the identity of each Hospital, ASC, or other facility at which You provided Anesthesia Services, including its address, zip code, and facility identification number (e.g., Medicare Provider Number), and whether it offered Inpatient Services, Outpatient Services, or both.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and Communications relating to the termination of any contractual relationship between You and a Hospital, ASC, or other facility located in the State of Texas. This request includes, but is not limited to, Documents or Communications discussing, analyzing, or assessing the reason(s) why any such contractual relationship ended (and if You terminated the relationship, the reasons why You did so), as well as feedback or complaints You have received relating to (i) Your Network Status, (iii) any Subsidy You requested or required, or (iii) the quality of Your Anesthesia Services or other services You provided.

**REQUEST FOR PRODUCTION NO. 4:**

Documents sufficient to show, on an annual basis, the number of Clinicians who worked at Your practice and the number of Clinicians who were physicians, CRNAs, and CAAs.

**REQUEST FOR PRODUCTION NO. 5:**

Documents Relating to any attempt You have made to establish a new relationship with a

Hospital, ASC, or other facility or to maintain any existing relationship, including, but not

limited to, the following:

      a.     Any bids or responses to requests for proposals from Hospitals, ASCs, or other facilities that You prepared or submitted; and

      b.     Documents or Communications reflecting any challenges or competition You face in seeking to establish or maintain a relationship with a Hospital, ASC, or other facility.

**REQUEST FOR PRODUCTION NO. 6:**

Documents and Communications with Hospitals, ASCs, or other facilities relating to any

Subsidy You or the Hospital, ASC, or other facility negotiated, calculated, requested, or agreed

to between January 1, 2010, and the present.

**REQUEST FOR PRODUCTION NO. 7:**

Documents concerning any evaluation or analysis (whether conducted by You or by a

consultant or other third party) of the Subsidies You receive, have requested, or plan to request

from any Hospital, ASC, or other facility, or of how those Subsidies compare to those received

or requested by any other Anesthesia Service Provider.

**REQUEST FOR PRODUCTION NO. 8:**

Documents or data sufficient to identify how You track, measure, or assess the quality of

Your Anesthesia Services, including, but not limited to, the following:

      a.     Documents assessing or reflecting Your performance under those metrics;

      b.     Documents and Communications with Hospitals, ASCs, or other facilities concerning the quality of Your Services or Your quality reporting; and

      c.     Documents and data from third parties assessing the quality of Your Anesthesia Services or Your quality reporting practices, protections, and protocols, including Communications, presentations, audits, and reports from any third party reflecting any such evaluation or assessment.

**REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to identify all complaints You have received concerning the Anesthesia Services You have provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 10:**

All Merit-based Incentive System ("MIPS") performance reports You have received for Anesthesia Services You provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 11:**

All data You provided to the Centers for Medicare & Medicaid as part of the Physician Quality Reporting System, MIPs, or MIPS Value Pathways relating to Anesthesia Services You provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 12:**

All data related to quality measures and quality reporting You provided to the Anesthesia Quality Institute relating to Anesthesia Services You provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 13:**

Documents sufficient to show the results of any patient surveys, including, but not limited to, those generated by SurveyVitals (Qualtrics), that You have performed or solicited relating to Your Anesthesia Services or other services You provided in the State of Texas.

**REQUEST FOR PRODUCTION NO. 14:**

Documents concerning actual or potential competition You face in the provision of Anesthesia Services in the State of Texas, including:

      a.    Documents sufficient to show who You view as actual or potential competitors;

      b.    Documents concerning Your share of any market for Anesthesia Services in the State of Texas, including Documents identifying or discussing third-party estimates or analyses of Your market share;

c.   Documents sufficient to identify all methods and metrics You use to assess
     whether and to what extent other Anesthesia Service Providers are actual and/or
     potential competitors;

d.   Documents concerning actual or perceived barriers to entry or expansion for
     Anesthesia Service practices; and

e.   Documents and Communications reflecting any analysis, evaluation, or
     assessment of how often and why any Hospital, ASC, or other facility selected
     You or a competing Anesthesia Service Provider.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show the time period(s) when You have been In Network and

when You have been Out of Network in the State of Texas (or any MSA within the State of

Texas) with any Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 16:**

Documents and Communications discussing or evaluating any potential benefits or

downsides of being In Network or Out of Network State of Texas (or any MSA within the State

of Texas) with any Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 17:**

Documents or data sufficient to show whether and, if so, under what circumstances, You

engaged in Balance Billing.

**REQUEST FOR PRODUCTION NO. 18:**

All Agreements between You and any Commercial Healthcare Insurer between January

1, 2010, and the present.

**REQUEST FOR PRODUCTION NO. 19:**

Documents and Communications relating to Tuck-in Clauses, including, but not limited

to, any Documents and Communications concerning negotiations with Commercial Healthcare

Insurers about Tuck-in Clauses in a contract or Agreement.

**REQUEST FOR PRODUCTION NO. 20:**

All Documents and Communications analyzing, evaluating, measuring, or assessing the actual or potential impact of the Federal No Surprises Act or the Texas Surprise Billing Law on You, other Anesthesia Service Providers, Hospitals, ASCs, other facilities and/or Commercial Healthcare Insurers, including, but not limited to, any impact on Your negotiations or negotiating strategy with Commercial Healthcare Insurers and/or Hospitals, ASCs, or other facilities.

**REQUEST FOR PRODUCTION NO. 21:**

Documents sufficient (i) to identify each arbitration or independent dispute resolution proceeding involving You and a Commercial Healthcare Insurer in the State of Texas that raises claims under the Federal No Surprises Act or the Texas Surprise Billing Law; (ii) to show which side prevailed in the proceeding; and (iii) to show the time period (in days) between the issuance of any award and Your receipt of payment from the Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 22:**

Documents sufficient to identify each acquisition (of or by You), partnership, or merger You have made or considered making with another Anesthesia Service Provider, including: (i) the purpose of the acquisition, partnership, or merger; (ii) the amount You paid or accepted, or considered paying or accepting, in connection with the acquisition, partnership, or merger; and (iii) any analyses relating to potential acquisitions, partnerships, or mergers.

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to show Your employment Agreements with Clinicians, including any changes in those Agreements over time.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents and Communications relating to any shortage of Clinicians or Anesthesia Service Providers in the State of Texas.

16

**REQUEST FOR PRODUCTION NO. 25:**

Documents sufficient to show Your efforts to recruit Clinicians to Your practice, including Documents sufficient to show online job postings, email campaigns, or showcases at medical schools or nursing schools that You participated in in order to recruit Clinicians.

**REQUEST FOR PRODUCTION NO. 26:**

Documents sufficient to show the ownership interest in Your practice, including changes over time.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents and Communications discussing or referring to USAP, including, but not limited to, Documents and Communications concerning the pricing or quality of USAP's Anesthesia Services.

# EXHIBIT 1

United States District Court
Southern District of Texas

**ENTERED**

October 03, 2024

Nathan Ochsner, Clerk

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

FEDERAL TRADE COMMISSION,

      Plaintiff,

v.

U.S. ANESTHESIA PARTNERS, INC., *et al.*,

      Defendants.

**Case No.: 4:23-CV-03560-KH**

### Order and Stipulation Regarding Electronic
### Discovery Procedure

WHEREAS, Rule 26(f) of the Federal Rules of Civil Procedure states that the parties must confer about a proposed discovery plan that states the parties' views and proposals on, among other things, "any issues about disclosure, discovery, or preservation of electronically stored information, including the form or forms in which it should be produced," Fed. R. Civ. P. 26(f)(3)(C);

WHEREAS, the parties mutually seek to reduce the time, expense, and other burdens of discovery of certain electronically stored information ("ESI") and privileged materials, as described further below, and to better define the scope of their obligations with respect to preserving such information and materials;

WHEREAS, the parties are aware of the importance of cooperation and recognize that cooperation does not require nor does it always result in agreement. Nonetheless, the parties agree to cooperate in good faith throughout the matter as long as that cooperation promotes the "just, speedy, and inexpensive determination" of this action, as required by Fed. R. Civ. P. 1. The parties agree to use reasonable, good faith, and proportional efforts to preserve, identify and produce

1

relevant and discoverable information consistent with Fed. R. Civ. P. 26(b)(1). The parties'
anticipated areas of cooperation include identifying limits on custodians, identifying relevant and
discoverable subject matter, establishing time periods for eDiscovery, and other parameters to limit
and guide preservation and eDiscovery issues;

WHEREAS, the parties therefore are entering into this Stipulation with the request that the
Court enter it as an Order;

NOW THEREFORE, it is hereby STIPULATED and ORDERED:

## I. GENERAL PROVISIONS

1. **Applicability.** The procedures and protocols set forth in this order shall govern the search
   for, disclosure of, and format of documents, tangible things, and ESI (collectively "discovery
   materials") produced for use in this litigation.

2. **Limitations & Non-Waiver.** This order does not define the scope of production nor the
   relevance, discoverability, confidentiality, or admissibility of any particular discovery
   materials. Nothing in this order establishes any agreement as to either the temporal or
   subject-matter scope of discovery in this litigation. Compliance with this order does not
   constitute a waiver of any objection to the production of particular discovery materials,
   including as irrelevant, undiscoverable, inadmissible, unduly burdensome or not reasonably
   accessible, or privileged. Nothing in this order shall be construed to affect the authenticity or
   admissibility of any discovery materials, and all objections to authenticity or admissibility of
   any discovery material are preserved. Except as specifically set forth herein, this order does
   not alter or affect the applicability of the Federal Rules of Civil Procedure or Local Rules for
   the United States District Court for the Southern District of Texas. Nothing in this order is
   intended to be an exhaustive list of discovery obligations or rights.

2

3. **Prior Productions**. If any producing entity previously produced discovery materials to the FTC in connection with the FTC's investigation (FTC File No. 201-0031), the producing entity need not produce another copy of such discovery materials in response to any discovery requests (as the FTC has agreed to provide copies of those previously produced materials to Defendant). Any such discovery materials are deemed produced in this litigation. No producing entity is obligated to reformat any discovery materials produced during the investigation in accordance with the production specifications in this order.

## II.   PRESERVATION

1. **Materials To Be Preserved**. Each party will take reasonable and proportionate steps to preserve relevant and discoverable ESI in compliance with duties to preserve material under the Federal Rules of Civil Procedure. To reduce the costs and burdens of preservation and to ensure proper ESI is preserved, the parties agree that:

    a) Parties shall preserve non-duplicative, relevant information currently in their possession, custody, or control;

    b) Subject to and without waiving any protection described above, the parties agree that the parties will endeavor to agree upon date limitation(s) for the preservation of ESI and to identify relevant custodians from whom relevant ESI will be preserved.

2. Nothing in this Stipulation and Order prevents any party from asserting, in accordance with the Federal Rules of Civil Procedure, that certain categories of Documents or ESI are not reasonably accessible.

3. **Preservation Does Not Affect Discoverability or Claims of Privilege**. By preserving discovery materials for the purpose of this litigation, the parties are not conceding that such material is discoverable, nor are they waiving any claim of privilege or other protection.

3

### III.   COLLECTION AND REVIEW

1. **Cooperation.** The parties agree that in responding to an initial Fed. R. Civ. P. 34 request, they will meet and confer about methods to search discovery materials in order to identify discovery material that is subject to production in discovery and filter out discovery material that is not subject to discovery.

2. **System Files.** Each producing entity will use its best efforts to filter out common system files and application executable files by using a commercially reasonable hash identification process. Examples of hash values that may be filtered out during this process are located in the National Software Reference Library ("NSRL") NIST hash set list. Each producing entity will provide a list of additional document types, if any, used as a filter to the receiving entity as soon as practicable.

3. **Deduplication.** Each producing entity is required to produce only a single copy of a responsive document and each producing entity may remove exact duplicate documents (based on MD5 or SHA-1 hash values at the family level) across custodians. For emails with attachments, the hash value is generated based on the parent/child document grouping. Attachments should not be eliminated as duplicates for purposes of production, unless the parent email and all attachments are also duplicates. To the extent that deduplication through MD5 or SHA-1 hash values is not possible, the parties shall meet and confer to discuss any other proposed method of deduplication. A producing entity must make reasonable effort to identify all agreed upon custodians who were in possession of any deduplicated documents in the "Alternative Custodian" field. In the event of rolling productions of discovery materials, the producing entity will, as needed, supplement the load files with updated

4

Alternative Custodian information. Duplicate custodian information may be provided by a metadata overlay and will be provided by a producing party on an ongoing basis.

4. **Email Threading.** Where multiple email messages are part of a single chain or "thread," a producing entity is only required to produce the most inclusive message ("Last In Time Email") and need not produce earlier, less inclusive email messages or "thread members" that are fully contained, including attachments and inline objects (including inline images and hyperlinks) and including identical text, identical subject(s), identical senders and recipients (including in "to," "cc," and "bcc" fields), within the Last In Time Email. Only email messages (including inline objects, text, subject(s), and senders and recipients) and all attachments that are fully contained in and identical to the Last In Time Email will be considered less inclusive email messages that need not be produced.

5. **Filtering.** If a producing entity proposes to apply other filters to limit discovery materials that are collected for processing and review (e.g., filters that identify system files, non-user generated files, or zero-byte files or pictures in signature files or embedded objects), the producing entity shall advise the requesting party and the parties shall meet and confer regarding such additional proposed filters.

## IV.   CLAIMS OF PRIVILEGE

1. **Privilege Logs.** For documents withheld from production on the basis of attorney-client privilege, work product doctrine and/or any other applicable privilege or protection (collectively "privilege"), the producing entity shall prepare a summary log containing, for each document (except as agreed upon by the parties) claimed as privileged, an export of all or a subset of the metadata fields listed below (as agreed upon by the parties) to the extent such information exists and has not been suppressed or redacted for privilege. The

5

export should include, at a minimum, the following information from the top line email

and from any attachment, in separate entries:

- BEGNO (if not produced) or BEGBATES (if produced)
- ENDNO (if not produced) or ENDBATES (if produced)
- BEGATTACH (if not produced) or BEGBATESATTACH (if produced)
- ENDATTACH (if not produced) or ENDBATESATTACH (if produced)
- NUMBER_OF_ATTACHMENTS
- CUSTODIAN(S)
- FROM
- TO
- CC
- BCC
- SUBJECT
- SENTDATE
- RECEIVEDDATE
- FILENAME
- FILEXT
- DOCTYPE
- AUTHOR
- CREATEDDATE
- REDACTED

2. **Document and Claim Descriptions.** In addition to the fields described in paragraph IV.1, the producing entity's log should include two additional fields for each document on the summary log: (a) the subject matter of the document and (b) the basis of the privilege claim.

3. **List of Counsel.** The producing entity must also provide a list of all counsel identified in the summary log.

4. **Prior Claims of Privilege.** Privilege logs and counsel lists provided to the FTC during the investigation are deemed served in this litigation. The FTC reserves all rights to challenge any privilege claims.

5. **Rolling Privilege Logs.** The parties agree to provide rolling privilege logs. Privilege logs are due forty-five (45) days after production for the set of requests is substantially

complete. However, the privilege log for documents responsive to requests issued before June 1, 2024 is due by February 14, 2025.

## V.      REDACTION

1. **Initial Categories**. Discovery material may be redacted on the following bases: privilege, sensitive PII, and SHI. Discovery materials redacted for sensitive PII and SHI need not be logged.

2. **Additional Categories**. If, during the course of discovery, the producing entity identifies other kinds of information that it has a reasonable basis for redacting, the parties will meet and confer before such redactions are made. If the issue cannot be resolved, the parties will seek resolution from the Court.

3. **Sensitive PII or Sensitive Health Information**. A Producing Entity shall make reasonable efforts not to produce unredacted sensitive personally identifiable information ("Sensitive PII") or Confidential Health Information, as defined in the Protective Order (ECF No. 149-1). If a receiving party determines that a producing entity has produced unredacted Sensitive PII or CHI, the receiving party shall request the producing entity provide a redacted version, which shall be provided as soon as practicable.

## VI.      PRODUCTION FORMAT

1. **Format**. The parties agree to produce documents in the formats described in Appendix 1 to this order, unless otherwise agreed in writing by a requesting party. The parties agree to produce privilege logs in Excel.

2. **Format of Materials Collected During the Investigation**. Notwithstanding the foregoing, materials collected by USAP during the investigation and materials produced to the FTC by nonparties during the investigation may be produced in the same format as

originally collected or produced, respectively. A producing entity may exclude metadata and coding fields set forth in Appendix 1 when producing data for documents collected during the investigation and for which those fields are not available in the form collected.

3. **Cooperation on Format.** If particular documents warrant a different format, the parties will cooperate to arrange for the mutually acceptable production of such documents.

4. **Searchability.** The parties agree, to the extent practicable, not to materially degrade the searchability of the documents as part of the document production process.

## VII.    MISCELLANEOUS PROVISIONS

1. **Amendment.** Nothing herein shall preclude the parties from seeking to amend this order, provided that the parties first meet and confer before seeking relief from the Court.

2. **Costs of Document Production.** Unless this Court orders otherwise for good cause shown, each party and nonparty shall bear the costs of collecting, processing, reviewing, and producing its own documents provided they are reasonably accessible.

3. **Integration/Appendices.** The following documents are incorporated herein by reference:

   a.    "Appendix 1" is a document describing the production format and fields to be included in the documents produced by each party.

Pursuant to stipulation, **IT IS SO ORDERED.**

Dated: October 3, 2024

Kenneth M. Hoyt
United States District Judge

8

## APPENDIX 1: PRODUCTION FORMAT

A. **Cover Letter.** A cover letter shall be included with each production and shall include (1) the producing entity's name; (2) the production date; (3) the production volume name or number (e.g. VOL001); (4) information sufficient to identify all accompanying media (hard drive, thumb drive, DVD, CD, Secure FTP); and (5) the Bates number range of the materials contained in the production volume.

B. **Entire Document.** Except for privileged material, the producing entity will produce each responsive document in its entirety by including all attachments and all pages, regardless of whether they directly relate to the specified subject matter. Notwithstanding this paragraph embedded links without attachments or references to linked documents which are not attached (by way of example only, a website on the public internet) need not be included. Attachments must be produced along with the document to which they are attached, regardless of whether they have been produced separately. Copies that differ in any respect from an original (because, by way of example only, handwritten or printed notations have been added) should be produced separately.

C. **Production Components.** Except as otherwise provided below, discovery materials shall be produced in accordance with the following specifications:

   1. An ASCII delimited data file (.DAT) with ASCII 020 for the comma character and ASCII 254 for the quote character, with all values in a multi-value field separated by a semi-colon ASCII 059 (with the use of commas and quotes as delimiters not acceptable using standard delimiters) and encoded in UTF-8;

   2. An image load file (.OPT) that can be loaded into commercially acceptable production software (e.g. Concordance);

3. TIFF images single-page: Black and White, Compression Group 4 300dpi and a party can make a reasonable good faith and limited request for production of a color JPEG file after conferring with opposing counsel;

4. Document level.TXT files for all documents containing extracted full text or OCR text;

5. Parent-child relationships will be maintained in production;

6. Document families must be produced, even if only the parent email or an attachment to an email is responsive, except (1) junk files and non-user created content routinely excluded during processing (for example embedded images), and (2) documents that are withheld on the basis of attorney-client privilege or work product protection;

If a particular document or category of documents warrants a different production format, for example if it is impractical to produce an entire document family for particular documents, the parties will cooperate in good faith to arrange for a mutually acceptable production format.

D. **Production Media and Access Controls.** Documents shall be encrypted and produced through electronic means, such as secure file sharing methods (e.g. FTP), or on CD, DVD, flash drive or external hard drive ("Production Media"). Each piece of Production Media shall identify a production number corresponding to the production volume (e.g. "VOL001"). Each piece of Production Media shall also identify: (a) the producing party's name; (2) the production date; (3) the Bates Number range of the materials contained on the Production Media. Nothing in this order will preclude or impair any and all protections provided the parties by any Protective Order(s) agreed and entered into by the parties. Any data produced by the producing party must be protected in transit, in use, and at rest by all in receipt of such data. Parties will use best efforts to avoid the unnecessary copying or transmittal of produced documents. Any copies made of produced data must be kept on media or hardware employing

whole-disk or folder level encryption or otherwise secured on information systems and networks in a manner consistent with the best practices for data protection. If questions arise, parties will meet and confer to ensure security concerns are addressed prior to the exchange of any documents.

E. **Data Load Files/Image Load Files**. All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (such as an Opticon file) and a metadata (.dat) file with the metadata fields identified below on the document level to the extent available. Each TIFF in a production must be referenced in the corresponding image load file. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the image load file(s) in the production. The total number of pages referenced in a production's image load file should match the total number of TIFF files in the production. All images must be assigned a unique Bates number that is sequential within a given document and across the production sets. The Bates numbers in the image load file must match the corresponding documents' beginning Bates numbers in the data load file. The total number of documents in a production should match the total number of records in the data load file. Load files shall not vary in format or structure within a production, or from one production to another.

F. **Metadata Fields**. With the exception of the hard copy paper documents, which are separately addressed in paragraph N below, each of the metadata and coding fields set forth below that can be extracted shall be produced for each document to the extent reasonably practicable. The parties are not obligated to populate manually any of the fields below if such fields cannot be extracted from a document, with the exception of the following: (a) BEGBATES, (b) ENDBATES, (c) BEGATTACH, (d) ENDATTACH, (e) CUSTODIAN, (f) ALTERNATIVE

CUSTODIAN(S), (g) CONFIDENTIALITY (except for documents already produced to the FTC during the investigation and which by agreement of the parties and the Protective Order in this case are automatically Highly Confidential if previously designated Confidential), (h) REDACTIONS, (i) NATIVEFILEPATH, and (j) TEXTFILEPATH, which should be populated by the producing entity or the entity's vendor. The parties will make reasonable efforts to ensure that metadata fields automatically extracted from the documents correspond directly to the information that exists in the original documents.

| Field Name[1] | Field Description (when applicable/available) |
| --- | --- |
| BEGBATES | Beginning Bates number as stamped on the production image |
| ENDBATES | Ending Bates number as stamped on the production image |
| BEGATTACH | First production Bates number of the first document in a family |
| ENDATTACH | Last production Bates number of the last document in a family |
| PARENT ID | Document ID or Beginning Bates number of the parent email |
| CUSTODIAN | Individual identified for collection and from whom the document originated |
| ALT CUSTODIAN(S) | Identified Custodian(s) whose documents de-duplicated out |
| CONFIDENTIALITY | Confidentiality designation assigned to document |

[1] Field names can vary from system to system and even between different versions of systems. Thus, parties are to be guided by these Field Names and Field Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI protocol order.

| HASHVALUE | MD5 or SHA1 hash value of document (only if no deuplicaiton is utilized) |
|---|---|
| AUTHOR | Any value populated in the Author field of the document properties (Edoc or attachment only) |
| DATECREATED | Date the document was created (format: MM/DD/YYYY) (Edoc or attachment only) |
| DATEMODIFIED | Date when document was last modified according to filesystem information (format: MM/DD/YYYY) (Edoc or attachment only) |
| FROM | The name and email address of the sender of the email |
| TO | All recipients that were included on the "To" line of the email |
| CC | All recipients that were included on the "CC" line of the email |
| BCC | All recipients that were included on the "BCC" line of the email |
| DATERECEIVED | Date email was received (format: MM/DD/YYYY) |
| DATESENT | Date email was sent (format: MM/DD/YYYY) |
| FILESIZE | The original file size of the produced document |
| ORIGINATING PATH | File path of the file as it resided in its original environment |
| REDACTIONS | Indicate Yes if a document is redacted. If no leave blank. |
| NATIVEFILEPATH | Native File Link (Native Files only) |
| EMAIL THREAD ID | Unique identification number that permits threading of email conversations. For instance, MS Outlook identification number ("PR_CONVERSATION_INDEX") is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, that facilitates use |

|  | of email threading. (Microsoft application documents only) (only if no email threading is utilized) |
|---|---|
| TEXTFILEPATH | Path to extracted text/OCR file for document |
| EMAILSUBJECT | Subject Line of email |
| TIMESENT | Time email was sent |
| TIMEZONEUSED | Time zone used to standardize date/time during document processing |
| RECEIVETIME | Time email was received |
| FILENAME | File Name of the edoc or email |
| TITLE | Any value populated in Title field of the document properties |
| SUBJECT | Any value populated in the Subject field of the document properties |
| DOCEXT | File extension of the document |

G. **TIFFs**. Documents that exist only in hard copy format shall be scanned and produced as TIFFs. Documents that exist as ESI shall be converted and produced as TIFFs, except as provided below. The imaged data shall retain all attributes of the native or hard-copy file, such as document breaks, to the extent reasonably practicable. To the extent reasonably practicable, produced TIFF images will show all text and images that are visible in the form in which the electronic document was last saved, with the exception of redacted portions. Hidden content, tracked changes or edits, comments, notes, and other similar information, shall to the extent reasonably practicable, also be imaged so that such content is viewable on the image file. Unless excepted below, single page, black and white, Group IV TIFFs should be provided, at least 300 dots per inch (dpi) for all documents, with corresponding multi-page text and

necessary load files. Each TIFF image shall be named according to a unique corresponding Bates number associated with the document. Each image shall be branded according to the Bates number and the agreed upon confidentiality designation. Original document orientation should be maintained (i.e., portrait to portrait and landscape to landscape). Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF forma, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively." A producing entity retains the option to produce ESI in alternative formats if so agreed by the requesting party, which may include native format, or a combination of native and TIFF formats. Where the TIFF image is unreadable or has materially degraded the quality of the original, the producing entity shall provide a higher quality TIFF image or the native or original file.

H. **Color.** A party that received a production may make reasonable good faith and limited requests that color images be produced where color is helpful to interpret the contents of the relevant document. The production of documents and/or ESI in color shall be made in single-page JPEG format (300 DPI). All requirements for productions stated in this ESI protocol order regarding productions in TIFF format apply to any productions of documents and/or ESI in color made in such an alternative format. Reasonable requests that a document be produced in color for the reasons set forth in this paragraph will not be unreasonably denied by the producing entity. If a producing entity wishes to object, it may do so by responding in writing and setting forth its objection(s) to the production of the requested document in color.

I. **Text Files.** A single multi-page, document-level text file shall be provided for each document, and the filename should match its respective TIFF filename. When possible, the text of native files should be extracted directly from the native file. Text files will not contain the redacted

portions of the documents. A commercially acceptable technology for optical character recognition "OCR" shall be used for all scanned, hard copy documents and for documents with redactions.

J. **Native Files.** Spreadsheets (e.g. MS Excel) and presentations (e.g. MS PowerPoint) will be produced in native format unless redacted, in which instance, spreadsheets shall be produced as native redactions or in TIFF, with OCR Text Files post redaction. To the extent that they are produced in this action, audio, video, and multi-media files will be produced in native format. Native files shall be produced with a link in the NATIVEFILEPATH field, along with extracted text (where extracted text is available) and applicable metadata fields set forth in paragraph F above. A Bates numbered TIFF placeholder indicating that the document was provided in native format must accompany every native file.

K. **Request for Other Native Files.** Other than as specifically set forth above, a producing entity need not produce documents in native format. If a party would like a particular document produced in native format and this ESI protocol order does not require the production of that document in its native format, the party making such a request shall explain the reason for its request that the document be produced in its native format. The requesting party will provide a specific Bates range for documents it wishes to be produced in native format. The producing party need only produce such a document in native format if reasonably practicable. Any native files that are produced should be produced with a link in the NativeLink field, along with all extracted text and applicable metadata fields set forth in Appendix 1.

L. **Confidentiality Designation.** Responsive documents in TIFF format will be stamped with the appropriate confidentiality designations in accordance with any order regarding confidentiality entered in this matter. Each responsive document produced in native format will have its

confidentiality designation identified in the filename of the native file and indicated on its corresponding TIFF placeholder.

M. **Databases and Other Structured Data.** Data compilations should be submitted separately from document productions. The parties shall meet and confer regarding the production format and scope of data contained in databases in order to ensure that any information produced is reasonably usable by the requesting party and that its production does not impose an undue burden on the producing entity. To avoid doubt, information will be considered reasonably usable when produced in CSV format, tab-delimited text format, Microsoft Excel format, or Microsoft Access format. To the extent a party is constrained from producing responsive ESI because of a third-party license or because software necessary to view the ESI is hardware-dependent, the parties shall meet and confer in an attempt to reach an agreement on whether alternative methods exist to enable the requesting party to view the ESI.

N. **Paper Documents.** A producing entity may scan paper documents using OCR technology and searchable ASCII text files shall be produced, unless otherwise agreed by the parties. The following information shall be produced in the load file accompanying production of paper documents produced by scan and OCR to the extent reasonably practicable: (a) Beg Bates, (b) End Bates, (e) Custodian, (f) Confidentiality, and (g) Redacted. Paper documents should be logically unitized for production to the extent reasonably practicable. When scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records. The parties will make reasonable efforts to unitize documents correctly. Where a document or a document group – such as folder, clipped bundle, or binder has an identification spine or other label, the information on the label

shall be scanned and produced as the first page of the document or grouping to the extent reasonably practicable.

O. **Date and Time.** No party shall modify the date or time as contained in any original ESI. This provision does not prevent parties from deleting inaccurate date or time information that arises as an incident of collection or processing.

P. **Time Zone.** To the extent reasonably practicable, ESI items shall be processed using a consistent time zone (e.g. Central Standard Time) and the time zone shall be disclosed to the requesting party.

Q. **Auto Date/Time Stamps.** To the extent reasonably practicable, ESI items shall be processed so as to preserve the data/time shown in the document as it was last saved, not the date of collection or processing.

R. **Hidden Text.** ESI items shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments.

S. **Password-Protected, Encrypted, or Proprietary-Software Files.** With respect to any ESI items that are password-protected or encrypted within the scope of review, the producing entity will take reasonable steps based on industry standards to break the protection so that the documents can be reviewed and produced if appropriate. In the event that encrypted or password-protected documents, which are reasonably likely to be responsive to a document request, remain for a particular custodian after such reasonable efforts have been made, the producing entity shall advise the requesting party by producing a placeholder TIFF image stating "Technical Issue." ESI that cannot be reviewed because proprietary software is

necessary to view the ESI will be disclosed to a requesting party, and the parties shall meet and confer regarding the next steps, if any, with respect to such ESI.

T. **Submission Guidelines.**

    1. Where possible, productions should be submitted via secure File Transfer Protocol, such as Accellion. Where not possible, adhere to the following guidelines:

        a. For productions over 10 gigabytes that cannot be submitted via a secure File Transfer Protocol, use hard disk drives, formatted in Microsoft Windows-compatible, uncompressed data in USB 2.0 or 3.0 external enclosure.

        b. For productions under 10 gigabytes that cannot be submitted via a secure File Transfer Protocol, CD-ROM (CD-R, CD-RW) optical disks and DVD-ROM (DVD+R, DVD+RW) optical disks for Windows-compatible personal computers, and USB 2.0 Flash Drives are acceptable storage formats.

    2. Encryption of productions using NIST FIPS-Compliant cryptographic hardware or software modules, with passwords sent under separate cover, is strongly encouraged.

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | |
| Plaintiff, | |
| v. | **Case No.: 4:23-CV-03560-KH** |
| U.S. ANESTHESIA PARTNERS, INC., et al. | |
| Defendants. | |

**[Revised Proposed] Protective Order**

Pursuant to Federal Rule of Civil Procedure 26(c), the parties to the above-captioned case

(the "Litigation"), through their respective counsel, agree that the terms and conditions of this

Protective Order (the "Order") shall govern the production and handling of all documents, items,

or other information exchanged by the parties and/or nonparties in the Litigation including,

without limitation, responses to requests for production, interrogatories, requests for admissions,

pleadings, exhibits, and deposition or other testimony, regardless of the medium or manner in

which any such materials are generated, stored, or maintained. This includes any material

produced, filed, or served by any party or nonparty during discovery in this Litigation, or any

information included in any such material. The Court finds that good cause exists for entry of a

protective order in this Litigation to prevent unauthorized disclosure and use of confidential

information during and after the course of the Litigation.

Accordingly, **IT IS HEREBY ORDERED AS FOLLOWS:**

1.      **Persons/Entities Covered**. This Order is binding upon all current and future

parties to this Litigation, including their respective corporate parents, subsidiaries, affiliates,

successors, or assigns and their respective counsel, agents, representatives, officers, and employees and any others set forth in this Order. This Order shall also apply to any materials produced in discovery in this Litigation by nonparties, and shall apply to parties and non-parties alike, and further provided that this Order does not limit any party or nonparty's rights with respect to its own materials that it produces in discovery in this Litigation. When conducting discovery from nonparties, the parties to this Litigation shall provide notice of the terms of this Order to such nonparties by providing a copy of this Order with the discovery requests.

      2.    **Designation of Materials**. Any party or nonparty responding to discovery requests or providing materials in connection with this Litigation ("Producing Entity") may designate a document, or all or any part of a discovery response, deposition, or other material as Confidential Material or Highly Confidential Material (defined below) based on a good-faith belief that such materials qualify for that designation under the terms of this Order:

      (a)    "Confidential Material" shall mean (i) any information, testimony, or tangible thing produced during discovery that reveals a trade secret; confidential research, analysis, development or commercial information, which is maintained as confidential and has not been released into the public domain (unless through unauthorized disclosure), in accordance with Federal Rule of Civil Procedure 26(c); (ii) personal information that is protected from disclosure by statute, regulation, or is otherwise entitled to protection from public disclosure; and (iii) any other information for which a good faith claim of need of protection can be made under the Federal Rules of Civil Procedure and/or applicable law.

      (b)    "Highly Confidential Material" shall mean any Confidential Material that, if disclosed, is likely to cause significant competitive or commercial harm. By way of example only, Highly Confidential Material may include: trade secrets; highly sensitive and non-public

2

research or analysis; competitively sensitive customer information; non-public financial, marketing, or strategic business planning information not more than three (3) years old; current or future non-public pricing information relating to research, development, testing of, or plans for existing or proposed future products, or services; information relating to the processes, apparatus, or analytical techniques used by a party or nonparty in its present or proposed commercial production of such products or services; confidential contractual terms, proposed contractual terms, or negotiating positions (including internal deliberations about negotiating positions) taken with respect to U.S. Anesthesia Partners or competitors to U.S. Anesthesia Partners; personnel files; and communications that disclose any Highly Confidential Material. Material that is more than three (3) years old is presumptively not entitled to protection as Highly Confidential Material; provided, that such material may be considered Highly Confidential Material if it discloses current business practices. Nothing in the foregoing description of "Highly Confidential Material" (and, in particular, the fact that financial information less than three (3) years old is generally considered to be "Highly Confidential Material") is intended to foreclose any party from arguing that specific pricing information that may be less than three (3) years old is neither Confidential Material nor Highly Confidential Material.

(c)     The parties to this Litigation and third parties desire to ensure the privacy of patient records and other information that the parties have determined might contain Confidential Health Information ("CHI") and agree that a Producing Entity may designate CHI as Confidential Material at a minimum and, as such, subject to the terms of this Order. The parties to this Litigation and third parties also seek to ensure that any person who receives and stores CHI in connection with this proceeding will develop, implement, maintain, and use appropriate administrative, technical, and physical safeguards to preserve the privacy, integrity,

3

and confidentiality of any CHI and to prevent unpermitted use or disclosure of any confidential

health information they may receive from any person in connection with this proceeding. CHI

will be securely returned or destroyed pursuant to the provisions of this Order. As used in this

Order, "Confidential Health Information" or "CHI" shall mean any patient health information

protected by any state or federal law, including but not limited to "Protected Health Information"

or "PHI" as set forth in 45 C.F.R. § 160.103.

> (d)     Confidential and Highly Confidential Material, respectively, shall include:
> (i) all copies, extracts, and complete or partial summaries prepared from such Confidential or
> Highly Confidential Material; (ii) portions of deposition transcripts and exhibits thereto that
> contain or summarize the content of any such Confidential or Highly Confidential Material; (iii)
> portions of briefs, memoranda, or any other writings filed with the Court and exhibits thereto that
> contain or summarize the content of any such Confidential or Highly Confidential Material; (iv)
> written discovery responses and answers that contain or summarize the content of any such
> Confidential or Highly Confidential material; and (v) deposition testimony designated in
> accordance with paragraph 2(g) below.

> (e)     Information designated as Confidential or Highly Confidential Material
> shall be considered "trade secrets and commercial or financial information" that is "privileged or
> confidential" under 5 U.S.C. § 552(b)(4) for the purpose of the Freedom of Information Act.

> (f)     Any document produced by a Producing Entity in this Litigation may be
> designated as Confidential Material by marking it "CONFIDENTIAL" on the face of the
> document at the time of production. Any document produced by a Producing Entity in this
> Litigation may be designated as Highly Confidential Material by marking it "HIGHLY
> CONFIDENTIAL" on the face of the document at the time of production. A Producing Entity

4

may also designate electronic documents and other non-paper media as Confidential or Highly

Confidential Material, as appropriate, by (i) noting such designation in an accompanying cover

letter; (ii) affixing the confidentiality designation to the material or its container, including the

appropriate confidentiality designation in the load file provided with the electronic production;

(iii) including the appropriate confidentiality designation in the name of the file(s) provided with

the electronic production; or (iv) using any other means that reasonably notifies the party in

receipt of the material (the "Receiving Party") of the designation.

        (g)    Testimony provided in this Litigation may be designated as Confidential

Material or as Highly Confidential Material if the testimony concerns or relates to the

designating party's or nonparty's Confidential or Highly Confidential Material. The party or

nonparty desiring to designate any portion of testimony as Confidential or Highly Confidential

Material shall do so by so stating orally on the record on the day that the testimony is being

given. Following any such oral designation, the confidential portions of the deposition shall be

taken only in the presence of persons entitled to access such information under this Order. A

Producing Entity may designate any or all portions of the transcript or video of any deposition

(or of any other testimony) as containing Confidential or Highly Confidential Material in

accordance with this Order by notifying all other parties in writing within thirty (30) calendar

days of the Producing Entity's receipt of the final transcript that the transcript contains

Confidential or Highly Confidential Material and designating the specific pages and/or lines as

containing Confidential or Highly Confidential Material. All transcripts and videos of testimony

in this Litigation shall be treated as Highly Confidential Material and subject to this Order until

thirty (30) calendar days after a final transcript of the deposition (or other testimony) is received

by the Producing Entity. Any portion of any deposition testimony that is not designated as

Confidential or Highly Confidential Material in accordance with this paragraph, within thirty
(30) calendar days after a final transcript and/or video of the deposition (or other testimony) is
received by the Producing Entity shall not be entitled to the protections afforded to Confidential
or Highly Confidential Material under this Order.

(h)     Any document produced (or material containing or summarizing
information from a document produced), as well as all transcripts of any investigational hearings,
during the investigation by the Federal Trade Commission ("FTC" or "Commission") (the
"Investigatory Material") shall be treated as Highly Confidential Material under this Order,
notwithstanding any designation or lack thereof on the documents as originally produced, unless
either the original source of the document agrees or the Court orders otherwise. Nothing in this
Order shall constitute any waiver of any applicable privileges or protections from discovery that
may apply to Investigatory Materials pursuant to the FTC's Rules of Practice or other legal
obligation imposed upon the FTC. The confidentiality of Investigatory Material may be
challenged under the provisions of paragraph 7.

(i)      Notwithstanding any of the foregoing, information shall be deemed non-
confidential material under this Order if it is in the public domain, or is already known to a party
through proper means and on a nonconfidential basis or is or becomes available to a party from a
source rightfully in possession of such information on a nonconfidential basis.

3.      **Individuals to Whom Confidential Material May Be Disclosed**. Unless
otherwise ordered by the Court or permitted in writing by a Producing Entity, Confidential
Material may be used only in connection with this Litigation, and disclosure of Confidential
Material may be made only to:

6

(a)     The Court and court personnel, including assistants, clerks, law clerks, and other support staff (this category is referred to as the "Court").

(b)     Outside attorneys for a party who are working on this Litigation and their employed or retained secretaries, paralegals, legal assistants, and support services (including, without limitation, copy services, jury consultants, interpreters, translators, document management services, graphics services, and similar professional services) (this category is referred to as "Outside Attorneys").

(c)     For U.S. Anesthesia Partners, one attorney employed in-house (i) who has executed the agreement annexed hereto as Appendix A, and (ii) who, at the time of signing the agreement annexed as Appendix A and for a period of two (2) years after receipt of Confidential Material, does not participate in or advise on Competitive Decision-Making or litigation or other legal actions involving the Producing Entity of the Confidential Material (this category is referred to as "In-House Counsel"). "Competitive Decision-Making" means decision-making relating to a competitor, or potential competitor, of U.S. Anesthesia Partners, a payor, or a healthcare provider (such as a hospital or ambulatory surgery center), including decisions regarding contracts, marketing, pricing, rates, product or service development or design, service offerings, research and development, mergers or acquisitions, or licensing, acquisition, or enforcement of intellectual property rights.

(d)     [intentionally omitted]

(e)     FTC personnel, including FTC Commissioners, as well as FTC attorneys, employees, and law clerks who are working on, supervising, or being briefed about this Litigation (this category is referred to as "FTC Personnel").

7

(f)    Court reporters, court videographers, and similar transcription services and their support staff providing services in court or at depositions for the purpose of assisting the Court in this Litigation (this category is referred to as "Court Reporters").

(g)    Any expert or consultant, including all nonparty personnel and support staff assisting such expert or consultant, but not the entity itself by which such expert or consultant and assisting personnel are employed, who is retained by or for the benefit of any of the parties in this Litigation to assist counsel in this Litigation, and provided that the expert or consultant has executed the agreement annexed hereto as Appendix A (this category is referred to as "Experts").

(h)    Any mediators engaged by the parties or appointed by the Court, and their support staff (this category is referred to as "Mediators").

(i)    Any person who authored or previously received the material. For e-mails, this provision is limited to individuals in the to, from, cc, or bcc fields, and includes any attachments to an e-mail that the person received.

(j)    The Producing Entity's current directors, officers, employees, or outside counsel.

(k)    The Producing Entity's former employees, provided that the party showing the former employee the materials has a good faith reason to believe that the former employee accessed the materials in the ordinary course of business during their employment or worked on issues sufficiently related that such access would have been likely.

(l)    To the extent such Confidential Material was produced by a Producing Entity, any person who has been designated as a Rule 30(b)(6) witness by the Producing Entity.

8

    (m) A custodian of records that has or had possession of the material or access

in the ordinary course of business to the material.

    (n) During the conduct of hearings, witnesses in the Litigation, to whom

disclosure is reasonably necessary and who have signed the agreement annexed hereto as

Appendix A (this category is referred to as "Witnesses").

    (o) Any other person to whom the Producing Entity consents in writing or by

order of the Court.

   4. **Individuals to Whom Highly Confidential Material May Be Disclosed**. Unless

otherwise ordered by the Court or permitted in writing by the Producing Entity, Highly

Confidential Material may be used only in connection with this Litigation, and disclosure of

Highly Confidential Material may be made only to the following, as defined in paragraph 3

above:

    (a) The Court.

    (b) Outside Attorneys.

    (c) FTC Personnel.

    (d) Court Reporters.

    (e) Experts.

    (f) Mediators.

    (g) Any person who authored or previously received the material. For e-mails,

this provision is limited to individuals in the to, from, cc, or bcc fields, and includes any

attachments to an e-mail that the person received.

    (h) The Producing Entity's current directors, officers, employees, or outside

counsel.

9

(i)     The Producing Entity's former employees, provided that the party

showing the former employee the materials has a good faith reason to believe that the former

employee accessed the materials in the ordinary course of business during their employment or

worked on issues sufficiently related that such access would have been likely.

(j)     To the extent such Confidential Material was produced by a Producing

Entity, any person who has been designated as a Rule 30(b)(6) witness by the Producing Entity.

(k)     A custodian of records that has or had possession of the material or access

in the ordinary course of business to the material.

(l)     Witnesses.

(m)     Any other person to whom the Producing Entity consents in writing or by

order of the Court.

5.     **Handling of Confidential Material and Highly Confidential Material**. All

material designated Confidential or Highly Confidential shall remain in the possession of the

attorneys who receive such material through discovery in this Litigation, and they shall not

release or disclose the nature, substance, or contents thereof, except that copies of such materials

may be made for the use of those assisting the attorneys to whom disclosure may be made under

paragraphs 3 and 4 above, including Experts, and copies of such materials may be submitted to

the Court under seal as necessary. Persons who have been shown Confidential or Highly

Confidential Material pursuant to this Order and have not otherwise obtained or maintained the

material in the normal course of business shall not retain copies of that material.

6.     **Inadvertent Failure to Designate as to Confidentiality**. Except to the extent

provided in paragraph 2(f), in the event that a Producing Entity fails to designate confidential

material as Confidential or Highly Confidential, the Receiving Party shall, upon a written request

from the Producing Entity, treat and preserve such information, document, paper, or other thing in accordance with the confidentiality designation that the Producing Entity states should have been affixed to it. The Producing Entity shall re-produce the information, document, paper, or other thing with the appropriate confidentiality designation unless doing so would not be feasible (as, for example, in the case of a final deposition transcript). Each Receiving Party shall replace the incorrectly designated materials with the newly designated materials, destroy the incorrectly designated materials, and treat the materials in accord with their new designation. Except as provided in paragraph 2(f), the inadvertent failure of a party or nonparty to designate material as Confidential or Highly Confidential at the time of production shall not be deemed a waiver of the protections afforded by this Order, either as to specific information in the material or as to any other information relating thereto or on the same or related subject matter. No party shall be deemed to have violated this Order if, prior to notification of any later designation, such material has been disclosed or used in a manner inconsistent with the later designation. If material inadvertently not designated as confidential was filed with a court on the public record or otherwise disclosed before the time of the material's later designation, then the Producing Entity shall be responsible for seeking appropriate relief, including return of the material.

7.    **Challenging a Confidentiality Designation.**

(a)    A Receiving Party shall not be obligated to challenge the propriety of a Confidential or Highly Confidential designation at the time the designation is made. A Receiving Party may challenge a confidentiality designation at any time or at such time defined and identified in any pre-trial Order or process entered by this Court, and a Receiving Party's failure to have made such a challenge at any previous time, including after acceptance or receipt of

11

material with a confidentiality designation, shall not be deemed a waiver of the Receiving
Party's right to challenge any confidentiality designation.

(b)     A Receiving Party seeking to challenge a Confidential or Highly
Confidential designation shall give notice in writing of such challenge to counsel for the
Producing Entity specifying the document or portion of document or otherwise identifying the
materials at issue and setting forth the basis for the Receiving Party's challenge.

(c)     Within seven (7) calendar days of receipt of written notice that the
Receiving Party objects to the confidentiality designation, counsel for the Producing Entity shall
meet and confer with counsel for the Receiving Party to attempt to resolve the challenge.

(d)     If the Receiving Party and Producing Entity are unable to resolve the
challenge within fourteen (14) calendar days of the notice provided under paragraph 7(b), then
the Receiving Party may move the Court for an order removing the challenged material from the
restrictions of this Order. Any papers filed in support of or in opposition to this motion shall, to
the extent necessary, be filed under seal to preserve the claimed confidentiality of the material at
issue. The Producing Entity bears the burden of proof on the issue of the propriety of the
challenged confidentiality designation.

(e)     Until the parties or the Court resolves a challenge to the designation of
Confidential or Highly Confidential Material, the asserted designation shall remain in effect.

8.      **Challenging In-House Counsel Access**.

(a)     Within seven (7) days after entry of this Order, Defendant must submit to
the FTC a written statement that (i) sets forth the full name of the designated In-House Counsel;
(ii) describes the In-House Counsel's past, and current, and reasonably foreseeable future
primary job duties and responsibilities in sufficient detail to determine if In-House Counsel

12

participates in or advises on, or may participate in or advise on, any competitive decision-making; and (iii) lists the current litigations or other legal actions in which the In-House Counsel participates or advises on behalf of defendant. Within eight (8) days after entry of this Order, the FTC must provide a copy of this Order and the written statement to all nonparties that produced materials in response to compulsory process during the FTC's investigation. For nonparties that did not produce materials during the FTC's investigation, the party serving a subpoena on that nonparty shall attach a copy of this Order and the written statement to the request.

(b)     Defendant may disclose Confidential Material to its designated In-House Counsel unless the defendant receives a written objection from another party or the Producing Entity within (a) eighteen (18) days of entry of this Order (for nonparties that provided documents or information in response to compulsory process from the FTC during its investigation) or (b) fourteen (14) days of receipt of the first request in the form of a subpoena for documents or information. Any such objection must set forth in detail the grounds on which it is based. For the avoidance of doubt, Defendant may not disclose Confidential material to its designated In-House Counsel during the objection period.

(c)     If a Defendant receives a timely written objection, it must meet and confer with the objecting party or nonparty to try to resolve the matter by agreement within seven (7) calendar days of the written objection. If no agreement is reached, the objecting party or nonparty must file a motion seeking a ruling from the Court on its objections within seven (7) calendar days of the conference or other date agreed-to by the parties to the dispute. The response to any such motion will be due within seven (7) calendar days.

(d)     Until the parties to the dispute or the Court resolves a challenge to the sharing of Confidential Material with a defendant's In-House Counsel, the defendant shall not

13

share such Confidential Material with its In-House Counsel, nor can the objecting party or
nonparty withhold production or provision of documents or information from Defendant's
Outside Attorneys or Experts.

9.    **Filing Confidential Material and Highly Confidential Material**. No
Confidential or Highly Confidential Materials, including, but not limited to, any documents,
pleadings, motions, transcripts, or other filings that disclose the contents or substance thereof,
shall be filed in the public record of the Litigation unless otherwise ordered by the Court. In
filing papers with the Court that contain or make reference to material designated as Confidential
or Highly Confidential, the filing party or nonparty will seek leave from the Court to file the
Confidential or Highly Confidential Material under temporary seal. Upon or after filing any
paper containing Confidential or Highly Confidential Material, the filing party or nonparty shall
file on the public record a duplicate copy of the paper that does not reveal the Confidential or
Highly Confidential Material. The Producing Entity will have fourteen (14) days to provide a
basis for maintaining the record under seal consistent with the public's common-law and First
Amendment right of access. Any responses in opposition are due fourteen (14) days after the
Producing Entity files its motion. No replies are permitted without leave of court. Nothing in this
Order shall restrict the parties or nonparties from challenging the filing or maintenance of any
Confidential or Highly Confidential Material under seal.

10.    **Use of Confidential Material and Highly Confidential Material**.

(a)    All documents produced in discovery, and all materials designated
Confidential and Highly Confidential, shall be used solely in furtherance of the prosecution,
defense, or attempted settlement of this Litigation, shall not be used at any time for any other
purpose whatsoever, except as provided in paragraph 10(b) below, including, without limitation,

14

any commercial or business purpose, and shall not be disclosed to or made accessible to any

person except as specifically permitted by this Order. All materials designated Confidential or

Highly Confidential must be stored and maintained by the Receiving Party in a manner no less

secure than a Receiving Party would store and maintain its own confidential material or that of

its clients.

(b)      Nothing in this Order prevents the parties to *Electrical Medical Trust, et*

*al. v. U.S. Anesthesia Partners, Inc., et al.*, No. 4:23-cv-04398 (S.D. Tex.; Bennett, J.) from

utilizing Confidential or Highly Confidential Material in connection with that action, provided

that a protective or confidentiality order is entered in that case that provides protections for

Confidential and Highly Confidential Material comparable to the protections for such

information contained in this Order. Prior to such use, Defendant must provide to all Producing

Entities (that provided documents or materials during the FTC's investigation) proof of the entry

of such order.

(c)      This Order shall not restrict any attorney who is a qualified recipient under

the terms of this Order from rendering advice to his or her client that is a party with respect to

these actions, and in the course thereof, from generally relying upon his or her examination of

Confidential or Highly Confidential Material. In rendering such advice or in otherwise

communicating with the client, the attorney shall not disclose directly or indirectly the specific

content of any Confidential or Highly Confidential Material of another party or nonparty where

such disclosure would not otherwise be permitted under the terms of this Order.

(d)      If any Confidential or Highly Confidential Material is filed in the public

record by the Producing Entity, such public filing shall constitute the Producing Entity's waiver

of the designation of the publicly filed material for its use by any party in this Litigation;

15

provided, however, that inadvertent disclosure of Confidential or Highly Confidential Material
through a public filing shall not constitute a waiver if the inadvertent disclosure is corrected
within three (3) business days by withdrawing the public filing containing Confidential or Highly
Confidential Material, and the filing is replaced with a filing under seal pursuant to paragraphs 6
and 9. However, such public filing will not constitute a waiver of any confidentiality
designations made with respect to any non-publicly filed portions of the publicly filed document
or concerning any other material not actually publicly filed.

(e)     Nothing in this Order shall be construed to prejudice any party's right to
use Confidential or Highly Confidential Material in any hearing or other pre-trial proceeding
before the Court, or any party's right to challenge any such use.

(f)     The parties agree to cooperate in good faith to develop a process for
disclosure of Confidential or Highly Confidential information at trial.

(g)     Subject to taking appropriate steps to preserve confidentiality, the
Commission may disclose Confidential Material, Highly Confidential Material, or Sensitive
Personal Information to other governmental entities, as provided by 16 C.F.R. §§ 4.9–4.11, 15
U.S.C. §§ 46(f) and 57b-2, or as otherwise authorized or required by law. Such entities include
officers and employees of Federal or State law enforcement agencies (including duly authorized
employees of the Commission) and congressional committees.

11.     **Other Proceedings**. Any person or party subject to this Order who receives a
subpoena or other request for production of information covered by this Order shall promptly
notify the Producing Entity so that the party or nonparty may have an opportunity to appear and
be heard on whether that information should be disclosed. Confidential and Highly Confidential
Material shall not be produced in any other proceeding, or for any use other than in this

16

Litigation, without an order compelling production from a court of competent jurisdiction or the agreement of the Producing Entity.

12.    **Unauthorized Disclosure of Confidential or Highly Confidential Material**.

(a)    If any person subject to this Order becomes aware that they or any other person has, either intentionally or inadvertently, disclosed Confidential or Highly Confidential Material to someone not authorized to receive such material under this Order, counsel for the party involved shall (i) as soon as is practicable notify in writing the Producing Entity of the unauthorized disclosure; (ii) use best efforts to obtain the return or destruction of all copies of the protected materials; and (iii) inform the person or persons to whom unauthorized disclosures were made, to the extent the person or persons are identifiable, of the terms of this Order.

(b)    The Court has jurisdiction to enforce this Order and to grant relief, as authorized by law or in equity, for any violations thereof.

13.    **Inadvertent Production or Disclosure of Privileged Documents**. If information subject to a claim of attorney-client privilege, work product immunity, or any other applicable privilege or immunity is produced inadvertently, the parties shall comply with Federal Rule of Evidence 502(d), Federal Rule of Civil Procedure 26(b)(5)(B), and any other relevant order of the Court.

14.    **Nonparties**.

(a)    If information sought in a discovery request implicates a Producing Entity's obligation to a nonparty not to disclose such information, the following procedures shall be followed:

17

(i)     The Producing Entity shall timely serve a written objection to the production of such information on the basis of its obligation to a nonparty not to disclose the information.

(ii)    The Producing Entity shall, no later than the date on which written objections are served under paragraph 14(a)(i), provide the nonparty written notice of the pending request and a copy of this Order.

(iii)   If the nonparty does not object to the disclosure within fourteen (14) calendar days from which the written notice of the pending request was sent by the party or such additional time as may be required by the Producing Entity's obligation to the nonparty, the Producing Entity shall produce the materials subject to any appropriate designations under the terms of this Order.

(iv)    If the nonparty objects to the disclosure, the nonparty shall timely seek a protective order by filing within fourteen (14) calendar days from the objection a motion for a protective order or other appropriate relief from the Court. Should the nonparty timely seek relief, no disclosure shall be made or required unless disclosure is ordered by the Court.

(v)     Nothing in this Order shall be deemed to require any Producing Entity to subject itself to any penalties for noncompliance with any legal process or order, or to seek any relief from the Court in connection with obligations imposed by a discovery request.

(b)     If any discovery requests are served on a nonparty, the party serving the discovery request shall provide the nonparty with notice of the terms of this Order. Documents produced by nonparties in this Litigation that consist of or contain portions of documents originally created or generated by a party shall be treated as Highly Confidential. If any party believes the designation should be Confidential or no designation, it can notify the party who

18

originally created/generated the document, the parties can confer, and go through the dispute resolution process as necessary.

15.  **Further Application**. Nothing in this Order shall preclude any party, or any nonparty from whom discovery has been requested, from applying to the Court for additional or different protective provisions with respect to specific material based on a showing of good cause. The Court shall retain jurisdiction over the parties, nonparty Producing Entities and over any person executing an undertaking to be bound by the terms of this Order, during the pendency of the Litigation and for such time thereafter as is needed to enforce the terms of this Order.

16.  **Reservation of Rights**.

(a)  By designating any material Confidential or Highly Confidential, the parties do not acknowledge that any such material is relevant or admissible in this Litigation. All parties reserve the right to seek discovery of, or alternatively to resist discovery of, such material in this Litigation.

(b)  Nothing in this Order shall prohibit a party from using or disclosing publicly available or independently discovered information, unless the party is aware that the information has become public improperly or inadvertently.

(c)  Nothing in this Order prevents any party from seeking a further order of this Court pursuant to Federal Rule of Civil Procedure 26(c).

17.  **Modification**. The Court retains the right to allow disclosure of any subject covered by this Order or to modify this Order at any time. Furthermore, nothing in this Order shall prejudice the right of the parties to stipulate (subject to Court approval) an amendment, modification, or supplement to this Order. Nothing in this Order shall preclude any party from seeking an order of the Court amending, modifying, or supplementing this Order.

19

18.   **Conclusion of this Litigation**.

(a)   The provisions of this Order will not terminate at the conclusion of this Litigation. This Order shall remain in full force and effect unless modified, superseded, or terminated by written agreement of the parties or by an order of this Court.

(b)   Absent a written request by a Producing Entity to return materials (at its own expense) within sixty (60) calendar days after such time as this Litigation is concluded, whether by final adjudication on the merits from which there remains no right of appeal, or by other means, all persons having received information designated as Confidential or Highly Confidential Material must destroy such materials. Alternatively, the Producing Entity may require all counsel to certify in writing to the Producing Entity that all such information has been destroyed. As to those materials that contain or reflect attorney work product, counsel of record for the parties shall be entitled to retain such work product in their files, so long as such materials, in accordance with the provisions of this Order, are clearly marked to reflect that they contain information subject to this Order and are maintained as such.

(c)   Notwithstanding any other provision of this Order, attorneys shall be entitled to retain pleadings, affidavits, motions, briefs, expert reports (and exhibits thereto), correspondence (including internal correspondence and e-mail), any other papers filed with the Court (including exhibits), deposition transcripts (including exhibits), and the trial record (including exhibits) even if such materials contain Confidential or Highly Confidential Material, so long as this Order will continue to govern any such retained materials. The Receiving Party's reasonable efforts shall not require the return or destruction of materials that (i) are stored on backup storage media made in accordance with regular data backup procedures for disaster recovery purposes; (ii) are located in the email archive system or archived electronic files of

20

departed employees; (iii) are subject to litigation hold obligations; or (iv) are otherwise required by law to be retained. Backup storage media need not be restored for the purpose of returning or certifying destruction of materials, but any such materials retained in backup storage media shall continue to be treated in accordance with this Order.

(d) Nothing in this Order shall preclude the FTC from complying with the provisions of Rule 4.12 of the FTC's Rules of Practice, 16 C.F.R. § 4.12.

19. **Termination of Access**.

(a) In the event any person or party permanently ceases to be engaged in the conduct of these actions, such person's or party's access to Confidential and Highly Confidential Material shall be terminated, and all copies thereof shall be returned or destroyed in accordance with the terms of paragraph 18 above, except that such return or destruction shall take place as soon as practicable after such person or party ceases to be engaged in the conduct of this Litigation.

(b) The provisions of this Order shall remain in full force and effect as to any person or party who previously had access to Confidential and Highly Confidential Material, except as may be specifically ordered by the Court or consented to by the Producing Entity.

**IT IS SO ORDERED.**

Dated: _____

Kenneth M. Hoyt
United States District Judge

21

## APPENDIX A

## AGREEMENT TO BE BOUND BY PROTECTIVE ORDER

I, _____, am employed as _____ by

_____. I acknowledge and certify as follows:

1. I have read the Protective Order in Federal Trade Commission v. U.S. Anesthesia Partners, Inc, et. al., Civil Action No. **4:23-CV-03560**, United States District Court for the Southern District of Texas and agree to be bound by its terms.

2. I will not make copies or notes of Confidential or Highly Confidential Material that I receive in this litigation except as necessary to enable me to render assistance in connection with this Litigation.

3. I will not disclose Confidential or Highly Confidential Material that I receive in this Litigation to any person not expressly entitled to receive it under the terms of the Protective Order and will retain any such material in a safe place.

4. I will not use Confidential or Highly Confidential Material that I receive in this Litigation for any purpose other than that authorized by the Protective Order.

5. I will retain all Confidential or Highly Confidential Material that I receive in this Litigation in my custody until I have completed my assigned duties, whereupon the materials will be returned to the person that provided them to me or destroyed, as provided by the Protective Order. Such delivery or destruction shall not relieve me from any of the continuing obligations imposed upon me by the Protective Order.

6. I agree to be subject to the continuing jurisdiction of the United States Court for the Southern District of Texas for the sole purpose of having the terms of the Protective Order enforced.

7. I understand that my failure to abide by the terms of the Protective Order will subject me, without limitation, to civil and criminal penalties for contempt of Court.

Date: _____     Signature: _____

                                   Address: _____

                                   _____

United States District Court
Southern District of Texas

**ENTERED**

May 28, 2024
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:23-CV-03560 |
| | § | |
| U.S. ANESTHESIA PARTNERS, INC., *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## ORDER ON MOTION FOR PROTECTIVE ORDER

Before the Court are competing proposed protective orders. The significant difference between the two, centers on whether Ki Jhana Friday, U.S. Anestheisa Parnters, Inc.'s ("USAP") Deputy General Counsel and Othon Prounis, Welsh Carson's Acting General Counsel, should have access to non-public material that reveal trade secrets and/or highly confidential, commercial information that will likely include competitors' pricing information and insurers' negotiating positions.

The Federal Trade Commission takes the position that disclosure would result in harm, and sets out its reasons for denying access to USAP's Welsh Carson's, Deputy General Counsel and Acting General Counsel, respecitvely. FTC asserts:

(a)     disclose risks harm to non-parties from whom the FTC may also seek information in the future;

(b)     it is impossible to insure against inadvertent disclosures;

(c)     both Friday and Prounis occupy roles where competitive decision making occurs;

(d)     Friday publicly presents as having a role in strategic planning and having oversight in USAP's corporate litigation; and,

(e)     Prounis is the sole in-house counsel at Welsh Carson and advertises as focusing primarily on "leveraged buyouts and mergers acquisitions";

Neither USAP nor Welsh Carson disputes the accuracy of the public disclosure information concerning the roles that the two attorneys play with the respective employers. Instead, USAP argues that:

(a)     FRCP, Rule 26(c)(G) places the burden on the FTC to establish that "good cause" supports the denial of access;

(b)     Access by Friday to highly confidential materials present little or no risk of inadvertent disclosure; and

(c)     Friday's role at USAP specifically involves or relates to disputes between former and current employees, not negotiations concerning business terms or regularly engaging in giving legal advice concerning competitive – sensitive information, trade secrets, or highly sensitive non-public, strategic business planning. *See In re Terra Int'l, Inc.,* 134 F.3d 302, 306 (5th Cir. 1998).

It appears that Welsh Carson accedes to the FTC's argument concerning access to confidential or highly confidential materials as it relates to Prounis. Nevertheless, the Court is of the view that if it the Court is mistaken, in this regard, its determination of the issue would mirror those involving USAP's attorney, Friday.

A review of the arguments and the information concerning how Friday is presented in the public domain reveals that she is involved, at some level, in competitive decision making of the same or similar nature as that which is the subject of this suit. There is always a risk of disclosure as conceded by USAP. USAP does not argue in absolute terms on this point but uses the phrase "little or no risk of inadvertent disclosure" in addressing the risk. Finally, USAP does not argue that any hardship or prejudice that USAP might claim, cannot be overcome by outside counsel who will have access to the materials can confer with Friday. In fact, the FTC concedes that Friday "can still assist USAP's outside counsel using confidential materials, non-designated materials,

2 / 3

and most importantly USAP's own materials.   *See Wi-Lan, Inc. v. Acer, Inc.,*   2009WL1766143,

at 2 [E.D. Tex. June 23, 2009).

After a review of the pleadings, memoranda, and arguments of Counsel, the Court

determines that the FTC's motion to exclude access to "highly confidential" materials by Friday

and Prounis should be granted.

It is so Ordered and a Protective Order is Entered.

SIGNED on May 28, 2024, at Houston, Texas.

Kenneth M. Hoyt
United States District Judge

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

Case No.: 4:23-CV-03560-KH

U.S. ANESTHESIA PARTNERS, INC., et al.

Defendants.

## DEFENDANT U.S. ANESTHESIA PARTNERS, INC.'S
## WRITTEN STATEMENT DESIGNATING IN-HOUSE COUNSEL

Pursuant to Paragraph 8(a) of the Protective Order (Dkt. No. 149-1), Defendant U.S.

Anesthesia Partners, Inc. ("USAP") designates Ki'Jhana R. Friday as the USAP in-house counsel

to receive access to Confidential Material. *See* Dkt. No. 149-1 ¶ 2(a) (defining "Confidential

Material"); *id.* ¶ 3(c) (providing one in-house USAP attorney with access to Confidential

Material). The FTC has already agreed that Ms. Friday may access Confidential Material. *See*

Dkt. No. 145 at 1 (arguing that Ms. Friday "should . . . be limited to seeing only Confidential

Material"); Dkt. No. 152 at 3 (precluding Ms. Friday only from accessing Highly Confidential

Material).

## I.   Ms. Friday's Past, Current, and Reasonably Foreseeable Future Primary Job Duties and Responsibilities

Ms. Friday is the Vice President, Deputy General Counsel of USAP. She has held that

position since February 2021. Prior to her current role, she served as Vice President, Associate

General Counsel for two years. In her past, current, and reasonably foreseeable roles, Ms. Friday

has been, is, and will be a litigator, not a "Competitive Decision-Mak[er]." Dkt. No. 149-1

¶ 3(c). And there are no plans for her to be a "Competitive Decision-Mak[er]." Ms. Friday

advises the Board of Directors, Executive Team, and USAP Clinical Governance Boards (the

regional leadership) on strategic decisions related to litigation. That litigation typically involves

former or current employees—not "a competitor, or potential competitor, of U.S. Anesthesia

Partners, a payor, or a healthcare provider." *Id.* And that strategic advice does not involve any

trade secret information or "confidential research, analysis, development or commercial

information" that belongs to third parties. *Id.* ¶ 2(a) (defining "Confidential Material"). To the

extent Ms. Friday is involved in lawsuits with insurers, hospitals, or ambulatory surgical centers,

her advice again relates solely to litigation strategy concerning the claims at issue in that

particular case.

Aside from litigation, Ms. Friday regularly provides legal advice as it relates to

employment issues. For instance, she works to craft employment agreements for the physicians

and certified registered nurse anesthetists who join USAP and analyzes state employment law

issues that may arise. In offering this legal advice, Ms. Friday does not negotiate business terms

during acquisitions or with commercial payors. Ms. Friday also does not typically negotiate any

business terms on USAP's behalf in recruiting new clinicians. Finally, Ms. Friday advises

USAP's Clinical Governance Boards on corporate governance matters.

**II.    Current Litigation and Other Legal Actions**

Ms. Friday currently participates in or advises on behalf of USAP in the following

matters:

- *Electrical Medical Trust v. U.S. Anesthesia Partners, Inc.*, No. 4:23-cv-04398 (S.D. Tex.);

- *Green v. U.S. Anesthesia Partners of Colorado, Inc.*, No. 2022CV32181 (Arapahoe Cnty. Dist. Ct. Colo.);

- *Green v. U.S. Anesthesia Partners of Colorado, Inc.*, No. 1:18-cv-02206 (D. Colo.);

2

- *Green v. U.S. Anesthesia Partners of Colorado, Inc.*, No. 22-1319 (10th Cir.);

- *Nassif v. U.S. Anesthesia Partners of Florida Inc.*, No. 2021-CA-012168-O (Fl. Cir. Ct. Orange Cnty.);

- *Pond v. Associated Anesthesiologists of Fort Wayne LLC*, No. 02D03-2307-PL-000277 (Ind. Super. Ct. Allen Cnty.);

- *Tischer v. U.S. Anesthesia Partners of Maryland*, No. C-15-CV-23-003405 (Md. Cir. Ct. Montgomery Cnty.);

- *Axmann v. U.S. Anesthesia Partners Holdings, Inc.*, No. 3:22-cv-01635 (N.D. Tex.);

- *Noble Anesthesia Partners, PLLC v. U.S. Anesthesia Partners, Inc.*, No. DC-17-09602 (298th Dist. Ct., Dallas Cnty., Tex.);

- *Hamlin v. Star Anesthesia PLLC*, No. 2021CI01859 (225th Dist. Ct., Bexar Cnty., Tex.);

- *U.S. Anesthesia Partners of Texas, P.A. v. Doan*, No. 2022CI09471 (285th Dist. Ct., Bexar Cnty., Tex.);

- *U.S. Anesthesia Partners of Texas, P.A. v. Conlin*, No. DC-22-15482 (116th Dist. Ct., Dallas Cnty., Tex.);

- *Patel v. S. Anesthesia Partners of Texas, P.A.*, No. 2022-34508 (165th Dist. Ct., Harris Cnty., Tex.);

- EEOC Charge No. 450-2024-01080 (Dallas Dist. Office); and

- EEOC Charge No. 450-2023-09709 (Dallas Dist. Office).

* * *

Before accessing any Confidential Material, Ms. Friday will execute the agreement annexed to the Protective Order as Appendix A. Pursuant to Paragraph 3(c) of the Protective Order, Ms. Friday agrees, for a period of two (2) years after receipt of Confidential Material, that she will not participate in or advise on competitive decisionmaking or litigation or other legal actions involving the Producing Entity of Confidential Material.

3

Dated:  June 4, 2024

Respectfully submitted,

/s/ *Kenneth M. Fetterman*

David J. Beck (TX Bar No. 00000070)
    (Federal I.D. No. 16605)
Garrett S. Brawley (TX Bar No. 24095812)
    (Federal I.D. No. 3311277)
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX  77010
Tel: (713) 951-3700
Fax: (713) 951-3720
dbeck@beckredden.com
gbrawley@beckredden.com

Mark C. Hansen (D.C. Bar No. 425930)
    (*Pro Hac Vice)*
Attorney-in-Charge
Geoffrey M. Klineberg (D.C. Bar No. 444503)
    (*Pro Hac Vice*)
David L. Schwarz (D.C. Bar No. 471910)
    (*Pro Hac Vice*)
Kenneth M. Fetterman (D.C. Bar No. 474220)
    (*Pro Hac Vice*)
Kyle M. Wood (D.C. Bar No. 90012250)
    (*Pro Hac Vice*)

KELLOGG, HANSEN, TODD,
    FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
dschwarz@kellogghansen.com
kfetterman@kellogghansen.com
kwood@kellogghansen.com

*Counsel for Defendant U.S. Anesthesia Partners, Inc.*

4

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2024, I served or caused to be served a true and correct

copy of U.S. Anesthesia Partners, Inc.'s Written Statement Designating In-House Counsel to the

Federal Trade Commission upon the following counsel of record for the FTC at the email

addresses listed below:

Kara Monahan
Bradley S. Albert
Michael J. Arin
Daniel W. Butrymowicz
Timothy Grayson
Dylan Herts
Leah P. Hubinger
Patrick Kennedy
Neal Perlman
Gary H. Schorr
Eric M. Sprague

Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
Tel: 202-326-2075

kmonahan@ftc.gov
balbert@ftc.gov
marin@ftc.gov
dbutrymowicz@ftc.gov
tgrayson@ftc.gov
dherts@ftc.gov
lhubinger@ftc.gov
pkennedy@ftc.gov
nperlman@ftc.gov
gschorr@ftc.gov
esprague@ftc.gov

Dated: June 4, 2024

/s/ *Kyle M. Wood*
Kyle M. Wood
*Counsel for Defendant U.S. Anesthesia
Partners, Inc.*

EXHIBIT 3

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Southern District of Texas

| | | |
|---|---|---|
| Federal Trade Commission | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.  4:23-CV-03560 |
| U.S. Anesthesia Partners, Inc. | ) | |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:             Texans Anesthesia Associates, PLLC
             c/o Diane Dinh, 1317 Mark Street, Stafford, Texas 77477
*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: 600 Pennsylvania Ave, NW, Washington, DC 20580 | Date and Time: |
|---|---|
| | 12/12/2024 5:00 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

      The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     11/12/2024

                    *CLERK OF COURT*
                                                 OR
                                                          /s/ Michael Goldenberg
     _____          _____
         *Signature of Clerk or Deputy Clerk*              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Federal Trade Commission                                    , who issues or requests this subpoena, are:

600 Pennsylvania Ave, NW, Washington, DC 20580, mgoldenberg@ftc.gov, (202) 506-0798

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:23-CV-03560

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

    I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ☐ I served the subpoena by delivering a copy to the named person as follows: _____

By email, to _____

_____ on *(date)* _____ ; or

    ☐ I returned the subpoena unexecuted because: _____

_____ .

    Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

    $ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00   .

    I declare under penalty of perjury that this information is true.

Date: _____

                                                     _____
                                                     *Server's signature*

                                                     _____
                                                     *Printed name and title*

                                                     _____
                                                     *Server's address*

Additional information regarding attempted service, etc.:

Print      Save As...      Add Attachment      Reset

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) *For Other Discovery.*** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) *Command to Produce Materials or Permit Inspection.***
  **(A) *Appearance Not Required.*** A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B) *Objections.*** A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) *Quashing or Modifying a Subpoena.***
  **(A) *When Required.*** On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B) *When Permitted.*** To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C) *Specifying Conditions as an Alternative.*** In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
  **(A) *Documents.*** A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B) *Form for Producing Electronically Stored Information Not Specified.*** If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C) *Electronically Stored Information Produced in Only One Form.*** The person responding need not produce the same electronically stored information in more than one form.
  **(D) *Inaccessible Electronically Stored Information.*** The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
  **(A) *Information Withheld.*** A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B) *Information Produced.*** If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**Attachment A to Plaintiff's Subpoena for the Production of Documents to Texans Anesthesia Associates, PLLC**

**DEFINITIONS**

For the purposes of this subpoena, the following Definitions apply:

D 1.   "Company," "Texans Anesthesia Associates, PLLC" and "You" mean Texans Anesthesia Associates, PLLC and includes any related entities; its domestic and foreign parents, predecessors, successors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25% or more) or total ownership or control between the Company and any other Person.

D 2.   "And" and "or" have both conjunctive and disjunctive meanings as necessary to bring within the scope of these Requests anything that might otherwise be outside their scope.

D 3.   The term "Collaborative Work Environment" means a platform used to create, edit, review, approve, store, organize, share, and access documents and information by and among authorized users, potentially in diverse locations and with different devices. Even when based on a common technology platform, Collaborative Work Environments are often configured as separate and closed environments, each of which is open to a select group of users with layered access control rules (reader vs. author vs. editor). Collaborative Work Environments include Microsoft SharePoint sites, eRooms, document management systems (*e.g.*, iManage), intranets, web content management systems ("CMS") (*e.g.*, Drupal), wikis (*e.g.*, Confluence), work tracking software (*e.g.*, Jira), and blogs.

D 4.   "Communications" is used in the broadest possible sense and means any exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished.

D 5.   "Discuss" and "discussing" mean in whole or in part constituting, containing, describing, or addressing the designated subject matter, regardless of the length of the treatment or detail of analysis of the subject matter, but not merely referring to the designated subject matter without elaboration. In addition, a document that "discusses" another document includes the other document itself (e.g., a document that "discusses" an agreement or contract includes the agreement or contract itself). Further, these terms include any operating or financial data about the designated subject matter where such data are separately set out as in a chart, listing, table, or graph.

D 6.   The term "documents" means all written, printed, recorded, or electronically stored information ("ESI") of any kind in the possession, custody, or control of the Company, including information stored on and communications sent through social media accounts

1

like Twitter, Facebook, or Snapchat; including chats, instant messages, text messages, direct messages, other Messaging Applications, audio/visual recordings, wherever stored, including documents contained in Collaborative Work Environments and other document databases as well as copies of documents that are not identical duplicates of the originals in a person's files; and copies of documents the originals of which are not in the possession, custody, or control of the Company. Employee-Owned Devices used to store or transmit documents responsive to this subpoena are considered in the possession, custody, or control of the Company. "Documents" includes metadata, formulas, and other embedded, hidden, and bibliographic or historical data describing or relating to any document. Unless otherwise specified, "documents" excludes bills of lading, invoices in non-electronic form, purchase orders, customs declarations, and other similar documents of a purely transactional nature; architectural plans and engineering blueprints; and documents solely relating to environmental, tax, human resources, OSHA, or ERISA issues.

D 7.    Each," "any," and "all" mean "each and every."

D 8.    The term "Employee-Owned Device" means any computer, phone, tablet, or other electronic device owned by a Company employee that has been used to conduct business for Company.

D 9.    "Include" and "including" mean "including but not limited to." The use of the term "include" in any Request shall not be used to limit the generality or scope of any Request. Nor shall the generality of any Request be limited by the fact that another Request touches on the same topic with a greater or lesser degree of specificity.

D 10.    The term "Litigation" means the proceeding captioned *Federal Trade Commission v. U.S. Anesthesia Partners, Inc.*, 4:23-CV-03560-KH (S.D. Tex.).

D 11.    The term "Messaging Application" refers to any electronic method that has ever been used by the Company and its employees to communicate with each other or entities outside the Company for any business purposes. "Messaging Application" includes platforms, whether for ephemeral or non-ephemeral messaging, for email, chats, instant messages, text messages, and other methods of group and individual communication (*e.g.*, Microsoft Teams, Slack). "Messaging Application" may overlap with "Collaborative Work Environment."

D 12.    "Person" includes the Company and means any natural person, corporate entity, sole proprietorship, partnership, association, joint venture, governmental entity, or trust.

D 13.    "Relate," "related to," and "relating to" mean, in whole or in part, addressing, analyzing, concerning, constituting, containing, commenting on, discussing, describing, identifying, referring to, reflecting, reporting on, stating, or dealing with.

D 14.    "USAP" means U.S. Anesthesia Partners, Inc., together with its successors, predecessors, divisions, wholly- or partially-owned subsidiaries, domestic or foreign parents, affiliates,

partnerships, and joint ventures; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing.

## INSTRUCTIONS

I 1.    All references to year refer to calendar year. Unless otherwise specified, each of the Requests calls for documents and information for each of the years from January 1, 2012 to the present. Where information, rather than documents, is requested, provide it separately for each year; where yearly data is not yet available, provide data for the calendar year to date. If calendar year information is not available, supply the Company's fiscal year data indicating the 12-month period covered, and provide the Company's best estimate of calendar year data.

I 2.    Company shall respond to these Requests in accordance with Attachment A or any agreement or order regarding electronic discovery.

I 3.    This subpoena shall be deemed continuing in nature so as to require production of all documents responsive to any Request included in this subpoena produced or obtained by the Company up to 45 calendar days prior to the date of the Company's full compliance with this subpoena.

I 4.    Whenever necessary to bring within the scope of a Request a response that might otherwise be construed to be outside its scope, the following constructions should be applied:

   (a)    Construing the singular form of any word to include the plural and the plural form to include the singular;

   (b)    Construing the past tense of a verb to include the present tense and the present tense to include the past tense;

   (c)    Construing the masculine form to include the feminine form; and

   (d)    Construing the term "date" to mean the exact day, month, and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations, or matters.

I 5.    Unless otherwise stated, construe each Request independently and without reference to any other for the purpose of limitation.

I 6.    If you object to any part of this subpoena, set forth the basis for your objection and respond to all parts of the subpoena to which you do not object. Any ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be waived. All objections must be made with particularity and must set forth all the information upon which you intend to rely in response to any motion to compel.

I 7.    All objections must state with particularity whether and in what manner the objection is being relied upon as a basis for limiting the scope of any search for documents or

4

withholding any responsive document. If you are withholding responsive information pursuant to any general objection, you should so expressly indicate. If, in responding to any part of this subpoena, you claim any ambiguity in interpreting either the subpoena or a definition or instruction applicable thereto, set forth as part of your response the language deemed to be ambiguous and the interpretation used in responding to that part of the subpoena, and produce all documents that are responsive to that part of the subpoena as you interpret it.

I 8.    If documents responsive to a particular Request no longer exist for reasons other than the ordinary course of business, but the Company has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the Request(s) to which they are responsive, and identify the Persons having knowledge of the content of such documents.

I 9.    Any questions you have relating to the scope or meaning of anything in this Request or suggestions for possible modifications thereto should be directed to Michael Goldenberg at 202-506-0798 or mgoldenberg@ftc.gov. The response to the Request shall be delivered per the instruction of Michael Goldenberg during the course of normal business (8:30 a.m. to 5:30 p.m., Monday through Friday). Michael Goldenberg will provide specific mail delivery instructions should that method of transmittal be required.

## REQUESTS FOR PRODUCTION

### Request No. 1.

All Documents called for by the Instructions, Definitions, and Requests set forth in Appendix A of USAP's Subpoena to Texans Anesthesia Associates, PLLC to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action in this Litigation dated November 4, 2024, without regard to any limitations of the scope of the subpoena agreed to by USAP following issuance.

# EXHIBIT 4

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| *Plaintiff* | § | |
| | § | |
| v. | § | Case No.  4:23-CV-03560-KH |
| | § | |
| U.S. ANESTHESIA PARTNERS, INC. | § | |
| | § | |
| *Defendant* | § | |

## DECLARATION OF DIANE DINH

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

I, Diane Dinh, am competent to testify to the matters set forth in this declaration and state as follows:

1.      I am the Practice Manager of Texans Anesthesia Associates, PLLC, and as such I have personal knowledge of the matters set forth in this declaration.

2.      I have reviewed the Subpoenas to Produce Documents served on Texans Anesthesia by U.S. Anesthesia Partners, Inc. on November 1 and 13, 2024 (Ex. 1 and 2), and by the Federal Trade Commission on November 13, 2024 (Ex. 3).

3.      A search for information responsive to Request No. 2 would take many hours to several days of staff time to go back and figure out all facilities to which Texans Anesthesia provided services since January 1, 2012. Additionally, some of the documents have likely been shredded over time.

**REQUEST FOR PRODUCTION NO. 2:**

All contracts or Agreements with Hospitals, ASCs, or other facilities in the State of Texas where You have provided Anesthesia Services, including, but not limited to, the following:

    a. Documents sufficient to show any Subsidy You received from a Hospital, ASC, or other facility for the provision of Anesthesia Services;

    b. Documents sufficient to show Your coverage obligations between You and any Hospital, ASC, or other facility, including any obligations relating to the availability of physicians or CRNAs; whether in-house or on-call coverage is needed; and whether specialized coverage is required for specific departments within Your facility/facilities (e.g., trauma or cardiac care);

    c. Documents sufficient to show any nonmedical or administrative services (including, but not limited to, scheduling and billing) provided by You to any Hospital, ASC, or other facility, including any changes over time;

    d. Documents sufficient to identify whether You acted as the exclusive Anesthesia Provider at any Hospital, ASC, or other facility; and

    e. Documents sufficient to show the identity of each Hospital, ASC, or other facility at which You provided Anesthesia Services, including its address, zip code, and facility identification number (e.g., Medicare Provider Number), and whether it offered Inpatient Services, Outpatient Services, or both.

4.    Regarding Request No. 3, searching for responsive materials going back to

January 1, 2012 would most likely take several hours.

**REQUEST FOR PRODUCTION NO. 3:**

All Documents and Communications relating to the termination of any contractual relationship between You and a Hospital, ASC, or other facility located in the State of Texas. This request includes, but is not limited to, Documents or Communications discussing, analyzing, or assessing the reason(s) why any such contractual relationship ended (and if You terminated the relationship, the reasons why You did so), as well as feedback or complaints You have received relating to (i) Your Network Status, (iii) any Subsidy You requested or required, or (iii) the quality of Your Anesthesia Services or other services You provided.

5.     Regarding Request No. 4, given there are regular employees, temporary employees, and contractors, there is no fixed number of physician anesthesiologists, CRNAs, CAAs, nurse practitioners, and registered nurses who work at Texans Anesthesia on any given day. Additionally, Texans Anesthesia switched from QuickBooks payroll to PRISM payroll in 2022. I estimate it would take at least an entire day of work to compile responsive information from the two systems on a daily basis going back to January 1, 2012.

### REQUEST FOR PRODUCTION NO. 4:

Documents sufficient to show, on an annual basis, the number of Clinicians who worked at Your practice and the number of Clinicians who were physicians, CRNAs, and CAAs.

6.     Regarding Request No. 5, it would require multiple staff members to look for responsive materials, such as Texans Anesthesia submitting bids and responding to requests for proposals, going back to January 1, 2012. Such materials are not maintained in a central repository.

### REQUEST FOR PRODUCTION NO. 5:

Documents Relating to any attempt You have made to establish a new relationship with a Hospital, ASC, or other facility or to maintain any existing relationship, including, but not limited to, the following:

        a.  Any bids or responses to requests for proposals from Hospitals, ASCs, or other facilities that You prepared or submitted; and

        b.  Documents or Communications reflecting any challenges or competition You face in seeking to establish or maintain a relationship with a Hospital, ASC, or other facility.

7.    Regarding Request No. 6, it would require at least half a day to look for responsive materials covering 14 years starting on January 1, 2010, to the extent any such materials still exist.

**REQUEST FOR PRODUCTION NO. 6:**

Documents and Communications with Hospitals, ASCs, or other facilities relating to any Subsidy You or the Hospital, ASC, or other facility negotiated, calculated, requested, or agreed to between January 1, 2010, and the present.

8.    Regarding Request No. 7, it would require at least half a day to look for responsive materials going back to January 1, 2012, if any such materials exist. Texans Anesthesia is not aware of Subsidies related to other Anesthesia Service Providers.

**REQUEST FOR PRODUCTION NO. 7:**

Documents concerning any evaluation or analysis (whether conducted by You or by a consultant or other third party) of the Subsidies You receive, have requested, or plan to request from any Hospital, ASC, or other facility, or of how those Subsidies compare to those received or requested by any other Anesthesia Service Provider.

9.    Regarding Request No. 8, the hospitals track quality, but Texans Anesthesia does not maintain any information related to assessing quality.

**REQUEST FOR PRODUCTION NO. 8:**

Documents or data sufficient to identify how You track, measure, or assess the quality of Your Anesthesia Services, including, but not limited to, the following:

  a.    Documents assessing or reflecting Your performance under those metrics;
  b.    Documents and Communications with Hospitals, ASCs, or other facilities concerning the quality of Your Services or Your quality reporting; and
  c.    Documents and data from third parties assessing the quality of Your Anesthesia Services or Your quality reporting practices, protections, and protocols, including Communications, presentations, audits, and

reports from any third party reflecting any such evaluation or assessment.

10.    Regarding Request No. 9, to discover whether responsive materials exist would require me to ask each of the more than one hundred regular and PRN physician anesthesiologists and CRNAs whether they received any complaints concerning anesthesia services since January 1, 2012. Even assuming the providers were willing to cooperate it would take several weeks or even months to follow up with each provider for the information.

**REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to identify all complaints You have received concerning the Anesthesia Services You have provided in the State of Texas.

11.    Regarding Request No. 15, to search for responsive documents going back to January 1, 2012 would require at least two of Texans Anesthesia's three administrative staff members many hours to several days.

**REQUEST FOR PRODUCTION NO. 15:**

Documents sufficient to show the time period(s) when You have been In Network and when You have been Out of Network in the State of Texas (or any MSA within the State of Texas) with any Commercial Healthcare Insurer.

12.    Regarding Request No. 18, agreements between Texans Anesthesia and health insurance entities are confidential and proprietary and only result from providing quality services over a long period of time. No anesthesia services provider would disclose such information or share it with competitors.

**REQUEST FOR PRODUCTION NO. 18:**

All Agreements between You and any Commercial Healthcare Insurer between

January 1, 2010, and the present.

13.    Regarding Request No. 23, Texans Anesthesia has employed at least two hundred physician anesthesiologists, CRNAs, CAAs, nurse practitioners, and registered nurses since January 1, 2012, and it would take several days to search for responsive materials, to the extent they still exist.

**REQUEST FOR PRODUCTION NO. 23:**

Documents sufficient to show Your employment Agreements with Clinicians, including any changes in those Agreements over time.

14.    Regarding Request No. 25, it would take many hours to search for responsive materials going back to January 1, 2012. Texans Anesthesia posts job opportunities on GasWork.com and attends the annual National CRNA Week recruitment event hosted by the Texas Association of Nurse Anesthetists.

**REQUEST FOR PRODUCTION NO. 25:**

Documents sufficient to show Your efforts to recruit Clinicians to Your practice, including Documents sufficient to show online job postings, email campaigns, or showcases at medical schools or nursing schools that You participated in in order to recruit Clinicians.

15.    Regarding Request No. 26, it would take several hours to search for responsive information related to changes in ownership of Texans Anesthesia going back to January 1, 2012.

**REQUEST FOR PRODUCTION NO. 26:**

Documents sufficient to show the ownership interest in Your practice, including changes overtime.

   I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING

IS TRUE AND CORRECT. EXECUTED ON THE _22_ DAY OF NOVEMBER

2024.

Diane Dinh, Practice Manager
Texans Anesthesia Associates, PLLC

# EXHIBIT 5

Jeff Potts
713 221 2317
jpotts@Steptoe.com

**Steptoe**

717 Texas Avenue Suite 2800
Houston, TX 77002-2761
713 221 2300 main
www.steptoe.com

September 5, 2024

**VIA Certified Mail**
Texans Anesthesia Associates, PLLC
9525 Katy Freeway, Suite 206
Houston, Texas 77024
Attn: Canh Nguyen, MD

> RE:    *FTC v. U.S. Anesthesia Partners, Inc.*, Case No. 4:23-cv-03560, Subpoena to
> Memorial Hermann

To Whom it May Concern:

I write to provide notice in accordance with the Anesthesiology Services Agreement between Memorial Hermann Health System ("Memorial Hermann") and Texans Anesthesia Associates PLLC ("Texans Anesthesia") (the "Services Agreement") and the Mutual Non-Disclosure Agreement between Memorial Hermann and Texans Anesthesia (the "NDA"). Memorial Hermann has received subpoenas from the Federal Trade Commission and U.S. Anesthesia Partners, L.P. in the matter captioned *Federal Trade Commission v. U.S. Anesthesia Partners, Inc.*, Case No. 4:23-cv-03560-KH, pending in the United States District Court for the Sothern District of Texas. Memorial Hermann intends to produce documents responsive to these subpoenas, and some of your confidential information, as defined in the Services Agreement and the NDA, may be contained in the produced documents. Memorial Hermann provides written notice that it intends to produce these documents as either "Confidential" or "Highly Confidential" in accordance with the enclosed protective orders and federal law.

A copy of the complaint and the subpoenas are also enclosed. Please reach out if you have any questions or concerns.

Respectfully,

Jeff Potts

JP:bh
Enclosures

35895001

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **FEDERAL TRADE COMMISSION**<br>600 Pennsylvania Avenue, N.W.<br>Washington, DC, 20580<br><br>**Plaintiff,**<br><br>**v.**<br><br>**U.S. ANESTHESIA PARTNERS, INC.**<br>12222 Merit Drive, Suite 700<br>Dallas, TX, 75251<br><br>**and**<br><br>**WELSH, CARSON, ANDERSON &**<br>**STOWE XI, L.P.,**<br>**WCAS ASSOCIATES XI, LLC,**<br>**WELSH, CARSON, ANDERSON &**<br>**STOWE XII, L.P.,**<br>**WCAS ASSOCIATES XII, LLC,**<br>**WCAS MANAGEMENT CORPORATION,**<br>**WCAS MANAGEMENT, L.P., and**<br>**WCAS MANAGEMENT, LLC**<br>599 Lexington Avenue, Suite 1800<br>New York, NY, 10022<br><br>**Defendants.** | **Case No.:**<br><br>**Redacted Public Version** |

**Complaint for Injunctive and Other Equitable Relief**

Plaintiff Federal Trade Commission ("FTC"), by its designated attorneys, petitions this

Court pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), for a permanent injunction

and other equitable relief, against Defendants U.S. Anesthesia Partners, Inc. ("USAP"); and

Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson,

Anderson & Stowe XII, L.P., WCAS Associates XII, LLC, WCAS Management Corporation,

1

WCAS Management, L.P., and WCAS Management, LLC (collectively "Welsh Carson" or the "Welsh Carson Defendants") to redress and prevent violations of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## NATURE OF THE CASE

1.      This action challenges USAP and Welsh Carson's multi-year anticompetitive scheme to consolidate anesthesia practices in Texas, drive up the price of anesthesia services provided to Texas patients, and increase their own profits.

2.      Welsh Carson is a New York-based private equity firm. From its Park Avenue offices in Midtown Manhattan, Welsh Carson had observed that anesthesiology in Texas was "fragmented"—that is, full of small physician practices that competed against one another. This dynamic allowed insurers to negotiate lower prices for themselves, for their clients (including Texas businesses), and ultimately for patients. Although Texans benefited from this competition, Welsh Carson saw an opportunity to profit from eliminating it and consolidating these various practices into a dominant provider with the power to extract high prices.

3.      In 2012, Welsh Carson created USAP to execute this consolidation strategy. Specifically, USAP's founding purpose was to pursue an "aggressive" strategy to "consolidat[e] practices with high market share in a few key markets." By doing so, Welsh Carson sought to exploit the fact that anesthesia services are critical to modern surgery; hospitals need to offer anesthesia services, and patients, their employers, and insurers must pay for them, even if choices dwindle and prices go up. Welsh Carson saw that eliminating competitors—by acquiring or conspiring with them, instead of competing on the merits—would give USAP the power to raise prices, raking in tens of millions of extra dollars for USAP, Welsh Carson, and their

2

executives. Welsh Carson and USAP spent the next decade bringing that consolidation strategy to life through a set of illegal tactics.

4.     First, USAP and Welsh Carson engaged in what they referred to as a "roll-up," buying nearly every large anesthesia practice in Texas. This scheme began in Houston, where USAP entered in December 2012 by purchasing the region's largest practice and then making three further acquisitions. USAP expanded to Dallas in 2014 and quickly acquired other key groups there. Starting in 2016, USAP made significant acquisitions elsewhere in Texas—San Antonio, Austin, Amarillo, and Tyler. All told, USAP's roll-up scheme involved over a dozen practices, 1,000 doctors, and 750 nurses.

5.     USAP's acquisitions have hit Texans' wallets hard. With each deal, USAP raised the acquired group's prices to USAP's (often much) higher price. As one insurance executive summarized, USAP and Welsh Carson used acquisitions to "take the highest rate of all . . . and then peanut butter spread that across the entire state of Texas." Welsh Carson and USAP euphemistically referred to this practice—wielding its increasingly dominant market position to net tens of millions of dollars in additional profits—as "synergies." Before USAP made a single acquisition, Welsh Carson was already bragging to potential financiers about the plan to create a "significant synergy opportunity" at the expense of patients, their employers, and insurers. USAP's and Welsh Carson's executives, in plotting their "roll up," underscored that "captur[ing] significant synergies" was a key part of their scheme. Following one acquisition, a USAP executive put it more bluntly: "Cha-ching!"

6.     Second, USAP supported its "roll-up" strategy by entering or maintaining price-setting arrangements with other, independent anesthesia groups that shared key hospitals in Houston and Dallas. Under these price-setting arrangements, USAP charges its own high prices

3

for services in fact provided by those independent groups that had been charging lower prices.
Like its acquisitions, USAP's price-setting arrangements yielded "synergies"—or additional
revenues—that USAP then split with each independent group. Despite USAP's own executives
recognizing that these price-setting arrangements are "odd from a compliance standpoint," two
of them remain in use today and USAP has signed or pursued multiple others.

7.     Third, USAP and Welsh Carson entered a market allocation with another large
anesthesia services provider. ███████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████. The Welsh Carson partner who acted as USAP's
chief negotiator made clear that this market allocation agreement was "what we want," and he
later expressed appreciation for ████████ "constructive" attitude towards USAP's and Welsh
Carson's interest in sidelining a significant rival.

8.     Defendants' consolidation strategy has worked. Thanks to its roll-up, price-setting
agreements, and market allocation scheme, USAP is the dominant provider of anesthesia services
in Texas and in many of its major metropolitan areas, including Houston and Dallas. No rival
comes close to matching USAP's size. As of 2021, USAP was at least four times larger than the
second-largest group in Houston; six times larger than the second-largest group in Dallas; and
nearly seven times larger than the second-largest group in all of Texas. It is also one of the most
expensive, with reimbursement rates that are double the median rate of other anesthesia

4

Case 4:23-cv-03560   Document 1   Filed on 09/21/23 in TXSD   Page 5 of 106

providers in Texas. The predictable (and intended) effect is that anesthesia services—from the
same anesthesiologists—cost Texans tens of millions of dollars more each year than they did
before USAP was created.

9.      In other words, thanks to its anticompetitive conduct, USAP has been able to
extract monopoly profits while simultaneously growing its monopoly power. Defendants'
scheme was so successful that Welsh Carson has already begun "deploying a similar strategy to
consolidate" multiple other physician practice specialties.

10.     The FTC now asks this Court to put an end to Defendants' unlawful scheme,
prevent its recurrence, and restore competition across Texas.

# Table of Contents

| | | |
|---|---|---|
| I. | JURISDICTION AND VENUE | 10 |
| II. | THE PARTIES | 11 |
| | A. Plaintiff Federal Trade Commission | 11 |
| | B. Defendant U.S. Anesthesia Partners | 11 |
| | C. Defendant Welsh Carson | 12 |
| III. | BACKGROUND | 18 |
| | A. Anesthesia is administered to patients by doctors and nurses to prevent pain | 18 |
| | B. Anesthesia services are performed in hospitals or outpatient facilities | 19 |
| | C. Hospitals contract with anesthesia providers to serve their facilities | 20 |
| | D. Insurers negotiate network status and reimbursement with anesthesia providers | 22 |
| | E. To discipline price demands, insurers may refuse to include anesthesia groups in their network | 24 |
| IV. | USAP'S AND WELSH CARSON'S ANTICOMPETITIVE SCHEME | 26 |
| | A. Welsh Carson hatches a strategy to consolidate anesthesia practices in Texas | 26 |
| | B. Welsh Carson executes on its consolidation strategy by creating USAP and acquiring a large practice in Houston | 27 |
| | C. Welsh Carson and the newly-formed USAP develop a plan to roll up independent anesthesia practices and raise prices | 31 |
| V. | USAP CONTINUES ITS ANTICOMPETITIVE SCHEME BY ROLLING UP ADDITIONAL PRACTICES | 33 |
| | A. After its founding acquisition, USAP makes three additional acquisitions in Houston | 33 |
| | 1. North Houston Anesthesiology – Kingwood Division (2014) | 33 |
| | 2. MetroWest Anesthesia Care (2017) | 34 |
| | 3. Guardian Anesthesia Services (2020) | 35 |
| | 4. USAP's consolidation of Houston as it stands today | 36 |

B.   USAP expands its roll-up scheme to Dallas ............................................... 37

  1.   Pinnacle Anesthesia Consultants (2014) ....................................... 38

  2.   Anesthesia Consultants of Dallas (2015) ...................................... 40

  3.   Excel Anesthesia Consultants (2015) ............................................ 41

  4.   Southwest, BMW, Medical City Physicians, and Sundance (2015-2016) ................................................................................................ 42

  5.   USAP's consolidation of Dallas as it stands today ........................... 44

C.   USAP further expands its roll-up scheme by acquiring other large practices across Texas ............................................................................................ 45

  1.   East Texas Anesthesiology Associates (2016) ................................ 47

  2.   Capitol Anesthesiology Association (2018) ................................... 48

  3.   Amarillo Anesthesia Consultants (2018) ....................................... 49

  4.   Star Anesthesia (2019) .................................................................. 50

VI.   USAP'S OTHER ANTICOMPETITIVE CONDUCT .................................. 51

A.   USAP uses price-setting arrangements to charge its own, higher rates for anesthesia services provided by other practices ........................................ 52

  1.   The Methodist Hospital Physician Organization ............................ 54

  2.   Dallas Anesthesiology Associates ................................................ 56

  3.   Baylor College of Medicine ......................................................... 57

  4.   University of Texas ..................................................................... 58

B.   USAP's market allocation with ███████ ................................... 59

VII.   RELEVANT MARKETS ......................................................................... 61

A.   The relevant service market is commercially insured hospital-only anesthesia services .................................................................................................. 61

  1.   Services performed outside a hospital are not part of the relevant service market ........................................................................ 62

  2.   Non-commercial insurance plans are not part of the relevant service market ....................................................................................... 65

B.    The relevant geographic markets to assess the competitive implications of the challenged conduct are no broader than the local metropolitan statistical areas ...... 66

    1.    A relevant geographic market is no broader than the Houston metropolitan statistical area .................................................................. 66

    2.    A relevant geographic market is no broader than the Dallas-Fort Worth metropolitan statistical area .................................................................. 68

    3.    A relevant geographic market is no broader than the Austin metropolitan statistical area .................................................................. 69

VIII.    MARKET POWER AND MONOPOLY POWER ........................................................ 71

A.    USAP has monopoly power in the Houston MSA .................................................... 71

    1.    USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share in Houston ................................................................................ 71

    2.    USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Houston ...................................... 73

    3.    USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Houston ......................... 74

B.    USAP has monopoly power in the Dallas MSA ...................................................... 75

    1.    USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share ................................................................................ 75

    2.    USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Dallas .......................................... 77

    3.    USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Dallas ........................... 78

C.    USAP has a dominant position in the commercially insured hospital-only anesthesia market in Austin .................................................................................. 79

    1.    USAP and Welsh Carson's roll-up of anesthesia providers has substantially increased concentration, resulting in a dominant market share ................................................................................ 79

    2.    USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Austin ........................................ 81

|  |  | 3. | USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its dominance in Austin ....................................................... 82 |

|  | D. | High barriers to entry to the hospital-only anesthesia markets in Houston, Dallas, and Austin protect USAP's market share ....................................................... 82 |

| IX. | USAP'S DOMINANCE IN TEXAS ....................................................................................... 84 |

| X. | HARM TO CONSUMERS AND COMPETITION ................................................................. 86 |

|  | A. | USAP's conduct has increased its negotiating leverage against insurers, reducing insurers' ability to constrain USAP's demands to raise prices ................. 86 |

|  | B. | USAP's conduct has increased prices for hospital-only anesthesia services in Texas ....................................................................................... 89 |

|  | C. | There are no valid procompetitive justifications for or efficiencies from USAP's conduct ....................................................................................... 91 |

| XI. | LIKELIHOOD OF RECURRENCE ....................................................................................... 92 |

|  | A. | Without appropriate relief, USAP's harmful conduct is likely to recur ................... 92 |

|  | B. | Without appropriate relief, Welsh Carson's harmful conduct is likely to recur ....... 93 |

| XII. | VIOLATIONS ....................................................................................... 95 |

| XIII. | PRAYER FOR RELIEF ....................................................................................... 105 |

## I.   JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

12.     This Court has personal jurisdiction over USAP because USAP has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

13.     This Court has personal jurisdiction over Welsh Carson because Welsh Carson has the requisite constitutional contacts with the United States of America pursuant to 15 U.S.C. § 53(b).

14.     Venue in this district is proper under 15 U.S.C. § 22, 28 U.S.C. § 1391(b) and (c), and 15 U.S.C. § 53(b). Each Defendant resides, transacts business, committed an illegal or tortious act, or is found in this district.

15.     Defendants' general business practices, and the unfair methods of competition alleged herein, are "in or affecting commerce" within the meaning of Section 5 of the FTC Act, 15 U.S.C. § 45.

16.     USAP, Welsh Carson Associates XI, LLC, Welsh Carson Associates XII, LLC, Welsh Carson Management Corp., and Welsh Carson Management, LLC are, and at all relevant times have been, "corporations," as the term "corporation" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

17.     Welsh, Carson, Anderson & Stowe XI, L.P., Welsh, Carson, Anderson & Stowe XII, L.P., and Welsh Carson Management, L.P., are, and at all relevant times have been, "partnerships" within the meaning of 15 U.S.C. § 45(a).

10

## II.    THE PARTIES

### A. Plaintiff Federal Trade Commission

18.    Plaintiff FTC is an administrative agency of the United States Government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. § 41, *et seq.*, with its principal offices in the District of Columbia. The FTC is vested with authority and responsibility for enforcing, among other things, Section 5 of the FTC Act, 15 U.S.C. § 45, and is authorized under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate court proceedings to enjoin violations of any law the FTC enforces.

19.    The FTC is authorized to bring this case in federal court because Defendants are violating or about to violate a provision of law enforced by the FTC, and this is a proper case for permanent injunctive relief within the meaning of Section 13(b) of the FTC Act, 15 U.S.C. § 53(b).

### B. Defendant U.S. Anesthesia Partners

20.    Defendant U.S. Anesthesia Partners, Inc. is a for-profit Delaware corporation, with its principal place of business at 12222 Merit Drive, Suite 700, Dallas, TX, 75251.[1]

21.    Founded in late 2012, USAP is a physician-service organization that focuses on anesthesia and pain management services. Since its founding, USAP has grown significantly, primarily through acquiring other anesthesia practices. In 2013, approximately 400 USAP anesthesia providers performed 300,000 anesthesia procedures at 45 healthcare facilities. As of late 2021, over 4,500 USAP anesthesia providers performed 2.5 million anesthesia procedures at 1,100 healthcare facilities. Between 2013 and 2021, USAP's revenue increased ██████████ ████████████████████████████████████████████████.

---

[1] Except where otherwise specified, "USAP" refers to U.S. Anesthesia Partners, Inc. and all corporate predecessors, successors, parents, subsidiaries, and affiliates.

22.    USAP currently has a presence in eight states: Colorado, Florida, Indiana, Maryland, Nevada, Tennessee, Texas, and Washington. At all times, Texas has been USAP's largest market, accounting for approximately 65% of the company's profit in 2021.

**C. Defendant Welsh Carson**

23.    Welsh Carson is engaged in the business of private equity investment and management, primarily in the healthcare and technology sectors. Since its founding in 1979, Welsh Carson has raised over $31 billion and invested in over 95 healthcare companies. Welsh Carson's investments include USAP, which it co-founded in 2012 with an approximately $██ █████ investment.

24.    Like other private equity firms, Welsh Carson uses a complex maze of related entities, including but not limited to the Welsh Carson Defendants, to carry out its business.

25.    Defendant WCAS Management Corporation is a for-profit Delaware corporation founded in 2000. WCAS Management Corporation employs or otherwise compensates investment professionals. This includes both Welsh Carson's "partners," who serve as the officers, directors, and managers of Welsh Carson Management Corp., and more junior investment professionals, whom the partners supervise and direct. These investment professionals raise money from investors such as insurance companies, pension plans, and high-net-worth individuals and pool that money into investment vehicles called "funds," which operate as limited partnerships.

26.    Defendant Welsh, Carson, Anderson & Stowe XII, L.P. (the "WCAS XII fund") is a Delaware limited partnership founded in 2014. The WCAS XII fund, like other Welsh Carson funds before and since, uses money raised from investors to purchase ownership stakes in

other companies. The WCAS XII fund holds, and has held since 2017, stock in USAP.[2] USAP and the other companies in which Welsh Carson's funds acquire ownership positions are referred to as "portfolio companies." Eventually, the Welsh Carson funds sell some or all of their stake in portfolio companies and distribute the proceeds to the investors and to Welsh Carson itself.

27.    Defendant WCAS XII Associates, LLC is a for-profit Delaware corporation founded in 2014. WCAS XII Associates, LLC is the general partner of the WCAS XII fund and makes investment and other decisions on its behalf.[3] Welsh Carson's general partners control and direct WCAS Associates XII—and by extension the WCAS XII fund—both in their capacity as the "managing members" of WCAS XII Associates and in their role as the officers, directors, and managers of Welsh Carson Management Corp., which serves as the investment manager for WCAS Associates XII.

28.    Defendant Welsh, Carson, Anderson & Stowe XI, L.P. (the "WCAS XI fund") is a Delaware limited partnership founded in 2008. The WCAS XI fund held USAP stock from 2012 to 2017.

29.    Defendant WCAS Associates XI, LLC is a for-profit Delaware corporation founded in 2008. WCAS Associates XI is the general partner of the WCAS XI fund and makes investment and other decisions on its behalf. As with Defendant WCAS Associates XII, Welsh Carson's partners control and direct WCAS Associates XI—and by extension the WCAS XI fund—both in their capacities as the "managing members" of WCAS Associates XI and in their

---

[2] Technically, the WCAS XII fund is comprised of four separate limited partnerships. Welsh, Carson, Anderson & Stowe XII is the "main" fund that holds most of the USAP stock controlled by Welsh Carson. There are also three "parallel" funds: Welsh, Carson, Anderson & Stowe Delaware, L.P.; Welsh, Carson, Anderson & Stowe Delaware II, L.P.; and Welsh, Carson, Anderson & Stowe Cayman, L.P.

[3] WCAS Associates XII is the general partner of the main fund and one parallel fund. The remaining two parallel funds have a different general partner, WCAS Associates XII Cayman, L.P., but WCAS Associates XII is in turn the general partner of—and controls—WCAS Associates XII Cayman, L.P. As such, WCAS Associates XII is effectively the general partner for the entirety of the WCAS XII fund.

role as officers, directors, and managers of WCAS Management Corp., which serves as the

investment manager for WCAS Associates XI.

30.    Defendant WCAS Management, L.P. is a Delaware limited partnership founded

in 2017. Welsh Carson has transitioned many (if not all) of the responsibilities and employees of

WCAS Management Corp. to WCAS Management, L.P. Welsh Carson's partners control WCAS

Management, L.P. in their capacity as directors and managing members of Defendant WCAS

Management, LLC.

31.    Defendant WCAS Management, LLC is a for-profit Delaware corporation

founded in 2017. WCAS Management, LLC is the general partner of WCAS Management, L.P.

and makes all its "[m]ajor decisions." In other words, through both WCAS Associates XII and

the WCAS Management entities, Welsh Carson controls the decision-making of the WCAS XII

fund. For its other funds, including the WCAS XI fund, Welsh Carson uses or has used a similar

structure to achieve the same outcome. The WCAS XI fund operated out of the same office

space as the WCAS XII fund, was controlled by largely the same individuals, relied on the same

personnel to conduct its operations, was engaged in the same line of business, and even invested

in some of the same portfolio companies (including USAP).

32.    The Welsh Carson Defendants operate as a common enterprise. They share a

website, www.wcas.com, which refers to "Welsh, Carson, Anderson & Stowe" as "the Firm."

They use the same office space and principal place of business, 599 Lexington Avenue, Suite

1800, New York, NY, 10022,[4] and direct that mail sent to any Welsh Carson Defendant be

addressed "c/o Welsh, Carson, Anderson & Stowe." They all use the common trademarks

"WCAS" and "Welsh, Carson, Anderson & Stowe," which are registered to Defendant WCAS

---

[4] In 2017, Welsh Carson moved its principal place of business from 320 Park Avenue to 599 Lexington Avenue.

Management Corp. And the same individual "partners" serve as officers, directors, or managers of—and thus ultimately control—the different Welsh Carson Defendants. To take just one example: D. Scott Mackesy, described on the Welsh Carson website as the "Managing Partner of the Firm," is a managing member of Defendants WCAS XI and XII Associates, LLC (which, as described above, control Defendants Welsh, Carson, Anderson & Stowe XI and XII, L.P.); President and a director of Defendant Welsh Carson Management Corp.; and a managing member and director of Welsh Carson Management, LLC (which, as described above, controls Welsh Carson Management, L.P.).

33.     Welsh Carson controls many of its funds' portfolio companies. If a Welsh Carson fund directly owns more than 50% of a portfolio company or otherwise has rights to more than 50% of its shares, Welsh Carson has formal control over the company's major decisions. Welsh Carson typically is guaranteed representation—sometimes a majority—on a portfolio company's board of directors, to which the company's management reports. Welsh Carson also identifies, and has its portfolio companies hire, management teams who share the vision of and take direction from Welsh Carson. And Welsh Carson personnel supervise and assist company management and other employees in day-to-day operations.

34.     USAP has been a Welsh Carson portfolio company since 2012, when Welsh Carson created the company for the purpose of rolling up anesthesia practices in Texas.

35.     Welsh Carson's specific ownership stake in USAP has varied over time. At USAP's founding in 2012, Welsh Carson owned 50.2% of the company. Between 2013 and 2017, Welsh Carson's ownership stake was diluted to 44.8% as USAP granted equity to acquired physician groups. In late 2017, Welsh Carson sold about half its stake in USAP to other institutional investors, Berkshire Partners and GIC Capital. Today, it owns approximately 23% of

15

USAP. Despite the changes in the degree of its formal ownership of USAP, Welsh Carson has actively directed USAP's corporate strategy and decision-making, particularly with respect to mergers and acquisitions of anesthesia practices in Texas.

36.     At all times, Welsh Carson has been guaranteed at least two seats on the USAP board of directors. From 2012 and 2017, Welsh Carson had the right to appoint the majority of USAP's board of directors, including its chair. Between 2013 and 2017, even when its ownership stake dipped below 50%, Welsh Carson—in its own words—maintained control over USAP "in all practical respects" because it held the voting rights of almost all of the company's other shareholders. Indeed, one of the Welsh Carson partners most intimately involved with USAP's business stated in 2014 that "our mandate is to be control investors." Following its partial sale of USAP in late 2017, Welsh Carson remained, as USAP's former CEO and Chairman put it, the "most influential" member of USAP's board. Welsh Carson currently has two directors on USAP's board. In addition, the current board Chairman, though not appointed by Welsh Carson, is affiliated with the firm.

37.     While the Welsh Carson directors on USAP's board sometimes act for USAP, they retain duties to and interests in Welsh Carson. At least one Welsh Carson director on USAP's board, Brian Regan, acted in his Welsh Carson capacity when formulating, directing, and participating in USAP's unlawful conduct. As described below, Regan served on USAP's board from 2012 until 2022. During that time, he facilitated USAP's roll-up scheme by, among other things, signing deal documents for several of the challenged acquisitions—and doing so expressly on behalf of Welsh Carson. He also helped strike deals integral to USAP's consolidation strategy, such as by leading negotiations for its market-allocation agreement with ▮▮▮▮▮ with the help of a confidentiality agreement he signed on Welsh Carson's behalf. And

Regan often directed Welsh Carson employees (who were not USAP board members) to assist with USAP's consolidation scheme, such as by identifying attractive acquisitions, helping secure funding, and assisting in negotiations with insurers. ████████████████████████

████████████████████████████████████████████

████████████████████████████████.

38.     Welsh Carson hired most of USAP's original management team, including the Chief Executive Officer, Chief Financial Officer, Chief Operations Officer, and head of Human Resources, all of whom had previously served in similar capacities at other Welsh Carson portfolio companies. Other senior employees—such as USAP's longtime Vice President of Payor Contracting—were hired in part due to their Welsh Carson connections. USAP's current CEO came from Welsh Carson and ████████████████████████.

39.     Welsh Carson has regularly provided USAP with strategic, operational, and financial support since its founding. Pursuant to a series of management agreements and otherwise, Welsh Carson personnel have provided USAP with services related to corporate finance, acquisition due diligence, and strategic planning (among other things). At USAP's founding, when the company was considerably smaller than it is today, USAP relied extensively on Welsh Carson personnel. Over the years, USAP and Welsh Carson personnel continued to work together frequently and closely.

40.     At all relevant times, Welsh Carson has formulated, directed, controlled, had the authority to control, dictated, encouraged, or actively and directly participated in the anticompetitive conduct describe herein.

### III.    BACKGROUND

**A. Anesthesia is administered to patients by doctors and nurses to prevent pain**

41.    Anesthesia is a type of medical treatment that prevents patients from feeling pain during procedures such as surgery or dental work. Depending on the procedure, a patient may receive general anesthesia—which affects the entire body, often rendering them unconscious while sustaining critical life functions—or local / regional anesthesia, which blocks pain in only part of the body and does not affect a patient's consciousness.

42.    Patients receive general anesthesia through the bloodstream (i.e., intravenously) or by inhaling gas. General anesthesia is typically safe but can pose risks for some patients, such as the elderly or persons with chronic illnesses. Local and regional anesthesia are safer, and patients can typically return home soon after their procedure. For example, local anesthesia is often used in routine dental surgery and regional anesthesia is often used during childbirth.

43.    The practice of administering anesthesia is a specialty medical field known as anesthesiology. Anesthesia providers include physician anesthesiologists as well as nurse anesthetists. Physician anesthesiologists are doctors with a medical degree. After completing medical school, physicians complete a residency in anesthesiology. Most physician anesthesiologists then become "board-certified" by passing an examination administered by the American Board of Anesthesiology. Some physicians also complete an additional "fellowship" year of training in a sub-specialty, such as cardiovascular anesthesia.

44.    Nurse anesthetists must have a year of nursing experience and obtain a specialized certification in anesthesia administration (a training course that lasts two to three years) and then pass a national certification exam. After achieving this certification, a nurse is referred to as a "certified registered nurse anesthetist" or CRNA.

18

45.     Physician anesthesiologists and nurse anesthetists alike must be certified by a state's medical licensing boards to practice within that state. In Texas, the licensing and regulation of anesthesia providers is overseen by the Texas Medical Board for physician anesthesiologists and the Texas Board of Nursing for CRNAs. Each state's medical licensing boards may also decide whether and when CRNAs can administer anesthesia without supervision by a practicing physician anesthesiologist. In Texas, a CRNA can sometimes independently order and administer anesthesia supervised by a physician, but generally cannot administer anesthesia services without such supervision.

46.     Unlike other areas of medical care, patients rarely choose their anesthesia providers. Instead, a patient's chosen surgeon may select the anesthesia provider, or the anesthesia provider may be chosen randomly based on who is assigned to cover the operating room when a patient's surgery occurs. Moreover, anesthesia providers have little personal interaction with patients since their role is often to keep the patient unconscious.

**B. Anesthesia services are performed in hospitals or outpatient facilities**

47.     Anesthesia providers can treat patients in several healthcare facility settings, including hospitals, outpatient surgery centers, ambulatory surgical centers, and doctors' offices.

48.     Hospitals, unlike ambulatory surgical centers or outpatient surgery centers, perform inpatient surgery—where the procedure requires a patient to stay overnight. Hospitals may be independent or part of a larger system. Hospital systems can include specialty hospitals, such as children's hospitals or heart-care centers, or hospitals across different geographies.

49.     Outpatient surgery centers and ambulatory surgical centers perform only outpatient surgery. Outpatient surgery consists of surgical procedures typically completed without requiring a patient to stay overnight in a hospital. These procedures can be performed in

a hospital, but it has become increasingly common to perform them in dedicated clinics. Unlike hospitals, ambulatory surgical centers do not have facilities that can accommodate a patient's overnight stay. In addition, these settings lack the specialized tools and equipment that hospitals possess to perform more complex surgeries that require a hospital setting.

50.     Local anesthesia generally can be performed in outpatient care centers (i.e., facilities where patients do not stay overnight) and doctors' offices because they require less robust medical facilities and fewer staff.

51.     General anesthesia and some regional anesthesia services, by contrast, are typically performed only in hospitals or qualified facilities specifically designed for outpatient surgery, such as ambulatory surgical centers or outpatient surgery centers.

**C. Hospitals contract with anesthesia providers to serve their facilities**

52.     While certain hospitals directly employ anesthesia providers, many rely on independent anesthesiologists or anesthesia groups, such as USAP.

53.     Hospitals that rely on independent anesthesiologists differ in how they staff their operating rooms. Some hospitals select an "open staffing" or "follow the surgeon" model, allowing any credentialed anesthesiologist to practice at the facility and leaving it to individual surgeons to coordinate anesthesia coverage. Many other hospitals choose an exclusive anesthesia provider, whose anesthesiologists cover the entire facility or certain services lines (e.g., trauma) on a 24/7 basis.

54.     Hospitals perceive benefits to exclusive anesthesiology arrangements. For instance, an exclusive arrangement can help secure coverage overnight or during other off-peak hours. Exclusive agreements may also help guarantee treatment for less lucrative patients by ensuring 24/7 coverage.

55.     Anesthesia groups often compete for exclusive hospital contracts. By definition, winning a hospital's exclusive contract is necessary to be able to perform anesthesia services at that hospital. Obtaining an exclusive contract thus typically guarantees a provider group not only a certain amount of business—since it will perform all anesthesia at a hospital—but also a degree of control—since with limited exceptions, no other group will perform any.

56.     To win an exclusive contract, an anesthesia group needs enough local providers to staff the hospital around the clock. The larger the hospital, the more providers the group needs. As such, for large hospitals, only certain large local anesthesia groups are viable exclusive providers.

57.     Hospitals often agree to pay a fee—known as a "stipend"—to their exclusive anesthesia providers. Stipends compensate for the fact that providing 24/7 coverage at a hospital is not always lucrative for an anesthesia group. Procedures may occur infrequently during off-peak shifts, and some patients may have government insurance (which typically reimburses at lower rates) or be uninsured or under-insured.

58.     Although in theory many exclusive contracts between hospitals and anesthesia groups are terminable on short notice by either party, in practice these relationships are "sticky" because switching exclusive anesthesia providers is disruptive for hospitals. For instance, switching may interfere with surgical procedure scheduling or even negatively impact patient care. Thus, once a hospital has chosen its exclusive provider, it can be difficult for a competing group to displace that provider and take over the exclusive.

59.     Notwithstanding the difficulties, however, hospitals can—and occasionally do—switch exclusive anesthesia providers. They can do so more easily when there are sufficient alternative providers. Existing local providers tend to be the most significant competitors for

21

exclusive hospital contracts because, for example, they may have established reputations for quality and may not require as much recruiting, temporary hiring, or travel costs as more distant alternatives. But absent sufficient local competitors, a hospital may consider more distant alternatives. That is particularly true for hospitals that are part of larger systems, which may look to anesthesia groups from different parts of the state that reliably serve the system's other facilities.

### D. Insurers negotiate network status and reimbursement with anesthesia providers

60.     To control healthcare costs, insurers build networks, which are combinations of hospitals, outpatient facilities, physicians, physician groups, and other providers, including anesthesia providers that are available at a lower cost to the insurer's clients.

61.     In exchange for being included in an insurer's network, providers typically agree to give a discount off the total amount they charge. These discounted reimbursement rates establish how much the payor will pay the provider on behalf of its beneficiaries (referred to as "members"). Services obtained outside of an insurer's network are subject to different—and usually higher—reimbursement rates.

62.     Anesthesia providers are typically paid based upon three factors: (1) 15-minute intervals of time spent on a procedure; (2) a base unit reflective of the difficulty or complexity of the procedure, as established by the American Society of Anesthesiologists; and (3) a dollar-value "conversion factor." Commercial insurers negotiate the conversion factor with the anesthesia providers.

63.     A provider's reimbursement is calculated by adding the number of time units and base units, then multiplying by the conversion factor. For example, a physician who provides

anesthesia during a 90-minute procedure with a base value of 4 and a negotiated conversion factor of $95 will bill $950 for that procedure.

64.      Commercial insurers use their provider networks, and the reimbursement rates they negotiate with participating providers (along with factors such as geographic coverage), to compete for clients. The party responsible for paying in-network anesthesiologists depends on the client.

65.      Although "payor" and "insurer" are often used synonymously, including by USAP and Welsh Carson, the insurer and the payor can in fact be different parties. "Payor" more accurately denotes the party that bears the financial responsibility to reimburse for the healthcare services their members receive. Which party is the payor varies. Some insurance clients—usually smaller employers or individuals—are "fully insured," meaning the insurers themselves are the payors and bear the responsibility for reimbursing members' covered healthcare costs. Other clients—more sizeable employers or other large entities—are "administrative services only" (ASO). ASO clients themselves bear financial responsibility for the members' healthcare costs; they hire insurers for administrative services like negotiating with providers and assembling provider networks, creating plans to offer members, and administering the payments. Ultimately, members finance these endeavors through premiums paid either to the insurer (for fully insured clients) or to the ASO client.

66.      For the four largest insurers in Texas (Aetna, Blue Cross Blue Shield of Texas, Cigna, and United), ▮▮ or more of their clients are ASO. This means that in Texas, patients and their employers (not insurers) bear the brunt of higher prices for anesthesia services.

67.      These ASO clients have different demands for network access to anesthesia providers depending on where their members work and reside. Some ASO clients have members

23

concentrated in a single metropolitan area, while others have members in multiple locations throughout the state.

### E. To discipline price demands, insurers may refuse to include anesthesia groups in their network

68.    If an insurer considers the reimbursement rates demanded by an anesthesia group during negotiations to be too high, both sides understand that the insurer's primary alternative to reaching an agreement is to take the group out of network. Whether the threat of network removal can effectively keep prices low depends on how credible it is—that is, whether there are any credible alternative groups and how likely the insurer is to follow through, which would disrupt the relationship between the insurer, anesthesia group, and hospital.

69.    In general, insurers, hospitals, and anesthesia providers each prefer that the anesthesia provider remain in-network.

70.    Hospitals generally prefer to work with anesthesia providers who are in-network with insurers, and hospitals may encourage out-of-network anesthesiologists to reach in-network agreements. Having out-of-network anesthesiologists could result in large bills from the anesthesiologists, which patients and their employers may misattribute to the hospital. Moreover, in some instances, insurers condition portions of their reimbursements to hospitals on the in-network status of the hospital's anesthesia providers. For example, ███ encourages hospitals to include anesthesia providers in-network using a "pay-for-performance" term that offers hospitals better reimbursement rates based on the percentage of its anesthesia providers that are in-network.

71.    Hospitals often retain the right in their exclusive contracts with anesthesia groups to break exclusivity and use other providers if the group goes out of network with insurers. In practice, they do not exercise these rights frequently, but are more likely to do so when an

24

anesthesia group remains out of network for an extended period or when the anesthesia group is out-of-network with multiple large insurers.

72.      Anesthesia providers prefer to remain in-network. The reason is partially financial and administrative. Rather than collect their fees directly from the insurance company, for most of the relevant period, an out-of-network anesthesia group needed to collect money directly from patients, which can be difficult, unpredictable, and ultimately unsuccessful. Today, out-of-network anesthesiologists must obtain payment through costly and uncertain arbitration.

73.      In addition, an out-of-network anesthesia group may also jeopardize some of its hospital relationships. Because hospitals generally prefer to contract with in-network providers, they may ultimately choose to switch to a different provider if a group remains out of network. Insurers may even seek to encourage the hospital to switch by, for example, subsidizing an alternative provider's bid for a hospital contract.

74.      Insurers also prefer to have anesthesia groups in network—especially those that practice at in-network hospitals. Otherwise, their members may be treated by out-of-network anesthesiologists, who will charge much more. Certain ASO clients pay a significant portion of these bills, which can result in their dissatisfaction. And historically, out-of-network anesthesiologists billed patients directly. These "surprise bills" can upset patients—who mistakenly assume that because they went to an in-network hospital they saw an in-network anesthesiologist—and result in them complaining to their hospitals or employers.[5] Insurers can thus be pressured to return out-of-network anesthesia providers to their network by as many as

---

[5] Although certain states and, more recently, the federal government have passed legislation targeted at ending "surprise billing," the ultimate results of these legislative efforts remain uncertain. The arbitration procedures created by state or federal law still involve significant costs and uncertainty as to the amount due. These costs and uncertainties may be disproportionately large when payors arbitrate with larger anesthesia providers due to the volume of claims involved.

four parties: patients, hospitals, existing ASO clients (who may take their business elsewhere), and potential ASO clients (who may keep their business elsewhere).

75.     Insurers view certain anesthesia groups as particularly important to have in-network and, as such, particularly costly to remove from their networks. This essentially boils down to groups that are more likely to treat the insurer's members.

76.     Several factors make an anesthesia group more likely to treat an insurer's members, whether on an in- or out-of-network basis. The more hospitals a given group serves, the more likely it is to see a given insurer's members. This is particularly true at certain hospitals, which are more likely to treat members—and thus especially important to insurers' networks—based on factors like their size, location, system affiliation, or specialty care offered. In addition, a group that holds an exclusive contract at a hospital, especially an important hospital, is all but guaranteed to treat all members that visit that hospital (whereas in an openly staffed hospital, the hospital may try to direct patients towards in-network providers). Eventually, through a combination of size, hospital presence, and exclusive contracts, an anesthesia group may become effectively irreplaceable—even by a combination of multiple groups.

### IV.    USAP'S AND WELSH CARSON'S ANTICOMPETITIVE SCHEME
#### A. Welsh Carson hatches a strategy to consolidate anesthesia practices in Texas

77.     In early 2012, John Rizzo, a former executive at a large national anesthesia group, emailed D. Scott Mackesy, a partner at Welsh Carson, seeking investors for a new anesthesia practice. Rizzo planned to call the practice "New Day Anesthesia." It would have a nationwide presence built through an "aggressive 'buy and build' consolidation strategy."

78.     Mackesy handed Rizzo off to a junior partner, Brian Regan, who soon led the process of evaluating a Welsh Carson investment in New Day. After carefully evaluating Rizzo's

strategy, Regan began working with Rizzo and other Welsh Carson employees on a presentation

for Welsh Carson's partnership to secure their approval and obtain funding.

79.    On July 2, 2012, Regan and the team he was supervising at Welsh Carson

presented the vision for New Day to the Welsh Carson partnership. The presentation described

New Day Anesthesia as pursuing an "anesthesiology consolidation strategy." In Regan's words,

the "[g]oal for New Day" would be "to build a platform with national scale by consolidating

practices with high market share in a few key markets." Capturing such market share, would,

according to Regan, give New Day "[n]egotiating leverage with commercial payors"—in other

words, create a monopolist with the ability to raise prices for anesthesia care.

80.    The Welsh Carson partners agreed to invest in New Day. As Regan described the

plan, the firm would "devote real time and resources to New Day and the anesthesiology

consolidation strategy." For starters, Welsh Carson would "[c]ommit $1-$2 million to set-up

shop, develop a market roadmap, and diligence acquisition candidates."

### B. Welsh Carson executes on its consolidation strategy by creating USAP and acquiring a large practice in Houston

81.    The first step was determining which anesthesia group New Day should acquire

as a "platform" from which to roll up other practices. Welsh Carson hired Dean & Company as a

consultant to develop a methodology for identifying attractive regions for acquisitions and

practice groups in each region. Regan provided repeated rounds of feedback to Dean on its

methodology, and a more junior Welsh Carson employee working at his direction supervised the

relationship with Dean. Ultimately, they collectively developed what they colloquially referred

to as the "Dean tool," which USAP would rely on for many years thereafter.

82.    Meanwhile, Welsh Carson found a CEO for the new venture. Welsh Carson

selected Kristen Bratberg, the former CEO of one of its portfolio companies, Pediatrix. Pediatrix

27

is a national group practicing neonatology, which is another hospital-based physician specialty. Mackesy, the Welsh Carson partner initially approached by John Rizzo, had been a Pediatrix board member.

83.    Bratberg had experience with "rolling up" physician practices. During his eight-year stint as CEO, Pediatrix acquired over 100 neonatology practices. Bratberg's experience with "rolling up" independent physician groups was key to Welsh Carson's decision to hire him.

84.    Regan and Bratberg began scoping out potential first acquisitions for New Day. A few months earlier, in April, Greater Houston Anesthesiology had begun searching for a buyer, billing itself as "20 times the size of the second largest local competitor." That piqued Regan's and Bratberg's interest. In June 2012, New Day signed a letter of interest with Greater Houston Anesthesiology. Regan also signed the letter of interest, in his capacity as a "General Partner" of "Welsh, Carson, Anderson & Stowe." Over the summer of 2012, Welsh Carson and executives from New Day (soon to be renamed USAP) met with and ran due diligence on Greater Houston Anesthesiology.

85.    In early August 2012, Welsh Carson and New Day presented to Greater Houston Anesthesiology's physicians about joining together and creating a new company to be named USAP. In their presentation, Welsh Carson and New Day highlighted Welsh Carson's experience investing in healthcare portfolio companies and their plan for aggressive growth through additional acquisitions. Soon after, on August 29, 2012, Welsh Carson and New Day submitted a formal Letter of Intent to acquire Greater Houston Anesthesiology for $██████████ ██████████; Bratberg and Rizzo signed the letter for New Day, and Regan for WCAS Associates XI. To fund the Greater Houston Anesthesiology purchase and roughly $██████ in transaction expenses, Welsh Carson would contribute approximately $██████ from one of

its investment funds, WCAS XI, and New Day would borrow roughly $██████ from third-party lenders.

86.     On August 13, 2012, New Day Anesthesia, Inc. and New Day Anesthesia Holdings, Inc. were incorporated. Both companies had the same board of directors: Brian Regan, D. Scott Mackesy, Kristen Bratberg, and John Rizzo.

87.     Greater Houston Anesthesiology chose the offer from Welsh Carson and New Day out of the several it had received. On August 31, 2012, the parties agreed to a three-month exclusivity period to negotiate the details of the transaction. During that time, Welsh Carson ran extensive diligence, relying on several outside advisors, input from employees at several of its other portfolio companies, and other internal and external sources of information developed during Welsh Carson's history of investing in healthcare.

88.     Three consulting groups examined and blessed the transaction. First, Avalere Health assessed Greater Houston Anesthesiology's reimbursements and found that anesthesiologists "have more power than most specialists," and this power was "magnified" by Greater Houston Anesthesiology's "commanding market share."

89.     Second, Stax, Inc., examined the supply and demand for anesthesia services in Houston, observing that Greater Houston Anesthesiology was "the largest anesthesia physician group in the greater Houston region." Stax saw few threats to Greater Houston Anesthesiology's dominance, noting that "the closest groups to GHA in size are academic in nature, with most independent groups being much smaller" and Greater Houston Anesthesiology was "well-positioned within the [Houston region], and specifically within the four major hospital systems." According to this Stax report, these four hospital systems—Houston Methodist, Memorial Hermann, St. Luke's, and HCA—performed almost 65% of all inpatient surgeries in Houston.

90.    Third, consultants at Savvy Sherpa observed that Greater Houston Anesthesiology

had "achieved very good levels of reimbursement from commercial payers." Regan heard that

Greater Houston Anesthesiology's reimbursement rates were the highest from an ambulatory

surgical center executive, who described it as having the "best rates."

91.    Welsh Carson swiftly leveraged these assessments with potential lenders. To

make good on their offer to Greater Houston Anesthesiology, Welsh Carson and New Day

needed to secure $███████ in loans. In October 2012, Regan and the Welsh Carson / New

Day team gave potential lenders a simple pitch: even if USAP simply stopped after acquiring

Greater Houston Anesthesiology, it would still have acquired a practice with ███████████

████████ reimbursement rates ████████████████████████████████████.

But the plan did not stop with the Greater Houston Anesthesiology acquisition.

92.    Instead, as Regan had previously explained to his partners and now reiterated to

potential lenders: Greater Houston Anesthesiology would be the linchpin in USAP's ultimate

plan to "build a platform with national scale by consolidating practices with high market share in

a few key markets." Regan repeated that a key goal of this consolidation strategy was to increase

"[n]egotiating leverage with" payors, enabling USAP to charge even higher prices.

93.    Lenders liked what they heard. Welsh Carson and USAP secured $███████ in

debt financing from a consortium that included General Electric Capital, KeyBank, Bank of

America, Wells Fargo, and Ares Capital. And as planned, Welsh Carson committed over $████

█████ in financing from its fund Welsh Carson XI. In a November 2012 memo to Welsh

Carson's "Investment Professionals" seeking approval for that investment, Mackesy, Regan, and

four Welsh Carson employees working under their direction reiterated that the Greater Houston

Anesthesiology acquisition was the first and essential step in USAP's "roll-up strategy."

94.    With a deal looking likely, on November 19, 2012, Welsh Carson and Bratberg put out a press release—"Welsh, Carson Forms U.S. Anesthesia Partners"—announcing the creation of the new anesthesiology provider group.

95.    On December 12, 2012, USAP entered into an agreement to acquire Greater Houston Anesthesiology for $▮▮▮▮▮▮▮. Two weeks later, Greater Houston Anesthesiology's 220 physicians and 180 CRNAs officially joined the new company.

### C. Welsh Carson and the newly-formed USAP develop a plan to roll up independent anesthesia practices and raise prices

96.    On December 13, 2012—one day after signing the Greater Houston deal— Bratberg and Rizzo met in New York with Regan and the Welsh Carson team to develop an acquisition strategy and discuss potential targets. At Welsh Carson's direction, USAP continued to develop its strategy, with a particular focus on its "value maximization plan." A value maximization plan, according to USAP's longtime CEO Bratberg, is a "tool that Welsh Carson introduced . . . to clarify and focus management's attention."

97.    By January 2013, USAP's strategic plan was set. In a presentation emblazoned with both the USAP and Welsh Carson logos, USAP and Welsh Carson explained that USAP would "Roll Up Houston" through a series of "tuck-in acquisitions." These acquisitions were called "tuck-ins" because they would be folded into USAP's newly acquired Greater Houston Anesthesiology "platform" operation. USAP planned to use both large and small tuck-in acquisitions to expand beyond Houston.

98.    Welsh Carson and USAP's plan exploited the fact that hospitals' contracts with their anesthesia providers are often "sticky." Rather than competing against other anesthesia practices to win their clients, Welsh Carson and USAP planned on buying practices with existing exclusive hospital contracts. Ideally, these hospitals would also be important ones for insurers to

include in their networks. The end goal was to "bolster [USAP's] market share and drive profitability" by buying up more exclusive contracts with hospitals, giving USAP the leverage to charge higher prices.

99.    But that was not all. Regan, Bratberg, and the other Welsh Carson and USAP executives agreed that a key part of USAP's expansion plans—in Houston and beyond—would be spreading Greater Houston Anesthesiology's high reimbursement rates to other practices through tuck-in acquisitions. After acquiring each firm, Welsh Carson and USAP planned to ratchet up the newly-acquired providers' rates to those used by Greater Houston Anesthesiology—which had some of the highest rates in Texas when USAP acquired it. USAP thus planned to supply hospitals with generally the same providers as before, but now at significantly higher reimbursement rates. USAP and Welsh Carson referred to these increases as "synergies," even though they were simply excess profits generated from consolidating the market.

100.    By early 2013, Welsh Carson and USAP had set in motion their consolidation strategy, outfitted USAP with the funding and personnel to execute it, and fleshed out a plan for how to realize that strategy. USAP soon began executing on it.

101.    Welsh Carson continued to play a critical oversight role. USAP's "Business Development Playbook," developed in early 2013, called it "important that [Welsh Carson] remains fully informed" and described how USAP's acquisitions "will typically involve multiple memos/presentation decks and discussions with [Welsh Carson]." Indeed, the Playbook explained, before USAP could send a letter of intent proposing an acquisition, "the deal must be reviewed and approved by Welsh Carson."

### V.    USAP CONTINUES ITS ANTICOMPETITIVE SCHEME BY ROLLING UP ADDITIONAL PRACTICES

**A.  After its founding acquisition, USAP makes three additional acquisitions in Houston**

102.    In August 2013, less than a year after acquiring Greater Houston Anesthesiology, USAP was already "working to advance discussions with all actionable Houston practices." As the next step in its roll-up scheme, between 2014 and 2020, USAP acquired three of the largest remaining independent anesthesia groups in Houston.

**1.  North Houston Anesthesiology – Kingwood Division (2014)**

103.    In June 2014, USAP acquired a division of North Houston Anesthesiology located in Kingwood for $█████████. At the time of the acquisition, the Kingwood Division of North Houston Anesthesiology included 21 physicians and 9 CRNAs.

104.    USAP targeted North Houston Anesthesiology because it had "[s]trategic hospital affiliation" with important Houston hospitals, including HCA Kingwood and Memorial Hermann Northeast.

105.    Before USAP acquired North Houston Anesthesiology, the two practices competed head-to-head. For example, survey results included in a 2013 report prepared by a USAP consultant indicated that hospital administrators and surgeons in Houston considered North Houston Anesthesiology among "the best in the area," "along with the likes of [USAP]." And when finalizing the acquisition of the Kingwood division, USAP's Chief Commercial Officer acknowledged internally that North Houston Anesthesiology's Conroe division—which opted not to join USAP—would remain a USAP "competitor."

106.    In August 2014, USAP and Welsh Carson explained to lenders that after uniting with North Houston Anesthesiology's Kingwood Division, USAP had become the "clear leader"

in providing hospital-based anesthesiology services in the Houston area. At that point, USAP estimated that the next largest anesthesia group in Houston was "less than 5% the size of USAP."

107.    USAP's acquisition of NHA Kingwood resulted in significantly higher reimbursement rates. For example, before the acquisition, NHA Kingwood's reimbursement rate from ▉ was $▉ per unit. Following the acquisition, USAP raised NHA Kingwood's reimbursement for the same anesthesia providers to its own contracted rate—$▉ per unit for ▉, an increase of ▉%. Other insurers also saw rate increases: ▉% and ▉% for Blue Cross and United, respectively. USAP estimated that raising North Houston Anesthesiology's Kingwood Division's rates to USAP levels increased the practice's revenues by about $▉ in the first year alone.

### 2. MetroWest Anesthesia Care (2017)

108.    In March 2017, USAP acquired MetroWest Anesthesia Care for $▉. At the time of the acquisition, MetroWest was a group of 51 physicians and 79 CRNAs.

109.    MetroWest was one of USAP's "high-priority" acquisition targets in the Houston market because of its relationships with the Memorial Hermann hospital system, including contracts at Memorial Hermann Katy Hospital and Memorial City Hospital. In addition, USAP recognized that acquiring MetroWest could play an important "defensive" role. In 2014, Sheridan Healthcare—a large, multi-state physician group now part of Envision Physician Services—was targeting MetroWest for acquisition; the parties signed a confidentiality agreement in April 2014. As USAP's Director of Business Development told the CEO and COO, another large player entering into Houston would "spoil the entire market." Instead, USAP planned to encourage MetroWest to consider a deal with USAP to "preserve the protected market" both enjoyed.

34

110. Before USAP acquired MetroWest, the two practices competed head-to-head. Indeed, MetroWest was one of USAP's largest remaining competitors for hospital contracts left in Houston. In April 2016, USAP worried the Memorial Hermann hospital system (consisting of 11 hospitals) would be "moving to a single source anesthesia provider," meaning an exclusive contract for the entire hospital system. MetroWest and USAP both had exclusive contracts with hospitals in the Memorial Hermann hospital system, so both were positioned to potentially take over an exclusive systemwide contract. Instead of competing with MetroWest to win Memorial Hermann's business, USAP acquired the practice to "further expand its relationship with Memorial Hermann" while earning "synergies."

111. USAP's acquisition of MetroWest resulted in significantly higher reimbursement rates. For example, before being acquired, MetroWest's reimbursement rate from United was $███ per unit. Six months after the acquisition, MetroWest's reimbursement rate for the same anesthesia providers from United was $████, an increase of nearly ███%. After USAP acquired MetroWest, Blue Cross reported that USAP "[a]ccounted for . . . 69% of cases and 83% of cost in Houston" and that it "leverag[ed] market share" into a reimbursement rate more than double that of other Houston anesthesiologists. USAP estimated that raising MetroWest's rates to USAP levels increased the practice's incremental revenues by about $████ in the first year.

### 3. Guardian Anesthesia Services (2020)

112. In January 2020, USAP acquired Guardian Anesthesia Services for $████. Guardian was a group of 21 physicians and 56 CRNAs.

113. USAP identified Guardian as an acquisition target in 2013, along with MetroWest and NHA, because of the group's exclusive contracts with three HCA hospitals in Houston. Guardian had declined USAP's offers to merge for several years, until they acquiesced in 2020.

By acquiring Guardian and thus gaining control of its exclusive hospital contracts, USAP grew its presence in the HCA health system and increased its patient volume in Houston.

114.    Before USAP acquired Guardian, the two practices competed head-to-head. For example, in 2014, before opening its new Pearland hospital, HCA requested proposals from anesthesia groups to staff the facility. Both Guardian and USAP responded to this request. Guardian won. Guardian continued to staff HCA Pearland until the group was acquired by USAP in 2020, at which point, USAP assumed the contract.

115.    USAP's acquisition of Guardian resulted in significantly higher reimbursement rates. For example, before the acquisition, Guardian's reimbursement rate from Cigna was $███ per unit. Six months after being acquired by USAP, Guardian's reimbursement rate from Cigna for the same anesthesia providers was $████, a nearly ██% increase. USAP estimated that raising Guardian's rates to USAP levels increased the practice's incremental revenues by about $███████ in the first year.

### 4.    USAP's consolidation of Houston as it stands today

116.    After acquiring Greater Houston Anesthesiology, but before rolling up additional practices, USAP was already in a strong position. It had about 400 providers in Houston and handled a significant share of the anesthesia services there—nearly 40% of hospital-only cases and roughly half of payors' hospital-only anesthesia costs. It also controlled a majority of the surgical anesthesia volume in the Houston Methodist and St. Luke's systems (73% and 60%, respectively), with strong positions in the Memorial Hermann and HCA systems (32% and 29%).

117.    Today, the Houston market is even more concentrated. USAP now boasts nearly ███ anesthesia providers in Houston and is more than eight times larger than its next largest competitor in Houston in terms of revenue. USAP handles about 60% of the hospital-only

anesthesia cases and accounts for almost 70% of payors' hospital-only anesthesia costs. Through its acquisitions, USAP has also grown in key hospital systems, including Memorial Hermann and HCA, where Greater Houston Anesthesiology's presence had been more modest.

118.    USAP also continues to have the highest contracted reimbursement rates of any provider in Houston. That was already the case in 2013, when, for example, its rates with three of the largest commercial insurers were about $▮ to $▮ per unit. As of December 2022, however, its rates with these insurers ranged from about $▮ to $▮ per unit. As of February 2020, United reported that it reimbursed USAP at rates 95% higher than its in-network median for Texas and 65% higher than the Houston average, which was calculated including USAP. USAP has maintained its high rates and broad network of exclusive facility contracts in Houston despite an anesthesiology labor shortage, the COVID-19 pandemic, and losing network access to United Healthcare in 2020.

119.    As a result of USAP's acquisitions in Houston, both hospitals and insurers are left without sufficient alternatives to USAP to constrain the group's high rates.

**B. USAP expands its roll-up scheme to Dallas**

120.    USAP's roll-up strategy was not confined to Houston. Between 2014 and 2016, USAP spent over $▮▮▮▮▮ to acquire at least seven practices in Dallas.

121.    From the time it founded USAP, Welsh Carson understood that USAP had "room to expand its footprint throughout Texas." The Dallas-Fort Worth area (referred to here as Dallas) was an attractive target. Four major hospital systems accounted for a large share of the surgical case volume in Dallas: Texas Health Resources, Baylor Scott & White, HCA North Texas (operating as Medical City), and Methodist Health System.

37

### 1. Pinnacle Anesthesia Consultants (2014)

122.    At the time of USAP's founding, Pinnacle Anesthesia Consultants was the largest anesthesia group in the Dallas region and anywhere in the state. Per USAP's and Welsh Carson's estimates, Pinnacle accounted for 26% of anesthesia providers in Dallas and about 10% of anesthesia providers in Texas. Those providers performed about 40% of the anesthesia services in Dallas and had a strong presence within each of the four hospital systems: approximately 54% of the case volume in the HCA system, 52% in the Baylor system, 42% in the Texas Health Resources system, and 22% in the Methodist Dallas system.

123.    Initially, USAP questioned whether it could acquire Pinnacle, because a competitor, EmCare, already provided Pinnacle with the same "back office" services that USAP offered its practices (such as insurer contracting and billing). However, Pinnacle reached out to USAP in early 2013 after hearing news of USAP's acquisition of Greater Houston Anesthesiology to "explor[e] potential business opportunities concerning future strategic partnerships." USAP's leadership team—John Rizzo and Kristen Bratberg—met Pinnacle's President and Chairman Mike Hicks and CEO Michael Saunders in January 2013 for an "exploratory discussion." When they met, Hicks had explained that "he has wanted to do what [USAP is] doing for years," which was "roll up" many of the largest anesthesia practices through acquisition.

124.    USAP and Welsh Carson personnel agreed that a Pinnacle acquisition was worth pursuing. Regan called it "an interesting opportunity" and "definitely a worthwhile discussion given the size of their group and market." Bratberg concurred, noting that a deal with Pinnacle "[c]ould be strategically a huge step forward from a Texas and national standpoint." Others on the Welsh Carson team agreed with Bratberg, noting there was "[s]ignificant potential revenue upside applying [USAP's Houston] rates" to Pinnacle's providers.

38

125.    USAP proceeded to "[p]ursue aggressive interaction" with Pinnacle, hoping to close an acquisition toward the end of 2013. In May 2013, EmCare communicated to the Pinnacle physicians that it did not object to USAP acquiring Pinnacle. At that point, USAP and Welsh Carson initiated due diligence, including hiring multiple consultants to review the competitive dynamics in the Dallas anesthesiology market and Pinnacle's position in it. These consultants confirmed Pinnacle's dominance, including the fact that it had managed to negotiate exclusive hospital contracts (which were more unusual in Dallas than Houston). They also confirmed that the other, much smaller anesthesia groups in Dallas "pose[d] no strategic or competitive threat to Pinnacle" and recommended that, after buying Pinnacle, USAP acquire additional groups to help enter "key [hospital] system facilities not served by Pinnacle" and secure more "exclusive contracts over time."

126.    After completing initial due diligence, USAP, Welsh Carson, and Pinnacle signed a letter of intent on September 13, 2013, which memorialized USAP and Welsh Carson's offer to purchase Pinnacle as well as the parties' plan to "expand throughout the state of Texas by acquiring other local anesthesia groups." Brian Regan signed the letter in his capacity as a managing member of WCAS Associates XI, the general partner entity for the WCAS XI fund. After signing the letter of intent, USAP and Welsh Carson personnel, including but not limited to Regan, continued to conduct further diligence and to negotiate the specifics of a transaction with Pinnacle.

127.    In January 2014, USAP acquired Pinnacle for $▮▮▮▮▮▮. Welsh Carson purchased approximately $▮▮▮▮▮ worth of additional shares of USAP to help fund the acquisition. At the time of the acquisition, Pinnacle employed 320 anesthesiologists and 217 CRNAs. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

39

████████████████████████████████████████████████

█████████████████████████████████████.

128.    USAP immediately began attempting to apply its existing (higher) reimbursement rates from Houston to Pinnacle providers. Insurers balked at the idea of Houston rates for Dallas anesthesia providers, leading to protracted negotiations. One insurer, ████, even opted to treat the former Pinnacle (now USAP) anesthesia providers as out of network and arbitrate the amount it was required to reimburse for their services. That arbitration, however, ultimately settled in early 2016, with USAP securing for its Dallas providers a roughly ██% retroactive price increase on claims filed during the dispute and a ██% price increase going forward. USAP likewise obtained significant price increases from the other insurers for the same anesthesia providers—██% to ██%, depending on the insurer.

129.    Even before they completed the Pinnacle acquisition, Welsh Carson and USAP started planning further acquisitions in Dallas. They focused on Pinnacle's pre-existing "wish list" of acquisition targets: Anesthesia Consultants of Dallas, Excel Anesthesia Consultants, and North Texas Anesthesia Consultants. USAP and Welsh Carson quickly ticked off the practices on that wish list.

### 2. Anesthesia Consultants of Dallas (2015)

130.    In January 2015, USAP acquired Anesthesia Consultants of Dallas for $████. Anesthesia Consultants of Dallas included 21 physicians and 29 CRNAs at the time of the acquisition.

131.    USAP targeted Anesthesia Consultants of Dallas largely because of its exclusive contract at Methodist Dallas's flagship facility, an already large and expanding facility that Anesthesia Consultants of Dallas had served for twenty years. Anesthesia Consultants of Dallas

covered other Methodist Dallas hospitals as well, and an acquisition would give USAP a dominant share of five of the system's six facilities in Dallas. In addition, Anesthesia Consultants of Dallas had an exclusive contract at the Texas Regional Medical Center facility and significant presence at nine open-staffed hospitals.

132.    Before USAP acquired Anesthesia Consultants of Dallas, the two practices competed head-to-head. Tom Swygert, a leading USAP anesthesiologist in Dallas who serves as a board member today, told USAP's then-CEO Bratberg and Welsh Carson's Regan that, outside of Pinnacle, Anesthesia Consultants of Dallas was one of the two groups (along with Excel) with "the largest number of anesthesiologists with specialized skill sets in the DFW market." By acquiring Anesthesia Consultants of Dallas, USAP would "create a barrier to entry and promote our ability to garner system contracts."

133.    USAP's acquisition of Anesthesia Consultants of Dallas resulted in significantly higher reimbursement rates. For example, before the acquisition, Anesthesia Consultants of Dallas's reimbursement rate from United was $▮▮▮▮ per unit. After the acquisition, Anesthesia Consultants of Dallas's United rate went to $▮▮▮▮ per unit for the same anesthesia providers, an increase of ▮▮▮%. USAP estimated that acquiring Anesthesia Consultants of Dallas would yield $▮▮▮▮▮▮ per year.

### 3. Excel Anesthesia Consultants (2015)

134.    In March 2015, USAP acquired Excel Anesthesia Consultants for $▮▮▮▮▮▮. At the time of the USAP acquisition, Excel employed 55 physicians and 19 CRNAs, including some providers it added after merging with North Texas Anesthesia Consultants (the other practice that had been on Pinnacle's "wish list").

41

135.    Excel was an attractive target in part because of its exclusive contract with Texas Health Presbyterian Hospital Dallas, which is the second largest hospital within the Texas Health Resources system. Beyond that, Excel had a presence in more than 20 additional hospital facilities at all four of the area's major hospital systems. USAP and Welsh Carson anticipated using Excel's "broad reach and relationships across the Dallas market" to "[p]osition[] [USAP] to obtain exclusive facility contracts." Brian Regan of Welsh Carson called Excel "our most strategic move in the market next to [Anesthesia Consultants of Dallas]."

136.    Before USAP acquired Excel, the two practices competed head-to-head. In February 2014, Swygert had highlighted that Excel "compete[s] directly with some of the [Pinnacle] divisions . . . within the open-staff hospitals." Absent the acquisition, Regan was concerned that Excel could become an even bigger competitor to USAP. As Regan explained, Excel could join a different large group, and USAP would face "a 100 doc [sic] competitive practice with a strong sub specialty orientation in our backyard." Acquiring Excel, however, would "create a barrier to entry."

137.    USAP's acquisition of Excel resulted in significantly higher reimbursement rates. For example, before USAP acquired it, Excel's reimbursement rate from United was $▇ per unit. After the acquisition, USAP raised Excel's reimbursement rate from United to $▇ per unit for the same anesthesia providers, an increase of ▇%. USAP estimated that raising Excel's rates to USAP levels increased the practice's incremental revenues between $▇ and $▇ per year.

### 4.  Southwest, BMW, Medical City Physicians, and Sundance (2015-2016)

138.    Having acquired all the groups on their 2014 "wish list," USAP and Welsh Carson shifted their focus to smaller groups in Dallas that had exclusive contracts or established

relationships with facilities or health systems. Over five months from December 2015 to April 2016, USAP acquired four additional groups in Dallas: Southwest Anesthesia Associates, BMW Anesthesiology, Medical City Physicians, and Sundance Anesthesia.

139.    First, in December 2015, USAP acquired Southwest Anesthesia Associates. USAP acquired Southwest Anesthesia Associates in part because it was the exclusive provider at Charlton Methodist.

140.    USAP's acquisition of Southwest Anesthesia Associates resulted in significantly higher reimbursement rates. For example, approximately six months before the acquisition, United agreed to increase Southwest Anesthesia Associates' rate to $▒ per unit "in hopes to keep them independent from USAP." After the acquisition, USAP raised Southwest Anesthesia Associates' rates with United to $▒ per unit rate, a ▒% increase.

141.    Next, in January 2016, USAP acquired BMW Anesthesiology and unaffiliated anesthesiologists referred to as the Medical City Physicians. USAP purchased BMW, a group of 9 anesthesiologists for $▒▒▒▒. USAP acquired the Medical City Physicians, a group of 7 anesthesiologists for $▒▒▒

142.    Both the BMW and Medical City Physicians acquisitions were intended to expand USAP's presence at HCA's flagship facility, Medical City Dallas. Prior to these acquisitions, USAP covered only 30% of cases at Medical City Dallas and faced rigorous competition from BMW Physicians and Medical City Physicians. USAP recognized BMW's "strategic value due to their strong participation in leadership roles in the Dallas HCA flagship hospital[.]" Similarly, the Medical City Physicians held "a key strategic position within Medical City and HCA," as their group included the newly elected chief of anesthesia. After acquiring both groups, USAP controlled approximately 80% of HCA's flagship hospital.

43

143.    USAP's acquisition of BMW and Medical City Physicians resulted in significantly higher reimbursement rates. For example, BMW's reimbursement rate with BCBS was $███ per unit. After the acquisition, USAP raised BMW's rate from BCBS for the same anesthesia providers to USAP's contracted rate of $███ per unit, an increase of ███%. USAP estimated that raising BMW's rates to USAP levels increased the practice's incremental revenues by about $████████ per year.

144.    Finally, in April 2016, USAP acquired Sundance Anesthesia. At the time of the acquisition, Sundance consisted of 7 physicians and 24 CRNAs. USAP targeted Sundance because of its exclusive contract to service Texas Health Resources's Southwest Fort Worth hospital, which was immediately assigned to USAP. USAP's Chief Operating Officer remarked "[i]t's a huge win, that's a key THR site we didn't have. Great work[!]"

145.    USAP's acquisition of Sundance resulted in significantly higher reimbursements rates. For example, before USAP acquired Sundance, Sundance's reimbursement rate from United was $██ per unit. After the acquisition, USAP raised Sundance's reimbursement rates to $██ per unit, a ██% increase. USAP estimated that raising Sundance's rates to USAP levels increased the practice's incremental revenues between $██ to $███████ per year.

### 5.    USAP's consolidation of Dallas as it stands today

146.    In 2013, prior to USAP's acquisition spree, at least fifteen small groups accounted for 60% of the anesthesia case volume in Dallas. The competition in Dallas between those groups led to lower prices. Today, USAP has over 900 anesthesia providers and accounts for 57% of the hospital-only cases in Dallas (and 68.5% of the revenue). USAP is six times larger by case volume than the next-largest group in Dallas, and nine times larger by revenue.

44

147.   In total, USAP is now the exclusive provider at 13 of the largest 25 hospitals in the Dallas area and provides the majority of anesthesia services in another two. USAP is the exclusive provider for the Baylor Scott & White flagship facility—the Baylor University Medical Center—as well as its Grapevine and Irving facilities. USAP entered into an agreement in 2022 with Texas Health Resources to cover nine of its fourteen facilities on an exclusive basis until at least 2027. Finally, USAP is the exclusive provider at Methodist Health System's Dallas, Charlton, Midlothian, Mansfield, and Richardson hospitals and a dominant provider at its McKinney hospital.

148.   USAP also continues to have the highest contracted rates of any anesthesia provider in Dallas. ███████████████████████████████████████

████████████████████████████████████████████████████.

USAP has maintained its high rates and broad network of exclusive facility contracts in Dallas despite an anesthesiology labor shortage, the COVID-19 pandemic, and losing network access to United Healthcare in 2020.

149.   As a result of USAP's acquisitions in Dallas, both hospitals and insurers are left without sufficient alternatives to USAP to constrain the group's high rates.

### C. USAP further expands its roll-up scheme by acquiring other large practices across Texas

150.   From its founding, USAP and Welsh Carson's vision for expansion extended across Texas. Their plan was simple: acquire practices throughout the state with exclusive contracts at key hospitals for insurers' networks and extract "synergies" by raising the acquired group's prices to USAP's higher price.

151.   In 2013, USAP and Welsh Carson hired consultants Welsh Carson identified to assess whether Greater Houston Anesthesiology's contracts would allow USAP to incorporate

45

acquired physician groups and bill for their services at Greater Houston Anesthesiology's
reimbursement rates. The consultants—Savvy Sherpa—concluded USAP could acquire groups,
incorporate them into most of Greater Houston Anesthesiology's contracts that USAP had
assumed, then bill for the acquired groups at USAP's reimbursement rates.

152.   USAP and Welsh Carson decided to follow the consultants' approach with the
Pinnacle acquisition, but insurers pushed back and USAP ultimately agreed to rates for Dallas
that were lower than those in Houston (but still higher than rates that existed before the
acquisitions). *See* ¶ 128. USAP was able to secure ███% to ███% price increases, though only after
protracted negotiations that lasted months or years. For instance, ████████ opted to treat the former
Pinnacle anesthesia providers as out of network; USAP arbitrated the amount owed to them,
which took almost two years to settle.

153.   To resolve the confusion about whether its insurer contracts covered new
acquisitions, USAP worked closely with Welsh Carson to develop a new contract clause—
referred to within USAP as the "tuck-in clause"—to eliminate doubt about the rates that would
apply whenever USAP acquired a new physician group. ██████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████

154.   ██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

 Welsh Carson
personnel assisted in crafting the contractual language. Eventually, USAP's Vice President of
Payor Contracting, Alan Glenesk, sent a draft to Regan to see "if you approve." Glenesk later
reported to a different insurer that Regan was required to approve all USAP's insurer contracts.

155.

USAP, however, credibly
threatened to leave (or not join) their networks; USAP's extensive—often exclusive—presence
at key hospitals throughout Texas made taking USAP out-of-network too difficult.

156.   With the                          , from 2016 to 2019, USAP acquired
four groups—one each in Tyler, Austin, Amarillo, and San Antonio—and then raised their
reimbursement rates well above the median in each metropolitan area.

### 1.  East Texas Anesthesiology Associates (2016)

157.   In June of 2016, USAP acquired East Texas Anesthesiology Associates in Tyler,
Texas for $          . East Texas Anesthesiology Associates included 23 physicians and 11
CRNAs at the time of the acquisition.

158.   USAP targeted East Texas Anesthesiology Associates because of its dominant
position at the East Texas Medical Center in Tyler, at which East Texas Anesthesiology covered
over 50% of case volume and revenue. East Texas Anesthesiology Associates also provided
near-exclusive coverage at University of Texas Health Science Center at Tyler.

47

159.    USAP's acquisition of East Texas Anesthesiology Associates resulted in significantly higher reimbursement rates. For example, before the acquisition, East Texas Anesthesiology Associates' rate with HealthFirst was $█ per unit; afterwards reimbursement rates increased to $█ per unit—a █% increase for the same anesthesia providers. Similarly, East Texas Anesthesiology Associates' rates with █████ increased from $█ (before the acquisition) to $█ (after the acquisition), an increase of nearly █%.

**2.    Capitol Anesthesiology Association (2018)**

160.    In February 2018, USAP acquired Capitol Anesthesiology Association, the largest group in Austin, for $████████. Capitol included 80 physicians and 152 CRNAs at the time of the acquisition.

161.    USAP had initially entered the Austin market in July 2013 with its acquisition of Lake Travis Anesthesia for $██████. Lake Travis was a small group that provided local call coverage for Lakeway Hospital. USAP executives referred to the transaction as "points on the board[:] growth in Austin." Although the group was small, it was positioned to help "'Chip away' at the market leader, Capitol" and to "Continue GHA's expansion into [the] Austin MSA," where Greater Houston Anesthesiology was already the fourteenth largest group.

162.    As early as 2013, USAP and Welsh Carson had identified Capitol as an attractive acquisition target because of its "substantial market position in Austin," which they estimated at a 50% share. Capitol also had lucrative contracts with multiple hospitals in Austin, including exclusive contracts with five of the eleven hospitals in the Seton system, the largest hospital system in Austin, and a presence at five others. Capitol also had exclusive contracts at multiple other Austin-area hospitals.

163.    USAP's acquisition of Capitol resulted in significantly higher reimbursement rates. Before the acquisition, Capitol's rates from United were $██ per units. Six months after the acquisition, Capitol's United rates went to $█████ per unit, a more than ██% increase for the same anesthesia providers.

164.    USAP estimated raising Capitol's rates to USAP levels would increase the practice's incremental revenues by $███████ within the first five months, and even greater revenues over the next twelve months because the rate escalation USAP had built into its insurer contracts would be applied to the now-acquired Capitol anesthesiology providers. As Capitol's Vice President of Operations, who became a USAP executive post-acquisition, put it: "Awesome! Cha-ching!"

### 3.    Amarillo Anesthesia Consultants (2018)

165.    In July 2018, USAP acquired Amarillo Anesthesia Consultants in Amarillo for $██████. Amarillo Anesthesia included 10 physicians and 10 CRNAs at the time of the acquisition. In addition, at the time of the acquisition, Cigna's internal analysis suggested that Amarillo Anesthesia accounted for as much as 85% of the hospital-based anesthesia cases in Amarillo.

166.    USAP targeted Amarillo Anesthesia because of its exclusive relationship with Baptist St. Anthony's hospital, the largest hospital in Amarillo, and one of only two hospitals in the area. Baptist St. Anthony's is also part of the Ardent Health Services system. USAP was also interested in negotiating exclusive agreements with Ardent in other locations.

167.    USAP was not the only firm that had been interested in entering Amarillo. Metro/IPN, another anesthesia provider with a significant presence in the Dallas market, also sought to enter the Amarillo market through acquisition. According to one insurer, had Metro

succeeded in acquiring an Amarillo anesthesia group, it was expected to raise the practice's rate to $▮ per unit.

168.    USAP acquired Amarillo Anesthesia and raised reimbursement rates higher than Metro likely could. For example, before the acquisition, Amarillo Anesthesia's reimbursement rate from Blue Cross was $▮ per unit. Six months after the acquisition, Amarillo Anesthesia's reimbursement rate from Blue Cross was $▮ per unit, a ▮% increase for the same anesthesia providers. Similarly, within six months of the acquisition, Amarillo Anesthesia's rate with United Healthcare increased over ▮%. USAP estimated that raising Amarillo Anesthesia' rates to USAP levels would increase the practice's incremental revenues by about $▮ in the first year.

### 4.  Star Anesthesia (2019)

169.    In September 2019, USAP acquired Star Anesthesia, based in San Antonio, for $▮. Star included 182 physicians and 12 CRNAs at the time of the acquisition. At the time of the acquisition, Star was the largest remaining independent anesthesia practice in Texas.

170.    USAP and Welsh Carson identified Star as an attractive target as it considered expanding across Texas as early as 2013 because Star had exclusive contracts with the HCA co-owned Methodist San Antonio hospital system.

171.    In March 2016, Star acquired anesthesiologists that had declined to join USAP when it bought North Houston Anesthesiology in 2014. Because of Star's existing relationship with HCA in San Antonio, USAP viewed Star as a threat to its position in HCA's Houston hospitals. Indeed, when Star announced its entry into Houston, Brian Regan of Welsh Carson's reaction was that USAP "need[ed] to do a system deal with HCA and kick these guys [i.e., Star]

out of town." USAP's head of Business Development met with Star's President just a few months later to discuss the prospect of an acquisition.

172.    Star rebuffed USAP and indicated to at least one insurer that it planned to expand elsewhere in Texas. Buoyed by Star's decision, insurers such as United sought to make Star "a statewide messenger model to be a competitor against USAP," with Star leveraging its planned independence to obtain considerable price increases. USAP eliminated this competitive threat and the largest remaining independent anesthesiology practice in Texas when it acquired Star in 2019.

173.    USAP's acquisition of Star resulted in significantly higher reimbursement rates. For example, before the acquisition, Star's reimbursement rate from Cigna was $██ per unit. After the acquisition, Star's reimbursement rate was $██ per unit, a nearly ██% increase. Cigna projected that it would pay an extra $██████—or ██% more—for the same Star anesthesiologists after they joined USAP. Similarly, after the acquisition, Star's rate to United increased ██%, costing United an additional $██████ for the same Star anesthesiologists. USAP estimated that raising Star's rates to USAP levels would increase the practice's incremental revenue by about $██████ per year.

## VI.    USAP'S OTHER ANTICOMPETITIVE CONDUCT

174.    As it was consolidating anesthesia services in Houston, Dallas, Austin, and across Texas by acquiring other practices, USAP extended and defended its growing power through further anticompetitive conduct. That conduct took at least two forms: (1) price-setting arrangements in which USAP charged its own, higher prices for services rendered by anesthesia providers who chose to remain independent; and (2) a market allocation agreement to avoid a head-to-head rivalry ██████ with another large anesthesia provider, ██████.

### A. USAP uses price-setting arrangements to charge its own, higher rates for anesthesia services provided by other practices

175.    Unlike the acquired anesthesia practices described in Sections IV-V, some providers did not want to sell to USAP. Academic practices, for example, might lose their affiliation with medical schools or teaching hospitals if bought by USAP, and at least one "d[id] not view USAP employment as a viable option." And even some non-academic providers simply preferred to remain independent.

176.    USAP raised the reimbursement rates for anesthesia services provided by some of these independent practices by using price-setting arrangements. Namely, USAP and another practice would agree that USAP would bill payors for the anesthesia services rendered by both groups using USAP's own provider or tax information. These price-setting arrangements made it appear to payors as if USAP was doing the work of the other group's anesthesia providers. And the arrangements effectively raised the reimbursement rates of the non-USAP providers up to USAP's much higher rates. USAP then paid the non-USAP providers, typically sharing some portion of the mark-up from using USAP's higher rates.

177.    Although USAP nominally gained exclusive contracts at the affected hospitals, the reality was that the other groups continued to work at the affected hospitals. In fact, the hospitals expected (and often expressly required) that they would keep their existing providers. In other words, the effect of these price-setting arrangements was that, at the affected hospitals, payors paid USAP's higher rates for anesthesia services provided by the same doctors as before. These arrangements functioned the same as an agreement between USAP and the non-USAP providers to charge the higher USAP rates.

178.    These price-setting arrangements appeared in contracts styled as "collaboration," "professional services," or "independent contractor" agreements. But the price-setting

arrangements were not necessary for USAP to offer administrative services to non-USAP
anesthesiologists or to collaborate with or hire them as subcontractors at facilities where USAP
had an exclusive contract. USAP could have cooperated with other providers in any of those
ways while still separating USAP and non-USAP claims for billing purposes. Indeed, USAP has
on at least one occasion provided administrative services to an anesthesia group without entering
into a price-setting arrangement.

179.    Several USAP executives recognized that these price-setting arrangements posed
legal risks for the company. One senior vice president wrote that it "seems odd from a
compliance standpoint" for USAP to bill on another provider's behalf while "keeping the
revenue." And USAP's Vice President of Payor Relations feared that a price-setting arrangement
"might possibly compromise" the company by breaching its insurer contracts "due to compliance
issues related to pass through billing."

180.    Nevertheless, USAP has price-setting arrangements with at least two anesthesia
groups in Texas that remain active to this day: (1) the Methodist Hospital Physician Organization
("TMHPO") in Houston, and (2) Dallas Anesthesiology Associates. At one time, USAP also had
a price-setting arrangement with providers affiliated with the Baylor College of Medicine in
Houston.

181.    USAP has also sought additional price-setting arrangements. USAP tried, albeit
unsuccessfully, to reach a price-setting arrangement with providers affiliated with the University
of Texas. USAP at least considered price-setting arrangements with even more anesthesia
practices. For example, in 2014, USAP considered an arrangement with cardiovascular
anesthesiologists employed at St. Luke's hospital facilities in Houston. And before Guardian was
acquired by USAP, USAP had offered it a price-setting arrangement.

### 1.  The Methodist Hospital Physician Organization

182.    The Methodist Hospital Physician Organization is a non-profit anesthesia group that is affiliated with Houston Methodist Hospital and Weill Cornell School of Medicine and specializes in providing anesthesia for cardiovascular care.

183.    On July 1, 2005, Greater Houston Anesthesiology (later acquired by USAP) signed a contract with the Methodist Hospital Physician Organization. Greater Houston Anesthesiology agreed to retain certain anesthesia providers employed by the Methodist Hospital Physician Organization so they could provide care at Houston Methodist Hospital. At the time of this contract, Methodist Hospital Physician Organization already provided anesthesia care at Houston Methodist Hospital.

184.    Greater Houston Anesthesiology's contract with the Methodist Hospital Physician Organization contained a price-setting arrangement. The contract provided that "GHA will bill and collect, in the name of GHA and using GHA provider numbers, for Services furnished by" the Methodist Hospital Physician Organization and its providers under the agreement. The Methodist Hospital Physician Organization, in turn, assigned to Greater Houston Anesthesiology any right to bill and receive payment from patients and payors for services rendered under the contract.

185.    Several months later, Greater Houston Anesthesiology signed an exclusive contract with the Houston Methodist Hospital. That contract required Greater Houston Anesthesiology to "provide seamless Anesthesia Services with TMH[PO] physicians." Indeed, Greater Houston Anesthesiology's contract with the hospital expressly contemplated that Houston Methodist would continue to receive anesthesia care from "anesthesiologists employed by TMHPO, including, but not limited to cardiovascular anesthesiologists." And the chair of

anesthesia at Houston Methodist—the "ultimate authority" in the department—would remain "an employee of TMHPO."

186.    USAP inherited Greater Houston Anesthesiology's price-setting arrangement with the Methodist Hospital Physician Organization when USAP acquired Greater Houston Anesthesiology in December 2012.

187.    Afterwards, USAP maintained the price-setting arrangement with the Methodist Hospital Physician Organization. USAP has continued billing for anesthesia services provided by the Methodist Hospital Physician Organization and has done so at USAP's reimbursement rates—which are much higher than those previously charged by the other group.

188.    USAP executives also looked for ways to build on the existing price-setting arrangement. A June 2015 internal strategy presentation states that one of USAP's "interim goals" was to "determine avenues for [a] deeper [] relationship" with the Methodist Hospital Physician Organization. USAP executives saw that interim goal as a step towards USAP becoming the "system-wide anesthesia provider" for the Houston Methodist hospital system.

189.    USAP's price-setting arrangement with the Methodist Hospital Physician Organization remains active today. USAP continues to charge higher, USAP reimbursement rates for anesthesia services rendered by the Methodist Hospital Physician Organization's providers. Under their price-setting arrangement, ███████████████████████████

███████████████████████████████████████████████████████████████████

███████████████.

## 2. Dallas Anesthesiology Associates

190. Dallas Anesthesiology Associates is a private anesthesia group of approximately 20 physicians. As of 2021, it was one of the ten largest anesthesia practices in Dallas. It also has a longstanding relationship with Baylor University Medical Center.

191. In October 2008, Baylor University Medical Center signed a contract making Pinnacle its exclusive provider of anesthesia services. Baylor University Medical Center expected, however, to continue receiving anesthesia services from Dallas Anesthesiology Associates' providers. Indeed, in later versions of their contract, Baylor University Medical Center expressly required Pinnacle to staff the hospital "together with Dallas Anesthesia [sic] Associates."

192. On December 31, 2008, Pinnacle Anesthesia Consultants (later acquired by USAP) signed a contract with Dallas Anesthesiology Associates. Pinnacle agreed to contract with Dallas Anesthesiology Associates' anesthesia providers to provide care at Baylor University Medical Center.

193. Pinnacle's contract with Dallas Anesthesiology Associates included a price-setting arrangement. The contract provided that "Pinnacle shall bill and collect, or cause to be billed and collected" charges for all anesthesia services provided under the contract using Pinnacle's own name and tax identification number. Dallas Anesthesiology Associates and its providers assigned to Pinnacle "all of [their] rights and interest in receiving payment" for anesthesia provided at Baylor University Medical Center under the contract.

194. USAP inherited Pinnacle's price-setting arrangement with Dallas Anesthesiology Associates when it acquired Pinnacle in January 2014.

195. Pinnacle and USAP were capable of billing their own claims separately from Dallas Anesthesiology Associates' claims. Although they were required to bill Dallas

56

Anesthesiology Associates' claims to payors in Pinnacle's name, they had to bill the claims "to patients in the service provider Physician's name." So, the two groups remained separate from patients' perspective. In fact, Pinnacle even agreed to "provide a telephone number that will be provided on the billing documents. Calls received at the telephone number will be answered as 'Dallas Anesthesiology Associates' by Pinnacle."

196.    After acquiring Pinnacle, USAP maintained its price-setting arrangement with Dallas Anesthesiology Associates. USAP continued to bill for Dallas Anesthesiology Associates at USAP's higher reimbursement rates, compensating Dallas Anesthesiology Associates at a lower rate based on the other group's billing rate at Baylor University Medical Center before the arrangement, and thereby "collects a nice margin on the business." USAP's price-setting arrangement with Dallas Anesthesiology Associates remains active today.

### 3.  Baylor College of Medicine

197.    Baylor College of Medicine is a medical school based in Houston. It has an affiliated group of practicing physicians that includes anesthesiologists. As of 2012, Baylor College of Medicine had 50 affiliated anesthesiologists and was the second-largest anesthesia group in Houston (behind Greater Houston Anesthesiology) in terms of procedure volume.

198.    As early as August 2013, USAP considered partnering with Baylor College of Medicine. USAP executives and Brian Regan of Welsh Carson saw such a partnership as a way for USAP to become the exclusive anesthesia provider at more hospitals in Houston.

199.    By October 2013, USAP found itself in direct competition against Baylor College of Medicine to provide anesthesia to St. Luke's Health, one of the primary hospital systems in Houston. USAP quickly began sizing up Baylor College of Medicine as a competitor, including by hiring a consulting firm, Stax, to evaluate the academic anesthesia practice.

200.    But USAP soon decided that colluding, rather than competing, with Baylor College of Medicine would be more profitable. In October 2013, as USAP executives strategized over how to beat out Baylor for the contract with St. Luke's, Brian Regan made a proposal: "[I]f Baylor is really pushing for a piece of the anesthesia, get us in a room with them. Maybe we could work something out that would be mutually beneficial and acceptable to everyone."

201.    USAP acted on Regan's suggestion. USAP executives reached out to Baylor College of Medicine about a partnership and on October 23, 2014, USAP and Baylor College of Medicine signed a contract styled as an "Anesthesia Services Collaboration Agreement." Under the terms, Baylor College of Medicine agreed to provide USAP with several providers who would work at two campuses of the Baylor St. Luke's Medical Center hospital.

202.    USAP agreed to bill and collect in its own name and using its own provider numbers—and thus, at USAP's rates—for anesthesia services rendered by Baylor College of Medicine providers under the contract. Baylor College of Medicine and its providers, in turn, assigned to USAP any rights they had to bill and receive payment from patients or payors for anesthesia services rendered under the contract.

203.    For several years, USAP billed anesthesia claims performed by Baylor College of Medicine physicians in USAP's name and at USAP's higher rates. Meanwhile, USAP paid Baylor College of Medicine ▮▮▮▮▮▮▮▮▮▮▮▮ for its anesthesia providers' time. In 2020, the practices' price-setting arrangement was terminated.

### 4. University of Texas

204.    Like Baylor College of Medicine, the medical school programs at the University of Texas are affiliated with practicing physicians, including a group of anesthesiologists. As of

2012, that group numbered roughly 84 anesthesiologists and held an exclusive contract with Memorial Hermann's Texas Medical Center, one of the largest hospitals in the state.

205.    When USAP was considering a collaboration with Baylor College of Medicine in 2013, it also identified a similar partnership with the University of Texas anesthesia group as a "significant rate opportunity."

206.    By June 2014, USAP was actively working on an "alliance with UT." That summer, USAP and the University of Texas exchanged term sheets that contemplated UT assigning its exclusive contract at Texas Medical Center to USAP while UT's physicians would continue to work there, now as contractors for USAP. Among the terms proposed by USAP was another price-setting arrangement.

207.    Despite USAP's efforts, it could not secure a price-setting arrangement with the anesthesia group from the University of Texas. Discussions in 2014 petered out. They resumed in 2020, but the two anesthesia practices never came to an agreement.

**B.    USAP's market allocation with** ████████████████

208.    In 2013, ████████████████████████ USAP learned that ████████
████████████████████████████████████████.



209.    At that time, ██████████ was a subsidiary of ████████████████, a publicly traded nationwide healthcare company that includes, among other things, a physician group providing services in anesthesiology and other hospital-based specialties.[6]

210.    ████████████████████████████████████████████



211.

212.   In late November 2013,

213.

214.



215.   This agreement had the purpose and effect of keeping ████—a significant

potential competitor—out of the ████████ market for anesthesia services.

## VII.   RELEVANT MARKETS

**A. The relevant service market is commercially insured hospital-only anesthesia services**

216.   The relevant service market to assess the challenged conduct is the market for

hospital-only anesthesia services sold to commercial insurers and their insured members. This

service market encompasses (1) all inpatient anesthesia services, including surgical and obstetric

anesthesia performed while the patient is admitted to a hospital; and (2) any other anesthesia

services that must be provided in a hospital setting because the procedure subjects the patient to

an elevated risk such that it requires quick access to emergency medical services.

217.   Although the conduct's likely effects on competition could be analyzed for each

commercially insured hospital-only anesthesia service, it is appropriate to evaluate the

challenged conduct's likely effects across this cluster of hospital-only anesthesia services

because these services are offered to patients in the relevant geographic markets under similar

competitive conditions. Specifically, all hospital-only anesthesia services require patients to

receive care in a hospital setting. Thus, grouping the various individual hospital-only anesthesia

services into a cluster for analytical convenience enables the effective evaluation of competitive

effects with no reduction in analytical rigor.

218.    The relevant service market, as defined, is conservative (and likely overinclusive) because it includes commercially insured hospital-only anesthesia services provided at academic medical centers by academic anesthesia provider groups in conjunction with their educational mission. Houston, for example, has numerous academic medical centers, including Memorial Hermann's Texas Medical Center facility and Houston Methodist. These academic medical centers employ professors of medicine to teach anesthesiology, as well as residents and fellows, all of whom provide anesthesia services in conjunction with their educational mission.

219.    Anesthesia services at academic medical centers related to their educational mission are not subject to the same competitive conditions as other non-education related hospital-only anesthesia services because they must be provided by academic anesthesia groups. As a result, industry typically views academic anesthesia groups as different than independent anesthesia groups. Thus, including all hospital-only anesthesia services provided by academic anesthesia groups in the relevant market (including those related to the educational mission) understates USAP's actual market share.

### 1. Services performed outside a hospital are not part of the relevant service market

220.    The relevant service market appropriately excludes anesthesia services that can be provided outside a hospital setting. Patients requiring hospital-only services must receive that service in a hospital setting and cannot obtain it elsewhere.

221.    The Centers for Medicare and Medicaid Services ("CMS") maintain a list that distinguishes between hospital-only and other anesthesia services for governmentally insured patients. The list identifies anesthesia billing codes that may be used for ambulatory surgical centers. All other anesthesia codes must be billed in a hospital setting. Commercially insured patients generally face similar billing rules either formally or because hospitals adopt CMS

policy to remain certified for government insurance programs. In practice, an insignificant amount of anesthesia services provided in a surgical center is billed to commercial insurance using the codes CMS lists as hospital-only.

222.    Competitive realities also differ for hospital-only and other anesthesia services because they are administered to distinct sets of patients. Patients who must be treated in a hospital, based on their specific medical condition, can only receive hospital-only anesthesia. Determining whether a patient must undergo a procedure in a hospital is based on medical considerations, such as the time to recuperate from surgery and the need to use anesthesia that may place the patient at risk for loss of life-preserving protective reflexes. In many cases, this overlaps with the decision to admit a patient overnight—i.e., inpatient care—but there may be medical procedures that must be performed in a hospital but do not require an overnight stay. Thus, even though the anesthesia services that form the hospital-only services may be performed by the same providers as other services, the services themselves are distinct because once a patient requires treatment in a hospital, neither the patient nor their payor can turn to non-hospital anesthesia services. Therefore, patients, their payors, and referring physicians cannot substitute non-hospital services in response to a small but significant non-transitory increase in price for hospital-only services.

223.    Hospital-only anesthesia services also require unique facilities, i.e., hospitals. Hospitals must provide a minimum standard of care, which requires providing appropriate facilities and staffing for recuperation and monitoring following certain procedures. The facilities and staffing required to admit and care for patients overnight differ from those requirements for outpatient care. Similarly, facilities administering general anesthesia may require the capability to admit a patient if an adverse event occurs during the procedure. Accordingly, outpatient

facilities are not viable alternatives to hospitals for procedures requiring an overnight stay because of elevated risk of adverse events during anesthesia.

224.    Hospital-only anesthesia services require providers to practice under conditions distinct from outpatient services. Specifically, hospitals often need anesthesia providers to cover long shifts and overnight call. Unlike non-hospital procedures, which are frequently scheduled in advance, procedures performed during overnight call are often hospital-only or inpatient services, such as anesthesia for emergency surgery. Hospitals may also require certain specialized anesthesia services, which can require advanced training or experience and which, in turn, providers practicing only in outpatient settings are less likely to have.

225.    For hospitals, anesthesia groups providing outpatient services with insufficient size to provide 24-hour coverage or without the scope of services, including specialty anesthesia services, to meet hospital needs cannot be reasonable substitutes for anesthesia groups providing hospital-only anesthesia services.

226.    In addition, industry participants recognize hospital-only anesthesia services as distinct. USAP's business documents regularly measure its presence within hospital systems or at individual facilities, without regard to ambulatory surgical centers.

227.    For example, when USAP and Welsh Carson were first planning to acquire Greater Houston Anesthesiology in late 2012, they emphasized its high "wallet share" of anesthesia services at at each of the four largest hospital systems in Houston, separately assessing the practice's inpatient and outpatient procedure shares.

228.    Similarly, when USAP began expanding beyond Houston by acquiring Pinnacle, the company assessed Pinnacle's growth in inpatient and outpatient procedures separately and

highlighted the practice's "stable" position at the four largest hospital systems in Dallas, without focusing on the group's outpatient competitive position.

229.    Finally, from insurers' perspective, hospital-only and non-hospital or outpatient anesthesia services are not substitutes because they are not substitutes from the perspective of insurers' ASO clients or members, or their in-network hospitals and providers.

230.    Narrower relevant service markets may also exist for purposes of assessing the challenged anticompetitive conduct, including one consisting of only inpatient anesthesia services (which, for the same reasons as hospital-only anesthesia services, can be "clustered" for convenience with no reduction in analytical rigor).

### 2. Non-commercial insurance plans are not part of the relevant service market

231.    The relevant service market can be appropriately limited to anesthesia services sold to commercial insurers and their insured members.

232.    Commercial and government-sponsored insurance serve distinct customers. Private health insurance companies offer commercial insurance and plan administrative services to individuals and employers. Commercial insurance plans are typically linked to an insured member's employment. Government-sponsored plans serve individuals who meet specific eligibility criteria, such as age or income level, which are usually unrelated to their employer or employment situation.

233.    Commercial insurers pay distinct prices from government-sponsored plans. Anesthesiologists generally receive significantly higher reimbursement rates for services sold to commercial plans compared to Medicaid, Medicare, or Medicare Advantage plans, which are tied to government fee schedules.

65

234.    USAP, like other provider groups, recognizes the commercial insurance market as separate, tracking its pricing and positioning with commercial insurers without reference to, e.g., Medicare or Medicaid.

**B.  The relevant geographic markets to assess the competitive implications of the challenged conduct are no broader than the local metropolitan statistical areas**

235.    There are three relevant geographic markets to assess the competitive implications of the challenged conduct: (1) the Houston metropolitan statistical area ("MSA"); (2) the Dallas-Fort Worth MSA; and (3) the Austin MSA.

**1.  A relevant geographic market is no broader than the Houston metropolitan statistical area**

236.    The relevant market to address the anticompetitive effects of USAP's conduct within Houston is no broader than the Houston metropolitan statistical area.

237.    The Houston MSA includes the following counties: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

238.    Patients in the Houston MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts—often exclusive—to provide hospital-only anesthesia services at hospitals in the Houston MSA.

239.    Hospitals typically select anesthesia groups for hospital contracts in the Houston MSA from groups with a significant portion of doctors within the Houston MSA. Practices outside the Houston MSA may be less cost competitive due to the need to recruit, hire short-term substitute physicians to fill in for staffing gaps on short notice (known as *locum tenens* physicians), or provide travel and lodging for more distant providers. These groups may also lack

relationships with Houston hospitals or have little established reputation in Houston and may lead to more disruption at the hospital.

240.    To constrain rates charged by an anesthesia group in the Houston MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Houston MSA to construct its network with enough coverage to avoid burdening patients and clients in the Houston MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Houston MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Houston MSA would accept an alternative anesthesia group.

241.    To maintain the ability to make credible out of network threats, insurers may try to support the availability of alternative providers in the Houston MSA. For example, Blue Cross considered subsidizing a specific anesthesia group—MetroWest—to maintain it as an independent competitor for exclusive business at hospitals in the Houston MSA.

242.    Other qualitative evidence confirms that the Houston MSA is a relevant market to assess the competitive implications of USAP's conduct in Houston. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Houston MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

243.    Industry participants, including USAP and payors, recognize metropolitan areas, such as the Houston MSA, as markets for anesthesia services.

244.    Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Houston MSA could profitably impose small but significant non-transitory price increases.

USAP's acquisition of local rivals enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. For example, in Houston, when USAP acquired North Houston Anesthesiology, MetroWest, and Guardian, it significantly raised rates but retained enough volume to increase each practice's annual earnings by over ▮%, ▮%, and ▮%, respectively.

### 2. A relevant geographic market is no broader than the Dallas-Fort Worth metropolitan statistical area

245.    The relevant market to address the anticompetitive effects of USAP's conduct within Dallas is no broader than the Dallas-Fort Worth metropolitan statistical area.

246.    The Dallas MSA includes the following counties: Collin, Dallas, Denton, Ellis, Hood, Hunt, Johnson, Kaufman, Parker, Rockwall, Somervell, Tarrant, and Wise.

247.    Patients in the Dallas MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts (often exclusive contracts) to provide hospital-only anesthesia services at particular hospitals in the Dallas MSA.

248.    Hospitals typically select anesthesia groups for hospital contracts in the Dallas MSA from groups with a significant portion of doctors within the Dallas MSA. Practices outside the Dallas MSA serving Dallas hospitals may be less cost competitive due to the need to recruit, hire *locum tenens* physicians to fill in for staffing gaps on short notice, or provide travel and lodging for more distant providers. These groups may also lack relationships with Dallas hospitals or have little established reputation in Dallas and may lead to more disruption at the hospital.

249.    To constrain rates charged by an anesthesia group in the Dallas MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats

68

depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Dallas MSA to construct its network with enough coverage to avoid burdening patients and clients in the Dallas MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Dallas MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Dallas MSA would accept an alternative anesthesia group.

250.    Other qualitative evidence confirms that the Dallas MSA is a relevant market to assess the competitive implications of USAP's conduct in Dallas. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Dallas MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

251.    Industry participants, including USAP and insurers, recognize metropolitan areas, such as the Dallas MSA, as markets for anesthesia services.

252.    Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Dallas MSA could profitably impose small but significant non-transitory price increases. USAP's acquisition of local rivals enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. For example, in Dallas, after USAP acquired Excel, Anesthesia Consultants of Dallas, and BMW Anesthesiology, it significantly raised rates but retained enough volume to increase each practice's annual earnings by approximately ▉%, ▉%, and ▉%, respectively.

### 3.    A relevant geographic market is no broader than the Austin metropolitan statistical area

253.    The relevant market to address the anticompetitive effects of USAP's conduct within Austin is no broader than the Austin metropolitan statistical area.

254.    The Austin metropolitan statistical area includes the following counties: Bastrop, Caldwell, Hays, Travis, and Williamson.

255.    Patients in the Austin MSA seek hospital-only services close to where they live. Patients do not, however, actively choose their anesthesiologists. Instead, anesthesia practices compete for contracts (often exclusive contracts) to provide hospital-only anesthesia services at particular hospitals in the Austin MSA.

256.    Hospitals typically select anesthesia groups for hospital contracts in the Austin MSA from groups with a significant portion of doctors within the Austin MSA. Practices outside the Austin MSA serving Austin hospitals may be less cost competitive due to the need to recruit, hire *locum tenens* physicians to fill in for staffing gaps on short notice, or provide travel and lodging for more distant providers. These groups may also lack relationships with Austin hospitals or have little established reputation in Austin and may lead to more disruption at the hospital.

257.    To constrain rates charged by an anesthesia group in the Austin MSA, insurers may seek or threaten to exclude that group from their networks. The credibility of such threats depends on (1) the insurer's ability to turn to alternative anesthesia groups in the Austin MSA to construct its network with enough coverage to avoid burdening patients and clients in the Austin MSA with out-of-network claims; (2) hospitals' ability to turn to alternative anesthesia groups in the Austin MSA to provide hospital-only anesthesia services; and (3) the likelihood that the hospitals in the Austin MSA would accept an alternative anesthesia group.

258.    Other qualitative evidence confirms that the Austin MSA is a relevant market to assess the competitive implications of USAP's conduct in Austin. Patients and their payors face, on average, distinct prices for anesthesia services in distinct metro areas, including the Austin

70

MSA. Indeed, an anesthesia group's rates are typically sensitive to those of other local groups because insurers negotiate rates by comparing among similar groups within the same metropolitan area.

259.   Industry participants, including USAP and insurers, recognize metro areas, such as the Austin MSA, as markets for anesthesia services.

260.   Evidence from USAP's acquisitions confirms that a hypothetical monopolist in the Austin metropolitan statistical area could profitably impose small but significant non-transitory price increases. USAP's acquisition of a local rival enabled it to significantly increase earnings by raising rates, without any corresponding loss in patient volume. Specifically, in Austin, after USAP acquired Capitol, it significantly raised rates but retained enough volume to increase the practice's annual earnings by ▮%.

## VIII.   MARKET POWER AND MONOPOLY POWER
### A. USAP has monopoly power in the Houston MSA
#### 1.   USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share in Houston

261.   USAP and Welsh Carson's "consolidation strategy" combined four significant anesthesia practices in Houston. In 2013, after its initial acquisition, USAP controlled about 50% of the commercially insured hospital-only market, measured by revenue. In 2021, after its roll-up, USAP had a nearly 70% market share by revenue.

262.   USAP also commands a majority share of the commercially insured hospital-only anesthesia volume in Houston. One common way to measure volume is by the number of cases, though this metric may understate USAP's actual volume share to the extent USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless, even by this metric, claims data from one major insurer show that USAP controlled nearly 60% of the commercially

71

insured hospital-only anesthesia cases in Houston in 2021, compared to roughly 36% in 2013 after its initial acquisition.

263.    USAP's share of the commercially insured inpatient anesthesia market in Houston, under any metric, has been roughly the same as its share of the commercially insured hospital-only market in Houston at all relevant times.

264.    Insurers' ordinary course documents confirm USAP's share. For example, one calculated USAP's share in 2020 at about 63% of the inpatient anesthesia spend in Houston.

265.    The high concentration resulting from USAP's roll-up is also demonstrated by the Herfindahl-Hirschman Index (HHI). HHIs are commonly accepted (including by courts) as a measure of market concentration and are calculated by squaring the market shares of each firm competing in a market and then summing the results. Under this framework, a near-0 HHI indicates a highly competitive market filled with atomistic competitors of roughly equal size; an HHI of 10,000 indicates a pure monopoly in which there is only one firm and no competition whatsoever. Horizontal mergers—that is, mergers between market competitors—result in an increase in HHI, with the difference between the pre- and post-merger HHI often referred to as the "delta."[7]

266.    Following USAP's initial platform acquisition of Greater Houston Anesthesiology, each subsequent transaction in Houston, when measured by revenue, resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI figures for each relevant transaction are summarized in the table below:

---

[7] HHI deltas can be calculated by doubling the product of the merging firms' (unsquared) market shares.

| Table 1: Houston Acquisitions – Hospital-Only Anesthesia Services | | | | | |
|---|---|---|---|---|---|
| Date | Provider Group | Pre-Acquisition Market Share | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 12/27/2012 | Greater Houston Anesthesiology | 39.0% | 50.5% | 1774 (+0) | 2754 (+0) |
| 6/24/2014 | North Houston Anesthesiology | 4.4% | 3.2% | 2115 (+341) | 3081 (+327) |
| 3/1/2017 | MetroWest Anesthesia Care | 7.0% | 6.1% | 2979 (+649) | 3962 (+680) |
| 1/1/2020 | Guardian Anesthesia Services | 4.1% | 3.8% | 3874 (+465) | 4989 (+501) |

**2.  USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Houston**

267.    USAP has maintained or grown its market share in Houston year-over-year since it acquired Greater Houston Anesthesiology, the largest group in Houston at the time. At the time of its acquisition, it had the highest average reimbursement rate of any anesthesia group in Houston.

268.    Nevertheless, USAP's reimbursement rates in Houston, aggregated and averaged across all payors, have increased regularly, without any clear improvement in quality. Since its entry in 2013, USAP has raised rates by ▮% or more. Today, USAP charges ▮▮▮▮▮ ▮ the median reimbursement rate for anesthesia services in Houston.

269.    Despite charging the highest rates in Houston, USAP's volume of cases has grown significantly. From 2013 to 2021, USAP's share of case volume grew from 39.0% to

73

58.5%. During the same period, USAP's share of anesthesia costs in Houston grew from 50.5% to 69.5%.

270.    Despite charging the highest rates in Houston, USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems. Instead, its retention of volume year-over-year was approximately 100%. For example, in 2015, a Welsh Carson associate who was working to secure additional financing on behalf of USAP bragged that USAP's retention of hospital contracts had "effectively been 100%."

271.    USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

### 3. USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Houston

272.    USAP is substantially larger than any other anesthesia group in Houston. Specifically, USAP is more than eight times the size of the next largest group by revenue, and four times the size of the next largest group by number of cases. Table 2 below summarizes USAP's and its rivals' shares of the commercially insured hospital-only anesthesia services market in Houston:

| Table 2: Houston Market Shares (2021) – Hospital-Only Anesthesia Services | | |
|---|---|---|
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 58.5% | 69.5% |
| UT Physicians | 13.3% | 8.3% |
| North American Partners in Anesthesia | 8.1% | 8.2% |
| Texans Anesthesia Associates | 4.8% | 3.1% |
| Compass Anesthesia Providers | 2.5% | 1.9% |
| Baylor College of Medicine | 2.4% | 1.4% |
| Best Choice Anesthesia & Pain | 1.1% | 1.0% |

273.     None of these far smaller rivals has successfully displaced USAP or eroded its

market share enough to constrain its ability to charge supracompetitive rates in Houston.

### B.  USAP has monopoly power in the Dallas MSA

#### 1.  USAP and Welsh Carson's roll-up of anesthesia practices has substantially increased concentration, resulting in a dominant market share

274.     USAP and Welsh Carson's "consolidation strategy" combined seven significant

anesthesia practices in Dallas. In 2014, after its initial acquisition, USAP controlled about 46%

of the commercially insured hospital-only anesthesia market, measured by revenue. In 2021,

after its roll-up, USAP had a 68% market share by revenue.

275.     USAP also commands a majority share of the commercially insured hospital-only

anesthesia volume in Dallas. One common way to measure volume is by the number of cases,

though this metric has the potential to understate USAP's actual volume share to the extent

USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless,

even by this metric, claims data from one major insurer show that USAP controlled nearly 60%

of the commercially insured hospital-only anesthesia cases in Dallas in 2021, compared to 42% in 2014 after its initial acquisition.

276.   USAP's share of the commercially insured inpatient anesthesia market in Dallas, under any metric, has been roughly the same as its share of the commercially insured hospital-only market in Dallas at all relevant times.

277.   Insurers' ordinary course documents confirm USAP's share. For example, one calculated USAP controls about 70% of the inpatient commercial anesthesia spend in Dallas. Another insurer estimated in 2020 that, excluding academic medical groups' employed providers, USAP controlled "over 80% of anesthesia in Houston. In DFW, similar dominance."

278.   The high concentration resulting from USAP's roll-up is also demonstrated by the HHI. Following its initial platform acquisition of Pinnacle, USAP's acquisitions of Excel and Sundance Anesthesia, when measured by revenue, resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. USAP's cumulative acquisitions in Dallas also resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI figures for each relevant transaction are summarized in the table below:

| Table 3: Dallas Acquisitions – Hospital-Only Anesthesia Services | | | | | |
| --- | --- | --- | --- | --- | --- |
| Date | Provider Group | Pre-Acquisition Market Share | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 1/6/2014 | Pinnacle Anesthesia Consultants | 39.9% | 42.3% | 1609 (+0) | 1890 (+0) |
| 1/20/2015 | Anesthesia Consultants of Dallas | 1.7% | 1.7% | 1954 (+137) | 2381 (+157) |
| 3/3/2015 | Excel Anesthesia Consultants | 5.5% | 5.3% | 2399 (+445) | 2866 (+485) |
| 12/2/2015 | Southwest Anesthesia Associates | 1.1% | 0.8% | 2588 (+106) | 3142 (+86) |
| 1/21/2016 | BMW Anesthesiology | 0.8% | 0.4% | 2762 (+82) | 3387 (+44) |
| 1/25/2016 | Medical City Physicians | 0.5% | 0.3% | 2807 (+45) | 3418 (+31) |
| 4/1/2016 | Sundance Anesthesia | 3.0% | 2.2% | 3254 (+322) | 3886 (+271) |

**2. USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Dallas**

279.    USAP has maintained or grown its market share in Dallas year-over-year since it acquired Pinnacle, the largest group in Dallas at the time. At the time of its acquisition, it had the highest average reimbursement rate of any anesthesia group in Dallas.

280.    Nevertheless, USAP's reimbursement rates in Dallas, aggregated and averaged across all major insurers, have increased regularly without any clear improvement in quality.

Since its entry in 2014, USAP has raised rates by ███ % or more in Dallas. Today, USAP charges

████████████ the median reimbursement rate for anesthesia services in Dallas.

281.    Despite charging the highest rates in Dallas, USAP's volume of cases has grown significantly. From 2014 to 2021, USAP's share of case volume grew from 39.9% to 58.6%. During the same period, USAP's share of anesthesia costs in Dallas grew from 42.3% to 68.3%.

282.    Despite charging the highest rates in Dallas, USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems. Instead, its retention of volume year-over-year was, as a Welsh Carson associated boasted in 2015, "effectively . . . 100%."

283.    USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

### 3.    USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its monopoly power in Dallas

284.    USAP is substantially larger than any other anesthesia group in Dallas. Specifically, USAP is more than nine times the size of the next largest group by revenue, and six times the size of the next largest group by number of cases. Table 4 below summarizes USAP's and its rivals' shares of the commercially insured hospital-only anesthesia market in Dallas.

| Table 4: Dallas Market Shares (2021) – Hospital-Only Anesthesia Services | | |
|---|---|---|
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 58.6% | 68.3% |
| Metropolitan Anesthesia Consultants | 9.0% | 7.4% |
| UT Physicians | 8.3% | 4.9% |
| NorthStar Anesthesia | 4.6% | 2.7% |
| Anesthesia Partners of Dallas | 3.2% | 3.3% |
| Allen Anesthesia Associates | 2.6% | 2.0% |
| Noble Anesthesia Partners | 1.1% | 1.0% |

285.    None of these far smaller rivals has successfully displaced USAP or eroded its market share enough to constrain its ability to charge supracompetitive rates in Dallas.

**C. USAP has a dominant position in the commercially insured hospital-only anesthesia market in Austin**

**1. USAP and Welsh Carson's roll-up of anesthesia providers has substantially increased concentration, resulting in a dominant market share**

286.    As a result of USAP and Welsh Carson's consolidation strategy, USAP is the dominant anesthesia provider in Austin. In 2013, USAP controlled about 3.5% of the commercially insured hospital-only anesthesia markets, measured by revenue. In 2021, after its roll-up, USAP had a greater than 50% market share by revenue.

287.    USAP also commands a majority share of the commercially insured hospital-only anesthesia volume in Austin. One common way to measure volume is by the number of cases, though this metric has the potential to understate USAP's actual volume share to the extent USAP handles more time-consuming procedures than other anesthesia practices. Nonetheless, even by this metric, claims data from one major insurer show that USAP controlled nearly 44%

79

of the commercially insured hospital-only anesthesia cases in Austin in 2021, compared to 2.5% in 2013 after its initial acquisition.

288.    USAP's share of the commercially insured inpatient anesthesia market in Austin, under any metric, has been roughly the same as its share of the commercially insured hospital-only market in Austin at all relevant times,.

289.    USAP's and payors' ordinary course documents confirm USAP's share. USAP itself characterized its primary acquired group in Austin, Capitol Anesthesiology Association, as having a "[l]arge share of [a] great market in top hospital systems" in Austin. Specifically, USAP claimed Capitol had "significant organic growth for the last 3 years, although they have seen a market share decline from 75% to around 50% today."

290.    The high concentration resulting from USAP's roll-up is also demonstrated by the HHI. Following USAP's initial acquisition of Lake Travis Anesthesia, USAP's subsequent acquisition of Capitol Anesthesia, whether measured by revenue or case volume, resulted in a post-transaction HHI exceeding 2,500, with an increase in HHI of more than 200. The HHI figures for the relevant transaction are summarized in the table below:

| Table 5: Austin Acquisitions – Hospital-Only Anesthesia Services | | | | | |
|---|---|---|---|---|---|
| Date | Provider Group | Pre-Acquisition Market Shares | | Post-Acquisition HHI (Increase) | |
| | | By Cases | By Revenue | By Cases | By Revenue |
| 7/3/2013 | Lake Travis Anesthesiology | 3.5% | 5.1% | 2480 (+0) | 3220 (+0) |
| 2/1/2018 | Capitol Anesthesiology Association | 33.8% | 42.0% | 2713 (+233) | 3660 (+440) |

**2. USAP has demonstrated its ability to increase prices while retaining and increasing its market share in Austin**

291.    Despite charging the highest rates in Austin, USAP's volume of cases has grown significantly. From 2014 to 2021, USAP's share of case volume grew from 3.5% to 44.2%; during the same period, USAP's share of anesthesia costs in Austin grew from 5.1% to 52.5%.

292.    Since its entry in 2013, USAP has raised prices by at least ▇%. After acquiring Capitol and raising its rates, USAP increased Capitol's incremental revenues by $▇▇▇▇ within five months.

293.    USAP did not lose exclusive contracts with any high-volume hospitals or hospital systems in Austin, despite its high reimbursement rates without any clear quality improvements. Instead, its retention of volume year-over-year was approximately 100%.

294.    USAP's pricing power is durable in part because there are no close substitutes for patients undergoing procedures requiring anesthesia. In some cases, medical boards may require patients to receive anesthesia for surgical procedures. Even if not required, few patients will voluntarily forego anesthesia, given the absence of another way to avoid pain during surgery.

### 3. USAP's high share of the hospital-only anesthesia market relative to its rivals reinforces its dominance in Austin

295.    USAP has a single rival in Austin, North American Partners in Anesthesia. No other group has more than 4% of the market, whether measured by revenue or volume of cases. Table 6 below summarizes USAP's and its rivals' share of the commercially insured hospital-only anesthesia market in Austin.

| Table 6: Austin Market Shares (2021) – Hospital-Only Anesthesia Services | | |
|---|---|---|
| Provider Group | By Cases | By Revenue |
| U.S. Anesthesia Partners | 44.2% | 52.5% |
| North American Partners in Anesthesia | 37.8% | 37.2% |
| NorthStar Anesthesia | 1.8% | 1.2% |
| Scott & White Physicians | 2.5% | 0.8% |
| UT Physicians | 1.0% | 0.9% |
| Westlake Anesthesia | 2.5% | 0.6% |

296.    USAP's sole rival has not successfully displaced USAP or eroded its market share enough to constrain its ability to charge above-market rates in Austin.

### D. High barriers to entry to the hospital-only anesthesia markets in Houston, Dallas, and Austin protect USAP's market share

297.    Anesthesiologists cannot easily increase their productivity and see additional patients in response to competitors' increasing their price. Limited operating room capacity and schedule availability may also prevent anesthesiologists from seeing additional patients. Even if anesthesia groups could see more patients, hospitals face complications and difficulties transitioning from one group to another.

298.    Providing hospital-only anesthesia requires postsecondary education, including either a graduate medical degree or nursing degree, in addition to training and licensing. As a

82

result, the supply of anesthesia providers is limited and cannot be increased or react quickly to market trends in demand or reimbursement rates.

299.    Attracting higher patient volume can require anesthesia providers to contract with hospitals because anesthesia is provided in conjunction with other medical care, rather than as a standalone service. Providers face an uphill battle to win hospital contracts because those contracts are "sticky" due to high switching costs. In addition, hospitals generally do not change their contracting practices in response to reimbursement rates anesthesia providers charge payors, because hospitals do not pay any part of those rates. Indeed, hospitals often face a disincentive to switch away from anesthesiologists who charge payors high rates, because those anesthesiologists can (and sometimes do) offer to share the spoils with hospitals in the form of a lower subsidy from the hospital.

300.    Even if a group could overcome these structural barriers to winning market share, USAP has erected additional entry barriers in Houston, Dallas, and Austin.

301.    First, USAP uses a network of physician non-compete agreements to prevent physicians from splitting off and forming their own groups or joining other groups looking to challenge USAP's market position.

. USAP's non-competes prevent rivals from gaining scale by hiring doctors in Houston, Dallas, and Austin.

302.    Second, USAP's equity vesting rules discourage its providers from joining competing practices.

83

█████████████████████████████████████████████. This makes individual

physicians reluctant to leave until well after they join USAP, and makes it difficult for a group of

physicians, who may have joined USAP at different times and thus have different vesting

schedules, to leave en masse.

303.    Experience confirms these barriers to entry protect USAP's market share. USAP

has managed to retain its exclusive hospital relationships and insurer contracts despite both sets

of contracts containing clauses that █████████████████████████████

███████████████████████████████████████████.

## IX.    USAP'S DOMINANCE IN TEXAS

304.    USAP's acquisitions in Texas have combined seventeen anesthesia practices,

growing its presence in a single city into a dominant position across the state. The direct result is

that USAP now controls nearly 60% of hospital-only anesthesia costs statewide, and

approximately 43% of cases. There is no other anesthesia group that comes close to matching

USAP's presence in Texas. USAP is more than ten times larger than the next largest group by

revenue and seven times larger by volume of cases. In fact, USAP is larger than the ten next-

largest groups in Texas combined.

305.    As USAP accumulated practices throughout the state, it has been able to exercise

more leverage in its negotiations with insurers, limiting their ability to constrain pricing.

306.    The experience in Amarillo is illustrative of how USAP's growing presence in

Texas increased its negotiating leverage, even for a group that was already locally dominant.

Before USAP acquired Amarillo Anesthesia—a group with as much as an 85% share of hospital-

only services in that city—insurers successfully resisted Amarillo Anesthesia's demands to

dramatically increase its reimbursement rates. But once USAP acquired Amarillo Anesthesia in

2018, USAP was able to ███████████ its reimbursement rate from Blue Cross, from $█ to
$██ per unit, even though the acquisition did not increase market concentration in Amarillo.

307.    The Pinnacle acquisition provides another example of how USAP's growing
statewide presence cemented its high prices. When USAP's predecessor Greater Houston
Anesthesiology practiced only in Houston, Blue Cross could—and did—exclude Greater
Houston Anesthesiology from its network in response to requested rate increases. Once USAP
expanded to Dallas through the Pinnacle acquisition, however, Blue Cross concluded that it was
too difficult to exclude USAP, even though the Pinnacle acquisition did not increase
concentration in the Dallas market. As a result, Blue Cross agreed to raise Pinnacle's
reimbursement rate by █%, at a total cost of over $10 million. That price increase cannot be
explained by USAP simply being a more skilled negotiator than Pinnacle, as Pinnacle's contract
negotiations had been handled by EmCare, a subsidiary of a large, sophisticated corporation.

308.    USAP effectively exercised this leverage with each acquisition it made in Texas.
Each time it acquired a group, even in places where it had no existing presence, USAP raised the
target group's rates ████████████ to █% (depending on the payor), increasing the group's
earnings—all without an offsetting loss in patient volume. These so-called "synergies" figured
prominently in USAP's planning documents.

309.    Moreover, while raising reimbursement rates for acquired groups, USAP
maintained or even raised its own already high rates. As United recounted in an internal strategy
discussion, by 2020, USAP's rates were "nearly 40% more expensive than the average cost of all
other anesthesia providers in Texas" and "USAP Texas's rates are 96% higher than the median
rate we pay other anesthesia groups in Texas, but their quality performance is not meaningfully
better than their peers." Another participant in the United strategy discussion later pointed out

that, in fact, USAP was even more expensive—110% of the statewide median. When United

attempted to lower USAP's rates, resulting in USAP going out-of-network, United's clients,

including ASO clients operating in multiple parts of the state, pushed for United to bring USAP

back in-network to avoid disruption to their members. To return USAP to the network, however,

United was forced to accept above-market reimbursement rates.

310.    USAP has steadily hiked prices across Texas without ceding—and instead

growing—its dominant position. Despite these increases in reimbursement rates, USAP

continued to provide the same or greater volume of hospital-only anesthesia services each year.

Thanks in part to the high entry barriers that protect its positioning, *see* ¶¶ 297-303, no

acquisition or concomitant average price increase resulted in meaningful volume loss for USAP.

Rather, USAP successfully increased its presence in Texas, as illustrated in Table 7 below:

| Table 7: USAP Statewide Presence 2013-2021 | | |
|---|---|---|
| Year | By Cases | By Revenue |
| 2013 | 8.8% | 13.0% |
| 2014 | 22.2% | 31.6% |
| 2015 | 25.9% | 36.4% |
| 2016 | 28.8% | 40.0% |
| 2017 | 29.3% | 41.0% |
| 2018 | 34.3% | 45.9% |
| 2019 | 37.0% | 53.8% |
| 2020 | 42.2% | 60.4% |
| 2021 | 43.0% | 57.1% |

## X.    HARM TO CONSUMERS AND COMPETITION

### A.  USAP's conduct has increased its negotiating leverage against insurers, reducing insurers' ability to constrain USAP's demands to raise prices

311.    As a result of Welsh Carson and USAP's roll-up strategy, USAP has amassed

exclusive or nearly exclusive contracts at hospitals throughout Houston, Dallas, and across

Texas. USAP's resulting war chest of facilities where it dominates anesthesia services includes

86

all or nearly all of the important hospitals for payors in Houston, Dallas, San Antonio, Austin, and several other Texas cities, and numerous other hospitals throughout Texas.

312.    USAP's price-setting arrangements, although not outright acquisitions, have had a similar effect. By enabling USAP to bill other providers' services at additional hospitals as if they were USAP's own, these price-setting arrangements further extended USAP's hold over anesthesia services in Texas.

313.    Moreover, to the extent that any anesthesia providers might have competed against USAP to displace it at key hospitals or other healthcare facilities, USAP has largely neutralized these competitors by acquiring them outright, by striking price-setting arrangements with them, or by securing their agreement not to enter the market.

314.    USAP's conduct has thus significantly increased its leverage in negotiations with insurers. Indeed, according to an executive at the largest health insurer in Texas, "every time [USAP] folded in a geographic region or every time that they grew, it just strengthened their ability to raise rates and . . . leverage at the negotiating table."

315.    Because of USAP's conduct, insurers' abilities to take USAP out of network—a key way of constraining prices—have substantially diminished. With USAP as the only exclusive provider at many hospitals across Texas, taking USAP out-of-network is now less likely to occur, and in turn, a far less powerful negotiating tool. As a Welsh Carson analyst explained to a potential lender, "if a payor refuses to give us the pricing that we're looking for, then the threat of us going out-of-network would be more painful on the payor than it would be on us. . . . [W]hen we cover every major hospital in the market, it doesn't really have much of an impact on us. All the while, the payor would be responsible for reimbursing at out-of-network rates which are substantially higher than what we see on an in-network basis . . . ." In addition,

taking USAP out of network entails administrative costs for payors. There is also the possibility of backlash from members and actual or potential clients. *See* ¶¶ 74-76.

316.    Even the biggest insurers have had to bow to USAP's dominance. Indeed, one insurer—United—learned this the hard way in a dispute with USAP in 2020. By January 2020, USAP's price increases had become unsustainable for United, which tried to renegotiate USAP's rates by unilaterally amending the United-USAP contract to reduce USAP's rates. Although the unilateral amendment resulted in some negotiations, they failed, and USAP terminated its contract with United in early 2020. At the time, United was one of the largest insurers in Texas.

317.    Over the next 18 months, USAP forced United to come back to the negotiating table and to accept USAP's high rates through a multi-front "pressure" campaign. USAP encouraged hospitals where it provided anesthesia services to lobby United to bring USAP back in-network. USAP persuaded ASO clients that bought insurance from United, ▮▮▮▮▮▮▮▮

▮▮▮▮, to complain to United ▮▮▮▮▮▮▮▮▮▮▮▮. USAP had patients complain to state regulators that United no longer met state-prescribed network adequacy requirements after taking USAP out-of-network. And USAP filed a lawsuit against United in Texas state court—which was sent to arbitration—alleging that United had unlawfully diverted patients away from USAP's anesthesia providers.[8] While USAP was replaced for certain procedures at select hospitals during this out of network period, no hospitals ended their exclusive contracts with USAP as a result of United having taken it out of network.

318.    Eventually, United gave in, settled the arbitration, and signed a new contract with USAP in September 2021. Under the terms, USAP's rates decreased, but far less than United was seeking, remaining well above the median rate in Texas. In addition, United had to pay some

---

[8] *See* Pl.'s Original Petition, U.S. Anesthesia Partners of Tex. v. United Healthcare Ins. Co. (DC-21-04104) (Tex. D. Ct. Dallas Cty., Mar. 31, 2021).

of USAP's out of network claims at USAP rates. In sum, United resisted USAP for over a year and had little to show for it. Taking USAP out-of-network had frustrated United's hospitals, clients, and members; incurred large out-of-network costs; and failed to meaningfully decrease USAP's reimbursement rates.

### B.    USAP's conduct has increased prices for hospital-only anesthesia services in Texas

319.    With its increased negotiating leverage, USAP has significantly increased prices for hospital-only anesthesia services in Houston, Dallas, and throughout Texas. Just as Welsh Carson and USAP planned, USAP took Greater Houston Anesthesiology's already-high prices, increased them, and extended them across the state of Texas via further acquisitions (███████

████████████████). As a United executive summarized: "you've basically taken the highest rate of all in one distinct market and then peanut butter spread that across the entire state of Texas."

320.    For example, before its acquisition by USAP, MetroWest's in-network reimbursement rate with United had been $██ per unit. After USAP acquired MetroWest, it raised that rate to $████ per unit, an increase of nearly ██%.

321.    Similarly, before its acquisition by USAP, Anesthesia Consultants of Dallas's in-network reimbursement rate with United was $███ per unit. After USAP acquired the practice, its rate rose to approximately $███ per unit, an increase of over █%.

322.    The story for Excel Anesthesia is the same. Before its acquisition by USAP, its in-network reimbursement rate with United was $██ per unit. That rate rose to more than $███ per unit—an increase of over █%—after USAP acquired Excel.

323.    Today, USAP is the largest and most expensive anesthesia provider in Texas across all payors. USAP charges well over $███████████████. For comparison, the median reimbursement rate among other anesthesia providers in Texas is roughly $██ per unit.

324.    The effect of USAP's higher rates has been to raise the costs of anesthesia care in Texas by dozens of millions of dollars every year. For example, one insurer estimated that by 2016, it was spending roughly $119 million in Texas annually on anesthesia services from USAP alone. Even ignoring USAP's rate increases in the years since, that figure suggests USAP's monopoly mark-ups are running up the cost of providing healthcare in Texas every year by tens of millions of dollars. And because—as discussed in ¶¶ 65-66—most clients of the largest insurers in Texas bear financial responsibility for their own members' healthcare costs, the burden of USAP's higher prices is borne largely by Texas businesses and their employees.

325.    USAP's conduct has not only increased its own ability to raise prices—it has led other anesthesia providers to raise their prices, too. Anesthesia practices across Texas have successfully demanded price increases by threatening to otherwise raise their reimbursement rates by selling their practices to USAP. For example, prior to its acquisition by USAP, Capitol Anesthesia in Austin threatened insurers that it would join USAP unless they raised Capitol's rates. One large insurer privately conceded that the "best option" was to accede to Capitol's demands. Guardian Anesthesia in Houston made similar threats. Before successfully acquiring Guardian in 2020, USAP reached out to Guardian in 2014 about a potential acquisition. Guardian rejected the proposal. Nevertheless, it used the USAP offer to seek a 25% increase in reimbursement rates from ████ when it previously had sought only a 3% increase. Star Anesthesia in San Antonio made similar threats. So, too, have other practices that have not yet been acquired by USAP.

90

326.    Similarly, USAP's price-setting arrangements with other anesthesia practices
have contributed to increasing prices. By billing other providers' anesthesia services at USAP's
reimbursement rates, USAP has spread its higher rates to additional anesthesia groups—just as if
those, too, had been acquired by USAP. And to the extent that any of these independent
anesthesia groups might have competed with USAP, thereby constraining its prices, USAP has
effectively neutralized them by agreeing to instead share a portion of its monopoly profits.

327.    USAP has also neutralized competition through its market allocation agreement
with ███████████████████████████████████████████
███████████████, USAP stifled any competition from ███████. If not for that unlawful
agreement, ██████ competitive presence █████, or even the threat of █████ entering the
market, would likely have acted as a constraint on USAP's ability to raise prices.

**C. There are no valid procompetitive justifications for or efficiencies from USAP's conduct**

328.    USAP cannot justify the substantial harm to competition resulting from its
acquisitions with valid procompetitive justifications or efficiencies that could not be achieved
through other means less harmful to competition.

329.    For example, USAP holds itself out as a high-quality anesthesia practice. But
USAP's own metrics are home-brewed, self-serving, and otherwise flawed. Moreover, even if it
were possible to confirm that USAP anesthesiologists offer high-quality services, there is no
reason to think that they owe this to USAP. USAP simply acquires physician groups with an
already-strong reputation for quality and does little (if anything) to improve their services once
they join USAP.

330.    There are no valid procompetitive justifications for or efficiencies from USAP's
price-setting arrangements. Indeed, as discussed above, USAP could have collaborated with

other anesthesia practices or provided them with back-office services without billing their claims as USAP's own and at USAP's reimbursement rates. *See* ¶¶ 178, 195178195.

331.    There are no valid procompetitive justifications for or efficiencies from USAP's market allocation agreement with ███████████████████. That agreement was not reasonably necessary to ███████████████████████████████████████████



."

332.    Nor can the market allocation be justified as safeguarding competitively sensitive business information ███████████████████████████

## XI.    LIKELIHOOD OF RECURRENCE

### A. Without appropriate relief, USAP's harmful conduct is likely to recur

333.    USAP's course of conduct—and the resulting harm to competition and consumers—remains ongoing. In addition, there is a reasonable likelihood that USAP will engage in similar or related conduct in the future.

334.    USAP's conduct has not been isolated. Instead, USAP has engaged in a whole set of anticompetitive tactics to execute the consolidation scheme Welsh Carson set out. The dozen-plus acquisitions, price-setting arrangements, and market allocation scheme were all designed to

stifle competition and enrich USAP. This conduct has resulted in egregious price increases for patients and their employers, on the order of tens of millions of dollars or more each year.

335.    USAP has never acknowledged the wrongful nature of its conduct. Nor has it offered any assurances against engaging in similar conduct in the future, whether in Texas or in any of the nine other states in which it operates. To the contrary, USAP continues to plan for acquisitions in Texas, as well as elsewhere, and is well-positioned to continue its conduct.

**B.  Without appropriate relief, Welsh Carson's harmful conduct is likely to recur**

336.    Welsh Carson masterminded the plan for USAP to roll up markets across Texas and inflate prices. Since then, it has remained deeply involved in crafting and executing that plan. Welsh Carson itself developed the overarching strategy to consolidate anesthesia markets, recognizing that doing so would yield market power and higher prices. Welsh Carson then carefully directed—and assisted—USAP in following through on the consolidation strategy. Indeed, in internal communications, Welsh Carson has bragged that it is USAP's "primary architect." In other words, the fact that Texans pay considerably more for hospital-only anesthesia services is the direct result of Welsh Carson's conduct.

337.    Welsh Carson continues to play a critical role in USAP's anticompetitive conduct. Welsh Carson personnel still regularly advise USAP on, and assist it with, acquisitions and insurer negotiations. For instance, in 2018, Welsh Carson personnel reported "participat[ing] in commercial payor negotiations" and "due diligence on potential tuck-in acquisitions." As another example, in 2019, USAP consulted with Welsh Carson personnel when considering ██████. In addition, Welsh Carson continues to benefit handsomely from USAP's supracompetitive prices, having received nearly $85 million in dividend payments between 2018 and 2020 (and over $350 million

93

between 2012 and 2020). Nor does anything prevent Welsh Carson from re-upping its investment in USAP, retaking formal control of the company, and directing yet more anticompetitive acquisitions.

338.    Further, there is a reasonable likelihood that Welsh Carson will engage in similar and related conduct in the future. Welsh Carson's conduct has not been isolated. Instead, Welsh Carson planned the consolidation scheme and created USAP for the express purpose of implementing that scheme. This conduct has resulted in egregious price increases for Texans, costing them tens of millions of dollars annually. Yet Welsh Carson has never acknowledged the wrongful nature of its conduct, nor has it offered any assurances against engaging in similar conduct in the future (in Texas or elsewhere). And Welsh Carson remains well-positioned to engage in similar conduct in the future, with its 16 active healthcare investments and frequent search for new investments.

339.    In fact, Welsh Carson itself has intentionally repeated its USAP strategy. In 2015 Welsh Carson entered the emergency medicine market and engaged in a similar roll-up strategy to the one it deployed with USAP. Then, in 2017, when preparing to enter the radiology market, Welsh Carson explained that "[g]iven our success to date with USAP and [in emergency medicine], we would like to . . . deploy[] a similar strategy to consolidate the market . . . ." By all appearances, Welsh Carson did just that. Today, U.S. Radiology Specialists, which describes itself as "founded jointly" by Welsh Carson and "one of the nation's largest" radiology groups, covers over 80 hospitals in more than a dozen states. Two of its directors are affiliated with Welsh Carson, and one of them is Brian Regan—the same partner who led Welsh Carson's investment and involvement in USAP.

## XII.   VIOLATIONS
### COUNT I

**Monopolization of Houston Hospital-Only Anesthesia Market
Arising Under Section 2 of the Sherman Act**

340.   The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

341.   USAP has monopoly power in the market for commercially insured hospital-only anesthesia services in Houston.

342.   USAP and Welsh Carson have willfully acquired and maintained monopoly power in the market for commercially insured hospital-only anesthesia services in Houston.

343.   In 2012, USAP acquired Greater Houston Anesthesiology. Subsequently, between 2014 and 2020, USAP acquired three additional Houston anesthesia practices: North Houston Anesthesiology, MetroWest Anesthesia Care, and Guardian Anesthesia (collectively, the "Houston Tuck-In Acquisitions").

344.   In addition, USAP entered into, or maintained, agreements with Baylor College of Medicine anesthesiologists and anesthesiologists in the Methodist Hospital Physician Organization in which USAP billed services by their providers at USAP's higher rates.

345.   Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, these acquisitions and price-setting arrangements.

346.   There is no valid procompetitive justification for USAP's exclusionary conduct in the commercially insured hospital-only anesthesia market in Houston.

347.   USAP and Welsh Carson's anticompetitive course of conduct constitutes unlawful monopolization in the commercially insured hospital-only anesthesia services market in

95

Houston in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT II

### Roll-up of Houston Hospital-Only Anesthesia Market in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act

348.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

349.    Between 2014 and 2020, USAP and Welsh Carson, directly or indirectly, made the three Houston Tuck-In Acquisitions.

350.    At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Houston.

351.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Houston Tuck-In Acquisitions.

352.    USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their Houston Tuck-In Acquisitions are not likely to be anticompetitive.

353.    USAP and Welsh Carson's Houston Tuck-In Acquisitions substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Houston in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, whether considered individually or as a series of acquisitions.

354.    USAP and Welsh Carson's Houston Acquisitions are an unfair method of competition in the commercially insured hospital-only anesthesia services market in Houston in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), whether considered individually or as a series of acquisitions.

## COUNT III

### Conspiracy to Monopolize Houston Hospital-Only Anesthesia Market
### Arising Under Section 2 of the Sherman Act

355.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1–339 above.

356.    At all relevant times, USAP has had monopoly power, or monopoly power was economically feasible for USAP to achieve, in the commercially insured hospital-only anesthesia services market in Houston.

357.    USAP and Welsh Carson entered into an agreement, understanding, or conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

358.    USAP and Welsh Carson took numerous overt acts in furtherance of their conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

359.    USAP and Welsh Carson had the specific intent to monopolize the commercially insured hospital-only anesthesia services market in Houston.

360.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston has had an effect on a substantial amount of interstate commerce.

361.    There is no valid procompetitive justification for USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

362.    Neither USAP nor Welsh Carson has withdrawn from the conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston.

363.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Houston violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT IV

**Monopolization of Dallas Hospital-Only Anesthesia Market**
**Arising Under Section 2 of the Sherman Act**

364.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

365.    USAP has monopoly power in the commercially insured hospital-only anesthesia services market in Dallas.

366.    USAP and Welsh Carson have willfully acquired and maintained monopoly power in the commercially insured hospital-only anesthesia services market in Dallas.

367.    In 2014, USAP acquired Pinnacle Anesthesia Consultants. Subsequently, between 2015 and 2016, USAP acquired six additional Dallas anesthesia practices: Anesthesia Consultants of Dallas, Excel Anesthesia Consultants, Southwest Anesthesia Associates, BMW Anesthesiology, Medical City Physicians, and Sundance Anesthesia (collectively, the "Dallas Tuck-In Acquisitions").

368.    In addition, USAP entered into, or maintained, agreements with Dallas Anesthesiology Associates in which USAP billed services by their providers at USAP's higher rates.

369.    USAP also ███████████████████████████████████████
███████████████████████████████████████████████████.

370.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, these acquisitions and price-setting arrangements.

371.    There is no valid procompetitive justification for USAP's exclusionary conduct in the commercially insured hospital-only anesthesia market in Dallas.

372.    USAP and Welsh Carson's anticompetitive course of conduct constitutes unlawful monopolization in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT V

### Roll-up of Dallas Hospital-Only Anesthesia Market
### in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act

373.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

374.    Between 2015 and 2016, USAP and Welsh Carson, directly or indirectly, made the six Dallas Tuck-In Acquisitions.

375.    At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Dallas.

376.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Dallas Tuck-In Acquisitions.

377.    USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their Dallas Tuck-In Acquisitions are not likely to be anticompetitive.

378.    USAP and Welsh Carson's Dallas Tuck-In Acquisitions substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, whether considered individually or as a series of acquisitions.

379.    USAP and Welsh Carson's Dallas Acquisitions are an unfair method of competition in the commercially insured hospital-only anesthesia services market in Dallas in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), whether considered individually or as a series of acquisitions.

## COUNT VI

### Conspiracy to Monopolize Dallas Hospital-Only Anesthesia Market Arising Under Section 2 of the Sherman Act

380.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

381.    At all relevant times, USAP has had monopoly power, or monopoly power was economically feasible for USAP to achieve, in the commercially insured hospital-only anesthesia services market in Dallas.

382.    USAP and Welsh Carson entered into an agreement, understanding, or conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas

383.    USAP and Welsh Carson took numerous overt acts in furtherance of their conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

384.    USAP and Welsh Carson had the specific intent to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

385.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas has had an effect on a substantial amount of interstate commerce.

386.    There is no valid procompetitive justification for USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia market in Dallas.

387.    Neither USAP nor Welsh Carson has withdrawn from the conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas.

388.    USAP and Welsh Carson's conspiracy to monopolize the commercially insured hospital-only anesthesia services market in Dallas violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and thus constitutes an unfair method of competition in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT VII

### Roll-up of Austin Hospital-Only Anesthesia Market
### in Violation of Section 7 of the Clayton Act and Section 5 of the FTC Act

389.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

390.    In 2013, USAP and Welsh Carson, directly or indirectly, acquired Lake Travis Anesthesia. Subsequently, in 2018 USAP and Welsh Carson, directly or indirectly, acquired an additional Austin anesthesiology practice: Capitol Anesthesiology Association (collectively "Austin Acquisitions").

391.    At all relevant times, USAP has had market power in the commercially insured hospital-only anesthesia services market in Austin.

392.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the Austin Acquisitions.

393.    USAP and Welsh Carson cannot show that any cognizable efficiencies are of a character and magnitude such that their acquisition of Capitol is not likely to be anticompetitive.

394.    USAP and Welsh Carson's acquisition of Capitol substantially lessened competition or tended to create a monopoly in the commercially insured hospital-only anesthesia services market in Austin in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

395.    USAP and Welsh Carson's acquisition of Capitol is an unfair method of competition in the commercially insured hospital-only anesthesia services market in Austin in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### COUNT VIII

**Scheme to Reduce Anesthesia Competition in Texas
in Violation of Section 5 of the FTC Act**

396.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

397.    USAP's acquisition of Greater Houston Anesthesiology, the Houston Tuck-In Acquisitions, the acquisition of Pinnacle, the Dallas Tuck-In Acquisitions, the Austin Acquisitions, and the acquisitions of East Texas Anesthesiology, Amarillo Anesthesia Consultants, and Star Anesthesia (collectively, the "Texas Acquisitions"), its price-setting arrangements, and the ▮▮▮▮ market allocation are all methods of competition. None is an inherent feature of the anesthesia marketplace. Instead, they all result from USAP's and Welsh Carson's deliberate consolidation scheme.

398.    USAP's and Welsh Carson's Texas Acquisitions, price-setting arrangements, and ▮▮▮▮ market allocation are unfair: they go beyond competition on the merits. In making each of the Texas Acquisitions, Welsh Carson and USAP planned that USAP would—and USAP did in fact—accumulate positions at key hospitals across the state. Recognizing that patients will

102

visit these hospitals regardless of USAP's network participation status with insurers, USAP and

Welsh Carson exploited USAP's positioning to extract significant rate increases following each

of the Texas Acquisitions. USAP and Welsh Carson likewise used their price-setting

arrangements and the ██████ market allocation to secure further leverage in their insurer

negotiations.

399.    USAP's and Welsh Carson's conduct has had a demonstrated tendency to harm

competitive conditions for anesthesia in and across Texas. The Texas Acquisitions, price-setting

arrangements, and ██████ market allocation resulted in higher prices to patients and their

employers for anesthesia groups who joined USAP. Moreover, the conduct has resulted in price

increases even for anesthesia groups who remain unaffiliated with USAP.

400.    Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with

respect to, and directly and actively participated in, the Texas Acquisitions, price-setting

arrangements, and ██████ market allocation.

401.    There is no cognizable justification for the Texas Acquisitions, price-setting

arrangements, and ██████ market allocation.

402.    USAP's and Welsh Carson's course of conduct, whether considered as a whole or

each portion in isolation, is an unfair method of competition in violation of Section 5(a) of the

FTC Act, 15 U.S.C. § 45(a).

## COUNT IX

### Horizontal Agreements to Bill at a Fixed Price
### Arising under Section 1 of the Sherman Act

403.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-

339 above.

404.    At all relevant times, USAP has had market power in Houston and Dallas with respect to commercially insured hospital-only anesthesiology services.

405.    USAP entered into, or maintained, agreements with the Methodist Hospital Physician Organization, Dallas Anesthesiology Associates, and the Baylor College of Medicine in which USAP billed services by their anesthesia providers at USAP's higher rates.

406.    At all relevant times, Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the price-setting arrangements.

407.    These price-setting arrangements violate Section 1 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT X

### Horizontal Agreement to Divide Market
### Arising under Section 1 of the Sherman Act

408.    The FTC re-alleges and incorporates by reference the allegations in paragraphs 1-339 above.

409.    At all relevant times, USAP had market power or was acquiring market power in Dallas with respect to commercially insured hospital-only anesthesiology services.

410.    USAP engaged in unlawful horizontal market allocation with an actual or potential competitor, █████, in the market for commercially insured hospital-only anesthesiology services in ███████████████████████ ███████████ and USAP agreed that █████ would not compete in the commercially insured hospital-only anesthesia services market in ████ in exchange for consideration.

104

411.   At all relevant times, Welsh Carson controlled, directed, dictated, or encouraged USAP's conduct with respect to, and directly and actively participated in, the unlawful horizontal market division.

412.   USAP's anticompetitive acts violate Section 1 of the Sherman Act and thus constitute an unfair method of competition, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### XIII.  PRAYER FOR RELIEF

WHEREFORE, Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to issue a permanent injunction against violations of the FTC Act; therefore, the FTC requests that this Court, as authorized by 15 U.S.C. § 53(b), 15 U.S.C. § 26, and its own equitable powers, enter final judgment against Defendants, declaring, ordering, and adjudging:

413.   That USAP's course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18;

414.   That Welsh Carson's course of conduct violates Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18;

415.   That Defendants are permanently enjoined from engaging in similar and related conduct in the future; and

416.   That the Court grant other such equitable relief, including but not limited to structural relief, as the Court finds necessary to redress and prevent recurrence of Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 7 of the Clayton Act, 15 U.S.C. § 18, as alleged herein.

Dated: September 21, 2023                    Respectfully submitted,

Of counsel:                                 */s/ Kara Monahan*

HENRY LIU                                   KARA MONAHAN (NJ Bar No. 011392010)
Director                                    Attorney-In-Charge
                                            Deputy Assistant Director
RAHUL RAO                                   Federal Trade Commission
Deputy Director                             600 Pennsylvania Avenue, N.W.
                                            Washington, D.C. 20580
SHAOUL SUSSMAN                              Tel: (202) 326-2018
Associate Director for Litigation           Email: kmonahan@ftc.gov

Federal Trade Commission                    BRADLEY S. ALBERT (MD Bar)
Bureau of Competition                       Deputy Assistant Director

                                            MICHAEL J. ARIN (CA Bar No. 335693)
                                            DYLAN HERTS (NY Bar)
                                            LEAH P. HUBINGER (CA Bar No. 324976)
                                            TIMOTHY GRAYSON (DC Bar No. 1028502)
                                            PATRICK KENNEDY (IL Bar No. 6332905)
                                            NEAL PERLMAN (NY Bar)
                                            GARY H. SCHORR (NY Bar)
                                            ERIC M. SPRAGUE (NY Bar)
                                            Admissions *pro hac vice* pending

                                            GARTH HUSTON
                                            (TX Bar No. 24041161, SDTX Bar No. 3858253)

                                            Attorneys
                                            Bureau of Competition

                                            *Counsel for Plaintiff Federal Trade Commission*

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Southern District of Texas

| | | |
|---|---|---|
| Federal Trade Commission | ) | |
| *Plaintiff* | ) | Civil Action No.  4:23-CV-03560 |
| v. | ) | |
| U.S. Anesthesia Partners, Inc. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:    Memorial Hermann Health System (c/o Charmaine Ferguson) 929 Gessner Rd, Suite 2686, Houston, TX 77024

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: 600 Pennsylvania Ave, NW, Washington, DC 20580 | Date and Time: |
|---|---|
| | 06/28/2024 5:42 pm |

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    05/28/2024

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
Federal Trade Commission _____ , who issues or requests this subpoena, are:

600 Pennsylvania Ave, NW, Washington, DC 20580, (202) 642-8976

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:23-CV-03560

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☑ I served the subpoena by delivering a copy to the named person as follows: _____

By email, to Memorial Hermann Health System (c/o Charmaine Ferguson) 929 Gessner Rd, Suite 2686

Houston, TX 77024                          on *(date)*    05/28/2024    ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date:    05/28/2024    

_____
Server's signature

Leah P. Hubinger
*Printed name and title*
600 Pennsylvania Ave, NW, Washington, DC 20580

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

(1) *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
　(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
　(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
　　(i) is a party or a party's officer; or
　　(ii) is commanded to attend a trial and would not incur substantial expense.

(2) *For Other Discovery.* A subpoena may command:
　(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
　(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*
　(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
　(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
　　(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
　　(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*
　(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
　　(i) fails to allow a reasonable time to comply;
　　(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
　　(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
　　(iv) subjects a person to undue burden.
　(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
　　(i) disclosing a trade secret or other confidential research, development, or commercial information; or

　　(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
　(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
　　(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
　　(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
　(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
　(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
　(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
　(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*
　(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
　　(i) expressly make the claim; and
　　(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
　(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# Appendix A

# to Memorial Hermann Health System

## DEFINITIONS

For the purposes of this subpoena, the following Definitions apply:

D 1.    "Memorial Hermann Health System," "Company," "Memorial Hermann," and "You" mean Memorial Hermann Health System, and includes any related entities; its domestic and foreign parents, predecessors, successors, divisions, subsidiaries, affiliates, partnerships and joint ventures; and all directors, officers, employees, agents, and representatives of the foregoing. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25% or more) or total ownership or control between the Company and any other Person.

D 2.    "Agreement" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more Persons, together with all modifications or amendments thereto.

D 3.    "And" and "or" have both conjunctive and disjunctive meanings as necessary to bring within the scope of these Requests anything that might otherwise be outside their scope.

D 4.    "Anesthesia Services" means all perioperative anesthesia services for patients and other medical procedures related to pain management.

D 5.    "Best Efforts Clause" refers to any clause that requires or encourages any Provider of Anesthesia Services to participate in any payor network for which the Company Facility is an in-network provider.

D 6.    The term "Company Facility" means any Facility owned or operated by Company, in whole or in part.

D 7.    The term "Collaborative Work Environment" means a platform used to create, edit, review, approve, store, organize, share, and access documents and information by and among authorized users, potentially in diverse locations and with different devices. Even when based on a common technology platform, Collaborative Work Environments are often configured as separate and closed environments, each of which is open to a select group of users with layered access control rules (reader vs. author vs. editor). Collaborative Work Environments include Microsoft SharePoint sites, eRooms, document management systems (*e.g.*, iManage), intranets, web content management systems ("CMS") (*e.g.*, Drupal), wikis (*e.g.*, Confluence), work tracking software (*e.g.*, Jira), and blogs.

D 8.    "Communications" and "communications" are used in the broadest possible sense and means any exchange, transfer, or dissemination of information, regardless of the means by which it is accomplished.

D 9.    "Discuss" and "discussing" mean in whole or in part constituting, containing, describing, or addressing the designated subject matter, regardless of the length of the treatment or

detail of analysis of the subject matter, but not merely referring to the designated subject matter without elaboration. In addition, a document that "discusses" another document includes the other document itself (e.g., a document that "discusses" an agreement or contract includes the agreement or contract itself). Further, these terms include any operating or financial data about the designated subject matter where such data are separately set out as in a chart, listing, table, or graph.

D 10.    The term "documents" means all written, printed, recorded, or electronically stored information ("ESI") of any kind in the possession, custody, or control of the Company, including information stored on and communications sent through social media accounts like Twitter, Facebook, or Snapchat; including chats, instant messages, text messages, direct messages, other Messaging Applications, audio/visual recordings, wherever stored, including documents contained in Collaborative Work Environments and other document databases as well as copies of documents that are not identical duplicates of the originals in a person's files; and copies of documents the originals of which are not in the , possession, custody, or control of the Company. Employee-Owned Devices used to store or transmit documents responsive to this subpoena are considered in the possession, custody, or control of the Company. "Documents" includes metadata, formulas, and other embedded, hidden, and bibliographic or historical data describing or relating to any document. Unless otherwise specified, "documents" excludes bills of lading, invoices in non-electronic form, purchase orders, customs declarations, and other similar documents of a purely transactional nature; architectural plans and engineering blueprints; and documents solely relating to environmental, tax, human resources, OSHA, or ERISA issues.

D 11.    Each," "any," and "all" mean "each and every."

D 12.    The term "Employee-Owned Device" means any computer, phone, tablet, or other electronic device owned by a Company employee that has been used to conduct business for Company.

D 13.    "Exclusive Provider" means a Provider that solely or primarily provides services at a Facility or a department or unit within a Facility.

D 14.    "Facility" means any physical location that offers Anesthesia Services, including but not limited to hospitals, surgery centers, offices, and clinics.

D 15.    "Hospital" means a Facility or portion of a facility that provides General Acute Care Inpatient Services, collectively or individually.

D 16.    "Include" and "including" mean "including but not limited to." The use of the term "include" in any Request shall not be used to limit the generality or scope of any Request. Nor shall the generality of any Request be limited by the fact that another Request touches on the same topic with a greater or lesser degree of specificity.

D 17.   "Inpatient Services" refers to the provision of medical services that requires at least one overnight stay at a Provider or at least 24-hour nursing care, including any Physician Services rendered as part of the inpatient Treatment.

D 18.   The term "Messaging Application" refers to any electronic method that has ever been used by the Company and its employees to communicate with each other or entities outside the Company for any business purposes. "Messaging Application" includes platforms, whether for ephemeral or non-ephemeral messaging, for email, chats, instant messages, text messages, and other methods of group and individual communication (*e.g.*, Microsoft Teams, Slack). "Messaging Application" may overlap with "Collaborative Work Environment."

D 19.   "Outpatient Services" refers to the provision of medical services, including Physician Services, that do not require an overnight stay at a Facility or 24-hour nursing care.

D 20.   "Payor" means any entity, other than the receiving patient, that pays or reimburses in whole or in part for the administration or sale of medical service of any kind. Payors include, but are not limited to, federal and state government programs such as TRICARE, Medicare, and Medicaid; private insurers and health-maintenance organizations; and health-and-welfare funds.

D 21.   "Person" or "person" includes the Company and means any natural person, corporate entity, sole proprietorship, partnership, association, joint venture, governmental entity, or trust.

D 22.   The term "Physician Services" refers to services provided by a physician, physician group, or any other entity organized to offer primarily the services of physicians.

D 23.   "Provider" refers to any doctor, nurse, hospital, clinic, or other person or entity that provides health care services, including any individuals employed by, serve as the agent of, or are otherwise contracted or affiliated with a doctor, hospital clinic, or other person or entity that provides healthcare services to patients. Provider also includes bona fide, integrated firms in which physicians practice medicine together as partners, shareholders, owners, or employees, or in which only one physician practices medicine.

D 24.   "Relate," "related to," and "relating to" mean, in whole or in part, addressing, analyzing, concerning, constituting, containing, commenting on, discussing, describing, identifying, referring to, reflecting, reporting on, stating, or dealing with.

D 25.   "Relevant Area" means the state of Texas.

D 26.   "RFP" or "Request for Proposal" means a document that announces a project, describes it, and solicits bids from qualified contractors or Providers to complete it.

D 27.   The term "Technology Assisted Review" means any process that utilizes a computer algorithm to limit the number of potentially responsive documents subject to a manual

review. A keyword search of documents with no further automated processing is not a Technology Assisted Review.

D 28. "Transaction" means merger, acquisition (including asset purchases or acquisitions), consolidation, investment, joint venture, license, partnership, sale, or other transaction.

D 29. "USAP" means U.S. Anesthesia Partners, Inc., together with its successors, predecessors, divisions, wholly- or partially-owned subsidiaries, domestic or foreign parents, affiliates, partnerships, and joint ventures; and all the directors, officers, employees, consultants, agents, and representatives of the foregoing.


## INSTRUCTIONS

I 1.    All references to year refer to calendar year. Unless otherwise specified, each of the Requests calls for documents and information for each of the years from January 1, 2012 to the present. Where information, rather than documents, is requested, provide it separately for each year; where yearly data is not yet available, provide data for the calendar year to date. If calendar year information is not available, supply the Company's fiscal year data indicating the 12-month period covered, and provide the Company's best estimate of calendar year data.

I 2.    Unless otherwise specified, all documents and information requested are related to, in whole or in part, the Relevant Area. Unless otherwise specified, provide responses to requests separated by Company Facility from which the information was gathered.

I 3.    Company shall respond to these Requests in accordance with Attachment A or any agreement or order regarding electronic discovery.

I 4.    This subpoena shall be deemed continuing in nature so as to require production of all documents responsive to any Request included in this subpoena produced or obtained by the Company up to 45 calendar days prior to the date of the Company's full compliance with this subpoena.

I 5.    Whenever necessary to bring within the scope of a Request a response that might otherwise be construed to be outside its scope, the following constructions should be applied:

    (a)    Construing the singular form of any word to include the plural and the plural form to include the singular;

    (b)    Construing the past tense of a verb to include the present tense and the present tense to include the past tense;

    (c)    Construing the masculine form to include the feminine form; and

      (d)    Construing the term "date" to mean the exact day, month, and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations, or matters.

I 6.    Unless otherwise stated, construe each Request independently and without reference to any other for the purpose of limitation.

I 7.    If you object to any part of this subpoena, set forth the basis for your objection and respond to all parts of the subpoena to which you do not object. Any ground not stated in an objection within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof, shall be waived. All objections must be made with particularity and must set forth all the information upon which you intend to rely in response to any motion to compel.

I 8.    All objections must state with particularity whether and in what manner the objection is being relied upon as a basis for limiting the scope of any search for documents or withholding any responsive document. If you are withholding responsive information pursuant to any general objection, you should so expressly indicate. If, in responding to any part of this subpoena, you claim any ambiguity in interpreting either the subpoena or a definition or instruction applicable thereto, set forth as part of your response the language deemed to be ambiguous and the interpretation used in responding to that part of the subpoena, and produce all documents that are responsive to that part of the subpoena as you interpret it.

I 9.    If the Company is unable to answer any question fully, supply such information and data as are available. Explain why the answer is incomplete, the efforts made by the Company to obtain the information and data, and the source from which the complete answer may be obtained. If books and records that provide accurate answers are not available, enter best estimates and describe how the estimates were derived, including the sources or bases of such estimates. Estimated data should be followed by the notation "est." If there is no reasonable way for the Company to make an estimate, provide an explanation.

I 10.    If documents responsive to a particular Request no longer exist for reasons other than the ordinary course of business, but the Company has reason to believe have been in existence, state the circumstances under which they were lost or destroyed, describe the documents to the fullest extent possible, state the Request(s) to which they are responsive, and identify the Persons having knowledge of the content of such documents.

I 11.    In order for the Company's response to this subpoena to be complete, the attached certification form must be executed by the Company official supervising compliance with this subpoena, notarized, and submitted along with the responsive materials.

I 12.    Any questions you have relating to the scope or meaning of anything in this Request or suggestions for possible modifications thereto should be directed to Leah Hubinger at (202) 642-8976 or lhubinger@ftc.gov. The response to the Request shall be delivered per

the instruction of Leah Hubinger during the course of normal business (8:30 a.m. to 5:30 p.m., Monday through Friday). Leah Hubinger will provide specific mail delivery instructions should that method of transmittal be required.

## REQUESTS FOR PRODUCTION

### Request No. 1.

A complete copy of all Agreements with any Provider or Physician Group providing Anesthesia Services at any Company Hospital.

### Request No. 2.

All documents related to the Company's needs for Anesthesia Services at any Hospital, including but not limited to the number and type of Providers, specialized or subspecialized forms of Anesthesia Services, and quality of care.

### Request No. 3.

All documents relating to RFPs, include a complete copy of any RFP related to Anesthesia Services, or other outreach to any Person relating to Anesthesia Services at any unit of any Company Facility, including all documents discussing the criteria that the Company uses to select Providers that offer Anesthesia Services at each Company Facility.

### Request No. 4.

All documents relating to competition between Providers offering or seeking to offer Anesthesia Services at Company Facilities, including all documents related to Transactions by USAP with any Providers offering Anesthesia Services.

### Request No. 5.

All documents relating to negotiations between the Company and USAP relating to the actual or contemplated provision of or termination of Anesthesia Services at any Company Facility.

### Request No. 6.

All documents discussing the quality of Anesthesia Services provided at Company Facilities, including, but not limited to, the methodology used to evaluate the quality of Anesthesia Services provided at Company Facilities, quality reviews provided by Hospitals, complaints or compliments regarding Anesthesia Services, and adequacy of staffing of Providers of Anesthesia Services at Company Facilities.

**Request No. 7.**

All documents relating to communications with Payors or Providers of Anesthesia Services regarding the network participation, or lack thereof, by Providers, or reimbursement rates paid by Payors, plan sponsors, or patients for Anesthesia Services, including any communications related to the meaning of Best Efforts Clauses in the Company's contracts with Payors.

**Request No. 8.**

All documents relating to the subsidies or stipends paid by any Company Facility to Providers of Anesthesia Services, including but not limited to forecasted or projected subsidies, subsidy negotiations, and subsidy payments.

**Request No. 9.**

All documents relating to the process of changing Providers offering Anesthesia Services at Company Facilities, including any difficulties involved therein.

**Request No. 10.**

All documents discussing the billing practices of Providers offering Anesthesia Services at Company Facilities.

**Request No. 11.**

All documents discussing a Company request to a Provider offering Anesthesia Services to engage in a Transaction with another Provider offering Anesthesia Services or to provide Anesthesia Services at another Company Facility.

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Texas

| | |
|---|---|
| Federal Trade Commission | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  4:23-CV-03560-KH |
| U.S. Anesthesia Partners, Inc. | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:                    Memorial Hermann Health System
c/o Capitol Corporate Services, Inc., 1501 South Mopac Expressway, Suite 220, Austin, Texas 78746

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Appendix A

| Place: Veritext Houston<br>811 Main Street, Suite 4675<br>Houston, Texas 77002 | or a mutually<br>agreed-upon<br>location | Date and Time:<br><br>07/12/2024 |
|---|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    06/12/2024

                    *CLERK OF COURT*
                                        OR
                                                        /s/ Kenneth M. Fetterman
_____            _____
   *Signature of Clerk or Deputy Clerk*                   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
U.S. Anesthesia Partners, Inc. _____ , who issues or requests this subpoena, are:

Kenneth M. Fetterman, 1615 M Street, N.W., Suite 400, Washington, D.C. 20036, kfetterman@kellogghansen.com, (202) 326-7988

#### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:23-CV-03560-KH

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## APPENDIX A

## DEFINITIONS

1.    "Action" means the case captioned *Federal Trade Commission v. U.S. Anesthesia Partners, Inc.*, No. 23-cv-03560 (S.D. Tex.), including any related discovery, pretrial, trial, post-trial, or appellate proceedings.

2.    "Acquired Practices" means and includes each of Greater Houston Anesthesiology, P.A.; Lake Travis Anesthesiology; Pinnacle Anesthesia Consultants; North Houston Anesthesiology; Anesthesia Consultants of Dallas; Excel Anesthesia, P.A.; BMW Physicians; Medical City Physicians; East Texas Anesthesiology Associates, P.A.; Sugarland Anesthesia PLLC; Metrowest Anesthesia Care PLLC; Capital Anesthesiology Association; Amarillo Anesthesia Consultants, P.A.; Star Anesthesia P.A.; Guardian Anesthesia Services, Inc.; and Guardian Anesthesia Services, PLLC.

3.    "Agreement" means any oral or written contract, arrangement, or understanding, whether formal or informal, between two or more Persons, together with all addenda or amendments thereto.

4.    "Anesthesia Services" means all services offered by Clinicians to patients undergoing surgical or nonsurgical procedures in an outpatient or inpatient setting requiring the administration of an anesthetic or analgesic. These types of services include preoperative visits, the administration of medication, fluids, and/or blood during surgery, monitoring services during surgery, and postoperative visits. The type of anesthesia offered during surgery includes general anesthesia, regional anesthesia, and local anesthesia. The term "Anesthesia Services" also includes any pain management services offered to a patient by Clinicians, including postoperative pain management services, or services designed to manage pain resulting from acute or chronic injuries or conditions.

1

5.    "Anesthesia Service Provider" means an institution engaged in providing, by or under the supervision of physicians, Anesthesia Services in either an inpatient or outpatient setting.

6.    "Balance Billing" means the practice of a healthcare service provider (including any Anesthesia Services Provider) billing a patient for the difference between the provider's charge for a service and the amount the patient's insurance has paid. This includes when a patient receives care from an Out-of-Network provider, and the Commercial Healthcare Insurer pays only a portion of the billed amount based on their Out-of-Network Reimbursement Rates.

7.    "Clinicians" means physician anesthesiologists, certified registered nurse anesthetists ("CRNA"), certified anesthesiology assistants ("CAAs"), nurse practitioners, or registered nurses.

8.    "Coinsurance" means the set percentage of covered charges (i.e., the charges recognized by the Health Plan) that a Health Plan enrollee must pay out-of-pocket for each episode of healthcare covered by the enrollee's Health Plan.

9.    "Commercial Healthcare Insurer" means a publicly or privately held entity that provides businesses and individuals with healthcare insurance coverage and/or administrative services necessary to utilize the healthcare insurance coverage it offers. Such administrative services may include benefits enrollment, premiums collection, claims processing and adjudication, healthcare provider network establishment, negotiation of Reimbursement Rates with healthcare providers, and compliance measures.

10.    "Communication" means the transmittal of information or request for information, including, but not limited to, any written contact between two or more people by such means as letters, memoranda, facsimile transmissions, text messages, instant messages, and

2

emails, as well as any oral discussion by such means as face-to-face meetings and telephone or video conversations.

11. "Complaint" means the Complaint filed in the Action by Plaintiff Federal Trade Commission on September 21, 2023.

12. "Concern" or "Concerning" means relating to, in relation to, comprising, constituting, containing, regarding, referring to, describing, discussing, embodying, evidencing, exhibiting, identifying, memorializing, mentioning, recording, showing, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to a given subject matter.

13. Copay" means the set fee that a Health Plan enrollee must pay out-of-pocket for each episode of healthcare covered by the enrollee's Health Plan."

14. "Date" means the exact day, month, and year if ascertainable; if not, the closest approximation that can be made by means of relationship to other events, locations, or matters.

15. "Deductible" means the set amount that a Health Plan enrollee must pay out-of-pocket each year for healthcare services before the enrollee's Health Plan benefits go into effect.

16. "Document" or "Documents" means all documents or Electronically Stored Information or data as defined in Federal Rule of Civil Procedure 34(a), including all copies where the copy is not identical to the original. For the avoidance of doubt, "Document" or "Documents" shall be construed to include Communications.

17. "Electronically-Stored Information" or "ESI" means all Documents or data that are stored in any electronic medium from which information can be obtained.

18.    "Federal No Surprises Act" refers to the legislation enacted by Congress in 2020, at Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758-2890 (2020), and codified at 42 U.S.C. §§ 300gg-11, 300gg-131, 300gg-132, with implementing regulations at 45 C.F.R. § 149.

19.    "FTC Investigation" means the Federal Trade Commission's investigation undertaken pursuant to the July 1, 2021 Resolution of the Commissioners, File No. P210100, pursuant to which it issued Civil Investigative Demand ("CID") No. 2010031 to USAP, and includes all activities taken in connection with that investigation, including obtaining information and testimony from non-parties to the investigation.[1]

20.    "Fully Insured" means any arrangement by which a Health Plan is directly responsible for paying the provider claims generated by the healthcare consumption of its members.

21.    "Health Plan" means any health maintenance organization, managed healthcare organization, preferred provider arrangement or organization, managed healthcare plan of any kind, Fully Insured health benefit plan, Self-Insured health benefit plan, other employer or union health benefit plan, Medicare, Medicaid, TRICARE, or private or governmental healthcare plan, or health insurance of any kind.

22.    "Hospital" means an institution or group of institutions engaged in providing, by or under the supervision of physicians, inpatient diagnostic, therapeutic, and rehabilitation services.

23.    "In-Network" means that a healthcare provider has an Agreement with a Commercial Healthcare Insurer under which the healthcare provider agrees to provide services to

---

[1] The FTC has at times referred to the FTC Investigation as File Nos. 201003 and 20100031. For the avoidance of doubt, the definition of "FTC Investigation" includes those file numbers, whether or not they describe matters that differ from that authorized through the July 1, 2021 Resolution of the Commissioners.

4

the Commercial Healthcare Insurer's members at pre-negotiated rates and are part of the Commercial Healthcare Insurer's physician network.

24.    "Inpatient Services" means the provision of medical services that require at least one overnight stay in a Hospital or other facility, including observation stays, or at least 24-hour nursing care.

25.    "Network Status" means a healthcare provider's status with Commercial Healthcare Insurers, and whether the healthcare provider is In Network or Out of Network with a particular Commercial Healthcare Insurer.

26.    "Out-of-Network" means that a healthcare provider does not have an Agreement with a Commercial Healthcare Insurer under which the healthcare provider agrees to provide services to the Commercial Healthcare Insurer's members at pre-negotiated rates and are not part of the Commercial Healthcare Insurer's physician network.

27.    "Outpatient Services" means the provision of medical services that do not require an overnight stay in a Hospital or other facility.

28.    "Payor" means any Person that pays or reimburses in whole or in part for the administration, provision, or sale of healthcare services (including Anesthesia Services), including, but not limited to, federal and state government programs such as TRICARE, Medicare, and Medicaid, Commercial Healthcare Insurers, employee health and welfare plans, and individual patients that are Self-Insured.

29.    "Person" means any person and includes natural persons, corporations, firms, partnerships, proprietorships, associations, joint ventures, States, Territories, government agencies or entities, and other enterprises or legal entities.

5

30. "Reimbursement Rates" mean the money a Payor provides to an Anesthesia Service Provider to compensate the Anesthesia Service Provider for providing Anesthesia Services to patients.

31. "Relating to," "relate to," "related to," or "in relation to" mean concerning, constituting, regarding, referring to, describing, discussing, embodying, evidencing, memorializing, mentioning, recording, studying, analyzing, reflecting, pertaining to, supporting, refuting, responsive to, or with respect to.

32. "Self-Insured" means any arrangement by which an employer or other Health Plan customer is directly responsible for paying Provider claims generated by the healthcare consumption of its employees or other members.  The term includes and refers to, without limitation, Administrative Services Only ("ASO") arrangements.

33. "Subsidy" means an amount paid by a Hospital to an Anesthesia Service Provider to cover shortfalls or anticipated shortfalls between the provider's revenue and the costs of providing the Anesthesia Services required by the Hospital, whether paid annually, semi-annually, quarterly, or monthly, including any financial arrangement under which a hospital agrees to ensure that the Anesthesia Service Provider receives a minimum level of net revenue.

34. "Texas Surprise Billing Law" means the legislation entitled Elimination of Surprise Billing for Certain Health Benefit Plans, S.B. No. 1264 (2019), Act of June 14, 2019, 86th Leg., R.S., ch. 1342 § 5.01, 2019 Tex. Sess. Law Serv. 3977.

35. "USAP" means U.S. Anesthesia Partners, Inc., and any predecessors thereof, including, but not limited to, the Acquired Practices.

36. "Welsh Carson" means Welsh, Carson, Anderson & Stowe XI, L.P., WCAS Associates XI, LLC, Welsh, Carson, Anderson & Stowe XII, L.P., WCAS Associates XII, LLC,

WCAS Management Corporation, WCAS Management, L.P., and WCAS Management, LLC, any and all of them, and to any and all of their respective subsidiaries, divisions, affiliates, predecessors and successors, their past and present directors, officers, employees, agents, representatives, consultants, attorneys and assignees, and to all Persons either acting or purporting to act on their behalf.

     37.    "You" and "Your" refers to Memorial Hermann Health System, including, but not limited to, any related entities; its domestic and foreign parents, predecessors, successors, divisions, components, subsidiaries, affiliates, partnerships, joint ventures, agents, representatives, consultants, contractors, employees, attorneys, experts, economists, and any other Person(s) acting or purporting to act with or on its behalf. The terms "subsidiary," "affiliate," and "joint venture" refer to any Person in which there is partial (25% or more) or total ownership or control between You and any other Person.

     The definitions set forth above shall apply to all requests.

<u>**GENERAL INSTRUCTIONS**</u>

     1.    In answering each request, You shall produce all responsive Documents, however held or obtained, that are in Your possession, custody, or control, including, but not limited to, legal (de jure), actual (de facto), constructive, and practical possession, custody, or control of Your officers, directors, employees, contractors, counsel, auditors, insurers, investigators, consultants, agents, or other representatives acting for or on Your behalf, or that are maintained in Your records, including, but not limited to, Documents obtained through discovery or pre-suit investigation in this or any other proceeding. A Document is deemed to be in Your possession, custody, or control if You have possession of the Document, have the right to secure such Document or Communication from another Person having possession thereof, or the Document or Communication is reasonably available to You (including those Documents and

7

Communications in the custody or control of Your present employees, attorneys, agents, or other Persons acting on Your behalf).

2.      Each request that seeks Documents concerning Communications to, from, or within a governmental, business, or corporate entity means all Communications to, from, between, or among representatives, officers, officials, directors, employees, agents, servants, and anyone acting on behalf of such entity.

3.      The singular form shall include the plural and vice versa wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

4.      The words "and" and "or" shall be construed both conjunctively and disjunctively, and each shall include the other wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

5.      The words "any," "each," and "every" shall be construed to mean individually and collectively wherever such dual construction will serve to bring within the scope of these requests any Document that would otherwise not be brought within their scope.

6.      The use of a verb in any tense, mood, or voice shall be construed as the use of the verb in all tenses, moods, or voices, as necessary to bring within the scope of a request all information that might otherwise be construed to be outside of its scope.

7.      Each request seeks production of all Documents and things described, along with any addenda, attachments, appendices, drafts, and non-identical copies, as found or located in Your files, together with a copy of the descriptive file folder or database category in its entirety.

8

8.    All Documents should be produced in the order in which they appear in Your files, organized by source, and should contain a clear indication of where each Document ends and the next begins. Documents that are found in boxes, file folders, bindings, or other containers are to be left intact as kept. Documents maintained in a file folder or binding should be preceded by the file folder or binding label, if one exists, and should contain a clear indication of where the file folder or binding begins and ends. All attachments to a Document should be produced with the Document. A unique Bates number should be affixed to each page, except as otherwise provided for by any protocols ordered by the Court in this Action.

9.    If any request cannot be responded to completely, respond to it to the extent possible, specify the portion(s) that cannot be responded to, and explain why any such portion(s) cannot be responded to.

10.    If Documents are withheld under any claim of privilege, including, but not limited to, attorney-client privilege, work product doctrine, deliberative process privilege, investigative files privilege, and/or law enforcement privilege, provide a privilege log that complies with Federal Rule of Civil Procedure 26(b)(5) and any protocols ordered by the Court in this Action. Such log shall, at a minimum, identify each such Document, state the specific basis for the claim of privilege for each Document withheld, and provide the following information: (1) the date appearing on the Document; (2) a description of the subject matter and general nature of the Document (e.g., whether it is a letter, memorandum, email, etc.); (3) the author of the Document; and (4) the identity of each Person to whom the Document was addressed and the identity of each Person to whom a copy was sent.

11.    If You object to any request made herein as unduly broad, identify the categories of Documents within the scope of the request that You believe are properly discoverable,

9

produce all such Documents, and state, with particularity, Your reason for asserting that the remainder of the request seeks Documents that are beyond the scope of permissible discovery.

12.    Each request shall be construed independently and, therefore, no request shall be construed to limit any other request.

13.    All Documents produced should comply with the ESI Protocol attached hereto as Exhibit 1 or otherwise adhere to any Order entered in this Action, with the exception that any responsive ESI that has already been produced to any government agency or entity by a third party may be produced in the same format in which it was produced to that government agency or entity and with the same confidentiality designation.

14.    These requests are continuing in nature. If further information, evidence, or documentation comes into Your possession, custody, or control or is brought to the attention of You or Your attorneys or agents at any time subsequent to the service of any responses to these requests or the production of any Documents, prompt and complete supplementation of the responses to these requests and the corresponding production is required pursuant to the Federal Rules of Civil Procedure.

15.    Unless otherwise stated, the relevant time period for all requests is from January 1, 2012, to the present.

16.    Please contact USAP counsel Kenneth Fetterman of Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C. at kfetterman@kellogghansen.com or (202) 326-7988 to discuss how You intend to produce the Documents.

## REQUESTS FOR PRODUCTION

### REQUEST FOR PRODUCTION NO. 1:

All Documents and Communications -- including, but not limited to, Communications between You and Your representatives, on the one hand, and any third party, including

governmental entities, on the other – relating to the Complaint, the Action, the FTC

Investigation, or any purported anticompetitive conduct by USAP or Welsh Carson. This request

includes, but is not limited to, all Documents produced in response to any subpoena, civil

investigative demand, information request, informal request, or document request or any other

request for information (voluntary or compelled) issued or made in any investigation, the FTC

Investigation, the Action, or any related action.

**REQUEST FOR PRODUCTION NO. 2:**

For January 1, 2010, to the present, Documents sufficient to identify, on an annual basis,

each Anesthesia Services Provider that has provided Anesthesia Services at Your

facility/facilities. For each such provider, provide the following:

     a.     The provider's name;

     b.     The provider's address (including zip code);

     c.     The provider's medical specialty and subspecialty (whether formal or informal);

     d.     The provider's unique identifier, such as National Provider Identifier, UPIN (Unique Provider Identification Number);

     e.     The tax identification used for any billing or charging by or on behalf of the provider;

     f.     The name, address (including zip code) and Medicare Provider Number of each of Your facilities at which the provider has offered services or maintains medical staff privileges; and

     g.     All contracts and Agreements with any Anesthesia Service Provider (other than USAP) with which You have contracted, including any amendments or addenda thereto.

**REQUEST FOR PRODUCTION NO. 3:**

Documents sufficient to show the coverage obligations under the terms of any contract or

Agreement between You and any Anesthesia Service Provider, including any obligations relating

to the availability of Clinicians; whether in-house or on-call coverage is needed; and whether

11

specialized coverage is required for specific departments within Your facility/facilities (e.g., trauma or cardiac care).

**REQUEST FOR PRODUCTION NO. 4:**

Documents sufficient to identify any non-medical or administrative services (including, but not limited to, scheduling and billing) provided to You by any Anesthesia Service Provider with which You contract or have an Agreement.

**REQUEST FOR PRODUCTION NO. 5:**

Documents and Communications reflecting any evaluation or analysis (whether by You or by a consultant or other third party acting on Your behalf) of any Anesthesia Service Provider in connection with any decision to contract with, renew, extend, or terminate a contract with that provider or in connection with the process of changing to or adding a new Anesthesia Service Provider, including any difficulties involved in doing so.

**REQUEST FOR PRODUCTION NO. 6:**

Documents and Communications reflecting any evaluation or analysis (whether by You or by a consultant or other third party acting on Your behalf) relating to You directly employing Clinicians instead of or in addition to contracting with third-party Anesthesia Service Providers.

**REQUEST FOR PRODUCTION NO. 7:**

Documents sufficient to identify any consultants or third parties that have assisted You in negotiations with or preparation of contracts with an Anesthesia Service Provider for the provision of Anesthesia Services at Your facility/facilities.

**REQUEST FOR PRODUCTION NO. 8:**

All Documents and Communications relating to any Subsidy You paid to any Anesthesia Service Provider from January 1, 2010, to the present, including any negotiations over the amount of the Subsidy, any proposals made by You or the Anesthesia Service Provider regarding

12

the Subsidy, and any analysis, evaluation or calculation related to any such proposal (whether by You or by a consultant or third party acting on Your behalf).

**REQUEST FOR PRODUCTION NO. 9:**

Documents sufficient to show how You calculate, evaluate, or assess the amount of any Subsidy that You have considered paying, or proposed or agreed to pay, to any Anesthesia Service Provider.

**REQUEST FOR PRODUCTION NO. 10:**

Documents sufficient to show the amount of Subsidy that You paid to any Anesthesia Service Provider, on an annual basis, from January 1, 2010, to the present, including the identity of the Anesthesia Service Provider(s) and the Subsidy paid to each.

**REQUEST FOR PRODUCTION NO. 11:**

All Documents and Communications relating to any shortage of Clinicians or Anesthesia Service Providers in the state of Texas.

**REQUEST FOR PRODUCTION NO. 12:**

Documents sufficient to show the payor mix and sources of revenue at Your facility/facilities – i.e., the percentage of revenues that arise from federal and state government programs such as TRICARE, Medicare, and Medicaid; Commercial Health Insurers; health-and-welfare funds; and individual patients.

**REQUEST FOR PRODUCTION NO. 13:**

For each request for proposal, invitation to bid, or analogous solicitation (collectively, "RFP") You issued for Anesthesia Services, provide the following:

a.      The RFP;

b.      The responses You received to the RFP;

13

c.  Your evaluations or assessments of the responses You received, the factors You considered in deciding which Anesthesia Service Provider(s) to retain, and all Communications related to any such evaluation or assessment; and

d.  Documents sufficient to identify the Anesthesia Service Provider You selected for Your facility/facilities.

**REQUEST FOR PRODUCTION NO. 14:**

All Documents or data (whether prepared by You or by a consultant or third party acting on Your behalf) evaluating, assessing, or comparing the quality of Anesthesia Services provided by any Anesthesia Service Provider, including any evaluation, assessment, or comparison of the quality of the Anesthesia Service Providers with which You contract.

**REQUEST FOR PRODUCTION NO. 15:**

All Documents or data showing, identifying, or defining the quality reporting You require from Anesthesia Service Providers, as well as any quality metrics relating to the provision of Anesthesia Services that You capture or measure, including any changes over time.

**REQUEST FOR PRODUCTION NO. 16:**

All Documents or data showing the methods of quality reporting You use in connection with Anesthesia Services, including any changes over time.

**REQUEST FOR PRODUCTION NO. 17:**

All Communications with Commercial Healthcare Insurers regarding Reimbursement Rates provided to Anesthesia Service Providers.

**REQUEST FOR PRODUCTION NO. 18:**

Documents and Communications reflecting any terms in Your contracts with Commercial Health Insurers that impact Reimbursement Rates based on whether Your Hospital-based providers are In-Network and/or contingent on Your Hospital-based provider having a "reasonable" Reimbursement Rate.

14

**REQUEST FOR PRODUCTION NO. 19:**

All Communications with Commercial Healthcare Insurers regarding any Subsidy that You offer or pay to Anesthesia Service Providers in connection with the Anesthesia Services provided at Your facility/facilities.

**REQUEST FOR PRODUCTION NO. 20:**

All Communications with any Commercial Healthcare Insurer concerning Your actual or potential relationship with any Anesthesia Service Provider, including, but not limited to, whether the Anesthesia Service Provider is In-Network or Out-of-Network with the Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 21:**

All Documents and Communications referring or relating to the Network Status of those Anesthesia Service Providers that provide Anesthesia Services at Your facility/facilities, including any internal policies requiring Anesthesia Service Providers to be In Network with any Commercial Healthcare Insurer.

**REQUEST FOR PRODUCTION NO. 22:**

Documents sufficient to show any complaints You received regarding Anesthesia Service Providers that provide Anesthesia Services at Your facility/facilities, including, but not limited to, the providers' being Out-of-Network with any Commercial Healthcare Insurer or their quality of service.

**REQUEST FOR PRODUCTION NO. 23:**

All Documents relating to any Balance Billing engaged in by Anesthesia Service Providers that provide Anesthesia Services at Your facility/facilities.

**REQUEST FOR PRODUCTION NO. 24:**

All Documents and Communications relating to, evaluating, or assessing an exclusive arrangement for the provision of Anesthesia Services at Your facility/facilities between You and an Anesthesia Service Provider, including, but not limited to, any advantages or disadvantages associated with an exclusive arrangement.

**REQUEST FOR PRODUCTION NO. 25:**

All Documents and Communications discussing, evaluating, or assessing USAP, including, but not limited to, the pricing or quality of USAP's Anesthesia Services.

**REQUEST FOR PRODUCTION NO. 26:**

All Documents and Communications referring or relating to USAP's actual or potential acquisition of the Acquired Practices, including any Communications with USAP, the relevant Acquired Practice, or any Commercial Healthcare Insurer concerning any actual or potential acquisition.

**REQUEST FOR PRODUCTION NO. 27:**

All Documents and Communications relating to Your assessment of the advantages or disadvantages of USAP's partnering with or acquiring any of the Acquired Practices or any other Anesthesia Service Provider.

**REQUEST FOR PRODUCTION NO. 28:**

All Communications with any Anesthesia Service Provider regarding an actual or potential acquisition of that provider by any other Anesthesia Service Provider, including, but not limited to, USAP.

**REQUEST FOR PRODUCTION NO. 29:**

All Documents and Communications analyzing, evaluating, measuring, or assessing the actual or potential impact of the Federal No Surprises Act or the Texas Surprise Billing Law on

16

You, other Hospitals, Commercial Healthcare Insurers, and/or healthcare service providers, including, but not limited to, any impact on negotiations or negotiating leverage among Hospitals, Commercial Healthcare Insurers, and/or healthcare service providers.

# EXHIBIT 1

## PRODUCTION FORMAT

A. **Production Components.** Except as otherwise provided below, ESI shall be produced in accordance with the following specifications:

　1.　An ASCII delimited data file (.DAT) with ASCII 020 for the comma character and ASCII 254 for the quote character, with all values in a multi-value field separated by a semi-colon ASCII 059 (with the use of commas and quotes as delimiters not acceptable using standard delimiters) and encoded in UTF-8;

　2.　An image load file (.OPT) that can be loaded into commercially acceptable production software (e.g., Concordance);

　3.　TIFF images;

　4.　Document level text files (.TXT) for all documents containing extracted full text or OCR text;

　5.　Parent-child relationships will be maintained in production; and

　6.　Document families must be produced, even if only the parent email or an attachment to an email is responsive, except (1) junk files and non-user created content routinely excluded during processing (for example embedded images), and (2) documents that are withheld on the basis of attorney-client privilege or work product protection.

If a particular document or category of documents warrants a different production format, for example if it is impractical to produce an entire document family for particular documents, the parties will cooperate in good faith to arrange for a mutually acceptable production format.

B. **Production Media and Access Controls.** Documents shall be encrypted and produced through electronic means, such as secure file sharing methods (e.g., FTP), or on CD, DVD, flash drive or external hard drive ("Production Media"). Each piece of Production Media

shall identify a production number corresponding to the production volume (e.g., "VOL001"). Each piece of Production Media shall also identify: (1) the producing party's name; (2) the production date; and (3) the Bates number range of the materials contained on the Production Media.

Nothing in this Order will preclude or impair any and all protections provided to the parties by any Protective Order(s) agreed and entered into by the parties. Any data produced by the producing party must be protected in transit, in use, and at rest by all in receipt of such data. Parties will use best efforts to avoid the unnecessary copying or transmittal of produced documents. Any copies made of produced data must be kept on media or hardware employing whole-disk or folder-level encryption or otherwise secured on information systems and networks in a manner consistent with the best practices for data protection. If questions arise, parties will meet and confer to ensure security concerns are addressed prior to the exchange of any documents.

**C. Data Load Files/Image Load Files.** All production items will be provided with a delimited data file or "load file," which will include both an image cross-reference load file (such as an Opticon file) and a metadata (.DAT) file with the metadata fields identified below on the document level to the extent available. Each TIFF in a production must be referenced in the corresponding image load file. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the image load file(s) in the production. The total number of pages referenced in a production's image load file should match the total number of TIFF files in the production. All images must be assigned a unique Bates number that is sequential within a given document and across the production sets. The Bates numbers in the image load file must match the corresponding

2

documents' beginning Bates numbers in the data load file. The total number of documents in

a production should match the total number of records in the data load file. Load files shall

not vary in format or structure within a production, or from one production to another.

**D. Metadata Fields.** With the exception of the hard copy paper documents, which are

separately addressed in paragraph M below, each of the metadata and coding fields set forth

below that can be extracted shall be produced for each document to the extent reasonably

practicable. The parties are not obligated to populate manually any of the fields below if

such fields cannot be extracted from a document, with the exception of the following:

(a) BEGBATES, (b) ENDBATES, (c) BEGATTACH, (d) ENDATTACH, (e) CUSTODIAN,

(f) ALLCUSTODIANS, (g) CONFIDENTIALITY, (h) REDACTIONS,

(i) NATIVEFILEPATH, and (j) TEXTFILEPATH, which should be populated by the party

or the party's vendor. The parties will make reasonable efforts to ensure that metadata fields

automatically extracted from the documents correspond directly to the information that exists

in the original documents.

| Field Name[1] | Field Description |
|---|---|
| BEGBATES | Beginning Bates number as stamped on the production image |
| ENDBATES | Ending Bates number as stamped on the production image |
| BEGATTACH | First production Bates number of the first document in a family |
| ENDATTACH | Last production Bates number of the last document in a family |
| CUSTODIAN | Individual identified for collection and from whom the document originated |
| ALLCUSTODIAN(S) | Identified Custodian(s) whose documents de-duplicated out |

---

[1] Field names can vary from system to system and even between different versions of systems. Thus, parties are to be guided by these Field Names and Field Descriptions when identifying the metadata fields to be produced for a given document pursuant to this ESI Protocol.

| Field Name[1] | Field Description |
|---|---|
| CONFIDENTIALITY | Confidentiality designation assigned to document |
| HASHVALUE | MD5 hash value of document |
| AUTHOR | Any value populated in the Author field of the document properties (Edoc or attachment only) |
| DATECREATED | Date the document was created (format: MM/DD/YYYY) (Edoc or attachment only) |
| DATEMODIFIED | Date when document was last modified according to filesystem information (format: MM/DD/YYYY) (Edoc or attachment only) |
| FROM | The name and email address of the sender of the email |
| TO | All recipients that were included on the "To" line of the email |
| CC | All recipients that were included on the "CC" line of the email |
| BCC | All recipients that were included on the "BCC" line of the email |
| DATERECEIVED | Date email was received (format: MM/DD/YYYY) |
| DATESENT | Date email was sent (format: MM/DD/YYYY) |
| FILESIZE | The original file size of the produced document |
| ORIGINATING PATH | File path of the file as it resided in its original environment |
| REDACTIONS | Indicate Yes if a document is redacted.  If no leave blank. |
| NATIVEFILEPATH | Native File Link (Native Files only) |
| EMAIL THREAD ID | Unique identification number that permits threading of email conversations.  For instance, MS Outlook identification number ("PR_CONVERSATION_INDEX") is 22 bytes in length, followed by zero or more child blocks each 5 bytes in length, that facilitates use of email threading.  (Microsoft application documents only) |
| TEXTFILEPATH | Path to extracted text/OCR file for document |
| EMAILSUBJECT | Subject Line of email |
| TIMESENT | Time email was sent |
| TIMEZONEUSED | Time zone used to standardize date/time during document processing |

| Field Name[1] | Field Description |
|---|---|
| RECEIVETIME | Time email was received |
| FILENAME | File Name of the edoc or email |
| TITLE | Any value populated in Title field of the document properties |
| SUBJECT | Any value populated in the Subject field of the document properties |
| DOCEXT | File extension of the document |

E. **TIFFs.** Documents that exist only in hard copy format shall be scanned and produced as TIFFs. Documents that exist as ESI shall be converted and produced as TIFFs, except as provided below. The imaged data shall retain all attributes of the native or hard copy file, such as document breaks, to the extent reasonably practicable. To the extent reasonably practicable, a produced TIFF image will show all text and images that are visible in the form in which the electronic document was last saved, with the exception of redacted portions. Hidden content, tracked changes or edits, comments, notes, and other similar information, shall to the extent reasonably practicable, also be imaged so that such content is viewable on the image file. Unless excepted below, single page, black and white, Group IV TIFFs should be provided, at least 300 dots per inch (DPI) for all documents, with corresponding multi-page text and necessary load files. Each TIFF image shall be named according to a unique corresponding Bates number associated with the document. Each image shall be branded according to the Bates number and the agreed upon confidentiality designation. Original document orientation should be maintained (i.e., portrait to portrait and landscape to landscape). Documents that are difficult to render in TIFF because of technical issues, or any other documents that are impracticable to render in TIFF format, may be produced in their native format with a placeholder TIFF image stating "Document Produced Natively." A producing party retains the option to produce ESI in alternative formats if so agreed by the

5

requesting party, which may include native format, or a combination of native and TIFF

formats. Where the TIFF image is unreadable or has materially degraded the quality of the

original, the producing party shall provide a higher quality TIFF image or the native or

original file.

F. **Color.** A party that received a production may make reasonable requests that color images

be produced where color is helpful to interpret the contents of the relevant document. The

production of documents and/or ESI in color shall be made in single-page JPEG format (300

DPI). All requirements for productions stated in this ESI Protocol regarding productions in

TIFF format apply to any productions of documents and/or ESI in color made in such an

alternative format. Reasonable requests that a document be produced in color for the reasons

set forth in this paragraph will not be unreasonably denied by the producing party. If a

producing party wishes to object, it may do so by responding in writing and setting forth its

objection(s) to the production of the requested document in color.

G. **Text Files.** A single multi-page text file shall be provided for each document, and the

filename should match its respective TIFF filename. When possible, the text of native files

should be extracted directly from the native file. Text files will not contain the redacted

portions of the documents. A commercially acceptable technology for optical character

recognition "OCR" shall be used for all scanned, hard copy documents and for documents

with redactions.

H. **Native Files.** Spreadsheets (e.g., MS Excel) and presentations (e.g., MS PowerPoint) will be

produced in native format unless redacted, in which instance, spreadsheets shall be produced

as native redactions or in TIFF, with OCR text files post redaction. To the extent that they

are produced in this Action, audio, video, and multi-media files will be produced in native

format. Native files shall be produced with a link in the NATIVEFILEPATH field, along with extracted text (where extracted text is available) and applicable metadata fields set forth in paragraph D above. A Bates numbered TIFF placeholder indicating that the document was provided in native format must accompany every native file.

I. **Request for Other Native Files.** Other than as specifically set forth above, a producing party need not produce documents in native format. If a party would like a particular document produced in native format and this ESI Protocol does not require the production of that document in its native format, the party making such a request shall explain the reason for its request that the document be produced in its native format. The requesting party will provide a specific Bates range for documents it wishes to be produced in native format. The producing party need only produce such a document in native format if reasonably practicable. Any native files that are produced should be produced with a link in the NATIVEFILEPATH field, along with all extracted text and applicable metadata fields set forth in paragraph D above.

J. **Linked Files and Collaborative Work Environments.** Where an email or other document links to another file or documents in a collaborative work environment, and a producing party is unable to reasonably generate information indicating relationships for linked files or documents in a collaborative work environment, the parties agree to negotiate a process for identifying impacted documents and producing information to identify relevant relationships.

K. **Confidentiality Designation.** Responsive documents in TIFF format will be stamped with the appropriate confidentiality designations in accordance with any Protective Order(s) entered in this matter. Each responsive document produced in native format will have its

confidentiality designation identified in the filename of the native file and indicated on its corresponding TIFF placeholder.

L. **Databases and Other Structured Data.** The parties shall meet and confer regarding the production format and scope of data contained in databases in order to ensure that any information produced is reasonably usable by the receiving party and that its production does not impose an undue burden on the producing party. To avoid doubt, information will be considered reasonably usable when produced in CSV format, tab-delimited text format, MS Excel format, or MS Access format. To the extent a party is constrained from producing responsive ESI because of a third-party license or because software necessary to view the ESI is hardware-dependent, the parties shall meet and confer in an attempt to reach an agreement on whether alternative methods exist to enable the requesting party to view the ESI.

M. **Paper Documents.** A producing party may make paper documents available for inspection and copying in accordance with Federal Rule of Civil Procedure 34 or, additionally or alternatively, scan and OCR paper documents. The following information shall be produced in the load file accompanying production of paper documents produced by scan and OCR to the extent reasonably practicable: (a) BEGBATES, (b) ENDBATES, (c) CUSTODIAN, (d) CONFIDENTIALITY, and (e) REDACTIONS. Paper documents should be logically unitized for production to the extent reasonably practicable. Generally, when scanning paper documents for production, distinct documents shall not be merged into a single record and single documents shall not be split into multiple records. The parties will make reasonable efforts to unitize documents correctly. Where a document or a document group – such as folder, clipped bundle, or binder has an identification spine or other label, the information on

the label shall be scanned and produced as the first page of the document or grouping to the extent reasonably practicable.

**N. Date and Time.** No party shall modify the date or time as contained in any original ESI. This provision does not prevent parties from deleting inaccurate date or time information that arises as an incident of collection or processing.

**O. Time Zone.** To the extent reasonably practicable, ESI items shall be processed using a consistent time zone (e.g., Central Standard Time) and the time zone shall be disclosed to the requesting party.

**P. Auto Date/Time Stamps.** To the extent reasonably practicable, ESI items shall be processed so as to preserve the date/time shown in the document as it was last saved, not the date of collection or processing.

**Q. Hidden Text.** ESI items shall be processed, to the extent practicable, in a manner that preserves hidden columns or rows, hidden text, worksheets, speaker notes, tracked changes, and comments.

**R. Password-Protected, Encrypted, or Proprietary-Software Files.** With respect to any ESI items that are password-protected or encrypted within the scope of review, the producing party will take reasonable steps based on industry standards to break the protection so that the documents can be reviewed and produced if appropriate. In the event that encrypted or password-protected documents, which are reasonably likely to be responsive to a document request, remain for a particular custodian after such reasonable efforts have been made, the producing party shall advise the requesting party by producing a placeholder TIFF image stating "Technical Issue." ESI that cannot be reviewed because proprietary software is

9

necessary to view the ESI will be disclosed to a requesting party, and the parties shall meet
and confer regarding the next steps, if any, with respect to such ESI.

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>U.S. ANESTHESIA PARTNERS, INC., et al.<br><br>Defendants. | Case No.: 4:23-CV-03560-KH |

### [Revised Proposed] Protective Order

Pursuant to Federal Rule of Civil Procedure 26(c), the parties to the above-captioned case (the "Litigation"), through their respective counsel, agree that the terms and conditions of this Protective Order (the "Order") shall govern the production and handling of all documents, items, or other information exchanged by the parties and/or nonparties in the Litigation including, without limitation, responses to requests for production, interrogatories, requests for admissions, pleadings, exhibits, and deposition or other testimony, regardless of the medium or manner in which any such materials are generated, stored, or maintained. This includes any material produced, filed, or served by any party or nonparty during discovery in this Litigation, or any information included in any such material. The Court finds that good cause exists for entry of a protective order in this Litigation to prevent unauthorized disclosure and use of confidential information during and after the course of the Litigation.

Accordingly, **IT IS HEREBY ORDERED AS FOLLOWS:**

1.    **Persons/Entities Covered**. This Order is binding upon all current and future parties to this Litigation, including their respective corporate parents, subsidiaries, affiliates,

successors, or assigns and their respective counsel, agents, representatives, officers, and employees and any others set forth in this Order. This Order shall also apply to any materials produced in discovery in this Litigation by nonparties, and shall apply to parties and non-parties alike, and further provided that this Order does not limit any party or nonparty's rights with respect to its own materials that it produces in discovery in this Litigation. When conducting discovery from nonparties, the parties to this Litigation shall provide notice of the terms of this Order to such nonparties by providing a copy of this Order with the discovery requests.

2.    **Designation of Materials**. Any party or nonparty responding to discovery requests or providing materials in connection with this Litigation ("Producing Entity") may designate a document, or all or any part of a discovery response, deposition, or other material as Confidential Material or Highly Confidential Material (defined below) based on a good-faith belief that such materials qualify for that designation under the terms of this Order:

(a)    "Confidential Material" shall mean (i) any information, testimony, or tangible thing produced during discovery that reveals a trade secret; confidential research, analysis, development or commercial information, which is maintained as confidential and has not been released into the public domain (unless through unauthorized disclosure), in accordance with Federal Rule of Civil Procedure 26(c); (ii) personal information that is protected from disclosure by statute, regulation, or is otherwise entitled to protection from public disclosure; and (iii) any other information for which a good faith claim of need of protection can be made under the Federal Rules of Civil Procedure and/or applicable law.

(b)    "Highly Confidential Material" shall mean any Confidential Material that, if disclosed, is likely to cause significant competitive or commercial harm. By way of example only, Highly Confidential Material may include: trade secrets; highly sensitive and non-public

2

research or analysis; competitively sensitive customer information; non-public financial, marketing, or strategic business planning information not more than three (3) years old; current or future non-public pricing information relating to research, development, testing of, or plans for existing or proposed future products, or services; information relating to the processes, apparatus, or analytical techniques used by a party or nonparty in its present or proposed commercial production of such products or services; confidential contractual terms, proposed contractual terms, or negotiating positions (including internal deliberations about negotiating positions) taken with respect to U.S. Anesthesia Partners or competitors to U.S. Anesthesia Partners; personnel files; and communications that disclose any Highly Confidential Material. Material that is more than three (3) years old is presumptively not entitled to protection as Highly Confidential Material; provided, that such material may be considered Highly Confidential Material if it discloses current business practices. Nothing in the foregoing description of "Highly Confidential Material" (and, in particular, the fact that financial information less than three (3) years old is generally considered to be "Highly Confidential Material") is intended to foreclose any party from arguing that specific pricing information that may be less than three (3) years old is neither Confidential Material nor Highly Confidential Material.

(c)     The parties to this Litigation and third parties desire to ensure the privacy of patient records and other information that the parties have determined might contain Confidential Health Information ("CHI") and agree that a Producing Entity may designate CHI as Confidential Material at a minimum and, as such, subject to the terms of this Order. The parties to this Litigation and third parties also seek to ensure that any person who receives and stores CHI in connection with this proceeding will develop, implement, maintain, and use appropriate administrative, technical, and physical safeguards to preserve the privacy, integrity,

and confidentiality of any CHI and to prevent unpermitted use or disclosure of any confidential

health information they may receive from any person in connection with this proceeding. CHI

will be securely returned or destroyed pursuant to the provisions of this Order. As used in this

Order, "Confidential Health Information" or "CHI" shall mean any patient health information

protected by any state or federal law, including but not limited to "Protected Health Information"

or "PHI" as set forth in 45 C.F.R. § 160.103.

(d)    Confidential and Highly Confidential Material, respectively, shall include:

(i) all copies, extracts, and complete or partial summaries prepared from such Confidential or

Highly Confidential Material; (ii) portions of deposition transcripts and exhibits thereto that

contain or summarize the content of any such Confidential or Highly Confidential Material; (iii)

portions of briefs, memoranda, or any other writings filed with the Court and exhibits thereto that

contain or summarize the content of any such Confidential or Highly Confidential Material; (iv)

written discovery responses and answers that contain or summarize the content of any such

Confidential or Highly Confidential material; and (v) deposition testimony designated in

accordance with paragraph 2(g) below.

(e)    Information designated as Confidential or Highly Confidential Material

shall be considered "trade secrets and commercial or financial information" that is "privileged or

confidential" under 5 U.S.C. § 552(b)(4) for the purpose of the Freedom of Information Act.

(f)    Any document produced by a Producing Entity in this Litigation may be

designated as Confidential Material by marking it "CONFIDENTIAL" on the face of the

document at the time of production. Any document produced by a Producing Entity in this

Litigation may be designated as Highly Confidential Material by marking it "HIGHLY

CONFIDENTIAL" on the face of the document at the time of production. A Producing Entity

4

may also designate electronic documents and other non-paper media as Confidential or Highly

Confidential Material, as appropriate, by (i) noting such designation in an accompanying cover

letter; (ii) affixing the confidentiality designation to the material or its container, including the

appropriate confidentiality designation in the load file provided with the electronic production;

(iii) including the appropriate confidentiality designation in the name of the file(s) provided with

the electronic production; or (iv) using any other means that reasonably notifies the party in

receipt of the material (the "Receiving Party") of the designation.

      (g)    Testimony provided in this Litigation may be designated as Confidential

Material or as Highly Confidential Material if the testimony concerns or relates to the

designating party's or nonparty's Confidential or Highly Confidential Material. The party or

nonparty desiring to designate any portion of testimony as Confidential or Highly Confidential

Material shall do so by so stating orally on the record on the day that the testimony is being

given. Following any such oral designation, the confidential portions of the deposition shall be

taken only in the presence of persons entitled to access such information under this Order. A

Producing Entity may designate any or all portions of the transcript or video of any deposition

(or of any other testimony) as containing Confidential or Highly Confidential Material in

accordance with this Order by notifying all other parties in writing within thirty (30) calendar

days of the Producing Entity's receipt of the final transcript that the transcript contains

Confidential or Highly Confidential Material and designating the specific pages and/or lines as

containing Confidential or Highly Confidential Material. All transcripts and videos of testimony

in this Litigation shall be treated as Highly Confidential Material and subject to this Order until

thirty (30) calendar days after a final transcript of the deposition (or other testimony) is received

by the Producing Entity. Any portion of any deposition testimony that is not designated as

Confidential or Highly Confidential Material in accordance with this paragraph, within thirty (30) calendar days after a final transcript and/or video of the deposition (or other testimony) is received by the Producing Entity shall not be entitled to the protections afforded to Confidential or Highly Confidential Material under this Order.

(h)    Any document produced (or material containing or summarizing information from a document produced), as well as all transcripts of any investigational hearings, during the investigation by the Federal Trade Commission ("FTC" or "Commission") (the "Investigatory Material") shall be treated as Highly Confidential Material under this Order, notwithstanding any designation or lack thereof on the documents as originally produced, unless either the original source of the document agrees or the Court orders otherwise. Nothing in this Order shall constitute any waiver of any applicable privileges or protections from discovery that may apply to Investigatory Materials pursuant to the FTC's Rules of Practice or other legal obligation imposed upon the FTC. The confidentiality of Investigatory Material may be challenged under the provisions of paragraph 7.

(i)    Notwithstanding any of the foregoing, information shall be deemed non-confidential material under this Order if it is in the public domain, or is already known to a party through proper means and on a nonconfidential basis or is or becomes available to a party from a source rightfully in possession of such information on a nonconfidential basis.

3.    **Individuals to Whom Confidential Material May Be Disclosed**. Unless otherwise ordered by the Court or permitted in writing by a Producing Entity, Confidential Material may be used only in connection with this Litigation, and disclosure of Confidential Material may be made only to:

6

       (a)     The Court and court personnel, including assistants, clerks, law clerks, and other support staff (this category is referred to as the "Court").

       (b)     Outside attorneys for a party who are working on this Litigation and their employed or retained secretaries, paralegals, legal assistants, and support services (including, without limitation, copy services, jury consultants, interpreters, translators, document management services, graphics services, and similar professional services) (this category is referred to as "Outside Attorneys").

       (c)     For U.S. Anesthesia Partners, one attorney employed in-house (i) who has executed the agreement annexed hereto as Appendix A, and (ii) who, at the time of signing the agreement annexed as Appendix A and for a period of two (2) years after receipt of Confidential Material, does not participate in or advise on Competitive Decision-Making or litigation or other legal actions involving the Producing Entity of the Confidential Material (this category is referred to as "In-House Counsel"). "Competitive Decision-Making" means decision-making relating to a competitor, or potential competitor, of U.S. Anesthesia Partners, a payor, or a healthcare provider (such as a hospital or ambulatory surgery center), including decisions regarding contracts, marketing, pricing, rates, product or service development or design, service offerings, research and development, mergers or acquisitions, or licensing, acquisition, or enforcement of intellectual property rights.

       (d)     [intentionally omitted]

       (e)     FTC personnel, including FTC Commissioners, as well as FTC attorneys, employees, and law clerks who are working on, supervising, or being briefed about this Litigation (this category is referred to as "FTC Personnel").

7

    (f) Court reporters, court videographers, and similar transcription services and their support staff providing services in court or at depositions for the purpose of assisting the Court in this Litigation (this category is referred to as "Court Reporters").

    (g) Any expert or consultant, including all nonparty personnel and support staff assisting such expert or consultant, but not the entity itself by which such expert or consultant and assisting personnel are employed, who is retained by or for the benefit of any of the parties in this Litigation to assist counsel in this Litigation, and provided that the expert or consultant has executed the agreement annexed hereto as Appendix A (this category is referred to as "Experts").

    (h) Any mediators engaged by the parties or appointed by the Court, and their support staff (this category is referred to as "Mediators").

    (i) Any person who authored or previously received the material. For e-mails, this provision is limited to individuals in the to, from, cc, or bcc fields, and includes any attachments to an e-mail that the person received.

    (j) The Producing Entity's current directors, officers, employees, or outside counsel.

    (k) The Producing Entity's former employees, provided that the party showing the former employee the materials has a good faith reason to believe that the former employee accessed the materials in the ordinary course of business during their employment or worked on issues sufficiently related that such access would have been likely.

    (l) To the extent such Confidential Material was produced by a Producing Entity, any person who has been designated as a Rule 30(b)(6) witness by the Producing Entity.

8

(m)    A custodian of records that has or had possession of the material or access in the ordinary course of business to the material.

(n)    During the conduct of hearings, witnesses in the Litigation, to whom disclosure is reasonably necessary and who have signed the agreement annexed hereto as Appendix A (this category is referred to as "Witnesses").

(o)    Any other person to whom the Producing Entity consents in writing or by order of the Court.

4.    **Individuals to Whom Highly Confidential Material May Be Disclosed**. Unless otherwise ordered by the Court or permitted in writing by the Producing Entity, Highly Confidential Material may be used only in connection with this Litigation, and disclosure of Highly Confidential Material may be made only to the following, as defined in paragraph 3 above:

(a)    The Court.

(b)    Outside Attorneys.

(c)    FTC Personnel.

(d)    Court Reporters.

(e)    Experts.

(f)    Mediators.

(g)    Any person who authored or previously received the material. For e-mails, this provision is limited to individuals in the to, from, cc, or bcc fields, and includes any attachments to an e-mail that the person received.

(h)    The Producing Entity's current directors, officers, employees, or outside counsel.

9

       (i)      The Producing Entity's former employees, provided that the party showing the former employee the materials has a good faith reason to believe that the former employee accessed the materials in the ordinary course of business during their employment or worked on issues sufficiently related that such access would have been likely.

       (j)      To the extent such Confidential Material was produced by a Producing Entity, any person who has been designated as a Rule 30(b)(6) witness by the Producing Entity.

       (k)      A custodian of records that has or had possession of the material or access in the ordinary course of business to the material.

       (l)      Witnesses.

       (m)     Any other person to whom the Producing Entity consents in writing or by order of the Court.

     5.      **Handling of Confidential Material and Highly Confidential Material**. All material designated Confidential or Highly Confidential shall remain in the possession of the attorneys who receive such material through discovery in this Litigation, and they shall not release or disclose the nature, substance, or contents thereof, except that copies of such materials may be made for the use of those assisting the attorneys to whom disclosure may be made under paragraphs 3 and 4 above, including Experts, and copies of such materials may be submitted to the Court under seal as necessary. Persons who have been shown Confidential or Highly Confidential Material pursuant to this Order and have not otherwise obtained or maintained the material in the normal course of business shall not retain copies of that material.

     6.      **Inadvertent Failure to Designate as to Confidentiality**. Except to the extent provided in paragraph 2(f), in the event that a Producing Entity fails to designate confidential material as Confidential or Highly Confidential, the Receiving Party shall, upon a written request

10

from the Producing Entity, treat and preserve such information, document, paper, or other thing in accordance with the confidentiality designation that the Producing Entity states should have been affixed to it. The Producing Entity shall re-produce the information, document, paper, or other thing with the appropriate confidentiality designation unless doing so would not be feasible (as, for example, in the case of a final deposition transcript). Each Receiving Party shall replace the incorrectly designated materials with the newly designated materials, destroy the incorrectly designated materials, and treat the materials in accord with their new designation. Except as provided in paragraph 2(f), the inadvertent failure of a party or nonparty to designate material as Confidential or Highly Confidential at the time of production shall not be deemed a waiver of the protections afforded by this Order, either as to specific information in the material or as to any other information relating thereto or on the same or related subject matter. No party shall be deemed to have violated this Order if, prior to notification of any later designation, such material has been disclosed or used in a manner inconsistent with the later designation. If material inadvertently not designated as confidential was filed with a court on the public record or otherwise disclosed before the time of the material's later designation, then the Producing Entity shall be responsible for seeking appropriate relief, including return of the material.

7.    **Challenging a Confidentiality Designation.**

(a)    A Receiving Party shall not be obligated to challenge the propriety of a Confidential or Highly Confidential designation at the time the designation is made. A Receiving Party may challenge a confidentiality designation at any time or at such time defined and identified in any pre-trial Order or process entered by this Court, and a Receiving Party's failure to have made such a challenge at any previous time, including after acceptance or receipt of

11

material with a confidentiality designation, shall not be deemed a waiver of the Receiving

Party's right to challenge any confidentiality designation.

       (b)     A Receiving Party seeking to challenge a Confidential or Highly

Confidential designation shall give notice in writing of such challenge to counsel for the

Producing Entity specifying the document or portion of document or otherwise identifying the

materials at issue and setting forth the basis for the Receiving Party's challenge.

       (c)     Within seven (7) calendar days of receipt of written notice that the

Receiving Party objects to the confidentiality designation, counsel for the Producing Entity shall

meet and confer with counsel for the Receiving Party to attempt to resolve the challenge.

       (d)     If the Receiving Party and Producing Entity are unable to resolve the

challenge within fourteen (14) calendar days of the notice provided under paragraph 7(b), then

the Receiving Party may move the Court for an order removing the challenged material from the

restrictions of this Order. Any papers filed in support of or in opposition to this motion shall, to

the extent necessary, be filed under seal to preserve the claimed confidentiality of the material at

issue. The Producing Entity bears the burden of proof on the issue of the propriety of the

challenged confidentiality designation.

       (e)     Until the parties or the Court resolves a challenge to the designation of

Confidential or Highly Confidential Material, the asserted designation shall remain in effect.

    8.    **Challenging In-House Counsel Access**.

       (a)     Within seven (7) days after entry of this Order, Defendant must submit to

the FTC a written statement that (i) sets forth the full name of the designated In-House Counsel;

(ii) describes the In-House Counsel's past, and current, and reasonably foreseeable future

primary job duties and responsibilities in sufficient detail to determine if In-House Counsel

12

participates in or advises on, or may participate in or advise on, any competitive decision-making; and (iii) lists the current litigations or other legal actions in which the In-House Counsel participates or advises on behalf of defendant. Within eight (8) days after entry of this Order, the FTC must provide a copy of this Order and the written statement to all nonparties that produced materials in response to compulsory process during the FTC's investigation. For nonparties that did not produce materials during the FTC's investigation, the party serving a subpoena on that nonparty shall attach a copy of this Order and the written statement to the request.

(b)   Defendant may disclose Confidential Material to its designated In-House Counsel unless the defendant receives a written objection from another party or the Producing Entity within (a) eighteen (18) days of entry of this Order (for nonparties that provided documents or information in response to compulsory process from the FTC during its investigation) or (b) fourteen (14) days of receipt of the first request in the form of a subpoena for documents or information. Any such objection must set forth in detail the grounds on which it is based. For the avoidance of doubt, Defendant may not disclose Confidential material to its designated In-House Counsel during the objection period.

(c)   If a Defendant receives a timely written objection, it must meet and confer with the objecting party or nonparty to try to resolve the matter by agreement within seven (7) calendar days of the written objection. If no agreement is reached, the objecting party or nonparty must file a motion seeking a ruling from the Court on its objections within seven (7) calendar days of the conference or other date agreed-to by the parties to the dispute. The response to any such motion will be due within seven (7) calendar days.

(d)   Until the parties to the dispute or the Court resolves a challenge to the sharing of Confidential Material with a defendant's In-House Counsel, the defendant shall not

13

share such Confidential Material with its In-House Counsel, nor can the objecting party or nonparty withhold production or provision of documents or information from Defendant's Outside Attorneys or Experts.

9.    **Filing Confidential Material and Highly Confidential Material**. No Confidential or Highly Confidential Materials, including, but not limited to, any documents, pleadings, motions, transcripts, or other filings that disclose the contents or substance thereof, shall be filed in the public record of the Litigation unless otherwise ordered by the Court. In filing papers with the Court that contain or make reference to material designated as Confidential or Highly Confidential, the filing party or nonparty will seek leave from the Court to file the Confidential or Highly Confidential Material under temporary seal. Upon or after filing any paper containing Confidential or Highly Confidential Material, the filing party or nonparty shall file on the public record a duplicate copy of the paper that does not reveal the Confidential or Highly Confidential Material. The Producing Entity will have fourteen (14) days to provide a basis for maintaining the record under seal consistent with the public's common-law and First Amendment right of access. Any responses in opposition are due fourteen (14) days after the Producing Entity files its motion. No replies are permitted without leave of court. Nothing in this Order shall restrict the parties or nonparties from challenging the filing or maintenance of any Confidential or Highly Confidential Material under seal.

10.    **Use of Confidential Material and Highly Confidential Material**.

(a)    All documents produced in discovery, and all materials designated Confidential and Highly Confidential, shall be used solely in furtherance of the prosecution, defense, or attempted settlement of this Litigation, shall not be used at any time for any other purpose whatsoever, except as provided in paragraph 10(b) below, including, without limitation,

14

any commercial or business purpose, and shall not be disclosed to or made accessible to any person except as specifically permitted by this Order. All materials designated Confidential or Highly Confidential must be stored and maintained by the Receiving Party in a manner no less secure than a Receiving Party would store and maintain its own confidential material or that of its clients.

(b)     Nothing in this Order prevents the parties to *Electrical Medical Trust, et al. v. U.S. Anesthesia Partners, Inc., et al.*, No. 4:23-cv-04398 (S.D. Tex.; Bennett, J.) from utilizing Confidential or Highly Confidential Material in connection with that action, provided that a protective or confidentiality order is entered in that case that provides protections for Confidential and Highly Confidential Material comparable to the protections for such information contained in this Order. Prior to such use, Defendant must provide to all Producing Entities (that provided documents or materials during the FTC's investigation) proof of the entry of such order.

(c)     This Order shall not restrict any attorney who is a qualified recipient under the terms of this Order from rendering advice to his or her client that is a party with respect to these actions, and in the course thereof, from generally relying upon his or her examination of Confidential or Highly Confidential Material. In rendering such advice or in otherwise communicating with the client, the attorney shall not disclose directly or indirectly the specific content of any Confidential or Highly Confidential Material of another party or nonparty where such disclosure would not otherwise be permitted under the terms of this Order.

(d)     If any Confidential or Highly Confidential Material is filed in the public record by the Producing Entity, such public filing shall constitute the Producing Entity's waiver of the designation of the publicly filed material for its use by any party in this Litigation;

provided, however, that inadvertent disclosure of Confidential or Highly Confidential Material through a public filing shall not constitute a waiver if the inadvertent disclosure is corrected within three (3) business days by withdrawing the public filing containing Confidential or Highly Confidential Material, and the filing is replaced with a filing under seal pursuant to paragraphs 6 and 9. However, such public filing will not constitute a waiver of any confidentiality designations made with respect to any non-publicly filed portions of the publicly filed document or concerning any other material not actually publicly filed.

(e)    Nothing in this Order shall be construed to prejudice any party's right to use Confidential or Highly Confidential Material in any hearing or other pre-trial proceeding before the Court, or any party's right to challenge any such use.

(f)    The parties agree to cooperate in good faith to develop a process for disclosure of Confidential or Highly Confidential information at trial.

(g)    Subject to taking appropriate steps to preserve confidentiality, the Commission may disclose Confidential Material, Highly Confidential Material, or Sensitive Personal Information to other governmental entities, as provided by 16 C.F.R. §§ 4.9–4.11, 15 U.S.C. §§ 46(f) and 57b-2, or as otherwise authorized or required by law. Such entities include officers and employees of Federal or State law enforcement agencies (including duly authorized employees of the Commission) and congressional committees.

11.    **Other Proceedings**. Any person or party subject to this Order who receives a subpoena or other request for production of information covered by this Order shall promptly notify the Producing Entity so that the party or nonparty may have an opportunity to appear and be heard on whether that information should be disclosed. Confidential and Highly Confidential Material shall not be produced in any other proceeding, or for any use other than in this

16

Litigation, without an order compelling production from a court of competent jurisdiction or the agreement of the Producing Entity.

     12.   **Unauthorized Disclosure of Confidential or Highly Confidential Material**.

     (a)   If any person subject to this Order becomes aware that they or any other person has, either intentionally or inadvertently, disclosed Confidential or Highly Confidential Material to someone not authorized to receive such material under this Order, counsel for the party involved shall (i) as soon as is practicable notify in writing the Producing Entity of the unauthorized disclosure; (ii) use best efforts to obtain the return or destruction of all copies of the protected materials; and (iii) inform the person or persons to whom unauthorized disclosures were made, to the extent the person or persons are identifiable, of the terms of this Order.

     (b)   The Court has jurisdiction to enforce this Order and to grant relief, as authorized by law or in equity, for any violations thereof.

     13.   **Inadvertent Production or Disclosure of Privileged Documents**. If information subject to a claim of attorney-client privilege, work product immunity, or any other applicable privilege or immunity is produced inadvertently, the parties shall comply with Federal Rule of Evidence 502(d), Federal Rule of Civil Procedure 26(b)(5)(B), and any other relevant order of the Court.

     14.   **Nonparties**.

     (a)   If information sought in a discovery request implicates a Producing Entity's obligation to a nonparty not to disclose such information, the following procedures shall be followed:

17

   (i) The Producing Entity shall timely serve a written objection to the production of such information on the basis of its obligation to a nonparty not to disclose the information.

   (ii) The Producing Entity shall, no later than the date on which written objections are served under paragraph 14(a)(i), provide the nonparty written notice of the pending request and a copy of this Order.

   (iii) If the nonparty does not object to the disclosure within fourteen (14) calendar days from which the written notice of the pending request was sent by the party or such additional time as may be required by the Producing Entity's obligation to the nonparty, the Producing Entity shall produce the materials subject to any appropriate designations under the terms of this Order.

   (iv) If the nonparty objects to the disclosure, the nonparty shall timely seek a protective order by filing within fourteen (14) calendar days from the objection a motion for a protective order or other appropriate relief from the Court. Should the nonparty timely seek relief, no disclosure shall be made or required unless disclosure is ordered by the Court.

   (v) Nothing in this Order shall be deemed to require any Producing Entity to subject itself to any penalties for noncompliance with any legal process or order, or to seek any relief from the Court in connection with obligations imposed by a discovery request.

   (b) If any discovery requests are served on a nonparty, the party serving the discovery request shall provide the nonparty with notice of the terms of this Order. Documents produced by nonparties in this Litigation that consist of or contain portions of documents originally created or generated by a party shall be treated as Highly Confidential. If any party believes the designation should be Confidential or no designation, it can notify the party who

originally created/generated the document, the parties can confer, and go through the dispute resolution process as necessary.

15. **Further Application**. Nothing in this Order shall preclude any party, or any nonparty from whom discovery has been requested, from applying to the Court for additional or different protective provisions with respect to specific material based on a showing of good cause. The Court shall retain jurisdiction over the parties, nonparty Producing Entities and over any person executing an undertaking to be bound by the terms of this Order, during the pendency of the Litigation and for such time thereafter as is needed to enforce the terms of this Order.

16. **Reservation of Rights**.

    (a)    By designating any material Confidential or Highly Confidential, the parties do not acknowledge that any such material is relevant or admissible in this Litigation. All parties reserve the right to seek discovery of, or alternatively to resist discovery of, such material in this Litigation.

    (b)    Nothing in this Order shall prohibit a party from using or disclosing publicly available or independently discovered information, unless the party is aware that the information has become public improperly or inadvertently.

    (c)    Nothing in this Order prevents any party from seeking a further order of this Court pursuant to Federal Rule of Civil Procedure 26(c).

17. **Modification**. The Court retains the right to allow disclosure of any subject covered by this Order or to modify this Order at any time. Furthermore, nothing in this Order shall prejudice the right of the parties to stipulate (subject to Court approval) an amendment, modification, or supplement to this Order. Nothing in this Order shall preclude any party from seeking an order of the Court amending, modifying, or supplementing this Order.

18.    **Conclusion of this Litigation**.

      (a)    The provisions of this Order will not terminate at the conclusion of this Litigation. This Order shall remain in full force and effect unless modified, superseded, or terminated by written agreement of the parties or by an order of this Court.

      (b)    Absent a written request by a Producing Entity to return materials (at its own expense) within sixty (60) calendar days after such time as this Litigation is concluded, whether by final adjudication on the merits from which there remains no right of appeal, or by other means, all persons having received information designated as Confidential or Highly Confidential Material must destroy such materials. Alternatively, the Producing Entity may require all counsel to certify in writing to the Producing Entity that all such information has been destroyed. As to those materials that contain or reflect attorney work product, counsel of record for the parties shall be entitled to retain such work product in their files, so long as such materials, in accordance with the provisions of this Order, are clearly marked to reflect that they contain information subject to this Order and are maintained as such.

      (c)    Notwithstanding any other provision of this Order, attorneys shall be entitled to retain pleadings, affidavits, motions, briefs, expert reports (and exhibits thereto), correspondence (including internal correspondence and e-mail), any other papers filed with the Court (including exhibits), deposition transcripts (including exhibits), and the trial record (including exhibits) even if such materials contain Confidential or Highly Confidential Material, so long as this Order will continue to govern any such retained materials. The Receiving Party's reasonable efforts shall not require the return or destruction of materials that (i) are stored on backup storage media made in accordance with regular data backup procedures for disaster recovery purposes; (ii) are located in the email archive system or archived electronic files of

20

departed employees; (iii) are subject to litigation hold obligations; or (iv) are otherwise required by law to be retained. Backup storage media need not be restored for the purpose of returning or certifying destruction of materials, but any such materials retained in backup storage media shall continue to be treated in accordance with this Order.

(d)    Nothing in this Order shall preclude the FTC from complying with the provisions of Rule 4.12 of the FTC's Rules of Practice, 16 C.F.R. § 4.12.

19.    **Termination of Access**.

(a)    In the event any person or party permanently ceases to be engaged in the conduct of these actions, such person's or party's access to Confidential and Highly Confidential Material shall be terminated, and all copies thereof shall be returned or destroyed in accordance with the terms of paragraph 18 above, except that such return or destruction shall take place as soon as practicable after such person or party ceases to be engaged in the conduct of this Litigation.

(b)    The provisions of this Order shall remain in full force and effect as to any person or party who previously had access to Confidential and Highly Confidential Material, except as may be specifically ordered by the Court or consented to by the Producing Entity.

**IT IS SO ORDERED.**

Dated: _____        _____
                                      Kenneth M. Hoyt
                                      United States District Judge

21

## APPENDIX A

### AGREEMENT TO BE BOUND BY PROTECTIVE ORDER

I, _____, am employed as _____ by

_____. I acknowledge and certify as follows:

1.    I have read the Protective Order in Federal Trade Commission v. U.S. Anesthesia Partners, Inc, et. al., Civil Action No. **4:23-CV-03560**, United States District Court for the Southern District of Texas and agree to be bound by its terms.

2.    I will not make copies or notes of Confidential or Highly Confidential Material that I receive in this litigation except as necessary to enable me to render assistance in connection with this Litigation.

3.    I will not disclose Confidential or Highly Confidential Material that I receive in this Litigation to any person not expressly entitled to receive it under the terms of the Protective Order and will retain any such material in a safe place.

4.    I will not use Confidential or Highly Confidential Material that I receive in this Litigation for any purpose other than that authorized by the Protective Order.

5.    I will retain all Confidential or Highly Confidential Material that I receive in this Litigation in my custody until I have completed my assigned duties, whereupon the materials will be returned to the person that provided them to me or destroyed, as provided by the Protective Order. Such delivery or destruction shall not relieve me from any of the continuing obligations imposed upon me by the Protective Order.

6.    I agree to be subject to the continuing jurisdiction of the United States Court for the Southern District of Texas for the sole purpose of having the terms of the Protective Order enforced.

7.    I understand that my failure to abide by the terms of the Protective Order will subject me, without limitation, to civil and criminal penalties for contempt of Court.

Date: _____        Signature: _____

                                  Address: _____

United States District Court
Southern District of Texas

**ENTERED**

May 28, 2024

Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FEDERAL TRADE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:23-CV-03560 |
| | § | |
| U.S. ANESTHESIA PARTNERS, INC., *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**ORDER ON MOTION FOR PROTECTIVE ORDER**

Before the Court are competing proposed protective orders.  The significant difference between the two, centers on whether Ki Jhana Friday, U.S. Anestheisa Parnters, Inc.'s ("USAP") Deputy General Counsel and Othon Prounis, Welsh Carson's Acting General Counsel, should have access to non-public material that reveal trade secrets and/or highly confidential, commercial information that will likely include competitors' pricing information and insurers' negotiating positions.

The Federal Trade Commission takes the position that disclosure would result in harm, and sets out its reasons for denying access to USAP's Welsh Carson's, Deputy General Counsel and Acting General Counsel, respecitvely.  FTC asserts:

(a)     disclose risks harm to non-parties from whom the FTC may also seek information in the future;

(b)     it is impossible to insure against inadvertent disclosures;

(c)     both Friday and Prounis occupy roles where competitive decision making occurs;

1 / 3

(d)   Friday publicly presents as having a role in strategic planning and having oversight in USAP's corporate litigation; and,

(e)   Prounis is the sole in-house counsel at Welsh Carson and advertises as focusing primarily on "leveraged buyouts and mergers acquisitions";

Neither USAP nor Welsh Carson disputes the accuracy of the public disclosure information concerning the roles that the two attorneys play with the respective employers. Instead, USAP argues that:

(a)   FRCP, Rule 26(c)(G) places the burden on the FTC to establish that "good cause" supports the denial of access;

(b)   Access by Friday to highly confidential materials present little or no risk of inadvertent disclosure; and

(c)   Friday's role at USAP specifically involves or relates to disputes between former and current employees, not negotiations concerning business terms or regularly engaging in giving legal advice concerning competitive – sensitive information, trade secrets, or highly sensitive non-public, strategic business planning. *See In re Terra Int'l, Inc.*, 134 F.3d 302, 306 (5th Cir. 1998).

It appears that Welsh Carson accedes to the FTC's argument concerning access to confidential or highly confidential materials as it relates to Prounis. Nevertheless, the Court is of the view that if it the Court is mistaken, in this regard, its determination of the issue would mirror those involving USAP's attorney, Friday.

A review of the arguments and the information concerning how Friday is presented in the public domain reveals that she is involved, at some level, in competitive decision making of the same or similar nature as that which is the subject of this suit. There is always a risk of disclosure as conceded by USAP. USAP does not argue in absolute terms on this point but uses the phrase "little or no risk of inadvertent disclosure" in addressing the risk. Finally, USAP does not argue that any hardship or prejudice that USAP might claim, cannot be overcome by outside counsel who will have access to the materials can confer with Friday. In fact, the FTC concedes that Friday "can still assist USAP's outside counsel using confidential materials, non-designated materials,

2 / 3

and most importantly USAP's own materials.   *See Wi-Lan, Inc. v. Acer, Inc.,*  2009WL1766143, at 2 [E.D. Tex. June 23, 2009).

After a review of the pleadings, memoranda, and arguments of Counsel, the Court determines that the FTC's motion to exclude access to "highly confidential" materials by Friday and Prounis should be granted.

It is so Ordered and a Protective Order is Entered.

SIGNED on May 28, 2024, at Houston, Texas.

Kenneth M. Hoyt
United States District Judge

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

U.S. ANESTHESIA PARTNERS, INC., et al.

Defendants.

Case No.: 4:23-CV-03560-KH

DEFENDANT U.S. ANESTHESIA PARTNERS, INC.'S
WRITTEN STATEMENT DESIGNATING IN-HOUSE COUNSEL

Pursuant to Paragraph 8(a) of the Protective Order (Dkt. No. 149-1), Defendant U.S.

Anesthesia Partners, Inc. ("USAP") designates Ki'Jhana R. Friday as the USAP in-house counsel

to receive access to Confidential Material. *See* Dkt. No. 149-1 ¶ 2(a) (defining "Confidential

Material"); *id.* ¶ 3(c) (providing one in-house USAP attorney with access to Confidential

Material). The FTC has already agreed that Ms. Friday may access Confidential Material. *See*

Dkt. No. 145 at 1 (arguing that Ms. Friday "should . . . be limited to seeing only Confidential

Material"); Dkt. No. 152 at 3 (precluding Ms. Friday only from accessing Highly Confidential

Material).

I.    **Ms. Friday's Past, Current, and Reasonably Foreseeable Future Primary Job Duties
and Responsibilities**

Ms. Friday is the Vice President, Deputy General Counsel of USAP. She has held that

position since February 2021. Prior to her current role, she served as Vice President, Associate

General Counsel for two years. In her past, current, and reasonably foreseeable roles, Ms. Friday

has been, is, and will be a litigator, not a "Competitive Decision-Mak[er]." Dkt. No. 149-1

¶ 3(c). And there are no plans for her to be a "Competitive Decision-Mak[er]." Ms. Friday

advises the Board of Directors, Executive Team, and USAP Clinical Governance Boards (the regional leadership) on strategic decisions related to litigation. That litigation typically involves former or current employees—not "a competitor, or potential competitor, of U.S. Anesthesia Partners, a payor, or a healthcare provider." *Id.* And that strategic advice does not involve any trade secret information or "confidential research, analysis, development or commercial information" that belongs to third parties. *Id.* ¶ 2(a) (defining "Confidential Material"). To the extent Ms. Friday is involved in lawsuits with insurers, hospitals, or ambulatory surgical centers, her advice again relates solely to litigation strategy concerning the claims at issue in that particular case.

Aside from litigation, Ms. Friday regularly provides legal advice as it relates to employment issues. For instance, she works to craft employment agreements for the physicians and certified registered nurse anesthetists who join USAP and analyzes state employment law issues that may arise. In offering this legal advice, Ms. Friday does not negotiate business terms during acquisitions or with commercial payors. Ms. Friday also does not typically negotiate any business terms on USAP's behalf in recruiting new clinicians. Finally, Ms. Friday advises USAP's Clinical Governance Boards on corporate governance matters.

II.    **Current Litigation and Other Legal Actions**

Ms. Friday currently participates in or advises on behalf of USAP in the following matters:

- *Electrical Medical Trust v. U.S. Anesthesia Partners, Inc.*, No. 4:23-cv-04398 (S.D. Tex.);

- *Green v. U.S. Anesthesia Partners of Colorado, Inc.*, No. 2022CV32181 (Arapahoe Cnty. Dist. Ct. Colo.);

- *Green v. U.S. Anesthesia Partners of Colorado, Inc.*, No. 1:18-cv-02206 (D. Colo.);

2

- *Green v. U.S. Anesthesia Partners of Colorado, Inc.*, No. 22-1319 (10th Cir.);

- *Nassif v. U.S. Anesthesia Partners of Florida Inc.*, No. 2021-CA-012168-O (Fl. Cir. Ct. Orange Cnty.);

- *Pond v. Associated Anesthesiologists of Fort Wayne LLC*, No. 02D03-2307-PL-000277 (Ind. Super. Ct. Allen Cnty.);

- *Tischer v. U.S. Anesthesia Partners of Maryland*, No. C-15-CV-23-003405 (Md. Cir. Ct. Montgomery Cnty.);

- *Axmann v. U.S. Anesthesia Partners Holdings, Inc.*, No. 3:22-cv-01635 (N.D. Tex.);

- *Noble Anesthesia Partners, PLLC v. U.S. Anesthesia Partners, Inc.*, No. DC-17-09602 (298th Dist. Ct., Dallas Cnty., Tex.);

- *Hamlin v. Star Anesthesia PLLC*, No. 2021CI01859 (225th Dist. Ct., Bexar Cnty., Tex.);

- *U.S. Anesthesia Partners of Texas, P.A. v. Doan*, No. 2022CI09471 (285th Dist. Ct., Bexar Cnty., Tex.);

- *U.S. Anesthesia Partners of Texas, P.A. v. Conlin*, No. DC-22-15482 (116th Dist. Ct., Dallas Cnty., Tex.);

- *Patel v. S. Anesthesia Partners of Texas, P.A.*, No. 2022-34508 (165th Dist. Ct., Harris Cnty., Tex.);

- EEOC Charge No. 450-2024-01080 (Dallas Dist. Office); and

- EEOC Charge No. 450-2023-09709 (Dallas Dist. Office).

\* \* \*

Before accessing any Confidential Material, Ms. Friday will execute the agreement annexed to the Protective Order as Appendix A. Pursuant to Paragraph 3(c) of the Protective Order, Ms. Friday agrees, for a period of two (2) years after receipt of Confidential Material, that she will not participate in or advise on competitive decisionmaking or litigation or other legal actions involving the Producing Entity of Confidential Material.

Dated: June 4, 2024

Respectfully submitted,

/s/ Kenneth M. Fetterman

David J. Beck (TX Bar No. 00000070)
  (Federal I.D. No. 16605)
Garrett S. Brawley (TX Bar No. 24095812)
  (Federal I.D. No. 3311277)
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX 77010
Tel: (713) 951-3700
Fax: (713) 951-3720
dbeck@beckredden.com
gbrawley@beckredden.com

Mark C. Hansen (D.C. Bar No. 425930)
  (*Pro Hac Vice*)
Attorney-in-Charge
Geoffrey M. Klineberg (D.C. Bar No. 444503)
  (*Pro Hac Vice*)
David L. Schwarz (D.C. Bar No. 471910)
  (*Pro Hac Vice*)
Kenneth M. Fetterman (D.C. Bar No. 474220)
  (*Pro Hac Vice*)
Kyle M. Wood (D.C. Bar No. 90012250)
  (*Pro Hac Vice*)

KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
mhansen@kellogghansen.com
gklineberg@kellogghansen.com
dschwarz@kellogghansen.com
kfetterman@kellogghansen.com
kwood@kellogghansen.com

*Counsel for Defendant U.S. Anesthesia Partners, Inc.*

4

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2024, I served or caused to be served a true and correct copy of U.S. Anesthesia Partners, Inc.'s Written Statement Designating In-House Counsel to the Federal Trade Commission upon the following counsel of record for the FTC at the email addresses listed below:

Kara Monahan
Bradley S. Albert
Michael J. Arin
Daniel W. Butrymowicz
Timothy Grayson
Dylan Herts
Leah P. Hubinger
Patrick Kennedy
Neal Perlman
Gary H. Schorr
Eric M. Sprague

Federal Trade Commission
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
Tel: 202-326-2075

kmonahan@ftc.gov
balbert@ftc.gov
marin@ftc.gov
dbutrymowicz@ftc.gov
tgrayson@ftc.gov
dherts@ftc.gov
lhubinger@ftc.gov
pkennedy@ftc.gov
nperlman@ftc.gov
gschorr@ftc.gov
esprague@ftc.gov

Dated: June 4, 2024

/s/ *Kyle M. Wood*
Kyle M. Wood
*Counsel for Defendant U.S. Anesthesia
Partners, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FEDERAL TRADE COMMISSION, §
§
    *Plaintiff* §
§
v. §     Case No.  4:23-CV-03560-KH
§
U.S. ANESTHESIA PARTNERS, INC. §
§
    *Defendant* §

## ORDER GRANTING TEXANS ANESTHESIA ASSOCIATES, PLLC'S PROTECTIVE ORDER AND MOTION TO QUASH

After considering Texans Anesthesia Associates, PLLC's (TAA) Protective Order, the evidence, and the arguments of the parties if any, the Court finds that a protective order is necessary to protect TAA, a nonparty, from undue discovery and information that is proprietary and confidential, and TAA's Motion for Protective Order should be GRANTED in its entirety.

It is therefore ORDERED that the scope of the discovery is limited to discovery this Court finds as relevant, non-confidential, and does not include proprietary and competitive information.

It is further ORDERED that the party requesting "to produce any and all documents TAA has and has had since 2010/2012" must pay all of the reasonable costs of obtaining that information.

It is further ORDERED that the party requesting electronically stored information must pay all of the reasonable costs of obtaining information from sources that are not reasonably accessible.

SIGNED this _____ day of _____, 2024.

_____
JUDGE PRESIDING

# MAYER

*Board Certified - Personal Injury Trial Law*
*Texas Board of Legal Specialization*

*Roger D. Oppenheim*
*Partner*
*Direct: 281.205.4810*
*E-mail:* roppenheim@mayerllp.com

November 27, 2024

**Via E-Mail: TBW@williamscaputo.com**
S. Burgess Williams
Williams Caputo, PLLC
206 Wild Basin Rd. S.
Austin, Texas 78746

**Re:    Cause No. D-1-GN-24-004535; *Kevin McCarthy and Kristen McCarthy, Individually and as Next Friend to KM and MM, Minors v. Evan Nathaniel Davis and Izzeddine Ben Bettiche*; In the 261st Judicial Court of Travis County, Texas.**

Dear Mr. Williams,

We are in receipt of your correspondence dated November 6, 2024, wherein you tendered a demand for $250,000.00 on behalf of your clients, Kevin McCarthy and Kristen McCarthy, Individually and as Next Friend to KM and MM, Minors (collectively "the McCarthys"). The McCarthys allege they sustained injuries in a motor vehicle accident that occurred on October 13, 2021. Please allow this correspondence to serve as a formal and timely response to your demand.

This demand is premature, there has not been a reasonable opportunity to ascertain anything other than what the McCarthys contend caused or resulted from the motor vehicle collision. Discovery is ongoing, no one has been deposed — including the Mcarthy's and other parties/witnesses. Further, the Austin Police Department's investigation of the motor vehicle collision in question concluded that Co-Defendant, Evan Davis's un-safe lane change was the only contributing factor that caused the collision. Suffice to say that liability is not clear, and we have not had the opportunity to depose the McCarthys and other parties/witnesses. Their testimony will be critical in understanding whether there is any liability.

Other than the medical records your office provided for Kevin McCarthy and Kristen McCarthy, we are unable to evaluate the validity of McCarthy's injuries and treatment. To that end, we have not been afforded the opportunity to evaluate and refute a claimant's alleged past medical bills.

After considering the limited information available, and for the reasons stated above, your time limited demand is respectfully rejected. However, in the spirit of cooperation, and in an attempt to resolve all of the claims, we will continue the negotiation of the claim at mediation.

Please do not hesitate to reach out should you wish to discuss this further.

Very truly yours,

**MAYER** LLP

Roger D. Oppenheim

RDO/wjf