**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>        v.<br><br>U.S. ANESTHESIA PARTNERS, INC. et al.<br><br>        Defendants. | Case No.: 4:23-CV-03560-KH |

**APPENDIX TO DEFENDANT U.S. ANESTHESIA PARTNERS, INC.'S MOTION TO
COMPEL NORTHWEST ANESTHESIOLOGY & PAIN SERVICES, P.A.
TO PRODUCE ITS FACILITY AND PAYOR CONTRACTS**

## TABLE OF CONTENTS

Page

**CASES**

*Application of Michael Wilson & Partners, Ltd., for Jud. Assistance Pursuant to 28 U.S.C. § 1782, In re*, 2012 WL 1901218 (D. Colo. Mar. 19, 2012), *report and recommendation adopted*, 2012 WL 1901217 (D. Colo. May 24, 2012), *aff'd*, 520 F. App'x 736 (10th Cir. 2013) ................................................................... USAP001

*Dexon Comput., Inc. v. Cisco Sys., Inc.*, 2023 WL 2730656 (E.D. Tex. Mar. 31, 2023) .......................................................... USAP010

*Pandora Media, LLC v. Spoken Giants, LLC*, 2023 WL 9421132 (C.D. Cal. Dec. 6, 2023) ......................................................... USAP039

*Shields v. Elevated Energy Sols., LLC*, 2020 WL 5658499 (S.D. Tex. Sept. 23, 2020) ........................................................ USAP047

*United States ex rel. Eichner v. Ocwen Loan Servicing LLC*, 2024 WL 2922979 (E.D. Tex. June 10, 2024) ........................................................ USAP051

2012 WL 1901218
Only the Westlaw citation is currently available.
United States District Court, D. Colorado.

In re APPLICATION OF MICHAEL WILSON
& PARTNERS, LIMITED, FOR JUDICIAL
ASSISTANCE PURSUANT TO 28 U.S.C. § 1782.

Civil Actio No. 06–CV–02575–MSK–KMT.
|
March 19, 2012.

**Attorneys and Law Firms**

Anne Katherine Toomey, Washington, DC, James F. Scherer,
Miller & Law, P.C., Thomas R. Bromberg, Littleton, CO, for
Michael Wilson & Partners.

### RECOMMENDATION OF UNITED
### STATES MAGISTRATE JUDGE

KATHLEEN M. TAFOYA, United States Magistrate Judge.

 **\*1** This matter is before the court on "Respondents' Motion
for Reimbursement of Costs and Fees" [Doc. No. 181]
("Mot.") and Brief in Support [Doc. No. 182] ("Mot.Br.").
"Petitioner's Opposition to Motion For Reimbursement of
Costs and Fees" ("Resp.") was filed on November 7, 2011
[Doc. No. 185] and the "Reply Memoranudm (sic) of Law in
Further Support of Respondents' Motion for Reimbursement
of Costs and Fees" [Doc. No. 186] ("Reply") was filed
November 23, 2011. Fed.R.Civ.P. 54(d)(2)(D) provides that
a referral to a Magistrate Judge of an attorney's fees dispute
requires that the referral be treated like a dispositive matter.
Therefore, the matter is ripe for review and recommendation
to the District Judge Marcia S. Krieger.

### *Procedural History*

Petitioner Michael Wilson & Partners, Limited ("MWP") is
an international law firm that has been, over the past six years,
seeking discovery from its former clients who have ended
their business relationship with Petitioner in favor of one
with a law firm comprised of Petitioner's former partner Mr.
Emmott, and former associates, Messrs. Nicholls and Slater.
When Respondents were clients of MWP they allegedly
worked together in developing certain projects. MWP alleges
against Emmott, *et al.,* in certain foreign proceedings that

the potential profit from those projects was improperly
diverted from MWP to Emmott's competitor firm(s). MWP
instituted a lawsuit against Emmott in England seeking
evidence related to Petitioner's claims against Emmott in
private arbitration proceedings. MWP also filed suit against
Nicholls and Slater in Australia, alleging accessory liability
for dishonest assistance, conspiracy to defraud, and breaches
of fiduciary and contractual duties, including breaches of
restrictive covenants and duties of confidentiality.

Petitioner filed its Application for discovery pursuant to 28
U.S .C. § 1782 to obtain documents and deposition testimony
from its two former clients, Sokol and Frontier Mining, as
well as the principal owners of these companies, Thomas
Sinclair and Brian Savage, respectively. The two Respondent
companies are both Delaware corporations with principal
places of business in Centennial, Colorado.

Petitioner's claimed losses in the foreign proceedings are
based on allegations that Sokol and Frontier Mining, having
previously agreed to compensate MWP for its legal work
by giving the firm a stake in their underlying ventures,
have broken this promise. Petitioner asserts that Emmott
has received an interest in one project in particular, the
Max Petroleum project, as well as others, as a result of
work Emmott completed while still associated with MWP.
This interest in Max Petroleum allegedly would have inured
to the benefit of MWP if not for Emmott's interference
Thus, Petitioner seeks documentation related to ten different
ventures around the world in which Petitioner believes that
an interest or compensation for the project has been diverted
from MWP to Emmott controlled entities.

 **\*2** MWP served subpoenas on Respondents in January
and February 2007. Respondents objected to the subpoenas
on various grounds, and after some months of conferring,
Petitioner filed a Motion to Compel. Magistrate Judge
Hegarty issued rulings with respect to the motion on July 27,
2007, allowing discovery under 28 U.S.C. § 1782 and stating

> the Court determines that some
> discovery is appropriate. First,
> although Mr. Sinclair is a party in
> a related proceeding in the Bahamas,
> neither corporation is a party in
> that action, and the information is
> not sought for use in the Bahamian
> proceedings. Despite Respondents'

USAP001

Case 4:23-cv-03560   Document 229-1   Filed on 02/26/25 in TXSD   Page 4 of 60

In re Application of Michael Wilson & Partners, Limited, for..., Not Reported in...

promises to cooperate in the foreign proceedings, none of the Respondents are subject to the jurisdiction of either the English or Australian courts, for which this discovery sought.

[Doc. No. 37 at 5.]

On or about July 13, 2007, the respondents set forth an estimate of the cost of full compliance with the discovery requests set forth in the subpoenas. (*See* Declaration of Matthew John Blower [Doc. No. 20]("Blower Declaration").) Respondents represented, "[t]he potentially responsive data on the laptops of Mr. Sinclair and Mr. Savage amounts to over 10,000 electronic documents and over 90,000 email files (including attachments)." (*Id.* at ¶ 2.15.) Mr. Blower represented that Sokol and Frontier Mining's email server's "total data size is 40 gigabytes and it is believed that there could be as many as 36,000 potentially responsive email documents (including attachments) on the server." (*Id.* at ¶ 2.16.) Mr. Blower stated

> Once these electronic documents and emails have been processed according to search terms to be agreed and de-duplicated, they will need to be reviewed by counsel for privilege. It is nearly impossible to predict exactly how large this task will be but based on the starting point of approximately 126,000 email documents and 10,000 electronic documents, I consider that a review rate of approximately 100 documents per hour by a junior associate rate of $225 U.S. dollars per hour is reasonable. At that rate, the exercise could cost *as much as* $300,000.00 U.S. dollars.

*Id.* at ¶ 2.17 (emphasis added). Given the construction of the sentence, the $300,000 figure was obviously Mr. Blower's outside highest figure for the cost of compliance with the subpoenas from the Respondents. Respondents' counsel confirmed the estimate during the hearing on July 20, 2007. (See Transcript, Motions Hearing July 20, 2007 [Doc. No. 38] at 51:5–17), but conceded that review of every document in

electronic storage might be "an overexpansive view of what was going to be necessary in terms of the production." (*Id.* at 52:16–18.)

Magistrate Judge Hegarty required the parties to meet and confer over the issue of costs of compliance with the subpoenas and directed the parties to file a status report setting forth any agreements. Ultimately, on August 17, 2007, the parties informed the court that they were unable to agree on the issue of responsibility for costs and fees associated with Respondents' production. [Doc. No. 46.] On October 1, 2007 Respondents advised the court

> **\*3** MWP has agreed to reimburse Respondents' reasonable copying costs, however it has not agreed to pay attorney's fees on the basis that MWP does not believe such payment is justified under Rule 45, Fed.R.Civ.P., and interpreting case law. Specifically, MWP asserts that Respondents are not unrelated third parties, but rather have a direct financial interest in the foreign proceedings, and, moreover, because Respondents have considerable wealth relative to MWP, they would not be unreasonably burdened by complying with the subpoenas, particularly given MWP's agreement to narrow their scope.

[Doc. No. 49.] MWP confirmed this representation in their own status report filed October 15, 2007. [Doc. No. 52.] On October 31, 2007, Magistrate Judge Hegarty issued rulings with respect to the scope of the subpoenas and the Court's jurisdiction and, as to costs and fees, held

> While the Court will not set forth parameters at this time, Petitioner should be prepared to share equally the cost of imaging, preserving, searching, and producing the requested documents. The Court, however, does not believe that an award of attorney's fees for document review is appropriate in this case, particularly

Case 4:23-cv-03560   Document 229-1   Filed on 02/26/25 in TXSD   Page 5 of 60

In re Application of Michael Wilson & Partners, Limited, for..., Not Reported in...

given Respondents' position that they are already participating parties in some of the foreign proceedings, as well as their obvious interest in the outcome of these foreign proceedings.

(October 31, 2007Order [Doc. No. 54] at 6.) Magistrate Judge Hegarty's order was appealed by both sides and, in particular, "the Respondents object[ed] to the Magistrate Judge's Order ... which denied them any recovery for attorney fees." (Order of District Judge Marcia S. Krieger, May 15, 2008 [Doc. No. 85] at 2.) Judge Krieger upheld Magistrate Judge Hegarty's order in all respects, including specifically the ruling banning recovery for attorney fees. (*Id.* at 3.) A motion for reconsideration of the District Court's Order was unsuccessful. (*See* Order Denying Motion for Reconsideration [Doc. No. 108] filed March 5, 2009.) Between the time of Magistrate Judge Hegarty's October 31, 2077 Order and District Judge Krieger's first affirmation, the case was reassigned to the undersigned Magistrate Judge.

MWP filed another Motion to Compel on November 24, 2008. [Doc. No. 100.] Respondents opposed producing any further documents, claiming they had fully complied with the subpoenas and had produced over 350,000 [1] pages of discovery at a cost of "in excess of $2 .5 million." [Doc. No. 102 at 6.] Respondents requested that the court require MWP to post a bond in the sum of $1 million dollars to guarantee the payment of their equal share of the costs of production as previously ordered by Magistrate Judge Hegarty. On April 30, 2009, this court issued a finding that Respondent Savage had been inexcusably unprepared for his deposition by MWP and required Respondents to bear the costs associated with a continued deposition. [Doc. No. 109 at 9.] Although the court found largely in favor of MWP on the remaining issues contained in the Motion to Compel, the court did not relieve MWP from the burden of cost sharing with respondents for compliance with the subpoena. (*Id.* at 15.) Further the court ordered MWP to post a cost bond in the amount of $1 million to cover its share of the production burden, noting, "The respondents state that the cost of production to date is in excess of $2.5 million." Although MWP alleged that a significant portion of the skyrocketing costs of compliance with the subpoenas was a direct result of Respondents' own counsel's mis—and mal-feasance, [2] MWP was ordered to have the bond posted by May 18, 2009. [Doc. No. 118.] On May 18, 2009 MWP appealed the court's requirement of the $1 million bond, requested a stay from the District Court, but

did not post the bond as ordered, nor tender any payment to Respondents as a share of the costs of production. (June 8, 2010 Order [Doc. No. 141] at 3.)

[1] In a later pleading, Respondents asserted they had "reviewed" 350,000 pages of material and had actually electronically produced over 15,000 pages. [Doc. No. 170 at 3.]

[2] Unbeknownst to the court at that time, MWP's allegations came to be shared by respondents as well who have sued their former counsel for exactly this alleged behavior.

**\*4** On December 29, 2009, MWP filed a motion for an order to show cause alleging Respondents had failed to comply with the April 30, 2009 Order. [Doc. No. 126.] At that time the District Court had neither granted a stay as to the directive to MWP to post a cost bond nor had the appeal of the April 30, 2009 order been addressed. Therefore, MWP, by failing to post the bond as ordered, was itself in direct noncompliance with the April 30, 2009 Order. On June 8, 2010 this court found that Respondents had fully complied with the April 30, 2009 order and thereafter issued an order to show cause against MWP. [Doc. No. 141 at 6.]

After further briefing and argument, on July 14, 2010, this court re-affirmed its previous orders respecting the posting of security by MWP for its production cost share, but found "that the costs which may potentially be assessed against Petitioner in connection with production pursuant to the subpoenas at issue is unlikely to exceed $500,000.00" and allowed MWP to post alternate security in lieu of the one million dollar cost bond. [Doc. No. 147/148.] On July 23, 2010 MWP filed a "Renewed and Supplemented Objection to the April 30, 2009 Order of the Magistrate Judge Requiring the Posting of a Cost Bond" which was still pending before the District Court. [Doc. No. 155.]

The District Court affirmed the April 30, 2009 Order as amended and denied the request for a stay on August 15, 2011. [Doc. No. 173 .] MWP appealed the District Court's order to the Tenth Circuit Court of Appeals on September 13, 2011. [Doc. No. 175, Notice of Appeal.] This appeal remains pending.

Based on the "Notice" filed by MWP on December 15, 2011, it appears the parties continue to do battle around the globe in several pending matters, some of which are currently on appeal.

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 6 of 60

In re Application of Michael Wilson & Partners, Limited, for..., Not Reported in...

Before the court at this juncture is whether sharing of costs and/or attorney fees with respect to the costs of Respondents' compliance with MWP's Rule 45 subpoenas is justified and, if so, what that amount should be. Noteworthy is that although Respondents make reference to remarks made by this court during various hearings to the effect that this court had not yet specifically determined the propriety of awarding fees and costs nor what proportionality, if any, should be used, Magistrate Hegarty's October 31, 2007 Order finding against an award of attorney fees in this matter has not been substantively re-visited or overruled, but rather stands specifically affirmed by the District Court. Squarely before this court, then, is a determination of the amount of reasonable costs expended by Respondents in complying with the subpoenas and whether events subsequent to Magistrate Judge Hegarty's early ruling have caused the court to reconsider the propriety of recommending an award of some amount of reasonable attorney's fees to the respondents to defray the costs of compliance.

**Legal Standards**

It is the Court's obligation to protect any person who is not a party to the underlying lawsuit from significant expense resulting from the inspection and copying which was commanded pursuant to Rule 45. *R.J. Reynolds Tobacco v. Philip Morris, Inc.,* 29 F. App'x 880, 882–83 (3rd Cir.2002)(an award of recompense for significant expenses is mandatory under the Rule); *Linder v. Calero–Portocarrero,* 251 F.3d 178, 182 (D.C.Cir.2001) (The "court must protect the nonparty by requiring the party seeking discovery to bear at least enough of the expense to render the remainder 'nonsignificant.' "). Rul3 45(c)(1) of the Federal Rules of Civil Procedure provides

**\*5**  (c) Protecting a Person Subject to a Subpoena.

(1) Avoiding Undue Burden or Expense; Sanctions. A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction— which may include lost earnings and

reasonable attorney's fees—on a party or attorney who fails to comply.

*Id.* The Rule further provides

(B) Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises-or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

Fed.R.Civ.P. 45(c)(2)(B)(ii).

Such protection, however, does not necessarily mean that the requesting party must bear the entire cost of compliance. *Linder,* 251 F.3d at 182. The court, in determining to what extent costs should be shifted, shall consider (1) whether the nonparty has an interest in the outcome of the case; (2) whether the nonparty can more readily bear its costs than the requesting party; and (3) whether the litigation is of public importance. *Id.* (citations omitted). Cost shifting is not limited to costs of inspection and production, but those "significant expenses resulting from the inspection and copying." *Klay v. All Defendants,* 425 F.3d 977, 983–84 (11th Cir.2005).

Respondents have produced, according to their submissions, approximately 15,000 documents (all in electronic format), reviewed prior to production over 325,000 documents, and have produced a single Rule 30(b)(6) witness for deposition. [Doc. No. 170, Memorandum of Law in Support of Respondents' Motion to Close Proceedings, at 3.]

***A. Attorney Fees***

In re Application of Michael Wilson & Partners, Limited, for..., Not Reported in...

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 7 of 60

Complicating the court's analysis with respect to reasonable costs of subpoena compliance in this case, Respondents have sued their former attorneys Dorsey & Whitney ("Dorsey") in a 2008 Delaware case claiming

> Dorsey's unreasonable legal bills were caused by a an [sic] intentional plan to churn its bill and milk Sokol for the highest amount of attorneys' fees possible, combined with gross errors in judgment and strategy, inattention and neglect, glaring mistakes, a failure to alter its strategy and methods based on developments in the 1782 action, poor communication with its client, and indifference to all of the above.

**\*6**  (*See,* Resp., Ex. 3 at 2) (citations omitted).) Such a statement does much to bolster the confidence which might be placed in Mr. Blower's early estimate of $300,000.00 as the costs for Respondents to respond to MWP in the Section 1782 proceedings. According to the submissions of MWP, Respondents' own expert has opined in the Delaware case,

> Dorsey is right in arguing that the 100% manual review [of the Respondents' universe of documents] caused a substantial portion of the more than $2.5 million ultimately incurred. Dorsey is wrong, however, in contending that the 100% manual review was caused by MWP's refusal to agree to the use of search terms. In fact Dorsey's decision was based on its own mistaken belief that the "hit rate" for the search terms that it solely proposed was 90%, when the actual hit rate was much less. Or as MWP's counsel put it, "this costly decision [to perform a 100% manual review], like so many others, was made by respondents and their counsel alone. Therefore, the resulting expense, whether disproportionate or not, cannot be attributed to MWP."

(Resp., Ex. 4 at 22.)

In fact, in the Delaware proceeding, Respondents have represented to the Court that a reasonable cost for the document production in this Section 1782 proceeding would be only $571,187.00, including attorneys' fees. (Resp., Ex. 3 at 5.) Nevertheless, the Respondents have asked this court to award fees and costs to them from MWP of $2,151,053.00.

(*See* Proposed Order Granting Respondents' Motion for Reimbursement of Costs and Fees [Doc. No. 181–1].) [3]

[3]
> To be sure, in their Reply, Respondents state, "Respondents do not ask this court to impose the full amount billed by Respondents' former counsel for such work. Instead, Respondents ask that MWP be held responsible for the reasonable amount of such fees and costs, as determined by the Delaware court in its ultimate decision regarding the precise amount that reasonably falls into each category. When the Delaware court rules, the precise amount that must be reimbursed by MWP will then be known." (Reply at 1–2.) However, they did not withdraw their proposed order. Since this court is recommending that no attorney fees be awarded to the Respondents in connection with this motion, the Delaware court's ultimate decision is of limited relevance.

As noted throughout this Recommendation, Respondents are not strangers to the worldwide litigation being pursued between MWP and Emmott. In fact, Mr. Sinclair is a named defendant in one of the proceedings. When Respondents, former clients and partners of MWP in various ventures, took their business to Emmott and his associates, they surely must have anticipated that MWP would attempt in some manner to recoup the lost venture revenues. Clearly, too, they put themselves in the position of indispensable witnesses at the very least.

Nothing that has transpired since Magistrate Judge Hegarty's order convinces this court that Respondents should be awarded attorneys' fees in connection with production of materials relevant to the various litigations which have been ongoing these many years and in which Respondents play a pivotal role. Taken together with the fact that even Respondents agree that the amount of attorney fees they have been billed by Dorsey and & Whitney is some two and a half million dollars above a reasonable level (Resp., Ex. 3–5.), the court declines to recommend an award to Respondents of any share of the attorneys' fees incurred in responding in this Section 1782 litigation.

### B. Costs

The party seeking an award of costs bears the burden of showing the necessity of the costs incurred. *Crandall v. City and County of Denver, Colo.,* 594 F.Supp.2d 1245, 1247 (D.Colo.2009); *Allison v. Bank One–Denver,* 289 F.3d

USAP005

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 8 of 60

In re Application of Michael Wilson & Partners, Limited, for..., Not Reported in...

1223, 1248–49 (10th Cir.2002). The party seeking costs also "bear[s] the burden of providing ... sufficient information and supporting documentation to allow ... a reasoned decision for each cost item presented." *Grynberg, v. Ivanhoe Energy, Inc.,* Case No. 08–cv–02528–WDM–BNB, 2011 WL 3294351, at *10 (D.Colo. Aug. 1, 2011) (citations omitted).

 **\*7** Respondents' costs summary is broken out between costs incurred during Dorsey's representation of Respondents and costs incurred during representation by Marcus & Auerbach ("M & A"). (Mot.Br. at 3–4.)

Dorsey commissioned the creation and maintenance of a sophisticated and expensive database of Sokol's electronically stored documents so that search terms and keywords could be used to eliminate the bulk of unresponsive documents from the necessity of later manual review. KPMG initially billed Respondents $715,629.00 for these services and equipment. (Mot. Br., Declaration of Brian Savage [Doc. No. 182–1] at 1–2.) However, after Respondents paid KPMG $194,113.00 (*id.),* M & A then expended $80,984.00 in legal fees negotiating a reduction with KPMG. (*Id.*) KPMG ultimately agreed to and accepted an additional $231,210.00 as payment in full for a total to KPMG of $425,323.00. (*Id.*)

Petitioner argues that it should not bear any part of this database expense because Respondents "abandoned the use of search terms and undertook a full manual review of all of Sokol's documents because it erroneously thought that the search terms would only eliminate 10% of the documents, when actually it would have eliminated 35% to 55% of the documents." (Resp, Ex. 3, at 3.) However, electronically organizing what later turned out to be more than 350,000 documents originally stored on several different computers and servers to facilitate full and accurate production compliant with Petitioner's subpoenas is a legitimate expense intended to benefit both parties in document retrieval.[4] The Respondents, prior to receiving the broad subpoenas from MWP had no need or desire for such a database. The court will allow the costs paid to KPMG of $425,323.00. The court will not allow the fees charged by M & A to reduce KMPG's bill to a more reasonable amount; the Respondent is at fault for hiring a company and entering into an unreasonable compensation agreement in the first instance. Although Petitioner benefits by the reduction as well as Respondents, this court would not likely have considered the initial $715,629.00 price tag to have been reasonable in any event and a reduction by court order would have worked primarily to Respondents' detriment.

[4] The costs associated with abandoning the database capabilities and

Respondents next claim costs of $989,131.00 to hire reviewers, including outside attorneys and paralegals, to parse through 350,000 documents potentially responsive to Petitioner's subpoenas. Petitioner's argue, as noted above, that insufficient and incompetent usage of the KPMG system resulted in far too many documents being identified as potentially responsive to the Section 1782 subpoenas and resulted in a disproportionate cost for manual review. This court's recommendation to allow the costs for implementation of a sophisticated database system specifically recognizes the value of such a system to lessen the burden of manual review. It is obvious to the court, by the costs associated with manual review, that the attorneys utilizing the KPMG system did not properly utilize its capabilities. The Petitioner should not be required to share in the costs associated with such lack of skill since Petitioner had no control over the hiring of Dorsey by Respondents.

 **\*8** Further, Magistrate Judge Hegarty specifically ordered,"[t]he Court, however, does not believe that an award of attorney's fees *for document review* is appropriate in this case, particularly given Respondents' position that they are already participating parties in some of the foreign proceedings, as well as their obvious interest in the outcome of these foreign proceedings." (October 31, 2007 Order at 6) (emphasis added). Interestingly, Respondents have focused on the phrase "an award of attorney's fees" rather than on the directive "for document review" to justify hiring non-attorneys to perform the document review instead of Dorsey associates. This court reads Magistrate Judge Hegarty's order to ban recovery of any costs, including wages in any form, associated with time spent for individuals to perform manual document review; not as a ban simply on Dorsey attorneys (or attorneys in general) from recovering fees for such work. Therefore, for all the reasons set forth herein, the court recommends that no allowance or cost sharing be made for costs of contract attorney/paralegal/other reviewers associated with review of documents prior to production.

Given the time it took Respondents to organize and review the documents for production, the court finds the following additional costs to be reasonable and allowable: fax: $27.50; conference calls: $1,352.77; long distance calls: $306.31; after hours secretary: $62.50; anti-virus scan: $45.00; and, electronic bates numbering: $55.88. The court does not find reasonable or necessary the claimed costs for 'messenger'

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    6

totaling $947.64 or for 'overnight delivery' amounting to $1,795.73, both submitted without any explanation at all why such high expenses were necessary or over what time and in what amounts the costs were accrued. Further, the parties are not in disagreement that approximately 15,000 pages of documents were *electronically* delivered to MWP in response to the subpoenas. [Doc. No. 170 at 3.]

Why the Respondents allegedly incurred a photocopy expense of $42,846.27 is neither explained nor is it facially obvious to the court, especially in light of the court's allowance of almost a half million dollars to KPMG to put Sokol's electronic documents into a database for searching and production. To the extent Respondents needed printed versions of the documents for some reason, the expense of printing was for Respondents' benefit only. Petitioner should not be obligated to pay for "copy" charges when printed copies were neither produced nor requested. Given that the production of documents to Petitioner was electronic, the court also does not agree with Respondents' request to be reimbursed for shredding costs of $225.00 under the same rationale.

This court finds expenses for working meals of $249.01, unspecified after hours labor charges of $3,420.00 and after hours HVAC of $11,503.81 are also expenses incurred as a result of Respondents' choice in how it worked to satisfy its production obligations and are not compensable.

**\*9** Further, there has been no explanation, and the court cannot conceive of a reasonable explanation, for a claim that Respondents spent $32,579.00 on PACER services. PACER [5] is the electronic docket maintained by federal courts. There is no charge to register for PACER or CM/ECF by an attorney. (*See* District of Colorado ECF User Manual, Version 5.x (12/2/2011).) When a document is filed in PACER, each party to the litigation receives a free "look" at the filed document and all its exhibits and attachments. Such a "look" produces a downloaded Adobe.pdf file which can be saved to a computer or other electronic storage device and/or printed. Once saved to another computer, device or server, that one time downloaded document can be re-created unlimited times at no further cost. Alternatively, if the free initial view of the document is printed, it can then be photocopied or scanned and re-printed if needed again. To the extent a party squanders its first "look" and needs to retrieve a filed document again, the cost is a modest $ .08 per page to retrieve the document but with a maximum charge for any one document of $2.40 regardless of page length. (See PACER

Fees, www.cod.uscourts.gov.) Notably, no PACER billing statements were submitted to support this outlandish cost request. This court declines to recommend that this cost be borne in any part by Petitioner.

[5]     Also referred to as CM/ECF.

Finally, the Respondents claim costs for a court reporter for a deposition of $626.16 and meals for unspecified people or during the unspecified deposition of $182.03. The only deposition taken in the case was accomplished by the Petitioner and therefore the Petitioner would have borne the court reporter fees. Respondents were ordered to bear the entire costs of the second deposition of the same deponent due to the deponent's initial unpreparedness. (*See* April 30, 2009 Order at 9.) Accordingly, neither meals nor court reporter costs associated with either deposition can be shifted to Petitioner.

Finally, the Respondents list $1,214.00 in "costs" billed by M & A. This cost request is completely unsupported by any description, invoice [6] or other indicia of what may be included. While the court does not doubt that M & A may have incurred legitimate costs during its representation of Respondents, a blanket and conclusory number on a piece of paper does not meet Respondents' burden to provide sufficient information and supporting documentation to allow the court to come to a reasoned decision concerning the submission of the cost items included. *See Grynberg, v. Ivanhoe Energy, Inc.,* 2011 WL 3294351, at \*10. Therefore, the court will not recommend allowance of the $1,214.00 in unidentified costs.

[6]     Respondents include several M & A billing invoices (Mot.Br., Attach 4, 5, and 9 [Doc. Nos. 182–4, 182–5 and 182–9] ), however the invoices simply quote blanket dollar entries under a category called "Costs/Expenses" without further elaboration and, even so, only represent costs in the amount of $209.57. undertaking a massive manual review are addressed *supra.*

### Conclusion

In sum, the court has specifically considered the factors supporting an award of cost shifting in connection with a Section 1782 proceeding including, (1) whether the nonparty has an interest in the outcome of the case, (2) whether the nonparty can more readily bear its costs than the requesting party, and (3) whether the litigation is of public importance. *Crandall,* 2007 WL 162743, at \* 1. Using these standards,

USAP007

In re Application of Michael Wilson & Partners, Limited, for..., Not Reported in...

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 10 of 60

the court makes the following conclusions: First, the expense incurred by Respondents to comply with Petitioner's demands has been significant, although not all of the expense was reasonable and therefore entitled to cost sharing. Second, all parties, including the Petitioner, were aware of the potential for cost-shifting at all relevant points during this dispute. Third, the Respondents, while not parties to the specific foreign litigation for which the subpoenas were originally served, have a significant interest in the outcome of the worldwide litigation and at least one of them is actually a party in a related case. Respondents were at all times likely to have been key witnesses in the underlying litigations and the litigation matters could have significant financial ramifications for Respondents. Fourth, Respondents and Petitioner have a significant ability to readily bear their own costs particularly in terms of attorneys' fees which are no doubt now in the millions of dollars considering all the litigation related to the primary issues between them.[7] Fifth, this lawsuit has little public importance concerning as it does individual investors' participation in various private ventures.

[7] "With respect to the relative ability of the parties to bear the costs, the respondents (sic) submissions indicated they are persons of considerable wealth. MWP is a law firm, they're about a 20–person law firm, with offices in Almaty, Kazakhstan and Baku, Azerbaijan. Their gross annual revenues last year were $6.5 million...." (Transcript, Motion Hearing July 20, 2007 at 37:2–8.)

**\*10** The court concurs with the early assessment and order of Magistrate Judge Hegarty that an equal sharing of the allowable costs of production of the documents by Respondents to Petitioner is appropriate. The court has specifically set forth reason to allow total costs in the amount of $427,172.96. Therefore, it is recommended that Petitioner's share of the costs is $213,586.48.

WHEREFORE, for the foregoing reasons, I respectfully

**RECOMMEND** that

"Respondents' Motion for Reimbursement of Costs and Fees" [Doc. No. 181] be **GRANTED in part** and that Petitioner be ORDERED to pay to Respondent the total sum of $213,586.48 within fourteen days of the court's order accepting this Recommendation as its share of the costs of production pursuant to the Rule 45 subpoenas.

It is further **RECOMMENDED** that

Upon payment in full of the $213,586.48 by Petitioner to Respondents for its share of costs associated with the production of documents at issue in this case, the security posted by Petitioner in response to the court's April 30, 2009 Order be released and the case closed.

### ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); *In re Griego,* 64 F.3d 580, 583 (10th Cir.1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop.* Known As 2121 East 30th Street, Tulsa, Okla., 73 F.3d 1057, 1060 (10th Cir.1996). Failure to make timely objections may bar de novo review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers,* 195 F.3d 573, 579– 80 (10th Cir.1999) (a district court's decision to review a magistrate judge's recommendation de novo despite the lack of an objection does not preclude application of the "firm waiver rule"); One Parcel of Real Prop., 73 F.3d at 1059– 60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.,* 52 F.3d 901, 904 (10th Cir.1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States,* 980 F.2d 1342, 1352 (10th Cir.1992) (by their failure to file objections, plaintiffs waived their right to appeal the magistrate judge's ruling); but see, *Morales–Fernandez v. INS,* 418 F.3d 1116, 1122 (10th Cir.2005) (firm waiver rule does not apply when the interests of justice require review).

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

USAP008

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 11 of 60

In re Application of Michael Wilson & Partners, Limited, for..., Not Reported in...

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1901218

---

**End of Document**                                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**USAP009**

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 12 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

2023 WL 2730656
Only the Westlaw citation is currently available.
United States District Court,
E.D. Texas, Texarkana Division.

DEXON COMPUTER, INC., Plaintiff

v.

CISCO SYSTEMS, INC. and
CDW Corporation, Defendants.

CASE NO. 5:22-CV-00053-RWS-JBB
|
Signed March 31, 2023

**Attorneys and Law Firms**

David Reichenberg, Matthew F. Bruno, Pro Hac Vice, Tina Lapsia, Manatt, Phelps & Phillips, LLP, New York, NY, William Ellsworth Davis, III, The Davis Firm, PC, Longview, TX, for Plaintiff.

Aaron M. Panner, Law Office of Aaron M. Panner, PLLC, Washington, DC, Alex Atticus Parkinson, Andrew Goldsmith, Caroline Schechinger, Chiseul Kim, Ryan M. Folio, Donald Chanslor Gallenstein, Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., Washington, DC, Deron R. Dacus, The Dacus Firm, PC, Tyler, TX, Louis Feuchtbaum, Richard J. Nelson, Sideman & Bancroft LLP, San Francisco, CA, for Defendant Cisco Systems, Inc.

James Arthur Reeder, Jr., Jones Day, Houston, TX, Cole Alan Riddell, Jennifer Haltom Doan, Haltom & Doan, Texarkana, TX, Thomas York, Jones Day, Dallas, TX, for Defendant CDW Corporation.

**ORDER**

ROBERT W. SCHROEDER III, UNITED STATES DISTRICT JUDGE

**\*1** Before the Court is Defendants' Objection to the Order Denying Defendants' Motion to Transfer (Docket No. 96), Defendant Cisco's Objection to the Report and Recommendation Denying Cisco's Motion to Dismiss (Docket No. 119), and Defendant CDW's Objections to the February 7, 2023 Report and Recommendation (Docket No. 120). The objections have been fully briefed (Docket Nos. 102, 121, 122), and the Court has heard oral argument regarding them. Docket No. 130.

**BACKGROUND**

On April 27, 2022, Plaintiff Dexon filed the above-captioned antitrust case in the Eastern District of Texas (the "Texas Lawsuit"). Plaintiff alleges Defendant Cisco is a monopolist in several worldwide and U.S. markets related to networking equipment and services for the internet and locks in customers who require maintenance with Cisco's SmartNet program to make supracompetitive purchases of routers and ethernet switches. *See, e.g.*, Docket No. 1 (Original Complaint), ¶¶ 23–49. Plaintiff claims that Cisco employed FUD (fear, uncertainty, and doubt) tactics, especially in Texas, to foreclose competitive purchases of any product and maintain supracompetitive pricing for its products. *Id.*, ¶ 67. According to Plaintiff, in carrying out its scheme, Cisco conspired with Defendant CDW to sell Cisco equipment in the Relevant Networking Markets to maintain its supracompetitive pricing in those Markets and exclude other resellers from making sales in the Relevant Networking Equipment Markets to end-user customers in violation of federal and state antitrust laws. *Id.*, ¶¶ 56–57.

Plaintiff asserts the agreement between Cisco and CDW (collectively, "Defendants") reflects an unreasonable restraint of trade and a conspiracy to monopolize that is unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, and under Section 2 of the Sherman Act, 15 U.S.C. § 2. *See, e.g., id.* at ¶¶ 87–100. Plaintiff also asserts claims under Section 1 of the Sherman Act for *per se* tying in the Relevant Product Markets, under Section 2 of the Sherman Act for unlawful monopolization of the Relevant Networking Equipment Markets, and for unlawful attempted monopolization of the Relevant Product Markets against Cisco and under the Texas Free Enterprise and Antitrust Act against Cisco and CDW. *Id.*, ¶¶ 87–128. Plaintiff seeks injunctive relief, damages, and costs in connection with such violations. *Id.*, ¶ 137.

**I. California Lawsuit**

Almost two years before Plaintiff filed its current case, Cisco filed suit against Dexon in the Northern District of California. *Cisco Systems, Inc., et al. v. Dexon Computer, Inc.*, Case No. 3:20-cv-4926 (N.D. Cal. filed July 22, 2020) [hereinafter "California Lawsuit"]. In the California Lawsuit, Cisco's First Amended Complaint against Dexon was filed on March 19, 2021, asserting claims of trademark infringement, trade counterfeiting, false designation of origin,

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

and associated state law claims. California Lawsuit, Docket No. 32. Specifically, Cisco alleges Dexon sells counterfeit Cisco products (including switches and transceivers) in violation of the Lanham Act and California state law. *Id.*

**\*2**  On July 29, 2021, Dexon filed its Amended Answer, Affirmative Defenses, Counterclaims and Third Party Claims ("Dexon's California Counterclaims"). California Lawsuit, Docket No. 50; *see also* Texas Lawsuit, Docket No. 21-2. Dexon asserted various antitrust counterclaims among other trademark and tort counterclaims. *Id.* On motion from Cisco, the California Court dismissed Dexon's California Counterclaims, but the court granted Dexon leave to amend. *See Cisco Sys. Inc. v. Dexon Computer, Inc.* (*Cisco I*), No. 20-cv-04926-CRB, 2021 WL 5848080, at \*1, \*9 (N.D. Cal. Dec. 9, 2021). In its amended pleading, Dexon did not re-assert the dismissed antitrust counterclaims. California Lawsuit, Docket No. 92 ("Dexon's Second Amended Counterclaims"); *see also* Texas Lawsuit, Docket No. 21-4 (same).

On a further motion from Cisco, the California Court dismissed Dexon's Second Amended Counterclaims. *See Cisco Sys., Inc. v. Dexon Computer, Inc.* (*Cisco II*), No. 20-cv-04926-CRB, 2022 WL 797015, at \*1 (N.D. Cal. Mar. 16, 2022). According to the California Court, although Dexon provided more detail than it did in its prior complaint, Dexon still failed "to state these claims," and gave Dexon "leave to amend one last time." *Id.* at \*4, \*8.

On April 6, 2022, Dexon filed its Third Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims ("Dexon's Third Amended Counterclaims"). California Lawsuit, Docket No. 107. Once again, Dexon chose not to re-plead any antitrust claims. *See id.*; *see also* Texas Lawsuit, Docket No. 21-6 (same). On April 27, 2022, Cisco moved to dismiss Dexon's Third Amended Counterclaims pursuant to Rule 12(b)(6). *See* California Lawsuit, Docket No. 117; *see also* Texas Lawsuit, Docket No. 21-7.

That same day, Dexon filed its Original Complaint in this Court, asserting antitrust causes of action. As it did in the California Lawsuit, Dexon brings against Cisco a *per se* tying claim under § 1 of the Sherman Act (Docket No. 1, Count III) and monopolization claims under § 2 of the Sherman Act (Docket No. 1, Counts IV, V). On June 21, 2022, the California Court entered an Order granting Cisco's motion to dismiss the six counterclaims asserted in the Third Amended Counterclaims and denying Dexon's motion for leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.* (*Cisco III*), No. 20-CV-04926-CRB, 2022 WL 2222962, at \*1 (N.D. Cal. June 21, 2022).

## II. Cisco's Motion to Transfer

On June 23, 2022, Cisco filed its motion to transfer, requesting the case be transferred to the Northern District of California pursuant to the first-to-file rule. Docket No. 21. Cisco argues most of the antitrust claims that Dexon asserts in this matter are nearly identical to the counterclaims that the Northern District of California dismissed in the California Lawsuit almost nine months earlier. *Id.* at 3–4. Cisco further asserts the factual allegations in the present complaint are materially the same as the allegations contained in Dexon's California Counterclaims which were later amended without the antitrust allegations. *Id.* at 4. Cisco contends the two pleadings are substantially similar, and "comity and sound administration of justice demand that Dexon's complaint be transferred." Docket No. 31 at 2. CDW filed a notice of joinder to Cisco's motion, joining in, and adopting as its own, the arguments made in Cisco's motion to transfer. Docket No. 27.

On December 22, 2022, the Magistrate Judge entered an order denying Cisco's motion to transfer. Docket No. 94 [hereinafter "Order"]. After setting forth the law applicable to the first-to-file rule (*id.* at 5–7) and the parties' assertions (*id.* at 7–8), the Order stated a "survey of the relevant caselaw, as well as the underlying purposes of the first-to-file rule, shows that the first-to-file doctrine should not be applied here, where the antitrust claims are not pending in the California suit." *Id.* at 8. Defendants have filed an objection (Docket No. 96), and Dexon has filed a response to the objection (Docket No. 102).

## III. Defendants' Motions to Dismiss

**\*3**  Cisco filed a motion to dismiss asserting Dexon's present claims are precluded by true res judicata or claim preclusion. *See* Docket No. 22 at 12–13. Cisco further asserts Dexon's antitrust claims fail on the merits. Specifically, Cisco asserts as follows: (1) Dexon fails to allege an actionable conspiracy claim and parallel state law claim (Counts I–II, VI) because Dexon does not allege any actionable agreement; (2) Dexon fails to allege an actionable tying claim and parallel state law claim (Counts III, VI) because Dexon does not allege any foreclosure; (3) Dexon fails to allege an actionable monopolization claim and parallel state law claim (Counts IV–VI) because Dexon fails to allege any exclusionary conduct; and (4) Dexon lacks antitrust injury (Counts I–VI).

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 14 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

CDW filed its own motion to dismiss in which it joins in and adopts as its own the arguments and assertions made by Cisco and also focuses on the facts most relevant to Dexon's claims against it. Docket No. 28 at 1, n. 1. Similar to Cisco, in addition to arguing Dexon's claims fail to state a claim upon which relief can be granted, CDW asserts Dexon is precluded from re-litigating issues that have already been decided by the California Court. *Id.* at 2. Instead of relying on the doctrine of true res judicata or claim preclusion, CDW relies on the doctrine of collateral estoppel or issue preclusion.

On the merits, CDW contends Dexon's Sherman Act (and parallel state law) claims against CDW (Counts I, II) should be dismissed for the following reasons: (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon fails to allege specific intent by CDW to monopolize. CDW further asserts Dexon fails to establish an antitrust injury. Finally, CDW argues Dexon's pre-2018 claims are time-barred.

The Magistrate Judge issued a Report and Recommendation, recommending Defendant Cisco's Motion to Dismiss (Docket No. 22) be denied, with the part of the motion seeking dismissal under true res judicata being denied without prejudice. Docket No. 107 [hereinafter "R&R"] at 81. The R&R further recommended Defendant CDW's Motion to Dismiss (Docket No. 28) be denied, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being denied without prejudice. *Id.* As to CDW's specific intent to monopolize, the Magistrate Judge recommended that, if the R&R is adopted, Dexon be ordered to replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, within thirty days from the date of entry of any such Order Adopting, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize. *Id.* at 44. Dexon has not filed objections to the R&R. Both Cisco and CDW have filed objections to the R&R. Docket Nos. 119, 120. Dexon has filed responses to the Defendants' objections. Docket Nos. 121, 122.

## LEGAL STANDARD

### I. Standard of Review

Defendants' objection to the Magistrate Judge's Order is governed by Rule 72(a), which provides, in pertinent part, that "[t]he district judge ... must ... modify or set aside any part of the [magistrate judge's] order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a).

A district court conducts a *de novo* review of any portion of a magistrate judge's report and recommendation to which any party files an objection. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b)(3); *Warren v. Miles*, 230 F.3d 688, 694 (5th Cir. 2000). After conducting a *de novo* review, the district court may accept, reject, or modify, in whole or in part, the findings or recommendations of the magistrate judge. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(3).

### II. First-to-File Rule

**\*4** The first-to-file rule is a discretionary doctrine resting on "principles of comity and sound judicial administration." *Encore Wire Corp. v. Copperweld Bimetallics, L.L.C.*, No. 4:22-CV-232-SDJ, 2023 WL 123506, at \*4 (E.D. Tex. Jan. 6, 2023) (quoting *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599, 603 (5th Cir. 1999); *Save Power Ltd. v. Syntek Fin. Corp.*, 121 F.3d 947, 950 (5th Cir. 1997)). It has long been recognized that "the principle of comity requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *Id.* (quoting *Save Power*, 121 F.3d at 950 (quoting *W. Gulf Maritime Ass'n v. ILA Deep Sea Local 24*, 751 F.2d 721, 728 (5th Cir. 1985))). "The concern manifestly is to avoid the waste of duplication, to avoid rulings which may trench upon the authority of sister courts, and to avoid piecemeal resolution of issues that call for a uniform result." *Id.* (quoting *W. Gulf Maritime Ass'n*, 751 F.2d at 729). As applied, the first-to-file rule is "forward-looking," seeking to preserve judicial resources and avoid inconsistent results by ensuring that "substantially overlap[ping]" issues are decided in the same federal forum. *Id.* (quoting *Cadle*, 174 F.3d at 603–04).

Application of the first-to-file rule does not require that the cases at issue be identical or that all of the same parties are involved in both actions. *Id.* (citing *Save Power*, 121 F.3d at 950–51). Instead, to decide whether substantial overlap exists, courts have looked at factors such as whether the core issue in each case is the same or if much of the proof adduced would likely be identical. *Id.* (citing *Int'l Fid. Ins. Co. v. Sweet Little Mexico Corp.*, 665 F.3d 671, 678 (5th Cir. 2011) (citing *W. Gulf Maritime Ass'n*, 751 F.2d at 729; *Mann Mfg., Inc. v. Hortex Inc.*, 439 F.2d 403, 407 (5th Cir. 1971))). When the overlap between claims is less than complete, courts consider several additional factors, including the extent of the overlap, the likelihood of conflict, and the "comparative advantage and

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

interest of each forum in resolving the dispute." *Id.* (citing *Sweet Little Mexico*, 665 F.3d at 678) (internal quotations omitted). These additional factors are applied on a "case by case" basis. *Id.* (internal quotations omitted).

### III. Res Judicata, Generally

The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as "res judicata." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). "Under res judicata, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Clyce v. Farley*, 836 Fed. Appx. 262, 267 (5th Cir. 2020). "The rule of res judicata encompasses two separate but linked preclusive doctrines: (1) true res judicata or claim preclusion and (2) collateral estoppel or issue preclusion." *Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1087 (5th Cir. 2022). "True res judicata bars the litigation of claims that either have been litigated or should have been raised in an earlier suit, while collateral estoppel precludes relitigation of only those issues actually litigated in the original action, whether or not the second suit is based on the same cause of action." *Oyekwe v. Rsch. Now Grp., Inc.*, 542 F. Supp. 3d 496, 505–06 (N.D. Tex. 2021), *appeal dismissed*, No. 21-10580, 2021 WL 8776378 (5th Cir. Dec. 28, 2021) (internal citations and quotations omitted).

Res judicata is an affirmative defense principally raised in a party's responsive pleading. *Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 571 (5th Cir. 2021) (citing Fed. R. Civ. P. 8(c)(1)) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense, including ... res judicata."); *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 n.2 (5th Cir. 2005) ("[G]enerally a res judicata contention cannot be brought in a motion to dismiss; it must be pleaded as an affirmative defense." "Although courts have considered res judicata and related preclusion principles on a motion to dismiss under Rule 12(b)(6), the Fifth Circuit has held that generally a res judicata contention cannot be brought in a motion to dismiss." *Parker v. Buckley Madole, P.C.*, No. 4:17-CV-00307-ALM-CAN, 2018 WL 1704079, at *4 (E.D. Tex. Jan. 11, 2018), *report and recommendation adopted*, No. 4:17-CV-307, 2018 WL 1625670 (E.D. Tex. Apr. 4, 2018) (citing *Segatto v. JPMorgan Chase Bank, N.A.*, No. 4:16-CV-00712-ALM, 2016 WL 7664306, at *3 (E.D. Tex. Dec. 16, 2016), *report and recommendation adopted*, No. 4:16-CV-712, 2017 WL 67944 (E.D. Tex. Jan. 6, 2017) (Mazzant, J.) (citing *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Test*

*Masters*, 428 F.3d at 570 n.2)). Claim preclusion is generally an affirmative defense best resolved at summary judgment or trial. *Seven Networks, L.L.C. v. Motorola Mobility L.L.C.*, No. 3:21-CV-01036-N, 2022 WL 426589, at *2 (N.D. Tex. Feb. 10, 2022).

**\*5** However, the Fifth Circuit has held that "[d]ismissal under Rule 12(b)(6) on res judicata grounds is appropriate when the elements of *res judicata* are apparent on the face of the pleadings." *Stevens*, 17 F.4th at 571 (quoting *Murry v. Gen. Servs. Admin.*, 553 Fed. Appx. 362, 364 (5th Cir. 2014) (per curiam) (unpublished) (citing *Kansa Reinsurance Co. v. Cong. Mortg. Corp. of Tex.*, 20 F.3d 1362, 1366 (5th Cir. 1994))); *see also Kansa*, 20 F.3d at 1366 ("[W]hen a successful affirmative defense appears on the face of the pleadings, dismissal under Rule 12(b)(6) may be appropriate."). "With respect to a specific affirmative defense such as res judicata, the rule seems to be that if the facts are admitted or are not controverted or are conclusively established so that nothing further can be developed by a trial of the issue, the matter must be disposed of upon a motion to dismiss." *Madison v. Health Care Servs. Corp.*, No. W-20-CV-00835-ADA-DTG, 2022 WL 14225447, at *2 (W.D. Tex. Oct. 24, 2022), *report and recommendation adopted*, No. 6:20-CV-00835-ADA-DTG, 2022 WL 17732718 (W.D. Tex. Dec. 9, 2022) (quoting *Larter & Sons, Inc. v. Dinkler Hotels Co.*, 199 F.2d 854, 855 (5th Cir. 1952)).

### IV. Claim Preclusion (True Res Judicata)

Claim preclusion, or true res judicata, is a "venerable legal canon" that "insures the finality of judgments and thereby conserves judicial resources and protects litigants from multiple lawsuits." *Clyce*, 836 Fed. Appx. at 267–68. Claim preclusion applies where (1) the parties to both actions are identical or are in privity; (2) the first judgment is rendered by a court of competent jurisdiction; (3) the first action resulted in a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits. *Id.* at 268.

The Fifth Circuit uses the transactional test to determine whether two suits involve the same claim or cause of action as required by the fourth element above. *Warren v. Mortg. Elec. Registration Sys., Inc.*, 616 Fed. Appx. 735, 738 (5th Cir. 2015). This test requires a court to consider whether the two cases are based on "the same nucleus of operative facts." *Id.* "The nucleus of operative facts, rather than the type of relief requested, substantive theories advanced, or types of rights asserted, defines the claim." *Id.* If both cases are based on the same nucleus of operative facts, "the prior judgment's

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

preclusive effect extends to all rights the original plaintiff had with respect to all or any part of the transaction, or series of connected transactions, out of which the original action arose." *Id.*

### V. Issue Preclusion (Collateral Estoppel)

"Issue preclusion or collateral estoppel prevents a party from litigating an issue it previously 'litigated and lost' in another action" and thus " 'prevent[s] repetitious litigation of what is essentially the same dispute,' " in addition to " 'conserving judicial resources, [ ] maintaining consistency, and [ ] avoiding oppression or harassment of the adverse party.' " *Hacienda Records, L.P. v. Ramos*, 718 Fed. Appx. 223, 228 (5th Cir. 2018) (per curiam) (internal quotations and citations omitted). Collateral estoppel can be used defensively—a plaintiff may be estopped from asserting a claim that the plaintiff has previously litigated and lost against another defendant—or can be used offensively—a plaintiff seeks to estop a defendant from relitigating issues that the defendant previously litigated and lost against another plaintiff. *Wellogix, Inc. v. Accenture, L.L.P.*, 788 F. Supp. 2d 523, 532 (S.D. Tex. 2011) (citing *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 328 (1979)). CDW's arguments here concern defensive non-mutual collateral estoppel.

**\*6** Under Fifth Circuit law, collateral estoppel or issue preclusion requires that: (1) the issue in the current litigation is identical to the one in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the determination of the issue in the prior action was necessary to the judgment in that prior action and (4) there are no special circumstances that would render estoppel inappropriate or unfair. *Papst Licensing GmbH & Co., KG v. Samsung Elecs. Co., Ltd.*, 403 F. Supp. 3d 571, 601 (E.D. Tex. 2019) (citing *State Farm Mut. Auto. Ins. Co. v. LogistiCare Solutions*, 751 F.3d 684, 689 (5th Cir. 2014)). Courts do not consider special circumstances when "both parties were involved" in the prior suit. *ETC Sunoco Holdings, L.L.C. v. United States*, 36 F.4th 646, 649 (5th Cir. 2022).

### VI. Rule 12(b)(6) Pleading Standard

A Rule 12(b)(6) motion allows a party to move for dismissal of an action when the complaint fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Rule 12(b)(6), the court must accept as true all well-pleaded facts in the plaintiff's complaint and view those facts in the light most favorable to the plaintiff. *Bowlby v. City of Aberdeen*, 681 F.3d 215,

219 (5th Cir. 2012). The court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint." *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). The court must then determine whether the complaint states a claim for relief that is plausible on its face.

" 'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.' " *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In *Iqbal*, the Supreme Court established a two-step approach for assessing the sufficiency of a complaint in the context of a Rule 12(b)(6) motion. First, the court should identify and disregard conclusory allegations, for they are "not entitled to the assumption of truth." *Id.* at 664. Second, the court "consider[s] the factual allegations in [the complaint] to determine if they plausibly suggest an entitlement to relief." *Id.* "This standard 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary claims or elements.' " *Morgan v. Hubert*, 335 Fed. Appx. 466, 470 (5th Cir. 2009) (citation omitted). This evaluation will "be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### DISCUSSION

### I. Cisco's Motion to Transfer

The Court now reviews for clear error the Magistrate Judge's Order (Docket No. 94) denying the motion to transfer in light of Defendants' objections (Docket No. 96) to the Order.

The issue is whether to apply the first-to-file rule here, where there are no antitrust claims pending in the California Lawsuit. In the December 22, 2022 Order, the Magistrate

Judge pointed out that Cisco and Dexon both rely upon *Cadle Co. v. Whataburger of Alice, Inc.*, 174 F.3d 599 (5th Cir. 1999). Order at 11. Courts have recognized that *Cadle* stands for the proposition that there must be two actions "pending *at the same time*." *Olaoye v. Wells Fargo Bank NA*, No. 3:12-CV-4873-M-BH, 2013 WL 5422888, at *1 (N.D. Tex. Sept. 27, 2013) (emphasis in original) (citing *Akins v. Worley Catastrophe Response, L.L.C.*, 921 F.Supp.2d 593, 598 (E.D. La. 2013); *J2 Global Communications, Inc. v. Protus IP Solutions, Inc.*, 2008 WL 5378010, *3 n. 3 (E.D. Tex. Dec. 23, 2008)). Pointing out that neither party disputes that requirement, the Magistrate Judge stated the relevant question is whether the co-pending actions must also have co-pending claims that are substantially similar. Order at 11.

**\*7** According to Cisco's reply in support of its motion to transfer, although Dexon's antitrust counterclaims are no longer pending in the California Lawsuit, "Dexon ignores that the *case* in which it filed its antitrust counterclaims *is* pending —to be sure, its counterclaims have been dismissed, but the case continues." Docket. No. 31 at 1 (emphasis in original). However, according to the Magistrate Judge, a "survey of the relevant caselaw, as well as the underlying purposes of the first-to-file rule, shows that the first-to-file doctrine should not be applied here, where the antitrust claims are not pending in the California suit." Order at 8.

In so finding, the Magistrate Judge found instructive *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, Case No. 2:20-CV-00003-JRG, 2020 WL 6889173 (E.D. Tex. Nov. 24, 2020). In that case, the SIMO plaintiffs filed suit in the Eastern District of Texas, alleging misappropriation of trade secrets by the uCloudlink defendants. *SIMO Holdings*, 2020 WL 6889173 at *1. Previously, SIMO had filed trade secret counterclaims against Hong Kong uCloudlink in a separate action in the Northern District of California. *Id.* However, the California court dismissed those counterclaims with prejudice on September 12, 2019, but the case remained pending. *SIMO Holdings, Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, Case No. 2:20-CV-0003 [hereinafter "*SIMO* Texas Case"], Docket. No. 27-1 (E.D. Tex. July 8, 2020). In the Texas case, Defendant Hong Kong uCloudlink moved to transfer the plaintiffs' trade secret claims to California under the first-to-file rule and 28 U.S.C. § 1404. *SIMO Holdings*, 2020 WL 6889173 at *4–5.

The procedural posture here tracks *SIMO Holdings*. The *SIMO Holdings* California court initially dismissed SIMO's trade secret claims without prejudice, giving SIMO leave

to amend and re-plead with more specificity. *SIMO* Texas Case, Docket No. 27 at 4–5. "SIMO re-pled these trade secret claims, focusing on a conspiracy between Wang Bin and uCloudlink. Again, the California court dismissed them, this time with prejudice, finding 'they do not establish a plausible allegation of a conspiracy.' " *Id.* (emphasis in original). Hong Kong uCloudlink argued that SIMO's trade secret claims in the Texas case, to the extent they were not dismissed, should be transferred to California under the first-to-file rule. *Id.* at 9 ("Similarly, there is substantial overlap between the trade secret claims brought here and the trade secret claims disposed of by the California court. And the California action is indisputably the first-filed action with respect to these same trade secret claims."). Like Dexon, the SIMO plaintiffs opposed transfer of the trade secret claims, asserting the first-to-file rule was inapplicable because the "trade secret counterclaims were dismissed in the California Action." *SIMO* Texas Case, Docket No. 38 at 1–2 (E.D. Tex. Sept. 9, 2020). Thus, the plaintiffs argued there were "no overlapping pending claims in California and therefore no risk of duplication." *Id.* at 2. In its reply, Hong Kong uCloudlink argued, similar to Cisco here, that the plaintiffs, not liking the resolution in California, brought the same trade secret claims in Texas. *SIMO* Texas Case, Docket No. 43 at 2 (E.D. Tex. Sept. 16, 2020). According to Hong Kong uCloudlink, "SIMO's forum shopping and attempted re-litigation are the very concerns underlying the first-to-file rule." *Id.* The *Simo Holdings* Court addressed the issue, holding as follows:

Hong Kong uCloudlink moved for the transfer of Plaintiffs' trade secret claims to California on the basis that "there is substantial overlap between the trade secret claims brought [in the Eastern District of Texas] and the trade secret claims disposed of by the California court." ... In response, Plaintiffs point out that the California Action is no longer pending, and thus the first-to-file rule is inapplicable. (Dkt. No. 38 at 1–2.) As Hong Kong uCloudlink admits in its Motion to Transfer, the trade secret claims were disposed of by the California court. The first-to-file rule only applies in instances where there are concurrent, pending proceedings in different federal courts, and moreover, the Court responding to the motion has discretion to apply the rule. See *Colorado River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 817 (1976) ("[T]here are principles ... which govern in situations involving the contemporaneous exercise of concurrent jurisdictions ...") (emphasis added); *see also Cadle Co.*, 174 F.3d at 603 ("Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse

to hear it ..."). Accordingly, the Court is not compelled to transfer the trade secret claims under the first-to-file rule and does not do so here.

**\*8** *SIMO Holdings*, 2020 WL 6889173, at \*4.

Although the California Lawsuit is still pending, Dexon's antitrust claims are no longer pending in California. Thus, the California Lawsuit does not contain a co-pending legal action that is sufficiently similar to the claims contained in the current case to justify invoking the first-to-file rule and transferring this suit to California. Like *SIMO Holdings*, the Magistrate Judge held the Court is not compelled to transfer the antitrust claims under the first-to-file rule. Order at 10.

In their objections, Defendants assert *SIMO Holdings* does not support the Order's construction of the first-to-file rule because *SIMO Holdings* did not substantively rule on the precise issue before this Court. *See* Docket No. 21 at 3. Defendants acknowledge that *SIMO Holdings* held the first-to-file rule was inapplicable in a situation where the counterclaims (but not the entire case) had been dismissed in the first-filed action. *See id.* at 3–4. The Magistrate Judge noted that Hong Kong uCloudlink had filed a motion for reconsideration, asserting the court's decision was based on an incorrect premise (*SIMO* Texas Case, Docket No. 68 at 1 (E.D. Tex. Jan. 25, 2021) because other claims remained pending in the California case. Order at 10, n. 6. Notably, the Magistrate Judge further pointed out that Hong Kong uCloudlink argued in reconsideration that the overlap between the Texas case and the California case extended beyond the trade secret claims and attached examples of the pleadings from the two cases in an attempt to demonstrate substantial overlap, including a reference to SIMO's live answer and counterclaims in the California case. *Id.*

In their objection, Defendants state the *SIMO Holdings* Court denied reconsideration because the movant's argument that "the California case remains pending" came too late; thus, Defendants assert the *SIMO Holdings* Court did not rule on the merits. Docket No. 96 at 4. However, Defendants do not address the Magistrate Judge's larger point as raised in the footnote and throughout the December 22, 2022 Order. Namely, the proper point of comparison for purposes of determining substantial similarity is between the presently pending claims in California and Dexon's antitrust claims. [1] Indeed, nowhere in their objections do Defendants argue their presently pending claims in California are substantially similar to Dexon's antitrust claims in this case.

[1]  Although not raised in Defendants' objections, Cisco also cited *Young v. L'Oreal USA, Inc.*, 526 F.Supp.3d 700, 706 (N.D. Cal. 2021), and *Am. Can! Cars for Kids v. Kars 4 Kids, Inc.*, No. 3:15-CV-3648-B, 2016 WL 3688631 (N.D. Tex. July 11, 2016) in support of their motion to transfer arguments. But those cases do not address the scenario here. *See* Order at 11–12.

In their objections, Defendants assert, as they did in their prior briefing, that *Cadle* supports their position. Defendants contend *Cadle* makes clear that when the first-filed case is still pending, avoiding inconsistent rulings concerning issues already decided by other courts "is among the concerns that the first-to-file rule addresses: as the Fifth Circuit explained, the first-to-file rule avoids the possibility of a (future) ruling that either 'conflict[s] with' or 'rehash[es] an issue already decided' by the first-filed court." Docket No. 96 at 2 (quoting *Cadle*, 174 F.3d at 604). According to Defendants, "Dexon's antitrust claims overlap with (indeed, are virtually identical to) those it brought in the Northern District of California. Accordingly, [Defendants argue] this Court will be required to determine the legal sufficiency of antitrust allegations that the California court has already dismissed for failure to state a claim." *Id.*

**\*9**  In the December 22, 2022 Order, the Magistrate Judge held as follows:

> Here, there are no risks of inconsistent judgments seeing as the first-filed antitrust counterclaims were dismissed without prejudice. Although the California court issued a substantive ruling, it also allowed Dexon leave to amend. Dexon's amended counterclaims did not include the antitrust claims that are now alleged in this case. Those counterclaims were not part of the operative complaint which was eventually dismissed with prejudice in California. Because there are no longer two pending antitrust "actions," there is little risk of duplicative work or unnecessary

burden on the judiciary in refusing to transfer.

Order at 12. According to Defendants' objection, the Magistrate Judge erred in concluding "there are no risks of inconsistent judgments" because the first-filed antitrust counterclaims were dismissed without prejudice. Order at 12. Specifically, Defendants assert as follows:

Not only did the California court dismiss Dexon's antitrust claims (and characterize those it filed here as "duplicative"), but it also stated that Dexon's third-amended counterclaims would be its "last." *See* Mot. To Transfer, Dkt. 21 at 3–6; Order 4 n.4. Allowing Dexon to evade these rulings would "trench[ ] on the authority of [a] sister court." *Cadle*, 174 F.3d at 606.

To the extent the Order relied on the fact that there is no technically preclusive judgment in the earlier filed action, as its reference (at 12) to dismissal "without prejudice" suggests, that too is incorrect—because Dexon failed to re-assert its antitrust counterclaims in three successive amendments, the later dismissal with prejudice applies to its antitrust counterclaims as well. *See* Mot. To Dismiss, Dkt. 22 at 11–13. More importantly, it is beside the point. Transfer is not limited to circumstances where preclusion applies. *See, e.g., Cadle,* 174 F.3d at 603–04 (distinguishing preclusion and the first-to-file rule).

The Order's statement (at 12) that there is "little risk of duplicative work or unnecessary burden" from allowing this case to proceed is also clear error. Cisco has already moved to dismiss the same claims twice in different courts; this Court will have to address a motion to dismiss hardly different from one that the California court already granted; and the parties are engaged in discovery on claims the California court has held are legally insufficient. Moreover, Dexon's illegal conduct—the basis for Cisco's claims in the California court—is a defense to Dexon's antitrust claims. Cisco should not be forced to litigate those intertwined questions in two different courts, and Dexon should be barred from changing the locus of that controversy.

Docket No. 96 at 5.

Defendants' objection to the December 22, 2022 Order reiterates the same arguments Cisco previously made but without addressing the Magistrate Judge's reasoning indicating the first-to-file rule does not fit here. As suggested

by the Magistrate Judge, Defendants' argument fails to address that the first-to-file rule is a "forward-looking doctrine" used to "maximize" "the values of economy, consistency, and comity."[2] *Cadle*, 174 F.3d at 604. And Defendants' citations to *Cadle* in their objections actually address the Fifth Circuit's decision declining to add a jurisdictional requirement to the first-to-file rule—not any statement that the first-to-file rule functions as a backward-looking doctrine. *See* Docket No. 96 at 2 (citing *Cadle,* 174 F.3d at 604). Moreover, it bears noting that the portion of *Cadle* that Defendants cite, entitled "The Relationship Between the First–To–File Rule and Collateral Estoppel," distinguishes the forward-looking first-to-file rule from the backward-looking doctrine of collateral estoppel. *Id.* (citing *Cadle,* 174 F.3d at 603–04).

[2]  In a footnote, the Magistrate Judge stated as follows:

Cisco appears to acknowledge this by reframing the first-to-file rule as a tool to prevent this Court from issuing rulings that are inconsistent with the reasoning expressed in the dismissal of Dexon's California Counterclaims with leave to amend. Dkt. No. 21 at 11–13. Broadly expanding the first-to-file rule to look *backward* as Cisco urges is not the appropriate solution for that concern. As explained at the hearing, this Court will not be a "super appellate court" to the California Court. Dkt. No. 62 at 74:6–22.

Order at 14, n. 8.

**\*10**  Defendants also fail to address the Magistrate Judge's determination that the proper analysis to determine substantial similarity is to compare (i) Cisco's currently pending IP claims against Dexon in California and (ii) Dexon's present antitrust claims in this Court. According to Dexon's response to Defendants' objection, the first-to-file rule does not apply when, as here, "the allegedly substantially similar claims are not pending before the first-filed court." Docket No. 102 at 1. The Court agrees.

The Magistrate Judge correctly found that the proper comparison for application of the forward-looking first-to-file rule is between Cisco's presently pending IP claims in California and Dexon's antitrust claims in this Court. *See United States v. Texas,* No. EP-21-CV-173-KC, 2022 WL 499861, at *1 (W.D. Tex. Jan. 11, 2022) ("Defendants argue that the issues presented substantially overlap with those in *Texas v. Biden ...* However, Defendants base that argument on

the content of the original Complaint in *Texas v. Biden* ... As discussed, that Complaint is no longer operative, as Texas has filed an Amended Complaint in *Texas v. Biden* that challenges a different set of federal government actions. Because the allegations in the case before the Northern District have changed, Defendants' Motion ... is DENIED as moot."); *see also Encore Wire Corp. v. Copperweld Bimetallics, L.L.C.*, No. 4:22-CV-232-SDJ, 2023 WL 123506, at *5 (E.D. Tex. Jan. 6, 2023) ("Encore's false advertising declaratory claim pending in this Court (and for that matter, Copperweld's Lanham Act and unfair competition counterclaims) do not substantially overlap with the antitrust claims pending in the Alabama action."); *see also L-3 Commc'n Integrated Sys., L.P. v. Lockheed Martin Corp.*, No. 3:07-CV-0341-B, 2008 WL 89659, at *2 (N.D. Tex. Jan. 8, 2008).

This Court has stated the factors relevant to whether substantial overlap exists include whether "the core issue" in each case is the same and whether "much of the proof adduced ... would likely be identical." [3] *TravelPass Grp. L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-00153-RWS, 2019 WL 4071784, at *5 (E.D. Tex. Aug. 29, 2019) (citing *Sweet Little Mexico*, 665 F.3d at 678 (citation omitted in *TravelPass*) (alterations in original)). "Where the overlap between two suits is less than complete, the judgment is made case by case, based on such factors as the extent of overlap, the likelihood of conflict, the comparative advantage and the interest of each forum in resolving the dispute." *Id.* (quoting *Stannard v. Nat'l Indoor RV Centers, L.L.C.*, No. 4:18-CV-00366, 2018 WL 3608560, at *1 (E.D. Tex. July 27, 2018)) (quoting *Save Power*, 121 F.3d at 951).

[3]   In *TravelPass*, although both pending cases contained similar allegations regarding the existence of an unlawful agreement between the five hotel companies in violation of antitrust laws, the Court agreed with the Magistrate Judge that the cases did not substantially overlap. While the cases were related, there are many significant differences (different claimants, claims, allegations, defenses, defendants, witnesses and damages) between them. *TravelPass Grp. L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-00153-RWS, 2019 WL 4071784, at *5 (E.D. Tex. Aug. 29, 2019).

The Magistrate Judge analyzed each of the relevant factors and found that there was no substantial overlap. After comparing Cisco's still-pending claims in California and the

Sherman Antitrust claims currently alleged by Dexon in this Court, the Magistrate Judge noted as follows:

**\*11**   In the California Lawsuit, Cisco alleges claims of trademark infringement, trademark counterfeiting, false designation of origin, and associated state law claims, asserting that Dexon allegedly "engaged in schemes to traffic counterfeit Cisco products." *Cisco Sys., Inc. v. Dexon Computer, Inc.*, 541 F. Supp. 3d 1009, 1013 (N.D. Cal. June 1, 2021). In the current Texas Lawsuit, Dexon alleges five claims under the Sherman Antitrust Act and one claim under the Texas Free Enterprise and Antitrust Act, including allegations of a conspiracy between Cisco and CDW to monopolize and to suppress inter-brand and intra-brand competition from entities like Dexon.

Order at 13. The Magistrate Judge stated the "core issues" in the two forums are not the same, and the "proof adduced" will not be identical. *Id.* at 14 (citing *Sweet Little Mexico*, 665 F.3d at 678). The Magistrate Judge concluded that "Cisco has not shown how any ruling by this Court will affect the California Lawsuit, which concerns different issues, much less the risk of piecemeal litigation or inconsistent outcomes." *Id.* (citing *Cadle*, 174 F.3d at 604; *BNSF Ry. Co. v. OOCL (USA), Inc.*, 667 F. Supp. 2d 703, 709 (N.D. Tex. 2009)).

In large part, Defendants object to the Magistrate Judge's interpretation of the first-to-file rule but do not expressly object to the Magistrate Judge's finding of a lack of substantial similarity between the claims pending in the instant case and the claims pending in California. *See* Docket No. 96 at 1–4. Defendants otherwise resort to policy arguments. *See id.* at 4–5. In making those policy arguments, Defendants cite only *Cadle*. *See id.* at 4–5 (citing no further case law other than *Cadle*, 174 F.3d at 603-04, 606). But instead of citing *Cadle* for any instructive rule in this instance, Defendants cite *Cadle* to highlight the principles of economy, consistency and comity underlying the first-to-file rule and collateral estoppel doctrine (both of which *Cadle* discusses). *See id.*

The Court does not minimize—or ignore—those important policy considerations but agrees with the Magistrate Judge that the cases do not substantially overlap, and application of the first-to-file rule is inappropriate. Dexon's antitrust claims pending in this Court do not substantially overlap with the claims currently pending in California. And hearing Dexon's antitrust claims in this case does not threaten to undermine the principles of comity and judicial economy underlying the first-to-file rule. *See W. Gulf Maritime Ass'n*, 751 F.2d at 728 (recognizing that the first-to-file rule requires the federal

courts "to exercise care to avoid interference with each other's affairs"). Accordingly, Defendants' Objection (Docket No. 96) to the Magistrate Judge's Order is **OVERRULED**.

### II. Defendants' Motions to Dismiss

The Court has reviewed the pleadings, motions to dismiss, R&R, objections to the motions to dismiss, and relevant briefing. Based on the Court's review of the unobjected to-portions of the R&R, the Court is of the opinion the unobjected-to findings and conclusions of the Magistrate Judge's R&R (including, but not limited to, those related to CDW's specific intent to monopolize) are correct and are hereby **ADOPTED** as the opinion of the District Court.

The Court now conducts a *de novo* review of the objected-to portions of the Magistrate Judge's Report recommending to deny Defendants' motions to dismiss.

### A. Claim Preclusion (True Res Judicata)

**Report and Recommendation.** In the R&R, the Magistrate Judge found Cisco's true res judicata arguments are premature at the Rule 12(b)(6) stage; thus, the Magistrate Judge recommended the Court deny the part of Cisco's motion for dismissal on true res judicata grounds without prejudice to refiling. R&R at 22–23 (citing *Anderson v. Wells Fargo Bank, N.A.*, 953 F.3d 311, 314 (5th Cir. 2020); *Giddy Holdings, Inc. v. Kim*, No. 1:20-CV-434-DAE-ML, 2021 WL 2773019, at *4 (W.D. Tex. June 7, 2021), *report and recommendation adopted as modified*, No. 1:20-CV-434-DAE, 2021 WL 8442028 (W.D. Tex. July 2, 2021); also citing *Stonecoat of Texas, L.L.C. v. Procal Stone Design, L.L.C.*, No. 4:17-CV-00303, 2018 WL 324446, at *9 (E.D. Tex. Jan. 8, 2018) (finding that "Plaintiffs have a plausible claim and res judicata would be better addressed at a later stage in the proceeding")); *see also* R&R at 26. According to the Magistrate Judge, even if the Court were to address the applicability of true res judicata at this early stage, "the Court would have serious concerns as to whether Cisco, on its current briefing, could show the third and fourth elements for true res judicata." *Id.* at 23.

**\*12** Regarding the third element, requiring final judgment on the merits, the Magistrate Judge noted the California Court dismissed Dexon's initial set of counterclaims (which included its California antitrust counterclaims) with leave to amend and that Dexon's next amended counterclaims, which

were eventually dismissed with prejudice, did not include any antitrust allegations. R&R at 23. The Magistrate Judge was not persuaded the California Court's dismissal was a final adjudication on the merits with preclusive effect. The Magistrate Judge discussed *Eldridge v. Kohls Dep't Stores, Inc.*, No. CIV-20-158-R, 2020 WL 1528233 (W.D. Okla. Mar. 30, 2020), the case relied upon by Cisco in its motion to dismiss, stating the unique circumstances in that case limits its application to the instant case where Dexon added new claims, legal theories, and "non-trivial factual allegations" that were not alleged in the California Lawsuit. R&R at 24.

Regarding the fourth element, whether the same claim or cause of action is involved in both suits, the Magistrate Judge listed the new claims and facts alleged in this lawsuit which were not alleged in the California Lawsuit and held "Cisco fails to show that the claims here arise out of the same nucleus of operative facts as [Dexon's] initial counterclaims in California." *Id.* at 25.

**Cisco's assertions.** In its objections, Cisco states the Court can decide true res judicata[4] at the dismissal stage because the R&R took judicial notice of the filings in the California Lawsuit (R&R at 15, n.3) and "all of the relevant facts are contained in the record before [the court] and are uncontroverted." Docket No. 119 at 2 (citing *R&R Motorsports, L.L.C. v. Textron Specialized Vehicles, Inc.*, 2022 WL 4379515, at *2 (E.D. La. Sept. 22, 2022) (brackets in original) (granting 12(b)(6) motion on res judicata grounds); also citing *McIntyre v. Ben E. Keith Co.*, 754 Fed. Appx. 262, 264–65 (5th Cir. 2018) (per curiam) (affirming 12(b)(6) dismissal on res judicata grounds)). According to Cisco, *Anderson*, 958 F.3d at 314–15, wherein the Fifth Circuit affirmed a dismissal based on true res judicata, does not support the R&R's conclusion that "Dexon can prolong this case simply by objecting." Docket No. 119 at 2.

> [4]
>
> Cisco often uses the term "claim splitting" in its briefing even though that doctrine is not wholly equivalent to claim preclusion. The R&R pointed out that Cisco fundamentally relies on claim preclusion (R&R at 21 n. 8), and Cisco did not object to that finding.

Substantively, Cisco asserts the California Court's earlier dismissal of Dexon's antitrust counterclaims with leave to amend satisfies the third element (the finality requirement) for claim preclusion.[5] Relying for the first time in its objections on a Third Circuit case, *Hoffman v. Nordic Nats.,*

*Inc.*, 837 F.3d 272 (3d Cir. 2016), Cisco asserts that the California Court's decision in *Cisco I*, 2021 WL 5848080, has preclusive effect because Dexon did not re-assert its antitrust counterclaims when granted leave to do so. Docket No. 119 at 2.

5    In its objections, Cisco states the R&R misunderstands "Cisco's argument for finality of the California court's rulings: those rulings are preclusive not only because Dexon failed to amend its antitrust counterclaims when given the chance ... but also because the California court dismissed Dexon's remaining counterclaims with*out* leave to amend ..." Docket No. 119 at 1 (emphasis in original).

The R&R did not misunderstand Cisco's argument. The R&R cited it, providing the following summary of Cisco's finality argument:

> "The California Court eventually dismissed with prejudice Dexon's amended counterclaims. Cisco claims that final dismissal with prejudice meets the finality requirement of claim preclusion because Dexon could have, but chose not to, replead its initial set of antitrust counterclaims. Dkt. No. 32 at 1–2."

R&R at 23.

**\*13**  Regarding the fourth element, Cisco states Dexon's complaint in this case arises out of the same nucleus of operative facts as the California counterclaims. *Id.* at 3. According to Cisco, although the California counterclaims did not include allegations about the Texas bank, energy company, or car dealership, "that conduct is of a piece with the conduct that Dexon did allege, pre-dates the California court's ruling, and could have been asserted there." *Id.* at 4.

***De novo* review.** The Court agrees with the R&R that dismissal on claim preclusion grounds at this stage would be premature and that the part of the motion seeking dismissal under true res judicata should thus be denied without prejudice. Here, Cisco's argument that Dexon's claims are barred by true res judicata is inappropriate at this early stage

of the case. *See Madison*, 2022 WL 14225447, at *2. Looking to the pleadings and viewing them in the light most favorable to Dexon, a true res judicata defense does not appear "clearly on the face of the pleadings to warrant dismissal under 12(b)(6)." *See id.* The Court finds Dexon has a plausible claim and true res judicata would be better addressed at a later stage in the proceeding. *See Stonecoat of Texas, L.L.C. v. Procal Stone Design, L.L.C.*, No. 4:17-CV-00303, 2018 WL 324446, at *9 (E.D. Tex. Jan. 8, 2018).

Cisco's claim preclusion defense, as currently raised at this early stage of the proceeding, also lacks merit. It is not clear that *Cisco I* satisfies the finality requirement, even considering the reasoning—which Cisco cites for the very first time in its objections—provided by the Third Circuit in *Hoffman*, 837 F.3d at 272. Discussing *Hoffman*, the Third Circuit recently explained that claim preclusion's requirement of a "judgment on the merits" is "better understood in terms of its functional equivalent: whether a dismissal is with prejudice." *Smith v. Kershentsef*, 843 Fed. Appx. 447, 449 (3d Cir. 2021) (quoting *Papera v. Pa. Quarried Bluestone Co.*, 948 F.3d 607, 610 (3d Cir. 2020)). Thus, "[a] dismissal with prejudice operates as an adjudication on the merits, so it ordinarily precludes future claims." *Id.* (quoting *Papera*, 948 F.3d at 611 (internal quotation marks omitted in *Smith*)). On the other hand, a dismissal without prejudice does not operate as an adjudication on the merits and therefore does not have a claim-preclusive effect. *Id.*

In determining whether an order was a final judgment for jurisdictional purposes, the Third Circuit in *Hoffman* held a plaintiff can convert a dismissal "without prejudice" into a final order by "declar[ing] his intention to stand on his complaint." *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 279 (3d Cir. 2016). However, in *Hoffman*, the order dismissing without prejudice was self-effectuating and automatically converted to a dismissal with prejudice when the appellant did not file an amended complaint within the mandated deadline. [6] *Smith*, 843 Fed. Appx. at 450, n. 4 (citing *Hoffman*, 837 F.3d at 279–80); *see also id.* at 449-50 (citing *Weber v. McGrogan*, 939 F.3d 232, 240 (3d Cir. 2019) (noting "a 'self-effectuating' order is one that directs a party to take some action to cure a defective complaint by a defined date and provides express notice that it will then automatically produce a final order of dismissal when the time to amend runs out")). In *Smith*, the Third Circuit could not read the district court's dismissal of Smith's FDCPA claim as having ripened into a dismissal with prejudice. *Id.* at 450.

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 23 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

6     The Court further notes both actions at issue in *Hoffman* had been brought before the same court. *Hoffman v. Nordic Nats., Inc.*, 837 F.3d 272, 280 (3d Cir. 2016). The Court has the authority to *sua sponte* dismiss cases on the basis of claim preclusion or res judicata when both actions are brought before it. *See Boone v. Kurtz*, 617 F.2d 435, 436 (5th Cir. 1980) ("Dismissal by the court sua sponte on res judicata grounds, however, is permissible in the interest of judicial economy where both actions were brought before the same court."); *see also McIntyre v. Ben E. Keith Co.*, 754 Fed. Appx. 262, 264-65 (5th Cir. 2018) (explaining the court's ability to dismiss a case *sua sponte* on res judicata grounds for purposes of judicial economy). Here, Dexon's cases have not been brought before the same court.

**\*14** In *Cisco I*, the California Court dismissed Dexon's antitrust counterclaims with leave to amend. *Cisco Sys., Inc. v. Dexon Computer, Inc.*, No. 20-CV-04926-CRB, 2021 WL 5848080, at \*9 (N.D. Cal. Dec. 9, 2021) ("Dexon may file an amended answer and counterclaims within 30 days of the date of this order."). Cisco has not shown any express intent from Dexon (or the California Court) that would convert the California Court's dismissal with leave to amend to some final judgment equivalent to a dismissal with prejudice. *See Weber*, 939 F.3d at 240 ("while it provided thirty days' leave to file an amended complaint, it lacked any language converting the dismissal to a final order at the end of the period. And ... Weber did not submit a clear and unequivocal declaration of intent to 'stand on her complaint' ").

Cisco has also not established the fourth element essential for claim preclusion at this time. Under the "same claim" inquiry, the critical issue is whether the two actions under consideration are based on the same nucleus of operative facts. *Test Masters*, 428 F.3d at 571. "What grouping of facts constitutes a 'transaction' or a 'series of transactions' must be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Tillman v. Hammond's Transportation, L.L.C.*, No. CV 20-1656, 2021 WL 1733995, at \*3 (E.D. La. May 3, 2021) (quoting *Test Masters*, 428 F.3d at 571 (citing *Petro–Hunt, L.L.C. v. United States*, 365 F.3d 385, 395 (5th Cir. 2004))).

At the hearing on Defendants' motions, Dexon's counsel focused on the new allegations regarding the Cisco/CDW conspiracy. *See, e.g.*, Docket No. 62 (Transcript) at 66:20-67:13 (citing Docket No. 1, ¶ 61) (new allegations regarding the Cisco/CDW conspiracy); *see also id.* at 67:14-68:4; 72:14-73:24 (citing Docket No. 1, ¶ 3 (new allegations regarding the Texas bank), ¶ 7 (new allegations regarding the Texas energy company), ¶ 51 (new allegations regarding the Texas automobile dealership), ¶¶ 65-67 (new allegations regarding the Texas school district); ¶¶ 69-77 (detailed allegations of global and U.S. IP phones); and ¶ 4 (more specific allegations regarding limited IP budgets)). Comparing the factual predicate of the antitrust claims asserted here with the counterclaims that were at one time pending in California, the Court is not convinced the claims arise out of the same transaction or series of transactions. *See Students for Fair Admissions, Inc. v. Univ. of Tex. at Austin*, 37 F.4th 1078, 1088–89 (5th Cir. 2022) (explaining the transactional test applied here focuses on the facts out of which the claims arise). Accordingly, Cisco's objections to the R&R regarding claim preclusion are **OVERRULED**.

### B. Issue Preclusion (Collateral Estoppel)

Similar to Cisco, in addition to arguing Dexon's claims fail to state a claim upon which relief can be granted, CDW asserts Dexon is precluded from re-litigating issues that have already been decided by the California Court. Docket No. 28 at 2. Instead of relying on the doctrine of true res judicata or claim preclusion, CDW relies on the doctrine of collateral estoppel or issue preclusion.

**Report and Recommendation.** In the R&R, the Magistrate Judge noted issue preclusion requires that the issues in the two suits be identical. R&R at 28. For an issue to be identical, both the facts and the "legal standard used to assess them" must be identical. *Id.* (citing *Hammervold v. Blank*, 3 F.4th 803, 810–11 (5th Cir. 2021) (quoting *Brister v. A.W.I., Inc.*, 946 F.2d 350, 354 n.1 (5th Cir. 1991))). The Magistrate Judge held the facts, and the legal standard used to assess the facts, are not identical in both the California Lawsuit and this lawsuit. *Id.* at 29. Therefore, the Magistrate Judge recommended the Court deny CDW's motion to dismiss under collateral estoppel or issue preclusion. *Id.*

**\*15** **CDW's assertions.** In its objections, CDW asserts the R&R "gives too much weight to Dexon's argument" that a *per se* tying claim and conspiracy claims are entirely different,

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 24 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

as well as "Dexon's conclusory allegations relating to loss of Interbrand competition." Docket No. 120 at 8. According to CDW, the legal standards for assessing both harm to competition and antitrust injury are identical in tying claims and conspiracy claims, and Dexon already had an opportunity to litigate "these two common elements in California." *Id.* Additionally, CDW argues, as it did in its motion to dismiss, that the only "new" factual allegations raised in this lawsuit —relating to loss of interbrand competition—are "entirely conclusory ... and should be disregarded ..." *Id.*

***De novo*** **review.** Dexon's California Counterclaims addressed tying rather than an "inter-corporate conspiracy that gives rise to two new claims against CDW, separate and apart from Dexon's claims against Cisco for tying." R&R at 26 (quoting Docket No. 37 at 19–20). The word "conspiracy" (or any similar derivation) does not appear in Dexon's California counterclaims, "whereas the term appears thirty-six times in the Complaint" in the Texas Lawsuit. *Id.* at 26–27 (quoting Docket No. 37 at 19). Focusing on a "host of new facts about the conspirators, their motivations, their agreement and coordinated conduct, and the effects of the conspiracy" which have been alleged under new causes of action in this case, Dexon asserts, and the Magistrate Judge agreed, that the issues in both cases are not identical. *Id.*

The Court, having reviewed *de novo* the parties' arguments, the relevant case law, the R&R, CDW's objections, and Dexon's response to CDW's objections, finds issue preclusion (or collateral estoppel) does not apply. Dexon pleads factual allegations here, not found in the California Lawsuit, to allege CDW and Cisco entered into a conspiracy that violated §§ 1 and 2 of the Sherman Act. *See, e.g.,* Docket No. 1, ¶¶ 56– 58, 60–63, 87–100. As one example, although Dexon alleged in California that it lost a sale to a Pennsylvania hospital due to Cisco's unilateral monopolization, the California Court did not consider that the lost sale could have been the result of a conspiracy to accomplish that end. R&R at 28. Additionally, the Court is not convinced that the issues before the California Court (*i.e.*, Dexon's allegations that Cisco threatened customers that it would terminate their SmartNet service unless they purchased new Cisco equipment; that Cisco engaged in "pressure and bullying tactics" to dissuade customers from doing business with Dexon; or that Cisco pressured a "value added reseller" (CDW) to stop doing business with Dexon) were fully and vigorously litigated in the California Lawsuit and necessary to the judgment in that action. Accordingly, CDW's objections to the R&R regarding issue preclusion are **OVERRULED**.

## C. Rule 12(b)(6) *Pleading Standard Regarding Dexon's Antitrust Claims*

### 1) Dexon's conspiracy claims against Cisco and CDW under Sherman Act §§ 1, 2 (Counts I, II)

To the extent they overlap, the Court addresses Defendants' objections under this section (even if some of the arguments might also apply to Dexon's other claims against Cisco alone).

**Defendants' motions, generally.** In their motions to dismiss, with regard to Dexon's conspiracy claims asserted against them, Cisco and CDW separately argue as follows: (1) Dexon has not plausibly alleged an anticompetitive agreement between Cisco and CDW; (2) Dexon fails to allege harm to competition; and (3) Dexon fails to establish an antitrust injury.

**Report and Recommendation, generally.** In the R&R, the Magistrate Judge addressed the first two arguments in the context of Dexon's Sherman Act § 1 claim (Count I) and then addressed CDW's separate argument specific to Dexon's Sherman Act § 2 conspiracy claim (Count II), namely whether Dexon fails to allege specific intent by CDW to monopolize. Because Cisco asserts Dexon's failure to allege antitrust injury applies to Counts I–VI (all of which have been asserted against Cisco), the Magistrate Judge addressed antitrust injury following the Magistrate Judge's discussion of Counts III, IV, and V against Cisco.

**\*16** Regarding Dexon's conspiracy claims against Cisco and CDW, the Magistrate Judge found Dexon sufficiently alleges an agreement between Cisco and CDW and does not involve a "mere unilateral change of distributors" as urged by Cisco; thus, the alleged agreement is not *per se* legal. R&R at 33. Although the Magistrate Judge noted the sufficiency of Dexon's allegations of competitive harm is a closer call, on the whole, the Magistrate Judge concluded that Dexon's allegations, in combination with the specific examples provided in the complaint, are sufficient to survive a motion to dismiss (other than Dexon's allegation that CDW had specific intent to monopolize). *Id.*

The Magistrate Judge found Dexon fails to plausibly allege specific intent by CDW to monopolize for purposes of the Sherman Act § 2 conspiracy to monopolize claim. *Id.* at 42– 44. Rather than recommend dismissal of Dexon's conspiracy

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 25 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

to monopolize claim against CDW, the Magistrate Judge recommended Dexon be given an opportunity to amend. Accordingly, the Magistrate Judge recommended this part of CDW's motion to dismiss be denied without prejudice to refiling and that, if the R&R is adopted, Dexon be ordered to replead with specificity its Sherman § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize. *Id.* at 44.

Regarding antitrust injury, the Magistrate Judge found Dexon has sufficiently alleged antitrust injury for purposes of antitrust standing and recommended this part of Defendants' motions to dismiss be denied. *Id.* at 77.

**Defendants' objections, generally.** In its objections, CDW identifies the three arguments it raised in its motion and argues the R&R erred in not agreeing with those arguments: (1) Dexon's failure to plausibly allege an anticompetitive agreement between Cisco and CDW; (2) Dexon's failure to plausibly allege harm to competition; and (3) Dexon's failure to allege antitrust injury. Docket No. 120 at 4. In both its second and third objections, CDW asserts Dexon's complaint is devoid of factual allegations to explain how the alleged conspiracy harmed competition. *Id.* at 2–3. According to CDW, Dexon relies on conclusory allegations of "loss of interbrand" and "intrabrand" competition but does not plausibly explain how interbrand competition was harmed. *Id.* at 2. Specifically, CDW asserts Dexon never alleges it was prevented from selling its secondary Cisco equipment to end-customers; thus, Dexon was not foreclosed from selling Cisco products which would result in harm to competition. *Id.* at 3.

In its objections, Cisco similarly asserts, as it did in its underlying briefing, that Dexon does not allege an anticompetitive agreement between Cisco and CDW. Docket No. 119 at 6–7. Additionally, Cisco states the R&R "errs in devising a theory supporting Dexon's conspiracy claim that Dexon neither pleaded nor argued," namely, that because Dexon pleads Cisco and CDW have market power, competitive harm can be inferred. *Id.* at 6. Finally, Cisco argues Dexon has failed to allege antitrust injury. According to Cisco, "Dexon has not alleged any harm to competition because the gravamen of its claims is that it was denied sales of *Cisco* products, not products manufactured by Cisco's competitors." *Id.* at 8 (emphasis in original) (further stating "Dexon cannot show that its injuries flow from that which makes conspiracy, tying, or monopolization unlawful, and it lacks antitrust injury").

**Applicable law.** To establish a violation of § 1 of the Sherman Act, a plaintiff must demonstrate that: "(1) [the defendants] engaged in a conspiracy, (2) the conspiracy had the effect of restraining trade, and (3) trade was restrained in the relevant market." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014) (citation omitted). To satisfy the conspiracy element of a Sherman Act claim, a plaintiff must show "that the defendants engaged in concerted action, defined as having 'a conscious commitment to a common scheme designed to achieve an unlawful objective.' " *Id.* at 373–74 (quoting *Golden Bridge Tech., Inc. v. Motorola, Inc.*, 547 F.3d 266, 271 (5th Cir. 2008) (quoting *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984))).

**\*17** To establish concerted action, the plaintiff must present "evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 409 (5th Cir. 2007) (quoting *Monsanto*, 465 U.S. at 768). In other words, "[t]here must be evidence that tends to exclude the possibility of independent action." *Id.* Whether an action violates § 1 of the Sherman Act depends on whether it is adjudged an *unreasonable* restraint. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289, 105 S. Ct. 2613, 2616, 86 L. Ed. 2d 202 (1985) (emphasis in original).

Under Sherman Act § 2, a conspiracy to monopolize can be established only by proof of (1) the existence of specific intent to monopolize; (2) the existence of a combination or conspiracy to achieve that end; (3) overt acts in furtherance of the combination or conspiracy; and (4) an effect upon a substantial amount of interstate commerce. *N. Mississippi Commc'ns, Inc. v. Jones*, 792 F.2d 1330, 1335 (5th Cir. 1986).

Antitrust cases are not subject to a heightened pleading standard. *Torrey v. Infectious Diseases Soc'y of Am.*, No. 5:17-CV-00190-RWS, 2018 WL 10124894, at \*7 (E.D. Tex. Sept. 27, 2018) (citing *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010)). At this stage in the litigation, plaintiffs need only allege facts that "state a claim to relief that is plausible on its face." *Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.* ("*Quest III*"), No. 5:17-CV-1295-RCL, 2022 WL 980791, at \*6 (W.D. Tex. Mar. 31, 2022) (quoting *Twombly*, 550 U.S. at 570). " '[E]nough data must be pleaded so that each element of the

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 26 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

alleged antitrust violation can be properly identified.' " *David B. Turner Builders L.L.C. v. Weyerhaeuser Co.*, No. 3:21-CV-309-KHJ-LGI, 2021 WL 5869183, at *2 (S.D. Miss. Dec. 10, 2021).

### (a) Whether Dexon plausibly alleges a competition-harming agreement between Cisco and CDW

**Defendants' motions.** In its motion, Cisco states Count I (§ 1 of the Sherman Act), Count II (§ 2 of the Sherman Act), and Count VI (Texas Free Enterprise and Antitrust Act) each depend on allegations that Cisco entered into an unlawful agreement with CDW. Cisco argues Dexon's claim that "Cisco and CDW conspired to exclude Dexon" from the Relevant Networking Equipment Market fails because Dexon has not plausibly alleged any competition-harming agreement between Cisco and CDW. Docket No. 22 at 13–14. Specifically, Cisco asserts Dexon has not properly alleged any unlawful agreement to replace Dexon with CDW as a seller of Cisco products. *Id.* at 14. CDW similarly argues Dexon fails to plausibly allege any direct evidence of an anticompetitive agreement between Cisco and CDW. Docket No. 28 at 13. Whether considered individually or as a whole, CDW argues "Dexon's allegations are more consistent with CDW's independent actions and its individual interest than with a conspiracy." *Id.*

**Report and Recommendation.** The Magistrate Judge considered whether Dexon plausibly alleges an agreement between Cisco and CDW, and separately, whether Dexon's allegations plausibly raise the suggestion of an unlawful agreement. Specifically, the Magistrate Judge found Dexon sufficiently alleges "the who, what, when, where, when, and why to show the existence of an agreement between CDW and Cisco," and the complaint does not allege a "mere unilateral change of distributors" or that the alleged conspiracy falls exclusively within Cisco's "right to control its distribution network;" thus, the alleged agreement is not *per se* legal. R&R at 33, 35, 38.

**\*18** The Magistrate Judge further considered whether Dexon plausibly alleges competitive harm and concluded the allegations regarding CDW, combined with the allegations regarding Cisco as a monopolist, allow the Court to draw the reasonable inference that the Cisco-CDW agreement is capable of causing substantial harm to competition. *Id.* at 42. After distinguishing the allegations in this case from those involved in *Burdett Sound, Inc. v. Altec Corp.*, 515 F.2d 1245

(5th Cir. 1975), and other dealer termination/substitution cases, the Magistrate Judge stated as follows:

> Further, case law supports the view that a monopolist manufacturer who conspires with a large distributor to exclude a lower-priced distributor can survive a motion to dismiss. *See Graphic Prods. Distribs. v. ITEK Corp.*, 717 F.2d 1560, 1572 n. 20 (11th Cir. 1983) ("A seller with considerable market power in the interbrand market —whether stemming from its dominant position in the market structure or from the successful differentiation of its products—will necessarily have some power over price. In that situation, intrabrand competition will be a significant source of consumer welfare because it alone can exert downward pressure on the retail price at which the good is sold."). The court in *Graphic Prods.* explained that "in situations of manufacturer market power, intrabrand restrictions on distributor competition can have a substantial adverse effect on consumer welfare by eliminating an important source of competitive pressure on price" and in that scenario, vertical restraints "may enable a manufacturer to retain monopoly profits arising from an Interbrand competitive advantage." *Id.* Dexon alleges this precise scenario: a Cisco-CDW conspiracy enabling Cisco to maintain its monopoly profits. The Third Circuit Court of Appeals similarly found a well-pled conspiracy alleging a dominant insurer conspired with a dominant hospital to exclude a smaller rival due to allegations of increased prices and decreased competition for the co-conspirators' services. *West Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 100 (3d Cir. 2010).

R&R at 37–38. According to the Magistrate Judge, Dexon's allegations of interbrand harm and intrabrand harm (which were not pleaded with this level of specificity in the California Lawsuit) explain how the alleged conspiracy harms competition and mirrors the allegations contained in *Graphic Prods.* and *West Penn. Id.* at 39.

The Magistrate Judge also found instructive *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013), wherein the court found the plaintiffs' allegations sufficient to state a plausible Sherman Act § 1 claim against PoolCorp, the country's largest distributor of Pool Products, and the Manufacturer Defendants, the three largest manufacturers of Pool Products in the country, even though the complaint did not allege that PoolCorp possessed any specific share of the Pool Products Distribution Market. *Id.* at 40–41 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 373, 383, 399). The court held the allegations that the Manufacturer

Defendants had "substantial market clout" combined with the "market power" of the distributor "allow[ed] the Court to draw the reasonable inference" that the conspiracy was "capable of causing substantial harm to competition." *Id.* at 41 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 398). The Magistrate Judge also noted the court in *In re Pool Prods.* pointed out the Fifth Circuit has stated that the reason for looking at market power is to determine "whether the combination or conspiracy, not each individual conspirator, has the power to hurt competition in the relevant market." *Id.* (quoting *In re Pool Prods.*, 940 F. Supp. 2d at 398) (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 225 (5th Cir. 2001); also citing *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460–61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ("[T]he purpose of the inquiries into market definition and market power is to determine whether an *arrangement* has the potential for genuine adverse effects on competition....") (emphasis added in *In re Pool Prods.*))).

 **\*19** The Magistrate Judge stated Dexon has alleged facts sufficient to create a reasonable inference of Cisco's market power in the relevant markets. R&R at 41 (citing Docket No. 1, ¶¶ 1 ("Cisco is a monopolist ..."); 24 ("On information and belief, Cisco has a stranglehold on the supply of networking products in the United States, with a dominant market share that has reached 70% or more, including in routers and Ethernet switches, both markets with high barriers to entry ... Cisco is also dominant in the Worldwide and United States markets for IP phones, with market shares that have exceed 40% or more with its closest competitors half its size, in markets with high barriers to entry."); 29 ("Upon information and belief, Cisco consistently possessed a share of the Relevant Service Market in excess of 90% ...")). The Magistrate Judge further stated Dexon has pleaded factual content that allows the Court to draw the reasonable inference that CDW has "substantial clout in the industry." *Id.* at 41–42 (citing *In re Pool Prods.*, 940 F. Supp. 2d at 398; also citing Docket No. 1, ¶ 56 (alleging CDW's 2020 annual revenue was $18.47 billion compared to Cisco's $49.8 billion in the same time period); also citing *Universal Hosp. Servs., Inc. v. Hill-Rom Holdings, Inc.*, No. CIV.A. SA-15-CA-32, 2015 WL 6994438, at *11 (W.D. Tex. Oct. 15, 2015) ("At the motion to dismiss stage, with discovery still to be completed, the plaintiff does not have to allege an exact, percentage-based market share." (quoting *Scooter Store, Inc. v. Spinlife.Com.*, 777 F.Supp.2d 1102, 1117 (S.D. Ohio 2011))))). Considering the allegations regarding CDW, combined with Dexon's allegations regarding Cisco as a monopolist, the Magistrate Judge concluded the complaint allows the Court to draw

the reasonable inference that the Cisco-CDW agreement is capable of causing substantial harm to competition. *Id.* at 42.

**Defendants' objections.** In their objections, Defendants take issue with these findings. Among other things, both Cisco and CDW argue CDW's decision not to sell CDW equipment to its direct competitor does not raise the suggestion of an unlawful agreement between Cisco and CDW. Docket No. 119 at 6 (stating CDW had every incentive to compete with Dexon and CDW's alleged sale of Cisco products to a Pennsylvania hospital could have been independent action); Docket No. 120 at 5 (stating Cisco has the absolute right to control its distribution network, including to sell through one reseller (here, CDW) over another (Dexon)). According to Cisco and CDW, any agreement would be *per se* legal under *Burdett Sound*, 515 F.2d 1245 and *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301 (5th Cir. 1997) [hereinafter *Doctor's Hospital*]. Docket No. 119 at 7; Docket No. 120 at 5. Consideration of these arguments dovetails into the related issue of whether Dexon has plausibly alleged harm to competition. Thus, the Court considers the issues together.

*De novo* review. As an initial matter, the Court agrees with the Magistrate Judge that Dexon sufficiently shows the existence of an agreement between Cisco and CDW as distinct from independent action. Dexon alleges Cisco conspired with one of its favored distributors, CDW, "to help it exclude resellers like Dexon and maintain its network equipment monopolies." Docket No. 1, ¶ 13. The complaint provides a specific example of an alleged conspiracy involving a Pennsylvania hospital system. *Id.*, ¶¶ 58–63. There are two aspects to Dexon's conspiracy allegations.

First, Dexon alleges Cisco and CDW coordinated their communications and actions for the Pennsylvania hospital system, which awarded a contract to Dexon to purchase Ethernet switches and routers. *Id.*, ¶ 59. According to the complaint, when Cisco learned that the hospital system awarded the order to Dexon, it threatened the customer that it would "not honor the contemplated new SmartNet service package, [and] also would cancel immediately all SmartNet service packages which the customer had in place for the entire hospital system and clinics." *Id.* "Upon information and belief, Cisco agreed with CDW that after the hospital cancelled the equipment order with Dexon, CDW would instead secure those sales and assure the customer that SmartNet service would be provided for all of its Cisco equipment." *Id.*, ¶ 60. Dexon alleges the "sales

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 28 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

representatives of Cisco and CDW took coordinated steps to execute this plan, and it was agreed that Cisco would portray CDW as the 'savior' to the hospital system in that the customer would keep its service for all of its Networking Equipment." *Id.* Dexon alleges "Defendants' plan was successful, and the hospital instead bought the Networking Equipment from CDW at a higher price than had been negotiated with Dexon." *Id.*

**\*20** Second, Dexon alleges that as part of the conspiracy, CDW agreed not to sell Networking Equipment to Dexon. *Id.*, ¶ 62. Specifically, Dexon alleges that as part of the conspiracy, which continues through the present day, "Cisco demanded that CDW stop selling Networking Equipment and associated services to Dexon (which had previously been to both parties' benefit), and CDW agreed." *Id.* According to Dexon, "when the CDW representative previously assigned to Dexon refused to comply with" Cisco's demand that CDW stop selling Networking Equipment and associated services to Dexon, "CDW assigned the representative to a different region and account so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* According to Dexon, pursuant to the conspiracy, "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.* Dexon alleges Cisco recruited CDW into the conspiracy because it favors Cisco products over those of Cisco's competitors; when one completes a search on CDW's website for ethernet switches, it pulls up 1,440 selections for Cisco with no other ethernet switch competitor with more than 250 selections. *Id.*, ¶ 61.

Contrary to CDW's suggestion otherwise, the Court finds Dexon's complaint states facts that raise a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. *See* Docket No. 120 at 4 (citing *Twombly*, 550 U.S. at 557). As pointed out by the Magistrate Judge, the Fifth Circuit recently decided *BRFHH Shreveport, L.L.C. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520 (5th Cir. 2022), a case which supports Dexon. R&R at 36, n. 12.

In that case, the Fifth Circuit reiterated that tacit agreements are still agreements. *BRFHH*, 49 F.4th at 526 (citing *Twombly*, 550 U.S. at 553 ("[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision *or from an agreement, tacit or express*." (emphasis added and quotation omitted in *BRFHH*))). According to the Fifth Circuit, threat and accession is one way to form a tacit agreement. *Id.* (discussing *Monsanto*, 465 U.S. at 765,

wherein the Supreme Court held that evidence of A's threat to B, coupled with B's subsequent buckling to the pressure, could constitute "substantial direct evidence" of an agreement for § 1 purposes.). The Fifth Circuit had elaborated on a threat-and-accession theory, *id.* (citing *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 220–22 (5th Cir. 2001); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 331–33 (5th Cir. 2015); *Viazis v. Am. Ass'n of Orthodontists*, 314 F.3d 758, 763–64 (5th Cir. 2002); *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 844–45 (5th Cir. 2015)), making it clear that a threat itself is not enough. Rather, A's threat can give rise to an agreement with B only if B actually gives in and does what A wants—and only if B gives in because of A's threat. *Id.* (citing *Viazis*, 314 F.3d at 764).

In *BRFHH*, the Fifth Circuit, addressing a threat-and-accession case for the first time at the Rule 12(b)(6) stage, stated as follows:

> A plaintiff proceeding on a threat-and-accession theory must plausibly allege three things: first, that A made a threat; second, that B subsequently did what A wanted; and third, that B did so because of A's threat. That third requirement is often the hardest to satisfy. It's not enough to allege that B's behavior was "merely consistent with" caving to the threat. *See Twombly*, 550 U.S. at 557, 127 S.Ct. 1955. The plaintiff must do more, providing "allegations plausibly suggesting" that B acted in response to the threat rather than out of its own self-interest. *See ibid.*; *Viazis*, 314 F.3d at 764 (affirming a district court's grant of judgment as a matter of law on the ground that the plaintiff hadn't shown the defendant acted "in response to [the relevant] threats" rather than "based on an independent evaluation of its best interests" after "ignor[ing] the threats"); *Abraham & Veneklasen*, 776 F.3d at 333 (similar).

*Id.*

In its complaint, Dexon plausibly alleges Cisco threatened CDW to stop selling Networking Equipment and associated services to Dexon and that CDW subsequently did what Cisco demanded it do. It is not enough to allege that CDW's behavior was "merely consistent with" caving to the threat. *BRFHH*, 49 F.4th at 526 (citing *Twombly*, 550 U.S. at 557). Rather, Dexon must provide "allegations plausibly suggesting" that CDW acted in response to the threat rather than out of its own self-interest. [7] *Id.* (citations omitted).

Case 4:23-cv-03560   Document 229-1   Filed on 02/26/25 in TXSD   Page 29 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

7

In its motion, CDW points out that Dexon and CDW are competitors and argues it has "clear unilateral incentives not to supply its rivals." Docket No. 28 at 14. CDW further contends the fact that it displays Cisco's products prominently on its website demonstrates CDW's efforts to compete with rival distributors like Dexon and does not suggest an anticompetitive agreement with Cisco "to do anything, much less restrain trade." *Id.* at 15.

**\*21** At this stage of the litigation, the Court finds Dexon has provided allegations plausibly suggesting that CDW acted in response to Cisco's alleged demand. Dexon alleges CDW removed the CDW representative previously assigned to Dexon to a different region and account when the representative "refused to comply with ... Cisco's demand." Docket No. 1, ¶ 62. According to Dexon, CDW did this "so that Cisco would not fear that CDW had withdrawn from the conspiracy." *Id.* As further factual support for CDW's behavior, Dexon alleges "no CDW sales representative has fulfilled a Cisco order from Dexon since March 2021." *Id.*

Even without a threat-and-accession theory, the Court finds, similar to the Magistrate Judge, that Dexon has sufficiently alleged the co-conspirators, the conspirators' respective motivations and intent, the sequencing of their coordinated conduct, the impact of that conduct, and how, most recently, "CDW doubled down on the conspiracy by taking its representative off of the Dexon account because of his failure to adhere to the conspiracy (an action that is also against CDW's self-interest)." R&R at 35–36 (quoting Docket No. 34 at 4–5 (citing Docket No. 1, ¶¶ 56–63, 87–100)). Accepting as true all well-pleaded facts in the complaint and viewing those facts as a whole in the light most favorable to Dexon, the Court finds Dexon has plausibly alleged an agreement between Cisco and CDW.

That brings the Court to the next issue: whether Dexon has alleged a competition-harming agreement between Cisco and CDW. According to Defendants, any alleged agreement between Cisco and CDW is not anticompetitive because Cisco as manufacturer has the absolute right to control its distribution network, including to sell through one reseller (here, CDW) over another (Dexon). Docket No. 120 at 5. In its motion to dismiss, Cisco asserts any alleged agreement between Cisco and CDW that CDW would not sell Cisco equipment to Dexon would be *per se* lawful under Fifth Circuit law. Docket No. 22 at 16 (citing *Burdett Sound*, 515 F.2d at 1245; also citing *Doctor's Hospital*, 123 F.3d at 301). According to Cisco, it does not violate antitrust law for Cisco

to encourage end-users to purchase Cisco equipment from one reseller rather than another. Cisco contends that in either event, the customer is purchasing Cisco equipment; thus, the alleged conduct does not affect the market opportunities of other equipment manufacturers (the competitors in the markets that Dexon alleges). *Id.* at 15.

As noted in the R&R, *Burdett Sound* states that "it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business." R&R at 36 (citing *Burdett Sound*, 515 F.2d at 1249). As explained by the Fifth Circuit in that case, it is settled law that a manufacturer has the right to select its customers and to refuse to sell its goods to anyone for reasons sufficient to itself. *Id.* (citing *Burdett Sound*, 515 F.2d at 1248 (citations omitted in R&R)). The Magistrate Judge explained Dexon does not present claims based on a "mere unilateral change of distributors," *i.e.*, a claim that Dexon was excluded from Cisco's distribution and nothing more. *Id.* at 37 (citing *Burdett Sound*, 515 F.2d at 1248). Instead, according to the Magistrate Judge, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (which provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets). *Id.*

**\*22** In its objections, CDW states this is "a dealer termination case" "exactly" like *Burdett Sound*. Docket No. 120 at 5 ("Dexon alleges it was prevented from effectively reselling Cisco equipment by Cisco (the manufacturer) and replaced with CDW (the new reseller)."). According to CDW, under *Burdett Sound*, "any loss of *intrabrand* competition —*i.e.*, the loss of Dexon as a Cisco reseller—is immaterial because the purpose of the antitrust laws is to promote *interbrand* competition." *Id.* (emphasis in original). CDW argues this is true "even when the new dealer and the manufacturer agree before the termination of the old dealer." *Id.* (quoting *Doctor's Hospital*, 123 F.3d at 307).

Based on *Burdett Sound* and *Doctor's Hospital*, Defendants ask the Court to find any agreement between Cisco and CDW would be *per se* legal because this case is nothing more than a dealer termination/substitution case. Not only are Defendants incorrect on the applicability of *Burdett Sound*, but a review of *Doctor's Hospital* also shows—through proper analysis under the rule of reason—why this case is distinguishable from the dealer termination/substitution cases.

First, *Burdett Sound* supports the general proposition that <u>without a showing of an actual adverse effect on competition market-wide</u>, it is not a violation of antitrust laws "for a manufacturer to terminate a distributor ... and to appoint an exclusive distributor." *See Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prod., Inc.*, 129 F.3d 240, 244 (2d Cir. 1997) (citing *Burdett Sound*, 515 F.2d at 1249). This does not mean that a manufacturer's or supplier's discretion as to whom it will sell is unlimited. *Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 33 (5th Cir. 1977). As explained in *Burdett Sound*, a refusal to deal becomes illegal under the Sherman Act when it produces an unreasonable restraint of trade, such as price-fixing, elimination of competition, or creation of a monopoly. *Burdett Sound*, 515 F.2d at 1248 (citations omitted). In other words, if a refusal to deal is a device used to, among other things, acquire a monopoly or establish market dominance and drive out competitors, it is illegal. *Universal Brands*, 546 F.2d at 33 (citations omitted).

In *Burdett Sound*, the Fifth Circuit held the appellant had not presented an antitrust claim, noting the appellant alleged no horizontal conspiracy among competitors, no effort by either appellee to establish market dominance, no restrictive trade practices, and no anti-competitive intent or effect. *Burdett Sound*, 515 F.2d at 1248. Here, Dexon does not merely allege —without more—that Cisco substituted one distributor for another within the scope of *Burdett Sound*. Rather, Dexon alleges a monopolist (Cisco) is conspiring with a large distributor (CDW) to coerce customers away from Dexon (who provides price and quality competition to other Cisco resellers and allows for Cisco's competitors to penetrate the relevant markets). R&R at 37 (citing Docket No. 1, ¶¶ 56, 60–61, 90–91). Dexon further alleges the alleged conspiracy results in Cisco and CDW maintaining supra-competitive prices, reduced technology choices for customers, and Cisco's maintaining its monopoly in the relevant markets. *Id.* (citing Docket No. 1, ¶¶ 63, 100).

Second, *Burdett Sound* only addressed conduct designed to lessen intrabrand competition. *Nw. Power Prod., Inc. v. Omark Indus., Inc.*, 576 F.2d 83, 87 (5th Cir. 1978). Here, as explained more fully below, Dexon alleges the Cisco-CDW conspiracy restricted both interbrand competition (between Cisco and its competitors) and intrabrand competition (between Cisco resellers). Docket No. 1, ¶¶ 60–61, 90–91.

**\*23** Defendants' reliance on *Doctor's Hospital* does not support their argument that any agreement between Cisco

and CDW should be considered *per se* legal under *Burdett Sound*. In that case, Doctor's Hospital of Jefferson, Inc. ("DHJ") filed suit against a competing hospital and a preferred provider organization ("PPO"), which sold a mix of providers' products as a separate product and substituted one provider for DHJ allegedly at the insistence of a competing provider. *Doctor's Hospital*, 123 F.3d at 302, 308. The district court granted summary judgment to the defendants, reasoning that DHJ lacked standing to bring an antitrust suit against the defendants because it had failed to demonstrate antitrust injury. *Id.* at 303. On appeal, the Fifth Circuit disagreed with the district court's analysis of the standing issue but affirmed the grant of summary judgment on other grounds, one of which being that DHJ failed to establish injury to competition as required for a Sherman Act § 1 claim. *Id.*

As their principal answer to each of DHJ's alleged harms to competition, the defendants argued on appeal that the case was governed by the "substitution of dealer cases" like *Burdett Sound*, 515 F.2d at 1249, "which hold that a manufacturer has a virtually absolute right to choose to whom it sells its goods." *Doctor's Hosp.*, 123 F.3d at 307. Rather than find the alleged agreement *per se* lawful, the Fifth Circuit applied the rule of reason and found DHJ had not presented evidence that affiliation with the PPO was necessary to compete in the marketplace or that DHJ's exclusion from the PPO "somehow reflected injury to competition generally." *Id.* at 309. Among other things, the court considered DHJ's allegation that it had been substantially weakened as a competitor because it lost PPO revenues and had been unfairly deprived of membership in a "premier managed care plan." *Id.* at 310. The court noted that while injury to a competitor can be some evidence of injury to competition, "the injuries to DHJ [were] insufficient under the circumstances to create a fact issue on injury to competition." *Id.*

Conducting that analysis here, the Court cannot say there are insufficient facts to state a claim and that it is implausible that Defendants engaged in a conspiracy, effectively restraining trade. An antitrust violation only occurs if the termination or substitution of a dealer produces an "unreasonable restraint of trade." *Daniels v. All Steel Equip., Inc.*, 590 F.2d 111, 113 (5th Cir. 1979) (quoting *Burdett Sound*, 515 F.2d at 1248). *Continental T.V.* teaches that market considerations provide the "objective benchmarks" for distinguishing antitrust violations. *Id.* (citing *Cont'l T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 53 n.21 (1977)). "The first step in establishing an unreasonable restraint of trade is to show anticompetitive

effect, either in the intrabrand or interbrand markets." *Id.* (quoting *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978)).

According to the Fifth Circuit, the question is whether the agreement caused anticompetitive effects or "created the potential for anticompetitive effects." *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 492 (5th Cir. 2021), *cert. denied*, 142 S. Ct. 712 (2021), (citing *Doctor's Hosp.*, 123 F.3d at 310; *Retractable Techs, Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 895 (5th Cir. 2016) ("noting that an antitrust plaintiff must show that a restraint 'had the potential to eliminate, or did in fact eliminate, competition' ")). "Anticompetitive effects are those that harm consumers. Think increased prices, decreased output, or lower quality goods." *Id.* at 493. Such effects may be proved "indirectly," with "proof of market power plus some evidence that the challenged restraint harms competition." *Id.* at 492–93 (quoting *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018)).

Deciding whether a plaintiff has plausibly alleged that a vertical agreement causes substantial anti-competitive harm requires an analysis of the defendants' role in the relevant market. *In re Pool Prods.*, 940 F. Supp. 2d at 397 (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 207 (4th Cir. 2002)). Under the rule of reason, the plaintiff must plausibly allege that defendants have sufficient market power to restrain competition substantially in a relevant market. [8] *Id.* The Fifth Circuit has stated that an examination of anti-competitive harm "cannot stop without an inquiry into the market power of the defendants." *Nw. Power Prod.*, 576 F.2d at 90.

[8]   Whether or not a combination or conspiracy falls under the *per se* rule often depends upon whether the restriction is implemented by a vertical or horizontal agreement. *Jayco Sys., Inc. v. Savin Bus. Machines Corp.*, 777 F.2d 306, 317 (5th Cir. 1985) (citing *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1004 (5th Cir. 1981) (explaining the first step of the analysis is to determine whether alleged conspiracy is vertical or horizontal)). Horizontal agreements affect *inter* brand competition, and because interbrand competition is "the primary concern of antitrust law," they are generally illegal *per se. Id.* (citing *Cont'l T. V., Inc.* 433 U.S. at 36). Vertical agreements, on the other hand, generally affect *intra* brand competition. *Id.* "Because interbrand competition can act as a check on intrabrand restrictions, [ ] and because intrabrand restrictions in turn can increase interbrand competition in several ways, [ ] vertical agreements are generally considered not so pernicious as to warrant *per se* treatment." *Id.*

**\*24** Notably, in *Northwest Power Products*, the Fifth Circuit pointed out in this regard that *Burdett Sound* indicated the evidence there showed "no effort by either (defendant) to establish market dominance." *Id.* (quoting *Burdett Sound*, 515 F.2d at 1248). In contrast, in *Cherokee Lab'ys, Inc. v. Rotary Drilling Servs., Inc.*, 383 F.2d 97 (5th Cir. 1967), a case involving interbrand as well as intrabrand competition, the Fifth Circuit held an anticompetitive effect existed when the new distributor, if effective in driving out the old, would become a monopolist. *Id.*

This case involves allegations of both interbrand and intrabrand competition, and Dexon has pleaded allegations of market dominance. As noted by the Magistrate Judge concerning intrabrand competition, the complaint alleges the Cisco-CDW conspiracy required customers to pay more for Cisco equipment from CDW and limited customers' choices for Cisco products. R&R at 39. The conspiracy allegedly harmed interbrand competition by removing Dexon who "does not prioritize" Cisco products, thereby "limiting the opportunities of its competitors to make sales through resellers like Dexon." *Id.* (quoting Docket No. 1, ¶ 61). Dexon provides an example of this conspiracy involving a Pennsylvania hospital system wherein the hospital bought equipment from CDW at a higher price than had been negotiated with Dexon. *Id.* (citing Docket No. 1, ¶ 60). This conspiracy allegedly allows Cisco to maintain its monopoly position and its supra-competitive prices. *Id.*, (citing Docket No. 1, ¶¶ 90–93). According to the Magistrate Judge, not only does these interbrand and intrabrand allegations explain how the conspiracy harms competition, but they also mirror those in *Graphic Prods.*, 717 F.2d at 1572 n. 20 and *West Penn*, 627 F.3d at 85. Relying further on *In re Pool Prods. Distribution Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367 (E.D. La. 2013), discussed above, the Magistrate Judge held the alleged agreement between a monopolist and a favored distributor to exclude interbrand and intrabrand competition states a claim.

In its objections, Cisco argues Dexon cannot plausibly allege harm to competition because the vertical conspiracy alleged by Dexon "cannot conceivably prevent Cisco's *competitors* from making sales—Dexon instead alleges that

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 32 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

the conspiracy caused *it* to specifically lose sales of *Cisco* equipment." Docket No. 119 at 6 (emphasis in original). In its objections, CDW argues Dexon alleges "nothing more than a classic, lawful restriction on intrabrand competition to promote interbrand competition, which is presumptively lawful under the Sherman Act." Docket No. 120 at 7. Although CDW attempts to distinguish the *Graphic Prods.* and *West Penn* cases relied upon by the Magistrate Judge, [9] Dexon argues in its response that both cases illustrate that when a monopolist allegedly uses its power to foreclose interbrand and intrabrand competition from an unfavored dealer, that is sufficient to state a claim under the Sherman Act. Docket No. 122 at 5. Dexon further points out CDW fails to meaningfully discuss the Magistrate Judge's application of *In re Pool Prods.*, "which confirms the correct result." *Id.* Both Defendants fail to address the critical fact that Cisco is an alleged monopolist that allegedly has the ability to control price and exclude competition in the relevant markets.

[9]     According to CDW, in both cases cited in the R&R (*Graphic Prods.* and *West Penn*), the disfavored distributor was excluded from the market, affecting prices or output market-wide. Docket No. 120 at 6. CDW contends Dexon does not allege it was excluded from selling its Cisco products (or those of other OEMs) to end customers or that a few lost sales opportunities had a market-wide effect. *Id.* The Magistrate Judge noted these arguments but found them insufficient to grant Defendants' motion to dismiss in light of Dexon's well-pleaded complaint. R&R at 38–39.

**\*25** The Fifth Circuit has held that "injury to a competitor can be some evidence of injury to the competition." *Doctor's Hospital*, 123 F.3d at 311; *see also West Penn*, 627 F.3d at 108 ("a firm engages in anticompetitive conduct when it attempts to exclude rivals on some basis other than efficiency ... or the merits."). Here, the Court finds Dexon has sufficiently alleged indirect proof of anticompetitive effects with allegations of "market power plus some evidence that the challenged restraint harms competition." *Impax*, 994 F.3d at 492–93 (quoting *Am. Express Co.*, 138 S.Ct. at 2284). Dexon contends the Cisco-CDW conspiracy resulted in sales losses to Dexon and in improper losses of goodwill, "which has had the effect of lowering intra-brand and inter-brand competition to Cisco in the upstream market." Docket No. 24 at 19. Dexon states it provides price and quality competition to other Cisco resellers and provides an opportunity for Cisco's competitors to penetrate the Relevant Product Markets, but the alleged

conspiracy between Cisco and CDW blocked competition from a "price cutting" distributor. *Id.* at 17–19 (citing Docket No. 1, ¶¶ 60–61, 90–92).

Dexon's complaint is neither vague nor speculative; it contains far more than a "bare assertion of conspiracy" or "conclusory allegation of agreement[.]" *Drs. Hosp. of Laredo v. Cigarroa*, No. SA-21-CV-01068-XR, 2022 WL 3567353, at *13 (W.D. Tex. Aug. 17, 2022) (quoting *Twombly*, 550 U.S. at 556–57). Upon *de novo* review, the Court finds Dexon's complaint plausibly alleges a restraint that is likely to result in an anticompetitive effect. Accordingly, Defendants' objections to this portion of the R&R are **OVERRULED**.

### *(b) Whether Dexon sufficiently alleges antitrust injury*

**Report and Recommendation.** Regarding antitrust injury, the Magistrate Judge found Dexon has sufficiently alleged antitrust injury for purposes of antitrust standing and recommended this part of Defendants' motions to dismiss be denied. R&R at 77. Specifically, the Magistrate Judge noted the Fifth Circuit has repeatedly distinguished between antitrust injury and injury to competition. *Id.* at 73 (citations omitted). According to the Magistrate Judge, injury to competition, while often a necessary component to substantive liability, need not be pleaded as an element of standing for a plaintiff's antitrust claims to survive a motion to dismiss. *Id.* (citing *TravelPass Grp., L.L.C. v. Caesars Ent. Corp.*, No. 5:18-CV-153-RWS-CMC, 2019 WL 5691996, at *24 (E.D. Tex. Aug. 29, 2019), *report and recommendation adopted*, No. 5:18-CV-00153-RWS-CMC, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019)).

For purposes of the analysis, the Magistrate Judge assumed a violation of the antitrust laws. R&R at 76 (citing *Sanger Ins. Agency v. HUB Intern., Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015)) (stating in the context of exclusive dealing that "[i]n analyzing this [antitrust] standing issue, we assume that [plaintiffs'] allegations of exclusive dealing amount to an antitrust violation" (citing *Doctor's Hospital*, 123 F.3d at 306)). At this stage of the litigation, viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Magistrate Judge found Dexon has adequately claimed an antitrust injury. *Id.* According to the Magistrate Judge, the alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the "conceptual bounds of antitrust injury, whatever the ultimate merits of its

USAP030

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

case." *Id.* (quoting *Doctor's Hospital*, 123 F.3d at 305) (other citations omitted).

In finding Dexon has sufficiently shown antitrust injury, the Magistrate Judge found *Pulse Network* instructive. In that case, the Fifth Circuit held Pulse had not shown antitrust injury as to its first theory (PAVD), but it had shown antitrust injury as to its second and third theories (FANF and volume-based agreements). *Pulse Network, L.L.C. v. Visa, Inc.*, 30 F.4th 480, 491–95 (5th Cir. 2022). In its FANF theory, Pulse alleged the FANF pricing structure used by Visa caused merchants to use its debit network less, decreasing Pulse's revenue. *Id.* at 491. According to Pulse, "Visa uses its market dominance to foist on merchants a high fixed fee they wouldn't ordinarily accept" and "then uses the revenues from that unavoidable upfront fee to artificially lower its per-transaction fees, which effectively forecloses rivals like Pulse from competing." *Id.* In arguing there was no antitrust injury, Visa argued that Pulse was "really harmed only by the increased competition created by FANF (i.e., cheaper per-transaction fees), rather than some anticompetitive aspect of the pricing structure." *Id.* The Fifth Circuit held as follows:

**\*26** Pulse claims more than price competition is afoot, though. After the Durbin Amendment loosened Visa's grip on the debit network market, Visa began shedding merchants to Pulse and other networks because its pricing wasn't competitive on a per-transaction basis. Instead of improving its product or competing on price, however, VISA began charging the FANF to merchants—and then using some of those revenues to reduce per-transaction fees. This integrated fee structure, argues Pulse, forces merchants to pay a higher total cost (fixed plus per-transaction fees) than before, and yet Visa's market share and profits have recovered.

This alleged scheme inflicts antitrust injury on Pulse. Under Pulse's theory, it doesn't lose customers to Visa in a fair fight over per-transaction fees. Rather, Pulse loses customers because Visa abuses its dominance in the debit card market. Merchants have no choice but to pay Visa's high fixed monthly fee. They recoup that expense by routing more transactions through Visa's network, which charges lower per-transaction fees than competitors. But Visa can achieve that only by leveraging the upfront fees to artificially deflate its per-transaction fees. We must assume this pricing structure violates the antitrust laws. *See Sanger Ins. Agency* [*v. HUB Intern, Ltd.*, 802 F.3d 732, 738 (5th Cir. 2015)]; *Doctor's Hosp.*, 123 F.3d at 306. When we do, the link between Pulse's injury and Visa's alleged

anticompetitive conduct becomes plain. Pulse is squeezed out of the market because Visa exploits its dominance to impose supra-competitive prices on merchants and simultaneously undercut competitors' per-transaction fees. That is textbook antitrust injury. *See Andrx Pharms., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor ... suffers a distinct injury if it is prevented from selling its product.").

*Id.* at 74–75.

**Defendants' objections.** CDW contends, along with Cisco, that Dexon did not sustain an antitrust injury. In its objections, Cisco argues that to the extent Dexon alleges it lost sales to Cisco-authorized resellers like CDW, those losses result from competition, not the lack thereof. Docket No. 119 at 8. CDW argues Dexon lacks antitrust injury because "it does not allege it has been prevented from selling its products to customers." Docket No. 120 at 7. Attempting to distinguish *Pulse Network*, CDW states that case involved allegations that the defendant "manipulat[ed] prices in a way that excludes competitors from the market." *Id.* (quoting *Pulse Network*, 30 F.4th at 493). According to CDW, Dexon does not allege it has been excluded from anything. *Id.*

The Magistrate Judge stated that antitrust injury requires that a plaintiff's injury is "of the type the antitrust laws were intended to prevent and ... flows from that which makes defendants' acts unlawful." R&R at 74 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488–89 (1977)). In *Doctor's Hospital*, the Fifth Circuit held that when the antitrust injury was viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition, the plaintiff's "alleged losses and competitive disadvantage because of its exclusion from SMA [fell] easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Doctor's Hospital*, 123 F.3d at 305.

The R&R explains that when "viewing the alleged antitrust injury from the perspective of Dexon's position in the marketplace, the Court finds Dexon has adequately claimed an antitrust injury." *Id.* at 76. According to the Magistrate Judge, "[t]he alleged losses and competitive disadvantage resulting from Cisco's alleged actions, including the alleged conspiracy with CDW, fall within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case." *Id.* (citing *Doctor's Hospital*, 123 F.3d at 305; *Pulse Network*,

30 F.4th at 491 (finding Pulse's incremental exclusion from the relevant market because of defendant's alleged anticompetitive conduct "is textbook antitrust injury"); *Andrx Pharms., Inc. v. Biovail Corp. Int'l,* 256 F.3d 799, 816–17 (D.C. Cir. 2001) ("Irrespective of consumer injury, an excluded competitor ... suffers a distinct injury if it is prevented from selling its product.")).

**\*27** Defendants object to the R&R's finding as to antitrust injury, focusing narrowly on whether Dexon was excluded from the market. In its response to Cisco's objections, Dexon states it has alleged Cisco's conduct was specifically designed to maintain its dominance over its smaller competitors and also that Dexon's reputation as a trusted multi-vendor reseller has been harmed by Defendants' conduct. Docket No. 121 at 8. As the R&R points out, Dexon's allegations of antitrust injury include, among other allegations, the following:

> Dexon has lost customers and customer revenues and profits from purchases due to the anticompetitive and coercive tactics employed by Cisco. Even for those customers it did not lose, where Dexon was forced to provide new equipment to customers under duress from Cisco, Dexon was forced to sustain losses that directly stem from Cisco's anticompetitive conduct. Namely, to preserve the integrity of customers' networks while assuring customers that they would receive the services for which they had paid, Dexon took losses for products which should have been serviced by Cisco under the previously approved SmartNet service packages.

R&R at 14; *see also id.* at 15.

An antitrust plaintiff must present plausible allegations establishing an antitrust injury in its complaint. *Corrente v. Charles Schwab Corp.,* Case No. 4:22-CV-00470, 2023 WL 2244680, at *6 (E.D. Tex. Feb. 24, 2023) (citing *In re Pool Prods.,* 940 F. Supp. 2d at 399). That said, the adequacy of a plaintiff's contentions regarding a transaction's effect on competition is often a fact-intensive inquiry that requires discovery. *Id.* (citing *Sanger,* 802 F.3d at 738 ("noting

that antitrust injury and other standing issues 'may present disputed issues of fact' "); *Pfizer Inc. v. Johnson & Johnson,* 333 F. Supp. 3d 494, 501 (E.D. Pa. 2018) ("noting that 'the adequacy of a plaintiff's contentions regarding the effect on competition is typically resolved after discovery, either on summary judgment or after trial' "). For this reason, "the existence of an antitrust injury is not typically resolved through motions to dismiss." *Id.* (quoting *TravelPass,* 2019 WL 5691996, at *22 n. 25). Indeed, in assessing whether a plaintiff has adequately alleged an antitrust injury, the Court must assume that an antitrust violation has occurred. *Id.* (citing *Sanger,* 802 F.3d at 738). Similar to the court in *Corrente,* the Court finds on *de novo* review that Dexon has adequately pleaded an antitrust injury. *Id.* Accordingly, Defendants' objections to this portion of the R&R are **OVERRULED**.

### 2) Dexon's *per se* tying claim against Cisco under Sherman Act § 1 (Count III) and monopolization and attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V)

**Cisco's assertions regarding Dexon's *per se* tying claim.** Cisco asserts Dexon's tying claim under Sherman Act § 1 (Count III) fails for three reasons, two of which relate to the California Court's earlier dismissal of Dexon's California Counterclaims with leave to amend. R&R at Docket No. 22 at 17–23. Cisco first asserts Dexon never alleges any facts to support its conclusory allegations that Cisco used its market power to foreclose sales of any competitor's equipment and cites the California Court's dismissal of Dexon's tying claim for failure to allege "Cisco's competitors are impacted." *Id.* at 17–21 (citing *Cisco I,* 2021 WL 5848080, at *4). Cisco next asserts Dexon has not plausibly alleged any tie between service and equipment. *Id.* at 21–22. Again, Cisco references the California Court's decision, noting the California Court found the supposed tie "makes no logical sense." *Id.* at 21 (citing *Cisco I,* 2021 WL 5848080, at *5). Finally, unrelated to the California Court's decision, Cisco argues Dexon's allegations state that customers can pay a " 're-certification fee" to forego the purchase of new equipment as a condition of obtaining SmartNet service, and that is not a tying claim. *Id.* at 22–23.

**\*28** Dexon makes at least two arguments in response to Cisco's motion, both of which would distinguish the reasoning provided by the California Court based on the factual allegations contained in Dexon's California

Counterclaims. First, Dexon disputes that it is required to plead "substantial foreclosure" in the tied product market. Docket No. 24 at 17. Dexon asserts Cisco improperly attempts to import the "substantial foreclosure" requirement applicable to exclusive dealing claims to this *per se* tying claim. *Id.*

Second, unlike in the California Lawsuit, here Dexon says "lock-in" is key to its *per se* tying claim. Apparently relying on a *Kodak* "lock-in" theory of tying, Dexon states it alleges Cisco has threatened to withhold service on an entire installed base of products "to extract supra-competitive purchases of specific tied products." Docket No. 34 at 8. Pursuant to this theory, Dexon states it has sufficiently alleged anticompetitive effects in the tied product markets by providing "detailed allegations that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding considering of competitive alternatives." Docket No. 24 at 23; *see also id.* at 22–23 (further stating Cisco "takes advantage" of "locked-in customers" who had been assured they would receive maintenance and service without purchasing anything else, "forcing the customer to spend more of their limited budget to eliminate competitive alternatives in the process"). According to Dexon, as in *Kodak*, it is the timing of the withholding service that makes Cisco's conduct anticompetitive. *Id.* at 22.

**Cisco's assertions regarding Dexon's monopolization/attempted monopolization claims.** Regarding Dexon's monopolization/attempted monopolization claims against Cisco under Sherman Act § 2 (Counts IV, V), Cisco asserts Dexon fails to allege actionable exclusionary conduct. Docket No. 22 at 23–28. Cisco argues the monopolization claims fail "for the same reason that its tying claim fails: Dexon does not allege that Cisco's SmartNet-related conduct prevents Cisco's equipment-manufacturing competitors from making sales." *Id.* at 24. Cisco next argues that "in any event," Cisco's alleged conduct does not plausibly amount to anticompetitive or exclusionary conduct. *Id.* Cisco characterizes Dexon's complaint as a "change of distributor" or "refusal to deal" case, and then argues that Dexon's allegations that Cisco maintained or attempted to maintain its monopoly position by having distributors charge higher prices do not "make economic sense" while claiming Cisco "has no antitrust obligation to assist its competitors." *Id.* at 24–28.

**Report and Recommendation.** In the R&R, the Magistrate Judge discusses at length the "lock-in" tying arrangement

expressed in *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451 (1992). *See* R&R at 48, 52–65. The Magistrate Judge found Dexon's complaint contains sufficient allegations concerning a *Kodak* lock-in theory of tying, explaining the installed networking equipment already purchased is the alleged "lock-in" product; SmartNet service is the alleged tying product; and new networking equipment in the Relevant Products Markets is the alleged tied product. *Id.* at 55 (citing *Lee v. Life Ins. Co. of N. Am.*, 23 F.3d 14, 17 (1st Cir. 1994)); *see also id.* at 55–56 (citing Docket No. 1, ¶¶ 45–46, 67, 102; also citing Docket No. 1 at 15 ("Cisco locks in customers who required maintenance with SmartNet, and then uses SmartNet as a hammer to force supracompetitive purchases of routers and ethernet switches.")).

**\*29** The Magistrate Judge noted the parties' arguments reflect differences in how the parties view Dexon's tying claim. Dexon alleges a *Kodak* "lock-in" theory of tying liability, arguing it does not need to allege substantial foreclosure to competitors because that is only applicable to exclusive dealing claims. R&R at 52. Having found Dexon plausibly alleges a *Kodak* theory of *per se* tying liability, *id.* at 52–58, and that Cisco has not shown Dexon's theory fails to make economic sense, *id.* at 58–60, the Magistrate Judge stated Dexon has sufficiently alleged a tying arrangement involving the use of market power to force consumers to buy goods they would not otherwise purchase. *Id.* at 60–65.

The Magistrate Judge found Cisco fails to persuasively show that such a theory of tying liability requires a showing of substantial market foreclosure of competitors' sales that it argues for in its briefing. *Id.* at 65. Even so, the Magistrate Judge further found Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. Among other things, the Magistrate Judge noted Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. *Id.* (citing Docket No. 24 at 23 (citing Docket No. 1, ¶¶ 4–5, 51)).

Regarding Cisco's argument that Dexon's tying claims also fail because Dexon alleges that customers can avoid purchasing new equipment by instead paying a "re-certification fee" (apparently arguing that because no new equipment is purchased, there is no tie), the Magistrate Judge stated "Cisco's argument is not well developed, and the

USAP033

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 36 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

extent, effect, and details of any re-certification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile." *Id.* at 66. For all these reasons, the Magistrate Judge concluded Dexon has plausibly stated a *per se* tying claim against Cisco under Sherman Act § 1.

The Magistrate Judge, viewing Dexon's allegations collectively and in the light most favorable to Dexon, further found Dexon plausibly states monopolization and attempted monopolization claims against Cisco under Sherman Act § 2. *Id.* at 69. Specifically, the Magistrate Judge held as follows:

Cisco does not challenge Dexon's pleading regarding the first element, that Cisco possesses monopoly power in each of the Relevant Markets. Cisco disputes the second element, the anticompetitive (or "exclusionary") conduct element. Dexon alleges two theories to establish anticompetitive conduct: tying and FUD tactics.

Dexon's allegations regarding Cisco's tying-related conduct and FUD strategies towards the end-users of its equipment are sufficient to defeat a motion to dismiss. As noted above, the Court in *Kodak* stated the second element of a § 2 claim is the use of monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Kodak*, 504 U.S. at 482–83 (citations omitted). According to the Court, if Kodak adopted its parts and service policies as part of a scheme of willful acquisition or maintenance of monopoly power, it will have violated § 2. *Id.* The Court further stated respondents had presented evidence that Kodak took exclusionary action to maintain its parts monopoly and used its control over parts to strengthen its monopoly share of the Kodak service market; liability turned, then, on whether "valid business reasons" could explain Kodak's actions. Id. at 483 (citations omitted). Finally, the Court considered Kodak's "three valid business justifications for its actions," concluding factual questions existed "about the validity and sufficiency of each claimed justification, making summary judgment inappropriate." *Id.* at 483. Like the ISOs in *Kodak*, Dexon alleges Cisco's tying conduct supports a § 2 claim as well.

**\*30** Further, Dexon's allegations concerning Cisco's FUD strategies also plausibly show exclusionary conduct by Cisco to support Dexon's § 2 claims. *See* Dkt. No. 1, ¶¶ 6–9, 64–68 (alleging Cisco uses FUD to dissuade customers from purchasing from resellers with lower prices and to accomplish its coercion strategies). The Third Circuit previously rejected a defendant's attempt to claim such conduct does not show anticompetitive conduct,

specifically "in the context of a *Kodak* claim." *See Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354 (3d Cir. 2016) (holding that "the allegedly predatory acts—e.g., terminating dealings with TLI; sending 'fear, doubt, and uncertainty' letters to TLI's maintenance customers; and trespassing and spying on TLI's customers" was "sufficient to show exclusionary conduct for purposes of § 2" and to support the jury's judgment on the issue). For its part, Cisco's briefing does not specifically address Dexon's FUD[ ] allegations.

Instead, Cisco first argues that the monopolization claims fail "for the same reason that its tying claim fails: Dexon does not allege that Cisco's SmartNet-related conduct prevents Cisco's equipment-manufacturing competitors from making sales." Dkt. No. 22 at 24. For the reasons explained with respect to Dexon's tying claims, Cisco's argument that Dexon fails to plausibly plead harm to competition is rejected. Further, Cisco does not address Fifth Circuit law holding that "injury to competition is presumed to follow from the conduct proscribed by § 2." *Walker* [*v. U–Haul Co. of Mississippi*, 747 F.2d 1011, 1013 (5th Cir. 1984)].

Cisco next argues that "in any event," Cisco's alleged conduct does not plausibly amount to anticompetitive or exclusionary conduct. Dkt. No. 22 at 24. Cisco characterizes Dexon's complaint as a "change of distributor" or "refusal to deal" case, and then argues that Dexon's allegations that Cisco maintained or attempted to maintain its monopoly position by having distributors charge higher prices does not "make economic sense" while claiming Cisco "has no antitrust obligation to assist its competitors." *Id.* at 24–28. None of these arguments are proper at this stage. Dexon does allege a mere change of distributor or refusal to deal dispute, and assuming the allegations are true, Cisco's tying and FUD strategies make economic sense, at least in terms of a *Kodak* claim, as long as those actions maintain or enhance Cisco's monopoly power as alleged. *See* Dkt. No. 24 at 27 (citing Dkt. No. 1, ¶¶ 84, 91, 98, 106, 112).

*Id.* at 67–69.

The Magistrate Judge recommended the Court deny Cisco's motion to dismiss Dexon's *per se* tying claim against Cisco under Sherman Act § 1 and Dexon's monopolization and attempted monopolization claims against Cisco under Sherman Act § 2.

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

**Cisco's objections.** In its objections, Cisco asserts Dexon's failure to allege that Cisco's conduct hindered competitors from making sales is fatal to Dexon's claims. Docket No. 119 at 4. Relying on *Cisco I*, Cisco argues Dexon's claims require allegations of foreclosure—"that is, that Cisco's conduct prevented Cisco's competitors from making sales in the relevant markets." *Id.* (citing *Cisco I*, 2021 WL 5848080, at *4–5). Asserting the R&R conflicts with the ruling of the California Court, Cisco asserts the Magistrate Judge fails to "distinguish" *Cisco I* on the ground that Dexon's complaint relies on a *Kodak* lock-in theory of tying. According to Cisco, Dexon's California Counterclaims pleaded this theory, and the California Court rejected the theory. *Id.* at 4–5. Cisco further asserts the R&R cites no case supporting its holding that a plaintiff need not allege harm to competition in the relevant market, and it ignores relevant cases cited by Cisco. *Id.* at 5 (citing *Chawla v. Shell Oil Co.*, 75 F. Supp. 2d 626, 641 (S.D. Tex. 1999) ("*Kodak* ... does not excuse failure of a plaintiff to allege an effect on competition in the tied product's market.")).

 ***31** Cisco reiterates its arguments as expressed in its underlying briefing that Dexon fails to allege foreclosure. In its objections, Cisco asserts the R&R cites no case holding that a plaintiff can state a monopolization claim without alleging foreclosure. *Id.* Cisco argues Dexon's tying and monopolization/attempted monopolization claims fail because Dexon "does not allege that any customer wanted to buy networking equipment or IP phones made by Cisco's competitors and that Cisco prevented them from doing so." *Id.* (citing *Cisco I*, 2021 WL 5848080, at *4–5).

Finally, Cisco asserts Dexon does not allege a tie with regard to its *Kodak* lock-in theory. *Id.* at 7. According to Cisco, the R&R "has no meaningful response" to Cisco's argument regarding the "re-certification fee." *Id.* Cisco further contends, as it did in its motion to dismiss, that Dexon's antitrust claims do not make economic sense and must be dismissed. *Id.* at 7–8.

***De novo* review.** The R&R considered Dexon's complaint in detail and properly found that the Court must accept as true all well-pleaded facts in the complaint and view those facts in the light most favorable to Dexon. R&R at 19. In doing so, the Magistrate Judge found that Cisco is a monopolist in the Relevant Networking Equipment Markets (*id.* at 41), the Relevant IP Phone Markets (*id.*), (together the "Relevant Product Markets"), and the Relevant Service Markets (collectively the "Relevant Markets"). *Id.* at 41–

42. The Magistrate Judge also found that Dexon properly stated claims under §§ 1 and 2 of the Sherman Act as well as under the Texas Free Enterprise Act due to Dexon's allegations regarding Cisco's alleged tying-related conduct and use of fear, uncertainty and doubt ("FUD") strategies. Cisco's objections to the R&R's recommended findings of fact and conclusions of law regarding Counts III, IV, and V do not specifically challenge the majority of the Magistrate Judge's findings and conclusions, except for Cisco's assertions as outlined above and which the Court summarizes as follows:

- The R&R conflicts with *Cisco I* because the California Court considered and rejected a *Kodak* "lock-in" theory of tying liability, stated the "supposed tie makes no logical sense," and also held Dexon's monopolization claims fail because the "theory for why Cisco took action against Dexon makes little economic sense."

-  The R&R errs with regard to Dexon's tying and monopolization claims because it did not find foreclosure (i.e., that Cisco's conduct affected the sales of Cisco's competitors).

- The R&R did not correctly determine a tie as required to allege a *Kodak* "lock-in" theory, and the R&R has "no meaningful response" to Cisco's arguments regarding Dexon's allegations of "re-certification fee."

Although many of the arguments rehash Cisco's earlier assertions without meaningfully engaging in the analysis contained in the R&R, the Court considers each in turn, finding each one without merit. Throughout its objections, Cisco challenges the R&R's finding of *per se* tying on the basis that it conflicts with the California Court's prior ruling on Dexon's California Counterclaims. According to Cisco, the California Court specifically rejected a "lock-in" theory of *per se* tying liability, citing *Kodak.* Docket No. 119 at 3–4. Cisco argues the California Court held that "this reverse-*Kodak* theory" "makes no logical sense" because no consumer wants Cisco service unless it wants Cisco equipment in the first place. *Id.* at 7.

The Magistrate Judge was clear that he would only revisit specific findings of the California Court to the extent there was a compelling reason to do so, "such as a difference in controlling law, citation to prior rulings of this Court, or substantive factual allegations not pleaded in the California Court." R&R at 17. The R&R also makes clear there are four new examples of alleged anticompetitive conduct involving tying in this complaint which were not alleged in

USAP035

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 38 of 60

Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)

Dexon's California Counterclaims (Texas bank, automotive dealership, energy company, and school district), and the "IT budget phenomenon" was also absent from the California Lawsuit. *Id.* at 52–53. As the R&R explains, Dexon states the "lock-in combined with the limited IT budget" brings Dexon's allegations in this case in line with *Kodak*. *Id.* at 53 (quoting Docket No. 62 (Transcript) at 102:18–20).

 **\*32**  Additionally, in addressing whether Dexon's *Kodak* "lock-in" tying claim makes economic sense as alleged in this case, the Magistrate Judge specifically considered whether the California Court had substantively ruled on a *Kodak* "lock-in" theory of tying liability in *Cisco I*. *Id.* at 59. Although the California Court stated in a footnote that it "is at least theoretically possible for a firm to harm competitors by locking customers into a costly long-term service plan and then requiring purchases in a tied equipment market that customers en masse (for some set of reasons) cannot refuse," the California Court also noted the "the conditions necessary" for such an arrangement were "far away from the facts alleged here." *Id.* (quoting *Cisco I*, 2021 WL 5848080, at \*5, n.2). The Magistrate Judge found the California Court had not ruled on a *Kodak* "lock-in" theory of tying liability, especially considering the new substantive factual allegations pleaded in this case. *Id.* (citing Docket No. 62 (Transcript) at 73:4–7 (stating an "important fact" that was not before the California Court "that is littered throughout these [new] examples but also pled more generally are limited IT budgets"); also citing *id.* at 90:22–24 ("I just did a search, the only allegation on budget that we made in California was why a customer might buy SmartNet in general. It was not about lock-in")). The Court finds no conflict between the R&R and the substantive rulings of the California Court in *Cisco I*.

Cisco argues Dexon's claims do not make economic sense without addressing the Magistrate Judge's extensive discussion that they do make economic sense in the context of a *Kodak* "lock-in" theory of tying liability. *Id.* at 59–60. As the R&R explains, "fundamentally, Dexon does not allege [as Cisco contends] that the already owned network equipment is the tied product; rather, as explained above, Dexon alleges here that the equipment the customer already owns is the lock-in product while the new equipment is the tied product." *Id.* at 59 (emphasis added). In addition, "the complaint sufficiently alleges that Cisco has threatened to withhold service on an entire installed base of products to extract supra-competitive purchases of specific tied products." *Id.*

In its objections, Cisco reiterates, with regard to the *per se* tying claims, its argument regarding Dexon's allegation that some customers can pay a recertification fee to receive SmartNet service. However, as the R&R explained, "Cisco's argument is not well developed, and the extent, effect, and details of any recertification fee are not sufficiently known to render Dexon's otherwise well-pleaded claims futile." *Id.* at 66. Cisco's assertions regarding Dexon's allegation of a "re-certification fee" do not invalidate the sufficiency of other allegations contained in the complaint which properly raise a *Kodak* "lock-in" theory of tying that makes economic sense. For example, in Dexon's response to Cisco's objections, Dexon points out "the R&R correctly observed that in the case of the Texas Bank, it could only be eligible for SmartNet renewal if it bought more Cisco switches and routers. Docket No. 121 at 7 (citing R&R at 60).

In its objections, Cisco incorrectly describes the R&R as concluding a "plaintiff need not allege harm to competition in the relevant market," arguing the R&R ignores that *Kodak* does not excuse the failure of a plaintiff to allege an effect on competition in the tied product's market. Docket No. 119 at 4. Instead, the R&R states as follows: "[a]s explained below, Cisco has failed to show Dexon fails to allege the requisite level of foreclosure to survive a motion to dismiss." R&R at 61.

The R&R points out Dexon's allegations of four new examples of "foreclosure." *Id.* at 61–62. The R&R then explains why the Fifth Circuit's decision *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379 (5th Cir. 1994), *cert. denied*, 513 U.S. 1103 (1995), a case relied upon by Cisco, is procedurally different from Cisco's motion to dismiss and also "tends to support Dexon's argument that the law does not require plaintiffs to plead the same level of foreclosure in tying claims." *Id.* at 62; *see also id.* at 64 ("The claim in *Roy B. Taylor Sales* was not a *Kodak* 'lock-in' theory of tying liability which would result in an ultimate foreclosure of choice to the ultimate consumer. Rather, the case involved 'an exclusive dealing line-forcing arrangement' where a manufacturer was forcing the dealer to buy its full line to the exclusion of other competitors."). The Magistrate Judge concluded as follows:

 **\*33**  In this case, Dexon alleges a *Kodak* "lock-in" theory of *per se* tying liability. As noted by the Fifth Circuit in *Roy B. Taylor Sales*, the common ground to those types of tying arrangements is "consumers have to buy one product or service to receive another, removing them from the market for the tied good." *Id.* at 1383 (citing *Kodak*, 504 U.S. 451). As noted by the Fifth Circuit, a *per se*

condemnation requires proof that the tying arrangement involved "the use of market power to force [consumers] to buy [goods] they would not otherwise purchase." *Breaux Bros. Farms v. Teche Sugar Co.*, 21 F.3d 83, 86 (5th Cir. 1994) .... Likewise, here, Dexon has sufficiently alleged a tying arrangement involving the use of market power to force consumers to buy goods they would not otherwise purchase.

*Id.* at 65 (internal footnote omitted).

Although disagreeing with Cisco that "substantial" market foreclosure of competitors' sales is necessary for a *Kodak* "lock-in" theory of *per se* tying liability, the Magistrate Judge held Dexon has sufficiently alleged foreclosure of Cisco's competitors to survive a motion to dismiss. *Id.* Specifically, the Magistrate Judge concluded as follows:

Dexon has alleged that when customers are forced to purchase products they do not want or need, or are forced to purchase them on coerced terms, it inevitably leads to foreclosure of Cisco's equipment competitors because customers' limited IT budgets have already been spent, precluding consideration of competitive alternatives. Dkt. No. 24 at 23 (citing Dkt. No. 1, ¶¶ 4–5, 51). According to Dexon, "if Cisco did not withhold service and thus engage in tying, customers would be free to purchase alternative equipment from competitive vendors at a lower price, as was critical to them in the first place when they bought the equipment and service." *Id.* (citing Dkt. No. 1, ¶¶ 7, 13, 46, 50–51, 82). Dexon alleges Cisco subsequently takes advantage of locked-in customers because of Cisco's virtual monopoly in service, forcing the customers to spend more of their limited budget to eliminate competitive alternatives in the process. *Id.* (citing Dkt. No. 1, ¶¶ 4–5, 26, 51, 103, 125).

*Id.* at 65–66.

Upon *de novo* review, the Court agrees with the Magistrate Judge that Dexon sufficiently alleges *per se* tying under § 1 that results in competitive foreclosure due to unwanted and forced purchases from an alleged monopolist. The Court also finds Dexon has sufficiently alleged that Cisco engages in anticompetitive or exclusionary conduct for purposes of its monopolization and attempted monopolization claims under § 2. Accordingly, Cisco's objections to Dexon's *per se* tying and monopolization/attempted monopolization claims are **OVERRULED**.

## CONCLUSION

For the reasons set forth above, the Court does not find clearly erroneous or contrary to law the Magistrate Judge's December 22, 2022 Order (Docket No. 94) denying Defendant Cisco Systems, Inc.'s Motion to Transfer (Docket No. 21). Accordingly, it is

**ORDERED** that Defendants Cisco Systems, Inc. and CDW Corporation's Objection to the Order Denying Cisco's Motion to Transfer (Docket No. 96) is **OVERRULED**.

For the reasons set forth above, the Court is of the opinion the findings and conclusions of the Magistrate Judge's Report and Recommendation (Docket No. 107) are correct, and the Defendants' Objections (Docket Nos. 119, 120) are without merit as to the ultimate findings of the Magistrate Judge. Accordingly, it is

**ORDERED** that the Report and Recommendation of the United States Magistrate Judge (Docket No. 107) is **ADOPTED** as the opinion of the District Court. It is further

**ORDERED** that Defendant Cisco's Objections to the Report and Recommendation (Docket No. 119) and Defendant CDW's Objections to the Report and Recommendation (Docket No. 120) are **OVERRULED**. It is further

 **\*34** **ORDERED** that Defendant Cisco's Motion to Dismiss (Docket No. 22) is **DENIED**, with the part of the motion seeking dismissal under true res judicata being **DENIED WITHOUT PREJUDICE**. It is further

**ORDERED** that Defendant CDW Corporation's Motion to Dismiss (Docket No. 28) is **DENIED**, with the parts of the motion seeking dismissal for failure to plead with sufficient specificity CDW's specific intent to monopolize and dismissal of Dexon's pre-2018 claims as time-barred being **DENIED WITHOUT PREJUDICE**. It is further

**ORDERED** that within thirty (30) days from the date of entry of this Order, Dexon shall replead with specificity its Sherman Act § 2 conspiracy to monopolize claim against CDW, specifically addressing the issues raised in the R&R regarding CDW's specific intent to monopolize.

**So ORDERED and SIGNED this 31st day of March, 2023.**

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    28

**Dexon Computer, Inc. v. Cisco Systems, Inc., Not Reported in Fed. Supp. (2023)**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 2730656

---

**End of Document**                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

USAP038

2023 WL 9421132
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

PANDORA MEDIA, LLC
v.
SPOKEN GIANTS, LLC

Case No. 2:23-mc-149-MCS-MAR
|
Filed December 6, 2023

**Attorneys and Law Firms**

Maximillian Wolden Hirsch, Mayer Brown LLP, Los
Angeles, CA, Raymond J. DiCamillo, Richards Layton and
Finger, Wilmington, DE, Allison M. Aviki, Paul M. Fakler,
Jacob B. Ebin, Mayer Brown LLP, New York, NY, Douglas
Allen Smith, Mayer Brown LLP, Los Angeles, CA, Katharine
Lester Mowery, Nathalie Anne Freeman, Richards Layton
and Finger, PA, Wilmington, DE, for Petitioner.

John P. Cogger, Gordon Rees Scully Mansukhani LLP,
Los Angeles, CA, Joshua D. Wilson, Gordon Rees Skully
Mansukhani LLP, Franklin, TN, for Respondent.

**Proceedings (in chambers): ORDER RE: PANDORA'S
MOTION TO COMPEL SPOKEN GIANTS,
LLC TO COMPLY WITH SUBPOENA, DKT. 1.**

MARGO A. ROCCONI, UNITED STATES MAGISTRATE
JUDGE

**\*1** On October 12, 2023, Pandora Media, LLC ("Pandora")
filed a Motion to Compel Spoken Giants, LLC ("Spoken
Giants") to comply with a subpoena in the District of
Delaware. Case No. 2:23-mc-149-MCS-MAR ("No. 149"),
ECF Docket No. ("Dkt.") 1. The subpoena sought discovery
for Yellow Rose Productions, Inc. v. Pandora Media, LLC,
No. 2:22-cv-809-MCS-MAR ("No. 809"), a case pending
in this district. Id. On October 25, 2023, the motion was
transferred to the Central District of California upon the
parties' stipulation. No. 149, Dkt. 8–11.

The Court finds this matter suitable for resolution without oral
argument. See Fed. R. Civ. P. 78(b); Local Rule 7-15. For the
reasons set forth below, the Motion is **DENIED** in part and
**GRANTED** in part.

**I.**

**BACKGROUND:**

On February 7, 2022, Yellow Rose Productions, Inc. filed
an action against Pandora. No. 809, Dkt. 1. On March 22,
2022, the district court ordered this case to be consolidated
for pretrial purposes with nine (9) other cases brought
against Pandora by individual comedians, their production
companies, or their estates (collectively "Plaintiffs"). No.
809, Dkt. 18.

Plaintiffs bring their consolidated copyright infringement
action against Pandora, a digital broadcast radio and
interactive streaming service. No. 809, Dkt. 178 at 9.
Plaintiffs argue that Pandora's use of comedic recordings
implicate two (2) distinct copyrights—one for the sound
recording of the comedy routine and one for the underlying
jokes embodied in the spoken-word comedy recordings. Id. at
29. Plaintiffs allege that Pandora failed to obtain a license or
pay royalties on the underlying literary works. Id. at 9–10.

Pandora denies that they have infringed Plaintiffs' literary
copyrights. Id. at 4. Pandora raises various affirmative
defenses, including implied license and misuse of copyright.
Id. at 10. With respect to their implied license defense,
Pandora claims that—per decades-long industry custom—
no compositional licenses are necessary, as no royalties
have ever been paid to license comedians' underlying
compositions. Id. Pandora argues, in the alternative, that they
have received an implied license to use the works. Id.

Pandora brought antitrust counterclaims against the
comedians, as well as Spoken Giants and Word Collections,
LLC ("Word Collections"), licensing groups that represent
the comedians. No. 809, Dkts. 34, 72. On July 15, 2022,
Plaintiffs and counter-defendants Spoken Giants and Word
Collections filed a motion to dismiss Pandora's counterclaims.
No. 809, Dkt. 49. On October 26, 2022, the district court
dismissed the counterclaims without prejudice. No. 809,
Dkt. 83. On November 18, 2022, Pandora brought amended
counterclaims against the comedians, Spoken Giants, and
Word Collections. No. 809, Dkts. 93, 94. On April 5, 2023, the
district court dismissed all of Pandora's counterclaims with
prejudice; accordingly, Spoken Giants and Word Collections
were terminated as parties to the action. No. 809, Dkt. 164.

USAP039

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 42 of 60

Pandora Media, LLC v. Spoken Giants, LLC, Not Reported in Fed. Supp. (2023)

On November 28, 2022, when Spoken Giants was still a counter-defendant in the case, Pandora propounded sixty-eight (68) discovery requests on them. No. 149, Dkt. 2 at 10. After Spoken Giants was dismissed as a party, Pandora propounded twenty-eight (28) discovery requests on Spoken Giants as a nonparty, pursuant to Federal Rule of Civil Procedure 45. Id.

## II.

### DISCUSSION

#### A. RELEVANT LAW

**\*2** Federal Rule of Civil Procedure 45 governs the issuing and service of subpoenas on nonparties. Fed. R. Civ. P. 45 ("Rule 45"). If necessary to enforce that subpoena, a party may move to compel the nonparty to comply in the court where the discovery is to be taken. Fed. R. Civ. P. 37(a)(1)–(2). Under Rule 45, a subpoena must be modified or quashed if it "requires disclosure of privileged or other protected matter, if no exception or waiver applies," or if the subpoena "subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iii), (iv); see also Fed. R. Civ. P. 45(d)(1) (party issuing a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena").

Whether a subpoena imposes an undue burden on a particular witness is a "case specific inquiry." Thayer v. Chiczewski, 257 F.R.D. 466, 469 (N.D. Ill. 2009) (internal quotations and citations omitted). Generally, under the Federal Rules of Civil Procedure,

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within

this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1). Relevant information includes more information than is necessarily needed for a trial in the matter and does not have to "be admissible in evidence" during a trial. Id. A court "must limit the frequency or extent of discovery otherwise allowed" if:

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C). "Thus, a court determining the propriety of a subpoena balances the relevance of the discovery sought, the requesting party's need, and the potential hardship to the party subject to the subpoena." Heat & Control, Inc. v. Hester Industries, Inc., 785 F.2d 1017, 1024 (Fed. Cir. 1986).

However, while discovery should not be unnecessarily restricted, nonparty discovery is more limited to protect nonparties from harassment, inconvenience, or disclosure of confidential documents. Dart Indus. Co. v. Westwood Chem. Co., 649 F.2d 646, 649 (9th Cir. 1980). Accordingly, "concern for the unwanted burden thrust upon nonparties is a factor entitled to special weight in evaluating the balance of competing needs." Cusumano v. Microsoft Corp., 162 F.3d 708, 717 (1st Cir. 1998). However, "third party discovery is a time-honored device to get at the truth of a claim or defense. A party in litigation is not obligated to take the word of an opponent regarding what relevant documents do or do not exist." L.G. Philips LCD Co. v. Tatung Co., No. C 07 80073WHA, 2007 WL 869256, at *2 (N.D. Cal. March 20, 2007).

USAP040

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 43 of 60

Pandora Media, LLC v. Spoken Giants, LLC, Not Reported in Fed. Supp. (2023)

## B. ANALYSIS

Pandora asserts that all of their requests fall under a few broad categories:

1. Documents concerning Spoken Giants's licensing practices (RFP Nos. 1, 3–6, 8–12, 15–22, 25–27);

2. Documents concerning the significance and size of Spoken Giants's catalog (RFP Nos. 10, 13, 14, 23, 24);

**\*3** 3. Documents concerning Spoken Giants's relationship with Plaintiff Black (RFP No. 28);

4. Documents concerning the benefits to comedians of joining Spoken Giants (RFP No. 15);

5. Documents concerning past enforcement actions regarding the rights at issue in the Consolidated Litigation (RFP No. 7);

6. Documents concerning royalties for "literary works" rights (RFP Nos. 3, 6, 16–17, 20–21, 26); and

7. Documents concerning Spoken Giants's role in the Consolidated Litigation (RFP No. 2).

No. 149, Dkt. 2 at 14–15.

Pandora asserts the requests are all relevant because they either: (1) relate to Pandora's defenses of copyright misuse and unclean hands; (2) relate to Plaintiffs' copyright infringement claims and Pandora's defenses based upon custom and practice in the comedy industry; or (3) bear on to the damages calculations, should Plaintiffs prevail. Id. at 10–20.

### 1. Relevance to defenses

Pandora justifies the breadth of their requests by citing the facts that Spoken Giants was formally a party in this action and that the district court expressly noted that Spoken Giants as a nonparty would still need to provide some discovery. See No. 809, Dkt. 83 at 27. However, Pandora neglects to meaningfully discuss how Spoken Giants was only a party because Pandora brought them in as a counter-defendant, and how the counterclaims against Spoken Giants were dismissed not once, but twice by the district court. No. 809, Dkts. 83, 164. As noted above, after Pandora was given an opportunity to amend, the counterclaims against Spoken Giants were dismissed with prejudice and Spoken Giants was terminated as a party in this action. See No. 809, Dkt. 83.

The procedural history of this case reveals that, despite Pandora's own efforts to join Spoken Giants in this action, the district court has expressly and finally determined Spoken Giants not be joined. Thus, the Court is not persuaded by Pandora's argument that Spoken Giants, as a former party, should not be afforded the same considerations as a typical nonparty. Therefore, here the Court considers, as is typical in subpoenas served on nonparties, that "the standards for nonparty discovery ... require a stronger showing of relevance than for simple party discovery." Laxalt v. McClatchy, 116 F.R.D. 455, 458 (D. Nev. 1986).

Here, many of Pandora's requests have no connection to the Plaintiffs in this action. See No. 149, Dkt. 12–17. Pandora relies on M. Witmark & Sons v. Jensen, 80 F. Supp. 843 (D. Minn. 1948) to argue that the act of banding together to form blanket licensing collectives can support the defense of copyright misuse. However, M. Whitmark & Sons is distinguishable from this case. In M. Whitmark & Sons, the collective was found to control 80% of the market, and based on that percentage, the court found the collective liable for violating antitrust laws. Id. at 847–50. Thus, the copyright misuse in M. Witmark & Sons was directly tied to an antitrust violation. By contrast, here the district court found that Pandora's claims lacked specificity, and that even with a "hypothetical total," Spoken Giants and Word Collections's combined market share was only 28%—well below the threshold of 65% market share courts generally use "for finding a prima facie case of monopoly power." No. 809, Dkt. 164 at 22–23 (quoting Epic Games, Inc. v. Apple Inc., 559 F. Supp. 3d 898, 1029 (N.D. Cal. 2021)); accord Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir. 1997) ("Courts generally require a 65% market share to establish a prima facie case of market power."). The district court dismissed the antitrust claims on this basis. Id. at 28. Pandora has cited no authority that would support the proposition that, absent a potential antitrust violation, the mere existence of Spoken Giants as a collective of comedians would automatically make their actions relevant to this action —particularly where Spoken Giants has expressly and finally been terminated as a party to the action.

**\*4** To be sure, the district court did note that "discovery may yield information about the nature of the agreements between the comedians and [counter-defendants], at the very least in the context of Pandora's copyright misuse defense." No. 809, Dkt. 83 at 27. Thus, the district court left open the possibility that communication between Spoken Giants and

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 44 of 60

Pandora Media, LLC v. Spoken Giants, LLC, Not Reported in Fed. Supp. (2023)

Plaintiffs may be relevant. Indeed, Spoken Giants does not appear to argue that they possess no documents relevant to Pandora's defenses—they merely note that Pandora's defenses of misuse and unclean hands are solely based on the Plaintiffs' knowledge and actions, not their own as a nonparty, and argue that this distinction must necessarily be reflected in the breadth of Pandora's requests. No. 149, Dkt. 31 at 5–6. This Court agrees.

Notably, there is no dispute that Spoken Giants communicated to at least one Plaintiff about the claims in this action. Id. at 5 n.1. This communication and others like it may be relevant to what knowledge Plaintiffs may have had or acted upon. Thus, the Court finds that any communications to Plaintiffs pertaining to the copyright claims at issue here are discoverable. By contrast, all the discovery requests solely seeking information on Spoken Giants's business model, investors, catalogue, research, clients (other than Plaintiffs), or communications with other entities that do not implicate Plaintiffs are not relevant to the claims or defenses at issue here.

#### 2. Relevance to custom and practice

Pandora asserts the defense of industry custom and practice; they argue that Spoken Giants seeks, through Plaintiffs, to overturn the traditional custom and practice of comedy works royalties and therefore will have relevant discovery about the traditional industry custom and practice. No. 149, Dkt. 2 at 18. While Pandora's theory is reasonable-sounding, Pandora does not provide evidence to support their allegations of Spoken Giants's involvement, nor do they convincingly argue why they know such information exists or why the information would be produced in response to their broad requests.

The Court notes that "[n]on-parties have a different set of expectations. Accordingly, concern for the unwanted burden thrust upon nonparties is a factor entitled to special weight in valuating the balance of competing needs." Monster Energy Co. v. Vital Pharm., Inc., No. 5:18-cv-01882-JGB (SHKx), 2020 WL 2405295, at *6 (C.D. Cal. Mar. 10, 2020) (quoting Cusumano, 162 F.3d at 717 (citing, inter alia, Dart Indus. Co., 649 F.2d at 649; In re Pioneer Corp., No. CV 18-4524 JAK (SSx), 2019 WL 5401015, at *5 (C.D. Cal. Jan. 9, 2019) (quoting Cusumano))). Additionally, Rule 45(d)(3)(B) allows a court to strike a request where the information would disclose "confidential research, development, or commercial information" or an "unretained expert's opinion or information that does not describe specific occurrences

in dispute and results from the expert's study that was not requested by a party." Id.

Here, the Court finds the requests are overbroad, and would require Spoken Giants to produce their own "research, development, and commercial information" that are unconnected to specific occurrences in dispute in this action. See id. As an initial matter, the Court notes it has already found Pandora is entitled to any communications with specific Plaintiffs in this action that relate to the claims in dispute; this would surely include any communications with Plaintiffs relevant to Pandora's theory that Spoken Giants has somehow induced them to bring this action in an attempt to upend industry custom and practice. Furthermore, the Court notes that Spoken Giants was founded only in 2019. See Spoken Giants, https://www.spokengiants.com/ (last visited November 29, 2023). It follows that nearly all of the information that Spoken Giants has regarding longstanding industry and custom is likely based on their own independent research. To the extent that Pandora seeks information Spoken Giants has collected about industry custom and practice generally, as opposed to documents pertaining to their personal involvement within the industry, this essentially amounts to a request for information from Spoken Giants as an unretained expert. See Fed. R. Civ. P. 45(c)(3)(B). Pandora has not made the requisite showing to justify such a request. See Fed. R. Civ. P. 45(c)(3)(C) (noting that, instead of quashing a subpoena on an unretained expert, the court may "order appearance or production under specified conditions if the serving party: (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and (ii) ensures that the subpoenaed person will be reasonably compensated); see also, e.g., Los Altos El Granada Invs. v. City of Capitola, No. CV 04-05138 JF (PSG), 2011 WL 13260732, at *2 (N.D. Cal. Mar. 11, 2011) (listing several factors that guide the court's discretion in determining whether to allow discovery from an unretained expert).

**\*5** Accordingly, the Court declines to allow discovery into Spoken Giants's own commercial research except in the instance where that information was communicated to any Plaintiff. If, as Pandora argues, Spoken Giants has been attempting to encourage Plaintiffs to upend industry custom, communications to Plaintiffs should reveal the relevant information concerning the customs at issue.

#### 3. Damages calculation

As to requests that are purportedly relevant to damages, Pandora asserts:

USAP042

Pandora Media, LLC v. Spoken Giants, LLC, Not Reported in Fed. Supp. (2023)

These requests all call for documents that relate to the royalties sought or secured by SG for a license to its catalog of works, the financial benefits to comedians of joining SG and licensing the rights to their "literary works" through SG, or the value of the rights at issue in the Consolidated Litigation.

No. 149, Dkt. 2 at 18–19.

Pandora argues that courts routinely conclude that documents that go to damages are relevant in copyright infringement cases. Id. However, Pandora only cites to cases dealing with requests propounded on a party to the action. Id. at 14–15. Here, Spoken Giants is a nonparty; Pandora provides no case law that supports the premise that a nonparty's financial data would be relevant to a plaintiff's claim for damages in a copyright infringement case.

Indeed, Micro Motion, Inc. v. Kane Steel Co., 894 F.2d 1318, 1325 (Fed. Cir. 1990), is instructive here. There, the Federal Circuit found that the plaintiff was not entitled to discovery on financial data, sales, and client lists from a nonparty competitor solely because the complaint asked for damages. Id. In Micro Motion, Inc., it was the plaintiff seeking discovery on the financial information; an alleged infringer like Pandora arguably would have even less standing to seek a nonparty's financial information based on the Plaintiff's claims for damages. In any case, the court in Micro Motion, Inc. noted that, should the discovery be allowed, "of course, the alleged infringer in such case would have the same right." Id. Accordingly, the court appeared to contemplate and intend that alleged infringers would be entitled to the same discovery as the plaintiff, and, presumably, subject to the same limitations.

Notably here, Spoken Giants claims, and Pandora does not dispute, that none of the Plaintiffs in the consolidated case are currently members of Spoken Giants. No. 149, Dkt. 31 at 12. Spoken Giants notes that, at one time, Plaintiff Lewis Black was a client, but has since disassociated with them. Id. As none of the Plaintiffs are members of Spoken Giants, no information concerning the Plaintiffs' damages can be directly discerned from Spoken Giants's financial

information. It is unclear how else Pandora's broad sweeping requests for Spoken Giants's past or future revenue, client lists, or catalogue would be relevant to the Plaintiffs' damages or the asserted works at issue in this litigation. Accordingly, Pandora is not entitled to this discovery on Spoken Giants's financial information.

## C. MODIFIED REQUESTS FOR PRODUCTION

Typically, it is not the Court's job to rewrite overbroad discovery requests. See Finkelstein v. Guardian Life Ins. Co. of Am., No. C07-1130CRB(BZ), 2008 WL 2095786, at *2 (N.D. Cal. May 14, 2008) ("Rule 26 does not require the Court to rewrite discovery requests for the parties."); Kilby v. CVS Pharmacy, Inc., No. 09-cv-2051, 2017 WL 1424322, at *4 n.3 (S.D. Cal. Apr. 19, 2017) ("Particularly when a party stands on an overly broad request and does not make a reasonable attempt to narrow it or to explain the need for such a broad range of documents and/or information, the Court will not rewrite a party's discovery request to obtain the optimum result for that party. That is counsel's job.") (internal citations and quotation marks omitted). However, in the interest of preventing future motion practice in what has already been a fraught discovery period, the Court will modify certain requests. Furthermore, as stated in a previous discovery order, all requests are limited in scope to include only Documents within the relevant timeframe—from February 7, 2019 (three years prior to the filing of the first Complaint in this action) to the present. See Dkt. 193 at 5. Thus, for the reasons discussed above, the Court amends the requests as follows:

**\*6  REQUEST FOR PRODUCTION 1**

All Documents Concerning contracts, agreements, and memoranda of understanding between You and any Plaintiff that references, discusses, or pertains to the topic of Comedy Works Rights.

**REQUEST FOR PRODUCTION 2**

[STRICKEN]

**REQUEST FOR PRODUCTION 3**

All Documents Concerning any Plaintiff and any entity that streams, distributes, reproduces, broadcasts, publicly performs, or otherwise uses audio or audio-visual comedy recordings, including all Documents Concerning requests for licenses from You, licenses proposed by You, or licenses granted by You to such entities for any Plaintiff and/or any Asserted Works in this action.

### REQUEST FOR PRODUCTION 4

All Documents Concerning Pandora or Sirius XM that discuss any Plaintiff and/or any Asserted Works in this action.

### REQUEST FOR PRODUCTION 5

All Documents Concerning Communications between You and any Plaintiff.

### REQUEST FOR PRODUCTION 6

All Documents Concerning any Communications or agreements with any record label, record company, sound recording rights administrators or aggregators, or live performance venues on the one hand, and You or any Plaintiff on the other, regarding any of the Asserted Works.

### REQUEST FOR PRODUCTION 7

All Documents Concerning past copyright enforcement actions, litigations, cease-and-desist letters, or takedown notices involving any of the Asserted Works.

### REQUEST FOR PRODUCTION 8

All affiliation agreements, including any side letters, amendments, or other modifications thereto, that you have entered into with any Plaintiff.

### REQUEST FOR PRODUCTION 9

All Documents Concerning the termination of affiliation agreements between You and any Plaintiff, Including requests for release from such agreements.

### REQUEST FOR PRODUCTION 10

[STRICKEN]

### REQUEST FOR PRODUCTION 11

[STRICKEN]

### REQUEST FOR PRODUCTION 12

[STRICKEN]

### REQUEST FOR PRODUCTION 13

[STRICKEN]

### REQUEST FOR PRODUCTION 14

[STRICKEN]

### REQUEST FOR PRODUCTION 15

All Documents Concerning marketing materials, investor pitch materials, or other Documents provided to any Plaintiff (or their representatives).

### REQUEST FOR PRODUCTION 16

All Documents that were shared with any Plaintiff, Concerning any actual or potential fees or terms for a license from You for any Plaintiff's Comedy Works Rights, Including any forecasts of license fees for Comedy Works Rights where any Plaintiff's Asserted Works is part of the forecast.

### REQUEST FOR PRODUCTION 17

[STRICKEN]

### REQUEST FOR PRODUCTION 18

[STRICKEN]

### REQUEST FOR PRODUCTION 19

[STRICKEN]

### REQUEST FOR PRODUCTION 20

[STRICKEN]

### REQUEST FOR PRODUCTION 21

All Documents Concerning advances, upfront payments, bonuses, royalty guarantees, or equity interests that You paid or proposed to pay any Plaintiff for their Asserted Works.

### REQUEST FOR PRODUCTION 22

[STRICKEN]

### REQUEST FOR PRODUCTION 23

All Documents, Including Communications, Concerning Pandora's or another streaming service's removal of one or more comedy recordings of performances by any Plaintiff associated with Spoken Giants from its service.

### REQUEST FOR PRODUCTION 24

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 47 of 60

Pandora Media, LLC v. Spoken Giants, LLC, Not Reported in Fed. Supp. (2023)

All Documents, Including Communications, relating to efforts to have streaming services, Including Pandora or Spotify U.S.A., restore to their service any comedy recordings of performances by any Plaintiff associated with Spoken Giants that had previously been taken down.

**\*7  REQUEST FOR PRODUCTION 25**

All Documents, Including Communications, relating to Your solicitation of any Plaintiff to become affiliated with Spoken Giants, whether or not such solicitation ultimately led to affiliation with Spoken Giants.

**REQUEST FOR PRODUCTION 26**

Your Communications with any Plaintiff, including documents shared, relating to the value of Comedy Works Rights.

**REQUEST FOR PRODUCTION 27**

All Documents, Including Communications, relating to complaints by any Plaintiff about You or about actions taken by You or on Your behalf.

**REQUEST FOR PRODUCTION 28**

All Documents, including Communications, Concerning Lewis Black's dissociation with You.

**D. DATE CERTAIN**

The district court's amended scheduling order provides that the non-expert discovery deadline is February 28, 2024. No. 809, Dkt. 174 at 2. That is the last date to complete fact discovery and the date by which all discovery motions must be resolved. Based on the discovery motions currently before the Court, it appears that the parties still have extensive discovery to complete before that date, which is not altogether too far from now, especially considering the intervening holidays. Therefore, the Court finds that twenty-one (21) days from this order is a reasonable date for Spoken Giants to provide the discovery responses.

**III.**

**COMPLIANCE COSTS**

Spoken Giants request that Pandora pay for the costs of producing responses to their discovery requests.

Rule 45(d)(2)(B)(ii) requires a court to shift costs from a nonparty if the expense of complying with a party's subpoena is "significant." Legal Voice v. Stormans Inc., 738 F.3d 1178, 1184 (9th Cir. 2013). "[O]nly two considerations are relevant" to the inquiry: "whether the subpoena imposes expenses on the nonparty, and whether those expenses are 'significant.' " Id. (citation omitted).

Although cost-shifting is mandatory and the only relevant questions are the two (2) posed above, what constitutes a "significant expense" is capable of a "myriad [of] interpretations depending on the circumstances of a particular case." United States v. McGraw-Hill Cos., 302 F.R.D. 532, 536 (C.D. Cal. 2014). For example, "an expense might be 'significant' ... to a small family-run business, while being 'insignificant' to a global financial institution." Id.; see also Legal Voice, 738 F.3d at 1185 (finding $20,000 significant for nonprofit legal-aid group); Cornell v. Columbus McKinnon Corp., No. 13-cv-02188-SI, 2015 WL 4747260, at *4–5 (N.D. Cal. Aug. 11, 2015) (finding $227,597 not significant to FedEx and denying cost-shifting).

Spoken Giants is not entitled to cost shifting for numerous reasons. First, it has made almost no factual showing in support of its request. "Rule 45 does not cut a blank check to non-parties—unnecessary or unduly expensive services do not 'result from compliance' and, therefore, do not count as 'expenses.' " McGraw-Hi ll, 302 F.R.D. at 536. Absent evidentiary support, the Court cannot determine what expenses would result from typical costs of compliance, and which may result from unnecessary expenses.

**\*8**  Second, while the Court agrees that Spoken Giants is still due the protections of a nonparty as to the potential burden imposed by the subpoena, the Court also acknowledges that Spoken Giants does not stand as an entirely disinterested third party. For one, Spoken Giants has a direct connection to the case, having been previously affiliated with Plaintiff Black. Furthermore, and perhaps more importantly, Spoken Giants seeks to retain royalties on the art that is the subject matter of the claims in this litigation, and thus has a strong financial interest in the outcome of this action. This weighs against a finding that Spoken Giants's expenses are significant. See Cornell, 2015 WL 4747260, at *5 (holding that "[c]hief among the factors to be considered" in determining whether

nonparty's expenses were significant "is the extent to which the nonparty has an interest in the outcome of the case").

For all these reasons, there is no basis for finding that Spoken Giants will incur "significant expense" in complying with the subpoena, as modified by the Court. Accordingly, Spoken Giants request for cost-shifting is **DENIED**.

### IV.

### <u>ORDER</u>

**IT IS THEREFORE ORDERED** that:

(1) Pandora's Motion to Compel, Dkt. 1, is **DENIED** as written and **GRANTED** as modified above;

(2) Spoken Giants must provide responses within 21-days of this order; and

(3) Spoken Giants's request for cost shifting is **DENIED**.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2023 WL 9421132

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 49 of 60

Shields v. Eleveated Energy Solutions, LLC, Not Reported in Fed. Supp. (2020)

2020 WL 5658499
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas, Galveston Division.

Joe SHIELDS, Plaintiff.

v.

ELEVEATED ENERGY
SOLUTIONS, LLC, et al., Defendants.

Civil Action No. 3:19-CV-00390
|
Signed 09/23/2020

**Attorneys and Law Firms**

Joe Shields, Friendswood, TX, Pro se.

Daniel Webb Lanfear, The Lanfear Law Firm PC, San Antonio, TX, Alan Ray San Miguel, San Miguel Attorneys PC, The Woodlands, TX, for Defendant.

### ORDER

ANDREW M. EDISON, UNITED STATES MAGISTRATE JUDGE

 **\*1**  This discovery dispute requires me to decide whether Plaintiff Joe Shields ("Shields") should be required to pay a $50.00 fee to obtain documents he has subpoenaed from non-party Inteliquent, Inc. ("Inteliquent"). Although a relatively small amount of money is at stake here, the underlying issue is one that often confounds litigants, non-parties, and courts: when may a non-party shift fees and costs to the party serving a subpoena? Few district courts in the Fifth Circuit have written on this topic. I hope this opinion provides some guidance for those courts having to decide who should be required to shoulder the financial burden of complying with a subpoena directed to a non-party.

### BACKGROUND

In this lawsuit, Shields alleges that the Defendants—various individuals and entities engaged in the business of selling solar power systems—initiated unsolicited and unauthorized telemarketing calls to his phone number in violation of the Telephone Consumer Protection Act and Texas Business and Commerce Code § 305.053.

In August 2020, Shields issued a narrowly tailored subpoena to Inteliquent, a long-distance telecommunications carrier, seeking to obtain the name and contact information for the entity that used two phone numbers to call him on specified dates and times in April and July 2020. Upon receipt of the subpoena, Inteliquent's counsel sent Shields a lengthy email. The email explained that Inteliquent is a large provider of wholesale communications services, carrying around one billion minutes of traffic daily.[1] As a direct result of its vast business operations, Inteliquent routinely receives subpoenas from civil litigants. According to the email sent to Shields, "the burden of compliance imposed upon Inteliquent is real."[2] Dkt. 26-1 at 3. To help defray the costs of complying with these civil subpoenas, Inteliquent has put into place a "civil subpoena processing fee," which varies depending on the quantity of phone numbers for which customer-related information is sought. *Id.* "This fee covers all such common costs for the processing of our compliance response to a subpoena seeking customer-identifying information for a quantity of numbers in a matter of civil litigation to which [Inteliquent is] a non-party." *Id.* at 3–4. The standard processing fees are as follows:

[1]     One billion minutes is a lot of minutes. To put that figure into perspective, one billion minutes amounts to a tad over 1,902 years.

[2]     Inteliquent notes that it "receives a disturbing quantity of subpoenas that are at least partially or even entirely erroneous with reference to one or more numbers that are not or have never been in service with our company." Dkt. 26-1 at 3.

[Editor's Note: The preceding image contains the reference for footnote [3] ]

Inteliquent's letter raises several blanket objections to the subpoena,[4] but readily acknowledges that "upon receipt of the standard processing fee provided for in our civil subpoenas policy ($50.00 – a Tier 1 request), we are willing to withdraw the [objections] and process this subpoena." Dkt. 26-1 at 5.

Shields v. Elevated Energy Solutions, LLC, Not Reported in Fed. Supp. (2020)

3    Inteliquent, Civil Subpoena Policy (December 31, 2019), https://www.inteliquent.com/getmedia/ad7784c0-bc44-47b8-8820-d061d6daba00/Civil-Subpoena-Policy-20200101.aspx.

4    The objections are, in my view, simply placeholders with little, if any, applicability to the present case. The objections include the standard "unduly burdensome, overly broad, and neither relevant to nor proportional to the needs of the litigation," "attorney client and work product rights against production of privileged information," and "confidential and proprietary information." Dkt. 26-1 at 3. Given that all Shields is requesting here is identification of the entity who utilized two phone numbers at very specific dates and times, the objections are without merit.

**\*2** Shields strongly objects to paying the $50 processing fee, labelling the charge a "profiteering fee." Dkt. 26 at 2. According to Shields, who is representing himself *pro se*, "Inteliquent is attempting to extort money for profiteering purposes from those seeking to identify an entity responsible for the illegal Solar telemarketing calls." *Id.*

## ANALYSIS

Federal Rule of Civil Procedure 45 governs the issuance of subpoenas to non-parties. The rule provides that a party may serve a subpoena commanding a non-party "to whom it is directed to ... produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." FED. R. CIV. P. 45(a)(1)(A)(iii). A litigant is entitled to use a Rule 45 subpoena to "obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1).

Our judicial system is based, in part, on the principle that, if properly summoned, every person has a civic duty to testify regardless of the financial burden imposed by doing so. *See Hurtado v. United States*, 410 U.S. 578, 589 (1973) ("It is beyond dispute that there is in fact a public obligation to provide evidence ... no matter how financially burdensome it may be."). As the United States Supreme Court explained more than a century ago:

> [T]he giving of testimony and the attendance upon court or grand jury in order to testify are public duties which every person within the jurisdiction of the government is bound to perform upon being properly summoned, and for performance of which he is entitled to no further compensation than that which the statutes provide. The personal sacrifice involved is a part of the necessary contribution of the individual to the welfare of the public. The duty, so onerous at times, [is] necessary to the administration of justice according to the forms and modes established in our system of government.

*Blair v. United States*, 250 U.S. 273, 281 (1919). The Fifth Circuit has also acknowledged the "fundamental responsibility of every person to give testimony," *Garner v. Wolfinbarger*, 430 F.2d 1093, 1100 (5th Cir. 1970), and "the duty to provide evidence has long been considered to be almost absolute." *In re Grand Jury Subpoena Duces Tecum*, 555 F.2d 1306, 1308–09 (5th Cir. 1977).

Because the cost of complying with a subpoena is generally considered part of the public duty of providing evidence, district courts across the country routinely hold that a non-party is required to pay its own costs for complying with a Rule 45 subpoena, especially when those costs are minimal. *See id.* at 1308 ("As a general rule, a witness or the recipient of a subpoena duces tecum is required to bear the costs of compliance."); *Gould v. O' Neal*, No. 17-100 (JMV), 2019 WL 4686991, at \*4 (D.N.J. Sept. 26, 2019) ("[A] nonparty responding to a subpoena is typically required to pay its own costs of production."); *Sakhil Ctr. at Doral Condo. Ass' n v. Hanover. Ins. Co.*, 2019 WL 7881626, at \*1 (S.D. Fla. Mar. 21, 2019) ("A nonparty is usually required to pay its own costs of production, so long as the costs do not represent an undue burden or expense."); *Miller v. Allstate Fire & Cas. Ins. Co.*, No. 07-260, 2009 WL 700142, at \*2 (W.D. Pa. Mar. 17, 2009) (same); *Honda Lease Tr. v. Middlesex Mut. Assurance. Co.*, No. 3:05-CV-1426(RNC), 2008 WL 349239, at \*5 (D. Conn. Feb. 6, 2008) ("Typically, a non-party is required to absorb the

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 51 of 60

Shields v. Elevated Energy Solutions, LLC, Not Reported in Fed. Supp. (2020)

costs of complying with a subpoena duces tecum.") (internal quotation marks and citation omitted).

**\*3** There is, naturally, a genuine concern that it might be unfair to force a non-party to incur an enormous financial burden in responding to a subpoena. This is especially true when the non-party has no real interest in the underlying litigation. To address this concern, Rule 45(d) provides that there are "two related avenues by which a person subject to a subpoena may be protected from the costs of compliance." *In re Mod. Plastics Corp.*, 890 F.3d 244, 250 (6th Cir. 2018) (internal quotation marks and citation omitted). First, the rule gives district courts the authority to assess fees and costs to parties serving subpoenas as a sanction for failing to take "reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." FED. R. CIV. P. 45(d)(1). Second, the rule provides that if a district court issues an order compelling compliance with a subpoena, "the order must protect a person who is neither a party nor a party's officer from *significant expense* resulting from compliance." FED. R. CIV. P. 45(d)(2)(B)(ii) (emphasis added).

Courts across this great country have had numerous opportunities to address the cost-shifting provision of Rule 45(d)(2)(B)(ii). A number of courts have recognized Rule 45's cost shifting as mandatory upon a finding that the costs incurred are significant. *See Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) (If "discovery is ordered against a non-party," and "the subpoena imposes significant expense on the non-party, ... [then] the district court must order the party seeking discovery to bear at least enough of the cost of compliance to render the remainder 'non-significant.' "); *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001) (Under Rule 45, if a subpoena imposes significant expenses on a non-party, "the court must protect the non-party by requiring the party seeking discovery to bear at least enough of the expense to render the remainder 'non-significant.' "). Despite that hardline rule, the determination of whether particular costs are significant is relative and "an expense might be 'significant,' for instance, to a small family-run business, while being 'insignificant' to a global financial institution." *United States v. McGraw-Hill Cos.*, 302 F.R.D. 532, 536 (C.D. Cal. 2014).

Other "[c]ourts have used a balancing approach to examine the equities of each particular case in order to determine how much cost to shift from the non-party to the discovering party." *Sun Cap. Partners, Inc. v. Twin City Fire Ins. Co.*, No. 12-CIV-81397-Marra/Matthewman, 2016 WL 1658765,

at \*7 (S.D. Fla. Apr. 26, 2016). Those courts consider three factors, "including whether the non-party actually has an interest in the outcome of the case, whether the non-party can more readily bear its cost than the requesting party, and whether the litigation is of public importance." *Sun Cap. Partners*, 2016 WL 1658765, at \*7. *See also DeGeer v. Gillis*, 755 F. Supp. 2d 909, 928 (N.D. Ill. 2010); *Georgia-Pacific LLC v. Am. Int'l Specialty Lines Ins. Co.*, 278 F.R.D. 187, 190 (S.D. Ohio 2010).

This is not a case where the cost of compliance on the non-party is particularly large or excessive—at least with respect to the subpoena at issue. Far from it. Here, Inteliquent is simply being asked to access its computer network to determine the identity of the person or entity assigned two phone numbers. While there might be some costs associated with this task, they are certainly not overwhelming. At the same time, I fully appreciate that while the cost of reviewing, researching, and responding to this subpoena might not be huge, the expenses are likely to represent a significant sum when a company faces hundreds or thousands of subpoenas. I do not ascribe any deleterious motives to Inteliquent's desire to charge a standard civil processing fee. The company simply wants to offset the expense of responding to a growing volume of subpoenas. That is completely understandable.

**\*4** But the federal rules do not allow Inteliquent, as a non-party, to force Shields to pay a standard processing fee, no matter how small, as a precondition to obtaining documents for which he has properly issued a subpoena. Since some costs can be anticipated in complying with any subpoena duces tecum, Rule 45's provision that a trial court must quash a subpoena "if compliance subjects a person to undue burden," FED. R. CIV. P. 45(d)(3)(A)(iv), "must be read to mean that in the main run of cases the cost of compliance will be assumed as part of the public duty of providing evidence." *In re Grand Jury Subpoena Duces Tecum*, 555 F.2d at 1308. Our judicial system has, in effect, concluded that a non-party must assume some costs if our justice system is to work efficiently and effectively. *See Matter of Midland Asphalt Corp.*, 616 F. Supp. 223, 225 (W.D.N.Y. 1985) ("Compliance with a subpoena duces tecum ordinarily will result in some inconvenience and costs to the recipient."). Only when the cost of compliance is significant, or a litigant has failed to take steps to avoid undue burden or expense on a non-party may cost-shifting be appropriate. As one district court waxed poetic:

Case 4:23-cv-03560     Document 229-1     Filed on 02/26/25 in TXSD     Page 52 of 60

Shields v. Elevated Energy Solutions, LLC, Not Reported in Fed. Supp. (2020)

Any witness who is subpoenaed suffers inconvenience. An individual operating a small business, for example, or a corporation operated by a sole shareholder, may suffer, in like circumstances, more inconvenience than [a major corporation] with its thousands of employees. But this inconvenience, whether suffered by witnesses, grand jurors, or jurors, is part of the price we pay to secure ... the enforcement of our laws.

*Application of Radio Corp. of Am.*, 13 F.R.D. 167, 172 (S.D.N.Y. 1952).

When the costs of responding to a Rule 45 subpoena are minimal, the non-party must fulfill its civic responsibilities and bear the cost of compliance. I, therefore, overrule Inteliquent's objections to the subpoena and order Inteliquent to respond to the subpoena without assessing a fee of any sort on Shields.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5658499

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

USAP050

Case 4:23-cv-03560   Document 229-1   Filed on 02/26/25 in TXSD   Page 53 of 60

United States ex rel. Eichner v. Ocwen Loan Servicing LLC, Slip Copy (2024)

2024 WL 2922979

2024 WL 2922979
Only the Westlaw citation is currently available.
United States District Court, E.D. Texas, Sherman Division.

UNITED STATES of America EX
REL. Jean-Marc EICHNER, Plaintiff,
v.
OCWEN LOAN SERVICING LLC, Defendant.

Civil Action No. 4:23–mc–00172
|
Underlying Case: Civil Action No. 4:19-cv-00524
|
Signed June 10, 2024

**Attorneys and Law Firms**

Robert T. Mowrey, William Scott Hastings, Locke Lord LLP, Dallas, TX, for Defendant in No. 4:23–mc–00172.

Samuel L. Boyd, Pro Hac Vice, Catherine Carlyle Jobe, Pro Hac Vice, Boyd & Associates, Dallas, TX, Daniel Fletcher Olejko, Jeffrey Ray Bragalone, Mark Douglass, Bragalone Olejko Saad PC, Dallas, TX, Roger D. Sanders, Sanders, Motley, Young & Gallardo, PLLC, Sherman, TX, for Plaintiff Jean-Marc Eichner in No. 4:19-cv-00524.

James Garland Gillingham, United States Attorney's Office, Tyler, TX, for Plaintiff United States of America in No. 4:19-cv-00524.

Ashley M. Pavel, Pro Hac Vice, Elizabeth Lemond McKeen, O'Melveny & Myers LLP, Newport Beach, CA, C. Scott Jones, Katherine Swan Wright, Robert T. Mowrey, William Scott Hastings, Roger Brian Cowie, Locke Lord LLP, Dallas, TX, Stephanie Rene' Barnes, Plunk Smith, PLLC, Frisco, TX, for Defendant in No. 4:19-cv-00524.

**<u>MEMORANDUM OPINION AND ORDER</u>**

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is Samuel L. Boyd and Boyd & Associates' Motion to Quash, Motion for Protective Order, and Objections to Subpoena (Dkt. #1). Having considered the motion and the relevant pleadings, the Court finds that the motion should be **GRANTED in part** and **DENIED in part**.

**BACKGROUND**

On July 15, 2019, in the underlying case, Relators Jean-Marc Eichner ("Eichner") and Brandon Loyd ("Loyd") filed their Original Complaint under seal alleging that the Defendants presented false or fraudulent claims to the Government, made express and/or implied false certifications to the Government, made or used false records or statements material to false or fraudulent claims, fraudulent inducement, and reverse false claims under 31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G) (4:19-CV-524, Dkt. #1 ¶¶ 221–28). More specifically, Relators allege that Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC (collectively, the "Ocwen Defendants") violated the Federal Housing Administration, the Dodd-Frank Act, the Real Estate Settlement Procedures Act, the Unfair, Deceptive, or Abusive Acts or Practice Laws, the Truth in Lending Act, Regulation Z, and Texas state law (4:19-CV-524, see generally Dkt. #1). Additionally, Relators accuse the remaining Defendants in this case of being vicariously liable for the actions of the Ocwen Defendants (4:19-CV-524, Dkt. #1 at ¶ 2).

On December 10, 2021, the Government opted to not intervene in the case (4:19-CV-524, Dkt. #6), and on December 14, 2021, the Court unsealed the case.

On May 4, 2023, counsel for the Ocwen Defendants issued a non-party subpoena (Dkt. #1, Exhibit 1) to Samuel L. Boyd and Boyd & Associates ("Boyd")—counsel for Relators—to produce various documents and information from two prior qui tam cases that involved the Ocwen Defendants: United States ex rel. Fisher v. Homeward Residential, Inc., 4:12–CV–461 (E.D. Tex. filed Jul. 25, 2012); and United States ex rel. Fisher v. Ocwen Loan Servicing, LLC, 4:12–CV–543 (E.D. Tex. filed Aug. 20, 2012) (collectively, "Fisher"). [1] Specifically, the subpoena in question seeks production of the following:

1. Full copies of the pleadings at ECF #541, 543, 545, 546, 549, 550, 551, 553, 554, 555, 556, 558, 559, 561, 565, 567, 568, 582, 585, 587, 592, 602, 603–610, 623 in Fisher with exhibits, which were filed under seal and are not publicly available through the Court's website.

2. Full copies of the pleadings at ECF #339, 341, 343, 344, 348, 349, 352, 353, 354, 356, 357, 360, 365, 366, 381, 384, 366, 395–403, 415 in Fisher-Homeward with

United States ex rel. Eichner v. Ocwen Loan Servicing LLC, Slip Copy (2024)

2024 WL 2922979

exhibits, which were filed under seal and are not publicly available through the Court's website.

3. Copies of the *Fisher* Relators' trial exhibits identified on the exhibit lists at ECF #439-3 in *Fisher*.

4. Copies of all deposition transcripts, with exhibits, for any witnesses who were not Ocwen employees that were taken in *Fisher* and *Fisher-Homeward*.

5. Copies of all the *Fisher* Relators' expert reports, including any expert witness working files, from *Fisher* and *Fisher-Homeward*.

**\*2** 6. All pleadings, demands, and communications among *Fisher* Relators Counsel relating to their various lawsuits, arbitrations, and disputes regarding the amount and allocation of attorneys' fees among counsel in *Fisher*.

7. Copies of each document that was produced by one or more of the parties in *Fisher* and *Fisher-Homeward*, to the extent that you are still in possession of those documents.

8. All communications with Relators prior to the Retention Date.

9. Relators' Engagement Letters.

(Dkt. #1, Exhibit 1 at pp. 9–10).

1
    In *Fisher*, Boyd served as counsel for multiple relators who alleged that the Ocwen Defendants had violated various federal, state, and local laws in the residential mortgage industry (4:12–CV–461, Dkt. #101; 4:12–CV–543, Dkt. #126). *Fisher* ultimately ended in settlement (4:12–CV–461, Dkt. #327; 4:12–CV–543, Dkt. #528).

In addition to issuing the subpoena to Boyd, the Ocwen Defendants served a subpoena on Fish & Richardson ("F&R")—counsel for a relator in *Fisher*—seeking production of some of the same documents to which Boyd has objected here (Dkt. #9 at p. 2). Boyd objected to seventeen documents sought by the F&R subpoena (Dkt. #9, Exhibit 1 at pp. 3–4, ¶ 12). However, F&R produced a substantial number of unobjected documents in response to the subpoena (Dkt. #9, Exhibit 1 at p. 4, ¶¶ 13–15). F&R produced 121 documents consisting of deposition transcripts and exhibits from some of the *Fisher* witnesses, the trial exhibits from the *Fisher* relators, and over two million pages

of documents that Ocwen had produced in *Fisher* (Dkt. #9, Exhibit 1 at p. 4, ¶¶ 14–15). The Ocwen Defendants have since informed the Court that they are narrowing the scope of information sought by their subpoena on Boyd to not include documents and information already produced by F&R (*see* Dkt. #9 at p. 3).

The Ocwen Defendants further notified the Court that Boyd produced a significant number of documents in response to two subpoenas issued by the Office of Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") in 2017 after *Fisher* settled (Dkt. #9 at p. 4). Those subpoenas sought all the documents that any party, including the defendants, produced to Boyd in *Fisher* (Dkt. #9 at p. 4). On August 8, 2023, SIGTARP provided copies of the two subpoenas to the Ocwen Defendants but did not provide the actual documents produced by Boyd (Dkt. #9 at p. 4). Despite the Ocwen Defendants' request, Boyd has refused to produce the documents it gave SIGTARP to the Ocwen Defendants (Dkt. #8 at p. 6; Dkt. #9 at p. 4). The Department of Justice ("DOJ") also declined to produce such documents upon the Ocwen Defendants' requests (Dkt. #9 at p. 5).

The Court entered Protective Orders in *Fisher* to help facilitate discovery and prevent the improper disclosure of confidential information (4:12–CV–461, Dkt. #307; 4:12–CV–543, Dkt. #447). The Protective Orders prohibited the disclosure of confidential information "to anyone for any purpose other than matters arising from the litigation" of each *Fisher* action, as provided in each order (4:12–CV–461, Dkt. #307 at p. 4, ¶ 4; 4:12–CV–543, Dkt. #447 at p. 4, ¶ 4). Following the termination of *Fisher*, the Protective Orders required a party's counsel to destroy or return protected confidential information that the counsel had received (4:12–CV–461, Dkt. #307 ¶ 15; 4:12–CV–543, Dkt. #447 ¶ 15). However, the Protective Orders allowed a party's counsel to retain their own work product, even if it refers or relates to otherwise protected confidential information (4:12–CV–461, Dkt. #307 ¶ 15; 4:12–CV–543, Dkt. #447 ¶ 15). Further, the Protective Orders provided the Court with continuing jurisdiction to enforce the Protective Orders (4:12–CV–461, Dkt. #307 ¶ 16; 4:12–CV–543, Dkt. #447 ¶ 16).

**\*3** On May 31, 2023, the Court ordered in the underlying case that any party may produce Protected Information from *Fisher*, provided that the Protected Information is produced subject to and treated in accordance with the terms of the Court's Protective Order (4:19-CV-524, Dkt. #84; 4:19-CV-524, Dkt. #90).

USAP052

Case 4:23-cv-03560   Document 229-1   Filed on 02/26/25 in TXSD   Page 55 of 60
United States ex rel. Eichner v. Ocwen Loan Servicing LLC, Slip Copy (2024)
2024 WL 2922979

**LEGAL STANDARD**

Federal Rule of Civil Procedure 45 governs subpoenas to obtain discovery from non-parties. The party issuing the subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." FED. R. CIV. P. 45(d)(1). On timely motion, the court must quash or modify a subpoena if it requires disclosure of privileged or other protected matter, or otherwise subjects the subpoenaed person to undue burden. FED. R. CIV. P. 45(d)(3)(A)(iii)–(iv).

The moving party has the burden of proof "to demonstrate 'that compliance with the subpoena would be unreasonable and oppressive.' " Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 817–18 (5th Cir. 2004) (quoting Williams v. City of Dallas, 178 F.R.D. 103, 109 (N.D. Tex. 1998) (internal citations omitted)). "Whether a burdensome subpoena is reasonable 'must be determined according to the facts of the case.' " Linder v. Dep't of Defense, 133 F.3d 17, 24 (D.C. Cir. 1998) (quoting Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 407 (D.C. Cir. 1984)).

To determine whether compliance with a subpoena creates an undue burden, the Court considers the following factors: "(1) relevance of the information requested; (2) the need of the party for the documents; (3) the breadth of the document request; (4) the time period covered by the request; (5) the particularity with which the party describes the requested documents; and (6) the burden imposed." Wiwa, 392 F.3d at 818 (citing Williams, 178 F.R.D. at 109). Additionally, the Court "may find that a subpoena presents an undue burden when the subpoena is facially overbroad." Id. (citing Williams, 178 F.R.D. at 109). "Further, if the person to whom the document request is made is a non-party, the court may also consider the expense and inconvenience to the non-party." Id.; see also FED. R. CIV. P. 45(c)(2)(B). However, despite these considerations, "modification of a subpoena is [generally] preferable to quashing it outright." Wiwa, 392 F.3d at 818.

A party or any person from whom discovery is sought may move for a protective order. FED. R. CIV. P. 26(c)(1). Under Rule 26, the Court "may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." FED. R. CIV. P. 26(c)(1). The burden is on the party seeking the protective order "to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." In re Terra Int'l, 134 F.3d 302, 306 (5th Cir. 1998) (internal quotation marks and citation omitted). Therefore, a protective order is warranted in those instances in which the party seeking it demonstrates good cause and a specific need for protection. See Laundry v. Air Line Pilots Ass'n, 901 F.2d 404, 435 (5th Cir. 1990). The Court has broad discretion in determining whether to grant a motion for protective order because it is "in the best position to weigh fairly the competing needs and interests of parties affected by discovery." Seattle Times Co. v. Rhinehart, 467 U.S. 20, 36 (1984); see Harris v. Amoco Prod. Co., 768 F.2d 669, 684 (5th Cir. 1985).

**ANALYSIS**

**\*4** Boyd moves the Court to quash the subpoena at issue arguing, among other grounds, that it improperly seeks information protected by various forms of privilege, violates public policy concerning qui tam litigation, requests documents that were filed under seal, and is unduly burdensome, harassing, expensive, and overbroad. Boyd also moves the Court to enter a protective order protecting Boyd from the alleged abusive discovery. In the alternative, Boyd asks the Court to shift all costs of production to the Ocwen Defendants and grant Boyd at least six months to produce the requested documents.

The Court will first address Boyd's overarching challenges to the subpoena. The Court will then address the subpoena's specific requests and their associated objections. Lastly, the Court will address whether a protective order is warranted and whether Boyd is likely to incur significant expense from complying with the subpoena in light of Boyd's undue expense objection.

**I. Overarching Challenges to the Rule 45 Subpoena**
Boyd's contention that the subpoena is unduly burdensome because it violates principles outlined in Dondi Properties Corporation v. Commerce Savings and Loan Association is unconvincing. 121 F.R.D. 284 (N.D. Tex. 1988). Among other rules governing the ethical and professional conduct of practicing lawyers, the Court's local rules prohibits the use of discovery as a means of harassing opposing counsel or counsel's client. See Local Rule AT–3(h). There is no

Case 4:23-cv-03560    Document 229-1    Filed on 02/26/25 in TXSD    Page 56 of 60

United States ex rel. Eichner v. Ocwen Loan Servicing LLC, Slip Copy (2024)

2024 WL 2922979

evidence that the Ocwen Defendants issued the subpoena to Boyd for the purpose of harassment or undue delay. Boyd's motion to quash on such grounds operates on the evidently false premise that the Ocwen Defendants already possess the documents sought by the subpoena (Dkt. #1 at p. 6). The Ocwen Defendants deny that premise, claiming instead that they are seeking "to fill in the gaps in the *Fisher* file that [they have] not been able to obtain from other sources" (Dkt. #6, Exhibit 2 at p. 4). Therefore, Boyd's motion to quash should be denied on the grounds of undue delay or harassment.

The Court finds Boyd's proportionality objections unconvincing. Indeed, Rule 26 requires the Court to limit discovery if it determines that: "(i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1)." FED. R. CIV. P. 26(b)(2)(C). Boyd's objections under these rules, which are briefed in a conclusory manner, also appear to erroneously assume that the Ocwen Defendants seek duplicative discovery (Dkt. #1 at p. 9). To the extent Boyd objects that the Ocwen Defendants had ample opportunity to obtain the information during the past *Fisher* litigation, the Court finds such objection baseless given the language in Rule 26. Rule 26 clearly contemplates squandered opportunities to obtain information by *discovery* in the present action, rather than limiting a party who had an opportunity to obtain information by any means before the current litigation even began. *See* FED. R. CIV. P. 26(b)(2)(C)(ii). To the extent Boyd's motion to quash is based on such proportionality objections, it should be denied.

Boyd argues that public policy "compels that *qui tam* litigation not be chilled by the sweeping effects of tactics such as this" (Dkt. #1 at p. 10). Essentially, Body argues that public policy should bar overreaching non-party subpoenas on attorneys because they hinder the effective legal representation of relators in *qui tam* actions and impose a form of sanctions (*see* Dkt. #1 at pp. 10–11). Boyd draws a comparison to how, in certain circumstances, public policy bars the enforcement of release and indemnification clauses signed by relators when it would encourage individuals guilty of defrauding the Government to insulate themselves from the False Claims Act with such clauses. *See United States ex rel. Longhi v. United States*, 575 F.3d 458, 473–75 (5th Cir. 2009). The Court appreciates the creative effort behind such

an argument but ultimately finds it unavailing. Boyd's appeal to public policy is unnecessary and misplaced. There are protective mechanisms already in place, in both Rule 45 and applicable caselaw, that address Boyd's concerns surrounding an overbroad non-party subpoena. Moreover, Boyd has taken a traditional common-law principle of contracts out of context and erroneously applies it to a discovery setting. *See Newton v. Rumery*, 480 U.S. 386, 392 (1987) ("[A] promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by the enforcement of the agreement."). Boyd offers no authority showing that a party's attorney is intrinsically immune to a Rule 45 subpoena. Therefore, Boyd's motion to quash should be denied on the issue of public policy.

**\*5** Boyd further argues that the instructions in the non-party subpoena improperly impose requirements from Rule 34 (Dkt. #1 at p. 12). In other words, Boyd complains that the subpoena imposes requirements beyond what Rule 45 requires. Rule 45 expressly outlines the duties that a non-party must follow in responding to a subpoena. *See* FED. R. CIV. P. 45(e). The subpoena's instructions do appear to furnish some obligations not specifically enumerated in Rule 45 (*see* Dkt. #1, Exhibit 1 at pp. 8–9). *See* FED. R. CIV. P. 45(e). Therefore, the Court finds that to the extent the subpoena's instructions require action beyond the scope of what Rule 45 requires, such instructions should be quashed.

## II. The Rule 45 Subpoena's Specific Requests

The first two requests in the subpoena seek specific copies of pleadings that were filed under seal in *Fisher* (Dkt. #1, Exhibit 1 at p. 9). Both requests identify the pleadings by their respective docket entry numbers from *Fisher*. Boyd argues that these pleadings are not discoverable because they consist of documents shown to the Government by the *Fisher* relators and, thus, are protected by the common interest privilege (Dkt. #1 at pp. 11–12).

"Despite its name, the common interest privilege is neither common nor a privilege." *Ferko v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 219 F.R.D. 396, 401 (E.D. Tex. 2003). Rather, it is an extension of the attorney client privilege and the work product privilege. *Id.* Nevertheless, the Court cannot properly assess the merits of Boyd's privilege claims because Boyd has not yet provided a privilege log. *See EEOC v. BDO USA, L.L.P.*, 876 F.3d 690, 697 (5th Cir. 2017) ("[A] privilege log's description of each document and its contents must provide sufficient information to permit courts and other parties to 'test[ ] the merits of' the privilege

Case 4:23-cv-03560   Document 229-1   Filed on 02/26/25 in TXSD    Page 57 of 60

United States ex rel. Eichner v. Ocwen Loan Servicing LLC, Slip Copy (2024)

2024 WL 2922979

claim"). Even a non-party must produce a privilege log when claiming that subpoenaed information is privileged. *See* FED. R. CIV. P. 45(e)(2) (requiring a non-party who withholds subpoenaed information under a claim that it is privileged to "(i) expressly make the claim; and (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim"); *Am. Fed.'n of Musicians*, 313 F.R.D. at 46 ("Rule 45(e)(2) governs a non-party's withholding of information on the grounds of privilege or work-product protections but is substantively identical to Rule 26(b)(5)'s requirements as to a responding party.").

Presently, Boyd's privilege claims are no better than boiler-plate objections lacking specificity and explanation and do not provide sufficient information enabling the parties to assess them. *See Nguyen v. Excel Corp.*, 197 F.3d 200, 206 n.16 (5th Cir. 1999) ("Blanket claims of privilege are disfavored."); *United States v. Cabelka*, No. 7:18-CV-00174-O-BP, 2022 WL 2612411, at *1 (N.D. Tex. Jan. 25, 2022) ("If a party seeks to quash a subpoena because it seeks information protected by the attorney-client privilege, that party has the burden to show the privilege applies with 'particular and specific demonstration[s] of fact.' ") (citation omitted). Therefore, Boyd must produce a privilege log as described in the rules.

Boyd also objects that the sought pleadings were filed under seal in *Fisher* and that "Boyd is not at liberty to violate the seal" (Dkt. #1 at p. 14). The Ocwen Defendants argue in response that Boyd's objections are baseless because the Court's May 31, 2023 Order (4:19-CV-524, Dkt. #90) purportedly allows the parties to "file and use the sealed materials from *Fisher* under the protective order in this case" (Dkt. #6 at p. 12). The parties' arguments ignore the important reality that different legal standards govern protective orders and sealing orders. *June Med. Servs., L.L.C. v. Phillips*, 22 F.4th 512, 521 (5th Cir. 2022). As the Fifth Circuit has previously explained:

**\*6**  Protective orders require a finding of "good cause" by the district court and apply to documents produced in discovery. [*Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 419 (5th Cir. 2021) (quoting FED. R. CIV. P. 26(c)(1))]. "At the *discovery* stage, when parties are exchanging information, a stipulated protective order under Rule 26(c) may well be proper." *Id.* at 420. "But at the *adjudicative* stage, when materials enter the court record, the standard for shielding records from public view is far

more arduous." *Id.* Sealing judicial records and blocking public access require a "stricter balancing test." *Id.* at 419. To decide whether something should be sealed, the court must undertake a " 'document-by-document,' 'line-by-line' balancing of 'the public's common law right of access against the interests favoring nondisclosure.' " *Id.* (quoting [*Vantage Health Plan, Inc. v. Willis-Knighton Med. Ctr.*, 913 F.3d 443, 451 (5th Cir. 2019); *Bradley ex rel. AJW v. Ackal*, 954 F.3d 216, 225 (5th Cir. 2020)]). "Under both standards, the working presumption is that judicial records should not be sealed." *Le*, 990 F.3d at 419. "[C]ourts should be ungenerous with their discretion to seal judicial records ...." *Id.* at 418. And, to the extent that any sealing is necessary, it must be "congruent to the need." *Id.* at 420.

*Id.* The Ocwen Defendants misconstrue the Court's previous Order. The Court did not order that *sealed materials* from *Fisher* may be produced. Instead, the Court ordered that any party may produce "*Protected Information*" from *Fisher* (4:19-CV-524, Dkt. #90).

Despite this misunderstanding, Boyd does not offer any authority showing that it is prohibited from producing the sealed pleadings in response to the subpoena. Boyd's objections are conclusory and offer no substantive analysis. On the contrary, Boyd implies that the Ocwen Defendants previously had access to the sealed documents, further undercutting Boyd's position that it is somehow prohibited from producing them now (Dkt. #7 at p. 7). If Boyd believes that a Protective Order or some other authority prohibits Boyd from disclosing this information, Boyd may file a subsequent motion to quash identifying said authority and explaining the issues in detail. As it stands, Boyd's motion to quash on the first two requests does not pass muster. Therefore, the motion should be denied as to those requests.

As to request no. 3 in the subpoena, the Court finds that Boyd's motion to quash should be denied as moot because the Ocwen Defendants have already received copies of the *Fisher* relators' trial exhibits and no longer seek their production (Dkt. #9 at p. 3).

Request no. 4 seeks "[c]opies all deposition transcripts, with exhibits, for any witnesses who were not Ocwen employees" that were taken in *Fisher* (Dkt. #1, Exhibit 1 at p. 9). Notably, the Ocwen Defendants have narrowed this request by identifying responsive documents they have already received from F&R (Dkt. #9 at p. 3, Exhibit 1 at p. 4, ¶¶ 14–15). The Court does not find the request unduly burdensome.

United States ex rel. Eichner v. Ocwen Loan Servicing LLC, Slip Copy (2024)

2024 WL 2922979

Thus, Boyd's motion to quash as to request no. 4 should be denied.

Request no. 5 seeks "[c]opies of all the *Fisher* Relators' expert reports, including any expert witness working files," from *Fisher* (Dkt. #1, Exhibit 1 at p. 10). To the extent such request seeks non-privileged information, the Court does not find the request unduly burdensome. However, Boyd must produce a privilege log in accordance with Rule 45(e)(2) if Boyd believes responsive information is protected by various forms of privilege. *See* FED. R. CIV. P. 45(e)(2). Boyd's privilege claims asserted here, like the others before it, lack sufficient information to allow the Court or the parties to assess them. Accordingly, Boyd's motion to quash should be denied as to request no. 5.

Request no. 6 seeks "[a]ll pleadings, demands, and communications among *Fisher* Relators Counsel relating to their various lawsuits, arbitrations, and disputes regarding the amount and allocation of attorneys' fees among counsel in *Fisher*" (Dkt. #1, Exhibit 1 at p. 10). Boyd's first objects to this request arguing that it seeks documents that were filed under seal. However, like the subpoena's first two requests, if Boyd believes that a Protective Order or some other authority prohibits Boyd from disclosing responsive information to the Ocwen Defendants, Boyd may file a subsequent motion to quash identifying said authority and explaining such issues in detail. As of now, Boyd's objection is insufficient.

**\*7** Boyd also objects that request no. 6 seeks information not relevant to the issues in this case. The Ocwen Defendants argue in response that the sought communications are relevant to their defenses in this case "based on the *Fisher* settlement and dismissal with prejudice" (Dkt. #6 at p. 14). The Ocwen Defendants argue that the communications may lead to the discovery of admissible evidence or shed light on what contributions the *Fisher* relators made to the Government.

When determining if a subpoena is relevant, courts apply the relevancy standard from Rule 26(b)(1). Under Rule 26(b)(1), parties may discover "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). Because the bar for relevancy is low and includes any matter "that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case," the Court declines to quash this request on relevancy grounds. *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). The non-privileged communications between the *Fisher* relators' counsel may

indeed lead to the discovery of information relevant to this case.

Boyd further argues that the Ocwen Defendants should be estopped from demanding documents sought by request no. 6 because they refused to negotiate statutory fees with the relators' counsel in *Fisher* (Dkt. #1 at pp. 16–17). The Ocwen Defendants respond that had they known that Boyd intended to sue them again, they would have actively participated in the discussions (Dkt. #6 at p. 15). "A court may apply judicial estoppel if '(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) the court accepted the prior position; and (3) the party did not act inadvertently.' " *United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 766 F. App'x 38, 41 (5th Cir. 2019). The Ocwen Defendants' prior refusal to negotiate fees obviously did not amount to a prior legal position or a claim in the technical sense required for judicial estoppel. *See Reed v. City of Arlington*, 650 F.3d 571, 573 (5th Cir. 2011) ("The doctrine of judicial estoppel prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding."). And, in the interest of striking a just and fair balance in the discovery process, the Court does not believe that it would be appropriate to preclude the Ocwen Defendants from seeking relevant, non-privileged discovery for past failings that occurred outside the lifespan of this case.

Boyd lastly objects to request no. 6 on the basis of various forms of privilege. If Boyd believes any responsive information is privileged, Boyd must produce a privilege log in accordance with Rule 45(e)(2). *See* FED. R. CIV. P. 45(e)(2). Boyd's privilege claims currently lack sufficient information to allow the Court or the parties to assess them. For all the above reasons, Boyd's motion to quash should be denied as to request no. 6.

The Court finds that request no. 7 in the subpoena is unduly burdensome because it is facially overbroad. *See Wiwa*, 392 F.3d at 818. "Courts have found that a subpoena for documents from a non-party is facially overboard where the subpoena's document requests 'seek all documents concerning the parties to [the underlying] action, regardless of whether those documents relate to that action and regardless of date'; '[t]he requests are not particularized'; and '[t]he period covered by the requests is unlimited.' " *Am. Fed'n of Musicians of the U.S. & Can. V. Skodam Films, LLC*, 313 F.R.D. 39, 45 (N.D. Tex. 2015) (citing *Wiwa*, 392 F.3d at 818); *In re O'Hare*, No. MISC. H-11-0539, 2012 WL 1377891, at

2024 WL 2922979

*2 (S.D. Tex. Apr. 19, 2012); *Turnbow v. Life Partners, Inc.,* No. 3:11-CV-1030-M, 2013 WL 1632795, at *1 (N.D. Tex. Apr. 16, 2013). Request no. 7 seeks "copies of each document that was produced by one or more of the parties in *Fisher* and *Fisher-Homeward,* to the extent that you are still in possession of those documents" (Dkt. #1, Exhibit 1 at p. 10). This request, postured as a catch-all to obtain relevant discovery (Dkt. #6 at p. 15), is not particularized to the underlying case and "not limited by any reasonable restriction[s] on time." *See Turnbow,* 2013 WL 1632795, at *1.

**\*8** The Ocwen Defendants suggest that recreation of the entire *Fisher* file is necessary to properly defend this suit— e.g., to assess materiality under *Universal Health Servs., Inc. v. United States ex rel. Escobar,* 579 U.S. 176 (2016)—but their request, as written, is not narrowly tailored to discover relevant information (*see* Dkt. #6 at pp. 4, 10–11, 17; Dkt. #8 at pp. 5–6). The request appears to cast a wide, indefinite net into the universe of discovery in *Fisher,* limited only by whether Boyd possesses such information. The Ocwen Defendants even state that a future conference between the parties is warranted to further discuss the scope of such request, which seemingly concedes its indeterminate nature (Dkt. #6 at p. 15). Accordingly, Boyd's motion to quash should be granted as to request no. 7. [2]

[2]   The Court believes that quashing request no. 7 in the subpoena also disposes of the parties' dispute over the Ocwen Defendants' purported request for Boyd to reproduce the information it provided in response to SIGTARP's subpoenas (Dkt. #8 at p. 6). Aside from request no. 7, which is not particularized to what Boyd provided SIGTARP but seemingly encompasses that subject matter, the remaining requests in the subpoena do not specifically seek such information. Further, it does not appear that the Ocwen Defendants ever subpoenaed Boyd in his capacity as a non-party for such information, and "[i]n the case of discovery from a nonparty, a subpoena duces tecum must be served." *Kendrick v. Heckler,* 778 F.2d 253, 257 n.7 (5th Cir. 1985).

The Court also finds that request no. 8 is facially overbroad. Request no. 8 seeks "[a]ll communications with Relators prior to the Retention Date" regardless of whether those communications relate to the current *qui tam* litigation (Dkt. #1, Exhibit 1 at p. 10). The onus is on the Ocwen Defendants to limit their subpoena's requests to the suit's

relevant subject matter and to a specific time period. *See Scrum All. Inc. v. Scrum, Inc.,* No. 4:20-CV-00227, 2020 WL 6559625, at *2 (E.D. Tex. Nov. 9, 2020) (Mazzant, J.). The Ocwen Defendants did not do so here. The request is not particularized to this suit and could "likely ensnare scores of communications unrelated to this [*qui tam*] dispute." *Id.* (citing *Am. Fed.'n of Musicians,* 313 F.R.D. at 45). Therefore, Boyd's motion to quash should be granted as to request no. 8.

The Court finds further that Boyd's motion to quash should be granted as to request no. 9, which seeks "Relators' Engagement Letters" (Dkt. #1, Exhibit 1 at p. 10). "[Federal Rule of Civil Procedure] 45 subpoenas are not meant to circumvent the regular discovery process under [Federal Rules of Civil Procedure] 34 and 26." *United States v. Cabelka,* No. 7:16–CV–00126, 2017 WL 11814622, at *2 (N.D. Tex. Oct. 5, 2017) (citing *Ntakirutimana v. CHS/Cmty. Health Sys., Inc.,* No. L–09–114, 2011 WL 13135608, at *2 (S.D. Tex. June 29, 2011)). " ' [I]f documents are available from a party, it has been thought preferable to have them obtained pursuant to [Federal Rule of Civil Procedure] 34 rather than subpoenaing them' pursuant to [Federal Rule of Civil Procedure] 45." *Thomas v. EIM, Inc.,* No. 06-886-B-M2, 2008 WL 695230, at *2 (M.D. La. Mar. 12, 2008) (quoting *Burns v. Bank of Am.,* No. 03 Civ. 1685, 2007 WL 1589437, at *14 (S.D.N.Y. June 4, 2007)). "At least one district court has specifically held 'where the sought-after documents are within the possession, custody, or control of a party, it is not appropriate to employ Rule 45 to secure such documents from a [non-party] attorney who may also be in possession of the documents or copies.' " *Ntakirutimana v. CHS/Cmty. Health Sys., Inc.,* No. CV L-09-114, 2011 WL 13135608, at *2 (S.D. Tex. June 28, 2011) (citing *Suntrust Mortgage, Inc. v. Busby,* 2009 WL 5511215, at *2 (W.D.N.C. Dec 18, 2009)).

**\*9** The Ocwen Defendants indicate that the Relators did not produce any *Fisher*-related documents with their Rule 26 initial disclosures (Dkt. #8 at p. 4). The Ocwen Defendants have not shown here, however, that they attempted to obtain the engagement letters which relate to this suit by first serving Rule 34 requests for production on the Relators themselves. Thus, the Court does not believe, at this juncture, that the non-party subpoena is necessary to obtain such information. *See id.*; *see also Soto v. Castlerock Farming & Transp., Inc.,* 282 F.R.D. 492 (E.D. Cal. 2012) ("In general, there is a preference for parties to obtain discovery from one another before burdening non-parties with discovery requests.").

## III. Whether a Protective Order is Necessary and Potential Cost-Shifting

Given that the Court has found that Boyd's motion to quash should be partly granted on the overreaching portions of the subpoena, the Court does not believe that a protective order is necessary to protect Boyd or its clients from annoyance, embarrassment, oppression, or undue burden or expense. Boyd has failed to meet its burden otherwise showing "the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." *In re Terra Int'l*, 134 F.3d at 306 (internal quotation marks and citation omitted). Therefore, Boyd's motion for a protective order is denied.

Boyd also objects that the subpoena is unduly expensive and asks the Court to shift the costs of compliance to the Ocwen Defendants (Dkt. #1 at pp. 9, 13). In a nutshell, the Ocwen Defendants respond that there is no basis for shifting costs under these circumstances and that Boyd should be partially responsible for paying for the costs of reproducing the *Fisher* record (*see* Dkt. #6 at p. 17). The Court disagrees that no basis exists to shift costs to the extent that the Ocwen Defendants meant no such mechanism exists at all. Rule 45(d)(2)(B)(ii) requires that when the Court orders the nonparty to comply with a subpoena despite timely objections, "the order must protect" the nonparty "from significant expense resulting from compliance." FED. R. CIV. P. 45(d)(2)(B)(ii). In the Fifth Circuit, this rule "requires a district court to shift a nonparty's cost of complying with a subpoena if those costs are significant." *Leonard v. Martin*, 38 F.4th 481, 490 n.8 (5th Cir. 2022). The cost of complying with a subpoena may be significant at values as low as $20,000 or $9,000. *See id.* (citing *Legal Voice v. Stormans Inc.*, 738 F.3d 1178, 1184 (9th Cir. 2013) & *Linder v. Calero-Portocarrero*, 251 F.3d 178, 182 (D.C. Cir. 2001)).

The Court, at this stage, however, cannot discern whether Boyd's compliance with the subpoena will result in significant expense. Boyd's undue expense objection appears to hinge on

request no. 7 in the subpoena, which the Court found should be quashed as overbroad. Indeed, Boyd's declaration suggests that significant expense would have come from reproducing the *Fisher* discovery production in its entirety (*see* Dkt. #1, Exhibit 1 at pp. 13–14). But it is unclear how expensive Boyd's compliance with the remaining requests will be. Thus, the Court finds that to shift costs now would be premature because such costs could potentially be insignificant.[3]

[3]     The Court notes that the Ocwen Defendants have not filed a motion compelling production as to the non-party subpoena in question. Local Rule CV-7 requires that each pleading, motion, or response to a motion be filed as a separate document, except for motions for alternative relief (e.g., a motion to dismiss or, alternatively, to transfer).

## CONCLUSION

**\*10**  It is therefore **ORDERED** that Samuel L. Boyd and Boyd & Associates' Motion to Quash, Motion for Protective Order, and Objections to Subpoena (Dkt. #1) is hereby **GRANTED in part** and **DENIED in part**. The subpoena issued to Samuel L. Boyd and Boyd & Associates is **QUASHED without prejudice** as to requests no. 7, 8, and 9 and as to its instructions that exceed the scope of FED. R. CIV. P. 45(e).

It is further **ORDERED** that Samuel L. Boyd and Boyd & Associates shall produce to Defendants Ocwen Financial Corporation and Ocwen Loan Servicing, LLC, privilege logs as discussed above no later than fourteen (14) days from the issuance of this Order.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 2922979

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.