**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>U.S. ANESTHESIA PARTNERS, INC.,<br><br>Defendant. | **PUBLIC REDACTED VERSION**<br><br>**Case No.: 4:23-CV-03560-KH** |

**Plaintiff Federal Trade Commission's Opposition to
Defendant USAP's Motion for Summary Judgment**

**Table of Contents**

Background ...................................................................................................................... 2

Legal Standard ............................................................................................................... 5

Argument ........................................................................................................................ 5

I.      USAP cannot obtain summary judgment on monopoly or market power. ......................... 5

        A.      USAP's price increases are direct evidence of monopoly power. ........................... 7

                1.  Reduced output is not an additional requirement. ............................................ 9

                2.  The benchmark competitive price is what competing groups charged
                    before being acquired. ..................................................................................... 10

        B.      Indirect evidence demonstrates USAP's monopoly and market power ................ 13

                1.  The relevant product market is hospital-only anesthesia services. ................. 13

                2.  USAP has a dominant market share protected by entry barriers. ................... 18

                3.  USAP's reliance on hospital staffing contracts is misplaced ......................... 20

II.     Ample evidence shows USAP's agreements with competitors are unlawful. ................... 22

        A.      Section 13(b) does not bar the FTC's Section 1 claims ....................................... 23

        B.      USAP's merits arguments are factual disputes and unavailing. ........................... 25

                1.  USAP's price-setting arrangements unlawfully restrained trade .................... 26

                2.  USAP's market allocation with Envision unlawfully restrained trade. .......... 27

III.    USAP's consolidation scheme violates Section 5 of the FTC Act. ................................. 28

IV.     USAP's statutory and constitutional arguments have already been rejected .................... 30

Conclusion .................................................................................................................... 30

**Table of Authorities**

**Cases**

*1-800 Contacts, Inc. v. FTC*,
    1 F.4th 102 (2d Cir. 2021) ...................................................................................................... 29

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................................. 5

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
    300 F.3d 620 (5th Cir. 2002) ............................................................................................ 13, 16

*Atl. Ref. Co. v. FTC*,
    381 U.S. 357 (1965) ............................................................................................................... 29

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic* ("*Marshfield I*"),
    65 F.3d 1406 (7th Cir. 1995) ................................................................................................. 11

*Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic* ("*Marshfield II*"),
    152 F.3d 588 (7th Cir. 1998) ................................................................................................. 11

*BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.*,
    176 F. Supp. 3d 606 (W.D. La. 2016) ................................................................................... 14

*BRFHH Shreveport, LLC. v. Willis-Knighton Med. Ctr.*,
    49 F.4th 520 (5th Cir. 2022) .................................................................................................. 25

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ................................................................................................................. 9

*Brown Shoe Co. v. United States*,
    370 U.S. 294 (1962) ............................................................................................................... 17

*Business Elecs. Corp. v. Sharp Elecs. Corp.*,
    485 U.S. 717 (1988) ............................................................................................................... 26

*CF Indus., Inc. v. Surface Transp. Bd.*,
    255 F.3d 816 (D.C. Cir. 2001) ................................................................................................. 8

*Chi. Bridge & Iron Co. N.V. v. FTC*,
    534 F.3d 410 (5th Cir. 2008) .................................................................................. 6, 7, 19, 22

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*,
    51 F.4th 616 (5th Cir. 2022) .................................................................................................. 30

*Cole v. Carson*,
    935 F.3d 444 (5th Cir. 2019) ................................................................................................... 5

*Collins v. Yellen*,
    594 U.S. 220 (2021) ............................................................................................................... 30

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
150 F.4th 1056 (9th Cir. 2025) ............................................................................... 8, 9

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) ..................................................................................... 11

*Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*,
732 F.2d 480 (5th Cir. 1984) ....................................................................................... 6

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)................................................................................................. 5, 7

*Elec. Distributors, Inc. v. SFR, Inc.*,
166 F.3d 1074 (10th Cir. 1999) ................................................................................. 28

*Endure Indus., Inc. v. Vizient Inc.*,
164 F.4th 405 (5th Cir. 2026) .............................................................................. passim

*FTC v. Abbvie Inc.*,
976 F.3d 327 (3d Cir. 2020) ...................................................................................... 24

*FTC v. Advoc. Health Care Network*,
841 F.3d 460 (7th Cir. 2016) .............................................................................. passim

*FTC v. Brown Shoe Co., Inc.*,
384 U.S. 316 (1966)................................................................................................... 29

*FTC v. Elec. Payment Sols. of Am. Inc.*,
No. CV-17-02535-PHX-SMM, 2019 WL 4287298 (D. Ariz. Aug. 28, 2019) ...................... 25

*FTC v. Hackensack Meridian Health, Inc.*,
30 F.4th 160 (3d Cir. 2022) ................................................................................ 15, 21

*FTC v. IQVIA Holdings Inc.*,
710 F. Supp. 3d 329 (S.D.N.Y. 2024) ......................................................................... 6

*FTC v. Meta Platforms, Inc.*,
No. CV 20-3590 (JEB), 2025 WL 3458822 (D.D.C. Dec. 2, 2025) .................................... 23

*FTC v. Motion Picture Advert. Serv. Co.*,
344 U.S. 392 (1953)................................................................................................... 29

*FTC v. Penn State Hershey Med. Ctr.*,
838 F.3d 327 (3d Cir. 2016) ........................................................................ 14, 16, 20, 21

*FTC v. R.F. Keppel & Bro., Inc.*,
291 U.S. 304 (1934)................................................................................................... 29

*FTC v. Shire ViroPharma, Inc.*,
917 F.3d 147 (3d Cir. 2019) ...................................................................................... 23

iii

*FTC v. Shkreli*,
581 F. Supp. 3d 579 (S.D.N.Y. 2022) .............................................................. 10, 24

*FTC v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972)..................................................................................................... 29

*FTC v. Texaco, Inc.*,
393 U.S. 223 (1968)..................................................................................................... 28

*Fulton v. Hecht*,
580 F.2d 1243 (5th Cir. 1978) ....................................................................................... 7

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
386 F.3d 485 (2d Cir. 2004) ......................................................................................... 7

*Goldberg v. Tri-States Theatre Corp.*,
126 F.2d 26 (8th Cir. 1942) ........................................................................................ 28

*Harrison Aire, Inc. v. Aerostar Int'l, Inc.*,
423 F.3d 374 (3d Cir. 2005) ....................................................................................... 11

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935)..................................................................................................... 30

*Illumina, Inc. v. FTC*,
88 F.4th 1036 (5th Cir. 2023) .................................................................................. 5, 17

*Impax Labs., Inc. v. FTC*,
994 F.3d 484 (5th Cir. 2021) ................................................................................... 9, 27

*In re AndroGel Antitrust Litig. (No. II)*,
No. 1:09-MD-2084-TWT, 2018 WL 2984873 (N.D. Ga. June 14, 2018)............................. 25

*In re Catfish Antitrust Litig.*,
908 F. Supp. 400 (N.D. Miss. 1995)................................................................................ 27

*In re Pilgrim's Pride Corp.*,
728 F.3d 457 (5th Cir. 2013) ...................................................................................... 11

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ...................................................................................... 15

*Kinetic Concepts, Inc. v. Bluesky Med. Corp.*,
No. SA-03-CA-0832 RF, 2005 WL 3068206 (W.D. Tex. Nov. 1, 2005) ....................... 26, 27

*LDDS Commc'ns, Inc. v. Automated Commc'ns, Inc.*,
35 F.3d 198 (5th Cir. 1994) ........................................................................................ 28

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)..................................................................................................... 23

*Lektro-Vend Corp. v. Vendo Co.*,
   660 F.2d 255 (7th Cir. 1981) ................................................................ 28

*MLB Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ................................................................. 28

*N. Tex. Specialty Physicians v. FTC*,
   528 F.3d 346 (5th Cir. 2008) ............................................................... 27

*Native Village of Nuiqsut v. Bureau of Land Mgmt.*,
   9 F.4th 1201 (9th Cir. 2021) ................................................................ 25

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ......................................................................... 7, 10

*Neumann v. Reinforced Earth Co.*,
   786 F.2d 424 (D.C. Cir. 1986) ............................................................. 15

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ..................................................................... 7, 9, 13

*Palmer v. BRG of Ga., Inc.*,
   498 U.S. 46 (1990) .............................................................................. 27

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
   615 F.3d 412 (5th Cir. 2010) ............................................................... 13

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
   802 F. Supp. 1544 (S.D. Tex. 1991) .................................................... 18

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
   778 F.3d 775 (9th Cir. 2015) ........................................................ 20, 21

*Shah v. VHS San Antonio Partners, LLC*,
   985 F.3d 450 (5th Cir. 2021) ........................................................ 14, 21

*Sidibe v. Sutter Health*,
   No. 12-CV-04854-LB, 2019 WL 2078788 (N.D. Cal. May 9, 2019) ............ 15, 17

*Spectators' Commc'n Network, Inc. v. Colonial Country Club*,
   253 F.3d 215 (5th Cir. 2001) ............................................................... 25

*Spitzer v. Saint Francis Hosp.*,
   94 F. Supp. 2d 399 (S.D.N.Y. 2000) .................................................... 26

*Tolan v. Cotton*,
   572 U.S. 650 (2014) .............................................................................. 5

*United States v. Baker Hughes, Inc.*,
   908 F.2d 981 (D.C. Cir. 1990) ......................................................... 7, 22

v

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)...................................................................................... 7, 13

*United States v. Google LLC*,
  747 F. Supp. 3d 1 (D.D.C. 2024)...................................................................... 9

*United States v. Google LLC*,
  778 F. Supp. 3d 797 (E.D. Va. 2025) ......................................................... 10, 13

*United States v. Jindal*,
  No. 4:20-CR-00358, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) .................................... 25

*United States v. Microsoft Corp.*,
  253 F.3d 34 (D.C. Cir. 2001)...................................................................... 7, 13, 19

*United States v. Phila. Nat'l Bank*,
  374 U.S. 321 (1963).................................................................................. 6, 29

*United States v. Rockford Mem'l Corp.*,
  898 F.2d 1278 (7th Cir. 1990) ........................................................................ 15

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)..................................................................................... 22

## Statutes

15 U.S.C. § 18............................................................................................ 5

15 U.S.C. § 45........................................................................................... 28

15 U.S.C. § 53(b) ...................................................................................... 23

## Other Authorities

Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 538 (4th ed. 2017) ........................... 17

U.S. Dep't of Justice & FTC, Merger Guidelines § 2.1 (Dec. 18, 2023) ............................... 6, 16

Defendant U.S. Anesthesia Partners had a straightforward anticompetitive scheme to ██████████████ The plan was to "roll up" numerous hospital-based anesthesia practices across the state into a single massive company. USAP did so, and with each acquisition, it used its size and market power to dramatically increase the prices of the acquired practice. While Texas businesses, patients, and their insurers were forced to pay tens of millions of dollars more for anesthesia each year, USAP executives celebrated: "Cha-ching!"

The factual record compiled in this case paints a vivid picture of how USAP "peanut butter spread" its absurdly high rates across the entire state of Texas; how its size left insurers with no choice but to accept USAP's price increases and other "crazy" contract terms; and how USAP ultimately took many millions of dollars out of the pockets of Texas employers and patients. USAP asks the Court to ignore this compelling factual record and decide as a matter of law that none of its conduct could possibly violate the antitrust laws. USAP MSJ Br. (ECF 302) ("Br.") at 1. But its motion rests on legal errors, unsupported factual contentions, and, at times, inversions of basic common sense.

**First**, USAP wrongly argues that the FTC has no facts to show monopoly or market power under the Sherman or Clayton Acts. But USAP fails to even acknowledge the less stringent market requirements of the Clayton Act, under which many of the challenged acquisitions are presumptively illegal based on USAP's *own* market share calculations. And as for the Sherman Act, a reasonable factfinder could easily find monopoly power either directly (based on USAP's demonstrated ability to massively raise the prices of the anesthesia groups it acquired) or indirectly (based on USAP's dominant shares of relevant markets).

**Second**, USAP asks the Court to accept—at summary judgment—its factual characterizations that its agreements with competing anesthesia groups to either charge the same

1

price or not compete were simply "commonplace" arrangements for "administrative services." Br. 2. But the facts show that these agreements fix prices and allocate markets, and they should thus either be condemned as *per se* illegal, or at least evaluated under the fact-intensive rule of reason, which cannot be done at summary judgment.

**Third**, USAP barely addresses the FTC's claims under Section 5 of the FTC Act, suggesting they are simply duplicative of the FTC's Sherman Act and Clayton Act claims. But the Supreme Court has long explained that Section 5 is broader than these laws and may reach USAP's conduct even if it did not violate the other antitrust laws.

The Court should reject USAP's invitation to ignore the factual record and absolve it of liability for its decade-long anesthesia consolidation scheme that has cost Texans dearly.

## BACKGROUND

**USAP was created to dominate the Texas anesthesia market.**

In 2012, a Florida businessman and a New York private equity firm created a new company to consolidate competing anesthesia groups across Texas, raise prices, and reap millions in profits. They named it U.S. Anesthesia Partners. USAP's private equity backers recognized that the anesthesia landscape in Texas was "fragmented," that is, made up of smaller groups that competed against one another.[1] USAP would "roll up" a critical mass of these smaller practices into one big anesthesia group with "high market share in a few key markets."[2] In private equity terms, this large scale would ████████████████████ and ██████ ██████████████[3] But one USAP executive later put it more simply: "Cha-ching!"[4]

---

[1] Ex. 1 (Bratberg (USAP) Dep.) at 70:20-71:15.

[2] Ex. 1 (Bratberg (USAP) Dep.) at 164:21-165:8; Ex. 2 (PX0170) at 020.

[3] Ex. 3 (PX2265) at 021.

[4] Ex. 4 (PX0030) at 003.

Armed with over $█████████ in funding from its investors, USAP set out to ████████████[5] First, USAP bought Greater Houston Anesthesia (GHA), which was the largest anesthesia provider in Houston[6] and charged the highest rates in Houston—indeed, all of Texas—by a significant margin.[7] USAP recognized that GHA's "first-in-class" rates provided "significant synergy opportunity ████████████████" i.e., the opportunity to buy other practices with cheaper rates and raise them to match GHA's extremely high prices.[8]

After acquiring GHA, USAP bought another "platform," Pinnacle Anesthesia Consultants, which was by far the largest anesthesia group in Dallas.[9] USAP then spent the next seven years buying up fourteen other anesthesia groups, including six more in Dallas and three more in Houston.[10] USAP also branched out into other cities, purchasing the largest practice in Austin (Capitol Anesthesia Association),[11] the largest practice in San Antonio (Star Anesthesia),[12] the largest practice in Amarillo (Amarillo Anesthesia Consultants),[13] and a practice in Tyler.[14] After this buying spree, USAP controlled ██% of hospital-only anesthesia cases in Houston, ██% in Dallas, and ██% in Austin.[15]

In a few instances, USAP used alternative methods to neutralize a competitor. It had

---

[5] Ex. 5 (PX2343) at 024; Ex. 6 (PX1638); Ex. 7 (PX1649) at 001-002.

[6] Ex. 1 (Bratberg (USAP) Dep.) at 121:21-122:2.

[7] Ex. 2 (PX0170) at 026; Ex. 8 ████████████████ at 158:4-16.

[8] Ex. 2 (PX0170) at 026; Ex. 9 (Coward (USAP) Dep.) at 77:2-17, 115:21-116:2.

[9] Ex. 1 (Bratberg (USAP) Dep.) at 192:7-193:3; Ex. 10 (PX1214) at 028 (████████████████████████████); Ex. 11 ████████████████ at 16:5-17; Ex. 12 (PX0184) at 002.

[10] Ex. 13 (PX3007) at 023-025.

[11] Ex. 14 (Hendrix (USAP) Dep.) at 25:14-26:4.

[12] Ex. 13 (PX3007) at 023-025; Ex.15 (PX1523) at 010; Ex. 16 (PX2432) at 002 ████████████████████).

[13] See Ex. 17 (PX1708) at 001, 005.

[14] Ex. 13 (PX3007) at 023-025.

[15] Ex. 18 (Capps Rep.) ¶¶ 155, 157, 159 and Figs. 14, 16, 18.

arrangements with three competing anesthesia groups in which USAP billed for the competitor's services, charging USAP's high prices—rather than the competitor's much lower ones. And it struck a five-year deal with a large potential competitor, Envision, in which it paid Envision $9 million per year to stay out of the Dallas area.[16] These agreements worked in tandem with the acquisitions to maintain and augment USAP's dominance.

**USAP dramatically increased the price of anesthesia across Texas.**

USAP's acquisitions have hit Texans' wallets hard. With each acquisition, USAP raised the acquired group's rates to match USAP's.[17] As one insurance executive summarized, USAP took "the highest rate of all. . . and then peanut butter spread that across the state of Texas."[18] This raised the cost of anesthesia services in Texas by tens of millions of dollars per year.[19] For example, after acquiring three additional practices, USAP calculated that it raised the cost of anesthesia services to employers using Blue Cross by $██████.[20] The ██████████████ ████████████████ in San Antonio for Blue Cross customers was ██████████.[21] And United estimated that the total rate increase from just USAP's post-2015 acquisitions cost United and its customers $████████.[22]

USAP has used its market power to force patients and payors to pay these higher prices, as well as agree to other ██████ contractual terms.[23] As one major insurer explained, ██████

---

[16] Ex. 19 (PX0231); Ex. 20 (PX0175) at 002; Ex. 21 (Bratberg (USAP) Investigational Hearing ("IH")) at 198:17-199:11.

[17] Ex. 8 ██████████████ at 205:5-23.

[18] Ex. 22 ██████████████ at 67:25-69:12.

[19] Ex. 11 ██████████████ at 62:6-21.

[20] Ex. 23 (PX1400).

[21] Ex. 24 (PX1064) at 001; *see also* Ex. 25 (PX0191) at 001 (██████████████████████████████).

[22] Ex. 25 (PX0191) at 001; Ex. 26 ██████████████ at 46:7-47:18.

[23] Ex. 27 ██████████████ at 44:11-45:17.



[24] Insurers cannot construct a viable insurance network without sufficient coverage for anesthesia at hospitals.[25] So ███████████████████████████████████████████████ gave them ██████████████ ██████████████[26] Insurers became █████████████████████████ ██████████[27]

## LEGAL STANDARD

Rule 56 requires USAP to show there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law. The Court does not weigh the evidence, and draws all reasonable inferences in favor of the nonmovant. *See Tolan v. Cotton*, 572 U.S. 650, 656 (2014); *Cole v. Carson*, 935 F.3d 444, 452 (5th Cir. 2019) (en banc). If the evidence is sufficient for a reasonable factfinder to return a verdict for the FTC, summary judgment is inappropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## ARGUMENT

### I.    USAP cannot obtain summary judgment on monopoly or market power.

The FTC challenges USAP's acquisitions in Houston, Dallas, and Austin under Section 7 of the Clayton Act (counts II, V, and VII),[28] and its acquisitions in Houston and Dallas as monopolization under Section 2 of the Sherman Act (counts I and IV).[29] USAP seeks summary

---

[24] Ex. 26 ███████████ at 72:13-73:8.

[25] Ex. 11 ███████████████ at 17:10-19, 51:13-52:4, 53:3-24.

[26] Ex. 11 ███████████████ at 56:13-57:12.

[27] Ex. 22 ███████████ at 171:8-172:14; Ex. 8 ████████████ at 191:17-193:2.

[28] An acquisition is unlawful under Section 7 if it "may [] substantially [] lessen competition, or [] tend to create a monopoly" in a market. 15 U.S.C. § 18; *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1047-48 (5th Cir. 2023).

[29] Monopolization has two elements: (1) the possession of monopoly power and (2) the acquisition or maintenance of that power through anticompetitive conduct. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992). USAP's motion does not challenge that its acquisitions could constitute anticompetitive conduct.

judgment on all of these claims on the sole basis that "the FTC cannot show . . . market power or monopoly power in any relevant market." Br. 8 (cleaned up). But the legal standard for Section 7—which USAP does not even mention—precludes summary judgment. And USAP's arguments about monopoly power ignore the legal framework and rely on factual disputes.

**Clayton Act Section 7 claims.** Section 7 "is much broader than the Sherman Act," and "[a] defendant need not have a market share approaching monopoly proportions" to violate it. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491 (5th Cir. 1984). Based on Supreme Court precedent, courts generally presume that an acquisition is illegal under Section 7 if it results in a market share greater than 30%. *See FTC v. IQVIA Holdings Inc.*, 710 F. Supp. 3d 329, 378-79 (S.D.N.Y. 2024) (citing *United States v. Phila. Nat'l Bank*, 374 U.S. 321 (1963), and collecting cases). And the Merger Guidelines—which have been relied on by the Fifth Circuit[30]—similarly state that acquisitions are presumptively illegal if they result in a market share of greater than 30% and a change in HHI (a measure of market concentration) of greater than 100. *See* U.S. Dep't of Justice & FTC, Merger Guidelines § 2.1 (Dec. 18, 2023).

The market share figures provided by USAP's own brief and economic expert preclude summary judgment under this standard. USAP's brief cites market shares of ███ % (Br. 18), and its economic expert found that many of the acquisitions in Houston, Dallas, and Austin resulted in shares above 30% and HHI increases greater than 100, making them presumptively illegal.[31] USAP entirely fails to mention the legal standard for Section 7 or provide any response to this presumption—which, even if it did so, would at best raise questions of fact. *See United*

---

[30] The Fifth Circuit has relied on these guidelines as recently as this year (*Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 411 (5th Cir. 2026)) and has previously described them as "persuasive authority when deciding if a particular acquisition violates anti-trust laws" (*Chi. Bridge & Iron Co. N.V. v. FTC*, 534 F.3d 410, 431 n.11, 434 n.13 (5th Cir. 2008)).

[31] Ex. 28 (Fowdur Rebuttal Rep.) at 105 (Ex. 36).

*States v. Baker Hughes, Inc.*, 908 F.2d 981, 982-83, 992 (D.C. Cir. 1990) (Thomas, J.) (explaining that government can establish *prima facie* case under Section 7 "[b]y presenting statistics" showing increased concentration, and assessing defendant's rebuttal based on full factual record after trial); *Chi. Bridge & Iron Co. N.V. v. FTC,* 534 F.3d 410, 422, 426 (5th Cir. 2008) (similar).

**Section 2 monopolization claims.** Although USAP's brief does address the standard for monopoly power, its arguments fall far short of justifying summary judgment. "Monopoly power is 'the power to control prices or exclude competition.'" *Fulton v. Hecht*, 580 F.2d 1243, 1246 (5th Cir. 1978) (quoting *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956)). "[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001).[32] This power "can be proven directly through evidence of control over prices or the exclusion of competition, or it may be inferred from a firm's large percentage share of the relevant market." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500 (2d Cir. 2004). Here, a reasonable factfinder could find that USAP had market power using either method.

### A.      USAP's price increases are direct evidence of monopoly power.

USAP agrees that monopoly or market power can be shown directly by "reduced output, increased prices, or decreased quality." Br. 8 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018)). Here, a reasonable factfinder could easily find direct evidence of monopoly power based on the record facts that: (1) USAP imposed massive price increases on the rates of the

---

[32] Similarly, "[m]arket power is the ability to raise prices above those that would be charged in a competitive market." *NCAA*, 468 U.S. at 109 n.38 (citations omitted). The only difference between the two is degree: "Monopoly power under § 2 requires . . . something greater than market power under § 1." *Eastman Kodak*, 504 U.S. at 481.

anesthesia groups it acquired;[33] (2) none of those groups could charge those high rates on their own when they competed with USAP;[34] (3) USAP was able to impose those price increases due to its size and leverage against payors;[35] and (4) USAP did not meaningfully lose sales volume from raising price.[36] This "evidence of supracompetitive pricing [i.e, pricing above competitive levels] is direct proof of the actual exercise of monopoly power." *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1069 (9th Cir. 2025); *see also CF Indus., Inc. v. Surface Transp. Bd.*, 255 F.3d 816, 823 (D.C. Cir. 2001) (an "accepted method of measuring market power" is assessing whether company "can increase its net revenues by raising its prices").[37]

Unable to dispute that it significantly raised the prices of the groups it acquired, USAP asks the Court to ignore that evidence for two baseless reasons. First, USAP claims that the FTC must *also* show that USAP reduced output for anesthesia services (i.e. dissuaded some patients from getting anesthesia at all). Second, USAP asserts that the lower prices charged by competing

---

[33] *See, e.g.*, Ex. 29 (PX1526) at 001-002 (calculating $▮▮▮ from NHA Kingwood rates increasing from range of $▮▮ to range of $▮▮); Ex. 30 (Wade (USAP) Dep.) at 89:18-90:4, 93:15-94:8; Ex. 31 (PX1053) at 025 (projecting ▮% increase in USAP's United rate from acquisition of Metrowest, ▮▮▮▮); Ex. 11 ▮▮▮▮ at 36:1-18, 36:21-38:16; Ex. 32 (PX0186) (stating that after MetroWest's acquisition, USAP raised their anesthesia costs for United by $▮▮▮); *compare* Ex. 33 (PX2194) at 006 (original Guardian 2011 rate to Cigna was $▮) *with* Ex. 34 (PX0115) at 003 (calculating $▮ pro forma increase in Guardian revenue per unit based on acquisition, including $▮ USAP rate to Cigna); Ex. 4 (PX0030) at 002 (celebrating that raising Capitol's rates to USAP's would yield an additional $▮ to USAP ▮ ▮▮▮▮); Ex. 18 (Capps Rep.) ¶¶ 196-97, Figs. 31-32; Monahan Decl. at ¶ 2.

[34] *See, e.g.*, Ex. 11 ▮▮▮ at 50:14-52:4; Ex. 27 ▮▮▮ at 54:1-54:20; Ex. 11 ▮▮▮ at 36:21-38:16; Ex. 35 ▮▮▮ at 57:1-9.

[35] USAP's bargaining leverage against payors stemmed from USAP's size and the resulting difficulty that payors would have to construct an adequate network without it. *E.g.*, Ex. 8 ▮▮▮ at 191:7-11, 191:17-192:4; 192:13-193:20; Ex. 36 ▮▮▮ at 48:10-49:15; Ex. 11 ▮▮▮ at 51:13-52:4, 92:25-93:16; Ex. 35 ▮▮▮ at 34:8-16.

[36] Ex. 18 (Capps Rep.) ¶ 205; Ex. 37 ▮▮▮ at 71:3-6; Ex. 38 (Wright (USAP) Dep.) at 35:22-36:6 and Ex. 29 (PX1526) (▮▮▮▮); Ex. 38 (Wright (USAP) Dep.) at 42:7-18, 44:10-15.

[37] *See also* Ex. 39 (Capps Reply Rep.) ¶ 48 ("direct" evidence is "evidence of persistent high pricing not explained by other factors such as cost or quality"); *see also* Ex. 18 (Capps Rep.) §§ V.A.1, VI.A-B.1; Monahan Decl. ¶¶ 2-4.

8

anesthesia practices before USAP acquired them are not an appropriate benchmark for a competitive price. USAP is wrong on both counts.

### 1. Reduced output is not an additional requirement.

Though monopoly power *can* be established by showing that the defendant "cut back the market's total output" (Br. 9), "a plaintiff need not allege both output restrictions and supracompetitive pricing to plead direct evidence of monopoly power." *CoStar Grp.*, 150 F.4th at 1069. Indeed, the Supreme Court and Fifth Circuit describe increased prices and reduced output as alternative options for direct evidence. *See Am. Express*, 585 U.S. at 549 (direct evidence of harm to competition requires "some evidence that tends to prove that output was restricted **or** prices were above a competitive level" (emphasis added, cleaned up)); *Impax Labs., Inc. v. FTC*, 994 F.3d 484, 493 (5th Cir. 2021) (direct evidence requires showing "increased prices, decreased output, **or** lower quality goods" (emphasis added)).[38]

Moreover, courts have recognized that "reduced output is an ill-fitting indicia of monopoly power" in a market like this one where "a dominant firm has no incentive to restrict output to earn monopoly profits." *United States v. Google LLC*, 747 F. Supp. 3d 1, 123 (D.D.C. 2024). The record shows that USAP has no motive to reduce output since it can raise prices without losing sales. In the words of a former USAP director, ███████████████████



███████████████████ because ███████████████████████████

██████████[39] And USAP and insurers testified that USAP did not lose ███████████████

---

[38] USAP points to isolated language in *American Express* describing market power as "the ability to raise price profitably *by restricting output*." Br. 9 (quoting 585 U.S. at 549). But the *American Express* Court only examined output because "[t]he plaintiffs did not offer any evidence that the price of credit-card transactions was higher than the price one would expect to find in a competitive market." *See id.* at 547-48. Ultimately the Court rejected the plaintiffs' claim because (unlike here) there was no "evidence that tends to prove that output was restricted **or** prices were above a competitive level." *Id.* at 549 (quoting *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) (emphasis added)).

[39] Ex. 40 (Regan (WCAS) IH) at 41:20-23.

when it raised the prices of groups it acquired.[40] It would thus make no sense for USAP to artificially "cut back the market's total output" and make patients "bid more in competing against one another" to get anesthesia. Br. 9 (cleaned up).

### 2. The benchmark competitive price is what competing groups charged before being acquired.

USAP also contends that the FTC cannot show supracompetitive pricing because there is "no competitive benchmark for reimbursement rates." Br. 13-14. Even assuming a "benchmark" price is required,[41] a reasonable factfinder could easily find one: the lower prices the acquired anesthesia practices actually charged for the same services when they were competing with USAP.[42] Without USAP's market power, these groups could not get insurers to pay them higher rates.[43] When USAP acquired them, however, it was able to raise their prices to match its own, much higher price.[44] This directly demonstrates USAP's "ability to raise prices above those that would be charged in a competitive market." *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 n.38 (1984); *see also FTC v. Shkreli*, 581 F. Supp. 3d 579, 630 (S.D.N.Y. 2022) (finding that competitive price level could be measured by the product's "price in the years before [the defendant] acquired it").

USAP tries various tactics to distract the Court from this obvious price comparison. First, USAP asks the Court to ignore the prices anesthesia groups charge insurers "when they actually furnish anesthesia services" (Br. 4)—and instead focus solely on "stipends" in hospital staffing contracts—because it claims that "[a]nesthesia providers do not compete to sell

---

[40] Ex. 37 ██████████ at 71:3-6; Ex. 38 (Wright (USAP) Dep.) at 35:22-36:6, 39:3-9, 44:10-15, 109:12-17.

[41] *See United States v. Google LLC*, 778 F. Supp. 3d 797, 854 (E.D. Va. 2025) (failure to define "what prices would have been in a competitive market" did not "undermine[]" finding of direct evidence).

[42] Ex. 39 (Capps Reply Rep.) at ¶¶ 193-94.

[43] *See supra* n. 34.

[44] *See supra* n. 33.

10

anesthesia services to insurers." Br. 1, 12-13. This factual assertion is inappropriate for summary judgment. It is also completely wrong. Courts routinely recognize that health care providers "compete to be included in insurers' networks." *FTC v. Advoc. Health Care Network*, 841 F.3d 460, 470‑71 (7th Cir. 2016); *see also infra* 20-21. In this case, major insurers and even USAP's own economic expert agree that anesthesia providers compete on price for network inclusion. *See infra* 21. USAP's investor documents promise that increasing in size will boost "negotiating leverage" to extract higher rates from insurers.[45] And USAP has argued in a related private case that "the direct purchasers" of its anesthesia services "are the commercial insurers USAP negotiates with."[46] In contrast, focusing on hospital stipends sheds little light on USAP's monopoly power: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓[47] and USAP's internal documents dismissed hospital stipends as ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ and ▓▓▓▓▓▓▓▓.[48]

Second, USAP protests that "prices differ for entirely lawful reasons, such as higher quality, greater clinical complexity, or the costs of providing reliable coverage." Br. 14; *see also* Br. 10. But USAP's brief does not point to any evidence suggesting any of these alternative explanations apply in this case.[49] To the contrary, overwhelming evidence, including testimony

---

[45] Ex. 41 (PX2350) at 003 (emphasis added).

[46] USAP's Mot. to Dismiss, *Electrical Medical Trust v. USAP*, 4:23-cv-04398, ECF No. 50, at 1-2.

[47] *E.g.*, Ex. 42 ▓▓▓▓▓▓▓▓▓▓▓▓▓ at 71:1-15; Ex. 43 ▓▓▓▓▓▓▓▓ at 100:13-16, 261:10-14.

[48] Ex. 2 (PX0170) at 23, 59.

[49] The numerous cases cited by USAP (Br. 9-10 & n.33) in which courts found that, unlike here, price increases could or did reflect an alternative explanation are thus irrelevant. *See Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic* ("*Marshfield I*"), 65 F.3d 1406, 1411-12 (7th Cir. 1995) (higher prices may be explained by superior quality); *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 381 (3d Cir. 2005) (finding the "record demonstrates that [the higher-priced product] is of comparatively high quality"); *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic* ("*Marshfield II*"), 152 F.3d 588, 593 (7th Cir. 1998) (statistical model for calculating private plaintiff damages was "worthless" because it did not account for, among other things, "the quality of the [defendant's] service"); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 310 (5th Cir. 1997) (explaining that "a provider's higher prices . . . **may** correlate with better services or more experienced providers" but finding the defendant's prices were not actually higher (emphasis added)). USAP's citation to *In re Pilgrim's Pride Corp.*, 728 F.3d 457, 462 (5th Cir. 2013) is puzzling because that case involved the Packers and Stockyards (Continued…)

from every major Texas payor, shows that the price increases were due to USAP's size and not some other cause.[50] As one insurer explained, the acquired practices were ███████████ ██████████████████████████████████████████████████ ██████████████████████████████████[51] Moreover, even if USAP could point to evidence that the price increases were caused by something other than USAP's acquisitions, that would merely raise a factual dispute inappropriate for summary judgment.

Third, USAP asks the Court to ignore its price increases because the overall rates it charges major payors "have been flat or declining in real terms." Br 14. But USAP's overall rates are stratospheric: ██████████████████████████████████ ██████[52] Indeed, one of the main reasons USAP bought GHA as its initial "platform" was to obtain these "first-in-class" rates.[53] And USAP took this "highest rate of all . . . and then peanut butter spread [it] across the entire state of Texas."[54] As one payor explained, ████████ ████████████[55] The fact that USAP was able to maintain extraordinarily high

---

Act of 1921, not the Sherman Act, and simply made the obvious observation that if a company tries to raise its prices and does not do anything else (like acquire competitors), there is no competition problem.

[50] *See, e.g.,* Ex. 11 ███████████ at 20:6-21:7, 51:13-52:4; Ex. 27 ████████████ at 24:1-18, 45:3-17, 51:22-53:5; Ex. 44 ████████ at 44:5-21, 72:3-7, 90:4-18; Ex. 45 ██████████ at 88:5-19; Ex. 35 ███████ at 46:19-47:1; Ex. 37 █████████ at 34:9-23, 78:9-23, 83:23-85:10; Ex. 8 █████████ at 192:13-193:20; Ex. 46 █████████ at 76:25-77:17.

[51] Ex 46 ██████ at 76:25-77:17; Ex. 47 (PX1368 ████) at 004 ████████ █████████████████████████████████████████████████████████ ██████ ); *see also* Ex. 11 ████████████ at 31:22-32:11 █████████████████████████████████████ ███ ); Ex. 8 ( █████████ at 175:19-176:5 ██████████████ █████████████████████████████████ ; Ex. 48 (PX2226) at 005 █████████████████████████████████████████████████████████████

[52] Ex. 47 (PX1368) at 004.

[53] Ex. 2 (PX0170) at 026.

[54] Ex. 22 █████████████ at 67:25-69:12.

[55] Ex. 11 ████████████████ at 20:6-11. For example, in 2014 United's conversion factor for the Amarillo area averaged $██ Ex. 12 (PX0184) at 002, but six months after USAP acquired Amarillo Anesthesia Consultants, it became subject to USAP's statewide rate for United of $████. Ex. 49 (PX0187) at 002.

rates and expand them *statewide* for over a decade shows the exercise of market power. *See, e.g.*, *Google LLC¸* 778 F. Supp. 3d at 852 (maintaining supracompetitive transaction fee for "over a decade" is direct evidence of monopoly power).

**B.      Indirect evidence demonstrates USAP's monopoly and market power.**

As an alternative to direct evidence, monopoly or market power can also "be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51.[56] A relevant market has two components: "(1) the product market, and (2) the geographic market." *Endure Indus., Inc. v. Vizient Inc.*, 164 F.4th 405, 411 (5th Cir. 2026). Here, USAP has a dominant share of hospital-only anesthesia services (the product market) in Houston, Dallas, and Austin (the geographic markets). USAP's motion challenges only the FTC's product market, and its arguments either misapply the relevant legal framework or raise factual disputes.

**1.   The relevant product market is hospital-only anesthesia services.**

"A proposed product market must include 'all commodities reasonably interchangeable by consumers for the same purposes.'" *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). The Fifth Circuit considers "the extent to which the seller's product is interchangeable in use and the degree of cross-elasticity of demand between the product itself and substitutes for it"—meaning the extent to which customers will switch to substitutes in response to a price increase. *See Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (cleaned up). The Fifth Circuit has also used two other "classical measures of

---

[56] USAP errs in suggesting that market shares do not matter without direct evidence of market power. Br. 16. As USAP's brief notes elsewhere, "[m]arket power can be shown either 'directly' **or** 'indirectly'" based on market share. Br. 8 (emphasis added) (quoting *Am. Express*, 585 U.S. at 542), 18 (describing required market shares).

market definition and market power: the Hypothetical Monopolist Test and the *Brown Shoe* qualitative factors." *Endure Indus.*, 164 F.4th at 412 (cleaned up).

"Whether a relevant market has been identified is usually a question of fact," and summary judgment is only appropriate if the FTC (1) "fails to define [its] proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand" or (2) "alleges a proposed relevant market that clearly does not encompass all interchangeable substitutes even when all factual inferences are granted in [its] favor." *Shah v. VHS San Antonio Partners, LLC*, 985 F.3d 450, 454 (5th Cir. 2021) (cleaned up).

Here, a reasonable factfinder could easily conclude that the relevant product market is hospital-only anesthesia services, which are anesthesia services provided to patients requiring hospital care.[57] This includes (1) all inpatient anesthesia services performed while the patient is admitted to a hospital, and (2) any other anesthesia services that must be provided in a hospital setting because the risk to the patient requires quick access to emergency medical services.[58] USAP contends that this product market is "gerrymandered" because it excludes "most outpatient services provided in hospitals, ASCs, and other facilities." Br. 18. But in fact the FTC's approach is so widely accepted that parties in antitrust cases involving health systems often just stipulate that the relevant market is limited to inpatient hospital care. *See, e.g., FTC v.*

---

[57] The product market is also limited to commercially-insured services, which USAP's motion does not appear to challenge. Commercially-insured patients facing rate increases generally cannot switch to government insurance (Medicare or Medicaid), which is only available to people who meet certain requirements. *See, e.g.,* Ex. 50 ▆▆▆▆▆▆▆▆ at 22:4-25; *see also* Ex. 18 (Capps Rep.) at ¶ 129. Excluding non-commercial payors is standard in healthcare cases. *E.g.*, *Advoc. Health*, 841 F.3d at 468 (citing *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (parties stipulated)); *see also BRFHH Shreveport, LLC v. Willis Knighton Med. Ctr.,* 176 F. Supp. 3d 606, 611-12, 614-15 (W.D. La. 2016).

[58] To identify these services, the FTC's economic expert, Dr. Capps, uses a "baseline" definition including all inpatient anesthesia services plus any outpatient anesthesia services that are performed at least 90% of the time in a hospital. Dr. Capps also assesses alternative definitions—including limiting the market to only inpatient anesthesia services, or broadening it to include outpatient services performed at hospitals at least 50% of the time. Under each of these various ways of identifying hospital-only anesthesia services, USAP's market share remains consistently high, within a few percentage points. *See* Ex. 18 (Capps Rep.) at ¶¶ 161, 167-74, Figs. 20, 25, 29, 30.

*Hackensack Meridian Health, Inc.*, 30 F.4th 160, 166 (3d Cir. 2022) ("parties do not dispute the relevant product market" limited to inpatient acute care).[59] And, indeed, all three tests used by the Fifth Circuit confirm that patients who need to receive a procedure at a hospital cannot substitute anesthesia services from ASCs or other facilities.

**Reasonable interchangeability and cross elasticity.** Anesthesia services for hospital-only procedures are not "interchangeable in use" with anesthesia services provided at ASCs or other facilities.[60] As this Court previously observed when assessing the FTC's complaint allegations, "it does not matter if, theoretically, out-of-patient anesthesiologists could perform the same services within the hospital, because as a practical matter once a patient requires treatment in a hospital, outpatient anesthesiology services are off the table." Mem. Op. & Order on MTDs (ECF 146) ("MTD Op.") at 22; *see also United States v. Rockford Mem'l Corp.*, 898 F.2d 1278, 1284 (7th Cir. 1990) (Posner, J.) (excluding services by "nonhospital providers" because "for many services provided by acute-care hospitals, there is no competition from other sorts of provider"). USAP's various statistics about procedures that "could also be performed in ASCs" (Br. 19-20) are thus irrelevant.[61]

---

[59] *See also, e.g., Advoc. Health*, 841 F.3d at 468 ("the parties here agree that the product market here is . . . inpatient general acute care services . . . sold to commercial health plans and their members."); *Sidibe v. Sutter Health*, No. 12-CV-04854-LB, 2019 WL 2078788, at *6 (N.D. Cal. May 9, 2019) ([Defendant] "does not challenge any product-market definition" including "a relevant product market for . . . inpatient hospital services.").

[60] *E.g.*, Ex. 51 (Dutton (USAP) 4/4/25 Dep.) at 227:3-228:11 ( ███████████████████████████████████████████████████████████████████ ; *see also* Ex. 52 (Dutton (USAP) 1/14/26 Dep.) at 121:5-126:6 ( ██████████████ ); Ex. 53 (PX1201) at 033 ██████████████ ).

[61] USAP's reliance on cases in which courts granted judgment against plaintiffs who created obviously ridiculous self-serving markets is inapposite. *See It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 683 (4th Cir. 2016) (rejecting proposed market limited to amphitheaters that "must have a capacity of 8,000 or more, actually sell 8,000 or more tickets, and be in use only from May to September" as "akin to defining a market to include tennis players who have won more than three Olympic gold medals and finding that only Venus and Serena Williams fit the bill"); *Neumann v. Reinforced Earth Co.*, 786 F.2d 424, 429-30 (D.C. Cir. 1986) (rejecting attempt to claim "an entrant (Continued…)

For the same reason, "the degree of cross-elasticity of demand between" hospital-only anesthesia and anesthesia provided at other facilities is virtually none. *Apani*, 300 F.3d at 626. "The cross-elasticity of demand for substitutes measures consumers' propensity to switch from one product to another, similar product when relative prices change." *Endure Indus.*, 164 F.4th at 411 (cleaned up). If a patient needs a procedure in the hospital, there is essentially no change in price that could cause them to seek (or their insurer to direct them to) anesthesia from an ASC.[62]

**The Hypothetical Monopolist Test (HMT).** Under the HMT, if a hypothetical monopolist owning all of the products or services in a proposed market "likely would undertake at least a small but significant and nontransitory increase in price"—on the order of about 5%—then the market is appropriately defined. *Endure Indus.*, 164 F.4th at 412 n.2 (quoting 2023 Merger Guidelines § 4.3.A). In healthcare cases, courts apply the HMT "through the lens of the insurers" and ask whether insurers could "avoid the price increase" by switching patients to other medical services. *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 342 (3d Cir. 2016).

Here, an insurer cannot offer a commercially viable health plan unless it has a network that includes anesthesia for hospital-only procedures.[63] Thus, if a hypothetical monopolist of hospital-only anesthesia services raised its prices, payors would have no alternative but to pay

---

with a new technology has monopoly power by defining the market as those customers whom the entrant has so far managed to persuade").

[62] *E.g.*, Ex. 35 ███████ at 20:11-21:6 ████████████

██████ ); Ex. 54 ████████ at 158:13-24 ████████

██.

[63] *See* Ex. 35 ███████ at 19:14-22:13 █████████

███████████ ), 30:9-15 █████

████ ; *see also, e.g.*, Ex. 18 (Capps Rep.) ¶¶ 128, 130; Ex. 11 █████████ at 56:13-58:11.

up.[64] As one insurer explained:

[65]

**The *Brown Shoe* factors.** The Fifth Circuit has also defined markets using the "'Brown Shoe' methodology, which looks to certain 'practical indicia' of market demarcation, such as 'industry or public recognition of the [market] as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.'" *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1049 (5th Cir. 2023) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962)).

Here, these factors demonstrate that hospital-only anesthesia services are the relevant market. **(1)** Industry participants including hospitals, ASCs, anesthesia groups (including USAP), and payors all recognize that

[66] **(2)** Hospital-only anesthesia services have peculiar characteristics: they can be needed at any time, often requiring 24-hours/7 days per week coverage from providers with specific subspecialties, whereas ASCs

---

[64] Ex. 18 (Capps Rep.) ¶ 128. *See also* Ex. 35 ███████████ at 20:11-21:6; Ex. 36 ███████████ at 28:11-30:15 ███████████

███████████ ).

[65] Ex. 11 ███████████ at 57:13-58:11. USAP implies that the FTC failed to do an "econometric" version of the HMT (Br. 20), but the HMT often relies on "'testimony by customers . . . of how they would respond to a price increase.'" *Sutter Health*, 2019 WL 2078788, at *26 (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 538 (4th ed. 2017)).

[66] Ex. 42 ███████████ at 18:10-19:24. *Hospitals: E.g.*, Ex. 43 ███████████ at 145:7-146:18 ( ███████████ ); Ex. 55 ███████████ ███████ at 91:2-15; *Providers: E.g.*, Ex. 56 ███████████ at 22:3-26:17, Ex. 52 (Dutton (USAP) 1/14/26 Dep.) at 121:5-126:6; *ASCs:* Ex. 57 ███████████ at 93:15-94:6; *Payors: E.g.*, Ex. 36 ███████████ at 27:4-28:7 ( ███████████

███████ ).

17

████████████████████████████████████████████ and █████████████ [67] **(3)** Hospitals and

ASCs are specialized vendors serving distinct customers; hospitals have inpatient beds,

emergency departments, and intensive care units, and can serve patients who are ████████ or

require █████████████████████████ [68] whereas ASCs serve patients that are ████████

████ [69] **(4)** Hospital anesthesia services have distinct prices: due to their generally higher

complexity, payors paid, on average, ████████████████ for hospital-only anesthesia

claims than other anesthesia services. [70] **(5)** As described above, hospital-only anesthesia services

are not sensitive to the price of ASC services. *See supra* 15-16.

### 2. USAP has a dominant market share protected by entry barriers.

USAP does not dispute that "a market share of at least fifty percent" can establish

monopoly power. Br. 18 (quoting *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp.

1544, 1551 (S.D. Tex. 1991)). As of 2023, USAP—███████████████████ [71]—has a

54% share of hospital-only anesthesia cases in Houston and over ██% share of revenue. [72] In

Dallas, it has a ██% share of cases and a ██% share of revenue. [73] In both cities USAP is about

█████████████████████████████████ [74] In Austin (where the FTC brings

---



[67] Ex. 58 █████████████ at 25:6-26:2. *See also, e.g.,* Ex. 59 █████████ at 87:10-88:2
█████████████████████████████████████████████████████████████████
██ ; Ex. 42 ███████████████████ at 19:11-20:22, 37:11-17 ███████████████████
█████████████████████████████████████████████████████████████████ );
Ex. 28 (Fowdur Rebuttal Rep.) ¶ 28.

[68] Ex. 55 █████████████ at 91:2-15. *See also* Ex. 52 (Dutton (USAP) 1/14/26 Dep.) at 122:2-123:4, 124:4-
126:6. *See supra* n. 66.

[69] Ex. 57 █████████ at 93:15-94:6. *See also* Ex. 60 ███████████ at 180:20-181:24.

[70] Ex. 39 (Capps Reply Rep.) ¶¶ 58-59, Fig. 2.

[71] Ex. 61 ████████████ at 27:3-28:1.

[72] Ex. 18 (Capps Rep.) ¶¶ 18, 155, 174, Figs. 15, 30.

[73] Ex. 18 (Capps Rep.). ¶¶ 18, 157-58, 174, Figs. 17, 30.

[74] Ex. 18 (Capps Rep.) ¶¶ 156-58, Figs. 15-17.

18

only a Section 7 claim) USAP has a ██% share of cases and over ██% of revenue.[75]

These high shares are protected by significant entry barriers, i.e. "factors . . . that prevent new rivals from timely responding to an increase in price above the competitive level." *Microsoft*, 253 F.3d at 51. USAP contends that "providers who focus on hospital outpatient and ASC cases could shift to hospitals without retraining or new capital investment." Br. 22. But it fails to identify any examples of this happening—let alone evidence that shows new entry has successfully eroded the high share or high pricing USAP has maintained for over a decade.[76]

Indeed, the record shows that it is neither "easy" nor likely for ASC anesthesia providers to start offering or significantly expand their hospital-only services. *See Chi. Bridge & Iron Co.*, 534 F.3d at 428-29. Opportunities to expand into hospital-only services are limited: hospitals often have an existing "sticky" contract with another anesthesia group and have little incentive to incur the costs of switching groups just because of higher anesthesia rates that affect *payors*—not them.[77] Even when the opportunity arises, not all providers can compete for hospital services. As USAP's own expert explains, ██████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ [78] And many anesthesia providers ████

---

[75] Ex. 18 (Capps Rep.) ¶¶ 18, 159, 174, Figs. 19, 30.

[76] Ex. 39 (Capps. Reply Rep.) ¶¶ 72, 97-105, Figs. 9-10 ██████████████████████████ ██████████████████████████████████████ ).

[77] Ex. 18 (Capps. Rep.) ¶¶ 53-56, 179-180; Ex. 39 (Capps Reply Rep.) ¶¶ 71, 108-09. *See also e.g.,* Ex. 43 ███████ at 80:4-6 ██████████████████ ); Ex. 62 ██████████████ at 166:3-19 ████████████████████ ; Ex. 63 (PX0221) at 005 ( ██████████████████████ "[h]ospital contracts are sticky ████████████ ).

[78] Ex. 28 (Fowdur Rebuttal Rep.) ¶ 28. *See also* Ex. 42 ██████████████ at 19:11-20:22, 36:25- (Continued…)

███████████████████████████████████████████████ that serving hospitals

requires.[79]

### 3. USAP's reliance on hospital staffing contracts is misplaced.

USAP does not dispute the fundamental point that patients who need to receive a procedure in a hospital cannot substitute anesthesia services provided at an ASC or other facility. Nor does it dispute its high shares of hospital-only anesthesia services in Houston, Dallas, or Austin. Instead, it insists that the Court should completely ignore what patients and payors pay providers when they "actually furnish anesthesia services" (Br. 4) and focus solely on the process by which some anesthesia groups bid for staffing contracts at certain hospitals. Br. 16-17; *see supra* 10-11. But this hospital staffing process is not the "relevant competitive transaction" that determines the relevant market in this case. And even if one did view the market based on bidding for hospital contracts, summary judgment would still be inappropriate.

**Hospital staffing contracts are not the "relevant competitive transaction."** The Fifth Circuit—like other courts—"has oriented its market analysis toward consumers' choices" and assesses whether services are "reasonably interchangeable *by consumers*." *Endure Indus.*, 164 F.4th at 411 (emphasis added). In healthcare markets, "consumers purchase health insurance and the insurance companies negotiate directly with the providers." *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015). Such markets are thus defined by looking at "services sold to commercial health plans and their members." *Advoc. Health*, 841 F.3d at 468; *see also Penn State Hershey*, 838 F.3d at 342 (collecting cases and defining market "though the lens of the insurers"). Anesthesia services are no different. Indeed,

---

38:6; Ex. 64 (Schlotter (USAP) Dep.) at 103:8-105:3 ███████████████████████ ██████████████████████ ).

[79] Ex. 58 ██████████████ at 193:16-194:9.

in another antitrust case about anesthesia, the Fifth Circuit analyzed the relevant market by assessing "where *people*"—not hospitals—"could practically go for [] anesthesia services" within a Texas geographic region. *Shah*, 985 F.3d at 455 (emphasis added) (quotation omitted).[80]

This focus on the perspective of patients and insurers makes sense because, contrary to USAP's claim, the negotiations between anesthesia groups and insurers *are* the "transaction where competitive choices are actually made." *See* Br. 17. Anesthesia groups, like most health care providers, "compete to be included as in-network providers in health plans." *See Advoc. Health*, 841 F.3d at 470-71 (citing *Saint Alphonsus*, 778 F.3d at 784 & n.10).[81] Insurers in this case explained that ██████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████[82] And even USAP's own economic expert acknowledged that ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████[83]

---

[80] Even USAP, in a related private case, has argued that "the insurer" would be the "*direct* victim of antitrust harm" resulting from its alleged conduct in anesthesia markets. *See* USAP's Mot. to Dismiss, *Electrical Medical Trust v. USAP*, 4:23-cv-04398, ECF No. 50, at 9 (emphasis in original).

[81] *See also, e.g.*, *Penn State Hershey*, 838 F.3d at 342; *Hackensack Meridian*, 30 F.4th at 168.

[82] Ex. 45 ████████████████ at 59:10-62:20. *See also* Ex. 44 ████████████ at 25:3-21; Ex. 11 ████████████ at 56:13-57:12 ████████████████████████████████████████████████████████

████████████ ).

[83] Ex. 28 (Fowdur Rebuttal Rep.) at ¶ 17. Dr. Fowdur describes a ████████████████████████████ ████████████████████████████████████ This is highly similar to the "two-stage" model of healthcare competition widely used by courts. *Saint Alphonsus*, 778 F.3d at 784 n.10; *see also Penn State Hershey*, 838 F.3d at 342; *Advoc. Health*, 841 F.3d at 465, 470-71. Courts applying this two-step model are clear that antitrust analyses "focuses" on the stage in which "providers compete for inclusion in insurance plans." *Saint Alphonsus*, 778 F.3d at 784 n.10. Competition for hospital placement is a form of competition for "who serves patients" (Br. 1), which is typically relevant in antitrust cases only "to the extent [patient] behavior affects the relative bargaining positions of insurers and [providers] as they negotiate rates." *Penn State Hershey*, 838 F.3d at 342.

**USAP still has dominance in a bidding market for hospital placement.** Summary judgment would be inappropriate even if this were the kind of bidding market USAP describes. First, a reasonable factfinder could determine that USAP's long-term high shares of hospital placement still demonstrate its dominance. USAP errs in relying on *United States v. Baker Hughes, Inc.*, 908 F.2d 981 (D.C. Cir. 1990), to claim that its high "post-bid market shares" of hospital placement do not matter. Br. 17. In fact, the Fifth Circuit has explained that *Baker Hughes* carved out a "very limited exception" in "extreme situation[s]" where proposed markets are based on tiny data samples ("such as two data points") of "an esoteric product." *Chi. Bridge & Iron Co.*, 534 F.3d at 432-33. That "very limited exception" does not apply here: decades of data from many transactions demonstrate USAP's consistently high market shares (*see* Ex. 39 (Capps Reply Rep.) at ¶¶ 133-136).

Second, even if the market were defined by assessing which anesthesia groups "compete by bidding for facility contracts" (Br. 13), there is still a question of fact as to whether USAP has a dominant share of such groups. Many providers that staff ASCs would not be able or willing to bid for hospital contracts. *See supra* 19-20. ██████████████████

████████[84] One Dallas-based hospital system executive explained they have ████████

████████████████████████████████████

████████████████████████████.[85]

## II.    Ample evidence shows USAP's agreements with competitors are unlawful.

Collusion between competitors is "the supreme evil of antitrust." *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). And "agreements among

---

[84] *E.g.*, Ex. 42 ████████████ at 36:25-38:6 (████████████
████████████████████████ ; *see also* Ex. 65 ████████ at 32:14-33:10; Ex. 66 ████████ at 30:3-22; Ex. 18 (Capps Rep.) ¶ 238.
[85] Ex. 42 ████████████████ at 51:5-52:3.

competitors to fix prices . . . or to divide markets" are *per se* illegal regardless of a party's excuses for entering one. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Here, USAP had three price-setting arrangements where it agreed with competitors that USAP would charge for their services at USAP's higher rates (count IX). And USAP entered into a market allocation agreement in which it paid a competitor, Envision, to stay out of USAP's market for five years (count X). These agreements are quite obviously problematic, and USAP's own employees recognized that they are "odd from a compliance standpoint."[86]

USAP nonetheless asks the Court to decide at summary judgment that none of these agreements violate Section 1 of the Sherman Act because (1) USAP voluntarily ended (or will end) them and (2) the facts supposedly show they are run-of-the-mill "administrative" agreements. The Court should reject this invitation.

### A. Section 13(b) does not bar the FTC's Section 1 claims.

USAP first re-runs an unsuccessful argument from its motion to dismiss: It claims these agreements are "[b]eyond Section 13(b)'s [r]each" because USAP has ended three (and says it plans to end the fourth) and "terminated agreements cannot be 'part' of any ongoing or imminent violation." Br. 23-25. That argument fares no better at summary judgment.

First, the "is . . . or is about to" language in Section 13(b) sets out, at most, a "pleading requirement—which is applied right out of the gate," *FTC v. Shire ViroPharma, Inc.*, 917 F.3d 147, 158 (3d Cir. 2019); *see also* 15 U.S.C. § 53(b).[87] The Court already found that the FTC satisfied this pleading standard. MTD Op. at 18-20. With that requirement met, the Court's

---

[86] Ex. 67 (PX1495) at 001.

[87] We are aware of only a single district court case—decided under Section 2 of the Sherman Act, not Section 1—that held differently. *See FTC v. Meta Platforms, Inc.*, No. CV 20-3590 (JEB), 2025 WL 3458822, at *11 (D.D.C. Dec. 2, 2025). Unlike here, *Meta* did not involve a defendant unilaterally claiming it ended its challenged conduct, but rather a Court finding after trial that competition had eroded the defendant's market share.

decision "whether to grant or deny injunctive relief" is now governed by traditional equity standards, not Section 13(b). *FTC v. Abbvie Inc.*, 976 F.3d 327, 381 (3d Cir. 2020) (cleaned up).

Second, even if the "is . . . or is about to" requirement still applied, the Court previously explained that the ending of USAP's agreements poses no problem as long as they were "part of the 'large-scale, systematic scheme' alleged by the FTC." MTD Op. 20. Indeed, some of these agreements had *already* ended before the FTC filed its complaint, yet the Court found 13(b) did not bar claims challenging them. MTD Op. 3, 20. USAP asks the Court to reach a different conclusion now because it erroneously claims that "the FTC has no evidence connecting USAP's agreements to any alleged 'scheme.'" Br. 25. In fact, the record shows USAP used these agreements to pay off challengers to its dominance. For example, USAP executives saw academic anesthesia groups like Baylor College of Medicine as ████████████[88] but ████████ ████████████████████████[89] So, rather than compete with Baylor, USAP executives opted to ████████████████████████████████████ i.e., a price-setting arrangement.[90]

Third, USAP is simply wrong in claiming that "no court has ever allowed the FTC to bring a Section 1 claim to trial under Section 13(b) where discovery confirmed the challenged agreement has ended and will not resume." Br. 25. To take a recent example, the court in *FTC v. Shkreli* found after trial that an exclusive supply agreement violated Section 1 even though it had ended conclusively two years before trial.[91] 581 F. Supp. 3d at 609, 614, 629, 634-36. And even

---

[88] Ex. 68 (PX2229) at 001.

[89] Ex. 40 (Regan (WCAS) IH) at 109-111.

[90] Ex. 69 (PX1226) at 002.

[91] The facts in *Shkreli* show that the agreement ended bitterly and would not resume: the supplier extorted a $750,000 "termination fee" from the defendant under threat of "speak[ing] to the FTC" and then immediately started working with the defendant's competitor to help launch a competing product. 581 F. Supp. 3d at 609, 614, 634-36.

if USAP's legal claim were correct, discovery has **not** "confirmed" that USAP's price setting agreements have "ended and will not resume." Br. 25. USAP announced the termination of its remaining price-setting agreement for the first time in this motion and will not commit to actually terminating it until August 2026. USAP MSJ, Ex. 29. It is "reasonable to infer" this termination is "in response to the FTC's litigation." *FTC v. Elec. Payment Sols. of Am. Inc.*, No. CV-17-02535-PHX-SMM, 2019 WL 4287298, at \*10 (D. Ariz. Aug. 28, 2019). And though USAP had an executive submit an untested declaration that it presently ████████████ (USAP MSJ, Ex. 29) of striking similar deals, this "intention could change at any time," *Native Village of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1215 (9th Cir. 2021) (cleaned up).

### B.    USAP's merits arguments are factual disputes and unavailing.

To establish a Section 1 claim, the FTC must show (1) agreements that (2) unreasonably restrain trade (3) in a particular market. *BRFHH Shreveport, LLC. v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022). USAP's motion focuses only on whether the agreements unreasonably restrained trade—that is, whether they were on balance anticompetitive.[92]

Agreements with competitors to fix prices or stay out of markets are *per se* illegal and condemned automatically under Section 1 "without inquiry into the effect on the market in the particular case at hand." *Spectators' Commc'n Network, Inc. v. Colonial Country Club*, 253 F.3d 215, 223 (5th Cir. 2001). "The scope of conduct found to constitute horizontal price-fixing agreements . . . is broad." *United States v. Jindal*, No. 4:20-CR-00358, 2021 WL 5578687, at \*4

---

[92] Although USAP claims (Br. 25) the FTC "cannot establish any element of its Section 1 claims," it does not meaningfully dispute that its written contracts with Envision and other anesthesia groups are "agreements" under Section 1. *See In re AndroGel Antitrust Litig. (No. II)*, No. 1:09-MD-2084-TWT, 2018 WL 2984873, at \*7-8 (N.D. Ga. June 14, 2018) (written agreements that "specifically address the conduct the Plaintiffs argue is unlawful" satisfy Section 1 "agreement" requirement); *see also BRFHH Shreveport*, 49 F.4th at 525-26 (using the terms agreement and conspiracy "interchangeably."). And the FTC has ample evidence of USAP's market power in Dallas and Houston. *See supra* 7-20.

25

(E.D. Tex. Nov. 29, 2021). Agreements that do not qualify for *per se* condemnation are instead assessed under the rule of reason, "a highly-fact intensive inquiry, requiring the fact finder to weigh all the circumstances of a case in deciding whether" an agreement is anticompetitive. *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-0832 RF, 2005 WL 3068206, at *3 (W.D. Tex. Nov. 1, 2005) (quotation omitted). Here, a reasonable factfinder could easily conclude that the challenged agreements are unlawful either *per se* or under the rule of reason.

### 1. USAP's price-setting arrangements unlawfully restrained trade.

USAP seeks summary judgment based on its factual assertion that its price-setting arrangements "were not agreements among competing anesthesiology practices to fix prices" but rather vertical "administrative services contracts" between firms "at different levels of the market." Br. 26. The record shows otherwise: in all three agreements, (1) USAP and the other practice were horizontal competitors for anesthesia services[93] and (2) USAP billed for services performed by the competing group as if the services came from USAP—and did so charging USAP's own rates, which were ▮▮▮▮▮▮ than the competitor's rates.[94]

A reasonable factfinder could easily find that these agreements are *per se* illegal because their "practical effect" was to set a uniform price for the two groups' anesthesia services. *Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 406, 412-14 (S.D.N.Y. 2000) (two hospitals' use of a "common and exclusive agent to negotiate with insurers" and set prices was *per se* unlawful). And even if these agreements were not unlawful *per se*, USAP's factual claims that they

---

[93] "Restraints imposed by agreements between competitors have traditionally been denominated as horizontal restraints," *Business Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988), and USAP competed against the practices with which it had price-setting arrangements. Ex. 70 ▮▮▮▮▮▮▮▮▮▮ at 164:3-165:9, 174:6-11; Ex. 71 ▮▮▮▮▮ at 19:23-20:5; Ex. 68 (PX2229) at 001-002.

[94] Ex. 72 (PX3009) at 028-029, 033-034, 037-038; Ex. 73 (PX2067) at 002; Ex. 74 ▮▮▮▮▮▮▮▮ at 25:6-24, 30:15-23, 39:6-40:22, 45:16-25, 55:5-20, 128:9-12; Ex. 75 (Wright (USAP) IH) at 187:2-6 (USAP ▮▮▮▮▮▮); Ex. 76 (PX1237) (USAP billed for Dallas Anesthesia Associates and ▮▮▮▮▮▮).

26

"promoted competition" (Br. 26) would still need to be assessed under the "fact intensive" rule of reason. *See Kinetic Concepts*, 2005 WL 3068206, at *3. The Court would need to evaluate whether USAP's claimed justifications bear a "logical nexus" to USAP charging its own rates for a competitor's service;[95] whether USAP could achieve those justifications "through less anticompetitive means" like providing the same services but billing at the competitor's actual rates;[96] and whether the agreements' "anticompetitive harms"—i.e., much higher prices charged for competitors' services—"outweigh the procompetitive benefits" that USAP claims.[97] This cannot be done at summary judgment.

### 2. USAP's market allocation with Envision unlawfully restrained trade.

Ample evidence confirms USAP paid Envision millions of dollars to stay out of USAP's market. Envision provides anesthesia services, among other things, and competes with USAP.[98] When USAP entered the Dallas market, it feared Envision would ███████████████[99] USAP thus agreed to pay Envision $9 million per year for five years in exchange for Envision not providing anesthesia in the "Dallas/Ft. Worth Metroplex" during that time.[100] After the five-year term ended, ████████████████████[101]

This is a straightforward illegal market division. *See Palmer v. BRG of Ga., Inc.*, 498

---

[95] *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 363-71 (5th Cir. 2008) (applying abbreviated rule of reason and affirming physician group's joint negotiation of prices was unlawful).

[96] *See Impax Labs, Inc. v. FTC*, 994 F.3d 484, 492 (5th Cir. 2021).

[97] *See id.* Similarly, USAP claims (Br. 26) these arrangements are "commonplace" but in examples which it cites, anesthesia practices kept billing at their own, separate rates. *E.g.*, Ex. 60 ██████████ at 128:23-129:5. Regardless, "simply because 'everyone else is doing it' is not an absolute defense and does not mean [a defendant] can avoid the legal consequences of its actions." *See In re Catfish Antitrust Litig.*, 908 F. Supp. 400, 417 (N.D. Miss. 1995).

[98] Ex. 77 (Regan (WCAS) Dep.) at 236:5-21.

[99] Ex. 20 (PX0175) at 002. EmCare is a subsidiary of Envision. Ex. 77 (Regan (WCAS) Dep.) at 199:15-17.

[100] Ex. 19 (PX0231) at 003, 004-005; Ex. 20 (PX0175) at 002; Ex. 21 (Bratberg (USAP) IH) at 198:17-199:11.

[101] Ex. 78 (Flowers (USAP) IH) at 76:20-77:2.

27

U.S. 46, 49-50 (1990) (agreement in which two competitors "agreed not to compete in the other's territories" was "unlawful on its face"). Contrary to USAP's claim, it cannot be saved as an "ancillary restraint" to USAP's acquisition of Pinnacle (Br. 27) because a reasonable factfinder could easily conclude that paying *Envision* not to compete was not "reasonably necessary" for USAP to purchase *Pinnacle*, an entirely different anesthesia group.[102] And even if the ancillary restraint doctrine were to apply, it "is not a pass from the antitrust laws." *LDDS Commc'ns, Inc. v. Automated Commc'ns, Inc.*, 35 F.3d 198, 199 (5th Cir. 1994). Instead, USAP's non-compete would "be analyzed under the rule of reason" and must be "as limited as is reasonable." *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 265 (7th Cir. 1981). This is a fact intensive inquiry, and none of the cases USAP cites granted summary judgment on this basis.[103]

## III.    USAP's consolidation scheme violates Section 5 of the FTC Act.

USAP's scheme to roll up competing Texas anesthesia providers into a single enormous group is an "unfair method[] of competition" under Section 5 of the FTC Act. 15 U.S.C. § 45. It "unfairly burdened competition for a not insignificant volume of commerce" and substantially raised anesthesia prices in Houston, Dallas, and Austin (counts II, V, and VII), and across Texas (count VIII). *See FTC v. Texaco, Inc.*, 393 U.S. 223, 230 (1968). USAP is not entitled to summary judgment on any of these claims.

First, the Section 5 claims are not "merely derivative" of "the Sherman and Clayton Act theories." *See* Br. 28. The Supreme Court has explained that Section 5 prohibits conduct that

---

[102] *See MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 337-39 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment). The ancillary restraint doctrine sometimes allows competitors "to engage in a variety of activities that would normally be illegal under a *per se* rule," if and only if those activities are "reasonably necessary to achieve" an efficiency-enhancing purpose. *Id*.

[103] *See Lektro-Vend*, 660 F.2d  at 262 (appeal from bench trial); *Elec. Distributors, Inc. v. SFR, Inc.*, 166 F.3d 1074, 1078 (10th Cir. 1999) (same); *Goldberg v. Tri-States Theatre Corp.*, 126 F.2d 26, 28 (8th Cir. 1942) (appeal from grant of an injunction).

"may not actually violate" those laws. *FTC v. Brown Shoe Co., Inc.*, 384 U.S. 316, 321-22 (1966) (exclusive dealing agreements violated Section 5 even though they might not have violated the Clayton Act).[104] Thus, even if the Court finds that USAP's acquisitions do not meet the elements of the Sherman or Clayton Acts, they may still violate Section 5. *Id.* at 321-22.

Second, Section 5 is not confined to "incipient practice[s] that, 'when full blown, would violate' the antitrust laws." Br. 28 (cleaned up). *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 243 (1972) (Section 5 is not limited to methods "which are likely to grow into violations of the Sherman Act." (quoting *FTC v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304, 310 (1934)).

Third, the FTC has not argued that a standalone Section 5 claim is judged against some amorphous "public policy." *See* Br. 28. Instead, Section 5 prohibits "trade practices which conflict with the basic policies of the Sherman and Clayton Acts." FTC Opp. to USAP's MTD (ECF 119) at 34 (quoting *Brown Shoe*, 384 U.S. at 321). The "overriding congressional purpose" of the Clayton Act was to "control corporate concentrations tending to monopoly." *Phila. Nat'l Bank*, 374 U.S. at 338. USAP's scheme to ███████████████[105] and enhance its "[n]egotiating leverage" with payors "by consolidating practices with high market share in a few key markets"[106]—costing Texas payors, employers, and patients tens of millions of dollars[107]—

---

[104] The Second Circuit's decision in *1-800 Contacts, Inc. v. FTC* does not hold otherwise. 1 F.4th 102, 114 (2d Cir. 2021). There, the Second Circuit limited its review of an FTC administrative decision to Sherman Act precedent because the Commission's decision relied only on "Sherman Act jurisprudence to determine whether the Challenged Agreements violated Section 5 of the FTC Act." *Id.* at 114. And the Supreme Court has long made clear that "'[U]nfair methods of competition,' which are condemned by § 5 (a) of the Act, are not confined to those that were illegal at common law or that were condemned by the Sherman Act." *FTC v. Motion Picture Advert. Serv. Co.*, 344 U.S. 392, 394 (1953) (internal citation omitted); *see also Atl. Ref. Co. v. FTC*, 381 U.S. 357, 369 (1965) (section 5 extends to "unfair methods of competition that do not assume the proportions of antitrust violations").

[105] Ex. 5 (PX2343) at 024.

[106] Ex. 63 (PX0221) at 001-002, 018. *See also* Ex. 79 ███████████████ at 44:6-16 ████████████████ .

[107] *E.g.*, Ex. 23 (PX1400) at 003 (showing that three acquisitions alone cost BCBS over $████████ ); Ex. 80 (PX0193) at 002 (United estimates that ████████████████████████████ and that Star's rates ████████████ ); Ex. 47 (PX1368) at 005 (USAP is ████████████████████████
(Continued…)

plainly conflicts with this policy.

## IV.    USAP's statutory and constitutional arguments have already been rejected.

USAP is "preserv[ing] for appeal"—not re-raising—its previously rejected statutory and constitutional arguments. *See* Br. 29; *see also* MTD Op. at 16-21 (rejecting these arguments); FTC Opp. to USAP's MTD (ECF 119) at 7-20; FTC Opp. to Welsh Carson's MTD (ECF 120) at 31-33. Thus, no further ruling from the Court is necessary on these issues.

Though it has no bearing on the outcome of this motion or case, the FTC informs the Court of a change in its position since these issues were last briefed: The FTC now agrees that the for-cause removal in 15 U.S.C. § 41 is unconstitutional, whether or not judged under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935).[108] The unlawfulness of that removal restriction, however, does not affect this case because (1) this action was voted out by duly appointed Commissioners, *Collins v. Yellen*, 594 U.S. 220, 258 (2021), and (2) USAP has not shown that "the President's inability to fire an agency head affected" the FTC's decision to bring this action. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 632 (5th Cir. 2022).

## CONCLUSION

For the foregoing reasons, the Court should deny USAP's Motion for Summary Judgment.

---

); Ex. 18 (Capps Rep.) at ¶¶ 254-256, Figs. 46-48 (showing price increases on USAP targets in Tyler, Amarillo, and San Antonio, ranging from about ██% (Star for BCBS) to over ██% (███████ ).

[108] *See* Brief for Petitioners, *Trump v. Slaughter*, No. 25-332, 2025 WL 2932736, ECF No. 16, at 12-30. This issue has been argued and is presently awaiting decision by the Supreme Court.

Dated: March 27, 2026

Respectfully submitted,

*/s/ Kara Monahan*
 Kara Monahan (NJ Bar No. 011392010) *

Taylor C. Hoogendoorn
*Deputy Director*
*Bureau of Competition*

*Attorney-in-Charge*

Bradley S. Albert (MD Bar) *
Michael J. Arin (CA Bar No. 335693) *
Daniel W. Butrymowicz (NY Bar) **
Michael Goldenberg (DC Bar No. 1725079) *
Dylan Herts (NY Bar) *
Leah P. Hubinger (CA Bar No. 324976) *
Neal Perlman (NY Bar) *
Sophie Pollack (DC Bar No. 90028042) *
Eric M. Sprague (NY Bar) *
Mary Strimel (DC Bar No. 455303) *
Matthew B. Weprin (NY Bar) *

600 Pennsylvania Avenue, N.W.
Washington, D.C. 20580
Tel: 202-326-2018
Email: kmonahan@ftc.gov

*Counsel for Plaintiff*
*Federal Trade Commission*
*\*Pro Hac Vice*
*\*\*Pro Hac Vice pending*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, I caused the foregoing Plaintiff Federal Trade Commission's Opposition to U.S. Anesthesia Partners, Inc.'s Motion for Summary Judgment to be served on all counsel of record using the ECF system of the United States District Court for the Southern District of Texas.

Dated: March 27, 2026

*/s/ Kara Monahan*
Kara Monahan

*Counsel for Plaintiff*
*Federal Trade Commission*

32