# Exhibit 18

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| Federal Trade Commission, | |
| Plaintiff, | |
| v. | Case No.: 4:23-CV-03560-KH |
| U.S. Anesthesia Partners, Inc., | |
| Defendant. | |

**CORRECTED EXPERT REPORT OF CORY S. CAPPS, PHD**

**August 28, 2025**

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

███ ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

### I.A.2.c. USAP has high market shares in each relevant market

(18)    After defining the relevant service and geographic markets, the next step is to measure market shares and market concentration. In each of the three MSAs, USAP's collective acquisitions substantially increased its market share and overall market concentration. The following shares correspond to my baseline definition of hospital-only anesthesia services. In the body of this report, I implement sensitivity tests, such as evaluating shares in an inpatient only service market or on the basis of revenue, and show that my conclusions are robust.

- Houston MSA. After the GHA transaction and formation of USAP in 2012, USAP acquired the Kingwood Division of North Houston, MetroWest, and Guardian. Prior to these three acquisitions, USAP's market share was about ████. USAP's market share reached ████ as of the end of 2023. Over the same time, market concentration as measured by the Herfindahl-Hirschman Index (HHI) increased from about ████ to over ████. (Under the Merger Guidelines, a market is presumed to be "highly concentrated" when the HHI is over 1,800 points; the prior version of those guidelines used a threshold of 2,500.)

- Dallas MSA. After the January 2014 Pinnacle acquisition, USAP acquired six additional groups. USAP's market share increased from about ████ prior to these acquisitions to about ████ as of the end of 2023. Over the same time, the HHI increased from about ████ to over ████.

- Austin MSA. In this instance, USAP had a small set of anesthesia providers in the Austin areas and then acquired a larger group (rather than the other way around, as in Houston and Dallas). USAP's market share increased from around ████ before that acquisition to about ████ as of the end of 2023. Over the same time, the HHI increased from about ████ to ████.

Expert Report of Cory S. Capps, PhD

providers but are generally not employed by hospitals.[13] Instead, they are approved to provide anesthesia service at hospitals.

### III.A.1. Hospitals' selections of anesthesia providers

(49)    According to a publication from 2010, hospitals account for more than 80% of an anesthesiologist's clinical time on average.[14] In this case, payer claims data show that, as of 2023, 75% of commercial payments for anesthesia services rendered in a facility were for services rendered in a hospital setting and 25% for services rendered in an ambulatory surgery center (ASC). For USAP, ▆▆▆ of commercial payments are for services provided in a hospital setting. Although anesthesia providers can be directly employed by a hospital, it is more common for them to be part of a group, such as USAP, that is independent from hospitals.[15] Hospitals that rely on independent anesthesia groups use either an "exclusive" or "closed" model in which the hospital contracts with a single anesthesia group to provide most or all of its anesthesia services or an "open" model in which anesthesia providers from multiple groups render services within a hospital, often the request of the surgeon.[16]

(50)    Under the exclusive model, the anesthesia group may commit to providing 24/7 coverage.[17] As compared with an open model, an exclusive contract to provide anesthesia services at a hospital will bring greater and more steady patient volume for the group.[18] In contrast, hospitals that use an open model do not typically contract directly with an anesthesia group and instead rely on surgeons to

---

[13]    The U.S. Bureau of Labor Statistics reports that in May 2023, 93% of anesthesiologists in the U.S. were employed by "Offices of Physicians." U.S. Bureau of Labor Statistics, "Occupational Employment and Wage Statistics, May 2023, Anesthesiologists," https://www.bls.gov/oes/2023/may/oes291211.htm. Hospital-based providers are medical professionals "such as a pathologist, anesthesiologist, or emergency physician, who furnishes substantially all of such services in a hospital inpatient or emergency room setting and through the use of the facilities and equipment, including qualified electronic health records, of the hospital." 42 U.S.C. § 1395w-4(o)(1)(C)(ii).

[14]    Lindsay Daugherty et al., *An Analysis of the Labor Markets for Anesthesiology* (RAND Corporation, 2010), 28.

[15]    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (for anesthesia services nationally, ▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ while ▆▆▆▆▆▆▆▆▆▆ make up ▆▆ and ▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆ .

[16]    For example, the following anesthesiology services agreements between hospitals and USAP identify USAP as the exclusive provider: ▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[17]    *See* Deposition of ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (agreeing that staffing arrangements make it easier for ▆▆▆ to ▆▆▆▆▆▆▆▆ Deposition of ▆▆▆▆▆▆▆▆▆▆▆▆ (explaining that surgeons have ▆▆▆▆▆▆▆▆ for any cases under an exclusive arrangement); Deposition of ▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (explaining that an exclusive contract ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

[18]    PX0170 at -016 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ *see also*, ▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and PX1077 at -001 ▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆▆



Expert Report of Cory S. Capps, PhD

coordinate with anesthesia providers to cover their cases.[19] In some cases, hospitals use exclusivity only for specific service lines (e.g., trauma and obstetrics) or for specific hospitals within a multi-hospital system.[20]

(51)   The prevalence of exclusivity varies across geographies and over time. For example, in 2015 ███  ██████ estimated that about ████ of hospitals in Houston used exclusive contracts, whereas in Dallas, ████ of hospitals did so.[21] ███████████████████████████████

███████████████████.[22]

(52)   When selecting an anesthesia group for an exclusive contract, hospitals consider various factors, including quality and local reputation,[23] size and the ability to provide 24/7 coverage,[24] local

---

[19] *See, e.g.,* Deposition of ████████████████████████████████████████████ Deposition of ███████████████████████████████████████████████████████ Deposition of ████████████████████████████████████████████████████ and noting that ████ works with hospitals operating under the open model and does not have contracts directly with those hospitals).

[20] Examples of service-specific anesthesiology contracts include ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[21] ████████████████████████

[22] ████████████████████████████████████████████████████████████████ *id.* at 11–12, 145; Deposition of ███████████████████████████████████████████████████████████████ *id.* at 82-83; Deposition of ████████████████████████████████████ Investigational Hearing of ████████████████████████████████████

[23] *See, e.g.,* ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[24] *See, e.g.,* ██████████████████████████████████████████████ *id.* at

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

geographic coverage and timeliness,[25] and the stipend amount that the hospital would need to pay the group to cover the requested services.[26] Contract terms can vary in length; for example, contracts produced in this matter have terms ranging from ▉ to ▉ years.[27]

(53)  Hospitals face high costs of switching anesthesia groups, even when contracts expire. As ▉ ▉ noted in a 2012 presentation about the anesthesia investment opportunity, ▉ ▉ ▉[28] Similarly, ▉ ▉ testified that ▉ ▉ ▉ ▉[29] One source of switching costs is that, based on evidence in the record, ▉ .[30] Switching anesthesia groups also leads to financial costs for the replacement group (which could be



[25]  *See, e.g.,* ▉ ▉ ▉

[26]  *See* ▉ ▉ ▉ ▉ ▉ ▉

[27]  *See, e.g.,* ▉ ▉ ▉ ▉

[28]  PX0221 at -005 ▉ *See also,* PX170 at -016 ▉

[29]  Deposition of ▉ ▉ *See also* ▉ Dep. at 149–150 ▉ ▉ *id.* at 80 ▉

[30]  *See, e.g.,* ▉ ▉ ▉ ▉ ▉ ▉ and ▉ Deposition of ▉ ▉ ▉

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

passed on to the hospital making the switch through stipends). ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮[31]



(54)     Taken together these costs can be substantial. For example, ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.[32] While "switching costs" are substantial, they are finite—hospitals do have the ability to replace anesthesia groups.[33] As one example, UT Health Tyler and The University of Texas at Tyler Health Science Center replaced USAP with Northstar Anesthesia in August 2022.[34]

(55)     Payers contract separately with hospitals and independent anesthesia practices. Thus, a hospital may be in-network with a payer even as a practice providing anesthesia in the hospital may not be. Many contracts between hospitals and hospital-based providers, such as anesthesia groups, include language that requires the groups to make best efforts to contract with and be in-network with the payers with which the hospital contracts. Both hospitals and payers prefer having anesthesia groups in-network, because that ensures that anesthesia services will be rendered at pre-negotiated prices and contractually agreed-upon terms, and will often also have lower cost-sharing for the patient.[35]

---

[31]  ▮▮▮▮▮▮ Dep. at 169–170.

[32]  PX2381 at -005▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *id.* at -018▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[33]  *See* Deposition of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[34]  Northstar Anesthesia, *Northstar Anesthesia Announces New Services and a Residency Program at UT Health Tyler*, PR Newswire, August 31, 2022, https://www.prnewswire.com/news-releases/northstar-anesthesia-announces-new-services-and-a-residency-program-at-ut-health-tyler-301613903.html.

[35]  *See, e.g.,* Deposition of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ 95 (noting ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



Dep. at 24–25▮

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

Historically, when the anesthesia group at a hospital was not in-network, patients would have higher cost-sharing and could be subject to "surprise billing," which could lead to complaints from patients and the employers who provide their insurance coverage while adding administrative costs for hospitals, payers, and the anesthesia group.[36] This changed after enactment of the No Surprises Act (NSA) in 2022 and the Texas Surprise Billing Law (Texas SBL) in 2020, which I describe in section III.D.

(56)    If the anesthesia group is not in-network with a payer that contracts with hospitals at which the group practices, the agreement may permit the hospital to use other anesthesia providers (which is otherwise prohibited under exclusive agreements), allow the hospital to terminate the agreement, or may not specify a recourse.[37] However, even if the agreement allows the hospital to use an alternative provider or terminate the anesthesia group, the hospital would have to incur the costs of adding and managing a second anesthesia group or incur the costs of switching to a new anesthesia group. Although the hospital bears these costs, the benefits accrue in significant part to payers, patients, and employers, which attenuates hospitals' incentive to make this switch.

(57)    Hospitals may pay a "subsidy" or "stipend" to the anesthesia groups they select to provide services (anesthesia groups receive this amount from the hospital in addition to the payments anesthesia groups receive from payers). One commonly cited rationale for stipends is to compensate anesthesia groups for an unfavorable payer mix at a hospital—i.e., a high proportion of patients who are covered by Medicare or Medicaid, which generally pay less than private payers, or who are uninsured.[38]

---



[36]    Surprise billing occurs when patients have surgery at an in-network hospital but receive anesthesia from an out-of-network provider, resulting in a high bill for out-of-network anesthesia services. *See* "Surprise Medical Bills / Out-of-Network Payments," American Society of Anesthesiologists, https://www.asahq.org/advocating-for-you/surprise-medical-bills.

Expert Report of Cory S. Capps, PhD

# V. USAP possesses substantial market power in several relevant markets

(116)  In this section, I explain how economists define relevant antitrust markets and assess whether a firm possesses market power. I apply this framework to the facts of this case and conclude that USAP possesses substantial market power.

- Section V.A. Explain how economists define and assess market power.

- Section V.B. Define the relevant product market: commercially reimbursed hospital-only anesthesia services.

- Section V.C. Define the relevant geographic markets: the metropolitan areas around Houston, Dallas, and Austin.

- Section V.D. Calculate USAP's market shares in the relevant markets and show that USAP's market share and market concentration have generally increased as a result of USAP's acquisitions.

- Section V.E. Calculate market shares and HHIs resulting from USAP's individual acquisitions and show that many of them exceed the Merger Guidelines threshold for a presumption of illegality.

- Section V.F. Calculate USAP's market shares under alternative definitions of the relevant services market and show that my conclusions are robust.

- Section V.G. Explain that the relevant markets are characterized by high barriers to entry, allowing USAP to sustain its market power. This conclusion is corroborated by my analysis of USAP's pricing in section VI; specifically, I show that USAP has sustained high prices and that, through its acquisitions since 2012, it has extended those high prices to additional groups and markets in Texas.

## V.A. Market definition and market power

### V.A.1. Market power

(117)  Courts commonly define monopoly power as the ability to "raise price or exclude rivals."[157] This does not mean that there is literally only one seller. Rather, a firm with monopoly power is not constrained

---

[157]  The US Supreme Court has defined monopoly power as "the power to control prices or exclude competition." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). The Court of Appeals for the District of Columbia Circuit stated that "a firm is a monopolist if it can profitably raise prices substantially above the competitive level." *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001). Because a firm with monopoly power can maintain prices above the competitive level, evidence of sustained economic profits is also indicative of monopoly power.

Expert Report of Cory S. Capps, PhD

by the forces present in competitive markets—principally, demand and/or supply substitution—to the same degree as other firms. "Monopoly power" and "substantial market power" are often used interchangeably (a convention that I follow), and the term "market power" is sometimes used interchangeably as well.[158]

(118)  Economists use two primary approaches to determine whether a firm has substantial market power. The first is commonly referred to as the "structural" approach.[159] This consists of three steps: (1) define appropriate relevant product and geographic markets, (2) calculate market shares and measure market concentration within the relevant markets, and (3) assess entry barriers. Under the structural approach, monopoly power is not tested directly but rather is inferred from market shares and concentration: a sufficiently high market share in a concentrated market that also has significant barriers to entry supports a conclusion of monopoly power. Conversely, a sufficiently low share, a low degree of market concentration, or an absence of meaningful entry barriers supports a conclusion of no monopoly power.[160]

(119)  The second approach is to directly assess whether there is evidence of such power. Where the requisite data are available, this often involves an analysis of pricing by the firm or firms alleged to have market power; evidence of persistent high pricing not explained by other factors such as cost or quality differences provides direct evidence of substantial market power.[161]

---

Michael Cragg et al. "The Proper Measure of Profits for Assessing Market Power." *Antitrust Magazine* 37, no. 2 (Spring 2023): 48–52.

[158]  "[M]arket power and monopoly power are qualitatively identical concepts—both terms refer to anticompetitive economic power that ultimately can compromise consumer welfare." Thomas G. Krattenmaker, Robert H. Lande, and Steven C. Salop, "Monopoly Power and Market Power in Antitrust Law" (paper presented at Arlie House Conference on the Antitrust Alternative 1987), http://www.justice.gov/atr/public/hearings/single_firm/docs/222144.htm at § II. "[T]he terms both refer to the ability to price above competitive levels." *Id*. Some courts and economists use the terms "monopoly power" and "substantial market power" to describe the degree of market power—in this framing, which I adopt, market power is akin to what is being measured and the term "substantial market power" is akin to the measurement itself (analogous to "hot" being a measurement of "temperature.").

[159]  "Courts more typically examine market structure in search of circumstantial evidence of monopoly power." United States v. Microsoft Corp., 253 F.3d 34, 51 (D.C. Cir. 2001) (citing 2A Areeda et al., Antitrust Law p 531a, at 156 and *Grinnell*, 384 U.S. at 571). "Under this structural approach, monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers." *Microsoft*, 253 F.3d at 51 (citing *Rebel Oil*, 51 F.3d at 1434). *See also* United States v. Dentsply Intern. Inc., 399 F.3d 181, 188–89 (3d Cir. 2005).

[160]  *United States v. Grinnell Corp.,* 384 U.S. 563, 571 (1966) ("In *United States v. du Pont & Co.,* 351 U.S. 377, 391, we defined monopoly power as 'the power to control prices or exclude competition.' The existence of such power ordinarily may be inferred from the predominant share of the market." *United States v. Google LLC*, 747 F. Supp. 3d 1, 117 (D.D.C. 2024) (citing *United States v. Microsoft Corp.*, 253 F.3d 34, 51 (D.C. Cir. 2001)):

> The possession of monopoly power may be proven through direct or indirect evidence. Direct evidence of monopoly power is rare. "Where evidence indicates that a firm has in fact profitably" raised prices substantially above the competitive level, "the existence of monopoly power is clear." Microsoft, 253 F.3d at 51. More often, courts "examine market structure in search of circumstantial evidence of monopoly power." []see id. at 57 (observing that "direct evidence [is not required] to show monopoly power in any market"). Under this indirect, structural approach, "monopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."

[161]  U.S. Department of Justice and the Federal Trade Commission, "Merger Guidelines," Dec. 18, 2023 [hereinafter "2023 Merger Guidelines"] at § 4.3 ("Direct evidence of the exercise of market power can demonstrate the existence of a

---

(120)   In section VI, I show that USAP consistently increased the prices of the anesthesia groups it acquired to levels substantially higher than competitor groups and sustained those price increases over time, including through successive rounds of contractual negotiations with payers. This provides direct evidence of USAP's substantial market power (as well as evidence of harm to consumers). At the same time, anesthesia quality measures reviewed by Dr. Pimentel "do not show that USAP made improvements in the quality of patient care at the practices it acquired, or any such improvements were not shown to be clinically significant or meaningful."[162]

## V.A.2. Market definition and the SSNIP test

(121)   The purpose of market definition is to identify collections of goods or services that are "reasonably interchangeable"—i.e., closely substitutable—with the goods or services at issue in a given merger or set of mergers.[163] A properly defined antitrust market should include the set of products and locations that exercise a significant competitive constraint on each other; i.e., the defined market should identify those market participants whose interactions principally determine price.[164] Relevant markets have both a product and a geographic component.

(122)   To define markets, economists, antitrust agencies, and courts generally rely on the "hypothetical monopolist test."[165] The test proceeds by evaluating whether a hypothetical monopolist comprising all sellers for a candidate relevant market could profitably impose a "small but significant and non-transitory increase in price" (SSNIP).[166] If the hypothetical monopolist *could not* do so, then the candidate market excludes the alternative sellers that are sufficiently close competitors (i.e., substitutes) to render the SSNIP unprofitable. This indicates that the candidate market is too narrow and should be expanded to include additional sellers, and the test repeated for the expanded set. Conversely, if the hypothetical monopolist *could* profitably impose a SSNIP, then the excluded

---

relevant market in which that power exists. This evidence can be valuable when assessing the risk that a dominant position may be entrenched, maintained, or extended, since the same evidence identifies market power and can be sufficient to identify the line of commerce and section of the country affected by a merger, even if the metes and bounds of the market are only broadly characterized.").

[162]   Expert report of Dr. Marc Philip T. Pimentel, M.D., July 25, 2025, 4-5, § VIII.

[163]   Brown Shoe Co. v. United States, 370 U.S. 294, 325 (1962) ("The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it."); United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956) ("[C]ommodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade or commerce,' monopolization of which may be illegal.").

[164]   2023 Merger Guidelines, § 4.3.

[165]   2023 Merger Guidelines, § 4.3.A.

[166]   The 2023 Merger Guidelines also consider a hypothetical monopolist imposing a "small but significant and non-transitory increase in price . . . or other worsening of terms ('SSNIPT') for at least one product in the group. . . . A SSNIPT may entail worsening terms along any dimension of competition, including price (SSNIP), but also other terms (broadly defined) such as quality, service, capacity investment, choice of product variety or features, or innovative effort." 2023 Merger Guidelines, §§ 4.3.A and 4.3.B. Here, the primary issues relate to USAP's pricing and so I focus my market definition analysis on SSNIP rather than SSNIPT.

---

such inpatient services and many such outpatient services—a payer cannot offer a commercially viable health plan that features a provider network that includes no hospitals.[172] This is true no matter how many ASCs an insurer includes in its provider network: though ASCs provide some competition to hospitals for a subset of outpatient services and patients, ASCs are not a substitute for hospitals.[173] Moreover, claims data show that hospitals rely on anesthesiologists (as opposed to CRNAs) to a greater degree than ASCs do.[174] For these reasons, anesthesia services provided at ASCs are not a substitute for hospital-only anesthesia services. ██████████████████████████ ████████████████████████[175]



(128)   Reflecting the derived nature of demand for anesthesia services, evaluating the relevant service market for those services is closely related to the relevant service market for the medical services and procedures that require anesthesia services. In the first instance, ASCs generally do not offer overnight care or the full range of outpatient services that payers need in order to offer a viable health plan product. This means that a hypothetical monopolist of all hospitals would be able to profitably increase price (because, by not contracting, the hypothetical monopolist would be able to prevent a payer from offering a viable health plan). That is, ASCs are not a close substitute for hospitals; they

---

[172]  Such a network would almost certainly violate network adequacy requirements (*see* section III.C).

[173]  By way of analogy, consider the difference between a basic calculator and a smartphone. Both can perform arithmetic functions, but a calculator cannot send text messages, browse the web, make voice or video calls, or host multi-user games. Consequently, a smartphone is much more expensive than a calculator, and the two are not substitutes, even though a calculator performs a subset of smartphone functions.

[174]  Specifically, ██ of all cases in hospitals (not limited to hospital-only) are performed by CRNAs without anesthesiologists compared to ██ of cases in ASCs. "CRNA without anesthesiologist" refers to a case in which a CRNA is the sole provider (i.e., there is no physician NPI present). Providers are identified as CRNAs or physicians (MDs/DOs) based on their degree in the NPPES data.

[175]  ███████████████ at 145–146. *See also* ██████████████. at 17–18.

Expert Report of Cory S. Capps, PhD

are in a distinct relevant service market from hospitals. Given that ASCs are not a substitute for hospitals, anesthesia services provided at ASCs are not a substitute for anesthesia services provided at hospitals. Thus, a hypothetical monopolist of all hospital-only anesthesia services could profitably increase price because payers would not be able to shift patients who require hospital-only anesthesia services to ASCs and payers could not offer a viable network without hospital-only anesthesia services. In formal terms, the cross-price elasticity of the demand from hospital-only to non-hospital-only anesthesia services is low.[176] Therefore, hospital-only anesthesia services constitute a relevant antitrust market.

(129)    Moreover, it is appropriate to restrict the relevant service market to services sold to commercial insurers because commercial insurers negotiate with providers over price for network inclusion in "stage one" of two-stage competition (see section III.B). In contrast, government payers such as Medicare and Medicaid do not negotiate prices with providers; rather, they pay administratively determined rates. Hence, there is little scope for market power to affect the prices paid by government payers.[177] Consistent with this principle, the FTC and merging parties have agreed on a relevant service market limited to commercial payers in recent hospital merger cases.[178] The relevant service market in this case is no broader than commercially reimbursed hospital-only anesthesia services.

(130)    The next question is whether the appropriate relevant service market in this case should be narrower than all commercially reimbursed hospital-only anesthesia services. For example, given that inpatient and outpatient hospital services are generally not substitutes, should inpatient and outpatient hospital-only anesthesia services be grouped into distinct service markets and evaluated separately? In principle, it would be valid to define a narrower market consisting only of inpatient hospital-only anesthesia services because many anesthesia-requiring procedures are solely or predominantly performed in inpatient hospitals. An insurer cannot offer a commercially viable health plan that features a provider network that includes no hospitals. Consequently, a hypothetical monopolist of all inpatient hospital-based anesthesiology groups would be able to profitably increase price. (In section

---

[176] Another way to see this is through the logic of aggregate diversion ratios. For a patient receiving a medical procedure that requires hospital-only anesthesia, if that patient's first choice of hospital were unavailable, the probability that the patient would substitute to another hospital for the underlying service and the accompanying hospital-only anesthesia service, rather than to an ASC, is high. This means that the "recapture rate" for a hypothetical monopolist of hospital-only anesthesia services will be high. A high recapture percentage in combination with a significant incremental profit margin implies that a hypothetical monopolist of such services could profitably impose a SSNIP. *See* 2023 Merger Guidelines at § 4.3.C and Joseph Farrell and Carl Shapiro. "Recapture, Pass-through, and Market Definition." *Antitrust Law Journal* 76 (2010): 585–604. Regarding USAP's margins, *see* ███████████ ██████████████████████ 58.

[177] While Medicare Advantage is administered by private payers, in practice payment rates are usually close to those of traditional Medicare. *See* Robert A. Berenson, Jonathan H. Sunshine, David Helms, and Emily Lawton, "Why Medicare Advantage Plans Pay Hospitals Traditional Medicare Prices," *Health Affairs* 34, no. 8 (August 2015), 1289–1295.

[178] *See, e.g.,* FTC v. Advocate Healthcare, No. 15-cv-11473 (N.D. Ill. June 20, 2016) at 5 ("The parties agree that the relevant product market in this case is inpatient general acute care services sold to commercial payers and their insured members"); FTC v. Penn State Hershey Med. Ctr., No. 16-2365 (3d Cir. September 27, 2016) at 14 ("There is no dispute as to the relevant product market. The District Court found, and the parties stipulated, that the relevant product market is general acute care ("GAC") services sold to commercial payors.").

---

Expert Report of Cory S. Capps, PhD

V.F.1, I report market shares, as a sensitivity check, for a service market limited to commercially reimbursed anesthesia services performed in an inpatient setting; computed this way, USAP's share is ▮▮▮▮ than when measured based on hospital-only anesthesia services.)

(131)    Alternatively, by the same logic, should anesthesia for individual service lines such as cardiology and orthopedic surgery, separately for inpatient and outpatient services, be grouped into distinct service markets and evaluated separately? Or should anesthesiology for individual services such as bypass graft surgery and hip replacements—two services that are clearly not substitutes—be grouped into distinct product markets and evaluated separately?

(132)    In principle, anesthesia services for each hospital-only service line or individual service could, by repeated application of the hypothetical monopolist test, be placed into a distinct relevant service market and separately evaluated. Although possible in principle, when competitive conditions are sufficiently similar for the services at issue, it is more straightforward and efficient to analyze competition across the "cluster" of services as a whole.[179] The use of cluster markets to evaluate inpatient services as a group rather than individually is standard in antitrust cases involving hospital mergers.[180] The same logic applies to the case at hand, with the distinction that all hospital-only anesthesia services, including both inpatient and outpatient services, are predominantly provided in hospitals and, within a hospital, are commonly provided by the same anesthesia group. Thus, competitive conditions are similar for inpatient and outpatient hospital-only anesthesia services.[181]

(133)    In addition, when payers form their provider networks and when employers and patients evaluate the value of those provider networks, it is the cluster of services offered by hospitals that is most relevant. An insurer cannot offer a viable health plan without the array of services offered by hospitals, even if a subset of that array is offered by ASCs. In this respect, the set of services offered by ASCs are not a substitute for the array of hospital services. Likewise, at the time of purchasing a health plan product, a consumer will generally not know the full set of healthcare needs that she and her dependents may require in the coming year. For that reason, consumers will value health plan products that offer a full array of covered provider services across the set of healthcare needs that may arise. A health plan

---

[179]    2023 Merger Guidelines at § 4.3.D.4. There are roughly 400 different inpatient surgical DRG codes and nearly 6,000 outpatient surgical CPT codes. FY 2023 IPPS Final Rule, CMS, September 10, 2024, https://www.cms.gov/medicare/payment/prospective-payment-systems/acute-inpatient-pps/fy-2023-ipps-final-rule-home-page; "Surgery CPT® Code range 10004-69990," Codify by AAPC, https://www.aapc.com/codes/cpt-codes-range/10004-69990/.

[180]    FTC v. Advocate Health Care Network, No. 16-2492 (7th Cir. July 15, 2016), at 6 ("In this case, the parties' experts agreed that the relevant product market was inpatient GAC hospital services ('inpatient services') sold to commercial payers (i.e., insurers) and their members, and the district court agreed."); FTC v. Hackensack Meridian Health, Inc., No. 21-2603 (3d Cir. March, 22, 2022) at 10 ("The District Court found the relevant product market to be the 'cluster of inpatient [general acute care] services' offered by Englewood and Hackensack's Bergen County hospitals and sold to commercial insurers. The parties do not dispute the relevant product market, but their agreement ends here." (citation omitted)).

[181]    If a hypothetical monopolist of inpatient anesthesia services could profitably impose a SSNIP then it is necessarily true that a hypothetical monopolist of both inpatient and outpatient hospital-only anesthesia services could do so.

---

Expert Report of Cory S. Capps, PhD



## V.D. USAP has high market shares in each relevant market

(154)   Having established that the relevant services market consists of hospital-only anesthesia services and that the Houston, Dallas, and Austin MSAs are relevant geographic markets, in this section I present USAP's market shares and overall market concentration—in the most recent year of available data as well as over time—in these relevant markets.

### V.D.1. Houston

(155)   After the GHA transaction and formation of USAP, USAP acquired three additional groups: North Houston, MetroWest, and Guardian. Prior to these acquisitions, in 2012, USAP's share of hospital-only anesthesia services was about ███. USAP's share reached ███ as of the end of 2023. Over the same time, market concentration as measured by the Herfindahl-Hirschman Index (HHI) increased from about ███ to over ███, which indicates that ███████████████

Expert Report of Cory S. Capps, PhD

████████████████████.[201] As Figure 14 shows, ████████████████████████
████████████████████████████████.[202]

(156)   Figure 15 shows 2023 market shares for USAP and ████████ three ███████ groups in the Houston MSA. The combined market share of USAP's top three rivals, at ████, is ████████████████ market share of about ████.

---

[201]  2023 Merger Guidelines, § 2.1. ("The Agencies generally measure concentration levels using the Herfindahl-Hirschman Index ('HHI'). The HHI is defined as the sum of the squares of the market shares; it is small when there are many small firms and grows larger as the market becomes more concentrated, reaching 10,000 in a market with a single firm."). A market with an HHI greater than 1,800 is considered "highly concentrated." *Id.* (The 2010 Merger Guidelines consider markets with HHIs above 2,500 to be "highly concentrated." U.S. Department of Justice and the Federal Trade Commission, "Horizontal Merger Guidelines," August 19, 2010 [hereinafter "2010 Horizontal Merger Guidelines"], § 5.3. The Houston MSA meets this definition as well.)

[202]  At the start of 2022, USAP's share fell from about ████ to about ████ and the HHI declined from about ████ to about ████. This decline reflects ████████████████████████████████████. ████



████████████████████████████████████████████████████ 2025, ████████████████████████████████████████████████████ which will likely increase its share. ████████████████████████████

Expert Report of Cory S. Capps, PhD

**Figure 14. The HHI and USAP's share of hospital-only anesthesia cases, Houston MSA**



Source: Professional claims data ███████████████████ hospital-only anesthesia services.

Expert Report of Cory S. Capps, PhD

**Figure 15. USAP and top 3 rival market shares in the Houston MSA, 2023**



Source: Professional claims data ███████████████████ hospital-only anesthesia services.

## V.D.2. Dallas

(157)  After the January 2014 Pinnacle acquisition (bar A), USAP acquired six additional groups: ACD and Excel (bar B), Southwest (bar C), BMW and Medical City (bar D), and Sundance (bar E). Prior to these acquisitions, in mid-2014, USAP's share of hospital-only anesthesia services in the Dallas MSA was about ███. USAP's share reached ███ as of the end of 2023. Over the same time, the HHI increased from about ███ to over ███, which indicates that ███████████████████ ███████████████. As Figure 16 shows, USAP's acquisitions were ███████████████ ███████████████████████.

(158)  As shown in Figure 17, USAP's 2023 market share in the Dallas MSA of approximately ███ is ███ ███████ the ███████████ market share of its ███ three largest rivals.

Expert Report of Cory S. Capps, PhD

**Figure 16. The HHI and USAP's share of hospital-only anesthesia cases, Dallas MSA**



Source: Professional claims data ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, hospital-only anesthesia services.

Notes: Bar A represents the Pinnacle transaction, bar B represents ACD and Excel, bar C represents Southwest, bar D represents BMW and Medical City, and bar E represents Sundance.

Expert Report of Cory S. Capps, PhD

**Figure 17. USAP and top 3 rival market shares in the Dallas MSA, 2023**



Source: Professional claims data ███████████████████, hospital-only anesthesia services.

## V.D.3. Austin

(159)   After the GHA transaction, USAP acquired two additional groups, Lake Travis and Capitol Austin.[203] Prior to the Capitol Austin acquisition, USAP's share of hospital-only anesthesia services was around ███ over several years. USAP's share reached about ███ as of the end of 2023. Over the same time, the HHI increased from about ███ to ███ As Figure 18 shows, USAP's Capitol Austin acquisition ██████████████████████████

(160)   As shown in Figure 19, in 2023, USAP and ██████████████████████████.

---

[203]   GHA had a small presence in Austin prior to the formation of USAP. ████████████████████████
██████████████████. USAP-FTC-CID-01710527 at slides -22, 25.
Prior to the Capitol acquisition, ██████████████████████████████
██████████████████████████████████
██████████████████████

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 18. The HHI and USAP's share of hospital-only anesthesia cases, Austin MSA**



Source: Professional claims data █████████████████████, hospital-only anesthesia services.

Expert Report of Cory S. Capps, PhD

**Figure 19. USAP and top 3 rival market shares in the Austin MSA, 2023**





Source: Professional claims data ███████████████████, hospital-only anesthesia services.

## V.D.4. Summary of market shares and HHIs

(161)    As shown above, USAP's acquisitions were accompanied by increases in its share and increases in market concentration. ████████████████████████████████████ ████████████████████ Figure 20 summarizes USAP's shares and HHIs in the relevant markets.[204]

---

[204] This figure provides an overall view of year-over-year growth changes in USAP's share and market HHIs. It does not report the effects of USAP's acquisitions on market shares and HHIs (e.g., because most acquisitions did not coincide with the start of a calendar year). I evaluate the market share and HHI effects of USAP's acquisitions in section V.E.

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 20. USAP market shares and HHIs for commercial hospital-only anesthesia cases in the Houston, Dallas, and Austin MSAs**

| Year | Houston | | Dallas | | Austin | |
|------|---------|-----|--------|-----|--------|-----|
|      | USAP share | HHI | USAP share | HHI | USAP share | HHI |
| 2012 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2013 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2014 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2015 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2016 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2017 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2018 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2019 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2020 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2021 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2022 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 2023 | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

Source: Professional claims data ▬▬▬▬▬▬▬▬, hospital-only anesthesia services.
Notes: Shares calculated using data from September–October of each year. Shading denotes years with one or more acquisitions.

## V.E. Individual USAP acquisitions exceed the Merger Guidelines threshold for a "presumption of illegality"

(162)    The 2023 Merger Guidelines state that mergers that (1) increase the HHI by at least 100 points and result in either (2-a) a combined market share of the merging firms greater than 30% or (2-b) a post-merger HHI greater than 1,800 are presumptively anticompetitive.[205] The 2010 Horizontal Merger Guidelines, which were operative at the time of USAP's acquisitions, state that mergers that result in an HHI increase of at least 200 points and a highly concentrated market (i.e., an HHI of at least 2,500) are presumed likely to enhance market power.[206] A transaction that exceeds these thresholds is commonly referred to as "meeting the structural presumption" (shorthand for a presumption that the transaction is likely to substantially lessen competition.) In this section, I assess whether USAP's individual acquisitions, considered individually or collectively for certain acquisitions that occurred close in time, exceed these structural presumption thresholds. For all calculations below, I use the

---

[205]  2023 Merger Guidelines, § 2.1.
[206]  2010 Horizontal Merger Guidelines, § 5.3.

Expert Report of Cory S. Capps, PhD

**Figure 24. Market share and HHI changes from USAP's individual Austin MSA acquisitions**

| Date | Acquisition | Pre-acquisition | | | Post-acquisition | | Delta HHI |
|---|---|---|---|---|---|---|---|
| | | USAP share | Target share | HHI | USAP share | HHI | |
| Feb 2018 | Capitol Anesth. | ▪ | ▪ | ▪ | ▪ | ▪ | ▪ |

Source: Professional claims data �as, hospital-only anesthesia services.

Notes: Pre-acquisition period includes the two quarters prior to acquisition. Light orange indicates 2023 presumption and dark orange indicates 2010 presumption.

# V.F. Alternative definitions of the relevant service market yield comparable or greater USAP market shares

(167) The market shares presented above are robust to alternative definitions of the relevant service market. In particular, under each of the following alternative definitions, USAP's share is consistent with, and higher than in most sensitivities, the baseline analysis presented above.

- A relevant service market limited to inpatient anesthesia services.

- A relevant service market based on excluding all ASC claims.

- A relevant service market using a 99% threshold, rather than 90%, to identify relevant outpatient anesthesia services.

- A relevant service market using a 50% threshold, rather than 90%, to identify relevant outpatient anesthesia.

(168) In addition, I show that USAP's shares as measured based on revenue, rather than cases, are significantly greater.[208]

## V.F.1. Inpatient anesthesia services only

(169) As I explained above, a market consisting only of anesthesia services provided in an inpatient setting is also a valid antitrust market given the general lack of substitutability between inpatient and outpatient services.

(170) USAP's shares and the market HHIs are �array in an inpatient-only market than in the hospital-only services market. However, this difference is not large. For example, in 2023, USAP's Houston share of inpatient cases is ▪ as compared to its hospital-only share of ▪.

---

[208] 2023 Merger Guidelines, § 4.4.B.

Expert Report of Cory S. Capps, PhD

**Figure 25. USAP shares and market HHIs for hospital-only anesthesia cases in the Houston, Dallas, and Austin MSAs—inpatient-only relevant services market**

| Year | Houston | | Dallas | | Austin | |
|---|---|---|---|---|---|---|
| | USAP share | HHI | USAP share | HHI | USAP share | HHI |
| 2012 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2013 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2014 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2015 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2016 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2017 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2018 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2019 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2020 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2021 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2022 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2023 | ■ | ■ | ■ | ■ | ■ | ■ |

Source: Professional claims data ██████████████████████.
Notes: Shares calculated using data from September–October of each year, limited to POS code 21 (IP).

## V.F.2. Hospital-only anesthesia services, excluding ASC claims

(171)   In my baseline approach, I define hospital-only anesthesia services by identifying outpatient anesthesia CPT codes for which 90% or more of outpatient cases in the claims data appear at a hospital rather than an ASC. Having identified the set of hospital-only services, I include all instances of those CPT codes at facilities, whether a hospital or an ASC, when computing shares.[209] This baseline approach is conservative in that it yields lower shares compared to not including instances of those CPT codes at ASCs, though the difference is small. For example, in 2023 USAP has a ██████ share of hospital-only anesthesia cases when I include ASCs versus a ██████ share when I exclude ASCs. Overall, the difference between including and excluding the ASC cases is negligible.

---

[209]   Some ████████████████████████████████████████████ *see* Appendix C.1.

Expert Report of Cory S. Capps, PhD

**Figure 26. USAP shares and market HHIs for hospital-only anesthesia cases in the Houston, Dallas, and Austin MSAs—excluding all ASC claims**

| Year | Houston | | Dallas | | Austin | |
|---|---|---|---|---|---|---|
| | USAP share | HHI | USAP share | HHI | USAP share | HHI |
| 2012 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2013 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2014 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2015 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2016 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2017 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2018 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2019 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2020 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2021 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2022 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| 2023 | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

Source: Professional claims data [redacted].
Notes: Shares calculated using data from September–October of each year, limited to (a) all IP cases and (b) non-ASC OP cases for procedures with 90%+ of cases performed in a hospital setting (HOPD or ED).

## V.F.3. Hospital-only anesthesia services, using a 99% threshold to identify the relevant outpatient anesthesia services

(172)    As explained above, the baseline hospital-only relevant service market includes (1) all inpatient cases and (2) outpatient cases for procedures with 90% or more cases performed in a hospital setting in a given year. Figure 19 displays results based on using a threshold of 99%. The effect on shares and HHIs is small. For example, under the 90% threshold, USAP has a [redacted] share of anesthesia cases in the Dallas MSA in 2023. Under the 99% threshold, USAP's corresponding 2023 share in Dallas is [redacted].

Expert Report of Cory S. Capps, PhD

**Figure 27. USAP shares and market HHIs for hospital-only anesthesia cases in the Houston, Dallas, and Austin MSAs—99% hospital-only threshold**

| Year | Houston | | Dallas | | Austin | |
|------|---------|-----|--------|-----|--------|-----|
| | USAP share | HHI | USAP share | HHI | USAP share | HHI |
| 2012 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2013 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2014 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2015 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2016 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2017 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2018 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2019 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2020 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2021 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2022 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2023 | ■ | ■ | ■ | ■ | ■ | ■ |

Source: Professional claims data ████████████████████████.
Notes: Shares calculated using data from September–October of each year, limited to (a) all IP cases and (b) OP cases for procedures with 99%+ of cases performed in a hospital setting (HOPD or ED).

## V.F.4. Hospital-only anesthesia services, using a 50% threshold to identify the relevant outpatient anesthesia services

(173)    In my baseline analysis, I operationalize the hospital-only service market by limiting to inpatient anesthesia services and to outpatient anesthesia services for which at least 90% of cases are in a HOPD rather than an ASC. Several high-volume anesthesia services have less than 90% of cases at a HOPD (i.e., more than 10% at an ASC) but are still heavily concentrated in the HOPD setting, as shown in Figure 28. As a sensitivity, I also calculate shares based on including services for which at least 50% of outpatient cases, rather than at least 90%, are at a HOPD. As shown in Figure 31, the effect on shares and HHIs is small and does not change my conclusions. For example, with a 50% threshold, USAP has a ████ share of anesthesia cases in Houston in 2023 as compared with a ████ share under the baseline approach.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 28. Top 20 outpatient anesthesia services with between 50% and 90% of cases at HOPDs**

| CPT | CPT description | IP+OP count | OP count | % OP | ASC as % of OP | USAP share |
|---|---|---|---|---|---|---|
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

Source: 2023 professional claims ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ .

Notes: "IP + OP count" reports the total count of cases with a POS code of 21 (IP), 22 (HOPD), 23 (ED), or 24 (ASC); "OP count" reports the total count of cases with a POS code of 22, 23, or 24; "ASC as % of OP" equals the ASC count divided by the OP count.

Expert Report of Cory S. Capps, PhD

**Figure 29. USAP shares and market HHIs for hospital-only anesthesia cases in the Houston, Dallas, and Austin MSAs—50% hospital-only threshold**

| Year | Houston | | Dallas | | Austin | |
|------|---------|-----|--------|-----|--------|-----|
| | USAP share | HHI | USAP share | HHI | USAP share | HHI |
| 2012 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2013 | ■ | ■ | ■ | ■ | ■ | ■ 2 |
| 2014 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2015 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2016 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2017 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2018 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2019 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2020 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2021 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2022 | ■ | ■ | ■ | ■ | ■ | ■ |
| 2023 | ■ | ■ | ■ | ■ | ■ | ■ |

Source: Professional claims data ▬▬▬▬▬▬▬▬

Notes: Shares calculated using data from September–October of each year, limited to (a) all IP cases and (b) OP cases for procedures with 50%+ of cases performed in a hospital setting (HOPD or ED).

## V.F.5. Revenue-based shares

(174)    The shares and HHIs presented above are based on USAP's share of cases, which are instances of anesthesia service provision for unique combinations of patient and date. Figure 30 shows USAP's 2023 share of revenue corresponding to the baseline, inpatient-only, and 50% threshold service markets. These revenue-based shares are ▬▬▬▬▬ than the corresponding shares based on cases. For example, USAP's 2023 share in Houston as measured by cases in the baseline approach is ▬▬ but its corresponding revenue-based share is ▬▬ . ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬

Expert Report of Cory S. Capps, PhD

**Figure 30. USAP shares and market HHIs for hospital-only anesthesia in the Houston, Dallas, and Austin MSAs, 2023—revenue-based shares**

| Service market | Houston | | Dallas | | Austin | |
|---|---|---|---|---|---|---|
| | USAP share | HHI | USAP share | HHI | USAP share | HHI |
| Baseline | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| Inpatient only | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |
| 50% HOPD threshold | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

Source: Professional claims data ▮▮▮▮▮▮▮▮▮▮▮.

Notes: "Baseline," "Inpatient only," and "50% HOPD threshold" shares are the revenue-based analogs of the shares presented in Figure 20, Figure 25, and Figure 29, respectively.

## V.G. High barriers to entry

(175)    In a competitive market, firms will enter and drive down price until economic profits are zero.[210] In contrast, when factors specific to an industry or market inhibit this process, existing or incumbent firms can sustain higher prices and earn positive economic profits. Those factors are called "barriers to entry." Barriers to entry can stem from regulatory, technological, or other industry-specific factors. They can also arise from or be enhanced by business practices such as long-term contracts or noncompete agreements.

(176)    In retrospective cases such as the current litigation, there are two ways to evaluate entry barriers. First, through direct observation of historical pricing and the presence or absence of entry: if a firm in a market is able to sustain high prices—meaning high prices that would be brought down through the aforementioned entry process in a competitive market without entry barriers—then there likely exists a substantial impediment to entry. In other words, evidence of sustained high prices not brought down by competitive entry into a market provides a strong basis to conclude that there are high barriers to entry into that market.[211] In section VI.A, I present robust evidence of sustained, widespread high pricing by USAP.

---

[210]  Economic profits are defined as the "difference between a firm's sales revenue and the totality of its economic costs, including all relevant opportunity costs." David Besanko and Ronald R. Braeutigam, *Microeconomics*, 2d ed. (Hoboken: John Wiley & Sons, 2005), 333. The term "zero economic profit" does not mean that a firm earns zero profits in the accounting sense that revenue in dollars equals cost in dollars but rather that a firm earns a normal rate of return, accounting for opportunity costs. For example, if an outlay of $10,000 in a business venture yields a $200 accounting profit per period but the same $10,000 placed in some other comparably risky investment would yield $500 per period, then the venture has an accounting profit of $200 but an economic profit of –$300 per period.

[211]  2023 Merger Guidelines, § 2.6 ("[T]he persistence of market power can indicate that entry barriers exist, that further entrenchment may tend to create a monopoly, and that there would be substantial benefits from the emergence of new competitive constraints or disruptions.") and 2023 Merger Guidelines, § 3.2 ("lack of successful entry in the past will likely suggest that entry may be slow or difficult."). *See also*, 2010 Horizontal Merger Guidelines, § 9.

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

(177)    Second, the extent of barriers to entry in a market can be evaluated by examining the structure of the market and the assets and skills that an entrant would need, and the challenges it would face and costs it would incur, in order to succeed at capturing significant business from existing firms. By necessity, this is the primary or sole approach in most prospective merger cases. The 2023 Merger Guidelines describe the assessment of entry barriers as follows: [212]

> Merging parties sometimes raise a rebuttal argument that a reduction in competition resulting from the merger would induce entry or repositioning into the relevant market, preventing the merger from substantially lessening competition or tending to create a monopoly in the first place. This argument posits that a merger may, by substantially lessening competition, make the market more profitable for the merged firm and any remaining competitors, and that this increased profitability may induce new entry. To evaluate this rebuttal evidence, the Agencies assess whether entry induced by the merger would be "timely, likely, and sufficient in its magnitude, character, and scope to deter or counteract the competitive effects of concern."

(178)    In the case at hand, both approaches support the conclusion that barriers to entry into markets for the provision of hospital-only anesthesia services are high. As noted above, USAP's long-running track record of sustaining high prices provides a strong basis to conclude that entry barriers are high. As I explain in the remainder of this section, the structure of the market reinforces the conclusion that entry into the hospital-only anesthesia services market is unlikely to be so easy as to deter or counteract anticompetitive effects.

(179)    A central driver of high barriers to entry, as I described in section III.A, is that it is challenging and costly for hospitals to switch their anesthesia providers.[213] Record evidence indicates that an important component of those switching costs, beyond the general disruption to the hospital, is that surgeons value having relationships with the anesthesia providers with whom they work.[214] By definition, entrants do not have those relationships.

(180)    Consider a group evaluating whether to enter a new geography. To succeed, it would have to convince one or more hospitals to displace their current group(s) and instate the entrant. That entails switching costs for the hospital(s), so the new group would have to offer the hospital a net benefit

---

[212]  2023 Merger Guidelines, § 3.2 (internal citations omitted).

[213]  For example, ███████████████████████████████████████████ ████████████████████████████████████████████████ Consistent with this, ████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ████████████

[214]  *See supra* n. 30.

Expert Report of Cory S. Capps, PhD

greater than those switching costs.[215] In contrast, incumbent providers do not incur these costs. Such cost disadvantages for entrants constitute a barrier to entry.[216]

(181)    Other industry features and practices— ████████████████████ ████████████ —augment the barrier to entry arising from hospitals' switching costs. ███████ ████████████████████████████████████████████████████████.

For example, ████████████████████████████████████████

████████████████████████████████████████████[217] ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ However, insofar as ████████████████████████████████, ████

████████████████████████ ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████[219]

---

[215]  In the face of high costs of switching away from an already-made choice, an agent may persist with that choice even if, with the benefit of hindsight, the agent would have preferred a different choice.

[216]  This discussion focuses on entry from outside the geographic market, but a similar point applies to entry from outside the product market. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

The conclusion that there are barriers to entry from ASC-based anesthesia providers into the provision of hospital-only anesthesia services is also supported by ████████████████████████████████████████████

[217]  *See, e.g.,* ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

█ ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

[219]  ████████████████████████████████



Expert Report of Cory S. Capps, PhD

# VI. USAP's acquisitions have increased its market power and harmed consumers

(183)    In this section, I address the channels through which USAP's acquisitions have lessened competition and given it the power to charge high prices for anesthesia services.

(184)    In section VI.A, I first establish a key fact: USAP's acquisitions resulted in price increases, with price increases concentrated at the acquired groups in at least the near-term post-acquisition period. The price increases are large and sustained, and persist through one or more post-acquisition rounds of contractual negotiations between USAP and payers.

(185)    In section VI.B, I explain that a significant portion of those sustained price increases is attributable to lessenings of competition from USAP's series of acquisitions.

(186)    Therefore, I conclude that USAP's acquisitions have lessened competition and harmed consumers. Because premiums are based on the costs that payers incur, when payers' costs increase due to higher prices for anesthesia services, premiums will increase.[224] For self-funded employers, the increase in costs is direct, rather than mediated through premiums. Higher healthcare costs for employers ultimately harm workers through higher out-of-pocket costs and slower wage growth.[225]

## VI.A. USAP's price increases are large and persist over time

(187)    I use professional claims data for anesthesia services produced by ▮▮▮▮▮▮▮▮ ▮▮▮▮ to calculate anesthesia services prices for USAP, anesthesia groups acquired by USAP (pre- and post-acquisition), and other anesthesia groups. For each USAP acquisition, I identify the providers who moved from the acquired group to USAP and analyze those providers' pricing before and after being acquired by USAP. Across payers and geographies, a number of consistent patterns are evident:

- Prior to each acquisition, USAP's pricing ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮



---

[224] *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See also, infra* n. 244.

[225] *See infra* n. 303.

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

- After each acquisition, USAP ███████████████████ ███████████. In some later transactions, the price ████████████████████ ████████.

- USAP's price ███████████████████████.

- USAP's acquisitions and price ████████████████████████████ ████████.

- ███████████████████████████████████████ USAP's prices were ████ ██████████████████████████████ the Houston, Dallas, and Austin MSAs.

(188)    I construct prices for commercial hospital-only anesthesia services as the average allowed amount per case at the group-quarter level. A case is a unique combination of patient and date associated with an anesthesia CPT code.[226] I identify the provider group for each claim by using ██████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████.[227]

(189)    In section III.A.2, I explained that most anesthesia payments are computed as the product of (1) "total units," which equals the sum of base, time, and modifying units, and (2) the applicable "conversion factor." Given this, the conversion factor, which equals the average allowed amount per unit (rather than per case), is a potential alternative measure of price. I focus on the allowed amount per case for both practical and conceptual reasons.

(190)    On the practical front, █████████████████████████████████ ██████████████████████. For example, █████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████████████████ █████████████████████████████████

(191)    On the conceptual front, measuring price as the allowed amount per case also accounts for changes to contractual terms other than the conversion factor that affect payment amounts. For example, ██████████████████████████████████████████████████████████████

---

[226]  In some instances, providers from different groups each provide an anesthesia service to the same patient on the same day; I assign such cases proportionally (e.g., if providers from two different groups provide anesthesia service to the same patient on the same day, I assign each group 0.5 cases).

[227] ███████████████████

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

████████████████████████████████████████████████████████████████████████████
████

(192)    A potential drawback of measuring price as the allowed amount per case is that case acuity can vary across providers. For example, a provider group that renders more complex anesthesia services that have higher base units and consume more time on average would have a higher measured per case price than a group that renders less complex services. However, because demand for hospital-only anesthesia services is derived from the demand for the medical services hospitals provide, this is unlikely to bias my before -and-after analyses of price changes following USAP acquisitions. This is because the composition of surgeries and other anesthesia-requiring services that the hospital provides is unlikely to change as a result of a change in ownership of the hospital's anesthesia group.

### VI.A.1. Three illustrative USAP acquisitions

(193)    I use three illustrative acquisitions and claims data from three payers to demonstrate the types of price changes that follow a USAP acquisition: (1) price changes to ████████ after USAP's 2017 acquisition of MetroWest in the Houston MSA; (2) price changes to ████████████ after USAP's 2015 acquisition of SW Anesthesia in the Dallas MSA; and (3) price changes to ██████ after USAP's 2018 acquisition of Capitol Anesthesia in the Austin MSA. (Below, I also present a comprehensive analysis of the price changes that follow USAP's acquisitions in each focal market.)

(194)    For each of the three acquisitions, I display four quarterly average price series. All four lines represent average allowed amounts per case for hospital-only anesthesia services. The solid blue lines show the prices for providers that were part of the group USAP acquired in the eight quarters prior to the acquisition. These providers are identified as those who bill to the target group's billing NPI. The dashed blue line shows prices for same set of providers in the eight quarters after the acquisition when they bill to USAP's NPI (sometimes after a transition period). The green line shows prices for providers who billed under USAP's billing NPI but are not part of the acquired group—i.e., the green line shows USAP providers who are not part of the blue lines. Finally, the orange line shows the average price among all other providers in the MSA.[228]

(195)    In the first quarter of 2017, USAP acquired MetroWest Anesthesia in the Houston MSA. As shown in Figure 31, in the four quarters prior to the acquisition, USAP's pricing was ████████████████ ████████████ and ██████████████████████ than the average of non-USAP providers in Houston. After the acquisition, prices for the acquired MetroWest anesthesia providers ██████████████████████

---

[228] ████████████████████████████████████████████████████████████████████████
████████████████████████ For more details describing how I identify these providers, *see* Appendix C.3. Additionally, I restrict the set of providers included in the USAP (green) price line to USAP providers who bill a plurality of their quarterly cases to the MSA of the acquired group (identified using the USAP billing data because ████████████████████████ ████████████████████████████████████████████████████████████████████████

Expert Report of Cory S. Capps, PhD



**Figure 31. USAP's 2017-Q1 Houston MSA acquisition of MetroWest—** ███



Quarter relative to acquisition

Source: Professional claims data ███ ), in-network, hospital-only anesthesia services.

(196)     Figure 32 shows the analogous chart for pricing to ███ before and after USAP's acquisition of Southwest Anesthesia Associates in the Dallas MSA. This acquisition, in the fourth quarter of 2015, was USAP's third acquisition after it entered the MSA through the Pinnacle acquisition. In the six quarters preceding the acquisition, Southwest's prices were ███ ███ . Once the acquisition closed, prices for the former Southwest providers ███ ███ ███

(197)     In this case, the prices of non-USAP providers ███ ███ ███

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 32. USAP's 2015-Q4 Dallas MSA acquisition of Southwest Anesthesia Associates—** ████



Source: Professional claims data (████), in-network, hospital-only anesthesia services.

(198)   Figure 33 shows the corresponding chart for pricing to ████ before and after USAP's Austin MSA acquisition of Capitol Anesthesia in the first quarter of 2018. This transaction is different from the others in that USAP had a share of about ██ in the Austin MSA prior to the acquisition.[229] In contrast, the acquired group, Capitol Anesthesia, had a share of about ██. In the figure below, the green USAP line corresponds to the already-present, smaller group of USAP providers and the blue line corresponds to the larger Capitol Anesthesia; that is, the smaller group is the acquirer and the larger group is the target. A second respect in which Austin differs from Houston and Dallas is that, prior to that event, the ████████████████████████████

████.[230] In the eight quarters prior to the acquisition, ████████████████

████████████████████████

---

[229] ████████████████████████

████████████████████████

████████ *See* section IV.

[230] ████████████████████

████████████████████████

████████████████████

████████████

Expert Report of Cory S. Capps, PhD

among non-USAP providers, *see* Figure 19). After the acquisition, prices for the former Capitol providers ██████████████████████████████████████████████████████

████████████████████████████████████████████████████

**Figure 33. USAP's 2018-Q1 Austin MSA acquisition of Capitol Anesthesia—**████



Source: Professional claims data (████), in-network, hospital-only anesthesia services.
Notes: Prior to the Capitol acquisition, USAP had about ██████████████████████████
████████████████████████████████████████████████
████████████████████████

(199)    These patterns of post-acquisition price increases are consistent with deposition testimony from payers. For example, ██████████████████████████████████████████

████████:[231]



---

[231] ████████████████████████

Expert Report of Cory S. Capps, PhD



## VI.A.2. USAP's acquisitions in the Houston, Dallas, and Austin MSAs

(200) The prior three charts showed three illustrative USAP acquisitions. In this section, I present three figures, each with ▮▮▮ panels, that display quarterly average prices over the 2010 through 2022 period or whatever years are available for each payer for the various groups that USAP acquired, as well as the average among groups that never became part of USAP.[232]

(201) Each figure represents one of the three focal MSAs and, within each figure, the four panels depict pricing for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. As in the charts in Section VI.A.1, the green line shows prices for any provider that, within the quarter, billed under USAP's billing NPI. The orange line displays average prices among all providers that were not part of USAP and would never become so. The other lines show the prices of the acquired provider groups up to the quarter in which they were acquired by USAP (thereafter, those providers contribute to the green line insofar as they shift to having claims appear under USAP's billing NPI). The red vertical lines indicate when a group was acquired by USAP. Grey shading indicates quarters in which a group was out-of-network with a given payer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮.

(202) Houston. Figure 34 displays quarterly prices by group in the Houston MSA, separately for each payer. In the quarter of each acquisition, USAP's prices were ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮. Therefore, each acquisition ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. For ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. For ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[233] Some of the acquisitions were also ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮.

(203) Dallas. Figure 35 displays quarterly prices by group for each payer in the Dallas MSA. When it was acquired by USAP in 2014, Pinnacle's prices were ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[232] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮

[233] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮

Expert Report of Cory S. Capps, PhD

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[234] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ In addition, during and after the series of acquisitions between 2014 and 2017, which ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ to ▮▮▮▮▮▮ (*see* Figure 16), USAP's rates ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ This pattern is evident for all ▮▮▮ payers.

(204)   <u>Austin</u>. Figure 36 shows quarterly prices in the Austin MSA. Prior to 2018-Q1, the green line reflects pricing for USAP's relatively small set of anesthesia providers and the blue line reflects pricing for the larger Capitol Anesthesia.[235] (In Houston and Dallas, it is the larger initial group that goes on to acquire smaller groups.) As noted above, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A second distinction unique to Austin is that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*see* Figure 19). After being acquired by USAP, Capitol's prices ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮.[236]

---

[234] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[235]   As I described above, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

[236] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮

Expert Report of Cory S. Capps, PhD

**Figure 34. Houston MSA prices by payer**



Source: Professional claims data ███████████████████████, in-network, hospital-only anesthesia services.
Notes: ████████████████████████████████████████████████████████████
████████████████████████████████

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 35. Dallas MSA prices by payer**



Source: Professional claims data ████████████████████, in-network, hospital-only anesthesia services.
Notes: ████████████████████████████████████████████████████████████████████

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 36. Austin MSA prices by payer**



Source: Professional claims data ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, in-network, hospital-only anesthesia services.
Notes: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

### VI.A.3. USAP's acquisitions have consistently increased the amount that payers and employers pay for hospital-only anesthesia services

(205)    When USAP makes an acquisition and raises the target group's price, total payments for the services provided by that group increase. (As noted in various points in this report, that higher price is likely to result in a small decline or no decline in quantity, at least in the near term.) The average payment for the services of USAP and the acquired group, taken together, also increases.[237] Thus, as USAP adds additional groups and raises their prices, a greater proportion of the hospital-only anesthesia services rendered in a market are paid at USAP's high rates.[238]

(206)    For example, prior to 2014, USAP accounted for about ▮▮▮ of hospital-only anesthesia services in the Houston MSA. At the time, its average price across the payers was about ▮▮▮▮▮▮▮▮ than the average price among other groups. By 2020—after three Houston MSA acquisitions—USAP's share was ▮▮▮ and its average price was about ▮▮▮▮▮▮▮ the average for non-USAP groups.[239] Stated differently, over that period, the proportion of the Houston market that was paying USAP's high prices ▮▮▮▮▮▮▮ percentage points ▮▮▮▮▮▮▮▮▮▮. In addition, as I show below, the gap between USAP and non-USAP prices for ▮▮▮▮▮▮ after the series of Houston acquisitions.

(207)    To illustrate how USAP's acquisitions have increased average payments per case for anesthesia services, I use ▮▮▮▮ claims data to construct two price lines for each MSA. The green line shows the average price in each quarter for the services of USAP's initial group along with the anesthesia groups that USAP would eventually acquire (the "eventual USAP" groups). Two factors will cause

---

[237]    To illustrate using a stylized example, assume that USAP provides 900 cases at a price of $150 and a target group provides 100 cases at a price of $80 pre-acquisition. In this case, payers procure 1,000 cases for a total payment of $900 \times $150 + 100 \times $80 = $143,000$, an average payment of $143 per case. Post-transaction, USAP raises the price of the target group to $150 and the total payment increases to $900 \times $150 + 100 \times $150 = $150,000$, an average payment of $150 per case. As a result of the transaction, the amount paid for 1,000 cases increases by $7,000, or 5%.

[238]

*See also*, Deposition of ▮▮▮▮▮

[239]    I compute the yearly average price for USAP as the total allowed amount divided by its total number of cases in a year. I perform the same calculation to compute the prices for the never USAP group. For both groups, I restrict the sample of cases to ▮▮▮▮▮▮▮

---

Expert Report of Cory S. Capps, PhD

this line to increase: (1) increases in USAP's contracted rates with payers and (2) post-acquisition price increases at the target groups. The orange line shows the average price in each quarter for services provided by anesthesia groups that were never acquired by USAP (the "never USAP" groups). I normalize the lines to show prices in percentage terms relative to the average price among the never USAP groups as of (i) the quarter of the GHA acquisition in Houston and Austin (2012-Q4) and (ii) the quarter of the Pinnacle acquisition in Dallas (2014-Q1). As I explain below, normalized price indices make it simple to read percentage changes over time from the charts. I use ███████████ for these analyses because ████████████████████████████

(208)   Figure 37 shows the cumulative effect of USAP's Houston acquisitions on average payments for the services provided by the set of eventual USAP providers. Leading into its acquisition by USAP, GHA ████████████████████████████████████████████████████████ ████████████████████████████████████.[240] As of the first quarter of 2013, the price indices for the never USAP group and USAP were about ██ and ██ indicating that prices for the eventual USAP providers' services were about ████████ than for the never USAP providers. ████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████

---

[240] ████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████

Expert Report of Cory S. Capps, PhD

Figure 37. Price indices for eventual USAP and never USAP groups in Houston—



Source: Professional claims data ███████, in-network, hospital-only anesthesia services.
Notes: ███████████████████████

(209)    Figure 38 shows the same chart for USAP's Dallas acquisitions. When USAP made its initial acquisition of Pinnacle (2014-Q1), average payments for services provided for the eventual USAP groups were about ███████ than for the never USAP groups. As USAP made additional acquisitions, ████████████████████████████████ ███████████████████

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 38. Price indices for eventual USAP and never USAP groups in Dallas—**████████



Source: Professional claims data ████████, in-network, hospital-only anesthesia services.

(210)    Figure 39 shows the analogous chart for USAP's Austin acquisitions, again using ████████ claims data. In 2014, services provided by the eventual USAP providers (i.e., the legacy GHA group and Capitol Anesthesia) had prices about ████████ than services provided by the never USAP group. After 2020, that differential ████████████████████

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 39. Price indices for eventual USAP and never USAP groups in Austin—** ▪▪▪▪▪▪



Source: Professional claims data ▪▪▪▪▪▪▪, in-network, hospital-only anesthesia services.

## VI.A.4. USAP's prices are high relative to other anesthesia groups

(211)   In this section, I compare USAP's prices with the prices of the largest other groups within each MSA as of 2023, the most recent full year of available claims data. As the figures below illustrate, USAP's prices are ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪. In addition, in the Houston and Dallas MSAs, ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪ ▪▪▪▪▪▪▪▪▪▪▪▪.

(212)   The Houston MSA.

- As shown above in Figure 15, as of 2023, USAP had a hospital-only anesthesia services market share in the Houston MSA of about ▪▪▪ the ▪▪▪▪▪▪▪▪▪ ▪▪▪▪▪▪▪▪▪ ▪▪▪▪▪▪▪▪▪▪▪▪▪▪.

- Figure 40 shows average prices for USAP and the ▪▪▪ three largest groups by payer as of 2023, separately for non-obstetrics and obstetrics anesthesia services. For non-obstetrics, USAP's prices ▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪▪, particularly for ▪▪▪▪▪▪▪▪▪▪. The

Expert Report of Cory S. Capps, PhD

same is true for obstetrics, ███████████████████████████████ ██████████.[241]

(213)    The Dallas MSA.

- As shown above in Figure 17, as of 2023, USAP had a market share in the Dallas MSA of about ████ the ███ three largest groups were █████████████████████████ ████████████

- Figure 41 shows prices for USAP and its three largest rivals in the Dallas MSA. For both non-obstetrics and obstetrics, USAP's prices are, ███████████████████████████████ ███████████████████████

(214)    The Austin MSA.

- As shown above in Figure 19, as of 2023, USAP had a market share in the Austin MSA of about ███████████████████████████████████ ████████

- Figure 42 shows prices for these groups as of 2023. USAP's prices for non-obstetric and obstetric anesthesia services are, ███████████████████████████████ ███████████████████████████████ ██████

---

[241] ███████████████████████████████████ ███████████████████████████████████ █████████████

Expert Report of Cory S. Capps, PhD

**Figure 40. 2023 Prices for USAP and the next three largest groups—Houston MSA**



Source: Professional claims data ▬▬▬▬▬▬▬▬▬▬, in-network, hospital-only anesthesia services, with a 2023 date of service.

Notes: Obstetrics cases are those in that include an anesthesia CPT code for services related to obstetric procedures (CPT codes 01958-19969).

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 41. 2023 Prices for USAP and the next three largest groups—Dallas MSA**



Source: Professional claims data ████████████████████████, in-network, hospital-only anesthesia services, with a 2023 date of service.

Notes: Obstetrics cases are those in that include an anesthesia CPT code for services related to obstetric procedures (CPT codes 01958-19969).

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

**Figure 42. 2023 Prices for USAP and the next three largest groups—Austin MSA**



Source: Professional claims data ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, in-network, hospital-only anesthesia services, with a 2023 date of service.

Notes: Obstetrics cases are those in that include an anesthesia CPT code for services related to obstetric procedures (CPT codes 01958-19969).

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

## VI.B. **USAP's** price increases result, at least in significant part, from reductions in competition

(215)    The preceding section establishes that USAP increases the prices of anesthesia groups that it acquires—to levels well above nearly all other groups—and sustains those increases over time. In this section, I explain the ways in which USAP's acquisitions have reduced the degree of competition it faces and, thereby, have built and extended its market power. This establishes that reductions in competition explain, at least in significant part, USAP's price increases.

(216)    I evaluate USAP's market power through the lens of bargaining theory, as discussed in section III.B. A key lesson from bargaining theory is that as one party's best alternative to reaching an agreement (i.e., that party's BATNA, or outside option) deteriorates, the counterparty will fare better in the negotiation. In the case at hand, this means that as payers' BATNAs in negotiations with USAP deteriorate, USAP will fare better in contractual negotiations. That is, as payers' alternatives to contracting with USAP become less attractive, USAP will be able to negotiate higher rates and more favorable contractual terms. Thus, the key question in assessing the competitive effects of USAP's acquisitions is: did the acquisitions worsen payers' BATNAs relative to USAP's BATNA? That relative change could occur through an improvement in USAP's BATNA, a worsening of payers' BATNAs, or a combination of both.

(217)    This leads directly to the question of the respective BATNAs for USAP and a payer that are seeking to reach a contractual agreement over the terms at which USAP will provide services to patients covered by the payer. This, in turn, requires evaluating outcomes for each side if no agreement is reached and USAP becomes out-of-network with the payer. Evaluating effects on payers requires evaluating the effects on their customers, which are patients and employers.

(218)    Broadly, there are two categories of patients, with different implications for each. The first is patients who are aware that USAP is out-of-network, understand that they may have to pay more out-of-pocket for anesthesia services provided by USAP, and so may switch to an alternative hospital (and likely, a different surgeon) that relies on an anesthesia group that is in-network with the payer. Historically (i.e., during the period in which USAP made most of its acquisitions), these patients would avoid additional out-of-pocket costs but would still be disaffected because they must receive care at a hospital (and surgeon) that is not their most preferred choice. This would make the insurer's provider network less valuable to some patients. At the same time, any such patient switching would reduce USAP's patient volume and revenue. However, this effect is likely to be small to the extent that USAP's host hospitals remain in-network with the insurer—this is because the demand for anesthesia services is derived from the demand for the anesthesia-requiring hospital services that

Expert Report of Cory S. Capps, PhD

patients require (*see* section III.B.1).[242] The NSA and Texas SBL, which protect patients from balance bills and higher out-of-network cost-sharing, have likely reduced this effect even further.

(219)    The second, and significantly larger, category is patients who do not switch to a different hospital and so receive anesthesia services from an out-of-network provider. This shift has implications for an out-of-network USAP, the payer, patients, and the affected hospital(s).

- USAP, when out-of-network. Historically, USAP's revenue derived from services provided to patients who do not switch would likely fall because USAP would receive an out-of-network payment based on UCR or similar from the payer but would have to pursue patients for a higher proportion of that payment amount as well as any balance bill ███████████████ ███████████████████████████████. In addition, collecting from patients is slower and more costly for USAP. In the wake of the NSA and Texas SBL, an out-of-network USAP would not have to pursue collections from patients (beyond the in-network level of cost-sharing) but may have to enter arbitration to determine the final amount owed and collect accordingly; in addition to delays, USAP would also incur administrative costs for IDRs.[243]

- The payer. Prior to the NSA and Texas SBL, the patient would pay a greater proportion of the out-of-network allowed amount and the insurer would pay a smaller proportion, meaning the payer would pay less in total. However, the insurer would face costs in the form of patient dissatisfaction and resulting dissatisfaction among the employers who provide coverage to those patients—both create a risk to the payer of losing customers. Subsequent to the NSA and SBL, the final price to the payer is frequently determined through an IDR or possibly a settlement after the initiation of an IDR. Like USAP, the payer will also incur administrative costs for IDRs. As described in section III.D, providers have generally fared well in arbitration and, perhaps for that reason, ███████████████████████████████ Patient protections under the NSA and SBL have likely reduced or eliminated patient dissatisfaction. Because out-of-network providers tend to fare well in IDRs, having an out-of-network anesthesia group will increase costs to the employers that are the payers' customers, because those employers bear the costs of the payments determined through arbitration.[244] As with patient dissatisfaction, as costs

---

[242]   In contrast, for providers that face direct demand, becoming out-of-network would likely cause a substantial decline in patient volume from the relevant insurer.

[243]   ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████

[244]   As IDR outcomes are favorable to out-of-network anesthesia providers (relative to amounts paid absent an IDR), self-funded employers will directly pay more for anesthesia services. Fully-funded employers would also have to pay more, possibly with some delay, as higher costs to the insurer generally lead to higher premiums. (For example, in 2021 the Congressional Budget Office and the Joint Committee on Taxation projected that "in most affected markets in most years, smaller payments to some providers would reduce premiums by between 0.5 percent and 1 percent." Congressional Budget Office, "Estimate for Divisions O Through FF," H.R. 133, Consolidated Appropriations Act, at

---

Expert Report of Cory S. Capps, PhD

to employers increase, the payer will face a greater risk of losing customers, on top of the costs of IDRs and general administrative costs of an out-of-network provider. An additional cost to the insurer is the risk that the State of Texas could deem its provider network inadequate, as I discuss below.

■ Patients. Before the NSA and Texas SBL took effect in 2022 and 2020, patients would typically face higher cost-sharing for out-of-network services and potentially large balance bills for the difference between USAP's list charges and the out-of-network allowed amount set by their health plan. For many of these patients, these would amount to "surprise bills" (*see* section III.D). Many patients who end up paying more out-of-pocket would likely direct complaints to some combination of USAP, the hospital, the payer, and their employer.[245] Subsequent to enactment of the NSA and Texas SBL, patients are generally limited to paying in-network levels of cost-sharing and are protected from balance bills. Hence, the extent of patient dissatisfaction from surprise billing by out-of-network hospital-based providers has likely diminished and may be eliminated in the wake of these laws.

■ Hospitals. Prior to the NSA and Texas SBL, hospitals that rely on USAP when it is out-of-network with a payer would likely face complaints from patients covered by that payer, and from the employers who provide coverage to those patients. ███████████████████ ██████████████████████████████████ ██████████████████████████████████ ████████████████████████[246] If a hospital or system does switch to a different anesthesia group, USAP would see a corresponding reduction in volume and revenue. In the wake of the NSA and Texas SBL, the hospital is unlikely to face complaints from patients, but may still face complaints and pressure from payers and employers who bear the higher costs of out-of-network anesthesia services.



2–3 (January 14, 2021). *See also*, *infra* n. 251.

[245] ████████████████████████████████

████████████████████████ *See* section III.A.1. ██████████

Expert Report of Cory S. Capps, PhD

◻ Theoretically, the payer could terminate its contracts with some or all of the hospitals that rely on USAP.[247] Because hospitals face direct demand for their services, becoming out-of-network with an insurer would lead to a large drop in volume among patients covered by the at-issue insurer for the USAP hospital(s) and, by extension, for USAP. One drawback of this tactic for payers is that many hospital services do not require anesthesia, so excluding hospitals from their networks would create dissatisfaction beyond just those patients who require anesthesia services.

(220) Focusing specifically on contractual negotiations between USAP and a payer, key points of leverage for USAP (i.e., factors that worsen the *payer's* BATNA) are the risks of dissatisfaction among the payer's customers—whether driven by patient dissatisfaction or by employer concern over higher costs—that may cause the payer to lose business, and the potential risk that the state could deem its provider network to be inadequate. Key points of leverage for the payer (i.e., factors that worsen *USAP's* BATNA) are its ability to, potentially, steer some patients away from USAP hospitals, to slow USAP's cash flow, to pressure hospitals to switch to another anesthesia group, and, potentially, to terminate contracts with some or all hospitals that rely on USAP.

(221) Importantly, as USAP has grown and gained market share, in large part through acquisitions, USAP's BATNA has improved relative to payers' BATNAs. That is, USAP's expansion has increased its bargaining leverage in selective contracting negotiations with insurers, which gives USAP the market power to increase price. This has occurred in the three focal metropolitan areas—Houston, Dallas, and Austin—through two categories of expansion through acquisitions: (1) adding groups that serve hospitals that are themselves close competitors to each other and (2) adding groups that are potential replacements for USAP at hospitals that are located in the same metropolitan area. In addition, acquiring a high market share in multiple metropolitan areas may further increase USAP's bargaining leverage through "cross-market" effects rooted in employer linkages across the various Texas metropolitan areas in which USAP has sustained a high market share—including the three focal metropolitan areas, as well as San Antonio, Amarillo, and, until recently, Tyler. I describe and present evidence regarding these mechanisms in the remainder of this section.

### VI.B.1. By acquiring anesthesiology groups and gaining market share within a metropolitan area, USAP increases its bargaining leverage

(222) As USAP's market share within a metropolitan area grows, consequences for insurers of USAP becoming out-of-network—insurers' BATNAs—worsen relative to the consequence for USAP. That

---

[247] ███████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

Expert Report of Cory S. Capps, PhD

is, a higher share gives USAP greater bargaining leverage to negotiate higher prices.[248] This conclusion is rooted in multiple, complementary mechanisms.

### VI.B.1.a. Costs to payers from patient and employer dissatisfaction, and thus the risk of losing customers, increase as USAP's market share is greater

(223)    A higher USAP share increases the risk to an insurer that it would lose customers (primarily, employers) if USAP were to become out-of-network. Before the enactment of the surprise billing laws, the mechanism was as follows: when USAP's share in an area is greater, more patients would face higher out-of-network cost-sharing and balance billing when USAP is out-of-network. At a low level, the resulting patient dissatisfaction would be unlikely to cause employers to change to another insurer, which would entail switching costs for the employer.[249] But as the degree of patient dissatisfaction expands, so does the risk that employers would change to another payer, making the payer's BATNA worse as USAP's market share is greater.[250] This patient dissatisfaction mechanism applies whether USAP's share is derived from hospitals that are spread throughout the metropolitan area or derived from competing hospitals that are relatively proximate within the metropolitan area. It can also apply across markets, as I discuss in the next section.

(224)    After the NSA and Texas SBL, the mechanism is that, when USAP is out-of-network, the IDR process—███████████████████████—is likely to result in higher costs to the employer (*see* section VII.A) that, at some point, will increase the risk that the employer would switch to a different payer. The difference is that, in this case, the key driver is direct increases in employers' costs from having to pay more for out-of-network anesthesia services.[251] In contrast, in the prior case, the key



[248]    *See, e.g.,* ████████████████████████████████████████████ ████████████████████████████████████████ ███████████

[249]    *See, e.g.,* ████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████ *See also* Stuart V. Craig, "Competition in Employer Sponsored Health Insurance: Implications for a Public Option" (Working paper, October 24, 2022).

[250]    *See* ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████

[251]    ████████████████████████████████ ████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ ████████████████

    *See also,* ████████████████████████████ ████████████████████████████

Expert Report of Cory S. Capps, PhD

driver was the indirect costs to payers of navigating patient and employer complaints, and potential losses of employers, over surprise billing. Either way, as USAP's market share is greater, so too are the costs (whether direct or indirect) to employers of an out-of-network USAP and, consequently, the risk to payers of losing customers is also greater.[252]

(225)    Just as with increasing patient dissatisfaction in the preceding case, increasing costs to an employer will increase the risk that the employer would switch to a different payer.

### VI.B.1.b. Network adequacy risks to insurers increase as USAP's market share is greater

(226)    Network adequacy regulations in Texas, which I summarize in section III.C, are another mechanism by which USAP's bargaining leverage would increase as its market share is greater (and as it has a greater share in more markets within Texas). If USAP has a low market share, excluding USAP from its network is unlikely to risk a determination by the Texas Department of Insurance that the payer's network is inadequate. But, as USAP's share increases, that risk increases.

(227)

---

[252]   The cost to the payer of USAP being out-of-network not only increases as USAP's market share is higher, it increases at an increasing rate. Compare the case of USAP having a 10% share in the Houston area with it having a 50% share. At a 10% USAP share, the insurer will have to incur some costs for addressing patient and employer complaints (whether about surprise billing or about increased costs to the employer). But it would have a low probability of losing customers to another insurer. At a 50% USAP share, the payer's costs of addressing complaints would be five times as high *and* it would have a risk of losing customers. Thus, a USAP share of 50% is more than five times as challenging for the insurer as a USAP share of 10%. This means that the insurer's BATNA worsens relative to USAP's as USAP's market share increases.

[253]   PX2060 at -005 ███████████████████████████████████████ ███████████████

[254]   PX2060 at -001–002.

[255]   ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████████████████████████ ████████████████████████████████████████████████████

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD



(228) Looking back, ███████████████████████████████████████, testified as follows:[256]

(229) Evidence in the record shows that ███████████████████████████████████
████████████████████████

Expert Report of Cory S. Capps, PhD



(230)  I do not offer any opinion on the legal meaning or interpretation of Texas' network adequacy laws. I do take as given, based on the evidence above, that these laws exist and that, as more providers are out-of-network with a payer, the risk that the state may conclude that the payer's network does not satisfy network adequacy laws increases. This is an additional channel through which a higher USAP share (both within relevant geographic markets and across them) can increase USAP's market power and bargaining leverage.

**VI.B.1.c. USAP faces less risk of losing patient volume as its market share is greater**

(231)  Because anesthesia groups face a derived demand, becoming out-of-network is not likely to result in a large drop in volume (e.g., as compared with a provider such as a PCP or hospital that faces direct demand). Nonetheless, becoming out-of-network has historically created some risk of reduced patient

---



[260] ████████████████

[261] PX1407 at -001.

[262] *Id.* at -002.

[263] ████████████████

[264] PX1383 at -002.

[265] ████████████████

Expert Report of Cory S. Capps, PhD

volume for USAP insofar as either (1) some patients may be well-informed regarding the higher out-of-pocket costs of an out-of-network anesthesia provider and select an alternative hospital that relies on an anesthesia provider other than USAP or (2) payers may be able to steer some patients to alternate hospitals.[266]

(232)    USAP's acquisitions and increased market share also shrink this risk, because more and more of the potential alternatives to a given USAP hospital are *also* USAP hospitals. With a higher USAP share, it is more difficult for an informed patient whose first choice of hospital (and surgeon) is a USAP hospital to instead select a non-USAP hospital (and likely a different surgeon). To illustrate, suppose USAP were the anesthesia provider at only one hospital in the Houston area. Every patient who prefers that hospital would be able to avoid USAP and still go to their second most preferred hospitals. If USAP is the anesthesia provider at two hospitals in the Houston area, then some patients would have to switch to their third-most preferred hospital in order to avoid USAP (these are patients whose top two choices are both USAP hospitals). As USAP's market share grows within a metropolitan area, it becomes increasingly difficult for patients to avoid USAP and still have access to a reasonably preferred, albeit not most preferred, hospital. A higher USAP market share also makes a threat by USAP to not treat a payer's patients more impactful because more of the alternative hospitals that the payer, and the patient, could turn to are also USAP hospitals.[267]

(233)    Figure 43 shows that patients whose first choice is a USAP hospital are ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Economic research and court rulings over the last 15 years indicate that, all else equal, hospitals that are geographically closer to each other are more likely to be closer substitutes.[268] In more formal terms, the diversion ratio from one hospital to another is likely to be higher as the distance between them is shorter.[269]

---



266  *See, e.g.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

267  During contract negotiations in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

268  Cory Capps, "From Rockford to Joplin and back again: The impact of economics on hospital merger enforcement," *Antitrust Bulletin* 59, no. 3 (2014): 443–478; Cory Capps et al., "The Continuing Saga of Hospital Merger Enforcement," *Antitrust Law Journal* 82, no. 2 (2019): 441–496 at 479.

269  The diversion ratio from Hospital A to Hospital B is the percentage of A's patients who, if they had to change their hospital selection, would switch (or "divert") to B. I use geographic proximity as a proxy because data well-suited to directly estimating diversion ratios between hospitals are not available. In general, as USAP hospitals account for a greater number of hospitals that surround a focal hospital, diversion from that focal hospital to other USAP hospitals will be greater. This will be magnified if the surrounding USAP hospitals are larger (e.g., as measured by beds) than the surrounding non-USAP hospitals, and vice-versa.

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

(234) Across USAP hospitals in the Houston MSA, ███████████████████ ████████████In the Dallas MSA, █████████████████████ ███████████████████ In the Austin MSA, the corresponding figure is ███ A decreasing risk of losing overall patient volume from being out-of-network (because, to the extent they have that ability, it is harder for payers to shift patients away from USAP hospitals) means that USAP's BATNA improves relative to insurers' BATNAs as USAP's market share increases.[270]

**Figure 43. Frequency and share of other USAP hospitals among the five nearest hospitals to each USAP hospital**



| MSA | Number of USAP hospitals | Average number of other USAP hospitals among the nearest 5 hospitals | USAP's average share of beds among the nearest 5 hospitals |
|---|---|---|---|
| HOUSTON | ██ | ██ | ███ |
| DALLAS | ██ | ██ | ███ |
| AUSTIN | █ | ██ | ███ |

Source: ████████████████████████████ RAND hospital data.

Notes: For each hospital at which USAP provides anesthesia services as of 2024-Q4, I identify the five closest hospitals by drive time and determine how many of those also have USAP as their anesthesia provider in order to construct the average number and average bed share of USAP hospitals among the five hospitals that surround each USAP hospital. I exclude hospitals with 25 or fewer beds and USAP hospitals that do not appear in the RAND hospital data.

(235) As this shows, a higher USAP share within a metropolitan area, particularly when rooted in hospitals that are likely to be mutually substitutable in the eyes of patients, will improve USAP's BATNA by making it more challenging for payers to shift patient volume from hospitals at which USAP is the primary or sole anesthesia provider to hospitals where it is not.

(236) USAP's acquisitions have increased the extent to which USAP hospitals have, among their five nearest hospitals, other USAP hospitals.

- In the Houston MSA, USAP acquired Metrowest, which provided anesthesia services at Memorial Hermann Katy and Memorial Hermann Memorial City, in March 2017. The two hospitals are each among the other's nearest five hospitals. The other four nearest hospitals to both Memorial Hermann Katy and Memorial Hermann Memorial City were █████████ ███████████████████████As a result, USAP hospitals account for ████ of beds among the five nearest hospitals to both hospitals that USAP added when it acquired MetroWest.

---

[270] The cost to USAP of being out-of-network with an insurer decreases more than proportionally as USAP's market share is greater, because USAP's recapture of diverted patients will be greater.

Expert Report of Cory S. Capps, PhD

- In the Dallas MSA, USAP acquired Sundance, which provided anesthesia services at Texas Health Southwest, in April 2016. Four of Texas Health Southwest's five nearest hospitals were ███████████████████████████████████. As a result, USAP hospitals account for ████ of the beds among the five nearest hospitals to Texas Health Southwest.

- In the Austin MSA, USAP acquired Capitol Anesthesiology Association, which provided anesthesia services at several Ascension Seton hospitals, in February 2018. USAP already provided anesthesia services at ████████████████████████████████████████████ Capitol provided anesthesia services at three of the five nearest hospitals to Lakeway (specifically, Ascension Seton Medical Center, Ascension Seton Northwest, and Dell Seton Medical Center).[271]

(237)  The same logic and conclusion apply to the possible measure of payers attempting to reduce volume for USAP by terminating contracts with a subset of the hospitals at which USAP is the main or sole provider of anesthesia services. Namely, as USAP's share is higher, the potential impact to USAP of such a termination becomes smaller because a greater percentage of the diverted patients would simply shift to a different USAP hospital.[272] This also improves USAP's BATNA relative to a payer's BATNA as USAP's market share is greater.[273]

**VI.B.1.d. As USAP's market share is greater, it faces less risk of displacement from hospitals**

(238)  Increases in USAP's market share within a metropolitan area make it increasingly difficult for hospitals and hospital systems, whether on their own or in response to pressure from insurers, to change their anesthesia group from USAP to a different, lower-priced anesthesia group. This is because, with a higher USAP market share, the pool of potential replacement anesthesia groups from within the same metropolitan area shrinks. For instance, if USAP's hospital-only anesthesia services share in a given metropolitan area is 10%, groups that account for 90% of those services are available as potential replacements for a hospital or hospitals that would like to switch. But if USAP's share is 60%, then that pool is limited to groups that account for 40% of anesthesia services volume in the area, rather than 90%. Thus, with a higher market share, USAP faces less risk of displacement from



271 ████████████████████████████████

272 ███████████████████████████████████████████████████████
███████████████████████████████

273 ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████

Expert Report of Cory S. Capps, PhD

hospitals, which improves its BATNA relative to payers.[274] ███████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████

(239)    An important predicate for this mechanism is that it is more practical and less costly for hospitals seeking to replace their anesthesia group to do so using anesthesia providers already providing anesthesia services to hospitals located within the metropolitan area. ████████████████
████████████████████████████████████████████████████. In particular, in section V.C.1, I summarized my analysis of ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████

(240)    Finally, insofar as a hospital's next best alternative source of a replacement anesthesia group to an existing group within the hospital's metropolitan area is a group within a relatively nearby metropolitan area in the same state, USAP's acquisitions in multiple metropolitan areas within Texas further narrows the pool of non-USAP anesthesia groups hospitals could potentially turn to as a replacement for USAP.

## VI.B.2. Cross-market effects rooted in "common customers" may also increase USAP's bargaining leverage

(241)    In previous sections, I explained how USAP's acquisitions *within* a metropolitan area increased its bargaining leverage and lessened competition. In this section, I explain how USAP's acquisitions *across* metropolitan areas can create additional, reinforcing leverage and show that evidence in the record is consistent with this effect.

(242)    In recent years, economists and antitrust agencies have been evaluating "cross-market" mergers.[276] These are mergers of providers that would not be considered substitutes from patients' perspective— e.g., because they are located further away from each other than patients would typically be willing to

---



[274] ████████████████████████████████████████████████████
█████████████████████████████████

[275] ██████████████████████ *See also* ████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████

[276] *See* Cory Capps, Leyla Karakas, and Tetyana Shvydko, "Cross-Market Mergers: Theories of Harm and Limiting Principles," *CPI Antitrust Chronicle* (May 2023): 2–9 and cites therein.

---

Expert Report of Cory S. Capps, PhD

- ███████████████████████████████████████████
  ███████████████████████████████████
  ██████████

- ███████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████
  ███████████████████████████████████████
  ███████████████████████████████████
  ██████████████████████████████████
  ████████████████████████████████
  ████████████

- ██████████████████████████████████████
  ████████████████████████████████████
  ███████████████

- ████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████████████
  ████████████████████████████████
  ████████████████████████████████████████
  █████████████████████████████████
  ████████████

## VI.B.3. USAP significantly increased prices after its acquisitions in each of Tyler, Amarillo, and San Antonio

(254)    In this section, I present evidence showing that, in addition to price increases in MSAs where USAP acquired one or more in-market competing groups, USAP also increased price after making



Expert Report of Cory S. Capps, PhD

acquisitions of groups with significant shares in three MSAs with no in-market overlap. That is, in these three MSAs, USAP had no presence before the acquisition and made only one acquisition. These price increases are consistent with, and may be attributable in significant part, to the cross-market effects described in the preceding subsection.[293]

(255)    USAP made the first of these three acquisitions in June 2016, when it acquired East Texas Anesthesiology Associates in Tyler, about 90 minutes southeast of Dallas; the group provided anesthesia services at two hospitals, East Texas Medical Center and University of Texas Health Science Center at Tyler.[294] Then, in July 2018, USAP acquired Amarillo Anesthesia Associates in Amarillo, located in the Texas panhandle; the group provided anesthesia services at Baptist St. Anthony's, the largest hospital system in the area.[295] Last, in September 2019, USAP acquired Star Anesthesia in San Antonio, about 90 minutes southwest of Austin; at the time, Star was the largest anesthesia group in San Antonio.[296]

(256)    In each instance, USAP ███████████████████████████████████████
████████████████████.[297]

- Figure 46 shows the price changes for the four payers from before to after USAP's acquisition of East Texas Anesthesiology in Tyler in June 2016. The group's prices ██████████████
████████████████████████, but after the USAP acquisition, its prices ██████████████
████████████████████████. In the two quarters prior to the acquisition, the acquired group's share of hospital-only anesthesia services in the Tyler MSA averaged ██████ (and subsequently ██████████ by 2019-Q1).[298] ██████████████████
███████████████████████████████

---

[293] Other mechanisms not directly rooted in bargaining leverage could also explain part of USAP's price increases in these areas. One is tying: when a buyer and seller transact in multiple geographic or product markets, it is possible for market power in one market to be used to charge a higher price in the other; the effect may be an increase in total payments for the services in the linked markets or simply a reallocation of payments between them. A second is commonly referred to as "change-in control," a term for the potential for higher prices to result from a firm being acquired by an entity that is a more effective bargainer (i.e., an entity that, holding the BATNAs of both sides to a negotiation as fixed, is able to negotiate a more favorable outcome). The common customers, tying, and change-in-control mechanisms are not mutually exclusive.

*See generally*, Cory Capps, Leyla Karakas, and Tetyana Shvydko, "Cross-Market Mergers: Theories of Harm and Limiting Principles," *CPI Antitrust Chronicle* (May 2023): 2–9 276 and Gregory Vistnes, "Cross-Market Hospital Mergers: Assessing Likely Harm and Implications for Government Action," *Antitrust Law Journal* 86, no. 1 (2024): 251–315.

[294] USAP Answer to Compl., Dkt. No. 157, ¶¶ 157–158; ████████████████████.

[295] USAP Answer to Compl., Dkt. No. 157, ¶¶ 165–166; ████████████████████ *see also* ████████████

[296] ██████████████████████████████████████████████████████████
████████████████████

[297] For this reason, ████████████████████████████████████████████
████████████ *see, e.g.,* ████████████████████
████████████

[298] When USAP acquired groups in Tyler (in June 2016), Amarillo (in July 2018), and San Antonio (in September 2019),

---

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER

Expert Report of Cory S. Capps, PhD

- Figure 47 shows price changes from before to after USAP acquired Amarillo Anesthesia Consultants in July 2018. Before the acquisition, Amarillo's prices were ████████ ███████████████████ After the acquisition, █████████████████████ ████████████████████████████████████. In the two quarters prior to the acquisition, the acquired group's share of hospital-only anesthesia services in the Amarillo MSA averaged ████

- Figure 48 shows the price changes from before to after the September 2019 acquisition of Star Anesthesia in San Antonio. Star's pricing ████████████████████s but, after the acquisition, ██████████ or more after the transaction. In the two quarters prior to the acquisition, the acquired group's share of hospital-only anesthesia services in the San Antonio MSA averaged ████

**Figure 46. Price increases by payer—Tyler (East Texas Anesthesiology)**

| Payer | Category | Average prices | |
| --- | --- | --- | --- |
| | | Two quarters prior | Quarters 3 and 4 after |
| ███ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |
| ████ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |
| ███ | USAP-acquired group | – | – |
| | Other groups | ██ | ██ |
| ███ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |

Source: Professional claims data ██████████████████████ in-network, hospital-only anesthesia services.
Notes: The dashes for Cigna indicate that it has too few cases to measure price reliably.

Expert Report of Cory S. Capps, PhD

**Figure 47. Price increases by payer—Amarillo (Amarillo Anesthesia)**

| Payer | Category | Average prices | |
|---|---|---|---|
| | | Two quarters prior | Quarters 3 and 4 after |
| ██ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |
| ██ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |
| ██ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |
| ██ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |

Source: Professional claims data ██████████ in-network, hospital-only anesthesia services.

**Figure 48. Price increases by payer—San Antonio (Star Anesthesia)**

| Payer | Category | Average prices | |
|---|---|---|---|
| | | Two quarters prior | Quarters 3 and 4 after |
| ██ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |
| ██ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |
| ██ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |
| ██ | USAP-acquired group | ██ | ██ |
| | Other groups | ██ | ██ |

Source: Professional claims data ██████████ in-network, hospital-only anesthesia services.

HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER