**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>        Plaintiff,<br><br>    v.<br><br>U.S. ANESTHESIA PARTNERS, INC.,<br><br>        Defendant. | **Case No.: 4:23-CV-03560-KH** |

**Appendix of Authorities in Plaintiff Federal Trade Commission's
Opposition to Defendant USAP's Motion for Summary Judgment**

**Cases**

Brief for Petitioners, *Trump v. Slaughter*,
  No. 25-332, 2025 WL 2932736, ECF No. 16 ..........................................................................1

*FTC v. Elec. Payment Sols. of Am. Inc.*,
  No. CV-17-02535-PHX-SMM, 2019 WL 4287298 (D. Ariz. Aug. 28, 2019).......................25

*FTC v. Meta Platforms, Inc.*,
  No. CV 20-3590 (JEB), 2025 WL 3458822 (D.D.C. Dec. 2, 2025).......................................34

*In re AndroGel Antitrust Litig. (No. II)*,
  No. 1:09-MD-2084-TWT, 2018 WL 2984873 (N.D. Ga. June 14, 2018).............................69

*Kinetic Concepts, Inc. v. Bluesky Med. Corp.*,
  No. SA-03-CA-0832 RF, 2005 WL 3068206 (W.D. Tex. Nov. 1, 2005)..............................90

*Sidibe v. Sutter Health*,
  No. 12-CV-04854-LB, 2019 WL 2078788 (N.D. Cal. May 9, 2019)....................................95

*United States v. Jindal*,
  No. 4:20-CR-00358, 2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) ...................................138

USAP's Mot. to Dismiss, *Electrical Medical Trust v. USAP*,
  4:23-cv-04398, ECF No. 50................................................................................................155

Case 4:23-cv-03560    Document 331-82    Filed 03/30/26 in TXSD    Page 3 of 182

Donald J. TRUMP, President of the United States, et al.,..., 2025 WL 2932736...

**2025 WL 2932736 (U.S.) (Appellate Brief)**
Supreme Court of the United States.

Donald J. TRUMP, President of the United States, et al., Petitioners,

v.

Rebecca Kelly SLAUGHTER, et al.

No. 25-332.
October 10, 2025.

On Writ of Certiorari Before Judgment to the United States Court of Appeals for the District of Columbia Circuit

**Brief for the Petitioners**

Lucas Croslow, General Counsel, Alex Potapov, Deputy General Counsel, Federal Trade Commission, Washington, D.C. 20580.

D. John Sauer, Solicitor General, Counsel of Record, Brett A. Shumate, Assistant Attorney General, Sarah M. Harris, Deputy Solicitor General, Eric D. McArthur, Deputy Assistant, Attorney General, Vivek Suri, Assistant to the Solicitor General, Mark R. Freeman, Michael S. Raab, Daniel Aguilar, Laura E. Myron, Attorneys, Department of Justice, Washington, D.C. 20530-0001, SupremeCtBriefs@usdoj.gov, (202) 514-2217.

**\*I  QUESTIONS PRESENTED**

1. Whether the statutory removal protections for members of the Federal Trade Commission violate the separation of powers and, if so, whether *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), should be overruled.

2. Whether a federal court may prevent a person's removal from public office, either through relief at equity or at law.

**\*II  PARTIES TO THE PROCEEDING**

Petitioners (defendants-appellants below) are Donald J. Trump, President of the United States; Andrew N. Ferguson, Chairman, Federal Trade Commission; Melissa Holyoak, Commissioner, Federal Trade Commission; and David B. Robbins, Executive Director, Federal Trade Commission.

**RELATED PROCEEDINGS**

United States District Court (D.D.C.):

*Slaughter v. Trump*, No. 25-cv-909 (July 17, 2025)

United States Court of Appeals (D.C. Cir.):

*Donald J. TRUMP, President of the United States, et al.,..., 2025 WL 2932736...*

*Slaughter v. Trump*, No. 25-5261 (pending)

## *III  TABLE OF CONTENTS

Opinions below .................................................................................................................... 1
Jurisdiction .......................................................................................................................... 1
Statutory provision involved .............................................................................................. 2
Introduction ........................................................................................................................ 2
Statement ............................................................................................................................. 6
Summary of argument ......................................................................................................... 9
Argument:
I. The FTC's statutory removal protections violate the separation of powers ................... 12
A. Article II grants the President conclusive and preclusive power to remove executive officers ................. 13
B. The removal power extends to heads of multimember administrative agencies such as the FTC ............ 18
C. *Humphrey's Executor* does not justify the FTC's removal restrictions today ................... 21
D. This Court should overrule anything that remains of *Humphrey's Executor* ............................... 30
II. Courts may not prevent the removal of executive officers ............................................. 37
A. Judicial orders blocking the removal of executive officers violate Article II ................... 38
B. Judicial orders blocking the removal of executive officers violate traditional remedial principles ............ 41
C. Congress has foreclosed judicial orders reinstating presidentially appointed officers ............................ 44
Conclusion ........................................................................................................................... 48
Appendix - Statutory provision ........................................................................................... la

## *IV  TABLE OF AUTHORITIES

Cases:
*Abramowitz v. Lake*, No. 25-cv-887, 2025 WL 2480354 (D.D.C. Aug. 28, 2025) ...................................... 38
*Aviel v. Gor*, 780 F. Supp. 3d 1 (D.D.C. 2025) ...................... 38
*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ............................ 37
*Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023) .............. 46
*Baker v. Carr*, 369 U.S. 186 (1962) ...................................... 41
*Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ................................................................. 40
*Bessent v. Dellinger*, 145 S. Ct. 515 (2025) ......................... 39, 40
*Bloch v. Executive Office of the President*, 164 F. Supp. 3d 841 (E.D. Va. 2016) ........................................................... 47
*Bowsher v. Synar*, 478 U.S. 714 (1986) ............................... 16, 24
*Buckley v. Valeo*, 424 U.S. 1 (1976) .................................... 19, 26
*Cheney v. U.S. District Court*, 542 U.S. 367 (2004) ............. 43
*City of Arlington v. FCC*, 569 U.S. 290 (2013) ..................... 24, 34
*Citizens United v. FEC*, 558 U.S. 310 (2010) ....................... 32
*Collins v. Yellen*, 594 U.S. 220 (2021) ................................. 4, 16, 33, 36, 44
*Consumers' Research v. CPSC*, 91 F.4th 342 (5th Cir.), cert. denied, 145 S. Ct. 414 (2024) ............................................. 35
*Dellinger v. Bessent*: 768 F. Supp. 3d 33 (D.D.C. 2025) ....... 38
No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) .... 38, 41
*Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022) ........................................................................... 11, 30, 33, 34
*Elgin v. Department of Treasury*, 567 U.S. 1 (2012) ............. 45, 46
*Edwards v. Vannoy*, 593 U.S. 255 (2021) ............................. 35
*FCC v. Consumers' Research*, 145 S. Ct. 2482 (2025) .......... 4, 20, 33
*FTC v. Ruberoid Co.*, 343 U.S. 470 (1952) .......................... 34
*V Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) ..... 45, 46

*Franchise Tax Board v. Hyatt*, 587 U.S. 230 (2019) ............. 31
*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ................... 44
*Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010) ........ 5, 13-20, 22, 23, 26
*Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293 42, 43
(1943) ................ 
*Grupo Mexicano de Desarrollo S.A. v. Alliance*
*Bond Fund, Inc.*, 527 U.S. 308 (1999) ...................... 41
*Harkrader v. Wadley*, 172 U.S. 148 (1898) ...................... 41
*Harper v. Bessent*, No. 25-cv-1294, 2025 WL 2049207 38
(D.D.C. July 22, 2025) ........................ 
*Harris v. Bessent:* 775 F. Supp. 3d 164 (D.D.C. 2025) ......... 35
No. 25-5037, 2025 WL 980278 (D.C. Cir. Mar. 25, 2025) .... 36
No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025) .... 30, 35, 43
*Hecht Co. v. Bowles*, 321 U.S. 321 (1944) ........................... 44
*Hennen, Ex parte*, 13 Pet. 230 (1839) ............................ 16, 43
*Howes v. Fields*, 565 U.S. 499 (2012) ............................ 37
*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) 3, 8, 10, 11, 13, 21-25, 27, 28, 30, 31, 34, 36, 40
*INS v. Chadha*, 462 U.S. 919 (1983) ............................ 29, 37
*Kennedy v. Braidwood Management, Inc.*, 145 S. Ct. 2427 14, 31, 44
(2025) ........................ 
*Kennedy v. Bremerton School District*, 597 U.S. 507 (2022) 30
*Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446 (2015) 31
**\*VI** *Lemon v. Kurtzman*, 403 U.S. 602 (1971) ................... 30
*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) 36
*Macauley v. Waterman S.S. Corp.*, 327 U.S. 540 (1946) ....... 43
*Marbury v. Madison*, 1 Cranch 137 (1803) ......................... 43
*Mississippi v. Johnson*, 4 Wall. 475 (1867) ........................ 43
*Mistretta v. United States*, 488 U.S. 361 (1989) ................... 33
*Montejo v. Louisiana*, 556 U.S. 778 (2009) ........................ 32
*Morrison v. Olson*, 487 U.S. 654 (1988) ............................ 5, 24, 31, 32, 34, 37
*Munaf v. Geren*, 553 U.S. 674 (2008) ................................. 37
*Myers v. United States*, 272 U.S. 52 (1926) ........................ 4, 9, 10, 16-19, 29, 37, 40
*Nixon v. Fitzgerald*, 457 U.S. 731 (1982) ........................... 44
*Palmore v. United States*, 411 U.S. 389 (1973) .................... 23
*Parsons v. United States*, 167 U.S. 324 (1897) .................... 16, 18, 40
*Perlmutter v. Blanche*, No. 25-5285, 2025 WL 2627965 38
(D.C. Cir. Sept. 10, 2025) ........................ 
*PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) ............. 26, 29, 30, 33
*Powell v. McCormack*, 395 U.S. 486 (1969) ....................... 29
*Raines v. Byrd*, 521 U.S. 811 (1997) ................................. 42
*Ramos v. Louisiana*, 590 U.S. 83 (2020) ........................... 30
*Ryan, LLC v. FTC*, 746 F. Supp. 3d 369 (N.D. Tex. 2024) .... 27
*Samuels v. Mackell*, 401 U.S. 66 (1971) ............................ 12, 42, 43
*Sawyer, In re*, 124 U.S. 200 (1888) ................................. 41, 42
*Seila Law LLC v. CFPB*, 591 U.S. 197 (2020) ..................... 2-4, 9, 10, 14-20, 22-27, 29, 32-34, 36
*Shurtleff v. United States*, 189 U.S. 311 (1903) ................... 40, 44
**\*VII** *Space Exploration Technologies Corp. v. NLRB*, No. 35
24-50627, 2025 WL 2396748 (5th Cir. Aug. 19, 2025) ........ 
*Synar v. United States*, 626 F. Supp. 1374 (D.D.C. 1986) ..... 26
*Taylor v. Beckham (No. 1)*, 178 U.S. 548 (1900) .................. 47
*Trump v. Boyle*, 145 S. Ct. 2653 (2025) ............................ 38
*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ......................... 41
*Trump v. United States*, 603 U.S. 593 (2024) ..................... 2, 4, 9, 16, 18, 25, 27, 31
*Trump v. Wilcox*, 145 S. Ct. 1415 (2025) ........................... 3, 8, 29, 35, 42
*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ................. 14, 18, 24
*United States v. Duell*, 172 U.S. 576 (1899) ....................... 44
*United States v. Fausto*, 484 U.S. 439 (1988) ..................... 45-47
*United States v. Perkins*, 116 U.S. 483 (1866) .................... 40

**WESTLAW**   © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 4:23-cv-03560    Document 331-82    Filed 03/30/26 in TXSD    Page 6 of 182

Donald J. TRUMP, President of the United States, et al.,..., 2025 WL 2932736...

*United States Institute of Peace v. Jackson*, 783 F. Supp. 3d 316 (D.D.C. 2025) .................................................... 38

*Walton v. House of Representatives*, 265 U.S. 487 (1924) ..... 42

*White v. Berry*, 171 U.S. 366 (1898) ..................................... 12, 41-43

*Wiener v. United States*, 357 U.S. 349 (1958) ....................... 30, 40

*Wilcox v. Trump*, 775 F. Supp. 3d 215 (D.D.C. 2025) ........... 35

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) .................................................................................. 16

Constitution and statutes: U.S. Const.:

Art. I ...................................................................................... 16

§ 1 (Legislative Vesting Clause) ........................................... 24

Art. II .................................................................................... 5, 10-12, 16, 18, 24, 28, 29, 38

§ 1, Cl. 1 (Executive Vesting Clause) ................................... 2, 4, 9, 13, 24

§ 2, Cl. 1 (Opinions Clause) ................................................. 13

**\*VIII**  § 2, Cl. 2 (Appointments Clause) ........................... 14

Art. III ................................................................................... 24

§ 1 (Judicial Vesting Clause) ................................................ 24

Back Pay Act of 1966, 5 U.S.C. 5596 .................................. 45

Children's Online Privacy Protection Act of 1998, 15 U.S.C. 6502(b)(1) ........................................................................... 26

Civil Service Reform Act of 1978, 5 U.S.C. 1101 *et seq* ...... 12, 45

5 U.S.C. 7511 ....................................................................... 45

5 U.S.C. 7511(b)(1) .............................................................. 46

5 U.S.C. 7511(b)(2) .............................................................. 46

5 U.S.C. 7511(b)(3) .............................................................. 46

Clayton Act, 15 U.S.C. 12 *et seq* ......................................... 6

Declaratory Judgment Act, 28 U.S.C. 2201 ......................... 42

28 U.S.C. 2202 ..................................................................... 43

28 U.S.C. 2401(a) ................................................................. 36

Dolphin Protection Consumer Information Act, 16 U.S.C. 1385 ...................................................................................... 19

Elder Abuse Prevention and Prosecution Act, 34 U.S.C. 21711 .................................................................................... 6

Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq* ................ 6

Fair Debt Collection Practices Act, 15 U.S.C. 1692 *et seq.* ... 6

Federal Trade Commission Act, ch. 311, 38 Stat. 717 (15 U.S.C. 41 *et seq.*) ................................................................ 6

§ 5, 38 Stat. 719 ................................................................... 6

§ 6(a), 38 Stat. 721 ............................................................... 25

§ 6(f), 38 Stat. 721 ............................................................... 7

§ 6(g), 38 Stat. 722 ............................................................... 7, 26

§ 7, 38 Stat. 722 ................................................................... 7

§ 9, 38 Stat. 722 ................................................................... 7

**\*IX**  15 U.S.C. 41 ............................................................... 3, 6, 8, la

15 U.S.C. 45(a)(1) ................................................................ 6

15 U.S.C. 45c ....................................................................... 20

15 U.S.C. 45(g) ..................................................................... 7, 27

15 U.S.C. 45(*l*) ..................................................................... 7, 27

15 U.S.C. 45(m) .................................................................... 25

15 U.S.C. 45(m)(1)(A) .......................................................... 7

15 U.S.C. 46(j) ...................................................................... 7

15 U.S.C. 46(j)(1) ................................................................. 28

15 U.S.C. 46(j)(4) ................................................................. 28

15 U.S.C. 53(b) ..................................................................... 7, 25

15 U.S.C. 57 .......................................................................... 36

15 U.S.C. 57a ........................................................................ 7

15 U.S.C. 57a(a)(1)(B) .......................................................... 26

15 U.S.C. 57b ........................................................................ 7

Donald J. TRUMP, President of the United States, et al.,..., 2025 WL 2932736...

| | |
|---|---|
| 15 U.S.C. 57b(b) | 25 |
| Fur Products Labeling Act, 15 U.S.C. 69f(b) | 26 |
| Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. 18a | 7, 26, 27 |
| Horseracing Integrity and Safety Act of 2020, 15 U.S.C. 3051 *et seq* | 6 |
| 15 U.S.C. 3053 | 20, 26 |
| 15 U.S.C. 3057(d) | 27 |
| 15 U.S.C. 3058(b) | 27 |
| Independent Counsel Reauthorization Act of 1987, Pub. L. No. 100-191, § 596, 101 Stat. 1305 | 45 |
| Judiciary Act of 1789, ch. 20, 1 Stat. 73 | 41 |
| Lanham Act, 15 U.S.C. 1051 *et seq* | 6 |
| **\*X** Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 1112, 117 Stat. 2461 | 27 |
| Military Lending Act, 10 U.S.C. 987 | 6 |
| Muhammad Ali Boxing Reform Act, 15 U.S.C. 6301 *et seq.* | 6 |
| Sherman Act, 15 U.S.C. 1 *et seq* | 6 |
| 7 U.S.C. 227(b) | 19 |
| 15 U.S.C. 1607(c) | ,19 |
| 15 U.S.C. 2051 note | 36 |
| 15 U.S.C. 7607 | 19 |
| 16 U.S.C. 1862(j)(6) | 20 |
| 28 U.S.C. 2401(a) | 36 |
| 29 U.S.C. 166 | 36 |
| D.C. Code (2025): | |
| § 11-1501 | 23 |
| § 11-1502 | 23 |
| Miscellaneous: | |
| 1 Annals of Cong. (1789) (Joseph Gales ed., 1834): | |
| p. 395 (James Madison) | 39 |
| p. 464 (James Madison) | 17 |
| p. 469 (Elias Boudinot) | 39 |
| p. 499 (James Madison) | 15 |
| p. 507 (Egbert Benson) | 39 |
| pp. 522-523 (Theodore Sedgwick) | 31 |
| p. 581 (James Madison) | 17 |
| pp. 611-612 (James Madison) | 24 |
| Aditya Bamzai, *Taft, Frankfurter, and the First Presidential For-Cause Removal*, 52 U. Rich. L. Rev. 691 (2018) | 40 |
| **\*XI** 2 James L. High, *Treatise on the Law of Injunctions* (2d ed. 1880) | 42 |
| 3 Joseph Story, *Commentaries on the Constitution of the United States* (1833) | 18 |
| FTC, *Legal Library: Statutes*, https://ftc.gov/legal-library/browse/statutes | 6, 26 |
| *The Federalist* (Jacob E. Cooke ed. 1961): | |
| No. 70 (Alexander Hamilton) | 33 |
| No. 72 (Alexander Hamilton) | 14, 28 |
| Eugene C. Gerhart, *America's Advocate* (1958) | 34 |
| Letter from James Madison to Thomas Jefferson (June 30, 1789), *in* 16 *Documentary History of the First Federal Congress of the United States of America* (Charlene Bangs Bickford et al. eds., 1992) | 15 |
| Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law*, 116 Harv. L. Rev. 467 (2002) | 7 |
| Geoffrey P. Miller, *Independent Agencies*, 1986 Sup. Ct. Rev. 41 | 32 |

Case 4:23-cv-03560    Document 331-82    Filed 03/30/26 in TXSD    Page 8 of 182

Donald J. TRUMP, President of the United States, et al.,..., 2025 WL 2932736...

Cass R. Sunstein & Lawrence Lessig, *The President and the Administration*, 94 Colum. L. Rev. 1 (1994) ........................ 32

30 *Writings of George Washington* (John C. Fitzpatrick ed. 1939) ..................................................................... 14

## *1  OPINIONS BELOW

The court of appeals' order denying a stay (J.A. 102-137) is available at 2025 WL 2551247. The district court's order denying a stay (J.A. 92-99) and memorandum opinion (J.A. 41-89) are available at 2025 WL 2145665 and 2025 WL 1984396.

## JURISDICTION

The district court entered final judgment on July 17, 2025. Petitioners filed a notice of appeal the same day. The court of appeals' jurisdiction rests on 28 U.S.C. 1291. Petitioners applied to this Court for a stay on September 4, 2025. On September 22, 2025, the Court treated the application as a petition for a writ of certiorari before judgment and granted the petition. The Court's jurisdiction rests on 28 U.S.C. 1254(1) and 2101(e).

## *2  STATUTORY PROVISION INVOLVED

The pertinent statutory provision is reproduced in the appendix. App., *infra*, la.

## INTRODUCTION

This case raises constitutional questions of surpassing importance. Can the President, in whom the Constitution vests all executive power, remove agency heads who exercise the executive power on his behalf? Or may Congress insulate those agency heads from presidential control by barring the President from removing them at will - and may courts grant relief to prevent their removal, so that they continue to wield executive power against the President's will?

The answer to these questions is clear. "Under our Constitution, the 'executive Power' - all of it - is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 203 (2020) (quoting U.S. Const. Art. II, § 1, Cl. 1). Removal is the President's indispensable tool of control. "Without such power, the President could not be held fully accountable for discharging his own responsibilities." *Ibid.* (citation omitted). Thus, the President's "exclusive power of removal in executive agencies" ranks among his "conclusive and preclusive" powers. *Trump v. United States*, 603 U.S. 593, 609 (2024). And when the President removes executive officers, courts cannot reinstate them and authorize them to wield executive power against the President's will.

Here, these questions arise because President Trump removed respondent Rebecca Slaughter as a Commissioner of the Federal Trade Commission (FTC), only for lower courts to reinstate her after determining that Congress permissibly restricted the President to removing Commissioners for "inefficiency, neglect of *3 duty, or malfeasance in office." 15 U.S.C. 41. The same cycle of presidential removal and judicial reinstatement had already unfolded for members of the National Labor Relations Board, Merit Systems Protection Board, and Consumer Product Safety Commission, prompting this Court to grant interim relief so that removed agency heads would remain removed. See 25A264, slip op. 1 (Sept. 22, 2025); *Trump v. Boyle*, 145 S. Ct. 2653 (2025); *Trump v. Wilcox*, 145 S. Ct. 1415 (2025).

In truth, these questions have been percolating since the Court upheld the FTC's removal protections in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935). *Humphrey's Executor* acknowledged that, by vesting the executive power in the President alone, Article II grants him "illimitable" authority to remove officers who exert any "part of the executive power." *Id.* at 628. Yet it found that rule inapplicable to the 1935 FTC because it viewed the FTC as a "quasi-legislative," "quasi-judicial" body that

was "wholly disconnected from the executive department" and whose heads needed tenure protection to "maintain an attitude of independence against the [President's] will." *Id.* at 629-630.

"The Court's conclusion that the FTC did not exercise executive power has not withstood the test of time." *Seila Law*, 591 U.S. at 216 n.2. Since *Humphrey's Executor*, the Court has held many times that, "even though the activities of administrative agencies take legislative and judicial forms, they are exercises of - indeed, under our constitutional structure they *must* be exercises of - the 'executive Power.'" *Ibid.* (quotation marks omitted). And the FTC has accumulated executive powers that *Humphrey's Executor* never considered.

Meanwhile, Congress took *Humphrey's Executor* and ran with it, creating more independent agencies **\*4** that exercise executive power even as removal protections keep them outside the President's control. Such agencies regulate innumerable aspects of modern life, including lending terms, union recognition, nuclear waste, furniture anchoring, telemarketing calls, and employment disputes - among many others. They issue binding rules, adjudicate claims that businesses and individuals have violated the law, investigate wrongdoing, and bring civil suits seeking substantial fines.

Today, everyone agrees those powers are executive. Yet statutory removal restrictions stop the President from superintending agency heads who wield those powers. No matter how sharply they disagree with the President's agenda - no matter how vigorously the President disagrees with their exercise of his executive power - the President remains saddled with subordinate officers who prevent him from "tak[ing] Care that the Laws [are] faithfully executed." *Seila Law*, 591 U.S. at 203 (quoting U.S. Const. Art. II, § 1, Cl. 1).

That transfer of executive power to a "headless Fourth Branch" unravels the constitutional design. *FCC v. Consumers' Research*, 145 S. Ct. 2482, 2517 (2025) (Kavanaugh, J., concurring). Article II concentrates "the executive Power" in one person - an elected President. U.S. Const. Art. II, § 1, Cl. 1. By vesting the President with all "executive Power," Article II authorizes him to oversee those who execute federal law - including by removing them. The First Congress recognized the President's plenary removal power in 1789. This Court confirmed that "unrestricted" power in *Myers v. United States*, 272 U.S. 52, 176 (1926). And the Court has reaffirmed that power time and again. *Trump*, 603 U.S. 593; *Collins v. Yellen*, 594 U.S. 220 (2021); **\*5** *Seila Law*, 591 U.S. 197; *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010).

The modern-day FTC, like its many independent-agency counterparts and its 1935 predecessor, exercises executive power - indeed, quite a bit of it. That brings those agencies within the President's removal power even under the reasoning of *Humphrey's Executor* itself, which "at least had the decency formally to observe the constitutional principle that the President had to be the repository of *all* executive power." *Morrison v. Olson*, 487 U.S. 654, 726 (1988) (Scalia, J., dissenting). If *Humphrey's Executor* is not already a dead letter, this Court should overrule it and end independent agencies' "serious, ongoing threat to our Government's design." *Seila Law*, 591 U.S. at 251 (Thomas, J., concurring in part and dissenting in part).

Finally, this Court should hold that courts cannot reinstate executive officers removed by the President. Flawed as *Humphrey's Executor* was, it involved only back pay; it did not compel the President to entrust executive power to someone he had already removed. Article II, history, traditional remedial principles, and applicable modern-day statutes all establish that courts may not issue any remedy, legal or equitable, to prevent an executive officer's removal - especially where, as here, the officer was appointed by the President.

Under our Constitution, the "buck stops with the President" in no small part because he can "remove those who assist him in carrying out his duties." *Free Enterprise Fund*, 561 U.S. at 493. Congress and the courts cannot divert accountability "somewhere else" by empowering unelected agency heads to wield executive power walled off from presidential control and electoral accountability. *Id.* at 514.

**\*6  STATEMENT**

1. In 1914, Congress passed and President Wilson signed the Federal Trade Commission Act, ch. 311, 38 Stat. 717 (15 U.S.C. 41 et seq.). The Act establishes the Federal Trade Commission, an agency composed of five members appointed by the President with the Senate's advice and consent. See 15 U.S.C. 41. Members serve staggered seven-year terms, and no more than three members may belong to the same political party. See *ibid.* The Act provides that a Commissioner "may be removed by the President for inefficiency, neglect of duty, or malfeasance in office." *Ibid.*

In 1914, the FTC Act empowered the FTC to prevent unfair methods of competition. See 15 U.S.C. 45(a)(1). In 1938, Congress also empowered the FTC to prevent unfair or deceptive acts or practices against consumers. See *ibid.* Congress has granted the FTC further powers since. Today, the FTC enforces or administers more than 80 statutes, including the FTC Act; Sherman Act, 15 U.S.C. 1 et seq.; Clayton Act, 15 U.S.C. 12 et seq.; Elder Abuse Prevention and Prosecution Act, 34 U.S.C. 21711; Fair Credit Reporting Act, 15 U.S.C. 1681 et seq.; Fair Debt Collection Practices Act, 15 U.S.C. 1692 et seq.; Horseracing Integrity and Safety Act of 2020, 15 U.S.C. 3051 et seq.; Lanham Act, 15 U.S.C. 1051 et seq.; Military Lending Act, 10 U.S.C. 987; and Muhammad Ali Boxing Reform Act, 15 U.S.C. 6301 et seq. See FTC, *Legal Library: Statutes (FTC Statutes)*, https:// ftc.gov/ legal-library/browse/statutes.

Originally, the FTC's core power was issuing cease-and-desist orders that courts could then enforce. See FTC Act § 5, 38 Stat. 719. The FTC could also conduct investigations, submit reports to Congress, and make recommendations to courts as a master in chancery. **\*7** See §§ 6(f), 7, 9, 38 Stat. 721-722. The agency possessed some rulemaking power in 1935, see § 6(g), 38 Stat. 722, but its scope remains contested, see Thomas W. Merrill & Kathryn Tongue Watts, *Agency Rules with the Force of Law*, 116 Harv. L. Rev. 467, 549-552 (2002).

Since 1935, the FTC's powers have swelled. Today, the FTC may file civil suits seeking monetary penalties, injunctions, and other relief. See 15 U.S.C. 45(m)(1)(A), 53(b), 57b. The FTC may make substantive rules, including rules defining unfair or deceptive acts and practices. See 15 U.S.C. 57a. Its orders may take effect without judicial enforcement, see 15 U.S.C. 45(g) and (*l*), and its investigative powers have expanded, see, *e.g.*, 15 U.S.C. 18a. The FTC may even negotiate agreements with foreign law-enforcement agencies and assist their investigations. See 15 U.S.C. 46(j).

2. In 2018, President Trump, with the Senate's advice and consent, appointed respondent Rebecca Slaughter to the FTC, for a term ending in 2025. J.A. 11. In 2024, President Biden, with the Senate's advice and consent, reappointed respondent, this time for a term ending in 2029. *Ibid.*

In March 2025, respondent received a letter from President Trump stating: "I am writing to inform you that you have been removed from the Federal Trade Commission, effective immediately. \*\*\* Your continued service on the FTC is inconsistent with my Administration's priorities. Accordingly, I am removing you from office pursuant to my authority under Article II of the Constitution." J.A. 26-28.

3. Respondent sued the President, the FTC's Chairman, another Commissioner, and the FTC's Executive Director in the U.S. District Court for the District of Columbia. J.A. 4. She claimed her removal violated the **\*8** FTC Act because the President did not assert "inefficiency, neglect of duty, or malfeasance in office," 15 U.S.C. 41. J.A. 19. Alvaro Bedoya, another Commissioner removed without a qualifying cause, joined the suit. J.A. 4. But he later submitted a resignation letter that eliminated any remaining claim to office, and the court dismissed his claim as moot. J.A. 48-51.

The district court granted summary judgment to respondent, holding that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), established the constitutionality of the FTC's removal protections. J.A. 41-89. The court issued a declaration that respondent's removal was "unlawful" and "without legal effect" and that respondent "remains a rightful member" of the FTC. J.A. 90. The court also enjoined the defendants other than the President from "interfering with" respondent's "right to perform her lawful duties as an FTC Commissioner." J.A. 91. The court rejected the argument that courts may not issue such relief restoring removed executive officers. J.A. 77-80.

Case 4:23-cv-03560   Document 331-82   Filed 03/30/26 in TXSD   Page 11 of 182

Donald J. TRUMP, President of the United States, et al.,..., 2025 WL 2932736...

4. The government appealed to the D.C. Circuit. J.A. 93. The district court denied a stay pending appeal. J.A. 92-99. After granting an administrative stay, J.A. 100-101, the court of appeals ultimately denied a stay pending appeal, J.A. 102-137. It concluded that *"Humphrey's Executor* controls," that the government is unlikely to succeed on the merits, and that the equities favor respondent. J.A. 106; see J.A. 105-121. Judge Rao dissented; she would have granted a stay based on this Court's orders staying the reinstatement of other removed independent-agency heads in *Trump v. Wilcox*, 145 S. Ct. 1415 (2025), and *Trump v. Boyle*, 145 S. Ct. 2653 (2025). J.A. 122-137.

**\*9** This Court granted the government's application for a stay, treated the application as a petition for a writ of certiorari before judgment, and granted the petition. See No. 25A264, slip op. 1 (Sept. 22, 2025). Justice Kagan, joined by two other Justices, dissented from the stay. See *id.* at 1-3.

### SUMMARY OF ARGUMENT

I. The FTC's statutory removal protections, which preclude the President from removing Commissioners at will, violate the separation of powers.

Article II vests all "[t]he executive Power" in the President and requires him to "take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 1, Cl. 1; § 3. Article II thereby grants the President "general administrative control of those executing the laws." *Myers v. United States*, 272 U.S. 52, 164 (1926). That power to control executive officers includes the ability to remove them at will, "for it is 'only the authority that can remove' such officials that they 'must fear and, in the performance of their functions, obey.'" *Seila Law LLC v. CFPB*, 591 U.S. 197, 213-214 (2020) (brackets omitted). The First Congress recognized the President's plenary removal power in 1789, and this Court has repeatedly reaffirmed it in *Myers* and many other landmark cases. Just two Terms ago, the Court reiterated that the President's "conclusive and preclusive" "power to remove 'executive officers of the United States whom he has appointed' may not be regulated by Congress or reviewed by the courts." *Trump v. United States*, 603 U.S. 593, 620-621 (2024).

That conclusive and preclusive removal power includes the authority to remove at will the presidentially appointed heads of multimember administrative agencies, such as the FTC. Such agencies exercise executive **\*10** power by filing civil enforcement suits, promulgating binding rules, issuing final orders in agency adjudications, and investigating potential violations. Article II requires that the President control all executive power - especially the authority wielded by agency heads, who are "the most important" of the President's subordinates and who "must be the President's *alter ego*[*s*]" in their agencies. *Myers*, 272 U.S. at 133.

*Humphrey's Executor* v. *United States*, 295 U.S. 602 (1935), does not dictate a contrary conclusion. That case recognized the President's "illimitable" authority to remove "executive officers," yet upheld a statutory provision permitting the President to remove FTC Commissioners only for "inefficiency, neglect, or malfeasance in office." *Id.* at 620, 631. The decision rested on the conclusion that the FTC exercised "no part of the executive power" because it purportedly had only "quasi-legislative or quasi-judicial powers," "as distinguished from executive power." *Id.* at 628.

This Court has since repudiated the notion that the powers exercised by the 1935 FTC were anything but executive. See, *e.g., Seila Law*, 591 U.S. at 216 n.2. The Court has also cabined *Humphrey's Executor* to "the set of powers the Court considered as the basis for its decision." *Id.* at 219 n.4. And the executive power that the FTC and other agencies now exercise vastly exceeds the authority that *Humphrey's Executor* attributed to the 1935 FTC. Like other modern administrative agencies, today's FTC can bring civil enforcement suits against private parties, promulgate binding rules, issue final orders in administrative adjudications, and investigate potential violations of the law - all executive powers, and all powers that *Humphrey's Executor* never discussed. Even under the logic of *Humphrey's* **\*11** *Executor*, the President must be able to remove the heads of those agencies at will because Article II grants the President "illimitable" authority over officers wielding executive power. 295 U.S. at 631.

This Court should overrule anything that remains of *Humphrey's Executor.* That decision was "egregiously wrong from the start," both legally and factually. *Dobbs v. Jackson Womean's Health Organization,* 597 U.S. 215, 231 (2022). It conflicts with Article II's text, history, and the Court's earlier and later decisions on the removal power. The notion that some agencies that exercise executive power can be sequestered from presidential control seriously offends the Constitution's structure and the liberties that the separation of powers protects. Moreover, because *Humphrey's Executor* was poorly reasoned, this Court has repeatedly whittled its foundations away - to the point where, in the last few months, nearly every lower court that has decided a removal-power case has offered a different understanding of the decision's scope today. If anything of *Humphrey's Executor* is left, overruling it now would comport with principles of *stare decisis.*

II. This Court should additionally hold that courts may not prevent the removal or order the reinstatement of an executive officer.

Even if Congress could in some circumstances restrict the President's removal power, Article II prohibits a court from issuing relief, whether legal or equitable, countermanding the removal of an executive officer. Such an order imposes a distinct constitutional harm, over and above the *ex ante* removal restriction, by forcing the President to entrust executive power to someone he has already determined is unfit to exert it. Consistent with that constitutional concern, executive offic- **\*12** ers have historically contested their removals by seeking back pay, not by demanding reinstatement.

Traditional remedial principles, too, preclude courts from blocking removals of executive officers. Under longstanding equitable principles, "a court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee." *White v. Berry,* 171 U.S. 366, 377 (1898). Because courts must "grant or withhold declaratory relief on the basis of traditional equitable principles," *Samuels v. Mackell,* 401 U.S. 66, 70 (1971), courts likewise may not issue declaratory judgments blocking removals. And because courts must respect separation-of-powers principles when issuing writs of mandamus, courts also may not use mandamus to reinstate a removed executive officer.

At a minimum, Congress must speak clearly to authorize judicial reinstatement of removed FTC Commissioners. But Congress instead clearly foreclosed reinstatement (and even backpay) for such officers in the Civil Service Reform Act of 1978, 5 U.S.C. 1101 *et seq.* That statute establishes the exclusive avenue through which federal employees (including officers) may challenge personnel actions such as firings - and, if they prevail, obtain reinstatement and back pay. The statute specifically withholds those remedies from presidential appointees, such as the FTC Commissioner here - so respondent's remedial claim necessarily fails.

## ARGUMENT

### I. THE FTC'S STATUTORY REMOVAL PROTECTIONS VIOLATE THE SEPARATION OF POWERS

Article II vests the President with all executive power and the responsibility to supervise all executive officers who wield it - including through removal, his most important tool of control. The President's plenary **\*13** removal power includes unrestricted authority to remove heads of the FTC and other multimember administrative agencies. *Humphrey's Executor v. United States,* 295 U.S. 602 (1935), upheld FTC Commissioners' removal protections under the belief that the FTC's "duties are neither political nor executive." *Id.* at 624. That conception of the FTC was wrong then and is even more wrong today. The FTC has always exercised executive power, and it certainly exercises immense executive power now, not least because dozens of later statutes have expanded its bailiwick. If anything remains of *Humphrey's Executor,* the Court should overrule it. "The President cannot 'take Care that the Laws be faithfully executed' if he cannot oversee the faithfulness of the officers who execute them." *Free Enterprise Fund v. PCAOB,* 561 U.S. 477, 484 (2010).

### A. Article II Grants The President Conclusive and Preclusive Power To Remove Executive Officers

In general, Article II empowers the President to remove "those who wield executive power on his behalf." *Seila Law LLC v. CFPB,* 591 U.S. 197, 204 (2020). That power "follows from the text of Article II," "was settled by the First Congress," and has been "confirmed" in a long line of cases. *Ibid.*

WESTLAW     © 2026 Thomson Reuters. No claim to original U.S. Government Works.     10

1. Article II provides that "[t]he executive Power shall be vested in a President," who "shall take Care that the Laws be faithfully executed." U.S. Const. Art. II, § 1, Cl. 1; § 3. "The entire 'executive Power' belongs to the President alone." *Seila Law*, 591 U.S. at 213.

"Because no single person could fulfill that responsibility alone, the Framers expected that the President would rely on subordinate officers for assistance." *Seila Law*, 591 U.S. at 203-204. Article II contemplates that "executive Departments," U.S. Const. Art. II, § 2, Cl. 1, **\*14** will "assist the supreme Magistrate," *Free Enterprise Fund*, 561 U.S. at 483 (quoting 30 *Writings of George Washington* 334 (John C. Fitzpatrick ed. 1939)). Those departments are controlled by "Officers of the United States," Art. II, § 2, Cl. 2 - principal officers supervised by the President, plus inferior officers supervised by principal officers. See *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021). Such officers "ought to be considered as the assistants or deputies of the chief magistrate." *The Federalist* No. 72, at 487 (Jacob E. Cooke ed. 1961) (Alexander Hamilton).

"These lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 591 U.S. at 213. "If any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Ibid.* (quoting 1 Annals of Cong. 463 (1789) (James Madison)). "The people do not vote for the 'Officers of the United States,'" but "instead look to the President" - the sole, elected Executive - "to guide the 'assistants or deputies subject to his superintendence.'" *Free Enterprise Fund*, 561 U.S. at 498 (quoting *The Federalist* No. 72, at 487) (ellipsis omitted)).

As a "general rule," the President's power to control the Executive Branch thus includes "'the authority to remove those who assist him.'" *Seila Law*, 591 U.S. at 215. Removal is the essential "tool [of] control," for "[o]nce an officer is appointed, it is only the authority that can remove him" whom "he must fear and, in the performance of his functions, obey." *Kennedy v. Braidwood Management, Inc.*, 145 S. Ct. 2427, 2443 (2025). Without the removal power, "the President could not be held fully accountable for discharging his own responsi- **\*15** bilities; the buck would stop somewhere else." *Free Enterprise Fund*, 561 U.S. at 514.

2. "The President's removal power has long been confirmed by history and precedent." *Seila Law*, 591 U.S. at 214. From the start, the Framers recognized that, so long as the President possesses the "power to oversee executive officers through removal," "'those who are employed in the execution of the law will be in their proper situation, and the chain of dependence be preserved; the lowest officers, the middle grade, and the highest, will depend, as they ought, on the President, and the President on the community.'" *Free Enterprise Fund*, 561 U.S. at 492, 498 (quoting 1 Annals of Cong. 499 (1789) (James Madison)).

The First Congress discussed the removal power "extensively" when creating the first executive departments (Foreign Affairs, Treasury, and War) in 1789. *Free Enterprise Fund*, 561 U.S. at 492. "The view that 'prevailed, as most consonant to the text of the Constitution' and 'to the requisite responsibility and harmony in the Executive Department,' was that the executive power included a power to oversee executive officers through removal.'" *Ibid.* (quoting Letter from James Madison to Thomas Jefferson (June 30, 1789), *in* 16 *Documentary History of the First Federal Congress of the United States of America* 893 (Charlene Bangs Bickford et al. eds., 1992)). As Madison put it, the Constitution grants the President a removal power that Congress "has no right to diminish or modify." *Id.* at 500 (quoting 1 Annals of Cong. 463).

The Decision of 1789 supplies "contemporaneous and weighty evidence of the Constitution's meaning," and it soon became the "settled and well understood construction of the Constitution." **\*16** *Free Enterprise Fund*, 561 U.S. at 492 (quoting *Bowsher v. Synar*, 478 U.S. 714, 723-724 (1986), and *Ex parte Hennen*, 13 Pet. 230, 259 (1839)). Congress "followed and enforced" that decision "in a number of acts" spanning decades. *Myers v. United States*, 272 U.S. 52, 145 (1926); see *Seila Law*, 591 U.S. at 242 (Thomas, J., concurring in part and dissenting in part). The "universal practice of the Government" conformed to it, and statesmen and jurists accepted its "correctness." *Parsons v. United States*, 167 U.S. 324, 330 (1897).

Consistent with Article II's original meaning, this Court has repeatedly invalidated statutes infringing the President's removal power. *Myers* held unconstitutional a statute requiring the President to obtain the Senate's consent to remove a postmaster, a Senate-confirmed inferior officer. See 272 U.S. at 176. *Free Enterprise Fund* held that the President may not "be restricted

in his ability to remove a principal officer, who is in turn restricted in his ability to remove an inferior officer." 561 U.S. at 484. *Seila Law* invalidated a statute making the Director of the Consumer Financial Protection Bureau removable only for inefficiency, neglect of duty, or malfeasance in office. See 591 U.S. at 220. *Collins v. Yellen*, 594 U.S. 220 (2021), invalidated a statute making the Director of the Federal Housing Finance Agency removable only for cause. See *id.* at 250. And *Trump v. United States*, 603 U.S. 593 (2024), reaffirmed that the removal power is "conclusive and preclusive," "disabling the Congress from acting upon the subject." *Id.* at 608 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-638 (1952) (R. Jackson, J., concurring)).

3. Dissenting Justices have opined that Congress's Article I power to "organize the Executive Branch" en- **\*17** ables it to restrict removals of executive officers. *Seila Law*, 591 U.S. at 266 (opinion of Kagan, J.). But this Court has soundly rejected that theory. See *id.* at 231 (majority opinion); *Free Enterprise Fund*, 561 U.S. at 500; *Myers*, 272 U.S. at 127. "The powers relative to offices are partly Legislative and partly Executive. The Legislature creates the office, defines the powers, limits its duration and annexes a compensation. This done, the Legislative power ceases." *Myers*, 272 U.S. at 128 (quoting 1 Annals of Cong. 581 (James Madison)). Because "the power of removal is of an Executive nature," "it is beyond the reach of the Legislative body." *Seila Law*, 591 U.S. at 227 n.10 (quoting 1 Annals of Cong. 464 (James Madison)). Congress's authority "to structure the Executive Branch," *id.* at 261 (opinion of Kagan, J.), enables it to establish and organize executive departments underneath the President - not to establish a Fourth Branch that siphons executive power away from the Chief Executive's control.

A contrary reading "provides a blueprint for the extensive expansion of the legislative power" at the President's expense. *Free Enterprise Fund*, 561 U.S. at 500. "In a system of checks and balances, 'power abhors a vacuum,' and one branch's handicap is another's strength." *Ibid.* (brackets omitted). "Congress has plenary control over the salary, duties, and even existence of executive offices. Only Presidential oversight can counter its influence." *Ibid.* Congress's power over offices makes presidential oversight "*more* critical" for maintaining the balance struck by the Constitution. *Sella Law*, 591 U.S. at 231.

Dissenting Justices have also contended that the President can use "other tools" "to exert influence" over independent agencies. *Sella Law*, 591 U.S. at 296 (opin- **\*18** ion of Kagan, J.). But this Court has rejected that theory too, explaining that "the various 'bureaucratic minutiae' a President might use to corral agency personnel" do not "substitute for at will removal." *Id.* at 231 (majority opinion). Article II requires "'a clear and effective chain of command' down from the President, on whom all the people vote." *Arthrex*, 594 U.S. at 11.

Finally, dissenting Justices have questioned whether "the fabled Decision of 1789" really did establish the President's preclusive removal power. *Seila Law*, 591 U.S. at 295 (opinion of Kagan, J.). The Court has not entertained "the slightest doubt" that it did. *Myers*, 272 U.S. at 114; see *Seila Law*, 591 U.S. at 204 (majority opinion); *Free Enterprise Fund*, 561 U.S. at 492. Early commentators similarly understood that it "expressed the sense of the [First Congress] that the power of removal by the executive could not be abridged by the legislature." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1531, at 390 n.1 (1833). Even those few commentators who disagreed with "the decision of Congress in 1789" acknowledged that it "had settled the question beyond any power of alteration." *Parsons*, 167 U.S. at 330.

### B. The Removal Power Extends To Heads Of Multimember Administrative Agencies Such As The FTC

1. This Court has held that the President's "'unrestricted power of removal' with respect to 'executive officers of the United States whom he has appointed'" stands among the President's "core constitutional powers." *Trump*, 603 U.S. at 606, 609 (quoting *Myers*, 272 U.S. at 106, 176). The power to remove department heads lies at the very center of that preclusive authority. Department heads are "the most important of [the President's] subordinates," and their duties are "the **\*19** most important in the whole field of executive action." *Myers*, 272 U.S. at 134. They exert immense power on their own, and they can appoint, oversee, and remove inferior officers who themselves possess "significant authority pursuant to the laws." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam). A department head therefore "must be the President's *alter ego* in the matters of that department." *Myers*, 272 U.S. at 133.

Unquestionably, then, the President's removal power extends to heads of multimember administrative agencies, such as the FTC, the National Labor Relations Board, the Consumer Product Safety Commission, and the Merit Systems Protection Board. Those agencies typically may bring enforcement actions, promulgate rules implementing statutes, issue final orders in adjudications, and investigate potential violations of the law. Those are all executive powers - and significant ones at that. See *Seila Law*, 591 U.S. at 218-219. Moreover, this Court's Appointments Clause cases establish that agencies like the FTC are "'Department[s]'" - "freestanding component[s] of the Executive Branch" - and that Congress may empower their heads to appoint inferior executive officers. *Free Enterprise Fund*, 561 U.S. at 511 (brackets omitted). Those agency heads must be subject to the President's "general administrative control of those executing the laws." *Myers*, 272 U.S. at 164.

The FTC perfectly illustrates the point. The FTC executes more than 80 federal laws, including major laws like the FTC Act and narrow ones like the Dolphin Protection Consumer Information Act, 16 U.S.C. 1385. The FTC regulates matters ranging from meat products, see 7 U.S.C. 227(b); to contact lenses, see 15 U.S.C. 7607; to credit cards, see 15 U.S.C. 1607(c); to movie **\*20** tickets, see 15 U.S.C. 45c; to horseracing, see 15 U.S.C. 3053; and crab fishing, see 16 U.S.C. 1862(j)(6). Because the people do not elect FTC Commissioners, accountability for the exercise of that vast power depends on "oversight by an elected President." *Free Enterprise Fund*, 561 U.S. at 499. Without such oversight, the Executive Branch "may slip from the Executive's control, and thus from that of the people." *Ibid.* If the President cannot remove FTC Commissioners at will, "[w]hom do the people blame and hold responsible for a bad decision or policy adopted by [the FTC]?" *FCC v. Consumers' Research*, 145 S. Ct. 2482, 2517-2518 (2025) (Kavanaugh, J., concurring).

Upholding tenure protections for agency heads like FTC Commissioners would also invert this Court's removal jurisprudence regarding other types of officers. While recognizing a "general rule" of "unrestricted removal" for executive officers, this Court's cases have carved out an "exceptio[n]" for certain inferior officers who are appointed by department heads or courts, perform "limited duties," and have "no policymaking or administrative authority." *Seila Law*, 591 U.S. at 215, 218. That narrow exception - which is dubious but not directly at issue here - represents the "outermost constitutional limi[t] of permissible congressional restrictions" on the removal of inferior officers. *Id.* at 218. It would make little sense for the removal power to extend to inferior officers with even minor "policymaking or administrative authority," *ibid.*, yet not encompass FTC Commissioners and other agency heads, who are among the most powerful executive officers in the government.

**\*21   C.** *Humphrey's Executor* **Does Not Justify The FTC's Removal Restrictions Today**

Some 90 years ago, the Court upheld the FTC's removal protections in *Humphrey's Executor*. The Court recognized the President's "illimitable" authority to remove "executive officers," but distinguished FTC Commissioners on the ground that the FTC exercised "no part of the executive power." 295 U.S. at 628, 631. That characterization was wrong in 1935 - as this Court has already recognized - and is even more clearly wrong today. The modern FTC, like other multimember agencies, indisputably wields executive power. Even under the reasoning of *Humphrey's Executor* itself, the President must be able to remove executive officers at will.

1. *Humphrey's Executor* arose after President Franklin D. Roosevelt removed William Humphrey, an FTC Commissioner appointed by President Hoover, based on disagreement over policy and a belief that the Administration's aims would be "carried out most effectively with personnel of [the President's] own selection." 295 U.S. at 618. Humphrey died soon after his removal. See *ibid.* The Court sustained his executor's back-pay claim and upheld the FTC's removal protections. See *id.* at 626-632.

To reach that holding, *Humphrey's Executor* first reasoned that the President's "illimitable power of removal" extends to "executive officer[s]," but does not "include an officer who occupies no place in the executive department and who exercises no part of the executive power." 295 U.S. at 627-628. According to the Court's "reading of the [First Congress's] debates," the Decision of 1789 concerned only "executive officers." *Id.* at 631. The Court similarly described *Myers* as involving "the power of executive removal," *id.* at 626, and **\*22** "an executive officer restricted to the performance of executive functions," *id.* at 627. Because a postmaster is "merely one of the units in the executive department," the Court stated, he falls within the

"exclusive and illimitable power of removal by the Chief Executive, whose subordinate and aid he is." *Ibid.*; see *Free Enterprise Fund*, 561 U.S. at 493.

Then came the critical step: *Humphrey's Executor* concluded that, unlike a postmaster, the FTC "cannot in any proper sense be characterized as an arm or an eye of the executive." 295 U.S. at 628. The Court stated that the FTC was "independent of executive authority," *id.* at 625, and "wholly disconnected from the executive department," *id.* at 630. The Court added that Congress created the FTC "as a means of carrying into operation legislative and judicial powers, and as an agency of the legislative and judicial departments." *Ibid.*; see *Seila Law*, 591 U.S. at 215.

Specifically, *Humphrey's Executor* stated that the FTC acted as a "legislative" "aid" by conducting "investigations" and publishing "reports" "for the information of Congress," and as a "judicial aid" or "master in chancery" by making recommendations to courts. 295 U.S. at 628. The Court also stated that the FTC "act[ed] in part quasi-legislatively and in part quasi-judicially" in "filling in and administering" the unfair-competition standard through judicially enforceable cease-and-desist orders. *Ibid.*; *see id.* at 621. The Court concluded: "To the extent that [the FTC] exercises any executive function - as distinguished from the executive power in the constitutional sense - it does so in the discharge and effectuation of its quasi-legislative or quasi-judicial powers, or as an agency of the legislative or judicial departments of the government." *Id.* at 628; see *Seila* **\*23** *Law*, 591 U.S. at 215-216; *Free Enterprise Fund*, 561 U.S. at 493.

*Humphrey's Executor*, in sum, involved "a multimember body of experts, balanced along partisan lines," that performed what the Court in 1935 deemed "legislative and judicial functions" and that "was said not to exercise any executive power." *Seila Law*, 591 U.S. at 216. Because the Court thought the FTC was "an agency of the legislative and judicial departments," "wholly disconnected from the executive department," it held that the President could not remove Commissioners at will. *Humphrey's Executor*, 295 U.S. at 630. Precisely because the Court viewed the FTC as exercising quasi-legislative and quasi-judicial power, it feared that empowering the President to remove Commissioners at will would violate the separation-of-powers "principle" that one branch cannot "impos[e] [its] control in the house of another who is master there." *Ibid.*

*Humphrey's Executor* thus "did not abandon *Myers*"; it "distinguished *Myers*" on the ground that "the FTC exercised 'quasi-legislative' and 'quasi-judicial' power that is not part of 'the executive power.'" *Seila Law*, 591 U.S. at 245 n.2 (Thomas, J., concurring in part and dissenting in part).

2. No one disputes that "the President's illimitable power of removal" extends only to "executive officers," *Humphrey's Executor*, 295 U.S. at 631, and excludes truly non-executive appointees, such as D.C. Court of Appeals judges, see D.C. Code §§ 11-1501, 11-1502; *Palmore v. United States*, 411 U.S. 389, 397-404 (1973). But *Humphrey's Executor* erred both legally and factually in holding that the FTC, even in 1935, exercised "no part of the executive power." 295 U.S. at 628. To put it mildly, the "conclusion that the FTC did not exercise **\*24** executive power has not withstood the test of time." *Seila Law*, 591 U.S. at 216 n.2.

Most fundamentally, *Humphrey's Executor* misclassified the powers it considered as "quasi-legislative or quasi-judicial," "as distinguished from executive." 295 U.S. at 628; see *id.* at 624, 628, 629 (describing powers as "quasi-legislative" or "quasi-judicial" five times). Articles I, II, and III establish three branches and grant them distinct types of power: legislative, executive, or judicial. See U.S. Const. Art. I, § 1; Art. II, § 1, Cl. 1; Art. III, § 1. Mixed quasi-powers are alien to our constitutional structure. See *Seila Law*, 591 U.S. at 239-241 (Thomas, J., concurring in part and dissenting in part).

*Humphrey's Executor* also misapprehended specific powers of the 1935 FTC, prompting a later Court to find it "hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive.'" *Morrison v. Olson*, 487 U.S. 654, 689 n.28 (1988). For example, the power to issue cease-and-desist orders is plainly executive - not, as *Humphrey's Executor* would have it, "in part quasi-legislativ[e] and in part quasi-judicia[l]." 295 U.S. at 628. "Interpreting a law enacted by Congress to implement the legislative mandate is the very essence of 'execution' of the law." *Bowsher*, 478 U.S. at 733; see *City of Arlington v. FCC*, 569 U.S. 290, 305 n.4 (2013) (agency adjudications "are exercises of - indeed, under our constitutional structure they *must be* exercises of - the 'executive Power'"); *Arthrex*, 594 U.S. at 17 (even when an adjudicator's

duties "'partake of a Judiciary quality as well as Executive,'" he is "still exercising executive power and must remain 'dependent on the President'") (quoting 1 Annals of Cong. 611-612 (James Madison)). Indeed, cease-and-desist orders were the 1935 FTC's **\*25** principal means of enforcing the FTC Act; other tools, such as civil penalties, came later. See p. 25, *infra.*

In a similar vein, *Humphrey's Executor* misunderstood other powers in ways that obscured their executive nature, for instance suggesting that the FTC conducted investigations only "for the information of Congress." 295 U.S. at 628. In reality, the FTC could investigate potential violations to decide whether to pursue enforcement action - a core executive power. See FTC Act § 6(a), 38 Stat. 721; see also *Trump*, 603 U.S. at 620; *Seila Law*, 591 U.S. at 206.

*Humphrey's Executor* itself limited its holding "to officers of the kind here under consideration," 295 U.S. at 632, and *Seila Law* explained that it extended only to "the set of powers the Court considered as the basis for its decision," 591 U.S. at 219 n.24. Those powers, properly understood, are all executive - and all executive power ultimately is vested in the President.

3. The FTC's removal restrictions are even less defensible today because Congress has granted the FTC new powers that *Humphrey's Executor* did not consider at all. Those powers, too, are indisputably executive.

First, post-1935 statutes authorize the FTC to file civil suits seeking relief from private parties. Unlike in 1935, today's FTC may seek injunctions preventing violations of the laws it enforces, see 15 U.S.C. 53(b); civil penalties for violations of certain rules and orders, see 15 U.S.C. 45(m); and relief "necessary to redress injury to consumers," including the "refund of money or return of property," 15 U.S.C. 57b(b). The power to seek such remedies on behalf of the United States is a "quintessentially executive power not considered in *Humphrey's Executor.*" *Sella Law*, 591 U.S. at 219. "A lawsuit is the ultimate remedy for a breach of the law, and it is to the **\*26** President *** that the Constitution entrusts the responsibility to 'take Care that the Laws be faithfully executed.'" *Buckley*, 424 U.S. at 138. Indeed, the ability to file enforcement actions is "the primary threat to individual liberty posed by executive power," making it vital that those who wield that authority be accountable for how they use it. *PHH Corp. v. CFPB*, 881 F.3d 75, 174 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting).

The modern FTC also exercises broad power to issue substantive rules. For example, it may issue "rules which define with specificity acts or practices which are unfair or deceptive acts or practices" under the FTC Act. 15 U.S.C. 57a(a)(1)(B). It also makes rules under a host of statutes enacted since *Humphrey's Executor*, such as the Fur Products Labeling Act, 15 U.S.C. 69f(b); the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. 18a; the Children's Online Privacy Protection Act of 1998, 15 U.S.C. 6502(b)(1); and the Horseracing Integrity and Safety Act of 2020, 15 U.S.C. 3053; see generally *FTC Statutes.*

Again, that authority to issue "binding rules" implementing statutes is "executive power." *Seila Law*, 591 U.S. at 218, 220. And again, *Humphrey's Executor* did not consider such power. The "quasi-legislative" powers it mentioned "were not substantive rulemaking powers, which the [FTC] itself did not assert it possessed until 1962," "but rather the responsibility to conduct investigations for the purpose of recommending legislation to Congress." *Synar* v. *United States*, 626 F. Supp. 1374, 1397 n.24 (D.D.C. 1986) (Scalia, Johnson, *&* Gasch, J.J.). Though post-1935 statutes unambiguously empower the FTC to issue substantive rules, see, *e.g.*, 15 U.S.C. 57a(1)(B), it remains contested whether the rulemaking authority originally conferred by Section 6(g) of **\*27** the FTC Act extended beyond internal procedural rules, see *Ryan, LLC v. FTC*, 746 F. Supp. 3d 369, 384 (N.D. Tex. 2024).

The modern FTC's adjudicatory authority is also broader. The 1935 FTC's cease-and-desist orders lacked binding effect until courts granted injunctions enforcing them, see *Humphrey's Executor*, 295 U.S. at 620-621 - so they functioned as little more than "recommended dispositions," *Seila Law*, 591 U.S. at 218. But under post-1935 amendments, FTC orders can become final and enforceable without judicial intervention. See 15 U.S.C. 45(g) and (*l*). Statutes enacted since 1935 also empower the FTC to issue other remedies, including lifetime bans from horseracing, see 15 U.S.C. 3057(d), 3058(b), and civil penalties for violating certain rules, see 42 U.S.C. 6303(a). Authority to "unilaterally issue final decisions" in "administrative adjudications" is yet another "executive power" unaddressed in *Humphrey's Executor. Seila Law*, 591 U.S. at 219.

Further, Congress has broadened the FTC's investigative powers. For instance, a 1976 statute empowers the FTC to review mergers and acquisitions before their consummation, so that it can sue to block them if it thinks they violate the antitrust laws. See 15 U.S.C. 18a. A 2003 statute similarly authorizes the FTC to review certain agreements among pharmaceutical companies, so that it can pursue enforcement action when it finds antitrust violations. See Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 1112, 117 Stat. 2461. The power to investigate potential lawbreakers for the purpose of determining whether to pursue enforcement action falls within "the special province of the Executive Branch." *Trump*, 603 U.S. at 620.

**\*28**  Finally, unlike most independent agencies, the FTC conducts foreign relations. A 2006 statute empowers it to provide investigative "assistance" to a "foreign law enforcement agency," and, with the Secretary of State's approval, to "negotiate and conclude an international agreement, in the name of either the United States or the Commission, for the purpose of obtaining such assistance" from other countries. 15 U.S.C. 46(j)(1) and (4). The "conduct of foreign negotiations" "falls peculiarly within the province of the executive department." *The Federalist* No. 72, at 486. By any measure, the FTC today exercises wide-ranging executive power.

Especially given those powers, this case is straightforward. *Humphrey's Executor* reaffirmed the President's "illimitable power" to remove "executive officers." 295 U.S. at 631. Members of the modern FTC and other administrative agencies are executive officers. The characterization of the 1935 FTC as non-executive has already been repudiated by *Morrison* and *Seila Law*, see pp. 23-25, *supra*, and has in any event been overtaken by later statutes, see pp. 25-28, *supra*. The FTC's removal protections violate Article II.

4. Respondent misinterprets *Humphrey's Executor* as creating a gaping hole in Article II for "multimember boards." Stay Opp. 34; see J.A. 61. That interpretation not only subverts bedrock Article II principles and misreads *Humphrey's Executor* itself, but also lacks any limiting principle. On that view, Congress could wrest the entire Executive Branch from the President by converting every department into a multimember agency. The Department of State could become a multimember Foreign Affairs Commission, the Department of the Treasury could become a Finance and Taxation Board, the Department of Health and Human Services could  **\*29**  become the Federal Health Authority, and so on. Article II does not countenance sidelining the President as a spectator in an Executive Branch of multimember agencies that exercise his executive power outside his control. See *PHH*, 881 F.3d at 155-157 (Henderson, J., dissenting).

Respondent invokes history, noting (Stay Opp. 15 n.2) that independent multimember agencies began with the Interstate Commerce Commission in 1887. But the Constitution's text trumps contrary practice, see *INS v. Chadha*, 462 U.S. 919, 945-959 (1983), and Founding-era practice trumps later practice, see *Powell v. McCormack*, 395 U.S. 486, 541-547 (1969). This Court has therefore refused to subordinate Article II's text and original meaning to late-19th-century statutes requiring Senate consent for removal. See *Myers*, 272 U.S. at 171-176. And *Seila Law* reaffirmed the "general rule" of "unrestricted removal," 591 U.S. at 215, rejecting dissenting Justices' reliance on the practice of creating independent agencies that began in 1887, *id.* at 275 (opinion of Kagan, J.).

Respondent's reliance (Stay Opp. 22) on the removal protections of the Federal Reserve Board of Governors is likewise misplaced. This Court has described the Federal Reserve System as a "uniquely structured, quasi-private entity" that "follows in the distinct historical tradition of the First and Second Banks of the United States." *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025); see *Seila Law*, 591 U.S. at 222 n.8. If a historical exception to the removal power exists for the Federal Reserve Board - a question the Court need not decide - it would be an agency-specific "anomaly" based on the Federal Reserve System's history and "unique function" "with respect to monetary policy." *PHH*, 881 F.3d at 192 n.17  **\*30**  (Kavanaugh, J., concurring). The Federal Reserve System is "not a model or precedent" for "a vast independent regulatory state." *Ibid*.

### D. This Court Should Overrule Anything That Remains Of *Humphrey's Executor*

Appendix of Authorities: 16 of 180

If anything remains of *Humphrey's Executor*, this Court should overrule it. While the Court ordinarily adheres to precedent, *stare decisis* is not an "inexorable command" and is "at its weakest" in constitutional cases. *Ramos v. Louisiana*, 590 U.S. 83, 105 (2020). In that context, the Court considers the nature of the error, the decision's harmful real-world and jurisprudential consequences, and reliance interests. See, *e.g., Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215, 268 (2022); *Ramos*, 590 U.S. at 121-122 (Kavanaugh, J., concurring in part). By those metrics, if *Humphrey's Executor* is read to limit the President's power to remove executive officers, it should be overruled so that lower courts cease relying on its "long ago abandoned" reasoning. Cf. *Kennedy v. Bremerton School District*, 597 U.S. 507, 534 (2022) (recognizing the "long ago" demise of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), despite lower courts' misapprehensions). [1]

 **\*31**  1. *Humphrey's Executor* grievously erred in holding that the President could not remove FTC Commissioners at will. It broke from text, history, and precedent, and misapprehended the FTC's powers to boot. Thus, in four cases over the last 15 years - *Free Enterprise Fund, Seila Law, Collins*, and *Trump* - the Court has reaffirmed *Myers* and confined *Humphrey's Executor* to its facts. Those decisions now leave no doubt that "Congress lacks authority to control the President's 'unrestricted power of removal' with respect to 'executive officers of the United States whom he has appointed.'" *Trump*, 603 U.S. at 608-609. *Humphrey's Executor* has become a "doctrinal dinosaur," justifying a "depart[ure] from *stare decisis*." *Kimble v. Marvel Entertainment, LLC*, 576 U.S. 446, 458 (2015); see *Franchise Tax Board v. Hyatt*, 587 U.S. 230, 248 (2019).

The poor quality of its reasoning weighs further against retaining *Humphrey's Executor*. The decision rests on the erroneous and now-repudiated premise that the 1935 FTC exercised only "quasi-legislative or quasi-judicial powers," "as distinguished from executive power." 295 U.S. at 628. Its "six quick pages," which are "devoid of textual [ support] or historical precedent for th[at] novel principle," starkly contrast with Chief Justice Taft's "carefully researched and reasoned 70-page opinion" in *Myers*. *Morrison*, 487 U.S. at 726 (Scalia, J., dissenting). And the Court has recognized that "the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered 'executive'" and that a removal restriction's constitutionality "can- **\*32**  not be made to turn" on "the terms 'quasi-legislative' and 'quasi-judicial.'" *Id.* at 689 & n.28 (majority opinion).

Scholars have likewise criticized the decision as "one of the more egregious opinions" in the Court's history. Geoffrey P. Miller, *Independent Agencies*, 1986 Sup. Ct. Rev. 41, 93. Even scholars who have defended FTC removal restrictions have noted the "widespread view that the case was a bizarre and unfounded exercise in constitutional innovation." Cass R. Sunstein & Lawrence Lessig, *The President and the Administration*, 94 Colum. L. Rev. 1, 101 (1994).

Likewise, those Justices who have defended the decision's result have abandoned its rationale, accepting that "today we view *all* the activities of administrative agencies as exercises of" executive power. *Seila Law*, 591 U.S. at 278 n.7 (opinion of Kagan, J.). They have rationalized *Humphrey's Executor* on a ground the opinion never invokes - that Article I leaves decisions about removal to Congress, "so long as the President retains the ability to carry out his constitutional duties." *Id.* at 264. But when a precedent's "underlying reasoning has become so discredited" that retaining it requires inventing "new and different justifications to shore up the original mistake," the better course is to overrule it, not reinvent it. *Citizens United v. FEC*, 558 U.S. 310, 379 (2010) (Roberts, C.J., concurring); see *Montejo v. Louisiana*, 556 U.S. 778, 792 (2009). That is especially true where, as here, this Court has already rejected the new theory - *i.e.*, that removal restrictions are valid unless they go "too far," *Seila Law*, 591 U.S. at 275 n.6 (opinion of Kagan, J.). See, *e.g., id.* at 228 n.11 (majority opinion).

2. "An erroneous interpretation of the Constitution is always important, but some are more damaging than others." *Dobbs*, 597 U.S. at 268. By upholding the FTC's **\*33**  removal restrictions and spawning decades of misapprehensions about other multimember agencies, *Humphrey's Executor* has been uniquely "destructive of the structure of the Constitution." *Mistretta v. United States*, 488 U.S. 361, 424 (1989) (Scalia, J., dissenting). The myth of independent agencies has operated as a "direct threat to our constitutional structure," *Seila Law*, 591 U.S. at 239 (Thomas, J., concurring in part and dissenting in part), and a "significant threat to individual liberty and to the constitutional system of separation of powers," *PHH*, 881 F.3d at 165 (Kavanaugh, J., dissenting). "Few things could be more perilous to liberty than some 'fourth branch' that does not answer even to the one executive official who *is* accountable to the body politic." *Collins*, 594 U.S. at 278-279 (Gorsuch, J., concurring in part).

The Framers understood the danger to liberty posed by unaccountable officers, having fought a war in part because the King had "erected a multitude of New Offices, and sent hither swarms of Officers to harass our people, and eat out their substance." Declaration of Independence ¶ 12. So they subjected officers to oversight by an elected President and secured the Executive Branch's "due dependence on the people." *The Federalist* No. 70 (Alexander Hamilton), at 472; see *Collins*, 594 U.S. at 252 (removal power ensures "electoral accountability" for "Executive Branch actions"). But independent agencies mean independence from presidential oversight and insulation from democratic accountability. "[W]hen Congress delegates authority to an independent agency, no democratically elected official is accountable." *Consumers' Research*, 145 S. Ct. at 2517 (Kavanaugh, J., concurring).

**\*34** The growth of the administrative state since 1935 only heightens those concerns. Justice Robert Jackson, President Roosevelt's Attorney General, colorfully described *Humphrey's Executor* as "that damn little case," reflecting its relative insignificance. Eugene C. Gerhart, *America's Advocate* 99 (1958). Even by the 1950s, independent agencies had only just "begun to have important consequences on personal rights." *FTC v. Ruberoid Co.*, 343 U.S. 470, 487 (1952) (R. Jackson, J., dissenting). Today, however, their power extends "into every nook and cranny of daily life." *Arlington*, 569 U.S. at 315 (Roberts, C. J., dissenting). The "expansion of that bureaucracy into new territories the Framers [and the *Humphrey's* Court] could scarcely have imagined only sharpens [this Court's] duty to ensure that the Executive Branch is overseen by a President accountable to the people." *Seila Law*, 591 U.S. at 231-232.

3. *Humphrey's Executor* has also proved unworkable. See *Dobbs*, 597 U.S. at 280-281. It distinguished "quasi-legislative or quasi-judicial powers" from "executive power," *Humphrey's Executor*, 295 U.S. at 628, but *Morrison* repudiated that approach due to the "difficulty of defining such categories," 487 U.S. at 690 n.28. *Morrison* substituted another test, whether the statute "impermissibly interferes" with the President's constitutional functions, *id.* at 685, but *Seila Law* rejected that "reimagined" test as a "gloss added by a later Court in dicta," 591 U.S. at 219. Rather than reviving the illusory distinction between executive power and quasi-legislative or quasi-judicial powers, *Seila Law* declined to extend *Humphrey's Executor* to agencies that exercise "significant executive power," *id.* at 204, and just a year later, *Collins* clarified that the "breadth of an agency's authority is not dispositive," 594 U.S. at 251. **\*35** In short, this Court has already limited *Humphrey's Executor* to the facts set out in the opinion. Since those facts did not actually exist for the FTC in 1935 or any other agency then or later, keeping the precedent on the books serves no purpose. Cf. *Edwards v. Vannoy*, 593 U.S. 255, 272 (2021) (declining to retain "a theoretical exception that never actually applies in practice").

Moreover, because the decision's flaws have repeatedly prompted the Court to limit its scope, judges have struggled to decipher its meaning. In just the last two years, judges have variously concluded that the *Humphrey's Executor* exception encompasses:
• All multimember agencies. See *Wilcox v. Trump*, 775 F. Supp. 3d 215, 234 (D.D.C. 2025).

• Multimember agencies with statutory partisan-balance requirements (such as the CPSC, but not the NLRB). See *Consumers' Research v. CPSC*, 91 F.4th 342, 352-356 (5th Cir.), cert. denied, 145 S. Ct. 414 (2024); *Space Exploration Technologies Corp. v. NLRB*, No. 24-50627, 2025 WL 2396748 (5th Cir. Aug. 19, 2025).

• Multimember agencies with "'quasi-legislative or quasi-judicial' (not 'purely executive') functions." *Wilcox*, 145 S. Ct. at 1418 (Kagan, J., dissenting).

• Multimember "adjudicatory bodies." *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *1 (D.C. Cir. Apr. 7, 2025) (en banc).

• Multimember agencies whose executive power is not "substantial." *Harris v. Bessent*, 775 F. Supp. 3d 164, 177 (D.D.C. 2025).

• Multimember agencies that are "identical twin[s] of the 1935 FTC (as *Humphrey's Executor* under- **\*36** stood the 1935 FTC)." *Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *13 (D.C. Cir. Mar. 25, 2025) (Walker, J., concurring).

• The FTC, "the exact same agency" addressed in *Humphrey's Executor.* J.A. 116.

Because *Humphrey's Executor* was "indeterminate" from the start, and because later efforts "to clarify" the decision have "only added to [its] unworkability," the decision now "undermine[s] the very 'rule of law' values that *stare decisis* exists to secure." *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 409, 411 (2024).

4. Reliance interests cannot save removal protections for multimember agencies, since those agencies will continue operating even after their removal restrictions are invalidated. The FTC Act and many other independent-agency statutes include severability clauses, see, *e.g.*, 15 U.S.C. 57 (FTC); 15 U.S.C. 2051 note (CPSC); 29 U.S.C. 166 (NLRB), and "[e]ven in the absence of a severability clause," the normal remedy for a removal defect is severing "the removal provision," *Seila Law*, 591 U.S. at 234; see, *e.g., Free Enterprise Fund*, 561 U.S. at 509. Nor would remedies include reopening past agency decisions. In many cases, the six-year statute of limitations, 28 U.S.C. 2401(a), has expired. And an agency's unconstitutional tenure protection does not automatically make its actions void. See *Collins*, 594 U.S. at 259.

Congress's creation of independent agencies since *Humphrey's Executor* does not justify retaining the decision. Because *Humphrey's Executor* was limited to agencies that exercise "no part of the executive power," 295 U.S. at 628, statutes granting tenure protection to agencies that execute the law go beyond what the decision on its face allows. That Congress has repeated the **\*37** violation is no saving grace, as other separation-of-powers precedents illustrate. *Myers* affirmed the President's unrestricted removal power, see 272 U.S. at 176, even though, in the preceding six decades, Congress had enacted statutes requiring Senate consent for the removal of "the great majority" of inferior officers, *id.* at 243-244 (Brandeis, J., dissenting). And *Chadha* struck down the legislative veto, see 462 U.S. at 959, even though, in the preceding half century, Congress had included such a veto "in nearly 200 statutes," *id.* at 968 (White, J., dissenting).

Rather, the more sustained the disregard for the separation of powers, the more important its restoration becomes. This Court should uphold "the judgment of the wise men who constructed our system, and of the people who approved it, and of two centuries of history that have shown it to be sound." *Morrison*, 487 U.S. at 734 (Scalia, J., dissenting). "[T]hat judgment says, quite plainly, that 'the executive Power shall be vested in a President of the United States.'" *Ibid.* (brackets omitted).

## II. COURTS MAY NOT PREVENT THE REMOVAL OF EXECUTIVE OFFICERS

In addition to reversing the district court's judgment on the merits, this Court should exercise its discretion to address the lawfulness of remedies preventing the removal of executive officers. See, *e.g., Howes v. Fields*, 565 U.S. 499, 505-517 (2012) (alternative holdings on merits and habeas corpus); *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (alternative holdings on merits and qualified immunity); *Munaf v. Geren*, 553 U.S. 674, 689-705 (2008) (alternative holdings on merits and preliminary injunction). Here, the district court erroneously granted injunctive and declaratory relief blocking respondent's **\*38** removal and effectively reinstating her. J.A. 100-101. Lower courts have improperly granted similar relief in cases involving various types of officers.[2] Whether a court may prevent an officer's removal is also at issue in *Cook v. Trump*, No. 25A312 (filed Sept. 18, 2025), which involves for-cause removal of a Federal Reserve Governor. This Court should hold that courts may not issue any remedy, legal or equitable, to prevent the removal of an executive officer - especially where, as here, the officer was appointed by the President. Such relief violates Article II, traditional remedial principles, and applicable statutes.

### A. Judicial Orders Blocking The Removal Of Executive Officers Violate Article II

Even if Congress could restrict some removals of executive officers, a court may not issue an order blocking such a removal. An order preventing a removal *ex post* raises separation-of-powers concerns beyond those presented by *ex ante* removal restrictions. Such an order "deeply intrudes into the core concerns of the executive branch" by forcing the President, after he has determined

Case 4:23-cv-03560     Document 331-82     Filed 03/30/26 in TXSD     Page 22 of 182

Donald J. TRUMP, President of the United States, et al.,..., 2025 WL 2932736...

that an officer should not exercise executive power, to reverse course and entrust executive power to someone he has removed. **\*39** *Dellinger v. Bessent*, No. 25- 5028, 2025 WL 559669, at \*14 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting).

That understanding of the constitutional problems with undoing a removal after the fact - even where the President's grounds for removal might be questioned - dates to the Founding. Many members of the First Congress opposed requiring Senate consent for removals precisely because of the danger that such a procedure would force the President to retain someone he had tried to remove. Representative Benson noted that, if the Senate "were to acquit the officer," "the President would then have a man forced on him whom he considered as unfaithful." 1 Annals of Cong. 507. Representative Boudinot argued: "But suppose they shall decide in favor of the officer, what a situation is the President then in," "having officers imposed upon him who do not meet his approbation?" *Id.* at 469. And Representative Sedgwick asked, "Shall a man under these circumstances be saddled upon the President, who has been appointed for no other purpose but to aid the President in performing certain duties?" *Id.* at 522-523. The First Congress thus understood that "no person can be forced upon [the President] as an assistant by any other branch." *Id.* at 395 (James Madison).

History also cuts against the district court's remedies. "[T]hroughout the Nation's history," executive officers often "have contested their removal." *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting). Secretary of War Edwin Stanton barricaded himself in his office after his removal by President Andrew Johnson; Myers disputed his removal by President Wilson; Humphrey disputed his removal by President Roosevelt; two members of the Board of General Appraisers disputed their removal by President Taft; **\*40** and so on. See, *e.g.*, Aditya Bamzai, *Taft, Frankfurter, and the First Presidential For-Cause Removal*, 52 U. Rich. L. Rev. 691, 737-738 (2018). Yet none obtained a judicial reinstatement order, and most did not even try.

Indeed, until the current Administration, no court appears to have ever restrained the President's removal of *any* presidentially appointed executive officer. At most, a district court in 1983 enjoined the removal of members of the U.S. Commission on Civil Rights because the court believed that the Commission functioned as a "legislative agency" whose "'only purpose'" was "to find facts which [could] subsequently be used as a basis for legislative or executive action." *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at \*2 (D.D.C. Nov. 14, 1983).

Instead of seeking reinstatement, all sorts of executive officers, including presidential appointees, historically contested their removal by invoking the political process, see *Myers*, 272 U.S. at 150-169, or by seeking back pay, see *Dellinger*, 145 S. Ct. at 517 (Gorsuch, J., dissenting). Thus, most of this Court's removal-power cases, including *Humphrey's Executor*, involved backpay claims by removed officers or their estates. See *Wiener v. United States*, 357 U.S. 349, 350 (1958); *Humphrey's Executor*, 295 U.S. at 612; *Myers*, 272 U.S. at 106; *Shurtleff v. United States*, 189 U.S. 311, 318 (1903); *Parsons*, 167 U.S. at 327; *United States v. Perkins*, 116 U.S. 483, 483 (1866). A back-pay order, where available under applicable statutes, compensates the removed officer for any loss of salary due to an allegedly improper removal. But such orders avoid the problems that arise when courts force the President "to recognize and work with an agency head whom he has already removed." *Dellinger*, 2025 WL 559669, at \*16 (Katsas, J., dissenting).

### **\*41  B. Judicial Orders Blocking The Removal Of Executive Officers Violate Traditional Remedial Principles**

Even setting aside constitutional concerns, traditional principles of equity and law preclude courts from issuing orders - whether injunctions, declaratory judgments, or writs of mandamus - blocking removals of executive officers.

*Injunctions.* Courts may not enjoin removals of executive officers. Federal courts' power to issue injunctions derives from the Judiciary Act of 1789, ch. 20, 1 Stat. 73. See *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025); *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999). Courts must exercise that power in accordance with "traditional principles of equity," *Grupo*, 527 U.S. at 319, as understood "at the time" of "the enactment of the original Judiciary Act," *CASA*, 606 U.S. at 841-842.

One particularly well-settled principle of equity is that a court may not enjoin the removal of an executive officer. Thus, in *White v. Berry*, 171 U.S. 366 (1898), the Court determined that a court could not enjoin an inferior officer's allegedly unlawful removal because "a court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee." *Id.* at 377. *In re Sawyer*, 124 U.S. 200 (1888), similarly determined that a federal court could not enjoin a state officer's allegedly unlawful removal because it is "well settled that a court of equity has no jurisdiction over the appointment and removal of public officers." *Id.* at 212. Other decisions reaffirm that rule. See *Baker v. Carr*, 369 U.S. 186, 231 (1962); *Walton v. House of Representatives*, 265 U.S. 487, 490 (1924); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898).

**\*42**   That equitable principle has deep roots. "No English case has been found of a bill for an injunction to restrain the appointment or removal" of an officer. *Sawyer*, 124 U.S. at 212. American state courts have "denied" the "power of a court of equity to restrain" a "removal" in "many well considered cases." *Ibid.*; see *id.* at 212-214 (collecting cases). And commentators explained that "[n]o principle of the law of injunctions, and perhaps no doctrine of equity jurisprudence, is more definitely fixed or more clearly established than that courts of equity will not interfere by injunction to determine questions concerning the appointment of public officers or their title to office." 2 James L. High, *Treatise on the Law of Injunctions* § 1312, at 863 (2d ed. 1880).

That rule also makes sense. Reinstatement orders can cause "the utmost confusion in the management of executive affairs," *White*, 171 U.S. at 378, for instance by subjecting the government to "the disruptive effect of the repeated removal and reinstatement of officers during the pendency of litigation," *Wilcox*, 145 S. Ct. at 1415. By contrast, removals do not irreparably harm removed officers, who have no judicially cognizable private interest in continuing to exercise "political power." *Raines v. Byrd*, 521 U.S. 811, 821 (1997).

**Declaratory judgments.**  Courts also may not issue declarations blocking removals of executive officers. A suit under the Declaratory Judgment Act, 28 U.S.C. 2201, is "essentially an equitable" action. *Samuels v. Mackell*, 401 U.S. 66, 70 (1971). Declarations are "analogous" to equitable remedies such as "decree[s] quieting title." *Great Lakes Dredge & Dock Co. v. Huffman*, 319 U.S. 293, 300 (1943). Because a court may enforce a declaration through "[f]urther necessary or proper relief," 28 U.S.C. 2202, a declaration can "serve as the  **\*43**  basis for a subsequent injunction," *Samuels*, 401 U.S. at 72. And "even if the declaratory judgment is not used as a basis for actually issuing an injunction, the declaratory relief alone has virtually the same practical impact as a formal injunction would." *Ibid.*

Thus, "the same equitable principles relevant to the propriety of an injunction must be taken into consideration" "in determining whether to issue a declaratory judgment." *Samuels*, 401 U.S. at 73; see *Macauley v. Waterman S.S. Corp.*, 327 U.S. 540, 545 & n.4 (1946); *Huffman*, 319 U.S. at 300. Because a court of equity may "not, by injunction, restrain an executive officer from making a wrongful removal," *White*, 171 U.S. at 376, courts lack the power to issue declarations against such removals. The Declaratory Judgment Act incorporates, not abrogates, that longstanding limitation.

**Mandamus.**  While mandamus is a proper mechanism for trying the title to *judicial* offices, see *Marbury v. Madison*, 1 Cranch 137, 167-173 (1803) (justice of the peace); *Hennen*, 13 Pet. at 256 (court clerk), courts may not use it to restore *executive* officers. Mandamus must comport with separation-of-powers principles, see *Cheney v. U.S. District Court*, 542 U.S. 367, 381 (2004), and those principles preclude courts from blocking the removal of an executive officer, see pp. 38-40, *supra*. Mandamus directed to the President would also violate the bedrock principle that a court may not restrain the President "in the performance of his official duties." *Mississippi v. Johnson*, 4 Wall. 475, 501 (1867). Before this Administration, no federal court appears to have ever issued mandamus to prevent the President's removal of an executive officer. See *Harris*, 2025 WL 1021435, at *6 (Rao, J., dissenting).

**\*44**   Further, while parties can obtain preliminary injunctions upon showing a likelihood of success and can obtain declaratory judgments upon prevailing on the merits, anyone seeking mandamus must establish a "clear and indisputable" right to relief. *United States v. Duell*, 172 U.S. 576, 582 (1899). Respondent cannot satisfy that standard here. Respondent has not made a clear

and indisputable showing that she should prevail on the merits or that Article II allows courts to reinstate removed executive officers.

### C. Congress Has Foreclosed Judicial Orders Reinstating Presidentially Appointed Officers

1. At a minimum, if Congress wishes to authorize courts to block removals, it must say so expressly. This Court's precedents require "an express statement by Congress" to authorize remedies that could burden the President's Article II powers. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); see *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982). The Court has also required "clear and explicit language" before interpreting statutes to burden the President's removal power; "inference or implication" does not suffice. *Braidwood*, 145 S. Ct. at 2448; see *Collins*, 594 U.S. at 248; *Shurtleff*, 189 U.S. at 315. And the Court usually presumes that, if Congress intends "a drastic departure from the traditions of equity practice," it makes "an unequivocal statement." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944).

Congress knows how to speak clearly in authorizing reinstatement of removed officers. The independent-counsel statute in *Morrison* stated that an "independent counsel removed from office may obtain judicial review of the removal in a civil action" and "may be reinstated" by court order. Independent Counsel Reau- **\*45** thorization Act of 1987, Pub. L. No. 100-191, § 596, 101 Stat. 1305. The FTC Act includes no such language.

2. Far from clearly authorizing relief that would prevent removals of FTC Commissioners, Congress instead clearly *barred* them from seeking reinstatement (or even back pay) as a remedy for statutory violations. The Civil Service Reform Act of 1978 (CSRA), 5 U.S.C. 1101 *et seq.*, establishes a comprehensive "framework for evaluating adverse personnel actions against federal employees," *United States v. Fausto*, 484 U.S. 439, 443 (1988) (brackets omitted), including officers of the United States, see 5 U.S.C. 7511. That statute replaced the earlier "patchwork system" of remedies for various types of government officers and employees with an "integrated scheme" that delineates who may obtain relief; what actions they may challenge; how, when, and where they may do so; and what relief they may obtain. *Fausto*, 484 U.S. at 445. The Back Pay Act of 1966, 5 U.S.C. 5596, though enacted before the CSRA, now operates as part of that scheme. See *Fausto*, 484 U.S. at 454. For federal employees, "what you get under the CSRA is what you get." *Fornaro v. James*, 416 F.3d 63, 67 (D.C. Cir. 2005) (Roberts, J.).

For employees covered by the CSRA, challenges to firings and other employment actions generally get channeled to the MSPB - which may award reinstatement and back pay - with review in the Federal Circuit. See *Elgin v. Department of the Treasury*, 567 U.S. 1, 6 (2012). That "integrated scheme of administrative and judicial review" "balance[s] the legitimate interests of the various categories of federal employees with the needs of sound and efficient administration." *Fausto*, 484 U.S. at 445. The CSRA's review scheme is "exclusive." *Elgin*, 567 U.S. at 13. Employees covered by the **\*46** CSRA generally must proceed to the MSPB and cannot obtain relief in district court. *Id.* at 10-15.

The CSRA also expressly withholds remedies from some categories of "employees" - including presidential appointees like FTC Commissioners. Specifically, the CSRA's remedial provisions "d[o] not apply" to those appointed "by and with the advice and consent of the Senate" or "by the President," or those "whose position has been determined to be of a confidential, policy-determining, policy-making or policy-advocating character." 5 U.S.C. 7511(b)(1), (2), and (3). Congress thus elected not to allow removed FTC Commissioners to seek relief, whether reinstatement or back pay.

For such individuals, the CSRA's exclusive scheme precludes statutory claims in the MSPB or anywhere else. For instance, *Fausto* held that certain employees in the "excepted service," with no path to judicial review under the CSRA, may not bring back-pay claims outside the CSRA. See 484 U.S. at 447. As *Fausto* illustrates, "the 'failure to include' any relief 'within the remedial scheme of so comprehensive a piece of legislation reflects a congressional intent that no judicial relief be available.'" *Fornaro*, 416 F.3d at 67. Thus, even if reinstatement were otherwise available as a remedy for removed officers - which it is not, see pp. 41-44, *supra* - the CSRA would foreclose it for respondent.[3]

Appendix of Authorities: 22 of 180

**\*47** As one district court explained after a former Special Counsel attempted to contest his removal: "Because the CSRA is the comprehensive statutory scheme governing federal personnel actions, and because Congress intentionally excluded presidential appointees" from its remedial provisions, it follows that such officers "simply should not have administrative or judicial remedies." *Bloch v. Executive Office of the President*, 164 F. Supp. 3d 841, 852 (E.D. Va. 2016). In other words, where a party's "federal service category has no remedies under the CSRA, the absence of such remedies is properly understood as a conscious choice by Congress to afford *no* statutory remedies." *Ibid.*

The separation-of-powers concerns raised by orders reinstating removed presidential appointees, see pp. 38-40, *supra*, support that congressional line-drawing. So does this Court's longstanding recognition that a "public office is not property." *Taylor v. Beckham (No. 1)*, 178 U.S. 548, 576 (1900). Especially where, as here, the President removes an agency head, the answer has never been for courts to countermand that decision, leaving her free to wield executive power in the President's name but without his confidence. The answer instead lies with Congress, which has decided against judicial remedies here, and the political process, which continues to unfold.

### *48 CONCLUSION

The judgment of the district court should be reversed.

Respectfully submitted.

D. JOHN SAUER

*Solicitor General*

BRETT A. SHUMATE

*Assistant Attorney General*

SARAH M. HARRIS

*Deputy Solicitor General*

ERIC D. MCARTHUR

*Deputy Assistant*

*Attorney General*

VIVEK SURI

*Assistant to the*

*Solicitor General*

MARK R. FREEMAN

MICHAEL S. RAAB

DANIEL AGUILAR

LAURA E. MYRON

*Attorneys*

LUCAS CROSLOW

*General Counsel*

ALEX POTAPOV

*Deputy General Counsel*

*Federal Trade Commission*

OCTOBER 2025

## Footnotes

1    *Wiener v. United States*, 357 U.S. 349 (1958), applied the "philosophy of *Humphrey's Executor"* to hold that the President could not remove, at will, a member of the War Claims Commission, even though the applicable statute lacked an express removal restriction. *Id.* at 356. *Seila Law* treated *Wiener* as an "appli[cation]" of *Humphrey's Executor*, not a freestanding exception to the removal power. 591 U.S. at 216. Yet the en banc D.C. Circuit has suggested that *Wiener* independently justifies tenure protections for the NLRB and MSPB. See *Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (Apr. 7, 2025). To avoid confusion, the Court should clarify that, to the extent *Wiener* suggests Congress may restrict the removal of executive officers, it, too, no longer remains good law. Indeed, the Court has already effectively abrogated *Wiener* by holding that "Congress must use 'very clear and explicit language'" "to 'take away' the power of at-will removal from an appointing officer." *Braidwood*, 145 S. Ct. at 2448.

2    See, *e.g., Harper v. Bessent*, No. 25-cv-1294, 2025 WL 2049207, at *13 (D.D.C. July 22, 2025) (multimember-agency heads); *United States Institute of Peace v. Jackson*, 783 F. Supp. 3d 316, 376-383 (D.D.C. 2025) (same); *Dellinger v. Bessent*, 768 F. Supp. 3d 33, 75 (D.D.C. 2025) (single agency head); *Perlmutter* v. *Blanche*, No. 25-5285, 2025 WL 2627965, at *1 (D.C. Cir. Sept. 10, 2025) (inferior officer); *Abramowitz v. Lake*, No. 25-cv-887, 2025 WL 2480354, at *11 (D.D.C. Aug. 28, 2025) (same); *Aviel v. Gor*, 780 F. Supp. 3d 1, 16 (D.D.C. 2025) (same).

3    When the CSRA channels a case to another tribunal, it deprives district courts of jurisdiction. See *Elgin*, 567 U.S. at 12; Gov't Appl. for Stay at 7-8, 19-21, *OPM v. AFGE*, 145 S. Ct. 1914 (2025) (No. 24A904) (arguing district courts lacked jurisdiction over cases channeled to other forums). The grant of jurisdiction to one tribunal implies the denial of jurisdiction to others. See *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175, 185 (2023). Here, however, the CSRA entirely withholds relief from respondent. Such a total exclusion from the CSRA's remedial scheme does not channel jurisdiction to an alternate court; instead, it shows a "congressional intent to deny" relief on the merits to the "excluded employees." *Fausto*, 484 U.S. at 447.

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Federal Trade Commission v. Electronic Payment Solutions..., Not Reported in Fed....

2019 WL 4287298

2019 WL 4287298
Only the Westlaw citation is currently available.
United States District Court, D. Arizona.

FEDERAL TRADE COMMISSION, Plaintiff,
v.
ELECTRONIC PAYMENT SOLUTIONS OF
AMERICA INCORPORATED, et al., Defendants.

No. CV-17-02535-PHX-SMM
|
Signed 08/28/2019

**Attorneys and Law Firms**

Bikram Bandy, James Evans, Jody Goodman, Karen S. Hobbs, Michelle Chua, Federal Trade Commission, Washington, DC, for Plaintiff.

Derek Robert Young, Pro Hac Vice, Justin Brett Kaplan, Kaplan Young & Moll Parron PLLC, Miami, FL, Matthew Seth Sarelson, Matthew Seth Sarelson PA, Coral Gables, FL, for Defendants Electronic Payment Solutions of America Incorporated, Electronic Payment Services Incorporated, Jay Wigdore.

Matthew Z. Krob, Pro Hac Vice, Krob Law Office LLC, Scotty P. Krob, Pro Hac Vice, Scotty P. Krob Attorney at Law, Greenwood Village, CO, for Defendants Electronic Payment Systems LLC, Electronic Payment Transfer LLC.

Christopher David Lindstrom, Pro Hac Vice, Potts Law Firm LLP, Houston, TX, Timothy Micah Dortch, Potts Law Firm LLP, Dallas, TX, for Defendants John Dorsey, Thomas McCann.

**ORDER**

Honorable Stephen M. McNamee, Senior United States District Judge

**\*1** Before the Court are three motions filed by the parties: (1) Defendants Electronic Payment Systems, LLC and Electronic Payment Transfer, LLC's (collectively, "EPS") Motion to Dismiss Plaintiff Federal Trade Commission's (the "FTC") Claim for Monetary Relief (Doc. 153); (2) EPS's Motion to Amend its Amended Answer, Crossclaims, and Third-Party Claims (Doc. 170); and (3) Defendants John Dorsey ("Dorsey") and Thomas McCann's ("McCann") Motion for

Judgment on the Pleadings (Doc. 173). [1] The motions are ripe for review. The Court will consider each motion in turn.

**I. BACKGROUND**

In 2013, the FTC brought suit against Money Now Funding ("MNF"), a telemarketing scheme that sold worthless business opportunities to consumers as a cover to launder money via fraudulent credit card transactions. (Doc. 85 at 3.) Credit card processing involves numerous entities including, on one side, the consumer and the consumer's bank, and on the other, the merchant and the merchant's bank. (Id. at 4-5.) In between the consumer and the merchant are the credit card networks and other third parties such as independent sales organizations ("ISOs"). (Id. at 5.) ISOs solicit merchants seeking to open merchant accounts and refer them to the ISOs' acquiring bank, which is the bank that has access to the credit card networks. (Id.) In the credit card industry, merchant accounts are established to settle payment of credit card transactions. (Id.) The practice of processing credit card transactions through another company's merchant account is called "credit card laundering" and is illegal under the Telemarketing Sales Rules ("TSR"), 16 C.F.R. Part 310. (Id. at 4.)

To facilitate the MNF scheme, MNF principals created fictitious entities and processed individual's credit card charges through merchant accounts associated with these entities, rather than through a merchant account associated with MNF. (Id.) The MNF scheme resulted in a total injury to consumers of approximately $7,300,000.00. (Id.) In 2015, the FTC settled with many of the MNF defendants, the Court granted summary judgment against some defendants and entered default judgment against the remaining defendants. (Id. at 13.) Then, in 2016, the Arizona Attorney General's Office brought criminal charges against the MNF principals, and as of January 25, 2017, all four defendants entered guilty pleas. (Id.)

During the investigation and prosecution of the MNF scheme, the FTC discovered that the defendants named in the instant matter (collectively, "Defendants") played an integral role in facilitating the MNF scheme. (Doc. 184 at 8.)

Defendant EPS is an ISO that markets payment processing services to merchants. (Doc. 85 at 10.) EPS served as the ISO to numerous entities involved in the MNF scheme and set up and approved the merchant accounts for the fictitious entities. (Id.) Defendant Dorsey is the CEO and co-owner of EPS, and

2019 WL 4287298

Defendant McCann is the managing member and co-owner of EPS. (Id. at 10-11.) Dorsey and McCann were responsible for approving all merchant applications submitted to EPS. (Id. at 44-47.) Defendant Michael Peterson ("Peterson") is the former risk manager of EPS. (Id. at 11.)

**\*2** EPS used three sales agents to market its services: Defendant Jay Wigdore ("Wigdore"), Defendant Michael Abdelmesseh ("Abdelmesseh"), and Defendant Nikolas Mihilli ("Mihilli") (collectively, the "KMA-Wigdore Defendants"). (Id. at 7.) Wigdore is the president of Defendant Electronic Payment Services, Inc. ("EP Services") and director of Defendant Electronic Payment Solutions of America ("EPSA"). (Id. at 9.) Abdelmesseh is a director of EPSA and managing member of Defendant KMA Merchant Services, LLC ("KMA"). (Id.) Mihilli is an officer and member of Defendant Dynasty Merchants, LLC ("Dynasty"). (Id.) According to the First Amended Complaint ("FAC"), EPS processed consumer transactions through the fictious entities' merchant accounts and then transferred the money to the above-mentioned companies associated with the KMA-Wigdore Defendants. (Id. at 6.)

The FTC brought this action on July 28, 2017 under § 13(b) of the Federal Trade Commission Act (the "FTC Act"), and the Telemarketing and Consumer Fraud and Abuse Prevention Act, seeking permanent injunctive relief, restitution, disgorgement, and other relief on behalf of consumers who were allegedly defrauded by Defendants. (Id. at 3.)

## II. MOTION TO DISMISS

EPS moves to dismiss the FTC's claim for monetary relief – specifically, restitution and disgorgement – pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 153.) However, because EPS filed its Answer to the FTC's FAC prior to filing the instant motion, the Court will construe EPS's motion as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

### A. Legal Standard

A motion asserting dismissal for failure to state a claim must be made before pleading if a responsive pleading is allowed. Fed. R. Civ. P. 12(b). A motion to dismiss for failure to state a claim for relief made after an answer is filed should be treated as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Aldabe v. Aldabe, 616 F.2d 1089, 1093 (9th Cir. 1980).

Rule 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." Honey v. Distelrath, 195 F.3d 531, 532 (9th Cir. 1999). Judgment on the pleadings is only appropriate when the moving party establishes no material fact remains to be resolved. Doleman v. Meiji Mut. Life Ins., 727 F.2d 1480, 1482 (9th Cir. 1984). Dismissal on the pleadings is inappropriate if the facts as pled would entitle the non-moving party to a remedy. See Merchs. Home Delivery Serv., Inc. v. Hall & Co., 50 F.3d 1486, 1488 (9th Cir. 1995). "The [c]ourt cannot consider evidence outside the pleadings unless the [c]ourt treats the motion for judgment on the pleadings as a motion for summary judgment under Rule 56." Phillips & Assocs., P.C. v. Navigators Ins., 764 F. Supp. 2d 1174, 1175 (D. Ariz. 2011).

### B. Discussion

EPS moves to dismiss the FTC's claim for equitable monetary relief, arguing restitution and disgorgement are not permissible forms of equitable relief ancillary to an injunction under § 13(b) of the FTC Act. (Doc. 153-1 at 3.)

Section 13(b) of the FTC Act states that "the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b). While this provision mentions only injunctive relief, the Ninth Circuit Court of Appeals has interpreted this provision as authorizing district courts to grant "any ancillary relief necessary to accomplish complete justice." F.T.C. v. Commerce Planet, Inc., 815 F.3d 593, 598 (9th Cir. 2016) (quoting F.T.C. v. Pantron I Corp., 33 F.3d 1088, 1102 (9th Cir. 1994)); see also F.T.C. v. H. N. Singer, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982). This includes monetary relief such as restitution and the disgorgement of ill-gotten gains. See Commerce Planet, 815 F.3d at 598-99; F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1159-60 (9th Cir. 2010); Pantron I Corp., 33 F.3d at 1102.

**\*3** While EPS concedes that the Court has the authority to grant ancillary equitable relief, EPS cites Kokesh v. Securities and Exchange Commission, 137 S. Ct. 1635 (2017), for the proposition that the monetary relief the FTC seeks is a penalty, not equitable relief, and is therefore impermissible under § 13(b). (Doc. 153-1 at 3, 7.) In Kokesh, the Supreme Court held that disgorgement constitutes a penalty, not equitable relief, for purposes of imposing a five-year statute of limitations

2019 WL 4287298

under a Security and Exchange Commission ("SEC") statute. 137 S. Ct. at 1639. However, the Supreme Court specifically limited the applicability of Kokesh to the SEC's statute of limitations, stating "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings" generally. Id. at 1642 n.3.

The Ninth Circuit recognized this limitation in Federal Trade Commission v. AMG Capital Management, LLC, 910 F.3d 417 (9th Cir. 2018). In a unanimous opinion, the Ninth Circuit found that Kokesh did not overturn Ninth Circuit precedent because it was not "clearly irreconcilable" with prior circuit authority that permits courts to grant ancillary equitable relief under § 13(b). AMG Capital Mgmt., 910 F.3d at 427. In so finding, the court reasoned that Kokesh expressly limited its applicability by declining to address whether courts possessed authority to order disgorgement in SEC proceedings generally. Id. Moreover, the court reasoned the Ninth Circuit has continuously authorized courts to grant equitable remedies, including restitution and disgorgement, under § 13(b). Id. The three-judge panel found that it remained bound by Ninth Circuit precedent because this circuit authority was not "clearly irreconcilable with the reasoning or theory of" Kokesh. Id. Although Judge O'Scannlain and Judge Bea noted in a special concurrence that Kokesh did call into question the viability of Ninth Circuit precedent, see id. at 433, absent an en banc review explicitly overruling that precedent, Commerce Planet remains controlling authority.

Accordingly, the Court finds that the monetary relief the FTC seeks is a permissible form of equitable relief pursuant to Ninth Circuit precedent. See Commerce Planet, 815 F.3d at 598-99. Despite the apparent similarities between equitable monetary relief under § 13(b) and disgorgement in SEC proceedings, the Ninth Circuit in AMG Capital Mgmt. found that Kokesh was not entirely inconsistent with circuit precedent such that it expressly or impliedly overturned circuit authority. See 910 F.3d at 427. Therefore, the Court finds that the FTC may permissibly seek monetary relief ancillary to an injunction under § 13(b). See Commerce Planet, 815 F.3d at 598-99.

EPS next argues that the Court should revisit the Ninth Circuit precedent articulated in Commerce Planet. (Doc. 153-1 at 14.) However, the Court declines EPS's invitation to set aside or "revisit" Ninth Circuit precedent as it has no authority to do so. See Hart v. Massanari, 266 F.3d 1155, 1175 (9th Cir. 2001)

("A district court bound by circuit authority ... has no choice but to follow it, even if convinced that such authority was wrongly decided.").

Based on the foregoing, the Court denies EPS's motion to dismiss the FTC's claim for monetary relief. (Doc. 153.)

### III. MOTION TO AMEND ANSWER

EPS moves to amend its amended answer pursuant to Federal Rule of Civil Procedure 15. (Doc. 170.) The Court filed a pretrial case management schedule on February 1, 2018, setting a sixty-day deadline for the parties to amend their pleadings. (Doc. 78 at 2.) Because the Court has already filed the pretrial case management schedule and the deadline to amend pleadings has long passed, Federal Rule of Civil Procedure 16, which requires good cause to amend a scheduling order, controls the inquiry into whether the pretrial case management schedule should be modified.

#### A. Background

*4 On May 31, 2019, EPS filed a motion to amend its answer, cross-claims, and third-party claims, requesting that the Court grant it leave to assert four cross-claims against Defendant Peterson based on Peterson's alleged theft of EPS's funds. (Doc. 170 at 1-2.) EPS contends that it discovered the facts underlying its cross-claims at Peterson's May 16 and 17, 2019 deposition and filed the instant motion in response. (Id. at 7.) The Court discusses the facts relevant to the discovery of EPS's cross-claims below.

On November 15, 2015 and March 2, 2016, the FTC issued a Civil Investigative Demand ("CID") to Peterson seeking testimonial evidence. (Doc. 175-1 at 2.) Pursuant to the CID, Peterson appeared for a non-public, investigational hearing on April 21, 2016. (Id.; Docs. 170 at 3; 175 at 9.) Counsel for EPS represented Peterson at the hearing. (Doc. 175 at 9.) At the hearing, the FTC questioned Peterson about two check payments he received from entities associated with the KMA-Wigdore Defendants. (Id.) The FTC showed Peterson copies of these checks. (Id.) Peterson's endorsement and bank account number x1402 appeared on the back of each check. (Id.; Doc. 175-1 at 17-18.) Peterson testified he did not receive compensation outside of his EPS salary from the KMA-Wigdore Defendants and these payments were of a personal nature. (Docs. 170 at 3; 175 at 9.)

In 2017, the Department of Treasury contacted EPS regarding an investigation into $1,000,000 in funds that the Department

2019 WL 4287298

believed had been taken by an EPS employee. (Doc. 197 at 5, 7.) The Department indicated that the funds had been transferred into a checking account at Academy Bank, belonging to another EPS employee, not Peterson. (Id. at 7-8.)

On July 28, 2017, the FTC filed the instant action. (Docs. 1; 175 at 9.) EPS arranged for counsel to represent Dorsey, McCann, and Peterson in the matter because Peterson was employed by EPS at that time. (Doc. 175 at 9.) However, Peterson left EPS on September 30, 2017 – the same day that Peterson, EPS's Chief Operating Officer ("COO") Anthony Maley, Dorsey, and McCann were scheduled to meet with a merchant-client regarding the missing $1,000,000. (Id. at 9-10.) Counsel for EPS represented Peterson until October 30, 2018, when the Court granted EPS counsel's motion to withdraw. (Id. at 11.)

As the litigation progressed, the FTC provided EPS with a review copy of its electronically-stored information ("ESI") production pursuant to the Mandatory Initial Discovery Pilot ("MIDP") program on January 17, 2018. (Docs. 197 at 3; 175 at 10; 175-1 at 3.) Included in this production were bank records for entities associated with the KMA-Wigdore Defendants, reflecting payments to Peterson. (Docs. 175 at 10; 175-1 at 3.) The production also included a spreadsheet, generated by an EPS employee, that highlighted transfers from EPS's Diverted Funds Account to a routing number linked to a bank account at Academy Bank. (Docs. 197 at 3; 175 at 10; 175-1 at 3.) The Diverted Funds Account is a holding account controlled by EPS and Merrick Bank for pending transactions suspected of fraud.[2] (Doc. 170 at 4.)

**\*5** On August 7, 2018, the FTC propounded discovery requests on Peterson, Dorsey, McCann, and EPS, which included Requests for Production and Interrogatories. (Doc. 175 at 10.) The FTC also served a subpoena on Academy Bank on that date. (Id.)

In the interrogatory served on Peterson, the FTC requested information about payments Peterson received from the Diverted Funds Account and stated in a footnote that "Appendix 2 contains examples of payments from the Diverted Funds Account into your Academy Bank account x1402." (Doc. 175-1 at 120 n.2.) Appendix 2, titled "Payments from Diverted Funds Account to Academy Bank Account x1402," was attached to the interrogatory, listing examples of numerous transfers from the Diverted Funds Account into Peterson's bank account. (Id. at 130.) The FTC also requested information about payments Peterson

received from the KMA-Wigdore Defendants. (Id. at 122.) The FTC attached Appendix 3, titled "Checks from Wigdore/ Abdelmesseh Entities or Dynasty Payable to Peterson," to the interrogatory. (Id. at 131.) This appendix detailed examples of checks that were made payable to Peterson drawn on bank accounts from entities associated with the KMA-Wigdore Defendants. (Id.)

Similar to the interrogatory served on Peterson, the interrogatories served on both Dorsey and McCann requested information about all payments made to Peterson from the Diverted Funds Account. (Id. at 79, 99.) The interrogatories contained a footnote, stating "Appendix 2 contains examples of payments from the Diverted Funds Account into Peterson's Academy Bank account x1402." (Id. at 79 n.2, 99 n.2.) Appendix 2, titled "Payments from Diverted Funds Account to Academy Bank Account x1402," was attached to Dorsey's and McCann's Interrogatories. (Id. at 89, 109.)

In the subpoena served on Academy Bank, the FTC requested information regarding two bank accounts associated with Peterson – specifically, bank accounts x1402 and x0106. (Docs. 175 at 10; 175-1 at 150-51.)

On the day the FTC propounded its discovery requests, the FTC emailed counsel for all the parties, notifying them of the discovery requests and attached to the email copies of the Requests for Production, Interrogatories, and Subpoena. (Doc. 175 at 10.)

In October 2018, the FTC produced to all parties its first supplemental MIDP ESI production. (Id.; Doc. 175-1 at 5, 157.) The supplemental production included Academy Bank's response to the FTC's subpoena. (Docs. 175 at 11; 175-1 at 5, 157.) The documents produced included copies of signature cards, bank statements, and images of deposited checks from two bank accounts associated with Peterson. (Doc. 175 at 11.)

Peterson did not respond to the FTC's discovery request, so on November 29, 2018 the FTC mailed him a letter, notifying him of the outstanding requests. (Id.) Then, on December 18, 2018, the FTC spoke with Peterson over the phone. (Id. at 12; Docs. 175-1 at 5-6; 197 at 4.) During the conversation, Peterson stated that the transfers listed in Appendix 2 ("Payments from Diverted Funds Account to Academy Bank Account x1402") of the August 7, 2018 Interrogatory were bonuses authorized by Dorsey. (Doc. 175 at 12.) Peterson also stated that the payments listed in Appendix 3 ("Checks from Wigdore/Abdelmesseh Entities or Dynasty Payable to

2019 WL 4287298

Peterson") of the August 7, 2018 Interrogatory were payments that the KMA-Wigdore Defendants made to Peterson for help with fighting chargebacks. (Id.)

**\*6** EPS served discovery requests on the FTC on February 25, 2019, requesting summaries of the FTC's conversations with Peterson and any evidence of payments from the KMA-Wigdore Defendants to Peterson. (Id.; Doc. 197 at 4.) On April 26, 2019, the FTC produced summaries of its conversations with Peterson. (Docs. 175 at 12; 197 at 4.) In response to EPS's request for evidence of payments from the KMA-Wigdore Defendants, the FTC reproduced copies of Appendix 3 from the August 7, 2018 Interrogatory. (Docs. 175 at 12; 197 at 4.)

On May 16 and 17, 2019, Peterson was deposed. (Docs. 175-1 at 6-7; 197 at 5.) At the deposition, Peterson rolled back his prior testimony. That is, he admitted to accepting "kickbacks" from the KMA-Wigdore Defendants, stated that the KMA-Wigdore Defendants offered to pay him for "chargeback consulting services," testified that he disclosed the KMA-Wigdore Defendants' payments to EPS's COO, and admitted to accepting transfers from the Diverted Funds Account into his Academy Bank account. (Docs. 175-1 at 6-7; 197 at 4.)

In response to Peterson's deposition, EPS filed the instant motion to amend its answer to assert cross-claims against Peterson. (Doc. 170.)

### B. Legal Standard

After a district court has filed a pretrial case management schedule pursuant to Federal Rule of Civil Procedure 16, establishing a timetable for amending pleadings, Rule 16 standards control any modification. See Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 607-08 (9th Cir. 1992). Pursuant to Rule 16, a case management schedule shall not be modified except by leave of court upon a showing of good cause. Fed. R. Civ. P. 16(b)(4). The good cause standard primarily considers the diligence of the party seeking the amendment. See Johnson, 975 F.2d at 609. A district court may modify a pretrial schedule if amendment cannot reasonably be sought despite the diligence of the party seeking the modification. Id.

"The good cause standard typically will not be met where the party seeking to modify the scheduling order has been aware of the facts and theories supporting amendment since the inception of the action." In re W. States Wholesale Nat. Gas Antitrust Litig., 715 F.3d 716, 737 (9th Cir. 2013). Similarly,

a party does not show good cause where it does not conduct a basic investigation into the circumstances underlying its claims until after the deadline to amend has passed. See, e.g., Hernandez v. Select Portfolio Servicing, Inc., CV 15-1896 PA (AJWx), 2016 WL 770869, at \*3 (C.D. Cal. Feb. 24, 2016).

If the party is able to establish good cause, then the party must also demonstrate that the amendment is proper under Rule 15. See Johnson, 975 F.2d at 608. Rule 15 permits a party to amend a pleading "with the opposing party's consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Although leave to amend "shall be freely given when justice so requires," it "is not to be granted automatically." Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1087 (9th Cir. 2002) (citing Jackson v. Bank of Haw., 902 F.2d 1385, 1387 (9th Cir. 1990)). A district court may deny a motion for leave to amend if permitting an amendment would, among other things, cause an undue delay in the litigation or prejudice the opposing party. See Jackson, 902 F.2d at 1387; see also Solomon v. N. Am. Life & Cas. Ins., 151 F.3d 1132, 1139 (9th Cir. 1998) (affirming district court's denial of motion to amend pleadings filed on the eve of the discovery deadline). A court's discretion to deny leave to amend is particularly broad where Plaintiff has previously been granted leave to amend. Sisseton-Wahpeton Sioux Tribe v. United States, 90 F.3d 351, 355-56 (9th Cir. 1996).

**\*7** While the Rule 15 factors should be analyzed with "extreme liberality" toward favoring amendments, see United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981), the moving party cannot "appeal to the liberal amendment procedures afforded by Rule 15" unless it first "satisf[ies] the *more stringent* 'good cause' showing required under Rule 16." AmerisourceBergen Corp. v. Dialysist W., Inc., 465 F.3d 946, 952 (9th Cir. 2006) (emphasis in original).

### C. Discussion

EPS requests leave to amend its amended answer to add cross-claims against Peterson for deceit based on fraud, civil conspiracy to commit deceit based on fraud, conversion and theft, and breach of fiduciary duty. (Doc. 170 at 1-2.) EPS alleges that it did not have a basis for asserting these additional cross-claims against Peterson until Peterson rolled back his prior testimony at the May 2019 deposition.[3] (Id. at 7.) Accordingly, EPS contends that it was "diligent in ferreting out Peterson's theft and deception and in asserting the added claims against him as soon as EPS had a good faith basis for the claims." (Doc. 197 at 7.)

In opposition, the FTC contends that EPS was not diligent in seeking an amendment. (Doc. 175 at 14-15.) The FTC argues that the facts that form the basis of EPS's cross-claims were readily ascertainable as early as Peterson's testimony in 2016. (Id. at 15.) If not in 2016, then the FTC argues that the facts were discernible at least by January 2018, when the FTC disclosed a spreadsheet to EPS that highlighted transfers from the Diverted Funds Account to Peterson's bank account. (Id.) Because EPS waited to assert its cross-claims until after Peterson's deposition, the FTC contends that EPS was not diligent. (Id.)

Here, the Court finds that EPS was not diligent in seeking to amend its answer because the facts underlying EPS's cross-claims were readily discernible sooner than Peterson's May 2019 deposition. Although the FTC contends that EPS knew or should have known of the facts underlying its cross-claims as early as Peterson's hearing in 2016, the Court disagrees. At the time of Peterson's hearing, Peterson was employed by EPS, and EPS had no reason to question the veracity of his testimony. Thus, Peterson's then testimony regarding payments from the KMA-Wigdore Defendants would not have put EPS on notice of potential cross-claims.

Nor could the spreadsheet disclosed in the FTC's January 2018 MIDP production have put EPS on notice of potential cross-claims. The FTC contends that because the spreadsheet highlighted transfers from the Diverted Funds Account into an Academy Bank account, EPS should have investigated Peterson for theft at that time. (Doc. 175 at 15.) However, EPS states that it did not further investigate because it "assumed that the Academmy [sic] Bank account" listed in the spreadsheet "was the one related to the other EPS employee and the matter being investigated by the Treasury Department." (Doc. 197 at 8.) While EPS's "assumption" does not constitute due diligence, the Court agrees with EPS that the facts underlying its cross-claims were not likely discoverable at this time. At the time the FTC produced the spreadsheet, EPS was already aware of transfers from the Diverted Funds Account into a bank account at Academy Bank because of the Department of Treasury's investigation. Because the spreadsheet provided no additional information about the bank account – i.e., the account number or the account owner – at Academy Bank, the spreadsheet alone would not have prompted EPS to further investigate the transfers, or, more specifically, Peterson.

**\*8** However, the Court finds that EPS should have been on notice of the facts underlying its cross-claims as early as August 7, 2018 – the date the FTC emailed counsel copies of its discovery requests and subpoena to Academy Bank. First, the interrogatories attached to the email asked about payments Peterson received from the Diverted Funds Account and attached an appendix, detailing transfers that were made to "*Peterson's* Academy Bank account *x1402.*" (Doc. 175-1 at 79 n.2, 99 n.2 (emphasis added).) This information should have put EPS on notice that Peterson was potentially involved in the transfers from the Diverted Funds Account. Moreover, because the subpoena served on Academy Bank requested information about bank accounts associated with Peterson, and, more specifically, bank account number x1402, EPS should have considered that the Academy Bank account suspected of receiving funds from the Diverted Funds Account was associated with Peterson. Given the numerous indications of Peterson's involvement in the transfers from the Diverted Funds Account, the Court finds that EPS should have known of the facts underlying its cross-claims at this time.

Even if the facts underlying EPS's cross-claims were not readily discernible at that time, the Court finds that the FTC's October 2018 supplemental disclosures should have put EPS on notice of its potential cross-claims. In the FTC's October 2018 supplemental disclosures, the FTC provided Academy Bank's response to its subpoena, which included copies of checks deposited into Peterson's bank account, substantiating the transfers from the Diverted Funds Account. (Doc. 175 at 11.) Accordingly, EPS should have been on notice of Peterson's involvement in the transfers from the Diverted Funds Account and should have investigated Peterson at that time. By stating that EPS should have been on notice, the Court is not suggesting that EPS should have filed its motion to amend at that time. Indeed, the Court is aware of the obligations imposed on attorneys by Federal Rule of Civil Procedure 11 and the Model Rules of Professional Conduct. However, at the very least, a reasonable attorney under the circumstances would have undertaken further inquiry to determine whether Peterson was involved in the transfers from the Diverted Funds Account. EPS, however, failed to investigate further, failed to propound any discovery requests on Peterson,[4] and instead, waited until Peterson verbally confirmed his involvement during his May 2019 deposition – nearly seven months later – to assert its cross-claims; this does not constitute due diligence. See, e.g., Act Grp., Inc. v. Hamlin, No. CV-12-567-PHX-SMM, 2014 WL 1285857, at \*6-7 (D. Ariz. Mar. 28, 2014) (finding lack of due diligence

2019 WL 4287298

where movant had prior knowledge of facts underlying claims yet waited until it had sworn testimony to request leave to amend). Thus, the Court finds that EPS was not diligent in requesting leave to amend its answer and failed to establish good cause to amend the pretrial case management schedule.

Moreover, even if EPS had demonstrated due diligence, the Court notes that the cross-claims that EPS seeks to assert appear to be unrelated to the core proceeding before the Court. That is, allowing EPS to join the claims would be permissive in nature. Accordingly, the Court will deny EPS's motion to amend its answer. (Doc. 170.)

**IV. MOTION FOR JUDGMENT ON THE PLEADINGS**
Under Federal Rule of Civil Procedure 12(c), Dorsey and McCann move for judgment on the pleadings, contending the FTC failed to allege sufficient facts in the FAC to establish they are "violating" or "about to violate" the FTC Act. (Doc. 173-1 at 1-2, 8.)

   **A. Legal Standard**
 **\*9** Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed – but early enough not to delay trial – any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Judgment on the pleadings is proper when, taking all the allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law." Honey, 195 F.3d at 532-33. Judgment on the pleadings is only appropriate when the moving party establishes no material fact remains to be resolved. Doleman, 727 F.2d at 1482. Dismissal on the pleadings is inappropriate if the facts as pled would entitle the non-moving party to a remedy. See Merchs. Home Delivery Serv., Inc., 50 F.3d at 1488. "The court cannot consider evidence outside the pleadings unless the court treats the motion for judgment on the pleadings as a motion for summary judgment under Fed. R. Civ. P. 56." Phillips & Assocs., P.C., 764 F. Supp. 2d at 1175.

   **B. Discussion**
Dorsey and McCann move for judgment on the pleadings, contending that the FTC has failed to plead sufficient facts to invoke the FTC's limited authority under 15 U.S.C. § 53(b). (Doc. 173-1 at 4.) Because the FAC states that Defendants' unlawful conduct ceased in 2013, Dorsey and McCann argue that the FTC has failed to allege that they are "violating" or "about to violate" the law pursuant to § 53(b). (Id. at 8-9.) In

support, Dorsey and McCann cite Federal Trade Commission v. Shire ViroPharma, Inc., 917 F.3d 147 (3d Cir. 2019), for the proposition that the plain language of the statute prohibits the FTC from bringing a claim under § 53(b) based on allegations of long-past conduct – that is, the FTC must allege a current or imminent violation of the FTC Act. (Id. at 6.) Because this proposition is contrary to the standard articulated by the Ninth Circuit in Federal Trade Commission v. Evans Products Co., 775 F.3d 1084, 1087 (9th Cir. 1985), the Court declines to follow Shire ViroPharma. [5]

In opposition, the FTC emphasizes that it may bring an action for permanent injunction whenever it has "*reason to believe*" an individual "is violating, or is about to violate" the FTC Act and contends that such belief is unreviewable. (Doc. 184 at 10 (emphasis in original).) However, even if the FTC's "reason to believe" is reviewable, the FTC argues that it pled sufficient facts based upon Defendants' past conduct to establish that the FTC had reason to believe that Dorsey and McCann are violating or about to violate the law. (Id. at 14.)

Although the Court declines to rule on whether the FTC's "reason to believe" is reviewable, the Court agrees with the FTC that it has pled sufficient facts to withstand Dorsey and McCann's motion.

Section 53(b) states that the FTC may seek an injunction if it has "reason to believe" a person "is violating, or is about to violate" any law enforced by the FTC. 15 U.S.C. § 53(b). A court's power to grant injunctive relief survives the discontinuance of illegal conduct. United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953). Indeed, "[a]n inference arises from illegal past conduct that future violations may occur. The fact that illegal conduct has ceased does not foreclose injunctive relief." F.T.C. v. Citigroup Inc., No. 1:01-CV-606-JTC, 2001 WL 1763439 (N.D. Ga. Dec. 27, 2001) (internal quotations omitted) (quoting S.E.C. v. Koracorp Indus., Inc., 575 F.2d 692, 698 (9th Cir. 1978)). The voluntary cessation of violative conduct does not vitiate the need for injunctive relief if there is a possibility that the defendant is "free to return to his old ways." W. T. Grant Co., 345 U.S. at 632; F.T.C. v. Affordable Media, LLC, 179 F.3d 1228, 1237 (9th Cir. 1999) (internal quotations and citations omitted); F.T.C. v. Sage Seminars, Inc., No. C 95-2854 SBA, 1995 WL 798938, at *6 (N.D. Cal. Nov. 2, 1995) (citing W. T. Grant Co., 345 U.S. at 632). Indeed, courts should be wary of a defendant's termination of illegal conduct when a defendant voluntarily ceases unlawful conduct in anticipation of formal intervention. Id. (citing W. T. Grant Co., 345 U.S. at 632 n.5.)

2019 WL 4287298

Thus, in the Ninth Circuit, if a violation of the FTC Act has ceased, an injunction will issue under § 53(b) if the FTC has reason to believe that the past conduct is "likely to recur." F.T.C. v. Evans Prods. Co., 775 F.2d 1084, 1087 (9th Cir. 1985). [6]

**\*10** To determine whether past conduct is likely to recur, courts consider the totality of the circumstances surrounding the defendant's conduct including "the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." S.E.C. v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980); F.T.C. v. Magui Publishers, Inc., Civ. No. 89-3818RSWL(GX), 1991 WL 90895, at \*15 (C.D. Cal. Mar. 28, 1991).

Here, the Court finds that the FTC has pled sufficient facts to establish that it has "reason to believe" Dorsey and McCann's violations are "likely to recur." See Evans Prods., 775 F.2d at 1087. Although Dorsey and McCann contend that the need for a permanent injunction is vitiated because the alleged unlawful conduct ended in 2013, the Court is unconvinced. As pled in the FAC, Dorsey and McCann ceased their alleged unlawful conduct in 2013. (Doc. 85 at 5, 11, 49.) Because the FTC's prosecution of the MNF scheme also occurred in 2013, the Court finds it reasonable to infer that Dorsey and McCann's cessation took place in response to the FTC's litigation. Accordingly, Dorsey and McCann's cessation of their unlawful conduct can hardly be classified as voluntary. Moreover, Dorsey and McCann further contend that an injunction is unnecessary because the FTC has failed to allege that Dorsey and McCann have "violated the FTC Act in the interim time between 2014 and July 2017" – the date the FTC filed the instant matter. (Doc. 173-1 at 10.) The Court finds this argument equally unconvincing. The FAC alleges that the FTC litigated the MNF scheme from 2013 through 2015, and the Arizona Attorney General's Office prosecuted the MNF principals from 2016 through 2017. (Doc. 85 at 13.) Because the government has continually prosecuted aspects of this scheme since 2013, the Court finds that Dorsey and McCann's lack of continued violations fails to qualify as a voluntary discontinuance, and thus, the need for a permanent injunction is not vitiated.

The Court further finds that the FTC alleged a reasonable belief of likely recurrence because the FAC contends that Dorsey and McCann were integral in intentionally perpetrating the MNF scheme. See Murphy, 626 F.2d at 655 (considering the degree of scienter involved to determine whether past conduct is likely to recur). To perpetrate the scheme, EPS sales agents created at least 23 fictitious entities and submitted the entities' merchant applications to EPS for underwriting approval. The FAC alleges that Dorsey and McCann were directly responsible for approving all merchant applications submitted to EPS and approved many applications despite each application containing various indications of fraud. (Doc. 85 at 44-47.) Accordingly, because the FAC indicates a pattern and practice of Dorsey and McCann automatically approving fictious merchant applications, the Court finds the FTC alleged a reasonable belief that the conduct is likely to recur.

Last, in conjunction with the above-mentioned factors, the Court is convinced that the FTC has sufficiently pled a reasonable belief that Dorsey and McCann's past wrongs are likely to recur because Dorsey and McCann remain in the same professional occupation. See Murphy, 626 F.2d at 655 (considering defendant's occupation to determine whether past conduct is likely to recur). At the time of the alleged violations, Dorsey was the CEO and co-owner of EPS, and McCann was the managing member and co-owner of EPS. (Doc. 85 at 10-11.) The FTC also alleges that Dorsey and McCann continue to be "at the helm of EPS, which continues to approve and board merchants and utilize sales agents." (Docs. 184 at 18; 85 at 10-11.) Because Dorsey and McCann are engaged in the same professional occupation, the Court finds that they could easily reengage in similar unlawful conduct in the future absent a permanent injunction. See, e.g., F.T.C. v. Accusearch Inc., 570 F.3d 1187, 1202 (10th Cir. 2009) (finding past conduct likely to recur where the defendant remained in the same industry such that it had the capacity to engage in similar unfair acts or practices in the future).

**\*11** Therefore, the Court finds that the FTC has pled sufficient facts that indicate a reasonable belief that Dorsey and McCann's past conduct is likely to recur. See Evans Prods., 775 F.2d at 1087. Thus, the Court denies Dorsey and McCann's Motion for Judgment on the Pleadings (Doc. 173) because the FTC has pled a plausible claim for injunctive relief under 15 U.S.C. § 53(b).

**V. CONCLUSION**

Based on the foregoing,

2019 WL 4287298

**IT IS HEREBY ORDERED denying** Defendants Electronic Payment Systems, LLC and Electronic Payment Transfer, LLC's Motion to Dismiss Plaintiff Federal Trade Commission's Claim for Monetary Relief. (Doc. 153.)

**IT IS FURTHER ORDERED denying** Defendants Electronic Payment Systems, LLC and Electronic Payment Transfer, LLC's Motion to Amend its Amended Answer, Crossclaims, and Third-Party Claims. (Doc. 170.)

**IT IS FURTHER ORDERED denying** Defendants John Dorsey and Thomas McCann's Motion for Judgment on the Pleadings. (Doc. 173.)

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4287298

---

**Footnotes**

1    The various parties requested oral argument on two of the pending motions. (Docs. 153, 173.) The Court denies the parties' requests because the issues have been fully briefed and oral argument will not aid the Court's decision. See Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

2    "Normally, the funds that a merchant is entitled to receive as a result of a credit card transaction are delivered electronically to the merchant's bank account." (Doc. 170 at 4.) However, for suspicious transactions, "EPS or Merrick Bank had the ability to divert those funds into another account until the issue involving the suspicious transaction was resolved. The account where the funds are held pending this resolution is referred to as the Diverted Funds Account." (Id.)

3    The Court notes a discrepancy in EPS's pleadings. EPS states in its motion to amend that it did not discover facts underlying its cross-claims – that is, Peterson's theft – until Peterson's deposition in May 2019. (Doc. 170 at 7.) However, in its Reply, EPS states that it first learned about Peterson's theft on April 26, 2019 when it received the FTC's discovery responses. (Doc. 197 at 6.)

4    EPS states that it could have propounded discovery on Peterson, but because Peterson failed to respond to the FTC's discovery request, "there was no reason to believe Peterson would have been any more responsive to a discovery request from EPS." (Doc. 197 at 9.) EPS further contends that it did not propound discovery at that time because "the deposition of Peterson had been scheduled and EPS knew it would have the opportunity to ask Peterson about the additional checks at his deposition." (Id.) EPS's arguments are contrary to a showing of due diligence.

5    The Court also notes that it is improper to cite other circuit authority in disregard for controlling Ninth Circuit precedent without stating that Defendants intend to request an en banc review of that controlling precedent.

6    District courts in the Ninth Circuit have applied this standard to determine whether the FTC has pled a plausible claim for relief under 15 U.S.C. § 53(b). See, e.g., F.T.C. v. Qualcomm Inc., No. 17-CV-00220-LHK, 2019 WL 2206013 (N.D. Cal. May 21, 2019); F.T.C. v. Vemma Nutrition Co., No. CV-15-01578-PHX-JJT, 2015 WL 11118111 (D. Ariz. Sept. 18, 2015); F.T.C. v. Merch. Servs. Direct, LLC, No. 13-CV-0279-TOR, 2013 WL 4094394 (E.D. Wash. Aug. 13, 2013); F.T.C. v. Infinity Grp. Servs., Inc., No. SACV 09-977 DOC (MLGx), 2009 WL 10672411 (C.D. Cal. Sept. 2, 2009); F.T.C. v. Equinox Int'l Corp., No. CV-S-990969HBR (RLH), 1999 WL 1425373 (D. Nev. Sept. 14, 1999).

---

**End of Document**                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2025 WL 3458822

2025 WL 3458822
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.

FEDERAL TRADE COMMISSION, Plaintiff,

v.

META PLATFORMS, INC., Defendant.

Civil Action No. 20-3590 (JEB)
|
Signed December 2, 2025

**Synopsis**
**Background:** Federal Trade Commission (FTC) brought action alleging that online social networking provider maintained monopoly in market for personal social networking services, in violation of the Sherman Act, by acquiring firms that it believed were well positioned to erode its monopoly and by adopting policies preventing interoperability between its service and certain other applications that it saw as threats. The matter proceeded to bench trial.

**Holdings:** The District Court, James E. Boasberg, Chief Judge, held that:

fact that provider had profits that were greater than its cost of capital did not prove that it had monopoly power in relevant market, as element of claim that provider maintained monopoly in violation of Sherman Act;

fact that provider charged higher quality-adjusted price to subset of its application users by showing them more advertisements did not show that provider had monopoly power, as element of claim that provider maintained monopoly in violation of Sherman Act;

video entertainment applications were competitors in same product market for provider's applications, in defining product market, as element of claim that provider maintained monopoly in violation of Sherman Act;

provider competed in one market for connected and unconnected content, not two separate markets, in action alleging that provider maintained monopoly in violation of Sherman Act;

factors to identify distinct product markets indicated that personal social networking was not separate market from other social media applications, in analysis of claim that provider maintained monopoly in violation of Sherman Act; and

provider's market share was modest, and, thus, provider did not hold monopoly in market for social networking and video applications, in violation of Sherman Act.

Judgment for defendant.

**Attorneys and Law Firms**

Ario Fazli, Peter Taylor, Abby L. Dennis, Albert Teng, Alicia Loh, Barrett James Anderson, Christopher Douglas Harris, Elan J. Weinberger, Gary Mitchell London, Jr., Jennifer Elyse Tarr, Krisha A. Cerilli, Maria M. DiMoscato, Mark Silvia, Michael H. Smith, Michael David White, Nathan Daniel Brenner, Nicholas A. Widnell, Njeri Mugure, Noel Miller, Oren Vitenson, Owen T. Masters, Patricia Galvan, Robert E. Zuver, Jr., Stephen Pearson, III, Timothy Slattery, Daniel John Matheson, Erin Frake, David Brunfeld, Thomas G. Mattes, Justin Lorber, Susan Musser, Washington, DC, Melissa M. Ihnat, Federal Trade Commission, Technology Enforcement Division, Washington, DC, Benjamin D. Rashkovich, Portland, OR, Danica Noble, William Stuart Hirschfeld, Federal Trade Commission Northwest Regional Office, Seattle, WA, Douglas A. Gretz, Federal Trade Commission, New York, NY, Jessica Moy, Karen Virginia Goff, Federal Trade Commission, San Francisco, CA, for Plaintiff.

David Gringer, Wilmer Cutler Pickering Hale & Dorr LLP, New York, NY, Sheila R. Adams James, Pro Hac Vice, James P. Rouhandeh, Pro Hac Vice, Michael Stuart Scheinkman, Davis Polk & Wardwell LLP, New York, NY, Kevin J. Orsini, Cravath, Swaine & Moore LLP, New York, NY, Kevin Brent Huff, Mark Charles Hansen, Andrew Skaras, Hannah Dayle Carlin DePalo, Joseph S. Hall, Aaseesh P. Polavarapu, Alex Parkinson, Ana Nikolic Paul, Andrew Edward Goldsmith, Ariela Migdal, Pro Hac Vice, Catherine Redlingshafer, Pro Hac Vice, Daniel V. Dorris, Evan T. Leo, Geoffrey M. Klineberg, Hilary Weaver, Jacob Hartman, Pro Hac Vice, Jordan Reinold Garcia Gonzalez, Pro Hac Vice, Kevin David Horvitz, Lillian V. Smith, Natalie Giotta, Pro Hac Vice, Nataliia Gillespie, Pro Hac Vice, Silvija A. Strikis, Zachary Michael Meskell, Diego Negron-Reichard,

Alex Treiger, Kellogg, Hansen, Todd, Figel & Frederick, PLLC, Washington, DC, Justin Berg, Washington, DC, Perry A. Lange, Wilmer Cutler Pickering Hale & Dorr LLP, Washington, DC, Sonal Naresh Mehta, Pro Hac Vice, Wilmer Cutler Pickering Hale & Dorr LLP, Palo Alto, CA, for Defendant.

## MEMORANDUM OPINION

JAMES E. BOASBERG, Chief Judge

 **\*1**  Believing that the only constant in the world was change, the Greek philosopher Heraclitus posited that no man can ever step into the same river twice. In the online world of social media, the current runs fast, too. The landscape that existed only five years ago when the Federal Trade Commission brought this antitrust suit has changed markedly. While it once might have made sense to partition apps into separate markets of social networking and social media, that wall has since broken down.

In this action, the FTC has argued that Facebook, Instagram, Snapchat, and minor player MeWe compete only with one another in a market that the agency calls "personal social networking" (PSN). It claims that Meta holds a monopoly in this market and, faced with challenges to its dominance, preserved its monopoly not by outcompeting its upstart rivals Instagram and WhatsApp, but by buying them. This, the agency has maintained, constitutes maintaining monopoly power through means other than competition on the merits, which would violate Section 2 of the Sherman Act.

Meta's position, conversely, is that if PSN apps were ever a separate economic unit, they no longer are. The company sees itself as competing in the broader field of social media, which at a minimum includes TikTok and YouTube, fierce competitors for users' time and attention in this space. Adding those two companies to the relevant market, Defendant points out, diminishes Meta's share below monopoly level. What is more, Meta defends its acquisitions as beneficial to consumers.

In this fifth year of litigation, the Court held a lengthy bench trial, hearing from myriad witnesses throughout the industry, as well as from dueling sets of experts. As it has forecast in prior Opinions over the years, the FTC has an uphill battle to establish the contours of any separate PSN market and Defendant's monopoly therein. The Court ultimately concludes that the agency has not carried its burden: Meta holds no monopoly in the relevant market. Judgment must therefore be entered in its favor.

**Table of Contents**

I. Background...——
A. The Platforms...——

   1. Facebook, Instagram, TikTok, YouTube...——

   2. The Evolution of Meta's Apps...——

   3. Convergence...——

B. Meta's Business Model...——

C. Procedural History...——

II. Analysis...——
A. Monopolization...——

B. Timing...——

C. Direct Evidence...——

   1. Profits...——

   2. Quality-Adjusted Price...——

     a. Ad Load...——

     b. Sentiment...——

     c. Underinvestment in Friends and Family...——

   3. Price Discrimination...——

D. Indirect Evidence...——

   1. Empirical Evidence of Substitution...——

     a. Observational Evidence...——

       i. Response to TikTok...——

       ii. Meta Study Panel...——

     b. Natural and Field Experiments...——

       i. Payment Experiment...——

       ii. 2021 Meta Outage...——

iii. India TikTok Ban...——

iv. U.S. TikTok Shutdown...——

v. 2018 YouTube Outage...——

c. Interpreting the Evidence...——

d. The FTC's Counterarguments...——

i. Hemphill...——

ii. Cellophane Fallacy...——

iii. Expansion into New Market...——

2. Brown Shoe...——

a. Peculiar Characteristics and Uses...——

i. Peculiar Characteristics...——

ii. Peculiar Uses...——

b. Industry or Public Recognition...——

*2 c. Unique Production Facilities...——

d. Distinct Customers, Prices, and Sensitivity to Price Changes...——

e. Overall Assessment...——

3. Whole Foods...——

E. Monopoly Power...——

1. Measuring Market Share...——

2. Meta's Market Share and Market Power...——

III. Conclusion...——

## I. Background

Rather than aggregate all its factual findings in one lengthy recitation, the Court uses this section to lay out the background against which to view the evidence it will then discuss. It begins with the platforms themselves: Facebook and Instagram, as well as two other apps that will play important roles in what follows — TikTok and YouTube. It next details Meta's business model, whose particulars will be critical in assessing market definition and monopoly power.

The section winds up with a summary of this case's procedural history.

### A. The Platforms

Consistent with our theme of change, the Court emphasizes that Facebook and Instagram have significantly transformed over the last several years. Before explaining that transformation, the Court first sketches the basics of Facebook, Instagram, TikTok, and YouTube. It then details how that quartet of social-media apps has recently converged to offer similar experiences.

#### 1. *Facebook, Instagram, TikTok, YouTube*

The mighty Meta of today was once a scrappy dorm-room startup called The Facebook. See ECF No. 94 (Answer), ¶ 23. This upstart website — a threadbare tool to add friends and see their posts — launched for Harvard students in 2004, fanned out to other college campuses, and then opened up to the general public in 2006. Id. It kept growing at a dizzying pace: by the end of 2011, almost 850 million people a month were using Facebook. See Plaintiff's Exhibit (PX) 292 (Facebook S-1) at 8. Today, more than 3 billion people do. See Apr. 15 PM Tr. at 228:22–25.

If you are one of them, you can open Facebook's app and see your News Feed. See May 12 PM Tr. at 260:22–261:4; Apr. 14 PM Tr. at 151:21–24. This feed contains a mix of content from your friends, from accounts you follow, and from people who you do not know but who have posted something that Facebook thinks you will be interested in. See Apr. 14 PM Tr. at 170:9–15, 185:11–20; Defendant's Exhibit (DX) 1152 (Jan. 2025 Facebook Surface Breakdown). Just a tap away lie other features. These include Stories: disappearing posts from your friends and accounts you follow that are visible for only 24 hours. See Apr. 14 PM Tr. at 184:21–185:10; Stories, Facebook, https://perma.cc/69UV-N6UF. Or Facebook Reels, which Meta added in 2021. See ECF No. 539 (Joint Stipulations of Fact), ¶ 20. Reels are short videos that have been created by other users. Id., ¶ 21. They are made and posted by people whom a user does not know. See DX 1152 (Jan. 2025 Facebook Surface Breakdown). Instead, they are recommended by an AI algorithm based on the user's interests. See Apr. 16 AM Tr. at 24:21–25:5. Facebook also offers a separate app called Facebook Messenger, which lets users exchange private messages. Id. at 21:9–13, 105:14–21.

Facebook was not the only platform to sweep across the globe on the surging wave of social media. In 2010, Kevin Systrom and Mike Krieger launched an app called Instagram. See Joint Stipulations of Fact, ¶ 24. This app combined a photo-editing tool with a social network. If you downloaded the original Instagram, you could edit photos and upload them, follow other accounts, scroll through a feed of photos uploaded by accounts you followed, and like and comment on those photos. Id., ¶¶ 25–27; PX 3221 (Instagram Board Meeting Deck) at 13; Apr. 22 AM Tr. at 22:2–24:9.

**\*3** Facebook bought Instagram in 2012, see Joint Stipulations of Fact, ¶¶ 58–59, and has been adding new features ever since. See DX 1180 (New Instagram Features); DX 1208 (New Instagram Features, 2023–25). Instagram today looks a lot like Facebook. It has a Feed, containing posts from accounts that you follow and content from strangers that an AI algorithm recommends. See May 8 AM Tr. at 92:4–17, 114:6–19. It also has Stories. See May 8 AM Tr. at 22:10–17. Embedded throughout the app is Instagram Reels. See May 8 PM Tr. at 157:11–17. And it lets you send private messages to other users. See May 8 AM Tr. at 96:25–97:2.

Meta's other relevant platform is WhatsApp, an internet-based messaging app that launched as an independent company in 2009. See May 20 AM Tr. at 103:18–104:2; May 20 PM Tr. at 155:8–17. Facebook bought WhatsApp in 2014. See Joint Stipulations of Fact, ¶¶ 60–61. The FTC theorizes that Facebook feared WhatsApp would build its own social network and bought the service to keep it out of Facebook's lane. See ECF No. 622-1 (FTC Post-trial Mem.) at 44, 49. WhatsApp is therefore relevant to whether Meta maintained its monopoly through an anticompetitive acquisition, but both sides agree that it does not belong in the relevant market. Id. at 8; ECF No. 629-1 (Meta Post-trial Findings of Fact), ¶¶ 89–138. Because the Court decides this case on that market's boundaries alone, WhatsApp is not relevant to what follows and will now disappear from the case.

The company that started as a connection among Harvard students has thus grown to own three platforms. In 2021, the umbrella company changed its name to Meta. Introducing Meta: A Social Technology Company, Meta (Oct. 28, 2021), https://perma.cc/LD5Y-3P9J.

Two other social-media apps are relevant here: TikTok and YouTube. The former lets users watch and upload short videos. See Apr. 30 AM Tr. at 78:23–79:13. Like Facebook and Instagram, it has some social features: users can like

videos, comment on them, repost them, search for specific accounts, follow accounts, exchange messages, and share videos with others — either in a TikTok message or via text message. Id. at 62:23–63:8, 84:13–86:10, 86:22–87:7, 87:19–88:2, 88:17–21. Yet the app's breakthrough innovation and central feature opened a new path that traditional social networks had not yet explored: an AI algorithm that shows users content based not on their friends, but on their interests. See PX 689 (Adam Presser Decl.) at 16. This is TikTok's For You page, a scrollable feed that the algorithm assembles by trawling through the app's videos, analyzing the user's behavior, and predicting which video she will most want to see next. Id. More than 70% of time on TikTok is spent on this feed. See Apr. 30 AM Tr. at 53:21–54:10. TikTok is a recent import to the United States, having arrived only in 2018. Id. at 32:17–18. It has since spread furiously. As of the start of this year, more than 170 million Americans per month were using the app. Id. at 65:22–25.

Finally, YouTube. This platform lets users upload videos and watch the billions of videos uploaded by others. See Apr. 17 PM Tr. at 151:5–8, 151:24–152:2, 196:6–11. It also recommends videos based on each user's interests and what others are watching. Id. at 154:4:3–4, 157:23–158:4, 173:3–7. Users can like videos and comment on them. Id. at 160:6–11, 164:9–13. If watching a video on the YouTube app, they can tap a button to send it to others — say, by texting it to a friend. Id. at 189:23–191:1. Many videos on YouTube are longer than what you will find on TikTok or Instagram. See PX 13494 (Google Resp. to Australian Regulators) at 9; May 8 PM Tr. at 180:5–9. But the platform has also added YouTube Shorts, short videos that are virtually identical to a TikTok video or a Facebook or Instagram Reel. See Apr. 17 PM Tr. at 162:14–15; DX 1088 (TikTok Resp. to Australian Regulators) at 3–4.

### 2. *The Evolution of Meta's Apps*

**\*4** The Facebook and Instagram that exist today bear little resemblance to the versions that readers might remember from the 2010s. Time was, both apps primarily showed content from users' friends — you might log on to Facebook and see a friend's post on your wall, then open up Instagram to a feed full of pictures from your friends' weekends. See Apr. 14 PM Tr. at 170:9–13; Apr. 16 AM Tr. at 53:20–54:5; Apr. 22 AM Tr. at 26:4–27:17; DX 517 (Mosseri Post on Meaningful Social Interactions) at 1. Those versions of Meta's apps are gone. See Apr. 14 PM Tr. at 170:14–171:25; Apr. 29 AM Tr. at 9:12–25.

Americans now spend only 17% of their time on Facebook viewing content from their friends. See DX 1152 (Jan. 2025 Facebook Surface Breakdown). On Instagram, that number is 7%. See DX 1153 (Jan. 2025 Instagram Surface Breakdown). What has replaced content from friends? For the most part, short videos posted by strangers and recommended by AI.

A majority of Americans' time on Facebook is now spent watching videos. See DX 1147 (U.S. Share of Facebook Time Spent on Video). Same for their time on Instagram. See DX 1153 (Jan. 2025 Instagram Surface Breakdown). In particular, both apps have shifted to primarily showing Reels. See Apr. 29 PM Tr. at 193:10–194:5; PX 10034 (Apr. 2022 Meta Executives Email Thread) at 4. Adam Mosseri, the Head of Instagram, painted a particularly vivid picture of how central Reels is to that app: "[W]e integrated Reels throughout the entire experience. We added them to feed .... We added them to explore. We added them to the create flow. We added them to the Reels tab itself, and we added a Reels tab within the profile. So every tab ... across Instagram had Reels integrated in some way across them." May 8 PM Tr. at 157:11–17. Most of the time that Americans spend on Instagram is spent watching Reels, see DX 1153 (Jan. 2025 Instagram Surface Breakdown), and Reels is also the single most-used part of Facebook. See DX 1152 (Jan. 2025 Facebook Surface Breakdown).

Reels relates to some helpful vocabulary that the Court will be returning to. Meta uses the phrase "connected content" for posts from accounts that a user has friended or followed. See Apr. 14 PM Tr. at 185:21–186:5. By contrast, "unconnected content" is from accounts that the user has not friended or followed. Id. at 186:5–7; Apr. 15 PM Tr. at 199:18–200:2.

The shift to Reels is notable because they are entirely unconnected. See DX 1152 (Jan. 2025 Facebook Surface Breakdown); DX 1153 (Jan. 2025 Instagram Surface Breakdown). Even feeds that used to show endless streams of friends' posts now mostly display unconnected content. Today, fewer than 15% of posts that users see in Facebook's News Feed are original posts from their friends. See May 12 AM Tr. at 44:8–45:13; May 14 PM Tr. at 248:12–17; Defendant's Demonstrative (DDX) 29.3 (Facebook Feed Composition); see also DX 1152 (Jan. 2025 Facebook Surface Breakdown) (calculating this number as 25%, possibly by including content that friends reshare). On Instagram's Feed, that number is 5%. See DX 1153 (Jan. 2025 Instagram Surface Breakdown).

To be sure, connecting with friends remains an important part of both apps. See Apr. 14 PM Tr. at 162:11–163:8, 164:1–10, 181:13–25; May 8 AM Tr. at 18:8–19, 86:11–87:1; May 15 AM Tr. at 10:11–13; PX 708 (Mosseri Interview) at 12; PX 3008 (Facebook Feed & Ecosystems Deck) at 39; PX 10034 (Apr. 2022 Meta Executives Email Thread) at 1; PX 12341 (Zuckerberg-Mosseri Email Exchange) at 2–3; PX 12669 (FB App Strategy Thread) at 4; DX 522 (Instagram 2021 H2 Planning Primer) at 3. Yet friends' content has withdrawn from the main feature to a smaller ingredient in a blend. See May 14 PM Tr. at 218:7–12 (friend content "is becoming a supporting part of the cast instead of the main character"); PX 3827 (Aug. 2022 Meta Email Thread) at 2; May 12 AM Tr. at 41:2–8; May 8 AM Tr. at 30:8–31:8, 87:7–11; May 14 PM Tr. at 172:11–173:13, 174:15–175:2, 215:16–24; PX 10236 (Facebook H1 2022 Review) at 2; PX 12341 (Zuckerberg-Mosseri Email Exchange) at 2.

*5 How people use Facebook and Instagram socially has changed, too. Users have become far less likely to post publicly and instead primarily share content using private messages, either in the app or over text. See May 8 AM Tr. at 65:20–22, 87:7–11, 118:13–22; May 14 PM Tr. at 217:24–218:18, 221:5–9; DX 606 (Instagram U.S. Teen Messaging Deck) at 4, 10–11; DX 585 (Facebook Board Meeting Deck on Messaging) at 3, 6; DX 517 (Mosseri Post on Meaningful Social Interactions) at 2; PX 708 (Mosseri Interview) at 10; DX 600 (Facebook U.S. Long-Term Themes Deck) at 5.

Put those changes together — a shift from feeds full of friends' posts to ones dominated by unconnected content, and a pivot from posting in a semi-public feed to sending content to a single friend or a group chat — and both scrolling and sharing have transformed. A decade ago, users who checked Facebook or Instagram would see a stock of updates broadcasted by their friends: a status update, a baby picture, a video posted on a friend's Facebook wall. When they wanted to share, they would post something to this ever-growing feed for all their friends to see. Now, they are more likely to open the app and scroll through AI-recommended content, then share by sending that content as a private message. See Apr. 14 PM Tr. at 167:22–168:6; Apr. 15 PM Tr. at 213:3–13; Apr. 16 AM Tr. at 53:20–54:5; Apr. 16 PM Tr. at 165:22–166:7; May 12 AM Tr. at 63:14–64:2.

Why did this happen? The tectonic transformation was the sum of six smaller shifts.

2025 WL 3458822

First, smartphone usage exploded. In 2011, only 35% of Americans owned a smartphone. See May 13 AM Tr. at 62:2–8. By 2024, 91% did. Id. As Americans increasingly relied on their phones, they increasingly kept up with their friends by texting, especially using group chats that let them keep up with many friends at once. Texting a medium-sized group of close friends, it turns out, was often more appealing than broadcasting updates to 1,000 acquaintances. See Apr. 14 PM Tr. at 171:14–22; Apr. 16 AM Tr. at 63:6–64:8, 103:9–13; May 12 AM Tr. at 49:3–9, 63:5–20; DX 606 (U.S. Teen Messaging Deck) at 4; DX 585 (Facebook Board Meeting Deck on Messaging) at 3. Smartphones thus helped Americans easily share with select groups of friends they cared about, which in turn made posting to a social-media feed less important.

Second, cellphone data got better. It got faster, so people could watch videos on their phones without bushwhacking through constant freezing and buffering. See Apr. 15 PM Tr. at 210:16–211:2; Apr. 16 PM Tr. at 274:16–275:1; Apr. 16 AM Tr. at 36:16–23. Data also got cheaper, making it feasible to watch videos anywhere instead of only when tethered to a Wi-Fi connection. See May 8 PM Tr. at 179:17–180:3; May 14 PM Tr. at 253:2–9. Meta CEO Mark Zuckerberg captured these years of progress and their effect on social media in a 2022 call with investors: "[V]ideo is really becoming the primary thing" because "mobile networks [have] gotten really good." PX 545 (Meta Investor Call) at 17; see also PX 708 (Mosseri Interview) at 11 ("When networks get faster, when data gets cheaper, people keep moving more and more to video.").

Third, the steady progress of cellular data was followed by a massive leap in AI. Advanced AI algorithms can now analyze your preferences, search through billions of pieces of content, and find engaging videos about the things you care most about in the world. As a result, when Facebook and Instagram want to serve a user the post that she is most interested in, they are not limited to posts from her friends or accounts she follows. See Apr. 15 PM Tr. at 214:14–215:10; May 15 AM Tr. at 6:19–7:12. Instead, they can sift through millions of videos and find the perfect one for her — and it is more likely to interest her than a humdrum update from a friend she knew in high school. See May 12 AM Tr. at 63:14–23; May 14 PM Tr. at 254:6–256:8

 *6  Fourth, as social networks have matured, the alternatives to AI-recommended content have become less appealing. When someone first signed up for Facebook, his friends on the app were his friends in real life. More than a decade later, his offline friends have changed, but his old Facebook friends are still there. See Apr. 16 AM Tr. at 49:2–50:8; May 14 at 222:23–223:13. Longtime users' friend lists have thus become an often-outdated archive of people they once knew: a casual friend from college, a long-ago friend from summer camp, some guy they met at a party once. Posts from friends have therefore grown less interesting. See PX 10034 (Apr. 2022 Meta Executives Email Thread) at 4 ("[A] lot of people's friend graphs are stale and not filled with the people they want to hear from or connect with.").

Put those four changes together — millions of Americans with a smartphone in hand, hooked up to a fast and cheap network that shows videos on demand, equipped with an algorithm that can find just the right one, and increasingly bored by their friends' posts — and the conditions were set for a social-media app that would show nothing but unconnected videos recommended by an algorithm. That app was TikTok, see Apr. 29 PM Tr. at 194:4–16, and it was the fifth force pushing Facebook and Instagram to evolve.

TikTok launched in the United States in 2018. See Apr. 30 AM Tr. at 32:17–18. It soon put enormous competitive pressure on Meta. See, e.g., May 12 AM Tr. at 68:19–25, 70:5–17; DX 660 (IG Metric Softness Deck) at 6; DX 650 (May 2020 Raji Email) at 1; DX 663 (Meta Executive Chat Thread) at 1. To defend its business, Meta added Reels to Instagram in 2020, see Joint Stipulations of Fact, ¶ 34, and to Facebook in 2021, id., ¶ 20, copying TikTok to keep users on Meta's apps. See DX 922 (TikTok Project Blue Summ.) at 14 (Meta is "shifting to short-form video content and prioritizing ... Reels" to prevent users from switching to TikTok); id. at 19 (Reels was "Meta's competitive response to TikTok, particularly around gaining back user timespent from young adults"); DX 1018 (Sep. 2020 Meta Board Meeting Deck) at 15; Apr. 29 PM Tr. at 193:13–194:5; May 12 AM Tr. at 70:8–17. These short unconnected videos recommended by AI then multiplied to dominate users' feeds. See DX 1153 (Jan. 2025 Instagram Surface Breakdown); DX 1152 (Jan. 2025 Facebook Surface Breakdown).

Finally, those five changes both caused and were reinforced by a change in social norms, which evolved to discourage public posting. People have increasingly become less interested in blasting out public posts that hundreds of others can see. See DX 522 (Instagram 2021 H2 Planning Primer) at 22; DX 572 (Long-Term Sharing Trends & Future Expectations Deck) at 14; May 12 AM Tr. at 51:5–52:5,

53:5–7, 102:1–103:11; PX 10034 (Apr. 2022 Meta Executives Email Thread) at 7; May 1 PM Tr. at 176:11–17; May 8 AM Tr. at 29:19–24; DX 606 (Instagram U.S. Teen Messaging Deck) at 10–11. Instead, they prefer to send messages to individual friends or to group chats. See DX 522 (Instagram 2021 H2 Planning Primer) at 21–22; DX 888 (Dec. 2021 Snapchat Board Meeting Update on Stories) at 3; Apr. 15 PM Tr. at 213:18–214:13; Apr. 16 PM Tr. at 165:22–166:7; May 7 PM Tr. at 251:21–23; May 12 AM Tr. at 52:23–54:2; May 12 PM Tr. at 168:12–18; May 14 PM Tr. at 177:2–9.

That shift in norms has not only changed what people post; it has also limited what is there for them to see. Because Meta has fewer posts from friends to fill each user's feed, it must turn to unconnected content to fill the gap. See May 8 AM Tr. at 65:20–22; May 14 PM Tr. at 221:5–9; see also PX 3008 (Facebook Feed & Ecosystems Deck) at 40 ("Given the ongoing" fall in public posting, "we think increasing" the number of friend posts on users' feeds "is almost impossible ...."); PX 3631 (Instagram Insights) at 13 ("[T]he issue is related to inventory decline — how much potential content people have available to them. We are running out of [friends and family] inventory to show our users.").

**\*7**   Those six trends have transformed Facebook and Instagram into the apps that exist today, ones that primarily show users short unconnected videos recommended by algorithms. Both apps are pushing still further in that direction. In just the last two years, the share of time on Facebook that Americans spent viewing friends' content fell by almost a quarter; the share of time they spent watching Reels more than doubled. Compare DX 1169 (Jan. 2023 Facebook Surface Breakdown), with DX 1152 (Jan. 2025 Facebook Surface Breakdown). In the same period on Instagram, the share of time spent on friends' content fell by more than a third, while the share of time spent watching Reels more than tripled. Compare DX 1171 (Feb. 2023 Instagram Surface Breakdown), with DX 1153 (Jan. 2025 Instagram Surface Breakdown).

### 3. *Convergence*

Facebook, Instagram, TikTok, and YouTube have thus evolved to have nearly identical main features. See Apr. 16 AM Tr. at 21:3–22:1, 36:13–37:23. On all four, users spend most of their time watching videos. See DX 1147 (U.S. Share of Facebook Time Spent on Video); DX 1153 (Jan. 2025

Instagram Surface Breakdown); Apr. 30 AM Tr. at 53:21–54:7; Apr. 17 PM Tr. at 151:23–24. All four use algorithms to recommend those videos to users. See Apr. 16 AM Tr. at 21:3–9, 36:13–37:23; Apr. 17 PM Tr. at 173:3–7. And if someone finds content that she likes, all four apps let her tap a button to send it to friends — whether via a direct message on Facebook, Instagram, or TikTok, or using a text message. See Apr. 16 AM Tr. at 53:20–54:14.

The convergence is especially striking among Meta's Reels, TikTok's videos, and YouTube's Shorts. As TikTok told Australian regulators, "TikTok, Reels and [YouTube] Shorts are virtually — and deliberately — indistinguishable in function and user experience." DX 1088 (TikTok Resp. to Australian Regulators) at 3; accord V Pappas Deposition at 55:19–20 (Reels is copy of TikTok and "[t]he features are almost identical"); Eric Morrison Deposition at 85:16–19. Indeed, the same content creators often post the same videos to all four platforms, see Apr. 17 PM Tr. at 192:1–6, where those videos are shown in the same formats with the same options to like, comment, and share:



| Instagram Reel | Facebook Reel | TikTok video | YouTube Short |
| DDX 8.3 | DDX 8.5 | DDX 8.7 | DDX 8.8 |

The most-used part of Meta's apps is thus indistinguishable from the offerings on TikTok and YouTube.

As Meta has moved to showing TikTok-style videos, TikTok has moved to adding Meta-style features to share them with friends. TikTok encourages users to add their friends, including by importing their list of Facebook and Instagram friends and phone contacts, and uses those lists to recommend accounts for users to follow. See Apr. 30 AM Tr. at 57:21–58:5, 80:15–82:11. Users can also search for accounts and follow them, id. at 88:17–89:7, and they can use TikTok to send messages. Id. at 62:23–63:9, 88:9–13, 88:25–89:3. As Tom Alison, the Head of Facebook, wrote to employees: "[L]ast week ... someone asked 'Are we chasing TikTok?' I like to flip this on its head and consider 'Is TikTok chasing Facebook?' ... I see more and more social features every day." PX 10249 (Meta Discovery Engine Thread) at 3. Mosseri, the Head of Instagram, agreed: he testified that while Instagram has shifted to focus on unconnected video, TikTok has added

social features, and "we have met in the middle, so to speak." May 8 AM Tr. at 112:19–113:2.

At the same time, the technological changes discussed above have made video apps more social. Watch a video on the desktop website www.youtube.com, and it takes several steps to share it with a friend. Watch it on the YouTube app, and you can text it to her with the tap of a button. See Apr 16 AM Tr. at 40:6–7; Apr. 17 PM Tr. at 189:21–190:4. Ditto for watching a TikTok video. See Apr. 30 AM Tr. at 62:23–63:9, 88:9–13, 88:25–89:3. The possibilities opened by technology, the responses by users, and the competitive choices of the apps have combined to push Facebook, Instagram, TikTok, and YouTube into similar social-media experiences.

B. Meta's Business Model

**\*8** In terms of a business model, both Facebook and Instagram have always charged users the same amount: nothing. See Apr. 15 PM Tr. at 221:22–222:6, 227:24–228:1. Instead, Meta makes money by selling ads. See Joint Stipulations of Fact, ¶ 54; PX 715 (Meta 10-K) at 61. Companies like Meta measure the intensity of advertising on their apps by analyzing "ad load": the share of posts that are ads. See May 1 AM Tr. at 91:23–92:2.

Common sense tells us that users would prefer content to ads — i.e., a lower ad load. While Meta witnesses insisted that ads are benign, see, e.g., Apr. 15 AM Tr. at 96:17–99:12, the record says otherwise. For instance, Facebook has run an experiment where it does not show ads to a small group of users; those users spend 7% more time on the platform. See PX 10295 (Meta Interrog. Resp.) at 15–16; May 13 AM Tr. at 50:23–51:11; May 20 AM Tr. at 36:18–23; see also May 8 AM Tr. at 66:1–5 (similar small but nonzero effect of withholding ads from some Instagram users). Meta's internal documents also universally reflect an awareness that users dislike ads. See PX 15112 (Feb. 2018 Meta Email Thread) at 5 (Facebook employee calling ads " 'tax[ ]' on engagement"); id. at 7 (Zuckerberg: "replacing ... organic content with ... ads" would inflict "engagement hit[ ]"); PX 15129 (Meta Board Update) at 1 (Zuckerberg telling Meta's Board of Directors that ad load is "tax" and "headwind"); PX 12501 (May 2021 Meta Executives Email Thread) at 4; PX 15240 (2018 Instagram Executives Email Thread) at 1–3. One Instagram survey found that the top two user complaints were both about seeing too many ads. See PX 3778 (Instagram Voice of the Community Deck) at 6.

While users indeed prefer fewer ads, however, the preference is slight. Again, showing users no ads whatsoever gets them to spend only 7% more time on Facebook. See May 13 AM Tr. at 50:23–51:11; May 20 AM Tr. at 36:18–23. Even for teens and young adults — who are especially sensitive to ads, see PX 12501 (May 2021 Meta Executives Email Thread) at 1, 3–4 — ads seem to impose a low cost. Meta estimated that reducing teens' ad load by 80% would get them to use Facebook only 3% more often, while cutting young adults' ad load in half would juice their Facebook sessions by only 1%. Id. at 4; see also May 1 PM Tr. at 165:2–166:3 (discussing this modest effect). As a Facebook analysis concluded, "Increasing ad load has a measurable ... impact on engagement[,] ... but the magnitude of change is very small." DX 342 (News Feed Ad Load Trajectory Deck) at 26; accord id. at 34.

In fact, people are not willing to pay much to avoid ads. European regulators require Meta to offer ad-free versions of its apps. See Apr. 15 PM Tr. at 168:6–14. Those versions cost €5.99 per month for the platforms' websites and €7.99 per month for the apps. Facebook and Instagram to Offer Subscription for No Ads in Europe, Meta (Nov. 12, 2024), https://perma.cc/6VXR-HRCY. Fewer than .01% of users have taken the offer. See May 1 PM Tr. at 163:22–164:13. This negligible willingness to pay to avoid Meta's ads is striking: the ad-free version of Netflix costs $17.99 per month, Plans and Pricing, Netflix, https://perma.cc/H5W6-F8F3, while ad-free Disney+ runs for $18.99 a month. Disney + Plans and Prices, Disney+, https://help.disneyplus.com/article/disneyplus-price (accessed Nov. 14, 2025).

One reason why users seem to mind ads so little is that Meta works hard to make them unintrusive and engaging. For one, users can scroll past an ad on their feeds — unlike, say, an ad on Netflix. See Apr. 17 AM Tr. at 13:12–14:3; May 19 PM Tr. at 251:1–4. Meta also tries to ensure that its ads are interesting and relevant. After all, the better the ad, the more consumers will interact with it, thus enhancing Meta's bottom line. See May 1 PM Tr. at 154:21–155:2; May 20 AM Tr. at 32:23–33:5. Meta sells ads by auctioning off spots in a user's feed. See May 1 PM Tr. at 153:3–154:10. The price that it accepts in this auction depends in part on the quality of the ad: the more engaging the ad and the more relevant to this particular user, the less Meta will charge to show it. See Apr. 17 AM Tr. at 15:15–16:3; May 1 PM Tr. at 153:12–155:20. Relatedly, the more likely a user is to be interested in an ad, the more likely Meta is to show it to him. See May 1 PM Tr. at 153:12–155:14.

Federal Trade Commission v. Meta Platforms, Inc., --- F.Supp.3d ---- (2025)

2025 WL 3458822

**\*9** Meta tailors ad load to each user. See May 1 AM Tr. at 99:7–14; May 1 PM Tr. at 157:2–8; May 15 AM Tr. at 23:12–18. The company knows basic information about users: their demographics, how long they have been on Facebook or Instagram, how many friends or followers they have, how much they use the app. It also tracks how each user responds to ads — how often she clicks on them, whether they make her use the app less, and how large that effect is. See Apr. 17 AM Tr. at 15:3–5; May 12 PM Tr. at 220:10–17; PX 722 (Meta Privacy Policy) at 5. Meta uses that information to individually calibrate each user's ad load. See Apr. 15 AM Tr. at 98:7–11, 99:4–6; Apr. 17 AM Tr. at 24:4–10; May 1 AM Tr. at 99:15–100:15; May 1 PM Tr. at 157:2–8, 160:7–19; May 12 PM Tr. at 220:21–221:9; May 13 AM Tr. at 18:13–21, 19:2–20:13, 21:4–24; May 14 PM Tr. at 185:25–186:5; May 15 AM Tr. at 23:12–24:3; PX 10295 (Meta Interrog. Resp.) at 11, 15–16; DX 1202 (Facebook Ad Load by Age).

This business model — give people a compelling product for free, then sell ads that can be seen by millions — has been amazingly successful. Facebook has grown from a handful of college campuses to 240 million active American users. See May 8 PM Tr. at 187:1–10. Meanwhile, Meta's advertising revenue has swelled from $80 million in 2009 to $161 billion last year. See Plaintiff's Demonstrative (PDX) 90 (Hemphill Demonstrative) at 209.

C. Procedural History

On now to the history of what brings us here. Facebook bought Instagram in 2012 and WhatsApp in 2014. See Joint Stipulations of Fact, ¶¶ 58–61. The FTC approved both acquisitions at the time. Id., ¶¶ 41–49; FTC v. Meta Platforms, Inc., 775 F. Supp. 3d 16, 30 (D.D.C. 2024). Years later, it changed its mind. At the end of 2020, it filed this suit alleging that there exists a distinct market for "personal social networking" services in the United States, see ECF No. 3 (Redacted Compl.), ¶¶ 51–60, that Meta has held a monopoly in this market since 2011, id., ¶ 170, and that Meta maintained that monopoly power by (among other acts) buying Instagram and WhatsApp to squash their competitive threats. Id., ¶¶ 71–73. The agency claimed that Meta thereby violated Section 2 of the Sherman Act, which forbids monopolization. Id. ¶¶ 171–74; 15 U.S.C. § 2.

This Court dismissed the initial Complaint. FTC v. Facebook, Inc., 560 F. Supp. 3d 1, 32 (D.D.C. 2021). It expressed doubts about the boundaries of any purported market for personal social networking, which depends on the porous borders of several apps that offer a changing mix of free services, some of which involve connecting with friends and others of which do not. Id. at 4. Still, the FTC had alleged enough about the market to survive a motion to dismiss. Id. at 16–17. But it had merely rattled off a conclusory assertion that Facebook held a monopoly in that market, so the Court held that the agency had not plausibly stated a claim. Id. at 4.

The FTC tried again with a beefed-up Amended Complaint, once again alleging that Meta holds a monopoly in personal social networking and unlawfully maintained that monopoly by buying Instagram and WhatsApp to eliminate them as competitive threats. See ECF No. 82 (Redacted Am. Compl.), ¶¶ 17–18, 231–35. This time, the Court held that the FTC had plausibly alleged that Facebook held monopoly power and that its acquisitions of Instagram and WhatsApp constituted monopolization. FTC v. Facebook, Inc., 581 F. Supp. 3d 34, 40 (D.D.C. 2022). It therefore let this count proceed, albeit with a warning that "the agency may well face a tall task down the road in proving its allegations." Id.

After extensive discovery, the parties each moved for summary judgment. See ECF Nos. 324 (Meta MSJ); 327 (FTC MSJ). The Court largely denied both motions, holding that the FTC had met "the forgiving summary-judgment standard" but warning that it "face[d] hard questions about whether its claims c[ould] hold up in the crucible of trial." Meta, 775 F. Supp. 3d at 26.

**\*10** The Court held that bench trial this spring. It heard testimony that stretched for more than six weeks, considered thousands of documents, and has now received both parties' post-trial submissions. This Opinion constitutes the Court's verdict and thus incorporates its findings of fact and conclusions of law.

The Court decides only what product market Meta competes in and whether Defendant holds monopoly power in that market. Both are primarily factual questions. Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291, 1300 (9th Cir. 1982), United States v. Microsoft Corp., 253 F.3d 34, 52 (D.C. Cir. 2001) (en banc); Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc., 386 F.3d 485, 502 (2d Cir. 2004); Mid-Tex. Commc'ns Sys., Inc. v. AT&T Co., 615 F.2d 1372, 1387 (5th Cir. 1980). While the Court explicitly discusses the credibility of only one witness, its findings are inevitably informed by how credible it found each witness's testimony. Findings of fact and determinations of credibility are thus inextricably woven into the analysis that follows, which makes and applies legal holdings as needed.

Appendix of Authorities: 42 of 180

## II. Analysis

Section 2 of the Sherman Act prohibits monopolization, an offense whose relevant elements here require (1) holding monopoly power and (2) maintaining it through means other than competition on the merits. Monopoly power is power over some market, so courts usually start a monopolization case by defining that market's boundaries. In doing so, the Court first sets out some threshold legal basics, then devotes the bulk of the Opinion to defining the market in which Facebook and Instagram compete. It last weighs whether Meta commands a monopoly.

### A. Monopolization

Section 2 of the Sherman Act forbids monopolizing trade. See 15 U.S.C. § 2. But just because a firm holds a monopoly does not mean that it has committed the offense of monopolization. Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). Instead, monopolization requires (1) holding monopoly power in some market and (2) acquiring or maintaining that power through anticompetitive conduct — that is, through means other than outcompeting one's rivals. United States v. Grinnell Corp., 384 U.S. 563, 570–71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). The Court decides this case on the first element alone.

A firm commands monopoly power if it could maximize its profit by charging a price substantially above what would prevail in a competitive market. Microsoft, 253 F.3d at 51; see generally IIB Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, ¶ 501 (5th ed. 2021). Plaintiffs can prove monopoly power either directly or indirectly. Direct proof is usually straightforward: typically, evidence that the firm in fact is charging significantly more than the competitive price. Microsoft, 253 F.3d at 51. While such red-handed proof is analytically simple, it is rare. Id. Instead, Plaintiffs typically prove monopoly power indirectly — by showing that a firm has a dominant share of a market that is protected by barriers to entry. Id.

### B. Timing

Before turning to the methods of proof, one more preliminary remains: when must the FTC show that Meta had monopoly power? Throughout this case, the Court has held that the agency must prove that Meta is violating the law now. See ECF Nos. 503 (Order Den. FTC Mot. to Exclude); 610

(Order Overruling FTC Obj.) at 1. In its post-trial brief, the FTC nonetheless tries another angle, arguing that if Meta broke the law in the past and this violation is still harming competition, then the agency may seek an injunction to redress the lingering harm. See FTC Post-trial Mem. at 5–6.

**\*11** That might be a sensible statutory scheme, but it is not the one that Congress passed. The FTC's authority to seek injunctions comes from Section 13(b) of the FTC Act: "Whenever the Commission has reason to believe that any ... corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission" — including the antitrust laws — then "the Commission ... may bring suit in a district court of the United States to enjoin any such act or practice." 15 U.S.C. § 53(b) (emphasis added). As courts have emphasized, "Section 13(b) serves a ... forward-facing role: enjoining ongoing and imminent future violations." FTC v. Credit Bureau Ctr., LLC, 937 F.3d 764, 774 (7th Cir. 2019); see also AMG Cap. Mgmt., LLC v. FTC, 593 U.S. 67, 76, 141 S.Ct. 1341, 209 L.Ed.2d 361 (2021) (Section 13(b) "focuses upon relief that is prospective, not retrospective"); FTC v. Evans Prods. Co., 775 F.2d 1084, 1087 (9th Cir. 1985) (Section 13(b) "cannot be used to remedy past violations"). The FTC can therefore seek to enjoin only conduct that currently violates the law or imminently will.

To win the permanent injunction that it seeks here, the FTC must prove a current or imminent legal violation. While Section 13(b) is always forward facing, the burden it sets for the agency rises as a case progresses. To have a cause of action, the FTC needs only "reason to believe" that a defendant is currently breaking the law or is about to. See 15 U.S.C. § 53(b). To secure a preliminary injunction, it must make a "proper showing." Id. And to win a permanent injunction, the relevant standard here, the FTC must provide "proper proof" — that is, proof that the "act or practice" that it seeks to enjoin is an ongoing or imminent violation of the law. Id.

What does that mean for this case? Recall that Meta is violating Section 2 only if it (1) has monopoly power and (2) is maintaining that power through anticompetitive conduct. Grinnell, 384 U.S. at 570–71, 86 S.Ct. 1698. As both elements must be met, the FTC must prove that Meta has monopoly power now. FTC v. Surescripts, LLC, 665 F. Supp. 3d 14, 38–39 (D.D.C. 2023) (reaching same result); cf. United States v. U.S. Steel Corp., 251 U.S. 417, 444, 40 S.Ct. 293, 64 L.Ed. 343 (1920) (holding, in antitrust case brought under different statute, that "our consideration should be of, not what the

corporation had power to do or did, but what it has now power to do and is doing").

The Court now turns to whether the FTC has made that showing. At trial, the agency offered direct and indirect evidence, which the Court looks at separately.

## C. Direct Evidence

The FTC claims that three pieces of evidence prove Meta's monopoly power: the company's lavish profits, the jacking up of its apps' quality-adjusted price, and price discrimination. The Court addresses them one by one.

### 1. *Profits*

The FTC first argues that Meta must hold a monopoly because it has long earned profits that exceed its cost of capital. See FTC Post-trial Mem. at 9. Persistent profits above the cost of capital may indeed suggest monopoly power. Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 481 n.17 (3d Cir. 1992) (*en banc*); FTC v. Actavis, Inc., 570 U.S. 136, 157, 133 S.Ct. 2223, 186 L.Ed.2d 343 (2013). But they can also imply any of the other reasons why one firm is more profitable than its rivals: shrewd management, exceptional efficiency, booming demand, or risky investments that hit big. Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic, 65 F.3d 1406, 1412 (7th Cir. 1995); Bailey v. Allgas, Inc., 284 F.3d 1237, 1252 (11th Cir. 2002). As Chief Judge Richard Posner has written for the Seventh Circuit, "[I]t is always treacherous to try to infer monopoly power from a high rate of return[;] ... there is not even a good economic theory that associates monopoly power with a high rate of return." Blue Cross, 65 F.3d at 1412. Unsurprisingly, then, "[m]any courts have disparaged the evidentiary value of high profits to indicate monopoly power." Apple Inc. v. Psystar Corp., 673 F. Supp. 2d 926, 931 (N.D. Cal. 2009).

**\*12**  The record here is a case study in why. It reveals several other factors that could be driving Meta's handsome profits, none of which the FTC has foreclosed. For instance, Defendant has developed impressive technology that helps advertisers create engaging ads and target them to exactly the right users. See May 19 PM Tr. at 249:23–255:19; May 20 AM Tr. at 20:16–22:18, 23:22–24:3; see also May 1 PM Tr. at 177:13–20 ("vast majority" of Meta's projected revenue growth is from making ads more relevant). Its superb

returns, then, might come from an enticing appeal to the advertisers who pay it billions, not from a tight grip on the users who pay it nothing. Cf. Ohio v. Am. Express Co., 585 U.S. 529, 544–47, 138 S.Ct. 2274, 201 L.Ed.2d 678 (2018) (when analyzing platforms with two sides, courts must consider both). Alternatively, Meta's high returns could be the appropriate reward for risky investments that paid off. It has, for example, plowed enormous sums of money into research and development. See May 21 AM Tr. at 159:20–160:3. When those investments pan out, any lavish profit is not a monopoly rent but instead the appropriate reward for a roll of the dice. Or the company could simply be exceptionally well managed.

The FTC's experts did not assess whether any of these alternatives could be responsible for Meta's high profits. See May 14 AM Tr. at 69:4–23, 77:15–18. The agency bears the burden of proving that Meta is a monopoly, Microsoft, 253 F.3d at 58, yet the mere fact of high profits could show any number of alternatives, none of which the FTC rebutted.

The agency did not even show that Meta's profits are greater than other successful tech firms'. The Supreme Court has refused to infer monopoly power from high profits "without proof of lack of comparable profits during those years in other prosperous industries." United States v. E. I. du Pont de Nemours & Co., 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The FTC offered no such proof here. See Apr. 24 AM Tr. at 20:16–18; May 14 AM Tr. at 86:5–20. The Court struggles to conclude that Meta's profits are suspiciously high when the FTC has not even proven that they are unusual.

Finally, the FTC's story about monopoly profits does not fit its own account of Meta's business. The agency thinks that Meta (1) holds a monopoly in sharing with friends (think of posting a picture to Instagram's feed), (2) faces far stiffer competition to show unconnected videos (think of the choice between watching an Instagram Reel or an indistinguishable TikTok video), and (3) has exploited its monopoly in friend sharing to extract monopoly profits. If that account were right, then as Meta's business has shifted away from friend sharing and toward unconnected video, it should be losing its monopoly profits. Yet the opposite has happened: as Meta's apps have become closer substitutes for TikTok and YouTube, the company's projected rate of return has only increased. See Apr. 24 AM Tr. at 15:23–16:13; Apr. 17 AM Tr. at 25:20–24. When Meta's supposed monopoly is falling while its alleged monopoly profits are rising, it seems unlikely that the former is driving the latter.

### 2. *Quality-Adjusted Price*

Next, the FTC maintains that Meta has profitably raised the quality-adjusted price of its apps. See FTC Post-trial Mem. at 9–12. It must resort to this unintuitive argument because Meta has never raised its apps' nominal price: Facebook and Instagram are free, just as they always have been. See Apr. 15 PM Tr. at 221:22–23. So the FTC instead argues that Meta has degraded these apps' quality. By offering a worse product for the same price, the agency reasons, Meta has imposed the equivalent of a price increase.

The record, however, shows the opposite: Meta's apps have continuously improved. The company has added scores of new features to Facebook and Instagram, from Stories to Reels to Marketplace. See DX 1180 (New Instagram Features); DX 1182 (New Facebook Features); DX 1207 (New Facebook Features, 2023–25); DX 1208 (New Instagram Features, 2023–25); May 14 AM Tr. at 42:9–23; May 21 PM Tr. at 158:16–24. It also spends billions on research and development to offer further improvements. See Apr. 15 PM Tr. at 230:13–231:23. The Court simply does not find it credible that users would prefer the Facebook and Instagram apps that existed ten years ago to the versions that exist today. Id. at 228:5–21 ("If you took a freeze frame of where our app used to be and that was the experience that [users] could have today, we would just be crushed.").

**\*13** Still, for completeness, the Court will address the FTC's three arguments to the contrary: that Meta has degraded its apps' quality by increasing their ad load, that falling user sentiment shows that the apps have deteriorated, and that Meta has sabotaged its apps by underinvesting in friend sharing.

### a. Ad Load

The agency first points out that Meta has steadily increased the ad load on Facebook and Instagram. See FTC Post-trial Mem. at 10; May 13 AM Tr. at 10:22–12:8. Since users dislike ads, Plaintiff reasons, the increase in ad load is equivalent to an increase in quality-adjusted price. See FTC Post-trial Mem. at 10. That position has two problems. For one, ads are only one aspect of an app's quality. See May 14 AM Tr. at 41:3–6, 41:17–42:8, 49:24–50:2. When Meta has stuffed its apps with more ads and upgraded them with new features, it is not clear that the company has reduced quality overall.

More importantly, even considering just this one input into app quality, the effect of ads on users' experience depends on not only their number but also on their quality and relevance. See Apr. 15 AM Tr. at 96:22–25; Apr. 17 AM Tr. at 20:12–21:15; May 20 AM Tr. at 17:20–19:11, 30:5–17, 31:6–16. An ad that is attractive, engaging, unobtrusive, and shows a user something that he wants imposes a much lower cost than an ad that is unsightly, disruptive, and irrelevant. The Court therefore cannot say whether increases in the number of ads have degraded Facebook and Instagram without accounting for changes in those ads' quality.

All the evidence, in fact, shows that their quality has increased. For one, Meta generally does not increase ad load until its ads have improved — that way, the company can sell more ads without pushing users away from its apps. See DX 342 (News Feed Ad Load Trajectory Deck) at 7 ("[W]e will ... [o]nly increase ad load when ... ad quality is increasing."); Apr. 17 AM Tr. at 23:20-24:3; May 8 AM Tr. at 60:7–14; see also May 20 AM Tr. at 30:18–31:5, 31:17–32:4.

That rule makes cold economic sense. If Meta could profitably have imposed today's higher ad load years ago, it would have. Instead, the company was likely already freighting users with the highest ad load that they would tolerate. See CF Indus., Inc. v. Surface Transp. Bd., 255 F.3d 816, 824 (D.C. Cir. 2001) ("Koch is a for-profit institution, not an eleemosynary one, and it has provided no reason to believe that it priced below market for eight years, rather than calculated that those prices were the most the market would bear."); see also May 13 AM Tr. at 9:16–10:13 (describing this tradeoff for Meta). The only way that Meta could profitably increase ad load from that already-profit-maximizing optimum, then, would be if the ads themselves had become less costly — that is, if their quality had improved.

What economic logic suggests direct evidence confirms. The rate at which users buy something or subscribe to a service based on Meta's ads has steadily risen, suggesting that the ads have gotten more and more likely to connect users to products in which they have an interest. See May 1 PM Tr. at 177:24–179:16; DDX 18.3 (Ad Conversion Rate).

If we assume that the quality-adjusted price of Meta's apps several years ago represented the competitive price, then Meta's subsequent increase in ad load suggests one of two things. It might show that Meta raised the quality-adjusted

Federal Trade Commission v. Meta Platforms, Inc., --- F.Supp.3d ---- (2025)

2025 WL 3458822

price above competitive levels, revealing monopoly power. It might equally show that as the quality of Meta's ads has increased and the apps' features have improved, the company increased ad load to hold the quality-adjusted price of its apps at the same, competitive level. All evidence points toward the latter.

b. Sentiment

**\*14**  Next, the FTC posits that falling user sentiment shows that the "overall quality of Facebook and Instagram ha[s] declined." FTC Post-trial Mem. at 11. Meta regularly surveys users on whether they think that Facebook and Instagram care about their users, whether they think these apps are good for the world, and how satisfied they are with the apps. See Apr. 30 PM Tr. at 197:7–199:18. The FTC (1) notes that the scores users give Meta have fallen over the years, (2) claims that "user sentiment measures [the] overall quality of Facebook and Instagram," and so (3) concludes that Facebook and Instagram have deteriorated. See FTC Post-trial Mem. at 11.

While the argument's first premise is true, the second is emphatically not. Nobody knows more about these surveys than Curtis Cobb, Meta's Vice President of Research, head of the company's Demography and Survey Science group, and administrator of these surveys. See Apr. 30 PM Tr. at 193:1–11, 197:1–4. He explained that sentiment scores primarily measure "brand reputation," not product quality. Id. at 197:7–14; accord May 1 AM Tr. at 28:1–4. Meta's ordinary-course documents back him up: a 2020 deck calls these surveys measures of "our brand's standing." PX 3013 (Relative Metrics Update) at 6.

As Cobb and other executives testified, sentiment mostly reflects the tone of news coverage about the company, not the quality of its products. See May 1 AM Tr. at 30:5–19, 69:21–70:10; Apr. 29 PM Tr. at 158:7–10; May 8 PM Tr. at 267:2–6. For instance, sentiment increased when Zuckerberg announced that he would give much of his wealth to charity. See May 1 AM Tr. at 32:4–12. And it moves around when Meta makes controversial decisions. Sentiment fell after Facebook blocked posts about anti-lockdown protests at the height of COVID, as well as when the company left up Donald Trump's posts criticizing Black Lives Matter protests. See PX 15475 (Weekly Sentiment Update) at 7; May 1 AM Tr. at 31:16–22. None of those events reflects a change in the apps' quality. Plus, sentiment varies widely across countries

— where the apps are identical, but the news cycles differ. See May 8 PM Tr. at 269:5–24; DDX 24.1 (Relative Cares About Users Scores by Country).

Unsurprisingly, then, Meta does not put much weight on these surveys to measure quality. See May 1 AM Tr. at 49:19–51:18. One Meta study "fail[ed] to detect significant and consistent effects of sentiment" on how often users posted, commented, or liked content, nor on how much advertising revenue Meta earned. See PX 12968 (Does Sentiment Towards Facebook Affect Revenue and Engagement?) at 4, 7. Meta has also found that sentiment surveys are poor predictors of user behavior. See May 1 AM Tr. at 26:5–17; Apr. 29 PM Tr. at 163:23–164:4.

To be sure, these surveys detect some reactions to Meta's products, see Apr. 30 PM Tr. at 197:7–18; May 1 AM Tr. at 69:12–70:10, 71:13–72:6, 73:13–74:6, and many negative news stories are about problems with Meta's apps. For instance, the Cambridge Analytica scandal revealed genuine problems with Facebook's privacy protections, see Apr. 29 PM Tr. at 157:16–158:1, and it inflicted the biggest sentiment decline in the company's history. See PX 12110 (Cambridge Analytica Sentiment Effects Deck) at 4; PX 12968 (Does Sentiment Towards Facebook Affect Revenue and Engagement?) at 6.

At bottom, however, the testimony of the people who know these surveys best, Meta's own internal analysis, and user sentiment's response to external events convince the Court that any signal is drowned in noise. That is unsurprising: ask people how they feel about, say, Exxon Mobil, and their answers will tell you very little about how good its oil is. The FTC's claim that worsening sentiment shows a worsening product is unpersuasive.

**\*15**  The agency also tries to turn all this to its advantage: the very fact that users report greater dissatisfaction with Meta but do not use its apps less shows that they have nowhere else to turn. See FTC Post-trial Findings of Fact, ¶¶ 165–66. On the contrary, as discussed below, users have several alternatives that they have been turning to in droves. The better interpretation is that sentiment surveys primarily measure what people think of Meta's business as seen through the lens of salient news stories, not what users think of its apps.

2025 WL 3458822

### c. Underinvestment in Friends and Family

The FTC last claims that Meta has worsened its apps by underinvesting in the content that users value most: updates from friends and family. See FTC Post-trial Mem. at 11, 32; May 13 AM Tr. at 22:16–24:13. According to the agency, users consistently report that they want to see more content from their friends, but Meta — insouciant in its monopoly power — has chosen not to listen. See FTC Post-trial Findings of Fact, ¶¶ 341–43.

While the Court acknowledges the FTC's thoughtful briefing and diligent trial presentation, this theory makes no sense. First, the evidence contradicts it. While it is true that users see less content from their friends these days, that is largely due to the friends themselves: people simply post less. See May 8 AM Tr. at 65:20–22; May 14 PM Tr. at 221:5–9. An internal Instagram presentation concluded that it was "[u]nlikely" that the dwindling share of friend content in users' feeds was because of Instagram's ranking algorithm. See PX 3631 (Instagram Insights) at 13. Instead, "the issue is related to inventory decline — how much potential content people have available to them. We are running out of [friends and family] inventory to show our users." Id.; see also id. at 14–15. Another Meta deck lamented, "Given the ongoing" fall in public posting, "we think increasing" friend posts "is almost impossible." PX 3008 (Facebook Feed & Ecosystems Deck) at 40. Users are not seeing less friend content because Meta is hiding it from them, but instead because there is less friend content for Meta to show.

Nor is it clear that users want more friend posts. True, they report on surveys that they do. See PX 3785 (Lorax 2.0: Top User Issues Deck) at 9; May 13 AM Tr. at 100:18–101:1; May 27 AM Tr. at 61:4–9; May 14 PM Tr. at 166:11–169:9. But their actions tell a different story. See Apr. 14 PM Tr. at 167:11–168:9, 169:7–24, 189:1–190:1; May 1 AM Tr. at 52:15–53:17; cf. United States v. Eastman Kodak Co., 63 F.3d 95, 104–05 (2d Cir. 1995) ("[W]hile many consumers state a preference for the familiar Kodak brand name, the empirical evidence of what consumers actually do indicates that consumers find non-Kodak film to be an acceptable substitute.").

Facebook tried boosting the amount of friend content in some users' feeds by 20% and decreasing it in others' by 20%. See May 14 PM Tr. at 249:21–250:10; PX 3008 (Facebook Feed & Ecosystems Deck) at 49. In both cases, time spent on Facebook was virtually unchanged. See DX 1168 (Facebook Feed Composition Experiment Result); PX 3008 (Facebook Feed & Ecosystems Deck) at 49. Instead, what users really seem to want is Reels. Meta measured the effect of Reels by rolling them out to most Instagram users, withholding them from a control group, and comparing how much each group used the app. See May 8 PM Tr. at 190:9–192:13. The effect was astonishing: users with Reels spent almost 50% more time on Instagram, opened the app more than 10% more, and were about 5% less likely to stop using it. Id. at 193:5–195:17. As Mosseri, the Head of Instagram testified, "It's insane.... [N]othing I can think of ever moved time by 48 percent, or anything even close to it. ... [T]his is the most successful series of features as measured by a holdout in my 17 years at the company." Id. at 195:2–8. An equivalent experiment on Facebook found similar results. See May 14 PM Tr. at 259:20–260:5. Remember that Reels is not content from friends. See DX 1153 (Jan. 2025 Instagram Surface Breakdown). So whatever users might say they desire, what seems to draw them to Meta's apps is not marginal posts from marginal friends, but unconnected videos picked just for them. Meta's shift to the latter does not reveal monopoly power so much as a profit-maximizing corporation giving its customers what they want.

**\*16** Indeed, the FTC's theory defies common sense. Meta's goal is to get users to spend as much time on its apps as possible, and it tunes its algorithms to show users the content they most want to see. See May 12 PM Tr. at 192:3–23; May 14 PM Tr. at 249:21–250:10. It has no reason to deliberately suppress content that will bring users in the door and put forward content that will push them out.

It would be especially irrational to force Reels on unwilling viewers because Reels earns Meta less money. Meta has a lower ad load on Reels, and the company and its rivals understand that the shift to Reels is costing Meta revenue in the short term. See DX 663 (Meta Executive Chat Thread) at 1; DX 922 (TikTok Project Blue Summ.) at 14; May 8 PM Tr. at 162:19–163:20; May 12 AM Tr. at 70:8–17. So does the FTC: its theory of this case is that Meta burdens friend content with ads because it enjoys a monopoly but can show fewer ads on Reels because it faces competition in short videos. See FTC Post-trial Mem. at 22, 33; FTC Post-trial Findings of Fact, ¶¶ 155, 169; May 12 PM Tr. at 214:6–12; May 13 AM Tr. at 17:3–11; May 27 AM Tr. at 45:5–18. Yet it now asks the Court to believe that Meta is gratuitously forgoing monopoly profits by pushing users away from its

most popular and profitable offering to one that is both less appealing and less profitable.

Courts presume that sophisticated corporations act rationally. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 594 n.19, 595, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); Chase Mfg., Inc. v. Johns Manville Corp., 84 F.4th 1157, 1168 (10th Cir. 2023). So "if the factual context renders [a] claim implausible — if the claim is one that simply makes no economic sense — [the party] must come forward with more persuasive evidence to support [its] claim than would otherwise be necessary." Matsushita, 475 U.S. at 587, 106 S.Ct. 1348. Here, the FTC has not offered even an ordinarily persuasive case that Meta is making the economically irrational choice to underinvest in its most lucrative offerings. It certainly has not made a particularly persuasive one.

\* \* \* \* \*

In the end, the Court finds it impossible to believe that consumers would prefer the versions of Instagram and Facebook that existed a decade ago to the versions that exist today. That leaves open the possibility that while Meta's apps have improved, they are still worse than they would be if Meta faced more competition. Direct proof that a product is worse than some unknown counterfactual is elusive, however. Instead, this argument is best considered as the harm that would follow if Meta were indeed a monopoly. But the FTC must first prove that the company is one. Up to this point, it has not.

### 3. *Price Discrimination*

Last, the agency asserts that Meta charges a higher quality-adjusted price to a subset of users by showing them more ads. See FTC Post-trial Mem. at 12. That is mostly true: Meta shows more ads to the users who it predicts will respond by cutting their usage of Facebook and Instagram less. See, e.g., May 1 AM Tr. at 99:15–100:15; May 12 PM Tr. at 220:21–221:9; May 14 PM Tr. at 185:25–186:5; May 15 AM Tr. at 23:12–24:3.

That also does not prove monopoly power. Instead, price discrimination reveals only what economists call market power — the power to price a good above marginal cost. See Lars A. Stole, Price Discrimination and Competition, 3 Handbook of Indus. Org. 2221, 2224 (2007). In the real world,

almost every business enjoys some degree of market power, which is a far lower bar than monopoly power. See Richard Schmalensee, Another Look at Market Power, 95 Harv. L. Rev. 1789, 1790 (1982); Areeda & Hovenkamp, ¶ 501, at 115–16 ("Market power exists in degrees," which often fall below monopoly power.). True, courts often confusingly call monopoly power "market power," but different concepts they remain. Price discrimination shows only that a firm is not the undifferentiated fiction earning zero profits that scarcely exists outside the pages of an Econ 101 textbook. It does not prove that the market is monopolized.

**\*17** That must be true, since "price discrimination is a ubiquitous phenomenon." Hal R. Varian, Price Discrimination, 1 Handbook of Indus. Org. 597, 646 (1989). You will find it in every movie theater offering a student discount, every drug store offering a senior discount, and every airline charging higher prices to travelers who book at the last minute. Id. at 641. When price discrimination prevails in just about every market, it cannot reliably distinguish the few markets in the grips of a monopoly from the many more markets where the competitive price exceeds marginal cost. The Supreme Court agrees: "[W]hile price discrimination may provide evidence of market power, ... it is generally recognized that it also occurs in fully competitive markets." Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28, 44–45, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006).

### D. Indirect Evidence

Having found no direct proof that Meta holds monopoly power, the Court now turns to indirect evidence. The FTC here must show that Meta holds a dominant share of the market that is protected by barriers to entry. Microsoft, 253 F.3d at 51.

The Court must therefore first define what market Facebook and Instagram compete in. A market involves a product market and a geographic market — say, midsize sedans in the United States or segway tours in Washington, D.C. Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp., 947 F. Supp. 2d 88, 102 (D.D.C. 2013). In this case, both sides agree that the relevant geographic market is the United States. Meta, 775 F. Supp. 3d at 35 (noting agreement on this point at summary judgment); FTC Post-trial Mem. at 6 (FTC maintaining that position in post-trial briefing); ECF No. 626-1 (Meta Post-trial Mem.) at 12 (same for Meta). What they fight over are the bounds of the relevant product market.

2025 WL 3458822

According to the FTC, Meta competes in a separate market for PSN apps, which people use to keep up with their friends and family. See ECF No. 623-1 (FTC Post-trial Findings of Fact), ¶ 7; FTC Post-trial Mem. at 6–7. The agency insists that this market contains only four apps: Facebook, Instagram, Snapchat, and a less-used option called MeWe. See FTC Post-trial Findings of Fact, ¶¶ 33, 40. Apps like TikTok and YouTube, by contrast, are used for entertainment. Id., ¶¶ 58–59, 73. So, the FTC insists, they do not offer a substitute for Facebook and Instagram. Id., ¶ 14.

Meta rejoins that that is a hypothesis that must be tested against the evidence. According to the company, people mostly use Facebook and Instagram to watch unconnected videos, just like they use TikTok and YouTube. See Meta Post-trial Mem. at 1. Turning to consumer behavior, Meta maintains that all the empirical evidence shows that consumers treat other apps — especially TikTok and YouTube — as substitutes for Facebook and Instagram. Id. at 14–15. The FTC might have drawn up some theories that sound plausible in the abstract and might even have been true in years gone by, but Defendant says that they do not match today's reality.

Having introduced these dueling accounts, the Court now lays out the legal framework against which it will test them. A product market is the set of all alternatives that are "reasonably interchangeable by consumers for the same purposes." Du Pont, 351 U.S. at 395, 76 S.Ct. 994. An alternative need not be identical to be reasonably interchangeable. Id. at 394, 76 S.Ct. 994. On the other hand, a vast spectrum of goods can serve as substitutes to some extent, "[b]ut a relevant market cannot meaningfully encompass that infinite range." Times-Picayune Publ'g Co. v. United States, 345 U.S. 594, 612 n.31, 73 S.Ct. 872, 97 L.Ed. 1277 (1953); see also United States v. H & R Block, Inc., 833 F. Supp. 2d 36, 54 (D.D.C. 2011) (just because products "may compete at some level" does not mean they belong in same product market). Indeed, judges could find differences between just about every product in earth: Coca-Cola differs from root beer, which differs from Sprite, which differs from milk. How should courts draw conclusions about reasonable interchangeability?

 *18  The leading way is the hypothetical-monopolist test. E.g., FTC v. Penn State Hershey Med. Ctr., 838 F.3d 327, 338 (3d Cir. 2016). The HMT defines a product market as the smallest set of products such that if a hypothetical monopolist controlled them all, then it would maximize its profits by

raising prices significantly above competitive levels. See Areeda & Hovenkamp, ¶ 536, at 322–25. More precisely, courts ask whether the hypothetical monopolist would profitably impose a small but significant and nontransitory increase in price (SSNIP). E.g., Penn State Hershey Med. Ctr., 838 F.3d at 338. While the threshold needed for a "small but significant" price increase might vary, a common number is 5%. See U.S. Dep't of Just. & Fed. Trade Comm'n, Merger Guidelines 43 (2023); Penn State Hershey Med. Ctr., 838 F.3d at 338 n.1; FTC v. Sysco Corp., 113 F. Supp. 3d 1, 34 (D.D.C. 2015).

To see how the HMT works in practice, suppose that a single firm controlled the entire production of pencils. If that hypothetical monopolist could maximize its profits by charging a price about 5% higher than the competitive level, then pencils would be a market in themselves. But if that price hike would be unprofitable because too many consumers would switch to pens, then pencils and pens would belong in the same market.

What if the products are free, like Facebook and Instagram? Courts can update the hoary HMT for the digital age by asking whether a hypothetical monopolist would impose a small but significant and nontransitory increase in the apps' quality-adjusted price — basically, whether it would make them significantly worse than they would be in a competitive market (say, by bloating them with ads). See Merger Guidelines at 41–42. Of course, the answer is unobservable (by definition, it is hypothetical). But the HMT at least tells the Court what question to ask: would a firm that controlled both Facebook and Instagram maximize its profit by making them about 5% worse than they would be under competitive conditions? If it would not because, say, too many users would substitute time on Instagram for time on TikTok, then TikTok belongs in the product market.

Note that this test does not focus on whether items have abstract qualitative differences but instead on the reality of what consumers would do. After all, whether a hypothetical monopolist could profitably raise prices — and therefore where the product market's borders lie — depends on which alternatives consumers would turn to and how readily they would do so, not on how different the products seem to a judge. Rothery Storage & Van Co. v. Atlas Van Lines, Inc., 792 F.2d 210, 218 (D.C. Cir. 1986) (Bork, J.).

Consider United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953 (1964), where the

2025 WL 3458822

Supreme Court decided whether metal cans and glass containers belonged in the same product market. Id. at 456, 84 S.Ct. 1738. The Court could have noted all the qualitative differences between glass and metal — their different transparencies, tensile strengths, and weights — and held that they therefore must occupy different markets. Instead, the Court looked to real-world evidence of whether users treated the two as substitutes. Id. at 456–57, 84 S.Ct. 1738. They did, so the Court held that these superficially different products belonged in the same market. Id. In general, the Supreme Court has warned against any rule that would make "only physically identical products ... part of the market." Du Pont, 351 U.S. at 394, 76 S.Ct. 994; accord Cont'l Can, 378 U.S. at 452, 84 S.Ct. 1738. Instead, courts must "recognize competition where, in fact, competition exists." Brown Shoe Co. v. United States, 370 U.S. 294, 326, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); see also Eastman Kodak Co. v. Image Tech. Servs., Inc., 504 U.S. 451, 467, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) (courts must "examine[ ] closely the economic reality of the market at issue"). Of course, real-world substitution evidence is sometimes unreliable. And qualitative differences between products can serve as useful "evidentiary proxies for direct proof of substitutability." Rothery, 792 F.2d at 218. But the touchstone of market definition remains how consumers would respond to a price increase.

 **\*19**  The Court makes one last preliminary point. The HMT does not ask whether consumers would stop buying a product entirely. Instead, the question is whether they would cut back enough to make a significant price increase unprofitable. Applying that logic to social media, the relevant question is not whether a SSNIP would cause people to stop checking Facebook and Instagram at all, but whether it would cause them to use these apps less — and whether that shift in usage would make the SSNIP unprofitable. See FTC v. Tenet Health Care Corp., 186 F.3d 1045, 1053 n.11 (8th Cir. 1999). That is especially true because social-media apps are free, so users are unlikely to entirely replace one app with another. Instead, these companies fight over users' time: when people have a free moment, which app will they open, and how long will they spend on it? See May 12 PM Tr. at 175:18–176:4 (because these apps are used by almost everyone, they compete over marginal time); May 1 PM Tr. at 170:21–171:6 (similar); May 15 PM Tr. at 257:2–8 (advertising dollars are based on time spent); May 8 PM Tr. at 265:4–266:3 (similar).

The Court is finally ready to preview what follows. The FTC bears the burden of proving the product market's bounds. Du Pont, 351 U.S. at 381, 76 S.Ct. 994; Gross v. Wright, 185 F. Supp. 3d 39, 50 (D.D.C. 2016). The Court will first examine empirical evidence of whether consumers treat TikTok and YouTube as substitutes for Facebook and Instagram. The evidence resoundingly shows that they do. The Court then considers the factors from Brown Shoe, which use qualitative evidence as a proxy for substitutability. See United States v. Google LLC, 747 F. Supp. 3d 1, 108 (D.D.C. 2024) (courts consider both empirical substitution evidence and Brown Shoe factors). Even when the Court considers the apps qualitatively, it finds that their similarities outweigh their differences. PSN apps may have been a market unto themselves when the FTC filed this case in 2020 or when it approved Facebook's acquisitions of Instagram and WhatsApp in 2012 and 2014. That is no longer the case.

### 1. *Empirical Evidence of Substitution*

The best evidence of what consumers consider as substitutes often comes from consumers themselves. After all, "[t]he definition of product market ... focuses" on whether "consumers regard the products as substitutes." FTC v. H.J. Heinz Co., 246 F.3d 708, 718 (D.C. Cir. 2001) (quotation marks omitted); see also FTC v. Whole Foods Mkt., Inc., 548 F.3d 1028, 1039 (D.C. Cir. 2008) (opinion of Brown, J.) (product market's bounds "must ultimately be determined by 'settled consumer preference' ") (quoting United States v. Phila. Nat'l Bank, 374 U.S. 321, 357, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963)).

Two kinds of evidence demonstrate that users consider TikTok and YouTube reasonably interchangeable with Meta's apps: observational and experimental evidence. The Court will consider each, but it notes at the outset that these sources show only that TikTok and YouTube are the closest substitutes for Facebook and Instagram. That fact alone does not answer the relevant question: whether those apps are reasonable enough substitutes to prevent Meta from profitably imposing a SSNIP. Because no evidence in the record measures that question directly, the Court will explain what the evidence does show, then assess what light it throws on the HMT.

### a. Observational Evidence

The Court starts with everyday evidence of what apps users treat as substitutes for time on Facebook and Instagram. That evidence comes in two forms: users' response to the launch

2025 WL 3458822

of TikTok and Meta's tracking of almost 50,000 users as they used their phones over several months. Both strongly suggest that time on TikTok substitutes for time on Meta's apps, and the latter source shows that YouTube is an even stronger substitute.

#### i. Response to TikTok

When TikTok entered the United States, Americans reallocated massive amounts of time from Facebook and Instagram to this new app. As TikTok surged in popularity among young adults, they cut their time on Facebook by a quarter. See May 12 AM Tr. at 68:19–25, 70:5–17, 82:14–23; DX 605 (U.S. Young Adults on IG Deck) at 10. Alison testified that when he became Head of Facebook in 2021, the app's biggest challenge was that people were using it less, and "[t]he main factor we attributed the declining engagement to was competitive pressure from TikTok." May 14 PM Tr. at 237:20–238:23; see also DX 600 (Facebook U.S. Long-Term Themes Deck) at 5 (similar).

 **\*20**  TikTok also took time away from Instagram. See Apr. 29 PM Tr. at 194:6–195:3. In 2019 — before TikTok had even won widespread adoption in the United States, see May 12 AM Tr. at 82:14–15, 21–22 — Meta estimated that almost a quarter of Instagram's year-over-year loss in user time was because of this new app. See DX 660 (IG Metric Softness Deck) at 6; see also DX 573 (Instagram Mem.) at 4 (Instagram use had dropped or plateaued, partly because of "competition from TikTok and Snapchat"); DX 606 (Instagram U.S. Teen Messaging Deck) at 4 (Instagram deck fretting about "growing competition" from TikTok, which "is winning in share of total time spent on social media apps").

By 2021, Meta estimated that TikTok was causing active Facebook users to spend 4–7% less time on the app, and active Instagram users 4–5% less time. See DX 535 (TikTok Headwinds on FB and IG Deck) at 4, 7. That decline was especially alarming because so many of Meta's users had not even downloaded TikTok yet. See May 12 AM Tr. at 82:19–23. Among Facebook users who had, Meta estimated that TikTok caused them to use Facebook 17–26% less. See DX 535 (TikTok Headwinds on FB and IG Deck) at 4. Young adults — who were bellwethers of TikTok adoption, id. at 10, 15 — had cut their time on Meta's apps by 11% in just eighteen months. See DX 605 (U.S. Young Adults on IG Deck) at 10; May 12 AM Tr. at 70:8–17, 79:6–80:24;

see also id. at 52:18–22 ("Fundamentally, younger cohorts were declining faster than older cohorts, and those cohorts were using TikTok."); Apr. 16 AM Tr. at 19:20–20:4 (when TikTok started growing, Facebook's and Instagram's growth "slowed down dramatically"); Apr. 17 AM Tr. at 29:20–32:16 (discussing document for Meta's Board saying that Meta's usage was 5% lower than expected in first half of 2020, that this was partly because people were using TikTok instead, and that TikTok's growth was expected to cost Meta $3 billion in ad revenue).

In short, Meta observed widespread substitution from Facebook and Instagram to TikTok, and the rate of substitution was high enough to constrain Meta's growth. True, this evidence largely predates Meta's pivot to Reels, see Joint Stipulations of Fact, ¶¶ 20, 34, which likely won user time back from TikTok. But remodeling Facebook and Instagram to resemble TikTok only makes the latter an even closer substitute.

#### ii. Meta Study Panel

More formal measurement confirms that people treat TikTok as a substitute for Meta's apps — and especially treat YouTube as one. Meta tracks what it calls the study panel, in which almost 50,000 users let Meta record how much time they spend on each of their phone's apps over eighteen weeks. See May 19 PM Tr. at 147:7–12, 148:11–16. Its expert John List examined this data to assess which apps most traded off with Facebook and Instagram. Specifically, he tested the following question: when users decreased the time they spent on Facebook or Instagram, what apps did they spend more time on instead? And when users increased their time on Facebook or Instagram, what apps did they cut time from? Id. at 147:1–6, 151:10–153:3.

Time on both Facebook and Instagram seemed to trade off most with time on YouTube. Id. at 150:3–7; DX 1226 (Facebook Time Shift Results) (single app with strongest relationship was YouTube, although some app categories, like "Games," had stronger negative relationship); DX 1228 (Instagram Time Shift Results) (similar findings with similar caveats). For both of Meta's apps, the second-biggest tradeoff was with TikTok. See May 19 PM Tr. at 150:7–8; DX 1226 (Facebook Time Shift Results); DX 1228 (Instagram Time Shift Results).

2025 WL 3458822

In other words, when people cut time from Facebook and Instagram, they were most likely to devote it to YouTube and TikTok. When they spent more time on Meta's apps, it was most likely to come at the expense of time on YouTube and TikTok.

#### b. Natural and Field Experiments

**\*21** While the Court finds that observational evidence compelling, it recognizes that those results might be contaminated by other changes in a messy world. See May 19 PM Tr. at 148:17–19. More persuasive are results from experiments, including natural experiments that take advantage of times when an app suddenly became unavailable and thereby reveal which apps users consider the next-best alternatives. At trial, the parties introduced evidence concerning five natural and field experiments. All five confirmed the observational evidence discussed above.

#### i. Payment Experiment

The cleanest experiment was another run by List. He recruited 6,000 people and had them install a device that tracked how much time they spent on each of their phone's apps. See May 19 AM Tr. at 84:1–4. For four weeks, he sat back and measured app usage. See May 19 PM Tr. at 201:19–23. He then randomly assigned participants to a treatment or control group. See May 19 AM Tr. at 84:1–12. People in the treatment group were paid $4 for each hour that they cut from their Facebook or Instagram use. Id. at 84:12–17. The control group was given a fixed weekly payment. Id. at 84:17–18. The payments lasted four weeks, during which List tracked each group's usage. See May 19 PM Tr. at 201:19–23.

The experiment thus made it more expensive to use Meta's apps and so simulated what would happen if Meta exercised monopoly power (or, if one accepts the FTC's view, what would happen if Meta further exercised that power). It worked: people in the treatment group reduced the time they spent on Facebook or Instagram by about two-thirds. See DX 1230 (Payment Experiment Effect). By measuring which apps users reallocated that time to, List could test which apps they considered the next-best thing.

Among people paid to use Facebook less, the app that they transferred the greatest share of time to was YouTube. See May 19 AM Tr. at 98:9–17; but see DX 1246 (Payment

Experiment Facebook Diversion Rates) (highest diversion rate went to phone's browser — but that is not use in itself, but instead portal to reach other uses, like New York Times or ESPN). The second-biggest share went to Instagram. See May 19 AM Tr. at 98:18–19. Third was TikTok. Id. at 98:20–21.

Turning to the group paid to use Instagram less, the app they reallocated the most time to was YouTube. See DX 1221 (Payment Experiment Instagram Diversion Rates); May 19 AM Tr. at 101:24–102:1. Second was Facebook. See DX 1221 (Payment Experiment Instagram Diversion Rates) (excluding phone's browser for same reason as above); May 19 AM Tr. at 102:2–3. TikTok was once again third. See DX 1221 (Payment Experiment Instagram Diversion Rates); May 19 AM Tr. at 102:3–4.

Still, those numbers might not represent substitution if they merely reflected where users were spending time anyway. Suppose that someone was already spending 10% of his day on YouTube. If, when he was paid to spend less time on Instagram, he devoted 10% of his newfound free time to YouTube, then he would not be using that app to substitute for Instagram but simply spending additional time as he normally would have. To avoid this problem, List calculated the ratio of (1) the share of erstwhile Instagram time that a user allocated to an app to (2) the share of pre-treatment time that this user was spending on the app. See May 19 AM Tr. at 108:11–21. A ratio above 1 shows that people disproportionately used an app when they would have otherwise been on Facebook or Instagram and thus suggests that the app is peculiarly a Facebook or Instagram substitute.

**\*22** Measured this way, List's results grow even more striking. Among the group paid to use Facebook less, the highest ratio went to Instagram (a ratio of 4), then TikTok (2.7), then YouTube (2.1), then Snapchat (1.9). Id. at 109:13–15; DX 1248 (Facebook Indexed Diversion Rates). No other app had a ratio much above 1. See DX 1248 (Facebook Indexed Diversion Rates). For people paid to use Instagram less, the highest ratio went to TikTok (2.7), then YouTube (2.5), then Facebook (2.4), then Snapchat (2.1). See May 19 AM Tr. at 109:25–110:8; DX 1249 (Instagram Indexed Diversion Rates). No other app had a ratio meaningfully above 1. See May 19 AM Tr. at 109:25–110:8; DX 1249 (Instagram Indexed Diversion Rates); but see id. (phone's browser had ratio of 1.6).

This experiment, which in the Court's judgment offers the single best evidence of what consumers consider alternatives

to Meta's apps, tells a clear and consistent story: when using Facebook and Instagram becomes more costly, users turn to TikTok, YouTube, and Snapchat, with no other app notably standing out.


### ii. 2021 Meta Outage

What about when people cannot use Facebook or Instagram at all? In October 2021, Meta's apps suffered an outage and were offline for several hours. See DX 921 (Metrics Lift due to FB Outage) at 1. Meta's experts analyzed where users spent time instead. Of the total increase in usage of other apps, the largest share went to TikTok. See DX 1167 (Meta Outage Effects). The second largest went to YouTube. Id. And Snapchat — which the FTC insists is Meta's closest competitor — fell far below, seeing its usage increase by less than a third of what TikTok enjoyed and less than half of what YouTube did. Id.; see also May 21 AM Tr. at 86:9–12 ("If you think that Snapchat is in the market, then you are seriously underestimating the importance of the competitive constraints that apps like TikTok [and] YouTube ... are imposing on Meta.").

These results are especially striking because Reels was still in its infancy. See May 21 AM Tr. at 97:4–9. Users were thus not trying to replace unconnected videos but instead content from their friends. Yet they still turned to TikTok and YouTube. This episode thus not only reinforces that those apps are the closest alternatives to Facebook and Instagram, but it also suggests that connected and unconnected content might compete with one another. Id. at 97:10–15.


### iii. India TikTok Ban

Opposite scenarios have also occurred, where users had to seek alternatives to TikTok or YouTube. The Court starts with India's banning of TikTok in 2020. See May 19 AM Tr. at 116:6–8.

As soon as TikTok disappeared, Indians spent more time on Facebook and Instagram. See May 12 AM Tr. at 67:13–20; DX 535 (TikTok Headwinds on FB and IG Deck) at 14. The shift was especially dramatic among teens, who presumably were most likely to have been using TikTok before the ban, see DX 535 (TikTok Headwinds on FB and IG Deck) at 10, 15 (teens more likely to use TikTok in United States): 12% more teens used Facebook each day, and the average teenage user

spent 27% more time on the app. Id. at 14. Use of Instagram also surged. See May 12 AM Tr. at 84:10–19.

**\*23** List tested whether TikTok's unavailability caused this stampede to Meta's apps. He created a synthetic control — a weighted average of several countries constructed to match the pre-ban pattern of usage in India — and compared how time spent on Facebook and Instagram changed in India (where TikTok had been banned) to the synthetic control (where it had not been). See May 19 AM Tr. at 116:17–117:8; see also Alberto Abadie, Using Synthetic Controls: Feasibility, Data Requirements, and Methodological Aspects, 59 J. Econ. Literature 391, 392–98 (2021) (explaining synthetic controls). The results practically speak for themselves:



DX 1224

DX 1225

Two weeks into the TikTok ban, Indians had increased their time on Facebook by more than 20%. See DX 1224 (India TikTok Ban Facebook Effects). In the synthetic control, Facebook time fell. Id. And Meta's usage in India kept

climbing. Nine months into the ban, Indians were spending over 60% more time on Facebook, while its use had not changed in the synthetic control. Id. In the same time period, Indians increased their time on Instagram by a whopping 150%. See DX 1225 (India TikTok Ban Instagram Effects). In the synthetic control, Instagram time rose only about 25%. Id.

This natural experiment shows what the world might look like without TikTok. Crucially, it measures long-term effects, confirming that substitution between Meta's apps and TikTok is not a passing phenomenon produced only by short-term outages. It shows that TikTok takes an enormous amount of time away from Facebook and Instagram.

### iv. U.S. TikTok Shutdown

Closer to home, as the United States' short-lived TikTok ban was about to go into effect, the app went offline for about half a day this past January. See May 8 PM Tr. 201:9–12. While TikTok was down, people switched to other apps. See DX 1154 (TikTok Shutdown Effects). The greatest share of that newfound free time went to Facebook, then to Instagram, then YouTube. Id. YouTube was following the outage closely, and it homed in on users who were looking for a TikTok substitute: tracking app usage on people's phones, it drilled down on users who tried to open TikTok, saw that it was down, and opened another app in the next five minutes. See DX 1255 (U.S. TikTok Offline Period Impact Analysis Deck) at 7. Of the apps those would-be TikTok users turned to, they spent the most time on Facebook, then Instagram, then YouTube. Id. (also showing that Google Chrome was third ahead of YouTube, which Court ignores for reasons above).

Two results here are especially striking. First, according to the FTC's theory, TikTok and YouTube are video-entertainment apps, see FTC Post-trial Findings of Fact, ¶¶ 58–60, 73–74, while Facebook and Instagram are used for personal social networking. Id., ¶¶ 48–49. If the FTC were right, you would expect that users seeking a substitute for TikTok would turn most often to YouTube. The evidence shows otherwise: people evidently thought that the closest platforms to TikTok were Facebook and Instagram. It is unclear whether that was because Meta's apps are really entertainment apps, because TikTok is really a social-networking app, or because those artificial categories do not make sense. What is clear is that the FTC's hypothesis about how people use these apps is consistently disproven by the data.

Second, the amount of time that TikTok seems to be taking from Meta's apps is stunning. Compared to the same time on prior weekends, Americans used Instagram either 72% or 58% more when TikTok was down, depending on which measurement you use. See DX 1255 (U.S. TikTok Offline Period Impact Analysis Deck) at 6; DX 1154 (TikTok Shutdown Effects). Teens, who were more likely to be on TikTok, see DX 535 (TikTok Headwinds on FB and IG Deck) at 10, doubled their Instagram time. See May 8 PM Tr. at 202:7–9. In the same comparison, Americans overall used Facebook either 10% or 12% more. See DX 1255 (U.S. TikTok Offline Period Impact Analysis Deck) at 6; DX 1154 (TikTok Shutdown Effects). Mosseri, the Head of Instagram, put the Instagram numbers in perspective: "[I]n a world where we fight for basis points, .01 percent wins.... The idea of the entire app doubling ... was jaw dropping." May 8 PM Tr. at 202:10–13. The Court finds this evidence particularly relevant because it is so recent and thus reflects the apps as they exist now.

**\*24** Meta's leadership team took away a clear lesson. Mosseri reflected that the episode showed "there's no question about whether or not we compete with TikTok." Id. at 16–17. Alison, the Head of Facebook, drew the same conclusion: "We believe that TikTok is taking ... engagement ... and people's attention away from Facebook and that it is a very strong competitor today and will likely continue to be." May 15 AM Tr. at 21:9–12.

### v. 2018 YouTube Outage

YouTube suffered a 90-minute outage in 2018. See May 12 AM Tr. at 88:13–16; DX 345 (Oct. 2018 Meta Executives Email Thread) at 3. During that time, the number of people using Facebook's mobile app rose 6%, and time on Facebook climbed by 7%. See DX 345 (Oct. 2018 Meta Executives Email Thread) at 3; see also May 12 AM Tr. at 88:13–19. Facebook had been debating whether to invest more in video and whether that would cannibalize time on its traditional offerings. See DX 345 (Oct. 2018 Meta Executives Email Thread) at 3. Studying the effect of the YouTube outage, one executive wrote that "YouTube[ ] ... cannibalizes us already. We weren't able to prove this assumption with any data, but tonight" the outage provided evidence that "confirms our strongly-held belief." Id. Knocking out YouTube had an "instant impact" on Facebook use, and that impact was "huge." Id. Indeed, the evident substitution between

Facebook and YouTube helped convince Meta to invest billions in video. See May 8 PM Tr. at 179:12–16.

### c. Interpreting the Evidence

Those natural and field experiments — the pricing experiment, the Meta outage, India's TikTok ban, the TikTok pause in the United States, and the YouTube outage — tell a consistent and unmistakable story. When consumers cannot use Facebook and Instagram, they turn first to TikTok and YouTube. When they cannot use TikTok or YouTube, they turn to Facebook and Instagram. That evidence leaves the Court with no doubt that TikTok and YouTube compete with Meta's apps. Alexander Schultz, Meta's Chief Marketing Officer and Vice President of Analytics, see May 7 PM Tr. at 247:2–4, put it succinctly: "[E]very time we go down, [time] goes to those services. And [when] they go down, it goes to us." May 12 AM Tr. at 89:2–3.

Of course, a rival does not belong in the product market simply because it competes with the defendant. H & R Block, 833 F. Supp. 2d at 54. Instead, it must compete enough to prevent the defendant from exercising monopoly power. Rothery, 792 F.2d 210 at 218; Areeda & Hovenkamp, ¶ 536, at 322–23. The Court finds that TikTok and YouTube do, for two reasons.

First, the magnitude of substitution. India offers a counterfactual world in which TikTok does not exist: in that world, people spend 60% more time on Facebook and roughly double their time on Instagram compared to the synthetic control. See DX 1224 (India TikTok Ban Facebook Effects); DX 1225 (India TikTok Ban Instagram Effects). When TikTok went offline in the United States, Americans spent 58–72% more time on Instagram and 10–12% more time on Facebook. See DX 1154 (TikTok Shutdown Effects); DX 1255 (U.S. TikTok Offline Period Impact Analysis Deck) at 6. True, in May 2021, Meta estimated that TikTok was depressing active users' Facebook time by only 4–7% and their Instagram time by only 4–5%. See DX 535 (TikTok Headwinds on FB and IG Deck) at 4, 7. But when Meta considered only users who had adopted TikTok, its estimate of lost time rose to 17–26% (at least for Facebook). Id. at 8. The number of Americans using TikTok has soared by about 80% since then, so the app's current effect on Meta is likely closer to the latter numbers than the former. Compare DX 60 (V Pappas Decl.), ¶ 9 (as of September 2020, TikTok had 93 million monthly active U.S. users), with Apr. 30 AM Tr. at 65:22–25, and PX 689 (Presser Decl.) at 6 (today, that number is over 170 million).

**\*25** As for the effect of YouTube's competition, the only quantitative measure comes from the YouTube 2018 outage, when Facebook use rose by 7%. See DX 345 (Oct. 2018 Meta Executives Email Thread) at 3. That is meaningful "in a world where [these companies] fight for basis points." May 8 PM Tr. at 202:10. But remember that the 2018 version of Facebook did not have Reels, see Joint Stipulations of Fact, ¶ 20, and had much more content from friends. Nor did 2018's YouTube have Shorts. See Todd Sherman, YouTube Off. Blog, Bringing YouTube Shorts to the U.S. (Mar. 18, 2021). https://perma.cc/7BPL-3CWW. Today, Americans spend most of their time on Facebook watching videos, see DX 1147 (U.S. Share of Facebook Time Spent on Video), and the part of Facebook on which they spend the most time (Reels), see DX 1152 (Jan. 2025 Facebook Surface Breakdown), is identical to the Shorts that YouTube offers. The 2018 YouTube outage thus likely underestimates the effect of competition from YouTube on Facebook's business today. More recent evidence comes from List's payment experiment, which found that YouTube is Facebook's closest substitute. See May 19 AM Tr. at 98:9–17.

The magnitude of TikTok's and YouTube's effect on Meta's market share convinces the Court that these apps do not merely compete with Facebook and Instagram "at some level." H & R Block, 833 F. Supp. 2d at 54. Instead, they compete fiercely over a meaningful share of Meta's business.

Second, one need not take the Court's word for it: Meta has made billions of dollars of investment decisions because it views TikTok and YouTube as serious competitive threats. Take Reels, which Meta launched to meet the competition from TikTok. See May 8 PM Tr. at 154:21–155:23; DX 922 (TikTok Project Blue Summ.) at 14. Developing and maintaining this new feature cost Meta a small fortune in dollars and resources. See May 8 PM Tr. at 159:19–160:7; Apr. 29 PM Tr. at 197:12–25; May 1 PM Tr. at 171:10–14; May 12 AM Tr. at 70:18–71:7; May 14 PM Tr. at 256:9–16. It required the company to train and run a large AI model, see May 8 PM Tr. at 159:19–160:7; May 14 PM Tr. at 254:6–256:8, to redesign its video player, see May 14 PM Tr. at 256:19–257:18, to overhaul its apps' features, see May 8 PM Tr. at 156:20–157:17, and to develop an infrastructure for content creators to make those Reels in the first place. See May 14 PM Tr. at 257:20–258:18. All told, Meta spent around $4 billion on Reels last year and is on track to spend about

2025 WL 3458822

$4.5 billion this year. See May 8 PM Tr. at 159:25–160:2. The true cost of Reels is even higher: because Reels has a lower ad load than Meta's other features, shifting to Reels cost Meta dearly in short-term advertising revenue. See DX 922 (TikTok Project Blue Summ.) at 14 (TikTok estimate that shift to Reels would cost Meta 6% of total ad revenue in 2022); May 8 PM Tr. at 162:19–163:13; May 12 AM Tr. at 69:25–70:17.

That Meta sunk so much money and resources into fighting off competition from TikTok shows that substitution was taking a chunk out of Meta's bottom line. See May 8 PM Tr. at 163:14–20; May 12 AM Tr. at 69:13–24, 70:5–17; May 14 PM Tr. at 261:12–16. Indeed, since Reels now accounts for most time spent on Instagram and the most popular part of Facebook, Meta's balance sheet tells only part of the story: substitution from Meta to TikTok was so high that it forced Meta to fundamentally transform its apps.

While the evidence of substitution to YouTube is thinner, Meta similarly invested billions and developed new features to respond to that competitive threat. See May 8 PM Tr. at 179:2–16; May 12 AM Tr. at 89:17–90:4; May 14 PM Tr. at 252:5–20; May 15 AM Tr. at 22:2–12.

True, none of this empirical evidence is a SSNIP test. Bans and outages do not impose small but significant price increases; they get rid of a product entirely. The outages and pricing experiment were transitory. And the India ban has the further flaw that it is from a different geographic market.

In the real world, however, no evidence is perfect. Nor is any single piece dispositive here. While each of Meta's empirical showings can be quibbled with, they all tell a consistent story: people treat TikTok and YouTube as substitutes for Facebook and Instagram, and the amount of competitive overlap is economically important. Against that unmistakable pattern, the FTC offers no empirical evidence of substitution whatsoever.

**\*26** Although the HMT and its SSNIP test cannot be directly tested in this case, it remains the relevant question. So the Court must take the non-HMT substitution evidence, make a qualitative, holistic appraisal of it, and ask what light it sheds on the relevant legal issue: could Meta maximize its profit by making its apps significantly worse than they would be in a competitive world, or is it constrained by competition from TikTok and YouTube? When the evidence implies that consumers are reallocating massive amounts of time from Meta's apps to these rivals and that the amount of substitution

has forced Meta to invest gobs of cash to keep up, the answer is clear: Meta is not a monopolist insulated from competition. The Court finds the evidence favoring Meta on this issue both credible and convincing.

#### d. The FTC's Counterarguments

The FTC, naturally, disagrees. Before launching into its objections, the Court first comments on the credibility of the expert witness from which many of them issue. It then moves on to the merits of the agency's counterarguments.

#### i. Hemphill

While much of the evidence discussed above comes from lay witnesses (plus Meta's experts List and Dennis Carlton), the Court acknowledges that Professors Scott Hemphill and Clifford Lampe offered some contrary testimony. It seems unlikely that Hemphill, however, could have approached his task with an open mind. Before the FTC filed this suit, he met with it, the Department of Justice, and state attorneys general to urge them to investigate Meta and outlined an antitrust suit that those enforcers could bring. See May 13 PM Tr. at 148:20–149:15, 152:23–153:25. He had created this presentation with Professor Tim Wu, who has long advocated breaking up Facebook, id. at 155:1–156:11, and Chris Hughes, a disillusioned Facebook cofounder who had become a public champion of dismantling the company. Id. at 156:13–159:11. The presentation even advised the FTC on specific next steps: recommending whom the agency should subpoena, advising it on what topics to ask those people about, and urging it to seek a preliminary injunction before Meta could integrate its messaging services and thereby make divestiture harder. See May 27 PM Tr. at 169:21–173:8.

The FTC took Hemphill's advice to heart. It opened the current investigation just one week after meeting with him, id. at 169:6–16, interviewed the people he had mentioned, id. at 170:20–171:3, and requested detailed information about Meta's plans to integrate its messaging services. Id. at 173:4–8. Just one day after the agency filed its Complaint, Hemphill wrote an article proclaiming, "These were acquisitions that ... were by a monopolist, of its direct competitors or nascent competitors, with abundant evidence of anticompetitive intent." Id. at 174:22–175:19. All of this was before he had been hired as an expert witness. Id. at 173:15–18.

2025 WL 3458822

Once Hemphill was brought on, the Court doubts that he weighed the evidence objectively. Instead, it was almost as if the FTC had put one of its own lawyers on the stand. The Court realizes that parties seek out experts who they expect will reach conclusions that help them, and it cannot demand that parties find some antitrust expert who has never even considered whether the subject company might be a monopoly. The fact that someone has views on such a question — and might even have published articles on it — is, after all, what makes him an expert and not a desert hermit. But when Hemphill urged a party to bring this very suit, advised it on litigation strategy, and publicly championed its case before getting hired, it makes a neutral evaluation of his opinions more difficult.

The Court nonetheless does not reject such opinions merely because of potential bias. Instead, it explains why they do not persuade on the merits.

### ii. Cellophane Fallacy

**\*27**  Through Hemphill, the FTC insists that the Court cannot trust Meta's substitution evidence because of the so-called Cellophane fallacy. See FTC Post-trial Mem. at 34–35. This principle warns that consumers are more likely to turn to alternatives if a product is already priced above competitive levels, so a monopolist charging a supracompetitive price will appear to face competition that it would not in a competitive market. See, e.g., Epic Games, Inc. v. Apple, Inc., 67 F.4th 946, 975 n.7 (9th Cir. 2023).

While the Court is mindful of this trap, it does not find the fallacy too worrying here. Start with the evidence that Cellophane does not threaten. It would not affect the order of substitution, which shows that the closest substitutes for Meta's apps are YouTube and TikTok. Nor does it undermine the amount of substitution to Meta's products when TikTok or YouTube becomes unavailable. If anything, Meta's purported monopoly power would bias those rates down, since consumers would be less likely to switch to an app charging a supracompetitive quality-adjusted price. It would also not affect evidence from Facebook and Instagram outages, which do not slightly increase the price of Meta's apps but take them away entirely. Indeed, if Meta were charging a monopoly price, that might make substitution rates to TikTok and YouTube look misleadingly low: the users most likely to respond to a price increase by switching to a different app already would have, while the ones still clinging

to Meta's apps would be least likely to consider another app an acceptable substitute.

At most, then, the Cellophane fallacy makes the Court wary of Meta's alarm at how much business TikTok was taking from it and of its executives' perception that YouTube was a serious competitor. Yet while the Cellophane fallacy fits this general kind of evidence, it does not easily fit this market. Because Meta's apps are free, the FTC's primary theory of a supracompetitive price is that Meta has saturated its apps with ads. See FTC Post-trial Findings of Fact, ¶¶ 157–63. Yet those ads have such marginal effects on users' behavior that is hard to imagine that they are yanking substitution rates around. See May 13 AM Tr. at 50:23–51:11; May 20 AM Tr. at 36:18–23; DX 342 (News Feed Ad Load Trajectory Deck) at 26. Consider that Facebook users who downloaded TikTok used Meta's app 17–26% less. See DX 535 (TikTok Headwinds on FB and IG Deck) at 4. By comparison, Facebook users who were given a product with no ads whatsoever used the app only 7% more. See May 13 AM Tr. at 50:23–51:11; May 20 AM Tr. at 36:18–23. It is hard to believe that nudging down the ad load to whatever the FTC considers the competitive level would make substitution rates to TikTok unimportant.

Invoking the Cellophane fallacy here also puts the cart before the horse. The fallacy is a risk only if Meta is in fact a monopoly. Because the FTC's affirmative evidence does not establish monopoly power, it does not persuade the Court that Facebook and Instagram are charging supracompetitive prices. The substitution evidence therefore seems reliable here. Cf. PepsiCo, Inc. v. Coca-Cola Co., 114 F. Supp. 2d 243, 257–58 (S.D.N.Y. 2000) (no risk of Cellophane fallacy when plaintiff had "not submitted any evidence to show that [defendant's] prices are supracompetitive").

### iii. Expansion into New Market

The FTC's next theory is that Meta does not compete in one market but in two. The agency acknowledges that Facebook and Instagram have added unconnected video and even admits that this option might compete with TikTok and YouTube. But, the agency rejoins, Meta's original offering of friend content still has no substitute. It is instead as "if the only supermarket in a town starts selling pet food." FTC Post-trial Mem. at 3. "[T]he supermarket would find itself in newfound competition with Petco and PetSmart[, b]ut those competitors would not alter the supermarket's dominance,

because consumers cannot patron[ize] pet-store retailers to accomplish the purpose of buying groceries for the week." Id.

**\*28**  The evidence, however, shows that consumers treat connected and unconnected content as substitutes. In the FTC's telling, Meta added Reels to enter a new market where it could poach users from TikTok. See FTC Post-trial Mem. at 3. But it was the other way around: people were substituting time from Meta's apps to TikTok before Meta launched Reels. See May 12 AM Tr. at 105:18–24; Apr. 16 AM Tr. at 24:19–24; Apr. 17 AM at 31:21–25, 32:17–19. Meta did not create Reels to break into a new market but instead to hang onto its own users who were already flocking to TikTok. See May 8 PM Tr. at 1634:14–20; May 12 AM Tr. at 69:13–24, 70:5–17; May 14 PM Tr. at 261:12–16. Consumers therefore used TikTok as a replacement not just for unconnected video but for the friends' posts on Facebook and Instagram that the FTC claims have no substitute.

What is more, when Meta experimentally rolled out Reels for some users and not others, the users with Reels spent less time on their Instagram feed and marginally less time on Instagram Stories. See DDX 36.17 (Reels Holdout Effects); May 21 AM Tr. at 101:22–103:19. They therefore seemed to treat unconnected Reels as a substitute for the parts of the app where they would see posts from their friends. Those results were consistent with what happened to Meta's apps when TikTok first gained a foothold: it crimped the growth of time spent on every part of Facebook and Instagram, not just videos. See Apr. 16 AM Tr. at 19:20–21:2.

Similarly, Snapchat found that users were [Redacted] For instance, when Snapchat surveyed users about [Redacted] A Snapchat executive confirmed that [Redacted] Another source of evidence, another confirmation that people use TikTok as a substitute for content from friends.

The Court is the first to admit that seeing a photo from a friend and watching a video of a stranger are different. Yet like many differentiated products — Chinese and Mexican restaurants, Sprite and Coca-Cola, glass containers and metal cans — they compete.

### 2. *Brown Shoe*

Courts also identify distinct product markets using the factors from Brown Shoe: (1) the products' "peculiar characteristics and uses," (2) "industry or public recognition of the submarket as a separate economic entity," (3) "unique production facilities," (4) "distinct customers, distinct prices [and] sensitivity to price changes," and (5) "specialized vendors." Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502. The parties do not discuss the last factor, so the Court will ignore it as well.

Before plunging into the Brown Shoe factors, the Court notes two preliminary points. First, those factors do not set out a separate inquiry from the one the Court has already been performing. Rothery, 792 F.2d at 218 & n.4. The controlling question remains which firms belong in the product market, and that depends on which apps are reasonably interchangeable with Facebook and Instagram. The Brown Shoe factors approach that same question via a different path, using qualitative evidence as "evidentiary proxies" for whether consumers would in fact substitute between products. Id. at 218. Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc., 875 F.2d 1369, 1375 (9th Cir. 1989) ("We have repeatedly noted that the Brown Shoe indicia are practical aids for identifying the areas of actual or potential competition and that their presence or absence does not decide automatically the submarket issue."); see also Whole Foods, 548 F.3d at 1038 (opinion of Brown, J.) (treating Brown Shoe factors and empirical substitution evidence as identical).

Second, the Court will avoid some confusing language that these factors have invited. Courts typically explain that the Brown Shoe factors pick out distinct "submarkets," which implies that a product market can be further split into cognizable niches. See Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502. That impression would be misleading. The only relevant concept is the product market, indivisible as an atom. Id. (submarkets might be relevant only because they, "in themselves, constitute product markets for antitrust purposes"). By definition, the product market is already the smallest grouping of products on which a hypothetical monopolist could profitably impose a SSNIP. Meta, 775 F. Supp. 3d at 36. If a subcomponent of that market meets that test, then it is not a "submarket" but a product market in its own right. See Areeda & Hovenkamp, ¶ 533c, at 288–91. If a subcomponent flunks that test, then it is legally irrelevant, and dignifying it with the name "submarket" adds only confusion. Id. (exhorting courts to abandon the word "submarket"); see also Geneva, 386 F.3d at 496 (noting these points).

**\*29**  Recall that the FTC argues that within social media, two relevant markets exist: one for PSN apps like Facebook, Instagram, and Snapchat, and a separate one for entertainment

apps like TikTok and YouTube. The Court now tests that hypothesis against the evidence to which Brown Shoe points.

### a. Peculiar Characteristics and Uses

This factor will be familiar to any reader who has compared products in the aisle of a hardware store. It asks whether different products have physical or functional differences that make them less likely to be interchangeable. See Rothery, 792 F.2d at 218 n.4; Brown Shoe, 370 U.S. at 326–28, 82 S.Ct. 1502. Of course, it is not enough to find some difference between products. Any two products will have differences, yet the Supreme Court has rejected the notion that "Brown Shoe w[as] intended to limit the competition protected by [antitrust law] to competition between identical products." Cont'l Can, 378 U.S. at 452, 84 S.Ct. 1738; see also du Pont, 351 U.S. at 394 ("[I]llegal monopoly does not exist merely because the product said to be monopolized differs from others. If it were not so, only physically identical products would be a part of the market."). The Court therefore considers how Meta's apps differ from TikTok and YouTube but also how important those differences are in the context of the overall apps. See Brown Shoe, 370 U.S. at 326, 82 S.Ct. 1502 (asking whether this factor showed that product's "characteristics peculiar to itself render[ed] it generally noncompetitive with the others" at issue).

### i. Peculiar Characteristics

The FTC first points out that PSN apps all feature a so-called social graph — a map of each user's connections to other people on the app, whom the user usually knows in real life. See Apr. 14 PM Tr. at 162:7–163:8; Apr 23 AM Tr. at 85:4–86:18; Apr. 30 AM Tr. at 46:1–10; May 8 AM Tr. at 66:25–67:9, 70:4–71:1, 106:13–15; May 12 PM Tr. at 226:20–227:8; Jacob Andreou Deposition at 182:8–11; PX 729 (People You May Know Explanation) at 1–3. They use this graph to curate the content that each user sees. Think of Facebook's Feed showing you someone's picture because you are friends with her or Instagram showing you a Story because you followed the account that posted it. See Apr. 14 PM Tr. at 170:9–13; May 14 PM Tr. at 255:13–20; Andreou Dep. at 183:3–184:15 (without friend graph, Snapchat "can't deliver any value" to user).

By contrast, TikTok and YouTube are built around a content graph — a map of the topics that a user is interested in. See Apr. 17 PM Tr. at 172:20–173:7, 174:7–14; Apr. 30 AM Tr. at 46:11–25, 47:10–21; Blake Chandlee Deposition at 17:07–18:03; PX 13616 (TikTok Talking Points) at 3. Both apps use this content graph to recommend posts to users. See Apr. 16 AM Tr. at 37:14–23; Apr. 17 AM Tr. at 173:3–7; Apr. 23 AM Tr. at 95:12–21; Apr. 30 AM Tr. at 38:11–17; PX 13616 (TikTok Talking Points) at 3; PX 11525 (2019 Top Social-Media Trends Deck) at 23.

True enough, but TikTok has a social graph, too. It lets users follow people they know and has tried to make mapping those offline connections a bigger part of the app. It prompts users to import their list of Facebook and Instagram friends as well as their phone contacts, see Apr. 30 AM Tr. at 57:21–58:5; May 12 AM Tr. at 55:12–20, 72:8–10, which it uses to suggest accounts to follow that belong to people the user knows. See Apr. 30 PM Tr. at 151:20–152:6. TikTok has also added a Friends tab, which contains only posts created or reshared by accounts that the user follows and that follow the user back. See Apr. 30 AM Tr. at 90:16–91:1. [Redacted] see also DX 535 (TikTok Headwinds on FB and IG Deck) at 16 (Meta noting that TikTok is building "[s]ocial graph"); PX 3827 (Aug. 2022 Meta Email Thread) at 2 (Alison noting that "TikTok [is] pushing so hard into friending and friend sharing[;] ... we are not the only company working on blending recommendations and socially connected content"); DX 922 (TikTok Project Blue Summ.) at 19 ("Meta is concerned that the moat around its core differentiator, the social graph, is getting weaker as Tiktok Friends tab and messaging functionality continues to gain traction.").

*30 To be sure, TikTok's social graph has not achieved great success. A TikTok executive estimated that fewer than 10% of users import their contacts. See Apr. 30 AM Tr. at 58:6–17. Meanwhile, users spend only about 1% of time on the app watching videos in the Friends tab. Id. at 56:13–21; Pappas Dep. at 23:3–24:14.

Then again, these features are now also ancillary on Facebook and Instagram. Content from friends that is delivered through a social graph is a tiny minority of what users see on Meta's apps. See DX 1152 (Jan. 2025 Facebook Surface Breakdown); DX 1153 (Jan. 2025 Instagram Surface Breakdown). Instead, they overwhelmingly use the apps to see unconnected content recommended by AI algorithms. Id. That feature is identical to the core of TikTok and YouTube. While social features are relatively more important on Facebook and Instagram, both apps' primary features are found on these two rivals.

Also probative is the fact that Meta's apps, Snapchat, TikTok, and YouTube all deliberately copy each other. See May 8 AM Tr. at 107:23–108:4; May 12 AM Tr. at 38:15–39:11; May 15 AM Tr. at 22:2–23:4. Meta's Reels and YouTube's shorts are transparent clones of TikTok, as is Snapchat's Spotlight feature. See DX 1088 (TikTok Resp. to Australian Regulators) at 3; Pappas Dep. at 55:19–20; Morrison Dep. at 85:16–19; May 15 AM Tr. at 22:17–23:7; May 15 PM Tr. at 265:12–19; May 19 AM Tr. at 53:7–9; Chandlee Dep. at 68:16–69:12. Snapchat first popularized stories, and Facebook, Instagram, and TikTok added identical versions. See Apr. 30 AM Tr. at 89:8–20; May 8 PM Tr. at 181:18–182:13; May 12 AM Tr. at 38:19–22; Chandlee Dep. at 68:13–15. Even YouTube tried its hand at a stories feature. See May 8 PM Tr. at 182:10–11. TikTok's addition of a social graph incorporates the feature that rocketed Facebook and Instagram to global popularity. See Apr. 16 AM Tr. at 21:3–23; Apr. 29 PM Tr. at 196:22–197:10; May 8 AM Tr. at 105:14–22; May 12 AM Tr. at 71:12–25.

The apps also compete to attract the same content creators. See Apr. 15 PM Tr. at 151:18–23; Apr. 16 AM Tr. at 36:13–37:10; Apr. 30 PM at 171:22–23; May 8 PM Tr. at 174:2–176:19; PX 12669 (FB App Strategy Thread) at 5. Those creators often post the same video to multiple platforms, as an Instagram Reel, a TikTok video, and a YouTube short. See Apr. 17 PM Tr. at 192:1–6; May 8 PM Tr. at 175:5–10.

When apps inside and outside the FTC's alleged market are deliberately offering the same features and competing to get the same people to post the same videos, that is strong evidence that that they are competing for the same users who are after the same things. See May 21 AM Tr. at 68:6–20. It is also evidence that while these apps do indeed have distinguishing features, the identical ones predominate.

### ii. Peculiar Uses

Still hunting for differences, the FTC argues that people use Facebook, Instagram, and Snapchat for distinct reasons. For one, they have norms of sharing personal content for others to see. People find it natural to post a vacation photo to Instagram or a life update to Facebook, but they are far less likely to share moments from their daily life on TikTok or YouTube. See May 8 AM Tr. at 92:7–17; Chandlee Dep. at 21:3–16; Apr. 23 PM Tr. at 143:13–144:7; May 12 PM Tr. at 216:2–20; PX 13564 at 13.

That is indeed a difference between the apps; once again, it is a minor one. People seldom post on Facebook or Instagram these days. See May 15 AM Tr. at 13:17–21 ("[F]or most people, [Facebook] is a consumption experience."); May 7 AM Tr. at 70:7–18; May 8 AM Tr. at 65:20–22, 87:7–11; May 14 PM Tr. at 176:14–177:11, 217:24–218:18, 221:5–9; May 15 AM Tr. at 11:9–23; DX 600 (Facebook U.S. Long-Term Themes Deck) at 5. On a given day, only about 1 in 20 active Facebook users shares an original post in Facebook's News Feed, and about the same percentage posts an original story. See May 15 AM Tr. at 84:11–17; DDX 29.2 (Participation Rates); see also May 15 AM Tr. at 12:1–6 (explaining participation rates). Over on Instagram, "maybe 1 in 40 or 30 people a day will post something to Feed, and about 1 in 6, 1 in 7 will post something to Stories." May 8 AM Tr. at 32:14–16.

 **\*31**  Instead, the dominant way that people use Meta's apps to connect with friends is by sharing content in private messages or texts. See DX 606 (Instagram U.S. Teen Messaging Deck) at 4; DX 585 (Facebook Board Meeting Deck on Messaging) at 3, 6; DX 517 (Mosseri Post on Meaningful Social Interactions) at 2; May 8 AM Tr. at 118:13–22; PX 708 (Mosseri Interview) at 10. As of 2018, there were 63 times as many Facebook messages per day as posts. See DX 517 (Mosseri Post on Meaningful Social Interactions) at 2. Even when Meta's users want to share a picture with friends, they do so overwhelmingly using direct messages:



DX 585 (Facebook Board Meeting Deck on Messaging) at 6
(title reformatted and image rescaled for clarity)

The dominant way that people use Meta's apps to share with friends is therefore the same way they share content from TikTok or YouTube.

The FTC tries one last angle. Its expert Clifford Lampe testified that survey responses and social norms show that people use Facebook, Instagram, and Snapchat to connect with friends, but open TikTok and YouTube to be entertained. The Court found none of this persuasive.

2025 WL 3458822

Starting with the surveys, they are far more mixed than the FTC lets on. For instance, it turns out that TikTok is fairly social. In one survey, when asked why they used TikTok, 51% of respondents chose, "To watch videos posted by my friends." DX 584 (Facebook Deck on How People Share Across Social Platforms in U.S.) at 48. That answer was essentially tied for first, neck and neck with "[t]o watch videos from the creators I follow" (53%) and "[t]o watch videos recommended by TikTok" (52%). Id. Another survey found that people were more likely to report that they used TikTok to "[s]tay connected with others" than they were for Instagram. See DX 952 (Social Media Landscape Quantification Deck) at 12. The same survey found that people said interacting with "[f]riends, family, and other people I know" was more important on TikTok than on Instagram. Id. at 22. Indeed, Instagram is less social than the FTC thinks. In one survey, more people said they use it for entertainment than to keep up with friends and family. See Apr. 23 PM Tr. at 195:4–12.

To be fair, the totality of the survey evidence suggested that Americans considered at least Facebook and Snapchat to be more social than TikTok. But this evidence was mixed at best and, even when read charitably, at most showed a difference of degree and not one of kind.

The evidence about social norms also had problems. For one, norms can change. Sure enough, as discussed above, they have changed in ways that have brought all four social-media apps together. In addition, much of the FTC's evidence — for both surveys and norms — was outdated. See Apr. 14 PM Tr. at 153:7–154:16 (discussing post from 2006); PX 292 (Facebook S-1) at 1, 78 (statement from 2012); PX 48 (Building a Better News Feed for You Announcement) at 2 (post from 2016); PX 3431 (Facebook Research Insights Post on Understanding Value Prop of Social Apps) at 1 (survey from 2017); PX 794 (Zuckerberg Post) at 1 (post from January 2018); PX 12991 (Aug. 9, 2018, Product Territories of Family of Apps in United States Deck) at 8 (survey from July 2018); PX 12333 (Mosseri Talking Points) at 2 (talking points from January 2018); PX 14986 (Cathcart-Zuckerberg Email Thread) at 1 (email from July 2018); PX 12992 (Aug. 21, 2018, Product Territories of Family of Apps in United States Deck) at 4, 44, 73 (deck from August 2018); PX 12993 (Facebook User Goals and Intent Survey) at 1, 3 (survey from August 2018).

Lampe also conceded points that make the survey and norm evidence seem rather otiose. Were these differences ones of degree or of kind? He could not really say, having asked only

whether the apps had differences at all. See Apr. 23 PM Tr. at 160:17–161:2. Did his analysis of why people use these apps consider how they actually spend their time on them? Nope. Id. at 190:15–191:11, 193:12–194:2. Did he study how consumers would respond to changes in one app's price? "That's not a question in my field ..., so no." Id. at 265:20–23. Did the evidence give him an opinion on whether Meta's apps compete with TikTok and YouTube? No; "[m]y field doesn't look in terms of competition." Id. at 265:9–17.

**\*32** The field of antitrust law does. In it, eyeballing the apps and looking at some surveys does not produce evidence remotely as useful as examining actual consumer behavior. Turning to that question, whatever users say they are doing and whatever differences an expert might pick out between screenshots of the apps, the facts are that people spend a tiny share of their time on Meta's apps viewing content from their friends and a far greater share watching Reels. See DX 1152 (Jan. 2025 Facebook Surface Breakdown); see DX 1153 (Jan. 2025 Instagram Surface Breakdown).

Meta's apps are primarily recommendation systems hooked onto messaging tools. Their characteristics and uses are hardly peculiar.

### b. Industry or Public Recognition

This factor looks at whether industry participants think that the proposed submarket really is "a separate economic entity." Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502. "[E]conomic actors usually have accurate perceptions of economic realities," Rothery, 792 F.2d at 218 n.4, so if those actors think that another firm competes in or outside their own market, they are probably right. Because market definition depends on competition, courts applying this factor pay particular attention to which products and companies a firm considers its competitors. FTC v. Staples, Inc., 970 F. Supp. 1066, 1079–80 (D.D.C. 1997); United States v. SunGard Data Sys., Inc., 172 F. Supp. 2d 172, 187–88 (D.D.C. 2001); Geneva, 386 F.3d 485 at 498.

The FTC rests on a claim that industry participants consider PSN apps a different kind of platform. That is largely true: in internal and external discussions, industry experts typically agreed that Facebook and Instagram let users keep up with friends, that TikTok and YouTube are less effective at this, and that this makes them different options. See PX 15043 (Twitter CorpDev Discussion) at 4; Apr. 28 AM Tr. at 35:1–

22; Apr. 30 AM Tr. at 40:24–43:8; PX 13581 (ByteDance Resp. to European Commission) at 5–6, 8–10; DX 856 (The Magic of Reddit: Insights Report) at 10; Chandlee Dep. at 17:07–18:09, 20:21–21:16; Morrison Dep. at 190:22–192:21; Pappas Dep. at 14:10–15:10; 22:4–24:14; 88:05–89:07. That said, many industry executives make no such distinction and consider our four apps, and others, part of a single category. See DX 855 (Reddit Competitive Benchmarking Analysis) at 7 (considering market of "leading social media platforms," including Facebook, Instagram, and TikTok); DX 771 (Google Executives Email Thread) at 3 (studying "major social platforms" and including Facebook, Instagram, Snapchat, and TikTok); DX 1071 (Google Resps. to European Commission) at 5–6 (rejecting idea that there is "single industry definition of a social networking service" but saying that if there were, TikTok would be included); Apr. 24 PM Tr. at 149:6–150:5; Jonathan Chen Dep. at 19:15–21:10, 23:13–24:20, 25:16–27:07; Kumaresh Pattabiraman Deposition at 36:10–37:04; Apr. 17 PM Tr. at 198:5–199:19; 202:17–20; DX 606 (Instagram U.S. Teen Messaging Deck) at 4 (comparing Instagram and TikTok as part of single market); DX 965 (Walmart Connect Q3 Competitive Update) at 10; May 20 PM Tr. at 231:16–232:1.

Either way, whether industry experts recognize different categories of apps is not primarily the point. More important is "industry or public recognition of the submarket as a separate economic entity," Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502 (emphasis added) — that is, recognition that the submarket is its own competitive realm. See Staples, 970 F. Supp. at 1079–80 (applying this factor by asking which rivals firms considered their competition); SunGard, 172 F. Supp. 2d at 187–89 (same); Geneva, 386 F.3d 485 at 498 (same); see also Reynolds Metals Co. v. FTC, 309 F.2d 223, 229 (D.C. Cir. 1962) (looking to whether firms' economic behavior, like pricing and purchasing practices, showed that they responded to putatively separate markets); Rothery, 792 F.2d at 218 n.4 (this factor susses out "economic realities").

 *33  Here, the evidence overwhelmingly shows that industry insiders think that TikTok and YouTube compete with PSN apps. Documents and testimony from these people noted this competition. See [Redacted] DX 947 (X Q3 '21 Competitive Earnings Analysis) at 9 (noting "shift" in Instagram "driven by stiff competition from TikTok and YouTube"); DX 933 (TikTok 2021 July–Aug. Bimonthly Report) at 3 ("YouTube and Instagram are TikTok's most important competitors."); DX 1306 (TikTok 2025 Q1 Management Quarterly) at 3 (similar); DX 931 (TikTok Leadership Townhall) at 4

(similar); DX 917 (TikTok's Reels Post-Launch Resp.) at 2–3; Morrison Dep. at 85:4–87:9; Chandlee Dep. at 68:16–73:20, 77:10–20; Apr. 17 PM Tr. at 206:2–19 (discussing Google document saying that TikTok and YouTube compete with Facebook), 206:23–209:11; Apr. 30 AM Tr. at 108:1–109:8; Apr. 30 PM Tr. at 134:7–137:15; Pappas Dep. at 37:21–39:1; Debbie Weinstein Deposition at 241:9–242:17. TikTok and YouTube tracked Meta's products as competitive threats. See DX 766 (YouTube Quarterly Industry Update) at 5; DX 782 (YouTube Facebook Competitive Teardown); DX 917 (TikTok's Reels Post-Launch Resp.) at 2–3; DX 922 (TikTok Project Blue Summ.) at 14; DX 932 (TikTok 2022 Mar.–Apr. Bimonthly Report) at 5; Weinstein Dep. at 336:1–338:13; Apr. 17 PM Tr. at 212:14–213:5 (YouTube executive could not recall single competitive report that omitted Facebook and Instagram). Both companies also monitored Meta's share of what they deemed the market. See DX 766 (YouTube Quarterly Industry Update) at 5; DX 768 (YouTube Quarterly Industry Deep Dive) at 6; DX 931 (TikTok Leadership Townhall) at 4; DX 932 (TikTok 2022 Mar.–Apr. Bimonthly Report) at 4–5; DX 1307 (TikTok Monthly 2025 Report) at 4–5.

Meta itself has no doubt that TikTok and YouTube compete with it. Its executives unsurprisingly testified to that belief. See Apr. 16 AM Tr at 36:13–37:10; Apr. 16 PM Tr. at 274:6–275:7; May 1 PM Tr. at 183:5–10; May 8 PM Tr. at 163:14–20, 179:2–16; May 12 AM Tr. at 62:19–63:4, 65:16–20, 68:14–69:1, 83:11–83:24; May 15 AM Tr. at 15:12–14. More persuasively, business documents created outside litigation reflect a consistent and urgent focus on TikTok's competitive threat. For instance, Zuckerberg told investors, "Competition has gotten more intense, especially with ... the rise of TikTok which is one of the most effective competitors we have ever faced." DX 922 (TikTok Project Blue Summ.) at 22 (omission in original); see also DX 650 (May 2020 Raji Email) at 1 ("TikTok in the US is a much bigger threat to our entire family of apps."); DX 660 (IG Metric Softness Deck) at 6 ("Competition from TikTok is a big concern[.]"); DX 663 (Meta Executive Chat Thread) at 1 ("TikTock [sic] competition really matters ... TikTock [sic] is the best competitor yet and this is what really competing feels like .... [W]e have the best competitor we've seen in a long way."); DX 1018 (Sep. 2020 Meta Board Meeting Deck) at 15; PX 3827 (Aug. 2022 Meta Email Thread) at 2; PX 12669 (FB App Strategy Thread) at 5.

Meta obsessively tracks TikTok's strategy and success. See, e.g., DX 535 (TikTok Headwinds on FB and IG Deck) at

14–16; May 12 AM Tr. 116:9–120:4. Schultz, Meta's Chief Marketing Officer and Vice President of Analytics, testified that he and his colleagues discussed TikTok "weekly." May 12 AM Tr. at 81:24–82:1. For example, at "every leadership dinner with Mark [Zuckerberg], like, once a month, Adam [Mosseri, the Head of Instagram,] would have to, at the beginning of the dinner, give us a full rundown of the growth of TikTok and what we were doing about Reels." Id. at 82:2–5. Put simply, "we analyze the hell out of them." Id. at 72:23–25.

The balance of the persuasive evidence, then, shows that industry participants recognize that Facebook, Instagram, and Snapchat differ from TikTok and YouTube in important ways, but it also shows that they recognize that the apps compete. The second fact is more probative of whether there is "industry ... recognition of the submarket as a separate economic entity," Brown Shoe, 370 U.S. at 325, 82 S.Ct. 1502, so this factor also weighs against the FTC's proposed market.

### c. Unique Production Facilities

The next factor fits the digital world awkwardly, but its spirit asks whether firms outside the proposed market could quickly enter or whether their current production technology would need to be overhauled. See Rothery, 792 F.2d at 218 (explaining cross-elasticity of supply). In other words, how much would TikTok and YouTube need to change to produce an app like Facebook, Instagram, or Snapchat?

Not much at all. As emphasized above, the apps are already quite similar. True, to the extent that TikTok or YouTube wanted to replicate a traditional social network, they would need lots of people using them socially to create network effects. See PX 1136 (Zuckerberg Email Exchange) at 3; PX 1204 (Facebook Top Investor Questions Talking Points) at 2–3; PX 14319 (Facebook Roadshow Talking Points) at 5; PX 15200 (May 2016 Meta Executives Email Thread) at 2; PX 11304 (Google Executives Email Thread) at 4; DX 1317 (Snapchat Board Product Update) at 2; Apr. 14 PM Tr. at 194:6–15; Apr. 16 AM Tr. at 48:15–25. Yet both apps have already achieved that scale, even if not as many users people use them to connect with people they know. See Apr. 30 AM Tr. at 65:22–25 (TikTok had over 170 million monthly active users in United States at start of this year); DDX 24.15 (App Monthly Active Users). What is more, as Meta's apps have transitioned to focus on unconnected, recommended content,

the experience depends less and less on having friends who post content and view your posts. See Apr. 16 AM Tr. at 53:15–54:14; May 14 AM Tr. at 17:2–7; May 27 PM Tr. at 136:17–137:23. Instead, the key inputs are a library of content and an advanced algorithm to recommend it. TikTok and YouTube already have both.

**\*34** Apps inside and outside the FTC's proposed market thus share similar raw ingredients and similar technology to build them into similar experiences. This factor cuts against the agency.

### d. Distinct Customers, Prices, and Sensitivity to Price Changes

The fourth factor also favors Meta. First, the customers of its apps, YouTube, and TikTok are not distinct. "[P]eople are ... using every app." May 12 PM Tr. at 175:18–176:4. In fact, most customers of each app are also customers of all the others. Id. at 175:11–17 (there are about 250–300 million Americans older than 13); id. at 175:8–10 (240 million Americans use Facebook each month); id. at 173:2–4 (about 225 million Americans use Instagram each month); Apr. 30 AM Tr. at 65:22–25 (more than 170 million Americans use TikTok each month); DDX 24.15 (App Monthly Active Users) (more than 200 million people in United States and Canada use YouTube each month).

The price of all these apps is identical: $0. See Apr. 15 PM Tr. at 221:22–24, 227:24–228:1. Finally, undisputed evidence suggests that if Meta tried to raise its sticker price, users would flee. Id. at 224:22–225:23; see also May 1 PM Tr. at 163:22–164:13 (almost nobody willing to pay for ad-free version).

### e. Overall Assessment

The FTC contends that Facebook, Instagram, and Snapchat form a distinct market that can be identified by those apps' unique features. While those apps certainly show some distinct markings, they mostly resemble two other social-media apps that the FTC insists must be excluded: TikTok and YouTube. Their dominant features are identical, people mostly use all four to watch unconnected content that they can send in direct messages, industry participants agree that the apps belong in the same competitive market, they use similar resources and technologies, and they charge the same price to the same customers.

\* \* \* \* \*

Even when considering only qualitative evidence, the Court finds that Meta's apps are reasonably interchangeable with TikTok and YouTube. Moreover, that evidence must be considered in light of the widespread substitution between these apps. The Brown Shoe factors "necessitate, rather than avoid, careful consideration based upon the entire record." Cont'l Can, 378 U.S. at 449, 84 S.Ct. 1738; see also Geneva, 386 F.3d at 496 ("The emphasis always is on the actual dynamics of the market ...."). After all, it was Brown Shoe that declared that courts must "recognize competition where, in fact, competition exists." 370 U.S. at 326, 82 S.Ct. 1502. Taking all the evidence together, it shows that personal social networking is not a separate product market. Instead, Meta competes in the market for social media, and that market includes — at minimum — TikTok and YouTube as well.

### 3. *Whole Foods*

Faced with that evidence, the FTC offers one last argument: a subset of users cares especially about friend sharing, they have no substitute for Facebook and Instagram, and Meta exploits this smaller group by targeting them with a higher ad load. See FTC Post-trial Mem. at 12, 22–23. Plaintiff thinks that this makes our case like FTC v. Whole Foods Market.

In that case, the D.C. Circuit found that Whole Foods occupied a market for "premium natural and organic supermarkets" separate from conventional grocery stores. Whole Foods, 548 F.3d at 1041 (opinion of Brown, J.); id. at 1042 (Tatel, J., concurring in the judgment). Writing only for herself, Judge Janice Rogers Brown explained that while some shoppers might substitute between those premium organic stores and any old supermarket, a group of "core customers" would not, and premium organic stores like Whole Foods exploited those captive costumers by charging higher prices. Id. at 1038–40 (opinion of Brown, J.). By analogy, the FTC reasons, even if users in general might swap out time on Facebook and Instagram for time on TikTok and YouTube, a group of core Meta users wants to see content from their friends, cannot get it elsewhere, and Meta exploits that by showing them a higher ad load. See FTC Post-trial Mem. at 12, 22–23.

**\*35** Never mind that Judge Brown's opinion did not command a majority. Set aside the fact that it has never been adopted by the D.C. Circuit. And ignore the obstacle that because the Whole Foods court was not statutorily authorized to decide whether the proposed merger would actually violate the antitrust laws, Judge Brown's opinion would have held only that the FTC had raised serious enough "questions going to the merits ... as to make them fair ground for" a more "thorough investigation." Whole Foods, 548 F.3d at 1035 (opinion of Brown, J.) (quotation marks omitted). Even on its own terms, the Whole Foods analogy does not work.

For one, the sign of a product market is that a monopolist could charge a significantly higher price. See id. at 1038. So if there were a separate market for users who cared about friend content, then that market's borders must be shown by significant differences in price. It is hard to imagine that is true here. Remember, Facebook and Instagram are free no matter how much someone values friend sharing. The FTC thus frames price discrimination as offering a lower-quality app to some users. But quality mostly does not vary across users: apps have the same features, layout, speed, reliability, and privacy practices for everyone. See May 21 AM Tr. at 72:2–13. The only aspect of quality that varies is ad load, see May 14 AM Tr. at 91:15–18, but, as discussed above, users barely seem to mind more ads. When removing ads entirely caused users to spend only 7% more time on Facebook, see May 13 AM Tr. at 50:23–51:11; May 20 AM Tr. at 36:18–23, and cutting ad load in half for the most ad-sensitive users was expected to increase their Facebook sessions by only 1%, see PX 12501 (May 2021 Meta Executives Email Thread) at 1, 3–4, it is hard to see how presumably smaller variations in ad load could possibly constitute a significant difference in price. Sure enough, Hemphill, who put forward this theory, admitted that he could not measure whether users faced significant price differences. See May 27 AM Tr. at 46:4–47:7.

The FTC's theory also fails for a more old-fashioned reason: it is contradicted by the evidence. As discussed earlier in this Opinion, Meta no doubt shows a higher ad load to some users than others. The FTC's claim, however, is that the company bases this discrimination on how much users value friend sharing. Meta's executives unanimously testified that it does not. See May 1 AM Tr. at 62:21–63:10; May 1 PM Tr. at 180:21–183:5; May 12 PM Tr. at 149:11–150:8; May 15 AM Tr. at 24:4–8. True, Meta might achieve this effect indirectly: users who especially value seeing their friends' Facebook and Instagram posts might tolerate a higher ad load, and Meta's algorithm might sense this and show them more ads. But that account is also at odds with the record.

Federal Trade Commission v. Meta Platforms, Inc., --- F.Supp.3d ---- (2025)

2025 WL 3458822

The FTC claims that parts of Meta's apps with more friend content have higher ad loads — for instance, Facebook's Feed has a higher ad load than Facebook Reels. See May 13 AM Tr. at 17:3–15. When comparing all features, however, there is no consistent relationship between the share of friend content and the ad load. See DX 1203 (Facebook Friend Content and Ad Load by Surface). For instance, the Facebook feature with the highest share of friend content is Stories, yet it has a lower ad load than the main Facebook Feed. Id. The feature with the lowest share of friend content is Facebook Watch; it has a higher ad load than Stories. Id.



DDX 36.30

Against this broader view, Hemphill offers only one comparison: Feed and Stories have a higher ad load than Reels. See May 13 AM Tr. at 17:2–11, 17:25–18:2; May 27 AM Tr. at 52:5–13. Yet even that fact does not justify his conclusion. Instead, the evidence suggests that Reels has a lower ad load because it is new and Meta wants to get people using it. John Hegeman, Meta's Chief Revenue Officer, see May 1 AM Tr. at 77:18–19, explained that "when a new surface is introduced, we'll often start with a fairly low ad load, and then we'll take time to carefully figure out how can we best introduce ads in a way that doesn't disrupt the user experience." May 1 PM Tr. at 181:14–25. Meta's rivals understood its strategy this way; for example, an internal TikTok document noted that "Facebook has primarily focused on growing Reels user adoption and engagement in the short-term, rather than monetization." DX 922 (TikTok Project Blue Summ.) at 14.

**\*36**  That matches Meta's approach in the past — in regard to Facebook's mobile app, for instance. As people were shifting to using the platform on their phones, a company document stated that "we currently don't monetize mobile in a meaningful way." PX 1204 (Facebook Top Investor Questions Talking Points) at 11. "Our strategy ... has always been to build the best experience for users first and drive user engagement which leads to downstream monetization opportunities and the most long-term value for our business."

Id. Once the mobile app had won a foothold, Meta squeezed it for all it was worth. See May 13 AM Tr. at 13:7–19 (ad load on Facebook's mobile feed tripled from 2014 to 2022); Apr. 17 AM Tr. at 15:8–14 (Meta was "[v]ery" successful in monetizing mobile because "we first built a consumer product on mobile that they were happy with and engaging, and then we added ads in"); Apr. 16 PM Tr. at 225:17–226:25; May 12 AM Tr. at 77:2–14. Meta did the same thing with Stories. They started out with almost no ads; then Meta cranked up the ad load. See May 12 AM Tr. at 77:11–14; May 13 AM Tr. at 11:23–12:1.

In the context of that pattern, the low ad load on Reels seems linked to its novelty, not its share of friend content. Meta's ordinary-course documents reinforce this interpretation. Schultz told other Meta executives that the shift to Reels was costing Meta money because "we have to provide consumers the formats they want first and monetize second." DX 663 (Meta Executive Chat Thread) at 1. "Engagement is shifting formats to one that hasn't got significant ad load yet ...." Id. (emphasis added); see also May 1 PM Tr. at 181:24–25 ("[W]e expect ... to ramp up the ad load on Reels over time."). In fact, Meta has already started raising the ad load on Reels. See May 13 AM Tr. at 17:4–6.

Facebook's Friends tab offers an almost perfect test. It is a feature that Facebook just launched that shows only content from a user's friends. See PX 796 (Friends Tab Announcement) at 2. If the FTC's price-discrimination hypothesis were right, it should be choked with ads. If Meta's story were right, this new feature's ad load should be low. The Friends tab has no ads at all. See May 15 AM Tr. at 24:9–12; see also id. at 24:14–25:3 ("[T]he friends tab is still a new product. So when we are building a new product, we ... want to first prioritize making sure that people actually want to use the product" before ramping up ad load.). In sum, Meta's feature-level ad load does not show price discrimination against users who value friend content.

Judge Brown's Whole Foods opinion is nonbinding and tentative, and the Court doubts that marginal differences in ad load add up to significant differences in quality-adjusted price. Even setting those doubts aside, the evidence shows that Meta does not discriminate against users who value friend content. This last FTC rebuttal thus falls by the wayside.

E. Monopoly Power

In assessing Meta's monopoly power, the Court considers a market that comprises Facebook, Instagram, Snapchat,

2025 WL 3458822

MeWe, TikTok, and YouTube. Monopoly power depends on whether the company can profitably and sustainably charge a price significantly above competitive levels. Microsoft, 253 F.3d at 51. Courts typically use the defendant's market share as an observable proxy for that unobservable fact. See Reazin v. Blue Cross & Blue Shield of Kan., Inc., 899 F.2d 951, 967 (10th Cir. 1990). The Court first explains how it will measure market share in this novel market, then evaluates whether Meta's share shows monopoly power.

### 1. *Measuring Market Share*

When companies sell a product for a price, calculating their market share is straightforward. Because the apps in this case are free, however, measuring their market share is trickier. The obvious candidates are total time spent on each app or total users, which in turn can be measured as daily or monthly active users.

In the Court's view, the best single measure of market share is total time spent. For one, that statistic makes the most analytic sense. Because Facebook, Instagram, Snapchat, TikTok, and YouTube are all free, people often use all five apps, which pulls each one's market share toward an uninformative tie. See May 12 PM Tr. at 175:18–176:4. Measuring the market by number of users, then, would ensnare the Court in a mess of double counting. Id. Time spent avoids this problem. It also captures the intensity of use: if someone spends two minutes on Instagram and two hours on TikTok, she should not count as an equal user of each.

**\*37**  Plus, time spent is the best proxy for what drives these apps' revenue: ads. The more time someone spends on an app, the more ads it can show him, and the more money it will make. See Apr. 17 AM Tr. at 11:17–21; May 8 PM Tr. at 265:21–266:3 ("[W]e show a certain number of ads per hour and if you have less hours, you show less ads."); May 15 PM Tr. at 257:6–8 ("The longer time you spend on the app, the more ads you might be served and the more money these services might make."); May 21 PM Tr. at 154:20–155:2; PX 12664 (Meta Project Bluejay Update) at 7, 54.

It also matches how the companies themselves think about competition. Their executives' testimony and ordinary-course documents reveal that they understand themselves to be competing for users' time, not competing to get people to use their app at all. See May 1 PM Tr. at 182:18–24 (people are "unlikely to stop using [Facebook or Instagram] altogether";

they will just spend less time on the app "even in a case where they wouldn't choose to stop using the product entirely"); May 12 PM Tr. at 175:21–176:4 ("TikTok, YouTube, Facebook, and Instagram in the U.S." have all signed up most Americans already, so "the competition is about marginal time."); Chen Dep. at 21:13–19 (Q: "[W]hat did Twitter compete with Facebook over? What was the point of competition between the two companies?" A: "I would say we competed over the time share of people or users on consumer social platforms."), 24:21–25:03, 27:09–11; DX 885 (2022 Snapchat Stories Research Deck) at 2, 7, 21; [Redacted]

In addition, time spent reflects how users themselves experience the relevant choice: they typically have multiple free apps, so the choice they face — when they are bored in line, sitting on their couch, or early to a date — is which app they will pop open and how long they will use it before switching to another.

Unsurprisingly, then, the companies themselves most often measure their market share using total time spent. See May 8 PM Tr. at 205:4–12 ("[W]e use time ... as the best measure of how well we are fairing [*sic*] relative to the competition."); see also, e.g., DX 606 (Instagram U.S. Teen Messaging Deck) at 4; DX 643 (Reels Summary Deck) at 4–5; DX 875 (Snapchat Email Thread) at 1–2; DX 922 (TikTok Project Blue Summ.) at 1–2; DX 1307 (TikTok Monthly 2025 Report) at 4.

Yet time spent is an imperfect yardstick. Most obviously, it takes longer to watch a video than to scroll through a picture, so measuring market shares using time spent overestimates the competitive importance of video apps like YouTube. See Apr. 23 PM Tr. at 162:12–23; May 13 AM Tr. at 39:3–7; see also DX 1152 (Jan. 2025 Facebook Surface Breakdown) (showing difference between time spent and pieces of content viewed). While these apps predominantly measure their market share using time spent, they all also consider other measures, most often daily and monthly average users. See May 8 PM Tr. at 207:14–24 ("Time spent is the best metric that we have to measure our relevance relative to the competition," but "we have always ... also looked at other metrics. I think it's important ... that you don't try to oversimply all the way down to just one metric."); Apr. 22 AM Tr. at 29:12–30:11; DX 600 (Facebook U.S. Long-Term Themes Deck) at 12; DX 660 (IG Metric Softness Deck) at 4; DX 830 (Pinterest Competitive Assessment) at 16; DX 875 (Snapchat Email Thread) at 1–2; DX 888 (Dec. 2021 Snapchat Board Meeting Update on Stories) at 2; DX 1306 (TikTok 2025 Q1 Management Quarterly) at 3.

The Court follows their lead, using time spent as the most informative measure of market share but also checking it against daily and monthly average users to take a holistic view of these apps' size.

### 2. *Meta's Market Share and Market Power*

**\*38**  As established above, the FTC must prove that Meta is a monopoly <u>now</u>. So where it can, the Court calculates market share using the latest available data from 2025.

The FTC concedes that Snapchat and MeWe belong in a product market with Facebook and Instagram. <u>See</u> FTC Post-trial Findings of Fact, ¶¶ 33, 40; FTC Post-trial Mem. at 8. Adding in TikTok and YouTube, Meta's share of that market comes out to around 30% of time spent. <u>See</u> DX 1185 (Apps Time Spent in 2022); DDX 24.14 (Apps Time Spent in Feb. 2025). As a matter of law, that modest share cannot establish monopoly power. <u>United States v. Aluminum Co. of Am.</u> (Alcoa), 148 F.2d 416, 424 (2d Cir. 1945) (Hand, J.) ("certainly thirty-three percent is not enough" market share for monopoly power); <u>Blue Cross, 65 F.3d at 1411</u> (market share under 50% is "below any accepted benchmark for inferring monopoly power from market share"); <u>Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1438 (9th Cir. 1995)</u>; <u>Bailey, 284 F.3d at 1250</u>; <u>U.S. Steel, 251 U.S. at 444, 40 S.Ct. 293</u>.

To be fair, while the case for including TikTok in the product market is overwhelming, YouTube's inclusion, which the Court finds appropriate, is concededly more debatable. Yet even if YouTube is excluded, Meta still would not hold a monopoly. That would leave Facebook, Instagram, Snapchat, MeWe, and TikTok. As measured by Hemphill, as of 2025, Meta's share of time spent in that market is only 54%. <u>See</u> PDX 149 (Hemphill Rebuttal Demonstrative) at 47. Its share of monthly average users is 59%, while its share of daily average users is 62%. <u>Id.</u> When measured using third-party data that Meta ordinarily relies on in its business, Meta's share of time spent falls to 42%, and its share of daily active users dips to 56%. <u>See</u> DDX 24.14 (Apps Usage Data); May 12 AM Tr. at 116:9–22; <u>but see</u> DDX 24.14 (Apps Usage Data) (footnotes listing several inaccuracies in this data, which cause the Court to give it less weight).

Even the market shares calculated by Hemphill do not win the day for the FTC. There is no threshold that a firm must

cross to hold a monopoly. <u>Kolon Indus. Inc. v. E.I. DuPont de Nemours & Co. (Kolon II), 748 F.3d 160, 174 (4th Cir. 2014)</u>. But courts that have surveyed the caselaw have found helpful guideposts. For instance, "the Supreme Court has never found a party with less than 75% market share to have monopoly power." <u>Id.</u>; accord <u>Dimmitt Agri Indus., Inc. v. CPC Int'l Inc., 679 F.2d 516, 528 & n.11 (5th Cir. 1982)</u>. Lower courts have not lowered the bar much. <u>See</u> <u>Colo. Interstate Gas Co. v. Nat. Gas Pipeline Co. of Am., 885 F.2d 683, 694 n.18 (10th Cir. 1989)</u> ("[L]ower courts generally require a minimum market share of between 70% and 80%."); <u>Exxon Corp. v. Berwick Bay Real Estate Partners, 748 F.2d 937, 940 (5th Cir. 1984)</u> (Fifth Circuit "has noted that monopolization is rarely found when the defendant's share of the relevant market is below 70%"); <u>E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc. (Kolon I), 637 F.3d 435, 450 (4th Cir. 2011)</u> ("[W]hen monopolization has been found the defendant controlled seventy to one hundred per cent of the relevant market.") (internal quotation marks omitted); <u>Image Tech. Servs., Inc. v. Eastman Kodak Co., 125 F.3d 1195, 1206 (9th Cir. 1997)</u> ("Courts generally require a 65% market share to establish a prima facie case of market power.").

**\*39**  The canonical statement on the relationship between market shares and monopoly remains Judge Learned Hand's opinion in <u>Alcoa</u>, which declares that "it is doubtful whether sixty or sixty-four percent [market share] would be enough [for monopoly power]." 148 F.2d at 424. The Supreme Court, moreover, has held that a firm with 64% market share lacked monopoly power. <u>United States v. Int'l Harvester Co., 274 U.S. 693, 709–10, 47 S.Ct. 748, 71 L.Ed. 1302 (1927)</u>; <u>see also</u> <u>Alcoa, 148 F.2d at 430</u> (understanding <u>International Harvester</u> as holding that defendant was not monopoly because it "had less than two-thirds of the production in its hands").

Nothing, in short, suggests that a market share of 54% produces monopoly power, even if the Court nudges the figure upward in light of Meta's roughly 60% share of active users. <u>See</u> PDX 149 (Hemphill Rebuttal Demonstrative) at 47. Indeed, many cases expressly hold the contrary. <u>Kolon II, 748 F.3d at 174</u> ("market share of less than 60% during the relevant period does not necessarily foreclose a finding of monopoly power," but "it does weigh heavily against such a finding"); <u>Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 201 (3d Cir. 1992)</u> ("As a matter of law, absent other relevant factors, a 55 percent market share will not prove the existence of monopoly power."); <u>Kolon II, 748 F.3d at 174</u> (market share that had fallen to 55%, along with other factors,

**Federal Trade Commission v. Meta Platforms, Inc., --- F.Supp.3d ---- (2025)**

2025 WL 3458822

not enough for monopoly power); Exxon, 748 F.2d at 939–40 (52% share not monopoly power as matter of law).

Of course, market shares must be considered in the context of each case's facts. United States v. Columbia Steel Co., 334 U.S. 495, 528, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). Here, that context weighs even further against finding monopoly power.

First, Meta's market share is falling. "[I]n evaluating monopoly power, it is not market share that counts, but the ability to maintain market share." United States v. Dentsply Int'l, Inc., 399 F.3d 181, 188–89 (3d Cir. 2005) (cleaned up). A given market share is thus less likely to add up to a monopoly if it is eroding. Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc., 89 F.4th 430, 445 (3d Cir. 2023); Kolon II, 748 F.3d at 174–75.

Meta has suffered that fate. TikTok — which Meta considers its fiercest competitor — broke into the market only seven years ago, see Apr. 30 AM Tr. at 32:17–18, and has been overrunning the market ever since. At least some usage data finds that it is more popular in the United States and Canada than either Facebook or Instagram. See DDX 24.14 (Apps Usage Data) (estimating that TikTok commands more daily active users than Instagram and more total time spent than either of Meta's apps). Unsurprisingly, then, Meta's market share seems to be shrinking. Compare DDX 36.3 (Carlton Demonstrative) (estimating Meta's share of market that includes TikTok as 58% in 2022), with PDX 149 (Hemphill Rebuttal Demonstrative) at 47 (estimate had fallen to 54% in 2025). If "[m]onopoly power is the power to control prices or exclude competition," du Pont, 351 U.S. at 391, 76 S.Ct. 994, then that power seems to have slipped from Meta's grasp.

Plus, Meta's true share of this market is almost certainly below 54%. In the real world, competition is a matter of degree. But market definition is binary, forcing courts to artificially place products entirely in or out of the market. See Areeda & Hovenkamp, ¶ 801, at 429–30. As a result, every product market — and so every market share — is mismeasured, and courts must make realistic adjustments for the weak substitutes that barely squeaked into the market

or the competitive ones lying just outside. See id. at 427, 429–30; Kodak, 504 U.S. at 466–67, 112 S.Ct. 2072 ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."). Here, even if YouTube should be excluded from the market, it remains a behemoth that offers some alternative to Meta's apps. A market share calculated by entirely excluding it thus overestimates Meta's power.

**\*40** The Court ultimately finds that YouTube and TikTok belong in the product market, and they prevent Meta from holding a monopoly. Even if YouTube is out, including TikTok alone defeats the FTC's case.

### III. Conclusion

Like Heraclitus's river, the rapids of social media rush along so fast that the Court has never even stepped into the same case twice. It considered motions to dismiss in 2021 and 2022, motions for summary judgment in 2024, and a full merits trial this year. Each time it examined Meta's apps, they had changed. The competitors had, too. The Court's two Opinions on motions to dismiss did not even mention the word "TikTok." Today, that app holds center stage as Meta's fiercest rival.

With apps surging and receding, chasing one craze and moving on from others, and adding new features with each passing year, the FTC has understandably struggled to fix the boundaries of Meta's product market. Even so, it continues to insist that Meta competes with the same old rivals it has for the last decade, that the company holds a monopoly among that small set, and that it maintained that monopoly through anticompetitive acquisitions. Whether or not Meta enjoyed monopoly power in the past, though, the agency must show that it continues to hold such power now. The Court's verdict today determines that the FTC has not done so. A judgment so stating shall issue this day.

### All Citations

--- F.Supp.3d ----, 2025 WL 3458822

---

2018 WL 2984873, 2018-1 Trade Cases P 80,409

2018 WL 2984873
United States District Court,
N.D. Georgia, Atlanta Division.

IN RE: ANDROGEL ANTITRUST
LITIGATION (NO. II)
Federal Trade Commission, Plaintiff,

v.

Actavis, Inc., et al., Defendants.

MDL DOCKET NO. 2084
|
1:09-MD-2084-TWT
|
CIVIL ACTION FILE NO. 1:09-CV-955-TWT
|
Signed 06/14/2018

### OPINION AND ORDER

THOMAS W. THRASH, JR., United States District Judge

**\*1** This is an antitrust action brought by the Federal Trade Commission and private antitrust actions transferred to this Court by the Judicial Panel on Multidistrict Litigation. They are before the Court on the Defendant Solvay's Motion for Summary Judgment on the FTC's Claims [FTC Doc. 620], Solvay's Motion for Summary Judgment as to the Par/Paddock Settlement [FTC Doc. 621, MDL Doc. 1551], the Defendants Actavis and Actavis Holdco's Motion for Summary Judgment [FTC Doc. 625, MDL Doc. 1556], Solvay's Motion for Summary Judgment for Lack of Antitrust Injury Against the Private Plaintiffs [MDL Doc. 1550], Solvay's Motion for Summary Judgment as to Retailer's Damages Claims on AndroGel 1.62% Purchases [MDL Doc. 1552], the Defendants Par and Paddock's Motion for Summary Judgment [MDL Doc. 1559], the Defendants Actavis, Inc. and Solvay's Motion to Exclude Plaintiffs' Proposed Patent Law Expert Jack C. Goldstein, Esq. [FTC Doc. 622, MDL Doc. 1553], and the Defendants Solvay, Par, and Paddock's Motion to Exclude in Part Plaintiffs' Expert James R. Bruno [FTC Doc. 630, MDL Doc. 1562].

For the reasons set forth below, Solvay's Motion for Summary Judgment on the FTC's Claims [FTC Doc. 620] is DENIED, Solvay's Motion for Summary Judgment as to the Par/ Paddock Settlement [FTC Doc. 621, MDL Doc. 1551] is

DENIED, Actavis and Actavis Holdco's Motion for Summary Judgment [FTC Doc. 625, MDL Doc. 1556] is DENIED, Solvay's Motion for Summary Judgment for Lack of Antitrust Injury Against the Private Plaintiffs [MDL Doc. 1550] is DENIED, Solvay's Motion for Summary Judgment as to Retailer's Damages Claims on AndroGel 1.62% Purchases [MDL Doc. 1552] is GRANTED, the Defendants Par and Paddock's Motion for Summary Judgment [MDL Doc. 1559] is DENIED, Actavis, Inc. and Solvay's Motion to Exclude Plaintiffs' Proposed Patent Law Expert Jack C. Goldstein, Esq. [FTC Doc. 622, MDL Doc. 1553] is DENIED, and Solvay, Par, and Paddock's Motion to Exclude in Part Plaintiffs' Expert James R. Bruno [FTC Doc. 630, MDL Doc. 1562] is GRANTED in part and DENIED in part.

### I. Background

In the early nineties, Besins Healthcare, S.A. developed the pharmaceutical formulation for AndroGel, a prescription topical gel used to treat low testosterone in men. In August 1995, Besins granted Solvay Pharmaceuticals, Inc., a license to sell AndroGel in the United States. [1] Besins also agreed to manufacture AndroGel and supply it to Solvay once Solvay received FDA approval to sell the drug.

At this point, it is important to understand how new drugs enter the market in the United States. In order to sell a new drug in the United States, a pharmaceutical firm must file a New Drug Application ("NDA") with the Food and Drug Administration. [2] The NDA must contain a complete report about the drug, including safety and efficacy studies, the composition of the drug, a description of how the drug is produced, and proposed labeling. [3] The process to approve new proprietary drugs—known as "brand name" drugs—is both time consuming and costly.

**\*2** Although the possibility for large profits after FDA approval is often an incentive for pharmaceutical companies to pursue the NDA process for brand name drugs, the cost associated with it may also serve as a significant barrier to entry by generic formulations of the same drug. These high barriers limit competition, which in turn may hurt consumers. This concern led Congress to enact the Hatch-Waxman Act in 1984. [4] The Hatch-Waxman Act enables companies that want to market and sell a generic version of a brand-name drug to avoid filing an NDA. As long as the generic and the brand-name drug are effectively the same

WESTLAW    © 2026 Thomson Reuters. No claim to original U.S. Government Works.    1

thing, generic manufacturers can file a substantially shorter Abbreviated New Drug Application ("ANDA"). This reduces costs for generics manufacturers, which may allow them to charge much lower prices than brand name drugs, therefore benefitting consumers.

In order to prevent generic manufacturers from completely cutting into the profitability of brand name drugs, thereby reducing the incentive for brand name manufacturers to go through the cost and risk of the NDA process, federal law provides two ways for brand name pharmaceutical manufacturers to protect their investment. First, the FDA can grant brand name manufacturers periods of "exclusivity," which means that the FDA will not approve another application to sell the same drug until the exclusivity period (usually three or five years) ends. Second, brand name manufacturers can patent their new drug. Just like any other patent, drug patents grant brand name manufacturers a legal monopoly for a limited period of time. If there are any patents that cover the brand name drug, a generic manufacturer's ANDA must contain an additional certification. The ANDA must certify that (1) the patent has not been listed with the FDA, (2) the patent has expired, (3) the patent will expire on a certain date, or (4) the patent is invalid or will not be infringed by the generic drug. [5] The last certification is known as a Paragraph IV certification. For any ANDA with a Paragraph IV certification, the applicant must also notify the patent holder of the ANDA. [6] If the patent holder decides to file an infringement suit after receiving notice of the Paragraph IV certification, the FDA is then prohibited from approving the generic for market entry for up to thirty months while the litigation proceeds.

In April 1999, Solvay filed an NDA for AndroGel. It was approved by the FDA in February 2000, and Solvay received three years of exclusivity. Solvay was also issued a patent on AndroGel, U.S. Patent No. 6,503,894 ('894 patent). Although AndroGel was not the only available method of testosterone replace-ment therapy, other methods were not as effective or as popular as AndroGel. The protection afforded Solvay by the exclusivity period and Solvay's patent helped AndroGel to quickly become the most popular form of testosterone replacement therapy. From 2000 to 2007, sales of AndroGel in the United States were over $1.8 billion.

In the meantime, other pharmaceutical companies were developing generic versions of AndroGel. Once Solvay's new drug product exclusivity expired in February 2003, the FDA was authorized to approve generic versions of AndroGel.

In May 2003, two companies each submitted ANDAs with Paragraph IV certifications for generic AndroGel. Actavis, Inc. [7] submitted the first ANDA, and Paddock Laboratories, Inc. submitted the second. Both companies also sent notice of their ANDAs to Solvay and Besins. In July 2003, Paddock reached an agreement with Par Pharmaceuticals. Par agreed to share any litigation costs with Paddock, and to sell Paddock's generic AndroGel. In return, Paddock agreed to share profits with Par.

**\*3** Solvay responded to the ANDAs by asserting its rights under the '894 patent. In August 2003, Solvay's subsidiary, Unimed Pharmaceuticals, Inc., filed patent infringement actions against Watson and Paddock (the "Generics") in this Court. [8] Solvay alleged infringement based on the filing of the ANDAs. [9] Because Solvay filed infringement actions against the Generics within the forty-five day window of receiving notice, the FDA stayed approval of their ANDAs for thirty months.

For the next few years, Solvay and the Generics litigated the infringement actions. Both followed a similar schedule. From late 2003 to the middle of 2005, the parties engaged in discovery, scheduling, and other initial litigation matters. By August 2005, the parties had filed motions for claim construction. By December 2005, the Generics had filed motions for summary judgment on the validity of the '894 patent as well as claims construction briefs. All of the motions were fully briefed and ready for decision in early 2006.

While the motions were pending, Actavis and Paddock moved toward entering the market with generic AndroGel. In January 2006, the thirty month stay ended, and the FDA approved Actavis' ANDA. The FDA, however, continued to stay approval of Paddock's ANDA. The first firm to file an ANDA with a Paragraph IV certification receives generic exclusivity upon FDA approval, which is similar to brand-name exclusivity, but shorter. Generic exclusivity means that the FDA will not approve a subsequent ANDA for the same drug until 180 days after the earlier of (1) the date the first filer begins commercial marketing of its generic drug, or (2) the date a district court enters judgment that the patent is invalid or not infringed, whichever date is earlier. [10] Because Actavis was the first to file an ANDA for generic AndroGel, it received generic exclusivity over Paddock. In February 2006, Actavis prepared a report predicting that it would sell generic AndroGel by January 2007 and that the price would be 75 percent less than brand name AndroGel. In the same

month, Par prepared a report predicting that Actavis would sell generic AndroGel as early as March 2006 and that Par and Paddock would follow in September 2006.

But before the Court decided the pending motions in the infringement actions, and before anyone entered the market with generic AndroGel, Solvay and the Generics settled the cases. Under the September 13, 2006 settlement between Solvay and Actavis, Solvay agreed to voluntarily dismiss the infringement action, and Actavis agreed not to market generic AndroGel until the earlier of August 31, 2015 or the date another company marketed generic AndroGel. [11] And under the September 13, 2006 settlement between Solvay and Par/Paddock, Solvay agreed to a consent judgment dismissing the infringement action, and Par/Paddock agreed not to market generic AndroGel until the earliest of August 31, 2015 (but only if Actavis did not assert its 180 day generic exclusivity period), the date another company launched generic AndroGel, or February 28, 2016. [12]

 **\*4** On the same day as the settlements, Solvay also entered into business promotion agreements with Actavis, Par, and Paddock. Under the agreement between Solvay and Actavis, Solvay agreed to share profits of AndroGel with Actavis, and Actavis agreed to promote AndroGel to urologists. [13] Under the agreement between Solvay and Par, Solvay agreed to share profits of AndroGel with Par, and Par agreed to promote AndroGel to primary care physicians. [14] And under the agreement between Solvay and Paddock, Solvay agreed to share profits of AndroGel with Paddock, and Paddock agreed to serve as a backup supplier of AndroGel. [15]

Together, these types of settlements are called "reverse payment" settlements, and they have recently become popular in pharmaceutical litigation. Reverse payment settlements are so called because they are the reverse of traditional patent infringement settlements. In a traditional settlement, the party with the claim—in this case, the brand name manufacturer—receives a payment from the defendant—in this case the generic—either equal to or less than the value of its claim. [16] But in a reverse settlement, "a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market." [17]

The reverse payment settlements prompted an investigation by the Federal Trade Commission for violations of antitrust laws. That investigation was completed in 2008. In 2009,

the FTC and a number of private parties filed these antitrust actions against Solvay, Actavis, Par, and Paddock. All of the actions were filed in other federal district courts and then transferred to this Court either by change of venue or by order of the United States Judicial Panel on Multidistrict Litigation. On February 22, 2010, applying settled Eleventh Circuit precedent, this Court dismissed the FTC action for failure to state a claim. [18] On appeal, the Eleventh Circuit affirmed. [19] However, the Supreme Court granted certiorari, and eventually reversed and remanded the cases in 2013. [20]

So, after five years, everything started all over. [21] The Plaintiffs are divided into three groups: the FTC, the Direct Purchaser Class Plaintiffs, and the Retailers. [22] The Direct Purchaser Class Plaintiffs and the Retailers constitute the Private Plaintiffs. All of the Plaintiffs allege that the Defendants violated federal antitrust law. [23] The Defendants now move for summary judgment on various grounds.

## II. Legal Standards

### A. Daubert Motions
 **\*5** Federal Rule of Evidence 702 governs the admission of expert opinion testimony. Pursuant to that rule, before admitting expert testimony a court must consider: (1) whether the expert is competent to testify regarding the matters he intends to address; (2) whether the methodology used to reach his conclusions is sufficiently reliable; and (3) whether the testimony is relevant, in that it assists the jury to understand the evidence or determine a fact in issue. [24] In ruling on the admissibility of expert testimony, "[t]he focus must be 'solely' on the expert's 'principles and methodology, not on the conclusions that they generate.' " [25] If the expert predicates his testimony on an assumption that is belied by the evidence, the expert's testimony is properly excluded. [26] The party offering the expert's testimony has the burden to prove it is admissible by a preponderance of the evidence. [27]

### B. Summary Judgment
Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. [28] The court should view the evidence and any inferences that may be drawn

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018 WL 2984873, 2018-1 Trade Cases P 80,409

in the light most favorable to the nonmovant. [29] The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact. [30] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. [31] "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party." [32]

### III. Discussion

The FTC and the Private Plaintiffs allege that the Defendants violated federal antitrust law by entering into the reverse settlement agreements. Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." [33] Section 2 of the Sherman Act likewise prohibits agreements to monopolize trade. [34] And Section 5 of the Federal Trade Commission Act states that "unfair methods of competition" are illegal, [35] a prohibition which has long been held to encompass the violations of the Sherman Act. [36] Thus, the different claims can be analyzed together.

### A. Daubert Motions

#### 1. Jack Goldstein

Solvay and Actavis move to exclude the testimony of Jack Goldstein. The Private Plaintiffs will call Goldstein to testify at trial as to how a reasonable and competent patent attorney would have advised litigants in Solvay's or the Generics' positions at the time they settled the underlying patent litigation on (1) the likelihood of success in the litigation; (2) the likely timing of the litigation's resolution if the parties had not settled; and (3) each of the parties' likely litigation costs had they not settled. [37] The Defendants argue that Goldstein is not qualified to give these opinions, and that his methodology is unreliable. Both arguments are without merit.

**\*6** The Defendants challenge Goldstein's qualifications, arguing that he does not have the requisite firsthand experience to properly assess the likely outcome, cost, or

timing of the litigation. But the Defendants mistakenly argue that in order to testify about these issues, Goldstein needs to have recent, repeated, and specialized experience litigating patent cases arguing the specific legal and factual issues that were at issue in the underlying patent litigation. Goldstein does not need such specialized experience at all. "It is not necessary that the witness be recognized as a leading authority in the field in question.... Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony—not its admissibility." [38] Further, Goldstein is testifying as to what a reasonable and competent patent attorney would have thought at the time of the settlements. The question, therefore, is whether Goldstein has experience as a reasonable and competent patent attorney. [39]

There can be no doubt that the answer to that question is yes. Goldstein has had a long and distinguished career in the field of patent law. He has studied, interacted with, and litigated patent issues for fifty years. [40] After earning his law and engineering degrees, Goldstein began his legal career as a clerk for a judge on the U.S. Court of Customs and Patent Appeals, one of the predecessor courts to the Federal Circuit. [41] He then went on to work for a law firm specializing in intellectual property for almost thirty years, during which time he also taught patent and copyright law as an adjunct professor at South Texas College of Law in Houston. [42] After leaving the firm in 1997, Goldstein became president of an intellectual property holding company, during which time he enforced the company's IP rights through patent litigation multiple times. [43] Goldstein now serves as a mediator, arbitrator, counsel, and expert in intellectual property matters. [44] In addition, he serves or has served in numerous national intellectual property law professional groups, including as President of the American Intellectual Property Law Association. [45] The experience the Court lists here is only a fraction of that listed on Goldstein's *curriculum vitae*. Goldstein clearly "possess[es] skill or knowledge greater than the average layman," [46] and is qualified to testify as to what a reasonable and competent attorney would have considered the likely outcome, length, and cost of pursuing the underlying litigation to a complete and final end.

The Defendants also seek to exclude Goldstein's testimony on the grounds that his methodology is unreliable. First, the Defendants argue that Goldstein had no methodology at all for his opinion that a reasonable and competent patent attorney would have advised Solvay that it had a 20% chance of

Case 4:23-cv-03560    Document 331-82    Filed 03/30/26 in TXSD    Page 75 of 182

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018 WL 2984873, 2018-1 Trade Cases P 80,409

winning the litigation. This is incorrect. Goldstein began his analysis by using two studies available at the time of the settlement to assess what the average outcomes were in patent cases involving a generic defendant. [47] Using these studies, it is Goldstein's opinion that on average a brand manufacturer plaintiff would have about a 25-30% chance of winning a Hatch-Waxman patent infringement case. [48] Goldstein then examined the merits of the underlying patent litigation in this case to determine whether Solvay's position was stronger or weaker than the average Hatch-Waxman plaintiff. [49] Goldstein found that it was weaker than the average, although not by a lot. Goldstein estimated that a reasonable and competent patent attorney would have discounted Solvay's chances of success by about 10%, meaning that it would have had between a 15-20% chance of succeeding in the underlying litigation. [50] Goldstein clearly has a methodology, even if the Defendants believe it to be a weak one.

**\*7** Similarly, Goldstein's opinions on the merits, cost, and timing of the litigation are reliable enough to be put to a jury. Although the Defendants argue that his views on the law are unreliable because they are incorrect, that is something on which reasonable and competent patent attorneys can disagree. Indeed, the only people who can say with true 100% certainty what the law is are the Justices of the United States Supreme Court. Further, while using survey data and the Court's statements to estimate cost and timing are not foolproof, they are reliable enough for reasonable jurors to consider. The Defendants' arguments basically boil down to the fact that they disagree with Goldstein's opinions, not their reliability. Such arguments are better addressed through the traditional means of "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." [51] For these reasons, the Defendants' motion to exclude Goldstein's testimony is denied.

### 2. James Bruno

The Defendants also seek to exclude testimony of the Plaintiffs' expert James Bruno. In particular, the Defendants seek to exclude Bruno's opinions and testimony on the valuation of the Backup Manufacturing Agreement ("BMA") between Solvay and Par/Paddock, including whether Solvay's compensation to Par/Paddock was fair value for services or constituted a large and unjustified payment. The Court agrees, and the Plaintiffs concede, that Bruno does not offer

a quantitative valuation of the BMA. [52] As such, Bruno does not and cannot offer testimony as to a specific monetary value for the BMA. To the extent that other experts assign one to the BMA based on Bruno's testimony, such testimony would be inappropriate and should be excluded.

However, the Defendants are incorrect in saying that all of Bruno's testimony regarding the BMA should be excluded. Although Bruno does not offer a specific monetary value to the BMA, such testimony is not *necessary* to show that a payment is "large and unjustified" under *Actavis*. As discussed later in this Opinion, the key inquiry in determining whether the reverse payment settlements violated the antitrust laws is whether they were entered into for the purpose of avoiding the risk of competition. Bruno's other testimony regarding the BMA, including his opinions that the BMA was out of step with industry practice and the Generics' regular business practices, is certainly relevant to answering that question. [53] Thus, while Bruno's testimony cannot support a specific, monetary valuation for the purpose of mathematically comparing the value of services, his testimony is relevant to answering what the "value" of the settlement was to the Defendants, whether its value was actually in the services provided, or in avoiding the risk of competition. On those grounds, Bruno's testimony would be helpful to the jury, and is allowed.

### B. Antitrust Conspiracy

Turning now to the summary judgment motions, Actavis first moves for summary judgment on the theory that the Plaintiffs have failed to demonstrate that Actavis conspired to restrain trade. [54] Under the Sherman Act, Section 1 claims and Section 2 conspiracy to monopolize claims "require the same threshold showing—the existence of an agreement to restrain trade." [55] A written contract satisfies this requirement "only if it embodies an agreement to unlawfully restrain trade." [56]

Actavis argues that the settlement agreements do not meet this standard because "they evince no agreement or understanding by [Actavis] to 'delay its entry' in exchange for a share of Solvay's monopoly profits ..." [57] Actavis cites a number of cases that find that the mere existence of a contract between two parties is not sufficient to establish a conspiracy between them. [58] In those cases, however, the contracts were merely *indirect* evidence of a conspiracy from which the factfinder could infer an agreement to violate the antitrust laws. Finding

a conspiracy on such indirect evidence raises the concern that "contractual partners would potentially be on the hook for any future conduct the other party engages in under color of the contract."[59]

**\*8** But that concern is not present in cases with *direct* evidence, such as this one. "Direct evidence of a conspiracy 'obviates the need' for evidence that excludes the possibility of independent action."[60] In this case, the settlement agreements specifically address the conduct the Plaintiffs argue is unlawful. The parties negotiated and agreed that in exchange for dropping the patent litigation, providing some services, and delaying generic introduction until 2015, the Generics would receive compensation.[61] Whether that common objective—dropping the patent litigation in exchange for compensation—was an illegal restraint of trade is a separate question. But if it was, then the settlements are clear, direct evidence of an agreement to unlawfully restrain trade.[62] Not only is there enough evidence for a jury to find that there was an agreement, it is doubtful that a reasonable jury could find otherwise. Therefore, Actavis' motion for summary judgment on the issue of conspiracy is denied.

### C. Anticompetitive Effect

Having disposed of Actavis' conspiracy argument, the Court now turns to what has been the central issue in this case all along: whether the reverse settlement agreements were unlawful.[63] The antitrust laws prohibit conduct that is "unreasonable and anticompetitive."[64] "A restraint is unreasonable if it has an adverse impact on competition and cannot be justified as a pro-competitive measure."[65] Usually this is determined by balancing the effects under the test known as the "rule of reason." "[T]he rule of reason standard hinges the ultimate legality of a restraint on whether the plaintiff has demonstrated an anticompetitive effect which is not offset by a need to achieve a procompetitive benefit or justification."[66] Sometimes, however, conduct is so blatantly anticompetitive that courts have found it to be illegal *per se*.[67]

When this case was before the Supreme Court on appeal, the FTC and the Defendants took starkly opposing views on the question of the settlements' effect on competition. The Defendants argued that the settlements were not anticompetitive because they did not delay generic entry past the life of the '894 patent. In other words, as long

as the '894 patent would have independently blocked generic entry, the settlements could not possibly be anticompetitive. If anything, the settlements should be considered procompetitive by allowing entry earlier than the expiration of patented exclusivity. The FTC, by contrast, took the view that reverse payment settlements are by their very definition anticompetitive, and should be subject to the *per se* rule of illegality, because they explicitly and openly involve sharing the profits of a monopoly to buy off competitors and delay generic entry in order to restrict competition.

**\*9** The Supreme Court took a middle road between these two extremes. While recognizing that a valid patent certainly would have excluded generics from the market, the Court noted that "an *invalidated* patent carries with it no such right. And even a valid patent confers no right to exclude products or processes that do not actually infringe."[68] Thus, the existence of a patent does not necessarily say anything about whether competition was restricted.

At the same time, the Court said abandoning the rule of reason in favor of the FTC's *per se* approach was not appropriate, because "the likelihood of a reverse payment bringing about anticompetitive effects depends upon its size, its scale in relation to the payor's anticipated future litigation costs, its independence from other services for which it might represent payment, and the lack of any other convincing justification."[69] Instead, the Court held that when it comes to scrutinizing reverse payment settlements, the "FTC must prove its case as in other rule-of-reason cases."

The parties disagree about what constitutes an anticompetitive harm and what the Plaintiffs must demonstrate to prove it. The Defendants argue that the relevant anticompetitive harm is an *actual* harm to consumers in the form of higher prices through the delay of generic entry into the market. Thus, the Defendants argue the Plaintiffs must show that the settlements *actually* caused a delay in the sale of generic versions of AndroGel.[70] But as the FTC points out, the Supreme Court made clear in *Actavis* that avoiding even the possibility of competition, however small, is itself an antitrust violation.[71] Rather than having to litigate the merits of any underlying patent suits or establish a theory of causation, the Supreme Court said that courts can look to the "size of the payment ... [to] be able to assess its likely anticompetitive effects...."[72] Where the size of a reverse payment "reflects traditional settlement considerations, such as avoided litigation costs or fair value for services, there is not the same concern that a

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018 WL 2984873, 2018-1 Trade Cases P 80,409

patentee is using its monopoly profits to avoid the risk of patent invalidation or a finding of noninfringement."[73] But where a payment is "large and unjustified" by these traditional settlement concerns, it is likely directed toward avoiding the risk of competition. Thus, if the settlement payments are shown to be larger than what could reasonably be expected to cover such traditional settlement concerns as future litigation costs or the value of services rendered, the Plaintiffs will have satisfied their burden in showing that the settlements violated the antitrust laws.[74]

**\*10** In this case, the Defendants entered into two separate settlement agreements.[75] The first, between Solvay and Actavis, provided that Solvay would drop its patent claims against Actavis and pay Actavis 60 to 70% of AndroGel's profits in exchange for co-promoting AndroGel and delaying generic entry until 2015.[76] The second, between Solvay, Paddock, and Par, likewise had Solvay drop its patent claims and pay $12 million to Par per year in exchange for a delay in generic entry until 2015, as well as co-promotion and manufacturing help from Paddock and Par.[77] Clearly, Solvay agreed to pay the Generics significant sums of money. The only remaining question, therefore, is whether these payments were "large" relative to the services provided or the cost of avoided litigation.

According to the Plaintiffs, Solvay determined that it would be much better off if the Generics delayed entering the market until 2015.[78] However, Solvay also figured out that the Generics would see a loss in value of generic entry compared to continuing the litigation if entry was delayed that long.[79] This made it unlikely that the Generics would agree to such a settlement without added incentives.[80] Consequently, Solvay offered the Co-Promotion Agreements ("CPAs") and Backup Manufacturing Agreement ("BMA") in order to entice the Generics to settle their claims.

The Plaintiffs present significant evidence from the negotiation of the settlements to suggest that the services were merely an afterthought to the Defendants, the proverbial lipstick on the pig that was the delay in generic entry.[81] But even if taken at face value, the Plaintiffs' experts opine that Solvay vastly overpaid for the services it was receiving.[82] The Plaintiffs' experts also will testify that the side agreements did not make much business sense on their own.[83]

The Defendants respond in two ways. First, they argue that the FTC failed to show that the settlements *actually* delayed entry.[84] That may well be true, but that is not what the FTC needs to prove in order to show an antitrust harm. As discussed above, the FTC only needs to prove that the Defendants entered into the settlements in order to avoid the risk of a competitive market.

The Defendants' second argument focuses only on Solvay's settlement with Par and Paddock. The Defendants argue that the Plaintiffs have failed to show that the Par/Paddock settlement was "large and unjustified" because the Plaintiffs did not supply their own valuation of some of the services in those contracts. While the Plaintiffs' expert valued the CPA between Solvay and Par/Paddock, the Defendants point out that the Plaintiffs' expert never quantitatively valued the BMA, which the Defendants argue must be considered jointly with the CPA. Without their own valuation of the BMA, the Plaintiffs must rely on the defense expert's valuation of the CPA in order to show that the agreements were out of step with the value of the services provided. This, the Defendants argue, inappropriately shifts the burden onto them.

**\*11** However, comparative valuations of services are not a necessary requirement to show that a reverse payment is "large and unjustified." Helpful, certainly, but not necessary. The size of the payment is merely the Supreme Court's proxy for reaching the ultimate question: whether the agreement was entered into for the purpose of avoiding the risk of competition. If a settlement was agreed to for that purpose, it is "large and unjustified."

As discussed above, the Plaintiffs have provided evidence to suggest that the BMA and CPA in the Par/Paddock settlement were merely vehicles to facilitate payment to the Generics for delaying entry. In addition to the size of the settlement —$12 million per year—the Plaintiffs' experts opine that the BMA was out of step with industry practice and the Generics' regular business practices.[85] In particular, the Plaintiffs' experts criticize the loose oversight over Paddock, the lack of any assurance that Paddock could meet Solvay's manufacturing needs, Solvay's inability under the contract to cancel if Paddock did not meet its manufacturing needs, and the fact that Paddock was unable to manufacture AndroGel for the vast majority of the agreement's term.[86] In addition, there is evidence that the Defendants agreed to the reverse payment amount before negotiating the specifics of any services Par/Paddock were going to render.[87] A reasonable

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018 WL 2984873, 2018-1 Trade Cases P 80,409

jury could infer from such evidence that the BMA and CPA were merely post-hoc justifications when the true purpose of the settlement was to avoid the risk of competition. This evidence is enough to shift the burden to the Defendants to justify the payments as being procompetitive.

Solvay's counsel suggested at oral argument that one way the Defendants plan to justify the settlements as procompetitive is to argue that the patents were valid and infringed; in other words, the settlements were procompetitive because they allowed generic entry earlier than the patent would have allowed. There are two ways to make this argument. One way would be to provide evidence that shows what Solvay *thought* at the time about the strength of its patents. The other is to argue that Solvay would have won the underlying patent litigation.

While the former is acceptable, the latter is problematic for two reasons. First, as discussed above, the actual validity of the patent is irrelevant to the question of whether the reverse payments violated the antitrust laws. Paying the Generics to stay out of the market for the purpose of avoiding the risk of competition is an antitrust harm, *regardless* of whether or not the patent is actually valid and infringed. [88] Put another way, even if the patent was valid and infringed, the Defendants took away the opportunity to know that for sure by settling before the end of the litigation. If they did so for the purpose of avoiding the risk that a court would find otherwise, however small a risk they considered it to be, that is an antitrust violation under *Actavis*. [89]

 **\*12** Second, for reasons explained more fully elsewhere in this Opinion, even if the actual validity of the patent was relevant, determining the ultimate outcome of the underlying patent litigation is both fundamentally unknowable and procedurally impossible. The underlying litigation was assigned to me. There is no one who can say how I would have ruled on the summary judgment motions, how I would have construed the claims, and whether I would have found infringement. There is no one who can say how the Federal Circuit would have ruled upon any unknowable judgment that may have been rendered. In Actavis, the Supreme Court said "it is normally not necessary to litigate patent validity to answer the antitrust question (unless, perhaps, to determine whether the patent litigation is a sham ...)." [90] I will accept the Court's invitation to "structure [this] antitrust litigation so as to avoid, on the one hand, the use of antitrust theories too abbreviated to permit proper analysis, and, on the other, consideration of every possible fact or theory irrespective of the minimal light it may shed on the basic question—that of the presence of significant unjustified anticompetitive consequences." [91] Any evidence or argument on actual outcome would be far too speculative to aid a jury in making a reasoned decision. Thus, any arguments based on the actual validity or invalidity of the patent, or about what would have happened in the underlying patent litigation, are inappropriate and will be disallowed regarding the antitrust violation question.

In sum, the Court finds that the Plaintiffs have provided enough evidence for a reasonable jury to find that, by overvaluing these side agreements in the settlement, the Defendants were able to reach agreements that left them better off than any party would have been had the Generics won the patent litigation. A reasonable jury could find that the settlements were structured so as to be more beneficial to everyone involved than a competitive market; everyone, that is, except the consumer. Settling for that purpose is an antitrust harm. Of course, the Defendants may still justify the settlements by demonstrating that the payments were for "traditional settlement considerations, such as avoided litigation costs or fair value for services," [92] but they may not justify the payments on the grounds that the patent was valid and infringed because such an argument is irrelevant and, in any case, impossible to know without relitigating to their conclusion the underlying patent cases. I do not plan to do that. Because the Plaintiffs have shown enough to satisfy their prima facie burden, the Defendants' motions for summary judgment on these issues are denied.

### D. Antitrust Standing

Unlike the FTC, which only needs to prove an antitrust violation, private plaintiffs asserting a private right of action under the Clayton Act must also establish antitrust standing. [93] This is separate from Article III standing. [94] "Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action." [95]

The Eleventh Circuit employs a two-prong test for antitrust standing. "First, the plaintiff must establish that it has suffered an antitrust injury." [96] This means the plaintiff must have suffered an "injury of the type that the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." [97] "The injury should reflect

Appendix of Authorities: 76 of 180

the anticompetitive effect ... of the violation...." [98] "Second, the plaintiff must be an 'efficient enforcer' of the antitrust laws." [99] The Defendants move for summary judgment only on the first prong.

In this case, the harm "that flows from that which makes the defendants' acts unlawful"—the avoidance of the risk of competition—is higher drug prices. The Private Plaintiffs must therefore prove that they suffered an injury in the form of higher drug prices because of the delay in generic entry caused by the reverse payment settlements. The Private Plaintiffs have offered, at various times, three alternative theories for why the Generics would have entered the market prior to 2015: (1) the Generics ultimately would have prevailed in the underlying patent litigation; (2) the Generics would have come to the market "at risk" during the patent litigation; and (3) the parties would have reached an alternative settlement with an earlier entry date than 2015.

### 1. Success on the Patent Merits and At-Risk Entry

 **\*13**  During oral argument, the Private Plaintiffs disavowed the argument that they would have won the underlying patent litigation, leaving only the latter two theories to show causation. However, the Private Plaintiffs' at-risk theory of causation still ultimately depends on showing that the Generics would have won the underlying patent litigation. The *Wellbutrin* district court stated this point clearly. "The existence of a valid and uninfringed patent would interfere with the plaintiffs' chain of causation: a valid patent independently preclude[s] competition apart from any agreement and an 'at risk' launch is unlawful absent a later finding of patent invalidity or non-infringement." [100] In other words, if the patent was valid, any at-risk launch would have been unlawful if it infringed on the patent, and the law will not allow the Private Plaintiffs to use illegal behavior as a link in their chain of causation. [101] At least three other courts have reached similar results. [102] In order to show that the Generics could have successfully—i.e., legally—launched at-risk, the Private Plaintiffs would therefore need to show that the patent would ultimately have been found either invalid or uninfringed in the underlying patent litigation.

This raises again the central problem raised by Actavis: how to determine what the outcome of the underlying patent litigation would have been in a way that is manageable. Do the parties need to accomplish what Judge Carnes called

the "turducken task" of litigating "a patent case within an antitrust case about the settlement of the patent case?" [103] Alternatively, can they offer experts to testify as to what would have happened in the but-for world, neatly summarized into each party's percent chance of winning? [104] Is it even possible to do either?

It is the Court's opinion that it is not. At least in relation to this particular case, arguments which depend on determining what the ultimate outcome of the underlying patent litigation would have been are simply too procedurally burdensome and speculative to serve as valid theories of causation under *Actavis*. Consider for a moment the particularly thorny issues that would be raised were the Court to consider such a theory at trial. Would the Private Plaintiffs be allowed to make any argument that was potentially available to the Generics, or would they be limited to the arguments the Generics had actually made up to the point the parties settled? The Defendants at various points in their papers assume the latter, but the underlying litigation never came to a final, preclusive decision. It did not even reach summary judgment. Who knows what arguments may have been raised as the litigation went forward?

Further, is the outcome of the underlying litigation a question of fact or law, and who would decide what the outcome would have been—the Court or the jury? If the latter, how could a jury determine what the outcome of a bench trial would have been? Unlike the issue of an antitrust violation, a jury cannot estimate the likelihood of the Generics' success on the patent merits by simply looking to the size of the reverse payment as a proxy. [105] Instead, a jury would have to answer that question by determining how the judge—in this case, me—would have found on the merits. Thus, when combined with the standard of proof in this case, this means that to survive summary judgment, the Private Plaintiffs would have to provide enough evidence to show that a reasonable jury could find it more likely than not that a judge would have found it more likely than not that the Generics did not infringe or that the '894 patent was invalid. [106] On top of that, a jury would have to determine how the judge would have decided various legal issues, including claim construction and summary judgment. If that sounds ridiculously unwieldy, that's because it is. And even if a jury could comprehend that standard, how would the inevitable appeal be handled? Would the case be split, with the antitrust issues going to the Eleventh Circuit, but the patent issues going to the Federal Circuit? Clearly, actually

2018 WL 2984873, 2018-1 Trade Cases P 80,409

litigating the underlying merits would be a procedural and administrative nightmare.

 **\*14**  But let us assume for a moment that the procedural issues could somehow be worked out. At least with regard to this case, it is impossible to say what the court would have actually done in the underlying case. Any experts who testify otherwise, like the expert relied upon in *Wellbutrin*,[107] are coming up with probabilities out of whole cloth. Unlike the antitrust issues, where we can assume that the parties would have acted in their best economic interest, such assumptions cannot necessarily be made about courts and juries. One court is not the same as another. Much of a patent case depends on how a claim is construed, and no one can say how I would have construed the claims at issue. Nor can one simply estimate what would have happened based on other cases. Every patent case is inherently different, with numerous variable affecting the outcome. And the issue here is not what would have happened in a generic case, but what would have happened in *this* case.

By contrast, most of the cases which have considered this question and decided otherwise have differed from this case in at least one of two ways. First, at least two of those cases relied upon what this Court views was an improper causation standard, finding that the plaintiffs only needed to show that the generics *could* have won, not that they *would* have won.[108] Obviously it is much easier to provide substantive proof of what could have happened as opposed to what would have happened. Second, the experts offering testimony in those cases had at least some concrete outcome in the underlying litigation on which to base their opinions. For example, in the *Lidoderm* litigation, the defendants had actually gone to trial on the case, but settled before the judge issued his opinion.[109] Thus, the expert was able to rely on statements made by the judge, as well as his claim construction order.[110] And in *Wellbutrin*, where there were two underlying patent suits, the court in one of them had also entered claim construction and summary judgment orders (the plaintiffs did not argue the generic could have won the other).[111] In this case, however, the Court never entered a claim construction or summary judgment order in the underlying patent litigation in this case, let alone actually tried the issues. Any opinion that would purport to state how a particular piece of litigation would turn out without any evidence from the court in question on how it would rule can only be characterized as pure speculation. Such attenuated

evidence cannot possibly serve as the basis of a reasonable decision by a jury.

Although this eliminates two of the Private Plaintiffs' theories of causation, as well as a possible procompetitive justification for the settlements, the Court feels it is justified in light of *Actavis*, the other theories available to the parties, and the desire for a logical congruency of outcome. First, as noted earlier, Justice Breyer explicitly states that:

> [a]s in other areas of law, trial courts can structure antitrust litigation so as to avoid, on the one hand, the use of antitrust theories too abbreviated to permit proper analysis, and, on the other, consideration of every possible fact or theory irrespective of the minimal light it may shed on the basic question—that of the presence of significant unjustified anticompetitive consequences.[112]

 **\*15**  Admittedly, Justice Breyer was speaking only in the context of an antitrust violation, not causation. But his concern for the ability of trial courts to manage the cases before them extends here.

Second, not all theories of causation are now out of bounds for the Private Plaintiffs. As discussed in more detail below, they still have the ability to show that the Defendants would have reached alternative, legal settlements that would have allowed for earlier generic entry without the reverse payments. Indeed, this theory is less attenuated than any theory based on the outcome of the underlying patent litigation because a factfinder can rely on the assumption that the parties are economic actors who would have done what was in their best financial interest.

Lastly, precluding such a basis of causation avoids potentially inconsistent outcomes. As discussed above, the FTC does not need to prove causation to win its case. The Supreme Court was clear, for better or worse, that it merely needs to prove that the Defendants entered into the settlements for the purpose of avoiding the risk, however small, of competition. Consider the incongruity, then, if the FTC should win its case on those grounds, while the Private Plaintiffs lose because

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018 WL 2984873, 2018-1 Trade Cases P 80,409

the Defendants are able to show the patent would have been declared valid and infringed. How can the Defendants both have a valid patent, and commit an antitrust violation? Such an outcome makes no sense.

The Court recognizes that this solution is not the most appetizing, but it benefits from the sheer distastefulness of the other options available. To quote Churchill, "[i]t has been said that democracy is the worst form of Government except all those other forms that have been tried from time to time." [113] The same is true here. The Court can simply see no way of entertaining arguments that purport to say what the outcome would have been in the underlying patent litigation without relying on wholly speculative evidence or untying a Gordian knot of procedural problems. With that in mind, it is the Court's opinion that such arguments are simply unworkable, and should not be considered further in this litigation.

### 2. Alternative Settlement Scenario

The Private Plaintiffs' remaining causation theory is that but-for the reverse payment the Defendants would have come to an alternative, legal settlement that would have allowed for generic entry earlier than 2015. In *Actavis*, the Supreme Court endorsed patent litigation settlements that do not involve reverse payments. [114] The Defendants argue that this alternative settlement theory is ultimately dependent on the outcome of the patent merits because "if the '894 patent was valid and infringed, then Plaintiffs are complaining about the inability to buy an *infringing* product." [115]

 **\*16**  This argument is unpersuasive. Unlike the at-risk theory of causation, the Private Plaintiffs are not arguing that they would have done something illegal. Instead, their theory is that Solvay, faced with the uncertain prospect of continuing the litigation and acting in its economic best interest, still would have granted the Generics a license to enter the market before the expiration of the patent. Without a payment, however, the Generics, if confident in their chances at trial and on appeal, would have required an earlier entry date than 2015, the entry date under the actual reverse settlement. Using leverage to negotiate an earlier settlement date is obviously legal. Further, focusing upon the difference between 2015 and a hypothetical earlier entry date results in the type of injury intended to be prevented by the antitrust laws as interpreted by the Supreme Court in *Actavis*. If the Private Plaintiffs can show that, but-for an illegal reverse payment intended

to avoid the risk of a competitive market place, the Generics would have entered earlier, they will have shown they have suffered an antitrust injury.

Other courts have endorsed this approach. In *Wellbutrin*, the district court accepted the plausibility of an alternative settlement scenario, although it granted summary judgment to the defendants because the brand manufacturer had "expressly and unwaveringly refused to settle" without the allegedly anticompetitive provision of the actual settlement. [116] In *Lidoderm*, the court also found that the alternative settlement theory was cognizable, and found there to be sufficient evidence to submit the issue to a jury. [117] And in *Solodyn*, the district court also allowed the plaintiffs to proceed on an alternative settlement theory. [118]

In order to prove this theory, of course, the Private Plaintiffs must have evidence that an alternative settlement *would* have occurred in the but-for world. To do so, the Private Plaintiffs offer three expert opinions, as well as some direct evidence. The first, that of Jack Goldstein, thoroughly evaluates the merits of the underlying patent litigation, comparing it to the average patent case, and concludes that a reasonable and competent attorney would have advised Solvay and the Generics that Solvay had about a 20% chance of winning, if not less. [119]

Independently of Goldstein, the Private Plaintiffs' other two experts, Dr. Leffler and Prof. Elhauge, each reach their own conclusions on what the Defendants considered their chances to be. [120] Dr. Leffler looked to the terms of the actual settlement, and concluded that Solvay likely viewed its chances of winning to be at about 33%. [121] Likewise, Prof. Elhauge looked to the actual terms of the settlement agreement and determined that it would only have been economically rational for Solvay to agree to the actual settlements at issue if it believed its chances of winning were at best 48.8%. [122] This is consistent with the "Project Tulip" evidence which shows that Solvay's executives crafted the settlement with Actavis around a 50% chance of winning the patent litigation. [123]

With these expectations in mind, Dr. Leffler and Prof. Elhauge each agree that it would have been economically rational for Solvay to settle, even without a reverse payment. Using Goldstein's estimate of Solvay's chance of winning the litigation, Dr. Leffler concludes that the Defendants

would have agreed to an alternative settlement that allowed for generic entry on January 1, 2008, while Prof. Elhauge concludes the Generics would have entered on May 22, 2009. [124] And using his own estimate of Solvay's belief about the strength of the patent, based upon the actual settlement, Dr. Leffler concludes that the Generics would have entered on October 1, 2010. [125] Under all of these scenarios, the Generics would have entered the market earlier than 2015.

**\*17** The Defendants argue that the Private Plaintiffs' evidence is not sufficient because they do not have actual, direct evidence that the Defendants ever negotiated a different date. [126] "Requiring such evidence, however, would be an almost impossible standard to require of Plaintiffs, given that this is a but-for scenario." [127] "Because this case is set in a but-for world, it is not surprising that no evidence shows that defendants were contemplating anything other than the actual settlement." [128] If Solvay and the Generics "were acting unlawfully to eliminate competition throughout their settlement negotiations, then it is unreasonable to expect a paper trail signifying rational, lawful business choices." [129] Any criticism the Defendants have of the experts' methodologies or conclusions are best handled through cross-examination and the production of contrary evidence.

The Defendants also mistakenly argue that Dr. Leffler's and Prof. Elhauge's models assume that a reverse payment always causes delay. Their models assume nothing of the sort. Rather, both experts use their experience and knowledge in the field to conclude that reverse payments cause delay, and they confirm that conclusion in their models addressing the specific settlement at issue in this case.

Indeed, such a conclusion is economically logical, especially at the causation stage, in which the Private Plaintiffs will have already proven that the purpose of the reverse payment was to avoid the risk of competition. It would make no sense for Solvay to pay the Generics tens of millions of dollars if it could get the Generics to enter on the same date without paying them all of that money. Nor would it make sense for the Generics to agree to delay entry for free if they could receive tens of millions of dollars to do the same thing. Solvay paid the Generics a lot of money for something, and if it was not for services or saved litigation costs, it is logical to conclude it was for delay. [130]

Lastly, Par/Paddock argue that even if the Private Plaintiffs prove their case as to the Actavis settlement, they cannot show causation regarding Solvay's settlement with Par/Paddock because Par/Paddock could not have entered before Actavis did. [131] But the fact that Actavis would have had to agree to a settlement before Par/Paddock could have does not vitiate causation, it merely adds another step. If the Private Plaintiffs can show that Solvay and Actavis would have settled earlier without a reverse payment, then they might also be able to show that Par/Paddock would have done so as well. And for all the reasons discussed above regarding the Actavis settlement, the Private Plaintiffs have produced evidence that indeed Par/Paddock and Solvay also would have settled earlier. For these reasons, the Court finds that the Private Plaintiffs have provided enough evidence for an alternative settlement theory of causation to survive summary judgment.

### 3. Lack of Injury Regarding AndroGel 1.62%

The final antitrust injury related argument involves AndroGel 1.62%. All of the Private Plaintiffs in this case are seeking damages regarding the original AndroGel formula, AndroGel 1%. However, one group of plaintiffs—the Retailers—is also seeking damages related to purchases of a newer formulation, AndroGel 1.62%. [132]

**\*18** AndroGel 1.62% was not introduced until 2011, five years after the challenged settlements. [133] It was developed in order to improve upon AndroGel 1%, namely by increasing the ease of application and reducing drying time, thereby increasing patient satisfaction. [134] When it was introduced, AndroGel 1.62% quickly became the leading testosterone replacement therapy. [135] Even after generic versions of AndroGel 1% were introduced to the market, consumers still continued to prefer AndroGel 1.62% by a wide margin despite its significantly higher price. [136]

The Retailers argue that the settlements delayed the launch of generic AndroGel 1% long enough that Solvay could "switch the market" to AndroGel 1.62%. [137] This argument can only work under one of two theories: either Solvay engaged in an anticompetitive "product hop," or AndroGel 1.62% is essentially the same product as AndroGel 1%. The Retailers are adamant that they are not pursuing a "product hop theory," so the Court need not address it. [138] As for the latter theory, there can be no doubt that AndroGel 1.62% is a different

2018 WL 2984873, 2018-1 Trade Cases P 80,409

product than AndroGel 1%. AndroGel 1.62% is covered by eight different patents that do not cover AndroGel 1%. [139] This is further supported by the fact that, if the products were the same, one would expect consumers in a competitive market place to choose the less expensive of two identical products. But as mentioned above, even when faced with a fully competitive market after 2015 that includes AndroGel 1.62%, and branded and generic AndroGel 1%, consumers have still chosen the significantly higher priced AndroGel 1.62% over generic AndroGel 1% by a wide margin. [140]

In essence, then, the Retailers are arguing that the alleged delay in entry of one product caused them damages by forcing them to pay higher prices for a different, better product. This is the Retailer's "shifting the market" argument, meaning that the reverse settlements gave Solvay the time to "shift the market" to AndroGel 1.62%. But courts generally presume that the introduction of new, better products is a good thing for competition. "The attempt to develop superior products is ... an essential element of lawful competition." [141] Plus, if the '894 patent was valid, the patent itself would have given Solvay the time to "shift the market" by introducing a new product. This is further proof that "shifting the market" is not, in and of itself, a problem. [142] Instead, the proper measure of injury is and must be the comparison between like-products. Given that AndroGel 1.62% and AndroGel 1% are different products, the Retailers cannot claim that they were injured by purchasing AndroGel 1.62% simply because that is what consumers wanted.

### E. FTC's Available Remedies

**\*19**   Should the FTC successfully prove that the reverse payment settlements were anticompetitive and violated the antitrust laws, the FTC is seeking broad equitable relief, including preventing the Defendants from entering into any reverse payment agreements in the future, as well as compulsory generic licenses for AndroGel 1.62%. [143] The Defendants argue that these remedies are far too broad, and that they would inappropriately restrain lawful conduct.

But federal courts have extensive authority to order equitable relief in antitrust cases. [144] The goal of an equitable antitrust suit is not to simply punish past behavior, "nor is it merely to end specific illegal practices." [145] The goal is to "effectively

pry open to competition a market that has been closed by defendants' illegal restraints." [146] In other words, the goal is to prevent anticompetitive activity in the future, and the courts have a wide range of means at their disposal to do so. [147] "[I]t is not necessary that all of the untraveled roads to that end be left open and that only the worn one be closed." [148] Sometimes, this may even mean that otherwise legal activity may have to be enjoined. [149] "The standard against which the order must be judged is whether the relief represents a reasonable method of eliminating the consequences of the illegal conduct." [150] Because the appropriate remedy fundamentally depends on the nature and scope of any wrongful conduct, it is premature to determine what may or may not be an appropriate remedy at this stage in the litigation, where there has not yet been a decision on liability.

### IV. Conclusion

For the reasons stated above, Solvay's Motion for Summary Judgment on the FTC's Claims [FTC Doc. 620] is DENIED, Solvay's Motion for Summary Judgment as to the Par/Paddock Settlement [FTC Doc. 621, MDL Doc. 1551] is DENIED, Actavis and Actavis Holdco's Motion for Summary Judgment [FTC Doc. 625, MDL Doc. 1556] is DENIED, Solvay's Motion for Summary Judgment for Lack of Antitrust Injury Against the Private Plaintiffs [MDL Doc. 1550] is DENIED, Solvay's Motion for Summary Judgment as to Retailer's Damages Claims on AndroGel 1.62% Purchases [MDL Doc. 1552] is GRANTED, the Defendants Par and Paddock's Motion for Summary Judgment [MDL Doc. 1559] is DENIED, Actavis, Inc. and Solvay's Motion to Exclude Plaintiffs' Proposed Patent Law Expert Jack C. Goldstein, Esq. [FTC Doc. 622, MDL Doc. 1553] is DENIED, and Solvay, Par, and Paddock's Motion to Exclude in Part Plaintiffs' Expert James R. Bruno [FTC Doc. 630, MDL Doc. 1562] is GRANTED in part and DENIED in part.

**\*20**   SO ORDERED, this 14 day of June, 2018.

### All Citations

Not Reported in Fed. Supp., 2018 WL 2984873, 2018-1 Trade Cases P 80,409

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018 WL 2984873, 2018-1 Trade Cases P 80,409

**Footnotes**

1    Technically speaking, Unimed entered into the Agreements with Besins. Solvay, now known formally as Abbvie Products LLC, later acquired Unimed. However, in order to reduce confusion, the Court will simply use the name Solvay throughout this Opinion.

2    21 U.S.C. § 355(a).

3    21 U.S.C. § 355(b).

4    Pub.L. No. 98–417, 98 Stat. 1585 (1984).

5    *See* 21 U.S.C. § 355(j)(2)(A)(vii).

6    21 U.S.C. § 355(j)(2)(B).

7    Originally known as Watson Pharmaceuticals, the company has since split into two separate entities now known as Actavis, Inc. and Actavis Holdco US, Inc. For the purposes of this Opinion, the Court will refer to these as just Actavis. And while the Court continues to call Solvay by its original name, it will use Actavis' new name to minimize confusion in light of the Supreme Court's opinion in *FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

8    *See Unimed Pharm., Inc. v. Watson Pharm., Inc.*, No. 1:03-CV-2501-TWT, 2003 WL 23824320 (N.D. Ga. Aug. 21, 2003); *Unimed Pharm., Inc. v. Paddock Labs., Inc.*, No. 1:03-CV-2503-TWT, 2003 WL 23824347 (N.D. Ga. Aug. 21, 2003).

9    *See* 35 U.S.C. § 271(e)(2)(A)(submitting an ANDA is an act of infringement if the branded drug is covered by a patent).

10   21 U.S.C. § 355(j)(5)(B)(iv).

11   FTC's Statement of Additional Material Facts ("SAMF") ¶ 174 [FTC Doc. 689].

12   *Id.* at ¶ 186.

13   *Id.* at ¶¶ 180-183.

14   *Id.* at ¶ 185.

15   *Id.*

16   *Actavis*, 570 U.S. at 152.

17   *Id.*

18   *In re Androgel Antitrust Litig. (No. II)*, 687 F. Supp. 2d 1371 (N.D. Ga. 2010). The Court also dismissed the Private Plaintiffs' per se claims, and later granted the Defendants' motion for summary judgment on the "sham litigation" claims of the Private Plaintiffs. *In re Androgel Antitrust Litig. (No. II)*, 888 F. Supp. 2d 1336 (N.D. Ga. 2012).

19   *FTC v. Watson Pharm., Inc.*, 677 F.3d 1298 (11th Cir. 2012), *rev'd and remanded sub nom. FTC v. Actavis, Inc.*, 570 U.S. 136 (2013).

In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)

2018 WL 2984873, 2018-1 Trade Cases P 80,409

20 *See Actavis, 570 U.S. at 160.*

21 Now, after five more years, it remains to be seen whether this case or I will first confirm Queen Gertrude's observation: "Thou know'st 'tis common; all that lives must die, passing through nature to eternity." WILLIAM SHAKE-SPEARE, HAMLET, act 1, sc. 2.

22 The Direct Purchaser Plaintiffs include Rochester Drug Co-Operative, Inc., Louisiana Wholesale Drug Co., Inc., Meijer Inc., and Meijer Distribution, Inc. The Retailers include Rite Aid Corp., Rite Aid Hdqtrs. Corp., JCG (PJC) USA, LLC, Maxi Drug, Inc., Eckerd Corp., CVS Pharmacy, Inc., Caremark L.L.C., Walgreens Co., Safeway, Inc., American Sales Co., Inc., HEB Grocery Co., LP, Supervalu, Inc., and Giant Eagle, Inc.

23 *See* Sherman Antitrust Act §§ 1–2, 15 U.S.C. §§ 1–2; Federal Trade Commission Act § 5(a), 15 U.S.C. § 45(a).

24 Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

25 *KW Plastics v. United States Can Co.*, 131 F. Supp. 2d 1289, 1292 (M.D. Ala. 2001) (quoting *Daubert*, 509 U.S. at 594-95).

26 *Ferguson v. Bombardier Services Corp.*, 244 Fed. Appx. 944, 949 (11th Cir. 2007).

27 *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999).

28 FED. R. CIV. P. 56(a).

29 *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970).

30 *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

31 *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986).

32 *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990).

33 15 U.S.C. § 1.

34 *Id.* at § 2.

35 *Id.* at § 45(a).

36 *See, e.g.*, *FTC v. Cement Institute*, 333 U.S. 683, 691-93 (1948) ("In other cases this Court has pointed out many reasons which support interpretation of the language 'unfair methods of competition' in [Section] 5 of the Federal Trade Commission Act as including violations of the Sherman Act.... We adhere to our former rulings.").

37 Goldstein Rep. ¶ 2 [Doc. 1564-33].

38 *Leathers v. Pfizer, Inc.*, 233 F.R.D. 687, 692 (N.D. Ga. 2006) (quoting 29 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure*; *Evidence* § 6265 (West 1997) ).

39 "Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation." MODEL RULES OF PROF'L CONDUCT r. 1.1 (AM. BAR ASS'N 2018).

40 Goldstein Rep. ¶ 4.

2018 WL 2984873, 2018-1 Trade Cases P 80,409

41    *Id.* at ¶¶ 5, 7.

42    *Id.* at ¶ 8.

43    *Id.* at ¶ 12.

44    *Id.*

45    *Id.*

46    *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (quoting *Aloe Coal Co. v. Clark Equip. Co.*, 816 F.2d 110, 114 (3d Cir. 1987) ).

47    Goldstein Rep. ¶¶ 40-46.

48    *Id.* at ¶ 46.

49    *Id.* at ¶¶ 46, 53.

50    *Id.* at ¶¶ 179-181.

51    *Daubert*, 509 U.S. at 596.

52    Pls.' Resp. to Defs.' Mot. to Exclude, at 13 [MDL Doc. 1616].

53    FTC's SAMF at ¶¶ 278-81, 290-93 [FTC Doc. 689].

54    *See* Actavis' Mot. for Summ. J. [FTC Doc. 625, MDL Doc. 1556].

55    *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1576 (11th Cir. 1991).

56    *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1081 (11th Cir. 2016).

57    Actavis' Mot. for Summ. J. at 13 [MDL Doc. 1556, FTC Doc. 625].

58    *See Procaps*, 845 F.3d at 1081 (finding that an agreement which was legal at its conception could not on its own conclusively demonstrate a conspiracy related to later unlawful conduct); *Merced Irrigation District v. Barclays Bank PLC*, 165 F. Supp. 3d 122, 139-40 (S.D.N.Y. 2016) (finding that a series of contracts in furtherance of one party's monopolization efforts could support a Section 2 claim, but not a Section 1 claim because there was no evidence of an agreement on the ultimate objective).

59    *Id.*

60    *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 770 (E.D. Pa. 2015), *aff'd*, 868 F.3d 132 (3d Cir. 2017) [hereinafter *Wellbutrin Summary Judgment*].

61    *See, e.g.*, FTC's SAMF ¶¶ 174-82 [FTC Doc. 689].

62    *Wellbutrin Summary Judgment*, 133 F. Supp. 3d at 770 (finding settlement agreement to be direct evidence of conspiracy where manufacturer was involved in settlement negotiations, provided sublicenses, and waived its right to launch an authorized generic).

63    This is also why this case is different in that there is direct evidence of an agreement to restrain trade. Unlike other cases, where it is "rare ... that a plaintiff can establish a conspiracy by showing an explicit agreement," *Gulf States Reorganization Group, Inc. v. Nucor Corp.*, 822 F. Supp. 2d 1201, 1218 (N.D. Al. 2011), the

2018 WL 2984873, 2018-1 Trade Cases P 80,409

parties here explicitly and openly agreed to the course of conduct. The real question is whether that conduct was illegal.

64　　*Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

65　　*Seagood*, 924 F.2d at 1569.

66　　*Id.* (citing *Kestenbaum v. Falstaff Brewing Corp.*, 575 F.2d 564, 571 (5th Cir. 1978) ).

67　　*Id.* at 1567 ("Some violations of section 1, however, are illegal per se because of their pernicious effect on competition and lack of any redeeming virtue ...") (quotations omitted).

68　　*Actavis*, 570 U.S. at 147 (emphasis original).

69　　*Id.* at 159.

70　　*See* Defs.' Mot. for Summ. J., at 5-9. *See also* Solvay's Mot. for Summ. J. as to the Par/Paddock Settlement, at 19-27 [FTC Doc. 621, MDL Doc. 1551]; and Par/Paddock's Mot. for Summ. J., at 23-24 [MDL Doc. 1559].

71　　*Actavis*, 570 U.S. at 157 ("The owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely seeks to prevent the risk of competition. And, as we have said, that consequence constitutes the relevant anticompetitive harm."). Candidly, it seems unlikely that many reverse payments will survive such scrutiny. Virtually all settlements are, to some extent, designed to avoid the risk of competition. *See also id.* at 173 (Roberts, C.J. dissenting) (Under the majority's opinion, "taking away any *chance* that a patent will be invalidated is itself an antitrust problem....") (emphasis in original).

72　　*Id.* at 158.

73　　*Id.* at 156.

74　　*See In re Lipitor Antitrust Litigation*, 868 F.3d 231, 251-52 (3d Cir. 2017) (articulating a similar standard at the motion to dismiss stage). Solvay argues that this amounts to a "quick look" test, which the Supreme Court expressly rejected in *Actavis*, 570 U.S. at 158-59, because all the FTC has to do is show that Solvay made a reverse payment. *See* Solvay Reply in Supp. of Mot. for Summ. J., at 9 [FTC Doc. 681]. But under this standard, the FTC has to prove much more than the simple fact that a reverse payment occurred; it also has to prove that the payment was "large" relative to traditional settlement concerns. *See In re K-Dur Antitrust Litig.*, No. 01CV1652SRCCLW, 2016 WL 755623, at *12 (D.N.J. Feb. 25, 2016) ("the burden must be on Plaintiffs to show that the settlement delayed the generic company's entry onto the market, that the brand-name company paid the generic company consideration of some kind, and that the consideration exchanged in the settlement exceeded the estimated cost of litigation and the costs of other services and products, in order to establish a prima facie case.").

75　　The two settlements actually contained multiple agreements within them. For example, the Solvay-Actavis settlement included three agreements: a Final Settlement and Release Agreement, a Patent License Agreement, and a Co-Promotion Agreement. FTC's SAMF ¶ 172 [FTC Doc. 689]. The parties do not argue that these should be considered separately, so for simplicity's sake, the Court will refer to the constituent agreements collectively, unless otherwise noted.

76　　FTC's SAMF ¶¶ 178-79, 181-82 [FTC Doc. 689]. Beginning at 60% in 2006, Actavis' share of AndroGel's profits was to increase over time to 70% by 2012. *Id.* at ¶ 181.

2018 WL 2984873, 2018-1 Trade Cases P 80,409

77    *Id.* at ¶¶ 307, 308.

78    *See* FTC's Resp. to Defs.' Mot. for Summ. J., at 8 [FTC Doc. 657].

79    *Id.*

80    *Id.*

81    *See, e.g.*, FTC's SAMF at ¶¶ 88, 100, 109, 133-34 [FTC Doc. 689].

82    *Id.* at ¶ 231.

83    *Id.* at ¶¶ 232-34.

84    Solvay's Reply in Support of its Mot. for Summ. J., at 3 [FTC Doc. 681].

85    FTC's SAMF at ¶¶ 278-81, 290-93 [FTC Doc. 689].

86    *Id.* at ¶¶ 290-96.

87    *Id.* at ¶¶ 131-33, 135, 139.

88    *Actavis*, 570 U.S. at 157 ("The owner of a particularly valuable patent might contend, of course, that even a small risk of invalidity justifies a large payment. But, be that as it may, the payment (if otherwise unexplained) likely seeks to prevent the risk of competition. And, as we have said, that consequence constitutes the relevant anticompetitive harm.").

89    *Id.* at 173 (Roberts, C.J. dissenting) (Under the majority's opinion, "taking away any *chance* that a patent will be invalidated is itself an antitrust problem....") (emphasis in original).

90    *Id.* at 157.

91    *Id.* at 159-60.

92    *Id.* at 156.

93    15 U.S.C. § 15(a).

94    *Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 535 n.31 (1983).

95    *Id.*

96    *Sunbeam Television Corp. v. Nielsen Media Research, Inc.*, 711 F.3d 1264, 1271 (11th Cir. 2013).

97    *Id.* at n.16 (quoting *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977) ).

98    *Brunswick*, 429 U.S. at 489.

99    *Sunbeam*, 711 F.3d at 1271.

100   *Wellbutrin Summary Judgment*, 133 F. Supp. 3d at 764 (quotations omitted).

101   *Id.* at 765 ("Where a regulation—such as patent law—precludes competition, that regulation cuts off the chain of causation.").

102    *See In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 63 (1st Cir. 2016) (stating that at-risk entry theories ultimately depend on the outcome of the patent litigation); *In re Wellbutrin*, 868 F.3d 132, 165 (3d Cir. 2017) [hereinafter *Wellbutrin Appeal*] (same); *Apotex, Inc. v. Cephalon, Inc.*, 2017 WL 2473148, at *8 (E.D. Pa. June 8, 2017) (same).

103    *FTC v. Watson*, 677 F.3d at 1315.

104    *See, e.g.*, *Wellbutrin Appeal*, 868 F.3d at 169 (finding that plaintiffs could not show generics would have won where expert testified they only had a 20% chance of winning).

105    For a discussion of why the size of the reverse payment does not serve well as a proxy for what the parties thought of the merits, *see Wellbutrin Appeal*, 868 F.3d at 167-69.

106    *Id.* at 169 (using the preponderance of the evidence standard with regard to the patent merits).

107    *Wellbutrin Appeal*, 868 F.3d at 169.

108    *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2018 WL 563144, at *14 (D. Mass. Jan. 25, 2018); *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund v. Teikoku Pharma USA, Inc. (Lidoderm)*, 296 F. Supp. 3d 1142, 2017 WL 50682533, at *5 (N.D. Cal. 2017). The Court views this standard as inappropriate because evidence that the Generics *could* have won gets us no closer than we are now to answering the question of whether the Generics *would* have been able to enter the market in a but-for world, or if a valid patent would *have* prevented them.

109    *Lidoderm*, 74 F. Supp. 3d 1052, 1063 (N.D. Cal. 2014).

110    *Lidoderm*, 296 F. Supp. 3d 1142, 2017 WL 50682533, at *28-29 (N.D. Cal. 2017).

111    *Wellbutrin Summary Judgment*, 133 F. Supp. 3d at 766-67.

112    *Actavis*, 570 U.S. at 159-60.

113    444 Parl Deb HC (5th ser.) (1947) col. 207.

114    *Actavis*, 570 U.S. at 158 (Defendants "may, as in other industries, settle in other ways, for example, by allowing the generic manufacturer to enter the patentee's market prior to the patent's expiration, without the patentee paying the challenger to stay out prior to that point.").

115    Solvay's Mot. for Summ. J., at 8 [Doc. 1566-1].

116    *Wellbutrin Summary Judgment*, 133 F. Supp. 3d at 757. On appeal, the Third Circuit agreed. *Wellbutrin Appeal*, 868 F.3d at 167 & n.57.

117    *Lidoderm*, 296 F. Supp. 3d 1142, 2017 WL 5068533, at *10-13.

118    *Solodyn*, 2018 WL 563144, at *21-23.

119    Goldstein Rep. ¶¶ 181, 193.

120    The Defendants do not move to exclude either Dr. Leffler or Prof. Elhauge.

121    Leffler Rep. ¶ 83 [Doc. 1564-22].

122    Elhauge Rep. ¶ 149 [Doc. 1564-31].

2018 WL 2984873, 2018-1 Trade Cases P 80,409

123 Private Pls.' SAMF ¶ 49 [Doc. 1598].

124 *Id.* at ¶¶ 15, 26.

125 *Id.* at ¶ 14.

126 Solvay's Mot. for Summ. J., at 33-34 [MDL Doc. 1566].

127 *Solodyn*, 2018 WL 563144, at *21.

128 *Lidoderm*, 296 F. Supp. 3d 1142, 2017 WL 5068533, at *34.

129 *Solodyn*, 2018 WL 563144, at *21.

130 Other courts have come to the same conclusion. *See, e.g.*, *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 752 (E.D. Pa. 2014) ("One can logically infer that, all else equal, with a [reverse payment], a generic would be willing to agree to a later entry date than it would otherwise agree to in order to settle a patent-infringement case.").

131 Par/Paddock's Mot. for Summ. J., at 16-18 [MDL Doc. 1559].

132 AndroGel 1.62% was developed in order to increase the ease of application and reduce drying time, thereby increasing patient satisfaction. *See* Solvay's Mot. for Summ. J., at 5 [MDL Doc. 1552].

133 Solvay's SMF ¶ 23 [MDL Doc. 1567-2].

134 *See* Solvay's Mot. for Summ. J., at 5 [MDL Doc. 1552].

135 Solvay's SMF ¶¶ 27, 29-30 [MDL Doc. 1567-2].

136 *Id.* at ¶¶ 30, 35.

137 Retailer Pls.' Resp. to Solvay's Mot. for Summ. J., at 1 [MDL Doc. 1610]. The Retailers do not allege that the introduction of AndroGel 1.62% was itself in anyway anticompetitive.

138 *Id.* at 5-6, 9.

139 Solvay's SMF ¶ 25 [MDL Doc. 1567-2].

140 Solvay's Mot. for Summ. J., at 4 [MDL Doc. 1567-1].

141 *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 286 (2d Cir. 1979).

142 It can potentially be a problem if brand name manufacturers tweak a drug and pull the older version off the shelf just as a generic is about to enter the market. This is the "product hopping" referenced above. It is problematic because it extends a manufacturer's monopoly at the expense of consumer choice. Again, however, the Retailers were clear that they were not pursuing this kind of theory. But even if they were, such an argument would have failed because Solvay never pulled AndroGel 1% off the shelf.

143 The FTC abandoned any damages claims it had when it applied for *certiorari* with the Supreme Court. *See* Petition for Writ of Certiorari, *FTC v. Watson Pharmaceuticals, Inc.*, 2012 WL 4750283, at *31 (U.S.) ("here the FTC seeks only declaratory and prospective injunctive relief....").

**In re Androgel Antitrust Litigation (No. II), Not Reported in Fed. Supp. (2018)**

2018 WL 2984873, 2018-1 Trade Cases P 80,409

144    *Int'l Salt Co. v. United States*, 332 U.S. 392, 400–01 (1947) *abrogated by Illinois Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28 (2006) (District Courts "are invested with large discretion to model their judgments to fit the exigencies of the particular case.").

145    *Id.* at 401.

146    *Id.*

147    *Fed. Trade Comm'n v. Nat'l Lead Co.*, 352 U.S. 419, 430 (1957) (Courts are "obliged not only to suppress the unlawful practice but to take such reasonable action as is calculated to preclude the revival of the illegal practices.").

148    *Int'l Salt Co.*, 332 U.S. at 400.

149    *Nat'l Lead Co.*, 352 U.S. at 430 ("... decrees often suppress a lawful device when it is used to carry out an unlawful purpose.").

150    *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 698 (1978).

---

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

2005 WL 3068206

2005 WL 3068206
Only the Westlaw citation is currently available.
United States District Court,
W.D. Texas, San Antonio Division.

KINETIC CONCEPTS, INC., KCI Licensing,
Inc., KCI USA, Inc. and Wake Forest
University Health Sciences Plaintiffs,
v.
BLUESKY MEDICAL CORPORATION, Medela AG,
Medela, Inc., and Patient Care Systems, Inc. Defendants.

No. SA-03-CA-0832 RF.
|
Nov. 1, 2005.

**Attorneys and Law Firms**

Kirt S. O'Neill, R. Laurence Macon, Akin, Gump, Strauss, Hauer Feld, San Antonio, TX, for Plaintiffs.

Randy McClanahan, McClanahan & Clearman, L.L.P., Trang Quoc Tran, Tran Law Firm, LLP, David M. Rodi, James R. Robinson, Elizabeth L. Durham, R. William Beard, Jr., Joseph P. Della Maria, Scott F. Partridge, Baker Botts LLP, Houston, TX, Thad Harkins, Attorney at Law, San Antonio, TX, Kevin J. Moore, Daniel Cummings, Kenneth P. Taube, Rothschild, Barry & Myers, Chicago, IL, Kevin M. Sadler, Baker Botts, LLP, Austin, TX, for Defendants.

ORDER GRANTING DEFENDANT
MEDELA AG AND MEDELA, INC.'S
MOTION FOR SUMMARY JUDGMENT ON
COUNT I OF PLAINTIFF'S COMPLAINT

FURGESON, J.

**\*1** BEFORE THE COURT is Defendant Medela AG and Medela Inc.'s Motion for Summary Judgment on Count I of Plaintiffs' Complaint (Docket No. 309) and Plaintiffs' Response to Medela AG and Medela, Inc.'s Motion for Summary Judgment on Count I of Plaintiffs' Complaint (Docket No. 251). After due consideration, the Court finds that Defendants' Motion should be GRANTED.

Background information concerning this patent infringement matter has been set forth previously in the Court's Order

Construing Patent '643 Claim Terms filed on June 28, 2005 (Docket No. 258).

STANDARD OF REVIEW

Summary judgment is appropriate if, after adequate time for discovery, no genuine issue as to any material facts exists, and the moving party is entitled to judgment as a matter of law. [1] Where the issue is one for which the nonmoving party bears the burden of proof at trial, it is sufficient for the moving party to identify those portions of the record which reveal the absence of a genuine issue of material fact as to one or more essential elements of the nonmoving party's claim. [2] The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." [3] To prevail on summary judgment, the moving party need only demonstrate that "there is an absence of evidence to support the nonmoving party's case." [4] Upon viewing the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party, the court, in order to grant summary judgment, must be satisfied that no rational trier of fact could find for the nonmoving party as to each element of his case. [5]

BREACH OF CONTRACT

*Introduction*

In Count I of their complaint, Plaintiffs allege Medela and its subsidiaries breached several contracts. The contracts at issue are the European Settlement Agreements (Agreements) entered into between KCI's European Affiliates and the Swiss, German, and Dutch affiliates of Medela. The Swiss and German Agreements were entered to settle patent protection actions that had been filed against those particular Medela entities, and the Dutch Agreement was entered pre-suit. Each Medela entity that entered into one of these Agreements agreed 1) to discontinue selling a VARIO type pump for use in the vacuum sealing of wounds and 2) to warn customers that the VARIO pump was not suitable for vacuum assisted closure of wounds and should not be used like KCI's VAC. Plaintiff KCI asserts that it entitled to enforce these Agreements either as a third-party beneficiary of the contracts or by virtue of assignment. Defendant Medela contends that KCI and its American affiliates have no standing to enforce these

2005 WL 3068206

European Settlement Agreements, but even if they did have standing, the contracts constitute illegal restraints of trade, and therefore, are unenforceable.

*Standing*

**\*2** To maintain an action for breach of contract, the "plaintiff must establish that he was in privity with the defendant at the time of the breach."[6] Plaintiff can establish privity by proving it was a third-party beneficiary under the contract.[7] The contract must "clearly and fully express" an intent to confer a direct benefit to the third party."[8] Texas courts refuse to imply a third-party beneficiary contract.[9] "If there is any reasonable doubt as to the intent of the contracting parties to confer a direct benefit on the third party, then the third-party beneficiary claim must fail."[10]

In the case at hand, Plaintiff KCI claims it is a third-party beneficiary of three separate settlement agreements ("European Agreements") entered into between Medela AG and Kinetic Concepts, Inc.'s European affiliates. At no time does Plaintiff KCI assert that it is the same entity as KCI Medical GmbH, KCI GmbH, or KCI Medical B.V. which each entered into the settlement agreements with Medela AG in Europe. Only the relevant European KCI affiliate is specifically referenced in each settlement agreement.

Plaintiff sets forth three arguments as summary judgment evidence to support its claim of standing as a third-party beneficiary. First, Plaintiff asserts that the general counsel for each of the KCI European affiliates, Dennis Noll, believed the European Agreements were executed for the benefit of Plaintiff. Plaintiff then asserts its status as a third-party beneficiary should be inferred because the term "KCI" is not expressly defined in any of the European Agreements. Last, Plaintiff argues that following the signing of the German Agreement, a Medela AG representative, Mr. Urs Tanner, "instructed Medela, Inc. not to market the VARIO pump as a wound treatment system in the U.S."[11] Therefore, Plaintiff asserts Medela AG necessarily believed that Plaintiff was a third-party beneficiary. None of the foregoing summary judgment evidence rises to the level of a clear and full expression of an intent to confer a benefit on a party. As a result, this Court finds Plaintiff was not a third-party beneficiary of the European Agreements.

Plaintiff further contends that it has standing to pursue a breach of contract claim by virtue of assignment. Plaintiff

asserts that each European KCI affiliate assigned its rights under the European Agreements to Plaintiff immediately following the execution of those Agreements. Plaintiff offers a declaration from Dennis Noll, general counsel of the KCI European affiliates, as summary judgment evidence in support of this claim.

A valid assignment of contractual rights may be achieved orally or in writing and requires no formalities.[12] Absent applicable statutory language, an effective assignment only requires the assignee to manifest a present intent to then and there assign its rights in the contract.[13] While logically it may seem that a written document evidencing the assignment of rights should have been created before March 2005, the Plaintiff gets the benefit of the doubt in the summary judgment context. In accordance with the summary judgment standard of review, viewing the facts in a light most favorable to Plaintiff, Plaintiff presented enough evidence that the assignment of rights under the European Agreements occurred prior to the lawsuit to present a genuine issue of material fact. Therefore, this Court finds Plaintiff does have standing by virtue of assignment to pursue a claim of breach of contract. The court therefore DENIES Defendants' Motion for Summary Judgment on Plaintiffs' Breach of Contract claim based on a lack of standing.

*Illegal Restraints on Trade*

**\*3** Section 1 of the Sherman Act bars contracts in restraint of trade.[14] The Sherman Act does not prohibit all restraints on trade but rather unreasonable restraints on competition. Courts usually apply the Supreme Court's "rule of reason" analysis to determine the reasonableness of a particular agreement.[15] Application of the "rule of reason" involves "consideration of the facts peculiar to the business in which the restraint is applied, the nature of the restraint and its effects, and the history of the restraint and the reasons for its adoption."[16] The Supreme Court also developed a body of law under which certain types of restraints are "per se" violations of the Sherman Act without any inquiry into the reasonableness of the restraint.[17] The *Topco* Court elaborated on per se violations stating that "[i]t is only after considerable experience with certain business relationships that courts classify them per se violations of the Sherman Act."[18]

In explaining the necessity of per se rules, Justice Black once stated that they "avoid the necessity for an incredibly complicated and prolonged economic investigation into the

Kinetic Concepts, Inc. v. Bluesky Medical Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3068206

entire history of the industry involved...." [19] Applying the rule of reason to determine if a contract is in violation of the Sherman Act is a highly fact-intensive inquiry, requiring the fact finder to "weigh all the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." [20] This Court is of the opinion that the fact-specific nature of determining whether the European Agreements are in violation of the Sherman Act renders this issue inappropriate for resolution by summary judgment under either a per se or rule of reason analysis.

Black's Law Dictionary defines a covenant not to compete as "[a]n agreement, generally part of a contract of employment or a contract to sell a business, in which the covenantor agrees for a specific period of time and within a particular area to refrain from competition with the covenantee. Such covenant restrictions must be reasonable in scope and duration or backed by adequate consideration." [21] If a contract qualifies as a covenant not to compete, then it is subject to the restrictions of section 15.50 of the Texas Business and Commerce Code. Enforceability under section 15.50 requires that the covenant not to compete be "ancillary to or part of an otherwise enforceable agreement" and any time, geographic area, or scope of activity limitations must be reasonable. [22] Texas law considers covenants not to compete to be restraints on trade and unenforceable as a matter of public policy unless the restraints are reasonable. [23]

Defendants argue that the European Agreements are unenforceable covenants not to compete under TEX. BUS. & COMM.CODE § 15.50. Defendants claim that because the European Agreements contain a provision in which Medela AG agrees not to sell the VARIO pump for the vacuum assisted closure of wounds, the agreement must therefore be a non-competition agreement. Plaintiffs believe that TEX. BUS. & COMM.CODE § 15.50 is inapplicable to these agreements. Instead, Plaintiffs assert that the European Agreements are not covenants not to compete at all, but rather litigation settlement agreements that do not purport to prevent Defendants from competing.

*4 KCI's general counsel, Dennis Noll, testified in a declaration that the German and Swiss Agreements were obtained after false advertising/patent infringement litigation was initiated by KCI; the Dutch Agreement was signed pre-suit. Mr. Noll testified that in each case Medela AG admitted that the VARIO pump was not suitable for vacuum

assisted closure of wounds and agreed to cease and desist advertising and selling it for that purpose. Additionally, Mr. Noll asserted that the "purpose of the Agreements and the Statements was to resolve legitimate disputes between KCI and Medela concerning Medela's anticompetitive conduct and the protection of KCI's patents." [24] As a result, Plaintiffs claim that even if the Agreements are found to be non-competition agreements, they are ancillary to valid litigation settlement agreements. Further, Mr. Noll stated in his declaration that Defendants did not request time or geographic limitations in either the German or Swiss Agreements, and that he declined their request to limit the Dutch Agreement to the Netherlands.

Viewing the evidence in the light most favorable to the non-movants, Plaintiffs presented enough evidence to raise a genuine issue of material fact as to: (1) whether the European Agreements are covenants not to compete, (2) if they are, whether they are in violation of Texas law, and (3) whether the restraints are unreasonable such that enforcement would violate public policy. As a result, this Court DENIES Defendants' motion for summary judgment on the basis that the European Agreements constitute illegal restraints of trade.

*The Breach Element*

A breach of contract claim requires proof of the following elements: "(1) the existence of a valid contract, (2) performance or tendered performance by the plaintiff, (3) breach of the contract by the defendant, and (4) resulting damages to the plaintiff." [25] Defendants claim that Plaintiffs cannot establish the breach element of their breach of contract claim. Defendants' assert that Plaintiffs can only show they sold the VARIO pump to Blue Sky, and that in and of itself does not constitute a breach of the Agreements. On the other hand, Plaintiffs contend that by selling the VARIO pump to Blue Sky knowing that Blue Sky was buying it for the sole purpose of selling it for use in negative wound pressure therapy is an explicit breach of the Agreement. Viewing the evidence in the light most favorable to the non-moving party, Plaintiffs have presented enough evidence to raise a genuine issue of material fact as to whether Medela AG breached the European Agreements.

However, Plaintiffs have not presented sufficient evidence that Defendant Medela, Inc. is a party to the European Agreements. Plaintiffs claim that Medela, Inc. is a party to the European Agreements in the same way that Plaintiffs were third-party beneficiaries to those same Agreements.

Appendix of Authorities: 92 of 180

Kinetic Concepts, Inc. v. Bluesky Medical Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3068206

However, as discussed previously in this order, Texas courts will not imply a third-party beneficiary relationship. Medela AG was the only party to sign the Agreements, and there are no explicit provisions binding any entity other than Medela AG. Plaintiffs contend that binding Medela AG also binds its subsidiaries, which may be true. But, Plaintiffs have failed to present sufficient evidence that Medela, Inc. is in fact a subsidiary of Medela AG. As a result, this court GRANTS Defendants' Motion for Summary Judgment on Plaintiffs' Claim for Breach of Contract as to Defendant Medela, Inc.

*Vagueness and Indefiniteness*

**\*5** Defendants contend the European Agreements are too vague or indefinite to be enforced as contracts. As Defendants identify, Texas law requires agreements to be definite enough to reasonably fix the obligations of the parties in order to be enforceable as contracts.[26] The terms of a contract must be "expressed with sufficient certainty so that there will be no reasonable doubt as to what the parties intended or what the court is being called upon to enforce."[27] Additionally, the terms of the contract must be "sufficiently certain so that neither party can reasonably misunderstand them."[28] Whether a contract fails on the basis of being too indefinite is a question of law.[29]

Plaintiffs contend that even though there is no specific statement about the time and geographic scope of the Agreements, the Agreements are still sufficiently definite as to those elements. Plaintiffs argue that their position is supported by the fact that after the German Agreement was signed, Urs Tanner "instructed Medela, Inc. not to market the VARIO pump as a wound treatment system in the U.S."[30] Therefore, Plaintiffs reason, the Agreements must apply globally. The Court does not find this argument persuasive. Plaintiffs' interpretation of the terms of the contract based on a Medela employee's behavior does not qualify as contract terms that are "sufficiently certain so that neither party can reasonably misunderstand them."[31] None of the Agreements contain a time or geographic scope limitation. This omission leaves the Court with more than a reasonable doubt as to what the parties intended and what it is supposed to enforce. Therefore, this Court finds that the European Agreements rise to the level of vagueness or indefiniteness so as to fail for that reason as a matter of law. Defendants' Motion for Summary Judgment on Plaintiffs' Breach of Contract Claim on the basis of vagueness or indefiniteness is GRANTED.

CONCLUSION

Accordingly, the Court ORDERS that Defendant Medela AG and Medela, Inc.'s Motion for Summary Judgment on Count I of Plaintiffs' Complaint (Docket No. 309) be GRANTED. It is SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 3068206

---

**Footnotes**

1      Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

2      *Celotex,* 477 U.S. at 323-24.

3      *Id.* at 324.

4      *Id.* at 325.

5      *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

6      *Broadnax v. Kroger Texas, L.P.,* No. 05-04-01306-CV, 2005 WL 2031783 at *11 (Tex.App.-Dallas Aug.24, 2005).

7      *Id.*

Kinetic Concepts, Inc. v. Bluesky Medical Corp., Not Reported in F.Supp.2d (2005)

2005 WL 3068206

8      *Stine v. Stewart,* 80 S.W.3d 586, 589 (Tex.2002).

9      *Id.*

10     *Braodnax,* at *13.

11     Docket No. 251 at III.A.1.

12     *U.S. v. Central Gulf Lines, Inc.,* 974 F.2d 621, 630 (5th Cir.1992) (citing Restatement (Second) of Contracts § 324, at 37 (1981)).

13     *Id.*

14     15 U.S.C. § 1.

15     *Oil Co. v. Khan,* 552 U.S. 3, 20, 118 S.Ct. 275, 284, 139 L.Ed.2d 199, ---- (1997).

16     *Chicago Bd. of Trade v. U.S.,* 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).

17     *U.S. v. Topco Assoc., Inc.,* 405 U.S. 596, 607, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972).

18     *Id.* at 607-08.

19     *N. Pac. R. Co. v. U.S.,* 365 U.S. 1, 5, 78 S.Ct. 514, 518 (1958).

20     *Cont'l T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977).

21     BLACK'S LAW DICTIONARY 364 (6th ed.1990).

22     TEX. BUS. & COMM.CODE § 15.50.

23     *Wright v. Sport Supply Group, Inc.,* 137 S.W.3d 289, 298 (Tex.App.-Beaumont 2004).

24     Declaration of Dennis Noll in Support of Plaintiffs' Response to Medela AG and Medela, Inc.'s Motion for Summary Judgment on Count One of Plaintiffs' Complaint at ¶ 17.

25     *Harris v. Am. Prot. Ins. Co.,* 158 S.W.3d 614, 622-23 (Tex.App.Fort Worth 2005, no pet.).

26     *Richter, S.A. v. Bank of Am. Nat'l Trust and Sav. Ass'n,* 939 F.2d 1176, 1196 (5th Cir.1991).

27     *Wiley v. H.H. Bertelsen, M.D.,* 770 S.W.2d 878, 882 (Tex.App.Texarkana 1989, no writ) (citing Kirkwood and Morgan, Inc. v. Roach, 360 S.W.2d 173 (Tex.App. San Antonio 1962, writ ref'd n.r.e.).

28     *Id.* (citing Moore v. Mohon, 514 S.W.2d 508 (Tex.App. Waco 1974, no writ).

29     *Richter, S.A.,* 939 F.2d at 1196.

30     Pl. Response to Def. MSJ (Docket No. 251) at p. 8.

31     *Wiley v. H.H. Bertelsen, M.D.,* 770 S.W.2d 878, 882 (Tex.App.Texarkana 1989, no writ) (citing Kirkwood and Morgan, Inc. v. Roach, 360 S.W.2d 173 (Tex.App. San Antonio 1962, writ ref'd n.r.e.).

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

2019 WL 2078788
United States District Court, N.D. California,
San Francisco Division.

Djeneba SIDIBE, et al., Plaintiffs,
v.
SUTTER HEALTH, Defendant.

Case No. 12-cv-04854-LB
|
Signed 04/12/2019
|
Filed 05/09/2019

**Attorneys and Law Firms**

Azra Z. Mehdi, The Mehdi Firm PC, Allan Howard Steyer, Donald Scott MacRae, Jill Michelle Manning, Laura Lee Gildengorin, Suneel Jain, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, Charles Ralph Jaeger, David C. Brownstein, David Mark Goldstein, Esq., William S. Farmer, Farmer Brownstein Jaeger & Goldstein LLP, Eric A. Grover, Keller Grover LLP, San Francisco, CA, Todd Michael Schneider, Kyle Geoffrey Bates, Schneider Wallace Cottrell Konecky Wotkyns LLP, Emeryville, CA, Ankur Kapoor, Axel Bernabe, Pro Hac Vice, Rosa Morales, Pro Hac Vice, Matthew L. Cantor, Jean Kim, Pro Hac Vice, Constantine Cannon LLP, New York, NY, Justin Wyatt Fore, Constantine Cannon LLP, Washington, DC, for Plaintiff Djeneba Sidibe.

Todd Michael Schneider, Kyle Geoffrey Bates, Schneider Wallace Cottrell Konecky Wotkyns LLP, Emeryville, CA, Allan Howard Steyer, Donald Scott MacRae, Jill Michelle Manning, Suneel Jain, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, Charles Ralph Jaeger, David C. Brownstein, David Mark Goldstein, Esq., William S. Farmer, Farmer Brownstein Jaeger & Goldstein LLP, Azra Z. Mehdi, The Mehdi Firm PC, San Francisco, CA, Ankur Kapoor, Axel Bernabe, Pro Hac Vice, Rosa Morales, Pro Hac Vice, Matthew L. Cantor, Jean Kim, Pro Hac Vice, Constantine Cannon LLP, New York, NY, Justin Wyatt Fore, Constantine Cannon LLP, Washington, DC, for Plaintiff Jerry Jankowski.

Azra Z. Mehdi, The Mehdi Firm PC, David C. Brownstein, David Mark Goldstein, Esq., Farmer Brownstein Jaeger & Goldstein LLP, Jill Michelle Manning, Suneel Jain, Steyer Lowenthal Boodrookas Alvarez & Smith LLP, San Francisco, CA, Jean Kim, Matthew L. Cantor, Constantine Cannon PC, New York, NY, for Plaintiff Johnson Pool & Spa.

Emilio Eugene Varanini, IV, State Attorney General's Office, David C. Brownstein, David Mark Goldstein, Esq., Farmer Brownstein Jaeger & Goldstein LLP, San Francisco, CA, for Plaintiff People of the State of California.

Jeffrey Alan LeVee, Evan B. McGinley, Jones Day, Los Angeles, CA, Oliver Quinn Dunlap, Patrick Martin Ryan, Robert H. Bunzel, Bartko Zankel Bunzel & Miller, Benjamin Chung Lee, Caroline Nason Mitchell, David Craig Kiernan, Matthew James Silveira, Jones Day, San Francisco, CA, Brian G. Selden, Catherine Tara Zeng, Jones Day, Palo Alto, CA, Caroline Owens Van Wagoner, Jones Day, San Diego, CA, Christopher Henry Domingo, Pro Hac Vice, Jones Day, Houston, TX, Jason Corbitt Wright, Jones Day, LA, CA, John Andrew Sharp Whittaker, Stephen L. Goff, King & Spalding LLP, Sacramento, CA, for Defendant.

**(REDACTED) ORDER (1) GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, (2) DENYING IN PART AND DENYING AS MOOT IN PART DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERT, AND (3) DENYING AS MOOT PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT**

Re: ECF Nos. 272, 311-1 (under seal) and 494-2 (redacted version), 409-3 (under seal) and 503 (redacted version)

LAUREL BEELER, United States Magistrate Judge

**TABLE OF CONTENTS**

**\*1** INTRODUCTION...——

BACKGROUND...——

1. Antitrust and Markets Generally...——
1.1 "Market Power"...——

1.2 "Market"...——

1.3 "Tying"...——

1.4 Requirement to Define the Relevant Market...——

1.5 The "Hypothetical Monopolist" Test for Defining a Relevant Geographic Market...——

Case 4:23-cv-03560 Document 331-82 Filed 03/30/26 in TXSD Page 98 of 182

**Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)**

2019 WL 2078788, 2019-1 Trade Cases P 80,765

2. Health-Care Buyers, Sellers, and Markets...——
2.1 Hospitals Sell Hospital Services to Health Plans...——

2.2 Health Plans Sell Health Insurance to Individuals and Employers...——

2.3 Hospitals Attract Health-Plan Enrollees...——

2.4 The Relevant Product Market Is the Market for Hospitals Selling Inpatient Hospital Services to Health Plans...——

STATEMENT...——

1. The *Dartmouth Atlas of Health Care* and "Hospital Service Areas"...——

2. The Candidate Tying Markets...——
2.1 The Antioch HSA...——

    2.1.1 Overview...——

    2.1.2 Knox-Keene Act...——

    2.1.3 Blue Shield redirection analysis...——

    2.1.4 Other evidence...——

2.2 The Auburn HSA...——

    2.2.1 Overview...——

    2.2.2 Knox-Keene Act...——

    2.2.3 Blue Shield redirection analysis...——

    2.2.4 Other evidence...——

2.3 The Crescent City HSA...——

    2.3.1 Overview...——

    2.3.2 Knox-Keene Act...——

    2.3.3 Blue Shield redirection analysis...——

    2.3.4 Other evidence...——

2.4 The Jackson HSA...——

    2.4.1 Overview...——

    2.4.2 Knox-Keene Act...——

    2.4.3 Blue Shield redirection analysis...——

    2.4.4 Other evidence...——

2.5 The Lakeport HSA...——

    2.5.1 Overview...——

    2.5.2 Knox-Keene Act...——

    2.5.3 Blue Shield redirection analysis...——

    2.5.4 Other evidence...——

2.6 The Tracy HSA...——

    2.6.1 Overview...——

    2.6.2 Blue Shield redirection analysis...——

    2.6.3 Other evidence...——

2.7 The Combined Berkeley-Oakland HSAs...——

    2.7.1 Overview...——

    2.7.2 Blue Shield redirection analysis...——

    2.7.3 Other evidence...——

3. The Candidate Tied Markets...——
3.1 The Modesto HSA...——

    3.1.1 Overview...——

    3.1.2 Dr. Chipty's analyses...——

3.2 The Sacramento HSA...——

    3.2.1 Overview...——

    3.2.2 Dr. Chipty's analyses...——

3.3 The San Francisco HSA...——

    3.3.1 Overview...——

    3.3.2 Dr. Chipty's analyses...——

3.4 The Santa Rosa HSA...——

    3.4.1 Overview...——

2019 WL 2078788, 2019-1 Trade Cases P 80,765

3.4.2 Dr. Chipty's analyses...——

STANDARD OF REVIEW...——

ANALYSIS...——

1. Framing the Issues...——
1.1 As Applied Here, the Hypothetical-Monopolist Test Focuses on How Health Plans, as Opposed to Patients, Would Respond to a Monopolist Hospital...——

1.2 At Summary Judgment, the Plaintiffs Do Not Have to Establish Definitively That Their Candidate Markets Are Relevant Geographic Markets or Exclude All Other Possible Geographic Markets...——

1.3 At Summary Judgment, There Is No Per Se Requirement for the Plaintiffs to Present Expert Testimony or an Econometric Analysis in Support of Their Candidate Markets...——

2. Selecting Initial Candidate Markets for the Hypothetical-Monopolist Test...——

3. The Candidate Tying Markets...——

   3.1.1 Blue Shield redirection analysis...——

   3.1.2 Knox-Keene Act...——

   3.1.3 Other evidence...——

4. The Candidate Tied Markets...——

CONCLUSION...——

## INTRODUCTION

In this putative class action, seven plaintiffs (five individuals who enrolled in health insurance from the health plans Aetna, Anthem Blue Cross, and Blue Shield, and two companies that paid for health insurance for their employees) are suing Sutter Health, which owns and operates a network of hospitals and medical-service providers in Northern California, for violations of the federal Sherman Antitrust Act, the California Cartwright Act, and the California Unfair Competition Law.

**\*2**  The plaintiffs allege that Sutter has "market power" in eight specific "geographic markets" (the "Candidate Tying Markets") in Northern California, where Sutter's hospitals are either the only hospital in the market (i.e., a monopoly) or the predominant provider in the market. [1] The plaintiffs allege that in order for health plans like Aetna, Anthem Blue Cross, and Blue Shield to assemble health-insurance products that are commercially marketable to individuals and to employers purchasing insurance for their employees, health plans must have those Sutter hospitals in their provider networks. [2] The plaintiffs allege that Sutter imposes "all or nothing" terms on health plans, telling health plans that they cannot include those hospitals as in-network providers unless they also accept as in-network providers Sutter's hospitals in four other geographic markets (the "Candidate Tied Markets") at the prices that Sutter dictates. [3] The plaintiffs allege that Sutter charges supra-competitive rates at its hospitals in the Candidate Tied Markets. [4] Because Sutter has tied access to the "must have" hospitals in the Candidate Tying Markets to acceptance of its supra-competitive rates for its hospitals in the Candidate Tied Markets, Sutter forces health plans to pay higher rates for hospital services than they otherwise would pay but for this tying arrangement [5] —higher rates that in turn are passed downstream to individuals and employers who buy health insurance. [6]

Sutter moves for summary judgment on the ground that the plaintiffs have not met their burden of establishing that their proposed Candidate Markets are properly defined "geographic markets" for antitrust purposes. [7] In their complaint, the plaintiffs define their Candidate Markets by reference to "Hospital Service Areas" ("HSAs") as set out in an industry source called the *Dartmouth Atlas of Health Care* ("*Dartmouth Atlas*"). [8] Sutter argues that *Dartmouth Atlas* HSAs do not define geographic markets for antitrust purposes, citing the report of its expert Dr. Gautam Gowrisankaran. The plaintiffs respond that documents and testimony (from health plans and from Sutter) and the competing report of their expert Dr. Tasneem Chipty support their position that their Candidate Markets are relevant geographic markets for antitrust purposes. Both sides have filed cross-motions to exclude the other side's expert. [9]

The court holds that there are disputes of material fact about whether the plaintiffs can establish that their Candidate Markets are properly defined geographic markets for antitrust purposes. [10] The court grants summary judgment with respect to the Davis HSA Candidate Tying Market and otherwise denies Sutter's motion for summary judgment. The court

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

denies in part and denies as moot in part Sutter's motion to exclude Dr. Chipty and denies as moot the plaintiffs' motion to exclude Dr. Gowrisankaran.

## BACKGROUND

### 1. Antitrust and Markets Generally

#### 1.1 "Market Power"

"Market power is the ability to raise price profitably by restricting output." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2288 (2018) (emphasis removed) (quoting Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 5.01 (4th ed. 2017)). "A defendant firm has market power if it can raise price without a total loss of sales." Philip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application ¶ 5.01 (4th ed. 2018) (Areeda & Hovenkamp). "[T]he substantial market power that concerns antitrust law arises when the defendant (1) can profitably set prices well above its costs and (2) enjoys some protection against rival[s'] entry or expansion that would erode such supracompetitive prices and profits." *Id.* "For antitrust purposes, therefore, market power is the abilities (1) to price substantially above the competitive level and (2) to persist in doing so for a significant period without erosion by new entry or expansion." *Id.* (emphasis removed).

#### 1.2 "Market"

**\*3** " '[A] market is the group of sellers or producers who have the actual or potential ability to deprive each other of significant levels of business.' " *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) (quoting *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995)). "To define a market is to identify those producers providing customers of a defendant firm (or firms) with alternative sources for the defendant's product or service." Areeda & Hovenkamp ¶ 530a.

A market for antitrust purposes includes both a "product market" and a "geographical market." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (citing *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999)). The relevant product market " 'must encompass the product at issue as well as all economic substitutes for the product.' " *Id.* (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008)). The relevant geographic

market "is the 'area of effective competition where buyers can turn for alternate sources of supply.' " *St. Luke's*, 778 F.3d at 784 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th Cir. 1991)). "A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are not likely to shift promptly to offer defendant's customers a suitably proximate (in both product and geographic terms) alternative." Areeda & Hovenkamp ¶ 530a.

#### 1.3 "Tying"

This case involves allegations of an anticompetitive restraint known as "tying." "A tying arrangement is a device used by a seller with market power in one product market to extend its market power to a distinct product market." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 912 (9th Cir. 2008) (citing *Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003)). "To accomplish this objective, the seller conditions the sale of one product (the tying product) on the buyer's purchase of a second product (the tied product)." *Id.* (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 561 (1992); Richard A. Posner, Antitrust Law 197 (2d ed. 2001)). " 'The essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.' " *Id.* at 913–14 (emphasis removed, internal brackets omitted) (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 12 (1984)). "Tying arrangements are forbidden on the theory that, if the seller has market power over the tying product, the seller can leverage this market power through tying arrangements to exclude other sellers of the tied product." *Id.* at 912 (citing *Jefferson Parish*, 466 U.S. at 14; *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 517–18 (1969) (White, J., dissenting)).

#### 1.4 Requirement to Define the Relevant Market

"[I]n all cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 46 (2006). In the context of a tying claim under Section 1 of the Sherman Antitrust Act, whether a defendant has market power "cannot be evaluated unless the Court first defines the relevant market." *Am. Express*, 138 S. Ct. at 2285 & n.7.[11]

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

**\*4** "Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one." *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962). "An element of 'fuzziness would seem inherent in any attempt to delineate the relevant geographical market.' " *United States v. Conn. Nat'l Bank*, 418 U.S. 656, 669 (1974) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 350, 360 n.37 (1963)). The boundaries of a relevant geographic market "need not ... be defined with scientific precision," *id.*, or "by metes and bounds as a surveyor would lay off a plot of ground," *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966). Rather, the relevant geographic market should " 'correspond to the commercial realities' of the industry and be economically significant." *Brown Shoe*, 370 U.S. at 336–37. "Thus, although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area." *Id.* (citing cases).

### 1.5 The "Hypothetical Monopolist" Test for Defining a Relevant Geographic Market

"A common method to determine the relevant geographic market ... is to find whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ('SSNIP') in the proposed market." *St. Luke's*, 778 F.3d at 784; *accord FTC v. Advocate Health Care Network*, 841 F.3d 460, 468 (7th Cir. 2016); *FTC v. Penn State Hershey Med. Ctr.*, 838 F.3d 327, 338 (3d Cir. 2016). This hypothetical-monopolist test "asks what would happen if a single firm became the only seller in a candidate geographical region." *Advocate Health*, 841 F.3d at 468 (citing *FTC v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008)). "If that hypothetical monopolist could profitably raise prices above competitive levels, the region is a relevant geographical market." *Id.* (citing Kenneth G. Elzinga & Anthony W. Swisher, *Limits of the Elzinga-Hogarty Test in Hospital Mergers: The Evanston Case*, 18 Int'l J. of the Econ. of Bus. 133, 136 (2011)). "But if customers would defeat the attempted price increase by buying from outside the region, it is not a relevant market; the test should be rerun using a larger candidate region." *Id.* (citing *St. Luke's*, 778 F.3d at 784; *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277–78 (6th Cir. 2014)). Courts have recognized that a hypothetical monopolist's ability to impose a SSNIP of five percent may satisfy the hypothetical-monopolist test. *Penn State Hershey*, 838 F.3d at 338 nn.1–2 (citing U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizonal Merger Guidelines* § 4.1.2 (2010); *St. Luke's*, 778 F.3d at 784 n.9).

Analyzing how buyers would respond to a hypothetical-monopolist seller's imposing a SSNIP requires defining the buyers and sellers in the relevant market.

### 2. Health-Care Buyers, Sellers, and Markets

"The market for hospital services and medical care is complex." *Cascade Health*, 515 F.3d at 891. There are at least three transactions involved in providing hospital services and health care in connection with health insurance.

#### 2.1 Hospitals Sell Hospital Services to Health Plans

First, hospitals sell hospital services to health-insurance plans. Hospitals and health plans negotiate whether a given hospital will be included in the health plan's network and negotiate the rates that the health plan will pay the hospital for its hospital services. *St. Luke's*, 778 F.3d at 784 & n.10 (citing Gregory Vistnes, *Hospitals, Mergers, and Two-Stage Competition*, 67 Antitrust L.J. 671, 672, 674 (2000)). These negotiations are highly price-sensitive. *Advocate Health*, 841 F.3d at 465 (citing Vistnes, 67 Antitrust L.J. at 674–75). All else being equal, hospitals prefer higher rates and health plans prefer lower rates. *Cascade Health*, 515 F.3d at 892 ("Insurers are usually commercial health insurance companies that seek to buy medical services from hospitals on the best terms possible.... It follows that hospitals prefer high reimbursement rates and insurers prefer low reimbursement rates, as each group pursues its own economic interest.").

**\*5** While hospital services are delivered to the health plan's enrollees (i.e., patients), the health plan negotiates whether a hospital will be included in the health plan's provider network and buys the services that the hospital sells. *Cascade Health*, 515 F.3d at 892 ("Hospitals ... provide services to patients and sell services to insurers."); *see St. Luke's*, 778 F.3d at 784 ("the vast majority of health care consumers are not direct purchasers of health care — [(1)] the consumers purchase health insurance and [(2)] the insurance companies negotiate directly with the providers," such as hospitals); *Advocate Health*, 841 F.3d at 470 ("[C]onsumers do not directly pay the full cost of hospital care. Instead, insurance companies cover most hospital costs.") (citing Elzinga & Swisher, 18 Int'l J. of the Econ. of Bus. at 138); *Penn State Hershey*, 838 F.3d at 342 ("[P]atients, in in large part, do not feel the impact of price increases. Insurers do. And they are the ones who negotiate directly with the hospitals to determine both reimbursement rates and the hospitals that will be included in their networks."). [12]

Appendix of Authorities: 99 of 180

### 2.2 Health Plans Sell Health Insurance to Individuals and Employers

Second, health plans sell health insurance to consumers. The consumers are individuals (who directly purchase health insurance for themselves or their families) and employers (which purchase health insurance for their employees). *Cascade Health*, 515 F.3d at 892; *St. Luke's*, 778 F.3d at 784. Health plans' selling of insurance to employers may be further divided into two transactions. Gregory S. Vistnes & Yianis Sarafidis, *Cross-Market Hospital Mergers: A Holistic Approach*, 79 Antitrust L.J. 253, 266 (2013). First, health plans compete to be one of a limited number of health plans that employers offer to their employees. *Id.* at 266–67. Second, after employers select them, health plans compete to be chosen by employees. *Id.* at 267; *accord* Vistnes, 67 Antitrust L.J. at 678 ("A health plan must ensure not only that employees will choose the plan if offered, but also that employers will choose to offer it.").

An important way that health plans compete for consumers is their provider networks: the hospitals, physicians, and ancillary providers that the health plan offers "in network" and that enrollees are encouraged to use. Vistnes & Sarafidis, 79 Antitrust L.J. at 267. All else being equal, a health plan with a more comprehensive provider network will be more attractive to consumers. *Id.* At the same time, health plans that have high-priced providers in their networks have higher costs. *Id.* Thus, in choosing how inclusive their provider network is, health plans balance the benefit of more comprehensive networks with the costs of paying more to providers in their networks. *Id.*

### 2.3 Hospitals Attract Health-Plan Enrollees

Third, hospitals seek to attract health-plan enrollees who need hospital services to come to them (as opposed to other hospitals). *St. Luke's*, 778 F.3d at 784 n.10 (citing Vistnes, 67 Antitrust L.J. at 681–82); *Advocate Health*, 841 F.3d at 460 (citing Vistnes, 67 Antitrust L.J. at 672); *Penn State Hershey*, 838 F.3d at 342 (citing Vistnes, 67 Antitrust L.J. at 672).

Unlike health plans, which are sensitive to the prices that hospitals charge for their services, enrollees "are 'largely insensitive' to price" because the prices that hospitals charge are largely borne by the enrollees' health plans, not by the enrollees. *St. Luke's*, 778 F.3d at 784 n.10 (citing Vistnes, 67 Antitrust L.J. at 682); *accord Advocate Health*, 841 F.3d at 471 ("Insured patients are usually not sensitive to retail hospital prices, while insurers respond to both prices and patient preferences.") (citing Vistnes, 67 Antitrust L.J. at 677, 680); *Penn State Hershey*, 838 F.3d at 342 ("Patients are largely insensitive to healthcare prices because they utilize insurance, which covers the majority of their healthcare costs."). Instead of taking price into account, enrollees choose hospitals "based mostly on non-price factors, such as location or quality of services." *Penn State Hershey*, 838 F.3d at 341; *accord St. Luke's*, 778 F.3d at 784 n.10 (citing Vistnes, 67 Antitrust L.J. at 682); *Advocate Health*, 841 F.3d at 465 (citing Vistnes, 67 Antitrust L.J. at 677, 682). [13]

### 2.4 The Relevant Product Market Is the Market for Hospitals Selling Inpatient Hospital Services to Health Plans

**\*6** The plaintiffs plead in their complaint both (1) a relevant product market for hospitals selling inpatient hospital services to commercial health plans [14] and (2) a relevant product market for health plans selling health insurance to individuals and employers. [15]

Sutter moves for summary judgment on the ground that the plaintiffs have not established the relevant geographic markets for the first product market: the market for hospitals selling inpatient hospital services to health plans. [16] In this motion, Sutter does not challenge any product-market definition or the geographic markets for health plans selling health insurance to individuals and employees. [17]

### STATEMENT

In their complaint, the plaintiffs propose twelve Candidate Markets: eight Candidate Tying Markets and four Candidate Tied Markets. [18] The eight Candidate Tying Markets are:

1. the Antioch HSA, as defined in the *Dartmouth Atlas*, [19]

2. the Auburn HSA, as defined in the *Dartmouth Atlas*, [20]

3. the Crescent City HSA, as defined in the *Dartmouth Atlas*, [21]

4. the Davis HSA, as defined in the *Dartmouth Atlas*, [22]

5. the Jackson HSA, as defined in the *Dartmouth Atlas*, [23]

6. the Lakeport HSA, as defined in the *Dartmouth Atlas*, [24]

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

7. the Tracy HSA, as defined in the *Dartmouth Atlas*,[25] and

8. the Berkeley HSA, as defined in the *Dartmouth Atlas*,[26] combined with the Oakland HSA, as defined in the *Dartmouth Atlas*.[27]

The four Candidate Tied Markets are:

1. the Modesto HSA, as defined in the *Dartmouth Atlas*,[28]

2. the Sacramento HSA, as defined in the *Dartmouth Atlas*,[29]

3. the San Francisco HSA, as defined in the *Dartmouth Atlas*,[30] and

4. the Santa Rosa HSA, as defined in the *Dartmouth Atlas*.[31]

**\*7** The following map, taken from the plaintiffs' Fourth Amended Complaint, identifies the geographic layout of the Candidate Tying Markets (in red) and the Candidate Tied Markets (in green).



[**Editor's Note:** The preceding image contains the reference for footnote [32] ].

At the hearing on Sutter's motion for summary judgment, the plaintiffs stipulated that summary judgment should be granted with respect to the Davis HSA.[33]

**1. The *Dartmouth Atlas of Health Care* and "Hospital Service Areas"**

The plaintiffs define their Candidate Markets by reference to "Hospital Service Areas," or "HSAs," set out in the *Dartmouth Atlas*, an industry source compiled by the Dartmouth Institute for Health Policy & Clinical Practice and available at http://www.dartmouthatlas.org.[34] The following summarizes the *Dartmouth Atlas*'s identification of HSAs.[35]

In 1996, the Center for the Evaluative Clinical Sciences at Dartmouth Medical School published the first edition of the *Dartmouth Atlas*.[36] The *Dartmouth Atlas* defined 3,436 "Hospital Service Areas," or "HSAs," that (according to the *Dartmouth Atlas* group) represented " 'the geographic boundaries of naturally occurring health care markets in the United States.' "[37] The *Dartmouth Atlas* identified these HSAs through a three-step process that used the location of acute-care hospitals in the United States in 1992 and Medicare patient-discharge data for 1992 and 1993.[38]

First, each acute-care hospital in the United States in 1992 was assigned to the town or city where it was located.[39] The 3,953 towns or cities that contained at least one acute-care hospital were defined as "candidate HSAs."[40]

Second, using Medicare patient-discharge data for 1992 and 1993, each zip code in the country was assigned to one of the 3,953 candidate HSAs.[41] All zip codes were assigned to the candidate HSA where the plurality of Medicare discharges for residents from that zip code had been hospitalized.[42] If a plurality of a candidate HSA's residents' Medicare hospitalizations took place in another candidate HSA, then the first HSA was eliminated as a candidate HSA, and its zip codes were reassigned to other HSAs.[43] Approximately 500 candidate HSAs were eliminated in this way.[44]

Third, the *Dartmouth Atlas* group visually examined the boundaries of each HSA and performed manual adjustments to reach contiguous HSAs (including reassigning "island" zip codes, which had been assigned to a non-contiguous HSA, to the HSA that surrounded them).[45]

**\*8** In constructing HSAs, the *Dartmouth Atlas* group did not use patient-discharge data from commercial-health-plan enrollees; it used only Medicare-patient-discharge data.[46] The *Dartmouth Atlas* group has not redefined HSAs since they were first constructed, meaning that HSAs are still defined based on patient-discharge data from 1992–1993.[47]

**Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)**

2019 WL 2078788, 2019-1 Trade Cases P 80,765

The plaintiffs' expert Dr. Chipty and Sutter's expert Dr. Gowrisankaran agree that HSAs were not created to delineate antitrust markets and that not all HSAs are antitrust markets. [48]

## 2. The Candidate Tying Markets

In their complaint, the plaintiffs alleged seven Candidate Tying Markets (excluding the Davis HSA). The following gives an overview of each Candidate Tying Market and then summarizes evidence relevant to the markets and Sutter's motion for summary judgment. There are three categories of evidence that are relevant: (1) evidence relating to the application of California's Knox-Keene Health Care Service Plan Act of 1985, Cal. Health & Safety Code §§ 1340 et seq., and California Code of Regulations title 28, § 1300.51(d)(H)(ii) (collectively, "Knox-Keene Act"), (2) a "redirection analysis" by the health plan Blue Shield of California, and (3) other testimony and documentary evidence from health plans and Sutter.

### 2.1 The Antioch HSA

#### 2.1.1 Overview

The Antioch HSA includes the city of Antioch in Contra Costa County, California. There are approximately 172,000 residents in the Antioch HSA. [49] Excluding a hospital operated by Kaiser Permanente ("Kaiser"), [50] there is one hospital in the Antioch HSA: Sutter Delta Medical Center ("Sutter Delta"). [51]



[52]

**\*9** [**Editor's Note:** The preceding image contains the reference for footnote [52] ].

Between 40 and 45 percent of the non-Kaiser, commercially insured patients residing in the Antioch HSA stay in the Antioch HSA for inpatient hospital services, and the remaining 55 to 60 percent travel out of the Antioch HSA for inpatient hospital services. [53] Dr. Chipty stated that the patients who stay in the Antioch HSA drive an average of 17 minutes for their care and the patients who travel out of the Antioch HSA drive an average of 44 minutes for their care. [54]

#### 2.1.2 Knox-Keene Act

A former Senior Vice President of the health plan Blue Shield stated in a sworn declaration that California's Knox-Keene Act "requires Blue Shield to create a network with access to health care providers such that 'all enrollees have a residence or workplace within 30 minutes or 15 miles of a contracting or plan-operated hospital[.]' " [55] The former Senior Vice President explained, "[f]or example, if one of Blue Shield's self-funded customers has an employee living in a rural area of Northern California, and the only hospital within 30 minutes or 15 miles of his residence or workplace was a Sutter hospital, the law mandates that Sutter's hospital be included in the network." [56]

At the end of 2014, Blue Shield's then-effective agreement with Sutter was scheduled to automatically terminate (absent a renewal). [57] Blue Shield had to file "transition

Appendix of Authorities: 102 of 180

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

disengagement plans" with the California Department of Managed Health Care ("DMHC"). [58] The DMHC reviewed Blue Shield's proposed termination of Sutter Delta as an in-network hospital and whether the termination complied with the Knox-Keene Act. [59] The DMHC sent a notice to Blue Shield that it effectively had to keep Sutter Delta in its network for certain hospital services, and allow its enrollees to use Sutter Delta, because there were no other alternative hospitals that complied with Knox-Keene Act requirements. [60]

Dr. Gowrisankaran stated that 51 percent of patients discharged from a non-Kaiser hospital in the Antioch HSA (i.e., Sutter Delta) live within a 30-minute drive of another non-Sutter, non-Kaiser hospital in another HSA. [61] That means that 49 percent of patients do not live within a 30-minute drive of another non-Sutter, non-Kaiser hospital. [62]

### 2.1.3 Blue Shield redirection analysis

**\*10** A former Senior Vice President of the health plan Blue Shield of California stated in a sworn declaration that "consumer demand dictated the geographic 'footprint' of Blue Shield's networks. Many self-funded payors and insured employers who contract with Blue Shield have members throughout Northern California. Therefore, providing broad geographic coverage for members is important. In addition, certain Sutter hospitals and physician groups are 'must have' providers because particular Blue Shield customers insist that they be included in the network." [63] The former Senior Vice President stated that "Sutter's 'all or nothing' negotiation strategy, and leveraging of its market position in multiple counties (where they are dominant) to demand higher rates across the board has forced Blue Shield to accept Sutter's significantly higher pricing." [64] The former Senior Vice President stated that "Sutter's prices were 'materially higher' than the average prices in Northern California and across the state[.]" [65]

Blue Shield conducts "redirection analyses" whenever its contract with Sutter comes up for renewal, because it has to determine the cost of terminating its contract with Sutter. [66] As Blue Shield's Director of Provider Contracting for Northern California testified, when Blue Shield's contract with Sutter comes up for renewal, "one of those reports we have run is, okay, if Sutter's out of network, what can

be redirected elsewhere, where are their alternatives, what our cost implications are." [67] The redirection analysis that Blue Shield conducted in 2014 ("Blue Shield Redirection Analysis") included an estimate that if Blue Shield were to terminate its contract with Sutter and Sutter Delta became an out-of-network hospital, then [Redacted] percent of Blue Shield enrollees who used Sutter Delta could be "redirected" to other hospitals ([Redacted]) and [Redacted] percent of enrollees would stay with Sutter Delta, even if Sutter were out of network and they had to pay higher costs. [68]

**\*11** The Director acknowledged that "[t]here [wa]s no, you know, set criteria" for coming up with the redirection percentages listed in the Blue Shield Redirection Analysis (for Sutter Delta or for any other hospital). [69] He testified that, "you have got to use your experience of the marketplace and understanding of which hospitals are compl[e]mentary, how far apart they are from one another, preferences of members." [70] He acknowledged that he did not look at any patient-admission patterns or data and did not test his assumptions and that there was no way for a third party to replicate his analysis. [71]

### 2.1.4 Other evidence

In a 2008 internal email ("UnitedHealthcare Email"), the Director of Provider Services for Northern California for the health plan UnitedHealthcare wrote to several of her colleagues that Sutter "ha[s] geographic monopolies for hospital services in the following submarkets — ... Antioch...." [72] The UnitedHealthcare director further stated that "[d]espite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO [health-maintenance organization] or FFS [fee-for-service] network in Northern CA that does not include them. In addition, many of our largest national accounts require Sutter network participation to retain and grow business." [73]

## 2.2 The Auburn HSA

### 2.2.1 Overview

The Auburn HSA includes the city of Auburn in Placer County, California. There are approximately 69,000 residents

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

in the Auburn HSA. [74] The is one hospital in the Auburn HSA: Sutter Auburn Faith Hospital ("Sutter Auburn"). [75]



[76]

[**Editor's Note:** The preceding image contains the reference for footnote [76]].

Between 30 and 37 percent of the non-Kaiser, commercially insured patients residing in the Auburn HSA stay in the Auburn HSA for inpatient hospital services, and the remaining 63 to 70 percent travel out of the Auburn HSA for inpatient hospital services. [77] Dr. Chipty stated that the patients who stay in the Auburn HSA drive an average of 18 minutes for their care and the patients who travel out of the Auburn HSA drive an average of 45 minutes for their care. [78]

### 2.2.2 Knox-Keene Act

Dr. Gowrisankaran stated that 44 percent of patients discharged from a non-Kaiser hospital in the Auburn HSA (i.e., Sutter Auburn) live within a 30-minute drive of another non-Sutter, non-Kaiser hospital in another HSA. [79] That means that 56 percent of patients do not live within a 30-minute drive of another non-Sutter, non-Kaiser hospital. [80]

### 2.2.3 Blue Shield redirection analysis

 **\*12**  The Blue Shield Redirection Analysis estimated that if Blue Shield were to terminate its contract with Sutter and Sutter Auburn became an out-of-network hospital, then

[Redacted] percent of Blue Shield enrollees who used Sutter Auburn could be "redirected" to [Redacted] ([Redacted]) and [Redacted] percent of enrollees would stay with Sutter Auburn, even if Sutter were out of network and they had to pay higher costs. [81]

### 2.2.4 Other evidence

The UnitedHealthcare Email stated that Sutter "ha[s] geographic monopolies for hospital services in the following submarkets — Auburn.... Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them. In addition, many of our largest national accounts require Sutter network participation to retain and grow business." [82]

The Vice President for Network Management in Northern California at the health plan Aetna testified that "using my definition of monopoly meaning a must-have from a marketability standpoint, .... there are some rural hospitals where Sutter hospitals are really it for a given area," including Sutter Auburn. [83] The Vice President explained, "[s]o my own terms, a monopoly, it's really the must-have from a marketability or a member perception standpoint." [84]

## 2.3 The Crescent City HSA

### 2.3.1 Overview

The Crescent City HSA includes the city of Crescent City in Del Norte County, California. The Crescent City HSA also extends into Oregon. [85] There are approximately 35,000 residents in the Crescent City HSA. [86] There is one hospital in the Crescent City HSA: Sutter Coast Hospital ("Sutter Coast"). [87]

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765


[88]

[**Editor's Note:** The preceding image contains the reference for footnote [88] ].

Between 72 and 77 percent of the non-Kaiser, commercially insured patients residing in the Crescent City HSA stay in the Crescent City HSA for inpatient hospital services, and the remaining 23 to 28 percent travel out of the Crescent City HSA for inpatient hospital services. [89] Dr. Chipty stated that the patients who stay in the Crescent City HSA drive an average of 32 minutes for their care and the patients who travel out of the Crescent City HSA to another California hospital drive an average of 275 minutes for their care. [90]

### 2.3.2 Knox-Keene Act

**\*13** At the end of 2014, Blue Shield's then-effective agreement with Sutter was scheduled to automatically terminate (absent a renewal). [91] The DMHC reviewed Blue Shield's proposed termination of Sutter Coast as an in-network hospital and whether the termination complied with the Knox-Keene Act. [92] The DMHC sent a notice to Blue Shield that it effectively had to keep Sutter Coast in its network for certain hospital services, and allow its enrollees to use Sutter Coast, because there were no other alternative hospitals that complied with Knox-Keene Act requirements. [93]

Dr. Gowrisankaran stated that zero percent of patients discharged from a non-Kaiser hospital in the Crescent City HSA (i.e., Sutter Coast) live within a 30-minute drive of another non-Sutter, non-Kaiser hospital in another HSA. [94] — which means that 100 percent of patients do not live within a 30-minute drive of another non-Sutter, non-Kaiser hospital. [95]

### 2.3.3 Blue Shield redirection analysis

The Blue Shield Redirection Analysis included an estimate that if Blue Shield were to terminate its contract with Sutter and Sutter Coast became an out-of-network hospital, then [Redacted] percent of Blue Shield enrollees who used Sutter Coast would stay with Sutter Coast, even if Sutter were out of network and they had to pay higher costs. [96]

### 2.3.4 Other evidence

The Vice President for Network Management in Northern California at Aetna testified that "using my definition of monopoly meaning a must-have from a marketability standpoint, .... there are some rural hospitals where Sutter hospitals are really it for a given area," including Sutter Coast. [97]

Sutter maintained an internal "model amendment" ("Sutter Model Amendment") that it used as a proposal in negotiating contracts with health plans. [98] The Sutter Model Amendment included a term, "Rural Hospitals," defined as "a designation given by Sutter Health to any facility which acts as a sole practical resource for acute care and emergency care within the community it serves." [99] Sutter's Chief Contracting Officer explained that "Rural Hospital" was "a term to describe a rural hospital that in all practical reality was the hospital, the local hospital in that community, typically a more rural community[ that d]oesn't have other hospitals in the local vicinity." [100] The Sutter Model Amendment identified Sutter Coast as a "Rural Hospital." [101]

**\*14** In 2001, Sutter entered into an amendment agreement with the health plan Blue Cross of California ("Sutter Blue Cross Amendment"). The Sutter Blue Cross Amendment included a term, "Rural Hospitals," defined as "a designation given by Sutter Health to any facility which acts as a sole practical resource for acute care and emergency care within the rural community it serves, and the next closest facility is at least 30 miles away from the Rural Hospital." [102] The

2019 WL 2078788, 2019-1 Trade Cases P 80,765

Sutter Blue Cross Amendment identified Sutter Coast as a "Rural Hospital." [103]  Anthem Blue Cross's Director of Network Development for Northern California (from 2001 to 2005) and Vice President of Provider Engagement and Contracting for California (from 2009 to 2011) acknowledged in testimony that Sutter Coast was a rural hospital and agreed that it was "essentially the only game in town." [104]

### 2.4 The Jackson HSA

#### 2.4.1 Overview

The Jackson HSA includes the city of Jackson in Amador County, California. There are approximately 34,000 residents in the Jackson HSA. [105]  There is one hospital in the Jackson HSA: Sutter Amador Hospital ("Sutter Amador"). [106]



107

[**Editor's Note:** The preceding image contains the reference for footnote [107] ].

Between 43 and 65 percent of the non-Kaiser, commercially insured patients residing in the Jackson HSA stay in the Jackson HSA for inpatient hospital services, and the remaining 35 to 57 percent travel out of the Jackson HSA for inpatient hospital services. [108]  Dr. Chipty stated that the patients who stay in the Jackson HSA drive an average of 21 minutes for their care and the patients who travel out of the Jackson HSA drive an average of 71 minutes for their care. [109]

#### 2.4.2 Knox-Keene Act

At the end of 2014, Blue Shield's then-effective agreement with Sutter was scheduled to automatically terminate (absent a renewal). [110]  The DMHC reviewed Blue Shield's proposed termination of Sutter Amador as an in-network hospital and whether the termination complied with the Knox-Keene Act. [111]  The DMHC sent a notice to Blue Shield that it effectively had to keep Sutter Amador in its network for certain hospital services, and allow its enrollees to use Sutter Amador, because there were no other alternative hospitals that complied with Knox-Keene Act requirements. [112]

Dr. Gowrisankaran stated that 29 percent of patients discharged from a non-Kaiser hospital in the Jackson HSA (i.e., Sutter Amador) live within a 30-minute drive of another non-Sutter, non-Kaiser hospital in another HSA. [113]  That means that 71 percent of patients do not live within a 30-minute drive of another non-Sutter, non-Kaiser hospital. [114]

#### 2.4.3 Blue Shield redirection analysis

 **\*15**  The Blue Shield Redirection Analysis included an estimate that if Blue Shield were to terminate its contract with Sutter and Sutter Amador became an out-of-network hospital, [Redacted] percent of Blue Shield enrollees who used Sutter Amador would choose to stay with Sutter Amador even if Sutter were out of network and they had to pay higher costs. [115]

#### 2.4.4 Other evidence

The UnitedHealthcare Email stated that Sutter "ha[s] geographic monopolies for hospital services in the following submarkets — ... Amador.... Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them. In addition, many of our largest national accounts require Sutter network participation to retain and grow business." [116]

Aetna's Vice President for Network Management in Northern California testified that "using my definition of monopoly meaning a must-have from a marketability standpoint, ....

2019 WL 2078788, 2019-1 Trade Cases P 80,765

there are some rural hospitals where Sutter hospitals are really it for a given area," including Sutter Amador. [117]

The Sutter Model Amendment identifies Sutter Amador as a "Rural Hospital" that "acts as a sole practical resource for acute care and emergency care within the community it serves" and a hospital "that in all practical reality was the hospital, the local hospital in that community, typically a more rural community[ that d]oesn't have other hospitals in the local vicinity." [118] The Sutter Blue Cross Amendment similarly identifies Sutter Amador as a "Rural Hospital" that "acts as a sole practical resource for acute care and emergency care within the rural community it serves, and [where] the next closest facility is at least 30 miles away from the Rural Hospital." [119] Anthem Blue Cross's former Director of Network Development for Northern California and Vice President of Provider Engagement and Contracting for California acknowledged in testimony that Sutter Amador was a rural hospital and agreed that it was "essentially the only game in town." [120]

### 2.5 The Lakeport HSA

#### 2.5.1 Overview

The Lakeport HSA includes the city of Lakeport in Lake County, California. There are approximately 27,000 residents in the Lakeport HSA. [121] There is one hospital in the Lakeport HSA: Sutter Lakeside Hospital ("Sutter Lakeside"). [122]



[123]

**\*16** [**Editor's Note:** The preceding image contains the reference for footnote [123] ].

Between 41 and 50 percent of the non-Kaiser, commercially insured patients residing in the Lakeport HSA stay in the Lakeport HSA for inpatient hospital services, and the remaining 50 to 59 percent travel out of the Lakeport HSA for inpatient hospital services. [124] Dr. Chipty stated that the patients who stay in the Lakeport HSA drive an average of 16 minutes for their care and the patients who travel out of the Lakeport HSA drive an average of 107 minutes for their care. [125]

#### 2.5.2 Knox-Keene Act

At the end of 2014, Blue Shield's then-effective agreement with Sutter was scheduled to automatically terminate (absent a renewal). [126] The DMHC reviewed Blue Shield's proposed termination of Sutter Lakeside as an in-network hospital and whether the termination complied with the Knox-Keene Act. [127] The DMHC sent a notice to Blue Shield that it effectively had to keep Sutter Lakeside in its network for certain hospital services, and allow its enrollees to use Sutter Lakeside, because there were no other alternative hospitals that complied with Knox-Keene Act requirements. [128]

Dr. Gowrisankaran stated that 45 percent of patients discharged from a non-Kaiser hospital in the Lakeport HSA (i.e., Sutter Lakeside) live within a 30-minute drive of another non-Sutter, non-Kaiser hospital in another HSA. [129] That

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

means that 55 percent of patients do not live within a 30-minute drive of another non-Sutter, non-Kaiser hospital. [130]

### 2.5.3 Blue Shield redirection analysis

The Blue Shield Redirection Analysis included an estimate that if Blue Shield were to terminate its contract with Sutter and Sutter Lakeside became an out-of-network hospital, [Redacted] percent of Blue Shield enrollees who used Sutter Lakeside could be "redirected" to other hospitals ([Redacted]) and [Redacted] percent of enrollees would stay with Sutter Lakeside, even if Sutter were out of network and they had to pay higher costs. [131]

### 2.5.4 Other evidence

**\*17**  The UnitedHealthcare Email stated that Sutter "ha[s] geographic monopolies for hospital services in the following submarkets — ... Clearlake.... Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them. In addition, many of our largest national accounts require Sutter network participation to retain and grow business." [132]

Aetna's Vice President for Network Management in Northern California testified that "using my definition of monopoly meaning a must-have from a marketability standpoint, .... there are some rural hospitals where Sutter hospitals are really it for a given area," including Sutter Lakeside. [133]

The Sutter Model Amendment identifies Sutter Lakeside as a "Rural Hospital" that "acts as a sole practical resource for acute care and emergency care within the community it serves" and a hospital "that in all practical reality was the hospital, the local hospital in that community, typically a more rural community[ that d]oesn't have other hospitals in the local vicinity." [134]  The Sutter Blue Cross Amendment also identifies Sutter Lakeside as a "Rural Hospital" that "acts as a sole practical resource for acute care and emergency care within the rural community it serves, and [where] the next closest facility is at least 30 miles away from the Rural Hospital." [135]  Anthem Blue Cross's former Director of Network Development for Northern California and Vice President of Provider Engagement and Contracting for

California acknowledged in testimony that Sutter Lakeside was a rural hospital and agreed that it was "essentially the only game in town." [136]

### 2.6 The Tracy HSA

#### 2.6.1 Overview

The Tracy HSA includes the city of Tracy in San Joaquin County, California. There are approximately 84,000 residents in the Tracy HSA. [137]  There is one hospital in the Tracy HSA: Sutter Tracy Community Hospital ("Sutter Tracy"). [138]


139

[**Editor's Note:** The preceding image contains the reference for footnote [139]].

Approximately 57 percent of the non-Kaiser, commercially insured patients residing in the Tracy HSA stay in the Tracy HSA for inpatient hospital services, and the remaining 43 percent travel out of the Tracy HSA for inpatient hospital services. [140]  Dr. Chipty stated that the patients who stay in the Tracy HSA drive an average of nine minutes for their care and the patients who travel out of the Tracy HSA drive an average of 51 minutes for their care. [141]  Dr. Gowrisankaran stated that 100 percent of patients discharged from a non-Kaiser hospital in the Tracy HSA (i.e., Sutter Tracy) live within a 30-minute drive of another non-Sutter, non-Kaiser hospital in another HSA. [142]

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

### 2.6.2 Blue Shield redirection analysis

**\*18**  The Blue Shield Redirection Analysis included an estimate that if Blue Shield were to terminate its contract with Sutter and Sutter Tracy became an out-of-network hospital, then [Redacted] percent of Blue Shield enrollees who used Sutter Tracy could be "redirected" to other hospitals ([Redacted]) and [Redacted] percent of enrollees would stay with Sutter Tracy, even if Sutter were out of network and they had to pay higher costs. [143]

### 2.6.3 Other evidence

The UnitedHealthcare Email stated that Sutter "ha[s] geographic monopolies for hospital services in the following submarkets — ... Tracy.... Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them. In addition, many of our largest national accounts require Sutter network participation to retain and grow business." [144]

Aetna's Vice President for Network Management in Northern California testified that "using my definition of monopoly meaning a must-have from a marketability standpoint, .... I would say probably Sutter Tracy down in Tracy is the only hospital in that particular town[.]" [145]

### 2.7 The Combined Berkeley-Oakland HSAs

### 2.7.1 Overview

The Berkeley HSA includes the city of Berkeley in Alameda County, California. The Oakland HSA includes the city of Oakland in Alameda County, California. There are approximately 506,000 residents in the combined Berkeley-Oakland HSAs. [146] Excluding one Kaiser hospital, there are two hospitals in the combined Berkeley-Oakland HSAs: Sutter Alta Bates Medical Center ("Sutter Alta Bates") (which has three campuses: Alta Bates in Berkeley and Herrick in Berkeley, collectively "Alta Bates Main," and Alta Bates Summit in Oakland) and a non-Sutter hospital, Alameda County Medical Center. [147]



[148]

[**Editor's Note:** The preceding image contains the reference for footnote [148] ].

Sutter Alta Bates and Summit previously were separately owned hospitals. *See California v. Sutter Health Sys.*, 130 F. Supp. 2d 1109, 1112 (N.D. Cal. 2001). In 1998, Sutter and Summit signed an agreement to merge the Alta Bates and Summit facilities. *Id.* at 1115. The California Attorney General filed suit in this district to enjoin the merger. *Id.* at 1117. The court denied the California Attorney General's preliminary-injunction motion, *id.* at 1137, and the merger went through. [149] A 2011 study found that after Summit merged with Sutter, Summit raised its prices by 29 to 72 percent. *Advocate Health*, 841 F.3d at 472 (citing Steven Tenn, *The Price Effects of Hospital Mergers: A Case Study of the Sutter-Summit Transaction*, 18 Int'l J. of the Econ. of Bus. 65, 75–76 (2011)). Sutter Summit's price change was 28 to 44 percent larger than the average price change from a control group of hospitals. Tenn, 18 Int'l J. of the Econ. of Bus. at 76, 79. Health plans responded by paying Sutter Summit's increased prices. *See id.*

**\*19**  Approximately 80 percent of the non-Kaiser, commercially insured patients residing in the combined Berkeley-Oakland HSAs stay in the combined Berkeley-Oakland HSAs for inpatient hospital services, and the remaining 20 percent travel out of the combined Berkeley-Oakland HSAs for inpatient hospital services. [150] Dr. Chipty stated that the patients who stay in the combined Berkeley-Oakland HSAs drive an average of 14 minutes for their care and the patients who travel out of the combined Berkeley-Oakland HSAs drive an average of 45 minutes for

Case 4:23-cv-03560     Document 331-82     Filed 03/30/26 in TXSD     Page 112 of 182

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

their care.[151] Dr. Gowrisankaran stated that 100 percent of patients discharged from a non-Kaiser hospital in the combined Berkeley-Oakland HSAs live within a 30-minute drive of another non-Sutter, non-Kaiser hospital in another HSA.[152]

### 2.7.2 Blue Shield redirection analysis

The Blue Shield Redirection Analysis included an estimate that if Blue Shield were to terminate its contract with Sutter and the Sutter Alta Bates hospitals became out-of-network hospitals, then [Redacted] percent of Blue Cross enrollees who use each of the Alta Bates hospitals could be "redirected" to other hospitals and [Redacted] percent of enrollees would stay with Sutter Alta Bates, even if Sutter were out of network and they had to pay higher costs.[153]

Blue Shield's Vice President overseeing pricing and forecasting testified that [Redacted][154]

### 2.7.3 Other evidence

The UnitedHealthcare Email stated that Sutter "ha[s] geographic monopolies for hospital services in the following submarkets — ... Berkeley, Oakland.... Despite widespread Broker acknowledgement of the high cost of Sutter, it is not feasible to present an HMO or FFS network in Northern CA that does not include them. In addition, many of our largest national accounts require Sutter network participation to retain and grow business."[155]

Aetna's Vice President for Network Management in Northern California testified that "using my definition of monopoly meaning a must-have from a marketability standpoint, one would be Alta Bates Summit Medical Center, which it's — it's the only hospital really for Oakland and Berkeley for commercial business, yeah, you have got — you have got either to cross the bridge or go through the tunnel or drive to Alameda to really get to the next hospital. So from a marketing standpoint it's a must have."[156]

### 3. The Candidate Tied Markets

The plaintiffs in their complaint alleged four Candidate Tied Markets. The following gives an overview of each Candidate

Tied Market and then summarizes certain analyses of the Candidate Markets by the plaintiffs' expert Dr. Chipty.

For the Candidate Tied Markets, Dr. Chipty conducted a "diversion analysis" to study the question of where patients would go if they could no longer go to their first-choice hospital and, based on diversion ratios and data on hospital prices and margins, analyzed how much a profit-maximizing hypothetical monopolist that controlled all non-Kaiser hospitals in each Candidate Tied Market could raise prices at the Sutter hospital in the market.[157]

**\*20** Dr. Chipty first constructed a patient-level model of non-Kaiser hospitals that patients choose based on factors including (1) patient characteristics, such as age, gender, income, and distance (in minutes) from different hospital choices, (2) patient medical needs, and (3) hospital characteristics, including whether the hospital is a teaching hospital, whether it is a designated trauma facility, and whether it offers the medical services that the patient needs.[158] She used these results to estimate the "utility" that each patient would obtain from each hospital.[159]

Dr. Chipty then conducted a diversion analysis, a counterfactual experiment where she removed the predicted first-choice hospital from each patient's choice set and asked where the patient would go instead.[160] She computed for each area resident the probability of that resident's choosing each alternative hospital.[161] She also computed "aggregate diversion" levels of the share of all area residents choosing alternative hospitals.[162]

Dr. Chipty then conducted an analysis to calculate the profit-maximizing price increase that a hypothetical monopolist could impose on hospitals in each Candidate Tied Market based on a model of the bargaining framework between hospitals and health plans that takes into account the diversion ratio of hospitals to other in-area or out-of-area hospitals and the hospitals' prices and contribution margins.[163]

### 3.1 The Modesto HSA

### 3.1.1 Overview

The Modesto HSA includes the city of Modesto in Stanislaus County, California. There are approximately

Appendix of Authorities: 110 of 180

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

342,000 residents in the Modesto HSA. [164] Excluding one Kaiser hospital, there are two hospitals in the Modesto HSA: Sutter Memorial Medical Center Modesto ("Sutter Modesto") and a non-Sutter hospital, Doctors Medical Center. [165]


166

[**Editor's Note:** The preceding image contains the reference for footnote [166] ].

Between 81 and 84 percent of the non-Kaiser, commercially insured patients residing in the Modesto HSA stay in the Modesto HSA for inpatient hospital services, and the remaining 16 to 19 percent travel out of the Modesto HSA for inpatient hospital services. [167] Dr. Chipty stated that the patients who stay in the Modesto HSA drive an average of 18 minutes for their care and the patients who travel out of the Modesto HSA drive an average of 71 minutes for their care. [168]

### 3.1.2 Dr. Chipty's analyses

 **\*21**  Dr. Chipty conducted a diversion analysis to ask where patients would go if Sutter Modesto were removed from each patient's choice set. [169] She estimated that 61 percent of patients would go to another hospital inside the Modesto HSA and that 39 percent of patients would go to a hospital outside the Modesto HSA. [170] She then conducted an analysis to calculate the profit-maximizing price increase that a hypothetical monopolist could impose and estimated that a hypothetical monopolist that controlled all of the non-Kaiser hospitals in the Modesto HSA would find it profitable to raise

Sutter Modesto's price between 12 and 20 percent over Sutter Modesto's actual prices from 2010 to 2012. [171]

### 3.2 The Sacramento HSA

### 3.2.1 Overview

The Sacramento HSA includes the city of Sacramento in Sacramento County, California. There are approximately 879,000 residents in the Sacramento HSA. [172] Excluding two Kaiser hospitals, there are four hospitals in the Sacramento HSA: Sutter Medical Center, Sacramento ("Sutter Sacramento") and three non-Sutter hospitals, University of California Davis Medical Center, Methodist Hospital of Sacramento, and Mercy General Hospital. [173]


174

[**Editor's Note:** The preceding image contains the reference for footnote [174] ].

Between 78 and 82 percent of the non-Kaiser, commercially insured patients residing in the Sacramento HSA stay in the Sacramento HSA for inpatient hospital services, and the remaining 18 to 22 percent travel out of the Sacramento HSA for inpatient hospital services. [175] Dr. Chipty stated that the patients who stay in the Sacramento HSA drive an average of 17 minutes for their care and the patients who travel out of the Sacramento HSA drive an average of 38 minutes for their care. [176]

Appendix of Authorities: 111 of 180

2019 WL 2078788, 2019-1 Trade Cases P 80,765

### 3.2.2 Dr. Chipty's analyses

Dr. Chipty conducted a diversion analysis to ask where patients would go if Sutter Sacramento were removed from each patient's choice set. [177] She estimated that 61 percent of patients would go to another hospital inside the Sacramento HSA and that 39 percent of patients would go to a hospital outside the Sacramento HSA. [178] She then conducted an analysis to calculate the profit-maximizing price increase that a hypothetical monopolist could impose and estimated that a hypothetical monopolist that controlled all of the non-Kaiser hospitals in the Sacramento HSA would find it profitable to raise Sutter Sacramento's price between 11 and 12 percent over Sutter Sacramento's actual prices from 2010 to 2012. [179]

### 3.3 The San Francisco HSA

### 3.3.1 Overview

The San Francisco HSA includes the City and County of San Francisco. There are approximately 740,000 residents in the San Francisco HSA. [180] Excluding one Kaiser hospital, there are seven hospitals in the San Francisco HSA: Sutter's California Pacific Medical Center ("CPMC") (which has four campuses: Davies, Pacific, and California, collectively "CPMC Main," and St. Luke's) and six non-Sutter hospitals (Chinese Hospital, Laguna Honda Hospital and Rehabilitation Center, San Francisco General Hospital Medical Center, St. Francis Memorial Hospital, St. Mary's Medical Center-San Francisco, and University of San Francisco Medical Center). [181]



182

[**Editor's Note:** The preceding image contains the reference for footnote [182]].

**\*22** Between 95 and 98 percent of the non-Kaiser, commercially insured patients residing in the San Francisco HSA stay in the San Francisco HSA for inpatient hospital services, and the remaining three to four percent travel out of the San Francisco HSA for inpatient hospital services. [183] Dr. Chipty stated that the patients who stay in the San Francisco HSA drive an average of 16 minutes for their care and the patients who travel out of San Francisco HSA drive an average of 45 minutes for their care. [184]

### 3.3.2 Dr. Chipty's analyses

Dr. Chipty conducted a diversion analysis to ask where patients would go if CPMC Main and CPMC St. Luke's were removed from each patient's choice set. [185] She estimated that 65 percent of patients would go to another hospital inside the San Francisco HSA and that 35 percent of patients would go to a hospital outside the San Francisco HSA. [186] She then conducted an analysis to calculate the profit-maximizing price increase that a hypothetical monopolist could impose and estimated that a hypothetical monopolist that controlled all of the non-Kaiser hospitals in the San Francisco HSA would find it profitable to raise CPMC Main's price by 13 percent over CPMC Main's actual prices from 2010 to 2012. [187]

### 3.4 The Santa Rosa HSA

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

### 3.4.1 Overview

The Santa Rosa HSA includes the city of Santa Rosa in Sonoma County, California. There are approximately 256,000 residents in the Santa Rosa HSA. [188] Excluding one Kaiser hospital, there are two hospitals in the Santa Rosa HSA: Sutter Santa Rosa Regional Hospital ("Sutter Santa Rosa") and one non-Sutter hospital, Santa Rosa Memorial Hospital. [189]



190

[**Editor's Note:** The preceding image contains the reference for footnote [190] ].

Between 75 and 83 percent of the non-Kaiser, commercially insured patients residing in the Santa Rosa HSA stay in the Santa Rosa HSA for inpatient hospital services, and the remaining 17 to 25 percent travel out of the Santa Rosa HSA for inpatient hospital services. [191] Dr. Chipty stated that the patients who stay in the Santa Rosa HSA drive an average of 20 minutes for their care and the patients who travel out of the Santa Rosa HSA drive an average of 67 minutes for their care. [192]

### 3.4.2 Dr. Chipty's analyses

Dr. Chipty conducted a diversion analysis to ask where patients would go if Sutter Santa Rosa were removed from each patient's choice set. [193] She estimated that 73 percent of patients would go to another hospital inside the Santa Rosa HSA and that 27 percent of patients would go to a hospital

outside the Sutter Rosa HSA. [194] She then conducted an analysis to calculate the profit-maximizing price increase that a hypothetical monopolist could impose and estimated that a hypothetical monopolist that controlled all of the non-Kaiser hospitals in the Santa Rosa HSA would find it profitable to raise Sutter Santa Rosa's price between seven and ten percent over Sutter Santa Rosa's actual prices from 2010 to 2012. [195]

### STANDARD OF REVIEW

**\*23** The court must grant a motion for summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Material facts are those that may affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id.* at 248–49.

The party moving for summary judgment bears the initial burden of informing the court of the basis for the motion, and identifying portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To meet its burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.' ") (quoting *Celotex*, 477 U.S. at 325).

If the moving party meets its initial burden, then the burden shifts to the non-moving party to produce evidence supporting its claims or defenses. *Nissan Fire & Marine*, 210 F.3d at 1103. The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial. *See Devereaux*, 263 F.3d at 1076. If the non-moving party does not produce evidence to show a genuine issue of material fact, the moving

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

party is entitled to summary judgment. *See Celotex*, 477 U.S. at 323.

In ruling on a motion for summary judgment, the court does not make credibility determinations or weigh conflicting evidence. Instead, it views the evidence in the light most favorable to the non-moving party and draws all factual inferences in the non-moving party's favor. *E.g., Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Ting v. United States*, 927 F.2d 1504, 1509 (9th Cir. 1991).

## ANALYSIS

### 1. Framing the Issues

Before addressing the specifics of the parties' arguments, the court frames the issues relating to Sutter's limited motion for summary judgment.

First, as applied here to the product market of hospitals selling inpatient hospital services to health plans, the hypothetical-monopolist test for defining geographic markets focuses on the responses of health plans, as opposed to patients, to a price increase by hypothetical-monopolist hospitals.

Second, on this limited motion, the plaintiffs do not have to establish definitively that their Candidate Markets are in fact relevant geographic markets for antitrust purposes. In that vein, at this juncture, the plaintiffs do not need to exclude definitively all other possible geographic markets. If there is a dispute of material fact about whether the Candidate Markets could be relevant geographic markets, then the court must deny Sutter's summary-judgment motion.

 **\*24**   Third, on this limited motion, there is no per se requirement that the plaintiffs present expert testimony or an econometric analysis in support of their Candidate Markets. If non-expert evidence raises a dispute of material fact, then the court must deny Sutter's summary-judgment motion.

The next sections address in more detail these three issues.

### 1.1 As Applied Here, the Hypothetical-Monopolist Test Focuses on How Health Plans, as Opposed to Patients, Would Respond to a Monopolist Hospital

As discussed above, the hypothetical-monopolist test for defining geographic markets "asks what would happen if a single firm became the only seller in a candidate geographical region." *Advocate Health*, 841 F.3d at 468 (citing *Whole Foods*, 548 F.3d at 1038). The test then asks whether that hypothetical monopolist could profitably impose a small but significant nontransitory increase in price, or whether consumers would respond to a SSNIP by buying the product from outside the proposed geographic region (i.e., by buying from a seller other than the hypothetical monopolist), thus making the hypothetical monopolist's SSNIP unprofitable. *St. Luke's*, 778 F.3d at 784.

Here, the consumers responding to a hypothetical-monopolist hospital's SSNIP are health plans, not the health-plan enrollees (i.e., patients), because health plans (not enrollees) directly pay the hospital's price increases. As the Third Circuit explained:

> Imagine that a hospital raised the cost of a procedure from $ 1,000 to $ 2,000. The patient who utilizes health insurance will still have the same out-of-pocket costs before and after the price increase. It is the insurer who will bear the immediate impact of that price increase. Not until the insurer passes that cost on to the patient in the form of higher premiums will the patient feel the impact of that price increase. And even then, the cost will be spread among many insured patients; it will not be felt solely by the patient who receives the higher-priced procedure. This is the commercial reality of the healthcare market as it exists today.

*Penn State Hershey*, 838 F.3d at 342; *see Brown Shoe*, 370 U.S. at 336 (geographic markets must "correspond to the commercial realities of the industry"). Thus, as the Ninth Circuit has recognized, because "the vast majority of health care consumers are not direct purchasers of health care — the consumers purchase health insurance and the insurance companies negotiate directly with the providers, the ... correct[ ] focus[ is] on the likely response of insurers to a hypothetical demand by all the [hospitals] in a particular market for a SSNIP." *St. Luke's*, 778 F.3d at 784 (internal quotation marks omitted); *see id.* at 784 n.10 (because patients are "largely insensitive" to price, antitrust analysis focuses

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

on the interactions between hospitals and health plans, not hospitals and patients) (citing Vistnes, 67 Antitrust L.J. at 678, 681–82, 692). Citing the Ninth Circuit's decision in *St. Luke's*, the Third and Seventh Circuits similarly have held that "when we apply the hypothetical monopolist test, we must also do so through the lens of the insurers," *Penn State Hershey*, 838 F.3d at 342, and that "[t]he geographic market question is therefore most directly about 'the likely response of insurers,' not patients, to a price increase," *Advocate Health*, 841 F.3d at 471.[196]

**\*25** This is of course not to suggest that the response of patients is irrelevant. *Cf. id.* at 343. For example, "[i]n assessing the impact of dropping a hospital from its network ..., a [health] plan must consider both how individual employees are likely to react and how the loss might affect the employer's willingness to offer that plan to its employees." Vistnes, 67 Antitrust L.J. at 678; *accord Advocate Health*, 841 F.3d at 475. But the response of health plans may not mirror the response of patients, which is why the Ninth Circuit (and the Third and Seventh Circuits) distinguish between the two. For example, if health plans believe — rightly or wrongly — that their potential customer base would react negatively to their dropping a hospital from their networks, they might respond to the hospital's imposing a SSNIP by paying the price increase. That response might satisfy the hypothetical-monopolist test regardless of whether the belief that drove them to pay the price increase ultimately was inaccurate or misguided in some way. Thus, courts distinguish the responses, and it is the latter response — the response of health plans — that is the focus of the hypothetical-monopolist test here.

### 1.2 At Summary Judgment, the Plaintiffs Do Not Have to Establish Definitively That Their Candidate Markets Are Relevant Geographic Markets or Exclude All Other Possible Geographic Markets

Defining the relevant geographic markets is generally a question for the jury. *Newcal*, 513 F.3d at 1045 ("the validity of the 'relevant market' is typically a factual element rather than a legal element") (citing *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993)); *Dooley v. Crab Boat Owners Ass'n*, No. C 02-0676 MHP, 2004 WL 902361, at \*9 (N.D. Cal. Apr. 26, 2004) ("The definition of the relevant market — both product and geographic — is generally a question of fact reserved for the jury.") (citing *High Tech. Careers*, 996 F.2d at 990; *Oahu Gas Serv., Inc. v. Pac. Res. Inc.*, 838 F.2d 360, 363 (9th Cir. 1988)).

The plaintiffs bear the ultimate burden of defining the relevant geographic markets. *St. Luke's*, 778 F.3d at 784 (citing *Conn. Nat'l Bank*, 418 U.S. at 669–70). On a motion for summary judgment, "[i]f the [plaintiff]'s evidence cannot sustain a jury verdict on the issue of market definition, summary judgment is appropriate." *Rebel Oil*, 51 F.3d at 1435.

On a summary-judgment motion, the court must view the evidence and draw all inferences with respect to defining the relevant geographic market in the light most favorable to the non-moving party. *Rebel Oil*, 51 F.3d at 1435 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–52 (1986)); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1159 & n.9 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 250). "While the [plaintiff] bear[s] the burden of demonstrating a relevant market at trial, [the moving party] has the burden on summary judgment of demonstrating that there is no genuine issue of material fact." *Hynix Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at \*9 (N.D. Cal. Jan. 5, 2008). If there is a dispute of material fact regarding the proper geographic markets, summary judgment must be denied.

At summary judgment, the plaintiffs do not need to establish definitively that their Candidate Markets are relevant geographic markets for antitrust purposes. It is enough to raise a dispute of material fact about whether their Candidate Markets could be relevant geographic markets to overcome a summary-judgment motion. In that vein, at summary judgment, the plaintiffs do not need to exclude definitively all other possible relevant geographic markets. The fact that the plaintiffs might not have foreclosed all other possible geographic-market definitions does not mean that they have failed to raise a dispute of material fact regarding their Candidate Markets and does not, without more, entitle Sutter to summary judgment.[197]

### 1.3 At Summary Judgment, There Is No Per Se Requirement for the Plaintiffs to Present Expert Testimony or an Econometric Analysis in Support of Their Candidate Markets

**\*26** Sutter argues that "courts routinely hold that 'construction of the relevant market and a showing of monopoly power must be based on expert testimony,' " citing an Eleventh Circuit case, *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1246 (11th Cir. 2002).[198] Sutter has not identified any court in the Ninth Circuit that has held that a plaintiff must base its

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

market definition on expert testimony to withstand summary judgment. [199] *Cf. AFMS LLC v. United Parcel Serv., Inc.*, 696 F. App'x 293, 294 (9th Cir. 2017)* (Nguyen, J., concurring in the result) ("AFMS was not required, as the district court suggested, to provide expert testimony regarding the relevant market.") (citing *United States v. Pabst Brewing Co.*, 384 U.S. 546, 549 (1966)* ("Certainly the failure of the Government to prove by an army of expert witnesses what constitutes a relevant 'economic' or 'geographic' market is not an adequate ground on which to dismiss a [Clayton Act § 7] case.")); *see also Semiconductor Inc. v. Rambus Inc.*, No. CV-00-20905 RMW, 2008 WL 73689, at *10 n.13 (N.D. Cal. Jan. 5, 2008)* (describing the Eleventh Circuit as having "gone farther" than the Ninth Circuit in holding that construction of the relevant market must be based on expert testimony).

To the contrary, in *St. Luke's*, for example, the Ninth Circuit focused on testimony from health-industry participants — about how health plans had to include Nampa-based primary-care physicians ("PCPs") in their network in order for their health-insurance products to be marketable to Nampa residents — to affirm the trial-court finding that Nampa was a geographic market. *See St. Luke's*, 778 F.3d at 785 ("Evidence was presented that insurers generally need local PCPs to market a health care plan, and that this is true in particular in the Nampa market. For example, Blue Cross of Idaho has PCPs in every zip code in which it has customers, and the executive director of the Idaho Physicians Network testified that it could not market a health care network in Nampa that did not include Nampa PCPs."); [200] *accord Penn State Hershey*, 838 F.3d at 345–46 (similarly focusing on testimony from health plans about which hospitals they needed to include in network in order for their health-insurance products to be marketable, as opposed to expert testimony, to define a geographic market); *see also* Areeda & Hovenkamp ¶ 538 ("The profitability of a hypothetical increase in the price of a hypothetical monopolist of product A depends, of course, on the reactions of customers and of other suppliers. To predict those reactions and their impact on the hypothetical monopolist's profitability, we look to[, among other things,] testimony by customers or alternative suppliers of how they would respond to the hypothetical price increase."). To take another counterexample, in a case from this district involving antitrust claims relating to crab fishing, the court held on a motion for summary judgment that (non-expert) declarations by the plaintiff fisherman and a third-party seafood buyer that consumers prefer San Francisco crab to other crab were sufficient to raise a genuine dispute of material fact as to whether the relevant geographic market for the crab product

market should be defined as being the San Francisco Bay Area. *Dooley*, 2004 WL 902361, at *10. [201]

**\*27** In the absence of any Ninth Circuit authority holding that a geographic-market definition must be based on expert testimony, the court does not adopt that rule here. *Cf. Lantec, Inc. v. Novell, Inc.*, 146 F. Supp. 2d 1140, 1148 (D. Utah 2001)* ("The absence of expert testimony on the issue of relevant market and like issues is not, per se, fatal to a plaintiff's antitrust claims. In other words, expert testimony is not required, but in its absence a plaintiff must show by other evidence sufficient facts from which a jury could infer market share, market power, relevant market, monopolization, dangerous probability of monopolization, and the like.") (citing *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 806 (8th Cir. 1987)), *aff'd*, 306 F.3d 1003 (10th Cir. 2002); *accord* Areeda & Hovenkamp ¶ 531f ("Courts have disagreed about whether expert testimony is necessary to establish a relevant market. We do not believe a categorical rule is necessary."). [202]

**2. Selecting Initial Candidate Markets for the Hypothetical-Monopolist Test**

The parties agree that the hypothetical-monopolist test is the "well-established test," and neither argues that any other test should be used here to define the relevant geographic markets. [203] The parties also agree that the hypothetical-monopolist test begins by selecting at an initial "candidate" geographic market. [204]

The parties disagree about the initial candidate markets. The plaintiffs argue that their HSA-based Candidate Markets are appropriate initial candidate markets. [205] Sutter argues that HSAs are not appropriate initial candidate markets. [206] Sutter does not propose appropriate initial candidate markets, other than to suggest "a wide variety of other markets, counties or regions, or just looking at maps." [207] Sutter does not offer a methodology for determining whether a given geographic market is an appropriate initial candidate market.

As noted above, defining the relevant markets is typically a question of fact. Absent a showing that the plaintiffs may not use HSA-based markets as initial candidate markets as a matter of law — a showing that Sutter has not made here [208] — the question of what initial candidate markets to use in the hypothetical-monopolist test to define the relevant geographic market is a question of fact. On a

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

summary-judgment motion, all inferences must be drawn in the non-moving party's favor, and thus at this juncture, the court adopts the plaintiffs' approach of using their HSA-based Candidate Markets as initial candidate markets for the purposes of the hypothetical-monopolist test. [209]

### 3. The Candidate Tying Markets

**\*28** In six of the seven Candidate Tying Markets (the Antioch, Auburn, Crescent City, Jackson, Lakeport, and Tracy HSAs), there is only one non-Kaiser hospital (Sutter Delta, Sutter Auburn, Sutter Coast, Sutter Amador, Sutter Lakeside, and Sutter Tracy, respectively). Using the Candidate Tying Markets as initial candidate markets, the hypothetical-monopolist test for each candidate market is this: if the Sutter hospital in that candidate market imposed a SSNIP, would health plans respond by (1) paying the Sutter hospital's price increases (thereby keeping it in network) or (2) refusing to pay the Sutter hospital's price increases (thereby rendering it out of network) and instead buying from other hospitals? [210]

In the seventh Candidate Tying Market, the combined Berkeley-Oakland HSA, there are Sutter hospitals (the Sutter Alta Bates campuses) and one non-Sutter, non-Kaiser hospital (Alameda County Medical Center). Using the combined Berkeley-Oakland HSA as an initial candidate market, the hypothetical-monopolist test reduces to the following: if a single firm controlled Sutter Alta Bates and Alameda County Medical Center and imposed a SSNIP at those hospitals, would health plans respond by (1) paying the price increases (thereby keeping the hospitals in network) or (2) refusing to pay the price increases (thereby rendering the hospitals out of network) and instead buying from other hospitals? If health plans would pay the hospitals' price increases, the proposed candidate markets are geographic markets for antitrust purposes.

The Blue Shield Redirection Analysis, the application of the Knox-Keene Act, and other evidence from health plans and from Sutter raise disputes of material fact about whether, if hypothetical-monopolist hospitals in the Candidate Tying Markets imposed a SSNIP, health plans would respond by paying the price increases. They thus raise disputes of material fact as to whether the hypothetical-monopolist test is satisfied and, therefore, whether the plaintiffs' Candidate Tying Markets are geographic markets for antitrust purposes. [211]

#### 3.1.1 Blue Shield redirection analysis

Blue Shield's Director of Provider Contracting for Northern California testified that Blue Shield conducts redirection analyses when its agreements with Sutter come up for renewal, specifically to assess "okay, if Sutter's out of network, what can be redirected elsewhere, what are their alternatives, what our cost implications are." [212] The Blue Shield Redirection Analysis conducted in 2014 estimated that if Sutter were to go out of network, [Redacted] percent of Blue Shield enrollees that use the Sutter hospitals in the Candidate Tying Markets would not be willing to use other hospitals. [213] A former Blue Shield Senior Vice President said in a sworn declaration that "providing broad geographic coverage for members is important. In addition, certain Sutter hospitals and physician groups are 'must have' providers because particular Blue Shield customers insist that they be included in the network." [214] The former Senior Vice President further attested that Sutter's "leveraging of its market position in multiple counties (where they are dominant) to demand higher rates across the board has forced Blue Shield to accept Sutter's significantly higher pricing." [215]

**\*29** This raises a dispute of material fact about whether, if a hypothetical monopolist that controlled all of the hospitals in each of the respective Candidate Tying Markets (i.e., the Sutter hospitals) imposed a SSNIP, health plans like Blue Shield would pay those price increases (rather than refusing to pay and losing those hospitals from their networks, and thereby running the risk that a significant percentage of enrollees might in turn stop buying their health-insurance products because they no longer offered their hospitals-of-choice as in-network providers). And if there is a dispute of material fact about whether buyers (i.e., health plans like Blue Shield) would pay a hypothetical monopolist's price increases, then there is a dispute of material fact about whether the hypothetical-monopolist test is satisfied and thus whether the Candidate Tying Markets are geographic markets for antitrust purposes.

Sutter argues that there was "nothing scientific" about the Blue Shield Redirection Analysis and that it was a "back-of-the-envelope product" that was "not the result of the sort of economic rigor that a court would expect to see [from an expert witness]." [216] Sutter argues that the Blue Shield network-management team "provided the hospital redirection numbers, adjusting them if the team thought they were 'too

Case 4:23-cv-03560    Document 331-82    Filed 03/30/26 in TXSD    Page 120 of 182

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

much' or 'not enough' " and "[w]hen determining how many patients would move from one hospital to another, Blue Shield was 'just looking at assumptions,' not 'any numbers,' admission patterns, or data, and there 'was no testing' of the assumptions on which it relied." [217] Sutter argues that the Blue Shield Redirection Analysis does not accurately describe how Blue Shield enrollees would in fact react to Sutter's hospitals going out of network and that one of Blue Shield's customers criticized the Redirection Analysis as "relying on 'assumptions in some regions [that] did not make sense' " and as being "in need of reworking." [218] Sutter argues that "far from being an unbiased, scientific exercise, the Redirection Analysis was 'one of the levers' Blue Shield used to determine the plan designs it wanted to sell." [219] Sutter argues that more Blue Shield enrollees might be willing to be redirected to other non-Sutter hospitals than the Redirection Analysis estimated. [220]

Sutter's arguments attacking the accuracy or reliability of the Redirection Analysis are misplaced on this narrow motion for summary judgment. As discussed above, the hypothetical-monopolist test focuses not on how patients would respond to a hypothetical-monopolist hospital's imposing a SSNIP but on how health plans would respond. *St. Luke's*, 778 F.3d at 784 & n.10; *accord Advocate Health*, 841 F.3d at 471; *Penn State Hershey*, 838 F.3d at 342. The hypothetical-monopolist test thus does not solely turn on whether [Redacted] percent of Blue Shield enrollees who use the Sutter hospitals could not be redirected to other hospitals (as the Blue Shield Redirection Analysis estimated). What the test might turn on is whether Blue Shield concluded that [Redacted] percent of its enrollees could not be redirected, and thus would respond by paying a price increase to keep those hospitals in network. Blue Shield conducted these redirection analyses to determine the repercussions of its terminating its agreement with Sutter. Sutter's arguments — that the Blue Shield Redirection Analysis's estimates were unscientific, based on unverifiable assumptions, contradicted by other analyses, or just plain wrong — do not demonstrate an absence of material fact about whether Blue Shield concluded from those estimates that it could not afford to terminate its agreement with Sutter and thus would pay a price increase rather than lose Sutter hospitals from its network.

**\*30** Sutter also argues that the Redirection Analysis conflicts with Blue Shield's real-world experience with narrower provider networks and Blue Shield's representations to California regulators about what substitute hospitals were

available. [221] Sutter cites to the district-court decision in *Advocate Health* and argues that there, "the district court 'shared some of defendants' concerns about the credibility of the insurers' testimony, which may indeed be self-serving,' but set those concerns aside because that 'there [wa]s no inconsistency in the insurers' testimony," [222] whereas here, by contrast, "the inconsistency of Blue Shield's own positions regarding substitutable hospitals is overwhelming, and the record as a whole contradicts the redirection analysis." [223]

This argument is misplaced on this narrow motion for summary judgment. *Advocate Health* was before the court on a preliminary-injunction motion, where the court had to weigh the evidence to determine the likelihood of the plaintiff's success on the merits. This is a summary-judgment motion, where the court does not weigh evidence and instead draws all inferences in the non-moving party's favor. Contradictions in Blue Shield's positions at most raise disputes of fact. They do not provide a basis for discounting the Blue Shield Redirection Analysis, much less for granting Sutter summary judgment.

For each of the Candidate Tying Markets, the Blue Shield Redirection Analysis raises disputes of material fact as to whether the hypothetical-monopolist test is satisfied, and thus, whether the Candidate Tying Markets are geographic markets for antitrust purposes.

### 3.1.2 Knox-Keene Act

A former Blue Shield Senior Vice President stated in a sworn declaration that if a Blue Shield enrollee "liv[es] in a rural area of Northern California, and the only hospital within 30 minutes or 15 miles of his residence or workplace was a Sutter hospital, the [Knox-Keene Act] mandates that Sutter's hospital be included in the network." [224]

Sutter's expert Dr. Gowrisankaran stated that for the patients discharged from Sutter Delta, Sutter Auburn, Sutter Coast, Sutter Amador, and Sutter Lakeside, 49 to 100 percent of them do not live within a 30-minute drive of another non-Kaiser hospital. Additionally, the DMHC sent Blue Shield notices that it effectively had to keep Sutter Delta, Sutter Coast, Sutter Amador, and Sutter Lakeside in network for certain hospital services because there were no other alternative hospitals available that complied with Knox-Keene Act requirements. This raises a dispute of material fact as to whether, if a

Appendix of Authorities: 118 of 180

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

hypothetical monopolist that controlled all of the hospitals in the Antioch, Auburn, Crescent City, Jackson, and Lakeport HSAs (i.e., Sutter Delta, Sutter Auburn, Sutter Coast, Sutter Amador, and Sutter Lakeside) imposed a SSNIP, health plans would pay those price increases (rather than refusing to pay and losing those hospitals from their networks, and thereby losing a significant portion of that potential-enrollee customer base because they would no longer have Knox-Keene Act compliant hospitals to offer). And if there is a dispute of material fact about whether buyers (i.e., health plans) would pay a hypothetical monopolist's price increases, then there is a dispute of material fact about whether the hypothetical-monopolist test is satisfied and thus whether the Antioch, Auburn, Crescent City, Jackson, and Lakeport HSAs are geographic markets for antitrust purposes.

**\*31** Sutter argues that the Knox-Keene Act 30-minute regulations are only "presumptively reasonable standards" and that "health plans can comply with California's reasonable accessibility requirements after taking into account a range of other factors, including whether the community is rural or urban."[225] Again, Sutter's argument is misplaced on this narrow motion for summary judgment. Whether health plans might have exceptions to the Knox-Keene Act 30-minute requirement that might be applicable in certain situations does not demonstrate an absence of material fact about whether health plans understood that the Knox-Keene Act generally would bar them from being able to sell health-insurance products to a significant percentage of their customer bases.

Sutter also argues that several of its hospitals are within a 30-minute drive of a non-Sutter hospital.[226] But the Knox-Keene Act does not require health plans to offer in-network hospitals within a 30-minute drive of other hospitals; it requires them to offer in-network hospitals within a 30-minute drive of their enrollees. The fact that a non-Sutter hospital may be within a 30-minute drive of a Sutter hospital does not mean that the non-Sutter hospital is within a 30-minute drive of the enrollees who currently use that Sutter hospital.[227]

For the Antioch, Auburn, Crescent City, Jackson, and Lakeport HSAs, the application of the Knox-Keene Act raises a dispute of material fact as to whether the hypothetical-monopolist test is satisfied, and thus, whether the Antioch, Auburn, Crescent City, Jackson, and Lakeport HSAs are geographic markets for antitrust purposes.

### 3.1.3 Other evidence

According to the UnitedHealthcare Email, UnitedHealthcare's Director of Provider Services for Northern California believed that Sutter had monopolies in a number of submarkets, including Auburn, Amador, Tracy, Antioch, Berkeley, Oakland, and Clearlake, and that it was "not feasible" to present a health-maintenance-organization or fee-for-service insurance network that did not include Sutter.[228] This raises a dispute of material fact as to whether, if a hypothetical monopolist that controlled all hospitals in the Antioch, Auburn, Jackson, Lakeport, Tracy, and combined Berkeley-Oakland HSAs (i.e., Sutter Delta, Sutter Auburn, Sutter Amador, Sutter Lakeside, Sutter Tracy, and Sutter Alta Bates) imposed a SSNIP, health plans like UnitedHealthcare would pay those price increases (rather than refusing to pay and losing those hospitals from their networks).

Aetna's Vice President for Network Management in Northern California testified that "there are some rural hospitals where Sutter hospitals are really it for a given area," including Sutter Alta Bates, Sutter Amador, Sutter Auburn, Sutter Lakeside, and Sutter Coast, and that such hospitals were "really the must-have from a marketability or a member perception standpoint."[229] This raises a dispute of material fact as to whether, if a hypothetical monopolist that controlled all hospitals in the Auburn, Crescent City, Jackson, Lakeport, and combined Berkeley-Oakland HSAs (i.e., Sutter Auburn, Sutter Coast, Sutter Amador, Sutter Lakeside, and Sutter Alta Bates) were to impose a SSNIP, health plans like Aetna would pay those price increases, rather than refusing to pay and losing those hospitals from their networks.

**\*32** The Sutter Model Amendment designated Sutter Amador, Sutter Coast, and Sutter Lakeside as "rural hospitals," which Sutter's Chief Contracting Officer testified meant a hospital "that in all practical reality was the hospital, the local hospital in that community, typically a more rural community[that d]oesn't have other hospitals in the local vicinity."[230] The Sutter Blue Cross Amendment similarly designated Sutter Amador, Sutter Coast, and Sutter Lakeside as "Rural Hospitals," defined as a designation for a hospital "which acts as the sole practical resource for acute care and emergency care within the rural community it serves, and the next closest facility is at least 30 miles away[.]"[231] Anthem's former Director of Network Development for Northern California and Vice President of Provider Engagement and

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

Contracting for California agreed that these hospitals were "essentially the only game in town" in their rural areas. [232] This raises a dispute of material fact as to whether, if a hypothetical monopolist that controlled all hospitals in the Crescent City, Jackson, and Lakeport HSAs (i.e., Sutter Coast, Sutter Amador, and Sutter Lakeside) imposed a SSNIP, health plans would pay those price increases (rather than refusing to pay and losing those hospitals from their networks).

Sutter argues that "[o]ffhand comments that certain Sutter hospitals are 'monopolies' or 'must have hospitals' say nothing of the actual boundaries of a market, which could just as readily be a multi-county area or a two-block radius of the hospital as an HSA." [233] But on a summary-judgment motion, that this evidence might also support other geographic-market definitions does not demonstrate an absence of material fact about the plaintiffs' Candidate Markets. The Supreme Court has recognized that "[a]n element of 'fuzziness would seem inherent in any attempt to delineate the relevant geographical market,'" *Conn. Nat'l Bank*, 418 U.S. at 669, and thus the boundaries of a relevant geographic market "need not ... be defined with scientific precision," *id.*, or "by metes and bounds as a surveyor would lay off a plot of ground," *Pabst Brewing Co.*, 384 U.S. at 549. As Sutter's expert Dr. Gowrisankaran testified, "[a] market analysis does not always yield only one market definition that is accurate. It might yield a couple of different market definitions that could each be plausible." [234] That the plaintiffs' evidence might not foreclose all other possible geographic-market definitions does not mean that it fails to raise a dispute of material fact in support of the plaintiffs' Candidate Markets and does not entitle Sutter to summary judgment. [235]

\* \* \*

**\*33**  There are disputes of material fact about whether the plaintiffs can establish that the Candidate Tying Markets are geographic markets for antitrust purposes. The court denies Sutter's motion for summary judgment with respect to the Candidate Tying Markets.

### 4. The Candidate Tied Markets
Courts have recognized that a hypothetical monopolist's ability to impose a SSNIP of five percent may satisfy the hypothetical-monopolist test. *Penn State Hershey*, 838 F.3d at 338 nn.1–2 (citing U.S. Dep't of Justice & Fed. Trade Comm'n, *Horizontal Merger Guidelines* § 4.1.2 (2010); *St.*

*Luke's,* 778 F.3d at 784 n.9). The plaintiffs' expert Dr. Chipty conducted diversion analyses for the Candidate Tied Markets (the Modesto, Sacramento, San Francisco, and Santa Rosa HSAs) and estimated that a hypothetical monopolist that controlled all of the hospitals in each such market could profitably impose a SSNIP of between seven and twenty percent at the Sutter hospital in the market. This raises a dispute of material fact as to whether the hypothetical-monopolist test is satisfied for the Candidate Tied Markets and thus, whether they are relevant geographic markets for antitrust purposes.

Sutter moves to exclude Dr. Chipty's opinions with respect to the plaintiffs proposed geographic markets, including the Candidate Tied Markets, under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). [236]

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "Under *Daubert*, the trial court must act as a 'gatekeeper' to exclude junk science that does not meet Federal Rule of Evidence 702's reliability standards by making a preliminary determination that the expert's testimony is reliable." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 147–49 (1999)). "*Daubert* does not require a court to admit or to exclude evidence based on its persuasiveness; rather it requires a court to admit or exclude evidence based on its scientific reliability and relevance." *Id.* (citing *Daubert*, 509 U.S. at 589–90). "Thus, an expert's 'inference or assertion must be derived by the scientific method' to be admissible." *Id.* (citing *Daubert*, 509 U.S. at 590). "A trial court has broad latitude not only in determining whether an expert's testimony is reliable, but also in deciding how to determine the testimony's reliability." *Id.* (citing *Kumho Tire*, 526 U.S. at 152).

Sutter does not dispute that Dr. Chipty has the knowledge, skill, experience, training, or education to render an expert opinion. [237]  Instead, Sutter raises two main objections why Dr. Chipty's report is unreliable with respect to the Candidate Tied Markets.

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

**\*34**  First, Sutter argues that Dr. Chipty created a "brand new methodology" to analyze the Candidate Tied Markets that has never been used in any prior antitrust case and that (so Sutter argues) was not subject to peer review and publication. [238] The Ninth Circuit recently reversed a district-court decision excluding expert reports for placing undue weight on arguments akin to those that Sutter makes here. The Ninth Circuit explained:

> [T]he district court was wrong to put so much weight on the fact that the experts' opinions were not developed independently of litigation and had not been published. While independent research into the topic at issue is helpful to establish reliability, its absence does not mean the experts' methods were unreliable. Where "the proffered expert testimony is not based on independent research," the experts can instead present "other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.' " To be sure, 'one means of showing that the testimony is based on scientifically valid principles is by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication.' However, expert testimony may still be reliable and admissible without peer review and publication.

*Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1235 (9th Cir. 2017) (citations and internal brackets omitted). Dr. Chipty's report explains the formulas that she used and cites the articles and sources that support her opinion. Further, she testified that "my sense from reading the materials written — including by the testifying expert in [the *Advocate Health*] case — I believe this type of approach has been used recently in the *Advocate [Health]* matter." [239]  To the extent that Sutter believes that Dr. Chipty's formulas are incorrect or that she failed to consider important facts, it can challenge her on cross-examination. *Cf. id.* at 1237 ("Where, as here, the experts' opinions are not the 'junk science' Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system — 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof' — to 'attack shaky but admissible evidence.' ") (citations and internal brackets omitted); *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 281 (6th Cir. 2014) (reversing district-court decision excluding expert opinion on hypothetical-monopolist test and holding

that "[i]ncluding some facts while admitting others goes to the accuracy of the conclusions, not to the reliability of the testimony") (citations and internal quotation marks omitted).

Second, Sutter argues that Dr. Chipty did not use her diversion analysis for the Candidate Tying Markets, and her failure to use a common methodology for the Candidate Tied and Tying Markets renders her opinions unreliable. The court disagrees. That a hospital in a given region may have so few competitors that there are no other hospitals where its patients can be diverted — and hence a diversion analysis cannot be applied — does not render unreliable a diversion analysis for hospitals that have closer competitors.

The court denies Sutter's motion to exclude Dr. Chipty's opinions with respect to the Candidate Tying Markets.

\* \* \*

**\*35**  There are disputes of material fact about whether the plaintiffs can establish that the Candidate Tied Markets are geographic markets for antitrust purposes. Sutter's motion for summary judgment with respect to the Candidate Tied Markets is denied.

### CONCLUSION

The court grants summary judgment with respect to the Davis HSA Candidate Tying Market and otherwise denies Sutter's motion for summary judgment.

Because Dr. Chipty's opinions about the Candidate Tying Markets and Dr. Gowrisankaran's opinions generally do not affect the outcome of Sutter's summary-judgment motion, the court denies as moot Sutter's motion to exclude Dr. Chipty's opinion with respect to the Candidate Tying Markets and the plaintiffs' motion to exclude Dr. Gowrisankaran. The court denies Sutter's motion to exclude Dr. Chipty's opinions with respect to the Candidate Tied Markets.

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2019 WL 2078788, 2019-1 Trade Cases P 80,765

**Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)**

2019 WL 2078788, 2019-1 Trade Cases P 80,765

---

**Footnotes**

1 Fourth Amend. Compl. ("4AC") – ECF No. 202 at 4 (¶ 4), 10 (¶¶ 30–31), 29 (¶¶ 86–87). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

2 *See id.* at 4 (¶ 6), 11–12 (¶ 35).

3 *Id.* at 4 (¶ 6), 11 (¶ 33). The court refers to the Candidate Tying Markets and the Candidate Tied Markets collectively as the "Candidate Markets."

4 *Id.* at 4 (¶ 5), 33 (¶ 103).

5 *Id.* at 5 (¶ 9), 33 (¶¶ 103–05).

6 *Id.* at 5 (¶ 8), 34–35 (¶¶ 109–12).

7 Def. MSJ – ECF No. 272.

8 4AC – ECF No. 202 at 3–4 (¶¶ 3–4), 17–24 (¶¶ 53–67).

9 Pls. Mot. to Exclude Gowrisankaran – ECF Nos. 311-1 (under seal), 494-2 (redacted version); Def. Mot. to Exclude Chipty – ECF Nos. 409-3 (under seal), 503 (redacted version).

10 The court does not address whether HSAs are geographic markets for antitrust purposes generally, only that there are disputes of material facts as to whether the specific Candidate Markets that the plaintiffs propose — which here are defined by reference to HSAs — are geographic markets for antitrust purposes here.

11 In cases involving allegations of horizontal restraints (imposed by agreements between competitors), courts might not need to "precisely define the relevant market to conclude that these agreements were anticompetitive," but in cases involving allegations of vertical restraints (involving agreements between firms at different levels of distribution), courts must "first define[ ] the relevant market." *Am. Express,* 138 S. Ct. at 2285 n.7. Tying is a vertical restraint. *Brantley v. NBC Universal, Inc.,* 675 F.3d 1192, 1198–99 (9th Cir. 2012).

   The plaintiffs argue that market definition is not a required element of their state-law Cartwright Act claims. Pls. Mot. for Summary J. ("MSJ") Opp'n – ECF No. 494 at 8. Because the court holds that there are disputes of material fact regarding the plaintiffs' geographic-market definitions that are sufficient to defeat summary judgment, the court need not decide whether market definitions are a necessary element of a Cartwright Act claim.

12 In some instances, a hospital might sell hospital services directly to an individual patient (e.g., an uninsured patient who directly pays the hospital out-of-pocket). This case, however, relates only to enrollees in health-insurance plans. *See* 4AC – ECF No. 204 at 3 (¶¶ 1–2).

13 Some enrollees may be more directly sensitive to price, e.g., enrollees in high-deductible plans. *See Penn State Hershey,* 838 F.3d at 342 n.6.

14 4AC – ECF No. 204 at 15 (¶ 47).

15 *Id.* at 25 (¶¶ 68–69).

16 Def. MSJ – ECF No. 272 at 11–13.

**Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)**

2019 WL 2078788, 2019-1 Trade Cases P 80,765

17    *Id.* at 14.

18    4AC – ECF No. 204 at 17–24 (¶¶ 56–67).

19    Zip codes 94505, 94509, 94511, 94513, 94514, 94531, 94548, and 94561. *Id.* at 18 (¶ 56).

20    Zip codes 95602, 95603, 95604, 95614, 95631, 95658, 95664, 95701, 95703, 95713, 95714, 95717, 95722, and 95736. *Id.* (¶ 57).

21    Zip codes 95531, 95532, 95538, 95543, 95548, 95567, and 97415. *Id.* at 19 (¶ 58).

22    Zip codes 95616, 95617, 95618, 95620, and 95694. *Id.* (¶ 59).

23    Zip codes 95232, 95255, 95601, 95629, 95640, 95642, 95644, 95646, 95654, 95665, 95666, 95669, 95675, 95685, 95689, and 95699. *Id.* at 20 (¶ 60).

24    Zip codes 95426, 95435, 95451, 95453, 95458, 95464, 95485, and 95493. *Id.* (¶ 61).

25    Zip codes 95304, 95376, 95377, 95378, and 95391. *Id.* at 21 (¶ 62).

26    Zip codes 94530, 94701, 94702, 94703, 94704, 94705, 94706, 94707, 94708, 94709, 94710, 94712, and 94720. *Id.* (¶ 63).

27    Zip codes 94502, 94604, 94608, 94612, 94620, 94649, 94661, 94601, 94605, 94609, 94613, 94617, 94621, 94662, 94602, 94606, 94610, 94614, 94618, 94623, 94659, 94666, 94603, 94607, 94611, 94615, 94619, 94624, and 94660. *Id.*

28    Zip codes 95307, 95230, 95313, 95319, 95320, 95322, 95323, 95326, 95328, 95329, 95350, 95351, 95352, 95353, 95354, 95355, 95356, 95357, 95358, 95360, 95363, 95366, 95367, 95368, 95385, 95386, 95387, and 95397. *Id.* at 22 (¶ 64).

29    Zip codes 94203, 94204, 94205, 94206, 94207, 94208, 94209, 94211, 94229, 94230, 94232, 94234, 94235, 94236, 94237, 94239, 94240, 94244, 94245, 94247, 94248, 94249, 94250, 94252, 94254, 94256, 94257, 94258, 94259, 94261, 94262, 94263, 94267, 94268, 94269, 94271, 94273, 94274, 94277, 94278, 94279, 94280, 94282, 94283, 94284, 94285, 94286, 94287, 94288, 94289, 94290, 94291, 94293, 94294, 94295, 94296, 94297, 94298, 94299, 95605, 95612, 95615, 95624, 95626, 95639, 95651, 95652, 95655, 95659, 95662, 95668, 95670, 95672, 95673, 95680, 95683, 95690, 95691, 95693, 95741, 95757, 95758, 95759, 95762, 95798, 95799, 95811, 95812, 95813, 95814, 95815, 95816, 95817, 95818, 95819, 95820, 95821, 95822, 95823, 95824, 95825, 95826, 95827, 95828, 95829, 95830, 95831, 95832, 95833, 95834, 95835, 95836, 95837, 95838, 95840, 95851, 95852, 95853, 95860, 95864, 95865, 95866, 95867, 95894, and 95899. *Id.* at 22–23 (¶ 65).

30    Zip codes 94102, 94103, 94104, 94105, 94107, 94108, 94109, 94110, 94111, 94112, 94114, 94115, 94116, 94117, 94118, 94119, 94120, 94121, 94122, 4123, 94124, 94126, 94127, 94129, 94130, 94131, 94132, 94133, 94134, 94137, 94139, 94140, 94141, 94142, 94143, 94144, 94145, 94146, 94147, 94151, 94158, 94159, 94160, 94161, 94163, 94164, 94172, 94177, and 94188. *Id.* at 23 (¶ 66).

31    Zip codes 94926, 94927, 94928, 94931, 95401, 95402, 95403, 95404, 95405, 95406, 95407, 95409, 95412, 95421, 95436, 95439, 95445, 95446, 95452, 95459, 95462, 95468, 95471, 95480, 95486, 95492, 95494, and 95497. *Id.* at 24 (¶ 67).

32    *Id.* at 12 (¶ 37).

2019 WL 2078788, 2019-1 Trade Cases P 80,765

33     Hr'g Tr. – ECF No. 611 at 126.

34     4AC – ECF No. 204 at 3 (¶ 3), 10 (¶ 30), 17–24 (¶¶ 53–67).

35     Sutter's expert Dr. Gowrisankaran discusses the *Dartmouth Atlas* and how the *Dartmouth Atlas* group construed the "Hospital Service Areas," or "HSAs." The plaintiffs and their expert Dr. Chipty do not contend that Dr. Gowrisankaran's discussion about how the *Dartmouth Atlas* group constructed HSAs is inaccurate. *See generally* Chipty Dep. – ECF No. 479-2 at 56–57 (pp. 55–56). The court thus recounts a portion of Dr. Gowrisankaran's discussion as background about what HSAs are. The court does not adopt Dr. Gowrisankaran's discussions on this topic as a fact finding and instead summarizes his discussions to provide background on HSAs.

36     Gowrisankaran Decl. – ECF No. 272-3 at 18 (¶ 26).

37     *Id.* (quoting *Dartmouth Atlas*).

38     *Id.* at 20 (¶ 30).

39     *Id.*

40     *Id.*

41     *Id.*

42     *Id.*

43     *Id.*

44     *Id.*

45     *Id.* at 21 (¶ 30).

46     *Id.* at 27 (¶ 43); *see also* Dartmouth Atlas Project, General FAQ, https://www.dartmouthatlas.org/faq (last visited Apr. 12, 2019) ("[Q.] Why does the Dartmouth Atlas Project focus on Medicare data? Are there similar variations in utilization and spending in the under-65 population? [A.] The Centers for Medicare and Medicaid Services (CMS), the federal agency that collects data for every person and provider using Medicare health insurance, makes available a uniform national claims database for research purposes. There is no counterpart to this database for the commercially insured population. However, similar studies we have done using state all-payer data in Pennsylvania and Virginia, and with Blue Cross Blue Shield data in Michigan, have shown similar variations among the under-65 population.").

47     Gowrisankaran Decl. – ECF No. 272-3 at 19 (¶ 27); *see also* Dartmouth Atlas Project, About Our Regions, http://archive.dartmouthatlas.org/data/region (last visited Apr. 12, 2019) ("When these regions were created in the early 1990s, most hospital service areas contained only one hospital. In the intervening years, hospital closures have left some HSAs with no hospital; these HSAs have been maintained as distinct areas in order to preserve the continuity of the database.").

48     Gowrisankaran Decl. – ECF No. 272-3 at 18 (¶ 26); Chipty Decl. – ECF No. 494-1 at 106 (¶ 144).

49     Chipty Decl. – ECF No. 494-1 at 82–83 (¶ 107).

50     Kaiser Permanente is another large hospital system in Northern California. 4AC – ECF No. 204 at 10–11 (¶ 32). Kaiser operates in a "closed system," where (other than in emergencies) its hospitals offer inpatient hospital services only to Kaiser health plans and not to other health plans. *Id.* The plaintiffs therefore allege

2019 WL 2078788, 2019-1 Trade Cases P 80,765

that Kaiser's hospitals do not compete with Sutter's hospitals with respect to selling inpatient hospital services to non-Kaiser health plans. *Id.* Sutter does not challenge the exclusion of Kaiser in its motion for summary judgment. Def. MSJ – ECF No. 272 at 19 n.7 ("[T]his Motion generally focuses on data that exclude Kaiser in keeping with Plaintiffs' approach to market definition in this case.").

51 Chipty Decl. – ECF No. 494-1 at 81 (¶ 106); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

52 Chipty Decl. – ECF No. 494-1 at 82 (¶ 106).

53 *Id.* (¶ 107) (40%/60%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (44.2%/55.8%).

54 Chipty Decl. – ECF No. 494-1 at 82 (¶ 107).

55 Joyner Decl. – ECF No. 497 at 7 (¶ 20).

56 *Id.*

57 Barnes Dep. – ECF Nos. 311-15 at 13 (under seal), 494-10 at 13 (redacted version) (p. 538); DMHC Letter– ECF No. 494-13 at 3 (BSC_SutterSub00062560).

58 Barnes Dep. – ECF No. 494-10 at 13–14 (pp. 538–39).

59 DMHC Letter – ECF No. 494-13 at 3 (BSC_SutterSub00062560); *see* Barnes Dep. – ECF No. 494-10 at 14 (p. 539); Barnes Dep. – ECF No. 494-13 at 12 (p. 542).

60 Barnes Dep. – ECF No. 494-10 at 13–14 (pp. 538–39); Barnes Dep. – ECF No. 494-13 at 12 (p. 542); Barnes Dep. – ECF No. 494-11 at 11 (p. 543); DMHC Letter – ECF No. 494-13 at 3–5 (BSC_SutterSub00062560–62).

61 Gowrisankaran Decl. Ex. 8 – ECF No. 272-3 at 68. Dr. Gowrisankaran referred to discharges from hospitals within the Antioch HSA, excluding Kaiser hospitals. Because Sutter Delta is the only non-Kaiser hospital in the Antioch HSA, these discharges necessarily are discharges from Sutter Delta.

62 Dr. Gowrisankaran referred to whether patients live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA. Because there are no other non-Sutter, non-Kaiser hospitals in the Antioch HSA, patients who do not live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA necessarily do not live within 30 minutes of any non-Sutter, non-Kaiser hospital other than Sutter Delta.

63 Joyner Decl. – ECF No. 497 at 7–8 (¶ 21).

64 *Id.* at 19 (¶¶ 58–59) (internal brackets and some internal quotation marks omitted); *see also* Joyner Decl. Ex. 18 (Unchecked Provider Clout presentation) – ECF No. 499 at 13 (BSC_UFCW-00045213) ("[T]he Sutter system operates 24 facilities in 17 northern counties — sole provider in five counties — controls nearly 50 percent of [Blue Shield of California] spend in 10 or their 17 counties[.] Sutter negotiation ... — leverage its market position in multiple counties (where they are dominant) to demand higher rates across the board[.]").

65 Joyner Decl. – ECF No. 497 at 19 (¶ 60).

66 Barnes Dep. – ECF Nos. 469-2 at 12, 23 (under seal), 493 at 12, 23 (redacted version) (pp. 426, 437).

67 Barnes Dep. – ECF Nos. 469-2 at 12 (under seal), 493 at 12 (redacted version) (p. 426).

68 Blue Shield Redirection Analysis – ECF Nos. 469-2 at 63 (under seal), 493 at 63 (redacted version) (BSC_SutterSub00037814). The Redirection Analysis includes an Excel chart with a column for Sutter hospitals associated with columns for "Alternative Hospitals" and "Expected Allocation %." *Id.* at 62–63.

2019 WL 2078788, 2019-1 Trade Cases P 80,765

Blue Shield's Director of Provider Contracting for Northern California explained that the "Expected Allocation %" column indicates Blue Shield's estimate of where its enrollees would go to get medical care if the corresponding Sutter hospital were no longer in network. Barnes Dep. – ECF 503-1 at 47–50 (pp. 436–39); *see* Barnes Dep. – ECF No. 493 at 19–20 (pp. 433–34) (discussing the 95-percent-of-billed-charges rates for out-of-network patients); *see also* Barnes Dep. – ECF Nos. 428-6 at 69 (under seal), 479-5 at 69 (redacted version) (p. 469) (allocation-percentage estimates were for [Redacted]).

The Director testified about some of the reasons he arrived at that estimate, including the reasons that Antioch is a [Redacted], and it is [Redacted] Barnes Dep. – ECF Nos. 469-2 at [Redacted] (under seal), 493 at [Redacted] (redacted version) (pp. [Redacted]).

69    Barnes Dep. – ECF No. 493 at 26 (p. 440).

70    *Id.; see also id.* ("I could have hospitals right next door to each other, but if one had a very bad reputation you are not going to be able to channel there.").

71    Barnes Dep. – ECF No. 503-1 at 62–65 (pp. 730–33).

72    UnitedHealthcare Email – ECF No. 311-20 at 2 (under seal) (UHC-00134453).

73    *Id.*

74    Chipty Decl. – ECF No. 494-1 at 92–93 (¶ 120).

75    *Id.* at 91 (¶ 119); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

76    Chipty Decl. – ECF No. 494-1 at 92 (¶ 119).

77    *Id.* (¶ 120) (37%/63%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (30.3%/69.7%).

78    Chipty Decl. – ECF No. 494-1 at 92 (¶ 120).

79    Gowrisankaran Decl. Ex. 8 – ECF No. 272-3 at 68. Dr. Gowrisankaran referred to discharges from hospitals within the Auburn HSA, excluding Kaiser hospitals. Because Sutter Auburn is the only hospital in the Auburn HSA, these discharges necessarily are discharges from Sutter Auburn.

80    Dr. Gowrisankaran referred to whether patients live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA. Because there are no other non-Sutter, non-Kaiser hospitals in the Auburn HSA, patients who do not live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA necessarily do not live within 30 minutes of any non-Sutter, non-Kaiser hospital other than Sutter Auburn.

81    Blue Shield Redirection Analysis – ECF Nos. 469-2 at 62 (under seal), 493 at 62 (redacted version) (BSC_SutterSub00037814). Blue Shield's Director of Provider Contracting for Northern California testified about some of the reasons for that estimate, including the reason that Auburn is a [Redacted] and that the [Redacted] Barnes Dep. – ECF Nos. 469-2 at [Redacted] (under seal), 493 at [Redacted] (redacted version) (pp. [Redacted]).

82    UnitedHealthcare Email – ECF No. 311-20 at 2 (under seal) (UHC-00134453).

83    Welsh Dep. – ECF No. 311-5 at 7–8 (under seal) (pp. 196–97).

84    *Id.* at 7 (p. 196).

2019 WL 2078788, 2019-1 Trade Cases P 80,765

85    Chipty Decl. – ECF No. 494-1 at 73 (¶ 96); Gowrisankaran Decl. – ECF No. 272-3 at 32 n.78 (¶ 50 n.78).

86    Chipty Decl. – ECF No. 494-1 at 74–75 (¶ 97).

87    *Id.* at 73 (¶ 96); Gowrisankaran Decl. Ex. 1B – ECF No. 272-3 at 61.

88    Chipty Decl. – ECF No. 494-1 at 74 (¶ 96).

89    *Id.* at 75 (¶ 97) (72%/28%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (77.0%/23.0%).

90    Chipty Decl. – ECF No. 494-1 at 75 & n.193 (¶ 97 & n.193). Dr. Chipty was not able to calculate the average driving time for patients that traveled out of the Crescent City HSA to an Oregon hospital. *Id.* at 75 n.193 (¶ 97 n.193).

91    Barnes Dep. – ECF Nos. 311-15 at 13 (under seal), 494-10 at 13 (redacted version) (p. 538); DMHC Letter– ECF No. 494-10 at 3 (BSC_SutterSub00062477).

92    DMHC Letter – ECF No. 494-10 at 3 (BSC_SutterSub00062477); *see* Barnes Dep. – ECF No. 494-10 at 14–15 (pp. 539–40).

93    Barnes Dep. – ECF No. 494-10 at 13–15 (pp. 538–40); DMHC Letter – ECF No. 494-10 at 3–5 (BSC_SutterSub00062477–79).

94    Gowrisankaran Decl. Ex. 8 – ECF No. 272-3 at 68. Dr. Gowrisankaran referred to discharges from hospitals within the Crescent City HSA, excluding Kaiser hospitals. Because Sutter Coast is the only hospital in the Crescent City HSA, these discharges necessarily are discharges from Sutter Crescent City.

95    Dr. Gowrisankaran referred to whether patients live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA. Because there are no other non-Sutter, non-Kaiser hospitals in the Crescent City HSA, patients who do not live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA necessarily do not live within 30 minutes of any non-Sutter, non-Kaiser hospital other than Sutter Coast.

96    Blue Shield Redirection Analysis – ECF Nos. 469-2 at 63 (under seal), 493 at 63 (redacted version) (BSC_SutterSub00037814). Blue Shield's Director of Provider Contracting for Northern California testified about some of the reasons for that estimate, including [Redacted] Barnes Dep. – ECF Nos. 469-2 at [Redacted] (under seal), 493 at [Redacted] (redacted version) (pp. [Redacted]).

97    Welsh Dep. – ECF No. 311-5 at 7–8 (under seal) (pp. 196–97).

98    Brendt Dep. – ECF Nos. 313-3 at 86 (under seal), 494-17 at 86 (redacted version) (p. 184); Brendt Dep. – ECF No. 494-17 at 91–92 (pp. 189–90).

99    Sutter Model Amendment – ECF Nos. 313-3 at 8 (under seal), 494-17 at 8 (redacted version) (DEF007581579).

100    Brendt Dep. – ECF Nos. 313-3 at 99–100 (under seal), 494-17 at 99–100 (redacted version) (pp. 197–98).

101    Sutter Model Amendment – ECF Nos. 313-3 at 36 (under seal), 494-17 at 36 (redacted version) (DEF007581607); Brendt Dep. – ECF Nos. 313-3 at 104 (under seal), 494-17 at 104 (redacted version) (p. 202).

102    Sutter Blue Cross Amendment – ECF No. 494-5 at 8 (DEF000097801).

2019 WL 2078788, 2019-1 Trade Cases P 80,765

103    Sutter Blue Cross Amendment – ECF No. 311-10 at 41, 43 (under seal), 494-5 at 41, 43 (redacted version) (DEF000097834, DEF000097836).

104    Ramseier Dep. – ECF No. 311-9 at 6 (under seal) (p. 139).

105    Chipty Decl. – ECF No. 494-1 at 85–86 (¶ 111).

106    *Id.* at 84 (¶ 110); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

107    Chipty Decl. – ECF No. 494-1 at 85 (¶ 110).

108    *Id.* at 86 (¶ 111) (43%/57%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (64.2%/35.8%).

109    Chipty Decl. – ECF No. 494-1 at 86 (¶ 111).

110    Barnes Dep. – ECF Nos. 311-15 at 13 (under seal), 494-10 at 13 (redacted version) (p. 538); DMHC Letter– ECF No. 494-11 at 3 (BSC_SutterSub00062387).

111    DMHC Letter – ECF No. 494-11 at 3 (BSC_SutterSub00062387); *see* Barnes Dep. – ECF No. 494-10 at 14 (p. 539); Barnes Dep. – ECF No. 494-11 at 11–12 (pp. 543–44).

112    Barnes Dep. – ECF No. 494-10 at 13–14 (pp. 538–39); Barnes Dep. – ECF No. 494-11 at 11–12 (pp. 543– 44); DMHC Letter – ECF No. 494-11 at 3–5 (BSC_SutterSub00062387–89).

113    Gowrisankaran Decl. Ex. 8 – ECF No. 272-3 at 68. Dr. Gowrisankaran referred to discharges from hospitals within the Jackson HSA, excluding Kaiser hospitals. As Sutter Amador is the only hospital in the Jackson HSA, these discharges necessarily are discharges from Sutter Amador.

114    Dr. Gowrisankaran referred to whether patients live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA. Because there are no other non-Sutter, non-Kaiser hospitals in the Jackson HSA, patients who do not live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA necessarily do not live within 30 minutes of any non-Sutter, non-Kaiser hospital other than Sutter Amador.

115    Blue Shield Redirection Analysis – ECF Nos. 469-2 at 63 (under seal), 493 at 63 (redacted version) (BSC_SutterSub00037814). Blue Shield's Director of Provider Contracting for Northern California testified about some of the reasons for that estimate, including the reasons that one alternative hospital was [Redacted] and another alternative hospital was [Redacted] Barnes Dep. – ECF Nos. 469-2 at [Redacted] (under seal), 493 at [Redacted] (redacted version) (pp. [Redacted]).

116    UnitedHealthcare Email – ECF No. 311-20 at 2 (under seal) (UHC-00134453).

117    Welsh Dep. – ECF No. 311-5 at 7–8 (under seal) (pp. 196–97).

118    Sutter Model Amendment – ECF Nos. 313-3 at 8, 34 (under seal), 494-17 at 8, 34 (redacted version) (DEF007581579, DEF007581605); Brendt Dep. – ECF Nos. 313-3 at 99–100, 102 (under seal), 494-17 at 99–100, 102 (redacted version) (pp. 197–98, 200).

119    Sutter Blue Cross Amendment – ECF No. 494-5 at 8 (DEF000097801); Sutter Blue Cross Amendment – ECF Nos. 311-10 at 37, 39 (under seal), 494-5 at 37, 39 (redacted version) (DEF000097830, DEF000097832).

120    Ramseier Dep. – ECF No. 311-9 at 6 (under seal) (p. 139).

121    Chipty Decl. – ECF No. 494-1 at 78–79 (¶ 102).

2019 WL 2078788, 2019-1 Trade Cases P 80,765

122   *Id.* at 77 (¶ 101); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

123   Chipty Decl. – ECF No. 494-1 at 78 (¶ 101).

124   *Id.* (¶ 102) (50%/50%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (41.8%/58.2%).

125   Chipty Decl. – ECF No. 494-1 at 78 (¶ 102).

126   Barnes Dep. – ECF Nos. 311-15 at 13 (under seal), 494-10 at 13 (redacted version) (p. 538); DMHC Letter– ECF No. 494-12 at 3 (BSC_SutterSub0267438).

127   DMHC Letter – ECF No. 494-12 at 3 (BSC_SutterSub0267438); *see* Barnes Dep. – ECF No. 494-10 at 14– 15 (pp. 539–40); Barnes Dep. – ECF No. 494-12 at 12 (p. 541); Barnes Dep. – ECF No. 494-13 at 12 (p. 542).

128   Barnes Dep. – ECF No. 494-10 at 13–15 (pp. 538–40); Barnes Dep. – ECF No. 494-12 at 12 (p. 541); Barnes Dep. – ECF No. 494-13 at 12 (p. 542); DMHC Letter – ECF No. 494-12 at 3–5 (BSC_SutterSub0267438–40).

129   Gowrisankaran Decl. Ex. 8 – ECF No. 272-3 at 68. Dr. Gowrisankaran referred to discharges from hospitals within the Lakeport HSA, excluding Kaiser hospitals. Because Sutter Lakeside is the only hospital in the Lakeport HSA, these discharges necessarily are discharges from Sutter Lakeside.

130   Dr. Gowrisankaran referred to whether patients live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA. Because there are no other non-Sutter, non-Kaiser hospitals in the Lakeport HSA, patients who do not live within 30 minutes of a non-Sutter, non-Kaiser hospital in another HSA necessarily do not live within 30 minutes of any non-Sutter, non-Kaiser hospital other than Sutter Lakeside.

131   Blue Shield Redirection Analysis – ECF Nos. 469-2 at 62 (under seal), 493 at 62 (redacted version) (BSC_SutterSub00037814). Blue Shield's Director of Provider Contracting for Northern California testified about some of the reasons for that estimate, including the reasons that one alternative hospital was [Redacted] and another alternative hospital was [Redacted] Barnes Dep. – ECF Nos. 469-2 at [Redacted] (under seal), 493 at [Redacted] (redacted version) (pp. [Redacted]).

132   UnitedHealthcare Email – ECF No. 311-20 at 2 (under seal) (UHC-00134453).

133   Welsh Dep. – ECF No. 311-5 at 7–8 (under seal) (pp. 196–97).

134   Sutter Model Amendment – ECF Nos. 313-3 at 8, 36 (under seal), 494-17 at 8, 36 (redacted version) (DEF007581579, DEF007581607); Brendt Dep. – ECF Nos. 313-3 at 99–100, 104 (under seal), 494-17 at 99–100, 104 (redacted version) (pp. 197–98, 202).

135   Sutter Blue Cross Amendment – ECF No. 494-5 at 8 (DEF000097801); Sutter Blue Cross Amendment – ECF No. 311-10 at 41, 43 (under seal), 494-5 at 41, 43 (redacted version) (DEF000097834, DEF000097836).

136   Ramseier Dep. – ECF No. 311-9 at 6 (under seal) (p. 139).

137   Chipty Decl. – ECF No. 494-1 at 89–90 (¶ 116).

138   *Id.* at 88 (¶ 115); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

139   Chipty Decl. – ECF No. 494-1 at 89 (¶ 115).

140   *Id.* (¶ 116) (57%/43%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (57.1%/42.9%).

141   Chipty Decl. – ECF No. 494-1 at 89 (¶ 116).

2019 WL 2078788, 2019-1 Trade Cases P 80,765

142     Gowrisankaran Decl. Ex. 8 – ECF No. 272-3 at 68. Dr. Gowrisankaran referred to discharges from hospitals within the Tracy HSA, excluding Kaiser hospitals. Because Sutter Tracy is the only hospital in the Tracy HSA, these discharges necessarily are discharges from Sutter Tracy.

143     Blue Shield Redirection Analysis – ECF Nos. 469-2 at 62 (under seal), 493 at 62 (redacted version) (BSC_SutterSub00037814). Blue Shield's Director of Provider Contracting for Northern California testified about some of the reasons for that estimate, including [Redacted] Barnes Dep. – ECF Nos. 469-2 at [Redacted] (under seal), 493 at [Redacted] (redacted version) (pp. [Redacted]).

144     UnitedHealthcare Email – ECF No. 311-20 at 2 (under seal) (UHC-00134453).

145     Welsh Dep. – ECF No. 311-5 at 7–8 (under seal) (pp. 196–97).

146     Chipty Decl. – ECF No. 494-1 at 70–71 (¶ 92).

147     *Id.* at 67–68 (¶¶ 90–91); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

148     Chipty Decl. – ECF No. 494-1 at 70 (¶ 91).

149     The court in the 2001 *Sutter* case denied the preliminary-injunction motion in part because it held that the California Attorney General had not proven a well-defined geographic market. *Id.* at 1132. To assess the geographic market, the court applied a test known as the Elzinga-Hogarty test, "a two-part test which examines current market behavior through an analysis of hospital service areas and patient flow data." *Id.* at 1120. "The Elzinga-Hogarty test was once the preferred method to analyze the relevant geographic market and was employed by many courts. But subsequent empirical research demonstrated that utilizing patient flow data to determine the relevant geographic market resulted in overbroad markets with respect to hospitals. Professor Elzinga himself testified before the FTC that this method 'was not an appropriate method to define geographic markets in the hospital sector.' " *Penn State Hershey*, 838 F.3d at 340 (citing *In re Evanston Nw. Healthcare Corp.*, No. 9315, 2007 WL 2286195, at *64 (F.T.C. Aug. 6, 2007), and distinguishing *Sutter*, 130 F. Supp. 2d 1109, and other older cases). More recent court decisions have rejected the Elzinga-Hogarty test as generating geographic markets that are too large, which then hurt consumers because they understate the anticompetitive effects of hospital consolidation. *Advocate Health*, 841 F.3d at 472; *see generally id.* at 469–73 (discussing the flaws of the Elzinga-Hogarty test); *Penn State Hershey*, 838 F.3d at 340–343 (same).

150     Chipty Decl. – ECF No. 494-1 at 70 (¶ 92) (79%/21%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (80.2%/19.8%).

151     Chipty Decl. – ECF No. 494-1 at 70 (¶ 92).

152     Gowrisankaran Decl. Ex. 8 – ECF No. 272-3 at 68.

153     Blue Shield Redirection Analysis – ECF Nos. 469-2 at 62–63 (under seal), 493 at 62–63 (redacted version) (BSC_SutterSub00037814). Blue Shield's Director of Provider Contracting for Northern California testified about some of the reasons for that estimate, including the reasons that the Oakland-Berkeley corridor is a [Redacted] Barnes Dep. – ECF Nos. 469-2 at [Redacted] (under seal), 493 at [Redacted] (redacted version) (pp. [Redacted]).

154     Beuoy Dep. – ECF Nos. 311-7 at 7 (under seal), 494-4 at 7 (redacted version) (p. 157). The Vice President testified that he did not participate in any analyses or conversations regarding whether Blue Shield would have a viable network in Alameda without including Sutter facilities. *Id.*

155     UnitedHealthcare Email – ECF No. 311-20 at 2 (under seal) (UHC-00134453).

2019 WL 2078788, 2019-1 Trade Cases P 80,765

156 Welsh Dep. – ECF No. 311-5 at 7 (under seal) (p. 196).

157 Chipty Decl. – ECF No. 494-1 at 13–15 (¶¶ 14–16).

158 *Id.* at 39 (¶ 50).

159 *Id.*

160 *Id.* at 39–40 (¶ 51).

161 *Id.* at 40 (¶ 51).

162 *Id.*

163 *Id.* at 43–44 (¶¶ 58–59). Dr. Chipty stated that she was unable to conduct a similar diversion analysis for the Candidate Tying Markets because, with respect to six of the proposed Candidate Tying Markets, there are no non-Kaiser hospitals in the Candidate Tying Markets where patients at the Sutter hospitals could be diverted, so the in-area diversion ratio would necessarily be zero percent. *Id.* at 41 (¶ 54). For the seventh Candidate Tying Market—the combined Berkeley-Oakland HSAs — Dr. Chipty stated that the one non-Sutter hospital (Alameda County Medical Center) was perceived to be of lower quality and thus there were "effectively" no other non-Kaiser hospitals in combined Berkeley-Oakland HSAs where patients at Sutter Alta Bates could be diverted. Chipty Decl. – ECF Nos. 311-3 at 71–72 (under seal), 494-1 at 71–72 (redacted version) (¶¶ 93–94). Dr. Chipty notes, however, that Alameda County Medical Center was among the highest recipients of patients diverted from Sutter Alta Bates. Chipty Decl. – ECF No. 494-1 at 72 n.184 (¶ 94 n.184).

164 *Id.* at 61 (¶ 79).

165 *Id.* at 59–60 (¶ 78); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

166 Chipty Decl. – ECF No. 494-1 at 60 (¶ 78).

167 *Id.* at 61 (¶ 79) (81%/19%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (83.9%/16.1%).

168 Chipty Decl. – ECF No. 494-1 at 61 (¶ 79). Dr. Gowrisankaran did not analyze the percentage of patients discharged from a non-Kaiser hospital in the Candidate Tied Market HSAs who live within a 30-minute drive of a non-Sutter hospital in another HSA, Gowrisankaran Decl. Ex. 8 – ECF No. 272-3 at 68, and thus those numbers are not included for the Candidate Tied Markets.

169 Chipty Decl. – ECF No. 494-4 at 61–62 (¶ 80).

170 *Id.*

171 *Id.* at 62 (¶ 81).

172 *Id.* at 49–50 (¶ 67).

173 *Id.* at 47–48 (¶ 66); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

174 Chipty Decl. – ECF No. 494-1 at 49 (¶ 66).

175 *Id.* (¶ 67) (78%/22%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (81.6%/18.4%).

176 Chipty Decl. – ECF No. 494-1 at 49 (¶ 67).

2019 WL 2078788, 2019-1 Trade Cases P 80,765

177    *Id.* at 51–52 (¶¶ 68–69).

178    *Id.*

179    *Id.* at 52–53 (¶ 70).

180    *Id.* at 49–50 (¶ 67).

181    *Id.* at 53–54 (¶ 72); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

182    Chipty Decl. – ECF No. 494-1 at 55 (¶ 33).

183    *Id.* (¶ 74) (95%/5%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (97.5%/2.5%).

184    Chipty Decl. – ECF No. 494-1 at 55 (¶ 74).

185    *Id.* at 56–58 (¶ 75).

186    *Id.* at 51–52 (¶ 69).

187    *Id.* at 58–59 (¶ 76).

188    *Id.* at 65 (¶ 84).

189    *Id.* at 63 (¶ 83); Gowrisankaran Decl. Ex. 1A – ECF No. 272-3 at 60.

190    Chipty Decl. – ECF No. 494-1 at 64 (¶ 83).

191    *Id.* at 65 (¶ 84) (75%/25%); Gowrisankaran Decl. Fig. 5 – ECF No. 272-3 at 46 (82.7%/17.3%).

192    Chipty Decl. – ECF No. 494-1 at 55 (¶ 74).

193    *Id.* at 56–58 (¶ 75).

194    *Id.* at 65–66 (¶ 85).

195    *Id.* at 66 (¶ 86).

196    Sutter cites *ProMedica Health System, Inc. v. FTC*, 749 F.3d 559 (6th Cir. 2014), to argue that distinguishing between health plans versus patients as the relevant consumers is "an argument about semantics." Def. MSJ – ECF No. 272 at 16. *ProMedica* does not hold that distinguishing between health plans and patients is "semantics" in all contexts. That case involved a merger between two of the four hospital systems in Lucas County, Ohio: ProMedica and St. Luke's. *Id.* at 561. The FTC challenged the merger as adversely affecting competition in violation of the Clayton Act. *Id.* There was no dispute about the relevant geographic market. *Id.* at 565. Instead, the main issue was whether ProMedica had rebutted the presumption that the merger would affect competition adversely. *Id.* at 568 (noting that the merger resulted in a Herfindahl-Hirschman market-concentration index between 4,391 to 6,854, far above the threshold of 2,500 where a merger is presumed to be anticompetitive), 571–72 (addressing ProMedica's arguments that it rebutted the presumption). The Sixth Circuit noted that what was "more remarkable is what ProMedica does not argue. By way of background, the goal of antitrust law is to enhance consumer welfare.... But ProMedica did not even attempt to argue before the [Federal Trade] Commission, and does not attempt to argue here, that this merger would benefit consumers (as opposed to only the merging parties themselves) in any way. To the contrary, St. Luke's CEO admitted that a merger with ProMedica might 'harm the community by forcing higher rates on them.' " *Id.* at 571 (internal brackets omitted). ProMedica argued that the FTC erred in addressing whether the two merging

Sidibe v. Sutter Health, Not Reported in Fed. Supp. (2019)

2019 WL 2078788, 2019-1 Trade Cases P 80,765

hospitals were substitutes for each other from the perspective of patients, rather than health plans. *Id.* at 572. The Sixth Circuit rejected that argument as "an argument about semantics. [Health plans] assemble networks based primarily upon patients' preferences, not their own; and thus the extent to which an MCO regards ProMedica and St. Luke's as close substitutes depends upon the extent to which the [health plan]'s members do." *Id.* But this statement does not mean that the Sixth Circuit endorsed a view that distinguishing between health plans and patients is "semantics" in all contexts, such as in the context of a hypothetical-monopolist test (a test the *ProMedica* court never addressed) to define a geographic market for hospitals' selling hospital services to health plans. Even if it were, this out-of-circuit pronouncement would not be controlling in light of the Ninth Circuit's more recent, binding opinion in *St. Luke's* on this issue.

It may be proper to focus on the response of patients, as opposed to health plans, in other contexts, such as in antitrust cases brought by medical providers alleging that they have been shut out of competing for patients. Sutter cites a number of these cases. Def. MSJ – ECF No. 272 at 15, 24–25. For example, one of the cases that Sutter cites, *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009), involved allegations by cardiologists that a large hospital system and a health plan conspired to shut them out from competing to attract patients to their clinic (instead of the hospitals). *Id.* at 597. In the context of the doctors' claims that they were shut out from competing for patients, it made sense to examine from where doctors draw their patients. *Id.* at 599; *see Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004) ("the concern in an ordinary exclusive dealing claim by a shut-out supplier is with the available market *for the supplier*," as opposed to the buyer) (emphasis in original). Other cases that Sutter cites are similar. *See Gordon v. Lewistown Hosp.*, 423 F.3d 184, 198 (3d Cir. 2005) (ophthalmologist alleging that hospital attempted to prevent him from competing to obtain or retain patients); *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1*, 309 F.3d 836, 838 (5th Cir. 2002) (outpatient surgery clinic alleging that large hospital attempted to monopolize the outpatient-surgery market); *Minn. Ass'n of Nurse Anesthetists v. Unity Hosp.*, 208 F.3d 655, 658–59 (8th Cir. 2000) (nurse anesthetists alleging that hospitals and doctors conspired to shut them out of competing with doctor anesthesiologists); *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 304 (5th Cir. 1997) (hospital alleging that rival hospital and health plan conspired to monopolize the hospital market); *Novak v. Somerset Hosp.*, 625 F. App'x 65, 67 (3d Cir. 2015) (surgeon alleging that hospital terminated his privileges to perform surgery on patients at the hospital); *Brown v. Our Lady of Lourdes Med. Ctr.*, 767 F. Supp. 618, 620 (D.N.J. 1991) (cardiothoracic surgeon alleging that hospital denied him medical-staff privileges).

None of those medical-provider shut-out cases addresses the hypothetical-monopolist test. And this is not a medical-provider shut-out case. The Ninth Circuit has recognized that competition between medical providers to be included as in-network providers in health plans is a separate stage of competition than competition between medical providers to attract patients. *St. Luke's*, 778 F.3d at 784 n.10 ("This 'two-stage model' of health care competition is 'the accepted model.' In the first stage, providers compete for inclusion in insurance plans. In the second stage, providers seek to attract patients enrolled in the plans.") (citing John J. Miles, 1 Health Care & Antitrust L. § 1:5 (2014); Vistnes, 67 Antitrust L.J. at 674, 681–82); *accord* Gowrisankaran Decl. – ECF No. 272-3 at 14–16 (¶¶ 19–22) (Sutter's expert agreeing these stages of competition are different). With respect to negotiations between medical providers and health plans and the hypothetical-monopolist test, the focus is on the response of health plans, as opposed to patients. *St. Luke's*, 778 F.3d at 784 & n.10; *accord Advocate Health*, 841 F.3d at 471; *Penn State Hershey*, 838 F.3d at 342.

197    The court expresses no opinion here as to whether the plaintiffs must exclude other possible geographic markets to prevail at trial. It holds only that the plaintiffs need not do so at summary judgment.

198    Def. MSJ Reply – ECF No. 436 at 15 (internal brackets omitted); Hr'g Tr. – ECF No. 611 at 48 (Sutter arguing that "the case law is clear that a plaintiff must have expert testimony to support its antitrust markets").

2019 WL 2078788, 2019-1 Trade Cases P 80,765

199    Hr'g Tr. – ECF No. 611 at 137. Sutter points to *Hammer v. Clear Channel Communications (In re Live Concert Antitrust Litigation)*, 863 F. Supp. 2d 966 (C.D. Cal. 2012) (cited by Def. MSJ Reply – ECF No. 436 at 17; Hr'g Tr. – ECF No. 611 at 139), but that case is inapposite. In that case, the plaintiffs relied solely on their expert to provide an evidentiary basis for their product (not geographic) market definition. *See Live Concert*, 863 F. Supp. 2d at 1000 ("Plaintiffs do not argue ... that there is an adequate evidentiary basis in the record, absent [their expert's] testimony, for a jury to find that Plaintiffs have defined an economically significant product market."). The court excluded the plaintiffs' expert, and then granted the defendants partial summary judgment because the plaintiffs offered no evidence besides their expert in support of their market definition. *Id.* But that case does not stand for the principle that plaintiffs must always base their market definition on expert testimony if — unlike the *Live Concert* plaintiffs — the plaintiffs also have non-expert evidence that supports their market definition.

200    The Ninth Circuit cited expert testimony for the general precept that patients are insensitive to physicians' raising their prices because they pay only a small percentage of their physicians' prices out of pocket. *St. Luke's*, 778 F.3d at 785. In applying the hypothetical-monopolist test to determine how health plans would react to a price increase, however, it cited the testimony of industry participants, not experts. *Id.*

201    Additionally, even where parties rely on expert opinion to support their market definitions, there is no requirement that the expert conduct an econometric analysis, as opposed to basing the expert opinion on other facts. *In re Apple iPod iTunes Antitrust Litig.*, No. 05-CV-0037 YGR, 2014 WL 4809288, at *7 (N.D. Cal. Sept. 26, 2014) (denying defendant's motion to exclude an expert opinion on market definition that was based on "internal Apple documents, employee testimony, and discovery responses, third-party information such as contemporaneous financial analysis and press coverage ..., and his own experience," and holding that the defendant's argument that an expert opinion on market definitions must be based on an econometric analysis "lacks legal support").

202    The court does not suggest that non-expert declarations are sufficient in all instances to raise a genuine dispute of material fact regarding geographic market-definitions on a summary-judgment motion. *Cf. Morgan, Strand, Wheeler & Biggs*, 924 F.2d at 1490 (defining geographic markets can be a "highly technical economic question"). But it also is not the case that non-expert evidence is per se insufficient to raise a genuine dispute of material fact.

203    Def. MSJ – ECF No. 272 at 14–15; Pls. MSJ Opp'n – ECF No. 494 at 25; Hr'g Tr. – ECF No. 611 at 125–26.

204    Hr'g Tr. – ECF No. 622 at 7–8; *see Advocate Health*, 841 F.3d at 473 ("[T]he hypothetical monopolist test is an iterative analysis. The analyst proposes a candidate market, simulates a monopolization of that market, then adjusts the candidate market and reruns the simulation as necessary.").

205    *See* Pls. Mot. to Exclude Chipty Opp'n – ECF No. 479 at 11; Hr'g Tr. – ECF No. 622 at 7–8.

206    Hr'g Tr. – ECF No. 622 at 8–9.

207    *Id.* at 8.

208    Sutter argues that the plaintiffs are starting with initial candidate markets "that we've now pretty much all agreed were not created with antitrust geographic markets in mind[.]" *Id.* at 8; *see also* Def. MSJ – ECF No. 272 at 7–8 ("HSAs were not constructed for antitrust purposes or with hospital competition in mind."). But Sutter has not identified *any* proposed initial candidate markets that were constructed with antitrust geographic markets in mind. Other courts have defined geographic markets in terms of cities, counties, etc., which were no more created with antitrust geographic markets in mind than were HSAs.

2019 WL 2078788, 2019-1 Trade Cases P 80,765

209    It is worth noting that Sutter is not complaining that that the plaintiffs' Candidate Markets are too broad. An initial candidate market might pass the hypothetical-monopolist test despite being too broad. (For example, an initial candidate market of the entire United States would pass the hypothetical-monopolist test because if a hypothetical monopolist controlled every hospital in the United States and imposed a SSNIP, health plans would respond by paying it instead of buying hospital services only from hospitals outside the market (i.e., hospitals in other countries). But this would not exclude the possibility that that candidate market is too broad to be a properly defined relevant geographic market.) Instead, Sutter is complaining that the plaintiffs' initial candidate markets are too narrow. *See* Def. MSJ – ECF No. 272 at 22–23 (arguing that geographic markets should be larger than HSAs), 26 ("the proffered HSAs are too narrow to constitute relevant geographic markets"). The hypothetical-monopolist test accounts for the scenario where initial candidate markets are too narrow: if the candidate market is too narrow and buyers thus would turn to alternate sellers outside of the candidate market, broaden the candidate market to include those alternate sellers and rerun the test. *Advocate Health,* 841 F.3d at 468; *accord St. Luke's,* 778 F.3d at 784. If buyers would not turn to alternate sellers outside of the candidate market, that does not mean that the initial candidate market was too narrow. Indeed, it may mean the opposite.

Sutter cites *Little Rock Cardiology,* 591 F.3d 591, in which the Eighth Circuit cautioned against plaintiffs delineating arbitrarily narrow geographic markets. Def. MSJ Reply – ECF No. 436 at 10–11. As discussed above, *Little Rock Cardiology* was a medical-provider shut-out case, which does not present its issues in the same context as this case. *See supra* note 196. The *Little Rock Cardiology* court looked to the response of patients (not health plans) and did not address the hypothetical-monopolist test (which accounts for the scenario where initial candidate markets are too narrow).

Sutter also claims that the asserted geographic markets in the Third Circuit's *Penn State Hershey* case and the Seventh Circuit's *Advocate Health* case spanned eleven and nine HSAs, respectively, to suggest that HSA-based markets are too narrow to be relevant geographic markets for antitrust purposes. Def. MSJ – ECF No. 272 at 22. Sutter conspicuously does not address the Ninth Circuit's *St. Luke's* case and does not say whether the geographic market there — the city of Nampa, Idaho — supports its theory that geographic markets should be broader than a single HSA. *See id.*

210    As discussed above, the parties agree to exclude Kaiser hospitals for the purposes of this summary-judgment motion. *See supra* note 50. In any event, it is not clear that including Kaiser hospitals would substantially change the outcome. The hypothetical-monopolist test requires one to assume that a single firm becomes the only seller in the candidate market and imposed a SSNIP, so if the Kaiser hospital were included, the hypothetical-monopolist test would require one to assume that the SSNIP-imposing hypothetical monopolist controlled the Kaiser hospital, in addition to the Sutter hospital.

211    Because this non-expert evidence raises disputes of material fact with respect to the Candidate Tying Markets, the court does not address whether Dr. Chipty's report also raises disputes of material fact. The court denies as moot Sutter's motion to exclude Dr. Chipty's opinions regarding the Candidate Tying Markets.

212    Barnes Dep. – ECF Nos. 469-2 at 12 (under seal), 493 at 12 (redacted version) (p. 426).

213    Blue Shield Redirection Analysis – ECF Nos. 469-2 at 62–63 (under seal), 493 at 62–63 (redacted version) (BSC_SutterSub00037814).

214    Joyner Decl. – ECF No. 497 at 8 (¶ 21).

215    *Id.* at 19 (¶¶ 58–59) (internal brackets and some internal quotation marks omitted).

216    Def. MSJ Reply – ECF No. 436 at 14; Def. Mot. to Exclude Chipty – ECF No. 503 at 9.

2019 WL 2078788, 2019-1 Trade Cases P 80,765

217    Def. Mot. to Exclude Chipty – ECF No. 503 at 14 (citations omitted).

218    *Id.* at 14–15 (citations omitted).

219    *Id.* (citations omitted).

220    *See id.* at 15 (citations omitted).

221    Def. Mot. to Exclude Chipty – ECF No. 409-3 at 15–17 (under seal), 503 at 15–17 (redacted version) (citations omitted); Def. MSJ Reply – ECF No. 436 at 14.

222    Def. Mot. to Exclude Chipty – ECF No. 503 at 24 (internal brackets omitted) (quoting *FTC v. Advocate Health Care*, No. 15 C 11473, 2017 WL 1022015, at *5 (N.D. Ill. Mar. 16, 2017)).

223    *Id.*

224    Joyner Decl. – ECF No. 497 at 7 (¶ 20).

225    Def. MSJ Reply – ECF No. 436 at 16.

226    Def. MSJ – ECF No. 272 at 23–24; Def. MSJ Reply – ECF No. 436 at 16; *see also, e.g.*, Gowrisankaran Decl. Ex. 7 – ECF No. 272-3 at 67 (stating that there are four hospitals within a 30-minute drive of Sutter Delta).

227    For example, that there might be a non-Sutter hospital 30 minutes east of a particular Sutter hospital does not mean that the non-Sutter hospital is within a 30-minute drive of the enrollees who currently use that Sutter hospital, such as enrollees who live to the west of the Sutter hospital.

228    UnitedHealthcare Email – ECF No. 311-20 at 2 (under seal) (UHC-00134453).

229    Welsh Dep. – ECF No. 311-5 at 7–8 (under seal) (pp. 196–97).

230    Brendt Dep. – ECF Nos. 313-3 at 86, 91–92, 99–100, 102, 104 (under seal), 494-17 at 86, 91–92, 99–100, 102, 104 (redacted version) (pp. 184, 189–90, 197–98, 200, 202); Sutter Model Amendment – ECF Nos. 313-3 at 8, 34, 36 (under seal), 494-17 at 8, 34, 36 (redacted version) (DEF007581579, DEF007581605, DEF007581607).

231    Sutter Blue Cross Amendment – ECF Nos. 311-10 at 8, 37, 39, 41, 43 (under seal), 494-5 at 8, 37, 39, 41, 43 (redacted version) (DEF000097801, DEF000097830, DEF000097832, DEF000097834, DEF000097836).

232    Ramseier Dep. – ECF No. 311-9 at 6 (under seal) (p. 139).

233    Def. Mot. to Exclude Chipty Reply – ECF No. 467 at 11.

234    Gowrisankaran Dep. – ECF No. 311-4 at 14 (under seal).

235    In his deposition testimony, Dr. Gowrisankaran raised the prospect of whether, in the context of a product market of hospitals selling inpatient hospital services to health plans, geographic markets can be defined as a set of sellers in a geographic region — i.e., that the market can be defined by listing what hospitals are part of the market and what hospitals are outside of it — rather than by trying to draw precise "metes and bounds" on a map. Dr. Gowrisankaran testified that the courts in *Advocate Health* defined their geographic market solely by specifying which hospitals were inside the market and which hospitals were outside and did not define the precise boundaries of the market. Gowrisankaran Dep. – ECF No. 311-4 at 34–35 (pp. 237–38) (under seal) ("[W]hat the courts accepted in this case was not the geographic markets that I've outlined there in the shape files.... Rather what they accepted is that, or what they stipulated was that the following

2019 WL 2078788, 2019-1 Trade Cases P 80,765

hospitals are in the geographic market.... There w[ere] no precise geographic boundaries for which — which residents lived inside the market. There were precise boundaries for — there are precise definitions of which hospitals were inside the market."). As Dr. Gowrisankaran explained, "what really needs to happen in an antitrust setting is — is understanding what are the sets of potential competitors and the likely set of potential competitors and using that as the basis for a market analysis. A market analysis does not always yield only one market definition that is accurate. It might yield a couple of different market definitions that could each be plausible. And what these — what these sentences [that relevant markets need not have precise metes and bounds] are pointing out is that what's important here is not saying well, we want to have an airtight definition of a market, but rather that it's the process of market analysis that identifies likely potential competitors to any firm[.]" *Id.* at 14 (p. 110). Taking into account the "the commercial realities of the industry," *Brown Shoe*, 370 U.S. at 336–37 (internal quotation marks omitted) — including the fact that in a market between hospitals and health plans, both the seller and the buyer are stationary and cannot move — Dr. Gowrisankaran's testimony raises the question of whether it is sufficient to define the market by listing which sellers are in the market and which sellers are out, as opposed to trying to engage in "metes and bounds" line-drawing on a map in the spaces between hospitals. *Cf. St. Luke's*, 778 F.3d at 784 (markets, ultimately, are just "groups of sellers"); Areeda & Hovenkamp ¶ 530a ("To define a market is to identify those producers providing customers of a defendant firm (or firms) with alternative sources for the defendant's product or service."). Under that framework, a geographic market of the Crescent City HSA and Sutter's hypothetical two-block radius around the Sutter Coast hospital would be functionally equivalent: each would clearly and concretely define which sellers are in the market (Sutter Coast) and which sellers are not (hospitals other than Sutter Coast). The court expresses no opinion here on this approach, other than to say that these questions further demonstrate why, at this juncture, Sutter has not established that there are no disputes of material fact and that it is entitled to judgment as a matter of law.

236    Def. Mot. to Exclude Chipty – ECF Nos. 409-3 (under seal), 503 (redacted version).

237    *See* Hr'g Tr. – ECF No. 611 at 31.

238    *Id.* at 29; Def. Mot. to Exclude Chipty – ECF No. 503 at 28–29.

239    Chipty Dep. – ECF No. 479-2 at 82 (under seal) (p. 81).

**End of Document**    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

2021 WL 5578687
United States District Court, E.D. Texas, Sherman Division.

UNITED STATES of America,
v.
Neeraj JINDAL (1), John Rodgers (2)

Civil Action No. 4:20-CR-00358
|
Signed 11/29/2021

**Attorneys and Law Firms**

Jariel A. Rendell, Matthew William Lunder, Doha Gamal Mekki, Assistant US Attorneys, Rachel Danielle Kroll, US Department of Justice, Antitrust Division, Washington, DC, for United States of America.

Paul Edward Coggins, Bradley Carroll Weber, Brendan Patrick Gaffney, Locke Lord LLP, Dallas, TX, for Neeraj Jindal.

Brian Daniel Poe, Brian D. Poe, Attorney at Law, PLLC, Fort Worth, TX, for John Rodgers.

**MEMORANDUM OPINION AND ORDER**

AMOS L. MAZZANT, UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court is Defendant Neeraj Jindal's Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36), and Defendant John Rodgers' Motion to Dismiss the Superseding Indictment (Dkt. #45). Having considered the motions and the relevant pleadings, the Court finds the motions should be **DENIED**.

**FACTUAL BACKGROUND**

One December 12, 2020, the Government filed an indictment against Neeraj Jindal ("Jindal") (Dkt. #1), and on April 15, 2021, the Government filed the First Superseding Indictment (hereinafter "Indictment") as to Neeraj Jindal and John Rodgers ("Rodgers") (Dkt. #21). Pursuant to the Indictment, Defendants were charged with violating the following statutes: 1) 15 U.S.C. § 1 (Antitrust Conspiracy: Price Fixing under the Sherman Act); 2) 18 U.S.C. § 371

(Conspiracy to Commit Offense); and 3) 18 U.S.C. §§ 1505 and 2 (Obstruction of Proceedings before the Federal Trade Commission).

The complexity of this case warrants a recitation of the events leading up to the Indictment. Jindal owned a therapist staffing company, which the Indictment refers to as "Company A" (Dkt. #21 ¶ 5). Rodgers was a physical therapist who contracted with Company A and was a clinical director of Company A (Dkt. #21 ¶ 6). Rodgers reported to Jindal in his work (Dkt. #21 ¶ 6).

Company A contracted with physical therapists ("PTs") and physical therapist assistants ("PTAs") to provide in-home physical therapy to patients (Dkt. #21 ¶ 7). Therapist staffing companies such as Company A receive patient referrals from home health agencies and act as "middlemen," staffing their PTs or PTAs to provide in-home patient care (Dkt. #21 at ¶¶ 1–2). Therapist staffing companies compete with each other to contract with or employ PTs and PTAs (Dkt. #21 ¶ 4). Each PT and PTA who contracted with Company A had set prices (a "rate" or "pay rate") that Company A paid them for providing in-home care visits (Dkt. #21 ¶ 7). Company A billed home health agencies set prices (the "bill rate") for providing the services (Dkt. #21 ¶ 7). The difference between the pay rates that Company A paid to its PTs and PTAs and the bill rates that it billed to the home health agencies constituted Company A's margin (Dkt. #21 ¶ 7).

Count One of the Indictment charges Defendants with violating 15 U.S.C. § 1 of the Sherman Act. More specifically, Count One states:

> From in or around March 2017 to in or around August 2017 (the Relevant Period"), in the Eastern District of Texas and elsewhere, Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs. The conspiracy engaged in by Jindal, Rodgers, and co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

Section 1 of the Sherman Act (15 U.S.C. § 1).

(Dkt. #21 ¶ 11).

The Indictment alleges that on March 10, 2017, Rodgers, acting on behalf of Jindal and Company A, texted with the owner of a competing staffing company, Individual 2, regarding the rates that Company A and Individual 2's staffing company paid their PTs and PTAs (Dkt. #21 ¶ 12(a)). During the text exchange, Rodgers texted Individual 2, asking, "[h]ave you considered lowering PTA reimbursement" and stating, "I think we're going to lower PTA rates to $45" (Dkt. #21 ¶ 12(a)). Individual 2 responded, "[y]es I agree" and "I'll do it with you" (Dkt. #21 ¶ 12(a)). Rodgers responded with a "thumbs up" emoji and texted, "I feel like if we're all on the same page, there won't be a bunch of flip flopping and industry may stay stable" (Dkt. #21 ¶ 12(a)). According to the Indictment, Rodgers reported back to Jindal regarding this text message conversation with Individual 2 (Dkt. #21 ¶ 12(a)).

**\*2** The Indictment further alleges that, following the text exchange between Rodgers and Individual 2, Jindal texted the owners of other therapist staffing companies to recruit additional competitors to join the conspiracy to collectively lower rates (Dkt. #21 ¶ 12(b)). Specifically, on March 10, 2017, Jindal separately texted at least four other owners of therapist staffing companies, saying "I am reaching out to my counterparts about lowering PTA rates to $45. What are your thoughts if we all collectively do it together?" (Dkt. #21 ¶ 12(b)). Jindal further texted each owner that he had Individual 2's company "on board" (Dkt. #21 ¶ 12(b)).

The Indictment then references another text exchange between Rodgers and Individual 2 that took place on March 17, 2017 (Dkt. #21 ¶ 12(c)). Rodgers stated: "FYI we made rate changes effective next payroll Monday decreasing PT's and PTA's" (Dkt. #21 ¶ 12(c)). Individual 2 responded: "Well I can join in where did u go" (Dkt. #21 ¶ 12(c)). According to the Indictment, Rodgers and Individual 2 subsequently exchanged text messages regarding their companies' pay rates for PTs and PTAs (Dkt. #21 ¶ 12(c)). And, pursuant to the agreement, Company A thereafter paid lower rates to certain PTs and PTAs (Dkt. #21 ¶ 12(d)).

On May 25, 2021, Jindal filed his Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36). On June 18, 2021, Rodgers filed his Motion to Dismiss the Superseding Indictment (Dkt. #45). In Rodgers' motion, he incorporated the arguments in Jindal's motion and added a separate argument alleging the Government's prosecution of him breached an oral agreement (Dkt. #45). The United States Responded to Jindal's Motion on June 22, 2021 (Dkt. #46) and responded to Rodgers' Motion on July 16, 2021 (Dkt. #48). Jindal filed a Reply on July 6, 2021 (Dkt. #47). Rodgers filed a Reply on July 30, 2021 (Dkt. #50).

## STATUTORY BACKGROUND

Since Count One of the Indictment charges Defendants with violating § 1 the Sherman Act, the Court finds it helpful to provide an overview of the Sherman Act before turning to Defendants' arguments. The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. The Supreme Court, however, "has not taken a literal approach" in interpreting this language. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). Instead, the Supreme Court has found § 1 "outlaw[s] only *unreasonable* restraints." *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (emphasis added). In determining whether a restraint is unreasonable, and thus unlawful, courts use one of two rules of decision. *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 848 (5th Cir. 2015).

Most restraints under § 1 are analyzed under the so-called rule of reason. *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 343 (1982). As its name suggests, the rule of reason requires a context-specific inquiry to "distinguish[ ] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Rule of reason analysis involves "analyzing the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *Nat'l Soc'y of Prof. Eng'r v. United States*, 435 U.S. 679, 692 (1978).

A smaller group of restraints under § 1 are at the outset "deemed unlawful *per se*" dispensing with the need for case-by-case evaluation. *Kahn*, 522 U.S. at 10. These restraints are unreasonable *per se* because the conduct at issue is "manifestly anticompetitive" and "always or almost always tend[s] to restrict competition and decrease output." *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 723 (1988)

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

(internal citations omitted). *Per se* treatment is reserved for "only those agreements that are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality." *Dagher*, 547 U.S. at 5 (internal citations omitted). Thus, "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue" in order to determine whether it has the requisite "manifestly anticompetitive effect[ ]." *Leegin*, 551 U.S. at 886 (quotation omitted).

**\*3** "Typically only 'horizontal' restraints—restraints 'imposed by agreement between competitors'—qualify as unreasonable *per se*." *Ohio v. Am. Express Co.*, 138 S.Ct. 2274, 2283–84 (2018) (quoting *Bus. Elecs.*, 485 U.S. at 730). Courts have found three types of horizontal restraints to be *per se* violations of the Sherman Act: price fixing, market allocation, and bid rigging. [1] *See, e.*g., *Dagher*, 547 U.S. at 5 (price fixing); *Palmer v. BRG of Ga, Inc.,* 498 U.S. 46, 49–50 (1990) (market allocation); *United States v. Young Brothers Inc.*, 728 F.2d 682, 687 (5th Cir. 1984) (bid rigging). If a naked trade restraint falls in one of these forms, it is summarily condemned *per se* illegal.

The Sherman Act is enforced both criminally and civilly. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438 (1978) ("Both civil remedies and criminal sanctions are authorized with regard to the same generalized definitions of the conduct proscribed."). But the Department of Justice has a longstanding policy of only bringing criminal antitrust prosecutions based on *per se* violations of the Act. *See United States v. Kemp & Assocs, Inc.* 907 F.3d 1264, 1274 (10th Cir. 2018) (noting that the United States Attorney's Antitrust Manual states that "current Antitrust Division policy is to proceed by criminal investigation and prosecution in cases involving horizontal, per se unlawful agreements."). Whether the allegations in an Indictment constitute a *per se* violation is a legal question for the court. *MM Steel*, 806 F.3d at 847 ("The decision to analyze the conspiracy under a per se theory of liability is a question of law...."); *see also Maricopa Cnty,* 457 U.S. at 337 n.3, 354.

### LEGAL STANDARD

An indictment is subject to dismissal for the Government's failure to state an offense. *See* FED. R. CRIM. P. 12(b)(3) (B). This means that, taking the Government's allegations as true, *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011), the indictment must state the elements of each offense and facts "sufficient to permit the defendant to plead former jeopardy in a subsequent prosecution." *United States v. Contris*, 592 F.2d 893, 896 (5th Cir. 1979). Indictments are read as a whole, and "[t]he sufficiency of an indictment is to be tested by practical rather than technical considerations." *Id.* Indeed, "the law does not compel a ritual of words." *United States v. Ratcliff*, 488 F.3d 639, 643 (5th Cir. 2007) (citation omitted). As such, an indictment will not be dismissed based on minor deficiencies or because it "could have been more artfully or precisely drawn." *Contris*, 592 F.2d at 896. Courts generally measure the sufficiency of an indictment "by whether (1) each count contains the essential elements of the offense charged, (2) the elements are described with particularity, without any uncertainty or ambiguity, and (3) the charge is specific enough to protect the defendant against a subsequent prosecution for the same offense." *United States v. Threadgill,* 172 F.3d 357, 366 (5th Cir. 1999) (citation omitted).

### ANALYSIS: JINDAL'S MOTION

In the present motion, Jindal argues that Count One of the Indictment should be dismissed for two main reasons (Dkt. #36). First, he argues that that Count One fails to state an offense under Federal Rule of Criminal Procedure 12(b)(3)(B)(v) because it does not identify a *per se* Sherman Act violation (Dkt. #36 at p. 1). Second, Jindal argues that Count One violates due process under the Fifth and Sixth Amendments because he did not receive "fair warning" the conduct was criminal, and the *per se* designation improperly promotes a presumption of intent (Dkt. #36 at pp. 13–14). Rodgers adopts Jindal's arguments for Count One and also moves to dismiss the Indictment on the basis that the Government has breached an alleged oral agreement not to prosecute him. Because both Defendants move to dismiss Count One on the same grounds, the Court will address the arguments pertaining to Count One in Jindal's motion first before addressing Rodgers' separate argument.

### I. Sufficiency of the Indictment—Do the Allegations in the Indictment Constitute a *Per Se* Violation of the Sherman Act?

**\*4** In Count One of the Indictment, Defendants were charged with conspiracy to fix prices in violation of § 1 of the Sherman Act. The Indictment further alleges that the alleged conspiracy was a *per se* violation of the Sherman Act (Dkt. #21 ¶ 11) ("The conspiracy engaged in by Jindal,

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

Rodgers, and co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act."). Accordingly, in the Government's view, to obtain conviction, it does not need to prove market power, intent, or any anticompetitive effects on trade—it simply must prove the bare fact that an agreement existed. This is further reflected by the Indictment —it does not allege any of the elements of a rule-of-reason offense. Thus, the Indictment can only stand if the allegations in it constitute a *per se* violation of the Sherman Act. Stated differently, the Indictment must be dismissed if it fails to state a cognizable *per se* offense under the Sherman Act. Whether the allegations in the Indictment constitute a *per se* violation is a question of law for the Court. *MM Steel*, 806 F.3d at 847.

For over 100 years, the Supreme Court has consistently held that price-fixing agreements are unlawful *per se* under the Sherman Act. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940). In fact, the Supreme Court has stated that "[n]o antitrust offense is more pernicious than price fixing." *Fed. Trade Comm'n v. Ticor Title Ins. Co.*, 504 U.S. 621, 639 (1992). Defendants do not dispute that the Supreme Court has designated price fixing as a *per se* Sherman Act violation (Dkt. #47 at p. 3). But Defendants do dispute that the Indictment in-fact alleges a price-fixing agreement (Dkt. #47 at p. 4).

The core of Defendants argument is that the Indictment does not allege a price-fixing agreement because it "[a]t most[ ] alleges an agreement to fix wages" (Dkt. #36 at p. 13). According to Defendants, though the Indictment uses the word "prices" to refer to the "pay rates" for the PTs and PTAs, the "appropriate word" to describe the "pay rates" is "wages" because the rates constitute compensation for the PTs' and PTAs' labor (Dkt. #36 at p. 13). Thus, Defendants argue that the "Indictment does not allege any agreement to fix 'prices' " because "[w]ages do not fall within the definition of 'price fixing,' which is defined as 'fixing ... the price of a commodity' " (Dkt. #36 at p. 12-13). Further, according to Defendants, "[m]erely substituting the word 'prices' for 'wages' does not transform the factual allegations from alleging a wage-fixing agreement to alleging a price-fixing agreement" (Dkt. #47 at p. 4). But Defendants' narrow view of horizontal price-fixing agreements reveals the flaw in their arguments.

**A. Price-Fixing Agreements Come in Many Forms.**

The scope of conduct found to constitute horizontal price-fixing agreements warranting application of the *per se* rule is broad. For example, courts have applied the *per se* rule to price-fixing agreements: 1) establishing minimum prices, *United States v. Trenton Potteries Co.*, 273 U.S. 392, 401 (1927); 2) setting maximum prices, *Maricopa Cnty.*, 457 U.S. at 335; 3) fixing credit terms, *Catalano, Inc. v. Target Sales Inc.*, 446 U.S. 643, 648 (1980); 4) setting fee schedules, *Goldfarb v. Va. State Bar*, 421 U.S. 773, 783 (1975); 5) purchasing surplus product to keep it off the market, *Socony-Vacuum*, 310 U.S. at 167; 6) refusing to advertise prices, *United States v. Gasoline Retailers Ass'n*, 285 F.2d 688, 691 (7th Cir. 1961); and 7) excluding purchasers unless they increased the price they paid for a service, *Fed. Trade Comm'n. v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 436 n.19 (1990). Thus, contrary to Defendants' argument, "price fixing" has not been limited to conduct that literally directly "fix[es] ... the price of a commodity." (*See* Dkt. #36 at p. 13). Instead, as the above cases and many more have recognized, the definition of horizontal price-fixing agreements cuts broadly. As such, any naked agreement among competitors —whether by sellers or buyers—that fixes components that affect price meets the definition of a horizontal price-fixing agreement. *See Socony-Vacuum*, 310 U.S. at 221 ("Any combination which tampers with price structures is engaged in an unlawful activity."); *Jacobi v. Bache & Co., Inc.*, 377 F. Supp 86, 95–96 (S.D.N.Y 1974) ("When the purpose of an agreement is to fix or stabilize prices, even if the means used affects only one element of the price structure, or only indirectly affects prices, the agreement is illegal per se....")

**\*5** The Court recognizes that the facts of this case do not present those typical of a price-fixing agreement. For example, the classic horizontal price-fixing scheme involves an agreement among sellers to fix the prices of goods they sell. But just because the typical price-fixing conspiracy involves certain hallmarks does not mean that other less prevalent forms of price-fixing agreements are not likewise unlawful. Indeed, Courts have not limited price-fixing conspiracies to agreements concerning the purchase and sale of goods but have found them to cover the purchase and sale of services. *See Goldfarb*, 421 U.S. at 783 (finding that minimum fee schedule for lawyers services' "constitute[d] a classic illustration of price fixing"); *Superior Ct. Trial Laws. Ass'n*, 493 U.S. at 423 (finding that lawyers' boycott aimed at forcing increase of compensation paid to them was "the essence of 'price fixing[.]' "). More importantly, courts have also not only found price-fixing agreements among sellers, but also among buyers. *See Mandeville Island Farms, Inc.*

*v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) ("It is clear that the agreement is the sort of combination condemned by the Act, even though the price-fixing was by purchasers, and the persons specially injured ... are sellers, not customers or consumers."); *Nat'l Macaroni Mfrs. Ass'n v. Fed. Trade Comm'n.*, 345 F.2d 421, 426–27 (7th Cir. 1995) (finding a price-fixing agreement among manufacturers to standardize the composition of their product in an effort to depress the price of an essential raw material to be illegal *per se*). In sum, price-fixing agreements come in many forms and include agreements among competing buyers of services.

### B. The Sherman Act Prohibits Conspiracies Among Buyers of Labor.

The Supreme Court has made clear that the Sherman Act applies equally to all industries and markets—to sellers and buyers, to goods and services, and consequently to buyers of services—otherwise known as employers in the labor market. *See Anderson v. Shipowners' Ass'n of Pac. Coast, 272 U.S. 359, 361–65 (1926).* More than a century ago, the Supreme Court recognized that the Sherman Act applies to labor markets. *Id.* In *Anderson*, along with other restraints that were imposed on the seamen to control their employment, the "[shipowners] fix[ed] the wages which shall be paid to the seamen." 272 U.S. at 362. The Court found that this conduct, along with the other restraints on labor by the employers, violated the Sherman Act. *Id.* at 365. Thus, there is little doubt that "[t]he Sherman Act ... applies to abuse of market power on the buyer side...." *Todd v. Exxon Corp.*, 275 F.3d 191, 201 (2d Cir. 2001) (Sotomayor, J); *see also All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 747 (11th Cir. 1998) ("That price fixing is equally violative of antitrust laws whether it is done by buyers or sellers is also undisputed.").

### C. The Indictment Alleges a Price-Fixing Agreement That Is *Per Se* Illegal.

With these principles in mind, the Court turns to the Indictment to determine if it alleges a price-fixing agreement that is *per se* illegal. *MM Steel*, 806 F.3d at 847. The Indictment alleges that "Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs" (Dkt. #21 ¶ 11). The Indictment thus alleges a naked price-fixing conspiracy among buyers in

the labor market to fix the pay rates of the PTs and PTAs. As such, the Indictment describes a price-fixing conspiracy that is *per se* unlawful. *See Socony-Vacuum*, 310 U.S. at 222 ("[T]he Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike."). In other words, to summarize, the scope of anticompetitive conduct that constitutes price fixing is broad —it covers agreements among buyers in the labor market. And the *per se* rule applies to naked price-fixing agreements categorically. Accordingly, the Indictment sufficiently alleges a price-fixing conspiracy that warrants the *per se* rule.

### D. Fixing the Price of Labor, or Wage Fixing, is a Form of Price Fixing and Thus Illegal *Per Se*.

Defendants do not dispute that price-fixing agreements are *per se* illegal; they do, however, challenge how the Government labeled the offense and whether the charged conduct constitutes a *per se* offense (Dkt. #36 at p. 8). But, contrary to Defendants' argument, whether the Indictment refers to the "pay rates" of the PTs and PTAs as "prices" or "wages" does not affect the outcome. *See* L. Sullivan, Handbook of the Law of Antitrust, s 74, at 198 (1977) ("The antitrust laws concern substance, not form, in the preservation of competition."). The antitrust laws fully apply to the labor markets, and price-fixing agreements among buyers—like therapist staffing companies—are prohibited by the Sherman Act. *See Anderson*, 272 U.S. at 361–65. At bottom, the alleged agreement between Defendants and co-conspirators had the purpose and effect of fixing the pay rates of the PTs and PTAs —the price of labor. When the price of labor is lowered, or wages are suppressed, fewer people take jobs, which "always or almost always tend[s] to restrict competition and decrease output." *See Bus. Elecs. Corp.*, 485 U.S. at 723. This type of agreement is plainly anticompetitive and has no purpose except stifling competition. *See All Care Nursing Serv., Inc.*, 135 F.3d at 748 ("The key to per se treatment is whether the conduct is of the kind that can only be anticompetitive."). Indeed, "[b]uyers' cartels engaged in price fixing have been held to be illegal under the Sherman Act even though their goal is to lower the price of the input." *Int'l Outsourcing Servs, LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 864 (N.D. Ill. 2006).

**\*6** Additionally, contrary to Defendants' argument, that the Indictment lacks allegations that Defendants "made any agreement to fix prices paid by consumers" does not mean the Indictment fails to state a price-fixing agreement (*see* Dkt. #36 at p. 13). The Sherman Act "does not confine its

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

protection to consumers, or to purchasers, or to competitors, or sellers." *Mandeville,* 334 U.S. at 236. Rather, the statute protects "all who are made victims of the forbidden practices by whomever they may be perpetrated," and those protections extend to sellers of goods and services—such as the PTs and PTAs—to the same extent they do buyers, consumers, or competitors. *Id.* Besides, "[j]ust as antitrust law seeks to preserve the free market opportunities of buyers and sellers of goods, so also it seeks to do the same for buyers and sellers of employment services." *Roman v. Cessna Aircraft Co.,* 55 F.3d 542, 544 (10th Cir. 1995) (quoting II Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 377c (rev. ed. 1995)). As *Anderson* makes clear, employees are no less entitled to the protection of the Sherman Act than are consumers. *See* 272 U.S. at 364–65.

Justice Kavanaugh's recent concurrence in *National Collegiate Athletic Ass'n v. Alston* provides further support for the conclusion that fixing the price of labor, or wage fixing, is a form of price fixing. 141 S. Ct. 2141 (2021). In *Alston,* the Supreme Court addressed wage fixing by the NCAA—namely the NCAA's cap on education-related compensation that student-athletes are eligible to receive. *Id.* at 2147. In his concurrence, Justice Kavanaugh unequivocally asserts: "Price-fixing labor is price-fixing labor. And price-fixing labor is ordinarily a textbook antitrust problem because it extinguishes the free market in which individuals can otherwise obtain fair compensation for their work." *Id.* at 2167–68 (Kavanaugh, J., concurring) (citations omitted). Thus, in Justice Kavanaugh's mind, wage fixing is price fixing—price fixing of labor. *See id.*

While Defendants correctly state that *Alston* does not classify wage fixing as a *per se* violation,[2] Justice Kavanaugh's concurrence is significant because he characterizes wage fixing as price fixing. *See id.* And, "[i]t has long been settled that an agreement to fix prices is unlawful *per se.*" *Catalano,* 446 U.S. at 647. Thus, outside the extraordinary context at issue in *Alston,* naked horizontal agreements to fix the price of labor, like the agreement here, are ordinarily *per se* illegal.

### E. Other Courts Have Recognized that Wage-Fixing Conspiracies Are *Per Se* Unlawful as Price-Fixing Agreements.

Other courts have also recognized that wage-fixing conspiracies—or horizontal agreements among buyers in the labor market—are illegal *per se* like other price-fixing

agreements. *See Todd,* 275 F.3d at 198 ("If the plaintiff in this case could allege that defendants actually formed an agreement to fix [ ] salaries, [the] *per se* rule would likely apply."); *Law v. Nat'l Coll. Athletic Ass'n,* 134 F.3d 1010, 1017 (10th Cir. 1998) (finding that NCAA rule limiting salary of basketball coaches would ordinarily be a *per se* violation of § 1 of the Sherman Act); *In re Animation Workers Antitrust Litig.,* 123 F. Supp. 3d 1175, 1179, 1213–14 (N.D. Cal. 2015) ("[T]he Court concludes that [p]laintiff[-employees] have alleged sufficient facts to support a plausible *per se* claim that [d]efendant[-employers] allegedly conspired to suppress the compensation of the putative class."); *Cason-Merenda v. Detroit Med. Ctr.,* 862 F. Supp. 2d 603, 624–25 (E.D. Mich. 2012) (noting plaintiffs and defendants agreed that wage fixing "like an analogous horizontal price-fixing conspiracy" should be characterized as a *per se* violation); *Fleischman v. Albany Med. Ctr.,* 728 F. Supp. 2d 130, 157 (N.D.N.Y. 2010) ("Generally, price-fixing [or in this case wage-fixing] agreements are considered a per se violation of the Sherman Act.") (alterations in original) (internal quotations and citations omitted); *Doe v. Ariz. Hosp. & Healthcare Ass'n,* No. CV07-1292, 2009 WL 1423378, at *3–4 (D. Ariz. Mar. 19, 2009) (finding complaint that alleged defendant-hospitals conspired to keep temporary nursing wages below free market level should survive motion to dismiss because agreement was a *per se* illegal price-fixing agreement); *Cordova v. Bache & Co.,* 321 F. Supp. 600, 606 (S.D. N.Y. 1970) ("There can be little doubt about the fact that if a group of employers, as the complaint here alleges, were allowed ... to agree together to reduce the commissions paid to their respective employees, they would have the same power to restrain competition as is inherent in a price-fixing agreement.").

**\*7** Though Defendants take issue with the fact that all the cases that have labeled wage fixing as a *per se* violation are civil cases, (*see* Dkt. #47 at p. 5), the distinction is irrelevant. Just because this is the first time the Government has prosecuted for this type of offense does not mean that the conduct at issue has not been illegal until now. Rather, as these cases indicate, price-fixing agreements—even among buyers in the labor market—have been *per se* illegal for years.

### F. There is Sufficient Judicial Experience with Price Fixing to Justify a *Per Se* Designation.

Defendants misapprehend the role of judicial experience in applying a *per se* designation to certain conduct. Defendants

contend that agreements are deemed unlawful *per se* "only after courts have had considerable experience with the type of restraint at issue" (Dkt. #36 at p. 10) (quoting *Leegin,* 551 U.S. at 886). As a result, because neither the Supreme Court nor any Court of Appeals has ever determined whether a purported wage-fixing agreement is *per se* unlawful under § 1 of the Sherman Act, Defendants argue there is insufficient judicial experience with wage fixing to justify a *per se* designation (Dkt. #36 a p. 9). Defendants are mistaken.

Judicial experience informs the decision to recognize a "*new per se* rule." *See Maricopa Cnty.,* 457 U.S. at 350 n.19 (emphasis in original). Price-fixing agreements, as horizontal restraints, have long been held to merit a *per se* designation. *Socony-Vacuum,* 310 U.S. at 218. Thus, courts "have [ ] considerable experience with the *type of restraint* at issue"—price-fixing agreements. See *Leegin,* 551 U.S. at 886 (emphasis added). As courts have recognized, price-fixing agreements come in many forms. *See supra* pp. 8–10. And though no appellate court has ever specifically found that a price-fixing agreement among employers in the labor market is *per se* illegal does not mean the Court is recognizing a new *per se* rule. *See United States v. Andreas,* 216 F.3d 645, 667 (7th Cir. 2000) ("Yet the fact that the lysine producers' scheme did not fit precisely the characterization of a prototypical *per se* practice does not remove it from *per se* treatment."). Rather, a restraint that is "tantamount to" *per se* unlawful conduct "falls squarely within the tradition *per se* rule." *Catalano,* 446 U.S. at 648. Similarly, here, an agreement to fix the price of labor is "tantamount" to an agreement to fix prices, and "thus falls squarely within the traditional *per se* rule against price fixing." *See id.* Besides, the Supreme Court has explicitly rejected arguments like Defendants': "[T]he argument that the *per se* rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for *per se* rules...." *Maricopa Cnty.,* 457 U.S. at 351.

Moreover, Defendants further argue that "[t]he need for further judicial experience and analysis is also evident" in light of the possibility that wage-fixing could "benefit[ ] consumers downstream through lower prices" and "encourage, rather than discourage, competitors" (Dkt. #36 at p. 11). In other words, *per se* designation is not appropriate because Defendants' conduct cannot be said to "lack any redeeming virtue" (Dkt. #36 at p. 11) (internal citations omitted). But the Supreme Court has also rejected similar arguments.

For example, in *Catalano,* the Supreme Court explicitly rejected similar procompetitive justifications that the court of appeals had relied upon—namely that the anticompetitive behavior at issue might actually decrease prices for consumers and increase competition by removing a barrier to market entry. *Id.* at 649–50. The Court stated that "[w]hile it may be that the elimination of a practice of giving variable discounts" may ultimately lead to a decrease in the invoice price, "[i]t is more realistic to view an agreement to eliminate credit sales as extinguishing one form of competition among the sellers." *Id.* at 649. Similarly, here, though an agreement to fix the price of labor could benefit consumers, "that is surely not necessarily to be anticipated" and that will not prevent it from being declared unlawful *per se. See id.* Undeniably, "Supreme Court jurisprudence is clear: where the per se rule applies, it is of no consequence that an agreement could potentially bring net economic benefits to some part of the market...." *Kemp & Assocs., Inc.* 907 F.3d at 1277.

**\*8** Further, in *Catalano,* the Supreme Court rejected the justification that an agreement to eliminate the practice of giving credit could actually enhance competition by removing a barrier to entry for other sellers. 446 U.S. at 649. The Court reasoned, "it would seem to follow that the more successful an agreement is in raising the price level [or curtailing production], the safer it is from antitrust attack. Nothing could be more inconsistent with our cases." *Id.* Again, similarly, Defendants' argument that an agreement to fix the price of labor may "encourage, rather than discourage, competitors" misses the mark (*see* Dkt. #36 at p. 11). Time and time again, the Supreme Court has reiterated, "when a particular concerted activity entails an obvious risk of anticompetitive impact with no apparent potentially redeeming value, the fact that a practice may turn out to be harmless in a particular set of circumstances will not prevent its being declared unlawful *per se.*" *Catalano,* 446 U.S. at 649.

### G. Count One of the Indictment Sufficiently Charges a Conspiracy to Fix Price.

Since the Court has found that the allegations in the Indictment constitute a *per se* offense, the Court must next review the Indictment to determine whether it is legally sufficient on its face. To prove a *per se* violation of 15 U.S.C. § 1, the Government must prove that (1) the defendant knowingly formed, joined, or participated in a contract, combination, or conspiracy; (2) its purpose was to fix, raise, maintain, or stabilize prices; and (3) the activities subject to

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

the conspiracy occurred in the flow of interstate commerce or substantially affected interstate commerce. 15 U.S.C. § 1; *Socony-Vacuum.*, 310 U.S. at 219–20, 223; *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 679, 681 (5th Cir. 1981).

Count One tracks the elements of a *per se* violation of 15 U.S.C. § 1. It alleges that Defendants knowingly formed, joined, or participated in a conspiracy, that the conspiracy was meant to suppress competition by agreeing to fix prices,[3] and that the business activities occurred within the flow of, and substantially affected, interstate trade and commerce.[4] The Indictment therefore is legally sufficient on its face. It contains the "essential elements of the offense charged, [ ] the elements are described with particularity, without any uncertainty or ambiguity, and [ ] the charge is specific enough to protect Defendants against a subsequent prosecution for the same offense." *United States v. Lavergne*, 805 F.2d 517, 521 (5th Cir. 1986).

Thus, Count One of the Indictment sufficiently alleges facts constituting a *per se* violation of the Sherman Act. Because the Court has found that the Indictment properly alleges a *per se* violation of the Sherman Act, the Court now turns to Defendants' next argument as to why the Court should dismiss Count One.

### II. Constitutional Issues

**\*9** Defendants argue that application of the *per se* rule is unconstitutional because it violates the Fifth and Sixth Amendments of the U.S. Constitution (Dkt. #36 at p. 15). Specifically, first, Defendants argue the Indictment violates the Fifth Amendment because it "violates the rule of lenity and fails to give fair warning of the prohibited conduct" (Dkt. #36 at pp. 15–16). Second, Defendants argue the Indictment violates the Sixth Amendment because it "improperly promotes a presumption of intent, vitiating the requirement of proof of state of mind in the criminal context" (Dkt. #36 at p. 16). The Court will address each argument in turn.

### A. Defendants' Fifth Amendment Challenges Fail.

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury ... nor be deprived of life, liberty, or property without due process of law...." U.S. CONST. amend. V. As embodied by the "fair warning requirement," due process requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S. 259, 265 (1997) (internal quotations omitted).

The Supreme Court has identified "three related manifestations of the fair warning requirement." *Id.* at 266. "First, the vagueness doctrine bars enforcement of a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Id.* (internal quotations omitted). Second, the rule of lenity "ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Id.* (citations omitted). And third, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* (citations omitted). To satisfy each of these requirements, a criminal statute, "standing alone or as construed" must "ma[k]e it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

Defendants do not contend that the Sherman Act itself is unconstitutionally vague; rather, they argue that the Indictment violates the second and third manifestations of the fair warning requirement (Dkt. 47 at pp. 10–11). According to Defendants, because no court has found that purported wage-fixing agreements constitute criminal conduct and neither the Supreme Court nor any Court of Appeals has held wage fixing to be *per se* unlawful, then Defendants "could not possibly have had fair warning that the conduct alleged in the Indictment may be criminal" (Dkt. #36 at p. 18). Further, Defendants argue that because there is "a grievous uncertainty as to whether the Supreme Court condemns wage fixing as a *per se* antitrust violation," the rule of lenity mandates dismissal (Dkt. #47 at p. 11). In response, the Government argues "[t]his is not even close" because "the Supreme Court has long recognized that wage fixing is price fixing" (Dkt. #46 at p. 15 (citing *Anderson*, 272 U.S. at 361–63; *Superior Ct.*, 493 U.S. at 423, 427, 432, 436 n.19)). While the issue is not as clear-cut as the Government suggests, Defendants' constitutional arguments fail.

### i. The Defendants Received Fair Notice That Their Conduct Was Illegal.

The Indictment charges Defendants with price fixing. For more than 100 years, courts have repeatedly held price fixing as *per se* illegal under the Sherman Act. *Socony-Vacuum.*, 310 U.S. at 218. Thus, Defendants could not have had any reasonable doubt that any price-fixing agreement was *per se* illegal. Defendants do not dispute this conclusion and instead insist that the "novel construction of the statute to construe *'wage fixing'* as *per se* unlawful ... fails to give fair warning of the prohibited conduct" (Dkt. #36 at p. 15) (emphasis added). But this argument relies on the same semantical arguments this Court already rejected. *See supra* Part I.

**\*10** Regardless of whether the Indictment characterizes Defendants' conduct as wage fixing or price fixing, the Sherman Act, in conjunction with the decades of case law, made it "reasonably clear" that Defendants' conduct was unlawful. *See Lanier*, 520 U.S. at 267. Indeed, most criminal statutes "deal with untold and unforeseen variations in factual situations," so "no more than a reasonable degree of certainty can be demanded." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1950). Belaboring the point discussed in Part I, the Supreme Court has long recognized that price-fixing agreements come in many forms. *See Catalano*, 446 U.S. at 647–50; *see also supra* Part I pp. 8–10. And the Supreme Court has long recognized that § 1 categorically prohibits *per se* unlawful restraints across all markets and industries— including restraints on the buyer side and in the labor market. *See Mandeville*, 334 U.S. at 235–36; *Anderson*, 272 U.S. at 361–63; *see also supra* Part I pp. 9–11. Thus, decades of precedent gave Defendants more than sufficient notice that agreements among competitors to fix the price of labor are *per se* illegal. Moreover, the numerous district court decisions holding that agreements to fix the compensation of employees are *per se* unlawful reinforce this conclusion. *See supra* Part I. p. 14. At a minimum, these decisions foreclose Defendants' argument because it cannot be said that "no[ ] [ ] prior judicial decision has fairly disclosed [Defendants' conduct] to be within [the] scope [of the Sherman Act]." *See Lanier*, 520 U.S. at 266.

Moreover, the holding today is not a "novel" construction of the Sherman Act—it comports with previous broad interpretations of the Act and is a logical application of precedent. Similarly, that "no court has found that purported wage-fixing agreements constitute criminal conduct under the Sherman Act" does not mean that Defendants' did not have fair notice. *See United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of this prosecution does not help [defendant's fair notice argument], for it is immaterial that there is no litigated fact pattern precisely on point.") (internal quotations omitted). Rather, the lack of criminal judicial decisions only indicates Defendants' unlucky status as the first two individuals that the Government has prosecuted for this type of conduct before.

But, "[t]o find unfair notice whenever a court specified new types of acts to which a criminal statute applied would stifle courts' ability to interpret and fairly apply criminal statutes." *United States v. Kay*, 513 F.3d 432, 444–45. Rather, "as *Lanier* points out, lack of prior court interpretations 'fundamentally similar' to the case in question does not create unfair notice." *Id.* at 444. Instead, "so long as the prior decisions gave reasonable warning" that the conduct was unlawful, then fair notice was satisfied. *See id.* And, here, decades of judicial interpretations gave Defendants more than "reasonably clear" notice that their conduct was unlawful. *See Lanier*, 520 U.S. at 267.

Even where the Supreme Court has considered certain conduct "not price fixing as such," it has affirmed the district court's application of the *per se* rule. *United States v. Nat'l Soc'y of Pro. Eng'rs*, 435 U.S. 681, 692, 699 (1978). Thus, even accepting Defendants' argument that their conduct was not literally price fixing, Defendants were still on notice that their conduct was "perilously close" to a line that subjected them to criminal prosecution. *See Boyce*, 342 U.S. at 331; *Id.* ("Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line."). Thus, Defendants received fair notice that their conduct was illegal.

### ii. The Rule of Lenity Does Not Apply.

Defendants also argue that the rule of lenity requires dismissal of Count One because there remains a "grievous uncertainty as to whether the Supreme Court condemns wage fixing as a *per se* antitrust violation" since "it has never evaluated it as such" (Dkt. #47 at p. 11). The Government responds by arguing that the rule of lenity is inapplicable here because "[t]here is no grievous ambiguity or uncertainty in this case" (Dkt. #46 at p. 15).

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

The rule of lenity is a principle of statutory construction that "applies primarily to the interpretation of criminal statutes." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 16 (2011). It dictates that courts resolve ambiguities in criminal statutes in favor of defendants. *See Crandon v. United States*, 494 U.S. 152, 168 (1990). But "[c]ourts do not resort to the rule of lenity every time a difficult issue of statutory interpretation arises." *United States v. Bittner*, 469 F. Supp. 3d 709, 723 (E.D. Tex. 2020) (citation and internal quotation marks omitted). "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted).

**\*11** Here, the rule of lenity has no application. As discussed, the rule of lenity applies only if a court can make "no more than a guess as to what Congress intended." *Ladner v. United States*, 358 U.S. 169, 178 (1958). Here, the Court can do much better than "guess." *See id.* Indeed, the Supreme Court has recognized that "Congress intended to strike as broadly as it could in § 1 of the Sherman Act...." *Goldfarb*, 421 U.S. at 787. And price-fixing agreements—in many forms—have long been held to be *per se* violations of the Act. *See Catalano*, 446 U.S. at 647–50; *see also supra* Part I pp. 8–10. The Supreme Court has also long held that the Sherman Act applies equally to all industries and markets—including to agreements made by buyers in the labor market. *See Mandeville*, 334 U.S. at 235–36; *Anderson*, 272 U.S. at 361–63; *see also* supra Part I pp. 9–11. Thus, these cases leave no room for application of the rule of lenity. Put bluntly, "the rule of lenity cannot be used to create ambiguity when the meaning of a law, even if not readily apparent, is, upon inquiry, reasonably clear." *United States v. Nippon Paper Industries Co.*, 109 F.3d 1, 8 (1st Cir. 1997). Though Defendants disagree with this Court's interpretation of the Sherman Act, that does not mean there is a "grievous ambiguity." *See Barber*, 560 U.S. at 488. Rather, decades of precedent make it clear that agreements to fix the price of labor—like all other price-fixing agreements—are *per se* illegal. Thus, the rule of lenity does not apply.

### B. Defendants' Sixth Amendment Challenge Also Fails.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury...." U.S. CONST. amend. VI. Defendants argue that the Indictment's *per se* designation

violates the Sixth Amendment because it "improperly suggest[s] that intent could be presumed without further evidence" (Dkt. #36 at p. 20). According to Defendants, such a presumption would unconstitutionally take from the jury the determination of intent—thus depriving Defendants of their right to trial by jury (Dkt. #36 at p. 20). The basis of Defendants' argument stems from *United States v. U.S. Gypsum Co.*, where the Supreme Court held "that a defendant's state of mind or intent is an element of a criminal antitrust offense" which "cannot be taken by the trier of fact through reliance on a legal presumption of wrongful intent from proof of an effect on prices." 438 U.S. at 435. But Defendants' cursory Sixth Amendment argument also fails.

Decades ago, the Fifth Circuit rejected essentially the same argument that Defendants now make. *United States v. Cargo Serv. Stations, Inc.*, 657 F.2d 676, 681–84 (5th Cir. 1981). Defendants fail to acknowledge, much less distinguish, this precedent. In *Cargo Service*, defendants were charged with a conspiracy to fix prices and subsequently found guilty after a jury trial. *Id.* at 678. On appeal, relying on *Gypsum*, defendants argued that they were denied due process of law because the district court's jury instruction "improperly allowed the jury to convict absent a finding of intent" *Id.* at 684. The Fifth Circuit rejected this argument: "Neither a conclusive nor a permissive presumption is at issue here" because "a finding of intent to fix prices [equates to] an intent to unreasonably restrain trade." *Id.* at 683 n.7. Thus, "a finding that [defendants] intended to fix prices supplies the criminal intent necessary for a conviction of a criminal antitrust offense." *Id.* at 684. Further, the Fifth Circuit found the Defendants' reliance on *Gypsum* was misplaced—*Gypsum* was "easily distinguishable" because it involved the mere exchange of price information, not price fixing itself, and thus was a rule of reason case. *Id.* at 683. This Court thus finds that *Cargo Service* forecloses Defendants' argument. [5] Accordingly, application of the *per se* rule does not violate the Sixth Amendment.

**\*12** Since the Court has addressed both Defendants' arguments pertaining to Count One, the Court will now turn to Rodgers' separate argument.

### ANALYSIS: RODGERS' MOTION

In addition to adopting Jindal's arguments for Count One, Rodgers moves to dismiss the entire Indictment against him on another ground (Dkt. #45). Specifically, Rodgers argues

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

the Indictment should be dismissed because the Government's prosecution breaches an oral non-prosecution agreement between Rodgers and the Government (Dkt. #45). In response, the Government denies the existence of an oral non-prosecution agreement (Dkt. #48). In fact, the Government contends that the only agreements between Rodgers and the Government were two no-direct use agreements ("NDU's"), commonly referred to as "proffer letters" (Dkt. #48 at p. 3).

### I. Rodgers' Background

Details of the events between Rodgers, his attorney, and the Government are helpful for context regarding the alleged non-prosecution agreement. Based on a declaration from Brian Poe ("Poe"), Rodgers' attorney, and a declaration from Ryan Danks ("Danks"), Acting Chief of the Washington Criminal I Section of the Antitrust Division, the Court summarizes the following background information (Dkt. #45-8; Dkt. #48-1).

On November 26, 2019, DOJ Trial Attorney Katie Stella ("Stella") contacted Poe and the two spoke on the phone following a brief email exchange (Dkt. #45-8 ¶ 2). During the phone call, Stella stated that the Government considered Rodgers to be a "subject" of a criminal investigation and wanted to interview Rodgers in connection with an antitrust investigation. (Dkt. #45-8 ¶ 2). According to Poe's declaration, Stella also stated that "she did not anticipate Rodgers being charged if he continued to cooperate with the government's investigation" (Dkt. #45-8 ¶ 2). Danks' declaration does not mention this phone call.

On December 12, 2019, Rodgers and Poe met with the Government in Fort Worth for an interview or "proffer" (Dkt. #45-8 ¶ 4). A written NDU was executed before the interview on the same day, setting out the terms of the interview (Dkt. #48-1 ¶ 6; Dkt. #48, Exhibit 2). Poe's declaration does not mention the written NDU. Following Rodgers' proffer, Poe and the Government communicated several times via phone and email (Dkt. #45-8 ¶ 6). On May 22, 2020, Poe received a phone call from Stella concerning Rodgers (Dkt. #45-8 ¶ 7). During the call, Poe claims that Stella confirmed that Rodgers was still considered a "subject" of the criminal investigation and stated again that Rodgers would not be charged criminally if he continued to cooperate with the Government's investigation (Dkt. #45-8 ¶ 7). Again, Danks' declaration contains no mention of this call.

On or about December 9, 2020, Poe states he received a phone call from DOJ Antitrust Trial Attorney Megan Lewis ("Lewis") regarding Rodgers (Dkt. #45-8 ¶ 9). The purpose

of the call was to inform Poe that a Grand Jury had indicted Jindal and that the Government anticipated Rodgers would need to testify at trial (Dkt. #45-8 ¶ 9; Dkt. #45-1 ¶ 7). Poe claims that while he had been previously assured by Stella that Rodgers would not be charged if he continued to cooperate, he took the opportunity to confirm this with Lewis since she was Stella's supervisor (Dkt. #45-8 ¶ 9). According to Poe's declaration, "Lewis unequivocally stated that Rodgers would not be charged if he continued to cooperate with the [G]overnment" (Dkt. #45-8 ¶ 9). Danks admits the Government contacted Poe on that day, but his declaration contains no further details of the substance of the conversation (Dkt. #48-1 ¶ 7). He does state, however, that the Government attorney with whom Poe spoke was not Lewis, nor was the attorney a supervisor of another attorney who worked on the investigation (Dkt. #48-1 ¶ 7).

**\*13** On January 27, 2021, Rodgers and Poe attended a virtual proffer with the Government (Dkt. #45-8 ¶ 11). As with the first proffer, another NDU was executed setting out terms of the interview (Dkt. #48-1 ¶ 9; Dkt. #48, Exhibit 3). Again, Poe's declaration contains no mention of the written agreement that was executed that day. Subsequently, on a March 1, 2021 phone call, the Government notified Poe that it was recommending prosecution for Rodgers because, in the Government's view, Rodgers had not been truthful during the proffer on January 27, 2021 (Dkt. #45-8 ¶ 12; Dkt. #48-1 ¶ 10). Rodgers was indicted on April 15, 2021 (Dkt. #45-8 ¶ 14).

### II. Non-Prosecution Agreement Legal Standard

"Non[-]prosecution agreements, like plea bargains, are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." *United States v. Castaneda*, 162 F.3d 832, 835 (5th Cir. 1998). Applying contract law, Rodgers "bears the burden of proving that there was a mutual manifestation of assent—either verbally, or through conduct—to the agreement's essential terms." *United States v. Jimenez*, 256 F.3d 330, 347 (5th Cir. 2001).

If Rodgers proves that there was a non-prosecution agreement and "lives up to his end of the bargain, the government is bound to perform its promises." *Castaneda*, 162 F.3d at 835–36. If Rodgers " 'material breaches' his commitments under the agreement, however, the government can be released from its reciprocal obligations." *Id.* at 836. To be relieved of its obligations, the Government must "prove to the court by a preponderance of the evidence that (1) the defendant breached

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

the agreement, and (2) the breach is sufficiently material to warrant rescission." *Id.*

### III. Analysis

Armed with a better understanding of the communication between Rodgers' counsel, Poe, and the Government, the Court turns back to Rodgers' argument. Rodgers claims there was an oral non-prosecution agreement that was "reached on or about December 9, 2020" "that Rodgers would not be charged if [he] continued to cooperate, which included testifying at trial" (Dkt. #50 at p. 6). Rodgers further contends that the Government has not proved that Rodgers breached the terms of his non-prosecution agreement (Dkt. #45 at p. 9). Accordingly, Rodgers argues the Government cannot rescind the agreement (Dkt. #45 at p. 9). The Government counters by arguing that no oral agreement was ever reached (Dkt. #48 at p. 10). The Government also argues that two written NDUs "conclusively establish that Rodgers did not have a non-prosecution agreement" "[b]ecause parol evidence is inadmissible to prove the meaning of the unambiguous NDUs" (Dkt. #48 at p. 10). Further, while the Government has not come forward with any evidence proving Rodgers violated any alleged oral agreement, it argues that "[i]f necessary" it "could readily show a material violation of any non-prosecution agreement" (Dkt. #48 at p. 13).

Applying basic contract principles to the alleged agreements in this case, in order to dismiss the Indictment, the Court must 1) find that the parol evidence rule does not bar the enforcement of the alleged oral non-prosecution agreement; 2) an oral non-prosecution agreement was in fact reached; 3) Rodgers performed his part of the agreement; and 4) the Government has breached the agreement. [6] *See Jimenez*, 256 F.3d at 347 n.23 (noting that before considering whether any alleged agreement was breached, it must first be determined whether an agreement ever existed). Thus, the Court will first consider the effect of the written NDUs as part of its inquiry into whether an oral non-prosecution agreement was ever reached.

### A. The Two Written NDUs Do Not Bar Enforcement of Any Alleged Oral Agreement.

**\*14** As previously stated, the Government argues that two written NDUs between the Government and Rodgers trigger the parol evidence rule and thus "conclusively establish that Rodgers did not have a non-prosecution agreement" (Dkt.

#48 at p. 10). According to the Government, because the NDUs contemplate Rodgers' potential prosecution and contain merger clauses, they "foreclose any contention that there was a non-prosecution agreement at the time of their signing" (Dkt. #48 at p. 10). In his motion to dismiss the Indictment, Rodgers does not mention the written NDUs. In his reply, however, Rodgers concedes that the written NDUs exist, but cites no law on the parol evidence rule and instead just repeatedly asserts that the Government "misconstrue[s] the language of these agreements" (Dkt. #50 at p. 5).

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the writing itself. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). Parties may not rely on extrinsic evidence to create an ambiguity or give the contract a different meaning from that which its language imports. *First Bank v. Brumitt*, 519 S.W.3d 95, 110 (Tex. 2017). "If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). Likewise, "when a contract is unambiguous, [courts] generally will not look beyond the four corners of the document." *United States v. Long*, 722 F.3d 257, 262 (5th Cir. 2013) (internal quotations omitted). Further, when there is valid integrated agreement with respect to a particular subject matter, the parol evidence rule "precludes the enforcement of inconsistent prior or contemporaneous agreements." *Jack H. Brown & Co. v. Toys "R" Us, Inc.*, 906 F.2d 169, 173 (5th Cir. 1990). However, the parol evidence rule "does not preclude enforcement of prior or contemporaneous agreements which are collateral to an integrated agreement and which are not inconsistent with and do not vary or contradict the express or implied terms or obligations thereof." *Hubacek v. Ennis State Bank*, 317 S.W.2d 30, 32 (Tex. 1958).

As a starting point, only the second NDU—executed on January 22, 2021—would trigger the parol evidence rule and thus bar enforcement of the alleged oral non-prosecution agreement. The first NDU was executed on December 12, 2019, (Dkt. #48, Exhibit 2), and Rodgers claims the oral agreement was not reached until about one year later—on or about December 9, 2020 (Dkt. #50 at p. 6). Yet, the parol evidence rule only bars enforcement of prior or contemporaneous agreements; it does not apply to agreements made *subsequent* to the written agreement. *Brumitt*, 519 S.W.3d at 111. Thus, only the second written NDU, executed on January 22, 2021, could trigger the parol evidence rule

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

since the oral agreement was allegedly formed before the second written NDU was signed.

Moreover, the second NDU is the type of agreement that triggers the parol evidence rule. It is a written agreement that is "integrated." Indeed, it contains an integration or "merger" clause. *See People's Cap. & Leasing Corp. v. McClung*, No. 4:18-CV-00877, 2020 WL 4464503, at *8 (E.D. Tex. Aug. 4, 2020) ("A merger clause is a provision in a contract to the effect that the written terms may not be varied by prior or oral agreements because all such agreements have been merged into the written document.") (internal quotations omitted). But, as well, by its own terms, it is integrated only as to the parties' agreements relating to the subject matter it addresses —not as to all prior or contemporaneous agreements between the parties related to other matters. *See West v. Quintanilla, 573 S.W.3d 237, 244 (Tex. 2019)* ("Although it is complete and final as to its subject matter, it does not purport to address or supersede agreements related to other matters."). In this sense, the NDU is only partially integrated. The language in the NDU makes this clear. For example, it states:

> **\*15** It is understood that this agreement is limited to statements made during the interview on January 27, 2021, and does not apply to any oral, written, or recorded statements made by you at any other time. This letter and the attached Addendum constitute the entire understanding between the United States and you *in connection with this interview.*

(Dkt. #48, Exhibit 3) (emphasis added). Accordingly, though the NDU unambiguously states that it "constitute[s] the entire understanding between the United States and [Rodgers,]" it does so only in connection with the terms of the January 22, 2021, proffer meeting (*See* Dkt. #48, Exhibit 3). Thus, even though the NDU contains an integration clause, it does not foreclose the possibility that Rodgers and the Government reached another separate, unrelated agreement.

This is significant because under the parol evidence rule, the written, integrated NDU only "precludes enforcement of any prior or contemporaneous agreement that addresses the same subject matter and is inconsistent with [the NDUs'] terms." *Id.* at 244–45. Stated differently, the parol evidence

rule does not preclude enforcement of a prior agreement that is "collateral to and not inconsistent" with the NDU. *Id.* at 245. Therefore, to determine if the parol evidence rule bars enforcement of the oral agreement, the Court must determine whether the alleged oral agreement was "collateral" to the NDU and whether it was "not inconsistent" with it. *See id.*

Here, the Court finds that any alleged oral non-prosecution agreement was "collateral" to the second NDU. To be collateral, the agreement must be one the parties might naturally make separately and would not be ordinarily be expected to be embodied in or integrated with the written agreement and not so clearly connected with the principal transaction as to be part and parcel of it. *Boy Scouts of Am. v. Responsive Terminal Sys., Inc.*, 790 S.W.2d 738, 745 (Tex. App.—Dallas 1990, writ withdrawn). Here, the NDU and the oral agreement addressed different subject matters. An NDU is generally "an agreement between an [individual] and the government in a criminal case that sets forth the terms under which the [individual] will provide information to the government during an interview, commonly referred to as a 'proffer session.' " *United States v. Lopez*, 219 F.3d 343, 345 n.1 (4th Cir. 2000). On the other hand, a non-prosecution agreement is exactly what it sounds like—it is an agreement that states the Government will agree not to prosecute an individual if certain conditions are met (Dkt. #48-1 ¶3). Thus, the NDU agreement addressed the terms of the proffer session, while the alleged oral agreement would have addressed the terms of any protection from prosecution. Even in the Government's own words, "[n]on-prosecution agreements differ markedly from NDUs" (Dkt. #48 at p. 4). Consequently, because the oral non-prosecution agreement was collateral to the written NDU, the Court must resolve whether the oral non-prosecution agreement was inconsistent with the terms of the NDU. *See Quintanilla, 573 S.W.3d at 244–45*. If the oral non-prosecution agreement was "not inconsistent" with the NDU, then the parol evidence rule will not preclude enforcement of the oral agreement. *Id.*

The Court turns to the language of the NDU to determine if it is consistent with the alleged oral agreement that Rodgers would not be prosecuted if he continued to cooperate. In relevant part, the agreement states:

> **\*16** 3. The United States agrees that no statement made by you during the interview will be used directly against you in any legal proceeding, except that your statements may be offered in any such proceeding to impeach your testimony or to rebut evidence offered on your behalf. In addition, the United States may use any statements made

Appendix of Authorities: 150 of 180

in the interview in a prosecution of you for making a false statement or declaration (18 U.S.C. §§ 1001, 1623), obstruction of justice (18 U.S.C. § 1503, *et seq.*), or perjury (18 U.S.C. § 1621).

4. The United States is free to use any information directly or indirectly derived from the interview to pursue its investigation and in any subsequent prosecution of you or others.

(Dkt. #48, Exhibit 3). The language, particularly in paragraph four, broadly contemplates future prosecution of Rodgers. At first glance, this broad language appears to be inconsistent with the Government's oral promise not to prosecute Rodgers. But, after a closer examination of the language, the Court reaches a different conclusion. Instead, the Court finds that the collateral oral agreement at issue is "not inconsistent" with the written NDU—even though the NDU contemplates future prosecution of Rodgers. Indeed, in *Quintanilla*, the Texas Supreme Court explored what "inconsistent" means in this context and found that when the oral agreement contradicts or varies the parties' obligations under the written agreement, the oral agreement is an inconsistent collateral agreement. *Id.* at 247.

Here, the alleged oral agreement does not vary the parties' obligations under the written NDU. For one thing, the NDU does not specifically state that Rodgers is subject to a future prosecution; it simply states the Government can use the information from the interview in any subsequent prosecution (Dkt. #48, Exhibit 3). Further, the alleged oral agreement was not simply an agreement to not prosecute Rodgers— it was conditioned on his continued cooperation. Thus, just like the NDU contemplates future prosecution of Rodgers, so, too, does the alleged oral agreement—if Rodgers fails to continue to cooperate. As such, the oral agreement does not alter fundamental terms of the NDU.

Consequently, because the alleged oral non-prosecution agreement is "collateral to and not inconsistent" with the second NDU, the parol evidence rule does not preclude enforcement of it. *See id.* at 245. Accordingly, since the parol evidence rule is not applicable, the Court now turns to whether Rodgers has proved that there was a legally enforceable oral non-prosecution agreement.

### B. No Legally Enforceable Oral Non-Prosecution Agreement Was Reached.

A defendant claiming to have a non-prosecution agreement bears the burden of "prov[ing] that such an agreement existed." *Jimenez*, 256 F.3d at 347. "Non-prosecution agreements ... are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." *Castaneda*, 162 F.3d at 835. Any "ambiguities" in a non-prosecution agreement "must be construed against the government." *McBride*, 571 F. Supp. at 605. Because a non-prosecution agreement is governed by contract law standards, whether the parties reached an agreement is question of fact. *Westlake Petrochemicals, L.L.C. v. United Polychem, Inc.*, 688 F.3d 232, 238–39 (5th Cir. 2012). However, whether an agreement has all the essential terms to be an enforceable agreement is a question of law. *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012). In other words, Rodgers' contention has both a factual dimension—namely, whether Rodgers and the Government agreed that the Government would not prosecute him if he cooperated—and a legal dimension—whether there was a meeting of minds on the agreement's essential terms.

**\*17** Rodgers claims the oral agreement "that Rodgers would not be charged if Rodgers continued to cooperate, which included testifying at trial" was reached "on or about December 9, 2020" (Dkt. #50 at p. 6). In other words, Rodgers argues that the basis for the oral agreement was Poe's phone call with Lewis. Further, Rodgers asserts that the Government's failure to deny the occurrence of the oral conversation and the Government's failure to deny that an agreement was reached "is further proof to corroborate counsel's declaration" (Dkt. #50 at p. 6). Indeed, the Court does find that the absence of any explicit denial of an oral agreement in Danks' declaration is telling. But the Court also notes that Rodgers bears the burden of proving an agreement existed, and he faces some difficult challenges.

For example, contrary to Poe's declaration, Danks declares that Lewis was *not* the attorney on the phone call on December 9, 2021, and the attorney on the phone call was *not* a supervisor of another attorney who worked on the investigation (Dkt. #48-1 ¶ 7). These statements both directly contradict Poe's statements. While the name of the Government attorney who made the alleged agreement might seem like a minor detail, it does cast doubt on Poe's "unequivocal[ ]" recollection of the events. *See United States v. Casares*, No. 2:14-653, 2019 WL 1243617, at \*4 (S.D. Tex. Mar. 18, 2019) (singling out Defendant's failure to "specify with whom he entered into this alleged agreement" in holding no oral non-prosecution agreement existed). Further, while

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

Poe asserts an oral agreement was made, Danks declares that "[t]he Division's general practice is that both NDUs and NPAs are written" (Dkt. #48-1 ¶ 3). Moreover, while Poe claims an oral non-prosecution was reached around December 9, 2020, Rodgers entered into a second written NDU with the Government after this that contained no mention of the oral agreement. The execution of the written NDU not only reinforces the Government's claim that agreements like this are in writing, but it also indicates that the course of dealing between the parties was to put important agreements in writing.

Even more telling, the Court finds it odd that Poe's declaration does not mention that two written NDUs were executed. And, finally, looking at Poe's declaration, the Court finds it noteworthy that when Poe was notified that the Government was now recommending prosecution, he never asserted that the change violated any alleged agreement. *See United States v. Sattar*, No. 02-CR-395, 2003 WL 22510398, *3 (S.D.N.Y Nov. 5, 2003) (noting that if a non-prosecution agreement had been reached then Poe's response upon learning of the indictment "should have been an anguished howl of protest over the breach of the agreement.") (internal quotations omitted).

Nonetheless, even fully crediting Poe's declaration and assuming *arguendo* that Rodgers has demonstrated the factual aspect of the alleged agreement, the Court finds that no agreement was reached as a matter of law. *See Coe*, 695 F.3d at 320 ("Whether an agreement fails for indefiniteness is a question of law."). Indeed, a contract is "legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations." *Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 323 (5th Cir. 2006) (internal quotations omitted). Stated differently, "when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Coe*, 695 F.3d at 320. To determine whether essential terms were sufficiently settled to find a contract, "[c]ourts look not only at any relevant written agreements but also at the relationship of the parties, [and] their course of dealings...." *APS Cap. Corp. v. Mesa Air Grp., Inc.*, 580 F.3d 265, 272–73 (5th Cir. 2009).

**\*18** Here, no legally enforceable agreement was reached because there was no "meeting of the minds" on all essential terms. Even accepting Rodgers' Poe's declaration as the truth —"that Rodgers would not be charged if Rodgers continued to cooperate, which included testifying at trial"—the agreement

nevertheless fails to contain essential terms. *See id.* at 272 ("[A]n agreement is not enforceable unless it resolves all essential terms and leaves no material matters open for future negotiation."). Indeed, not every "meeting of the minds" is a contract. The minds may not have met on essential terms. When the parties leave an essential term open for future negotiation, there is no binding contract. *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Here, the alleged agreement contains no mention of essential terms like "what level of cooperation would be required of [Rodgers] in order for h[im] to satisfy the purported [non-prosecution] agreement [and] who would determine whether [Rodgers] had fulfilled [his] part of the [ ] agreement." *See United States v. Lua*, 990 F. Supp. 704, 711 (N.D. Iowa 1998); *see also Commonwealth v. Stewart*, No. 04-1409, 2004 WL 3455442, at *17 (Va. Cir. Ct. Oct. 22, 2004) (finding an absence of sufficient detail to prove a meeting of the minds). Absent such essential terms, there could be no meeting of the minds. That Rodgers now argues that he has lived up to his end of the agreement—by cooperating—and the Government disagrees illustrates how these details were material terms to the agreement. Undeniably, these details could change the outcome of the case. *See United States v. Aleman*, 286 F.3d 86, 92 (2d. Cir. 2002) ("A critical factual element of the alleged agreement will be who determines [Defendant]'s truthfulness and willingness to testify-the government, the court, or some other party.").

Further, examining the written NDUs, the relationship of the parties, their course of dealings, and other evidence only confirms there was no meeting of the minds as to the essential terms of the non-prosecution agreement. *See Mesa*, 580 F.3d 272–73. Indeed, when the agreement is oral, the court "must consider the possibility that immunity discussions ... never progressed to a meeting of the minds and formation of an enforceable bargain." *Aleman*, 286 F.3d at 89. That a final oral agreement was never reached is bolstered by the existence of two written NDUs. These objectively show the course of dealing between the parties—when the parties agreed to final and essential terms of a contract, they did so in writing. By contrast, the only evidence that Rodgers offers to show that an oral agreement was reached is subjective evidence —Poe's declaration. But even Poe's declaration supports the conclusion that no final agreement was ever reached. Indeed, Poe's repeated conversations with the Government indicate that there was a possibility a deal could be made in the future, not that a final agreement already existed as to all essential terms. *See Lua*, 990 F. Supp at 711. For example, Poe acknowledges that he asked the Government about Rodgers'

United States v. Jindal, Not Reported in Fed. Supp. (2021)

2021 WL 5578687, 2021-2 Trade Cases P 81,898

status several times. However, if there had been a prior meeting of the minds on all essential terms, then Poe's inquiries would have been unnecessary. Thus, his repeated inquiries highlight that even he might have been unsure that there was a final agreement on the table.

In short, the Court finds that Rodgers has failed to prove that essential terms of the agreement were sufficiently settled and definite. Indeed, the lack of detail regarding the terms of the alleged agreement highlight that the parties never reached a final agreement. And a court may not create an agreement where none exists. *See Lamajak, Inc. v. Frazin, 230 S.W.3d 786, 793 (Tex. App.—Dallas 2007, no pet.)*. A defendant must establish something "more than an unfounded and unilateral belief" that the government made a claimed promise in exchange for his cooperation. *United States v. Williams, 198 F.3d 988, 992 (7th Cir. 1999)*. Rodgers has not done so. Accordingly, because the Court concludes that there was no meeting of the minds as to the essential terms, the

Court finds no non-prosecution agreement exists for the Court to enforce. Therefore, the Court denies Rodgers' motion to dismiss on this ground.

### CONCLUSION

It is therefore **ORDERED** that Defendant Neeraj Jindal's Motion to Dismiss Count One of the First Superseding Indictment (Dkt. #36) and Defendant John Rodgers' Motion to Dismiss the Superseding Indictment (Dkt. #45) are hereby **DENIED.**

**IT IS SO ORDERED.**

### All Citations

Not Reported in Fed. Supp., 2021 WL 5578687, 2021-2 Trade Cases P 81,898

---

**Footnotes**

1       Certain types of group boycotts have also been found to be *per se* illegal, but "precedent limits the per se rule in the boycott context to cases involving horizontal agreements among direct competitors." *NYNEX Corp. v. Discon, Inc.* 525 U.S. 128, 135 (1998).

2       In *Alston*, the Supreme Court affirmed a judgment that evaluated the NCAA's limit on education-related compensation under the rule of reason. *Id.* at 10–11 (majority opinion). However, for many years, the Supreme Court has declined to condemn the NCAA's restraints as illegal *per se* because the "horizontal restraints on competition are essential if the product is to be available at all." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.,* 468 U.S. 85, 101 (1984). In these situations—where collaboration is essential among certain actors for there to be a product at all—the rule of reason applies regardless of the nature of the restraint at issue. *See id.* at 103. Accordingly, contrary to Defendants' argument, that the Supreme Court evaluated the NCAA's wage-fixing under the rule of reason does not justify the rule of reason in this case.

3       "... Jindal, Rodgers, and co-conspirators knowingly entered into and engaged in a conspiracy to suppress competition by agreeing to fix prices by lowering the pay rates to PTs and PTAs" (Dkt. #21 at pp. 3–4).

4       "During the Relevant Period, the business activities of Jindal, Rodgers, and their co-conspirators that are the subject of the conspiracy charged in this Count were within the flow of, and substantially affected, interstate trade and commerce. For example, during the Relevant Period: (a) Insurance funds, including federal Medicare funds, traveled from banks or companies located in states outside of Texas through a home health agency to Company A in Texas, and from Company A to its PTs and PTAs to pay them for providing care to patients; (b) To provide care in patients homes and assisted living facilities, PTs and PTAs used equipment and vehicles purchased in interstate commerce; and (c) The conspiracy was intended to lower

**United States v. Jindal, Not Reported in Fed. Supp. (2021)**

2021 WL 5578687, 2021-2 Trade Cases P 81,898

rates paid to PTs and PTAs, which would lessen their purchases in interstate trade and commerce" (Dkt. #21 at p. 6).

5    Moreover, every other circuit to address this issue has agreed. *United States v. Giordano*, 261 F.3d 1134, 1143–44 (11th Cir. 2001); *United States v. Fishbach & Moore, Inc.*, 750 F.2d 1183, 1195–96 (3d. Cir. 1984); *United States v. Koppers Co.*, 652 F.2d 290, 293–95 (2d Cir. 1981); *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979); *United States v. Mfrs.' Ass'n*, 462 F.2d 49, 52 (9th Cir. 1972).

6    The parties did not address choice of law questions. The Court, however, is bound by *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938) to apply the contract law of the State of Texas, where was the agreement was allegedly executed and where it would be performed. *United States v. McBride*, 571 F. Supp. 596, 604 n.3 (S.D. Tex. 1983), *aff'd*, 915 F.2d 1569 (5th Cir. 1990)

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

---

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ELECTRICAL MEDICAL TRUST, et al., | § | |
| | § | |
| Plaintiffs, | § | CIVIL ACTION NO.: 4:23-CV-04398 |
| vs. | § | |
| | § | **ORAL ARGUMENT REQUESTED** |
| U.S. ANESTHESIA PARTNERS, INC., et al., | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT U.S. ANESTHESIA PARTNERS, INC.'S
<u>MOTION TO DISMISS THE COMPLAINT</u>**

Plaintiffs' lawsuit threatens the ability of a leading physician-owned anesthesiology practice to continue to provide high quality service to Texas hospitals and other healthcare facilities. Many hospitals in Houston and Dallas – particularly those in underserved communities – have determined that clinicians affiliated with U.S. Anesthesia Partners, Inc. ("USAP") will provide the best care for their patients. By partnering with USAP, hospital systems secure 24/7 coverage for all procedures across multiple sites, whether their patients have commercial or government sponsored insurance (such as Medicare or Medicaid), or no ability to pay. And competition for these hospital partnerships is fierce. Plaintiffs' lawsuit would interfere with local hospitals' decisions about how best to provide quality care to their patients, and would remake antitrust law in several respects. For the following reasons, all of Plaintiffs' claims should be dismissed.

***Plaintiffs Lack Standing To Sue As Indirect Purchasers.*** Plaintiffs have not sufficiently alleged that they satisfy the "bright-line rule" set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and its progeny: only "*direct* purchasers" may seek damages under the federal antitrust laws. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1520 (2019). The Complaint artfully avoids alleging that Plaintiffs *directly* paid USAP for "hospital-only anesthesia services." For good reason: the

Complaint makes plain that the direct purchasers are the commercial insurers USAP negotiates with – not Plaintiffs and other downstream customers of those insurers.  The Court should dismiss the Complaint on that ground alone.  *See infra* Part I.

**The Complaint Does Not Plausibly Allege A Relevant Product Market.**  Plaintiffs assert that there is a well-defined antitrust market for "commercially insured hospital-only anesthesia services," arbitrarily excluding reasonably interchangeable substitutes – most obviously, anesthesiology performed in ambulatory surgical centers.  Plaintiffs do not plead enough facts to make their alleged market plausible in light of either "the rule of reasonable interchangeability" or "cross-elasticity of demand," leaving it insufficient "as a matter of law."  *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002).  *See infra* Part II.

**The Complaint Does Not Plausibly Allege That USAP Has Monopoly Power.**  Plaintiffs nowhere allege that USAP has charged or has the power to charge supracompetitive rates – *i.e.*, monopoly power – in any alleged market.  Indeed, the Complaint takes no steps to analyze competitive market pricing at all.  Instead, Plaintiffs' own allegations prove that USAP *cannot* charge rates higher than those set by competitive market negotiation *before USAP even entered the market*.  Were there any doubt, recent legislation subjecting out-of-network anesthesiologists' rates to mandatory arbitration now effectively prevents any provider from charging supracompetitive rates.  The absence of any plausible factual basis for a claim of monopoly power is fatal to Plaintiffs' claims under Section 2 of the Sherman Act.  *See infra* Part III.A.

**The Complaint Does Not Plausibly Allege Exclusionary Conduct.**  Plaintiffs also do not allege exclusionary conduct.  Acquisitions like those challenged often increase competition and therefore do not presumptively harm "the competitive *process* and thereby harm consumers." *Rambus, Inc. v. FTC*, 522 F.3d 456, 463 (D.C. Cir. 2008).  Plaintiffs' only attempt to plead facts

showing these acquisitions did harm consumers fails because (again) the rates they challenge were set by USAP's nonmonopolist predecessor, not USAP.  *See infra* Part III.B.

*Plaintiffs' Section 2 Conspiracy Claim Fails.*  The Court should dismiss Plaintiffs' Section 2 conspiracy claim because, for the reasons Welsh Carson explains in its motion, USAP and Welsh Carson are legally incapable of conspiring under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 770-71 (1984).  *See infra* Part III.C.

*Plaintiffs' Section 7 Claim Fails.*  Plaintiffs do not state a claim under Section 7 of the Clayton Act because they fail to allege a probability that anticompetitive effects would flow from the challenged acquisitions, neither when they were consummated nor with the present benefit of hindsight.  *See infra* Part IV.

*Plaintiffs' Section 1 "Price-Fixing" Claim Fails.*  The Complaint also attacks USAP's agreement to handle administrative-billing and payor-relations functions on behalf of three small anesthesiology practices by contorting these separate administrative services agreements into a Section 1 "price-fixing" claim.  But the Complaint does not allege an agreement among competitors to fix prices.  Rather, it alleges that USAP's administrative services clients assigned it their right to payment from insurers in exchange for compensation at rates other than USAP's. Even as alleged, that is not "price fixing," so the claim should be dismissed.  *See infra* Part V.

## BACKGROUND

USAP is an organization owned by anesthesiologists who treat patients throughout Texas. *See* Compl. ¶¶ 1-2.  USAP did not exist until 2012, when it acquired a preexisting, standalone practice called Greater Houston Anesthesiology, or GHA.  *See id.* ¶¶ 2, 56.  Apart from providing anesthesiology services, USAP also performs certain administrative services for non-USAP physicians.  *See*, *e.g.*, *id.* ¶ 112.

3

**I.      Anesthesia Providers Work Both In And Out Of Hospitals And Negotiate Rates Directly With Insurance Companies**

"Anesthesiologists administer medications to prevent patients from feeling pain during medical procedures or surgery." *Id.* ¶ 25.  Physician anesthesiologists and certified registered nurse anesthetists, or CRNAs, are qualified to practice anesthesiology.  *See id.* ¶ 97.  These providers can provide anesthesia services in several healthcare facility settings throughout Texas, including hospitals (on an inpatient or outpatient basis), "outpatient surgery centers, ambulatory surgical centers, [and] doctors' offices."  *Id.* ¶¶ 25, 27.  Yet Plaintiffs' claims are limited to "hospital-only anesthesia services reimbursed by commercial payors."  *Id.* ¶ 25.

To guarantee the availability of "hospital-only anesthesia services," hospitals often choose to partner exclusively with anesthesia groups like USAP.  *See id.* ¶ 39.  Hospitals derive many benefits from these contractual agreements.  They "give[ ] the hospital a central hub for scheduling dozens of procedures per day"; "allow[ ] the hospital to implement accountability-of-care quality measures with the practice"; and ensure sufficient staffing for procedures "on a 24/7 basis."  *Id.* ¶ 28.

The rates at which anesthesia groups are paid differ depending on who pays them. Government insurers pay at rates set by government fee schedules.  *See id.* ¶ 31.  Commercial payors pay rates that are set by contracts negotiated between insurers (who offer to include the groups in their provider "networks") and the groups (who, in exchange, offer often-substantial discounts).  *Id.* ¶¶ 31, 34, 57; *see also id.* ¶ 94 ("[H]ealthcare providers negotiate reimbursement rates with insurers that must offer plans and maintain networks that cover members [in] multiple cities.").  If the providers and insurers do not form such an agreement, the anesthesia group is considered "out of network."  *See id.* ¶ 67.  Out-of-network providers used to be able to bill at higher rates they set, but the law has recently changed such that this is no longer the case.  Under

recent state and federal legislation (the latter known generally as the No Surprises Act), out-of-network providers (like anesthesiologists) must obtain payment through costly and uncertain arbitration. *See generally* No Surprises Act, Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2757-890 (2020); 2019 Tex. Gen. Laws ch. 1342 (S.B. No. 1264).

Plaintiffs are self-funded employee benefit plans that do not themselves negotiate reimbursement rates with providers like USAP. *See* Compl. ¶¶ 14-15. Instead, Plaintiffs each contract with an insurer (in the case of Plaintiff Plumbers Local Union No. 68 Welfare Fund, United Healthcare) that "provides access to its network and negotiates rates with providers." *Id.* ¶ 15; *see also id.* ¶ 33 ("[C]ommercial insurers such as Blue Cross and United Healthcare build provider networks, and self-funded insurers sometimes contract with insurers for access to those networks."). While Plaintiffs allege that they "reimburse[ ] healthcare providers," *id.* ¶¶ 14-15, their claims are limited to USAP's conduct purportedly harming the alleged market for "hospital-only anesthesia services" that are "reimbursed *by commercial payors*," *id.* ¶ 25 (emphasis added).

## II.    USAP Inherited Reimbursement Rates That Had Been Negotiated Between Commercial Insurers And GHA

Plaintiffs focus much of their attention on the rates at which USAP's anesthesiologists are compensated. *See*, *e.g.*, *id.* ¶ 8. Many of these rates trace to long-term agreements that GHA had negotiated with commercial payors before USAP existed. When USAP acquired GHA (in 2012), GHA's 220 physicians and 180 CRNAs, *see id.* ¶ 4, were "well-positioned" with four prominent Houston hospitals, *see id.* ¶ 53. But Plaintiffs do not allege that GHA had monopoly power.

In acquiring GHA, USAP inherited GHA's contracts with commercial payors – contracts that established, for example, GHA's in-network status and reimbursement rates. *See id.* ¶¶ 31, 95 (explaining that contracts between providers and commercial payors establish rates and network status); *see also id.* ¶ 53 (alleging one consultant's analysis of GHA's then-existing reimbursement

5

rates with commercial payors). GHA's pre-acquisition negotiations with commercial insurers "achieved very good levels of reimbursement from commercial payers." *Id.* ¶ 53. Plaintiffs do not allege that these rates were supracompetitive or that GHA had monopoly power when it negotiated these rates.

GHA's legacy contracts generally established that if GHA acquired another practice, the insurer would compensate the newly acquired physicians for their services at GHA's pre-existing, contractually agreed upon rates. *See id.* ¶ 53 ("Savvy Sherpa advised that [after acquiring GHA] USAP would be able to spread [GHA's] higher reimbursement rates to other practices it acquired."). Where necessary, USAP later modified these legacy contracts "to clarify" that GHA's legacy rates "would apply after an acquisition." *Id.* ¶ 68. Plaintiffs do not allege that these provisions (so-called "tuck-in clause[s]," *id.*) were unusual in the industry.

## III.    USAP Expanded Its Provision Of High-Quality Anesthesia Services Within And Outside Of Houston

After acquiring GHA, USAP sought to grow its business and to improve the quality of anesthesia services offered across the State of Texas. The Complaint alleges that USAP made 15 acquisitions over the course of the following seven years, starting with Lake Travis Anesthesiology in 2013, *see id.* ¶ 60, and ending with Guardian Anesthesia Services in 2020, *see id.* ¶ 82.

Even though GHA's contracts with many commercial insurers authorized USAP to bill the newly acquired practitioners at GHA's negotiated rates, *see id.* ¶ 53, the insurers did not always honor those prior agreements. For example, after USAP acquired Pinnacle – an anesthesia practice in Dallas – one insurer refused to honor the agreed-upon GHA rates, and instead opted to treat the former Pinnacle (now USAP) anesthesia providers "as out of network." *Id.* ¶ 67. It took nearly two years of arbitration to resolve that dispute. *See id.*

**IV.    USAP Inherited And Executed Administrative Services Agreements In Connection With Certain Acquisitions**

Plaintiffs also challenge certain administrative services agreements that USAP either inherited or executed between 2012 and 2014 that are separate from its provision of anesthesia services.[1]  USAP inherited two administrative services agreements from practices it had acquired – in 2012, USAP assumed GHA's contract with The Methodist Hospital Physicians Organization, *see id.* ¶ 114; and in 2014, USAP assumed Pinnacle's contract with the Baylor University Medical Center.  *See id.* ¶ 117.  USAP itself entered into the third challenged agreement with the Baylor College of Medicine in 2014.  *See id.* ¶ 121.  Notably, that latest agreement was terminated in 2020.  *See id.*  Plaintiffs nowhere allege that any of these agreements were materially significant.

Plaintiffs allege that under these agreements, USAP agreed to perform back-office functions such as payor relations and billing on behalf of a group of physicians.  *See id.* ¶¶ 112, 116.  USAP "bill[s] and receive[s] payments" for the anesthesia services performed by client provider groups using USAP's own "name and tax identification number."  *E.g.*, *id.* ¶ 116.  USAP keeps a portion of the collected payment as compensation for the administrative services it has performed.  *See id.* ¶ 117.

**LEGAL STANDARD**

"Federal Rule of Civil Procedure 12(b)(6) requires that a plaintiff plead facts sufficient to state a plausible cause of action."  *Collins v. Midland Mortg.*, 2022 WL 16556810, at \*1 (S.D. Tex. Oct. 31, 2022) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court 'accepts all well-pleaded facts as true, viewing them in the light most favorable to the [nonmovant].'"  *Id.* (alteration in original)

---

[1] Plaintiffs also allege that USAP attempted to enter into a fourth administrative services agreement with physicians at the University of Texas in 2014 and again in 2020, but an agreement was never reached.  *See id.* ¶ 123.

7

(quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007)).  "Even so, 'a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.'"  *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555).  Although USAP disputes many of the facts alleged in Plaintiffs' Complaint, the factual allegations described below are from the Complaint and are taken as true for this motion.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## ARGUMENT

## I.  PLAINTIFFS LACK STANDING TO SUE AS INDIRECT PURCHASERS

Plaintiffs "have not shown they were direct purchasers," as they must to state a claim.  *Hughes v. Tobacco Inst., Inc.*, 278 F.3d 417, 423 (5th Cir. 2001) (affirming dismissal).  Under the federal antitrust laws, "*indirect* purchasers who are two or more steps removed from [an alleged antitrust] violator in a distribution chain may not sue" for damages.  *Apple*, 139 S. Ct. at 1520 (citing *Ill. Brick Co.*, 431 U.S. at 736).  Under this "bright-line rule," *Apple*, 139 S. Ct. at 1520, "customers of parties more directly injured by an alleged antitrust violation do not have standing to assert their own claims for damages."  *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 915 (7th Cir. 2020).

"In healthcare-services cases, the possible candidates for the mantle of 'direct purchaser' could be the patient, the patient's employer (if the patient is insured under an employer-sponsored health plan), or the insurer itself – or possibly more than one of these candidates if more than one *directly paid the healthcare provider.*"  *In re NorthShore Univ. HealthSystem Antitrust Litig.*, 2018 WL 2383098, at *6 (N.D. Ill. Mar. 31, 2018) (emphasis added).  Courts thus must attend carefully to "the mechanics of the transaction" – even on a motion to dismiss.  *E.g.*, *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 88 (3d Cir. 2011) (affirming dismissal because the plaintiff had

purchased from an intermediary, not the alleged antitrust violator); *Sharif Pharmacy*, 950 F.3d at 915 (affirming dismissal of complaint by customers of a pharmacy that was itself the direct victim of an alleged antitrust violation); *In re Xyrem (Sodium Oxybate) Antitrust Litig.*, 555 F. Supp. 3d 829, 881 (N.D. Cal. 2021) (similar result where self-funded payers had purchased the relevant product from an intermediary, not the alleged violator).

Plaintiffs' allegations fail to "show[ ] they were direct purchasers" from USAP. *Hughes* 278 F.3d at 423. The Complaint explains that "[c]ommercial insurers negotiate with providers to set reimbursement rates," Compl. ¶ 31, and that "self-funded insurers sometimes contract with" these commercial insurers "for access to" their provider "networks," *id.* ¶ 33. Pursuant to those contracts, a self-funded payer generally agrees to "fund[ ] a bank account from which *the insurer*" – and not the plan – "pays the claims as they are submitted by the providers." *United States v. Anthem, Inc.*, 236 F. Supp. 3d 171, 188 (D.D.C. 2017) (emphasis added), *aff'd*, 855 F.3d 345 (D.C. Cir. 2017). A self-funded payer thus does not have antitrust standing to sue a healthcare provider it does not pay directly: in that circumstance, "the *direct* victim of antitrust harm is [the insurer], not" the self-funded payer. *NorthShore*, 2018 WL 2383098, at *8.

Plaintiffs do not sufficiently allege that they paid USAP *directly*, such that they (rather than their insurer counterparties) are "the *direct* victim[s]" of USAP's alleged antitrust violations. *Id.* Plaintiffs come no closer than conclusory statements highlighting this point by negative implication: each of them allegedly "directly reimburses healthcare providers who treat its members," but neither alleges that it *directly* "paid USAP for hospital anesthesia services provided to its plan participants." Compl. ¶¶ 14-15; *cf. In re Surescripts Antitrust Litig.*, 2020 WL 4905692, at *4 (N.D. Ill. Aug. 19, 2020) (dismissing complaint and explaining: "If the plaintiffs paid Surescripts directly for e-prescription routing services, they need only say so to render the *Illinois*

*Brick* doctrine irrelevant. They have instead engaged in what looks like artful pleading intended (albeit unsuccessfully) to disguise their failure to allege that they are direct purchasers from Surescripts."). Compounding this failure, although each Plaintiff alludes to a commercial insurer,[2] neither alleges the terms of any "contract" it has "with [an] insurer[.]". Compl. ¶ 33; *cf. Warren Gen. Hosp.*, 643 F.3d at 88 (affirming dismissal because the relevant contracts showed that the plaintiff was not a direct purchaser).

The Complaint's class-action allegations drive home Plaintiffs' indifference to the "bright-line [direct-purchaser] rule," *Apple*, 139 S. Ct. at 1520, because they seek to represent anyone who "paid for hospital-only anesthesia services provided in Texas by USAP or its coconspirators." Compl. ¶ 128. If anything, the Complaint undermines Plaintiffs' claim to be direct purchasers. The nub of their theory is the claim that USAP has too much leverage in negotiating reimbursement rates *with insurers*,[3] who in turn contract with self-funded payers. By their own account, then, Plaintiffs are "customers of parties more directly injured by an alleged antitrust violation": the insurers. *Sharif Pharmacy,* 950 F.3d at 915; *see also NorthShore*, 2018 WL 2383098, at *8 ("All in all, the [self-funded payers'] contract simply does not [set up the insurer] as some mere conduit of payment, as if it were some PayPal-like clearinghouse. The only other relevant consideration in the *Illinois Brick* analysis here is which entity negotiated and maintained the contract with the healthcare provider. That is [the insurer].").

---

[2] *See* Compl. ¶ 14 (Aetna); *see id.* ¶ 15 (United Healthcare).

[3] *See id.* ¶¶ 7-8, (quoting insurer executive as complaining about USAP's "leverage at the negotiating table"); *id.* ¶¶ 41-42 (contending that USAP has "enjoy[ed] a multiplier effect in negotiations with insurers"); *id.* ¶ 95 (asserting that "USAP" had "successfully negotiated rate increases with Blue Cross in" particular areas); *id.* ¶¶ 108, 119, 122 (challenged conduct increased USAP's "negotiating leverage with insurers"); *id.* ¶¶ 149, 162, 170, 187 (similar express or implicitly incorporated allegations supporting Sherman Act claims); ¶ 155 (same for Clayton Act claim).

Because Plaintiffs have failed to plausibly allege that they are direct purchasers of USAP's anesthesia services, the Court should dismiss the Complaint in its entirety.

## II.   THE COMPLAINT FAILS TO PLAUSIBLY ALLEGE A RELEVANT PRODUCT MARKET

To state an antitrust claim, Plaintiffs must plausibly plead a relevant product market. *See Apani*, 300 F.3d at 628 (relevant market must be defined for Sherman Act and Clayton Act claims); *Shah v. VHS San Antonio Partners, L.L.C.*, 985 F.3d 450, 453-54 (5th Cir. 2021) (relevant market necessary for both Sherman Act Sections 1 and 2).  The Court may determine whether Plaintiffs have sufficiently alleged such a market "as a matter of law." *Apani*, 300 F.3d at 628.  If Plaintiffs either have "[1] fail[ed] to define [their] proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or [2] allege[d] a proposed relevant market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in [their] favor, the relevant market is legally insufficient, and a motion to dismiss may be granted." *Id.*

Plaintiffs' proposed product market – "hospital-only anesthesia services reimbursed by commercial payors," Compl. ¶ 25 – requires dismissal on each of the grounds referenced in *Apani*. While the Complaint provides a laundry list of reasons why "hospital-only anesthesia services" are supposedly distinct, they all reduce to the irrelevant tautology that "hospital-only anesthesia services" must be provided in hospitals.  *See*, *e.g.*, Compl. ¶ 27 ("Patients requiring hospital admission to receive treatment necessarily must receive anesthesia services in a hospital."); *id.* ("[P]atients whose outpatient procedures or surgeries must occur in a hospital . . . must receive anesthesia services in a hospital").  Conspicuously absent are any supporting allegations regarding reasonable interchangeability (what can be substituted for the relevant service) or cross-elasticity of demand (where consumers will go if prices rise).  That alone compels dismissal. *See*, *e.g.*, *NSS*

11

*Labs, Inc. v. Symantec Corp.*, 2019 WL 3804679, at *9 (N.D. Cal. Aug. 13, 2019) (dismissing antitrust claims for improper market definition where plaintiff "fail[ed] to identify the economic substitutes for the product markets" and did not "plead any facts regarding the cross-elasticity of demand"); *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1338 (11th Cir. 2010) (affirming dismissal under *Twombly* where complaint "provide[d] no factual allegations of the cross-elasticity of demand or other indications of price sensitivity").

Plaintiffs' "hospital-only" market definition also "clearly does not encompass all interchangeable substitute products" (here, services). *Apani*, 300 F.3d at 628. Licensed anesthesiologists work in both hospital and non-hospital facilities, and Plaintiffs do not allege that the facility changes the "anesthesia services" themselves in a way that bears on competition. The tautological observation that "[p]atients requiring hospital admission . . . must receive anesthesia services in a hospital," Compl. ¶ 27, is a distraction: absent allegations that that setting-based distinction is also a boundary of competition among "anesthesia services" providers, that distinction makes no market-definition difference. Plaintiffs have not alleged that, so their alleged market does *not* "encompass[ ] the group or groups of sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120-21 (9th Cir. 2018) (citation omitted).

The Fifth Circuit has routinely rejected artificial market definitions similar to Plaintiffs' litigation-driven definition here. For instance, in *Shah*, the plaintiff attempted to define a market for "pediatric anesthesia services" provided at a handful of facilities within an eight-county radius. *See Shah*, 985 F.3d at 454. The Fifth Circuit found the plaintiff's proposed market "insufficient as a matter of law" because it failed to "encompass all interchangeable substitute products." *Id.* at 455. The same is true here. By limiting the market to "hospital-only" anesthesia services,

12

Plaintiffs have artificially excluded the large population of "non-hospital" anesthesiologists capable of providing the same anesthesiology services, scrubbing the proposed market of "reasonably interchangeable substitutes" and thereby rendering it "unduly narrow and legally insufficient." *New Orleans Ass'n of Cemetery Tour Guides & Cos. v. New Orleans Archdiocesan Cemeteries*, 56 F.4th 1026, 1038 (5th Cir. 2023) (affirming dismissal of antitrust complaint on that ground).

Plaintiffs' other justifications for their obviously crabbed market definition are all unavailing. Most notably, Plaintiffs contend that "[s]ome private insurers formally require . . . billing practices" that distinguish "hospital-only" from non-hospital anesthesia services. Compl. ¶ 26. To begin with, the fact that different insurers employ different billing practices on this point undercuts Plaintiffs' argument that this distinction has widespread commercial significance. But moreover, the Complaint does not allege, and cannot allege, that insurers prevent hospitals from contracting with fully credentialed anesthesiologists merely because those anesthesiologists do not currently practice at a hospital. If, contrary to Plaintiffs' theory, insurers are the relevant consumers in this market and have the power to dictate who provides what service to patients, then plainly the power lies with insurers and Plaintiffs' allegations of monopolization by USAP are entirely misdirected.

Plaintiffs' proposed market definition for "hospital-only anesthesia services reimbursed by commercial payors" is "plainly designed to bolster" its claims "by artificially exaggerating [USAP's] market power." *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 681 (4th Cir. 2016). Dismissal is therefore required.

## III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 2 OF THE SHERMAN ACT

Counts I, III, and IV of Plaintiffs' Complaint assert violations of Section 2 of the Sherman

Act.  "A violation of section 2 of the Sherman Act is made out when it is shown that the asserted violator 1) possesses monopoly power in the relevant market and 2) acquired or maintained that power willfully, as distinguished from the power having arisen and continued by growth produced by the development of a superior product, business acumen, or historic accident."  *Stearns Airport Equip. Co. v. FMC Corp.,* 170 F.3d 518, 522 (5th Cir. 1999) (citing *United States v. Grinnell Corp.*, 384 U.S. 563 (1966)).

### A.      The Complaint Fails To Plausibly Allege That USAP Has Monopoly Power

The Complaint fails to allege that USAP has monopoly power, a *sine qua non* of any Section 2 monopolization claim.  *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481 (1992); *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 334 (5th Cir. 2015).  Monopoly power is the power to raise price *above a competitive level,* to restrict output (to the same effect), or to reduce quality below a competitive level.  *See*, *e.g.*, *Taylor v. Christus St. Joseph Health Sys.*, 216 F. App'x 410, 412 (5th Cir. 2007); *see also Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008) ("Monopoly power we know is a seller's ability to charge a price above the competitive level") (Posner, J.) (emphasis omitted).  The Complaint fails to plausibly allege that USAP has any such power, in light of both the pricing history they allege and the regulatory context described below.  Counts I, III, and IV should therefore be dismissed.

### 1.      Plaintiffs' Pricing Allegations Confirm That USAP Lacks Monopoly Power

Plaintiffs base their claim of monopoly power on allegations that USAP has increased the prices for anesthesia services throughout Texas.  But that claim fails because the Complaint lacks any allegation that USAP raised prices "above the competitive level," *Abraham*, 776 F.3d at 335, after it supposedly attained a monopoly through its acquisition of various anesthesia practices in

Texas.  Indeed, the pricing history recounted in the Complaint alleges the opposite of what Plaintiffs must plead and prove.  The allegations establish that, at all relevant times, USAP has functioned in a highly competitive marketplace that sets prices based on individualized negotiations.  Plaintiffs do not allege that USAP has extracted a monopoly price from any purchaser.  On the contrary, it has struggled to maintain the contractually agreed prices that a predecessor, *non-monopolist* provider negotiated prior to its acquisition by USAP.

Plaintiffs' only pricing allegations pertain to "Tuck-In Acquisitions" by which USAP acquired a number of smaller anesthesiology practices in Houston and Dallas following its anchor purchase of Greater Houston Anesthesiology in December 2012.  *See*, *e.g.*, Compl. ¶¶ 60-82 (describing USAP's subsequent acquisitions).  Rather than alleging that USAP followed these acquisitions by raising prices to supracompetitive levels, the Complaint alleges that USAP "tucked in" these acquired practices to the *preexisting* rates that GHA itself had negotiated with the commercial insurers.  *See id.* ¶ 57 ("After each acquisition, USAP would raise the new practitioners' reimbursement rates *to those of Greater Houston Anesthesiology.*") (emphasis added)).  And at the time of its December 2012 acquisition, GHA had less than a 15% share of even Plaintiffs' gerrymandered market for "commercially insured hospital-only anesthesia services" in Texas.  *See id.* ¶ 85.  In other words, Plaintiffs' only alleged fact regarding monopoly power is that, after acquiring small anesthesiology practices, USAP raised the rates of *some* (but not all) practices to the prevailing market rate for their services, as it was contractually permitted to do under agreements negotiated at arms-length with sophisticated commercial payors by USAP's concededly non-monopolist predecessor, GHA.

Aside from these self-defeating pricing allegations, Plaintiffs make no serious effort to allege monopoly power.  They never allege that USAP has held output below the competitive level

15

(or, indeed, that output has decreased at all). And although they recite isolated episodes of individual physicians' alleged malpractice, *see* Compl. ¶¶ 102-05, Plaintiffs do not allege that USAP anesthesiologists offer lower-quality patient care than they would have offered but for USAP's challenged acquisitions and agreements. Indeed, no such allegation could be plausible, given Plaintiffs' own allegations that hospitals have continued to contract with USAP. Because a firm that cannot charge more than a competitive price, restrict output to the same effect, or reduce quality below competitive levels is no monopolist at all, the Court should dismiss Plaintiffs' Section 2 claims.[4]

## 2. The Regulatory Structure Of The No Surprises Act Forecloses Any Claim That USAP Has Monopoly Power

Plaintiffs' allegation of USAP's monopoly power is implausible for a second reason: patient and insurer protections in the federal No Surprises Act and related Texas legislation foreclose any exercise of monopoly power by USAP. As the Supreme Court has explained, "[o]ne factor of particular importance" in assessing a Section 2 Sherman Act claim "is the existence of a regulatory structure designed to deter and remedy anticompetitive harm." *Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 412 (2004) (affirming dismissal of Section 2 claim). "Where such a structure exists, the additional benefit to competition provided by antitrust enforcement will tend to be small, and it will be less plausible that the antitrust laws contemplate such additional scrutiny." *Id.* Here, the "regulatory structure" created by the No Surprises Act (and its Texas equivalent) contradicts Plaintiffs' claim that USAP possesses monopoly power because it precludes USAP from exercising any pricing leverage over the patients and insurers that

---

[4] Plaintiffs' allegations of indirect evidence of monopoly power, in the form of USAP's purportedly dominant share of the market for "hospital-only anesthesia services reimbursed by commercial payors," Compl. ¶ 25, are likewise insufficient due to the gerrymandered nature of that market. *See* Part II, *supra*.

the Act protects.  The Court may take judicial notice of these statutes, which form the regulatory background against which USAP's purported exercise of power takes place.  *See*, *e.g.*, *In re Waller Creed, Ltd.*, 867 F.2d 228, 238 n.14 (5th Cir. 1989).

In the market for healthcare services, insurers generally respond to price demands from USAP and other provider groups by taking those provider groups "out of network."  *See*, *e.g.*, Compl. ¶ 67 (explaining how, following USAP's acquisition of Pinnacle, one insurer responded to USAP's "inflated reimbursement rates" by "treat[ing] the new USAP providers as out of network").  When an insured patient receives care from an out-of-network provider, "the individual's plan or issuer may decline to pay for the service or may pay an amount that is lower than the provider's billed charges."  Requirements Related to Surprise Billing; Part I, 86 Fed. Reg. 36872, 36874 (July 13, 2021).  "Prior to the No Surprises Act, the [out-of-network] provider could generally balance bill the individual for the difference between the provider's billed charges and the sum of the amount paid by the plan or issuer and the cost sharing paid by the individual, unless otherwise prohibited by state law."  *Id.*

Congress enacted the No Surprises Act in December 2020 to change that state of play.  *See Tex. Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528, 533 (E.D. Tex. 2022), *appeal dismissed*, 2022 WL 15174345 (5th Cir. Oct. 24, 2022).  On June 14, 2019, Texas enacted S.B. 1264, a state law imposing similar requirements.  *See Tex. Med. Res., LLP v. Molina Healthcare of Tex., Inc.*, 659 S.W.3d 424, 427-29 (Tex. 2023) (explaining the relevant provisions of S.B. 1264).[5]  The Act protects both patients and insurers by preventing out-of-network providers from exercising pricing leverage by balance billing patients in the manner

---

[5] To the extent USAP had the ability to exercise monopoly power prior to the passage of S.B. 1264, the Sherman Act's four-year statute of limitations precludes liability for any conduct committed prior to that date.  *See* 15 U.S.C. § 15b.

described above. With respect to patients, "the Act limits the amount an insured patient will pay for emergency services . . . and for certain non-emergency services furnished by an out-of-network provider." *Tex. Med. Ass'n*, 587 F. Supp. 3d. at 533; *see* 42 U.S.C. §§ 300gg-111; 300gg-131. With respect to insurers, "the Act requires insurers to reimburse out-of-network providers at . . . either the amount agreed to by the insurer and the out-of-network provider or an amount determined through an independent dispute resolution ('IDR') process." *Tex. Med. Ass'n*, 587 F. Supp. 3d at 533-34. That IDR process consists of "a 'baseball-style' arbitration" in which the "provider and insurer each submits a proposed payment amount and explanation to the arbitrator," who in turn "must select one of the two proposed payment amounts." *Id.* at 534; *see* 42 U.S.C. § 300gg-111(a)-(c).

The No Surprises Act perfectly exemplifies the Supreme Court's description of a "regulatory structure designed to deter and remedy anticompetitive harm" that minimizes any "additional benefit to competition provided by antitrust enforcement[.]" *Trinko*, 540 U.S. at 412. The Act's prohibition on balance billing prevents USAP from exercising any pricing leverage that could result in anticompetitive harm to consumers. And the requirement of mandatory arbitration for disputes between providers and insurers over out-of-network rates only further constrains such leverage. What is more, that requirement places insurers in a superior bargaining position by amplifying the power of their networks regardless of the market share that any particular provider group acquires. Plaintiffs offer no explanation of how USAP could exercise monopoly power – "the ability to charge a price above the competitive level," *Abraham*, 776 F.3d at 335 – in the teeth of these statutory protections for patients and insurers. At a minimum, against the regulatory backdrop of the No Surprises Act, Plaintiffs' allegation of USAP's monopoly power is simply not "plausible." *Twombly*, 550 U.S. at 570.

B.      **The Complaint Fails To Plausibly Allege Exclusionary Conduct**

Plaintiffs' Section 2 claims fail for the additional reason that the Complaint contains no cognizable allegations of exclusionary conduct. As the Supreme Court has made clear, "the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Trinko*, 540 U.S. at 407.

Plaintiffs' sole allegation of exclusionary conduct is that USAP obtained a monopoly by acquiring several anesthesia practices throughout Texas, consolidated these providers under the USAP umbrella, and thereby increased its market share. *See* Compl. ¶¶ 146-52 (referencing only USAP's acquisitions). Acquisition-based allegations similar to these do not amount to a plausible claim of actionable exclusionary conduct under Section 2. Indeed, as the Fifth Circuit has expressly recognized, "acquiring a monopoly is not in and of itself illegal." *Abraham*, 776 F.3d at 334. Instead, "[t]he illegal abuse of power occurs when the monopolist exercises its power to control prices or exclude competitors from the relevant market for its products." *Id.* Only in rare circumstances not alleged here have acquisitions of competitors been held to be exclusionary under Section 2. *E.g.*, *United States v. Am. Tobacco Co.*, 221 U.S. 106, 183 (1911) (Section 2 violation where defendant spent "millions upon millions of dollars in buying out plants, not for the purpose of utilizing them, but in order to close them up and render them useless for the purposes of trade"). Plaintiffs' theory, which would find exclusionary conduct based on a pattern of acquisitions alone, violates these principles and threatens to collapse the "monopoly power" and "exclusionary conduct" elements of a section 2 claim by allowing the means of obtaining the monopoly to satisfy both elements in a single stroke.

Contrary to that theory, multiple courts have recognized that acquisitions, including acquisitions of competitors, support no presumption of anticompetitive effect because such acquisitions often increase competition and benefit consumers. *See Eastman v. Quest Diagnostics*

19

*Inc.*, 2016 WL 1640465, at *9 (N.D. Cal. Apr. 26, 2016) ("plaintiffs cannot rely on the fact of the acquisitions alone"), *aff'd*, 724 F. App'x 556 (9th Cir. 2018); *Dresses for Less, Inc. v. CIT Grp./Com. Servs., Inc.*, 2002 WL 31164482, at *12 (S.D.N.Y. Sept. 30, 2002) ("[T]he mere fact that a merger eliminates competition between the firms concerned has never been a sufficient basis for illegality.") (quoting IV Phillip E. Areeda et al., *Antitrust Law* ¶ 901a (1998)).  This is particularly true when an established firm acquires a fledgling competitor:  there are obvious opportunities for benefits not only to the acquiring company, but also to consumers.  *See Dresses for Less*, 2002 WL 31164482, at *12 ("horizontal mergers are much more likely to be procompetitive than anticompetitive"); Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 901a (2023) (competitors may merge "to achieve synergies in the production or distribution of complementary goods, to put inefficiently run assets into the hands of superior management").

Moreover, actionable exclusionary conduct must have an "anticompetitive effect," that is, "it must harm the competitive process and thereby harm consumers."  *Rambus*, 522 F.3d at 463; *see also United States v. Microsoft Corp.*, 253 F.3d 34, 58, 79 (D.C. Cir. 2001) (preventing distribution of rival browsers on third-party PCs prevented competition on the merits in the PC operating system market).  Plaintiffs' Complaint contains no plausible allegation that USAP's acquisitions caused harm to competition in any measurable way.  As explained above, the Complaint nowhere alleges that USAP's rates themselves have increased above a competitive level as a consequence of its acquisitions.  And its core allegation – that the newly acquired practices were "tucked in" at USAP's existing rates, *see*, *e.g.*, Compl. ¶ 57 – merely reflects the extension of market rates negotiated at arms-length by a non-monopolist.  *See* Part III.A, *supra*.

The Complaint states, in conclusory fashion, that USAP's acquisitions have increased prices for anesthesia services.  But given the concrete facts alleged in the Complaint regarding

USAP's pricing practices (as discussed above), Plaintiffs' claims of *market-wide* harm are purely speculative. *See Twombly*, 550 U.S. at 555 (conclusions must be disregarded); *Roy B. Taylor Sales, Inc. v. Hollymatic Corp.*, 28 F.3d 1379, 1385 (5th Cir. 1994) ("Speculation about anticompetitive effects is not enough."). Plaintiffs' allegations do not establish USAP's "exercise[] [of] its power to control prices or exclude competitors from the relevant market for its products." *Abraham*, 776 F.3d at 334. Plaintiffs therefore have not alleged the "element of anticompetitive conduct" that a Section 2 monopolization claim requires, *Trinko*, 540 U.S. at 407, and the Section 2 claims should also be dismissed on this independent ground.

### C.    Plaintiffs' Section 2 Conspiracy Claim Independently Requires Dismissal

USAP hereby incorporates by reference Section II.A.1 of Welsh Carson's motion to dismiss. *See* WC Mot. Section II.A.1. As explained therein, Plaintiffs have failed to state a Section 2 conspiracy claim because Welsh Carson and USAP were not separate economic actors in this context and were thus incapable of conspiring as a matter of law under *Copperweld*, 467 U.S. at 770-71. *See*, *e.g.*, *Surgical Care Ctr. of Hammond, L.C. v. Hosp. Serv. Dist. No. 1 of Tangipahoa Parish*, 309 F.3d 836, 840-41 (5th Cir. 2002) (affirming dismissal of Section 2 conspiracy claim because "as a matter of law, [the two corporate entities concerned] . . . are incapable of conspiring with one another to violate the antitrust laws.").

Plaintiffs' own allegations make this point abundantly clear from the face of the Complaint. Plaintiffs expressly allege that "Welsh Carson has . . . control[led] USAP since its founding through the present." Compl. ¶ 20. *See also id.* ¶ 23 ("Welsh Carson has also controlled USAP by supervising its day-to-day operations, including corporate finances, securing financing from lenders or Welsh Carson funds, identifying targets, conducting due diligence on potential acquisitions, negotiating acquisitions, negotiating prices with insurers, and determining USAP's overall strategy."). Because Plaintiffs expressly allege that Welsh Carson and USAP are not

"independent sources of economic power previously pursuing separate interests," *Copperweld*, 467 U.S. at 771, Count III of Plaintiffs' Complaint must be dismissed.

**IV.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 7 OF THE CLAYTON ACT**

Plaintiffs' "unlawful acquisition" claim under Section 7 of the Clayton Act (Count II) also fails.  "To state a claim under Section 7, a complaint must define the relevant market and demonstrate the probability of anticompetitive results flowing from the challenged merger or acquisition."  *David B. Turner Builders LLC v. Weyerhaeuser Co.*, 603 F. Supp. 3d 459, 466 (S.D. Miss. 2022) (citing *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491-92 (5th Cir. 1984)), *aff'd*, 2023 WL 2401587 (5th Cir. Mar. 8, 2023).  Plaintiffs' market definition is deficient for the reasons stated above.

The Section 7 claim should also be dismissed because the acquisitions described in the Complaint are not alone sufficient to state a claim, given the absence of any factual allegations establishing competitive harm "flowing from" these acquisitions.  *Turner Builders*, 603 F. Supp. at 466 (dismissing section 7 claim where complaint did "not provide any facts to plausibly suggest the probability of anticompetitive results" from the acquisitions in question).  Unlike a typical Section 7 case, where courts have to speculate about potential harm to consumers from a challenged acquisition, here there is no need to speculate.  These acquisitions have already taken place (some more than a decade ago), yet Plaintiffs do not (because they cannot) allege that consumers have sustained any cognizable harm as a result of USAP's expanded ability to provide critical care in hospitals throughout Texas.  That is, as explained *supra,* the acquisitions have *not* led to prices above competitive levels.

**V.    THE COMPLAINT FAILS TO STATE A PRICE-FIXING CLAIM UNDER SECTION 1 OF THE SHERMAN ACT**

Plaintiffs' price-fixing claim (Count V) fails because the Complaint does not allege the

most basic ingredient of such a claim:  an agreement among competitors to fix prices.  To establish a violation of Section 1 of the Sherman Act, "a plaintiff must show that the defendant (1) engaged in a conspiracy (2) that restrained trade (3) in a particular market." *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 525 (5th Cir. 2022) (cleaned up) (quoting *MM Steel, L.P. v. JSW Steel (USA) Inc.*, 806 F.3d 835, 843 (5th Cir. 2015)).  For purposes of the first element, "[t]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or *from an agreement*, tacit or express." *Id.* at 526 (quoting *Twombly*, 550 at 553 (emphasis in original)).  At the pleading stage, it is the plaintiff's burden to make "allegations plausibly suggesting (not merely consistent with) agreement." *Id.* at 528 (quoting *Twombly*, 550 U.S. at 557).

Count V of Plaintiffs' Complaint claims a violation of Section 1 based on USAP's "[h]orizontal [a]greements [with other anesthesiology practices] to [f]ix [p]rices." Compl. ¶¶ 176-184.  Plaintiffs' allegations in support of this claim describe three contracts – two that USAP inherited (GHA's contract with TMHPO, and Pinnacle's contract with Dallas Anesthesiology Associates) and one that USAP entered directly (with Baylor College of Medicine).[6]  Through these contracts, the smaller anesthesiology practices (TMHPO, Dallas Anesthesiology Associates, and Baylor College of Medicine) contracted with USAP or its predecessors (GHA and Pinnacle) to obtain certain back-office, administrative services that the larger practices could more efficiently provide.  Among other things, USAP and its predecessors agreed to bill and collect from payors on the smaller practices' behalf.[7]  The smaller practices "assigned [to] USAP [or its predecessors]

---

[6] The Complaint also describes one theoretical agreement that USAP "attempted to negotiate" with a group affiliated with the University of Texas. *Id.* ¶ 123.  Needless to say, USAP cannot incur antitrust liability for a business proposal that never ultimately materialized.

[7] Apart from payor relations and billing, the Complaint also alleges that Dallas Anesthesiology Associates, for example, paid Pinnacle to maintain a customer-service phone

authority to bill and receive reimbursements for hospital-only anesthesia services provided by their physicians." *Id.* ¶ 109.  USAP would then "collect . . . reimbursements for those services using [USAP's] name and tax identification number," and then remit payment to the smaller group, keeping the difference as payment for the administrative services it provided. *Id.* ¶¶ 116, 117.

The Complaint does not (because it cannot) allege that these agreements dictated the price at which USAP would obtain reimbursement from payors.  The relevant contract terms dictated that USAP (or its predecessors) would "bill[] and collect[] . . . reimbursements for [the smaller groups'] services," and that the smaller groups would "assign[] [their] rights and interest in receiving payment" to USAP (or its predecessors) in exchange for a payout. *Id.* ¶ 116.  But the contracts were agnostic about the rates that USAP (or its predecessors) ultimately charged to insurers.  Submitting claims and bearing the attendant risks of non-payment, became USAP's (or its predecessors') prerogative and responsibility.  *See*, *e.g.*, *id.*¶¶ 112 ("*Greater Houston Anesthesiology* used its billing authority to charge payors higher reimbursement rates for Methodist's services.") (emphasis added); *id.* ¶ 116 ("Under that agreement, *Pinnacle set the rates it charged payors for anesthesia services provided by Dallas Anesthesiology Associates.*") (emphasis added).  Because the contracts at issue did not set the price of either party's anesthesia services, they did not constitute an "agreement" to "fix prices."

Indeed, Plaintiffs concede that the contracts at issue recognized a difference between the two parties' reimbursement rates and compensated the smaller practices at their preexisting rates. *See*, *e.g.*, *id.* ¶ 117 (explaining that USAP "compensates Dallas Anesthesiology Associates based on that group's lower rate").  Thus, far from alleging an agreement between competitors to charge the same rates for their services, Plaintiffs' allegations expressly confirm that USAP and the other

---

number that Pinnacle's back-office staff would answer on behalf of Dallas Anesthesiology Associates. *See id.* ¶ 118.

anesthesiology practices at issue continued to offer their services at different prices.

Because Plaintiffs have not alleged an agreement to fix prices, they have failed to "nudge[ ] [their price fixing claim] across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, and Count V must be dismissed.  *See*, *e.g.*, *BRFHH*, 49 F.4th at 525 (dismissing Section 1 claim because plaintiff failed to plausibly allege an "agreement" to fix prices for healthcare services).

**CONCLUSION**

The Court should dismiss Plaintiffs' Complaint in its entirety.

Dated: February 20, 2024

David J. Beck (TX Bar No. 00000070)
  (Federal I.D. No. 16605)
Garrett S. Brawley (TX Bar No. 24095812)
  (Federal I.D. No. 3311277)
BECK REDDEN LLP
1221 McKinney Street, Suite 4500
Houston, TX  77010
Tel: (713) 951-3700
Fax: (713) 951-3720

Respectfully submitted,

/s/ *Mark C. Hansen*

Mark C. Hansen* (D.C. Bar No. 425930)
Attorney-in-Charge
Geoffrey M. Klineberg* (D.C. Bar No. 444503)
David L. Schwarz* (D.C. Bar No. 471910)
Kevin J. Miller* (D.C. Bar No. 478154)
Collin R. White* (D.C. Bar No. 1031005)
Dennis D. Howe* (D.C. Bar No. 90011114)
KELLOGG, HANSEN, TODD,
  FIGEL & FREDERICK, P.L.L.C.
1615 M Street N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999

*Admitted *Pro Hac Vice*

*Counsel for Defendant U.S. Anesthesia Partners, Inc.*

25

## CERTIFICATE OF CONFERENCE

On February 13, 2024, counsel for the U.S. Anesthesia Partners, Inc. conferred with Plaintiffs' counsel by phone and by email regarding this motion.  Plaintiffs are opposed to the relief requested herein.

/s/ *Mark C. Hansen*
Mark C. Hansen

## CERTIFICATE OF SERVICE

I hereby certify that on February 20, 2024, I filed the foregoing document with the Court and served it on opposing counsel through the Court's CM/ECF system.  All counsel of record are registered ECF users.

/s/ *Mark C. Hansen*
Mark C. Hansen